**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **SECURITIES AND EXCHANGE COMMISSION**, | § § § | |
| *Plaintiff,* | § § | |
| v. | § § | **CASE NO. 3:22-cv-2118-X** |
| **TIMOTHY BARTON ET AL.,** | § § § | |
| *Defendants.* | § § | |

**APPENDIX VOLUME I**

**APP. 1-184**

**APPENDIX TO SOUTHERN PROPERTIES CAPITAL, LTD.'S BRIEF IN SUPPORT OF RESPONSE TO SEC'S MOTION FOR APPOINTMENT OF A RECEIVER, FOR A PRELIMINARY INJUNCTION AND ANCILLARY RELIEF, AND TO LIFT STAY FOR LIMITED PURPOSE, AND BRIEF IN SUPPORT**

| Ex. No. | Title | App. No. |
|---|---|---|
| Ex. A | Declaration of Erik Johnson, dated October 2, 2023 | App. 1-23 |

| Ex. No. | Title | App. No. |
|---|---|---|
| Ex. A-1 | D4DS's August 2019 Chase Bank Statement | App. 24-28 |
| Ex. A-2 | D4DS's September 2019 Chase Bank Statement | App. 29-33 |
| Ex. A-3 | D4DS's August 2019 Chase Bank Statement | App. 34-38 |
| Ex. A-4 | D4DS's September 2019 Chase Bank Statement | App. 39-43 |
| Ex. A-5 | SPC Leumi 8/31/19 Bank Statement | App. 44-45 |
| Ex. A-6 | D4DS's August 2019 Chase Bank Statement | App. 46-50 |
| Ex. A-7 | SPC Reconciliation of Project Equity to SPC Convertible Loan | App. 51-52 |
| Ex. A-8 | Windmill General Ledger 1/1/16 – 7/15/20 | App. 53-56 |
| Ex. A-9 | HUD Settlement Statement for Ingleside Loan | App. 57-61 |
| Ex. A-10 | D4IN's June 2020 Chase Bank Statement | App. 62-64 |
| Ex. A-11 | D4OP's November 2021 Chase Bank Statement | App. 65-67 |
| Ex. A-12 | D4OP's December 2021 Chase Bank Statement | App. 68-72 |
| Ex. A-13 | D4OP LLC General Ledger | App. 73-74 |
| Ex. A-14 | D4OP's June 2021 Chase Bank Statement | App. 75-79 |
| Ex. A-15 | D4OP's August 2021 Chase Bank Statement | App. 80-82 |
| Ex. A-16 | Bellwether HUD Promissory Note | App. 83-96 |
| Ex. A-17 | Bellwether HUD Deed of Trust | App. 97-148 |

| Ex. A-18 | Bellwether UCC Statements | App. 149-159 |
|----------|---------------------------|--------------|
| Ex. A-19 | Bellwether Exercise Letter | App. 160-161 |
| Ex. A-20 | Bellwether First Amendment to Purchase and Sale Agreement | App. 162-164 |
| Ex. A-21 | Bellwether Check | App. 165-166 |
| Ex. A-22 | Bellwether Delivery Confirmation | App. 167-170 |
| Ex. A-23 | Windmill HUD Promissory Note | App. 171-184 |

**RESPECTFULLY SUBMITTED BY:**

/s/ *Brian K. Norman*
**C. GREGORY SHAMOUN**
State Bar No. 18089650
Email: g@snlegal.com
**BRIAN K. NORMAN**
State Bar No. 00797161
Email: bkn@snlegal.com
**J. BLAIR NORRIS**
State Bar No. 24014515
Email: bn@snlegal.com
**SHAMOUN & NORMAN, LLP**
1800 Valley View Lane, Suite 200
Farmers Branch, Texas 75234
Telephone (214) 987-1745
Facsimile: (214) 521-9033

**ATTORNEYS FOR SOUTHERN
PROPERTIES CAPITAL, LTD.**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on October 2, 2023, a true and correct copy of the foregoing document was served upon all counsel of record through the Court's CM/ECF system:

/s/ *J. Blair Norris*
**J. BLAIR NORRIS**

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § § § | |
| Plaintiff, | § § § | |
| v. | § § | CASE NO. 3:22-cv-2118-X |
| TIMOTHY BARTON ET AL., | § § § | |
| Defendants, | § § | |

## DECLARATION OF ERIK JOHNSON

"My name is Erik Johnson, I am over the age of twenty-one (21), have never been convicted of a felony or a crime involving moral turpitude, and am fully competent to testify in all respects. I have personal knowledge of all facts set forth herein.

1. I am a real estate executive with over 18 years of experience in development, acquisitions, finance, asset management, and portfolio management. On April 18, 2023, I became the Interim President of Pillar Income Asset Management, Inc. ("Pillar"), Transcontinental Realty Investors, Inc. ("TCI"), and American Realty Investors, Inc. ("ARI"). TCI, and ARI are national real estate companies publicly traded on the New York Stock Exchange that specialize in the acquisition, development, and management of multifamily and commercial real estate. The companies also develop raw land for single family home communities. The companies operate a portfolio that has included hundreds of properties, tens of thousands of multifamily units, and thousands of acres of raw land holdings. I oversee all aspects of investment and operations for the above companies, including Southern Properties Capital, Ltd. ("SPC"). TCI is the 100% owner of SPC. Pillar is contractual advisor and management company for TCI and ARI. When TCI and SPC

Declaration of Erik Johnson
456100v2

Page 1 of 22

App. 2

are stated to perform functions, in most situations Pillar is the manager carrying out the functions pursuant to a publicly filed and disclosed Advisory and Cash Management Agreement.

2. Prior to my current position, I joined Pillar, TCI and ARI in 2020 as Chief Financial Officer. Before that, from 2005 to 2020, I served as Vice President of Financial Reporting at Macerich (NYSE: MAC), the third-largest retail REIT in the United States with over $9.2 billion in assets. I spent 15 years ensuring the quality, accuracy, and timely consolidation of financial data from 100 subsidiaries, drafting SEC reports, and structuring transactions such as acquisitions, dispositions, and joint ventures. Prior to that, I worked for North American Scientific, Inc. as Chief Accounting Officer, and before that, as an auditor with PricewaterhouseCoopers.

## I.   Summary of SPC's Business Model

3. To provide proper context, TCI and its affiliates, such as SPC, are in the business of developing, constructing and managing properties, including multifamily residential projects. TCI develops projects with different types of financing, including through conventional lending, loans guaranteed through government programs, and convertible loans.

4. One of the business models TCI uses when building properties is to outsource the developer role. There are business advantages to outsourcing the developer role, including (i) TCI can operate a leaner corporate structure by reducing personnel and associated expenses, such as payroll and benefits; and (ii) TCI can delegate to the outside developer certain responsibilities rather than performing them internally, such as negotiating the acquisition of the real property, pursuing zoning, obtaining mortgage financing, and setting up processes. Under this business model, TCI pays the developer a fair market developer's fee for these services. The developer does not invest or contribute its own money in the project. Once the project is complete and stabilized, the developer transfers the ownership of the project to TCI or an affiliate. Under this business

model, TCI and the developer intend that TCI or an affiliate will subsequently own and manage the project.

5.    TCI has outsourced the developer role on a number of projects involving a number of developers. TCI/SPC outsourced the developer role to Timothy Barton ("Barton") on projects known as Bellwether Ridge ("Bellwether Ridge" or "Bellwether Project"), Parc at Windmill Farms ("Windmill Farms" or "Windmill Farms Project"), Parc at Ingleside ("Ingleside" or "Ingleside Project"), and Parc at Opelika ("Opelika" or "Opelika Project") (collectively, the "SPC Projects").

6.    The SPC Projects followed the business model of SPC being effectively the primary responsible party and simply outsourcing the developer role to Barton. As discussed in more detail below, for each SPC Project, Barton (through his development company JMJ Development, LLC ("JMJ") or his borrower company, one of the "D4" companies) was paid a development fee to perform development services. His development fee was fair market. It was: (i) Bellwether Ridge: $491,954.37; (ii) Windmill Farms: $947,745.00; (iii) Ingleside: $576,000.00; and (iv) Opelika: $504,000.00.

7.    The development fee compensated Barton for all development services. Among other things, the development fee compensated Barton for: (i) developing and adhering to an approved project budget; (ii) keeping full and detailed accounts of the construction of the project; (iii) preparing an approved project schedule; (iv) providing general administration of the construction contract; (v) visiting and inspecting the project; (vi) assisting  to obtain building permits; and (viii) performing such additional supervisory functions necessary to accomplish the orderly and proper construction of the project. The development fee compensated Barton for any general and administrative ("G&A") costs associated with the SPC Projects, such as employees, home office, etc.

8.    For the SPC Projects, SPC has paid Barton his development fees in full (other than approximately $14,000.00 pending on Opelika).

9.    As discussed in more detail below, the equity financing mechanism that SPC used on the SPC Projects were convertible loans, with a low interest rate of 5% (with the exception of 10% on Opelika), evidencing that the conversion feature was part of the consideration SPC bargained for, especially since this capital was contributed to the highest risk tranche of the project's capitalization. This rate is below typical construction loans with a 60% to 70% loan-to-value ("LTV") and far below the market required return-on-investment ("ROI") on equity funding. Importantly, SPC's loans are secured by a pledge of stock (described below), and perfected by the filing of UCC financing statements.

10.    Through the use of the convertible loans, it was contemplated that after the development stage and stabilization, SPC could, and expected to, exercise the option of converting the loans to 100% equity in the projects in exchange for the convertible loan and any accrued interest, and SPC would continue with ownership and management of the projects. On October 3, 2022, before the SEC moved for a Receiver, SPC exercised its option to convert its convertible loans to equity with respect to Bellwether Ridge, Windmill Farms and Ingleside. SPC has not yet, but retains the right to, exercise its option to convert the loan to an ownership interest to acquire Opelika. SPC had not exercised the conversion of Opelika prior to the Receivership because Opelika was still under construction.

11.    SPC was involved in all aspects of the projects. SPC: (i) identified land sites, (ii) provided the raw land, (iii) assembled and maintained required documents for the land development projects; (iv) funded the equity, (v) controlled, funded and managed the construction, design and development processes; (vi) provided certificates of deposit and cash collateral to

Declaration of Erik Johnson                                                          Page 4 of 22
456100v2

App. 5

obtain Letters of Credit; (vii) funded change orders and costs overruns; and (viii) supervised operations and leasing of properties. TCI's and SPC's financial statements issued during development and operation of the SPC Projects evidence the indicia of future ownership from an investment perspective.

12.     All four of the SPC Projects are encumbered by HUD-insured mortgage and are therefore governed by HUD regulations and requirements, which include a cost certification upon closing, annual audits and rules governing the amount, manner, and timing of distributions to ownership.

## II.     SPC's Response to Receiver's tracing allegations as to each SPC Project.

### A. *Bellwether Ridge*

13.     In his Declaration, the Receiver alleges, at Page 33, ¶ 84, that "D4DS [Bellwether Ridge] received Wall Investor Funds, or at the very least, commingled funds from JMJ Development and other Receivership Entities."

14.     The Receiver relies on Receiver's Exhibit 5, at Page 122, to allege that on August 1, 2019, JMJ made a $25,000.00 payment to D4DS (Chase No. 5851), which the Receiver alleges originates from a loan by Southern Star Capital, pertaining to refinancing for LDG001, LLC.

15.     The $25,000.00 was paid *in error*. D4DS returned the $25,000.00 to JMJ on September 9, 2019. *Compare* Exhibit 1 (D4DS's August 2019 Chase Bank Statement for account ending in 5851[deposits]) with Exhibit 2 (D4DS's September 2019 Chase Bank Statement for account ending in 5851 [withdrawals]). The $25,000.00 was an in-and-out/cancelled transaction, and resulted in no equity contribution or investment in Bellwether Ridge.

16.     The Receiver also relies on Receiver's Exhibit 5, at Page 123, to allege that on August 12, 2019, JMJ made a $30,000.00 payment to D4DS (Chase No. 5851), which the Receiver alleges originated from funding from Goldmark Hospitality LLC or John Geoffry Dowdall.

17.     The $30,000.00 payment was made *in error*. D4DS returned the $30,000.00 to JMJ on September 11, 2019. *Compare* Exhibit 3 (D4DS's August 2019 Chase Bank Statement for account ending in 5851[deposits]) with Exhibit 4 (D4DS's September 2019 Chase Bank Statement for account ending in 5851[withdrawals]). The $30,000.00 was an in-and-out/cancelled transaction, and resulted in no equity contribution or investment in Bellwether Ridge.

18.     The Receiver relies on Receiver's Exhibit 5, at Page 123, Footnote (**), to allege that on August 14, 2019, D4DS received funds in the amount of $35,529.45, and on the same day paid the same amount to Greystone Servicing Company (which serviced Bellwether Ridge's HUD loan). The Receiver makes no showing where the $35,529.45 originated from. Rather, SPC sent the $35,529.45 to JMJ, who in turn sent the funds to D4DS as part of SPC's equity contribution in Bellwether Ridge. See Exhibit 5 (SPC Leumi 8/31/19 bank statement for account ending in 4800; Exhibit 6 (D4DS's August 2019 Chase Bank Statement for account ending in 5851 comparing deposits with withdrawals).

19.     In summary, the Bellwether Ridge Project received no equity contribution or investment traceable to the Wall Investor Funds.

20.     All funds for construction or initial operations of Bellwether Ridge came from the primary HUD loan or SPC equity. SPC equity advances either equal or exceed reported equity for Bellwether Ridge. See Exhibit 7 (SPC Reconciliation of Project Equity to SPC Convertible Loans 12/31/2022 [D4DS, LLC/Bellwether Ridge).

B. *Windmill Farms*

21.    The Receiver alleges in his Declaration, at Page 35, ¶ 91, that "D4FR [Windmill Farms] received Wall Investor Funds that were used to construct Windmill Farms."

22.    The Receiver relies on Receiver's Exhibit 6, at page 125, to allege that on July 17, 2019, JMJ made a payment to D4FR of $106,097.70 (Chase No. 9375), which the Receiver alleges originates from a loan by Southern Star Capital, pertaining to refinancing for LDG001, LLC.

23.    On July 3, 2019, JMJ received the $106,097.70 *in error,* and on July 17, 2019, JMJ returned the funds to D4FR. See Exhibit 8 (Windmill General Ledger 1/1/16 – 7/15/20, withdrawal from Chase No. 9375 on 7/17/2019). The $106,097.70 was an in-and-out/cancelled transaction, and resulted in no equity contribution or investment in Windmill Farms.

24.    In addition, the Receiver alleges in Receiver's Exhibit 6, at Footnote (**), that after JMJ paid the $106,097.70 to D4FR, D4FR paid various construction venders of Windmill Farms. D4FR did not use the $106,097.70 to pay contractors because – as shown above – D4FR returned the $106,097.70 to JMJ.

25.    In summary, the Windmill Farms Project received no equity contribution or investment traceable to the Wall Investor Funds.

26.    All funds for construction or initial operations of Windmill Farms came from the primary HUD loan or SPC equity. SPC equity advances either equal or exceed reported equity for Windmill Farms. See Exhibit 7 (SPC Reconciliation of Project Equity to SPC Convertible Loans 12/31/2022 [D4FR, LLC/Windmill Farms]).

C. *Ingleside*

27.    The Receiver alleges in his Declaration, at Page 36, ¶95, that D4IN [Ingleside] was "involv[ed] in other Receivership Entities' extensive commingling."

Declaration of Erik Johnson
456100v2

Page 7 of 22

App. 8

28.     The Receiver relies on Receiver's Exhibit 7, at page 127, to allege that JMJD4, LLC ("JMJD4") made three (3) payments, totaling $355,054.48. The Receiver alleges the three (3) payments were: (i) $163,054.48 paid to SPC on February 24, 2022; (ii) $72,000.00 paid to JMJ VC Management, LLC; and (iii) $120,000.00 paid to Maximillian Barton on February 28, 2022. The Receiver alleges that the $355,054.48 in total payments originate from a February 23, 2022 loan escrow account for $357,147.50 held by Capital Title of Texas, LLC ("Capital Title").

29.     The Receiver fails to show that the $357,147.50 in the Capital Title loan escrow account originated from Wall Investor Funds. Rather, they were remaining loan proceeds net of closing costs for the Ingleside HUD loan, referred to as "Excess Loan Proceeds." Under HUD regulations, the Excess Loan Proceeds may be distributed to the equity holder of the Ingleside Project upon the closing of the HUD loan. The two Excess Loan Proceeds that JMJD4 paid to JMJ Management ($72,000.00) and Maximillian Barton ($120,000.00) are not traceable to investor funds because they trace back to HUD loan proceeds. They are accounted for by the HUD auditor as a cost component of Ingleside. See Exhibit 9 (HUD settlement statement, showing $357,147.50 paid to JMJ as Excess Loan Proceeds).[1]

30.     The Receiver also relies on Receiver's Exhibit 7, at page 128, to allege that a $24,014.85 payment that D4MC made on June 17, 2020, to D4IN (Chase No. 1565), may have originated from the "Sbad Treas 310" loan issued by the Small Business Administration ("SBA"). The Receiver alleges in Exhibit 7 that on the day before, June 16, 2020, D4IN made payment of the same amount, $24,014.85, to the City of Fort Worth.

---

[1] All of the Excess Loan Proceeds were supposed to be distributed to SPC, as equity holder, to reduce the balance on the SPC convertible loan. JMJD4 distributed Excess Loan Proceeds to JMJ Management and Maximillian Barton *in error* (and represents an additional claim that SPC has against Barton, in addition to its convertible right to Ingleside).

Declaration of Erik Johnson
456100v2

Page 8 of 22

31.     The Receiver fails to show that the $24,014.85 was paid into Ingleside Project, or that it is even connected to Ingleside in the first place. The Ingleside Project is located near Corpus Christi, Texas, and would have no permits or dealings with the City of Fort Worth. Clearly, the $24,014.85 relates to another project or business that Barton managed. The likely scenario is that D4IN paid the City of Fort Worth the $24,104.85 from Ingleside on June 16, 2020 *in error* (since Ingleside is not related to the City of Fort Worth), and D4MC returned the funds to D4IN the following day, on June 17, 2020. *See* Exhibit 10 (D4IN's June 2020 Chase Bank Statement for account ending in 1565, comparing deposit 6/16/20 with withdrawal 6/17/20). The $24,014.85 was an in-and-out/cancelled transaction, and resulted in no equity contribution or investment in Ingleside.

32.     In summary, the Ingleside Project received no equity contribution or investment traceable to the Wall Investor Funds.

33.     All funds for construction or initial operations of Ingleside came from the primary HUD loan or SPC's equity. SPC equity advances either equal or exceed reported equity for Ingleside. See Exhibit 7 (SPC Reconciliation of Project Equity to SPC Convertible Loans 12/31/2022 [D4IN, LLC/Ingleside]).

D. *Opelika*

34.     The Receiver alleges in his Declaration, at Page 37, ¶ 97, that "D4OP [Opelika] received Wall Investor Funds that were used to construct the Parc at Opelika."

35.     The Receiver relies on Receiver's Exhibit 8, at page 130, to allege that on December 3, 2021, Enoch Investments, LLC ("Enoch") made a $210,000.00 payment to D4OP (Chase No. 1720). The Receiver alleges the funds originate from American Benefit Life Insurance Company.

36.    The Receiver fails to trace the American Benefit Life Insurance Company funds to the Wall Investor Funds. Rather, American Benefit Life Insurance Company was a lender that made a loan to Ridgeview Additions, LLC.

37.    The Receiver fails to disclose that the $210,000.00 was paid in error and returned to D4OP. On an earlier date, on November 10, 2021, D4OP paid Enoch the $210,000.00 *in error*. Enoch returned the money to D4OP on December 3, 2021. *Compare* Exhibit 11 (D4OP's November 2021 Chase Bank Statement for account ending in 1720 [withdrawal for $214,349.00]) with Exhibit 12 (D4OP's December 2021 Chase Bank Statement for account ending in 1720 [deposit for $210,000.00]). See also Exhibit 13 (D4OP LLC General Ledger through November 17, 2022, showing the payments to and from Enoch). The $120,000.00 was an in-and-out/cancelled transaction, and represents no equity contribution or investment by Enoch. Additionally, there is no $120,000 payment recorded as a funding of equity on the equity contribution reconciliation. See Exhibit 7 (SPC Reconciliation of Project Equity to SPC Convertible Loans 12/31/2022 [D4OP, LLC/Opelika]).

38.    The Receiver also relies on Receiver's Exhibit 8, at page 131, to allege that a $15,000.00 payment made by JMJD4 to D4OP (Chase No. 1720) on June 23, 2021, originated from NMP-Killeen LP or Chicago Title, relating to the sales proceeds of Rosewood Dr., Killeen Texas.

39.    The Receiver fails to show that the $15,000.00 was paid into the Opelika Project. JMJD4 made the payment *in error*. On August 11, 2021, D4OP returned to JMJD4 the $15,000.00. *Compare* Exhibit 14 (D4OP's June 2021 Chase Bank Statement for account ending in 1720 [deposits]) with Exhibit 15 (D4OP's August 2021 Chase Bank Statement for account ending in 1720 [withdrawals]). See also Exhibit 13 (D4OP LLC General Ledge through November 17, 2022,

Declaration of Erik Johnson
456100v2

Page 10 of 22

showing the payments to and from JMJD4). The $15,000.00 was an in-and-out/cancelled transaction and is not an equity contribution or investment in Opelika.

40.     In summary, the Opelika Project received no equity contribution or investment traceable to the Wall Investor Funds.

41.     All funds for construction or initial operations of Opelika came from the primary HUD loan or SPC's equity. SPC equity advances either equal or exceed reported equity for Opelika. See Exhibit 7 (SPC Reconciliation of Project Equity to SPC Convertible Loans 12/31/2022 [D4OP, LLC/Opelika]).

III.    **Summary of the 4 SPC Projects' HUD Debt and SPC Convertible Loan Equity**

A.      _Bellwether Ridge HUD debt and SPC convertible loan equity._

42.     Bellwether Ridge is an apartment complex located in Desoto, Texas.

43.     For the Bellwether Ridge development, SPC outsourced the developer role to Barton. Barton used as developer his company JMJ Development, LLC ("JMJ"). To obtain a mortgage loan for Bellwether Ridge, Barton used as the borrower his company, D4DS, LLC ("D4DS"). D4DS obtained a HUD loan. HUD agreed to provide the loan to Greystone, to administer to D4DS. To finalize the loan, D4DS executed HUD loan documents on or about October 1, 2017, including a Promissory Note and Deed of Trust. The loan was eventually modified to reduce the principal amount to $18,608,100.00. Exhibits 16, 17.

44.     SPC provided the Bellwether Project with equity financing to fund the construction in the form of a convertible loan. JMJ, as borrower, executed a note dated October 19, 2017, in favor of SPC, as lender, in the principal amount of $3,800,000.00 ("Bellwether Note"). JMJ provided to SPC security for the Bellwether Note by assigning to SPC all of JMJ's right, title and interest in the membership interests of D4DS's parent company, JMJD4, LLC ("JMJD4"). Each

of the Bellwether pledge and security agreements included a "Conversion Option," granting SPC an option to acquire either the Bellwether pledged equity or the Bellwether Project. On May 13 and 14, 2020, multiple UCC financing statements were filed. See Exhibit 18.

45.    On October 3, 2022, SPC sent a letter exercising its conversion option to JMJ, D4DS, JMJD4, among others ("Bellwether Exercise Letter"). A copy of the Bellwether Exercise Letter is attached as Exhibit 19. The Bellwether Exercise Letter stated that SPC "hereby exercises its option to acquire all interest of the addresses [sic] above in the Project known as Bellwether Ridge, DeSoto, Texas." SPC attached to the Bellwether Exercise Letter a "First Amendment to the Purchase and Sale Agreement" to complete the transfer of the Bellwether Project to SPC, once HUD consented to the transfer.  A copy of the amendment is attached to Exhibit 20. SPC also attached a check for $100.00 as required consideration. A copy of the check is attached to Exhibit 21. The letter was delivered on October 4, 2022 at 8:16 am. A copy of the confirmation of receipt is attached as Exhibit 22.

B.    *Windmill Farms HUD debt and SPC convertible loan equity.*

46.    Windmill Farms is an apartment complex located in Forney, Texas.

47.    For the Windmill Farms development, SPC also outsourced the developer role to Barton. Barton used as developer his company JMJ. To obtain a mortgage loan for Bellwether Ridge, Barton used as the borrower his company, D4FR, LLC ("D4FR"). D4FR obtained a HUD loan. HUD agreed to provide the loan to Greystone, to administer to D4FR. To finalize the loan, D4FR executed HUD loan documents on or about December 1, 2017, including a Promissory Note and Deed of Trust. The loan was in the principal amount of $36,540,600.00. Exhibits 23, 24.

48.    SPC provided the Windmill Project with equity financing to fund the construction in the form of a convertible loan. JMJ, as borrower, executed a note dated December 2017 in favor

of SPC, as lender, in the principal amount of $7,300,000.00, which was subsequently increased to $8,300,000.00 ("Windmill Note"). JMJ provided to SPC security for the Windmill Note by assigning to SPC all of JMJ's right, title and interest in the membership interests of D4FR's parent company, JMJD4. Each of the Windmill pledge and security agreements included a "Conversion Option," granting SPC an option to acquire either the Windmill Farms pledged equity or the Windmill Project. On May 13 and 14, 2020, multiple UCC financing statements were filed. See Exhibit 25.

49.     On October 3, 2022, SPC sent a letter exercising its conversion option to JMJ, D4FR, JMJAV, among others ("Windmill Exercise Letter"). A copy of the Windmill Exercise Letter is attached as Exhibit 26. The Windmill Exercise Letter stated that SPC "hereby exercises its option to acquire all interest of the addresses [sic] above in the Project known as Parc at Windmill Farms, Forney, Texas." SPC attached to the Windmill Exercise Letter a form of "Agreement for Purchase and Sale" to complete the transfer of the Windmill Farms Project from D4FR to SPC, once HUD consented to the transfer. A copy of the form of Agreement is attached to Exhibit 27. SPC also attached a check for $100.00 as required consideration. A copy of the check is attached to Exhibit 28. The letter was delivered on October 4, 2022 at 8:16 am. A copy of the confirmation of receipt is attached as Exhibit 29.

C.     *Ingleside HUD debt and SPC convertible loan equity.*

50.     Ingleside is an apartment complex located in Ingleside, Texas.

51.     For the Ingleside development, SPC also outsourced the developer role to Barton. Barton used as developer his company JMJ. To obtain a mortgage loan for Ingleside, Barton used as the borrower his company, D4IN, LLC ("D4IN"). D4IN obtained a HUD loan. HUD agreed to provide the loan to Greystone, to administer to D4IN. To finalize the loan, D4IN executed HUD

Declaration of Erik Johnson                                          Page 13 of 22
456100v2

App. 14

loan documents on or about August 27, 2019, including a Promissory Note and Deed of Trust. The HUD loan was in the principal amount of $25,201,000.00. Exhibit 30, 31.

52.    SPC provided the Ingleside Project with equity financing to fund the construction of Ingleside in the form of a convertible loan. JMJ's parent company JMJAV, LLC ("JMJAV"), as borrower, executed a note in favor of SPC dated June 4, 2019, in the principal amount of $6,634,490.00 ("Ingleside Note"). As security for the Ingleside Note, SPC was assigned all of the right, title and interest in the membership interests in JMJD4. Each of the Ingleside pledge and security agreements included a "Conversion Option," granting SPC an option to acquire either the Ingleside pledged equity or the Ingleside Project. On May 13 and 14, 2020, multiple UCC financing statements were filed. Exhibit 32.

53.    On October 3, 2022, SPC sent a letter exercising its conversion option to JMJ, D4IN, JMJAV, among others ("Ingleside Exercise Letter"). A copy of the Ingleside Exercise Letter is attached as Exhibit 33. The Ingleside Exercise Letter stated that SPC "hereby exercises its option to acquire all interest of the addresses [sic] above in the Project known as Parc at Ingleside Apartments, Ingleside, Texas." SPC attached to the Ingleside Exercise Letter a form of "Agreement for Purchase and Sale" to complete the transfer of the Ingleside Project from D4IN to SPC, once HUD consented to the transfer. A copy of the form of Agreement is attached to Exhibit 34. SPC also attached a check for $100.00 as required consideration. A copy of the check is attached to Exhibit 35. The letter was delivered on October 4, 2022 at 8:16 am. A copy of the confirmation of receipt is attached as Exhibit 36.

D.    *Opelika HUD debt and SPC convertible loan equity.*

54.    Opelika is an apartment complex located in Opelika, Alabama.

55.    For the Opelika development, SPC also outsourced the developer role to Barton. Barton used as developer his companies D4OP, LLC ("D4OP") and ONE MF D4, LLC ("MF D4"). To obtain a mortgage loan for Opelika, Barton used as the borrower his company, D4OP. D4OP obtained a HUD loan. HUD agreed to provide the loan to Greystone, to administer to D4OP. To finalize the loan, D4OP executed HUD loan documents on or about January 1, 2021, including a Promissory Note and Deed of Trust. The HUD loan was in the principal amount of $23,789,100.00. Exhibit 37, 38.

56.    SPC provided the Opelika Project with equity financing to fund construction in the form of a convertible loan. D4OP and MF D4, LLC, as borrowers, executed a note in favor of SPC dated January 13, 2021, in the principal amount of $5,129,000.00 ("Opelika Note"). As security for the Opelika Note, SPC has the option to acquire the membership interest in D4OP. See Exhibit 39.

57.    As mentioned above, SPC has not yet, but retains the right to exercise its option to convert the loan to an ownership interest to acquire the equity. SPC expects to obtain a Transfer of Physical Assets ("TPA") from HUD to assume the underlying Opelika debt. Construction loans are not assumable under HUD rules until a cost certification is completed on the project. Only now is a cost certification being completed on Opelika.[2]

---

[2] HUD approval is only needed to assume the HUD insured mortgage; it is not necessary to the exercise of the conversion right. Absent HUD approval, the HUD mortgage can be refinanced by another lender or paid off by SPC. But for the Barton Receivership, SPC would have already commenced the process of requesting HUD approval for TPAs with respect to Bellwether Ridge, Windmill Farms, and Ingleside. Since September 16, 2022, TCI (or SPC) has commenced and is in the process of completing the HUD TPA process with respect to at least four (4) other development projects involving third-party developers using convertible loans.

I have TCI corporate representative knowledge that TCI is one of HUD's largest borrowers, that TCI, or one of its affiliates such as SPC, has requested HUD approve a TPA a significant number of times, that TCI is experienced in requesting HUD approval for TPAs, and that I am not aware of any instance in which HUD denied a request for TPA by TCI or one of its affiliates such as SPC, for a TPA. In any event, as mentioned above, if HUD did not approve the TPA, SPC could pay off loan.

Declaration of Erik Johnson
456100v2

Page 15 of 22

## IV.    SPC's ownership interest in the SPC Projects

58.    SPC has an ownership interest in the SPC Projects, as evidenced by the facts below.

### A.    *SPC selected and funded the actual raw land.*

59.    When initiating the development, SPC selected and funded the actual raw land upon which the SPC Projects were to be developed. TCI affiliates held raw land for developments in areas SPC considered prime development opportunities and those affiliates sold the land to Barton entities which were financed as the part of the convertible loan. SPC wire transferred to Commonwealth Land Title Insurance: (a) $1,770,979.91 to purchase the Bellwether Ridge raw land; (b) $5,605,100.96 to purchase the Windmill Farms raw land; and (c) $1,240,702.49 to purchase the Opelika raw land. SPC also transferred to Capital Title of Texas, LLC $797,729.63 to purchase the Parc at Ingleside raw land. Copies of the SPC wire transfers are attached to this Declaration as Exhibit 40 (Bellwether Ridge); Exhibit 41 (Windmill Farms); Exhibit 42 (Ingleside); and Exhibit 43 (Opelika). The reasons SPC wire transferred almost $9,500,000.00 in funds to purchase the raw land for the SPC Projects is because it was intended that Barton would transfer ownership to SPC, who would continue with ownership and management of the projects.

### B.    *SPC managed the construction.*

60.    SPC assembled and maintained required documents for the land development projects. SPC controlled, funded and managed the construction, design and development processes. SPC funded change orders and costs overruns.

### C.    *SPC funds Escrows and Letters of Credits.*

61.    SPC funded escrow agreements for Bellwether Ridge and Windmill Farms. The Escrow Agreements are attached to this Declaration as Exhibit 44 and Exhibit 45. Each project utilized funds from an Escrow Agreement for both Operating Deficits and Working Capital.

62.     Each Escrow took the form of cash provided by SPC. Attached to this Declaration as Exhibit 46 and Exhibit 47 are Settlement Statements from SPC. The Settlement Statements evidence the money SPC provided to pay the escrow for both Bellwether ($996,006.05) and Windmill Farms ($2,480,383.78), respectively.

63.     TCI funded Letters of Credit for Ingleside and Opelika. The Letters of Credit were used, like the Escrows, to fund Operating Deficits and Working Capital for the Projects. The Ingleside Letter of Credit is attached to this Declaration as Exhibit 48, and the Opelika Letter of Credit is attached as Exhibit 49. TCI signed the Ingleside and Opelika Letter of Credit Applications, on behalf of, among others, TCI. The Ingleside Letter of Credit Application is attached to this Declaration as Exhibit 50 (for $1,250,898.00) and the Opelika Letter of Credit Application is attached as Exhibit 51 (for $1,073,963.00). The Applications evidence SPC as providing collateral security for the Ingleside and Opelika projects and was the responsible party.

D.     *SPC's Convertible Loan Equity*

64.     SPC extended convertible debt relating to the SPC Projects. SPC had the right to convert the debt into 100% equity ownership for Bellwether Ridge, Windmill Farms, Ingleside, and maintains this right for Opelika. This right was an integral and primary part of the bargain at the time the convertible loans were made (and long before the Receiver was appointed). SPC has converted the debt into equity and is now the 100% equity owner of Bellwether Ridge, Windmill Farms, and Ingleside and maintains the right to exercise its equity in Opelika. Functionally, the convertible loan is different from a traditional loan. The convertible loan carried various interest rates usually lower than the market rate of upwards of at least 10% to 15%.

E.    *SPC financial statements evidence SPC Projects are Not Mere Loans.*

65.    SPC issued bonds on the Israeli Bond Exchange, those bonds being a primary source of financing for SPC during the late 2010s and early 2020s. SPC files financial and other reports in Israel, as required by applicable Israeli law. Assets in Israel are reported pursuant to International Financial Reporting Standards ("IFRS") which account for assets at "fair value." SPC's financial statements evidence the fair value of the convertible loan portfolio by providing the loan balance and an appraised value for the conversion rights in each note.

66.    Attached as Exhibit 52 are the first and cited pages of SPC's "Audited Consolidated Financial Statements" as of December 31, 2021 ("SPC 2021 Financial Statements"). Attached as Exhibit 53 are the first and cited pages of SPC's "Interim Unaudited Consolidated Financial Statements" as of September 30, 2022 ("SPC Interim 2022 Financial Statements"). These SPC financial statements address the SPC Projects and show that SPC considered them to effectively be ownership investments, not merely loans.

67.    Note 10 in the SPC 2021 Financial Statements is titled, "Notes Receivable." Exhibit 52. The table, shown below, includes the SPC Projects:

| Borrower / Project | Carrying Value 2021 | Carrying Value 2020 | Interest Rate | Maturity Date |
|---|---|---|---|---|
| Autumn Breeze(1) | $  10,365 | $  4,854 | 5.00 % | 7/1/22 |
| Bellwether Ridge(1)(2) | 12,308 | 5,898 | 5.00 % | 11/1/26 |
| Forest Pines(1) | 9,404 | 2,294 | 5.00 % | 11/1/22 |
| Parc at Ingleside(1) | 2,426 | 2,422 | 5.00 % | 11/1/26 |
| Parc at Opelika(1)(3) | 1,363 | — | 10.00 % | 1/13/23 |
| Parc at Windmill Farms(1) | 18,819 | 10,770 | 5.00 % | 11/1/22 |
| Plum Tree(1) | 1,979 | 1,113 | 5.00 % | 4/26/26 |
| RNC Portfolio, Inc.(4) | — | 9,430 | 5.00 % | 9/1/24 |
| Spyglass of Ennis(1)(5) | 9,488 | 4,680 | 5.00 % | 11/1/22 |
| Steeple Crest(1) | 13,355 | 6,389 | 5.00 % | 8/1/26 |
| | $  79,507 | $  47,850 | | |

68.    Below the table, the 2021 Financial Statements explain that SPC owns convertible debt in the properties listed in the table, including the SPC Projects. It states the following:

Declaration of Erik Johnson    Page 18 of 22
456100v2

> "The note is convertible, at our option, into a 100% ownership interest in the underlying development property and is collateralized by the underlying development property." *Id.*

The 2021 Financial Statements add further explanation, stating:

> "The convertible loans are stated at fair value, which has been determined based on valuations performed by independent external valuation experts who hold recognized and relevant professional qualifications and who have experience in the category of the assets being valued." *Id.*

The 2022 Interim Financial Statements mirror this point, adding:

> "The Company accounts for its investment in convertible notes at fair value that is based on third-party appraisals." Exhibit 53.

69.　　SPC carried the SPC Projects' notes receivable for these convertible loans, not at the loan amounts, but at an enhanced value accounting for the value of the equity conversion right as established by a third-party appraiser.

70.　　First, SPC owned convertible debt "into a 100% ownership interest" in the SPC Projects. Exhibit 52. This is different from a typical loan because SPC could, "at its option," obtain 100% ownership interest in the properties. *Id.* SPC did just that for Bellwether, Windmill Farms and Ingleside, on October 3, 2022 when it exercised its option to acquire 100% equity interest in them. SPC similarly retains the same option for Opelika.

71.　　Second, SPC explains that it had the properties valued by "independent external valuation experts" or "third-party appraisals." *Id.* If these were simply loans, SPC would not have gone through the process of having the properties appraised for the purpose of determining their carrying values. Such an action is consistent with equity value because SPC was expending resources to ascertain the properties' values, as opposed to simply waiting for a return on its loan.

G.     *TCI's SEC Filings Show SPC Projects are Not Mere Loans.*

72.     TCI files financial reports under Generally Acceptable Accounting Procedures, or GAAP, for compliance with its public reporting requirements through the SEC as a corporation listed on the New York Stock Exchange. TCI's SEC filings, as far back as 2018, evidence that Ingleside and Opelika are not mere loans. Attached as Exhibit 54 to this Declaration are the first and cited pages to the TCI Form 10-K for fiscal year ended December 31, 2017 through December 31, 2021.

73.     In the 2020 10K and 2021 10K, TCI describes its interest in the SPC Projects not as a loan, but as a "note . . . convertible, at our option, into a 100% ownership interest." *Id.* The 2018 10K and 2019 10K provide that TCI "intends to service and hold for investment the mortgage notes in [TCI's] portfolio." *Id.* "Servic[ing] and hold[ing] for investment" a convertible loan is not consistent with a mere loan; it is consistent with property ownership. *Id.*

74.     Further, in its 10Ks, TCI consistently included the SPC Projects as "Notes Receivable" or "Mortgage Loans." In the 10Ks, there is a table listing all notes receivable TCI owns. TCI had convertible debt into 100% ownership interest for all entities included in the table. The SPC Projects were included in each table. An example of such a table is included below.

