803 F.3d 653 **IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **SECURITIES AND EXCHANGE COMMISSION**, | § § § | |
| *Plaintiff,* | § § | |
| v. | § § | **CASE NO. 3:22-cv-2118-X** |
| **TIMOTHY BARTON ET AL.,** | § § § | |
| *Defendants.* | § § | |

**APPENDIX VOLUME III**

**APP. 279-580**

**APPENDIX TO SOUTHERN PROPERTIES CAPITAL, LTD.'S BRIEF IN SUPPORT OF RESPONSE TO SEC'S MOTION FOR APPOINTMENT OF A RECEIVER, FOR A PRELIMINARY INJUNCTION AND ANCILLARY RELIEF, AND TO LIFT STAY FOR LIMITED PURPOSE, AND BRIEF IN SUPPORT**

| Ex. No. | Title | App. No. |
|---|---|---|
| Ex. A-28 | Windmill Check | App. 279-280 |
| Ex. A-29 | Windmill Delivery Confirmation | App. 281-284 |
| Ex. A-30 | Ingleside HUD Promissory Note | App. 285-297 |
| Ex. A-31 | Ingleside HUD Deed of Trust | App. 298-350 |
| Ex. A-32 | Ingleside UCC Statements | App. 351-359 |
| Ex. A-33 | Ingleside Exercise Letter | App. 360-361 |
| Ex. A-34 | Ingleside Form of Purchase and Sale Agreement | App. 362-390 |
| Ex. A-35 | Ingleside Check | App. 391-392 |
| Ex. A-36 | Ingleside Delivery Confirmation | App. 393-396 |
| Ex. A-37 | Opelika HUD Promissory Note | App. 397-403 |
| Ex. A-38 | Opelika HUD Deed of Trust | App. 404-455 |
| Ex. A-39 | Opelika Pledge and Security Agreement | App. 456-476 |
| Ex. A-40 | Bellwether Raw Land Wire | App. 477-479 |
| Ex. A-41 | Windmill Raw Land Wire | App. 480-483 |
| Ex. A-42 | Ingleside Raw Land Wire | App. 484-488 |
| Ex. A-43 | Opelika Raw Land Wire | App. 489-492 |
| Ex. A-44 | Bellwether Escrow Agreement | App. 493-505 |
| Ex. A-45 | Windmill Escrow Agreement | App. 506-518 |
| Ex. A-46 | Bellwether Settlement Statement | App. 519-524 |
| Ex. A-47 | Windmill Settlement Statement | App. 525-530 |

| Ex. A-48 | Ingleside Letter of Credit | App. 531-535 |
| Ex. A-49 | Opelika Letter of Credit | App. 536-548 |

**RESPECTFULLY SUBMITTED BY:**

/s/ *Brian K. Norman*
**C. GREGORY SHAMOUN**
State Bar No. 18089650
Email: g@snlegal.com
**BRIAN K. NORMAN**
State Bar No. 00797161
Email: bkn@snlegal.com
**J. BLAIR NORRIS**
State Bar No. 24014515
Email: bn@snlegal.com
**SHAMOUN & NORMAN, LLP**
1800 Valley View Lane, Suite 200
Farmers Branch, Texas 75234
Telephone (214) 987-1745
Facsimile: (214) 521-9033

**ATTORNEYS FOR SOUTHERN
PROPERTIES CAPITAL, LTD.**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on October 2, 2023, a true and correct copy of the foregoing document was served upon all counsel of record through the Court's CM/ECF system:

/s/ *J. Blair Norris*
**J. BLAIR NORRIS**

# EXHIBIT A-28

Enoch Investments/TRWF/JMJAV
JMJ01

| | CHECK PAYMENT NBI | 311666 | DATE | 10/03/2022 |
|---|---|---|---|---|

| INVOICE | DESCRIPTION | NET AMOUNT |
|---|---|---|
| CONVERSION-NOTE_1 SPC Conversion Notice | | $ 100.00 |
| | TOTALS: | $ 100.00 |

Southern Properties Capital Ltd
1603 LBJ Freeway
Suite 300
DALLAS, TX 75234



THIS CHECK IS VOID WITHOUT A PURPLE & BLUE BORDER AND BACKGROUND PLUS A KNIGHT & FINGERPRINT WATERMARK ON THE BACK - HOLD AT ANGLE TO VIEW

**Southern Properties Capital Ltd**
1603 LBJ Freeway, Suite 800
Dallas, TX 75234        (469)522-4200

Bank Leumi USA
New York, NY

VOID AFTER 90 DAYS          311666

1-279/260

DATE   10/03/2022

PAY TO THE
ORDER OF   Enoch Investments/TRWF/JMJAV

AMOUNT
$ 100.00

One Hundred Dollars and 00 Cents

Enoch Investments/TRWF/JMJAV
Enoch Investments, LLC
TRWF LLC
JMJAV, LLC
Dallas, TX 75234

Alla Dzyuba

⑆311666⑆ ⑆026002794⑈ 4104294800⑈

App. 280

# EXHIBIT A-29

## FedEx® Tracking

**DELIVERED**

# Tuesday

10/4/2022 at 8:16 am

Signed for by: S.PATEL

⤓ Obtain Proof of delivery

How was your delivery?

☆ ☆ ☆ ☆ ☆

**DELIVERY STATUS**

Delivered ✓

✉ Get Status Updates

**TRACKING ID**

770101862781 ✎ ☆

**FROM**
Dallas, TX US

*Label Created*
10/3/2022 3:45 PM

**PACKAGE RECEIVED BY FEDEX**
ADDISON, TX
10/3/2022 7:02 PM

**IN TRANSIT**
ADDISON, TX
10/4/2022 7:07 AM

**OUT FOR DELIVERY**
ADDISON, TX
10/4/2022 7:07 AM

**DELIVERED**
Dallas, TX US

*DELIVERED*
10/4/2022 at 8:16 AM

↓ View travel history

Manage Delivery                  ⌄

App. 282

Case 3:22-cv-02118-X     Document 332     Filed 10/02/23     Page 7 of 272     PageID 11472

Travel history                                                                 ∨

**OUR COMPANY**

About FedEx(https://www.fedex.com/en-us/about.html)

Our Portfolio(https://www.fedex.com/en-us/about/company-structure.html)

Investor Relations(https://investors.fedex.com/home/default.aspx)

Careers(https://careers.fedex.com/fedex/)

FedEx Blog(https://www.fedex.com/en-us/blog.html)

Corporate Responsibility(https://www.fedex.com/en-us/about/corporate-social-responsibility.html)

Newsroom(https://newsroom.fedex.com/)

Contact Us(https://www.fedex.com/en-us/customer-support/contact-us.html)

**MORE FROM FEDEX**

FedEx Compatible(https://www.fedex.com/en-us/compatible.html)

FedEx Developer Portal(https://developer.fedex.com/api/en-us/home.html)

FedEx Logistics(https://www.fedex.com/en-us/logistics.html)

FedEx Cross Border(https://www.fedex.com/en-us/cross-border.html)

ShopRunner(https://www.fedex.com/en-us/shoprunner.html)

**LANGUAGE**

 Change Country/Territory(https://www.fedex.com/?location=home)

**FOLLOW FEDEX** ✉ (https://www.fedex.com/en-us/email.html)   f (Https://www.facebook.com/FedEx/)

🐦 (Https://twitter.com/fedex)   📷 (https://www.instagram.com/fedex/)   in (https://www.linkedin.com/company/fedex)

📺 (https://www.youtube.com/fedex)   📌 (https://www.pinterest.com/FedEx/)

© FedEx 1995-2022

Site Map (https://www.fedex.com/en-us/sitemap.html)   |   Terms of Use (https://www.fedex.com/en-us/terms-of-use.html)   |   Privacy & Security (https://www.fedex.com/en-us/trust-center.html)

App. 283



**After printing this label:**

1. Use the 'Print' button on this page to print your label to your laser or inkjet printer.
2. Fold the printed page along the horizontal line.
3. Place label in shipping pouch and affix it to your shipment so that the barcode portion of the label can be read and scanned.

**Warning:** Use only the printed original label for shipping. Using a photocopy of this label for shipping purposes is fraudulent and could result in additional billing charges, along with the cancellation of your FedEx account number.
Use of this system constitutes your agreement to the service conditions in the current FedEx Service Guide, available on fedex.com.FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery,misdelivery,or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim.Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental,consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss.Maximum for items of extraordinary value is $1,000, e.g. jewelry, precious metals, negotiable instruments and other items listed in our ServiceGuide. Written claims must be filed within strict time limits, see current FedEx Service Guide.

App. 284

# EXHIBIT A-30

OMB Approval No. 2502-0598
(Exp. 9/30/2021)

Public Reporting Burden for this collection of information is estimated to average 1 hour per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Response to this request for information is required in order to receive the benefits to be derived. This agency may not collect this information, and you are not required to complete this form unless it displays a currently valid OMB control number.

**Warning:** Federal law provides that anyone who knowingly or willfully submits (or causes to submit) a document containing any false, fictitious, misleading, or fraudulent statement/certification or entry may be criminally prosecuted and may incur civil administrative liability. Penalties upon conviction can include a fine and imprisonment, as provided pursuant to applicable law, which includes, but is not limited to, 18 U.S.C. 1001, 1010, 1012; 31 U.S.C. 3729, 3802, 24 C.F.R. Parts 25, 28 and 30, and 2 C.F.R. Parts 180 and 2424.

## NOTE
## (MULTISTATE)

*HUD Project No. 115-35872*
*HUD Project Name: Parc at Ingleside*

US $25,201,000.00                                   As of November 1, 2019

FOR VALUE RECEIVED, the undersigned, D4IN LLC, a limited liability company organized and existing under the laws of the State of Texas (**"Borrower"**) jointly and severally (if more than one) promises to pay to the order of Greystone Funding Company LLC, a limited liability company organized and existing under the laws of the State of Delaware, the principal sum of Twenty Five MillionTwo Hundred One Thousand and 00/100 Dollars ($25,201,000.00) (**"Loan"**), with interest on the unpaid principal balance at the Interest Rate.*

As used herein, **"Interest Rate"** means the annual rate of Three and 59/100 per centum (3.59%).*

1.    **Defined Terms.** As used in this Note, (a) the term **"Lender"** means the holder of this Note, (b) the term **"Indebtedness"** means the principal of, interest on, and all other amounts due at any time under this Note, the Security Instrument or any other Loan Document, including prepayment premiums, late charges, default interest, and advances to protect the security of the Security Instrument under Section 13 of the Security Instrument; (c) the term **"Security Instrument"** has the meaning set forth in Section 4 of this Note; and (d) the term **"Program Obligations"** means (1) all applicable statutes and any regulations issued by the Secretary pursuant thereto that apply to the Project, including all amendments to such statutes and regulations, as they become effective, except that changes subject to notice and comment rulemaking shall become effective only upon completion of the rulemaking process, and (2) all current requirements in HUD handbooks and guides, notices, and mortgagee letters that apply to the Project, and all future updates, changes and amendments thereto, as they

Previous editions are obsolete                    Note                    HUD-94001M (6/18)

become effective, except that changes subject to notice and comment rulemaking shall become effective only upon completion of the rulemaking process, and provided that such future updates, changes and amendments shall be applicable to the Project only to the extent that they interpret, clarify and implement terms in this Note rather than add or delete provisions from such document. Handbooks, guides, notices, and mortgagee letters are available on "HUDCLIPS," at www.hud.gov.

Any capitalized term or word used herein but not defined shall have the meaning given to such term or word in the Regulatory Agreement between Borrower and HUD or the Security Instrument.

    2.    **Address for Payment.**  All payments due under this Note shall be payable in immediately available funds at 419 Belle Air Lane, Warrenton, VA 20186, or such other place as may be designated by written notice to Borrower from or on behalf of Lender.

    3.    **Payment of Principal and Interest.**  Principal and interest shall be paid as follows:

    (a)    Interest only at the Interest Rate on such amount of principal as may be advanced from time to time, computed from the date of such advance, shall be payable monthly commencing on December 1, 2019, and on the first day of each month thereafter up to and including August 1, 2021  (**"Last Interest Only Payment Date"**). Thereafter, consecutive monthly installments of principal and interest at the Interest Rate, each in the amount of Ninety Eight Thousand Nine Hundred Ninety One and 32/100 Dollars (US $98,991.32), shall be payable on the first day of each month beginning on September 1, 2021, (**"Amortization Commencement Date"**), until the entire unpaid principal balance evidenced by this Note is fully paid.  Notwithstanding the foregoing, in the event that any principal under this Note is advanced after the Last Interest Only Payment Date, for the period commencing on the Amortization Commencement Date and continuing through the first day of the month following the date on which the final advance of principal is made, the monthly installments of principal and interest shall be reduced, as determined by the Lender, to equal the sum of (i) interest accrued on this Note (at the Interest Rate) on the outstanding principal balance during the prior month plus (ii) the principal payment due under the original amortization schedule used in determining the monthly principal and interest payment amount set forth above.  In any event, the balance of the principal (if any) remaining unpaid, plus accrued interest shall be due and payable on August 1, 2061 or on any earlier date on which the unpaid principal balance of this Note becomes due and payable, by acceleration or otherwise (**"Maturity Date"**).

    (b)    Solely for the purpose of calculating interest due, any regularly scheduled monthly installment of principal and interest that is received by Lender before the date it is due shall be deemed to have been received on the due date.

---

3

4. **Security.** The Indebtedness is secured by, among other things, a mortgage, deed to secure debt or deed of trust dated as of the date of this Note (**"Security Instrument"**), and reference is made to the Security Instrument for other rights of Lender as to collateral for the Indebtedness.

5. **Application of Payments.** If at any time Lender receives, from Borrower or otherwise, any amount applicable to the Indebtedness that is less than all amounts due and payable at such time, Lender shall apply that payment to amounts then due and payable in the manner and in the order set forth in Section 7(a)(3) of the Security Instrument. Neither Lender's acceptance of an amount that is less than all amounts then due and payable nor Lender's application of such payment in the manner authorized shall constitute or be deemed to constitute either a waiver of the unpaid amounts or an accord and satisfaction. Notwithstanding the application of any such amount to the Indebtedness, Borrower's obligations under this Note shall remain unchanged.

6. **Acceleration.** If a Monetary Event of Default occurs and is continuing for a period of thirty (30) days, the entire unpaid principal balance, any accrued interest and all other amounts payable to Lender under this Note and any other Loan Document shall at once become due and payable, at the option of Lender, without any prior notice to Borrower. If a Covenant Event of Default occurs and the Indebtedness is accelerated as set forth in the Security Instrument, the entire unpaid principal balance, any accrued interest, and all other amounts payable to Lender under this Note and any other Loan Document shall at once become due and payable. Lender may exercise this option to accelerate regardless of any prior forbearance. Upon Lender's exercise of any right of acceleration under this Note, Borrower shall pay to Lender, in addition to the entire unpaid principal balance of this Note outstanding at the time of the acceleration, all accrued interest and all other sums due Lender under the Loan Documents.

7. **Late Charge.** If any monthly amount payable under this Note or under the Security Instrument or any other Loan Document is not received by Lender within ten (10) days after the amount is due, Borrower shall pay to Lender, immediately and without demand by Lender, a late charge equal to two percent (2%) of the unpaid principal and interest due in such month. Borrower acknowledges that its failure to make timely payments will cause Lender to incur additional expenses in servicing and processing the Loan, and that it is extremely difficult and impractical to determine those additional expenses. Borrower agrees that the late charge payable pursuant to this Section represents a fair and reasonable estimate, taking into account all circumstances existing on the date of this Note, of the additional expenses Lender will incur by reason of such late monthly payment.

8. **Exculpation; Remedies.**

(a) Except for personal liability expressly provided for in this Note or in the Security Instrument or in the Regulatory Agreement, the execution of this Note shall impose no personal liability upon Borrower and those parties listed in the Section 50

| Previous editions are obsolete | Note | HUD-94001M (6/18) |
| --- | --- | --- |

4

Addendum to the Regulatory Agreement for payment of the Indebtedness evidenced thereby, and in the Event of Default, the holder of the Note shall look solely to the Mortgaged Property in satisfaction of the Indebtedness and will not seek or obtain any deficiency or personal judgment against Borrower and those parties listed in the Section 50 Addendum to the Regulatory Agreement, except such judgment or decree as may be necessary to foreclose or bar its interest in the Mortgaged Property and all other property mortgaged, pledged, conveyed or assigned to secure payment of the Indebtedness; provided, that nothing in this Section 8 of this Note and no action so taken shall operate to impair any obligation of Borrower under the Regulatory Agreement.

(b)     Notwithstanding Section 8(a) above, Borrower shall be liable to Lender for any loss or damage suffered by Lender as a result of (1) failure of Borrower to pay to Lender, upon demand after an Event of Default, all Rents to which Lender is entitled under Section 3(a) of the Security Instrument and the amount of all security deposits collected from tenants with existing Leases; (2) failure of Borrower to apply all insurance proceeds and condemnation proceeds as required by Sections 19 and 20 of the Security Instrument; (3) failure of Borrower to comply with Section 15 of the Security Instrument relating to the delivery of books and records, statements, schedules and reports; (4) Borrower's acquisition of any property or operation of any business not permitted by Section 33 of the Security Instrument; (5) a transfer or the granting of a lien or encumbrance that is an Event of Default under Sections 17 and 21 of the Security Instrument, other than a transfer consisting solely of the involuntary removal or involuntary withdrawal of a general partner in a limited partnership or a manager in a limited liability company; or (6) fraud or written material misrepresentation by Borrower or any officer, director, general partner, member, manager or employee of Borrower in connection with the Loan Application for or creation of the Indebtedness or any request for any action or consent by Lender.  These damages shall be paid only from the available proceeds of an appropriate insurance policy or from Surplus Cash or other escrow accounts.

(c)     Notwithstanding Section 8(a) above, Borrower shall provide complete redress as set forth in Section 45(c) of the Security Instrument and shall indemnify and hold harmless the Indemnitees as set forth in Section 48 of the Security Instrument.

9.     **Voluntary and Involuntary Prepayments.**

(a)     This Note contains a prepayment restriction and prepayment premium charge acceptable to HUD as to term, amount, and conditions, which are set forth in the attached Rider 1. In the event of a default, pursuant to Program Obligations, HUD may override any lockout or any prepayment premium, or combination thereof, in Rider 1 on the last day of any calendar month during any year in which the prepayment premium is greater than one percent (1%) in order to facilitate a partial or full refinancing of the Mortgaged Property and avoid a mortgage insurance claim.

---

Previous editions are obsolete                    Note                    HUD-94001M (6/18)

5

(b)   Any application by Lender of any collateral or other security to the repayment of any portion of the unpaid principal balance of this Note prior to the Maturity Date and in the absence of acceleration shall be deemed to be a partial prepayment by Borrower, requiring the payment to Lender by Borrower of a prepayment premium in the amount provided for in Section 9(a) or in Rider 1, as applicable.

(c)   Notwithstanding the provisions of subsections (a) and (b) above: (1) any payment made, other than as a result of acceleration, within 30 days of the Maturity Date shall not be considered a prepayment, (2) any payment made in accordance with Sections 19(f) or 20(b) of the Security Instrument shall not be considered a prepayment, (3) no prepayment premium shall be payable with respect to any reduction in the original principal amount of the Loan, or any prepayment, resulting from any cost certification or other report required by HUD pursuant to Program Obligations, and (4) any payment made pursuant to Section 13 of this Note shall not be considered a prepayment.

(d)   Any permitted or required prepayment of less than the unpaid principal balance of this Note shall not extend or postpone the due date of any subsequent monthly installments or change the amount of such installments, unless Lender agrees otherwise in writing.

(e)   Borrower acknowledges that the provisions of this Note relating to prepayment restrictions and prepayment premiums are a material part of the consideration for the Loan, and acknowledges that the terms of this Note are in other respects more favorable to Borrower as a result of the Borrower's voluntary agreement to such provisions.

(f)   If the Indebtedness is paid in full while insured under the provisions of the National Housing Act, as amended, the Borrower shall pay to the Lender such adjusted mortgage insurance premium as may be required by Program Obligations.

(g)   All payments to reduce the principal balance hereunder, other than regularly scheduled payments of principal, shall be made to Lender in immediately available funds.  Payments received after 2:00pm Eastern Time will be deemed to have been received on the next Business Day.

**10.   Costs and Expenses.**  Borrower shall pay all expenses and costs, including reasonable fees and out-of-pocket expenses of attorneys and expert witnesses and costs of investigation and litigation (including appellate), incurred by Lender as a result of any default under this Note or in connection with efforts to collect any amount due under this Note, or to enforce the provisions of any of the other Loan Documents, including those incurred in post-judgment collection efforts and in any bankruptcy proceeding (including any action for relief from the automatic stay of any bankruptcy proceeding) or judicial or non-judicial foreclosure proceeding.

6

11.    **Forbearance.**  Any forbearance by Lender in exercising any right or remedy under this Note, the Security Instrument, or any other Loan Document, or otherwise afforded by applicable law, shall not be a waiver of or preclude the exercise of any other right or remedy.  The acceptance by Lender of payment of all or any part of the Indebtedness after the due date of such payment, or in an amount that is less than the required payment, shall not be a waiver of Lender's right to require prompt payment when due of all other payments on account of the Indebtedness or to exercise any right or remedy for any failure to make prompt payment.  Enforcement by Lender of any security for the Indebtedness shall not constitute an election by Lender of remedies so as to preclude the exercise of any other right or remedy available to Lender.

12.    **Waivers.**  Presentment, demand, notice of dishonor, protest, notice of acceleration, notice of intent to demand or accelerate payment or maturity, presentment for payment, notice of nonpayment, grace, and diligence in collecting the Indebtedness are waived by Borrower.

13.    **Loan Charges.**  If any applicable law limiting the amount of interest or other charges permitted to be collected from Borrower in connection with the Loan is interpreted so that any interest or other charge provided for in any Loan Document, whether considered separately or together with other charges provided for in any Loan Document, violates that law, and Borrower is entitled to the benefit of that law, that interest or charge is hereby reduced to the extent necessary to eliminate that violation. The amounts, if any, previously paid to Lender in excess of the permitted amounts shall be applied by Lender to reduce the Indebtedness. For the purpose of determining whether any applicable law limiting the amount of interest or other charges permitted to be collected from Borrower has been violated, all Indebtedness that constitutes interest, as well as all other charges made in connection with the Indebtedness that constitute interest, shall be deemed to be allocated and spread ratably over the stated term of the Note.  Unless otherwise required by applicable law, such allocation and spreading shall be effected in such a manner that the rate of interest so computed is uniform throughout the stated term of this Note.

14.    **Commercial Purpose.**  Borrower represents that the Indebtedness is being incurred by Borrower solely for the purpose of carrying on a business or commercial enterprise, and not for personal, family or household purposes.

15.    **Counting of Days.**  Except where otherwise specifically provided, any reference in this Note to a period of **"days"** means calendar days, not Business Days.

16.    **Governing Law; Consent to Jurisdiction and Venue.**
(a)    This Note and the Security Instrument, if it does not itself expressly identify the law that is to apply to it, shall be governed by the laws of the jurisdiction in which the Land is located (**"Property Jurisdiction"**), except so long as the Loan is insured or held by HUD, federal law will apply to HUD's rights and remedies where state or local laws are preempted by federal law.

---

Previous editions are obsolete                    Note                    HUD-94001M (6/18)

App. 291

(b)     Borrower agrees that any controversy arising under or in relation to this Note or the Security Instrument shall be litigated exclusively in the Property Jurisdiction except as, so long as the Loan is insured or held by HUD and solely as to rights and remedies of HUD, federal jurisdiction may be appropriate pursuant to any federal requirements. The state courts, and with respect to HUD's rights and remedies, federal courts and Governmental Authorities in the Property Jurisdiction, shall have exclusive jurisdiction over all controversies which shall arise under or in relation to this Note, any security for the Indebtedness, or the Security Instrument.  Borrower irrevocably consents to service, jurisdiction, and venue of such courts for any such litigation and waives any other venue to which it might be entitled by virtue of domicile, habitual residence or otherwise.

**17.     Rules of Construction.**   The captions and headings of the Sections of this Note are for convenience only and shall be disregarded in construing this Note. Any reference in this Note to a **"Section"** shall, unless otherwise explicitly provided, be construed as referring, respectively, to a Section of this Note.  Use of the singular in this Note includes the plural and use of the plural includes the singular.  As used in this Note, the term **"including"** means "including, but not limited to."

**18.     Notices.**   All notices, demands and other communications required or permitted to be given by Lender to Borrower or Borrower to Lender pursuant to this Note shall be given in accordance with Section 31 of the Security Instrument.

**19.     Federal Remedies.**   In addition to any rights and remedies set forth in the Regulatory Agreement between Borrower and HUD, HUD has rights and remedies under federal law so long as HUD is the insurer or holder of the Loan, including but not limited to the right to foreclose pursuant to the Multifamily Mortgage Foreclosure Act of 1981, as amended, 12 U.S.C. Section 3701, *et seq.*, as amended, when HUD is the holder of the Note.

**20.     Termination of HUD Rights and Remedies.**   At such time as HUD no longer insures or holds this Note, (a) all rights and responsibilities of HUD shall conclude, all mortgage insurance and references to mortgage insurance premiums, all references to HUD, GNMA and Program Obligations and related terms and provisions shall cease, and all rights and obligations of HUD shall terminate; (b) all obligations and responsibilities of Borrower to HUD shall likewise terminate; and (c) all obligations and responsibilities of Lender to HUD shall likewise terminate; provided, however, nothing contained in this Section 20 shall in any fashion discharge Borrower from any obligations to HUD under the Regulatory Agreement or Program Obligations or Lender from any obligations to HUD under Program Obligations, which occurred prior to termination of the Contract of Insurance or Regulatory Agreement, as applicable.  The provisions of this Section 20 shall be given effect automatically upon the termination of the Contract of Insurance or the transfer of this Note and the Security Instrument by HUD to another party, provided that upon the request of Borrower, Lender or the party to whom the Note or the Security Instrument has been transferred, at no cost to HUD,

HUD shall execute such documents as may be reasonably requested to confirm the provisions of this Section 20.

21. WAIVER OF TRIAL BY JURY. BORROWER AND LENDER EACH (a) AGREES NOT TO ELECT A TRIAL BY JURY WITH RESPECT TO ANY ISSUE ARISING OUT OF THIS NOTE OR THE RELATIONSHIP BETWEEN THE PARTIES AS LENDER AND BORROWER THAT IS TRIABLE OF RIGHT BY A JURY AND (b) WAIVES ANY RIGHT TO TRIAL BY JURY WITH RESPECT TO SUCH ISSUE TO THE EXTENT THAT ANY SUCH RIGHT EXISTS NOW OR IN THE FUTURE. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS SEPARATELY GIVEN BY EACH PARTY, KNOWINGLY AND VOLUNTARILY WITH THE BENEFIT OF COMPETENT LEGAL COUNSEL.

[Signature page follows]

App. 293

9

**IN WITNESS WHEREOF**, Borrower has signed and delivered this Note or has caused this Note to be signed and delivered by its duly authorized representative as of the date first above written.

D4IN LLC,
a Texas limited liability company

By:  JMJD4 LLC,
a Delaware limited liability company
Its Managing Member

By: _____
Timothy Barton, Manager

App. 294

NOTE (Multistate)

State of Texas

D4IN LLC, a Texas limited liability company

To

Greystone Funding Company LLC, a Delaware limited liability company

Project No.: 115-35872

Initially endorsed for insurance under § 221(d)(4) of the National Housing Act, as amended, and regulations published thereunder in effect on August 29, 2019 to the extent of advances approved by HUD.

By: _Mary Walsh_____     Date: _November 15, 2019_

Print Name: _Mary V. Walsh_____
Title:      Authorized Representative
            Multifamily Regional Director

At final endorsement, a total sum of $_____ has been approved for insurance hereunder by HUD.

By: _____     Date: _____ , 20___

Print Name: _____
Title:      Authorized Representative

---

Previous editions are obsolete                    Note                    HUD-94001M (6/18)

App. 295

**RIDER 1 TO NOTE**
**FROM**
**D4IN LLC, a Texas limited liability company**
**TO**
**Greystone Funding Company LLC, a Delaware limited liability company**
**In the original principal sum of $25,201,000.00**

1.      This Rider 1 to Note (this "Rider") is attached to and made a part of the Note from D4IN LLC, a Texas limited liability company (the "Borrower"), to Greystone Funding Company LLC, a Delaware limited liability company (the "Lender") dated as of November 1, 2019 (the "Note").

2.      Borrower shall not have the right to prepay the indebtedness evidenced hereby in whole or in part at any time prior to September 1, 2021.  Borrower shall have the right, on or after September 1, 2021, to prepay the indebtedness evidenced hereby in whole on the last day of any calendar month after such date during the term hereof, upon at least thirty (30) days prior written notice to the holder of this Note, which notice shall specify the date on which the prepayment is to be made, the principal amount of such prepayment and the total amount to be paid.  In the event of any prepayment of principal at any time on or after September 1, 2021, the Borrower shall concurrently pay to the holder of this Note a prepayment premium equal to the following designated percentages of the amount of principal of this Note to be so prepaid with respect to any prepayment which occurs during the following indicated time periods:

| Time of Prepayment | Prepayment Premium |
|---|---|
| from September 1, 2021 through August 31, 2022 | 10% |
| from September 1, 2022 through August 31, 2023 | 10% |
| from September 1, 2023 through August 31, 2024 | 8% |
| from September 1, 2024 through August 31, 2025 | 7% |
| from September 1, 2025 through August 31, 2026 | 6% |
| from September 1, 2026 through August 31, 2027 | 5% |
| from September 1, 2027 through August 31, 2028 | 4% |
| from September 1, 2028 through August 31, 2029 | 3% |
| from September 1, 2029 through August 31, 2030 | 2% |
| from September 1, 2030 through August 31, 2031 | 1% |
| from September 1, 2031 and thereafter | None |

FHA# 115-35872                                    Rider 1 to Note                                    Parc at Ingleside

App. 296

App. 297

Notwithstanding any partial prepayment of principal made pursuant to the privilege of prepayment set forth in this Note, the Maker shall not be relieved of its obligations to make scheduled monthly installments of principal and interest as and when such payments are due and payable under this Note.

The Borrower has executed this Rider to Note on the date first above written.

**BORROWER:**

D4IN LLC,
a Texas limited liability company

By:  JMJD4 LLC,
a Delaware limited liability company
Its Managing Member

By: _____
Timothy Barton, Manager


**END OF RIDER 1**

# EXHIBIT A-31

1

**693806 DT    Total Pages: 52**

OMB Approval No. 2502-0598
(Exp. 9/30/2021)

Public Reporting Burden for this collection of information is estimated to average .75 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information.  Response to this request for information is required in order to receive the benefits to be derived.  This agency may not collect this information, and you are not required to complete this form unless it displays a currently valid OMB control number.

**Warning:** Federal law provides that anyone who knowingly or willfully submits (or causes to submit) a document containing any false, fictitious, misleading, or fraudulent statement/certification or entry may be criminally prosecuted and may incur civil administrative liability. Penalties upon conviction can include a fine and imprisonment, as provided pursuant to applicable law, which includes, but is not limited to, 18 U.S.C. 1001, 1010, 1012; 31 U.S.C. 3729, 3802, 24 C.F.R. Parts 25, 28 and 30, and 2 C.F.R. Parts 180 and 2424.

**Prepared by and Recording Requested by:**
Thomas Kelly Derryberry
Peaseley & Derryberry PLC
504 Autumn Springs Ct, Suite 26
Franklin, TN 37067

**After Recording return to:**
Leslie F. Dominy
Greystone Funding Company LLC
419 Belle Air Lane
Warrenton, VA 20186

## MULTIFAMILY DEED OF TRUST, ASSIGNMENT OF LEASES AND RENTS AND SECURITY AGREEMENT

### (Texas)

**HUD Project Number: *115-35872***
**Project Name: *Parc at Ingleside***

NOTICE OF CONFIDENTIALITY RIGHTS:  IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OR ALL OF THE FOLLOWING INFORMATION FROM THIS INSTRUMENT BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS:  YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.

2

## MULTIFAMILY DEED OF TRUST,
## ASSIGNMENT OF LEASES AND RENTS
## AND SECURITY AGREEMENT

THIS MULTIFAMILY DEED OF TRUST, ASSIGNMENT OF LEASES AND RENTS, AND SECURITY AGREEMENT, WHICH, FOR AS LONG AS THE LOAN IS INSURED OR HELD BY HUD, SHALL BE DEEMED TO BE THE MORTGAGE AS DEFINED BY PROGRAM OBLIGATIONS (**"Security Instrument"**), is made as of this 1st day of November, 2019 among D4IN LLC, a limited liability company organized and existing under the laws of the State of Texas, whose address is 1755 Wittington Place, Suite 340, Dallas, TX 75234, as grantor, trustor and borrower (**Borrower**), to Thomas Kelly Derryberry, as trustee (**Trustee**), a person whose address is 504 Autumn Springs Ct, Suite 26, Franklin, TN 37067, for the benefit of Greystone Funding Company LLC, a limited liability company organized and existing under the laws of State of Delaware, whose address is 419 Belle Air Lane, Warrenton, VA 20186 as beneficiary and as Lender (**Lender**).

Borrower, in consideration of the Indebtedness and the trust created by this Security Instrument, irrevocably grants, conveys and assigns to Trustee and Trustee's successors and assigns, in trust, with power of sale, the Mortgaged Property, including the Land located in San Patricio County, State of Texas and described in Exhibit A attached to this Security Instrument, to have and to hold the Mortgaged Property unto Trustee and Trustee's successors and assigns.

THIS SECURITY INSTRUMENT IS EXECUTED TO SECURE TO LENDER the repayment of the Indebtedness evidenced by Borrower's Note payable to Lender dated as of the date of this Security Instrument, and maturing on August 1, 2061, in the principal amount of Twenty Five Million Two Hundred One Thousand and 00/100 Dollars (US $25,201,000.00) (**"Loan"**), and all renewals, extensions and modifications of the Indebtedness, and the performance of the covenants and agreements of Borrower contained in this Security Instrument and the Note.

Borrower represents and warrants that Borrower is lawfully seized of the Mortgaged Property and has the right, power and authority to mortgage, grant, convey and assign the Mortgaged Property, and that the Mortgaged Property is unencumbered except for easements and restrictions listed in a schedule of exceptions to coverage in any title insurance policy issued to Lender contemporaneously with the execution and recordation of this Security Instrument and insuring Lender's interest in the Mortgaged Property. Borrower covenants that Borrower shall warrant and defend generally such title to the Mortgaged Property against all claims and demands, subject to said easements and restrictions.

HUD-94000M (Rev. 06/14)                                        State Modification Addendum

App. 300

3

**Covenants.** Borrower and Lender covenant and agree as follows:

1. **DEFINITIONS.** The definition of any capitalized term or word used herein can be found in this Security Instrument, and then if not found in this Security Instrument, then found in the Regulatory Agreement between Borrower and HUD, and/or in the Note. The following terms, when used in this Security Instrument (including when used in the above recitals), shall have the following meanings:

(a) **"Borrower"** means all entities identified as "Borrower" in the first paragraph of this Security Instrument, together with any successors and assigns (jointly and severally). Borrower shall include any entity taking title to the Mortgaged Property whether or not such entity assumes the Note. Whenever the term "Borrower" is used herein, the same shall be deemed to include the obligor of the debt secured by the Security Instrument, and so long as the Note is insured or held by HUD shall also be deemed to be the mortgagor as defined by Program Obligations.

(b) **"Building Loan Agreement"** means the HUD-approved form of the agreement between Borrower and Lender setting forth the terms and conditions for a construction loan.

(c) **"Business Day"** is defined in Section 31.

(d) **"Claim"** is defined in Section 48(m).

(e) **"Collateral Agreement"** means any separate agreement between Borrower and Lender for the purpose of establishing replacement reserves for the Mortgaged Property, establishing an account to assure the completion of repairs or Improvements specified in that agreement, or any other agreement or agreements between Borrower and Lender which provide for the establishment of any other fund, reserve or account including but not limited to those reserves and escrows required by HUD.

(f) **"Contract of Insurance"** is defined in 24 C.F.R. Part 207, Subpart B.

(g) **"Environmental Inspections"** is defined in Section 48(h).

(h) **"Event of Default"** means the occurrence of any event listed in Section 22.

(i) **"Fixtures"** means all property or goods that become so related or attached to the Land or the Improvements that an interest arises in them under real property law, whether acquired now or in the future, excluding all tenant owned goods

App. 301

4

and property, and including but not limited to: machinery, equipment, engines, boilers, incinerators, installed building materials; systems and equipment for the purpose of supplying or distributing heating, cooling, electricity, gas, water, air, or light; antennas, cable, wiring and conduits used in connection with radio, television, computers, security, fire prevention, or fire detection or otherwise used to carry electronic signals; telephone systems and equipment; elevators and related machinery and equipment; fire detection, prevention and extinguishing systems and apparatus; security and access control systems and apparatus; plumbing systems; water heaters, ranges, stoves, microwave ovens, refrigerators, dishwashers, garbage disposals, washers, dryers and other appliances; light fixtures, awnings, storm windows and storm doors; pictures, screens, blinds, shades, curtains and curtain rods; mirrors; cabinets, paneling, rugs and floor and wall coverings; fences, trees and plants; swimming pools; playground and exercise equipment and classroom furnishings and equipment.

(j)      **"Governmental Authority"** means any board, commission, department or body of any municipal, county, state, tribal or federal governmental unit, including any U.S. territorial government, and any public or quasi-public authority, or any subdivision of any of them, that has or acquires jurisdiction over the Mortgaged Property, including the use, operation or improvement of the Mortgaged Property.

(k)      **"HUD"** means the United States Department of Housing and Urban Development acting by and through the Secretary in the capacity as insurer or holder of the Loan under the authority of the National Housing Act, as amended, the Department of Housing and Urban Development Act, as amended, or any other federal law or regulation pertaining to the Loan or the Mortgaged Property.

(l)      **"Impositions"** and **"Imposition Deposits"** are defined in Section 8(a).

(m)      **"Improvements"** means the buildings, structures, and alterations now constructed or at any time in the future constructed or placed upon the Land, including any future replacements and additions.

(n)      **"Indebtedness"** means the principal of, interest on, and all other amounts due at any time under the Note, this Security Instrument, and any other Loan Document, including prepayment premiums, late charges, default interest, and advances to protect the security of this Security Instrument as provided in Section 13.

(o)      **"Indemnitees"** is defined in Section 48(k).

(p)      **"Land"** means the estate in realty described in Exhibit A.

App. 302

5

(q)   **"Leases"** means all present and future leases, subleases, licenses, concessions or grants or other possessory interests now or hereafter in force, whether oral or written, covering or affecting the Mortgaged Property, or any portion of the Mortgaged Property (including but not limited to proprietary leases, non-residential leases or occupancy agreements if Borrower is a cooperative housing corporation), and all modifications, extensions or renewals.  (Ground leases that create a leasehold interest in the Land and where the Borrower's leasehold is security for the Loan are not included in this definition.)

(r)   **"Lender"** means the entity identified as "Lender" in the first paragraph of this Security Instrument, or any subsequent holder of the Note, and whenever the term "Lender" is used herein, the same shall be deemed to include the obligee, or the beneficiary of this Security Instrument, and so long as the Loan is insured or held by HUD, shall also be deemed to be the mortgagee as defined by Program Obligations.

(s)   **"Lien"** is defined in Section 17.

(t)   **"Loan"** is defined in the opening paragraphs of this Security Instrument.

(u)   **"Loan Application"** is defined in Section 41.

(v)   **"Loan Documents"** means the Note, this Security Instrument, the Regulatory Agreement and all other agreements, instruments and documents which are now existing or are in the future required by, delivered to and/or assigned to Lender and/or HUD in connection with or related to the Loan, as such documents may be amended from time to time.

(w)   **"Mortgaged Property"** means all of Borrower's present and future right, title and interest in and to all of the following whether now held or later acquired:

(1)   the Land;

(2)   the Improvements;

(3)   the Fixtures;

(4)   the Personalty;

(5)   all current and future rights, including air rights, development rights, zoning rights and other similar rights or interests, easements, tenements, rights-of-way, strips and gores of land, streets, alleys, roads, sewer rights, waters, watercourses, and appurtenances

App. 303

6

related to or benefiting the Land or the Improvements, or both, and all rights-of-way, streets, alleys and roads which may have been or may in the future be vacated;

(6)     all insurance policies covering the Mortgaged Property, and all proceeds paid or to be paid by any insurer of the Land, the Improvements, the Fixtures, the Personalty or any other part of the Mortgaged Property, whether or not Borrower obtained such insurance policies pursuant to Lender's requirement;

(7)     all awards, payments and other compensation made or to be made by any Governmental Authority with respect to the Land, the Improvements, the Fixtures, the Personalty or any other part of the Mortgaged Property, including any awards or settlements resulting from condemnation proceedings or the total or partial taking of the Land, the Improvements, the Fixtures, the Personalty or any other part of the Mortgaged Property under the power of eminent domain or otherwise and including any conveyance in lieu thereof;

(8)     all contracts, options and other agreements for the sale of the Land, the Improvements, the Fixtures, the Personalty or any other part of the Mortgaged Property entered into by Borrower now or in the future, including cash or securities deposited to secure performance by parties of their obligations;

(9)     all proceeds (cash or non-cash), liquidated claims or other consideration from the conversion, voluntary or involuntary, of any of the Mortgaged Property and the right to collect such proceeds, liquidated claims or other consideration;

(10)    all Rents and Leases;

(11)    all earnings, royalties, instruments, accounts, accounts receivable, supporting obligations, issues and profits from the Land, the Improvements or any other part of the Mortgaged Property, and all undisbursed proceeds of the Loan and, if Borrower is a cooperative housing corporation, maintenance charges or assessments payable by shareholders or residents;

(12)    all Imposition Deposits;

App. 304

7

(13)    all refunds or rebates of Impositions by any Governmental Authority or insurance company (other than refunds applicable to periods before the real property tax year in which this Security Instrument is dated);

(14)    all forfeited tenant security deposits under any Lease;

(15)    all names under or by which any of the above Mortgaged Property may be operated or known, and all trademarks, trade names, and goodwill relating to any of the Mortgaged Property;

(16)    all deposits and/or escrows held by or on behalf of Lender under Collateral Agreements; and

(17)    all awards, payments, settlements or other compensation resulting from litigation involving the Project.

Notwithstanding items numbered (1) through (17) above or Section 33 below, Borrower may hold non-project funds in separate, segregated accounts, specifically labeled as non-project funds, which are not part of the Mortgaged Property.  These accounts may hold those assets owned or received by Borrower, through equity contributions, gifts, or loan proceeds, that were not required by HUD to become part of the Mortgaged Property and were not made a part of the Mortgaged Property by Borrower and funds released from the Mortgaged Property in compliance with Program Obligations (such as Distributions of Surplus Cash and loan repayments, if allowed).

(x)    **"Note"** means the Note executed by Borrower described in this Security Instrument, including all schedules, riders, alloys and addenda, as such Note may be amended from time to time.

(y)    **"Notice"** is defined in Section 31.

(z)    **"O&M Program"** is defined in Section 48(b).

(aa)    **"Personalty"** means all equipment, inventory, and general intangibles. The definition of "Personalty" includes furniture, furnishings, machinery, building materials, appliances, goods, supplies, tools, books, records (whether in written or electronic form), computer equipment (hardware and software) and other tangible or electronically stored personal property (other than Fixtures) that are owned, leased or used by Borrower now or in the future in connection with the ownership, management or operation of the Land or the Improvements or are located on the Land or in the Improvements, and any operating agreements relating to the Land or the

App. 305

8

Improvements, and any surveys, plans and specifications and contracts for architectural, engineering and construction services relating to the Land or the Improvements, choses in action and all other intangible property and rights relating to the operation of, or used in connection with, the Land or the Improvements, including all certifications, approvals and governmental permits relating to any activities on the Land. Intangibles shall also include all cash and cash escrow funds related to the Project, such as but not limited to:  Reserve for Replacement accounts, bank accounts, Residual Receipts accounts, and investments.

(bb)    **"Principal"** is defined in the Regulatory Agreement.

(cc)    **"Project"** and **"Project Assets"** mean the Mortgaged Property.

(dd)    **"Program Obligations"** means (1) all applicable statutes and any regulations issued by the Secretary pursuant thereto that apply to the Project, including all amendments to such statutes and regulations, as they become effective, except that changes subject to notice and comment rulemaking shall become effective only upon completion of the rulemaking process, and (2) all current requirements in HUD handbooks and guides, notices, and mortgagee letters that apply to the Project, and all future updates, changes and amendments thereto, as they become effective, except that changes subject to notice and comment rulemaking shall become effective only upon completion of the rulemaking process, and provided that such future updates, changes and amendments shall be applicable to the Project only to the extent that they interpret, clarify and implement terms in this Security Instrument rather than add or delete provisions from such document.  Handbooks, guides, notices, and mortgagee letters are available on "HUDCLIPS," at www.hud.gov.

(ee)    **"Property Jurisdiction"** is defined in Section 30(a).

(ff)    **"Regulatory Agreement"** means the agreement between the Borrower and HUD establishing Borrower's obligations in the operation of the Mortgaged Property and the rights and powers of HUD.

(gg)    **"Remedial Work"** is defined in Section 48(i).

(hh)    **"Rents"** means all rents (whether from residential or non-residential space), revenues, issues, profits, (including carrying charges, maintenance fees, and other cooperative revenues, and fees received from leasing space on the Mortgaged Property), and other income of the Land or the Improvements, gross receipts, receivables, parking fees, laundry and vending machine income and fees and charges for food and other services provided at the Mortgaged Property, whether now due, past

9

due, or to become due, Residual Receipts, and escrow accounts, however and whenever funded and wherever held.

(ii)    **"Residual Receipts"** is defined in the Regulatory Agreement.

(jj)    **"Taxes"** means all taxes, assessments, vault rentals and other charges, if any, general, special or otherwise, including all assessments for schools, public betterments and general or local improvements, which are levied, assessed or imposed by any public authority or quasi-public authority, and which, if not paid, could become a lien on the Land or the Improvements.

(kk)    **"Waste"** means a failure to keep the Mortgaged Property in decent, safe and sanitary condition and in good repair. During any period in which HUD insures this Loan or holds a security interest on the Mortgaged Property, Waste is committed when, without Lender's and HUD's express written consent, Borrower:

(1)    physically changes the Mortgaged Property, whether negligently or intentionally, in a manner that reduces its value;

(2)    fails to maintain and repair the Mortgaged Property in accordance with Program Obligations;

(3)    fails to pay before delinquency any Taxes secured by a lien having priority over this Security Instrument;

(4)    materially fails to comply with covenants in the Note, this Security Instrument or the Regulatory Agreement respecting physical care, maintenance, construction, abandonment, demolition, or insurance against casualty of the Mortgaged Property; or

(5)    retains possession of Rents to which Lender or its assigns have the right of possession under the terms of the Loan Documents.

**2.    UNIFORM COMMERCIAL CODE SECURITY AGREEMENT.**

This Security Instrument is also a security agreement under the Uniform Commercial Code for any of the Mortgaged Property which, under applicable law, may be subject to a security interest under the Uniform Commercial Code, whether acquired now or in the future, and all products and cash proceeds and non-cash proceeds thereof (collectively, **"UCC Collateral"**), and Borrower hereby grants to Lender a security interest in the UCC Collateral. Borrower hereby authorizes Lender to file financing statements, continuation statements and amendments, in such form as

---

Previous editions are obsolete               HUD MF Security Instrument                HUD-94000M (6/18)

App. 307

10

Lender may require to perfect or continue the perfection of this security interest. Borrower agrees to enter into any agreements, in form as Lender may require, that the Uniform Commercial Code requires to perfect and continue perfection of Lender's security interest in the portion of UCC Collateral that requires Lender control to attain such perfection.  Borrower shall pay all filing costs and all costs and expenses of any record searches for financing statements that Lender may require.  Without the prior written consent of Lender, Borrower shall not create or permit to exist any other lien or security interest in any of the UCC Collateral.  Except for such UCC filings disclosed to Lender and HUD that are to be released in connection with the financing of the Loan or that are otherwise consented to in writing by Lender and HUD, Borrower represents and warrants to Lender that no UCC filings have been made against Borrower, the Project or the Project Assets prior to the initial or initial/final endorsement of the Note by HUD, and Borrower has taken and shall take no action that would give rise to such UCC filings, except for any UCC filings in connection with the acquisition of any Personalty that has been approved in writing by HUD.  Borrower also represents and warrants to Lender that it has not entered into, and will not enter into, any agreement with any party other than Lender in conjunction with the present Loan transaction that allows for the perfection of a security interest in any portion of the UCC Collateral.  Borrower will promptly notify Lender of any change in its business or principal location, name, or other organizational change that would require a filing under the UCC to continue perfection of Lender's interest, and hereby authorizes Lender to file, and will assist Lender in filing, any forms necessary to continue the effectiveness of existing financing statements or for perfection of Lender's security interest.  If an Event of Default has occurred and is continuing, Lender shall have the remedies of a secured party under the Uniform Commercial Code, in addition to all remedies provided by this Security Instrument or existing under applicable law.  In exercising any remedies, Lender may exercise its remedies against the UCC Collateral separately or together, and in any order, without in any way affecting the availability of Lender's other remedies.  This Security Instrument constitutes a fixture filing financing statement with respect to any part of the Mortgaged Property which is or may become a Fixture and which shall be filed in the local real estate records.

    **3.    ASSIGNMENT OF RENTS; APPOINTMENT OF RECEIVER; LENDER IN POSSESSION.**

    (a)    As part of the consideration for the Indebtedness, Borrower absolutely and unconditionally assigns and transfers to Lender all Rents.  It is the intention of Borrower to establish a present, absolute and irrevocable transfer and assignment to Lender of all Rents and to authorize and empower Lender to collect and receive all Rents without the necessity of further action on the part of Borrower.  Promptly upon request by Lender, Borrower agrees to execute and deliver such further assignments as Lender may from time to time require.  Borrower and Lender intend this assignment of Rents to be

11

immediately effective and to constitute an absolute present assignment and not an assignment for additional security only, provided that prior to an Event of Default, Borrower is entitled to Rents.  For purposes of giving effect to this absolute assignment of Rents, and for no other purpose, Rents shall not be deemed to be a part of the Mortgaged Property.  However, if this present, absolute and unconditional assignment of Rents is not enforceable by its terms under the laws of the Property Jurisdiction, then the Rents shall be included as a part of the Mortgaged Property and it is the intention of Borrower that in this circumstance this Security Instrument create and perfect a lien on Rents in favor of Lender, which lien shall be effective as of the date of this Security Instrument.

(b)      After the occurrence of an Event of Default, Borrower authorizes Lender to collect, sue for and compromise Rents and directs each tenant (whether residential or non-residential) of the Mortgaged Property to pay all Rents to, or as directed by, Lender. However, until the occurrence of an Event of Default, Lender hereby grants to Borrower a revocable license to collect and receive all Rents for use in accordance with the provisions of this Security Instrument (and the Regulatory Agreement during the period of its applicability), to hold all Rents in trust for the benefit of Lender and to apply all Rents to pay the installments of interest and principal then due and payable under the Note and the other amounts then due and payable under this Security Instrument, including Imposition Deposits, and to pay the current costs and expenses of managing, operating and maintaining the Mortgaged Property, including utilities, Taxes and insurance premiums (to the extent not included in Imposition Deposits), tenant improvements and other capital expenditures.  So long as no Event of Default has occurred and is continuing, the Rents remaining after application pursuant to the preceding sentence may be retained by Borrower free and clear of, and released from, Lender's rights with respect to Rents under this Security Instrument, unless otherwise restricted by the terms of the Regulatory Agreement during the period of its applicability. From and after the occurrence of an Event of Default, and without the necessity of Lender entering upon and taking and maintaining control of the Mortgaged Property directly, or by a receiver, Borrower's license to collect Rents shall automatically terminate and Lender shall without Notice be entitled to all Rents as they become due and payable, including Rents then due and unpaid.  Borrower shall pay to Lender upon demand all Rents to which Lender is entitled.  At any time on or after the date of Lender's demand for Rents, Lender may give, and Borrower hereby irrevocably authorizes Lender to give, Notice to all tenants of the Mortgaged Property instructing them to pay all Rents to Lender.  No tenant shall be obligated to inquire further as to the occurrence or continuance of an Event of Default, and no tenant shall be obligated to pay to Borrower any amounts which are actually paid to Lender in response to such a Notice.  Any such Notice by Lender shall be delivered to each tenant personally, by mail or by delivering such demand to each rental unit.  Borrower shall not interfere with and shall cooperate with Lender's collection of such Rents.

12

(c)     Borrower represents and warrants to Lender that Borrower has not executed any prior assignment of Rents, that Borrower has not performed, and Borrower covenants and agrees that it shall not perform, any acts and has not executed, and shall not execute, any instrument that would prevent Lender from exercising its rights under Section 3, and that at the time of execution of this Security Instrument there has been no anticipation or prepayment of any Rents for more than two months prior to the due dates of such Rents.  Borrower shall not collect or accept payment of any Rents more than two months prior to the due dates of such Rents (other than collections in connection with transactions as approved by HUD).

(d)     If an Event of Default has occurred and is continuing, Lender may, regardless of the adequacy of Lender's security or the solvency of Borrower and even in the absence of Waste (but only with the prior written approval of HUD in the event of Covenant Defaults), enter upon and take and maintain full control of the Mortgaged Property in order to perform all acts that Lender in its discretion determines to be necessary or desirable for the operation and maintenance of the Mortgaged Property, including the execution, cancellation or modification of Leases, the collection of all Rents, the making of repairs to the Mortgaged Property and the execution or termination of contracts providing for the management, operation or maintenance of the Mortgaged Property, for the purposes of enforcing the assignment of Rents pursuant to Section 3(a), protecting the Mortgaged Property or the security of this Security Instrument, or for such other purposes as Lender in its discretion may deem necessary or desirable.  Alternatively, if an Event of Default has occurred and is continuing, regardless of the adequacy of Lender's security, without regard to Borrower's solvency and without the necessity of giving prior Notice (oral or written) to Borrower, Lender may apply to any court having jurisdiction for the appointment of a receiver for the Mortgaged Property to take any or all of the actions set forth in the preceding sentence. If Lender elects to seek the appointment of a receiver for the Mortgaged Property at any time after an Event of Default has occurred and is continuing, Borrower, by its execution of this Security Instrument, expressly consents to the appointment of such receiver, including the appointment of a receiver *ex parte* if permitted by applicable law.  Lender or the receiver, as the case may be, shall be entitled to receive a reasonable fee for managing the Mortgaged Property.  Immediately upon appointment of a receiver or immediately upon Lender's entering upon and taking possession and control of the Mortgaged Property, Borrower shall surrender possession of the Mortgaged Property to Lender or the receiver, as the case may be, and shall deliver to Lender or the receiver, as the case may be, all documents, records (including records on electronic or magnetic media), accounts, surveys, plans, and specifications relating to the Mortgaged Property and all security deposits and prepaid Rents.  In the event Lender takes possession and control of the Mortgaged Property, Lender may exclude Borrower and its representatives from the Mortgaged Property.  Borrower acknowledges and agrees that

App. 310

13

the exercise by Lender of any of the rights conferred under Section 3 shall not be construed to make Lender a lender-in-possession of the Mortgaged Property so long as Lender, or authorized agent of Lender, has not entered into actual possession of the Land and Improvements.

(e)     If Lender enters the Mortgaged Property, Lender shall be liable to account only to Borrower and only for those Rents actually received. Lender shall not otherwise be liable to Borrower, anyone claiming under or through Borrower or anyone having an interest in the Mortgaged Property, by reason of any act or omission of Lender under Section 3, and Borrower hereby releases and discharges Lender from any such liability to the fullest extent permitted by law.

(f)     If the Rents are not sufficient to meet the costs of taking control of and managing the Mortgaged Property and collecting the Rents, any funds expended by Lender for such purposes shall become an additional part of the Indebtedness as provided in Section 13; provided that Lender shall have the right, but no obligation to make any such advances; and provided further that so long as the Loan is insured by HUD, no such advances by Lender shall become an additional part of the Indebtedness unless such advances receive the prior written approval of HUD.

(g)     Any entering upon and taking of control of the Mortgaged Property by Lender or the receiver, as the case may be, and any application of Rents as provided in this Security Instrument shall not cure or waive any Event of Default or invalidate any other right or remedy of Lender under applicable law or provided for in this Security Instrument.

4.     **ASSIGNMENT OF LEASES; LEASES AFFECTING THE MORTGAGED PROPERTY.**

(a)     As part of the consideration for the Indebtedness, Borrower absolutely and unconditionally assigns and transfers to Lender all of Borrower's right, title and interest in, to and under the Leases, including Borrower's right, power and authority to modify the terms of any such Lease, or extend or terminate any such Lease. It is the intention of Borrower to establish a present, absolute and irrevocable transfer and assignment to Lender of all of Borrower's right, title and interest in, to and under the Leases. Borrower and Lender intend this assignment of the Leases to be immediately effective and to constitute an absolute present assignment and not an assignment for additional security only. For purposes of giving effect to this absolute assignment of the Leases, and for no other purpose, the Leases shall not be deemed to be a part of the Mortgaged Property. However, if this present, absolute and unconditional assignment of the Leases is not enforceable by its terms under the laws of the Property Jurisdiction, then the Leases shall be included as a part of the Mortgaged Property and it is the intention

App. 311

14

of Borrower that in this circumstance this Security Instrument create and perfect a lien on the Leases in favor of Lender, which lien shall be effective as of the date of this Security Instrument.

(b)    Until Lender gives Notice to Borrower of Lender's exercise of its rights under this Section 4, Borrower shall have all rights, power and authority granted to Borrower under any Lease (except as otherwise limited by this Section or any other provision of this Security Instrument), including the right, power and authority to modify the terms of any Lease or extend or terminate any Lease.  Upon the occurrence of an Event of Default and throughout its continuation, the permission given to Borrower pursuant to the preceding sentence to exercise all rights, power and authority under Leases shall automatically terminate.  Borrower shall comply with and observe Borrower's obligations under all Leases, including Borrower's obligations pertaining to the maintenance and disposition of tenant security deposits.

(c)    Borrower acknowledges and agrees that the exercise by Lender, either directly or by a receiver, of any of the rights conferred under this Section 4 shall not be construed to make Lender a lender-in-possession of the Mortgaged Property so long as Lender, or an authorized agent of Lender, has not entered into actual possession of the Land and the Improvements.  The acceptance by Lender of the assignment of the Leases pursuant to Section 4(a) shall not at any time or in any event obligate Lender to take any action under this Security Instrument or to expend any money or to incur any expenses.  Lender shall not be liable in any way for any injury or damage to person or property sustained by any person or persons, firm or corporation in or about the Mortgaged Property unless Lender is a lender-in-possession.  Prior to Lender's actual entry into and taking possession of the Mortgaged Property, Lender shall not (1) be obligated to perform any of the terms, covenants and conditions contained in any Lease (or otherwise have any obligation with respect to any Lease); (2) be obligated to appear in or defend any action or proceeding relating to the Lease or the Mortgaged Property; or (3) be responsible for the operation, control, care, management or repair of the Mortgaged Property or any portion of the Mortgaged Property.  The execution of this Security Instrument by Borrower shall constitute conclusive evidence that all responsibility for the operation, control, care, management and repair of the Mortgaged Property is and shall be that of Borrower, prior to such actual entry and taking of possession.

(d)    Upon delivery of Notice by Lender to Borrower of Lender's exercise of Lender's rights under this Section 4 at any time after the occurrence of an Event of Default, and without the necessity of Lender entering upon and taking and maintaining control of the Mortgaged Property directly, by a receiver, or by any other manner or proceeding permitted by the laws of the Property Jurisdiction, Lender immediately shall have all rights, powers and authority granted to Borrower under any Lease, including

15

the right, power and authority to modify the terms of any such Lease, or extend or terminate any such Lease.

(e)     Borrower shall, promptly upon Lender's request, deliver to Lender an executed copy of each residential Lease then in effect. All Leases for residential dwelling units shall be acceptable to Lender and shall comply with Program Obligations.

(f)     Borrower shall not enter into any Lease for any portion of the Mortgaged Property for non-residential use except with the prior written consent of Lender, and Lender's prior written approval of the Lease agreement, consistent with Program Obligations. Borrower shall not modify the terms of, or extend or terminate, any Lease for non-residential use (including any Lease in existence on the date of this Security Instrument) without the prior written consent of Lender. Borrower shall, without request by Lender, deliver an executed copy of each non-residential Lease to Lender promptly after such Lease is signed. All non-residential Leases, including renewals or extensions of existing Leases, shall specifically provide that (i) such Leases are subordinate to the lien of this Security Instrument, except when approved in writing by Lender in accordance with Program Obligations, and (ii) the tenant shall, upon receipt after the occurrence of an Event of Default of a written request from Lender, pay all Rents payable under the Lease to Lender.

(g)     Borrower shall not receive or accept Rent under any Lease (whether residential or non-residential) for more than two months in advance.

5.     **PAYMENT OF INDEBTEDNESS; PERFORMANCE UNDER LOAN DOCUMENTS; PREPAYMENT PREMIUM.** Borrower shall pay the Indebtedness when due in accordance with the terms of the Note and this Security Instrument and shall perform, observe and comply with all other provisions of the Note and this Security Instrument. Borrower shall pay a prepayment premium in connection with certain prepayments of the Indebtedness, including a payment made after Lender's exercise of any right of acceleration of the Indebtedness, as provided in the Note.

6.     **EXCULPATION.** Except for personal liability expressly provided for in this Security Instrument or in the Note or in the Regulatory Agreement, the execution of the Note shall impose no personal liability upon Borrower or those parties listed in the Section 50 Addendum to the Regulatory Agreement for payment of the Indebtedness evidenced thereby, and in the Event of Default, the holder of the Note shall look solely to the Mortgaged Property in satisfaction of the Indebtedness and will not seek or obtain any deficiency or personal judgment against Borrower or those parties listed in the Section 50 Addendum to the Regulatory Agreement, except such judgment or decree as may be necessary to foreclose or bar its interest in the Mortgaged Property and all other property mortgaged, pledged, conveyed or assigned to secure payment of the

---

Previous editions are obsolete                HUD MF Security Instrument                HUD-94000M (6/18)

16

Indebtedness; provided, that nothing in this Section 6 of this Security Instrument and no action so taken shall operate to impair any obligation under the Regulatory Agreement of Borrower or those parties listed in the Section 50 Addendum to the Regulatory Agreement.

## 7.    DEPOSITS FOR TAXES, INSURANCE AND OTHER CHARGES.

(a)    Borrower shall pay to and deposit with Lender, together with and in addition to the monthly payments of interest or of principal and interest payable under the terms of the Note on the first day of each month after the commencement of amortization under the Note, and continuing until the debt secured hereby is paid in full, the following sums:

(1)    an amount sufficient to provide Lender with funds to pay the next mortgage insurance premium if this Security Instrument and the Note are insured by HUD, or a monthly service charge, if they are held by HUD, as follows:

(i)  If and so long as the Note is insured under the provisions of the National Housing Act, as amended, an amount sufficient to accumulate in the hands of Lender one month prior to its due date the annual mortgage insurance premium; or

(ii)  If and so long as the Note and this Security Instrument are held by HUD, a monthly service charge in an amount equal to the lesser of the amount permitted by law or the amount set forth in Program Obligations computed for each successive year beginning with the first day of the month following the date of this Security Instrument, or the first day of the month following assignment, if the Note and this Security Instrument are assigned to HUD without taking into account delinquencies or prepayment; and

(2)    a sum equal to the ground rents, if any, next due, plus the premiums that will next become due and payable on policies of fire and other property insurance covering the premises covered hereby, plus water rates, Taxes, municipal/government utility charges and special assessments next due on the premises covered hereby (all as estimated by Lender) less all sums already paid therefore divided by the number of months to the date when such ground rents, premiums, water rates, Taxes, municipal/utility

App. 314

17

charges and special assessments will become delinquent, such sums to be held by Lender in trust to pay said ground rents, premiums, water rates, Taxes, and special assessments; and

(3)    all payments and deposits mentioned in the two preceding paragraphs of this subsection and all payments to be made under the Note shall be added together and the aggregate amount thereof shall be paid each month in a single payment or deposit to be applied by Lender to the following items in the order set forth:

(i)  mortgage insurance premium charges under the Contract of Insurance;

(ii) ground rents, if Lender has required them to be escrowed with Lender, Taxes, special assessments, water rates, municipal/government utility charges, fire and other property insurance premiums;

(iii) interest on the Note; and

(iv) amortization of the principal of the Note.

(b)    Borrower shall pay to and deposit with Lender all other escrows and deposits, including any Reserve for Replacements.

(c)    Borrower shall deposit with Lender such amounts as may be required by any Collateral Agreement and shall perform all other obligations of Borrower under each Collateral Agreement.  Collateral Agreement deposits shall be held in an institution (which may be Lender, if Lender is such an institution) whose deposits or accounts are insured or guaranteed by a federal agency and in accordance with Program Obligations.

## 8.    IMPOSITION DEPOSITS.

(a)    In the event Borrower fails to pay any sums provided for in this Security Instrument, Lender, at its option, may pay the same.  Any excess funds accumulated under Section 7(a) remaining after payment of the items therein mentioned, shall be credited to subsequent monthly payments of the same nature required thereunder; but if any such item shall exceed the estimate therefore, or if Borrower shall fail to pay any other governmental or municipal charge, Borrower shall forthwith make good the deficiency or pay the charge before the same become delinquent or subject to interest or penalties and in default thereof Lender may pay the same.  All sums paid or advanced by Lender and any sums which Lender may be required to advance to pay

18

mortgage insurance premiums shall be added to the Indebtedness and shall bear interest from the date of payment at the rate specified in the Note and shall be due and payable on demand.  In case of termination of the Contract of Insurance by prepayment of the Indebtedness in full or otherwise (except as hereinafter provided), accumulations under Section 7(a) not required to pay sums due under Section 7(a)(3) shall be credited to Borrower.  If the Mortgaged Property is sold under foreclosure or is otherwise acquired by Lender after an Event of Default, any remaining balance of the accumulations under Section 7(a) shall be credited to the principal under the Note as of the date of the commencement of foreclosure proceedings or as of the date the Mortgaged Property is otherwise acquired; and accumulations under Section 7 shall be likewise credited unless required to pay sums due HUD under Section 7(a)(3).  The amounts deposited under Section 7 and Section 8 are collectively referred to in this Security Instrument as the "**Imposition Deposits**".  The obligations of Borrower for which the Imposition Deposits are required are collectively referred to in this Security Instrument as "**Impositions**".  The amount of the Imposition Deposits shall be sufficient to enable Lender to pay applicable Impositions before the last date upon which such payment may be made without any penalty or interest charge being added.  Lender shall maintain records indicating how much of the monthly Imposition Deposits and how much of the aggregate Imposition Deposits held by Lender are held for the purpose of paying Taxes, insurance premiums and each other obligation of Borrower for which Imposition Deposits are required.  Any waiver by Lender of the requirement that Borrower remit Imposition Deposits to Lender may be revoked by Lender, in Lender's discretion, at any time upon Notice to Borrower.

(b)     Imposition Deposits shall be held in accounts insured or guaranteed by a federal agency and in accordance with Program Obligations.  Lender shall apply the Imposition Deposits to pay Impositions so long as no Event of Default has occurred and is continuing.  Unless required by Program Obligations, Lender shall not be required to pay Borrower any interest, earnings or profits on the Imposition Deposits with the exception of the Reserve for Replacement account or Residual Receipts account (if any).  Borrower hereby pledges and grants to Lender a security interest in the Imposition Deposits as additional security for all of Borrower's obligations under this Security Instrument and the Note.  Any amounts deposited with Lender under Section 7 shall not be trust funds, nor shall they operate to reduce the Indebtedness.

(c)     If Lender receives a bill or invoice for an Imposition, Lender shall pay the Imposition from the Imposition Deposits held by Lender.  Lender shall have no obligation to pay any Imposition to the extent it exceeds Imposition Deposits then held by Lender.  Lender may pay an Imposition according to any bill, statement or estimate from the appropriate public office or insurance company without inquiring into the accuracy of the bill, statement or estimate or into the validity of the Imposition.

App. 316

19

(d)    If at any time the amount of the Imposition Deposits held by Lender (other than the Reserve for Replacement or Residual Receipts, if any) for payment of a specific Imposition exceeds the amount reasonably deemed necessary by Lender plus one-sixth of such estimate, the excess shall be credited against future installments of Imposition Deposits.  If at any time the amount of the Imposition Deposits held by Lender for payment of a specific Imposition is less than the amount reasonably estimated by Lender to be necessary plus one-sixth of such estimate, Borrower shall pay to Lender the amount of the deficiency within 15 days after Notice from Lender.

9.    **REGULATORY AGREEMENT.**  Borrower and HUD have executed a Regulatory Agreement, which is being recorded simultaneously with this Security Instrument, and is incorporated in and made a part of this Security Instrument.  Upon Default of the Regulatory Agreement and at the direction of HUD, Lender shall declare the whole of the Indebtedness to be due and payable.

10.    **APPLICATION OF PAYMENTS.**  If at any time Lender receives, from Borrower or otherwise, any amount applicable to the Indebtedness which is less than all amounts due and payable at such time, Lender must apply that payment to amounts then due and payable in the manner and in the order set forth in Section 7(a)(3).  Neither Lender's acceptance of an amount that is less than all amounts then due and payable nor Lender's application of such payment in the manner authorized shall constitute or be deemed to constitute either a waiver of the unpaid amounts or an accord and satisfaction.  Notwithstanding the application of any such amount to the Indebtedness, Borrower's obligations under this Security Instrument and the Note shall remain unchanged.

11.    **COMPLIANCE WITH LAWS.**  Borrower shall comply with all applicable: laws; ordinances; regulations; requirements of any Governmental Authority; lawful covenants and agreements recorded against the Mortgaged Property; so long as the Loan is insured or held by HUD, the Regulatory Agreement, and Program Obligations including lead-based paint maintenance requirements of 24 C.F.R. Part 35, Subpart G, and any successor regulations;  including but not limited to those of the foregoing pertaining to:  health and safety; construction of Improvements on the Mortgaged Property; fair housing; civil rights; zoning and land use; Leases; and maintenance and disposition of tenant security deposits; and, with respect to all of the foregoing, all subsequent amendments, revisions, promulgations or enactments.  Borrower shall at all times maintain records sufficient to demonstrate compliance with the provisions of this Section 11.  Borrower shall take appropriate measures to prevent, and shall not engage in or knowingly permit, any illegal activities at the Mortgaged Property, including those that could endanger tenants or visitors, result in damage to the Mortgaged Property, result in forfeiture of the Mortgaged Property, or otherwise impair the lien created by this Security Instrument or Lender's interest in the Mortgaged Property.  Borrower

20

represents and warrants to Lender that no portion of the Mortgaged Property has been or will be purchased with the proceeds of any illegal activity.

**12.    USE OF PROPERTY.**  Unless permitted by applicable law and approved by Lender, Borrower shall not (a) allow changes in the use for which all or any part of the Mortgaged Property is being used at the time this Security Instrument was executed, (b) convert any individual dwelling units or common areas to commercial use, (c) initiate or acquiesce in a change in the zoning classification of the Mortgaged Property that results in any change in permitted use that was in effect at the time of initial/final endorsement, (d) establish any condominium or cooperative regime with respect to the Mortgaged Property, (e) materially change any unit configurations or change the number of units in the Mortgaged Property, (f) combine all or any part of the Mortgaged Property with all or any part of a tax parcel which is not part of the Mortgaged Property, (g) subdivide or otherwise split any tax parcel constituting all or any part of the Mortgaged Property, or (h) so long as the Note is insured or held by HUD, permit the Mortgaged Property to be used as transient housing or as a hotel in violation of Section 513 of the National Housing Act, as amended.

**13.    PROTECTION OF LENDER'S SECURITY.**

(a)    If Borrower fails to perform any of its obligations under this Security Instrument, Note or Regulatory Agreement, or if any action or proceeding is commenced which purports to affect the Mortgaged Property, Lender's security or Lender's rights under this Security Instrument, including eminent domain, insolvency, Waste, code enforcement, civil or criminal forfeiture, enforcement of Hazardous Materials Laws, fraudulent conveyance or reorganizations or proceedings involving a bankrupt or decedent, then Lender at Lender's option may make such appearances, advance such sums and take such actions as Lender reasonably deems necessary to perform such obligations of Borrower and to protect Lender's interest, including (1) payment of fees and out-of-pocket expenses of attorneys (including fees for litigation at all levels), accountants, inspectors and consultants, (2) entry upon the Mortgaged Property to make repairs or secure the Mortgaged Property, (3) procurement of the insurance required by Section 19, and (4) payment of amounts which Borrower has failed to pay under Section 16 or any other Section of this Security Instrument.

(b)    Any amounts advanced by Lender for taxes, special assessments, or water rates (which are liens prior to the Security Instrument), for insuring the Project, or for mortgage insurance premiums, which amounts are paid after an Event of Default, shall be added to, and become part of the Indebtedness, and shall be immediately due and payable and shall bear interest from the date of the advance until paid at the Interest Rate specified in the Note.  So long as the Loan is insured or held by HUD, Lender does not have any obligation to make advances except as required under

App. 318

21

Program Obligations, and any advance by Lender other than as required by Program Obligations requires prior written HUD approval before such advance can be added to the Indebtedness.

(c)    Nothing in Section 13 shall require Lender to incur any expense or take any action to protect its security.

**14.    INSPECTION.**  Upon reasonable notice, Lender, its agents, representatives, and designees, may make or cause to be made entries upon and inspections of the Mortgaged Property (including any environmental inspections and tests) during normal business hours, or at any other reasonable time.

**15.    BOOKS AND RECORDS; FINANCIAL REPORTING.**

(a)    Borrower shall keep and maintain at all times at the Mortgaged Property or the management agent's offices, and upon Lender's request shall make available at the Mortgaged Property, complete and accurate books of account and records (including copies of supporting bills and invoices) adequate to reflect correctly the operation of the Mortgaged Property, and copies of all written contracts, Leases, and other instruments that affect the Mortgaged Property.  The books, records, contracts, Leases and other instruments shall be subject to examination and inspection at any reasonable time by Lender.

(b)    If an Event of Default has occurred and is continuing, Borrower shall, at Borrower's expense, deliver to Lender upon written demand all books and records relating to the Mortgaged Property or its operation, which shall be maintained at the Mortgaged Property.

(c)    Borrower authorizes Lender to obtain a credit report on Borrower, at Borrower's expense, at any time.

(d)    Within 120 days after the end of each fiscal year of Borrower, Borrower shall furnish to Lender a statement of income and expenses of Borrower's operation of the Mortgaged Property for that fiscal year, a statement of changes in financial position of Borrower relating to the Mortgaged Property for that fiscal year and, when requested by Lender, a balance sheet showing all assets and liabilities of Borrower relating to the Mortgaged Property as of the end of that fiscal year.  If Borrower's fiscal year is other than the calendar year, Borrower must also submit to Lender a year-end statement of income and expenses within 120 days after the end of the calendar year.  Lender also may require that any statements, schedules or reports required to be delivered to Lender under this Section 15 be audited at Borrower's expense by independent certified public accountants acceptable to Lender.  If Borrower fails to provide in a timely manner

22

the statements, schedules and reports required by this Section 15, Lender shall have the right to have Borrower's books and records audited, at Borrower's expense, by independent certified public accountants selected by Lender in order to obtain such statements, schedules and reports, and all related costs and expenses of Lender shall become immediately due and payable and shall become an additional part of the Indebtedness. Notwithstanding the foregoing, however, so long as the Loan is insured or held by HUD, Borrower's obligation under this subsection (d) shall be satisfied by the delivery to Lender, concurrently with its delivery to HUD, of a copy of the annual financial statement required to be delivered to HUD in accordance with the Regulatory Agreement.

(e)    Borrower shall deliver to Lender, within 15 days, copies of all operating budgets, capital budgets, and other records or documents concerning the Mortgaged Property or Borrower, reasonably requested by Lender.

## 16.    TAXES; OPERATING EXPENSES.

(a)    Subject to the provisions of Section 16(c) and Section 16(d), Borrower shall pay, or cause to be paid, all Taxes when due and before the addition of any interest, fine, penalty or cost for nonpayment.

(b)    Subject to the provisions of Section 16(c), Borrower shall pay the expenses of operating, managing, maintaining and repairing the Mortgaged Property (including insurance premiums, utilities, repairs and replacements) before the last date upon which each such payment may be made without any penalty or interest charge being added.

(c)    As long as no Event of Default exists and Borrower has timely delivered to Lender any bills or premium notice that it has received, Borrower shall not be obligated to pay Taxes, insurance premiums or any other individual Imposition to the extent that sufficient Imposition Deposits are held by Lender for the purpose of paying that specific Imposition. If an Event of Default exists, Lender may exercise any rights Lender may have with respect to Imposition Deposits without regard to whether Impositions are then due and payable; provided that so long as the Loan is insured by HUD, Lender's exercise of its rights shall be subject to Program Obligations pertaining to claims for mortgage insurance benefits. Lender shall have no liability to Borrower for failing to pay any Impositions to the extent that any Event of Default has occurred and is continuing, insufficient Imposition Deposits are held by Lender at the time an Imposition becomes due and payable or Borrower has failed to provide Lender with bills and premium notice as provided above.

App. 320

23

(d)      Borrower, at its own expense, and, so long as the Loan is insured or held by HUD, in accordance with the Regulatory Agreement, may contest by appropriate legal proceedings, conducted diligently and in good faith, the amount or validity of any Imposition other than insurance premiums, if (1) Borrower notifies Lender of the commencement or expected commencement of such proceedings, (2) the Mortgaged Property is not in danger of being sold or forfeited, (3) Borrower deposits with Lender reserves sufficient to pay the contested Imposition, if requested by Lender, and (4) Borrower furnishes whatever additional security is required in the proceedings or is reasonably requested by Lender, which may include the delivery to Lender of the reserves established by Borrower to pay the contested Imposition.

(e)      Borrower shall promptly deliver to Lender a copy of all Notices of, and invoices for, Impositions, and if Borrower pays any Imposition directly, Borrower shall promptly furnish to Lender receipts evidencing such payments.

**17.     LIENS; ENCUMBRANCES.** (a) Borrower shall not permit the grant, creation or existence of any mortgage, deed of trust, deed to secure debt, security interest or other lien or encumbrance ("**Lien**") on the Mortgaged Property (other than the lien of this Security Instrument, any tax liens which are imposed before payment is due, or any inferior liens which are approved in writing by HUD and Lender), whether voluntary, involuntary or by operation of law, and whether or not such Lien has priority over the lien of this Security Instrument.  (b) Borrower shall not repay any HUD-approved inferior Lien from proceeds of the Loan nor from Project Assets other than from Surplus Cash (as defined in the Regulatory Agreement) or Residual Receipts, except, with the prior written approval of HUD, in the case of an inferior Lien created in an operating loss loan insured pursuant to Section 223(d) of the Act or a supplement loan insured pursuant to Section 241 of the Act.

**18.     PRESERVATION, MANAGEMENT AND MAINTENANCE OF MORTGAGED PROPERTY.**  Borrower (a) shall not commit Waste, (b) shall not abandon the Mortgaged Property, (c) shall restore or repair promptly, in a good and workmanlike manner, any damaged part of the Mortgaged Property to the equivalent of its original condition, or such other condition as Lender may approve in writing, whether or not litigation or insurance proceeds or condemnation awards are available to cover any costs of such restoration or repair, (d) shall keep the Mortgaged Property in decent, safe, and sanitary condition and good repair, including the replacement of Personalty and Fixtures with items of equal or better function and quality, all in accordance with Program Obligations, (e) shall provide for qualified management of the Mortgaged Property by a residential rental property manager, (f) shall give Notice to Lender of and, unless otherwise directed in writing by Lender, shall appear in and defend, any action or proceeding that could impair the Mortgaged Property, Lender's security or Lender's rights under this Security Instrument, (g) shall not (and shall not permit any tenant or

App. 321

24

other person to) remove, demolish or alter the Mortgaged Property or any part of the Mortgaged Property except that Borrower may dispose of obsolete or deteriorated Fixtures or Personalty if the same are replaced with like items of the same or greater quality or value, or make minor alterations which do not impair the Mortgaged Property, and (h) so long as the Loan is insured or held by HUD, shall not expend any Project funds except from permissible withdrawals of Surplus Cash and except for Reasonable Operating Expenses and necessary repairs without the prior written approval of HUD. So long as the Loan is insured or held by HUD, all expenses incurred by Borrower in connection with the Mortgaged Property shall be incurred in compliance with Program Obligations.

## 19.    PROPERTY AND LIABILITY INSURANCE.

(a)    Borrower shall keep the Mortgaged Property insured at all times against such hazards as Lender may from time to time require, which insurance shall include but not be limited to coverage against loss by fire and allied perils, general boiler and machinery coverage, builders all-risk and business income coverage.  Lender's insurance requirements may change from time to time throughout the term of the Indebtedness.  If Lender so requires, such insurance shall also include sinkhole insurance, mine subsidence insurance, earthquake insurance, and, if the Mortgaged Property does not conform to applicable zoning or land use laws, building ordinance or law coverage.  If any of the Improvements are located in an area identified by the Federal Emergency Management Agency (or any successor to that agency) as an area having special flood hazards, Borrower shall maintain flood insurance covering such Improvements and any machinery, equipment, Fixtures and furnishings contained therein that are funded, in whole or in part, with Loan proceeds in an amount at least equal to its development or project cost (less estimated land cost) or to the maximum limit of coverage made available with respect to the particular type of property under the National Flood Insurance Act of 1968, as amended, or its successor statute, whichever is less, provided that the amount of flood insurance need not exceed the outstanding principal balance of the Note, and flood insurance need not be maintained beyond the term of the Note.  If Lender determines that flood insurance has not been obtained in the required amount, Lender must notify Borrower of Borrower's obligations to obtain the proper flood insurance.  If Borrower does not obtain such insurance within 45 days of the date of this notification, Lender shall purchase such flood insurance on behalf of Borrower and may charge Borrower for the cost of premiums and fees incurred by Lender in purchasing the flood insurance.

(b)    All premiums on insurance policies required under Section 19(a) shall be paid in the manner provided in Section 7, unless Lender has designated in writing another method of payment.  All such policies shall also be in a form approved by Lender.  All policies of property damage insurance shall include a non-contributing, non-

25

reporting mortgage clause in a form approved by Lender, and in favor of Lender (and HUD, as their interests appear) and shall name as loss payee Lender, its successors and assigns. Lender shall have the right to hold the original policies or duplicate original policies of all insurance required by Section 19(a). Borrower shall promptly deliver to Lender a copy of all renewal and other notices received by Borrower with respect to the policies and all receipts for paid premiums. At least 30 days prior to the expiration date of a policy, Borrower shall deliver to Lender evidence of continuing coverage in form satisfactory to Lender.

(c)      Borrower shall maintain at all times commercial general liability insurance, workers' compensation insurance and such other liability, errors and omissions and fidelity insurance coverages as Lender may from time to time require, or shall require any appropriate party to maintain at all times commercial general liability insurance, workers' compensation insurance and such other liability, errors and omissions and fidelity insurance coverages as Lender may from time to time require or such other insurance coverage as required by Program Obligations.

(d)      All insurance policies and renewals of insurance policies required by this Section 19 shall be in such amounts and for such periods as Lender may from time to time require, and shall be issued by insurance companies satisfactory to Lender and in accordance with Program Obligations. Lender shall have the right to effect insurance in the event Borrower fails to comply with this Section.

(e)      Borrower shall comply with all insurance requirements and shall not permit any condition to exist on the Mortgaged Property that would invalidate any part of any insurance coverage that this Security Instrument requires Borrower to maintain.

(f)      In the event of loss, Borrower shall give immediate written Notice to the insurance carrier and to Lender. Borrower hereby authorizes and appoints Lender as attorney-in-fact for Borrower to make proof of loss, to adjust and compromise any claims under policies of property damage insurance, to appear in and prosecute any action arising from such property damage insurance policies, to collect and receive the proceeds of property damage insurance, and to deduct from such proceeds Lender's expenses incurred in the collection of such proceeds. This power of attorney is coupled with an interest and therefore is irrevocable. Borrower shall notify Lender of any payment received from any insurer. Lender shall (1) hold the balance of such proceeds to be used to reimburse Borrower for the cost of restoring and repairing the Mortgaged Property to the equivalent of its original condition or to a condition approved by Lender, or (2) apply the balance of such proceeds to the payment of the Indebtedness, whether or not then due. No amount applied to the reduction of the principal amount of the Indebtedness in accordance with this Section 19(f) shall be considered an optional prepayment as the term is used in this Security Instrument and the Note secured

App. 323

26

hereby, nor relieve Borrower from continuing to make regular monthly payments in the amount required by the Note. To the extent Lender determines to apply insurance proceeds to restoration, Lender shall do so in accordance with Lender's then-current policies relating to the restoration of casualty damage on similar multifamily properties; provided that so long as the Loan is insured or held by HUD, insurance proceeds shall be applied as approved by HUD and in accordance with Program Obligations pursuant to Section 19(g) below.

(g)      Lender shall not exercise its option to apply insurance proceeds to the payment of the Indebtedness if all of the following conditions are met:  (1) no Event of Default (or any event which, with the giving of Notice or the passage of time, or both, would constitute an Event of Default) has occurred and is continuing; (2) Lender determines, in its discretion, that there will be sufficient funds to complete the restoration; (3) Lender determines, in its discretion, that the rental income from the Mortgaged Property after completion of the restoration will be sufficient to meet all operating costs and other expenses, Imposition Deposits, deposits to reserves and loan repayment obligations relating to the Mortgaged Property; and (4) Lender determines, in its discretion, that the restoration will be completed before the earlier of (A) one year before the maturity date of the Note or (B) one year after the date of the loss or casualty.  Further, so long as the Loan is insured by HUD, Lender may not exercise its option to apply insurance proceeds to the payment of the Indebtedness without the prior written approval of HUD.  In seeking this approval, Lender shall provide evidence acceptable to HUD that there has been a total loss of the Mortgaged Property such that complete restoration is improbable.  If HUD fails to give its approval to the use or application of such funds within 60 days after the written request by Lender, Lender may use or apply such funds for any of the purposes specified herein without the approval of HUD.

(h)      If the Mortgaged Property is sold at a foreclosure sale or Lender or HUD acquire title to the Mortgaged Property, Lender and HUD, as applicable, shall automatically succeed to all rights of Borrower in and to any insurance policies and unearned insurance premiums and in and to the proceeds of property damage insurance resulting from any damage to the Mortgaged Property prior to such sale or acquisition.

## 20.    CONDEMNATION.

(a)      Borrower shall promptly notify Lender of any action or proceeding relating to any condemnation or other taking, or conveyance in lieu thereof, of all or any part of the Mortgaged Property, whether direct or indirect condemnation.  Borrower shall appear in and prosecute or defend any action or proceeding relating to any condemnation unless otherwise directed by Lender in writing.  Borrower authorizes and

27

appoints Lender as attorney-in-fact for Borrower to commence, appear in and prosecute, in Lender's or Borrower's name, any action or proceeding relating to any condemnation and to settle or compromise any claim in connection with any condemnation. This power of attorney is coupled with an interest and therefore is irrevocable. However, nothing contained in this Section 20 shall require Lender to incur any expense or take any action. Borrower hereby transfers and assigns to Lender all right, title and interest of Borrower in and to any award or payment with respect to (1) any condemnation, or any conveyance in lieu of condemnation, and (2) any damage to the Mortgaged Property caused by governmental action that does not result in a condemnation.

(b)    All awards of compensation in connection with condemnation for public use of or a taking of any of the Mortgaged Property shall be paid to Lender to be applied (1) to fees, costs and expenses (including reasonable attorneys' fees) incurred by Lender; and (2) to the amount due under the Note secured hereby in (i) amounts equal to the next maturing installment or installments of principal and (ii) with any balance to be credited to the next payment due under the Note. After payment to Lender of all fees, costs and expenses (including reasonable attorneys' fees) incurred by Lender under this Section 20, all awards of damages in connection with any condemnation for public use of or damage to the Mortgaged Property, shall be paid to Lender to be applied to an account held for and on behalf of Borrower, which account shall, at the option of Lender, either be applied to the amount due under the Note as specified in the preceding sentence, or be disbursed for the restoration. No amount applied to the reduction of the principal amount due in accordance with this Section 20(b) shall be considered an optional prepayment as the term is used in this Security Instrument and the Note secured hereby, nor relieve Borrower from making regular monthly payments commencing on the first day of the first month following the date of receipt of the award. Lender is hereby authorized in the name of Borrower to execute and deliver necessary releases or approvals or to appeal from such awards.

**21.    TRANSFERS OF THE MORTGAGED PROPERTY OR INTERESTS IN BORROWER.**

(a)    So long as the Loan is insured or held by HUD, Borrower shall not, without the prior written approval of HUD, convey, assign, transfer, pledge, hypothecate, encumber or otherwise dispose of the Mortgaged Property or any interest therein or permit the conveyance, assignment or transfer of any interest in Borrower (if the effect of such conveyance, assignment or transfer is the creation or elimination of a Principal), unless permitted by Program Obligations. Lender may charge Borrower a fee, in accordance with Program Obligations, for Lender's additional responsibilities related to Borrower's actions in this Section 21. Borrower need not obtain the prior written approval of HUD for: (1) a conveyance of the Mortgaged Property at a judicial or non-

---

28

judicial foreclosure sale under this Security Instrument, (2) inclusion of the Mortgaged Property in a bankruptcy estate by operation of law under the United States Bankruptcy Code, or (3) acquisition of an interest by inheritance or by Court decree.

(b)    If the Loan is no longer insured or held by HUD, Borrower shall not convey, assign, transfer, pledge, hypothecate, encumber or otherwise dispose of the Mortgaged Property or any interest therein or permit the conveyance, assignment or transfer of any interest in Borrower without the prior written approval of Lender in its sole discretion.

**22.    EVENTS OF DEFAULT.** The occurrence of any one or more of the following shall constitute either a Monetary Event of Default or a Covenant Event of Default under this Security Instrument:

(a)    Monetary Event of Default:  Any failure by Borrower to pay or deposit when due any amount required by the Note or Section 7(a) of this Security Instrument.

(b)    Covenant Events of Default shall include:

(1)    fraud or material misrepresentation or material omission by Borrower, any of its officers, directors, trustees, general partners, members, managers or any guarantor in connection with (i) the Loan Application for or creation of the Indebtedness, (ii) any financial statement, rent roll, or other report or information provided to Lender during the term of the Indebtedness, or (iii) any request for Lender's consent to any proposed action under this Security Instrument or the Note;

(2)    the commencement of a forfeiture action or proceeding, whether civil or criminal, which, in Lender's reasonable judgment, could result in a forfeiture of the Mortgaged Property or otherwise materially impair the lien created by this Security Instrument or Lender's interest in the Mortgaged Property;

(3)    any material failure by Borrower to perform or comply with any of its obligations under this Security Instrument (other than those specified in Section 22(a) and Section 22(b)(1) and (b)(2)), as and when required, which continues for a period of 30 days after Notice of such failure by Lender to Borrower.  However, no such Notice shall apply in the case of any such material failure which could, in Lender's judgment, absent immediate exercise by Lender of a right

29

or remedy under this Security Instrument, result in harm to Lender or impairment of the Note or this Security Instrument; and,

(4)     so long as the Loan is insured or held by HUD, any failure by Borrower to perform any of its obligations as and when required under the Regulatory Agreement, which failure continues beyond the applicable cure period, if any, specified in the Regulatory Agreement; however, Violations under the terms of the Regulatory Agreement may only be treated as a default under this Security Instrument if HUD instructs Lender to treat them as such.

(c)     Lender shall deliver Notice to any Principal(s) of Borrower identified in Section 31, within five (5) Business Days in each case where Lender has delivered Notice to Borrower of an Event of Default, in order to provide such Principal(s) an opportunity to cure either a Monetary Event of Default or a Covenant Event of Default.

**23.     REMEDIES CUMULATIVE.** Each right and remedy provided in this Security Instrument is distinct from all other rights or remedies under this Security Instrument, the Note, or so long as the Loan is insured or held by HUD, HUD's remedies under the Regulatory Agreement or afforded by applicable law, and each shall be cumulative and may be exercised concurrently, independently, or successively, in any order.

**24.     FORBEARANCE.**

(a)     So long as the Loan is insured by HUD, Lender shall not without obtaining the prior written consent of HUD, take any of the following actions:  extend the time for payment of all or any part of the Indebtedness; reduce the payments due under this Security Instrument or the Note; release anyone liable for the payment of any amounts under this Security Instrument or the Note; accept a renewal of the Note; modify the terms and time of payment of the Indebtedness; join in any extension or subordination agreement; release any Mortgaged Property; take or release other or additional security; modify the rate of interest or period of amortization of the Note or change the amount of the monthly installments payable under the Note; and otherwise modify this Security Instrument or the Note.  However, if the Contract of Insurance has been terminated, Lender may (but shall not be obligated to) agree with Borrower to any of the aforementioned actions in this Section and Lender shall not have to give Notice to or obtain the consent of any guarantor or third-party obligor.

(b)     Any forbearance by Lender in exercising any right or remedy under the Note, this Security Instrument, or any other Loan Document or otherwise afforded by

---

30

applicable law, shall not be a waiver of or preclude the exercise of any right or remedy. The acceptance by Lender of payment of all or any part of the Indebtedness after the due date of such payment, or in an amount that is less than the required payment, shall not be a waiver of Lender's right to require prompt payment when due of all other payments on account of the Indebtedness or to exercise any right or remedy for any failure to make prompt payment.  Enforcement by Lender of any security for the Indebtedness shall not constitute an election by Lender of remedies so as to preclude the exercise of any other right available to Lender.  Lender's receipt of any proceeds or awards under Section 19 and Section 20 shall not operate to cure or waive any Event of Default.

     **25.**    **LOAN CHARGES.**  If any applicable law limiting the amount of interest or other charges permitted to be collected from Borrower in connection with the Loan is interpreted so that any interest or other charge provided for in any Loan Document, whether considered separately or together with other charges provided for in any Loan Document, violates that law, and Borrower is entitled to the benefit of that law, that interest or charge is hereby reduced to the extent necessary to eliminate that violation. The amounts, if any, previously paid to Lender in excess of the permitted amounts shall be applied by Lender to reduce the principal of the Indebtedness.  For the purpose of determining whether any applicable law limiting the amount of interest or other charges permitted to be collected from Borrower has been violated, all Indebtedness that constitutes interest, as well as all other charges made in connection with the Indebtedness that constitute interest, shall be deemed to be allocated and spread ratably over the stated term of the Note.  Unless otherwise required by applicable law, such allocation and spreading shall be effected in such a manner that the rate of interest so computed is uniform throughout the stated term of the Note.

     **26.**    **WAIVER OF STATUTE OF LIMITATIONS.**  To the extent permitted by law, Borrower hereby waives the right to assert any statute of limitations as a bar to the enforcement of the lien of this Security Instrument or to any action brought to enforce any of the Loan Documents.

     **27.**    **WAIVER OF MARSHALLING.**  Notwithstanding the existence of any other security interests in the Mortgaged Property held by Lender or by any other party, Lender shall have the right to determine the order in which any or all of the Mortgaged Property shall be subjected to the remedies provided in this Security Instrument and the Note or applicable law.  Lender shall have the right to determine the order in which any or all portions of the Indebtedness are satisfied from the proceeds realized upon the exercise of such remedies.  Borrower and any party who now or in the future acquires a security interest in the Mortgaged Property and who has actual or constructive notice of this Security Instrument waives any and all right to require the marshalling of assets or to require that any of the Mortgaged Property be sold in the inverse order of alienation

---

31

or that any of the Mortgaged Property be sold in parcels or as an entirety in connection with the exercise of any of the remedies permitted by applicable law or provided in this Security Instrument.

**28.    FURTHER ASSURANCES.**  Borrower shall execute, acknowledge, and deliver, at its sole cost and expense, all further acts, deeds, conveyances, assignments, estoppel certificates, financing statements, transfers and assurances as Lender may require from time to time in order to better assure, grant, and convey to Lender the rights intended to be granted, now or in the future, to Lender under this Security Instrument and the Note.

**29.    ESTOPPEL CERTIFICATE.**  Within ten (10) days after a request from Lender, Borrower shall deliver to Lender a written statement, signed and acknowledged by Borrower, certifying to Lender or any person designated by Lender, as of the date of such statement, (a) that the Note, the Regulatory Agreement (so long as the Loan is insured or held by HUD), and this Security Instrument are unmodified and in full force and effect (or, if there have been modifications, that the Note, the Regulatory Agreement (so long as the Loan is insured or held by HUD), and this Security Instrument are in full force and effect as modified and setting forth such modifications); (b) the unpaid principal balance of the Note; (c) the date to which interest under the Note has been paid; (d) that Borrower is not in default in paying the Indebtedness or in performing or observing any of the covenants or agreements contained in the Note, the Regulatory Agreement (so long as the Loan is insured or held by HUD), and this Security Instrument (or, if Borrower is in default, describing such default in reasonable detail); (e) whether or not there are then existing any setoffs or defenses known to Borrower against the enforcement of any right or remedy of Lender under the Note, the Regulatory Agreement (so long as the Loan is insured or held by HUD), and this Security Instrument; and (f) any additional facts requested by Lender.

**30.    GOVERNING LAW; CONSENT TO JURISDICTION AND VENUE.**

(a)    This Security Instrument and the Note, if it does not itself expressly identify the law that is to apply to it, shall be governed by the laws of the jurisdiction in which the Land is located (**"Property Jurisdiction"**), except so long as the Loan is insured or held by HUD, and solely as to rights and remedies of HUD, as such local or state laws may be preempted by federal law.

(b)    Borrower agrees that any controversy arising under or in relation to the Note or this Security Instrument shall be litigated exclusively in the Property Jurisdiction except as, so long as the Loan is insured or held by HUD and solely as to rights and remedies of HUD, federal jurisdiction may be appropriate pursuant to any federal requirements. The state courts, and with respect to HUD's rights and remedies, federal

32

courts, and Governmental Authorities in the Property Jurisdiction shall have exclusive jurisdiction over all controversies which shall arise under or in relation to the Note, any security for the Indebtedness, or this Security Instrument. Borrower irrevocably consents to service, jurisdiction, and venue of such courts for any such litigation and waives any other venue to which it might be entitled by virtue of domicile, habitual residence or otherwise.

## 31.    NOTICE.

(a)    All notices, demands and other communications (**"Notice"**) under or concerning this Security Instrument shall be in writing. Each Notice shall be addressed to the intended recipients at their respective addresses set forth in this Security Instrument, and shall be deemed given on the earliest to occur of (1) the date when the Notice is received by the addressee; (2) the first Business Day after the Notice is delivered to a recognized overnight courier service, with arrangements made for payment of charges for next Business Day delivery; or (3) the third Business Day after the Notice is deposited in the United States mail with postage prepaid, certified mail, return receipt requested. As used in this Section 31, the term (**"Business Day"**) means any day other than a Saturday or a Sunday, a federal holiday or holiday in the state where the Project is located or other day on which the federal government or the government of the state where the Project is located is not open for business. When not specifically designated as a Business Day, the term "**day**" shall refer to a calendar day. Failure of Lender to send Notice to Borrower or its Principal(s) shall not prevent the exercise of Lender's rights or remedies under this Security Instrument or under the Loan Documents.

(b)    Any party to this Security Instrument may change the address to which Notices intended for it are to be directed by means of Notice given to the other party in accordance with this Section 31. Each party agrees that it shall not refuse or reject delivery of any Notice given in accordance with this Section 31, that it shall acknowledge, in writing, the receipt of any Notice upon request by the other party and that any Notice rejected or refused by it shall be deemed for purposes of this Section 31 to have been received by the rejecting party on the date so refused or rejected, as conclusively established by the records of the U.S. Postal Service or the courier service.

33

(c)    Any Notice under the Note which does not specify how Notice is to be given shall be given in accordance with this Section 31.

**BORROWER:**
D4IN LLC
Attn: Timothy Barton
1755 Wittington Place, Suite 340
Dallas, TX 75234

**PRINCIPAL(S)/RELATED PARTIES:**

Timothy Barton                              JMJD4 LLC
1755 Wittington Place, Suite 340     1755 Wittington Place, Suite 340
Dallas, TX 75234                            Dallas, TX 75234

**LENDER:**
Greystone Funding Company LLC
Attn: General Counsel
419 Belle Air Lane
Warrenton, VA 20186

**32.    SALE OF NOTE; CHANGE IN SERVICER.** The Note or a partial interest in the Note (together with this Security Instrument) may be sold one or more times without prior Notice to Borrower. A sale may result in a change of the loan servicer. There also may be one or more changes of the loan servicer unrelated to a sale of the Note. If there is a sale or transfer of all or a partial interest in the Note or a change of the loan servicer, Lender shall be responsible for ensuring that Borrower is given Notice of the sale, transfer and/or change. Any loan servicer, including any loan servicer resulting from any changes mentioned above, must be approved by HUD in accordance with Program Obligations.

**33.    SINGLE ASSET BORROWER.** Until the Indebtedness is paid in full or unless otherwise approved in writing by HUD so long as the Loan is insured or held by HUD, (a) Borrower shall be a single purpose entity and shall maintain the assets of the Mortgaged Property in segregated accounts and (b) Borrower (1) shall not acquire any real or personal property other than the Mortgaged Property and personal property related to the operation and maintenance of the Mortgaged Property, and so long as the Loan is insured or held by HUD, except pursuant to the Regulatory Agreement and Program Obligations and (2) shall not own or operate any business other than the management and operation of the Mortgaged Property, and so long as the Loan is insured or held by HUD, except pursuant to the Regulatory Agreement and Program Obligations.

---

34

**34.    SUCCESSORS AND ASSIGNS BOUND.** This Security Instrument shall bind, and the rights granted by this Security Instrument shall inure to, the respective successors and assigns of Lender and Borrower.

**35.    JOINT AND SEVERAL LIABILITY.** If more than one person or entity signs this Security Instrument as Borrower, the obligations of such persons and entities shall be joint and several.

**36.    RELATIONSHIP OF PARTIES; NO THIRD-PARTY BENEFICIARY.**

(a)    The relationship between Lender and Borrower shall be solely that of creditor and debtor, respectively, and nothing contained in this Security Instrument shall create any other relationship between Lender and Borrower. Borrower agrees that it is not a third-party beneficiary to the Contract of Insurance between HUD and Lender, as more fully set forth in 24 C.F.R. Part 207, Subpart B.

(b)    No creditor of any party to this Security Instrument and no other person (the term "person" includes, but is not limited to, any commercial or governmental entity or institution) shall be a third-party beneficiary of this Security Instrument, the Note, or so long as the Loan is insured or held by HUD, the Regulatory Agreement. Without limiting the generality of the preceding sentences, (1) any servicing arrangement between Lender and any loan servicer for loss sharing or interim advancement of funds shall constitute a contractual obligation of such loan servicer that is independent of the obligation of Borrower for the payment of the Indebtedness, (2) Borrower shall not be a third-party beneficiary of any servicing arrangement, and (3) no payment by the loan servicer under any servicing arrangement shall reduce the amount of the Indebtedness.

**37.    SEVERABILITY; AMENDMENTS.** The invalidity or unenforceability of any provision of this Security Instrument shall not affect the validity or enforceability of any other provision, and all other provisions shall remain in full force and effect. This Security Instrument contains the entire agreement among the parties as to the rights granted and the obligations assumed in this Security Instrument. This Security Instrument may not be amended or modified except by a writing signed by the party against whom enforcement is sought.

**38.    RULES OF CONSTRUCTION.** The captions and headings of the Sections of this Security Instrument are for convenience only and shall be disregarded in construing this Security Instrument. Any reference in this Security Instrument to an **"Exhibit"** or a **"Section"** shall, unless otherwise explicitly provided, be construed as referring, respectively, to an Exhibit attached to this Security Instrument or to a Section of this Security Instrument. All Exhibits attached to or referred to in this Security Instrument are incorporated by reference into this Security Instrument. Use of the

---

35

singular in this Security Instrument includes the plural and use of the plural includes the singular. As used in this Security Instrument, the term **"including"** means "including, but not limited to."

      39.    **LOAN SERVICING.** All actions regarding the servicing of the Note, including the collection of payments, the giving and receipt of Notice, inspections of the Mortgaged Property, inspections of books and records, and the granting of consents and approvals, may be taken by the HUD-approved loan servicer unless Borrower receives Notice to the contrary. If Borrower receives conflicting Notices regarding the identity of the loan servicer or any other subject, any such Notice from Lender shall govern; provided that so long as the Loan is insured or held by HUD, if Borrower receives conflicting Notice regarding the identity of the loan servicer or any other subject, any such Notice from Lender shall govern unless there is a Notice from HUD and, in all cases, any Notice from HUD governs notwithstanding any Notice from any other party.

      40.    **DISCLOSURE OF INFORMATION.** To the extent permitted by law, Lender may furnish information regarding Borrower or the Mortgaged Property to third parties with an existing or prospective interest in the servicing, enforcement, evaluation, performance, purchase or securitization of the Indebtedness, including but not limited to trustees, master servicers, special servicers, rating agencies, and organizations maintaining databases on the underwriting and performance of multifamily mortgage loans.

      41.    **NO CHANGE IN FACTS OR CIRCUMSTANCES.** Borrower certifies that all information in the application for the Loan submitted to Lender (the **"Loan Application"**) and in all financial statements, rent rolls, reports, certificates and other documents submitted in connection with the Loan Application are complete and accurate in all material respects and that there has been no material adverse change in any fact or circumstance that would make any such information incomplete or inaccurate. The submission of false or incomplete information shall be a Covenant Event of Default.

      42.    **ESTOPPEL.** The Lender is not the agent of HUD. Any action by Lender in exercising any right or remedy under this Security Instrument shall not be a waiver or preclude the exercise by HUD of any right or remedy which HUD might have under the Regulatory Agreement or other Program Obligations.

      43.    **ACCELERATION; REMEDIES.** If a Monetary Event of Default occurs and is continuing for a period of thirty (30) days, Lender, at Lender's option, may declare the Indebtedness to be immediately due and payable without further demand, and may invoke the power of sale and any other remedies permitted by applicable law or

---

Previous editions are obsolete        HUD MF Security Instrument        HUD-94000M (6/18)

App. 333

36

provided in this Security Instrument or in the Note. Following a Covenant Event of Default, Lender, at Lender's option, but so long as the Loan is insured or held by HUD, only after receipt of the prior written approval of HUD, may declare the Indebtedness to be immediately due and payable without further demand, and may invoke the power of sale and any other remedies permitted by applicable law or provided in this Security Instrument or in the Note. Borrower acknowledges that the power of sale granted in this Security Instrument may be exercised by Lender without prior judicial hearing. Lender shall be entitled to collect all costs and expenses incurred in pursuing such remedies, including reasonable attorneys' fees (including but not limited to appellate litigation), costs of documentary evidence, abstracts and title reports.

**PROVISIONS PERTAINING TO SALE AS APPROPRIATE UNDER STATE LAW, IF ANY, ARE ADDRESSED IN ATTACHED FORM STATE ADDENDUM**

    **44.    FEDERAL REMEDIES.** In addition to any rights and remedies set forth in the Regulatory Agreement, HUD has rights and remedies under federal law so long as HUD is the insurer or holder of the Loan, including but not limited to the right to foreclose pursuant to the Multifamily Mortgage Foreclosure Act of 1981, 12 U.S.C. Section 3701, *et seq.*, as amended, when HUD is the holder of the Note.

    **45.    REMEDIES FOR WASTE.** In addition to any other rights and remedies set forth in the Note and this Security Instrument or those available under applicable law, including exemplary damages where permitted, the following remedies for Waste by Borrower are available to Lender as necessary to give complete redress to Lender for Lender's loss or damage:

    (a)    the exercise of the remedies available to Lender during the existence of a Covenant Event of Default, as set forth in Section 43 of this Security Instrument;

    (b)    an injunction prohibiting future Waste or requiring correction of Waste already committed, but only to the extent that Waste has impaired or threatens to impair Lender's security; and

    (c)    recovery of damages, limited by the amount of Waste, to the extent that Waste has impaired Lender's security. So long as the Loan is insured or held by HUD, any recovery of damages by Lender or HUD for Waste shall be applied, at the sole discretion of HUD, (1) to fees, costs and expenses (including reasonable attorneys' fees) incurred by Lender; (2) to remedy Waste of the Mortgaged Property, (3) to the Indebtedness or (4) for any other purpose designated by HUD.

    **46.    TERMINATION OF HUD RIGHTS AND REFERENCES.** At such time as HUD no longer insures or holds the Note, (a) all rights and responsibilities of HUD shall

| Previous editions are obsolete | HUD MF Security Instrument | HUD-94000M (6/18) |

App. 334

37

conclude, all mortgage insurance and references to mortgage insurance premiums, all references to HUD, GNMA and Program Obligations and related terms and provisions shall cease, and all rights and obligations of HUD shall terminate; (b) all obligations and responsibilities of Borrower to HUD shall likewise terminate; and (c) all obligations and responsibilities of Lender to HUD shall likewise terminate; provided, however, nothing contained in this Section 46, shall in any fashion discharge Borrower from any obligations to HUD under the Regulatory Agreement or Program Obligations or Lender from any obligations to HUD under Program Obligations, which occurred prior to termination of the Contract of Insurance. The provisions of this Section 46 shall be given effect automatically upon the termination of the Contract of Insurance or the transfer of this Security Instrument by HUD to another party, provided that upon the request of Borrower, Lender or the party to whom the Security Instrument has been transferred, at no cost to HUD, HUD shall execute such documents as may be reasonably requested to confirm the provisions of this Section 46.

46.    **47.    CONSTRUCTION FINANCING.** The Indebtedness represents funds to be used in the construction of certain Improvements on the Land, in accordance with the Building Loan Agreement which is incorporated herein by reference to the same extent and effect as if fully set forth and made herein (provided, however, that if and to the extent that the Building Loan Agreement is inconsistent herewith, this Security Instrument shall govern). If the construction of the Improvements to be made pursuant to the Building Loan Agreement are not made in accordance with the terms of said Building Loan Agreement, or Borrower otherwise defaults under the Building Loan Agreement, Lender, after due Notice to Borrower, or any subsequent owner, is hereby vested with full and complete authority to enter upon the Land to employ watchmen to protect such Improvements from depredation or injury and to preserve and protect the Personalty therein, to continue any and all outstanding contracts for the erection and completion of said Improvements, to make and enter into any contracts and obligations wherever necessary, either in its own name or in the name of Borrower, or other owner, and to pay and discharge all debts, obligations, and liabilities incurred thereby. All such sums so advanced by Lender (exclusive of advances of the principal of the Indebtedness) shall be added to the principal of the Indebtedness secured hereby and all shall be secured by this Security Instrument and shall be due and payable on demand with interest at the rate provided in the Note, but no such advances shall be insured unless same are specifically approved by HUD prior to the making thereof. The Indebtedness shall, at the option of Lender or holder of this Security Instrument and the Note, become due and payable on the failure of Borrower, or other owner, to keep and perform any of the covenants, conditions and agreements of the Building Loan Agreement. This covenant shall be terminated upon the completion of the Improvements to the satisfaction of Lender and the making of the final advance as provided in the Building Loan Agreement.

38

## 48.   ENVIRONMENTAL HAZARDS.

(a)   Definitions:

(1)   **"Hazardous Materials"** means petroleum and petroleum products and compounds containing them, including gasoline, diesel fuel and oil; explosives; flammable materials; radioactive materials; polychlorinated biphenyls (**"PCBs"**) and compounds containing them; lead and lead-based paint; asbestos or asbestos-containing materials in any form that is or could become friable; underground or above-ground storage tanks, whether empty or containing any substance; any substance the presence of which on the Mortgaged Property is prohibited by any Governmental Authority; any substance that requires special handling; and any other material or substance now or in the future defined as a "hazardous substance," "hazardous material," "hazardous waste," "toxic substance," "toxic pollutant," "contaminant," or "pollutant" within the meaning of any Hazardous Materials Law.

(2)   **"Hazardous Materials Laws"** means all federal, state, and local laws, ordinances and regulations and standards, rules, policies and other governmental requirements, administrative rulings and court judgments and decrees in effect now or in the future and including all amendments that relate to Hazardous Materials and apply to Borrower or to the Mortgaged Property.  Hazardous Materials Laws include, but are not limited to, the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. Section 9601, *et seq.*, the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, *et seq.*, the Toxic Substance Control Act, 15 U.S.C. Section 2601, *et seq.*, the Clean Water Act, 33  U.S.C. Section 1251, *et seq.*, and the Hazardous Materials Transportation Act, 49 U.S.C. Section 5101, *et seq.*, and their state analogs.

(3)   **"Environmental Permit"** means any permit, license, or other authorization issued under any Hazardous Materials Law with respect to any activities or businesses conducted on or in relation to the Mortgaged Property.

(b)   Except for (1) matters covered by a written program of operations and maintenance approved in writing by Lender (**"O&M Program"**); (2) matters described in

---

Previous editions are obsolete                   HUD MF Security Instrument                   HUD-94000M (6/18)

App. 336

39

subsection (c) of this Section 48; or (3) (for so long as the Loan is insured or held by HUD) matters covered by Program Obligations that may differ from this Section 48 (with respect to lead based paint requirements, for example), Borrower shall not cause or permit any of the following:

(i)    any occurrence or condition on the Mortgaged Property or any other property of Borrower that is adjacent to the Mortgaged Property, which occurrence or condition is or may be in violation of Hazardous Materials Laws; or

(ii)    any violation of or noncompliance with the terms of any Environmental Permit with respect to the Mortgaged Property or any property of Borrower that is adjacent to the Mortgaged Property.

The matters described in clauses (i) and (ii) above are referred to collectively in this Section 48 as **"Prohibited Activities or Conditions."**

(c)    Prohibited Activities and Conditions shall not include the safe and lawful use and storage of quantities of (1) supplies, cleaning materials and petroleum products customarily used in the operation and maintenance of comparable multifamily properties; (2) cleaning materials, personal grooming items and other items sold in containers for consumer use and used by tenants and occupants of residential dwelling units in the Mortgaged Property; and (3) petroleum products used in the operation and maintenance of motor vehicles and motor-operated equipment from time to time located on the Mortgaged Property's parking areas, so long as all of the foregoing are used, stored, handled, transported and disposed of in compliance with Hazardous Materials Laws.

(d)    Borrower shall take all commercially reasonable actions (including the inclusion of appropriate provisions in any Leases executed after the date of this Security Instrument) to prevent its employees, agents, and contractors, and all tenants and other occupants from causing or permitting any Prohibited Activities or Conditions. Borrower shall not lease or allow the sublease or use of all or any portion of the Mortgaged Property to any tenant or subtenant for nonresidential use by any user that, in the ordinary course of its business, would cause or permit any Prohibited Activity or Condition.

(e)    If an O&M Program has been established with respect to Hazardous Materials, Borrower shall comply in a timely manner with, and cause all employees, agents, and contractors of Borrower and any other persons encompassed by the O&M Program and present on the Mortgaged Property to comply with the O&M Program. All

---

Previous editions are obsolete                HUD MF Security Instrument                HUD-94000M (6/18)

40

costs of performance of Borrower's obligations under any O&M Program shall be paid by Borrower, and Lender's out-of-pocket costs incurred in connection with the monitoring and review of the O&M Program and Borrower's performance shall be paid by Borrower upon demand by Lender.  Any such out-of-pocket costs of Lender which Borrower fails to pay promptly shall become an additional part of the Indebtedness as provided in Section 13; provided that so long as the Loan is insured by HUD, no advances made by Lender under this subsection (e) shall become an additional part of the Indebtedness unless such advances receive the prior written approval of HUD and provided further that unless approved by HUD, Lender shall have no obligation to make any such advances.

(f)     Borrower represents and warrants to Lender that, except as previously disclosed by Borrower to Lender in writing:

(1)     Borrower has not at any time engaged in, caused or permitted any Prohibited Activities or Conditions;

(2)     to the best of Borrower's knowledge after reasonable and diligent inquiry, no Prohibited Activities or Conditions exist or have existed;

(3)     the Mortgaged Property does not now contain any underground storage tanks, and, to the best of Borrower's knowledge after reasonable and diligent inquiry, the Mortgaged Property has not contained any underground storage tanks in the past.  If there is an underground storage tank located on the Mortgaged Property that has been previously disclosed by Borrower to Lender in writing, that tank complies with all requirements of Hazardous Materials Laws;

(4)     Borrower has complied with all Hazardous Materials Laws, including all requirements for notification regarding releases of Hazardous Materials.  Without limiting the generality of the foregoing, Borrower has obtained all Environmental Permits required for the operation of the Mortgaged Property in accordance with Hazardous Materials Laws now in effect and all such Environmental Permits are in full force and effect;

(5)     no event has occurred with respect to the Mortgaged Property that constitutes, or with the passing of time or the giving of Notice would constitute, noncompliance with the terms of any Environmental Permit;

41

(6)    to the best of Borrower's knowledge after reasonable and diligent inquiry, there are no actions, suits, claims or proceedings, pending or threatened, that involve the Mortgaged Property and allege, arise out of, or relate to any Prohibited Activity or Condition; and

(7)    Borrower has not received any complaint, order, notice of violation or other communication from any Governmental Authority with regard to air emissions, water discharges, noise emissions or Hazardous Materials, or any other environmental, health or safety matters affecting the Mortgaged Property or any other property of Borrower that is adjacent to the Mortgaged Property that have not previously been resolved legally.

The representations and warranties in this Section 48 shall be continuing representations and warranties that shall be deemed to be made by Borrower throughout the term of the Loan, until the Indebtedness has been paid in full.

(g)    Borrower shall promptly notify Lender in writing upon the occurrence of any of the following events:

(1)    Borrower's discovery of any Prohibited Activity or Condition;

(2)    Borrower's receipt of or knowledge of any complaint, order, notice of violation or other communication from any Governmental Authority or other person with regard to present or future alleged Prohibited Activities or Conditions or any other environmental, health or safety matters affecting the Mortgaged Property or any other property of Borrower that is adjacent to the Mortgaged Property; and

(3)    any representation or warranty in this Section 48 becoming untrue after the date of this Security Instrument.

Any such Notice given by Borrower shall not relieve Borrower of, or result in a waiver of, any obligation under this Security Instrument, the Note, or any other Loan Document.

(h)    Borrower shall pay promptly the costs of any environmental inspections, tests or audits (**"Environmental Inspections"**) required by Lender in connection with any foreclosure or deed in lieu of foreclosure, or as a condition of Lender's consent to any transfer under Section 21, or required by Lender following a reasonable determination by Lender that Prohibited Activities or Conditions may exist. Any such costs incurred by Lender (including the fees and out-of-pocket costs of attorneys and

---

Previous editions are obsolete      HUD MF Security Instrument      HUD-94000M (6/18)

App. 339

42

technical consultants whether incurred in connection with any judicial (appellate or otherwise) or administrative process or otherwise) which Borrower fails to pay promptly shall become an additional part of the Indebtedness as provided in Section 13; provided that so long as the Loan is insured by HUD, no advances made by Lender under this subsection (h) shall become an additional part of the Indebtedness unless such advances receive the prior written approval of HUD and provided further that unless approved by HUD, Lender shall have no obligation to make such further advances.  The results of all Environmental Inspections made by Lender shall at all times remain the property of Lender and Lender shall have no obligation to disclose or otherwise make available to any party other than Borrower, and so long as the Loan is insured by HUD, to HUD, such results or any other information obtained by Lender in connection with its Environmental Inspections.  Lender hereby reserves the right, and Borrower hereby expressly authorizes Lender, to make available to any party, including any prospective bidder at a foreclosure sale of the Mortgaged Property, the results of any Environmental Inspections made by Lender with respect to the Mortgaged Property.  Borrower consents to Lender notifying any party (either as part of a notice of sale or otherwise) of the results of any of Lender's Environmental Inspections.  Borrower acknowledges that Lender cannot control or otherwise assure the truthfulness or accuracy of the results of any of its Environmental Inspections and that the release of such results to prospective bidders at a foreclosure sale of the Mortgaged Property may have a material and adverse effect upon the amount which a party may bid at such sale.  Borrower agrees that Lender shall have no liability whatsoever as a result of delivering the results of any of its Environmental Inspections to any third party, and Borrower hereby releases and forever discharges Lender from any and all claims, damages, or causes of action, arising out of, connected with or incidental to the results of, the delivery of any of Lender's Environmental Inspections.

(i)     If any investigation, site monitoring, containment, clean-up, restoration or other remedial work (**"Remedial Work"**) is necessary to comply with any Hazardous Materials Law applicable to the Mortgaged Property or to its use, operation or improvement, Borrower shall, by the earlier of (1) the applicable deadline required by the Hazardous Materials Law or (2) thirty (30) days after Notice from Lender demanding such action, begin performing the Remedial Work, and thereafter diligently prosecute it to completion, and shall in any event complete the work by the time required by applicable Hazardous Materials Law.  If Borrower fails to begin on a timely basis or diligently prosecute any required Remedial Work, Lender may, at its option, cause the Remedial Work to be completed, in which case Borrower shall reimburse Lender on demand for the cost of doing so.  So long as the Loan is insured by HUD, no advances made by Lender under this subsection (i) shall become part of the Indebtedness as provided in Section 13 unless such advances receive the prior written approval of HUD and provided further that unless approved by HUD, Lender shall have no obligation to make any such advances.

| Previous editions are obsolete | HUD MF Security Instrument | HUD-94000M (6/18) |

App. 340

43

(j)      Borrower shall cooperate with any inquiry by any Governmental Authority and shall comply with any governmental or judicial order which arises from any alleged Prohibited Activity or Condition.

(k)      Borrower shall indemnify [if Borrower is located in a State that requires an indemnification agreement separate and apart from this Security Instrument, Borrower shall provide said indemnification agreement to Lender], hold harmless and defend (1) Lender, (2) any prior owner or holder of the Note, (3) the loan servicer, (4) any prior loan servicer, (5) the officers, directors, shareholders, partners, employees and trustees of any of the foregoing, and (6) the heirs, legal representatives, successors and assigns of each of the foregoing (collectively, **"Indemnitees"**) from and against all proceedings, claims, damages, penalties and costs (whether initiated or sought by Governmental Authorities or private parties), including fees and out of pocket expenses of attorneys and expert witnesses, investigatory fees, and remediation costs, whether incurred in connection with any judicial (including appellate) or administrative process or otherwise, arising directly or indirectly from any of the following except where the Mortgaged Property became contaminated subsequent to any transfer of ownership which was approved in writing by Lender (and so long as the Loan is insured or held by HUD, by HUD), provided such transferee assumes in writing all obligations of Borrower with respect to Prohibited Activities or Conditions:

(i)      any breach of any representation or warranty of Borrower in this Section 48;

(ii)     any failure by Borrower to perform or comply with any of its obligations under this Section 48;

(iii)    the existence or alleged existence of any Prohibited Activity or Condition;

(iv)    the actual or alleged violation of any Hazardous Materials Law.

(l)      Counsel selected by Borrower to defend Indemnitees shall be subject to the approval of those Indemnitees.  However, any Indemnitee may elect to defend any claim or legal or administrative proceeding at Borrower's expense.

(m)     Borrower shall not, without the prior written consent of those Indemnitees who are named as parties to a claim or legal or administrative proceeding (**"Claim"**), settle or compromise the Claim if the settlement (1) results in the entry of any judgment that does not include as an unconditional term the delivery by the claimant or plaintiff to Lender of a written release of those Indemnitees, satisfactory in form and substance to

44

Lender; or (2) may materially and adversely affect Lender, as determined by Lender in its discretion.

(n)    Borrower's obligation to indemnify the Indemnitees shall not be limited or impaired by any of the following, or by any failure of Borrower or any guarantor to receive Notice of or consideration for any of the following:

(1)    any amendment or modification of any Loan Document;

(2)    any extensions of time for performance required by any Loan Document;

(3)    the accuracy or inaccuracy of any representations and warranties made by Borrower under this Security Instrument or any other Loan Document;

(4)    the release of Borrower or any other person, by Lender or by operation of law, from performance of any obligation under any Loan Document;

(5)    the release or substitution in whole or in part of any security for the Indebtedness; and

(6)    Lender's failure to properly perfect any lien or security interest given as security for the Indebtedness.

(o)    Borrower shall, at its own cost and expense, do all of the following:

(1)    pay or satisfy any judgment or decree that may be entered against any Indemnitee or Indemnitees in any legal or administrative proceeding incident to any matters against which Indemnitees are entitled to be indemnified under this Section 48;

(2)    reimburse Indemnitees for any expenses paid or incurred in connection with any matters against which Indemnitees are entitled to be indemnified under this Section 48; and

(3)    reimburse Indemnitees for any and all expenses, including fees and out-of-pocket expenses of attorneys and expert witnesses, paid or incurred in connection with the enforcement by Indemnitees of their rights under this Section 48, or in monitoring and participating in any legal (including appellate) or administrative proceeding.

App. 342

45

(p)     In any circumstances in which the indemnity under this Section 48 applies, Lender may employ its own legal counsel and consultants to prosecute, defend or negotiate any claim or legal or administrative proceeding and Lender, with the prior written consent of Borrower (which shall not be unreasonably withheld, delayed or conditioned), may settle or compromise any action or legal or administrative proceeding. Borrower shall reimburse Lender upon demand for all costs and expenses incurred by Lender, including all costs of settlements entered into in good faith, and the fees and out of pocket expenses of such attorneys (including but not limited to appellate litigation) and consultants.

(q)     The provisions of this Section 48 shall be in addition to any and all other obligations and liabilities that Borrower may have under applicable law or under other Loan Documents, and each Indemnitee shall be entitled to indemnification under this Section 48 without regard to whether Lender or that Indemnitee has exercised any rights against the Mortgaged Property or any other security, pursued any rights against any guarantor, or pursued any other rights available under the Loan Documents or applicable law.  If Borrower consists of more than one entity, the obligation of those entities to indemnify the Indemnitees under this Section 48 shall be joint and several. The obligation of Borrower to indemnify the Indemnitees under this Section 48 shall survive any repayment or discharge of the Indebtedness, any foreclosure proceeding, any foreclosure sale, any delivery of any deed in lieu of foreclosure, and any release of record of the lien of this Security Instrument.  Notwithstanding anything in Section 48 to the contrary, so long as the Loan is insured or held by HUD, indemnification costs and reimbursements to Lender or to any or all Indemnitees shall be paid only from the available proceeds of an appropriate insurance policy or from Surplus Cash or other escrow accounts.

(r)     So long as the Loan is insured or held by HUD, all references to Lender in this Section 48 shall also be construed to refer to HUD as its interest appears (solely as determined by HUD) and all notifications to Lender must also be made to HUD and all Lender approvals and exercises of discretion by Lender under this Section 48 must first have the prior written approval of HUD, provided, that, so long as the Loan is insured or held by HUD, the reference to Lender as an Indemnitee shall be construed to refer to HUD, and Borrower's obligations to indemnify HUD as an Indemnitee shall remain in effect in accordance with this Section 48, notwithstanding the termination or expiration of insurance of the Loan by HUD.

(s)     To the extent any HUD environmental requirements or standards are inconsistent or conflict with the provisions of this Section 48, the HUD requirements or standards shall control so long as the Loan is insured or held by HUD.

46

**49.**     State requirements for future advances, credit line or open-end mortgages, if any, are addressed in State Addendum attach hereto.

**ATTACHED EXHIBITS.**  The following Exhibits are attached to this Security Instrument:

|X|     Texas State Addendum

|X|     <u>Exhibit A</u>               Description of the Land (required).

App. 344

47

**IN WITNESS WHEREOF**, Borrower has signed and delivered this Security Instrument or has caused this Security Instrument to be signed and delivered by its duly authorized representative, as a sealed instrument.

D4IN LLC,
a Texas limited liability company

By:  JMJD4 LLC,
a Delaware limited liability company
Its Managing Member

By: _____
Timothy Barton, Manager

STATE OF TEXAS          §
                        §
COUNTY OF __Dallas__    §

The foregoing instrument was acknowledged before me on this __12th__ day of November, 2019, by Timothy Barton, Manager of JMJD4 LLC, a Texas limited liability company, managing member of D4IN LLC, a Texas limited liability company.

_____
Notary Public
Printed Name of Notary: __BELLA D. Khusal__

My Commission Expires: __09/24/2022__
[seal]

Bella D Khusal
My Commission Expires
09/24/2022
ID No. 131734480

---

Previous editions are obsolete          HUD MF Security Instrument          HUD-94000M (6/18)

App. 345

HUD Project Number: 115-35872
Project Name: Parc at Ingleside

**ADDENDUM**

(Texas)

The following sections are inserted into the Security Instrument and made a part thereof:

43.  Accelerations/ Remedies:

If Lender invokes the power of sale, Lender may, by and through the Trustee, or otherwise, sell or offer for sale the Mortgaged Property in such portions, order and parcels as Lender may determine, with or without having first taken possession of the Mortgaged Property, to the highest bidder for cash at public auction.  Such sale shall be made at the courthouse door of the county in which all or any part of the Land to be sold is situated (whether the parts or parcel, if any, situated in different counties are contiguous or not, and without the necessity of having any Personalty present at such sale) on the first Tuesday of any month between the hours of 10:00 a.m. and 4:00 p.m., after advertising the time, place and terms of sale and that portion of the Mortgaged Property to be sold by posting or causing to be posted written or printed notice of sale at least twenty-one (21) days before the date of the sale at the courthouse door of the county in which the sale is to be made and at the courthouse door of any other county in which a portion of the Land may be situated, and by filing such notice with the County Clerk(s) of the county(s) in which all or a portion of the Land may be situated, which notice may be posted and filed by the Trustee acting, or by any person acting for the Trustee, and Lender has, at least twenty-one (21) days before the date of the sale, served written or printed notice of the proposed sale by certified mail on each debtor obligated to pay the Indebtedness according to Lender's records by the deposit of such notice, enclosed in a postpaid wrapper, properly addressed to such debtor at debtor's most recent address as shown by Lender's records, in a post office or official depository under the care and custody of the United States Postal Service.  The affidavit of any person having knowledge of the facts to the effect that such service was completed shall be prima facie evidence of the fact of service.

49.  Trustee:

(a)    Trustee may resign by giving of notice of such resignation in writing to Lender.  If Trustee shall die, resign or become disqualified from acting under this Instrument or shall fail or refuse to act in accordance with this Instrument when requested by Lender or if for any reason and without cause Lender shall prefer to appoint a substitute trustee to act instead of the original Trustee named in this Instrument or any prior successor or substitute trustee, Lender shall have full power to appoint a substitute trustee and, if preferred, several substitute trustees in succession who shall succeed to all the estate, rights, powers and duties of the original Trustee named in this Instrument.  Such appointment may be executed by an authorized officer,

3

agent or attorney-in-fact of Lender (whether acting pursuant to a power of attorney or otherwise), and such appointment shall be conclusively presumed to be executed with authority and shall be valid and sufficient without proof of any action by Lender.

(b)     Any successor Trustee appointed pursuant to this Section shall, without any further act, deed or conveyance, become vested with all the estates, properties, rights, powers and trusts of the predecessor Trustee with like effect as if originally named as Trustee in this Instrument; but, nevertheless, upon the written request of Lender or such successor Trustee, the Trustee ceasing to act shall execute and deliver an instrument transferring to such successor Trustee, all the estates, properties, rights, powers and trusts of the Trustee so ceasing to act, and shall duly assign, transfer and deliver any of the property and monies held by the Trustee ceasing to act to the successor Trustee.

(c)     Trustee may authorize one or more parties to act on Trustee's behalf to perform the ministerial functions required of Trustee under this Instrument, including the transmittal and posting of any notices.

THE SECURITY INSTRUMENT SHALL BE PREPARED TO CONFORM TO THE REQUIREMENTS OF THE LOCAL FILING JURISDICTION IN WHICH THE DOCUMENT IS TO BE RECORDED AND FILED.

App. 347

HUD Project Number: 115-35872
Project Name: Parc at Ingleside

## EXHIBIT A

### (DESCRIPTION OF THE LAND)

TRACT I:

A 3.038 ACRE, OR 132,327 SQUARE FEET MORE OR LESS, BEING PORTION OF LOT 5 AND ALL OF LOT 6, HARGUS SUBDIVISION, RECORDED IN <u>VOLUME 3, PAGE 54</u>OF MAP RECORDS OF SAN PATRICIO COUNTY, TEXAS DESCRIBED IN A DEED TO ABC LAND AND DEVELOPMENT, INC. (A NEVADA CORPORATION) RECORDED IN DOCUMENT NUMBER <u>671767</u>, OFFICIAL PUBLIC RECORDS OF SAN PATRICIO COUNTY, TEXAS. SAID 5.270 ACRE TRACT BEING MORE FULLY DESCRIBED AS FOLLOWS, WITH BEARINGS BASED ON THE TEXAS COORDINATE SYSTEM ESTABLISHED FOR THE SOUTH ZONE FROM THE NORTH AMERICAN DATUM OF 1983 NAD 83 (NA2011) EPOCH 2010.00;

BEGINNING: AT A FOUND IRON ROD WITH CAP MARKED "BRISTER" AT THE NORTH CORNER OF SAID 3.038 ACRE TRACT, THE EAST CORNER OF A 3.3495 ACRE TRACT OF LAND DESCRIBED IN A DEED RECORDED IN DOCUMENT NUMBER 299383, OFFICIAL PUBLIC RECORDS OF SAN PATRICIO COUNTY, TEXAS, ON THE SOUTHWEST RIGHT-OF-WAY LINE OF SOUTHERN PACIFIC RAILROAD, 100-FOOT RIGHT-OF-WAY, NO RECORDING INFORMATION FOUND;

THENCE: S 60°05'04" E, ALONG THE COMMON LINE OF SAID 3.038 ACRE TRACT AND SAID SOUTHERN PACIFIC RAILROAD RIGHT-OF-WAY LINE, A DISTANCE OF 305.89 FEET TO A SET "+" IN CONCRETE ON THE EAST CORNER OF SAID 3.038 ON THE NORTHWEST RIGHT-OF-WAY LINE OF AVENUE J, A 60-FOOT PUBLIC RIGHT, NO RECORDING INFORMATION FOUND;

THENCE: DEPARTING THE SOUTHWEST RIGHT-OF-WAY LINE OF SAID SOUTHERN PACIFIC RAILROAD, ALONG THE NORTHWEST RIGHT-OF-WAY LINE OF SAID AVENUE J, THE FOLLOWING BEARINGS AND DISTANCES:

S 33°04'30" W, A DISTANCE OF 94.20 FEET TO A SET 1/2" IRON ROD WITH YELLOW CAP MARKED "PAPEDAWSON";

ALONG A NON-TANGENT CURVE TO THE RIGHT, SAID CURVE HAVING A RADIAL BEARING OF N 51°50'35" W, A RADIUS OF 627.87 FEET, A CENTRAL ANGLE OF 16°40'29", A CHORD BEARING AND DISTANCE OF S 46°29'40" W, 182.08 FEET, FOR AN ARC LENGTH OF 182.73 FEET TO A SET 1/2" IRON ROD WITH YELLOW CAP MARKED "PAPE-DAWSON";

ALONG A REVERSE CURVE TO THE LEFT, SAID CURVE HAVING A RADIUS OF 192.33 FEET, A CENTRAL ANGLE OF 21°49'24", A CHORD BEARING AND DISTANCE OF S 43°55'12" W, 72.81 FEET, FOR AN ARC LENGTH OF 73.26 FEET TO A SET 1/2" IRON ROD WITH YELLOW CAP MARKED "PAPE-DAWSON";

HUD-94000M (Rev 06/18)                                        Legal Description

App. 348

S 33°00'30" W, PASSING AT 118.05', A FOUND DRILL HOLE AT THE INTERSECTION OF THE NORTHWEST RIGHT-OF- WAY LINE OF SAID AVENUE J AND THE NORTHEAST RIGHT-OF-WAY LINE OF FIRST STREET (FORMERLY FIFTEENTH STREET), A 50-FOOT PUBLIC RIGHT-OF-WAY AS SHOWN ON SAID HARGUS SUBDIVISION, AND CONTINUING FOR A TOTAL A DISTANCE OF 148.05 FEET TO A CALCULATED POINT IN SAID FIRST STREET;

THENCE: N 56°59'30" W, ALONG SAID FIRST STREET, A DISTANCE OF 248.91 FEET TO A CALCULATED POINT;

THENCE: N 32°59'10" E, PASSING AT 30.00', A FOUND DRILL HOLE ON THE NORTHEAST RIGHT-OF-WAY LINE OF SAID FIRST STREET, AND CONTINUING FOR A TOTAL DISTANCE OF 474.31 FEET TO THE POINT OF

BEGINNING, AND CONTAINING 3.038 ACRES IN THE CITY OF INGLESIDE, SAN PATRICIO COUNTY, TEXAS. SAID TRACT BEING DESCRIBED IN ACCORDANCE WITH A SURVEY MADE ON THE GROUND AND A SURVEY DESCRIPTION AND MAP PREPARED UNDER JOB NUMBER 11561-00 BY PAPE-DAWSON ENGINEERS, INC.


TRACT II:

A 5.270 ACRE, OR 229,546 SQUARE FEET MORE OR LESS, BEING PORTION OF LOTS 2, 4, 5 AND ALL OF LOT 3, HARGUS SUBDIVISION, RECORDED IN VOLUME 3, PAGE 54OF MAP RECORDS OF SAN PATRICIO COUNTY, TEXAS DESCRIBED IN A DEED TO ABC LAND AND DEVELOPMENT, INC. (A NEVADA CORPORATION) RECORDED IN DOCUMENT NUMBER 671767, OFFICIAL PUBLIC RECORDS OF SAN PATRICIO COUNTY, TEXAS. SAID 5.270 ACRE TRACT BEING MORE FULLY DESCRIBED AS FOLLOWS, WITH BEARINGS BASED ON THE TEXAS COORDINATE SYSTEM ESTABLISHED FOR THE SOUTH ZONE FROM THE NORTH AMERICAN DATUM OF 1983 NAD 83 (NA2011) EPOCH 2010.00;

BEGINNING: AT A FOUND IRON ROD WITH CAP MARKED "BRISTER" AT THE EAST CORNER OF SAID 5.270 ACRE TRACT, THE NORTH CORNER OF THE EAST ONE-HALF (E/2) OF LOT 2 DESCRIBED IN A DEED RECORDED IN DOCUMENT NUMBER 632609, OFFICIAL PUBLIC RECORDS OF SAN PATRICIO COUNTY, TEXAS, ON THE SOUTHWEST RIGHT-OF-WAY LINE OF SOUTHERN PACIFIC RAILROAD, 100-FOOT RIGHT-OF-WAY, NO RECORDING INFORMATION FOUND;

THENCE: S 33°00'29" W, PASSING AT 487.03, A FOUND HEX ROD ON THE NORTHEAST RIGHT-OF-WAY LINE OF FIRST STREET (FORMERLY FIFTEENTH STREET), 50-FOOT PUBLIC RIGHT-OF-WAY AS SHOWN ON SAID HARGUS SUBDIVISION, AND CONTINUING FOR A TOTAL DISTANCE OF 517.03 FEET TO A CALCULATED POINT IN SAID FIRST STREET;

THENCE: N 56°59'30" W, ALONG SAID FIRST STREET, A DISTANCE OF 481.57 FEET TO A CALCULATED POINT;

THENCE: N 33°00'30" E, PASSING AT 30.00', A FOUND DRILL HOLE AT THE INTERSECTION OF THE NORTHEAST RIGHT-OF-WAY LINE OF SAID FIRST STREET AND THE SOUTHEAST LINE OF AVENUE J, A 60-FOOT PUBLIC RIGHT-OF-WAY, NO RECORDING INFORMATION FOUND, AND CONTINUING ALONG THE SOUTHEAST RIGHT-OF- WAY LINE OF SAID AVENUE J FOR A TOTAL DISTANCE OF 148.05 FEET TO A SET 1/2" IRON ROD WITH YELLOW CAP MARKED "PAPE-DAWSON";

THENCE: ALONG THE SOUTHEAST RIGHT-OF-WAY LINE OF SAID AVENUE J, THE FOLLOWING BEARINGS AND DISTANCES:

ALONG A TANGENT CURVE TO THE RIGHT, SAID CURVE HAVING A RADIUS OF 132.33 FEET, A CENTRAL ANGLE OF 21°49'24", A CHORD BEARING AND DISTANCE OF N 43°55'12" E, 50.10 FEET, FOR AN ARC LENGTH OF 50.40 FEET TO A SET 1/2" IRON ROD WITH YELLOW CAP MARKED "PAPE-DAWSON";

ALONG A REVERSE CURVE TO THE LEFT, SAID CURVE HAVING A RADIUS OF 687.87 FEET, A CENTRAL ANGLE OF 16°54'06", A CHORD BEARING AND DISTANCE OF N 46°22'52" E, 202.18 FEET, FOR AN ARC LENGTH OF 202.91 FEET TO A SET 1/2" IRON ROD WITH YELLOW CAP MARKED "PAPE-DAWSON";

N 33°04'30" E, A DISTANCE OF 100.12 FEET TO A SET 1/2 INCH IRON ROD WITH YELLOW CAP MARKED "PAPEDAWSON" AT THE NORTH CORNER OF SAID 5.270 ACRE TRACT ON THE SOUTHWEST RIGHT-OF-WAY LINE OF SAID SOUTHERN PACIFIC RAILROAD;

THENCE: S 60°05'04" E, ALONG THE SOUTHWEST RIGHT-OF-WAY LINE OF SAID SOUTHERN PACIFIC RAILROAD, A DISTANCE OF 425.83 FEET TO THE POINT OF BEGINNING, AND CONTAINING 5.270 ACRES IN THE CITY OF INGLESIDE, SAN PATRICIO COUNTY, TEXAS. SAID TRACT BEING DESCRIBED IN ACCORDANCE WITH A SURVEY MADE ON THE GROUND AND A SURVEY DESCRIPTION AND MAP PREPARED UNDER JOB NUMBER 11561-00 BY PAPE-DAWSON ENGINEERS, INC.

FILED AND RECORDED
OFFICIAL PUBLIC RECORDS

Gracie Alaniz-Gonzales
County Clerk
San Patricio County, Texas
11/14/2019 08:56 AM
Fee: $230.00
693806    DT

HUD-94000M (Rev 06/18)                                    Legal Description

App. 350

# EXHIBIT A-32

Uniform Commercial Code
P.O. Box 13193
Austin, Texas 78711-3193

Ruth R. Hughs
Secretary of State

## Office of the Secretary of State

May 13, 2020
Page 1 of 1

| Filing Fee: | $30.00 |
|---|---|
| **Total Filing Fee:** | **$30.00** |

Capitol Services, Inc.
PO Box 1831
Austin, TX 78767 -

Re: **Texas UCC Initial Filing Acknowledgment**

The Texas Secretary of State's Office has received and filed your document. The information below reflects the data that was indexed into our system.

Initial Filing Type: **Financing Statement**

Initial Filing Number: **20-0017679567**      Filing Date: **05/13/2020**      Filing Time: **11:56 a.m.**

Lapse Date: **05/13/2025**      Document Number: **970068230002**

| Party Type | Party Name and Address |
|---|---|
| Debtor | **ENOCH INVESTMENTS LLC** |
| | **1755 WITTINGTON PLACE SUITE 340, FARMERS BRANCH, TX, USA, 75234** |
| Secured Party | **SOUTHERN PROPERTIES CAPITAL LTD** |
| | **1603 LBJ FREEWAY, SUITE 280, FARMERS BRANCH, TX, USA, 75234** |

Please feel free to contact us at 512-475-2703 if you have any questions regarding the above information.

User ID: JHUNT

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

**A. NAME & PHONE OF CONTACT AT FILER (optional)**
Date Chin, 214-350-3667

**B. E-MAIL CONTACT AT FILER (optional)**
dchin@bennettweston.com

**C. S**

Return Acknowledgement to:

Capitol Services, Inc.
PO Box 1831
Austin, TX 78767
800.345.4647

CAPITOL SERVICES

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of Item 1 blank, check here ☐ and provide the Individual Debtor Information in Item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| ENOCH INVESTMENTS LLC | | | |
| OR 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 1755 Wittington Place Suite 340 | Farmers Branch | TX | 75234 | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of Item 2 blank, check here ☐ and provide the Individual Debtor information in Item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| | | | |
| OR 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| SOUTHERN PROPERTIES CAPITAL LTD | | | |
| OR 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 1603 LBJ Freeway, Suite 280 | Farmers Branch | TX | 75234 | USA |

4. COLLATERAL: This financing statement covers the following collateral:

See Exhibit "A" attached hereto and made a part hereof.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, Item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box!
☐ Public-Finance Transaction  ☐ Manufactured-Home Transaction  ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien  ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor  ☐ Consignee/Consignor  ☐ Seller/Buyer  ☐ Bailee/Bailor  ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
Parc at Windmill Farms - ENOCH INVESTMENTS Secured Interest - DOT UCC - TX SOS Filing

International Association of Commercial Administrators (IACA)

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

App. 353

## EXHIBIT "A"

100% of its interest in JMJD4 LLC which consist of 99% of the membership interest in JMJD4 LLC.

███████████████
███████████████
███████████████

# UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

| A. NAME & PHONE OF CONTACT AT FILER (optional)<br>Date Chin, 214-350-3667 |
| --- |
| B. E-MAIL CONTACT AT FILER (optional)<br>dchin@bennettweston.com |
| C. SEND ACKNOWLEDGMENT TO:   (Name and Address)<br><br>Bennett, Weston, Lajone & Turner P.C.<br>Attn:  Date Chin<br>1603 LBJ Freeway, Suite 280<br>Dallas, Texas  75234 |

Delaware Department of State
U.C.C. Filing Section
Filed: 12:46 PM 05/13/2020
U.C.C. Initial Filing No: 2020 3378223

Service Request No:  20203837199

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME<br>TRWF LLC | | | | |
| --- | --- | --- | --- | --- |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 1c. MAILING ADDRESS<br>1755 Wittington Place Suite 340 | CITY<br>Farmers Branch | STATE<br>TX | POSTAL CODE<br>75234 | COUNTRY<br>USA |

2 DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
| --- | --- | --- | --- | --- |
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME<br>SOUTHERN PROPERTIES CAPITAL LTD | | | | |
| --- | --- | --- | --- | --- |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 3c. MAILING ADDRESS<br>1603 LBJ Freeway, Suite 280 | CITY<br>Farmers Branch | STATE<br>TX | POSTAL CODE<br>75234 | COUNTRY<br>USA |

4. COLLATERAL:  This financing statement covers the following collateral:

See Exhibit "A" attached hereto and made a part hereof.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box: ☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box: ☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable) ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
Parc at Windmill Farms - TRWF Secured Interest - DOT UCC - DE SOS Filing

International Association of Commercial Administrators (IACA)

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

App. 355

## EXHIBIT "A"

100% of its interest in JMJAV LLC which consist of 100% of the membership interest in JMJAV LLC.

FILING NUMBER: 20-0017975435
FILING DATE: 5/14/2020 12:26 PM
DOCUMENT NUMBER: 970482870002
FILED: Texas Secretary of State
Received by Fax

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

**A. NAME & PHONE OF CONTACT AT FILER (optional)**

**B. E-MAIL CONTACT AT FILER (optional)**

**C. SEND ACKNOWLEDGMENT TO:**

Return Acknowledgment to:

Capitol Services, Inc.
PO Box 1831
Austin, TX 78767
800.345.4647

CAPITOL SERVICES

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**1. DEBTOR'S NAME:** Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | JMJAV LLC | | | |
|---|---|---|---|---|
| OR 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 1c. MAILING ADDRESS 13901 MIDWAY ROAD, SUITE 102-LB243 | CITY FARMERS BRANCH | STATE TX | POSTAL CODE 75244 | COUNTRY USA |

**2. DEBTOR'S NAME:** Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| OR 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

**3. SECURED PARTY'S NAME** (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | SOUTHERN PROPERTIES CAPITAL LTD | | | |
|---|---|---|---|---|
| OR 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 3c. MAILING ADDRESS 1603 LBJ FREEWAY, SUITE 800 | CITY DALLAS | STATE TX | POSTAL CODE 75234 | COUNTRY USA |

**4. COLLATERAL:** This financing statement covers the following collateral:

100% OF ITS INTEREST IN D4IN LLC WHICH CONSISTS OF 1% OF THE MEMBERSHIP INTEREST IN D4IN LLC.

| 5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) | ☐ being administered by a Decedent's Personal Representative |
|---|---|
| 6a. Check only if applicable and check only one box: ☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility | 6b. Check only if applicable and check only one box: ☐ Agricultural Lien ☐ Non-UCC Filing |
| 7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor | |

**8. OPTIONAL FILER REFERENCE DATA:**
JMJAV - D4IN - TX - STATE

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

FILING NUMBER: 20-0017975172
FILING DATE: 5/14/2020 12:15 PM
DOCUMENT NUMBER: 970482800002
FILED: Texas Secretary of State
Received by Fax

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)

B. E-MAIL CONTACT AT FILER (optional)

C. S...

Return Acknowledgement to:

Capitol Services, Inc.
PO Box 1831
Austin, TX 78767
800.345.4647

CAPITOL SERVICES

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME JMJAV LLC | | | | |
|---|---|---|---|---|
| OR 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 1c. MAILING ADDRESS 13901 MIDWAY ROAD, SUITE 102-LB243 | CITY FARMERS BRANCH | STATE TX | POSTAL CODE 75244 | COUNTRY USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| OR 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME SOUTHERN PROPERTIES CAPITAL LTD | | | | |
|---|---|---|---|---|
| OR 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 3c. MAILING ADDRESS 1603 LBJ FREEWAY, SUITE 800 | CITY DALLAS | STATE TX | POSTAL CODE 75234 | COUNTRY USA |

4. COLLATERAL: This financing statement covers the following collateral:
100% OF ITS INTEREST IN JMJD4 LLC WHICH CONSISTS OF 1% OF THE MEMBERSHIP INTEREST IN JMJD4 LLC.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
JMJAV – JMJD4 – TX – STATE

International Association of Commercial Administrators (IACA)

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

App. 358

# UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

| A. NAME & PHONE OF CONTACT AT FILER (optional) |
| --- |

| B. E-MAIL CONTACT AT FILER (optional) |
| --- |

C. SEND ACKNOWLEDGMENT TO:  (Name and Address)

⌐ CAPITOL SERVICES, INC. ⌐

L                                                    ⌐

**Delaware Department of State**
**U.C.C. Filing Section**
**Filed: 11:58 AM 05/14/2020**
**U.C.C. Initial Filing No: 2020 3407071**

**Service Request No:  20203897451**

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME JMJD4 LLC | | | |
| --- | --- | --- | --- |
| OR 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

| 1c. MAILING ADDRESS 13901 MIDWAY ROAD, SUITE 102-LB243 | CITY FARMERS BRANCH | STATE TX | POSTAL CODE 75244 | COUNTRY USA |
| --- | --- | --- | --- | --- |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | |
| --- | --- | --- | --- |
| OR 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| --- | --- | --- | --- | --- |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME SOUTHERN PROPERTIES CAPITAL LTD | | | |
| --- | --- | --- | --- |
| OR 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

| 3c. MAILING ADDRESS 1603 LBJ FREEWAY, SUITE 800 | CITY DALLAS | STATE TX | POSTAL CODE 75234 | COUNTRY USA |
| --- | --- | --- | --- | --- |

4. COLLATERAL: This financing statement covers the following collateral:
100% OF ITS INTEREST IN D4IN LLC WHICH CONSISTS OF 98.75% OF THE MEMBERSHIP INTEREST IN D4IN LLC

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions)    ☐ being administered by a Decedent's Personal Representative

| 6a. Check only if applicable and check only one box: | 6b. Check only if applicable and check only one box: |
| --- | --- |
| ☐ Public-Finance Transaction   ☐ Manufactured-Home Transaction   ☐ A Debtor is a Transmitting Utility | ☐ Agricultural Lien   ☐ Non-UCC Filing |

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor  ☐ Consignee/Consignor  ☐ Seller/Buyer  ☐ Bailee/Bailor  ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
JMJD4 - D4IN - DE - STATE

International Association of Commercial Administrators (IACA)

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

App. 359

# EXHIBIT A-33

## SOUTHERN PROPERTIES CAPITAL LTD.
### 1603 LBJ Freeway, Suite 800
### Dallas, Texas  75234

October 3, 2022

**<u>VIA HAND DELIVERY</u>**
ENOCH INVESTMENTS, LLC
JMJAV, LLC
JMJD4, LLC
D4IN, LLC
c/o JMJ Development, LLC
13901 Midway Road, Suite 102
Dallas, Texas  75244
Attn: Timothy Barton

Re: Conversion option for Parc at Ingleside Apartments Project; **EXERCISE NOTICE**

Dear Mr. Barton:

Southern Properties Capital Ltd. ("SPC") hereby exercises its option to acquire all interest of the addresses above in the Project known as Parc at Ingleside Apartments, Ingleside, Texas ("Project").

Attached is a proposed purchase contract to effect a transfer from the Project owner, D4IN LLC, to SPC through a deed, once the lender on the Project and HUD have consented to the transfer. Also attached is a check for $100.00 made out to Enoch Investments, LLC and JMJAV, LLC.

Please return the signed contract so we can continue to process TPA approval of the transfer.  If you or your attorney have any questions, please contact Jay LaJone of Steptoe & Johnson PLLC at 214-373-2556.

Sincerely,

SOUTHERN PROPERTIES CAPITAL LTD.

By: _____
Bradley J. Muth, President

15519351v1

App. 361

# EXHIBIT A-34

## AGREEMENT FOR PURCHASE AND SALE

This **AGREEMENT FOR PURCHASE AND SALE** (this "**Agreement**"), is made and entered into as of October _____, 2022 (the "Effective Date"), by and between SOUTHERN PROPERTIES CAPITAL LTD., a British Virgin Islands corporation ("**Purchaser**"), and D4IN LLC, a Texas limited liability company ("**Seller**").

## WITNESSETH:

## ARTICLE 1:  AGREEMENT FOR PURCHASE AND SALE

1.1     Seller agrees to sell and cause to be conveyed to Purchaser, and Purchaser agrees to purchase, the following real and personal property (collectively, the "**Project**") on the terms and conditions contained herein:

(a)     The real property located in the City of Ingleside, San Patricio County, State of Texas, described with particularity on Exhibit "A" (the "**Land**") together with all existing buildings, structures, fixtures, amenities and improvements thereon situated including apartment units known as the Parc at Ingleside Apartments, and together with all easements and other rights appurtenant to such Land, as well as Seller's rights, titles and interests in and to the mineral rights for the Land, if any (together, the "**Property**");

(b)     Seller's interest as landlord in all leases and occupancy agreements affecting the Property reflected in the current rent roll attached hereto as Exhibit "C" (the "**Current Rent Roll**"), as updated by the certified Closing Rent Roll to be delivered by Seller to Purchaser at Closing (the "**Leases**") or any space therein and any prepaid rent and Seller's interest in all security deposits and guaranties;

(c)     Seller's right, if any, to the use of the name "Parc at Ingleside Apartments" in connection with the Property and any other trademarks, copyrights, trade names or other intangible rights associated with the Property in which Seller has a transferable right including any telephone numbers associated with on-site management and leasing operations, and website(s) and internet address(es) which relate to the Property (the "**Intangible Property**");

(d)     All of Seller's right, title and interest in and to all items of personal property owned by Seller and located at the Property and used in the operation thereof including, without limitation, plans, specifications,  building supplies, marketing materials, boilers, HVAC equipment, alarms, signage, fittings, appliances, shades, wall-to-wall carpet, draperies, screens and screening, awnings, plants, shrubbery, landscaping, furniture, furnishings, office equipment, lawn care and building maintenance equipment, and other furnishings or items of personal property used in connection with the ownership and operation of the Land (the "**Personal Property**");

(e)     All of Seller's right, title and interest in and to all service contracts and agreements relating to the Property, to the extent such agreements are permitted under this Agreement (the "**Contracts**") (but specifically excluding management and leasing agreements ("**Management and Leasing Agreements**"), which will be terminated by Seller on or before

Closing), all rights of actions against previous owners of the Land and Improvements, and any unexpired warranties and guarantees relating to the Personal Property;

(f)    All of Seller's right, title and interest in and to any permits, certificates of occupancy or other licenses and governmental approvals held by Seller in connection with the ownership or operation of the Project (the "**Permits**"), to the extent that the same are assignable; and

(g) All escrows and reserves associated with the First Lien (hereinafter defined) for the Project, including, without limitation, the tax and insurance reserves, the MIP reserve and the replacement and repair reserve.

## ARTICLE 2:  PURCHASE PRICE

2.1    The purchase price (the "**Purchase Price**") for the Project shall be an amount equal to the First Lien Amount as hereinafter defined, payable as follows:

Assumption by Purchaser of the unpaid balance of the existing HUD-insured note and first lien mortgage, dated June 13, 2019, encumbering the Property in the original principal amount of $25,201,000.00 ("**First Lien**").  The amount to be assumed will be the outstanding principal balance, plus accrued but unpaid interest, as of Closing ("**First Lien Amount**").

2.2    (a)    Not later than three (3) business days after the Effective Date of this Agreement, Purchaser shall deliver a check in the amount of $1,000.00 ("**Earnest Money Deposit**") to Commonwealth Land Title Insurance Company (the "**Title Company**"), 5949 Sherry Lane, Suite 111, Dallas, Texas 75225, Attn: James P. Lazar ("**Escrow Agent**") to be held in escrow in an interest-bearing account pursuant to the terms of this Agreement pending the Closing.

(b)    As used in this Agreement, the term "Deposit" shall mean any sums, including the Earnest Money Deposit, and, if applicable, the Closing Extension Deposit, and instruments and accrued interest thereon, if any, held by Escrow Agent hereunder.  The Deposit shall be applied to the Purchase Price at the Closing.  If Purchaser desires to terminate this Agreement pursuant to a right granted to Purchaser in any section of this Agreement, Purchaser shall effect such termination by giving written notice thereof to Seller and Escrow Agent within any applicable time period provided therefor in this Agreement.  Upon receipt of such notice, unless otherwise provided herein, Escrow Agent shall return the Deposit to Purchaser without the requirement of any further notice or instruction, this Agreement shall wholly cease and terminate, and no party to this Agreement shall have any further claim against, or obligation to, any other party to this Agreement except as expressly provided herein, and the lien, if any, of Purchaser against the Project shall automatically cease and terminate.  In the event that notice shall not have been given or be deemed to have been given prior to the last day of the Inspection Period (as hereinafter defined) and Seller shall object to the disbursal of the Deposit, the Escrow Agent shall hold the Deposit pending a non-appealable adjudication by a court of competent jurisdiction or by joint written instructions of Seller and Purchaser.

## ARTICLE 3: PHYSICAL CONDITION OF PROJECT, INSPECTION PERIOD

3.1     Purchaser will inspect the Project during the hereinafter described Inspection Period. Purchaser acknowledges that Seller has not made, does not make and is unwilling to make any express or implied representations or warranties as to the present, past or future physical condition, income, expenses, operation, legality of occupancy or any other matter affecting or related to the Project except as specifically set forth in this Agreement. No representation, warranty or covenant made by Seller in this Agreement or any document delivered pursuant hereto shall survive the Closing except as expressly provided in this Agreement. Purchaser agrees to purchase the Project in its "AS IS" condition (but subject only to the express representations and warranties herein) with a complete waiver of any and all warranties as to the condition of the Project or its fitness for any purpose, other than as expressly provided herein, all in accordance with the waiver language to be included in the Special Warranty Deed conveying the Property to Purchaser (the "**Deed**").

3.2     Any documents, records or information provided to Purchaser in connection with Purchaser's inspection of the Project shall be kept in strictest confidence (but may be disclosed to Purchaser's agents, brokers, accountants, advisors, consultants, attorneys and prospective lenders or investors) and shall be returned to Seller in the event that this Agreement is canceled for any reason. In the event that Purchaser elects not to proceed with this transaction, Purchaser shall deliver to Seller copies of all reports prepared for Purchaser by third-parties in connection with its inspection, without any representation as to the accuracy thereof, upon receipt of payment from Seller of the actual costs for such reports incurred by Purchaser.

3.3     Seller represents and warrants to Purchaser as of the date of this Agreement as follows:

(a)     Seller is a Texas limited liability company, duly formed, validly existing and in good standing in the state of its formation and is qualified to do business in Texas.

(b)     Seller has full power and authority to enter into and perform this Agreement. The execution, delivery and performance of this Agreement by Seller has been duly and validly authorized by all necessary action on the part of Seller and all required consents and approvals have been duly obtained.

(c)     All Due Diligence Materials delivered in furtherance of Purchaser's inspection of the Project, including all leases, lease correspondence, and rent rolls have been prepared and assembled in the ordinary course of business by Seller's fee manager, are believed to be true, complete and accurate and have been relied upon by Seller.

(d)     The Rent Roll is a true, correct and complete list of all of the Leases and rent roll for the Property. The rents and other sums due or to become due under each Lease have not been assigned, encumbered or subjected to any lien by Seller. Seller has provided Purchaser with true, correct and complete copies of all the Leases, including all amendments thereto. To Seller's actual knowledge, which has not been contradicted by any written notice; (i) the Leases have been duly authorized and executed by the landlord, and, by the tenant thereunder, (ii) the Leases are in full force and effect according to the terms set forth therein, (iii) the Leases set forth

the entire agreement between landlord and tenant with respect to the premises affected thereby; (iv) there are no uncured defaults under the Leases; and (v) the Rent Roll and other financial information prepared by Seller as part of the Seller Deliveries are true and complete in all material respects. Seller has not (i) made any representations to any tenant regarding the condition of the premises covered by any Lease or the compliance of the premises with any applicable governmental regulations, except as expressly set forth in the Leases, (ii) granted any concessions to any tenant not disclosed in such Lease; or (iii) received any written notice of any defaults under the Leases. There are no lease brokerage agreements, leasing commission agreements or other agreements providing for payments of any amounts for leasing activities or procuring tenants with respect to the Property other than any agreements explicitly contained in the Leases. The Leases set forth all Tenant inducement costs and commissions that are currently due and payable or which have otherwise accrued with respect to any Lease. Other than as provided for in the Leases, there are no other agreements, oral or written, in connection with any Tenant inducement costs or leasing commissions that may become due and payable in the future in connection with any Lease.

(e)     The operating statements of the Project to be delivered by Seller to Purchaser during the Inspection Period were prepared in the ordinary course of business by Seller's fee manager, are believed to be accurate, and have been relied upon by Seller.

(f)     To the best knowledge of Seller, the Permits have been duly and validly issued, are in full force and effect.

(g)     To the best knowledge of Seller, there is no litigation or arbitration or other legal or administrative suit, action, proceeding of any kind pending against or involving Seller relating to Seller's ownership of the Property or any part thereof which would prevent Seller from conveying the Project in accordance with this Agreement. Except as may be described in the Due Diligence Materials, Seller has not received any notice from any Governmental Authority with respect to any violation of any applicable zoning ordinances and building codes, flood disaster laws and health and environmental laws, rules and regulations (hereinafter collectively called the "Applicable Laws").

(h)     Seller is not a "foreign person" as defined in Section 1445 of the Internal Revenue Code of 1986, as amended, and the Income Tax Regulations thereunder.

(i)     Seller owns fee simple title to the Property, subject to the exceptions of record.

(j)     Except for the Contracts, there will be no contracts or other agreements which affect or will affect or which are or will be obligations of the Purchaser or the Property after the Close of Escrow. All of the service contracts currently effecting the Property ("Service Contracts") may be terminated without penalty or other payment upon no more than thirty (30) days' notice except for the contract for electrical service.

(k)     To Seller's knowledge, the Property is not in violation of any recorded covenants, conditions, restrictions or other agreements recorded in the Real Property Records of Dallas County, Texas ("Recorded CC&Rs").

(l)      To the best of Seller's knowledge or as described in the Due Diligence Materials (i) the Property is free of hazardous wastes, materials, substances, urea formaldehyde, PCB's and all other toxic, radioactive or hazardous wastes, materials, substances or contaminations in excess of amounts permitted under applicable federal, state and local regulations (collectively, "Hazardous Materials"); and (ii) no Hazardous Materials have been stored, disposed or located upon the Property except in the ordinary course of business for a multi-family residential community.  Without in any way limiting the generality of above, neither the Property nor the Seller are the subject of any pending or, to the best of Seller's knowledge or as described in the Due Diligence Materials or the Violation, threatened investigation or inquiry by any Governmental Authority, or are subject to any remedial obligations under any Applicable Laws pertaining to health or the environment ("Applicable Environmental Laws"), including, without limitation, the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended ("CERCLA"), the Resource Conservation and Recovery Act of 1987, as amended ("RCRA"), and this representation and warranty would continue to be true and correct following disclosure to any applicable Governmental Authority of all relevant facts, conditions and circumstances pertaining to the Property and/or the Seller.  Seller has taken all steps necessary to determine and has determined that no hazardous substances, solid wastes, or other substances known or suspected to pose a threat to health or the environment ("Hazards") have been disposed of or otherwise released on or to the Property or exist on or within any portion of the Property.  To the knowledge of Seller, or as otherwise disclosed in the Due Diligence Materials, no prior use, either by Seller or the prior owners of the Property, has occurred, which violates any Applicable Environmental Laws.  The use which Seller makes of the Property will not result in the disposal or release of any hazardous substance, solid waste or Hazard on, in or to the Property.  The terms "hazardous substance" and "release" shall each have the meanings specified in CERCLA, and the terms "solid waste" and disposal" (or "disposed") shall each have the meanings specified in RCRA; provided, however, that in the event either that CERCLA or RCRA is amended so as to broaden the meaning of any term defined thereby, such broader meaning shall apply subsequent to the effective date of such amendment; and provided further that, to the extent that the laws of the State of Texas establish a meaning for "hazardous substance", "release", "solid waste", or "disposal" which is broader than that specified in either CERCLA or RCRA, such broader definition shall apply.  To the best of Seller's knowledge and belief, there has been no litigation brought or threatened nor any settlement reached by or with any parties alleging the presence, disposal, release, or threatened release, of any hazard substance, solid wastes or Hazards from the use or operation of the Property.  To the best of Seller's knowledge and belief after diligent investigation and inquiry, the Property is not on any federal or state "Superfund" list, nor subject to any environmentally related liens.

(m)      Except as set forth in the Title Commitment or Due Diligence Materials, there are no unpaid assessments (governmental or otherwise) for sewers, water, paving, electrical power or otherwise affecting the Property (matured or unmatured) and, to the best of Seller's knowledge, no such assessments are threatened.  There are no options, contracts or other obligations outstanding for the sale, exchange or transfer of the Property, or any portion thereof.

(n)      At the Closing there will be no unpaid bills or claims in connection with any repair of the Property or other work performed or materials purchased in connection with the Property, or sufficient funds in the reasonable judgment of Purchaser shall be escrowed for such purpose.

AGREEMENT FOR PURCHASE AND SALE    Page 5
15511263.1 – 110596.00024

(o)     Seller has not received any written notice from any governmental entity of any violation by Seller of any law, rule or regulation affecting the Property or its use including any environmental law or regulation, nor any written notice that the Property is in violation of any applicable building or zoning code or ordinance, except for any such matters which may have been previously cured by Seller.

(p)     There are no persons employed by Seller in connection with the operation of the Property, and there are no maintenance, advertising, management, leasing, employment, or service contracts affecting the Property that will be in effect at Closing except for the Contracts unless expressly assumed in writing by Purchaser.  Otherwise, Seller shall terminate any such employee and any such contracts (not expressly assumed by Purchaser) other than the Contracts at or prior to the Closing.

If, at any time prior to Closing, Seller shall discover that any representation or warranty contained in this Article 3.3 is, or has become, inaccurate in any material respect, Seller shall so notify Purchaser in writing (the "Correction Notice"), and Purchaser shall have the right by notice given in writing not more than five (5) business days after receipt of the Correction Notice to terminate this Agreement and receive a refund of the Deposit.  The representations and warranties contained in this Agreement shall survive one (1) year from the Closing Date.

3.4     Purchaser intends to conduct its physical inspection of the Project beginning on the Effective Date of this Agreement and ending at 5:00 p.m. Dallas, Texas time, thirty (30) days after the Effective Date ("**Inspection Period**"). The Purchaser's inspection shall be at the sole cost and expense of Purchaser and at times approved in advance by Seller's manager (not to be unreasonably withheld) so as to minimize disturbance to the operations of the Project, its employees, and guests.  Seller shall reasonably assist with such inspection and shall provide Purchaser with access to the Project, but shall not be obligated to incur any material cost or expense in connection therewith or to furnish any information other than at the place where same is maintained.  During the Inspection Period, Seller shall provide Purchaser with accurate and complete copies of, or permit Purchaser to review at the Property, all books and records in the possession of Seller or its agents relating to the Project, including, without limitation, all of the Leases, Contracts and Permits, all lease files and correspondence, all property tax bills in Seller's possession, utility bills, and repair and maintenance records with respect to the Property and Personal Property.  All information received by Purchaser relating to the Project, Seller or its affiliates shall be kept in strict confidence (subject to the terms above) and used solely for the purpose of determining the advisability of proceeding with the transaction described in this Agreement.  On or before five (5) days after the Title Company's receipt of the Deposit, Seller shall deliver to Purchaser or make the items described on Exhibit "D" (collectively, the "**Due Diligence Materials**") available to Purchaser for Purchaser's review:

PURCHASER ACKNOWLEDGES THAT PURCHASER HAS INSPECTED AND INVESTIGATED THE PROPERTY (OR PRIOR TO THE CLOSING WILL HAVE INSPECTED AND INVESTIGATED THE PROPERTY) AND HAS ENTERED INTO THIS AGREEMENT BASED UPON SUCH INVESTIGATION AND INSPECTION AND PURCHASER'S RIGHT TO CONDUCT THE INSPECTION AND INVESTIGATION PURSUANT TO THIS ARTICLE 3. EXCEPT AS EXPRESSLY PROVIDED IN THIS AGREEMENT AND THE WARRANTIES OF TITLE SET FORTH IN THE ACT OF SALE,

PURCHASER ACKNOWLEDGES THAT IT IS RELYING SOLELY ON ITS OWN INVESTIGATION AND INSPECTION OF THE PROPERTY AND NOT ON ANY INFORMATION PROVIDED FOR OR ON BEHALF OF SELLER. EXCEPT AS EXPRESSLY PROVIDED IN THIS AGREEMENT AND THE WARRANTIES OF TITLE SET FORTH IN THE DEED, THE SALE OF THE PROPERTY IS MADE ON AN "AS IS", "WHERE IS" AND "WITH ALL FAULTS" BASIS, AND PURCHASER EXPRESSLY ACKNOWLEDGES THAT, IN CONSIDERATION OF THE AGREEMENTS OF THE SELLER AND EXCEPT AS EXPRESSLY PROVIDED IN THIS AGREEMENT AND THE WARRANTIES OF TITLE SET FORTH IN THE DEED, SELLER HAS NOT MADE ANY WARRANTY OR REPRESENTATION, EXPRESS OR IMPLIED, OR ARISING BY OPERATION OF LAW, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTY OF SUITABILITY, HABITABILITY, CONDITION, ELIGIBILITY, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE WITH RESPECT TO THE PROPERTY OR ANY PORTION THEREOF AND SELLER HAS NO LIABILITY OF ANY KIND TO PURCHASER ON ACCOUNT OF THE FOREGOING. THE PROVISIONS OF THIS PARAGRAPH SHALL SURVIVE THE CLOSING.

3.5     In consideration of the option to purchase the Project granted to Purchaser under the terms of this Article 3 (the "**Option**"), Purchaser shall pay to Seller the sum of ONE HUNDRED DOLLARS ($100), the sufficiency of which consideration is hereby acknowledged by the parties. Such payment shall be fully earned by Seller's delivery to Purchaser of an executed copy of this Agreement, and shall be credited to Seller at the Closing or deducted from the Deposit if the Deposit is returned to Purchaser.

3.6     If Purchaser, in Purchaser's sole and absolute discretion, decides that the Project or any aspect of it is unsatisfactory, then Purchaser shall have the right to terminate this Agreement by giving written notice to Seller and Escrow Agent at any time during the Inspection Period and have the Deposit, less the Option fee described in Section 3.5, above, returned to it and neither party shall have any further obligation to the other except as expressly provided in this Agreement. If Purchaser does not give Seller and Escrow Agent written notice on or before 7 p.m. Central Time on the last day of the Inspection Period that Purchaser waives its right to terminate this Agreement pursuant to this Section 3.6, then Purchaser shall be deemed to have terminated this Agreement.

3.7     Purchaser shall have (10) ten days after the Inspection Period ("**Board Approval Period**") to obtain the approval of its Board of Directors to the transaction contemplated hereby. If Purchaser's Board of Directors approves this transaction, it shall give notice of such approval to Purchaser ("**Board Approval Notice**"). If Purchaser does not notify Seller within said period that such approval has been obtained, then this Agreement shall be deemed void ab initio and the Deposit shall be returned to Purchaser and neither party shall have any further obligation to the other.

3.8     Covenants.

(a)     Between the date of this Agreement and the Closing Seller shall continue to maintain the Property in accordance with Seller's prior practices, ordinary wear and tear, casualty

losses and condemnation excepted. During the term of this Agreement, Seller shall not take any action which would materially adversely affect the title to the Property.

(b)    Seller will cause fire and extended coverage insurance relating to the Property to be maintained in full force and effect at an amount no less than the full replacement cost of the Property.

(c)    Seller shall continue to operate the Property in accordance with its normal and customary practice after the Effective Date and prior to Closing, so that the Property will be in substantially the same condition on the Closing Date as on the Effective Date, reasonable wear and tear excepted. After the Effective Date, Seller shall not, without approval of Purchaser enter into any new Service Contracts that are not cancelable without any penalty or fee on thirty (30) days' or less notice by Seller. Seller shall terminate all Service Contracts related to the Property prior to Closing, unless Purchaser elects (prior to expiration of the Inspection Period) to assume such Service Contracts. From and after the Effective Date through the Closing, Seller, at its sole cost and expense, shall   (i) not voluntarily subject the Property to any additional liens, encumbrances, covenants, conditions, easements, rights-of-way or similar matters, (ii) not make any alterations to the Property, except in the ordinary course of business, all of which Seller shall complete at its sole cost and expense prior to Closing,  (iii) pay for all capital and other improvements which are performed or contracted for by Seller at or prior to Closing, and (iv) not accept from any tenant payment of rent more than one (1) month in advance, or apply any security deposit to rent or any other default by any tenant. Seller shall continue to lease residential units in accordance with Seller's prior practices and market conditions.

(d)    Seller shall not remove any personal property from the Property without the consent of Seller unless the same is replaced by property of equal or greater value, and will make all necessary repairs and replacements during such time.

3.9    Conditions to Purchaser's Obligations. Purchaser's obligation to purchase the Property shall be conditioned upon the satisfaction of each of the following conditions prior to or simultaneously with the Closing any of which may be waived by written notice from Purchaser to Seller:

(a)    Seller has complied with and otherwise performed the obligations of Seller set forth in this Agreement.

(b)    All representations and warranties of Seller as set forth in this Agreement shall be in all material respects substantively true and correct as of the date hereof and on the date of Closing (except for representations which by their terms are made as of a specific date or refer to a specific date).

    (c)    Financing

    (1)    Seller is the borrower under the First Lien in the original principal amount of $36,240,000.00. The First Lien is secured by a first mortgage lien on the Property. As provided in Section 2 herein, Seller and Purchaser have agreed that the Purchase Price in the amount of the outstanding principal balance thereof shall be paid via Purchaser's assumption of the First Lien. Because the Project will be encumbered by financing insured by HUD, closing of this transaction shall be subject to the approval by HUD and the lender under the First Lien ("**Lender**") of a Transfer of Physical Assets ("**TPA**") of the Project. Any and all documents to be executed by Seller in connection with the TPA shall be subject to Purchaser's approval, not to be unreasonably withheld, conditioned or delayed. From and after the consummation by Seller of the HUD Final Endorsement Closing with respect to the First Lien until the Closing or earlier termination of this Agreement, Seller authorizes Purchaser to contact Lender with respect to facilitating the TPA and assumption of the First Lien ("Loan Assumption"). The "**Financing Contingency**" shall be deemed satisfied when the parties have obtained conditional Lender and HUD approval to the TPA with conditions, including the form of the Loan Assumption documents, approved by Purchaser in its reasonable discretion. Provided Seller has provided Purchaser with all documents necessary including the Due Diligence Documents, Purchaser agrees to file the application for TPA with the Lender by the date that is fourteen (14) days after the Board Approval Period. If Lender requires additional information from Seller or Purchaser, Purchaser shall have a reasonable amount of time after receipt of such information required to make a filing or supplemental filing. In the event that on or before the 180th day following the Board Approval Period (the "**Financing Contingency Deadline**"), the Financing Contingency has not been satisfied, this Agreement will terminate, the Deposit shall be returned to Purchaser, and the parties shall have no further obligations hereunder (except for obligations that are expressly intended to survive termination of this Agreement). At all times prior to satisfaction of the Financing Contingency, whether by the Financing Contingency Deadline or the Extended Financing Contingency Deadline, Seller shall reasonably cooperate with Purchaser in such efforts, including without limitation the execution of any applications which are required to be executed by the existing owner of the Project and the furnishing of any and all information in its possession which is reasonably required by Purchaser in its efforts to obtain approval of the TPA and satisfy the Financing Contingency. Purchaser shall be required to pay all costs, fees, assumption fees, or other charges imposed or incurred by the Lender, HUD or Seller in connection with the TPA and the Loan Assumption, other than Seller's legal fees incurred therewith.

    (d)    Purchaser shall at all times have the right to waive any conditions (other than those given under Section 3.9(c) above), provided that no such waiver shall be effective unless such waiver or waivers are in writing; provided that if Closing occurs and Purchaser has actual knowledge of the non-fulfillment of any such condition, such act of consummating Closing shall be deemed a waiver of such known, unfulfilled condition. Any such waiver shall be deemed a release of Seller and any liability of Seller, if any, as a result of the failure of such condition.

## ARTICLE 4: PERMITTED ENCUMBRANCES TO TITLE

    4.1    Purchaser agrees to accept title to the Property subject to the following matters (collectively, the "Permitted Encumbrances"):

(a)     Leases and tenancies reflected on the Rent Roll and such further Leases as may be entered into in accordance with this Agreement.

(b)     Liens securing payment of all ad valorem, intangible and other real and personal property taxes, special and general assessments, school taxes, and water and sewer charges against the Property or the Personal Property covered by this Agreement for the tax year in which the Closing Date occurs and subsequent years to the extent such items are properly apportioned under this Agreement, and the lien of any special taxes not entered of record against the Property on the Closing Date.

(c)     Servitudes, easements and restrictive covenants, if any, which are recorded in the land records of the County Clerk of Dallas County, Texas, as of the date hereof and which do not materially affect the marketability of the Property.

(d)     Matters approved or deemed approved pursuant to the terms of this Agreement.

(e)     Zoning ordinances and regulations and building restrictions and regulations affecting the Property on the Closing Date.

(f)     The First Lien.

(g)     All building, subdivision, land sales, securities, ecology, environmental protection and like laws, ordinances, rules and regulations of governmental authorities, including those of any and all regulatory agencies and administrative officials having or asserting jurisdiction over the Property.

## ARTICLE 5: CONDITION OF TITLE, TITLE INSURANCE

5.1     Seller shall promptly obtain from the Title Company through Escrow Agent, and deliver to Purchaser, a title commitment (the "Title Commitment") to issue a TLTA Owner's Policy of Title Insurance (the "Title Policy") insuring Purchaser's title to the Property to be good and indefeasible in the amount of the Purchase Price, containing coverage over all general exceptions subject to only the Permitted Encumbrances.  A copy of the Title Commitment and legible copies of each of the documents of record reflected therein shall be furnished to the attorneys for Purchaser and Seller.  Seller shall also deliver to Purchaser a copy of the Existing Survey.  Within ten (10) days of receipt of the title materials described above, together with the Existing Survey, Purchaser shall give written notice (the "Objection Notice") to the attorney for Seller identifying with particularity any defect of title to which Purchaser objects (the "Objections") separately specifying and setting forth each such Objection.  Seller shall be entitled to reasonable adjournments of the Closing Date not exceeding thirty (30) days in the aggregate, to cure the Objections, unless waived by Purchaser.  If Purchaser gives Seller an Objection Notice within the period set forth above, then all matters disclosed on the Title Commitment which are not objected to in such Objection Notice shall be deemed to be Permitted Encumbrances.

5.2     Seller shall not be required to expend any money or bring any action or proceeding or do any other thing in order to deliver the Project or convey title to the Property as required by this Agreement or the Objection Notice.  If Seller gives Purchaser notice (the "Response Notice")

AGREEMENT FOR PURCHASE AND SALE   Page 10
15511263.1   110596.00024

that Seller is unable or unwilling to convey the Project or title to the Project as required by this Agreement or the Objection Notice, Purchaser may, as its exclusive remedy, elect by written notice given to Seller within five (5) days after the Response Notice is given, either (a) to accept such title as Seller is able to convey without any reduction or abatement of the Purchase Price, or (b) to terminate this Agreement, in which event the Deposit and Financing Period Extension Fee shall be returned to Purchaser.

5.3    If Purchaser shall fail to give timely notice of its election to terminate this Agreement, Purchaser shall be deemed to have accepted all matters reflected on the Title Commitment as Permitted Encumbrances.

5.4    Unpaid liens for real estate and personal property taxes for years prior to the fiscal year in which the Closing Date occurs and any other matters which Seller is obligated to pay and discharge at the Closing shall not be deemed objections to title, but the amount thereof chargeable to Seller, plus interest and penalties thereon charged by the taxing authority, if any, shall be deducted from the Purchase Price on the Closing Date and paid to the Title Company with instructions to pay and discharge such matters.

5.5    Closing costs associated with the Closing and typically paid by a seller including, but not limited to, deed stamps, transfer taxes, and Seller's attorneys' fees shall be paid by Seller. Seller shall pay all premiums and other fees associated with the Title Policy and survey to be delivered at Closing. The cost of physical inspection, accounting, audit, and other investigations made in connection with Purchaser's due diligence, Purchaser's attorneys' fees and all other costs associated with the Closing shall be paid by Purchaser.

5.6    Time is of the essence with respect to the provisions of this Section 5.

## <u>ARTICLE 6: CLOSING</u>

6.1    Provided that all of the conditions of this Agreement shall have theretofore been satisfied, the closing (the "**Closing**") of the purchase and sale of the Property shall be conducted at the offices of the Escrow Agent (or at such other location as shall be mutually agreeable to Seller and Purchaser) on the date ("**Closing Date**") that is on or before ten (10) days after the Financing Contingency Deadline.

6.2    Upon Seller's and Purchaser's delivery of all required documents and instruments and payment of the Purchase Price and other amounts required herein, Purchaser and Seller shall prepare and sign a closing statement reflecting the adjustments and payments made and agreements in connection therewith. Seller and Purchaser shall jointly deliver a copy of the closing statement and all of the aforesaid documents to the Title Company which shall do the following:

(a)    Record the Deed and loan documents, if any, associated with this transaction.

(b)    Deliver to Seller and Purchaser or other appropriate party the documents and payments delivered to it as escrow holder for delivery to such party.

AGREEMENT FOR PURCHASE AND SALE    Page 11
15511263.1    110596.00024

App. 373

(c)    Pay all recording taxes and transfer fees and all filing fees reflected on the closing statement.

(d)    Issue the Title Policy and, if applicable, an endorsement to the existing Lender's Policy of Title Insurance.

(e)    File the reports required by Section 6045 of the Internal Revenue Code and regulations promulgated thereunder.

## ARTICLE 7: DOCUMENTS REQUIRED ON CLOSING DATE

7.1    At or prior to the Closing, Seller shall execute and/or deliver the following to Purchaser through Escrow Agent:

(a)    A Deed in a form reasonably acceptable to Seller and Purchaser and approved by HUD.

(b)    A Blanket Conveyance, Bill of Sale and Assignment, in a form reasonably acceptable to Seller and Purchaser and approved by HUD (the "**Bill of Sale**").

(c)    An Assignment and Assumption of Leases in a form reasonably acceptable to Seller and Purchaser and approved by HUD (the "**Assignment of Leases**"), as well as the hereinafter described Tenant Notification Letter.

(d)    A pro forma of the Title Policy, as described in Section 5.1 of this Agreement.

(e)    Keys to all locks and plans and specifications for the Property, if in the possession of Seller, which shall be delivered to Purchaser's representative at the Property.

(f)    A rent roll for the Property (the "**Closing Rent Roll**") dated and certified as of the Closing Date listing each tenant, the monthly base rent payable, lease expiration date, security deposit and reflecting any rent due at the time of closing.

(g)    The originals or certified copies of the leases and other occupancy agreements described in the Closing Rent Roll.

(h)    All transfer documents (the "**Transfer Documentation**") necessary to assume the First Lien executed by Seller and the Existing Lender and to release Seller and current guarantors.

(i)    Organizational and authority documents satisfactory to the Title Company.

(j)    All costs and fees required to be paid by Seller pursuant to Article 8.

(k)    Such other documents and instruments as may be required by this Agreement or by the Title Company in order to consummate the transactions described in this Agreement and to issue the Title Policy to Purchaser.

(l)    A non-foreign (FIRPTA) affidavit for Seller complying with the requirements of Internal Revenue Code Section 1445(f)(3) and the regulations promulgated thereunder.

(m)    Evidence of termination of those Contracts that are terminable pursuant to Section 3.7(b)(vi).

(n)    An affidavit acceptable to the Title Company reflecting that there are no changes to the Survey except those approved by the Purchaser.

(o)    Such other instruments and affidavits as are customarily executed by the seller of an interest in real property in connection with the recording of a deed.

7.2    At or prior to the Closing, Purchaser shall execute and/or deliver the following to Escrow Agent:

(a)    The Purchase Price.

(b)    The Deed.

(c)    The Bill of Sale.

(d)    The Assignment of Leases.

(e)    The Transfer Documentation executed by Purchaser.

(f)    Organizational and authority documents satisfactory to the Title Company.

(g)    A written notice of the acquisition of the Property by Purchaser, originally executed by Seller and Purchaser, which shall be transmitted to all tenants and to other parties affected by the sale and purchase of the Property (the "**Tenant Notification Letter**"). Such notice (in the form of Exhibit "B" hereto) shall inform the addressees of the sale and transfer of the Property to Purchaser and contain appropriate instructions relating to the payment of future rentals and the giving of future notices. The said notices shall specify that unapplied security deposits under the tenant leases have been delivered to the Purchaser and that the Purchaser is responsible for the refund thereof and such notice shall be in form and substance adequate under local law to relieve Seller of all liability for return of such deposits.

(h)    All costs and fees required to be paid by Purchaser pursuant to Article 8.

(i)    Such other documents and instruments as may be required in this Agreement or by the Title Company in order to consummate the transactions described in this Agreement.

(j)    Such other instrument, affidavits, and tax returns as are customarily executed by the purchaser of an interest in real property in connection with the recording of the deed.

## ARTICLE 8:  APPORTIONMENTS AND ADJUSTMENTS

8.1     Seller shall be responsible for and pay all accrued expenses with respect to the Project accruing up to 11:59 P.M. on the day prior to the Closing Date (the "Adjustment Date") and shall be entitled to receive and retain all revenue from the Project accruing up to the Adjustment Date; provided, however, that if the Closing Date occurs on the last day of the month, the Adjustment Date shall be the Closing Date.

8.2     On the Closing Date, the following adjustments and apportionments shall be made by authorized representatives of the parties in cash as of the Adjustment Date:

(a) Rent payable and paid for the month of Closing shall be prorated as of the Adjustment Date.  There shall be no proration of delinquent rentals.  After the Closing, Purchaser shall continue to bill tenants for sums reflected on the Closing Rent Roll as past due, shall receive such rents as trustee for Seller, and shall deliver such sums to Seller if, as and when received. Such rents shall be applied first to costs of collection, second to rents due for the Closing Month, third to rents due to Purchaser at the time of receipt, and last to rents due Seller for periods prior to Closing.  After the Closing, if Seller receives rents for periods after the Closing Date, it shall remit such sums to Purchaser within two (2) business days of receipt.

(b)     Real estate taxes, ad valorem taxes, school taxes, assessments and personal property, intangible and use taxes, if any.  In the event that either the tax assessment or the tax rate for the current year is not known at Closing, the parties shall prorate at Closing on the basis of the last known values and rates and adjust the prorations once such values or rates become known for the current year.  Seller shall pay installments of confirmed assessments that have been levied against the Property and are due and payable as of the Closing.  Purchaser shall pay all installments of any special assessments due after Closing.

(c)     Charges under Contracts affecting the Project on the Adjustment Date, and utility charges and relating to the Project, including any payments made to Seller prior to the Closing Date in respect of Contracts, laundry lease or information services, whether characterized as "decorating fees", "sign-up bonuses", "additional rents" or the like.

(d)     Utilities, water and sewer charges on the basis of the period for which assessed.

(e)     Income from vending machines and tenant services, if any.

8.3     At the Closing, Purchaser will receive a credit against the Purchase Price in an amount equal to all unapplied security deposits held under Leases in effect on the Adjustment Date, against Purchaser's receipt and indemnification therefor.  Upon making such credit, Purchaser will be deemed to have received all such security deposits and shall be fully responsible for the same as if a cash amount equal to such security deposits were actually delivered to Purchaser.  Prior to the Closing, Seller reserves the right to apply security deposits as provided under the respective leases and permitted by applicable law; provided however, Seller shall not apply security deposits for any rentals due for the month in which the Closing Date occurs.

8.4     All other income of the Property, accruing or relating to the period through the Adjustment Date shall be paid to Seller.  All other income of the Property, accruing or relating to the period commencing on the Adjustment Date and thereafter shall be paid to Purchaser.

8.5     All other expenses, such as utilities, maintenance and other operating expenses, incurred in connection with the Property and accruing or relating to the period through the Adjustment Date shall be the responsibility of and paid by Seller.  Seller shall pay the existing amounts due under Construction Contracts.  All other expenses, such as utilities, maintenance and other operating expenses incurred in connection with the Property and accruing or relating to the period commencing on the date of Closing and thereafter shall be the responsibility of and paid by Purchaser.

8.6     At the Closing and subject to the prorations herein provided, Seller shall receive a cash credit in an amount equal to the sum of all amounts held in escrow by holder of the First Lien, including, without limitation, hazard insurance premiums, taxes and MIP reserve or repair and replacement reserve. All escrows associated with the First Lien shall be assigned to Purchaser.

8.7     Walk-Through.  Seven (7) days prior to Closing, Seller and Purchaser will perform a walk-through of all vacant units to determine which ones are not made-ready for rental.

8.8     To the extent that any amount of any of the above items shall not be available for exact proration as of the Closing, the proration at Closing will be based on the best available information and Seller or its representative and Purchaser or its representative shall meet as soon after the Closing as possible, but in no event later than thirty (30) days after Closing, and compute and settle and adjust or readjust the Closing prorations between the parties as of the date of Closing. Rents, if any, collected by Purchaser after the Closing shall be applied first to any amounts due Purchaser and then to the extent such rents relate to the period through and including the day before the day of the Closing shall be paid to Seller. Purchaser agrees to use good faith collection procedures with respect to the collection of any delinquent rentals, but will have no liability for the failure to collect any such amounts and will not be required to incur any material cost, conduct lock-outs or take any other legal action to enforce collection of any such amounts owed to Seller by tenants of the Property. The provisions of this Section 8.6 shall survive Closing.

The provisions of this **ARTICLE 8** shall survive the Closing.

## **ARTICLE 9:  REMEDIES**

9.1     If Purchaser breaches its obligation to purchase the Project pursuant to this Agreement, and after receipt of any applicable notice and a five (5) day opportunity to cure, then Seller shall have the right, as its sole and exclusive remedy, to terminate this Agreement by giving Purchaser and the Escrow Agent written notice thereof and, upon receipt of such notice the Escrow Agent shall deliver the Deposit to Seller which shall retain the same as liquidated damages.  Seller shall not be required to give Purchaser notice of failure to close, on the date provided in this Agreement and Purchaser shall not have any five (5) day grace period therefor.  Seller and Purchaser acknowledge that the amount of damages resulting from a breach of this Agreement by Purchaser would be difficult or impossible to accurately ascertain and that Seller's damages would, in any event, be substantial and would exceed the Deposit.  Upon Seller's receipt of the Deposit,

AGREEMENT FOR PURCHASE AND SALE   Page 15
15511263.1 – 110596.00024

this Agreement shall wholly cease and terminate, no party to this Agreement shall have any further claim, agreement, or obligation to any other party to this Agreement, and any lien of Purchaser against the Project shall automatically cease, terminate and be released.

9.2    If the sale contemplated by this Agreement is not consummated because of Seller's failure to perform its obligations hereunder, Purchaser shall be entitled, as its exclusive remedy, to elect after notice to Seller and a five (5) day opportunity to cure either (a) to terminate this Agreement and have the Deposit returned to it or (b) to enforce specific performance of Seller's obligations under this Agreement. Purchaser shall not be required to give Seller notice of failure to close, on the date provided in this Agreement and Seller shall not have any five (5) day grace period therefor.

9.3    The non-breaching party shall also be entitled to recover against the breaching party its costs and expenses, including reasonable attorneys' fees and court costs, incurred by such non-breaching party in enforcing any of the remedies hereunder, as determined by a court of competent jurisdiction in Texas.

## ARTICLE 10:  DAMAGE, DESTRUCTION OR CONDEMNATION

10.1    Seller agrees to maintain its present policies of casualty insurance covering the Project in full force and effect from the date of this Agreement through and including the Closing Date.

10.2    If either a substantial part of the improvements on the Land is damaged or destroyed or any part of the Property is taken by condemnation or other power of eminent domain then Purchaser shall have the right to terminate this Agreement based upon such damage, destruction or taking. If Purchaser does not terminate this Agreement as aforesaid, then on the Closing Date:

(i)    The Purchase Price shall not be reduced, but Seller shall credit the Purchase Price with an amount equal to any sums of money collected by Seller under its policies of casualty insurance or renewals thereof insuring against the loss in question (after deducting any reasonable expenses incurred by Seller in collecting such insurance and any amount that Seller shall have paid or shall be obligated to pay for repairs or restoration of the damage), and Seller shall assign, transfer and set over to Purchaser at Closing all of Seller's right, title and interest in and to its casualty insurance policy or policies with respect to the Property and any further sums payable under said policies, plus the amount of any deductibles; provided that in no event shall the credits and insurance assigned to Purchaser exceed the cost of the unrepaired damage; and

(ii)    Seller shall assign, transfer and set over to Purchaser all of Seller's right, title and interest in and to any awards that may be made for any taking by condemnation or other power of eminent domain.

10.3    For the purposes of this Article, a substantial part of the Improvements on the Land shall be deemed to mean a portion having a value of $100,000 or more or which would require expenditure of $100,000 or more for repair or restoration.

AGREEMENT FOR PURCHASE AND SALE    Page 16
15511263.1   110596.00024

App. 378

## ARTICLE 11: BROKER

11.1    Purchaser represents and warrants to Seller that neither Purchaser nor any entity related to Purchaser has dealt with any broker or other person or entity who would be entitled to a commission, consulting fee or other brokerage fee in connection with the transactions described in this Agreement.

11.2    Seller represents and warrants to Purchaser that neither Seller nor any entity related to Seller has dealt with any broker or other person or entity that would be entitled to a commission, consulting fee, or other brokerage fee in connection with the transactions described in this Agreement.

11.3    Each party agrees to indemnify, defend and hold the other harmless of and from any loss, cost, damage or expense (including reasonable attorneys' fees and court costs) arising out of any inaccuracy in the representation or warranty made by such party in Sections 11.1 and 11.2 above.

11.4    Notwithstanding any other provision of this Agreement to the contrary, the provisions of this Article shall survive the Closing and any prior termination of this Agreement for any reason whatsoever.

## ARTICLE 12: NOTICES

12.1    Any notice given or required to be given pursuant to any provision of this Agreement shall be in writing and shall be personally delivered or sent by facsimile, certified U.S. mail, with return receipt requested, or a reputable commercial courier service guaranteeing overnight delivery, and shall be deemed to have been given upon receipt if personally delivered, or, as the case may be, upon transmittal by facsimile with electronic confirmation of receipt, upon deposit in U.S. mail or upon delivery to such commercial courier, with delivery charges prepaid, if sent by such a courier, in either case addressed as follows:

Seller:           D4IN LLC
                  13901 Midway Road, Suite 102
                  Dallas, Texas 75244
                  Attention:    Timothy Barton
                  Telephone:    972-385-9934
                  E-mail:       TBarton@jmjdevelopment.net

Purchaser:        Southern Properties Capital Ltd.
                  1603 LBJ Freeway, Suite 800
                  Dallas, Texas 75234
                  Attn:  Bradley Muth
                  Phone: 469-522-2366
                  E-mail:bradley.muth@pillarincome.com

AGREEMENT FOR PURCHASE AND SALE - Page 17
15511263.1 - 110596.00024

App. 379

with a copy to:                      Steptoe & Johnson PLLC
                                     1603 LBJ Freeway, Suite 750
                                     Dallas, Texas 75234
                                     Attn:   Jay A. LaJone
                                     Phone: 214-373-2556
                                     E-mail:jay.lajone@steptoe-johnson.com

12.2   (a)    Either party may, by giving notice to the other in the manner set forth above, change the address to which notices shall be sent to it, provided that any such change or address shall be effective three (3) days after it is given.

(b)    The attorney for each party to this Agreement identified in Article 12.1 may give notices on behalf of his client with the same force and effect as if such notice were given directly by such party.

## ARTICLE 13: ASSIGNMENT

13.1   Purchaser may, without the prior written consent of Seller, but upon providing written notice of such assignment to Seller, assign its rights and interest in this Agreement and the Deposit and Additional Payments to a third party.

## ARTICLE 14: MISCELLANEOUS

14.1   The following matters of general application shall apply to this Agreement and control interpretation notwithstanding any provision apparently to the contrary:

(a)    This Agreement is binding upon and shall inure to the benefit of the parties hereto, their respective heirs, successors, legal representatives and permitted assigns.

(b)    Wherever under the terms and provisions of this Agreement the time for performance falls upon a Saturday, Sunday or legal holiday in the state where Seller or Purchaser maintains the office reflected in Article 12 hereof, such time for performance shall be extended to the next business day thereafter.

(c)    This Agreement may be executed in one or more counterparts, all of which when taken together shall constitute one and the same agreement. Escrow Agent is authorized to attach multiple signature pages to a single conformed original.

(d)    The captions at the beginning of the several paragraphs, Sections and Articles are for convenience in locating the context, but are not part of the context. Unless otherwise specifically set forth in this Agreement to the contrary, all references to Exhibits contained in this Agreement refer to the Exhibits which are attached to this Agreement, all of which Exhibits are incorporated in, and made a part of, this Agreement by reference. Unless otherwise specifically set forth in this Agreement to the contrary, all references to Articles, Sections, paragraphs and clauses refer to portions of this Agreement.

(e)    If any term or provision of this Agreement shall be held to be illegal, invalid, unenforceable or inoperative as a matter of law, the remaining terms and provisions of this

AGREEMENT FOR PURCHASE AND SALE – Page 18
15511263.1 – 110596.00024

App. 380

Agreement shall not be affected thereby, but each such remaining term and provision shall be valid and shall remain in full force and effect.

(f)    This Agreement and the other writings referred to in, or delivered pursuant to, this Agreement, embody the entire understanding and contract between the parties hereto with respect to the Project and supersede any and all prior agreements and understandings between the parties hereto, whether written or oral, formal or informal, with respect to the subject matter of this Agreement.  This Agreement has been entered into after full investigation by each party and its professional advisors, and neither party is relying upon any statement, representation or warranty made by or on behalf of the other which is not expressly set forth in this Agreement.

(g)    No extensions, changes, waivers, modifications or amendments to or of this Agreement, of any kind whatsoever, shall be made or claimed by Seller or Purchaser, and no notices of any extension, change, waiver, modification or amendment made or claimed by Seller or Purchaser shall have any force or effect whatsoever, unless the same is contained in writing and is fully executed by the party against whom such matter is asserted.

(h)    This Agreement shall be governed and interpreted in accordance with the laws of the State where the Property is located.

(i)    Each party hereto shall pay all charges specified to be paid by them pursuant to the provisions of this Agreement and their own attorney's fees in connection with the negotiation, drafting and closing of this Agreement.

(j)    Purchaser and Seller agree that this Agreement has been entered into solely for the benefit of Purchaser and Seller and no other person or entity, it being the intention of Purchaser and Seller that no person or entity not a party to this Agreement shall have any right or standing to (a) bring any action against Purchaser or Seller based on this Agreement, or (b) assume that any provision of this Agreement will be enforced or remain unmodified or unwaived, or (c) assert that it or he is or should be or was intended to be a beneficiary or any provision of this Agreement.

(k)    The parties agree that any actions taken or documents (including this Agreement) signed by any trustee, officer, or director of Seller or Purchaser are undertaken in their fiduciary capacity and no recourse shall be had to the personal assets of any such trustee, officer, or director for enforcement of this Agreement.

(l)    Wherever a time is set forth for performance or notice in this Agreement, time shall be of the essence unless explicitly stated to be otherwise.

(m)    Purchaser and Seller agree that the Property will not be actively marketed and the Seller will not enter into negotiations with any other prospective purchasers while this Agreement is in effect or any contract negotiations are pending.

*[Signature page to follow]*

AGREEMENT FOR PURCHASE AND SALE – Page 19
15511263.1 – 110596.00024

**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be executed in their names by their respective duly authorized representatives as of the day and year first above written.

Seller:            **D4IN LLC,**
                   a Texas limited liability company


                   By:    _____
                          Timothy Barton, President



Purchaser:         **SOUTHERN PROPERTIES CAPITAL LTD.,**
                   a British Virgin Islands corporation



                   By:    _____
                   Name:  _____
                   Title: _____

## ACKNOWLEDGEMENT OF RECEIPT BY TITLE COMPANY

The undersigned Title Company hereby acknowledges receipt of a fully executed copy of the Agreement on this, the _____ day of _____, 20___, and agrees to accept, hold and disburse the Earnest Money Deposit in accordance with the provisions of the Contract. The undersigned acknowledges that it is not a party to this Agreement and that it is executing below solely for the purpose of the foregoing acknowledgment and agreement.

TITLE COMPANY:

Commonwealth Land Title Insurance Company

By:     _____
Name: James P. Lazar
Title:   Escrow Agent


## EXHIBITS:

A - Legal Property Description
B - Tenant Notification Letter
C - Current Rent Roll
D - Due Diligence Materials

# EXHIBIT "A"

## LEGAL PROPERTY DESCRIPTION

## EXHIBIT "B"

## TENANT NOTIFICATION LETTER

Dated: _____, 20____

_____
_____
_____
_____

Re:    _____ ("Property")

Dear _____:

As of the date of this letter, _____, a _____ and the former owner of the Property ("Seller"), transferred title and possession of the Property to                                                            ("Purchaser").

Pursuant to the provisions of Section _____ of the Texas _____, you are hereby notified that Purchaser is responsible for all of the obligations of the landlord under your lease first arising from and after the date hereof. Seller is joining in the execution of this letter to acknowledge the fact that title and possession to the Property and all future responsibilities of the landlord under your lease have been transferred to Purchaser.

From and after the date of this letter, please make all rental checks payable to _____, and deliver same to _____, until otherwise notified in writing.

Sincerely,

**PURCHASER:**                          _____,
                                        a _____

                                        By: _____
                                        Name: _____
                                        Title: _____

AGREEMENT FOR PURCHASE AND SALE    Page 23
15511263.1    110596.00024

**ACKNOWLEDGED:**

**SELLER:**

_____,
a _____


By: _____
Name: _____
Title: _____

# EXHIBIT "C"

## CURRENT RENT ROLL

**(see attached)**

App. 387

# EXHIBIT "D"

## DUE DILIGENCE MATERIALS

**(see attached)**

| Item | Received | Comments |
|------|----------|----------|
| **I. General Information (Title, Survey, Etc.)** | | |
| 1 Description of Property: legal description | | |
| 2 Mortgage documents (note, deed of trust, etc.) and other liens/deeds on the Property (if applicable). | | |
| 3 Title documents | | |
| 4 ALTA Survey | | |
| 5 As Builts or Building plans (please note if they are located at the property) | | |
| **II. Contracts** | | |
| 6 Service Contracts: List and copies of service contracts, equipment leases, warranties, vehicles and other agreements relating to the operation of the property, including assignability/cancellation provisions: | | |
| Cable | | |
| Laundry | | |
| Phone | | |
| Internet | | |
| Landscaping | | |
| Trash removal | | |
| Pest Control | | |
| Termite | | |
| Resident Water/Sewer reimbursement billing | | |
| 7 Vendor List | | |
| 8 Permits & License | | |
| 9 Insurance Certificates and Policies and a loss run for the past 3 years | | |
| 10 Management Agreement: or leasing agreements | | |
| 11 Utility Bills for the Property for the 2 most recent months | | |
| 12 Warranties/guarantees: with respect to any part of the property or any mechanical equipment in, on or about the property; including but not limited to termites, roofs, laundry equipment, and pool | | |
| **III. Financial Information** | | |
| 13 Detail Operating Statements: Current month & past three calendar years, to include a current 12 month rolling report. Audited financials if a HUD deal - three years | | |
| 14 Capital Expenditures: Past three years, detailed with dollar amounts | | |
| 15 Current Budget | | |
| 16 Rent Roll: tenants' unit number, square feet, lease beginning-ending dates, base rent per unit, free rent/rent abatement, security deposit. In Excel the 1st month. | | |
| 17 Current Lease form with addendums - leases to be available for inspection at site visit | | |
| 18 Bank Statements & Reconciliations: last 3 months for property | | |
| 19 Accounts payable/aging list - will need to be updated immediately prior to closing | | |
| 20 Aged delinquency & prepaid reports - will need updated immediately prior to | | |
| 21 All Units report in Excel | | |
| 22 Rentable Items report | | |

| Item | Received | Comments |
|---|---|---|
| | | |
| **I. General Information (Title, Survey, Etc.)** | | |
| 1 Description of Property: legal description | | |
| 2 Mortgage documents (note, deed of trust, etc.) and other liens deeds on the Property (if applicable). | | |
| 3 Title documents | | |
| 4 ALTA Survey | | |
| 5 As Builts or Building plans (please note if they are located at the property) | | |
| **II. Contracts** | | |
| 6 Service Contracts: List and copies of service contracts, equipment leases, warranties, vehicles and other agreements relating to the operation of the property, including assignability/cancellation provisions: | | |
| Cable | | |
| Laundry | | |
| Phone | | |
| Internet | | |
| Landscaping | | |
| Trash removal | | |
| Pest Control | | |
| Termite | | |
| Resident Water/Sewer reimbursement billing | | |
| 7 Vendor List | | |
| 8 Permits & License | | |
| 9 Insurance Certificates and Policies and a loss run for the past 3 years | | |
| 10 Management Agreement: or leasing agreements | | |
| 11 Utility Bills for the Property for the 2 most recent months | | |
| 12 Warranties guarantees: with respect to any part of the property or any mechanical equipment in, on or about the property; including but not limited to termites, roofs, laundry equipment, and pool | | |
| **III. Financial Information** | | |
| 13 Detail Operating Statements: Current month & past three calendar years, to include a current 12 month rolling report. Audited financials if a HUD deal - three years | | |
| 14 Capital Expenditures: Past three years, detailed with dollar amounts | | |
| 15 Current Budget | | |
| 16 Rent Roll: tenants' unit number, square feet, lease beginning/ending dates, base rent per unit, free rent/rent abatement, security deposit. In Excel the 1st month. | | |
| 17 Current Lease form with addendums - leases to be available for inspection at site visit | | |
| 18 Bank Statements & Reconciliations: last 3 months for property | | |
| 19 Accounts payable/aging list - will need to be updated immediately prior to closing | | |
| 20 Aged delinquency & prepaid reports - will need updated immediately prior to | | |
| 21 All Units report in Excel | | |
| 22 Rentable Items report | | |

AGREEMENT FOR PURCHASE AND SALE   Page 28
15511263.1   110596 00024

# EXHIBIT A-35

Enoch Investments LLC and JMJAV LLC

JMJ02

CHECK PAYMENT NBR    311668    DATE    10/03/2022

| INVOICE | DESCRIPTION | NET AMOUNT |
|---|---|---|
| CONVERSION NOTE | SPC Conversion Notice | $ 100.00 |

Southern Properties Capital Ltd
1603 LBJ Freeway
Suite 300
DALLAS, TX 75234

TOTALS:    $ 100.00

---

THIS CHECK IS VOID WITHOUT A PURPLE & BLUE BORDER AND BACKGROUND PLUS A KNIGHT & FINGERPRINT WATERMARK ON THE BACK - HOLD AT ANGLE TO VIEW

**Southern Properties Capital Ltd**
1603 LBJ Freeway, Suite 800
Dallas, TX 75234          (469)522-4200

Bank Leumi USA
New York, NY

VOID AFTER 90 DAYS          311668

1-279/260

DATE    10/03/2022

PAY TO THE
ORDER OF          Enoch Investments LLC and JMJAV LLC

AMOUNT
$ 100.00

One Hundred Dollars and 00 Cents

Enoch Investments LLC and JMJAV LLC
Dallas, TX 75234

Alla Dzyuba

⑈311668⑈ ⑈026002794⑈ 410429480⑈

App. 392

# EXHIBIT A-36

FedEx® Tracking                                                                        ⋮

**DELIVERED**

# Tuesday

10/4/2022 at 8:16 am

Signed for by: S.PATEL

⤓ Obtain Proof of delivery

How was your delivery?

☆ ☆ ☆ ☆ ☆

**DELIVERY STATUS**

Delivered ✔

✉ Get Status Updates

**TRACKING ID**

770101862781 ✎ ☆

**FROM**
Dallas, TX US

*Label Created*
10/3/2022 3:45 PM

**PACKAGE RECEIVED BY FEDEX**
ADDISON, TX
10/3/2022 7:02 PM

**IN TRANSIT**
ADDISON, TX
10/4/2022 7:07 AM

**OUT FOR DELIVERY**
ADDISON, TX
10/4/2022 7:07 AM

**DELIVERED**
Dallas, TX US

*DELIVERED*
10/4/2022 at 8:16 AM

↓ View travel history

Manage Delivery                                                                        ⌄

App. 394

Case 3:22-cv-02118-X     Document 332     Filed 10/02/23     Page 119 of 272     PageID 11584

## Travel history

**OUR COMPANY**

About FedEx(https://www.fedex.com/en-us/about.html)

Our Portfolio(https://www.fedex.com/en-us/about/company-structure.html)

Investor Relations(https://investors.fedex.com/home/default.aspx)

Careers(https://careers.fedex.com/fedex/)

FedEx Blog(https://www.fedex.com/en-us/blog.html)

Corporate Responsibility(https://www.fedex.com/en-us/about/corporate-social-responsibility.html)

Newsroom(https://newsroom.fedex.com/)

Contact Us(https://www.fedex.com/en-us/customer-support/contact-us.html)

**MORE FROM FEDEX**

FedEx Compatible(https://www.fedex.com/en-us/compatible.html)

FedEx Developer Portal(https://developer.fedex.com/api/en-us/home.html)

FedEx Logistics(https://www.fedex.com/en-us/logistics.html)

FedEx Cross Border(https://www.fedex.com/en-us/cross-border.html)

ShopRunner(https://www.fedex.com/en-us/shoprunner.html)

**LANGUAGE**

 Change Country/Territory(https://www.fedex.com/?location=home)

**FOLLOW FEDEX** ✉ (https://www.fedex.com/en-us/email.html)    f (Https://www.facebook.com/FedEx/)

🐦 (Https://twitter.com/fedex)    📷 (https://www.instagram.com/fedex/)    in (https://www.linkedin.com/company/fedex)

▶ (https://www.youtube.com/fedex)    📌 (https://www.pinterest.com/FedEx/)

© FedEx 1995-2022

Site Map (https://www.fedex.com/en-us/sitemap.html)  |  Terms of Use (https://www.fedex.com/en-us/terms-of-use.html)  |  Privacy & Security (https://www.fedex.com/en-us/trust-center.html)

App. 395



**After printing this label:**

1. Use the 'Print' button on this page to print your label to your laser or inkjet printer.

2. Fold the printed page along the horizontal line.

3. Place label in shipping pouch and affix it to your shipment so that the barcode portion of the label can be read and scanned.

**Warning**: Use only the printed original label for shipping. Using a photocopy of this label for shipping purposes is fraudulent and could result in additional billing charges, along with the cancellation of your FedEx account number.

Use of this system constitutes your agreement to the service conditions in the current FedEx Service Guide, available on fedex.com.FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery,misdelivery,or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim.Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental,consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss.Maximum for items of extraordinary value is $1,000, e.g. jewelry, precious metals, negotiable instruments and other items listed in our ServiceGuide. Written claims must be filed within strict time limits, see current FedEx Service Guide.

App. 396

# EXHIBIT A-37

## PROMISSORY NOTE

**$5,129,000.00**                                                      **January 13, 2021**

FOR VALUE RECEIVED, **D4OPM, LLC,** a Texas limited liability company, and **ONE MF D4, LLC,** a Texas limited liability company (collectively "Maker"), do hereby promise to pay to the order of **SOUTHERN PROPERTIES CAPITAL LTD**, a British Virgin Islands company ("Payee"), at such place as the holder hereof may from time to time designate in writing, in lawful money of the United States, the principal sum of FIVE MILLION ONE HUNDRED TWENTY-NINE THOUSAND AND NO/100 DOLLARS ($5,129,000.00) or so much of such sum as may be advanced from Payee in its sole discretion from time to time, with interest thereon as provided in this Note.

1.    Certain Definitions. For the purposes hereof, the terms set forth below shall have the following meanings:

   a.    "Affiliate" shall mean with respect to any person or entity, any other person or entity who, or which, controls, is controlled or under common control with such person or entity.

   b.    "Applicable Law" shall mean (i) the laws of the United States of America applicable to contracts made or performed in the State of Texas, now or at any time hereafter prescribing maximum rates of interest or eliminating maximum rates of interest on loans and extensions of credit, (ii) the laws of the State of Texas, as the same may be amended from time to time, now or at any time hereafter prescribing or eliminating maximum rates of interest on loans and extensions of credit, and (iii) any other laws at any time applicable to contracts made or performed in the State of Texas which permit a higher interest rate ceiling hereunder.

   c.    "Base Rate" shall mean ten percent (10%) per annum.

   d.    "Maturity Date" shall mean January 13, 2023.

   e.    "Highest Lawful Rate" shall mean at the particular time in question the lesser of (i) eighteen percent (18%) per annum or, (ii) the maximum rate of interest which, under Applicable Law, Payee is then permitted to charge Maker in regard to the loan evidenced by this Note. If the maximum rate of interest which, under Applicable Law, Payee is permitted to charge Maker in regard to the loan evidenced by this Note shall change after the date hereof, the Highest Lawful Rate shall be automatically increased or decreased, as the case may be, from time to time as of the effective date of each change in the Highest Lawful Rate without notice to Maker.

   f.    "Loan Documents" shall mean this Note, the Pledge and Security Agreement with Assignment of Rights and all other documents given to evidence or secure the Note.

   g.    "Security Agreement" shall mean that certain Pledge and Security Agreement with Assignment of Rights dated of even date herewith given to secure the Note.

2.    Calculation and Payment of Principal and Interest.

    a.    Principal and interest of this Note shall be payable as follows: all accrued but unpaid interest, together with the outstanding principal balance, shall be due and payable in full on the Maturity Date.

    b.    Interest on this Note shall be calculated at the Base Rate on the number of days actually elapsed, but computed as though each year consisted of 360 days.

    c.    If the date for any payment or prepayment hereunder falls on a day which is a Saturday, Sunday or other legal holiday in the State of Texas, then for all purposes of this Note, the same shall be deemed to have fallen on the next following day which is not a Saturday, Sunday or other legal holiday, and such extension of time shall in such case be included in the calculation of interest.

    d.    All payments on this Note pursuant to this paragraph 2 shall be applied first to the payment of any accrued and unpaid Late Charge, as hereinafter defined, then to accrued and unpaid interest and then to the payment of principal; provided, however, if an Event of Default, as hereinafter defined, has occurred and is continuing, payments on this Note shall be applied as Payee shall elect, in Payee's sole discretion.

3.    Prepayment. Maker may prepay all or any part of the principal balance of this Note.

4.    Waiver. Maker and all sureties, endorsers, accommodation parties, guarantors and other parties now or hereafter liable for the payment of this Note, in whole or in part, hereby severally (i) except as otherwise specifically set forth in this Note, waive demand, notice of demand, presentment for payment, notice of nonpayment, notice of default, protest, notice of protest, notice of intent to accelerate, notice of acceleration, notice of dishonor and all other notices, and further waive diligence in collecting this Note, in taking action to collect this Note, in bringing suit to collect this Note, or in enforcing this Note or any of the security for this Note; (ii) agree to any substitution, subordination, exchange or release of any security for this Note or the release of any party primarily or secondarily liable for the payment of this Note; (iii) agree that Payee shall not be required to first institute suit or exhaust its remedies hereon against Maker or others liable or to become liable for the payment of this Note or to enforce its rights against any security for the payment of this Note; and (iv) consent to any extension of time for the payment of this Note, or any installment hereof, made by agreement by Payee with any person now or hereafter liable for the payment of this Note, even if Maker is not a party to such agreement.

5.    Events of Default

    a.    Upon the happening of any of the following events (each an "Event of Default"), Payee may, at its option, by written notice thereof to Maker, declare immediately due and payable the entire principal balance of this Note together with all interest accrued and owing hereon, plus any other sums payable at the time of such declaration

pursuant to this Note, or any instrument securing this Note, including, without limitation, the Security Agreement. Events of Default include the following:

i.     If Maker shall fail to pay any installment of principal and/or interest under this Note as and when same becomes due and payable in accordance with the terms hereof; or

ii.    The occurrence of any Event of Default, as defined in the Security Agreement, or the occurrence of a default under any other document or instrument evidencing, securing or pertaining to the indebtedness evidenced hereby, which remains uncured upon the expiration of any cure period applicable thereto as set forth in the document under which such default occurred; or

iii.   Any default by Maker or any Affiliate of Maker under any loan, advance or other obligation now or hereafter owed or owing to Payee or any Affiliate of Payee.

b.    The failure to exercise the foregoing option upon the happening of one or more Events of Default shall not constitute a waiver of the right to exercise the same or any other option at any subsequent time, and no such failure shall nullify any prior exercise of any such option without the express written consent of Payee.

6.    Collateral. This Note is secured by, among other things, the Pledge and Security Agreement with Assignment of Rights which contains provisions for the acceleration of the maturity hereof upon the happening of certain events.

7.    Default Interest; Late Charge. If any installment of principal and/or interest is not paid on or before the due date thereof or if the entire unpaid principal balance and accrued but unpaid interest is not paid on or before the earlier to occur of the (i) Maturity Date, or, (ii) any accelerated maturity date as permitted hereby, all unpaid amounts of this Note, including principal and interest, shall thereafter bear interest at a rate of interest (the "Default Rate") equal to the Highest Lawful Rate; provided, however, that the obligation to pay such interest is subject to the limitation contained in the following paragraph.

8.    Compliance with Law. All agreements between Maker and Payee, whether now existing or hereafter arising and whether written or oral, are hereby limited so that in no contingency, whether by reason of demand or acceleration of the Maturity Date, or otherwise, shall the interest contracted for, charged, received, paid or agreed to be paid to Payee in regard to the loan evidenced by this Note exceed the maximum amount permissible under Applicable Law. If, from any circumstance whatsoever, interest would otherwise be payable to Payee in excess of the maximum amount permissible under Applicable Law, the interest payable to Payee shall be reduced to the maximum amount permissible under Applicable Law; and if from any circumstance Payee shall ever receive anything of value deemed interest by Applicable Law in excess of the maximum amount permissible under Applicable Law, an amount equal to the excessive interest shall be applied to the reduction of the principal hereof and not to the payment of interest, or if such excessive amount of interest exceeds the unpaid

balance of principal hereof, such excess shall be refunded to Maker. All interest paid or agreed to be paid to Payee shall, to the extent permitted by Applicable Law, be amortized, prorated, allocated, and spread throughout the full period (including any renewal or extension) until payment in full of the principal so that the interest hereon for such full period shall not exceed the maximum amount permissible under Applicable Law. Payee expressly disavows any intent to contract for, charge or receive interest in an amount which exceeds the maximum amount permissible under Applicable Law. This paragraph shall control all agreements between Maker and Payee.

9.    Attorneys' Fees and Costs. If an Event of Default shall occur, and in the event that thereafter this Note is placed in the hands of an attorney for collection, or in the event this Note is collected in whole or in part through legal proceedings of any nature, then and in any such case Maker promises to pay, and there shall be added to the unpaid principal balance hereof, all reasonable costs of collection, including, but not limited to, reasonable attorneys' fees incurred by the holder hereof, on account of such collection, whether or not suit is filed.

10.    Cumulative Rights. No delay on the part of the holder of this Note in the exercise of any power or right under this Note or under any other instrument executed pursuant hereto shall operate as a waiver thereof, nor shall a single or partial exercise of any power or right preclude other or further exercise thereof or the exercise of any other power or right. Enforcement by the holder of this Note of any security for the payment hereof shall not constitute any election by it of remedies so as to preclude the exercise of any other remedy available to it.

11.    Headings. The paragraph headings used in this Note are for convenience of reference only, and shall not affect the meaning or interpretation of this Note.

12.   Notices and Demands.  Any notice or demand to be given or to be served upon Maker in connection with this Note must be in writing and may be given by facsimile, overnight delivery service, hand delivery, or certified or registered mail, return receipt requested, properly addressed, with postage prepaid, addressed to Maker as follows:

> D4OPM, LLC
> 13901 Midway Road
> Suite 102
> Farmers Branch, Texas 75244
> Attention:  Timothy Barton
>
> ONE MF D4, LLC
> 13901 Midway Road
> Suite 102
> Farmers Branch, Texas 75244
> Attention:  Timothy Barton

or at such other address as Maker may designate from time to time by written notice (specifically notifying of a change of address) given to and received by the holder hereof. Any notice or demand will be deemed given on the day the notice or demand given by Payee, if given by facsimile or hand delivery, the following day is given by overnight delivery service, (which receipt may be evidenced by a delivery service receipt) or two (2) days following the day such notice is deposited in an authorized depository under the care and custody of the United States Postal Service if given by registered or certified mail.

13.   Governing Law.  This Note shall be deemed to have been executed and shall be performed in the State of Texas and this Note and the Loan Documents shall be governed by its laws. Maker irrevocably agrees that subject to Payee's sole and absolute election, Payee may bring suit, action, or other legal proceedings arising out of the Loan Documents in a court located in Texas, whether local, state, or federal.  Maker hereby submits to the jurisdiction of such court(s) and waives any right maker may have to request a change of venue or a removal to another court.

14.   Successors and Assigns.  The term "Payee" shall include all of Payee's successors and assigns to whom the benefits of this Note shall inure.

*[Signature page to follow]*

**MAKER:**

**D4OPM, LLC,**
a Texas limited liability company

By: _____
Name: _____
Title: _____

**ONE MF D4, LLC,**
a Texas limited liability company

By: _____
Name: _____
Title: _____

# EXHIBIT A-38

# Tab #17

## Security Instrument

**PEASELEY**
— & —
**DERRYBERRY**
P L C

504 Autumn Springs Ct, Suite 26, Franklin, TN 37067
Phone 615-807-2351 / Fax 888-351-6013

Attorney: Felicia Parks Frasch – Felicia@mailpdlaw.com
Project Manager: Tami@mailpdlaw.com

1

```
4680   588
Recorded in the Above
MORTGAGES  Book & Page
01-25-2021 01:31:40 PM
Bill English - Probate Judge
Lee County, AL
Book/Pg: 4680/588
Term/Cashier: CHPJDSK02 / coliver
Tran: 24314.359970.479310
Recorded: 01-25-2021 13:31:52
MTG Mortgage Tax              35491.95
REC Recording Fee               155.00
Total Fees:  $ 35646.95
```

OMB Approval No. 2502-0598
(Exp. 9/30/2021)

Public Reporting Burden for this collection of information is estimated to average .75 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Response to this request for information is required in order to receive the benefits to be derived. This agency may not collect this information, and you are not required to complete this form unless it displays a currently valid OMB control number.

**Warning:** Federal law provides that anyone who knowingly or willfully submits (or causes to submit) a document containing any false, fictitious, misleading, or fraudulent statement/certification or entry may be criminally prosecuted and may incur civil administrative liability. Penalties upon conviction can include a fine and imprisonment, as provided pursuant to applicable law, which includes, but is not limited to, 18 U.S.C. 1001, 1010, 1012; 31 U.S.C. 3729, 3802, 24 C.F.R. Parts 25, 28 and 30, and 2 C.F.R. Parts 180 and 2424.

**Prepared by and Recording Requested by:**
Thomas Kelly Derryberry
Peaseley & Derryberry PLC
504 Autumn Springs Ct, Suite 26
Franklin, TN 37067

**After Recording return to:**
Leslie F. Dominy
Greystone Funding Company LLC
419 Belle Air Lane
Warrenton, VA 20186

## MULTIFAMILY MORTGAGE,
## ASSIGNMENT OF LEASES AND RENTS
## AND SECURITY AGREEMENT

### (Alabama)

*HUD Project Number: 062-35778*
*Project Name: Parc at Opelika*

---

| | | |
|---|---|---|
| Previous editions are obsolete | HUD MF Security Instrument | HUD-94000M (6/18) |

App. 406

4680     589
MORTGAGES   Book & Page

2

## MULTIFAMILY MORTGAGE,
## ASSIGNMENT OF LEASES AND RENTS
## AND SECURITY AGREEMENT

THIS MULTIFAMILY MORTGAGE, ASSIGNMENT OF LEASES AND RENTS, AND SECURITY AGREEMENT, WHICH, FOR AS LONG AS THE LOAN IS INSURED OR HELD BY HUD, SHALL BE DEEMED TO BE THE MORTGAGE AS DEFINED BY PROGRAM OBLIGATIONS (**"Security Instrument"**), is made as of this 1st day of January, 2021 between D4OP LLC, a limited liability company organized and existing under the laws of the State of Texas, whose address is 13901 Midway Rd, Suite 102, Dallas, TX 75244-4388, as grantor, trustor and borrower (**Borrower**), to Greystone Funding Company LLC, a limited liability company organized and existing under the laws of State of Delaware, whose address is 419 Belle Air Lane, Warrenton, VA 20186 as Lender (**Lender**).

Borrower, in consideration of the Indebtedness and the security interest created by this Security Instrument, irrevocably mortgages, grants, conveys and assigns to Lender and Lender's successors and assigns, with power of sale, the Mortgaged Property, including the Land located in Lee County, State of Alabama and described in Exhibit A attached to this Security Instrument, to have and to hold the Mortgaged Property unto Lender and Lender's successors and assigns.

THIS SECURITY INSTRUMENT IS EXECUTED TO SECURE TO LENDER the repayment of the Indebtedness evidenced by Borrower's Note payable to Lender dated as of the date of this Security Instrument, and maturing on November 1, 2062, in the principal amount of Twenty Three Million Six Hundred Sixty One Thousand Three Hundred and 00/100 Dollars (US $23,661,300.00) (**"Loan"**), and all renewals, extensions and modifications of the Indebtedness, and the performance of the covenants and agreements of Borrower contained in this Security Instrument and the Note.

Borrower represents and warrants that Borrower is lawfully seized of the Mortgaged Property and has the right, power and authority to mortgage, grant, convey and assign the Mortgaged Property, and that the Mortgaged Property is unencumbered except for easements and restrictions listed in a schedule of exceptions to coverage in any title insurance policy issued to Lender contemporaneously with the execution and recordation of this Security Instrument and insuring Lender's interest in the Mortgaged Property. Borrower covenants that Borrower shall warrant and defend generally such title to the Mortgaged Property against all claims and demands, subject to said easements and restrictions.

| Previous editions are obsolete | HUD MF Security Instrument | HUD-94000M (6/18) |
|---|---|---|

**Covenants.** Borrower and Lender covenant and agree as follows:

1.      **DEFINITIONS.** The definition of any capitalized term or word used herein can be found in this Security Instrument, and then if not found in this Security Instrument, then found in the Regulatory Agreement between Borrower and HUD, and/or in the Note. The following terms, when used in this Security Instrument (including when used in the above recitals), shall have the following meanings:

(a)      **"Borrower"** means all entities identified as "Borrower" in the first paragraph of this Security Instrument, together with any successors and assigns (jointly and severally). Borrower shall include any entity taking title to the Mortgaged Property whether or not such entity assumes the Note. Whenever the term "Borrower" is used herein, the same shall be deemed to include the obligor of the debt secured by the Security Instrument, and so long as the Note is insured or held by HUD shall also be deemed to be the mortgagor as defined by Program Obligations.

(b)      **"Building Loan Agreement"** means the HUD-approved form of the agreement between Borrower and Lender setting forth the terms and conditions for a construction loan.

(c)      **"Business Day"** is defined in Section 31.

(d)      **"Claim"** is defined in Section 48(m).

(e)      **"Collateral Agreement"** means any separate agreement between Borrower and Lender for the purpose of establishing replacement reserves for the Mortgaged Property, establishing an account to assure the completion of repairs or Improvements specified in that agreement, or any other agreement or agreements between Borrower and Lender which provide for the establishment of any other fund, reserve or account including but not limited to those reserves and escrows required by HUD.

(f)      **"Contract of Insurance"** is defined in 24 C.F.R. Part 207, Subpart B.

(g)      **"Environmental Inspections"** is defined in Section 48(h).

(h)      **"Event of Default"** means the occurrence of any event listed in Section 22.

(i)      **"Fixtures"** means all property or goods that become so related or attached to the Land or the Improvements that an interest arises in them under real property law, whether acquired now or in the future, excluding all tenant owned goods

---

4

and property, and including but not limited to:  machinery, equipment,  engines, boilers, incinerators, installed building materials; systems and equipment for the purpose of supplying or distributing heating, cooling, electricity, gas, water, air, or light; antennas, cable, wiring and conduits used in connection with radio, television, computers, security, fire prevention, or fire detection or otherwise used to carry electronic signals; telephone systems and equipment; elevators and related machinery and equipment; fire detection, prevention and extinguishing systems and apparatus; security and access control systems and apparatus; plumbing systems; water heaters, ranges, stoves, microwave ovens, refrigerators, dishwashers, garbage disposals, washers, dryers and other appliances; light fixtures, awnings, storm windows and storm doors; pictures, screens, blinds, shades, curtains and curtain rods; mirrors; cabinets, paneling, rugs and floor and wall coverings; fences, trees and plants; swimming pools; playground and exercise equipment and classroom furnishings and equipment.

(j)      **"Governmental Authority"** means any board, commission, department or body of any municipal, county, state, tribal or federal governmental unit, including any U.S. territorial government, and any public or quasi-public authority, or any subdivision of any of them, that has or acquires jurisdiction over the Mortgaged Property, including the use, operation or improvement of the Mortgaged Property.

(k)      **"HUD"** means the United States Department of Housing and Urban Development acting by and through the Secretary in the capacity as insurer or holder of the Loan under the authority of the National Housing Act, as amended, the Department of Housing and Urban Development Act, as amended, or any other federal law or regulation pertaining to the Loan or the Mortgaged Property.

(l)      **"Impositions"** and **"Imposition Deposits"** are defined in Section 8(a).

(m)      **"Improvements"** means the buildings, structures, and alterations now constructed or at any time in the future constructed or placed upon the Land, including any future replacements and additions.

(n)      **"Indebtedness"** means the principal of, interest on, and all other amounts due at any time under the Note, this Security Instrument, and any other Loan Document, including prepayment premiums, late charges, default interest, and advances to protect the security of this Security Instrument as provided in Section 13.

(o)      **"Indemnitees"** is defined in Section 48(k).

(p)      **"Land"** means the estate in realty described in <u>Exhibit A</u>.

4680    592
MORTGAGES  Book & Page

5

(q)    **"Leases"** means all present and future leases, subleases, licenses, concessions or grants or other possessory interests now or hereafter in force, whether oral or written, covering or affecting the Mortgaged Property, or any portion of the Mortgaged Property (including but not limited to proprietary leases, non-residential leases or occupancy agreements if Borrower is a cooperative housing corporation), and all modifications, extensions or renewals.  (Ground leases that create a leasehold interest in the Land and where the Borrower's leasehold is security for the Loan are not included in this definition.)

(r)    **"Lender"** means the entity identified as "Lender" in the first paragraph of this Security Instrument, or any subsequent holder of the Note, and whenever the term "Lender" is used herein, the same shall be deemed to include the obligee, or the beneficiary of this Security Instrument, and so long as the Loan is insured or held by HUD, shall also be deemed to be the mortgagee as defined by Program Obligations.

(s)    **"Lien"** is defined in Section 17.

(t)    **"Loan"** is defined in the opening paragraphs of this Security Instrument.

(u)    **"Loan Application"** is defined in Section 41.

(v)    **"Loan Documents"** means the Note, this Security Instrument, the Regulatory Agreement and all other agreements, instruments and documents which are now existing or are in the future required by, delivered to and/or assigned to Lender and/or HUD in connection with or related to the Loan, as such documents may be amended from time to time.

(w)    **"Mortgaged Property"** means all of Borrower's present and future right, title and interest in and to all of the following whether now held or later acquired:

(1)    the Land;

(2)    the Improvements;

(3)    the Fixtures;

(4)    the Personalty;

(5)    all current and future rights, including air rights, development rights, zoning rights and other similar rights or interests, easements, tenements, rights-of-way, strips and gores of land, streets, alleys, roads, sewer rights, waters, watercourses, and appurtenances

App. 410

6

related to or benefiting the Land or the Improvements, or both, and all rights-of-way, streets, alleys and roads which may have been or may in the future be vacated;

(6)   all insurance policies covering the Mortgaged Property, and all proceeds paid or to be paid by any insurer of the Land, the Improvements, the Fixtures, the Personalty or any other part of the Mortgaged Property, whether or not Borrower obtained such insurance policies pursuant to Lender's requirement;

(7)   all awards, payments and other compensation made or to be made by any Governmental Authority with respect to the Land, the Improvements, the Fixtures, the Personalty or any other part of the Mortgaged Property, including any awards or settlements resulting from condemnation proceedings or the total or partial taking of the Land, the Improvements, the Fixtures, the Personalty or any other part of the Mortgaged Property under the power of eminent domain or otherwise and including any conveyance in lieu thereof;

(8)   all contracts, options and other agreements for the sale of the Land, the Improvements, the Fixtures, the Personalty or any other part of the Mortgaged Property entered into by Borrower now or in the future, including cash or securities deposited to secure performance by parties of their obligations;

(9)   all proceeds (cash or non-cash), liquidated claims or other consideration from the conversion, voluntary or involuntary, of any of the Mortgaged Property and the right to collect such proceeds, liquidated claims or other consideration;

(10)  all Rents and Leases;

(11)  all earnings, royalties, instruments, accounts, accounts receivable, supporting obligations, issues and profits from the Land, the Improvements or any other part of the Mortgaged Property, and all undisbursed proceeds of the Loan and, if Borrower is a cooperative housing corporation, maintenance charges or assessments payable by shareholders or residents;

(12)  all Imposition Deposits;

App. 411

MORTGAGES Book & Page

7

(13)  all refunds or rebates of Impositions by any Governmental Authority or insurance company (other than refunds applicable to periods before the real property tax year in which this Security Instrument is dated);

(14)  all forfeited tenant security deposits under any Lease;

(15)  all names under or by which any of the above Mortgaged Property may be operated or known, and all trademarks, trade names, and goodwill relating to any of the Mortgaged Property;

(16)  all deposits and/or escrows held by or on behalf of Lender under Collateral Agreements; and

(17)  all awards, payments, settlements or other compensation resulting from litigation involving the Project.

Notwithstanding items numbered (1) through (17) above or Section 33 below, Borrower may hold non-project funds in separate, segregated accounts, specifically labeled as non-project funds, which are not part of the Mortgaged Property. These accounts may hold those assets owned or received by Borrower, through equity contributions, gifts, or loan proceeds, that were not required by HUD to become part of the Mortgaged Property and were not made a part of the Mortgaged Property by Borrower and funds released from the Mortgaged Property in compliance with Program Obligations (such as Distributions of Surplus Cash and loan repayments, if allowed).

(x)  **"Note"** means the Note executed by Borrower described in this Security Instrument, including all schedules, riders, allonges and addenda, as such Note may be amended from time to time.

(y)  **"Notice"** is defined in Section 31.

(z)  **"O&M Program"** is defined in Section 48(b).

(aa)  **"Personalty"** means all equipment, inventory, and general intangibles. The definition of "Personalty" includes furniture, furnishings, machinery, building materials, appliances, goods, supplies, tools, books, records (whether in written or electronic form), computer equipment (hardware and software) and other tangible or electronically stored personal property (other than Fixtures) that are owned, leased or used by Borrower now or in the future in connection with the ownership, management or operation of the Land or the Improvements or are located on the Land or in the Improvements, and any operating agreements relating to the Land or the

---

Previous editions are obsolete                    HUD MF Security Instrument                    HUD-94000M (6/18)

8

Improvements, and any surveys, plans and specifications and contracts for architectural, engineering and construction services relating to the Land or the Improvements, choses in action and all other intangible property and rights relating to the operation of, or used in connection with, the Land or the Improvements, including all certifications, approvals and governmental permits relating to any activities on the Land. Intangibles shall also include all cash and cash escrow funds related to the Project, such as but not limited to: Reserve for Replacement accounts, bank accounts, Residual Receipts accounts, and investments.

(bb)    **"Principal"** is defined in the Regulatory Agreement.

(cc)    **"Project"** and **"Project Assets"** mean the Mortgaged Property.

(dd)    **"Program Obligations"** means (1) all applicable statutes and any regulations issued by the Secretary pursuant thereto that apply to the Project, including all amendments to such statutes and regulations, as they become effective, except that changes subject to notice and comment rulemaking shall become effective only upon completion of the rulemaking process, and (2) all current requirements in HUD handbooks and guides, notices, and mortgagee letters that apply to the Project, and all future updates, changes and amendments thereto, as they become effective, except that changes subject to notice and comment rulemaking shall become effective only upon completion of the rulemaking process, and provided that such future updates, changes and amendments shall be applicable to the Project only to the extent that they interpret, clarify and implement terms in this Security Instrument rather than add or delete provisions from such document. Handbooks, guides, notices, and mortgagee letters are available on "HUDCLIPS," at www.hud.gov.

(ee)    **"Property Jurisdiction"** is defined in Section 30(a).

(ff)    **"Regulatory Agreement"** means the agreement between the Borrower and HUD establishing Borrower's obligations in the operation of the Mortgaged Property and the rights and powers of HUD.

(gg)    **"Remedial Work"** is defined in Section 48(i).

(hh)    **"Rents"** means all rents (whether from residential or non-residential space), revenues, issues, profits, (including carrying charges, maintenance fees, and other cooperative revenues, and fees received from leasing space on the Mortgaged Property), and other income of the Land or the Improvements, gross receipts, receivables, parking fees, laundry and vending machine income and fees and charges for food and other services provided at the Mortgaged Property, whether now due, past

---

Previous editions are obsolete                HUD MF Security Instrument                        HUD-94000M (6/18)

MORTGAGES  Book & Page

9

due, or to become due, Residual Receipts, and escrow accounts, however and whenever funded and wherever held.

(ii)　**"Residual Receipts"** is defined in the Regulatory Agreement.

(jj)　**"Taxes"** means all taxes, assessments, vault rentals and other charges, if any, general, special or otherwise, including all assessments for schools, public betterments and general or local improvements, which are levied, assessed or imposed by any public authority or quasi-public authority, and which, if not paid, could become a lien on the Land or the Improvements.

(kk)　**"Waste"** means a failure to keep the Mortgaged Property in decent, safe and sanitary condition and in good repair.  During any period in which HUD insures this Loan or holds a security interest on the Mortgaged Property, Waste is committed when, without Lender's and HUD's express written consent, Borrower:

(1)　physically changes the Mortgaged Property, whether negligently or intentionally, in a manner that reduces its value;

(2)　fails to maintain and repair the Mortgaged Property in accordance with Program Obligations;

(3)　fails to pay before delinquency any Taxes secured by a lien having priority over this Security Instrument;

(4)　materially fails to comply with covenants in the Note, this Security Instrument or the Regulatory Agreement respecting physical care, maintenance, construction, abandonment, demolition, or insurance against casualty of the Mortgaged Property; or

(5)　retains possession of Rents to which Lender or its assigns have the right of possession under the terms of the Loan Documents.

## 2.　UNIFORM COMMERCIAL CODE SECURITY AGREEMENT.

This Security Instrument is also a security agreement under the Uniform Commercial Code for any of the Mortgaged Property which, under applicable law, may be subject to a security interest under the Uniform Commercial Code, whether acquired now or in the future, and all products and cash proceeds and non-cash proceeds thereof (collectively, **"UCC Collateral"**), and Borrower hereby grants to Lender a security interest in the UCC Collateral.  Borrower hereby authorizes Lender to file financing statements, continuation statements and amendments, in such form as

App. 414

10

Lender may require to perfect or continue the perfection of this security interest. Borrower agrees to enter into any agreements, in form as Lender may require, that the Uniform Commercial Code requires to perfect and continue perfection of Lender's security interest in the portion of UCC Collateral that requires Lender control to attain such perfection. Borrower shall pay all filing costs and all costs and expenses of any record searches for financing statements that Lender may require. Without the prior written consent of Lender, Borrower shall not create or permit to exist any other lien or security interest in any of the UCC Collateral. Except for such UCC filings disclosed to Lender and HUD that are to be released in connection with the financing of the Loan or that are otherwise consented to in writing by Lender and HUD, Borrower represents and warrants to Lender that no UCC filings have been made against Borrower, the Project or the Project Assets prior to the initial or initial/final endorsement of the Note by HUD, and Borrower has taken and shall take no action that would give rise to such UCC filings, except for any UCC filings in connection with the acquisition of any Personalty that has been approved in writing by HUD. Borrower also represents and warrants to Lender that it has not entered into, and will not enter into, any agreement with any party other than Lender in conjunction with the present Loan transaction that allows for the perfection of a security interest in any portion of the UCC Collateral. Borrower will promptly notify Lender of any change in its business or principal location, name, or other organizational change that would require a filing under the UCC to continue perfection of Lender's interest, and hereby authorizes Lender to file, and will assist Lender in filing, any forms necessary to continue the effectiveness of existing financing statements or for perfection of Lender's security interest. If an Event of Default has occurred and is continuing, Lender shall have the remedies of a secured party under the Uniform Commercial Code, in addition to all remedies provided by this Security Instrument or existing under applicable law. In exercising any remedies, Lender may exercise its remedies against the UCC Collateral separately or together, and in any order, without in any way affecting the availability of Lender's other remedies. This Security Instrument constitutes a fixture filing financing statement with respect to any part of the Mortgaged Property which is or may become a Fixture and which shall be filed in the local real estate records.

3.   **ASSIGNMENT OF RENTS; APPOINTMENT OF RECEIVER; LENDER IN POSSESSION.**

(a)   As part of the consideration for the Indebtedness, Borrower absolutely and unconditionally assigns and transfers to Lender all Rents. It is the intention of Borrower to establish a present, absolute and irrevocable transfer and assignment to Lender of all Rents and to authorize and empower Lender to collect and receive all Rents without the necessity of further action on the part of Borrower. Promptly upon request by Lender, Borrower agrees to execute and deliver such further assignments as Lender may from time to time require. Borrower and Lender intend this assignment of Rents to be

11

immediately effective and to constitute an absolute present assignment and not an assignment for additional security only, provided that prior to an Event of Default, Borrower is entitled to Rents. For purposes of giving effect to this absolute assignment of Rents, and for no other purpose, Rents shall not be deemed to be a part of the Mortgaged Property. However, if this present, absolute and unconditional assignment of Rents is not enforceable by its terms under the laws of the Property Jurisdiction, then the Rents shall be included as a part of the Mortgaged Property and it is the intention of Borrower that in this circumstance this Security Instrument create and perfect a lien on Rents in favor of Lender, which lien shall be effective as of the date of this Security Instrument.

(b)      After the occurrence of an Event of Default, Borrower authorizes Lender to collect, sue for and compromise Rents and directs each tenant (whether residential or non-residential) of the Mortgaged Property to pay all Rents to, or as directed by, Lender. However, until the occurrence of an Event of Default, Lender hereby grants to Borrower a revocable license to collect and receive all Rents for use in accordance with the provisions of this Security Instrument (and the Regulatory Agreement during the period of its applicability), to hold all Rents in trust for the benefit of Lender and to apply all Rents to pay the installments of interest and principal then due and payable under the Note and the other amounts then due and payable under this Security Instrument, including Imposition Deposits, and to pay the current costs and expenses of managing, operating and maintaining the Mortgaged Property, including utilities, Taxes and insurance premiums (to the extent not included in Imposition Deposits), tenant improvements and other capital expenditures. So long as no Event of Default has occurred and is continuing, the Rents remaining after application pursuant to the preceding sentence may be retained by Borrower free and clear of, and released from, Lender's rights with respect to Rents under this Security Instrument, unless otherwise restricted by the terms of the Regulatory Agreement during the period of its applicability. From and after the occurrence of an Event of Default, and without the necessity of Lender entering upon and taking and maintaining control of the Mortgaged Property directly, or by a receiver, Borrower's license to collect Rents shall automatically terminate and Lender shall without Notice be entitled to all Rents as they become due and payable, including Rents then due and unpaid. Borrower shall pay to Lender upon demand all Rents to which Lender is entitled. At any time on or after the date of Lender's demand for Rents, Lender may give, and Borrower hereby irrevocably authorizes Lender to give, Notice to all tenants of the Mortgaged Property instructing them to pay all Rents to Lender. No tenant shall be obligated to inquire further as to the occurrence or continuance of an Event of Default, and no tenant shall be obligated to pay to Borrower any amounts which are actually paid to Lender in response to such a Notice. Any such Notice by Lender shall be delivered to each tenant personally, by mail or by delivering such demand to each rental unit. Borrower shall not interfere with and shall cooperate with Lender's collection of such Rents.

4680    599
MORTGAGES   Book & Page

12

(c)    Borrower represents and warrants to Lender that Borrower has not executed any prior assignment of Rents, that Borrower has not performed, and Borrower covenants and agrees that it shall not perform, any acts and has not executed, and shall not execute, any instrument that would prevent Lender from exercising its rights under Section 3, and that at the time of execution of this Security Instrument there has been no anticipation or prepayment of any Rents for more than two months prior to the due dates of such Rents.  Borrower shall not collect or accept payment of any Rents more than two months prior to the due dates of such Rents (other than collections in connection with transactions as approved by HUD).

(d)    If an Event of Default has occurred and is continuing, Lender may, regardless of the adequacy of Lender's security or the solvency of Borrower and even in the absence of Waste (but only with the prior written approval of HUD in the event of Covenant Defaults), enter upon and take and maintain full control of the Mortgaged Property in order to perform all acts that Lender in its discretion determines to be necessary or desirable for the operation and maintenance of the Mortgaged Property, including the execution, cancellation or modification of Leases, the collection of all Rents, the making of repairs to the Mortgaged Property and the execution or termination of contracts providing for the management, operation or maintenance of the Mortgaged Property, for the purposes of enforcing the assignment of Rents pursuant to Section 3(a), protecting the Mortgaged Property or the security of this Security Instrument, or for such other purposes as Lender in its discretion may deem necessary or desirable.  Alternatively, if an Event of Default has occurred and is continuing, regardless of the adequacy of Lender's security, without regard to Borrower's solvency and without the necessity of giving prior Notice (oral or written) to Borrower, Lender may apply to any court having jurisdiction for the appointment of a receiver for the Mortgaged Property to take any or all of the actions set forth in the preceding sentence. If Lender elects to seek the appointment of a receiver for the Mortgaged Property at any time after an Event of Default has occurred and is continuing, Borrower, by its execution of this Security Instrument, expressly consents to the appointment of such receiver, including the appointment of a receiver *ex parte* if permitted by applicable law.  Lender or the receiver, as the case may be, shall be entitled to receive a reasonable fee for managing the Mortgaged Property.  Immediately upon appointment of a receiver or immediately upon Lender's entering upon and taking possession and control of the Mortgaged Property, Borrower shall surrender possession of the Mortgaged Property to Lender or the receiver, as the case may be, and shall deliver to Lender or the receiver, as the case may be, all documents, records (including records on electronic or magnetic media), accounts, surveys, plans, and specifications relating to the Mortgaged Property and all security deposits and prepaid Rents.  In the event Lender takes possession and control of the Mortgaged Property, Lender may exclude Borrower and its representatives from the Mortgaged Property.  Borrower acknowledges and agrees that

13

the exercise by Lender of any of the rights conferred under Section 3 shall not be construed to make Lender a lender-in-possession of the Mortgaged Property so long as Lender, or authorized agent of Lender, has not entered into actual possession of the Land and Improvements.

(e)    If Lender enters the Mortgaged Property, Lender shall be liable to account only to Borrower and only for those Rents actually received. Lender shall not otherwise be liable to Borrower, anyone claiming under or through Borrower or anyone having an interest in the Mortgaged Property, by reason of any act or omission of Lender under Section 3, and Borrower hereby releases and discharges Lender from any such liability to the fullest extent permitted by law.

(f)    If the Rents are not sufficient to meet the costs of taking control of and managing the Mortgaged Property and collecting the Rents, any funds expended by Lender for such purposes shall become an additional part of the Indebtedness as provided in Section 13; provided that Lender shall have the right, but no obligation to make any such advances; and provided further that so long as the Loan is insured by HUD, no such advances by Lender shall become an additional part of the Indebtedness unless such advances receive the prior written approval of HUD.

(g)    Any entering upon and taking of control of the Mortgaged Property by Lender or the receiver, as the case may be, and any application of Rents as provided in this Security Instrument shall not cure or waive any Event of Default or invalidate any other right or remedy of Lender under applicable law or provided for in this Security Instrument.

4.    **ASSIGNMENT OF LEASES; LEASES AFFECTING THE MORTGAGED PROPERTY.**

(a)    As part of the consideration for the Indebtedness, Borrower absolutely and unconditionally assigns and transfers to Lender all of Borrower's right, title and interest in, to and under the Leases, including Borrower's right, power and authority to modify the terms of any such Lease, or extend or terminate any such Lease. It is the intention of Borrower to establish a present, absolute and irrevocable transfer and assignment to Lender of all of Borrower's right, title and interest in, to and under the Leases. Borrower and Lender intend this assignment of the Leases to be immediately effective and to constitute an absolute present assignment and not an assignment for additional security only. For purposes of giving effect to this absolute assignment of the Leases, and for no other purpose, the Leases shall not be deemed to be a part of the Mortgaged Property. However, if this present, absolute and unconditional assignment of the Leases is not enforceable by its terms under the laws of the Property Jurisdiction, then the Leases shall be included as a part of the Mortgaged Property and it is the intention

---

Previous editions are obsolete           HUD MF Security Instrument                  HUD-94000M (6/18)

MORTGAGES   Book & Page

14

of Borrower that in this circumstance this Security Instrument create and perfect a lien on the Leases in favor of Lender, which lien shall be effective as of the date of this Security Instrument.

(b)      Until Lender gives Notice to Borrower of Lender's exercise of its rights under this Section 4, Borrower shall have all rights, power and authority granted to Borrower under any Lease (except as otherwise limited by this Section or any other provision of this Security Instrument), including the right, power and authority to modify the terms of any Lease or extend or terminate any Lease.  Upon the occurrence of an Event of Default and throughout its continuation, the permission given to Borrower pursuant to the preceding sentence to exercise all rights, power and authority under Leases shall automatically terminate.  Borrower shall comply with and observe Borrower's obligations under all Leases, including Borrower's obligations pertaining to the maintenance and disposition of tenant security deposits.

(c)      Borrower acknowledges and agrees that the exercise by Lender, either directly or by a receiver, of any of the rights conferred under this Section 4 shall not be construed to make Lender a lender-in-possession of the Mortgaged Property so long as Lender, or an authorized agent of Lender, has not entered into actual possession of the Land and the Improvements.  The acceptance by Lender of the assignment of the Leases pursuant to Section 4(a) shall not at any time or in any event obligate Lender to take any action under this Security Instrument or to expend any money or to incur any expenses.  Lender shall not be liable in any way for any injury or damage to person or property sustained by any person or persons, firm or corporation in or about the Mortgaged Property unless Lender is a lender-in-possession.  Prior to Lender's actual entry into and taking possession of the Mortgaged Property, Lender shall not (1) be obligated to perform any of the terms, covenants and conditions contained in any Lease (or otherwise have any obligation with respect to any Lease); (2) be obligated to appear in or defend any action or proceeding relating to the Lease or the Mortgaged Property; or (3) be responsible for the operation, control, care, management or repair of the Mortgaged Property or any portion of the Mortgaged Property.  The execution of this Security Instrument by Borrower shall constitute conclusive evidence that all responsibility for the operation, control, care, management and repair of the Mortgaged Property is and shall be that of Borrower, prior to such actual entry and taking of possession.

(d)      Upon delivery of Notice by Lender to Borrower of Lender's exercise of Lender's rights under this Section 4 at any time after the occurrence of an Event of Default, and without the necessity of Lender entering upon and taking and maintaining control of the Mortgaged Property directly, by a receiver, or by any other manner or proceeding permitted by the laws of the Property Jurisdiction, Lender immediately shall have all rights, powers and authority granted to Borrower under any Lease, including

| Previous editions are obsolete | HUD MF Security Instrument | HUD-94000M (6/18) |

App. 419

15

the right, power and authority to modify the terms of any such Lease, or extend or terminate any such Lease.

    (e)    Borrower shall, promptly upon Lender's request, deliver to Lender an executed copy of each residential Lease then in effect. All Leases for residential dwelling units shall be acceptable to Lender and shall comply with Program Obligations.

    (f)    Borrower shall not enter into any Lease for any portion of the Mortgaged Property for non-residential use except with the prior written consent of Lender, and Lender's prior written approval of the Lease agreement, consistent with Program Obligations. Borrower shall not modify the terms of, or extend or terminate, any Lease for non-residential use (including any Lease in existence on the date of this Security Instrument) without the prior written consent of Lender. Borrower shall, without request by Lender, deliver an executed copy of each non-residential Lease to Lender promptly after such Lease is signed. All non-residential Leases, including renewals or extensions of existing Leases, shall specifically provide that (i) such Leases are subordinate to the lien of this Security Instrument, except when approved in writing by Lender in accordance with Program Obligations, and (ii) the tenant shall, upon receipt after the occurrence of an Event of Default of a written request from Lender, pay all Rents payable under the Lease to Lender.

    (g)    Borrower shall not receive or accept Rent under any Lease (whether residential or non-residential) for more than two months in advance.

    **5.**    **PAYMENT OF INDEBTEDNESS; PERFORMANCE UNDER LOAN DOCUMENTS; PREPAYMENT PREMIUM.** Borrower shall pay the Indebtedness when due in accordance with the terms of the Note and this Security Instrument and shall perform, observe and comply with all other provisions of the Note and this Security Instrument. Borrower shall pay a prepayment premium in connection with certain prepayments of the Indebtedness, including a payment made after Lender's exercise of any right of acceleration of the Indebtedness, as provided in the Note.

    **6.**    **EXCULPATION.** Except for personal liability expressly provided for in this Security Instrument or in the Note or in the Regulatory Agreement, the execution of the Note shall impose no personal liability upon Borrower or those parties listed in the Section 50 Addendum to the Regulatory Agreement for payment of the Indebtedness evidenced thereby, and in the Event of Default, the holder of the Note shall look solely to the Mortgaged Property in satisfaction of the Indebtedness and will not seek or obtain any deficiency or personal judgment against Borrower or those parties listed in the Section 50 Addendum to the Regulatory Agreement, except such judgment or decree as may be necessary to foreclose or bar its interest in the Mortgaged Property and all other property mortgaged, pledged, conveyed or assigned to secure payment of the

---

Previous editions are obsolete        HUD MF Security Instrument        HUD-94000M (6/18)

4680    603
MORTGAGES  Book & Page

16

Indebtedness; provided, that nothing in this Section 6 of this Security Instrument and no action so taken shall operate to impair any obligation under the Regulatory Agreement of Borrower or those parties listed in the Section 50 Addendum to the Regulatory Agreement.

## 7.    DEPOSITS FOR TAXES, INSURANCE AND OTHER CHARGES.

(a)    Borrower shall pay to and deposit with Lender, together with and in addition to the monthly payments of interest or of principal and interest payable under the terms of the Note on the first day of each month after the commencement of amortization under the Note, and continuing until the debt secured hereby is paid in full, the following sums:

(1)    an amount sufficient to provide Lender with funds to pay the next mortgage insurance premium if this Security Instrument and the Note are insured by HUD, or a monthly service charge, if they are held by HUD, as follows:

(i) If and so long as the Note is insured under the provisions of the National Housing Act, as amended, an amount sufficient to accumulate in the hands of Lender one month prior to its due date the annual mortgage insurance premium; or

(ii) If and so long as the Note and this Security Instrument are held by HUD, a monthly service charge in an amount equal to the lesser of the amount permitted by law or the amount set forth in Program Obligations computed for each successive year beginning with the first day of the month following the date of this Security Instrument, or the first day of the month following assignment, if the Note and this Security Instrument are assigned to HUD without taking into account delinquencies or prepayment; and

(2)    a sum equal to the ground rents, if any, next due, plus the premiums that will next become due and payable on policies of fire and other property insurance covering the premises covered hereby, plus water rates, Taxes, municipal/government utility charges and special assessments next due on the premises covered hereby (all as estimated by Lender) less all sums already paid therefore divided by the number of months to the date when such ground rents, premiums, water rates, Taxes, municipal/utility

17

charges and special assessments will become delinquent, such sums to be held by Lender in trust to pay said ground rents, premiums, water rates, Taxes, and special assessments; and

(3)    all payments and deposits mentioned in the two preceding paragraphs of this subsection and all payments to be made under the Note shall be added together and the aggregate amount thereof shall be paid each month in a single payment or deposit to be applied by Lender to the following items in the order set forth:

(i) mortgage insurance premium charges under the Contract of Insurance;

(ii) ground rents, if Lender has required them to be escrowed with Lender, Taxes, special assessments, water rates, municipal/government utility charges, fire and other property insurance premiums;

(iii) interest on the Note; and

(iv) amortization of the principal of the Note.

(b)    Borrower shall pay to and deposit with Lender all other escrows and deposits, including any Reserve for Replacements.

(c)    Borrower shall deposit with Lender such amounts as may be required by any Collateral Agreement and shall perform all other obligations of Borrower under each Collateral Agreement.  Collateral Agreement deposits shall be held in an institution (which may be Lender, if Lender is such an institution) whose deposits or accounts are insured or guaranteed by a federal agency and in accordance with Program Obligations.

## 8.    IMPOSITION DEPOSITS.

(a)    In the event Borrower fails to pay any sums provided for in this Security Instrument, Lender, at its option, may pay the same.  Any excess funds accumulated under Section 7(a) remaining after payment of the items therein mentioned, shall be credited to subsequent monthly payments of the same nature required thereunder; but if any such item shall exceed the estimate therefore, or if Borrower shall fail to pay any other governmental or municipal charge, Borrower shall forthwith make good the deficiency or pay the charge before the same become delinquent or subject to interest or penalties and in default thereof Lender may pay the same.  All sums paid or advanced by Lender and any sums which Lender may be required to advance to pay

4680    605
MORTGAGES  Book & Page

18

mortgage insurance premiums shall be added to the Indebtedness and shall bear interest from the date of payment at the rate specified in the Note and shall be due and payable on demand. In case of termination of the Contract of Insurance by prepayment of the Indebtedness in full or otherwise (except as hereinafter provided), accumulations under Section 7(a) not required to pay sums due under Section 7(a)(3) shall be credited to Borrower. If the Mortgaged Property is sold under foreclosure or is otherwise acquired by Lender after an Event of Default, any remaining balance of the accumulations under Section 7(a) shall be credited to the principal under the Note as of the date of the commencement of foreclosure proceedings or as of the date the Mortgaged Property is otherwise acquired; and accumulations under Section 7 shall be likewise credited unless required to pay sums due HUD under Section 7(a)(3). The amounts deposited under Section 7 and Section 8 are collectively referred to in this Security Instrument as the "**Imposition Deposits**". The obligations of Borrower for which the Imposition Deposits are required are collectively referred to in this Security Instrument as "**Impositions**". The amount of the Imposition Deposits shall be sufficient to enable Lender to pay applicable Impositions before the last date upon which such payment may be made without any penalty or interest charge being added. Lender shall maintain records indicating how much of the monthly Imposition Deposits and how much of the aggregate Imposition Deposits held by Lender are held for the purpose of paying Taxes, insurance premiums and each other obligation of Borrower for which Imposition Deposits are required. Any waiver by Lender of the requirement that Borrower remit Imposition Deposits to Lender may be revoked by Lender, in Lender's discretion, at any time upon Notice to Borrower.

(b)    Imposition Deposits shall be held in accounts insured or guaranteed by a federal agency and in accordance with Program Obligations. Lender shall apply the Imposition Deposits to pay Impositions so long as no Event of Default has occurred and is continuing. Unless required by Program Obligations, Lender shall not be required to pay Borrower any interest, earnings or profits on the Imposition Deposits with the exception of the Reserve for Replacement account or Residual Receipts account (if any). Borrower hereby pledges and grants to Lender a security interest in the Imposition Deposits as additional security for all of Borrower's obligations under this Security Instrument and the Note. Any amounts deposited with Lender under Section 7 shall not be trust funds, nor shall they operate to reduce the Indebtedness.

(c)    If Lender receives a bill or invoice for an Imposition, Lender shall pay the Imposition from the Imposition Deposits held by Lender. Lender shall have no obligation to pay any Imposition to the extent it exceeds Imposition Deposits then held by Lender. Lender may pay an Imposition according to any bill, statement or estimate from the appropriate public office or insurance company without inquiring into the accuracy of the bill, statement or estimate or into the validity of the Imposition.

---

Previous editions are obsolete            HUD MF Security Instrument            HUD-94000M (6/18)

App. 423

4680   606
MORTGAGES   Book & Page

19

(d)     If at any time the amount of the Imposition Deposits held by Lender (other than the Reserve for Replacement or Residual Receipts, if any) for payment of a specific Imposition exceeds the amount reasonably deemed necessary by Lender plus one-sixth of such estimate, the excess shall be credited against future installments of Imposition Deposits.  If at any time the amount of the Imposition Deposits held by Lender for payment of a specific Imposition is less than the amount reasonably estimated by Lender to be necessary plus one-sixth of such estimate, Borrower shall pay to Lender the amount of the deficiency within 15 days after Notice from Lender.

9.     **REGULATORY AGREEMENT.**  Borrower and HUD have executed a Regulatory Agreement, which is being recorded simultaneously with this Security Instrument, and is incorporated in and made a part of this Security Instrument.  Upon Default of the Regulatory Agreement and at the direction of HUD, Lender shall declare the whole of the Indebtedness to be due and payable.

10.     **APPLICATION OF PAYMENTS.**  If at any time Lender receives, from Borrower or otherwise, any amount applicable to the Indebtedness which is less than all amounts due and payable at such time, Lender must apply that payment to amounts then due and payable in the manner and in the order set forth in Section 7(a)(3).  Neither Lender's acceptance of an amount that is less than all amounts then due and payable nor Lender's application of such payment in the manner authorized shall constitute or be deemed to constitute either a waiver of the unpaid amounts or an accord and satisfaction.  Notwithstanding the application of any such amount to the Indebtedness, Borrower's obligations under this Security Instrument and the Note shall remain unchanged.

11.     **COMPLIANCE WITH LAWS.**  Borrower shall comply with all applicable: laws; ordinances; regulations; requirements of any Governmental Authority; lawful covenants and agreements recorded against the Mortgaged Property; so long as the Loan is insured or held by HUD, the Regulatory Agreement, and Program Obligations including lead-based paint maintenance requirements of 24 C.F.R. Part 35, Subpart G, and any successor regulations;  including but not limited to those of the foregoing pertaining to:  health and safety; construction of Improvements on the Mortgaged Property; fair housing; civil rights; zoning and land use; Leases; and maintenance and disposition of tenant security deposits; and, with respect to all of the foregoing, all subsequent amendments, revisions, promulgations or enactments.  Borrower shall at all times maintain records sufficient to demonstrate compliance with the provisions of this Section 11.  Borrower shall take appropriate measures to prevent, and shall not engage in or knowingly permit, any illegal activities at the Mortgaged Property, including those that could endanger tenants or visitors, result in damage to the Mortgaged Property, result in forfeiture of the Mortgaged Property, or otherwise impair the lien created by this Security Instrument or Lender's interest in the Mortgaged Property.  Borrower

---

App. 424

4680   607
MORTGAGES   Book & Page

20

represents and warrants to Lender that no portion of the Mortgaged Property has been or will be purchased with the proceeds of any illegal activity.

**12.   USE OF PROPERTY.** Unless permitted by applicable law and approved by Lender, Borrower shall not (a) allow changes in the use for which all or any part of the Mortgaged Property is being used at the time this Security Instrument was executed, (b) convert any individual dwelling units or common areas to commercial use, (c) initiate or acquiesce in a change in the zoning classification of the Mortgaged Property that results in any change in permitted use that was in effect at the time of initial/final endorsement, (d) establish any condominium or cooperative regime with respect to the Mortgaged Property, (e) materially change any unit configurations or change the number of units in the Mortgaged Property, (f) combine all or any part of the Mortgaged Property with all or any part of a tax parcel which is not part of the Mortgaged Property, (g) subdivide or otherwise split any tax parcel constituting all or any part of the Mortgaged Property, or (h) so long as the Note is insured or held by HUD, permit the Mortgaged Property to be used as transient housing or as a hotel in violation of Section 513 of the National Housing Act, as amended.

**13.   PROTECTION OF LENDER'S SECURITY.**

(a)   If Borrower fails to perform any of its obligations under this Security Instrument, Note or Regulatory Agreement, or if any action or proceeding is commenced which purports to affect the Mortgaged Property, Lender's security or Lender's rights under this Security Instrument, including eminent domain, insolvency, Waste, code enforcement, civil or criminal forfeiture, enforcement of Hazardous Materials Laws, fraudulent conveyance or reorganizations or proceedings involving a bankrupt or decedent, then Lender at Lender's option may make such appearances, advance such sums and take such actions as Lender reasonably deems necessary to perform such obligations of Borrower and to protect Lender's interest, including (1) payment of fees and out-of-pocket expenses of attorneys (including fees for litigation at all levels), accountants, inspectors and consultants, (2) entry upon the Mortgaged Property to make repairs or secure the Mortgaged Property, (3) procurement of the insurance required by Section 19, and (4) payment of amounts which Borrower has failed to pay under Section 16 or any other Section of this Security Instrument.

(b)   Any amounts advanced by Lender for taxes, special assessments, or water rates (which are liens prior to the Security Instrument), for insuring the Project, or for mortgage insurance premiums, which amounts are paid after an Event of Default, shall be added to, and become part of the Indebtedness, and shall be immediately due and payable and shall bear interest from the date of the advance until paid at the Interest Rate specified in the Note.  So long as the Loan is insured or held by HUD, Lender does not have any obligation to make advances except as required under

MORTGAGES  Book & Page

21

Program Obligations, and any advance by Lender other than as required by Program Obligations requires prior written HUD approval before such advance can be added to the Indebtedness.

(c)    Nothing in Section 13 shall require Lender to incur any expense or take any action to protect its security.

**14.    INSPECTION.**  Upon reasonable notice, Lender, its agents, representatives, and designees, may make or cause to be made entries upon and inspections of the Mortgaged Property (including any environmental inspections and tests) during normal business hours, or at any other reasonable time.

## 15.    BOOKS AND RECORDS; FINANCIAL REPORTING.

(a)    Borrower shall keep and maintain at all times at the Mortgaged Property or the management agent's offices, and upon Lender's request shall make available at the Mortgaged Property, complete and accurate books of account and records (including copies of supporting bills and invoices) adequate to reflect correctly the operation of the Mortgaged Property, and copies of all written contracts, Leases, and other instruments that affect the Mortgaged Property.  The books, records, contracts, Leases and other instruments shall be subject to examination and inspection at any reasonable time by Lender.

(b)    If an Event of Default has occurred and is continuing, Borrower shall, at Borrower's expense, deliver to Lender upon written demand all books and records relating to the Mortgaged Property or its operation, which shall be maintained at the Mortgaged Property.

(c)    Borrower authorizes Lender to obtain a credit report on Borrower, at Borrower's expense, at any time.

(d)    Within 120 days after the end of each fiscal year of Borrower, Borrower shall furnish to Lender a statement of income and expenses of Borrower's operation of the Mortgaged Property for that fiscal year, a statement of changes in financial position of Borrower relating to the Mortgaged Property for that fiscal year and, when requested by Lender, a balance sheet showing all assets and liabilities of Borrower relating to the Mortgaged Property as of the end of that fiscal year.  If Borrower's fiscal year is other than the calendar year, Borrower must also submit to Lender a year-end statement of income and expenses within 120 days after the end of the calendar year.  Lender also may require that any statements, schedules or reports required to be delivered to Lender under this Section 15 be audited at Borrower's expense by independent certified public accountants acceptable to Lender.  If Borrower fails to provide in a timely manner

the statements, schedules and reports required by this Section 15, Lender shall have the right to have Borrower's books and records audited, at Borrower's expense, by independent certified public accountants selected by Lender in order to obtain such statements, schedules and reports, and all related costs and expenses of Lender shall become immediately due and payable and shall become an additional part of the Indebtedness. Notwithstanding the foregoing, however, so long as the Loan is insured or held by HUD, Borrower's obligation under this subsection (d) shall be satisfied by the delivery to Lender, concurrently with its delivery to HUD, of a copy of the annual financial statement required to be delivered to HUD in accordance with the Regulatory Agreement.

(e)     Borrower shall deliver to Lender, within 15 days, copies of all operating budgets, capital budgets, and other records or documents concerning the Mortgaged Property or Borrower, reasonably requested by Lender.

## 16.     TAXES; OPERATING EXPENSES.

(a)     Subject to the provisions of Section 16(c) and Section 16(d), Borrower shall pay, or cause to be paid, all Taxes when due and before the addition of any interest, fine, penalty or cost for nonpayment.

(b)     Subject to the provisions of Section 16(c), Borrower shall pay the expenses of operating, managing, maintaining and repairing the Mortgaged Property (including insurance premiums, utilities, repairs and replacements) before the last date upon which each such payment may be made without any penalty or interest charge being added.

(c)     As long as no Event of Default exists and Borrower has timely delivered to Lender any bills or premium notice that it has received, Borrower shall not be obligated to pay Taxes, insurance premiums or any other individual Imposition to the extent that sufficient Imposition Deposits are held by Lender for the purpose of paying that specific Imposition. If an Event of Default exists, Lender may exercise any rights Lender may have with respect to Imposition Deposits without regard to whether Impositions are then due and payable; provided that so long as the Loan is insured by HUD, Lender's exercise of its rights shall be subject to Program Obligations pertaining to claims for mortgage insurance benefits. Lender shall have no liability to Borrower for failing to pay any Impositions to the extent that any Event of Default has occurred and is continuing, insufficient Imposition Deposits are held by Lender at the time an Imposition becomes due and payable or Borrower has failed to provide Lender with bills and premium notice as provided above.

MORTGAGES  Book & Page

23

(d)      Borrower, at its own expense, and, so long as the Loan is insured or held by HUD, in accordance with the Regulatory Agreement, may contest by appropriate legal proceedings, conducted diligently and in good faith, the amount or validity of any Imposition other than insurance premiums, if (1) Borrower notifies Lender of the commencement or expected commencement of such proceedings, (2) the Mortgaged Property is not in danger of being sold or forfeited, (3) Borrower deposits with Lender reserves sufficient to pay the contested Imposition, if requested by Lender, and (4) Borrower furnishes whatever additional security is required in the proceedings or is reasonably requested by Lender, which may include the delivery to Lender of the reserves established by Borrower to pay the contested Imposition.

(e)      Borrower shall promptly deliver to Lender a copy of all Notices of, and invoices for, Impositions, and if Borrower pays any Imposition directly, Borrower shall promptly furnish to Lender receipts evidencing such payments.

**17.    LIENS; ENCUMBRANCES.** (a) Borrower shall not permit the grant, creation or existence of any mortgage, deed of trust, deed to secure debt, security interest or other lien or encumbrance ("**Lien**") on the Mortgaged Property (other than the lien of this Security Instrument, any tax liens which are imposed before payment is due, or any inferior liens which are approved in writing by HUD and Lender), whether voluntary, involuntary or by operation of law, and whether or not such Lien has priority over the lien of this Security Instrument. (b) Borrower shall not repay any HUD-approved inferior Lien from proceeds of the Loan nor from Project Assets other than from Surplus Cash (as defined in the Regulatory Agreement) or Residual Receipts, except, with the prior written approval of HUD, in the case of an inferior Lien created in an operating loss loan insured pursuant to Section 223(d) of the Act or a supplement loan insured pursuant to Section 241 of the Act.

**18.    PRESERVATION, MANAGEMENT AND MAINTENANCE OF MORTGAGED PROPERTY.** Borrower (a) shall not commit Waste, (b) shall not abandon the Mortgaged Property, (c) shall restore or repair promptly, in a good and workmanlike manner, any damaged part of the Mortgaged Property to the equivalent of its original condition, or such other condition as Lender may approve in writing, whether or not litigation or insurance proceeds or condemnation awards are available to cover any costs of such restoration or repair, (d) shall keep the Mortgaged Property in decent, safe, and sanitary condition and good repair, including the replacement of Personalty and Fixtures with items of equal or better function and quality, all in accordance with Program Obligations, (e) shall provide for qualified management of the Mortgaged Property by a residential rental property manager, (f) shall give Notice to Lender of and, unless otherwise directed in writing by Lender, shall appear in and defend, any action or proceeding that could impair the Mortgaged Property, Lender's security or Lender's rights under this Security Instrument, (g) shall not (and shall not permit any tenant or

| Previous editions are obsolete | HUD MF Security Instrument | HUD-94000M (6/18) |

App. 428

4680    611
MORTGAGES  Book & Page

24

other person to) remove, demolish or alter the Mortgaged Property or any part of the Mortgaged Property except that Borrower may dispose of obsolete or deteriorated Fixtures or Personalty if the same are replaced with like items of the same or greater quality or value, or make minor alterations which do not impair the Mortgaged Property, and (h) so long as the Loan is insured or held by HUD, shall not expend any Project funds except from permissible withdrawals of Surplus Cash and except for Reasonable Operating Expenses and necessary repairs without the prior written approval of HUD. So long as the Loan is insured or held by HUD, all expenses incurred by Borrower in connection with the Mortgaged Property shall be incurred in compliance with Program Obligations.

### 19.    PROPERTY AND LIABILITY INSURANCE.

(a)    Borrower shall keep the Mortgaged Property insured at all times against such hazards as Lender may from time to time require, which insurance shall include but not be limited to coverage against loss by fire and allied perils, general boiler and machinery coverage, builders all-risk and business income coverage. Lender's insurance requirements may change from time to time throughout the term of the Indebtedness. If Lender so requires, such insurance shall also include sinkhole insurance, mine subsidence insurance, earthquake insurance, and, if the Mortgaged Property does not conform to applicable zoning or land use laws, building ordinance or law coverage. If any of the Improvements are located in an area identified by the Federal Emergency Management Agency (or any successor to that agency) as an area having special flood hazards, Borrower shall maintain flood insurance covering such Improvements and any machinery, equipment, Fixtures and furnishings contained therein that are funded, in whole or in part, with Loan proceeds in an amount at least equal to its development or project cost (less estimated land cost) or to the maximum limit of coverage made available with respect to the particular type of property under the National Flood Insurance Act of 1968, as amended, or its successor statute, whichever is less, provided that the amount of flood insurance need not exceed the outstanding principal balance of the Note, and flood insurance need not be maintained beyond the term of the Note. If Lender determines that flood insurance has not been obtained in the required amount, Lender must notify Borrower of Borrower's obligations to obtain the proper flood insurance. If Borrower does not obtain such insurance within 45 days of the date of this notification, Lender shall purchase such flood insurance on behalf of Borrower and may charge Borrower for the cost of premiums and fees incurred by Lender in purchasing the flood insurance.

(b)    All premiums on insurance policies required under Section 19(a) shall be paid in the manner provided in Section 7, unless Lender has designated in writing another method of payment. All such policies shall also be in a form approved by Lender. All policies of property damage insurance shall include a non-contributing, non-

| Previous editions are obsolete | HUD MF Security Instrument | HUD-94000M (6/18) |

reporting mortgage clause in a form approved by Lender, and in favor of Lender (and HUD, as their interests appear) and shall name as loss payee Lender, its successors and assigns. Lender shall have the right to hold the original policies or duplicate original policies of all insurance required by Section 19(a). Borrower shall promptly deliver to Lender a copy of all renewal and other notices received by Borrower with respect to the policies and all receipts for paid premiums. At least 30 days prior to the expiration date of a policy, Borrower shall deliver to Lender evidence of continuing coverage in form satisfactory to Lender.

(c)     Borrower shall maintain at all times commercial general liability insurance, workers' compensation insurance and such other liability, errors and omissions and fidelity insurance coverages as Lender may from time to time require, or shall require any appropriate party to maintain at all times commercial general liability insurance, workers' compensation insurance and such other liability, errors and omissions and fidelity insurance coverages as Lender may from time to time require or such other insurance coverage as required by Program Obligations.

(d)     All insurance policies and renewals of insurance policies required by this Section 19 shall be in such amounts and for such periods as Lender may from time to time require, and shall be issued by insurance companies satisfactory to Lender and in accordance with Program Obligations. Lender shall have the right to effect insurance in the event Borrower fails to comply with this Section.

(e)     Borrower shall comply with all insurance requirements and shall not permit any condition to exist on the Mortgaged Property that would invalidate any part of any insurance coverage that this Security Instrument requires Borrower to maintain.

(f)     In the event of loss, Borrower shall give immediate written Notice to the insurance carrier and to Lender. Borrower hereby authorizes and appoints Lender as attorney-in-fact for Borrower to make proof of loss, to adjust and compromise any claims under policies of property damage insurance, to appear in and prosecute any action arising from such property damage insurance policies, to collect and receive the proceeds of property damage insurance, and to deduct from such proceeds Lender's expenses incurred in the collection of such proceeds. This power of attorney is coupled with an interest and therefore is irrevocable. Borrower shall notify Lender of any payment received from any insurer. Lender shall (1) hold the balance of such proceeds to be used to reimburse Borrower for the cost of restoring and repairing the Mortgaged Property to the equivalent of its original condition or to a condition approved by Lender, or (2) apply the balance of such proceeds to the payment of the Indebtedness, whether or not then due. No amount applied to the reduction of the principal amount of the Indebtedness in accordance with this Section 19(f) shall be considered an optional prepayment as the term is used in this Security Instrument and the Note secured

4680    613
MORTGAGES  Book & Page

26

hereby, nor relieve Borrower from continuing to make regular monthly payments in the amount required by the Note. To the extent Lender determines to apply insurance proceeds to restoration, Lender shall do so in accordance with Lender's then-current policies relating to the restoration of casualty damage on similar multifamily properties; provided that so long as the Loan is insured or held by HUD, insurance proceeds shall be applied as approved by HUD and in accordance with Program Obligations pursuant to Section 19(g) below.

(g)    Lender shall not exercise its option to apply insurance proceeds to the payment of the Indebtedness if all of the following conditions are met:  (1) no Event of Default (or any event which, with the giving of Notice or the passage of time, or both, would constitute an Event of Default) has occurred and is continuing; (2) Lender determines, in its discretion, that there will be sufficient funds to complete the restoration; (3) Lender determines, in its discretion, that the rental income from the Mortgaged Property after completion of the restoration will be sufficient to meet all operating costs and other expenses, Imposition Deposits, deposits to reserves and loan repayment obligations relating to the Mortgaged Property; and (4) Lender determines, in its discretion, that the restoration will be completed before the earlier of (A) one year before the maturity date of the Note or (B) one year after the date of the loss or casualty.  Further, so long as the Loan is insured by HUD, Lender may not exercise its option to apply insurance proceeds to the payment of the Indebtedness without the prior written approval of HUD.  In seeking this approval, Lender shall provide evidence acceptable to HUD that there has been a total loss of the Mortgaged Property such that complete restoration is improbable.  If HUD fails to give its approval to the use or application of such funds within 60 days after the written request by Lender, Lender may use or apply such funds for any of the purposes specified herein without the approval of HUD.

(h)    If the Mortgaged Property is sold at a foreclosure sale or Lender or HUD acquire title to the Mortgaged Property, Lender and HUD, as applicable, shall automatically succeed to all rights of Borrower in and to any insurance policies and unearned insurance premiums and in and to the proceeds of property damage insurance resulting from any damage to the Mortgaged Property prior to such sale or acquisition.

## 20.    CONDEMNATION.

(a)    Borrower shall promptly notify Lender of any action or proceeding relating to any condemnation or other taking, or conveyance in lieu thereof, of all or any part of the Mortgaged Property, whether direct or indirect condemnation.  Borrower shall appear in and prosecute or defend any action or proceeding relating to any condemnation unless otherwise directed by Lender in writing.  Borrower authorizes and

---

4680    614
MORTGAGES    Book & Page

27

appoints Lender as attorney-in-fact for Borrower to commence, appear in and prosecute, in Lender's or Borrower's name, any action or proceeding relating to any condemnation and to settle or compromise any claim in connection with any condemnation. This power of attorney is coupled with an interest and therefore is irrevocable. However, nothing contained in this Section 20 shall require Lender to incur any expense or take any action. Borrower hereby transfers and assigns to Lender all right, title and interest of Borrower in and to any award or payment with respect to (1) any condemnation, or any conveyance in lieu of condemnation, and (2) any damage to the Mortgaged Property caused by governmental action that does not result in a condemnation.

(b)    All awards of compensation in connection with condemnation for public use of or a taking of any of the Mortgaged Property shall be paid to Lender to be applied (1) to fees, costs and expenses (including reasonable attorneys' fees) incurred by Lender; and (2) to the amount due under the Note secured hereby in (i) amounts equal to the next maturing installment or installments of principal and (ii) with any balance to be credited to the next payment due under the Note. After payment to Lender of all fees, costs and expenses (including reasonable attorneys' fees) incurred by Lender under this Section 20, all awards of damages in connection with any condemnation for public use of or damage to the Mortgaged Property, shall be paid to Lender to be applied to an account held for and on behalf of Borrower, which account shall, at the option of Lender, either be applied to the amount due under the Note as specified in the preceding sentence, or be disbursed for the restoration. No amount applied to the reduction of the principal amount due in accordance with this Section 20(b) shall be considered an optional prepayment as the term is used in this Security Instrument and the Note secured hereby, nor relieve Borrower from making regular monthly payments commencing on the first day of the first month following the date of receipt of the award. Lender is hereby authorized in the name of Borrower to execute and deliver necessary releases or approvals or to appeal from such awards.

## 21.    TRANSFERS OF THE MORTGAGED PROPERTY OR INTERESTS IN BORROWER.

(a)    So long as the Loan is insured or held by HUD, Borrower shall not, without the prior written approval of HUD, convey, assign, transfer, pledge, hypothecate, encumber or otherwise dispose of the Mortgaged Property or any interest therein or permit the conveyance, assignment or transfer of any interest in Borrower (if the effect of such conveyance, assignment or transfer is the creation or elimination of a Principal), unless permitted by Program Obligations. Lender may charge Borrower a fee, in accordance with Program Obligations, for Lender's additional responsibilities related to Borrower's actions in this Section 21. Borrower need not obtain the prior written approval of HUD for: (1) a conveyance of the Mortgaged Property at a judicial or non-

---

Previous editions are obsolete                HUD MF Security Instrument                HUD-94000M (6/18)

4680    615
MORTGAGES  Book & Page

28

judicial foreclosure sale under this Security Instrument, (2) inclusion of the Mortgaged Property in a bankruptcy estate by operation of law under the United States Bankruptcy Code, or (3) acquisition of an interest by inheritance or by Court decree.

(b)    If the Loan is no longer insured or held by HUD, Borrower shall not convey, assign, transfer, pledge, hypothecate, encumber or otherwise dispose of the Mortgaged Property or any interest therein or permit the conveyance, assignment or transfer of any interest in Borrower without the prior written approval of Lender in its sole discretion.

22.    **EVENTS OF DEFAULT.** The occurrence of any one or more of the following shall constitute either a Monetary Event of Default or a Covenant Event of Default under this Security Instrument:

(a)    Monetary Event of Default:  Any failure by Borrower to pay or deposit when due any amount required by the Note or Section 7(a) of this Security Instrument.

(b)    Covenant Events of Default shall include:

(1)    fraud or material misrepresentation or material omission by Borrower, any of its officers, directors, trustees, general partners, members, managers or any guarantor in connection with (i) the Loan Application for or creation of the Indebtedness, (ii) any financial statement, rent roll, or other report or information provided to Lender during the term of the Indebtedness, or (iii) any request for Lender's consent to any proposed action under this Security Instrument or the Note;

(2)    the commencement of a forfeiture action or proceeding, whether civil or criminal, which, in Lender's reasonable judgment, could result in a forfeiture of the Mortgaged Property or otherwise materially impair the lien created by this Security Instrument or Lender's interest in the Mortgaged Property;

(3)    any material failure by Borrower to perform or comply with any of its obligations under this Security Instrument (other than those specified in Section 22(a) and Section 22(b)(1) and (b)(2)), as and when required, which continues for a period of 30 days after Notice of such failure by Lender to Borrower.  However, no such Notice shall apply in the case of any such material failure which could, in Lender's judgment, absent immediate exercise by Lender of a right

---

Previous editions are obsolete          HUD MF Security Instrument          HUD-94000M (6/18)

App. 433

4680    616
MORTGAGES  Book & Page

29

or remedy under this Security Instrument, result in harm to Lender or impairment of the Note or this Security Instrument; and,

(4)    so long as the Loan is insured or held by HUD, any failure by Borrower to perform any of its obligations as and when required under the Regulatory Agreement, which failure continues beyond the applicable cure period, if any, specified in the Regulatory Agreement; however, Violations under the terms of the Regulatory Agreement may only be treated as a default under this Security Instrument if HUD instructs Lender to treat them as such.

(c)    Lender shall deliver Notice to any Principal(s) of Borrower identified in Section 31, within five (5) Business Days in each case where Lender has delivered Notice to Borrower of an Event of Default, in order to provide such Principal(s) an opportunity to cure either a Monetary Event of Default or a Covenant Event of Default.

**23.    REMEDIES CUMULATIVE.**  Each right and remedy provided in this Security Instrument is distinct from all other rights or remedies under this Security Instrument, the Note, or so long as the Loan is insured or held by HUD, HUD's remedies under the Regulatory Agreement or afforded by applicable law, and each shall be cumulative and may be exercised concurrently, independently, or successively, in any order.

**24.    FORBEARANCE.**

(a)    So long as the Loan is insured by HUD, Lender shall not without obtaining the prior written consent of HUD, take any of the following actions:  extend the time for payment of all or any part of the Indebtedness; reduce the payments due under this Security Instrument or the Note; release anyone liable for the payment of any amounts under this Security Instrument or the Note; accept a renewal of the Note; modify the terms and time of payment of the Indebtedness; join in any extension or subordination agreement; release any Mortgaged Property; take or release other or additional security; modify the rate of interest or period of amortization of the Note or change the amount of the monthly installments payable under the Note; and otherwise modify this Security Instrument or the Note.  However, if the Contract of Insurance has been terminated, Lender may (but shall not be obligated to) agree with Borrower to any of the aforementioned actions in this Section and Lender shall not have to give Notice to or obtain the consent of any guarantor or third-party obligor.

(b)    Any forbearance by Lender in exercising any right or remedy under the Note, this Security Instrument, or any other Loan Document or otherwise afforded by

App. 434

4680   617
MORTGAGES   Book & Page

30

applicable law, shall not be a waiver of or preclude the exercise of any right or remedy. The acceptance by Lender of payment of all or any part of the Indebtedness after the due date of such payment, or in an amount that is less than the required payment, shall not be a waiver of Lender's right to require prompt payment when due of all other payments on account of the Indebtedness or to exercise any right or remedy for any failure to make prompt payment. Enforcement by Lender of any security for the Indebtedness shall not constitute an election by Lender of remedies so as to preclude the exercise of any other right available to Lender. Lender's receipt of any proceeds or awards under Section 19 and Section 20 shall not operate to cure or waive any Event of Default.

25.   **LOAN CHARGES.** If any applicable law limiting the amount of interest or other charges permitted to be collected from Borrower in connection with the Loan is interpreted so that any interest or other charge provided for in any Loan Document, whether considered separately or together with other charges provided for in any Loan Document, violates that law, and Borrower is entitled to the benefit of that law, that interest or charge is hereby reduced to the extent necessary to eliminate that violation. The amounts, if any, previously paid to Lender in excess of the permitted amounts shall be applied by Lender to reduce the principal of the Indebtedness. For the purpose of determining whether any applicable law limiting the amount of interest or other charges permitted to be collected from Borrower has been violated, all Indebtedness that constitutes interest, as well as all other charges made in connection with the Indebtedness that constitute interest, shall be deemed to be allocated and spread ratably over the stated term of the Note. Unless otherwise required by applicable law, such allocation and spreading shall be effected in such a manner that the rate of interest so computed is uniform throughout the stated term of the Note.

26.   **WAIVER OF STATUTE OF LIMITATIONS.** To the extent permitted by law, Borrower hereby waives the right to assert any statute of limitations as a bar to the enforcement of the lien of this Security Instrument or to any action brought to enforce any of the Loan Documents.

27.   **WAIVER OF MARSHALLING.** Notwithstanding the existence of any other security interests in the Mortgaged Property held by Lender or by any other party, Lender shall have the right to determine the order in which any or all of the Mortgaged Property shall be subjected to the remedies provided in this Security Instrument and the Note or applicable law. Lender shall have the right to determine the order in which any or all portions of the Indebtedness are satisfied from the proceeds realized upon the exercise of such remedies. Borrower and any party who now or in the future acquires a security interest in the Mortgaged Property and who has actual or constructive notice of this Security Instrument waives any and all right to require the marshalling of assets or to require that any of the Mortgaged Property be sold in the inverse order of alienation

4680   618
MORTGAGES   Book & Page

31

or that any of the Mortgaged Property be sold in parcels or as an entirety in connection with the exercise of any of the remedies permitted by applicable law or provided in this Security Instrument.

**28.   FURTHER ASSURANCES.**  Borrower shall execute, acknowledge, and deliver, at its sole cost and expense, all further acts, deeds, conveyances, assignments, estoppel certificates, financing statements, transfers and assurances as Lender may require from time to time in order to better assure, grant, and convey to Lender the rights intended to be granted, now or in the future, to Lender under this Security Instrument and the Note.

**29.   ESTOPPEL CERTIFICATE.**  Within ten (10) days after a request from Lender, Borrower shall deliver to Lender a written statement, signed and acknowledged by Borrower, certifying to Lender or any person designated by Lender, as of the date of such statement, (a) that the Note, the Regulatory Agreement (so long as the Loan is insured or held by HUD), and this Security Instrument are unmodified and in full force and effect (or, if there have been modifications, that the Note, the Regulatory Agreement (so long as the Loan is insured or held by HUD), and this Security Instrument are in full force and effect as modified and setting forth such modifications); (b) the unpaid principal balance of the Note; (c) the date to which interest under the Note has been paid; (d) that Borrower is not in default in paying the Indebtedness or in performing or observing any of the covenants or agreements contained in the Note, the Regulatory Agreement (so long as the Loan is insured or held by HUD), and this Security Instrument (or, if Borrower is in default, describing such default in reasonable detail); (e) whether or not there are then existing any setoffs or defenses known to Borrower against the enforcement of any right or remedy of Lender under the Note, the Regulatory Agreement (so long as the Loan is insured or held by HUD), and this Security Instrument; and (f) any additional facts requested by Lender.

**30.   GOVERNING LAW; CONSENT TO JURISDICTION AND VENUE.**

(a)   This Security Instrument and the Note, if it does not itself expressly identify the law that is to apply to it, shall be governed by the laws of the jurisdiction in which the Land is located (**"Property Jurisdiction"**), except so long as the Loan is insured or held by HUD, and solely as to rights and remedies of HUD, as such local or state laws may be preempted by federal law.

(b)   Borrower agrees that any controversy arising under or in relation to the Note or this Security Instrument shall be litigated exclusively in the Property Jurisdiction except as, so long as the Loan is insured or held by HUD and solely as to rights and remedies of HUD, federal jurisdiction may be appropriate pursuant to any federal requirements. The state courts, and with respect to HUD's rights and remedies, federal

App. 436

32

courts, and Governmental Authorities in the Property Jurisdiction shall have exclusive jurisdiction over all controversies which shall arise under or in relation to the Note, any security for the Indebtedness, or this Security Instrument.  Borrower irrevocably consents to service, jurisdiction, and venue of such courts for any such litigation and waives any other venue to which it might be entitled by virtue of domicile, habitual residence or otherwise.

## 31.   NOTICE.

(a)   All notices, demands and other communications (**"Notice"**) under or concerning this Security Instrument shall be in writing.  Each Notice shall be addressed to the intended recipients at their respective addresses set forth in this Security Instrument, and shall be deemed given on the earliest to occur of (1) the date when the Notice is received by the addressee; (2) the first Business Day after the Notice is delivered to a recognized overnight courier service, with arrangements made for payment of charges for next Business Day delivery; or (3) the third Business Day after the Notice is deposited in the United States mail with postage prepaid, certified mail, return receipt requested.  As used in this Section 31, the term (**"Business Day"**) means any day other than a Saturday or a Sunday, a federal holiday or holiday in the state where the Project is located or other day on which the federal government or the government of the state where the Project is located is not open for business.  When not specifically designated as a Business Day, the term "**day**" shall refer to a calendar day.  Failure of Lender to send Notice to Borrower or its Principal(s) shall not prevent the exercise of Lender's rights or remedies under this Security Instrument or under the Loan Documents.

(b)   Any party to this Security Instrument may change the address to which Notices intended for it are to be directed by means of Notice given to the other party in accordance with this Section 31.  Each party agrees that it shall not refuse or reject delivery of any Notice given in accordance with this Section 31, that it shall acknowledge, in writing, the receipt of any Notice upon request by the other party and that any Notice rejected or refused by it shall be deemed for purposes of this Section 31 to have been received by the rejecting party on the date so refused or rejected, as conclusively established by the records of the U.S. Postal Service or the courier service.

(c)   Any Notice under the Note which does not specify how Notice is to be given shall be given in accordance with this Section 31.

---

Previous editions are obsolete            HUD MF Security Instrument                    HUD-94000M (6/18)

MORTGAGES  Book & Page

33

**BORROWER:**
D4OP LLC
Attn: Timothy Barton
13901 Midway Rd, Suite 102
Dallas, TX 75244-4388

**PRINCIPAL(S)/RELATED PARTIES:**

Timothy Barton
13901 Midway Rd, Suite 102
Dallas, TX 75244-4388

JMJD4, LLC
Attn: Timothy Barton
13901 Midway Rd, Suite 102
Dallas, TX 75244-4388

**LENDER:**
Greystone Funding Company LLC
Attn: General Counsel
419 Belle Air Lane
Warrenton, VA 20186

**32.    SALE OF NOTE; CHANGE IN SERVICER.** The Note or a partial interest in the Note (together with this Security Instrument) may be sold one or more times without prior Notice to Borrower.  A sale may result in a change of the loan servicer. There also may be one or more changes of the loan servicer unrelated to a sale of the Note.  If there is a sale or transfer of all or a partial interest in the Note or a change of the loan servicer, Lender shall be responsible for ensuring that Borrower is given Notice of the sale, transfer and/or change. Any loan servicer, including any loan servicer resulting from any changes mentioned above, must be approved by HUD in accordance with Program Obligations.

**33.    SINGLE ASSET BORROWER.** Until the Indebtedness is paid in full or unless otherwise approved in writing by HUD so long as the Loan is insured or held by HUD, (a) Borrower shall be a single purpose entity and shall maintain the assets of the Mortgaged Property in segregated accounts and (b) Borrower (1) shall not acquire any real or personal property other than the Mortgaged Property and personal property related to the operation and maintenance of the Mortgaged Property, and so long as the Loan is insured or held by HUD, except pursuant to the Regulatory Agreement and Program Obligations and (2) shall not own or operate any business other than the management and operation of the Mortgaged Property, and so long as the Loan is insured or held by HUD, except pursuant to the Regulatory Agreement and Program Obligations.

**34.    SUCCESSORS AND ASSIGNS BOUND.** This Security Instrument shall bind, and the rights granted by this Security Instrument shall inure to, the respective successors and assigns of Lender and Borrower.

| Previous editions are obsolete | HUD MF Security Instrument | HUD-94000M (6/18) |

App. 438

34

·35.·    **JOINT AND SEVERAL LIABILITY.** If more than one person or entity signs this Security Instrument as Borrower, the obligations of such persons and entities shall be joint and several.

36.    **RELATIONSHIP OF PARTIES; NO THIRD-PARTY BENEFICIARY.**

(a)    The relationship between Lender and Borrower shall be solely that of creditor and debtor, respectively, and nothing contained in this Security Instrument shall create any other relationship between Lender and Borrower. Borrower agrees that it is not a third-party beneficiary to the Contract of Insurance between HUD and Lender, as more fully set forth in 24 C.F.R. Part 207, Subpart B.

(b)    No creditor of any party to this Security Instrument and no other person (the term "person" includes, but is not limited to, any commercial or governmental entity or institution) shall be a third-party beneficiary of this Security Instrument, the Note, or so long as the Loan is insured or held by HUD, the Regulatory Agreement. Without limiting the generality of the preceding sentences, (1) any servicing arrangement between Lender and any loan servicer for loss sharing or interim advancement of funds shall constitute a contractual obligation of such loan servicer that is independent of the obligation of Borrower for the payment of the Indebtedness, (2) Borrower shall not be a third-party beneficiary of any servicing arrangement, and (3) no payment by the loan servicer under any servicing arrangement shall reduce the amount of the Indebtedness.

37.    **SEVERABILITY; AMENDMENTS.** The invalidity or unenforceability of any provision of this Security Instrument shall not affect the validity or enforceability of any other provision, and all other provisions shall remain in full force and effect. This Security Instrument contains the entire agreement among the parties as to the rights granted and the obligations assumed in this Security Instrument. This Security Instrument may not be amended or modified except by a writing signed by the party against whom enforcement is sought.

38.    **RULES OF CONSTRUCTION.** The captions and headings of the Sections of this Security Instrument are for convenience only and shall be disregarded in construing this Security Instrument. Any reference in this Security Instrument to an **"Exhibit"** or a **"Section"** shall, unless otherwise explicitly provided, be construed as referring, respectively, to an Exhibit attached to this Security Instrument or to a Section of this Security Instrument. All Exhibits attached to or referred to in this Security Instrument are incorporated by reference into this Security Instrument. Use of the singular in this Security Instrument includes the plural and use of the plural includes the singular. As used in this Security Instrument, the term **"including"** means "including, but not limited to."

---

Previous editions are obsolete                HUD MF Security Instrument                HUD-94000M (6/18)

35

**39.    LOAN SERVICING.** All actions regarding the servicing of the Note, including the collection of payments, the giving and receipt of Notice, inspections of the Mortgaged Property, inspections of books and records, and the granting of consents and approvals, may be taken by the HUD-approved loan servicer unless Borrower receives Notice to the contrary. If Borrower receives conflicting Notices regarding the identity of the loan servicer or any other subject, any such Notice from Lender shall govern; provided that so long as the Loan is insured or held by HUD, if Borrower receives conflicting Notice regarding the identity of the loan servicer or any other subject, any such Notice from Lender shall govern unless there is a Notice from HUD and, in all cases, any Notice from HUD governs notwithstanding any Notice from any other party.

**40.    DISCLOSURE OF INFORMATION.** To the extent permitted by law, Lender may furnish information regarding Borrower or the Mortgaged Property to third parties with an existing or prospective interest in the servicing, enforcement, evaluation, performance, purchase or securitization of the Indebtedness, including but not limited to trustees, master servicers, special servicers, rating agencies, and organizations maintaining databases on the underwriting and performance of multifamily mortgage loans.

**41.    NO CHANGE IN FACTS OR CIRCUMSTANCES.** Borrower certifies that all information in the application for the Loan submitted to Lender (the **"Loan Application"**) and in all financial statements, rent rolls, reports, certificates and other documents submitted in connection with the Loan Application are complete and accurate in all material respects and that there has been no material adverse change in any fact or circumstance that would make any such information incomplete or inaccurate. The submission of false or incomplete information shall be a Covenant Event of Default.

**42.    ESTOPPEL.** The Lender is not the agent of HUD. Any action by Lender in exercising any right or remedy under this Security Instrument shall not be a waiver or preclude the exercise by HUD of any right or remedy which HUD might have under the Regulatory Agreement or other Program Obligations.

**43.    ACCELERATION; REMEDIES.** If a Monetary Event of Default occurs and is continuing for a period of thirty (30) days, Lender, at Lender's option, may declare the Indebtedness to be immediately due and payable without further demand, and may invoke the power of sale and any other remedies permitted by applicable law or provided in this Security Instrument or in the Note. Following a Covenant Event of Default, Lender, at Lender's option, but so long as the Loan is insured or held by HUD, only after receipt of the prior written approval of HUD, may declare the Indebtedness to

---

36

be immediately due and payable without further demand, and may invoke the power of sale and any other remedies permitted by applicable law or provided in this Security Instrument or in the Note.  Borrower acknowledges that the power of sale granted in this Security Instrument may be exercised by Lender without prior judicial hearing.  Lender shall be entitled to collect all costs and expenses incurred in pursuing such remedies, including reasonable attorneys' fees (including but not limited to appellate litigation), costs of documentary evidence, abstracts and title reports.

**[INSERT PROVISIONS PERTAINING TO SALE AS APPROPRIATE UNDER STATE LAW IF NOT OTHERWISE ADDRESSED BY AN ATTACHED FORM STATE ADDENDUM]**

**44.    FEDERAL REMEDIES.**  In addition to any rights and remedies set forth in the Regulatory Agreement, HUD has rights and remedies under federal law so long as HUD is the insurer or holder of the Loan, including but not limited to the right to foreclose pursuant to the Multifamily Mortgage Foreclosure Act of 1981, 12 U.S.C. Section 3701, *et seq.*, as amended, when HUD is the holder of the Note.

**45.    REMEDIES FOR WASTE.**  In addition to any other rights and remedies set forth in the Note and this Security Instrument or those available under applicable law, including exemplary damages where permitted, the following remedies for Waste by Borrower are available to Lender as necessary to give complete redress to Lender for Lender's loss or damage:

(a)    the exercise of the remedies available to Lender during the existence of a Covenant Event of Default, as set forth in Section 43 of this Security Instrument;

(b)    an injunction prohibiting future Waste or requiring correction of Waste already committed, but only to the extent that Waste has impaired or threatens to impair Lender's security; and

(c)    recovery of damages, limited by the amount of Waste, to the extent that Waste has impaired Lender's security.  So long as the Loan is insured or held by HUD, any recovery of damages by Lender or HUD for Waste shall be applied, at the sole discretion of HUD, (1) to fees, costs and expenses (including reasonable attorneys' fees) incurred by Lender; (2) to remedy Waste of the Mortgaged Property, (3) to the Indebtedness or (4) for any other purpose designated by HUD.

**46.    TERMINATION OF HUD RIGHTS AND REFERENCES.**  At such time as HUD no longer insures or holds the Note, (a) all rights and responsibilities of HUD shall conclude, all mortgage insurance and references to mortgage insurance premiums, all references to HUD, GNMA and Program Obligations and related terms and provisions

37

shall cease, and all rights and obligations of HUD shall terminate; (b) all obligations and responsibilities of Borrower to HUD shall likewise terminate; and (c) all obligations and responsibilities of Lender to HUD shall likewise terminate; provided, however, nothing contained in this Section 46, shall in any fashion discharge Borrower from any obligations to HUD under the Regulatory Agreement or Program Obligations or Lender from any obligations to HUD under Program Obligations, which occurred prior to termination of the Contract of Insurance. The provisions of this Section 46 shall be given effect automatically upon the termination of the Contract of Insurance or the transfer of this Security Instrument by HUD to another party, provided that upon the request of Borrower, Lender or the party to whom the Security Instrument has been transferred, at no cost to HUD, HUD shall execute such documents as may be reasonably requested to confirm the provisions of this Section 46.

47. **CONSTRUCTION FINANCING.** The Indebtedness represents funds to be used in the construction of certain Improvements on the Land, in accordance with the Building Loan Agreement which is incorporated herein by reference to the same extent and effect as if fully set forth and made herein (provided, however, that if and to the extent that the Building Loan Agreement is inconsistent herewith, this Security Instrument shall govern). If the construction of the Improvements to be made pursuant to the Building Loan Agreement are not made in accordance with the terms of said Building Loan Agreement, or Borrower otherwise defaults under the Building Loan Agreement, Lender, after due Notice to Borrower, or any subsequent owner, is hereby vested with full and complete authority to enter upon the Land to employ watchmen to protect such Improvements from depredation or injury and to preserve and protect the Personalty therein, to continue any and all outstanding contracts for the erection and completion of said Improvements, to make and enter into any contracts and obligations wherever necessary, either in its own name or in the name of Borrower, or other owner, and to pay and discharge all debts, obligations, and liabilities incurred thereby. All such sums so advanced by Lender (exclusive of advances of the principal of the Indebtedness) shall be added to the principal of the Indebtedness secured hereby and all shall be secured by this Security Instrument and shall be due and payable on demand with interest at the rate provided in the Note, but no such advances shall be insured unless same are specifically approved by HUD prior to the making thereof. The Indebtedness shall, at the option of Lender or holder of this Security Instrument and the Note, become due and payable on the failure of Borrower, or other owner, to keep and perform any of the covenants, conditions and agreements of the Building Loan Agreement. This covenant shall be terminated upon the completion of the Improvements to the satisfaction of Lender and the making of the final advance as provided in the Building Loan Agreement.

48. **ENVIRONMENTAL HAZARDS.**

4680     625
MORTGAGES   Book & Page

38

(a)    Definitions:

(1)    **"Hazardous Materials"** means petroleum and petroleum products and compounds containing them, including gasoline, diesel fuel and oil; explosives; flammable materials; radioactive materials; polychlorinated biphenyls (**"PCBs"**) and compounds containing them; lead and lead-based paint; asbestos or asbestos-containing materials in any form that is or could become friable; underground or above-ground storage tanks, whether empty or containing any substance; any substance the presence of which on the Mortgaged Property is prohibited by any Governmental Authority; any substance that requires special handling; and any other material or substance now or in the future defined as a "hazardous substance," "hazardous material," "hazardous waste," "toxic substance," "toxic pollutant," "contaminant," or "pollutant" within the meaning of any Hazardous Materials Law.

(2)    **"Hazardous Materials Laws"** means all federal, state, and local laws, ordinances and regulations and standards, rules, policies and other governmental requirements, administrative rulings and court judgments and decrees in effect now or in the future and including all amendments that relate to Hazardous Materials and apply to Borrower or to the Mortgaged Property.  Hazardous Materials Laws include, but are not limited to, the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. Section 9601, *et seq.*, the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, *et seq.*, the Toxic Substance Control Act, 15 U.S.C. Section 2601, *et seq.*, the Clean Water Act, 33 U.S.C. Section 1251, *et seq.*, and the Hazardous Materials Transportation Act, 49 U.S.C. Section 5101, *et seq.*, and their state analogs.

(3)    **"Environmental Permit"** means any permit, license, or other authorization issued under any Hazardous Materials Law with respect to any activities or businesses conducted on or in relation to the Mortgaged Property.

(b)    Except for (1) matters covered by a written program of operations and maintenance approved in writing by Lender (**"O&M Program"**); (2) matters described in subsection (c) of this Section 48; or (3) (for so long as the Loan is insured or held by HUD) matters covered by Program Obligations that may differ from this Section 48 (with

App. 443

4680    626
MORTGAGES  Book & Page

39

respect to lead based paint requirements, for example), Borrower shall not cause or permit any of the following:

> (i)     any occurrence or condition on the Mortgaged Property or any other property of Borrower that is adjacent to the Mortgaged Property, which occurrence or condition is or may be in violation of Hazardous Materials Laws; or

> (ii)    any violation of or noncompliance with the terms of any Environmental Permit with respect to the Mortgaged Property or any property of Borrower that is adjacent to the Mortgaged Property.

The matters described in clauses (i) and (ii) above are referred to collectively in this Section 48 as **"Prohibited Activities or Conditions."**

   (c)     Prohibited Activities and Conditions shall not include the safe and lawful use and storage of quantities of (1) supplies, cleaning materials and petroleum products customarily used in the operation and maintenance of comparable multifamily properties; (2) cleaning materials, personal grooming items and other items sold in containers for consumer use and used by tenants and occupants of residential dwelling units in the Mortgaged Property; and (3) petroleum products used in the operation and maintenance of motor vehicles and motor-operated equipment from time to time located on the Mortgaged Property's parking areas, so long as all of the foregoing are used, stored, handled, transported and disposed of in compliance with Hazardous Materials Laws.

   (d)     Borrower shall take all commercially reasonable actions (including the inclusion of appropriate provisions in any Leases executed after the date of this Security Instrument) to prevent its employees, agents, and contractors, and all tenants and other occupants from causing or permitting any Prohibited Activities or Conditions. Borrower shall not lease or allow the sublease or use of all or any portion of the Mortgaged Property to any tenant or subtenant for nonresidential use by any user that, in the ordinary course of its business, would cause or permit any Prohibited Activity or Condition.

   (e)     If an O&M Program has been established with respect to Hazardous Materials, Borrower shall comply in a timely manner with, and cause all employees, agents, and contractors of Borrower and any other persons encompassed by the O&M Program and present on the Mortgaged Property to comply with the O&M Program. All costs of performance of Borrower's obligations under any O&M Program shall be paid by Borrower, and Lender's out-of-pocket costs incurred in connection with the

| Previous editions are obsolete | HUD MF Security Instrument | HUD-94000M (6/18) |

App. 444

monitoring and review of the O&M Program and Borrower's performance shall be paid by Borrower upon demand by Lender.  Any such out-of-pocket costs of Lender which Borrower fails to pay promptly shall become an additional part of the Indebtedness as provided in Section 13; provided that so long as the Loan is insured by HUD, no advances made by Lender under this subsection (e) shall become an additional part of the Indebtedness unless such advances receive the prior written approval of HUD and provided further that unless approved by HUD, Lender shall have no obligation to make any such advances.

(f)     Borrower represents and warrants to Lender that, except as previously disclosed by Borrower to Lender in writing:

(1)     Borrower has not at any time engaged in, caused or permitted any Prohibited Activities or Conditions;

(2)     to the best of Borrower's knowledge after reasonable and diligent inquiry, no Prohibited Activities or Conditions exist or have existed;

(3)     the Mortgaged Property does not now contain any underground storage tanks, and, to the best of Borrower's knowledge after reasonable and diligent inquiry, the Mortgaged Property has not contained any underground storage tanks in the past.  If there is an underground storage tank located on the Mortgaged Property that has been previously disclosed by Borrower to Lender in writing, that tank complies with all requirements of Hazardous Materials Laws;

(4)     Borrower has complied with all Hazardous Materials Laws, including all requirements for notification regarding releases of Hazardous Materials.  Without limiting the generality of the foregoing, Borrower has obtained all Environmental Permits required for the operation of the Mortgaged Property in accordance with Hazardous Materials Laws now in effect and all such Environmental Permits are in full force and effect;

(5)     no event has occurred with respect to the Mortgaged Property that constitutes, or with the passing of time or the giving of Notice would constitute, noncompliance with the terms of any Environmental Permit;

(6)     to the best of Borrower's knowledge after reasonable and diligent inquiry, there are no actions, suits, claims or proceedings, pending

---

Previous editions are obsolete           HUD MF Security Instrument                    HUD-94000M (6/18)

or threatened, that involve the Mortgaged Property and allege, arise out of, or relate to any Prohibited Activity or Condition; and

(7)     Borrower has not received any complaint, order, notice of violation or other communication from any Governmental Authority with regard to air emissions, water discharges, noise emissions or Hazardous Materials, or any other environmental, health or safety matters affecting the Mortgaged Property or any other property of Borrower that is adjacent to the Mortgaged Property that have not previously been resolved legally.

The representations and warranties in this Section 48 shall be continuing representations and warranties that shall be deemed to be made by Borrower throughout the term of the Loan, until the Indebtedness has been paid in full.

(g)     Borrower shall promptly notify Lender in writing upon the occurrence of any of the following events:

(1)     Borrower's discovery of any Prohibited Activity or Condition;

(2)     Borrower's receipt of or knowledge of any complaint, order, notice of violation or other communication from any Governmental Authority or other person with regard to present or future alleged Prohibited Activities or Conditions or any other environmental, health or safety matters affecting the Mortgaged Property or any other property of Borrower that is adjacent to the Mortgaged Property; and

(3)     any representation or warranty in this Section 48 becoming untrue after the date of this Security Instrument.

Any such Notice given by Borrower shall not relieve Borrower of, or result in a waiver of, any obligation under this Security Instrument, the Note, or any other Loan Document.

(h)     Borrower shall pay promptly the costs of any environmental inspections, tests or audits ("**Environmental Inspections**") required by Lender in connection with any foreclosure or deed in lieu of foreclosure, or as a condition of Lender's consent to any transfer under Section 21, or required by Lender following a reasonable determination by Lender that Prohibited Activities or Conditions may exist.  Any such costs incurred by Lender (including the fees and out-of-pocket costs of attorneys and technical consultants whether incurred in connection with any judicial (appellate or otherwise) or administrative process or otherwise) which Borrower fails to pay promptly

---

Previous editions are obsolete              HUD MF Security Instrument              HUD-94000M (6/18)

shall become an additional part of the Indebtedness as provided in Section 13; provided that so long as the Loan is insured by HUD, no advances made by Lender under this subsection (h) shall become an additional part of the Indebtedness unless such advances receive the prior written approval of HUD and provided further that unless approved by HUD, Lender shall have no obligation to make such further advances.  The results of all Environmental Inspections made by Lender shall at all times remain the property of Lender and Lender shall have no obligation to disclose or otherwise make available to any party other than Borrower, and so long as the Loan is insured by HUD, to HUD, such results or any other information obtained by Lender in connection with its Environmental Inspections.  Lender hereby reserves the right, and Borrower hereby expressly authorizes Lender, to make available to any party, including any prospective bidder at a foreclosure sale of the Mortgaged Property, the results of any Environmental Inspections made by Lender with respect to the Mortgaged Property.  Borrower consents to Lender notifying any party (either as part of a notice of sale or otherwise) of the results of any of Lender's Environmental Inspections.  Borrower acknowledges that Lender cannot control or otherwise assure the truthfulness or accuracy of the results of any of its Environmental Inspections and that the release of such results to prospective bidders at a foreclosure sale of the Mortgaged Property may have a material and adverse effect upon the amount which a party may bid at such sale.  Borrower agrees that Lender shall have no liability whatsoever as a result of delivering the results of any of its Environmental Inspections to any third party, and Borrower hereby releases and forever discharges Lender from any and all claims, damages, or causes of action, arising out of, connected with or incidental to the results of, the delivery of any of Lender's Environmental Inspections.

(i)     If any investigation, site monitoring, containment, clean-up, restoration or other remedial work (**"Remedial Work"**) is necessary to comply with any Hazardous Materials Law applicable to the Mortgaged Property or to its use, operation or improvement, Borrower shall, by the earlier of (1) the applicable deadline required by the Hazardous Materials Law or (2) thirty (30) days after Notice from Lender demanding such action, begin performing the Remedial Work, and thereafter diligently prosecute it to completion, and shall in any event complete the work by the time required by applicable Hazardous Materials Law.  If Borrower fails to begin on a timely basis or diligently prosecute any required Remedial Work, Lender may, at its option, cause the Remedial Work to be completed, in which case Borrower shall reimburse Lender on demand for the cost of doing so.  So long as the Loan is insured by HUD, no advances made by Lender under this subsection (i) shall become part of the Indebtedness as provided in Section 13 unless such advances receive the prior written approval of HUD and provided further that unless approved by HUD, Lender shall have no obligation to make any such advances.

---

Previous editions are obsolete                HUD MF Security Instrument                        HUD-94000M (6/18)

43

(j)      Borrower shall cooperate with any inquiry by any Governmental Authority and shall comply with any governmental or judicial order which arises from any alleged Prohibited Activity or Condition.

(k)      Borrower shall indemnify [if Borrower is located in a State that requires an indemnification agreement separate and apart from this Security Instrument, Borrower shall provide said indemnification agreement to Lender], hold harmless and defend (1) Lender, (2) any prior owner or holder of the Note, (3) the loan servicer, (4) any prior loan servicer, (5) the officers, directors, shareholders, partners, employees and trustees of any of the foregoing, and (6) the heirs, legal representatives, successors and assigns of each of the foregoing (collectively, **"Indemnitees"**) from and against all proceedings, claims, damages, penalties and costs (whether initiated or sought by Governmental Authorities or private parties), including fees and out of pocket expenses of attorneys and expert witnesses, investigatory fees, and remediation costs, whether incurred in connection with any judicial (including appellate) or administrative process or otherwise, arising directly or indirectly from any of the following except where the Mortgaged Property became contaminated subsequent to any transfer of ownership which was approved in writing by Lender (and so long as the Loan is insured or held by HUD, by HUD), provided such transferee assumes in writing all obligations of Borrower with respect to Prohibited Activities or Conditions:

(i)      any breach of any representation or warranty of Borrower in this Section 48;

(ii)     any failure by Borrower to perform or comply with any of its obligations under this Section 48;

(iii)    the existence or alleged existence of any Prohibited Activity or Condition;

(iv)     the actual or alleged violation of any Hazardous Materials Law.

(l)      Counsel selected by Borrower to defend Indemnitees shall be subject to the approval of those Indemnitees.  However, any Indemnitee may elect to defend any claim or legal or administrative proceeding at Borrower's expense.

(m)      Borrower shall not, without the prior written consent of those Indemnitees who are named as parties to a claim or legal or administrative proceeding (**"Claim"**), settle or compromise the Claim if the settlement (1) results in the entry of any judgment that does not include as an unconditional term the delivery by the claimant or plaintiff to Lender of a written release of those Indemnitees, satisfactory in form and substance to

Previous editions are obsolete                    HUD MF Security Instrument                    HUD-94000M (6/18)

44

Lender; or (2) may materially and adversely affect Lender, as determined by Lender in its discretion.

(n)    Borrower's obligation to indemnify the Indemnitees shall not be limited or impaired by any of the following, or by any failure of Borrower or any guarantor to receive Notice of or consideration for any of the following:

(1)    any amendment or modification of any Loan Document;

(2)    any extensions of time for performance required by any Loan Document;

(3)    the accuracy or inaccuracy of any representations and warranties made by Borrower under this Security Instrument or any other Loan Document;

(4)    the release of Borrower or any other person, by Lender or by operation of law, from performance of any obligation under any Loan Document;

(5)    the release or substitution in whole or in part of any security for the Indebtedness; and

(6)    Lender's failure to properly perfect any lien or security interest given as security for the Indebtedness.

(o)    Borrower shall, at its own cost and expense, do all of the following:

(1)    pay or satisfy any judgment or decree that may be entered against any Indemnitee or Indemnitees in any legal or administrative proceeding incident to any matters against which Indemnitees are entitled to be indemnified under this Section 48;

(2)    reimburse Indemnitees for any expenses paid or incurred in connection with any matters against which Indemnitees are entitled to be indemnified under this Section 48; and

(3)    reimburse Indemnitees for any and all expenses, including fees and out-of-pocket expenses of attorneys and expert witnesses, paid or incurred in connection with the enforcement by Indemnitees of their rights under this Section 48, or in monitoring and participating in any legal (including appellate) or administrative proceeding.

(p)      In any circumstances in which the indemnity under this Section 48 applies, Lender may employ its own legal counsel and consultants to prosecute, defend or negotiate any claim or legal or administrative proceeding and Lender, with the prior written consent of Borrower (which shall not be unreasonably withheld, delayed or conditioned), may settle or compromise any action or legal or administrative proceeding. Borrower shall reimburse Lender upon demand for all costs and expenses incurred by Lender, including all costs of settlements entered into in good faith, and the fees and out of pocket expenses of such attorneys (including but not limited to appellate litigation) and consultants.

(q)      The provisions of this Section 48 shall be in addition to any and all other obligations and liabilities that Borrower may have under applicable law or under other Loan Documents, and each Indemnitee shall be entitled to indemnification under this Section 48 without regard to whether Lender or that Indemnitee has exercised any rights against the Mortgaged Property or any other security, pursued any rights against any guarantor, or pursued any other rights available under the Loan Documents or applicable law.  If Borrower consists of more than one entity, the obligation of those entities to indemnify the Indemnitees under this Section 48 shall be joint and several. The obligation of Borrower to indemnify the Indemnitees under this Section 48 shall survive any repayment or discharge of the Indebtedness, any foreclosure proceeding, any foreclosure sale, any delivery of any deed in lieu of foreclosure, and any release of record of the lien of this Security Instrument.  Notwithstanding anything in Section 48 to the contrary, so long as the Loan is insured or held by HUD, indemnification costs and reimbursements to Lender or to any or all Indemnitees shall be paid only from the available proceeds of an appropriate insurance policy or from Surplus Cash or other escrow accounts.

(r)      So long as the Loan is insured or held by HUD, all references to Lender in this Section 48 shall also be construed to refer to HUD as its interest appears (solely as determined by HUD) and all notifications to Lender must also be made to HUD and all Lender approvals and exercises of discretion by Lender under this Section 48 must first have the prior written approval of HUD, provided, that, so long as the Loan is insured or held by HUD, the reference to Lender as an Indemnitee shall be construed to refer to HUD, and Borrower's obligations to indemnify HUD as an Indemnitee shall remain in effect in accordance with this Section 48, notwithstanding the termination or expiration of insurance of the Loan by HUD.

(s)      To the extent any HUD environmental requirements or standards are inconsistent or conflict with the provisions of this Section 48, the HUD requirements or standards shall control so long as the Loan is insured or held by HUD.

MORTGAGES Book & Page

46

**49.** State requirements for future advances, credit line or open-end mortgages, if any, are addressed in State Addendum attach hereto.

**ATTACHED EXHIBITS.** The following Exhibits are attached to this Security Instrument:

|X|    Alabama State Addendum

|X|    Exhibit A            Description of the Land (required).

App. 451

NORTGAGES   Book & Page

47

**IN WITNESS WHEREOF**, Borrower has signed and delivered this Security Instrument or has caused this Security Instrument to be signed and delivered by its duly authorized representative, as a sealed instrument.

D4OP LLC,
a Texas limited liability company

By: _____
Timothy Barton, President

I, _Bella D Khusal_____ the undersigned, a Notary Public in and for said County in said State hereby certify that on this the _14_ day of _January_____, _2021_ before me personally appeared Timothy Barton to me personally known (or proved to me on the basis of satisfactory evidence), and who, after being duly sworn, acknowledged himself to be the President of D4OP LLC, a Texas limited liability company, and that being informed of the contents of the instrument, he as such President and with full authority to so do, did execute the foregoing instrument voluntarily for and as the act of said limited liability company.
Witness my hand and official seal or stamp.

_____
Notary Public
My commission expires: _09|24|2022_

Bella D Khusal
My Commission Expires
09/24/2022
ID No. 131734480

App. 452

MORTGAGES  Book & Page

HUD Project Number: 062-35778
Project Name: Parc al Opelika

## ADDENDUM
(Alabama

The following sections are inserted into the Security Instrument and made a part thereof:

43.  ACCELERATION; REMEDIES.  The following additional Alabama provisions pertain to the power of sale granted in the Security Instrument:

Borrower acknowledges that the power of sale granted in this Security Instrument may be exercised or directed by Lender pursuant to Ala. Code § 35-10-1 to -71(1975). Borrower acknowledges that the power of sale granted in this Security Instrument may be exercised by Lender without prior judicial hearing. Lender shall be entitled to collect all costs and expenses incurred in pursuing such remedies, including but not limited to attorney's fees, costs of documentary evidence, abstracts and title reports.  Pursuant to the provisions of Ala. Code § 35-10-1 to -71 (1975) if Lender invokes the power of sale: (a) Lender shall mail a copy of a notice of sale to Borrower in the manner provided in Section 31. Whether or not possession of the Mortgaged Property is taken, Lender may sell the Mortgaged Property or any part thereof pursuant to the power of sale which is hereby given to Lender, at public outcry, to the highest bidder for cash, at the front or main door of the courthouse of the county in which the Mortgaged Property to be sold is located, either in person or by auctioneer, after first giving notice by publication once a week for three (3) successive weeks of the time, place and terms of such sale, together with a description of the property to be sold, in a newspaper published in said county.  If there is property to be sold in more than one (1) county, publication shall be made in all counties where the land to be sold is located, but if no newspaper is published in any such county, the notice shall be published in a newspaper published in an adjoining county for three (3) successive weeks.  The sale shall be held between the hours of 11:00 a.m. and 4:00 p.m. on the day designated in the notice for the exercise of the power of sale hereunder.  Lender may postpone sale of all or any part of the Mortgaged Property by public announcement at the time and place of any previously scheduled sale and by re-publication in the same manner provided above of notice announcing the new sale date. (Ala. Code § 6-8-69 (1975)) Lender may bid at any sale held under this Security Instrument and may purchase the Mortgaged Property, or any part thereof, if Lender is the highest bidder therefore;

(b) Except as set forth above, Lender shall have the authority to determine the terms of the sale.  Borrower hereby waives any requirements of a separate sale, and all or any part of the Mortgaged Property may be offered for sale, at one (1) or more sales, in lots or in parcels or "en masse" and in such order as Lender may determine;

(c) Lender or any person conducting the sale for Lender is authorized to execute to the purchaser at said sale a deed or such other appropriate conveyance document to the Mortgaged Property so purchased conveying the Mortgaged Property so sold without any covenant or warranty, express or implied, and shall deliver the same to said

HUD-94000M (Rev  06/18)                                                      State Addendum

App. 453

purchaser within a reasonable time after the sale.  The recitals in such deed or document shall be prima facie evidence of the truth of the statements made in those recitals; and
(d) Borrower covenants and agrees that the proceeds of any sale shall be applied as determined by Lender unless otherwise required by applicable law.

49.  FUTURE ADVANCES.  This Security Instrument creates and provides for a security interest in after-acquired collateral and future advances within the meaning of Ala. Code § 7-9A-204 (1975).

50.  WAIVER OF EXEMPTIONS.  Borrower waives all rights of exemptions as to personal property and all rights of exemptions under the Constitution and Laws of Alabama.

51.  DEFEASANCE.  If the Borrower shall well and truly pay and discharge the indebtedness hereby secured as it shall become due and payable and shall do and perform all acts and agreements to be done and performed by the Borrower under the terms and provisions of this Mortgage, then this conveyance shall be and become null and void.  (Ala. Code § 35-10-26 (1975))

52.  CONSTRUCTION MORTGAGE.  This Security Instrument is a construction mortgage within the meaning of Ala. Code § 7-9A-334(h) (1975), and secures an obligation incurred for the construction of an improvement on land.

53.  WAIVER OF TRIAL BY JURY.  TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, EACH OF BORROWER AND LENDER (BY ITS ACCEPTANCE HEREOF) (A) COVENANTS AND AGREES NOT TO ELECT A TRIAL BY JURY WITH RESPECT TO ANY ISSUE ARISING OUT OF THIS SECURITY INSTRUMENT OR THE RELATIONSHIP BETWEEN THE PARTIES AS BORROWER AND LENDER THAT IS TRIABLE OF RIGHT BY A JURY AND (B) WAIVES ANY RIGHT TO TRIAL BY JURY WITH RESPECT TO SUCH ISSUE TO THE EXTENT THAT ANY SUCH RIGHT EXISTS NOW OR IN THE FUTURE.  THIS WAIVER OF TRIAL BY JURY IS SEPARATELY GIVE BY EACH OF BORROWER AND LENDER, KNOWINGLY AND VOLUNTARILY WITH THE BENEFIT OF COMPETENT LEGAL COUNSEL.

---

THE SECURITY INSTRUMENT SHALL BE PREPARED TO CONFORM TO THE REQUIREMENTS OF THE LOCAL FILING JURISDICTION IN WHICH THE D DOCUMENT IS TO BE RECORDED AND FILE

HUD-94000M (Rev. 06/18)

State Addendum

MORTGAGES   Book & Page

HUD Project Number: 062-35778
Project Name: Parc at Opelika

## EXHIBIT A

## (DESCRIPTION OF THE LAND)

Tract "A-3-A" of the Fox Run Parkway Development, LLC Subdivision Opelika, Lee County, Alabama

All that certain tract or parcel of land containing 11.95 acres being shown as Tract "A-3-A" on the plat titled A Re-Subdivision of Tracts "A-3", "A-4" & "A-5" of the Re-Subdivision of Tract "A" of the Fox Run Parkway Development, LLC Subdivision as recorded in Plat Book 42 at Page 104 in the Office of the Judge of Probate of Lee County, Alabama, being located in Section 17, Township 19 North, Range 27 East, Opelika, Lee County, Alabama and being more particularly described a follows:

Starting at the locally accepted Southeast corner of the North Half of Section 17, Township 19 North, Range 27 East, Opelika, Lee County, Alabama go Westerly a distance of 4106 feet, more or less, to an iron pin on the Northwesterly right of way of South Fox Run Parkway; thence South 89 degrees 24 minutes 20 seconds West a distance of 494.29 feet to an iron pin on the present North right of way of Tree Avenue; thence North 58 degrees 38 minutes 34 seconds East a distance of 39.10 feet to an iron pin at the Northeast corner of Tract "A-6" of the Fox Run Parkway Development, LLC Subdivision as shown on the plat recorded in Plat Book 41 at Page 176, also being the POINT of BEGINNING of hereinabove described Tract "A-3-A"; thence along the North line of said Tract "A-6" South 89 degrees 24 minutes 20 seconds West a distance of 597.10 feet to an iron pin; thence continue along the North line of said Tract "A-6" North 45 degrees 27 minutes 20 seconds West a distance of 35.44 feet to an iron pin on the East right of way of McCoy Street; thence along the East right of way of McCoy Street North 00 degrees 19 minutes 01 seconds West a distance of 246.57 feet to a concrete monument; thence continue along the East right of way of McCoy Street North 04 degrees 05 minutes 58 seconds West a distance of 498.14 feet to an iron pin; thence continue along the East right of McCoy Street North 00 degrees 23 minutes 36 seconds West a distance of 68.49 feet to an iron pin; thence South 45 degrees 11 minutes 48 seconds East a distance of 70.95 feet to an iron pin; thence North 90 degrees 00 minutes 00 seconds East a distance of 58.71 feet to an iron pin; thence along a curve, concave Southerly, having a radius of 245.00 feet, an arc distance of 89.89 feet, a chord direction of South 79 degrees 29 minutes 20 seconds East and a chord distance of 89.39 feet to an iron pin; thence South 68 degrees 58 minutes 39 seconds East a distance of 15.00 feet to an iron pin; thence South 21 degrees 01 minutes 21 seconds West a distance of 60.00 feet to an iron pin; thence South 68 degrees 58 minutes 39 seconds East a distance of 174.69 feet to an iron pin; thence along a curve, concave Northerly, having a radius of 220.00 feet; an arc distance of 200.89 feet, a chord direction of North 84 degrees 51 minutes 48 seconds East, and a chord distance of 193.98 feet to an iron pin; thence South 43 degrees 53 minutes 10 seconds East a distance of 636.06 feet to an iron pin; thence South 58 degrees 38 minutes 34 seconds West a distance of 382.74 feet to the POINT of BEGINNING.  Subject to all easements and restrictions of record.

HUD-94000M (Rev. 06/18)                                                                                      Legal Description

App. 455

# EXHIBIT A-39

## PLEDGE AND SECURITY AGREEMENT
## WITH ASSIGNMENT OF RIGHTS

**THIS PLEDGE AND SECURITY AGREEMENT WITH ASSIGNMENT OF RIGHTS** (the "Pledge Agreement") is entered into effective as of the 13th day of January, 2021, from **D4OPM, LLC,** a Texas limited liability company ("D4OPM") and **ONE MF D4, LLC**, a Texas limited liability company ("OMD4" and D4OPM and OMD4 are collectively referred to as "Pledgor") to **SOUTHERN PROPERTIES CAPITAL LTD**, a British Virgin Islands company ("Secured Party").

### Recitals

A.    Secured Party has agreed to make a loan to Pledgor in the amount of $5,129,000.00, to be evidenced by a Promissory Note of even date herewith ("Loan").

B.    A condition of the Loan is that Pledgor delivers this Pledge Agreement to secure the Note.

**NOW, THEREFORE,** in consideration of the premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Pledgor hereby agrees with Secured Party as follows:

1.    Certain Defined Terms.

    a.    Affiliate – shall mean with respect to any person or entity, any other person or entity who, or which, controls, is controlled by or under common control with, such person or entity.

    b.    Code – the Uniform Commercial Code as adopted and in force in the State of Texas, as from time to time in effect.

    c.    Collateral – all of the property and interests in property described in Section 2 hereof, and all other property that now or hereafter secures the payment and performance of any of the Secured Indebtedness (as defined herein below).

    d.    Company – D4OP LLC, a Texas limited Liability Company.

    e.    Note – as defined above.

    f.    Membership Interest – the interest of Pledgor in the Company, consisting of 100% of the Membership Interest in the Company.

    g.    Secured Indebtedness – the debt of Pledgor to Secured Party evidenced by the Note, as the same may be renewed, extended or modified from time to time.

2.    Pledge and Security Interest. As collateral security for the prompt and complete payment and performance when due of the Secured Indebtedness, Pledgor hereby grants to Secured Party, a continuing security interest in all of Pledgor's right, title, and interest in the

following property, whether now owned or hereafter acquired and whether now existing or hereafter coming into existence (the "Collateral"):

a.    The Membership Interest and all certificates, if any, representing same, and all rights, benefits, and privileges of Pledgor as a member in the Companies, and all rights, benefits, and privileges associated with the Membership Interest, including rights to profits, conversions distributions, return of capital, and voting rights;

b.    All accounts and rights now or hereafter attributable to the Membership Interest and operating agreements for the Companies, all rights, benefits, and privileges of Pledgor attributable thereto, including, without limitation, all distributions (whether in the nature of securities, monies, or other property), profits, return of capital, increases, proceeds, fees, preferences, payments, distributions or payments in partial or complete liquidation or redemption, and other rights or benefits of whatever nature made with respect to or attributable to the Membership Interest or which Pledgor is now or may hereafter become entitled to receive or exercise with respect to the Membership Interest;

c.    All subscriptions, warrants, options, and any other rights issued by the Companies or any other person whatsoever upon or in connection with the Membership Interest or any part of the collateral described in this Section 2;

d.    All cash, securities, dividends, increases, distributions and profits received as a result of reclassifications, readjustments, reorganizations, mergers, consolidations, combinations, or changes in the capital structure of the Companies and any other collateral at any time and from time to time received, receivable or otherwise distributed or delivered to Secured Party, and all rights and privileges pertaining thereto;

e.    All securities hereafter delivered to Secured Party in substitution for, or in addition to any of the foregoing, or certificates representing or evidencing such securities, and all cash, securities, instruments, documents, dividends, increases, distributions and profits received therefrom, and any other collateral at any time and from time to time received by, receivable by or otherwise distributed or delivered to Secured Party in respect of or in exchange for any of the collateral described herein;

f.    All substitutes and replacements for the collateral described in this Section 2, and all proceeds (cash and non-cash) arising out of the sale, assignment, exchange, liquidation, collection or other disposition of all or any portion of the Membership Interest, or the assets of the Companies, or the other collateral described in this Section 2, and further including, without limitation, proceeds in the form of accounts, chattel paper, instruments, documents, consumer goods, inventory and equipment; and

g.    All books and records of Pledgor pertaining to any of the above.

Coverage of proceeds, however, does not authorize the sale, assignment, exchange, liquidation or other disposition of any Collateral without the prior written consent of Secured

Party, which consent shall not be unreasonably withheld or delayed. The security interest contained herein is granted to secure the payment and performance of the Secured Indebtedness.

3.    Secured Party as Custodian. If requested by Secured Party, Pledgor agrees that it will deposit with Secured Party, duly executed transfer powers in favor of Secured Party or its nominee and will make such arrangements with a transfer agent, satisfactory to Secured Party, as will require such transfer agent, solely upon Secured Party's written request, following any Default (defined below) to register the Membership Interest in the name of the Secured Party or its nominee as provided above and as may otherwise be satisfactory to Secured Party. In addition, Secured Party shall at all times have the right to exchange certificates or instruments representing or evidencing the Membership Interest for certificates or instruments of smaller or larger denominations for any purpose consistent with its performance of this Pledge Agreement.

4.    Assignment of Companies' Distributions. In addition to the security interest granted in Section 2 above, Pledgor hereby assigns and transfers to Secured Party from and after a Default all distributions and payments of whatever kind or character Pledgor may be then or thereafter entitled to receive from the Companies (collectively, all such distributions and payments are hereinafter referred to as "Distributions or Payments"), including without limitation, any distributions of escrows or other funds from lenders secured by property owned by the Company, and Pledgor hereby authorizes and directs the Companies to pay such Distributions or Payments directly to Secured Party from and after a Default. Upon receipt of each such Distributions or Payments, Secured Party shall apply such Distributions or Payments as follows: (i) first to the payment of all costs and expenses incurred by Secured Party under this Pledge Agreement or under the Note, (ii) second to reimbursement of Secured Party of any other disbursements made by Secured Party in accordance with this Pledge Agreement, (iii) third to the payment of all accrued and unpaid interest, if any, on the Secured Indebtedness, (iv) fourth, the payment of all other amounts then owing to Secured Party by Pledgor under the Note, and (v) fifth, the remainder of such Distributions or Payments, if any, to be paid to Pledgor. Such distributions shall include, without limitation, any proceeds to which Pledgor is entitled as a result of the sale or other disposition of any assets or collateral of the Companies or of any entity in which the Companies owns an interest or as a result of any financing or refinancing of any indebtedness of the Companies or of any entity in which the Companies owns an interest. Secured Party shall not, by virtue of this assignment, be deemed a member in the Companies.

5.    Pledgor's Representations and Warranties. Pledgor represents and warrants to Secured Party as follows:

a.    Pledgor has good right and lawful authority to execute, deliver and perform this Pledge Agreement and to pledge the Collateral under this Pledge Agreement and the execution and performance hereof has been authorized or deemed authorized by all necessary action of Pledgor and the Companies.

b.    No consent or approval of any governmental body or regulatory authority, or of any securities exchange or of any other person is necessary to effect the validity of the rights created hereunder which have not been obtained.

c.  There is no financing statement or other document creating or evidencing a lien now on file in any public office covering any of the Collateral nor is there any lien or encumbrance on any of the Collateral. Until the termination of this Pledge Agreement, Pledgor will not execute any such financing statement or statements on any of the Collateral, except as may have been or may hereafter be granted to Secured Party.

d.  No security agreement covering the Collateral, or any part thereof, has been made and no security interest, other than the one created under this Pledge Agreement, has been granted, or to the best knowledge of Grantor has attached or been perfected in the Collateral or any part thereof.

e.  Pledgor's principal place of business is at the address of Pledgor set forth herein.

f.  No bankruptcy or insolvency proceedings are pending by or against Pledgor and there are no outstanding judgments against Pledgor.

h.  Pledgor is the legal and equitable owner of, and has good and indefeasible title to, the Membership Interest free and clear of all liens, security interests, pledges, charges and encumbrances except for the secured interest created by this Pledge Agreement.

i.  This Pledge Agreement, together with all filings and other actions necessary or desirable to perfect and protect such security interest, create a valid and perfected first priority security interest in the Collateral securing the payment and performance of the Secured Indebtedness.

j.  There are no judicial or administrative actions, suits or proceedings pending or threatened against or affecting Pledgor or the Collateral.

k.  This Pledge Agreement constitutes the legal, valid and binding obligation of Pledgor, enforceable in accordance with its terms except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium, or similar laws affecting the enforcement of creditors' rights generally and by general equitable principles (whether enforcement is sought by proceedings in equity or at law).

6.  Covenants. Pledgor hereby covenants and agrees with Secured Party that, except as may be provided in or with respect to the documents evidencing and/or securing any loan to the Companies from American Bank of Commerce in connection with the acquisition and development of real property by the Companies, as follows:

a.  In the event, for any reason, that the law of any jurisdiction other than the State of Texas becomes or is applicable to the Collateral, or any part thereof, or to any of the Secured Indebtedness, Pledgor agrees to execute and deliver all such instruments and to do all such other things as may be reasonably necessary or reasonably appropriate to preserve, protect and enforce Secured Party's security interest or lien under the law of such other jurisdiction, at least to the same extent as such security interest would be protected under the Code.

PLEDGE AND SECURITY AGREEMENT WITH ASSIGNMENT OF RIGHTS – Page 4
1162875_1 – Parc at Opelika – D4OPM, LLC. and OMD4, LLC (7516.0045)

b. If any amount payable under or in connection with any of the Collateral shall be or become evidenced by any promissory note, security, or other instrument, such promissory note, security or instrument shall be immediately pledged to Secured Party under this Pledge Agreement and Pledgor shall deliver to Secured Party such promissory note, security, or instrument, duly endorsed, without recourse, in a manner satisfactory to Secured Party and Pledgor.

c. Pledgor shall keep the Collateral free from, and will not create, grant, permit, or suffer to exist, any lien, attachment, security interest, sequestration, encumbrance or any other legal or equitable process, or any encumbrance of any kind or character other than the lien and security interest granted in this Pledge Agreement.

d. Pledgor shall perform in all material respects all obligations, covenants and duties imposed upon Pledgor by the material agreements and instruments constituting part of the Collateral, including all of the material terms, provisions and conditions of the Companies in effect as of the date hereof, as amended, modified, or supplemented from time to time (but without affecting Pledgor's obligations prohibiting such action under this Pledge Agreement), and maintain in full force and effect all such agreements and instruments, and shall not cause, vote to consent to, vote in favor of, take any actions or fail to take any action that results in any amendment, modification, cancellation or limitation of such agreements or instruments.

e. Pledgor shall not change its name, identity, or corporate structure in any manner which might make any financing or continuation statement filed in connection herewith seriously misleading within the meaning of the then applicable provision of the Code unless Pledgor shall have given Secured Party at least 30 days prior written notice thereof and shall have taken all action (or made arrangements to take such action substantially simultaneously with such change if it is impossible to take such action in advance) necessary or reasonably requested by Secured Party to amend such financing statement or continuation statement so that it is not seriously misleading.

f. Pledgor will not change its principal place of business from the address set forth herein, change the location of any Collateral, or remove the records concerning the Collateral, unless it has given Secured Party at least 30 days prior written notice of its intent to do so and has taken such action as is necessary or advisable in the opinion of Secured Party to cause Secured Party's security interest in the Collateral to continue to be a first priority perfected security interest.

g. Pledgor shall promptly execute and deliver from time to time to Secured Party all such assignments, certificates, passbooks, stock powers, supplemental writings, notices, financing statements and other items and do all other acts or things as Secured Party may reasonably request in order to comply with the Code and more fully preserve, evidence and perfect the interest herein of Secured Party in the Collateral or in order to enable Secured Party to exercise and enforce its rights hereunder with respect to the pledge and security interests granted herein, including, without limitation, causing, after Default, any or all of the Collateral to be transferred

PLEDGE AND SECURITY AGREEMENT WITH ASSIGNMENT OF RIGHTS – Page 5
1162875_1 – Parc at Opelika – D4OPM, LLC, and OMD4, LLC (7516.0045)

App. 461

of record into the name of Secured Party or its nominee (and Secured Party agrees that if any Collateral is transferred into its name or the name of its nominee, Secured Party will thereafter promptly give to Pledgor copies of any notices and communications received by Secured Party or its nominee with respect to the Collateral).

h.   Pledgor shall notify Secured Party in writing, promptly upon Pledgor's learning thereof, of any litigation, proceeding or claim affecting Pledgor, the Companies or the Collateral, and, at Secured Party's request and expense, Pledgor shall appear in and defend such action or proceeding other than an action or proceeding against the Companies.

i.   Pledgor shall promptly pay or cause to be paid when due, all lawful taxes, assessments, levies, contributions, charges, fines and penalties, of every description, attributable to the Collateral or any distribution in respect of any of the Collateral (and, in connection therewith, Pledgor shall be entitled to receive from Secured Party or retain such amount of any distribution from the Companies as Pledgor shall deem reasonably necessary to satisfy any tax obligations), and shall furnish to Secured Party, upon request, evidence of the payment thereof. If any Collateral is levied upon, or taken into custody, or detained by any person whatsoever, Pledgor agrees to immediately notify Secured Party. If Pledgor should, for any reason, fail to pay and discharge promptly any such taxes, assessments, levies, contributions, charges, fines, or penalties, when due, Secured Party shall be authorized to pay the same, with full subrogation by reason of such payment, and the amount so paid, together with interest thereon as provided herein, shall be secured by the security interest herein granted, and Pledgor covenants and agrees, on demand, to repay the amount so paid by Secured Party in payment of such items, together with interest thereon at the applicable rate of interest set forth in the Note, from the date of such payment by Secured Party until said amounts are repaid. Secured Party shall have no liability for any loss, damage or injury resulting from the non-payment of any of such taxes, assessments, levies, contributions, charges, fines, or penalties.

j.   Pledgor will not sell, assign, or transfer any Collateral in any manner or any of Pledgor's rights in the Collateral, or any part thereof, except as expressly permitted in this Pledge Agreement.

k.   If this Pledge Agreement or any provision hereof shall be deemed invalid, in whole or in part, by reason of any present or future law or governmental regulation, or any decision of authoritative court, or shall be deemed by Secured Party, for any reason, ineffective to create or evidence the security interest herein granted, then from time to time, Pledgor shall execute and deliver such other and further instruments, documents or assurances, as in the reasonable judgment of Secured Party and Pledgor may be required to more effectively subject the Collateral to the payment of the Secured Indebtedness and the performance of the terms and provisions of this Pledge Agreement or to effectuate any sale of any Collateral as hereinafter provided.

l.   Pledgor shall promptly furnish Secured Party with any information or writings which Secured Party may reasonably request concerning the Collateral.

PLEDGE AND SECURITY AGREEMENT WITH ASSIGNMENT OF RIGHTS   Page 6
1162875_1 – Parc at Opelika   D4OPM, LLC, and OMD4, LLC (7516.0045)

m.   Pledgor shall allow Secured Party, or cause to be allowed to Secured Party, to inspect all records of Pledgor relating to the Collateral, to the Companies, or to the Secured Indebtedness and to make and take away copies of such records for any proper purpose.

n.   If following any Default the Collateral, or any part thereof, is ever converted by its issuer or maker into another type of collateral or if any of the items required to be pledged by Pledgor under Section 2 above, including any money or other proceeds, is ever paid or delivered to or received by Pledgor, then, in any such event, all such collateral, items, money and other proceeds and shall be transferred and delivered to Secured Party by Pledgor (together with, if appropriate, the certificates for any shares or securities duly endorsed in blank or accompanied by undated stock powers duly executed in blank) all of which thereafter shall be held by Secured Party, pursuant to the terms of this Pledge Agreement, as part of the Collateral and Pledgor shall take such other action as Secured Party shall deem necessary or appropriate to duly record the security interests created hereunder in such collateral, items, money, or other proceeds.

o.   Pledgor will not further encumber the Collateral without the consent of Secured Party.

7.   Voting Rights.

a.   Pledgor shall not be entitled to exercise any and all voting and/or consensual rights and powers relating or pertaining to the Collateral or any part thereof for any purpose, without the consent of Secured Party.

b.   Upon the occurrence after the date hereof and during the continuance of a Default, all rights of Pledgor to exercise the voting and/or consensual rights and powers which Pledgor is entitled to exercise pursuant to subsection (a) above shall cease, at the option of Secured Party, and all such rights shall thereupon become vested in Secured Party who shall have the sole and exclusive right and authority to exercise such voting and/or consensual rights and powers. In addition and except as otherwise provided in Section 4 above, Secured Party shall have the right upon occurrence of a Default to notify and direct the issuer of, or obligor under, any of the Collateral to thereafter make all payments, distributions, dividends and any other distributions payable in respect thereof directly to Secured Party. The issuer of, or obligor under, any of the Collateral making such payment or distribution to Secured Party shall be fully protected in relying on a written statement of Secured Party that Secured Party then holds a security interest which entitles Secured Party to receive such payments and distributions. Except as otherwise provided in Section 4 above, any and all money and other collateral paid over to or received by Secured Party pursuant to the provisions of this subsection (d) shall be retained by Secured Party as additional collateral hereunder and may be applied (and upon Pledgor's written request all cash shall permanently be applied) in accordance with the provisions hereof.

8.  Events of Default. The occurrence of any one or more of the following events shall constitute an "Event of Default" or a "Default":

   a.  The occurrence of any default which is not cured following any applicable notice and opportunity to cure by Pledgor under the Note, or the occurrence of any Event of Default or Default under this Pledge Agreement.

   b.  Pledgor shall fail to pay when due any of the Secured Indebtedness which is owed to Secured Party by Pledgor, or the failure of Pledgor to pay when due, any indebtedness, obligations or liabilities now or hereafter due under this Pledge Agreement;

   c.  The discovery by Secured Party that any statement, representation, warranty, or covenant of Pledgor in this Pledge Agreement is false, misleading or erroneous in any material respect when made, if Secured Party relied thereon to its detriment;

   d.  The occurrence of a levy against any of the Collateral under any execution, attachment, sequestration or other writ, or the appointment of a receiver for the Collateral or any part thereof;

   e.  Pledgor shall fail promptly to perform, observe, and keep any of its obligations, covenants or agreements contained in this Pledge Agreement and such failure is not cured before expiration of any applicable cure periods.

9.  Notice required or desired to be given under the terms of this Pledge Agreement shall be in writing, and sent by hand delivery, or overnight receipted courier service, or U.S. certified or registered mail, postage prepaid, return receipt requested, and shall be given to the parties at the following address:

   If to Pledgor:         D4OPM, LLC, and OMD4, LLC
                          13901 Midway Road
                          Suite 102
                          Farmers Branch, Texas 75244
                          Attention:    Timothy Barton
                          Telephone:    972-385-9934

   If to Secured Party:   Southern Properties Capital LTD
                          1603 LBJ Freeway
                          Suite 800
                          Dallas, Texas 75234

   Notice given under this provision by hand delivery or overnight receipted courier service shall be effective as of the date of delivery or first attempted delivery; notice given by U.S. mail as aforesaid shall be deemed effective on the earlier of actual receipt by Pledgor or three (3) business days after deposit in a regularly maintained receptacle of the U.S. Postal Service.

10.  Notwithstanding anything to the contrary contained in this Pledge Agreement or the Note:

PLEDGE AND SECURITY AGREEMENT WITH ASSIGNMENT OF RIGHTS – Page 8
1162875_1   Parcel Opelika   D4OPM, LLC, and OMD4, LLC (7516.0045)

App. 464

a. Pledgor shall not be in default under this Pledge Agreement for the failure to pay any sum due thereunder or hereunder, unless and until Pledgor has received a written notice of non-payment from Secured Party and has failed to cure, fully and unqualifiedly, such non-payment within five (5) days after the effective date of such notice (as hereinbelow provided); and

b. Pledgor shall not be in default under the Note or this Pledge Agreement for the failure to perform or comply with any non-monetary covenant or agreement contained therein or herein, unless and until Pledgor has received written notice of such default from Secured Party and has failed to cure, fully and unqualifiedly, such non-monetary default within thirty (30) days after the effective date of such notice (as hereinbelow provided).

11. <u>Acceleration of the Secured Indebtedness</u>. Without in any way limiting the right of Secured Party to demand payment of any portion of the Secured Indebtedness payable on demand, upon or at any time after the occurrence of a Default, all or any portion of the Secured Indebtedness due or to become due shall, at the option of Secured Party and without notice or demand by Secured Party, become at once due and payable and Pledgor shall forthwith pay to Secured Party, in addition to any and all sums and charges due, the entire unpaid balance of the Secured Indebtedness owed by Pledgor to Secured Party.

12. <u>Remedies of Secured Party</u>. Upon the occurrence of a Default:

a. Secured Party may, at Secured Party's option and at Pledgor's expense, either in Secured Party's own right or in the name of Pledgor and in the same manner and to the same extent that any Pledgor might reasonably so act if this Pledge Agreement had not been made:

b. demand, sue for, collect, recover, receive and otherwise enforce payment of all proceeds and other sums due and payable in respect of the Collateral, Pledgor hereby requesting and instructing all parties liable to Pledgor in connection with the Collateral to make all payments then due or which may thereafter become due thereunder or thereby to Secured Party, and Pledgor further agreeing that the receipt by Secured Party of any such payments shall be a complete release and discharge of the obligor or obligors thereof to the extent of the payment or payments so made;

 i. do all things requisite, convenient, or necessary to enforce the performance and observance of all rights, remedies and privileges of Pledgor arising from the Collateral, or any part thereof, including, but not limited to, compromising, waiving, excusing, or in any manner releasing or discharging any obligation of any party to or arising from the Collateral;

 ii. take possession of the books, papers, chattel paper, documents of title and accounts of Pledgor, wherever located, relating to the Collateral;

 iii. receive, and Pledgor will forthwith surrender to Secured Party, the possession of the Collateral, and, to the extent permitted by law, Secured Party may

PLEDGE AND SECURITY AGREEMENT WITH ASSIGNMENT OF RIGHTS – Page 9
1162875_1 – Parc at Opelika    D4OPM, LLC, and OMD4, LLC (7516.0045)

App. 465

itself or by such officers or agents as it may appoint, (a) exercise any voting rights and/or consensual rights and powers relating or pertaining to the Collateral or any part thereof (and Pledgor agrees to take all actions as may be appropriate to give effect thereto), (b) exclude Pledgor, his/its agents and servants from such activities, and (c) do all acts, including the making of contracts, which Secured Party deems necessary for the care or management of the Collateral;

iv.    sue or otherwise collect and receive money with respect to the Collateral; and

v.    exercise any other lawfully available powers or remedies, and do all other things which Secured Party reasonably deems requisite, convenient or necessary or which Secured Party reasonably deems proper to protect the security interest herein granted.

c.    Secured Party may reduce its claim to judgment.

d.    Secured Party may foreclose or otherwise enforce its security interests in all or any part of the Collateral by any available judicial procedure.

e.    At its discretion, Secured Party may retain all or any portion of the Collateral in satisfaction of the Secured Indebtedness whenever the circumstances are such that Secured Party is entitled to do so under the Code.

f.    Secured Party may apply by appropriate judicial proceedings for appointment of a receiver for the Collateral, or any part thereof, and Pledgor hereby consents to any appointment.

g.    After giving Pledgor written notice ten (10) days in advance of the time and place, Secured Party may sell, lease, assign, transfer or otherwise dispose of all or any part of the Collateral at public or private sale, at such place or places as Secured Party deems best, and for cash or for credit or for future delivery (without thereby assuming any credit risk), without demand of performance or notice of intention to effect any such disposition or (except such notice as is required above or by applicable statute and cannot be waived), and Secured Party or anyone else may be the purchaser, lessee, assignee, or recipient of any or all of the Collateral so disposed of at any public sale (or to the extent permitted by law, at any private sale), and Secured Party may, in its own name or as the irrevocably appointed attorney-in-fact of Pledgor, effectively sell, lease, assign or transfer the Collateral, or any part thereof, absolutely free from any claims or right of whatsoever kind, including any right or equity of redemption of Pledgor, and execute and deliver all necessary assignments, conveyances, bills of sale and other instruments with power to substitute one or more persons or corporations with like power. Any such foreclosure sale, assignment, or transfer shall, to the extent permitted by law, be a perpetual bar, both at law and in equity, against Pledgor and all persons and corporations lawfully claiming by or through or under Pledgor. Any public or private sale may, without notice or publication, be adjourned or caused to be adjourned by Secured Party from time to time by announcement at the time and place

PLEDGE AND SECURITY AGREEMENT WITH ASSIGNMENT OF RIGHTS – Page 10
1162875_1 – Parc at Opelika – D4OPM, LLC, and OMD4, LLC (7516.0045)

App. 466

fixed for the sale, and such sale may be made at any time or place to which the same may be adjourned. Upon any sale, Secured Party may bid for and purchase the Collateral, or any part thereof, and upon compliance with the terms of sale may hold, retain, possess and dispose of the Collateral, in its absolute right without further accountability. Secured Party shall have the right, at its option, to have any or all of the Secured Indebtedness as of the date of such sale credited against the amount of its bid. At any such sale it is not necessary to exhibit the Collateral. If any notice, exemption, filing, consent, approval or authorization of any federal, state, municipal or other governmental department, agency or authority should be necessary to effectuate any sale or other disposition of all or any of the Collateral, Pledgor will execute all such applications and other instruments as may be required in connection with applying for, obtaining, and securing any such notice, exemption, filing, consent, approval or authorization and will use its best efforts in connection therewith. Secured Party is authorized at any sale of the Collateral, if Secured Party deems it advisable, to restrict the prospective bidders or purchasers to those persons who will represent and agree that they are purchasing for their own account, for investment, and not with a view to distribution or resale of any of the Collateral. Any sale of the Collateral may be sold in one lot as an entirety or in separate parcels, as Secured Party may determine. The sale of any part of the Collateral will not exhaust Secured Party's power of sale, it being agreed that sales may be made from time to time until all of the Collateral has been sold or until the Secured Indebtedness has been paid in full. Secured Party shall not be obligated to make any sale pursuant to any notice.

h.    Secured Party shall have all of the rights and remedies of a secured party under the Code or under other applicable law, and all other legal and equitable rights to which Secured Party may be entitled, all of which rights and remedies shall be cumulative, and none of which shall be exclusive, and shall be in addition to any other rights or remedies contained in this Pledge Agreement or any other document or instrument.

13.    Restrictions on Sale. Pledgor recognizes that, by reason of certain prohibitions contained in the Securities Act of 1933, as amended, and applicable state securities laws, Secured Party may be compelled, with respect to any sale of all or any part of the Collateral, to limit purchasers to those who agree, among other things, to acquire the Collateral for their own account, for investment and not with a view to the distribution or resale thereof. Pledgor acknowledges that any private sales to such purchasers may be made at prices and on terms less favorable than those obtainable through public sale without such restrictions, and, notwithstanding such circumstances, Pledgor agrees that any such private sale shall be deemed to have been made in a commercially reasonable manner and that Secured Party shall have no obligation to engage in public sales and no obligation to delay the sale of any Collateral for the period of time necessary to permit the issuer thereof to register it for public sale. Pledgor further agrees that Secured Party shall have the right to rely upon the advice and opinion of any member of the National Securities Exchange as to the best price reasonably obtainable upon such private sale and that such reliance shall be conclusive evidence that Secured Party handled such matter in a commercially reasonable manner under the Code.

PLEDGE AND SECURITY AGREEMENT WITH ASSIGNMENT OF RIGHTS – Page 11
1162875_1 – Parc at Opelika – D4OPM, LLC. and OMD4, LLC (7516.0045)

App. 467

14. Private Sale. Secured Party shall incur no liability as a result of the sale of the Collateral, or any part thereof, at any private sale pursuant to this Pledge Agreement conducted in a commercially reasonable manner. Pledgor waives any claims against Secured Party arising by reason of the fact that the price at which the Collateral may have been sold at such a private sale was less than the price which might have been obtained at a public sale or was less than the aggregate amount of the Secured Indebtedness, even if Secured Party accepts the first offer received and does not offer the Collateral to more than one offeree.

15. Notification. Reasonable notification of the time and place of any public sale of the Collateral, or reasonable notification of the time after which any private sale or other intended disposition of the Collateral is to be made, shall be sent to Pledgor and to any other person entitled under the Code to notice; provided, that if the Collateral threatens to decline quickly in value or is of a type customarily sold on a recognized market, Secured Party may sell or otherwise dispose of the Collateral without notification, advertisement or other notice of any kind. It is agreed that notice sent or given not less than ten (10) calendar days prior to the taking of the action to which the notice relates is reasonable notification and notice for the purpose of this Pledge Agreement.

16. Waivers of Appraisement. In case of the occurrence of any Default, neither Pledgor nor anyone claiming by, through or under Pledgor, to the extent Pledgor may lawfully so agree, shall or will set up, claim or seek to take advantage of any appraisement, valuation, stay, extension or redemption law now or hereafter in force in any locality where any of the Collateral is situated for purposes of applicable law, in order to prevent or hinder the enforcement of this Pledge Agreement, or the absolute sale of the Collateral, or the final and absolute putting into possession thereof, immediately after such sale, of the purchaser thereof; and Pledgor in Pledgor's own right and for all who may claim under Pledgor, hereby waives, to the full extent that Pledgor may lawfully do so, the benefit of all such laws and any and all right to have the Collateral marshaled upon any enforcement of the security interest herein granted, and Pledgor agrees that Secured Party or any court having jurisdiction to enforce such security interest may sell the Collateral in parts or as an entirety.

17. Waiver of Notice. Pledgor waives notice of the creation, advance, increase, existence, extension, or renewal of, and of any indulgence with respect to, the Secured Indebtedness, waives presentment, demand, notice of dishonor, and protest, waives notice of the amount of the Secured Indebtedness outstanding at any time, notice of any change in financial condition of any person liable for the Secured Indebtedness or any part thereof, notice of any Default or Event of Default, and all other notices respecting the Secured Indebtedness, except as otherwise expressly provided in this Pledge Agreement.

18. Application of Proceeds. Except as provided in Section 4 above, Secured Party shall apply the proceeds of any collection, sale or other realization of all or any part of the Collateral pursuant hereto, and any other cash at the time held by Secured Party under this Pledge Agreement, as follows:

a. First, to the payment of all costs and expenses of any foreclosure and collection hereunder and all proceedings in connection therewith, including reasonable attorneys' fees;

PLEDGE AND SECURITY AGREEMENT WITH ASSIGNMENT OF RIGHTS – Page 12
1162875_1 – Parc at Opelika – D4OPM, LLC, and OMD4, LLC (7516.00-15)

App. 468

b.  Then, to the reimbursement of Secured Party for all disbursements made by Secured Party for taxes, assessments or liens superior to the security interest hereof and which Secured Party shall reasonably deem expedient to pay;

c.  Then, to the reimbursement of Secured Party of any other disbursements made by Secured Party in accordance with the terms hereof;

d.  Then, to the amounts then owing and unpaid in respect of the Secured Indebtedness, in such priority as Secured Party may determine in Secured Party's discretion;

e.  The remainder of such proceeds, if any, shall be paid to Pledgor or as otherwise required by a court of competent jurisdiction.

If such proceeds shall be insufficient to discharge the entire Secured Indebtedness owing by Pledgor, Secured Party may have any other available legal recourse against Pledgor for the deficiency under the Secured Indebtedness.

19.  Enforcement of Secured Indebtedness. Nothing in this Pledge Agreement shall affect or impair the unconditional and absolute right of Secured Party to enforce the Secured Indebtedness as and when the same shall become due in accordance with the terms of the Note.

20.  Right of Secured Party to Prevent or Remedy Default. If Pledgor shall fail to perform any of the covenants, conditions and agreements required to be performed and observed by Pledgor under this Pledge Agreement or under the Loan Documents, or in respect of the Collateral, as the case may be, Secured Party (i) may, but shall not be obligated to, take any action Secured Party reasonably deems necessary or desirable to prevent or remedy any such Default by Pledgor or otherwise to protect the security interest of Secured Party under this Pledge Agreement, and (ii) after a Default, shall have the absolute and immediate right to take possession of the Collateral or any part thereof to such extent and as often as Secured Party, in Secured Party's sole discretion, deems necessary or desirable in order to prevent or to cure any such Default by Pledgor, or otherwise to protect the security of this Pledge Agreement. Secured Party may advance or expend such sums of money for the account of Pledgor as Secured Party, in Secured Party's discretion, deems necessary for any such purpose. In no event, however, shall Secured Party have any obligation or duties whatsoever to perform any covenant or agreement of Pledgor contained herein, and any such performance by Secured Party shall be wholly discretionary with Secured Party.

21.  Duties of Secured Party. The powers conferred upon Secured Party hereunder are solely to protect Secured Party's interest in the Collateral and shall not impose any duty upon Secured Party to exercise any such powers. Except for the safe custody of any Collateral in Secured Party's possession and the accounting for money actually received by Secured Party hereunder, Secured Party shall have no duty as to any Collateral or as to the taking of any necessary steps to preserve rights against prior parties or any other rights pertaining to any Collateral.

22.  No Liability of Secured Party. Neither the acceptance of this Pledge Agreement by Secured Party, nor the exercise of any rights hereunder by Secured Party, shall be construed in any

way as an assumption by Secured Party of any covenants, representations, warranties, obligations, responsibilities, liabilities, or duties of Pledgor arising in connection with the Collateral assigned hereunder or otherwise bind Secured Party to the performance of any obligations respecting the Collateral, it being expressly understood that Secured Party shall not be obligated to perform, observe or discharge any covenant, warranty, representation, obligation, responsibility, duty, or liability of Pledgor in respect of any of the Collateral, including, but not limited to, appearing in or defending any action, expending any money or incurring any expense in connection therewith.

23.  Right of Secured Party to Defend Action Affecting Security. Secured Party may, at its expense, appear in and defend any action or proceeding at law or in equity purporting to affect Secured Party's security interest under this Pledge Agreement.

24.  Secured Party's Expenses. All reasonable advances, costs, expenses, charges and attorneys' fees which Secured Party may make, pay or incur under any provision of this Pledge Agreement for the protection of Secured Party's security or for the enforcement of any of Secured Party's rights hereunder, or in foreclosure proceedings commenced and subsequently abandoned, or in any dispute or litigation in which Secured Party may become involved by reason of or arising out of this Pledge Agreement or the Loan Documents, or the Collateral, shall be a part of the Secured Indebtedness and shall be paid by Pledgor to Secured Party, upon demand, and shall bear interest until paid at the applicable rate of interest set forth in the Note, from the date of such payment until repaid by Pledgor.

25.  Secured Party's Right of Set-Off. Upon the happening of any event entitling Secured Party to pursue any remedy provided herein or if Secured Party shall be served with garnishment process in which Pledgor shall be named as defendant, whether or not Pledgor shall be in Default hereunder at the time, Secured Party may, but shall not be required to, set-off any indebtedness owing by Secured Party to Pledgor against any of the Secured Indebtedness without first resorting to the security hereunder and without prejudice to any other rights or remedies of Secured Party or Secured Party's security interest herein.

26.  No Waiver. In case Secured Party shall have proceeded to enforce any right or remedy hereunder and such proceedings shall have been discontinued or abandoned for any reason, then in every such case, Pledgor and Secured Party shall be restored to their former positions and rights hereunder with respect to the Collateral, and all rights, remedies and powers of Secured Party shall continue as if no such proceeding had been taken. The failure or delay on the part of Secured Party in exercising any right, remedy or power under this Pledge Agreement or in giving or insisting upon strict performance by Pledgor hereunder or in giving notice hereunder shall not operate as a waiver of the same or any other power or right, and no single or partial exercise of any such power or right shall preclude any other or further exercise thereof or the exercise of any other such power or right. Secured Party, notwithstanding any such failure, shall have the right thereafter to insist upon the strict performance by Pledgor of any and all of the terms and provisions of this Pledge Agreement to be performed by Pledgor. The collection and application of proceeds, the entering and taking possession of the Collateral, and the exercise of the rights of Secured Party contained in the Loan Documents, including this Pledge Agreement, shall not cure or waive any default, or affect any notice of default, or invalidate any acts done pursuant to such notice. No waiver by Secured Party of any breach or default of or by any party hereunder shall be

deemed to alter or affect Secured Party's rights hereunder with respect to any prior to subsequent default.

27.    Remedies. No right or remedy herein reserved to Secured Party is intended to be exclusive of any other right or remedy, but each and every such remedy shall be cumulative, not in lieu of, but in addition to, any other rights or remedies given under this Pledge Agreement and all other Loan Documents and at law or in equity. Any and all of Secured Party's rights and remedies may be exercised from time to time and as often as such exercise is deemed necessary or desirable by Secured Party.

28.    Right of Secured Party to Extend Time of Payment, Substitute, Release Security, etc. Without affecting the liability of any person, including Pledgor, for the payment or performance of any of the Secured Indebtedness or the lien of this Pledge Agreement on the Collateral, or the remainder thereof, for the full amount of any indebtedness unpaid, Secured Party may from time to time, without notice or without affecting or impairing any of Secured Party's rights under this Pledge Agreement: (a) release any person liable for the payment or performance of any of the Secured Indebtedness, (b) extend the time or otherwise alter the terms of payment or performance of any of the Secured Indebtedness, (c) accept additional security therefor of any kind, including, without limitation, deeds of trust or mortgages, (d) alter, substitute or release any collateral securing the Secured Indebtedness, (e) resort for the payment or performance of all or any portion of the Secured Indebtedness to its several securities therefor in such order and manner as Secured Party may deem fit, or (f) join in any subordination or other agreement affecting this Pledge Agreement or the lien or charge thereof.

29.    Termination. When all Secured Indebtedness shall have been paid in full, this Pledge Agreement shall terminate and Secured Party shall forthwith cause to be assigned, transferred and delivered, against receipt, but without any recourse, warranty or representation whatsoever by Secured Party (other than such representations and warranties as to ownership and absence of encumbrances as Pledgor may reasonably require), all rights assigned to Secured Party under Section 4 above, and any remaining Collateral and money received in respect thereof, to or on the order of Pledgor.

30.    Miscellaneous.

   a.    This Pledge Agreement may be presented to filing officers for recordation as a financing statement or other document evidencing the security interest created hereunder.

   b.    Regardless of any provision contained in any document or instrument evidencing or securing any Secured Indebtedness, Secured Party shall not be entitled to receive, collect or apply as interest on the Secured Indebtedness an amount which would be usurious and, to this end, in the event of the acceleration of the maturity of the Secured Indebtedness, or any item hereof, a proper credit shall be given for unearned interest and such unearned interest shall be immediately refunded to Pledgor.

   c.    It is agreed that any custom or usage to the contrary notwithstanding, Secured Party shall have the right at all times to enforce the covenants and provisions of this Pledge

Agreement in strict accordance with its terms, notwithstanding any conduct or custom by Secured Party in refraining from so doing at any time, or any acceptance by Secured Party of partial performance by Pledgor.

d.  Secured Party's rights, titles, interests, liens and securities under this Pledge Agreement are cumulative of all other rights, titles, interests, liens and securities which Secured Party may now or at any time hereafter hold securing payment of the Secured Indebtedness, or any part thereof.

e.  This Pledge Agreement is binding upon Pledgor and Pledgor's successors and permitted assigns, and shall inure to the benefit of and be enforceable by Secured Party and its respective successors and assigns. Secured Party may assign this Pledge Agreement or any of its rights and powers hereunder, with the Secured Indebtedness, and may assign and/or deliver to any such assignee any of the Collateral therefor and, in the event of such assignment, the assignee shall have all rights and remedies as if originally named in this Pledge Agreement in place of Secured Party and Secured Party shall be thereafter fully discharged from all responsibility hereunder. Pledgor may not assign or transfer Pledgor's rights hereunder without the prior written consent of Secured Party, which consent may be granted or withheld in the sole discretion of Secured Party.

f.  Secured Party shall be deemed to have exercised reasonable care in the custody and preservation of any of the Collateral in Secured Party's possession if Secured Party takes such action for that purpose as Pledgor requests in writing, but Secured Party shall not be bound to follow such requests.

g.  Pledgor agrees that from time to time upon written request of Secured Party, Pledgor will execute and deliver such further documents and do such other acts and things as Secured Party may reasonably request in order fully to effect the purposes of this Pledge Agreement.

h.  Any notice of sale, disposition or other action by Secured Party required by the Code and sent to Pledgor at Pledgor's address set forth in this preamble of this Pledge Agreement, or at such other address for Pledgor as may from time to time be shown on Secured Party's records, at least ten days prior to such action, shall constitute reasonable notice to Pledgor. Any such notice shall be deemed to have been given on the day it is mailed to such address and shall be sent by certified mail, return receipt requested.

i.  Secured Party shall not be liable for any loss of interest on or any penalty or charge assessed by any depository institution against funds in, payable on or credited to a bank account as a result of Secured Party's exercising any of Secured Party's rights or remedies under this Pledge Agreement.

j.  All representations, warranties and covenants contained in this Pledge Agreement shall survive the execution of this Pledge Agreement and shall terminate upon termination of this Pledge Agreement under Section 29 above, except all

indemnification obligations of Pledgor under this Pledge Agreement shall survive the termination of this Pledge Agreement.

k.      Any provision of this Pledge Agreement found to be prohibited by law shall be ineffective to the extent of such prohibition without invalidating the rest of this Pledge Agreement.

l.      If all or part of the Secured Indebtedness is given in renewal or extension of or applied toward the payment of indebtedness secured by any mortgage, deed of trust, deed to secure debt, pledge, security agreement or other lien, Secured Party shall be, and hereby is, subrogated to all of the rights, titles, security interests and other liens securing the indebtedness so renewed, extended or paid.

m.      After Pledgor executes this Pledge Agreement, it shall be a valid and binding obligation of Pledgor, whether or not Secured Party executes this Pledge Agreement.

n.      No change, amendment, modification, cancellation, or discharge of any provision of this Pledge Agreement shall be valid unless consented to in writing by Secured Party.

o.      Secured Party shall have and be entitled to exercise all such powers hereunder as are delegated to Secured Party hereunder by the terms hereof, together with such powers as are incidental thereto. Secured Party may execute any of Secured Party's rights and duties hereunder by or through sub-agents or employees and shall be entitled to retain counsel and to act in reliance upon the advice of such counsel concerning all matters pertaining to such rights and duties.

p.      Unless the context indicates otherwise, definitions in the Code apply to words and phrases in this Pledge Agreement; if Code definitions conflict, Chapter 9 definitions apply.

31.   Release of Secured Party. Secured Party shall not be liable for any action taken or omitted to be taken by Secured Party hereunder or in connection herewith, except for Secured Party's own gross negligence or willful misconduct. Secured Party shall not be responsible for the validity, effectiveness or sufficiency hereof or of any document or security furnished pursuant hereto in connection herewith. Secured Party shall be entitled to rely on any communication, instrument or document believed by Secured Party to be genuine and correct and to have been signed or sent by the proper person or persons. Pledgor agrees to indemnify and hold harmless Secured Party from and against any and all liability incurred by Secured Party hereunder or in connection herewith, unless such liability shall be due to willful misconduct or gross negligence on the part of the Secured Party.

32.   Governing Law. This Pledge Agreement and all of the Loan Documents shall be governed by, and shall be construed and enforced in accordance with the laws (other than its choice of law rules) of the State of Texas, except to the extent required to comply with the requirements of laws of states in which collateral pledged to secure the Note is located which are applicable to some of the liens, pledges and security interest which secure the Note.

PLEDGE AND SECURITY AGREEMENT WITH ASSIGNMENT OF RIGHTS – Page 17
1162875_1 – Parc at Opelika – D4OPM. LLC. and OMD4. LLC (7516.0045)

App. 473

33. Oral Agreements Ineffective. **THIS PLEDGE AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN PLEDGOR AND SECURED PARTY WITH REGARD TO THE SUBJECT MATTER HEREOF, AND THIS PLEDGE AGREEMENT MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS BETWEEN THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**

*[Signature page to follow]*

PLEDGE AND SECURITY AGREEMENT WITH ASSIGNMENT OF RIGHTS – Page 18
1162875_1 – Parc at Opelika – D4OPM, LLC. and OMD4, LLC (7516.0045)

App. 474

EXECUTED effective as of the day and year first set forth above.

**PLEDGOR:**

**D4OPM, LLC,**
a Texas limited liability company

By: _____
Name: _____
Title: _____

**ONE MF D4, LLC.**
a Texas limited liability company

By: _____
Name: _____
Title: _____

PLEDGE AND SECURITY AGREEMENT WITH ASSIGNMENT OF RIGHTS – Page 19
1162875_1 - Parc at Opelika - D4OPM, LLC, and OMD4, LLC (7516.0045)

App. 475

## CONSENT OF COMPANY

Company hereby consents to the foregoing, and agrees that it will pay all proceeds it receives, including without limitation, any returns of escrows from any lender on Property owned by Company to Secured Party.

**D4OPM, LLC,**
a Texas limited liability company

By:

Name:

Title:

App. 476

# EXHIBIT A-40

# PURCHASER'S STATEMENT

**DATE:** October 20, 2017                                    **GF NO.:  2228005530a**

**SALE FROM:** DeSoto Development, LLC          **TO:** D4DS LLC
1603 LBJ Freeway, Suite 300                1755 Wittington Place, Suite 340
Dallas, TX  75234                          Dallas, TX  75234

**PROPERTY:** Bellwether Ridge Apartments Land
South Polk Street and East Parkerville Road
DeSoto, TX  75115

| | | |
|---|---|---|
| **PURCHASE PRICE** | | **$1,200,000.00** |
| **PLUS:  CHARGES** | | |
| PRECLOSING EXPENSES | | $326.19 |
| UCC/Tax/Judgment/Litigation Searches (Overage) to Capitol Services, Inc. | $58.89 | |
| Title Insurance Overage For Loan Closing to Commonwealth Title of Dallas, Inc. | $267.30 | |
| ADJUSTMENTS / PRORATIONS | | $566,988.20 |
| Reimburse Pre-Development Expenses | $566,988.20 | |
| 2017 Ad Valorem Property Taxes   From 10/21/2017 thru 12/31/2017 | | $3,665.52 |
| **TOTAL CHARGES** | | **$570,979.91** |
| **GROSS AMOUNT DUE BY PURCHASER** | | **$1,770,979.91** |

|  |
|---|
| 1,770,980 |
| (566,988) |
| 1,203,992 |

| | | |
|---|---|---|
| **LESS: CREDITS** | | |
| **TOTAL CREDITS** | | **$0.00** |
| **BALANCE DUE BY PURCHASER** | | **$1,770,979.91** |

Purchaser understands the Closing or Escrow Agent has assembled this information representing the transaction from the best information available from other sources and cannot guarantee the accuracy thereof.  Any real estate agent or lender involved may be furnished a copy of this Statement.

Purchaser understands that tax and insurance prorations and reserves were based on figures for the preceding year or supplied by others, or estimates for current year, and in the event of any change for current year, all necessary adjustments must be made between Purchaser and Seller direct.

The undersigned hereby authorizes Commonwealth Title of Dallas, Inc. to make expenditures and disbursements as shown and approves same for payment.  The undersigned also acknowledges receipt of Loan Funds, if applicable, in the amount shown above and a receipt of a copy of this Statement.

D4DS LLC, a Texas
limited liability company

Closing or Escrow Agent
James P. Lazar

By:_____
Timothy Barton, President

Commonwealth Title of Dallas, Inc.
5949 Sherry Lane, Suite 111
Dallas, TX  75225

Printed at:  10/20/2017 (02:02 pm)

App. 478

SOUTHERN PROPERTIES CAPITAL, LTD                                    Page 2
October 31, 2017                                             ████4800

| Date | Description | Subtractions |
|------|-------------|-------------:|
| 10-02 | ' Wire Out | 678,250.00 |
| | 201710020005895 U.S. BANK AS PAYING AGENT FOR | |
| | T RESIDENTIAL 1837TERM LOAN 1500 | |
| 10-03 | ' Wire Out | 1,803,765.00 |
| | 201710030003379 BERKADIA | |
| | PAG APARTMENTS LP OPTION ADVANCE | |
| 10-03 | ' Wire Out | 1,969,729.00 |
| | 201710030003377 BERKADIA | |
| | WYLIE APARTMENTS LP OPTION ADVANCE | |
| 10-03 | ' Wire Out | 2,514,270.00 |
| | 201710030003378 BERKADIA | |
| | MCKINNEY POINTE APTS LP OPTION ADVAN | |
| 10-17 | ' Analysis Results Chg | 539.10 |
| | ANALYSIS ACTIVITY FOR 09/17 | |
| 10-19 | ' Wire Out | 20,067.63 |
| | 201710190003844 SHIMONOV AND CO. | |
| | 540192622 | |
| 10-19 | Wire Out Intl | 8,086.92 |
| | 201710190003848 AVITAL BAR-DAYAN | |
| | DIRECTOR FEE | |
| 10-19 | Wire Out Intl | 8,086.92 |
| | 201710190003849 YOGI CONSULTING AND INVESTMENTS LTD | |
| 10-19 | Wire Out Intl | 8,086.92 |
| | 201710190003850 HARVEST CAPITAL MARKETS LTD | |
| 10-19 | Wire Out Intl | 25,000.00 |
| | 201710190003845 KOST FORER GABBAY AND KASIERER | |
| 10-19 | ' Wire Out | 151,267.08 |
| | 201710190003846 SUNCHASE AMERICAN LTD | |
| | LOFTS AT REYNOLDS VILLAGE | |
| 10-23 | ' Wire Out | 996,006.05 |
| | 201710230003584 COMMONWEALTH LAND TITLE INSURANCE | |
| | GF 2228005530B | |
| 10-23 | ' Wire Out | 1,770,979.91 |
| | 201710230003585 COMMONWEALTH LAND TITLE INSURANCE | |
| | GF 2228005530A | |
| 10-24 | ' Wire Out | 5,000.00 |
| | 201710240003621 ORI GROSSMAN | |
| | ACCOUNT 67810691695 | |
| 10-26 | ' Wire Out | 60,000.00 |
| | 201710260003231 CMBS PORTFOLIO | |
| | TATTERSALL APTS | |
| 10-26 | ' Wire Out | 60,000.00 |
| | 201710260003232 CMBS PORTFOLIO | |
| | OCEANAIRE APTS | |
| 10-30 | ' Wire Out | 1,099,535.49 |
| | 201710300003553 N. E. CONSTRUCTION, LLP | |
| | AW 1 | |

App. 479

# EXHIBIT A-41



Last statement: February 28, 2018
This statement: March 31, 2018
Total days in statement period: 31

SOUTHERN PROPERTIES CAPITAL, LTD
BROWNING PLACE
1603 LBJ FWY SUITE 800
DALLAS TX 75234

Page 1
████4800
( 22)

Direct inquiries to:
800-892-5430

*EFFECTIVE JANUARY 18, 2017, OUR ACCOUNT TERMS AND CONDITIONS WILL CHANGE. TO VIEW SUMMARY OF CHANGES AND REVISED CLIENT MANUAL, GO TO WWW.LEUMIUSA.COM/CLIENT-MANUAL*

## Commercial Checking

| | | | |
|---|---|---|---|
| Account number | ████4800 | Beginning balance | $23,438,125.71 |
| Enclosures | 22 | Total additions | 6,421,453.08 |
| Low balance | $713,287.07 | Total subtractions | 26,315,015.74 |
| Average balance | $11,817,749.80 | Ending balance | $3,544,563.05 |
| Avg collected balance | $11,817,749 | | |

### CHECKS

| Number | Date | Amount | Number | Date | Amount |
|---|---|---|---|---|---|
| 303194 | 03-07 | 34,308.64 | 303405 | 03-13 | 243.43 |
| 303227 * | 03-01 | 4,000.00 | 303420 * | 03-09 | 1,246.04 |
| 303228 | 03-02 | 2,200.00 | 303421 | 03-19 | 1,500.00 |
| 303282 * | 03-09 | 540.00 | 303444 * | 03-13 | 17,738.39 |
| 303320 * | 03-01 | 25,039.41 | 303448 * | 03-15 | 40,075.77 |
| 303358 * | 03-07 | 57,383.00 | 303464 * | 03-19 | 2,150.08 |
| 303402 * | 03-20 | 375.00 | 303602 * | 03-30 | 18,724.02 |
| 303403 | 03-13 | 960.00 | * Skip in check sequence | | |
| 303404 | 03-08 | 1,893.89 | | | |

### DEBITS

| Date | Description | Subtractions |
|---|---|---|
| 03-07 | Wire Out Intl | 995.00 |
| | 201803070002775 COLLAS CRILL FARARA KERINS | |
| | INVOICE BNB1 0001256 | |

App. 481

SOUTHERN PROPERTIES CAPITAL, LTD                                    Page 2
March 31, 2018                                                    ███4800

| Date | Description | Subtractions |
|------|-------------|-------------:|
| 03-07 | Wire Out Intl | 20,789.00 |
| | 201803070002776 THE TEL AVIV STOCK EXCHANGE LTD | |
| | ACCOUNT 214604 | |
| 03-07 | ' Wire Out | 100,000.00 |
| | 201803070002774 EQK BRIDGEVIEW PLAZA | |
| | TRANSFER OF FUNDS | |
| 03-09 | ' Wire Out | 3,100,365.47 |
| | 201803090000650 JMJ DEVELOPMENT INC. | |
| | PARC AT WINDMILL FARMS | |
| 03-15 | ' Analysis Results Chg | 924.60 |
| | ANALYSIS ACTIVITY FOR 02/18 | |
| 03-16 | ' Transfer Debit | 20,000,000.00 |
| | TRANSFER TO DEPOSIT ACCOUNT 6611861170 | |
| 03-26 | ' Wire Out | 2,883,564.00 |
| | 201803260001410 HERITAGE GUARANTY HOLDINGS | |
| | MCKINNEY POINTE APTS | |

**CREDITS**

| Date | Description | Additions |
|------|-------------|----------:|
| 03-02 | Wire IN | 588.45 |
| | 201803020003944 DEMAND DEPOSITS-MCCRACKEN CASH OUT | |
| | E OFFSITE ESC25809 | |
| 03-13 | Wire IN | 1,070,864.63 |
| | 201803130001650 WHITNEY BANK TRUST DEPOSITS | |
| | DISTRIBUTION PER ESCROWAGREEMENT | |
| 03-14 | Wire IN | 500,000.00 |
| | 201803140001463 REGIS REALTY PRIME LLC | |
| | 600 LAS COLINAS EXCESS CASH | |
| 03-23 | ' Cash Mgmt Trsfr Cr | 2,000,000.00 |
| | REF 0821040L FUNDS TRANSFER FRMDEP 6611861170 | |
| | FROM | |
| 03-29 | Wire IN | 2,850,000.00 |
| | 201803290000999 HERITAGE GUARANTY HOLDINGS INC | |
| | TION FUNDS | |

**DAILY BALANCES**

| Date | Amount | Date | Amount | Date | Amount |
|------|-------:|------|-------:|------|-------:|
| 02-28 | 23,438,125.71 | 03-13 | 21,141,876.52 | 03-23 | 3,596,851.07 |
| 03-01 | 23,409,086.30 | 03-14 | 21,641,876.52 | 03-26 | 713,287.07 |
| 03-02 | 23,407,474.75 | 03-15 | 21,600,876.15 | 03-29 | 3,563,287.07 |
| 03-07 | 23,193,999.11 | 03-16 | 1,600,876.15 | 03-30 | 3,544,563.05 |
| 03-08 | 23,192,105.22 | 03-19 | 1,597,226.07 | | |
| 03-09 | 20,089,953.71 | 03-20 | 1,596,851.07 | | |

*Thank you for banking with Bank Leuml USA*

App. 482

SOUTHERN PROPERTIES CAPITAL, LTD
December 31, 2017

Page 2
█████4800

| Date | Description | Subtractions | |
|------|-------------|--------------|--|
| 12-13 | Wire Out<br>201712130004505 COMMONWEALTH LAND TITLE<br>2228005339 WINDMILL FARMS | 2,480,383.78 | *BTL 368* |
| 12-14 | Wire Out<br>201712140002546 COMMONWEALTH LAND TITLE<br>2228005339WINDMILL FARMS | 24,351.71 | *BTL 368* |
| 12-15 | Wire Out<br>201712150004394 MANPOWER GROUP SOLUTIONS<br>INVOICE A 410080 INVOICE A 411018 | 180.00 | *BTL 388* |
| 12-15 | Wire Out Intl<br>201712150004393 GUEST KRIEGER LIMITED | 18,000.00 | *BTL 540* |
| 12-15 | Wire Out<br>201712150004392 ARCHITECTS COLLABORATIVE<br>LAKESIDE LOFTS | 8,349.35 | *BTL 390* |
| 12-15 | Wire Out<br>201712150004391 N. E. CONSTRUCTION, LLP<br>AW 2 | 707,474.15 | *BTL 390* |
| 12-15 | Analysis Results Chg<br>ANALYSIS ACTIVITY FOR 11/17 | 570.10 | *BTL 538* |
| 12-20 | Wire Out<br>201712200003819 REGIS REALTY PRIME | 45,000.00 | *BTL 540* |
| 12-20 | Wire Out<br>201712200003820 T RESIDENTIAL HOLDINGS LLC<br>MEDLEY INTEREST REIMBURSEMENT FEB 20 | 168,000.00 | *BTL 386* |
| 12-20 | Wire Out<br>201712200003818 EQK BRIDGEVIEW PLAZA<br>TRANSFER OF FUNDS | 500,000.00 | *Transfer Between Banks* |

**CREDITS**

| Date | Description | Additions | |
|------|-------------|-----------|--|
| 12-14 | Wire IN<br>201712140004897 COMMONWEALTH TITLE OF DALLAS INC<br>TATTERSALL VILLAGE APARTMENTS | 511,243.49 | *BTL 340* |
| 12-14 | Wire IN<br>201712140004873 COMMONWEALTH TITLE OF DALLAS INC<br>OCEANAIRE APARTMENTS | 1,187,905.50 | *BTL 340* |

**DAILY BALANCES**

| Date | Amount | Date | Amount | Date | Amount |
|------|--------|------|--------|------|--------|
| 11-30 | 5,470,931.62 | 12-07 | 5,193,624.72 | 12-19 | 3,618,187.58 |
| 12-01 | 5,303,431.62 | 12-08 | 5,159,316.08 | 12-20 | 2,865,111.81 |
| 12-04 | 5,259,533.62 | 12-13 | 2,678,434.90 | 12-26 | 2,862,742.19 |
| 12-05 | 5,217,457.85 | 12-14 | 4,353,232.18 | 12-27 | 2,855,425.75 |
| 12-06 | 5,193,999.72 | 12-15 | 3,618,658.58 | | |

*Thank you for banking with Bank Leumi USA*

# EXHIBIT A-42

## BORROWER'S STATEMENT

GFNo: 19-444119-DB

Date: November 15, 2019

**Loan From:** Greystone Funding Company LLC
152 West 57th Street
60th Floor
New York, NY 10019

**To:** D4IN LLC, a Texas limited liability company
1755 Wittington Place
Suite 340
Dallas, TX 75234

**Property:** HARGUS BLK 1 W/2 OF LOT 2 & LOT 3 - 6
1st Street
Ingleside, TX 78362

**Credits/Funds Received**

| | |
|---|---:|
| Loan Amount from Greystone Funding Company LLC | $25,201,000.00 |
| Lender Credit of Good Faith Deposit | $125,293.00 |
| **Total** | **$25,326,293.00** |

**Less: Charges/Disbursements**

| | | |
|---|---:|---:|
| Title Insurance to Capital Title of Texas | | $108,625.35 |
| Simultaneous, w/credit for pri to Capital Title of Texas | $78,279.00 | |
| Simultaneous w/OP 1st to Capital Title of Texas | $100.00 | |
| Survey Amend Non Residential to Capital Title of Texas | $13,032.75 | |
| Tax deletion (MTP & Binder On) to Capital Title of Texas | $20.00 | |
| T-36 Environmental Protection to Capital Title of Texas | $25.00 | |
| T19 Non-Res. Endorsement to Capital Title of Texas | $8,430.10 | |
| REM OTP T-19.1 Non-Res w/Amend to Capital Title of Texas | $8,688.50 | |
| Down Date - Mortgagee to Capital Title of Texas | $50.00 | |
| Other Title Company Charges | | $1,096.30 |
| Tax Certificate to United Tax Service, Inc. | $59.80 | |
| Texas Title Insurance Guaranty Fees to Texas Title Insurance Guaranty Association | $4.00 | |
| UCC-1 (State) to Capital Title of Texas | $30.00 | |
| Cost for Certified Copies of Probate Matters | $199.45 | |
| Down Date Endorsemens to Capital Title of Texas | $803.05 | |
| Recording Fees to Capital Title of Texas | | $1,012.00 |
| Deed of Trust | $234.00 | |
| UCC-1 (County) | $54.00 | |
| Regulatory Agreement | $190.00 | |
| Warranty Deed | $46.00 | |
| Payment and Performace Bonds | $108.00 | |
| Affidavit of Commencement | $54.00 | |
| Recording Probate Matters | $326.00 | |

Loan Charges

App. 485

**GFNo: 19-444119-DB**                                                   Page 2

Borrower understands the Closing or Escrow Agent has assembled this information representing the transaction from the best information available from other sources and cannot guarantee the accuracy thereof. The lender involved may be furnished a copy of this statement.

The undersigned hereby authorizes Capital Title of Texas, LLC to make expenditure and disbursements as shown above and approves same for payment. The undersigned also acknowledges receipt of Loan Funds, if applicable, in the amount shown above and a receipt of a copy of this Statement.

Capital Title of Texas, LLC

D4IN LLC, a Texas limited liability company

By: JMJD4, LLC, a Delaware limited liability company, its
    Managing Member

By: _____
    Robert A. Blanshard

By:_____
    Timothy Barton, Manager

*Note: Interest on existing liens is figured to the date indicated. If not paid by then, additional interest will have to be collected and your statement will be adjusted to have sufficient funds to secure release from the lienholder.

App. 486

## BORROWER'S STATEMENT

**Date:** November 15, 2019

GFNo: 19-444119A-DB

**Loan From:** Greystone Funding Company LLC
152 West 57th Street
60th Floor
New York, NY 10019

**To:** D4IN LLC, a Texas limited liability company
1755 Wittington Place
Suite 340
Dallas, TX 75234

**Property:** HARGUS BLK 1 W/2 OF LOT 2 & LOT 3 - 6
1st Street
Ingleside, TX 78362

**Credits/Funds Received**

Total................................................................................................................$0.00

**Less: Charges/Disbursements**

Other Charges & Fees ...........................................................................................$1,703.54
Additional Costs for Land Acquisition to Commonwealth Title .................................$1,703.54
of Dallas................................................................................

Total Charges/Disbursements.........................................................................$1,703.54
Net Amount Due by Borrower.........................................................................$1,703.54

Borrower understands the Closing or Escrow Agent has assembled this information representing the transaction from the best information available from other sources and cannot guarantee the accuracy thereof. The lender involved may be furnished a copy of this statement.

The undersigned hereby authorizes Capital Title of Texas, LLC to make expenditure and disbursements as shown above and approves same for payment. The undersigned also acknowledges receipt of Loan Funds, if applicable, in the amount shown above and a receipt of a copy of this Statement.

Capital Title of Texas, LLC

D4IN LLC, a Texas limited liability company

By: JMJD4, LLC, a Delaware limited liability company, its
Managing Member

By: _____
Robert A. Blanshard

By:_____
Timothy Barton, Manager

*Note: Interest on existing liens is figured to the date indicated. If not paid by then, additional interest will have to be collected and your statement will be adjusted to have sufficient funds to secure release from the lienholder.

Printed at: 11/14/2019 (09:17 am)

*Compliments of* **Capital Title of Texas, LLC- Blanshard**

App. 487

# Check Remittance

**Page:** 1/1

## Southern Properties Capital
1603 LBJ Freeway
Suite 800
Dallas 75234752347523475234TX  75234

| Vendor ID | Vendor Name | Check Name | | Payment Number | Check Date | Check Number |
|---|---|---|---|---|---|---|
| C1730 | CAPITAL TITLE OF TEXAS, LLC | CAPITAL TITLE OF TEXAS, LLC | | 054127 | 11/14/2019 | EFT000000000534 |

| Our Voucher Number | Your Voucher Number | Date | Amount | Amount Paid | Discount | Writeoff | Net |
|---|---|---|---|---|---|---|---|
| 040092 | 19-444119-DB | 11/14/2019 | $ 797,729.63 | $ 797,729.63 | $ 0.00 | $ 0.00 | $ 797,729.63 |
| | | **Totals** | $ 797,729.63 | $ 797,729.63 | $ 0.00 | $ 0.00 | $ 797,729.63 |

App. 488

# EXHIBIT A-43

Case 3:22-cv-02118-X    Document 332    Filed 10/02/23    Page 214 of 272    PageID 11679



Correct amount

# Wire Approval Confirmation

**The requests below have been transmitted successfully.**

Transmitted:     01/25/2021 09:49:50 AM (ET)
Transmitted By:   ADZYUBA

## Approved Wires

The requests below have been approved by you.

| Account | Template | Recipient | Amount | Currency | Effective | Confirmation Number | Approval Status |
|---|---|---|---|---|---|---|---|
| Southern Properties Capital Ltd - CommCk - *4800 | Commonwealth Title | Commonwealth Land Title Insurance | 1,240,702.49 | USD | 01/25/2021 | 1267024018 | 2 of 2 received |
| Additional information for recipient: REF 2200282000311 Parc at Opelika | | | | | | | |
| | | Total: 1 items for | 1,240,702.49 | USD | | | |

**Buyer's Settlement Statement**

|  | Buyer | |
|---|---|---|
|  | **Debit** | **Credit** |
| **PRECLOSING EXPENSES (continued)** | | |
| Borrower's Attorneys Fee to The Marx Firm | 9,500.00 | |
| Soil Gas Control Systems Fee to DFW Radon/Voc | 2,600.00 | |
| Company Search Fees to Capitol Services, Inc. | 1,559.38 | |
| **TITLE/ESCROW CHARGES: COMMONWEALTH LAND TITLE INSURANCE COMPANY** | | |
| Recording Fees | 650.00 | |
| Owner's & Loan Title Policies and Endorsements | 81,257.40 | |
| Mortgage Tax to Lee County Recorder | 35,491.95 | |
| **Subtotals** | 2,642,105.48 | 1,401,402.99 |
| **Balance Due FROM Buyer** | | 1,240,702.49 |
| **Totals** | 2,642,105.48 | 2,642,105.48 |

**See signature page to follow**

App. 491



SOUTHERN PROPERTIES CAPITAL, LTD                                      Page 2
January 31, 2021                                                   ████4800

| Date | Description | Subtractions |
|------|-------------|-------------:|
| 01-05 | ' Cash Mgmt Trsfr Db<br>REF 0051211L FUNDS TRANSFER TO DEP 6999187100<br>FROM LOC FEES | 6,805.56 |
| 01-05 | ' Cash Mgmt Trsfr Db<br>REF 0051301L FUNDS TRANSFER TO DEP 6611861170<br>FROM XFER FROM OPERATING TO MM | 1,500,000.00 |
| 01-07 | ' Cash Mgmt Trsfr Db<br>REF 0071610L FUNDS TRANSFER TO DEP 6611861170<br>FROM XFER FROM OPERATING TO MM | 600,000.00 |
| 01-08 | ' Wire Out<br>202101080003171 MANPOWER GROUP SOLUTIONS<br>INVOICE A 419447 | 407.92 |
| 01-08 | Wire Out Intl<br>202101080003169 C. C. R. MANAGEMENT 1998 LTD<br>INVOICE NO 40044 | 8,100.00 |
| 01-08 | Wire Out Intl<br>202101080003168 EREZ DINA AND OR EREZ<br>RECTOR FEES | 18,571.75 |
| 01-08 | Wire Out Intl<br>202101080003170 YOGI CONSULTING AND INVESTMENTS LTD<br>2020 | 18,571.75 |
| 01-08 | Wire Out Intl<br>202101080003172 LEAD N.A. LTD<br>4Q20 DIRECTOR FEES ROTEM POUGACH | 18,571.75 |
| 01-12 | Wire Out Intl<br>202101120002948 HAUTEVILLE TRUST BVI LTD<br>INVOICE 78103 | 705.00 |
| 01-15 | ' Fx Contract Db<br>DEAL# 1359794 | 9,921,826.43 |
| 01-15 | ' Analysis Results Chg<br>ANALYSIS ACTIVITY FOR 12/20 | 699.78 |
| 01-20 | ' Wire Out<br>202101200003623 HAUTEVILLE TRUST BVI LTD<br>INVOICE 78236 | 105.00 |
| 01-20 | ' Wire Out<br>202101200003625 PARC AT WINDMILL FARMS APTS<br>DEFICIT | 135,000.00 |
| 01-20 | ' Wire Out<br>202101200003624 D4DS LLC DBA<br>DEFICIT | 200,000.00 |
| 01-21 | ' Cash Mgmt Trsfr Db<br>REF 0211228L FUNDS TRANSFER TO DEP 6611861170<br>FROM XFER FROM OPERATING TO MM | 2,000,000.00 |
| 01-25 | ' Fx Contract Db<br>DEAL# 1360035 | 19,587.56 |
| 01-25 | ' Wire Out<br>202101250001625 COMMONWEALTH LAND TITLE INSURANCE<br>REF 2200282000311 PARC AT OPELIKA | 1,240,702.49 |

# EXHIBIT A-44

| **Escrow Agreement for Working Capital** | **U.S. Department of Housing and Urban Development** Office of Housing | OMB Approval No. 2502-0598 (Exp. 06/30/2017) |
|---|---|---|

**Public Reporting Burden** for this collection of information is estimated to average 0.5 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information.  Response to this request for information is required in order to receive the benefits to be derived.  This agency may not collect this information, and you are not required to complete this form unless it displays a currently valid OMB control number.  While no assurance of confidentiality is pledged to respondents, HUD generally discloses this data only in response to a Freedom of Information Act request.

**This ESCROW AGREEMENT FOR WORKING CAPITAL** (**"Agreement"**) made this 26th day of October, 2017, by and between Greystone Servicing Corporation, Inc., a Georgia corporation, (**"Lender"**), whose principal address is 419 Belle Air Lane, Warrenton, VA 20186, and D4DS LLC, a Texas limited liability company, (**"Borrower"**), whose principal address is 1755 Wittington Place, Suite 340, Dallas, TX  75234, in connection with HUD Project No. 113-35683, located in the County of Dallas, State of Texas, which Project is being constructed from the proceeds of a Loan insured by HUD and made by Lender. (The definition of any capitalized term or word used herein can be found in this Escrow Agreement for Working Capital, the Regulatory Agreement between Borrower and HUD, the Note, and/or the Security Instrument, except that the term **"Program Obligations"** means (1) all applicable statutes and any regulations issued by the Secretary pursuant thereto that apply to the Project, including all amendments to such statutes and regulations, as they become effective, except that changes subject to notice and comment rulemaking shall become effective only upon completion of the rulemaking process, and (2) all current requirements in HUD handbooks and guides, notices, and mortgagee letters that apply to the Project, and all future updates, changes and amendments thereto, as they become effective, except that changes subject to notice and comment rulemaking shall become effective only upon completion of the rulemaking process, and provided that such future updates, changes and amendments shall be applicable to the Project only to the extent that they interpret, clarify and implement terms in this Agreement rather than add or delete provisions from such document. Handbooks, guides, notices, and mortgagee letters are available on HUD's official website: (http://www.hud.gov/offices/adm/hudclips/index.cfm or a successor location to that site)).

RECITALS:

A.   HUD has issued a Firm Commitment to insure said Loan pursuant to § 221(d)(4) of the National Housing Act, as amended, and Program Obligations, on which mortgage insurance Borrower is relying for financing of the Project.

B.  The Firm Commitment is conditioned upon a working capital escrow being established and funded as indicated below.  This requirement applies to both the profit-motivated and the not-for-profit Borrower.

AGREEMENTS:

In consideration of the mutual promises and undertakings contained herein, and for the purpose of inducing the Lender to make and HUD to insure said Loan, the parties acknowledge and agree as follows:

1.     At or before initial endorsement of the Note by HUD for mortgage insurance, Borrower shall deposit, or cause to be deposited with Lender or subject to the control and order of Lender with a depository institution satisfactory to Lender in accordance with Program Obligations, the sum of $760,848.00 (**"Escrow")**.

2.     It is agreed that the Lender at all times shall control the Escrow.  In the event the Project consists of new construction and the Firm Commitment so requires, the Escrow shall be split equally between a **"Working Capital Amount"** and a **"Construction Contingency Amount"** in accordance with Program Obligations; in situations other than new construction the Escrow shall consist solely of the Working Capital Amount.  The Escrow shall take the form of [*specify as applicable*]:

> ☒   cash, and/or
> ☐    one or more unconditional, irrevocable letter(s) of credit issued to Lender by a banking institution, attached hereto as Exhibit "A".  The rating of the issuing banking institution and the duration of such letter(s) of credit shall comply with Program Obligations.

3.     It is understood that the funds in the Escrow may be released or allocated for the purposes indicated below and for no other purpose without the prior written approval of HUD.

> a.     With respect to the Working Capital Amount:
>
> (i) the cost of furniture, fixtures, and equipment for the Project that are not paid from Loan proceeds;
> (ii) the cost of marketing and leasing up the Project;
> (iii) for accruals during the course of construction, for interest, mortgage insurance premiums, taxes, ground rents, property insurance premiums and assessments, when funds available for these purposes under the Building Loan Agreement have been exhausted, and also for allocation to such accruals after completion of construction.
>
> b.     With respect to the Construction Contingency Amount (if applicable):
> (i) cost overruns;
> (ii) HUD approved change orders.

4.     Any unused balance remaining in the Escrow attributable to the Working Capital Amount will be released at Borrower's request and returned to Borrower at the later of twelve (12) months after final endorsement or when the Project has demonstrated to

HUD's satisfaction that the Project has achieved Break-Even Occupancy for each month of six (6) consecutive months.   Break-Even Occupancy is defined as 1.0 debt service coverage, based on all sources of Project income including ancillary income.  Any unused balance remaining in the Escrow attributable to the Construction Contingency Amount (if applicable) will be released at Borrower's request and returned to Borrower at final endorsement.

5.    The Escrow, when in the form of cash, shall be held by Lender or a depository institution satisfactory to the Lender and in accordance with Program Obligations.  Lender may, at any time, for any reason or no reason, draw upon any letter of credit included in the Escrow and convert the same to cash, which cash shall then be held and disbursed pursuant to the terms of this Agreement.  Fees charged by Lender and any interest earned on the Escrow shall be governed by Program Obligations.

6.    The Escrow may, at HUD's direction, be subject to immediate application to the Indebtedness if an Event of Default by Borrower occurs at any time.

*(signatures appear on following page)*

4

Each signatory below hereby certifies that each of their statements and representations contained in this Agreement and all their supporting documentation thereto are true, accurate, and complete. This Agreement has been made, presented, and delivered for the purpose of influencing an official action of HUD in insuring the Loan, and may be relied upon by HUD as a true statement of the facts contained therein.

IN WITNESS WHEREOF, the parties have duly executed this Escrow Agreement for Working Capital as of the day and year first above written.

**BORROWER:**

D4DS LLC,
a Texas limited liability company

By: _____
Timothy Barton, President

**DEPOSITORY INSTITUTION:**

_____

By: _____

_____
Print Name and Title

**LENDER:**

Greystone Servicing Corporation, Inc.,
a Georgia corporation
*Please See Counterpart*
By: ____*Signature Page Attached*____
Lisa Anderson, Vice President

Attachment: Exhibit "A"

**Warning:**

**Any person who knowingly presents a false, fictitious, or fraudulent statement or claim in a matter within the jurisdiction of the U.S. Department of Housing and Urban Development is subject to criminal penalties, civil liability, and administrative sanctions.**

App. 497

4

Each signatory below hereby certifies that each of their statements and representations contained in this Agreement and all their supporting documentation thereto are true, accurate, and complete. This Agreement has been made, presented, and delivered for the purpose of influencing an official action of HUD in insuring the Loan, and may be relied upon by HUD as a true statement of the facts contained therein.

IN WITNESS WHEREOF, the parties have duly executed this Escrow Agreement for Working Capital as of the day and year first above written.

**BORROWER:**

D4DS LLC,
a Texas limited liability company

*Please See Counterpart*

By: _____*Signature Page Attached*_____
Timothy Barton, President

**LENDER:**

Greystone Servicing Corporation, Inc.,
a Georgia corporation

By: _____
Lisa Anderson, Vice President

**DEPOSITORY INSTITUTION:**

_____

By: _____

_____
Print Name and Title

Attachment: Exhibit "A"

**Warning:**

**Any person who knowingly presents a false, fictitious, or fraudulent statement or claim in a matter within the jurisdiction of the U.S. Department of Housing and Urban Development is subject to criminal penalties, civil liability, and administrative sanctions.**

App. 498

EXHIBIT "A"

Form of Letter of Credit

N/A

**Escrow Agreement
For Operating Deficits**

**U.S. Department of Housing
and Urban Development**
Office of Housing

OMB Approval No. 2502-0598
(Exp. 06/30/2017)

Public Reporting Burden for this collection of information is estimated to average 0.5 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information.  Response to this request for information is required in order to receive the benefits to be derived. This agency may not collect this information, and you are not required to complete this form unless it displays a currently valid OMB control number.  While no assurance of confidentiality is pledged to respondents, HUD generally discloses this data only in response to a Freedom of Information Act request.

**This ESCROW AGREEMENT FOR OPERATING DEFICITS** (**"Agreement"**) made this 26th day of  October, 2017, by and between Greystone Servicing Corporation, Inc., a Georgia corporation, (**"Lender"**), whose principal address is 419 Belle Air Lane, Warrenton, VA 20186, and D4DS LLC, a Texas limited liability company, (**"Borrower")**, whose principal address is 1755 Wittington Place, Suite 340, Dallas, TX 75234, in connection with HUD Project No. 113-35683, located in the County of Dallas, State of Texas, which Project will be constructed from the proceeds of a Loan insured by HUD and made by Lender.  (The definition of any capitalized term or word used herein can be found in this Escrow Agreement for Operating Deficits, the Regulatory Agreement between Borrower and HUD, the Note, and/or the Security Instrument except that the term **"Program Obligations"** means (1) all applicable statutes and any regulations issued by the Secretary pursuant thereto that apply to the Project, including all amendments to such statutes and regulations, as they become effective, except that changes subject to notice and comment rulemaking shall become effective only upon completion of the rulemaking process, and (2) all current requirements in HUD handbooks and guides, notices, and mortgagee letters that apply to the Project, and all future updates, changes and amendments thereto, as they become effective, except that changes subject to notice and comment rulemaking shall become effective only upon completion of the rulemaking process, and provided that such future updates, changes and amendments shall be applicable to the Project only to the extent that they interpret, clarify and implement terms in this Agreement rather than add or delete provisions from such document.  Handbooks, guides, notices, and mortgagee letters are available on HUD's official website: (http://www.hud.gov/offices/adm/hudclips/index.cfm or a successor location to that site)).

RECITALS:

A.  HUD has issued a Firm Commitment to insure said Loan pursuant to § 221(d)(4) of the National Housing Act, as amended, and Program Obligations, on which mortgage insurance Borrower is relying for financing of the Project.

B.  The Firm Commitment is conditioned upon assurance that additional funds be made available for Project purposes, primarily for the absorption of any deficits resulting from the operation of the Project during the initial period of occupancy.

AGREEMENT:

App. 500

In consideration of the mutual promises and undertakings contained herein, and for the purpose of inducing the Lender to make and HUD to insure said Loan, the parties acknowledge and agree as follows:

1.  At or before initial endorsement of the Note by HUD for mortgage insurance, Borrower shall deposit, or cause to be deposited with Lender or subject to the control and order of Lender with a depository institution satisfactory to Lender in accordance with Program Obligations, the sum of $570,636.00 (**"Escrow"**).  If the Project is insured pursuant to § 223(f) of the National Housing Act, and if the Firm Commitment so requires, the amount of the Escrow shall include a debt service reserve in accordance with Program Obligations, in the amount of $N/A (**"Debt Service Reserve"**).

2.  It is agreed that the Lender at all times shall control the Escrow, and that the funds in the Escrow may be released or allocated for the purposes indicated in this Agreement and for no other purpose without the prior written approval of HUD.  The Escrow shall take the form of [*specify as applicable*]:

| | |
|---|---|
| ☒ | cash, and/or |
| ☐ | one or more unconditional, irrevocable letter(s) of credit issued to Lender by a banking institution, attached hereto as Exhibit "A".  The rating of the issuing banking institution and the duration of such letter(s) of credit shall comply with Program Obligations. |

3.  Disbursements from the Escrow may be authorized monthly with written HUD approval to meet any Cash Deficit in the operation of the Project for the time frame set forth in the following paragraph.  The term **"Cash Deficit"** means the shortfall between Rents and Reasonable Operating Expenses.

4.  Any unused balance remaining in the Escrow will be released at Borrower's request and returned to Borrower at the later of twelve (12) months after final endorsement or when the Project has demonstrated to HUD's satisfaction that the Project has achieved Break-Even Occupancy for each month of six (6) consecutive months; except unused funds in the Escrow attributable to the Debt Service Reserve, if applicable, will be released once the Project has achieved Break-Even Occupancy for each month of six (6) consecutive months.  Break-Even Occupancy is defined as 1.0 debt service coverage, based on all sources of Project income including ancillary income.

5.  The Escrow, when in the form of cash, shall be held by Lender or a depository institution satisfactory to the Lender and in accordance with Program Obligations. Lender may, at any time, for any reason or no reason, draw upon any letter of credit included in the Escrow and convert the same to cash, which cash shall then be held and disbursed pursuant to the terms of this Agreement.  Fees charged by Lender and any interest earned on the Escrow shall be governed by Program Obligations.

6.  The Escrow may, at HUD's direction, be subject to immediate application to the Indebtedness if an Event of Default by Borrower occurs at any time.

Each signatory below hereby certifies that each of their statements and representations contained in this Agreement and all their supporting documentation thereto are true, accurate, and complete.  This Agreement has been made, presented, and delivered for the purpose of influencing an official action of HUD in insuring the Loan, and may be relied upon by HUD as a true statement of the facts contained therein.

4

IN WITNESS WHEREOF, the parties have duly executed this Escrow Agreement for Operating Deficits as of the day and year first above written.

**BORROWER:**

D4DS LLC,
a Texas limited liability company

By: _____
    Timothy Barton, President

**DEPOSITORY INSTITUTION:**

_____

By: _____

_____
Print Name and Title

**LENDER:**

Greystone Servicing Corporation, Inc.,
a Georgia corporation

*Please See Counterpart
Signature Page Attached*

By: _____
    Lisa Anderson, Vice President

Attachment: Exhibit "A"

**Warning:**

**Any person who knowingly presents a false, fictitious, or fraudulent statement or claim in a matter within the jurisdiction of the U.S. Department of Housing and Urban Development is subject to criminal penalties, civil liability, and administrative sanctions.**

App. 503

IN WITNESS WHEREOF, the parties have duly executed this Escrow Agreement for Operating Deficits as of the day and year first above written.

**BORROWER:**

D4DS LLC,
a Texas limited liability company

*Please See Counterpart
Signati on Page Attached*

By: _____
Timothy Barton, President

~~DEPOSITORY INSTITUTION~~

_____

By: _____

_____

~~Print Name and Title~~

**LENDER:**

Greystone Servicing Corporation, Inc.,
a Georgia corporation

By: _____
Lisa Anderson, Vice President

Attachment  Exhibit "A"

**Warning:**

**Any person who knowingly presents a false, fictitious, or fraudulent statement or claim in a matter within the jurisdiction of the U.S. Department of Housing and Urban Development is subject to criminal penalties, civil liability, and administrative sanctions.**

Previous editions are obsolete
Replaces form HUD-92476-A (01/03)          Escrow Agreement for Operating Deficits          HUD-92476a-M (06/14)

App. 504

<u>EXHIBIT "A"</u>

Form of Letter of Credit

N/A

# EXHIBIT A-45

**Escrow Agreement
For Operating Deficits**

**U.S. Department of Housing
and Urban Development**
Office of Housing

OMB Approval No. 2502-0598
(Exp. 06/30/2017)

Public Reporting Burden for this collection of information is estimated to average 0.5 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information.  Response to this request for information is required in order to receive the benefits to be derived. This agency may not collect this information, and you are not required to complete this form unless it displays a currently valid OMB control number.  While no assurance of confidentiality is pledged to respondents, HUD generally discloses this data only in response to a Freedom of Information Act request.

**This ESCROW AGREEMENT FOR OPERATING DEFICITS** (**"Agreement"**) made this 14th day of  December, 2017, by and between Greystone Servicing Corporation, Inc., a Georgia corporation, (**"Lender"**), whose principal address is 419 Belle Air Lane, Warrenton, VA 20186, and D4FR LLC, a Texas limited liability company, (**"Borrower")**, whose principal address is 1755 Wittington Place, Suite 340, Dallas, TX 75234 in connection with HUD Project No. 113-35682, located in the County of Kaufman, State of Texas, which Project will be constructed from the proceeds of a Loan insured by HUD and made by Lender.  (The definition of any capitalized term or word used herein can be found in this Escrow Agreement for Operating Deficits, the Regulatory Agreement between Borrower and HUD, the Note, and/or the Security Instrument except that the term **"Program Obligations"** means (1) all applicable statutes and any regulations issued by the Secretary pursuant thereto that apply to the Project, including all amendments to such statutes and regulations, as they become effective, except that changes subject to notice and comment rulemaking shall become effective only upon completion of the rulemaking process, and (2) all current requirements in HUD handbooks and guides, notices, and mortgagee letters that apply to the Project, and all future updates, changes and amendments thereto, as they become effective, except that changes subject to notice and comment rulemaking shall become effective only upon completion of the rulemaking process, and provided that such future updates, changes and amendments shall be applicable to the Project only to the extent that they interpret, clarify and implement terms in this Agreement rather than add or delete provisions from such document.  Handbooks, guides, notices, and mortgagee letters are available on HUD's official website: (http://www.hud.gov/offices/adm/hudclips/index.cfm or a successor location to that site)).

RECITALS:

A.  HUD has issued a Firm Commitment to insure said Loan pursuant to § 221(d)(4) of the National Housing Act, as amended, and Program Obligations, on which mortgage insurance Borrower is relying for financing of the Project.

B.  The Firm Commitment is conditioned upon assurance that additional funds be made available for Project purposes, primarily for the absorption of any deficits resulting from the operation of the Project during the initial period of occupancy.

App. 507

AGREEMENT:

In consideration of the mutual promises and undertakings contained herein, and for the purpose of inducing the Lender to make and HUD to insure said Loan, the parties acknowledge and agree as follows:

1.  At or before initial endorsement of the Note by HUD for mortgage insurance, Borrower shall deposit, or cause to be deposited with Lender or subject to the control and order of Lender with a depository institution satisfactory to Lender in accordance with Program Obligations, the sum of $1,410,884.00 (**"Escrow"**).  If the Project is insured pursuant to § 223(f) of the National Housing Act, and if the Firm Commitment so requires, the amount of the Escrow shall include a debt service reserve in accordance with Program Obligations, in the amount of $__N/A___ (**"Debt Service Reserve"**).

2.  It is agreed that the Lender at all times shall control the Escrow, and that the funds in the Escrow may be released or allocated for the purposes indicated in this Agreement and for no other purpose without the prior written approval of HUD.  The Escrow shall take the form of [*specify as applicable*]:

☒         cash, and/or

☐         one or more unconditional, irrevocable letter(s) of credit issued to Lender by a banking institution, attached hereto as Exhibit "A".  The rating of the issuing banking institution and the duration of such letter(s) of credit shall comply with Program Obligations.

3.  Disbursements from the Escrow may be authorized monthly with written HUD approval to meet any Cash Deficit in the operation of the Project for the time frame set forth in the following paragraph.  The term **"Cash Deficit"** means the shortfall between Rents and Reasonable Operating Expenses.

4.  Any unused balance remaining in the Escrow will be released at Borrower's request and returned to Borrower at the later of twelve (12) months after final endorsement or when the Project has demonstrated to HUD's satisfaction that the Project has achieved Break-Even Occupancy for each month of six (6) consecutive months; except unused funds in the Escrow attributable to the Debt Service Reserve, if applicable, will be released once the Project has achieved Break-Even Occupancy for each month of six (6) consecutive months.  Break-Even Occupancy is defined as 1.0 debt service coverage, based on all sources of Project income including ancillary income.

5.  The Escrow, when in the form of cash, shall be held by Lender or a depository institution satisfactory to the Lender and in accordance with Program Obligations.

App. 508

Lender may, at any time, for any reason or no reason, draw upon any letter of credit included in the Escrow and convert the same to cash, which cash shall then be held and disbursed pursuant to the terms of this Agreement.  Fees charged by Lender and any interest earned on the Escrow shall be governed by Program Obligations.

6.  The Escrow may, at HUD's direction, be subject to immediate application to the Indebtedness if an Event of Default by Borrower occurs at any time.

4

Each signatory below hereby certifies that each of their statements and representations contained in this Agreement and all their supporting documentation thereto are true, accurate, and complete. This Agreement has been made, presented, and delivered for the purpose of influencing an official action of HUD in insuring the Loan, and may be relied upon by HUD as a true statement of the facts contained therein.

IN WITNESS WHEREOF, the parties have duly executed this Escrow Agreement for Operating Deficits as of the day and year first above written.

**BORROWER:**

D4FR LLC,
a Texas limited liability company

By: _____
    Timothy Barton, President

**DEPOSITORY INSTITUTION:**

_____

By: _____

_____
Print Name and Title

**LENDER:**

Greystone Servicing Corporation, Inc., a Georgia corporation

By: _*Please See Counterpart Signature Page Attached*_
    Lisa Anderson, Vice President

Attachment:  Exhibit "A"

**Warning:**

**Any person who knowingly presents a false, fictitious, or fraudulent statement or claim in a matter within the jurisdiction of the U.S. Department of Housing and Urban Development is subject to criminal penalties, civil liability, and administrative sanctions.**

Previous editions are obsolete;
Replaces form HUD-92476-A (01/03)    Escrow Agreement for Operating Deficits    HUD-92476a-M (06/14)

App. 510

4

Each signatory below hereby certifies that each of their statements and representations contained in this Agreement and all their supporting documentation thereto are true, accurate, and complete. This Agreement has been made, presented, and delivered for the purpose of influencing an official action of HUD in insuring the Loan, and may be relied upon by HUD as a true statement of the facts contained therein.

IN WITNESS WHEREOF, the parties have duly executed this Escrow Agreement for Operating Deficits as of the day and year first above written.

**BORROWER:**

D4FR LLC,
a Texas limited liability company
*Please See Counterpart*

By: _*Signature Page Attached*_____
Timothy Barton, President

**DEPOSITORY INSTITUTION:**

_____

By:_____

_____

Print Name and Title

**LENDER:**

Greystone Servicing Corporation, Inc., a
Georgia corporation

By: _____
Lisa Anderson, Vice President

Attachment: Exhibit "A"

**Warning:**

**Any person who knowingly presents a false, fictitious, or fraudulent statement or claim in a matter within the jurisdiction of the U.S. Department of Housing and Urban Development is subject to criminal penalties, civil liability, and administrative sanctions.**

Previous editions are obsolete:        Escrow Agreement for Operating Deficits        HUD-92476a-M (06/14)
Replaces form HUD-92476-A (01/03)

App. 511

EXHIBIT "A"

Form of Letter of Credit


Not Applicable

**Escrow Agreement for Working Capital**

**U.S. Department of Housing and Urban Development**
Office of Housing

OMB Approval No. 2502-0598
(Exp. 06/30/2017)

**Public Reporting Burden** for this collection of information is estimated to average 0.5 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information.  Response to this request for information is required in order to receive the benefits to be derived.  This agency may not collect this information, and you are not required to complete this form unless it displays a currently valid OMB control number.  While no assurance of confidentiality is pledged to respondents, HUD generally discloses this data only in response to a Freedom of Information Act request.

**This ESCROW AGREEMENT FOR WORKING CAPITAL** (**"Agreement"**) made this 14th day of December, 2017, by and between Greystone Servicing Corporation, Inc., a Georgia corporation, (**"Lender"**), whose principal address is 419 Belle Air Lane, Warrenton, VA 20186, and D4FR LLC, a Texas limited liability company, (**"Borrower"**), whose principal address is 1755 Wittington Place, Suite 340, Dallas, TX 75234, in connection with HUD Project No. 113-35682, located in the County of Kaufman, State of Texas, which Project is being constructed from the proceeds of a Loan insured by HUD and made by Lender.  (The definition of any capitalized term or word used herein can be found in this Escrow Agreement for Working Capital, the Regulatory Agreement between Borrower and HUD, the Note, and/or the Security Instrument, except that the term **"Program Obligations"** means (1) all applicable statutes and any regulations issued by the Secretary pursuant thereto that apply to the Project, including all amendments to such statutes and regulations, as they become effective, except that changes subject to notice and comment rulemaking shall become effective only upon completion of the rulemaking process, and (2) all current requirements in HUD handbooks and guides, notices, and mortgagee letters that apply to the Project, and all future updates, changes and amendments thereto, as they become effective, except that changes subject to notice and comment rulemaking shall become effective only upon completion of the rulemaking process, and provided that such future updates, changes and amendments shall be applicable to the Project only to the extent that they interpret, clarify and implement terms in this Agreement rather than add or delete provisions from such document.  Handbooks, guides, notices, and mortgagee letters are available on HUD's official website: (http://www.hud.gov/offices/adm/hudclips/index.cfm or a successor location to that site)).

RECITALS:

A.  HUD has issued a Firm Commitment to insure said Loan pursuant to § 221(d)(4) of the National Housing Act, as amended, and Program Obligations, on which mortgage insurance Borrower is relying for financing of the Project.

B.  The Firm Commitment is conditioned upon a working capital escrow being established and funded as indicated below.  This requirement applies to both the profit-motivated and the not-for-profit Borrower.

AGREEMENTS:

In consideration of the mutual promises and undertakings contained herein, and for the purpose of inducing the Lender to make and HUD to insure said Loan, the parties acknowledge and agree as follows:

1.     At or before initial endorsement of the Note by HUD for mortgage insurance, Borrower shall deposit, or cause to be deposited with Lender or subject to the control and order of Lender with a depository institution satisfactory to Lender in accordance with Program Obligations, the sum of $1,449,600.00(**"Escrow")**.

2.     It is agreed that the Lender at all times shall control the Escrow.  In the event the Project consists of new construction and the Firm Commitment so requires, the Escrow shall be split equally between a **"Working Capital Amount"** and a **"Construction Contingency Amount"** in accordance with Program Obligations; in situations other than new construction the Escrow shall consist solely of the Working Capital Amount.  The Escrow shall take the form of [*specify as applicable*]:

☒   cash, and/or
☐   one or more unconditional, irrevocable letter(s) of credit issued to Lender by a banking institution, attached hereto as Exhibit "A".  The rating of the issuing banking institution and the duration of such letter(s) of credit shall comply with Program Obligations.

3.     It is understood that the funds in the Escrow may be released or allocated for the purposes indicated below and for no other purpose without the prior written approval of HUD.

  a.    With respect to the Working Capital Amount:

      (i) the cost of furniture, fixtures, and equipment for the Project that are not paid from Loan proceeds;
      (ii) the cost of marketing and leasing up the Project;
      (iii) for accruals during the course of construction, for interest, mortgage insurance premiums, taxes, ground rents, property insurance premiums and assessments, when funds available for these purposes under the Building Loan Agreement have been exhausted, and also for allocation to such accruals after completion of construction.

  b.    With respect to the Construction Contingency Amount (if applicable):
      (i) cost overruns;
      (ii) HUD approved change orders.

4.     Any unused balance remaining in the Escrow attributable to the Working Capital Amount will be released at Borrower's request and returned to Borrower at the later of twelve (12) months  after final endorsement or when the Project has demonstrated to

App. 514

HUD's satisfaction that the Project has achieved Break-Even Occupancy for each month of six (6) consecutive months.  Break-Even Occupancy is defined as 1.0 debt service coverage, based on all sources of Project income including ancillary income.  Any unused balance remaining in the Escrow attributable to the Construction Contingency Amount (if applicable) will be released at Borrower's request and returned to Borrower at final endorsement.

5.      The Escrow, when in the form of cash, shall be held by Lender or a depository institution satisfactory to the Lender and in accordance with Program Obligations.  Lender may, at any time, for any reason or no reason, draw upon any letter of credit included in the Escrow and convert the same to cash, which cash shall then be held and disbursed pursuant to the terms of this Agreement.  Fees charged by Lender and any interest earned on the Escrow shall be governed by Program Obligations.

6.      The Escrow may, at HUD's direction, be subject to immediate application to the Indebtedness if an Event of Default by Borrower occurs at any time.

Each signatory below hereby certifies that each of their statements and representations contained in this Agreement and all their supporting documentation thereto are true, accurate, and complete. This Agreement has been made, presented, and delivered for the purpose of influencing an official action of HUD in insuring the Loan, and may be relied upon by HUD as a true statement of the facts contained therein.

IN WITNESS WHEREOF, the parties have duly executed this Escrow Agreement for Working Capital as of the day and year first above written.

**BORROWER:**

D4FR LLC,
a Texas limited liability company

By: _____
    Timothy Barton, President

**LENDER:**

GREYSTONE SERVICING CORPORATION, INC.,
a Georgia corporation

*Please See Counterpart
Signature Page Attached*

By: _____
    Lisa Anderson, Vice President

Attachment: Exhibit "A"

**Warning:**

**Any person who knowingly presents a false, fictitious, or fraudulent statement or claim in a matter within the jurisdiction of the U.S. Department of Housing and Urban Development is subject to criminal penalties, civil liability, and administrative sanctions.**

Each signatory below hereby certifies that each of their statements and representations contained in this Agreement and all their supporting documentation thereto are true, accurate, and complete. This Agreement has been made, presented, and delivered for the purpose of influencing an official action of HUD in insuring the Loan, and may be relied upon by HUD as a true statement of the facts contained therein.

IN WITNESS WHEREOF, the parties have duly executed this Escrow Agreement for Working Capital as of the day and year first above written.

**BORROWER:**

D4FR LLC,
a Texas limited liability company

*Please See Counterpart*

By: _____*Signature Page Attached*_____

Timothy Barton, President

**LENDER:**

GREYSTONE SERVICING CORPORATION, INC.,
a Georgia corporation

By: _____

Lisa Anderson, Vice President

Attachment: Exhibit "A"

**Warning:**

**Any person who knowingly presents a false, fictitious, or fraudulent statement or claim in a matter within the jurisdiction of the U.S. Department of Housing and Urban Development is subject to criminal penalties, civil liability, and administrative sanctions.**

EXHIBIT "A"

Form of Letter of Credit

**Not Applicable**

# EXHIBIT A-46

Bellwether Ridge Apa
FHA Project #:  11:

## SETTLEMENT STATEMENT

**SOURCES**

| | |
|---|---|
| Loan Proceeds | 1,115,040.00 |
| Good Faith Deposit | 96,655.00 |
| Borrower's Required Deposit (See Reconciliation) | 996,006.05 |
| **TOTAL SOURCES** | $    2,207, |

**USES**

1. A check is to be issued to <u>Steere CM, Inc.</u>
   Land Use & Zoning                                                                         9.
   *This check is to be mailed to:*
   *2627 Winding View, Suite 100*
   *San Antonio, TX 78260*
   *Reference:  Project #2017-02, Invoice #001*

2. A check is to be issued to <u>HR Sterling, LLC</u>
   Printing & Postage                                                                        3.
   *This check is to be mailed to:*
   *1800 Valley View Lane, Suite 150*
   *Dallas, TX 75234*
   *Reference:  Invoice #1733*

3. A check is to be issued to <u>Stantec</u>
   Stantec                                                                                   14,
   *This check is to be mailed to:*
   *12222 Merit Drive, Suite 400*
   *Dallas, TX 75251*
   *Reference:  Invoice #1242247*

4. A check is to be issued to <u>Henderson Design</u>
   Henderson Design                                                                         21,
   *This check is to be mailed to:*
   *Need mailing instructions*
   *Reference:  Bellwether Ridge Apartments*

5. A check is to be issued to <u>NE Construction</u>

| | |
|---|---|
| Bond | 132,000.00 |
| Builder's Risk | 94,000.00 |
| General Liability | 24,000.00 |
| Total | 250, |

   *This check is to be mailed to:*
   *420 Southfork Drive*
   *Lewisville, TX 75057*
   *Reference:  Bellwether Ridge Apartments*

App. 520

6. A check is to be issued to <u>BGO Architects</u>
Architect, Design                                                     50,
*This check is to be mailed to:*
*4202 Beltway Drive*
*Addison, Texas 75001*
*Reference: Invoice #17-09003*

7. A check is to be issued to <u>Insurance Professionals of Arizona, LLC</u>
General Liability                                                     45,
*This check is to be mailed to:*
*17812 N. 50th Street*
*Scotsdale, AZ 85254*
*Reference: Application / Policy #APP89569210*

8. A check is to be issued to <u>Commonwealth Land Title Insurance Company</u>
Title & Recording                                                    107,

9. A check is to be issued to <u>Scott K. McDonald, PLLC</u>
Legal                                                                15,
*This check is to be mailed to:*
*1605 LBJ Freeway, Suite 620*
*Dallas, TX 75234*
*Reference: D4DS LLC -- Bellwether Ridge Loan*

10. A wire is to be sent to <u>Greystone Servicing Corporation, Inc.</u>

| | |
|---|---:|
| Working Capital Escrow | 760,848.00 |
| Operating Deficit Escrow | 570,636.00 |

*Total*                                                            1,331,
*This wire is to be sent to:*
*Bank of America*
*ABA #:* ▮▮▮▮▮▮▮
*Account #:* ▮▮▮▮▮▮
*Credit: Greystone Servicing Corporation, Inc.,*
*    Custodial Clearing Account*
*Address: 419 Belle Air Ln., Warrenton VA 20186*
*Advise: Denise Monteleone, (540)-428- 7206*
*Reference: Bellwether Ridge Apartments*

11. A wire is to be sent to <u>Greystone Servicing Corporation, Inc.</u>

| | |
|---|---:|
| Financing Fee | 214,940.00 |
| Inspection Fee Reimbursement | 95,106.00 |
| MIP Reimbursement | 47,553.00 |
| Reimbursement to Greystone | 1,515.90 |

Total                                                               359,
*This wire is to be sent to:*
*Bank of America, New York*
*100 N. Tryon St.*
*Charlotte, NC*
*ABA #:* ▮▮▮▮▮▮
*Account #:* ▮▮▮▮▮▮
*Account: Greystone Servicing Corporation, Inc.*
*Attention: Denise Monteleone, (540)-428-7206*

App. 521

**ACCEPTED: TITLE AGENT**
**COMMONWEALTH LAND TITLE INSURANCE COMPANY**


By: _____

Name: _____

Date: October _____, 2017



**ACCEPTED: MORTGAGOR**
**D4DS LLC**
a Texas limited liability company



By: _____

    Timothy Barton
    President

Date: October _____, 2017



**ACCEPTED: LENDER**
**GREYSTONE SERVICING CORPORATION, INC.**


By: *Lisa Anderson* _____

    Lisa Anderson
    Vice President

Date: October _____, 2017



**WARNING: Federal law provides that anyone who knowingly or willfully submits (or causes to su document containing any false, fictitious, misleading, or fraudulent statement/certification or ent be criminally prosecuted and may incur civil administrative liability. Penalties upon conviction**

Bellwether Ridge Apartments
FHA Project #: 113-35683

## SETTLEMENT STATEMENT - RECONCILIATION

**A. Cash Required by the HUD Commitment**                                $  2,762,994.00

**B. Items Not Included, or Invoices Exceeding the HUD Commitment**
Title [1]                                                                    0.25
Subtotal                                                          $              0.25

**C. Less: Prepaid Items**
Good Faith Deposit                                          (96,655.00)
Other Fees - Borrower [2]                                  (117,490.50)
Bond                                                              (0.20)
Architect Fee [3]                                          (246,752.40)
Exam Fee                                                     (57,064.00)
Organization [4]                                            (49,026.10)
Land Payoff                                              (1,200,000.00)
Subtotal                                                  $ (1,766,988.20)

**Borrower's Required Deposit**                                  $      996,006.05

[1] **Title:** The invoice was $107,130.25 and the loan funded $107,130.00

[2] **Other Fees - Borrower:** The invoices from Steere CM, Inc., HR Sterling, LLC, Stantec, and Henderson Design are to be paid at closing and the balance will be reimbursed to the Borrower.

[3] **Architect Fee:** The total amount funded is $297,380.00, of which $50,627.60 will be paid at closing and the balance will be reimbursed to the Borrower.

[4] **Organization:** The loan funded $50,542.00, of which $10,042.00 is organization and $40,500.00 is third party. Of the third party amount, $38,984.10 was prepaid by the Borrower and the remaining balance of $1,515.90 was advanced by Greystone, which will be reimbursed at closing.

App. 523

SOUTHERN PROPERTIES CAPITAL, LTD                      Page 2
October 31, 2017                                      ████4800

| Date | Description | Subtractions |
|------|-------------|-------------:|
| 10-02 | ' Wire Out | 678,250.00 |
|  | 201710020005895 U.S. BANK AS PAYING AGENT FOR | |
|  | T RESIDENTIAL 1837TERM LOAN 1500 | |
| 10-03 | ' Wire Out | 1,803,765.00 |
|  | 201710030003379 BERKADIA | |
|  | PAG APARTMENTS LP OPTION ADVANCE | |
| 10-03 | ' Wire Out | 1,969,729.00 |
|  | 201710030003377 BERKADIA | |
|  | WYLIE APARTMENTS LP OPTION ADVANCE | |
| 10-03 | ' Wire Out | 2,514,270.00 |
|  | 201710030003378 BERKADIA | |
|  | MCKINNEY POINTE APTS LP OPTION ADVAN | |
| 10-17 | ' Analysis Results Chg | 539.10 |
|  | ANALYSIS ACTIVITY FOR 09/17 | |
| 10-19 | ' Wire Out | 20,067.63 |
|  | 201710190003844 SHIMONOV AND CO. | |
|  | 540192622 | |
| 10-19 | Wire Out Intl | 8,086.92 |
|  | 201710190003848 AVITAL BAR-DAYAN | |
|  | DIRECTOR FEE | |
| 10-19 | Wire Out Intl | 8,086.92 |
|  | 201710190003849 YOGI CONSULTING AND INVESTMENTS LTD | |
| 10-19 | Wire Out Intl | 8,086.92 |
|  | 201710190003850 HARVEST CAPITAL MARKETS LTD | |
| 10-19 | Wire Out Intl | 25,000.00 |
|  | 201710190003845 KOST FORER GABBAY AND KASIERER | |
| 10-19 | ' Wire Out | 151,267.08 |
|  | 201710190003846 SUNCHASE AMERICAN LTD | |
|  | LOFTS AT REYNOLDS VILLAGE | |
| 10-23 | ' Wire Out | 996,006.05 |
|  | 201710230003584 COMMONWEALTH LAND TITLE INSURANCE | |
|  | GF 2228005530B | |
| 10-23 | ' Wire Out | 1,770,979.91 |
|  | 201710230003585 COMMONWEALTH LAND TITLE INSURANCE | |
|  | GF 2228005530A | |
| 10-24 | ' Wire Out | 5,000.00 |
|  | 201710240003621 ORI GROSSMAN | |
|  | ACCOUNT 67810691695 | |
| 10-26 | ' Wire Out | 60,000.00 |
|  | 201710260003231 CMBS PORTFOLIO | |
|  | TATTERSALL APTS | |
| 10-26 | ' Wire Out | 60,000.00 |
|  | 201710260003232 CMBS PORTFOLIO | |
|  | OCEANAIRE APTS | |
| 10-30 | ' Wire Out | 1,099,535.49 |
|  | 201710300003553 N. E. CONSTRUCTION, LLP | |
|  | AW 1 | |

# EXHIBIT A-47

Parc at Windmill Farms Apartments
FHA Project #:  113-35682

### SETTLEMENT STATEMENT

**SOURCES**

| | |
|---|---|
| Loan Proceeds | 1,631,093.00 |
| Good Faith Deposit | 182,703.00 |
| Borrower's Required Deposit (See Reconciliation) | 2,480,383.78 |
| **TOTAL SOURCES** | $  4,294,179.78 |

**USES**

1. A check is to be issued to Henderson Design Studio
   Henderson Design Studio      22,500.00
   *This check is to be mailed to:*
   *1330 Turtle Creek Boulevard*
   *Dallas, TX 75207*
   *Reference:  Parc at Windmill Farms Apartments*

2. A check is to be issued to HR Sterling, LLC
   Copy, Printing, Postage & Delivery      3,460.00
   *This check is to be mailed to:*
   *1755 Wittington Place, Suite 340*
   *Dallas, TX 75234*
   *Reference:  Invoice #1753*

3. A check is to be issued to Stantec
   Other Fees – Stantec      9,987.25
   *This check is to be mailed to:*
   *12222 Merit Drive, Suite 400*
   *Dallas, TX 75251*
   *Reference:  Invoice #1268959*

4. A wire is to be sent to NE Construction

   | | | |
   |---|---|---|
   | Bond | 253,000.00 | |
   | Builder's Risk | 181,000.00 | |
   | General Liability | 46,000.00 | |
   | Total | | 480,000.00 |

   *This sire is to be sent to:*
   *BBVA Compass/Houston*
   *ABA #:* ▮▮▮▮▮▮▮
   *Account #:* ▮▮▮▮▮▮
   *Account Name: N.E. Construction, LLP*
   *Reference:  Parc at Windmill Farms Apartments*

App. 526

## SETTLEMENT STATEMENT

5. A check is to be issued to BGO Architects

| | | |
|---|---|---|
| Current Amount Due | 19,390.00 | |
| Previous Balance Due | 2,522.69 | |
| Reimbursable Expense | 1,737.59 | |
| Total | | 23,650.28 |

This check is to be mailed to:
4202 Beltway Drive
Addison, TX 75001
Reference: Invoice #17-11001,

6. A check is to be issued to Insurance Professionals of Arizona
Insurance                                                                  74,025.00
This check is to be mailed to:
3521 E. Brown Rd. Ste 101
Mesa, AZ 85213
Reference: Invoice #APP158439210

7. A check is to be issued to Commonwealth Land Title Insurance Company
Title & Recording                                                          148,876.25

8. A check is to be issued to Scott K. McDonald, PLLC
Legal                                                                      12,000.00
This check is to be mailed to:
445 E. FM 1382, Suite 3, PMB 131
Cedar Hill, TX 75104
Reference: Parc at Windmill Farms Apartments

9. A wire is to be sent to Greystone Servicing Corporation, Inc.

| | | |
|---|---|---|
| Working Capital Escrow | 1,449,600.00 | |
| Operating Deficit Escrow | 1,410,884.00 | |
| Total | | 2,860,484.00 |

This wire is to be sent to:
Bank of America, New York
100 N. Tryon St.
Charlotte, NC
ABA #: ▮▮▮▮▮▮
Account #: ▮▮▮▮▮▮
Account: Greystone Servicing Corporation, Inc.,
    Custodial Clearing Account
Attention: Denise Monteleone, (540)-428- 7206
Address: 419 Belle Air Ln., Warrenton VA 20186
Reference: Parc at Windmill Farms Apartments

App. 527

## SETTLEMENT STATEMENT

10. A wire is to be sent to Greystone Servicing Corporation, Inc.

| | |
|---|---:|
| Financing Fee | 362,400.00 |
| Placement Fee | 24,997.00 |
| Inspection Fee Reimbursement | 181,200.00 |
| MIP Reimbursement | 90,600.00 |
| Total | 659,197.00 |

*This wire is to be sent to:*
*Bank of America, New York*
*100 N. Tryon St.*
*Charlotte, NC*
*ABA #:* ▉▉▉▉▉▉
*Account #:* ▉▉▉▉▉▉
*Account: Greystone Servicing Corporation, Inc.*
*Attention: Denise Monteleone, (540)-428-7206*
*Address: 419 Belle Air Ln., Warrenton VA 20186*
*Reference: Parc at Windmill Farms Apartments*

**TOTAL USES**                                                        $   4,294,179.78

App. 528

Parc at Windmill Farms Apartments
FHA Project #:  113-35682

## SETTLEMENT STATEMENT - RECONCILIATION

| | | |
|---|---|---|
| A. Cash Required by the HUD Commitment | | $  5,580,749.00 |
| | | |
| B. Items Not Included, or Invoices Exceeding the HUD Commitment | | |
| Title[1] | 0.25 | |
| Subtotal | | $          0.25 |
| | | |
| C. Less: Prepaid Items | | |
| Good Faith Deposit | (182,703.00) | |
| Other Fees - Borrower [1] | (171,918.75) | |
| Architect Fee [2] | (376,323.72) | |
| Exam Fee [3] | (108,720.00) | |
| Organization | (51,700.00) | |
| Payoff | (2,209,000.00) | |
| Subtotal | | $ (3,100,365.47) |
| | | |
| **Borrower's Required Deposit** | | $  2,480,383.78 |

[1] **Title:** The invoice was $148,876.25 and the loan funded $148,876.00.

[2] **Architect Fee:** The total amount funded is $399,974.00, of which $23,650.28 will be paid at closing and the balance will be reimbursed to the Borrower.

[3] **Exam Fee:** The amount submitted to HUD for the exam fee was $109,622.00, of which the Borrower will be reimbursed $108,720.00 at closing. After closing Greystone will request a reimbursement from HUD to the Borrower in the amount of $902.00.

App. 529

SOUTHERN PROPERTIES CAPITAL, LTD
December 31, 2017

Page 2
4800

| Date | Description | Subtractions |
|---|---|---|
| 12-13 | Wire Out | 2,480,383.78 |
| | 201712130004505 COMMONWEALTH LAND TITLE | |
| | 2228005339 WINDMILL FARMS | |
| 12-14 | Wire Out | 24,351.71 |
| | 201712140002546 COMMONWEALTH LAND TITLE | |
| | 2228005339WINDMILL FARMS | |
| 12-15 | Wire Out | 180.00 |
| | 201712150004394 MANPOWER GROUP SOLUTIONS | |
| | INVOICE A 410080 INVOICE A 411018 | |
| 12-15 | Wire Out Intl | 18,000.00 |
| | 201712150004393 GUEST KRIEGER LIMITED | |
| 12-15 | Wire Out | 8,349.35 |
| | 201712150004392 ARCHITECTS COLLABORATIVE | |
| | LAKESIDE LOFTS | |
| 12-15 | Wire Out | 707,474.15 |
| | 201712150004391 N. E. CONSTRUCTION, LLP | |
| | AW 2 | |
| 12-15 | Analysis Results Chg | 570.10 |
| | ANALYSIS ACTIVITY FOR 11/17 | |
| 12-20 | Wire Out | 45,000.00 |
| | 201712200003819 REGIS REALTY PRIME | |
| 12-20 | Wire Out | 168,000.00 |
| | 201712200003820 T RESIDENTIAL HOLDINGS LLC | |
| | MEDLEY INTEREST REIMBURSEMENT FEB 20 | |
| 12-20 | Wire Out | 500,000.00 |
| | 201712200003818 EQK BRIDGEVIEW PLAZA | |
| | TRANSFER OF FUNDS | |

CREDITS

| Date | Description | Additions |
|---|---|---|
| 12-14 | Wire IN | 511,243.49 |
| | 201712140004897 COMMONWEALTH TITLE OF DALLAS INC | |
| | TATTERSALL VILLAGE APARTMENTS | |
| 12-14 | Wire IN | 1,187,905.50 |
| | 201712140004873 COMMONWEALTH TITLE OF DALLAS INC | |
| | OCEANAIRE APARTMENTS | |

DAILY BALANCES

| Date | Amount | Date | Amount | Date | Amount |
|---|---|---|---|---|---|
| 11-30 | 5,470,931.62 | 12-07 | 5,193,624.72 | 12-19 | 3,618,187.58 |
| 12-01 | 5,303,431.62 | 12-08 | 5,159,316.08 | 12-20 | 2,865,111.81 |
| 12-04 | 5,259,533.62 | 12-13 | 2,678,434.90 | 12-26 | 2,862,742.19 |
| 12-05 | 5,217,457.85 | 12-14 | 4,353,232.18 | 12-27 | 2,855,425.75 |
| 12-06 | 5,193,999.72 | 12-15 | 3,618,658.58 | | |

*Thank you for banking with Bank Leumi USA*

App. 530

# EXHIBIT A-48



BANK LEUMI
TRADE FINANCE DEPARTMENT
350 MADISON AVENUE
NEW YORK, NY 10017
TEL. (212) 626-1123
www.leumiusa.com

NOVEMBER 13, 2019

GREYSTONE FUNDING COMPANY LLC (BENEFICIARY)
419 BELLE AIR LANE
WARRENTON, VA 20186

LETTER OF CREDIT NO.:  S30002979
FHA PROJECT NO.: 115-35872
DATE: NOVERMBER 13, 2019

TO WHOM IT MAY CONCERN:

FOR THE ACCOUNT OF PARC AT INGLESIDE ON BEHALF OF D4IN LLC, WE HEREBY
AUTHORIZE YOU OR YOUR TRANSFEREE TO DRAW ON US AT SIGHT UP TO AN
AGGREGATE AMOUNT OF ONE MILLION TWO HUNDRED FIFTY THOUSAND EIGHT HUNDRED
NINEY EIGHT DOLLARS $1,250,898.00

THIS CREDIT IS IRREVOCABLE, UNCONDITIONAL AND TRANSFERABLE. THIS CREDIT
MAY BE TRANSFERRED WITHOUT CHARGE ONE OR MORE TIMES UPON RECEIPT OF YOUR
WRITTEN INSTRUCTIONS SUBMITTED IN ACCORDANCE WITH THE ATTACHED TRANSFER
FORM.

DRAFTS DRAWN UNDER THIS CREDIT MUST SPECIFY THE NUMBER OF THIS CREDIT
AND BE PRESENTED AT THIS OFFICE IDENTIFIED BELOW NOT LATER THAN NOVEMBER
1, 2021. ANY SIGHT DRAFT MAY BE PRESENTED TO US BY ELECTRONIC,
REPROGRAPHIC, COMPUTERIZED OR AUTOMATED SYSTEM, OR BY CARBON COPY, BUT
IN ANY EVENT MUST VISIBLY BEAR THE WORD "ORIGINAL". IF THE DOCUMENT IS
SIGNED, THE SIGNATURE MAY CONSIST OF (OR MAY APPEAR TO US AS) AN
ORIGINAL HANDWRITTEN SIGNATURE, A FACSIMILE SIGNATURE OR ANY OTHER
MECHANICAL OR ELECTRONIC METHOD OF AUTHENTICATION.

THIS CREDIT SETS FORTH IN FULL THE TERMS OF OUR OBLIGATION TO YOU, AND
SUCH UNDERTAKING SHALL NOT IN ANY WAY BE MODIFIED OR AMPLIFIED BY ANY
AGREEMENT IN WHICH THIS CREDIT IS REFERRED TO OR TO WHICH THIS CREDIT
RELATES, AND ANY SUCH REFERENCE SHALL NOT BE DEEMED TO INCORPORATE
HEREIN BY REFERENCE ANY AGREEMENT.

WE ENGAGE WITH YOU THAT DRAFTS DRAWN UNDER AND IN COMPLIANCE WITH THE
TERMS OF THIS CREDIT WILL BE DULY HONORED AT BANK LEUMI USA, 350 MADISON
AVENUE, NEW YORK, NY 10017.

_____          _____
AUTHORIZED SIGNATURE                 AUTHORIZED SIGNATURE

FRAN MARTELL - 677                   FRANK CHU - 323

FIRST VICE PRESIDENT                 VICE PRESIDENT

Page 1 of 2

App. 532



BANK LEUMI
TRADE FINANCE DEPARTMENT
350 MADISON AVENUE
NEW YORK, NY 10017
TEL. (212) 626-1123
www.leumiusa.com

OUR REF NO: S30002979        DATE: November 13, 2019


            SAMPLE FORM FOR TRANSFER OF LETTER OF CREDIT


TO:   BANK LEUMI USA
      350 MADISON AVENUE
      NEW YORK, NY 10017

DATE:

RE: LETTER OF CREDIT NO. _____ ISSUED BY BANK LEUMI USA, NEW YORK

TO WHOM IT MAY CONCERN:

WE HEREBY TRANSFER TO: _____ ALL RIGHTS TO YOUR
LETTER OF CREDIT NUMBER: _____, SUBJECT TO THE TERMS OF
SUCH CREDIT. ENCLOSED IS THE ORIGINAL LETTER OF CREDIT WHICH SHOULD BE
RETURNED TO US WITH THE ENDORSEMENT OF THIS TRANSFER THEREON.



SIGNED: _____
        AUTHORIZED SIGNATURE
        <BENEFICIARY>



SIGNATURE AUTHENTICATED

_____
 (BANK)

_____
 AUTHORIZED SIGNATURE


**Page 2 of 2**

App. 533



BANK LEUMI
TRADE FINANCE DEPARTMENT
350 MADISON AVENUE
NEW YORK, NY 10017
TEL. (212) 626-1123
www.leumiusa.com

NOVEMBER 13, 2019

GREYSTONE FUNDING COMPANY LLC (BENEFICIARY)
419 BELLE AIR LANE
WARRENTON, VA 20186

LETTER OF CREDIT NO.:  S30002978
FHA PROJECT NO.: 115-35872
DATE: NOVEMBER 13, 2019

TO WHOM IT MAY CONCERN:

FOR THE ACCOUNT OF PARC AT INGLESIDE ON BEHALF OF D4IN LLC, WE HEREBY
AUTHORIZE YOU OR YOUR TRANSFEREE TO DRAW ON US AT SIGHT UP TO AN
AGGREGATE AMOUNT OF ONE MILLION EIGHTY ONE THOUSAND THREE HUNDRED NINETY
SIX DOLLARS $1,081,396.00.

THIS CREDIT IS IRREVOCABLE, UNCONDITIONAL AND TRANSFERABLE. THIS CREDIT
MAY BE TRANSFERRED WITHOUT CHARGE ONE OR MORE TIMES UPON RECEIPT OF YOUR
WRITTEN INSTRUCTIONS SUBMITTED IN ACCORDANCE WITH THE ATTACHED TRANSFER
FORM.

DRAFTS DRAWN UNDER THIS CREDIT MUST SPECIFY THE NUMBER OF THIS CREDIT
AND BE PRESENTED AT THIS OFFICE IDENTIFIED BELOW NOT LATER THAN NOVEMBER
1, 2021. ANY SIGHT DRAFT MAY BE PRESENTED TO US BY ELECTRONIC,
REPROGRAPHIC, COMPUTERIZED OR AUTOMATED SYSTEM, OR BY CARBON COPY, BUT
IN ANY EVENT MUST VISIBLY BEAR THE WORD "ORIGINAL". IF THE DOCUMENT IS
SIGNED, THE SIGNATURE MAY CONSIST OF (OR MAY APPEAR TO US AS) AN
ORIGINAL HANDWRITTEN SIGNATURE, A FACSIMILE SIGNATURE OR ANY OTHER
MECHANICAL OR ELECTRONIC METHOD OF AUTHENTICATION.

THIS CREDIT SETS FORTH IN FULL THE TERMS OF OUR OBLIGATION TO YOU, AND
SUCH UNDERTAKING SHALL NOT IN ANY WAY BE MODIFIED OR AMPLIFIED BY ANY
AGREEMENT IN WHICH THIS CREDIT IS REFERRED TO OR TO WHICH THIS CREDIT
RELATES, AND ANY SUCH REFERENCE SHALL NOT BE DEEMED TO INCORPORATE
HEREIN BY REFERENCE ANY AGREEMENT.

WE ENGAGE WITH YOU THAT DRAFTS DRAWN UNDER AND IN COMPLIANCE WITH THE
TERMS OF THIS CREDIT WILL BE DULY HONORED AT BANK LEUMI USA, 350 MADISON
AVENUE, NEW YORK, NY 10017.

AUTHORIZED SIGNATURE
FRAN MARTELL - 677

FIRST VICE PRESIDENT

AUTHORIZED SIGNATURE
FRANK CHU - 323

VICE PRESIDENT

Page 1 of 2

App. 534



BANK LEUMI
TRADE FINANCE DEPARTMENT
350 MADISON AVENUE
NEW YORK, NY 10017
TEL. (212) 626-1123
www.leumiusa.com

OUR REF NO: S30002978       DATE: November 13, 2019


       SAMPLE FORM FOR TRANSFER OF LETTER OF CREDIT


TO:   BANK LEUMI USA
      350 MADISON AVENUE
      NEW YORK, NY 10017

DATE:

RE: LETTER OF CREDIT NO. _____ ISSUED BY BANK LEUMI USA, NEW YORK

TO WHOM IT MAY CONCERN:

WE HEREBY TRANSFER TO: _____ ALL RIGHTS TO YOUR
LETTER OF CREDIT NUMBER: _____, SUBJECT TO THE TERMS OF
SUCH CREDIT. ENCLOSED IS THE ORIGINAL LETTER OF CREDIT WHICH SHOULD BE
RETURNED TO US WITH THE ENDORSEMENT OF THIS TRANSFER THEREON.



SIGNED: _____
        AUTHORIZED SIGNATURE
        <BENEFICIARY>




SIGNATURE AUTHENTICATED

_____
  (BANK)

_____
  AUTHORIZED SIGNATURE

**Page 2 of 2**

App. 535

# EXHIBIT A-49

# SIGHT DRAFT

# ORIGINAL

Dated: May 25, 2021

To:    Bank Leumi ("Drawee")
        Trade Finance Department
        350 Madison Avenue
        New York, NY 10017


        DRAWN UNDER BANK LEUMI., IRREVOCABLE UNCONDITIONAL LETTER OF CREDIT NO. S30003085, for the account of Parc At Opelika On Behalf Of D4OP LLC  dated  January 22, 2021, as presented to Drawee, for a draw in the amount of FIFTY TWO THOUSAND ONE HUNDRED TWENTY TWO DOLLARS AND 30/100 ($52,122.30) to be paid at sight drawn under Bank Leumi located at 350 Madison Avenue, New York, NY 10017, to the order of Greystone Funding Company LLC, beneficiary of said Irrevocable Unconditional Letter of Credit, by wire transfer as below instructed:


        Bank:  Bank of America, New York
        Address:  100 N. Tryon Street, Charlotte, NC 28255
        ABA #026009593
        Credit: Greystone Funding Company LLC,
            419 Belle Air Lane, Warrenton, VA 20186
        Account # ████████8256
        Reference: Parc at Opelika


        DRAWER:

        GREYSTONE FUNDING COMPANY LLC,

        By:   _____
               Debi Martin
               Senior Vice President
               May 25, 2021

App. 537

ENDORSEMENT

GREYSTONE FUNDING COMPANY LLC,

By: _____
Debi Martin
Senior Vice President
May 25, 2021

**SIGHT DRAFT**

**ORIGINAL**

Dated: January 27, 2022

To:     Bank Leumi ("Drawee")
        Trade Finance Department
        350 Madison Avenue
        New York, NY 10017

        DRAWN UNDER BANK LEUMI., IRREVOCABLE UNCONDITIONAL
LETTER OF CREDIT NO. S30003085, for the account of Parc At Opelika On Behalf Of
D4OP LLC  dated  January 22, 2021, as presented to Drawee, for a draw in the amount of
ONE HUNDRED EIGHTEEN THOUSAND FOUR HUNDRED TWENTY ONE
DOLLARS AND 33/100 ($118,421.33) to be paid at sight drawn under Bank Leumi
located at 350 Madison Avenue, New York, NY 10017, to the order of Greystone
Funding Company LLC,  beneficiary of said Irrevocable Unconditional Letter of Credit,
by wire transfer as below instructed:


        Bank:  Bank of America, New York
        Address:  100 N. Tryon Street, Charlotte, NC 28255
        ABA #026009593
        Credit: Greystone Funding Company LLC,
              419 Belle Air Lane, Warrenton, VA 20186
        Account # ████████8256
        Reference: Parc at Opelika




        DRAWER:

        GREYSTONE FUNDING COMPANY LLC,

By:     _____
        Debi Martin
        Senior Vice President
        January 27, 2022


App. 539

ENDORSEMENT

GREYSTONE FUNDING COMPANY LLC,

By: _____

Debi Martin
Senior Vice President
January 27, 2022

App. 540

# SIGHT DRAFT

# ORIGINAL

Dated: April 11, 2022

To:     Bank Leumi ("Drawee")
        Trade Finance Department
        350 Madison Avenue
        New York, NY 10017

DRAWN UNDER BANK LEUMI., IRREVOCABLE UNCONDITIONAL LETTER OF CREDIT NO. S30003085, for the account of Parc At Opelika On Behalf Of D4OP LLC  dated  January 22, 2021, as presented to Drawee, for a draw in the amount of SIX THOUSAND SEVEN HUNDRED THIRTY THREE DOLLARS AND 02/100 ($6,733.02) to be paid at sight drawn under Bank Leumi located at 350 Madison Avenue, New York, NY 10017, to the order of Greystone Funding Company LLC,  beneficiary of said Irrevocable Unconditional Letter of Credit, by wire transfer as below instructed:

        Bank:  Bank of America, New York
        Address:  100 N. Tryon Street, Charlotte, NC 28255
        ABA #026009593
        Credit: Greystone Funding Company LLC,
              419 Belle Air Lane, Warrenton, VA 20186
        Account # ███████8256
        Reference: Parc at Opelika

                        DRAWER:

                        GREYSTONE FUNDING COMPANY LLC,

                        By:     _____
                                Debi Martin
                                Senior Vice President
                                April 11, 2022

App. 541

ENDORSEMENT

GREYSTONE FUNDING COMPANY LLC,

By:    _____
       Debi Martin
       Senior Vice President
       April 11, 2022

# SIGHT DRAFT

# ORIGINAL

Dated: May 18, 2022

To:    Bank Leumi ("Drawee")
       Trade Finance Department
       350 Madison Avenue
       New York, NY 10017

DRAWN UNDER BANK LEUMI., IRREVOCABLE UNCONDITIONAL LETTER OF CREDIT NO. S30003085, for the account of Parc At Opelika On Behalf Of D4OP LLC  dated  January 22, 2021, as presented to Drawee, for a draw in the amount of ONE HUNDRED EIGHTEEN THOUSAND SIX HUNDRED NINETY ONE DOLLARS AND 32/100 ($118,691.32) to be paid at sight drawn under Bank Leumi located at 350 Madison Avenue, New York, NY 10017, to the order of Greystone Funding Company LLC,  beneficiary of said Irrevocable Unconditional Letter of Credit, by wire transfer as below instructed:

Bank:  Bank of America, New York
Address:  100 N. Tryon Street, Charlotte, NC 28255
ABA #026009593
Credit: Greystone Funding Company LLC,
       419 Belle Air Lane, Warrenton, VA 20186
Account # ███████8256
Reference: Parc at Opelika

DRAWER:

GREYSTONE FUNDING COMPANY LLC,

By:    _____
       Debi Martin
       Senior Vice President
       May 18, 2022

App. 543

ENDORSEMENT

GREYSTONE FUNDING COMPANY LLC,

By:    _____
       Debi Martin
       Senior Vice President
       May 18, 2022

**SIGHT DRAFT**

**ORIGINAL**

Dated: August 23, 2022

To: Bank Leumi ("Drawee")
   Trade Finance Department
   350 Madison Avenue
   New York, NY 10017

   DRAWN UNDER BANK LEUMI., IRREVOCABLE UNCONDITIONAL LETTER OF CREDIT NO. S30003085, for the account of Parc At Opelika On Behalf Of D4OP LLC  dated  January 22, 2021, as presented to Drawee, for a draw in the amount of ONE HUNDRED FIVE THOUSAND FOUR HUNDRED TWENTY THREE DOLLARS AND 39/100 ($105,423.39) to be paid at sight drawn under Bank Leumi located at 350 Madison Avenue, New York, NY 10017, to the order of Greystone Funding Company LLC,  beneficiary of said Irrevocable Unconditional Letter of Credit, by wire transfer as below instructed:

   Bank:  Bank of America, New York
   Address:  100 N. Tryon Street, Charlotte, NC 28255
   ABA #026009593
   Credit: Greystone Funding Company LLC,
     419 Belle Air Lane, Warrenton, VA 20186
   Account # ████████8256
   Reference: Parc at Opelika

   DRAWER:

   GREYSTONE FUNDING COMPANY LLC,

By:  _____
   Debi Martin
   Senior Vice President
   August 23, 2022

App. 545

ENDORSEMENT

GREYSTONE FUNDING COMPANY LLC,

By: _____

Debi Martin
Senior Vice President
August 23, 2022

**SIGHT DRAFT**

**ORIGINAL**

Dated: October 11, 2022

To:     Bank Leumi ("Drawee")
         Trade Finance Department
         350 Madison Avenue
         New York, NY 10017

        DRAWN UNDER BANK LEUMI., IRREVOCABLE UNCONDITIONAL
LETTER OF CREDIT NO. S30003085, for the account of Parc At Opelika On Behalf Of
D4OP LLC  dated  January 22, 2021, as presented to Drawee, for a draw in the amount of
THIRTY NINE THOUSAND THREE HUNDRED FIFTY SEVEN DOLLARS AND
66/100 ($39,357.66) to be paid at sight drawn under Bank Leumi located at 350 Madison
Avenue, New York, NY 10017, to the order of Greystone Funding Company LLC,
beneficiary of said Irrevocable Unconditional Letter of Credit, by wire transfer as below
instructed:

        Bank:  Bank of America, New York
        Address:  100 N. Tryon Street, Charlotte, NC 28255
        ABA #026009593
        Credit: Greystone Funding Company LLC,
               419 Belle Air Lane, Warrenton, VA 20186
        Account # ██████8256
        Reference: Parc at Opelika

        DRAWER:

        GREYSTONE FUNDING COMPANY LLC,

By:     _____
        Debi Martin
        Senior Vice President
        October 11, 2022

App. 547

ENDORSEMENT

GREYSTONE FUNDING COMPANY LLC,

By:    _____
       Debi Martin
       Senior Vice President
       October 11, 2022