IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § § § | |
| Plaintiff, | § § § | |
| v. | § § | No. 3:22-CV-2118-X |
| TIMOTHY LYNCH BARTON | § | |
| CARNEGIE DEVELOPMENT, LLC | § | Jury Trial Demanded |
| WALL007, LLC | § | |
| WALL009, LLC | § | |
| WALL010, LLC | § | |
| WALL011, LLC | § | |
| WALL012, LLC | § | |
| WALL016, LLC | § | |
| WALL017, LLC | § | |
| WALL019, LLC | § | |
| HAOQIANG FU (a/k/a MICHAEL FU) | § | |
| STEPHEN T. WALL | § § | |
| Defendants, | § § | |
| DJD LAND PARTNERS, LLC | § | |
| LDG001, LLC | § § | |
| Relief Defendants. | § | |

**DEFENDANT BARTON'S OPPOSITION TO
PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S
MOTION FOR APPOINTMENT OF RECEIVER, FOR A PRELIMINARY
INJUNCTION AND ANCILLARY RELIEF, AND TO LIFT STAY FOR LIMITED
<u>PURPOSE, AND BRIEF IN SUPPORT</u>**

Defendant Timothy Lynch Barton respectfully submits this Opposition to Plaintiff United States Securities and Exchange Commission's ("Plaintiff" or the "Commission") Motion for Appointment of Receiver, for a Preliminary Injunction and Ancillary Relief, and to Lift Stay for Limited Purpose, and Brief in Support ("New Receivership Request" or "Motion") [Dkt. 308].

## I.    INTRODUCTION

The Court should reject the Commission's request to appoint a new receiver.  First, the Commission has failed to trace the subject loan proceeds into most of the 82 corporate entities over which it seeks a new receivership.  The Fifth Circuit, in this case, made clear to the Commission that tracing those loan proceeds was a prerequisite to seizing any corporate entity through a receivership.  *SEC v. Barton*, 79 F.4th 573, 16-17 (5th Cir. 2023).  For 57 of the 82 entities now at issue, the Commission provided no tracing analysis.  The Commission's attempted tracing analysis for several others is clearly flawed.  Notably, the Commission's brief spends no time on the legal standards for tracing, and the Commission's accountant does not identify the accounting methodology she used to reach her conclusions.

Second, for those entities that did receive lender funds, the Commission has failed to show that this "drastic measure" is permissible under the three part test required by the Fifth Circuit. *Barton*, 79 F.4th 573 at 11.  The Commission makes no case that a receivership is necessary to prevent asset flight, as is required under governing precedents.  And the Commission does not demonstrate that "legal and less drastic equitable remedies" are inadequate, in particular an injunction against transfers and sales of assets that the Commission concedes will suffice for half the entities it previously seized through receivership.  Further, the Commission continues to assert that a receivership is necessary to ensure that adequate funds are preserved for potential future damages and disgorgement, directly contrary to the Fifth Circuit precedent.

1

The Commission also does not establish it has jurisdiction over Chinese national loans at issue in this case are qualifying "securities" over which the Commission has jurisdiction. The Circuit Courts across the country have been clear: Loans to businesses, including loans that are broken up and syndicated to multiple co-lenders, are not securities within the Commission's ambit unless they were clearly for investment purposes and structured to be later traded on a secondary market or have other key features. *See*, *e.g.*, *Kirschner v. JP Morgan Chase Bank*, *N.A.*, 79 F.4th 290, 305 (2d Cir. 2023). The co-lender agreements at issue in this case do not bear those hallmarks.

Receiverships are "extraordinary remedies." *Barton*, 10. They are tools of last resort, not to become standard operating procedure where the Commission alleges securities fraud. And the Commission rarely has obtained them outside the context of ousting management who have mistreated a company's owners, that is, its shareholders. Here, the Commission seeks to strip control of multiple companies from their owners, prior to discovery or trial where the Government proves wrongdoing. The Court should reject the Commission's motion.

## II. BACKGROUND

### A. JMJ Development LLC Was a Real Estate Development Business Long Before the Loans in Question in This Case.

The motion before the Court, in part, concerns whether and to what extent various corporate entities received the loan proceeds from China that are the subject of the Commission's lawsuit. Each of these entities played a role in the real estate development business founded by Mr. Barton. Mr. Barton founded JMJ Development LLP ("JMJ Development") in 1990 as the laboring oar in a real estate development business that had long concerned taking underutilized land and transforming it into single family homes, apartments, or hotels. As is customary in the real estate development industry, the Defendant would start a special purpose corporate entity for each property under development. In the years before receipt of the first dollar of subject lender

funds, JMJ Development led major projects.  Significant revenue-generating projects started before 2017 and continued over the next three years.  *See, e.g.* App. 085-089.  These included the construction of apartment projects in DeSoto, Forney, and Ingleside, Texas, as well as in Opelika, Alabama, largely financed through government loans from the United States Department of Housing and Urban Development ("HUD").

**B. The Wall Entities Borrowed Money to Engage in Real Estate Development Activities.**

In 2017, co-defendants Stephen Wall ("Mr. Wall") and Haoqiang (Michael) Fu ("Mr. Fu") asked Mr. Barton to act as the developer for several pieces of land Messrs. Wall and Fu had identified.  For each tract, a special purpose entity, named after Mr. Wall, was established (individually, "Wall Entity," and collectively, the "Wall Entities").

Platinum Investment Company ("Platinum"), owned and controlled by Mr. Fu, agreed to loan each entity a certain amount of money.  Mr. Fu and Platinum, neither of whom are subject to a court-appointed receivership themselves, then syndicated portions of these loans to Chinese nationals with whom he said he had a pre-existing business relationship.  In support of that syndication, the relevant Wall Entity and the Chinese national supporting a portion of the loan would enter into a co-lender agreement.  These agreements *never* referred to the role of the Chinese national as an "investor," nor to the funds provided as an "investment."  Instead, the agreements *consistently* referred to the Chinese national as a "co-lender," the Wall Entity as a "borrower," and the transaction as a "loan." *See, e.g.,* App. 70-77.

The co-lenders consideration for lending the funds was a promise to a fixed rate of interest. In many agreements, this rate of interest would increase if the loan were not paid back within two years.  App. 70-77.  No aspect of the co-lender agreements provided the co-lender with any greater interest or compensation if any of the Wall Entities performed better than expected.

The co-lender agreements identified a purpose for each of the loans, most often to acquire and develop a particular piece of property.  The Commission has neither identified nor provided any evidence that the management of the Wall Entity in question did not intend to purchase the identified property when the co-lender agreement was entered into.

**C.  The Wall Entities Attempted to Execute on Each of the Projects Specified in the Loan Documents.**

Each of the Wall Entities was formed to advance a particular piece of land through the process of developing them into homes.  In many cases, the target property was farm land, with no government permissions to be used for high-density residential homes, much less for utilities, roads, or planning for those communities in place.  As is common in the real estate development industry, Mr. Wall or other members of the development team purchased options to buy farm land at a fixed price for a period of time.  During the option period, the development team invested in engineering, permitting, government approval, and other development work to ensure that the property could be developed into high-density residential housing.  Once this work was done, often before the expiration of the option period, the property was worth substantially more than the un-platted farm land would have been.

