# Ex. F

**BAKER BOTTS LLP**

| | | |
|---|---|---|
| 910 LOUISIANA | AUSTIN | NEW YORK |
| HOUSTON, TEXAS | BRUSSELS | PALO ALTO |
| 77002-4995 | DALLAS | RIYADH |
| | DUBAI | SAN FRANCISCO |
| TEL | **HOUSTON** | SINGAPORE |
| FAX +1 713.229.1522 | LONDON | WASHINGTON |
| BakerBotts.com | | |

July 18, 2023

BY CERTIFIED MAIL AND E-MAIL

Tina Nguyen
TEL: 7132291304
FAX: 7132297904
tina.nguyen@bakerbotts.com

Cortney C. Thomas
BROWN FOX PLLC
8111 Preston Road, Suite 300
Dallas, Texas 75225
cort@brownfoxlaw.com
*Receiver for the Estates of the Receivership Entities*

Keefe Bernstein
UNITED STATES SECURITIES AND
EXCHANGE COMMISSION
801 Cherry Street, Suite 1900
Fort Worth, Texas 76102
bernsteink@sec.gov
*Counsel for the U.S. Securities and Exchange Commission*

Michael J. Edney
HUNTON ANDREWS KURTH LLP
2200 Pennsylvania Avenue NW
Washington, DC 20037
medney@huntonak.com
*Counsel for Defendant Timothy Barton*

> Re:    Demand for Immediate Payment under Secured Loan Agreement with Pioneer Finance, Inc.

Dear Counsel:

This firm represents Pioneer Finance, Inc. ("Pioneer") with respect to a secured loan in the original principal amount of $3,000,000.00 made to LDG001, LLC ("LDG001") and guaranteed by Timothy Barton ("Barton") and JMJ Development, LLC ("JMJ"; with Barton, "Guarantors"). For your reference, we have attached:

> (1) a Notice of Default dated November 8, 2022 from Pioneer to LDG001, Barton, JMJ, and Cortney C. Thomas, in his capacity as Receiver for the Estates of the Receivership Entities including LDG001. *See* Ex. A, Notice of Default with Attachments; and

**BAKER BOTTS** LLP

- 2 -                                                                                                          July 18, 2023

(2) the certain Promissory Note; Security Agreement; Guaranty Agreement; Deed of Trust, Security Agreement and Financing Statement ("Deed of Trust"); and Absolute Assignment of Rents—all of which shall be referenced collectively as the Loan Documents and attached to Exhibit A.[1]

As detailed by Pioneer's Notice of Default, on October 24, 2022, LDG001 and Guarantors defaulted on their obligations to make the installment payment required by the Loan Documents and all past due principal and interest became due and payable. In addition, Pioneer is also entitled under the Loan Documents to declare the Promissory Note and all other indebtedness of LDG001 to Pioneer immediately due and payable as a result of the receivership ordered by the United States District Court for the Northern District of Texas on October 18, 2022, in *Securities and Exchange Commission v. Timothy Barton, et al.,* No. 22-CV-2118-X (ECF No. 29).

Almost nine months have now passed without a single payment by LDG001 and Guarantors under the Loan Documents. Pioneer is in receipt of the Fifth Circuit's June 28, 2023 decision vacating the order appointing the receiver effective 90 days after the issuance of the court's mandate. Any new receivership order sought by the parties cannot reasonably extend to the secured loan provided by Pioneer to LDG001 on March 24, 2022, as: (1) Pioneer's loan was made years after the alleged wrongdoing which forms the foundation of the SEC's suit; and (2) Pioneer's loan is not implicated in—nor was it the cause of—the alleged fraud that the SEC is litigating. Pioneer provided a secured loan, and there is no reasonable basis to contest that Pioneer must either be paid back for its loan or is entitled to foreclose on the property securing its loan. Pioneer's rights as a secured creditor must be honored, and the debt owed by LDG001 and Guarantors must be repaid.

In sum, Pioneer renews its demand for immediate repayment. As of July 20, 2023, LDG001 and Guarantors will owe and have failed to pay $3,631,812.10, which includes the past due unpaid principal and 18% interest. **If such payment and any additional accruing amounts owed and interest is not rendered by October 20, 2023, Pioneer intends to exercise any and all of its available remedies under the Loan Documents immediately after the stay imposed by the existing Receivership Order is lifted, including but not limited to acceleration of all indebtedness evidenced by the Loan Documents, foreclosure of the property covered by the Deed of Trust, and demanding reimbursement to Pioneer of its reasonable attorney's fees, costs, and expenses incurred in collecting this debt.** Interest will continue to accrue on the matured unpaid principal in accordance with the terms of the Promissory Note until this debt is paid. Pioneer is entitled under the Promissory Note and Deed of Trust to reimbursement for its reasonable attorney's fees, costs, and expenses incurred in collecting this debt.

---

[1] Any capitalized terms used and not defined in this letter shall have the meanings given in the Loan Documents.

**BAKER BOTTS** LLP

                             - 3 -                            July 18, 2023

This correspondence is without waiver of any of Pioneer's rights or remedies under the Loan Documents or otherwise, and Pioneer hereby expressly reserves all of its rights and remedies as may be available under the Loan Documents or otherwise. Pioneer may exercise each right and remedy available to it as it may determine in its sole and absolute discretion. Nothing in this letter shall be construed as limiting or modifying any of Pioneer's rights, benefits, or privileges or any power of any original, successor, or substitute trustee under the Deed of Trust. The exercise of any such right or remedy, in whole or in part, shall not be construed as a waiver of the right to exercise at the same time or thereafter any other right or remedy available to them.

Please let me know if you have any questions concerning this matter.

Very truly yours,

Tina Q. Nguyen

**Enclosure(s)**

Cc:    Charlene Koonce and Tim Wells
        BROWN FOX PLLC
        8111 Preston Road, Suite 300
        Dallas, Texas 75225
        charlene@brownfoxlaw.com
        tim@brownfoxlaw.com
        *Counsel for the Receiver*

# Ex. A

**BAKER BOTTS** L.L.P.

ONE SHELL PLAZA
910 LOUISIANA
HOUSTON, TEXAS
77002-4995

TEL  +1 713.229.1234
FAX +1 713.229.1522
BakerBotts.com

AUSTIN        LONDON
BEIJING       MOSCOW
BRUSSELS      NEW YORK
DALLAS        PALO ALTO
DUBAI         RIYADH
HONG KONG     SAN FRANCISCO
**HOUSTON**   WASHINGTON

November 8, 2022

**BY CERTIFIED MAIL AND E-MAIL**

Tina Nguyen
TEL  +1.713.229.1304
FAX  +1.713.229.7904
tina.nguyen@bakerbotts.com

LDG001, LLC
940 County Road 110
Venus, Texas 76084

Timothy Barton
3926 Vista Woods,
Carrollton, Texas 75007
tbarton@jmjdevelopment.com

JMJ Development, LLC
13901 Midway Rd, Suite 102
Dallas, TX 75244

Cortney C. Thomas
Receiver for the Estates of the Receivership Entities
BROWN FOX PLLC
8111 Preston Road, Suite 300
Dallas, Texas 75225
cort@brownfoxlaw.com
charlene@brownfoxlaw.com

   Re:  Notice of Default

Dear Messrs. Barton and Thomas:

   This firm represents Pioneer Finance, Inc. ("Pioneer") with respect to a secured loan in the original principal amount of $3,000,000.00 made to LDG001, LLC ("LDG001") and guaranteed by Timothy Barton and JMJ Development, LLC (collectively, "Guarantors"). For reference, we have attached the certain Promissory Note; Security Agreement; Guaranty Agreement; Deed of Trust, Security Agreement and Financing Statement ("Deed of Trust"); and Absolute Assignment of Rents—all of which shall be referenced collectively as the Loan Documents. Any capitalized terms used and not defined in this letter shall have the meanings given in the Loan Documents.

   This letter is formal notice of the following:

1.  On October 24, 2022, LDG001 and Guarantors failed to make its monthly installment payment of $30,000.00 as required by the Loan Documents. This constitutes a default of the Loan Documents, including the Promissory Note, the Deed of Trust, and Guaranty you executed in favor of Pioneer, and all past due

**BAKER BOTTS** LLP

- 2 -                                                                                November 8, 2022

principal and interest shall bear interest at the rate of eighteen percent (18%) per annuum.  As of this date, LDG001 and Guarantors therefore owe and have failed to pay $30,221.92, which includes the unpaid installment payment and 18% interest.

2.      **Per the Promissory Note, Pioneer hereby notifies you of the above-referenced monetary default and the required seven (7) day opportunity to cure.**

3.      This correspondence is without waiver of any of Pioneer's rights or remedies under the Loan Documents or otherwise, and Pioneer hereby expressly reserves all of its rights and remedies as may be available under the Loan Documents or otherwise.  Pioneer may exercise each right and remedy available to it as it may determine in its sole and absolute discretion.  Nothing in this letter shall be construed as limiting or modifying any of Pioneer's rights, benefits, or privileges or any power of any original, successor, or substitute trustee under the Deed of Trust.  The exercise of any such right or remedy, in whole or in part, shall not be construed as a waiver of the right to exercise at the same time or thereafter any other right or remedy available to them.

Please let me know if you have any questions concerning this matter.

Very truly yours,

Tina Q. Nguyen

Cc:     Darrell W. Cook
        Douglas L. Bynum
        COOK KEITH & DAVIS, P.C.
        6688 North Central Expressway, Suite 1000
        Dallas, TX 75206

**Enclosure(s)**

## PROMISSORY NOTE

**$3,000,000.00**                                                March 24, 2022

For value received, after date, without grace (other than as provided for herein) and in the manner, on the dates and in the amounts herein stipulated, the undersigned, **LDG001, LLC, a Texas limited liability company ("Borrower"),** whose address is 940 County Road 110, Venus, Texas 76084, promises to pay to the order of **PIONEER FINANCE, INC., A TEXAS CORPORATION ("Lender"),** at 13310 University Blvd, Suite 100, Sugar Land, TX 77479, or at such other place designated in writing by Lender, or other holder thereof:

(i)    The principal sum of $3,000,000.00, or as much thereof as disbursed pursuant to the Loan Agreement of even date herewith, together with,

(ii)   An interest rate per annum which is 12%.

(iii)  This note is due and payable as follows: Interest only is due and payable in twelve (12) equal monthly installments of $30,000.00, or more, each, payable on the 24th day of each and every calendar month, beginning the 24th day of April, 2022, and continuing regularly thereafter for an additional eleven (11) months. Thereafter, Principal and accrued, unpaid interest is due and payable in forty-eight (48) equal monthly installments of $36,005.04, or more, each payable on the 24th day of each and every calendar month, beginning the 24th day of April, 2023, and continuing regularly thereafter until March 24, 2027 (the "Maturity Date"), when a final balloon payment for the entire unpaid principal and accrued, unpaid interest shall be due and payable in full; interest being calculated on the unpaid principal to the date of each installment paid, and the payment made credited first to the discharge of the interest accrued and the balance to the reduction of the principal, the maturity hereof, at which time the final installment of all unpaid principal and all accrued but unpaid interest shall be due and payable in full. For all payments not honored by Borrower's financial institution, due to non-sufficient funds ("NSF") or any other reason, Lender may charge a fee of 5% of the amount of the payment. Upon receipt of three instances of payments that are not honored by the Borrower's financial institution due to NSF or any other reason during the loan term, Lender may declare the unpaid principal balance and earned interest on the Note immediately due and payable.

All past due principal and interest shall bear interest at the rate of eighteen percent (18%) per annum (the "Maximum Rate"). All scheduled payments as made shall be applied first to the interest then accrued, and the balance, if any, to the principal. The provisions of this paragraph shall not limit the Lender's right to compel prompt performance under this note, nor grant an option to Borrower to make late payments.

As an alternative to matured unpaid amounts accruing interest at the Maximum Rate, at the option of Lender, in the event any installment shall become overdue for a period in excess of ten (10) calendar days, at Lender's option, a late payment charge of FIFTY ($50.00) DOLLARS may be charged for the purpose of defraying the expense incident to handling such delinquent

1

Initial for Identification

payments. The provisions of this paragraph shall not limit the Lender's right to compel prompt performance under this note, nor grant an option to Borrower to make late payments.

Borrower may prepay this Note on any monthly installment date, only in whole, subject to the following conditions:

This Note may be prepaid at any time, in whole, and Borrower will pay a prepayment penalty in the amount of $60,000.00 ("Prepayment Penalty") to Lender at the time of such prepayment.

Borrower shall pay to Lender a loan exit fee of $60,000.00 at the Maturity Date. In the event the Borrower prepays the entire loan amount prior to the Maturity Date, the Maker shall pay the Prepayment Penalty only.

If payment of principal or interest on this note shall become due on a Saturday, Sunday or public holiday as defined under the laws of the State of Texas, such payment shall be made on the next succeeding business day and such extension of time shall in such case be included in computing interest in connection with such payment. Any check, draft, money order or other instrument given in payment of all or any portion hereof may be accepted by the holder hereof and handled in collection in the customary manner, but the same shall not constitute payment hereunder or diminish any rights of the holder hereof except to the extent that actual cash proceeds of such instrument are unconditionally received by the holder and applied to this note in the manner herein provided.

It is especially agreed that if default be made in any of the payment of principal and/or interest due hereon or if there is an Event of Default in any of the covenants of provisions set forth in any Deed of Trust, Security Agreement or other security document given to secure the payment hereof, or should any Borrower, endorser or guarantor hereof become insolvent or commit any act of bankruptcy or make an assignment for the benefit of creditors or authorize the filing or file a voluntary Petition in Bankruptcy or should a receiver of any of their property be appointed, or should involuntary bankruptcy proceedings be filed or threatened against any of said parties, then, in any such event, at the option of the holder hereof, at any time thereafter, after notice as provided for herein, the unpaid principal of this note and all accrued interest shall at once become due and payable and shall bear interest at the rate aforesaid from the date of such default or event. Failure to exercise any of said options shall not constitute a waiver on the part of the holder hereof of the right to exercise the same at any other time.

Lender shall provide Borrower seven (7) days prior written notice of a monetary default hereunder and twenty (20) days written notice of non-monetary default, both with opportunity to cure, prior to acceleration of the balance of this Note.

It is further agreed that if this note be placed in the hands of an attorney for collection, for the purposes of being sued upon or established in any manner in any court, then in any of said events, Borrower, any endorsers and guarantors hereof, promise to pay Lender's or other holder's reasonable attorney's fees and costs of collection, which sums shall become a part of the principal hereof.

2

Initial for Identification

It is the intention of the parties hereto to comply with applicable usury laws; accordingly, notwithstanding any provision to the contrary in this note, or in any of the documents securing the payment hereof or otherwise relating hereto, in no event shall this note or such documents require the payment or permit the collection of interest in excess of the maximum amount permitted by such laws. If any such excess or interest is contracted for, charged or received under this note or under the terms of the documents securing the payment hereof, or otherwise relating hereto, or in the event the maturity of the indebtedness evidenced by this note is accelerated in whole or in part, or in the event that all or any part of the principal or interest of this note shall be prepaid, so that under any such circumstances the amount of interest contracted for, charged or received under this note or under any of the instruments securing the payment hereof or otherwise relating hereto, on the amount of principal actually outstanding from time to time under this note shall exceed the maximum amount of interest permitted by applicable usury laws, then in any such event (a) the provisions of this paragraph shall govern and control, (b) any such excess which may have been collected shall, at final maturity of said indebtedness, either be applied as a credit against the then unpaid principal amount hereof or refunded to Borrower, at Lender's option, and (c) upon such final maturity, the effective rate of interest shall automatically be reduced to the maximum lawful contract rate allowed under the applicable usury laws. Without limiting the foregoing, all calculations as to the rate of interest contracted for, charged or received under this note or under such other documents which are made for the purposes of determining whether such rate exceeds the maximum lawful contract rate shall be made, to the extent permitted by applicable usury laws, by amortizing, prorating, allocating and spreading, in equal parts, during the period of the full stated term of the loan evidenced hereby, all interest at any time contracted for, charged or received from Borrower or otherwise by Lender in connection with such indebtedness.

This note and the Maximum Rate of nonusurious interest applicable to the loan evidenced hereby shall be governed by the laws of the United States of America and the State of Texas in effect on the date of the loan evidenced hereby, and, to the extent allowed by law, as now or as may hereafter be in effect, but in any event Texas Finance Code Section 303.006, as same may be amended, modified or supplemented (which regulates certain revolving credit loan accounts) shall not apply to the loan evidenced hereby. Unless changed in accordance with law, the applicable method of calculating the usury ceiling rate under Texas law shall be the indicated (weekly) ceiling rate from time to time in effect, as provided in Texas Finance Code Section 303.002, as same may be amended, modified or supplemented.

It is further agreed that any funds at any time in the possession of any holder hereof, which belong to any Borrower, endorser or guarantor hereof, and any deposits or other sums at any time credited by or due from any holder hereof to any of the said parties and defined as collateral under the Deed of Trust (defined herein) shall be held and treated as additional security for the payment of this note, and the holder hereof, at the holder's option, may at any time without notice and without liability, apply such funds or deposits to any sums credited by or due from such holder against any sums owing, whether due or not, under this note and in any manner and in any order or preference which the holder, at the holder's sole discretion, chooses.

The Borrower, endorsers and guarantors hereof and all other persons who are or may become liable for all or any part of the obligations represented by this note shall be considered as principals as to the making of this note and shall have joint and several liability and, except at

3



Initial for Identification

provided herein or in the Deed of Trust, Borrower, endorsers and guarantors hereof severally waive presentment for payment, protest, notice of protest, notice of intention to accelerate, and of nonpayment, as to this note and as to each, every and all installments hereof, and consent to the renewal or extension of the time of payment hereof and to the release of all or any part of the security described herein or any person liable hereon upon the terms deemed by the holder hereof, in the holder's sole discretion, to be adequate. Any renewal or extension or release of any of such security or person may be made without notice to any of said parties and without affecting their liability.

If any installment or payment of principal or interest of this note is not paid when due; or if default occurs under any document, instrument or agreement executed in connection with or as security for this Note (the "Loan Documents," including without limitation the agreements described in the following paragraph of this note); or if Maker or any co-maker, drawer, accepter, endorser, guarantor, surety, accommodation party or other person now or hereafter primarily or secondarily liable upon or for payment of all or any part of this Note (each hereinafter called an "other liable party") dies or becomes insolvent (however such insolvency may be evidenced); or if any proceeding, procedure or remedy supplementary to or in enforcement of judgment is resorted to or commenced against Maker or any other liable party, or with respect to any property of any of them; or if any governmental authority or any court at the instance thereof takes possession of any substantial part of the property of or assumes control over the affairs or operations of, or a receiver is appointed for or takes possession of the property of, or a writ or order of attachment or garnishment is issued or made against any of the property of Maker or any other liable party; or if any indebtedness owing to Payee for which Maker or any other liable party is primarily or secondarily liable is not paid when due or becomes due and payable by acceleration of maturity thereof, or if any event or condition occurs which permits the holder of any such indebtedness to declare it due and payable upon the lapse of time, giving of notice or otherwise; or if any indebtedness for which Maker or any other liable party is primarily or secondarily liable is not paid when due or becomes due and payable by acceleration of maturity thereof, or if any event or condition occurs which permits the holder of any such indebtedness to declare it due and payable upon lapse of time, giving notice or otherwise; or if Maker or any other liable party (if other than a natural person) is dissolved, wound up, liquidated or otherwise terminated, or a party to any merger or consolidation without the written consent of Payee; or if Maker or any other liable party sells substantially all or an integral portion of its assets without the written consent of Payee; or if Maker or any other liable party fails to furnish financial or other information requested by Payee; or if Maker or any other liable party furnishes or has furnished any financial or other information or statements that are misleading in any material respect; thereupon, at the option of Payee, this Note and any and all other indebtedness of Maker to Payee will become and be due and payable forthwith without demand, notice of default, notice of intent to accelerate the maturity of this note, notice of acceleration of the maturity of this note, notice of nonpayment, presentment, protest or notice of dishonor, all of which are expressly waived by Maker and each other liable party, except for such notice of default as is expressly required by the Mortgage, if any. Payee's failure to exercise this option upon any default does not waive the right to exercise it in the event of any subsequent default.

The payment of this note is secured by (i) Deed of Trust, Security Agreement and Financing Statement (the "Deed of Trust") of even date herewith to TED A. COX, Trustee for the

4


Initial for Identification

benefit of Lender; (ii) Security Agreements that place a lien on the business assets; and (iii) Absolute Assignment of Rents dated of even date herewith executed by Borrower for the benefit of Lender, covering the following described real property and all improvements now or hereafter thereon:

**See Exhibit "A" attached hereto.**

The payment of this note is further secured by: Guaranty Agreements of even date herewith executed by TIMOTHY BARTON and JMJ DEVELOPMENT, LLC, for the benefit of Lender;

## WAIVER OF JURY TRIAL

EACH PARTY HERETO ACKNOWLEDGES THAT ANY DISPUTE OR CONTROVERSY BETWEEN OR AMONG BORROWER AND THE LENDER WOULD BE BASED ON DIFFICULT AND COMPLEX ISSUES OF LAW AND FACT AND WOULD RESULT IN DELAY AND EXPENSE TO THE PARTIES. ACCORDINGLY, TO THE EXTENT PERMITTED BY APPLICABLE LAW, LENDER AND BORROWER EACH HEREBY WAIVE ITS RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING OF ANY KIND OR NATURE IN ANY COURT OR TRIBUNAL IN WHICH AN ACTION MAY BE COMMENCED BY OR AGAINST ANY PARTY HERETO ARISING OUT OF THIS GUARANTY OR ANY OTHER LOAN DOCUMENT ORBY REASON OF ANY OTHER SUIT, CAUSE OF ACTION OR DISPUTE WHATSOEVER BETWEEN BORROWER AND THE LENDER OF ANY KIND OR NATURE RELATING TO ANY OF THE LOAN DOCUMENTS.

## NOTICE UNDER SECTION 26.02 OF THE TEXAS BUSINESS & COMMERCE CODE

A LOAN AGREEMENT IN WHICH THE AMOUNT INVOLVED IN THE LOAN AGREEMENT EXCEEDS $50,000.00 IN VALUE IS NOT ENFORCEABLE UNLESS THE AGREEMENT IS IN WRITING AND SIGNED BY THE PARTY TO BE BOUND OR BY THAT PARTY'S AUTHORIZED REPRESENTATIVE.

THE RIGHTS AND OBLIGATIONS OF THE PARTIES TO AN AGREEMENT SUBJECT TO SUBSECTION (b) OF SECTION 26.02 OF THE TEXAS BUSINESS & COMMERCE CODE SHALL BE DETERMINED SOLELY FROM THE WRITTEN LOAN AGREEMENT AND ANY PRIOR ORAL AGREEMENTS BETWEEN THE PARTIES ARE SUPERSEDED BY AND MERGED INTO THE LOAN AGREEMENT.

THE WRITTEN LOAN AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEOUENT ORAL AGREEMENTS OF THE PARTIES.

THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

5



Initial for Identification

**BORROWER**:

**LDG001, LLC,**
**a Texas limited liability company**

> **By its Manager:**
> Carnegie Development, LLC,
> A Delaware limited liability company
>
> > **By its Managing Member:**
> > JMJ Development, LLC,
> > A Texas limited liability company

By: _____
Name: Tim Barton
Title: Manager

6

Initial for Identification

Exhibit "A" – Legal Description

### Tract I:

BEING a 154.93-acre tract of land situated in the B.B.B. & C.R.R. Co. Survey, Abstract No 93. Being part of that certain called 156-acre tract of land described in deed to Patrick M. Griffin, Stephen Griffin, Loretta Ann Griffin and Virginia Bone to LDG001, LLC, and recorded in Document No. 2018-24505 of the Deed Records of Johnson County, Texas, and a called 1.00 acre tract of land described in deed to LDG001, LLC, and recorded in Document No. 2018-32084 of the Deed Records of Johnson County, Texas, said 154.93 acre tract being more particularly described by meets and bounds as follows:

BEGINNING at a 1/2" iron rod found for corner at the Southwest corner of the B.B.B. & C.R.R. Co. Survey, the Northwest corner of the Jackson Smith Survey, Abstract No. 758 and being in the East line of Philip P. Barnes Survey, same being the Southwest corner of said 156 acre tract, the Northwest corner of Lot 2 of Plainview Acres, Phase 3, recorded in Volume 8, Page 248 of said Deed Recorded and also being in the East line of that certain called 94.26 acre tract of land described in deed to Harper Cattle, LLC and recorded in Volume 2304, Page 895, and also being at the intersection of County Road 213 (60' right-of-way) and County Road 110 (60' right-of-way);

THENCE North 30 Degrees 31 Minutes 39 Seconds West with said County Road 213, the West line of said 156-acre tract and the East line of said 94.26-acre tract, a distance of 2,640.00 feet to a point for corner at the Northwest corner of said 156-acre tract, the Southwest corner of that certain called 1.074-acre tract described in deed in deed to H.C. Griffin, recorded in Volume 1583, Page 241 of said Deed Records;

THENCE North 59 Degrees 28 Minutes 21 Seconds East, with the North line of said 156 acre tract and the South line of said 1.074 acre tract at a distance of 30.00 feet passing a 1/2" iron rod with plastic marked "SANDS" set for reference corner in said Right-of-Way and continuing a total distance of 869.98 feet to a 1/2" iron rod with plastic marked "SANDS" set for corner in the North line of said 156 acre tract, the East corner of said 1.074 acre tract and also being in the South line of G.C. & S.F. Railroad (100' wide Right-of-Way);

THENCE North 66 Degrees 32 Minutes 57 Seconds East, with the South line of said Railroad, a distance of 682.02 feet to a 1/2" iron rod with plastic cap marked "SANDS" set for corner in said South line at the beginning of a curve to the right;

THENCE in a Northeasterly direction with said curve to the right having a radius of 2,595.97 feet, whose chord bears North 70 Degrees 50 Minutes 32 Seconds East - 388.67 feet for an arc length of 389.03 feet to 1/2" iron rod with plastic cap marked "SANDS" set for corner in South line of said Railroad;

7

Initial for Identification

THENCE North 75 Degrees 08 Minutes 08 Seconds East, with said South line a distance of 756.88 feet to a 1/2" iron rod with plastic cap marked "SANDS" set for corner in the East line of said 156-acre tract and being in the West line of that certain called 184.887-acre tract of land conveyed to Billy C. Roten by deed recorded in Volume 1248, Page 742 of said Deed Records;

THENCE South 30 Degrees 31 Minutes 39 Seconds East, with the East line of said 156-acre tract and the West line of said 184.887-acre tract, at a distance of 2,245.02 feet passing a 1/2" iron rod with plastic marked "SANDS" set for reference in the North Right-of-Way of said County Road No. 110 and continuing a total distance of 2,275.02 feet a point for corner at the Southeast corner of said 156-acre tract and being in the Southerly edge of County Road 110 (60' right-of-way);

THENCE South 59 Degrees 28 Minutes 21 Seconds West, with said road and the South line of said 156-acre tract a distance of 860.80 feet a point for corner in said road and being at the Southeast corner of that certain called 1.00-acre tract of land described in deed to LDG001, LLC and continuing with said County Road 110 and the South line of said 156-acre tract, for a total distance of 2,656.62 feet to the POINT OF BEGINNING and containing 154.93 acres of land, more or less.

