**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

SECURITIES AND EXCHANGE
COMMISSION,

                          Plaintiff,

v.

TIMOTHY BARTON,                                    C.A. No.: 3:22-cv-2118-X
CARNEGIE DEVELOPMENT, LLC,
WALL007, LLC,
WALL009, LLC,                                       Jury Trial Demanded
WALL010, LLC,
WALL011, LLC,
WALL012, LLC,
WALL016, LLC,
WALL017, LLC,
WALL018, LLC,
WALL019, LLC,
HAOQIANG FU (A/K/A MICHAEL FU),
STEPHEN T. WALL,

                          Defendants,

DJD LAND PARTNERS, LLC, and
LDG001, LLC,

                          Relief Defendants.

**PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S REPLY
IN SUPPORT OF ITS MOTION FOR APPOINTMENT OF A RECEIVER,
FOR A PRELIMINARY INJUNCTION AND ANCILLARY RELIEF,
AND TO LIFT STAY FOR LIMITED PURPOSE**

**TABLE OF CONTENTS**

TABLE OF CONTENTS ................................................................................................... ii

TABLE OF AUTHORITIES ......................................................................................... iii-iv

    A.  The SEC is Likely to Succeed on Its Fraud Claims ........................................... 1

    B.  The SEC Has Satisfied the *Netsphere* factors ................................................. 1

        1.  Clear necessity ......................................................................................... 1

        2.  No less drastic remedy ............................................................................. 3

        3.  Benefits outweigh burdens ...................................................................... 4

    C.  Tracing ............................................................................................................. 4

    D.  A Preliminary Injunction is Warranted ........................................................... 9

    E.  The Loan Agreements Are Securities .............................................................. 10

    F.  Sworn Accounting ........................................................................................... 14

    G.  Response of Max Barton ................................................................................. 14

Conclusion ..................................................................................................................... 15

**TABLE OF AUTHORITIES**

<u>Federal Cases</u>

*Accordant Communications, LLC v. Sayers Construction, LLC,*
 2020 WL 7496657 (W.D. Tex. April 7, 2020) ........................................................ 2

*Farace v. Independent Fire Ins. Co.,*
 699 F.2d 204 (5th Cir. 1983) ............................................................................. 14

*FDIC v. Faulkner,*
 991 F.2d 262 (5th Cir. 1993) ...............................................................................9

*Kirschner v. JP Morgan Chase Bank, N.A.,*
 79 F.4th 290 (2d Cir. 2023) ........................................................................ 13, 14

*Long v. Shultz Cattle Co.,*
 881 F.2d 129 (5th Cir. 1989) ............................................................................. 11

*Netsphere, Inc. v. Baron,*
 703 F.3d 296 (5th Cir. 2012) ........................................................................2-3, 5

*Reves v. Ernst & Young,*
 494 U.S. 56 (1990) ......................................................................................12, 13

*SEC v. Arcturus Corp.,*
 928 F.3d 400 (5th Cir. 2019) .............................................................................11

*SEC v. Barton,*
 79 F. 4th 573 (5th Cir.) ....................................................................2, 5, 8, 10, 15

*SEC v. Cherif,*
 933 F.3d 403 (7th Cir. 1991) ............................................................................. 5

*SEC v. Faulkner, No. 3:16-CV-1735-D,*
 2021 WL 75551 (N.D. Tex. Jan. 8, 2021) ........................................................ 8, 9

*SEC v. Heden,*
 51 F.Supp.2d 296 (S.D.N.Y. 1999) ......................................................................5

*SEC v. W.J. Howey Co*
 *328 U.S. 293 (1946).* .......................................................................................11

*SEC v. Lifepay Group, LLC, No. CV H-18-1098,*
 2020 WL 1259328 (S.D. Tex. Feb. 26, 2020) .......................................................6

*SEC v. Seghers,*
 298 Fed. Appx. 319 (5th Cir. 2008) ......................................................................6

*SEC v. Sethi Petroleum, LLC,*

229 F. Supp. 3d 524 (E.D. Tex. 2017) ........................................................................................3

*SEC v. Silea*,
2022 WL 269105 (E.D. Tex. Jan. 27, 2022) ...........................................................................14

*SEC v. Smart, No. 2:09-CV-00224*,
2011 WL 2297659 (D. Utah June 8, 2011) .............................................................................14

