aniel Crow
700 Rec...26...18-Dr.
llas, TX 75204

Judge Brantley Starr
1100 Commerce St.
Room 1452    Dallas, TX 75242
Courtroom 1525   Letter Designation (X)

U.S. POSTAGE PAID
PM
DALLAS, TX 75219
OCT 06, 2023

Retail

RDC 03    1 Lb 2.00 Oz    R2305M145164-70

75242    $9.80

EXPECTED DELIVERY DAY: 10/07/23
USPS TRACKING® #

9505 5110 2184 3279 9807 82

From: Daniel Crow

danielhcrow@gmail.com; 214-263-8704; 3500 Rock Creek Dr., Dallas, Texas 75204

To: Judge Brantley Starr

1100 Commerce Street, Room 1452, Dallas, TX 75242

Courtroom 1525 with Case Letter Designation (X)

Case 3:22-cv-02118-X; Filed 09/23/22; Primary Plaintiff: Timothy Barton; UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF TEXAS DALLAS DIVISION

### Motion for Hearing regarding Venus59LLC

I request a hearing for myself, Daniel Crow, regarding the management of Venus59LLC, an entity that is part of the Timothy Barton Case. If a hearing requires a second individual, I request that it include a Receiver of the Timothy Barton Estate, such as Cort Thomas.

Assets of the entity entail 2 parcels totaling 62 acres next to the municipality of Venus, Texas. The entity is owned 60% by myself and 40% by the Bartons, primarily Max Barton. Max Barton was the manager until I brought the existence of the LLC to the attention of the Receiver. Since then, the LLC has been in receivership and, assumedly, the Receiver has been acting manager.

I will be requesting that the Court grant me management of Venus59LLC and make a formal declaration of that decision. I will also make smaller, related requests, such as changing the principal place of business of the LLC to my office address for mailing purposes.

This letter contains:

-Copy of Operating Agreement

-Copy of letter (with additions in red) sent to the court August 19 with no response.

I have the authority to take control of Venus59LLC based on the Operating Agreement; based on the Receiver not fulfilling the duties of manager; and based on owning over 50% interest in the LLC and being outside of Barton influence. In truth, the LLC no longer meets the requirements for being in Receivership.

I look forward to addressing the court,

-Daniel Crow

Submission to: United States District Court Northern District of Texas Dallas Division

to Hon. Judge Brantley Starr regarding case#3:22-cv-02118-X

Plaintiff: Securities and Exchange Commission v. Defendant: Timothy Barton

<u>Majority Shareholder Requesting to Regain Control of Venus 59, LLC</u>

August 19, 2023

Daniel, maybe check titles for liens before pulling this llc from receivership;
Starr_Orders@txnd.uscourts.gov

On August 14, I informed the Court Appointed Receiver, The Court, Maximilian Barton, and Timothy Barton that I am taking management of Venus59LLC on September 13, 2023. This power is explicitly stated in section 6.14 of the LLC Operating Agreement copied here:

> **Sale of Paper Lots.** Unless otherwise consented to by all Members including where the Members have agreed to perform Horizontal Construction, the Manager shall cause the sale and closing of the Paper Lots at fair market value on an arms-length transaction basis subject to commercial reasonable terms to a third party that is not related to any Member ("Sale Parameters") and shall ensure that at least fifty (50%) of the Paper Lots or total acreage of the Property is sold on or before the expiration of two (2) years following the closing of all Property ("Sales Objective"). Regardless of any conflict in this Agreement, **in the event that Manager fails to achieve the Sales Objective, the Manager may be removed and replaced by a Majority of the Members following thirty (30) days' written notice during which period the Manager fails to cure and meet the Sales Objective.** So long as Manager enters into a purchase contract on behalf of the Company and closes on the sale of Paper Lots in accordance with the Sale Parameters, then the Members shall not unreasonably withhold or delay any required consent to the sale and otherwise, such consent shall be deemed given.

**Introduction**

My name is Daniel Crow. On August 31, 2021 I signed the Operating Agreement with the Bartons for Venus59LLC with the intent to purchase 2 parcels of land and develop. I contributed 106% of the funds necessary to purchase the land (1.059M) in exchange for 60% interest in this newly formed, clean LLC. I checked the titles of the two properties and confirmed they were free of all liens and I wired my funds directly to the two escrow accounts. The titles were placed under the ownership of Venus59LLC. There is no evidence that the Bartons contributed any of their promised capital or conducted any engineering work on the property except a preliminary plat map. When I learned that the Barton Family Estate had been placed under court ordered receivership, I contacted the Court Appointed Receiver and made the Receiver aware of Venus59LLC and fully cooperated with Receiver and SEC.

I am not under any influence from the Barton Family and have never received any payment of any kind from the Bartons. As Manager of Venus59LLC, I intend to work with the controlling party of the Barton Estate, which appears to be the Court and Court Appointed Receiver.

**Failings of the Receiver**

One year ago, the Receiver took management of the Venus59LLC. Since that time, the Receiver has issued no Quarterly Reports or other updates. What's more, Receiver has made no effort to sell or develop the parcels. The brick house on the property sits unlocked and neighbors complain the front porch is crammed with trash. The Receiver has not been fulfilling the duties as Manager.

The Receiver never sent me a form for damaged parties connected to JMJ or the Bartons, even when I explicitly request the form. What's more, the Receiver has verbally stated on many occasions that the Receiver considers my interests to be a debt position. This leaves me to believe that the Receiver only intends to return to me my original investment and not any profits if the property sells for more than purchased. It is clear that the Receiver does not intend to conduct business with fiduciary duty to my interests.

I believe my interests are best served through the LLC Operating Agreement where I am considered an equity holder.

The Receiver does not have the authority to supersede the Operating Agreement or control an LLC that contains a majority interest member who contributed nearly all capital and that majority interest member, myself is outside the Bartons' control. Thusly, my potential management of the LLC would not pose any threat to the interests of the receivership.

**Plan Moving Forward**

I intend to work with the Court Appointed Receiver and conduct the business of Venus59LLC to the best interests of both parties. Unless I am told otherwise, I believe the best interest of both parties is to liquidate the holdings and wind down business.

Both parcels will be listed FSBO. All communication with potential buyers will include the Receiver and any other party the Receiver requests. This will be achieved by including the Receiver in all emails with potential buyers and providing copies of any text messages.

Once multiple offers are made, the best offer will be accepted. The LLC will then be wound down following the Operating Agreement.

If both parties think it is in their best interest to develop the property, then we can come up with a development agreement. However, it would still be necessary to list the property FSBO in order to determine Fair Value.

**Requests to the Court**

I am requesting that the court allow me to fund Venus59LLC up to $5,000 in exchange for zero equity but have my $5,000 contribution be returned to me once all members have their Principal returned to them. This funding will allow me to list the property for sale FSBO and make any emergent repairs that could lead to property damage on the house that sits on the smaller parcel.

Further, I request that the Court do one of two things:

1. Remove Venus59LLC from the Receivership. The Barton's 40% interests would still be controlled by the receiver.

2.  Leave Venus59LLC in receivership but formally recognize Daniel Crow as Manager and not interfere with the sale of the real estate in such a manner as to scare away potential buyers.

Thank you for the Court's consideration,

-Daniel Crow,    danielhcrow@gmail.com

214-263-8704

3526 Arrowhead Drive

Dallas, Texas 75204

## FUNDING AGREEMENT

This Funding Agreement ("**Agreement**") is entered into on this 31st day of August 2021 ("**Effective Date**"), by and between **Daniel Crow** ("**Crow**") and/or his assigns and **Venus59, LLC** ("**Company**") (collectively, "**Parties**") as consented to by One SF Residential, LLC ("**OSFR**") (as the manager and a member of the Company) and MXBA, LLC ("**MXBA**") (collectively, "**Members**") as the members in the Company.

## RECITALS

WHEREAS Company is under contract ("**59 Acre Contract**") to acquire approximately 59 acres of land in Venus, Johnson County, Texas ("**59 Acres**") which is due to close ("**Closing**") on August 31, 2021 ("**Closing Date**").

WHEREAS Company is also under contract ("**3 Acre Contract**" with the 3 Acre Contract and 59 Acre Contract referred to collectively as the "**Purchase Contract**") to purchase a 3.44 acre adjacent tract of land in Venus, Johnson County, Texas ("**3 Acres**" with the 59 Acres collectively consisting of 62.4 acres being the "**Property**") which will close simultaneously with or shortly after the Closing of the 59 Acre Contract. (see Exhibit "A").

WHEREAS Company intends to preliminary plat the Property into residential subdivision known as Mustang Meadows consisting of approximately 304 50 ft. single family lots or approximately 379 40 ft single family lots (or mix thereof) and associated street rights-of-way, detention areas and common area amenities which Company intends sell or otherwise perform such horizontal development as necessary to develop the Project for the purpose of selling developed lots to home builders to the extent agreed to by the Members.

WHEREAS Company seeks certain equity funding for the purchase of the Property;

WHEREAS the Parties agree that Crow shall provide certain equity funding on the terms provided herein including such supplemental terms attached as Exhibit "B" for the purpose of Closing the Purchase Contract and other specified costs upon which Crow shall be granted certain membership interests in the Company and admitted into the Company as defined in this Agreement upon the terms stated in the *Amended and Restated Company Agreement* ("**Company Agreement**") as attached hereto and under which Crow shall have certain consent rights to approve certain major decisions of the Company.

## AGREEMENT

NOW, THEREFORE, for valuable consideration the sufficiency and acceptance of which is acknowledged by the Parties, the Parties hereto agree as follows:

1. **Equity Funding by Crow.** Crow shall contribute a total of $1,098,675.36 as follows and as further described on Exhibit C as attached hereto: (i) $744,985.56 towards the closing of the 59 Acre Contract ("**59 Acre Closing Balance**") (ii) $254,220,80 towards the closing of the 3 Acre Contract ("**3 Acre Closing Balance**"), (iii) $36,860.00 for expenses incurred but which remain unpaid related to the Property ("**Unpaid Expenses**" with the 59 Acre Closing Balance and 3 Acre Closing Balance being referred to collectively as, "**Initial Contribution**") and (iv) $21,924.64 ("**Additional Crow Contribution**" with the Initial Contribution collectively, "**Crow**

Contributions"). as a required additional contribution to be used towards the $62,600.00 ("**Estimated Costs**") for estimated costs to complete the Paper Lots (defined below)

2.   **Equity Funding by MXBA and OSFR.** MXBA, including through is related entities, has made certain deposits and paid certain extension fees related to the closing of the Property, paid certain fees and other costs related to the Property, and has paid invoices on behalf of the Company as related to the Property totaling $81,653.65 (as further described on Exhibit C as attached hereto), copies of which shall be made available to Crow upon request, and all of which shall be treated as the initial capital contributions of MXBA in the Company Agreement. Additionally, MXBA shall be required to make an additional capital contribution of $40,675.36 ("**MXBA Additional Contribution**") to be used to pay the remaining Estimated Costs. OSFR, which is the manager of the Company, has contributed $10.00 as its total required capital contribution to the Company in exchange for its one percent (1%) membership interest.

3.   **Membership Interests.** In exchange for the Crow Contributions, Crow shall be granted sixty percent (60%) of the total outstanding membership interests in the Company with all profit and losses being allocated likewise under the terms of the Company Agreement of the Company the form attached hereto as Exhibit D. No preferred return shall be paid on any contributions by the members in the Company unless otherwise agreed to by all members.

4.   **Delivery of Crow Contributions.** Crow shall deliver (i) the 59 Acre Closing Balance on August 31, 2021 to the applicable Title Company which shall be held in escrow and applied at closing of such contract, (ii) the 3 Acre Closing Balance on or before the date the 3 Acre Contract closes to the applicable Title Company which shall be held in escrow and applied at closing of such contract,  (iii) the Unpaid Expenses to the Company within seven (7) days following the closing on the 59 Acre Contract, (iv) the Additional Crow Contribution to be used towards the Estimated Costs as determined by the Company prior to such costs becoming due. No part of the Initial Contribution may be refunded or returned to Crow unless either (1) Company fails to close on either the 3 Acre Contract or 59 Acre Contract including as may be extended upon the agreement of the applicable seller(s) or (2) Company's material default of this Agreement prior to closing of the Purchase Contract which is not otherwise cured as provided herein.

5.   **Use of Proceeds.** The Crow Contributions and the MXBA Contributions shall be used by the Company as described in Exhibit C. Upon the Closing and the application of the Crow Contributions, Crow will be (i) deemed to have delivered his required contributions under the Company Agreement to the Company, (ii) shall be granted sixty percent (60%) of the total outstanding membership interests in the Company, and (iii) shall be admitted as a member into the Company upon terms as stated and agreed to by Crow in the Company Agreement with all rights and obligations as agreed to therein.

6.   **Development of the Property.** Company shall perform all work necessary in order to create a preliminary plat of property designating single family residential subdivision and creating "paper lots" that may be sold to and/or developed by a third party land development company(ies) and/or home builder(s). OSFR as manager of the Company shall close on the sale of at least 50% of the paper lots or the total acreage of the Property within two (2) years following the closing of the entire Property as further described in the Company Agreement. Upon terms agreed to by Crow, MXBA, and OSFR, the Company may perform horizontal development on the Property in order to develop the Paper Lots into single family lots in a form ready for vertical construction and

which may be sold to third party home builders ("Horizontal Development") as further described in the Company Agreement.

7. **Development Costs and Fees.** No separate development fees shall be paid or earned by any member of the Company including their related persons and entities for the creation of Paper Lots. In the event Crow, MXBA, and OSFR agree to perform the Horizontal Development, a related entity of MXBA and/or OSFR may be utilized to perform such development work and shall be paid a development fee of three percent (3%) of the total costs of development.

8. **Company Agreement.** The execution of the Company Agreement shall not be effective or binding against the parties or the members and managers therein until the Closing of the Purchase Contract, provided that if the transaction contemplated in the 3 Acre Contract fails to close for any reason other than due to the action or inaction of Crow, the parties shall enter into the Company Agreement with the sole modification thereto being the reduction of Crow's membership interest set forth on Exhibit A thereof to 55%, together with modification of the other members' membership interests set forth thereon on a pro rata basis.

9. **Management.** As provided in the Company Agreement, OSFR is the current manager of Company and shall continue to serve as the manager and will control the day-to-day operations of Company subject to certain consent and removal rights of Crow and subject to the consent rights of all members for certain major decisions including but not limited to approving Company budgets, spending funds in excess of such budgets, execution of contracts beyond an agreed to amount, major debt financing, admission of new members/investors not otherwise agreed to herein, sale and/or development of the Property, and other major decisions to the extent provided in the Company Agreement.

10. **Distributions**. Allocation of all profits and losses in the Company shall be made in accordance with the percentages of each member in the Company in accordance with Exhibit A as attached to and incorporated into the Company Agreement and as such, Crow shall be allocated sixty percent (60%) of all such profits and losses.

11. **Termination.** This Agreement may be terminated only upon (1) the consent of the Parties or (2) upon a material default of this Agreement including any related agreement as attached hereto which is not cured within three (3) days (or such longer period as otherwise provided herein) following written notice from the non-breaching party (except where the default is the failure to provide the equity funding upon which Company may terminate immediately without providing any opportunity to cure.) Otherwise, this Agreement shall terminate upon the closing of the Purchase Contract and application of the Crow Contribution to the Company upon which the Company Agreement shall survive, shall become effective, and shall govern the relationship between the Parties subject to the representations of the Parties made herein and any other provisions which expressly survive termination. The termination of this Agreement prior to Closing of the Purchase Contract shall operate as a termination of the Company Agreement.

12. **Disclosure.** Crow has performed all necessary due diligence in order to enter into this Agreement including but not limited to reviewing the Purchase Contract and all related documents and the Company Agreement and is entering into this Agreement on its own accord independently of and without reliance on any statements or representations made by Company or any person or entity related thereto and as such neither Company or its related entities or persons makes any representations or warranties related to the transactions described in this Agreement and as such

expressly disclaims any and all implied warranties and representations to the maximum extent permitted by applicable law.

13. **Valid and Binding Obligation.** This Agreement along with the Amended and Restated Company Agreement (once effective), Supplemental Terms and any related agreements or documents thereto, constitute valid and binding obligations of Company and Crow enforceable in accordance with their terms.

14. **Title to Property.** Upon closing, Company shall own full legal and equitable title to the Property as provided in the warranty deed granted to Company at Closing only subject to the exceptions listed on the Title Commitment and/or exceptions of record as recorded in the real property records of Johnson County, Texas the rights and obligations under which shall be superior to this Agreement and shall not sell, pledge, or encumber the Property without consent of Crow as further provided in the Company Agreement.

15. **Default.** Any material breach of the terms, covenants, representations, or warranties in this Agreement shall constitute an "Event of Default" hereunder by either Party which, unless otherwise stated herein, is not cured within three (3) days following the receipt of written notice shall be an immediate default.

16. **Authorization.** This Agreement shall serve as authorization to the Title Company to apply the Crow Contribution held in escrow to the Purchase Price and applicable closing costs at Closing of the Purchase Contract and to refund any amounts remaining in escrow to Crow after Closing as further described in section 3 without any other authorization.

17. **Remedy.** Upon an Event of Default a non-defaulting Party may extend the cure period as necessary for a defaulting Party to cure such default or else may terminate this Agreement and be entitled to pursue its actual damages but in no event shall it be entitled to receive any consequential damages, special damages, punitive damages, or lost profits or revenues or the like even if the party has been advised of the likelihood of the occurrence of such damages (except where such default is the result of fraud, willful misconduct, or any criminal conduct) or be entitled to specific performance.   NOTWITHSTANDING ANY TERMS HEREOF TO THE CONTRARY, NEITHER THE COMPANY NOR ANY MEMBER THEREOF SHALL HAVE ANY REMEDY AGAINST CROW, IN DAMAGES OR OTHERWISE, DUE TO THE FAILURE BY CROW TO DELIVER THE 59 ACRE CLOSING BALANCE ON OR BEFORE THE CLOSE OF BUSINESS ON AUGUST 31, 2021. UPON ANY SUCH FAILURE, THE COMPANY'S SOLE REMEDY WILL BE THE TERMINATION OF THIS CONTRACT, WITH NO FURTHER OBLIGATIONS HEREUNDER BY ANY PARTY.

18. **Supplemental.** This Agreement is subject to the supplemental terms attached hereto as Exhibit E which are incorporated hereto by reference and any acquisition of any membership interests in Company and the admission of Crow as a member shall be governed by the terms of the Company Agreement which shall be interpreted in conjunction with this Agreement and in the event of any conflict between this Agreement and the Company Agreement then the Company Agreement shall control unless otherwise stated herein.

19. **Broker/Referral Fees.** No broker, agent, or similar party is entitled to any referral or broker fee as related to this Agreement.

20. **Intentionally Omitted.**

21. **Time of Essence.** Time is of the essence in performance of this Agreement by the Parties.

22. **APPLICABLE LAW. THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS AND THE LAWS OF THE UNITED STATES APPLICABLE TO TRANSACTIONS WITHIN SUCH STATE WITH EXCLUSIVE FORUM AND JURISDICTION BEING IN THE COURTS OF DALLAS COUNTY, TEXAS.**

23. **Notices.** All notices by Crow to Company pursuant to any provisions of this Agreement must be in writing. Such notices shall be given at such addresses as provided by each party to one another by personal delivery, expedited delivery service with proof of delivery, registered or certified mail, return receipt requested, or by email transmission (provided that such email transmission is confirmed by any other method of notice provided herein or delivery confirmation of such email along with a read receipt is received by the sending party) Any such notice or communication shall be deemed to have been given and received either at the time of personal delivery; in the case of expedited delivery service or mail, as of the date of deposit with a reputable overnight courier service or an official depository of the United States Postal Service; or in the case of an email transmission, upon receipt.

24. **Miscellaneous.** In case any of the provisions of this Agreement shall for any reason be held to be invalid, illegal, or unenforceable, such invalidity, illegality, or unenforceability shall not affect any other provision hereof, and this Agreement shall be construed as if such invalid, illegal, or unenforceable provision had never been contained herein; provided, however, if the disregard of such provision would frustrate the intent and purposes of this Agreement, either Party may petition any court having jurisdiction in equity to render a judgment modifying the disregarded provision of this Agreement so as to carry out such intent and purposes. Except as otherwise provided herein, no provision of this Agreement may be modified, waived, or terminated except by instrument in writing executed by the party against whom a modification, waiver or termination is sought to be enforced. Except as otherwise provided herein, in the event of any conflict between this Agreement and any other documents, then this Agreement shall control except for the Company Agreement in which case the Company Agreement shall control. This Agreement may be executed in counterparts, all of which taken together shall constitute one agreement.

*[Signature Pages to Follow]*

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the Effective Date.

**CROW**

By: _Daniel Crow_                              25 Aug 20
Name: Daniel Crow

**COMPANY**

Venus59, LLC

By: _____
Name: Maximilien Barton
Its:      President

*[Consent Pages to Follow]*

Funding Agreement – Crow & Venus 59, LLC                                        5

As consented to by MXBA, LLC

By:

Name: Maximilien Barton
Its:    President

As consented to by One SF Residential, LLC

By:

Name: Maximilien Barton
Its:    President

6

## EXHIBIT A
## Purchase Contract and related Documents

[See Attached]

## CONTRACT FOR SALE AND
## PURCHASE OF UNIMPROVED
## REAL PROPERTY

**THIS CONTRACT** is made and entered into by and between JMJ Acquisitions, LLC, and or assigns (the "Purchaser" or "Buyer") and  Johnston & Associates, LLP & Frank Carvalho(the "Seller").

### WITNESSETH:

**WHEREAS**, Seller is the owner of that certain parcel(s) of real property containing approximately 59 +/- acres located along the east side of CR 214 between Student Dr., and Vista Dr., in an unincorporated Johnson County, Texas, (the "Property"), and being more particularly described on Exhibit "A" (including Legal Description) attached hereto and made a part hereof by reference for all purposes; and

**WHEREAS**, Purchaser is desirous of purchasing the Property, subject to the conditions and the other agreements hereinafter set forth, and Seller is agreeable to such sale on the terms, conditions and agreements set forth herein.

**NOW, THEREFORE**, in consideration of the premises and the respective undertakings of the parties hereinafter set forth, the receipt and sufficiency of which consideration is hereby acknowledged, it is hereby agreed as follows:

1.    **Sale of Property.** Seller shall sell the Property to Purchaser, and Purchaser shall purchase the Property from Seller, together with, but without warranty and in its AS-IS condition, all and singular the rights and appurtenances pertaining to the Property, if any, including any mineral rights(other than oil and gas mineral right that are reserved to the Seller) , title and interest of Seller in and to inclusive streets, alleys, strips and gores, and rights-of-way, together with improvements, fixtures and personal property, development plans and approvals, if any, owned by Seller and situated on or attached to the Property, for the sum equal to Seven Hundred Eight Thousand Dollars  ($708,000.00) Dollars, (the "Purchase Price). If there is any discrepancy on survey to the available 59 acres, the Purchase Price will be adjusted based on Twelve Thousand Dollars ($12,000,00) per acre.

2.    **Conveyance of Property.**  Seller shall convey the Property to Purchaser at the Closing subject to all liens, encumbrances, conditions, easements, assessments, leases and restrictions (the "Permitted Exceptions"), which are the exceptions as may be approved, or deemed approved, by Purchaser in accordance with the terms hereof.  Deed shall contain clause that Seller shall have no reservation of surface rights of any kind to include executive and leasing rights and provide surface waivers to Purchaser. Seller does not reserve nor retain implied rights of ingress and egress and of reasonable use of the Property (including surface materials) for mining, drilling, exploring, operating, developing, or removing the oil, gas, and other minerals. Sellers do not retain any mineral rights other than oil

1

59 Acres Johnson County - 0119

and gas.

3.   **Closing.** The Closing shall be held at the offices of Sendera Title (Heather Niedens) 4161 McKinney Ave., Suite 401, Dallas, Texas 75204, the ("Title Company") or at such other location as may be acceptable to Purchaser and Seller, commencing after 10:00 a.m. on that date which is on or before thirty (30) days after the end of the Review Period, (the "Closing" or "Closing Date"), provided, however, that Buyer is granted one option to extend the Closing Date for an additional thirty (30) day period which shall result in Purchaser having 120 days in order to conduct the Purchaser's review period plus another 30 days to effectuate the closing., (a) Buyer is not in default either at the time of the exercise of the respective option, (b) Buyer gives written notice of its exercise of the respective option prior to the Closing Date that would otherwise occur (each an "Extension Notice"), and (c) Buyer, together with each Extension Notice deposits an additional Ten Thousand Dollars ($10,000.00) with the Title Company, which amount(s) shall be non-refundable to Buyer in any event, but shall be applicable to the Purchase Price at Closing.

At the Closing. the Earnest Money shall be applicable to the Purchase Price at Closing.

At the Closing, Seller shall deliver to Purchaser a special warranty deed executed and acknowledged by Seller in recordable form, conveying the Property to Purchaser.

At the Closing, Purchaser shall deliver to Seller the Purchase Price, payable in cash or by other evidence of good funds acceptable to the Title Company (hereinafter defined) for immediate disbursement at Closing.

At the Closing, Purchaser and Seller each shall deliver a statement addressed to the Title Company stating its true and correct Federal Taxpayer Identification Number, and stating whatever other information is requested by the Title Company or other "person" so that any "person" responsible under the Tax Reform Act of 1986 for filing a form 1099 regarding this sale will have all the information required by then current IRS regulations.

