**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**

**CASE NO. 3:22-cv-2118-X**

-------------------------------------------x

SECURITIES & EXCHANGE COMMISSION,

                    Plaintiffs,

v.

TIMOTHY BARTON, et al.,

                    Defendants.

-------------------------------------------x

**TRANSCRIPT OF THE HEARING**

**BEFORE THE HONORABLE BRANTLEY STARR**

**UNITED STATES DISTRICT JUDGE**

Dallas, Texas

October 11, 2023

1:13 p.m.

SECURITIES & EXCHANGE COMMISSION vs THOMAS LYNCH BARTON
3:22-cv-2118-X                    October 11, 2023                    Page 2

A P P E A R A N C E S:


FOR THE PLAINTIFF:

        SECURITIES & EXCHANGE COMMISSION
                801 Cherry Street
                Suite 1900
                Fort Worth, Texas 76102
        BY:   KEEFE M. BERNSTEIN, ESQ.
                bernsteink@sec.gov
                (817) 900-2607


FOR THE DEFENDANT BARTON:

        HUNTON ANDREWS KURTH, LLP
                2200 Pennsylvania Avenue NW
                Suite 905
                Washington, DC  20037
        BY:   MICHAEL J. EDNEY, ESQ.
                ROGER GIBBONI, ESQ.
                medney@HuntonAK.com
                (202) 778-2204


FOR THE RECEIVER:

        BROWN FOX, LLP
                8111 Preston Road
                Suite 300
                Dallas, Texas  75225
        BY:   CHARLENE KOONCE, ESQ.
                TIM WELLS, ESQ.
                charlene@brownfoxlaw.com
                (214) 327-5000

COURT REPORTER:   MS. KELLI ANN WILLIS, RPR, CRR, CSR
                  United States Court Reporter
                  1100 Commerce Street
                  Room 1528
                  Dallas, Texas  75242
                  livenotecrr@gmail.com


        Proceedings reported by mechanical

stenography and transcript produced by computer.


                        * * * *

# I N D E X

CORTNEY THOMAS

    Direct Examination by Mr. Bernstein ..... 14

    Cross-Examination by Mr. Edney .......... 44

    Redirect Examination by Mr. Bernstein ... 79

    Recross Examination by Mr. Edney ........ 85


ANTHONY CECIL

    Direct Examination by Mr. Bernstein ..... 88

    Cross-Examination by Mr. Edney .......... 96


CAROL HAHN

    Direct Examination by Mr. Bernstein ..... 107

    Cross-Examination by Mr. Edney .......... 120

    Redirect Examination by Mr. Bernstein ... 138


GREGG GINN

    Direct Examination by Mr. Edney ......... 143

    Cross-Examination by Mr. Bernstein ...... 166

SECURITIES & EXCHANGE COMMISSION vs THOMAS LYNCH BARTON
3:22-cv-2118-X                        October 11, 2023                        Page 5

# E X H I B I T S

Plaintiff's Exhibit 35 ..................  44

Plaintiff's Exhibit  1 .................. 141

Plaintiff's Exhibit  2 .................. 141

Plaintiff's Exhibit  3 .................. 141

Plaintiff's Exhibit 32 .................. 141

Plaintiff's Exhibit 33 .................. 141

Plaintiff's Exhibit 34 .................. 141

Remaining Documents ..................... 142


Defendants' Exhibit A ................... 128

Remaining Documents ..................... 165

Defendants' Exhibit E ................... 165

SECURITIES & EXCHANGE COMMISSION vs THOMAS LYNCH BARTON
3:22-cv-2118-X                    October 11, 2023                                    Page 6

- P R O C E E D I N G S -

-o-

THE COURT SECURITY OFFICER:  All rise.

THE COURT:  Thank you.

You can be seated.

Okay.  I'm calling for receivership hearing.  This is Case No. 3:22-cv-2118-X that is SEC versus Barton, et al.

Let's do appearances, first for the Government.

MR. BERNSTEIN:  Your Honor, Keefe Bernstein on behalf of the Plaintiff, the Securities & Exchange Commission.

THE COURT:  Thank you, Mr. Bernstein.

And how about for Barton?

MR. EDNEY:  Your Honor, Michael Edney on behalf of Defendant.  I have with me here at the counsel table, Roger Gibboni, but I will be doing the talking today, and the Defendant, Tim Barton.

THE COURT:  Thank you for being here.

Good morning.  Oh, or afternoon, whatever it is.  I have been in court all day, so it is confusing to me on whether it's morning or afternoon.  Thank you, Mr. Edney.

MR. EDNEY:  I am disoriented my own self.

THE COURT:  Very good.  Very good.

And for the Receiver?

MS. KOONCE:  Charlene Koonce and Tim Wells on behalf of Cort Thomas, the Receiver.

THE COURT:  Okay, thank you.

Let me ask if there is anyone in the audience who wants to make an appearance.  We need you to come to the podium, just so we can actually hear anyone that wants to make an appearance.

And I'll say for everyone else at counsel table, permission to stay seated the rest of the time that you are at counsel table.  When you stand up, out of respect, then I can't hear you because of the microphone.

But if you are at the podium questioning a witness later on, then don't worry.  Standing up is the only option you have.

Okay, appearances.

MS. CHANDLER:  Good afternoon, your Honor.

Carina Chandler and Daniel Alexander on behalf of judgment creditor, David Ramolia.

THE COURT:  Okay.  Thank you for being here.

MS. CHANDLER:  Thank you.

THE COURT:  Okay.  Anyone else

appearance-wise?

Okay.  So we are back here in a remand posture because I used the wrong legal standard at the outset.  I shouldn't have used "owns or controls," I should have used "tracing principles." So we are back to figure that out.

As I see it, the highest level scope of this proceeding is to figure out, one, if there should be a receivership.

Two, if so, what the scope is.

And three, if there is any other ancillary relief that the SEC is requesting that is warranted, like an injunction on sale or transfer of other assets.

And y'all know based on the docket that I allocated 90 minutes per side between SEC and Barton to go in an evidentiary fashion.

Mr. Edney, I did see your motion for oral argument time.  I will think about that at the end. I know they haven't responded yet, but a lot of times what I like to do, instead of oral argument at the end of the proceeding or later on, is to have y'all maybe file just some sort of short supplemental brief, once you have ordered the transcript.

And that way, none of us are operating in a hindsight posture where y'all have been in the heat of battle for the last three hours and you can't remember what was said or was not.

So I'll think about that.  But I'm also mindful of my timeline that November 29th, 2023 is my date to tie off whatever I'm going to do, according to the Fifth Circuit, based on their 90-day stay posture.

So I have got to keep this train moving on time so that I follow orders.

With that, any issues before we start with the SEC's first witness?

Mr. Edney?

MR. EDNEY:  Yes, your Honor.

THE COURT:  Can you stay seated because I can't hear you when you are standing up.

MR. EDNEY:  You told me about that.  I'm sorry.

THE COURT:  It is okay.

MR. EDNEY:  Yes, your Honor, on that last point, we are perfectly happy to come back in short order, if you want us.  I agree with it would be better if we all had a little bit time to digest what happened today.  And if you wanted a writing

and/oral argument, we would happy to do that.  But we would like an opportunity to address some of the bigger issues, in light of what occurs today.

THE COURT:  I understand that.

So I won't cut off that right, I'm just trying to figure how it is most helpful to me, if that makes sense and most effective for you.

MR. EDNEY:  For your Honor.  That is the important thing, your Honor.

THE COURT:  Understood.

With that, what about first witness?  Who are you going to call?

MR. BERNSTEIN:  Your Honor, our first witness will be Cort Thomas, the Receiver.  But before I call Mr. Thomas, I did have just two quick issues on the witnesses.

THE COURT:  Yes.

MS. KOONCE:  First, I provided a notebook of the materials that were included in our appendixes and filed with the Court as well as Mr. Thomas' declaration.

We would like to move to preadmit those exhibits for use during the hearing today.

THE COURT:  Understood.

Mr. Edney, what is your position on the

notebook?

MR. EDNEY: Well, your Honor, I think -- I think it would probably be best to take those one-by-one, as they come up.

I haven't -- I haven't -- obviously, I'm familiar with the whole thing. But, you know, from an evidentiary and admissibility standpoint, I think that is probably the better course.

THE COURT: So here is what I will plan on doing, and I learned this from a variety of judges I appeared before as a lawyer. In a bench trial, or a PI posture, every time I made an evidentiary objection, the judge would sit there, scratch the goatee, and say, I will give the weight to which it is due.

So what I can tell you, because you want to go one-by-one, we can. But you can paper up your objections but you can't take a lot of his time. That is what I don't want to do. Because I will look at your objections in not the heat of battle and then decide how much weight, if any, I will give any exhibit.

But I don't want you sitting there and buying five minutes of his time on thinking of what your objections are.

So just tell me your objections in short form.  I will say, I will give it the weight to which it is due, and I will rule on those objections, once I issue a written judgment.

MR. BERNSTEIN:  Your Honor, so we submitted all of these materials with our motion, and we want the Court to consider these materials in connection with its ruling on the motion.

There has been no objection to any of these exhibits in response.  So I was not planning to spend the Court's time going through each of the exhibits to our submission today.

I can do that, but it is just going to take time.

THE COURT:  I wouldn't expect you to take time doing that.  I would expect for you to move for admission.  You can see what his objection is, and if you think there is a weakness there, you can shore it up.  But you don't necessarily need to do that because I'm going to let you talk about the exhibit with the witness.

Does that make sense?

MR. BERNSTEIN:  It does, your Honor.  Except I wasn't -- so a lot of these are exhibits that we have submitted in support of our motion that

we are not planning to necessarily cover with a witness at the hearing.  I just want to make sure that the Court is aware of them and is able to consider them in connection with the decision on our motion.

We submitted them with our brief.  He didn't object to them.  They have been filed as of record in connection with this motion.

THE COURT:  Okay.  Let's take it this way.

When you have a witness that will talk about an exhibit, offer it.  He can object.  At the end, when you are done with your witnesses, then you can move for all other exhibits in the binder that weren't otherwise admitted and he can make any objections he wants to.  And then I will tell you that I will give it the weight to which it is due.

Fair enough?

MR. BERNSTEIN:  Absolutely, your Honor.

THE COURT:  Okay.  Who's our first witness?

Mr. Thomas, you can come on over to the witness stand.  But you are not going to take a seat yet, because we will have to swear you in, once you get in the general vicinity of the witness stand.

Okay.  If you would raise your right hand.

Mr. Frye will swear you in.

(CORT THOMAS was duly sworn by the Courtroom Deputy.)

THE COURT:  All right.  You can take a seat, Mr. Thomas.

And then I will just ask for some space between their questions and your answers, and vice versa.  That way we can have a clean record and it lets me rule on any objections before you have to answer.

You can proceed, Mr. Bernstein.

You are on the clock.

DIRECT EXAMINATION

BY MR. BERNSTEIN:

Q.   Mr. Thomas, can you please state your name for the record?

A.   Cortney Christopher Thomas.

Q.   Mr. Thomas, you are the court-appointed receiver in this matter?

A.   Yes, I am.

Q.   Approximately how many entities does the receivership currently include?

A.   Roughly 165.

Q.   Are you the corporate representative and custodian of records for the receivership entities?

A.   Pursuant to the receivership order, yes.

Q.   Mr. Thomas, if you go to Exhibit 35 in the notebook in front of you, there is a copy of a declaration and interim report you recently submitted to the Court in this case.

A.   Yes, I see it.

Q.   If you go to paragraph 20 of your declaration, you discuss several challenges facing the receivership.

     Can you describe what the state of the receivership assets were at the outset of this receivership?

A.   Sure.

     So what comes to mind, first, I'm still turning there, but the receivership has been cash starved from the very outset.  When I was appointed, October 18th of last year, there was less than $75,000 in the receivership accounts.

     As we sit here today, there is more than that, but still not sufficient funds to continue administering the various properties that are within the receivership.

Q.   And can you describe what the state of the receivership assets were at the outset of this receivership?

A.    So there is a variety of real estate assets.

One in particular, the Marigold Suites was in a state of disrepair.  There were a lot of vacant units.  And so we have done our best to start getting some of those back online.

But there were properties on the verge of foreclosure.  We could go one-by-one through the assets, but there was -- my declaration here and probably the other filings from the case lay it out better than I can.

Q.    And you touched on this a little bit in your earlier answer, Mr. Thomas, but what are the challenges currently facing the receivership?

A.    Sure.

So the biggest current hurdle is the lack of significant cash flow to continue administering the receivership.

Q.    All right.

Moving to paragraph 22 of your declaration, when you began to obtain the receivership entities' financial records, did you encounter commingling of funds?

A.    Yes, we did.

Q.    Do you provide examples of that commingling in your declaration?

A.    Yes, we do.

Q.    Based on your experience, how would you describe the scale of commingling in this case?

A.    So it was extensive.  I haven't spent as much time in the bank records as other members of my team and the accounting -- the accountants that have helped me, but I have spent a decent amount of time and it is extensive commingling.

Q.    Mr. Thomas, could you go now to paragraph 33 of your declaration?

A.    I'm there.

Q.    Did you determine whether Mr. Barton controlled the receivership entities?

A.    Yes, I did.

Q.    How did you make that determination?

A.    Well, so we looked a host of different documents in the main office at 2999 Turtle Creek. There were corporate formation binders that we looked at.  We looked at tax returns; we spoke to individuals, yeah.  A host of different things, as detailed in my declaration.

Q.    You stated that there are approximately 165 receivership entities, is that correct?

A.    That is correct.

Q.    Did you determine whether these receivership

entities were operating independently?

A.   We did look at that.  They were operating, I would say, inter-dependently.  They were -- it was kind of common enterprise, is what it appeared to be.

Q.   And can you explain that a little more for the Court?

A.   Sure.  So back to commingling point, it seemed that most funds flowed through either JMJ Development or Carnegie Development.

No matter the source, they kind of flowed through there and then went out to the various different companies.  And that, again, is detailed more in this section that you pointed me to in my declaration.

Q.   Could you go now, please, to paragraph 46 of your declaration?

A.   Sure.  I'm there.

Q.   You identified bank records and other receivership entity business records in your declaration as the financial records, correct?

A.   Correct.

Q.   Are those financial records voluminous?

A.   They are.

Q.   Are the financial records the records you

analyzed and summarized in your declaration?

A.    Yes, they are.

Q.    Are the summaries attached to your declaration and your statements in the declaration regarding financial transactions and tracing derived from those financial records?

A.    Yes.  They are derived from the bank records, the QuickBooks files and the documents from title companies.

Q.    And have those financial records been made available to Mr. Barton?

A.    Those ones just listed have, yes.

Q.    All right.

      Mr. Thomas, I want to talk to you now about the potential entities for a new receivership.

      Have you analyzed and summarized the financial records to determine which of the current receivership entities received or otherwise benefited from assets traceable to the WALL entity offerings at issue in this lawsuit?

A.    Yes, I have.

Q.    What did you do to determine the entities that fall into that category?

A.    So I worked hand-in-hand with my accountants. We examined, like I said before, the bank records

were the big thing to determine where the WALL investor funds flowed.  We came up with an example. It is not all examples; it is just an example for each entity that we saw receiving or benefiting from WALL investor monies.

Q.   You mentioned accountants.

Did you, as the receiver, retain an accounting firm to assist you in your work as the receiver in this matter?

A.   Yes.  From the outset, we retained Ahuja & Clark.

Q.   Why did you initially retain an accounting firm?

A.   So for a variety reasons.  One, I knew that we would have to file taxes eventually, and so I needed a tax accountant to help.

I also knew, based on prior receivership experience, that we would need a forensic accounting at the end of the day, both on the front end, determining investor monies that come in, and then on the back end, trying to figure out who received those monies, who were the fraudulent transferees.

And so the taxes, the taxes and the forensic accounting were the main reasons they were hired early on.

Q.    Is Anthony Cecil one of the accountants that you worked with from Ahuja & Clark?

A.    Yes.

Q.    And did Mr. Cecil review the tracing information and other summaries in your declaration?

A.    We worked hand-in-hand in preparing them, so yes.

Q.    Can you now go, Mr. Thomas, to Exhibit 34 in the notebook in front of you, which is the SEC's list of proposed receivership entities?

A.    Yes, I see it.

Q.    Are all the entities listed on Exhibit 34 entities that fall within the group of entities that you determined received or benefited from investor funds from the WALL entity offerings?

        MR. EDNEY:  I'm going to object to that question.  It calls for an expert conclusion and he's not one.

        THE COURT:  I will allow him to answer and give it the weight to which it is due.

        You can answer.

        THE WITNESS:  Sorry.  Just give me a couple more seconds to look through this list.

        I'm sorry.

SECURITIES & EXCHANGE COMMISSION vs THOMAS LYNCH BARTON
3:22-cv-2118-X                        October 11, 2023                        Page 22

BY MR. BERNSTEIN:

Q.    Again, just to be clear, Mr. Thomas, all I'm asking is that all the entities on your list are on the list that appears on Exhibit 34?

A.    I understand.  I just haven't looked at this list, so I wanted to make sure.  Yes, they -- they are included in my declaration.

Q.    So in fact, the list of proposed receivership assets the SEC has proposed is a subset of the entities that you identified in your declaration as entities that received or benefited from the investor funds?

        MR. EDNEY:  I'm going to lodge the same objection for the record.

        THE COURT:  The same ruling.

        You can answer.

        THE WITNESS:  It appears to be fewer entities, so yes, a subset would be correct.

BY MR. BERNSTEIN:

Q.    And are all the entities addressed in your declaration?

A.    Yes.

Q.    Can you go back to your declaration at paragraph 54?

        Did you provide entity-by-entity examples of

funds or benefits received by each of the proposed receivership entities?

A.    Yes.  I went category-by-category through the entities.

Q.    But in addition to going -- and we will talk about the categories in a moment -- but in addition to going category-by-category, didn't you also address each entity, entity-by-entity?

A.    Yes, yes.

Q.    So let's talk about the categories.

You divided the entities into several categories.

Could you explain for the Court what those categories are?

A.    Sure.  So there are 12 of them.  They are listed here in paragraph 54 of my declaration.

The first category was entities which were the WALL entities that directly received funds from the WALL investors.  The second category was entities that received -- received or benefited from WALL investor monies and hold real estate, currently hold real estate.

I think the third category was used to real estate, no longer holds real estate.  And then it goes from there.

The idea was to try to make buckets of entities that would be treated similarly as each other to just try to parse through the 165 entities that are currently in the receivership.

Q.   And you mentioned that you also went entity-by-entity in your declaration and gave an example for each entity, correct?

A.   For certain of those categories, yes.  We gave examples for each entity.  And then others, more categorically, if the category alone applied.

Q.   Could you walk the Court through an example of the results of your tracing set forth in your declaration for one of the entities?

A.   Sure.

So for the purposes of this analysis, I think the second category is the most important because that is what currently holds -- currently holds real estate assets.

So if you look at Exhibit 10 to my report, that is the DJD Land Partners acquisition.  And so you can just kind of follow the flow of funds here on this Exhibit 10 diagram, where monies come in from WALL007.  They then go into Carnegie Development.

From Carnegie Development, they flow into WALL011.  And then they are ultimately used for

the -- I believe it is the acquisition of the DJD Land Partners land in Venus.

Q.   Mr. Thomas, do the tracing examples in your declaration show all of the investor funds or other benefits traceable to each entity?

A.   No.

As I mentioned before, we just provided one example and in some instances of a couple of examples of WALL investor funds or commingling, or whatever it was in the example.

Q.   Based on your review of the financial records, are there other examples?

A.   Yes, there are.

Q.   Subsequent to your declaration, have you identified additional examples that are not addressed in your declaration?

A.   Sure.  Yes.

Q.   Could you describe for the Court a recent example that you have identified?

A.   Sure.

So just yesterday, someone on my team brought me transactions they had located related to Goldmark Hospitality in the months leading up to the receivership.

There were checks made on the Goldmark

Hospitality loan that were made by Gillespie Villas by one of the 2999 Turtle Creek entities, by Broadview Holdings, just from a host of other sources that were ultimately tied to investor funds.

Q.   Are you familiar with the entities that Mr. Barton's son, Max Barton claimed should be excluded from the receivership?

A.   Yes, I'm aware of those entities.

Q.   And you address those entities starting at paragraph 163 of your declaration, is that correct?

A.   Yes, that's correct.

Q.   Did those entities receive or otherwise benefit from assets traceable to the WALL entity offerings?

A.   Yes, they did.

MR. EDNEY:  I will assert the same objection, your Honor.

THE COURT:  The same ruling.

You can answer.  It will stand.

You can proceed.

BY MR. BERNSTEIN:

Q.   Mr. Thomas, did you provide examples in your declaration of tracing to the Max Barton entities?

A.   Yes, we did.

Q.   Are you also familiar with a group of receivership entities that hold interest in certain

HUD apartment complexes?

A.   Yes.

Q.   And you address those entities starting at paragraph 77 of your declaration.

Did those entities connected to the HUD apartment complexes, based on your summaries of the financial records, receive or otherwise benefit from assets traceable to the WALL entity offerings at issue in this lawsuit?

A.   Yes, they did.

Q.   And can you give the Court an example of the type of benefit or benefits that the HUD apartment complex entities received?

A.   Sure.

So they are detailed here in my declaration. The two that come to mind first are that the benefiting from a component of this, there were at least two, possibly more JMJ employees who were paid by HR Sterling.  Those funds were ultimately -- some of those were ultimately tied to WALL investor funds.

Their time was used to manage, help develop the HUD apartments, and then possibly the biggest concern with these SPC -- what we call the SPC properties in mind, or HUD apartments, depending on

the filings you are looking at, is that these properties were developed -- the overwhelming majority of the money for each of these four properties came from a HUD loan; then a lesser amount came a loan from SPC, and then there was also SBA loans that were pulled out on all three properties.

In securing the HUD loan, which is by far the biggest contributor to the development of these properties, Mr. Barton had to file loan applications with HUD.

And in order to qualify, be approved for these HUD loans, he listed assets that he possessed.  And the assets that were listed were WALL investors -- or properties that were purchased with WALL investor funds.

Q.  So he used --

MR. EDNEY:  Your Honor, I am going to object and move to strike the last answer on the previously stated grounds.

THE COURT:  I will overrule that.

BY MR. BERNSTEIN:

Q.  So Mr. Thomas, he essentially used properties obtained with WALL investor funds and other assets traceable to the investor funds to obtain the HUD

loan?

MR. EDNEY:  Objection, leading.

THE COURT:  I will allow that.

You can answer.

THE WITNESS:  Yes, I think that is what I just testified to.

BY MR. BERNSTEIN:

Q.   All right.

Mr. Thomas, I want to talk to you just for a moment about the report that has been submitted by Mr. Ginn, by the defense.

Have you had a chance to review that report?

A.   I did review it.

Q.   Okay.

Did you observe that Mr. Ginn claimed that your tracing analysis does not account for potentially non-investor funds being deposited in the WALL entity and JMJ Development accounts?

A.   Yes.

Q.   Do you have a response to that?

MR. EDNEY:  Objection; same grounds.

THE COURT:  I will allow him to answer.

THE WITNESS:  So sure.

So as I think I have already testified, we did not do a complete forensic accounting of all

money coming in and all money going out.  That would have taken much, much longer and been much, much more expensive than what we did.

We do know, and I didn't haven't seen the anything to the contrary in the 300 plus filings in this case this far; that at least $26 million came in from WALL investors during the course of 2017 to 2019.

That -- sorry.  I got distracted by the noise.

26 million came in between 2017 and 2019. I believe, if I remember right, from the Mr. Ginn's report, he notes that there is 35 million coming in. And so he questions, you know, what was the source. If only 26 million is from WALL investors, then 35 million, where did that 9 million delta come from.

And so my response there, one, from the documents I've seen, I'm pretty sure that more than 26 million came in at the end of the day.  I'm not ready to put that in writing yet because we are -- if a new receivership order gets put in place, if eventually there is a claims process, there is always a big fight with investors saying they are or they are not part of the receivership.

And so I believe there are more than $26 million that came in.  I think that the bigger number, probably the bigger reason for that $9 million delta are what I would call churning or turning over, where that example I gave before from Exhibit 10, roughly one and a half million dollars came from a WALL entity.

That one and a half million, if you look back at the origination, it was originally WALL investor monies that then went to purchase a property in Fort Worth.

When that property was sold, those monies came back into the WALL entity.  And then that money was then transferred on down the road to buy the DJD Land Partners' land.

So it is still WALL investor monies originating.  It just gets kind of turned over.  It comes in twice into the WALL.  It leaves and then it comes back in.  So it looks like it is a bigger number; it looks like it is 35 million, instead of 26 million, but it is still the same origination point.

Q.    And in any event, Mr. Thomas, did the fact that there are potentially other sources of funds in those accounts impact your ability to trace funds?

A.    No, it did not.

And we have looked at the origination of funds for all of the examples we provided.

Q.    All right.

Mr. Thomas, what is the current status of your tracing efforts?

A.    I mean, I would say it is ongoing.  If the receivership -- if the new receivership gets put in place, we will have to do this forensic accounting, like I mentioned, focusing on the front end and the back end.

We were delayed with these proceedings coming up with these examples.  But I'm sure more examples will pop up as it has all along.

Q.    And has your tracing considered whether investor funds or an associated benefit has survived in an account, property, or claim held by a proposed receivership entity?

A.    Yes, it has.

Q.    And can you tell the Court a little bit more about that?

A.    Sure.

So for that second bucket that we were talking about, where WALL investor funds flowed into property that is still there, those funds are still

in the property.  They were put into the property and the property is held by the receivership.

There are other instances where funds may have gone into a property like the 2999 Turtle Creek property, where funds went in and then there was a judicial determination that the receivership entities no longer owned those properties.

And so what would be held as a claim -- that receivership entity would have a claim to try to go after fraudulent transferees or whatever claims there may be.  And so we should go through the different entities.  But generally speaking, it is properties, banks accounts, and legal claims that survive.

Q.   If you were provided additional time, do you believe it is likely that you would be able to trace to additional Barton-controlled entities?

MR. EDNEY:  Objection on the same grounds.

THE COURT:  I will allow him to answer.

THE WITNESS:  If I had more time, sure.  I don't know if it is cost effective as it is inefficient.  This has already been a very expensive process.

BY MR. BERNSTEIN:

Q.   All right.

Mr. Thomas, I want to switch gears now and talk a little bit about the net sphere factors?

A.    Okay.

Q.    Do any of the properties in the proposed receivership require active management?

A.    Yes.

Q.    Can you tell us a little bit more about that?

A.    Sure.

The easiest example is that Marigold Suites property that I talked about.  With the HUD properties, there is a third-party property manager that is overseeing it, so day-to-day oversight is more limited.

With the Marigold Suites, there is a -- she was an employee of receivership entities before I was put in place and she actively manages the property.

There is all sorts of issues.  This summer it was, you know, incredibly hot, and so we had to deal with requests to replace a bunch of AC units.  This summer I was made aware that there was a fire at the complex.

There is just a host of things.  And it is detailed in my report.  It is detailed in my prior reports.  And it is detailed in the various filings we have made in this case.

But that is just one example.

Q.   Are there liens on any of the receivership properties?

A.   I believe there are liens on all the receivership properties.

Q.   Are any of the properties facing foreclosure?

A.   Prior to my appointment, two or three of them had been scheduled for foreclosure.  If you look on the docket, you will see even now people are filing requests to lift the stay.  I believe all of them would be subject to foreclose because we haven't had enough cash to service the debt.

Or I shouldn't say all of them; the vast majority of them.

Q.   Are any of the properties embroiled in other litigation?

A.   Yes.  There is a lot of other litigation.

Q.   Were any of the receivership properties in disrepair or facing other challenges when you were appointed?

A.   Yes. I think we have already talked the Marigold Suites a few times.

Q.   And you have talked about the foreclosures, the litigation, issues with the properties themselves that you have encountered when you became the

receiver.

Are any of those challenges still present and present going forward?

A.   Yes, I would say all the challenges are still present and present going forward.  Primarily being cash strapped, it continues to hinder our efforts.

Q.   Mr. Thomas, have you made any determination about whether properties in the receivership are increasing or decreasing in value?

A.   Yes.

Q.   And what have you determined?

A.   Well, so for each of these properties, we have real estate professionals who have been helping us in some capacity.

In talking to them and just being in the business community in Dallas, generally speaking, the higher interest rates have had a negative effect on commercial real estate in the Dallas area and prices have gone down, today compared to where they were when I was first appointed a year ago.

Q.   And based on your diligence in talking to members of the real estate community in your role as a receiver, what have you determined as to the trend in the property values held by the receivership?

A.   So each property would have to be looked at

individually, but the general trend has been downward and we don't know when we will be out of that.

Q.   If you could go now to paragraphs 194 and 195 of your declaration.

A.   Okay.  I'm there.

Q.   Have you made a determination as to whether the assets of the receivership entities are sufficient to disgorge the amount of funds raised from investors in the WALL offerings?

A.   Yes.  We have done that, or I have done that analysis.

Q.   And what did you determine?

A.   So if you look at paragraph 194, the chart on page 82, it is kind of a back of the envelope calculation.  Based on prior reports, if you go look at the prior reports, you will see that it is an amalgamation of a bunch of things.

What it shows is, one, it -- even if the SPC or the HUD properties are included in the receivership, the total amount recovered is still going to be less than 26 million.

And that is a big if, as you have seen from the filings; SPC strongly contests our position that the receivership entities still own those properties.

So if those were taken out, it would be substantially less than the 26 million.

Q.   Can you go now to paragraph 199 of your declaration?

A.   Yes.  I'm there.

Q.   Did your review of the financial records show how Mr. Barton used investor funds?

A.   Yes.

Q.   Did Mr. Barton use investor funds for personal expenses?

A.   There were examples of that, yes.

Q.   Can you provide a further description of some of the ways that Mr. Barton used investor funds?

A.   Sure.

So shortly before I was appointed, funds that were ultimately attributed to WALL investor funds were used to pay attorneys, they were used to pay credit cards, I think somewhere between 5 and a half and $7 million in credit card payments were made, much of those tied back to WALL investor funds.

Q.   And is that described in your declaration as well?

A.   Yes, it is.

And then I provide a lot of additional examples in here.

Q.    You mentioned this in your last answer, did monies -- just to clarify, did money flow into the receivership entities during the months leading up to your appointment as a receiver?

A.    Yes.

Q.    About how much money came in?

A.    So let's say from December of '21 through October of '22, it was several million dollars.

Q.    Was any of that money traceable to WALL investor funds?

A.    Yes.

        MR. EDNEY:  Objection.

        THE COURT:  What is the objection?

        MR. EDNEY:  On the same grounds, your Honor.

        THE COURT:  Okay.  The same ruling.

BY MR. BERNSTEIN:

Q.    And Mr. Thomas, how much cash was actually left on hand when you were appointed?

A.    Less than $75,000.

Q.    Do you know where the rest of that money went?

A.    I have some instances.  Like I said, we have not completed the, you know, forensic accounting on the front end and the back end to know where every single dollar went.  And I don't know that that it

will be cost effective at the end of the day.

We do have ideas -- I just testified as to some of the examples of where monies went in the last few months.

Q.   And what was the latest point in time that Mr. Barton was using investor funds from the WALL offerings for his expenses based on your review of the financial expenses, financial records?

A.   It was within a couple of weeks.  I don't know the exact day.  I would have to go look at the bank records to say.

Q.   So within a few weeks of you being appointed, Mr. Barton was still using funds traceable to the WALL entity offerings for his own expenses?

MR. EDNEY:  Objection on the expert grounds and objection on leading grounds.

THE COURT:  Understood.  Overruled.

You can answer.

THE WITNESS:  So I was appointed on October 18th.  And so I remember seeing examples after the SEC filed this lawsuit, which I think was late September.  So yes, I just don't know the exact date, as I sit here.

BY MR. BERNSTEIN:

Q.   All right.

Mr. Thomas, at previous points in this case, Mr. Barton has proposed a monitorship as an alternative to a receivership.

Would a monitorship be adequate to protect investors in this case?

A.    No, it would not.

Q.    Why not?

A.    So a variety of reasons.  One of the biggest reasons is that I don't know that I have ever heard of a monitorship with a litigation stay.  And the litigation stay is very, very important here for all the reasons we have talked about with potential foreclosures.

Also, as your Honor is well aware with all the filings here, to start entering a receivership order in October, part of the reasons we have 300 different filings is because of Mr. Barton's disregard of the receivership order in some ways and lack of compliance with the order.

So I would be nervous how a monitorship would go.

Q.    Would simply freezing all the assets that are currently in receivership be sufficient to protect investors?

A.    No.  It would not, for the cash reasons I gave

before.

It would be -- it has already been difficult enough managing the receivership with limited cash flow.  If everything was just frozen, if the assets were frozen without a litigation stay, without a stay of foreclosure, then the properties would be foreclosed on.

If there was somehow an asset freeze with a stay of foreclosure, there is still property taxes aren't going to be paid, insurance isn't going to be paid.  We have been able not service debt so far because of the receivership order, but at some point that is going to lifted.  It can't be indefinite under the case law.

Q.   Mr. Thomas, can you now go to paragraph 197 of your declaration?

A.   I'm there.

Q.   Has Mr. Barton provided you with the information required by the receivership order?

A.   Generally, no.

And that is, yes, detailed there in paragraph 197.

Q.   Has Mr. Barton provided you an accounting of his entities' assets and liabilities?

A.   No, he has not.

Q.    Has Mr. Barton interfered with your work as the receiver in any way?

A.    So, yes.  As I testified before, I would point to the various filings that have gone on and here -- well, I think it is elsewhere in my declaration, we bullet some of the different things that have happened over the course of the last year.

