IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § § § | |
| *Plaintiff*, | § § | |
| v. | § § | No. 3:22-cv-2118-X |
| TIMOTHY BARTON, CARNEGIE DEVELOPMENT, LLC, WALL007, LLC, WALL009, LLC, WALL010, LLC, WALL011, LLC, WALL012, LLC, WALL016, LLC, WALL017, LLC, WALL018, LLC, WALL019, LLC, HAOQIANG FU (A/K/A MICHAEL FU), STEPHEN T. WALL, | § § § § § § § § § § § § § § § § | |
| *Defendants*, | § § | |
| DJD LAND PARTNERS, LLC, and LDG001, LLC, | § § § | |
| *Relief Defendants*. | § § | |

## RECEIVER'S FIFTH STATUS REPORT (3Q23)

Cortney C. Thomas, as the court-appointed Receiver in the above-referenced case, submits the following quarterly status report for the Third Quarter of 2023 pursuant to this Court's Order Appointing Receiver [Dkt. 29] (the "Receivership Order" or "RO").

The Receiver previously filed his Initial Status Report [Dkt. 67], covering the period October 18, 2022, through November 17, 2022; his Second Status Report [Dkt. 139], covering the period November 18, 2022 through December 31, 2022; his Third Status Report [Dkt. 225], covering the period January 1, 2023 through March 31, 2023; and his Fourth Status Report

RECEIVER'S FIFTH STATUS REPORT – PAGE 1

[Dkt. 299], covering the period April 1, 2023 through June 30, 2023.  As discussed further below, on September 5, 2023, the Receiver also filed a Declaration and Interim Report [Dkt. 308] at the Court's request.  This Fifth Status Report provides an updated summary of the Receivership for the period spanning July 1, 2023, through September 30, 2023.  Where possible, the Receiver has incorporated background and other information from prior status reports and previous briefing from this case to most cost-effectively summarize the activities of the Receivership from the prior Quarter.

Pursuant to the Receivership Order, the Receiver is directed to submit quarterly reports that contain the following information:

A.    A summary of the operations of the Receiver;

B.    A description of all known Receivership Property, including approximate or actual valuations, anticipated or proposed dispositions, and reasons for retaining assets where no disposition is intended;

C.    The amount of cash on hand, the amount and nature of accrued administrative expenses, and the amount of unencumbered funds in the estate;

D.    A schedule of all the Receiver's receipts and disbursements (attached as **Exhibit A** to the Quarterly Status Report), with one column for the quarterly period covered and a second column for the entire duration of the receivership;

E.    A description of liquidated and unliquidated claims held by the Receivership Estate, including the need for forensic and/or investigatory resources; approximate valuations of claims; and anticipated or proposed methods of enforcing such claims (including likelihood of success in; (i) reducing the claims to judgment; and, (ii) collecting such judgments);

F.    A list of all known creditors with their addresses and the amounts of their claims;

G.    The status of Creditor Claims Proceedings, after such proceedings have been commenced; and

H.    The Receiver's recommendations for a continuation or discontinuation of the receivership and the reasons for the recommendations."

RO at ¶ 59.

**RECEIVER'S FIFTH STATUS REPORT – PAGE 2**

**I.**
**SUMMARY OF THE OPERATIONS OF THE RECEIVER AND**
**DESCRIPTION OF ALL KNOWN RECEIVERSHIP PROPERTY**

As outlined below, substantial work was performed by the Receiver and his team during the Third Quarter of 2023.  This Section of the Quarterly Status Report includes (A) a summary of the SEC's allegations and the procedural posture of the case; (B) a summary of the Receiver's efforts to identify, sell, develop, hold, or otherwise dispose of real estate assets; (C) a summary of the Receiver's efforts to identify, sell, hold, or otherwise dispose of other property; (D) a summary of the efforts expended by the accountants engaged by the Receiver's counsel (the "Receiver's accountants"), including an update on their forensic accounting; and (E) a summary of other Receivership Activities from the Quarter.

**A.      Summary of SEC Allegations and Status of Proceedings**

**1.      The SEC's Lawsuit**

On September 23, 2022, the SEC filed its Complaint [Dkt. 1] against Defendants Timothy Barton ("Barton"), Carnegie Development, LLC ("Carnegie Development"), Wall007, LLC, Wall009, LLC, Wall010, LLC, Wall011, LLC, Wall012, LLC, Wall016, LLC, Wall017, LLC, Wall018, LLC, Wall019, LLC (collectively, the "Wall Entities"), Haoqiang Fu (a/k/a Michael Fu) ("Fu"), and Stephen T. Wall ("Wall" and together with Barton, Carnegie Development, the Wall Entities, and Fu, the "Defendants").

Among other things, the SEC alleges that between March 2017 and June 2019, Barton "raised approximately $26 million from over 100 investors . . . in unregistered, fraudulent securities offerings related to real-estate investments in Texas."  Compl. ¶ 1.  The SEC further alleges that Barton "partnered with Wall . . . and Fu . . . to offer and sell investment loans issued by" the Wall Entities.  *Id.* ¶ 2.  More specifically, the SEC alleges that Defendants promised that funds raised by the Wall Entities would be used to purchase specific parcels of land at specific

prices set forth in the offering materials, those parcels would then be developed by Barton into residential lots, and then Wall would build homes on the lots and sell them.  *Id.* ¶ 3.

While the Wall Entities purportedly promised investors that they would receive their principal back in two years along with annual interest payments, the SEC contends that Defendants misappropriated nearly all of the investor funds and misused them to, among other things:

- pay personal expenses of Barton and his family, including credit card bills, rent, and to buy a plane;

- pay Fu undisclosed and unauthorized commissions and fees;

- make Ponzi payments to earlier investors (as well as other interest payments to investors using commingled funds);

- make political contributions;

- acquire properties not related to the offerings in the names of other Barton companies;

- acquire properties identified in a Wall offering but in the name of other Barton companies and using funds from a different Wall Entity;

- pay professional fees (such as engineering, surveying, and land development) related to, in most cases, properties unrelated to the offerings; and

- make payments to Wall.

*Id.* ¶¶ 3-5, 35.  In the end, the SEC alleges that the Wall Entities "were left with little or no assets, the projects were not developed, and the investors were never paid back."  *Id.* ¶ 5.

### 2.    The Appointment of the Receiver

On September 26, 2022, the SEC filed a Motion for Appointment of Receiver [Dkt. 6], requesting that United States District Judge Brantley Starr appoint a federal equity receiver over the Wall Entities, Carnegie Development, certain Relief Defendants (DJD Land Partners, LLC and LDG001, LLC) and "[a]ny other entities that Barton directly or indirectly controls, including, but not limited to" BM318 LLC; D4DS LLC; D4FR LLC; D4KL LLC; Enoch Investments LLC; FHC

Acquisition LLC; Goldmark Hospitality LLC; JMJ Acquisitions LLC; JMJ Development LLC; JMJAV LLC; JMR100 LLC; Lajolla Construction Management LLC; Mansions Apartment Homes at Marine Creek LLC; MO 2999TC, LLC; Orchard Farms Village LLC; Villita Towers LLC; and 126 Villita LLC (collectively, the "Receivership Entities").  On October 17, 2022, Barton filed a Response [Dkt. 24] in opposition to the appointment of a Receiver.  On October 18, 2022, the Court entered the Receivership Order [Dkt. 29], which appointed the undersigned to serve as Receiver over the Receivership Entities.

### 3.       Supplementation of the Receivership Order

The Receivership Order states that the Court assumed "exclusive jurisdiction and possession of the assets . . . of . . . any other entities that Defendant Timothy Barton directly or indirectly controls . . . ."  RO ¶ 1.  While several entities controlled by Defendant Barton are included in the Receivership Order, the Receiver quickly discovered from a review of formation binders in the Turtle Creek Office that over 100 entities controlled by Defendant Barton had not been specifically listed in the Receivership Order.  Because certain banks and lenders had refused to follow the Receivership Order's mandates absent specific identification of certain companies as "Receivership Entities," on November 1, 2022, the Receiver filed a Motion to Supplement Order Appointing Receiver [Dkt. 41], asking the Court to supplement its Order to specifically list each of these entities.  Defendant Barton opposed the motion [Dkt. 55], as did his son Maximilien Barton ("Max Barton") [Dkt. 53].  On November 16, 2022, the Court entered an Order Granting Receiver's Motion to Supplement Order Appointing Receiver [Dkt. 62] (the "First Supplemental Order") as to the vast majority of these entities and directed the Receiver to file supplemental briefing addressing certain Max Barton-related entities.

On November 30, 2022, the Receiver filed his Supplemental Brief in Support of the Motion to Supplement [Dkt. 73], asking the Court to specifically identify the following entities as

Receivership Entities because they were controlled by Defendant Barton: Gillespie Villas, LLC; Venus 59, LLC; TRTX Properties, LLC; MXBA, LLC; Titan Investments, LLC; TC Hall, LLC; and Titan 2022 Investment, LLC.  Defendant Barton filed a Response [Dkt. 81] opposed to the requests contained in the supplemental brief.  Max Barton similarly filed a Response [Dkt. 82] the same day opposed to the requested relief.  On December 13, 2022, the Court entered an Order Granting Receiver's Motion to Supplement Order Appointing Receiver [Dkt. 88] (the "Second Supplemental Order").

4.    **Stay of the SEC Case and Barton's Attempts to Stay the Receivership.**

On November 2, 2022, the United States Department of Justice filed an Unopposed Motion to Intervene and to Stay Proceedings, whereby it sought to stay the SEC's civil enforcement lawsuit pending resolution of certain Defendants' criminal proceedings.  On November 16, 2022, the Court entered an Order Granting Motion to Intervene and Stay Proceedings [Dkt. 64], but ordered that "[n]othing in this Order shall preclude the Court-appointed Receiver from performing the duties and obligations, and from exercising the powers and rights, set forth in the Court's Order Appointing Receiver."

As detailed in the Receiver's Third Quarterly Report, Defendant Barton filed motions with both the District Court and the Fifth Circuit to stay the Receivership Order pending his appeal. These motions were both denied during the First Quarter of 2023.  Additional motions to stay were denied during the Second Quarter of 2023.

5.    **Barton's Appeal of the Receivership Order**

On November 17, 2022, Defendant Barton filed a Notice of Appeal [Dkt. 66] concerning the Receivership Order, the First Supplemental Order, and other orders entered by the Court.  Case No. 22-11132.  The Fifth Circuit Court of Appeals heard oral argument on May 1, 2023, and on June 28, 2023, that court issued a published opinion that vacated the Receivership Order effective

90 days after the issuance of the Fifth Circuit's mandate and remanded back to the district court for further proceedings. The Fifth Circuit also suspended the Receiver's ability to sell or dispose of any property not previously approved by the Court; however, initially the court expressly authorized the Receiver to engage in "activities in furtherance of sales or dispositions of property that have already occurred or been approved by the district court." During the Third Quarter of 2023, the Fifth Circuit modified its prior opinion and suspended the Receiver's ability to sell or dispose of any property, including those properties that the District Court had previously authorized the Receiver to sell.

### 6.    The SEC's Second Motion to Appoint Receiver

On July 5, 2023, the District Court entered an order noting the Fifth Circuit's remand for further proceedings and directing the SEC and Barton, in the interest of expediency, to meet and confer and inform the Court whether they would agree to proceed before a mandate issues from the Fifth Circuit. On July 12, 2023, the SEC and Barton submitted a joint status report in which the SEC indicated that they were willing to proceed before the mandate issued but Barton indicated that he was not willing to so proceed. On July 16, 2023, the District Court entered an order (a) stating that because the parties did not consent to proceed before the mandate issues, the Court lacked jurisdiction to order the parties to proceed; (b) indicating that once the mandate issues, the Court intends to order the SEC to move for appointment of a receiver; and (c) noting that, consistent with the Fifth Circuit's opinion, the Court will require the SECs motion to (1) request appointment of a receiver under the factors set out in *Netsphere, Inc. v. Baron*, 703 F.3d 296, 305 (5th Cir. 2012); (2) request injunctive relief; and (3) provide a basis for the inclusion of entities in the receivership that complies with the Fifth Circuits standard, *i.e.*, that limits the receivership to entities that received or benefitted from assets traceable to Barton's alleged fraudulent activities that are the subject of this litigation." Finally, the Court indicated that the SEC's motion would be

due within one week of the Fifth Circuit's mandate issuing and that it will set a briefing schedule after issuance of the mandate.

The Fifth Circuit's mandate issued on August 31, 2023. That same day, the District Court ordered [Dkt. 305] the SEC to move for entry of a new Receivership Order on or before September 7, 2023, with Barton's response due September 25, 2023, and the SEC's reply due October 5, 2023. The Court also directed the Receiver to submit a declaration "providing all information obtained since his appointment that he believes is relevant to the Court's consideration of a proposed new receivership order, or anything else he believes will assist the Court or help inform the Court's deliberation on this matter."

The overwhelming majority of the Receiver and his team's efforts during the Third Quarter of 2023 involved the Receiver's preparation of his Declaration and Interim Report [Dkt. 308],[1] which was filed on September 5, 2023. As detailed more fully in the Declaration and Interim Report, the significant time and expense of preparing the Declaration and Interim Report were justified, among other things, because the filing was mandated by the District Court, complied with the Receiver's duties under the Receivership Order, and most importantly, gave the Receivership (and thus defrauded investors and creditors) the best chance to maximize and accurately identify the assets to be included in the Receivership Estate given the Receiver's extensive efforts during the past twelve months.

