**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

|  |  |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | |
| Plaintiff, | |
| v. | |
| TIMOTHY BARTON, | C.A. No.: 3:22-cv-2118-X |
| CARNEGIE DEVELOPMENT, LLC, | |
| WALL007, LLC, | |
| WALL009, LLC, | Jury Trial Demanded |
| WALL010, LLC, | |
| WALL011, LLC, | |
| WALL012, LLC, | |
| WALL016, LLC, | |
| WALL017, LLC, | |
| WALL018, LLC, | |
| WALL019, LLC, | |
| HAOQIANG FU (A/K/A MICHAEL FU), | |
| STEPHEN T. WALL, | |
| Defendants, | |
| DJD LAND PARTNERS, LLC, and | |
| LDG001, LLC, | |
| Relief Defendants. | |

**PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S PROPOSED FINDINGS
OF FACT AND CONCLUSIONS OF LAW IN SUPPORT OF ITS MOTION FOR
APPOINTMENT OF A RECEIVER, FOR A PRELIMINARY INJUNCTION
<u>AND ANCILLARY RELIEF, AND TO LIFT STAY FOR LIMITED PURPOSE</u>**

The Securities and Exchange Commission ("SEC") submits these Proposed Findings of Fact and Conclusions of Law in Support of its Motion ("Motion") for Appointment of a Receiver, for a Preliminary Injunction and Ancillary Relief, and to Lift Stay for Limited Purpose.[1]

## I.    FINDINGS OF FACT

### A.    The Wall Offerings.

1.    From approximately March 2017 through June 2019, Timothy Barton ("Barton"), acting through Defendants Carnegie Development, LLC ("Carnegie") and the Wall Entities[2] (collectively, "Barton Defendants"), raised at least approximately $26 million from over 100 investors in securities offerings related to real estate investments in Texas.  Ex. 1, Declaration of Carol Hahn ("Hahn Dec.") at ¶ 14.  (App. 6)[3]

2.    The investments were offered through a series of investment contracts styled as "Agency and Loan Agreements" ("Loan Agreements") that each Wall Entity issued as the offering entity.  *See, e.g.,* Ex. 6, Wall 9 Loan Agreement at 1 (App. 25); Ex. 12, Wall 12 Loan Agreement at 1.  (App. 49)

3.    Though dealing with separate parcels of land, the Loan Agreements followed a similar template and contained similar terms.  Each Wall Entity:

---

[1] The Court provided the SEC until November 10, 2023, to respond to the Eric Johnson Declaration (Dkt. 330) admitted as Defense Exhibit F.  (Dkt. 385)  The SEC's response to the declaration is set forth herein at Proposed Findings of Fact ¶ 49.

[2] The "Wall Entities" refers to Defendants Wall007, LLC; Wall009, LLC; Wall010, LLC; Wall011, LLC; Wall012, LLC; Wall016, LLC; Wall017, LLC; Wall018, LLC; and Wall019, LLC.

[3] "Ex." citations refer to the notebook of exhibits the SEC submitted at the October 11, 2023 hearing.  The materials were also submitted via ECF with the Motion in the SEC's Appendix in Support of its Expedited Motion for Appointment of Receiver (Dkts. 7-9), the SEC's Supplemental Appendix in Support of the Motion (Dkt. 310), and the incorporated Declaration of Cort Thomas ("Thomas Dec.") (Dkt. 308).  Page citations to "App" and "Supp. App." appear on both the hearing and ECF copies of the exhibits.

- borrowed a fixed amount from individual investors;

- promised to repay the funds after two years;

- promised to pay interest after the first and second years;

- promised regular progress reports;

- represented the invested funds would be combined with other investors' funds and funds contributed by the offering entity itself (or, for Wall 7, contributed by Fu and Wall);

- the combined funds would be used to acquire a specific parcel of land identified in the loan agreement;

- specified the purchase price of the land; and

- pledged the Wall Entities' membership interests as collateral to secure the investments.

*See, e.g.,* Ex. 6, Wall 9 Loan Agreement at 1-7.  (App. 25-31)

4.      Barton developed, authorized, and approved the contents of the Loan Agreements, and he signed the Loan Agreements on behalf of Carnegie, the managing member of each of the Wall Entities.  *Id.* at 8 (App. 32)*; see also* Ex. 13, August 27, 2017 Loan Agreement Approval Email at 1 (App. 143); Ex. 26, July 20, 2021 Investigative Testimony of Haoqiang (Michael) Fu ("Fu Tr.") at 153:9-12.  (App. 263)

5.      Fu, acting directly or through personnel at his company, solicited Chinese investors living in China and in one or more U.S. states via emails, social media applications (*e.g.*, "WeChat"), internet sites, telephone and VOIP calls, and in-person presentations using the Loan Agreements, written investor presentations, and oral pitches.  *See, e.g.,* Ex. 11, Wall 10 Investor Presentation (with English translation) (App. 66-109); Ex. 12, Wall 12 Investor

Presentation (Chinese only) (App. 110-142); Ex. 26, Fu Tr. at 30:1-14; 30:25-31:15; 139:15-24; 153:17-19; 157:14-158:18.  (App. 260-265)  The Loan Agreements were offered and sold using wires, emails, phone calls, and internet applications.  Ex. 1, Hahn Dec. at ¶ 15 (App. 6); Ex. 26, Fu Tr. at 30:1-14; 30:25-31:15.  (App. 260-261)

6.      Investors invested money to obtain a fixed investment return, and their funds were pooled with other investors' funds, and were also supposed to be pooled with funds from the Wall Entities.  *See, e.g.,* Ex. 6, Wall 9 Loan Agreement at 1-2 (App. 25-26); Ex. 1, Hahn Dec. at ¶ 15.  (App. 6-7)

7.      These were entirely passive investments: the investors had no role or say in the operations or management of the Wall Entitles or the underlying real-estate projects, and the investors were entirely dependent upon, and expecting to profit solely from, the Barton Defendants' and Wall's expertise and efforts to manage the real-estate ventures and to identify, purchase, and develop the properties and operate the Wall Entities in a manner that would enable them to pay interest on the loans.  *See, e.g.,* Ex. 27, January 25, 2021 Investigative Transcript of Stephen Wall ("Wall Tr.") at 53:19-54:14 (App. 271-272); Ex. 25, May 24, 2021 Investigative Transcript of Timothy Barton ("Barton Tr.") at 294:3-296:17.  (App. 247-249)

8.      Although not titled as "notes," the Loan Agreements were notes in economic substance, because they included a promise to pay along with all the material terms evidencing the obligation to repay the promised amounts (including the amounts owed, interest rates, and maturity dates), and Defendants marketed them as notes.  *See, e.g.,* Wall 19 Subscription Agreement at 1 ("I hereby subscribe to the Note (promissory note) as co-lender.").  (App. 57)

3

### B. The Barton Defendants Defrauded Investors.

#### 1. Misappropriation of investor funds.

9.      Each of the Loan Agreements represented that *all* investor funds would be used to buy a specific, identified piece of land.  For example, the Wall 12 Loan Agreement represented that investor funds:

> **shall be used to acquire 172 acres located in Fort Worth ETJ, Parker County, State of Texas** f**or residential lot development known as Lyons Ranch ("Property")**.  The Property has a purchase price of $5,250,000 and the balance of funds will be provided by Borrower. (emphasis added)

Ex. 9, Wall 12 Loan Agreement at 2 (App. 50); *see also* Ex. 29, March 9, 2022 Investigative Testimony of investor Hong Chen ("Chen Tr.") at 36:2-38-1 (App. 285-287); Ex. 30, March 15, 2022 Investigative Testimony of investor Sun Yun ("Yun Tr.") at 5:25-6:13; 23:10-24:6; 26:7-25; 30:22-31-7.  (App. 299-305)

10.      These representations were false.  Of the approximately $26.3 million raised, only two Wall Entities (Wall 7 and Wall 9) actually purchased the properties described in their agreements for a total purchase price of approximately $2.6 million.  Ex. 1, Hahn Dec. at ¶ 17 (App. 7); Transcript of October 11, 2023 Hearing ("Hearing Tr.") at 110:3-15.  Even in those two limited instances, neither Wall 7 nor Wall 9 used its own investors' funds to purchase its property, and instead used commingled funds from one or more other offerings.  *Id*.  None of the other Wall Entities acquired the properties described in their respective agreements.  Ex. 1, Hahn Dec. at ¶ 22 (App. 9); Hearing Tr. at 110:3-15.

11.      Instead, Barton misappropriated and misused the remaining approximately $23.7 million of investor funds to, among other things: (a) pay personal expenses of Barton and his family, including exorbitant credit card bills, rent, and to buy a plane; (b) pay Fu undisclosed and unauthorized commissions and fees; (c) make Ponzi payments to earlier investors (as well as

4

other interest payments to investors using commingled funds); (d) to make political contributions; (e) acquire properties not related to the offerings in the names of other Barton companies; (f) acquire properties identified in a Wall offering but in the name of other Barton companies (including LDG001 and DJD) and using funds from a different Wall Entity; (g) pay professional fees (such as engineering, surveying, and land development) for, in most cases, properties unrelated to the offerings; and (h) make payments to Wall.  Ex. 1, Hahn Dec. at ¶¶ 22-27 (App. 9-11); *see also* Ex. 25, Barton Tr. at 345:7-14; 346:4-11; 349:1-350:17; 357:8-24 (App. 250-254); Ex. 35, Thomas Dec. at ¶¶ 199-204; Hearing Tr. at 110:19-112:5.

