IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § § § | |
| *Plaintiff,* | § § § | |
| v. | § § § | No. 3:22-CV-2118-X |
| TIMOTHY LYNCH BARTON CARNEGIE DEVELOPMENT, LLC WALL007, LLC WALL009, LLC WALL010, LLC WALL011, LLC WALL012, LLC WALL016, LLC WALL017, LLC WALL018, LLC WALL019, LLC HAOQIANG FU (a/k/a MICHAEL FU) STEPHEN T. WALL | § § § § § § § § § § § § § § | |
| *Defendants,* | § § | |
| DJD LAND PARTNERS, LLC LDG001, LLC | § § § | |
| *Relief Defendants.* | § | |

**DEFENDANT TIMOTHY LYNCH BARTON'S BRIEF IN SUPPORT OF
PROPOSED FINDINGS OF FACTS AND CONCLUSIONS OF LAW**

Defendant Timothy Lynch Barton (the "Defendant" or "Barton") submits this Brief in Support of Proposed Findings of Fact and Conclusions of Law.

**I. INTRODUCTION**

Seizing a citizen's companies and assets is not the next natural step after the United States Securities and Exchange Commission ("Plaintiff" or the "Commission") alleges securities fraud against that citizen. To the contrary, stripping a defendant of ownership prior to any

1

findings of guilt or liability is a drastic remedy saved for the extraordinary case. As sentries against the misuse of this remedy are formidable tests the Government must meet before obtaining it. The receivership must be necessary to prevent asset flight, and there must be no less drastic alternative for achieving that end. Even if these serious hurdles are overcome, the remedy cannot be against the defendant as a person, to gather his assets for some future execution of a hoped-for liability judgment. Instead, the remedy can only be against the property that is the subject of the litigation—in this case, the proceeds of the loans the Commission claims are illegal securities under federal law.

This case shows the importance of applying and enforcing these demanding standards. The Commission has alleged securities fraud based on loans for real estate projects that encountered difficulty and needed cash. The Government simultaneously launched a criminal prosecution on the exact same grounds. The very next business day, the Commission asked the Court to seize all Defendant's assets. The intended outcome is clear—that the Government's allegations of wrongdoing would ripen into criminal convictions and civil judgments of liability because the Defendant would, as a direct result of the sweeping seizure, lack the resources to wade through the millions of documents at issue and defend against those charges.

The Commission put the Court in a horrible position, simply arguing that the Commission is entitled to seize all a defendant's assets of a 30-year old company—and in many instances dispose of, through receivership, whenever the Commission alleges a plausible case for securities fraud. It did not even attempt to show that the receivership is necessary and that no less drastic measure would suffice. And it made no effort to show it was only seizing the loan proceeds that it claims are affected by securities law violations. As far as the Commission was—

2

and apparently continues to be—concerned, if it belongs to this Defendant, still assumed innocent in the eyes of the law, it is fair game.

On remand, the Commission is not doing much better. It's do-over motion is heavy on recitations of its securities fraud allegations, but light on why a new receivership is necessary. Indeed, this time around, the Commission drops any assertion of asset flight, claiming that a receiver will simply be a better manager of the real estate development business that Barton was. Dkt. 309 at 18, 27; Dkt. 352 at 1, 3. Tr. at 34:4-25.

As for the scope of any receivership, the Commission never took seriously the Fifth Circuit's clear instruction and that only entities holding subject loan proceeds could be seized. For its part, the Commission added a three-page declaration from its "staff accountant," who (as it turns out) is not actually an accountant, to its motion requesting this new receivership. When added to the so-called Wall entities that received the funds, the Commission performed any tracing analysis for only 29 of the 82 entities over which it is seeking a receivership. That "staff accountant" refused to explain in her declaration, or on the stand at the October 11, 2023 hearing, the methodology she used or the documents she relied upon in conducting her asset tracing analyses. And, for the Commission, one drop of traced loan proceeds into a multi-million dollar real estate project entitles the Commission to take all of it.[1]

The Commission is stretching. It is common ground that several Chinese nationals loaned money to the Wall entities, each designed to support a real estate project and that those funds were, in many instances, intentionally diverted to other projects. The Defendant will argue

---

[1] In analyzing asset tracing in the context of money laundering allegations, courts have been clear that "the presence of one illegal dollar in an account does not taint the rest—as if the dollar obtained from [money laundering activity] were like a drop of ink falling into a glass of water." *United States v. $448,342.85*, 969 F.2d 474, 476 (7th Cir. 1992). "[A]n account with a small percentage of illegal funds should not necessarily be treated in the same way, or analyzed under the same framework, as an account with a high percentage of illegal funds." *NOTE: Untangling Laundered Funds: The Tracing Requirement Under 18 U.S.C. § 1957*, 75 Stan. L. Rev. 1157, 1194.

those alternative uses were justified and certainly not a violation of the securities laws; the Commission disagrees. In the papers here, the Defendant thus does not contest that several projects and companies are in receipt of lender funds. Dkt. 334 at 12. If the Court finds a new receivership justified (and it should not), that receivership should only extend to the Wall entities and the companies holding and operating these replacement projects. The Commission simply has not given the Court enough to take more, much less everything, again.

## II. ARGUMENT

I. **The Commission Has Failed to Establish the Factors Set Forth in *Netsphere*; Its Motion for a Receivership Should Be Denied.**

A. **The Commission Has Abandoned Any Claim A Receivership Is Necessary to Stop Asset Flight. Clearly.**

The paradigmatic, Commission-sought receivership is the *Stanford* case. There, Stanford was running a continuing and classic Ponzi scheme that a receivership was required to end. And he was blowing assets in real time on luxury yachts and second homes. *United States v. Stanford*, 832 F. Supp. 2d 767 (S.D. Tex. 2011).

None of that is an issue here. The Government made no meaningful allegations of paying off old investors to attract new ones (its principal gripe is that investors were not paid). And the Government has entirely abandoned any suggestion of some imminent risk of asset flight. The Receiver began to resurrect this claim in his testimony, complaining about Mr. Barton's main operating entity paying credit card bills. Tr. at 38:9-22. But he admitted on cross-examination that no efforts were undertaken to disaggregate personal and business expenses on those cards. Tr. at 132:4-23. And the Defendant's expert testified to accounting records coded credit card charges as personal and business in the company's books and records. Tr. at 163:4-7.