**9. Notes Receivable**

The following table summarizes our notes receivables at December 31, 2021 and 2020:

| Borrower / Project | Carrying Value 2021 | Carrying Value 2020 | Interest Rate | Maturity Date |
|---|---|---|---|---|
| ABC Land and Development, Inc. | $ 4,408 | $ 4,408 | 9.50% | 6/30/2026 |
| ABC Paradise, LLC | 1,210 | 1,210 | 9.50% | 6/30/2026 |
| Autumn Breeze(1) | 2,486 | 1,867 | 5.00% | 7/1/2022 |
| Bellwether Ridge(1) | 3,967 | 3,858 | 5.00% | 11/1/2026 |
| Forest Pines(1) | 6,472 | 2,869 | 5.00% | 11/1/2022 |
| Lake Wales | 3,000 | 3,000 | 9.50% | 6/30/2026 |
| Legacy Pleasant Grove | 496 | 496 | 12.00% | 10/23/2022 |
| McKinney Ranch | 4,554 | 4,554 | 6.00% | 9/15/2022 |
| One Realco Land Holding, Inc. | 1,728 | 1,728 | 9.50% | 6/30/2026 |
| Parc at Ingleside(1) | 3,700 | 2,523 | 5.00% | 11/1/2026 |
| Parc at Opelika(1) | 2,305 | — | 10.00% | 1/13/2023 |
| Parc at Windmill Farms(1) | 7,830 | 7,803 | 5.00% | 11/1/2022 |

Declaration of Erik Johnson
456100v2

Under the table, the 2020 10K and the 2021 10K state, "[t]he note is convertible, at our option, into a 100% ownership interest in the underlying development property, and is collateralized by the underlying development property." *Id.*

H.    *TCI did not accrue interest on the convertible notes.*

75.    TCI did not recognize interest income under SPC's convertible loans because of the view that TCI, through SPC, would exercise its right of conversion for ownership. TCI would not be expected to recognize the interest income because when it chose to exercise its conversion rights, as it planned, such interest income would have been forgiven, per the Convertible Loans.

76.    This is shown in TCI's 10Ks. In its 10Ks, TCI accrued, but fully reserved, interest income recognition on the Convertible Loans. Any uncollected interest income is forgiven in the event of conversion. TCI had the ability and the intent to convert the SPC Convertible Loans into 100% equity interest. TCI, through SPC, exercised its rights. Any interest was forgiven once TCI exercised its convertible rights. Since TCI planned to exercise its right, it did not recognize interest income on the convertible loans.

77.    SPC has the right to convert its loan regarding the SPC Projects into 100% equity. TCI withheld recognizing interest income concerning the SPC Projects, because it intended to exercise its right to conversion for Bellwether Ridge, Windmill Farms and Ingleside and still intends the same for Opelika. TCI does not view the SPC Projects as mere loans; it views them as owner investment properties it intends to fully acquire.

V.    **Business Records**

78.    I am a custodian of records for TCI/SPC, responsible for ensuring that SPC maintains accurate and complete records of its regularly conducted activities. Attached to my Declaration are Exhibits 1 through 54 from TCI/SPC. These exhibits were made at or near the time

App. 23

of the events referenced in each exhibit by, or from information transmitted by, someone with knowledge of the facts; were kept by TCI/SPC in the course of regularly conducted activity; and were made as part of the regular practice of that activity.

I declare under penalty of perjury that the foregoing is true and correct."

Executed in Dallas County, State of Texas, on the 2nd day of October, 2023.

ERIK JOHNSON

App. 23

# EXHIBIT A-1



JPMorgan Chase Bank, N.A.
P O Box 182051
Columbus, OH 43218 - 2051

August 01, 2019 through August 30, 2019

Account Number: ████████5851

00007218 DRI 201 142 24819 NNNNNNNNNNN  1 000000000 D3 0000

D4DS LLC
1755 WITTINGTON PL STE 340 DALLAS
DALLAS TX 75234-1930



## CUSTOMER SERVICE INFORMATION

| | |
|---|---|
| Web site: | www.Chase.com |
| Service Center: | 1-877-425-8100 |
| Deaf and Hard of Hearing: | 1-800-242-7383 |
| Para Espanol: | 1-888-622-4273 |
| International Calls: | 1-713-262-1679 |

## CHECKING SUMMARY          Chase Platinum Business Checking

| | INSTANCES | AMOUNT |
|---|---|---|
| **Beginning Balance** | | **$6,367.82** |
| Deposits and Additions | 5 | 120,143.96 |
| Checks Paid | 1 | -969.72 |
| Electronic Withdrawals | 11 | -90,649.76 |
| **Ending Balance** | **17** | **$34,892.30** |

Your Chase Platinum Business Checking account provides:
- No transaction fees for unlimited electronic deposits (including ACH, ATM, wire, Chase Quick Deposit)
- 500 debits and non-electronic deposits (those made via check or cash in branches) per statement cycle
- $25,000 in cash deposits per statement cycle
- Unlimited return deposited items with no fee

There are additional fee waivers and benefits associated with your account - please refer to your Deposit Account Agreement for more information.

## DEPOSITS AND ADDITIONS

| DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| 08/01 | Online Transfer From Chk ...5193 Transaction#: 8491660344 | $25,000.00 |
| 08/12 | Online Transfer From Chk ...5193 Transaction#: 8530388106 | 30,000.00 |
| 08/13 | Deposit     1062307830 | 28,644.51 |
| 08/14 | Online Transfer From Chk ...5193 Transaction#: 8536592857 | 35,529.45 |
| 08/15 | Fedwire Credit Via: Bank of America, N.A./026009593 B/O: General Disbursement 20186 US VA Ref: Chase Nyc/Ctr/Bnf=D4Ds LLC Dallas, TX 75234/Ac-000000002838 Rfb=198Fg0 459Eiq0542 Obi=Bellwether Ridge Apa Rtments Bbi=/Ocmt/USD970,00/ Imad: 0815B6B7Hu4R015246 Trn: 7980909227Ff | 970.00 |

**Total Deposits and Additions**          **$120,143.96**

App. 25



August 01, 2019 through August 30, 2019

Account Number: ████████ 5851

## CHECKS PAID

| CHECK NO. | DESCRIPTION | DATE PAID | AMOUNT |
|---|---|---|---|
| 10028  ^ | | 08/22 | $969.72 |
| **Total Checks Paid** | | | **$969.72** |

If you see a description in the Checks Paid section, it means that we received only electronic information about the check, not the original or an image of the check. As a result, we're not able to return the check to you or show you an image.

^ An image of this check may be available for you to view on Chase.com.

## ELECTRONIC WITHDRAWALS

| DATE | DESCRIPTION | | AMOUNT |
|---|---|---|---|
| 08/01 | 08/01 Online Domestic Wire Transfer Via: Bk Amer Nyc/026009593 A/C: Greystone Servicing Company Warrenton VA 20186 US Ref: Loan Number 002081 Bellwether Ridgeapartments Mortgage Payment/Bnf/Loa N Number 002081 Bellwether Ridge Ap Artments Mortgage Payment Imad: 0801B1Qgc08C028961 Trn: 6733500213Es | | $28,644.51 |
| 08/02 | Desoto-UTIL-Pmnt UTIL-Pmnt  6557415 | Web ID: 0000000160 | 763.24 |
| 08/02 | Desoto-UTIL-Pmnt UTIL-Pmnt  6557479 | Web ID: 0000000160 | 116.49 |
| 08/02 | Desoto-UTIL-Pmnt UTIL-Pmnt  6557383 | Web ID: 0000000160 | 100.50 |
| 08/02 | Desoto-UTIL-Pmnt UTIL-Pmnt  6557381 | Web ID: 0000000160 | 93.89 |
| 08/02 | Desoto-UTIL-Pmnt UTIL-Pmnt  6557404 | Web ID: 0000000160 | 85.03 |
| 08/02 | Desoto-UTIL-Pmnt UTIL-Pmnt  6557478 | Web ID: 0000000160 | 76.57 |
| 08/02 | Desoto-UTIL-Pmnt UTIL-Pmnt  6557437 | Web ID: 0000000160 | 72.17 |
| 08/02 | Desoto-UTIL-Pmnt UTIL-Pmnt  6557424 | Web ID: 0000000160 | 65.17 |
| 08/12 | 08/12 Online Domestic Wire Transfer Via: Bk Amer Nyc/026009593 A/C: Greystone Servicing Company Warrenton VA 20186 US Ref: Loan 002081 Bellwether Ridge Apartments/Bnf/Loan Number 002081 Bellwet Her Ridge Apartments Imad: 0812B1Qgc08C021037 Trn: 5631500224Es | | 25,102.74 |
| 08/14 | 08/14 Online Domestic Wire Transfer Via: Bk Amer Nyc/026009593 A/C: Greystone Servicing Company Warrenton VA 20186 US Ref: Funds For Change Order 03 For Bellwether Ridge Apartments Loan Number 002081/Bnf/Funds For Change Order 0 3 For Bellwether Ridge Apartments L Oan Number 002081 Imad: 0814B1Qgc08C008933 Trn: 5269600226Es | | 35,529.45 |
| **Total Electronic Withdrawals** | | | **$90,649.76** |

## DAILY ENDING BALANCE

| DATE | AMOUNT |
|---|---|
| 08/01 | $2,723.31 |
| 08/02 | 1,350.25 |
| 08/12 | 6,247.51 |
| 08/13 | 34,892.02 |
| 08/14 | 34,892.02 |
| 08/15 | 35,862.02 |
| 08/22 | 34,892.30 |

## SERVICE CHARGE SUMMARY

| | |
|---|---|
| Monthly Service Fee | $0.00 |
| Other Service Charges | $0.00 |
| **Total Service Charges** | **$0.00** |



August 01, 2019 through August 30, 2019

Account Number:                5851

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC FUNDS TRANSFERS:** Call us at 1-866-564-2262 or write us at the address on the front of this statement (non-personal accounts contact Customer Service) immediately if you think your statement or receipt is incorrect or if you need more information about a transfer listed on the statement or receipt.

For personal accounts only: We must hear from you no later than 60 days after we sent you the FIRST statement on which the problem or error appeared. Be prepared to give us the following information:

- Your name and account number
- The dollar amount of the suspected error
- A description of the error or transfer you are unsure of, why you believe it is an error, or why you need more information.

We will investigate your complaint and will correct any error promptly. If we take more than 10 business days (or 20 business days for new accounts) to do this, we will credit your account for the amount you think is in error so that you will have use of the money during the time it takes us to complete our investigation.

**IN CASE OF ERRORS OR QUESTIONS ABOUT NON-ELECTRONIC TRANSACTIONS:** Contact the bank immediately if your statement is incorrect or if you need more information about any non-electronic transactions (checks or deposits) on this statement. If any such error appears, you must notify the bank in writing no later than 30 days after the statement was made available to you. For more complete details, see the Account Rules and Regulations or other applicable account agreement that governs your account. Deposit products and services are offered by JPMorgan Chase Bank, N.A. Member FDIC

 JPMorgan Chase Bank, N.A. Member FDIC

**IMAGES**                                                    ACCOUNT # 5851

See both front and back images of cleared checks at Chase.com. If you're not enrolled in this free service, please enroll now.



002670570727 AUG 22 #0000010028 $969.72

**CHASE ⬡**

August 01, 2019 through August 30, 2019
Account Number: █████████5851

This Page Intentionally Left Blank

App. 28

# EXHIBIT A-2



**CHASE** ◯

JPMorgan Chase Bank, N.A.
P O Box 182051
Columbus, OH 43218 - 2051

August 31, 2019 through September 30, 2019

Account Number:  ███████ 5851

00007176 DRI 201 142 27619 NNNNNNNNNNN  1 000000000 D3 0000
D4DS LLC
1755 WITTINGTON PL STE 340 DALLAS
DALLAS TX 75234-1930

### CUSTOMER SERVICE INFORMATION

| | |
|---|---|
| Web site: | **www.Chase.com** |
| Service Center: | **1-877-425-8100** |
| Deaf and Hard of Hearing: | 1-800-242-7383 |
| Para Espanol: | 1-888-622-4273 |
| International Calls: | 1-713-262-1679 |



## Good news! We're making it easier to get a replacement account number if your account is compromised.

Starting November 17, 2019, if your account is compromised, we can simply issue you a replacement account number without the hassle of closing your existing account and opening a new one. This will allow you to continue using your existing debit card.

We've updated our Deposit Account Agreement to explain this change:

> *We can assign and transfer your account information and documentation to a replacement account number at our discretion. We may make this assignment when your account is reported compromised by you or any signer. If we issue you a replacement account number, this Deposit Account Agreement governing you and your account will continue to apply, without interruption, as if you retained the discontinued account number.*

Please call us at the number at the top of this statement if you have any questions.

| CHECKING SUMMARY | Chase Platinum Business Checking | |
|---|---|---|
| | **INSTANCES** | **AMOUNT** |
| **Beginning Balance** | | **$34,892.30** |
| Deposits and Additions | 5 | 110,827.96 |
| Checks Paid | 1 | -498.98 |
| Electronic Withdrawals | 4 | -131,796.86 |
| **Ending Balance** | **10** | **$13,424.42** |

Your Chase Platinum Business Checking account provides:
- No transaction fees for unlimited electronic deposits (including ACH, ATM, wire, Chase Quick Deposit)
- 500 debits and non-electronic deposits (those made via check or cash in branches) per statement cycle
- $25,000 in cash deposits per statement cycle
- Unlimited return deposited items with no fee

There are additional fee waivers and benefits associated with your account - please refer to your Deposit Account Agreement for more information.

App. 30

 **CHASE** ⬡

August 31, 2019 through September 30, 2019

Account Number: ▮▮▮▮▮**5851**

## DEPOSITS AND ADDITIONS

| DATE | DESCRIPTION | AMOUNT |
|------|-------------|--------|
| 09/09 | Deposit    1061857695 | $75,354.93 |
| 09/09 | Deposit    1061857696 | 8,154.34 |
| 09/09 | Deposit    1061857700 | 14.83 |
| 09/12 | Online Transfer From Chk ...5193 Transaction#: 8637239380 | 26,694.86 |
| 09/18 | Fedwire Credit Via: Bank of America, N.A./026009593 B/O: General Disbursement 20186 US VA Ref: Chase Nyc/Ctr/Bnf=D4Ds LLC Dallas, TX 75234/Ac-000000002838 Rfb=199ID2 1000Hw0G57 Obi=Bellwether Ridge Apa Rtements Bbi=/Ocmt/USD609,00/ Imad: 0918B6B7Hu3R010049 Trn: 4818709261Ff | 609.00 |

**Total Deposits and Additions**          **$110,827.96**

## CHECKS PAID

| CHECK NO. | DESCRIPTION | DATE PAID | AMOUNT |
|-----------|-------------|-----------|--------|
| 10030  ^ | | 09/30 | $498.98 |

**Total Checks Paid**          **$498.98**

If you see a description in the Checks Paid section, it means that we received only electronic information about the check, not the original or an image of the check. As a result, we're not able to return the check to you or show you an image.

^ An image of this check may be available for you to view on Chase.com.

## ELECTRONIC WITHDRAWALS

| DATE | DESCRIPTION | AMOUNT |
|------|-------------|--------|
| 09/09 | 09/09 Online Transfer To Chk ...5193 Transaction#: 8627421677 | $25,000.00 |
| 09/11 | 09/11 Online Transfer To Chk ...5193 Transaction#: 8633744696 | 30,000.00 |
| 09/12 | 09/12 Online Domestic Wire Transfer Via: Bk Amer Nyc/026009593 A/C: Greystone Servicing Company Warrenton VA 20186 US Ref: Loan 002081 Bellwether Ridge Apartments - Mortgage Payment/Bnf/Loan 00 2081 Bellwether Ridge Apartments - Mortgage Payment Imad: 0912B1Qgc02C016207 Trn: 5823800255Es | 26,694.86 |
| 09/24 | 09/24 Online Domestic Wire Transfer Via: Bk Leumi Tr NY/026002794 A/C: Southern Properties Capital Ltd Dallas TX 75234 US Ref: Refund August Mortgage And Management Fee For Sunridge./Bnf/Refund Aug Ust Mortgage And Management Fee For Sunridge. Imad: 0924B1Qgc05C012526 Trn: 5686300267Es | 50,102.00 |

**Total Electronic Withdrawals**          **$131,796.86**

## DAILY ENDING BALANCE

| DATE | AMOUNT |
|------|--------|
| 09/09 | $93,416.40 |
| 09/11 | 63,416.40 |
| 09/12 | 63,416.40 |
| 09/18 | 64,025.40 |
| 09/24 | 13,923.40 |
| 09/30 | 13,424.42 |

## SERVICE CHARGE SUMMARY

| | |
|---|---|
| Monthly Service Fee | $0.00 |
| Other Service Charges | $0.00 |
| **Total Service Charges** | **$0.00** |

App. 31



August 31, 2019 through September 30, 2019

Account Number: ███████ **5851**

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC FUNDS TRANSFERS:** Call us at 1-866-564-2262 or write us at the address on the front of this statement (non-personal accounts contact Customer Service) immediately if you think your statement or receipt is incorrect or if you need more information about a transfer listed on the statement or receipt.

For personal accounts only: We must hear from you no later than 60 days after we sent you the FIRST statement on which the problem or error appeared.  Be prepared to give us the following information:

- Your name and account number
- The dollar amount of the suspected error
- A description of the error or transfer you are unsure of, why you believe it is an error, or why you need more information.

We will investigate your complaint and will correct any error promptly.  If we take more than 10 business days (or 20 business days for new accounts) to do this, we will credit your account for the amount you think is in error so that you will have use of the money during the time it takes us to complete our investigation.

**IN CASE OF ERRORS OR QUESTIONS ABOUT NON-ELECTRONIC TRANSACTIONS:** Contact the bank immediately if your statement is incorrect or if you need more information about any non-electronic transactions (checks or deposits) on this statement.  If any such error appears, you must notify the bank in writing no later than 30 days after the statement was made available to you.  For more complete details, see the Account Rules and Regulations or other applicable account agreement that governs your account. Deposit products and services are offered by JPMorgan Chase Bank, N.A. Member FDIC

 JPMorgan Chase Bank, N.A. Member FDIC

**IMAGES** _____ ACCOUNT # ███████ 5851

See both front and back images of cleared checks at Chase.com.  If you're not enrolled in this free service, please enroll now.



005380131191 SEP 30 #0000010030 $498.98

**CHASE** ⬡

August 31, 2019 through September 30, 2019
Account Number:                    5851

This Page Intentionally Left Blank

App. 33

# EXHIBIT A-3

# CHASE ○

JPMorgan Chase Bank, N.A.
P O Box 182051
Columbus, OH 43218 - 2051

August 01, 2019 through August 30, 2019

Account Number: █████████5851

00007218 DRI 201 142 24819 NNNNNNNNNNN  1 000000000 D3 0000

D4DS LLC
1755 WITTINGTON PL STE 340 DALLAS
DALLAS TX 75234-1930

## CUSTOMER SERVICE INFORMATION

| | |
|---|---|
| Web site: | www.Chase.com |
| Service Center: | 1-877-425-8100 |
| Deaf and Hard of Hearing: | 1-800-242-7383 |
| Para Espanol: | 1-888-622-4273 |
| International Calls: | 1-713-262-1679 |



## CHECKING SUMMARY    Chase Platinum Business Checking

| | INSTANCES | AMOUNT |
|---|---|---|
| Beginning Balance | | $6,367.82 |
| Deposits and Additions | 5 | 120,143.96 |
| Checks Paid | 1 | -969.72 |
| Electronic Withdrawals | 11 | -90,649.76 |
| Ending Balance | 17 | $34,892.30 |

Your Chase Platinum Business Checking account provides:
- No transaction fees for unlimited electronic deposits (including ACH, ATM, wire, Chase Quick Deposit)
- 500 debits and non-electronic deposits (those made via check or cash in branches) per statement cycle
- $25,000 in cash deposits per statement cycle
- Unlimited return deposited items with no fee

There are additional fee waivers and benefits associated with your account - please refer to your Deposit Account Agreement for more information.

## DEPOSITS AND ADDITIONS

| DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| 08/01 | Online Transfer From Chk ...5193 Transaction#: 8491660344 | $25,000.00 |
| 08/12 | Online Transfer From Chk ...5193 Transaction#: 8530388106 | 30,000.00 |
| 08/13 | Deposit    1062307830 | 28,644.51 |
| 08/14 | Online Transfer From Chk ...5193 Transaction#: 8536592857 | 35,529.45 |
| 08/15 | Fedwire Credit Via: Bank of America, N.A./026009593 B/O: General Disbursement 20186 US VA Ref: Chase Nyc/Ctr/Bnf=D4Ds LLC Dallas, TX 75234/Ac-000000002838 Rfb=198Fg0 459Eiq0542 Obi=Bellwether Ridge Apa Rtments Bbi=/Ocmt/USD970,00/ Imad: 0815B6B7Hu4R015246 Trn: 7980909227Ff | 970.00 |
| **Total Deposits and Additions** | | **$120,143.96** |

Page 1 of 4

App. 35

**CHASE**

August 01, 2019 through August 30, 2019

Account Number: ███████5851

## CHECKS PAID

| CHECK NO. | DESCRIPTION | DATE PAID | AMOUNT |
|---|---|---|---|
| 10028 ^ | | 08/22 | $969.72 |
| **Total Checks Paid** | | | **$969.72** |

If you see a description in the Checks Paid section, it means that we received only electronic information about the check, not the original or an image of the check. As a result, we're not able to return the check to you or show you an image.

^ An image of this check may be available for you to view on Chase.com.

## ELECTRONIC WITHDRAWALS

| DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| 08/01 | 08/01 Online Domestic Wire Transfer Via: Bk Amer Nyc/026009593 A/C: Greystone Servicing Company Warrenton VA 20186 US Ref: Loan Number 002081 Bellwether Ridgeapartments Mortgage Payment/Bnf/Loa N Number 002081 Bellwether Ridge Ap Artments Mortgage Payment Imad: 0801B1Qgc08C028961 Trn: 6733500213Es | $28,644.51 |
| 08/02 | Desoto-UTIL-Pmnt UTIL-Pmnt  6557415    Web ID: 0000000160 | 763.24 |
| 08/02 | Desoto-UTIL-Pmnt UTIL-Pmnt  6557479    Web ID: 0000000160 | 116.49 |
| 08/02 | Desoto-UTIL-Pmnt UTIL-Pmnt  6557383    Web ID: 0000000160 | 100.50 |
| 08/02 | Desoto-UTIL-Pmnt UTIL-Pmnt  6557381    Web ID: 0000000160 | 93.89 |
| 08/02 | Desoto-UTIL-Pmnt UTIL-Pmnt  6557404    Web ID: 0000000160 | 85.03 |
| 08/02 | Desoto-UTIL-Pmnt UTIL-Pmnt  6557478    Web ID: 0000000160 | 76.57 |
| 08/02 | Desoto-UTIL-Pmnt UTIL-Pmnt  6557437    Web ID: 0000000160 | 72.17 |
| 08/02 | Desoto-UTIL-Pmnt UTIL-Pmnt  6557424    Web ID: 0000000160 | 65.17 |
| 08/12 | 08/12 Online Domestic Wire Transfer Via: Bk Amer Nyc/026009593 A/C: Greystone Servicing Company Warrenton VA 20186 US Ref: Loan 002081 Bellwether Ridge Apartments/Bnf/Loan Number 002081 Bellwet Her Ridge Apartments Imad: 0812B1Qgc08C021037 Trn: 5631500224Es | 25,102.74 |
| 08/14 | 08/14 Online Domestic Wire Transfer Via: Bk Amer Nyc/026009593 A/C: Greystone Servicing Company Warrenton VA 20186 US Ref: Funds For Change Order 03 For Bellwether Ridge Apartments Loan Number 002081/Bnf/Funds For Change Order 0 3 For Bellwether Ridge Apartments L Oan Number 002081 Imad: 0814B1Qgc08C008933 Trn: 5269600226Es | 35,529.45 |
| **Total Electronic Withdrawals** | | **$90,649.76** |

## DAILY ENDING BALANCE

| DATE | AMOUNT |
|---|---|
| 08/01 | $2,723.31 |
| 08/02 | 1,350.25 |
| 08/12 | 6,247.51 |
| 08/13 | 34,892.02 |
| 08/14 | 34,892.02 |
| 08/15 | 35,862.02 |
| 08/22 | 34,892.30 |

## SERVICE CHARGE SUMMARY

| | |
|---|---|
| Monthly Service Fee | $0.00 |
| Other Service Charges | $0.00 |
| **Total Service Charges** | **$0.00** |



August 01, 2019 through August 30, 2019

Account Number: ▉▉▉▉▉▉ 5851

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC FUNDS TRANSFERS:** Call us at 1-866-564-2262 or write us at the address on the front of this statement (non-personal accounts contact Customer Service) immediately if you think your statement or receipt is incorrect or if you need more information about a transfer listed on the statement or receipt.

For personal accounts only: We must hear from you no later than 60 days after we sent you the FIRST statement on which the problem or error appeared. Be prepared to give us the following information:
- Your name and account number
- The dollar amount of the suspected error
- A description of the error or transfer you are unsure of, why you believe it is an error, or why you need more information.

We will investigate your complaint and will correct any error promptly. If we take more than 10 business days (or 20 business days for new accounts) to do this, we will credit your account for the amount you think is in error so that you will have use of the money during the time it takes us to complete our investigation.

**IN CASE OF ERRORS OR QUESTIONS ABOUT NON-ELECTRONIC TRANSACTIONS:** Contact the bank immediately if your statement is incorrect or if you need more information about any non-electronic transactions (checks or deposits) on this statement. If any such error appears, you must notify the bank in writing no later than 30 days after the statement was made available to you. For more complete details, see the Account Rules and Regulations or other applicable account agreement that governs your account. Deposit products and services are offered by JPMorgan Chase Bank, N.A. Member FDIC

 JPMorgan Chase Bank, N.A. Member FDIC

**IMAGES**          ACCOUNT # ▉▉▉▉▉ 5851

See both front and back images of cleared checks at Chase.com. If you're not enrolled in this free service, please enroll now.



002670570727 AUG 22 #0000010028 $969.72

App. 37

**CHASE ⬡**

August 01, 2019 through August 30, 2019

Account Number: ████████5851

This Page Intentionally Left Blank

App. 38

# EXHIBIT A-4



**CHASE** ⬡

JPMorgan Chase Bank, N.A.
P O Box 182051
Columbus, OH 43218 - 2051

August 31, 2019 through September 30, 2019

Account Number: ████████ 5851

00007176 DRI 201 142 27619 NNNNNNNNNNN  1 000000000 D3 0000

D4DS LLC
1755 WITTINGTON PL STE 340 DALLAS
DALLAS TX 75234-1930

### CUSTOMER SERVICE INFORMATION

| | |
|---|---|
| Web site: | www.Chase.com |
| Service Center: | **1-877-425-8100** |
| Deaf and Hard of Hearing: | 1-800-242-7383 |
| Para Espanol: | 1-888-622-4273 |
| International Calls: | 1-713-262-1679 |



## Good news! We're making it easier to get a replacement account number if your account is compromised.

Starting November 17, 2019, if your account is compromised, we can simply issue you a replacement account number without the hassle of closing your existing account and opening a new one. This will allow you to continue using your existing debit card.

We've updated our Deposit Account Agreement to explain this change:

*We can assign and transfer your account information and documentation to a replacement account number at our discretion. We may make this assignment when your account is reported compromised by you or any signer. If we issue you a replacement account number, this Deposit Account Agreement governing you and your account will continue to apply, without interruption, as if you retained the discontinued account number.*

Please call us at the number at the top of this statement if you have any questions.

| CHECKING SUMMARY | Chase Platinum Business Checking | |
|---|---|---|
| | INSTANCES | AMOUNT |
| **Beginning Balance** | | **$34,892.30** |
| Deposits and Additions | 5 | 110,827.96 |
| Checks Paid | 1 | -498.98 |
| Electronic Withdrawals | 4 | -131,796.86 |
| **Ending Balance** | **10** | **$13,424.42** |

Your Chase Platinum Business Checking account provides:
- No transaction fees for unlimited electronic deposits (including ACH, ATM, wire, Chase Quick Deposit)
- 500 debits and non-electronic deposits (those made via check or cash in branches) per statement cycle
- $25,000 in cash deposits per statement cycle
- Unlimited return deposited items with no fee

There are additional fee waivers and benefits associated with your account - please refer to your Deposit Account Agreement for more information.

Page 1 of 4

App. 40



August 31, 2019 through September 30, 2019

Account Number: ███████5851

## DEPOSITS AND ADDITIONS

| DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| 09/09 | Deposit    1061857695 | $75,354.93 |
| 09/09 | Deposit    1061857696 | 8,154.34 |
| 09/09 | Deposit    1061857700 | 14.83 |
| 09/12 | Online Transfer From Chk ...5193 Transaction#: 8637239380 | 26,694.86 |
| 09/18 | Fedwire Credit Via: Bank of America, N.A./026009593 B/O: General Disbursement 20186 US VA Ref: Chase Nyc/Ctr/Bnf=D4Ds LLC Dallas, TX 75234/Ac-000000002838 Rfb=199ID2 1000Hw0G57 Obi=Bellwether Ridge Apa Rtements Bbi=/Ocmt/USD609,00/ Imad: 0918B6B7Hu3R010049 Trn: 4818709261Ff | 609.00 |
| **Total Deposits and Additions** | | **$110,827.96** |

## CHECKS PAID

| CHECK NO. | DESCRIPTION | DATE PAID | AMOUNT |
|---|---|---|---|
| 10030  ^ | | 09/30 | $498.98 |
| **Total Checks Paid** | | | **$498.98** |

If you see a description in the Checks Paid section, it means that we received only electronic information about the check, not the original or an image of the check. As a result, we're not able to return the check to you or show you an image.

^ An image of this check may be available for you to view on Chase.com.

## ELECTRONIC WITHDRAWALS

| DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| 09/09 | 09/09 Online Transfer To Chk ...5193 Transaction#: 8627421677 | $25,000.00 |
| 09/11 | 09/11 Online Transfer To Chk ...5193 Transaction#: 8633744696 | 30,000.00 |
| 09/12 | 09/12 Online Domestic Wire Transfer Via: Bk Amer Nyc/026009593 A/C: Greystone Servicing Company Warrenton VA 20186 US Ref: Loan 002081 Bellwether Ridge Apartments - Mortgage Payment/Bnf/Loan 00 2081 Bellwether Ridge Apartments - Mortgage Payment Imad: 0912B1Qgc02C016207 Trn: 5823800255Es | 26,694.86 |
| 09/24 | 09/24 Online Domestic Wire Transfer Via: Bk Leumi Tr NY/026002794 A/C: Southern Properties Capital Ltd Dallas TX 75234 US Ref: Refund August Mortgage And Management Fee For Sunridge./Bnf/Refund Aug Ust Mortgage And Management Fee For Sunridge. Imad: 0924B1Qgc05C012526 Trn: 5686300267Es | 50,102.00 |
| **Total Electronic Withdrawals** | | **$131,796.86** |

## DAILY ENDING BALANCE

| DATE | AMOUNT |
|---|---|
| 09/09 | $93,416.40 |
| 09/11 | 63,416.40 |
| 09/12 | 63,416.40 |
| 09/18 | 64,025.40 |
| 09/24 | 13,923.40 |
| 09/30 | 13,424.42 |

## SERVICE CHARGE SUMMARY

| | |
|---|---|
| Monthly Service Fee | $0.00 |
| Other Service Charges | $0.00 |
| **Total Service Charges** | **$0.00** |

App. 41



August 31, 2019 through September 30, 2019

Account Number:                5851

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC FUNDS TRANSFERS:** Call us at 1-866-564-2262 or write us at the address on the front of this statement (non-personal accounts contact Customer Service) immediately if you think your statement or receipt is incorrect or if you need more information about a transfer listed on the statement or receipt.

For personal accounts only: We must hear from you no later than 60 days after we sent you the FIRST statement on which the problem or error appeared. Be prepared to give us the following information:

- Your name and account number
- The dollar amount of the suspected error
- A description of the error or transfer you are unsure of, why you believe it is an error, or why you need more information.

We will investigate your complaint and will correct any error promptly. If we take more than 10 business days (or 20 business days for new accounts) to do this, we will credit your account for the amount you think is in error so that you will have use of the money during the time it takes us to complete our investigation.

**IN CASE OF ERRORS OR QUESTIONS ABOUT NON-ELECTRONIC TRANSACTIONS:** Contact the bank immediately if your statement is incorrect or if you need more information about any non-electronic transactions (checks or deposits) on this statement. If any such error appears, you must notify the bank in writing no later than 30 days after the statement was made available to you. For more complete details, see the Account Rules and Regulations or other applicable account agreement that governs your account. Deposit products and services are offered by JPMorgan Chase Bank, N.A. Member FDIC

 JPMorgan Chase Bank, N.A. Member FDIC

**IMAGES**

ACCOUNT #            5851

See both front and back images of cleared checks at Chase.com. If you're not enrolled in this free service, please enroll now.



005380131191 SEP 30 #0000010030 $498.98

App. 42

**CHASE** ⬡

August 31, 2019 through September 30, 2019
Account Number: ███████████5851

This Page Intentionally Left Blank

# EXHIBIT A-5

SOUTHERN PROPERTIES CAPITAL, LTD                                    Page 2
August 31, 2019                                                     ███4800

**DEBITS**

| Date | Description | Subtractions |
|------|-------------|-------------:|
| 08-01 | ' Wire Out | 6,866.96 |
| | 201908010005839 MANPOWER GROUP SOLUTIONS | |
| | INVOICE A 415573 | |
| 08-01 | ' Wire Out | 22,494.46 |
| | 201908010005840 SHIMONOV AND CO. | |
| | PROFORMA INVOICE 6060 | |
| 08-01 | ' Wire Out | 30,000.00 |
| | 201908010003574 LANIER FORD SHAVER AND PAYNE PC | |
| | ATHENS 1 MAIN PARCEL 33 ACRES LINDSA | |
| 08-05 | ' Wire Out | 187,222.24 |
| | 201908050004101 PILLAR INCOME ASSET MANAGEMENT | |
| | MANAGEMENT FEE EXPENSE JULY 2019 | |
| 08-05 | ' Cash Mgmt Trsfr Dr | 1,000,000.00 |
| | REF 2171741L FUNDS TRANSFER TO DEP 6611861170 | |
| | FROM TRANSFER FROM OPERATING TO MM | |
| 08-08 | ' Wire Out | 25,000.00 |
| | 201908080003833 BARRINGTON SERVICES CORPORATION | |
| 08-09 | ' Cash Mgmt Trsfr Dr | 4,000,000.00 |
| | REF 2211205L FUNDS TRANSFER TO DEP 6611861170 | |
| | FROM TRANSFER FROM OP TO MONEY MARKET | |
| 08-13 | ' Wire Out | 25,102.74 |
| | 201908130002594 JMJ DEVELOPMENT INC. | |
| | BELLWETHER RIDGE GREYSTONE AUGUST 20 | |
| 08-13 | ' Wire Out | 35,529.45 |
| | 201908130002595 JMJ DEVELOPMENT INC. | |
| | BELLWESTHER RIDGE CHANGE ORDER 3 | |
| 08-13 | ' Cash Mgmt Trsfr Dr | 1,000,000.00 |
| | REF 2251053L FUNDS TRANSFER TO DEP 6611861170 | |
| | FROM TRANSFER FROM OPERATING TO MM | |
| 08-15 | ' Wire Out | 1,243.00 |
| | 201908150004563 OFAKIM TRAVEL AND TOURS LTD | |
| 08-15 | ' Wire Out | 5,202.00 |
| | 201908150004565 OFAKIM TRAVEL AND TOURS LTD | |
| 08-15 | Wire Out Intl | 20,000.00 |
| | 201908150004564 KOST FORER GABBAY AND KASIERER | |
| | IL0100253961 | |
| 08-15 | ' Analysis Results Chg | 922.52 |
| | ANALYSIS ACTIVITY FOR 07/19 | |
| 08-23 | ' Wire Out | 2,363.40 |
| | 201908230002022 AVI-SHAYO | |
| 08-27 | ' ACH Debit | 6,437.68 |
| | LEUMI ONECRD PMT PAYMENT 190827 | |
| 08-27 | ' Fx Contract Dr | 5,130.08 |
| | DEAL# 1341909 | |

App. 45

# EXHIBIT A-6



CHASE

JPMorgan Chase Bank, N.A.
P O Box 182051
Columbus, OH 43218 - 2051

August 01, 2019 through August 30, 2019

Account Number:        5851

00007218 DRI 201 142 24819 NNNNNNNNNNN  1 000000000 D3 0000

D4DS LLC
1755 WITTINGTON PL STE 340 DALLAS
DALLAS TX 75234-1930

### CUSTOMER SERVICE INFORMATION

| | |
|---|---|
| Web site: | www.Chase.com |
| Service Center: | 1-877-425-8100 |
| Deaf and Hard of Hearing: | 1-800-242-7383 |
| Para Espanol: | 1-888-622-4273 |
| International Calls: | 1-713-262-1679 |



## CHECKING SUMMARY | Chase Platinum Business Checking

| | INSTANCES | AMOUNT |
|---|---|---|
| **Beginning Balance** | | **$6,367.82** |
| Deposits and Additions | 5 | 120,143.96 |
| Checks Paid | 1 | -969.72 |
| Electronic Withdrawals | 11 | -90,649.76 |
| **Ending Balance** | **17** | **$34,892.30** |

Your Chase Platinum Business Checking account provides:
- No transaction fees for unlimited electronic deposits (including ACH, ATM, wire, Chase Quick Deposit)
- 500 debits and non-electronic deposits (those made via check or cash in branches) per statement cycle
- $25,000 in cash deposits per statement cycle
- Unlimited return deposited items with no fee

There are additional fee waivers and benefits associated with your account - please refer to your Deposit Account Agreement for more information.

## DEPOSITS AND ADDITIONS

| DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| 08/01 | Online Transfer From Chk ...5193 Transaction#: 8491660344 | $25,000.00 |
| 08/12 | Online Transfer From Chk ...5193 Transaction#: 8530388106 | 30,000.00 |
| 08/13 | Deposit    1062307830 | 28,644.51 |
| 08/14 | Online Transfer From Chk ...5193 Transaction#: 8536592857 | 35,529.45 |
| 08/15 | Fedwire Credit Via: Bank of America, N.A./026009593 B/O: General Disbursement 20186 US VA Ref: Chase Nyc/Ctr/Bnf=D4Ds LLC Dallas, TX 75234/Ac-000000002838 Rfb=198Fg0 459Eiq0542 Obi=Bellwether Ridge Apa Rtments Bbi=/Ocmt/USD970,00/ Imad: 0815B6B7Hu4R015246 Trn: 7980909227Ff | 970.00 |

**Total Deposits and Additions** | | **$120,143.96**

App. 47

## CHASE

August 01, 2019 through August 30, 2019

Account Number: ⬛⬛⬛⬛⬛⬛⬛5851

## CHECKS PAID

| CHECK NO. | DESCRIPTION | DATE PAID | AMOUNT |
|---|---|---|---|
| 10028 ^ | | 08/22 | $969.72 |
| **Total Checks Paid** | | | **$969.72** |

If you see a description in the Checks Paid section, it means that we received only electronic information about the check, not the original or an image of the check. As a result, we're not able to return the check to you or show you an image.