In each case, the Wall Entity in question took substantial steps to advance the subject property.  In some cases, the projects succeeded:  The property proved feasible for residential development, key government approvals were obtained, and the Wall Entity executed on the contracted option to buy the farm land and to progress it further in the development process.  In other cases, despite the Wall Entity having invested significant sums in attempting to obtain approvals or to engineer the property for residential housing, the project encountered insurmountable difficulties.  In Wall 10, for example, the target property was the Lost Creek Golf Course.  That project ultimately failed, despite best efforts, do to adjacent homeowner opposition

and zoning issues. *Id*. Wall 12 and Wall 16, which the target property for was Lyon's Ranch, and Wall 17, which the target property for was Windmill Farms, similarly encountered development hurdles that ultimately led to their failures. In nearly every case, the primary lender, Platinum, which was syndicating pieces of loans to Chinese nationals did not deliver the amount budgeted for completing the project to construction financing, which generally repay initial loans for property acquisition and development like those at issue here. App. 007, Barton Testimony, 126:1-13.

When projects encountered difficulties, the management of the Wall Entities consulted with the primary lender's and co-lender's designated agent and offered to return funds that had not been consumed by the project. The agent of the primary lender and co-lenders insisted that the funds be put to work on alternative projects in the United States, rather than returned to China. App. 007, Barton Testimony, 130:22-25; App. 008, 131:1-20. These projects included the Bear Creek, Berkowitz, and Ridgeview Addition projects.

When alternative projects and uses were pursued, the Wall Entities loaned the money to their managing member—Carnegie Development, LLC ("Carnegie Development")—which in turn loaned funds to entities pursuing the alternative projects. These intercompany loans were contemporaneously documented on the books and records of the Wall Entities and Carnegie Development. This practice has been verified by both the Receiver and Mr. Gregory Ginn ("Mr. Ginn"), the Defendant's expert. Declaration and Interim Report of Cortney C. Thomas, As Receiver at 39 [Dkt. 308; App. 023 / ("Ginn Decl.") at 2.

The Defendant's master development entity—JMJ Development—was paid some of the subject funds. But there were several legitimate reasons for the Defendant's main development entity to be paid some of these funds, as JMJ Development was advancing many expenses to move

the Wall Entities and alternative development projects forward by paying engineers, civil planners, and government affairs consultants.  App. 015, Barton Testimony, 309:9-18.

### D. Efforts Were Made to Repay Chinese National Co-Lenders.

Under many of the co-lender agreements, the borrower agreed to make an annual interest payment and either to repay principal within two years or to accrue interest at a fourteen percent rate.  Initially, the Wall Entities made some of the annual interest payments back to the accounts in China from which the loan proceeds were drawn.  Later in the process, the Wall Entity management was advised that it must withhold U.S. taxes from the remittances.  Barton Testimony, Page 332, Lines 1-25, Page 33, Lines 1-4.  Around the same time, the lender's agent— Platinum and Mr. Fu—rejected the return of funds to the China-based bank accounts from which the loans were funded.  *Id*.  Instead, Mr. Fu demanded payments to him directly, contrary to the terms of the receipt of funds provided to the co-lenders.  App. 070-077.  The Wall Entity managers were advised that redirecting funds to an unrelated account designated by Mr. Fu would raise money laundering issues.  The Wall Entity contemporaneously reported Mr. Fu's demands to redirect the funds to U.S. law enforcement, including the United States Department of the Treasury and the United States Department of Justice, which opened inquiries.

### E. Procedural Background.

Mr. Fu and his company Platinum, initiated a lawsuit against Wall007 LLC and, separately, launched involuntary bankruptcy proceedings against the Wall Entities in 2019 (both of which were dismissed), after Mr. Fu rejected repayment to the Chinese accounts from which the loans were made.  The United States Bankruptcy Court for the Northern District of Texas dismissed Mr. Fu's involuntary petition.  After lengthy proceedings, the court held that Mr. Fu was not the real party in interest and could not demand that he be paid back the co-lender funds.  The bankruptcy

court attempted to give notice to the Chinese national co-lenders and offered to continue the proceedings if any of them would appear.  None did, and the court dismissed Mr. Fu's proceeding.

At the urging of Mr. Fu and his counsel, the Commission opened an investigation into the Chinse loans on October 8, 2020.  Entities associated with the Defendant produced thousands of documents to the Commission in the course of that investigation.   The Defendant voluntarily sat for two day-long interviews with Commission staff.  In the course of those productions and interviews, the Commission was provided a list of entities related to the Wall Entities and Mr. Barton's broader real estate development business and a list of bank accounts associated with entities about which the Commission inquired.  Prior to initiating this case, the Commission had thousands of pages of bank records associated with these entities.

The Commission coordinated with the Department of Justice to simultaneously launch a parallel civil proceeding and criminal prosecution against the Defendant, entirely stemming from the Commission's allegations regarding the Chinese lender loans.  On September 23, 2022, the Commission filed this action against Mr. Barton, Mr. Wall, Mr. Fu, and 11  corporate entities.  The lawsuit alleged that the loans were "securities" falling within the Commission's jurisdiction and that the Defendant committed securities fraud because, among other things, the loan proceeds were used for purposes other than those specified in various co-lender agreements.

The same day the Commission filed suit, the Department of Justice moved to unseal an indictment against the Defendant making similar allegations, and he was arrested.  Three days later, the Commission moved to place all corporate entities "directly or indirectly controlled by" Mr. Barton into receivership.  The Commission supported its motion with the declaration from its in-house accountant, Carol Hahn.  The Commission's accountant asserted that there had been

widespread "commingling" of the Chinese national loan proceeds into entities controlled by Mr. Barton and attempted to provide a handful of examples.

This Court granted the Commission's motion without a hearing, only hours after Defendant filed his opposition to such. The order had the effect of stripping the Defendant of all his assets, as he held nearly nothing outside his interest in corporate entities. As his personal home was held in the name of a limited liability corporation, the order had the effect of seizing it, and the Receiver immediately put him out on the street. Since the receivership order, the Defendant has been cut off from his corporate records and other critical information necessary to defend himself, including attorney work product that was seized by the current receiver from Mr. Barton's offices, who continues to hold such files.

The Defendant appealed. After oral argument, the Fifth Circuit reversed the Court's order imposing the receivership. *Sec. & Exch. Comm'n v. Barton*, 79 F.4th 573, 580 (5th Cir. 2023). The Circuit Court reiterated that a "[r]eceivership is 'an extraordinary remedy that should be employed with the utmost caution' and is justified only where there is a clear necessity to protect a party's interest in property, legal and less drastic equitable remedies are inadequate, and the benefits of receivership outweigh the burdens on the affected parties." *Id.* at 578. (citing *Netsphere,* 703 F.3d at 305). The Circuit Court ruled that the Commission had not been held to that significant burden in determining whether any receivership should be created.