**Tract II:**

BEING a 47.86-acre tract of land situated in the Jackson Smith Survey, Abstract No. 758, Johnson County, Texas, being all of that certain called 47.5-acre tract of land described in deed to LDG001, LLC, and recorded in Document No. 2018-24505 of the Deed Records of Johnson County, Texas, said 47.86-acre tract to be more particularly described by meets and bounds as follows:

COMMENCING at a 1/2" iron rod found for corner at the Northwest corner of said Jackson Smith Survey, same being the Southwest corner of the B.B.B. & C.R. R. Co. Survey, Abstract No. 93 and being at the intersection of County Road No. 213 (601 right-of-way) with County Road No. 110 (60' right-of-way);

THENCE North 59 Degrees 28 Minutes 21 Seconds East, with the North line of said Jackson Smith Survey and the South line of said B.B.B. & C.R.R. Co. Survey and with County Road No, 110, a distance of 2,656.62 feet to a point for corner in the southerly line of said County Road 110, same being the Northwest corner of said 47-1/2 acre tract, the Northeast corner of that certain called 50 acre tract described in deed to Judith Louise Brown and recorded in Volume 3119, Page 27 of said Deed Records, the Southeast corner of that certain called 156 acre tract described in deed to Patrick M. Griffin and recorded in Volume 3130, Page 714 of said Deed Records and the Southwest corner of that certain called 184.887 acre tract described in deed to Bill C. Roten and recorded in Volume 1248, Page 472 of said Deed Records and being the POINT OF BEGINNING;

8

Initial for Identification

THENCE North 59 Degrees 28 Minutes 21 Seconds East, with the North line of said 47-1/2-acre tract and with said County Road 110 a distance of 843.25 feet to a point for corner at the Northeast corner of said 47-1/2-acre tract, the Northwest corner of that certain called 70.74 acres tract of land described in deed to Duane Schifano and recorded in Instrument No.201200024756 of said Deed Records and also being in the South line of said 184.887-acre tract;

THENCE South 30 Degrees 31 Minutes 39 Seconds East, with the East line of said 47-1/2 acre tract and the West line of said 70.74 acre tract at a distance of 30.00 feet passing a 1/2" iron rod with plastic cap marked "SANDS" set for reference and continuing for a distance of 1,721.56 feet, passing a 1" iron found for corner at the southwest corner of said 70.74 acre tract, same being the Northwest corner of that certain called 15.004 acre tract of land described in deed to RES Land Holding and recorded in Volume 3507, Page 398 of said Deed Records and continuing at a distance of 2,088.49 feet passing a 1" iron bar found for corner at the Southwest corner of said 15.004 acre tract, same being the Northwest corner of that certain called 0.78 acre tract of land described in deed to Daniel II, Vesper, Sr. and recorded in Instrument No. 201000011279 of said Deed Records and continuing at a distance of 2,443.17, feet passing a 1/2" iron rod with plastic cap marked "SANDS" set for reference and continuing a total distance of 2,472.17 feet to a point for corner at the Southeast corner of said 47.5 acre tract, the Southwest corner of said 0.78 acre tract, and being in County Road 109 (60' right-of- way) and also being in the North line of Southern Acres, Phase 1, an addition to Johnson County, Texas;

THENCE South 59 Degrees 28 Minutes 21 Seconds West, with the South line of said 47.5-acre tract and the North line of said Southern Acres a distance of 843.25 feet to a point for comer in said County Road 109 and being in the North line of that certain called Lot 2R-1, Block 1 of Harden Estates, an addition to Johnson County, Texas, according to the plat thereof recorded in Volume 10, Page 463 of said Deed Records, same being the Southeast corner of said above mentioned 50-acre tract;

THENCE North 30 Degrees 31 Minutes 39 Seconds West, with the West line of said 47-1/2-acre tract and the East line of said 50-acre tract, a distance of 2,472.17 feet to the POINT OF BEGINNING and containing 47.86 acres of land, more or less.

9

Initial for Identification

# SECURITY AGREEMENT

Date:        March **24**, 2022

Debtors:        **LDG001, LLC, a Texas limited liability company**

Debtor's Mailing Address:

> 940 County Road 110
> Venus, Texas 76084

Secured Party:    **PIONEER FINANCE, INC.**

Secured Party's Mailing Address:

> 13310 University Blvd, Suite 100,
> Sugar Land, TX 77479
> County: Fort Bend

Classification of Collateral: Furniture, fixtures, equipment, inventory, or other tangible personal property, accounts, proceeds, receivables, contract rights, intangibles, and tradenames.

Collateral (including all accessions):

> Furniture, fixtures, equipment, inventory, or other tangible personal property, accounts, proceeds, receivables, contract rights, intangibles, and tradenames located on the property described on Exhibit "A" attached hereto.

Obligation:

> Note:
>
> Date:    March **24**, 2022
>
> Original principal amount:    $3,000,000.00
>
> Borrowers:    LDG001, LLC, a Texas limited liability company
>
> Lender:    PIONEER FINANCE, INC., a Texas corporation
>
> Maturity date:    As therein provided.
>
> Terms of payment:    As therein provided.

Other debt/Future advances: The security interest also secures all other present and future debts and liabilities of Debtor to Secured Party, including future advances.

Other obligation: None

Debtor's Representation Concerning Location of the Collateral:

Exhibit "A" attached hereto.

Debtor grants to Secured Party a security interest in the Collateral and all its proceeds to secure the Obligation and all renewals of the Obligation.

**A.    Debtor represents and warrants the following:**

1.     No financing statement covering the Collateral is filed in any public office except any financing statement in favor of Secured Party.

2.     Debtor owns the Collateral and has the authority to grant this security interest, free from any setoff, claim, restriction, security interest, or encumbrance except liens for taxes not yet due.

3.     None of the Collateral is an accession to any goods, is commingled with other goods, or will become an accession or part of a product or mass with other goods except as provided in this agreement.

4.     All information about Debtor's financial condition is or will be accurate when provided to Secured Party.

5.     None of the Collateral is affixed to real estate.

**B.    Debtor agrees to:**

1.     Defend the Collateral against all claims adverse to Secured Party's interest; keep the Collateral free from liens, except for liens in favor of Secured Party or for taxes not yet due; keep the Collateral in Debtor's possession and ownership except as otherwise provided in this agreement; maintain the Collateral in good condition; and protect the Collateral against waste, except for ordinary wear and tear.

2.     Pay all Secured Party's expenses incurred to obtain, preserve, perfect, defend, and enforce this agreement or the Collateral and to collect or enforce the Obligation. These expenses will bear interest from the date of advance at the rate stated in the Note for matured, unpaid amounts and are payable on demand at the place where the Obligation is payable. These expenses and interest will become part of the Obligation and will be secured by this agreement.

3.     Sign any documents that Secured Party considers necessary to obtain, maintain, and perfect this security interest.

2

4.    Notify Secured Party immediately of any material change in the Collateral; change in Debtor's name, address, or location; change in any warranty or representation in this agreement; change that may affect this security interest; and any event of default.

5.    Use the Collateral primarily according to the stated classification.

6.    Maintain accurate records of the Collateral; furnish Secured Party any requested information related to the Collateral; and allow Secured Party to inspect and copy all records relating to the Collateral.

7.    Allow Secured Party to inspect the Collateral.

**C.    Debtor agrees not to:**

1.    Sell, transfer, or encumber any of the Collateral, except in the ordinary course of Debtor's business.

2.    Except as permitted in this agreement, permit the Collateral to be affixed to any real estate, to become an accession to any goods, to be commingled with other goods, or to become a fixture, accession, or part of a product or mass with other goods.

**D.    Insurance and Risk of Loss**

1.    Debtor will insure the Collateral in accordance with Secured Party's reasonable requirements regarding choice of carrier, casualties insured against, and amount of coverage. Policies must be written in favor of Debtor, be endorsed to name Secured Party as an additional insured or as otherwise directed in writing by Secured Party, and provide that Secured Party will receive at least ten days' notice before cancellation. Debtor must provide copies of the policies or certificates to Secured Party.

2.    Debtor assumes all risk of loss to the Collateral.

3.    Debtor appoints Secured Party as attorney-in-fact to collect any returned unearned premiums and proceeds of any insurance on the Collateral and to endorse and deliver to Secured Party any payment from such insurance made payable to Debtor. Debtor's appointment of Secured Party as Debtor's agent is coupled with an interest and if Debtor is an individual will survive any disability of Debtor.

**E.    Default and Remedies**

1.    Debtor's defaults are:

a.    failing to timely pay or perform any obligation or covenant in any written agreement between Debtor and Secured Party;

b.      making any false warranty, covenant, or representation in this agreement to Secured Party;

c.      having a receiver appointed for Debtor or any of the Collateral;

d.      assigning the Collateral for the benefit of creditors;

e.      to the extent permitted by law, having bankruptcy or insolvency proceedings commenced against or by any of the following parties: Debtor; any partnership of which Debtor is a general partner; or any maker, drawer, acceptor, endorser, guarantor, surety, accommodation party, or other person liable on or for any part of the Obligation;

f.      the dissolution of any of the following parties: Debtor; any partnership of which Debtor is a general partner; or any maker, drawer, acceptor, endorser, guarantor, surety, accommodation party, or other person liable on or for any part of the Obligation; and

g.      permitting the impairment of any of the Collateral by loss, theft, damage, or destruction, unless it is promptly replaced with collateral of like kind and quality or restored to its former condition.

2.      During the existence of any default, Secured Party may:

a.      demand, collect, convert, redeem, settle, compromise, receipt for, realize on, sue for, and adjust the Collateral either in Secured Party's or Debtor's name, as Secured Party desires, or take control of any proceeds of the Collateral and apply the proceeds against the Obligation;

b.      declare the unpaid principal and earned interest of the Obligation immediately due in whole or part;

c.      enforce the Obligation; and

d.      exercise any rights and remedies granted by law or this agreement.

3.      Foreclosure of this security interest by suit does not limit Secured Party's remedies, including the right to sell the Collateral under the terms of this agreement. Secured Party may exercise all remedies at the same or different times, and no remedy is a defense to any other. Secured Party's rights and remedies include all those granted by law and those specified in this agreement.

4.      Secured Party's delay, partial exercise, or failure to exercise any of its remedies or rights does not waive Secured Party's rights to subsequently exercise those remedies or rights. Secured Party's waiver of any default does not waive any further default by Debtor. Secured Party's waiver of any right in this agreement or of any default is binding only if it is in writing. Secured Party may remedy any default without waiving it.

4

5.    If the Collateral is sold after default, recitals in the bill of sale or transfer will be prima facie evidence of their truth, and all prerequisites to the sale specified by this agreement and by law will be presumed satisfied.

**F.    General**

1.    Secured Party may at any time:

a.    take control of proceeds of insurance on the Collateral and reduce any part of the Obligation accordingly or permit Debtor to use the funds to repair or replace the Collateral; and

b.    purchase single-interest insurance coverage that will protect only Secured Party if Debtor fails to maintain insurance and premiums for the insurance will become part of the Obligation.

2.    Notice is reasonable if it is mailed, postage prepaid, to Debtor at Debtor's Mailing Address at least ten days before any public sale or ten days before the time when the Collateral may be otherwise disposed of without further notice to Debtor.

3.    This security interest will attach to after-acquired consumer goods only to the extent permitted by law.

4.    This security interest will neither affect nor be affected by any other security for any of the Obligation. Neither extensions of any of the Obligation nor releases of any of the Collateral will affect the priority or validity of this security interest.

5.    This agreement binds, benefits, and may be enforced by the successors in interest of the parties, except as otherwise provided. Assignment of any part of the Obligation and Secured Party's delivery of any part of the Collateral will fully discharge Secured Party from responsibility for that part of the Collateral. All representations, warranties, and obligations are joint and several as to each Debtor.

6.    This agreement may be amended only by an instrument in writing signed by Secured Party and Debtor.

7.    The unenforceability of any provision of this agreement will not affect the enforceability or validity of any other provision.

8.    This agreement will be construed according to Texas law. This agreement is to be performed in the county of Secured Party's Mailing Address.

9.    Interest on the Obligation secured by this agreement will not exceed the maximum amount of nonusurious interest that may be contracted for, taken, reserved, charged, or received under law. Any interest in excess of that maximum amount will be credited on the principal of the Obligation or, if that has been paid, refunded. On any acceleration or required or permitted prepayment, any such excess will be canceled automatically as of the acceleration or prepayment or, if already paid, credited on the principal of the Obligation or, if the principal of the Obligation

has been paid, refunded. This provision overrides any conflicting provisions in this and all other instruments concerning the Obligation.

10. In no event may this agreement secure payment of any debt subject to title IV of the Texas Finance Code or create a lien otherwise prohibited by law.

11. When the context requires, singular nouns and pronouns include the plural.

12. The term *Note* includes all extensions and renewals of the Note and all amounts secured by the Note.

13. If Borrower and any party executing any document evidencing the Obligation are not the same person, the term *Debtor* includes the party executing the document evidencing the Obligation.

14. Debtor represents that this agreement and the Note are given for the following purposes: purchase of land and improvements.

**DEBTOR**:

**LDG001, LLC,**
**a Texas limited liability company**

**By its Manager:**
Carnegie Development, LLC,
A Delaware limited liability company

**By its Managing Member:**
JMJ Development, LLC,
A Texas limited liability company

By: _____
Name: Tim Barton
Title: Manager

6

STATE OF TEXAS §

§

COUNTY OF _DALLAS_ §

This instrument was acknowledged before me on the 24th day of March, 2022, by TIM BARTON, acting as Manager of JMJ Development, LLC, a Texas limited liability company, acting as Managing Member of Carnegie Development, LLC, a Delaware limited liability company, acting as Manager of **LDG001, LLC, a Texas limited liability company**, in his capacity therein.



R A Blanshard
Notary Public, State of Texas
My Comm. Exp. 08/16/2024
Notary ID 135379-7

_____
Notary Public, State of Texas

7

<u>**Exhibit "A" – Legal Description**</u>

## Tract I:

BEING a 154.93-acre tract of land situated in the B.B.B. & C.R.R. Co. Survey, Abstract No 93. Being part of that certain called 156-acre tract of land described in deed to Patrick M. Griffin, Stephen Griffin, Loretta Ann Griffin and Virginia Bone to LDG001, LLC, and recorded in Document No. 2018-24505 of the Deed Records of Johnson County, Texas, and a called 1.00 acre tract of land described in deed to LDG001, LLC, and recorded in Document No. 2018-32084 of the Deed Records of Johnson County, Texas, said 154.93 acre tract being more particularly described by meets and bounds as follows:

BEGINNING at a 1/2" iron rod found for corner at the Southwest corner of the B.B.B. & C.R.R. Co. Survey, the Northwest corner of the Jackson Smith Survey, Abstract No. 758 and being in the East line of Philip P. Barnes Survey, same being the Southwest corner of said 156 acre tract, the Northwest corner of Lot 2 of Plainview Acres, Phase 3, recorded in Volume 8, Page 248 of said Deed Recorded and also being in the East line of that certain called 94.26 acre tract of land described in deed to Harper Cattle, LLC and recorded in Volume 2304, Page 895, and also being at the intersection of County Road 213 (60' right-of-way) and County Road 110 (60' right-of-way);

THENCE North 30 Degrees 31 Minutes 39 Seconds West with said County Road 213, the West line of said 156-acre tract and the East line of said 94.26-acre tract, a distance of 2,640.00 feet to a point for corner at the Northwest corner of said 156-acre tract, the Southwest corner of that certain called 1.074-acre tract described in deed in deed to H.C.
Griffin, recorded in Volume 1583, Page 241 of said Deed Records;

THENCE North 59 Degrees 28 Minutes 21 Seconds East, with the North line of said 156 acre tract and the South line of said 1.074 acre tract at a distance of 30.00 feet passing a 1/2" iron rod with plastic marked "SANDS" set for reference corner in said Right-of-Way and continuing a total distance of 869.98 feet to a 1/2" iron rod with plastic marked "SANDS" set for corner in the North line of said 156 acre tract, the East corner of said 1.074 acre tract and also being in the South line of G.C. & S.F. Railroad (100' wide Right-of-Way);

THENCE North 66 Degrees 32 Minutes 57 Seconds East, with the South line of said Railroad, a distance of 682.02 feet to a 1/2" iron rod with plastic cap marked "SANDS" set for corner in said South line at the beginning of a curve to the right;

THENCE in a Northeasterly direction with said curve to the right having a radius of 2,595.97 feet, whose chord bears North 70 Degrees 50 Minutes 32 Seconds East - 388.67 feet for an arc length of 389.03 feet to 1/2" iron rod with plastic cap marked "SANDS" set for corner in South line of said Railroad;

8

THENCE North 75 Degrees 08 Minutes 08 Seconds East, with said South line a distance of 756.88 feet to a 1/2" iron rod with plastic cap marked "SANDS" set for corner in the East line of said 156-acre tract and being in the West line of that certain called 184.887-acre tract of land conveyed to Billy C. Roten by deed recorded in Volume 1248, Page 742
of said Deed Records;

THENCE South 30 Degrees 31 Minutes 39 Seconds East, with the East line of said 156-acre tract and the West line of said 184.887-acre tract, at a distance of 2,245.02 feet passing a 1/2" iron rod with plastic marked "SANDS" set for reference in the North Right-of-Way of said County Road No. 110 and continuing a total distance of 2,275.02 feet a point for corner at the Southeast corner of said 156-acre tract and being in the Southerly edge of County Road 110 (60' right-of-way);

THENCE South 59 Degrees 28 Minutes 21 Seconds West, with said road and the South line of said 156-acre tract a distance of 860.80 feet a point for corner in said road and being at the Southeast corner of that certain called 1.00-acre tract of land described in deed to LDG001, LLC and continuing with said County Road 110 and the South line of said 156-acre tract, for a total distance of 2,656.62 feet to the POINT OF BEGINNING and containing 154.93 acres of land, more or less.

## Tract II:

BEING a 47.86-acre tract of land situated in the Jackson Smith Survey, Abstract No. 758, Johnson County, Texas, being all of that certain called 47.5-acre tract of land described in deed to LDG001, LLC, and recorded in Document No. 2018-24505 of the Deed Records of Johnson County, Texas, said 47.86-acre tract to be more particularly described by meets and bounds as follows:

COMMENCING at a 1/2" iron rod found for corner at the Northwest corner of said Jackson Smith Survey, same being the Southwest corner of the B.B.B. & C.R. R. Co. Survey, Abstract No. 93 and being at the intersection of County Road No. 213 (601 right-of-way) with County Road No. 110 (60' right-of-way);

THENCE North 59 Degrees 28 Minutes 21 Seconds East, with the North line of said Jackson Smith Survey and the South line of said B.B.B. & C.R.R. Co. Survey and with County Road No, 110, a distance of 2,656.62 feet to a point for corner in the southerly line of said County Road 110, same being the Northwest corner of said 47-1/2 acre tract, the Northeast corner of that certain called 50 acre tract described in deed to Judith Louise Brown and recorded in Volume 3119, Page 27 of said Deed Records, the Southeast corner of that certain called 156 acre tract described in deed to Patrick M. Griffin and recorded in Volume 3130, Page 714 of said Deed Records and the

Southwest corner of that certain called 184.887 acre tract described in deed to Bill C. Roten and recorded in Volume 1248, Page 472 of said Deed Records and being the POINT OF BEGINNING;

THENCE North 59 Degrees 28 Minutes 21 Seconds East, with the North line of said 47-1/2-acre tract and with said County Road 110 a distance of 843.25 feet to a point for corner at the Northeast corner of said 47-1/2-acre tract, the Northwest corner of that certain called 70.74 acres tract of land described in deed to Duane Schifano and recorded in Instrument No.201200024756 of said Deed Records and also being in the South line of said 184.887-acre tract;

THENCE South 30 Degrees 31 Minutes 39 Seconds East, with the East line of said 47-1/2 acre tract and the West line of said 70.74 acre tract at a distance of 30.00 feet passing a 1/2" iron rod with plastic cap marked "SANDS" set for reference and continuing for a distance of 1,721.56 feet, passing a 1" iron found for corner at the southwest corner of said 70.74 acre tract, same being the Northwest corner of that certain called 15.004 acre tract of land described in deed to RES Land Holding and recorded in Volume 3507, Page 398 of said Deed Records and continuing at a distance of 2,088.49 feet passing a 1" iron bar found for corner at the Southwest corner of said 15.004 acre tract, same being the Northwest corner of that certain called 0.78 acre tract of land described in deed to Daniel II, Vesper, Sr. and recorded in Instrument No. 201000011279 of said Deed Records and continuing at a distance of 2,443.17, feet passing a 1/2" iron rod with plastic cap marked "SANDS" set for reference and continuing a total distance of 2,472.17 feet to a point for corner at the Southeast corner of said 47.5 acre tract, the Southwest corner of said 0.78 acre tract, and being in County Road 109 (60' right-of- way) and also being in the North line of Southern Acres, Phase 1, an addition to Johnson County, Texas;

THENCE South 59 Degrees 28 Minutes 21 Seconds West, with the South line of said 47.5-acre tract and the North line of said Southern Acres a distance of 843.25 feet to a point for corner in said County Road 109 and being in the North line of that certain called Lot 2R-1, Block 1 of Harden Estates, an addition to Johnson County, Texas, according to the plat thereof recorded in Volume 10, Page 463 of said Deed Records, same being the Southeast corner of said above mentioned 50-acre tract;

THENCE North 30 Degrees 31 Minutes 39 Seconds West, with the West line of said 47-1/2-acre tract and the East line of said 50-acre tract, a distance of 2,472.17 feet to the POINT OF BEGINNING and containing 47.86 acres of land, more or less.

10

## GUARANTY AGREEMENT

This Guaranty Agreement ("Guaranty") is made and entered into effective as of March **24**, 2022, by **TIMOTHY BARTON and JMJ DEVELOPMENT, LLC, a Texas limited liability company** (collectively the "Guarantor") in favor of **PIONEER FINANCE, INC., A TEXAS CORPORATION** (the "Lender"), to induce Lender to make one or more loans and/or extensions of credit to **LDG001, LLC, a Texas limited liability company** (the "Borrower"), including, but not limited to, the extension of credit evidenced by that certain promissory note (the "Note") dated of even date herewith executed by Borrower payable to the order of Lender in the original principal sum of **$3,000,000.00** and being payable as therein provided. Lender's address is **13310 University Blvd, Suite 100, Sugar Land, TX 77479.** Guarantor's address is 3926 Vista Woods, Carrollton, Texas 75007 (Timothy Barton); 13901 Midway Road, Suite 102, Dallas, Texas 75244 (JMJ DEVELOPMENT, LLC).

1.      For the purpose of enabling the Borrower to obtain extensions of credit (the "loans") from the Lender, and recognizing that the Guarantor has benefited or shall benefit, directly or indirectly, from the making of such loans by. the Lender to the Borrower, that such loans are in the best interests of the Guarantor, and that but for this Guaranty such loans would not be made by the Lender to the Borrower and the funds advanced thereunder, the Guarantor hereby irrevocably, absolutely and unconditionally guarantees to the Lender the prompt payment when due of all current and future indebtedness, liabilities and obligations of any kind of the Borrower to the Lender (collectively, the "Obligations"), including, but not limited to: (i) all Obligations now outstanding or owing or which may hereafter be created, executed or incurred directly between the Borrower and the Lender or acquired outright or as a participation, conditionally or as collateral security from another by the Lender, absolute or contingent, joint and/or several, secured or unsecured, due or not due, arising by operation of law or otherwise, direct or indirect, including indebtedness, obligations and liabilities to the Lender of the Borrower as a member of any partnership, syndicate, association or other group, and whether incurred by the Borrower as principal, surety, endorser, guarantor, accommodation party or otherwise; (ii) all principal, interest, charges, fees, attorneys' fees and other sums which are or may be or becoming due or owing on, under or in connection with the Note, and all renewals, rearrangements, extensions, modifications and consolidations thereof, (iii) all of the liabilities, indebtedness and other Obligations and other sums which are or become payable to Lender under any and all instruments and documents now or hereafter securing or regarding the payment of any of the Obligations including, but not limited to, any deed of trust, mortgage, security agreement, environmental indemnity agreement, assignment of rentals or other assignment and loan agreement or other similar agreement; and (iv) all costs, attorneys' fees and expenses incurred or expended by the Lender in collecting any of the Obligations due to any default in the performance of the Obligations or in enforcing any right granted to Lender hereunder.