*SEC v. The Better Life Club of America, Inc.*,
995 F. Supp. 167 (D.D.C. 1998) ....................................................................................... 11-12

*SEC v. Tyler*,
2002 WL 32538418 (N.D. Tex. Feb. 21, 2002) ......................................................................12

*SEC v. Voight, CV H-15-2218*,
2021 WL 5177779 (S.D. Tex. Feb. 3, 2021) .............................................................................6

*Sierra Club, Lone Star Chapter v. FDIC*,
992 F.2d 545 (5th Cir. 1993) ....................................................................................................6

*Taylor v. Trevino*,
569 F. Supp. 3d 414 (N.D. Tex. 2021) ......................................................................................3

*United States v. Milkiewicz*,
470 F.3d 390 (1st Cir. 2006) .....................................................................................................6

*United States v. Ransfer*,
749 F.3d 914 (11th Cir. 2014) ..................................................................................................6

## Federal Statutes

## Securities Act of 1933

Section 2(a)(1)
[15 U.S.C. § 77b ....................................................................................................... 10-11

## Securities Exchange Act of 1934

Section 3(a)(10)
[15 U.S.C. § 78c(a)(10)] ........................................................................................... 10-11

Section 21(d)(5)
15 U.S.C. § 78u(d)(5) ...................................................................................................10

iv

The Securities and Exchange Commission ("SEC") submits this Reply in Support of its Motion for Appointment of a Receiver, for a Preliminary Injunction and Ancillary Relief, and to Lift Stay for Limited Purpose ("Motion"), and respectfully shows the Court as follows:

**A. The SEC Is Likely to Succeed on Its Fraud Claims**

The SEC has presented substantial evidence that Barton violated the antifraud provisions of the federal securities laws. *See, e.g.,* Motion at 4-11. Barton did not provide any evidence to contest the SEC's fraud claims in response to the SEC's first motion to appoint a receiver, and he does not do so a year later in response to the Motion.

The closest that Barton comes to challenging the SEC's fraud claims is the inaccurate statement that the SEC has not provided evidence that Barton intended to misuse investor funds at the time he entered into the loan agreements with investors. Response at 17. The SEC's evidence demonstrates that Barton raised investor funds for over two years, and that he misused investor funds throughout that period while he continued to enter into new agreements with investors. Motion at 4-11. Barton knew that he was misusing funds and not purchasing the properties as he continued to raise money from investors. *Id.* Barton's inaccurate claim also ignores the unrefuted evidence that Barton knowingly inflated the property prices at the time of the investments, provided phony guarantees to induce investments, and caused his development company to make false lulling statements to investors in furtherance of the fraud. *Id.* at 8-11.

**B. The SEC Has Satisfied the *Netsphere* factors**

1. Clear necessity

The SEC demonstrates in its Motion that a receivership is necessary to manage and protect the properties, to marshal and maximize the available assets, including by staying, defending, and pursuing claims, and to prevent the dissipation of assets. Motion at 19-20.

In response, Barton first argues the SEC has not shown a clear necessity for a receivership, because it has not shown that a receivership is necessary to prevent the "flight of assets." Barton does not define this term and it is not mentioned in *Netsphere*, much less set out as a requirement for imposing a receivership. *Netsphere, Inc. v. Baron*, 703 F.3d 296, 305 (5th Cir. 2012). The case Barton cites, *Accordant Communications, LLC v. Sayers Construction, LLC*, 2020 WL 7496657, at *3 (W.D. Tex. April 7, 2020) (Slip. Op.), also does not mention "flight of assets." In that case, the court considered whether there was a risk that assets would be "concealed, lost, or diminished in value" absent a receivership. *Id.* If that is what Barton means by "flight of assets," the SEC has presented substantial unrebutted evidence – and the Court has previously found – that such a risk is present here and that a receivership is necessary to prevent the dissipation of assets. *See e.g.,* Motion at 5-12, 20; Order Denying Motion to Stay Pending Appeal at 8 (Dkt. 132).