4.   **Title Insurance.** At the Closing, Seller shall cause Title Company to commit to issue to Purchaser a Texas Form T-1 Owner's Policy of Title Insurance (the "Owner's Title Policy") in the full amount of the Purchase Price, insuring Purchaser as owner of the Property, in fee simple, and containing no exceptions to title other than the standard printed exceptions (provided that the exception for restrictive covenants shall be endorsed "None of Record" or limited to restrictions approved or deemed approved by Purchaser, and the exception for taxes shall be limited to the year in which the Closing occurs and subsequent years and subsequent assessments for prior years due to change in land usage or ownership and endorsed "Not Yet Due and Payable"), the Permitted Exceptions, and any other exceptions which have been approved or deemed approved by Purchaser. Seller shall pay the premium charged for the basic Owner's Title Policy provided, not to exceed $4,199.00, for above, and Seller shall pay the full premium charged for any endorsements thereto, and all other closing costs shall be paid by Purchaser; provided, each party shall be responsible for its own attorneys' fees and such

2

59 Acres Johnson County - 0119

other costs as specifically provided herein. If the transaction/purchase does not get closed, the Sellers will not be responsible for the payment of the title insurance indicated in paragraph 4 above, the Buyers will be responsible.

5.    **Title Commitment and Survey.** Seller shall deliver the following items to Purchaser within ten (10) days after the date hereof:

(a)    An Owner's Title Policy Commitment (the "Commitment") covering the Property, issued by the Title Company, together with copies of all items referred to therein as exceptions.

(b)    An existing survey (the "Survey") of the Property. A new survey shall be ordered if determined by the Purchaser to be necessary. If a new survey is ordered it shall be paid by Purchaser at Purchaser's discretion.

6.    **Title Review Period.** Purchaser shall have fifteen (15) days after receipt of the Commitment and the Survey in which to approve or disapprove such items. If Purchaser, during such fifteen (15) day period, shall fail to give written notice to Seller of any objection(s) it may have to the Survey or Commitment, Purchaser shall have waived its rights to object to any such item(s) and all title exceptions reflected in the Commitment or the Survey shall be deemed approved by Purchaser. If Purchaser shall provide Seller with written notice of any objections to title to the Property within such fifteen (15) day period Seller shall have a period of five (5) days thereafter to cure or correct such items, Seller having no duty or obligation to cure or correct any such title objections. If Seller shall fail or refuse during such five (5) day period to cure or correct any title objection noted by Purchaser, Purchaser may elect to terminate this Contract by giving Seller written notice thereof within three (3) days following Seller's five (5) day cure period, whereupon all Earnest Money previously deposited, less the cost of the Survey and the Commitment, shall be immediately refunded to Purchaser and the parties hereto shall have no further obligations or liabilities one to the other, or Purchaser may elect to waive such title deficiencies and proceed to close the transaction contemplated herein. Further, by its execution hereof, the Purchaser hereby approves all Permitted Exceptions as exceptions to the title to the Property and waives all rights to object to any such items.

7.    **Purchaser's Review Period.** Purchaser shall have a period (the "Review Period") of one hundred twenty (120) days from the effective date of this Contract to do the following:

(a)    To conduct any and all inspections, engineering and feasibility studies which Purchaser deems necessary, in an effort to determine whether or not to proceed with the Closing of this transaction. In this regard, Seller hereby agrees that Purchaser, and/or Purchaser's agents or employees, may have unlimited access to the Property during such the feasibility period to conduct such studies and inspections with reasonable notice. Purchaser agrees to indemnify and hold Seller and the Property harmless from any and all claims of lien, liens, claims, causes of action, damages, losses, attorney's fees, costs and expenses incurred in relation to the inspections and studies described herein, and to restore the Property to its pre-existing condition following the completion of such tests and studies.

(b)    To obtain such assurances or approvals from the appropriate governmental

3

59 Acres Johnson County · 0119

authorities as Purchaser deems necessary in relation to Purchaser's intended use of the Property.

(c)    In the event Purchaser is dissatisfied, for any reason with the information it obtains relative to the Property or is unable to obtain the governmental assurances or approvals it deems necessary, during the initial Review Period, Purchaser may terminate this Contract by giving written notice thereof to Seller prior to the expiration of the initial Review Period, in which event this Contract shall terminate, the Earnest Money less Ten Dollars and 00/100 Dollars ($10.00) as consideration, whereupon neither Seller nor Purchaser shall have any further obligations or liabilities to the other in connection with the transaction contemplated hereby.

8.    **Possession of Property.** Purchaser shall be entitled to full possession of the Property at Closing, subject only to rights of tenants under any tenant leases or rights of parties in possession.

9.    **Closing Cost and Prorations.**

(a)    Purchaser will pay (1) the cost of recording the Deed, (2) the costs of recording documentation associated with Purchaser's financing of the purchase of the Property, (3) the entire cost of the "survey deletion" premium to the Title Policy, and the entire costs of any endorsements or other modifications to the Title Policy, if any, and (4) one half of the escrow fee. Purchaser will pay (1) the escrow fees charged by the Title Company, (2) the cost of all documentation necessary to evidence the cancellation or satisfaction of any liens Seller is obligated to remove as provided herein, and (3) the premium for the Title Policy for coverage in the amount of the Purchase Price. Buyer and Seller each will pay their own respective attorneys' fees. Other costs will be paid by Buyer, as applicable or as specified by other provisions of this Agreement.

(b)    Rents, if any, and ad valorem taxes on the Property for the current year shall be prorated at the Closing, effective as of the Closing Date. If tax assessments for the Property for the current year are unavailable as of the Closing Date, said ad valorem taxes shall be prorated based upon the immediately preceding tax year figures with said proration to be adjusted in cash between the parties, based on actual taxes for the current year at the time such actual taxes are determined, and at Closing the parties shall enter into an agreement specifying the method of such adjustment.

(c)    Seller shall assume all liability for taxes for prior years related to agricultural status of the land, as calculated by County Appraisal District at the time of Closing. Notwithstanding Section 4, Purchaser ASSUMES ALL LIABILITY FOR ROLLBACK TAXES.

10.    **Commissions.** Seller and Purchaser acknowledge, warrant and represent that Robert Sandlin Development, as agent for the Purchaser, is involved in the transaction, and shall be compensated by separate agreement and paid by the Purchaser.

4

59 Acres Johnson County - 0119

Contract at any time prior to the expiration of the initial one hundred twenty (120) day Review Period (hereinafter defined). The Earnest Money then shall be non-refundable, but applicable as a credit to the Purchase Price at Closing.

12. **Seller's Remedies.** In the event Purchaser fails to close this transaction for any reason, Purchaser agrees that the Seller may retain the Earnest Money as liquidated damages, the parties agreeing that the damages to Seller would be difficult or inconvenient to ascertain, and such sum represents a reasonable amount to be paid to Seller in light of all aspects of this transaction. The failure by Purchaser to terminate this Contract for any reason pursuant to this Paragraph 11 shall in no way waive, alter or modify any rights of Seller in regard to the covenants and agreements of Purchaser herein.

13. **Purchaser's Remedies.** If Seller defaults in performing any of Seller's obligations under this Contract, Purchaser may seek to enforce specific performance of this Contract, as its sole and exclusive remedy with acceptance of the Property in its AS-IS condition, along with all title and all other associated conditions as set forth herein.

14. **Assignment of Contract.** Purchaser shall have the right to assign this Contract at any time. Seller agrees to close this transaction with the assignee of Purchaser. No such permitted assignment will release the assigning party from the terms and conditions herein.

15. **Representations And Warranties.** For any representations and warranties of Seller set forth herein, "the knowledge of" or "to the best knowledge of Seller, without requirement for any investigation or inquiry of any scope.

A. In order to induce Buyer to enter into this Agreement and to complete the transaction, Seller makes the following representations and warranties to Buyer as of the date of the Agreement:

(a) Seller has been duly organized and is validly existing and in good standing under the laws of the State of Texas. Seller has the authority to enter into this Agreement, to perform its obligations under this Agreement and to complete the transaction as contemplated by this Agreement. Seller has taken all action necessary to authorize the execution and delivery of this Agreement.

(b) This Agreement has been duly executed and delivered by Seller and constitutes a valid, binding and enforceable obligation of Seller, subject to bankruptcy and other debtor relief laws and principles of equity.

(c) No action, suit or proceeding is pending or, to Seller's knowledge, threatened against Seller or the Property.

(d) Seller has not received any written notice of any condemnation proceeding which is currently pending in connection with the Property.

(e) Seller has no knowledge, nor has received any notice of any violation of law or ordinance affecting the Property, including without limitation any law regarding environmental or hazardous substances issues.

5

59 Acres Johnson County - 0119

## CONTRACT FOR SALE AND
## PURCHASE OF UNIMPROVED
## REAL PROPERTY

**THIS CONTRACT** is made and entered into by and between JMJ Acquisitions, LLC, and or assigns (the "Purchaser" or "Buyer") and Johnston & Associates, LLP & Frank Carvalho(the "Seller").

### WITNESSETH:

**WHEREAS,** Seller is the owner of that certain parcel(s) of real property containing approximately 59 +/- acres located along the east side of CR 214 between Student Dr., and Vista Dr., in an unincorporated Johnson County, Texas, (the "Property"), and being more particularly described on Exhibit "A" (including Legal Description) attached hereto and made a part hereof by reference for all purposes; and

**WHEREAS,** Purchaser is desirous of purchasing the Property, subject to the conditions and the other agreements hereinafter set forth, and Seller is agreeable to such sale on the terms, conditions and agreements set forth herein.

**NOW, THEREFORE,** in consideration of the premises and the respective undertakings of the parties hereinafter set forth, the receipt and sufficiency of which consideration is hereby acknowledged, it is hereby agreed as follows:

1.    **Sale of Property.** Seller shall sell the Property to Purchaser, and Purchaser shall purchase the Property from Seller, together with, but without warranty and in its AS-IS condition, all and singular the rights and appurtenances pertaining to the Property, if any, including any mineral rights(other than oil and gas mineral right that are reserved to the Seller) , title and interest of Seller in and to inclusive streets, alleys, strips and gores, and rights-of-way, together with Improvements, fixtures and personal property, development plans and approvals, if any, owned by Seller and situated on or attached to the Property, for the sum equal to Seven Hundred Eight Thousand Dollars  ($708,000.00) Dollars, (the "Purchase Price). If there is any discrepancy on survey to the available 59 acres, the Purchase Price will be adjusted based on Twelve Thousand Dollars ($12,000,00) per acre.

2.    **Conveyance of Property.** Seller shall convey the Property to Purchaser at the Closing subject to all liens, encumbrances, conditions, easements, assessments, leases and restrictions (the "Permitted Exceptions"), which are the exceptions as may be approved, or deemed approved, by Purchaser in accordance with the terms hereof.  Deed shall contain clause that Seller shall have no reservation of surface rights of any kind to include executive and leasing rights and provide surface waivers to Purchaser. Seller does not reserve nor retain implied rights of ingress and egress and of reasonable use of the Property (including surface materials) for mining, drilling, exploring, operating, developing, or removing the oil, gas, and other minerals. Sellers do not retain any mineral rights other than oil

1

59 Acres Johnson County - 0119

and gas.

3.      Closing. The Closing shall be held at the offices of Sendera Title (Heather Niedens) 4161 McKinney Ave., Suite 401, Dallas, Texas 75204, the ("Title Company") or at such other location as may be acceptable to Purchaser and Seller, commencing after 10:00 a.m. on that date which is on or before thirty (30) days after the end of the Review Period, (the "Closing" or "Closing Date"), provided, however, that Buyer is granted one option to extend the Closing Date for an additional thirty (30) day period which shall result in Purchaser having 120 days in order to conduct the Purchaser's review period plus another 30 days to effectuate the closing., (a) Buyer is not in default either at the time of the exercise of the respective option, (b) Buyer gives written notice of its exercise of the respective option prior to the Closing Date that would otherwise occur (each an "Extension Notice"), and (c) Buyer, together with each Extension Notice deposits an additional Ten Thousand Dollars ($10,000.00) with the Title Company, which amount(s) shall be non-refundable to Buyer in any event, but shall be applicable to the Purchase Price at Closing.

At the Closing, the Earnest Money shall be applicable to the Purchase Price at Closing.

At the Closing, Seller shall deliver to Purchaser a special warranty deed executed and acknowledged by Seller in recordable form, conveying the Property to Purchaser.

At the Closing, Purchaser shall deliver to Seller the Purchase Price, payable in cash or by other evidence of good funds acceptable to the Title Company (hereinafter defined) for immediate disbursement at Closing.

At the Closing, Purchaser and Seller each shall deliver a statement addressed to the Title Company stating its true and correct Federal Taxpayer Identification Number, and stating whatever other information is requested by the Title Company or other "person" so that any "person" responsible under the Tax Reform Act of 1986 for filing a form 1099 regarding this sale will have all the information required by then current IRS regulations.

4.      Title Insurance. At the Closing, Seller shall cause Title Company to commit to issue to Purchaser a Texas Form T-1 Owner's Policy of Title Insurance (the "Owner's Title Policy") in the full amount of the Purchase Price, insuring Purchaser as owner of the Property, in fee simple, and containing no exceptions to title other than the standard printed exceptions (provided that the exception for restrictive covenants shall be endorsed "None of Record" or limited to restrictions approved or deemed approved by Purchaser, and the exception for taxes shall be limited to the year in which the Closing occurs and subsequent years and subsequent assessments for prior years due to change in land usage or ownership and endorsed "Not Yet Due and Payable"), the Permitted Exceptions, and any other exceptions which have been approved or deemed approved by Purchaser. Seller shall pay the premium charged for the basic Owner's Title Policy provided, not to exceed $4,199.00, for above, and Seller shall pay the full premium charged for any endorsements thereto, and all other closing costs shall be paid by Purchaser; provided, each party shall be responsible for its own attorneys' fees and such

2

59 Acres Johnson County - 0119

other costs as specifically provided herein. If the transaction/purchase does not get closed, the Sellers will not be responsible for the payment of the title insurance indicated in paragraph 4 above, the Buyers will be responsible.

5.    **Title Commitment and Survey.** Seller shall deliver the following items to Purchaser within ten (10) days after the date hereof:

(a)    An Owner's Title Policy Commitment (the "Commitment") covering the Property, issued by the Title Company, together with copies of all items referred to therein as exceptions.

(b)    An existing survey (the "Survey") of the Property. A new survey shall be ordered if determined by the Purchaser to be necessary. If a new survey is ordered it shall be paid by Purchaser at Purchaser's discretion.

6.    **Title Review Period.** Purchaser shall have fifteen (15) days after receipt of the Commitment and the Survey in which to approve or disapprove such items. If Purchaser, during such fifteen (15) day period, shall fail to give written notice to Seller of any objection(s) it may have to the Survey or Commitment, Purchaser shall have waived its rights to object to any such item(s) and all title exceptions reflected in the Commitment or the Survey shall be deemed approved by Purchaser. If Purchaser shall provide Seller with written notice of any objections to title to the Property within such fifteen (15) day period Seller shall have a period of five (5) days thereafter to cure or correct such items, Seller having no duty or obligation to cure or correct any such title objections. If Seller shall fail or refuse during such five (5) day period to cure or correct any title objection noted by Purchaser, Purchaser may elect to terminate this Contract by giving Seller written notice thereof within three (3) days following Seller's five (5) day cure period, whereupon all Earnest Money previously deposited, less the cost of the Survey and the Commitment, shall be immediately refunded to Purchaser and the parties hereto shall have no further obligations or liabilities one to the other, or Purchaser may elect to waive such title deficiencies and proceed to close the transaction contemplated herein. Further, by its execution hereof, the Purchaser hereby approves all Permitted Exceptions as exceptions to the title to the Property and waives all rights to object to any such items.

7.    **Purchaser's Review Period.** Purchaser shall have a period (the "Review Period") of one hundred twenty (120) days from the effective date of this Contract to do the following:

(a)    To conduct any and all inspections, engineering and feasibility studies which Purchaser deems necessary, in an effort to determine whether or not to proceed with the Closing of this transaction. In this regard, Seller hereby agrees that Purchaser, and/or Purchaser's agents or employees, may have unlimited access to the Property during such the feasibility period to conduct such studies and inspections with reasonable notice. Purchaser agrees to indemnify and hold Seller and the Property harmless from any and all claims of lien, liens, claims, causes of action, damages, losses, attorney's fees, costs and expenses incurred in relation to the inspections and studies described herein, and to restore the Property to its pre-existing condition following the completion of such tests and studies.

(b)    To obtain such assurances or approvals from the appropriate governmental

3

 

11.    Earnest Money. Within five (5) business days after the Effective Date, Purchaser shall deliver the sum of Twenty Thousand Dollars ($20,000.00), the "Earnest Money Deposit", in the form of cash or wire transfer to Sendera Title (Heather Niedens) (hereinafter "Escrow" and the "Title Company") to be held in escrow. The Deposit shall be refundable upon termination of the Contract at any time prior to the expiration of the initial sixty (60) day Review Period (hereinafter defined). The Earnest Money then shall be non-refundable, but applicable as a credit to the Purchase Price at Closing.

12.    Seller's Remedies. In the event Purchaser fails to close this transaction for any reason, Purchaser agrees that the Seller may retain the Earnest Money as liquidated damages, the parties agreeing that the damages to Seller would be difficult or inconvenient to ascertain, and such sum represents a reasonable amount to be paid to Seller in light of all aspects of this transaction. The failure by Purchaser to terminate this Contract for any reason pursuant to this Paragraph 11 shall in no way waive, alter or modify any rights of Seller in regard to the covenants and agreements of Purchaser herein.

13.    Purchaser's Remedies. If Seller defaults in performing any of Seller's obligations under this Contract, Purchaser may seek to enforce specific performance of this Contract, as its sole and exclusive remedy with acceptance of the Property in its AS-IS condition, along with all title and all other associated conditions as set forth herein.

14.    Assignment of Contract. Purchaser shall have the right to assign this Contract at any time. Seller agrees to close this transaction with the assignee of Purchaser. No such permitted assignment will release the assigning party from the terms and conditions herein.

15.    Representations And Warranties. For any representations and warranties of Seller set forth herein, "the knowledge of" or "to the best knowledge of Seller, without requirement for any investigation or inquiry of any scope.

A.    In order to induce Buyer to enter into this Agreement and to complete the transaction, Seller makes the following representations and warranties to Buyer as of the date of the Agreement:

(a)    Seller has been duly organized and is validly existing and in good standing under the laws of the State of Texas. Seller has the authority to enter into this Agreement, to perform its obligations under this Agreement and to complete the transaction as contemplated by this Agreement. Seller has taken all action necessary to authorize the execution and delivery of this Agreement.

(b)    This Agreement has been duly executed and delivered by Seller and constitutes a valid, binding and enforceable obligation of Seller, subject to bankruptcy and other debtor relief laws and principles of equity.

(c)    No action, suit or proceeding is pending or, to Seller's knowledge, threatened against Seller or the Property.

(d)    Seller has not received any written notice of any condemnation proceeding

5

59 Acres Johnson County - 0119

which is currently pending in connection with the Property.

       (e)    Seller has no knowledge, nor has received any notice of any violation of law or ordinance affecting the Property, including without limitation any law regarding environmental or hazardous substances issues.

B.    Buyer, to induce Seller to enter into this Agreement and to complete the transaction, makes the following representations and warranties to Seller, which representations and warranties are true and correct as of the date of this Agreement:

       (a)    Buyer has been duly organized and is validly existing under the laws of the State of Texas. Buyer has the power to enter into this Agreement, to perform its obligations under this Agreement and to complete the transaction as contemplated by this Agreement. Buyer has taken all action necessary to authorize the execution and delivery of this Agreement and the performance by Buyer of its obligations under this Agreement.

       (b)    This Agreement has been duly executed and delivered by Buyer and constitutes a valid, binding and enforceable obligation of Buyer, subject to bankruptcy and other debtor relief laws and principles of equity.

       (c)    There is no action, suit, proceeding, inquiry or investigation (including any bankruptcy or other debtor relief proceeding), pending or to the knowledge of Buyer threatened, against Buyer by or before any court or governmental authority that would prevent or hinder the performance by Buyer of its obligations under this Agreement or the completion of the transaction as contemplated by this Agreement.

       (d)    Except for consents, approvals, authorizations and filings already completed, Buyer is not required to obtain any consent, approval or authorization from, or to make any filing with, any person (including any governmental authority) in connection with, or as a condition to, the execution and delivery of this Agreement, the performance by Buyer of its obligations under this Agreement or the completion of the transaction as contemplated by this Agreement.

The representations and warranties in Section 15(A) and Section 15(B) will survive the Close of Escrow, but only for a period of six (6) months no claim shall be allowed on any such representation or warranty unless written notice of the claim is delivered by the claimant to the other party within such six (6) month period or the shortest period allowed under law. No document, information, geotechnical report, engineering, surveys, environmental studies or any other instrument, oral representation, status, condition or otherwise associated with the Property, this transaction, Agreement or related thereto is relied upon by either party hereto and no warranty and/or guarantee is by made the other or any third-party, all of same being waived and disclaimed, all and any of same is provided only as an accommodation and for informational purposes, each party assuming all risks associated with same.

    16.    **Entire Contract.** This Contract embodies the entire agreement between the parties hereto and cannot be amended or varied without the express written agreement of the parties hereto.

6

59 Acres Johnson County - 0119

Attn: Mark Adams, Vice President
Tel: 972-385-9934
Email: madams@jmjdevelopment.net

20.     **Effective Date.** All references in this Contract to the "date hereof" or the effective date of this Contract shall be deemed to refer to the last date, in point of time, on which all parties hereto have fully executed (and, if required, initialed) this Contract.

21.     **No Recordation.** Purchaser shall neither record this Contract nor a memorandum of the terms hereof in any public records without the prior written consent to such recordation from the Seller. Any unauthorized recording of this Contract, or a memorandum of the terms hereof, by Purchaser shall constitute an event of default by the Purchaser in the terms hereof, whereupon this Contract shall immediately and automatically terminate and all Earnest Money deposited by Purchaser hereunder shall be retained by the Seller as liquidated damages in accordance with the terms hereof. Further, the placing of record by Seller of an affidavit reciting the unauthorized recording of this Contract, or a memorandum of the terms hereof, by Purchaser and the subsequent termination of this Contract due to such unauthorized recording shall constitute full and sufficient evidence of the termination of this Contract and any third parties shall have the right to rely upon such termination of this Contract in accordance with the terms hereof.

22.     **Termination of Offer.** This Contract constitutes an offer by Seller to sell the Property to Purchaser on the terms and conditions set forth herein, and this offer shall expire and be of no further force and effect, unless sooner withdrawn, unless accepted by Purchaser by May 1, 2019.

23.     **Seller not a Foreign Person.** Seller hereby represents to Purchaser that it is not a foreign person, corporation, partnership, trust or estate (as those terms are defined in the Internal Revenue Code of 1954, as amended, and the regulation promulgated and in force with respect thereto), and Seller will, at Closing, deliver to Purchaser a certificate confirming such representation in a form satisfying the requirements of applicable law or  regulations.

SIGNATURE PAGE TO FOLLOW

8

59 Acres Johnson County - 0119

EXECUTED by Seller this _____ day of _____ 2019.

SELLER(s):

Johnston & Associates, LLP  & Frank Carvalho

By: _____    By: _____
Michael w. Johnston              Frank Carvalho

EXECUTED by Purchaser this 15 day of ____APRIL____ 2019.

PURCHASER:

JMJ Acquisitions, LLC

By: _____
Mark Adams,  its Vice President

59 Acres Johnson County - 0119

9

Exhibit A



59 Acres Johnson County - 0119

10

# JOHNSTON LEGAL GROUP PC

April 18, 2019

**VIA E-MAIL:  CDolan@jmjdevelopment.net**
Ms. Cheri Dolan
JMJ Development, LLC
1755 Wittington Place, Suite 340
Dallas, Texas  75234


        Re:    59 acres – Venus, Texas


Dear Cheri:

        Enclosed please the approved change to the Contract.  Please notice that Frank Carvalho and I have added our initials to the changed portion.

        If you have any questions, please let us know.  While looking forward to working with you in connection with the closing of this sale, we remain

                            Sincerely,

                            JOHNSTON LEGAL GROUP PC

                            By: _____
                            Michael W. Johnston
                            Board Certified Texas Board of Legal Specialization
                                Civil Trial Law
                                Consumer and Commercial Law
                            Board Certified National Board of Trial Advocacy
                                Civil Trial Law
                                Civil Pre-Trial Practice Advocacy
                            AV Preeminent Rated – Martindale Hubbell

MWJ/bw
Enclosure

---

PLEASE REPLY TO:

ABILENE
DALLAS
FORT WORTH                        1616 WABASH                    PRINCIPAL OFFICE
HOUSTON                      FORT WORTH, TEXAS 76107                 IN FORT WORTH
LUBBOCK                         (817) 820-0825                 ALL OFFICES ARE BY
OKLAHOMA CITY                                                    APPOINTMENT ONLY
SAN ANTONIO

                    E-MAIL: JOHNSTON@JOHNSTONLEGALGROUP.COM
                        www.johnstonlegalgroup.com
                            800-771-6946

## JOHNSTON LEGAL GROUP PC

April 9, 2019

**VIA OVERNIGHT MAIL**
Ms. Cheri Dolan
JMJ Development, LLC
1755 Wittington Place, Suite 340
Dallas, Texas 75234

Re:    59 acres – Venus, Texas

Dear Cheri:

Enclosed please find the original contract that has been signed by Johnston & Associates as well as Frank Carvalho. Please have the contract signed by Mark Adams and call us when it has been signed and we will be happy to make arrangements to visit with you in person in order to obtain a fully signed copy of the contract.

If you have any questions, please let us know.