Q.    All right.

Mr. Thomas, is there anything else that you want to tell the Court in connection with this motion at this time?

A.    So no.  I think we have covered -- I could sit here and talk for a long time, but I don't know that I want to waste the limited time that we have here with my thoughts.

MR. BERNSTEIN:  Your Honor, at this time we move to admit Exhibit 35, which is the declaration and the interim report of the Receiver.

THE COURT:  Objection?

MR. EDNEY:  Your Honor, I object to the admission of the report on the grounds that it contains tracing conclusions that are -- that require the introduction of expert testimony for which he's not been qualified.

THE COURT:  Understood.  I will give to

the weight to which it is due.

I will grant its admission at this point, conditionally on the objections.

(The referred-to document was admitted in Evidence as Plaintiff's Exhibit 35.)

MR. BERNSTEIN:  We pass the witness, your Honor.

THE COURT:  Okay.  Thank you.

You can proceed when you're ready, Mr. Edney.

MR. EDNEY:  Thank you, your Honor.

CROSS-EXAMINATION

BY MR. EDNEY:

Q.   Good afternoon, Mr. Thomas.

My name is Mike Edney.  I represent the Defendants in this matter.  Thank you for being here today.

A.   Thank you, Mr. Edney.

Q.   I'm going to begin with some of the things that you said in your testimony and then go on to some other topics that are raised your declaration, is that all right?

A.   Sure.

Q.   Let me just begin with one thing.

I heard earlier, and correct me if I'm wrong,

that you, in your declaration, provided tracing examples for each of the 82 entities that the Commission now seeks to put in receivership, is that right?

A.   So I think I was careful.  So we provide -- for certain buckets, yes, we provide tracing examples.

For other categories, so for instance parent entities that never had funds really flow back and forth but they owned, they were the ultimate parent of or somewhere in the ownership chain of a property that received WALL investor funds, I took the position in my declaration that those entities benefited from the WALL investors funds, and so there wouldn't be examples of those entities for those categories.

Q.   I see.

So your tracing examples are laid out in Exhibits 3 through 27 of your declaration?  Does that sound about right?  I think you have it up there.

A.   That sounds about right.

Q.   So you have about -- and each one of these exhibits is for one of the companies, is that right?

A.   Correct.  Now, some of them end up applying to multiple entities, but yes.

Q.    So you have about 24 tracing examples, right?

A.    Twenty-four different entities that we traced funds into, yes.

Q.    And that leaves roughly, if my math is correct, 56 entities for which you don't have tracing examples, is that correct?

A.    Fifty-six other entities that benefited from but we did not do tracing.

Q.    I see.

A.    Because there were not funds flowing into them.

Well, that we didn't see at this time.  I guess, I don't know one way or another whether they did.

Q.    So to clarify your testimony for those 56 entities, at this time you haven't seen alleged investor funds traced into those entities, is that right?

A.    I have seen them the benefiting from but yes, that's correct, no lender funds.

Q.    Okay.  All right.

We will come back to the benefiting issue in a few moments, but I want to talk about a couple of other things before I lose my train of thought.

You were asked questions about Mr. Ginn's report and the suggestion that we have been talking

about, $26.3 million in lender funds, but there is $35 million in receipts into the WALL entities, correct?

A.   Yes, we talked about that.

Q.   Is that monetary figure inconsistent with what you have determined through the accounting process?

A.   It is not inconsistent.  Like I said in my testimony, we haven't determined the exact amounts. And I'm hesitant about exact amounts right now, given the status of the proceedings.

Q.   I understand.

But the $35 million top line number is not inconsistent with what you have seen, is that correct?

A.   That's correct.

Q.   And you have ascribed some of that $9 million difference, or delta to churn, I think you called it, is that right?

A.   Correct.  That was my term, but yes.

Q.   And you cited an example, is that right?

A.   Correct.

Q.   But neither you or nor your accounting team has done an evaluation to address that $9 million difference, is that right?

A.   We have not yet done that because we haven't

needed to.

Q.   I see.

A.   But we have looked at portions of the 9 million.  I gave an example of one and a half million of the 9 million.

Q.   You have an example, but you haven't done an analysis of the full 9 million, is that correct?

A.   I have not done an analysis.

Q.   And neither has your accounting team, is that correct?

A.   I don't know if they have.  I have not instructed them to do that.

Q.   Okay.

I would like to turn your attention to paragraph 194 of your declaration.

Are you there?  I apologize.  I don't remember the page, but I will get there in a second.

THE COURT:  Eighty-two.

MR. EDNEY:  Eighty-two.

THE COURT:  Or page 81, if it is before the chart.

MR. EDNEY:  Your Honor is ahead of me.  I appreciate it.

BY MR. EDNEY:

Q.   So I want to talk about the chart.

This is a chart that you and Mr. Bernstein talked about that suggested that the assets in the receivership estate were going to short kick the alleged amount of the loan proceeds, is that correct?

A.    That is correct.

Q.    And I'm just looking down this chart here, there are several entries on the left-hand side, and that -- that refers to property owners.

So these are companies that have real property under its purview and possession, is that right?

A.    Well, so there is a variety -- some of these don't have real property under their purview anymore.  These are potential value coming into the receivership estate.

Q.    Either have claims or possess title to properties, is that right?

A.    Yes, that is fair.

Q.    And I see some valuations ascribed to some of these companies, isn't that right?

A.    I don't know that I would call it "valuations."

This is my back of envelope trying to determine, here are the valuations I have gotten for the value of the property.  And then you take out the debt and just give -- this is the amount that

could be expected, if I sold it today, without accounting for administrative costs, broker's fees, all the different other costs of the receivership, correct.

Q.   And over in the right-hand column, I see seven entries that say "unknown," is that right?

A.   Correct.

Q.   And when we are adding that all the way down to the bottom, those are zeros, correct?

A.   That is correct.  At this point.

Q.   But you don't know what the value of the property is for those entities, isn't that correct?

A.   I don't have enough of an idea to put an estimate in here because there would be -- each of these properties involves claimants, if I put a number in here, it would have consequences.

So at this time I don't -- I don't know if it will result in anything to the receivership or if there will be some amount.

Q.   You just don't know?

A.   That is correct, I do not know.

Q.   Okay.

Isn't it true that several of the real estate properties held by the receivership entities at this point would significantly increase in value if

further advanced in the development process?

A.    Yes, that is true.

Q.    And isn't this particularly true for several properties in and around Venus, Texas?

A.    Yes.  That is true.

Q.    And together these holdings constitute more than 1,000 acres of land in various stages of development, isn't that correct?

A.    I don't believe it is over 1,000 acres.  It is somewhere --

Q.    I mean, if we had to go look, we would look --

A.    At least --

Q.    -- at page 44 of your declaration, sir.

            THE COURT:  We can't talk over each other.

            MR. EDNEY:  No.  That is a good point.

BY MR. EDNEY:

Q.    So why don't you finish your answer, and I apologize for stomping on it.

A.    I'm not trying to fight with you.  We will say at least 600 acres, and it could be over 1,000 acres.

Q.    Can I turn you to page 44 of your -- page 43 through 44 of your declaration?

A.    Pages or paragraphs?

Q.    Pages.

A.    Okay.  I'm there.

Q.    If we wanted to determine the total acreage, we would add up that right column there, these are the Venus properties, is that right?

A.    That's right.  And it looks like it is more like 600 than 1,000.

Q.    Okay.

       It is a substantial amount of land, isn't that right?

A.    Yes.

Q.    And one of these -- the advances in the development of these projects would be securing development agreements with the City of Venus, isn't that correct?

A.    That is one potential opportunity, correct.

Q.    And if that occurred, that would increase the value of these properties significantly, isn't that right?

A.    It depends on the development agreement that gets signed.  Could it?  Sure.  There would be extensive costs to it, most likely.

Q.    And are you aware of the recent changes in Texas law that give properties outside the city's perimeter the ability to establish their own public improvement districts?

A.   Am I aware of it?  Yes.

Q.   Did you happen to take a look at the declaration of Kirk Wilson attached to our paperwork?

A.   I did look at that declaration.

Q.   And in that declaration, he describes setting up those public improvement districts or getting city approval and that potentially doubling the value of the land.

Do you disagree with his assessment?

A.   I disagree with parts of his assessment.  But generally speaking, would it increase the value if a favorable development agreement was entered?  Yes.

Q.   Maybe not double it, but it would increase it significantly, is that right?

A.   It is so uncertain what would happen, I just can't tell you.

I have spoken with Mr. Wilson multiple times over the last year and have not found a good solution for moving forward at this point.

Q.   And do you have development professionals working on moving the Venus development forward?

A.   I have development professionals that I'm consulting with.

Q.   But are they actively working on moving the

Venus development forward?

A.    They have not found a way to move the development forward at this time.  So is it actively moving forward?  No.  And I don't know that it can actively move forward.

Q.    Okay.

You mentioned that several of the properties require active management, is that right?

A.    I don't know if it was several.  I know some of the properties, specifically, the Marigold Suites requires active management.

Q.    So essentially the work of a property manager, is that right?

A.    And oversight of the property manager, yes, correct.

Q.    And is that work that is typically done out of the Brown Fox law firm?

A.    Being a property manager?  No.

Q.    You have had to hire that out, is that right?

A.    Well, we have continued to employ the receivership entity employee who was doing it, correct.

Q.    And have you had to guide her moves in any particular way?  Or are you adding value to that, do you think?

A.    Are we adding -- yes, we are overseeing to make sure funds are spent in a reasonable manner and we are trying to make sure that cash flow is managed in such a way as to be able to make that water payments.

When I was appointed, it is in my declaration, the water was about to be cut off at Marigold.  And she was managing the property at the time.  So Jeronca (ph) has been great and continues to go a good job.  But yes, she needs oversight and assistance at different points.

Q.    And money?

A.    Depending on the month, yes.  It is cash flow neutral as of this month, but property taxes and insurance will be a challenge.

Q.    It has ups and downs?

A.    Sure.  It has ups and downs.

Q.    And you mentioned there were a series of mortgages and liens on the properties when you entered the receivership, is that right?

A.    Every single property had a mortgage or a lien on it, yes.

Q.    And in your experience, it is rare for properties in real estate development to have mortgages or liens on them?

A.   No, it's not.  But it is rare to have a business with only $75,000 in its accounts to manage the properties.

Q.   I see.

     So it is -- the liens weren't exceptional, it was the -- it was the cash position of the companies that was, is that right?

A.   The ability to satisfy the amount of liens on those properties.  It was highly leveraged.

Q.   Okay.

     And so you mentioned that when you came into the receivership the -- the receivership entities were cash starved, is that right?

A.   That is correct.

Q.   And since you have been receiver, you have been able to bring some cash into the receivership, isn't that right?

A.   Some amounts.  We have done several things to try to bring cash into the receivership. Specifically, a couple of property sales that, as I'm sure you are aware, have not been able to go through.

     We entered a couple of settlements with different entities that did not involve real estate.

     The sales of real estate have not gone through

because our closing company was unwilling to close pending Mr. Barton's appeal of those sales.

Q.    I mean, look, I apologize for exercising our rights to challenge the seizure of our properties. I understand that it has been meddlesome.

A.    We can look back over the 300 filings and we have made are points both very clear, I would say.

But because we have been unable to sell properties, the only source of income that we have been able to bring, or of cash, I wouldn't even say income, the sorts of the cash have been the settlement over the 2999 Turtle Creek building and the sale of the DLP Participation Interest.

But for those, we would not have been able to pay property taxes and do the different things we have done.

Q.    I see.

Have any of those funds been put into escrow for potential payments of the lenders that the SEC is trying to protect?

A.    The funds are sitting in bank accounts.

So if the receivership ended today, could they be used to pay investors?  Sure.  It is a long process to get to that point.  And it is an expensive process that, candidly, if we had to close

it today, with the amount of money we have brought in, there would not be money to pay the investors.

Q.   But some of those funds have been used to pay the fees of your law firm, isn't that right?

A.   Some of the funds, sure.  We have not been paid for any time since March.

Q.   Since March.

A.   Yes.

Q.   But up through your last quarterly report, the Brown Fox law firm has racked up about a $1 million in legal fees, is that right?

A.   We would have to go back and look.

It has been an extensive and expensive process and much more expensive than I would have ever hoped.

Q.   977,000 some dollars, isn't that right?

A.   I don't know.  It doesn't surprise me, given that we are at Docket 308 and we are less than a year into this thing.

Q.   I see.

And do you have an estimate for how much the Brown Fox law firm will bill for preparing the September 2023 interim report that we have been talking about here today?

A.   No, I don't.

You are talking about for the last -- the last quarter of the receivership?

Q.   Right.

A.   So I file these fee applications every quarter.

My next one is due November 15th.  And so that is for the time from July through September.  I don't know.  I think the bill is sitting on my desk, actually, but I haven't looked at the time.  I don't know the numbers.

Q.   But Brown Fox has been paid for its first fee application, which was 342,000, is that right?

A.   It has been paid for its first and its second.

Q.   And that was for 345, right?

A.   I don't remember off the top of my head.

Q.   So roughly $700,000, the Brown Fox law firm has been paid?

A.   We could go look at the documents.  I'm not fighting with you.  I don't know the number off the top of my head.

Q.   I understand.

A.   It is several hundred thousand dollars, yes.

Q.   Is this one of the bigger matters at the Brown Fox law firm?

A.   I have no idea.  Our firm is a little different in how it is structured, so I don't know what the

biggest matters at our firm are.

Q.   Do you, through your counsel, you asked the Hunton Andrews Kurth law firm how much they have been paid by Mr. Barton, is that right?

A.   By Mr. Barton, yes, that is true.

Q.   And you got the answer, $50,000, before the receivership was entered, is that right?

A.   That is the answer we were given.

Q.   And you are not aware that this law firm has been paid anything else since the receivership occurred, isn't that right?

A.   I'm not.

I have big questions.  Because, again, given the voluminous filings, in my experience in big law.

Q.   Well, I can tell you that my partners are very mad at me, let's put it that way.  But yes, we did not abandon our client after the receivership dropped, if that is what your question is.

Okay.  Let's turn to a couple of final topics.

Some of the assets that the receivership entities has is an entitlement, a contractual entitlement to either development fees or profit sharing interests in properties that those entities have sold, isn't that right?

A.   That is correct.  Generally participation

interest is what I call them, but each one is different, yes.

Q.   And some of them involve a 25 percent piece in the profit of a project after it is finished and sold, is that right?

A.   I don't remember all the numbers off the top of my head.  Most of the ones I remember were 10 percent.  There may have been one that was 25 percent.  I don't remember off the top of my head.

Q.   I see.

And some of that is contingent on one of the receivership entities continuing to do the development work, is that right?

A.   For one of those, yes.  At least one of those.

Q.   And has your team been in a position to continue that development work?

A.   I have been told the development work hasn't started.  From the documents I saw, that is true. We wouldn't have continued anything.

Now, has my team been in a place to actively develop any of those properties that have a participation interest?  No.

Could I have retained a real estate industry professional to do it?  Sure.  But it was not worth

it.  It is not.

If you want to talking about a specific property, then that would be helpful.

Q.   But for example, in the DLP transaction, you sold those rights at a pretty substantial discount because we were incapable of continuing to do the development work, isn't that right?

A.   That is not correct.

The disagreement is that particular property, there would have been a default letter already sent to JMJ Development saying that they were already in default of the development agreement.  And from what I have -- from what I have seen, there hasn't been active development of the Marine Creek or Orchard Farms developments, the least at the level required by the contract.  And so it was already in breach.

And DLP would not let us continue to execute and it didn't make financial sense.  We didn't have the money to hire a developer to do it.

Q.   The default letter came after the receivership was imposed, isn't that right?

A.   I think the default letter was either the same day or the day after, something like that.

Q.   Regarding transfers from the WALL entities to other companies, you talked with Mr. Bernstein a bit

about that, is that right?

A.   The transfer from the WALL entities into other companies, yes.  Yes, we talked about that.

Q.   And you have access to the QuickBooks accounting files of the various receivership entities, isn't that right?

A.   We do have access to QuickBooks.  We still don't know exactly which iteration of QuickBooks it is that we have.  And again, that all has been detailed voluminously in the various filings.

But yes, we now have access through no help from Mr. Barton.

Q.   Yes.  But a couple of weeks ago you had to produce that to defense counsel so we could take a look at it, isn't that right?

A.   We did produce it.  It was after --

Q.   You are not saying that the Hunton Andrews Kurth law firm is sitting on the QuickBooks files, we had to get it from you, isn't that right?

A.   You asked for it and we provided it, yes.

Q.   So in those QuickBooks files, there are accounting records for the WALL entities, isn't that right?

A.   It would be a better question for my accountants, but yes, I believe that the WALL

entities were in there.

Q.    And its managing member, Carnegie Development, LLC, isn't that right?

A.    That's correct.

Q.    And for JMJ Development, isn't that right?

A.    I believe so.

Q.    And when funds were transferred out of the WALL entities to Carnegie Development LLC or to other companies, there are notations in those accounting records booking those transfers as inter-company loans, isn't that right?

A.    I don't know about every instance, but yes, definitely that happens in the books and it happens frequently, yes.

Q.    And -- and those inter-company loans are sitting as assets of the books of the WALL entities, isn't that right?

A.    So I actually don't know that.  That would be a better question for the accountants.  There were several instances where those inter-companies were eventually wiped off or not shown as a liability anymore by some of the different entities.

      And I still -- I question the validity of the books altogether because I think they were created towards the end, but that is no --

Q.   I see.

You haven't done a full analysis of the documentation of the inter-company loans in the QuickBook records, is that right?

A.   I have not done a full analysis.  I don't know how much my accountants have looked at it.

I doubt they have done a full analysis because I instructed them -- again, this was an expensive process and we didn't need to do the full every dollar trace to every dollar out.

Q.   And you don't dispute that the WALL entities couldn't force those inter-company loans against other companies in the suite of companies that you have seized, isn't that right?

A.   I haven't seen any documentation of any inter-company loans.  I've not seen any loan documents.

If you are talking about inter-company transfers, I don't know.  I have seen no documentation of how those transfers worked other than in the QuickBooks, there are notations that it is an inter-company transaction.

Q.   An inter-company loan, correct?

A.   So you could ask my accountants.  It would probably be better directed towards them.  I don't

remember.  I just remember seeing "inter-company."

Q.    Okay.  Let's talk about the tracing exercise a bit.

In many places in your declaration, you talk about commingled funds, right?

A.    Correct.

Q.    And in many of your tracing examples, you show transfers of funds from JMJ Development, LLC to an onward company, isn't that right?

A.    I think that happened in some of the examples, yes.

Q.    And JMJ Development, LLC is kind of the main operating entity for the development services that was going on in the Barton family companies, isn't that right?

A.    That is fair.

Q.    And is it fair to say that the operating assumption in your tracing exercise was that any money spent by JMJ Development, LLC was tainted with lender funds?

A.    No.  That is not a fair statement of the assumptions we made.

So what we did is we traced WALL investor monies, saw where they flowed in to ultimately end up in an asset.  And very often that went through

JMJ.  But the analysis was -- follow the tainted funds as they went through and then as they left JMJ.

We weren't so concerned with other sources coming into JMJ, unless the sources came in around the same time.  And even then, as I sit here today, I still haven't seen significant independent sources of revenue or capital coming in other than property sales that were already tainted with WALL investor funds.

Q.   So it is fair to say in your view any money that JMJ Development spent was tainted with lender funds due to commingling?

A.   No.

MR. BERNSTEIN:  Objection, your Honor.

Asked and answered.

THE COURT:  I will allow his answer to stand.

BY MR. EDNEY:

Q.   Now, we talked with Mr. Bernstein, or I guess Mr. Bernstein talked about kind of a tracing group and a benefit group of companies.

There is a group of companies that were benefited by lender funds, right?

A.   I think it was more me making the distinction

with my categories, yes.

Q.   So in your view, in terms of looking where the lender funds went, it would be sufficient for a JMJ employee to assist the company in its work?  That would make -- that would make the onward company benefited by lender funds?

A.   Is your question is that an example?

Q.   Would that be sufficient from your standpoint to, in your view, put a company into the new receivership?

A.   So we don't have the situation where that was the only factor that went into whether an entity should be put in the receivership.

Does it go to the question of benefited from if a JMJ employee was paid with WALL investor funds and that employee's sole job, in the instance of the HUD departments, was the development of multifamily apartments?  Yes, that is a benefit from.

Fortunately, that is not the only example we have of how the -- the HUD apartments received or benefited from WALL investor funds.

Q.   I see.

And that is laid out on page 29 and paragraph 21 of your declaration, is that right?

A.   Let me go look.  I don't know.

Yes. Those were examples we provided in paragraph 81, lists the employee. And then the other example that we talked about before, about the HUD applications.

Q.   Right.

So subparagraph A there talks about having received a benefit because there were employees that were paid by JMJ Management, which you believe is commingled and tainted that benefited the HUD entities, right?

A.   So not exactly.

So we traced the payment from -- HR Sterling was the entity that employed Bella Khusol. And for several of the payments made to Bella Khusol, we traced WALL investor funds into HR Sterling and those funds were then used to pay her salary.

So it is not because JMJ itself was tainted; we tied direct investor funds into those payments to her.

Q.   And then B, we had employees working at the JMJ offices, which you think was tainted and benefited their work, is that right?

A.   So any business usually rents the space where they are in. And so there were costs that -- there wasn't rent, but there were other costs attributed

to officing at the Turtle Creek office.  And so, yes, it is true that they -- that the four D4 entities held their offices there and that was a benefit.  Because the WALL investor funds were used to pay various electricity bills and various other things at the Turtle Creek office.

Q.    And because that helped the employees a bit and the employees helped the HUD properties a bit, the lender funds benefited them, that is your view?

A.    No.  I would say but for the lender funds paying for that space to be there, for the lights to be held on, these employees would not have been doing this work.  They would not have been possible to happen.  If you don't have an office, you don't have electricity, you don't have the Internet to do the work they were doing for these entities.

Then the HUD developments would not have occurred, would not have happened, at least through JMJ.

Q.    I see.

Generally speaking, you believe that a JMJ employee, who is working in the office at 2999 Turtle Creek, when he or she helps another company, that company has been benefited by lender funds?

That is your general operating principle,

correct?

A.   If lender funds were used to pay a mortgage or here, in this instance, to pay electricity, to pay the various costs of the space where they were officing, yes, that is a benefit.  Those entities benefited from WALL investor funds.

Q.   Which in your view is pretty much all of the time, right?

A.   What do you mean "all the time"?

Q.   I mean, that office didn't have a month where the electricity bill wasn't paid through lender funds, is that right?

A.   So, again, we haven't done the full analysis. We found examples.  And so -- again, it would be a very, very, expensive long process to trace every single dollar into every spot.

What I can't tell you -- I don't have any examples, as I sit here, where I saw some independent source that was not tainted with WALL investor funds being used to pay the electricity bill at 2999 Turtle Creek.  But I haven't done that analysis.

And could it have happened?  Maybe it did.  But there were several examples where that is not what happened, it was WALL investor funds.

Q.    Well, with my apologies, I return to my previous question.

It is your operating assumption that if a JMJ-related employee worked and assisted another company, that company is now tainted with lender funds?

That's an operating principle of your tracing analysis?

A.    No, it is not, for all the reasons I have said a couple times now.

Q.    All right.

Let's move to Goldmark Hospitality.  And I'll direct you to page 41, paragraph 112 of your declaration.

You have an average appraised value of that property of 4.366 million, is that right?

A.    That's correct.

Q.    And in your tracing analysis, you conclude $450,000 through several companies in lender funds got into Goldmark Hospitality, is that right?

A.    That was the example we provided, yes, as examples.

Q.    It is your view, based on your current tracing analysis, that $450,000 of funds into a property worth four and a half million is sufficient to seize

that property, is that right?

A.   Well, so we traced additional funds that I talked about, but we have not traced significantly more.  But again, our analysis was to go find examples to try to do this in the most economic manner possible.

Q.   You don't have other examples, do you?

A.   Other than the ones I mentioned before off the top of my head, no.

Q.   If I wanted to look at the current state of your examples, I would look at your declaration, is that right?

A.   For the examples that we prepared for this declaration, yes.  And then I guess my testimony before about the additional examples someone happened to show me yesterday, yes.

Q.   That is all the examples that you are putting into evidence at this time, is that right?

A.   That is correct, yes.

Q.   Let's talk about --

A.   Sorry.

     I'm parsing words, to be a lawyer.  I'm not putting anything in evidence; I'm just talking and answering questions, yes.

Q.   Fair enough.  Fair enough.

As far as you know, that is the evidence that is being put in through you, is that right?

A.    That's correct.

Q.    Okay.

I think we got the passive voice correct. Okay.

So let's go to the HUD properties, and I think we see that discussion beginning at page 33.

So there is four big properties there, right?

A.    That's correct.

Q.    And one of them is Bellwether Ridge, you see at page 33?

A.    Correct.

Q.    And you are valuing that at about $30 million gross, correct?

A.    I don't know off the top of my head, but that is probably right.  I can look at the --

Q.    If that is the number in there, it is correct?

A.    Yes, that's correct.  Yes, roughly 30 million prior to accounting for the loans on the property.

Q.    And Windmill Farms, at page 35, you are valuing that at about 50 million, correct?

A.    Again, prior to accounting for the loans, yes.

Q.    And Ingleside, page 36, you are valuing that at about 36 million, correct?

I think that is the number I have.

A.    I think the values I have are between 28 and 31.1 million.  Now, those were older numbers.  And Ingleside is doing better today, so it would be a higher value today.

Q.    Do you know how much higher?

A.    I do not.

Q.    Okay.

A.    And I should clarify, I haven't had additional appraisals or valuations done.  I just know that there were issues when the valuation was initially done and the property was not performing well.  It is performing much better now.

Q.    And Opelika, do we have a valuation for that yet?

A.    So no, I don't believe so.

It was still in the cost certification process. So we do have the amount of the HUD loan, I think that is listed in here.

But I -- if I have a value, it would be outdated because development has finished in the last -- since I was appointed.

Q.    Do you think -- do you think the value is in the range of these others?

A.    Not Forney, but similar to Ingleside and

DeSoto, sure.

Q.    Okay.

And isn't it true that these properties were constructed almost exclusively through third-party financing from loans guaranteed by the Department of Housing and Urban Development and third-party mezzanine financing from Southern Capital Properties?

A.    Yes.  I think I already testified to that.

Q.    And when we go to your tracing examples, we can find those at several exhibits at the back of your declaration, right?

A.    Yes.  That is correct.

Q.    And I showed conclusions, which, of course, I think we disagree with, but conclusions of tracing lender funds into those entities of 25,000, 30,000, and 106,000, depending on which one we are talking about?

A.    Sure.

As I already testified, there is no dispute that the vast majority of money came from the HUD loan.  And then next to that were the SPC loans, and those numbers are in my declaration.  And very little outside funds came into those properties.

Q.    But it is your position that the receivership

should be able to seize those properties worth more than $110 million, because of roughly $160,000 of alleged lender funds having temporarily benefited them?

A.    So the primary reason these developments exist is because of the HUD loans.  And the only reason those HUD loans exist is because in the loan application, it was the properties purchased with WALL investor monies were used to support that.

So as I sit here, yes, I don't believe it is correct -- it would be right for Mr. Barton to get the benefit of these properties.  I don't think it would be right for SPC to get the benefit of those properties.

We will find out with this receivership fight from now and then also, if any receivership order is put in place and the SPC or HUD properties are there in the fight with SPC, whether they are ultimately assets of the receivership estate, I hope they are for the sake of the investors.  If they are not, that chart we looked at will be vastly different because that is, by far, the most significant value to the receivership estate, are those four properties.

Q.    I appreciate your answer, Mr. Thomas.

But my numbers were roughly correct, that these properties are worth in excess of $110 million, and based on the examples here, you have traced about $160,000 worth of lender funds into them, is that right?

A.    That's correct.

I couldn't help myself.  I'm sorry.

MR. EDNEY:  Okay.

I have no further questions for this witness, your Honor.  Thank you very much.

THE COURT:  Okay.  Thank you.

Mr. Bernstein, whether or not we have a round 2, out of the 82 entities that are at issue in Exhibit 34, I understand both sides' argument after round 1 on 78 of them.

There are four of them that I don't yet understand.  That is Middlebury Trust, which is No. 46; the Timothy L. Barton Irrevocable Life Insurance, which is entity No. 61; TLB 2012 IRR Trust, entity No. 63.  And then the last one is entity No. 66; that is TLB 2020 Trust.

Part of my confusion -- if y'all want to flip with me to page 72 of Mr. Thomas' affidavit.

These four entities are all addressed in paragraph 183.  But there is a sentence that I'm

still struggling with.

It says, "I have found evidence of additional trusts controlled by Defendant Barton but to date, I have been able to locate the trust agreements or what assets would be subject to the trust.  Accordingly, these would fall within category K."

That is the one I'm wrestling with in terms of lack of clarity.  So if there is a round 2, I would love if anyone can give my clarity on that to understand where these entities, 46, 61, 63, and 66 fit with within the group of 82.

MR. BERNSTEIN:  Let me try to address that, your Honor, with the witness.

Let me just confirm to your Honor those entities are all on our proposed list of --

THE COURT:  That's right.  They are all on the second page of two page list.  They are 46, 61, 63, and 66.

MR. BERNSTEIN:  Got it.  Okay.

REDIRECT EXAMINATION

BY MR. BERNSTEIN:

Q.   All right.

Mr. Thomas, can you go to paragraph 183 of your declaration?

A.    I'm there.

Q.    And can you talk a little bit more about why you determined in your declaration that those particular entities would fall within the scope of entities that received a benefit traceable to the WALL offering funds?

A.    So sure.  I will try to answer this.

I think the ultimate question is, I have it going in category K, which would be the freeze.

Since the time of my declaration, because we have had to prepare the tax returns for the 165 different entities, I would now classify the TLB 2020 Trust and the TLB 2012 IRR Trust back with one of the prior categories about ownership, having ownership of those entities.

If it was up to me, I still don't know what Middlebury Trust or The Timothy L. Barton Irrevocable Life Insurance Trust are.

So to determine how those would be part of the receivership and not part of a freeze order, as I proposed in my declaration, that would be a question for the SEC, maybe Ms. Hahn, or I don't know who prepared your list.

Q.    Okay.

A.    As I sit here, those two, Middlebury Trust and

the Irrevocable Life Insurance Trust are two entities I have not seen anything on, other than they were controlled by Mr. Barton.  So they were on our initial receivership list.

The hard part with all of this, with 165 different entities, I don't know which of the entities hold assets or don't hold assets, and which ones did or didn't receive WALL investor funds until there is a complete forensic accounting.  You know, tracing every dollar in to every dollar out.

And like I said, I don't know that it will ever be cost effective to do that.  But we have different things that pop up every day.  We learn new things about these various entities and what they were used for.

I still haven't, you know, other than one short conversation, I haven't spoken to Mr. Barton and the employees generally don't talk to me.  So I don't know -- I'm flying blind with a lot of these entities, which is why here, I said put them category K, put them subject to a freeze order, because who knows what assets they hold.

MR. BERNSTEIN:  Okay.

Well, then, subject to me, your Honor, why don't address that with Ms. Hahn, to the extent it

can be addressed.  Otherwise, we may propose moving those entities into freeze bucket as opposed to the proposed receivership bucket.

THE COURT:  Understood.

BY MR. BERNSTEIN:

Q.   And in terms of redirect, I have just one topic I want to address with Mr. Thomas, briefly.

On direct and then on cross, you talked about evaluating the Venus properties for development. You talked about having to manage the Marigold Suites property through the property manager.

And I think sometimes it gets lost in all of the litigation that is going on in this case, all the things that you are having to do on a day-to-day basis to preserve and protect the properties.

So I thought maybe you could give the Court a little more detail on what you are having to do every day to make sure these properties are protected and preserved for the benefit of investors?

A.   Sure.

So at the most basic level, we get calls or emails weekly, if not daily, from the lienholders on the properties, asking for updates and threatening to ask the Court to lift the stay.  And we have seen

a couple of those filings, even in the last month.

We can kind of go property-by-property.  So let's start with the Gillespie Villas, for instance. There is no huge active management.  We have keep the lawn mowed.  We have received different citations at different points, whether it is because the lawn is not mowed or the deck needed to be fixed.  Every property has different little pieces or issues.

In the grand scheme, do the Gillespie Villas take up a ton of time?  No.  But we still have to -- we had talks about the insurance there at different points.

The TC Hall property is just land that is sitting there.  And so all that really entails is mowing it from a day-to-day basis.

But then there is the ultimate, okay, what are we going to do with this property?  Is it going to be developed or does it need to be sold?

We have talked about the loans on all of these properties.  The math is every month, while we are not paying the interest on these loans, every month if it was just the standard interest rate, there is $165,000 in interest per month that is accruing across all the properties.

If you include the penalty interest that all the lenders are claiming they are owed, or most of the lenders claim they are owed, that number is over $250,000 a month in equity that is deteriorating because of the continuing balances of these loans that are still there.

I'm sorry. I get sidetracked easily when thinking of -- yes, the equity is diminishing.

So for every piece of property we are analyzing, what do we do this? Do we develop it? Do we find -- do we need to sell it now? Is it more beneficial to sit on it?

The job of the receivership isn't to speculate on raw land. And much of the raw land, as far as I can tell, there weren't active plans to develop it or the plans that there were to develop it were not feasible, given the financial situation of what I inherited.

Q.    And if it wasn't you making those day-to-day decisions about each of the properties, it would be Mr. Barton, if a receivership was not put in place?

A.    If a receivership is not in place, meaning me or some other receiver, that is correct. It would go back to how it was before my appointment, which there was 75 grand in the bank, the properties were

on the verge of foreclosure.

MR. BERNSTEIN:  Thank you, Mr. Thomas.