The SEC filed its Motion for Appointment of a Receiver, for a Preliminary Injunction and Ancillary Relief, and to Lift Stay for Limited Purpose [Dkt. 309] (the "Second Motion to Appoint Receiver") on September 7, 2023. As will be detailed in the Quarterly Report for the Fourth

---

[1] The Receiver's Declaration and Interim Report, together with all prior Quarterly Status Reports of the Receiver, are hereby incorporated by reference as if fully set forth herein.

Quarter of 2024, on September 27, 2023, the Court granted Barton's request for additional time to respond to the Second Motion to Appoint Receiver and set a hearing on the motion for October 11, 2023. As of the date of this Report, the hearing has occurred, the Court has taken the matter under advisement, and the Court indicated at the hearing that it will rule on the Second Motion to Appoint Receiver before the Initial Receivership Order expires on November 29, 2023.

The District Court has separately ordered [Dkt. 306] that all pending motions in the case as of August 31, 2023 are denied without prejudice and directed the parties to refile any such motions after the Court resolves the Second Motion to Appoint Receiver.

Until a new receivership order is entered, the Receiver's ability to sell or dispose of property belonging to the Receivership Entities is suspended, though his other duties, obligations, and powers continue in full force and effect. If the District Court does not enter a new receivership order prior to 90-days after the Fifth Circuit's mandate issues (November 29, 2023), then the Initial Receivership Order will be vacated and the Receiver's authority under that order will cease. If the District Court enters a new receivership order before that time, the suspension of the receivership's ability to sell or dispose of property will have no bearing going forward.

### 7.    Other Dismissed and Pending Appeals

In addition to the main appeal of the Receivership Order, Defendant Barton and others have filed appeals of other orders granting motions filed by the Receiver.[2] These other appeals include the following:

On December 21, 2022, Defendant Barton filed a Notice of Appeal of the Rock Creek Sale Order. Case No. 22-11226. On June 19, 2023, the Fifth Circuit entered an Order dismissing the

---

[2]As discussed below, Barton opposed the Receiver's request that the appellate docket reflect the Receiver as an appellee or other real party in interest, despite the order on appeal having been issued based on the Receiver's motion. Accordingly, the Receiver has sought to be heard in those appeals as an amicus.

appeal. On September 1, 2023, the Fifth Circuit withdrew its prior opinion and entered a new opinion that dismissed the appeal as moot. The mandate issued on October 24, 2023. This appeal and the status of the Rock Creek Sale are discussed further below.

On December 23, 2022, Defendant Barton filed a Notice of Appeal of the District Court's Order Granting the Receiver's Motion to Ratify Agreement with DLP Capital and Other DLP Entities. Case No. 22-11242. Briefing is fully ripe on this appeal. While the case was tentatively scheduled for oral argument for the week of October 2, 2023, during the Third Quarter of 2023 the Fifth Circuit notified the parties that the panel assigned to the case had determined that oral argument was not required for the case. As of the date of this Report, the appeal is still pending and the Fifth Circuit has not yet issued its Opinion.

On January 12, 2023, Max Barton filed a Notice of Appeal of the Second Supplemental Order. Case No. 23-10046. As of the filing of this Report, briefing is fully ripe, but oral argument has not yet been granted or set.

On May 16, 2023, Defendant Barton filed a Notice of Appeal of the District Court's Sale Order approving the sale of the Amerigold Property. Case No. 23-10515. On July 17, 2023, the Fifth Circuit entered an Order dismissing the appeal. On October 12, 2023, the Fifth Circuit withdrew its prior opinion and entered a new opinion that dismissed the appeal as moot. The mandate issued on October 20, 2023. This appeal and the status of the Amerigold Sale are discussed further below.

On May 16, 2023, Defendant Barton also filed a Notice of Appeal of the District Court's Order Granting the Receiver's Motion to Approve Settlement Agreement with HNGH Turtle Creek, LLC. Case No. 23-10516. On July 17, 2023, the Fifth Circuit entered an Order dismissing this appeal as well. On October 12, 2023, the Fifth Circuit withdrew its prior opinion and stated

RECEIVER'S FIFTH STATUS REPORT – PAGE 10

that that the opposed motion to dismiss the appeal would instead be carried with the case. As of the date of this Report, this appeal is still pending. The appeal and a variety of matters concerning 2999 Turtle Creek are discussed further below.

On June 21, 2023, Defendant Barton appears to have filed a pro se direct appeal to the Fifth Circuit from the 2999TC Acquisitions, LLC bankruptcy case. Case No. 23-10648. As of the filing of this Report, briefing in the appeal is ripe, and oral argument has not yet been set.

**8.      Status of Defendants Barton and Fu's Criminal Trial**

On September 20, 2022, at the United States Department of Justice's request, a grand jury indicted Defendant Barton for wire fraud, conspiracy to commit wire fraud, and securities fraud. *See United States v. Barton, et al.*, No. 3:22-cr-352-K (N.D. Tex.). On October 13, 2022, Defendant Fu, rather than being similarly indicted, instead waived indictment and pleaded guilty to the sale of unregistered securities.

During the First Quarter of 2023, Defendant Barton sought and received a continuance of his criminal trial from May 8, 2023 to February 5, 2024. As of the date of this Report, Defendant Barton's criminal trial remains set for February 5, 2024, and Defendant Fu's sentencing remains set for February 21, 2024.

**B.      Status of Receiver's Efforts to Sell, Develop, Hold or Otherwise Dispose of Real Estate.**

To-date, the overwhelming majority of the Receiver's time—and a substantial portion of his counsel's time, when not responding to Defendant Barton's filings—has been spent identifying real estate-related assets of the Receivership Entities, reaching out to lenders and other interested parties on each property, determining insurance, utility, tax, and other payments coming due on each of the properties, identifying and communicating with a host of potential purchasers of each of the properties, identifying brokers and other professionals willing to assist in the initial valuation

and eventual sale of these properties, identifying appraisers who will be able to help carry out the mandates of 28 U.S.C. § 2001, and reviewing lien reports and title commitments on the properties.

As originally outlined in the Receiver's Initial Report and then further illuminated in the Second, Third, and Fourth Status Reports, without exception, the real estate assets held by the Receivership Entities face significant challenges.  For one, the vast majority of the assets are heavily leveraged, with some having favorable interest rates and others having abnormally high rates.  Additionally, as to the most valuable assets at one time owned by the Receivership Entities (2999 Turtle Creek and the HUD apartments described below), significant legal challenges have complicated potential dispositions of such properties, making recovery uncertain.  Finally, the economic environment remains uncertain and interest rates have continued to rise.

Additionally, the Receivership has been cash-starved from the outset.  These cash-flow issues still exist today—despite the Receiver's best efforts to increase liquidity and the District Court and Fifth Circuit's repeated denials of Barton's requested stays—because Barton's practice of appealing sale orders has caused title companies to refuse to issue title policies.  As of the date of this Report, sales that would net over $4 million to the Receivership have been approved for several months, yet none of the sales have closed.

Stated differently, with every passing month, accruing interest collectively for all Receivership Assets is between approximately $167,899.06 (at standard interest rates) and $256,529.13 (at default interest rates). As a result, if the Receivership Estate does not sell any of the real estate assets (the freeze Barton has repeatedly insisted is appropriate here), between $2 million and $3 million in interest alone accrues annually, further reducing the assets that may ultimately be available to defrauded investors and creditors.  Looking at just the three property sales previously approved by the District Court, the monthly interest cost is between $40,791.92

(standard rates) and $91,533.66 (default rates)—meaning that as of November 29, 2023, using the original agreed, approved closing dates for each transaction, the delayed closing of just these three properties has already cost the Receivership Estate between roughly $340,000 (standard rates) and $753,000 (default rates).

Based on the information now known by the Receiver, the Receiver believes the following real estate assets may result in a net recovery for the receivership estate and provides an update to his proposed plan for the fair, reasonable, and efficient disposition of the properties:

### 1.    4107 Rock Creek Drive

As detailed in the Initial Status Report, while reviewing documents at the Turtle Creek Office, the Receiver's team discovered documents indicating loans and insurance payments on a property located at 4107 Rock Creek Drive in Dallas (the "Rock Creek Property"). Upon further examination, the Receiver determined that this property was owned by SF Rock Creek, LLC, a Receivership Entity controlled by Defendant Barton. *See* Dkt. 41 ¶¶ 6-7. Accordingly, the Rock Creek Property is a Receivership Asset.

The Receiver obtained an initial opinion of value that the property is worth approximately $1.45 million. Because (1) the property was financed with a "house flipping loan" that included a high interest rate (9.99%), in addition to being saddled with continuing obligations to pay utilities, insurance, and taxes; (2) the Receivership faced a general dearth of liquid assets with which to administer its ongoing needs; and (3) the relative ease and efficiency in selling residential properties versus commercial properties, the Receiver listed this property for sale as expeditiously as possible through a respected, independent broker.

After receiving several offers on the property, the Receiver ultimately agreed, subject to Court approval, to sell the Rock Creek Property "AS IS" to the potential purchaser with the highest offer for a total payment price of $1.4 million. In accordance with 28 U.S.C. § 2001 and the

Court's Administration Order [Dkt. 63], the Receiver obtained three separate appraisals that resulted in an average appraised value of $1,393,333. The contracted sales price not only exceeded two-thirds of the average appraised value of the Property as required by 28 U.S.C. § 2001(b), but exceeded the average appraised value.

On December 2, 2022, the Receiver filed a Motion for Appointment of Appraisers, Approval of Appraisals of Rock Creek Property, and Setting Hearing Regarding Approval of Sale of Rock Creek Property [Dkt. 76], contending that the sale of the Rock Creek Property for $1.4 million was in the best interest of the Receivership. The Court set a hearing to consider approval of the sale for December 19, 2022. Barton filed a Response in opposition to the Receiver's proposed sale [Dkt. 91].

Shortly before the December 19 hearing, the title company assisting the Receiver with the sale of the Rock Creek Property notified the Receiver that on December 1, 2022—after the Receiver had discussed his efforts to sell the Rock Creek Property in his Initial Status Report and the same day that the Receiver's counsel conferred on the sale of the property—Defendant Barton recorded a lis pendens on the property. Because the title company was unwilling to issue a title policy with the existence of the lis pendens, the Receiver was forced to file an Emergency Motion to Declare Lis Pendens Void [Dkt. 96] on December 16, 2022.

At the December 19 hearing, which started at 10 am and concluded shortly before lunch, the Court found that the sale was in the best interest of the Receivership, giving the Receiver authority to complete the sale at the scheduled December 28 closing. The Court also ordered Barton to pay for the Receiver's fees (totaling $1,200) in seeking to have the lis pendens declared void.

However, just hours after the conclusion of the hearing, Defendant Barton reached out to the purchaser (unsolicited and without permission from the Court or the Receiver) to notify the purchaser of past foundation and flooding issues Barton claims to have had with the property. In light of Barton's communication, the purchaser requested an extension of the closing date.

Moreover, on December 21, 2022, Defendant Barton filed a Notice of Appeal of the Rock Creek Sale Order. Case No. 22-11226. The title company refused to issue a title policy while the appeal of the sale order was pending. Because of the title company's unwillingness to close (and the fact that the motion to approve the sale was filed by the Receiver), the Receiver initially sought to intervene in the appeal, be treated as an appellee, or alternatively be treated as an amicus and submitted a motion to dismiss. The Fifth Circuit denied the request to be treated as appellee or an intervenor, but granted the Receiver leave to file as an amicus. During the Second Quarter of 2023, the Receiver sought leave to file a second amicus brief in response to arguments by Barton relating to tracing of funds into the Rock Creek Property. This motion was opposed by Barton and denied. However, on June 19, 2022, the Fifth Circuit entered an Order dismissing the appeal based on the absence of jurisdiction. On September 1, 2023, the Fifth Circuit withdrew its prior opinion and entered a new opinion that dismissed the appeal as moot in light of its opinion vacating the Initial Receivership Order. The mandate in that appeal issued on October 24, 2023.

As of the date of this Report, sale of the Rock Creek Property has been suspended pending entrance of a new Receivership Order. It also remains unclear whether the title company will issue a title policy based on the procedural status of the case. In the months since the District Court's issuance of the Rock Creek sale order, the Receiver and the Rock Creek purchaser have entered into several extensions of the closing date. Pending resolution of the District Court's consideration

of a new Receivership Order, the Rock Creek purchaser continues to rent the property subject to a long-term lease.

In the interim, the financial problems that plagued the Rock Creek Property from the outset persist. As stated in prior status reports, the Receiver has confirmed that the loan on the Rock Creek Property was not a traditional homeowner's loan. To the contrary, Defendant Barton agreed that during the term of the Loan, SF Rock Creek would "not occupy any portion of the Mortgaged Property in any manner" and that "persons with a direct or indirect ownership interest in [SF Rock Creek] shall not occupy any portion of the Mortgaged Property in any manner throughout the term of the loan." Interest continues to accrue daily. While the Receiver has leased the Rock Creek Property to the approved purchaser to salvage (hopefully) the sale, under the loan documents all rent payments go to the lender. Finally, while the Receiver negotiated favorable terms regarding penalty interest and a pre-payment penalty that would otherwise have been due based upon a December 28, 2022 closing, and while the Receiver is optimistic he will be able to reach a similar agreement if he is able to close the approved sale, no guarantees exist that these favorable terms will be part of a delayed closing or subsequent sale.

After payment of the existing loan, associated fees, taxes, closing costs, and broker commissions, the Receiver still anticipates net proceeds flowing into the Receivership Estate. However, given the continued uncertainty surrounding the closing date, it is still impossible to accurately predict the amount of funds that will flow into the Receivership Estate. Regardless, the funds flowing into the Receivership if closing occurs in late 2023 will be considerably less than they otherwise would have been had closing occurred in December 2022 or January 2023.