12.     Barton controlled the bank accounts for the Wall Entities and Carnegie, and he had signatory authority over most of the accounts.  Ex. 1, Hahn Dec. at ¶ 12 (App. 5-6); *see also* Ex. 25, Barton Tr. at 178:2-12; 181:2-6; 187:12-190:20 (App. 234-239); Ex. 26, Fu Tr. at 192:4-18.  (App. 266)  Barton often directed his administrative assistant to make the improper transfers. Ex. 25, Barton Tr. at 178:2-12 (App. 234); Ex. 28, March 10, 2022 Investigative Testimony of Saskya Bedoya ("Bedoya Tr.") at 129:14-130:20 (App. 277-278); Ex. 14, June 27, 2017, Ex. 15, November 15, 2017, and Ex. 16, January 9, 2019 Examples of Barton Payment Instruction Emails.  (App. 152-155)

13.     A significant portion of the investor funds were misused to purchase real property interests.  Ex. 1, Hahn Dec. at ¶¶ 33-36 & Ex. B.  (App. 14 & 17)  Barton also took out loans on properties acquired with investor funds, and he used the loan proceeds (which were also commingled with investor funds) to, among other things, purchase other properties, support his businesses, and fund his lifestyle.  *Id.* at ¶ 29-30.  (App. 12-13)

14.     Despite promising to make annual interest payments and to return investors' principal, the Barton Defendants never returned any of the principal to investors as promised and

5

failed to pay over 80% of the promised interest payments.  *Id.* at ¶ 28.  (App. 11-12)

15.    Barton knew how investor funds were required to be used, because he was responsible for developing the Loan Agreements, he received copies of Loan Agreements, and he was a signatory to the Loan Agreements.  *See, e.g.,* Ex. 6, Wall 9 Loan Agreement at 8 (App. 32)*; see also* Ex. 13, August 27, 2017 Loan Agreement Approval Email at 1 (App. 143); Ex. 26, Fu Tr. at 153:9-12.  (App. 263)

16.    Barton knew the investor funds were being misused and misappropriated, and continuing to be misused and misappropriated throughout the securities offerings, because he controlled the bank accounts and caused the funds to be transferred and spent for improper purposes.  Ex. 1, Hahn Dec. at ¶ 12 (App. 5-6); *see also* Ex. 25, Barton Tr. at 178:2-12; 181:2-6; 187:12-190:20 (App. 234-239); Ex. 26, Fu Tr. at 192:4-18 (App. 266); Ex. 28, Bedoya Tr. at 129:14-130:20 (App. 277-278); Ex. 14, June 27, 2017, Ex. 15, November 15, 2017, and Ex. 16, January 9, 2019 Examples of Barton Payment Instruction Emails.  (App. 152-155)

### 2.  Inflation of property purchase prices.

17.    The Loan Agreements represented that the Wall Entity would purchase a specific parcel of land with the investor funds and represented that the offering entity would also contribute money to fund the purchase.  *See, e.g.,* Ex. 6, Wall 9 Loan Agreement at 2.  (App. 26)

18.    For example, the Wall 9 Loan Agreement had a total offering amount of $2,320,000.  It represented that the purchase price for the property was $2,900,000, and the offering entity would fund the difference between the offering amount and the purchase price:

> [The Loans] shall be used to acquire 100 acres located in Venus, Texas for residential lot development known as Venus 100 located on Country Rd 501 and West of FM157 in Venus, Texas ("Property").  **The Property has a purchase price of $2,900,000 and the balance of funds will be provided by Borrower**. (emphasis added)

Ex. 6, Wall 9 Loan Agreement at 2.  (App. 26)

19.     The representations about the purchase prices were also false.  The disclosed purchase prices were inflated.  At the time of the offerings, the Barton Defendants had already secured, or were in the process of negotiating, purchase prices for the properties that were significantly lower than the prices set forth in the Loan Agreements.  Ex. 1, Hahn Dec. at ¶¶ 31-32 (App. 13-14); Hearing Tr. at 112:14-113:6.

20.     For example, Wall 10 issued a Loan Agreement on October 18, 2017 that set a land purchase price of $4,400,000.  Ex. 7, Wall 10 Loan Agreement at 2.  (App. 34)  However, Barton had already executed a contract months earlier to purchase the Wall 10 property for $2,200,000.  Ex. 17, May 2, 2017 Lost Creek Price Email at 1 (App. 157); Ex. 23, Lost Creek Land Sale Contract at 1 and 13.  (App. 195 & 207)

21.     As another example, Wall 11 issued a Loan Agreement on February 7, 2018 that set a land purchase price of $2,950,000.  Ex. 8, Wall 11 Loan Agreement at 2.  (App. 42).  Yet, Barton had already executed a contract months earlier to purchase the Wall 11 property for $1,577,125.  Ex. 24, Anastasia Land Sale Contract at 1 and 8.  (App. 219 & 226)

22.     Barton knew that the inflated purchase prices were being provided to investors, because he, Fu, and Wall secretly agreed to inflate the prices.  Ex. 18, August 29, 2016 Wall to Barton Markup Email at 1 (App. 160); Ex. 19, February 28, 2019 Wall to Fu and Barton Markup Email at 1 (App. 176); Ex. 20, October 24, 2016 Fu to Wall Markup Email (forwarded to Barton) at 1-4.  (App. 177-179).  Further, Barton was involved in the underlying purchase negotiations (or received details on the purchase transactions) setting the actual prices, and he executed the Loan Agreements containing the inflated prices.  Ex. 17, May 2, 2017 Lost Creek Price Email at 1 (App. 157); Ex. 23, Lost Creek Land Sale Contract at 1 and 13 (App. 195 & 207); Ex. 24, Anastasia Land Sale Contract at 1 and 8.  (App. 219 & 226)

23.    By overstating the purchase prices, Barton could use the inflated prices to raise more funds from investors in each offering.  The inflated purchase prices also created the false appearance that the investments were safer than they were, because the Loan Agreements pledged the Wall Entities' membership interests to secure the investments.  *See, e.g.,* Ex. 6, Wall 9 Loan Agreement at 6.  (App. 30)  The inflated prices indicated the property could be sold to pay back investors via their share of the membership interests if necessary at or near the disclosed prices, when in fact the properties, and thus the Wall Entities, had far lower actual values.  *Cf.* Ex. 8, Wall 11 Loan Agreement at 2 (App. 42) *to* Ex. 24, Anastasia Land Sale Contract at 1 and 8.  (App. 219 & 226).

24.    The representations about the contributions of the Wall Entities' funds were also false.  Neither the Wall Entities nor any of the other Defendants contributed funds towards the purchase of the properties.  Ex. 1, Hahn Dec. at ¶ 31.  (App. 13)  The inflation of the purchase prices was used to mask this misrepresentation.  Indeed, in the two instances where the Wall Entities actually purchased their specified properties, no developer contribution was necessary to pay the balance of the difference between the offering amount and the purchase price, because the actual purchase price was lower than the offering amount.  Ex. 1, Hahn Dec. at ¶¶ 17, 32.  (App. 7 & 13-14)

**3.   Worthless guarantee.**

25.    The Loan Agreements for many of the offerings also included a purported corporate guarantee by one of Barton's other entities, JMJ Holdings, for "up to the principal loan amount in the event of default."  *See, e.g.,* Ex. 7, Wall 10 Loan Agreement at 6 (App. 38); Ex. 9, Wall 12 Loan Agreement at 6.  (App. 54)

26.    Barton approved the guarantees after learning that certain Chinese investors

8

considered them to be an important consideration for their investment decisions.  Ex. 21, January 23, 2019 Barton Guarantee Email at 1.  (App. 181)  Barton also executed a balance sheet purportedly showing that JMJ Holdings had total assets of more than $100 million.  *See, e.g.,* Ex. 11, Wall 10 Investor Presentation at 27 (App. 92); Ex. 12, Wall 12 Investor Presentation at 19 (App. 128); Ex. 29, Chen Tr. at 48:16-49:24.  (App. 288-289)  The purported guarantees were more deception, because JMJ Holdings is a dormant company that has never done any business or had any assets.  Ex. 25, Barton Tr. at 252:22-253:18; 254:1-24.  (App. 244-246)

### 4.  Lulling statements

27.     The Loan Agreements required the Wall Entities to provide investors with quarterly progress reports about the status of the relevant real estate developments.  *See, e.g.,* Ex. 7, Wall 10 Loan Agreement at 5 (App. 37)  One of Barton's other controlled entities, JMJ Development, acting on behalf of the Wall Entities, sent investors progress reports that misrepresented the actual status of the projects.  For example, a fourth quarter 2019 update sent to investors stated that "all of [the Wall Entities] appear to be tracking with the initial … development plans."  Ex. 22, 2019 Q4 Lender Update at 2 (App. 184); *see also* Ex. 30, Yun Tr. at 33:7-16; 34:20-35:7; 36:4-14.  (App. 306-309)  Yet, most of the properties were never actually acquired by a Wall Entity, much less developed as planned.  Ex. 1, Hahn Dec. at ¶ 17.  (App. 7)

## C.  The Barton Entities

### 1.  Commingling and dissipation

36.     Before the Court ordered the current receivership, Barton directly or indirectly controlled numerous entities ("Barton Entities").  Ex. 25, Barton Tr. at 172:3-173:2; 173:19-174:5; 192:8-193:24; 200:17-22; 236:8-16 (App. 231-233; 240-243); Ex. 5, Barton-Controlled Entities List (App. 23-24); Ex. 35, Thomas Dec. at ¶¶ 33, 35-36, 55; Hearing Tr. at 17:12-21.

28.    Barton treated the Barton Entities as one, collective enterprise.  Hearing Tr. at 17:22-18:15; Ex. 35, Thomas Dec. at ¶¶ 29, 33-39.  The Barton Entities were not managed or operated independently, and they disregarded corporate formalities.  *Id.*

29.    Barton engaged in extensive commingling and transferring of investor funds and properties between and among the Barton Entities.  Ex. 1, Hahn Dec. at ¶¶ 16-30, 37 (App. 7-13, 15); Ex. 35, Thomas Dec. at ¶¶ 22-32, Hearing Tr. at 16:19-17:8; 92:1-13; 112:6-13.

30.    Barton continued to misuse investor funds even after the SEC filed its Complaint, and up until Cort Thomas ("Receiver") was appointed as the Receiver.  Ex. 35, Thomas Dec. at ¶ 200; Hearing Tr. at 40:5-23.  The Receiver found less than $75,000 in cash available in the Barton Entities' bank accounts upon his appointment, despite the fact that at least several million dollars in receipts flowed into the Barton Entities during the 12-months immediately preceding the entry of the current receivership.  Ex. 35, Thomas Dec. at ¶¶ 20, 191; Hearing Tr. at 39:2-20.

31.    In addition to his direct misuse of assets, Barton failed to protect the properties. The Barton Entities are cash-starved, and one or more of the properties were in a state of disrepair and not current on property insurance or other obligations when the Receiver took possession of them last year.  Ex. 35, Thomas Dec. at ¶¶ 104-105, 191, 201, 207-210; Hearing Tr. at 15:10-16:17; 35:18-22.