Absent those clear hallmarks of a situation in need of receivership, Commission retreated into assertions that the companies needed to be seized to save them from Barton's

4

mismanagement.  Despite every opportunity to do so, the Commission has provided no authority for alleged poor management justifying stripping a company from its owners; all such receiverships are when the Commission is acting on behalf of the shareholder-owners—a company and against non-owning management. The evidence provided on this score came exclusively from the Receiver's effort to appear as a savior from dire circumstances and to set low expectations for his performance.  This evidence came in by anecdote.  When the receiver took over and immediately stopped JMJ Development's real estate development work, the company had only on $75,000 each on hand (the record showed millions more invested in real estate projects).  He cited a specific hotel project, Amerigold Suites—just getting back on its feet after the termination of COVID-rental assistance and ensuing evictions—in need of repair.  Tr. at 16:2-5.  He cited third party litigation over financing and development rights.  But there was no testimony that any of this was out of the ordinary for a real estate development business, an industry known for being leveraged and for disputes with lenders and others wending their way into Court.   And the Commission continues to have no explanation for why ending the company's real estate development work—and the revenue and value for projects under management it creates—was good for anyone.

In any event, stripping a defendant of his assets must be driven by "clear necessity," not arguments over marginal or even substantial improvement in how a company is managed.  That is why courts have insisted on evidence that the receivership is clearly necessary to prevent asset flight.  *SEC v. Spence & Green Chem. Co.*, 612 F.2d 896, 904 (5th Cir. 1980); *Accordant Commc'ns, LLC v. Sayers Constr., LLC*, No. A-19-CV-00401-LY, 2020 WL 7496657, at *3–4 (W.D. Tex. Apr. 7, 2020).

### B.        Less Drastic Measures Will Eliminate the Risks of Asset Flight.

A pre-judgment receivership—before discovery, trial, and the Government proving its charges—is the absolute last resort. *Barton*, 79 F.4th at 578 (quoting *Netsphere,* 703 F.3d at 305). It must be rejected if there are any alternatives that would prevent the flight of assets. Here, alternatives are apparent. They include a monitor who must approve a class of the subject corporation's major business decisions, including asset transfers.

They also include temporary injunction against transfers of assets without the permission of the Commission or the Court. Such an injunction would ensure assets remain where they are, while allowing real estate projects to be advanced through the development process. The Commission knows this is a viable alternative, as it is proposing something like it as a backup plan. The Commission's only response—in its papers and the hearing—is that injunction would expose true assets to the threat of third-party litigation. Dkt. 352 at 4; Tr. at 31:1-13. That is because the Commission's stock receivership order includes a stay of all litigation. But there is nothing that prevents the injunction against transfer from staying third-party litigation the Commission believes is a threat. Dkt. 334 at 7.

## II.    The Court Should Reject the Commission's Required Scope of any Remedy

Between the Commission and the Receiver, there is an apparent desire to return every major asset that the receiver tinkered with during his illegal tenure back into a carbon copy receivership. Perhaps this is driven by a desire to avoid liability; perhaps this is driven by a desire to maximize sources of revenue for the fees of the receiver and his law firm. The Commission has written down its desire to secure assets for a hoped-for liability judgment, an expressly forbidden purpose for a prejudgment receivership. Dkt. 309 at 18; Dkt. 309-1 at 2; Tr. 37:7-25; *See Netsphere*, 703 F.3d at 305 (finding that a receiver may not be "named simply to

secure or preserve funds for the satisfaction of a potential later judgment."). None of these motivations is a remotely valid reason to seize an asset into receivership before trial. All of these surround the Commission's latest effort to push this Court into error. If the Court imposes a receivership (which it should not), the Court must reject inclusion of the sweeping majority of companies the Commission sets to seize.

> **A.    The Commission (and the Receiver to the extent his analysis is adopted by the Commission) seeks to apply the wrong legal standard.**

Fifth Circuit law is clear. The Government cannot accuse a defendant of violating the law and seize all of his assets through a receivership before discovery, trial, and judgment. Instead, a receivership extends only to the *property*—in legal Latin, the "res"—at issue in the litigation. *Barton*, 79 F.4th at 580 ("the jurisdictional principle that a court's equitable powers do not extend to property unrelated to the underlying litigation applies with equal force to receiverships. A court lacks jurisdiction to impose a receivership over property that is not the subject of an underlying claim or controversy."); *Netsphere*, 703 F.3d at 305. It cannot be allowed to roundup a Defendant's assets for later satisfaction of a hoped-for liability judgment.

The receivership also must extend only insofar as that property. *Barton*, 79 F.4th at 580–81 ("Should the district court decide that a new receivership is justified on remand, it can only extend over entities that received from assets traceable to Barton's alleged fraudulent activities that are the subject of this litigation."); *see also supra* n.1. A company running a real estate development project worth tens of millions of dollars cannot be seized because it allegedly received $50,000.00 in traceable assets. *United States v. $448,342.85*, 969 F.2d 474, 476 (7th Cir. 1992). *At a minimum*, the company subject to seizure must currently possess substantial

amounts of the property in question to be seized.[2] *SEC v. Heden*, 51 F. Supp. 2d 296, 302 n.4 (S.D.N.Y. 1999); *SEC v. Cherif*, 933 F.2d 403, 413–14 & n.11 (7th Cir. 1991) (allowing equitable relief against a non-party to the litigation—and each of the ten entities in dispute are not parties—only to the extent "it is established that the non-party possesses illegally obtained profits but has no legitimate claim to them").

In its papers, the Commission at least tried to trace property, albeit in temporal snapshots and to a fraction of the companies it now wishes to freeze. The more ambitious Receiver (whose self-serving argument shall be ignored, for the reasons stated below) reached beyond the tracing of property, claiming that some vague set of ambient benefits from the loan proceeds would suffice for seizing a company. This was of one-piece with its misguided efforts to seize apartment buildings whose construction was funded almost entirely with Department of Housing and Urban Development guaranteed loans. This "benefits" thesis is grossly misguided.