^ An image of this check may be available for you to view on Chase.com.

## ELECTRONIC WITHDRAWALS

| DATE | DESCRIPTION | | AMOUNT |
|---|---|---|---|
| 08/01 | 08/01 Online Domestic Wire Transfer Via: Bk Amer Nyc/026009593 A/C: Greystone Servicing Company Warrenton VA 20186 US Ref: Loan Number 002081 Bellwether Ridgeapartments Mortgage Payment/Bnf/Loa N Number 002081 Bellwether Ridge Ap Artments Mortgage Payment Imad: 0801B1Qgc08C028961 Trn: 6733500213Es | | $28,644.51 |
| 08/02 | Desoto-UTIL-Pmnt UTIL-Pmnt 6557415 | Web ID: 0000000160 | 763.24 |
| 08/02 | Desoto-UTIL-Pmnt UTIL-Pmnt 6557479 | Web ID: 0000000160 | 116.49 |
| 08/02 | Desoto-UTIL-Pmnt UTIL-Pmnt 6557383 | Web ID: 0000000160 | 100.50 |
| 08/02 | Desoto-UTIL-Pmnt UTIL-Pmnt 6557381 | Web ID: 0000000160 | 93.89 |
| 08/02 | Desoto-UTIL-Pmnt UTIL-Pmnt 6557404 | Web ID: 0000000160 | 85.03 |
| 08/02 | Desoto-UTIL-Pmnt UTIL-Pmnt 6557478 | Web ID: 0000000160 | 76.57 |
| 08/02 | Desoto-UTIL-Pmnt UTIL-Pmnt 6557437 | Web ID: 0000000160 | 72.17 |
| 08/02 | Desoto-UTIL-Pmnt UTIL-Pmnt 6557424 | Web ID: 0000000160 | 65.17 |
| 08/12 | 08/12 Online Domestic Wire Transfer Via: Bk Amer Nyc/026009593 A/C: Greystone Servicing Company Warrenton VA 20186 US Ref: Loan 002081 Bellwether Ridge Apartments/Bnf/Loan Number 002081 Bellwet Her Ridge Apartments Imad: 0812B1Qgc08C021037 Trn: 5631500224Es | | 25,102.74 |
| 08/14 | 08/14 Online Domestic Wire Transfer Via: Bk Amer Nyc/026009593 A/C: Greystone Servicing Company Warrenton VA 20186 US Ref: Funds For Change Order 03 For Bellwether Ridge Apartments Loan Number 002081/Bnf/Funds For Change Order 0 3 For Bellwether Ridge Apartments L Oan Number 002081 Imad: 0814B1Qgc08C008933 Trn: 5269600226Es | | 35,529.45 |
| **Total Electronic Withdrawals** | | | **$90,649.76** |

## DAILY ENDING BALANCE

| DATE | AMOUNT |
|---|---|
| 08/01 | $2,723.31 |
| 08/02 | 1,350.25 |
| 08/12 | 6,247.51 |
| 08/13 | 34,892.02 |
| 08/14 | 34,892.02 |
| 08/15 | 35,862.02 |
| 08/22 | 34,892.30 |

## SERVICE CHARGE SUMMARY

| | |
|---|---|
| Monthly Service Fee | $0.00 |
| Other Service Charges | $0.00 |
| **Total Service Charges** | **$0.00** |



August 01, 2019 through August 30, 2019

Account Number:                5851

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC FUNDS TRANSFERS:** Call us at 1-866-564-2262 or write us at the address on the front of this statement (non-personal accounts contact Customer Service) immediately if you think your statement or receipt is incorrect or if you need more information about a transfer listed on the statement or receipt.
For personal accounts only: We must hear from you no later than 60 days after we sent you the FIRST statement on which the problem or error appeared. Be prepared to give us the following information:
- Your name and account number
- The dollar amount of the suspected error
- A description of the error or transfer you are unsure of, why you believe it is an error, or why you need more information.
We will investigate your complaint and will correct any error promptly. If we take more than 10 business days (or 20 business days for new accounts) to do this, we will credit your account for the amount you think is in error so that you will have use of the money during the time it takes us to complete our investigation.

**IN CASE OF ERRORS OR QUESTIONS ABOUT NON-ELECTRONIC TRANSACTIONS:** Contact the bank immediately if your statement is incorrect or if you need more information about any non-electronic transactions (checks or deposits) on this statement. If any such error appears, you must notify the bank in writing no later than 30 days after the statement was made available to you. For more complete details, see the Account Rules and Regulations or other applicable account agreement that governs your account. Deposit products and services are offered by JPMorgan Chase Bank, N.A. Member FDIC

 JPMorgan Chase Bank, N.A. Member FDIC

**IMAGES**                                                    ACCOUNT #        5851

**See both front and back images of cleared checks at Chase.com. If you're not enrolled in this free service, please enroll now.**



002670570727 AUG 22 #0000010028 $969.72

App. 49

CHASE ⬡

This Page Intentionally Left Blank

App. 50

# EXHIBIT A-7

**Barton Projects**
**Reconciliaton of Project Equity to SPC Converitible Loans**
**12/31/2022**

| | D4DS, LLC Bellwether | D4FR,LLC Windmill | D4IN, LLC Ingleside | D4OP, LLC Opelika (*) |
|---|---|---|---|---|
| Equity per HUD FS or Certification | 3,478,864 | 7,278,070 | 2,926,927 | 5,010,991 |
| Less BSPRA Loan | - | - | (2,535,166) | (2,374,165) |
| | 3,478,864 | 7,278,070 | 391,761 | 2,636,826 |
| Less Earnings | (332,799) | (55,839) | 1,138,366 | - |
| Project Contributed Equity | 3,146,065 | 7,222,231 | 1,530,127 | 2,636,826 |
| SPC Convertible Loan (Equity) | 3,797,759 | 7,885,547 | 3,759,164 | 3,189,660 |
| **SPC's contribution in excess of Contributed Equity** | **651,694** | **663,316** | **2,229,037** | **552,834** |

(*) Cost certification audit 1/16/2023

App. 52

App. 53

# EXHIBIT A-8

**D4FR LLC**
**General Ledger**
January 1, 2016 - July 15, 2020

**1006 D4FR Bank Accounts**
████ 5630

| Date | Num | Name | Memo/Description | Amount | Balance |
|------|-----|------|-----------------|--------|---------|
| 12/13/2016 | | | Phone transfer credit FR 4670207866 | 250.00 | 250.00 |
| 06/02/2017 | | Capital One | | -15.00 | 235.00 |
| 06/02/2017 | | Southern Properties Capital | | 6,000,000.00 | 6,000,235.00 |
| 06/06/2017 | | Capital One | | -25.00 | 6,000,210.00 |
| 06/06/2017 | | Southern Properties Capital | | -6,000,000.00 | 210.00 |
| 12/20/2017 | 1001 | Kaufman County Fresh Water Supply District No 1-B | | -25,000.00 | -24,790.00 |
| 12/20/2017 | | | Online banking xfer deposit FROM 1622 | 25,000.00 | 210.00 |
| 01/17/2018 | VFP - 3 | | Wire transfer fee | -15.00 | 195.00 |
| 01/17/2018 | 1003 | BGE Brown & Gay Engineers, Inc | | -56,156.05 | -55,961.05 |
| 01/31/2018 | | Greystone | | 89,435.00 | 33,473.95 |
| 02/16/2018 | 1006 | BGO Architects | | -779.00 | 32,694.95 |
| 02/16/2018 | 1004 | JMJ Development | | -7,500.00 | 25,194.95 |
| 02/23/2018 | | Greystone GFC - FHA | | 22,668.00 | 47,862.95 |
| 02/23/2018 | | Capital One | | -15.00 | 47,847.95 |
| 03/06/2018 | 1005 | JMJ Development | | -25,000.00 | 22,847.95 |
| 03/09/2018 | 1008 | Kaufman County Fresh Water Supply District No 1-B | | -15,000.00 | 7,847.95 |
| 03/09/2018 | 1007 | Crawford & Jordan LLP | Voided | 0.00 | 7,847.95 |
| 03/12/2018 | | | | 15,000.00 | 22,847.95 |
| 03/20/2018 | | Greystone | | 27,097.00 | 49,944.95 |
| 03/20/2018 | | Capital One | | -15.00 | 49,929.95 |
| 04/24/2018 | VFP - 6 | | Wire Transfer Fee | -15.00 | 49,914.95 |
| 04/24/2018 | | Greystone GFC - FHA | | 14,081.00 | 63,995.95 |
| 05/02/2018 | 1010 | BGE Brown & Gay Engineers, Inc | | -4,278.19 | 59,717.76 |
| 05/02/2018 | 1011 | BGE Brown & Gay Engineers, Inc | | -12,097.10 | 47,620.66 |
| 05/04/2018 | 1009 | Oncor Electric Delivery | | -10,683.45 | 36,937.21 |
| 05/04/2018 | 1013 | Visionary Sales Environments | | -646.69 | 36,290.52 |
| 05/04/2018 | 1012 | NE Construction Inc | Voided | 0.00 | 36,290.52 |
| 05/07/2018 | 1014 | BGO Architects | | -2,924.15 | 33,366.37 |
| 05/08/2018 | | Greystone GFC - FHA | | 6,469.00 | 39,835.37 |
| 05/15/2018 | 1015 | BGO Architects | | -1,559.00 | 38,276.37 |
| 05/17/2018 | VFP - 8 | | NSF Charge | -35.00 | 38,241.37 |
| 05/18/2018 | VFP - 7 | | Wire Transfer Fee | -15.00 | 38,226.37 |
| 05/21/2018 | | | Transfer Deposit from 1622 | 41,564.87 | 79,791.24 |
| 05/21/2018 | 1016 | NE Construction Inc | | -41,564.87 | 38,226.37 |
| 06/04/2018 | 1017 | Stantec Consulting Services Inc. | | -30,000.00 | 8,226.37 |
| 06/04/2018 | 1018 | CoServ Gas | | -5,340.50 | 2,885.87 |
| 06/04/2018 | 1019 | CoServ Gas | | -14,608.87 | -11,723.00 |
| 06/05/2018 | | | Transfer Deposit 1622 | 20,000.00 | 8,277.00 |
| 06/13/2018 | | | | -8,277.00 | 0.00 |

████ 5630
$  0.00

**1006.02 Chase Bank - 9375**

| Date | Num | Name | Memo/Description | Amount | Balance |
|------|-----|------|-----------------|--------|---------|
| 06/13/2018 | | | | 8,277.00 | 8,277.00 |
| 06/15/2018 | 5000 | BGO Architects | | -6,790.67 | 1,486.33 |
| 06/29/2018 | | Greystone GFC - FHA | | 3,065.00 | 4,551.33 |
| 06/29/2018 | | JMJ Development | | 20,000.00 | 24,551.33 |
| 07/17/2018 | 5028 | NE Construction Inc | | -41,564.87 | -17,013.54 |
| 07/17/2018 | | JMJ Development | | 41,564.87 | 24,551.33 |
| 07/19/2018 | | JMJ Development | | 41,564.87 | 66,116.20 |
| 07/23/2018 | 5027 | NE Construction Inc | | -41,564.87 | 24,551.33 |
| 07/24/2018 | | | DLX For Business BUS PROD  0204 2997144128  CCD ID: 1411877307 | -157.86 | 24,393.47 |
| 07/25/2018 | 5001 | Stantec Consulting Services Inc. | | -20,000.00 | 4,393.47 |
| 07/25/2018 | | Greystone GFC - FHA | FEDWIRE CREDIT VIA: BANK OF AMER ICA, N.A /026009593 B/O: GREYSTO | 17,569.00 | 21,962.47 |
| 07/27/2018 | 5028 | Long Engineering & Environmental | | -11,300.00 | 10,662.47 |
| 08/06/2018 | 5030 | BGO Architects | | -5,189.00 | 5,473.47 |

App. 54

| Date | Check# | Payee | Description | Amount | Balance |
|---|---|---|---|---|---|
| 08/20/2018 | 5029 | Stantec Consulting Services Inc. | | -1,079.74 | 4,393.73 |
| 08/22/2018 | VFP - 11 | | D4DS BGO Architects paid from D4FR in error | -4,453.00 | -59.27 |
| 08/23/2018 | | Greystone GFC - FHA | | 10,500.00 | 10,440.73 |
| 08/24/2018 | | | Online Transfer from Chck 5851 | 4,453.00 | 14,893.73 |
| 08/26/2018 | 10002 | Long Engineering & Environmental | | -6,700.00 | 8,193.73 |
| 09/10/2018 | 10003 | BGO Architects | | -6,455.00 | 1,738.73 |
| 09/18/2018 | | | Online Transfer from CHK ...5193 transaction#: 7500230478 | 25,000.00 | 26,738.73 |
| 09/18/2018 | 10005 | Stantec Consulting Services Inc. | | -25,000.00 | 1,738.73 |
| 09/26/2018 | 10004 | Stantec Consulting Services Inc. | | -409.99 | 1,328.74 |
| 09/26/2018 | | | FEDWIRE CREDIT VIA: BANK OF AMER ICA, N.A./026009593 B/O: GREYSTO | 3,361.00 | 4,689.74 |
| 10/12/2018 | | JMJ Development | | 41,564.87 | 46,254.61 |
| 10/19/2018 | 10006 | NE Construction Inc | | -41,564.87 | 4,689.74 |
| 10/29/2018 | | | | 224.00 | 4,913.74 |
| 11/29/2018 | | | | 11,895.00 | 16,808.74 |
| 12/04/2018 | | Long Engineering & Environmental | | -8,400.00 | 8,408.74 |
| 12/05/2018 | | Chase | | -95.00 | 8,313.74 |
| 12/05/2018 | | | | 95.00 | 8,408.74 |
| 12/18/2018 | | | | 56,420.82 | 64,829.56 |
| 12/31/2018 | | Chase | | 0.00 | 64,829.56 |
| 01/01/2019 | 10014 | BGO Architects | | -1,023.04 | 63,806.52 |
| 01/01/2019 | 10013 | Long Engineering & Environmental | | -6,375.00 | 57,431.52 |
| 01/01/2019 | 10010 | Stantec Consulting Services Inc. | Final Payment - Parc at Windmill Farms | -55,366.08 | 2,065.44 |
| 01/03/2019 | | Greystone GFC - FHA | FEDWIRE CREDIT VIA: BANK OF AMER ICA, N.A./026009593 B/O: GREYSTO | 50,220.00 | 52,285.44 |
| 01/14/2019 | 10011 | Brenda Samples  Kaufman County Tax Office | | -30,221.80 | 22,063.64 |
| 01/14/2019 | 10012 | Brenda Samples  Kaufman County Tax Office | | -12,600.00 | 9,463.64 |
| 01/28/2019 | | Greystone GFC - FHA | | 204,407.00 | 213,870.64 |
| 01/31/2019 | | Greystone GFC - FHA | | 74,975.00 | 288,845.64 |
| 02/04/2019 | 10016 | JMJ Development LLC | | -178,624.16 | 110,221.48 |
| 02/05/2019 | 10019 | BGO Architects | | -1,193.00 | 109,028.48 |
| 02/07/2019 | 10017 | BGO Architects | | -1,656.36 | 107,372.12 |
| 02/21/2019 | 10016 | BGE Brown & Gay Engineers, Inc | | -24,126.89 | 83,245.23 |
| 02/25/2019 | | Greystone GFC - FHA | Draw #15 | 3,270.00 | 86,515.23 |
| 03/05/2019 | 10021 | BGO Architects | | -1,449.31 | 85,065.92 |
| 03/05/2019 | 10020 | BGE Brown & Gay Engineers, Inc | | -1,820.74 | 83,245.18 |
| 04/10/2019 | | | | 62,935.00 | 146,180.18 |
| 04/12/2019 | 10022 | Torque Electric LLC | | -60,261.29 | 85,918.89 |
| 04/15/2019 | 10024 | BGE Brown & Gay Engineers, Inc | | -2,477.88 | 83,441.01 |
| 04/15/2019 | 10023 | BGO Architects | | -3,495.44 | 79,945.57 |
| 05/20/2019 | | | | 30,542.00 | 110,487.57 |
| 05/23/2019 | 10026 | Long Engineering & Environmental | | -19,800.00 | 90,687.57 |
| 05/24/2019 | 10027 | BGE Brown & Gay Engineers, Inc | | -989.21 | 89,698.36 |
| 06/03/2019 | 10029 | BGO Architects | | -7,538.86 | 82,159.50 |
| 06/05/2019 | 10028 | Stantec Consulting Services Inc. | | -214.50 | 81,945.00 |
| 06/05/2019 | 10025 | Stantec Consulting Services Inc. | | -196.00 | 81,749.00 |
| 06/27/2019 | | | | 98,625.00 | 180,374.00 |
| 07/03/2019 | | JMJ Development | | -106,097.70 | 74,276.30 |
| 07/17/2019 | | JMJ Development | | 106,097.70 | 180,374.00 |
| 07/17/2019 | 10031 | BGE Brown & Gay Engineers, Inc | | -162.09 | 180,211.91 |
| 07/17/2019 | 10032 | The Access Partnership LP | | -565.00 | 179,646.91 |
| 07/17/2019 | 10033 | Torque Electric LLC | | -15,000.00 | 164,646.91 |
| 07/17/2019 | 10035 | Home Innovation Research Labs | | -1,360.00 | 163,286.91 |
| 07/17/2019 | 10034 | BGO Architects | | -22,239.03 | 141,047.88 |
| 07/19/2019 | 10030 | Kaufman Co FWSD 1-C | | -59,300.00 | 81,747.88 |
| 07/22/2019 | | | | 13,028.00 | 94,775.88 |
| 07/22/2019 | 10036 | BGO Architects | | -10,827.22 | 83,948.66 |
| 07/22/2019 | 10037 | BGE Brown & Gay Engineers, Inc | | -535.02 | 83,413.64 |
| 08/15/2019 | | Greystone | | 20,984.14 | 104,397.78 |
| 08/15/2019 | | Greystone | | 11,618.86 | 116,016.64 |
| 08/19/2019 | 10041 | Long Engineering & Environmental | | -20,412.00 | 95,604.64 |
| 08/19/2019 | 10039 | BGO Architects | | -11,618.86 | 83,985.78 |
| 08/19/2019 | 10040 | BGE Brown & Gay Engineers, Inc | | -572.14 | 83,413.64 |

App. 55

| Date | Num | Name | Memo | Amount | Balance |
|---|---|---|---|---|---|
| 08/22/2019 | | JMJ Development | | -63,658.62 | 19,755.02 |
| 09/04/2019 | | JMJ Development | | 63,658.62 | 83,413.64 |
| 09/18/2019 | | Greystone | | 15,597.91 | 99,011.55 |
| 09/30/2019 | 10042 | BGO Architects | | -10,900.29 | 88,111.26 |
| 10/15/2019 | 10036 | Stantec Consulting Services Inc. | | -1,666.00 | 86,445.26 |
| 10/28/2019 | | Greystone | | 7,997.00 | 94,442.26 |
| 10/31/2019 | | | | 902,584.70 | 997,026.96 |
| 11/05/2019 | | | | -902,584.70 | 94,442.26 |
| 11/21/2019 | | Greystone | | 13,041.00 | 107,483.26 |
| 12/02/2019 | 10046 | BGO Architects | | -13,555.34 | 93,927.92 |
| 12/03/2019 | 10047 | BGE Brown & Gay Engineers, Inc | | -381.88 | 93,546.04 |
| 12/04/2019 | 10048 | Home Innovation Research Labs | | -6,800.00 | 86,746.04 |
| 12/12/2019 | | | | 17,869.08 | 104,615.12 |
| 12/12/2019 | | Greystone | | 20,494.00 | 125,109.12 |
| 12/16/2019 | 10045 | Commonwealth Land Title Company | | -300.00 | 124,809.12 |
| 12/18/2019 | | | | 17,869.08 | 142,678.20 |
| 12/19/2019 | | | | -17,869.08 | 124,809.12 |
| 12/26/2019 | 10049 | Long Engineering & Environmental | | -13,300.00 | 111,509.12 |
| 12/31/2019 | 10051 | Home Innovation Research Labs | | -1,360.00 | 110,149.12 |
| 01/06/2020 | | | | -17,869.08 | 92,280.04 |
| 01/08/2020 | | | | -17,869.08 | 74,410.96 |
| 01/06/2020 | | | | -17,869.08 | 56,541.88 |
| 01/09/2020 | | | | 17,869.08 | 74,410.96 |
| 01/13/2020 | 10050 | BGO Architects | | -5,833.79 | 68,577.17 |
| 01/14/2020 | | | | -17,869.08 | 50,708.09 |
| 01/24/2020 | | | | 88,645.72 | 139,353.81 |
| 01/24/2020 | | | | -88,645.72 | 50,708.09 |
| 01/28/2020 | | | | -17,869.08 | 32,839.01 |
| 01/28/2020 | | | | -17,869.08 | 14,969.93 |
| 01/28/2020 | | | | -17,869.08 | -2,899.15 |
| 01/28/2020 | | Greystone | | 102,437.00 | 99,537.85 |
| 01/31/2020 | 10053 | BGO Architects | | -4,274.86 | 95,262.99 |
| 02/03/2020 | 10055 | BGE Brown & Gay Engineers, Inc | | -4,163.36 | 91,099.63 |
| 02/04/2020 | | | | 17,869.08 | 108,968.71 |
| 02/07/2020 | 10054 | Home Innovation Research Labs | | -2,040.00 | 106,928.71 |
| 02/20/2020 | 10057 | Brenda Samples  Kaufman County Tax Office | | -83,521.59 | 23,407.12 |
| 02/20/2020 | 10056 | Brenda Samples  Kaufman County Tax Office | | -12,600.00 | 10,807.12 |
| 02/21/2020 | | AT&T | | 33.83 | 10,840.95 |
| 02/21/2020 | | Greystone | | 2,436.13 | 13,277.08 |
| 02/28/2020 | 10058 | BGO Architects | | -2,435.82 | 10,841.26 |
| 03/20/2020 | | Greystone | | 8,383.00 | 19,224.26 |
| 04/02/2020 | | Long Engineering & Environmental | | -6,300.00 | 12,924.26 |
| 04/17/2020 | | Greystone | | 1,626.50 | 14,550.76 |
| 04/27/2020 | 10060 | BGO Architects | | -3,458.87 | 11,091.89 |
| 05/01/2020 | 10059 | Commonwealth Land Title Company | | -250.00 | 10,841.89 |
| 05/29/2020 | | Greystone | | 2,142.74 | 12,984.63 |
| 06/18/2020 | | | | 149,900.00 | 162,884.63 |
| 06/26/2020 | | | | 4,000.00 | 166,884.63 |
| 06/30/2020 | 10061 | BGO Architects | | -2,143.52 | 164,741.11 |

9375 ........ | | | | $ 164,741.11 |

**Total for 1005 D4FR Bank Accounts** | | | | $ 164,741.11 |

**1506 D4FR Land**

| 12/14/2017 | Initial Draw | Settlement Statement | Initial Funding per Settlement Statement | 2,209,000.00 | 2,209,000.00 |
|---|---|---|---|---|---|

**Total for 1506 D4FR Land** | | | | $ 2,209,000.00 |

........ Consumption Analysis

| 04/25/2018 | 13086 | Oncor Electric Delivery | Cost to increase height of electrical poles | 10,683.45 | 10,683.45 |
|---|---|---|---|---|---|
| 06/04/2018 | Gas1519 | CoServ Gas | Relocation of Gas Line - Parc at Windmill Farms | 14,608.87 | 25,292.32 |
| 06/04/2018 | Gas1520 | CoServ Gas | Abandoment of Gas Line - Parc at Windmill Farms | 5,340.50 | 30,632.82 |

**Consumption Analysis** | | | | $ 30,632.82 |

# EXHIBIT A-9

### SETTLEMENT STATEMENT

**SOURCES**

| | | |
|---|---|---|
| Loan Proceeds | 1,208,662.00 | |
| Working Capital (Construction Contingency on Deposit) | 12,629.18 | |
| **TOTAL SOURCES** | | $ 1,221,291.18 |

**USES**

1. A wire is to be sent to <u>Peaseley & Derryberry PLC</u>

    Lender Legal          7,500.00

*This wire is to be sent to:*
*Pinnacle National Bank*
*7040 Carothers Pkwy, Franklin, TN 37067*
*ABA No.* ▉
*Account No.* ▉
*Re:  Parc at Ingleside  Invoice No. 6023-302*

2. A check is to be issued to <u>Capital Title Commercial</u>

    Title & Recording          28.95

3. A wire is to be sent to <u>Axia Contracting, LLC</u>

| | | |
|---|---|---|
| Retainage on Contract | 528,278.00 | |
| Bond | 77,857.00 | |
| Other Fees Contractor | 62,632.81 | |
| Retainage CO #1 | 10,263.38 | |
| Change Order #5 | 29,311.37 | |
| Offsite | 3,667.80 | |
| Total | | 712,010.36 |

*This wire is to be sent to:*
*First International Bank & Trust*
*4501 40th Ave S*
*Fargo, ND 58104*
*ABA #:* ▉
*Account #:* ▉
*Re: Parc at Ingleside*

4. A wire is to be sent to <u>Cross Architects, PLLC</u>

    Supervisory Fee          3,850.00

*This wire is to be sent to:*
*Legacy Texas Bank*
*2101 Custer Road*
*Plano, TX 75075-2962*
*ABA #:* ▉
*Account #:* ▉
*Account:  Brian Rumsey -- Cross Architects PLLC*
*Reference:  Invoice #14244*

5. A wire is to be sent to <u>Frontier Surveying Company</u>

    Survey          3,935.93

*This wire is to be sent to:*
*Charter Bank*
*Corpus Christi, TX*
*ABA No.* ▉
*Account No.* ▉
*Re: D4IN LLC  Acct. No. 32251*

App. 58

**SETTLEMENT STATEMENT**

6. A wire is to be sent to <u>Steptoe & Johnson PLLC</u>
Legal
*This wire is to be sent to:*                                                                        7,250.00
*The Huntington National Bank*
*7 Easton Oval, Columbus, OH 43216*
*ABA No.* ▮▮▮▮
*Account No.* ▮▮▮▮

7. A check is to be issued to <u>Farmer Fuqua & Huff PC</u>
Borrower Cost Certification                                                                    10,000.00
*This check is to be sent to:*
*2435 N. Central Expressway, Ste. 700*
*Richardson, TX 75080*
*Re: Invoice NO. 305674*

8. A wire is to be sent to <u>D4IN LLC</u>
Balance of Loan Proceeds                                                                     357,147.50
*This wire is to be sent to:*
*Third Coast Bank*
*Dallas, TX*
*ABA No.* ▮▮▮▮
*Account No.* ▮▮▮▮
*Re: Parc at Ingleside - Final Endorsement*

9. A wire is to be sent to <u>Greystone Funding Company LLC</u>

| | | |
|---|---:|---:|
| Deposit to T&I | 67,368.44 | |
| Deposit to RR | 52,200.00 | |
| Total | | 119,568.44 |

*This wire is to be sent to:*
*Bank of America*
*Charlotte, NC*
*ABA #:* ▮▮▮▮
*Account #:* ▮▮▮▮
*Account:  Greystone Funding Company LLC*
*Attention: Theresa Johnson (540-428-7213)*
*Address: 419 Belle Air Ln., Warrenton VA 20186*
*Re: 2208 Parc at Ingleside*

**TOTAL**                                                                         $   1,221,291.18

App. 59

## SETTLEMENT STATEMENT

**ACCEPTED: TITLE AGENT**
**STEWART TITLE GUARANTY COMPANY**
By: **CAPITAL TITLE OF TEXAS, LLC,** Authorized Agent

By: _____
Name: _____


**ACCEPTED: MORTGAGOR**
**D4IN LLC,**
a Texas limited liability company

By: **JMJD4 LLC,**
     a Delaware limited liability company
     Its Managing Member


     By: _____
          Timothy Barton
          Manager


**ACCEPTED: LENDER**
**GREYSTONE FUNDING COMPANY LLC**


By: _____
    Samantha Brooks
    Vice President


WARNING: Federal law provides that anyone who knowingly or willfully submits (or causes to submit)
a document containing any false, fictitious, misleading, or fraudulent statement/certification or entry
may be criminally prosecuted and may incur civil administrative liability. Penalties upon conviction
can include a fine and imprisonment, as provided pursuant to applicable law, which includes, but is
not limited to: 18 U.S.C. 1001, 1010, 1012; 13 U.S.C. 3729, 3802, 24 C.F.R. Parts 25, 28 and 30, and 2
C.F.R. Parts 180 and 2424.

App. 60

## SETTLEMENT STATEMENT

**ACCEPTED: TITLE AGENT**
**STEWART TITLE GUARANTY COMPANY**
By: **CAPITAL TITLE OF TEXAS, LLC,** Authorized Agent

By: _____
Name: _____

**ACCEPTED: MORTGAGOR**
**D4IN LLC,**
a Texas limited liability company

By: **JMJD4 LLC,**
      a Delaware limited liability company
      Its Managing Member

By: _____
      Timothy Barton
      Manager

**ACCEPTED: LENDER**
**GREYSTONE FUNDING COMPANY LLC**

By: _____
      Samantha Brooks
      Vice President

WARNING: Federal law provides that anyone who knowingly or willfully submits (or causes to submit) a document containing any false, fictitious, misleading, or fraudulent statement/certification or entry may be criminally prosecuted and may incur civil administrative liability. Penalties upon conviction

App. 61

# EXHIBIT A-10

## CHASE ◯

JPMorgan Chase Bank, N.A.
P O Box 182051
Columbus, OH 43218 - 2051

May 30, 2020 through June 30, 2020
Account Number:  �as▉▉▉▉1565

00004309 DRE 201 142 18520 NNNNNNNNNNN T 1 000000000 D2 0000

D4IN LLC
1755 WITTINGTON PLACE SUITE 340
DALLAS TX 75234-1930

### CUSTOMER SERVICE INFORMATION

| | |
|---|---|
| Web site: | www.Chase.com |
| Service Center: | 1-877-425-8100 |
| Deaf and Hard of Hearing: | 1-800-242-7383 |
| Para Espanol: | 1-888-622-4273 |
| International Calls: | 1-713-262-1679 |



## CHECKING SUMMARY | Chase Platinum Business Checking

| | INSTANCES | AMOUNT |
|---|---|---|
| Beginning Balance | | $30,678.22 |
| Deposits and Additions | 3 | 180,764.85 |
| Checks Paid | 1 | -24,014.85 |
| Electronic Withdrawals | 2 | -27,902.11 |
| Ending Balance | 6 | $159,526.11 |

Your Chase Platinum Business Checking account provides:
- No transaction fees for unlimited electronic deposits (including ACH, ATM, wire, Chase Quick Deposit)
- 500 debits and non-electronic deposits (those made via check or cash in branches) per statement cycle
- $25,000 in cash deposits per statement cycle
- Unlimited return deposited items with no fee

There are additional fee waivers and benefits associated with your account – please refer to your Deposit Account Agreement for more information.

## DEPOSITS AND ADDITIONS

| DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| 06/08 | Fedwire Credit Via: Bank of America, N.A./026009593 B/O: General Disbursement 20186 US VA Ref: Chase Nyc/Ctr/Bnf=D4IN LLC Dallas TX 75234 US/Ac-000000005801 Rfb=2068 H1318Pwx1767 Obi=Parc At Ingleside Bbi=/Ocmt/USD6850,00/ Imad: 0608B6B7Hu3R014439 Trn: 6993809160Ff | $6,850.00 |
| 06/17 | Online Transfer From Chk ...0735 Transaction#: 9796228254 | 24,014.85 |
| 06/18 | Orig CO Name:Sbad Treas 310    Orig ID:9101036151 Desc Date:061820 CO Entry Descr: Misc Paysec:CCD    Trace#:101036158236226 Eed:200618  Ind ID:628982790573000    Ind Name:D4IN LLC    Rmt*CT*6289827905 200 34337 F8118** ******\ Tm: 1708236226Tc | 149,900.00 |
| **Total Deposits and Additions** | | **$180,764.85** |

Page 1 of 2

App. 63



May 30, 2020 through June 30, 2020

Account Number: ▮▮▮▮1565

## CHECKS PAID

| CHECK NO. | DESCRIPTION | DATE PAID | AMOUNT |
|---|---|---|---|
| 0 ^ | | 06/16 | $24,014.85 |
| **Total Checks Paid** | | | **$24,014.85** |

If you see a description in the Checks Paid section, it means that we received only electronic information about the check, not the original or an image of the check. As a result, we're not able to return the check to you or show you an image.

^ An image of this check may be available for you to view on Chase.com.

## ELECTRONIC WITHDRAWALS

| DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| 06/04 | 06/04 Online Domestic Wire Transfer Via: Key Bank CO/307070267 A/C: Railpros Field Services Inc Irving TX 75038 US Imad: 0604B1Qgc04C010492 Trn: 6534720156Es | $15,650.00 |
| 06/25 | 06/25 Online Domestic Wire Transfer Via: Prosperity Bk Elca/111901234 A/C: Brian Rumsey Cross Architects Pllc Allen TX 75013 US Ref: Invoice 12817 And 12875/Bnf/Invoice 12817 And 12875 Imad: 0625B1Qgc07C007358 Trn: 5837520177Es | 12,252.11 |
| **Total Electronic Withdrawals** | | **$27,902.11** |

## DAILY ENDING BALANCE

| DATE | AMOUNT |
|---|---|
| 06/04 | $15,028.22 |
| 06/08 | 21,878.22 |
| 06/16 | -2,136.63 |
| 06/17 | 21,878.22 |
| 06/18 | 171,778.22 |
| 06/25 | 159,526.11 |

## SERVICE CHARGE SUMMARY

| | |
|---|---|
| Monthly Service Fee | $0.00 |
| Other Service Charges | $0.00 |
| **Total Service Charges** | **$0.00** |

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC FUNDS TRANSFERS:** Call us at 1-866-564-2262 or write us at the address on the front of this statement (non-personal accounts contact Customer Service) immediately if you think your statement or receipt is incorrect or if you need more information about a transfer listed on the statement or receipt.

For personal accounts only: We must hear from you no later than 60 days after we sent you the FIRST statement on which the problem or error appeared. Be prepared to give us the following information:
- Your name and account number
- The dollar amount of the suspected error
- A description of the error or transfer you are unsure of, why you believe it is an error, or why you need more information.

We will investigate your complaint and will correct any error promptly. If we take more than 10 business days (or 20 business days for new accounts) to do this, we will credit your account for the amount you think is in error so that you will have use of the money during the time it takes us to complete our investigation.

**IN CASE OF ERRORS OR QUESTIONS ABOUT NON-ELECTRONIC TRANSACTIONS:** Contact the bank immediately if your statement is incorrect or if you need more information about any non-electronic transactions (checks or deposits) on this statement. If any such error appears, you must notify the bank in writing no later than 30 days after the statement was made available to you. For more complete details, see the Account Rules and Regulations or other applicable account agreement that governs your account. Deposit products and services are offered by JPMorgan Chase Bank, N.A. Member FDIC

 JPMorgan Chase Bank, N.A. Member FDIC

App. 64

App. 65

# EXHIBIT A-11



**CHASE**
JPMorgan Chase Bank, N.A.
P O Box 182051
Columbus, OH 43218-2051

October 30, 2021 through November 30, 2021
Account Number:                    720

### CUSTOMER SERVICE INFORMATION

| Web site: | www.Chase.com |
|---|---|
| Service Center: | 1-877-425-8100 |
| Deaf and Hard of Hearing: | 1-800-242-7383 |
| Para Espanol: | 1-888-622-4273 |
| International Calls: | 1-713-262-1679 |

00014714 DRE 201 142 33721 NNNNNNNNNNN T 1 000000000 D4 0000
D4OP LLC
1755 WITTINGTON PL STE 340
DALLAS TX 75234



**Good news — we've made two changes to help simplify how overdraft fees work.**

We'll no longer charge:

1. Returned Item Fees when Items are declined or returned unpaid because you don't have a sufficient balance In your account.

2. Insufficient Funds Fees when your account balance Is overdrawn by $50 or less at the end of the business day. If you overdraw your account by more than that, we'll charge a $34 Insufficient Funds Fee per item, beginning with the first item that overdraws your account balance by more than $50 (maximum of 6 fees per business day, up to $204).

We pay overdrafts at our discretion so we don't guarantee that we will always pay any type of transaction. As a reminder, overdraft services are only available for qualifying checking accounts. For additional information, please visit **chase.com/overdraft**.

| CHECKING SUMMARY | Chase Platinum Business Checking | | |
|---|---|---|---|
| | INSTANCES | AMOUNT | |
| Beginning Balance | | $5,315.61 | |
| Deposits and Additions | 1 | 214,349.00 | |
| Electronic Withdrawals | 1 | -214,349.00 | |
| Ending Balance | 2 | $5,315.61 | |

Your Chase Platinum Business Checking account provides:
- No transaction fees for unlimited electronic deposits (including ACH, ATM, wire, Chase Quick Deposit)
- 500 debits and non-electronic deposits (those made via check or cash in branches) per statement cycle
- $25,000 In cash deposits per statement cycle
- Unlimited return deposited items with no fee

There are additional fee waivers and benefits associated with your account – please refer to your Deposit Account Agreement for more Information.

Page 1 of 2

App. 67

**CHASE ○**

October 30, 2021 through November 30, 2021
Account Number:          1720

## DEPOSITS AND ADDITIONS

| DATE | DESCRIPTION | AMOUNT |
|------|-------------|--------|
| 11/09 | Fedwire Credit Via: Bank of America, N.A./026009593 B/O: Greystone Servicing CO LLC Genera 20186 US VA Ref: Chase Nyc/Ctr/Bnf=D4Op LLC Dallas TX 75234-1930 US/Ac-000000006086 Rfb =21B9B03290Gn0C70 Obi=2227 Parc Al Opelika Bbl=/Oomt/USD214349.00/ Imad: 1109B6B7Hu3R010209 Trn: 0506650313Ft | $214,349.00 |
| **Total Deposits and Additions** | | **$214,349.00** |

## ELECTRONIC WITHDRAWALS

| DATE | DESCRIPTION | AMOUNT |
|------|-------------|--------|
| 11/10 | 11/10 Online Transfer To Chk ...9892  Transaction#: 12988991001 | $214,349.00 |
| **Total Electronic Withdrawals** | | **$214,349.00** |

## DAILY ENDING BALANCE

| DATE | AMOUNT |
|------|--------|
| 11/09 | $219,664.61 |
| 11/10 | 5,315.61 |

## SERVICE CHARGE SUMMARY

| | |
|---|---|
| Monthly Service Fee | $0.00 |
| Other Service Charges | $0.00 |
| **Total Service Charges** | **$0.00** |

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC FUNDS TRANSFERS:** Call us at 1-866-564-2262 or write us at the address on the front of this statement (non-personal accounts contact Customer Service) immediately if you think your statement or receipt is incorrect or if you need more information about a transfer listed on the statement or receipt.
For personal accounts only: We must hear from you no later than 60 days after we sent you the FIRST statement on which the problem or error appeared. Be prepared to give us the following information:
- Your name and account number
- The dollar amount of the suspected error
- A description of the error or transfer you are unsure of, why you believe it is an error, or why you need more information.