The Fifth Circuit also held that the scope of the receivership was erroneously determined. The Circuit Court held that it was insufficient for the Commission to seize all corporate entities by "alleg[ing] that Mr. Barton has engaged in extensive commingling of funds, [and] that Mr. Barton's control is an effective proxy for placing an entity in the receivership even if it had not yet traced the funds to that entity." *Barton*, 79 F.4th 573, 580. Instead, the Fifth Circuit made clear

"the jurisdictional principle that a court's equitable powers do not extend to property unrelated to the underlying litigation applies with equal force to receiverships.  A court lacks jurisdiction to impose a receivership over property that is not the subject of an underlying claim or controversy." *Id.*

Notably, during oral argument on May 1, 2023, the panel that issued the Vacatur Order specifically asked the Commission whether the court would see the "tracing to each asset that is now under the receiver's authority" and, even more specifically, asked whether, for example, the Chinese lenders' money "*ended up* in [Mr. Barton's] home."  Oral Argument, Higginson, J., beginning at 25:25 (emphasis added).

### III.   LEGAL STANDARD

Plaintiff's New Receivership Request seeks for this Court to implement a new receivership over more than 80 different entities associated with the Defendants, pursuant to Section 21(d)(5) of the Securities Exchange Act of 1934 ("Exchange Act"), which authorizes "equitable relief" only when "appropriate or necessary," and under *Netsphere, Inc. v. Baron*, 703 F.3d 296, 305 (5th Cir. 2012).  *See* Mot. at 25 (citing 15 U.S.C. § 78u(d)(5)).  The imposition of a receivership, however, is a "drastic measure" that is not appropriate or necessary in every case where the Commission alleges violations of the Exchange Act or fraud in connection with such alleged violations.  *S.E.C. v. Spence & Green Chem. Co.*, 612 F.2d 896, 904 (5th Cir. 1980); *see also Netsphere, Inc. v. Baron*, 703 F.3d 296, 305 (5th Cir. 2012) (holding that receivership is "an extraordinary remedy that should be employed with the utmost caution").  Receiverships, by their very nature, "interfere seriously with a defendant's property rights by ousting it from control and even possession."  *S.E.C. v. Republic Nat. Life Ins. Co.*, 378 F. Supp. 430, 437 (S.D.N.Y. 1974); *see also S.E.C. v. Petrofunds, Inc.*, 414 F. Supp. 1191, 1198 (S.D.N.Y. 1976) (denying receivership in light of its

potential "disastrous" effect on defendants).  Thus, prior to ordering the extraordinary remedy of receivership, courts must undertake careful consideration of whether the evidence supports the receivership is the least restrictive alternative to stop a grave threat of future asset flight and the receivership's likely effect on the Defendants' business interests and ability to defend themselves. *See Spence & Green*, 612 F.2d at 904.

## IV.   ARGUMENT AND AUTHORITIES

### A. The Commission Has Not Carried its Burden to Prove That the Entities it Proposes to Seize Contain the Subject Loan Proceeds.

The Fifth Circuit rejected the seizure of all corporate entities "directly or indirectly controlled by" the Defendant.  Instead, the Fifth Circuit held that, "[s]hould the district court decide that a new receivership is justified on remand, it can only extend over entities that received or benefitted from assets traceable to Barton's alleged fraudulent activities that are the subject of this litigation."  *Barton*, 79 F.4th 573, at 580-81.  This holding is an application of the well-settled principle that a "court lacks jurisdiction to impose a receivership over property that is not the subject of an underlying claim or controversy."  *Id.* at 580.  It would not be enough to show that Mr. Barton has "engaged in extensive commingling of funds," and that "Barton's control is an effective proxy for placing an entity in the receivership even if it had not yet traced the funds to that entity."  *Id.*  Instead, the Commission bears the burden of tracing loan proceeds into each entity is wishes to place into receivership.  A receivership cannot be a vehicle for tying up a Defendant's assets in support of a hoped-for final judgment of liability.  *See Netsphere*, 703 F.3d at 305 (finding that a receiver may not be "named simply to secure or preserve funds for the satisfaction of a potential later judgment.")

The Commission's brief, however, contains no argument about what the applicable standards for tracing the subject loan proceeds should be, much less detail about what methodology the Commission used in its analysis.

The Commission's argument for the receivership's scope is left to be divined from the declaration of an in-house Commission accountant. But the Commission's accountant does not even attempt tracing into 57 of the 82 entities the Commission now seeks to have placed into a receivership. Those 57 entities should be immediately released from the current receivership, excluded from any newly sought equitable remedy, and returned to their owners. Those corporate entities are listed on Exhibit A to this brief. App. 019-020.

Of the 25 entities that remain, the Defendant concedes that loan proceeds were received into each of the Wall Entities and their corporate managing member, Carnegie Development LLC. Carnegie Development, in turn, loaned funds to several replacement projects when the original projects encountered difficulties, with the permission of the lenders' designated agent. These projects include the Bear Creek, Berkowitz, and Ridgeview Addition projects. There are also several corporate entities in place to directly support each Wall Entity project. The Wall Entities, their supporting corporate entities, Carnegie Development, and the replacement project corporate entities—together 16 entities—are listed on Exhibit B to this brief. App. 021.

That leaves ten corporate entities for which the Commission provided a tracing analysis and that are in controversy. They are: (1) D4DS LLC; (2) D4FR LLC (3) Enoch Investments LLC; (4) FHC Acquisitions LLC; (5) Goldmark Hospitality LLC; (6) LaJolla Construction Management LLC; (7) MO 2999TC LLC, 2999TC JMJ CMGR LLC; (8) Villita Towers LLC; (9) 126 Villita LLC; and (10) Marine Creek SP, LLC. The Government has not carried its burden as to these remaining ten entities. As explained below, the Commission's analysis deviates from

universally accepted accounting standards for tracing assets, fails to account for the wholly separate business activities of the Defendant's main operating development entity, and does not address that many of the corporations at issue were independently functioning, income-producing assets during the time of the receipt of Chinese lender funds, among other defects.

1. **The Court Should Reject Commission Arguments for a Receivership Over Entities to Which it Has Not Traced Assets.**

The Court should reject the Commission's argument that 57 entities for which it provided no tracing analysis should nonetheless be placed in the receivership. New Receivership Req. at 19-22. First, the Commission says that placing these entities into receivership is necessary *in order to* produce adequate tracing. The Fifth Circuit in this case made clear, however, that it is the Commission's burden to provide the Court adequate tracing as a prerequisite to, and thus *prior to*, a receivership being implemented. *Barton*, 79 F.4th at 580-81.

Second, generalized assertions of commingling funds are insufficient to drop a net over all companies. The Fifth Circuit squarely rejected the Commission's argument on that score. *Id.* at 580. Indeed, at oral argument, the Commission was asked what authority it has for commingling to justify a receivership. It provided no authority then, and provides no authority now. *Id.*

Third, even if it were legally possible to do so, the record in this case does not excuse the Commission from proving tracing prior to obtaining a receivership. That record demonstrates the Commission has long had access to tens of thousands of pages of bank statements, accounting records, lists of entities, and other corporate documentation. Further, Mr. Barton sat with Commission lawyers for two days of transcribed interviews, where he laid out the Wall Entity projects and replacement projects when they ran into difficulty. *See* Barton Testimony generally. And the Receiver seized all corporate records at the offices of the relevant entities.

2.        **The Tracing for the Remaining Ten Entities in Controversy is Flawed.**

The Commission's effort to trace loan proceeds into the ten corporate entities in dispute is flawed.