2.      In each event whenever any of the Obligations shall become due and remain unpaid (howsoever the maturity thereof may have occurred), the Guarantor will, upon demand, pay the amount due to the Lender, without further notice of dishonor and without any notice having been given to the Guarantor previous to such demand of the acceptance by the Lender of this Guaranty or of the creating or incurring of such Obligations. The Guarantor shall be liable

1

as a primary obligor for the payment and performance of the Obligations. The Guarantor specifically agrees that it shall not be necessary or required, in order to enforce the Guarantor's obligations under this Guaranty, that the Lender have made demand for payment upon the Borrower or any other person or entity liable thereon or have made protest thereof or have given notice to the Borrower or any other party liable thereon of maturity or nonpayment of the Obligations. All amounts becoming payable by the Guarantor to the Lender under this Guaranty shall be payable at the Lender's offices in Harris County, Texas or such other place as the Lender may from time to time designate.

3.    The Guarantor specifically waives any notice of acceptance of this Guaranty by the Lender and of the creation, advancement, existence, extension, renewal, modification, consolidation, the rearrangement from time to time of the Obligations, the increase from time to time in the principal amount thereof, the increase or reduction from time to time of the rate of interest thereon, or any indulgence from time to time with respect to the Obligations, or any part thereof, and of nonpayment thereof or default thereon, and waives grace, demand, protest, presentment and notice of demand, protest, and presentment with respect to the Obligations, and waives notice of the amount of the Obligations outstanding at any time, and agrees that the maturity of the Obligations, or any part thereof, may be accelerated, extended, modified, amended or renewed from time to time or any other indulgence may be granted with respect thereto by the Lender at its will or as may be agreed by the Borrower without notice to or further consent by the Guarantor, at any time or times.

4.    If the total indebtedness of Borrower to the Lender shall at any time exceed the amount for which the Guarantor may be liable under the provisions hereof, the Lender (without in anywise impairing its rights hereunder or diminishing said Guarantor's liability) shall be at liberty to apply to so much of said indebtedness as shall exceed the Obligations for which the Guarantor is liable any amounts paid to or received by or coining into the hands of the Lender from or attributable to Borrower or the Guarantor or any other guarantor of all or any part of the indebtedness herein described or any other person or party liable for any of said indebtedness or from or attributable to or representing proceeds of any property or security held by the Lender securing payment of any of said Obligations or any credits, deposits or offsets due said Borrower or Guarantor or party liable on any of said indebtedness (whether or not the Obligations or such indebtedness is then due), it being intended to give the Lender the right to apply all payments, credits and offsets and amounts becoming available for application on or credit against the indebtedness of Borrower to the Lender (now or hereafter existing) first toward payment and satisfaction of the Borrower's indebtedness not hereby guaranteed, if there be any, before making application thereof on or against the Obligations for which the Guarantor is and shall be liable hereunder. If Guarantor becomes liable for any indebtedness or other sum owing by Borrower to the Lender, by endorsement, common or statutory law, or otherwise than under this Guaranty, such liability shall not be in any manner impaired or reduced hereby but shall have all and the same force and effect it would have had if this Guaranty had not existed. If such indebtedness or other sums would have been included in and covered by this Guaranty had there been no such endorsement or other liability, then this Guaranty shall also cover and include such indebtedness and be and remain in force and effect as to such indebtedness. In the event the Guarantor shall hereafter endorse or guarantee any indebtedness from Borrower to the Lender, then and in each such event the amount of such item of

2

indebtedness shall be deemed to be added to the maximum amount for which the Guarantor would otherwise be liable hereunder so that this Guaranty shall be increased by such additional amount as to the Guarantor, without, however, in anywise impairing or diminishing any responsibility or liability for such indebtedness which would otherwise have existed under this Guaranty against the Guarantor.

5.     The Guarantor agrees that: (i) no renewal, extension, modification, consolidation, or rearrangement of or any other indulgence, forbearance or compromise with respect to the Obligations, or any part thereof; (ii) no increase in the principal amount of any of the Obligations; (iii) no increase or reduction of the rate of interest thereon; (iv) no release, withdrawal, substitution, surrender, subordination, exchange, deterioration, waste or other impairment of any security or collateral or other guaranty now or hereafter held by the Lender for payment of the Obligations, or of any part thereof; (v) no release of the Borrower, any co-guarantor, or of any other person primarily or secondarily liable on the Obligations, or any part thereof; and (vi) no delay or omission or lack of diligence or care in exercising any right or power with respect to the Obligations or any security or collateral therefor or guaranty thereof or under this Guaranty shall in any manner impair, diminish or affect the rights of the Lender or the liability of the Guarantor hereunder. The Guarantor specifically agrees that it shall not be necessary or required, and that the Guarantor shall not be entitled to require, that the Lender mitigate damages, or file suit or proceed to obtain or assert a claim for personal Judgment against the Borrower for the Obligations, or make any effort at collection of the Obligations from the Borrower, or foreclose against or seek to realize upon any security or collateral now or hereafter existing for the Obligations, or file suit or proceed to obtain or assert a claim for personal judgment against any other party (whether maker, guarantor, endorser or surety) liable for the Obligations, or make any effort at collections of the Obligations from any such other party, or exercise or assert any other right or remedy to which the Lender is or may be entitled in connection with the Obligations or any security or collateral or other guaranty therefor, or assert or file any claim against the assets or estate of the Borrower or any other guarantor or other person liable for the Obligations, or any part thereof, before or as a condition of enforcing the liability of the Guarantor under this Guaranty or requiring payment of the Obligations by the Guarantor hereunder, or at any time thereafter. The Guarantor expressly waives any right to the benefit of or to require or control application of any security or collateral or the proceeds of any security or collateral now existing or hereafter obtained by the Lender as security for the Obligations, or any part thereof, and agrees that the Lender shall have no duty insofar as the Guarantor is concerned to apply upon any of the Obligations, any monies, payments or other property at any time received by or paid to or in the possession of the Lender, except as the Lender shall determine in its sole discretion. The Guarantor specifically agrees that Guarantor shall not have any recourse or action against the Lender by reason of any action the Lender may take or omit to take in connection with the Obligations, the collection of any sums or amounts herein mentioned, or in connection with any security or collateral or any other guaranty at any time existing therefor.

6.     The Guarantor agrees to the terms, provisions and conditions of the instruments evidencing the Obligations and of any renewal, modification, consolidation or rearrangement instruments or other agreements which may have been or may hereafter be executed by the Borrower from time to time evidencing or in connection with the Obligations or any part thereof,

3

and agrees that the Guarantor's liability hereunder shall in no manner be affected, reduced, impaired or released by reason of any term, provision or, condition of any such note or other agreement or by the failure, refusal or omission of the Lender to enforce or observe any of same or any forbearance or compromise made by the Lender or any action taken or omitted to be taken by the Lender pursuant thereto or in connection therewith. The Guarantor, by the execution and delivery of this Guaranty agrees, represents, warrants and acknowledges that Guarantor shall be bound by the provisions of any Deed of Trust and Security Agreement and any Environmental Certificate and Agreement of even date herewith, from the Borrower to the Lender and which purport to be applicable to Guarantor to the same extent and with the same effect as if Guarantor had executed and delivered such document to the Lender. In that connection, the Guarantor agrees that the provisions of this Paragraph shall survive any exercise of the power of sale granted in any instrument securing the Obligations, any foreclosure of the liens created by any of the instruments securing the Obligations, any conveyance in lieu of any such foreclosure, the repayment of the Obligations, and the discharge and release of all liens, rights and interests securing payment of the Obligations.

7.      The Guarantor absolutely and unconditionally covenants and agrees that: (i) in the event that" the Borrower does not or is unable to pay or perform the Obligations for any reason including, without limitation, liquidation, dissolution, receivership, insolvency, bankruptcy, assignment for the benefit of creditors, reorganization, arrangement, composition or readjustment or other similar proceedings affecting the status, composition, identity, existence, assets or obligations of the Borrower, or the disaffirmance or termination of any of the Obligations in or as a result of any such proceedings; and/or (ii) if all or any part of the Obligations (or any instrument or agreement made or executed in connection therewith) is for any reason found to be invalid, illegal, unenforceable, uncollectible or legally impossible, for any reason whatsoever (including; without limiting the generality of the foregoing, upon the grounds that the payment and/or performance of the Obligations is ultra vires or otherwise without authority, may violate applicable usury laws, is subject to valid defenses, claims or offsets of the Borrower, or any instrument evidencing any of the Obligations is forged or otherwise irregular), then in any such case the Guarantor shall pay and perform the Obligations as herein provided and that no such occurrence shall in any way diminish or otherwise affect the Guarantor's liabilities hereunder.

8.      Should the status, composition, structure or name of the Borrower change, including, but not limited to, by reason of a merger, dissolution, consolidation or reorganization; this Guaranty shall continue and also cover the indebtedness and Obligations of the Borrower under the new status, composition structure or name according to the terms hereof. If the Borrower is a general or limited partnership, no termination of said partnership, nor withdrawal therefrom or termination of any ownership interest therein owned, by any general or limited partner of such partnership shall alter; limit, terminate, excuse or modify the Guarantor's liabilities set forth in this Guaranty. The failure by the Lender to file or enforce a claim against the estate (either in administration, bankruptcy or other proceeding) of the Borrower or any other person primarily or secondarily liable for the Obligations or of any other or others shall not affect the liability of Guarantor hereunder.

9.      In the event any payment from the Borrower to the Lender is held to constitute a

4

preference under the bankruptcy laws, or if for any other reason the Lender is required to refund such payment or pay the amount thereof to any other party, such payment by the Borrower to the Lender shall not constitute a release of the Guarantor from any liability hereunder, but the Guarantor agrees to pay such amount to the Lender upon demand and this Guaranty shall continue to be effective or shall be reinstated, as the case may be, to the extent of any such payment or payments.

10.    All payments made upon the Obligations at any time shall be deemed to have been paid by the Borrower regardless of the source of the funds used for any such payments unless express notice in writing is given to the Lender at the time of payment by the Guarantor that the Lender has been paid by Guarantor.

11.    If any or all of the Obligations are now or hereafter secured in whole or in part, the Guarantor agrees that the. Lender may, from time to time, at its discretion, and with or without valuable consideration, allow substitution, withdrawal, release, surrender, exchange, subordination, deterioration, waste, loss or other impairment of all or any part of such security or collateral, without notice to or consent by the Guarantor, and without in anywise impairing, diminishing or releasing the liability of the Guarantor hereunder.

12.    As security for payment of the Obligations and any other amounts now or hereafter owing hereunder, the Guarantor hereby grants to the Lender a security interest in, and a contractual pledge and assignment of, any and all money, property, accounts, securities, documents, chattel paper, claims, demands, instruments, items or deposits of the Guarantor, or to which Guarantor is a party, now held or hereafter coming within the Lender's custody or control, including, by way of example and not of limitation, all certificates of deposit and other depository accounts, whether such have matured or the exercise of the Lender's rights results in loss of interest or other penalty on such deposits, but excluding deposits subject to tax penalties if assigned. Without prior notice to or demand upon Guarantor, the Lender may exercise its rights granted above, as well as other rights and remedies at law and equity (all of which are cumulative), at any time when Guarantor has failed to fully and immediately pay its liabilities hereunder. In addition, the Lender shall have the right to file this Guaranty as a Uniform Commercial Code financing statement naming the Guarantor, as debtor, and the Lender, as secured party, and indicating therein the types, or describing the items of security herein specified. The Lender shall have all the rights and remedies of a secured party under the Uniform Commercial Code and shall have the right, after five (5) days notice, which the parties agree is reasonable, to sell at a private or public sale, any of the collateral or other property held by the Lender pursuant to the provisions of this Paragraph 12 to enforce the obligations of the Guarantor hereunder. The Lender's rights and remedies hereunder shall be in addition to and cumulative of any other rights and remedies at law and equity, including, without limitation, any rights of setoff to which the Lender may be entitled.

13.    Guarantor waives the benefit of any right of discharge under Chapter 34 of the Texas Business and Commerce Code and all other rights of sureties and guarantors under such Chapter and under any amendments, remodifications, supplements or any successor statute or law of or to any such statute or law. Guarantor waives all rights and defenses under Sections 51.003, 51.004 and 51.005 of the Texas Property Code and under any amendments,

5

remodifications, supplements or any successor statute or law of or to any such statute or law. Guarantor waives all rights and defenses arising under Rule 31 of the Texas Rules of Civil Procedure, Section 17.001 of the Texas Civil Practice and Remedies Code, Chapter 34 of the Texas Business and Commerce Code, and under any amendments, recodifications, supplements or any successor statute or law. The Guarantor waives marshalling of assets and liabilities, sale in inverse order of alienation, and all other defenses given to sureties and guarantors under any statute, common law, law in equity or otherwise other than actual payment of the indebtedness and performance of the actions constituting the Obligations.

14.    This Guaranty is intended to be an absolute and unconditional guaranty of payment, and not of collection, and shall inure to the benefit of the Lender and each and every other person who shall from time to time be or become the owner or holder of any of the Obligations, and each and every reference herein to the Lender shall also include and refer to each and every successor or assignee of the Lender at any time holding or owning any part of or interest in any part of the Obligations. This Guaranty shall be transferable by the Lender, it being understood and stipulated that upon the assignment or transfer by the Lender of any of the Obligations (or any part thereof or interest therein thus transferred or assigned by the Lender) to a transferee, such transferee shall also, unless provided otherwise by the Lender in its assignment, have and may exercise all the rights granted to the Lender under this Guaranty to the extent of the part of or interest in the Obligations thus assigned or transferred to said person. The Guarantor expressly waives notice of transfer or assignment of the Obligations, or any part thereof, or of the rights of the Lender hereunder.

15.    If any of the following events shall occur or be continuing: (a) if the Guarantor petitions or applies to any tribunal for the appointment of a trustee or receiver of the business, estate or assets or of any substantial part of the business, estate or assets of the Guarantor or commences any proceedings relating to the Guarantor under any bankruptcy, reorganization, arrangement, insolvency, readjustment of debt, dissolution or liquidation law of any jurisdiction, whether now or hereafter in effect; or (b) if any such petition or application is filed or any such proceedings are commenced against the Guarantor and the Guarantor by any act indicates his approval thereof, consent thereto, or acquiescence therein, or an order is entered appointing any such trustee or receiver, or adjudicating the Guarantor bankrupt or insolvent or approving the petition in any such proceedings, and such order remains in effect for more than thirty (30) days; or (c) if the Guarantor dies (in which event this Guaranty shall be binding upon the Guarantor's estate, legal representatives and heirs) and his estate or a substantial part of such estate is distributed by the executor or administrator thereof to his heirs prior to all of the distributees of such estate or part thereof (by an instrument approved in form and substance by the Lender) either jointly and severally, assuming all of such deceased Guarantor's obligations hereunder or, to additionally secure the payment of the Obligations, effectively pledging, mortgaging or otherwise creating a first lien (but without any personal liability on such distributor's part) on a portion of the assets of such estate valued (when added to the value of the security then securing the Obligations) by a qualified appraiser approved by the Lender at not less than the amount of the Obligations then outstanding; then the Lender may, at its option, declare the Obligations to be, and the Obligations shall thereupon be and become forthwith, due and payable together with the interest accrued thereon under the terms of, and with the effect provided in, the Obligations and this Guaranty.

16.    Except as otherwise provided herein, all notices, demands, requests, and other communications required or permitted hereunder shall be given in writing and sent by (i) personal delivery, or (ii) expedited delivery service with proof of delivery, or (iii) United States mail, postage prepaid, registered or certified mail, return receipt requested, or (iv) prepaid telegram, telex, or telecopy (provided that such telegram, telex or telecopy is confirmed by expedited delivery service or by United States mail in the manner previously described), addressed to the addressee at such party's address set forth herein, or to such other address as such party may specify by written notice, sent in accordance with this paragraph at least thirty (30) days prior to the date of the giving of such notice. Any such notice or communication shall be deemed to have been given and received either at the time of personal delivery, or in the case of mail, as of the date three (3) days after deposit in an official depository of the United States mail, or in the case of delivery service, telegram, telex, or telecopy, upon receipt. To the extent actual receipt is required, rejection or other refusal to accept or the inability to deliver because of changed address of which no notice was received shall be deemed to be receipt of the notice, demand, request or other communication sent.

17. Unless the context clearly indicates otherwise, the Guarantor shall mean each guarantor hereunder, or any of them, if more than one. The liability of: (a) each Guarantor hereunder, if more than one, and (b) any and all other persons and/or entities now or hereafter guaranteeing payment of all or any portion of the Obligations shall be joint and several. Suit may be brought against any such guarantors (including Guarantor), jointly and severally, and against any one or more of them, or less than all, without impairing the rights of the Lender against the other guarantors. The Lender may compromise with any one of the guarantors for such sums or sum as it may see fit and release any of the guarantors from all further liability to the Lender for the Obligations without impairing the right of the Lender to demand and collect the balance of the Obligations from the other guarantors not so released; provided, however, it is agreed among the guarantors that such compromising and release by the Lender shall not impair the rights and obligations of the guarantors as among themselves.

18.    No provision or term within any instrument evidencing any of the Obligations shall ever be construed to create a contract by the Guarantor to pay, as consideration for the use, forbearance or detention of money, interest at a rate in excess of the maximum interest rate permitted to be charged by the applicable laws of the State of Texas or the United States of America. The Guarantor shall never be liable for interest in excess of the maximum rate that may lawfully be charged under the laws of the State of Texas or the United States of America, and this provision shall control over any other provision of this Guaranty. The Note referred to herein or any other instrument evidencing, related to or securing the Obligations which may be in apparent conflict herewith. It is hereby expressly stipulated and agrees to be the intent of both the Guarantor and Lender to at all times comply with the usury and all other laws relating to this Guaranty and the instruments evidencing or securing the Obligations, now or hereafter in effect in the State of Texas and the United States of America, and any subsequent judicial interpretation thereof to the extent that same are made applicable thereto.

19.    Notwithstanding anything contained in this Guaranty to the apparent contrary, no Guarantor shall have any right of subrogation in or under the Note and instruments securing

7

same or to participate in any way therein, or any right, title or interest in and to any mortgaged property or any other collateral securing the Obligations, all such rights of subrogations and participation being hereby expressly tolled and agreed not to be pursued, until the Obligations have been fully, finally and irrevocably paid and satisfied. The payment by the Guarantor of any amount pursuant to this Guaranty shall not in anywise entitle the Guarantor to any right, title or interest {whether by way of subrogation or otherwise) in and to any of the Obligations or any proceeds thereof, or any security or collateral therefor, unless and until the full amount owing to the Lender on the Obligations has been fully paid.

20.    The rights of the Lender are cumulative and shall not be exhausted by its exercise of any of its rights hereunder or otherwise against the Guarantor or by any number of successive actions until and unless all indebtedness constituting the Obligations have been paid all other Obligations have been performed, including each of the obligations of the Guarantor hereunder.

21.    This Guaranty shall be in addition to and cumulative of, and not in substitution, novation or discharge of, any and all prior or contemporaneous guaranty agreements by the Guarantor in favor of the Lender or assigned to the Lender by others.

22.    This Guaranty shall be deemed to have been made under and shall be governed by the laws of the State of Texas in all respects. This Guaranty shall not be waived, altered, modified or amended as to any of its terms or provisions except in writing duly signed by the Lender and the Guarantor.

23.    The Guarantor is familiar with, and has independently reviewed the books and records regarding the financial condition of the Borrower and is familiar with the value of any and all collateral intended to be created as security for the payment of the Obligations; however, the Guarantor is not relying on such financial condition or the collateral as an inducement to enter into this Guaranty. The Guarantor hereby specifically waives any requirement that the Lender communicate any facts that might materially increase the risk of the Guarantor and releases the Lender from any duty to disclose such facts concerning the Borrower which the Guarantor may not have discovered in its investigation of the Borrower. The Guarantor acknowledges and agrees that neither the Lender, nor any other party has made any representation, warranty or statement to the Guarantor in order to induce the Guarantor to execute this Guaranty.

24.    The Guarantor acknowledges and agrees that this Guaranty accurately represents and contains the entire agreement between the Guarantor and the Lender with respect to the subject matter hereof, that the Guarantor is not relying, in the execution of this Guaranty, on any representations (whether written or oral) made by or on behalf of the Lender except expressly set forth in this Guaranty, and that any and all prior statements and/or representations made by or on behalf of the Lender to the Guarantor (whether written or oral) in connection with the subject matter hereof are merged herein.

25.    The Guarantor acknowledges that the Guarantor has been afforded the opportunity to receive the advice of legal counsel of its own choice in connection with the preparation and negotiation of this Guaranty, and the Guarantor fully understands the implications and

8

ramifications of the agreements herein made by the Guarantor.

26.    This Guaranty shall bind the heirs, personal representatives, successors and assigns of the Guarantor and shall inure to the benefit of all transferees, credit participants, assignees, and/or endorsees of the Lender. The masculine and neuter genders used herein shall each include the masculine, feminine and neuter genders and the singular or plural numbers used herein shall each include the other. The words "person" and "entity" shall include individuals, corporations, partnerships, joint ventures, associations, joint stock companies, trusts and unincorporated organizations.

27.    If any provision of this Guaranty is held to be illegal, invalid or unenforceable under any present or future law effective during the term of this Guaranty, such provision shall be fully severable and this Guaranty shall be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part of this Guaranty, and the remaining provisions of this Guaranty shall, to the extent permitted by law, remain in full force and effect and shall not be affected by the illegal, invalid or unenforceable provision.

**THIS GUARANTY, AND ALL DOCUMENTS AND INSTRUMENTS REFERENCED HEREIN, OR EXECUTED IN CONNECTION WITH THE ABOVE-DESCRIBED PROMISSORY NOTE, REPRESENT THE FINAL AGREEMENT BETWEEN GUARANTOR AND LENDER, AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS BETWEEN GUARANTOR AND LENDER. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN GUARANTOR AND LENDER.**

IN WITNESS WHEREOF, the undersigned Guarantor has duly executed this Guaranty as of the date of the acknowledgment set forth below, to be dated and effective for all purposes, however, as of the date first above written.

GUARANTOR:

_____
TIMOTHY BARTON
DRIVER'S LICENSE NO. *16981398*
SOCIAL SECURITY NO. *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*


JMJ DEVELOPMENT, LLC,
A Texas limited liability company

_____
Name: Tim Barton
Title: Manager

9

THE STATE OF TEXAS    §
                      §
COUNTY OF DALLAS      §
                      §

SWORN TO AND SUBSCRIBED BEFORE ME on the 24th day of March, 2022, by **TIMOTHY BARTON**.



_____
NOTARY PUBLIC IN AND FOR
THE STATE OF TEXAS

THE STATE OF TEXAS    §
                      §
COUNTY OF DALLAS      §
                      §

SWORN TO AND SUBSCRIBED BEFORE ME on the 24th day of March, 2022, by **TIM BARTON, acting as Manager of JMJ DEVELOPMENT, LLC, a Texas limited liability company**, in his capacity therein.