Barton next argues that a receiver is not necessary, because in *Netsphere* the Fifth Circuit observed that the examples the Supreme Court previously provided of the proper use of receiverships did not include cases in which a receiver was named solely to secure funds for the satisfaction of a potential later judgment. Response at 23 (citing *Netsphere, Inc.*, 703 F.3d at 305.). Yet, Barton ignores that the Fifth Circuit goes on to state that "in cases of non-compliance with SEC regulations, a receiver may be appointed to prevent the corporation from dissipating corporate assets and to pay defrauded investors." *Netsphere, Inc.*, 703 F.3d at 305; *see also SEC v. Barton*, 79 F. 4th 573, 578 (5th Cir.) (quoting this language from *Netsphere*). This is not a private action in which a plaintiff is seeking a receiver solely to secure a defendant's assets to protect a future money judgment. The SEC, pursuant to its statutory authority to seek equitable

2

relief, seeks a receivership to secure assets purchased with or that otherwise benefited from investor funds to protect investors.

Barton then concedes that courts can impose receiverships to prevent mismanagement, but he makes the unsupported and incorrect statement that courts have exclusively adopted this justification in SEC matters where the "company's owners, its shareholders, are the victims." Response at 24.  To the contrary, courts have imposed receiverships in countless SEC actions where the victims were non-owner investors, including many of the very matters that Barton cites for the contrary proposition in his Response.  *See, e.g., SEC v. Sethi Petroleum, LLC*, 229 F. Supp. 3d 524 (E.D. Tex. 2017) *aff'd* 910 F.3d 198(5th Cir. 2018) (cited by Barton) (ordering receivership where victim investors were not shareholders); *Taylor v. Trevino*, 569 F. Supp. 3d 414, 424 (N.D. Tex. 2021) (cited by Barton) (similar).  The purposes of the receiverships in those cases was, as it is here, to protect defrauded investors, irrespective of whether the defendants sold equity interests, debt interests, or another security.

2. <u>No less drastic remedy</u>

Barton proposes that an injunction against the transfer or sale of unspecified assets is a less drastic available measure, and further proposes that the Court could also stay all litigation against the assets.  Response at 25-27.[1]  This is not adequate for several reasons.  First, the properties need to be managed.  Barton cannot do this, because he is a fraudster who will continue to misuse assets, fail to pay mortgages, and leave properties in disrepair as he did before—which is how Barton's investors find themselves in this situation to begin with.  Second, some assets must be sold to generate cash to operate and protect the remaining properties.

---

[1] Barton incorrectly states that there is no evidence that Barton would violate an asset transfer injunction.  Barton makes this statement in front of a backdrop where he has repeatedly violated this Court's orders.  Thus, it is likely that he would also violate an injunction.

Again, a competent third party, not Barton, must direct this process.  Third, although Barton

would undoubtedly welcome an indefinite stay of the myriad of litigation in which he has

embroiled himself and his controlled entities, such a stay would not solve the problem.  A

receiver is necessary to independently: (a) evaluate and resolve those claims, (b) trace assets, and

(c) evaluate affirmative claims to recover assets for the benefit of investors.

3.  <u>Benefits outweigh burdens</u>

Barton argues that the benefits of the proposed receivership do not outweigh the burdens,

because *he believes* that the current Receiver is too focused on liquidating assets and is not

equipped to advance real estate development projects.  Response at 29-30.  The current Receiver

has sold assets, because (a) Barton left his controlled entities with no cash to operate or protect

the properties, and because (b) the Receiver has determined that, in a declining property market,

it is in the best interest of the receivership estate to sell certain assets to maximize their value.

The Receiver has receivership experience and has retained competent professionals.  Further,

Barton provides no support for his assertion that the Receiver and his retained professionals are

not well equipped to evaluate and advance real estate projects.  Barton also ignores the many

benefits of the proposed receivership, including that it would oust the perpetrator of the fraud

from control, put a competent independent party in place to maximize the value of the available

assets and claims for the benefit of defrauded investors, and stay foreclosures, among other

protections, that are necessary to protect the assets.  Barton's vague and unsubstantiated claims

about the Receiver's management prowess do not outweigh these concrete and critical benefits.

**C. Tracing**

Barton concedes that the SEC has established that 18 Barton-controlled entities have

received or benefitted from substantial assets traceable to Barton's alleged fraudulent activities

that are the subject of this litigation.  Response at 12.[2]  Thus, if the Court determines that the

SEC has satisfied the *Netsphere* factors, the remaining contested issued is how many – not

whether – Barton-controlled entities should be placed in receivership.