Sincerely,

JOHNSTON LEGAL GROUP PC

By: _____
Michael W. Johnston
Board Certified Texas Board of Legal Specialization
    Civil Trial Law
    Consumer and Commercial Law
Board Certified National Board of Trial Advocacy
    Civil Trial Law
    Civil Pre-Trial Practice Advocacy
AV Preeminent Rated – Martindale Hubbell

MWJ/bw
Enclosures

ABILENE
DALLAS
FORT WORTH
HOUSTON
LUBBOCK
OKLAHOMA CITY
SAN ANTONIO

PLEASE REPLY TO:

1616 WABASH
FORT WORTH, TEXAS 76107
(817) 820·0825

PRINCIPAL OFFICE
IN FORT WORTH
ALL OFFICES ARE BY
APPOINTMENT ONLY

E-MAIL: JOHNSTON@JOHNSTONLEGALGROUP.COM
www.johnstonlegalgroup.com
800-771-6946

## FIRST AMENDMENT TO CONTRACT OF SALE

This FIRST AMENDMENT TO CONTRACT OF SALE (the "First Amendment") is entered into effective as of August 12, 2019 ("Effective Date") between **Johnston & Associates, LLP and Frank Carvalho, "collectively" ("Seller") and JMJ Acquisitions, LLC (and or assigns), ("Buyer").**

A. Seller and Buyer entered into that certain Contract for Sale and Purchase of Unimproved Real Property ("Agreement"), dated April 15, 2019, for the purchase and sale of approximately 59 acres in Johnson county, as more particularly described on Exhibit A of the Contract (the "Property").

B. Seller and Buyer desire to amend the Contract, as is set forth in this Amendment. All defined terms used and not otherwise defined herein will have the meaning set forth in the Contract.

Now, therefore, for good and valuable consideration, Seller and Buyer do hereby amend and supplement the Contract as follows:

1. Seller and Buyer amend the Contract and extend the Purchaser's Review Period an additional 90 days from the Effective date of this First Amendment. The Amended Purchaser's Review Period ("Amended Purchaser's Review Period") shall run through Monday, November 11, 2019.

2. At the time of First Amendment, said Property is under an Agricultural Lease ("Lease") between Purchaser and Goodwin Farms, INC ("Tenant"). Buyer agrees not to impede or cause any conditions which could impede the Tenant's ability to harvest their 2019 winter crops based on the terms of the Lease.

3. As amended and supplemented hereby, the Contract is ratified and will remain in full force and effect. The term "Contract" will mean the Contract as amended and supplemented by this Amendment. In the event of a conflict between this Amendment and the Contract, this Amendment will control. Each of the parties hereto agree that a facsimile or emailed PDF copy of the signature of the person executing this Amendment on either parties' behalf will be effective as an original signature and will cause the facsimile or emailed PDF copy of this Amendment to be legally binding and effective as an execution counterpart hereof.

*[The parties' signatures are on the following page.*

Executed effective as of the date set forth above

SELLER:

Johnston & Associates, LLP

By: _____

Name: Michael Johnston

Title: Partner

Frank Carvalho

By: _____

Name: FRANK CARVALHO

Title: PARTNER

BUYER:

JMJ ACQUISITIONS, LLC (and/or assigns)

By: _____

Name: Tim Barton

Title: President

## REINSTATEMENT OF AND SECOND AMENDMENT
## TO REAL ESTATE PURCHASE AGREEMENT

This Reinstatement of and Second Amendment ("Amendment") to Real Estate Purchase Agreement ("Agreement") is entered into effective as of the 18 day of November, 2019 ("Effective Date"), by and between Johnston & Associates, LLP and Frank Carvalho, in trust for the benefit of Rocky Carvalho, Jr., (collectively, "Seller") and JMJ Acquisitions, LLC, and or assigns ("Buyer").

### RECITALS

A.    Seller and Buyer entered into that certain Contract for Sale and Purchase of Unimproved Real Property ("Agreement"), dated April 15, 2019, and the First Amendment dated August 12, 2019 for the purchase and sale of approximately 59 acres in Johnson county, as more particularly described on Exhibit A of the Contract (the "Property").

B.    The Initial Purchaser's Review Period and Extended Review Period have expired.

B.    By email notice dated November 11, 2019, Buyer gave Seller notice terminating the Agreement, as permitted by the terms of the Agreement ("Termination").

C.    Following the Termination, the parties have reached an agreement to reinstate the Agreement upon the terms and conditions set forth in this Second Amendment and to further amend the Agreement, as more fully described below.

### AGREEMENTS

NOW, THEREFORE, for and in consideration of Ten and No/100 Dollars ($10.00), the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereby agree as follows:

1.    Reinstatement. The Agreement is hereby reinstated and is in full force and effect as of the Effective Date of this Amendment with the Effective Date under the Agreement continuing to be April 15, 2019. Except as revised herein, all terms and provisions of the Agreement shall remain fully enforceable.

2.    Seller. Record title to the Property as reflected on the title commitment is "Johnston & Associates, LLP, a Texas limited liability partnership, and Frank Carvalho, in trust for the benefit of Rocky Carvalho, Jr." and as such, the definition of "Seller" in the Agreement is revised to be "Johnston & Associates, LLP, a Texas limited liability partnership, and Frank Carvalho, in trust for the benefit of Rocky Carvalho, Jr.".

3.    Earnest Money. Simultaneously with the execution of this Amendment, Buyer agrees that all Earnest Money, including $20,000.00 on deposit with the Title Company, shall remain on deposit with the Title Company. The Agreement is revised so that the Earnest Money shall continue to be refundable through the Review Period as extended herein.

4.      Review Period. Purchaser's Review Period is extended through January 13, 2020. This necessary extension to the Review Period is due to the City of Venus scheduling delays to approve the water and drainage runoff which affect the site and its buildability. The January 13th date coincides with the City of Venus Council meeting date set for final approvals regarding these issues.

5.      Closing Date. The Closing Date on that date which is on or before thirty (30) days after the expiration of the Review Period as extended herein.

6.      Counterparts/Delivery. This instrument may be executed in any number of counterparts and by the different parties on separate counterparts, and each such counterpart shall be deemed to be an original but all such counterparts shall together constitute one and the same agreement. The parties hereto may execute and deliver this instrument by forwarding facsimile, telefax, email, or other means of copies of this instrument showing execution by the parties sending the same, and the parties agree and intend that such signature shall have the same effect as an original signature, that the parties shall be bound by such means of execution and delivery, and that the parties hereby waive any defense to validity based on any such copies or signatures.

7.      Continued Validity. Except as previously amended and as amended hereby, the Agreement shall remain in full force and effect as originally written and executed, as of the effective date of this Amendment.

8.      Captions. Headings of paragraphs are for convenience of reference only and shall not be construed as part of this Amendment.

9.      This Amendment shall be binding upon, and shall inure to the benefit of, the parties' respective heirs, representatives, successors and assigns.

10.     The Agreement including as amended by the First Amendment and this Amendment represent the final agreement between the parties hereto and may not be contradicted by evidence of prior, contemporaneous, or subsequent oral agreements of the parties. There are no unwritten oral agreements between the parties.

*[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK—SIGNATURE PAGE FOLLOWS]*

IN WITNESS WHEREOF, this Amendment has been executed by the Parties hereto, effective as of the date and year first above written.

SELLER:

Johnston & Associates, LLP

BY:_____

Name: _____

Title:_____

Frank Carvalho, in trust for the benefit of Rocky Carvalho, Jr.

_____

Frank Carvalho

BUYER:

JMJ Acquisition, LLC
(and/or assigns)

_____
Tim Barton, President

Frank Carvalho, individually, hereby agrees and accepts the revision to the definition of Seller as revised in this Amendment.

_____

Frank Carvalho

## FOURTH AMENDMENT
## TO REAL ESTATE PURCHASE AGREEMENT

This Fourth Amendment ("Amendment') to Real Estate Purchase Agreement ("Agreement") is entered into effective as of the 27th day of March, 2020 ("Effective Date"), by and between **Johnston & Associates, LLP, a Texas limited liability partnership, and Frank Carvalho, in trust for the benefit of Rocky Carvalho, Jr, (collectively, "Seller") and JMJ Acquisitions, LLC, and or assigns ("Buyer").**

## RECITALS

A.     Seller and Buyer entered into that certain Contract for Sale and Purchase of Unimproved Real Property ("Agreement"), dated April 15, 2019, the First Amendment dated August 12, 2019, Reinstatement of and Second Amendment dated November 18th, 2019, and Third Amendment dated January 13th 2020 for the purchase and sale of approximately 59 acres in Johnson county, as more particularly described on Exhibit A of the Contract (the "Property").

B.     The parties have reached an agreement to extend the date of Agreement upon the terms and conditions set forth in the Contract for Sale and Purchase of Unimproved Real Property dated April 15, 2019 and the First Amendment dated August 12, 2019, Reinstatement of and Second Amendment dated November 18th, 2019, Third Amendment dated January 13th, 2020 and this Fourth Amendment further amends and extends the feasibility review date to August 31st, 2020 and the closing to November 1st, 2020.

## AGREEMENTS

NOW, THEREFORE, for and in consideration of Ten and No/100 Dollars ($10.00), the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereby agree as follows:

1.     Earnest Money. Simultaneously with the execution of this Amendment, Buyer agrees that all Earnest Money, including $20,000.00 on deposit with the Title Company, shall remain on deposit with the Title Company. The Agreement is revised so that the Earnest Money shall continue to be refundable through the Review Period as extended herein.

2.     Review Period. Purchaser's Review Period is extended through August 31st, 2020. This necessary extension to the Review Period is due to the need for the seller to decertify the Mountain Peak CCN, to provide purchaser time to entitle the property with the City of Venus with an negotiated Development Agreement necessary to provide entitlements and reimbursements agreed to by the purchaser, continued commitment by purchaser to work with seller to address neighboring zoning concerns, the determination by the City of Venus to provide will service letters to provide water and sewer services to the site and determine drainage runoff which affects the site buildability. The November 2nd closing date coincides with the delivery of the farmer's crop and no development activity will take place on the property before the current Spring/Summer crop is harvested.

FOURTH AMENDMENT TO AGREEMENT FOR PURCHASE AND SALE - Page 1
JMJ – Johnston – FOURTH AMENDMENT – 3-27-2020

3.    Entitlement Submission. Purchaser agrees to submit 212 Development Agreement or Zoning application to the City of Venus prior to June 30th. If purchaser fails to do so, Seller may cancel at any time by returning purchaser's earnest money to them.

4.    Closing Date. The Closing Date on that date which is on or before sixty three (63) days after the expiration of the Review Period as extended herein. Closing date is set as Monday November 2nd, 2020

5.    Counterparts/Delivery. This instrument may be executed in any number of counterparts and by the different parties on separate counterparts, and each such counterpart shall be deemed to be an original, but all such counterparts shall together constitute one and the same agreement. The parties hereto may execute and deliver this instrument by forwarding facsimile, telefax, email, or other means of copies of this instrument showing execution by the parties sending the same, and the parties agree and intend that such signature shall have the same effect as an original signature, that the parties shall be bound by such means of execution and delivery, and that the parties hereby waive any defense to validity based on any such copies or signatures.

6.    Continued Validity. Except as previously amended and as amended hereby, the Agreement shall remain in full force and effect as originally written and executed, as of the effective date of this Amendment.

7.    Captions. Headings of paragraphs are for convenience of reference only and shall not be construed as part of this Amendment.

8.    This Amendment shall be binding upon, and shall inure to the benefit of, the parties' respective heirs, representatives, successors and assigns.

9.    The Agreement including as amended by the First Amendment dated August 12, 2019, Reinstatement of and Second Amendment dated November 18th, 2019, and Third Amendment dated January 13th 2020 and this Amendment represent the final agreement between the parties hereto and may not be contradicted by evidence of prior, contemporaneous, or subsequent oral agreements of the parties. There are no unwritten oral agreements between the parties.

*[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK—SIGNATURE PAGE FOLLOWS]*

IN WITNESS WHEREOF, this Amendment has been executed by the Parties hereto, effective as of the date and year first above written.

SELLER:

Johnston & Associates, LLP

BY: _____

Name: _____

Title: _____


Frank Carvalho, in trust for the benefit of Rocky Carvalho, Jr.

_____

Frank Carvalho


BUYER:

JMJ Acquisition, LLC
(and/or assigns)

Tim Barton, President

Frank Carvalho, individually, hereby agrees and accepts the revision to the definition of Seller as revised in this Amendment.

_____

Frank Carvalho

# FIFTH AMENDMENT
## TO REAL ESTATE PURCHASE AGREEMENT

This Fifth Amendment ("Amendment") to Real Estate Purchase Agreement ("Agreement") is entered into effective as of the 15th day of December 2020 ("Effective Date"), by and between **Johnston & Associates, LLP, a Texas limited liability partnership, and Frank Carvalho, in trust for the benefit of Rocky Carvalho, Jr, (collectively, "Seller") and JMJ Acquisitions, LLC,** and or assigns ("Buyer").

## RECITALS

A.    Seller and Buyer entered into that certain Contract for Sale and Purchase of Unimproved Real Property ("Agreement"), dated April 15, 2019, the First Amendment dated August 12, 2019, and Reinstatement of and Second Amendment dated November 18th, 2019, Third Amendment dated January 13th, 2020, and Fourth Amendment dated March 27th, 2020 for the purchase and sale of approximately 59 acres in Johnson county, as more particularly described on Exhibit A of the Contract (the "Property").

B.    The parties have reached an agreement to extend the date of Agreement upon the terms and conditions set forth in the Contract for Sale and Purchase of Unimproved Real Property dated April 15, 2019 and the First Amendment dated August 12, 2019, Reinstatement of and Second Amendment dated November 18th, 2019, Third Amendment dated January 13th, 2020, Fourth Amendment dated March 27th, 2020 and this Fifth Amendment further amends and extend the feasibility date to March 16, 2020.

C.    The parties have reached the agreement to further extend the Closing Date (the "Closing Date") to March 31, 2021 with the release of $10,000.00 of the Earnest Money to the Seller. The Title company is to release funds upon receipt of the fully executed Fifth Amendment.

C.    Buyer wishes to Assign and Convey all the terms of this agreement and previous agreements to a special purpose entity, Venus59, LLC a Texas limited liability company will be assigned the term of this agreement and all previous agreements.

## AGREEMENTS

NOW, THEREFORE, for and in consideration of Ten and No/100 Dollars ($10.00), the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereby agree as follows:

1.    Earnest Money. Simultaneously with the execution of this Amendment, Buyer agrees that $10,000 of the Earnest Money shall be released to the Seller and the remaining balance of $10,000 shall remain on deposit with the Title Company. The Agreement is revised so that the Earnest Money shall continue to be refundable through the Review Period as extended herein.

2.    Review Period. Purchaser's Review Period is extended through March 16, 2020. This necessary extension to the Review Period is due to the need for the seller to decertify the Mountain Peak CCN, and for the purchaser to work with seller to address neighboring zoning concerns, the determination by the City of Venus to provide will service letters to provide water and sewer services to the site and determine drainage runoff which affects the site buildability. No development activity will take place on the property before the current crop is harvested.

3.    Closing Date. The Closing Date on that date which is on or before fifteen (15) days after the expiration of the Review Period as extended herein.

4.    Counterparts/Delivery. This instrument may be executed in any number of counterparts and by the different parties on separate counterparts, and each such counterpart shall be deemed to be an original, but all such counterparts shall together constitute one and the same agreement. The parties hereto may execute and deliver this instrument by forwarding facsimile, telefax, email, or other means of copies of this instrument showing execution by the parties sending the same, and the parties agree and intend that such signature shall have the same effect as an original signature, that the parties shall be bound by such means of execution and delivery, and that the parties hereby waive any defense to validity based on any such copies or signatures.

5.    Continued Validity. Except as previously amended and as amended hereby, the Agreement shall remain in full force and effect as originally written and executed, as of the effective date of this Amendment.

6.    Captions. Headings of paragraphs are for convenience of reference only and shall not be construed as part of this Amendment.

7.    This Amendment shall be binding upon, and shall inure to the benefit of, the parties' respective heirs, representatives, successors and assigns.

8.    The Agreement including as amended by the First Amendment and this Amendment represent the final agreement between the parties hereto and may not be contradicted by evidence of prior, contemporaneous, or subsequent oral agreements of the parties. There are no unwritten oral agreements between the parties.

*[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK—SIGNATURE PAGE FOLLOWS]*

IN WITNESS WHEREOF, this Amendment has been executed by the Parties hereto, effective as of the date and year first above written.

SELLER:

Johnston & Associates, LLP

BY: _____

Name: Michael Johnston

Title: Partner

Frank Carvalho, in trust for the benefit of Rocky Carvalho, Jr.

_____

Frank Carvalho

BUYER:

JMJ Acquisition, LLC
(and/or assigns)

_____

Tim Barton, President

Frank Carvalho, individually, hereby agrees and accepts the revision to the definition of Seller as revised in this Amendment.

_____

Frank Carvalho

FIFTH AMENDMENT TO AGREEMENT FOR PURCHASE AND SALE - Page 3
JMJ - Johnston - FIFTH AMENDMENT - 10-30-2020

## SIXTH AMENDMENT
## TO REAL ESTATE PURCHASE AGREEMENT

This Sixth Amendment ("Amendment") to Real Estate Purchase Agreement ("Agreement") is entered into effective as of the 22nd day of March 2021 ("Effective Date"), by and between **Johnston & Associates, LLP, a Texas limited liability partnership, and Frank Carvalho, in trust for the benefit of Rocky Carvalho, Jr, (collectively, "Seller") and JMJ Acquisitions, LLC,** and or assigns ("Buyer").

### RECITALS

A.   Seller and Buyer entered into that certain Contract for Sale and Purchase of Unimproved Real Property ("Agreement"), dated April 15, 2019, the First Amendment dated August 12, 2019, and Reinstatement of and Second Amendment dated November 18th, 2019, Third Amendment dated January 13th, 2020, Fourth Amendment dated March 27th, 2020 and the Fifth Amendment dated December 15, 2020 for the purchase and sale of approximately 59 acres in Johnson county, as more particularly described on Exhibit A of the Contract (the "Property").

B.   The parties have reached an agreement to extend the date of Agreement upon the terms and conditions set forth in the Contract for Sale and Purchase of Unimproved Real Property dated April 15, 2019 and the First Amendment dated August 12, 2019, Reinstatement of and Second Amendment dated November 18th, 2019, Third Amendment dated January 13th, 2020, Fourth Amendment dated March 27th, 2020, Fifth Amendment dated December 15th, 2020 and this Sixth Amendment further amends and extend the Closing date to May 31, 2021.

C.   Buyer wishes to Assign and Convey all the terms of this agreement and previous agreements to a special purpose entity, Venus59, LLC a Texas limited liability company will be assigned the term of this agreement and all previous agreements.

### AGREEMENTS

NOW, THEREFORE, for and in consideration of Ten and No/100 Dollars ($10.00), the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereby agree as follows:

1.   Earnest Money. Simultaneously with the execution of this Amendment, Purchaser agrees that all remaining Earnest Money, ($10,000.00) on deposit with the Title Company, shall be released to the Seller. This money will be applied to the Purchase Price at Closing.

2.   Review Period. Purchaser's Review Period will end as of March 31, 2021. The Mountain Peak CCN has been decertified, and the purchaser continues to work with seller to address the final Development Agreement with the City of Venus to provide water and sewer services to the site. Purchaser agrees that the Development Agreement will not be executed prior to the closing of the property. No development activity will take place on the property before the current crop is

harvested, if Purchaser decides to pursue development on the first phase of construction, they will enter into an agreement to reimburse the farmer for his crop.

3.    Closing Date. The Closing Date is on or before May 31, 2021

4.    Extension Period. Purchaser shall have the option to extend the May 31st, 2021 Closing Date for a one thirty (30) day extension by giving written notice to Seller prior to the scheduled Closing Date along with a non-refundable fee of Ten Thousand and 00/100 ($10,000.00).

5.    Counterparts/Delivery. This instrument may be executed in any number of counterparts and by the different parties on separate counterparts, and each such counterpart shall be deemed to be an original, but all such counterparts shall together constitute one and the same agreement. The parties hereto may execute and deliver this instrument by forwarding facsimile, telefax, email, or other means of copies of this instrument showing execution by the parties sending the same, and the parties agree and intend that such signature shall have the same effect as an original signature, that the parties shall be bound by such means of execution and delivery, and that the parties hereby waive any defense to validity based on any such copies or signatures.

6.    Continued Validity. Except as previously amended and as amended hereby, the Agreement shall remain in full force and effect as originally written and executed, as of the effective date of this Amendment.

7.    Captions. Headings of paragraphs are for convenience of reference only and shall not be construed as part of this Amendment.

8.    This Amendment shall be binding upon, and shall inure to the benefit of, the parties' respective heirs, representatives, successors and assigns.

9.    The Agreement including as amended by the First Amendment and this Amendment represent the final agreement between the parties hereto and may not be contradicted by evidence of prior, contemporaneous, or subsequent oral agreements of the parties. There are no unwritten oral agreements between the parties.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK—SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, this Amendment has been executed by the Parties hereto, effective as of the date and year first above written.

SELLER:

Johnston & Associates. LLP

BY: _____

Name: Michael Johnston

Title: Partner

Frank Carvalho. in trust for the benefit of Rocky Carvalho, Jr.

_____

Frank Carvalho

BUYER:

JMJ Acquisition, LLC
(and/or assigns)

_____
Tim Barton, President

Frank Carvalho, individually, hereby agrees and accepts the revision to the definition of Seller as revised in this Amendment.

_____

Frank Carvalho

## SEVENTH AMENDMENT
## TO REAL ESTATE PURCHASE AGREEMENT

This Seventh Amendment ("Amendment") to Real Estate Purchase Agreement ("Agreement") is entered into effective as of the 31st day of May 2021 ("Effective Date"), by and between Johnston & Associates, LLP, a Texas limited liability partnership, and Frank Carvalho, in trust for the benefit of Rocky Carvalho, Jr, (collectively, "Seller") and Venus 59, LLC, as assigned by JMJ Acquisitions, LLC and or assigns ("Buyer").

### RECITALS

A.    Seller and Buyer entered into that certain Contract for Sale and Purchase of Unimproved Real Property ("Agreement"), dated April 15, 2019, the First Amendment dated August 12, 2019, and Reinstatement of and Second Amendment dated November 18th, 2019, Third Amendment dated January 13th, 2020, Fourth Amendment dated March 27th, 2020, Fifth Amendment dated December 15, 2020 and the Sixth Amendment dated March 22nd, 2021 for the purchase and sale of approximately 59 acres in Johnson county, as more particularly described on Exhibit A of the Contract (the "Property").

B.    The parties have reached an agreement to extend the date of Agreement upon the terms and conditions set forth in the Contract for Sale and Purchase of Unimproved Real Property dated April 15, 2019 and the First Amendment dated August 12, 2019, Reinstatement of and Second Amendment dated November 18th, 2019, Third Amendment dated January 13th, 2020, Fourth Amendment dated March 27th, 2020, Fifth Amendment dated December 15th, 2020, Sixth Amendment dated March 22nd, 2021 and the Seventh Amendment further amends and extend the Closing date to July 30, 2021.

### AGREEMENTS

NOW, THEREFORE, for and in consideration of Ten and No/100 Dollars ($10.00), the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereby agree as follows:

1.    Contract Extension Fee. With the execution of this Amendment, Purchaser agrees pay seller a contract extension fee of Ten Thousand ($10,000) which will be released to the seller within 7 days upon the execution of the agreement, the contract extension fee will not be applied to the Purchase Price at Closing.

2.    Review Period. Purchaser's Review Period ended as of March 31, 2021. The Mountain Peak CCN has been decertified, and seller and purchaser agree to continue to work together to address the final Development Agreement with the City of Venus to provide water and sewer services to the site. Purchaser agrees that the Development Agreement will not be executed prior to the closing of the property. No development activity will take place on the property before the current crop being harvested.

3.      Extension Period. Purchaser shall have until the closing date as amended, to finalize the development agreement with the City of Venus.

4.      Closing Date. The Closing Date is on or before July 30, 2021.

5.      Counterparts/Delivery.  This instrument may be executed in any number of counterparts and by the different parties on separate counterparts, and each such counterpart shall be deemed to be an original, but all such counterparts shall together constitute one and the same agreement. The parties hereto may execute and deliver this instrument by forwarding facsimile, telefax, email, or other means of copies of this instrument showing execution by the parties sending the same, and the parties agree and intend that such signature shall have the same effect as an original signature, that the parties shall be bound by such means of execution and delivery, and that the parties hereby waive any defense to validity based on any such copies or signatures.

6.      Continued Validity. Except as previously amended and as amended hereby, the Agreement shall remain in full force and effect as originally written and executed, as of the effective date of this Amendment.

7.      Captions. Headings of paragraphs are for convenience of reference only and shall not be construed as part of this Amendment.

8.      Assignment. Seller consents to the assignment of the agreement as amended from JMJ Acquisitions, LLC to Venus 59,LLC and as such the agreement is hereby assigned

9.      This Amendment shall be binding upon, and shall inure to the benefit of, the parties' respective heirs, representatives, successors and assigns.

10.     The Agreement including as amended by the First Amendment and this Amendment represent the final agreement between the parties hereto and may not be contradicted by evidence of prior, contemporaneous, or subsequent oral agreements of the parties. There are no unwritten oral agreements between the parties.

*[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK—SIGNATURE PAGE FOLLOWS]*

IN WITNESS WHEREOF, this Amendment has been executed by the Parties hereto, effective as of the date and year first above written.

SELLER:

Johnston & Associates, LLP

By _____

Name: Michael Johnston

Title: Principal/Partner

Frank Carvalho, in trust for the benefit of Rocky Carvalho, Jr.

Frank Carvalho

BUYER:

Venus59, LLC (and/or assigns)

Tim Barton, President

## EIGHTH AMENDMENT
## TO REAL ESTATE PURCHASE AGREEMENT

This Eighth Amendment ("Amendment") to Real Estate Purchase Agreement ("Agreement") is entered into effective as of the 31st day of July 2021 ("Effective Date"), by and between **Johnston & Associates, LLP, a Texas limited liability partnership, and Frank Carvalho, in trust for the benefit of Rocky Carvalho, Jr, (collectively, "Seller")** and **Venus 59, LLC, as assigned by JMJ Acquisitions, LLC and or assigns ("Buyer").**

## RECITALS

A.   Seller and Buyer entered into that certain Contract for Sale and Purchase of Unimproved Real Property ("Agreement"), dated April 15, 2019, the First Amendment dated August 12, 2019, and Reinstatement of and Second Amendment dated November 18th, 2019, Third Amendment dated January 13th, 2020, Fourth Amendment dated March 27th, 2020, Fifth Amendment dated December 15, 2020, Sixth Amendment dated March 22nd, 2021 and the Seventh Amendment dated May 31st, 2021 for the purchase and sale of approximately 59 acres in Johnson county, as more particularly described on Exhibit A of the Contract (the "Property").