I have no further questions.

THE COURT:  Any round 2?

MR. EDNEY:  Yes, your Honor.

THE COURT:  You can proceed.

RECROSS EXAMINATION

BY MR. EDNEY:

Q.  Again, thank you for coming, Mr. Thomas.  I just have one question.

You said that you were -- you have been contacted almost on a daily basis by the first-secured lienholders on many of these properties, is that right?

A.  I said at least weekly.  I don't think daily is fair.  It is somewhere between daily and weekly, we get contacted by first lienholders, correct.

Q.  Have you ever been contacted by any of the Chinese National lenders that the Commission is trying to protect in this case?

A.  The investors, yes.

Q.  How many?

A.  So in receiverships, one of the first things you do, you send out a request for information from investors.

And I don't know exactly how -- as I sit here how many reached out, but it was over 80 have provided information.

Again, I don't want to get into specific numbers.  I don't know how many investors total there were and I don't know the total amount that came in.

Six of them, who speak English, I have spoken with probably three or four times, just to give them an update on what is going on.  And then I still get emails almost daily asking for updates, not almost daily.  I should not have said that.

At least monthly, more than weekly, I get a random email from a Chinese investor asking for an update on the property.

And then there are other equity investors who put money into different properties.  Palisades is an example.  They put equity into the Turtle Creek property and they also put equity into the Frisco property, so those are going to be creditors.

If the receivership continues, those will be eventual creditors in the receivership, and they are very interested in how the receivership is going.

So I -- I field lots and lots calls and emails from creditors, whether it is investors, secured

lenders, or other lenders.

MR. EDNEY:  No further questions.

Thank you.

THE COURT:  Thank you Mr. Edney.

Any Round 3, Mr. Bernstein?

MR. BERNSTEIN:  No, your Honor.

THE COURT:  Okay.  Mr. Thomas, you are excused but because you are the receiver, you can still resume your place in the courtroom.

Mr. Bernstein, who's next on the SEC's list?

MR. BERNSTEIN:  Next the SEC calls Anthony Cecil.

THE COURT:  Okay.  You may do so.

Mr. Cecil, you can come on up and approach the witness box.  And if you would, raise your right hand; Mr. Frye will swear you in.

(ANTHONY CECIL was duly sworn by the Courtroom Deputy.)

THE COURT:  All right.  You know my request for some space between questions and answers.

And with that, you can proceed, Mr. Bernstein.

DIRECT EXAMINATION

BY MR. BERNSTEIN:

Q.   Mr. Cecil, can you state your full name for the record?

A.   It's Anthony Lee Cecil.

Q.   Mr. Cecil, has the receiver retained you as one of its accountants in this case?

A.   Yes.  He retained the company I'm working for at Ahuja & Clark.

Q.   And are you a CPA?

A.   I am.

Q.   Can you provide a very brief overview of your experience to the Court?

A.   Yes.  I have over 30 years of accounting and forensic accounting experience.

I have worked with Pricewaterhouse and KPMG.

I was the director of special investigations for Allied Mobile and Allied Corporation.  They're now Verizon.

And for the last 16 years, I have taught graduate classes at Utica College in financial investigations.

Q.   Mr. Cecil, if you go to Exhibit 35 in the notebook in front of you, you will see the declaration and interim report the Receiver

submitted in this case.

Have you reviewed this declaration?

A.    I have.

Q.    Did you also review bank records and other financial records for the receivership entities?

A.    I have.

Q.    Did you have a role in preparing the exhibit -- I'm sorry.

Did you have a role in preparing the declaration that appears at Exhibit 35?

A.    My role was the exhibit at the end of the declaration as far as the schedule and the visualizations of the exhibits.

Q.    Have you determined whether the tracing information and summaries set forth in the declaration are accurate and supported by the financial records?

MR. EDNEY:  I'm going to object to this, your Honor, on a couple of grounds.

First of all, if he is an expert, he's a completely undisclosed one.  This gentleman was not in the SEC's filings.  He did not put a declaration in this case.  He's not even identified in the Receiver's filing.

He says, well, I have accountants running

around doing this stuff, but he said -- he said --
nobody said who this guy was.  I have -- I have no
work papers from him.  I have no documents from him.

I asked Mr. Bernstein for the work papers
and documents and reliances the accountants he said
he was relying on in this case.  He didn't say a
word about this.

And here, he shows up at the hearing --

THE COURT:  So you're practicing your
cross-examination.  But in a PI posture, what I have
to do is listen to him and then say, I will give his
testimony the weight to which it is due.  So you're
going to lay out on cross that it's due no weight.

MR. EDNEY:  Correct.

THE COURT:  I've got to listen to him.

What's your second objection?

MR. EDNEY:  Well, that is essentially it.

You know, he said, you know, this is
expert testimony, he's about to provide.  He's not
been qualified as an expert.

On top of that, your Honor, he's an
undisclosed expert.  And if I have to cross-examine
him today, I will, but I do not --

THE COURT:  That is how we do it in the PI
setting.

MR. EDNEY:  I do want to reserve the right to get a production of the documents on which he's relying and come back and cross-examine him again. They had every opportunity to disclose this man and they didn't do it.

THE COURT:  Right.

Just like you had every opportunity to object to their written documents on the record and did not.  So I will hear what he has to say today and you do what you need to do.

Okay.  You can proceed, Mr. Bernstein.

MR. BERNSTEIN:  Thank you, your Honor.

BY MR. BERNSTEIN:

Q.   Mr. Cecil, have you determined whether the tracing information and summaries set forth in the declaration that appears at Exhibit 35 are accurate and supported by the financial records?

A.   I have.

Q.   And what was your conclusion?

A.   That they were accurate as presented in the declaration from the Receiver.

Q.   Mr. Cecil, have you also had the opportunity to review the reports submitted by Mr. Barton's retained accountant, Gregg Ginn?

A.   I have.

SECURITIES & EXCHANGE COMMISSION vs THOMAS LYNCH BARTON
3:22-cv-2118-X                        October 11, 2023                        Page 92

Q.    In that report, Mr. Ginn makes some statements about whether there was commingling in this case.

Do you recall that?

A.    Yes, I do.

Q.    Did you observe commingling in the financial records?

A.    I did.

Q.    Based on your experience, how would you characterize the scale of commingling?

A.    Yeah.  Over my 30 years in doing investigative work, it was pretty extensive.  The movement of the funds going from different entities on the same day and the same amount.

Q.    Mr. Ginn's report also includes some statements about whether the tracing methodology used in this case complies with accepted accounting standards.

Do you recall that?

A.    I do.

Q.    Do you know whether professional accounting standards, such as GAAP or GAAS apply to the tracing summaries provided by the Receiver and Ms. Hahn in this case?

A.    I'm not aware of any standards which specifically direct the tracing.

Q.    All right.

Mr. Ginn also raises the lowest intermediate balance method in his report, correct?

A.    Correct.

Q.    Does that method apply here?

A.    I do not believe so.

Q.    Why not?

A.    Because that is more -- the method that he -- that accountant is referring to is more for -- that it has been approved in the Court for final distribution of creditor funds and investor funds.

In this particular case, we had a very limited role of finding examples and tracing that money through the bank statements.

And the way that we did it was great because we didn't have to worry about assumptions or estimates. We took the exact amount of the balance on any particular day and followed it through on the ending day.

So we used the beginning balance and ending balance just to guide us.

Q.    And so to be clear, was it necessary to use the lowest intermediate balance method or any other similar method to show tracing of inventor fund or benefits to the Barton-controlled entities?

A.    No.

Q.   Again, explain why not.

A.   Again, that method, the methodology that was spoken in the declaration from Mr. Ginn was based on the final payout to investors and creditors.

     This is for -- the examples that we came up with were we used the actual third-party bank records and flowed the money through different accounts.

Q.   Were any estimates used in the tracing examples set forth in the Receiver's declaration?

A.   No.

Q.   So you did not need to use an estimating methodology?

A.   That is correct.

Q.   Mr. Ginn also talks about the source of funds.

     Do you recall that?

A.   I do.

Q.   In addition to investor funds, were some potentially non-investor funds also deposited in WALL entity and JMJ Development accounts?

A.   Based on the Ginn report, I did see that he redacted the investors and leaving the non-investors, and I looked at that and saw there was Carnegie Development, some other lenders.

     And so I did see what they considered non-WALL

investors.

Q.   Did the fact that there were potentially other sources of funds deposited into the WALL entity and JMJ Development accounts prevent the Receiver or you from performing the tracing that is set forth in the declaration?

A.   No, it did not.

Q.   Why not?

A.   Because we could actually trace the funds coming into WALL entities into the non-WALL entities.  We didn't need to know, where the deposits came from.

And then one point about the -- the non- -- the deposits that didn't come from the Chinese investors, it's difficult to tell because we have not done a full accounting, if that money was a circular, meaning that it went out, came back in or if the collateral used for the lender was from -- initially from the WALL entities or WALL investors.

So that analysis hasn't been done yet on that.

MR. BERNSTEIN:  Thank you, Mr. Cecil.

No further questions.

THE COURT:  All right.

Mr. Edney, you can proceed with the witness.

MR. EDNEY:  Thank you, your Honor.

CROSS-EXAMINATION

BY MR. EDNEY:

Q.   Mr. Cecil, I'm Michael Edney.  I represent the Defendant in this matter.

Mr. Cecil, do you have Mr. Thomas' declaration up there in that notebook?

A.   I should.  You'd just have to tell me what exhibit.

Q.   Perhaps -- I don't know where it is in the notebook.

MR. GIBBONI:  I believe it is 35.

BY MR. EDNEY:

Q.   Yes, I believe it is tab number 35.

A.   Thirty-five.  Okay.  Yes.

That is the Receiver's declaration?

Q.   Yes.

A.   Okay.  Sure.

Q.   Is there a declaration from you, Mr. Cecil, anywhere in his declaration or attached to it?

A.   No, it is not.

Q.   Have you ever put together a declaration for purposes of this case?

A.   I have not.

Q.   Were you -- are you aware that Mr. Ginn's

declaration was filed last Monday?

A.   I'm aware that it was filed because I read it.

Q.   Fair enough.

And are you aware that the Securities & Exchange Commission had an opportunity to file a reply brief in this case on Monday of this week?

A.   I'm not.

Q.   And were you asked to put together a declaration rebutting Mr. Ginn's conclusions in connection with that reply brief?

A.   I was not.

Q.   Are you the person that put together these examples that are attached to Mr. Thomas' declaration?

A.   I am.  It was a team of us, but I was helping in the project.

Q.   I read this thing pretty carefully, Mr. Cecil.

I didn't see your name in this declaration anywhere.  Is it?

A.   I don't believe so.  I was...

Q.   Would I have any idea who you are other than your name being disclosed as a potential witness on Friday night?

A.   I can't speak to that.

Q.   Okay.

In putting together these -- just to be clear, your work primarily focused on putting together the tracing examples between Exhibits 3 and -- what is it -- 27?

Yes.  Three and 27.

That is your work product, is that right?

A.   Yes.  I had some other people that were helping me as well.  Yes, that is correct.

Q.   Who were those people?

A.   They were accountants for Ahuja & Clark, that worked for Ahuja & Clark.

Q.   Okay.  And in putting together these examples, did you have -- did you put together any accounting work papers?

A.   Yes.

Q.   All right.

So this is kind of the final product encapsulating your conclusions, right?

A.   That's correct.

Q.   But there are work papers underlying that, correct?

A.   Yes.

Q.   And have you produced those work papers to the Defendant?

A.   I have not.

Q.    Have you produced them to the Commission?

A.    I have not.

Q.    But you have them, is that right?

A.    Yes.

Q.    Does Mr. Thomas have them?

A.    You know, he has the -- the various schedules that we provided back and forth.

Q.    And you have a -- in reaching the conclusions you have in here, you presumably relied on a series of primary source documents, is that right?

A.    Yes.  Bank records.

Q.    And you have those documents assembled someplace, is that correct?

A.    That's correct.

Q.    And have you produced those documents to the Defendant?

A.    I have not.

Q.    Have you produced those documents to the Commission?

A.    I have not.

Q.    Have you produced those documents to Mr. Thomas?

A.    I believe we have.

Q.    Okay.

        THE COURT:  Hold on.

MR. THOMAS:  To save some time, the documents we produced to you all are the documents that we gave to him, so they've all been produced.

The documents he has are the same documents we gave you, the bank records, the QuickBooks files.

MR. EDNEY:  I see.

BY MR. EDNEY:

Q.   So he gave you a set of documents, correct?

A.   Oh, right, from the beginning.

Q.   And then you have a set of documents that you selected that you relied upon for your opinion, right?

A.   There is a set of documents, bank records that I have relied upon, yes.

Q.   And you have maintained that set of documents that you relied upon for your opinion?

A.   That's correct.

MR. BERNSTEIN:  Objection to the characterization, your Honor.

He's not been offered an expert witness or provided expert opinions in this case.  He's just testifying about the declaration and as a fact witness.

THE COURT:  I understand your view, but I

will let him answer the question.

THE WITNESS:  I'm sorry.  What was question again, please?

BY MR. EDNEY:

Q.   I believe the question was, you maintained a set of -- a subset of the documents that you were provided by Mr. Thomas that you have relied on to reach the -- well, I don't know, maybe the wrong word is "opinions," but to help you put together these exhibits, correct?

A.   Correct.  Correct.

Q.   Okay.

You talked about your observations of extensive commingling of assets between the WALL entities and, for example, JMJ Development?

A.   Right.

Q.   From a tracing perspective, do you think there is any need to determine whether JMJ Development was spending lender funds or funds unrelated to lender funds?

A.   Well, we could see the tracing coming in from the non- -- the WALL entities into the JMJ and Carnegie Development.  It would come into Carnegie and then go into JMJ and then go out from JMJ.

Q.   But in light of the commingling that you talked

about as a matter of tracing, you don't think there is really any need to separate potential funds that aren't commingled -- those aren't -- I'm sorry -- that aren't derivative lender funds and funds that are, is that right?

A.   Well, we -- what we looked at was looking at the funds coming from the WALL bank accounts.

Q.   Okay.

Let's look at Mr. Thomas' Exhibit 7 -- I'm sorry -- 6.  I think you can find this at page 125.

A.   It's in Exhibit 6?

Q.   You know what, it is not Exhibit 6.

I apologize.

I was right the first time.  It is Exhibit 4.

This is a -- this is an exhibit claiming the tracing of funds into FHC Acquisitions, LLC, is that right?

A.   Correct.

Q.   And that asserts that $168,000 in funds related to the loan proceeds in question were transferred into FHC Acquisition, LLC, correct?

A.   Correct.

Q.   Do you know what the purchase FHC Acquisition, LLC is?

A.   I don't have that understanding, no.

Q.   Okay.

You've got an asterisk at the right end next to the date 3/29/22.

Do you see that?

A.   Unfortunately, mine is cut off.  I don't have an asterisk.

Q.   Oh, yes.  I noticed that.  I noticed that the Commission's copy got a little -- I tell you what, you can have mine.

MR. EDNEY:  Is that all right, your Honor?

THE COURT:  You may.

MR. EDNEY:  Do you have it, your Honor?

THE COURT:  No.  I think mine may have the same flaw that yours has.

MR. BERNSTEIN:  Your Honor, I apologize. But I think when it was printed on ECF, some of these were getting cut off, but we do have other copies of the declaration.

MR. EDNEY:  May I approach, your Honor?

THE COURT:  You may.

BY MR. EDNEY:

Q.   I have given away all of my paper.  Let's see if I can get a copy.

Anyways, by memory, that asterisk suggests that in the days preceding 3/29/2018, was it?  Is that

SECURITIES & EXCHANGE COMMISSION vs THOMAS LYNCH BARTON
3:22-cv-2118-X                      October 11, 2023                      Page 104

right?

A.    This was 3/14/2022.  It is between 3/14 and 3/24/22.

Q.    The last date on there is what?

A.    March 29th.

Q.    On the right side, the destination date.

A.    Right.  The last date of 3/29/2022.

        MR. EDNEY:  Do we have a copy of this, folks?

        MR. GIBBONI:  I'm sorry?

        MR. EDNEY:  Do we have copy for me?

        MR. GIBBONI:  I don't think we have any more copies, unfortunately.  I have given away all of our copies.

        THE COURT:  I have got a copy up here. Thank you.

BY MR. EDNEY:

Q.    Yes.  3/29/22.  Correct.  That last date on the right?

A.    Correct.

Q.    And this asterisk down there says that there were several other deposits into the Broadview Holdings accounts between 3/24/22 and 3/29/22; one of them was for $2 and a half million.

        Do you see that?

A.    Yes.

Q.    Was any effort made to account for the origins of those deposits and whether they were obtained by lender funds?

A.    I cannot -- off the top of my head on this one, but I recall that there were some other -- other -- it may have been represented in another exhibit where that -- where that 2.5 million was.

Q.    If there was a conclusion that those other deposits that are not reflected in the nifty diagram above were tainted by lender funds, it is not present here on this exhibit, is that right?

A.    Let me take a couple of minutes to look at it.

Q.    Sure.

A.    All right.

      So what was the question again?

Q.    If a conclusion was reached about the other deposits reflected in that asterisk footnote, that they were derivative of subject lender funds, that conclusion is not present on this exhibit, is that right?

A.    That's correct.

          MR. EDNEY:  Your Honor, I don't have any more questions for Mr. Cecil at this time.  But for the record, I do reserve the right to ask the

Commission to produce his work papers and documents in reliance and to reopen of this cross-examination at the appropriate time.

THE COURT:  I understand your argument.

Thank you.

MR. EDNEY:  Thank you, your Honor.

THE COURT:  Any round 2 for the witness, Mr. Bernstein?

MR. BERNSTEIN:  Nothing further, your Honor.

THE COURT:  That means you are excused from the stand.  Thank you for your testimony.

Okay.  Next witness.

MR. BERNSTEIN:  Your Honor, the SEC calls Carol Hahn.

THE COURT:  All right.  You may do so.

(The witness entered the courtroom.)

THE COURT:  Ms. Hahn, if you could raise your right hand.

(CAROL HAHN was duly sworn by the Courtroom Deputy.)

THE COURT:  Okay.  You know my request for space between questions and answers, so with that, you can proceed, Mr. Bernstein.

SECURITIES & EXCHANGE COMMISSION vs THOMAS LYNCH BARTON
3:22-cv-2118-X                         October 11, 2023                            Page 107

### DIRECT EXAMINATION

BY MR. BERNSTEIN:

Q.    Ms. Hahn, can you please state your full name for the record?

A.    Carol Hahn.

Q.    And Ms. Hahn, are you currently employed as a staff accountant at the SEC?

A.    Yes.

Q.    How long have you worked at the SEC?

A.    Since 2005.

Q.    And Ms. Hahn, where did you go to school?

A.    I went to Texas A & M University, and I received a bachelor's degree in economics.

Q.    Briefly, what did you do after school before joining the SEC?

A.    I worked for several large banks as an analyst. And then I worked for the Department of Navy as an analyst.  And then I went to work for the FDIC, the Federal Deposit Insurance Corporation, as a bank examiner.  And then I came to the SEC.

Q.    Are you a certified fraud examiner?

A.    Yes.

Q.    What are your responsibilities as a staff accountant for the SEC?

A.    I participate in investigations of public and

non-public companies.  I review and summarize financial records.  I trace financial transactions to determine sources and uses of investor funds as shown in bank records.

Q.   Did you analyze and summarize financial property and other business records in connection with this case?

A.   Yes.

Q.   Did you prepare a declaration and supplemental declaration that have been filed with this Court?

A.   Yes.

Q.   Did those declarations, with attachments, appear at Exhibits 1 through 3 and 32 through 34 of the notebook in front of you?

A.   Just one second.

     Yes.

Q.   Does your declaration, as supplemented, accurately set forth a summary of the financial and other records you reviewed in connection with this matter?

A.   Yes.

Q.   Could you please go to your original declaration, which is Exhibit 1 in the notebook.

     At paragraph 14 of Exhibit 1, did you summarize the amount of funds that the Defendants raised from

investors in the WALL entity offerings?

A.   Yes.

Q.   How did you do that?

A.   I took investor loan agreements and other investment-related documentation, including email correspondence, and then tied that back to amounts in the bank records.

Q.   Does paragraph 14 of your original declaration show the results of your summary?

A.   Yes.

Q.   What was the total amount of investor funds raised in the WALL offerings?

A.   Approximately 26.3 million.

Q.   Can you now go to paragraph 16 of your original declaration?

A.   Okay.

Q.   Did you also summarize how investor funds raised in the WALL entity offerings were used?

A.   Yes.

Q.   How did you go about doing that?

A.   So I took the bank records and identified investor deposits and then I scheduled out expenses and classified those, based on information in the bank records and other company or title company record information.

And then I traced the flow of funds to see how they were used.

Q.   Did you determine whether the WALL entities used investor funds to purchase the properties described in the respective loan agreements with investors?

A.   They did not.  There were two instances that I talk about in my original declaration, where two of the WALL entities purchased their respective properties, but they did not do so using the majority of their own investor funds.

Q.   And in all other instances, the properties weren't purchased by WALL entities at all, is that correct?

A.   That's correct.

Q.   Can you go to paragraphs 26 through 29 of your original declaration?

A.   Okay.

Q.   Ms. Hahn, did you also summarize how Mr. Barton used investor funds?

A.   Yes.

Q.   Did those expenditures fall into different categories?

A.   They did.

Q.   What were those categories?

A.    Investor funds were used for other non-WALL entity Barton-controlled entities, properties, investments, personal expenses for Mr. Barton and his family, commission payments, political contributions, Ponzi payments.

Q.    And does your declaration address these uses of funds in more detail?

A.    Yes.

Q.    Can you go now to Exhibit A to your original declaration, which is Exhibit 2 in the notebook?

A.    Okay.

Q.    What does Exhibit A show?

A.    This was an example showing the commingling of -- and transfer of investor funds.

      So we have WALL investor funds going to a WALL entity, transferred to Carnegie Development and then transferred to JMJ Development, where they were, in one instance, wired to a different Barton-controlled entity.  And then, also, wired to a title company to purchase a property in the name of a non-WALL entity.

      The second part of this exhibit shows that the WALL entity inventor funds were transferred from a WALL entity account, again through Carnegie Development.  This time to a different WALL entity

bank account where, in part, they were used to make Ponzi payments.

Q.   Is this an example of the types of transactions you saw in the financial records?

A.   Yes.

Q.   Did you encounter commingling in your review of the financial records?

A.   Yes.

Q.   Based on your experience as a SEC staff accountant, how did that commingling compare in scale to other matters you have worked on?

A.   The commingling was extensive and so were the transfers between other Barton-controlled entities.

Q.   Going back to your original declaration at Exhibit 1, did you also analyze and summarize business records relating to the property purchase prices set forth in the loan agreements with investors?

A.   Yes.

Q.   Did you then analyze records for actual contracts for sale for certain of the subject properties that were entered into before the investor loan agreements?

A.   Yes.

Q.   Did those records show purchase prices in the

loan agreements with investors that were higher than the actual contracted purchase prices?

A.   Yes.

Q.   And did you create a chart addressing that issue at paragraph 32 of your original declaration?

A.   I did.

Q.   All right.  Ms. Hahn, I want to talk to you now about the potential receivership entities.

Did you also analyze and summarize financial property and other business records to determine whether Mr. Barton's controlled entities received or benefited from investor funds?

A.   Yes, I did.

Q.   Were those records voluminous?

A.   Yes.

Q.   Have those records been made available to Mr. Barton?

A.   Yes.

Q.   Can you go now to Exhibit A of your supplemental declaration, which is Exhibit 33 in the notebook.

A.   Okay.

Q.   Ms. Hahn, what is this exhibit?

A.   This is a summary showing Barton-controlled entities that received or benefited from investor

funds.

Q.    Was Exhibit A derived from the records you reviewed and made available to Mr. Barton?

A.    Yes.

Q.    What steps did you take to review and summarize the information on Exhibit A?

A.    So mainly, I referenced the analysis I did last year, before we filed, which was to take the bank records, identify investor deposits and then trace those investor funds through the bank accounts to see how they were used.

And due to extensive transfers in, commingling, I typically looked at transactions where either there were only investor funds involved, where the beginning account balance was insufficient to make a transfer without using investor funds, which would include the beginning account balance comprised of investor funds as well, or where there was a matching transfer to an amount of investor funds that were transferred in.

Q.    And Ms. Hahn, did you make any estimates in preparing your summaries at Exhibit A?

A.    No.

Q.    Did you apply any specialized methodologies to prepare your summaries?

A.    No.

Q.    Can you walk the Court through an example on Exhibit A where you determined that a Barton-controlled entity received or benefited from investor funds?

MR. EDNEY:  Your Honor, I'm going to object to this line of questioning.

Our position is that these tracing conclusions require expert testimony.  She's not being offered as an expert and is incompetent to make them.

THE COURT:  I understand.  I will give it the weight to which it is due.  Thank you.

You can proceed.

THE WITNESS:  Okay.  We could look at No. 2 on my Exhibit A.

This is just a summary showing that on November 27th, 2018, there was 1,440,000 that was transferred from WALL017's bank account, which was WALL017 investor funds, to Carnegie Development.

Also on the same date, 60,000 of WALL016's investor funds were transferred to WALL016's bank account to Carnegie Development.

And then on the same date, there was 500,000 transferred from JMJAV.

And then on that same date, November 27th, 2018, 2 million was wired to a title company for the purchase of 118.34 acres of the Bear Creek Ranch property by BM318.

BY MR. BERNSTEIN:

Q.    And do the other entries on your exhibit follow a similar format?

A.    Yes.

Q.    Does Exhibit A show every instance where the entities listed on Exhibit A received or benefited from investor funds?

A.    No.

Q.    Why not?

A.    The transactions in some cases were voluminous and I just thought that it would not be helpful to show all of them.

Q.    Did your summaries include -- so we have been talking a lot about investor funds.

Did your summaries include any benefits in addition to the investor funds themselves?

A.    Yes.

I also included loan proceeds from loans secured either by a WALL entity property or by a property purchased with WALL investor funds.

Q.    Ms. Hahn, have you reviewed the report from

Mr. Ginn that the Defendant submitted in this case?

A.    Yes.

Q.    Why did you not use the lowest intermediate balance method or some other similar methodology for your summaries?

MR. EDNEY:  Objection on the same grounds, your Honor.

THE COURT:  All right.  I will let her answer.  I will give it the weight to which it is due.

THE WITNESS:  I wasn't trying to estimate amount of commingling funds that attributed to investor funds or some other source.  I was trying to show situations where investor funds were sent to a Barton-controlled entity.

BY MR. BERNSTEIN:

Q.    Did some of the WALL entity accounts and JMJ Development accounts receive funds other than investor funds?

A.    Yes.

Q.    Did you review the bank records to determine the source of those funds?

A.    Yes.

Q.    Can you give some examples of what the other sources of funds were?

A.    There could have been title company proceeds. There was -- I know there was at least a couple of transfers into WALL entity accounts from another Barton-controlled account that investor funds had been transferred out to that entity the day prior and then transferred back in a subsequent day.

Q.    Ms. Hahn, did the fact that funds from other sources were potentially deposited in the WALL entity and JMJ Development accounts prevent you from performing your tracing analysis?

MR. EDNEY:  Objection on the same grounds, your Honor.

THE COURT:  I will give it the weight to which it is due.

You can answer.

THE WITNESS:  No, for the reasons I stated previously for the things that I considered when tracing investor funds through the bank accounts.

BY MR. BERNSTEIN:

Q.    All right.

Ms. Hahn, can we go now to Exhibit 35, which is the Receiver's declaration?

A.    Okay.

Q.    Have you reviewed the Receiver's declaration?

A.    Yes.

Q.   Did you determine whether the Receiver's analysis of the properties that appear on your Exhibit A is consistent with your analysis?

MR. EDNEY:  Objection on the same grounds, your Honor.

THE COURT:  I will give it the weight to which it is due.

You can answer.

THE WITNESS:  I believe it is comparable, yes.  But his is more comprehensive and contains more recent transactions than mine.

BY MR. BERNSTEIN:

Q.   Does the Receiver identify entities that received or benefited from investor funds that do not appear on your Exhibit A?

A.   Yes.

Q.   Do you know why that is the case?

A.   I believe because they had additional or more updated records than I did.

Q.   Have you now received those records from the Receiver?

A.   Yes.  We recently received those records.

Q.   And you received them at the same time Mr. Barton's counsel did?

A.   I believe so.

Q.    And have you had an opportunity to analyze those additional records yet?

A.    That is currently in process.

Q.    So what is the current status of your tracing efforts?

A.    It is ongoing.

Q.    If you were provided additional time, do you believe it is likely that you would be able to identify additional Barton-controlled entities that received assets or benefits traceable to the WALL entity offerings?

A.    Yes, I believe so.

        MR. BERNSTEIN:  We pass the witness, your Honor.

        THE COURT:  Thank you, Mr. Bernstein.

        All right.  Mr. Edney, you can proceed when you are ready.

        MR. EDNEY:  Thank you, your Honor.

                CROSS-EXAMINATION

BY MR. EDNEY:

Q.    Good afternoon, Ms. Hahn.

      My name is Michael Edney.  I represent the Defendant in this matter.  Thank you very much for being here.

A.    Good afternoon.

Q.    I want to begin with some general questions about your tracing analysis.

Did you come up with any conclusions about whether companies that are proposed to be put in the receivership estate have the proceeds of the loans in question?

A.    No.

Q.    You didn't make any conclusions about that?

A.    I merely showed what the bank records showed, that they received investor funds or a benefit from investor funds.

Q.    You believe you demonstrated that through your exhibit, is that right?

A.    That's correct.

Q.    But you reached no conclusion about whether that's actually happened, is that right?

A.    No.  I didn't offer up any sort of conclusion other than to show what I believe happened based on the bank records and also title company documentation and some company records, email correspondence.

Q.    I mean, to use your verb, did your work in showing that loan proceeds ended up in various companies required specialized knowledge in asset tracing?

A.    No.

Q.    Do you have specialized knowledge in asset tracing?

A.    I do not.

Q.    How about in structured transactions?

A.    No.

Q.    Does it require a specialized knowledge in cash flow analysis?

A.    No.

Q.    You are a certified public accountant, aren't you?

A.    I am not.

Q.    Are you an accountant?

A.    My title is staff accountant.

Q.    Do you have training in accountancy?

A.    I have schooling in taking accounting classes, but when it comes to tracing financial transactions through the bank records, there is no specialized knowledge required for that.

Q.    That is your opinion, right?

A.    That's correct.

Q.    Okay.

      I want to take you to your supplemental declaration, which is from earlier in September, which I believe you have in front of you.

Could you turn to it, please.

Perhaps if we can turn to page 3, paragraph 4, which reads as follows:

"In my first declaration I provided a list of Barton-controlled entities in addition to the WALL entities, JMJ Development, JMJ Hospitality, and JMJAV that received investor funds, real property interest purchased, at least in part with investor funds, or owned property interest, they were improved with or otherwise have benefited from the use of investor funds."

Have I read that correctly?

A.    Yes.

Q.    So in your first declaration, you provided a list of entities to which you traced to investor funds that were in addition to the nine WALL entities in those three other companies you identified there, correct?

A.    Yes.  I believe so.  I would have to look back at it.

Q.    And then in -- in the next paragraph, paragraph 5, you say, as follows:

"Exhibit A attached hereto provides further detail about the assets and benefits these entities received and also includes additional entities not

identified in my first declaration."

Do you see that?

A.    Yes.

Q.    And if we go to your Exhibit A, we have 25 tracing entities, is that right?

A.    Yes.

Q.    And I believe some of the entries make assertions about more than one company, so at least 25 tracing entities, cover approximately 28 companies, does that sound about right?

A.    It looks to be 29 to me.

Q.    Twenty-nine, okay.

So with the -- with those 29 entities in Exhibit A, the nine WALL entities and then those three other companies you mentioned in the third paragraph of your -- the fourth paragraph, rather, of your declaration, that is JMJ Development, JMJ Hospitality, and JMJAV, that is the universe of entities into which you've traced lender assets, is that right?

A.    Yes.

Q.    But there aren't any others, correct?

A.    Not that I have presented here.

And there may be -- and there is other transactions for these entities, and there are some

subsequent entities I have identified in my more recent review of documents the Receiver has provided to us.  But I don't have that information in front of me to discuss those entities.

So, yes, at the time that I submitted this exhibit, yes, that would be all the entities.

Q.   All right.

Those are the entities on which you are presenting evidence today on behalf of the Commission, is that right?

A.   Yes.

Q.   And then, in paragraph 6, you have a discussion of the entities beyond those entities that we've just identified.

At the end you say, as a result of the issues that you identified in this paragraph, "The Commission cannot yet confirm whether additional Barton-controlled entities received or otherwise benefited from Barton's alleged fraudulent activities that are the subject of this litigation," right?

A.   Yes.

Q.   So that is the Commission's conclusion as to entities that are not listed, that are not the WALL entities, not the three entities listed in paragraph

4, and not the entities listed on Exhibit A, is that right?

A.    Right.

Q.    The Commission is seeking a receivership to be imposed over 82 entities, isn't that correct?

A.    I don't have a number in front of me.

Q.    Well, could you turn to Exhibit B of your supplemental declaration?

A.    Yes.

Q.    That lists the proposed receivership entities, right?

A.    Yes.  Eighty-two.

Q.    So they are seeking receivership over 82, is that correct?

A.    Yes.

Q.    All right.

        MR. EDNEY:  I'm going to hand to you and the Court, if I may approach.

        THE COURT:  You may.

        MR. EDNEY:  Defense Exhibit A to this proceeding.

        THE COURT:  Are you moving for its admission or are you waiting for --

        MR. EDNEY:  Not quite yet.  I'm laying a foundation, your Honor.