### 2. Frisco Gate Property

Receivership Entity FHC Acquisitions, LLC is the record owner of approximately 4.5 acres at the corner of the Dallas North Tollway and John Hickman Parkway in Frisco (the "Frisco Gate

Property"). Early in the Receivership, the Receiver obtained multiple broker's opinions of value for this property that generally estimated the property's value between $8.9MM and $10.8MM. Through a broker previously retained by Barton, and with Barton's cooperation, a potential purchaser of the Frisco Gate Property approached the Receiver about acquiring the Frisco Gate Property for $9,000,000. The parties entered a Letter of Intent on October 31, 2022. Between October 31 and December 13, 2022, the parties negotiated a purchase and sale agreement.

Pursuant to 28 U.S.C. § 2001, the Receiver sought three appraisals on the property—two broker opinions of value and one formal appraisal. The three appraisals valued the Property at $9,016,920 - $10,018,800, $8,896,365 - $9,884,850, and $9,000,000, respectively. After receiving the formal appraisal on December 16, 2022, the Receiver and his team prepared a Motion for Appointment of Appraisers, Approval of Appraisals, and a Hearing Regarding Approval of Sale of Frisco Gate Property [Dkt. 110], which was filed on December 22, 2022. Barton filed a Notice of Non-Opposition [Dkt. 123]. On January 31, 2023, the Court held a hearing to approve the sale of the Frisco Gate Property and entered an Order [Dkt. 142] approving the sale the same day.

Because of certain challenges regarding potential parking commitments on the property and obligations under certain master development agreements, on January 24, 2023 the Receiver and purchaser entered an Addendum to the purchase and sale agreement. The Addendum did not materially alter the agreement, but simply (1) extended the Feasibility Period defined in the Agreement by an additional 30 days, (2) extended the closing date in proportion to the Feasibility Period, and (3) made certain Earnest Money nonrefundable if specified conditions are met. Pursuant to the Addendum, the Feasibility Period would end on February 13, 2023, with Closing set to occur on or before April 14, 2023. The Receiver and purchaser ultimately entered similar Second and Third Amendments that extended the Feasibility Period and Closing Date because the

RECEIVER'S FIFTH STATUS REPORT – PAGE 17

parking issues remained unresolved.  Pursuant to a Fourth Amendment, the purchaser agreed to take the risk of resolving the parking issues, with closing set to occur in late September 2023. However, prior to the closing date, the purchaser indicated it would not be able to close in September, and the Fifth Circuit suspended any ability to close on the transaction prior to a new Receivership.  Moreover, additional parking complications have arisen since the Fourth Amendment was entered.

The Receiver continues to believe that this sale is in the best interest of the Receivership because, among other things, it allows the Receiver to accomplish a sale of the property (a) without a listing process, (b) without having to pay any broker fees (the potential purchaser of the property has agreed to pay its broker separately and outside of the sale proceeds), and (c) with a purchaser who is willing to work through and take the risk of the various parking and master development issues.

After payment of the existing loan (which appears to exceed $3 million), a second investment/loan of approximately $3.5 million, taxes, and closing costs, the Receiver anticipates this sale resulting in net proceeds of approximately $2 million into the Receivership Estate. However, continued delays caused by the non-disclosed parking issues continue to decrease the equity ultimately available to the Receivership.  Closing is currently set for December 2023; however, as of the date of this Report, the Receiver is still uncertain whether closing will actually occur during the Fourth Quarter because while progress has been made on the parking issues, the issues have not been fully resolved.

### 3.    2999 Turtle Creek

At one time, Receivership Entity 2999TC Acquisitions, LLC was the owner of the 2999 Turtle Creek Boulevard in Dallas (the "Turtle Creek Office"), having purchased the property in or around September of 2019.  In connection with this purchase, 2999TC Acquisitions, LLC or its

predecessor secured a loan in the amount of $32,500,000. Through protracted litigation in the bankruptcy court—and millions of dollars in payments from the Receivership Entities to the lender, HNGH Turtle Creek, LLC ("HNGH")—the Bankruptcy Court eventually entered an Order (the "Order Enforcing Agreed Orders") on September 28, 2022 that found, among other things, that HNGH, not 2999TC Acquisitions, LLC "owned" the Turtle Creek Office. That Order was appealed shortly after it was entered, and the appeal, which was also with this Court, was automatically stayed upon the Receiver's October 18, 2022 appointment.

On November 25, 2022, HNGH filed a Motion to Intervene and to Confirm Ownership of Property Located at 2999 Turtle Creek Boulevard [Dkt. 69]. Among other things, HNGH claimed that the Bankruptcy Court's September 28 order confirmed that as of May 2022, HNGH owned the Turtle Creek Office. The Receiver filed a Response [Dkt. 94] on December 15, 2022, in which he indicated that he was not opposed to HNGH's request to intervene as a party in interest but was opposed to HNGH's requested confirmation of any ownership interest in 2999 Turtle Creek and HNGH's implicit request to lift the stay of litigation imposed by the Receivership Order to permit resolution of the pending bankruptcy appeal. Defendant Barton also filed a Response [Dkt. 97] opposed to HNGH's request.

The Court ultimately granted [Dkt. 154] HNGH's motion to intervene but denied HNGH's request that the Court confirm ownership of the property. Instead, the Court ordered the parties to mediate the dispute and appointed Retired Bankruptcy Judge Harlin Hale as mediator. Mediation occurred on March 10, 2023.

As detailed more fully in the Receiver's Verified Motion to Approve Settlement Agreement with HNGH [Dkt. 210], the Receiver and HNGH settled their dispute as a result of the mediation. Pursuant to the terms of the Settlement Agreement, HNGH agreed to pay the Receiver

a total of $2.5 million in the following intervals following the Court's approval of the Settlement Agreement: (i) $500,000 paid within seven days; (ii) $500,000 paid within one year; (iii) $750,000 paid within eighteen months; and (iv) $750,000 paid within two years (collectively, the "Settlement Payments").

The Receiver entered the Settlement Agreement and presented the Motion to the Court because the settlement with HNGH was in the best interest of the Receivership. More specifically,

(1)   After an extensive investigation, the Receiver determined that there were significant, potentially impossible hurdles to unwinding the bankruptcy court's prior Agreed Orders, the confirmed and effective Plan, and the Order Enforcing Agreed Orders.  The Appeal would likely be unsuccessful, given the bankruptcy court's thoroughly examined factual record "in a hearing that lasted over fifty hours, stretched out over two months" and the requisite "clear error" standard of review for a bankruptcy court's findings of fact.

(2)   Even if the Receiver were to succeed on the Appeal—after an indefinite amount of time for the District Court's decision and then HNGH's inevitable appeal to the Fifth Circuit—the likely amount due under the Loan Documents would far exceed the value of the Property and the likely selling price of the Property.

(3)   The Receiver contended that $3.95 million of the $4.735 million that the Receivership Entities paid to HNGH under the Loan Documents were arguably fraudulent transfers, although $3.8 million of that was paid in accordance with obligations incurred by 2999TC under the Agreed Orders, which were incorporated into the confirmed and now-effective Plan, approved in the Bankruptcy Case.  Even if the payments were made with actual or constructive fraudulent intent, the

Receiver faced the significant hurdle of overcoming HNGH's good-faith defense because these payments were made by Receivership Entities pursuant to court orders. The substantial financial costs and delay of litigating these fraudulent transfer claims would only deplete the Receivership Estate with no guarantee of success. Consequently, the Receivership Estate's receipt of $2.5 million of potentially $3.95 million in fraudulent transfer amounts was a fair and equitable result.

The Court ultimately granted [Dkt. 236] the Motion to Approve Settlement Agreement with HNGH on May 15, 2023. On May 16, 2023, Defendant Barton filed a Notice of Appeal of the Court's Order approving the HNGH Settlement Agreement. Fifth Circuit Case No. 23-10516. On May 26, 2023, Barton separately filed a motion to stay with the Fifth Circuit that, among other things, sought a stay of the HNGH Settlement, including the Receiver's transfer of possession of the Turtle Creek Office to HNGH. On June 8 and June 9, 2023, the Fifth Circuit denied the motion to stay to the extent it sought to suspend the HNGH Settlement. On July 17, 2023, the Fifth Circuit dismissed Barton's separate appeal of the Order approving the HNGH Settlement Agreement. On October 12, 2023, the Fifth Circuit withdrew its prior opinion and stated that that the opposed motion to dismiss the appeal would instead be carried with the case. As of the date of this Report, this appeal is still pending.

As of the date of this Report, certain ancillary matters in the Bankruptcy Court remain pending. Otherwise, the second $500,000 payment under the HNGH Settlement is due on or before May 15, 2024, with the remaining $1.5 million being paid over two payments thereafter.

### 4.    HUD Apartments

Receivership Entities D4DS, LLC, D4FR, LLC, DRIN, LLC, and D4OP, LLC, are the record owners and HUD borrowers on four separate apartment complexes in Texas and Alabama

(collectively, the "HUD Apartments"). These properties include Bellwether Ridge in DeSoto, Texas (owned by D4DS, LLC), the Parc at Windmill Farms in Forney, Texas (owned by D4FR, LLC), the Parc at Ingleside near Corpus Christi, Texas (owned by D4IN, LLC), and the Parc at Opelika in Alabama (owned by D4OP, LLC).

Each of these properties was developed under (and is currently encumbered by) separate sizeable HUD loans administered through Greystone. Third-Party Southern Properties Capital, Ltd.'s ("SPC") provided a smaller second loan for each of the properties. SPC claims that its mezzanine loans were "convertible" in nature, whereby it had the option to convert its debt position into equity ownership of certain affiliated Receivership Entities and, indirectly, ownership of the HUD Apartments. SPC further claims that as to the DeSoto, Forney, and Ingleside HUD Apartments, it exercised conversion options prior to the appointment of the Receiver.

During the First Quarter of 2023, the Receiver entered into contracts to sell the DeSoto and Forney HUD Apartments owned by D4DS and D4FR, respectively, and filed motions to approve these sales free and clear of SPC's purported "ownership" premised on the claimed conversion of its debt into equity. [Dkts. 161 & 164]. SPC responded that the Receiver had no right to sell the DeSoto and Forney HUD Apartments [Dkt. 178]. The Court ultimately continued the hearing on the Receiver's motions to sell these properties and ordered the Receiver and SPC to file summary judgment briefing on the issue of ownership of the HUD Apartments. The Receiver filed his motion for summary judgment on April 13, 2023 [Dkt. 207], and SPC filed its response on May 30, 2023 [Dkts. 246 &247]. The Receiver's deadline to file a reply brief was originally stayed in light of the Fifth Circuit's opinion regarding the Receivership Order, and the Court has since dismissed without prejudice all pending motions, including the sale motion and the motion for summary judgment. While the Receiver is optimistic that he will ultimately succeed on the question of

ownership of the HUD Apartments, if SPC is successful in its challenge, the possibility exists that the Receivership Entities will not obtain any recovery on these properties.

As noted in prior Reports, Defendant Barton has suggested in various filings that the sale of one, two, or three of these properties would result in the recovery of sufficient funds to pay a 100% recovery to the Wall Investors.  However, as the Receiver has detailed in prior filings, this position not only ignores SPC's arguments regarding its equity position in the properties, but, even assuming that SPC's loans are treated as debt, ignores the existing HUD and SPC debt.  If SPC is determined to be the owner of the HUD Apartments, the Receivership will receive $0.  If the Receivership Entities are the owners of these properties, the current best estimate net value to the Receivership Estate would be $15.1 million; a substantial amount, but still far less than the $26 million alleged in the SEC's complaint.  Barton's suggestion also ignores the non-Wall creditors who would participate in the Receivership's eventual claims process, increasing total losses well in excess of $26 million.

Finally, at the hearing on the Motion to Approve the sale of the Amerigold Suites (discussed below), Barton indicated (through counsel) that contrary to prior assertions regarding the use of sale proceeds from these properties, Barton now contends he should receive the proceeds from the sale of any HUD Apartments rather than the Receivership Estate.  This was also confirmed by his challenges to the HUD Apartments (and other properties) being included in any new Receivership Order.

Similar to prior Quarterly Reports, each of the HUD Apartments is dealt with in turn:

> **a.      Bellwether Ridge (DeSoto)**

Receivership Entity D4DS, LLC is the record owner and HUD borrower on a certain apartment complex located at 841 S. Polk Street in DeSoto, Texas ("Bellwether Ridge"). In accordance with this Court's Orders and 28 U.S.C. § 2001, the Receiver obtained three

independent appraisals of the Property. One is a certified appraisal, and two are informal broker opinions of value. The three appraisals value Bellwether Ridge at $28,000,000, $27,750,000 - $29,750,000, and $28,800,000 - $31,900,000 resulting in an average appraised value of $29,033,333.[3]

After the Receiver's appointment, he consulted multiple industry professionals and brokers regarding the potential value of the Property and three other similar projects (Parc at Windmill Farms in Forney, the Parc at Ingleside outside of Corpus Christi, and the Parc at Opelika in Alabama) that involve both HUD loans serviced by Greystone and additional loans from SPC to JMJ. Due to the uncertainty surrounding the outstanding dispute with SPC, the Receiver ultimately was unable to reach agreement to engage the brokers, who expressed unease in marketing the properties due to SPC's ownership claims.

Despite difficulties listing the Property with a broker, the Receiver communicated with dozens of potential interested purchasers. While most of the potential purchasers ultimately were unwilling to submit offers on the Property, the Receiver obtained multiple offers on the Property, the highest of which was a letter of intent submitted by Palmetto Capital Partners, LLC—on behalf of a joint venture (Polk Street 2023, LLC) between Palmetto and i3 Interests LLC (collectively, "Palmetto/i3")—on November 30, 2023 at a purchase price of $27,000,000.