32.    Substantially all of the Barton Entities' properties are encumbered with liens, and because Barton failed to pay lenders and other creditors, several properties are facing foreclosure and the Barton Entities are embroiled in approximately 35 lawsuits.  Ex. 35, Thomas Dec. at ¶¶ 18, 20, 191, 212-216, 228; Hearing Tr. at 35:2-17; 55:18-56:3.  The properties are also declining in value.  Ex. 35, Thomas Dec. at ¶¶ 207, 236; Hearing Tr. at 36:7-37:3.

33.    It is uncertain, and in fact unlikely, that Barton and the Barton Entities collectively hold assets that would be sufficient to satisfy an order requiring the Barton Defendants to disgorge their ill-gotten gains for the benefit of investors.  Ex. 35, Thomas Dec. at ¶¶ 191-196, 205-206; Hearing Tr. at 37:7-38:2.

34.    The properties, which are in various stages of development, need competent and active management in place to develop, operate, maintain, and/or sell them.   Ex. 35, Thomas Dec. at ¶¶ 212, 226-227; Hearing Tr. at 34:4-35:1; 41:22-42:14; 82:8-85:1.

35.    The Receiver has undertaken efforts to preserve the remaining value of the Barton Entities' assets, including by, among other actions: (a) obtaining insurance for the properties; (b) valuing, marketing, and selling property interests to maximize their values; and (c) beginning to settle claims.  Ex. 35, Thomas Dec. at ¶¶ 191, 207-212.  However, those efforts are far from complete, and the assets remain at significant risk.  Hearing Tr. at 35:23-36:6.

36.    Barton has not cooperated with the SEC's and the Receiver's efforts to trace assets, he has failed to provide a sworn accounting and other critical information required by the current Receivership Order that would aid in such tracing, and has actively interfered with the Receiver's attempts to obtain such information.  Ex. 35, Thomas Dec. at ¶¶ 19, 40-42, 45, 197; Hearing Tr. at 42:18-43:7.

## 2.  The Proposed Receivership Entities

37.    The SEC has moved to include the following 82 Barton Entities ("PREs") in a new receivership:

1.  126 Villita, LLC
2.  2999TC Acquisitions LLC
3.  2999TC Acquisitions MZ, LLC fka MO 2999TC MZ, LLC
4.  2999TC JMJ CMGR, LLC (Delaware)
5.  AVG West, LLC
6.  BEE2019, LLC

11

7. BM318, LLC
8. Broadview Holdings Trust
9. Broadview Holdings, LLC (Texas)
10. Carnegie Development, LLC
11. D4AVEG, LLC
12. D4DS LLC
13. D4FR LLC
14. D4IN, LLC (Texas)
15. D4KL, LLC
16. D4MC, LLC (Texas)
17. D4OP, LLC
18. D4OPM, LLC (Texas)
19. Dallas Real Estate Investors, LLC
20. Dallas Real Estate Lenders, LLC (Delaware)
21. DJD Land Partners, LLC
22. Enoch Investments, LLC
23. FHC Acquisition, LLC
24. Five Star MM, LLC (Delaware)
25. Five Star MM, LLC (Texas)
26. Five Star TC, LLC (Delaware)
27. Gillespie Villas, LLC
28. Goldmark Hospitality, LLC
29. HR Sterling, LLC
30. JMJ Acquisitions, LLC
31. JMJ Development LLC (f/k/a JMJ Development, Inc.)
32. JMJ Hospitality, LLC
33. JMJ Residential, LLC
34. JMJ VC Management, LLC
35. JMJAV, LLC
36. JMJD4, LLC
37. JMJD4, LLC (Delaware)
38. JMR100, LLC
39. Lajolla Construction Management, LLC
40. LC Aledo TX, LLC
41. LDG001, LLC
42. Lynco Ventures, LLC
43. Mansions Apartment Homes at Marine Creek, LLC
44. Marine Creek SP, LLC
45. MF Container, LLC (Delaware)
46. Middlebury Trust
47. MO 2999TC, LLC
48. MXBA, LLC
49. Northstar PM, LLC (Texas)

12

50. ONE MF Residential, LLC
51. One MFD4, LLC
52. One Pass Investments, LLC (Delaware)
53. One RL Trust
54. ONE SF Residential, LLC
55. Orchard Farms Village, LLC
56. Ridgeview Addition, LLC (Texas)
57. Seagoville Farms, LLC
58. SF Rock Creek, LLC
59. TC Hall, LLC
60. The MXBA Trust
61. The Timothy L. Barton Irrevocable Life Insurance
62. Titan Investments, LLC a/k/a Titan 2022 Investments, LLC
63. TLB 2012 IRR Trust
64. TLB 2018 Trust
65. TLB 2019 Trust
66. TLB 2020 Trust
67. TRTX Properties, LLC
68. TRWF LODGE, LLC
69. TRWF, LLC
70. Venus59, LLC
71. Villita Development, LLC
72. Villita Towers, LLC
73. WALL007, LLC
74. WALL009, LLC
75. WALL010, LLC
76. WALL011, LLC
77. WALL012, LLC
78. WALL016, LLC
79. WALL017, LLC
80. WALL018, LLC
81. WALL019, LLC
82. WRL2019, LLC (Texas)

38.     The Court finds that Barton controls each of the PREs.  Ex. 25, Barton Tr. at 172:3-173:2; 173:19-174:5; 192:8-193:24; 200:17-22; 236:8-16 (App. 231-233; 240-243); Ex. 5, List of Barton-Controlled Entities (App. 23-24); Ex. 35, Thomas Dec. at ¶¶ 33, 35-36, 55; Hearing Tr. at 17:12-21.

### 3. Tracing Methods and Efforts

39.    The SEC submitted declarations from Carol Hahn ("Hahn") and the Receiver. Hahn is a SEC staff accountant and Certified Fraud Examiner whose job includes tracing the flow of funds in SEC investigations. Hearing Tr. at 107:6-108:8. The Receiver is an attorney who prepared his declaration with the assistance of the Receiver's retained accounting firm, Ahuja & Clark. Hearing Tr. 19:16-20:11.

40.    Hahn and the Receiver, with the assistance of his retained accountants, traced funds to various PREs. Hearing Tr. 19:16-20:11; 21:1-7; 89:7-13; 91:14-21. Hahn's tracing addressed 29 PREs. Ex. 32, Supp. Hahn Dec. at ¶¶ 3-5 & Ex. A. (Supp. App. 2-3, 5-10); Ex. 1, Hahn Dec. at ¶¶ 7-10. (App. 3-5) The Receiver, who had access to updated information, addressed approximately 78 PREs – providing tracing examples for 24 PREs and evidence of other benefits received traceable to Barton's alleged fraud for approximately 56 PREs (with some overlap). Hearing Tr. at 21:8-22:8; 22:23-9; 24:5-25:2; 45:17-46:8; 33:15-23; 119:13-19.

41.    The Hahn and Receiver declarations provide examples of tracing to the various PREs. They did not attempt to summarize every instance of tracing to the PREs, because the number of potential tracing examples was voluminous and tracing every example would also have been cost prohibitive to the Receiver. Hearing Tr. at 71:13-25; 72:12-73:6; 116:9-16.

42.    This was direct tracing: Hahn and the Receiver did not use estimates or specialized methodologies to perform the tracing analysis. Hearing Tr. 31:23-32:3; 92:14-95:12; 114:5-115:1; 121:9-122:1. Nor were any such estimates or methodologies necessary. *Id.* at 92:14-95:12; 114:5-115:1; 117:3-118:18. The SEC and the Receiver were each able to identify specific examples of money flowing to the subject PREs on the face of the financial records to support their respective tracing. *Id.* at 92:14-95:12; 114:5-115:1; 115:15-116:8.

14

43.     Hahn based her tracing on a review of the financial records and identified tracing examples that she could identify on the face of those records, which she then summarized. Hearing Tr. at 114:5-115:1; 117:3-118:18.  In these examples:

   a.   there were only investor funds obtained from investors in the Wall Entity securities offerings ("Wall Investor Funds") or, in some cases, loan proceeds obtained from loans secured at least in part with property purchased with Wall Investor Funds ("Wall Loan Proceeds"), in the account at the time of the transfer;

   b.   There were insufficient funds in the subject account to make the transfer without Wall Investor Funds or Wall Loan Proceeds; and/or

   c.   The transfer was made in a matching amount to a deposit of Wall Investor funds or Wall Loan Proceeds.  *Id.*

Hearing Tr. at 114:5-115:1; 117:3-118:18.  There was no uncertainty that the transfers at issue included Wall Investor Funds or the related Wall Loan Proceeds.  *Id.*  The Receiver followed a similar approach.  92:14-95:12.

44.     The tracing set forth in the Hahn and Receiver declarations were summaries of voluminous bank records, title company documents, and other financial records.  Hearing Tr. 18:19-19:9; 113:9-114:4.  All of these records were previously produced to Barton.  Hearing Tr. 19:10-12; 113:16-18.  These were also records that Barton created or to which he had access, and primarily include bank records from accounts he controlled before the receivership.  Ex. 35, Thomas Dec. at ¶¶ 43-47; Ex. 1, Hahn Dec. at ¶ 12 (App. 5-6).

45.     On October 11, 2023, the Court held an evidentiary hearing on the SEC's Motion. The SEC presented three witnesses at that hearing:  Hahn, the Receiver, and the Receiver's

accountant Anthony Cecil ("Cecil"), who is a CPA.  Hearing Tr. at 88:6-11.  These witnesses further testified at the hearing in support of the tracing to the PREs, and they were cross examined by Barton's counsel.

46.    Barton has submitted no tracing evidence or evidence directly contesting the SEC's evidence that the PREs received or benefitted from assets traceable to Barton's fraudulent activities that are the subject of this litigation.

47.    Barton did submit a report from a retained accountant named Gregg Ginn ("Ginn"), who Barton called as his only witness at the hearing.  Barton asked Ginn to examine tracing examples for five specific projects covering seven properties, which was the only tracing evidence Ginn reviewed.  Hearing Tr. at 167:23-168:3; 168:22-24.

48.    Ginn raised concerns about the reliability of the tracing methodology the SEC and the Receiver used, which the Court addresses below.  *Id.* at 171:16-172:4.  However, Ginn conceded that a specialized tracing methodology is only necessary when actual tracing is not possible and a party is seeking to estimate the *amount* of tainted funds attributable to a source from commingled funds, typically for final damages calculations.  *Id.* at 169:1-171:15.  Ginn did not perform his own tracing analysis, or directly dispute that any of the PREs received assets or benefits traceable to the Wall Investor Funds.  *Id.* at 173:11-174:3.