The Commission asserts that assets which either directly received lender funds or "otherwise benefited" from those funds may properly be placed in a receivership. *See* Commission's Rep. at 2-3, 4, 5, 8. The Commission points to language from the Fifth Circuit's prior decision in this case, where the court explained that this Court, on remand, may only place under a receivership those entities which "received or benefitted" from assets traceable to any alleged fraudulent activity. 79 F.4th at 580-81. But that language does not come from the cases the Commission cited when challenging Mr. Barton's appeal in the Fifth Circuit. *See id.* at 580 (citing *FDIC v. Faulkner*, 991 F.2d 262, 267-68 (5th Cir. 1993); *Netsphere*, 703 F.3d at 310). Neither *Faulkner* nor *Netsphere*, nor any other case in the country the undersigned were able to

---

[2] If the company were to possess a relatively small amount, securing that property should occur through a lien to be satisfied on sale, not the drastic measure of dispossessing a defendant of ownership of the whole property. Insisting on such lesser measures is right in line with the Fifth Circuit's firm admonition that a receivership is a last resort, for use when only when less drastic measure are completely inadequate. *Barton*, 79 F.4th at 578 (quoting *Netsphere,* 703 F.3d at 305).

identify, make any mention of how an entity may be placed in a receivership if it "benefitted from" certain assets. In fact, the case cited to by the Commission does not even use that term once. Instead, that is language that originated from the Commission's own briefing—no doubt an attempt to expand its reach. *See* Commission's Expedited Motion for Appointment of Receiver and Brief in Support Dkt. 6 at 3.

Instead, as stated in *Faulkner*, the proper standard for determining whether an asset may be placed in a receivership is whether that asset was acquired with or otherwise presently holds allegedly fraudulently-obtained funds. *Faulkner*, 991 F.2d at 267-68. The Commission does not provide any guidance from case law (likely because there is none), or attempt to craft guidance of its own as to what it would mean for an entity to "benefit" from assets traceable to an allegedly fraudulent scheme. The Court is left, as the Commission would have it, with a broad and largely boundless term.

The Commission provides a few limited, but extremely ambitious, examples of what it believes constitutes such "benefitting." *See* New Receivership Mot. at 13-14 (alleging that use of investor funds to pay employees, maintain corporate offices, obtain loans by using property purchased with lender funds, obtaining participation interests in developments that received lender funds, and being owners or beneficial interest holders of another entity that received lender funds constitute benefits). But the standard cannot be that the Commission gets to decide how or if an entity benefitted from the allegedly tainted funds without any grounding in the law. Nor can it be so amorphous that essentially everything is swept in. A receivership is an equitable remedy that is designed to hold and protect property where it is currently being held. *See Janvey v. Alguire*, No. 3:09-CV-0724-N, 2014 WL 12654910, at *17 (N.D. Tex. July 30, 2014), *aff'd*, 847 F.3d 231 (5th Cir. 2017) ("The purpose of a federal equity receivership is . . . to marshal

9

assets, preserve value, equitably distribute to creditors, and, either reorganize, if possible, or orderly liquidate.").

The Commission offers no authority for its position that certain assets may be placed into a receivership simply because that asset may have held the funds at issue for some period of time in the past, or otherwise indirectly benefitted in some way from the loan proceeds without actually receiving those proceeds. Allowing the Commission to place assets into a receivership that do not presently hold any allegedly-tainted funds does not serve the purpose of a receivership, and gives the Commission virtually unlimited discretion in deciding which entities should or should not be placed in a receivership, provided the Commission can come up with some distant way in which an entity could have "benefitted" from the funds.

**B.    When The Correct Legal Standards Are Applied, Eighteen companies Should Be the Outer Limit of Any Receivership**

There is no question that several companies received the subject loan proceeds. The nine Wall Entities received them directly. When the originally conceived projects encountered difficulty, the loan proceeds were redeployed into replacement projects. This was hidden to no one; it was briefed to the lenders' contractual agent and was testified to in Commission interviews prior to the filing of this case. Barton Test. 55:19–24. These redeployments occurred through intercompany loans to Carnegie Development LLC and then on to companies operating the replacement projects and were documented in the accounting ledger of the Wall Entities and Carnegie Development. Barton Test. 55:19–24; Ginn. Decl., Dkt. 335 at App. 023; Tr. at 180:6-14; 64:2-14; 158:21-24. Together, these companies are listed on Exhibit A introduced by the defense at the October 11, 2023 hearing.

**C.    Commission Efforts to Expand The Receivership Companies Beyond the Eighteen Wall and Replacement Project Entities Are Invalid**

10

The Commission clearly wants more than the companies managing the Wall Entities, their respective development projects, and the replacement projects. The Commission's efforts to expand the net are invalid for several reasons.

1. **The Commission failed to present competent evidence tracing the loan proceeds to other companies.**

The Commission's effort to trace loan proceeds to only a few of the subject entities occurred through the Commission's "staff accountant" Carol Hahn. Ms. Hahn was not presented as an expert witness at the October 11, 2023 hearing, and appropriately so. Tr. at 129:12-16. Despite her title in presentations to the Court, Ms. Hahn is not an accountant, much less one who passed the universally accepted examinations to become a certified public accountant. Tr. at 122:10-21. Neither in her testimony nor on the witness stand did she identify the methodology she used to reach conclusions tracing loan proceeds into those companies. Decl. of Greg Ginn, Dkt. 335 at App. 024; Ginn Test., Tr. at 114:24-25. Nor did she provide any testimony on the documents or materials she relied on to reach those conclusions. Dkt. 335 at App. 024; Tr. 134:9-13.

The Hahn Declaration and testimony fails any standard for expert testimony. Ms. Hahn—who is not an accountant—is not qualified to reach the accounting conclusions for tracing the proceeds. Nor does she provide the basic information necessary for the parties or the Court to determine whether her analysis is reliable, as explained below. The Commission had every opportunity to correct these defects, which were detailed in the opposition brief. The Commission's reply included no supplemental declaration for Ms. Hahn; her testimony did nothing to fill these gaps. *See e.g.*, Tr. 107-38.

For the tracing that occurred in this case, expert testimony is necessary. The Fifth Circuit's opinion in *United States v. Davis* does not bind this Court in regard to the issue on

11

whether the Commission's tracing witness must be qualified as an expert witness. 53 F.4th 833 (5th Cir. 2022). In *Davis*, the Fifth Circuit held that this Court did not abuse its discretion, on the facts of that case, when it admitted testimony from a non-expert government forensic auditor concluding the amount of funds from the Veterans Administration and from other sources in a company's banks accounts. That witness concluded that the VA funds were the sweeping majority: $776 million to $336,000 for other funds. that several massive payments from a single Government agency were the funds spent later. *Id.* at 848. For that money laundering case, the question was straightforward: Were $3.6 million in purchases from the account more than the amount of funds received from elsewhere than the VA. *Id.* at 848–49. The answer—involving "addition and subtraction"—was clearly "yes," a by a wide margin. *Id.* Instead, Court held that the funding analysis at issue in this case had testimony that relied on basic math—addition and subtraction—which does not require scientific, technical, or specialized knowledge within the scope of Fed. R. Evid. 702. The Fifth Circuit merely stated in *Davis* that qualification was not *necessary* when declining the defendant's argument, not that the district court was incorrect in requiring the witness to be qualified as an expert witness.