We will investigate your complaint and will correct any error promptly. If we take more than 10 business days (or 20 business days for new accounts) to do this, we will credit your account for the amount you think is in error so that you will have use of the money during the time it takes us to complete our investigation.

**IN CASE OF ERRORS OR QUESTIONS ABOUT NON-ELECTRONIC TRANSACTIONS:** Contact the bank immediately if your statement is incorrect or if you need more information about any non-electronic transactions (checks or deposits) on this statement. If any such error appears, you must notify the bank in writing no later than 30 days after the statement was made available to you. For more complete details, see the Account Rules and Regulations or other applicable account agreement that governs your account. Deposit products and services are offered by JPMorgan Chase Bank, N.A. Member FDIC

🏛 LENDER    JPMorgan Chase Bank, N.A. Member FDIC

Page 2 of 2

# EXHIBIT A-12

App. 69



**CHASE** 🟠
JPMorgan Chase Bank, N.A.
P O Box 182051
Columbus, OH 43218 - 2051

December 01, 2021 through December 31, 2021
Account Number: ▮▮▮▮▮720

00013871 DRE 201 142 00522 NNNNNNNNNNN T 1 000000000 D4 0000

D4OP LLC
1755 WITTINGTON PL STE 340
DALLAS TX 75234

### CUSTOMER SERVICE INFORMATION

| | |
|---|---|
| Web site: | www.Chase.com |
| Service Center: | 1-877-425-8100 |
| Deaf and Hard of Hearing: | 1-800-242-7383 |
| Para Espanol: | 1-888-622-4273 |
| International Calls: | 1-713-262-1679 |



## CHECKING SUMMARY | Chase Platinum Business Checking

| | INSTANCES | AMOUNT |
|---|---|---|
| Beginning Balance | | $5,315.61 |
| Deposits and Additions | 2 | 255,551.00 |
| Electronic Withdrawals | 3 | -253,750.00 |
| Ending Balance | 5 | $7,116.61 |

Your Chase Platinum Business Checking account provides:
- No transaction fees for unlimited electronic deposits (including ACH, ATM, wire, Chase Quick Deposit)
- 500 debits and non-electronic deposits (those made via check or cash in branches) per statement cycle
- $25,000 in cash deposits per statement cycle
- Unlimited return deposited items with no fee

There are additional fee waivers and benefits associated with your account – please refer to your Deposit Account Agreement for more information.

## DEPOSITS AND ADDITIONS

| DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| 12/03 | Fedwire Credit Via: Bank of America, N.A./026009593 B/O: Greystone Servicing CO LLC Genera 20186 US VA Ref: Chase Nyc/Ctr/Bnf=D4Op LLC Dallas TX 75234-1930 US/Ac-000000006086 Rfb =21C3E5915Aax2031 Obi=2227 Parc At Opelika Bbi=/Oomt/USD45551,00/ Imas; T203B6B7Hu2R018281 Tm: 0927670337Ff | $45,551.00 |
| 12/03 | Online Transfer From Chk ...9892 Transaction#: 13155536244 | 210,000.00 |
| | **Total Deposits and Additions** | **$255,551.00** |

## ELECTRONIC WITHDRAWALS

| DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| 12/03 | 12/03 Online Domestic Wire Transfer Via: Prosperity Bk Elca/113122655 A/C: Elevation ID Pflugerville TX 78660 US Ref:/Time/17:40 Imad: 1203B1Qgc09C034958 Tm: 3615421337Eo | $208,750.00 |
| 12/15 | 12/15 Online Transfer To Chk ...5320 Transaction#: 13241212830 | 40,000.00 |
| 12/31 | 12/31 Online Transfer To Chk ...5320 Transaction#: 13351148650 | 5,000.00 |
| | **Total Electronic Withdrawals** | **$253,750.00** |

Page 1 of 4

App. 70

**CHASE**

December 01, 2021 through December 31, 2021
Account Number:                720

## DAILY ENDING BALANCE

| DATE | AMOUNT |
|------|--------|
| 12/03 | $52,116.61 |
| 12/15 | 12,116.61 |
| 12/31 | 7,116.61 |

## SERVICE CHARGE SUMMARY

Chase Platinum Business Checking Accounts included: 00000000000623378392, 00000000000623378509, 00000000000625580151, 00000000000625598823, 00000000000625608275, 00000000000627506717, 00000000000628320183, 00000000000628509579, 00000000000630235098, 00000000000636323575

| | |
|---|---|
| Monthly Service Fee | $95.00 |
| Other Service Charges | $0.00 |
| **Total Service Charges** | **$95.00** Will be assessed on 1/5/22 |

You were assessed a monthly service fee on your Chase Platinum Business Checking account because you did not maintain the required relationship balance.

## SERVICE CHARGE DETAIL

| DESCRIPTION | VOLUME | ALLOWED | CHARGED | PRICE/ UNIT | TOTAL |
|-------------|--------|---------|---------|-------------|-------|
| **Monthly Service Fee** | | | | | |
| Monthly Service Fee | 1 | | | $95.00 | $95.00 |
| **Other Service Charges:** | | | | | |
| **Electronic Credits** | | | | | |
| Electronic Credits | 2 | Unlimited | 0 | $0.40 | $0.00 |
| **Credits** | | | | | |
| Non-Electronic Transactions | 8 | 500 | 0 | $0.40 | $0.00 |
| **Electronic Credits** | | | | | |
| Domestic Incoming Wire Fee | 2 | Unlimited | 0 | $15.00 | $0.00 |
| **Miscellaneous Fees** | | | | | |
| Online Domestic Wire Fee | 2 | 4 | 0 | $25.00 | $0.00 |
| Subtotal Other Service Charges(Will be assessed on 1/5/22) | | | | | $95.00 |

ACCOUNT 000000608671720

| | | | | | |
|---|---|---|---|---|---|
| **Monthly Service Fee** | | | | | |
| Monthly Service Fee | 1 | | | | |
| **Other Service Charges:** | | | | | |
| **Electronic Credits** | | | | | |
| Electronic Credits | 1 | | | | |
| **Credits** | | | | | |
| Non-Electronic Transactions | 1 | | | | |
| **Electronic Credits** | | | | | |
| Domestic Incoming Wire Fee | 1 | | | | |
| **Miscellaneous Fees** | | | | | |
| Online Domestic Wire Fee | 1 | | | | |

ACCOUNT 000000623378392

| | | | | | |
|---|---|---|---|---|---|
| **Electronic Credits** | | | | | |
| Electronic Credits | 1 | | | | |
| **Credits** | | | | | |
| Non-Electronic Transactions | 1 | | | | |
| **Electronic Credits** | | | | | |
| Domestic Incoming Wire Fee | 1 | | | | |
| **Miscellaneous Fees** | | | | | |
| Online Domestic Wire Fee | 1 | | | | |

ACCOUNT 000000636323575

| | | | | | |
|---|---|---|---|---|---|
| **Credits** | | | | | |
| Non-Electronic Transactions | 6 | | | | |

Page 2 of 4

76
App. 70

App. 71



December 01, 2021 through December 31, 2021
Account Number: 1720



IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC FUNDS TRANSFERS: Call us at 1-866-564-2262 or write us at the address on the front of this statement (non-personal accounts contact Customer Service) immediately if you think your statement or receipt is incorrect or if you need more information about a transfer listed on the statement or receipt.
For personal accounts only: We must hear from you no later than 60 days after we sent you the FIRST statement on which the problem or error appeared. Be prepared to give us the following information:
- Your name and account number
- The dollar amount of the suspected error
- A description of the error or transfer you are unsure of, why you believe it is an error, or why you need more information.
We will investigate your complaint and will correct any error promptly. If we take more than 10 business days (or 20 business days for new accounts) to do this, we will credit your account for the amount you think is in error so that you will have use of the money during the time it takes us to complete our investigation.

IN CASE OF ERRORS OR QUESTIONS ABOUT NON-ELECTRONIC TRANSACTIONS: Contact the bank immediately if your statement is incorrect or if you need more information about any non-electronic transactions (checks or deposits) on this statement. If any such error appears, you must notify the bank in writing no later than 30 days after the statement was made available to you. For more complete details, see the Account Rules and Regulations or other applicable account agreement that governs your account. Deposit products and services are offered by JPMorgan Chase Bank, N.A. Member FDIC

 JPMorgan Chase Bank, N.A. Member FDIC

Page 3 of 4

App. 72

**CHASE**

December 01, 2021 through December 31, 2021
Account Number:                    1720

This Page Intentionally Left Blank

SB1382099-F9

78
App. 72

# EXHIBIT A-13

**D4OP LLC**
**General Ledger**
through November 17, 2022

| Account | Date | Year | Transaction Type | Num | Name | Memo/Description | Split | Debit | Credit | Balance |
|---|---|---|---|---|---|---|---|---|---|---|
| **Bank - Chase x1720** | | | | | | | | | | |
| | 04/07/2020 | 2020 | Online Transfer | 9416726048 | JMJD4LLC | Intercompany | Intercompany Payable/Receivable | 100.00 | - | 100.00 |
| | 05/05/2020 | 2020 | Wire | 3303638638 | SBAD Treas 310 | Loan - SBA | Loan - SBA | 3,000.00 | - | 3,100.00 |
| | 06/17/2020 | 2020 | Wire | 101036152997582 | SBAD Treas 310 | Loan - SBA | Loan - SBA | 149,900.00 | - | 153,000.00 |
| | 08/17/2020 | 2020 | Online Transfer | 10132868066 | JMJD4LLC | Intercompany | Intercompany Payable/Receivable | - | 150,000.00 | 3,000.00 |
| | 09/25/2020 | 2020 | Withdrawals | | Chase Bank | Unknown Vendor/Services | Unknown Vendor/Services | - | 2,900.00 | 100.00 |
| | 03/18/2021 | 2021 | Fedwire Credit | 8859509077Ft | Loan - HUD/Greystone | Draw 2 | Loan - HUD/Greystone | 56,832.00 | - | 56,932.00 |
| | 03/31/2021 | 2021 | Online Transfer | 11481671344 | JMJD4LLC | Intercompany | Intercompany Payable/Receivable | - | 10,200.00 | 46,732.00 |
| | 04/01/2021 | 2021 | Online Transfer | 11491520136 | JMJD4LLC | Intercompany | Intercompany Payable/Receivable | - | 46,500.00 | 232.00 |
| | 04/12/2021 | 2021 | Online Transfer | 11562100868 | JMJD4LLC | Intercompany | Intercompany Payable/Receivable | - | 200.00 | 32.00 |
| | 05/12/2021 | 2021 | Online Transfer | 11760184564 | JMJD4LLC | Intercompany | Intercompany Payable/Receivable | 46,600.00 | - | 46,632.00 |
| | 05/13/2021 | 2021 | Fedwire Credit | 0796680133Ft | Loan - HUD/Greystone | Draw 4 | Loan - HUD/Greystone | 3,434.00 | - | 50,066.00 |
| | 05/20/2021 | 2021 | Online Transfer | 11813774805 | JMJD4LLC | Intercompany | Intercompany Payable/Receivable | - | 50,000.00 | 66.00 |
| | 06/10/2021 | 2021 | Fedwire Credit | 0800180161Ft | Loan - HUD/Greystone | Draw 5 | Loan - HUD/Greystone | 3,598.00 | - | 3,664.00 |
| | 06/15/2021 | 2021 | Online Transfer | 11984854778 | JMJD4LLC | Intercompany | Intercompany Payable/Receivable | 47,000.00 | - | 50,664.00 |
| | 06/22/2021 | 2021 | Check | 6250 | Opelika Power Services | Utility Development | Utility Development | - | 46,593.98 | 4,070.02 |
| | 06/23/2021 | 2021 | Online Transfer | 1.20342E+11 | JMJD4LLC | Intercompany | Intercompany Payable/Receivable | 15,000.00 | - | 19,070.02 |
| | 06/28/2021 | 2021 | Wire | 3538271179Ex | MBI Companies | Engineering-Structural | Construction in Progress:Engineering-Structural | - | 5,834.41 | 13,235.61 |
| | 06/29/2021 | 2021 | Wire | 3021041180Es | Wildland Services | Storm Water Inspection | Construction in Progress:Environmental Services | - | 1,300.00 | 11,935.61 |
| | 07/06/2021 | 2021 | Online Transfer | 12120693510 | JMJD4LLC | Intercompany | Intercompany Payable/Receivable | - | 900.00 | 11,035.61 |
| | 07/09/2021 | 2021 | Fedwire Credit | 0653670190Ft | Loan - HUD/Greystone | Draw 6 | Loan - HUD/Greystone | 4,238.00 | - | 15,273.61 |
| | 08/11/2021 | 2021 | Online Transfer | 12361962502 | JMJD4LLC | Intercompany | Intercompany Payable/Receivable | - | 15,000.00 | 273.61 |
| | 08/17/2021 | 2021 | Fedwire Credit | 0715490229Ft | Greystone Servicing CO LLC | Draw 7 | Loan - HUD/Greystone | 46,197.00 | - | 46,470.61 |
| | 08/25/2021 | 2021 | Online Transfer | 12453298320 | Carnegie Development | Intercompany | Intercompany Payable/Receivable | - | 44,030.00 | 2,440.61 |
| | 09/03/2021 | 2021 | Fedwire Credit | 0688460246Ft | Greystone Servicing CO LLC | Draw 8 | Loan - HUD/Greystone | 3,452.00 | - | 5,892.61 |
| | 09/15/2021 | 2021 | Check | 8665 | Opelika Utilities | Water Hookup & Meter Fee | Construction in Progess:Utility Development | - | 4,030.00 | 1,862.61 |
| | 10/06/2021 | 2021 | Fedwire Credit | 0851400279Ft | Greystone Servicing CO LLC | Draw 9 | Loan - HUD/Greystone | 3,453.00 | - | 5,315.61 |
| | 11/09/2021 | 2021 | Fedwire Credit | 056650313F1 | Greystone Servicing CO LLC | Draw 10 | Loan - HUD/Greystone | 214,349.00 | - | 219,664.61 |
| | 11/10/2021 | 2021 | Online Transfer | 12988991001 | Enoch Investments LLC | Intercompany | Intercompany Payable/Receivable | - | 214,349.00 | 5,315.61 |
| | 12/03/2021 | 2021 | Fedwire Credit | 0927670337Ft | Greystone Servicing CO LLC | Draw 11 | Loan - HUD/Greystone | 45,551.00 | - | 50,866.61 |
| | 12/03/2021 | 2021 | Online Transfer | 3615421337Ex | Elevation ID | Beginning Balance | Construction in Progress:Architectural-Design | - | 208,750.00 | (157,883.39) |
| | 12/03/2021 | 2021 | Online Transfer | 13155536244 | Enoch Investments LLC | Intercompany | Intercompany Payable/Receivable | 210,000.00 | - | 52,116.61 |
| | 12/15/2021 | 2021 | Online Transfer | 13241212830 | JMJD4LLC | Intercompany | Intercompany Payable/Receivable | - | 40,000.00 | 12,116.61 |
| | 12/31/2021 | 2021 | Online Transfer | 13351148650 | JMJD4LLC | Intercompany | Intercompany Payable/Receivable | - | 5,000.00 | 7,116.61 |
| | 01/05/2022 | 2022 | Bank Fee | 44562 | Chase Bank | Bank Fee | Construction in Progress:Environmental Services | | 95.00 | 7,021.61 |
| | 01/05/2022 | 2022 | Fedwire Credit | 0836890005Ft | Greystone Servicing CO LLC | Draw 12 | Loan - HUD/Greystone | 3,811.00 | | 10,832.61 |
| | 01/06/2022 | 2022 | Check | 5013 | Oline Price - Lee County | Property Tax | Property Tax | | 1,693.44 | 9,139.17 |
| | 01/13/2022 | 2022 | Check | 5014 | Wildland Services | Borrowers Other Fees | Accounts Payable | | 2,800.00 | 6,339.17 |
| | 02/01/2022 | 2022 | Check | 2289 | Basic Capital Roofing | Utility Development | Utility Development | | 41,718.00 | (35,378.83) |
| | 02/01/2022 | 2022 | Fedwire Credit | 0982060032Ft | JMJ Management LLC | Water System | Intercompany Payable/Receivable | 41,718.06 | | 6,339.23 |
| | 02/01/2022 | 2022 | Online Transfer | 13575239537 | SF Rock Creek LLC | Intercompany | Intercompany Payable/Receivable | 41,718.00 | | 48,057.23 |
| | 02/02/2022 | 2022 | Online Transfer | 13582811031 | SF Rock Creek LLC | Intercompany | Intercompany Payable/Receivable | | 41,718.00 | 6,339.23 |
| | 02/14/2022 | 2022 | Fedwire Credit | 0809100045Ft | Greystone Servicing CO LLC | Draw 13 | Loan - HUD/Greystone | 144,566.00 | | 150,905.23 |
| | 03/02/2022 | 2022 | Check | 1000 | MBI Companies | Engineering-Structural | Construction in Progress:Engineering-Structural | | 3,166.43 | 147,738.80 |
| | 03/07/2022 | 2022 | Fedwire Credit | 0693070066Ft | Greystone Servicing CO LLC | Draw 14 | Loan - HUD/Greystone | 2,501.00 | | 150,239.80 |
| | 03/16/2022 | 2022 | Check | 1006 | MBI Companies | Engineering-Structural | Construction in Progress:Engineering-Structural | | 2,100.63 | 148,139.17 |
| | 03/18/2022 | 2022 | Check | 1005 | Wildland Services | Borrowers Other Fees | Accounts Payable | | 400.00 | 147,739.17 |
| | 03/22/2022 | 2022 | Check | 1003 | Elevation ID | Architectural-Design | Construction in Progress:Architectural-Design | | 141,000.00 | 6,739.17 |
| | 04/05/2022 | 2022 | Check | 1004 | Wildland Services | Borrowers Other Fees | Accounts Payable | | 400.00 | 6,339.17 |
| | 04/08/2022 | 2022 | Fedwire Credit | 0651800098Ft | Greystone Servicing CO LLC | Draw 15 | Loan - HUD/Greystone | 3,476.00 | | 9,815.17 |
| | 05/04/2022 | 2022 | Fedwire Credit | 0829640124Ft | Greystone Servicing CO LLC | Draw 16 | Loan - HUD/Greystone | 3,122.00 | | 12,937.17 |
| | 06/06/2022 | 2022 | Fedwire Credit | 0678120157Ft | Greystone Servicing CO LLC | Draw 17 | Loan - HUD/Greystone | 57,620.00 | | 70,557.17 |
| | 06/10/2022 | 2022 | Check | 1007 | Broadview Holdings | Temp Loan | Intercompany Payable/Receivable | | 9,000.00 | 61,557.17 |
| | 06/15/2022 | 2022 | Check | 1008 | Broadview Holdings | Temp Loan | Intercompany Payable/Receivable | | 14,159.29 | 47,397.88 |
| | 06/16/2022 | 2022 | Check | 1009 | Broadview Holdings | Temp Loan | Intercompany Payable/Receivable | | 10,000.00 | 37,397.88 |
| | 06/17/2022 | 2022 | Check | 1010 | Broadview Holdings | Temp Loan | Intercompany Payable/Receivable | | 5,000.00 | 32,397.88 |
| | 06/21/2022 | 2022 | Check | 1011 | Broadview Holdings | Temp Loan | Intercompany Payable/Receivable | | 10,000.00 | 22,397.88 |
| | 06/21/2022 | 2022 | Check | 1012 | McMurry Law, PLLC | Legal | Legal Services | | 5,000.00 | 17,397.88 |
| | 06/22/2022 | 2022 | Check | 1013 | Metzger Law PPLC | Legal | Legal Services | | 5,000.00 | 12,397.88 |
| | 06/22/2022 | 2022 | Check | 1014 | Broadview Holdings | Temp Loan | Intercompany Payable/Receivable | | 10,000.00 | 2,397.88 |
| | 06/23/2022 | 2022 | Check | 1015 | Broadview Holdings | Temp Loan | Intercompany Payable/Receivable | | 2,000.00 | 397.88 |
| | 07/11/2022 | 2022 | Fedwire Credit | 0681140192Ft | Greystone Servicing CO LLC | Draw 18 | Loan - HUD/Greystone | 2,352.00 | | 2,749.88 |
| | 07/14/2022 | 2022 | Online Transfer | 14806252653 | Goldmark Hospitality LLC | Intercompany | Intercompany Payable/Receivable | | 2,600.00 | 149.88 |
| | 07/27/2022 | 2022 | Online Transfer | 14903435250 | SF Rock Creek LLC | Intercompany | Intercompany Payable/Receivable | | 100.00 | 49.88 |
| | 08/12/2022 | 2022 | Fedwire Credit | 056613224Ft | Greystone Servicing CO LLC | Draw 19 | Loan - HUD/Greystone | 2,294.00 | | 2,343.88 |

App. 74

# EXHIBIT A-14



**CHASE**
JPMorgan Chase Bank, N.A.
P O Box 182051
Columbus, OH 43218 - 2051

00007455 DRI 201 142 18421 NNNNNNNNNNN 1 000000000 D4 0000

D4OP LLC
1755 WITTINGTON PL STE 340
DALLAS TX 75234

May 29, 2021 through June 30, 2021
Account Number:                        1720

### CUSTOMER SERVICE INFORMATION

| | |
|---|---|
| Web site: | www.Chase.com |
| Service Center: | 1-877-425-8100 |
| Deaf and Hard of Hearing: | 1-800-242-7383 |
| Para Espanol: | 1-888-622-4273 |
| International Calls: | 1-713-262-1679 |



## CHECKING SUMMARY | Chase Platinum Business Checking

| | INSTANCES | AMOUNT |
|---|---|---|
| Beginning Balance | | $66.00 |
| Deposits and Additions | 3 | 65,598.00 |
| Checks Paid | 1 | -46,593.98 |
| Electronic Withdrawals | 2 | -7,134.41 |
| **Ending Balance** | **6** | **$11,935.61** |

Your Chase Platinum Business Checking account provides:
- No transaction fees for unlimited electronic deposits (including ACH, ATM, wire, Chase Quick Deposit)
- 500 debits and non-electronic deposits (those made via check or cash in branches) per statement cycle
- $25,000 in cash deposits per statement cycle
- Unlimited return deposited items with no fee

There are additional fee waivers and benefits associated with your account – please refer to your Deposit Account Agreement for more information.

## DEPOSITS AND ADDITIONS

| DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| 06/10 | Fedwire Credit Via: Bank of America, N.A./026009593 B/O: General Disbursement 20186 US VA Ref: Chase Nyc/Ctr/Bnf=D4Op LLC Dallas TX 75234-1930 US/Ac-000000006086 Rfb =216Af27010Sz4902 Obi=2227 Parc At Opelika Bbi=/Ocmt/USD3598,00/ Imad: 0610B6B7Hu2R015510 Trn: 0800480161Ff | $3,598.00 |
| 06/15 | Online Transfer From Chk ...5320 Transaction#: 11984854778 | 47,000.00 |
| 06/23 | Online Transfer From Chk ...5320 Transaction#: 12034214637 | 15,000.00 |
| **Total Deposits and Additions** | | **$65,598.00** |

## CHECKS PAID

| CHECK NO. | DESCRIPTION | DATE PAID | AMOUNT |
|---|---|---|---|
| 6250 ^ | | 06/22 | $46,593.98 |
| **Total Checks Paid** | | | **$46,593.98** |

If you see a description in the Checks Paid section, it means that we received only electronic information about the check, not the original or an image of the check. As a result, we're not able to return the check to you or show you an image.

^ An image of this check may be available for you to view on Chase.com.

Page 1 of 4

App. 76

# CHASE ⬡

May 29, 2021 through June 30, 2021

Account Number: ▮▮▮▮ 1720

## ELECTRONIC WITHDRAWALS

| DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| 06/28 | 06/28 Online Domestic Wire Transfer Via: Pinnacle Bank TN/064008637 A/C: Mbi Companies Inc Knoxville TN 37919 US Ref: Invoice 307935, 307936,310311, 310792, 311192/Bnf/Invoice 307935, 3079 36,310311,310792, 311192 Imad: 0628B1Qgc08C030734 Trn: 3538271179Es | $5,834.41 |
| 06/29 | 06/29 Online Domestic Wire Transfer Via: River Bk Trust AL/062206567 A/C: Wildland Services LLC Auburn AL 36830 US Ref: Invoice 15702, 15775, 15810/Bnf/Invoice 15702, 15775, 15810 Imad: 0629B1Qgc05C002499 Trn: 3021041180Es | 1,300.00 |
| **Total Electronic Withdrawals** | | **$7,134.41** |

## DAILY ENDING BALANCE

| DATE | AMOUNT |
|---|---|
| 06/10 | $3,664.00 |
| 06/15 | 50,664.00 |
| 06/22 | 4,070.02 |
| 06/23 | 19,070.02 |
| 06/28 | 13,235.61 |
| 06/29 | 11,935.61 |

## SERVICE CHARGE SUMMARY

| | |
|---|---|
| Monthly Service Fee | $0.00 |
| Other Service Charges | $0.00 |
| **Total Service Charges** | **$0.00** |

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC FUNDS TRANSFERS:** Call us at 1-866-564-2262 or write us at the address on the front of this statement (non-personal accounts contact Customer Service) immediately if you think your statement or receipt is incorrect or if you need more information about a transfer listed on the statement or receipt.
For personal accounts only: We must hear from you no later than 60 days after we sent you the FIRST statement on which the problem or error appeared. Be prepared to give us the following information:
- Your name and account number
- The dollar amount of the suspected error
- A description of the error or transfer you are unsure of, why you believe it is an error, or why you need more information.
We will investigate your complaint and will correct any error promptly. If we take more than 10 business days (or 20 business days for new accounts) to do this, we will credit your account for the amount you think is in error so that you will have use of the money during the time it takes us to complete our investigation.

**IN CASE OF ERRORS OR QUESTIONS ABOUT NON-ELECTRONIC TRANSACTIONS:** Contact the bank immediately if your statement is incorrect or if you need more information about any non-electronic transactions (checks or deposits) on this statement. If any such error appears, you must notify the bank in writing no later than 30 days after the statement was made available to you. For more complete details, see the Account Rules and Regulations or other applicable account agreement that governs your account. Deposit products and services are offered by JPMorgan Chase Bank, N.A. Member FDIC

 JPMorgan Chase Bank, N.A. Member FDIC

App. 77

App. 78

**CHASE**

May 29, 2021 through June 30, 2021
Account Number:  ███████1720

**IMAGES** ——————————  ACCOUNT # ███████1720

See both front and back images of cleared checks at Chase.com. If you're not enrolled in this free service, please enroll now.



006170312743 JUN 22 #0000006250 $46,593.98

Page 3 of 4

App. 79



May 29, 2021 through June 30, 2021
Account Number:               1720

This Page Intentionally Left Blank

Page 4 of 4

# EXHIBIT A-15



**CHASE** ⬡

JPMorgan Chase Bank, N.A.
P O Box 182051
Columbus, OH 43218-2051

July 31, 2021 through August 31, 2021

Account Number:                1720



00013294 DRE 201 142 24621 NNNNNNNNNNN T 1 000000000 D4 0000

D4OP LLC
1755 WITTINGTON PL STE 340
DALLAS TX 75234

### CUSTOMER SERVICE INFORMATION

| | |
|---|---|
| Web site: | www.Chase.com |
| Service Center: | 1-877-425-8100 |
| Deaf and Hard of Hearing: | 1-800-242-7383 |
| Para Espanol: | 1-888-622-4273 |
| International Calls: | 1-713-262-1679 |

---

## CHECKING SUMMARY | Chase Platinum Business Checking

| | INSTANCES | AMOUNT |
|---|---|---|
| Beginning Balance | | $15,273.61 |
| Deposits and Additions | 1 | 46,197.00 |
| Electronic Withdrawals | 2 | -59,030.00 |
| **Ending Balance** | **3** | **$2,440.61** |

Your Chase Platinum Business Checking account provides:
- No transaction fees for unlimited electronic deposits (including ACH, ATM, wire, Chase Quick Deposit)
- 500 debits and non-electronic deposits (those made via check or cash in branches) per statement cycle
- $25,000 in cash deposits per statement cycle
- Unlimited return deposited items with no fee

There are additional fee waivers and benefits associated with your account – please refer to your Deposit Account Agreement for more information.

---

## DEPOSITS AND ADDITIONS

| DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| 08/17 | Fedwire Credit Via: Bank of America, N.A./026009593 B/O: Greystone Servicing CO LLC Genera 20186 US VA Ref: Chase Nyc/Ctr/Bnf=D4Op LLC Dallas TX 75234-1930 US/Ac-000000006086 Rfb =218Hg3758Kvz2192 Obi=2227 Parc At Opelika Bbi=/Ocmt/USD46197,00/ Imad: 0817B6B7Hu1R013829 Tm: 0715490229Ff | $46,197.00 |
| **Total Deposits and Additions** | | **$46,197.00** |

## ELECTRONIC WITHDRAWALS

| DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| 08/11 | 08/11 Online Transfer To Chk ...5320 Transaction#: 12361962502 | $15,000.00 |
| 08/25 | 08/25 Online Transfer To Chk ...7036 Transaction#: 12453298320 | 44,030.00 |
| **Total Electronic Withdrawals** | | **$59,030.00** |

## DAILY ENDING BALANCE

| DATE | AMOUNT |
|---|---|
| 08/11 | $273.61 |
| 08/17 | 46,470.61 |
| 08/25 | 2,440.61 |

Page 1 of 2

App. 81

App. 82

**CHASE** ◯

July 31, 2021 through August 31, 2021
Account Number:            ▮1720

## SERVICE CHARGE SUMMARY

| | |
|---|---|
| Monthly Service Fee | $0.00 |
| Other Service Charges | $0.00 |
| **Total Service Charges** | **$0.00** |

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC FUNDS TRANSFERS:** Call us at 1-866-564-2262 or write us at the address on the front of this statement (non-personal accounts contact Customer Service) immediately if you think your statement or receipt is incorrect or if you need more information about a transfer listed on the statement or receipt.
For personal accounts only: We must hear from you no later than 60 days after we sent you the FIRST statement on which the problem or error appeared. Be prepared to give us the following information:
    •   Your name and account number
    •   The dollar amount of the suspected error
    •   A description of the error or transfer you are unsure of, why you believe it is an error, or why you need more information.
We will investigate your complaint and will correct any error promptly. If we take more than 10 business days (or 20 business days for new accounts) to do this, we will credit your account for the amount you think is in error so that you will have use of the money during the time it takes us to complete our investigation.

**IN CASE OF ERRORS OR QUESTIONS ABOUT NON-ELECTRONIC TRANSACTIONS:** Contact the bank immediately if your statement is incorrect or if you need more information about any non-electronic transactions (checks or deposits) on this statement. If any such error appears, you must notify the bank in writing no later than 30 days after the statement was made available to you. For more complete details, see the Account Rules and Regulations or other applicable account agreement that governs your account. Deposit products and services are offered by JPMorgan Chase Bank, N.A. Member FDIC

 **JPMorgan Chase Bank, N.A. Member FDIC**

Page 2 of 2

App. 82

# EXHIBIT A-16

OMB Approval No.2502-0598
(Exp. 06/30/2017)

Public Reporting Burden for this collection of information is estimated to average 1 hour per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Response to this request for information is required in order to receive the benefits to be derived. This agency may not collect this information, and you are not required to complete this form unless it displays a currently valid OMB control number.

**Privacy Act Notice:** The United States Department of Housing and Urban Development, Federal Housing Administration, is authorized to solicit the information requested in the form by virtue of Title 12, United States Code, Section 1701 et seq., and regulations promulgated thereunder at Title 12, Code of Federal Regulations. While no assurance of confidentiality is pledged to respondents, HUD generally discloses this data only in response to a Freedom of Information Act request.

## NOTE
## (MULTISTATE)

*HUD Project No. 113-35683*
*HUD Project Name: Bellwether Ridge Apartments*

US $19,021,200.00                          As of October 1, 2017

FOR VALUE RECEIVED, the undersigned, <u>D4DS LLC, a Texas limited liability company</u> (**"Borrower"**) jointly and severally (if more than one) promises to pay to the order of Greystone Servicing Corporation, Inc., a Georgia corporation, the principal sum of Nineteen Million Twenty One Thousand Two Hundred Dollars (US $19,021,200.00) (**"Loan"**), with interest on the unpaid principal balance at the Interest Rate.*

As used herein, **"Interest Rate"** means the annual rate of <u>Three and 70/100 per centum (3.70%)</u>.*

    **1.**    **Defined Terms.** As used in this Note, (a) the term **"Lender"** means the holder of this Note, (b) the term **"Indebtedness"** means the principal of, interest on, and all other amounts due at any time under this Note, the Security Instrument or any other Loan Document, including prepayment premiums, late charges, default interest, and advances under Section 13 of the Security Instrument to protect the security of the Security Instrument; (c) the term **"Security Instrument"** has the meaning set forth in Section 4 of this Note; and (d) the term **"Program Obligations"** means (1) all applicable statutes and any regulations issued by the Secretary pursuant thereto that apply to the Project, including all amendments to such statutes and regulations, as they become effective, except that changes subject to notice and comment rulemaking shall become effective only upon completion of the rulemaking process, and (2) all current requirements in HUD handbooks and guides, notices, and mortgagee letters that apply to the Project, and all future updates, changes and amendments thereto, as they become effective, except that changes subject to notice and comment rulemaking shall become effective only upon completion of the rulemaking process, and provided that such future updates, changes and amendments shall be applicable to the Project only to the extent that they interpret, clarify and implement terms in this Note rather than add

or delete provisions from such document. Handbooks, guides, notices, and mortgagee letters are available on HUD's official website: (http://www.hud.gov/offices/adm/hudclips/index.cfm or a successor location to that site).

The definition of any capitalized term or word used herein can be found in this Note and, if not found in this Note, then found in the Regulatory Agreement between Borrower and HUD and/or the Security Instrument.

**2.    Address for Payment.**  All payments due under this Note shall be payable in immediately available funds at <u>419 Belle Air Lane, Warrenton, VA 20186</u>, or such other place as may be designated by written notice to Borrower from or on behalf of Lender.

**3.    Payment of Principal and Interest.**  Principal and interest shall be paid as follows:

(a)  Interest only at the Interest Rate on such amount of principal as may be advanced from time to time, computed from the date of such advance, shall be payable monthly commencing on November 1, 2017 and on the first day of each month thereafter up to and including June 1, 2019 (**"Last Interest Only Payment Date"**). Thereafter, consecutive monthly installments of principal and interest at the Interest Rate, each in the amount of <u>Seventy Five Thousand Nine Hundred Eighty Five and 23/100 Dollars (US $75,985.23)</u>, shall be payable on the first day of each month beginning on July 1, 2019 (**"Amortization Commencement Date"**), until the entire unpaid principal balance evidenced by this Note is fully paid.  Notwithstanding the foregoing, in the event that any principal under this Note is advanced after the Last Interest Only Payment Date, for the period commencing on the Amortization Commencement Date and continuing through the first day of the month following the date on which the final advance of principal is made, the monthly installments of principal and interest shall be reduced, as determined by the Lender, to equal the sum of (i) interest accrued on this Note (at the Interest Rate) on the outstanding principal balance during the prior month plus (ii) the principal payment due under the original amortization schedule used in determining the monthly principal and interest payment amount set forth above.  In any event, the balance of the principal (if any) remaining unpaid, plus accrued interest shall be due and payable on June 1, 2059 or on any earlier date on which the unpaid principal balance of this Note becomes due and payable, by acceleration or otherwise (**"Maturity Date"**).

(b)    Solely for the purpose of calculating interest due, any regularly scheduled monthly installment of principal and interest that is received by Lender before the date it is due shall be deemed to have been received on the due date.

**4.    Security.**  The Indebtedness is secured by, among other things, a mortgage, deed to secure debt or deed of trust dated as of the date of this Note

---

("**Security Instrument**"), and reference is made to the Security Instrument for other rights of Lender as to collateral for the Indebtedness.

5.    **Application of Payments.**  If at any time Lender receives, from Borrower or otherwise, any amount applicable to the Indebtedness that is less than all amounts due and payable at such time, Lender shall apply that payment to amounts then due and payable in the manner and in the order set forth in Section 7(a)(3) of the Security Instrument.  Neither Lender's acceptance of an amount that is less than all amounts then due and payable nor Lender's application of such payment in the manner authorized shall constitute or be deemed to constitute either a waiver of the unpaid amounts or an accord and satisfaction.  Notwithstanding the application of any such amount to the Indebtedness, Borrower's obligations under this Note shall remain unchanged.

6.    **Acceleration.**  If a Monetary Event of Default occurs and is continuing for a period of thirty (30) days, the entire unpaid principal balance, any accrued interest and all other amounts payable to Lender under this Note and any other Loan Document shall at once become due and payable, at the option of Lender, without any prior notice to Borrower.  If a Covenant Event of Default occurs and the Indebtedness is accelerated as set forth in the Security Instrument, the entire unpaid principal balance, any accrued interest, and all other amounts payable to Lender under this Note and any other Loan Document shall at once become due and payable.  Lender may exercise this option to accelerate regardless of any prior forbearance.  Upon Lender's exercise of any right of acceleration under this Note, Borrower shall pay to Lender, in addition to the entire unpaid principal balance of this Note outstanding at the time of the acceleration, all accrued interest and all other sums due Lender under the Loan Documents.

7.    **Late Charge.**  If any monthly amount payable under this Note or under the Security Instrument or any other Loan Document is not received by Lender within ten (10) days after the amount is due, Borrower shall pay to Lender, immediately and without demand by Lender, a late charge equal to <u>two percent</u> of the unpaid principal and interest due in such month.  Borrower acknowledges that its failure to make timely payments will cause Lender to incur additional expenses in servicing and processing the Loan, and that it is extremely difficult and impractical to determine those additional expenses.  Borrower agrees that the late charge payable pursuant to this Section represents a fair and reasonable estimate, taking into account all circumstances existing on the date of this Note, of the additional expenses Lender will incur by reason of such late monthly payment.

8.    **Exculpation; Remedies.**

(a)    Except for personal liability expressly provided for in this Note or in the Security Instrument or in the Regulatory Agreement, the execution of this Note shall impose no personal liability upon Borrower and those parties listed in the Section 50 Addendum to the Regulatory Agreement for payment of the Indebtedness evidenced

thereby, and in the Event of Default, the holder of the Note shall look solely to the Mortgaged Property in satisfaction of the Indebtedness and will not seek or obtain any deficiency or personal judgment against Borrower and those parties listed in the Section 50 Addendum to the Regulatory Agreement, except such judgment or decree as may be necessary to foreclose or bar its interest in the Mortgaged Property and all other property mortgaged, pledged, conveyed or assigned to secure payment of the Indebtedness; provided, that nothing in this Section 8 of this Note and no action so taken shall operate to impair any obligation of Borrower under the Regulatory Agreement.