First, the Commission does not recognize or apply the governing legal standards for determining when a corporate entity has received subject funds sufficient to justify a receivership. The Fifth Circuit has made clear that a receivership remedy can extend only so far as the property that is the subject of the litigation, here the loan proceeds. *See, e.g., Barton*, 79 F.4th at 580; *Netsphere*, 703 F.3d at 305. To seize a whole corporation, it is not enough to show that it received some of the subject funds. Instead, whether a bank account and/or the assets of the corporation, the Government cannot seize and place into receivership portions of assets that were not the result of "ill-gotten gains." *SEC v. Heden*, 51 F. Supp. 2d 296, 302 n.4 (S.D.N.Y. 1999); *S.E.C. v. Cherif*, 933 F.2d 403, 413-14 & n.11 (7th Cir. 1991) (allowing equitable relief against a non-party to the litigation—and each of the ten entities in dispute are not parties—only to the extent "it is established that the non-party possesses illegally obtained profits but has no legitimate claim to them").

In many instances, the Commission claims to show one five-figure payment of alleged loan proceeds into a corporation. That does not justify the Commission's seizure of all the corporation's assets, including (in the case of the HUD-financed apartment complexes) projects worth tens of millions of dollars. If the Commission's analysis bears out, its claim on that corporation extends only to the extent of the subject funds.

Second, the Commission's tracing analysis is flawed because it identifies no methodology, much less one generally accepted in the accounting profession. Attached to this memorandum is the declaration of the Defendant's offered expert, certified public accountant Gregory Ginn.

Exhibit X/ ("Ginn Decl."). Mr. Ginn reviewed the tracing analysis of the Commission's in-house accountant and the tracing claims of the receiver. Neither in their reports nor in any produced materials did the Commission identify the accounting method used to trace, despite several arguably being available. Ginn Decl. at 4. The Receiver, for his part, did not even submit the opinion of an accountant, nor did the Commission's accountant validate his claims. Transparently identifying the methodology for an accounting exercise is a prerequisite for any admissible expert testimony. *United States v. Kuhrt*, 788 F.3d 403, 420 (5th Cir. 2015) ("The relevance prong requires the proponent to demonstrate that the expert's 'reasoning or methodology can be properly applied to the facts in issue.'"). Without it, it is impossible even to begin testing the expert's assertions through the adversarial process. The Commission's submission fails these basic standards.

Third, in the same vein, the Commission's analysis did not include—and the SEC has not produced despite requests to do so—any accounting work papers supporting the tracing claims regarding the ten disputed entities. Ginn Decl. at 5. Nor does the Commission's analysis identify the particular data relied on for each claim. Ginn Decl. at 5. These are core aspects to submitting a reliable expert opinion that can be verified by others. *See* Fed. R. Civ. P 702 (expert testimony must be based on "sufficient facts or data").

Fourth, the Commission's analysis does not account for funds having nothing to do with the subject loan proceeds. To trace assets into the ten entities in dispute, the Commission operated on the assumption that any corporation receiving any kind of transfer from Mr. Barton's main operating entity—JMJ Development LLC—then possessed tainted lender funds. This assumption is the basis of the tracing assertion as to the HUD financed apartment projects, the Amerigold Hotel, and others. Hahn Decl. at Exhibit A [Dkt.310-2]. But this assumption makes no effort

account for the JMJ Development LLC's receipts having nothing to do with the subject loan proceeds.  Mr. Ginn has identified at least $16 million of such unrelated receipts into JMJ Development during the relevant period.  Ginn Decl. at Schedule 11.  As the Ginn Declaration explains, the accounting profession has generally accepted principles for disaggregating allegedly tainted and untainted funds in a common account, and there is no evidence that the Commission's accountant attempted to employ them.  *Id.*

Fifth, the Commission's analysis violates professional accounting standards because it makes no effort to trace the lender funds *into any surviving property* in the corporation the Commission wishes to seize.  Ginn Decl. at 4.  This problem is particularly acute with regard to the HUD apartment buildings administer by three corporate entities in dispute:  D4DS LLC, D4FR LLC, and Enoch Investments LLC.  The properties were net income producing and their expenses were ultimately financed by Department of Housing and Urban Development loans.  Even indulging the Commission's assertion that transfers to these entities from JMJ Development raise questions, any transfers were promptly returned from financing draws and the projects were net contributors of income to JMJ development.  *Id.* at Schedule 7.  Nor does the Commission account for the third-party financing responsible for the purchase of the property in Frisco by FHC Acquisitions LLC.  *Id.* at Selected Tracing No. 9.

Sixth, the Commission's analysis does not address permitted uses of the loan proceeds. Ginn Decl. at 5.  The Commission's assumption is that any transfer of funds from the Wall Entities or their managing member—Carnegie Development LLC—is the proceeds of allegedly illegal activity.  The Defendant's operating development entities, however, did advance expenses for the projects specified in the co-lender agreements, including for the work of engineers, lawyers, government approval specialists, and other development professionals necessary to progress those

projects closer to construction financing.   Hardly a theoretical issue, Mr. Ginn's analysis shows receipt of more than $35 million into the Wall entities, when the Commission claims that only $26.3 million of Chinese national loan proceeds were received.  Ginn Decl. at Schedule 3.  The Commission cannot claim, in a manner consistent with generally accepted standards in the accounting professions, that onward transfers from the Wall Entities were all loan proceeds, without dealing with this issue.

Seventh, the Commission's analysis does not address the documentation of any transfers to other corporate entities in the accounting records of the Wall Entities and their managing member, Carnegie Development LLC.  Ginn Decl. at 5.  Those accounting records do not reflect reckless commingling of funds among multiple corporations. *Id.*  Instead, those records show that transfers from the Wall Entities to Carnegie Development LLC and then onward to other companies were carefully documented as either the reimbursement of expenses and intercompany loans that are the assets of the Wall Entities. *Id.* at Schedules 1 and 2.   Even the Receiver acknowledged this documentation in his submission to this Court.  Declaration and Interim Report of Cortney C. Thomas, As Receiver at 39 [Dkt. 308].  In possession of these Quickbooks accounting records, neither the Commission nor the Receiver can simply identify a transfer downstream from the Wall Entities and companies well beyond them and claim it must be a raid on loan proceeds.  Any tracing analysis following generally accepted standards in the accounting profession must address the reason for these transfers, stated in the books and records.  Ginn Decl. at 5.  Beyond that, in the case of intercompany loans, the Commission must account for the less drastic remedy of enforcing those loans on behalf of the Wall Entities rather than seizing all the assets of the companies that received such intercompany loans, no matter scale of those loans in comparison to the company's other assets.

Other fatal shortcomings in the Commission's tracing analysis are detailed in the Ginn report and will be elaborated upon in his testimony in the forthcoming here. These flaws are the product of the five business days provided to analyze the Commission's supporting materials, produced on September 22.

**B. The Commission Lacks Jurisdiction Because the Subject Loans Are Not Qualifying "Securities."**

The Commission has not established the elements of its securities fraud authorities and thus is jurisdiction over the Chinese loan instruments in question. New Receivership Req. at 15-16.

**1.** As an initial matter, the Commission has not brought forward evidence of fraud. The Commission complains about the use of loan proceeds on real estate development projects other than those identified in the loan documents. But the Commission presents no evidence that the Defendant did not intend to use the funds for the specified projects, when the co-lender agreements were signed. Section 10(b) requires proof of fraudulent intent at the inception of any qualifying security; it does not convert every violation of a loan's terms, every breach of contract, into a violation of federal law. *See* 15 U.S.C. § 78j(b); *Woodward v. Metro Bank of Dallas*, 522 F.2d 84, 90–91 (5th Cir. 1975) ("The court must ask whether the conduct in the case before it was the type of behavior meant to be forbidden by the securities acts, remembering that business transactions are not all reducible to a purchase or sale of a security.").