_____
NOTARY PUBLIC IN AND FOR
THE STATE OF TEXAS

10

## DEED OF TRUST, SECURITY AGREEMENT
## AND FINANCING STATEMENT

**NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OR ALL OF THE FOLLOWING INFORMATION FROM ANY INSTRUMENT THAT TRANSFERS AN INTEREST IN REAL PROPERTY BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.**

STATE OF TEXAS            §
                          §
                          §
COUNTY OF JOHNSON         §

LDG001, LLC, a Texas limited liability company (herein called "Grantor", whether one or more), for and in consideration of the indebtedness hereinafter described, has granted, bargained, transferred, sold and conveyed, and by these presents does grant, bargain, transfer, sell and convey in trust, unto **TED A. COX, Trustee** and unto Trustee's successors in this trust and Trustee's substitutes and assigns (herein called "Trustee"), forever, for the use and benefit of the Beneficiary (hereafter defined) all and singular the property hereinafter described situated in the County of Johnson, State of Texas, to wit:

(a) **See Exhibit "A" attached hereto.**

(b) all rights, titles, interest, estates, reversions and remainders now owned or hereafter acquired by Grantor in and to the Land and in and to all other properties covered hereby and all other lands now owned or hereafter acquired by Grantor abutting, adjacent or contiguous to the Land;

(c) all buildings and other improvements now or hereafter situated on the Land and in and to the properties covered hereby (herein sometimes called the "Improvements");

(d) all rights, titles and interest now owned or hereafter acquired by Grantor in and to all easements, licenses, streets and rights-of-way of every kind and nature adjoining, serving, belonging, appertaining or otherwise affording ingress and egress to the Land and all public or private utility connections thereto and all appurtenances, tenements, hereditaments, franchises, servitudes, rights, ways, privileges and prescriptions thereto;

(e) all goods, equipment, fixtures, furnishings, inventory, crops, other farm products, timber, shrubs and any other vegetation, and any and all other personal property of any kind or character defined in and subject to the applicable provisions of the Texas Business and Commerce Code as now adopted and existing and as it may hereafter be amended or succeeded (herein called the "Uniform Commercial Code") now owned or hereafter acquired by Grantor and now or hereafter affixed to, planted or grown on, located on or within, or severed from the Land or the Improvements, and any and all personal property purchased with a portion of the proceeds of the Note (hereinafter defined), regardless of the location of such property, and all replacements thereof, substitutions therefor, additions thereto, and proceeds and products thereof,

1

Initial for Identification

## DEED OF TRUST, SECURITY AGREEMENT
## AND FINANCING STATEMENT

**NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OR ALL OF THE FOLLOWING INFORMATION FROM ANY INSTRUMENT THAT TRANSFERS AN INTEREST IN REAL PROPERTY BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.**

STATE OF TEXAS            §
                          §
COUNTY OF JOHNSON          §

**LDG001, LLC, a Texas limited liability company** (herein called "Grantor", whether one or more), for and in consideration of the indebtedness hereinafter described, has granted, bargained, transferred, sold and conveyed, and by these presents does grant, bargain, transfer, sell and convey in trust, unto **TED A. COX, Trustee** and unto Trustee's successors in this trust and Trustee's substitutes and assigns (herein called "Trustee"), forever, for the use and benefit of the Beneficiary (hereafter defined) all and singular the property hereinafter described situated in the County of Johnson, State of Texas, to wit:

(a) **See Exhibit "A" attached hereto.**

(b) all rights, titles, interest, estates, reversions and remainders now owned or hereafter acquired by Grantor in and to the Land and in and to all other properties covered hereby and all other lands now owned or hereafter acquired by Grantor abutting, adjacent or contiguous to the Land;

(c) all buildings and other improvements now or hereafter situated on the Land and in and to the properties covered hereby (herein sometimes called the "Improvements");

(d) all rights, titles and interest now owned or hereafter acquired by Grantor in and to all easements, licenses, streets and rights-of-way of every kind and nature adjoining, serving, belonging, appertaining or otherwise affording ingress and egress to the Land and all public or private utility connections thereto and all appurtenances, tenements, hereditaments, franchises, servitudes, rights, ways, privileges and prescriptions thereto;

(e) all goods, equipment, fixtures, furnishings, inventory, crops, other farm products, timber, shrubs and any other vegetation, and any and all other personal property of any kind or character defined in and subject to the applicable provisions of the Texas Business and Commerce Code as now adopted and existing and as it may hereafter be amended or succeeded (herein called the "Uniform Commercial Code") now owned or hereafter acquired by Grantor and now or hereafter affixed to, planted or grown on, located on or within, or severed from the Land or the Improvements, and any and all personal property purchased with a portion of the proceeds of the Note (hereinafter defined), regardless of the location of such property, and all replacements thereof, substitutions therefor, additions thereto, and proceeds and products thereof,

1

Initial for Identification

including without limitation, all rights, titles and interests of Grantor now owned or hereafter acquired in and to any of such personal property that may be subject to any title retention or security agreement superior in lien or security interest to the lien or security interest of this Mortgage, Security Agreement and Financing Statement (herein called "Mortgage");

(f) all rights and interests of Grantor now owned or hereafter acquired in and to (i) all contracts, subcontracts, building permits, and plans and specifications relating to the Improvements and all deposits, funds, accounts, contract rights, instruments, documents, general intangibles (including but not limited to, trademarks, trade names and symbols used in connection therewith), notes or chattel paper arising from or by virtue of any transactions relating to the Land or the Improvements; (ii) all right, title and interest of Grantor in and to any and all wastewater capacity reservations of any kind or character covering the Land or Improvements, issued or which may be issued by any governmental agencies having jurisdiction thereof, and all other rights relating to sewage, treatment capacity, water capacity and utilities serving the Land or Improvements, (said rights described in this subparagraph (iii) being collectively sometimes called "Utilities Rights"), permits, licenses, franchises, certificates, and other rights and privileges obtained in connection with the Land or the Improvements; (iv) all proceeds and proceeds of proceeds arising from or by virtue of the sale, lease or other disposition of any of the real or personal property covered hereby;(v) all proceeds and proceeds of proceeds (including premium refunds) payable or to be payable under each policy of insurance relating to the Land or the Improvements; and (vi) all proceeds and proceeds of proceeds arising from the taking of all or any part of the Land or any rights appurtenant thereto, including, but not limited to, change of grade of streets, curb cuts or other rights of access, for any public or quasi-public use under any law, or by right of eminent domain, or by private or other purchase in lieu thereof (all of the items described in (e) and (f) inclusive, being herein called the "Goods"); and

(g) without limiting the foregoing, any and all rights, royalties, rents, revenues, profits, benefits, leases, contracts, accounts, general intangibles, money, instruments, chattel paper, insurance proceeds, documents, tenements, hereditaments, and appurtenances now owned or hereafter acquired by Grantor and appertaining to, generated from, arising out of or belonging to any of the foregoing (all of the foregoing items described in (a) through (g), inclusive, being herein called the "Mortgaged Property"). All of the Goods which constitute tangible personal property shall be deemed to be part of and affixed to the Land for all purposes to the maximum extent permitted by law.

TO HAVE AND TO HOLD the Mortgaged Property unto Trustee, and Trustee's successors in this trust, and Trustee's assigns, forever, to secure the payment of the Indebtedness (hereafter defined) and to secure the performance of the covenants, agreements, and obligations of the Grantor herein contained, and Grantor does hereby bind Grantor, and Grantor's respective heirs, personal representatives, successors and assigns, to warrant and forever defend the Mortgaged Property unto Trustee, and Trustee's successors and assigns, forever, against the claim or claims of all persons whomsoever claiming or to claim the same, or any part thereof.

2

Initial for Identification

## ARTICLE I:  INDEBTEDNESS SECURED

1.01    This conveyance is made in trust, however, to secure and enforce the payment and performance of all of the following obligations (herein collectively called the "Indebtedness"):

A.    All sums due or to become due pursuant to that one certain Promissory Note (herein called the "Note") of even date herewith, executed by **LDG001, LLC, a Texas limited liability company** (sometimes referred to herein as the "Borrower", whether one or more), payable to the order of **PIONEER FINANCE, INC., A TEXAS CORPORATION** (said party or any subsequent owner or holder of the Note being herein called "Beneficiary"), whose address is as specified below, in the original amount of **$3,000,000.00** bearing interest at the rate therein stated and finally maturing as stated therein, the Note providing that, if an uncured Event of Default occurs after applicable grace period or notice and failure to cure after applicable cure period, the unpaid principal thereof and all accrued unpaid interest thereon may, at Beneficiary's option, be declared due and payable prior to the stated maturity thereof and providing further for the payment of attorneys' fees and other expenses of collection under certain circumstances;

B.    All funds advanced by Beneficiary to or for the benefit of Borrower or Grantor pursuant hereto, pursuant to any other document securing, guaranteeing or relating to the Note; and

C.    All renewals, rearrangements, modifications and extensions for any of the foregoing.

1.02    The Indebtedness shall be payable at the address specified in the Note or at such other place as Beneficiary from time to time may hereafter designate in writing; and, unless otherwise expressly provided in the instruments evidencing the Indebtedness, all portions of the Indebtedness shall bear interest from the due date thereof until paid at the same rate per annum as provided in the Note for interest accruing on past due amounts; provided however, in no event shall Beneficiary compute the interest in a manner that would cause Beneficiary to contract for, charge or receive interest that would exceed the maximum legal contract rate of interest that Beneficiary may charge Grantor.

1.03 All payments received by Beneficiary, whether designated as payments of principal or interest, shall be applied to the principal or interest of the Indebtedness or to expenses provided for herein, or any combination of the foregoing, as directed by Beneficiary at Beneficiary's option, exercised in its sole discretion.

## ARTICLE II:  COVENANTS OF GRANTOR

2.1 In order to secure payment of the Indebtedness, and performance of Grantor's obligations hereunder, Grantor and Borrower covenant and agree with Beneficiary and with Trustee as follows:

A.    <u>Agreement to Pay Indebtedness.</u> Grantor or Borrower shall pay or cause there to be

3

Initial for Identification

paid when due all of the Indebtedness, together with the interest and all other charges accruing thereon and thereunder in accordance with the terms of the Note and all other instruments evidencing, securing or otherwise relating to the Indebtedness.

B.    Title to Mortgaged Property. Grantor represents and warrants that (1) Grantor has good and indefeasible title in fee simple to the Mortgaged Property, (2) unless otherwise herein provided, the Mortgaged Property is free from restrictions, easements, outstanding mineral or royalty interests, liens and security interests, and (3) Grantor has full right and authority to make this conveyance. Grantor agrees to maintain and preserve Grantor's legal existence and all related rights, franchises and privileges. If Grantor is an entity other than an individual, Grantor shall not amend its Articles of Organization or change its name or identity without Beneficiary's prior written consent, such consent not to be unreasonably withheld or delayed. For purposes hereof, the term "Articles of Organization" shall mean, as they exist on the date hereof, (a) Grantor's Articles of Incorporation and By-Laws, if Grantor is a corporation, (b) Grantor's Partnership Agreement or Joint Venture Agreement, if Grantor is a general partnership or joint venture, (c) Grantor's Limited Partnership Agreement and Certificate of Limited Partnership, if Grantor is a limited partnership or a registered limited liability partnership, (d) the Trust Agreement creating Grantor, if Grantor is a trust or (e) Grantor's Articles of Organization and Regulations, if Grantor is a limited liability company.

C.    Insurance. Grantor shall promptly obtain and deliver to Beneficiary insurance policies with premiums paid for at least one year in advance providing extended coverage for all Improvements and other property covered by this Mortgage against damage by fire, lightning and such other risks as Beneficiary shall require, all in amounts required by Beneficiary not exceeding 100% of full replacement cost of all Improvements and all other property covered by this Mortgage, such insurance to be written on a replacement cost form promulgated by the Texas State Board of Insurance and with companies approved by Beneficiary, with (1) loss made payable to Beneficiary pursuant to the standard mortgagee clause promulgated by the Texas State Board of Insurance, without contribution; (2) provision that (a) each of said policies shall not be terminated, reduced or limited, regardless of any breach of the representations and agreements set forth therein, and (b) no such policy shall be canceled, endorsed or amended to any extent unless the issuer thereof shall have first given Beneficiary at least thirty (30) days' prior written notice. In case Grantor fails to furnish such policies, Beneficiary, at Beneficiary's option, may procure such insurance at Grantor's expense, and Grantor further agrees to pay at Grantor's expense such reasonable placement fees, or charges and any other penalties assessed by Beneficiary in procuring such insurance. All renewal and substitute policies of insurance shall be delivered to the office of Beneficiary, premiums paid for at least one year, at least ten (10) days before expiration of the insurance protection to be replaced by such renewal or substituted policies. In case of loss, Beneficiary, at Beneficiary's option shall be entitled to receive and retain the proceeds of the insurance policies, applying the same toward payment of the Indebtedness in such manner as Beneficiary may elect, or at Beneficiary's option, Beneficiary may pay the same over wholly or in part to Grantor for the repair of the Improvements or for the erection of new improvements in their place, or for any other

4

Initial for Identification

purpose satisfactory to Beneficiary, but Beneficiary shall not be obligated to see to the proper application of any amounts so paid to Grantor. If Beneficiary elects to allow such payments to Grantor, disbursement shall be made on such terms and subject to such conditions as Beneficiary may specify, and any insurance proceeds in excess of the Indebtedness shall be refunded by Beneficiary to Grantor. Regardless of whether the insurance proceeds payable to Grantor are sufficient to pay the full costs of repair and restoration of the Mortgaged Property, Grantor shall promptly commence and carry out the repair, replacement, restoration and rebuilding of any and all of the Improvements damaged or destroyed so as to return same, to the extent practicable, to the same form and condition as existed immediately prior to such damage to or destruction thereof, with such modifications or additions as may be required to comply with applicable laws, ordinances, rules and regulations of all governmental agencies having jurisdiction thereof. Grantor shall not permit or carry on any activity within or relating to the Mortgaged Property that is prohibited by the terms of any insurance policy covering any part of the Mortgaged Property or which permits cancellation of or increase in the premium payable for any insurance policy covering any part of the Mortgaged Property. In the event of a foreclosure of this Mortgage, the purchaser of the Mortgaged Property shall succeed to all the rights of Grantor, including any right to unearned premiums, in and to all policies of insurance assigned and delivered to Beneficiary pursuant to the provisions of this instrument. Regardless of the types or amounts of insurance required and approved by Beneficiary, Grantor shall assign and deliver to Beneficiary all policies of insurance that insure against any loss or damage to the Mortgaged Property, as collateral and further security for the payment of the Indebtedness. Grantor also shall obtain and maintain in force and effect at Grantor's expense such liability and other insurance policies and protection as Beneficiary from time to time may require.

D.    <u>Taxes and Assessments.</u> Except as provided for in Section 2.01 M. hereof, Grantor shall pay, when due, all taxes, assessments, ground rents, maintenance charges, all other charges and impositions (herein called the "Impositions") now or hereafter assessed, levied or otherwise charged against the Mortgaged Property, or any part thereof, and shall promptly furnish proof, satisfactory in form and substance to Beneficiary, of such payment. In the event of the passage after date of this Mortgage of any law, ordinance, or regulation, deducting from the Mortgaged Property for the purposes of taxation any lien thereon, or changing in any way the laws now in force for the taxation of mortgages, deeds of trust, or indebtedness secured thereby, or the manner of the preparation of such taxes so as to affect the interest of Beneficiary, then and in such event, Grantor shall bear and pay the full amount of such taxes, unless the payment thereof by Grantor would be unlawful or if the payment thereof would constitute usury or render the Indebtedness wholly or partially usurious. If Grantor fails to pay any such taxes and assessments, Beneficiary may pay the same, together with all costs and penalties thereon, at Grantor's expense; provided, however, that if for any reason payment by Grantor or by Beneficiary of any such new or additional taxes would be unlawful or if the payment thereof would constitute usury or render the Indebtedness wholly or partially usurious, Beneficiary, at Beneficiary's option, may declare the unpaid Indebtedness with all accrued interest thereon to be immediately due and payable, or beneficiary, at Beneficiary's option, may pay the amount or portion of such taxes which

5


Initial for Identification

otherwise would render the Indebtedness unlawful or usurious, in which even Grantor shall concurrently therewith pay the remaining lawful and non-usurious portion or balance of said taxes. Grantor reserves the right to contest appraisals or other assessments made against the Mortgaged Property by applicable governmental authority, but such right shall not adversely affect Beneficiary's right to receive the escrow of taxes as provided for in Section 2.01 M. hereof.

E.    Eminent Domain. Grantor represents to Beneficiary that to Grantor's knowledge and belief no eminent domain proceedings affecting the Mortgaged Property or any part thereof are pending or threatened. In the event Grantor acquires knowledge or notice that any entity (public or private) having the right of eminent domain (herein called a "Condemning Authority") may or does intend to acquire or has threatened to institute or has instituted condemnation proceedings to acquire the Mortgaged Property, any part thereof or any interest therein, Grantor shall promptly give Beneficiary written notice of full details with regard thereto. Beneficiary shall be notified of and have the right to participate in all negotiations with any Condemning Authority and Grantor shall not grant to any Condemning Authority any right, title or interest in or to the Mortgaged Property or any part thereof (in lieu of eminent domain or condemnation proceedings or otherwise) without the prior written consent of Beneficiary to, and the joinder of Beneficiary with Grantor in, any such grant. Grantor has transferred and assigned, and does hereby transfer and assign unto Beneficiary (i) the full amount of and right to receive and be paid the full amount of all consideration and or damages for injury or damage to the Mortgaged Property paid or to be paid by an Condemning Authority for and, or, by virtue of the grant, in lieu of eminent domain or condemnation proceeding, of any right, title or interest in the Mortgaged Property, and (ii) all judgments, decrees and awards or payments for the taking of and, or, for injury or damage to the Mortgaged Property (including but not limited to all awards and judgments pursuant to any condemnation proceedings), including interest thereon, and Beneficiary shall apply all sums actually paid to and received by Beneficiary pursuant to any such grant, judgment, decree or award first to reimbursement of all costs and expenses (including but not limited to attorneys' fees) incurred by Beneficiary in connection with any such matters, and the balance shall be applied to the Indebtedness in such manner as Beneficiary may elect. Beneficiary shall have the right to participate in any such condemnation proceedings and upon an uncured Event of Default hereunder, Beneficiary is hereby authorized, in the name of Grantor, to direct the conduct of any such proceedings, compromise and settle any such proceedings and, or, to execute and deliver valid satisfactions of, and to appeal from, any award, judgment or decree in any such condemnation proceeding. If Beneficiary elects to allow a portion of the proceeds of any grant in lieu of threatened condemnation or condemnation proceedings to be paid to Grantor to be used in rebuilding, restoration or repair of the Mortgaged Property, then the disbursement of such proceeds shall be on such terms and subject to such conditions as Beneficiary and Grantor shall mutually agree. In the event that as a result of any grant in lieu of threatened condemnation or of any such judgment, decree or award and notwithstanding application by Beneficiary of the proceeds thereof in any manner herein provided, Beneficiary nevertheless determines that the payment of the Indebtedness or performance of any obligations under this Mortgage is impaired, Beneficiary, with notice

6


Initial for Identification

to Grantor, may declare all of the Indebtedness immediately due and payable.

F.      Agreement to Protect Mortgaged Property. Grantor shall keep the Mortgaged Property in first-class condition and presenting a first-class appearance, make promptly all repairs, renewals and replacements necessary to such end, prevent waste to any part of the Mortgaged Property, and do promptly all else necessary to such end; and Grantor shall promptly discharge or bond around all claims for labor performed and material furnished therefor, and shall not suffer any lien of mechanics or materialmen therefor to attach to any part of the Mortgaged Property. Grantor shall guard every part of the Mortgaged Property from removal, destruction and damage, and shall not do or suffer to be done any act whereby the value of any part of the Mortgaged Property may be lessened. No building, improvement or other property now or hereafter covered by the lien or security interest of this Mortgage shall be removed, demolished or materially altered or enlarged, nor shall any new building or other improvements be constructed, without the prior written consent of Beneficiary. Grantor shall not initiate, join in, or consent to any change in any private restrictive covenants, zoning ordinances or other public or private restrictions limiting or defining the uses that may be made of the Mortgaged Property or any part thereof without the prior express written consent of Beneficiary. Grantor at all times shall comply with and perform all obligations under any and all applicable laws, statutes, regulations, ordinances or restrictive covenants relating to the Mortgaged Property and the existence, use and operation thereof. With prior notice to Grantor and without unreasonably interfering with tenants in their enjoyment of the property and in their day-to-day operations, Beneficiary and Beneficiary's agents or representative shall have access to the Mortgaged Property at all reasonable times in order to inspect same and verify Grantor's compliance with Grantor's duties and obligations under this document. Grantor shall not, without the prior written consent of Beneficiary, engage in or permit any mining or drilling activities on the Land.

G.      Alienation of Interest in the Mortgaged Property. If, without the prior written consent of Beneficiary, (a) all or any part of the Mortgaged Property, or any interest therein, is sold, transferred or otherwise conveyed, or (b) any contract or instrument for the sale, transfer or conveyance of all or any part of the Mortgaged Property, or any legal, equitable; beneficial or other interest therein, is entered into, or (c) any substantial interest in Grantor ("substantial" meaning any interest of 25% or more of either the membership or ownership interest in the aggregate), whether beneficial, stockholding, partnership or otherwise, is sold, conveyed, mortgaged, pledged or otherwise transferred or encumbered, or (d) any lien or encumbrance is hereafter created or arises covering all or any part of the Mortgaged Property, or any interest therein, or all or any part of the Mortgaged Property, or any interest therein, is hereafter pledged or encumbered in any manner, or (e) any easement, right-of-way or any other right whatsoever with respect to the Mortgaged Property, is hereafter created or granted, or (f) all or any portion of the Mortgaged Property, or any interest therein, is leased or possession thereof is transferred, for any purpose, including, without limitation, one or more oil, gas or other mineral leases, for a period longer than one (1) year except in the ordinary course of business and at then market rates (any of the above being hereinafter called a "Transfer" or collectively "Transfers"), and irrespective of whether any such Transfers are done directly or

7



Initial for Identification

indirectly, voluntarily or involuntarily, by written instrument (whether or not filed for record), by operation of law or otherwise, then Beneficiary may, at its option, declare all or part of the Indebtedness immediately due and payable, and Beneficiary shall be entitled to exercise any and all rights and remedies provided under this Mortgage and under any other document securing payment of the Indebtedness or executed in connection therewith. Grantor shall immediately notify Beneficiary in writing of any Transfer (herein called "Transfer Notice") by certified mail, postage prepaid, return receipt requested, addressed to Beneficiary at the address set out herein (or to such other address as Beneficiary may have designated by notice to Grantor). The consent of Beneficiary to any Transfer may be given or withheld for any reason in the exercise of Beneficiary's sole and absolute discretion. Without limiting the foregoing or being limited thereby, Beneficiary's consent (1) may be withheld even though the Transfer will not (i) jeopardize or impair the security for the Indebtedness or Beneficiary's ability or right to enforce its liens and security interests against such security, or (ii) increase the risk of default in the payment of Indebtedness hereunder, or (iii) increase in the likelihood that Beneficiary may have to resort to other collateral for the payment of the Indebtedness, or (iv) release or discharge any person or party liable, directly or indirectly, for the payment of the Indebtedness, and (2) may be conditioned upon, any one or more of, (a) an increase in the rate of interest payable on the Indebtedness to a rate acceptable to Beneficiary or the rearrangement or acceleration of the payment of the Indebtedness or any part thereof, (b) the payment to Beneficiary of a reasonable transfer fee, in an amount determined by Beneficiary, and all costs and expenses, including, without limitation, attorneys' fees, incurred by Beneficiary in connection with the transfer or the giving of its consent, (c) the assumption or guarantee of the Indebtedness or any part thereof, by any party determined by Beneficiary to be necessary or desirable, (d) the payment of any part of the Indebtedness or the pledge of additional collateral to secure the payment thereof, or (e) the amendment, modification, rearrangement or other change in any of terms and provisions of any document evidencing the Indebtedness, or any part thereof, or in any of the terms and provisions of any document securing the payment of the indebtedness or any part thereof. The option of Beneficiary may be exercised at any time after the occurrence of the Transfer and until one (1) year after receipt by Beneficiary of said Transfer Notice; and if no such Transfer Notice is received by Beneficiary, then there shall be no limitation on the period of time within which Beneficiary may exercise said option.

H.    Successors.    In the event the ownership of the Mortgaged Property or any part thereof becomes vested in a person other than Grantor, Beneficiary, at Beneficiary's option, may deal with such successor or successors in interest with reference to this Mortgage, the Mortgaged Property and the Indebtedness in the same manner and to the same extent as with Grantor, without in any way vitiating or discharging Grantor's liability hereunder or upon the Indebtedness. No sale of the Mortgaged Property and no forbearance on the part of Beneficiary, or extension of the time for the payment of the Indebtedness, shall operate to release, discharge, modify, change or affect, either in whole or in part, any liability of Grantor or the liability of the guarantors or sureties of Grantor or of any other party liable for payment of the Indebtedness.

8

Initial for Identification

I.      Application of Payments. In the event any part of the indebtedness is not secured by this Mortgage, all payments hereafter made by Grantor, Borrower or any other person shall be applied first to the part of the Indebtedness not so secured until such part is paid in full. In the event any lien or security interest securing part of the Indebtedness does not cover or apply to all of the Mortgaged Property, then all payments paid hereunder by Grantor, Borrower or any other person shall be applied first to the part of such Indebtedness which is not secured by all of the Mortgaged Property and then to that part which is so secured by all of the Mortgaged Property.

J.      [Intentionally omitted].

K.      Advances Part of Indebtedness. To the extent that any advance of funds by Beneficiary is used to pay any indebtedness secured by an outstanding lien, security interest, charge or encumbrance against the Mortgaged Property or any part thereof, such funds have been advanced by Beneficiary at Borrower's or Grantor's request, shall constitute a part of the Indebtedness, and Beneficiary shall be subrogated to any and all rights, power, equities, liens and security interests owned or granted to any owner or holder of such indebtedness, irrespective of whether said security interests, liens, charges of encumbrances are transferred to Beneficiary or are released of record.

L.      Additional Documents. Grantor agrees that Grantor shall execute and deliver such other and further reasonable documents and do and perform such other acts as may be reasonably necessary and proper in Beneficiary's judgment to carry out the intention of the parties as herein expressed and to effect the purposes of this document and the loan transaction referred to herein. Without limitation of the foregoing, Grantor agrees to execute and deliver such documents as may be necessary to cause the liens and security interests granted hereby to cover and apply to any property placed in, on or about the Mortgaged Property in addition to, or replacement or substitution for, any of the Mortgaged Property, and to execute and deliver such documents requested by Beneficiary as Beneficiary may deem necessary or desirable to transfer to Beneficiary Grantor's Utilities Rights.