Barton largely ignores and does not object to or contest the Receiver's Declaration, which

includes evidence showing that all of the SEC's proposed receivership entities received or

benefitted from assets traceable to Barton's fraud.  That fact alone weighs heavily in favor of the

sufficiency of the evidence to place the proposed entities in a new receivership.

Barton contests SEC Staff Accountant Carol Hahn's ("Hahn") tracing analysis for

approximately ten entities.  Response at 12.[3]  First, Barton claims that the SEC did not apply the

correct governing legal standards to determine whether an entity received subject funds to justify

a receivership.  Response at 13.  The SEC applied the standard set forth in *Barton*, and included

"**entities** that received or benefitted from assets traceable to Barton's alleged fraudulent activities

that are the subject of this litigation." 79 F.4th at 580-81 (emphasis added).  Conversely, Barton

creates a new standard not articulated in *Barton* that would limit the SEC to placing entities into

receivership "only to the extent of the subject funds."  Barton does not explain what that means

or how an **entity** could be placed in receivership for only a portion of its funds, or only to the

extent of the other benefits it received.[4]

Second and third, Barton claims Hahn's tracing is deficient, because it does not identify a

---

[2] Barton says 16 entities in the text of his brief, but lists 18 entities on his referenced Exhibit B.

[3] Barton's expert only addresses seven of the 10 purportedly contested entities listed on page 18 of the Response.
Further, Barton incorrectly claims that Hahn did not attempt to trace to 57 entities listed at his Exhibit A.  Response
at 10.  Hahn's Supplement Declaration includes the nine Wall Entities plus 25 additional entities, including many of
the entities listed on Exhibit A to the response (*i.e.,* BEE2019 LLC, D4KL LLC, D4MC LLC, HR Sterling LLC,
JMJ Acquisitions LLC, JMJ Development LLC, JMJ Residential LLC, JMJ AV LLC, JMR100 LLC, Mansions
Apartment Homes at Marine Creek LLC, and WRL2019 LLC).

[4] The two cases Barton cites, *SEC v. Heden*, 51 F.Supp.2d 296 (S.D.N.Y. 1999) and *SEC v. Cherif*, 933 F.3d 403
(7th Cir. 1991), relate to asset freezes against relief defendants.  They do not address how, much less hold that, an
entity properly subject to a receivership could somehow be partially placed in receivership.

methodology accepted in the accounting profession.  Response at 13-14.  Barton misconstrues

the nature of Hahn's declaration and this proceeding.  This is not a *Daubert* hearing.  Hahn is a

summary witness; she is not proffering expert opinions that the Court must vet before they go to

a jury.  While Hahn does possess specialized knowledge in the subject matter, and her review of

Barton's financial records may have been tedious, it was not so complicated as to *require*

specialized expertise and opinions.  *SEC v. Seghers,* 298 Fed. Appx. 319, 326 (5th Cir. 2008);

*see also SEC v. Lifepay Group, LLC*, No. CV H-18-1098, 2020 WL 1259328, * 5-6 (S.D. Tex.

Feb. 26, 2020) (Slip Op.), *report and recommendation adopted,* 2020 WL 1308202 (S.D. Tex.

Mar. 16, 2020) (denying motion to strike declaration of SEC staff accountant who was not acting

as an expert and "traced the flow of funds through various entities and created a summary chart

of her finding," and made mathematical calculations in order to create a summary chart "totaling

the deposits and withdrawals related to various entities and people involved in the underlying

transactions").[5]  Further, "at the preliminary injunction stage, the procedures in the district court

are less formal, and the district court may rely on otherwise inadmissible evidence, including

hearsay evidence," and "can accept evidence in the form of deposition transcripts and affidavits."

*Sierra Club, Lone Star Chapter v. FDIC*, 992 F.2d 545, 551 (5th Cir. 1993).