B.   The parties have reached an agreement to extend the date of Agreement upon the terms and conditions set forth in the Contract for Sale and Purchase of Unimproved Real Property dated April 15, 2019 and the First Amendment dated August 12, 2019, Reinstatement of and Second Amendment dated November 18th, 2019, Third Amendment dated January 13th, 2020, Fourth Amendment dated March 27th, 2020, Fifth Amendment dated December 15th, 2020, Sixth Amendment dated March 22nd, 2021, Seventh Amendment dated May 31st, 2021 and the Eighth Amendment further amends and extends the Closing date to August 31, 2021.

## AGREEMENTS

NOW, THEREFORE, for and in consideration of Ten and No/100 Dollars ($10.00), the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereby agree as follows:

1.   Contract Extension Fee. With the execution of this Amendment, Purchaser agrees pay seller a contract extension fee of Ten Thousand ($10,000) which will be released to the seller within 7 days upon the execution of the agreement, the contract extension fee will not be applied to the Purchase Price at Closing.

2.   Review Period. Purchaser's Review Period ended as of March 31, 2021. The Mountain Peak CCN has been decertified, and seller and purchaser agree to continue to work together to address the final Development Agreement with the City of Venus to provide water and sewer services to the site. Purchaser agrees that the Development Agreement will not be executed prior to the closing of the property. No development activity will take place on the property before the current crop being harvested.

3.    Extension Period. Purchaser shall have until the closing date as amended, to finalize the development agreement with the City of Venus.

4.    Closing Date. The Closing Date is on or before August 31, 2021.

5.    Counterparts/Delivery. This instrument may be executed in any number of counterparts and by the different parties on separate counterparts, and each such counterpart shall be deemed to be an original, but all such counterparts shall together constitute one and the same agreement. The parties hereto may execute and deliver this instrument by forwarding facsimile, telefax, email, or other means of copies of this instrument showing execution by the parties sending the same, and the parties agree and intend that such signature shall have the same effect as an original signature, that the parties shall be bound by such means of execution and delivery, and that the parties hereby waive any defense to validity based on any such copies or signatures.

6.    Continued Validity. Except as previously amended and as amended hereby, the Agreement shall remain in full force and effect as originally written and executed, as of the effective date of this Amendment.

7.    Captions. Headings of paragraphs are for convenience of reference only and shall not be construed as part of this Amendment.

8.    Assignment. Seller consents to the assignment of the agreement as amended from JMJ Acquisitions, LLC to Venus 59, LLC and as such the agreement is hereby assigned

9.    This Amendment shall be binding upon, and shall inure to the benefit of, the parties' respective heirs, representatives, successors and assigns.

10.    The Agreement including as amended by the First Amendment and this Amendment represent the final agreement between the parties hereto and may not be contradicted by evidence of prior, contemporaneous, or subsequent oral agreements of the parties. There are no unwritten oral agreements between the parties.

*[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK—SIGNATURE PAGE FOLLOWS]*

IN WITNESS WHEREOF, this Amendment has been executed by the Parties hereto, effective as of the date and year first above written

SELLER

Johnston & Associates, LLP

BY Michael Johnston

Name: Michael Johnston

Title: Partner

Frank Carvalho, in trust for the benefit of Rocky Carvalho, Jr

Frank Carvalho

BUYER·

Company, LLC (or its assigns)

Tim Barton President

CARVALHO AND JOHNSTON PURCHASE AND SALE AGREEMENT AMENDMENT NO. 1
DEFENDANTS FOURTH AMENDMENT - PAGE 2

## CONTRACT OF SALE

IN CONSIDERATION of the mutual terms, provisions, covenants, and agreements contained in this Contract of Sale (the "Contract"), the parties hereto agree on this 21st day of May, 2021 ("Effective Date") as follows.

1.     PARTIES. Helen E. Elliott, an unmarried individual, ("Seller"), shall cause the sale and convey same to Venus59, LLC (the "Purchaser"), and Purchaser shall buy and pay for the Property (defined below).

2.     PROPERTY. Upon the terms and conditions hereinafter stated, Seller hereby agrees to sell and convey to Purchaser good and indefeasible title to approximately 3.44 acres located at 916 S FM 157 in Johnson County, Texas further described as ABST 379, TR 21E1, 21E2, WM Hill an approximate legal description of which may be set forth on Exhibit "A" attached hereto and incorporated herein by this reference for all purposes (the "Land"), together with (1) all improvements, benefits, privileges, tenements, hereditaments, rights and appurtenances thereon or pertaining to such real property, (2) all permits, approvals, licenses, leases, contracts, reports, water and sewer capacity commitments, all engineering and architectural plans, Declarant status under any Property Associations formed on the Land, rights to reimbursements from any governmental or quasi-agency for either utility impacts fees, taxing district bond sale proceeds if any, and other rights and interests owned or held by Seller, if any, in connection with the Land (collectively, "Intangible Property"), and (3) all easements owned by Seller, if any, which are used or needed in connection with the development of the Land (the foregoing is collectively referred to herein as the "Property")., and Purchaser agrees to purchase the Property at the Purchase Price (hereinafter defined) and upon the terms set forth herein. The metes and bounds description of the Land contained in the Survey (hereinafter defined), if different from the legal description attached hereto, shall be substituted for Exhibit "A", and shall become a part of this Contract as the description of the Land to be conveyed hereunder.   Furthermore, Exhibit "A" shall be automatically updated to include the description of the tract within the Property that Seller owns, upon receipt of the Survey from the Surveyor, a copy will be delivered to the Purchaser and the Seller within (5) business days.

The sale of the Property shall exclude the subsurface estate including all oil, gas, and other mineral rights which, to the extent currently owned by Seller, shall be retained by the Seller except that Seller shall provide a surface use waiver at Closing including as further described herein.

3.     PURCHASE PRICE. The purchase price for the Property is Two Hundred Fifty Thousand and 00/100ths Dollars ($250,000.00) (the "Purchase Price").

4.     EARNEST MONEY.

A.     Within three business days after the Effective Date of this Contract (as defined at Section 17(A)), Purchaser shall deposit refundable earnest money in the form of a check or wire transfer of funds in the amount of Five Thousand and 00/100 Dollars ($5,000.00) (the "Earnest Money") with Lawyers Title Company, 101 South Dallas Street, Suite 200, Ennis, Texas 75119 Attn: J. Ross Massengill (the "Title Company"), in its capacity as escrow agent, to be held in

CONTRACT OF SALE – Page 1

escrow pursuant to the terms of this Contract. Notwithstanding anything herein to the contrary, a portion of the Initial Earnest Money in the amount of $100.00 shall be non-refundable and shall be distributed to Seller upon any termination of this Contract as full payment and independent consideration (the "Independent Consideration") for Seller's performance under this Contract.

B.    If Purchaser fails to timely deposit the Earnest Money, Seller may terminate this Contract at any time before Purchaser deposits the Earnest Money with the Title Company. The Earnest Money, at Purchaser's election, may be placed in an interest-bearing account by the Title Company, and any interest earned thereon shall become a part of the Earnest Money. If Purchaser terminates this Contract on or prior to the expiration of the Inspection Period, all Earnest Money, other than the Independent Consideration, shall be returned to Purchaser. If Purchaser does not terminate this Contract on or prior to the expiration of the Inspection Period, the Earnest Money shall be non-refundable to Purchaser unless this Contract is terminated pursuant to Sections 6, 10 or 13(A) hereof. If this Contract is terminated pursuant to either Sections 6, 10 or 13(A) after the expiration of the Inspection Period, the Earnest Money shall be returned to Purchaser. The Earnest Money shall be paid to Seller at the Closing and shall be applicable to the Purchase Price.

5.    SURVEY AND TITLE DOCUMENTS.

A.    Survey. Purchaser shall obtain a survey at Purchaser's expenses as necessary.

B.    Title Commitment. Within ten (10) days after execution of the Contract, Purchaser shall, at Purchaser's expense, deliver or cause to be delivered (1) a title commitment (the "Title Commitment") covering the Property binding the Title Company to issue a Texas Owner Policy of Title Insurance (the "Title Policy") on the standard form prescribed by the Texas State Board of Insurance at the Closing, in the full amount of the Purchase Price, insuring Purchaser's fee simple title to the Property to be good and indefeasible, subject only to the Permitted Exceptions as defined below, and (2) the following documents (collectively, the "Title Documents"): (a) true and legible copies of all recorded instruments affecting the Property and recited as exceptions in the Title Commitment and (b) a current tax certificate.

C.    Special Assessment Districts. Purchaser acknowledges that the Property is located in Mountain Peak Special Utility District and has received all necessary information required by law related to the district including the current tax rate, the current bonded indebtedness and the authorized indebtedness of the district, and Purchaser will comply with all other applicable requirements of the Texas Water Code.

6.    REVIEW OF TITLE DOCUMENTS.

A.    Review Period. Purchaser shall have twenty (20) days (the "Review Period") after Purchaser's receipt of the last of (i) the Survey, (ii) the Title Commitment, and (iii) the Title Documents, to review them. If Purchaser has any objections to the Survey, Title Commitment or Title Documents, Purchaser may deliver the objections to Seller prior to the expiration of the Review Period. Any item to which Purchaser does not object shall be deemed a "Permitted Exception." Items that the Title Company identifies as to be released at closing will be deemed objections by Purchaser and shall not be Permitted Exceptions. If there are objections by

CONTRACT OF SALE – Page 2

Purchaser, or a third-party lender, Seller, may, but is not obligated to, attempt to satisfy the objections within ten (10) days after receipt of Purchaser's objections (the "Cure Period"). Regardless of any conflict herein or Purchaser's objections or any failure to object, any blanket easements, Seller's retained rights or rights of third parties including mineral owners and lessees, restrictions, or other encumbrances which would prohibit, materially interfere with, or increase the costs of Purchaser's redevelopment of the Land shall be deemed objections which must be cured by Seller at Seller's expense prior to Closing. Otherwise, Purchaser's failure to object within the time provided shall be a waiver of the right to object.

B.     Cure Period. If Seller cannot satisfy the objections within the Cure Period, then Purchaser may terminate this Contract by delivering a written notice to Seller within five (5) business days after the expiration of the Cure Period. If Purchaser terminates this Contract, the refundable portion of the Earnest Money shall be immediately returned to Purchaser and thereafter neither party shall have any rights or obligations under this Contract (except for those which may expressly survive the termination of this Contact). If Purchaser does not terminate this Contract, then Purchaser shall be deemed to have waived any uncured objections and must accept such title as Seller is able to convey as of Closing, subject to the other terms and provisions of this Contract. Notwithstanding the foregoing, at or prior to Closing, Seller shall discharge or cause to be discharged all: (i) matters set forth on Schedule C of the Title Commitment; (ii) exceptions to title created after the Effective Date without the written consent of Purchaser; and (iii) judgments, liens and mortgages affecting the Property, and same shall not constitute Permitted Exceptions.

7.     SELLER'S WARRANTIES AND REPRESENTATIONS.

A.     Statements. Seller represents and warrants to Purchaser as of the Effective Date and as of the Closing as follows:

(1)     Title. Seller has the right to, and will, convey to Purchaser good and indefeasible fee simple title to the Property free and clear of any and all liens, assessments, unrecorded easements, security interests and other encumbrances except only to the Permitted Exceptions.

(2)     Leases. There are not any parties in possession of any portion of the Property as lessees, tenants at sufferance or trespassers.

(3)     Negative Covenants. Seller shall not further encumber any of the Property or allow an encumbrance upon the title to any of the Property or execute or modify the terms or conditions of any leases, contracts, or encumbrances, if any, currently affecting the Property without the written consent of Purchaser.

(4)     Liens and Debts. Except for the liens securing any existing mortgages which will be paid in full at Closing, there are no mechanic's liens, Uniform Commercial Code liens or unrecorded liens against the Property, and Seller shall not allow any such liens to attach to the Property prior to Closing, which will not be satisfied out of the Closing proceeds. All obligations of Seller arising from the ownership and operation of the Property and any business operated on the Property, including, but not limited to, taxes, leasing commissions, salaries,

CONTRACT OF SALE – Page 3

contracts, and similar agreements, have been paid or will be paid prior to Closing. There will be no obligations of Seller with respect to the Property outstanding as of Closing.

(5)     <u>Litigation.</u> There is no pending or, to the knowledge of Seller, threatened litigation, condemnation, or assessment affecting any of the Property. Seller shall promptly advise Purchaser of any litigation, condemnation or assessment affecting any of the Property which is threatened or instituted after the Effective Date.

(6)     <u>Surface Use.</u> No party has any right to use the surface of the Land or otherwise, Seller shall provide a surface use waiver at Closing under which any party which has any surface use rights, including any mineral owner or lessee, waives any right to use the surface of the Land.

(7)     <u>Operation of the Property</u>. After the Effective Date until the Closing Date, Seller shall maintain the Property in a similar condition consistent with moving and removing items from the Property.

B.     <u>Remedies</u>. If Purchaser discovers prior to Closing that any of Seller's warranties or representations has been misrepresented or is inaccurate, Purchaser may notify Seller promptly in writing, and Seller shall correct or remedy the misrepresentation or inaccuracy at Seller's expense. If the misrepresentation or inaccuracy is not remedied prior to Closing, upon written notice to Seller, Purchaser may: (i) proceed to Closing without waiving any claim for breach of warranty or misrepresentation; or (ii) delay Closing until ten (10) days after the misrepresentation or inaccuracy is remedied or such other period necessary for Seller to cure such issue; or (iii) exercise Purchaser's remedies for default by Seller under this Contract including terminating this Contract and being refunded all Earnest Money and any other fees paid to Seller.

C.     **NO OTHER WARRANTIES AND DISCLAIMER.** **EXCEPT AS EXPRESSLY SET FORTH IN THIS CONTRACT AND SELLER'S WARRANTY OF TITLE SET FORTH IN THE DEED(S), PURCHASER ACKNOWLEDGES AND AGREES THAT SELLER HAS NOT MADE, DOES NOT MAKE AND SPECIFICALLY NEGATES AND DISCLAIMS, AND PURCHASER IS NOT RELYING ON, ANY REPRESENTATIONS, WARRANTIES, PROMISES, COVENANTS, AGREEMENTS OR GUARANTIES OF ANY KIND OR CHARACTER WHATSOEVER, WHETHER EXPRESS OR IMPLIED, ORAL OR WRITTEN, PAST, PRESENT OR FUTURE, OF, AS TO, CONCERNING OR WITH RESPECT TO (A) THE VALUE, NATURE, QUALITY OR CONDITION OF THE PROPERTY, INCLUDING, WITHOUT LIMITATION, THE WATER, SOIL AND GEOLOGY, (B) THE INCOME TO BE DERIVED FROM THE PROPERTY, (C) THE HABITABILITY, MERCHANTABILITY, MARKETABILITY, PROFITABILITY OR FITNESS FOR A PARTICULAR PURPOSE OF THE PROPERTY, (D) THE MANNER OR QUALITY OF THE CONSTRUCTION OR MATERIALS, IF ANY, INCORPORATED INTO THE PROPERTY, OR (E) THE MANNER, QUALITY, STATE OF REPAIR OR LACK OF REPAIR OF THE PROPERTY. EXCEPT AS EXPRESSLY SET FORTH IN THIS CONTRACT AND SELLER'S WARRANTY OF TITLE SET FORTH IN THE DEED CONVEYING THE PROPERTY TO PURCHASER, PURCHASER UNCONDITIONALLY AND IRREVOCABLY WAIVES AND RELEASES ANY AND ALL ACTUAL OR**

CONTRACT OF SALE – Page 4

POTENTIAL RIGHTS PURCHASER MIGHT HAVE (INCLUDING CONTRACTUAL AND/OR STATUTORY ACTIONS FOR CONTRIBUTION OR INDEMNITY) REGARDING THE NATURE, CONDITION OR SUITABILITY OF THE PROPERTY OR ANY FORM OF WARRANTY WITH RESPECT TO THE PROPERTY, EXPRESS OR IMPLIED OR ARISING BY OPERATION OF LAW. IT IS UNDERSTOOD AND AGREED THAT THE PURCHASE PRICE HAS BEEN ADJUSTED BY PRIOR NEGOTIATION TO REFLECT THAT ALL OF THE PROPERTY IS SOLD BY SELLER AND PURCHASED BY PURCHASER SUBJECT TO THE FOREGOING.

8.      NONCONFORMANCE. Purchaser has or will independently investigate and verify to Purchaser's satisfaction the extent of any limitations or permitted uses of the Property. Purchaser acknowledges that the current use of the Property or any improvements located on the Property (or both) may not conform to applicable Federal, State, or municipal laws, ordinances, codes, or regulations. Zoning, permitted uses, height limitations, setback requirements, minimum parking requirements, limitations on coverage of improvements to total area of land, requirements of the Americans with Disabilities Act, wetlands restrictions and other matters may have a significant economic impact upon the intended use of the Property by Purchaser.

9.      INSPECTION.

        A.      Inspection. Purchaser shall have ninety (90) days after the Effective Date (the "Inspection Period"), subject to the conditions listed in Section 9(B) below, to inspect the Property and to conduct feasibility studies regarding Purchaser's intended use of the Property. Purchaser's studies may include without limitation: (i) environmental and subsurface soil investigations. Purchaser and Purchaser's agents, employees, consultants, and contractors shall have the right of reasonable entry onto the Property during normal business hours, and upon reasonable advance notice to Seller and/or Seller's tenants, for purposes of the inspections, studies, tests and examinations deemed necessary by Purchaser. All inspections, studies, tests and examinations performed hereunder shall be at Purchaser's expense. Purchaser shall have the option to extend the Inspection Period for a one thirty (30) day extension by giving written notice to Seller prior to the then scheduled Closing Date along with a non-refundable fee of One Thousand and 00/100 ($1,000.00) which shall be credited to the Purchase Price at Closing in the event Purchaser does not terminate prior to the extended Inspection Period.

        B.      Seller's Obligation. Seller shall reasonably cooperate with Purchaser's efforts to obtain all entitlements necessary for Purchaser to develop the Land as planned by Purchaser including the execution of any consents or agreements such as a development agreement with the applicable governing body under sec. 212.172 of the Texas Local Government Code (collectively, "Entitlements").

        C.      Termination. If Purchaser determines, in Purchaser's sole discretion, no matter how arbitrary, that the Property is not in satisfactory condition or is not suitable for Purchaser's intended use or purpose, or if Purchaser for any reason does not desire to proceed with the acquisition of the Property, then Purchaser may terminate this Contract by delivering a written notice to Seller on or before the last day of the Inspection Period, in which event, the Earnest Money, other than the Independent Consideration, shall be promptly returned by the Title Company to Purchaser and

CONTRACT OF SALE – Page 5

neither party shall have any further rights or obligations under this Contract (except for those which may expressly survive the termination of this Contract).

D.    Restoration. If the transaction described in this Contract does not close through no fault of Seller, and the condition of the Property was altered due to tests and inspections performed by Purchaser or on Purchaser's behalf, Purchaser must restore the Property to its original condition. Purchaser shall not permit any liens or encumbrances to arise against the Property in connection with or as a result of such inspections, studies, or investigations. **PURCHASER SHALL INDEMNIFY, DEFEND AND HOLD SELLER HARMLESS OF AND FROM ANY AND ALL LOSSES, LIABILITIES, COSTS, EXPENSES (INCLUDING, WITHOUT LIMITATION, REASONABLE ATTORNEYS' FEES AND COSTS OF COURT), DAMAGES, LIENS, CLAIMS (INCLUDING, WITHOUT LIMITATION, MECHANIC'S OR MATERIALMEN'S LIENS OR CLAIMS OF LIENS), ACTIONS AND CAUSES OF ACTION (COLLECTIVELY, "CLAIMS") ARISING FROM OR RELATING TO PURCHASER'S (OR PURCHASER'S AGENTS, EMPLOYEES, CONTRACTORS, SUBCONTRACTORS, OR REPRESENTATIVES) ENTERING UPON THE PROPERTY TO TEST, STUDY, INVESTIGATE, OR INSPECT THE PROPERTY, WHETHER PURSUANT TO THIS SECTION 9, OR OTHERWISE, UNLESS DUE TO THE NEGLIGENCE OR WILLFUL MISCONDUCT OF SELLER.** Purchaser will not be required to indemnify, defend, or hold Seller harmless of or from any condition affecting any of the Property prior to Purchaser's entry thereon. This Section 9(D) shall survive termination of this Contract or a Closing of the transaction contemplated hereunder.

10.    CASUALTY LOSS; CONDEMNATION. All risk of loss to the Property shall remain upon Seller prior to the Closing. If, prior to the Closing, any portion of the Property is subject to a condemnation or taking or the threat of a condemnation or taking, Seller shall have a duty to notify Purchaser, and Purchaser may either terminate this Contract by delivering a written termination notice to Seller or elect to close. If the transaction is to proceed to Closing, there shall be no reduction in the Purchase Price.

11.    ASSIGNMENT. Purchaser may assign this Contract without the prior written consent of Seller. This Contract shall be binding upon and inure to the benefit of the respective legal representatives, successors, assigns, heirs, and devises of the parties; however, Seller may not assign this Contract without Purchaser's consent.

12.    CLOSING.

A.    Closing Date. The closing of the transaction described in this Contract (the "Closing") shall be held on the date which is thirty (30) days following the last day of the Inspection Period (the "Closing Date"), at the offices of the Title Company at its address stated below. Purchaser shall have the option to extend the Closing Date for a one thirty (30) day extension by giving written notice to Seller prior to the then scheduled Closing Date along with non-refundable fee of One Thousand and 00/100 ($1,000.00) which shall be credited to the Purchase Price at Closing.

CONTRACT OF SALE – Page 6

B.     Seller's Closing Documents. At the Closing, Seller shall deliver to Purchaser as further described in this Contract:

(1)     A duly executed Special Warranty Deed (the "Deed"), in a form reasonably acceptable to Seller and Purchaser, conveying the Property in fee simple according to the legal description as prepared by the surveyor as shown on the Survey, subject only to the Permitted Exceptions;

(2)     The Title Policy issued by the underwriter for the Title Company pursuant to the Title Commitment, subject only to the Permitted Exceptions, in the full amount of the Purchase Price, dated as of the date of Closing, and with the survey exception deleted except as to "shortages in area;"

(3)     Bill of Sale conveying the personal property and other items described in section 2 which are not considered part of the Land;

(4)     Possession of the Property except for the Lease Agreement and the removal of the items as defined in Section 15, Post Closing Obligations.

(5)     Evidence of Seller's authority and capacity to close this transaction;

(6)     Any required surface use waiver;

(7)     All other documents reasonably required in this Contract or by the Title Company from Seller to close this transaction.

C.     Purchaser's Closing Documents. At the Closing, Purchaser shall deliver to Seller at Purchaser's expense:

(1)     The payment equal to the Purchase Price along with any other agreed costs, credits, or prorations.

(2)     Evidence of Purchaser's authority and capacity to close this transaction; and

(3)     All other documents reasonably required by the Title Company from Purchaser to close this transaction.

D.     Closing Costs.     All closing costs shall be paid by Purchaser based on representations of the seller.

E.     Prorations. Seller has represented all taxes and expenses applicable to the Property prior to year-end 2020 have been paid and there are no outstanding debts or liens. Ad valorem taxes applicable to the Property 2021 shall be paid at the Closing effective as of the Closing date by the Purchaser. This provision shall survive the Closing.

CONTRACT OF SALE – Page 7

F.      Foreign Person Notification. If Seller is a Foreign Person, as deemed by the U.S. Internal Revenue Code, or if Seller fails to deliver to Purchaser a non-foreign affidavit pursuant to Section 1445 of the Internal Revenue Code, then Purchaser may withhold from the sales proceeds an amount sufficient to comply with applicable tax law and deliver the withheld proceeds to the Internal Revenue Service together with appropriate tax forms. The required affidavit(s) from Seller(s) shall include (1) a statement that Seller is not a foreign person, (2) the U. S. taxpayer identification number(s) of Seller(s), and (3) other information required by Section 1445 of the Internal Revenue Code.

13.    DEFAULT.

A.      Purchaser's Remedies. If Seller fails to perform its obligations under this Contract for any reason (except resulting from Purchaser's default or the termination of this Contract by Seller pursuant to a right to terminate as set forth in this Contract) which continues for more than thirty (30) days following delivery of written notice of such default from Purchaser to Seller, Seller shall be in default and Purchaser may elect one of the following, as Purchaser's sole remedies: (1) enforce specific performance of this Contract; or (2) terminate this Contract and receive the Earnest Money, other than the Independent Consideration, immediately. In the event of any breach of the representations or warranties in this Contract discovered after Closing or if Purchaser elects to enforce specific performance and such remedy is not available as a result of Seller's actions, such as conveying the Property to a third party, then Purchaser may pursue any legal remedy available at law or in equity.

B.      Seller's Remedies. If Purchaser fails to perform its obligations under this Contract for any reason (except resulting from Seller's default or the termination of this Contract by Purchaser pursuant to a right to terminate as set forth in this Contract) which continues for more than thirty (30) days following delivery of written notice of such default from Seller to Purchaser, Purchaser shall be in default and Seller may, as Seller's sole remedy, terminate this Contract, in which event, the Earnest Money shall be paid to Seller as liquidated damages for the Purchaser's breach of this Contract, thereby releasing Purchaser from this Contract.