THE COURT:  I understand.

BY MR. EDNEY:

Q.   Okay.

I have handed you a list of -- I have handed you a list of approximately 42 entities over which the Commission is seeking a receivership in this matter but are not listed in paragraph 3 of your declaration or on Exhibit A.

These are the entities for which the Commission, to quote your words, "cannot yet confirm whether additional Barton-controlled entities received or otherwise benefited from Barton's alleged fraudulent activities that are the subject of this litigation," isn't that right?

A.   Essentially, no, that is not correct.

If you look at -- on the exhibit you just handed me, item or entity No. 16, JMJ Development, LLC, in my supplemental declaration, paragraph 4, I do discuss that JMJ Development actually received WALL investor funds direct into the JMJ Development account, as well as item number 17, JMJ Hospitality, as well as No. 19, JMJAV, which is listed in paragraph No. 4 and also shown on my Exhibit A as item No. 14.

Q.   Do you see any others?

A.    I don't know.  Give me just one moment.

Q.    Sure.

A.    I don't believe so.

Q.    Okay.

      So if we made those three edits, the exhibit would be accurate?

A.    Yes, I believe so.

      MR. EDNEY:  Your Honor, I move the admission of that exhibit as informed by Mr. Hahn's editorial testimony.

      MR. BERNSTEIN:  No objection, your Honor.

      THE COURT:  Okay.  It's admitted for this proceeding.

      You can proceed.

      MR. EDNEY:  Thank you, your Honor.

      (The referred-to document was admitted into Evidence as Defendant's Exhibit A.)

BY MR. EDNEY:

Q.    Now, for the entities on Defense Exhibit A, minus the three that you identified, would it be fair to say the following:  Because the Commission believes that Barton has engaged in extensive commingling of funds, Barton's control of these entities is an effective proxy for placing an entity into receivership, even if the Commission has not

yet traced lender funds into that entity?

A.    I'm sorry.  Could you repeat that?

Q.    Sure.

For the entities on that exhibit, minus the three that you identified, is it fair to describe the Commission's position as the following:  Because the Commission believes Barton has engaged in extensive commingling of funds, Barton's control is an effective proxy for placing an entity into receivership, even if the Commission has not yet traced lender funds into that entity?

MR. BERNSTEIN:  Objection, your Honor.

We object to him having this fact witnesses characterize what the Commission's position is on these issues.  She's testifying as to her factual summary of the bank records.

THE COURT:  Understood.

If you are not pulling her up as a corporate representative, then I can't hold her to binding the Commission.

You can rephrase it, if you want to.

MR. EDNEY:  All right.

BY MR. EDNEY:

Q.    Would it be your position, Ms. Hahn, that because you believe Mr. Barton engaged in extensive

commingling, that the companies on that list are appropriate for receivership even though the Commission has not yet traced lender funds into those entities?

MR. BERNSTEIN:  Objection, your Honor.

THE COURT:  Basis?

MR. BERNSTEIN:  Her opinion or position is not relevant to these proceedings.  She's testifying as a fact witnesses about her factual summary of the bank records.

THE COURT:  I will let her answer, if she's got personal knowledge.

If you do, you can answer.

THE WITNESS:  I don't know.

I think, first, some of these entities, we definitely relied on work that the Receiver did to show investor funds and benefit received by entities.

I would have to go through these and look of them.

BY MR. EDNEY:

Q.   But one of the reasons that you haven't completed tracing in these other entities is because your view of extensive commingling has made it difficult, is that right?

A.    No.   I think it is more a lack of additional records and updated records.

Q.    That is one of the reasons you state in paragraph 6 of your supplemental declaration of why the Commission has not completed tracing analysis into these entities, is that right?

A.    Yes, I do state that.

Q.    Okay.

Let me turn your attention to page 10 of your original declaration, which I believe Mr. Bernstein put in front of you.

Can you turn to it, please?

A.    What exhibit was that again?

What exhibit was that?

Q.    Hang on a second.  Let me look...

So Mr. Bernstein talked to you a bit about this.

A.    I have it.

Q.    Your conclusions that commingled investor funds not spent to acquire WALL entities were used by Mr. Barton for various purposes here, including paying, you know, various credit cards and personal expenses and making political contributions, and things of that nature.

Do you see that?

A.    Yes.

Q.    Those expenses were generally paid by JMJ Development, LLC, is that right?

A.    I would have to go back to confirm, but I believe that it would have been paid by WALL investor funds that would have been transferred into JMJ Development, whether through Carnegie first or directly into JMJ Development.

Q.    I see.

And your view is that JMJ Development, LLC just turned into a commingled pot of lender funds and JMJ Development funds, is that right?

A.    That is not correct.

Q.    What is your view?

A.    I believe there were WALL investor funds and loan proceeds that were secured by a WALL entity property or a property purchased with WALL investor funds that came into the JMJ Development account. And then those funds were then used in these various ways I list here.

Q.    They were commingled with other funds and used in these various ways, is that right?

A.    A lot of times, yes.

Q.    I see.

In your view, was any money spent by JMJ

Development, LLC an expenditure of lender funds?

A.   Can you repeat that?

Q.   In your view, was any money spent by JMJ Development, LLC an expenditure of lender funds?

A.   Are you talking about investor funds?

Q.   Well, I call them lender funds, you call them investor funds.

A.   So you are asking if any expense out of the JMJ Development account was from WALL investor funds?

Q.   Let me ask this question a different way.

In order to reach the conclusion on paragraph 27, did you engage in a tracing exercise or did you just determine that JMJ Development, LLC spent this money?

A.   I traced investor funds through all the bank accounts that they would have transferred to, to see how they were used.

Q.   Straight down to these uses, is that right?

A.   Yes.

So as I said, in No. 27, it would have been commingled investor funds because a lot of times there were other funds that might have been present, whether a beginning balance on a particular date or transferred in on the same day.  But the majority of the funds would have been WALL investor funds or the

loan proceeds.

Q.   And this tracing exercise you refer to, is this documented in any way other than in your conclusions in this declaration?

A.   No, it's not documented anywhere.

Q.   Okay.

There is no document you should look to, to show your work on this?

A.   Are you asking me if I have work papers?

Q.   Yes.

A.   Yes, I have work papers.

Q.   And to the best of your knowledge, have those been produced to the Defendant?

A.   I don't believe so.

Q.   Okay.

You believe that your tracing analysis would benefit from more time, is that right?

A.   Yes.

Q.   Prior to the initiation of this case, did the Commission obtain bank records for many of the subject companies that are at issue here?

A.   Yes.

Q.   And that was more than a year ago, isn't that right?

A.   I don't remember the date they were obtained.

Q.    Has this case been pending for more than a year?

A.    Yes.

Q.    And you obtained those bank records before this case started, isn't that right?

A.    I don't know that to be true.

Q.    I see.

      Do you know that this original declaration that you -- that you put into evidence in this case was -- was issued three days after this case was initiated in September of 2022?

      As a matter of fact, it is dated September 26th, 2022.

      Do you see that?

A.    I do not.

Q.    The original declaration.

A.    It is dated September 23rd, 2022.

Q.    And it was filed with the Court on September 26th.

      Do you see that?

A.    No.

      Where is that?

Q.    Okay.  It is on my copy, which I would be happy to share with you.

      So it was executed in September 2022, isn't

that right, Ms. Hahn?

A.   My declaration was executed in September 2022.

Q.   Okay.  Let me get to the main point.

     That was more than a year ago, right?

A.   That's correct.

Q.   And you had the bank records that form the basis of your tracing analysis more than a year ago, isn't that right?

A.   We had some of the bank records, yes.  The Receiver was able to obtain updated and additional bank records.

Q.   And when were those shared with you?

A.   I believe it was about three weeks ago.

Q.   And when did you ask for them?

A.   I don't know.  I didn't ask for them.

Q.   I see.

     And did -- and did Mr. Barton sit for an interview with Commission staff prior to the initiation of this case?

A.   Can I ask what you mean "prior to the initiation of this case"?

Q.   Prior to September of 2022.

A.   Yes, he did.

Q.   And you participated in those interviews, is that right?

A.    Not all of them, no.

Q.    But in at least one of them, correct?

A.    I believe at least one, yes.

Q.    And you asked Mr. Barton questions, didn't you?

A.    Yes.

        MR. EDNEY:  I have no further questions of this witness.

        Thank you, your Honor.

        THE COURT:  Okay.  I am going to ask if we can take a break.

        Do you have a round 2 with this witness?

        MR. BERNSTEIN:  If any, it will be very brief, your Honor.

        THE COURT:  Okay.  I'll just ask you to not talk to anyone about the case during the 10-minute break, and then well come back and resume round 2 of your testimony.

        THE COURT SECURITY OFFICER:  All rise.

        (Recess.)

        THE COURT SECURITY OFFICER:  All rise.

        THE COURT:  Thank you.

        You can be seated.

        Okay.  I'm trying to think about where we stand as far as time calculations go.

        Okay.  I can give my rough numbers for

now.  Mr. Frye is putting pen to paper.

But I had 61 minutes of 90 that the SEC has used and 29 left.  And then I don't have it -- I have your total as 50, before we finished the last witness and so I need to do the math on that.  So it's 50 plus the last witness, the cross on Hahn.

MR. EDNEY:  Imperfectly, we have 32 minutes left, I think, over here on ours.

THE COURT:  That sounds about right.

We will keep doing the math and we will let you know by email, how about that?

MR. EDNEY:  We are trying to keep track and keep on it, Judge.

THE COURT:  Understood.

Okay.  It is Round 2.

Go for it, Mr. Bernstein.

REDIRECT EXAMINATION

BY MR. BERNSTEIN:

Q.   Ms. Hahn, briefly, if you go to your supplemental declaration, which appears at Exhibit 32.  And in particular, paragraph 6 of your declaration, at the end, Mr. Edney asked you a few questions about that statement at the end of your paragraph in the declaration where you write, "As a result, the Commission cannot yet confirm whether

additional Barton-controlled entities received or otherwise benefited from Barton's alleged fraudulent activities that are the subject of this litigation."

Do you see that?

A.   Yes.

Q.   All right.

And so your supplemental declaration provides the tracing examples that you were able to prepare based on the information that you had available at the time of your declaration, is that fair?

A.   Yes.

Q.   All right.

And there are entities that are included on your list of proposed receivership entities at Exhibit 34 -- if you go to Exhibit 34 -- that you did not -- that you did not trace, too, is that fair?

A.   Yes.

Q.   And that is because those additional entities, in addition to the entities you did trace to, were addressed in the Receiver's declaration, is that correct?

A.   Yes.

Q.   And so by your statement here at the end of your supplemental declaration that the Commission

had not confirmed at that point in time that that --
whether additional Barton-controlled entities
received or otherwise benefited from the WALL
investor funds, were you making that statement to
somehow suggest that you were discounting what the
Receiver had done in his own declaration?

A.    No.   And I think that list in Exhibit B was
meant to include entities based on what the Receiver
had outlined in his declaration.

Q.    All right.

And your point -- and I don't want to
mischaracterize what you said in your declaration,
so I will let you explain -- but in Exhibit 32 at
paragraph 6, you are talking about the fact that
there had been extensive commingling and that
there's still more work to do and that you're
getting more records and that, if allowed more time,
you could potentially perform additional tracing and
find additional funds or benefits going to
Barton-controlled entities?

A.    Yes.

MR. BERNSTEIN:  At this time, your Honor,
we would like to move to admit Exhibits 1 through 3
and 32 through 34, which are Ms. Hahn's declaration
and supplemental declaration.

THE COURT:  Any objection?

MR. EDNEY:  Your Honor, on the grounds of her not being an expert, I object to the tracing conclusions therein.  That is our objection.

THE COURT:  I understand.

I will give it the weight to which it is due and admit into evidence for this proceeding, contingent on my further examination of his objections.

(Thereupon, the referred-to documents were marked by the court reporter for Identification as Plaintiff's Exhibits 1, 2, 3, 32, 33, and 34.)

MR. BERNSTEIN:  Your Honor, at this time, we would pass the witness.

THE COURT:  Okay.  Round 2, Mr. Edney.

MR. EDNEY:  We are mindful of the clock. We have no further questions of this witness.

THE COURT:  Okay.  Thank you, Mr. Edney.

You are excused.  Thank you for your testimony, Ms. Hahn.

Any further Commission witnesses?

MR. BERNSTEIN:  Your Honor, this was our last witness, so at this time I would like to move to admit the other exhibits on our -- the other

exhibits on our list, which are the materials that are attached to our motion.

THE COURT:  Understood.

Any objections to the materials attached to the motion coming in as exhibits to this hearing?

MR. EDNEY:  Well, your Honor, I guess I'm not prepared to -- I haven't reviewed every single one of them, but I would object to any tracing conclusions therein because they haven't been offered, but otherwise I did not object.

THE COURT:  Okay, understood.  That is fair.

So what I will do is I contingently let them in until the further examination of the tracing argument that Mr. Edney is making today.

(The remaining documents were admitted in Evidence.)

MR. BERNSTEIN:  Thank you, your Honor.

MR. EDNEY:  Thank you, your Honor.

MR. BERNSTEIN:  Subject to any rebuttal, your Honor, that will be our last witness.

THE COURT:  Understood.

Okay.  So who do you want to put on the stand, Mr. Edney?

MR. EDNEY:  Your Honor, the defense calls

Mr. Gregg Ginn.

THE COURT:  Okay.  You may do so.

(The witness entered the courtroom.)

THE COURT:  All right.  If you could raise your right hand.

(GREGG GINN was duly sworn by the Courtroom Deputy.)

THE COURT:  Okay.  You know my request on some space between questions and answers.  That is all I will give you as far as a request and then you can proceed, Mr. Edney.

MR. EDNEY:  Thank you, your Honor.

DIRECT EXAMINATION

BY MR. EDNEY:

Q.   Sir, could you please state your name for the record?

A.   Gregory Wayne Ginn.

Q.   And what do you do for a living, Mr. Ginn?

A.   I'm a certified public accountant.

Q.   You went to college, I take it.

A.   Yes.  I went to the University of Texas in Austin.  I graduated in 1983.  I became a CPA in 1986, and have been practicing ever since in public accounting.

Q.   And what degrees did you receive in this

educational experience?

A.    A BBA in business administration.

Q.    And are you a Certified Public Accountant?

A.    Yes.

Q.    And when did you receive your certification as a public accountant?

A.    1986.

Q.    And that leaves you with several decades practicing as a CPA, is that right?

A.    Thirty-seven years.

Q.    Can you tell us about any training that would help us address the issues in this case today?

A.    We are required to take 40 hours a year of continuing education.  I have focused my practice and training in the last couple of years in some big data, some litigation support, that help in this kind of matter.

Q.    And do you have a familiarity with the accounting professional standards and principles for the tracing of assets and the flow of funds?

A.    Yes.

Q.    And have you done work in forensic accounting?

A.    Yes.

Q.    Can you describe that?

A.    I have served as a receiver in all the

contiguous counties.  I have been appointed in the Dallas District Court as an accountant in family law matters tracing community and separate property.  I routinely do business damage calculation-type engagements.

Q.   And Mr. Ginn, were you retained by the Defendant to evaluate certain matters in this case?

A.   Yes.

Q.   And has the Defendant agreed to pay you when funds become available?

A.   He didn't say when they would became available. He agreed to pay 375 an hour for my time.

Q.   And has he paid you yet?

A.   No.

Q.   Now, what materials did you review to perform the evaluation for which you were retained?

A.   I reviewed the staff accountant's declaration. I reviewed the Receiver's declaration and supporting schedules.  I reviewed a number of bank statements, accounting records from QuickBooks, both in native and Excel file formats, and a number of closing documents from some title companies.  And some of the other pleadings in the matter.

Q.   The bank statements and the accounting records, where did those come from?

A.    They were linked, provided to me by your law firm.  I understood they came from the Receiver or the SEC.

Q.    And about when did you receive those materials?

A.    Late September of this year.

Q.    So a couple -- few weeks ago --

A.    Yes.

Q.    -- is that right?

A.    Yes.

Q.    And were you able to review all those materials in the time allotted?

A.    I wouldn't say all.  I reviewed the ones that were responsive that were set forth in the declarations that we just talked about.

Q.    And -- and what topic were you retained to evaluate, Mr. Ginn?

A.    To review and see if the tracing supported the claim that the original lender funds could be identified in substitute assets.

Q.    Now, when an accountant makes conclusions about the specific types of funds have been traced into specific a company, does that involve the application of a specialized skill requiring training and experience in accounting and forensic accounting?

A.   Yes.

Q.   Does it require specialized knowledge in asset tracing standards?

A.   Yes.

Q.   Does it require specialized knowledge in structured transactions?

A.   Yes.

Q.   Does it require specialized knowledge in cash flow analysis?

A.   It may.  I don't think of that as specialized.

Q.   Do you believe that you retained the specialized knowledge necessary to -- to engage in this analysis?

A.   Yes, I do.

Q.   And are there professional accounting standards for deploying each of these areas of specialized knowledge?

A.   Yes.

Q.   I want to take you to the Hahn declaration that came in, in September of 2022.

     Perhaps we can provide you a copy of it.  I believe it is in those papers there.

A.   Exhibit 1 appears to be her declaration dated September 23rd, 2022.

          MR. EDNEY:  May I approach, your Honor?

THE COURT:  You may.

MR. EDNEY:  This is a copy of her supplemental declaration.

BY MR. EDNEY:

Q.   Do you see that?

A.   Yes.

Q.   And did you have a chance to review this declaration?

A.   Yes.

Q.   And specifically Exhibit A, where she gave -- engages in a tracing analysis?

A.   Yes.

Q.   And as a result of your review, did you reach a conclusion as to whether the analysis reflected in Exhibit A of the Hahn declaration and her other supporting materials were consistent with professional standards in the accounting profession for tracing assets?

A.   Yes.

Q.   And what was that conclusion?

A.   That they did not.

Q.   And can you explain the basis for that conclusion?

A.   So you're supposed to gather sufficient relevant data, maybe they have here based on what

I've looked at.  You are supposed to apply it with a generally-accepted method.  And tracing identifies four or five different methods to choose from.

That selected method is supposed to be consistently applied throughout the tracing.  It requires a beginning point.  It requires the application of that method and it requires an ending identification for it to serve as a tracing for the purpose we are talking about.

Q.   And with regard to this tracing method, were you able to identify from Exhibit A, or any of Ms. Hahn's other papers, what method she used to do tracing analysis?

A.   No.

Q.   And are there a number of methods to choose from?

A.   Yes.

Q.   And some accountants choose one over another, is that right?

A.   Yes.

Q.   Do they usually explain why?

A.   Yes.

Q.   And did you see either an identification of the tracing method or an explanation of what tracing method was selected in these papers?

A.    No.

Q.    Did review the declaration of Cort Thomas, the Receiver in this matter?

A.    Yes.

Q.    Did you reach a conclusion whether the tracing conclusions reached in that declaration were consistent with professional standards in the accounting profession for tracing assets?

A.    Yes.

Q.    And what was that conclusion?

A.    They did not.

Q.    And what is the basis for that conclusion?

A.    There wasn't a method identified or applied to the transactions.  It didn't identify the beginning, the method or trace all the way to the ending asset.

Q.    And were you able to evaluate the work of any accountant in the Receiver's declaration?

A.    No.

Q.    Was there an accountant identified?

A.    No.  Not by name.  They identified by staff or the consultant, the accountants he's employed.

Q.    But did you see a declaration from an accountant explaining the processes that went through to go into those exhibits --

A.    No.

Q.    -- and otherwise?  Okay.

Now, I'd -- when confronting the task of tracing alleged lender funds from the WALL entities into other companies, did you develop an opinion as to what aspects of the project would be more challenging than others?

A.    Yes.

Q.    And did you put together a demonstrative exhibit to kind of explain your thoughts on this issue?

A.    Yes.

MR. EDNEY:  Your Honor, may I approach?

THE COURT:  You may.

BY MR. EDNEY

Q.    I'm handing you what we've tentatively marked as Defendant's Exhibit B in this matter.

Is this is a diagram that you put together to help explain things in this case?

A.    Yes.

Q.    Can you tell us what it is?

A.    So it is a diagram that shows the catalyst of where a controversy starts of the WALL lender proceeds.  Individuals made loans into WALL entities.  There is nine of them.  Different lenders made different loans into each of them.

Monies from the individuals into the WALL entities directly traceable.  We can see their name; we can see who it came from.

Monies that move out of the WALL entities go into replacement properties, or they go into operating entities, like Carnegie, like JMJ.

As they move into different entities, it gets serially more complicated because the funds are fungible.  There is not a specific thing that is moving.  It's fungible money.

And so the accounting principles say, identify what is lender funds, what are other source funds.  And that gets serially more complicated as monies move from the operating entities into the single purpose entities that own land, the HUD projects, and so forth.

Q.   And so where -- how are those indicated on your chart here?

A.   They are more distant from the original funds themselves.  And there is more work to be done to trace them to the outer limits.

Q.   Now, Mr. Ginn, you have sat through the testimony of Ms. Hahn today, the testimony of the Receiver's accountant, you reviewed the Hahn declaration, you reviewed the Receiver's

declaration.

Did you see references to extensive commingling throughout that testimony and in the papers that you reviewed?

A.    Yes.

Q.    And what did you understand that reference to mean as an accountant?

A.    That monies have moved from one entity to another.  That is the context they are describing here, including return of money back from one entity to another.

Q.    And in review of Ms. Hahn's declaration, what, if anything, did Ms. Hahn appear to conclude about the effect of lender funds being commingled in the certain key operating entities, like JMJ Development, LLC?

A.    I thought her conclusion was it made the tracing impossible.

Q.    And based on your experience and training in the accounting profession, is it correct that it is impossible to distinguish affected and unaffected funds in a commingled account of a corporate entity?

A.    No.

Q.    Why not?

A.    We have methods to deal with that.  The one I

SECURITIES & EXCHANGE COMMISSION vs THOMAS LYNCH BARTON

selected here was the lowest interim balance.

And when money is deposited, we make assumptions about what money leaves first, is it the lender money or is it some other money.

And you trace and keep up on a pro rata basis what is the balance in the investor -- in the lender funds or the non-lender funds.  And that gives you a basis to trace the lender funds from one entity to -- into and out of some other spot.

Q.   Are there other potential methods for doing this?

A.   Yes.  There is a specific identification method, if a transaction matched dollar for dollar; LIFO is one, last in, first out; FIFO is one.

Q.   I'm sorry.

What's FIFO?

A.   First in, first out.

Q.   You can't --

A.   I'm sorry.

There's a number of methods that -- those are some of the more common ones.

Q.   But there are methods for disaggregating the two in a commingled account?

A.   Yes.

Q.   And as an accountant with knowledge of the

professional standards that apply to this field, what would you expect from another accountant that was trying to sort this issue out?

A.    Identify the assumptions that you're making, show me how you have applied that assumption consistently across your work papers that are supported by the underlying data.

Q.    And did you form an opinion as to whether that happened in the SEC's staff accountant's analysis?

A.    Yes.

Q.    What was that conclusion?

A.    It didn't.

Q.    And did you form an opinion as to whether that occurred in the Receiver's attempted tracing analysis in Mr. Thomas' declaration?

A.    Yes.

Q.    And what was conclusion?

A.    That it didn't.

Q.    Now, we have talked about JMJ Development, LLC a bit.

     What is your understanding of what that company is?

A.    It is the primary development engine for these projects, primarily development of real estate.

Q.    And in the course of your review, did you

SECURITIES & EXCHANGE COMMISSION vs THOMAS LYNCH BARTON
3:22-cv-2118-X                        October 11, 2023                        Page 156

review the accounting records and other documents to track receipts into -- from the WALL entities and its managing member, Carnegie Development, LLC, on the one hand, and to other sources on the other?

A.   Yes.

Q.   And did you, in your filed declaration in this matter, attach certain schedules to document this work?

A.   Yes.

MR. EDNEY:  I want to -- I want to -- if I may approach, your Honor.  I want to hand you what will be marked as Defense Exhibit C.

THE COURT:  You may.

MR. EDNEY:  Why don't I just do that.

BY MR. EDNEY

Q.   Your Honor and Mr. Ginn, I have just handed you what has been preliminarily marked as Defense Exhibit C.  It is entitled SEC versus T. Barton, Schedule 11.

Can you describe what this document is?

A.   This is a document that I compiled from the general ledger for the bank accounts, excluding deposits that had come in from WALL entities or Carnegie, the Carnegie entity, to identify other deposits other than those two.

And at the back, it totaled $16,439,000 of deposits other than monies directly from WALL or directly from Carnegie.

Q.   And Mr. Ginn, in reviewing the Hahn report and the Receiver's report, did you see an effort to account for these potentially unaffected funds?

A.   No.

Q.   And, again, does the accounting profession provide standards for distinguishing between these pools of funds in commingling account?

A.   Yes.

Q.   Mr. Ginn, based on the foregoing, did you reach an opinion about whether Ms. Hahn or the Receiver's tracing exercise in addressing payments from operating companies like JMJ Development, LLC was consistent with professional accounting standards?

Was that too fast?

A.   Yes.

            THE COURT:  It was a lot.

            THE WITNESS:  I thought they were -- I thought they were consistent accounting summaries. They don't represent tracings because they don't account for the fungibility of the money.

BY MR. EDNEY:

Q.   Now, now the --

United States District Court
Northern District of Texas - Dallas Division          10-13-2023 9:38AM

A.    Of the proceeds -- excuse me sorry, not the money, the proceeds.

Q.    Now, returning to the commingling topic, did you have a chance to review the accounting records' treatment of transfers between the WALL entities and Carnegie Development, LLC, which is the managing member of the WALL entities, on the one hand, and the operating companies like JMJ Development on the other?

A.    Yes.

Q.    And what did that -- what did you look at to do that review?

A.    I reviewed the general ledgers, and I noted that they have either assets or liability accounts for inter-company due to or due from the particular entity.

Q.    And what did that review show?

A.    That the transactions between the companies were recorded on the books as either an asset or a liability.

Q.    And were they -- was there any documentation of them as inter-company loans?

A.    Other than the general ledger, that is what I have seen.

Q.    Okay.

And I would like to -- well -- well, have you formed an opinion under professional accounting standards whether that documentation is consistent with the charge of indiscriminate commingling of funds?

A.    I don't know how to answer that.

It didn't meet the definition to me of indiscriminate commingling of funds.  They are categorized and characterized on the balance sheet of the company what is the nature of the transaction.

Q.    And then, did you see in the Hahn declaration or the Receiver's declaration any effort to address the accounting treatment of these inter-company transfers in the company's own accounting records?

A.    No.

Q.    And as an accounting professional trying to do this tracing analysis, would you expect to see that?

A.    Yes.

Q.    In reviewing the Hahn and Receiver declarations, did you form an opinion as to whether the declarations traced assets to their final destination?

A.    Yes.

Q.    And what was that opinion?

A.    That it did not.

Q.    And why is that important, Mr. Ginn?

A.    Because if a person is claiming an interest in the original proceeds, and that has somehow been substituted, we need to know what assets they now are claiming their interest in.

      And if it was perfect, we would know which investor money went to which entity or which property or which project and that gap is present in the current declarations.

Q.    Now turning to the Receiver's report, did you review his explanation for what in his opinion would qualify as tracing into an entity?

A.    Yes.

Q.    And specifically, his conclusions about what would benefit an entity from a tracing analysis?

A.    Yes.

Q.    And what did you determine his standards to be?

A.    He didn't identify a standard on that.  He identified some examples.

Q.    And what were those examples?

A.    One of them was that WALL proceeds were used to pay employees.  And those employees did work for the benefit of somebody else, so the jump in the analysis was, then that something else benefited

from these proceeds.

There is not a pecuniary benefit identified there.  There is not a quantifiable -- how -- what is the reimbursement for this labor or this utility as to something.  There is a gap in the analytics there.

Q.    And -- and did you form an opinion as to whether examples like that were consistent with professional accounting standards for asset tracing?

A.    I didn't think of it like that in that context.

Q.    Have you seen it before in similar tracing analyses?

A.    The -- the -- not the benefit testing like they are trying to apply here.

Q.    Mr. Ginn, did you review receipts into the WALL entities?

A.    Yes.

Q.    And what did that review entail?

A.    I have looked at the general ledger for each of the nine WALL entities.  I identified what I thought were lender proceeds, and it didn't add up to $26 million.

MR. EDNEY:  Your Honor, can you just give me a moment, please?

THE COURT:  Sure.

MR. EDNEY:  May I approach, your Honor?

THE COURT:  You may.

BY MR. EDNEY:

Q.    Mr. Ginn, I'm handing you what has been marked as Defense Exhibit D in this matter, Schedule 4.

Do you see that?

A.    Yes.

MR. BERNSTEIN:  Mr. Edney, is that graphic B?

MR. EDNEY:  Yes, I think so.

BY MR. EDNEY:

Q.    So what is this document, Mr. Ginn?

A.    I compiled a table of all of the deposits from the relevant time periods into each of the nine WALL entities.

I identified and redacted the ones that I thought represented WALL lenders and I revealed the deposits as reflected in the books from other sources.

On page 9, it totals that there were 35,669,000 total deposits into the WALL entities in the relevant period.

Q.    And in fact that was more than the 26.3 million in lender funds that folks have been referring to, is that right?

A.   Yes.

Q.   Mr. Ginn, did you see any effort in the Receiver or Hahn declarations to account for this difference?

A.   No.

Q.   And did you hear anything in the testimony today that thoroughly accounts for those differences?

A.   They provided some examples of what it might be, but we haven't seen that documented.

Q.   And from an accounting standpoint, would you -- would you expect an analysis of this difference, if you were trying to trace funds out of the WALL entities?

A.   Yes, I would.

Q.   I want to turn your attention, finally, to some testimony that we heard today and there is an assertion in the Receiver's report, too, that Mr. Barton allegedly diverted $5.3 million of lender funds for personal use.

     Did you hear that testimony and see that reference?

          MR. BERNSTEIN:  Objection, leading.

          THE COURT:  I will allow it.

          THE WITNESS:  Yes.

SECURITIES & EXCHANGE COMMISSION vs THOMAS LYNCH BARTON
3:22-cv-2118-X                     October 11, 2023                     Page 164

BY MR. EDNEY:

Q.   And what do you understand the basis for that assertion to be?

A.   We don't know with certainty.  Presumably somebody has added up payments to credit cards.  The report says it is for personal use or business or a number of other categories.

I did some work in that area and identified, if an entity receives charges on a credit card that are for personal, the company recorded them as distributions to the owner for personal expenses and they weren't allocated as costs of the entity.

The amounts I identified in the general ledgers were substantially less than the 6-point -- or whatever the multiple million dollar number was.

Q.   5.3 million, does that sound about right?

A.   Yes, sir.

THE COURT:  Mr. Edney, we are up on time.

I can give you one more minute.

BY MR. EDNEY:

Q.   Mr. Ginn, did you prepare a declaration in this case?

A.   Yes.

Q.   And is a true and accurate copy of the declaration attached to our briefs?

A.    Yes.

MR. EDNEY:  Your Honor, I move the admission of the exhibits that I have shown Mr. Ginn today as well as the declaration.

THE COURT:  Understood.

Any objection today as those?

MR. BERNSTEIN:  No objection for admission for purposes of this hearing, your Honor.

THE COURT:  Okay.  I will admit them for this hearing.

Thank you, Mr. Edney.

MR. EDNEY:  Thank you, your Honor.

(The referred-to documents were admitted into Evidence as Defendant's Exhibits.)

THE COURT:  Okay.  You can proceed, Mr. Bernstein on cross.

MR. BERNSTEIN:  Mr. Edney, did you mark the report as a number or letter?

MR. EDNEY:  No.  I would ask the Court to recognize it as an exhibit filed with the case but we are happy to put in a separate document if the Court decides.

THE COURT:  Which document are we speaking of?

MR. EDNEY:  The declaration of Mr. Ginn

attached to our opposition brief filed in this matter.

THE COURT:  Understood.

Could we give it E, Exhibit E?

MR. EDNEY:  E sounds great.

MR. BERNSTEIN:  And I'm only asking him because I wanted to use it and I have a copies of it here, so...

THE COURT:  Fair enough.

You can proceed, Mr. Bernstein.

MR. BERNSTEIN:  May I approach, your Honor?

THE COURT:  You may.

MR. BERNSTEIN:  This is for the Court.

CROSS-EXAMINATION

BY MR. BERNSTEIN:

Q.   What you have marked as Exhibit A, in front of you, is that a copy of your report?

A.   Exhibit E as in echo, yes, sir.

Q.   Yes, I'm sorry.  Exhibit E.

Okay.  Let's start off with your compensation.

I believe you testified that you have not been paid in this case?

A.   Yes.

Q.   Mr. Edney mentioned that you -- that your

payment may come if funds become available.

A.   He did.  That wasn't my understanding.

Q.   Well, presumably, if the receivership entity assets were released and made available to pay you, is that your understanding of what he was saying?

A.   No.  I expect to send a bill and get paid at the end of the month.

Q.   So is your payment in this matter subject to the outcome of this case?

A.   No, it is not.

Q.   And that would be against your professional standards, would it not, to make your payment subject to the outcome of this case?

A.   Yes.

Q.   So were you aware before you testified today that the payment that you were going to receive in this case may in fact be subject to the outcome?

A.   I don't know about -- I don't know that.

Q.   You don't know one way or the other?

A.   That's right.

     I'm not limiting it to the outcome of this case for my expectation of payment.

Q.   You were asked, in your report it states that you were asked to analyze tracing examples for five projects:  The HUD apartments, the Frisco real

property, 2999 Turtle Creek, Villita Towers, and the Marigold Suites, is that correct?