During the following months, the Receiver and Palmetto/i3 engaged in protracted negotiations regarding the purchase and sale agreements for the Property and one other related property. During this time, the Receiver continued to communicate with other potential interested

---

[3] On November 14, 2022, Defendant Barton filed an opinion of value—from an individual who is connected to Barton on at least one other transaction—that estimates the value of Bellwether Ridge to be between $26.7 million and $28.0 million. [Dkt. 57 at 7]. As of January 13, 2023, the balance on the HUD loan for this property was $17,823,548.47. As of January 17, 2023, SPC claims that the balance of its second loan for this property was $3,797,758.95.

purchasers, none of whom provided higher offers than that received from Palmetto/i3. Finally, on February 21, 2023 the Receiver and Palmetto/i3 entered into a Purchase and Sale Agreement, whereby the Receiver agreed, subject to Court approval and certain other contingencies, to sell the Property to Palmetto/i3, which will assume the existing HUD loan, for a total of $27,000,000.[4]

The Receiver remains hopeful, albeit increasingly pessimistic in light of the protracted and thorough summary judgment briefing, that he will be able to reach agreement with SPC to treat its loan as just that—a loan that will be paid at closing. Regardless of any ultimate agreement, SPC's claims to the proceeds from the sale of Bellwether Ridge can be administered through a claims process, where the adjudication of its claim to the proceeds from the sale of any HUD Apartment complex could range from treatment as an unsecured creditor, to the Court's determination that SPC is entitled to 100% of the sale proceeds.

As of the date of this Report, the contract for the sale of Bellwether Ridge remains pending, but the Sale Motion has been denied without prejudice. Pursuant to the parties' contract, because several months have passed since the execution of the agreement, either of the parties to the contract may terminate at any time. Once the issue of SPC's claimed ownership has been resolved, court approval for any sale will still be necessary pursuant to 28 U.S.C. § 2001. Assuming that SPC is ultimately treated as a lender, and if the Court approves the sale, after discounting the HUD loan balance ($17,823,548.47), the SPC loan balance ($3,797,758.95), and the fee to buyer's broker ($270,000), the sale would result in a net benefit of approximately $5.1 million to the Receivership Estate prior to other closing costs.[5]

---

[4] SPC's claimed ownership was a significant factor in the purchase price.

[5] These loan balances for each of the HUD Apartments are as of January 2023. The Receiver will update loan balances no later than January 2024.

### b.    Parc at Windmill Farms (Forney)

Receivership Entity D4FR, LLC is the record owner and HUD borrower on a certain apartment complex located at 1003 Windmill Farms Blvd., Forney, TX 75126 ("Windmill Farms"). In accordance with this Court's Orders and 28 U.S.C. § 2001, the Receiver obtained three independent appraisals of Windmill Farms. One is a certified appraisal, and two are informal broker opinions of value. The three appraisals value Windmill Farms at $50,000,000, $52,000,000 - $56,000,000, $53,000,000 - $58,000,000 resulting in an average appraised value of $53,166,666.

Despite difficulties listing the Property with a broker (as outlined above), after communicating with dozens of potential interested purchasers, the Receiver ultimately entered into a Purchase and Sale Agreement with Palmetto/i3 whereby the Receiver agreed, subject to Court approval, to sell the Property to Palmetto/i3, which will assume the existing HUD loan, for a total of $51,000,000.

As of the date of this Report, the contract for the sale of Windmill Farms remains pending, but the Sale Motion has been denied without prejudice. Assuming that SPC is ultimately treated as a lender, and if the Court ultimately approves the sale, after discounting the Greystone loan balance ($35,076,762.98), the SPC loan balance ($7,885,547.12), and the fee to buyer's broker ($510,000), the sale will result in a net benefit of approximately $7.5 million to the Receivership Estate prior to other closing costs.

### c.    Parc at Ingleside (Corpus Christi area)

Receivership Entity D4IN, LLC is the record owner and HUD borrower on a certain apartment complex located at 2850 Ave. J, Ingleside, TX, 78362 ("Parc at Ingleside"). The property is still in the process of rent stabilization. The Receiver is still gathering opinions of value and appraisal(s) on this property and anticipates discussing those in future status reports. To date, he has received opinions of value ranging between $28 million and $31.1 million. As of January

13, 2023, the balance on the HUD loan for this property was $24,790,081.91.  As of January 17, 2023, SPC claims that the balance of its second loan for this property was $3,759,163.65.  While the Receiver is hopeful that the value of this property compared to its loans will continue to increase in the coming months while the ownership dispute with SPC is resolved, the estimates above indicate that the sale of this property would result in the infusion of no more than $2.5 million into the Receivership Estate.

### d.    Parc at Opelika (Alabama)

Receivership Entity D4OP, LLC is the record owner and HUD borrower on a certain apartment complex located at 1375 McCoy Street, Opelika, AL 36801 (the "Parc at Opelika). Construction on Opelika is complete and the rental process has begun.  Endorsement of the HUD loan on the Opelika is not yet complete and cost certification remains in process.  The Receiver has encountered multiple challenges in this respect, including construction liens, interest payments that had to be made when draw requests were delayed, and ongoing challenges surrounding the Receiver's lack of access to QuickBooks and the Receivership Entities' digital files (as outlined below) and most recently Barton's refusal to sign cost certification documents.  At this time, there is no guarantee that certification will occur, but the Receiver is still optimistic that it will occur, albeit with potential loan penalty payments.  As noted in prior Reports, pre-Receivership findings identified by auditors—regarding repayment of an SBA loan and repayment of monies sent to other Receivership Entities—have been cured.

Similar to Bellwether Ridge, Windmill Farms, and Ingleside, Opelika has both a HUD loan as well as additional funding from SPC.  As of January 13, 2023, the balance on the HUD loan for this property was $21,878,710.41.  As of January 17, 2023, SPC claims that the balance of its second loan for this property was $3,189,659.90.  SPC claims that while it has not yet converted its debt to equity, its convertible loan will allow it to do so in the future.  While the Receiver

believes that Opelika presents significant value to the Receivership Estate, at this time it is impossible to predict what that value will be.

### 5.    Amerigold Suites

Receivership Entity Goldmark Hospitality, LLC is the record owner of a 70-unit extended-stay hotel located at 13636 Goldmark Dr. in Dallas, Texas (the "Amerigold Suites"). While the HUD Apartments have third-party property managers, the Goldmark Hospitality, LLC and other Receivership Entities coordinated with contractors to manage the Amerigold Suites. As discussed in his Initial Report, in the months prior to the institution of the Receivership, the Amerigold Suites had negative cashflow, in part because of a high number of vacant units and the generally poor condition of several units. Within days of the Receiver's appointment, he learned, among other things, that insurance on the property was on the verge of cancellation, that electricity was on the verge of being shut off, and that significant water bills were long overdue, even under a prior negotiated settlement. The Receiver was forced to expend scarce Receivership resources to preserve this asset and ensure that operations continued. Moreover, but–for the Receivership Order's automatic stay on foreclosure and other lender remedies, the lender, Texas Brand Bank, would likely have bene entitled to foreclosure after the Receiver's appointment since insufficient assets existed to make mortgage payments (whether on this property or any of the other properties owned by the Initial Receivership Entities).

During the Fourth Quarter of 2022 and continuing into the First Quarter of 2023, the Receiver and his team were forced to expend considerable effort (1) convincing electrical and water utility companies not to shut off services to the property; (2) securing property and liability insurance despite the history of the property and the existence of the Receivership; (3) meeting with the property manager to discuss the ongoing maintenance and repair needs of the property; and (4) analyzing various options to maximize the value of the Amerigold Suites.

In December 2022, Texas Brand Bank sold the note secured by the Amerigold Suites to a third party. As of January 30, 2022, the note holder claims that the outstanding balance on the primary loan on Amerigold Suites is $2,543,820.04. The Receiver is aware of at least one other smaller loan on the property, as well as a few other smaller liabilities.

As discussed below, a personal injury lawsuit involving Amerigold that was pending when I was appointed is currently stayed. The plaintiff in that case recently requested that the Court lift the stay in that proceeding in order to pursue settlement with the insurance carrier. During the First Quarter of 2023, the Receiver was notified of a second potential personal injury claim that occurred because of a recent storm. The insurance carrier has been notified of this incident, and the Receiver's investigation of the incident is ongoing.

During the Second Quarter of 2023, a City of Dallas fire inspector visited Amerigold and discovered a host of items that were out of compliance. Over several weeks the Amerigold property manager resolved each of the findings in the inspection report and eventually received a clean bill of health from the fire inspector. On or about July 6, 2023, a small fire occurred at the property. The Dallas Fire Department was called to the property, and the fire was extinguished with minimal property damage.

During the Second Quarter and into the Third Quarter of 2023, the Texas heat has continued to take its toll on the unit's air conditioning units, resulting in significant repair costs. Meanwhile, interest on the property has continued to accrue, the necessity for significant repairs have continued, property tax and insurance bills remain high, and the Receiver and his team are required to continue devoting significant attention to this property. The majority of these challenges have been present from the outset of the Receivership. Finally, the Receiver recently became aware of potential roof repairs that may be needed at the property.

In light of these challenges, and to avoid using limited receivership assets to continue operating the Property at a loss, the Receiver determined selling the Property was in the best interest of the Receivership Estate if a sale would generate a net return for the Estate. After consulting multiple industry professionals and brokers regarding the Property's potential value, the Receiver engaged a broker to market the Property.

The broker obtained multiple offers on the Property, the highest of which was a letter of intent submitted by Matthew Flume (the "Amerigold Purchaser") on January 25, 2023 at a purchase price of $5,500,000. The Amerigold Purchaser (and his affiliated entities) have extensive experience rehabilitating distressed multifamily assets.

The Receiver and the Amerigold Purchasers engaged in negotiations regarding a purchase and sale agreement for the Property, and on March 1, 2023, the Receiver and the Buyer entered into a Purchase and Sale Agreement (the "Amerigold Contract"), pursuant to which the Receiver agreed, subject to Court approval, to sell the Property to the Amerigold Purchaser for $5,500,000.

In connection with the sale and pursuant to 28 U.S.C. § 2001, the Receiver obtained three independent appraisals of the Property. Two are informal broker opinions of value, and one is a certified appraisal (collectively, the "Appraisals"). The three Appraisals valued the Property at $4,400,000, $3,500,000, and $4,900,000 -$5,500,000, resulting in an average appraised value of $4,366,667.[6] Thus, the contracted sales price, $5,500,000, not only greatly exceeded two-thirds of the average appraised value of the Property ($2.9 million) as required by 28 U.S.C. § 2001, but also exceeds the average appraised value by over $1 million.

---

[6] The averaged appraised value was calculated using the average of the WDIS Broker Opinion of Value, $5,200,00.

On March 2, 2023, the Receiver filed his Verified Motion for Appointment of Appraisers, Approval of Appraisals, Approval Hearing, and Approval of Sale of Amerigold Suites [Dkt. 167] (the "Amerigold Sale Motion"). Barton objected to the sale [Dkt. 185]. On March 20, 2023, the Court held a hearing on the Amerigold Sale Motion, and, on March 29, 2023, entered an Order approving the sale [Dkt. 202].

On May 16, 2023, Defendant Barton filed a Notice of Appeal of the District Court's Sale Order approving the sale of the Amerigold Property. Case No. 23-10515. Similar to the Rock Creek Property, the title company refused to issue a title policy so long as the appeal of the sale order was pending. Because of the title company's unwillingness to close (and the fact that the motion to approve the sale was filed by the Receiver, not the SEC) and the particular issues outlined above prompting the expeditious sale of this property, the Receiver once again sought to intervene or be treated as appellee. The Fifth Circuit denied the request to be treated as appellee or an intervenor, instead inviting the Receiver to file an amicus brief. The SEC ultimately filed a motion to dismiss, and on July 17, 2023, the Fifth Circuit granted the motion and dismissed the appeal. On October 12, 2023, the Fifth Circuit withdrew its prior opinion and entered a new opinion that dismissed the appeal as moot in light of the separate Opinion vacating the Initial Receivership Order. The mandate issued on October 20, 2023.

In the months since the District Court's entrance of the Amerigold sale order, the Receiver and the Amerigold purchaser have entered into amendments extending the closing date, with closing currently set for December of 2023.