49.    At the close of the hearing, Barton also proffered the declaration of Erik Johnson ("Johnson"), who is the interim president of a company that owns Southern Properties Capital, Ltd. ("SPC").  SPC loaned money that was used with the primary HUD loans to develop several HUD apartment complexes owned by Barton's "D4 Entities" (defined below).  The declaration largely relates to SPC's contested claim that it has converted its loans to equity interests in the

16

D4 Entities.[4]  That claim, which is currently being litigated in a summary proceeding between SPC and the current Receiver, is outside the scope of the Motion.  *See* Receiver's Brief in Support of Motion for Summary Judgment Regarding Southern Properties Capital, LTD.'s Claimed Ownership Interest in Certain Receivership Properties (contending in pending motion that SPC has not converted its loan to equity).  (Dkt. 207)  However, Johnson also contends that several payments made to the D4 Entities using funds traceable to the Wall offerings were made in error.  Johnson does not explain how he has personal knowledge that Barton's companies transferred funds in error.  In any event, and as discussed in more detail at Paragraphs 60-63 of these Proposed Findings of Fact, Johnson's claims, even if accurate, do not change the fact that Wall Investor Funds were sent to at least three of the D4 Entities and ignores that all of them received substantial other benefits from assets traceable to Barton's alleged fraud.  For example, and as addressed below, the D4 Entities would not have been able to obtain the HUD loans used to develop the apartment complexes without using such assets to support their credit.

50.    The SEC, the Receiver, and the Receiver's retained professionals have not completed their tracing of Wall Investor Funds, and those efforts are ongoing.  Ex. 35, Thomas Dec. at ¶¶ 43, 188; Supp. Hahn Dec. at ¶ 6 (Supp. App. 3-4); Hearing Tr. at 120:4-6.  Barton's refusal to cooperate with the SEC's and the Receiver's tracing efforts, and his extensive commingling, transferring, and encumbering of investor funds and assets obtained with investor funds has made these tracing efforts difficult.  Ex. 35, Thomas Dec. at ¶¶ 22-32; Hahn Dec. at ¶ 37 (App. 15); Supp. Hahn Dec. at ¶ 6. (Supp. App. 3-4)

51.    The tracing efforts to-date indicate that the SEC and a receiver would likely be able to trace funds or benefits to additional Barton Entities if they are provided a reasonable,

---

[4] Barton does not explain why he is proffering the declaration of a witness taking this position against his interest that SPC has converted its loans to equity interests in the D4 Entities.

17

unobstructed opportunity to perform additional analysis.  Hearing Tr. at 81:5-22; 120:7-12.

### 4. Barton Entities for Which Tracing Has Been Established

52.    The Court finds that the SEC has demonstrated that all of the PREs received or benefitted from assets traceable to Barton's alleged fraudulent activities that are the subject of this litigation, with the exception of the following trust entities:  Middlebury Trust; The Timothy L. Barton Irrevocable Life Insurance; TLB 2012 IRR Trust; and TLB 2020 Trust.

#### i.    Entities for which the parties agree tracing has been established

53.    The SEC and Barton agree, and the Court finds, that the following 18 PREs received or benefitted from assets traceable to Barton's alleged fraudulent activities that are the subject of this litigation:  the nine Wall Entities; Carnegie; Orchard Farms Village, LLC; BM318, LLC; Northstar PM, LLC (Texas); Lynco Ventures, LLC; DJD Land Partners, LLC; LDG001, LLC; Seagoville Farms, LLC; and Ridgeview Addition, LLC (Texas).  Barton's Supp. Response to the Motion at 11 (Dkt. 339); Barton's Appendix in Support (Dkt. 335) at Ex. B (Barton App. 021);  Ex. 32, Supp. Hahn Dec. at ¶¶ 3-5 & Ex. A. (Supp. App. 2-3, 5-10); Ex. 35, Thomas Dec. at ¶¶ 56, 117, 126, 146, 154, 158 & 181.

54.    All 18 of these entities received Wall Investor Funds.  The following five of the 18 entities also currently hold property purchased at least in part with Wall Investor Funds:  DJD Land Partners, LLC; Lynco Ventures LLC; LDG001, LLC; Carnegie; and Ridgeview Addition, LLC.  Ex. 35, Thomas Dec. at ¶¶ 117, 126; Ex. 32, Supp. Hahn Dec. at ¶¶ 3-5 & Ex. A. (Supp. App. 2-3, 5-9).

55.    That leaves 64 entities in dispute for tracing purposes.

#### ii.    Entities holding properties purchased with, or that otherwise benefitted from, investor funds

56.    The Court finds that 10 additional PREs currently hold property purchased with,

18

or that otherwise benefitted from, Wall Investor Funds, and therefore received or benefitted from assets traceable to Barton's alleged fraudulent activities that are the subject of this litigation. These entities are: FHC Acquisition, LLC; Goldmark Hospitality, LLC; SF Rock Creek, LLC; D4DS, LLC; D4FR, LLC; D4IN, LLC; D4OP, LLC; Gillespie Villas, LLC; TC Hall, LLC, and Venus59, LLC. Ex. 35, Thomas Dec. at ¶¶ 58-129, 164-171; Ex. 32, Supp. Hahn Dec. at ¶¶ 3-5 & Ex. A. (Supp. App. 2-3, 5-7).

57.    FHC Acquisition, LLC is the record owner of approximately 4.5 acres of property in Frisco, Texas. Wall Investor Funds were used to pay down FHC Acquisition, LLC's loan on the Frisco, Texas property. Ex. 35, Thomas Dec. at ¶ 71 & Ex. 4.

58.    Goldmark Hospitality, LLC is the record owner of a 70-unit extended stay hotel in Dallas, Texas. Ex. 35, Thomas Dec. at ¶ 103. Wall Investor Funds were used for improvements to the hotel, to fund hotel operations, and to pay the manager of the hotel. Ex. 35, Thomas Dec. at ¶103 & Ex. 9; Ex. 32, Supp. Hahn Dec. at ¶ 5 & Ex. A (Supp. App. 3, 7); Hearing Tr. at 25:14-26:4; 72:18-22.

59.    SF Rock Creek, LLC is the record owner of a home at 4107 Rock Creek Drive in Dallas, Texas. Ex. 35, Thomas Dec. at ¶ 59. Wall Investor Funds were used towards the purchase of the Rock Creek Drive property. Ex. 35, Thomas Dec. at ¶103 and Ex. 3. Wall Investor Funds were also used to purchase the Mansion Apartment Homes at Marine Creek, and when that property was sold, the proceeds were used to repay a loan on the Rock Creek Property held by SF Rock Creek, LLC. *Id.*

60.    D4DS, LLC; D4FR, LLC; D4IN, LLC; and D4OP, LLC (collectively, "D4 Entities") are the record owners and HUD borrowers on four apartment complexes, which include Bellwether Ridge in DeSoto, Texas (owned by D4DS), the Parc at Windmill Farms in

19

Forney, Texas (owned by D4FR), the Parc at Ingleside near Corpus Christi, Texas (owned by D4IN), and the Parc at Opelika in Alabama (owned by D4OP). Ex. 35, Thomas Dec. at ¶ 77.

61.     The vast majority of the funds used to develop each of these apartment complexes came from a HUD loan secured by a lien on each property, and a secondary mezzanine loan. Hearing Tr. at 76:3-24. Wall Investor Funds were transferred to three of the D4 Entities: D4DS, D4FR, and D4OP. Ex. 35, Thomas Dec. at ¶¶ 80, 84, 91, 95, 97 & Exhibit 5-8; Hearing Tr. at 76:3-24; Ex. 32, Supp. Hahn Dec. at ¶¶ 3-5 & Ex. A. (Supp. App. 2-3, 5-6).

62.     Each of the D4 Entities benefitted from the Wall Investor Funds. Wall Investor Funds were used to pay the salaries of employees who worked on the apartment complex development projects and who worked to obtain financing for the projects. Ex. 35, Thomas Dec. at ¶ 81; Hearing Tr. at 27:11-27:23; 69:12-70-19. Wall Investor Funds were also used to purchase and maintain the business office where these employees and the D4 Entities maintained their offices. *Id.* In addition, these salary and property expenses were used in obtaining Economic Injury Disaster Loans for each of the D4 Entities from the Small Business Administration ("SBA"). *Id.* at ¶ 81.

63.     The loan packets that the D4 Entities submitted to obtain the HUD loans to develop the apartment complexes all listed properties that Barton improperly obtained with, or which received, Wall Investor Funds to support his credit. *Id.*; Hearing Tr. at 27:23-29:6. Without the HUD loans, none of the D4 Entities could have constructed the apartment complexes, their primary assets. Hearing Tr. at 77:5-14; Ex. 35, Thomas Dec. at ¶ 82. In short, Barton obtained the HUD loans based upon financial information that in large part relied on assets obtained with, or otherwise benefitted from, Wall Investor Funds. *Id.*

64.     Venus59, LLC owns a parcel of land in Venus, Texas. Ex. 35, Thomas Dec. at ¶

117. Prior to the receivership, several Barton Entities were in the process of developing single-family communities around Venus, Texas and were negotiating a development agreement with the City of Venus. *Id.* The properties include Venus59, LLC and several of the uncontested entities discussed at (i) above (DJD Land Partners, LLC, Lynco Ventures, LLC, LDG001, LLC, and Carnegie Development LLC). Except for Venus59, LLC, these parcels were all purchased using Wall Investor Funds or proceeds from sales of other properties purchased with Wall Investor Funds. Ex. 35, Thomas Dec. at ¶ 120. However, Venus59, LLC also benefitted from the extensive engineering and other pre-development expenses used to prepare the properties as a single, joint development. *Id.* Venus 59, LLC also commingling funds with other Barton Entities. *Id.* at ¶ 170 and Ex. 27.

65. Gillespie Villas, LLC owns a residential multi-family property located in Dallas, Texas. *Id.* at ¶ 164. The property was purchased using the proceeds from the sale of the Marine Creek Property and the Winter Haven property, both of which were purchased using Wall Investor Funds. *Id.* at ¶ 164 and Ex. 25.