Nothing so simple is at issue here, and this Court needs to exercise its discretion as to the tracing work at issue here. What was going on in the Davis case was not "tracing," it was identifying the proportion of funds in one account. Here, the SEC is seeking to use non-expert testimony—with undisclosed methodologies and unestablished qualifications—to trace quants of funds through two or three of four companies. That kind of tracing work requires technical and specialized knowledge. *United States v. Tao*, No. 19-20052-JAR, 2022 WL 252019, at *12 (D. Kansas Jan. 27, 2022) ("one could argue that . . . asset tracing is specialized knowledge that must be offered by a 702 witness."). The Government seeks to have a witness, who they admit is not

qualified as an expert, testify on complex financial asset tracing analysis for hundreds of entities, which might entail thousands of transactions and various complex accounting practices. *See id.* at \*12 (directing the Government to provide a supplementation to comply with Fed. R. Crim. P. Rule 16 expert witness disclosure).

In any event, Ms. Hahn's testimony does not even meet the standards for a competent summary witness. The Fifth Circuit has explained that a summary witness chart is permissible under Fed. R. Evid. 1006 when the summary witness's conclusion is (1) a fair assumption based on all the evidence, (2) was subject to a full cross-examination by the defendant's attorneys, and (3) when the jury is instructed to only give the summary evidence due weight. Fed. R. Evid. 1006; *United States v. Spalding*, 894 F.3d 173, 186 (5th Cir. 2018) (citing *United States v. Means*, 695 F.2d 811, 817 (5th Cir. 1983)). To satisfy the first prong, the expert should explain in detail the methods relied upon that underly and justify the summary documents. *Id.* at 186 (finding facts supported forensic accountant's assumptions because the expert "'explained in [significant] detail how [s]he had derived figures contained in the summary charts from the underlying documents' and how the nature of each expenditure and vendor justified her otherwise admissible expert conclusions"); *United States v. Jennings*, 724 F.2d 436, 442 (5th Cir. 1984). Ms. Hahn's testimony contained no details that would pass the Fifth Circuit's standard for proper 1006 summary evidence.

The Receiver's effort at tracing is even further afield. The person who attempted the tracing requested in the diagram in the Receiver's declaration was *not even identified* in that declaration. His identity emerged, for the first time, at the evidentiary hearing: Mr.. Anthony Cecil Neither the Receiver's declaration nor the testimony of the Receiver or Mr. Cecil identified the methodology used to assemble these diagrams or the, nor the evidence relied upon to do so.

Worse, Mr. Cecil demonstrated a complete lack of facility with the details of some of the more important tracing claims. When questioned about Diagram 4 (Dkt. 304 at 120), for example, Mr. Cecil could not recall is any effort was made to account for the origins of several other, unrelated deposits and whether they were obtained by lender funds. Tr. at 104:21-24; 105:1-22. He deferred to absent members of his team who really did the work. *Id*. No small detail, Diagram 4 has the Receiver's sole attempt to hang on to a substantial real estate project in Frisco, Texas, which is worth, at least according to the receiver, nearly $8.9-10 million. Dkt. 306 at 26, ¶72. And seizing that property is counter-intuitive, as the record evidence shows the purchase and development was financed by third party lenders having nothing to do with the Chinese lenders at issue in this case. The Receiver's attachment to the Frisco property appears to show that it tried illegally to sell it out from under its true owners, in order to fuel his fees.

In the end, the Commission has failed to present competent evidence tracing to the property at issue to a where it can be seized. There's little excuse for this. The Commission—not in September 2022 and not today—has presented the Court with some emergency situation where doing serious accounting work should be excused. The SEC was investigating JMJ Development for two-years prior to filing suit, it subpoenaed and obtained tens of thousands of pages of bank records (which it proudly produced to the Defendant just days before its opposition brief); it had a year's time when its tracing was under challenge; it had more than two months since the Fifth Circuit held its tracing effort inadequate. What did the Court get—a three page chart with undetailed tracing assertions by the Commission's mystical "Staff Accountant." By now claiming the Court should seize everything again, but not providing the Court with serious work, the Commission is again putting the Court in a terrible position, setting it up for another reversal if it does what the Commission wants. This is not the first time the

14

Commission has sought a quick receivership—but when pressed—not provided an adequate or compelling tracing analysis.

### 2. The Commission Makes No Effort to Distinguish the Unaffected Revenue of the Main Development and Operating Entity

Expert accounting testimony is needed here because the tracing exercise is not uncomplicated. Nearly all of the Commission's trading claims depend on transfers to and from JMJ Development LLC, the main real estate and development operating entity. Hahn Decl. ¶¶16, 18–19. The undisputed evidence in the records is that JMJ Development received at least $17 million in revenue over the relevant period having nothing to do with the loan proceeds. Government witnesses speculated that money has also thinned, but cited no specific evidence for that assertion. And the Commission's professional and reaching tracing conclusions made no effort to distinguish funds potentially connected with the loan proceeds (from the Walls of Carnegie) from those that were not. This is a fatal flaw. If the Commission wants to seize companies and their assets because of payments from JMJ Development, it must distinguish between JMJ affiliated and unaffiliated assets, and there are accepted accounting methods for doing so. Neither Ms. Hahn nor Mr. Cecil would claim to have any of there methods, under cross-examination.

### 3. The Commission Improperly Relies on Assertions of Extensive Commingling to Excuse Careful Tracing.

Compounding the above error is the failure of the Commission to address the documentation of inter company loans in the accounting ledgers of the Wall Entities/Carnegie Development LLC. The Commission's refrain—or excuse—for incomplete tracing is that the Barton-companies "extensively commingled" loan proceeds with other company funds, making tracing impossible. Hahn Decl. ¶ 6. To indulge the Commission's argument would contradict the Fifth Circuit's decision in this case. There, the court rejected the following proposition: "Because

it alleges that Barton has engaged in extensive commingling of funds, it claims that Barton's control is an effective proxy for placing an entity in the receivership even if it had not yet traced funds to that entity." Barton, 79 F.4th at 580-81.