(b)    Notwithstanding Section 8(a) above, Borrower shall be liable to Lender for any loss or damage suffered by Lender as a result of (1) failure of Borrower to pay to Lender, upon demand after an Event of Default, all Rents to which Lender is entitled under Section 3(a) of the Security Instrument and the amount of all security deposits collected from tenants with existing Leases; (2) failure of Borrower to apply all insurance proceeds and condemnation proceeds as required by Sections 19 and 20 of the Security Instrument; (3) failure of Borrower to comply with Section 15 of the Security Instrument relating to the delivery of books and records, statements, schedules and reports; (4) Borrower's acquisition of any property or operation of any business not permitted by Section 33 of the Security Instrument; (5) a transfer or the granting of a lien or encumbrance that is an Event of Default under Sections 17 and 21 of the Security Instrument, other than a transfer consisting solely of the involuntary removal or involuntary withdrawal of a general partner in a limited partnership or a manager in a limited liability company; or (6) fraud or written material misrepresentation by Borrower or any officer, director, general partner, member, manager or employee of Borrower in connection with the Loan Application for or creation of the Indebtedness or any request for any action or consent by Lender.  These damages shall be paid only from the available proceeds of an appropriate insurance policy or from Surplus Cash or other escrow accounts.

(c) Notwithstanding Section 8(a) above, Borrower shall provide complete redress as set forth in Section 45(c) of the Security Instrument and shall indemnify and hold harmless the Indemnitees as set forth in Section 48 of the Security Instrument.

### 9.    Voluntary and Involuntary Prepayments.

(a)    This Note contains a prepayment restriction and prepayment premium charge acceptable to HUD as to term, amount, and conditions, which are set forth in the attached Rider 1.  In the event of a default, pursuant to Program Obligations, HUD may override any lockout or any prepayment premium, or combination thereof, in Rider 1 on the last day of any calendar month during any year in which the prepayment premium is greater than one percent (1%) in order to facilitate a partial or full refinancing of the Mortgaged Property and avoid a mortgage insurance claim.

---

Previous editions are obsolete                    Note                    HUD-94001M (06/14)

(b)    Any application by Lender of any collateral or other security to the repayment of any portion of the unpaid principal balance of this Note prior to the Maturity Date and in the absence of acceleration shall be deemed to be a partial prepayment by Borrower, requiring the payment to Lender by Borrower of a prepayment premium in the amount provided for in Section 9(a) or in Rider 1, as applicable.

(c)    Notwithstanding the provisions of subsections (a) and (b) above: (1) any payment made, other than as a result of acceleration, within 30 days of the Maturity Date shall not be considered a prepayment, (2) any payment made in accordance with Sections 19(f) or 20(b) of the Security Instrument shall not be considered a prepayment, (3) no prepayment premium shall be payable with respect to any reduction in the original principal amount of the Loan, or any prepayment, resulting from any cost certification or other report required by HUD pursuant to Program Obligations, or (4) any payment made pursuant to Section 13 of this Note shall not be considered a prepayment.

(d)    Any permitted or required prepayment of less than the unpaid principal balance of this Note shall not extend or postpone the due date of any subsequent monthly installments or change the amount of such installments, unless Lender agrees otherwise in writing.

(e)    Borrower acknowledges that the provisions of this Note relating to prepayment restrictions and prepayment premiums are a material part of the consideration for the Loan, and acknowledges that the terms of this Note are in other respects more favorable to Borrower as a result of the Borrower's voluntary agreement to such provisions.

(f)    If the Indebtedness is paid in full while insured under the provisions of the National Housing Act, as amended, the Borrower shall pay to the Lender such adjusted mortgage insurance premium as may be required by Program Obligations.

(g)    All payments to reduce the principal balance hereunder, other than regularly scheduled payments of principal, shall be made to Lender in immediately available funds.  Payments received after 2:00pm Eastern Time will be deemed to have been received on the next Business Day.

**10.    Costs and Expenses.**  Borrower shall pay all expenses and costs, including reasonable fees and out-of-pocket expenses of attorneys and expert witnesses and costs of investigation and litigation (including appellate), incurred by Lender as a result of any default under this Note or in connection with efforts to collect any amount due under this Note, or to enforce the provisions of any of the other Loan Documents, including those incurred in post-judgment collection efforts and in any bankruptcy proceeding (including any action for relief from the automatic stay of any bankruptcy proceeding) or judicial or non-judicial foreclosure proceeding.

Previous editions are obsolete                     Note                     HUD-94001M (06/14)

**11.    Forbearance.**  Any forbearance by Lender in exercising any right or remedy under this Note, the Security Instrument, or any other Loan Document, or otherwise afforded by applicable law, shall not be a waiver of or preclude the exercise of any other right or remedy.  The acceptance by Lender of payment of all or any part of the Indebtedness after the due date of such payment, or in an amount that is less than the required payment, shall not be a waiver of Lender's right to require prompt payment when due of all other payments on account of the Indebtedness or to exercise any right or remedy for any failure to make prompt payment.  Enforcement by Lender of any security for the Indebtedness shall not constitute an election by Lender of remedies so as to preclude the exercise of any other right or remedy available to Lender.

**12.    Waivers.**  Presentment, demand, notice of dishonor, protest, notice of acceleration, notice of intent to demand or accelerate payment or maturity, presentment for payment, notice of nonpayment, grace, and diligence in collecting the Indebtedness are waived by Borrower.

**13.    Loan Charges.**  If any applicable law limiting the amount of interest or other charges permitted to be collected from Borrower in connection with the Loan is interpreted so that any interest or other charge provided for in any Loan Document, whether considered separately or together with other charges provided for in any Loan Document, violates that law, and Borrower is entitled to the benefit of that law, that interest or charge is hereby reduced to the extent necessary to eliminate that violation. The amounts, if any, previously paid to Lender in excess of the permitted amounts shall be applied by Lender to reduce the Indebtedness. For the purpose of determining whether any applicable law limiting the amount of interest or other charges permitted to be collected from Borrower has been violated, all Indebtedness that constitutes interest, as well as all other charges made in connection with the Indebtedness that constitute interest, shall be deemed to be allocated and spread ratably over the stated term of the Note.  Unless otherwise required by applicable law, such allocation and spreading shall be effected in such a manner that the rate of interest so computed is uniform throughout the stated term of this Note.

**14.    Commercial Purpose.**  Borrower represents that the Indebtedness is being incurred by Borrower solely for the purpose of carrying on a business or commercial enterprise, and not for personal, family or household purposes.

**15.    Counting of Days.**  Except where otherwise specifically provided, any reference in this Note to a period of **"days"** means calendar days, not Business Days.

**16.    Governing Law; Consent to Jurisdiction and Venue.**

(a)    This Note and the Security Instrument, if it does not itself expressly identify the law that is to apply to it, shall be governed by the laws of the jurisdiction in which the Land is located (**"Property Jurisdiction"**), except so long as the Loan is insured or held by HUD, federal law will apply to HUD's rights and remedies where state or local laws are preempted by federal law.

---

(b)    Borrower agrees that any controversy arising under or in relation to this Note or the Security Instrument shall be litigated exclusively in the Property Jurisdiction except as, so long as the Loan is insured or held by HUD and solely as to rights and remedies of HUD, federal jurisdiction may be appropriate pursuant to any federal requirements. The state courts, and with respect to HUD's rights and remedies, federal courts and Governmental Authorities in the Property Jurisdiction, shall have exclusive jurisdiction over all controversies which shall arise under or in relation to this Note, any security for the Indebtedness, or the Security Instrument. Borrower irrevocably consents to service, jurisdiction, and venue of such courts for any such litigation and waives any other venue to which it might be entitled by virtue of domicile, habitual residence or otherwise.

17.    **Rules of Construction.**    The captions and headings of the Sections of this Note are for convenience only and shall be disregarded in construing this Note. Any reference in this Note to a **"Section"** shall, unless otherwise explicitly provided, be construed as referring, respectively, to a Section of this Note.  Use of the singular in this Note includes the plural and use of the plural includes the singular.  As used in this Note, the term **"including"** means "including, but not limited to."

18.    **Notices.**  All notices, demands and other communications required or permitted to be given by Lender to Borrower or Borrower to Lender pursuant to this Note shall be given in accordance with Section 31 of the Security Instrument.

19.    **Federal Remedies.**  In addition to any rights and remedies set forth in the Regulatory Agreement between Borrower and HUD, HUD has rights and remedies under federal law so long as HUD is the insurer or holder of the Loan, including but not limited to the right to foreclose pursuant to the Multifamily Mortgage Foreclosure Act of 1981, as amended, 12 U.S.C. § 3701, *et seq.*, as amended, when HUD is the holder of the Note.

20.    **Termination of HUD Rights and Remedies.**  At such time as HUD no longer insures or holds this Note, (a) all rights and responsibilities of HUD shall conclude, all mortgage insurance and references to mortgage insurance premiums, all references to HUD, GNMA and Program Obligations and related terms and provisions shall cease, and all rights and obligations of HUD shall terminate; (b) all obligations and responsibilities of Borrower to HUD shall likewise terminate; and (c) all obligations and responsibilities of Lender to HUD shall likewise terminate; provided, however, nothing contained in this Section 20 shall in any fashion discharge Borrower from any obligations to HUD under the Regulatory Agreement or Program Obligations or Lender from any obligations to HUD under Program Obligations, which occurred prior to termination of the Contract of Insurance or Regulatory Agreement, as applicable.  The provisions of this Section 20 shall be given effect automatically upon the termination of the Contract of Insurance or the transfer of this Note and the Security Instrument by HUD to another party, provided that upon the request of Borrower, Lender or the party to whom the Note or the Security Instrument has been transferred, at no cost to HUD,

HUD shall execute such documents as may be reasonably requested to confirm the provisions of this Section 20.

**21. WAIVER OF TRIAL BY JURY. BORROWER AND LENDER EACH (a) AGREES NOT TO ELECT A TRIAL BY JURY WITH RESPECT TO ANY ISSUE ARISING OUT OF THIS NOTE OR THE RELATIONSHIP BETWEEN THE PARTIES AS LENDER AND BORROWER THAT IS TRIABLE OF RIGHT BY A JURY AND (b) WAIVES ANY RIGHT TO TRIAL BY JURY WITH RESPECT TO SUCH ISSUE TO THE EXTENT THAT ANY SUCH RIGHT EXISTS NOW OR IN THE FUTURE. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS SEPARATELY GIVEN BY EACH PARTY, KNOWINGLY AND VOLUNTARILY WITH THE BENEFIT OF COMPETENT LEGAL COUNSEL.**

**See Rider 1 to Note containing modifications to the Note, attached hereto and incorporated herein by this reference.**

**IN WITNESS WHEREOF**, Borrower has signed and delivered this Note or has caused this Note to be signed and delivered by its duly authorized representative as of the date first above written.

> D4DS LLC,
> a Texas limited liability company
>
> By: _____
>      Timothy Barton, President

---

Previous editions are obsolete      Note      HUD-94001M (06/14)

App. 92

NOTE (Multistate)

State of Texas

<u>D4DS LLC</u>

To

<u>Greystone Servicing Corporation, Inc.</u>

Project No.: <u>113-35683</u>

Initially endorsed for insurance under §221(d)(4) of the National Housing Act, as amended, and regulations published thereunder in effect on <u>August 11, 2017</u> to the extent of advances approved by HUD.

By: _Kenneth L. Cooper_                    Date: October <u>26</u>, 2017

Print Name: Kenneth L. Cooper
Title:    Authorized Representative
          Production Division Director

At final endorsement, a total sum of $ <u>18,608,100.⁰⁰/₁₀₀</u> has been approved for insurance hereunder by HUD.

By: _Mike Buis_                            Date: October 15, 20 20

Print Name: Mike Buis
Title:    Authorized Representative

Previous editions are obsolete                Note                HUD-94001M (06/14)

App. 93

**RIDER 1 TO NOTE**
**From**
**D4DS LLC**
**TO**
**Greystone Servicing Corporation, Inc.**
**In the original principal sum of $19,021,200.00**

1.      This Rider 1 to Note (this "Rider") is attached to and made a part of the Note from D4DS LLC, a Texas limited liability company (the "Borrower"), to Greystone Servicing Corporation, Inc., a Georgia corporation (the "Lender") dated as of October 1, 2017 (the "Note").

2.      Borrower shall not have the right to prepay the indebtedness evidenced hereby in whole or in part at any time prior to July 1, 2019.  Borrower shall have the right, on or after July 1, 2019, to prepay the indebtedness evidenced hereby in whole on the last day of any calendar month after such date during the term hereof, upon at least thirty (30) days prior written notice to the holder of this Note, which notice shall specify the date on which the prepayment is to be made, the principal amount of such prepayment and the total amount to be paid.  In the event of any prepayment of principal at any time on or after July 1, 2019, the Borrower shall concurrently pay to the holder of this Note a prepayment premium equal to the following designated percentages of the amount of principal of this Note to be so prepaid with respect to any prepayment which occurs during the following indicated time periods:

| Time of Prepayment | Prepayment Premium |
|---|---|
| from July 1, 2019 through June 30, 2020 | 10% |
| from July 1, 2020 through June 30, 2021 | 10% |
| from July 1, 2021 through June 30, 2022 | 8% |
| from July 1, 2022 through June 30, 2023 | 7% |
| from July 1, 2023 through June 30, 2024 | 6% |
| from July 1, 2024 through June 30, 2025 | 5% |
| from July 1, 2025 through June 30, 2026 | 4% |
| from July 1, 2026 through June 30, 2027 | 3% |
| from July 1, 2027 through June 30, 2028 | 2% |
| from July 1, 2028 through June 30, 2029 | 1% |
| from July 1, 2029 and thereafter | None |

FHA# 113-35683                    Rider 1 to Note                    Bellwether Ridge Apartments

App. 94

Notwithstanding any partial prepayment of principal made pursuant to the privilege of prepayment set forth in this Note, the Borrower shall not be relieved of its obligations to make scheduled monthly installments of principal and interest as and when such payments are due and payable under this Note.

The Borrower has executed this Rider to Note on the date first above written.

**BORROWER:**

D4DS LLC,
a Texas limited liability company

By: _____
Timothy Barton, President

**END OF RIDER 1**

FHA# 113-35683                    Rider 1 to Note                    Bellwether Ridge Apartments

App. 95

...'G CORPORATION, INC.,
a Georgia corporation

PAY TO THE ORDER OF:

_____

WITHOUT RECOURSE:

GREYSTONE SERVICING CORPORATION, INC.

BY: _____
    Leslie F. Dominy
    Senior Vice President

# EXHIBIT A-17

# ELECTRONICALLY RECORDED  201700300652
# 10/24/2017 10:12:24 AM DT  1/51

OMB Approval No.2502-0598
(Exp. 06/30/2017)

Public Reporting Burden for this collection of information is estimated to average .75 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information.  Response to this request for information is required in order to receive the benefits to be derived. This agency may not collect this information, and you are not required to complete this form unless it displays a currently valid OMB control number.

**Privacy Act Notice:** The United States Department of Housing and Urban Development, Federal Housing Administration, is authorized to solicit the information requested in the form by virtue of Title 12, United States Code, Section 1701 et seq., and regulations promulgated thereunder at Title 12, Code of Federal Regulations. While no assurance of confidentiality is pledged to respondents, HUD generally discloses this data only in response to a Freedom of Information Act request.

 ZZZ8005530

## Recording Requested by:
Thomas Kelly Derryberry
Peaseley & Derryberry PLC
504 Autumn Springs Ct, Suite 26
Franklin, TN 37067

## After Recording return to:
Leslie F. Dominy
Greystone Servicing Corporation, Inc.
419 Belle Air Lane
Warrenton, VA 20186

## MULTIFAMILY DEED OF TRUST
## ASSIGNMENT OF LEASES AND RENTS
## AND SECURITY AGREEMENT

### (Texas)

### HUD Project Number: 113-35683
### Project Name: Bellwether Ridge Apartments

NOTICE OF CONFIDENTIALITY RIGHTS:  IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OR ALL OF THE FOLLOWING INFORMATION FROM THIS INSTRUMENT BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS:  YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.

| Previous editions are obsolete | HUD MF Security Instrument | HUD-94000M (06/14) |
|---|---|---|

2

# MULTIFAMILY
# DEED OF TRUST,
# ASSIGNMENT OF LEASES AND RENTS AND
# SECURITY AGREEMENT

THIS MULTIFAMILY DEED OF TRUST, ASSIGNMENT OF LEASES AND RENTS, AND SECURITY AGREEMENT, WHICH, FOR AS LONG AS THE LOAN IS INSURED OR HELD BY HUD, SHALL BE DEEMED TO BE THE MORTGAGE AS DEFINED BY PROGRAM OBLIGATIONS (**"Security Instrument"**), is made as of this 1st day of October, 2017 among D4DS LLC, a Texas limited liability company, a Limited Liability Company   organized and existing under the laws of State of Texas, whose address is1755 Wittington Place, Suite 340, Dallas, TX  75234, as grantor, trustor and borrower (**Borrower**), to Thomas Kelly Derryberry, as trustee (**Trustee**), a person whose address is 504 Autumn Springs Ct, Suite 26, Franklin, TN 37067, for the benefit of Greystone Servicing Corporation, Inc., as beneficiary and as Lender (**Lender**), a corporation organized and existing under the laws of State of Georgia, whose address is 419 Belle Air Lane, Warrenton, VA 20186.

Borrower, in consideration of the Indebtedness and the trust created by this Security Instrument, irrevocably grants, conveys and assigns to Trustee and Trustee's successors and assigns, in trust, with power of sale, the Mortgaged Property, including the Land located in Dallas County, State of Texas and described in Exhibit A attached to this Security Instrument, to have and to hold the Mortgaged Property unto Trustee and Trustee's successors and assigns.

THIS SECURITY INSTRUMENT IS EXECUTED TO SECURE TO LENDER the repayment of the Indebtedness evidenced by Borrower's Note payable to Lender dated as of the date of this Security Instrument, and maturing on June 1, 2059, in the principal amount of Nineteen Million Twenty One Thousand Two Hundred Dollars (US $19,021,200.00) (**"Loan"**), and all renewals, extensions and modifications of the Indebtedness, and the performance of the covenants and agreements of Borrower contained in this Security Instrument and the Note.

Borrower represents and warrants that Borrower is lawfully seized of the Mortgaged Property and has the right, power and authority to mortgage, grant, convey and assign the Mortgaged Property, and that the Mortgaged Property is unencumbered except for easements and restrictions listed in a schedule of exceptions to coverage in any title insurance policy issued to Lender contemporaneously with the execution and recordation of this Security Instrument and insuring Lender's interest in the Mortgaged Property.  Borrower covenants that Borrower shall warrant and defend generally such

---

3

title to the Mortgaged Property against all claims and demands, subject to said easements and restrictions.

**Covenants.** Borrower and Lender covenant and agree as follows:

**1. DEFINITIONS.** The definition of any capitalized term or word used herein can be found in this Security Instrument, and then if not found in this Security Instrument, then found in the Regulatory Agreement between Borrower and HUD, and/or in the Note. The following terms, when used in this Security Instrument (including when used in the above recitals), shall have the following meanings:

(a) **"Borrower"** means all entities identified as "Borrower" in the first paragraph of this Security Instrument, together with any successors and assigns (jointly and severally). Borrower shall include any entity taking title to the Mortgaged Property whether or not such entity assumes the Note. Whenever the term "Borrower" is used herein, the same shall be deemed to include the obligor of the debt secured by the Security Instrument, and so long as the Note is insured or held by HUD shall also be deemed to be the mortgagor as defined by Program Obligations.

(b) **"Building Loan Agreement"** means the HUD-approved form of the agreement between Borrower and Lender setting forth the terms and conditions for a construction loan.

(c) **"Business Day"** is defined in Section 31.

(d) **"Claim"** is defined in Section 48(m).

(e) **"Collateral Agreement"** means any separate agreement between Borrower and Lender for the purpose of establishing replacement reserves for the Mortgaged Property, establishing an account to assure the completion of repairs or Improvements specified in that agreement, or any other agreement or agreements between Borrower and Lender which provide for the establishment of any other fund, reserve or account including but not limited to those reserves and escrows required by HUD.

(f) **"Contract of Insurance"** is defined in 24 C.F.R. Part 207, Subpart B.

(g) **"Environmental Inspections"** is defined in Section 48(h).

(h) **"Event of Default"** means the occurrence of any event listed in Section 22.

4

(i) **"Fixtures"** means all property or goods that become so related or attached to the Land or the Improvements that an interest arises in them under real property law, whether acquired now or in the future, excluding all tenant owned goods and property, and including but not limited to:  machinery, equipment,  engines, boilers, incinerators, installed building materials; systems and equipment for the purpose of supplying or distributing heating, cooling, electricity, gas, water, air, or light; antennas, cable, wiring and conduits used in connection with radio, television, computers, security, fire prevention, or fire detection or otherwise used to carry electronic signals; telephone systems and equipment; elevators and related machinery and equipment; fire detection, prevention and extinguishing systems and apparatus; security and access control systems and apparatus; plumbing systems; water heaters, ranges, stoves, microwave ovens, refrigerators, dishwashers, garbage disposals, washers, dryers and other appliances; light fixtures, awnings, storm windows and storm doors; pictures, screens, blinds, shades, curtains and curtain rods; mirrors; cabinets, paneling, rugs and floor and wall coverings; fences, trees and plants; swimming pools; playground and exercise equipment and classroom furnishings and equipment.

(j)    **"Governmental Authority"** means any board, commission, department or body of any municipal, county, state, tribal or federal governmental unit, including any U.S. territorial government, and any public or quasi-public authority, or any subdivision of any of them, that has or acquires jurisdiction over the Mortgaged Property, including the use, operation or improvement of the Mortgaged Property.

(k)    **"HUD"** means the United States Department of Housing and Urban Development acting by and through the Secretary in the capacity as insurer or holder of the Loan under the authority of the National Housing Act, as amended, the Department of Housing and Urban Development Act, as amended, or any other federal law or regulation pertaining to the Loan or the Mortgaged Property.

(l)    **"Impositions"** and **"Imposition Deposits"** are defined in Section 8(a).

(m)    **"Improvements"** means the buildings, structures, and alterations now constructed or at any time in the future constructed or placed upon the Land, including any future replacements and additions.

(n)    **"Indebtedness"** means the principal, interest on, and all other amounts due at any time under the Note, this Security Instrument, and any other Loan Document including prepayment premiums, late charges, default interest, and advances as provided in Section 13 to protect the security of this Security Instrument.

5

(o)　**"Indemnitees"** is defined in Section 48(k).

(p)　**"Land"** means the estate in realty described in <u>Exhibit A</u>.

(q)　**"Leases"** means all present and future leases, subleases, licenses, concessions or grants or other possessory interests now or hereafter in force, whether oral or written, covering or affecting the Mortgaged Property, or any portion of the Mortgaged Property (including but not limited to proprietary leases, non-residential leases or occupancy agreements if Borrower is a cooperative housing corporation), and all modifications, extensions or renewals.  (Ground leases that create a leasehold interest in the Land and where the Borrower's leasehold is security for the Loan are not included in this definition.)

(r)　**"Lender"** means the entity identified as "Lender" in the first paragraph of this Security Instrument, or any subsequent holder of the Note, and whenever the term "Lender" is used herein, the same shall be deemed to include the obligee, or the beneficiary of this Security Instrument, and so long as the Loan is insured or held by HUD, shall also be deemed to be the mortgagee as defined by Program Obligations.

(s)　**"Lien"** is defined in Section 17.

(t)　**"Loan"** is defined in the opening paragraphs of this Security Instrument.

(u)　**"Loan Application"** is defined in Section 41.

(v)　**"Loan Documents"** means the Note, this Security Instrument, the Regulatory Agreement and all other agreements, instruments and documents which are now existing or are in the future required by, delivered to and/or assigned to Lender and/or HUD in connection with or related to the Loan, as such documents may be amended from time to time.

(w)　**"Mortgaged Property"** means all of Borrower's present and future right, title and interest in and to all of the following whether now held or later acquired:

(1)　the Land;

(2)　the Improvements;

(3)　the Fixtures;

(4)　the Personalty;

---

6

(5)    all current and future rights, including air rights, development rights, zoning rights and other similar rights or interests, easements, tenements, rights-of-way, strips and gores of land, streets, alleys, roads, sewer rights, waters, watercourses, and appurtenances related to or benefiting the Land or the Improvements, or both, and all rights-of-way, streets, alleys and roads which may have been or may in the future be vacated;

(6)    all insurance policies covering the Mortgaged Property, and all proceeds paid or to be paid by any insurer of the Land, the Improvements, the Fixtures, the Personalty or any other part of the Mortgaged Property, whether or not Borrower obtained such insurance policies pursuant to Lender's requirement;

(7)    all awards, payments and other compensation made or to be made by any Governmental Authority with respect to the Land, the Improvements, the Fixtures, the Personalty or any other part of the Mortgaged Property, including any awards or settlements resulting from condemnation proceedings or the total or partial taking of the Land, the Improvements, the Fixtures, the Personalty or any other part of the Mortgaged Property under the power of eminent domain or otherwise and including any conveyance in lieu thereof;

(8)    all contracts, options and other agreements for the sale of the Land, the Improvements, the Fixtures, the Personalty or any other part of the Mortgaged Property entered into by Borrower now or in the future, including cash or securities deposited to secure performance by parties of their obligations;

(9)    all proceeds (cash or non-cash), liquidated claims or other consideration from the conversion, voluntary or involuntary, of any of the Mortgaged Property and the right to collect such proceeds, liquidated claims or other consideration;

(10)    all Rents and Leases;

(11)    all earnings, royalties, instruments, accounts, accounts receivable, supporting obligations, issues and profits from the Land, the Improvements or any other part of the Mortgaged Property, and all undisbursed proceeds of the Loan and, if Borrower is a cooperative

7

housing corporation, maintenance charges or assessments payable by shareholders or residents;

(12)    all Imposition Deposits;

(13)    all refunds or rebates of Impositions by any Governmental Authority or insurance company (other than refunds applicable to periods before the real property tax year in which this Security Instrument is dated);

(14)    all forfeited tenant security deposits under any Lease;

(15)    all names under or by which any of the above Mortgaged Property may be operated or known, and all trademarks, trade names, and goodwill relating to any of the Mortgaged Property;

(16)    all deposits and/or escrows held by or on behalf of Lender under Collateral Agreements; and

(17)    all awards, payments, settlements or other compensation resulting from litigation involving the Project.

Notwithstanding items numbered (1) through (17) above, Borrower may hold non-project funds in separate, segregated accounts, specifically labeled as non-project funds, which are not part of the Mortgaged Property.  These accounts may hold those assets owned or received by Borrower, through equity contributions, gifts, or loan proceeds, that were not required by HUD to become part of the Mortgaged Property and were not made a part of the Mortgaged Property by Borrower and funds released from the Mortgaged Property in compliance with Program Obligations (such as Surplus Cash and loan repayments).

(x)    **"Note"** means the Note executed by Borrower described in this Security Instrument, including all schedules, riders, allonges and addenda, as such Note may be amended from time to time.

(y)    **"Notice"** is defined in Section 31.

(z)    **"O&M Program"** is defined in Section 48(b).

(aa)    **"Personalty"** means all equipment, inventory, and general intangibles. The definition of "Personalty" includes furniture, furnishings, machinery, building

---

8

materials, appliances, goods, supplies, tools, books, records (whether in written or electronic form), computer equipment (hardware and software) and other tangible or electronically stored personal property (other than Fixtures) that are owned, leased or used by Borrower now or in the future in connection with the ownership, management or operation of the Land or the Improvements or are located on the Land or in the Improvements, and any operating agreements relating to the Land or the Improvements, and any surveys, plans and specifications and contracts for architectural, engineering and construction services relating to the Land or the Improvements, choses in action and all other intangible property and rights relating to the operation of, or used in connection with, the Land or the Improvements, including all certifications, approvals and governmental permits relating to any activities on the Land. Intangibles shall also include all cash and cash escrow funds related to the Project, such as but not limited to:  Reserve for Replacement accounts, bank accounts, residual receipts accounts, and investments.

(bb)    **"Principal"** is defined in 24 C.F.R. 200.215, or any successor regulation.

(cc)    **"Project"** and **"Project Assets"** mean the Mortgaged Property.

(dd)    **"Program Obligations"** means (1) all applicable statutes and any regulations issued by the Secretary pursuant thereto that apply to the Project, including all amendments to such statutes and regulations, as they become effective, except that changes subject to notice and comment rulemaking shall become effective only upon completion of the rulemaking process, and (2) all current requirements in HUD handbooks and guides, notices, and mortgagee letters that apply to the Project, and all future updates, changes and amendments thereto, as they become effective, except that changes subject to notice and comment rulemaking shall become effective only upon completion of the rulemaking process, and provided that such future updates, changes and amendments shall be applicable to the Project only to the extent that they interpret, clarify and implement terms in this Security Instrument rather than add or delete provisions from such document.  Handbooks, guides, notices, and mortgagee letters are available on HUD's official website: (http://www.hud.gov/offices/adm/hudclips/index.cfm, or a successor location to that site).

(ee)    **"Property Jurisdiction"** is defined in Section 30(a).

(ff)    **"Regulatory Agreement"** means the agreement between the Borrower and HUD establishing Borrower's obligations in the operation of the Mortgaged Property and the rights and powers of HUD.

---

Previous editions are obsolete                    HUD MF Security Instrument                    HUD-94000M (06/14)

9

(gg)    **"Remedial Work"** is defined in Section 48(i).

(hh)    **"Rents"** means all rents (whether from residential or non-residential space), revenues, issues, profits, (including carrying charges, maintenance fees, and other cooperative revenues, and fees received from leasing space on the Mortgaged Property), and other income of the Land or the Improvements, gross receipts, receivables, parking fees, laundry and vending machine income and fees and charges for food and other services provided at the Mortgaged Property, whether now due, past due, or to become due, residual receipts, and escrow accounts, however and whenever funded and wherever held.

(ii)    **"Taxes"** means all taxes, assessments, vault rentals and other charges, if any, general, special or otherwise, including all assessments for schools, public betterments and general or local improvements, which are levied, assessed or imposed by any public authority or quasi-public authority, and which, if not paid, could become a lien on the Land or the Improvements.

(jj)    **"Waste"** means a failure to keep the Mortgaged Property in decent, safe and sanitary condition and in good repair.  During any period in which HUD insures this Loan or holds a security interest on the Mortgaged Property, Waste is committed when, without Lender's and HUD's express written consent, Borrower:

(1)    physically changes the Mortgaged Property, whether negligently or intentionally, in a manner that reduces its value;

(2)    fails to maintain and repair the Mortgaged Property in accordance with Program Obligations;

(3)    fails to pay before delinquency any Taxes secured by a lien having priority over this Security Instrument;

(4)    materially fails to comply with covenants in the Note, this Security Instrument or the Regulatory Agreement respecting physical care, maintenance, construction, abandonment, demolition, or insurance against casualty of the Mortgaged Property; or

(5)    retains possession of Rents to which Lender or its assigns have the right of possession under the terms of the Loan Documents.

10

## 2.  UNIFORM COMMERCIAL CODE SECURITY AGREEMENT.

This Security Instrument is also a security agreement under the Uniform Commercial Code for any of the Mortgaged Property which, under applicable law, may be subject to a security interest under the Uniform Commercial Code, whether acquired now or in the future, and all products and cash proceeds and non-cash proceeds thereof (collectively, **"UCC Collateral"**), and Borrower hereby grants to Lender a security interest in the UCC Collateral.  Borrower hereby authorizes Lender to file financing statements, continuation statements and amendments, in such form as Lender may require to perfect or continue the perfection of this security interest. Borrower agrees to enter into any agreements, in form as Lender may require, that the Uniform Commercial Code requires to perfect and continue perfection of Lender's security interest in the portion of UCC Collateral that requires Lender control to attain such perfection.  Borrower shall pay all filing costs and all costs and expenses of any record searches for financing statements that Lender may require.  Without the prior written consent of Lender, Borrower shall not create or permit to exist any other lien or security interest in any of the UCC Collateral.  Except for such UCC filings disclosed to Lender and HUD that are to be released in connection with the financing of the Loan or that are otherwise consented to in writing by Lender and HUD, Borrower represents and warrants to Lender that no UCC filings have been made against Borrower, the Project or the Project Assets prior to the initial or initial/final endorsement of the Note by HUD, and Borrower has taken and shall take no action that would give rise to such UCC filings, except for any UCC filings in connection with the acquisition of any Personalty that has been approved in writing by HUD.  Borrower also represents and warrants to Lender that it has not entered into, and will not enter into, any agreement with any party other than Lender in conjunction with the present Loan transaction that allows for the perfection of a security interest in any portion of the UCC Collateral.  Borrower will promptly notify Lender of any change in its business or principal location, name, or other organizational change that would require a filing under the UCC to continue perfection of Lender's interest, and hereby authorizes Lender to file, and will assist Lender in filing, any forms necessary to continue the effectiveness of existing financing statements or for perfection of Lender's security interest.  If an Event of Default has occurred and is continuing, Lender shall have the remedies of a secured party under the Uniform Commercial Code, in addition to all remedies provided by this Security Instrument or existing under applicable law.  In exercising any remedies, Lender may exercise its remedies against the UCC Collateral separately or together, and in any order, without in any way affecting the availability of Lender's other remedies.  This Security Instrument constitutes a fixture filing financing statement with respect to any part of the Mortgaged Property which is or may become a Fixture and which shall be filed in the local real estate records.

11

**3. ASSIGNMENT OF RENTS; APPOINTMENT OF RECEIVER; LENDER IN POSSESSION.**

(a) As part of the consideration for the Indebtedness, Borrower absolutely and unconditionally assigns and transfers to Lender all Rents. It is the intention of Borrower to establish a present, absolute and irrevocable transfer and assignment to Lender of all Rents and to authorize and empower Lender to collect and receive all Rents without the necessity of further action on the part of Borrower. Promptly upon request by Lender, Borrower agrees to execute and deliver such further assignments as Lender may from time to time require. Borrower and Lender intend this assignment of Rents to be immediately effective and to constitute an absolute present assignment and not an assignment for additional security only, provided that prior to an Event of Default, Borrower is entitled to Rents. For purposes of giving effect to this absolute assignment of Rents, and for no other purpose, Rents shall not be deemed to be a part of the Mortgaged Property. However, if this present, absolute and unconditional assignment of Rents is not enforceable by its terms under the laws of the Property Jurisdiction, then the Rents shall be included as a part of the Mortgaged Property and it is the intention of Borrower that in this circumstance this Security Instrument create and perfect a lien on Rents in favor of Lender, which lien shall be effective as of the date of this Security Instrument.

(b) After the occurrence of an Event of Default, Borrower authorizes Lender to collect, sue for and compromise Rents and directs each tenant (whether residential or non-residential) of the Mortgaged Property to pay all Rents to, or as directed by, Lender. However, until the occurrence of an Event of Default, Lender hereby grants to Borrower a revocable license to collect and receive all Rents for use in accordance with the provisions of this Security Instrument (and the Regulatory Agreement during the period of its applicability), to hold all Rents in trust for the benefit of Lender and to apply all Rents to pay the installments of interest and principal then due and payable under the Note and the other amounts then due and payable under this Security Instrument, including Imposition Deposits, and to pay the current costs and expenses of managing, operating and maintaining the Mortgaged Property, including utilities, Taxes and insurance premiums (to the extent not included in Imposition Deposits), tenant improvements and other capital expenditures. So long as no Event of Default has occurred and is continuing, the Rents remaining after application pursuant to the preceding sentence may be retained by Borrower free and clear of, and released from, Lender's rights with respect to Rents under this Security Instrument, unless otherwise restricted by the terms of the Regulatory Agreement during the period of its applicability. From and after the occurrence of an Event of Default, and without the necessity of Lender entering upon and taking and maintaining control of the Mortgaged Property directly, or by a receiver, Borrower's license to collect Rents shall automatically

12

terminate and Lender shall without Notice be entitled to all Rents as they become due and payable, including Rents then due and unpaid.  Borrower shall pay to Lender upon demand all Rents to which Lender is entitled.  At any time on or after the date of Lender's demand for Rents, Lender may give, and Borrower hereby irrevocably authorizes Lender to give, Notice to all tenants of the Mortgaged Property instructing them to pay all Rents to Lender.  No tenant shall be obligated to inquire further as to the occurrence or continuance of an Event of Default, and no tenant shall be obligated to pay to Borrower any amounts which are actually paid to Lender in response to such a Notice.  Any such Notice by Lender shall be delivered to each tenant personally, by mail or by delivering such demand to each rental unit.  Borrower shall not interfere with and shall cooperate with Lender's collection of such Rents.

(c)    Borrower represents and warrants to Lender that Borrower has not executed any prior assignment of Rents, that Borrower has not performed, and Borrower covenants and agrees that it shall not perform, any acts and has not executed, and shall not execute, any instrument that would prevent Lender from exercising its rights under Section 3, and that at the time of execution of this Security Instrument there has been no anticipation or prepayment of any Rents for more than two months prior to the due dates of such Rents.  Borrower shall not collect or accept payment of any Rents more than two months prior to the due dates of such Rents (other than collections in connection with transactions as approved by HUD).

(d)    If an Event of Default has occurred and is continuing, Lender may, regardless of the adequacy of Lender's security or the solvency of Borrower and even in the absence of Waste (but only with the prior written approval of HUD in the event of Covenant Defaults), enter upon and take and maintain full control of the Mortgaged Property in order to perform all acts that Lender in its discretion determines to be necessary or desirable for the operation and maintenance of the Mortgaged Property, including the execution, cancellation or modification of Leases, the collection of all Rents, the making of repairs to the Mortgaged Property and the execution or termination of contracts providing for the management, operation or maintenance of the Mortgaged Property, for the purposes of enforcing the assignment of Rents pursuant to Section 3(a), protecting the Mortgaged Property or the security of this Security Instrument, or for such other purposes as Lender in its discretion may deem necessary or desirable.  Alternatively, if an Event of Default has occurred and is continuing, regardless of the adequacy of Lender's security, without regard to Borrower's solvency and without the necessity of giving prior Notice (oral or written) to Borrower, Lender may apply to any court having jurisdiction for the appointment of a receiver for the Mortgaged Property to take any or all of the actions set forth in the preceding sentence. If Lender elects to seek the appointment of a receiver for the Mortgaged Property at any time after an Event of Default has occurred and is continuing, Borrower, by its execution

App. 109

13

of this Security Instrument, expressly consents to the appointment of such receiver, including the appointment of a receiver *ex parte* if permitted by applicable law.  Lender or the receiver, as the case may be, shall be entitled to receive a reasonable fee for managing the Mortgaged Property.  Immediately upon appointment of a receiver or immediately upon Lender's entering upon and taking possession and control of the Mortgaged Property, Borrower shall surrender possession of the Mortgaged Property to Lender or the receiver, as the case may be, and shall deliver to Lender or the receiver, as the case may be, all documents, records (including records on electronic or magnetic media), accounts, surveys, plans, and specifications relating to the Mortgaged Property and all security deposits and prepaid Rents.  In the event Lender takes possession and control of the Mortgaged Property, Lender may exclude Borrower and its representatives from the Mortgaged Property.  Borrower acknowledges and agrees that the exercise by Lender of any of the rights conferred under Section 3 shall not be construed to make Lender a lender-in-possession of the Mortgaged Property so long as Lender, or authorized agent of Lender, has not entered into actual possession of the Land and Improvements.

(e)     If Lender enters the Mortgaged Property, Lender shall be liable to account only to Borrower and only for those Rents actually received.  Lender shall not otherwise be liable to Borrower, anyone claiming under or through Borrower or anyone having an interest in the Mortgaged Property, by reason of any act or omission of Lender under Section 3, and Borrower hereby releases and discharges Lender from any such liability to the fullest extent permitted by law.