Nor does the Commission deal with undisputed evidence in the record of the specified projects encountering insurmountable difficulties, the lenders' agent authorizing the use of funds on replacement contracts, and lenders' agents interfering with repayments of funds to the Chinese nationals lenders rather than their diversion in favor of the agent's money laundering scheme.

**2.** More fundamentally, the Commission has not carried its burden to establish that these loans in multiple small-business real estate development entities were "securities" as defined by the Securities Exchange Act. Not all loans are securities. *Reves v. Ernst & Young*, 494 U.S. 56, 63-64 (1990).

The Supreme Court established the framework for determining whether a loan is a "security" in *Reves v. Ernst & Young*, 494 U.S. 56, 63-64 (1990). The *Reves* Court provided a non-exhaustive series of example loans that are not securities. *Id.* at 65. Loans that resemble those examples are not securities. *Id.* In addition, loans that do not resemble these examples may nonetheless not be "securities," under a four-factor test. *Id.* The four factors each relate to the economic realities of the relevant transaction, focusing the securities laws on notes that are issued for investment purposes and designed to trade on a secondary market. Applying the *Reves* analysis here, informed by circuit decisions addressing syndicated loans, the loans are issue here are not "securities."

**a.** To begin, the co-lender agreements here closely resemble one of the Supreme Court's examples of loans that are not securities, namely: "short-term note[s] secured by a lien on a small business or some of its assets." *Reves*, 494 U.S. at 65. The co-lender agreement is not some long-term funding, bond-like arrangement. Instead, it is "short-term," with payment due within two years. App. 070-077. It is "secured by a lien of a small business," as the collateral is a pledge of interest in the Wall Entity taking its loan and all of its assets. *Matthews v. Stolier*, 207 F. Supp. 3d 678, 686 (E.D. La. 2016) (applying *Reves* and holding that promissory note executed to secure the acquisition and development of a hospital was not a security). Relevantly, the loans were incurred to bridge the company's cash flow problems, between the pre-development and land acquisition work the company was undertaking and construction financing. *See, e.g.*, *Asset Prot. Plans, Inc.*

*v. Oppenheimer & Co.*, No. 8:11-cv-440-T-23MAP, 2011 U.S. Dist. LEXIS 68959, at \*7 (M.D. Fla. June 27, 2011) (finding notes not to be securities and noting that primary character or loans was to address a business's cash flow deficiencies).

**b.**    Beyond resemblance with the Supreme Court's examples, several factors counsel against finding the co-lender agreements securities.

**(1)** First, the co-lender agreements were not designed for investment purposes. *Reves*, 494 U.S. at 66.  For this factor, courts consider both the seller's and buyer's perspective to determine "motivations" to enter the transaction. *Kirschner v. JP Morgan Chase Bank, N.A.*, 79 F.4th 290, 305 (2d Cir. 2023).  Where a small business borrows to bridge a gap between the purchase of property and refinancing it through construction financing, the borrower is not seeking the loan for "investment purposes." *Shiny Investments, LLC v. Zeoli*, 2021 IL App (1st) 201353-U, ¶ 94 (citing *Reves*, 494 U.S. at 66) ("[Borrowers'] motivation, however, was to obtain short-term cash to purchase and refinance properties[.]").  That is the case here, as the loan's purpose was to fund pre-development and property acquisition expenses until the loan could be refinance, or repaid, through conventional construction financing.

As for the lenders' purpose, the lending agreements gave the lenders no stake in the relevant Wall Entity performing better than expected.  Instead, the interest rate was a fixed annual percentage rate; there would be no bonus if the Wall Entity's project were a surprising success.  These terms cut significantly against the loans being for an investment purpose. *Reves*, 494 U.S. at 66. Indeed,  the undisputed evidence in the record shows that the Chinese national co-lenders had a purpose other than making money off the performance of a Wall Entity.  Instead, Mr. Fu and Platinum insisted that any principal or interest repayments be directed to an account of his choosing, in the United States, and not be returned to the funding co-lender accounts in China.  For

the lender and the co-lenders, the purpose of these loans appeared to be for providing an excuse, acceptable to the Chinese Government, for transferring money out of China to the United States.

(2). Second and related, members of the investing public would not regard the co-lender agreements to be investments rather than loans. In *Kirschner v. JP Morgan Chase Bank, N.A.*, 79 F.4th 290 (2d Cir. 2023)., the Second Circuit considered at great length the circumstances under which a business loan that was broken up and syndicated to co-lenders would be considered a "security." *Id.* at 308-11. The Court placed great emphasis on the language of the co-lending agreement, which referred to the transaction as a loan and to the parties to the agreement as "the borrower" and "the lender" and which omitted any reference to the terms "investment" or "investor." *Kirschner*, 79 F.4th at 308. So too here. The co-lender agreement refer to the Wall entity in question as the "borrower," Platinum Investment Corporation as the "lender," and the relevant Chinese national as the "co-lender." The title of the agreement is "co-*lender* agreement." *Id.* The terms of the agreement reflect a straightforward loan, with a repayment period and fixed interest rate. There is no language in the co-lender agreements about "investments" or "equity interests," "shares," or "ownership." Such language gives "ample notice that the instruments were [agreements] in loans and not investments in a business enterprise." Kirschner, 79 F.4th at 308.

(3). Third, there was no "plan of distribution" for the co-lender agreements; they were not structured to facilitate a secondary market in the loans. The Commission has alleged that over 100 lenders entered into the co-lender agreements, and the evidence indicates that they were all prior business associates of Michael Fu. These loans simply were not structured to be marketed to the "general public" in the first instance or, more importantly, to be sold by the original lenders to third parties. *Kirschner*, 2020 WL 2614765, at *8. Instead, the entire point of the loans was to provide justification for transferring money from China to the United States, holding the loans the

maturity, and keeping them there.  The Loan Agreements were limited, one-time arrangements, that were not offered or sold to a broad segment of the public or designed to be traded on a secondary market.  *Reves*, 494 U.S. at 68.[1]

## C.  The Commission Has Not Demonstrated a Receivership is Necessary, is the Least Drastic Remedy Available, and that its Benefits Outweighs its Costs.

Under the binding law of this case, a "[r]eceivership is 'an extraordinary remedy that should be employed with the utmost caution' and is justified only where there is a clear necessity to protect a party's interest in property, legal and less drastic equitable remedies are inadequate, and the benefits of receivership outweigh the burdens on the affected parties."  *Barton*, 79 F.4th at 578 (quoting *Netsphere,* 703 F.3d at 305).  The Commission bears the burden of demonstrating each of these three elements.  The Commission has not done so here.  The Commission has abandoned making any showing of a risk of asset flight.  Further, it is clear that there are several less drastic measures that would provide pre-judgment security for the assets of those corporate entities that have received loan proceeds, including an injunction against sales or transfers.  And the costs of this receivership, imposing an expensive layer of management and liquidating assets at fire sale prices to raise funds for professional fees, outweigh its benefits.