M.      Escrow Funds. Unless otherwise not required by Beneficiary, in order to further secure the payment of the Indebtedness, and to further secure Grantor's obligation to timely pay the Impositions for calendar year 2021 and 2022 and pay premiums due on insurance policies (the "Premiums") required hereunder, Grantor has deposited with Beneficiary the sum of ___-0-___ (the "Escrow Funds"). Beneficiary shall use the Escrow Funds to pay the Impositions for 2013 and the Premiums for required hazard insurance on the Land. Grantor hereby conveys, pledges, transfers and grants to Beneficiary a security interest pursuant to the Texas Uniform Commercial Code in and to all Escrow Funds, as same may increase or decrease from time to time, for the purpose of securing Grantor's obligations under this Mortgage. In order to further secure the Indebtedness, Grantor shall pay to Beneficiary, in addition to all amounts of principal, interest and other sums required to be paid by the terms of the Note, this Mortgage or any other instruments evidencing, securing or otherwise relating to the Indebtedness, on the 1st day of each calendar month beginning on January 1, 2022, and on the first day of each month

9

Initial for Identification

thereafter until the Indebtedness shall be paid in full, a sum determined from time to time by Beneficiary to be equal to 1/12th of (i) all Impositions, as herein defined, and (ii) all Premiums. Beneficiary shall not be required to post any bond for any such amount so deposited with it by Grantor and shall not be required to pay any interest or other compensation for or on account of any such sums so deposited with it. Likewise, Beneficiary shall not be liable for any failure to pay any such taxes or other charges or premiums for which deposit has not been made with it pursuant to the foregoing provisions. Beneficiary may use and invest any such sums so deposited with it without any duty or obligation to compensate Grantor for the use thereof or for any profit or benefit therefrom realized by Beneficiary. If the amount of the deposits paid to Beneficiary are insufficient to pay all of the Impositions and the Premiums as and when same become due, Beneficiary may, but shall have no obligation to notify Grantor of the amount of such deficiency and, if so notified, Grantor shall deposit the full amount necessary to satisfy such deficiency with Beneficiary within five (5) days after its receipt of such notice of deficiency. Any sale and conveyance of the Mortgaged Property shall serve as a transfer by Grantor to the grantee of the Mortgaged Property of all of its rights to any sums then held by Beneficiary pursuant to the terms of this paragraph. Beneficiary shall have the right, at its option and without being required to do so, to advance its own funds for the purpose of paying any of the Impositions or the Premiums and any such amounts so paid shall bear interest from the date advanced at the maximum lawful rate of interest permitted by applicable law, now or hereafter mentioned, until the full amount thereof shall be paid in full and all such sums so advanced shall constitute a part of the Indebtedness and shall be secured by this Mortgage, Grantor hereby grants to Beneficiary a security interest in and right of set off against any and all funds so held by Beneficiary in order to additionally secure the payment and performance of the Indebtedness and Grantor's observance of the covenants in this Mortgage and any other instruments securing the payment of the Indebtedness or relating thereto and Beneficiary shall be entitled, at any time and without notice, demand or presentment to Grantor, to set off all or any part of such funds in said account against any sums then due and payable on the Indebtedness in such manner, order or priority, as determined by Beneficiary. In the event of a Default (as hereinafter defined) resulting in foreclosure, such conversion of such amounts so deposited with Beneficiary to the exclusive and sole ownership of Beneficiary shall be automatic without the necessity of any action on the party of the Beneficiary.

N.      Financials. Grantor shall furnish to Beneficiary annually, and at any other time upon Beneficiary's request, an itemized list of all tenants or lessees of any portion of the Property including the amount of rental each such tenant or lessee is paying. Grantor shall keep proper books and records of accounts in accordance with generally accepted accounting principles and set aside on Grantor's books from its earnings for each fiscal year reserves for depreciation, depletion, obsolescence and amortization of Grantor's properties during such fiscal year as determined in accordance with generally accepted accounting principles consistently applied and all other proper reserves, similarly determined, which should be set aside from such earnings in connection with Grantor's business. Beneficiary shall have the right to examine the books of account of the Grantor, to reasonably discuss the non-confidential affairs, finances and accounts of the Grantor

10

Initial for Identification

and also the Mortgaged Property and Grantor's operation thereof, and to be informed as to the same by Grantor's officers or other duly authorized representatives, all at such times designated by Beneficiary. Grantor shall further furnish from time to time to Beneficiary, upon written request, copies of balance sheets of Grantor, copies of statements of income and retained earnings of Grantor, and copies of statements of changes in financial position of Grantor, covering such periods of time and containing such reasonable detail as Beneficiary shall from time to time request, prepared and certified by a person or firm acceptable to Beneficiary.

O.    Non-Homestead Property.   Grantor represents and agrees that no part of the Mortgaged Property constitutes or shall constitute any part of Grantor's members' or owners' business, residential, urban or rural homestead.

P.    Grantor's Statement.   Grantor, at any time and from time to time, shall furnish promptly upon request, a written statement or affidavit, in such form as may be required by Beneficiary, stating the unpaid balance of the Note and that there are no offsets or defenses against full payment of the Note and performance of the terms hereof or of any document securing payment of the Note or executed in connection therewith, or if there are any such offsets and defenses, specifying them in reasonable detail.

Q.    Compliance with Laws.    Grantor shall comply with all laws, ordinances, rules and regulations of all governmental or quasi-governmental agencies relating to the Mortgaged Property or any part thereof and shall secure and maintain in full force and effect all contracts, franchises, permits and licenses necessary or desirable for the construction and/or the efficient operation of the Improvements and/or business conducted on the Mortgaged Property.

R.    Attorney's Fees.    Grantor shall reimburse Beneficiary and Trustee for all reasonable attorneys' fees and other reasonable and necessary costs and expenses of any kind which either of them may incur in connection with any legal proceedings or matters related to the Indebtedness including, but not limited to, condemnation proceedings, probate proceedings or bankruptcy proceedings.

S.    Mineral Exploration.    Grantor shall not, without the prior written consent of Beneficiary, engage in or permit any person to conduct geologic and geophysical surveys, or investigate, explore, prospect, drill, mine for or produce, store, treat or transport oil, gas and all other minerals or engage in activities related thereto on the Land.

T.    Appraisals. Upon an event of default by Borrower, Grantor hereby agrees that Beneficiary shall be entitled to obtain at any time, and from time to time, when deemed appropriate by Beneficiary (but no more frequently than annually if there is no Default and only then if required by Beneficiary's federal regulatory agency), a current appraisal of the Mortgaged Property from an appraiser, or appraisers, chosen by Grantor from a list of appraisers approved by Beneficiary. The reasonable cost and expenses of such appraisals shall be paid by grantor herein within ten (10) days of the date an invoice thereof is mailed to Grantor at the address of Grantor as provided in Section 6.01 G

11

_____
Initial for Identification

hereof. In the event Grantor fails to fully pay such invoice within such ten (10) days, Beneficiary may (i) pay the same at Grantor's expense, in which case the amount thereof shall be advanced and included as a portion of the Indebtedness pursuant to Section 1.01 B hereof, and or (ii) Beneficiary may declare the same to be a Default pursuant to Section 3.01 B hereof.

U.      Environmental Indemnity.        The terms "hazardous waste", "hazardous substance", "disposal", "release", and "threatened release", as used in this Mortgage, shall have the same meanings as set forth in the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 49 U.S.C. Section 6901, et seq., or other applicable state or Federal laws, rules, or regulations adopted pursuant to any of the foregoing. The terms "Hazardous waste" and "hazardous substance" shall also include, without limitation, petroleum and petroleum byproducts or any fraction thereof and asbestos. Grantor represents and warrants to Beneficiary that: (a) during the period of Grantor's ownership of the Mortgaged Property, Grantor has not and will not cause or allow, and Grantor will use best efforts to ensure that there will not occur any use, generation, manufacture, storage, treatment, disposal, release or threatened release of any hazardous waste or substance by any person on, under, or about the Mortgaged Property; (b) Grantor has no knowledge of, or reason to believe that there has been, except as previously disclosed to and acknowledged by Beneficiary in writing, (i) any use, generation, manufacture, storage, treatment, disposal, release, or threatened release of any hazardous waste or substance by any prior owners or occupants of the Mortgaged Property or (ii) any actual or threatened litigation or claims of any kind by any person relating to such matters; and (c) except as previously disclosed to and acknowledged by Beneficiary in writing, (i) neither Grantor nor any tenant, contractor, Agent or other authorized user of the Mortgaged Property shall use, generate, manufacture, store, treat, dispose of, or release any hazardous waste or substance on, under, or about the Mortgaged Property and (ii) any such activity shall be conducted in compliance with all applicable federal, state, and local laws, regulations and ordinances, including without limitation those laws, regulations, and ordinances described above. Grantor further represents and warrants to Beneficiary that Grantor has no knowledge of or reason to believe that there have been or currently are any underground storage tanks located under the Mortgaged Property. With prior notice to Grantor and without unreasonably interfering with tenants in their enjoyment of the property and in their day-to-day operations, Grantor authorizes Beneficiary and its agents to enter upon the Mortgaged Property to make such inspections and tests as Beneficiary may deem appropriate to determine compliance of the Mortgaged Property with this section of the Mortgage. Any inspections or tests made by Beneficiary shall be for Beneficiary's purposes only and shall occur without unreasonably interfering with tenants in their enjoyment of the property and in their day-to-day operations and shall not be construed to create any responsibility or liability on the part of Beneficiary to Grantor or to any other person. The representations and warranties contained herein are based on Grantor's due diligence in investigating the Mortgaged Property for hazardous waste. Grantor hereby (a) releases

12

Initial for Identification

and waives any future claims against Beneficiary for indemnity or contribution in the event Grantor becomes liable for cleanup or other costs under any such laws, and (b) agrees to indemnify and hold harmless Beneficiary against any and all claims, losses, liabilities, damages, penalties, and expenses which Beneficiary may directly or indirectly sustain or suffer resulting from a breach of this section of the Mortgage or as a consequence of any use, generation, manufacture, storage, disposal, release or threatened release occurring prior to Grantor's ownership or interest in the Mortgaged Property, whether or not the same was or should have been known to Grantor. The provisions of this section of the Mortgage, including the obligation to indemnify, shall survive any reconveyance of the lien of this Mortgage and shall not be affected by Beneficiary's acquisition of any interest in the Mortgaged Property, whether by foreclosure or otherwise; provided, however, Grantor's obligation to indemnify Beneficiary under this section shall be released by Beneficiary at such time as Grantor shall pay the Indebtedness in full and concurrent with said final payment, Grantor shall provide to Beneficiary a then current Phase I environmental report at Grantor's sole cost and expense, issued by an environmental inspection firm acceptable to Beneficiary which shows there is no hazardous waste and no hazardous materials in, on or under the Mortgaged Property.

V.    Reserve Replacement Agreement.    If, at any time, Beneficiary determines, in Beneficiary's sole judgment, that reserves necessary to keep the Mortgaged Property in the condition agreed to herein (including but not limited to those requirements set forth in paragraph 2.01(F) herein) are not being kept by Grantor, Grantor agrees to execute a Reserve Replacement Agreement ("Reserve Replacement Agreement") in a form and substance acceptable to Beneficiary upon Beneficiary's request. Thereafter, Grantor agrees to deposit with Beneficiary in accordance with the Reserve Replacement Agreement, the periodic amounts reasonably agreed by Beneficiary and Lender as sufficient to perform periodic maintenance and repairs to the Mortgaged Property.

W.    No Additional Indebtedness. Grantor shall not, and shall not permit any of its Subsidiaries, to incur, create, contract, waive, assume, have outstanding, guarantee or otherwise become, directly or indirectly, liable for any Additional Indebtedness (as hereinafter defined) exceeding, in sum, a combined total of $50,000.00, without the prior written consent of Beneficiary. "Additional Indebtedness" shall mean any and all new debt or obligations for which Grantor becomes liable after the effective date hereof, other than the indebtedness arising out of this Agreement.

2.2    If, while this Mortgage is in force, the title of Trustee to the Mortgaged Property, or any part thereof, or any interest therein, shall be endangered or shall be attacked directly or indirectly, Grantor hereby authorizes Beneficiary, at Grantor's reasonable cost and expense, to take all necessary and proper steps for the defense of said title, including the employment of counsel, the prosecution or defense of litigation, and the compromise or discharge of any such claims made against said title.

2.3    All costs, expenses, and reasonable attorneys' fees incurred in performing and complying with Grantor's covenants herein shall be borne solely by Grantor.  The sum of each

13

Initial for Identification

such payment shall be added to the Indebtedness and thereafter shall form a part of the same and shall be secured by this Mortgage. Beneficiary shall be automatically subrogated to all the rights of the person, corporation, or body politic receiving such payment made by Beneficiary.

2.4     Subject only to the terms of existing non-disturbance agreements, in the event that there be a trustee's sale hereunder, and, if at the time of such sale, Grantor, or Grantor's heirs, personal representatives, successors or assigns, is or are occupying the Mortgaged Property so sold, each and all shall immediately surrender and deliver possession of the Mortgaged Property so sold to the purchaser at such sale, and in the event of their failure to do so, they shall thereupon become the tenant of the purchaser at such sale, which tenancy shall be a tenancy at sufferance, terminable at the will of such purchaser as landlord, at a rental per day determined by such purchaser, such rental to be due and payable daily to such purchaser. An action of forcible entry and detainer and any other legal proceedings may be brought by any purchaser if the tenant holds over after a demand in writing for possession of any of the Mortgaged Property; and this Mortgage and the trustee's deed delivered at such sale shall constitute the lease and agreement under which any such tenant's possession arose.

2.5     The covenants herein contained shall inure to the benefit of Beneficiary and Trustee, their respective heirs, personal representatives, successors and assigns, and shall be binding upon the respective heirs, personal representatives, successors and assigns of Grantor and any other party now or hereafter liable for payment of the Indebtedness, but nothing in this paragraph shall constitute an authorization for Grantor to sell, transfer, lease or in any way dispose of the Mortgaged Property or any part thereof if otherwise prohibited by any of the terms hereof.

## ARTICLE III:  DEFAULT AND REMEDIES

3.1     The term "Default" or "Event of Default" as used in this Mortgage shall mean the occurrence of one or more of the following and the continuing existence of said Default or Event of Default after applicable grace period or notice and failure to cure after applicable cure period as provided for herein:

A.     Grantor or Borrower shall fail, refuse or neglect to promptly pay all Indebtedness due and payable under the Note, under this Mortgage, the Loan Agreement or under any instrument relating to or securing the payment of the Indebtedness or any part thereof, as the same shall become due and payable;

B.     Grantor or Borrower shall fail to materially keep and perform (or shall fail to furnish evidence of the performance of) any of the covenants or agreements contained herein or in the Note or in any other document evidencing, securing payment of, or otherwise relating to the Indebtedness;

C.     Grantor or Borrower, or any other person liable for the Indebtedness, or any portion thereof, files a voluntary petition in bankruptcy or for corporate reorganization, makes an assignment for the benefit of any creditor, or is the subject of an Order of Relief entered in any bankruptcy, insolvency, reorganization, rehabilitation or

14

Initial for Identification

other such proceeding, and such petition, assignment or proceeding is not dismissed within sixty (60) days after taking effect, and in said event, Grantor shall not be entitled to any notice or right to cure from Beneficiary;

D.    The Mortgaged Property or any property owned by a person now or hereafter liable for payment of the Indebtedness, or any interest therein or portion thereof, is placed under control or in the custody of any court or receiver and such petition, assignment or proceeding is not dismissed within sixty (60) days after taking effect;

E.    Grantor or Borrower or the general partner of either, if applicable, shall default in payment of sums due under obligations for borrowed money, whether to Beneficiary or otherwise, or an event of default shall occur which, with or without the giving of notice or passage of time, or both, will permit the holder of any such obligations to accelerate the maturity date thereof;

F.    Incapacity, dissolution, termination, cessation of business, merger or similar event affecting Grantor or Borrower or any other party now or hereafter liable for payment of the Indebtedness or any part thereof or any material adverse change in the business, operations or financial condition of Grantor or Borrower or any other party now or hereafter liable for payment of the Indebtedness or any part thereof;

G.    Occurrence of any condition, no matter how caused, which renders it impossible for Grantor or Borrower to comply fully in a timely manner with the provisions hereof or of any other documents evidencing, securing payment of, or relating to, the Indebtedness;

H.    Beneficiary discovers that any statement, representation, or warranty in the Note, this Mortgage or in any other document or instrument delivered to or relied upon by Beneficiary in connection with the Indebtedness is intentionally false, intentionally misleading or materially and adversely erroneous in any respect;

I.    Grantor or Borrower admits in writing Grantor's inability to pay its debts generally as they become due;

J.    Grantor abandons any of the Mortgaged Property for a period of time greater than twenty-one (21) consecutive days;

K.    If anyone applies for or consents to the appointment of a custodian, trustee, or liquidator of Grantor (or any of them) or of any guarantor of or surety for the performance of any obligation hereunder or of all or a substantial part of Grantor's assets, and such petition, assignment or proceeding is not dismissed within sixty (60) days after taking effect;

L.    Grantor or Borrower institutes or voluntarily is or becomes a party to any judicial proceedings intended to effect a discharge of the debts of Grantor or Borrower (or any of them) or of any guarantor or surety, in whole or in part, or to effect a

15

Initial for Identification

postponement of the maturity or the collection thereof or to effect a suspension of any of the rights or powers of Beneficiary granted in the Note, this Mortgage or in any other document or instrument evidencing or security payment of the Indebtedness, and such petition, assignment or proceeding is not dismissed within sixty (60) days after taking effect and in said event, Grantor shall not be entitled to any notice or right to cure from Beneficiary;

M.    An order, judgment or decree shall be entered by any court of competent jurisdiction appointing a trustee, custodian or liquidator of Grantor (or any of them) or of any guarantor or surety or of all or any substantial part of the assets of Grantor (or any of them) or any such guarantor or surety shall fail to pay any money judgment against it at least thirty (30) days prior to the date on which the assets of Grantor (or any of them) or any such guarantor or surety may be sold to satisfy such judgment;

N.    If Grantor (or any of them) or any such guarantor or surety, shall fail to have discharged within a period of thirty (30) days after the commencement thereof any attachment, sequestration, or similar proceeding against any assets of Grantor (or any of them), or of any guarantor or surety, or if any of the assets of Grantor (or any of them) or of any such guarantor or surety are levied upon, sequestered, garnished, attached or otherwise seized by or through any similar process.

Upon the occurrence of any Event of Default and after applicable notice and failure to cure as provided for herein, Beneficiary, at Beneficiary's option, and without notice of intention to accelerate, notice of acceleration or notice of any kind or nature whatsoever, demand or presentment, all of which are hereby expressly waived by Grantor and any and all other parties liable with respect to the Indebtedness or any part thereof, to the extent not prohibited by law, may declare the entire unpaid Indebtedness (other than interest therein which has not yet accrued) immediately due and payable, whereupon it shall be so due and payable, and may exercise or invoke all rights and remedies granted hereunder or in any other instrument securing payment of or relating to the Indebtedness and all rights and remedies available at law or in equity.

3.2    In addition, upon the occurrence of any Event of Default, after applicable grace period or notice and failure to cure after applicable cure period, Beneficiary shall have the option, without declaring the entire Indebtedness due, to proceed with foreclosure either through the courts or by directing Trustee to proceed as if under a full foreclosure, conducting the sale as hereinafter provided. Such sale may be made subject to the unmatured portion of the Note or other Indebtedness without any effect thereon, but as to such unmatured portion of the Note or other Indebtedness, this Mortgage shall remain in full force and effect just as though no sale had been made under the provisions of this paragraph. In addition, several sales may be made hereunder without exhausting the right of sale for any unmatured portion of the Note or other Indebtedness, it being the intention of the parties hereto to provide for a foreclosure and sale of the security for any matured portion of the Indebtedness without exhausting the power to foreclose and to sell the security for any other portion of the Indebtedness whether matured at the time or subsequently maturing.

16

Initial for Identification

3.3    Upon the occurrence of any Event of Default, Grantor hereby authorizes and empowers Trustee, at any time thereafter, at the request of Beneficiary (which request is hereby conclusively presumed), to sell at public venue the Mortgaged Property or any part thereof, or any interest therein, to the highest bidder, for cash, at the area of the County courthouse in which the Land (or any part thereof to be sold) is situated, as designated by the Commissioner's Court of such County as the area in which foreclosure sales are to take place, as evidenced by the designation of such area recorded in the real property records of the County in which the Land (or any part thereof to be sold) is situated, and, if no area is so designated, then in the area designated in the Notice of Sale as being the area for foreclosure sales to take place, between the hours of 10:00 a.m. and 4:00 p.m. of the first Tuesday of any month, after Trustee, or Trustee's Agent, has given notice of the time, place and terms of said sale, and the property to be sold (such property in this Section 3.03 being called the "Posted Mortgaged Property"), by posting (or by having any person acting for Trustee post) for at least twenty-one (21) days preceding the date of the sale, written notice of the proposed sale at the Courthouse door of said County in which the Posted Mortgaged Property is situated and as otherwise required by the applicable provisions of the Texas Property Code, as then amended. If the Posted Mortgaged Property is in more than one County, one such notice of sale shall be posted at the Courthouse door of each County in which part of the Posted Mortgaged Property is situated and the Posted Mortgaged Property may be sold at the courthouse door of any one of such counties, and the notice so posted shall designate in which County the Posted Mortgaged Property shall be sold. In addition to such posting of notice, Trustee (or any person acting for Trustee), at least twenty-one (21) days preceding the date of the sale, shall file a copy of such written notice of the proposed sale in the office of the County clerk of the County in which the sale is to be made, and if the Posted Mortgaged Property is situated in more than one County, a copy of such written notice of sale shall be so filed in the office of the County clerk of each County in which any of the Posted Mortgaged Property is situated. In addition to such posting and filing of notice, Beneficiary (or any person acting for Beneficiary), at least twenty-one (21) days preceding the date of the sale, shall serve written notice of the proposed sale by certified mail on each debtor obligated to pay the Indebtedness according to records of Beneficiary and as otherwise required by the applicable provision of the Texas Property Code, as then amended. Service of such notice shall be completed upon deposit of the notice, enclosed in a postpaid wrapper, properly addressed to such debtor at said debtor's most recent address as shown by the records of Beneficiary, in a post office or official depository under the care and custody of the United States Postal Service. The affidavit of any person having knowledge of the facts to the effect that such service was completed shall be prima facie evidence of the fact of service. Grantor agrees that no notice of any sale other than as set out in this paragraph need be given by Trustee, Beneficiary or any other person. Grantor designates as Grantor's address for the purposes of such notice, the address set out below, and each other debtor, if any, obligated to pay the Indebtedness agrees that such address shall likewise constitute such other debtor's address for such notice, unless a different address is designated by such other debtor; no change of such address or designation of a different address shall be binding on Beneficiary until fifteen (15) days after Beneficiary has received notice of such change sent to Beneficiary by certified mail postage prepaid, return receipt requested, addressed to Beneficiary at the address for Beneficiary set out herein (or to such other address as Beneficiary may have designated by notice given as above provided to Grantor and such other debtors). Any change of address of Beneficiary shall be effective fifteen (15) business days after written notice thereof addressed to Grantor and sent by regular United

17

_____
Initial for Identification

States mail, postage prepaid, has been deposited in the care and custody of the United States Postal Service. Grantor authorizes and empowers Trustee to sell the Posted Mortgaged Property, or any part thereof (which partial sale shall be governed by Section 3.08 hereof) or any interest therein, as an entirety or in parcels, by one sale or by several sales held at one time or at different times as the Trustee shall deem advisable at the time of sale, and to execute and deliver to the purchaser or purchasers thereof good and sufficient deed or deeds of conveyance thereof and bills of sale with covenants of general warranty binding on Grantor and Grantor's heirs, personal representatives, successors and assigns. Trustee making such sale shall receive the proceeds thereof and shall apply the same as follows: (i) Trustee shall pay, in addition to the reasonable attorneys' fees provided for in the Note, the reasonable expense of executing this trust, including a commission to Trustee of five percent (5%) of the gross proceeds of the sale; (ii) after paying such expenses, Trustee shall pay so far as may be possible the Indebtedness (other than interest thereon which has not yet accrued), discharging first that portion of the Indebtedness arising under the covenants or agreements herein contained and not evidenced by the Note; and (iii) Trustee shall pay the residue, if any, to Grantor, Grantor's respective heirs, personal representatives, successors or assigns. Payment of the purchase price to Trustee shall satisfy the obligation of the purchaser at such sale therefor, and such purchaser shall not be bound to look after the application thereof. Notwithstanding the foregoing, if any person or party other than the then owners of the Mortgaged Property shall notify Beneficiary or Trustee of a claim to said sums or any part thereof prior to disbursement thereof by Trustee, then Trustee or Beneficiary or both of them at their option, may interplead all or any part of said funds into a court of competent jurisdiction, and in such event, Beneficiary and Trustee each shall be entitled to recover from such sums so deposited an amount equal to the attorneys' fees and other costs and expenses incurred by them or either of them, in connection with such proceeding, to the full extent permitted by all applicable laws.

3.4    Grantor hereby ratifies and confirms any and all acts that Trustee shall do lawfully by virtue hereof. Grantor hereby agrees, on behalf of Grantor and Grantor's respective heirs, personal representatives, successors and assigns, that the recitals contained in any deed or deeds or other instrument executed in due form by any Trustee, acting under the provisions of this instrument, shall be prima facie evidence of the facts recited, and that it shall not be necessary to prove in any court, otherwise than by such recitals, the existence of the facts essential to authorize the execution and delivery of such deed or deeds or other instrument and the passing of title thereby, and all prerequisites and requirements of any sale or sales shall be conclusively presumed to have been performed, and all persons subsequently dealing with the Mortgaged Property purported to be conveyed by such deed or deeds or other instrument, including without limitation, the purchaser or purchasers thereof, shall be fully protected in relying upon the truthfulness of such recitals. Trustee, acting in accordance with the terms hereof, shall not be personally liable for any action taken pursuant hereto.