In any event, Hahn did use an accepted methodology – it is called addition and

subtraction.  Hahn reviewed primarily bank records and title records, all of which have been

made available to Barton, and then summarized from those records where investor funds went

based on the face of the records.  She did not perform an audit of Barton's businesses, and was

not, as Barton appears to claim, required to employ and create workpapers using Generally

---

[5] *See also SEC v. Voight*, CV H-15-2218, 2021 WL 5177779, at *1 (S.D. Tex. Feb. 3, 2021) (Slip. Op.) (citing *Lifepay Group, LLC*, 2020 WL 1259328, at *6)*; *United States v. Milkiewicz,* 470 F.3d 390, 401 (1st Cir. 2006) (stating that IRS agent's review and summary of data contained in invoices, checks, and other routine financial records "took patience but not expertise"); *United States v. Ransfer*, 749 F.3d 914, 938 (11th Cir. 2014) (similar).

Accepted Accounting Principles ("GAAP") and Generally Accepted Auditing Standards ("GAAS"). Hahn also did not, for example, employ a specialized methodology to estimate the amount of investor funds that went to Barton's entities to overcome the limitations imposed by Barton's extensive commingling. Hahn merely reviewed and followed the documents. The Court is well equipped to evaluate and weigh Hahn's testimony in this regard.

Fourth, Barton claims that Hahn does not account for funds having nothing to do with investor funds, because Hahn assumed that all of the funds JMJ Development received were tainted funds. Response at 14. This is not correct. Hahn's summaries take into consideration that non-investor funds went to JMJ Development, where they were commingled with investor funds. This included proceeds obtained from loans secured at least in part with property purchased with investor funds. Hahn then summarized the money coming out of JMJ Development (or Carnegie Development) that was investor funds or a benefit therefrom. She based her summaries on the fact that the face of the records show: (a) there were only investor funds and/or improperly obtained loan proceeds in the account at the time of the transfer at issue; (b) there were insufficient funds in the subject account to make the transfer without investor funds or the loan proceeds; and/or (c) the transfer was made in a matching amount to a deposit of investor funds or loan proceeds.[6] Further, Barton's retained accountant recognizes that when funds are commingled, as here, it is accepted within the accounting profession that a portion of those funds are considered tainted funds. Response at 14-15. Noticeably, Barton's accountant

---

[6] There is one exception, which relates FHC Acquisition. On October 26, 2018, there were two separate $100,000 transfers to JMJ Development, one from Carnegie Development and one from JMJAV. The Carnegie Development transfer included investor funds, but not the JMJAV transfer. The same day, JMJ Development transferred $100,000 to Chicago Title of Texas. As a result of the commingling, in that case Hahn cannot be certain from the face of the bank records that the $100,000 included investor funds. However, Hahn reviewed related emails that characterized the funds to Chicago Title of Texas as being from the funds transferred by Carnegie Development.

takes issue with the reliability of Hahn's methodology but does not contest Hahn's transaction summaries or provide his own analysis of the tainted funds that JMJ Development disbursed.

Fifth, Barton claims that Hahn's analysis violates professional accounting standards because it makes no effort to trace the investor funds into surviving property in a proposed receivership entity. Response at 15. Again, Hahn has not audited Barton's entities under GAAP and GAAS. She summarized the flow of funds primarily through the date of the records that were available to the SEC before it filed this action and the case was stayed. In several cases, these summaries show investor funds or an associated benefit surviving in an account or property held by a proposed receivership entity. The Receiver's tracing then encompasses and continues after Hahn's time period, and, with rare exception, traces investor funds or an associated benefit to a surviving account, property, or claim held by a proposed receivership entity.

Further, Barton's argument on this point is also misplaced, because the Fifth Circuit directed that entities that received or benefitted from investor funds could be placed in receivership. *Barton*, 79 F.4th at 580-81. It did not hold that the SEC must further demonstrate that the funds can be traced into a surviving property held by that entity. *Id.*; *see also SEC v. Faulkner*, No. 3:16-CV-1735-D, 2021 WL 75551, at *5 (N.D. Tex. Jan. 8, 2021) ("[T]he SEC is not required to trace wrongfully-obtained funds to an identifiable *res* in the defendant's possession in order to obtain disgorgement").[7]

Sixth, Barton claims that Hahn's analysis does not address permitted uses of the loan proceeds. Response at 16. This is not true. The investment agreements at issue ("Loan

---

[7] Barton also claims that Hahn did not take into account that the HUD apartment complexes were net income producing and their expenses were financed with HUD loans, or that third-party financing was used to purchase the FHC Acquisitions property in Frisco. Response at 15. Hahn is aware of these facts, but the fact that the apartment complexes generated income that did not benefit investors and FHC Acquisition purchased the underlying property with a loan does not change that the records show these entities received or benefitted from investor funds.