14.    DEVELOPMENT AGREEMENT.

Seller will cooperate with the Purchaser in their work to obtain a Development Agreement with the City of Venus.  This includes agreeing to sign development agreement application for which Venus 59, LLC will provide the Seller an indemnity agreement if Necessary.  At presentation of the document to obtain Development Agreement approval, Seller shall cooperate with Purchaser and cooperation cannot reasonably be withheld. **No Development Agreement will be executed between Purchaser and the City of Venus until after the Seller's property has been acquired by the Purchaser.**

CONTRACT OF SALE – Page 8

## 15. POST CLOSING OBLIGATIONS

Seller shall have up to 90 days post-closing ("Lease Period"), from the day of Closing to vacate the premises and take and remove all personal possessions which will be incorporated into a temporary lease agreement, (Exhibit B, the Seller Temporary Residential Lease) executed by the parties prior to Closing. Purchaser has the right to begin to remove external fencing, start cleaning up and commence staking and grading as needed without interfering with the Seller's ingress, egress, utilities, or septic system. In addition, Seller can have an estate sale, remove light fixtures, mirrors, gates, doors, paneling, cabinets, hardware, sea container and other fixed fixtures associated with the entire property up to the day Seller officially vacates the home permanently within the Lease Period. This section shall survive Closing.

## 16.    REAL ESTATE COMMISSIONS.

Each party to this Contract represents and warrants to the other party that such party has had no dealings with any person, firm, agent, or finder in connection with the negotiation of this Contract and/or the consummation of the purchase and sale contemplated herein, and no real estate broker, agent, attorney, person, firm or entity is entitled to any commission or finder's fee in connection with this transaction as the result of any dealings or acts of such party. Each party hereby agrees to indemnify, defend, protect, and hold the other party harmless from and against any costs, expenses or liability for compensation, commission, fee, or charges which may be claimed by any agent, finder, or other similar party by reason of any dealings or acts of the indemnifying party.

## 17.    MISCELLANEOUS PROVISIONS.

A.    Effective Date. The term "Effective Date" means the later of the date the Contract is marked receipted by the Title Company (if any) or date of execution of the last party executing this Contract and if not dated then the date the fully executed Contract is received by the first party which executed the Contract.

B.    Notices. All notices and other communications required or permitted under this Contract must be in writing and shall be deemed delivered on the earlier of: (i) actual receipt, if delivered in person or by messenger with evidence of delivery; or (ii) receipt of an electronic facsimile transmission ("Fax") with a transmission confirmation receipt; or (iii) three (3) business days after deposit in the United States Mail as required below. Notices may be transmitted by Fax to the Fax telephone numbers specified below, if any. Notices delivered by mail must be deposited with the U.S. Postal Service and sent by certified mail return receipt requested with postage prepaid, and properly addressed to the intended recipient at the address set forth below. Any party may change its address for notice purposes by delivering written notice of its new address to all other parties in the manner set forth above. For the purposes of notice, the addresses of the parties shall be as follows:

Purchaser:    Venus59, LLC
13901 Midway Road
Suite 102-LB 243
Dallas, Texas 75244

With a Copy to:  Vance McMurry
McMurry Law, PLLC
508 W. Lookout Suite 14-74
Richardson, Texas 75080
vance@mcmurrylegal.com

Seller:    Helen E. Elliott
P.O. Box 156
Venus, Texas 76084

C.    <u>Forms and Construction</u>. This Contract is the result of negotiations between the parties, neither of whom has acted under any duress or compulsion, whether legal, economic, or otherwise. Accordingly, the terms and provisions hereof shall be construed in accordance with their usual and customary meanings. Seller and Purchaser hereby waive the application of any rule of law which otherwise would be applicable in connection with the construction of this Contract that ambiguous or conflicting terms or provisions should be construed against the party who (or whose attorney) prepared the executed Contract or any earlier draft of the same.

D.    <u>Attorney Fees</u>. The prevailing party in any legal proceeding brought in relation to this Contract or transaction shall be entitled to recover from the non-prevailing parties court costs, reasonable attorneys' fees, and all other reasonable litigation expenses.

E.    <u>Integration</u>. This Contract contains the complete agreement between the parties with respect to the Property and cannot be varied except by written agreement of the parties hereto. The parties agree that there are no oral or signed agreements, understandings, representations, or warranties made by the parties which are not expressly set forth herein.

F.    <u>Survival</u>. Any warranty, representation, covenant, condition, or obligation contained in this Contract not otherwise consummated at the Closing will survive the Closing of this transaction and nothing herein shall act as an election, release, or waiver of any legal or equitable remedies related thereto.

G.    <u>Binding Effect</u>. This Contract shall inure to the benefit of and be binding upon the parties to this Contract and their respective heirs, legal representatives, successors and assigns.

H.    <u>Time for Performance</u>. Time is of the essence under each provision of this Contract. If any date of performance hereunder falls upon a Saturday, Sunday or recognized holiday, such date will be deemed moved forward to the next day which is not a Saturday, Sunday, or recognized holiday.

CONTRACT OF SALE – Page 10

I.    Right of Entry. Subject to the requirements of Section 9, upon reasonable advance notice and during normal business hours, Purchaser, Purchaser's representatives and the Broker have the right to enter upon the Property prior to Closing for purposes of viewing, inspecting, and conducting studies of the Property, so long as they do not interfere with the use of the Property by Seller or any tenants, or cause undue damage to the Property.

J.    Business Day. The term "business day" shall mean days elapsed exclusive of Saturday, Sunday, or recognized holidays.

K.    Governing Law. This Contract shall be construed under and governed by the laws of the State of Texas, and unless otherwise provided herein, all obligations of the parties created under this Contract are to be performed in the county where the Property is located.

L.    Severability. If any provision of this Contract is held to be invalid, illegal, or unenforceable by a court of competent jurisdiction, the invalid, illegal or unenforceable provision shall not affect any other provisions, and this Contract shall be construed as if the invalid, illegal, or unenforceable provision is severed and deleted from this Contract.

M.    Counterparts. This Contract may be executed in a number of identical counterparts. Each counterpart is deemed an original and all counterparts shall, collectively, constitute one agreement.

N.    Gender; Number. Unless the context requires otherwise, all pronouns used in this Contract shall be construed to include the other genders, whether used in the masculine, feminine or neuter gender. Words in the singular number shall be construed to include the plural, and words in the plural shall be construed to include the singular.

17.    CONTRACT AS OFFER. The execution of this Contract by the first party to do so constitutes an offer to purchase or sell the Property on the conditions contained in this Contract. Unless within ten (10) business days from the date of execution of this Contract by the first party, this Contract is accepted by the other party by signing the offer and delivering a fully executed copy to the first party, the offer of this Contract may be rescinded and the Earnest Money, if any, shall be promptly returned to Purchaser.

*[Signature Page to Follow]*

CONTRACT OF SALE -- Page 11

EXECUTED on the Effective Date stated above.

**SELLER:**

Helen E. Elliott
An unmarried, individual

**PURCHASER:**

Venus59, LLC

By: _____
Name: Tim Barton
Title:  President

CONTRACT OF SALE – Page 12

**EXHIBIT B**
**Supplemental Terms**

1.        As a condition of Venus 59 LLC or any of its related entities (collectively, "Company") to accept any investment and contribution from Crow and admit Crow as a member (which shall be effective upon the Closing of the Purchase Contract) for any reason including upon the as related to the Funding Agreement, Crow shall represent and warrant to Company and its members the following which may be further amended and supplemented as agreed to by Crow and Company:

  a.    Except as disclosed in writing to Company, Crow shall acquire any membership interests in Company for its own account; shall not have any contract, undertaking or arrangement with any person or entity to sell, transfer or grant a participation with respect to any of Company interests; and shall not acquire Company interests with a view to or for sale in connection with any distribution.

  b.    Crow or an advisor or consultant relied upon by Crow in reaching a decision to invest has such knowledge and experience in financial, tax and business matters as to enable Crow or such advisor or consultant to evaluate the merits and risks of an investment in Company interests and to make an informed investment decision with respect thereto.

  c.    Crow understands that Company interests have not been and will not be registered under the Securities Act of 1933 or 1934, as amended (collectively, the "Securities Act"), or any state law, and that Company is not registered under the Investment Company Act of 1940, as amended (the "Investment Company Act"). Crow understands that Company has no intention to register Company or Company interests or any of its related entities with the Securities and Exchange Commission or any state and is under no obligation to assist Crow in obtaining or complying with any exemption from registration. Company may require that a proposed transferee meet appropriate financial and other suitability standards and that the transferor, at its expense, furnish a legal opinion satisfactory to Company and its counsel that the proposed transfer complies with applicable federal, state and any other applicable securities laws. An appropriate legend evidencing such restrictions may be placed on any certificates issued representing Company interests and appropriate stop-transfer instructions may be placed with respect to Company interests.

  d.    In formulating a decision to invest in Company, Crow has not relied nor acted on the basis of any representations or other information purported to be given on behalf of Company (it being understood that no person has been authorized by Company furnish any such representations or other information) and has conducted sufficient due diligence and background investigation including into the Property and to the related persons and entities of Company including in the property and court records of Johnson County and secretary of the state of Texas.

  e.    Crow recognizes that there may not be any ascertainable secondary market for Company interests. Accordingly, it may not be possible for Crow readily to liquidate Crow's investment in Company.

  f.    Crow is qualified to become a member in Company and (i) has the legal capacity to execute, deliver and perform as agreed including any definitive agreement, and (ii) has all permits, licenses or approvals as may be required to make any investment to Company in US Dollars.

  g.    The acquisition of Company interests contemplated hereunder and the compliance by Crow with all of the provisions herein and the Company Agreement applicable to Crow and the consummation by Crow of the transactions as contemplated will not (i) conflict with or result in a breach or violation of any of the terms or provisions of, or constitute a default under, any statute, indenture, mortgage, deed of trust, loan agreement or other agreement or instrument to which Crow is a party or by which Crow is bound or to which any of the property or assets of Crow is subject, nor (ii) will such action result in any violation of any statute applicable to Crow or any order, rule or regulation of any court or governmental agency or body having jurisdiction over Crow or the property of Crow.

  h.    Crow has carefully reviewed and understands the various risks of an investment in Company.

Funding Agreement – Crow & Venus 59, LLC                                                                 9

i.   Crow is satisfied that it has received adequate disclosure from Company to enable it to enter into further negotiations towards the Company Agreement and shall be satisfied that it has received all requested due diligence materials and adequate disclosure prior to executing any definitive agreement.

j.   Crow has sufficient expertise and knowledge necessary to understand and evaluate the rights, obligations, distributions and other terms of a potential definitive agreement and the risks associated therewith.

k.   Crow agrees promptly to notify Company of any change in information affecting these representations and covenants.

l.   Crow acknowledges and agrees that any amounts paid to it will be paid to the same account from which its funds were originally remitted, unless Company agrees otherwise.

m.   Crow is purchasing Company interests for Crow's own account.

n.   Crow is an accredited investor under Rule 501 of the Securities Act and/or is outside the United States and is not a U.S. Person (i.e., is not a resident or citizen of the United States).

o.   If the managing member/manager permits a transfer of Company interests to occur, Crow will give each person to whom Crow transfers Company interests notice of any restrictions on transfer of Company interests including a copy of the Company Agreement/regulations of Company in which a transferee must agree to be bound.

p.   If Crow is not a U.S. person and is outside the United States, Crow is purchasing in accordance with Regulation S under the Securities Act and has not engaged in, and will not engage in any short selling of any interests granted by Company (including, without limitation, Company interests) or any hedging transaction with respect to any such equity security, including without limitation, put, call or other option transactions, option writing and equity swaps.

2.   Crow understands the meaning and legal consequences of the representations, warranties, agreements, covenants and confirmations set out above and agrees that any investment made to Company is accepted in reliance thereon.  Crow shall agree to indemnify and hold harmless Company, the managing member/manager, and their affiliates, and the partners, members, managing members/managers, stockholders, other beneficial owners, officers, directors and employees of any of the foregoing (the "Indemnified Persons") from and against any and all loss, damage, liability or expense, including reasonable costs and attorneys' fees and disbursements, which an Indemnified Person may incur by reason of, or in connection with, any representation or warranty made herein (or in any investment representation statement) not having been true, correct and complete when made, any misrepresentation made by Crow or any failure by Crow to fulfill any of the covenants or agreements set forth herein, in any representations or in any other document provided by Crow to Company.

3.   In the event of any breach of Crow's representations, Crow shall indemnify and hold any administrative agent, lenders, developer, and their affiliates and each of their officers, directors, employees, consultants, agents, and owners harmless, and to reimburse any administrative agent, lender, and its affiliates and each Party shall be responsible for their own costs, expenses, and fees related to the contemplated transaction including accounting and legal fees, consulting fees, costs of investigation, insurance, due diligence reports, brokers or finders fees, travel, and closing costs.  In the event of any dispute between the Parties, each Party waives any and all rights to seek or recover any consequential, punitive, or special damages.

4.   Crow's investment is subject to certain "know your customer" disclosures and requirements as promulgated by the government of the United States related to certain investments and transactions by foreign nationals within the United States.  As such, you agree to provide any and all necessary documents and information including personal and financial information regarding Crow and any entity which Crow uses to facilitate its investment.  Such information is subject to verification by Company and any required government authority.

5.   The actual terms and conditions upon which each Company is willing to accept Crow as a member are further defined in the form of the Company Agreement which shall govern the terms by which Crow is granted any membership interests in Company and admitted as a member and any other documentation reasonably requested by Company in order to close the applicable transaction which may include the following:

•   Completed and signed Investment Representation Statement;

Funding Agreement – Crow & Venus 59, LLC                                                                                      10

- Completed IRS Forms W-8BEN (non US citizens) or W-9: as designated by the U.S. Department of the Treasury Internal Revenue Service;
- Payment of any designated administrative or escrow fee;
- Delivery of any signed escrow agreement; and
- Delivery of consent to be bound to the Company Agreement of Company.

6.      Crow agrees to abide by all applicable laws, rules, regulations, orders and ordinances to which Company is or may be subject including but not limited to those related to the negotiation and consummation of an investment in Company.

7.      Crow shall hold harmless Company's managing member/manager including its related persons, officers, directors, members, and employees from any liability, damages or loss that the Crow sustains from any such person's action or failure to act except to the extent such losses, liability or damages are directly caused by the fraud or willful misconduct of any such person.

## EXHIBIT C

## <u>Venus59, LLC -</u>
## <u>Use of Proceeds from Capital Contributions of Members</u>

### <u>TOTAL CAPITAL CONTRIBUTIONS OF CROW</u>

1. <u>Closing of 59 Acre Contract</u>
   (as defined in the attached 59 Acre Purchaser's Statement)

   **"Balance Due by Purchaser"**                 **$744,985.56**

2. <u>Closing of 3 Acre Contract</u>
   (as defined in the attached 3 Acre Purchaser's Statement)

   **"Estimated Total" due by Purchaser**         **$254,229.80**

3. <u>Invoices to be Paid on behalf of Venus59, LLC</u>

   Jones|Carter Invoice 00320691                 $19,440.00

   Alpha Testing, Inc., Invoice 602974            $ 6,300.00

   CCN Settlement with Mountain Peak
   The AL Law Group (David Tuckfield) Invoice 40763   $ 1,120.00

   Barrett & Associates, PLLC Invoice 1539       <u>$10,000.00</u>

   **Total Invoices to be Paid:**                 **$36,860.00**

   ## <u>Total Initial Capital Contributions of Crow</u>       <u>**$1,036,075.36**</u>

4. <u>Estimated Cost to complete Preliminary Plat:</u>

   | | |
   |---|---|
   | Preliminary Plat | $29,000.00 |
   | Meeting and Coordination | $ 2,000.00 |
   | Easement Preparation | $ 1,000.00 |
   | Downstream Assessment and Flood Study | $24,225.00 |
   | Downstream Assessment Agency Comments | <u>$ 6,375.00</u> |
   | **Total Billing Remaining for Preliminary Plat:** | **$62,600.00** |
   | **LESS: MXBA Additional Contribution:** | **($40,675.36)** |

   ## <u>Estimated Costs Apportioned to the</u>
   ## <u>Crow Additional Contribution</u>                 <u>**$21,924.64**</u>

## <u>TOTAL CAPITAL CONTRIBUTIONS OF CROW:</u>       **<u>$1,058,000.00</u>**

Funding Agreement – Crow & Venus 59, LLC                          12

## TOTAL CAPITAL CONTRIBUTIONS OF MXBA

4.  **Estimated Cost to complete Preliminary Plat:**

| | |
|---|---:|
| Preliminary Plat | $29,000.00 |
| Meeting and Coordination | $ 2,000.00 |
| Easement Preparation | $ 1,000.00 |
| Downstream Assessment and Flood Study | $24,225.00 |
| Downstream Assessment Agency Comments | $ 6,375.00 |
| **Total Billing Remaining for Preliminary Plat:** | **$62,600.00** |
| **LESS: Crow's Additional Contribution:** | **($21,924.64)** |

**Estimated Costs Apportioned to the
MXBA Additional Contribution**          **$40,675.36**

5.  **Invoices and Monies Paid on behalf of Venus59, LLC**

| | |
|---|---:|
| City of Venus Professional Services Agreement Fee<br>Invoice 2021-01-112-1 | $15,000.00 |
| Retainer for Development Agreement with<br>Miklos\|Cinclair Attorneys & Counselors | $ 5,000.00 |
| Retainer for Decertification Filing with Mountain Peak<br>The AL Law Group (Andy Barrett) | $ 5,000.00 |
| Mountain Peak Settlement for Decertification 51-158 | $10,000.00 |
| Jones\|Carter – Services for Johnston Tract Legal<br>Description –  Invoice 00302850-2 | $ 1,116.33 |
|         Invoice 00303581-2 | $   372.11 |
| Non-Applicable Non-Refundable Deposit for Contract Extension<br>Johnston Seventh Amendment, May 31, 2021 | $10,000.00 |
| Non-Applicable Non-Refundable Deposit for Contract Extension<br>Johnston Eighth Amendment, July 31, 2021 | $10,000.00 |
| 59 Acres: Gross Amount Due By Purchaser Less Balance Due<br>    By Purchaser (per the Purchasers Statement including<br>    Applicable Earnest Money of $20,000.00)<br>    ($765,150.77 - $744,985.56) | $20,165.21 |
| "Earnest and Option" (per 3 Acre "Estimated Fees") | $ 5,000.00<br>**$81,653.65** |

## TOTAL CAPITAL CONTRIBUTIONS OF MXBA          $122,329.01

## EXHIBIT D
## Amended and Restated Company Agreement of Company

[See Attached]

## AMENDED AND RESTATED
## COMPANY AGREEMENT OF
## VENUS59, LLC
## A TEXAS LIMITED LIABILITY COMPANY

This Amended and Restated Company Agreement of VENUS 59, LLC a Texas limited liability company is executed as of AUGUST 31, 2021 by the persons who sign and are identified as "Members" and "Managers" in this Agreement but shall not be effective unless and until the closing of the acquisition of the Property under the terms of the Purchase Contract as described herein (the "Effective Date"), or as otherwise contemplated in the Funding Agreement entered into among the Members as of the date hereof.

## ARTICLE I
## DEFINITIONS

1.01  **Definitions.**  As used in this Agreement, the following terms have the following meanings:

"Affiliate" means, with reference to any person, any other person controlling, controlled by or under direct or indirect common control with such person.

"Agreement" means this Company Agreement, as amended from time to time.

"Assignee" means a person who receives a Transfer of all or a portion of the Membership Interest of a Member, but who has not been admitted to the Company as a Member.

"Bankrupt Member" means (except to the extent all Members consent otherwise) any Member (a) that (i) makes an assignment for the benefit of creditors; (ii) files a voluntary bankruptcy petition; (iii) becomes the subject of an order for relief or is declared insolvent in any federal or state bankruptcy or insolvency proceedings; (iv) files a petition or answer seeking for the Member a reorganization, arrangement, composition, readjustment, liquidation, dissolution, termination, or similar relief under any law; (v) files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against the Member in a Proceeding of the type described in sub-clauses (i) through (iv) of this clause (a); or (vi) seeks, consents to, or acquiesces in the appointment of a trustee, receiver, or liquidator of the Member's or of all or any substantial part of the Member's properties; or (b) against which a Proceeding seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any law has been commenced and one hundred twenty (120) days have expired without dismissal thereof or with respect to which, without the Member's consent or acquiescence, a trustee, receiver, or liquidator of the Member or of all or any substantial part of the Member's properties has been appointed and ninety (90) days have expired without the appointment's having been vacated or stayed, or ninety (90) days have expired after the date of expiration of a stay, if the appointment has not previously been vacated.

"Business Day" means any day other than a Saturday, a Sunday, or a holiday on which

national banking associations in the State of Texas are closed.

"Capital Account" means a capital account maintained for a Member as provided by Treasury Regulation 1.704-1(b)(2)(iv) of the Regulations of the Internal Revenue Service.

"Capital Contribution" means the amount of money and the Net Value of property other than money contributed to the Company by a Member.

"Capital Commitment" of a Member represents the aggregate amount of capital that such Member has agreed to contribute to the Company.

"Certificate of Formation" means the initial, amended, and restated certificate of formation of the Company.

"Company" means **Venus 59, LLC,** a Texas limited liability company.

"Default Interest Rate" means a rate per annum equal to the lesser of (a) ten percent (10%) plus the prime rate published in The Wall Street Journal on the day the rate is determined (or the most recent day on which The Wall Street Journal was published if the paper is not published on the day the rate is determined), or, (b) the maximum rate permitted by applicable law.

"Former Member" means any person who had executed this Agreement, as of the date of this Agreement as a Member, or hereafter admitted to the Company as a Member, as provided in the Agreement, but who is no longer a Member of the Company; however, this term does not include a person who ceases to be a Member as a result of bankruptcy, default or expulsion.

"Fundamental Business Transaction" has that meaning assigned to it by the definitions in the TBOC, as may be amended from time to time, and includes (a) a merger, (b) an interest exchange, (c) a conversion, or (d) a sale of all or substantially all of an entity's assets (with or without good will), other than in the usual and regular course of the Company's business.

"General Interest Rate" means a rate per annum equal to the lesser of (a) the prime rate published in The Wall Street Journal on the day the rate is determined (or the most recent day on which The Wall Street Journal was published if the paper is not published on the day the rate is determined), or, (b) the maximum rate permitted by applicable law.

"Good Cause" or similar language means (i) conviction of a crime of moral turpitude, (ii) action or inaction constituting willful misconduct or gross negligence, or (iii) a material breach of this Agreement which remains uncured thirty (30) days after written notice from any Member and/or Manager as applicable.

"Internal Revenue Code" means the Internal Revenue Code of 1986 and any successor statute, as amended from time to time.

"Manager" means any person named in the Certificate of Formation as an initial Manager of the Company and any person hereafter elected as a Manager of the Company as

provided in this Agreement, but does not include any person who has ceased to be a Manager of the Company.

"Member" means any person executing this Agreement as of the date of this Agreement as a Member or hereafter admitted to the Company as a Member as provided in this Agreement, but does not include any person who has ceased to be a Member of the Company.

"Membership Interest" means the interest of a Member in the Company, including, without limitation, rights to distributions (liquidating or otherwise), allocations, information, and to consent or approve.

"Net Value" means, in connection with a Capital Contribution of property, the value of the asset less any indebtedness to which the asset is subject when contributed.

"Percentage Interest" means the ratio in which the Members shall share profits and losses, as provided in this Agreement. The sum of the Members' Interests shall be one hundred percent (100%).

"Person" means any business entity, trust, estate, executor, administrator, or individual.

"Proceeding" means any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative, arbitrative or investigative.

"Simple Majority" or "Majority" means one or more Members having among them more than fifty percent (50%) of the Percentage Interests of all Members.

"Super Majority" means one or more Members having among them more than sixty-six and sixty-seven hundredths percent (66.67%) of the Percentage Interests of all Members.

"TBOC" means the Texas Business Organizations Code, including any successor statute, as amended from time to time.

"Transfer" means any sale, transfer, encumbrance, gift, donation, assignment, pledge, hypothecation, or other form of transfer of a Membership Interest or any portion of a Membership Interest, whether voluntary or involuntary, whether attempted or completed, and whether during the transferor's lifetime or upon or after the transferor's death, including by operation of law, court order, judicial process, foreclosure, levy or attachment.

"Unanimous Consent" including "consent of all" or similar language means consent of 100% of such persons entitled to vote or consent on such matters and in reference to the Members means 100% of all Membership Interests in the Company entitled to vote. Where consent of the Members is required such shall mean Unanimous Consent unless a Majority, Super Majority, or other specific consent is specifically stated.

Other terms defined herein have the meaning so given them.

---

**Company Agreement**                                                          **Page   3**
Venus 59, LLC

## ARTICLE II
## ORGANIZATION

2.01  **Formation.**  The Company has been organized as a Texas limited liability company by filing a Certificate of Formation with the Secretary of State of Texas, which may be amended or restated from time to time.

2.02  **Name.**  The name of the Company is "Venus 59, LLC" and all Company business must be conducted in that name or such other names that comply with applicable law as the Managers may select from time to time.

2.03  **Registered Office and Registered Agent.**  The registered office of the Company required by the TBOC to be maintained in the State of Texas shall be the office of the initial registered agent named in the Certificate of Formation or such other office (which need not be a place of business of the Company) as the Managers may designate from time to time in the manner provided by law.  The registered agent of the Company in the State of Texas shall be the initial registered agent named in the Certificate of Formation or such other person or persons as the Managers may designate from time to time in the manner provided by law.

2.04  **Principal Office and Other Offices.**  The principal office of the Company in the United States shall be at such place as the Managers may designate from time to time, which need not be in the State of Texas.  The Company may have such other offices as the Managers may designate from time to time.