A.   I think it is seven properties and five types.

I think the first -- the HUD properties have three subsets beneath them.

Q.   Right.

And I identified it as five projects and that is how you described it at page 2 of your report, correct?

A.   On page 1, I said on seven occasions.  And then if you have added up that list and it is five, I will accept that.

Q.   Yes.

If you look at page 2 of your report, under Analysis, it says, "I have been asked to analyze the tracing examples for" and then you list the five projects, correct?

A.   The HUD apartments have three different apartments.

Q.   And I'm not quibbling with you there.

A.   Sure.

Q.   Those are the only tracing examples addressed in your report?

A.   Yes.

Q.   All right.

You identify the lowest intermediate balance method with pro rata distribution as a method that can be used when multiple claimants are tracing their property back to the same commingled account, correct?

A.    Yes.

Q.    "When proceeds have completely lost their identity, this is a method that is potentially appropriate as a device for fictional tracing when real tracing is impossible."

Your words, correct?

A.    Yes.

Q.    "This is an accepted methodology that an expert can use to estimate tracing in cases where it is not possible to do real tracing and to actually follow the funds because of commingling."

A.    Is that a question?

Q.    It is.

A.    I think you have read that correctly.

Q.    "The lowest intermediate balance method is only one of several methodologies that an expert may use to address commingling."  Fair?

A.    Yes.

Q.    And in fact, you say that at page 4 of your report, "multiple tracing methods could be argued to

apply for use based on the circumstances of the matter upon a reasoned explanation that one or the other is the most appropriate method." Correct?

A. Yes.

Q. But Mr. Ginn, you do not need methodologies like the lowest intermediate balance method when you can do real tracing, right? When you can directly trace money to an entity on the face of the bank records?

A. I don't agree with that assertion.

Q. So in a circumstance where you can directly trace money on the face of the bank records, it is your opinion that you have to use a tracing methodology in all of those instances?

A. In the instance where the money is directly deposited into an account, there is no tracing method. It is specifically identified. It is once the funds are commingled with non-source funds that this method is required to be able to identify whose portion of the funds are what.

Q. Right.

To the extent -- but only to the extent you're trying to quantify the portion of the funds that are attributable?

A. Yes. No. Are they, in fact, traceable or not.

Q.   And so for example, if $1,000 of investor funds come into a bank account that only had $50 on deposit at the beginning of that day, and then that same day, $1,000 was transferred out of that bank account, you don't need an expert methodology to know that at least some portion of the funds that were transferred out of the bank account were investor funds?

A.   That's right.

Q.   But you could, if you chose, use the lowest intermediate balance method or another methodology to try to estimate and account for the exact portion of investor funds that you want to attribute to the transfer?

A.   Yes.

Q.   You next state in your report that Ms. Hahn's and the Receiver's declarations do not identify a specific tracing method in the tracing examples that you reviewed, correct?

A.   Yes.

Q.   So you are essentially raising a reliability complaint based on a failure to identify a methodology?  Is that fair?

A.   Yes.

Q.   In fact, you say that in your report, "without

a clear application of an accepted methodology, the tracing examples reliability to the surviving asset is incomplete."

A.    Yes.

Q.    But to be clear, you have not concluded or opined that the entities that the Receiver and Ms. Hahn identified as receiving investor funds did not actually receive investor funds?

A.    I don't know that that is true.

Q.    Where in your report do you opine that any specific entities did not actually receive investor funds?

A.    I think on one of the appendix, I show you that the general ledger is below zero.  And I raised the assertion there is no proof that investor funds left this account after that balance was zero.

Q.    Okay.

And that example is in the appendix?

A.    Yes.

Q.    And what entity does that refer to?

A.    One moment.

It is appendix 060, at the bottom.  And it is selective tracing No. 4 for the D4DS, LLC regarding Bellwether Ridge.

Q.    So it's your position here today that that is

an example of a case where you have concluded that -- that there were no investor funds received by that particular entity?

A.    I don't think that is the character of what I'm saying.  I'm saying this tracing doesn't support evidence that --

Q.    Okay.

A.    -- of investor funds.

Q.    Okay.  Let's go back to my original question then, Mr. Ginn.

I'm not asking you about your critique of the methodology that was used by the Receiver or Ms. Hahn.

I'm asking you, as an expert, are you opining or concluding that any particular entities that are being proposed to be put into the receivership, did not receive investor funds?

A.    No.

Q.    And you have not done that analysis for any of the entities?

A.    I have not -- yes.

Q.    Okay.

Setting aside the receipt of investor funds, your report also does not address whether any of the Barton-controlled entities otherwise benefited from

assets traceable to Barton's alleged fraud, is that correct?

A.    Yes.

Q.    All right.

You critiqued the five tracing examples you reviewed from an accounting perspective purportedly under accounting standards, correct?

A.    Yes.

Q.    And you -- you mentioned that several times during your testimony, accounting standards.

Show me where in your report -- so you are familiar with GAAP, GAAS, FASME standards?

A.    Yes.

Q.    Okay.

Show me where in your report where you identify a specific accounting standard that is applicable to the tracing at issue in this case.

A.    I don't know that I have identified it in the report.

Q.    And you didn't identify it during your testimony either?

A.    I can.  Would you like to know what it is?

Q.    Yeah.  Okay.  Sure.

A.    Statement of standards on consulting services say you have sufficient relevant data, you apply

generally accepted methods, and reach a conclusion without analytical gaps in between.

Q.   So that's an audit standard, right?  So that would -- again, that goes back to your critique of the methodology, right?

A.   It is the generally accepted accounting standard.  The GAAP you mentioned covers presenting financial statements.  The GAAS that you mentioned covers auditing those financial statements.

This is the standard that consulting services for damage-type calculations.

Q.   Okay.

So that would be used for a damage-type calculation, right?  To arrive at a damage figure based on an estimation, particularly, for example, like in a case of a trust where you're trying to determine an ultimate payout of trust funds.

A.   It could be, yes.

Q.   Okay.

Are you a certified fraud examiner -- well, first of all, so just to be clear, there are no other accounting standards set forth in the report that you submitted to this Court?

A.   That's correct.

Q.   All right.

So are you a certified fraud examiner?

A.    No.

Q.    And have you worked as an investigator?

A.    No.

Q.    Do GAAP, GAAS, or FASME standards apply to CFEs or investigators?

A.    I don't think they do.

Q.    You have not opined or concluded on how CFEs, examiners, or investigators summarize the flow of funds for financial transactions?

A.    Say that one more time.  I'm sorry.

Q.    You have not opined on how examiners, CFEs, or other investigators summarize the flow of funds for financial transactions?

A.    That's correct.

Q.    That is not part of your expertise?

A.    That's not part of what I have identified and worked on here.

Q.    Okay.

     You point out in your report that funds other than investor funds were deposited in WALL entity and JMJ Development accounts, at page 5.

     Do you recall that?

A.    Yes.

Q.    Did you determine the source of those other

funds?

A.    Only to the extent that they are identified in the bank records by whatever the label that supply it to.

Q.    Yes.  And did you schedule that out?

A.    The -- one of my exhibits has that.

Q.    Before I move on, so -- well, let me actually ask you this first, Mr. Ginn.

Did you observe that Ms. Hahn and the Receiver found that one of the proceeds obtained from loans secured with property purchased with investment funds were deposited in the WALL entity and JMJ Development accounts?

A.    I don't remember -- I think so.

Q.    You don't -- you don't contest that finding in your report?

In other words, you don't take issue with that fact?

A.    I don't know what you are describing here.

Q.    Mr. Edney mentioned during his examination of Mr. Cecil and, as well, Ms. Hahn, accounting work papers.

Do you remember that?

A.    Yes.

Q.    Did you prepare accounting work papers in

connection with your work on this case?

A.    Yes.

Q.    Were those produced to your -- well, did you produce those to Mr. Edney?

A.    I have attached them as either a schedule or an appendix.

Q.    And so all of your work papers are what are attached to your report?

A.    Yes.

Q.    You also claim that Ms. Hahn failed to consider permitted uses of funds in her analysis on page 5 of your report?

A.    Yes.

Q.    You state that no analysis was provided as to whether certain payments of lender funds to JMJ, for example, had a legitimate basis; e.g., for reimbursement of expenses incurred in acquiring and advancing the subject projects or disbursements for authorized replacement projects.

Do you see that?

A.    Yes.

Q.    Okay.

Do you contend that the loan agreements authorize Mr. Barton to use investor funds for purposes other than to purchase the properties

specified in the agreements?

A.    They say whatever they say.

Q.    All right.

And you have not reached a conclusion or opinion disputing Ms. Hahn's and the Receiver's review of the financial records that show that no investor funds were actually used to purchase the properties described in the WALL agreements with the investors?

A.    My recollection was, they have two occasions where they identified the specific purchases that -- and then there were replacement properties.

Q.    And are those -- are you referring to the two examples that Ms. Hahn referred to where other investor funds were used to -- or other funds were used to purchase WALL entity properties for two specific --

A.    That is what she said, yes.

Q.    That is what you are referring.

But you have not rendered a specific opinion or a conclusion on that issue?

A.    No.

Q.    You also talk about commingling in your report.

I believe this is the last topic I'm going to cover with you, Mr. Ginn.

SECURITIES & EXCHANGE COMMISSION vs THOMAS LYNCH BARTON
3:22-cv-2118-X                         October 11, 2023                         Page 180

At the bottom of page 2, you state that "the SEC's assertion of reckless commingling is incorrect."

Do you see that?

A.   Yes.

Q.   Your basis for that statement is that "when proceeds exited the WALL entities, they were carefully noted in the books by Carnegie Development, LLC and the WALL -- in the WALL entities as loans and are carried as enforceable assets in the general ledger accounts in the WALL entities."

Did I read that correctly?

A.   Yes.

Q.   Okay.

So that conclusion goes to how transactions were recorded in the books of the Barton companies, correct?

A.   Or the WALL entities.

Q.   Did Mr. Barton have control over Carnegie Development and the WALL entity's books?

A.   I don't know that.

Q.   Did you determine whether Mr. Barton instructed company personnel to miscode accounting entries in the QuickBooks?

A.    I don't have any information to suggest that.

Q.    Did you talk to anybody, any witnesses or Mr. Barton about those issues?

A.    No.

Q.    Do you agree that determining how Mr. Barton recorded or his companies recorded transactions on the books do not establish whether funds were actually commingled by or among the bank accounts Barton controlled for the various entities?

A.    I agree with that.

Q.    Now, you did not schedule Mr. Barton's controlled bank accounts to determine the extent of any commingling?

A.    The ones I scheduled are attached as an exhibit.

Q.    The examples, that is the extent of what you did?

A.    Yes.  I'm sorry.  I'm just trying to be clear.

Q.    Finally Mr. Ginn, did you have any discussions with Mr. Barton in connection with preparing your report in this case?

A.    No.  I had an initial discussion with him about being engaged and I didn't talk to him after that.

        MR. BERNSTEIN:  We pass the witness, your Honor.

THE COURT:  Okay.  Thank you.

We are out of time, so I will thank you for your testimony and you can take your place back in the courtroom.

MR. EDNEY:  I don't think, I am, your Honor.  I have five minutes, according to my folks.

THE COURT:  Well, y'all, don't keep the time, I do.  And I gave you an extra four before I said you were out of time and then gave you two more.  So I appreciate your keeping of the clock, but I keep the clock here in conjunction with my courtroom deputy.  So by our time, then, you're out.

So based on that, what I need to do is -- Mr. Thomas?

MR. THOMAS:  Your Honor, I had a quick housekeeping issue.  I don't know exactly how you want to handle it.  I'm just trying to save time and money.  We have been talking about Mr. Cecil's documents he relied upon.

But in connection with this, I had prepared and didn't have to get into it while I was on the stand, a binder of my exhibits plus the statements that were relied upon.

I think that will be helpful for you.  You were the one that told me to submit a declaration.

I think it will be helpful to you.  If you want it, I can file it under seal.

THE COURT:  Can you pull that microphone back you, Mr. Thomas?

MR. THOMAS:  Yes.  Sorry, Kelli.

I was saying, I can file it under seal or we can somehow submit it as a Receiver exhibit.

I think it will be helpful for you in your analysis.  For instance, when we were talking about Exhibit 4 with Mr. Cecil, and that $2.5 million, it is clearly reflected in the bank statements that that went right back out.

So I don't know how -- how to give this to you.  Or if you don't want it, we don't have to file it under seal.  We don't have to submit it as an exhibit.  I just thought --

THE COURT:  The reason to file under seal would be if it's got financial information, though, like bank account numbers.

MR. THOMAS:  It would just take a lot of time and money to redact it.  So yes, your Honor.

THE COURT:  I understand.

Okay.  Let me hear the SEC's position on the Receiver's proposal to file those materials under seal.  And then I will hear Mr. Edney's

opinion.

MR. BERNSTEIN:  We have no objection, your Honor.  We would be happy to have the Receiver provide that if it would aid to the Court.

THE COURT:  Mr. Edney?

MR. EDNEY:  Thank you, your Honor.

There's two evidence-generating parties in this case, the Commission and the Defendant.  The Receiver is not a party.  They had an opportunity to provide, you know, some thoughts on the issue.  They are not an appropriate producer of evidence.

THE COURT:  Understood.

So here is what I'm going to do.

I'm going to at least stick to your general notion that there are two evidence-producing parties.

If Mr. Bernstein, you think that it should come in, based on the discussion we had here today, then you can file a motion to supplement the record and include that as your exhibit.

If you want a chance to take shots at that, then you can respond to that.

I will probably put expedited briefing, if there is a motion to supplement.  Because, again, we are a train that needs to be completed down the end

of the line by November 29th.

Toward that end -- oh, what I want to do is tell y'all one thing right quick on the whole issue of expert testimony.  And then ask for your help in this kind of briefing or oral argument notion that you brought up in your filing, Mr. Edney.

On the expert testimony issue, the Fifth Circuit has spoken to the issue of whether or not tracing requires expert testimony.

They were talking about it with regard to a particular federal witness, who was the only tracing witness in that case, and, ironically, her name was Tracy.  Tracy Clark Ross was doing a tracing analysis on behalf of the VA.

And the district judge in that case was crazy.  His name was Starr, and he made her be qualified as an expert.  And the Fifth Circuit said, man, Starr, you were too harsh.  She didn't need to be qualified as an expert.  She could add and subtract along with any other human being.

It was a voluminous, copious, tedious adding and subtracting, but it was adding and subtracting.  No expert designation was needed under Rule 701.

That case is United States versus Davis, 53 F.4th 833.  And the pinpoint is 848 to 849.

I'm not going to say at this point that that case governs this one.  I know that case is a general statement, but y'all would have to tell me if that case binds this case or not.

I don't like lightly thumbing my nose at the Fifth Circuit, but I need to make sure that case governs this one, if I'm going to apply it.

Query.

How do y'all tell me your thoughts after we've heard the evidence we heard today?

Normally, I do not ask for proposed findings of fact and conclusions of law because I like writing my own receivership orders or preliminary injunction motions.  But those can take four or five months, after an evidentiary hearing.

We don't have that kind of luxury of time, right?  We've got until November 29th.

So what I'm going to ask y'all to do, for both the SEC and for Barton, is to, by November 10th, give me your proposed findings of fact and conclusions of law.  That gives you time to order a transcript, 14 days or less, I don't care, whatever you're comfortable with, as long as you

have a transcript in hand, that can let your findings of fact, proposals, link back to some record evidence, whether it be the transcript or an exhibit that came in at this hearing.

That will give me some brief window of time between November 10th and November 29th to work on what I think should be my findings of fact and conclusions of law in both a receivership order and a ruling on the request for an injunction in this case.

That is my proposal for the path forward.

Any questions, comments, issues on that path forward from the Commission?

MR. BERNSTEIN:  None from the SEC, your Honor.

MR. EDNEY:  Your Honor, I mean, I think --

THE COURT:  Can you sit down so I can hear you?

MR. EDNEY:  Fair enough.

THE COURT:  Or go to the podium, if you really want to stand up.  That's fine.

MR. EDNEY:  Sure.  Why not.

Your Honor, I think that sounds great.

I think we would like to have some time before you to answer your questions, perhaps, almost

SECURITIES & EXCHANGE COMMISSION vs THOMAS LYNCH BARTON
3:22-cv-2118-X                          October 11, 2023                          Page 188

immediately after the submission of those papers or at the Court's convenience, but certainly before the Court has to rule.

So my request for some amount of oral argument, however brief it may be, stands.

Your Honor, the other matter is that I really did -- l really did think we had 32 minutes left back there. I understand. We were trying to keep track of it.

We had one other witness. He has an extensive declaration that is in the record in this case, but it was the part of our motion to intervene that your Honor denied.

I would like to put him on the stand, authenticate that declaration and enter it in evidence and we can be on our way. So I would ask the Court's indulgence to do that.

THE COURT: I let you do it as a proffer.

MR. EDNEY: Okay.

Your Honor, if Mr. Erik Johnson were to testify, he would say that he was a -- he's an official at Southern Capital Properties. This is the mezzanine lender that had a significant role in the HUD development projects.

He developed an extensive declaration that

addresses the tracing examples into those HUD project entities.  This is Ingleside and Forney and Windmill Farms and others.  That declaration is in the record.  We have copies of it and I would like to have it admitted as Defense Exhibit F.

THE COURT:  And can you remind me which declaration we are speaking of?  Can you tie it off to a docket number?

MR. EDNEY:  Yes, your Honor.

So it is Document No. 330 in this case. It begins at page 4 of that submission.  It is the declaration of Erik Johnson.

And we have copies for the Court, if it would be convenient.

THE COURT:  I will take a copy from you, if you would.

MR. EDNEY:  Thank you, your Honor.

THE COURT:  Okay.

So Commission, I'm not requiring you take a position on this, because I'm having him put in as an attorney proffer.

If my examination is that I think it should come in, then I will notify you and then let you object.

MR. BERNSTEIN:  Thank you, your Honor.

THE COURT:  Understood.

Okay.  You can hand it to Mr. Frye.

MR. EDNEY:  May I approach, your Honor?

THE COURT:  You may.

One thing I will tell you is the Fifth Circuit has changed protocol now.  Y'all are the keepers of the exhibits, not me or Ms. Willis.  And so I'm keeping my copy of everything you have handed me because I need it for working through your proposed findings of fact and conclusions of law, but don't discard your copies.  I know some of them were handwritten and marked up today.  Keep them so you can give them to the Fifth Circuit at the appropriate time.

MR. EDNEY:  Thank you, your Honor.

THE COURT:  Any other questions, thoughts, comments, concerns?

MR. EDNEY:  No, your Honor, from the Defense.

THE COURT:  Okay.  Thank you for the good lawyering today.

I will wait to see your submissions on November 10th.

If there is a motion to supplement the record with Receiver materials from the Commission,

then I will order expedited briefing because that is something we would need to tie off sooner rather than later.

MR. EDNEY:  Thank you, your Honor.

THE COURT:  Thank you.

Court is in recess.

THE COURT SECURITY OFFICER:  All rise.

(Proceedings concluded at 4:51 p.m.)

C E R T I F I C A T E

I, Kelli Ann Willis, RPR, CRR, CSR certify that the foregoing is a transcript from the record of the proceedings in the foregoing entitled matter.

I further certify that the transcript fees format comply with those prescribed by the Court and the Judicial Conference of the United States.

This 12th day of October 2023.

s/ Kelli Ann Willis
Official Court Reporter
The Northern District of Texas
Dallas Division

SECURITIES & EXCHANGE COMMISSION vs THOMAS LYNCH BARTON
3:22-cv-2118-X                          October 11, 2023                          Index: $1..4:51

**$**

**$1** 58:10

**$1,000** 171:1,4

**$110** 77:2 78:2

**$16,439,000** 157:1

**$160,000** 77:2 78:4

**$165,000** 83:24

**$168,000** 102:19

**$2** 104:24

**$2.5** 183:10

**$250,000** 84:4

**$26** 30:6 31:2 161:22

**$26.3** 47:1

**$30** 74:14

**$35** 47:2,12

**$450,000** 72:19,24

**$5.3** 163:19

**$50** 171:2

**$50,000** 60:6

**$7** 38:19

**$700,000** 59:15

**$75,000** 15:18 39:20 56:2

**$9** 31:4 47:16,23

**-**

**-o-** 6:2

**0**

**060** 172:22

**1**

**1** 78:15 108:13,23,24 112:15 140:23 141:12 147:23 168:10

**1,000** 51:7,9,21 52:6

**1,440,000** 115:18

**10** 24:19,22 31:6 61:8 131:9

**10-minute** 137:16

**106,000** 76:17

**10th** 186:22 187:6 190:23

**11** 156:19

**112** 72:13

**118.34** 116:3

**12** 23:15

**125** 102:10

**12th** 191:21

**14** 108:24 109:8 127:24 186:24

**15th** 59:5

**16** 88:20 109:14 127:17

**163** 26:10

**165** 14:23 17:22 24:3 80:11 81:5

**17** 127:21

**183** 78:25 79:24

**18th** 15:17 40:20

**19** 127:22

**194** 37:4,14 48:15

**195** 37:4

**197** 42:15,22

**1983** 143:22

**1986** 143:23 144:7

**199** 38:3

**2**

**2** 78:13 79:9 85:4 106:7 111:10 115:16 116:2 137:11,17 138:15 141:12,16 168:8,14 180:1

**2.5** 105:8

**20** 15:7

**2005** 107:10

**2012** 78:19 80:13

**2017** 30:7,11

**2018** 115:18 116:2

**2019** 30:8,11

**2020** 78:21 80:13

**2022** 135:11,13,17,25 136:2,22 147:20,24

**2023** 9:6 58:23 191:21

**21** 39:7 68:24

**22** 16:19 39:8

**23rd** 135:17 147:24

**24** 46:1

**25** 61:3,9 124:4,9

**25,000** 76:16

**26** 30:11,15,20 31:21 37:22 38:2 110:16

**26.3** 109:13 162:23

**26th** 135:13,19

**27** 45:18 98:4,5 133:12, 20

**27th** 115:18 116:1

**28** 75:2 124:9

**29** 68:23 110:16 124:11, 13 138:3

**2999** 17:17 26:2 33:4 57:12 70:22 71:21 168:1

**29th** 9:6 104:5 185:1 186:19 187:6

**3**

**3** 45:18 87:5 98:3 108:13 123:2 127:7 140:23 141:12

**3/14** 104:2

**3/14/2022** 104:2

**3/24/22** 104:3,23

**3/29/2018** 103:25

**3/29/2022** 104:7

**3/29/22** 103:3 104:18, 23

**30** 74:19 88:14 92:10

**30,000** 76:16

**300** 30:5 41:16 57:6

**308** 58:18

**31.1** 75:3

**32** 108:13 113:5 138:7, 21 140:13,24 141:12 188:7

**33** 17:9 74:8,12 113:20 141:12

**330** 189:10

**34** 21:8,12 22:4 78:14 108:13 139:15 140:24 141:13

**342,000** 59:11

**345** 59:13

**35** 15:2 30:13,16 31:20 43:17 44:5 74:21 88:23 89:10 91:16 96:12,14 118:21

**35,669,000** 162:20

**36** 74:24,25

**375** 145:12

**3:22-cv-2118-x** 6:7

**4**

**4** 102:14 123:2 126:1 127:18,23 162:5 169:24 172:23 183:10 189:11

**4.366** 72:16

**40** 144:13

**41** 72:13

**42** 127:5

**43** 51:22

**44** 51:13,22,23

**46** 18:16 78:18 79:11,18

**4:51** 191:8

**5**

**5**  38:18 123:22 176:22 178:11

**5.3**  164:16

**50**  74:22 138:4,6

**500,000**  115:25

**53**  186:2

**54**  22:24 23:16

**56**  46:5,14

**6**

**6**  102:10,11,12 125:12 131:4 138:21 140:14

**6-point**  164:14

**60,000**  115:21

**600**  51:20 52:6

**61**  78:19 79:11,18 138:2

**63**  78:20 79:11,19

**66**  78:21 79:12,19

**7**

**7**  102:9

**701**  185:25

**72**  78:23

**75**  84:25

**77**  27:4

**78**  78:15

**8**

**80**  86:2

**81**  48:20 69:2

**82**  37:15 45:2 78:13 79:12 126:5,13

**833**  186:2

**848**  186:2

**849**  186:2

**9**

**9**  30:16 48:4,5,7 162:20

**90**  8:16 138:2

**90-day**  9:9

**977,000**  58:16

**A**

**abandon**  60:17

**ability**  31:25 52:24 56:8

**Absolutely**  13:18

**AC**  34:19

**accept**  168:12

**accepted**  92:16 169:13 172:1 175:1,6

**access**  63:4,7,11

**account**  29:16 32:17 105:2 111:24 112:1 114:15,17 115:19,23 118:4 127:21 132:18 133:9 153:22 154:23 157:6,10,23 163:3 169:4 170:16 171:2,5,7, 12 172:16 183:19

**accountancy**  122:15

**accountant**  20:16 91:24 93:8 107:7,24 112:10 122:10,13,14 143:19 144:3,6 145:2 146:20 150:17,19,23 152:24 153:7 154:25 155:2

**accountant's**  145:17 155:9

**accountants**  17:6 19:24 20:6 21:1 63:25 64:19 65:6,24 88:7 89:25 90:5 98:10 149:18 150:21

**accounting**  17:6 20:7, 12,18,24 29:25 32:9 39:23 42:23 47:6,22 48:9 50:2 63:5,22 64:9 74:20,23 81:9 88:14,15 92:16,19 95:16 98:13 122:16 143:24 144:19, 22 145:20,24 146:24,25 147:15 148:17 150:8 152:11 153:20 156:1 157:8,16,21 158:4 159:2,14,15,17 161:9 163:11 174:6,7,10,16 175:6,22 177:21,25 180:24

**accounts**  15:18 29:18 31:25 33:13 56:2 57:21 94:8,20 95:4 102:7 104:23 114:10 117:17, 18 118:3,9,18 133:16 156:22 158:14 163:7 176:22 177:13 180:11 181:8,12

**accruing**  83:24

**accurate**  89:16 91:16, 20 128:6 164:24

**accurately**  108:18

**acquire**  131:20

**acquiring**  178:17

**acquisition**  24:20 25:1 102:21,23

**Acquisitions**  102:16

**acreage**  52:2

**acres**  51:7,9,20,21 116:3

**active**  34:5 54:8,11 62:14 83:4 84:15

**actively**  34:16 53:25 54:3,5 61:21

**activities**  125:20 127:13 139:3

**actual**  94:6 112:20 113:2

**add**  52:3 161:21 185:20

**added**  164:5 168:11

**adding**  50:8 54:24 55:1 185:23

**addition**  23:5,6 94:18 116:20 123:5,16 139:20

**additional**  25:15 33:15, 17 38:24 73:2,15 75:9 79:3 119:18 120:2,7,9

123:25 125:17 127:11 131:1 136:10 139:1,19 140:2,18,19

**address**  10:2 23:8 26:9 27:3 47:23 79:13 81:25 82:7 111:6 144:12 159:13 169:22 173:24

**addressed**  22:20 25:16 78:24 82:1 139:21 168:22

**addresses**  189:1

**addressing**  113:4 157:14

**adequate**  41:4

**administering**  15:21 16:16

**administration**  144:2

**administrative**  50:2

**admissibility**  11:7

**admission**  12:17 43:21 44:2 126:23 128:9 165:3,7

**admit**  43:17 140:23 141:7,25 165:9

**admitted**  13:14 44:4 128:12,16 142:16 165:13 189:5

**advanced**  51:1

**advances**  52:11

**advancing**  178:18

**affected**  153:21

**affidavit**  78:23

**afternoon**  6:21,24 7:19 44:14 120:21,25

**agree**  9:23 170:10 181:5,10

**agreed**  145:9,12

**agreement**  52:19 53:13 62:12

**agreements**  52:13 79:5 109:4 110:5 112:17,23 113:1 178:23 179:1,8

**ahead** 48:22

**Ahuja** 20:10 21:2 88:9 98:10,11

**aid** 184:4

**Alexander** 7:20

**alleged** 46:15 49:4 77:3 125:19 127:13 139:2 151:3 174:1

**allegedly** 163:19

**Allied** 88:18

**allocated** 8:16 164:12

**allotted** 146:11

**allowed** 140:17

**alternative** 41:3

**altogether** 64:24

**amalgamation** 37:18

**amount** 17:7 28:5 37:9, 21 49:4,25 50:19 52:8 56:8 58:1 75:18 86:6 92:13 93:16 108:25 109:11 114:19 117:12 188:4

**amounts** 47:8,9 56:18 109:6 164:13

**analyses** 161:12

**analysis** 24:15 29:16 37:12 48:7,8 65:2,5,7 67:1 71:13,22 72:8,18, 24 73:4 95:20 114:7 118:10 119:2,3 121:2 122:8 131:5 134:16 136:7 147:9,13 148:11, 14 149:13 155:9,15 159:18 160:16,25 163:12 168:15 173:19 178:11,14 183:9 185:15

**analyst** 107:16,18

**analytical** 175:2

**analytics** 161:5

**analyze** 108:5 112:15, 20 113:9 120:1 167:24 168:15

**analyzed** 19:1,16

**analyzing** 84:10

**ancillary** 8:11

**and/oral** 10:1

**Andrews** 60:3 63:17

**Ann** 191:13,23

**answering** 73:24

**answers** 14:7 87:22 106:23 143:9

**anthony** 21:1 87:12,18 88:5

**anymore** 49:14 64:22

**apartment** 27:1,6,12

**apartments** 27:23,25 68:18,20 167:25 168:18,19

**apologies** 72:1

**apologize** 48:16 51:18 57:3 102:13 103:15

**appeal** 57:2

**appearance** 7:7,9

**appearance-wise** 8:1

**appearances** 6:9 7:18

**appeared** 11:11 18:4

**appears** 22:4,17 89:10 91:16 138:20 147:23

**appendix** 172:13,18,22 178:6

**appendixes** 10:20

**applicable** 174:16

**application** 59:11 77:8 146:23 149:7 172:1

**applications** 28:10 59:4 69:4

**applied** 24:10 149:5 150:13 155:5

**apply** 92:20 93:4 114:24 149:1 155:1 161:14 170:1 174:25 176:5 186:9

**applying** 45:24

**appointed** 15:16 35:20 36:20 38:15 39:19 40:12,19 55:6 75:22

145:1

**appointment** 35:7 39:4 84:24

**appraisals** 75:10

**appraised** 72:15

**approach** 87:15 103:19 126:18 147:25 151:12 156:11 162:1 166:11 190:3

**approval** 53:8

**approved** 28:12 93:9

**approximately** 14:21 17:22 109:13 124:9 127:5

**area** 36:18 164:8

**areas** 147:16

**argued** 169:25

**argument** 8:19,21 10:1 78:14 106:4 142:15 185:5 188:5

**arrive** 175:14

**ascribed** 47:16 49:19

**aspects** 151:5

**assembled** 99:12

**assert** 26:15

**assertion** 163:18 164:3 170:10 172:15 180:2

**assertions** 124:8

**asserts** 102:19

**assessment** 53:10,11

**asset** 42:8 66:25 121:24 122:2 147:2 150:15 158:19 161:9 172:2

**assets** 8:14 15:11,24 16:1,8 19:19 22:9 24:18 26:13 27:8 28:13,14,24 37:8 41:22 42:4,24 49:2 60:20 64:16 77:19 79:5 81:7,22 101:14 120:10 123:24 124:19 144:20 146:19 148:18 150:8 158:14 159:22 160:5 167:4 174:1 180:11

**assist** 20:8 68:4

**assistance** 55:11

**assisted** 72:4

**assumption** 66:18 72:3 155:5

**assumptions** 66:22 93:15 154:3 155:4

**asterisk** 103:2,6,24 104:21 105:18

**attach** 156:7

**attached** 19:3 53:3 96:20 97:13 123:23 142:2,4 164:25 166:1 178:5,8 181:14

**attachments** 108:12

**attempted** 155:14

**attention** 48:14 131:9 163:16

**attorney** 189:21

**attorneys** 38:17

**attributable** 170:24

**attribute** 171:13

**attributed** 38:16 69:25 117:12

**audience** 7:7

**audit** 175:3

**auditing** 175:9

**Austin** 143:22

**authenticate** 188:15

**authorize** 178:24

**authorized** 178:19

**average** 72:15

**aware** 13:3 26:8 34:20 41:14 52:22 53:1 56:21 60:9 92:23 96:25 97:2,4 167:15

---

**B**

**bachelor's** 107:13

**back** 8:2,6 9:22 16:5 18:8 20:21 22:23 31:9,

13,19 32:11 37:15 38:20 39:24 45:8 46:21 49:22 57:6 58:12 76:11 80:13 84:24 91:3 95:17 99:7 109:6 112:14 118:6 123:19 132:4 137:16 153:10 157:1 169:4 173:9 175:4 182:3 183:4,12 187:2 188:8

**balance** 93:2,16,19,20, 22 114:15,17 117:4 133:23 154:1,6 159:9 169:1,20 170:6 171:11 172:16

**balances** 84:5

**bank** 17:5 18:19 19:7, 25 40:10 57:21 84:25 89:4 93:13 94:6 99:11 100:5,14 102:7 107:19 108:4 109:7,21,24 112:1 114:8,10 115:19, 22 117:21 118:18 121:9,19 122:18 129:16 130:10 133:15 134:20 135:4 136:6,9,11 145:19,24 156:22 170:8,12 171:2,4,7 177:3 181:8,12 183:11, 19

**banks** 33:13 107:16

**Barton** 6:8,15,19 8:16 17:12 19:11 26:6,22 28:10 38:7,9,13 40:6,13 41:2 42:18,23 43:1 60:4,5 63:12 66:14 77:11 78:18 79:3 80:17 81:3,17 84:21 110:19 111:3 113:17 114:3 128:22 129:7,25 131:21 136:17 137:4 156:18 163:19 178:24 180:17, 20,23 181:3,5,9,20 186:21