If the sale ultimately closes, after discounting the loan balance (which was approximately $2,543,820 as of January 30, 2023 and has continued to accrue), liens on the Property (totaling

RECEIVER'S FIFTH STATUS REPORT – PAGE 31

approximately $6,298.59), and the fee to seller's broker ($192,500), prior to other closing costs, the sale will result in a net benefit of over $2.5 million to the Receivership Estate.[7]

### 6.    Venus Development

Prior to the Receiver's appointment, several Initial Receivership Entities were in the process of developing single-family communities around Venus, Texas and were negotiating a development agreement with the City of Venus.  The properties included in this potential development, including the Initial Receivership Entity that currently owns the properties is detailed below:

| Project Name | Current Owner | Approximate Address | CAD Geographic ID | Acres |
|---|---|---|---|---|
| Northstar | DJD Land Partners, LLC | 11417 CR 501, Venus, TX | 126.0857.00050 | 1 |
| Northstar | DJD Land Partners, LLC | 11417 CR 501, Venus, TX | 126.0857.00051 | 110.9 |
| Northstar | DJD Land Partners, LLC | 11417 CR 501, Venus, TX | 126.0857.00052 | 14.25 |
| Northstar | DJD Land Partners, LLC | 1025 N FM 157, Venus, TX | 126.0857.00030 | 1 |
| Northstar | Lynco Ventures, LLC | 1209 Cr 501, Venus, TX | 126.0358.00070 | 62.8 |
| Northstar | Lynco Ventures, LLC | 11209 Cr 501, Venus TX | 126.0358.00060 | 1 |
| Griffin I | LDG001, LLC | 980 CR 110, Venus, TX | 126.0093.00010 | 150.9 |

---

[7] Although not reflected in the title commitment or an independent review of the Dallas County property records, the Receiver has discovered a second loan for several hundred thousand dollars may encumber the Property.  The Receiver will verify the status of the purported loan before closing.  Even if the loan exists, the net to the Receivership Estate will likely be more than $2 million.

| Griffin II | LDG001, LLC | 324 W CR 109, Venus, TX | 126.0758.00100 | 46.9 |
| Griffin House | LDG001, LLC | 940 CR 110 Venus, TX | 126.0093.00009 | 1 |
| Berkowitz | Carnegie Development, LLC | 10901 CR 507, Venus, TX | 126.0261.00044 | 17.6 |
| Berkowitz | Carnegie Development, LLC | 10901 CR 507, Venus, TX | 126.0261.00039 | 86.9 |
| Berkowitz | Carnegie Development, LLC | 11129 CR 506, Venus, TX | 126.0261.00040 | 1 |
| Berkowitz | Carnegie Development, LLC | 11101 CR 506, Venus, TX | 126.0261.00041 | 30 |
| Berkowitz | Carnegie Development, LLC | 11129 N FM 157, Venus, TX | 126.0261.00042 | 30 |
| Berkowitz | Carnegie Development, LLC | 11129 N FM 157, Venus, TX | 126.0261.00043 | 30 |
| Johnston | Venus 59, LLC | 916 S Fm 157, Venus, TX | 126.0379.00110 | 3.4 |
| Johnston | Venus 59, LLC | 817 CR 214, Venus, TX | 126.0379.00040 | 59 |

At the time of the Receiver's appointment in October 2022, foreclosure proceedings initiated by secured lenders were in process regarding many of these properties. Those proceedings were automatically stayed upon entry of the Receivership Order, although the Receiver and his team had to expend effort to avoid scheduled foreclosure sales since not all lenders were aware of the stay included in the Receivership Order or even entry of the Receivership Order. Through the date of this Report, lenders on many of these properties have continued to

RECEIVER'S FIFTH STATUS REPORT – PAGE 33

threaten (and some have actually filed) motions to intervene and lift the stay of enforcement to permit them to initiate foreclosure proceedings.[8]

During the Third Quarter of 2023, the Receiver continued discussing the Venus Project with the representatives from the City of Venus, lenders and secured creditors, multiple developers who are potentially interested in developing the project, and other potential interested purchasers of the land.  If the development agreements with the City are finalized, the value of the properties could increase significantly.  However, as of the date of this Report, the Receiver is unable to predict (1) whether the development agreements will ultimately be finalized with the City of Venus and (2) if the development agreements are finalized, what value will ultimately be realized by the Receivership Estate.  Each of the properties associated with this development have significant debt (which debt collectively exceeds at least $11 million).  While I have received offers to purchase the property in excess of the total debt, as of the date of this Report I have not yet found viable paths towards development.  Thus, at this time, it is still too early to determine whether the Receiver will be able to recover any value for the Receivership Estate from the Venus Development or, if any net recoverable value exists, what that value will ultimately be.  Thus, I do not expect significant recoveries for the Receivership under either path.  Moreover, as of the date of this Report, the Receiver is unable to sell or otherwise dispose of these properties until a new Receivership Order is entered.

### 7.    Ridgeview Addition

Receivership Entity Ridgeview Addition, LLC owns approximately 54 platted lots near Bulldog Road in Venus, Texas (the "Ridgeview Property").  On or around July 2021, Ridgeview

---

[8] Another property (Venus Farms) was intended to be included in the development, but closing on the property never occurred.

Addition LLC entered into a Lot Take-Down Contract whereby it agreed to sell 54 developed lots to an affiliate of Lillian Homes at a price of $61,000 per lot (for a total purchase price of $3,294,000). The contract did not require conveyance of all lots at one time; rather twelve lots would be conveyed at closing, an additional twelve lots would be conveyed 120 days later, and three successive transfers of ten lots each would occur at 90 day intervals thereafter. All told, the contract contemplated that the take down of the lots will occur over a thirteen-month period.

The Receiver is aware of one loan on Ridgeview Addition (to a separate SPC-related entity) and a second loan burdening the property, which is cross-collateralized (to a separate SPC-related entity). Collectively, these loans almost certainly exceed the value of the property. Moreover, I have discovered significant additional liens burdening the property that would require release or satisfaction prior to closing the Lot Take-Down Contract or other transfer of the lots. And finally, the City of Venus insists that Defendant Barton agreed to construct a playground at the development as part of a platting promise, but the playground has not yet been constructed. Thus, despite Defendant Barton's prior claim that the sale of this property will bring in "approximately $265,000 in immediate cash equity into the Receivership," significant challenges and uncertainties render predicting the net recovery, if any, based on the Lot Take-Down Contract impossible.

During the Third Quarter of 2023, discussions with Lillian Homes, the lenders, the lienholders, and the City of Venus were paused in light of the Fifth Circuit's opinion. While the Receiver has made substantial progress towards the disposition of this asset, as of the date of this Report, the Receiver is unable to sell or otherwise dispose of these properties until a new Receivership Order is entered.

### 8.    Gillespie Property

Receivership Entity Gillespie Villas, LLC owns a residential/multi-family property located at 3600 Gillespie Dr. in Dallas, Texas (the "Gillespie Property"). On December 13, 2022, the

Court entered its Second Supplemental Order, which, among other things, confirmed that Gillespie Villas LLC is a Receivership Entity. Max Barton's appeal of the Second Supplemental Order is pending. Substantial funds were provided by Receivership Entity Broadview Holdings to purchase this property.

The Receiver has secured the necessary appraisals and opinions of value on the Gillespie Property, which on average value the property at approximately $1,100,000. The property remains in poor physical condition and without extensive repairs, is unrentable. The Gillespie Property is subject to a single promissory note, with an account balance exceeding $600,000, meaning if the property were to sell today, prior to closing costs and broker fees, it would result in a net benefit of approximately $500,000 to the Receivership.

### 9.    Hall Property

Receivership Entity TC Hall, LLC owns approximately 0.5 acres of raw land located at 3407 & 3409 Hall Street in Dallas, Texas (the "Hall Property"). The Court's December 13, 2022, Second Supplemental Order clarified that TC Hall, LLC is a Receivership Entity controlled by Defendant Barton. Once against Max Barton's appeal of the Second Supplemental Order is pending.

Substantial debt exists on this property, in the form of a loan from Louisiana National Bank. The most recent payoff statement received for the Hall Property shows a recurring balance of over $4.2 million. During the Second Quarter of 2023, the Receiver's brokers listed the Hall Property for sale at a price of $6 million. In light of the Fifth Circuit's opinion, the Receiver's efforts to sell this property have been paused. If the Hall Property were to sell for this amount, prior to closing costs and broker fees, the net value to the Receivership Estate would be $1,800,000.

### 10.    Other Potential Real Estate Assets

As outlined further below and in the Receiver's Motion to Compel (which was filed in January 2023 and granted during the Second Quarter of 2023), Defendant Barton still has not provided the overwhelming majority of the information required by the Receivership Order, including a list of properties owned by the Receivership Entities.  While the Receiver has endeavored to identify separately all properties owned by the Receivership Entities, he has reason to believe other properties owned, either directly or indirectly, by Defendant Barton exist.  The Receiver's investigation is ongoing.

### C.    Other Identified Assets of the Receivership.

Although subject to his on-going investigation, the Receiver believes the following assets may be additional sources of recovery for the receivership:

Artwork and other Contents of Turtle Creek Office.  The Turtle Creek office contained a large bronze casting of Michelangelo's Bacchus, along with other artwork and antiques.  During the early days of the Receivership, the Receiver was told by multiple individuals associated with Barton that more than $100,000 was paid for this sculpture and that an appraisal exists that indicates the sculpture is worth well in excess of that amount.  At one point, Defendant Barton and his lawyers suggested that the Receiver should liquidate this sculpture to help pay for administration of the Receivership.  However, Heritage Auctions has declined to assist the Receiver in selling this piece of art.  A professional art appraiser researched the bronze and estimates that its value at auction would likely be between $2,500 and $3,500.  The Receiver has contracted with a professional art and antiques auctioneer to sell this and certain other artwork and antiques from the Turtle Creek Office.  During the Second Quarter of 2023, these items were moved from the Turtle Creek Office to the auctioneer's warehouse.  The auction of artwork and antiques is expected to occur sometime in the Spring of 2024.

The remaining contents of the Turtle Creek Office were sold in May 2023.

Artwork at Rock Creek Property.  As discussed in the Initial Report, upon securing possession of the Rock Creek Property, the Receiver noticed several holes in the wall confirming, as he had been told, that artwork had been removed prior to his visit to the residence.  Despite multiple oral and written requests, for several weeks, Defendant Barton provided no list of artwork.  However, on November 15, Defendant Barton disclosed, perhaps inadvertently, pictures of some of the artwork that had been removed.  *See* Dkt. 58 at 29, 30, 33, 35.  Additionally, the Receiver located financial statements indicating that Barton believed the Receivership Entities owned artwork worth approximately $12 million.  In January 2023, the Receiver filed a Motion to Compel [Dkt. 133] Barton to disclose this and other information in accordance with the Receivership Order.  Barton has claimed that very little artwork was in either the Rock Creek Property or the Turtle Creek Property.  *See* Dkt. 160-1 at 23.  Without additional information regarding these pieces of art and their current location, it is impossible to ascertain the value of any such art.

Contents of Rock Creek Property.  In connection with approving the sale of the Rock Creek Property, the Court ordered that the Receiver move and store personal items belonging to Defendant Barton "before the Property is sold."  Because closing has yet to occur pending Barton's appeal of the sale order, contents of the Rock Creek Property remain on site.  The Receiver is still analyzing whether storage expenses will erode any recoverable value and whether to ask the Court for approval to sell these items if Barton is unwilling to pay storage costs.

Vehicles.  The Receiver has identified multiple vehicles that may have been purchased in whole or in part with Receivership Assets.  The Receiver is still determining what ownership interest the Receivership Entities have in these vehicles.

Airplane.  Receivership Entity JMJAV, LLC is the registered owner of a 1982 Learjet 55 located in Arlington, Texas.  The Receiver has received information indicating Third Coast Bank, SSB holds an approximately $350,000 note on the plane, and Elite Jet Solutions, LLC holds a $143,576.63 mechanic's lien.  The Receiver was informed that the aircraft has been parked at Elite Jet Solutions since 2019.  Elite Jet Solutions estimates the plane needs approximately $355,000 in parts and repairs to make it airworthy.  During the Third Quarter of 2023, the Receiver and his team continued to communicate with Third Coast and Elite Jet regarding the plane.

The Receiver estimates the plane is worth approximately $65,000 in its current condition, and if taken apart and selectively sold for parts, it could be worth as much as $200,000.  If the plane is operational, third-parties have informed the Receiver it may be worth approximately $900,000 - $1 million.  The Receiver's investigation of value and discussions with Elite Jet and Third Coast Bank are ongoing.

Participation Interests.  During the twelve months prior to the appointment of the Receiver (or longer in some instances), Receivership Entities AVG West, LLC, Orchard Farms Village, LLC, Mansions Apartment Homes at Marine Creek, LLC, D4KL, LLC, and 126 Villita, LLC (or their affiliates) sold properties in Fort Worth, Killeen, San Antonio, and Winter Haven, Florida.  In connection with these sales, the Receivership Entities often (though not always) received millions of dollars in sale proceeds, while also retaining a participation interest in the projects moving forward.

For example, the following funds were among those paid to Receivership Entities surrounding the sales of developments at Marine Creek, Orchard Farms, and Winter Haven:

- $800,000 on March 14, 2022 to Mansions Apartment Homes at Marine Creek, LLC

- $500,000 on March 14, 2022 to Orchard Farms Village, LLC

- $200,000 on May 6, 2022 to Mansions Apartment Homes at Marine Creek, LLC

- $2,000,000 on May 9, 2022 to AVG West, LLC (Winter Haven)

Although the Receiver's accountants still have not completed their forensic accounting, it appears that the majority of the above-described funds flowed into a bank account held at Texas Brand Bank in the name of Receivership Entity Broadview Holdings LLC.[9]

Certain Receivership Entities maintained participation interests of varying percentages with regard to some but not all of the above-referenced property sales (e.g., the Receiver does not believe a participation agreement exists for AVG West, LLC).  The Receiver is still investigating and analyzing potential value of participation interests related to the Killeen and San Antonio properties.  While it is impossible to predict the value these contractual interests may ultimately generate for the Receivership Estate, the Receiver is optimistic that some value will be realized.