66. Gillespie Villas, LLC is also one of several Barton Entities that are purportedly connected to Barton's son, Maximilien ("Max") Barton. Those entities are: Gillespie Villas, LLC; TC Hall, LLC; Venus59, LLC; TRTX Properties, LLC; MXBA, LLC; and Titan Investments, LLC / Titan 2022 Investments, LLC. As this Court has previously found, Barton controls each of these entities. Order Granting Receiver's Motion to Supp. Order Appointing Receiver at 6, 11. (Dkt. 88); *see also* Ex. 35, Thomas Dec. at ¶¶ 163, 166, and 168.

67. TC Hall, LLC owns approximately 0.5 acres of raw land on Hall Street in Dallas, Texas. Wall Investor Funds have been traced to the Hall Street property. Ex. 35, Thomas Dec. at ¶ 167. Shortly after PRE Gillespie Villas, LLC closed the purchase on the Gillespie property

21

(with Marine Creek proceeds received by Broadview Holdings), a third-party loan was provided to Gillespie Villas, LLC and collateralized against the Gillespie Property. *Id.* The proceeds from this loan were then wired to a title company to purchase the Hall Street property. *Id.* The purchase of the Hall Street property was funded, at least in part, by $545,806 received from Gillespie Villas, LLC, which in turn had borrowed $550,000 from a third party, after obtaining Barton's guaranty on that loan and subordinating Broadview's lien on the collateral (*i.e.*, the Gillespie Property). *Id.* at ¶ 169. TC Hall, LLC also received not less than $1.4 million from PRE Broadview Holdings, LLC and PRE JMJ Development, both of which also received Wall Investor Funds in dense commingled transactions. *Id*.

### iii.    Entities that purchased properties with Wall Investor Funds that were then sold before the current receivership

68.    The Court finds that 11 PREs purchased property, in whole or in part, with Wall Investor Funds that have since been sold, and therefore received or benefitted from assets traceable to Barton's allegedly fraudulent activities that are the subject of this litigation. Each of these entities currently holds contractual or legal rights related to those properties and the sales proceeds, including potential fraudulent transfer claims. *Id*. at ¶¶ 130, 162 & Ex. 15-27; Ex. 32, Supp. Hahn Dec. at ¶¶ 3-5 & Ex. A (Supp. App. 2-3, 5-10); Hearing Tr. at 32:15-33:14. These entities include three of the uncontested entities discussed at (i) above – BM318, LLC, Orchard Farms Village, LLC and Seagoville Farms, LLC – and the following eight additional entities: 2999TC Acquisitions, LLC; Mansion Apartment Homes at Marine Creek, LLC; AVG West, LLC; D4KL, LLC; 126 Villita, LLC; LC Aledo TX, LLC; Villita Towers, LLC; and JMR100, LLC. Ex. 35, Thomas Dec. at ¶¶ 130, 152, and 162; *see also* Ex. 32, Supp. Hahn Dec. at ¶¶ 3-5 & Ex. A. (Supp. App. 2-3, 5-10).

69.    At one time, 2999TC Acquisition, LLC was the owner of an office property at

22

2999 Turtle Creek Boulevard in Dallas, Texas. Ex. 35, Thomas Dec. at ¶ 131. Wall Investor Funds have been traced to the purchase of this property through direct transfers between Barton Entity bank accounts and title companies from loan proceeds obtained by borrowing against other Barton Entity properties. *Id.* Wall Investor Funds have also been traced to other payments made to the lender on the property. *Id.* at ¶ 131 & Ex. 15. Pursuant to a settlement agreement, the lender on the Turtle Creek property recently agreed to pay the current receivership estate a total of $2.5 million dollars in installments over a two-year period. *Id.* at ¶ 135. $500,000 of that settlement has been collected by the current Receiver. *Id.*

70.     At one time, Mansions Apartment Homes at Marine Creek, LLC was the owner of certain property along Shadydell Drive in Fort Worth, Texas. *Id.* at ¶ 139. Wall Investor Funds were used for the benefit of this entity, including to pay a loan Mansions Apartment Homes at Marine Creek, LLC acquired that was collateralized against the Shadydell Drive property. *Id.* at ¶ 139 and Ex. 16.

71.     AVG West, LLC, Orchard Farms Village, LLC, Mansions Apartment Homes at Marine Creek, LLC, D4KL, LLC, and 126 Villita, LLC (or their affiliates) sold properties in Fort Worth, Killeen, San Antonio, and Winter Haven, Florida before the current Receiver was appointed. *Id.* at ¶ 140. In connection with these sales, these entities often (though not always) received millions of dollars in sales proceeds, while retaining a participation interest in the projects moving forward. *Id.* The majority of these proceeds flowed into an account in the name of PRE Broadview Holdings LLC. *Id.* at ¶ 142.

72.     At one time, Orchard Farms Village, LLC owned certain property near Everman Parkway in Fort Worth, Texas. *Id.* at ¶ 146. Wall 7 initially purchased this property using Wall Investor Funds and later transferred the property to Orchard Farms Village, LLC. *Id.* at ¶ 146

23

and Ex. 17.  This is one of the PREs listed at (i) above for which tracing is not disputed.

73.    At one time, AVG West, LLC owned certain property in Winter Haven, Florida. The Winter Haven Property was originally acquired by JMJ Acquisitions, LLC, which later became AVG West, LLC.  *Id.* at ¶ 148.  Wall Investor Funds have been traced to the Winter Haven Property.  *Id.* at ¶ 148 and Ex. 18.

74.    At one time, D4KL, LLC owned certain property along Rosewood Drive in Killeen, Texas.  *Id.* at ¶ 150.  JMJ Acquisitions, LLC initially purchased this property and then transferred it to D4KL, LLC.  Wall Investor Funds were used to purchase the property.  *Id.* at ¶ 150 and Ex. 19; Ex. 32, Supp. Hahn Dec. at ¶¶ 3-5 & Ex. A.  (Supp. App. 2-3, 6)

75.    At one time, Villita Towers, LLC and 126 Villita, LLC owned certain property near Villita Street in San Antonio, Texas.  Ex. 35, Thomas Dec. at ¶ 152.  The property was purchased and developed, in part, using Wall Investor Funds.  *Id.* at ¶ 152 and Ex. 20; Ex. 32, Supp. Hahn Dec. at ¶¶ 3-5 & Ex. A.  (Supp. App. 2-3, 10)

76.    At one time, BM318, LLC owned property near Bear Creek Road in Aledo, Texas, which was referred to as the Bear Creek Ranch.  Ex. 35, Thomas Dec. at ¶ 154.  Wall Investor Funds have been traced to the Bear Creek Ranch.  *Id.* at ¶ 154 and Ex. 21.  These funds were transferred to a title company for the purchase of the Bear Creek Ranch.  *Id;* Ex. 32, Supp. Hahn Dec. at ¶¶ 3-5 & Ex. A. (Supp. App. 2-3, 5)

77.    At one time, JMJ Acquisitions, LLC entered into negotiations to purchase certain property in Aledo, Texas, commonly referred to as the Lost Creek Golf Course.  *Id.* at ¶ 156. During negotiations, JMJ Acquisitions, LLC brought Wall 10 into the transaction, and Wall 10 assigned certain rights to a newly formed entity, LC Aledo TX, LLC.  *Id.*  Wall Investor Funds were used to provide certain earnest money payments and loans for the Lost Creek Golf Course.

24

*Id.* at ¶ 156 and Ex. 22.

78.     At one time, Seagoville Farms, LLC owned certain property in Seagoville, Texas that was purchased using, in part, Wall Investor Funds.  *Id.* at ¶ 158 and Ex. 23.  This is one of the PREs listed at (i) above for which tracing is not disputed.

79.     At one time, JMR100, LLC owned certain property near White Settlement Road in Aledo, Texas.  *Id.* at ¶ 160.  Wall Investor Funds have been traced to this property.  *Id.* at ¶ 160 and Ex. 24; Ex. 32, Supp. Hahn Dec. at ¶¶ 3-5 & Ex. A.  (Supp. App. 2-3, 8)

80.     In late 2021, Orchard Farms Village, LLC and Mansions Apartment Homes at Marine Creek, LLC sold certain properties in Fort Worth (Orchard Farms and the Mansions at Marine Creek) and AVG West, LLC sold property in Florida (Winter Haven) to DLP Capital. *Id.* at ¶ 144.  As part of these transactions, these PREs (1) received several million dollars over a period of months, (2) transferred title to the properties, and (3) as to each of the Fort Worth properties, entered into a Construction Agreement, a Development Agreement, and a Participation Agreement.  *Id.*  On October 18, 2022, DLP Capital sent default notices to the involved Barton Entities regarding their obligations under the Construction Agreement and Development Agreement.  *Id.*  The Receiver and DLP Capital agreed to a mutual release of claims and a payment of $750,000 from DLP Capital to the current receivership estate.  *Id.*  The Court entered an Order ratifying that agreement.  (Dkt. 109).

### iv.     Additional Barton entities that received Wall Investor Funds

81.     The Court finds that several additional PREs received Wall Investor Funds, and therefore received or benefitted, or in some cases further received or benefitted, from assets traceable to Barton's alleged fraudulent activities that are the subject of this litigation.  Thomas Dec. at ¶ 179.  These entities either received funds: (a) directly from Wall investors or the Wall

25

Entities' bank accounts, (b) indirectly via other Barton Entities that received Wall Investor Funds, (c) indirectly through proceeds of the sales of properties that were originally purchased with or benefitted by Wall Investor Funds, or (d) indirectly through receiving Wall Loan Proceeds.  These PREs are: 126 Villita, LLC (also listed elsewhere herein); 2999TC JMJ CMGR, LLC (Delaware); BEE2019, LLC; Broadview Holdings Trust; Broadview Holdings, LLC (Texas); Carnegie Development, LLC (also listed elsewhere herein); D4AVEG, LLC; D4MC, LLC (Texas); Enoch Investments, LLC; HR Sterling, LLC; JMJ Acquisitions, LLC (also listed elsewhere herein in discussion of AVG West, LLC); JMJ Development LLC (f/k/a JMJ Development, Inc.); JMJ Hospitality, LLC; JMJ VC Management, LLC; JMJAV, LLC; JMJD4, LLC (Delaware); LaJolla Construction Management, LLC; MO 2999TC, LLC; and WRL2019, LLC (Texas).  *Id;* Ex. 32, Supp. Hahn Dec. at ¶¶ 3-5 & Ex. A.  (Supp. App. 2-3, 5-10)

## v.    Barton Entities that received participation interests

82.    The Court finds that several additional PREs received and are holding participation interests in continuing development projects that received Wall Investor Funds, and therefore received or benefitted, or in some cases further received or benefitted, from assets traceable to Barton's fraudulent activities that are the subject of this litigation.  *Id.* at ¶ 180.  Wall Investor Funds have been traced to the Marine Creek, Orchard Farms, Killeen, and Villita properties discussed above.  *Id.*  The Barton Entity that owned each property sold its ownership interests in these developments for several million dollars prior to the Court appointing the current Receiver.  *Id.*  In connection with the sales, several PREs retained some form of participation interest in each of the projects, including: Marine Creek SP, LLC—Marine Creek; Orchard Farms Village, LLC (also listed elsewhere herein)—Orchard Farms; Enoch Investments, LLC (also listed elsewhere herein)—Killeen; and Villita Development LLC (Villita).