Not only is the Commission's reliance of allegations of commingling invalid as matter of law, the allegations themselves are contrary to record evidence. The undisputed evidence in the record is that transfers of funds from the Wall entities and Carnegie Development were documented on the accounting ledgers of those companies as intercompany loans. Ginn Decl. App. 023. Such documentation belies assertions that loan proceeds were recklessly mixed with other funds, what accountants would regard as "co-mingling." Ginn Decl. App. 023.

Inexplicably, Ms. Hahn and the Receiver's tracing analysis did not review or address the documentation of these transfers in the accounting system. Ignoring this evidence fatally undermines their attempted tracing analysis. Ginn Decl. App. 024. The explanations offered for skipping the accounting system in the tracing analysis clearly fail. Ms. Hahn did not review the accounting system because she did not ask the Receiver for access to it. The Receiver speculated that the accounting system might be inaccurate. The time for allegations and speculation is past. If those purporting to trace assets are going to skip over the accounting system, they need evidence showing the system is inaccurate. Foregoing review of that system—without an evidence based explanation—undermines the Commission's (and the Receiver's) tracing claims.

### 4. The Commission Never Traced Property to its Current Destination

On its own terms, the Commission's conclusion is that a minimal and temporary transfer of funds into a company and its real estate project is sufficient to seize that company. That is consistent with neither the law nor well-established accounting standards.

16

First, the Government cannot seize an entire company—and a multi-million-dollar real estate project by showing a relatively insubstantial amount of affected funds was transferred to that company. The power to impose the receivership extends only so far as an entity possesses subject property. At a minimum, the Government must show possession of a substantial amount of subject property relative to the size of the company or asset it seeks to seize. *Heden*, 51 F. Supp. 2d at, 302 n.4; *Cherif*, 933 F.2d at 413–14 & n.11.

The Commission—and the Receiver—rested on *relatively* small transfers of allegedly affected funds to seize companies and assets orders of magnitudes larger. For HUD-financed apartments costing tens of millions to build, the Commission is relying on the transfer of tens of thousands of dollars. To accept the Commission's argument—to seize these significant assets based on these alleged transfers—would be plain error.

Second, the Commission never attempted to trace affected property to its final destination. Ginn Decl. App. 025. Instead, the Commission showed a transfer into a company it wished to seize and stopped its analysis. See id. That method omits plainly available evidence of some of the key transfers being immediately returned as errors. It also omits that—in the care of JMJ Management LLC—the company was receiving—on a net basis—substantial funds from the real estate projects the Commission now wants to seize. The undisputed evidence in the record is that, under applicable accounting standards, property can and should be traced through to where it is. Otherwise, the Government is not seizing the subject property, but instead using it to capture the entirety of every company it stopped at along the way.

### 5. The Commission Did Not Account for Legitimate Payments to Companies

To seize the property of a corporation, the Government must show the company possesses the subject property and has no legitimate claim to it. *Heden*, 51 F. Supp. 2d at, 302

17

n.4; *Cherif*, 933 F.2d at 413–14 & n.11. The undisputed evidence in the record is that JMJ Development (for example) advanced expenses for and performed work progressing the Wall Entity Projects. Those reimbursements and payments for service were coded in the accounting system. Also importantly, the Wall Entities accounting to the SEC's allegations—received was no more than $26 million in loan proceeds. The accounting system, however, shows more than $3 million of receipts into these entities.

The Commission's—and the Receiver's—attempted accounting analyses made no effort to account for any of this. Instead, the analyses assumed that any transfer from the Wall Entities—or its managing member, Carnegie Development—was an illegitimate out flow of lender funds. In doing so, the Commission leaps over a fundamental question in the tracing analysis and undermines any conclusion that it is tracing the property of the loan proceeds.

### D. The flaws in the Commission's Tracing Analysis Particularly Undermine Efforts to Seize Several Major Classes of Assets

The Commission wishes to leap from the Wall Entities, over the acknowledged replacement projects, past the main operating entities, to companies managing and owning real estate projects and assets far remote from the Chinese lender funds. The above detailed errors manifest in the invalid Commission efforts to stretch into conveyance and assets.

### 1. The Commission has no legitimate claim to the HUD-financed apartment buildings.

Barton-controlled and owned companies took out loans guaranteed by the Department of Housing and Urban Development and mezzanine financing from Southern Properties Capital to build four large apartment complexes in Texas and Alabama. They are Frisco Land, 2999 Turtle Creek, Villita Towers, Amerigold Suits; and the D4-HUD Financed Apts. Are Bellweather Ridge, Windmill Farms, and Rosewood Property. Ginn Decl. App. 027–28. They are worth tens of millions of dollars.

There is no question the Commission went to seize these assets to starve the Defendant of resources and the Receiver went then for nearly guaranteed payment of his fees. The Commission's entire case here turns on transfers of tens of thousands of dollars—less than 1% of the construction costs of the project—which it seeks to leverage into seizing the entire asset.

The Commission and Receiver did not disclose—but presumably was fully-aware given their review of bank statements—that the identified transfers to the companies performing the development of the apartment buildings were in error, were unnecessary, and were thus promptly returned to JMJ Development. Even if the Court were to assume these transfers as subject property, the record shows that the property is not in the D4 entities and, frankly, did not benefit them.

The record also demonstrates that these HUD-financial apartment projects were not some drain on resources for JMJ Development or other upstream Barton-companies. These projects were underway before any Chinese-national loan occurred, and net revenue positive for JMJ Development, which was being paid from the HUD-facility for its development services. These projects did not need to be, and were not, financially propped up by other Barton-related entities.

As for the assertion that these companies received Chinese-lender proceeds, the Commission and Receiver's analyses reflect a parade of the errors identified by expert accountant Mr. Ginn. The transfers in question came from JMJ Development—the main operating entity. But neither Ms. Hahn nor the diagram fragments in the Receiver's report explain how they disaggregated lender funds from other funds within JMJ Development. Nor do they reach a conclusion about the final  distribution of the funds, a shortcoming very real here as "following" the transfer shows the property is not in the D4 entities.

It is unsurprising that the Receiver abandons tracing funds into the HUD property, and argues they benefitted from ambient existence of JMJ Development. JMJ employees worked on the projects, with JMJ's roof over their head, using JMJ's electricity. This "benefit" these is not grounded in any law. *See* Supra Section II A. It also does even less to account for JMJ's unaffected revenues, totaling more than $17 million according to the undisputed evidence in the record. The Receiver's concept of benefits is conceived from whole cloth and is unknown to well accepted accounting standards. And reasoning like this pervades the Receiver's tracing conclusions, burying legal error in any reliance on them.