(f)     If the Rents are not sufficient to meet the costs of taking control of and managing the Mortgaged Property and collecting the Rents, any funds expended by Lender for such purposes shall become an additional part of the Indebtedness as provided in Section 13; provided that Lender shall have the right, but no obligation to make any such advances; and provided further that so long as the Loan is insured by HUD, no such advances by Lender shall become an additional part of the Indebtedness unless such advances receive the prior written approval of HUD.

(g)     Any entering upon and taking of control of the Mortgaged Property by Lender or the receiver, as the case may be, and any application of Rents as provided in this Security Instrument shall not cure or waive any Event of Default or invalidate any other right or remedy of Lender under applicable law or provided for in this Security Instrument.

14

## 4.    ASSIGNMENT OF LEASES; LEASES AFFECTING THE MORTGAGED PROPERTY.

(a)    As part of the consideration for the Indebtedness, Borrower absolutely and unconditionally assigns and transfers to Lender all of Borrower's right, title and interest in, to and under the Leases, including Borrower's right, power and authority to modify the terms of any such Lease, or extend or terminate any such Lease.  It is the intention of Borrower to establish a present, absolute and irrevocable transfer and assignment to Lender of all of Borrower's right, title and interest in, to and under the Leases.  Borrower and Lender intend this assignment of the Leases to be immediately effective and to constitute an absolute present assignment and not an assignment for additional security only.  For purposes of giving effect to this absolute assignment of the Leases, and for no other purpose, the Leases shall not be deemed to be a part of the Mortgaged Property.  However, if this present, absolute and unconditional assignment of the Leases is not enforceable by its terms under the laws of the Property Jurisdiction, then the Leases shall be included as a part of the Mortgaged Property and it is the intention of Borrower that in this circumstance this Security Instrument create and perfect a lien on the Leases in favor of Lender, which lien shall be effective as of the date of this Security Instrument.

(b)    Until Lender gives Notice to Borrower of Lender's exercise of its rights under this Section 4, Borrower shall have all rights, power and authority granted to Borrower under any Lease (except as otherwise limited by this Section or any other provision of this Security Instrument), including the right, power and authority to modify the terms of any Lease or extend or terminate any Lease.  Upon the occurrence of an Event of Default and throughout its continuation, the permission given to Borrower pursuant to the preceding sentence to exercise all rights, power and authority under Leases shall automatically terminate.  Borrower shall comply with and observe Borrower's obligations under all Leases, including Borrower's obligations pertaining to the maintenance and disposition of tenant security deposits.

(c)    Borrower acknowledges and agrees that the exercise by Lender, either directly or by a receiver, of any of the rights conferred under this Section 4 shall not be construed to make Lender a lender-in-possession of the Mortgaged Property so long as Lender, or an authorized agent of Lender, has not entered into actual possession of the Land and the Improvements.  The acceptance by Lender of the assignment of the Leases pursuant to Section 4(a) shall not at any time or in any event obligate Lender to take any action under this Security Instrument or to expend any money or to incur any expenses.  Lender shall not be liable in any way for any injury or damage to person or property sustained by any person or persons, firm or corporation in or about the Mortgaged Property unless Lender is a lender-in-possession.  Prior to Lender's actual

15

entry into and taking possession of the Mortgaged Property, Lender shall not (1) be obligated to perform any of the terms, covenants and conditions contained in any Lease (or otherwise have any obligation with respect to any Lease); (2) be obligated to appear in or defend any action or proceeding relating to the Lease or the Mortgaged Property; or (3) be responsible for the operation, control, care, management or repair of the Mortgaged Property or any portion of the Mortgaged Property.  The execution of this Security Instrument by Borrower shall constitute conclusive evidence that all responsibility for the operation, control, care, management and repair of the Mortgaged Property is and shall be that of Borrower, prior to such actual entry and taking of possession.

(d)    Upon delivery of Notice by Lender to Borrower of Lender's exercise of Lender's rights under this Section 4 at any time after the occurrence of an Event of Default, and without the necessity of Lender entering upon and taking and maintaining control of the Mortgaged Property directly, by a receiver, or by any other manner or proceeding permitted by the laws of the Property Jurisdiction, Lender immediately shall have all rights, powers and authority granted to Borrower under any Lease, including the right, power and authority to modify the terms of any such Lease, or extend or terminate any such Lease.

(e)    Borrower shall, promptly upon Lender's request, deliver to Lender an executed copy of each residential Lease then in effect.  All Leases for residential dwelling units shall be acceptable to Lender and shall comply with Program Obligations.

(f)    Borrower shall not enter into any Lease for any portion of the Mortgaged Property for non-residential use except with the prior written consent of Lender, and Lender's prior written approval of the Lease agreement, consistent with Program Obligations.  Borrower shall not modify the terms of, or extend or terminate, any Lease for non-residential use (including any Lease in existence on the date of this Security Instrument) without the prior written consent of Lender.  Borrower shall, without request by Lender, deliver an executed copy of each non-residential Lease to Lender promptly after such Lease is signed.

All non-residential Leases, including renewals or extensions of existing Leases, shall specifically provide that (i) such Leases are subordinate to the lien of this Security Instrument, except when approved in writing by Lender in accordance with Program Obligations, and (ii) the tenant shall, upon receipt after the occurrence of an Event of Default of a written request from Lender, pay all Rents payable under the Lease to Lender.

16

(g)   Borrower shall not receive or accept Rent under any Lease (whether residential or non-residential) for more than two months in advance.

**5.    PAYMENT OF INDEBTEDNESS; PERFORMANCE UNDER LOAN DOCUMENTS; PREPAYMENT PREMIUM.**  Borrower shall pay the Indebtedness when due in accordance with the terms of the Note and this Security Instrument and shall perform, observe and comply with all other provisions of the Note and this Security Instrument.  Borrower shall pay a prepayment premium in connection with certain prepayments of the Indebtedness, including a payment made after Lender's exercise of any right of acceleration of the Indebtedness, as provided in the Note.

**6.    EXCULPATION.**   Except for personal liability expressly provided for in this Security Instrument or in the Note or in the Regulatory Agreement, the execution of the Note shall impose no personal liability upon Borrower or those parties listed in the Section 50 Addendum to the Regulatory Agreement for payment of the Indebtedness evidenced thereby, and in the Event of Default, the holder of the Note shall look solely to the Mortgaged Property in satisfaction of the Indebtedness and will not seek or obtain any deficiency or personal judgment against Borrower or those parties listed in the Section 50 Addendum to the Regulatory Agreement, except such judgment or decree as may be necessary to foreclose or bar its interest in the Mortgaged Property and all other property mortgaged, pledged, conveyed or assigned to secure payment of the Indebtedness; provided, that nothing in this Section 6 of this Security Instrument and no action so taken shall operate to impair any obligation under the Regulatory Agreement of Borrower or those parties listed in the Section 50 Addendum to the Regulatory Agreement.

**7.    DEPOSITS FOR TAXES, INSURANCE AND OTHER CHARGES.**

(a)      Borrower shall pay to and deposit with Lender, together with and in addition to the monthly payments of interest or of principal and interest payable under the terms of the Note on the first day of each month after the commencement of amortization under the Note, and continuing until the debt secured hereby is paid in full, the following sums:

(1)      an amount sufficient to provide Lender with funds to pay the next mortgage insurance premium if this Security Instrument and the Note are insured by HUD, or a monthly service charge, if they are held by HUD, as follows:

(i)  If and so long as the Note is insured under the provisions of the National Housing Act, as amended, an amount sufficient to

---

17

accumulate in the hands of Lender one month prior to its due date the annual mortgage insurance premium; or

(ii)  If and so long as the Note and this Security Instrument are held by HUD, a monthly service charge in an amount equal to the lesser of the amount permitted by law or the amount set forth in Program Obligations computed for each successive year beginning with the first day of the month following the date of this Security Instrument, or the first day of the month following assignment, if the Note and this Security Instrument are assigned to HUD without taking into account delinquencies or prepayment; and

(2)    a sum equal to the ground rents, if any, next due, plus the premiums that will next become due and payable on policies of fire and other property insurance covering the premises covered hereby, plus water rates, Taxes, municipal/government utility charges and special assessments next due on the premises covered hereby (all as estimated by Lender) less all sums already paid therefore divided by the number of months to the date when such ground rents, premiums, water rates, Taxes, municipal/utility charges and special assessments will become delinquent, such sums to be held by Lender in trust to pay said ground rents, premiums, water rates, Taxes, and special assessments; and

(3)    all payments and deposits mentioned in the two preceding subsections of this Section and all payments to be made under the Note shall be added together and the aggregate amount thereof shall be paid each month in a single payment or deposit to be applied by Lender to the following items in the order set forth:

(i)  mortgage insurance premium charges under the Contract of Insurance;

(ii) ground rents, if Lender has required them to be escrowed with Lender, Taxes, special assessments, water rates, municipal/government utility charges, fire and other property insurance premiums;

(iii) interest on the Note; and

(iv) amortization of the principal of the Note.

18

(b)     Borrower shall pay to and deposit with Lender all other escrows and deposits, including any Reserve for Replacements.

(c)     Borrower shall deposit with Lender such amounts as may be required by any Collateral Agreement and shall perform all other obligations of Borrower under each Collateral Agreement.  Collateral Agreement deposits shall be held in an institution (which may be Lender, if Lender is such an institution) whose deposits or accounts are insured or guaranteed by a federal agency and in accordance with Program Obligations.

## 8.  IMPOSITION DEPOSITS.

(a)     In the event Borrower fails to pay any sums provided for in this Security Instrument, Lender, at its option, may pay the same.  Any excess funds accumulated under Section 7(a) remaining after payment of the items therein mentioned, shall be credited to subsequent monthly payments of the same nature required thereunder; but if any such item shall exceed the estimate therefore, or if Borrower shall fail to pay any other governmental or municipal charge, Borrower shall forthwith make good the deficiency or pay the charge before the same become delinquent or subject to interest or penalties and in default thereof Lender may pay the same.  All sums paid or advanced by Lender and any sums which Lender may be required to advance to pay mortgage insurance premiums shall be added to the Indebtedness and shall bear interest from the date of payment at the rate specified in the Note and shall be due and payable on demand.  In case of termination of the Contract of Insurance by prepayment of the Indebtedness in full or otherwise (except as hereinafter provided), accumulations under Section 7(a) not required to pay sums  due under Section 7(a)(3) shall be credited to Borrower.  If the Mortgaged Property is sold under foreclosure or is otherwise acquired by Lender after an Event of Default, any remaining balance of the accumulations under Section 7(a) shall be credited to the principal under the Note as of the date of the commencement of foreclosure proceedings or as of the date the Mortgaged Property is otherwise acquired; and accumulations under Section 7 shall be likewise credited unless required to pay sums due HUD under Section 7(a)(3).  The amounts deposited under Section 7 and Section 8 are collectively referred to in this Security Instrument as the **"Imposition Deposits"**.  The obligations of Borrower for which the Imposition Deposits are required are collectively referred to in this Security Instrument as **"Impositions"**.  The amount of the Imposition Deposits shall be sufficient to enable Lender to pay applicable Impositions before the last date upon which such payment may be made without any penalty or interest charge being added.  Lender shall maintain records indicating how much of the monthly Imposition Deposits and how much of the aggregate Imposition Deposits held by Lender are held for the purpose of paying Taxes, insurance premiums and each other obligation of Borrower

19

for which Imposition Deposits are required.  Any waiver by Lender of the requirement that Borrower remit Imposition Deposits to Lender may be revoked by Lender, in Lender's discretion, at any time upon Notice to Borrower.

(b)      Imposition Deposits shall be held in accounts insured or guaranteed by a federal agency and in accordance with Program Obligations.  Lender shall apply the Imposition Deposits to pay Impositions so long as no Event of Default has occurred and is continuing.  Unless required by Program Obligations, Lender shall not be required to pay Borrower any interest, earnings or profits on the Imposition Deposits with the exception of the Reserve for Replacement account or residual receipts account (if any).  Borrower hereby pledges and grants to Lender a security interest in the Imposition Deposits as additional security for all of Borrower's obligations under this Security Instrument and the Note.  Any amounts deposited with Lender under Section 7 shall not be trust funds, nor shall they operate to reduce the Indebtedness.

(c)      If Lender receives a bill or invoice for an Imposition, Lender shall pay the Imposition from the Imposition Deposits held by Lender.  Lender shall have no obligation to pay any Imposition to the extent it exceeds Imposition Deposits then held by Lender.  Lender may pay an Imposition according to any bill, statement or estimate from the appropriate public office or insurance company without inquiring into the accuracy of the bill, statement or estimate or into the validity of the Imposition.

(d)      If at any time the amount of the Imposition Deposits held by Lender (other than the Reserve for Replacement or residual receipts, if any) for payment of a specific Imposition exceeds the amount reasonably deemed necessary by Lender plus one-sixth of such estimate, the excess shall be credited against future installments of Imposition Deposits.  If at any time the amount of the Imposition Deposits held by Lender for payment of a specific Imposition is less than the amount reasonably estimated by Lender to be necessary plus one-sixth of such estimate, Borrower shall pay to Lender the amount of the deficiency within 15 days after Notice from Lender.

9.      **REGULATORY AGREEMENT.**  Borrower and HUD have executed a Regulatory Agreement, which is being recorded simultaneously with this Security Instrument, and is incorporated in and made a part of this Security Instrument.  Upon Default of the Regulatory Agreement and at the direction of HUD, Lender shall declare the whole of the Indebtedness to be due and payable.

10.      **APPLICATION OF PAYMENTS.**  If at any time Lender receives, from Borrower or otherwise, any amount applicable to the Indebtedness which is less than all amounts due and payable at such time, Lender must apply that payment to amounts then due and payable in the manner and in the order set forth in Section 7(a)(3).

---

20

Neither Lender's acceptance of an amount that is less than all amounts then due and payable nor Lender's application of such payment in the manner authorized shall constitute or be deemed to constitute either a waiver of the unpaid amounts or an accord and satisfaction.  Notwithstanding the application of any such amount to the Indebtedness, Borrower's obligations under this Security Instrument and the Note shall remain unchanged.

**11.    COMPLIANCE WITH LAWS.**  Borrower shall comply with all applicable: laws; ordinances; regulations; requirements of any Governmental Authority; lawful covenants and agreements recorded against the Mortgaged Property; so long as the Loan is insured or held by HUD, the Regulatory Agreement, and Program Obligations including lead-based paint maintenance requirements of 24 C.F.R. Part 35, subpart G, and any successor regulations;  including but not limited to those of the foregoing pertaining to:  health and safety; construction of Improvements on the Mortgaged Property; fair housing; civil rights; zoning and land use; Leases; and maintenance and disposition of tenant security deposits; and, with respect to all of the foregoing, all subsequent amendments, revisions, promulgations or enactments.  Borrower shall at all times maintain records sufficient to demonstrate compliance with the provisions of this Section 11.  Borrower shall take appropriate measures to prevent, and shall not engage in or knowingly permit, any illegal activities at the Mortgaged Property, including those that could endanger tenants or visitors, result in damage to the Mortgaged Property, result in forfeiture of the Mortgaged Property, or otherwise impair the lien created by this Security Instrument or Lender's interest in the Mortgaged Property.  Borrower represents and warrants to Lender that no portion of the Mortgaged Property has been or will be purchased with the proceeds of any illegal activity.

**12.    USE OF PROPERTY.**  Unless permitted by applicable law and approved by Lender, Borrower shall not (a) allow changes in the use for which all or any part of the Mortgaged Property is being used at the time this Security Instrument was executed, (b) convert any individual dwelling units or common areas to commercial use, (c) initiate or acquiesce in a change in the zoning classification of the Mortgaged Property that results in any change in permitted use that was in effect at the time of initial/final endorsement, (d) establish any condominium or cooperative regime with respect to the Mortgaged Property, (e) materially change any unit configurations or change the number of units in the Mortgaged Property, (f) combine all or any part of the Mortgaged Property with all or any part of a tax parcel which is not part of the Mortgaged Property, (g) subdivide or otherwise split any tax parcel constituting all or any part of the Mortgaged Property, or (h) so long as the Note is insured or held by HUD, permit the Mortgaged Property to be used as transient housing or as a hotel in violation of Section 513 of the National Housing Act, as amended.

21

## 13.    PROTECTION OF LENDER'S SECURITY.

(a)    If Borrower fails to perform any of its obligations under this Security Instrument, Note or Regulatory Agreement, or if any action or proceeding is commenced which purports to affect the Mortgaged Property, Lender's security or Lender's rights under this Security Instrument, including eminent domain, insolvency, Waste, code enforcement, civil or criminal forfeiture, enforcement of Hazardous Materials Laws, fraudulent conveyance or reorganizations or proceedings involving a bankrupt or decedent, then Lender at Lender's option may make such appearances, advance such sums and take such actions as Lender reasonably deems necessary to perform such obligations of Borrower and to protect Lender's interest, including (1) payment of fees and out-of-pocket expenses of attorneys (including fees for litigation at all levels), accountants, inspectors and consultants, (2) entry upon the Mortgaged Property to make repairs or secure the Mortgaged Property, (3) procurement of the insurance required by Section 19, and (4) payment of amounts which Borrower has failed to pay under Section 16 or any other Section of this Security Instrument.

(b)    Any amounts advanced by Lender for taxes, special assessments, water rates, which are liens prior to the Security Instrument, insuring the Project and mortgage insurance premiums, paid after an Event of Default, shall be added to, and become part of the Indebtedness, and shall be immediately due and payable and shall bear interest from the date of the advance until paid at the Interest Rate specified in the Note.  So long as the Loan is insured or held by HUD, Lender does not have any obligation to make advances except as required under Program Obligations, and any advance by Lender other than as required by Program Obligations requires prior written HUD approval before such advance can be added to the Indebtedness.

(c)    Nothing in Section 13 shall require Lender to incur any expense or take any action to protect its security.

## 14.    INSPECTION.  Upon reasonable notice, Lender, its agents, representatives, and designees, may make or cause to be made entries upon and inspections of the Mortgaged Property (including any environmental inspections and tests) during normal business hours, or at any other reasonable time.

## 15.    BOOKS AND RECORDS; FINANCIAL REPORTING.

(a)    Borrower shall keep and maintain at all times at the Mortgaged Property or the management agent's offices, and upon Lender's request shall make available at the Mortgaged Property, complete and accurate books of account and records (including copies of supporting bills and invoices) adequate to reflect correctly the

22

operation of the Mortgaged Property, and copies of all written contracts, Leases, and other instruments which affect the Mortgaged Property.  The books, records, contracts, Leases and other instruments shall be subject to examination and inspection at any reasonable time by Lender.

(b)      If an Event of Default has occurred and is continuing, Borrower shall, at Borrower's expense, deliver to Lender upon written demand all books and records relating to the Mortgaged Property or its operation, which shall be maintained at the Mortgaged Property.

(c)      Borrower authorizes Lender to obtain a credit report on Borrower, at Borrower's expense, at any time.

(d)      Within 120 days after the end of each fiscal year of Borrower, Borrower shall furnish to Lender a statement of income and expenses of Borrower's operation of the Mortgaged Property for that fiscal year, a statement of changes in financial position of Borrower relating to the Mortgaged Property for that fiscal year and, when requested by Lender, a balance sheet showing all assets and liabilities of Borrower relating to the Mortgaged Property as of the end of that fiscal year.  If Borrower's fiscal year is other than the calendar year, Borrower must also submit to Lender a year-end statement of income and expenses within 120 days after the end of the calendar year.  Lender also may require that any statements, schedules or reports required to be delivered to Lender under this Section 15 be audited at Borrower's expense by independent certified public accountants acceptable to Lender.  If Borrower fails to provide in a timely manner the statements, schedules and reports required by this Section 15, Lender shall have the right to have Borrower's books and records audited, at Borrower's expense, by independent certified public accountants selected by Lender in order to obtain such statements, schedules and reports, and all related costs and expenses of Lender shall become immediately due and payable and shall become an additional part of the Indebtedness.  Notwithstanding the foregoing, however, so long as the Loan is insured or held by HUD, Borrower's obligation under this subsection (d) shall be satisfied by the delivery to Lender, concurrently with its delivery to HUD, of a copy of the annual financial statement required to be delivered to HUD in accordance with the Regulatory Agreement.

(e)      Borrower shall deliver to Lender, within 15 days, copies of all operating budgets, capital budgets, and other records or documents concerning the Mortgaged Property or Borrower, reasonably requested by Lender.

---

23

## 16.    TAXES; OPERATING EXPENSES.

(a)    Subject to the provisions of Section 16(c) and Section 16(d), Borrower shall pay, or cause to be paid, all Taxes when due and before the addition of any interest, fine, penalty or cost for nonpayment.

(b)    Subject to the provisions of Section 16(c), Borrower shall pay the expenses of operating, managing, maintaining and repairing the Mortgaged Property (including insurance premiums, utilities, repairs and replacements) before the last date upon which each such payment may be made without any penalty or interest charge being added.

(c)    As long as no Event of Default exists and Borrower has timely delivered to Lender any bills or premium notice that it has received, Borrower shall not be obligated to pay Taxes, insurance premiums or any other individual Imposition to the extent that sufficient Imposition Deposits are held by Lender for the purpose of paying that specific Imposition.  If an Event of Default exists, Lender may exercise any rights Lender may have with respect to Imposition Deposits without regard to whether Impositions are then due and payable; provided that so long as the Loan is insured by HUD, Lender's exercise of its rights shall be subject to Program Obligations pertaining to claims for mortgage insurance benefits.  Lender shall have no liability to Borrower for failing to pay any Impositions to the extent that any Event of Default has occurred and is continuing, insufficient Imposition Deposits are held by Lender at the time an Imposition becomes due and payable or Borrower has failed to provide Lender with bills and premium notice as provided above.

(d)    Borrower, at its own expense, and, so long as the Loan is insured or held by HUD, in accordance with the Regulatory Agreement, may contest by appropriate legal proceedings, conducted diligently and in good faith, the amount or validity of any Imposition other than insurance premiums, if (1) Borrower notifies Lender of the commencement or expected commencement of such proceedings, (2) the Mortgaged Property is not in danger of being sold or forfeited, (3) Borrower deposits with Lender reserves sufficient to pay the contested Imposition, if requested by Lender, and (4) Borrower furnishes whatever additional security is required in the proceedings or is reasonably requested by Lender, which may include the delivery to Lender of the reserves established by Borrower to pay the contested Imposition.

(e)    Borrower shall promptly deliver to Lender a copy of all Notices of, and invoices for, Impositions, and if Borrower pays any Imposition directly, Borrower shall promptly furnish to Lender receipts evidencing such payments.

24

**17.     LIENS; ENCUMBRANCES.**  (a) Borrower shall not permit the grant, creation or existence of any mortgage, deed of trust, deed to secure debt, security interest or other lien or encumbrance ("**Lien**") on the Mortgaged Property (other than the lien of this Security Instrument, any tax liens which are imposed before payment is due, or any inferior liens which are approved in writing by HUD and Lender), whether voluntary, involuntary or by operation of law, and whether or not such Lien has priority over the lien of this Security Instrument.  (b) Borrower shall not repay any HUD-approved inferior Lien from proceeds of the Loan nor from Project Assets other than from Surplus Cash (as defined in the Regulatory Agreement) or residual receipts, except, with the prior written approval of HUD, in the case of an inferior Lien created in an operating loss loan insured pursuant to Section 223(d) of the Act or a supplement loan insured pursuant to Section 241 of the Act.

**18.     PRESERVATION, MANAGEMENT AND MAINTENANCE OF MORTGAGED PROPERTY.**  Borrower (a) shall not commit Waste, (b) shall not abandon the Mortgaged Property, (c) shall restore or repair promptly, in a good and workmanlike manner, any damaged part of the Mortgaged Property to the equivalent of its original condition, or such other condition as Lender may approve in writing, whether or not litigation or insurance proceeds or condemnation awards are available to cover any costs of such restoration or repair, (d) shall keep the Mortgaged Property in decent, safe, and sanitary condition and good repair, including the replacement of Personalty and Fixtures with items of equal or better function and quality, all in accordance with Program Obligations, (e) shall provide for qualified management of the Mortgaged Property by a residential rental property manager, (f) shall give Notice to Lender of and, unless otherwise directed in writing by Lender, shall appear in and defend, any action or proceeding that could impair the Mortgaged Property, Lender's security or Lender's rights under this Security Instrument, (g) shall not (and shall not permit any tenant or other person to) remove, demolish or alter the Mortgaged Property or any part of the Mortgaged Property except that Borrower may dispose of obsolete or deteriorated Fixtures or Personalty if the same are replaced with like items of the same or greater quality or value, or make minor alterations which do not impair the Mortgaged Property, and (h) so long as the Loan is insured or held by HUD, shall not expend any Project funds except from permissible withdrawals of Surplus Cash and except for Reasonable Operating Expenses and necessary repairs without the prior written approval of HUD. So long as the Loan is insured or held by HUD, all expenses incurred by Borrower in connection with the Mortgaged Property shall be incurred in compliance with Program Obligations.

App. 121

25

## 19.   PROPERTY AND LIABILITY INSURANCE.

(a)   Borrower shall keep the Mortgaged Property insured at all times against such hazards as Lender may from time to time require, which insurance shall include but not be limited to coverage against loss by fire and allied perils, general boiler and machinery coverage, builders all-risk and business income coverage.  Lender's insurance requirements may change from time to time throughout the term of the Indebtedness.  If Lender so requires, such insurance shall also include sinkhole insurance, mine subsidence insurance, earthquake insurance, and, if the Mortgaged Property does not conform to applicable zoning or land use laws, building ordinance or law coverage.  If any of the Improvements are located in an area identified by the Federal Emergency Management Agency (or any successor to that agency) as an area having special flood hazards, Borrower shall maintain flood insurance covering such Improvements and any machinery, equipment, Fixtures and furnishings contained therein that are funded, in whole or in part, with Loan proceeds in an amount at least equal to its development or project cost (less estimated land cost) or to the maximum limit of coverage made available with respect to the particular type of property under the National Flood Insurance Act of 1968, as amended, or its successor statute, whichever is less, provided that the amount of flood insurance need not exceed the outstanding principal balance of the Note, and flood insurance need not be maintained beyond the term of the Note.  If Lender determines that flood insurance has not been obtained in the required amount, Lender must notify Borrower of Borrower's obligations to obtain the proper flood insurance.  If Borrower does not obtain such insurance within 45 days of the date of this notification, Lender shall purchase such flood insurance on behalf of Borrower and may charge Borrower for the cost of premiums and fees incurred by Lender in purchasing the flood insurance.

(b)   All premiums on insurance policies required under Section 19(a) shall be paid in the manner provided in Section 7, unless Lender has designated in writing another method of payment.  All such policies shall also be in a form approved by Lender.  All policies of property damage insurance shall include a non-contributing, non-reporting mortgage clause in a form approved by Lender, and in favor of Lender (and HUD, as their interests appear) and shall name as loss payee Lender, its successors and assigns.  Lender shall have the right to hold the original policies or duplicate original policies of all insurance required by Section 19(a).  Borrower shall promptly deliver to Lender a copy of all renewal and other notices received by Borrower with respect to the policies and all receipts for paid premiums.  At least 30 days prior to the expiration date of a policy, Borrower shall deliver to Lender evidence of continuing coverage in form satisfactory to Lender.

26

(c)     Borrower shall maintain at all times commercial general liability insurance, workers' compensation insurance and such other liability, errors and omissions and fidelity insurance coverages as Lender may from time to time require, or shall require any appropriate party to maintain at all times commercial general liability insurance, workers' compensation insurance and such other liability, errors and omissions and fidelity insurance coverages as Lender may from time to time require or such other insurance coverage as required by Program Obligations.

(d)     All insurance policies and renewals of insurance policies required by this Section 19 shall be in such amounts and for such periods as Lender may from time to time require, and shall be issued by insurance companies satisfactory to Lender and in accordance with Program Obligations.  Lender shall have the right to effect insurance in the event Borrower fails to comply with this Section.

(e)     Borrower shall comply with all insurance requirements and shall not permit any condition to exist on the Mortgaged Property that would invalidate any part of any insurance coverage that this Security Instrument requires Borrower to maintain.

(f)     In the event of loss, Borrower shall give immediate written Notice to the insurance carrier and to Lender.  Borrower hereby authorizes and appoints Lender as attorney-in-fact for Borrower to make proof of loss, to adjust and compromise any claims under policies of property damage insurance, to appear in and prosecute any action arising from such property damage insurance policies, to collect and receive the proceeds of property damage insurance, and to deduct from such proceeds Lender's expenses incurred in the collection of such proceeds.  This power of attorney is coupled with an interest and therefore is irrevocable.  Borrower shall notify Lender of any payment received from any insurer.  Lender shall (1) hold the balance of such proceeds to be used to reimburse Borrower for the cost of restoring and repairing the Mortgaged Property to the equivalent of its original condition or to a condition approved by Lender, or (2) apply the balance of such proceeds to the payment of the Indebtedness, whether or not then due.  No amount applied to the reduction of the principal amount of the Indebtedness in accordance with this Section 19(f) shall be considered an optional prepayment as the term is used in this Security Instrument and the Note secured hereby, nor relieve Borrower from continuing to make regular monthly payments in the amount required by the Note. To the extent Lender determines to apply insurance proceeds to restoration, Lender shall do so in accordance with Lender's then-current policies relating to the restoration of casualty damage on similar multifamily properties; provided that so long as the Loan is insured or held by HUD, insurance proceeds shall be applied as approved by HUD and in accordance with Program Obligations pursuant to Section 19(g) below.

27

(g)    Lender shall not exercise its option to apply insurance proceeds to the payment of the Indebtedness if all of the following conditions are met:  (1) no Event of Default (or any event which, with the giving of Notice or the passage of time, or both, would constitute an Event of Default) has occurred and is continuing; (2) Lender determines, in its discretion, that there will be sufficient funds to complete the restoration; (3) Lender determines, in its discretion, that the rental income from the Mortgaged Property after completion of the restoration will be sufficient to meet all operating costs and other expenses, Imposition Deposits, deposits to reserves and loan repayment obligations relating to the Mortgaged Property; and (4) Lender determines, in its discretion, that the restoration will be completed before the earlier of (A) one year before the maturity date of the Note or (B) one year after the date of the loss or casualty.  Further, so long as the Loan is insured by HUD, Lender may not exercise its option to apply insurance proceeds to the payment of the Indebtedness without the prior written approval of HUD.  In seeking this approval, Lender shall provide evidence acceptable to HUD that there has been a total loss of the Mortgaged Property such that complete restoration is improbable.  If HUD fails to give its approval to the use or application of such funds within 60 days after the written request by Lender, Lender may use or apply such funds for any of the purposes specified herein without the approval of HUD.

(h)    If the Mortgaged Property is sold at a foreclosure sale or Lender or HUD acquire title to the Mortgaged Property, Lender and HUD, as applicable, shall automatically succeed to all rights of Borrower in and to any insurance policies and unearned insurance premiums and in and to the proceeds of property damage insurance resulting from any damage to the Mortgaged Property prior to such sale or acquisition.

## 20.    CONDEMNATION.

(a)    Borrower shall promptly notify Lender of any action or proceeding relating to any condemnation or other taking, or conveyance in lieu thereof, of all or any part of the Mortgaged Property, whether direct or indirect condemnation.  Borrower shall appear in and prosecute or defend any action or proceeding relating to any condemnation unless otherwise directed by Lender in writing.  Borrower authorizes and appoints Lender as attorney-in-fact for Borrower to commence, appear in and prosecute, in Lender's or Borrower's name, any action or proceeding relating to any condemnation and to settle or compromise any claim in connection with any condemnation.  This power of attorney is coupled with an interest and therefore is irrevocable.  However, nothing contained in this Section 20 shall require Lender to incur any expense or take any action.  Borrower hereby transfers and assigns to Lender all right, title and interest of Borrower in and to any award or payment with respect to (1)

28

any condemnation, or any conveyance in lieu of condemnation, and (2) any damage to the Mortgaged Property caused by governmental action that does not result in a condemnation.

(b)    All awards of compensation in connection with condemnation for public use of or a taking of any of the Mortgaged Property shall be paid to Lender to be applied (1) to fees, costs and expenses (including reasonable attorneys' fees) incurred by Lender; and (2) to the amount due under the Note secured hereby in (i) amounts equal to the next maturing installment or installments of principal and (ii) with any balance to be credited to the next payment due under the Note.  After payment to Lender of all fees, costs and expenses (including reasonable attorneys' fees) incurred by Lender under this Section 20, all awards of damages in connection with any condemnation for public use of or damage to the Mortgaged Property, shall be paid to Lender to be applied to an account held for and on behalf of Borrower, which account shall, at the option of Lender, either be applied to the amount due under the Note as specified in the preceding sentence, or be disbursed for the restoration.  No amount applied to the reduction of the principal amount due in accordance with this Section 20(b) shall be considered an optional prepayment as the term is used in this Security Instrument and the Note secured hereby, nor relieve Borrower from making regular monthly payments commencing on the first day of the first month following the date of receipt of the award.  Lender is hereby authorized in the name of Borrower to execute and deliver necessary releases or approvals or to appeal from such awards.

## 21.    TRANSFERS OF THE MORTGAGED PROPERTY OR INTERESTS IN BORROWER.

(a)    So long as the Loan is insured or held by HUD, Borrower shall not, without the prior written approval of HUD, convey, assign, transfer, pledge, hypothecate, encumber or otherwise dispose of the Mortgaged Property or any interest therein or permit the conveyance, assignment or transfer of any interest in Borrower (if the effect of such conveyance, assignment or transfer is the creation or elimination of a Principal), unless permitted by Program Obligations.  Lender may charge Borrower a fee, in accordance with Program Obligations, for Lender's additional responsibilities related to Borrower's actions in this Section 21.  Borrower need not obtain the prior written approval of HUD for: (1) a conveyance of the Mortgaged Property at a judicial or non-judicial foreclosure sale under this Security Instrument, (2) inclusion of the Mortgaged Property in a bankruptcy estate by operation of law under the United States Bankruptcy Code, or (3) acquisition of an interest by inheritance or by Court decree.

(b)    If the Loan is no longer insured or held by HUD, Borrower shall not convey, assign, transfer, pledge, hypothecate, encumber or otherwise dispose of the

App. 125

29

Mortgaged Property or any interest therein or permit the conveyance, assignment or transfer of any interest in Borrower without the prior written approval of Lender in its sole discretion.

    **22.    EVENTS OF DEFAULT.**  The occurrence of any one or more of the following shall constitute either a Monetary Event of Default or a Covenant Event of Default under this Security Instrument:

    (a)    Monetary Event of Default:  Any failure by Borrower to pay or deposit when due any amount required by the Note or Section 7(a) or (b) of this Security Instrument.

    (b)    Covenant Events of Default shall include:

        (1)    fraud or material misrepresentation or material omission by Borrower, any of its officers, directors, trustees, general partners, members, managers or any guarantor in connection with (i) the Loan Application for or creation of the Indebtedness, (ii) any financial statement, rent roll, or other report or information provided to Lender during the term of the Indebtedness, or (iii) any request for Lender's consent to any proposed action under this Security Instrument or the Note;

        (2)    the commencement of a forfeiture action or proceeding, whether civil or criminal, which, in Lender's reasonable judgment, could result in a forfeiture of the Mortgaged Property or otherwise materially impair the lien created by this Security Instrument or Lender's interest in the Mortgaged Property;

        (3)    any material failure by Borrower to perform or comply with any of its obligations under this Security Instrument (other than those specified in Section 22(a) and Section 22(b)(1) and (b)(2)), as and when required, which continues for a period of 30 days after Notice of such failure by Lender to Borrower.  However, no such Notice shall apply in the case of any such material failure which could, in Lender's judgment, absent immediate exercise by Lender of a right or remedy under this Security Instrument, result in harm to Lender or impairment of the Note or this Security Instrument; and,

        (4)    so long as the Loan is insured or held by HUD, any failure by Borrower to perform any of its obligations as and when required

30

under the Regulatory Agreement, which failure continues beyond the applicable cure period, if any, specified in the Regulatory Agreement; however, Violations under the terms of the Regulatory Agreement may only be treated as a default under this Security Instrument if HUD instructs Lender to treat them as such.

(c)   Lender shall deliver to the Principal(s) of Borrower, Notice, as provided in Section 31, within five (5) Business Days in each case where Lender has delivered Notice to Borrower of an Event of Default, in order to provide the Principal(s) an opportunity to cure either a Monetary Event of Default or a Covenant Event of Default.

**23.   REMEDIES CUMULATIVE.**  Each right and remedy provided in this Security Instrument is distinct from all other rights or remedies under this Security Instrument, the Note, or so long as the Loan is insured or held by HUD, HUD's remedies under the Regulatory Agreement or afforded by applicable law, and each shall be cumulative and may be exercised concurrently, independently, or successively, in any order.

**24.   FORBEARANCE.**

(a)   So long as the Loan is insured by HUD, Lender shall not without obtaining the prior written consent of HUD, take any of the following actions:  extend the time for payment of all or any part of the Indebtedness; reduce the payments due under this Security Instrument or the Note; release anyone liable for the payment of any amounts under this Security Instrument or the Note; accept a renewal of the Note; modify the terms and time of payment of the Indebtedness; join in any extension or subordination agreement; release any Mortgaged Property; take or release other or additional security; modify the rate of interest or period of amortization of the Note or change the amount of the monthly installments payable under the Note; and otherwise modify this Security Instrument or the Note.  However, if the Contract of Insurance has been terminated, Lender may (but shall not be obligated to) agree with Borrower to any of the aforementioned actions in this Section and Lender shall not have to give Notice to or obtain the consent of any guarantor or third-party obligor.

(b)   Any forbearance by Lender in exercising any right or remedy under the Note, this Security Instrument, or any other Loan Document or otherwise afforded by applicable law, shall not be a waiver of or preclude the exercise of any right or remedy. The acceptance by Lender of payment of all or any part of the Indebtedness after the due date of such payment, or in an amount that is less than the required payment, shall not be a waiver of Lender's right to require prompt payment when due of all other

31

payments on account of the Indebtedness or to exercise any right or remedy for any failure to make prompt payment. Enforcement by Lender of any security for the Indebtedness shall not constitute an election by Lender of remedies so as to preclude the exercise of any other right available to Lender. Lender's receipt of any proceeds or awards under Section 19 and Section 20 shall not operate to cure or waive any Event of Default.

      **25.    LOAN CHARGES.** If any applicable law limiting the amount of interest or other charges permitted to be collected from Borrower in connection with the Loan is interpreted so that any interest or other charge provided for in any Loan Document, whether considered separately or together with other charges provided for in any Loan Document, violates that law, and Borrower is entitled to the benefit of that law, that interest or charge is hereby reduced to the extent necessary to eliminate that violation. The amounts, if any, previously paid to Lender in excess of the permitted amounts shall be applied by Lender to reduce the principal of the Indebtedness. For the purpose of determining whether any applicable law limiting the amount of interest or other charges permitted to be collected from Borrower has been violated, all Indebtedness that constitutes interest, as well as all other charges made in connection with the Indebtedness that constitute interest, shall be deemed to be allocated and spread ratably over the stated term of the Note. Unless otherwise required by applicable law, such allocation and spreading shall be effected in such a manner that the rate of interest so computed is uniform throughout the stated term of the Note.

      **26.    WAIVER OF STATUTE OF LIMITATIONS.** To the extent permitted by law, Borrower hereby waives the right to assert any statute of limitations as a bar to the enforcement of the lien of this Security Instrument or to any action brought to enforce any of the Loan Documents.