---

[1] The Commission barely asserts that the loans  are "investment contracts."  They are not.  under.  The Supreme Court in *SEC v. W.J. Howey Co*. 328 U.S. 293, 298-99 (1946) adopted a four-part test and a plaintiff must satisfy each prong to establish the existence of an investment contract.  A plaintiff must show there was (1) an investment of money; (2) in a common enterprise; (3) with an expectation of profits; and (4) which profits are generated solely from the efforts of others.  *Id.* at 298-99.

The first *Howey* prong cannot be met, because there was nothing "purchased or otherwise acquired in exchange for value[,]" as would be common with an equity interest.  *See* SEC, *Framework for "Investment Contract" Analysis of Digital Assets*.  Instead, money was simply loaned.  As noted above, the monies lent pursuant to the Loan Agreements opportunities for Chinese foreign nationals to patriate money in the United States and, at the same time, receive interest on that loaned money.  Further, there was no "common enterprise" into which the lent monies went. Instead, each Loan Agreement was associated with a single real estate project.   Moreover, the Loan Agreements were not conditioned on the success of the Wall Properties, any other Barton-related entities, or Mr. Barton's efforts. Rather, "repayment of the loans was merely a function of the [Wall Properties'] ability to repay the loans," and the Commission does not allege that the Chinese lenders would "accept or that the [Wall Properties] could force [them] to accept any less than the amounts loaned."  *Wolfe v. Bellos*, No. 3:11-CV-02015-L, 2012 WL 652090, at *8 (N.D. Tex. Feb. 28, 2012) (citing *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 838 (1975)).

### a. The Commission Has Failed to Demonstrate that a Receivership is Clearly Necessary to Prevent Flight of Assets.

The Commission must prove that a receivership is clearly necessary to prevent the flight of assets from corporate entities possessing loan proceeds. Importantly, the Commission has dropped its assertions that there is any threat of asset flight. *Compare* Plaintiff Securities and Exchange Commission's Expedited Motion for Appointment of Receiver (ECF No. 6 at 18-19) *with* New Receivership Req. And appropriately so. For better or worse, the corporate assets in question are plowed into stationary real estate projects and due contractual payments for developments services. Real estate assets are necessarily transferred in plain view, through registered deeds, on the public record. They are not cash, bearer bonds, or securities that can move to foreign banks with the click of a mouse or the stroke of a pen. Courts applying *Netsphere* have been clear: Assertions that asset flight is "quite possible" are insufficient. *Accordant Commc'ns, LLC v. Sayers Constr., LLC*, No. A-19-CV-00401-LY, 2020 WL 7496657, at *3-4 (W.D. Tex. Apr. 7, 2020). Instead, the Government must show that a receivership is clearly necessary to prevent an imminent and demonstrated risk of asset flight.

Instead, the Commission rests on two justifications that are inapplicable as a matter of law. The Commission claims that a receiver must be put in place to secure or preserve funds for a potential later judgment. *See* New Receivership Mot. at 8 ("The property interests could potentially result in a recovery for investors.") That argument is directly contrary to the Fifth Circuitprecedent. *See Netsphere*, 703 F.3d at 305 ("In none of those situations was the receiver named simply to secure or preserve funds for the satisfaction of a potential later judgment.").

Second, the Commission claims that a receivership is necessary to prevent mismanagement of the entities and assets they hold. New Receivership Req. at 19-20. There are cases where receiverships were imposed to prevent mismanagement. But the prevention of mismanagement

has never been invoked to strip control of a company from its owners through a receivership. Instead, this justification has been exclusively adopted when the Commission seeks receiverships in matters involving to strip control from incompetent or fraudulent management    where the company's owners, its shareholders, are the victims.[2]

That is not  the situation here.  Mr. Barton and other individuals are the owners of the companies that the Commission is asking to seize.  The Commission cites no cases, and undersigned counsel is aware of none, where the Commission has stripped owners of a control of a company to protect the interests of lenders with no ownership of the companies in question.

Even if a concern about mismanagement were grounds for a receivership that divests control from a company's owners, the Commission has not shown that its proposed receiver is clearly necessary to so drastically improve management so as to justify the pre-judgment stripping of ownership rights.  The value of the companies lay in advancing the real estate development projects under their care.  This receiver's inclination has been to liquidate those projects, in many cases prematurely.  The Commission justifies this because of a concern of decreasing property values in a high-interest-rate environment.  The Commission's claim misstates the current condition of the real estate market in the Dallas Fort Worth area.  There is a profound shortage of housing in precisely the price range that the companies' projects are targeting.  The values of developable land are going up.  *Id.*  This is not a case where a liquidation specialist is needed to catch the falling knife in asset values.

---

[2] *See, e.g.*, *Spence & Green*, 612 F.2d at 904; *Taylor v. Trevino*, 569 F. Supp. 3d 414, 424 (N.D. Tex. 2021); *Sec. & Exch. Comm'n v. Sethi Petroleum, LLC*, 229 F. Supp. 3d 524, 536 (E.D. Tex. 2017), *aff'd sub nom. Sec. & Exch. Comm'n v. Sethi*, 910 F.3d 198 (5th Cir. 2018) *and aff'd sub nom. Sec. & Exch. Comm'n v. Sethi*, 910 F.3d 198 (5th Cir. 2018); *Sec. & Exch. Comm'n v. BioChemics, Inc.*, 435 F. Supp. 3d 281, 288 (D. Mass. 2020); *Sec. & Exch. Comm'n v. Keller Corp.*, 323 F.2d 397, 399 (7th Cir. 1963); *Sec. & Exch. Comm'n v. An-Car Oil Co., Inc.*, 604 F.2d 114, 119 (1st Cir. 1979); *S.E.C. v. Brown*, 579 F. Supp. 2d 1228, 1246 (D. Minn. 2008), *aff'd*, 658 F.3d 858 (8th Cir. 2011).

In many of the projects under management, taking the next incremental step in advancing the projects under management can significantly increase their value. One particularly significant cluster of assets are development projects in and around Venus, Texas. Attached to this submission is a letter from a real estate development professional, familiar with the projects and the area, about the next development steps required, the timeline for achieving them, and the likely effect on the value of those assets. App. 080-084. A receiver—particularly one without real estate development experience—would lay this value on the table, which would not be an enhancement in the management of these corporations (much less one significant enough to justify the stripping of property rights).

### b. The Commission Has Not Proven That "Legal and Less Drastic Equitable Remedies are Inadequate."

In recognition that "a receivership is an extraordinary remedy that should be employed with the utmost caution," the Commission must show that "legal and less drastic equitable remedies are inadequate" to serve the only arguably legitimate purpose for a receivership in this case—preventing the flight of assets. *Barton*, 79 F.4th at 578; *Netsphere*, 703 F.3d at 305; *Spence & Green*, 612 F.2d at 904. A receivership should be considered a particularly severe and drastic action when it strips control of a company from its owners, rather than liberating a company from managers who allegedly defrauded the company's shareholder-owners. The Fifth Circuit's standard is akin to the "least restrictive means" test for the "strict scrutiny" applied to incursions on constitutional rights, which is notoriously difficult to meet. *Compare Netsphere*, 703 F.3d at 305 *with Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 432-33 (2006) (describing strict scrutiny standard).