3.5    Beneficiary may bid, and being the highest bidder therefor, become the purchaser of any or all of the Mortgaged Property at any trustee's or foreclosure sale hereunder and shall have the right to credit the amount of the bid upon the unpaid amount of the Indebtedness in lieu of cash payment. Grantor waives the benefit of any right of discharge under Chapter 34 of the Texas Business and Commerce Code and all other rights of sureties and grantors under such Chapter and under any amendments, remodifications, supplements or any successor statute or

18

Initial for Identification

law of or to any such statute or law. Grantor waives all rights and defenses under Sections 51.003, 51.004 and 51.005 of the Texas Property Code and under any amendments, remodifications, supplements or any successor statute or law of or to any such statute or law. Grantor waives all rights and defenses arising under Rule 31 of the Texas Rules of Civil Procedure, Section 17.001 of the Texas Civil Practice and Remedies Code, Chapter 34 of the Texas Business and Commerce Code, and under any amendments, recodifications, supplements or any successor statute or law. The Grantor waives marshalling of assets and liabilities, sale in inverse order of alienation, and all other defenses given to sureties and grantors under any statute, common law, law in equity or otherwise other than actual payment of the indebtedness and performance of the actions constituting the Obligations.

3.6    The purchaser at any trustee's or foreclosure sale hereunder may disaffirm any easement granted, or lease or other agreement made in violation of any provision of this Mortgage and may take immediate possession of the Mortgaged Property free from and notwithstanding the terms of, such grant of easement, lease or other agreement.

3.7    Upon the occurrence of an Event of Default by Grantor as set out in Section 3.01, Beneficiary may, without limitation of any other rights or remedies of Beneficiary, exercise the rights and remedies set forth in an Absolute Assignment of Rents dated of even date herewith executed by Grantor in favor of Beneficiary.

3.8    The sale or sales by the Trustee of less than the whole of the Mortgaged Property shall not exhaust the power of sale herein granted, and the Trustee is specifically empowered to make successive sale or sales, under such power, of such portion of or interest in the Mortgaged Property and in such order as Trustee may determine until the whole of the Mortgaged Property shall be sold; and if the proceeds of such sale or sales of less than the whole of such Mortgaged Property shall be less than the aggregate of the Indebtedness and the expense of executing this trust, this Mortgage shall remain in full force and effect as to the unsold portion of the Mortgaged Property just as though no sale or sales had been made; provided, however, that Grantor shall never have the right to require that the Mortgaged Property be sold, as an entirety or in parcels, but Beneficiary shall have the right, as a matter of Beneficiary's sole discretion, to request the Trustee to sell the Mortgaged Property as an entirety or to sell any portion of or interest in the Mortgaged Property. In addition, if any sale hereunder is not completed or is defective in the opinion of Beneficiary, such sale shall not exhaust the power of sale hereunder, and Beneficiary shall have the right to have a subsequent sale or sales to be made by the Trustee.

3.9    In the event Trustee mails, files and/or posts the notices of foreclosure sale as required hereunder, Beneficiary may decide not to proceed with a foreclosure sale on the date set forth in such notice, and such decision shall in no manner prevent Beneficiary from directing the Trustee to give notice of a foreclosure sale, as provided herein, at any future date, nor effect a waiver of any of Beneficiary's rights and remedies hereunder. Further, in the event a foreclosure sale is commenced hereunder by Trustee, Beneficiary, at any time prior to the completion of such sale, may direct such Trustee to abandon the sale and may thereafter institute suit for foreclosure of any of the liens and security interests created by this Mortgage. If Beneficiary shall so elect to institute a suit for collection of the Indebtedness or any part thereof and for foreclosure of the liens and security interests evidenced hereby, it is agreed further that

19

Initial for Identification

Beneficiary, at any time before entry of final judgment, may cause such suit to be dismissed and thereafter direct and require that Trustee proceed to sell the Mortgaged Property, or any part thereof, in accordance with the terms hereof, including but not limited to, the terms of Section 3.03 hereof and the terms of the Uniform Commercial Code, as herein provided.

3.10    Each and all of the rights, powers and remedies hereunder are cumulative of and in addition to all other rights, powers and remedies herein contained or contained in any other instrument or document evidencing, securing or otherwise relating to the Indebtedness or which Beneficiary may have under all applicable laws. None of the terms and provisions hereof and no action or omission by or on behalf of Beneficiary shall ever make Beneficiary a trustee for, or otherwise create a trust, partnership or other fiduciary relationship between, Beneficiary and Grantor.

### ARTICLE IV:  SUBSTITUTE AND SUCCESSOR TRUSTEE

4.1    If Trustee shall die or become disqualified from acting in the execution of this trust, or shall fail or refuse to execute the same when requested by Beneficiary so to do, or if, for any reason, Beneficiary shall prefer to appoint a substitute trustee to act instead of the herein named Trustee, Beneficiary shall have full power to appoint, at any time and without any formality other than by written instrument recorded in the appropriate real property records prior to the trustee's taking any action hereunder, executed by Beneficiary, a substitute trustee, and, if desired by Beneficiary, several substitute trustees in succession, each of whom shall succeed to all the estate, rights, powers and duties of Trustee named herein, and no notice of such appointment need be given to Grantor or to any other person or filed for record in any public office. Such appointment may be executed by Beneficiary or any Agent of Beneficiary and, if Beneficiary is a corporation or other entity, such appointment shall be conclusively presumed to be executed with authority and shall be valid and sufficient without proof of any action by the board of directors or any executive officer of the corporation or otherwise.

### ARTICLE V: DEFEASANCE

5.1    All of the covenants and agreements of Grantor herein shall survive the execution and delivery of this document and shall continue in force until an express written release hereof is executed by Beneficiary. Accordingly, if Grantor shall perform faithfully each and all of the covenants and agreements herein contained and shall pay the Indebtedness in full, and shall satisfy all obligations secured hereby, then, and then only, this conveyance shall be promptly released upon Grantor's written request and at Grantor's expense, by documentation in form and substance satisfactory to Beneficiary. No release of this conveyance or the lien thereof shall be valid unless executed by Beneficiary.

### ARTICLE VI: SECURITY AGREEMENT

6.1    To further secure the payment and performance of the Indebtedness and Grantor's observance of the covenants of this Mortgage and any other instruments securing the payment of the Indebtedness or relating thereto, Grantor hereby grants a security interest to Beneficiary in and to all the Goods (all of the Goods and the proceeds and products thereof being herein called

20

Initial for Identification

the "Collateral", provided, however, (a) the mention of proceeds of collateral herein shall not be construed as an authorization for the sale or surrender by Grantor of the Collateral, and (b) the term Collateral as used in this Article VII shall be included in the term "Mortgaged Property" when used in this Mortgage). This document shall constitute a security agreement as well as a mortgage and Mortgage. The following applies with respect to the Collateral:

A.      In addition to and cumulative of any other remedies granted in this Mortgage to Beneficiary, Beneficiary, upon default hereunder, may proceed under Chapter 9 of the Uniform Commercial Code as to all or any part of the Collateral and shall have and may exercise with respect to all or any part of the Collateral all of the rights, remedies and powers of a secured party under the Uniform Commercial Code, including, without limitation, the right and power to repossess, retain and sell, at public or private sale or sales, or otherwise dispose of, lease or utilize the Collateral or any part thereof and dispose of the proceeds and products in any manner authorized or permitted under the applicable provisions of the Uniform Commercial Code, and to apply the proceeds and products thereof toward payment of Beneficiary's attorneys' fees and other expenses and costs of pursuing, searching for, receiving, taking, keeping, storing, advertising, and selling the Collateral thereby incurred by Beneficiary, and toward payment of the Indebtedness in such order and manner as Beneficiary may elect consistent with the provisions of the Uniform Commercial Code. Nothing in this Article VI shall be construed to impair or limit any other right or power to which Beneficiary may be entitled at law or in equity.

B.      Among the rights of Beneficiary upon default and acceleration of the Indebtedness pursuant to the provisions hereof, and without limitation, Beneficiary shall have the right (but not the obligation), without being deemed guilty of trespass and without liability for damages thereby occasioned, and to the extent such may now or hereafter be permitted under Texas law (i) to enter upon any Mortgaged Property where the Collateral may be situated and take possession of the collateral, or render it unusable, or dispose of the Collateral on Grantor's Mortgaged Property, and Grantor agrees not to resist or to interfere, and (ii) to take any action deemed necessary or appropriate or desirable by Beneficiary at Beneficiary's option and in Beneficiary's discretion, to repair, refurbish or otherwise prepare the Collateral for sale, lease or other use or disposition as herein authorized. Beneficiary, at Beneficiary's discretion, may require Grantor to assemble the Collateral and make it available to Beneficiary at a place designated by Beneficiary that is reasonably convenient to both parties.

C.      Beneficiary shall give Grantor notice, by certified mail, postage prepaid, of the time and place of any public sale of any of the collateral or of the time after which any private sale or other intended disposition thereof is to be made by sending notice to Grantor at the address of Grantor as specified below at least five (5) days before the time of the sale or other disposition, which provisions for notice Grantor and Beneficiary agree are reasonable and shall fully satisfy any requirement for giving of any such notice;

21

Initial for Identification

notwithstanding the foregoing, Grantor further agrees that, upon the occurrence of an Event of Default, Beneficiary may sell or otherwise dispose of all or any part of the Mortgaged Property which is subject to the Uniform Commercial Code in the manner provided therein or as provided in this Mortgage, or under both the Uniform Commercial Code and this Mortgage, as Beneficiary may determine, and any and all proceeds received at any such sale shall be applied in the manner set forth in Section 3.03 hereof.

D.      To the extent such now or hereafter may be permitted under Texas law, Beneficiary is authorized to execute and file financing statements and continuation statements under the Uniform Commercial Code with respect to the collateral without joinder of Grantor in such execution or filing. Grantor shall execute and deliver to Beneficiary such financing statements, continuation statements and other documents relating to the Collateral or any portion thereof as Beneficiary may reasonably request from time to time to preserve and maintain the priority of the security interest created by this Mortgage and shall pay to Beneficiary on demand any expenses and attorneys' fees incurred by Beneficiary in connection with the preparation, execution, filing and perfection and continuation of the liens and security interest of this Mortgage and of any financing statements, continuation statements, partial releases, termination statements or other documents necessary or      desirable      to      continue      or      confirm      Beneficiary's security interest, or any modification thereof, and in connection with any Uniform Commercial Code searches performed by Beneficiary. This document or any reproduction of this document may be filed by Beneficiary and shall be sufficient as a financing statement. All or part of the collateral is or is to become fixtures on the real estate constituting a portion of the Mortgaged Property, but this statement shall not impair or limit the effectiveness of this document as a security agreement or financing statement for other purposes, and, without limitation of any other provision hereof, this Mortgage shall constitute a fixture financing statement and, as such, shall be filed for record in the real estate records of each county in which the Land, or any part thereof, is located. Grantor shall not change Grantor's name, identity or structure without the prior express written consent of Beneficiary. The name of the record owner of the Land is the party or parties defined herein as Grantor.

E.      Grantor represents that, except for the security interest granted hereby in the collateral, Grantor is the owner of the Collateral free of any adverse claim, security interest or encumbrance, and Grantor shall defend the Collateral against all claims and demands of any person at any time claiming the same or any interest therein. Grantor has not heretofore signed any financing statement and no financing statement signed by Grantor is now on file in any public office except those statements, true and correct copies of which have been delivered to Beneficiary.  So long as any amount remains unpaid on the Indebtedness, Grantor shall not execute and there shall not be filed in any public office any such financing statement or statements affecting the Collateral other than financing statements in favor of Beneficiary hereunder unless the express prior written

22

Initial for Identification

consent and approval of the Beneficiary shall have first been obtained.

F.        The security interest granted herein shall not be construed or deemed to constitute Beneficiary or Trustee as a trustee or mortgagee in possession of the Mortgaged Property so as to obligate Beneficiary or Trustee to lease the Mortgaged Property or attempt to do the same, or take any action, incur any expenses or perform or discharge any obligation, duty or liability with respect to the Mortgaged Property or any part thereof or otherwise.

G.        Grantor's address is as stated below and Beneficiary's address is as stated below. Either party may notify the other of a new address in the manner specified in Section 3.03 above.

6.2        Grantor does hereby further grant and assign to Beneficiary a security interest in, general lien upon and/or right of set-off against: (i) all deposits, deposit accounts and other sums now or at any time hereafter credited by or due from Beneficiary to Grantor; (ii) all monies, instruments, securities, documents, chattel paper, credits, claims, demands and any other property, rights and interest of Grantor which at any time shall come into the possession or custody or under the control of Lender or any of its agents or affiliates, for any purpose; and, (iii) the proceeds, products and accessions of and to any of the foregoing, as security for the payment and performance of the Indebtedness and Grantors' observance of the covenants of this Mortgage and any other instruments securing the payment of the Indebtedness or relating thereto. In the event of any Default, Beneficiary, at its option, at any time thereafter and without notice, demand or presentment to Grantor, may hold all or any part of any such deposits or other sums until the Indebtedness shall have been paid in full, or may apply or set-off all or any part of such deposits or sums credited by or due from Beneficiary to or against any sums then due on the Indebtedness in any manner and in such order of preference as Beneficiary, in its sole discretion, shall determine.

## ARTICLE VII: MISCELLANEOUS

7.1        In the event Beneficiary shall elect to invoke any of the rights or remedies provided for herein, but shall thereafter determine to withdraw or discontinue same for any reason, Beneficiary shall have the unqualified right to do so, whereupon all parties shall be automatically restored and returned to their respective positions regarding the Indebtedness and this Mortgage as shall have existed prior to the invocation of Beneficiary's rights hereunder and the rights, powers and remedies of Beneficiary hereunder shall be and remain in full force and effect.

7.2        Any part of the Mortgaged Property, or any interest therein, may be released by Beneficiary without affecting Beneficiary's liens, security interests and other rights against the remainder of the Mortgaged Property. The lien, security interest and other rights hereby granted shall not affect or be affected by any other security taken or acquired by the Beneficiary or the Indebtedness or any part thereof. The taking of additional security, or the modification, extension or renewal of the Indebtedness or any part thereof, shall at no time release or impair the liens, security interests and the rights granted hereby, or affect the liability of any endorser, guarantor,

23

Initial for Identification

surety, or any other party liable on the Indebtedness, or improve the right or priority of any junior lien holder; and this Mortgage, as well as any instrument given to secure any modification, renewal or extension of the Indebtedness, or any part thereof, shall be and remain a first and prior lien and security interest on all of the Mortgaged Property not expressly released.

7.3    The invalidity, or unenforceability in particular circumstances, of any provision of this Mortgage shall not extend beyond such provision or such circumstances and no other provision of this Mortgage shall be affected thereby. It is the intention of the parties hereto to comply with the applicable usury laws, now or hereafter enacted (herein called "Applicable Laws"); accordingly, notwithstanding any provisions to the contrary in the Note, in any document evidencing or securing the Indebtedness, in this Mortgage or in any document securing payment of the Indebtedness or otherwise relating thereto, in no event shall the Note or such documents require the payment or permit the collection of interest in excess of the maximum amount permitted by such Applicable Laws. If any such excess of interest is contracted for, charged or received, under the Note or any document evidencing the Indebtedness, under this Mortgage or under the terms of any of the other documents securing payment of the Indebtedness or otherwise relating thereto, or in the event the maturity of any of the Indebtedness is accelerated in whole or in part, or in the event that all or part of the principal or interest of the Indebtedness shall be prepaid, so that under any of such circumstances, the amount of interest contracted for, charged or received, under the Note or any document evidencing the Indebtedness, under this Mortgage or under any document securing payment of the Indebtedness or otherwise relating thereto, on the amount of principal actually outstanding from time to time under the Note and other document evidencing or securing the Indebtedness, shall exceed the maximum amount of interest permitted by the Applicable Laws, then in any such event: (a) the provisions of this paragraph shall govern and control, (b) neither Grantor nor any other person or entity now or hereafter liable for the payment of the Note or any document evidencing the Indebtedness shall be obligated to pay the amount of such interest to the extent that it is in excess of the maximum amount of interest permitted by the Applicable Laws, (c) any such excess that may have been collected shall be either applied as a credit against the then unpaid principal amount hereof or refunded to Grantor, at the Beneficiary's option, and (d) the effective rate of interest shall be automatically reduced to the maximum lawful contract rate allowed under the Applicable Laws. Without limitation of the foregoing, all calculations of the rate of interest contracted for, charged or received under the Note, or any document evidencing the Indebtedness, under this Mortgage or under such other documents that are made for the purpose of determining whether such rate exceeds the maximum lawful contract rate, shall be made, to the extent permitted by the Applicable Laws, by amortizing, prorating, allocating and spreading in equal parts during the period of the full stated term of the loans evidenced by the Note or the documents evidencing the Indebtedness, all interest at any time contracted for, charged or received from Grantor or otherwise by Beneficiary in connection with such loans.

7.4    Beneficiary may accept any payment tendered by Grantor or Borrower after the due date of such payment or after acceleration of maturity of the Indebtedness and may apply the same to the principal, interest thereon or attorneys' fees and expenses of collection, or any combination thereof, as determined by Beneficiary, whether such payment was designated as a payment of principal, interest or otherwise; any such acceptance of a late payment shall not constitute a waiver of the rights of Beneficiary thereafter to accelerate the maturity of the

24

Initial for Identification

Indebtedness because of such default and foreclose the liens securing the payment thereof or, if the maturity of the Indebtedness has theretofore been accelerated, such acceptance of late payment shall not constitute a reinstatement of the indebtedness or otherwise affect the rights of Beneficiary to proceed with foreclosure of the lien securing the payment thereof. It is expressly agreed that (i) no waiver of any default on the part of Grantor or breach of any of the provisions of this Mortgage shall be considered a waiver of any other or subsequent default or breach, and no delay or omission in exercising or enforcing the rights and powers herein granted shall be construed as a waiver of such rights and powers, and likewise no exercise or enforcement of any rights or powers hereunder shall be held to exhaust such rights and powers, and every such right and power may be exercised from time to time; (ii) any failure by Beneficiary to insist upon the strict performance by Grantor of any of the terms and provisions hereof shall not be deemed to be a waiver of any of the terms and provisions hereof, and Beneficiary, notwithstanding any such failure, shall have the right thereafter to insist upon the strict performance by Grantor of any of the terms and provisions hereof shall not be deemed to be a waiver of any of the terms and provisions hereof, and Beneficiary, notwithstanding any such failure, shall have the right thereafter to insist upon the strict performance by Grantor of any and all of the terms and provisions of this Mortgage; (iii) neither Grantor nor any other person now or hereafter obligated for the payment of the whole or any part of the Indebtedness shall be relieved of such obligation by reason of the failure of Beneficiary or Trustee to comply with any request of Grantor, or of any other person so obligated, to take action to foreclose this Mortgage or otherwise enforce any of the provisions of this Mortgage or of any obligations secured by this Mortgage, or by reason of the release, regardless of consideration, of the whole or any part of the security held for the Indebtedness, or by reason of the subordination in whole or in part by Beneficiary of the lien, security interest or other rights evidenced hereby, or by reason of any agreement or stipulation with any subsequent owner or owners of the Mortgaged Property renewing or extending the time of payment or modifying the terms of the Indebtedness or this Mortgage without first having obtained the consent of Grantor or such other person, and in the latter event, Grantor and all such other persons shall continue liable to make such payments according to the terms of any such agreement of renewal, extension or modification unless expressly released and discharged in writing by Beneficiary; (iv) regardless of consideration, and without the necessity for any notice to or consent by the holder of any subordinate lien or security interest on the Mortgaged Property, Beneficiary may release the obligation of anyone at any time liable for any of the Indebtedness or any part of the security held for the Indebtedness and may renew or extend the time of payment or otherwise modify the terms of the documents evidencing or securing the Indebtedness or this Mortgage without impairing or affecting the lien or security interest of this Mortgage or the priority of such lien or security interest over any subordinate lien or security interest; (v) the holder of any subordinate lien or security interest shall have no right to terminate any leases affecting the Mortgaged Property whether or not such lease be subordinate to this Mortgage; and (vi) Beneficiary may resort for the payment of the Indebtedness to any security therefor held by Beneficiary in such order and manner as Beneficiary may elect.

7.5    The terms and provisions of this Mortgage shall be governed by and construed in accordance with the laws of the state of Texas.

7.6    Time is of the essence in the performance of this Mortgage.

25

Initial for Identification

7.7   Wherever used in this document, unless the context clearly indicates a contrary intent or unless otherwise specifically provided herein, the words "Mortgage" shall mean this Mortgage, Security Agreement and Financing Statement and any modifications, renewals or supplements hereto, the word "Grantor" shall mean Grantor, Grantor's heirs, personal representatives, successors and assigns, and/or any subsequent owner or owners of the Mortgaged Property, or any part thereof or any interest therein, the word "Beneficiary" shall mean Beneficiary and/or any subsequent transferee, assignee, owner or holder of the Note or any interest therein at the time in question, the word "Note" shall mean the Note secured by this Mortgage and any renewals, extensions and rearrangements thereof, the word "person" shall mean an individual, corporation, trust, partnership, joint venture or unincorporated association, and the pronouns of any gender shall include the other genders, and either the singular or plural shall include the other. In the event that the person who is the maker of the Note (herein called "Borrower") is not the same person as the Grantor, all terms and provisions of this Mortgage shall apply to and be binding on the Borrower, as well as the Grantor notwithstanding any term or provision contained herein to the contrary.

7.8   This Mortgage, together with any related documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Mortgage. No alteration of or amendment to this Mortgage shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

7.9   Notwithstanding anything to the contrary contained in this Mortgage, if any person executing this Mortgage is a "consumer" as defined in Regulation AA of the Board of Governors of the Federal Reserve System, 12 C.F.R. Part 227, or the Federal Trade Commission Credit Practices Act, 16. C.F.R. Part 444, as applicable, no lien or security interest created or evidenced by this Mortgage shall extend to or cover a nonpossessory lien or security interest in "household goods", other than a purchase money lien or security interest, in accordance with such regulations as applicable.

7.10   Grantor agrees that Grantor and Borrower shall perform and observe all of their covenants and agreements as set forth in a Loan Agreement ("Loan Agreement") of even date herewith between Grantor and Beneficiary and acknowledges that this Mortgage shall also secure performance of all obligations of Grantor thereunder. Grantor agrees that a default under the Loan Agreement shall constitute an Event of Default under this Mortgage.

7.11   Additional Funds - To the extent that the total sum advanced according to the Note hereby secured exceeds the total balance of any prior liens on the Mortgaged Property being paid-off hereby and the total balance owed on the Notes being renewed and extended herein, such difference, if any, represents the reasonable closing costs incident to the indebtedness evidenced by the Note hereby secured, and each Grantor herein acknowledges that the advancement of such closing costs by the Lender is necessary to the preservation of and solely for the benefit of such grantor's retention of the property hereby secured. In the event any portion of the sums intended to be secured by this Mortgage cannot be lawfully secured hereby, payments in reduction of such sums shall be applied first to those portions not secured hereby.

7.12   Other Indebtedness/Cross Default. This Mortgage secures payment of all other

26

Initial for Identification

indebtednesses, of whatever kind or character, now owing or that may hereafter become owing by Grantor, Maker and/or any Guarantor to Beneficiary, including but not limited to any referred to herein, whether such indebtedness is evidenced by note, open account, over draft, endorsement, surety agreement, guaranty, or otherwise. This Mortgage shall secure, in addition to the indebtedness and/or obligations described herein, the payment and performance of all other indebtednesses and obligations of whatever kind and character ( except solely any indebtedness which is prohibited from being secured hereby under any applicable law of the State of Texas or the United States of America), owing or which may hereafter become owing or to be performed by any one or more of the Grantors, as Debtors/Obligors to Beneficiary, whether such indebtednesses or obligations are evidenced by a note, open account, overdraft, endorsement, surety agreement, guaranty agreement, or otherwise, and whether such indebtednesses or obligations are present or future, direct or indirect, primary or secondary, joint or several, fixed or contingent or otherwise, whether such indebtednesses or obligations were originally owed to Beneficiary or to be performed for Beneficiary or owed to or to be performed for other and acquired by purchase or otherwise by any Beneficiary, and whether or not such indebtedness or obligations were created by any then owner of any interest in or to any of the Property, it being contemplated that one or more of the present or future Grantors or Debtors/Obligors may now or hereafter be or become indebted or obligated to Beneficiary in further sum or sums; and Grantors further agree that if any default ever occurs under any instrument, document or other writing whatsoever now or hereafter evidencing or securing any indebtedness now or hereafter secured by this Mortgage, then, jn any such event, Beneficiary may, at its option, (without demand, notice of any such default or event, notice of intent to accelerate maturity, notice of acceleration of maturity, presentment for payment or acceleration or any other act or notice whatsoever), declare immediately due and payable any and all indebtednesses then secured hereby.

7.13    Any Collateral pledged to Beneficiary to secure any obligation of Grantor or Guarantors shall also secure any other obligation of Grantor or Guarantors to Lender.

27

Initial for Identification

EXECUTED this, the ___24th___ day of March, 2022.

**GRANTOR**:

**LDG001, LLC,**
**a Texas limited liability company**

> **By its Manager:**
> Carnegie Development, LLC,
> A Delaware limited liability company
>
> > **By its Managing Member:**
> > JMJ Development, LLC,
> > A Texas limited liability company
> >
> > By: _____
> > Name: Tim Barton
> > Title: Manager

| | |
|---|---|
| STATE OF TEXAS | § |
| COUNTY OF DALLAS | § |
| | § |

This instrument was acknowledged before me on the 24th day of March, 2022, by TIM BARTON, acting as Manager of JMJ Development, LLC, a Texas limited liability company, acting as Managing Member of Carnegie Development, LLC, a Delaware limited liability company, acting as Manager of **LDG001, LLC, a Texas limited liability company**, in his capacity therein.