Agreements") make clear that the only permitted use of investor funds was to purchase the property specified in the Loan Agreement. Motion at 5-6. Barton was not authorized to use investor funds for development expenses, much less development expenses related to properties held by his other entities. The SEC also does not dispute that more than $26 million flowed through the Wall Entities, including because money was round-tripped and loan proceeds secured by properties purchased with investor funds were deposited in Wall Entity bank accounts and then disbursed and misused. However, none of this changes that Barton misused substantially all of the $26 million raised from investors.

Seventh, Barton claims that Hahn's analysis does not address the documentation of any transfers to other corporate entities in the accounting records of the Wall Entities and their managing member, Carnegie Development LLC. Response at 16. The SEC does not understand the point Barton tries to make here. Once again, Hahn did not audit Barton's companies. Hahn based her summaries on financial records showing actual transactions. She did not rely on summaries in Barton's own QuickBooks records, which only show how Barton chose to code (or miscode) his fraudulent transactions.

### D. A Preliminary Injunction is Warranted.

Barton agrees that an injunction against asset transfers is appropriate in this case. Response at 31. However, Barton argues that the injunction should be limited to the 18 entities that he has identified that he concedes received investor funds.

Barton claims that the SEC's requested injunction is too broad because the facts of *FDIC v. Faulkner*, 991 F.2d 262, 264 (5th Cir. 1993) are distinguishable. Barton relies on the fact that the defendant in *Faulkner* was convicted of a crime and the FDIC was seeking relief under a different statute. However, those attempted distinctions do not go to the breadth of the

injunction (*i.e.,* why is enjoining 18 entities proper but not more) and ignore that the SEC has statutory authority to seek broad equitable relief under Section 21(d)(5) of the Securities Exchange Act of 1934. 15 U.S.C. § 78u(d)(5). Barton also fails to acknowledge that the Fifth Circuit stated in *Barton* that the SEC could have sought *in this case* an "injunction freezing asset transfers while it trace[s] the funds and determine[s] which entities should be placed in the receivership." *Barton*, 79 F.4th at 580.

Barton then faults the SEC for not tracing the proceeds of Barton's fraud sooner and takes the SEC to task for requesting more time to do so. However, the SEC's and the Receiver's tracing efforts are not complete, because Barton extensively commingled funds to obfuscate his misconduct and has since refused to cooperate in untangling the knot he tied. Notably, Barton has not provided the accounting and other information required by the Receivership Order. Receivership Order at ¶¶ 7-12. (Dkt. 29) The mere fact that Barton produced some company documents and sat for testimony during the SEC's pre-suit investigation did not put the SEC in a reasonable position to complete tracing of the funds that he commingled over the course of years and potentially disbursed by and among more than 160 entities Barton controls.

Finally, Barton claims that any injunction must include a carve-out to permit him to pay his lawyers. Response at 28. However, the SEC is not seeking to put Barton in receivership or enjoin his use of any of his own funds. Barton provides no authority for the proposition that he should be able to use assets of business entities to pay personal legal fees. In any event, any request for a carveout for attorneys' fees in this case is at best premature. Barton is represented by competent counsel who continues to actively defend him in this case.

### E. The Loan Agreements Are Securities.

Barton argues that he was not offering and selling securities. He is wrong. Section

2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act define "security" to include, among other instruments, any "investment contract" or "note." 15 U.S.C. § 77b(a)(1); 15 U.S.C. § 78c(a)(10).

With the exception of a footnote, Barton ignores that the Loan Agreements are investment contracts. In *SEC v. W.J. Howey Co.*, the Supreme Court held that an investment contract exists where (1) a person invests his or her money, (2) in a common enterprise, and (3) with the expectation of profits to be derived solely from the efforts of the promoter or a third party. 328 U.S. 293, 298-99 (1946). The definition of a security "embodies a flexible rather than static principle, one that is capable of adaptation" and requires an analysis into the substance rather than the form of the transaction with an emphasis on economic reality. *Id*.