2.05  **Purposes.**  The purposes of the Company shall be:

(a)  The closing of a purchase contract ("59 Acre Contract") to acquire approximately 59 acres of land in Venus, Johnson County, Texas ("Large Tract") which is due to close ("Closing") on August 31, 2021 ("Closing Date");

(b)  The closing of a purchase contract ("3 Acre Contract" with the 3 Acre Contract and 59 Acre Contract referred to collectively as the "Purchase Contract") to purchase a 3.44 acre adjacent tract of land in Venus, Johnson County, Texas ("Small Tract" with the Large Tract and Small Tract collectively consisting of 62.4 acres being the "Property") which will close simultaneously with the Closing of the 59 Acre Contract;

(c)  Create a preliminary plat of the Property to create a residential subdivision known as Mustang Meadows consisting of approximately 304 50 ft. single family lots or approximately 379 40 ft single family lots (or mix thereof) and associated street rights-of-way, detention areas and common area amenities ("Paper Lots") which Company, unless otherwise agreed to by all Members, shall sell to a third party on terms as consented to by all Members (and which shall not be unreasonably withheld so long as such are sold at fair market value under an arms length transaction)  ("Project");

(d)  Otherwise, Company may perform horizontal development on the Property in order to develop the Paper Lots into single family lots in a form ready for vertical construction and which may be sold to third party home builders ("Horizontal Development") only upon the Unanimous Consent of the Members and only upon such terms as further agreed to

by all Members and which will include the payment of a development fee of three percent (3%) of the total development costs to be paid to a related entity of MXBA as the developer; and

(e) No other purposes whatsoever.

2.06 **Powers.** The Company shall have all powers necessary, suitable or convenient for the accomplishment of the purposes of the Company, including without limitation (a) to make and perform all contracts; (b) to borrow or lend money and secure payment thereof; (c) to engage in all activities and transactions; and (d) to have all powers available to a limited liability company under (i) the TBOC, (ii) any other laws in the State of Texas, and (iii) the laws of any other jurisdiction where the Company conducts business.

2.07 **Foreign Qualification.** Prior to the Company's conducting business in any jurisdiction other than Texas, the Managers shall cause the Company to comply, to the extent procedures are available and those matters are reasonably within the control of the Managers, with all requirements necessary to qualify the Company as a foreign limited liability company in that jurisdiction. At the request of the Managers, each Member shall immediately execute, acknowledge, swear to, and deliver all certificates and other instruments conforming with this Agreement that are necessary or appropriate to qualify, continue, and terminate the Company as a foreign limited liability company in all such jurisdictions in which the Company may conduct business.

2.08 **Term.** The Company will commence as provided in the Certificate of Formation for the Company filed with the Secretary of the State of Texas, and will continue until the Company terminates under the terms of this Agreement.

2.09 **Mergers and Exchanges.** The Company may be a party to a merger, an exchange, or acquisition under the TBOC, subject to the requirements of this Agreement.

2.10 **No State-Law Partnership.** The Members intend that the Company not be a partnership, a limited partnership, or a joint venture, and that no Member or Manager be a partner or joint venturer of any other Member or Manager, for any purposes other than federal and state tax purposes, and this Agreement may not be construed to suggest otherwise.

2.11 **Budget.** Upon closing of the Property, the Members shall unanimously agree to a development budget for any Horizontal Development of the Property and upon approval, the Manager shall have the power to spend money or incur liabilities in the ordinary course of business in accordance with the approved budget. Otherwise, the Manager is authorized to expend up to $100,000.00 for the purpose of creating Paper Lots including for reasonably necessary engineering costs ("Paper Lot Expenses").

## ARTICLE III
## MEMBERSHIP

3.01 **Initial Members, Capital Commitments, and Percentage Interests.** The persons listed on Exhibit A are hereby admitted to the Company as a Member, effective contemporaneously with the Effective Date of formation of the Company. Set forth opposite the name of each Member listed on Exhibit A is such Member's Capital Commitment and its Percentage Interest. Exhibit A may

be amended from time to time to reflect changes in or additions to the membership of the Company. Any such amended Exhibit A shall (a) supersede all prior Exhibit A's, (b) become part of this Agreement, and (c) be kept on file at the principal office of the Company. Each Member represents that the Member is acquiring an interest in the Company for the account of such Member and not with a view to distribution thereof within the meaning of the Securities Act of 1933, as amended, or any state securities laws. The Member will not transfer such interest in contravention of that act or any applicable state or federal securities laws.

3.02 **Additional Members.** Additional persons may be admitted to the Company as Additional Members on such terms and conditions as shall be determined by Unanimous Consent of the Members. The terms of admission or issuance must specify the Percentage Interests and the Capital Commitments applicable thereto. The terms of admission or issuance may also provide for the creation of different classes or groups of Members having different rights, powers, and duties. The Managers shall reflect the creation of any new class or group in an amendment to this Agreement indicating the different rights, powers, and duties, and such an amendment need be executed by all Members.

3.03 **Member Rights Specified in Agreement.** Except as otherwise specifically provided in this Agreement, no Member shall have the right (a) to sell, transfer or assign its interest in the Company; (b) to require partition of the property of the Company; (c) to compel the sale of Company assets; or (d) to cause the winding up of the Company.

3.04 **Representations and Warranties.** Each Member hereby represents and warrants to the Company and each other Member that, if that Member is a business entity: (a) that Member is duly organized, validly existing, and in good standing under the law of the state of its organization; (b) that Member is duly qualified to do business in the jurisdiction of its principal place of business; (c) that Member has full power and authority to execute and agree to this Agreement and to perform its obligations hereunder; (d) all necessary actions by the board of directors, shareholders, members, managers or other representative of that Member necessary for the due authorization, execution, delivery, and performance of this Agreement have been duly taken; and (e) that Member's authorization, execution, delivery, and performance of this Agreement do not conflict with any other agreement or arrangement to which that Member is a party or by which it is bound.

3.05 **No Authority.** Except as otherwise specifically provided in this Agreement, no Member (other than a Manager or an officer) has the authority or power to (a) transact business in the name of or on behalf of the Company, (b) bind or obligate the Company, or (c) incur any expenditures on behalf of the Company.

3.06 **Liability to Third Parties.** No Member or Manager shall be liable for the debts, obligations or liabilities of the Company, including under a judgment decree or order of a court.

3.07 **Withdrawal.** A Member may withdraw from the Company with sixty (60) days written notice to the Managers of the Company, subject to winding up or termination as provided in Article XVI of this Agreement.

### ARTICLE IV
### CAPITAL CONTRIBUTIONS

4.01 **Initial Contributions.** Contemporaneously with the execution of this Agreement, each Member shall make the initial Capital Contribution described for that Member in Exhibit "A".

4.02 **Additional Contributions.** Except for the additional Capital Contribution to be made by the Members Daniel Crow and MXBA up to the amounts described as the "Crow Additional Contribution" and "MXBA Additional Contribution" set forth on the *Use of Proceeds from Capital Contributions of Members* included as part of Exhibit A as attached to this Agreement, which amounts shall be a required additional Capital Contribution of such Members, no Member shall be required to make any Capital Contributions other than those specifically described by this Agreement unless agreed to in writing by the contributing Member or required by the TBOC.

4.03 **Return of Contributions.** No Member is entitled to the return of any part of its Capital Contributions or to be paid interest in respect of either its Capital Account or its Capital Contributions except as provided for in section 5.02. An unrepaid Capital Contribution is not a liability of the Company or of any Member.

4.04 **Loans by Members.** If the Company does not have sufficient cash to pay its obligations, any Member that may agree to do so with the Managers' consent without further consent of the Members and may advance all or part of the needed funds to or on behalf of the Company. An advance described in this paragraph constitutes a loan from the Member to the Company, bears interest at the General Interest Rate from the date of the advance until the date of payment, and is not a Capital Contribution.

4.05 **Capital Accounts.** A Capital Account shall be established and maintained for each Member. The Capital Account of each Member:

(a) shall consist of (i) the amount of money contributed by that Member to the Company, and (ii) the fair market value of property contributed by that Member to the Company (net of liabilities secured by the contributed property that the Company is considered to assume or take subject to under Section 752 of the Internal Revenue Code);

(b) shall be increased by allocations to that Member of Company income and gain (or items thereof), including income and gain exempt from tax and income and gain described in Treasury Regulation § 1.704-1(b)(2)(iv)(g), but excluding income and gain described in Treasury Regulation § 1.704-1(b)(4)(i); and

(c) shall be decreased by (i) the amount of money distributed to that Member by the Company, (ii) the fair market value of property distributed to that Member by the Company (net of liabilities secured by the distributed property that the Member is considered to assume or take subject to under section 752 of the Internal Revenue Code), (iii) allocations to that Member of expenditures of the Company described in Section 705(a)(2)(B) of the Internal Revenue Code, and (iv) allocations of Company loss and deduction (or items thereof), including loss and deduction described in Treasury Regulation § 1.704-1(b)(2)(iv)(g), but excluding items described in clause (c)(iii) above and loss or deduction described in Treasury Regulation § 1.704-1(b)(4)(i) or § 1.704-1(b)(4)(iii).

The Capital Account of each Member also shall be maintained and adjusted as permitted by the provisions of Treasury Regulation § 1.704-1(b)(2)(iv)(f) and as required by the other provisions of

Treasury Regulation § 1.704-1(b)(2)(iv) and 1.704-1(b)(4), including adjustments to reflect the allocations to the Members of depreciation, depletion, amortization, and gain or loss as computed for tax purposes, as required by Treasury Regulation §1.704-1(b)(2)(iv)(g). A Member that has more than one Membership Interest shall have a single Capital Account that reflects all its Membership Interests, regardless of the class of Membership Interests owned by that Member and regardless of the time or manner in which those Membership Interests were acquired. On the transfer of all or part of a Membership Interest, the Capital Account of the transferor that is attributable to the transferred Membership Interest or part thereof shall carry over to the transferee Member in accordance with the provisions of Treasury Regulation § 1.704-1(b)(2)(iv)(l).

## ARTICLE V
## ALLOCATIONS AND DISTRIBUTIONS

5.01 **Allocations.**

(a) Except as may be required by Section 704(c) of the Internal Revenue Code and Treasury Regulation § 1.704-1(b)(2)(iv)(f)(4), all items of income, gain, loss, deduction and credit of the Company shall be allocated among the Members in accordance with their Percentage Interests.

(b) All items of income, gain, loss, deduction, and credit allocable to any Membership Interest that may have been transferred shall be allocated between the transferor and the transferee based on the portion of the calendar year during which each was recognized as owning that Membership Interest, without regard to the results of Company operations during any particular portion of that calendar year and without regard to whether cash distributions were made to the transferor or the transferee during that calendar year; provided, however, that this allocation must be made in accordance with a method permissible under Section 706 of the Internal Revenue Code and the regulations thereunder.

(c) In the event any Member unexpectedly receives any adjustments, allocations or distributions described in § 1.704-1(b)(2)(ii)(d)(4), (5) or (6) of the Treasury Regulations, items of the Company's income and gain shall be specially allocated as a qualified income offset to each such Member in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the Adjusted Capital Account Deficit of such Member as quickly as possible, provided that an allocation pursuant to this paragraph 5.01(c) shall be made only if and to the extent that such Member has an Adjusted Capital Account Deficit after all other allocations provided for in this Article have been tentatively made as if this paragraph 5.01(c) were not in this Agreement.

(d) For the purpose of determining the Members entitled to receive allocations as provided for in this Agreement, the Managers may fix in advance a record date for any such determination of Members, such date in any case to be set not more than (30) days and not less than (5) days prior to the date on which the action authorizing the allocation is taken. If no record date is fixed, then the date on which the Managers take action to authorize such an allocation pursuant to this Agreement and the Internal Revenue Code, shall be the record date for such determination of Members.

(e)    Notwithstanding any terms of this Section 5.01 to the contrary, at the request of Daniel Crow and without the need of any further consent from any other Member, this Section shall be modified so as to allocate any losses to Daniel Crow, up to the amount of his Capital

Contribution, before the allocation of any losses to any other Member hereunder. All of the Members hereto acknowledge that this subsequent modification is in consideration for Daniel Crow's joinder as a Member of the Company immediately prior to the close of escrow on the acquisition of the Large Tract, and that the limitations of time prior thereto made consultation with a tax lawyer impracticable. No other Member shall impose any conditions on such further modification of this Section.

5.02 **Distributions.**

(a) From time to time (but at least once each calendar quarter) the Managers shall determine in their reasonable judgment to what extent (if any) the Company's cash on hand exceeds its current and anticipated needs, including, without limitation, for operating expenses, debt service, acquisitions, and a reasonable contingency reserve ("Distributable Cash"). If such an excess exists, the Managers shall cause the Company to distribute to the Members, in the following order:

(a) Reimbursement of all capital contributions of the Member, Daniel Crow

(b) Reimbursement of all capital contributions of the other Members.

(c) in accordance with their Percentage Interests, an amount in cash equal to that excess.

Notwithstanding the above, no distributions shall be paid until the Project is generating income or otherwise has closed on the sale of a sufficient number of lots sufficient to create Distributable Cash. The distributions made under this section for the purpose of paying back Capital Contributions shall not result in the reduction of any the Membership Interests of the Members. The Manager may require any and all loans to Members including any rate of return on such loans be paid prior to distributing any Distributable Cash.

## ARTICLE VI
## MANAGEMENT

6.01 **Designation of Manager and Management by Managers.** The Manager identified on Exhibit "B" are hereby designated by the Members as the Manager for the Company. Except for situations in which the approval of the Members is required by this Agreement or by non-waivable provisions of applicable law, and subject to the provisions of paragraph 6.02 of this Agreement, the Managers shall have the sole and exclusive control of the management, business and affairs of the Company, and the Managers shall make all decisions and take all actions for the Company not otherwise provided for in this Agreement, including, without limitation, the following:

(a) entering into, making, and performing contracts, agreements, and other undertakings binding the Company that may be necessary, appropriate, or advisable in connection with the purposes of the Company at the Manager's reasonable and sole discretion (except entering into any contract with or a sale to any related entity of any Member that is not for fair value or upon terms standard for the industry that would be conducted as an arms-length transaction) and making all decisions and waivers thereunder.

(c)     opening and maintaining bank and investment accounts and arrangements, drawing checks and other orders for the payment of money in accordance with the Budget or as authorized in this Agreement;

(d)     maintaining the assets of the Company in good order;

(e)     collecting sums due the Company;

(f)     to the extent that funds of the Company are available therefor, paying debts and obligations of the Company;

(g)     utilizing the assets of the Company for the approved Purposes of the Company;

(i)     selecting, removing, and changing the authority and responsibility of lawyers, accountants, and other advisers and consultants;

(j)     obtaining and maintaining insurance for the Company;

(l)     disposition of Company property in the ordinary course of business except for any capital assets including the Property which shall require Unanimous Consent of the Members;

(n)     designating Members or other individuals with authority to sign or give instructions with respect to those accounts and arrangements as authorized in this Agreement;

(p)     incurring any debt or liability (or agreeing to incur any debt or liability) on behalf of the Company which is consented to by all Members as part of an approved Budget or as otherwise authorized in this Agreement;

(q)     determining the amount and timing of distributions of Company cash and other property as provided in paragraph 5.02 of this Agreement;

(r)     appoint officers of the Company and provide such officers with authorities, powers,;

(t)     delegate any responsibilities to any Member, officer, or person retained by the Manager to perform certain tasks (except any payment or remuneration paid to such person shall require Unanimous Consent of the Members).

(u)     where the Company is a member, shareholder, partner, or joint venture in any partnership or entity, execute any necessary resolution, consent, or agreement on behalf of the Company including voting the interests of the Company in the best interests of the Company as reasonably determined by the Manager.

(v)     perform all necessary action on behalf of the Company in order to create Paper Lots as described in section 2.05(c) and expend up to $100,000.00 for the Paper Lot Expenses (as defined in section 2.11) without the necessity to obtain further consent of the Members.

6.02 **Restrictions.** Notwithstanding the provisions of paragraph 6.01 of this Agreement, the Manager(s) may not cause the Company to do any of the following which shall require the Unanimous

Consent of all Members and shall comply with any other applicable requirements as may be set forth in this Agreement:

    (a) enter into a Fundamental Business Transaction

    (b) do any act in violation of this Agreement;

    (c) sell or issue additional Membership Interests or admit new Members of the Company;

    (d) do any act which requires the prior consent or approval of the Members;

    (e) possess Company property or assign rights in Company property, other than for a Company purpose;

    (f) amend or terminate this Agreement, except as expressly permitted by this Agreement.

    (g) sell, transfer, assign, convey, encumber the Property except as necessary to plat the Property to create Paper Lots.

    (h) enter into any contract or expend funds which would exceed the Budget or as otherwise authorized in this Agreement.

    (i) enter into any development agreement, perform Horizontal Development, or perform any other material work on the Property not otherwise authorized in this Agreement for the purpose of creating Paper Lots.

    (j) borrowing money or otherwise committing the credit of the Company for Company activities and voluntary prepayments or extensions of debt;

    (k) agreeing to or paying any type of compensation or remuneration to any Manager, Officer, or Member or other employee of the Company which is not otherwise authorized in this Agreement

    (l) entering into and executing agreements in the ordinary course of business and related to the capital assets of the Company including those related to construction, development, sales (including assets), management, marketing and promotion of the Company and the Project.

    6.03 **Conflicts of Interest.** Subject to the other express provisions of this Agreement, each Manager, Member and officer of the Company at any time and from time to time may engage in and possess interests in other business ventures of any and every type and description, independently or with others, including ones in competition with the Company, with no obligation to offer to the Company or any other Member, Manager or officer the right to participate therein.

    6.04 **Contracts or Transactions with Interested Directors or Officers.** This provision applies only to a contract or transaction between the Company and one or more of its Managers, Members or officers, or between the Company and an entity or other organization in which one or more of the Company's Managers, Members or officers is a managerial official or has a financial interest.

    An otherwise valid contract or transaction is valid notwithstanding that a Manager, Member or officer of the corporation is present at or participates in the meeting of the Managers, Members or officers, or of a committee of the Managers, Members or officers that authorizes the contract or

transaction, or votes or signs, in the person's capacity as a Manager, Member or officer, a written consent of Managers, Members or officers to authorize the contract or transaction, if: the material facts as to the relationship or interest and as to the contract or transaction are disclosed to or known by the Members of the Company, and the disinterested Members in good faith approve the contract or transaction by vote of the disinterested Members.

6.05 **Number and Term of Office.** The number of Managers of the Company shall be determined from time to time by resolution of the Managers, and shall consist of at least one (1); provided, however, that no decrease in the number of Managers that would have the effect of shortening the term of an incumbent Manager may be made by the Managers. If the Managers make no such determination, the number of Managers shall be the number set forth in the Certificate of Formation as the number of Managers constituting the initial Managers. Each Manager shall hold office for the term for which he is elected and thereafter until his successor shall have been elected and qualified, or until his earlier death, resignation or removal. Unless otherwise provided in the Certificate of Formation, Managers need not be Members or residents of the State of Texas.

6.06 **Vacancies; Removal; Resignation.** Any Manager position to be filled by reason of an increase in the number of Managers or other reason may be filled upon the Unanimous Consent of the Members at an annual or special meeting of Members called for that purpose. A Manager elected to fill a vacancy occurring other than by reason of an increase in the number of Managers shall be elected for the unexpired term of his predecessor in office. At any meeting of Members at which a quorum of Members is present called expressly for that purpose, or pursuant to a written consent adopted pursuant to this Agreement, any Manager may be removed, with or without cause, by Unanimous Consent of the Members and otherwise may be removed upon any material breach of this Agreement which is not cured following thirty (30) days written notice from any Member, Manager, or Officer or for Good Cause (as defined in section 15.04) by a Majority of the Members. Any Manager may resign at any time. Such resignation shall be made in writing and shall take effect at the time specified therein, or if no time be specified, at the time of its receipt by the remaining Managers. The acceptance of a resignation shall not be necessary to make it effective, unless expressly so provided in the resignation.

6.07 **Compensation.** For their services in the management of the Company and its operations, the Managers may receive such compensation, if any, as may be designated from time to time by the Unanimous Consent of the Members.

6.08 **Reimbursement.** The Managers are not required to advance any funds to pay costs and expenses of the Company. However, in the event the Managers advance such funds, the Managers shall be entitled to be reimbursed for out-of-pocket costs and expenses incurred in the course of their service hereunder, including the portion of their overhead reasonably allocable to Company activities, provided that any such reimbursed amounts are promptly reported to all the Members.

6.09 **Meetings.**

(a) Unless otherwise required by law or provided in the Certificate of Formation or this Agreement, a majority of the total number of Managers fixed by, or in the manner provided in, the Certificate of Formation or this Agreement shall constitute a quorum for the transaction of business of the Managers, and the act of a majority of the Managers present at a meeting at which a quorum is present shall be the act of the Managers. A Manager who is present at a meeting of the

Managers at which action on any Company matter is taken shall be presumed to have assented to the action unless his dissent shall be entered in the minutes of the meeting or unless he shall file his written dissent to such action with the person acting as secretary of the meeting before the adjournment thereof or shall deliver such dissent to the Company immediately after the adjournment of the meeting. Such right to dissent shall not apply to a Manager who voted in favor of such action.

(b) Meetings of the Managers may be held at such place or places as shall be determined from time to time by resolution of the Managers. At all meetings of the Managers, business shall be transacted in such order as shall from time to time be determined by resolution of the Managers. Attendance of a Manager at a meeting shall constitute a waiver of notice of such meeting, except where a Manager attends a meeting for the purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

(c) In connection with any annual meeting of Members at which Managers were elected, the Managers may, if a quorum is present, hold their first meeting for the transaction of business immediately after and at the same place as such annual meeting of the Members. Notice of such meeting at such time and place shall not be required.

(d) Regular meetings of the Managers shall be held at such times and places as shall be designated from time to time by resolution of the Managers. Notice of such regular meetings shall not be required.

(e) Special meetings of the Managers may be called by any Manager on at least 24 hours written notice to each other Manager. Such notice need not state the purpose or purposes of, nor the business to be transacted at, such meeting, except as may otherwise be required by law or provided for by the Certificate of Formation or this Agreement. Notice of special meetings may be given by facsimile or electronic message (e-mail).

6.010 **Approval or Ratification of Acts or Contracts by Members.** The Managers in their discretion may submit any act or contract for approval or ratification at any annual meeting of the Members, or at any special meeting of the Members called for the purpose of considering any such act or contract. Any act or contract that shall be approved or be ratified by a majority of the Managers shall be as valid and as binding upon the Company and upon all the Members as if it shall have been approved or ratified by every Member of the Company.

6.11 **Action Without Meeting.** Any action permitted or required by the TBOC, the Certificate of Formation or this Agreement to be taken at a meeting of the Managers or any committee designated by the Managers may be taken without a meeting if a consent in writing, setting forth the action to be taken, is signed by all the Managers or members of such committee, as the case may be. Every written consent shall bear the date of signature of each Manager who signs the consent, and the consent may be in one or more counterparts. An email, telegram, telex, cablegram or similar transmission by a Manager, or a photographic, photostatic, facsimile or similar reproduction of a writing signed by a Manager, shall be regarded as signed by the Manager for purposes of this paragraph. Such consent shall have the same force and effect as a unanimous vote at a meeting and may be stated as such in any document or instrument filed with the Secretary of State of Texas, and the execution of such consent shall constitute attendance or presence in person at a meeting of the Managers or any such committee, as the case may be. The signed consent or a signed copy of the consent shall be kept on file at the principal office of the Company.

6.12 **Action by Telephone Conference or Other Remote Communications Technology.** Subject to the requirements of the TBOC, the Certificate of Formation or this Agreement for notice of meetings, unless otherwise restricted by the Certificate of Formation, Managers, or members of any committee designated by the Managers, may participate in and hold a meeting of the Managers or any committee of Managers, as the case may be, by means of conference telephone or similar communications equipment by which all persons participating in the meeting can hear each other. Or, another suitable electronic communications system may be used including video-conferencing technology or the Internet, but only if each Manager entitled to participate in the meeting consents to the meeting being held by means of that system and the system provides access to the meeting in a manner or using a method by which each Manager participating in the meeting can communicate concurrently with each other participant. Participation in such meeting shall constitute attendance and presence in person at such meeting, except where a person participates in the meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

6.13 **Broad Discretion and Authority of Managers.** Each Member acknowledges and understands that the Managers are granted broad discretion and authority under this Agreement and that the Managers' exercise of such broad discretion and authority may impair the value of the Membership Interest of the Member. Such Member further acknowledges and understands that the Managers would not cause the Company to issue a Membership Interest to the Member if the Managers did not have such broad discretion and authority, and such Member agrees not to challenge the Manager's exercise of such discretion and authority.

6.14 **Sale of Paper Lots.** Unless otherwise consented to by all Members including where the Members have agreed to perform Horizontal Construction, the Manager shall cause the sale and closing of the Paper Lots at fair market value on an arms-length transaction basis subject to commercial reasonable terms to a third party that is not related to any Member ("**Sale Parameters**") and shall ensure that at least fifty (50%) of the Paper Lots or total acreage of the Property is sold on or before the expiration of two (2) years following the closing of all Property ("**Sales Objective**"). Regardless of any conflict in this Agreement, in the event that Manager fails to achieve the Sales Objective, the Manager may be removed and replaced by a Majority of the Members following thirty (30) days' written notice during which period the Manager fails to cure and meet the Sales Objective. So long as Manager enters into a purchase contract on behalf of the Company and closes on the sale of Paper Lots in accordance with the Sale Parameters, then the Members shall not unreasonably withhold or delay any required consent to the sale and otherwise, such consent shall be deemed given.

## ARTICLE VII
## CONFIDENTIAL INFORMATION

7.01 **Confidential Information.** The Members agree that the Managers from time to time may determine, due to contractual obligations, business concerns, or other considerations, that certain information regarding the business, affairs, properties, and financial condition of the Company should be kept confidential and not provided to some or all other Members, and that it is not just or reasonable for those Members or assignees or representatives thereof to examine or copy that information. The Members acknowledge that, from time to time, they may receive information from or regarding the Company in the nature of trade secrets or that otherwise is confidential, the release of which may be damaging to the Company or persons with which it does business. Each Member

shall hold in strict confidence any information it receives regarding the Company that is identified as being confidential (and if that information is provided in writing, that is so marked) and may not disclose it to any person other than another Member or a Manager, except for disclosures (i) compelled by law (but the Member must notify the Managers promptly of any request for that information, before disclosing it, if practicable), (ii) to advisers or representatives of the Member or persons to which that Member's Membership Interest may be transferred as permitted by this Agreement, but only if the recipients have agreed to be bound by the provisions of this paragraph, or (iii) of information that Member also has received from a source independent of the Company that the Member reasonably believes obtained that information without breach of any obligation of confidentiality.