**Barton's** 26:6 41:17 57:2 91:23 113:11 119:24 125:19 127:12 128:23 129:8 139:2 174:1 181:11

**Barton-controlled** 33:17 93:24 111:2,18 112:13 113:24 115:4

117:15 118:4 120:9 123:5 125:18 127:11 139:1 140:2,20 173:25

**based** 8:15 9:8 17:2 20:17 25:11 27:6 36:21 37:16 40:7 72:23 78:3 92:8 94:3,21 109:23 112:9 121:18 139:9 140:8 148:25 153:19 157:12 170:1 171:22 175:15 182:13 184:18

**basic** 82:22

**basis** 82:15 83:16 85:12 130:6 136:7 148:22 150:12 154:5,8 164:2 178:16 180:6

**battle** 9:3 11:20

**BBA** 144:2

**Bear** 116:3

**began** 16:20

**begin** 44:19,24 121:1

**beginning** 74:8 93:19 100:10 114:15,17 133:23 149:6 150:14 171:3

**begins** 189:11

**behalf** 6:12,17 7:4,21 125:9 185:15

**believes** 128:22 129:7

**Bella** 69:13,14

**Bellwether** 74:11 172:24

**bench** 11:11

**beneath** 168:5

**beneficial** 84:12

**benefit** 26:12 27:7,12 32:16 67:22 68:18 69:7 70:4 71:5 77:12,13 80:5 82:19 121:10 130:17 134:17 160:16,24 161:2,13

**benefited** 19:19 21:14 22:11 23:20 45:13 46:7 67:24 68:6,14,21 69:9, 21 70:9,24 71:6 77:3 113:12,25 115:4 116:10

119:14 123:10 125:19 127:12 139:2 140:3 160:25 173:25

**benefiting** 20:4 27:17 46:18,21

**benefits** 23:1 25:5 27:12 93:24 116:19 120:10 123:24 140:19

**Bernstein** 6:11,12,14 10:13 12:5,23 13:18 14:11,14 22:1,19 26:20 28:22 29:7 33:24 39:17 40:24 43:16 44:6 49:1 62:25 67:15,20,21 78:12 79:13,20,22 81:23 82:5 85:2 87:5,6, 10,12,24 88:2 90:4 91:11,12,13 95:21 100:19 103:15 106:8,9, 14,24 107:2 116:5 117:16 118:19 119:12 120:13,15 128:11 129:12 130:5,7 131:10, 16 137:12 138:16,18 140:22 141:14,23 142:18,20 162:8 163:23 165:7,16,17 166:6,10, 11,14,16 181:24 184:2, 17 187:14 189:25

**big** 20:1 30:24 37:23 60:13,14 74:9 144:15

**bigger** 10:3 31:2,3,19 59:22

**biggest** 16:15 27:23 28:9 41:8 60:1

**bill** 58:22 59:7 71:11,21 167:6

**bills** 70:5

**binder** 13:13 182:22

**binders** 17:18

**binding** 129:20

**binds** 186:6

**bit** 9:24 16:11 32:20 34:2,7 62:25 66:3 70:7, 8 80:2 131:16 155:20

**blind** 81:19

**BM318** 116:4

**booking** 64:10

**books** 64:13,16,24 158:19 162:18 180:8, 17,21 181:7

**bottom** 50:9 172:22 180:1

**box** 87:16

**breach** 62:16

**break** 137:10,16

**briefing** 184:23 185:5 191:1

**briefly** 82:7 107:14 138:19

**briefs** 164:25

**bring** 56:16,19 57:10

**Broadview** 26:3 104:22

**broker's** 50:2

**brought** 25:21 58:1 185:6

**Brown** 54:17 58:10,22 59:10,15,22

**bucket** 32:23 82:2,3

**buckets** 24:1 45:6

**building** 57:12

**bullet** 43:6

**bunch** 34:19 37:18

**business** 18:20 36:16 56:2 69:23 108:6 112:16 113:10 144:2 145:4 164:6

**buy** 31:14

**buying** 11:24

---

**C**

**calculation** 37:16 175:14

**calculation-type** 145:4

**calculations** 137:24 175:11

**call**  10:12,15 27:24 31:4 49:21 61:1 133:6

**called**  47:17

**calling**  6:6

**calls**  21:17 82:22 86:24 87:12 106:14 142:25

**candidly**  57:25

**capacity**  36:14

**capital**  67:8 76:7 188:22

**card**  38:19 164:9

**cards**  38:18 131:22 164:5

**care**  186:24

**careful**  45:5

**carefully**  97:17 180:8

**Carina**  7:20

**Carnegie**  18:10 24:23, 24 64:2,8 94:24 101:23 111:16,24 115:20,23 132:7 152:6 156:3,24 157:3 158:6 180:8,20

**carol**  106:15,20 107:5

**carried**  180:10

**case**  6:7 15:5 16:9 17:3 30:6 34:25 41:1,5 42:14 82:13 85:20 88:7 89:1, 23 90:6 92:2,16,22 93:11 96:23 97:6 100:22 108:7 117:1 119:17 134:19 135:1,5, 9,10 136:19,21 137:15 144:12 145:7 151:18 164:22 165:20 166:23 167:9,13,17,21 173:1 174:17 175:16 178:1 181:21 184:8 185:13,16 186:1,4,6,8 187:10 188:12 189:10

**cases**  116:14 169:14

**cash**  15:15 16:16 35:12 36:6 39:18 41:25 42:3 55:3,13 56:6,13,16,19 57:10,11 122:7 147:8

**catalyst**  151:21

**categorically**  24:10

**categories**  23:6,10,12, 14 24:8 45:7,15 68:1 80:14 110:23,25 164:7

**categorized**  159:9

**category**  19:23 23:17, 19,23 24:10,16 79:7 80:9 81:21

**category-by-category**  23:3,7

**Cecil**  21:1,4 87:13,15, 18 88:3,5,6,23 91:14,22 95:21 96:4,6,19 97:17 105:24 177:21 183:10

**Cecil's**  182:18

**certainty**  164:4

**certification**  75:17 144:5

**certified**  107:21 122:10 143:19 144:3 175:20 176:1

**certify**  191:14,17

**CFES**  176:5,8,12

**chain**  45:10

**challenge**  55:15 57:4

**challenges**  15:8 16:13 35:19 36:2,4

**challenging**  151:6

**chance**  29:12 148:7 158:4 184:21

**Chandler**  7:19,20,24

**changed**  190:6

**character**  173:4

**characterization**  100:20

**characterize**  92:9 129:14

**characterized**  159:9

**charge**  159:4

**charges**  164:9

**Charlene**  7:3

**chart**  37:14 48:21,25

49:1,7 77:21 113:4 152:18

**checks**  25:25

**Chinese**  85:19 86:14 95:14

**choose**  149:3,15,18

**chose**  171:10

**Christopher**  14:17

**churn**  47:17

**churning**  31:4

**Circuit**  9:8 185:9,18 186:8 190:6,13

**circular**  95:17

**circumstance**  170:11

**circumstances**  170:1

**citations**  83:6

**cited**  47:20

**city**  52:13 53:8

**city's**  52:23

**claim**  32:17 33:8,9 84:3 146:18 178:10

**claimants**  50:15 169:3

**claimed**  26:6 29:15

**claiming**  84:2 102:15 160:3,6

**claims**  30:23 33:10,13 49:16

**clarify**  39:2 46:14 75:9

**clarity**  79:9,10

**Clark**  20:11 21:2 88:9 98:10,11 185:14

**classes**  88:21 122:16

**classified**  109:23

**classify**  80:12

**clean**  14:8

**clear**  22:2 57:7 93:21 98:1 172:1,5 175:21 181:18

**client**  60:17

**clock**  14:12 141:17

182:10,11

**close**  57:1,25

**closing**  57:1 145:21

**collateral**  95:18

**college**  88:21 143:20

**column**  50:5 52:3

**comfortable**  186:25

**comments**  187:12 190:17

**commercial**  36:18

**commingled**  66:5 69:9 102:3 131:19 132:11,21 133:21 153:14,22 154:23 169:4 170:18 181:8

**commingling**  16:21,24 17:3,8 18:8 25:9 67:13 92:2,5,9 101:14,25 111:13 112:6,10,12 114:12 117:12 128:23 129:8 130:1,24 140:15 153:2 157:10 158:3 159:4,8 169:16,22 179:23 180:2 181:13

**commission**  6:13 45:3 85:19 97:5 99:1,19 106:1 111:4 125:10,17 126:4 127:6,10 128:21, 25 129:7,10,20 130:3 131:5 134:20 136:18 138:25 139:25 141:22 184:8 187:13 189:19 190:25

**Commission's**  103:8 125:23 129:6,14

**common**  18:4 154:21

**community**  36:16,22 145:3

**companies**  18:13 19:9 45:23 49:10,20 56:6 62:25 63:3 64:9 65:13 66:14 67:22,23 72:19 108:1 121:4,24 123:17 124:10,15 130:1 134:21 145:22 151:4 157:15 158:8,18 180:17 181:6

**company**  57:1 66:9 68:4,5,9 70:23,24 72:5

88:8 109:24 111:19 116:2 118:1 121:19,20 124:8 146:22 155:21 159:10 164:10 180:24

**company's** 159:15

**comparable** 119:9

**compare** 112:10

**compared** 36:19

**compensation** 166:21

**compiled** 156:21 162:13

**complaint** 171:22

**complete** 29:25 81:9

**completed** 39:23 130:23 131:5 184:25

**completely** 89:21 169:7

**complex** 27:13 34:21

**complexes** 27:1,6

**compliance** 41:19

**complicated** 152:8,13

**complies** 92:16

**comply** 191:18

**component** 27:17

**comprehensive** 119:10

**comprised** 114:17

**concern** 27:24

**concerned** 67:4

**concerns** 190:17

**conclude** 72:18 153:13

**concluded** 172:5 173:1 176:8 191:8

**concluding** 173:15

**conclusion** 21:17 91:19 105:9,17,20 121:15,17 125:23 133:11 148:14,20,23 150:5,10,12 153:17 155:11,17 175:1 179:4, 21 180:16

**conclusions** 43:22 76:14,15 97:9 98:18 99:8 115:9 121:3,8 131:19 134:3 141:4 142:9 146:20 150:6 160:15 186:14,23 187:8 190:10

**conditionally** 44:3

**Conference** 191:19

**confirm** 79:15 125:17 127:10 132:4 138:25

**confirmed** 140:1

**confronting** 151:2

**confusing** 6:23

**confusion** 78:22

**conjunction** 182:11

**connected** 27:5

**connection** 12:8 13:4, 8 43:10 97:10 108:6,19 178:1 181:20 182:20

**consequences** 50:16

**considered** 32:15 94:25 118:17

**consistent** 119:3 148:16 150:7 157:16,21 159:3 161:8

**consistently** 149:5 155:6

**constitute** 51:6

**constructed** 76:4

**consultant** 150:21

**consulting** 53:24 174:24 175:10

**contacted** 85:12,17,18

**contend** 178:23

**contest** 177:15

**contests** 37:24

**context** 153:9 161:10

**contiguous** 145:1

**contingent** 61:12 141:8

**contingently** 142:13

**continue** 15:20 16:16 61:17 62:17

**continued** 54:20 61:20

**continues** 36:6 55:9 86:21

**continuing** 61:13 62:6 84:5 144:14

**contract** 62:16

**contracted** 113:2

**contracts** 112:21

**contractual** 60:21

**contrary** 30:5

**contributions** 111:5 131:23

**contributor** 28:9

**control** 128:23 129:8 180:20

**controlled** 17:12 79:3 81:3 113:11 181:9,12

**controls** 8:5

**controversy** 151:22

**convenience** 188:2

**convenient** 189:14

**conversation** 81:17

**copies** 103:18 104:13, 14 166:7 189:4,13 190:11

**copious** 185:22

**copy** 15:3 103:8,23 104:8,11,15 135:23 147:21 148:2 164:24 166:18 189:15 190:8

**corporate** 14:24 17:18 129:19 153:22

**Corporation** 88:18 107:19

**correct** 17:23,24 18:21, 22 22:18 24:7 26:10,11 44:25 45:24 46:4,6,19 47:3,14,15,19,21 48:7, 10 49:5,6 50:4,7,9,10, 12,21 51:8 52:14,15 54:15,22 56:14 60:25 62:8 64:4 65:23 66:6

71:1 72:17 73:19 74:3, 5,10,13,15,18,19,22,25 76:13 77:11 78:1,6 84:23 85:17 90:14 93:2, 3 94:14 98:8,19,21 99:13,14 100:9,18 101:10,11 102:18,21,22 104:18,20 105:22 110:14,15 121:14 122:21 123:18 124:22 126:5,14 127:15 132:13 136:5 137:2 139:22 153:20 168:2,9,17 169:5,11 170:3 171:19 174:2,7 175:24 176:15 180:18

**correctly** 123:12 169:19 180:13

**correspondence** 109:6 121:21

**cort** 7:4 10:14 14:2 150:2

**Cortney** 14:17

**cost** 33:21 40:1 75:17 81:12

**costs** 50:2,3 52:21 69:24,25 71:4 164:12

**counsel** 6:18 7:10,12 60:2 63:14 119:24

**counties** 145:1

**couple** 21:23 25:8 40:9 46:22 56:20,23 60:19 63:13 72:10 83:1 89:19 105:13 118:2 144:15 146:6

**court** 6:3,4,14,20,22 7:1,5,22,25 9:16,20 10:4,10,17,20,24 11:9 12:7,15 13:3,9,19 14:4 15:5 18:7 21:19 22:15 23:13 24:11 25:18 26:17 27:11 28:21 29:3, 22 32:20 33:19 39:13, 16 40:17 43:10,19,25 44:8 48:18,20 51:14 67:17 78:11 79:17 82:4, 16,25 85:4,6 87:4,7,14, 20 88:13 90:9,15,24 91:6 93:9 95:23 99:25 100:25 103:11,13,20 104:15 106:4,7,11,16,

18,22 108:10 115:2,12 117:8 118:13 119:6 120:15 126:18,19,22 127:1 128:12 129:17 130:6,11 135:18 137:9, 14,18,20,21 138:9,14 141:1,5,11,16,19 142:3, 11,22 143:2,4,8 145:2 148:1 151:13 156:13 157:19 161:25 162:2 163:24 164:18 165:5,9, 15,19,22,23 166:3,9,13, 14 175:23 182:1,7 183:3,17,22 184:4,5,12 187:17,20 188:3,18 189:6,13,15,18 190:1,4, 16,20 191:5,6,7,19,23

**Court's** 12:11 188:2,17

**court-appointed** 14:18

**courtroom** 14:3 87:9, 19 106:17,21 143:3,7 182:4,12

**cover** 13:1 124:9 179:25

**covered** 43:12

**covers** 175:7,9

**CPA** 88:10 143:22 144:9

**crazy** 185:17

**create** 113:4

**created** 64:24

**credit** 38:18,19 131:22 164:5,9

**creditor** 7:21 93:10

**creditors** 86:20,22,25 94:4

**Creek** 17:17 26:2 33:4 57:12 62:14 70:1,6,23 71:21 86:18 116:3 168:1

**critique** 173:11 175:4

**critiqued** 174:5

**cross** 82:8 90:13 138:6 165:16

**cross-examination** 44:12 90:10 96:2 106:2

120:19 166:15

**cross-examine** 90:22 91:3

**CRR** 191:13

**CSR** 191:13

**current** 16:15 19:17 32:5 72:23 73:10 120:4 160:10

**custodian** 14:25

**cut** 10:5 55:7 103:5,17

---

### D

**D4** 70:2

**D4ds** 172:23

**daily** 82:23 85:12,15,16 86:11,12

**Dallas** 36:16,18 145:2 191:24

**damage** 145:4 175:14

**damage-type** 175:11, 13

**Daniel** 7:20

**data** 144:16 148:25 155:7 174:25

**date** 9:7 40:23 79:4 103:3 104:4,6,7,18 115:21,24 116:1 133:23 134:25

**dated** 135:12,17 147:23

**David** 7:21

**Davis** 186:1

**day** 6:22 20:19 30:20 40:1,10 62:23 81:13 82:18 92:12 93:17,18 118:5,6 133:24 171:3,4 191:21

**day-to-day** 34:12 82:14 83:16 84:19

**days** 103:25 135:10 186:24

**deal** 34:18 153:25

**debt** 35:12 42:11 49:25

**decades** 144:8

**December** 39:7

**decent** 17:7

**decide** 11:21

**decides** 165:22

**decision** 13:4

**decisions** 84:20

**deck** 83:7

**declaration** 10:21 15:4,7 16:8,19,25 17:10,21 18:15,17,21 19:1,3,4 21:5 22:7,10, 21,23 23:16 24:6,13 25:4,14,16 26:10,22 27:4,15 37:5 38:4,21 42:16 43:5,18 44:21 45:1,12,18 48:15 51:13, 23 53:3,5,6 55:6 66:4 68:24 72:14 73:11,14 76:12,23 79:25 80:3,10, 21 88:25 89:2,10,12,16, 22 91:16,21 94:3,10 95:6 96:6,16,19,20,22 97:1,9,14,18 100:23 103:18 108:9,10,17,23 109:8,15 110:8,17 111:6,10 112:14 113:5, 20 118:22,24 122:24 123:4,14 124:1,17 126:8 127:8,18 131:4, 10 134:4 135:8,16 136:2 138:20,22,24 139:7,10,21,25 140:6,9, 12,24,25 145:17,18 147:19,23 148:3,8,15 150:2,6,17,22 152:25 153:1,12 155:15 156:6 159:12,13 164:21,25 165:4,25 182:25 188:11,15,25 189:3,7, 12

**declarations** 108:12 146:14 159:21,22 160:10 163:3 171:17

**decreasing** 36:9

**default** 62:10,12,20,22

**Defendant** 6:17,19 79:3 96:5 98:24 99:16 117:1 120:23 134:13 145:7,9 184:8

**Defendant's** 128:17 151:16 165:14

**Defendants** 44:16 108:25

**defense** 29:11 63:14 126:20 128:19 142:25 156:12,17 162:5 189:5 190:19

**definition** 159:7

**degree** 107:13

**degrees** 143:25

**delayed** 32:12

**delta** 30:16 31:4 47:17

**demonstrated** 121:12

**demonstrative** 151:8

**denied** 188:13

**Department** 76:5 107:17

**departments** 68:17

**depending** 27:25 55:13 76:17

**depends** 52:19

**deploying** 147:16

**deposit** 107:19 171:3

**deposited** 29:17 94:19 95:3 118:8 154:2 170:16 176:21 177:12

**deposits** 95:12,14 104:22 105:3,10,18 109:22 114:9 156:23,25 157:2 162:13,18,21

**deputy** 14:3 87:19 106:21 143:7 182:12

**derivative** 102:4 105:19

**derived** 19:5,7 114:2

**describe** 15:10,23 17:3 25:18 129:5 144:24 156:20

**describes** 53:6

**describing** 153:9 177:19

**description** 38:12

**designation** 185:24

**desk** 59:7

**Desoto** 76:1

**destination** 104:6
159:23

**detail** 82:17 111:7
123:24

**detailed** 17:21 18:13
27:15 34:23,24 42:21
63:10

**deteriorating** 84:4

**determination** 17:15
33:6 36:7 37:7

**determine** 17:12,25
19:17,22 20:1 37:13
49:23 52:2 80:19
101:18 108:3 110:3
113:10 117:21 119:1
133:13 160:18 175:17
176:25 180:23 181:12

**determined** 21:14
36:11,23 47:6,8 80:3
89:14 91:14 115:3

**determining** 20:20
181:5

**develop** 27:22 61:22
84:10,15,16 151:4

**developed** 28:2 83:19
188:25

**developer** 62:19

**development** 18:10
24:23,24 28:9 29:18
51:1,8 52:12,13,19
53:13,21,22,23 54:1,3
55:24 60:22 61:14,17,
18 62:7,11,12,14 64:2,
5,8 66:8,12,13,19 67:12
68:17 75:21 76:6 82:9
94:20,24 95:4 101:15,
18,23 111:16,17,25
115:20,23 117:18 118:9
123:6 124:17 127:17,
19,20 132:3,7,8,10,12,
18 133:1,4,9,13 153:16
155:19,23,24 156:3
157:15 158:6,8 176:22
177:13 180:9,21 188:24

**developments** 62:15
70:17 77:5

**device** 169:9

**diagram** 24:22 105:10
151:17,21

**difference** 47:17,24
163:4,12

**differences** 163:8

**difficult** 42:2 95:15
130:25

**digest** 9:24

**diligence** 36:21

**diminishing** 84:8

**direct** 14:13 69:18
72:13 82:8 88:1 92:24
107:1 127:20 143:13

**directed** 65:25

**directly** 23:18 132:8
152:2 157:2,3 170:7,11,
15

**director** 88:17

**disaggregating**
154:22

**disagree** 53:10,11
76:15

**disagreement** 62:9

**disbursements**
178:18

**discard** 190:11

**disclose** 91:4

**disclosed** 97:22

**discount** 62:5

**discounting** 140:5

**discuss** 15:8 125:4
127:19

**discussion** 74:8
125:12 181:22 184:18

**discussions** 181:19

**disgorge** 37:9

**disoriented** 6:25

**dispute** 65:11 76:20

**disputing** 179:5

**disregard** 41:18

**disrepair** 16:3 35:19

**distant** 152:19

**distinction** 67:25

**distinguish** 153:21

**distinguishing** 157:9

**distracted** 30:9

**distribution** 93:10
169:2

**distributions** 164:11

**district** 145:2 185:16
191:24

**districts** 52:25 53:7

**diverted** 163:19

**divided** 23:11

**Division** 191:24

**DJD** 24:20 25:1 31:14

**DLP** 57:13 62:4,17

**docket** 8:15 35:9 58:18
189:8

**document** 44:4 128:16
134:7 156:7,20,21
162:12 165:21,23
189:10

**documentation** 65:3,
15,20 109:5 121:20
158:21 159:3

**documented** 134:3,5
163:10

**documents** 17:17 19:8
30:19 59:17 61:19
65:17 90:3,5 91:2,8
99:10,12,15,18,21
100:2,4,5,9,11,14,16
101:6 106:1 125:2
141:10 142:16 145:22
156:1 165:13 182:19

**dollar** 39:25 65:10
71:16 81:10 154:13
164:15

**dollars** 31:6 39:8 58:16
59:21

**double** 53:14

**doubling** 53:8

**doubt** 65:7

**downs** 55:16,17

**downward** 37:2

**dropped** 60:18

**due** 11:15 12:3 13:16
21:20 44:1 59:5 67:13
90:12,13 114:12 115:13
117:10 118:14 119:7
141:7 158:15

**duly** 14:2 87:18 106:20
143:6

**E**

**e.g.** 178:16

**earlier** 16:12 44:25
122:24

**early** 20:25

**easiest** 34:9

**easily** 84:7

**ECF** 103:16

**echo** 166:19

**economic** 73:5

**economics** 107:13

**editorial** 128:10

**edits** 128:5

**Edney** 6:16,24,25 8:18
9:14,15,18,21 10:8,25
11:2 21:16 22:13 26:15
28:18 29:2,21 33:18
39:12,14 40:15 43:20
44:10,11,13,15,18
48:19,22,24 51:15,16
67:19 78:8 85:5,8 87:2,
4 89:18 90:14,17 91:1
95:24 96:1,3,4,13
100:7,8 101:4 103:10,
12,19,21 104:8,11,17
105:23 106:6 115:6
117:6 118:11 119:4
120:16,18,20,22
126:17,20,24 127:2
128:8,15,18 129:22,23
130:21 137:6 138:7,12,

22 141:2,16,17,19 142:6,15,19,24,25 143:11,12,14 147:25 148:2,4 151:12,14 156:10,14,15 157:24 161:23 162:1,3,8,10,11 164:1,18,20 165:2,11, 12,17,19,25 166:5,25 177:20 178:4 182:5 184:5,6 185:7 187:16, 19,22 188:19 189:9,17 190:3,15,18 191:4

**Edney's** 183:25

**education** 144:14

**educational** 144:1

**effect** 36:17 153:14

**effective** 10:7 33:21 40:1 81:12 128:24 129:9

**effort** 105:2 157:5 159:13 163:2

**efforts** 32:6 36:6 120:5

**Eighty-two** 48:18,19 126:12

**electricity** 70:5,15 71:3,11,20

**email** 86:14 109:5 121:20 138:11

**emails** 82:23 86:11,24

**embroiled** 35:15

**employ** 54:20

**employed** 69:13 107:6 150:21

**employee** 34:15 54:21 68:4,15 69:2 70:22 72:4

**employee's** 68:16

**employees** 27:18 69:7, 20 70:7,8,12 81:18 160:23

**encapsulating** 98:18

**encounter** 16:21 112:6

**encountered** 35:25

**end** 8:19,22 13:12 20:19,21 30:20 32:10, 11 39:24 40:1 45:24

64:25 66:24 89:11 103:2 125:15 138:22,23 139:24 167:7 184:25 185:2

**ended** 57:22 121:23

**ending** 93:17,19 149:7 150:15

**enforceable** 180:10

**engage** 133:12 147:12

**engaged** 128:22 129:7, 25 181:23

**engagements** 145:5

**engages** 148:11

**engine** 155:23

**English** 86:8

**entail** 161:18

**entails** 83:15

**enter** 188:15

**entered** 53:13 55:20 56:23 60:7 106:17 112:22 143:3

**entering** 41:15

**enterprise** 18:4

**entities** 14:21,25 17:13,23 18:1 19:15,18, 22 21:10,12,13 22:3,10, 11,18,20 23:2,4,11,17, 18,19 24:1,3,13 26:2,5, 8,9,12,22,25 27:3,5,13 33:7,12,17 34:15 37:8, 25 39:3 45:2,8,12,14,25 46:2,5,7,15,16 47:2 50:12,24 56:12,24 60:21,23 61:13 62:24 63:2,6,22 64:1,8,16,22 65:11 69:10 70:3,16 71:5 76:16 78:13,24 79:11,16 80:4,5,12,15 81:2,6,7,14,20 82:2 89:5 92:12 93:24 95:10, 11,19 101:14,22 110:3, 9,13 111:2 112:13 113:8,11,25 116:10 119:13 120:9 123:5,6, 15,17,24,25 124:5,9,13, 14,19,25 125:1,4,6,8, 13,18,24,25 126:1,5,10 127:5,9,11 128:19,24

129:4 130:4,15,18,23 131:6,20 139:1,13,14, 19,20 140:2,8,20 151:3, 24 152:2,4,6,7,14,15 153:15 156:2,23 158:5, 7 161:16,20 162:15,21 163:14 172:6,11 173:15,20,25 180:7,10, 12,19 181:9 189:2

**entities'** 16:20 42:24

**entitled** 156:18 191:15

**entitlement** 60:21,22

**entity** 18:20 19:19 20:4 21:15 23:8 24:7,9 25:5 26:13 27:8 29:18 31:7, 13 32:18 33:9 40:14 54:21 66:13 68:12 69:13 78:19,20,21 94:20 95:3 109:1,18 111:2,16,19,21,23,24, 25 115:4 116:23 117:15,17 118:3,5,9 120:11 127:17 128:24 129:1,9,11 132:16 153:8,10,22 154:8 156:24 158:16 160:8, 13,16 164:9,12 167:3 170:8 172:20 173:3 176:21 177:12 179:16

**entity's** 180:21

**entity-by-entity** 22:25 23:8 24:6

**entries** 49:8 50:6 116:6 124:7 180:24

**envelope** 37:15 49:22

**equity** 84:4,8 86:16,18, 19

**Erik** 188:20 189:12

**escrow** 57:18

**essentially** 28:23 54:12 90:17 127:15 171:21

**establish** 52:24 181:7

**estate** 16:1 23:21,22,24 24:18 36:13,18,22 49:3, 15 50:23 55:24 56:24, 25 61:24 77:19,23 121:5 155:24

**estimate** 50:14 58:21 117:11 169:14 171:12

**estimates** 93:15 94:9 114:21

**estimating** 94:12

**estimation** 175:15

**et al** 6:8

**evaluate** 145:7 146:16 150:16

**evaluating** 82:9

**evaluation** 47:23 145:16

**event** 31:23

**eventual** 86:22

**eventually** 20:15 30:23 64:21

**evidence** 44:5 73:18, 23 74:1 79:2 125:9 128:17 135:9 141:7 142:17 165:14 173:6 184:11 186:12 187:3 188:16

**evidence-generating** 184:7

**evidence-producing** 184:15

**evidentiary** 8:17 11:7, 12 186:17

**exact** 40:10,22 47:8,9 93:16 171:12

**examination** 14:13 79:21 85:7 88:1 107:1 138:17 141:8 142:14 143:13 177:20 189:22

**examined** 19:25

**examiner** 107:20,21 175:20 176:1

**examiners** 176:9,12

**examples** 16:24 20:3 22:25 24:9 25:3,9,12,15 26:21 32:3,13 38:11,24 40:3,20 45:2,6,14,17 46:1,6 66:7,10 69:1 71:14,18,24 72:22 73:5, 7,11,13,15,17 76:10 78:3 93:12 94:5,9 97:13

98:3,12 117:24 139:8 160:20,21 161:8 163:9 167:24 168:16,22 171:18 172:2 174:5 179:14 181:16 189:1

**Excel** 145:21

**exceptional** 56:5

**excess** 78:2

**Exchange** 6:13 97:5

**excluded** 26:6

**excluding** 156:22

**exclusively** 76:4

**excuse** 158:1

**excused** 87:8 106:11 141:20

**execute** 62:17

**executed** 135:25 136:2

**exercise** 66:2,18 133:12 134:2 157:14

**exercising** 57:3

**exhibit** 11:22 12:21 13:11 15:2 21:8,12 22:4 24:19,22 31:6 43:17 44:5 78:14 88:23 89:7, 10,11 91:16 96:9 102:9, 11,12,14,15 105:7,12, 20 108:23,24 111:9,10, 12,22 112:15 113:19, 20,23 114:2,6,22 115:3, 16 116:6,9,10 118:21 119:3,15 121:13 123:23 124:4,14 125:6 126:1,7, 20 127:8,16,23 128:5,9, 17,19 129:4 131:13,14 138:20 139:15 140:7,13 147:23 148:10,15 149:11 151:9,16 156:12,18 162:5 165:20 166:4,17,19,20 181:15 183:7,10,16 184:20 187:4 189:5

**exhibits** 10:23 12:10, 12,24 13:13 45:18,23 76:11 89:13 98:3 101:10 108:13 140:23 141:12,25 142:1,5 150:24 165:3,14 177:6 182:22 190:7

**exist** 77:5,7

**exited** 180:7

**expect** 12:15,16 155:2 159:18 163:12 167:6

**expectation** 167:22

**expected** 50:1

**expedited** 184:23 191:1

**expenditure** 133:1,4

**expenditures** 110:22

**expense** 133:8

**expenses** 38:10 40:7, 8,14 109:22 111:3 131:22 132:2 164:11 178:17

**expensive** 30:3 33:22 57:25 58:13,14 65:8 71:15

**experience** 17:2 20:18 55:23 60:14 88:13,15 92:8 112:9 144:1 146:24 153:19

**expert** 21:17 40:15 43:23 89:20 90:19,20, 22 100:21,22 115:9,10 141:3 169:13,21 171:5 173:14 185:4,8,10,18, 20,24

**expertise** 176:16

**explain** 18:6 23:13 94:1 140:13 148:22 149:21 151:9,18

**explaining** 150:23

**explanation** 149:24 160:12 170:2

**extensive** 17:4,8 52:21 58:13 92:11 101:13 112:12 114:12 128:22 129:8,25 130:24 140:15 153:2 188:11,25

**extent** 81:25 170:22 177:2 181:12,16

**extra** 182:8

---

**F**

**F.4th** 186:2

**face** 170:8,12

**facing** 15:8 16:13 35:6, 19

**fact** 22:8 31:23 95:2 100:23 118:7 129:13 130:9 135:12 140:14 162:23 167:17 169:24 170:25 171:25 177:18 186:14,23 187:2,7 190:10

**factor** 68:12

**factors** 34:2

**factual** 129:16 130:9

**failed** 178:10

**failure** 171:22

**fair** 13:17 49:18 66:16, 17,21 67:11 73:25 85:16 97:3 128:21 129:5 139:10,17 142:12 166:9 169:22 171:23 187:19

**fall** 19:23 21:13 79:6 80:4 110:22

**familiar** 11:6 26:5,24 174:12

**familiarity** 144:18

**family** 66:14 111:4 145:2

**Farms** 62:15 74:21 189:3

**fashion** 8:17

**FASME** 174:12 176:5

**fast** 157:17

**favorable** 53:13

**FDIC** 107:18

**feasible** 84:17

**federal** 107:19 185:12

**fee** 59:4,10

**fees** 50:2 58:4,11 60:22 191:18

**fewer** 22:17

**FHC** 102:16,21,23

**fictional** 169:9

**field** 86:24 155:1

**FIFO** 154:14,16

**Fifty-six** 46:7

**fight** 30:24 51:19 77:15, 18

**fighting** 59:18

**figure** 8:6,8 10:6 20:21 47:5 175:14

**file** 8:23 20:15 28:10 59:4 97:5 145:21 183:2, 6,14,17,24 184:19

**filed** 10:20 13:7 40:21 97:1,2 108:10 114:8 135:18 156:6 165:20 166:1

**files** 19:8 63:5,18,21 100:6

**filing** 35:9 89:24 185:6

**filings** 16:9 28:1 30:5 34:24 37:24 41:15,17 43:4 57:6 60:14 63:10 83:1 89:22

**final** 60:19 93:9 94:4 98:17 159:22

**finally** 163:16 181:19

**financial** 16:21 18:21, 23,25 19:5,6,10,16 25:11 27:7 38:6 40:8 62:18 84:17 88:21 89:5, 17 91:17 92:5 108:2,5, 18 112:4,7 113:9 122:17 175:8,9 176:10, 14 179:6 183:18