Ratification of DLP Settlement.  As detailed more fully in the Receiver's Verified Motion to Ratify Agreement with DLP Capital and Other Entities [Dkt. 95], the Receivership Entities sold certain properties in Fort Worth (Orchard Farms and the Mansions at Marine Creek) and Florida (Winter Haven) to DLP Capital in late 2021.  As part of these transactions, the Receivership Entities (1) received several million dollars over a period of months, (2) transferred title to the properties, and (3) as to each of the Fort Worth properties, entered into a Construction Agreement, a Development Agreement, and a Participation Agreement.  On October 18, 2022, the same day that the Receiver was appointed, DLP Capital sent default notices to the Receivership Entities regarding their obligations under the Construction Agreement and Development Agreement.  After a meeting between counsel and protracted settlement negotiations, the Receiver and DLP Capital

---

[9] A bank statement from September 2022 indicates that over $100,000 in Receivership Entity funds were transferred from the Broadview Holdings Account to Defendant Barton's law firms.  .

eventually agreed to a mutual release of claims and a payment of $750,000 from DLP Capital to the Receivership. Although the Receivership Order specifies that the Receiver does not need Court approval for such agreements, the Receiver nevertheless filed a Motion to Ratify the agreement. The Court entered an Order ratifying the DLP agreement [Dkt. 109] over Barton's objection, and also denied Barton's motion to stay the Receiver's performance of the DLP agreement.

Barton has filed an interlocutory appeal of this Order. Case No. 22-11242. As of the filing of this Report, briefing in the DLP appeal is fully ripe. While the case was tentatively scheduled for oral argument for the week of October 2, 2023, during the Third Quarter of 2023 the Fifth Circuit notified the parties that the panel assigned to the case had determined that oral argument was not required for the case. As of the date of this Report, the appeal is still pending.

Walker Ranch. On December 8, 2022, the Receiver was notified—for the first time and despite the Receiver's pending Motion to Supplement the Receivership Order and Supplemental Brief setting forth specific evidence that Defendant Barton controlled Titan Investments, LLC— of a contract between Titan Investments, LLC and Byron Walker for Titan's purchase of the Walker Ranch. The communication did not come from Defendant Barton, any of his attorneys, or any of the Receivership Entities' host of former lawyers and employees. Instead, it came from Mr. Walker himself, who was attempting to sell the property to avoid foreclosure on his property. However, shortly before closing on the sale, Mr. Walker was notified of a lis pendens and lawsuit filed by Max Barton—in violation of the Receivership Order—against Mr. Walker and an affiliated entity to recover certain payments made by Broadview Holdings and other Receivership Entities to Walker before the purchase contract was terminated. Over a period of weeks, the Receiver learned, among other things, that one of the Receivership Entities' former lawyers held the note on the property and was trying to foreclose and that many of the payments included in

Titan Investments' lawsuit against Walker were not recoverable. To allow Mr. Walker to close the sale, the Receiver agreed to hold a substantial portion of Mr. Walker' equity in the sale ($120,000) pending negotiation of a court-approved settlement with Mr. Walker.

During the Second Quarter of 2023, the Receiver continued extensive discussions with Mr. Walker regarding potential settlement options and the need for additional supporting information regarding certain transfers made to Walker. Because of the delays in starting the Receiver's forensic accounting (which, as detailed below, is still ongoing) and based upon supporting documentation provided by Mr. Walker, during the Second Quarter of 2023, the Receiver returned $60,000 of the $120,000 funds to Mr. Walker. The remaining $60,000 remains on deposit in the Receivership bank accounts as of the date of this Report. The Receiver is optimistic that he and Walker will be able to reach agreement, but is waiting on completion of the forensic accounting to conclude any such settlement.

Fraudulent Transfer Claims. From a cursory review of the Broadview Holdings bank statements, it appears that hundreds of thousands of dollars may have been fraudulently transferred from that account between July and October 2022 alone. The Receiver believes that these transactions from one account over a limited period are indicative of a broader pattern of fraudulent transfers made by the Receivership Entities. Following completion of the on-going forensic accounting by the Receiver's accountants, the Receiver will evaluate the disposition of investor funds to identify potential fraudulent transfer claims against the recipient of the funds, as well as the existence and likely viability of the likely defenses to such claims.

Potential Damages Claims. The Receiver is investigating the role of other persons and entities associated with the Defendants and the Receivership Entities.

Recovery of False Profits.  To the extent any investors received monies in excess of their principal investment, the Receiver may seek the return of those "false profits."

**D.      Status of Forensic Accounting and Other Accounting Work.**

Although the Receiver assumed possession of all documents and computers belonging to the Receivership Entities housed in the Turtle Creek Office on the first day of the Receivership, completion of the forensic accounting has been delayed for a variety of reasons, including (1) Barton's refusal to assist in identifying the location of or responsible persons for the Receivership Entities' QuickBooks accounts; (2) Intuit's delays in providing access to the Receivership Entities' online QuickBooks accounts, which were finally made available during the Second Quarter of 2023; (3) the Receivership Entities' banks providing bank statements and debit and credit information inconsistently and slowly; (4) the general lack of operating cash during the first months of the Receivership; and (5) most recently, a temporary change in focus for the forensic accounting from its primary focus—determining potential fraudulent transferees and identifying each Wall Investor and the size of their investment(s)) to a focus, in light of the Fifth Circuit's opinion, on finding tracing examples where Wall Investor Funds eventually flowed into the various assets described above.

The Receiver's counsel has retained Ahuja & Clark to prepare the forensic accounting, which when complete should enable tracing (1) the amount of funds flowing from each Wall-entity investor into other Receivership Entities and (2) potentially, the use of those investor funds (*i.e.*, whether they were saved, spent, or transferred to someone else).  As discussed in prior reports, however, the accountants have observed *extensive* comingling between various Receivership Entity funds and accounts, thereby complicating the process exponentially.  This forensic accounting is of paramount importance to the Receiver's duties in analyzing claims received from investors, identifying potential targets of fraudulent transfer claims, and determining the amounts

owing to the Receivership on account of such claims.  It is also of particular importance in performing any sort of tracing analysis into the various Receivership Entities and assets.  During the Third Quarter of 2023, the Receiver's accountants continued the forensic accounting, spending significant time on finding tracing examples to be used in connection with the Receiver's Declaration and Interim Report [Dkt. 308] and preparing demonstratives of those examples.  As of the date of this Report, the forensic accounting is still ongoing.

The Receiver remains hopeful that the online QuickBooks accounts, as well as certain Enterprise versions of QuickBooks, will enable his accounting team to avoid some of the time and expense associated with manually entering transactions from bank statements.  However, as the Receiver's accountants have slowly gained access to the Receivership Entities' various QuickBooks accounts, they have determined that the most accurate means of confirming the data in QuickBooks is electronically scanning bank records and comparing them against any QuickBooks accounts that have been located.

Separately, during the Third Quarter of 2023, the Receiver's accountants continued to spend significant time preparing various tax filings associated with the Receivership and the 160+ Receivership Entities.  The Receiver and his accountants also continued to spend considerable time analyzing prior tax returns for the Receivership entities.  The Receiver's accountants ultimately determined that no Receivership Entity had filed tax returns since tax year 2019, meaning that for each Receivership Entity, the accountants had to prepare three federal tax returns.  Given Barton's lack of cooperation regarding any of the prior tax filings, much less the organizational and tax setup of the entities, the Accountants were forced to prepare the tax returns with a host of disclosures.  It remains to be seem what additional work will have to be done with the IRS to resolve penalties and other potential issues surrounding these returns.  As will be detailed in the

Receiver's next Quarterly Fee Application, this process of curing Barton's non-filing of prior tax returns has been extremely costly.

**E.    Other Second Quarter 2023 Activities of the Receiver.**

Between July 1, 2023 and September 30, 2023, the Receiver and his attorneys also engaged in the following:

Maintenance of Receivership Website.  During the Third Quarter of 2023, the Receiver maintained www.bartonreceivership.com (the "Receivership Website").  The Receivership Website enables the Receiver to quickly, inexpensively, and broadly convey information regarding the Receivership, particularly to potentially impacted investors who live overseas.  The Receiver continues to update the Receivership Website periodically as the Receivership progresses.  The Receiver will post a copy of this Report on the Website and intends to continue posting periodic updates, information and links to any potential sales or auctions of real estate or other property.

Freeze Letters and Requests for Information.  The Receiver and his attorneys continued to send freeze letters and requests for information to banks, creditors, and others as they became aware of additional persons who conducted business with the Receivership Entities.

Mail.  The Receiver and his team have continued to review the substantial amount of mail received by the Receivership Entities, both at a UPS Store and from other forwarded addresses.

Other Miscellaneous Activities.  Among other things, the Receiver and his team have also continued (1) securing access to the Receivership Entities' bank records, (2) communicating with interested parties, potential purchasers of assets, litigation counter-parties, former employees, attorneys, creditors, and others and (3) identifying potential third-party claims and other sources of recovery.  In addition, the Receiver has expended significant efforts in attempting to obtain title insurance so as to permit the various property sales the Court has approved to close, and, has continued evaluating and preparing for termination of the original Receivership Order.

**II.**
**AMOUNT OF CASH ON HAND AND ACCRUED ADMINISTRATIVE EXPENSES,**
**INCLUDING SECOND QUARTER RECEIPTS AND DISBURSEMENTS.**

During the initial 30 days of the Receivership, the Receiver opened bank accounts for the Receivership Estate at Veritex Bank in order to administer the receipt and disposition of monies in the Receivership. Additionally, because of the continued operations of the Amerigold Suites, the Receiver continues to maintain accounts at Vista Bank for the sole purpose of managing that property (although the Receiver was recently notified that Vista would be closing those accounts).

As reflected more fully in the schedule of the Receiver's receipts and disbursements that is attached hereto as Exhibit A,[10] during the Third Quarter of 2023, the Receiver deposited $3,999.70[11] into the Receivership Estate and also received rental income from the Amerigold Suites totaling $202,645.84. Total expenses during the Third Quarter of 2023 were $184,576.13.

As of the end of the Third Quarter of 2023, the balance held in the receivership bank accounts is $428,570.91.

As of June 30, 2023, the only accrued and unpaid administrative expenses are fees and expenses incurred by the Receiver and his professionals for work performed during the Second and Third Quarters of 2023. The Receiver will be filing his fee application for this work on or before November 14, 2023, or a later date, as determined by the Court.

---

[10] Included in Exhibit A are (1) the Standardized Fund Accounting Report ("SFAR") required by the Court, (2) an itemized list of receipts and disbursements to date in the Receivership accounts at Veritex Bank, (3) an itemized list of receipts and disbursements to date in the Amerigold Suites accounts at Vista Bank; and (4) an itemized list of receipt and disbursements to date in the D4OP LLC account at Veritex Bank.

[11] Of the total deposits into the main Receivership bank account, $60,000 are funds related to the Walker Ranch transaction discussed above.

A.      **Description of Recoveries from Third Quarter of 2023**

   1.      **Deposits into Veritex Accounts**

The Receiver's deposits between July 1, 2023, and September 30, 2023, were comprised of the following:

Insurance Refund.  During the Third Quarter of 2023, the Receiver deposited a refund check in the amount of $3,410.07 related to insurance on the Gillespie Villas.

Interest Deposits.  During the Third Quarter of 2023, the Receiver received a total of $1,050.70 in interest payments.

Other Miscellaneous Receipts.  During the Third Quarter of 2023, the Receiver also received funds related to a shut-in payment on the BM318-related property ($528.00).

   2.      **Deposits into Vista Accounts (Amerigold Suites)**

Between July 1, 2023 and September 30, 2023, the Amerigold Suites generated $202,645.84 in gross rental income.

B.      **Description of Disbursements from Third Quarter of 2023**

   1.      **Disbursements from Veritex Accounts**

Between July 1, 2023, and September 30, 2023, the Receivership spent $3,162.17 on general Receivership (*i.e.*, non-Amerigold) expenses, comprised of the following:

Utility Fees.  The Receiver paid $124.32 to TXU and Dallas Water Utilities related to electricity and water at Gillespie during the Quarter.

Landscaping.  During the Third Quarter of 2023, the Receiver paid $2,025.00 to landscapers related to (1) mowing at the Gillespie, Hall, and Frisco Properties, (2) tree trimming at the Gillespie Property, and (3) securing the Hall Property from unwanted car parking.

Opelika Expenses.  During the Third Quarter of 2023, the Receiver transferred $127,594.85 to a segregated D4OP LLC account in order to cure the final finding from the Parc at Opelika cost certification.

Ingleside Expenses.  During the Third Quarter of 2023, the Receiver paid bills related to the Ingleside property totaling $146.85.

Other Miscellaneous Expenses.  During the Third Quarter of 2023, the Receiver also paid (1) $261.00 to the City of Dallas related to a citation for the property and (2) $605.00 related to the renewal of Receivership Entity One Agent LLC's status and registered agent in Delaware.

**2.      Disbursements from Vista Account (Amerigold Suites)**

Between July 1, 2023, and September 30, 2023, the Receivership spent $181,476.12 on the Amerigold Suites, comprised of the following:

Payments to Property Manager.  During this Quarter, the Receiver paid the property manager at Amerigold a total of $10,070.13.

Maintenance and Cleaning Payments.  During this Quarter, the Receiver paid maintenance and cleaning contractors a total of $14,892.50.

Landscaping.  During this Quarter, the Receiver paid $4,300.00 in landscaping and tree trimming invoices.

Repair Costs.  During this Quarter, the Receiver paid $46,635.10 in repairs.  The majority of these costs related to summer air conditioning repairs.

Utility Payments.  During this Quarter, the Receiver paid $62,012.90 in utility payments for electricity, water, and internet.

Trash Payments.  During this Quarter, the Receiver paid $2,752.30 for trash collection at the property.

Pest Control.  During this Quarter, the Receiver paid $632.18 relating to pest control at the property.

Insurance Payments.  During this Quarter, the Receiver paid $24,360.19 in insurance premium payments.

Bank Fees.  During this quarter, the Receiver paid $86.00 in check fees, wire fees, and other miscellaneous bank fees.