26

### vi.    Barton Entities that own, or are the managing member of, Barton Entities that received Wall Investor Funds

83.    The Court finds that several additional PREs are the manager, member, or other owner of the entities discussed above that received Wall Investor Funds.  Through the chain of ownership, these entities received a benefit from Wall Investor Funds by their ownership (whether partial or complete) and control of the activities of entities that received Wall Investor Funds, and thus controlled the disposition of the Wall Investor Funds.  *Id.* at ¶ 181.

84.    These entities are: 2999TC Acquisitions MZ, LLC f/k/a MO 2999TC MZ, LLC; Carnegie Development, LLC (also listed elsewhere herein); D4OPM, LLC (Texas); Dallas Real Estate Investors, LLC; Dallas Real Estate Lenders, LLC (Delaware); Enoch Investments LLC (also listed elsewhere herein); Five Star MM, LLC (Delaware) and Five Star MM, LLC (Texas); Five Star TC, LLC (Delaware); JMJAV, LLC (Texas) (also listed elsewhere herein); JMJD4 LLC; JMJ Residential, LLC; MF Container, LLC (Delaware); MXBA LLC (also listed elsewhere herein); MXBA Trust (also listed elsewhere herein); Northstar PM, LLC (Texas) (also listed elsewhere herein); One MFD4, LLC; One Pass Investments, LLC (Delaware); ONE MF Residential, LLC, ONE SF Residential LLC; TLB 2018 Trust; TRTX Properties, LLC (also listed elsewhere herein); TRWF, LLC; and TRWF Lodge, LLC.  *Id.*

85.    There are also several trusts that the Court finds similarly benefitted from the Wall Investor Funds by holding the ultimate beneficial interests in entities that hold or held property purchased with or benefitted by Wall Investor Funds.  Those trusts are:  One RL Trust, TLB 2018 Trust (also listed elsewhere herein); TLB 2019 Trust; Broadview Holdings Trust (also listed elsewhere herein); and MXBA Trust (also listed elsewhere herein).  *Id.* at ¶ 182.

27

## II.   CONCLUSIONS OF LAW

### A.  Proper Forum

1.      This Court has jurisdiction over the parties to, and the subject matter of, this action, and the SEC is a proper party to bring this action seeking the relief sought in its Complaint, and its Motion.

2.      The Court has subject matter jurisdiction over this action and personal jurisdiction over the parties and the PREs, and venue properly lies in this district.

3.      The Court finds that the SEC has brought this action to enforce the federal securities laws, in furtherance of the SEC's police and regulatory powers, and the relief sought by the SEC and provided in this Order is in the public interest by preserving the illicit proceeds of fraudulent conduct and is not in furtherance of a pecuniary purpose, and, therefore, the Court concludes that the entry of this Order is excepted from the automatic stay pursuant to 11 U.S.C. § 362(b)(4).

### B.  The SEC Has Established a Likelihood of Success on The Merits of Its Securities Fraud Claims against the Barton Defendants

4.      Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)] prohibits fraud in the offer or sale of a security, and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5] prohibit fraud in connection with the purchase or sale of any security.

5.      To establish a violation under these sections, the SEC must prove by a preponderance of the evidence: (1) that in connection with the purchase, offer, or sale of any security through the use of interstate communications, commerce, or the mails; (2) the Barton Defendants made a material misrepresentation or omission of material fact, or employed a

fraudulent device; (3) with the requisite mental state. *See generally SEC v. Gann*, 565 F.3d 932, 936 (5th Cir. 2009); *SEC v. Seghers*, 298 F. App'x 319, 327-28 (5th Cir. 2008).

6.      Liability arises not only from affirmative representations but also from failures to disclose material information. *See SEC v. Fehn*, 97 F.3d 1276, 1290 n.12 (9th Cir. 1996) (the antifraud provisions impose a "duty to disclose material facts that are necessary to make disclosed statements, whether mandatory or volunteered, not misleading").

7.      Establishing violations of Section 17(a)(1) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 require proof of scienter. *See Aaron v. SEC*, 446 U.S. 680, 695-97 (1980). Scienter is "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193 n.12 (1976). To prove scienter, the SEC need only show that the defendant acted with "severe recklessness." *SEC v. Sethi,* 910 F.3d 198, 206 (5th Cir. 2018) (citing *Broad v. Rockwell, Int'l Corp.,* 642 F.2d 929, 961 (5th Cir. 1981) (en banc)). Negligence is sufficient to show a violation of Sections 17(a)(2) and (3) of the Securities Act. *See Aaron*, 446 U.S. at 701-02.

8.      To establish violations of Sections 17(a) and 10(b) and Rule 10b-5 based on misrepresentations or omissions, the facts at issue must be material. *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976). A misstatement or omission is material if there is a substantial likelihood that a reasonable investor would consider it important in making an investment decision. *Id; SEC v. Seghers*, 298 F. App'x 318, 328 (5th Cir. 2008).

9.      The SEC has established that it is likely to succeed on the merits of its claims that the Barton Defendants violated the antifraud provisions of the federal securities laws.

10.      The Barton Defendants offered and sold securities. Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act define "security" to include, among

other instruments, any "investment contract" or "note."  15 U.S.C. § 77b(a)(1); 15 U.S.C. § 78c(a)(10).

11.    The Loan Agreements are investment contracts.  In *SEC v. W.J. Howey Co.*, the Supreme Court held that an investment contract exists where (1) a person invests his or her money, (2) in a common enterprise, and (3) with the expectation of profits to be derived solely from the efforts of the promoter or a third party.  328 U.S. 293, 298-99 (1946).  The definition of a security "embodies a flexible rather than static principle, one that is capable of adaptation" and requires an analysis into the substance rather than the form of the transaction with an emphasis on economic reality.  *Id*.

12.    The Loan Agreements satisfy the *Howey* test.  First, investors wired cash to accounts controlled by Barton.  Second, they invested in a "common enterprise," because their money was pooled with other investors and their fortunes were entirely dependent on the efforts and expertise of Barton and Stephen Wall, which more than satisfies the "broad vertical commonality" required in the Fifth Circuit.  *Long v. Shultz Cattle Co.*, 881 F.2d 129, 140-41 (5th Cir. 1989).  Third, the investors' role in the investment was entirely passive and they expected to realize profits based solely on Barton's and Stephen Wall's efforts to identify, purchase, and develop the properties and operate the Wall Entities in a manner that enabled them to pay interest (*i.e.,* profit) on the loans.  *See SEC v. Arcturus Corp.*, 928 F.3d 400, 409-10 (5th Cir. 2019) ("courts find the third Howey factor met if the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise") (internal quotes omitted); *see also SEC v. The Better Life Club of America, Inc.*, 995 F. Supp. 167, 173-174 (D.D.C. 1998), *aff'd*, 203 F.3d 54 (D.C. Cir. 1999) (holding loan agreements in which investors contributed funds to common enterprise with

expectation of receiving profits based solely on the efforts of the promoters were securities and finding it "hard to imagine a more perfect example" of an "investment contract").

13.    The Loan Agreements are also securities because they are "notes."  "The Supreme Court has held that the definition of 'note' may 'be viewed as a relatively broad term that encompasses instruments with widely varying characteristics,' and as with the term 'security,' the definition of 'note' looks to the economic reality and surrounding circumstances of a transaction."  *SEC v. Tyler*, 2002 WL 32538418, at *3 (N.D. Tex. Feb. 21, 2002) (citing *Reves v. Ernst & Young*, 494 U.S. 56, 59 (1990)).

14.    A note is presumed to be a security unless it bears a "family resemblance" to certain judicially crafted exceptions of notes that are not securities.  *Id*. at 66-70.  The Loan Agreements do not bear a family resemblance to the judicially created list of non-securities.

15.    If a note does not bear a strong family resemblance to one of the judicially crafted exceptions, a four-factor test is used to determine whether the notes should be added to the judicially crafted exceptions.  The four factors articulated by the Supreme Court in *Reves* look to: (1) the motivations that would prompt a reasonable buyer and seller to enter into a transaction; (2) the plan of distribution of the instrument; (3) the reasonable expectations of the investing public; and (4) whether there is any risk-reducing factor, such as the presence of another regulatory scheme.

16.    With regard to the first factor, *Reves* states that a note is more akin to a security "if the seller's purpose is to raise money for the general use of a business enterprise or to finance substantial investments and the buyer is interested primarily in the profit the note is expected to generate" as opposed to the note being exchanged for the purchase or sale of a minor asset or consumer good, to correct cash flow difficulties or to advance some sort of consumer purpose.

31

*Id*. at 66.  Here, Defendants offered the Loan Agreements to purportedly purchase a substantial investment – real property for each of the Wall Entities – and investors were primarily interested in profiting from these investments.

17.    The second *Reves* factor also supports that the Loan Agreements are securities, because they were "offered and sold to a broad segment of the public." *Id*. at 68.  Defendants widely solicited Chinese investors, including via large group presentations, and ultimately sold the notes to over 100 investors.

18.    The third *Reves* factor also supports that the notes are securities, because a reasonable member of the investing public would consider them a passive investment. *Id*. at 68. The notes make clear that the purpose of the investment was to generate returns for investors through the Wall Entities' efforts to acquire real estate for development.  Further, and contrary to Barton's assertion, Defendants actively marketed the notes as passive investments to *investors*. *See, e.g.,* Wall 10 Investor Presentation (repeatedly referring to the investment, including "investment highlights," "investment objective," "investment fund," "investment period," "investor(s)" in Wall 10, and "investors" as the source of funds).  (App. 66-109)

19.    The fourth *Reves* factor also supports that the notes are securities, because there is no regulatory scheme that would significantly reduce the risk of the investments offered.