**2. The Commission has not demonstrated the Frisco company and project possesses lender funds**

In 2018, FHC Acquisitions LLC purchased a promising property for a hotel in Frisco, Texas. This project was well and adequately financed by third-party lenders having nothing to do with the Chinese-nationals that are the subject of this case. The asset is significant even in the Receiver's haste to fuel his fees.

The Commission claims it is entitled to this $8 million asset because of a transfer to a title company in escrow for purchase of the property of $100,000. Hahn Decl. Ex. A ¶9. Although Ms. Hahn did not identify the documents relied on for her conclusions, Mr. Ginn - in the days the Commission made corporate bank statements available prior to the due date of the opposition and his declaration – found the relevant bank statements for Carnegie Development and JMJ Development. Ginn Decl. at App. 063. Ms. Hahn claimed to trace the $100k from the wall entities to Carnegie then, to JMJ then, to the title company. But the claim did not account for substantial other funds, in the Carnegie bank account, from another source prior to the transfer to JMJ. *Id.* Even more strikingly, it did not account for another $100,000 deposit into the JMJ bank account from a different source, on the same day as the Carnegie deposit. *Id.* Ms. Hahn

20

cannot say that the $100,000 deposited with Chicago Title was Wall or even Carnegie money, and her effort to do so amidst the other documented financial statements undermines her credibility.  At a minimum, Ms. Hahn's assertion shows the perils of relying on her report, which explains neither her methodology nor how she decided to include or omit transactions in her financial analysis.

The Receiver's diagram fragments regarding FHC Acquisitions raises more questions than they answer. Thomas Decl. 120. This diagram – accompanied by no information about who prepared it, how it was prepared, from what it was prepared – purports to trace funds from the Marine Creek project through to a company called Broadview Holdings to FHC Acquisition. The alleged proceeds arrive at Broadview on March 24, 2022 – some three years after the last Chinese National loan was made. Five days later, the diagram seems to imply that a portion of those funds - $168,146.67 – is transferred to FHC Acquisition. But the notes to the diagram acknowledge that the same Broadview account – in those intervening 5 days – received $2.917 million in other deposits, some 18 times the $167k it claims to trace out of that account. The diagram makes no effort to account for these other funds.

The Commission put the accountant purportedly responsible for these diagram, Mr. Anthony Cecil, on the stand. He was questioned about this diagram, and had no facility with the details. He did not even know what FHC Acquisitions was. Tr. 102: 23-25. And he acknowledged that the analysis did not account for these intervening deposits. Tr. 102: 9-22.

Beyond these clear flaws, the Commission is again trying to leverage a relatively small transfer into seizure of a property that cost millions, was financed by completely unrelated third parties, and is today worth between $10 and $12 million. If these tracings were not so manifestly flawed, they would not justify seizure of this whole company and all of its assets.

**3. The Commission did not demonstrate that the Villita Towers Project in San Antonio possesses loan proceeds.**

Villita Towers is an apartment development in San Antonio, Texas, which began in 2015, two years prior to the first Chinese national loans. Ginn Decl. at 28. The Commission is eager to have that asset (and the Receiver is eager to sell that valuable interest for real-time payment of his fees). An appeal of the order approving the sale is pending.

Ms. Hahn claimed that several transfers from JMJ Development, in 2017, 2018, and 2019, were actually subject loan proceeds. But, again, Ms. Hahn made no effort to disaggregate loan proceeds in JMJ's possession from other funds. Ginn Decl. at 065. Indeed, Ms. Hahn did not even make an assertion about what other funds were available, leaving blank the column in her spreadsheet regarding the beginning balance at the relevant JMJ account. She also asserts that some money into JMJ Development came from the closing of 2999 Turtle Creek, without doing any analysis to determine the extent to which that property was tainted and whether the funds in question were (the 2999 project had millions of dollars in third party investment, having absolutely nothing to do with the third party lenders in this matter). Hahn Decl. at 24; Ginn Decl. at 065. The Government put on no rebuttal evidence regarding these criticisms, either in its reply brief or at the evidentiary hearing.

**4. The Commission failed to show that the Amerigold Hotel possesses loan proceeds.**

The Amerigold Suites Hotel was purchased in 2010 and all its units were converted into long-term rentals. Ginn Decl. App. at 28. The Commission asserts that the company holding and managing the facility—Goldmark Hospitality—received subject lender funds. The basis for this assertion is a single transfer—on September 28, 2021—of money from JMJ Development. The Commission claims those funds come from the Wall Entities, through Carnegie Development.

22

That assertion, however, makes no effort to distinguish between loan proceeds and other funds in JMJ's possession.

Nor does the Commission trace those funds to their final destination. And there is no sense of proportion, as the Commission claims a multi-million-dollar asset and company on the on the basis of a single transfer.

**5. The Commission has not shown that the 2999 Turtle Creek project possesses lender funds**

The Commission has not given the Court nearly enough to seize the 2999 Turtle Creek project. 2999 Turtle Creek Boulevard is one of the most prominent properties in Dallas which the 2999 companies planned to develop into a hotel. It is valued at an excess of $70 million. And it was purchased through millions of in equity investment by companies and individuals having absolutely nothing to do with the Chinese-national lenders at issue in this case.

The Commission claims lender funds made their way into the company. It says a $4 million loan was taken out to "secured at least in part by Wall 11's property" and then a third of those loan proceeds were shared with the 2999 operating company. Hahn Decl. Ex A ¶20. The Commission, however, provides absolutely no detail on this loan, and its use of the term "in part" suggests a substantial portion of the loan originated from assets having nothing to do with the Chinese-national lenders. Ginn Decl. at App. 67. Again, the Commission makes no effort to distinguish between clean and unaffected funds, for use of a fraction of commingled proceeds. Nor does it provide the Court with the underlying loan documentation to unpack its "in part" hedge.

The Commission makes another transfer assertion, this time through JMJ Development. Hahn Decl. Ex. A ¶20. Again, though, this claim tells us nothing about whether the Commission

tried to disaggregate JMJ's affected and unaffected assets, much less what methodology it used to do so. Ginn Decl. at App. 67. This unilateral lob cannot be considered competent evidence.

The Receiver's effort suffers from the same problems, here not even explaining how the last diagram started with Chinese lender funds. Thomas Decl. at Ex. 15.