      **27.    WAIVER OF MARSHALLING.** Notwithstanding the existence of any other security interests in the Mortgaged Property held by Lender or by any other party, Lender shall have the right to determine the order in which any or all of the Mortgaged Property shall be subjected to the remedies provided in this Security Instrument and the Note or applicable law. Lender shall have the right to determine the order in which any or all portions of the Indebtedness are satisfied from the proceeds realized upon the exercise of such remedies. Borrower and any party who now or in the future acquires a security interest in the Mortgaged Property and who has actual or constructive notice of this Security Instrument waives any and all right to require the marshalling of assets or to require that any of the Mortgaged Property be sold in the inverse order of alienation or that any of the Mortgaged Property be sold in parcels or as an entirety in connection with the exercise of any of the remedies permitted by applicable law or provided in this Security Instrument.

App. 128

32

28.    **FURTHER ASSURANCES.**  Borrower shall execute, acknowledge, and deliver, at its sole cost and expense, all further acts, deeds, conveyances, assignments, estoppel certificates, financing statements, transfers and assurances as Lender may require from time to time in order to better assure, grant, and convey to Lender the rights intended to be granted, now or in the future, to Lender under this Security Instrument and the Note.

29.    **ESTOPPEL CERTIFICATE.**  Within ten (10) days after a request from Lender, Borrower shall deliver to Lender a written statement, signed and acknowledged by Borrower, certifying to Lender or any person designated by Lender, as of the date of such statement, (a) that the Note, (so long as the Loan is insured by HUD, the Regulatory Agreement) and this Security Instrument are unmodified and in full force and effect  (or, if there have been modifications, that the Note, (so long as the Loan is insured by HUD, the Regulatory Agreement) and this Security Instrument are in full force and effect as modified and setting forth such modifications); (b) the unpaid principal balance of the Note; (c) the date to which interest under the Note has been paid; (d) that Borrower is not in default in paying the Indebtedness or in performing or observing any of the covenants or agreements contained in this Security Instrument, and the Note and (so long as the Loan is insured or held by HUD, the Regulatory Agreement) (or, if Borrower is in default, describing such default in reasonable detail); (e) whether or not there are then existing any setoffs or defenses known to Borrower against the enforcement of any right or remedy of Lender under the Note, (so long as the Loan is insured or held by HUD, the Regulatory Agreement) and this Security Instrument; and (f) any additional facts requested by Lender.

30.    **GOVERNING LAW; CONSENT TO JURISDICTION AND VENUE.**

(a)    This Security Instrument and the Note, if it does not itself expressly identify the law that is to apply to it, shall be governed by the laws of the jurisdiction in which the Land is located (**"Property Jurisdiction"**), except so long as the Loan is insured or held by HUD and solely as to rights and remedies of HUD as such local or state laws may be preempted by federal law.

(b)    Borrower agrees that any controversy arising under or in relation to the Note or this Security Instrument shall be litigated exclusively in the Property Jurisdiction except as, so long as the Loan is insured or held by HUD and solely as to rights and remedies of HUD, federal jurisdiction may be appropriate pursuant to any federal requirements. The state courts, and with respect to HUD's rights and remedies, federal courts, and Governmental Authorities in the Property Jurisdiction shall have exclusive jurisdiction over all controversies which shall arise under or in relation to the Note, any

33

security for the Indebtedness, or this Security Instrument.  Borrower irrevocably consents to service, jurisdiction, and venue of such courts for any such litigation and waives any other venue to which it might be entitled by virtue of domicile, habitual residence or otherwise.

## 31.   NOTICE.

(a)     All notices, demands and other communications (**"Notice"**) under or concerning this Security Instrument shall be in writing.  Each Notice shall be addressed to the intended recipients at their respective addresses set forth in this Security Instrument , and shall be deemed given on the earliest to occur of (1) the date when the Notice is received by the addressee; (2) the first Business Day after the Notice is delivered to a recognized overnight courier service, with arrangements made for payment of charges for next Business Day delivery; or (3) the third Business Day after the Notice is deposited in the United States mail with postage prepaid, certified mail, return receipt requested.  As used in this Section 31, the term (**"Business Day"**) means any day other than a Saturday or a Sunday, a federal holiday or holiday in the state where the Project is located or other day on which the federal government or the government of the state where the Project is located is not open for business.  When not specifically designated as a Business Day, the term "**day**" shall refer to a calendar day.  Failure of Lender to send Notice to Borrower or its Principal(s) shall not prevent the exercise of Lender's rights or remedies under this Security Instrument or under the Loan Documents.

(b)     Any party to this Security Instrument may change the address to which Notices intended for it are to be directed by means of Notice given to the other party in accordance with this Section 31.  Each party agrees that it shall not refuse or reject delivery of any Notice given in accordance with this Section 31, that it shall acknowledge, in writing, the receipt of any Notice upon request by the other party and that any Notice rejected or refused by it shall be deemed for purposes of this Section 31 to have been received by the rejecting party on the date so refused or rejected, as conclusively established by the records of the U.S. Postal Service or the courier service.

34

(c)     Any Notice under the Note which does not specify how Notice is to be given shall be given in accordance with this Section 31.


**BORROWER:**
> D4DS LLC
> Attn: Timothy Barton
> 1755 Wittington Place, Suite 340
> Dallas, TX  75234

**PRINCIPAL(S):**

| | |
|---|---|
| Timothy Barton | TLB 2012 Irrevocable Trust |
| 1755 Wittington Place, Suite 340 | Attn: Saskya Bedoya |
| Dallas, TX  75234 | 1755 Wittington Place, Suite 340 |
| | Dallas, TX  75234 |

**LENDER:**
> Greystone Servicing Corporation, Inc.
> Attn: General Counsel
> 419 Belle Air Lane
> Warrenton, VA 20186

**32.    SALE OF NOTE; CHANGE IN SERVICER.** The Note or a partial interest in the Note (together with this Security Instrument) may be sold one or more times without prior Notice to Borrower.  A sale may result in a change of the loan servicer. There also may be one or more changes of the loan servicer unrelated to a sale of the Note.  If there is a sale or transfer of all or a partial interest in the Note or a change of the loan servicer, Lender shall be responsible for ensuring that Borrower is given Notice of the sale, transfer and/or change. Any loan servicer, including any loan servicer resulting from any changes mentioned above, must be approved by HUD in accordance with Program Obligations.

**33.    SINGLE ASSET BORROWER.** Until the Indebtedness is paid in full or unless otherwise approved in writing by HUD so long as the Loan is insured or held by HUD, (a) Borrower shall be a single purpose entity and shall maintain the assets of the Mortgaged Property in segregated accounts and (b) Borrower (1) shall not acquire any real or personal property other than the Mortgaged Property and personal property related to the operation and maintenance of the Mortgaged Property, and so long as the Loan is insured or held by HUD, except pursuant to the Regulatory Agreement and Program Obligations and (2) shall not own or operate any business other than the

35

management and operation of the Mortgaged Property, and so long as the Loan is insured or held by HUD, except pursuant to the Regulatory Agreement and Program Obligations.

**34.     SUCCESSORS AND ASSIGNS BOUND.**  This Security Instrument shall bind, and the rights granted by this Security Instrument shall inure to, the respective successors and assigns of Lender and Borrower.

**35.     JOINT AND SEVERAL LIABILITY.**  If more than one person or entity signs this Security Instrument as Borrower, the obligations of such persons and entities shall be joint and several.

**36.     RELATIONSHIP OF PARTIES; NO THIRD-PARTY BENEFICIARY.**

(a)     The relationship between Lender and Borrower shall be solely that of creditor and debtor, respectively, and nothing contained in this Security Instrument shall create any other relationship between Lender and Borrower.  Borrower agrees that it is not a third-party beneficiary to the Contract of Insurance between HUD and Lender, as more fully set forth in 24 C.F.R. Part 207, Subpart B.

(b)     No creditor of any party to this Security Instrument and no other person (the term "person" includes, but is not limited to, any commercial or governmental entity or institution) shall be a third-party beneficiary of this Security Instrument, the Note, or so long as the Loan is insured or held by HUD, the Regulatory Agreement.  Without limiting the generality of the preceding sentences, (1) any servicing arrangement between Lender and any loan servicer for loss sharing or interim advancement of funds shall constitute a contractual obligation of such loan servicer that is independent of the obligation of Borrower for the payment of the Indebtedness, (2) Borrower shall not be a third-party beneficiary of any servicing arrangement, and (3) no payment by the loan servicer under any servicing arrangement shall reduce the amount of the Indebtedness.

**37.     SEVERABILITY; AMENDMENTS.**  The invalidity or unenforceability of any provision of this Security Instrument shall not affect the validity or enforceability of any other provision, and all other provisions shall remain in full force and effect.  This Security Instrument contains the entire agreement among the parties as to the rights granted and the obligations assumed in this Security Instrument.  This Security Instrument may not be amended or modified except by a writing signed by the party against whom enforcement is sought.

**38.     RULES OF CONSTRUCTION.**  The captions and headings of the Sections of this Security Instrument are for convenience only and shall be disregarded

App. 132

36

in construing this Security Instrument. Any reference in this Security Instrument to an **"Exhibit"** or a **"Section"** shall, unless otherwise explicitly provided, be construed as referring, respectively, to an Exhibit attached to this Security Instrument or to a Section of this Security Instrument. All Exhibits attached to or referred to in this Security Instrument are incorporated by reference into this Security Instrument. Use of the singular in this Security Instrument includes the plural and use of the plural includes the singular. As used in this Security Instrument, the term **"including"** means "including, but not limited to."

      39.    **LOAN SERVICING.** All actions regarding the servicing of the Note, including the collection of payments, the giving and receipt of Notice, inspections of the Mortgaged Property, inspections of books and records, and the granting of consents and approvals, may be taken by the HUD-approved loan servicer unless Borrower receives Notice to the contrary. If Borrower receives conflicting Notices regarding the identity of the loan servicer or any other subject, any such Notice from Lender shall govern; provided that so long as the Loan is insured or held by HUD, if Borrower receives conflicting Notice regarding the identity of the loan servicer or any other subject, any such Notice from Lender shall govern unless there is a Notice from HUD and, in all cases, any Notice from HUD governs notwithstanding any Notice from any other party.

      40.    **DISCLOSURE OF INFORMATION.** To the extent permitted by law, Lender may furnish information regarding Borrower or the Mortgaged Property to third parties with an existing or prospective interest in the servicing, enforcement, evaluation, performance, purchase or securitization of the Indebtedness, including but not limited to trustees, master servicers, special servicers, rating agencies, and organizations maintaining databases on the underwriting and performance of multifamily mortgage loans.

      41.    **NO CHANGE IN FACTS OR CIRCUMSTANCES.** Borrower certifies that all information in the application for the Loan submitted to Lender (the **"Loan Application"**) and in all financial statements, rent rolls, reports, certificates and other documents submitted in connection with the Loan Application are complete and accurate in all material respects and that there has been no material adverse change in any fact or circumstance that would make any such information incomplete or inaccurate. The submission of false or incomplete information shall be a Covenant Event of Default.

      42.    **ESTOPPEL.** The Lender is not the agent of HUD. Any action by Lender in exercising any right or remedy under this Security Instrument shall not be a waiver or

App. 133

37

preclude the exercise by HUD of any right or remedy which HUD might have under the Regulatory Agreement or other Program Obligations.

**43.   ACCELERATION; REMEDIES.**  If a Monetary Event of Default occurs and is continuing for a period of thirty (30) days, Lender, at Lender's option, may declare the Indebtedness to be immediately due and payable without further demand, and may invoke the power of sale and any other remedies permitted by applicable law or provided in this Security Instrument or in the Note.  Following a Covenant Event of Default, Lender, at Lender's option, but so long as the Loan is insured or held by HUD, only after receipt of the prior written approval of HUD, may declare the Indebtedness to be immediately due and payable without further demand, and may invoke the power of sale and any other remedies permitted by applicable law or provided in this Security Instrument or in the Note.  Borrower acknowledges that the power of sale granted in this Security Instrument may be exercised by Lender without prior judicial hearing. Lender shall be entitled to collect all costs and expenses incurred in pursuing such remedies, including reasonable attorneys' fees (including but not limited to appellate litigation), costs of documentary evidence, abstracts and title reports.

**44. FEDERAL REMEDIES.**  In addition to any rights and remedies set forth in the Regulatory Agreement, HUD has rights and remedies under federal law so long as HUD is the insurer or holder of the Loan, including but not limited to the right to foreclose pursuant to the Multifamily Mortgage Foreclosure Act of 1981, 12 U.S.C. 3701 *et seq.*, as amended, when HUD is the holder of the Note.

**45.   REMEDIES FOR WASTE.**  In addition to any other rights and remedies set forth in the Note and this Security Instrument or those available under applicable law, including exemplary damages where permitted, the following remedies for Waste by Borrower are available to Lender as necessary to give complete redress to Lender for Lender's loss or damage:

(a)   the exercise of the remedies available to Lender during the existence of a Covenant Event of Default, as set forth in Section 43 of this Security Instrument;

(b)   an injunction prohibiting future Waste or requiring correction of Waste already committed, but only to the extent that Waste has impaired or threatens to impair Lender's security; and

(c)   recovery of damages, limited by the amount of Waste, to the extent that Waste has impaired Lender's security.  So long as the Loan is insured or held by HUD, any recovery of damages by Lender or HUD for Waste shall be applied, at the sole discretion of HUD, (1) to fees, costs and expenses (including reasonable attorneys'

38

fees) incurred by Lender; (2) to remedy Waste of the Mortgaged Property, (3) to the Indebtedness or (4) for any other purpose designated by HUD.

46.  **TERMINATION OF HUD RIGHTS AND REFERENCES.**  At such time as HUD no longer insures or holds the Note, (a) all rights and responsibilities of HUD shall conclude, all mortgage insurance and references to mortgage insurance premiums, all references to HUD, GNMA and Program Obligations and related terms and provisions shall cease, and all rights and obligations of HUD shall terminate; (b) all obligations and responsibilities of Borrower to HUD shall likewise terminate; and (c) all obligations and responsibilities of Lender to HUD shall likewise terminate; provided, however, nothing contained in this Section 46, shall in any fashion discharge Borrower from any obligations to HUD under the Regulatory Agreement or Program Obligations or Lender from any obligations to HUD under Program Obligations, which occurred prior to termination of the Contract of Insurance.  The provisions of this Section 46 shall be given effect automatically upon the termination of the Contract of Insurance or the transfer of this Security Instrument by HUD to another party, provided that upon the request of Borrower, Lender or the party to whom the Security Instrument has been transferred, at no cost to HUD, HUD shall execute such documents as may be reasonably requested to confirm the provisions of this Section 46.

47.  **CONSTRUCTION FINANCING.**  The Indebtedness represents funds to be used in the construction of certain Improvements on the Land, in accordance with the Building Loan Agreement which is incorporated herein by reference to the same extent and effect as if fully set forth and made herein (provided, however, that if and to the extent that the Building Loan Agreement is inconsistent herewith, this Security Instrument shall govern).  If the construction of the Improvements to be made pursuant to the Building Loan Agreement are not made in accordance with the terms of said Building Loan Agreement, or Borrower otherwise defaults under the Building Loan Agreement, Lender, after due Notice to Borrower, or any subsequent owner, is hereby vested with full and complete authority to enter upon the Land to employ watchmen to protect such Improvements from depredation or injury and to preserve and protect the Personalty therein, to continue any and all outstanding contracts for the erection and completion of said Improvements, to make and enter into any contracts and obligations wherever necessary, either in its own name or in the name of Borrower, or other owner, and to pay and discharge all debts, obligations, and liabilities incurred thereby.  All such sums so advanced by Lender (exclusive of advances of the principal of the Indebtedness) shall be added to the principal of the Indebtedness secured hereby and all shall be secured by this Security Instrument and shall be due and payable on demand with interest at the rate provided in the Note, but no such advances shall be insured unless same are specifically approved by HUD prior to the making thereof.  The Indebtedness shall, at the option of Lender or holder of this Security Instrument and the

39

Note, become due and payable on the failure of Borrower, or other owner, to keep and perform any of the covenants, conditions and agreements of the Building Loan Agreement.  This covenant shall be terminated upon the completion of the Improvements to the satisfaction of Lender and the making of the final advance as provided in the Building Loan Agreement.

## 48.    ENVIRONMENTAL HAZARDS.

(a)    Definitions:

(1)    **"Hazardous Materials"** means petroleum and petroleum products and compounds containing them, including gasoline, diesel fuel and oil; explosives; flammable materials; radioactive materials; polychlorinated biphenyls (**"PCBs"**) and compounds containing them; lead and lead-based paint; asbestos or asbestos-containing materials in any form that is or could become friable; underground or above-ground storage tanks, whether empty or containing any substance; any substance the presence of which on the Mortgaged Property is prohibited by any Governmental Authority; any substance that requires special handling; and any other material or substance now or in the future defined as a "hazardous substance," "hazardous material," "hazardous waste," "toxic substance," "toxic pollutant," "contaminant," or "pollutant" within the meaning of any Hazardous Materials Law.

(2)    **"Hazardous Materials Laws"** means all federal, state, and local laws, ordinances and regulations and standards, rules, policies and other governmental requirements, administrative rulings and court judgments and decrees in effect now or in the future and including all amendments that relate to Hazardous Materials and apply to Borrower or to the Mortgaged Property.  Hazardous Materials Laws include, but are not limited to, the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. Section 9601, *et seq.*, the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, *et seq.*, the Toxic Substance Control Act, 15 U.S.C. Section 2601, *et seq.*, the Clean Water Act, 33 U.S.C. Section 1251, *et seq.*, and the Hazardous Materials Transportation Act, 49 U.S.C. Section 5101, *et seq.*, and their state analogs.

40

(3)     **"Environmental Permit"** means any permit, license, or other authorization issued under any Hazardous Materials Law with respect to any activities or businesses conducted on or in relation to the Mortgaged Property.

(b)     Except for (1) matters covered by a written program of operations and maintenance approved in writing by Lender (**"O&M Program"**); (2) matters described in paragraph (c) of this Section 48; or (3) (for so long as the Loan is insured or held by HUD) matters covered by Program Obligations that may differ from this Section 48 (with respect to lead based paint requirements, for example), Borrower shall not cause or permit any of the following:

(i)     any occurrence or condition on the Mortgaged Property or any other property of Borrower that is adjacent to the Mortgaged Property, which occurrence or condition is or may be in violation of Hazardous Materials Laws; or

(ii)     any violation of or noncompliance with the terms of any Environmental Permit with respect to the Mortgaged Property or any property of Borrower that is adjacent to the Mortgaged Property.

The matters described in clauses (i) and (ii) above are referred to collectively in this Section 48 as **"Prohibited Activities or Conditions."**

(c)     Prohibited Activities and Conditions shall not include the safe and lawful use and storage of quantities of (1) supplies, cleaning materials and petroleum products customarily used in the operation and maintenance of comparable multifamily properties; (2) cleaning materials, personal grooming items and other items sold in containers for consumer use and used by tenants and occupants of residential dwelling units in the Mortgaged Property; and (3) petroleum products used in the operation and maintenance of motor vehicles and motor-operated equipment from time to time located on the Mortgaged Property's parking areas, so long as all of the foregoing are used, stored, handled, transported and disposed of in compliance with Hazardous Materials Laws.

(d)     Borrower shall take all commercially reasonable actions (including the inclusion of appropriate provisions in any Leases executed after the date of this Security Instrument) to prevent its employees, agents, and contractors, and all tenants and other occupants from causing or permitting any Prohibited Activities or Conditions. Borrower shall not lease or allow the sublease or use of all or any portion of the

---

Previous editions are obsolete              HUD MF Security Instrument              HUD-94000M (06/14)

41

Mortgaged Property to any tenant or subtenant for nonresidential use by any user that, in the ordinary course of its business, would cause or permit any Prohibited Activity or Condition.

(e)    If an O&M Program has been established with respect to Hazardous Materials, Borrower shall comply in a timely manner with, and cause all employees, agents, and contractors of Borrower and any other persons encompassed by the O&M Program and present on the Mortgaged Property to comply with the O&M Program. All costs of performance of Borrower's obligations under any O&M Program shall be paid by Borrower, and Lender's out-of-pocket costs incurred in connection with the monitoring and review of the O&M Program and Borrower's performance shall be paid by Borrower upon demand by Lender. Any such out-of-pocket costs of Lender which Borrower fails to pay promptly shall become an additional part of the Indebtedness as provided in Section 13; provided that so long as the Loan is insured by HUD, no advances made by Lender under this subsection (e) shall become an additional part of the Indebtedness unless such advances receive the prior written approval of HUD and provided further that unless approved by HUD, Lender shall have no obligation to make any such advances.

(f)    Borrower represents and warrants to Lender that, except as previously disclosed by Borrower to Lender in writing:

(1)    Borrower has not at any time engaged in, caused or permitted any Prohibited Activities or Conditions;

(2)    to the best of Borrower's knowledge after reasonable and diligent inquiry, no Prohibited Activities or Conditions exist or have existed;

(3)    the Mortgaged Property does not now contain any underground storage tanks, and, to the best of Borrower's knowledge after reasonable and diligent inquiry, the Mortgaged Property has not contained any underground storage tanks in the past. If there is an underground storage tank located on the Mortgaged Property that has been previously disclosed by Borrower to Lender in writing, that tank complies with all requirements of Hazardous Materials Laws;

(4)    Borrower has complied with all Hazardous Materials Laws, including all requirements for notification regarding releases of Hazardous Materials. Without limiting the generality of the foregoing, Borrower has obtained all Environmental Permits

42

required for the operation of the Mortgaged Property in accordance with Hazardous Materials Laws now in effect and all such Environmental Permits are in full force and effect;

(5)     no event has occurred with respect to the Mortgaged Property that constitutes, or with the passing of time or the giving of Notice would constitute, noncompliance with the terms of any Environmental Permit;

(6)     to the best of Borrower's knowledge after reasonable and diligent inquiry, there are no actions, suits, claims or proceedings, pending or threatened, that involve the Mortgaged Property and allege, arise out of, or relate to any Prohibited Activity or Condition; and

(7)     Borrower has not received any complaint, order, notice of violation or other communication from any Governmental Authority with regard to air emissions, water discharges, noise emissions or Hazardous Materials, or any other environmental, health or safety matters affecting the Mortgaged Property or any other property of Borrower that is adjacent to the Mortgaged Property that have not previously been resolved legally.

The representations and warranties in this Section 48 shall be continuing representations and warranties that shall be deemed to be made by Borrower throughout the term of the Loan, until the Indebtedness has been paid in full.

(g)     Borrower shall promptly notify Lender in writing upon the occurrence of any of the following events:

(1)     Borrower's discovery of any Prohibited Activity or Condition;

(2)     Borrower's receipt of or knowledge of any complaint, order, notice of violation or other communication from any Governmental Authority or other person with regard to present or future alleged Prohibited Activities or Conditions or any other environmental, health or safety matters affecting the Mortgaged Property or any other property of Borrower that is adjacent to the Mortgaged Property; and

(3)     any representation or warranty in this Section 48 becoming untrue after the date of this Security Instrument.

43

Any such Notice given by Borrower shall not relieve Borrower of, or result in a waiver of, any obligation under this Security Instrument, the Note, or any other Loan Document.

(h)    Borrower shall pay promptly the costs of any environmental inspections, tests or audits (**"Environmental Inspections"**) required by Lender in connection with any foreclosure or deed in lieu of foreclosure, or as a condition of Lender's consent to any transfer under Section 21, or required by Lender following a reasonable determination by Lender that Prohibited Activities or Conditions may exist. Any such costs incurred by Lender (including the fees and out-of-pocket costs of attorneys and technical consultants whether incurred in connection with any judicial (appellate or otherwise) or administrative process or otherwise) which Borrower fails to pay promptly shall become an additional part of the Indebtedness as provided in Section 13; provided that so long as the Loan is insured by HUD, no advances made by Lender under this subsection (h) shall become an additional part of the Indebtedness unless such advances receive the prior written approval of HUD and provided further that unless approved by HUD, Lender shall have no obligation to make such further advances. The results of all Environmental Inspections made by Lender shall at all times remain the property of Lender and Lender shall have no obligation to disclose or otherwise make available to any party other than Borrower, and so long as the Loan is insured by HUD, to HUD, such results or any other information obtained by Lender in connection with its Environmental Inspections. Lender hereby reserves the right, and Borrower hereby expressly authorizes Lender, to make available to any party, including any prospective bidder at a foreclosure sale of the Mortgaged Property, the results of any Environmental Inspections made by Lender with respect to the Mortgaged Property. Borrower consents to Lender notifying any party (either as part of a notice of sale or otherwise) of the results of any of Lender's Environmental Inspections. Borrower acknowledges that Lender cannot control or otherwise assure the truthfulness or accuracy of the results of any of its Environmental Inspections and that the release of such results to prospective bidders at a foreclosure sale of the Mortgaged Property may have a material and adverse effect upon the amount which a party may bid at such sale. Borrower agrees that Lender shall have no liability whatsoever as a result of delivering the results of any of its Environmental Inspections to any third party, and Borrower hereby releases and forever discharges Lender from any and all claims, damages, or causes of action, arising out of, connected with or incidental to the results of, the delivery of any of Lender's Environmental Inspections.

(i)    If any investigation, site monitoring, containment, clean-up, restoration or other remedial work (**"Remedial Work"**) is necessary to comply with any Hazardous Materials Law that has or acquires jurisdiction over the Mortgaged Property or the use, operation or improvement of the Mortgaged Property under any Hazardous Materials

44

Law, Borrower shall, by the earlier of (1) the applicable deadline required by the Hazardous Materials Law or (2) thirty (30) days after Notice from Lender demanding such action, begin performing the Remedial Work, and thereafter diligently prosecute it to completion, and shall in any event complete the work by the time required by applicable Hazardous Materials Law.  If Borrower fails to begin on a timely basis or diligently prosecute any required Remedial Work, Lender may, at its option, cause the Remedial Work to be completed, in which case Borrower shall reimburse Lender on demand for the cost of doing so.  So long as the Loan is insured by HUD, no advances made by Lender under this subsection (i) shall become part of the Indebtedness as provided in Section 13 unless such advances receive the prior written approval of HUD and provided further that unless approved by HUD, Lender shall have no obligation to make any such advances.

(j)       Borrower shall cooperate with any inquiry by any Governmental Authority and shall comply with any governmental or judicial order which arises from any alleged Prohibited Activity or Condition.

(k)       Borrower shall indemnify, and if Borrower is located in a State that requires an indemnification agreement separate and apart from this Security Instrument, Borrower shall provide said indemnification agreement to Lender, hold harmless and defend (1) Lender, (2) any prior owner or holder of the Note, (3) the loan servicer, (4) any prior loan servicer, (5) the officers, directors, shareholders, partners, employees and trustees of any of the foregoing, and (6) the heirs, legal representatives, successors and assigns of each of the foregoing (collectively, **"Indemnitees"**) from and against all proceedings, claims, damages, penalties and costs (whether initiated or sought by Governmental Authorities or private parties), including fees and out of pocket expenses of attorneys and expert witnesses, investigatory fees, and remediation costs, whether incurred in connection with any judicial (including appellate) or administrative process or otherwise, arising directly or indirectly from any of the following except where the Mortgaged Property became contaminated subsequent to any transfer of ownership which was approved in writing by Lender (and so long as the Loan is insured or held by HUD, by HUD), provided such transferee assumes in writing all obligations of Borrower with respect to Prohibited Activities or Conditions:

(i)       any breach of any representation or warranty of Borrower in this Section 48;

(ii)      any failure by Borrower to perform or comply with any of its obligations under this Section 48;

App. 141

45

(iii)    the existence or alleged existence of any Prohibited Activity or Condition;

(iv)    the actual or alleged violation of any Hazardous Materials Law.

(l)    Counsel selected by Borrower to defend Indemnitees shall be subject to the approval of those Indemnitees.  However, any Indemnitee may elect to defend any claim or legal or administrative proceeding at Borrower's expense.

(m)    Borrower shall not, without the prior written consent of those Indemnitees who are named as parties to a claim or legal or administrative proceeding (**"Claim"**), settle or compromise the Claim if the settlement (1) results in the entry of any judgment that does not include as an unconditional term the delivery by the claimant or plaintiff to Lender of a written release of those Indemnitees, satisfactory in form and substance to Lender; or (2) may materially and adversely affect Lender, as determined by Lender in its discretion.

(n)    Borrower's obligation to indemnify the Indemnitees shall not be limited or impaired by any of the following, or by any failure of Borrower or any guarantor to receive Notice of or consideration for any of the following:

(1)    any amendment or modification of any Loan Document;

(2)    any extensions of time for performance required by any Loan Document;

(3)    the accuracy or inaccuracy of any representations and warranties made by Borrower under this Security Instrument or any other Loan Document;

(4)    the release of Borrower or any other person, by Lender or by operation of law, from performance of any obligation under any Loan Document;

(5)    the release or substitution in whole or in part of any security for the Indebtedness; and

(6)    Lender's failure to properly perfect any lien or security interest given as security for the Indebtedness.

(o)    Borrower shall, at its own cost and expense, do all of the following:

App. 142

46

(1)    pay or satisfy any judgment or decree that may be entered against any Indemnitee or Indemnitees in any legal or administrative proceeding incident to any matters against which Indemnitees are entitled to be indemnified under this Section 48;

(2)    reimburse Indemnitees for any expenses paid or incurred in connection with any matters against which Indemnitees are entitled to be indemnified under this Section 48; and

(3)    reimburse Indemnitees for any and all expenses, including fees and out-of-pocket expenses of attorneys and expert witnesses, paid or incurred in connection with the enforcement by Indemnitees of their rights under this Section 48, or in monitoring and participating in any legal (including appellate) or administrative proceeding.

(p)    In any circumstances in which the indemnity under this Section 48 applies, Lender may employ its own legal counsel and consultants to prosecute, defend or negotiate any claim or legal or administrative proceeding and Lender, with the prior written consent of Borrower (which shall not be unreasonably withheld, delayed or conditioned), may settle or compromise any action or legal or administrative proceeding. Borrower shall reimburse Lender upon demand for all costs and expenses incurred by Lender, including all costs of settlements entered into in good faith, and the fees and out of pocket expenses of such attorneys (including but not limited to appellate litigation) and consultants.

(q)    The provisions of this Section 48 shall be in addition to any and all other obligations and liabilities that Borrower may have under applicable law or under other Loan Documents, and each Indemnitee shall be entitled to indemnification under this Section 48 without regard to whether Lender or that Indemnitee has exercised any rights against the Mortgaged Property or any other security, pursued any rights against any guarantor, or pursued any other rights available under the Loan Documents or applicable law. If Borrower consists of more than one entity, the obligation of those entities to indemnify the Indemnitees under this Section 48 shall be joint and several. The obligation of Borrower to indemnify the Indemnitees under this Section 48 shall survive any repayment or discharge of the Indebtedness, any foreclosure proceeding, any foreclosure sale, any delivery of any deed in lieu of foreclosure, and any release of record of the lien of this Security Instrument. Notwithstanding anything in Section 48 to the contrary, so long as the Loan is insured or held by HUD, indemnification costs and reimbursements to Lender or to any or all Indemnitees shall be paid only from the

App. 143

47

available proceeds of an appropriate insurance policy or from Surplus Cash or other escrow accounts.

(r)    So long as the Loan is insured or held by HUD, all references to Lender in this Section 48 shall also be construed to refer to HUD as its interest appears (solely as determined by HUD) and all notifications to Lender must also be made to HUD and all Lender approvals and exercises of discretion by Lender under this Section 48 must first have the prior written approval of HUD, provided, that, so long as the Loan is insured or held by HUD, the reference to Lender as an Indemnitee shall be construed to refer to HUD, and Borrower's obligations to indemnify HUD as an Indemnitee shall remain in effect in accordance with this Section 48, notwithstanding the termination or expiration of insurance of the Loan by HUD.

(s)    To the extent any HUD environmental requirements or standards are inconsistent or conflict with the provisions of this Section 48, the HUD requirements or standards shall control so long as the Loan is insured or held by HUD.

**49.**    (See Exhibit B)

**ATTACHED EXHIBITS.**  The following Exhibits are attached to this Security Instrument:

|X|    Exhibit A            Description of the Land (required).

|X|    Exhibit B            Modifications to Security Instrument

48

**IN WITNESS WHEREOF**, Borrower has signed and delivered this Security Instrument or has caused this Security Instrument to be signed and delivered by its duly authorized representative, as a sealed instrument.

D4DS LLC,
a Texas limited liability company

By: _____
Timothy Barton, President

STATE OF TEXAS          §
                        §
COUNTY OF Dallas        §

    The foregoing instrument was acknowledged before me on this ⏟11⏟ day of October, 20 17 by Timothy Barton, President of D4DS LLC., a Texas limited liability company.

[seal]

```
SASKYA BEDOYA
Notary Public, State of Texas
My Commission Expires
July 21, 2018
```

_____
Notary Public
Printed Name of Notary: Saskya Bedoya

My Commission Expires: July 21, 2018

---

Previous editions are obsolete          HUD MF Security Instrument          HUD-94000M (06/14)

App. 145

*HUD Project Number: 113-35683*
*Project Name: Bellwether Ridge Apartments*

**EXHIBIT A**
DESCRIPTION OF THE LAND

TRACT 1:

Being all of LOTS 1A1 AND 3A1, BLOCK A, HUNTINGTON RIDGE, an Addition to the City of DeSoto, Dallas County, Texas, according to the Plat thereof recorded in Instrument Number 201700293233, Official Public Records, Dallas County, Texas.

TRACT 2:

Non-exclusive easement right as created and described in Easement Grant executed by DeSoto Ridge Apartments, Ltd., as Grantor, to Branch Banking and Trust Company, as Grantee, dated December 27, 2013, filed December 31, 2013, under Clerk's File No. 201300390459, Real Property Records, Dallas County, Texas over the following described tract of land:

Lot 2, Block A, Huntington Ridge, an Addition to the City of DeSoto, Dallas County, Texas, according to the Map or Plat thereof recorded under Clerk's File No. 200600427008, Map Records, Dallas County, Texas.

HUD-94000M (06/14)                                                    Legal Description

App. 146

**EXHIBIT B**
MODIFICATIONS TO SECURITY INSTRUMENT

The following modifications are made to the text of the Security Instrument of which this Exhibit is a part:

ADDENDUM
(TEXAS)

HUD Project Number: 113-35683
Project Name: Bellwether Ridge Apartments

The following sections are inserted into the Security Instrument and made a part thereof:

43. Accelerations/ Remedies:

If Lender invokes the power of sale, Lender may, by and through the Trustee, or otherwise, sell or offer for sale the Mortgaged Property in such portions, order and parcels as Lender may determine, with or without having first taken possession of the Mortgaged Property, to the highest bidder for cash at public auction.  Such sale shall be made at the courthouse door of the county in which all or any part of the Land to be sold is situated (whether the parts or parcel, if any, situated in different counties are contiguous or not, and without the necessity of having any Personalty present at such sale) on the first Tuesday of any month between the hours of 10:00 a.m. and 4:00 p.m., after advertising the time, place and terms of sale and that portion of the Mortgaged Property to be sold by posting or causing to be posted written or printed notice of sale at least twenty-one (21) days before the date of the sale at the courthouse door of the county in which the sale is to be made and at the courthouse door of any other county in which a portion of the Land may be situated, and by filing such notice with the County Clerk(s) of the county(s) in which all or a portion of the Land may be situated, which notice may be posted and filed by the Trustee acting, or by any person acting for the Trustee, and Lender has, at least twenty-one (21) days before the date of the sale, served written or printed notice of the proposed sale by certified mail on each debtor obligated to pay the Indebtedness according to Lender's records by the deposit of such notice, enclosed in a postpaid wrapper, properly addressed to such debtor at debtor's most recent address as shown by Lender's records, in a post office or official depository under the care and custody of the United States Postal Service. The affidavit of any person having knowledge of the facts to the effect that such service was completed shall be prima facie evidence of the fact of service.

49. Trustee:

(a)     Trustee may resign by giving of notice of such resignation in writing to Lender.  If Trustee shall die, resign or become disqualified from acting under this Instrument or shall fail or refuse to act in accordance with this Instrument when requested by Lender or if for any reason and without cause Lender shall prefer to appoint a substitute trustee to act instead of the original Trustee named in this Instrument or any prior successor or substitute trustee, Lender shall have full power to appoint a substitute trustee and, if preferred, several substitute trustees in succession who shall succeed to all the estate, rights, powers and duties of the original Trustee named in this Instrument.  Such appointment may be executed by an authorized

officer, agent or attorney-in-fact of Lender (whether acting pursuant to a power of attorney or otherwise), and such appointment shall be conclusively presumed to be executed with authority and shall be valid and sufficient without proof of any action by Lender.

(b)     Any successor Trustee appointed pursuant to this Section shall, without any further act, deed or conveyance, become vested with all the estates, properties, rights, powers and trusts of the predecessor Trustee with like effect as if originally named as Trustee in this Instrument; but, nevertheless, upon the written request of Lender or such successor Trustee, the Trustee ceasing to act shall execute and deliver an instrument transferring to such successor Trustee, all the estates, properties, rights, powers and trusts of the Trustee so ceasing to act, and shall duly assign, transfer and deliver any of the property and monies held by the Trustee ceasing to act to the successor Trustee.

(c)     Trustee may authorize one or more parties to act on Trustee's behalf to perform the ministerial functions required of Trustee under this Instrument, including the transmittal and posting of any notices.

THE SECURITY INSTRUMENT SHALL BE PREPARED TO CONFORM TO THE REQUIREMENTS OF THE LOCAL FILING JURISDICTION IN WHICH THE DOCUMENT IS TO BE RECORDED AND FILED.

**Filed and Recorded**
**Official Public Records**
**John F. Warren, County Clerk**
**Dallas County, TEXAS**
**10/24/2017 10:12:24 AM**
**$226.00**
**201700300652**

HUD-94000M-ADD
Security Instrument - Addendum

App. 148

# EXHIBIT A-18

Uniform Commercial Code
P.O. Box 13193
Austin, Texas 78711-3193

Ruth R. Hughs
Secretary of State

## Office of the Secretary of State

May 13, 2020
Page 1 of 1

| | |
|---|---|
| Filing Fee: | $30.00 |
| **Total Filing Fee:** | **$30.00** |

Capitol Services, Inc.
PO Box 1831
Austin, TX 78767 -

Re: **Texas UCC Initial Filing Acknowledgment**

The Texas Secretary of State's Office has received and filed your document. The information below reflects the data that was indexed into our system.

Initial Filing Type: **Financing Statement**

Initial Filing Number: **20-0017679567**          Filing Date: **05/13/2020**          Filing Time: **11:56 a.m.**

Lapse Date: **05/13/2025**          Document Number: **970068230002**

| Party Type | Party Name and Address |
|---|---|
| Debtor | **ENOCH INVESTMENTS LLC** |
| | **1755 WITTINGTON PLACE SUITE 340, FARMERS BRANCH, TX, USA, 75234** |
| Secured Party | **SOUTHERN PROPERTIES CAPITAL LTD** |
| | **1603 LBJ FREEWAY, SUITE 280, FARMERS BRANCH, TX, USA, 75234** |

Please feel free to contact us at 512-475-2703 if you have any questions regarding the above information.