The Commission has not carried this heavy burden here. The most obvious alternative to stripping the companies' owners of control is to enter an injunction against certain transfers or

sales of company assets, absent Commission consent or Court approval.  The Commission recognizes this not a meaningless or ineffectual remedy, as it proposes a version of such an injunction for the companies over which it is not seeking a receivership in this go around.  New Receivership Req. at 22-24.

The Fifth Circuit repeatedly questioned the Commission at oral argument regarding why an injunction against alienation would not be an adequate alternative.  The Commission had little answer at oral argument, and offers not much more in its motion here.  The Commission's explanation for why an injunction is not an adequate alternative to the receivership it seeks spans a sentence: "Enjoining Barton from misusing and dissipating the assets is not enough, because, as discussed above, the entities have no cash, many of the properties require active management, and an independent third party must be put in place to marshal, manage, and maximize the available assets and claims."  New Receivership Req. at 21.  Importantly, the Commission *does not* argue that an injunction against certain transfers or alienation would be insufficient to prevent any risk of asset flight and has not presented any evidence that the Defendant or other owners of the companies in question would violate an injunction against sales or transfers.  The Commission's argument is a reversion to the Commission's claim that its proposed receiver would be a superior manager of the assets, which in turn depends on the Commission's unsupported prediction that liquidating most of the real estate development projects now—rather than managing them to maturity—would maximize their value.  The Commission also does not account for the costs of having a law firm run these companies, at high hourly rates.  Through the end of the second quarter 2023, that endeavor has costs the companies well over $1 million.  *See* Receiver's Fee Applications [Dkt. 156, 237, 300].

The Commission also argues that the appointment of a receiver is the only mechanism to stop the threat of third-party litigation against some of the assets. New Receivership Req. at 20. But the Commission cites no authority for the proposition that only through also ordering a receivership may the Court enter a stay of third-party litigation against the subject companies that the Commission views as a threat to the companies' assets. *Id.* To the contrary, this Court may order a stay of litigation against the companies from which the Court enjoins transfers or sales of assets without Commission or Court approval. *See, e.g.*, *Wolf Designs, Inc. v. Donald McEvoy Ltd., Inc.*, 341 F. Supp. 2d 639, 642–43 (N.D. Tex. 2004) (explaining "inherent power" of district courts to stay proceedings before them in deference to related actions). Such a stay of litigation—without a receivership stripping the owners of all control—would be a "legal and less drastic equitable remedy." *Barton*, 79 F.4th at 578; *Netsphere*, 703 F.3d at 305. The correct course is for the Court, as part of its order putting in place an injunction against asset transfers, to order the companies' owners and the Commission to meet and confer on what third-party claims ought to be stayed to protect the companies' assets and to propose a detailed order to the Court that does so.

Should the Commission argue that having to pass on each transfer or sale of several companies' assets would be a strain of limited agency resources, that function can be transferred to a court-appointed monitor experienced in real estate development.

Implied in the Commission's argument against an injunction is that it would lose the value of a co-prosecutor—well-funded with the assets of the Defendant's companies—to investigate the Defendant. This is not a valid argument in favor of stripping owners of control of their their companies. The Government has great power to accuse and to punish in this country. But its

effort to do so is to be funded by the Government, at least until the Government proves its allegations at trial, after the benefit of discovery and cross-examination.

In that regard, any injunction against transfer or alienation of assets must permit the expenditure of funds to pay lawyers to defend against the Government's allegations. The Fifth Circuit has overturned Government-obtained injunctions against transfers—and likely would overturn even the super-injunction of a pre-judgment receivership—when it did not allow for corporate assets to be spent on attorney fees to defend against the Government's allegations. *See Fed. Sav. & Loan Ins. Corp. v. Dixon*, 835 F.2d 554, 565 (5th Cir. 1987). In *Dixon*, the Court held that Government-sought injunctions freezing assets must permit for payment of defense costs unless the Government demonstrates likelihood of impropriety, as "the court cannot assume the wrongdoing before judgment in order to remove the defendants' ability to defend themselves." *Id.* The risk of Mr. Barton being unable to access funds to defend himself is especially pointed in light of the parallel criminal proceeding. As explained by another court, "the wound could be deep: wrongful imprisonment." *United States v. Michelle's Lounge*, 126 F.3d 1006, 1008 (7th Cir. 1997) (affirming a district court order releasing civilly forfeited funds to a defendant in a parallel criminal proceeding).

### c. The Commission Has Not Proven That the Benefits of Receivership Outweigh the Burdens on the Affected Parties.

The Government also must prove that the benefits of implementing a receivership outweigh the burdens on the affected parties. *Barton*, 79 F.4th at 578 (citing *Netsphere*, 703 F.3d at 305). The Commission has not done so here.

Again, the Commission is not meaningfully arguing that the receivership is necessary to prevent asset flight. The Commission's case for a receiver being better for everybody is that the receiver will do a better job of managing the companies. That assertion is difficult to square with

the orientation of this receiver, which has been towards liquidating assets now—before any judgment of liability—rather than managing them to maturity.  The validity of this approach, again, turns on the assertion that value of the real estate assets is falling.  New Receivership Req. at 19-20.  That assertion seems to be counterfactual.

The receivership proposed by the Commission—which appears to countenance retention of the vacated receiver—does not appear equipped to advance the real estate development projects in question to maturity.  The steps necessary to do so are incremental and achievable in the near term. *See, e.g.* App. 080-084.  But the receiver's reportsappear short on plans or preparation to take these steps.  A receivership that cannot advance the real estate development that is these companies' business is not in the interests of the companies' owners nor the lenders that the Commission believes should eventually be compensated from the companies' assets.  The costs of such a receivership outweighs its benefits.

The Court also should not disregard the cost of violently wresting property rights from the companies' owners before discovery much less a trial proving wrongdoing and liability.  This is not the normal course of events, and it is why the Fifth Circuit has repeatedly held that a prejudgment receivership is an "extraordinary remedy" to address emergent circumstances and to be avoided when less drastic measures are available.  *See Netsphere*, 703 F.3d at 305; *Redevelopment Capital Partners LLC v. N. Am. Recovery Mgmt. LLC*, No. 4:19-CV-03248, 2020 WL 2044094, at *3 (S.D. T.x. Apr. 28, 2020) ("[A]ppointment of a receiver is intended to be a rare event."); *Whisenhunt v. Park Lane Corp.*, 418 F. Supp. 1096, 1098 (N.D. Tx. 1976) (explaining that interference with use of property or appointment of a receiver "is a harsh and extreme remedy").  This issue is not present in nearly all of the receiverships sought by the Securities and Exchange Commission, which generally seek to remove a corporation's

management when they are damaging the corporation's owners—its shareholders. In this case, however, the Chinese national for which the Commission wishes to secure the companies' assets are lenders; they are not the company's owners.

All of this is not just a theoretical matter of corporate governance. The Commission asked this Court to seize the Defendant's home and continue to propose that outcome by requesting SF Rock Creek, LLC be placed in a receivership. *See* Proposed Order Appointing Receiver at 4, as attached to New Receivership Req. The now-reversed receivership also has had the effect of starving Mr. Barton of any and all resources to defend against the Government's allegations. As explained above, any replacement remedy must make allowance for the use of corporate resources for attorney fees to defend Mr. Barton against the Government's charges. Any remedy that takes all or substantially all of the Defendant's assets before trial—in hopes of using them to pay alleged victims after some eventual judgment—is an unfair effort to turn Government allegations against a citizen into a fait accompli: To make the Government's mere initiation of a case alleging wrongdoing into the equivalent of "game, set, match." It is a collateral attack on the fairness of the criminal justice process. And it (especially without allowances of defense expenses) presents costs to the administration of justice that far outweigh any incremental benefits from a receivership.