_____
Notary Public, State of Texas

R A Blanshard
Notary Public, State of Texas
My Comm. Exp. 08/16/2024
Notary ID 135379-7

**AFTER RECORDING RETURN TO:**
Pioneer Finance Inc.
13310 University Blvd, Suite 100,
Sugar Land, TX 77479

28

_____
Initial for Identification

Exhibit "A" – Legal Description

**Tract I:**

BEING a 154.93-acre tract of land situated in the B.B.B. & C.R.R. Co. Survey, Abstract No 93. Being part of that certain called 156-acre tract of land described in deed to Patrick M. Griffin, Stephen Griffin, Loretta Ann Griffin and Virginia Bone to LDG001, LLC, and recorded in Document No. 2018-24505 of the Deed Records of Johnson County, Texas, and a called 1.00 acre tract of land described in deed to LDG001, LLC, and recorded in Document No. 2018-32084 of the Deed Records of Johnson County, Texas, said 154.93 acre tract being more particularly described by meets and bounds as follows:

BEGINNING at a 1/2" iron rod found for corner at the Southwest corner of the B.B.B. & C.R.R. Co. Survey, the Northwest corner of the Jackson Smith Survey, Abstract No. 758 and being in the East line of Philip P. Barnes Survey, same being the Southwest corner of said 156 acre tract, the Northwest corner of Lot 2 of Plainview Acres, Phase 3, recorded in Volume 8, Page 248 of said Deed Recorded and also being in the East line of that certain called 94.26 acre tract of land described in deed to Harper Cattle, LLC and recorded in Volume 2304, Page 895, and also being at the intersection of County Road 213 (60' right-of-way) and County Road 110 (60' right-of-way);

THENCE North 30 Degrees 31 Minutes 39 Seconds West with said County Road 213, the West line of said 156-acre tract and the East line of said 94.26-acre tract, a distance of 2,640.00 feet to a point for corner at the Northwest corner of said 156-acre tract, the Southwest corner of that certain called 1.074-acre tract described in deed in deed to H.C.
Griffin, recorded in Volume 1583, Page 241 of said Deed Records;

THENCE North 59 Degrees 28 Minutes 21 Seconds East, with the North line of said 156 acre tract and the South line of said 1.074 acre tract at a distance of 30.00 feet passing a 1/2" iron rod with plastic marked "SANDS" set for reference corner in said Right-of-Way and continuing a total distance of 869.98 feet to a 1/2" iron rod with plastic marked "SANDS" set for corner in the North line of said 156 acre tract, the East corner of said 1.074 acre tract and also being in the South line of G.C. & S.F. Railroad (100' wide Right-of-Way);

THENCE North 66 Degrees 32 Minutes 57 Seconds East, with the South line of said Railroad, a distance of 682.02 feet to a 1/2" iron rod with plastic cap marked "SANDS" set for corner in said South line at the beginning of a curve to the right;

THENCE in a Northeasterly direction with said curve to the right having a radius of 2,595.97 feet, whose chord bears North 70 Degrees 50 Minutes 32 Seconds East -

29

Initial for Identification

388.67 feet for an arc length of 389.03 feet to 1/2" iron rod with plastic cap marked "SANDS" set for corner in South line of said Railroad;

THENCE North 75 Degrees 08 Minutes 08 Seconds East, with said South line a distance of 756.88 feet to a 1/2" iron rod with plastic cap marked "SANDS" set for corner in the East line of said 156-acre tract and being in the West line of that certain called 184.887-acre tract of land conveyed to Billy C. Roten by deed recorded in Volume 1248, Page 742
of said Deed Records;

THENCE South 30 Degrees 31 Minutes 39 Seconds East, with the East line of said 156-acre tract and the West line of said 184.887-acre tract, at a distance of 2,245.02 feet passing a 1/2" iron rod with plastic marked "SANDS" set for reference in the North Right-of-Way of said County Road No. 110 and continuing a total distance of 2,275.02 feet a point for corner at the Southeast corner of said 156-acre tract and being in the Southerly edge of County Road 110 (60' right-of-way);

THENCE South 59 Degrees 28 Minutes 21 Seconds West, with said road and the South line of said 156-acre tract a distance of 860.80 feet a point for corner in said road and being at the Southeast corner of that certain called 1.00-acre tract of land described in deed to LDG001, LLC and continuing with said County Road 110 and the South line of said 156-acre tract, for a total distance of 2,656.62 feet to the POINT OF BEGINNING and containing 154.93 acres of land, more or less.

**Tract II:**

BEING a 47.86-acre tract of land situated in the Jackson Smith Survey, Abstract No. 758, Johnson County, Texas, being all of that certain called 47.5-acre tract of land described in deed to LDG001, LLC, and recorded in Document No. 2018-24505 of the Deed Records of Johnson County, Texas, said 47.86-acre tract to be more particularly described by meets and bounds as follows:

COMMENCING at a 1/2" iron rod found for corner at the Northwest corner of said Jackson Smith Survey, same being the Southwest corner of the B.B.B. & C.R. R. Co. Survey, Abstract No. 93 and being at the intersection of County Road No. 213 (601 right-of-way) with County Road No. 110 (60' right-of-way);

THENCE North 59 Degrees 28 Minutes 21 Seconds East, with the North line of said Jackson Smith Survey and the South line of said B.B.B. & C.R.R. Co. Survey and with County Road No, 110, a distance of 2,656.62 feet to a point for corner in the southerly line of said County Road 110, same being the Northwest corner of said 47-1/2 acre tract, the Northeast corner of that certain called 50 acre tract described in deed to Judith Louise Brown and recorded in Volume 3119, Page 27 of said Deed Records, the

30

Initial for Identification

Southeast corner of that certain called 156 acre tract described in deed to Patrick M. Griffin and recorded in Volume 3130, Page 714 of said Deed Records and the Southwest corner of that certain called 184.887 acre tract described in deed to Bill C. Roten and recorded in Volume 1248, Page 472 of said Deed Records and being the POINT OF BEGINNING;

THENCE North 59 Degrees 28 Minutes 21 Seconds East, with the North line of said 47-1/2-acre tract and with said County Road 110 a distance of 843.25 feet to a point for corner at the Northeast corner of said 47-1/2-acre tract, the Northwest corner of that certain called 70.74 acres tract of land described in deed to Duane Schifano and recorded in Instrument No.201200024756 of said Deed Records and also being in the South line of said 184.887-acre tract;

THENCE South 30 Degrees 31 Minutes 39 Seconds East, with the East line of said 47-1/2 acre tract and the West line of said 70.74 acre tract at a distance of 30.00 feet passing a 1/2" iron rod with plastic cap marked "SANDS" set for reference and continuing for a distance of 1,721.56 feet, passing a 1" iron found for corner at the southwest corner of said 70.74 acre tract, same being the Northwest corner of that certain called 15.004 acre tract of land described in deed to RES Land Holding and recorded in Volume 3507, Page 398 of said Deed Records and continuing at a distance of 2,088.49 feet passing a 1" iron bar found for corner at the Southwest corner of said 15.004 acre tract, same being the Northwest corner of that certain called 0.78 acre tract of land described in deed to Daniel II, Vesper, Sr. and recorded in Instrument No. 201000011279 of said Deed Records and continuing at a distance of 2,443.17, feet passing a 1/2" iron rod with plastic cap marked "SANDS" set for reference and continuing a total distance of 2,472.17 feet to a point for corner at the Southeast corner of said 47.5 acre tract, the Southwest corner of said 0.78 acre tract, and being in County Road 109 (60' right-of- way) and also being in the North line of Southern Acres, Phase 1, an addition to Johnson County, Texas;

THENCE South 59 Degrees 28 Minutes 21 Seconds West, with the South line of said 47.5-acre tract and the North line of said Southern Acres a distance of 843.25 feet to a point for comer in said County Road 109 and being in the North line of that certain called Lot 2R-1, Block 1 of Harden Estates, an addition to Johnson County, Texas, according to the plat thereof recorded in Volume 10, Page 463 of said Deed Records, same being the Southeast corner of said above mentioned 50-acre tract;

THENCE North 30 Degrees 31 Minutes 39 Seconds West, with the West line of said 47-1/2-acre tract and the East line of said 50-acre tract, a distance of 2,472.17 feet to the POINT OF BEGINNING and containing 47.86 acres of land, more or less.

31

Initial for Identification

2022-10456 03/25/2022 1:27 PM Page 32 of 32

# Johnson County
## Becky Ivey
### Johnson County
### Clerk

---

**Instrument Number:** 2022 - 10456

eRecording - Real Property

Deed of Trust

**Recorded On:** March 25, 2022 01:27 PM                    Number of Pages: 32

---

" Examined and Charged as Follows: "

Total Recording: $146.00

\*\*\*\*\*\*\*\*\*\*\* **THIS PAGE IS PART OF THE INSTRUMENT** \*\*\*\*\*\*\*\*\*\*\*
Any provision herein which restricts the Sale, Rental or use of the described REAL PROPERTY
because of color or race is invalid and unenforceable under federal law.

**File Information:**                              **Record and Return To:**

Document Number:    2022 - 10456               Simplifile

Receipt Number:     20220325000104            5072 North 300 West

Recorded Date/Time: March 25, 2022 01:27 PM

User:               Leslie S                   PROVO UT

Station:            ccl83

---



**STATE OF TEXAS**
**COUNTY OF JOHNSON**

I hereby certify that this Instrument was FILED In the File Number sequence on the date/time
printed hereon, and was duly RECORDED in the Official Records of Johnson County, Texas.

Becky Ivey
Johnson County Clerk
Johnson County, TX

## ABSOLUTE ASSIGNMENT OF RENTS

**THE STATE OF TEXAS**

**COUNTY OF JOHNSON**

This Absolute Assignment of Rents ("Assignment") entered into on the $24th$ day of March, 2022 by **LDG001, LLC, a Texas limited liability company** ("Assignor"), whose address is 940 County Road 110, Venus, Texas 76084, for the benefit of **PIONEER FINANCE INC., a Texas corporation** ("Assignee"), whose address is 13310 University Blvd, Suite 100, Sugar Land, TX 77479.

### *ARTICLE I. DEFINITIONS*

*Section 1.1. Parties.* As used in this Assignment, the terms "Assignor" and "Assignee" mean the parties above-identified by such designation and their respective heirs, executors, administrators, successors and assigns. The preceding sentence shall not be interpreted to authorize any transfer which is otherwise prohibited by any agreement of such parties.

*Section 1.2. Other Definitions.* As used in this Assignment, the terms hereafter set forth shall have the respective meanings hereafter indicated.

> *"Property"* means the land described on attached Exhibit "A" together with all improvements presently or hereafter situated on such land.

> *"Leases"* means all present and future leases with respect to which the leased premises consist of any portion of the Property.

> *"Rents"* means all rent (including, without limitation, fixed rent, minimum rent and percentage rent, if any) and all other monetary amounts of every type (including, without limitation, damages for breach) which are from time to time payable by tenants (at the Property) to Assignor (as landlord) under the Leases or which are otherwise receivable by Assignor with respect to the Leases or Property and all of such previously mentioned sums which are from time to time payable by guarantors (of the obligations of tenants) to Assignor (as landlord) under the Leases and all amounts payable by tenants (and guarantors for tenants) to Assignor (as landlord) under the provisions of the Bankruptcy Code as amended from time to time.

> *"Note"* means that certain Promissory Note of even date herewith in the principal sum of $3,000,000.00, executed by **LDG001, LLC, a Texas limited liability company**, as "Maker," bearing interest and being payable to the order of Assignee, as "Payee," or "Lender" in installments in accordance with the terms and provisions therein set forth.

> *"Security Documents"* means the following documents of even date herewith: the Deed of Trust and Security Agreement executed by Assignor, as "Grantor," to the Trustee therein designated for the benefit of Assignee, as "Beneficiary," creating a lien on the Property and containing a power of sale, and including the

## ABSOLUTE ASSIGNMENT OF RENTS

**THE STATE OF TEXAS**

**COUNTY OF JOHNSON**

This Absolute Assignment of Rents ("Assignment") entered into on the 24th day of March, 2022 by **LDG001, LLC, a Texas limited liability company** ("Assignor"), whose address is 940 County Road 110, Venus, Texas 76084, for the benefit of **PIONEER FINANCE INC., a Texas corporation** ("Assignee"), whose address is 13310 University Blvd, Suite 100, Sugar Land, TX 77479.

### *ARTICLE I. DEFINITIONS*

***Section 1.1. Parties.*** As used in this Assignment, the terms "Assignor" and "Assignee" mean the parties above-identified by such designation and their respective heirs, executors, administrators, successors and assigns. The preceding sentence shall not be interpreted to authorize any transfer which is otherwise prohibited by any agreement of such parties.

***Section 1.2. Other Definitions.*** As used in this Assignment, the terms hereafter set forth shall have the respective meanings hereafter indicated.

> ***"Property"*** means the land described on attached Exhibit "A" together with all improvements presently or hereafter situated on such land.

> ***"Leases"*** means all present and future leases with respect to which the leased premises consist of any portion of the Property.

> ***"Rents"*** means all rent (including, without limitation, fixed rent, minimum rent and percentage rent, if any) and all other monetary amounts of every type (including, without limitation, damages for breach) which are from time to time payable by tenants (at the Property) to Assignor (as landlord) under the Leases or which are otherwise receivable by Assignor with respect to the Leases or Property and all of such previously mentioned sums which are from time to time payable by guarantors (of the obligations of tenants) to Assignor (as landlord) under the Leases and all amounts payable by tenants (and guarantors for tenants) to Assignor (as landlord) under the provisions of the Bankruptcy Code as amended from time to time.

> ***"Note"*** means that certain Promissory Note of even date herewith in the principal sum of **$3,000,000.00,** executed by **LDG001, LLC, a Texas limited liability company**, as "Maker," bearing interest and being payable to the order of Assignee, as "Payee," or "Lender" in installments in accordance with the terms and provisions therein set forth.

> ***"Security Documents"*** means the following documents of even date herewith: the Deed of Trust and Security Agreement executed by Assignor, as "Grantor," to the Trustee therein designated for the benefit of Assignee, as "Beneficiary," creating a lien on the Property and containing a power of sale, and including the

collateral assignment of lease and the other documents executed in connection with the loan evidenced by the Note and Security Agreement. This Assignment does not constitute one of the Security Documents in view of the fact that this Assignment provides for an absolute assignment of Rents, not a collateral assignment of Rents.

*"Indebtedness"* means all monetary amounts from time to time owing by Maker to Assignee under the Note, under this Assignment and under any one or more of the Security Documents including, without limitation, all, if any, amendments of this Assignment and all, if any, renewals, extensions, rearrangements and modifications of the Note and any of the Security Documents.

*"Event of Default"* shall have the same meaning as the definition of such phrase appearing in the above-described Deed of Trust and Security Agreement.

## *ARTICLE II. ASSIGNMENT*

**Section 2.1. Absolute Assignment.** For and in consideration of the sum of Ten and No/100 Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor does hereby absolutely assign, transfer, and set over to Assignee the Rents. To Have and to Hold the Rents to Assignee and Assignor hereby binds itself and agrees to Warrant and Forever Defend title to the Rents unto Assignee against every person whomsoever lawfully claiming or to claim the same or any part of such Rents.

**Section 2.2. Incidents of Assignment** This Assignment is absolute, unconditional and immediately effective. This Assignment does not collaterally transfer the Rents to Assignee and does not grant Assignee a lien on the Rents; instead, this Assignment absolutely vests title to the Rents in Assignee and constitutes Assignee as the owner of the Rents in accordance with the terms and provisions of this Assignment. It shall never be necessary for Assignee to institute legal proceedings of any kind to enforce the provisions of this Assignment.

**Section 2.3. No Pro Tanto Payment** Recognizing that, pursuant to subsequent terms and provisions of this Assignment, the Rents are permitted to be paid to Assignor under the circumstances hereafter provided and that the Rents may never be paid to Assignee and recognizing also that by reason of the terms and provisions of the Leases including, without limitation, those terms and provisions of the Leases providing for abatement of Rents, rights of termination of the Leases and other circumstances, and the possible occurrence of other events including possible insolvency of the tenants under the Leases, which may result in non-payment of the Rents, Assignor acknowledges and agrees that the execution and delivery of this Assignment absolutely transferring ownership of the Rents to Assignee does not constitute any nature of *pro tanto* payment of the Indebtedness to Assignee. In the case of Rents which may hereafter be paid to Assignor (pursuant to the subsequent provisions of this Assignment), such Rents will not constitute payment to Assignee (and hence will not be credited on the Indebtedness) unless and until such Rents are actually paid by Assignor to Assignee and applied by Assignee in such manner. In the

case of Rents paid to Assignee by the tenants, such Rents will be *pro tanto* credited on the Indebtedness only to the extent, if any, that such Rents paid to Assignee are neither disbursed by Assignee to Assignor nor paid directly by Assignee for utilities, maintenance, repairs, taxes, assessments, insurance or other expenses relating to the Property.

## ARTICLE III: COVENANTS, REPRESENTATIONS AND WARRANTIES OF ASSIGNOR

**Section 3.1. Covenants of Assignor.** Assignor hereby unconditionally covenants and agrees as follows (and any non-compliance by Assignor shall constitute an Event of Default and any attempt by Assignor to take any of the prohibited action hereafter described shall constitute an Event of Default and shall be void and of no effect):

(a)    to observe, perform and discharge, diligently and punctually, all the obligations imposed upon the landlord under the Leases and not to do or permit to be done anything to impair the Leases or the Rents obligations or any of the other obligations of the tenants under the Leases; and Assignor shall give prompt notice to Assignee of any failure on the part of the Assignor to observe, perform and discharge any of Assignor's obligations under this paragraph or under any other portion of this Assignment;

(b)   not to receive or collect any of the Rents arising or accruing under any of the Leases or from the Property in advance of the calendar month next preceding the calendar month with respect to which such Rents are due and payable;

(c)    not to grant any period of free rental or abated rental under any of the Leases;

(d)    not to execute any assignment of the rights or interest of Assignor (as landlord) in the Leases without Assignee's prior written consent and not to execute any other assignment of Rents (whether absolute or collateral) arising or accruing from the Leases or from the Property.

(e)    not to subordinate any of the Leases to any of the Security Documents or any other mortgage or other encumbrance, or permit, consent or agree to such subordination without Assignee's prior written consent;

(f)    not to alter, modify or change the terms of any of the Leases (or the terms of any guaranty of any of the Leases) or give any consent or exercise any option required or permitted by such terms without the prior written consent of Assignee, or cancel or terminate any of the Leases (or any guaranty of any of the Leases) or accept a surrender of any of the Leases or take or permit any action the effect of which is to result in a surrender of any Lease by operation of law;

(g)    not to consent to any assignment of or subletting under any of the Leases, whether or not in accordance with their terms, without the prior written consent of Assignee, and not to grant any renewal or extension option under any of the Leases or agree to the enlargement or diminution in size or relocation of the leased premises under any Lease without the prior written approval of Assignee;

(h) to execute and deliver at the request of Assignee all such further assurances and written instruments and take all such other action with respect to the Property as Assignee shall from time-to-time request in writing in order to carry out the purpose and intent of this Assignment;

(i)     to enforce, in the name of Assignor (as landlord), and at the cost, expense and risk of Assignor, the performance of each and every obligation, term, covenant, condition and agreement in the Leases to be performed by any tenant; and Assignor (as landlord) shall appear in and defend any action or proceeding arising under, occurring out of or in any manner connected with the Leases or the obligations, duties or liabilities of Assignor (as landlord) and any tenant thereunder, and, upon request by Assignee, Assignor will do so in the name and on behalf of Assignee, but at the expense of the Assignor, and Assignor shall pay all costs and expenses of Assignee, including attorneys' fees and disbursements, in any action or proceeding in which Assignee may appear;

(j)     not to waive, excuse, discount, setoff, compromise or in any manner release or discharge any tenant under any Lease (or any guarantor for any such tenant) of and from any monetary or other obligations, covenants, conditions and agreements to be kept, observed and performed by such tenant (or guarantor for such tenant), including, without limitations, the obligation to pay Rents thereunder, in the manner and at the time and place specified therein;

(k) not to incur any indebtedness to any tenant (or guarantor for any tenant) under any of the Leases unless each such tenant (or guarantor) contemporaneously expressly waives in writing any right to offset against (or recoup) any portion of such indebtedness from Rents; and

(l) to deliver to Assignee executed copies of all Leases when executed upon all or any part of the Property.

   *Section 3.2. Representations and Warranties of Assignor.* Assignor unconditionally represents and warrants to Assignee now and continuing throughout the term of this Assignment as follows:

(a)     Assignor is the sole owner of: (i) the Property, and (ii) the landlord's interests in the Leases;

(b)     Assignor has all of the requisite right, power and authority to absolutely assign the Rents to Assignee, and no other person, firm, corporation or entity has any right, title or interest in the Rents;

(c)     the Leases are valid and enforceable, in full force and effect and have not been altered, modified or amended in any manner whatsoever;

(d)     the tenants named in the Leases are not in default under any of the terms, covenants or conditions of the leases and Assignor has duly and punctually performed and shall at all times hereafter duly and punctually perform all and singular, the terms, covenants, conditions and warranties of the leases on the Assignor's part to be kept,

observed and performed;

      (e)    no Rents provided for under any of the Leases have been previously sold, assigned, transferred, mortgaged or pledged, and no Rents for any period subsequent to the date of this Assignment have been collected by Assignor or shall be collected by Assignor earlier than the calendar month next preceding the calendar month with respect to which such Rents are due and payable under the terms of any of the Leases; and

      (f)    no period of free or abated rental has been granted to any tenant under any of the Leases.

## ARTICLE IV: TERMINABLE LICENSE OF ASSIGNOR TO COLLECT RENTS

      ***Section 4.1. Terminable License of Assignor.*** So long as there exists no Event of Default, Assignor shall have and is hereby granted the license (the "License") to receive and collect all of the Rents. The Rents so received and collected by Assignor shall be deposited by Assignor in one or more accounts containing only the Rents so deposited in such accounts (plus any interest paid by the depository on the amount from time to time in such accounts). Such Rents (and interest, if any) shall not be commingled with any other funds of Assignor and Assignor shall not deposit any other funds in such accounts other than the Rents. Assignor shall, at all times, keep Assignee advised in writing of the names and locations of each depository at which such accounts containing the Rents are maintained as well as the account number of each such account and, within seven (7) days following notice from Assignee to Assignor, Assignor shall advise Assignee of the balance in each such account to the extent that such information may be requested by Assignee. As provided in Article III (entitled "Covenants, Representations and Warranties of Assignor") of this Assignment, Assignor shall not receive or collect any of the Rents arising or accruing under any of the Leases or from the Property in advance of the calendar month next preceding the calendar month with respect to which such Rents are due and payable under the terms of any of the Leases. Assignor acknowledges and agrees that the License does not negate or otherwise affect the status of this Assignment as being an absolute assignment fully transferring to Assignee title to the Rents.

      ***Section 4.2. Trust Fund.*** All of the Rents so received or collected by Assignor pursuant to the License hereby granted pursuant to Section 4.1 preceding shall constitute a trust fund held by Assignor for the benefit of Assignee; and the entirety of the Rents constituting such trust fund shall be utilized by Assignor for payment of the Indebtedness, for timely payment of taxes and assessments on the Property before the accrual of any penalty or interest with respect thereto, for payment of premiums on insurance required under the Security Documents, for payment of the costs of maintenance and repairs with respect to the Property, for fulfillment of Assignor's other obligations under the Security Documents and for fulfillment of Assignor's obligation (as landlord) under the Leases, all of such previously stated obligations of Assignor to be fulfilled by Assignor (in such order of priority as Assignee may from time to time direct) prior to Assignor's utilization of the Rents for any other purpose whatsoever. In all matters relating to the Rents, Assignor owes to Assignee the highest degree of loyalty and legal fiduciary responsibility recognized by law.

**Section 4.3. Automatic Termination of Assignor's License.** Upon the occurrence of any Event of Default, the aforesaid License of Assignor under Section 4.1 of this Agreement shall, *ipso facto,* automatically terminate without the necessity that Assignee give Assignor any nature of notice or institute against Assignor any nature of legal proceedings or take any other action. Upon the occurrence of any such Event of Default and the resulting automatic termination of such License, unless Assignee gives Assignor notice to the contrary (a matter within the sole discretion of Assignee), all Rents thereafter received by Assignor shall, in their entirety, be promptly paid over by Assignor to Assignee and Assignee may exercise any and all legal and equitable remedies including, without limitation, the remedies provided for under Article V of this Assignment. Under no circumstances, however, does Assignee's legal ownership of the rents depend upon the occurrence of any such Event of Default or the resulting automatic termination of Assignor's License or the giving of notice by Assignee or the filing of any lawsuit or the taking of any other action whatsoever by Assignee, it being the agreement and intention of Assignor and Assignee that this Assignment is absolute (not collateral) and immediately vests ownership of the Rents in Assignee.