The Loan Agreements satisfy the *Howey* test. First, investors wired cash to accounts controlled by Barton. Second, they invested in a "common enterprise," because their money was *pooled* with other investors *and* their fortunes were entirely dependent on the efforts and expertise of Barton and Stephen Wall, which more than satisfies the "broad vertical commonality" required in the Fifth Circuit. *Long v. Shultz Cattle Co.*, 881 F.2d 129, 140-41 (5th Cir. 1989). Third, the investors' role in the investment was entirely passive and they expected to realize profits based solely on Barton's and Stephen Wall's efforts to identify, purchase, and develop the properties and operate the Wall Entities in a manner that enabled them to pay interest (*i.e.*, profit) on the loans. *See SEC v. Arcturus Corp.*, 928 F.3d 400, 409-10 (5th Cir. 2019) ("courts find the third Howey factor met if the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise") (internal quotes omitted); *see also SEC v. The Better Life Club of America, Inc.*, 995 F. Supp. 167, 173-174 (D.D.C. 1998), *aff'd*, 203 F.3d 54 (D.C. Cir. 1999)

11

(holding loan agreements in which investors contributed funds to common enterprise with expectation of receiving profits based solely on the efforts of the promoters were securities and finding it "hard to imagine a more perfect example" of an "investment contract").

The Loan Agreements are also securities because they are "notes."  "The Supreme Court has held that the definition of 'note' may 'be viewed as a relatively broad term that encompasses instruments with widely varying characteristics,' and as with the term 'security,' the definition of 'note' looks to the economic reality and surrounding circumstances of a transaction." *SEC v. Tyler*, 2002 WL 32538418, at *3 (N.D. Tex. Feb. 21, 2002) (citing *Reves v. Ernst & Young*, 494 U.S. 56, 59 (1990)).[8]

A note is presumed to be a security unless it bears a "family resemblance" to certain judicially crafted exceptions of notes that are not securities. *Id*. at 66-70.  The Loan Agreements do not bear a sufficiently strong family resemblance to the judicially-created list of non-securities, and Barton does not claim that they do.

If a note does not bear a strong family resemblance to one of the judicially crafted exceptions, a four-factor test is used to determine whether the notes should be added to the judicially crafted exceptions.  The four factors articulated by the Supreme Court in *Reves* look to: (1) the motivations that would prompt a reasonable buyer and seller to enter into a transaction; (2) the plan of distribution of the instrument; (3) the reasonable expectations of the investing public; and (4) whether there is any risk-reducing factor, such as the presence of another regulatory scheme.

With regard to the first factor, *Reves* states that a note is more akin to a security "if the

---

[8] Although not titled as "notes," the Loan Agreements included a promise to pay along with all the material terms evidencing the obligation to repay the promised amounts (including the amounts owed, interest rates, and maturity dates), and Defendants marketed them as notes. *See, e.g.,* Wall 19 Subscription Agreement at 1 ("I hereby subscribe to the Note (promissory note) as co-lender.").  (App. 57)

seller's purpose is to raise money for the general use of a business enterprise or to finance substantial investments and the buyer is interested primarily in the profit the note is expected to generate" as opposed to the note being exchanged for the purchase or sale of a minor asset or consumer good, to correct cash flow difficulties or to advance some sort of consumer purpose. *Id*. at 66.  Here, Defendants offered the Loan Agreements to purportedly purchase a substantial investment – real property for each of the Wall Entities – and investors were primarily interested in the profit from these investments.

The second *Reves* factor also supports that the Loan Agreements are securities, because they were "offered and sold to a broad segment of the public." *Id*. at 68.  Defendants widely solicited Chinese investors, including via large group presentations, and ultimately sold the notes to over 100 investors.

The third *Reves* factor also supports that the notes are securities, because a reasonable member of the investing public would consider them a passive investment. *Id*. at 68.  The notes make clear that the purpose of the investment was to generate returns for investors through the Wall Entities' efforts to acquire real estate for development.  Further, and contrary to Barton's assertion, Defendants actively marketed the notes as passive investments to *investors*.  *See, e.g.,* Wall 10 Investor Presentation (repeatedly referring to the investment, including "investment highlights," "investment objective," "investment fund," "investment period," "investor(s)" in Wall010, and "investors" as the source of funds).  (App. 66-109)

The fourth *Reves* factor also supports that the notes are securities, because there is no regulatory scheme that would significantly reduce the risk of the investments offered.