7.02. **Specific Performance.** The Members acknowledge that breach of the provisions of paragraph 7.01 of this Agreement may cause irreparable injury to the Company for which monetary damages are inadequate, difficult to compute, or both. Accordingly, the Members agree that the provisions of paragraph 7.01 of this Agreement may be enforced by specific performance.

## ARTICLE VIII
## MEETING OF MEMBERS

8.01 **Meetings.**

(a) A quorum shall be present at a meeting of Members if the holders of 100% of the Membership Interests are represented at the meeting in person or by proxy. With respect to any matter, other than a matter for which the affirmative vote of the holders of a specified portion of the Percentage Interests of all Members entitled to vote is required by the TBOC or this Agreement, the affirmative vote of a Simple Majority at a meeting of Members at which a quorum is present shall be the act of the Members, except as provided by another specific provision in this Agreement.

(b) All meetings of the Members shall be held at the principal place of business of the Company or at such other place within or outside the State of Texas as shall be specified or fixed in the notices or waivers of notice thereof; provided that any or all Members may participate in any such meetings by means of conference telephone or similar communications equipment pursuant to paragraph 8.06 of this Agreement.

(c) Notwithstanding the other provisions of the Certificate of Formation or this Agreement, the chairman of the meeting or the holders of a Super Majority shall have the power to adjourn such meeting from time to time, without any notice other than announcement at the meeting of the time and place of the holding of the adjourned meeting. If such meeting is adjourned by the Members, such time and place shall be determined by a vote of the holders of a Super Majority. Upon the resumption of such adjourned meeting, any business may be transacted that might have been transacted at the meeting as originally called.

(d) An annual meeting of the Members, for the election of the Managers and for the transaction of such other business as may properly come before the meeting, shall be held at such place, within or outside the State of Texas, on such date and at such time as the Managers shall fix and set forth in the notice of the meeting, which date shall be within thirteen (13) months subsequent to the date of organization of the Company or the last annual meeting of Members, whichever most recently occurred.

(e) Special meetings of the Members for any proper purpose or purposes may be called at any time by the Managers or the holders of at least ten percent of the Percentage Interests of all Members. If not otherwise stated in or fixed in accordance with the remaining provisions hereof, the record date for determining Members entitled to call a special meeting is the date any Member first signs the notice of that meeting. Only business within the purpose or purposes described in the notice (or waiver thereof) required by this Agreement may be conducted at a special meeting of the Members.

(f) Written or printed notice stating the place, day and hour of the meeting and, in the case of a special meeting, the purpose or purposes for which the meeting is called, shall be given not less than ten (10) nor more than sixty (60) days before the date of the meeting, either personally or by mail, by or at the direction of the Managers or person calling the meeting, to each Member entitled to vote at such meeting. If mailed, any such notice shall be deemed to be given when deposited in the United States mail, addressed to the Member at his address on the voting list provided for in paragraph 8.02 of this Agreement, with postage thereon prepaid.

(g) The date on which notice of a meeting of Members is mailed or the date on which the resolution of the Managers declaring a distribution is adopted, as the case may be, shall be the record date for the determination of the Members entitled to notice of or to vote at such meeting, including any adjournment thereof, or the Members entitled to receive such distribution.

(h) Notice of meetings may be given to Members by facsimile or electronic message (e-mail).

## 8.02 Intentionally Omitted.

8.03 **Proxies.** A Member may vote either in person or by proxy executed in writing by the Member. A telegram, telex, cablegram or similar transmission by the Member, or a photographic, photostatic, facsimile or similar reproduction of a writing executed by the Member shall be treated as an execution in writing for purposes of this paragraph. Proxies for use at any meeting of Members or in connection with the taking of any action by written consent shall be filed with the Managers, before or at the time of the meeting or execution of the written consent, as the case may be. All proxies shall be received and taken charge of and all ballots shall be received and canvassed by the Managers, who shall decide all questions touching upon the qualification of voters, the validity of the proxies, and the acceptance or rejection of votes, unless an inspector or inspectors shall have been appointed by the chairman of the meeting, in which event such inspector or inspectors shall decide all such questions. No proxy shall be valid after eleven (11) months from the date of its execution unless otherwise provided in the proxy. A proxy shall be revocable unless the proxy form conspicuously states that the proxy is irrevocable and the proxy is coupled with an interest. Should a proxy designate two or more persons to act as proxies, unless that instrument shall provide to the contrary, a majority of such persons present at any meeting at which their powers thereunder are to be exercised shall have and may exercise all the powers of voting or giving consents thereby conferred, or if only one be present, then such powers may be exercised by that one; or, if an even number attend and a majority do not agree on any particular issue, the Company shall not be required to recognize such proxy with respect to such issue if such proxy does not specify how the Percentage Interests that are the subject of such proxy are to be voted with respect to such issue.

8.04 **Conduct of Meetings.** All meetings of the Members shall be presided over by the

chairman of the meeting, who shall be a Manager (or representative thereof) designated by a majority of the Managers. The chairman of any meeting of Members shall determine the order of business and the procedure at the meeting, including the regulation of the manner of voting and the conduct of discussion.

8.05 **Action by Unanimous Written Consent Without Meeting.**

(a) Any action required or permitted to be taken at any annual or special meeting of Members may be taken without a meeting, without prior notice, and without a vote, by unanimous written consent of all Members or committee members, as the case may be, setting forth the action so taken which may be evidenced by the delivery of an email, fax, or similar transmission or electronic consent delivered by a Member, or any copy, facsimile or similar reproduction of a writing signed by a Member or other written consent delivered to and received by the Manager. Each written consent shall bear the date of signature of each Member who signs the consent, and the consent may be in one or more counterparts. The signed consent or a signed copy of the consent shall be kept on file at the principal office of the Company.

(b) The record date for determining Members entitled to consent to action in writing without a meeting shall be the first date on which a signed written consent setting forth the action taken or proposed to be taken is delivered to the Company by delivery to its registered office, its principal place of business, or the Managers including by electronic transmission.

(c) If any action by Members is taken by written consent, any articles or documents filed with the Secretary of State of Texas as a result of the taking of the action shall state, in lieu of any statement required by the TBOC concerning any vote of Members, that written consent has been given in accordance with the provisions of the TBOC and that any written notice required by the TBOC has been given.

8.06 **Action by Telephone Conference or Other Remote Communications Technology.** Members may participate in and hold a meeting by means of conference telephone or similar communications equipment by which all persons participating in the meeting can hear each other. Or, another suitable electronic communications system may be used including video-conferencing technology or the Internet, but only if each member entitled to participate in the meeting consents to the meeting being held by means of that system and the system provides access to the meeting in a manner or using a method by which each member participating in the meeting can communicate concurrently with each other participant. Participation in such meeting shall constitute attendance and presence in person at such meeting, except where a person participates in the meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

8.07 **Classes of Members; Voting.** At an annual or special meeting called for that purpose, the Members may from time to time establish classes or groups of Members. One or more of the Members' groups or classes may have certain expressed relative rights, powers, and duties, including voting rights, to be established at the time when the classes or groups are created, with seniority granted to one or more class or group as designated by the Members.

**ARTICLE IX**
**OFFICERS**

9.01 **Qualification.** The Managers may, from time to time, designate one or more persons to be officers of the Company upon the Unanimous Consent of the Members. No officer need be a resident of the State of Texas, a Member or a Manager. Any officers so designated shall have such authority and perform such duties as the Managers may, from time to time, delegate to them. The Managers may assign titles to particular officers. Unless the Managers decide otherwise, if the title is one commonly used for officers of a business corporation, the assignment of such title shall constitute the delegation to such officer of the authority and duties that are normally associated with that office, subject to any specific delegation of authority and duties made to such officer by the Managers pursuant to this paragraph. Each officer shall hold office until his successor shall be duly designated and qualify for such office, until his death, or until he shall resign or shall have been removed in the manner hereinafter provided. Any vacancy occurring in any office of the Company (other than Manager) may be filled by the Managers. Any number of offices may be held by the one person.

9.02. **Compensation.** The salaries or other compensation, if any, of the officers and agents of the Company shall be fixed from time to time by the Managers. However, election or appointment of an officer or agent shall not of itself, nor shall anything in this Agreement, create contract rights.

9.03. **Resignation.** Any officer may resign as such at any time. Such resignation shall be made in writing and shall take effect at the time specified therein, or if no time be specified, at the time of its receipt by the Managers. The acceptance of a resignation shall not be necessary to make it effective, unless expressly so provided in the resignation.

9.04. **Removal.** Any officer may be removed for any material breach of this Agreement which is not cured following thirty (30) days written notice from any Member, Manager, or Officer or for Good Cause (as defined in section 15.04) by a Majority of the Members provided, however, that such removal shall be without prejudice to the contract rights, if any, of the person so removed.

9.05 **Appointment of Officers.** The initial President, Treasurer, Secretary and any other Officers, if any, are designated on Exhibit B who shall serve the Company without compensation. The President shall have the same rights, powers, and authorities as that of the Manager on a non-exclusive basis and may delegate any such rights, powers, or authorities to any other officer or an authorized representative of the Company as appointed by the President. The Secretary and Treasurer shall have those rights, powers, and authorities which are standard for such positions. Both the President and Treasurer shall have the power to open, manage, and close any accounts including with any financial institution on behalf of the Company and each shall be a signatory on such accounts without the need for any further consent.

## ARTICLE X
## INDEMNIFICATION

10.01 **Right to Indemnification.** Subject to the limitations and conditions as provided in this Article, each person who was or is made a party or is threatened to be made a party to or is involved in any Proceeding, or any appeal in such a Proceeding, or any inquiry or investigation that could lead to such a Proceeding, by reason of the fact that he or she, or a person of whom he or she is the legal representative, is or was a Member or Manager of the Company or while a Member or Manager of the Company is or was serving at the request of the Company as a Manager, director,

officer, partner, venturer, proprietor, trustee, employee, agent, or similar functionary of another foreign or domestic limited liability company, corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan or other enterprise shall be indemnified by the Company to the fullest extent permitted by the TBOC, as the same exist or may hereafter be amended (but, in the case of any such amendment, only to the extent that such amendment permits the Company to provide broader indemnification rights than said law permitted the Company to provide prior to such amendment) against judgments, penalties (including excise and similar taxes and punitive damages), fines, settlements and reasonable expenses (including, without limitation, attorney's fees) actually incurred by such person in connection with such Proceeding, and indemnification under this Article shall continue as to a person who has ceased to serve in the capacity which initially entitled such person to indemnity hereunder. The rights granted pursuant to this Article shall be deemed contract rights, and no amendments, modification or repeal of this Article shall have the effect of limiting or denying any such rights with respect to actions taken or Proceeding arising prior to any such amendment, modification or repeal. It is expressly acknowledged that the indemnification provided in this Article could involve indemnification for negligence or under theories of strict liability.

10.02 **Advance Payment.** The right to indemnification conferred in this Article shall include the right to be paid or reimbursed by the Company the reasonable expenses incurred by a person of the type entitled to be indemnified under paragraph 10.01 of this Agreement who was, is or is threatened to be made a named defendant or respondent in a Proceeding in advance of the final disposition of the Proceeding and without any determination as to the person's ultimate entitlement to indemnification; provided, however, that the payment of such expenses incurred by any such person in advance of the final disposition of a Proceeding, shall be made only upon delivery to the Company of a written affirmation by such person of his or her good faith belief that he has met the standard of conduct necessary for indemnification under this Article and a written undertaking, by or on behalf of such person, to repay all amounts so advanced if it shall ultimately be determined that such indemnified person is not entitled to be indemnified under this Article or otherwise.

10.03 **Indemnification of Officers, Employees and Agents.** The Company, by adoption of a resolution of the Managers, may indemnify and advance or reimburse expenses to an officer, employee or agent of the Company to the same extent and subject to the same conditions under which it may indemnify and advance expenses to Managers under this Article; and, the Company may indemnify and advance or reimburse expenses to persons who are not or were not Managers, officers, employees, or agents of the Company but who are or were serving at the request of the Company as a Manager, director, officer, partner, venturer, proprietor, trustee, employee, agent or similar functionary of another foreign or domestic limited liability company, corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan or other enterprise against any liability asserted against him and incurred by him in such a capacity or arising out of his status as such a person to the same extent that it may indemnify and advance expenses to Managers under this Article.

10.04 **Appearance as a Witness.** Notwithstanding any other provision of this Article, the Company may pay or reimburse expenses incurred by a Member or Manager in connection with his appearance as a witness or other participation in a Proceeding at a time when he is not a named defendant or respondent in the Proceeding.

10.05 **Non-exclusivity of Rights.** The right to indemnification and the advancement and payment of expenses conferred in this Article shall not be exclusive of any other right which a Member or Manager or other person indemnified pursuant to paragraph 10.03 of this Agreement may have or

hereafter acquire under any law (common or statutory), provision of the Certificate of Formation or this Agreement, agreement, vote of disinterested Managers or otherwise.

10.06 **Insurance.** The Company may purchase and maintain insurance, at its expense, to protect itself and any person who is a Member or was serving as a Manager, officer, employee or agent of the Company or is or was serving at the request of the Company as a Manager, director, officer, partner, venturer, proprietor, trustee, employee, agent or similar functionary of another foreign or domestic limited liability company, corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan or other enterprise against any expense, liability or loss, whether or not the Company would have the power to indemnify such person against such expense, liability or loss under this Article.

10.07 **Member Notification.** To the extent required by law, any indemnification of or advance of expenses to a Member or Manager in accordance with this Article shall be reported in writing to the Members with or before the notice or waiver of notice of the next Members' meeting or with or before the next submission to Members of a consent to action without a meeting and, in any case, within the twelve month period immediately following the date of the indemnification or advance.

10.08 **Savings Clause.** If this Article or any portion hereof shall be invalidated on any ground by any court of competent jurisdiction, then the Company shall nevertheless indemnify and hold harmless each Member or Manager or any other person indemnified pursuant to this Article as to costs, charges, and expenses (including attorney's fees), judgments, fines and amounts paid in settlement with respect to any action, suit or Proceeding, whether civil, criminal, administrative or investigative to the full extent permitted by any applicable portion of this Article that shall not have been invalidated and to the fullest extent permitted by applicable law.

## ARTICLE XI
## TAXES

11.01 **Tax Returns.** The Managers shall cause to be prepared and filed all necessary federal and state income tax returns for the Company, including making the elections described in paragraph 11.02 of this Agreement. Each Member shall furnish to the Managers all pertinent information in its possession relating to Company operations that is necessary to enable the Company's income tax returns to be prepared and filed.

11.02 **Tax Elections.** The Company shall make the following elections on the appropriate tax returns:

(a) to adopt the calendar year as the Company's fiscal year;

(b) to adopt the cash method of accounting for keeping the Company's books and records;

(c) if a distribution of Company property as described in Section 734 of the Internal Revenue Code occurs or if a transfer of a Membership Interest as described in Section 743 of the Internal Revenue Code occurs, on written request of any Member, to elect, pursuant to Section 754 of the Internal Revenue Code, to adjust the basis of Company properties;

---

(d) to elect to amortize the organizational expenses of the Company and the startup expenditures of the Company under Section 195 of the Internal Revenue Code ratably over a period of sixty (60) months as permitted by Section 709(b) of the Internal Revenue Code; and

(e) any other election the Managers may deem appropriate and in the best interest of the Members.

Either the Company or any Manager or Member may make an election for the Company to be excluded from the application of the provisions of subchapter K of chapter 1 subtitle A of the Internal Revenue Code or any similar provisions of applicable state law.

11.03 **"Tax Matters Partner."** A majority of the Managers shall designate one Manager that is a Member to be the "tax matters partner" of the Company pursuant to Section 6231(a)(7) of the Internal Revenue Code; or, if there is no Manager that is a Member, the "tax matters partner" shall be a Member that is designated as such by a Simple Majority. Any Member who is designated "tax matters partner" shall take such action as may be necessary to cause each other Member to become a "notice partner" within the meaning of Section 6223 of the Internal Revenue Code. Any Member who is designated "tax matters partner" shall inform each other Member of all significant matters that may come to its attention in its capacity as "tax matters partner" by giving notice thereof on or before the fifth Business Day after becoming aware thereof and, within that time, shall forward to each other Member copies of all significant written communications it may receive in that capacity. Any Member who is designated "tax matters partner" may not take action contemplated by Section 6222 through 6232 of the Internal Revenue Code without the Unanimous Consent of the Members, but this sentence does not authorize such Manager (or any other Manager) to take any action left to the determination of an individual Member under Sections 6222 through 6232 of the Internal Revenue Code.

11.04 **Employment Identification Number.** A separate individual as authorized by the Company may have originally obtained an Employment Identification Number ("EIN") from the IRS on behalf of the Company which designated such person as a member or sole member of the Company on its letter issuing the EIN as a result of the limitations of the IRS's online EIN request process but such designation by the IRS is not determinative of such person's capacity or ownership interests in the Company and as such as of the Effective Date, such person has no rights or interests in the Company except to the extent specifically stated in this Agreement.

## ARTICLE XII
## BOOKS, RECORDS, REPORTS, AND BANK ACCOUNTS

12.01 **Maintenance of Books.** The Company shall keep books and records of accounts and shall keep minutes of the proceedings of its Members, its Managers and each committee of the Managers. The books of account for the Company shall be maintained on a cash basis in accordance with the terms of this Agreement, except that the Capital Accounts of the Members shall be maintained in accordance with Article IV of this Agreement. The calendar year shall be the accounting year of the Company. The Members shall have full access to the Company's books of account, and any other financial or other records of the Company, upon reasonable advance notice.

12.02  **Accounts.**  The Managers shall establish and maintain one or more separate bank and investment accounts and arrangements for Company funds in the Company name with financial institutions and firms that the Managers determine.  The Managers may not commingle the Company's funds with the funds of any Member; however, Company funds may be invested in a manner the same as or similar to the Managers' investment of their own funds or investments by their Affiliates.

## ARTICLE XIII
## TRANSFERS

13.01  **Limited Right to Transfer.**  No Member or Assignee shall make any Transfer of all or any part of its Membership Interest, whether now owned or hereafter acquired, except (a) with the Unanimous Consent of the Members; (b) as provided by Article XIV of this Agreement; (c) as a Defaulting Member as provided by paragraph 15.01(f) of this Agreement; or (d) upon winding up or termination, as provided by paragraph 16.03 of this Agreement.  Any attempted Transfer by a person of an interest or right, or any part thereof, in or in respect of the Company other than as specifically provided by this Agreement shall be, and is hereby declared, null and void *ab initio*.

13.02  **Rights of an Assignee.**

(a) Unless and until an Assignee becomes a Substituted Member of the Company as provided in this Agreement, the Assignee shall be entitled only to (i) allocation of income, gain, loss, deduction, credit, or similar items, and to receive distributions to which the assignor is entitled to the extent these items were assigned, and (ii) reasonable information or account of transactions of the Company and to make reasonable inspection of the books and records of the Company.  The Membership Interest of the Assignee shall not be considered in the voting requirements of the Company, and the Assignee shall have no right to participate in the operations or management of the Company.

(b) In the event that the Members make additional contributions to the Company which the Membership Interest is held by an Assignee, the Assignor Member and its Assignee shall be jointly and severally liable for the corresponding contribution in connection with the Membership Interest held by Assignee.  If the Assignor Member or Assignee does not make such contribution in accordance with the provisions of this Agreement, then the Assignor Member and Assignee shall be treated as being in Default.  In the event that one or more new Members are admitted into the Company, or one or more existing Members increase their Membership Interest, the Membership Interest of the Assignee may be correspondingly reduced and no consent or other action on the part of such Assignee shall be required.

13.03  **Legal Opinion.**  For the right of a Member to transfer a Membership Interest or any part thereof or of any Person to be admitted to the Company in connection therewith to exist or be exercised, the Company must receive an opinion from legal counsel acceptable to the Managers that states (a) the Transfer is exempt from registration under federal and state securities laws, (b) the Transfer will not cause the Company to be in violation of federal and state securities laws, (c) the Transfer will not adversely affect the status of the Company as a partnership under the Internal Revenue Code or Treasury Regulations, and (d) the Transfer will not result in the Company's being considered to have terminated within the meaning of the Internal Revenue Code or Treasury Regulations.  The Managers, however, may waive the requirements of this paragraph.

13.04 **Admission as Substituted Member.** An Assignee has the right to be admitted to the Company as a Substituted Member with the Percentage Interest and the Capital Commitment so transferred to such person, in the event that:

(a) the Member making such Transfer grants the Assignee the right to be so admitted;

(b) such Transfer is consented to in accordance with paragraph 13.01 of this Agreement; and

(c) a written, signed and dated instrument evidencing the Transfer has been filed with the Company in form and substance reasonably satisfactory to the Managers, and said instrument contains (i) the agreement by the Assignee to be bound by all of the terms and provisions of this Agreement, (ii) any necessary or advisable representations and warranties, including that the Transfer was made in accordance with all applicable laws, regulations, and securities laws, (iii) the Percentage Interests and the Capital Commitments after the Transfer of the Member effecting the Transfer and the person to which the Membership Interest of part thereof is transferred (which together must total the Percentage Interest and the Capital Commitment of the Member effecting the Transfer before the Transfer) and (iv) the name, address and any other pertinent information necessary for amended Exhibit A and to make distributions.

13.05 **Transfer to Existing Member.** In the event of a Transfer to an existing Member, the existing Member shall be automatically deemed to be a Substituted Member.

13.06 **Third Party Offer.** In the event a Member desires to sell all or any portion of its Membership Interest to another person (other than an existing Member), the selling Member shall first offer to sell the Membership Interest to the other existing Members. Upon the receipt of an offer from a Third Party to purchase such Membership Interest, the selling Member shall promptly deliver a copy of the Third Party offer to all other Members. Each Member will have fifteen (15) days from the date of receipt of the Third Party offer to notify the selling Member in writing that the other Member intends to purchase the Membership Interest upon the terms and conditions of the Third Party offer. If more than one other Member desires to purchase the Membership Interest, each of the purchasing Members shall purchase a portion of the Membership Interest that is proportional to that Member's Percentage Interest. If none of the other Members give notification within fifteen (15) days of an intention to purchase the Membership Interest, then the selling Member shall be permitted to sell the Membership Interest to the Third Party upon the terms and conditions of the Third Party offer.

13.07 **Reasonable Expenses.** The Member effecting a Transfer and the Substituted Member shall pay, or reimburse the Company for, all costs incurred by the Company in connection with the admission of the Substituted Member (including, without limitation, the legal fees incurred in connection with the legal opinions referred to in paragraph 13.03 of this Agreement) on or before the tenth (10th) day after the receipt by that person of the Company's invoice for the amount due. If payment is not made by the date due, the person owing the amount shall pay interest on the unpaid amount from the date due until paid at a rate per annum equal to the Default Interest Rate.

**ARTICLE XIV**

## BUYOUT OF MEMBERSHIP INTEREST

### 14.01  Termination of Marital Relationship.

(a) If the marital relationship of a Member is terminated by death or divorce and such Member does not succeed to all of such Member's spouse's community or separate interest, if any, in the Membership Interest (such spouse is referred to hereafter in this Article as the "Assignee Spouse"), either as outright owner of such Membership Interest or as a trustee of a trust holding such Membership Interest, whether or not such Member is a beneficiary of such trust, then such Member shall have the option to purchase at Fair Value (determined as of the date of the death or divorce of the Member) the Assignee Spouse's interest in the Membership Interest to which such Member does not succeed. Such option must be exercised within ninety (90) days after the death of or the Member's divorce from the Assignee Spouse. Should the Member fail to exercise such option within such 90-day period, then the Company shall have the option to purchase such Membership Interest at Fair Value for a period of ninety (90) days after the lapse of the initial 90-day period.

(b) Any Membership Interest of the Company held by a Member as a trustee of a trust as a result of the death of or the Member's divorce from the Assignee Spouse shall be treated as owned by such Member for purposes of this agreement. If such Member ceases to act as trustee of such trust for any reason, then such Member shall have the option to purchase all of the Membership Interest at Fair Value held in such trust. Such option must be exercised within ninety (90) days after such Member ceases to act as trustee of such trust. Should such Member fail to exercise such option within such 90-day period, then the Company shall have the option to purchase such Membership Interest for a period of ninety (90) days after the lapse of the initial 90-day period.

### 14.02  Intentionally Omitted.

14.03  **Bankruptcy of Member.** If any Member becomes a Bankrupt Member, the Company shall have the option, exercisable by notice from the Managers to the Bankrupt Member (or its representative) at any time prior to the one hundred eightieth (180th) day after receipt of notice of the occurrence of the event causing it to become a Bankrupt Member, to purchase all or any portion of the Bankrupt Member's Membership Interest at Fair Value (determined as of the date that notice of the exercise of such option is given by the Managers); provided, however, the exercise of said option shall require the approval of the unanimous consent of the Managers. In the event that notice of the exercise of such option is given by the Managers to the Bankrupt Member (or its representative), the Bankrupt Member shall sell its interest to the Company as provided by this Article.

14.04  **Insufficient Surplus.** If the Company shall not have sufficient surplus to permit it lawfully to purchase the Membership Interest under paragraph 14.01 or 14.02 of this Agreement at the time of the closing, the other Members may take such action to vote their respective Membership Interests to reduce the capital of the Company or to take such other steps as may be appropriate or necessary in order to enable the Company lawfully to purchase such Membership Interest.