**financing** 76:5,7

**find** 73:4 76:11 77:15 84:11 102:10 140:19

**finding** 93:12 177:15

**findings** 186:14,22 187:2,7 190:10

**fine** 187:21

**finish** 51:17

**finished** 61:4 75:21
138:4

**fire** 34:20

**firm** 20:8,13 54:17 58:4,
10,22 59:15,23,24 60:1,
3,9 63:18 146:2

**first-secured** 85:13

**fit** 79:12

**fixed** 83:8

**flaw** 103:14

**flip** 78:23

**flow** 16:16 24:21,24
39:2 42:4 45:8 55:3,13
110:1 122:8 144:20
147:9 176:9,13

**flowed** 18:9,11 20:2
32:24 66:24 94:7

**flowing** 46:10

**flying** 81:19

**focused** 98:2 144:14

**focusing** 32:10

**folks** 104:9 162:24
182:6

**follow** 9:11 24:21 67:1
116:6 169:15

**footnote** 105:18

**force** 65:12

**foreclose** 35:11

**foreclosed** 42:7

**foreclosure** 16:7 35:6,
8 42:6,9 85:1

**foreclosures** 35:23
41:13

**foregoing** 157:12
191:14,15

**forensic** 20:18,23
29:25 32:9 39:23 81:9
88:15 144:22 146:24

**form** 12:2 136:6 155:8,
13 159:21 161:7

**format** 116:7 191:18

**formation** 17:18

**formats** 145:21

**formed** 159:2

**Forney** 75:25 189:2

**Fort** 31:11

**Fortunately** 68:19

**forward** 36:3,5 53:20,
22 54:1,3,4,5 187:11,13

**found** 53:19 54:2 71:14
79:2 177:10

**foundation** 126:25

**fourth** 124:16

**Fox** 54:17 58:10,22
59:10,15,23

**fraud** 107:21 174:1
175:20 176:1

**fraudulent** 20:22 33:10
125:19 127:13 139:2

**freeze** 42:8 80:9,20
81:21 82:2

**freezing** 41:22

**frequently** 64:14

**Friday** 97:23

**Frisco** 86:19 167:25

**front** 15:3 20:19 21:9
32:10 39:24 88:24
108:14 122:25 125:3
126:6 131:11 166:17

**frozen** 42:4,5

**Frye** 14:1 87:17 138:1
190:2

**full** 48:7 65:2,5,7,9
71:13 88:3 95:16 107:3

**fund** 93:23

**funds** 15:20 16:22 18:9
20:2 21:15 22:12 23:1,
18 24:21 25:4,9 26:4
27:19,21 28:16,24,25
29:17 31:24,25 32:2,16,
24,25 33:3,5 37:9 38:7,
9,13,15,16,20 39:10
40:6,13 45:8,11,13
46:3,10,16,19 47:1 55:2
57:18,21 58:3,5 64:7
66:5,8,20 67:2,10,13,24

68:3,6,15,21 69:15,16,
18 70:4,9,10,24 71:2,6,
12,20,25 72:6,19,24
73:2 76:16,24 77:3 78:4
80:6 81:8 92:12 93:10
94:15,18,19 95:3,9
101:19,20 102:2,4,7,16,
19 105:4,11,19 108:3,
25 109:11,17 110:1,4,
11,20 111:1,7,14,15,23
113:12 114:1,10,14,16,
18,19 115:5,20,22
116:11,18,20,24
117:12,13,14,18,19,22,
25 118:4,7,18 119:14
121:10,11 123:7,9,11,
16 127:20 128:23
129:1,8,11 130:3,17
131:19 132:6,11,12,15,
18,19,21 133:1,4,5,6,7,
9,15,21,22,25 140:4,19
144:20 145:10 146:18,
21 151:3 152:8,12,19
153:14,22 154:7,8
157:6,10 159:5,8
162:24 163:13,20 167:1
169:16 170:18,20,23
171:1,6,8,13 172:7,8,
12,15 173:2,8,17,23
175:17 176:10,13,20,21
177:1,12 178:11,15,24
179:7,15 181:7

**fungibility** 157:23

**fungible** 152:9,10

---

**G**

---

**GAAP** 92:20 174:12
175:7 176:5

**GAAS** 92:20 174:12
175:8 176:5

**gap** 160:9 161:5

**gaps** 175:2

**gather** 148:24

**gave** 24:6,8 31:5 41:25
48:4 100:3,5,9 148:10
182:8,9

**gears** 34:1

**general** 13:24 37:1
70:25 121:1 156:22
158:13,23 161:19

164:13 172:14 180:11
184:15 186:5

**generally** 33:12 36:16
42:20 53:12 60:25
70:21 81:18 132:2
175:1,6

**generally-accepted**
149:2

**gentleman** 89:21

**Gibboni** 6:18 96:12
104:10,12

**Gillespie** 26:1 83:3,10

**Ginn** 29:11,15 91:24
92:1 93:1 94:3,15,21
117:1 143:1,6,17,18
145:6 146:16 152:22
156:16 157:4,12 160:2
161:15 162:4,12 163:2
164:21 165:3,25 170:5
173:10 177:8 179:25
181:19

**Ginn's** 30:12 46:24
92:14 96:25 97:9

**give** 11:14,21 12:2
13:16 21:20,22 27:11
43:25 49:25 52:23
79:10 82:16 86:9 90:11
115:12 117:9,24 118:13
119:6 128:1 137:25
141:6 143:10 161:23
164:19 166:4 183:13
186:22 187:5 190:13

**goatee** 11:14

**Goldmark** 25:22,25
72:12,20

**good** 6:21 7:1,19 44:14
51:15 53:19 55:10
120:21,25 190:20

**Government** 6:10

**governs** 186:4,9

**graduate** 88:21

**graduated** 143:22

**grand** 83:10 84:25

**grant** 44:2

**graphic** 162:8

**great** 55:9 93:14 166:5

187:23

**gregg** 91:24 143:1,6

**Gregory** 143:17

**gross** 74:15

**grounds** 28:20 29:21 33:18 39:14 40:16 43:21 89:19 117:6 118:11 119:4 141:2

**group** 21:13 26:24 67:21,22,23 79:12

**guarantied** 76:5

**guess** 46:12 67:20 73:14 142:6

**guide** 54:23 93:20

**guy** 90:2

**H**

**Hahn** 80:22 81:25 92:21 106:15,18,20 107:3,5,6,11 110:19 113:7,23 114:21 116:25 118:7,21 120:21 129:24 136:1 138:6,19 141:21 147:19 148:15 152:23, 24 153:13 157:4,13 159:12,20 163:3 172:7 173:13 177:9,21 178:10 179:14

**Hahn's** 128:9 140:24 149:12 153:12 171:16 179:5

**half** 31:6,8 38:18 48:4 72:25 104:24

**Hall** 83:14

**hand** 13:25 39:19 87:17 106:19 126:17 143:5 156:4,11 158:7 187:1 190:2

**hand-in-hand** 19:24 21:6

**handed** 127:4,17 156:16 190:8

**handing** 151:15 162:4

**handle** 182:17

**handwritten** 190:12

**Hang** 131:15

**happen** 53:2,16 70:14

**happened** 9:25 43:7 66:10 70:18 71:23,25 73:16 121:16,18 155:9

**happy** 9:22 10:1 135:23 165:21 184:3

**hard** 81:5

**harsh** 185:19

**head** 59:14,19 61:7,10 73:9 74:16 105:5

**hear** 7:9,13 9:17 91:9 163:6,21 183:23,25 187:17

**heard** 41:9 44:25 163:17 186:12

**hearing** 6:7 10:23 13:2 90:8 142:5 165:8,10 186:17 187:4

**heat** 9:3 11:20

**held** 32:17 33:2,8 36:24 50:24 70:3,12

**helped** 17:7 70:7,8

**helpful** 10:6 62:3 116:15 182:24 183:1,8

**helping** 36:13 97:15 98:7

**helps** 70:23

**hereto** 123:23

**hesitant** 47:9

**higher** 36:17 75:5,6 113:1

**highest** 8:7

**highly** 56:9

**hinder** 36:6

**hindsight** 9:2

**hire** 54:19 62:19

**hired** 20:24

**hold** 23:21 26:25 81:7, 22 99:25 129:19

**holdings** 26:3 51:6 104:23

**holds** 23:24 24:17

**Honor** 6:11,16 7:19 9:15,21 10:8,9,13 11:2 12:5,23 13:18 26:16 28:18 39:15 41:14 43:16,20 44:7,11 48:22 67:15 78:10 79:14,15 81:24 85:5 87:6 89:19 90:21 91:12 96:1 100:20 103:10,12,15,19 105:23 106:6,10,14 115:6 117:7 118:12 119:5 120:14,18 126:25 128:8,11,15 129:12 130:5 137:8,13 140:22 141:2,14,23 142:6,18, 19,21,25 143:12 147:25 151:12 156:11,16 161:23 162:1 165:2,8, 12 166:12 181:25 182:6,15 183:21 184:3, 6 187:15,16,23 188:6, 13,20 189:9,17,25 190:3,15,18 191:4

**hope** 77:19

**hoped** 58:15

**Hospitality** 25:23 26:1 72:12,20 123:6 124:18 127:21

**host** 17:16,20 26:3 34:22

**hot** 34:18

**hour** 145:12

**hours** 9:3 144:13

**housekeeping** 182:16

**Housing** 76:6

**HR** 27:19 69:12,15

**HUD** 27:1,5,12,23,25 28:4,8,11,13,25 34:10 37:20 68:16,20 69:4,9 70:8,17 74:7 75:18 76:21 77:6,7,17 152:15 167:25 168:4,18 188:24 189:1

**huge** 83:4

**human** 185:21

**hundred** 59:21

**Hunton** 60:3 63:17

**hurdle** 16:15

**I**

**idea** 24:1 50:13 59:24 97:21

**ideas** 40:2

**identification** 141:11 149:8,23 154:12

**identified** 18:19 22:10 25:15,19 89:23 109:21 123:18 124:1 125:1,14, 16 128:20 129:5 146:19 150:13,19,20 160:20 161:2,20 162:16 164:8, 13 168:7 170:17 172:7 174:18 176:17 177:2 179:11

**identifies** 149:2

**identify** 114:9 119:13 120:9 149:11 150:14 152:11 155:4 156:24 160:19 169:1 170:19 171:17,22 174:15,20

**identity** 169:8

**immediately** 188:1

**impact** 31:25

**Imperfectly** 138:7

**important** 10:9 24:16 41:11 160:2

**imposed** 62:21 126:5

**impossible** 153:18,21 169:10

**improved** 123:10

**improvement** 52:25 53:7

**incapable** 62:6

**include** 14:22 84:1 114:17 116:17,19 140:8 184:20

**included** 10:19 22:7 37:20 116:22 139:13

**includes** 92:14 123:25

**including** 109:5 131:21 153:10

**income** 57:9,11

**incompetent** 115:10

**incomplete** 172:3

**inconsistent** 47:5,7,13

**incorrect** 180:3

**increase** 50:25 52:16 53:12,14

**increasing** 36:9

**incredibly** 34:18

**incurred** 178:17

**indefinite** 42:13

**independent** 67:7 71:19

**independently** 18:1

**indiscriminate** 159:4, 8

**individually** 37:1

**individuals** 17:20 151:23 152:1

**indulgence** 188:17

**industry** 61:24

**inefficient** 33:22

**information** 21:5 42:19 85:24 86:3 89:15 91:15 109:23,25 114:6 125:3 139:9 181:1 183:18

**informed** 128:9

**Ingleside** 74:24 75:4, 25 189:2

**inherited** 84:18

**initial** 81:4 181:22

**initially** 20:12 75:11 95:19

**initiated** 135:11

**initiation** 134:19 136:19,21

**injunction** 8:13 186:16

187:9

**instance** 45:7 64:12 68:16 71:3 83:3 111:18 116:9 170:15 183:9

**instances** 25:8 33:3 39:22 64:20 110:7,12 170:14

**instructed** 48:12 65:8 180:23

**insufficient** 114:15

**insurance** 42:10 55:15 78:19 80:18 81:1 83:12 107:19

**inter-companies** 64:20

**inter-company** 64:10, 15 65:3,12,16,18,22,23 66:1 158:15,22 159:14

**inter-dependently** 18:3

**interest** 26:25 36:17 57:13 61:1,23 83:22,23, 24 84:1 123:8,9 160:3,6

**interested** 86:23

**interests** 60:23

**interfered** 43:1

**interim** 15:4 43:18 58:23 88:25 154:1

**intermediate** 93:1,22 117:3 169:1,20 170:6 171:11

**Internet** 70:15

**intervene** 188:12

**interview** 136:18

**interviews** 136:24

**introduction** 43:23

**inventor** 93:23 111:23

**investigations** 88:17, 22 107:25

**investigative** 92:10

**investigator** 176:3

**investigators** 176:6,9, 13

**investment** 177:11

**investment-related** 109:5

**investments** 111:3

**investor** 20:2,5,20 21:14 22:12 23:21 25:4, 9 26:4 27:20 28:15,24, 25 31:10,16 32:16,24 38:7,9,13,16,20 39:10 40:6 45:11 46:16 66:23 67:9 68:15,21 69:15,18 70:4 71:6,20,25 77:9 81:8 86:14 93:10 94:18 108:3 109:4,11,17,22 110:4,11,20 111:1,14, 15 112:23 113:12,25 114:9,10,14,16,18,19 115:5,20,22 116:11,18, 20,24 117:13,14,19 118:4,18 119:14 121:10,11 123:7,8,11, 15 127:20 130:17 131:19 132:6,15,17 133:5,7,9,15,21,25 140:4 154:6 160:8 171:1,8,13 172:7,8,11, 15 173:2,8,17,23 176:21 178:24 179:7,15

**investors** 23:19 28:14 30:7,15,24 37:10 41:5, 24 45:13 57:23 58:2 77:20 82:20 85:21,25 86:5,16,25 94:4,22 95:1,15,19 109:1 110:6 112:18 113:1 179:9

**involve** 56:24 61:3 146:22

**involved** 114:14

**involves** 50:15

**ironically** 185:13

**IRR** 78:19 80:13

**Irrevocable** 78:18 80:18 81:1

**issue** 12:4 19:20 27:9 46:21 78:13 113:5 134:21 151:10 155:3 174:17 177:17 179:21 182:16 184:10 185:4,8, 9

**issued** 135:10

**issues** 9:12 10:3,16 34:17 35:24 75:11 83:9 125:15 129:15 144:12 181:3 187:12

**item** 127:17,21,24

**iteration** 63:8

---

**J**

---

**Jeronca** 55:9

**JMJ** 18:9 27:18 29:18 62:11 64:5 66:8,12,19 67:1,3,5,12 68:3,15 69:8,17,20 70:19,21 94:20 95:4 101:15,18, 22,24 111:17 117:17 118:9 123:6 124:17 127:17,19,20,21 132:2, 7,8,10,11,18,25 133:3, 8,13 152:6 153:15 155:19 157:15 158:8 176:22 177:12 178:15

**JMJ-RELATED** 72:4

**JMJAV** 115:25 123:7 124:18 127:22

**job** 55:10 68:16 84:13

**Johnson** 188:20 189:12

**joining** 107:15

**judge** 11:13 138:13 185:16

**judges** 11:10

**judgment** 7:21 12:4

**judicial** 33:6 191:19

**July** 59:6

**jump** 160:24

---

**K**

---

**Keefe** 6:11

**keepers** 190:7

**keeping** 182:10 190:8

**Kelli** 183:5 191:13,23

**key** 153:15

**Khusol** 69:13,14

**kick** 49:3

**kind** 18:4,11 24:21 31:17 37:15 66:12 67:21 83:2 98:17 144:17 151:9 185:5 186:18

**Kirk** 53:3

**knew** 20:14,17

**knowledge** 121:24 122:2,7,19 130:12 134:12 147:2,5,8,12,17 154:25

**Koonce** 7:3 10:18

**KPMG** 88:16

**Kurth** 60:3 63:18

**L**

**label** 177:3

**labor** 161:4

**lack** 16:15 41:19 79:9 131:1

**laid** 45:17 68:23

**land** 24:20 25:2 31:15 51:7 52:8 53:9 83:14 84:14 152:15

**large** 107:16

**late** 40:22 146:5

**latest** 40:5

**law** 42:14 52:23 54:17 58:4,10,22 59:15,23 60:3,9,14 63:18 145:2 146:1 186:14,23 187:8 190:10

**lawn** 83:5,7

**lawsuit** 19:20 27:9 40:21

**lawyer** 11:11 73:22

**lawyering** 190:21

**lay** 16:9 90:13

**laying** 126:24

**leading** 25:23 29:2 39:3 40:16 163:23

**learn** 81:13

**learned** 11:10

**leaves** 31:18 46:4 144:8 154:3

**leaving** 94:22

**ledger** 156:22 158:23 161:19 172:14 180:11

**ledgers** 158:13 164:13

**Lee** 88:5

**left** 39:18 67:2 138:3,8 172:15 188:8

**left-hand** 49:8

**legal** 8:3 33:13 58:11

**legitimate** 178:16

**lender** 46:19 47:1 66:20 67:12,24 68:3,6 70:9,10,24 71:2,11 72:5,19 76:16 77:3 78:4 95:18 101:19 102:4 105:4,11,19 124:19 129:1,11 130:3 132:11 133:1,4,6 146:18 151:3, 22 152:12 153:14 154:4,6,8 161:21 162:24 163:19 178:15 188:23

**lenders** 57:19 84:2,3 85:19 87:1 94:24 151:24 162:17

**lesser** 28:4

**lets** 14:9

**letter** 62:10,20,22 165:18

**level** 8:7 62:15 82:22

**leveraged** 56:9

**liabilities** 42:24

**liability** 64:21 158:14, 20

**lien** 55:21

**lienholders** 82:23 85:13,17

**liens** 35:2,4 55:19,25 56:5,8

**Life** 78:18 80:18 81:1

**LIFO** 154:14

**lift** 35:10 82:25

**lifted** 42:13

**light** 10:3 101:25

**lightly** 186:7

**lights** 70:11

**limited** 34:13 42:3 43:14 93:11

**limiting** 167:21

**limits** 152:21

**link** 187:2

**linked** 146:1

**list** 21:10,23 22:3,4,6,8 79:16,18 80:23 81:4 87:11 123:4,15 127:4,5 130:1 132:20 139:14 140:7 142:1 168:11,16

**listed** 19:12 21:12 23:16 28:13,14 75:19 116:10 125:24,25 126:1 127:7,22

**listen** 90:11,15

**lists** 69:2 126:10

**litigation** 35:16,17,24 41:10,11 42:5 82:13 125:20 127:14 139:3 144:16

**living** 143:18

**LLC** 64:3,8 66:8,12,19 102:16,21,24 127:18 132:3,10 133:1,4,13 153:16 155:19 156:3 157:15 158:6 172:23 180:9

**loan** 26:1 28:4,5,8,10 29:1 49:4 65:16,23 75:18 76:22 77:7 102:20 109:4 110:5 112:17,23 113:1 116:22 121:23 132:16 134:1 178:23

**loans** 28:6,13 64:11,15

65:3,12,16 74:20,23 76:5,22 77:6,7 83:20,22 84:5 116:22 121:5 151:23,25 158:22 177:10 180:10

**locate** 79:4

**located** 25:22

**lodge** 22:13

**long** 43:13 57:23 71:15 107:9 186:25

**longer** 23:24 30:2 33:7

**looked** 17:16,19 22:5 32:2 36:25 48:3 59:8 65:6 77:21 94:23 102:6 114:13 149:1 161:19

**lose** 46:23

**lost** 82:12 169:7

**lot** 8:20 11:18 12:24 16:3 35:17 38:24 81:19 116:18 132:23 133:21 157:19 183:20

**lots** 86:24

**love** 79:10

**lowest** 93:1,22 117:3 154:1 169:1,20 170:6 171:10

**luxury** 186:18

**M**

**mad** 60:16

**made** 11:12 19:10 25:25 26:1 34:20,25 36:7 37:7 38:19 57:7 66:22 69:14 105:2 113:16 114:3 128:5 130:24 151:23,25 153:17 167:4 185:17

**main** 17:17 20:24 66:12 136:3

**maintained** 100:16 101:5

**majority** 28:3 35:14 76:21 110:11 133:24

**make** 7:7,9 12:22 13:2, 14 17:15 22:6 24:1

55:1,3,4 62:18 68:5 82:18 112:1 114:15,21 115:11 121:8 124:7 154:2 167:12 186:8

**makes** 10:7 92:1 146:20

**making** 67:25 84:19 131:23 140:4 142:15 155:4

**man** 91:4 185:19

**manage** 27:22 56:2 82:10

**managed** 55:3

**management** 34:5 54:8,11 69:8 83:4

**manager** 34:11 54:12, 14,18 82:11

**manages** 34:16

**managing** 42:3 55:8 64:2 156:3 158:6

**manner** 55:2 73:6

**March** 58:6,7 104:5

**Marigold** 16:2 34:9,14 35:22 54:10 55:7 82:10 168:2

**Marine** 62:14

**mark** 165:17

**marked** 141:11 151:15 156:12,17 162:4 166:17 190:12

**matched** 154:13

**matching** 114:19

**materials** 10:19 12:6,7 142:1,4 145:15 146:4, 10 148:16 183:24 190:25

**math** 46:4 83:21 138:5, 10

**matter** 14:19 18:11 20:9 44:16 96:5 102:1 108:20 120:23 127:7 135:12 144:17 145:23 150:3 151:16 156:7 162:5 166:2 167:8 170:2 188:6 191:16

**matters** 59:22 60:1 112:11 145:3,7

**Max** 26:6,22

**meaning** 84:22 95:17

**means** 106:11

**meant** 140:8

**meddlesome** 57:5

**meet** 159:7

**member** 64:2 156:3 158:7

**members** 17:5 36:22

**memory** 103:24

**mentioned** 20:6 24:5 25:7 32:10 39:1 54:7 55:18 56:11 73:8 124:15 166:25 174:9 175:7,8 177:20

**method** 93:2,4,7,22,23 94:2 117:4 149:2,4,7, 10,12,24,25 150:13,15 154:13 169:2,8,20 170:3,6,17,19 171:11, 18

**methodologies** 114:24 169:21 170:5

**methodology** 92:15 94:2,13 117:4 169:13 170:14 171:5,11,23 172:1 173:12 175:5

**methods** 149:3,15 153:25 154:10,20,22 169:25 175:1

**mezzanine** 76:7 188:23

**Michael** 6:16 96:4 120:22

**microphone** 7:14 183:3

**Middlebury** 78:17 80:17,25

**Mike** 44:15

**million** 30:6,11,13,15, 16,20 31:2,4,6,8,20,21 37:22 38:2,19 39:8 47:1,2,12,16,23 48:4,5, 7 58:10 72:16,25 74:14,

19,22,25 75:3 77:2 78:2 104:24 105:8 109:13 116:2 161:22 162:23 163:19 164:15,16 183:10

**mind** 15:14 27:16,25

**mindful** 9:6 141:17

**mine** 103:5,9,13 119:11

**minus** 128:20 129:4

**minute** 164:19

**minutes** 8:16 11:24 105:13 138:2,8 182:6 188:7

**mischaracterize** 140:12

**miscode** 180:24

**Mobile** 88:18

**moment** 23:6 29:10 128:1 161:24 172:21

**moments** 46:22

**Monday** 97:1,6

**monetary** 47:5

**money** 28:3 30:1 31:13 39:2,6,9,21 55:12 58:1, 2 62:19 66:19 67:11 76:21 86:17 93:12 94:7 95:16 132:25 133:3,14 152:10 153:10 154:2,3, 4 157:23 158:2 160:8 170:8,12,15 182:18 183:21

**monies** 20:5,20,22 23:21 24:22 31:10,12, 16 39:2 40:3 66:24 77:9 152:1,4,13 153:8 157:2

**monitorship** 41:2,4, 10,20

**month** 55:13,14 71:10 83:1,21,22,24 84:4 167:7

**monthly** 86:13

**months** 25:23 39:3 40:4 186:17

**morning** 6:21,23

**mortgage** 55:21 71:2

**mortgages** 55:19,25

**motion** 8:18 12:6,8,25 13:5,8 43:11 142:2,5 184:19,24 188:12 190:24

**motions** 186:16

**move** 10:22 12:16 13:13 28:19 43:17 54:2, 5 72:12 128:8 140:23 141:24 152:4,7,14 165:2 177:7

**moved** 153:8

**movement** 92:11

**moves** 54:23

**moving** 9:10 16:19 53:20,22,25 54:4 82:1 126:22 152:10

**mowed** 83:5,7

**mowing** 83:16

**multifamily** 68:17

**multiple** 45:25 53:18 164:15 169:3,25

---

**N**

---

**National** 85:19

**native** 145:20

**nature** 131:24 159:10

**Navy** 107:17

**necessarily** 12:19 13:1

**needed** 20:15 48:1 83:7 185:24

**negative** 36:17

**nervous** 41:20

**net** 34:2

**neutral** 55:14

**nifty** 105:10

**night** 97:23

**noise** 30:10

**non-** 95:13 101:22

**non-investor** 29:17 94:19

**non-investors** 94:23

**non-lender** 154:7

**non-public** 108:1

**non-source** 170:18

**non-wall** 94:25 95:10 111:1,20

**Northern** 191:24

**nose** 186:7

**notations** 64:9 65:21

**notebook** 10:18 11:1 15:3 21:9 88:24 96:7,11 108:14,23 111:10 113:21

**noted** 158:13 180:8

**notes** 30:13

**noticed** 103:7

**notify** 189:23

**notion** 184:15 185:6

**November** 9:6 59:5 115:18 116:1 185:1 186:19,22 187:6 190:23

**number** 31:3,20 47:12 50:16 59:18 74:18 75:1 84:3 96:14 126:6 127:21 145:19,21 149:15 154:20 164:7,15 165:18 189:8

**numbers** 59:9 61:6 75:3 76:23 78:1 86:5 137:25 183:19

---

### O

**object** 13:7,11 21:16 28:19 43:20 89:18 91:8 115:7 129:13 141:3 142:8,10 189:24

**objection** 11:13 12:9, 17 22:14 26:16 29:2,21 33:18 39:12,13 40:15, 16 43:19 67:15 90:16 100:19 117:6 118:11 119:4 128:11 129:12 130:5 141:1,4 163:23 165:6,7 184:2

**objections** 11:18,20, 25 12:1,4 13:15 14:9 44:3 141:9 142:4

**observations** 101:13

**observe** 29:15 92:5 177:9

**obtain** 16:20 28:25 134:20 136:10

**obtained** 28:24 105:3 134:25 135:4 177:10

**occasions** 168:10 179:10

**occurred** 52:16 60:11 70:18 155:14

**occurs** 10:3

**October** 15:17 39:8 40:20 41:16 191:21

**offer** 13:11 121:17

**offered** 100:21 115:10 142:10

**offering** 80:6

**offerings** 19:20 21:15 26:13 27:8 37:10 40:7, 14 109:1,12,18 120:11

**office** 17:17 70:1,6,14, 22 71:10

**OFFICER** 6:3 137:18, 20 191:7

**offices** 69:21 70:3

**official** 188:22 191:23

**officing** 70:1 71:5

**older** 75:3

**one-by-one** 11:4,17 16:7

**ongoing** 32:7 120:6

**online** 16:5

**onward** 66:9 68:5

**Opelika** 75:14

**operating** 9:1 18:1,2 66:13,17 70:25 72:3,7 152:6,14 153:15 157:15 158:8

**opine** 172:10

**opined** 172:6 176:8,12

**opining** 173:14

**opinion** 100:12,17 122:20 130:7 151:4 155:8,13 157:13 159:2, 21,25 160:12 161:7 170:13 179:5,20 184:1

**opinions** 100:22 101:9

**opportunity** 10:2 52:15 91:4,7,22 97:5 120:1 184:9

**opposed** 82:2

**opposition** 166:1

**option** 7:17

**oral** 8:18,21 185:5 188:4

**Orchard** 62:14

**order** 9:23 15:1 28:12 30:22 41:15,18,19 42:12,19 77:16 80:20 81:21 133:11 186:24 187:8 191:1

**ordered** 8:24

**orders** 9:11 186:15

**original** 108:22 109:8, 14 110:8,17 111:9 112:14 113:5 131:10 135:8,16 146:18 152:19 160:4 173:9

**originally** 31:9

**originating** 31:17

**origination** 31:9,21 32:2

**origins** 105:2

**outcome** 167:9,13,17, 21

**outdated** 75:21

**outer** 152:21

**outlined** 140:9

**outset** 8:4 15:11,16,24 20:10

**overrule** 28:21

**Overruled** 40:17

**overseeing** 34:12 55:1

**oversight** 34:12 54:14 55:10

**overview** 88:12

**overwhelming** 28:2

**owed** 84:2,3

**owned** 33:7 45:9 123:9

**owner** 164:11

**owners** 49:9

**ownership** 45:10 80:14,15

**owns** 8:4

---

### P

**p.m.** 191:8

**Pages** 51:24,25

**paid** 27:18 42:10,11 58:5 59:10,12,16 60:4, 10 68:15 69:8 71:11 132:2,5 145:13 166:23 167:6

**Palisades** 86:17

**paper** 11:17 103:22 138:1

**papers** 90:3,4 98:14, 20,23 106:1 134:9,11 147:22 149:12,25 153:3 155:6 177:22,25 178:7 188:1

**paperwork** 53:4

**paragraph** 15:7 16:19 17:9 18:16 22:24 23:16 26:10 27:4 37:14 38:3 42:15,21 48:15 68:23 69:2 72:13 78:25 79:24 108:24 109:8,14 113:5 123:2,21 124:16 125:12,16,25 127:7,18, 23 131:4 133:11 138:21,24 140:14

**paragraphs** 37:4 51:24 110:16

**parent** 45:7,9

**parse** 24:3

**parsing** 73:22

**part** 30:25 41:16 78:22 80:19,20 81:5 111:22 112:1 123:8 176:16,17 188:12

**participate** 107:25

**participated** 136:24

**participation** 57:13 60:25 61:23

**parties** 184:7,16

**partners** 24:20 25:2 60:15

**Partners'** 31:15

**parts** 53:11

**party** 184:9

**pass** 44:6 120:13 141:15 181:24

**passive** 74:5

**path** 187:11,13

**pay** 38:17 57:15,23 58:2,3 69:16 70:5 71:2, 3,20 145:9,12 160:23 167:4

**paying** 70:11 83:22 131:21

**payment** 69:12 167:1, 8,12,16,22

**payments** 38:19 55:5 57:19 69:14,18 111:4,5 112:2 157:14 164:5 178:15

**payout** 94:4 175:17

**pecuniary** 161:2

**pen** 138:1

**penalty** 84:1

**pending** 57:2 135:1

**people** 35:9 98:7,9

**percent** 61:3,8,9

**perfect** 160:7

**perfectly** 9:22

**perform** 140:18 145:15

**performing** 75:12,13 95:5 118:10

**perimeter** 52:24

**period** 162:22

**periods** 162:14

**permission** 7:11

**permitted** 178:11

**person** 97:12 160:3

**personal** 38:9 111:3 130:12 131:22 163:20 164:6,10,11

**personnel** 180:24

**perspective** 101:17 174:6

**ph** 55:9

**PI** 11:12 90:10,24

**piece** 61:3 84:9

**pieces** 83:8

**pinpoint** 186:2

**place** 30:22 32:9 34:16 61:21 77:17 84:21,22 87:9 182:3

**places** 66:4

**placing** 128:24 129:9

**Plaintiff** 6:12

**Plaintiff's** 44:5 141:12

**plan** 11:9

**planning** 12:10 13:1

**plans** 84:15,16

**pleadings** 145:23

**podium** 7:8,15 187:20

**point** 9:22 18:8 31:22 40:5 42:12 43:3 44:2 50:10,25 51:15 53:20 57:24 95:13 136:3 140:1,11 149:6 176:20 186:3

**pointed** 18:14

**points** 41:1 55:11 57:7 83:6,13

**political** 111:4 131:23

**Ponzi** 111:5 112:2

**pools** 157:10

**pop** 32:14 81:13

**portion** 170:20,23 171:6,12

**portions** 48:3

**position** 10:25 37:24 45:12 56:6 61:16 76:25 115:8 129:6,15,24 130:7 172:25 183:23 189:20

**possess** 49:16

**possessed** 28:13

**possession** 49:11

**possibly** 27:18,23

**posture** 8:3 9:2,9 11:12 90:10

**pot** 132:11

**potential** 19:15 41:12 49:14 52:15 57:19 97:22 102:2 113:8 154:10

**potentially** 29:16 31:24 53:8 94:19 95:2 118:8 140:18 157:6 169:8

**practice** 144:14

**practicing** 90:9 143:23 144:9

**preadmit** 10:22

**preceding** 103:25

**preliminarily** 156:17

**preliminary** 186:16

**prepare** 80:11 108:9 114:25 139:8 164:21 177:25

**prepared** 73:13 80:23 142:7 182:21

**preparing** 21:6 58:22 89:7,9 114:22 181:20

**prescribed** 191:18

**present** 36:2,3,5 105:12,20 133:22 160:9

**presented** 91:20 124:23

**presenting** 125:9 175:7

**preserve** 82:15

**preserved** 82:19

**pretty** 30:19 62:5 71:7 92:11 97:17

**prevent** 95:4 118:9

**previous** 41:1 72:2

**previously** 28:20 118:17

**prices** 36:19 112:17,25 113:2

**Pricewaterhouse** 88:16

**primarily** 36:5 98:2 155:24

**primary** 77:5 99:10 155:23

**principle** 70:25 72:7

**principles** 8:5 144:19 152:11

**printed** 103:16

**prior** 20:17 34:23 35:7 37:16,17 74:20,23 80:14 118:5 134:19 136:18,20,22

**pro** 154:5 169:2

**proceed** 14:11 26:19 44:9 85:6 87:23 91:11 95:24 106:24 115:14 120:16 128:14 143:11 165:15 166:10

**proceeding** 8:8,22 126:21 128:13 141:7

**proceedings** 32:12 47:10 130:8 191:8,15

**proceeds** 49:4 102:20 116:22 118:1 121:5,23 132:16 134:1 151:23 158:1,2 160:4,22 161:1, 21 169:7 177:10 180:7

**process** 30:23 33:23 47:6 51:1 57:24,25 58:13 65:9 71:15 75:17 120:3

**processes** 150:23

**produce** 63:14,16 106:1 178:4

**produced** 98:23 99:1, 15,18,21 100:2,3 134:13 178:3

**producer** 184:11

**product** 98:6,17

**production** 91:2

**profession** 148:17 150:8 153:20 157:8

**professional** 61:25 92:19 144:19 147:15 148:17 150:7 155:1 157:16 159:2,17 161:9 167:11

**professionals** 36:13 53:21,23

**proffer** 188:18 189:21

**profit** 60:22 61:4

**project** 61:4 97:16 151:5 160:9 189:2

**projects** 52:12 152:15 155:24 167:25 168:7,17 178:18,19 188:24

**proof** 172:15

**properties** 15:21 16:6 27:25 28:2,4,7,10,15,23 33:7,13 34:4,11 35:3,5, 6,15,18,24 36:8,12 37:20,25 42:6 49:17 50:15,24 51:4 52:4,17, 23 54:7,10 55:19,24 56:3,9 57:4,9 60:23 61:22 70:8 74:7,9 76:3, 8,24 77:1,8,12,14,17,24 78:2 82:9,15,18,24 83:21,25 84:20,25 85:14 86:17 110:4,10, 12 111:2 112:22 119:2 152:5 168:3,4 178:25 179:8,12,16 188:22