Other Miscellaneous Expenses.  During the Third Quarter of 2023, the Receiver also paid (1) $10,000.00 to a property tax consultant who helped obtain a significant reduction of the 2023 Amerigold property tax bill; (2) $171.00 related to the City of Dallas's fire inspection; and (3) $1,563.82 in subscription fees related to software used at the property.

## III.
## DEVELOPMENT OF CLAIMS HELD BY
## RECEIVERSHIP ESTATE AND OTHER PENDING LITIGATION.

During the first day of the Receivership, the Receiver and his team interviewed multiple lawyers who officed in the Turtle Creek office who were aware of (and in many respects involved in) dozens of active and closed litigation matters involving the Receivership Entities.  As the Fourth Quarter of 2022 progressed, the Receiver and his team became aware of several additional active litigation matters involving the Receivership Entities and began speaking to counsel for counter-parties.  These conversations continued during the first three Quarters of 2023.  Pursuant to ¶¶ 34-36 of the Receivership Order, all civil legal proceedings of any nature are stayed until further order of the Receivership Court.

Included below is a list of the active (but stayed) litigation matters of which the Receiver is currently aware, as well as developments (in any) from the Third Quarter of 2023 (*in italics*). After the Fifth Circuit's opinion was entered on June 28, 2023, the Receiver and his team generally

paused efforts to resolve these disputes pending the Court's consideration of a renewed motion for entry of a new Receivership Order.  Because of the number of stayed cases, the Receiver anticipates making recommendations on each of these cases on a rolling basis in future reports.

**Wall-Related Litigation**

1.    *Wall Entity Bankruptcies*[12] (Bankr. E.D. Tex.)

On August 19, 2022, the Wall Entities and Seagoville Farms, LLC filed voluntary Chapter 11 bankruptcy petitions in the Eastern District of Texas.  Prior to the Receiver's appointment, counsel for the Debtors and the US Trustee's office agreed that the bankruptcy filings should be dismissed.  The Receiver has been told by counsel to the debtors that the purpose of these bankruptcy filings was to identify all investors in the Wall Entities.  Assuming this to be the case, these bankruptcy filings are unnecessary because one of the central purposes of the claims process in the Receivership is to identify investors in the Wall entities.  Moreover, it does not appear that there is any monetary value to be gained by proceeding with those cases.

Accordingly, in the near future, the Receiver will likely concede to the lifting of the stay in the Wall Entities' bankruptcy cases to permit their agreed dismissal.

*No new updates from Third Quarter of 2023.*

2.    *Sun Yun, Qu Yi, Ma Jinghui, Gao Huaizen v. WALL012, LLC, WALL016, LLC, WALL017, LLC, WALL018, LLC, Platinum Investment Corporation (PIC), JMJ Holdings, LLC*, No. DC-20-04575 (44th District Court, Dallas County, Texas)

Plaintiffs assert they loaned the various Wall Entities a total of $700,000 and claim Defendants defaulted on the loans. The Wall Defendants filed a third-party petition against Haoqiang Fu a/k/a Michael Fu his spouse, Jin Wang, and Silverland Finance, Ltd, and asserted

---

[12] These cases are styled In re: *WALL007, LLC*, No. 22-41049; *In re: WALL009, LLC*, No. 22-41113; *In re: WALL011, LLC*, No. 22-41114; *In re: WALL010, LLC*, No. 22-41125; *In re: WALL012, LLC*, No. 22-41135; *In re: WALL016, LLC*, No. 22-41136; *In re: WALL017, LLC*, No. 22-41137; *In re: WALL018, LLC*, No. 22-41176; *In re: WALL019, LLC*, No. 22-41177; *In re: Seagoville Farms, LLC*, No. 22-41181.

cross claims against Platinum Investment Corporation. On September 13, 2022, the Wall Defendants filed Chapter 11 Bankruptcy.

*No new updates from Third Quarter of 2023.*

3.   *Rone Engineering Services, Ltd. v. JMJ Development, LLC, WALL017, LLC, WALL009, LLC, and Seagoville Farms, LLC*, No. DC-19-20384 (116th District Court, Dallas County, Texas)

Rone initiated this lawsuit for breach of contract for unpaid services related to engineering work performed on properties owned by Wall007, Wall009, and Seagoville Farms.  Rone asserts the work was contracted by JMJ. Wall007 filed bankruptcy in 2020 and on August 6, 2020, the Court administratively closed the case.  The case remains inactive.

*No new updates from Third Quarter of 2023.*

4.   *JMJAV, LLC v. Michael Fu, Jin Wang, Lynn Zhou, Tidy Fan, Summer Tian, Shirley Qing, and Michele Guo*, No. 2020-00720 (281st District Court, Harris County, Texas)

Plaintiff initiated this lawsuit to recover funds in excess of $1 million paid to defendants based on defendants' allegedly fraudulent representations they were Texas realtors.  Defendant Shirley Quing was dismissed, and Plaintiff nonsuited claims against defendants Jin Wang, Lynn Zhou, Tidy Fan, Summer Tian, and Michele Guo. Case has been abated.

*No new updates from Third Quarter of 2023.*

**HNGH Bankruptcy Cases (2999 Turtle Creek)**

5.   *2999TC Acquisitions, LLC*, Chap. 11 Bk, No. 3:21-bk-31954 (United States Bankruptcy Court for the Northern District of Texas, Dallas Division)

Receivership Entity 2999TC Acquisitions borrowed $ 32.5M from HNGH to acquire property at 2999 Turtle Creek Blvd for the eventual construction of hotel but was unable to repay the loan.  Facing a deed in lieu of foreclosure, 2999TC Acquisitions filed chapter 11 bankruptcy.

*No new updates from Third Quarter of 2023.  As of the date of this Report, the Receiver's Motion for Final Decree remains pending.*

6.   *2999TC Acquisitions, LLC v. HNGH*, No. 22-03061-swe (United States Bankruptcy Court for the Northern District of Texas, Dallas Division)

Related to 3:21-bk-31954, Plaintiff filed the adversarial proceeding based on breach of contract and a request for declaratory judgment that they are the rightful owner of the disputed property at 2999 Turtle Creek.

*No new updates from Third Quarter of 2023.*

7.   *2999 Turtle Creek, LLC v. Timothy Lynch Barton*, No. DC-20-12133 (192nd District Court Dallas County, Texas)

Plaintiff sued Defendant claiming he guaranteed $32.5M loan on 2999 Turtle Creek property and when borrower defaulted, Defendant refused to pay.  The parties filed an agreed motion to abate the case based on an order entered in the related bankruptcy case. The court granted an abatement until March 15, 2022.  Shortly after March 15, 2022, Defendant filed a motion to dismiss which is still pending.

*No new updates from Third Quarter of 2023.*

**Palisades Litigation (2999 Turtle Creek and Frisco Gate Property)**

8.   *In Re: Dallas Real Estate Investors*, No. 21-41488 (US Bk Ct, ND Fort Worth Division)

9.   *In Re: Dallas Real Estate Investors Palisades TC, LLC, Individually and on behalf of Five Star GM, LLC v. Dallas Real Estate Investors, LLC et al.*, Nos. 21-04061, 21-04073 (United States District Court for the Northern District of Texas, Fort Worth Division)

Cases 21-04061 and 21-04073 were adversary proceedings that were consolidated in October 2022 under 21-04061.  Palisades invested approximately $4M in 2999 Turtle Creek Acquisition through Five Star MM, and approximately $3.5M in Frisco Gate property through

FHC Acquisitions.  Palisades alleges the money was a loan intended to be repaid and Defendants defaulted by not repaying. Defendants allege the money was a capital contribution.  Parties engaged in settlement talks but could not come to an agreement.

*No new updates from Third Quarter of 2023.*

**Hodges Litigation (2999 Turtle Creek)**

10. *Hodges III, L. Allen, as Independent Executor of the Estate of Leland A. Hodges, Jr., Tejas Group, Ltd., LAH III Family Specific Interests, Ltd., and Blackfoot Interest, Ltd. v. 2999TC LP, LLC, JMJ Development, LLC and Timothy Barton* No. 141-316567-20, (141st District Court Tarrant County, Texas)

In September 2019, Defendant 2999 TC LP, LLC borrowed $4,000,000 from Plaintiffs in connection with property at 2999 Turtle Creek. Timothy Barton, individually, and JMJ Development, LLC guaranteed the loan.  According to Plaintiffs, 2999 TC defaulted, and Plaintiffs accelerated the note. Defendants counterclaimed asserting Plaintiffs slip sheeted the loan documents and changed terms.  The Court granted Plaintiff's motion for summary judgment and awarded actual damages of $4.25M, pre and post judgment interest, costs of court, and $111,962 in attorney's fees.  The Court also entered an order severing claims not covered by the summary judgment. Defendants appealed, and the case is pending in the Court of Appeals.

*No new updates from Third Quarter of 2023.*

11. *In re 2999TC LP, LLC*, Chap. 11 BK , No. 4:20-BK-43204 (US Bk Ct, ND Fort Worth Division)

Related to 141-316567-20.  A few months after the related case was filed, 2999 TC, the debtor, filed for Chapter 11 bankruptcy.  In September 2022, the bankruptcy trustee filed a motion to dismiss or in the alternative convert to chapter 7, stating that the debtor was not likely to successfully reorganize.  Debtor objected and a hearing on the matter was postponed due to the Receiver's stay.

*No new updates from Third Quarter of 2023.*

12. *Hodges III, L. Allen, as Independent Executor of the Estate of Leland A. Hodges, Jr., Tejas Group, Ltd., LAH III Family Specific Interests, Ltd., and Blackfoot Interest, Ltd. v. 2999TC LP, LLP, JMJ Development, LLC and Timothy Barton*, No. 141-328490-21 (141st District Court, Tarrant County, Texas)

Related to 141-316567-20. This case originated when the Court in the related case entered an order severing claims not covered by the Order granting MSJ in the related case. Defendants appealed, and the case is pending in the Court of Appeals.

*No new updates from Third Quarter of 2023.*

13. *JMJ Development, LLC and Tim Barton v. L. Allen Hodges III, et al.*, No. 02-21-00414-CV (Second Court of Appeals, Fort Worth Division)

Appeal from 141-328490-21. On August 25, 2022, the Court of Appeals granted an order consolidating appeals 02-21-0041 and 02-22-00288. The appeal is pending.

*No new updates from Third Quarter of 2023.*

14. *JMJ Development, LLC and Tim Barton v. L. Allen Hodges III, et al.*, No. 02-22-00288-CV (2nd COA, Fort Worth)

Appeal from 141-316567-20. On August 25, 2022, the Court of Appeals granted an order consolidating appeals 02-21-0041 and 02-22-00288. The appeal is pending.

*No new updates from Third Quarter of 2023.*

**Kirby Litigation (2999 Turtle Creek)**

15. *Pamela Kirby v. Timothy L. Barton, John McElwee, JMJ Development, LLC, 2999TC Acquisitions, LLC, 2999TC Founders, LLC, 2999TC JMJ, LLC, 2999TC JMJ GM, LLC, 2999 Five Star GM, LLC, Five Star GM, LLC, Five Star MM, LLC, Five Star TC, LLC*, No. 3:22-CV-01447-M (United States District Court for the Northern District of Texas, Dallas Division)

Pursuant to a subscription agreement, in 2019 Ms. Kirby invested $1M with 2999TC Founders, LLC for the purchase and development of 2999 Turtle Creek. She contends her

investment was fraudulently induced, that Barton failed to disclose foreclosure proceedings, and misappropriated her funds which were comingled with the Chinese investor funds.  She contends she is a victim of the crimes Barton has been charged with and requests a judicial determination of that fact so she can claim a tax credit for her loss.  For any distributions, she also seeks treatment as an investor rather than a creditor.   The Receiver's counsel has had several lengthy communications with Ms. Kirby's counsel and will continue to seek a fair resolution.

*No new updates from Third Quarter of 2023.*

16.    *In Re: 2999FC Finders, LLC* (Bk.), No. 22-40911 (United States Bankruptcy Court for the Eastern District of Texas)

On July 21, 2022, 2999TC Founders filed for voluntary Chapter 11 bankruptcy. On October 7, 2022, debtor Pamela Kirby filed a Motion to Dismiss the Chapter 11 case.  In light of the receivership, the Court entered an order Staying Debtor's Pending Motion to Dismiss and All Other Matters.

*No new updates from Third Quarter of 2023.*

**Nitya Capital Litigation (2999 Turtle Creek)**

17.    *Nitya Capital, LLC v. 2999TC Acquisitions MZ, LLC*, No. DC-22-09841 (14th District Court, Dallas County, Texas)

Plaintiff made loan to Defendant for approximately $1.5M related to the development of 2999 Turtle Creek.  When 2999TC Acquisitions filed for bankruptcy in 3:21-bk-31954, Nitya asserts this caused an event of default without opportunity to cure and called the loan.  Defendant did not pay the loan balance and Nitya filed suit. Defendant has not filed an answer.

*No new updates from Third Quarter of 2023.*

**Dowdall Litigation (2999 Turtle Creek)**

18.    *John Dowdall v. 2999TC JMJ MGR, LLC and Timothy Barton*, No. DC-22-14770 (193rd District Court, Dallas County, Texas)

Plaintiff initiated suit against the Defendants to recover $2M loaned to JMJ MGR which Barton guaranteed.  Plaintiff alleges Defendants failed to make any payments and defaulted on the note.  This case was filed October 21, 2022, after the Receiver was appointed, and no answer has been filed.