20.    For all these reasons, the Loan Agreements are securities.  *See also SEC v. Smart*, No. 2:09-CV-00224, 2011 WL 2297659, at 12-14 (D. Utah June 8, 2011) (note agreements that pooled investor funds and promised fixed returns were securities as either investment contracts or notes).

21.    Turning to the other elements of the SEC's fraud claims, the Barton Defendants made material misstatements and omissions and engaged in deceptive acts in connection with the

offer, purchase, and sale of the securities.

22.     The Barton Defendants falsely told investors that the Wall Entities would use their money to purchase specific parcels of land, but then misappropriated the money and spent it on a litany of improper purposes.  A reasonable investor would consider it important in deciding whether to invest that their investment would not be used for the represented investment purpose. *SEC v. Brooks*, No. 3:99-cv-1326-D, 1999 WL 493052 at *2 (N.D. Tex. July 12, 1999) (misrepresentations about use of investor funds are material).

23.     The Barton Defendants misstated the land purchase prices.  A reasonable investor would consider it important in deciding whether to invest that the promoter was intentionally inflating the value of the collateral securing their investments.

24.     The Barton Defendants falsely told the investors that the Wall Entities would be contributing funds towards the land purchases.  A reasonable investor would consider it important in deciding whether to invest that the promoter was lying about putting its own money into a venture side-by-side with the investors.

25.     The Barton Defendants claimed to certain investors that their investments were fully guaranteed by one of Barton's other companies but omitted that the guaranteeing company had no assets.  A reasonable investor would consider it important in deciding whether to invest that he or she was receiving a worthless guarantee.

26.     The Barton Defendants offered or sold the securities through the use of interstate communications, commerce, or the mails.  *See SEC v. Straub*, 921 F.Supp.2d 244, 262 (S.D.N.Y. 2013) ("[I]t is undisputed that the use of the internet is an 'instrumentality of interstate commerce'"); *SEC v. One or More Unknown Traders in Common Stock of Certain Issuers*, No.

08CV1402, 2009 WL 3233110, at *4 (E.D.N.Y. Oct. 2, 2009) (holding that wire transfers were instrumentalities of interstate commerce).

27.    Barton acted with scienter.  Barton knew how investor funds were required to be used, because he was responsible for developing the Loan Agreements and he was a signatory to the Loan Agreements.  Barton knew the investor funds were being misused, because he controlled the bank accounts and caused the funds to be transferred and spent for improper purposes.  Barton also knew that the inflated purchase prices were being provided to investors, because: (a) he agreed to the scheme with Fu and Wall, (b) he was involved in underlying purchase negotiations setting the actual prices, and (c) he executed the Loan Agreements containing the inflated prices.  Finally, Barton knew that the company he was using to guarantee the investments had no assets.

28.    Barton's scienter is imputed to the other Barton Defendants.  *See Manor Nursing Ctrs., Inc.,* 458 F.2d 1082, 1089, n.3 (2nd Cir. 1972); *Southland Sec. Corp. v. INSpire Ins. Solution, Inc.*, 365 F.3d 353, 366 (5th Cir. 2004).

29.    The SEC's antifraud claims under Sections 17(a)(2) and (3) of the Securities Act only require a showing of negligence.  *See Aaron*, 446 U.S. at 701-02.  Barton did not exercise reasonable care in his use of investor funds and in making the other misstatements and omissions.

30.    For these reasons, the Court finds that the SEC has established a substantial likelihood of success on the merits of its claims that the Barton Defendants violated Section 17(a) of the Securities Act and Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder.

34

### C. A Receivership Is Warranted Under the *Netsphere* Factors

31. "In any action or proceeding brought or instituted by the Commission under any provision of the securities laws, the Commission may seek, and any Federal court may grant, any equitable relief that may be appropriate or necessary for the benefit of investors.  Exchange Act Section 21(d)(5) [15 U.S.C. § 78u(d)(5)]; *see also SEC v. Complete Bus. Sols. Grp., Inc.*, 44 F.4th 1326, 1334 (11th Cir. 2022) (recognizing that "the appointment of a receiver is a well-established equitable remedy available to the SEC" under Exchange Act Section 21(d)(5)).

32. In "'cases of non-compliance with SEC regulations, a receiver may be appointed to prevent the corporation from dissipating corporate assets and to pay defrauded investors.'" *SEC v. Barton*, 79 F. 4th 573, 578 (5th Cir. 2023) (quoting *Netsphere, Inc. v. Baron*, 703 F.3d 296, 305 (5th Cir. 2012)).

33. To establish that a receivership is justified under *Netsphere*, the SEC must show: "(1) a clear necessity to protect the defrauded investors' interest in property, (2) legal and less drastic equitable remedies are inadequate, and (3) the benefits of receivership outweigh the burdens on the affected parties." *Barton*, 79 F. 4th at 578 (citing *Netsphere*, 703 F.3d at 305).

34. The Court finds that: (a) there is a clear necessity for the receivership to protect defrauded investors' interest in property; (b) legal and less drastic equitable remedies are inadequate; and (c) the benefits of a receivership outweigh the burdens on the affected parties.

### 1. Clear necessity to protect the defrauded investors' interests in property.

35. A receivership is a clear necessity to protect the defrauded investors' interests in property.  A receiver is necessary to manage the PREs' assets, which include an operating hotel, several apartment complexes, and development projects.  Barton has misused and mismanaged these assets, including by using investor funds for personal expenses rather than to protect and

35

maximize the value of the properties. Several of the properties have been left in a state of disrepair or are facing foreclosure, and the properties are declining in value. These fundamental problems facing the PREs and the other Barton Entities remain. Absent a receiver to manage, maximize, and protect the properties' values, the investors' interests in these properties is at substantial risk.

36. Further, the PREs and their assets continue to be mired in liens, lawsuits, and foreclosures that threaten to further diminish the value of the assets. A receiver would have the power to stay litigation and foreclosures, and to defend, pursue, and compromise claims. These powers are critical to protecting the investors' interests in the properties. It is unlikely that Barton and the Barton Entities, much less the PREs, hold assets sufficient to satisfy an order requiring the Barton Defendants to disgorge their alleged ill-gotten gains for the benefit of investors. A receiver is therefore necessary to marshal and maximize the available property assets and claims.

37. Based on Barton's prior misconduct, it is also highly likely, if not certain, that Barton will continue to dissipate or conceal assets if he is left in control of the PREs. Barton would be in a position to transfer or hide the assets (including outside the jurisdiction of this Court), pledge or further encumber assets, and/or liquidate and misuse assets for his benefit and without Court supervision. There is a substantial risk that assets will be concealed, lost, or diminished in value absent a receivership.

**2. Legal and less drastic equitable remedies are inadequate.**

38. There are no legal or less drastic equitable measures that will protect investors and address the risks to their interests in the property discussed above. Without Court protection, Barton will continue to misuse and dissipate assets. However, merely enjoining Barton from

36

misusing and dissipating the assets is not enough, because the entities have insufficient cash, many of the properties require active management, and an independent third party must be put in place to marshal, manage, and maximize the available assets and claims. Barton has previously proposed a monitorship. Yet, a monitorship is clearly inadequate in this situation. At the outset, it puts Barton, the person who orchestrated and carried out the wide-ranging fraud, misused investor funds, and mismanaged assets, back in a primary management position, and then relies on a monitor to catch his misconduct. In any event, a monitor would not have the powers necessary to protect the investors' interests, including, but not limited to, the power to: (a) stay litigation and foreclosures, (b) investigate and trace assets, (c) sell assets, and (d) investigate, pursue, and settle claims.

39.    Barton has also failed to comply with previous court orders, and there is no assurance that he will not do so again even if enjoined. This is yet another reason that means other than a receivership are insufficient. A receivership would take control of the properties away from Barton.

**3.  The benefits of a receivership outweigh the burdens on the affected parties.**

40.    The benefits of a receivership are substantial. It would put a competent, independent party in place to maximize the value of the available assets and claims for the benefit of defrauded investors, and a receivership will stay litigation and foreclosures, among other protections, that are necessary to protect the assets. At the same time, it would oust Barton – the perpetrator of the extensive fraud detailed above – from control over the entities, assets, and claims at issue. Barton has identified no burden beyond his contention that he could manage the properties or oversee their sales better than the current receiver. However, the evidence shows otherwise, and there is no benefit to putting the party that committed fraud back in control

37

of his fraudulent enterprise. In addition, if a receivership is ordered: (a) Barton would still be in a position to make recommendations to the receiver on property issues, which the receiver would evaluate using appropriate business judgment; (b) a receiver will remain accountable to and supervised by the Court; and (c) Barton will be provided the opportunity to be heard on any efforts by the receiver to sell or compromise receivership assets.

41.     The Court may place into receivership "entities that received or benefitted from assets traceable to Barton's alleged fraudulent activities that are the subject of this litigation." *Barton*, 79 F.4th at 580-81. As the Court found above, the SEC has established that the PREs, except the excluded trusts, received or benefitted from assets traceable to Barton's alleged fraudulent activities that are the subject of this litigation. The receivership will be limited to those entities.

42.     For these reasons, a receivership is warranted under the factors set out in *Netsphere* and pursuant to Section 21(d)(5) of the Exchange Act.

**D.  Alternatively, A Receivership is Warranted under *First Financial***

43.     The appointment of a receiver is a well-established form of equitable, ancillary relief in SEC enforcement actions. *SEC v. First Fin. Grp. of Texas*, 645 F.2d 429, 438 (5th Cir. 1981). The SEC may obtain a receivership as an adjunct to injunctive relief for a securities fraud. *Barton*, 79 F. 4th at 578 (citations omitted).

44.     Courts may appoint a receiver to protect injured investors from further despoliation of their property or rights; preserve the status quo while transactions are being unraveled in order to determine an accurate picture of the fraudulent conduct; and/or marshal and prevent the dissipation of a defendant's assets pending further action by the court. *First Fin. Grp.*, 645 F.2d at 438.

45.     Under *First Financial*, the Court may appoint a receiver on a *prima facie* showing of fraud and mismanagement.  *First Fin. Grp.*, 645 F.2d at 438.

46.     The SEC has made a prima facie showing of fraud and mismanagement for the reasons discussed above.  The Court has now held a preliminary injunction hearing and, as discussed below, found that the SEC has shown that it is entitled to a preliminary injunction in this matter arising from Barton's securities fraud.  Thus, a receivership is warranted, in the alternative, as an adjunct to that injunction.