In all events, the Commission is trying to leverage relatively small transfers to seize a project in which tens of millions of dollars were invested by Mr. Barton and others who never ever heard of the Chinese-national lenders. Seizing this entire asset – even if the Commission's tracing analysis were valid – is not the least drastic remedy. *Netsphere*, 703 F.3d 296 (5th Cir. 2012). At most, if the Commission were to prove any of this, it should have a lien on the asset for the amount of the alleged transfer.

### 6. The Commission provides no justification for seizing the Defendant's house or the real estate projects owned by his son and the Trammel Crow Family

The Commission's ambitions extend beyond Mr. Barton's core businesses. Today, they continue to seek the seizure of his home (held by a special purpose entity- SF Rock Creek LLC), despite offering no analysis tracing lender funds into that home's purchase. Hahn Decl. Ex. B and A. The thesis appears to be that everything Barton touches or lived in is tainted by lender funds, as it falls into the category of "additional Barton controlled entities" that "the Commission cannot yet confirm . . . received, or otherwise benefitted from, Barton's alleged fraudulent activities that are the subject of this litigation."  Hahn Decl. ¶ 6.

That should be the end of the matter. The Receiver, though, is certainly worked up about having asked this Court to kick an American citizen out of his only house and then to sell it. So it stretches into some tracing theories, talking not about actual lender funds but entities that received some Small Business Administration ("SBA") loans while mentioning their associations with Wall properties. Even those SBA loan proceeds were "commingled" with assets whose

provenance is not determined. Thomas at ¶ 49. That's not enough, in the Fifth Circuit on its face. *Netsphere*, 703 F.3d 296 (5th Cir. 2012).

The Receiver also claims the house benefitted from sale of Marine Creek, which was purchased with investor funds. Thomas Decl. at ¶59. But the Receiver makes no effort to distinguish between affected and unaffected funds in the Marine Creek entity. And when a diagram appeared reflecting this "tracing," for which no witness would take responsibility, nobody explained why the funds repaying the house loan did not come from the intervening $2 million deposit in the ten days the alleged Marine Creek funds sat in the account. Thomas Decl. at p. 118 (reflecting a $2 million deposit from the sale of Winter Haven on May 10).

The Commission should not have asked the Court to seize Mr. Barton's home, and it is long past time that it is returned to him.

Next, the Commission continues to desire a series of companies and assets owned by his son, Max Barton, and the Trammel Crow family. This was always a stretch, and the Max Barton and Crow family briefing before this Court dispelling the attempted tracing is incorporated herein. In any event, no one has bothered to prove that the receipt of any funds by these third parties was illegitimate, as the Government must. The correct, less drastic, measure is that if entities are placed to receivership that are the lenders to those properties. Those entities should enforce the terms of those laws and recover principal and interest. There is no justification for seizing the extra property from these third parties.

## III. The Commission Failed to Establish Its Jurisdiction Over This Case.

Every problem with a business loan is not a matter for the Securities and Exchange Commission. To the contrary, the Commission only has jurisdiction over "securities," a defined term in federal law. And courts have vigilantly turned back efforts to convert business loans into securities.

25

This case demonstrates why. The federal Government has numerous tools to prosecute alleged fraud with business loans; they are being used here, with the Justice Department using its wire fraud authorities to address that same bundle of facts. The federal Government clearly thinks that is the primary method for addressing whatever went wrong with the Chinese national lenders, so it asked this Court to stay the discovery and merits of the SEC's case. This parallel action is an inefficient use of this District's scarce resources.

That is because the Commission has put zero effort into proving the Chinese national loans at issue here are securities. The documents use all the language of loans and lending, and none of the language of investment—a key indicator that the loans are not the type of notes that qualify as securities. Also relevant is the intent of the lender and borrower. The borrower's intent was clearly to take a short term business loan to bridge from pre-development of a real estate project to construction financing, a purpose inconsistent with the loans governing securities.

Where was the Commission's evidence on the intention of the Chinese national lenders? We did not hear from a single one of them at the evidentiary hearing. This is not new—not a single one of the lenders showed for the involuntary bankruptcy proceedings initiated by Government witness and lender agent, Michael Fu, and the Bankruptcy Court dismissed it for that reason. There is no evidence in the record that the intention of the Chinese-national lenders was to to invest in the success or failure of Mr. Wall's endeavor. Rather, the undisputed evidence in this record is that the purpose of these loans was as a waystation or excuse to patriate money from China (which controls money leaving that country) to the United States. For that reason, Fu insisted that principal and interest payments be made to the U.S.-based accounts of his choosing, rather than returned to the Chinese accounts from where they came. And he maintained that position, in the face of documented U.S. anti-money laundering and tax

compliance issues. The point of these loans, from the lender perspective, was to circumvent Chinese controls on sending money to the U.S.—to launder funds—a purpose discovered by the borrower mid-stream. The crickets—the lack of appearance of claimants or witnesses—in the bankruptcy proceedings or in the evidentiary hearing in this Court reinforces that laundering purpose. And the laundering purpose is contrary to the investment purpose required for these loans to begin to be considered securities.

The Commission's "investment contract" long-ball should also be rejected.

The Commission hopes the Court will adopt the Commission's "pretty much anything can be a security because it is an investment contract" approach. The Court should not entertain such notions. This is especially the case because a *Howey* analysis is a particularly fact-intensive consideration and the Commission has failed to provide essentially any facts supporting its investment contract claim. *See In re Bibox Grp. Holdings Ltd. Sec. Litig.*, 534 F. Supp. 3d 326 (S.D.N.Y. 2021) ("Additionally, the issue of whether a particular token is in fact a security has significant consequences for each of the claims alleged in the complaint, and that determination involves an application of the Supreme Court's *Howey* test. That test is a fact intensive inquiry and will reach a result that depends on the unique characteristics of each token.").

The Court, and the defendant, are simply left with too many open questions to endorse the Commission's broad and sweeping claims. Why has the Commission not provided testimony of a single lender, to elucidate the intensions of the parties involved in the transaction? Why has the Commission not shown a single instance in which the loan agreements were solicited or sold on secondary markets? And why has the Commission not provided any factual showing that the lenders expected anything in return for their loan other than payments from a fixed interest rate? The answer to those questions is, perhaps, that the facts do not support the Commission's claims.

As much as the Commission might wish it to be so, a financial instrument is not a security just because the Commission says it is. That is a question that requires a significant factual foundation laying and the Commission has failed to do so.