User ID: JHUNT

FILING NUMBER: 20-0017679567
FILING DATE: 5/13/2020 11:56 AM
DOCUMENT NUMBER: 970068230002
FILED: Texas Secretary of State
Received by Fax

# UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

**A. NAME & PHONE OF CONTACT AT FILER (optional)**
Date Chin, 214-350-3667

**B. E-MAIL CONTACT AT FILER (optional)**
dchin@bennettweston.com

**C. S**

Return Acknowledgement to:

Capitol Services, Inc.
PO Box 1831
Austin, TX 78767
800.345.4647

CAPITOL SERVICES

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. **DEBTOR'S NAME:** Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of Item 1 blank, check here ☐ and provide the Individual Debtor Information in Item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| ENOCH INVESTMENTS LLC | | | |

OR

| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 1755 Wittington Place Suite 340 | Farmers Branch | TX | 75234 | USA |

2. **DEBTOR'S NAME:** Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of Item 2 blank, check here ☐ and provide the Individual Debtor Information in Item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| | | | |

OR

| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

3. **SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY):** Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| SOUTHERN PROPERTIES CAPITAL LTD | | | |

OR

| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 1603 LBJ Freeway, Suite 280 | Farmers Branch | TX | 75234 | USA |

4. **COLLATERAL:** This financing statement covers the following collateral:

See Exhibit "A" attached hereto and made a part hereof.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, Item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
Parc at Windmill Farms - ENOCH INVESTMENTS Secured Interest - DOT UCC - TX SOS Filing

International Association of Commercial Administrators (IACA)

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

## EXHIBIT "A"

100% of its interest in JMJD4 LLC which consist of 99% of the membership interest in JMJD4 LLC.

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)
Date Chin, 214-350-3667

B. E-MAIL CONTACT AT FILER (optional)
dchin@bennettweston.com

C. SEND ACKNOWLEDGMENT TO: (Name and Address)

Bennett, Weston, Lajone & Turner P.C.
Attn: Date Chin
1603 LBJ Freeway, Suite 280
Dallas, Texas  75234

Delaware Department of State
U.C.C. Filing Section
Filed: 12:46 PM 05/13/2020
U.C.C. Initial Filing No: 2020 3378223

Service Request No: 20203837199

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| TRWF LLC | | | |
| OR 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 1755 Wittington Place Suite 340 | Farmers Branch | TX | 75234 | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| | | | |
| OR 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| SOUTHERN PROPERTIES CAPITAL LTD | | | |
| OR 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 1603 LBJ Freeway, Suite 280 | Farmers Branch | TX | 75234 | USA |

4. COLLATERAL: This financing statement covers the following collateral:

See Exhibit "A" attached hereto and made a part hereof.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable) ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
Parc at Windmill Farms - TRWF Secured Interest - DOT UCC - DE SOS Filing

International Association of Commercial Administrators (IACA)

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

App. 153

## EXHIBIT "A"

100% of its interest in JMJAV LLC which consist of 100% of the membership interest in JMJAV LLC.

FILING NUMBER: 20-0017975172
FILING DATE: 5/14/2020 12:15 PM
DOCUMENT NUMBER: 970482800002
FILED: Texas Secretary of State
Received by Fax

# UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

**A. NAME & PHONE OF CONTACT AT FILER (optional)**

**B. E-MAIL CONTACT AT FILER (optional)**

**C. S**

Return Acknowledgement to:

Capitol Services, Inc.
PO Box 1831
Austin, TX 78767
800.345.4647

CAPITOL SERVICES

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**1. DEBTOR'S NAME:** Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME  JMJAV LLC | | | |
|---|---|---|---|
| OR 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1c. MAILING ADDRESS 13901 MIDWAY ROAD, SUITE 102-LB243 | CITY FARMERS BRANCH | STATE TX / POSTAL CODE 75244 | COUNTRY USA |

**2. DEBTOR'S NAME:** Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE / POSTAL CODE | COUNTRY |

**3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY):** Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME  SOUTHERN PROPERTIES CAPITAL LTD | | | |
|---|---|---|---|
| OR 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3c. MAILING ADDRESS 1603 LBJ FREEWAY, SUITE 800 | CITY DALLAS | STATE TX / POSTAL CODE 75234 | COUNTRY USA |

**4. COLLATERAL:** This financing statement covers the following collateral:
100% OF ITS INTEREST IN JMJD4 LLC WHICH CONSISTS OF 1% OF THE MEMBERSHIP INTEREST IN JMJD4 LLC.

| 5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) | ☐ being administered by a Decedent's Personal Representative |
|---|---|
| 6a. Check only if applicable and check only one box: ☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility | 6b. Check only if applicable and check only one box: ☐ Agricultural Lien ☐ Non-UCC Filing |
| 7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor | |

**8. OPTIONAL FILER REFERENCE DATA:**
JMJAV - JMJD4 - TX - STATE

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

International Association of Commercial Administrators (IACA)

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

**A. NAME & PHONE OF CONTACT AT FILER (optional)**
Date Chin, 214-350-3667

**B. E-MAIL CONTACT AT FILER (optional)**
dchi~@~~~~~~~~~~~~~~~

**C. SEN**

Return Acknowledgement to:

Capitol Services, Inc.
PO Box 1831
Austin, TX 78767
800.345.4647

CAPITOL SERVICES

20-0017192082

05/08/2020 04:34 PM

FILED
TEXAS SECRETARY OF STATE
SOS

969280960003

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**1. DEBTOR'S NAME:** Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| JMJAV LLC | | | |
| OR 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | |
| 1c. MAILING ADDRESS | CITY | STATE / POSTAL CODE | COUNTRY |
| 13901 Midway Road Suite 102-LB 243 | Farmers Branch | TX / 75244 | USA |

**2. DEBTOR'S NAME:** Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| | | | |
| OR 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | |
| 2c. MAILING ADDRESS | CITY | STATE / POSTAL CODE | COUNTRY |
| | | | |

**3. SECURED PARTY'S NAME** (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| SOUTHERN PROPERTIES CAPITAL LTD | | | |
| OR 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | |
| 3c. MAILING ADDRESS | CITY | STATE / POSTAL CODE | COUNTRY |
| 1603 LBJ Freeway, Suite 280 | Farmers Branch | TX / 75234 | USA |

**4. COLLATERAL:** This financing statement covers the following collateral:

See Exhibit "A" attached hereto and made a part hereof.

**5.** Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

**6a.** Check only if applicable and check only one box:
☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

**6b.** Check only if applicable and check only one box:
☐ Agricultural Lien ☐ Non-UCC Filing

**7. ALTERNATIVE DESIGNATION (if applicable):** ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

**8. OPTIONAL FILER REFERENCE DATA:**
Bellwether Ridge - JMJAV Secured Interest - DOT UCC - TX SOS Filing

International Association of Commercial Administrators (IACA)

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

App. 156

## EXHIBIT "A"

100% of its interest in D4DS LLC which consist of 1% of the membership interest in D4DS LLC.

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

**A. NAME & PHONE OF CONTACT AT FILER (optional)**
Date Chin, 214-350-3667

**B. E-MAIL CONTACT AT FILER (optional)**
dchin@bennettweston.com

**C. SEND ACKNOWLEDGMENT TO:   (Name and Address)**

Bennett, Weston, Lajone & Turner P.C.
Attn:  Date Chin
1603 LBJ Freeway, Suite 280
Dallas, Texas  75234

Delaware Department of State
U.C.C. Filing Section
Filed: 03:07 PM 05/08/2020
U.C.C. Initial Filing No: 2020 3275759

Service Request No:   20203644567

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**1. DEBTOR'S NAME:** Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor Information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| JMJD4 LLC | | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | | |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 13901 Midway Road Suite 102-LB 243 | Farmers Branch | TX | 75244 | USA |

**2. DEBTOR'S NAME:** Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| | | | | |
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | | |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| | | | | |

**3. SECURED PARTY'S NAME** (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| SOUTHERN PROPERTIES CAPITAL LTD | | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | | |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 1603 LBJ Freeway, Suite 280 | Farmers Branch | TX | 75234 | USA |

**4. COLLATERAL:** This financing statement covers the following collateral:

See Exhibit "A" attached hereto and made a part hereof.

**5.** Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

**6a.** Check only if applicable and check only one box:
☐ Public-Finance Transaction  ☐ Manufactured-Home Transaction  ☐ A Debtor is a Transmitting Utility

**6b.** Check only if applicable and check only one box:
☐ Agricultural Lien  ☐ Non-UCC Filing

**7. ALTERNATIVE DESIGNATION (if applicable):** ☐ Lessee/Lessor  ☐ Consignee/Consignor  ☐ Seller/Buyer  ☐ Bailee/Bailor  ☐ Licensee/Licensor

**8. OPTIONAL FILER REFERENCE DATA:**
Bellwether Ridge - JMJD4 Secured Interest - DOT UCC - DE SOS Filing

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

International Association of Commercial Administrators (IACA)

App. 158

## EXHIBIT "A"

100% of its interest in D4DS LLC which consist of 98.5% of the membership interest in D4DS LLC.

# EXHIBIT A-19

**SOUTHERN PROPERTIES CAPITAL LTD.**
1603 LBJ Freeway, Suite 800
Dallas, Texas 75234

October 3, 2022

**VIA HAND DELIVERY**
Enoch Investments, LLC
TRWF LLC
JMJAV, LLC
JMJD4, LLC
D4DS, LLC
c/o JMJ Development, LLC
13901 Midway Road, Suite 102
Dallas, Texas 75244
Attn: Timothy Barton

Re: Conversion option for Bellwether Ridge Project; **EXERCISE NOTICE**

Dear Mr. Barton:

Southern Properties Capital Ltd. ("SPC") hereby exercises its option to acquire all interest of the addresses above in the Project known as Bellwether Ridge, DeSoto, Texas ("Project").

As you know, the Apartments at Bellwether Ridge, LLC and D4DS, LLC have previously executed a purchase contract to effect such transfer through a deed, once the lender on the Project and HUD have consented to the transfer. Attached is a proposed First Amendment to such contract together with a check for $100.00 made out to Enoch Investments, LLC, TRWF LLC and JMJAV, LLC.

Please return the signed amendment so we can continue to process the TPA approval. If you or your attorney have any questions, please contact Jay LaJone of Steptoe & Johnson PLLC at 214-373-2556.

Sincerely,

By: _____
Bradley J. Muth, President

15519290v1

App. 161

# EXHIBIT A-20

## FIRST AMENDMENT TO AGREEMENT OF PURCHASE AND SALE

This First Amendment to Agreement of Purchase and Sale ("Amendment") is made and entered into this ___ day of October, 2022, by and between **APTS AT BELLWETHER RIDGE, LLC**, a Delaware limited liability company ("Purchaser") and **D4DS LLC**, a Texas limited liability company ("Seller"):

### RECITALS

A.    Pursuant to an Agreement for Purchase and Sale ("Contract") dated July 6, 2021, Seller agreed to sell, and purchaser agreed to buy improved real property located in the City of Desoto, County of Dallas, State of Texas, known as Bellwether Ridge Apartments ("Property").

B.    The parties desire to amend the Contract under the terms and conditions set forth below.

### AGREEMENTS

NOW, THEREFORE, in consideration of ten and no/100 Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1.    Financing.  The Financing Contingency Period, as such term is defined in the Contract, is hereby amended to expire on March 31, 2023.

2.    Counterparts/Delivery:  This Amendment may be executed in any number of counterparts and by the different parties on separate counterparts, and each such counterpart shall be deemed to be an original but all such counterparts shall together constitute one and the same agreement.  The parties hereto may execute and deliver this Amendment by forwarding facsimile, telefax, email or other means of copies of this instrument showing execute by the partis sending the same, and the parties agree and intend that such signature shall have the same

1

15515400v1

effect as an original signature, that the parties shall be bound by such means of execution and delivery, and that the parties hereby waiver any defense to validity based on any such copies or signatures.

3.    Continued Validity. Except as amended hereby, the Agreement is and shall remain in full force and effect as originally written and executed.

4.    Captions. Headings of paragraphs are for convenience of reference only and shall not be construed as part of this Amendment.

EXECUTED as of the date first written above.

**PURCHASER:**

**APTS AT BELLWETHER RIDGE, LLC,**
a Delaware limited liability company

By: _____
Name: _____
Title: _____
Date: _____

**SELLER:**

**D4DS LLC,**
a Texas limited liability company

By: _____
Name: _____
Title: _____
Date: _____

2

15515400v1

# EXHIBIT A-21

Enoch Investments/TRWF/JMJAV
JMJ01

| | CHECK PAYMENT NBI | 311667 | DATE | 10/03/2022 |

| INVOICE | DESCRIPTION | NET AMOUNT |
|---|---|---|
| CONVERSION_NOTE_1 SPC Conversion Notice | | $ 100.00 |
| | TOTALS: | $ 100.00 |

Southern Properties Capital Ltd
1603 LBJ Freeway
Suite 300
DALLAS, TX 75234



THIS CHECK IS VOID WITHOUT A PURPLE & BLUE BORDER AND BACKGROUND PLUS A KNIGHT & FINGERPRINT WATERMARK ON THE BACK - HOLD AT ANGLE TO VIEW

Southern Properties Capital Ltd
1603 LBJ Freeway, Suite 800
Dallas, TX 75234          (469)522-4200

Bank Leumi USA
New York, NY

VOID AFTER 90 DAYS          311667

DATE   10/03/2022                    1-279/260

PAY TO THE
ORDER OF   Enoch Investments/TRWF/JMJAV

AMOUNT
$ 100.00

One Hundred Dollars and 00 Cents

Enoch Investments/TRWF/JMJAV
Enoch Investments, LLC
TRWF LLC
JMJAV, LLC
Dallas, TX 75234

Alla Dzyuba

⑈311667⑈ ⑆026002794⑊ 4104294800⑈

App. 166

# EXHIBIT A-22

Case 3:22-cv-02118-X     Document 330     Filed 10/02/23     Page 170 of 186     PageID 11353

FedEx® Tracking                                                            ⋮

**DELIVERED**

# Tuesday

10/4/2022 at 8:16 am

Signed for by: S.PATEL

⤓ Obtain Proof of delivery

How was your delivery?

☆ ☆ ☆ ☆ ☆

**DELIVERY STATUS**

Delivered ✓

✉ Get Status Updates

**TRACKING ID**

770101862781  ☆

**FROM**
Dallas, TX US

*Label Created*
10/3/2022 3:45 PM

**PACKAGE RECEIVED BY FEDEX**
ADDISON, TX
10/3/2022 7:02 PM

**IN TRANSIT**
ADDISON, TX
10/4/2022 7:07 AM

**OUT FOR DELIVERY**
ADDISON, TX
10/4/2022 7:07 AM

**DELIVERED**
Dallas, TX US

*DELIVERED*
10/4/2022 at 8:16 AM

↓ View travel history

Manage Delivery                                                          ⌄

App. 168

Case 3:22-cv-02118-X     Document 330     Filed 10/02/23     Page 171 of 186     PageID 11354

Travel history                                                                                    ⌄

**OUR COMPANY**

About FedEx(https://www.fedex.com/en-us/about.html)

Our Portfolio(https://www.fedex.com/en-us/about/company-structure.html)

Investor Relations(https://investors.fedex.com/home/default.aspx)

Careers(https://careers.fedex.com/fedex/)

FedEx Blog(https://www.fedex.com/en-us/blog.html)

Corporate Responsibility(https://www.fedex.com/en-us/about/corporate-social-responsibility.html)

Newsroom(https://newsroom.fedex.com/)

Contact Us(https://www.fedex.com/en-us/customer-support/contact-us.html)

**MORE FROM FEDEX**

FedEx Compatible(https://www.fedex.com/en-us/compatible.html)

FedEx Developer Portal(https://developer.fedex.com/api/en-us/home.html)

FedEx Logistics(https://www.fedex.com/en-us/logistics.html)

FedEx Cross Border(https://www.fedex.com/en-us/cross-border.html)

ShopRunner(https://www.fedex.com/en-us/shoprunner.html)

**LANGUAGE**

 Change Country/Territory(https://www.fedex.com/?location=home)

**FOLLOW FEDEX**  ✉ (https://www.fedex.com/en-us/email.html)    f (Https://www.facebook.com/FedEx/)

🐦 (Https://twitter.com/fedex)    📷 (https://www.instagram.com/fedex/)    in (https://www.linkedin.com/company/fedex)

▶ (https://www.youtube.com/fedex)    𝓟 (https://www.pinterest.com/FedEx/)

© FedEx 1995-2022

Site Map (https://www.fedex.com/en-us/sitemap.html)   |   Terms of Use (https://www.fedex.com/en-us/terms-of-use.html)   |   Privacy & Security (https://www.fedex.com/en-us/trust-center.html)

App. 169



**After printing this label:**

1. Use the 'Print' button on this page to print your label to your laser or inkjet printer.
2. Fold the printed page along the horizontal line.
3. Place label in shipping pouch and affix it to your shipment so that the barcode portion of the label can be read and scanned.

**Warning**: Use only the printed original label for shipping. Using a photocopy of this label for shipping purposes is fraudulent and could result in additional billing charges, along with the cancellation of your FedEx account number.

Use of this system constitutes your agreement to the service conditions in the current FedEx Service Guide, available on fedex.com.FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery,misdelivery,or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim.Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental,consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss.Maximum for items of extraordinary value is $1,000, e.g. jewelry, precious metals, negotiable instruments and other items listed in our ServiceGuide. Written claims must be filed within strict time limits, see current FedEx Service Guide.

App. 170

# EXHIBIT A-23

OMB Approval No.2502-0598
(Exp. 06/30/2017)

Public Reporting Burden for this collection of information is estimated to average 1 hour per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information.  Response to this request for information is required in order to receive the benefits to be derived. This agency may not collect this information, and you are not required to complete this form unless it displays a currently valid OMB control number.

**Privacy Act Notice:** The United States Department of Housing and Urban Development, Federal Housing Administration, is authorized to solicit the information requested in the form by virtue of Title 12, United States Code, Section 1701 et seq., and regulations promulgated thereunder at Title 12, Code of Federal Regulations. While no assurance of confidentiality is pledged to respondents, HUD generally discloses this data only in response to a Freedom of Information Act request.

# NOTE
## (MULTISTATE)

### HUD Project No. *113-35682*
### HUD Project Name: *Parc at Windmill Farms Apartments*

US $36,240,000.00                              As of December 1, 2017


FOR VALUE RECEIVED, the undersigned, D4FR LLC, a Texas limited liability company (**"Borrower"**) jointly and severally (if more than one) promises to pay to the order of Greystone Servicing Corporation, Inc., a Georgia corporation, the principal sum of Thirty Six Million Two Hundred Forty Thousand and 00/100 Dollars (US $36,240,000.00) (**"Loan"**), with interest on the unpaid principal balance at the Interest Rate.*

As used herein, **"Interest Rate"** means the annual rate of Three and 90/100 per centum (3.90%).*


1.      **Defined Terms.**  As used in this Note, (a) the term **"Lender"** means the holder of this Note, (b) the term **"Indebtedness"** means the principal of, interest on, and all other amounts due at any time under this Note, the Security Instrument or any other Loan Document, including prepayment premiums, late charges, default interest, and advances under Section 13 of the Security Instrument to protect the security of the Security Instrument; (c) the term **"Security Instrument"** has the meaning set forth in Section 4 of this Note; and (d) the term **"Program Obligations"** means (1) all applicable statutes and any regulations issued by the Secretary pursuant thereto that apply to the Project, including all amendments to such statutes and regulations, as they become effective, except that changes subject to notice and comment rulemaking shall become effective only upon completion of the rulemaking process, and (2) all current requirements in HUD handbooks and guides, notices, and mortgagee letters that apply to the Project, and all future updates, changes and amendments thereto, as they become effective, except that changes subject to notice and comment rulemaking shall become effective only upon completion of the rulemaking process, and provided that such future updates, changes and amendments shall be applicable to the Project only

App. 172

to the extent that they interpret, clarify and implement terms in this Note rather than add or delete provisions from such document. Handbooks, guides, notices, and mortgagee letters are available on HUD's official website: (http://www.hud.gov/offices/adm/hudclips/index.cfm or a successor location to that site).

The definition of any capitalized term or word used herein can be found in this Note and, if not found in this Note, then found in the Regulatory Agreement between Borrower and HUD and/or the Security Instrument.

2.    **Address for Payment.**  All payments due under this Note shall be payable in immediately available funds at <u>419 Belle Air Lane, Warrenton, VA 20186</u>, or such other place as may be designated by written notice to Borrower from or on behalf of Lender.

3.    **Payment of Principal and Interest.**  Principal and interest shall be paid as follows:

(a)  Interest only at the Interest Rate on such amount of principal as may be advanced from time to time, computed from the date of such advance, shall be payable monthly commencing on <u>January 1, 2018</u> and on the first day of each month thereafter up to and including <u>February 1, 2020</u> (**"Last Interest Only Payment Date"**). Thereafter, consecutive monthly installments of principal and interest at the Interest Rate, each in the amount of <u>One Hundred Forty Nine Thousand Two Hundred Fourteen and 83/100 Dollars (US $149,214.83)</u>, shall be payable on the first day of each month beginning on <u>March 1, 2020</u> (**"Amortization Commencement Date"**), until the entire unpaid principal balance evidenced by this Note is fully paid.  Notwithstanding the foregoing, in the event that any principal under this Note is advanced after the Last Interest Only Payment Date, for the period commencing on the Amortization Commencement Date and continuing through the first day of the month following the date on which the final advance of principal is made, the monthly installments of principal and interest shall be reduced, as determined by the Lender, to equal the sum of (i) interest accrued on this Note (at the Interest Rate) on the outstanding principal balance during the prior month plus (ii) the principal payment due under the original amortization schedule used in determining the monthly principal and interest payment amount set forth above.  In any event, the balance of the principal (if any) remaining unpaid, plus accrued interest shall be due and payable on February 1, 2060 or on any earlier date on which the unpaid principal balance of this Note becomes due and payable, by acceleration or otherwise (**"Maturity Date"**).

(b)    Solely for the purpose of calculating interest due, any regularly scheduled monthly installment of principal and interest that is received by Lender before the date it is due shall be deemed to have been received on the due date.

4.    **Security.**  The Indebtedness is secured by, among other things, a mortgage, deed to secure debt or deed of trust dated as of the date of this Note

("**Security Instrument**"), and reference is made to the Security Instrument for other rights of Lender as to collateral for the Indebtedness.

5.      **Application of Payments.**  If at any time Lender receives, from Borrower or otherwise, any amount applicable to the Indebtedness that is less than all amounts due and payable at such time, Lender shall apply that payment to amounts then due and payable in the manner and in the order set forth in Section 7(a)(3) of the Security Instrument.  Neither Lender's acceptance of an amount that is less than all amounts then due and payable nor Lender's application of such payment in the manner authorized shall constitute or be deemed to constitute either a waiver of the unpaid amounts or an accord and satisfaction.  Notwithstanding the application of any such amount to the Indebtedness, Borrower's obligations under this Note shall remain unchanged.

6.      **Acceleration.**  If a Monetary Event of Default occurs and is continuing for a period of thirty (30) days, the entire unpaid principal balance, any accrued interest and all other amounts payable to Lender under this Note and any other Loan Document shall at once become due and payable, at the option of Lender, without any prior notice to Borrower.  If a Covenant Event of Default occurs and the Indebtedness is accelerated as set forth in the Security Instrument, the entire unpaid principal balance, any accrued interest, and all other amounts payable to Lender under this Note and any other Loan Document shall at once become due and payable.  Lender may exercise this option to accelerate regardless of any prior forbearance.  Upon Lender's exercise of any right of acceleration under this Note, Borrower shall pay to Lender, in addition to the entire unpaid principal balance of this Note outstanding at the time of the acceleration, all accrued interest and all other sums due Lender under the Loan Documents.

7.      **Late Charge.**  If any monthly amount payable under this Note or under the Security Instrument or any other Loan Document is not received by Lender within ten (10) days after the amount is due, Borrower shall pay to Lender, immediately and without demand by Lender, a late charge equal to two percent of the unpaid principal and interest due in such month.  Borrower acknowledges that its failure to make timely payments will cause Lender to incur additional expenses in servicing and processing the Loan, and that it is extremely difficult and impractical to determine those additional expenses.  Borrower agrees that the late charge payable pursuant to this Section represents a fair and reasonable estimate, taking into account all circumstances existing on the date of this Note, of the additional expenses Lender will incur by reason of such late monthly payment.

8.      **Exculpation; Remedies.**

(a)      Except for personal liability expressly provided for in this Note or in the Security Instrument or in the Regulatory Agreement, the execution of this Note shall impose no personal liability upon Borrower and those parties listed in the Section 50 Addendum to the Regulatory Agreement for payment of the Indebtedness evidenced

thereby, and in the Event of Default, the holder of the Note shall look solely to the Mortgaged Property in satisfaction of the Indebtedness and will not seek or obtain any deficiency or personal judgment against Borrower and those parties listed in the Section 50 Addendum to the Regulatory Agreement, except such judgment or decree as may be necessary to foreclose or bar its interest in the Mortgaged Property and all other property mortgaged, pledged, conveyed or assigned to secure payment of the Indebtedness; provided, that nothing in this Section 8 of this Note and no action so taken shall operate to impair any obligation of Borrower under the Regulatory Agreement.

(b)      Notwithstanding Section 8(a) above, Borrower shall be liable to Lender for any loss or damage suffered by Lender as a result of (1) failure of Borrower to pay to Lender, upon demand after an Event of Default, all Rents to which Lender is entitled under Section 3(a) of the Security Instrument and the amount of all security deposits collected from tenants with existing Leases; (2) failure of Borrower to apply all insurance proceeds and condemnation proceeds as required by Sections 19 and 20 of the Security Instrument; (3) failure of Borrower to comply with Section 15 of the Security Instrument relating to the delivery of books and records, statements, schedules and reports; (4) Borrower's acquisition of any property or operation of any business not permitted by Section 33 of the Security Instrument; (5) a transfer or the granting of a lien or encumbrance that is an Event of Default under Sections 17 and 21 of the Security Instrument, other than a transfer consisting solely of the involuntary removal or involuntary withdrawal of a general partner in a limited partnership or a manager in a limited liability company; or (6) fraud or written material misrepresentation by Borrower or any officer, director, general partner, member, manager or employee of Borrower in connection with the Loan Application for or creation of the Indebtedness or any request for any action or consent by Lender.  These damages shall be paid only from the available proceeds of an appropriate insurance policy or from Surplus Cash or other escrow accounts.

(c) Notwithstanding Section 8(a) above, Borrower shall provide complete redress as set forth in Section 45(c) of the Security Instrument and shall indemnify and hold harmless the Indemnitees as set forth in Section 48 of the Security Instrument.

## 9.      Voluntary and Involuntary Prepayments.

(a)      This Note contains a prepayment restriction and prepayment premium charge acceptable to HUD as to term, amount, and conditions, which are set forth in the attached Rider 1.  In the event of a default, pursuant to Program Obligations, HUD may override any lockout or any prepayment premium, or combination thereof, in Rider 1 on the last day of any calendar month during any year in which the prepayment premium is greater than one percent (1%) in order to facilitate a partial or full refinancing of the Mortgaged Property and avoid a mortgage insurance claim.

App. 175

(b)     Any application by Lender of any collateral or other security to the repayment of any portion of the unpaid principal balance of this Note prior to the Maturity Date and in the absence of acceleration shall be deemed to be a partial prepayment by Borrower, requiring the payment to Lender by Borrower of a prepayment premium in the amount provided for in Section 9(a) or in Rider 1, as applicable.

(c)     Notwithstanding the provisions of subsections (a) and (b) above: (1) any payment made, other than as a result of acceleration, within 30 days of the Maturity Date shall not be considered a prepayment, (2) any payment made in accordance with Sections 19(f) or 20(b) of the Security Instrument shall not be considered a prepayment, (3) no prepayment premium shall be payable with respect to any reduction in the original principal amount of the Loan, or any prepayment, resulting from any cost certification or other report required by HUD pursuant to Program Obligations, or (4) any payment made pursuant to Section 13 of this Note shall not be considered a prepayment.

(d)     Any permitted or required prepayment of less than the unpaid principal balance of this Note shall not extend or postpone the due date of any subsequent monthly installments or change the amount of such installments, unless Lender agrees otherwise in writing.

(e)     Borrower acknowledges that the provisions of this Note relating to prepayment restrictions and prepayment premiums are a material part of the consideration for the Loan, and acknowledges that the terms of this Note are in other respects more favorable to Borrower as a result of the Borrower's voluntary agreement to such provisions.

(f)     If the Indebtedness is paid in full while insured under the provisions of the National Housing Act, as amended, the Borrower shall pay to the Lender such adjusted mortgage insurance premium as may be required by Program Obligations.

(g)     All payments to reduce the principal balance hereunder, other than regularly scheduled payments of principal, shall be made to Lender in immediately available funds.  Payments received after 2:00pm Eastern Time will be deemed to have been received on the next Business Day.

**10.    Costs and Expenses.**  Borrower shall pay all expenses and costs, including reasonable fees and out-of-pocket expenses of attorneys and expert witnesses and costs of investigation and litigation (including appellate), incurred by Lender as a result of any default under this Note or in connection with efforts to collect any amount due under this Note, or to enforce the provisions of any of the other Loan Documents, including those incurred in post-judgment collection efforts and in any bankruptcy proceeding (including any action for relief from the automatic stay of any bankruptcy proceeding) or judicial or non-judicial foreclosure proceeding.

**11.     Forbearance.**  Any forbearance by Lender in exercising any right or remedy under this Note, the Security Instrument, or any other Loan Document, or otherwise afforded by applicable law, shall not be a waiver of or preclude the exercise of any other right or remedy.  The acceptance by Lender of payment of all or any part of the Indebtedness after the due date of such payment, or in an amount that is less than the required payment, shall not be a waiver of Lender's right to require prompt payment when due of all other payments on account of the Indebtedness or to exercise any right or remedy for any failure to make prompt payment.  Enforcement by Lender of any security for the Indebtedness shall not constitute an election by Lender of remedies so as to preclude the exercise of any other right or remedy available to Lender.

**12.     Waivers.**  Presentment, demand, notice of dishonor, protest, notice of acceleration, notice of intent to demand or accelerate payment or maturity, presentment for payment, notice of nonpayment, grace, and diligence in collecting the Indebtedness are waived by Borrower.

**13.     Loan Charges.**  If any applicable law limiting the amount of interest or other charges permitted to be collected from Borrower in connection with the Loan is interpreted so that any interest or other charge provided for in any Loan Document, whether considered separately or together with other charges provided for in any Loan Document, violates that law, and Borrower is entitled to the benefit of that law, that interest or charge is hereby reduced to the extent necessary to eliminate that violation. The amounts, if any, previously paid to Lender in excess of the permitted amounts shall be applied by Lender to reduce the Indebtedness. For the purpose of determining whether any applicable law limiting the amount of interest or other charges permitted to be collected from Borrower has been violated, all Indebtedness that constitutes interest, as well as all other charges made in connection with the Indebtedness that constitute interest, shall be deemed to be allocated and spread ratably over the stated term of the Note.  Unless otherwise required by applicable law, such allocation and spreading shall be effected in such a manner that the rate of interest so computed is uniform throughout the stated term of this Note.

**14.     Commercial Purpose.**  Borrower represents that the Indebtedness is being incurred by Borrower solely for the purpose of carrying on a business or commercial enterprise, and not for personal, family or household purposes.

**15.     Counting of Days.**  Except where otherwise specifically provided, any reference in this Note to a period of **"days"** means calendar days, not Business Days.

**16.     Governing Law; Consent to Jurisdiction and Venue.**
     (a)     This Note and the Security Instrument, if it does not itself expressly identify the law that is to apply to it, shall be governed by the laws of the jurisdiction in which the Land is located (**"Property Jurisdiction"**), except so long as the Loan is insured or held by HUD, federal law will apply to HUD's rights and remedies where state or local laws are preempted by federal law.

---

(b)      Borrower agrees that any controversy arising under or in relation to this Note or the Security Instrument shall be litigated exclusively in the Property Jurisdiction except as, so long as the Loan is insured or held by HUD and solely as to rights and remedies of HUD, federal jurisdiction may be appropriate pursuant to any federal requirements. The state courts, and with respect to HUD's rights and remedies, federal courts and Governmental Authorities in the Property Jurisdiction, shall have exclusive jurisdiction over all controversies which shall arise under or in relation to this Note, any security for the Indebtedness, or the Security Instrument.  Borrower irrevocably consents to service, jurisdiction, and venue of such courts for any such litigation and waives any other venue to which it might be entitled by virtue of domicile, habitual residence or otherwise.

**17.    Rules of Construction.**   The captions and headings of the Sections of this Note are for convenience only and shall be disregarded in construing this Note. Any reference in this Note to a **"Section"** shall, unless otherwise explicitly provided, be construed as referring, respectively, to a Section of this Note.  Use of the singular in this Note includes the plural and use of the plural includes the singular.  As used in this Note, the term **"including"** means "including, but not limited to."

**18.    Notices.**  All notices, demands and other communications required or permitted to be given by Lender to Borrower or Borrower to Lender pursuant to this Note shall be given in accordance with Section 31 of the Security Instrument.

**19.    Federal Remedies.**  In addition to any rights and remedies set forth in the Regulatory Agreement between Borrower and HUD, HUD has rights and remedies under federal law so long as HUD is the insurer or holder of the Loan, including but not limited to the right to foreclose pursuant to the Multifamily Mortgage Foreclosure Act of 1981, as amended, 12 U.S.C. § 3701, *et seq.*, as amended, when HUD is the holder of the Note.

**20.    Termination of HUD Rights and Remedies.**  At such time as HUD no longer insures or holds this Note, (a) all rights and responsibilities of HUD shall conclude, all mortgage insurance and references to mortgage insurance premiums, all references to HUD, GNMA and Program Obligations and related terms and provisions shall cease, and all rights and obligations of HUD shall terminate; (b) all obligations and responsibilities of Borrower to HUD shall likewise terminate; and (c) all obligations and responsibilities of Lender to HUD shall likewise terminate; provided, however, nothing contained in this Section 20 shall in any fashion discharge Borrower from any obligations to HUD under the Regulatory Agreement or Program Obligations or Lender from any obligations to HUD under Program Obligations, which occurred prior to termination of the Contract of Insurance or Regulatory Agreement, as applicable.  The provisions of this Section 20 shall be given effect automatically upon the termination of the Contract of Insurance or the transfer of this Note and the Security Instrument by HUD to another party, provided that upon the request of Borrower, Lender or the party to whom the Note or the Security Instrument has been transferred, at no cost to HUD,

HUD shall execute such documents as may be reasonably requested to confirm the provisions of this Section 20.

**21. WAIVER OF TRIAL BY JURY. BORROWER AND LENDER EACH (a) AGREES NOT TO ELECT A TRIAL BY JURY WITH RESPECT TO ANY ISSUE ARISING OUT OF THIS NOTE OR THE RELATIONSHIP BETWEEN THE PARTIES AS LENDER AND BORROWER THAT IS TRIABLE OF RIGHT BY A JURY AND (b) WAIVES ANY RIGHT TO TRIAL BY JURY WITH RESPECT TO SUCH ISSUE TO THE EXTENT THAT ANY SUCH RIGHT EXISTS NOW OR IN THE FUTURE. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS SEPARATELY GIVEN BY EACH PARTY, KNOWINGLY AND VOLUNTARILY WITH THE BENEFIT OF COMPETENT LEGAL COUNSEL.**

**See Rider 1 to Note containing modifications to the Note, attached hereto and incorporated herein by this reference.**

**IN WITNESS WHEREOF**, Borrower has signed and delivered this Note or has caused this Note to be signed and delivered by its duly authorized representative as of the date first above written.

D4FR LLC,
a Texas limited liability company

By: _____
Timothy Barton, President

App. 180

NOTE (Multistate)

State of Texas

<u>D4FR LLC</u>

To

<u>Greystone Servicing Corporation, Inc.</u>

Project No.:  <u>113-35682</u>

Initially endorsed for insurance under <u>§221(d)(4)</u> of the National Housing Act, as amended, and regulations published thereunder in effect on <u>August 25, 2017</u> to the extent of advances approved by HUD.

By: _____  Date: December 14, 20 17

Print Name:  Lisa Farmer (Acting)
Title:    <u>Authorized Representative</u>

At final endorsement, a total sum of $_____has been approved for insurance hereunder by HUD.

By: _____  Date: _____ , 20___

Print Name: _____
Title:    <u>Authorized Representative</u>

App. 181

**RIDER 1 TO NOTE**
**From**
**D4FR LLC**
**TO**
**GREYSTONE SERVICING CORPORATION, INC.**
**In the original principal sum of $36,240,000.00**

1.    This Rider 1 to Note (this "Rider") is attached to and made a part of the Note from D4FR LLC, a Texas limited liability company (the "Borrower"), to Greystone Servicing Corporation, Inc., a Georgia corporation (the "Lender") dated as of December 1, 2017 (the "Note").

2.    Borrower shall not have the right to prepay the indebtedness evidenced hereby in whole or in part at any time prior to March 1, 2020.  Borrower shall have the right, on or after March 1, 2020, to prepay the indebtedness evidenced hereby in whole on the last day of any calendar month after such date during the term hereof, upon at least thirty (30) days prior written notice to the holder of this Note, which notice shall specify the date on which the prepayment is to be made, the principal amount of such prepayment and the total amount to be paid.  In the event of any prepayment of principal at any time on or after March 1, 2020, the Borrower shall concurrently pay to the holder of this Note a prepayment premium equal to the following designated percentages of the amount of principal of this Note to be so prepaid with respect to any prepayment which occurs during the following indicated time periods:

| Time of Prepayment | Prepayment Premium |
|---|---|
| from March 1, 2020 through February 28, 2021 | 10% |
| from March 1, 2021 through February 28, 2022 | 10% |
| from March 1, 2022 through February 28, 2023 | 8% |
| from March 1, 2023 through February 29, 2024 | 7% |
| from March 1, 2024 through February 28, 2025 | 6% |
| from March 1, 2025 through February 28, 2026 | 5% |
| from March 1, 2026 through February 28, 2027 | 4% |
| from March 1, 2027 through February 29, 2028 | 3% |
| from March 1, 2028 through February 28, 2029 | 2% |
| from March 1, 2029 through February 28, 2030 | 1% |
| from March 1, 2030 and thereafter | None |

Notwithstanding any partial prepayment of principal made pursuant to the privilege of prepayment set forth in this Note, the Borrower shall not be relieved of its obligations to make scheduled monthly installments of principal and interest as and when such payments are due and payable under this Note.

3.    Notwithstanding the provisions of Paragraph 2 above, the provisions of Paragraph 2 shall not apply, and no prepayment premium shall be collected by the holder of this Note, with respect to any prepayment which is made by or on behalf of the Maker from insurance proceeds as a result of damage to the mortgaged premises or condemnation awards which, at the option of the holder of this Note, may be applied to reduce the indebtedness of Maker evidenced hereby pursuant to the terms of the Deed of Trust of even date given by Maker to the holder of this Note to secure said indebtedness.  Any prepayment made pursuant to this Paragraph 3 shall be deemed to have been made on the last day of the month in which such payment is received by holder.

[signatures appear on subsequent page]

The Borrower has executed this Rider to Note on the date first above written.

**BORROWER:**

D4FR LLC,
a Texas limited liability company

By: _____
Timothy Barton, President

**END OF RIDER 1**