Finally, the Commission's presentation of the benefits and burdens of a receivership suffers from the tunnel litigation of this case. At most, the Commission and the Chinese national lenders it seeks to protect are, at most, future, unsecured judgment creditors against the Defendant's assets, to the extent they include the companies that the Commission seeks to cast into receivership. Importantly, many of these companies have owners other than the Defendant, including the prominent Crow family. The receivership is prioritizing all of them against other creditors, many

of whom are secured on the real estate assets as part of lending to advance the development process.

**D. The Commission Fails to Support its Request for Preliminary Injunction Over Certain Assets.**

The Defendant is proposing an injunction against transfers or sales of assets from eighteen companies that received substantial amounts of lender funds, as a "legal and less drastic" alternative to a receivership. *Barton*, 79 F.4th at 578 (quoting *Netsphere,* 703 F.3d at 305). The availability and adequacy of this alternative makes the Commission's request for the extraordinary and drastic remedy of a receivership unsustainable. *Id.*

Such an injunction should only extend to companies over which the Commission has proven to possess substantial subject loan proceeds. The Court should reject the Commission's late-breaking request for injunction casting over every company associated with Mr. Barton, whether or not the Commission has shown its possession of substantial subject loan proceeds. The Court should not allow the Commission to make freezing a person's assets—a person who has not been found guilty of a single offense—the default when the Commission is unable to make any showing that such assets are related to the claims the Commission seeks.

The Commission cites to the Fifth Circuit's opinion in this case for its statement that "[u]nder *Faulkner*, the SEC could have sought an injunction freezing asset transfers while it traced the funds and determined which entities should be placed in the receivership." *See* New Receivership Req. at 22 (citing *Barton*, 2023 WL 5618997, at *5). But in *Faulkner*, the defendants had already been convicted of crimes relating to the property for which the FDIC and a receiver sought a preliminary injunction. *See F.D.I.C. v. Faulkner,* 991 F.2d 262, 264 (5th Cir. 1993). Additionally, the plaintiffs in *Faulkner* were seeking a preliminary injunction under a particular statute not applicable here, 12 U.S.C. § 1281, which the court held intentionally removed the

"general rule" that preliminary injunctions may not be issued to protect a legal remedy. *Faulkner,* 991 F.2d at 265.  Absent the application of a statute expanding that same rule, which the Commission does not cite, a preliminary injunction cannot be appropriate to restrain entities that the Commission has failed to identify as being even remotely related to the underlying loan transactions.

The Commission's argument also turns on its assertion that is just has not had enough time and information to trace loan proceeds in question.  New Receivership Req. at 24.   That assertion is difficult to square with the record in this case.  The SEC's opened its investigation into these matters in October 2020.  In the two years that preceded the filing of this case, the SEC received tens of thousands of documents through requests for production to the Defendant and the companies in question and through third-party subpoenas to banks.  The Defendant himself sat for two-days of transcribed interviews with the SEC, where he explained the projects under the care of the Wall entities, which ones encountered difficulties, the replacement projects to which loan proceeds were redeployed, and the fees paid to Michael Fu.  In October 2022, the SEC successfully obtained a receiver over all Defendant companies, which seized their offices, electronic, and hard copy corporate records.  Since the filing of briefs in the Fifth Circuit in January 2023, the SEC has been on notice of the challenge to the adequacy of its tracing analysis.  And on the Fifth Circuit made clear that this would be major factual issue on remand.  *Barton*, 79 F.4th at 580.  On this record, not having had enough time to meet its factual burden cannot be the excuse for the Government to strip the companies' owners of their constitutionally protected property rights.

**E.  The Court Should Not Enter the Newly Requested Sworn Accounting and Preservation Order or Include Automatic Provisions Forcing the Defendant to Disclose Information in Any Replacement Receiver Order.**

The Court should deny the Commission's request for a sworn accounting and preservation order.  In addition, if the Court were to order a new receivership, it should remove portions of the

Commission's proposed order requiring the Defendant automatically to answer the new receiver's questions. These provisions are inappropriate given the parallel criminal proceeding, initiated by the same federal Government seeking what is effectively civil discovery through the requested orders.

The D.C. Circuit carefully explained the perils of the Government seeking civil discovery from a defendant while it is prosecuting him in a parallel proceeding:

> the strongest case for deferring civil proceedings until after completion of criminal proceedings is where a party under indictment for a serious offense is required to defend a civil or administrative action involving the same matter. The noncriminal proceeding, if not deferred, might undermine the party's Fifth Amendment privilege against self-incrimination, expand rights of criminal discovery beyond the limits of Federal Rule of Criminal Procedure 16(b), expose the basis of the defense to the prosecution in advance of criminal trial, or otherwise prejudice the case.

*SEC v. Dresser Indus., Inc.*, 628 F.2d 1368, 1376 (D.C. Cir. 1980) (*see also Afro-Lecon, Inc. v. United States*, 820 F.2d 1198, 1202 (Fed. Cir. 1987); *SEC v. Alexander*, Case No. 10-CV-04535-LHK, 2010 WL 5388000, at *10 (N.D. Cal. Dec. 22, 2010) (noting that, "the SEC's allegations in its civil complaint overlap significantly, if not entirely, with the criminal charges" and that the defendant's "Fifth Amendment concerns are significant, and this factor of the analysis strongly supports a stay.").

This Court already granted the Government's motion to stay the underlying case, a motion that also relied on the reasoning in *Dresser Industries.* ECF No. 44. Those same considerations cut strongly against allowing the Government to take the civil discovery it chooses that an accounting order and the compelled disclosure requirements of a new receivership order, while staying any discovery against the Government.

Again, this is not a situation where the Government has been provided no information. The Commission and the receiver already have thousands and thousands of pages of accounting and financial documentation.

For the same reasons, should this Court appoint a new receiver over any of the entities at issues, is must be one with a mandate only to oversee and maintain those entities and the assets. Any new receiver that, like its predecessor, engages in broad investigatory activity would be inappropriate and inconsistent with these principles.

## V.    CONCLUSION & PRAYER

For the foregoing reasons, Defendant respectfully requests that the Court deny Plaintiff's request for the imposition of a new receiver.


Dated: October 2, 2023

Respectfully submitted,

By: */s/ Michael J. Edney*
Michael J. Edney
Virginia Bar No. 48253
DC Bar No. 492024 (*admitted to N.D. Tex.)*
medney@huntonak.com
**HUNTON ANDREWS KURTH LLP**
2200 Pennsylvania Avenue NW
Washington, DC 20037
Phone: (202) 955-1500
Facsimile: (202) 778-2201

**COUNSEL FOR TIMOTHY LYNCH BARTON**

## CERTIFICATE OF SERVICE

On October 2, 2023 I filed the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas. I hereby certify that I have served the document on all counsel and/or pro se parties of record by a manner authorized by Federal Rules of Civil Procedure 5(b)(2).

*/s/ Michael J. Edney*