**Section 4.4. Impact on Tenants of Termination of Assignor's License.** Notwithstanding any of the other terms or provisions of this Assignment, until receipt from Assignee of notice of the occurrence of an Event of Default, each tenant may pay rentals directly to Assignor. Upon receipt by any tenant under the Leases, however, of notice from Assignee that an Event of Default has occurred, irrespective of whether Assignor contests the occurrence or existence of such Event of Default or contests Assignee's entitlement to receive the Rents, each such tenant under the Leases is hereby authorized and directed and required to pay directly to Assignee all Rents accruing after the date of the Event of Default stated in such notice from Assignee (irrespective of any contrary provision of the lease to such tenant or any other circumstances whatsoever); and the receipt by Assignee of Rents shall constitute a release of each tenant paying such Rents to the extent of the amounts so paid to Assignee by such tenant. The notice from Assignee to tenants referred to in this Section 4.4 is intended solely for the benefit of each tenant and shall never inure to the benefit of Assignor or any party claiming through or under Assignor. The receipt by a tenant of any such notice from Assignee constitutes full authorization and mandate for such tenant to make all future payment of Rents directly to Assignee and each tenant paying such future Rents to Assignee after such notice from Assignee shall be permitted to rely on such notice and shall have no liability to Assignor after such notice for any Rents so paid to Assignee by such tenant. In the event that any tenant receiving any such notice from Assignee does not timely pay such future rents to Assignee, whether on account .of continued payment of such Rents by such tenant to Assignor or withholding of such Rents by such tenant or such tenant's paying such rents into the registry of the court in connection with an interpleader or other action or any other non-payment of such Rents to Assignee by any tenant, such tenant will be liable to Assignee for the Rents not so paid to Assignee plus costs of court plus attorneys' fees of Assignee. Promptly upon notice from Assignee to Assignor, Assignor shall cause each tenant to agree in writing to the terms and provisions of this Section 4.4 and shall cause an executed counterpart of such writing to be delivered to Assignee. Whenever requested by Assignee, Assignor shall promptly obtain from each tenant an agreement executed by such tenant which provides that Assignee has notified such tenant of this Assignment, that Assignee has, nevertheless, subject to the terms and provisions of this Assignment, granted Assignor a revocable (by Assignee) license to collect the Rents so long as there is no Event of Default and containing the other terms and

provisions hereinabove set forth in this Section 4.4. Assignor agrees that the provisions of this Section 4.4 shall be contained in each Lease hereafter executed by Assignor (as landlord) and a tenant.

*Section 4.5. Application of Rents Received by Assignee Prior to Foreclosure.* All Rents received by Assignee for any period prior to Assignee's foreclosure on the Property or acceptance of a deed to the Property in lieu of foreclosure shall continue to constitute the property of Assignee and shall be applied by Assignee (in such order as Assignee may from time to time determine) to the payment of:

(a) all expenses of managing the Property including, but not limited to, salaries, fees, and other payments to a manager of the Property and/or such other personnel as Assignee may deem necessary or desirable;

(b) all expenses of preserving, maintaining and operating the Property including, without limitation, all taxes, assessments, utility charges, insurance premiums, repairs, renovations, alterations and replacements;

(c) all expenses incurred by Assignee incident to exercise of Assignee's rights under this Assignment and Assignee's rights under any of the Security Documents; and

(d) payment of the Indebtedness and performance of all of Assignor's other obligations under the Security Documents.

## ARTICLE V: REMEDIES

*Section 5.1. Remedies.* Assignor expressly acknowledges and agrees that upon or at any time after the occurrence of an Event of Default, Assignee's right, title and interest in and to the Leases and Rents shall be and remain absolute and inviolate in accordance with the provisions of this Assignment. Moreover, without limiting, altering, affecting or impairing in any manner or to any extent the absolute right, title and interest of Assignee as provided herein, upon the occurrence of such an Event of Default, Assignee shall have the complete right, power and authority hereunder, then or thereafter, to exercise and enforce any or all of the following rights and remedies:

(a)    To terminate the License and then and thereafter, without taking possession of the Property, in Assignee's own name, to demand, collect, receive, sue for, attach and levy on the Rents and give proper receipts, releases and acquaintances therefor, and after deducting all necessary and proper costs and expenses of operation of the Property and collection, as determined by Assignee, including attorneys' fees, and apply the net proceeds thereof, together with any funds of Assignor deposited with Assignee, in reduction or repayment of the Indebtedness and fulfillment of Assignor's other covenants, duties and obligations under this Agreement and under the Security Documents in such order or priority as Assignee may, in its sole discretion, determine; and

(b)    To declare the unpaid principal balance on the Note, the unpaid accrued interest

and other accrued but unpaid portion of the Indebtedness immediately due and payable without any (or any further) notice of default, notice of intent to accelerate, notice of acceleration, presentment, protest, demand or action of any nature whatsoever (each of which hereby is expressly waived by Assignor) whereupon the same shall become immediately due and payable and, at Assignee's option, exercise all of the rights and remedies contained in the Security Documents.

**Section 5.2. Exculpation of Assignee.** The acceptance by Assignee of this Assignment, and the exercise by Assignee of any of the rights, powers, privileges and authority provided under this Agreement, shall not, prior to action (if any) by Assignee in entering upon and taking possession of the Property, be deemed or construed to constitute Assignee a "mortgagee in possession," nor thereafter or at any time or in any event obligate Assignee to appear in or defend any action or proceeding relating to the Leases, the Rents or the Property or to take any action hereunder or to expend any money or incur any expenses or perform or discharge any obligation or responsibility for any security deposits or other deposits delivered to Assignor by any tenant which were not actually delivered by Assignor to Assignee, nor shall Assignee be liable in any way for any injury or damage to persons or property sustained by any person, firm or corporation in or about the Property.

**Section 5.3. No Waiver or Election of Remedies**

**(a) No Waiver:** Neither the collection of the Rents by Assignee nor application of the Rents by Assignee as provided for in this Assignment shall be deemed to cure or waive any Event of Default or waive, modify or affect any notice of default under any of the Security Documents or invalidate any act done pursuant to any such notice. The enforcement of any such right or remedy by Assignee, once exercised, shall continue for so long as Assignee shall elect, notwithstanding that the collection and application of the Rents may have cured the prior Event of Default. If Assignee shall thereafter elect to discontinue the exercise of any such right or remedy, the same or any other right or remedy under this Agreement may be reasserted at any time and from time to time following any subsequent Event of Default.

**(b) Election of Remedies:** The failure of Assignee to assert any of the terms, covenants and conditions of this Assignment for any period of time or at any time or times shall not be construed or deemed to be a waiver of any such right, and nothing contained in this Agreement nor anything done or omitted to be done by Assignee pursuant to this Assignment shall be deemed to be an election of remedies or a waiver by Assignee of any of its rights and remedies under any of the Security Documents or under the law. The right of Assignee to collect and enforce the payment of the Indebtedness may be exercised by the Assignee either prior to or simultaneously with or subsequent to any action taken under this Assignment.

**Section 5.4. Indemnification by Assignor.** Assignor hereby agrees to indemnify and hold Assignee free and harmless from and against any and all liability, loss, cost, damage or expense which Assignee may incur under or by reason of this Assignment, or by reason of any action taken by Assignee hereunder, or by reason of or in defense of any and all claims and

demands whatsoever which may be asserted against Assignee arising out of the Leases, including specifically, but without limitation, any claim by any tenant of credit for Rents paid to and received by Assignor, but not delivered to Assignee, for any period under any Lease earlier than the calendar month next preceding the calendar month with respect to which such Rents payment is due. In the event Assignee incurs any such liability, loss, cost, damage or expense, the amount thereof, including attorneys' fees, with interest thereon at the default rate specified in the Note, shall be payable by Assignor to Assignee immediately, without demand, and shall be secured by all the security for the payment and performance of the Indebtedness.

## ARTICLE VI: MISCELLANEOUS

**Section 6.1. Possible Inconsistency Between Assignment and Other Documents.** Notwithstanding that the Note or any of the Security Documents may indicate the transfer of Rents by Assignor to Assignee to be a pledge or a collateral assignment or assignment which is made as security or as further security for the payment or performance of some monetary or other obligation of Assignor, such provisions are not controlling and are intended to be and are hereby superseded by the provisions of this Assignment indicating that the assignment of Rents is an absolute assignment of Rents passing ownership of the Rents to Assignee subject to the terms and provisions of this Assignment.

**Section 6.2. Effect of this Assignment as a Severance.** This Assignment effects a severance of the Rents and, accordingly, Assignor's future collection of the Rents pursuant to the License granted under this Assignment does not impair the prior severance of such Rents arising by reason of the provisions of this Assignment. Assignee is expressly authorized to transfer title to the Rents by an assignment of such Rents to the purchaser at a foreclosure sale by effecting such transfer under the terms of the Trustee's Deed or under a separate assignment instrument and, similarly, Assignee is expressly authorized to transfer title to the Rents, in the case of a deed in lieu of foreclosure, either pursuant to and as a part of the terms and provisions of such deed or under a separate assignment instrument. If, after an Event of Default, but prior to any such foreclosure or deed in lieu of foreclosure, Assignor has received any of the Rents applicable to any period after such Event of Default but collected by Assignor prior to (or contemporaneous with) such Event of Default, the entirety of the Rents applicable to any period after such Event of Default are immediately due and payable by Assignor to Assignee.

**Section 6.3. Inapplicability of Non-Recourse, Limited Recourse and "Subject To" Provisions.** To the extent, if any, that the Note or any of the Security Documents contains any provision indicating that any obligation of Maker or Assignor under such Note or under any of such Security Documents is non-recourse or limited recourse in nature, such provisions shall not be applicable to or benefit Assignor with respect to any liability of Assignor under or with respect to or in the event of noncompliance by Assignor with any of the provisions of this Assignment. By way of example, but not limitation, if Assignor receives any of the Rents assigned to Assignee under the provisions of this Assignment and does not use or pay or dispose of such Rents in the manner required under this Assignment or under any of the Security Documents, then Assignor is fully personally liable for the payment of such Rents to Assignee.

Similarly, if Assignor has taken title to the Property subject to (but not assuming)

demands whatsoever which may be asserted against Assignee arising out of the Leases, including specifically, but without limitation, any claim by any tenant of credit for Rents paid to and received by Assignor, but not delivered to Assignee, for any period under any Lease earlier than the calendar month next preceding the calendar month with respect to which such Rents payment is due. In the event Assignee incurs any such liability, loss, cost, damage or expense, the amount thereof, including attorneys' fees, with interest thereon at the default rate specified in the Note, shall be payable by Assignor to Assignee immediately, without demand, and shall be secured by all the security for the payment and performance of the Indebtedness.

## ARTICLE VI: MISCELLANEOUS

**Section 6.1. Possible Inconsistency Between Assignment and Other Documents.** Notwithstanding that the Note or any of the Security Documents may indicate the transfer of Rents by Assignor to Assignee to be a pledge or a collateral assignment or assignment which is made as security or as further security for the payment or performance of some monetary or other obligation of Assignor, such provisions are not controlling and are intended to be and are hereby superseded by the provisions of this Assignment indicating that the assignment of Rents is an absolute assignment of Rents passing ownership of the Rents to Assignee subject to the terms and provisions of this Assignment.

**Section 6.2. Effect of this Assignment as a Severance.** This Assignment effects a severance of the Rents and, accordingly, Assignor's future collection of the Rents pursuant to the License granted under this Assignment does not impair the prior severance of such Rents arising by reason of the provisions of this Assignment. Assignee is expressly authorized to transfer title to the Rents by an assignment of such Rents to the purchaser at a foreclosure sale by effecting such transfer under the terms of the Trustee's Deed or under a separate assignment instrument and, similarly, Assignee is expressly authorized to transfer title to the Rents, in the case of a deed in lieu of foreclosure, either pursuant to and as a part of the terms and provisions of such deed or under a separate assignment instrument. If, after an Event of Default, but prior to any such foreclosure or deed in lieu of foreclosure, Assignor has received any of the Rents applicable to any period after such Event of Default but collected by Assignor prior to (or contemporaneous with) such Event of Default, the entirety of the Rents applicable to any period after such Event of Default are immediately due and payable by Assignor to Assignee.

**Section 6.3. Inapplicability of Non-Recourse, Limited Recourse and "Subject To" Provisions.** To the extent, if any, that the Note or any of the Security Documents contains any provision indicating that any obligation of Maker or Assignor under such Note or under any of such Security Documents is non-recourse or limited recourse in nature, such provisions shall not be applicable to or benefit Assignor with respect to any liability of Assignor under or with respect to or in the event of noncompliance by Assignor with any of the provisions of this Assignment. By way of example, but not limitation, if Assignor receives any of the Rents assigned to Assignee under the provisions of this Assignment and does not use or pay or dispose of such Rents in the manner required under this Assignment or under any of the Security Documents, then Assignor is fully personally liable for the payment of such Rents to Assignee.

Similarly, if Assignor has taken title to the Property subject to (but not assuming)

any prior lien indebtedness with respect to the Property or has assumed such prior lien indebtedness but subsequently has been granted non-recourse or limited recourse benefits with respect to such assumed prior lien indebtedness, such circumstances shall not be applicable to or benefit Assignor under or with respect to or in the event of noncompliance by Assignor with any of the provisions of this Assignment; and, accordingly, in the event that Assignor receives any of the Rents assigned to Assignee under this Assignment (even though Assignee's rights under this Assignment may be inferior to a prior assignment of the Rents which, however, Assignor warrants is not the case), if Assignor does not use or pay or dispose of such Rents in either the manner required under this Assignment or under any of the Security Documents or under the documents pertaining to such prior lien indebtedness, then Assignor is fully personally liable for the payment of such Rents to Assignee.

**Section 6.4. Termination of Assignment** Upon payment in full of the Indebtedness, performance of all of the covenants, duties and obligations of Assignor under the Security Documents and performance of all of the covenants, duties and obligations of Assignor under this Assignment, this Assignment shall be and become void and of no effect and, upon request of Assignor, Assignee shall promptly execute and deliver to Assignor an instrument under which Assignee releases its rights under this Assignment and sets forth the consent of Assignee to each tenant's future payment of Rents to Assignor.

**Section 6.5. Non-Merger.** So long as any of the Indebtedness remains unpaid and so long as any of the covenants, duties and obligations of Assignor under any of the Security Documents or under this Assignment have not been performed, unless Assignee otherwise consents in writing, the fee and leasehold estates in and to the Property and any portion thereof shall not merge, but shall always remain separate and distinct, notwithstanding the union of such estates (without implying Assignee's consent to any such union) either in Assignor, Assignee, any tenant or in any third party by purchase or otherwise.

**Section 6.6. Non-Liability of Assignee for Performance of Duties of Assignor Under Leases.** Notwithstanding any of the other terms or provisions of this Assignment or the Note or any of the Security Documents, Assignee has not assumed or agreed to perform and shall not be obligated to perform any of the covenants, duties or obligations of Assignor (as landlord) under any of the Leases.

**Section 6.7. Notices.** Any notice provided to be given or desired to be given by either party to the other pursuant to this Assignment is required to be in writing and transmitted either by U.S. Mail, Registered or Certified, adequate postage prepaid, or by hand delivery (with receipt for delivery signed in behalf of the recipient) or by delivery via Federal Express or other recognized overnight courier service (with receipt for delivery signed in behalf of the recipient), any such notice to be transmitted by the sender to the intended recipient at the recipients' addresses set forth in this Assignment (or hereafter designated as provided in this Section 6.7).

Assignor and Assignee may change their respective address for purposes of receipt of notices by giving notice to the other party in accordance with the preceding provisions.

**Section 6.8. Captions.** Titles and headings appearing in this Assignment are

intended solely for means of reference and are not intended to modify any of the provisions of this Assignment.

*Section 6.9. Severability.* If any of the provisions of this Assignment and the application thereof in any circumstances shall, to any extent, be invalid or unenforceable, the remainder of this Assignment shall remain in full force and effect and shall be valid and enforceable to the fullest extent permitted by applicable law.

*Section 6.10. Entire Agreement* This Assignment constitutes the entire agreement between Assignor and Assignee with respect to the subject matter of this Assignment and may not be modified or amended in any manner except by a writing executed by Assignor and Assignee and delivered.

*Section 6.11. Time of Essence.* Time is of the essence with respect to all of the terms and provisions of this Assignment.

*Section 6.12. Governing Law.* The rights of the parties under this Assignment and all matters relating to the validity, interpretation and enforcement of the provisions of this Assignment shall be governed by and determined under the internal local law of the State of Texas not including any choice of law rule of Texas law which makes applicable the law of some other jurisdiction for any of such purposes.

Executed on the dates of the acknowledgment shown below and effective and dated as of the date first above written.

**ASSIGNOR:**

**LDG001, LLC,**
**a Texas limited liability company**

> **By its Manager:**
> Carnegie Development, LLC,
> A Delaware limited liability company
>
> > **By its Managing Member:**
> > JMJ Development, LLC,
> > A Texas limited liability company
> >
> > By: _____
> > Name: Tim Barton
> > Title: Manager

STATE OF TEXAS            §
                         §
COUNTY OF DALLAS         §

This instrument was acknowledged before me on the 24th day of March, 2022, by TIM BARTON, acting as Manager of JMJ Development, LLC, a Texas limited liability company, acting as Managing Member of Carnegie Development, LLC, a Delaware limited liability company, acting as Manager of **LDG001, LLC, a Texas limited liability company**, in his capacity therein.

_____
Notary Public, State of Texas

R A Blanshard
Notary Public, State of Texas
My Comm. Exp. 08/16/2024
Notary ID 135379-7

AFTER RECORDING RETURN TO:

Pioneer Finance Inc.
13310 University Blvd, Suite 100,
Sugar Land, TX 77479.

**Exhibit "A" – Legal Description**

**Tract I:**

BEING a 154.93-acre tract of land situated in the B.B.B. & C.R.R. Co. Survey, Abstract No 93. Being part of that certain called 156-acre tract of land described in deed to Patrick M. Griffin, Stephen Griffin, Loretta Ann Griffin and Virginia Bone to LDG001, LLC, and recorded in Document No. 2018-24505 of the Deed Records of Johnson County, Texas, and a called 1.00 acre tract of land described in deed to LDG001, LLC, and recorded in Document No. 2018-32084 of the Deed Records of Johnson County, Texas, said 154.93 acre tract being more particularly described by meets and bounds as follows:

BEGINNING at a 1/2" iron rod found for corner at the Southwest corner of the B.B.B. & C.R.R. Co. Survey, the Northwest corner of the Jackson Smith Survey, Abstract No. 758 and being in the East line of Philip P. Barnes Survey, same being the Southwest corner of said 156 acre tract, the Northwest corner of Lot 2 of Plainview Acres, Phase 3, recorded in Volume 8, Page 248 of said Deed Recorded and also being in the East line of that certain called 94.26 acre tract of land described in deed to Harper Cattle, LLC and recorded in Volume 2304, Page 895, and also being at the intersection of County Road 213 (60' right-of-way) and County Road 110 (60' right-of-way);

THENCE North 30 Degrees 31 Minutes 39 Seconds West with said County Road 213, the West line of said 156-acre tract and the East line of said 94.26-acre tract, a distance of 2,640.00 feet to a point for corner at the Northwest corner of said 156-acre tract, the Southwest corner of that certain called 1.074-acre tract described in deed in deed to H.C. Griffin, recorded in Volume 1583, Page 241 of said Deed Records;

THENCE North 59 Degrees 28 Minutes 21 Seconds East, with the North line of said 156 acre tract and the South line of said 1.074 acre tract at a distance of 30.00 feet passing a 1/2" iron rod with plastic marked "SANDS" set for reference corner in said Right-of-Way and continuing a total distance of 869.98 feet to a 1/2" iron rod with plastic marked "SANDS" set for corner in the North line of said 156 acre tract, the East corner of said 1.074 acre tract and also being in the South line of G.C. & S.F. Railroad (100' wide Right-of-Way);

THENCE North 66 Degrees 32 Minutes 57 Seconds East, with the South line of said Railroad, a distance of 682.02 feet to a 1/2" iron rod with plastic cap marked "SANDS" set for corner in said South line at the beginning of a curve to the right;

THENCE in a Northeasterly direction with said curve to the right having a radius of 2,595.97 feet, whose chord bears North 70 Degrees 50 Minutes 32 Seconds East - 388.67 feet for an arc length of 389.03 feet to 1/2" iron rod with plastic cap marked "SANDS" set for corner in South line of said Railroad;

THENCE North 75 Degrees 08 Minutes 08 Seconds East, with said South line a distance of 756.88 feet to a 1/2" iron rod with plastic cap marked "SANDS" set for corner in the East line of said 156-acre tract and being in the West line of that certain called 184.887-acre tract of land conveyed to Billy C. Roten by deed recorded in Volume 1248, Page 742 of said Deed Records;

THENCE South 30 Degrees 31 Minutes 39 Seconds East, with the East line of said 156-acre tract and the West line of said 184.887-acre tract, at a distance of 2,245.02 feet passing a 1/2" iron rod with plastic marked "SANDS" set for reference in the North Right-of-Way of said County Road No. 110 and continuing a total distance of 2,275.02 feet a point for corner at the Southeast corner of said 156-acre tract and being in the Southerly edge of County Road 110 (60' right-of-way);

THENCE South 59 Degrees 28 Minutes 21 Seconds West, with said road and the South line of said 156-acre tract a distance of 860.80 feet a point for corner in said road and being at the Southeast corner of that certain called 1.00-acre tract of land described in deed to LDG001, LLC and continuing with said County Road 110 and the South line of said 156-acre tract, for a total distance of 2,656.62 feet to the POINT OF BEGINNING and containing 154.93 acres of land, more or less.

## Tract II:

BEING a 47.86-acre tract of land situated in the Jackson Smith Survey, Abstract No. 758, Johnson County, Texas, being all of that certain called 47.5-acre tract of land described in deed to LDG001, LLC, and recorded in Document No. 2018-24505 of the Deed Records of Johnson County, Texas, said 47.86-acre tract to be more particularly described by meets and bounds as follows:

COMMENCING at a 1/2" iron rod found for corner at the Northwest corner of said Jackson Smith Survey, same being the Southwest corner of the B.B.B. & C.R. R. Co. Survey, Abstract No. 93 and being at the intersection of County Road No. 213 (601 right-of-way) with County Road No. 110 (60' right-of-way);

THENCE North 59 Degrees 28 Minutes 21 Seconds East, with the North line of said Jackson Smith Survey and the South line of said B.B.B. & C.R.R. Co. Survey and with County Road No, 110, a distance of 2,656.62 feet to a point for corner in the southerly line of said County Road 110, same being the Northwest corner of said 47-1/2 acre tract, the Northeast corner of that certain called 50 acre tract described in deed to Judith Louise Brown and recorded in Volume 3119, Page 27 of said Deed Records, the Southeast corner of that certain called 156 acre tract described in deed to Patrick M. Griffin and recorded in Volume 3130, Page 714 of said Deed Records and the Southwest corner of that certain called 184.887 acre tract described in deed to Bill C. Roten and recorded in Volume 1248, Page 472 of said Deed Records and being the POINT OF BEGINNING;

THENCE North 59 Degrees 28 Minutes 21 Seconds East, with the North line of said 47-1/2-acre tract and with said County Road 110 a distance of 843.25 feet to a point for corner at the Northeast corner of said 47-1/2-acre tract, the Northwest corner of that certain called 70.74 acres tract of land described in deed to Duane Schifano and recorded in Instrument No.201200024756 of said Deed Records and also being in the South line of said 184.887-acre tract;

THENCE South 30 Degrees 31 Minutes 39 Seconds East, with the East line of said 47-1/2 acre tract and the West line of said 70.74 acre tract at a distance of 30.00 feet passing a 1/2" iron rod with plastic cap marked "SANDS" set for reference and continuing for a distance of 1,721.56 feet, passing a 1" iron found for corner at the southwest corner of said 70.74 acre tract, same being the Northwest corner of that certain called 15.004 acre tract of land described in deed to RES Land Holding and recorded in Volume 3507, Page 398 of said Deed Records and continuing at a distance of 2,088.49 feet passing a 1" iron bar found for corner at the Southwest corner of said 15.004 acre tract, same being the Northwest corner of that certain called 0.78 acre tract of land described in deed to Daniel II, Vesper, Sr. and recorded in Instrument No. 201000011279 of said Deed Records and continuing at a distance of 2,443.17, feet passing a 1/2" iron rod with plastic cap marked "SANDS" set for reference and continuing a total distance of 2,472.17 feet to a point for corner at the Southeast corner of said 47.5 acre tract, the Southwest corner of said 0.78 acre tract, and being in County Road 109 (60' right-of- way) and also being in the North line of Southern Acres, Phase 1, an addition to Johnson County, Texas;

THENCE South 59 Degrees 28 Minutes 21 Seconds West, with the South line of said 47.5-acre tract and the North line of said Southern Acres a distance of 843.25 feet to a point for comer in said County Road 109 and being in the North line of that certain called Lot 2R-1, Block 1 of Harden Estates, an addition to Johnson County, Texas, according to the plat thereof recorded in Volume 10, Page 463 of said Deed Records, same being the Southeast corner of said above mentioned 50-acre tract;

THENCE North 30 Degrees 31 Minutes 39 Seconds West, with the West line of said 47-1/2-acre tract and the East line of said 50-acre tract, a distance of 2,472.17 feet to the POINT OF BEGINNING and containing 47.86 acres of land, more or less.

# Johnson County
## Becky Ivey
### Johnson County
### Clerk

---

**Instrument Number:**  2022 - 10457

eRecording – Real Property

Assignment

Recorded On: March 25, 2022 01:27 PM                    Number of Pages: 16

---

**" Examined and Charged as Follows: "**

Total Recording: $82.00

---

**\*\*\*\*\*\*\*\*\*\*\* THIS PAGE IS PART OF THE INSTRUMENT \*\*\*\*\*\*\*\*\*\*\***
Any provision herein which restricts the Sale, Rental or use of the described REAL PROPERTY
because of color or race is invalid and unenforceable under federal law.

**File Information:**                              **Record and Return To:**

Document Number:    2022 - 10457              Simplifile
Receipt Number:     20220325000104           5072 North 300 West
Recorded Date/Time: March 25, 2022 01:27 PM
User:               Leslie S                 PROVO UT
Station:            ccl83

---



**STATE OF TEXAS**
**COUNTY OF JOHNSON**

I hereby certify that this Instrument was FILED In the File Number sequence on the date/time
printed hereon, and was duly RECORDED in the Official Records of Johnson County, Texas.

Becky Ivey
Johnson County Clerk
Johnson County, TX