Finally, the case that Barton relies on, *Kirschner v. JP Morgan Chase Bank, N.A.*, 79 F.4th 290 (2d Cir. 2023), is inapposite.  That case relates to a $310 million syndicated loan

between institutional banks and a drug company and not individual investment notes widely offered to retail investors. *Kirschner*, 79 F.4th at 296. There, unlike here, the complex syndicated loan was offered to a small group of sophisticated institutional entities and was unassignable, the sophisticated lenders signed certifications indicating they did not perceive the loan as a security, and bank regulators issued specific guidelines for syndicated term loans that reduced the risk of the loans. *Id.* at 306-311.

For all these reasons, the Loan Agreements are securities. *See also SEC v. Smart*, No. 2:09-CV-00224, 2011 WL 2297659, at 12-14 (D. Utah June 8, 2011) (note agreements that pooled investor funds and promised fixed returns were securities as either investment contracts or notes).

### F.  Sworn Accounting

Barton argues that he should not be required to provide a sworn accounting, because it may incriminate him. Response at 32-33. If Barton refuses to provide an accounting on these grounds, Barton should be required to make a Fifth Amendment assertion, and the SEC should receive an adverse inference from that assertion, at the Court's discretion. *See Farace v. Independent Fire Ins. Co.*, 699 F.2d 204, 210 (5th Cir. 1983); *SEC v. Silea*, 2022 WL 269105, at *12 (E.D. Tex. Jan. 27, 2022).

### G.  Response of Max Barton

Barton's son, Maximilien Barton ("Max Barton"), also filed a separate response to the Motion on behalf of himself and Gillespie Villas LLC, Venus59 LLC, TRTX Properties LLC, MXBA LLC, Titan Investments LLC, TC Hall, LLC, and Titan 2022 Investment, LLC ("Max Barton Entities"). (Dkt. 326)

14

Max Barton seeks to exclude the Max Barton Entities from the proposed receivership and argues those entities should be held to a different standard because they are non-parties.  Max Barton Response at 2.  However, the Court has previously found that Barton controls the Max Barton Entities.  Order Granting Receiver's Motion to Supp. Order Appointing Receiver at 6, 11. (Dkt. 88)  For purposes of determining their inclusion in the proposed receivership, the Max Barton entities should therefore be treated the same as the other Barton-controlled entities.

Further, in *Barton*, the Fifth Circuit stated that, "should the district court decide that a new receivership is justified on remand, it can only extend over entities that received or benefitted from assets traceable to Barton's alleged fraudulent activities that are the subject of this litigation."  279 F.4th at 580-581.  In his response, Max Barton argues that a different standard should apply.  Specifically, Max Barton contends that the receivership may only extend to entities that are *currently in possession* of assets traceable to the alleged fraud.  Response at 4-5.  As discussed above at pages 7-8, the *Barton* opinion does not impose this requirement, and in any event, the Receiver, with rare exception, does trace investor funds or an associated benefit to a surviving account, property, or claim held by the proposed receivership entities.  The Receiver's tracing includes the Max Barton Entities.  *See* Declaration of Cort Thomas at ¶¶ 163-178 (Dkt. 308).

## CONCLUSION

For the foregoing reasons, the SEC respectfully requests that the Court grant the SEC's motion and grant the SEC such other or further relief as this Court may deem just, proper, and equitable.

Dated: October 9, 2023

Respectfully submitted,

/s/ *Keefe M. Bernstein*
Keefe M. Bernstein
Texas Bar No. 24006839
James E. Etri
Texas Bar No. 24002061
Securities and Exchange Commission
801 Cherry Street, Suite 1900
Fort Worth, Texas 76102
(817) 900-2607 (KMB phone)
(817) 978-4927 (facsimile)
bernsteink@sec.gov

Counsel for Plaintiff
Securities and Exchange Commission

**CERTIFICATE OF SERVICE**

I affirm that on October 9, 2023, I caused the foregoing to be electronically filed with the Clerk of the Court for the Northern District of Texas, Dallas Division, by using the CM/ECF system which will send a notice of electronic filing to all CM/ECF participants.

*/s/ Keefe M. Bernstein*
Keefe M. Bernstein

17