14.05  **Option by Other Members.** If the Company fails or declines to exercise an option to purchase a Membership Interest of a Member as provided by this Agreement within the period of time specified for such option, then the other Members shall have the option for a period of ninety (90) days thereafter to purchase such Membership Interest in such proportions as they mutually agree or in proportion to their respective Percentage Interests for the same price and upon the same terms

available to the Company.

14.06  **Exercise of Option.**  Any option to purchase a Membership Interest as provided by this Agreement shall be deemed exercised at the time the purchasing party delivers to the selling party written notice of intent to exercise such option along with an initial payment in the form of a certified or cashier's check in the amount of ten percent (10%) of the estimated purchase price anticipated by the purchaser, in person or by United States registered mail, properly stamped and addressed to the last known address of the selling party.

14.07  **Determination of Fair Value.**  The "Fair Value" of a Membership Interest shall be the amount that would be distributable to the Member holding such interest in the event that the assets of the Company were sold for cash and the proceeds, net of liabilities, were distributed to the holders of all Membership Interests pursuant to this Agreement.  In the event that the Fair Value of a Membership Interest is to be determined under this Agreement, the Managers shall select a qualified independent appraiser to make such determination, and the Managers shall make the books and records available to the appraiser for such purpose.  The determination of Fair Value made by such appraiser shall be final, conclusive, and binding on the Company, all Members, and all Assignees of a Membership Interest.

14.08  **Fees and Expenses of Appraiser.**  In the case of a purchase and sale of Membership Interest under paragraph 14.01 of this Agreement (in the event of divorce of a Member), the fees and expenses of such appraiser shall be paid by the Company.  In the case of a purchase and sale of Membership Interest under paragraph 14.02 or 15.01 (in the event of the bankruptcy or default of a Member), the fees and expenses of such appraiser shall be paid by the Bankrupt Member or Defaulting Member, by deducting at closing such fees and expenses from the purchase price to be paid to such Bankrupt Member or Defaulting Member, and remitting the same to the Company.  Otherwise, the fees and expenses of such appraiser shall be shared equally by the purchaser and seller.

14.09  **Right to Withdraw Option.**  In the event that a Member has exercised an election to purchase a Membership Interest under this Agreement and Fair Value has been determined as provided by paragraph 14.08 of this Agreement, such Member may elect to terminate its right to purchase within fifteen (15) days following its receipt of the determination of Fair Value, by delivery of written notice to the Company and to the Assignee.  In such an event, the initial payment shall be returned to the Member withdrawing the option, and the other Members may elect to purchase the Membership Interest (or portion thereof) in such proportions as they mutually agree or in proportion to their respective Percentage Interests.

14.10  **Terms of Purchase.**

(a) The closing date for any sale and purchase made pursuant to this Article shall be the later of (i) thirty (30) days after the notice of the exercise of option has been received by the selling party, or (ii) thirty (30) days after the parties have received notice of the Fair Value of the Membership Interest.

(b) Payment of the purchase price for a Membership Interest may be made by the Company and/or the other Members as follows: (i) a down payment equal to ten percent (10%) of the Fair Value to be made at closing, and (ii) the balance of the purchase price, bearing interest at the General Interest Rate determined on the date of closing, to be paid in twenty-four (24) equal monthly

installments, with the first payment due thirty (30) days after the date of closing. Any such purchaser shall have the right to pay all or any part of such obligation at any time or times in advance of maturity without penalty. In the event that the Company becomes a party to a Fundamental Business Transaction, such obligation (or remaining portion thereof) shall be paid in full within thirty (30) days of the date that the Company becomes a party to such transaction.

(c) At the closing, the person selling the Membership Interest will transfer the Membership Interest free and clear of any liens or encumbrances, other than those which may have been created to secure any indebtedness or obligations of the Company.

(d) In each event that a Membership Interest in the Company is purchased as described in this Agreement, upon the execution and delivery of the notes or payment of the cash as required herein, this Agreement shall operate as an automatic transfer to the purchaser of the Membership Interest in the Company. The payment to be made to the selling Member, Assignee, or its representative shall constitute complete release, liquidation and satisfaction of all the rights and interest of the selling Member, Assignee, or its representative (and of all persons claiming by, through, or under the selling Member, Assignee, or its representative) in and in respect of the Company, including, without limitation, any Membership Interest, any rights in specific Company property, and any rights against the Company and (insofar as the affairs of the Company are concerned) against the Members. The parties shall perform such actions and execute such documents that may be reasonably necessary to effectuate and evidence such purchase and sale, and release as provided by this paragraph.

## ARTICLE XV
## DEFAULT OF A MEMBER

15.01 **Failure to Contribute.** If a Member does not contribute by the time required all or any portion of a Capital Contribution that Member is required to make as provided in this Agreement, the Company may exercise, on notice to that Member (the "Defaulting Member"), one or more of the following remedies:

(a) taking such action (including, without limitation, court proceedings) as the Managers may deem appropriate to obtain payment by the Defaulting Member of the portion of the Defaulting Member's Capital Contribution that is in default, together with interest thereon at the Default Interest Rate from the date that the Capital Contribution was due until the date that it is made, all at the cost and expense of the Defaulting Member;

(b) permitting the other Members in proportion to their Percentage Interests or in such other percentages as they may agree (the "Lending Member," whether one or more), to advance the portion of the Defaulting Member's Capital Contribution that is in default, with the following results:

(i) the sum advanced constitutes a loan from the Lending Member to the Defaulting Member and a Capital Contribution of that sum to the Company by the Defaulting Member pursuant to the applicable provisions of this Agreement,

(ii) the principal balance of the loan and all accrued unpaid interest thereon is due and payable in whole on the tenth (10th) day after written demand therefor by the Lending Member to the Defaulting Member,

(iii) the amount lent bears interest at the Default Interest Rate from the day that the advance is deemed made until the date that the loan, together with all interest accrued on it, is repaid to the Lending Member,

(iv) all distributions from the Company that otherwise would be made to the Defaulting Member (whether before or after termination of the Company) instead shall be paid to the Lending Member until the loan and all interest accrued on it have been paid in full to the Lending Member (with payments being applied first to accrued and unpaid interest and then to principal),

(v) the payment of the loan and interest accrued on it is secured by a security interest in the Defaulting Member's Membership Interest, as more fully set forth in paragraph 15.02 of this Agreement, and

(vi) the Lending Member has the right, in addition to the other rights and remedies granted to it pursuant to this Agreement or available to it at law or in equity, to take any action (including, without limitation, court proceedings) that the Lending Member may deem appropriate to obtain payment by the Defaulting Member of the loan and all accrued and unpaid interest on it, at the cost and expense of the Defaulting Member;

(c) proportionately reducing the Defaulting Member's Membership Interest or other interest in the Company;

(d) subordination of the Defaulting Member's Membership Interest to the non-defaulting Member; OR

(e) exercising any other rights and remedies available at law or in equity.

15.02 **Security.** Each Member grants to the Company, and to each Lending Member with respect to any loans made by the Lending Member to that Member as a Defaulting Member under this Article, as security, equally and ratably, for the payment of all Capital Contributions that Member has agreed to make and the payment of all loans and interest accrued on them made by Lending Members to that Member as a Defaulting Member pursuant to paragraph 15.01(b) of this Agreement, a security interest in, and a general lien on its Membership Interest and the proceeds thereof, all under the Uniform Commercial Code of the State of Texas. It is expressly agreed that the security interest created thereby shall be governed by Chapter 8 of the Uniform Commercial Code of the State of Texas. On any default in the payment of a Capital Contribution or in the payment of such a loan or interest accrued on it, the Company or the Lending Member, as applicable, is entitled to all the rights and remedies of a secured party under the Uniform Commercial Code of the State of Texas with respect to the security interest granted in this Article. Each Member shall execute and deliver to the Company and the other Members all financing statements and other instruments that the Managers or the Lending Member, as applicable, may request to effectuate and carry out the preceding provisions of this Article. At the option of the Managers or a Lending Member, this Agreement or a carbon, photographic, or other copy hereof may serve as a financing statement.

15.03 **Compromise or Release.** The obligation of a Defaulting Member or its legal

representative or successor to make a contribution or otherwise pay cash or transfer property or to return cash or property paid or distributed to the Defaulting Member in violation of the TBOC or this Agreement may be compromised or released only with the approval of the u Unanimous Consent of the non defaulting Members. Notwithstanding the compromise or release, a creditor of the Company who extends credit or otherwise acts in reasonable reliance on that obligation, after the Member signs a writing that reflects the obligation and before the writing is amended or canceled to reflect the compromise or release, may enforce the original obligation.

15.04 **Suspension.** A Member's right to vote and otherwise exercise the rights of a Member in the Company may be suspended upon the Unanimous Consent of all other Members (not including the Member to be suspended) for such period as determined by such other Members which may be indefinite if that Member is found to have (a) willfully and knowingly violated any material provision of this Agreement; (b) committed fraud, theft, or gross negligence against the Company or one or more Members of the Company, or (c) knowingly engaged in wrongful conduct that such person should have known would adversely and materially affects the business or operation of the Company and which actually adversely and materially affected the business or operation of the Company (collectively, "Good Cause"). Such a Member shall be considered in breach of this Agreement, and the Company or other Members may also exercise any available remedies as provided in this Agreement or at law or in equity. The Company may offset any damages to the Company or its Members occasioned by the misconduct of the breaching Member against any amounts distributable or otherwise payable by the Company to the expelled Member.

## ARTICLE XVI
## WINDING UP AND TERMINATION

16.01 **Event Requiring Termination.** The Company shall begin to wind up its affairs upon the first of the following to occur:

(a) the execution of an instrument approving the termination of the Company by a Simple Majority of the Members;

(b) the occurrence of any event that terminates the continued membership of the last remaining Member of the Company; provided, however, that the Company is not dissolved if, no later than ninety (90) days after the termination of the membership of the last remaining Member, the legal representative or successor of the last remaining Member agrees to cancel the event requiring winding up, to continue the Company and to become a Member, or to designate another person who agrees to become a Member, as of the date of termination of the membership of the last remaining Member;

(c) entry of a decree of judicial dissolution of the Company;

(d) the occurrence of a non-waivable event under the terms of the TBOC which requires the Company to be terminated; or

(e) by the act of a Simple Majority of the Members, if no capital has been paid into the Company, and the Company has not otherwise commenced business.

16.02 **Business May Be Continued.** Except as provided in paragraph 16.01(b) of this

Agreement:

(a) an event that requires the winding up of the Company's business shall not terminate the Company if, no later than one year after the date of the event, the Members unanimously consent to cancel the event requiring winding up.

(b) the expiration of a period of duration that requires the winding up of the Company's business shall not terminate the Company if, no later than three years after the date the period of duration expires, the Members unanimously consent to amend the Company's Certificate of Formation and this Agreement to extend the Company's period of duration.

16.03 **Purchase of Former Member's Membership Interest.** Upon an event requiring winding up as provided in 16.01 of this Agreement, the Company's books shall be closed upon the date of such event, so as to determine the Former Member's Membership Interest value on the date ending all of the Former Member's financial interest in the Company. Within one hundred eighty (180) days of such event, the Company shall purchase the Former Member's Membership Interest at Fair Value (as determined by paragraph 14.06 of this Agreement), upon terms of purchase as provided in Article XIV of this Agreement.

16.04 **Liquidation.** As soon as possible following an event requiring termination of the Company, the Managers shall act as liquidator or may appoint one or more Managers or Members as liquidator. The liquidator shall proceed diligently to wind up the affairs of the Company and make final distributions as provided herein and in the TBOC. The costs of liquidation shall be borne as a Company expense. Until final distribution, the liquidator shall continue to operate the Company properties with all of the power and authority of the Managers. The steps to be accomplished by the liquidator are as follows:

(a) as promptly as possible after such event and again after final liquidation, the liquidator shall cause a proper accounting to be made by a recognized firm of certified public accountants of the Company's assets, liabilities, and operations through the last day of the calendar month in which the termination occurs or the final liquidation is completed, as applicable;

(b) the liquidator shall cause the notice described in Section 11.052 of the TBOC to be delivered to each known claimant against the Company;

(c) the liquidator shall pay, satisfy or discharge from Company funds all of the debts, liabilities and obligations of the Company (including, without limitation, all expenses incurred in liquidation and any advances described in paragraph 4.04 of this Agreement) or otherwise make adequate provision for payment and discharge thereof (including, without limitation, the establishment of a cash escrow fund for contingent liabilities in such amount and for such term as the liquidator may reasonably determine); and

(d) all remaining assets of the Company shall be distributed to the Members as follows:

(i) the liquidator may sell any or all Company property, including to Members, and any resulting gain or loss from each sale shall be computed and allocated to the Capital Accounts of the Members;

(ii) with respect to all Company property that has not been sold, the fair market value of that property shall be determined and the Capital Accounts of the Members shall be adjusted to reflect the manner in which the unrealized income, gain, loss, and deduction inherent in property that has not been reflected in the Capital Accounts previously would be allocated among the Members if there were a taxable disposition of that property for the fair market value of that property on the date of distribution; and

(iii) Company property shall be distributed among the Members in accordance with the positive Capital Account balances of the Members, as determined after taking into account all Capital Account adjustments for the taxable year of the Company during which the liquidation of the company occurs (other than those made by reason of this clause (iii)); and those distributions shall be made by the end of the taxable year of the Company during which the liquidation of the Company occurs (or, if later, ninety (90) days after the date of liquidation).

All distributions in kind to the Members shall be made subject to the liability of each distributee for costs, expenses, and liabilities theretofore incurred or for which the Company has committed prior to the date of termination and those costs, expenses, and liabilities shall be allocated to the distributee pursuant to this paragraph. Upon completion of all distributions to the Member, such distribution shall constitute a complete return to the Member of its Capital Contributions and release all claims against the Company. To the extent that a Member returns funds to the Company, it has no claim against any other Member for those funds.

16.05 **Deficit Capital Accounts.** Notwithstanding anything to the contrary contained in this Agreement, and notwithstanding any custom or rule of law to the contrary, to the extent that the deficit, if any, in the Capital Account of any Member results from or is attributable to deductions and losses of the Company (including non-cash items such as depreciation), or distributions of money pursuant to this Agreement to all Members in proportion to their respective Percentage Interests, upon termination of the Company such deficit shall not be an asset of the Company and such Members shall not be obligated to contribute such amount to the Company to bring the balance of such Member's Capital Account to zero.

16.06 **Certificate of Termination.** On completion of the distribution of Company assets as provided herein, the Company is terminated, and the Managers (or such other person or persons as the TBOC may require or permit) shall execute, acknowledge and cause to be filed a Certificate of Termination, at which time the Company shall cease to exist as a limited liability company.

## ARTICLE XVII
## AMENDMENT OR MODIFICATION

17.01 **Amendment or Modification.** This Agreement may be amended or modified from time to time only with a written instrument executed with the Unanimous Consent of the Members.

## ARTICLE XVIII
## GENERAL PROVISIONS

18.01  **Construction.**  Whenever the context requires, the gender of all words used in this Agreement includes the masculine, feminine, and neuter.  In the event there is only one Member, then references to Members in the plural should be construed as singular; likewise, in the event there is only one Manager, then references to Members in the plural should also be construed as singular.

18.02  **Offset.**  Whenever the Company is to pay any sum to any Member, any amounts that Member owes the Company may be deducted from that sum before payment.

18.03  **Notices.**  Except as expressly set forth to the contrary in this Agreement, all notices, requests, or consents provided for or permitted to be given under this Agreement must be in writing and must be given either by depositing that writing in the United States mail, addressed to the recipient, postage paid, and registered or certified with return receipt requested or by delivering that writing to the recipient in person, by courier, or by facsimile transmission; and a notice, request, or consent given under this Agreement is effective on receipt by the person.  All notices, requests, and consents to be sent to a Member must be sent to or made at the addresses given for that Member on Exhibit A or such other address as that Member may specify by notice to the other Members.  Any notice, request, or consent to the Company or the Managers must be given to the Managers at the following address:

> 13901 Midway, Suite 102-243
> Farmers Branch, Texas 75244

Whenever any notice is required to be given by law, the Certificate of Formation or this Agreement, a written waiver thereof, signed by the person entitled to notice, whether before or after the time stated therein, shall be deemed equivalent to the giving of such notice.

18.04  **Entire Agreement; Supersedes Other Agreements.**  This Agreement includes the entire agreement of the Members and their Affiliates relating to the Company and supersedes all prior contracts or agreements with respect to the Company, whether oral or written.

18.05  **Effect of Waiver or Consent.**  A waiver or consent, express or implied, to or of any breach or default by any person in the performance by that person of its obligations with respect to the Company is not a consent or waiver to or of any other breach or default in the performance by that person of the same or any other obligations of that person with respect to the Company.  Failure on the part of a person to complain of any act of any person or to declare any person in default with respect to the Company, irrespective of how long that failure continues, does not constitute a waiver by that person of its rights with respect to that default until the applicable statute-of-limitations period has run.

18.06  **Binding Effect.**  Subject to the restrictions on Transfers set forth in this Agreement, this Agreement is binding on and inure to the benefit of the Members and their respective heirs, legal representatives, successors, and assigns.  However, unless and until properly admitted as a Member, no Assignee will have any rights of a Member beyond those provided expressly set forth in this Agreement or granted by the TBOC to assignees.

18.07  **Governing Law.**  THIS AGREEMENT IS GOVERNED BY AND SHALL BE CONSTRUED IN ACCORDANCE WITH THE LAW OF THE STATE OF TEXAS, EXCLUDING ANY CONFLICT-OF-LAWS RULE OR PRINCIPLE THAT MIGHT REFER THE GOVERNANCE OR THE CONSTRUCTION OF THIS AGREEMENT TO THE LAW

OF ANOTHER JURISDICTION.

18.08  **Severability.**  If any provision of this Agreement or the application thereof to any person or circumstance is held invalid or unenforceable to any extent, the remainder of this Agreement and the application of that provision to other persons or circumstances is not affected thereby and that provision shall be enforced to the greatest extent permitted by law.

18.09  **Further Assurances.**  In connection with this Agreement and the transactions contemplated hereby, each Member shall execute and deliver any additional documents and instruments and perform any additional acts that may be necessary or appropriate to effectuate and perform the provisions of this Agreement and those transactions.

18.10  **Waiver of Certain Rights.**  Each Member irrevocably waives any right it may have to maintain any action for dissolution of the Company or for partition of the property of the Company.

18.11  **Indemnification.**  To the fullest extent permitted by law, each Member shall indemnify the Company, each Manager and each other Member and hold them harmless from and against all losses, costs, liabilities, damages, and expenses (including, without limitation, costs of suit and attorney's fees) they may incur on account of any breach by that Member of this Agreement.

18.12  **Counterparts.**  This Agreement may be executed in any number of counterparts with the same effect as if all signing parties had signed the same instrument.

## ARTICLE XIX
## NOTICES AND DISCLOSURES

19.01  **Compliance with Regulation D of the Securities Act of 1933.**  THE OWNERSHIP INTERESTS THAT ARE THE SUBJECT OF THIS COMPANY AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR ANY STATE SECURITIES LAWS.  THE INTERESTS MAY NOT BE OFFERED FOR SALE, SOLD, PLEDGED, TRANSFERRED, OR OTHERWISE DISPOSED OF UNTIL THE HOLDER THEREOF PROVIDES EVIDENCE SATISFACTORY TO THE MANAGERS (WHICH, IN THE DISCRETION OF THE MANAGERS, MAY INCLUDE AN OPINION OF COUNSEL) THAT SUCH OFFER, SALE, PLEDGE, TRANSFER, OR OTHER DISPOSITION WILL NOT VIOLATE APPLICABLE FEDERAL OR STATE SECURITIES LAWS.  THE OWNERSHIP INTERESTS THAT ARE THE SUBJECT OF THIS COMPANY AGREEMENT ARE SUBJECT TO RESTRICTIONS ON THE SALE, PLEDGE, TRANSFER, OR OTHER DISPOSITION AS SET FORTH IN THIS COMPANY AGREEMENT.

19.02  **Notice to Members.**  By executing this Agreement, each Member acknowledges that it has actual notice of all of the provisions of this Agreement, including, without limitation, the restrictions on the transfer of Membership Interests set forth in this Agreement, and all of the provisions of the Certificate of Formation.  Except as otherwise expressly provided by law, each Member hereby agrees that this Agreement constitutes adequate notice of any notice requirement under Chapter 8 of the Uniform Commercial Code, and each Member hereby waives any requirement that any further notice thereunder be given.

19.03  **Limitation of Liability.**  Pursuant to Article 581-1 *et seq.* of the Texas Revised Civil

---

Statutes (the "Texas Securities Act"), the liability under the Texas Securities Act of a lawyer, accountant, consultant, the firm of any of the foregoing, and any other person engaged to provide services relating to an offering of securities of the Company ("Service Providers") is limited to a maximum of three times the fee paid by the Company or seller of the Company's securities, unless the trier of fact finds that such Service Provider engaged in intentional wrongdoing in providing the services. By executing this Agreement, each Member hereby acknowledges the disclosure contained in this paragraph.

*[Signature Page to Follow]*

IN WITNESS HEREOF, the Managers and Members have adopted and executed this Company Agreement as of the Effective Date set forth above.

MANAGER:

ONE SF Residential, LLC
a Delaware limited liability company

_____
Maximilien Barton
President


MEMBERS:

ONE SF Residential, LLC
a Delaware limited liability company

_____
Maximilien Barton
President


MXBA, LLC
a Delaware limited liability company

_____
Maximilien Barton
President


_____    25 Aug 2⍺
Daniel Crow, Individually

## EXHIBIT "A"
## MEMBERS

| Member Name & Address | Initial Capital Contributions | Membership Interest % | Profit/Loss |
|---|---|---|---|
| MXBA, LLC | $122,329.01* | 39.00% | 39.00% |
| ONE SF Residential, LLC | $10.00 | 1.00% | 1.00% |
| Daniel Crow | $1,058,000.00* | 60.0% | 60.00% |

*As itemized and detailed on the following *Use of Proceeds from Capital Contributions of Members*.

## EXHIBIT A (Continued)
## Use of Proceeds from Capital Contributions of Members

## TOTAL CAPITAL CONTRIBUTIONS OF CROW

1. **Closing of 59 Acre Contract**
   (as defined in the 59 Acre Purchaser's Statement)

   **"Balance Due by Purchaser"**                         $744,985.56

2. **Closing of 3 Acre Contract**
   (as defined in the 3 Acre Purchaser's Statement)

   **"Estimated Total" due by Purchaser**                 $254,229.80

3. **Invoices to be Paid on behalf of Venus59, LLC**

   Jones|Carter Invoice 00320691                          $19,440.00

   Alpha Testing, Inc., Invoice 602974                    $ 6,300.00

   CCN Settlement with Mountain Peak
   The AL Law Group (David Tuckfield) Invoice 40763       $ 1,120.00

   Barrett & Associates, PLLC Invoice 1539                $10,000.00

   **Total Invoices to be Paid:**                         $36,860.00

## Total Initial Capital Contributions of Crow

4. **Estimated Cost to complete Preliminary Plat:**

   Preliminary Plat                                       $29,000.00
   Meeting and Coordination                               $ 2,000.00
   Easement Preparation                                   $ 1,000.00
   Downstream Assessment and Flood Study                  $24,225.00
   Downstream Assessment Agency Comments                  $ 6,375.00

   **Total Billing Remaining for Preliminary Plat:**      $62,600.00
   **LESS: MXBA Additional Contribution:**                ($40,675.36)

## Estimated Costs Apportioned to the
## Crow Additional Contribution                           $21,924.64


## TOTAL CAPITAL CONTRIBUTIONS OF CROW:                   $1,058,000.00

## TOTAL CAPITAL CONTRIBUTIONS OF MXBA

### 4.  Estimated Cost to complete Preliminary Plat:

| | |
|---|---|
| Preliminary Plat | $29,000.00 |
| Meeting and Coordination | $ 2,000.00 |
| Easement Preparation | $ 1,000.00 |
| Downstream Assessment and Flood Study | $24,225.00 |
| Downstream Assessment Agency Comments | $ 6,375.00 |
| **Total Billing Remaining for Preliminary Plat:** | **$62,600.00** |
| **LESS: Crow's Additional Contribution:** | **($21,924.64)** |

## Estimated Costs Apportioned to the<br>  MXBA Additional Contribution                  $40,675.36

### 5.  Invoices and Monies Paid on behalf of Venus59, LLC

| | |
|---|---|
| City of Venus Professional Services Agreement Fee<br>Invoice 2021-01-112-1 | $15,000.00 |
| Retainer for Development Agreement with<br>Miklos\|Cinclair Attorneys & Counselors | $ 5,000.00 |
| Retainer for Decertification Filing with Mountain Peak<br>The AL Law Group (Andy Barrett) | $ 5,000.00 |
| Mountain Peak Settlement for Decertification 51-158 | $10,000.00 |
| Jones\|Carter – Services for Johnston Tract Legal<br>Description – Invoice 00302850-2 | $ 1,116.33 |
| Invoice 00303581-2 | $    372.11 |
| Non-Applicable Non-Refundable Deposit for Contract Extension<br>Johnston Seventh Amendment, May 31, 2021 | $10,000.00 |
| Non-Applicable Non-Refundable Deposit for Contract Extension<br>Johnston Eighth Amendment, July 31, 2021 | $10,000.00 |
| 59 Acres: Gross Amount Due By Purchaser Less Balance Due<br>  By Purchaser (per the Purchasers Statement including<br>  Applicable Earnest Money of $20,000.00)<br>  ($765,150.77 - $744,985.56) | $20,165.21 |
| "Earnest and Option" (per 3 Acre "Estimated Fees") | $ 5,000.00 |
| | **$81,653.65** |

## TOTAL CAPITAL CONTRIBUTIONS OF MXBA                $122,329.01

## EXHIBIT "B"
## MANAGER AND OFFICERS

**Manager:** ONE SF Residential, LLC

**President:** Maximilien "Max" Barton

**Treasurer:** Saskya Bedoya

**Secretary:** Saskya Bedoya