**property** 31:11,12 32:17,25 33:1,2,4,5

34:10,11,16 36:24,25 42:9 45:10 49:9,10,13, 24 50:12 54:12,14,18 55:8,14,21 56:20 57:15 62:3,9 67:8 72:16,24 73:1 74:20 75:12 82:11 83:8,14,18 84:9 86:15, 19,20 108:6 111:20 112:16 113:10 116:4, 23,24 123:7,9 132:17 145:3 160:9 168:1 169:4 177:11

**property-by-property** 83:2

**proposal** 183:24 187:11

**proposals** 187:2

**propose** 82:1

**proposed** 21:10 22:8,9 23:1 32:17 34:4 41:2 79:16 80:21 82:3 121:4 126:10 139:14 173:16 186:13,22 190:10

**protect** 41:4,23 57:20 82:15 85:20

**protected** 82:19

**protocol** 190:6

**provide** 16:24 22:25 26:21 38:12,24 45:5,6 88:12 90:19 147:21 157:9 184:4,10

**provided** 10:18 25:7 32:3 33:15 42:18,23 45:1 63:20 69:1 72:21 86:3 92:21 99:7 100:22 101:7 120:7 123:4,14 125:2 146:1 163:9 178:14

**proxy** 128:24 129:9

**public** 52:24 53:7 107:25 122:10 143:19, 23 144:3,6

**pull** 183:3

**pulled** 28:6

**pulling** 129:18

**purchase** 31:10 102:23 110:4 111:20 112:16,25 113:2 116:3 178:25

179:7,16

**purchased** 28:15 77:8 110:9,13 116:24 123:8 132:17 177:11

**purchases** 179:11

**purportedly** 174:6

**purpose** 149:9 152:15

**purposes** 24:15 96:23 131:21 165:8 178:25

**Pursuant** 15:1

**purview** 49:11,13

**put** 30:21,22 32:8 33:1 34:16 45:3 50:13,15 57:18 60:16 68:9,13 74:2 77:17 81:20,21 84:21 86:17,18,19 89:22 96:22 97:8,12 98:13 101:9 121:4 131:11 135:9 142:23 151:8,17 165:21 173:16 184:23 188:14 189:20

**putting** 73:17,23 98:1, 2,12 138:1

**Q**

**qualified** 43:24 90:20 185:18,20

**qualify** 28:12 160:13

**quantifiable** 161:3

**quantify** 170:23

**quarter** 59:2,4

**quarterly** 58:9

**Query** 186:10

**question** 21:17 60:18 63:24 64:19,23 68:7,14 72:2 80:8,21 85:10 101:1,3,5 102:20 105:16 121:6 133:10 169:17 173:9

**questioning** 7:15 115:7

**questions** 14:7 30:14 46:24 60:13 73:24 78:9 85:3 87:2,21 95:22 105:24 106:23 121:1

137:4,6 138:23 141:18 143:9 187:12,25 190:16

**quibbling** 168:20

**quick** 10:15 182:15 185:3

**Quickbook** 65:4

**Quickbooks** 19:8 63:4, 7,8,18,21 65:21 100:6 145:20 180:25

**quote** 127:10

**R**

**racked** 58:10

**raise** 13:25 87:16 106:18 143:4

**raised** 37:9 44:21 108:25 109:12,18 172:14

**raises** 93:1

**raising** 171:21

**Ramolia** 7:21

**Ranch** 116:3

**random** 86:14

**range** 75:24

**rare** 55:23 56:1

**rata** 154:5 169:2

**rate** 83:23

**rates** 36:17

**raw** 84:14

**reach** 101:8 133:11 148:13 150:5 157:12 175:1

**reached** 86:2 105:17 121:15 150:6 179:4

**reaching** 99:8

**read** 97:2,17 123:12 169:19 180:13

**reads** 123:3

**ready** 30:21 44:9 120:17

**real** 16:1 23:21,22,23,

24 24:17 36:13,18,22 49:10,13 50:23 55:24 56:24,25 61:24 123:7 155:24 167:25 169:10, 15 170:7

**reason** 31:3 77:5,6 183:17

**reasonable** 55:2

**reasoned** 170:2

**reasons** 20:14,24 41:8, 9,12,16,25 72:9 118:16 130:22 131:3

**rebuttal** 142:20

**rebutting** 97:9

**recall** 92:3,17 94:16 105:6 176:23

**receipt** 173:23

**receipts** 47:2 156:2 161:15

**receive** 26:12 27:7 81:8 117:18 143:25 144:5 146:4 167:16 172:8,11 173:17

**received** 19:18 20:21 21:14 22:11 23:1,18,20 27:13 45:11 68:20 69:7 80:5 83:5 107:13 113:11,25 115:4 116:10 119:14,20,22,23 120:10 121:10 123:7,25 125:18 127:12,19 130:17 139:1 140:3 173:2

**receiver** 7:2,4 10:14 14:19 20:7,8 36:1,23 39:4 43:2,18 56:15 84:23 87:8 88:6,25 91:21 92:21 95:4 119:13,21 125:2 130:16 136:10 140:6,8 144:25 146:2 150:3 159:20 163:3 172:6 173:12 177:9 183:7 184:3,9 190:25

**Receiver's** 89:24 94:10 96:16 118:22,24 119:1 139:21 145:18 150:17 152:24,25 155:14 157:5,13 159:13 160:11 163:18 171:17

179:5 183:24

**receivership** 6:6 8:9 14:22,25 15:1,9,11,12, 15,18,22,24,25 16:13, 17,20 17:13,23,25 18:20 19:15,18 20:17 21:10 22:8 23:2 24:4 25:24 26:7,25 30:22,25 32:8,18 33:2,6,9 34:5, 15 35:2,5,18 36:8,24 37:8,20,25 39:3 41:3, 15,18,23 42:3,12,19 45:3 49:3,15 50:3,18,24 54:21 55:20 56:12,16, 19 57:22 59:2 60:7,10, 17,20 61:13 62:20 63:5 68:10,13 76:25 77:15, 16,19,23 80:20 81:4 82:3 84:13,21,22 86:21, 22,23 89:5 113:8 121:5 126:4,10,13 127:6 128:25 129:10 130:2 139:14 167:3 173:16 186:15 187:8

**receiverships** 85:23

**receives** 164:9

**receiving** 20:4 172:7

**recent** 25:18 52:22 119:11 125:2

**recently** 15:4 119:22

**recess** 137:19 191:6

**reckless** 180:2

**recognize** 165:20

**recollection** 179:10

**record** 13:8 14:8,16 22:14 88:4 91:8 105:25 107:4 109:25 143:16 184:19 187:3 188:11 189:4 190:25 191:15

**recorded** 158:19 164:10 180:17 181:6

**records** 14:25 16:21 17:5 18:19,20,21,23,25 19:6,7,10,17,25 25:11 27:7 38:6 40:8,11 63:22 64:10 65:4 89:4,5,17 91:17 92:6 94:7 99:11 100:5,14 108:2,4,6,19 109:7,21,24 112:4,7,16,

20,25 113:10,14,16 114:2,9 117:21 119:19, 20,22 120:2 121:9,19, 20 122:18 129:16 130:10 131:2 134:20 135:4 136:6,9,11 140:17 145:20,24 156:1 159:15 170:9,12 177:3 179:6

**records'** 158:4

**recovered** 37:21

**RECROSS** 85:7

**redact** 183:21

**redacted** 94:22 162:16

**redirect** 79:21 82:6 138:17

**refer** 134:2 172:20

**reference** 153:6 163:22

**referenced** 114:7

**references** 153:2

**referred** 179:14

**referred-to** 44:4 128:16 141:10 165:13

**referring** 93:8 162:24 179:13,19

**refers** 49:9

**reflected** 105:10,18 148:14 162:18 183:11

**regard** 149:10 185:11

**reimbursement** 161:4 178:17

**related** 25:22 102:19

**relating** 112:16

**released** 167:4

**relevant** 130:8 148:25 162:14,22 174:25

**reliability** 171:21 172:2

**reliance** 106:2

**reliances** 90:5

**relied** 99:9 100:12,15, 17 101:7 130:16 182:19,23

**relief** 8:12

**relying** 90:6 91:3

**remaining** 142:16

**remand** 8:2

**remember** 9:4 30:12 40:20 48:16 59:14 61:6, 7,9 66:1 134:25 177:14, 23

**remind** 189:6

**rendered** 179:20

**rent** 69:25

**rents** 69:23

**reopen** 106:2

**repeat** 129:2 133:2

**rephrase** 129:21

**replace** 34:19

**replacement** 152:5 178:19 179:12

**reply** 97:6,10

**report** 15:4 24:19 29:10,12 30:13 34:23 43:18,21 46:25 58:9,23 88:25 92:1,14 93:2 94:21 116:25 157:4,5 160:11 163:18 164:6 165:18 166:18 167:23 168:8,14,23 169:25 171:16,25 172:10 173:24 174:11,15,19 175:22 176:20 177:16 178:8,12 179:23 181:21

**reporter** 141:11 191:23

**reports** 34:24 37:16,17 91:23

**represent** 44:15 96:4 120:22 157:22

**representative** 14:24 129:19

**represented** 105:7 162:17

**request** 85:24 87:21 106:22 143:8,10 187:9 188:4

**requesting** 8:12

**requests** 34:19 35:10

**require** 34:5 43:23 54:8 115:9 122:7 147:2,5,8

**required** 42:19 62:15 121:24 122:19 144:13 170:19

**requires** 54:11 149:6,7 185:10

**requiring** 146:23 189:19

**reserve** 91:1 105:25

**respect** 7:13

**respective** 110:5,9

**respond** 184:22

**responded** 8:20

**response** 12:10 29:20 30:18

**responsibilities** 107:23

**responsive** 146:13

**rest** 7:11 39:21

**result** 50:18 125:15 138:25 148:13

**results** 24:12 109:9

**resume** 87:9 137:16

**retain** 20:7,12

**retained** 20:10 61:24 88:6,8 91:24 145:6,16 146:15 147:11

**return** 72:1 153:10

**returning** 158:3

**returns** 17:19 80:11

**revealed** 162:17

**revenue** 67:8

**review** 21:4 25:11 29:12,13 38:6 40:7 89:4 91:23 108:1 112:6 114:5 117:21 125:2 145:15 146:10,17 148:7,13 150:2 153:12 155:25 156:1 158:4,12, 17 160:12 161:15,18 179:6

**reviewed** 89:2 108:19 114:3 116:25 118:24 142:7 145:17,18,19 146:12 152:24,25 153:4 158:13 171:19 174:6

**reviewing** 157:4 159:20

**Ridge** 74:11 172:24

**right-hand** 50:5

**rights** 57:4 62:5

**rise** 6:3 137:18,20 191:7

**road** 31:14

**Roger** 6:18

**role** 36:22 89:7,9,11 93:12 188:23

**Ross** 185:14

**rough** 137:25

**roughly** 14:23 31:6 46:4 59:15 74:19 77:2 78:1

**round** 78:13,15 79:9 85:4 87:5 106:7 137:11, 17 138:15 141:16

**routinely** 145:4

**RPR** 191:13

**rule** 12:3 14:9 185:25 188:3

**ruling** 12:8 22:15 26:17 39:16 187:9

**running** 89:25

---

**S**

**sake** 77:20

**salary** 69:16

**sale** 8:13 57:13 112:21

**sales** 56:20,25 57:2 67:9

**sat** 152:22

**satisfy** 56:8

**save** 100:1 182:17

**SBA** 28:6

**scale** 17:3 92:9 112:11

**schedule** 89:12 156:19 162:5 177:5 178:5 181:11

**scheduled** 35:8 109:22 181:14

**schedules** 99:6 145:19 156:7

**scheme** 83:10

**school** 107:11,14

**schooling** 122:16

**scope** 8:7,10 80:4

**scratch** 11:13

**seal** 183:2,6,15,17,25

**seat** 13:22 14:5

**seated** 6:5 7:11 9:16 137:22

**SEC** 6:8 8:12,16 22:9 40:21 57:19 80:22 87:12 106:14 107:7,9, 15,20,24 112:9 138:2 146:3 156:18 186:21 187:14

**SEC's** 9:13 21:9 87:10 89:22 155:9 180:2 183:23

**seconds** 21:23

**section** 18:14

**secured** 86:25 116:23 132:16 177:11

**securing** 28:8 52:12

**Securities** 6:12 97:4

**SECURITY** 6:3 137:18, 20 191:7

**seeking** 126:4,13 127:6

**seeks** 45:3

**seize** 72:25 77:1

**seized** 65:14

**seizure** 57:4

**selected** 100:12 149:4, 25 154:1

**selective** 172:23

**sell** 57:8 84:11

**send** 85:24 167:6

**sense** 10:7 12:22 62:18

**sentence** 78:25

**separate** 102:2 145:3 165:21

**September** 40:22 58:23 59:6 122:24 135:11,13,17,19,25 136:2,22 146:5 147:20, 24

**serially** 152:8,13

**series** 55:18 99:9

**serve** 149:8

**served** 144:25

**service** 35:12 42:11

**services** 66:13 174:24 175:10

**set** 24:12 89:15 91:15 94:10 95:5 100:9,11,14, 16 101:6 108:18 112:17 146:13 175:22

**setting** 53:6 90:25 173:23

**settlement** 57:12

**settlements** 56:23

**share** 135:24

**shared** 136:12

**sharing** 60:23

**sheet** 159:9

**shore** 12:19

**short** 8:23 9:22 12:1 49:3 81:16

**shortly** 38:15

**shots** 184:21

**show** 25:4 38:6 66:7 73:16 93:23 109:9 111:12 112:25 116:9,16 117:14 121:18 130:17 134:8 155:5 158:17 172:13 174:11,15 179:6

**showed** 76:14 121:9

**showing** 111:13 113:24 115:17 121:23

**shown** 64:21 108:4 127:23 165:3

**shows** 37:19 90:8 111:22 151:21

**side** 8:16 49:8 104:6

**sides'** 78:14

**sidetracked** 84:7

**signed** 52:20

**significant** 16:16 67:7 77:22 188:23

**significantly** 50:25 52:17 53:15 73:3

**similar** 75:25 93:23 116:7 117:4 161:11

**similarly** 24:2

**simply** 41:22

**single** 39:25 55:21 71:16 142:7 152:14

**sir** 51:13 143:15 164:17 166:19

**sit** 11:13 15:19 40:23 43:12 67:6 71:18 77:10 80:25 84:12 86:1 136:17 187:17

**sitting** 11:23 57:21 59:7 63:18 64:16 83:15

**situation** 68:11 84:17

**situations** 117:14

**skill** 146:23

**sold** 31:12 50:1 60:24 61:5 62:5 83:19

**sole** 68:16

**solution** 53:20

**someplace** 99:13

**son** 26:6

**sooner** 191:2

**sort** 8:23 121:17 155:3

**sorts** 34:17 57:11

**sound** 45:19 124:10 164:16

**sounds** 45:21 138:9 166:5 187:23

**source** 18:11 30:14 57:9 71:19 94:15 99:10 117:13,22 152:12 176:25

**sources** 26:4 31:24 67:4,5,7 95:3 108:3 117:25 118:8 156:4 162:19

**Southern** 76:7 188:22

**space** 14:6 69:23 70:11 71:4 87:21 106:23 143:9

**SPC** 27:24 28:5 37:19, 24 76:22 77:13,17,18

**speak** 86:8 97:24

**speaking** 33:12 36:16 53:12 70:21 165:23 189:7

**special** 88:17

**specialized** 114:24 121:24 122:2,7,18 146:23 147:2,5,8,10,12, 16

**specific** 62:2 86:4 146:21,22 152:9 154:12 171:18 172:11 174:16 179:11,17,20

**specifically** 54:10 56:20 92:24 148:10 160:15 170:17

**speculate** 84:13

**spend** 12:11

**spending** 101:19

**spent** 17:4,7 55:2 66:19 67:12 131:20 132:25 133:3,13

**sphere** 34:2

**spoke** 17:19

**spoken** 53:18 81:17 86:8 94:3 185:9

**spot** 71:16 154:9

**staff** 107:7,23 112:9 122:14 136:18 145:17 150:20 155:9

**stages** 51:7

**stand** 7:12 13:22,24 26:18 67:18 106:12 137:24 142:24 182:22 187:21 188:14

**standard** 8:3 83:23 160:19 174:16 175:3,7, 10

**standards** 92:16,20,23 144:19 147:3,15 148:17 150:7 155:1 157:9,16 159:3 160:18 161:9 167:12 174:7,10,12,24 175:22 176:5

**standing** 7:16 9:17

**standpoint** 11:7 68:8 163:11

**stands** 188:5

**Starr** 185:17,19

**start** 9:12 16:4 41:15 83:3 166:21

**started** 61:19 135:5

**starting** 26:9 27:3

**starts** 151:22

**starved** 15:15 56:13

**state** 14:15 15:10,23 16:3 73:10 88:3 107:3 131:3,7 143:15 171:16 178:14 180:1

**stated** 17:22 28:20 118:16

**statement** 66:21 138:23 139:24 140:4 174:24 180:6 186:5

**statements** 19:4 92:1, 14 93:13 145:19,24 175:8,9 182:23 183:11

**states** 167:23 186:1 191:20

**status** 32:5 47:10 120:4

**stay** 7:11 9:9,16 35:10 41:10,11 42:5,6,9 82:25

**steps** 114:5

**Sterling** 27:19 69:12,15

**stick** 184:14

**stomping** 51:18

**Straight** 133:18

**strapped** 36:6

**strike** 28:19

**strongly** 37:24

**structured** 59:25 122:5 147:6

**struggling** 79:1

**stuff** 90:1

**subject** 35:11 79:5 81:21,24 105:19 112:21 125:20 127:13 134:21 139:3 142:20 167:8,13, 17 178:18

**submission** 12:12 188:1 189:11

**submissions** 190:22

**submit** 182:25 183:7, 15

**submitted** 12:6,25 13:6 15:5 29:10 89:1 91:23 117:1 125:5 175:23

**subparagraph** 69:6

**subsequent** 25:14 118:6 125:1

**subset** 22:9,18 101:6

**subsets** 168:5

**substantial** 52:8 62:5

**substantially** 38:2 164:14

**substitute** 146:19

**substituted** 160:5

**subtract** 185:21

**subtracting** 185:23,24

**sufficient** 15:20 37:8 41:23 68:3,8 72:25 148:24 174:25

suggest 140:5 181:1

suggested 49:2

suggestion 46:25

suggests 103:24

suite 65:13

Suites 16:2 34:9,14 35:22 54:10 82:11 168:2

summaries 19:3 21:5 27:6 89:15 91:15 92:21 114:22,25 116:17,19 117:5 157:21

summarize 108:1,5,24 109:17 110:19 112:15 113:9 114:5 176:9,13

summarized 19:1,16

summary 108:18 109:9 113:24 115:17 129:16 130:9

summer 34:17,20

supplement 184:19,24 190:24

supplemental 8:24 108:9 113:20 122:23 126:8 127:18 131:4 138:20 139:7,25 140:25 148:3

supplemented 108:17

supply 177:3

support 12:25 77:9 144:16 173:5

supported 89:16 91:17 146:17 155:7

supporting 145:18 148:16

supposed 148:24 149:1,4

surprise 58:17

survive 33:14

survived 32:16

surviving 172:2

swear 13:23 14:1 87:17

switch 34:1

sworn 14:2 87:18 106:20 143:6

---

**T**

---

tab 96:14

table 6:18 7:11,12 162:13

tainted 66:19 67:1,9,12 69:9,17,21 71:19 72:5 105:11

taking 122:16

talk 12:20 13:10 19:14 23:5,10 29:9 34:1 43:13 46:22 48:25 51:14 66:2, 4 73:20 80:2 81:18 110:8 113:7 137:15 179:23 181:2,23

talked 34:10 35:21,23 41:12 47:4 49:2 62:25 63:3 67:20,21 69:3 73:3 82:8,10 83:20 101:13, 25 131:16 146:14 155:19

talking 6:19 32:23 36:15,21 46:25 58:24 59:1 62:2 65:18 73:23 76:17 116:18 133:5 140:14 149:9 182:18 183:9 185:11

talks 69:6 83:12 94:15

task 151:2

taught 88:20

tax 17:19 20:16 80:11

taxes 20:15,23 42:9 55:14 57:15

TC 83:14

team 17:5 25:21 47:22 48:9 61:16,21 97:15

tedious 185:22

temporarily 77:3

tentatively 151:15

term 47:19

terms 68:2 79:9 82:6

testified 29:6,24 40:2

43:3 76:9,20 166:22 167:15

testify 188:21

testifying 100:23 129:15 130:8

testimony 43:23 44:20 46:14 47:8 73:14 90:12, 19 106:12 115:9 128:10 137:17 141:21 152:23 153:3 163:6,17,21 174:10,21 182:3 185:4, 8,10

testing 161:13

Texas 51:4 52:23 107:12 143:21 191:24

thing 10:9 11:6 20:1 44:24 58:19 97:17 152:9 185:3 190:5

things 17:20 34:22 37:18 43:6 44:19 46:23 56:18 57:15 70:6 81:13 82:14 85:23 118:17 131:23 151:18

thinking 11:24 84:8

third-party 34:11 76:4, 6 94:6

Thirty-five 96:15

Thirty-seven 144:10

Thomas 7:4 10:14,15 13:21 14:2,5,15,17,18 15:2 16:12 17:9 19:14 21:8 22:2 25:3 26:21 28:23 29:9 31:23 32:5 34:1 36:7 39:18 41:1 42:15 43:9 44:14 77:25 79:24 82:7 85:2,9 87:7 99:5,22 100:1 101:7 150:2 182:14,15 183:4, 5,20

Thomas' 10:21 78:23 96:6 97:13 102:9 155:15

thought 46:23 82:16 116:15 153:17 157:20, 21 161:20 162:17 183:16

thoughts 43:15 151:9 184:10 186:11 190:16

thousand 59:21

threatening 82:24

thumbing 186:7

tie 9:7 189:7 191:2

tied 26:4 27:20 38:20 69:18 109:6

Tim 6:19 7:3

time 7:12 8:19 9:11,24 11:12,18,24 12:11,14, 16 17:5,7 27:22 33:15, 20 40:5 43:11,13,14,16 46:11,15 50:17 54:3 55:8 58:6 59:6,8 67:6 71:8,9 73:18 80:10 83:11 100:1 102:14 105:24 106:3 111:25 119:23 120:7 125:5 134:17 137:24 139:10 140:1,17,22 141:14,24 145:12 146:11 162:14 164:18 176:11 182:2,8, 9,12,17 183:21 186:18, 23 187:6,24 190:14

timeline 9:6

times 8:21 35:22 53:18 72:10 86:9 132:23 133:21 174:9

Timothy 78:18 80:17

title 19:8 49:16 109:24 111:19 116:2 118:1 121:19 122:14 145:22

TLB 78:19,21 80:12,13

today 6:19 9:25 10:3,23 12:12 15:19 36:19 44:17 50:1 57:22 58:1, 24 67:6 75:4,5 90:23 91:9 125:9 142:15 144:12 152:23 163:7,17 165:4,6 167:15 172:25 184:18 186:12 190:12, 21

told 9:18 61:18 182:25

ton 83:11

top 47:12 59:14,19 61:6,9 73:9 74:16 90:21 105:5

topic 82:6 146:15 158:3 179:24

**topics** 44:21 60:19

**total** 37:21 52:2 86:5,6 109:11 138:4 162:21

**totaled** 157:1

**totals** 162:20

**touched** 16:11

**Towers** 168:1

**trace** 31:25 33:16 65:10 71:15 95:9 108:2 114:9 139:16,20 150:15 152:21 154:5,8 163:13 170:8,12

**traceable** 19:19 25:5 26:13 27:8 28:25 39:9 40:13 80:5 120:10 152:2 170:25 174:1

**traced** 46:2,16 66:23 69:12,15 73:2,3 78:3 110:1 123:15 124:19 129:1,11 130:3 133:15 146:21 159:22

**tracing** 8:5 19:5 21:4 24:12 25:3 26:22 29:16 32:6,15 43:22 45:1,6,17 46:1,5,8 66:2,7,18 67:21 72:7,18,23 76:10, 15 81:10 89:14 91:15 92:15,20,24 93:12,23 94:9 95:5 98:3 101:17, 21 102:1,16 115:8 118:10,18 120:4 121:2, 25 122:3,17 124:5,9 130:23 131:5 133:12 134:2,16 136:7 139:8 140:18 141:3 142:8,14 144:20 145:3 146:17 147:3 148:11,18 149:2, 5,8,10,13,24 150:5,8 151:3 153:18 155:14 157:14 159:18 160:13, 16 161:9,11 167:24 168:16,22 169:3,9,10, 14,15,25 170:7,13,16 171:18 172:2,23 173:5 174:5,17 185:10,13,15 189:1

**tracings** 157:22

**track** 138:12 156:2 188:9

**Tracy** 185:14

**train** 9:10 46:23 184:25

**training** 122:15 144:11, 15 146:24 153:19

**transaction** 62:4 65:22 154:13 159:11

**transactions** 19:5 25:22 108:2 112:3 114:13 116:14 119:11 122:5,17 124:25 147:6 150:14 158:18 176:10, 14 180:16 181:6

**transcript** 8:25 186:24 187:1,3 191:14,17

**transfer** 8:13 63:2 111:14 114:16,19 171:14

**transferees** 20:22 33:10

**transferred** 31:14 64:7 102:20 111:16,17,23 114:20 115:19,22,25 118:5,6 132:6 133:16, 24 171:4,7

**transfers** 62:24 64:10 65:19,20 66:8 112:13 114:12 118:3 158:5 159:15

**treated** 24:2

**treatment** 158:5 159:14

**trend** 36:23 37:1

**trial** 11:11

**true** 50:23 51:2,3,5 60:5 61:19 70:2 76:3 135:6 164:24 172:9

**trust** 78:17,20,21 79:4,6 80:13,17,18,25 81:1 175:16,17

**trusts** 79:3

**turn** 48:14 51:22 60:19 123:1,2 126:7 131:9,12 163:16

**turned** 31:17 132:11

**turning** 15:14 31:5 160:11

**Turtle** 17:17 26:2 33:4 57:12 70:1,6,23 71:21 86:18 168:1

**Twenty-four** 46:2

**Twenty-nine** 124:12

**type** 27:12

**types** 112:3 146:21 168:3

**typically** 54:16 114:13

___

**U**

**ultimate** 45:9 80:8 83:17 175:17

**ultimately** 24:25 26:4 27:19,20 38:16 66:24 77:18

**unable** 57:8

**unaffected** 153:21 157:6

**uncertain** 53:16

**underlying** 98:20 155:7

**understand** 10:4 22:5 47:11 57:5 59:20 78:14, 17 79:11 100:25 106:4 115:12 127:1 141:5 153:6 164:2 183:22 188:8

**understanding** 102:25 155:21 167:2,5

**understood** 10:10,24 40:17 43:25 82:4 129:17 138:14 142:3, 11,22 146:2 165:5 166:3 184:12 190:1

**undisclosed** 89:21 90:22

**United** 186:1 191:19

**units** 16:4 34:19

**universe** 124:18

**University** 107:12 143:21

**unknown** 50:6

**unrelated** 101:19

**unwilling** 57:1

**update** 86:10,15

**updated** 119:19 131:2 136:10

**updates** 82:24 86:11

**ups** 55:16,17

**Urban** 76:6

**Utica** 88:21

**utility** 161:4

___

**V**

**VA** 185:15

**vacant** 16:3

**validity** 64:23

**valuation** 75:11,14

**valuations** 49:19,21,23 75:10

**values** 36:24 75:2

**valuing** 74:14,21,24

**variety** 11:10 16:1 20:14 41:8 49:12

**vast** 35:13 76:21

**vastly** 77:21

**Venus** 25:2 51:4 52:4, 13 53:22 54:1 82:9

**verb** 121:22

**verge** 16:6 85:1

**Verizon** 88:19

**versa** 14:8

**versus** 6:8 156:18 186:1

**vice** 14:7

**vicinity** 13:24

**view** 67:11 68:2,9 70:9 71:7 72:23 100:25 130:24 132:10,14,25 133:3

**Villas** 26:1 83:3,10

**Villita** 168:1

**visualizations** 89:13

**voice** 74:5

**voluminous** 18:23 60:14 113:14 116:14 185:22

**voluminously** 63:10

### W

**wait** 190:22

**waiting** 126:23

**walk** 24:11 115:2

**WALL** 19:19 20:1,5 21:15 23:18,19,20 25:9 26:13 27:8,20 28:14,15, 24 29:17 30:7,15 31:7, 9,13,16,18 32:24 37:10 38:16,20 39:9 40:6,14 45:11,13 47:2 62:24 63:2,22,25 64:7,16 65:11 66:23 67:9 68:15, 21 69:15 70:4 71:6,19, 25 77:9 80:6 81:8 94:20 95:3,10,19 101:14,22 102:7 109:1,12,18 110:3,9,13 111:15,23, 24,25 116:23,24 117:17 118:3,8 120:10 123:5, 16 124:14 125:24 127:20 131:20 132:5, 15,16,17 133:9,25 140:3 151:3,22,23 152:1,4 156:2,23 157:2 158:5,7 160:22 161:15, 20 162:14,17,21 163:13 176:21 177:12 179:8,16 180:7,9,11,19,21

**WALL007** 24:23

**WALL011** 24:25

**WALL016's** 115:21,22

**WALL017** 115:20

**WALL017's** 115:19

**wanted** 9:25 22:6 52:2 73:10 166:7

**warranted** 8:12

**waste** 43:14

**water** 55:4,7

**Wayne** 143:17

**ways** 38:13 41:18 132:20,22

**weakness** 12:18

**week** 97:6

**weekly** 82:23 85:15,16 86:13

**weeks** 40:9,12 63:13 136:13 146:6

**weight** 11:14,21 12:2 13:16 21:20 44:1 90:12, 13 115:13 117:9 118:13 119:6 141:6

**Wells** 7:3

**Willis** 190:7 191:13,23

**Wilson** 53:3,18

**Windmill** 74:21 189:3

**window** 187:5

**wiped** 64:21

**wired** 111:18,19 116:2

**witnesses** 10:16 13:12 129:14 130:9 141:22 181:2

**word** 90:7 101:9

**words** 73:22 127:10 169:11 177:17

**work** 20:8 43:1 54:12, 16 61:14,17,18 62:7 68:4 69:22 70:13,16 90:3,4 92:11 98:2,6,14, 20,23 106:1 107:18 121:22 130:16 134:8,9, 11 140:16 144:22 150:16 152:20 155:6 156:8 160:23 164:8 177:21,25 178:1,7 187:6

**worked** 19:24 21:2,6 65:20 72:4 88:16 98:11 107:9,16,17 112:11 176:3,18

**working** 53:22,25 69:20 70:22 88:8 190:9

**worry** 7:16 93:15

**worth** 31:11 61:25 72:25 77:1 78:2,4

**wrestling** 79:8

**write** 138:24

**writing** 9:25 30:21 186:15

**written** 12:4 91:8

**wrong** 8:3 44:25 101:8

### Y

**y'all** 8:15,23 9:2 78:22 182:7 185:3 186:5,11, 20 190:6

**year** 15:17 36:20 43:7 53:19 58:19 114:8 134:23 135:2 136:4,7 144:13 146:5

**years** 88:14,20 92:10 144:10,15

**yesterday** 25:21 73:16

### Z

**zeros** 50:9