*No new updates from Third Quarter of 2023.*

**Amerigold-Related Litigation**

19.    *Serena Badgley, As Next Friend of Bryson Badgley, Minor v. Goldmark Hospitality, LLC*, No. CC-21-02991-B (County Court at Law No. 2, Dallas County, Texas)

Plaintiffs are mother and son who lived at Amerigold Suites owned by Defendant.  Son fell from a second story window and was injured when a closed window gave way.

*No new updates from Third Quarter of 2023.*

20.    *Stream SPE LTD. v. Goldmark Hospitality by and through its General Partner, TRTX Properties, LLC*, No. 2021-81644 (80th District Court, Harris County, Texas

Plaintiff initiated suit against Defendant based on Defendant's failure to pay for contracted electrical service.  Defendant has answered.

*No new updates from Third Quarter of 2023.*

**Ridgeview-Related Litigation**

21.    *Circle H Contractors, LP, v. La Jolla Construction Management, LLC, and Ridgeview Addition, LLC*, No. DC-C202200522 (18th Dist. Ct. Johnson Cnty., Tex.)

Plaintiff initiated this lawsuit to recover approximately $64,000 in fees owed for work done installing a PVC water main system and fire hydrant assemblies, with related testing, connection of manholes, and sewer services and installation of storm drain system for the Ridgeview Addition project. This lawsuit was filed after the Receiver was appointed, and no answer has been entered.

*No new updates from Third Quarter of 2023.*

**Windmill Farms-Related Litigation**

22. *BGE, Inc. v. JMJ Development, LLC*, No. 471-03497-2020 (471st District Court, Collin County, Texas)

Plaintiff initiated suit against defendant to recover fees owed for surveying and engineering services provided for Windmill Farms Development in Kaufman County, Texas. Defendant contracted with Plaintiff to provide the services and allegedly refused to pay invoices sent by the Plaintiff. An order compelling discovery responses from Defendant was entered August 8, 2022.

*No new updates from Third Quarter of 2023.*

**Ramolia Litigation**

23. *"David" Dhirah Ramolia, v. Timothy Barton and JMJ Development*, No. DC-19-11030 (191st District Court, Dallas County, Texas)

24. *JMJ Development, LLC and Timothy Barton v. "David" Dhiraj Ramolia*, No. 05-21-01100-CV (From DC-19-11030, 5th Court of Appeals)

25. *"David" Dhirah Ramolia, v. Timothy Barton and JMJ Development*, No. 02-0922 (Appellate Case (to Sup. Ct.) Supreme Court from 5th Court of Appeals)

Defendants each executed a $3M note payable to the Plaintiff in connection with the sale of real property and a settlement agreement in Bankruptcy Case Nos. 17-34255-SGJ-11 and 17-34274-SGJ-11. Defendants counterclaimed asserting that conditions to the note were not completed by the Plaintiff and that the notes were not valid. After considering Plaintiff's motion

for summary judgment, the court entered a judgment against each Defendant for $3M plus pre-judgment interest.

Defendants appealed the final judgment entered in DC-19-11030. The Fifth Court of Appeals dismissed the case on the grounds that the appeal was not timely filed. Defendants then appealed to the Texas Supreme Court on October 13, 2022.

*No new updates from Third Quarter of 2023.*

26. *Timothy Barton and JMJ Development, LLC v. A.J. Babaria, Bilal Khaleeq and Dan Morenoff*, No. DC-20-17086, (Related case DC-19-11030) (191st District Court, Dallas County, Texas)

Plaintiffs in this case, (defendants in DC-19-11030) severed claims related to defendants from DC-19-11030. Among the claims are violations of ethical obligations related to Khaleeq's role as a former attorney for JMJ, and legal malpractice claims against Morenoff as attorney for JMJ and Barton in the bankruptcy proceeding underlying this case and the related case.

*No new updates from Third Quarter of 2023.*

27. *TRTX Properties, LLC and JMJ Development v. Dhirah "David" Ramolia*, No. 471-00033-2022 (471st District Court, Collin County, Texas)

Tim Barton and JMJ Development allege they entered into an agreement with Defendant and a third party to purchase a piece of land involved in a dispute between the third party and the Defendant. As part of the agreement Defendant was supposed to release his ownership claims to the property, but failed to do so, resulting in Barton and JMJ losing the property. Barton assigned his claims to TRTX, making it a party.

*No new updates from Third Quarter of 2023.*

**Lost Creek-Related Litigation**

28.   *The Somerset-Lost Creek Golf Ltd.v. Timothy Barton, LC Aledo TX LLC, WALL010, LLC, JMJ Acquisitions*, No. 096-319595-20 (96th District Court, Tarrant County, Texas)

Defendants hold a $300,000 note secured by a Deed of Trust on a golf course.  Plaintiffs initiated the lawsuit to set aside a prior foreclosure by the Wall Defendants while Plaintiff/a Third Party Trust also contemporaneously foreclosed their own senior lien.  Plaintiff/Third Party Plaintiff contends they can sell the property free and clear of the Wall Note based on that foreclosure.  Defendants' counterclaims for breach of contract and fraud in connection with real estate are pending.  The case has been stayed.

*No new updates from Third Quarter of 2023.*

**BM318-Related Litigation**

29.   *BM318, LLC v. Dixon Water Foundation*, No. 4:20-BK-42789 (US Bk Ct, ND Dallas Division)

BM318 purchased a tract of land from Dixon with $2M down and a seller financed note of $33 million held by Dixon.  BM318 defaulted on the note, and Dixon recorded a special warranty deed transferring most of the property back to Dixon.  BM318 then filed Chapter 11 bankruptcy and the Bankruptcy court confirmed the plan on August 2, 2021.

*No new updates from Third Quarter of 2023.*

30.   *BM318, LLC v. Dixon Water Foundation*, Adversary No. 4:21-AP-4051, Related to 4:20-BK-42789 (United States Bankruptcy Court, Northern District of Texas, Dallas Division)

After the Court approved the Chapter 11 plan in the related case, Plaintiff filed an adversarial proceeding against Dixon alleging the special warranty deed was a preferential or

fraudulent transfer. Plaintiff also filed a lis pendens. Dixon filed a counterclaim requesting that

if the Court determines the transfer was void to find that Dixon still has a lien on the property.

*No new updates from Third Quarter of 2023.*

31.    *BM318, LLC v. Lumar Land Cattle, et al.*, WF AP: 4:21-AP-4051 (United States Bankruptcy Court, Northern District of Texas, Dallas Division, Related to 4:20-BK-42789)

During the pending bankruptcy in the related case, but several months before the

adversarial proceeding was filed, Lumar bought a 204 acre tract of land from Dixon. The land

later became part of the adversarial proceeding between BM318 and Dixon. Lumar then

contracted to sell part of the land and the lis pendens was discovered causing the sale to fall

through. After discovering the lis pendens, Lumar sought, and was granted, permission to

intervene in the adversarial proceeding and asserts it was a good faith purchaser and that the lis

pendens is an incorrect cloud on its title. Lumar and the Receiver are currently in negotiations

regarding a settlement.

*No new updates from Third Quarter of 2023.*


**3820 Illinois-Related Litigation**

32.    *JMJ Development, LLC v. Tamamoi, LLC and 3820 Illinois, LLC*, No. DC-22-02622 (68th District Court, Dallas County)

Plaintiff obtained a $500,000 loan from Tamamoi to purchase land located at 3820 E.

Illinois Ave. After repeated missed payments and several extensions to the loan, Tamamoi

foreclosed on the property. Tamamoi then conveyed the property to 3820 Illinois, LLC. Plaintiff

asserts it was a wrongful foreclosure and initiated this lawsuit seeking to set aside the foreclosure.

Defendants filed an MSJ shortly before the receivership. The Receiver's counsel have had several

conversations with Defendants' counsel and will continue to seek a fair resolution.

*No new updates from Third Quarter of 2023.*

33.    *Deshazo Group v. Timothy Barton, JMJ Development*, No. CC-22-04381-B (County Court at Law No. 2, Dallas County, Texas)

Plaintiff sued Defendants in JP court on an unpaid invoice related to a traffic study that was performed for property owned by JMJ Development on Illinois Ave in Dallas.  A default was granted.  Defendants assert the JP suit was not properly served and appealed the judgment to the county court.

*No new updates from Third Quarter of 2023.*

**Other Pending Litigation Matters**

34.    *JMJAV v. Elite Jet*, No. 017-333443-22 (17th District Court, Tarrant County)

Plaintiff initiated this lawsuit asserting that defendants failed to provide reasonable estimates and overcharged Plaintiffs for work done to Plaintiff's Learjet 55.  Plaintiff refused to pay for the excess charges and in return defendant refused to release the aircraft, associated log books, and other documentation pertaining to the aircraft.  Defendant filed counterclaims against Plaintiff and Tim Barton, as a third party, based on suit on a sworn account, breach of contract, and unjust enrichment.

*No new updates from Third Quarter of 2023.*

35.    *In Re: FM 544 Park Vista, Ltd. and Pavist, LLC*, No. 17-34255-SGJ-11/17-34274-SJG-11 (US Bk Ct, ND Dallas Division); *on appeal*, *JMJ Development, LLC, et al. v. Roger Sefzik, et al.*, No. 3:22-cv-02254-L (N.D. Tex.)

Dispute arose between Tim Barton, JMJ and TRTX, and Debtor FM 544, Debtor Pavist in connection with the ownership and development of certain real property, consisting of approximately 31.159 acres located in Plano, Collin County, Texas.  The Court entered a Chapter 11 reorganization plan which became final in September 2018.  As part of the plan, the parties

agreed to release certain claims and not sue based on those claims. JMJ and TRTX filed a lawsuit against debtors in this case, and others, in violation of the Court's order. In response, the Court entered an injunction and contempt order against JMJ, TRTX, Tim Barton and the responsible attorneys (the "contemnors"). On October 4, 2022 the contemnors filed an appeal, which has been docketed but no other action has been taken.

*No new updates from Third Quarter of 2023.*

36.    *Cardno, Inc. v. JMJ Development, LLC, Villita Towers, LLC and Tim Barton*, No. DC-22-10928 (160th District Court Dallas County)

Plaintiff initiated this suit to recover approximately $84,000 in unpaid fees from Defendant related to Plaintiff's work as a structural engineer on the Villita Towers project. Defendants have yet to file an answer.

*No new updates from Third Quarter of 2023.*

## IV.
## STATUS OF CLAIMS PROCEEDINGS FOR INVESTORS AND CREDITORS

The Receiver has not yet filed a Motion for Order Establishing Claims Adjudication Process.

### A.    Wall Investors

On November 7, 2022, the Receiver sent letters to approximately 100 investors who had previously been identified as potential investors in Wall Entities. The letters also included a request for information. This letter and request for information were also posted to the Receivership Website. Dozens of the investors have completed the information forms, which the Receiver continues to receive on a daily basis. If a claims process is initiated, the Receiver anticipates receiving additional information from these investors, other Wall investors, and other creditors. Through the forensic accounting process, the Receiver will continue to identify and cross-reference potential investors in the Wall Entities.

## B.    Other Investors and Creditors

In addition to investors in the Wall Entities, the Receiver has continued identifying other lenders, equity investors, and creditors (both secured and unsecured) of the Receivership Entities. While the Receiver's efforts to date have focused primarily upon identifying investors and assets, dozens of creditors have already been identified, and the Receiver anticipates receiving many more creditor claims when the Court commences a claims process.

## V.
## PROPOSED PLAN FOR ADMINISTERING THE RECEIVERSHIP

The next immediate steps for administration of the Receivership, pending entrance of a new receivership order, include finalizing previously approved sales and completing the forensic accounting. If and when the Court enters a new Receivership Order, the Receiver's next steps will also include (1) continuing to secure and maintain the assets of the Receivership, including, liquidating assets of the Receivership where necessary to preserve and maximize their value; (2) completing a forensic accounting of the Receivership's bank accounts to (a) determine the amount of monies flowing into the Wall Entities from investors, (b) trace where those monies ultimately flowed, and (c) identify potential fraudulent transfers and transferees; and (3) completing the identification of investors in the Wall Entities.

The forensic accounting will greatly aid the Receiver in determining whether the Receivership Estate has other assets that have not yet been discovered. Because the Receiver has received limited information from Defendant Barton to date, the forensic accounting will likely be the best means of determining where investor monies flowed.

## VI.
## RECOMMENDATION FOR CONTINUATION OF RECEIVERSHIP

This is the fifth report from the Receiver and extensive work still remains. More specifically, assuming this Court enters a new Receivership Order, the Receiver intends to

**RECEIVER'S FIFTH STATUS REPORT – PAGE 63**

(1) continue securing, maintaining, and selling assets; (2) continue pursuing potential fraudulent conveyances; (3) continue investigating potential damages claims against third parties; (4) petition the Court to establish an investor and creditor claims process; and, (5) upon a determination of liability, agreement of Defendants, or further order of this Court, eventually make distributions pursuant to a Court-approved distribution plan.  Accordingly, the Receiver recommends that the Receivership continue.

Dated: October 30, 2023

                                        Respectfully submitted,

                                        **RECEIVER CORTNEY C. THOMAS**

                                        By: _/s/ Cortney C. Thomas_
                                            Cortney C. Thomas
                                             State Bar No. 24075153
                                             cort@brownfoxlaw.com
                                            BROWN FOX PLLC
                                            8111 Preston Road, Suite 300
                                            Dallas, Texas 75225
                                            T: (214) 327-5000
                                            F: (214) 327-5001

**CERTIFICATE OF SERVICE**

        Pursuant to Fed. R. Civ. P. 5(d)(1)(B), as amended, no certificate of service is necessary, because this document is being filed with the Court's electronic-filing system.

**RECEIVER'S FIFTH STATUS REPORT – PAGE 64**