### E. A Preliminary Injunction is Warranted

47.     The SEC's tracing efforts are ongoing.  The SEC may seek "an injunction freezing asset transfers while it trace[s] the funds and determine[s] which entities should be placed in the receivership."  *Barton*, 79 F. 4th at 580 (discussing *FDIC v. Faulkner*, 991 F.2d 262, 267-68 (5th Cir. 1993)); *see also CFTC v. American Metals Exch. Corp.*, 991 F.2d 71, 79 (3d Cir. 1993) ("Because a freeze is designed to preserve the status quo by preventing the dissipation and diversion of assets, we will allow the freeze to remain in effect until the district court determines whether it can make an informed determination of the amount of unlawful proceeds retained by [the defendant], and, if it can, what that amount may approximate.  The district court can then decide to maintain, remove or modify the freeze.").

48.     The SEC seeks a preliminary injunction that enjoins Barton – and, pursuant to FED. R. CIV. P. 65(d)(2), any other persons who are in active concert or participation with him – from transferring, selling, dissipating, assigning, concealing, pledging, withdrawing, alienating, encumbering, incurring debt upon, disposing of, or diminishing the value of any funds, property, or other assets of any entity that he directly or indirectly controls that is not placed in receivership.

49.     Such a preliminary injunction is appropriate and necessary for the benefit of

investors.  15 U.S.C. § 78u(d)(5); *see Porter v. Warner Holding Co.*, 328 U.S. 395, 397-98 (1946) (having "invoked the jurisdiction of the District Court to enjoin [illegal] acts and practices, … all the inherent equitable powers of the District Court are available for the proper and complete exercise of that jurisdiction"); *see also* 15 U.S.C. § 77v(a); 15 U.S.C. § 78aa.

50.     As discussed above, the SEC has made a substantial showing that it is likely to succeed on the merits of its claims that Barton violated the federal securities laws.  Moreover, the threatened injury if the preliminary injunction is denied also far outweighs any harm that will result if the asset freeze is not granted, and the preliminary injunction is indisputably in the public interest.  Again, the harm at issue is the dissipation of assets that will preclude a recovery for defrauded investors.  This interest far outweighs any potential harm that Barton may suffer if the status quo is maintained and Barton is enjoined from transferring assets held in his controlled entities.  It is also in the public interest to protect defrauded investors.

51.     Because a preliminary injunction preventing the transfer of assets is a provisional remedy intended to preserve the status quo, the SEC need not demonstrate irreparable harm.  *See, e.g., Smith v. SEC*, 653 F.3d 121, 128 (2d Cir. 2011) ("Where an asset freeze is involved, the SEC must show either a likelihood of success on the merits, or that an inference can be drawn that the party has violated the federal securities laws.").  But even were that not so, irreparable harm is presumptively established by a showing of a statutory violation.  *See, e.g.*, *EEOC v. Cosmair, Inc., L'Oreal Hair Care Div.*, 821 F.2d 1085, 1090 (5th Cir. 1987).

52.     In any event, beyond that presumption, there is a clear likelihood of irreparable harm without the requested preliminary injunction.  The SEC is seeking equitable relief for the benefit of investors.  The threatened harm is the further dissipation of the assets that are the subject of this litigation, and such dissipation would impair the Court's ability to grant an

40

effective remedy.  More specifically, as a result of Barton's extensive commingling of funds, transferring of properties, and interference with tracing efforts, the SEC and the Receiver cannot yet identify and demonstrate all of the Barton Entities that received or benefitted from investor funds.  However, the fact that the SEC and the Receiver have, despite Barton's extensive commingling and refusal to provide tracing information, already identified numerous entities that received or benefitted from investor funds indicates that, given time, additional entities will likely be added to the list.

53.    Based on Barton's prior conduct, it is also highly likely that if Barton is not enjoined he will continue to dissipate, transfer, and/or conceal assets held by those entities, including investor funds and assets obtained with, or that otherwise benefitted from, investor funds.

54.    It is unlikely that the value of the Barton Entities' assets – which are encumbered with liens and claims and have been declining in value – exceed the approximately $26 million that investors lost as a result of Barton's fraud.  Thus, without the injunction, it is likely that Barton would dissipate assets traceable to the fraud at issue in this litigation and render them unrecoverable to satisfy the SEC's equitable remedies for the benefit of investors.  *See Federal Sav. & Loan Ins. Corp. v. Dixon*, 835 F. 2d 554, 560 (5th Cir. 1987) (upholding preliminary injunction prohibiting defendants from dissipating assets pending resolution of claims for equitable relief); *see also Enterprise Intern, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464 (5th Cir. 1985) ("The absence of an available remedy by which the movant can later recover monetary damages, however, may also be sufficient to show irreparable injury.").

55.    For all these reasons, the Court finds that the SEC has established a substantial threat of irreparable injury if a preliminary injunction is not issued; that the threatened injury if a preliminary injunction is denied outweighs any harm that will result if the injunction is granted;

and that the grant of a preliminary injunction will not disserve the public interest.

### F. Sworn Accounting and Preservation Order

56.     The SEC also requests that the Court order Barton to provide a sworn accounting and to preserve all relevant documents throughout the litigation.  The Court finds that an accounting and preservation order will further the purpose of the requested injunction by assisting the SEC and the Receiver in tracing assets to and among the Barton Entities.  *See SEC v. International Swiss Inv. Corp.*, 895 F.2d 1272, 1276 (9th Cir. 1990); *SEC v. Unifund SAL*, 910 F.2d 1028, 1040, n.11 (2d Cir. 1990); 15 U.S.C. § 78u(d)(5).  Good cause exists to believe that an accounting of assets is necessary to determine the disposition of investor funds and assets obtained with, or that otherwise benefitted from, investor funds, and to determine which entities that Barton directly or indirectly controls received or benefitted from investor funds.

### G. Barton's Evidentiary Objections.

57.     Barton objected to the testimony of Hahn and the Receiver on the grounds that neither witness was offered and qualified as an expert witness to testify on tracing.  Barton objected to the testimony of Cecil on the grounds that Cecil did not provide expert disclosures.  Barton objected to the other materials that the SEC submitted in support of its Motion, but only to the extent they show tracing, again based on his claim that tracing required expert testimony.  The Court overrules these objections.

58.     Expert testimony was not required.  Neither the Receiver, Cecil, nor Hahn were required to use specialized knowledge or opine as experts to provide and summarize the tracing analysis they performed based on a review of the financial records.  These witnesses simply followed the flow of funds on the face of the financial records and then used basic math to add up and summarize what they found.  While Hahn and Cecil do possess specialized knowledge in

the subject matter, and Hahn's, the Receiver's, and Cecil's review of Barton's financial records may have been tedious, it was not so complicated as to require specialized expertise and opinions. *United States v. Davis*, 53 F.4th 833, 848-49 (5th Cir. 2022) (holding that the district court did not err in admitting testimony of forensic auditor who, as here, traced flow of funds from bank records and concluding that such testimony was not expert testimony); *see also SEC v. Lifepay Group, LLC*, No. CV H-18-1098, 2020 WL 1259328, *5-6 (S.D. Tex. Feb. 26, 2020) (Slip Op.), *report and recommendation adopted,* 2020 WL 1308202 (S.D. Tex. Mar. 16, 2020) (denying motion to strike declaration of SEC staff accountant who was not acting as an expert and "traced the flow of funds through various entities and created a summary chart of her finding," and made mathematical calculations in order to create a summary chart "totaling the deposits and withdrawals related to various entities and people involved in the underlying transactions").

59.    Further, "at the preliminary injunction stage, the procedures in the district court are less formal, and the district court may rely on otherwise inadmissible evidence, including hearsay evidence," and "can accept evidence in the form of deposition transcripts and affidavits." *Sierra Club, Lone Star Chapter v. FDIC*, 992 F.2d 545, 551 (5th Cir. 1993). The concerns of potential prejudice or confusion to a jury from improper expert testimony are also not present before trial, and the Court is not required to perform a *Daubert* analysis at the preliminary injunction stage. *Texas Med. Providers Performing Abortion Servs. v. Lakey*, 806 F. Supp. 2d 942, 956 (W.D. Tex. 2011), *vacated in part on other grounds*, 667 F.3d 570 (5th Cir. 2012) (rejecting arguments that declarations did not satisfy *Daubert*, because courts may rely on otherwise inadmissible evidence at preliminary injunction stage); *Half Price Books, Records, Magazines, Inc. v. Barnesandnoble.com, L.L.C.*, No. 3:02-CV-2518-G, 2003 WL 23175432, at

43

*1 (N.D. Tex. Aug. 15, 2003) ("[B]ecause the court is permitted to give weight to otherwise inadmissible evidence when considering an application for a preliminary injunction, [the] motion to exclude the [expert] [r]eport is denied.").

60.     Even if the tracing summaries that Hahn and the Receiver provided do require some level of "expert" testimony, the Court has carefully considered and weighed their declarations and the in-person testimony from Hahn, the Receiver, and Cecil in the context of this proceeding and finds that their testimony is reliable for the purposes for which it was advanced.  Hahn is an SEC staff accountant with extensive experience summarizing the flow of funds from financial records.  The Receiver is an experienced lawyer who was assisted by a professional CPA in his review and summary of the financial records.  Barton cross-examined each of these witnesses and offered his own expert, but made no showing that Hahn's or the Receiver's tracing summaries were inaccurate or unreliable.  To the contrary, the Court finds the summaries to be reliable and helpful to the Court in streamlining and presenting credible evidence on the issue of tracing.

61.     Finally, for all the reasons discussed above, good cause exists to lift the Court-imposed stay for the limited purpose of adjudicating the Motion.

Dated: November 10, 2023

Respectfully submitted,

/s/ *Keefe M. Bernstein*
Keefe M. Bernstein
Texas Bar No. 24006839
James E. Etri
Texas Bar No. 24002061
Securities and Exchange Commission
801 Cherry Street, Suite 1900
Fort Worth, Texas 76102
(817) 900-2607 (KMB phone)
(817) 978-4927 (facsimile)
bernsteink@sec.gov

Counsel for Plaintiff
Securities and Exchange Commission

**CERTIFICATE OF SERVICE**

I affirm that on November 10, 2023, I caused the foregoing to be electronically filed with the Clerk of the Court for the Northern District of Texas, Dallas Division, by using the CM/ECF system which will send a notice of electronic filing to all CM/ECF participants.

*/s/ Keefe M. Bernstein*
Keefe M. Bernstein