To establish that the loan agreements at issue here are investment contracts and, thus, subject to the Commission's jurisdiction, the Commission must meet each factor of the test set forth by the U.S. Supreme Court's in *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946). The Commission must show that there was (1) an investment of money; (2) in a common enterprise; (3) with a reasonable expectation of profits to be derived from the efforts of others. Failure to satisfy any of those factors is fatal. *Living Bens. Asset Mgmt., L.L.C. v. Kestrel Aircraft Co. (In re Living Bens. Asset Mgmt., L.L.C.)*, 916 F.3d 528, 535 (5th Cir. 2019). While it is the Commission's burden to satisfy the *Howey* factors, it is worth briefly addressing each.

First, the loans were not investments. As explained elsewhere in this brief, they loans were much more likely used as opportunities for Chinese foreign nationals to patriate money in the United States and, at the same time, receive interest on their money while it was located outside of China. Nothing in the course of these loan transactions was "purchased or otherwise acquired in exchange for value[,]" as would be common with an equity interest. *See* SEC, Framework for "Investment Contract" Analysis of Digital Assets. Instead, money was simply lent in exchange for interest payments. In fact, as this brief details, neither the loan agreements nor any other implied or formal agreements suggested that the Chinese lenders would ever receive anything other than their principle plus interest. That is because they never were intended to or, in fact, would. Again, the Commission has failed to provide any factual evidence to the contrary.

Further, there was no "common enterprise" into which the monies lent pursuant to the loan agreements went. Each loan agreement was associated with a single real estate project. A commercial operation receiving multiple loans for a single project does not make those multiple, discrete contractual arrangements a "common enterprise." Moreover, the loan agreements were not conditioned on the success of the Wall entity projects, any other Barton entities, or Barton's efforts. Rather, "repayment of the loans was merely a function of the [Wall Properties'] ability to repay the loans," and the Commission does not allege that the Chinese lenders would "accept or that the [Wall Properties] could force [them] to accept any less than the amounts loaned." *Wolfe v. Bellos*, No. 3:11-CV-02015-L, 2012 WL 652090, at *8 (N.D. Tex. Feb. 28, 2012) (citing *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 838 (1975)).

Interest paid on loans is clearly distinct from the "profits" envisioned by the Supreme Court in *Howey*. And there is no indication or evidence presented (in the form of lender testimony or otherwise) that the loan agreements held any value other than return of principle plus interest. The Commission has not shown, or even alleged, that the loan agreements were saleable for gains in some secondary market. The loan agreements entitled the lenders to a fixed rate of interest.

The "efforts of others" in this instance were totally inconsequential, as nothing Barton (or any other person working on the Wall entity projects) did would impact the obligation or amount of loan repayment or interest payment. The Fifth Circuit takes a broad vertical approach to the question of commonality, "focus[ing] on the expertise of the promoter in the industry of the alleged security. If the investor relies on the promoter's expertise, then the transaction or scheme represents a common enterprise and satisfies the second prong of the *Howey* test." Ryan Borneman, *Why the Common Enterprise Test Lacks a Common Definition A Look Into the*

29

*Supreme Court's Decision of* SEC v. Edwards, 5 U.C. Davis Bus. L.J. 16 (2005).  Here again, no lender has been put forward by the Commission claiming that he or she was relying upon Barton's real estate prowess and expertise to ensure repayment of the loan.  It is not even clear that many of the lenders knew who Barton was.

### IV. The Court Should Not Impose a Receivership; If It Does, Several Features of the Previous Order Must Be Changed.

The attached findings of fact and conclusion of law proposes an order for a receivership, should the Court (contrary to law and the facts in this record) impose one. We highlight certain modifications from the Court's prior order and the Commission's proposed order here.

#### A. Cort Thomas Should Not Be Reappointed

One thing is clear from these proceedings: The Commission—using public resources—have not made a case for taking all of the Defendant's assets. Phrased most generously to the Government, the Commission has leaned on the Receiver to try to build its case in lieu of the Commission doing serious work. *It has not been—would not be—in the interests of the Chinese national lenders, third-party creditors, or the Defendant to have the Receiver burn through estate assets—with the meter running at hundreds of dollars per hour—doing the Government's job of investigating.*

If there is a new receiver (and there should not be), that receiver should be focused on preserving known assets in place and advancing them through the development process. That will require a different skill set than Mr. Thomas's. It was of his skill set to investigate, to advocate, and to litigate, in lieu of the Commission doing his job. As for a hammer, everything seems like a nail for Mr. Thomas and Ms. Koonce, every task seemed like a dispute in need of scorched-earth litigation.

Any new receiver should be a real estate development professional, and the record so demonstrates. Mr. Thomas was right there, with a 60-page declaration trying to do the Commission's job and advocating for his law firm's continued retention.

But, when it came to tending the farm, Mr. Thomas was at sea. Just as an example, the undisputed evidence in the record is that the Venus properties would be substantially increased in value—by two or three times—if further advanced through government approvals. This is the primary direct asset procedure by lender funds. Yet Mr. Thomas had little grasp on the details of how to do so.

Perhaps to fit the Commission's narrative, Mr. Thomas testified that current asset values would fall short if paying back Chinese-national lenders. But his chart needing this conclusion failed to value more than a third of the properties, carrying them at zero. On cross-examination, he had no information on what these were worth and how they should be advanced. Mr. Thomas and his litigation colleagues have been long on using "other people's money" to support the Commission's investigatory and litigation needs, but short on the running of the real estate development business he seized.

Mr. Thomas cannot continue in his position. Any new receiver must be a real estate development professional as the Commission proposed in 2022. Not even the Commission endorsed Mr. Thomas's retention, making no recommendation in its briefs and leaving blank the identity of a new receiver in its proposed order.

### III. CONCLUSION

For the reasons set forth above, Barton respectfully requests that this Court accept his proposed findings of fact and conclusions of law.

Dated: November 10, 2023

Respectfully submitted,

By: */s/Michael J. Edney*
Michael J. Edney
Virginia Bar No. 48253
DC Bar No. 492024 (*admitted to N.D. Tex.*)
medney@huntonak.com
**HUNTON ANDREWS KURTH LLP**
2200 Pennsylvania Avenue NW
Washington, DC 20037
Phone: (202) 955-1500
Facsimile: (202) 778-2201

**COUNSEL FOR TIMOTHY LYNCH BARTON**

## CERTIFICATE OF SERVICE

On November 10, 2023, I electronically submitted the foregoing document with the clerk of court for the United States District Court for the Northern District of Texas, using the electronic case filing system of the court. I hereby certify that I have served all counsel of record electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

*/s/Michael J. Edney*
Michael J. Edney

32