IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § § § | |
| Plaintiff, | § § | |
| v. | § § | No. 3:22-CV-2118-X |
| TIMOTHY LYNCH BARTON CARNEGIE DEVELOPMENT, LLC WALL007, LLC WALL009, LLC WALL010, LLC WALL011, LLC WALL012, LLC WALL016, LLC WALL017, LLC WALL018, LLC WALL019, LLC HAOQIANG FU (a/k/a MICHAEL FU) STEPHEN T. WALL | § § § § § § § § § § § § § § | |
| Defendants, | § § | |
| DJD LAND PARTNERS, LLC LDG001, LLC | § § § | |
| Relief Defendants. | § § | |

**DEFENDANT TIMOTHY LYNCH BARTON'S BRIEF IN SUPPORT OF
PROPOSED FINDINGS OF FACTS AND CONCLUSIONS OF LAW**

Defendant Timothy Lynch Barton ( "Defendant" or "Barton") submits this Brief in Support

of Proposed Findings of Fact and Conclusions of Law.

**I. INTRODUCTION**

Seizing a citizen's companies and assets is not the next natural step after the United States

Securities and Exchange Commission ("Plaintiff" or the "Commission") alleges securities fraud

against that citizen.  To the contrary, stripping a defendant of ownership prior to any findings of

1

guilt or liability is a drastic remedy saved for the extraordinary case.  As sentries against the misuse of this remedy are formidable tests the Government must meet before obtaining it.   The receivership must be necessary to prevent asset flight, and there must be no less drastic alternative for achieving that end.  Even if these serious hurdles are overcome, the remedy cannot be against the defendant as a person, to gather his assets for some future execution of a hoped-for liability judgment.   Instead, the remedy can only be against the property that is the subject of the litigation—in this case, the proceeds of the loans the Commission claims are illegal securities under federal law.

This case shows the importance of applying and enforcing these demanding standards. The Commission has alleged securities fraud based on loans for real estate projects that encountered difficulty and needed cash.  The Government simultaneously launched a criminal prosecution on the exact same grounds.  The very next business day, the Commission asked the Court to seize all Defendant's assets.   The intended outcome is clear—that the Government's allegations of wrongdoing would ripen into criminal convictions and civil judgments of liability because the Defendant would, as a direct result of the sweeping seizure, lack the resources to wade through the millions of documents at issue and defend against those charges.

The Commission put the Court in a horrible position, simply arguing that the Commission can seize all a defendant's assets of a 30-year old company—and in many instances dispose of them, through receivership, whenever the Commission alleges a plausible case for securities fraud. It did not even attempt to show that the receivership is necessary and that no less drastic measure would suffice.  And it made no effort to show it was only seizing the loan proceeds that it claims are affected by securities law violations.  As far as the Commission was—and apparently continues

to be—concerned, if it belongs to this Defendant, still assumed innocent in the eyes of the law, it is fair game.

On remand, the Commission is not doing much better. Its do-over motion is heavy on recitations of its securities fraud allegations, but light on why a new receivership is necessary. Indeed, this time around, the Commission drops any assertion of asset flight, claiming that a receiver will simply be a better manager of the real estate development business than Barton was. Dkt. 309 at 18, 27; Dkt. 352 at 1, 3. Thomas Test., Tr. at 34:4-25.

As for the scope of any receivership, the Commission never took seriously the Fifth Circuit's clear instruction that only entities holding subject loan proceeds could be seized. For its part, the Commission added a three-page declaration from its "staff accountant," who (as it turns out) is not actually an accountant, to its motion requesting this new receivership. When added to the so-called Wall entities that received the funds, the Commission performed any tracing analysis for only 29 of the 82 entities over which it is seeking a receivership. That "staff accountant" refused to explain in her declaration, or on the stand at the October 11, 2023 hearing, the methodology she used or the documents she relied upon in conducting her asset tracing analyses. And, for the Commission, one drop of traced loan proceeds into a multi-million dollar real estate project entitles the Commission to take all of it.[1]

The Commission is stretching. It is common ground that several Chinese nationals loaned money to the Wall entities, each designed to support a real estate project and that those funds were, in many instances, intentionally diverted to other projects. The Defendant will argue those

---

[1] In analyzing asset tracing in the context of money laundering allegations, courts have been clear that "the presence of one illegal dollar in an account does not taint the rest—as if the dollar obtained from [money laundering activity] were like a drop of ink falling into a glass of water." *United States v. $448,342.85*, 969 F.2d 474, 476 (7th Cir. 1992). "[A]n account with a small percentage of illegal funds should not necessarily be treated in the same way, or analyzed under the same framework, as an account with a high percentage of illegal funds." *NOTE: Untangling Laundered Funds: The Tracing Requirement Under 18 U.S.C. § 1957*, 75 Stan. L. Rev. 1157, 1194.

alternative uses were justified and not a violation of the securities laws; the Commission disagrees. In the papers here, the Defendant thus does not contest that several projects and companies have received lender funds. Dkt. 334 at 12. If the Court finds a new receivership justified (and it should not), that receivership should only extend to the Wall entities and the companies holding and operating these replacement projects. The Commission simply has not given the Court enough to take more, much less everything, again.

## II. ARGUMENT

I.    **The Commission Has Failed to Establish the Factors Set Forth in *Netsphere*; Its Motion for a Receivership Should Be Denied**

A.    **The Commission Has Abandoned Any Claim A Receivership Is Necessary to Stop Asset Flight. Clearly.**

The paradigmatic, Commission-sought receivership is *Stanford*. There, the Defendant was running a continuing and classic Ponzi scheme that a receivership had to end. And he was blowing assets in real time on luxury yachts and second homes. *United States v. Stanford*, 832 F. Supp. 2d 767 (S.D. Tex. 2011).

None of that is an issue here. The Government made no meaningful allegations of paying off old investors to attract new ones (its principal gripe is that investors were not paid). And the Government has abandoned any suggestion of some imminent risk of asset flight. The Receiver began to resurrect this claim in his testimony, complaining about Mr. Barton's main operating entity paying credit card bills. Thomas Test., Tr. at 38:9-22. But he admitted on cross-examination that no efforts were undertaken to disaggregate personal and business expenses on those cards. Hahn Test., Tr. at 132:4-23. And the Defendant's expert testified to accounting records coded credit card charges as personal and business in the company's books and records. Ginn Test., Tr. at 163:4-7.

Absent those clear hallmarks of a situation in need of receivership, the Commission retreated into assertions that the companies needed to be seized to save them from Barton's mismanagement. Despite every opportunity to do so, the Commission has provided no authority for alleged poor management justifying stripping a company from its owners; all such receiverships are when the Commission is acting on behalf of the shareholder-owners—a company and against non-owning management. The evidence provided on this score came exclusively from the Receiver's effort to appear as a savior from dire circumstances and to set low expectations for his performance. This evidence came in by anecdote. When the receiver took over and immediately stopped JMJ Development's real estate development work, the company had only $75,000 on hand (the record showed millions more invested in real estate projects). He cited a specific hotel project, Amerigold Suites—just getting back on its feet after the termination of COVID-rental assistance and ensuing evictions—in need of repair. Thomas Test., Tr. at 16:2-5. He cited third party litigation over financing and development rights. But there was no testimony that any of this was out of the ordinary for a real estate development business, an industry known for being leveraged and for disputes with lenders and others wending their way into Court. And the Commission continues to have no explanation for why ending the company's real estate development work—and the revenue and value for projects under management it creates—was good for anyone.

In any event, stripping a defendant of his assets must be driven by "clear necessity," not arguments over marginal or even substantial improvement in how a company is managed. That is why courts have insisted on evidence that the receivership is clearly necessary to prevent asset flight. *SEC v. Spence & Green Chem. Co.*, 612 F.2d 896, 904 (5th Cir. 1980); *Accordant*

*Commc'ns, LLC v. Sayers Constr., LLC*, No. A-19-CV-00401-LY, 2020 WL 7496657, at *3–4 (W.D. Tex. Apr. 7, 2020).

>**B.      Less Drastic Measures Will Eliminate the Risks of Asset Flight**

A prejudgment receivership—before discovery, trial, and the Government proving its charges—is the absolute last resort. *Barton*, 79 F.4th at 578 (quoting *Netsphere,* 703 F.3d at 305). It must be rejected if there are any alternatives that would prevent the flight of assets. Here, alternatives are apparent.  They include a monitor who must approve a class of the subject corporation's major business decisions, including asset transfers.

They also include temporary injunction against transfers of assets without the permission of the Commission or the Court.  Such an injunction would ensure assets remain where they are, while allowing real estate projects to be advanced through the development process. The Commission knows this is a viable alternative, as it is proposing something like it as a backup plan.  The Commission's only response—in its papers and the hearing—is that injunction would expose true assets to the threat of third-party litigation. Dkt. 352 at 4; Thomas Test., Tr. at 31:1-13.  That is because the Commission's stock receivership order includes a stay of all litigation. But there is nothing that prevents the injunction against transfer from staying third-party litigation the Commission believes is a threat.  Dkt. 334 at 7.

>**C.      The Benefits of the Receivership Do Not Outweigh Its Burdens on All Parties**

For reasons detailed further in Section IV.A below, the benefits of a new receiver at this point do not outweigh its burdens on all parties.  This is particularly so if the new receiver is not one ably experienced in advancing real estate projects.

One of the most significant assets, directly purchased with Chinese lender funds, are significant plots of land in Venus, Texas.  The undisputed evidence in the record is that those properties would substantially increase in value if progressed through the development process.

Wilson Decl. Dkt. 335 at A78-84; Thomas Test. Tr. 50-53. This incumbent receiver, and perhaps any receiver, is ill-equipped for that purpose and gravitates towards prompt liquidation of assets. In this particular case, that would destroy substantial value, for the subject lenders, for creditors, and for the owners.

Indeed, at a late stage of the incumbent receivership, there has not been a focus on determining the value and promise of the real estate assets and developing a plan for their progression. For more than a third of the projects seized by the vacated receivership, the Receiver has not even been able to determine a preliminary value for those assets, much less any plan for maximizing their value. Thomas Decl. at 82; Thomas Test. Tr. at 50.

What the Receiver has been doing is investigating the businesses and the Defendant and sharing information with the Government. It also has been burning through massive sums litigating the propriety of the receivership, leading to legal fees alone approaching $ 1 million, not counting its active participation in remand proceedings before this Court. Thomas Decl. at 82. That is not in the interest of the Chinese national lenders the SEC claims to be protecting, nor in the interests of the third party creditors, much less the Defendant who is the owner of many of these assets. That is because the costs of investigation and the costs of defending a remedy sought by the Securities and Exchange Commission should be bourn by the Government, not the receivership estate or the Defendant.

Nor is a law firm—as undersigned counsel can attest—a particularly cost-efficient source of labor. The hourly rates of Brown Fox lawyers, who manage the day-to-day of this receivership, runs in the hundreds of dollars. The assets held by the improperly seized companies would be better protected if returned to the active management of a real estate professional, and a more modestly compensated team. If the concern is the wisdom of decisions made going forward, either

7

to invest substantial resources in further development of a project or to alienate it, that can be addressed through a properly scoped injunction. This incumbent receivership—and its inclination towards creating disputes and raising complex issues regarding the interaction of parallel proceedings—is certainly not sparing the time of this Court or the Fifth Circuit.

## II. The Court Should Reject the Commission's Required Scope of any Remedy

Between the Commission and the Receiver, there is an apparent desire to return every major asset that the receiver tinkered with during his illegal tenure back into a carbon copy receivership. Perhaps this is driven by a desire to avoid liability; perhaps this is driven by a desire to maximize sources of revenue for the fees of the receiver and his law firm. The Commission has written down its desire to secure assets for a hoped-for liability judgment, an expressly forbidden purpose for a prejudgment receivership. Dkt. 309 at 18; Dkt. 309-1 at 2; Thomas Test., Tr. 37:7-25; *See Netsphere*, 703 F.3d at 305 (finding that a receiver may not be "named simply to secure or preserve funds for the satisfaction of a potential later judgment."). None of these motivations is a remotely valid reason to seize an asset into receivership before trial. All of these surround the Commission's latest effort to push this Court into error. If the Court imposes a receivership (which it should not), the Court must reject inclusion of the sweeping majority of companies the Commission sets to seize.

### A. The Commission (And the Receiver to the Extent His Analysis is Adopted By the Commission) Seeks to Apply the Wrong Legal Standard

Fifth Circuit law is clear. The Government cannot accuse a defendant of violating the law and seize all of his assets through a receivership before discovery, trial, and judgment. Instead, a receivership extends only to the *property*—in legal Latin, the "res"—at issue in the litigation. *Barton*, 79 F.4th at 580 ("[T]he jurisdictional principle that a court's equitable powers do not extend to property unrelated to the underlying litigation applies with equal force to receiverships.

A court lacks jurisdiction to impose a receivership over property that is not the subject of an underlying claim or controversy."); *Netsphere*, 703 F.3d at 305.  It cannot be allowed to roundup a Defendant's assets for later satisfaction of a hoped-for liability judgment.

The receivership also must extend only insofar as that property.  *Barton*, 79 F.4th at 580–81 ("Should the district court decide that a new receivership is justified on remand, it can only extend over entities that received from assets traceable to Barton's alleged fraudulent activities that are the subject of this litigation."); *see also supra* n.1.  A company running a real estate development project worth tens of millions of dollars cannot be seized because it allegedly received $50,000.00 in traceable assets.  *United States v. $448,342.85*, 969 F.2d 474, 476 (7th Cir. 1992).  *At a minimum*, the company subject to seizure must currently possess substantial amounts of the property in question to be seized.[2] *SEC v. Heden*, 51 F. Supp. 2d 296, 302 n.4 (S.D.N.Y. 1999); *SEC v. Cherif*, 933 F.2d 403, 413–14 & n.11 (7th Cir. 1991) (allowing equitable relief against a non-party to the litigation—and each of the ten entities in dispute are not parties—only to the extent "it is established that the non-party possesses illegally obtained profits but has no legitimate claim to them.").

In its papers, the Commission at least tried to trace property, albeit in temporal snapshots and to a fraction of the companies it now wishes to freeze.  The more ambitious Receiver (whose self-serving argument must be ignored, for the reasons stated below) reached beyond the tracing of property, claiming that some vague set of ambient benefits from the loan proceeds would suffice for seizing a company. This was of one-piece with its misguided efforts to seize apartment

---

[2] If the company were to possess a relatively small amount, securing that property should occur through a lien to be satisfied on sale, not the drastic measure of dispossessing a defendant of ownership of the whole property. Insisting on such lesser measures is right in line with the Fifth Circuit's firm admonition that a receivership is a last resort, for use when only when less drastic measure are completely inadequate. *Barton*, 79 F.4th at 578 (quoting *Netsphere,* 703 F.3d at 305).

buildings whose construction was funded almost entirely with Department of Housing and Urban Development guaranteed loans. This "benefits" thesis is grossly misguided.

The Commission asserts that assets which either directly received lender funds or "otherwise benefited" from those funds may properly be placed in a receivership. *See* Commission's Rep. at 2-3, 4, 5, 8. The Commission points to language from the Fifth Circuit's prior decision in this case, where the court explained that this Court, on remand, may only place under a receivership those entities which "received or benefitted" from assets traceable to any alleged fraudulent activity. 79 F.4th at 580-81. But that language does not come from the cases the Commission cited when challenging Mr. Barton's appeal in the Fifth Circuit. *See id.* at 580 (citing *FDIC v. Faulkner*, 991 F.2d 262, 267-68 (5th Cir. 1993); *Netsphere*, 703 F.3d at 310). Neither *Faulkner* nor *Netsphere*, nor any other case in the country the undersigned were able to identify, make any mention of how an entity may be placed in a receivership if it "benefitted from" certain assets. In fact, the case cited to by the Commission does not even use that term once. Instead, that is language that originated from the Commission's own briefing—no doubt an attempt to expand its reach. *See* Commission's Expedited Motion for Appointment of Receiver and Brief in Support, Dkt. 6 at 3.

Instead, as stated in *Faulkner*, the proper standard for determining whether an asset may be placed in a receivership is whether that asset was acquired with or otherwise presently holds allegedly fraudulently-obtained funds. *Faulkner*, 991 F.2d at 267-68. The Commission does not provide any guidance from case law (likely because there is none), or attempt to craft guidance of its own as to what it would mean for an entity to "benefit" from assets traceable to an allegedly fraudulent scheme. The Court is left, as the Commission would have it, with a broad and largely boundless term.

10

The Commission provides a few limited, but extremely ambitious, examples of what it believes constitutes such "benefitting." *See* New Receivership Mot. at 13-14 (alleging that use of investor funds to pay employees, maintain corporate offices, obtain loans by using property bought with lender funds, obtaining participation interests in developments that received lender funds, and being owners or beneficial interest holders of another entity that received lender funds constitute benefits). But the standard cannot be that the Commission gets to decide how or if an entity benefitted from the allegedly tainted funds without any grounding in the law. Nor can it be so amorphous that essentially everything is swept in. A receivership is an equitable remedy designed to hold and protect property where it is currently being held. *See Janvey v. Alguire*, No. 3:09-CV-0724-N, 2014 WL 12654910, at *17 (N.D. Tex. July 30, 2014), *aff'd*, 847 F.3d 231 (5th Cir. 2017) ("The purpose of a federal equity receivership is . . . to marshal assets, preserve value, equitably distribute to creditors, and, either reorganize, if possible, or orderly liquidate.").

The Commission offers no authority for its position that certain assets may be placed into a receivership simply because that asset may have held the funds at issue for some time period in the past, or otherwise indirectly benefitted in some way from the loan proceeds without receiving those proceeds. Allowing the Commission to place assets into a receivership that do not presently hold any allegedly-tainted funds does not serve the purpose of a receivership, and gives the Commission virtually unlimited discretion in deciding which entities should or should not be placed in a receivership, provided the Commission can come up with some distant way in which an entity could have "benefitted" from the funds.

**B.    When The Correct Legal Standards Are Applied, Eighteen Companies Should Be the Outer Limit of Any Receivership**

There is no question that several companies received the subject loan proceeds. The nine Wall Entities received them directly. When the originally conceived projects encountered

11

difficulty, the loan proceeds were redeployed into replacement projects. This was hidden to no one; it was briefed to the lenders' contractual agent and was testified to in Commission interviews prior to the filing of this case. Barton Test. 55:19–24. These redeployments occurred through intercompany loans to Carnegie Development LLC and then on to companies operating the replacement projects and were documented in the accounting ledger of the Wall Entities and Carnegie Development. Barton Test. 55:19–24; Ginn. Decl., Dkt. 335 at App. 023; Ginn Test., Tr. at 180:3-22; 64:2-14; 158:21-24. Together, these companies are listed on Exhibit A introduced by the defense at the October 11, 2023 hearing.

        **C.**        **Commission Efforts to Expand The Receivership Companies Beyond the Eighteen Wall and Replacement Project Entities Are Invalid**

The Commission wants more than the companies managing the Wall Entities, their development projects, and the replacement projects. The Commission's efforts to expand the net are invalid for several reasons.

        1.  **The Commission Failed to Present Competent Evidence Tracing the Loan Proceeds to Other Companies**

The Commission's effort to trace loan proceeds into 29 companies occurred through the Commission's "staff accountant" Carol Hahn. Hahn Test., Tr. 124:11–21. Ms. Hahn was not presented as an expert witness at the October 11, 2023 hearing, and appropriately so. Hahn Test., Tr. at 129:12-16. Despite her title in presentations to the Court, Ms. Hahn is not an accountant, much less one who passed the universally accepted examinations to become a certified public accountant. Hahn Test., Tr. at 122:10-21. Neither in her testimony nor on the witness stand did she identify the methodology she used to reach conclusions tracing loan proceeds into those companies. Decl. of Greg Ginn, Dkt. 335 at App. 024; Ginn Test., Tr. at 114:24-25. Nor did she provide any workpapers on the documents or materials she relied on to reach those conclusions. Dkt. 335 at App. 024; Hahn Test., Tr. 131:7–14, 134:9–13, 149:10–14.

12

The Hahn Declaration and testimony fails any standard for expert testimony.  Ms. Hahn—who is not an accountant—is not qualified to reach the accounting conclusions for tracing the proceeds.  Nor does she provide the basic information necessary for the parties or the Court to determine whether her analysis is reliable, as explained below. Hahn Test., Tr. 131:7–14. The Commission had every opportunity to correct these defects, which were detailed in the opposition brief.  The Commission's reply included no supplemental declaration for Ms. Hahn; her testimony did nothing to fill these gaps. *See e.g.*, Hahn Test., Tr. 107-38.

For the tracing that occurred in this case, expert testimony is necessary. The Fifth Circuit's opinion in *United States v. Davis* does not bind this Court in regard to the issue on whether the Commission's tracing witness must be qualified as an expert witness.  53 F.4th 833 (5th Cir. 2022). In *Davis*, the Fifth Circuit held that this Court did not abuse its discretion, on the facts of that case, when it admitted testimony from a non-expert government forensic auditor concluding the amount of funds from the Veterans Administration and from other sources in a company's bank accounts. That witness concluded that the VA funds were the sweeping majority:  $776 million to $336,000 for other funds that several massive payments from a single Government agency the funds spent later.  *Id.* at 848.  For that money laundering case, the question was straightforward:  Were $3.6 million in purchases from the account more than the amount of funds received from elsewhere than the VA.  *Id.* at 848–49.   The answer—involving "addition and subtraction"—was clearly "yes," a by a wide margin.  *Id.*  Instead, Court held that the funding analysis at issue in this case had testimony that relied on basic math—addition and subtraction—which does not require scientific, technical, or specialized knowledge within the scope of Fed. R. Evid. 702. The Fifth Circuit merely stated in *Davis* that qualification was *unnecessary* when declining the defendant's

argument, not that the district court was incorrect in requiring the witness to be qualified as an expert witness.

Nothing so simple is at issue here, and this Court needs to exercise its discretion as to the tracing work at issue here. What was going on in the Davis case was not "tracing," it was identifying the proportion of funds in one account. Here, the SEC is seeking to use non-expert testimony—with undisclosed methodologies and unestablished qualifications—to trace quants of funds through two or three of four companies. That kind of tracing work requires technical and specialized knowledge. *United States v. Tao*, No. 19-20052-JAR, 2022 WL 252019, at *12 (D. Kansas Jan. 27, 2022) ("one could argue that . . . asset tracing is specialized knowledge that must be offered by a 702 witness."). The Government seeks to have a witness, who they admit is not qualified as an expert, testify on complex financial asset tracing analysis for hundreds of entities, which might entail thousands of transactions and various complex accounting practices. *See id.* at *12 (directing the Government to provide a supplementation to comply with Fed. R. Crim. P. Rule 16 expert witness disclosure).

In any event, Ms. Hahn's testimony does not even meet the standards for a competent summary witness. The Fifth Circuit has explained that a summary witness chart is permissible under Fed. R. Evid. 1006 when the summary witness's conclusion is (1) a fair assumption based on all the evidence, (2) was subject to a full cross-examination by the defendant's attorneys, and (3) when the jury is instructed to only give the summary evidence due weight. Fed. R. Evid. 1006; *United States v. Spalding*, 894 F.3d 173, 186 (5th Cir. 2018) (citing *United States v. Means*, 695 F.2d 811, 817 (5th Cir. 1983)). To satisfy the first prong, the expert should explain in detail the methods relied upon that underly and justify the summary documents. *Id.* at 186 (finding facts supported forensic accountant's assumptions because the expert "'explained in [significant] detail

how [s]he had derived figures contained in the summary charts from the underlying documents'
and how the nature of each expenditure and vendor justified her otherwise admissible expert
conclusions."); *United States v. Jennings*, 724 F.2d 436, 442 (5th Cir. 1984).  Ms. Hahn's
testimony contained no details that would pass the Fifth Circuit's standard for proper 1006
summary evidence.

The Receiver's effort at tracing is even further afield.  The person who attempted the
tracing requested in the diagram in the Receiver's declaration was *not even identified* in that
declaration.  His identity emerged, for the first time, at the evidentiary hearing: Mr. Anthony Cecil.
Neither the Receiver's declaration nor the testimony of the Receiver or Mr. Cecil identified the
methodology used to assemble these diagrams, nor the evidence relied upon to do so. Worse, Mr.
Cecil demonstrated a complete lack of facility with the details of some of the more important
tracing claims.  When questioned about Diagram 4 (Dkt. 304 at 120), for example, Mr. Cecil could
not recall if any effort was made to account for the origins of several other, unrelated deposits or
whether they were obtained by lender funds.  Cecil Test., Tr. at  102:23–25; 104:21-24; 105:1-22.
He deferred to absent members of his team who really did the work.  *Id*.  No small detail, Diagram
4 has the Receiver's sole attempt to hang on to a substantial real estate project in Frisco, Texas,
which is worth, at least according to the Receiver, nearly $2 million. Dkt. 306 at 26, ¶72.  And
seizing that property is counter-intuitive, as the record evidence shows the purchase and
development was financed by third party lenders having nothing to do with the Chinese lenders at
issue in this case. Dkt. 110. The Receiver's attachment to the Frisco property appears to show that
it tried illegally to sell it out from under its true owners, to fuel his fees.

In the end, the Commission has failed to present competent evidence tracing the property
at issue to where it can be seized. There's little excuse for this. The Commission—not in September

2022 and not today—has not presented the Court with some emergency situation where doing serious accounting work should be excused. The SEC was investigating JMJ Development for two-years prior to filing suit, it subpoenaed and obtained tens of thousands of pages of bank records (which it proudly produced to the Defendant just days before its opposition brief); it had a year's time when its tracing was under challenge; and it had more than two months since the Fifth Circuit held its tracing effort inadequate. *SEC v. Barton*, No. 22-11132 (5th Cir. Dec. 28, 2022) ("22-11132 Appeal" Dkt. 51); Hahn Test. Tr. 134:16–137:5. What did the Court get—a three page chart with undetailed tracing assertations by the Commission's mystical "Staff Accountant." By now claiming the Court should seize everything again, but not providing the Court with serious work, the Commission is again putting the Court in a terrible position, setting it up for another reversal if it does what the Commission wants.

### 2. The Commission Makes No Effort to Distinguish the Unaffected Revenue of the Main Development and Operating Entity

Expert accounting testimony is needed here because the tracing exercise is not uncomplicated. Nearly all of the Commission's trading claims depend on transfers to and from JMJ Development LLC, the main real estate and development operating entity. Hahn Decl. ¶¶16, 18–19. The undisputed evidence in the records is that JMJ Development received $16.4 million in revenue over the relevant period having nothing to do with the loan proceeds. Ginn Test. Tr. 176:20–175:6. Government witnesses speculated that money has also thinned, but cited no specific evidence for that assertion. And the Commission's professional and reaching tracing conclusions made no effort to distinguish funds potentially connected with the loan proceeds (from the Walls of Carnegie) from those that were not. Ginn Test. Tr. 178:10–179:18. This is a fatal flaw. If the Commission wants to seize companies and their assets because of payments from JMJ Development, it must distinguish between JMJ affected and unaffected assets, and there are

accepted accounting methods for doing so. Ginn Test., Tr. 153:19–154:21. Neither Ms. Hahn nor Mr. Cecil would claim to have performed any of these methods, under cross-examination.

### 3. The Commission Improperly Relies on Assertions of Extensive Commingling to Excuse Careful Tracing

Compounding the above error is the failure of the Commission to address the documentation of intercompany loans in the accounting ledgers of the Wall Entities/Carnegie Development LLC. The Commission's refrain—or excuse—for incomplete tracing is that the Barton-companies "extensively commingled" loan proceeds with other company funds, making tracing impossible. Hahn Decl. ¶ 6. To indulge the Commission's argument would contradict the Fifth Circuit's decision in this case. There, the court rejected the following proposition: "Because it alleges that Barton has engaged in extensive commingling of funds, it claims that Barton's control is an effective proxy for placing an entity in the receivership even if it had not yet traced funds to that entity." *Barton*, 79 F.4th at 580-81.

Not only is the Commission's reliance of allegations of commingling invalid as matter of law, the allegations themselves are contrary to record evidence. The undisputed evidence in the record is that transfers of funds from the Wall entities and Carnegie Development were documented on the accounting ledgers of those companies as intercompany loans. Ginn Decl. App. 023, 048; Ginn Test. Tr. 158:3–159:19. Such documentation belies assertions that loan proceeds were recklessly mixed with other funds, what accountants would regard as "co-mingling." Ginn Decl. App. 023; Ginn Test., Tr. 158:3–22

Inexplicably, Ms. Hahn and the Receiver's tracing analysis did not review or address the documentation of these transfers in the accounting system. Ginn Test., Tr. 157:12–159:19; Thomas Test., Tr. 62:24–66:13. Ignoring this evidence fatally undermines their attempted tracing analysis. Ginn Decl. App. 024. The explanations offered for skipping the accounting system in the tracing

17

analysis clearly fail. The Receiver speculated that the accounting system might be inaccurate. The time for allegations and speculation is past. If those purporting to trace assets are going to skip over the accounting system, they need evidence showing the system is inaccurate. Thomas Test., Tr. 64:23–25. Foregoing review of that system—without an evidence based explanation— undermines the Commission's (and the Receiver's) tracing claims.

### 4.    The Commission Never Traced Property to Its Current Destination

On its own terms, the Commission's conclusion is that a minimal and temporary transfer of funds into a company and its real estate project is sufficient to seize that company. That is consistent with neither the law nor well-established accounting standards.

First, the Government cannot seize an entire company—and a multi-million-dollar real estate project by showing a relatively insubstantial amount of affected funds was transferred to that company. The power to impose the receivership extends only so far as an entity possesses subject property. *Netsphere*, 703 F.3d at 310. At a minimum, the Government must show possession of a substantial amount of subject property relative to the size of the company or asset it seeks to seize. *Heden*, 51 F. Supp. 2d at, 302 n.4; *Cherif*, 933 F.2d at 413–14 & n.11.

The Commission—and the Receiver—rested on *relatively* small transfers of allegedly affected funds to seize companies and assets orders of magnitudes larger. For HUD-financed apartments costing tens of millions to build, the Commission is relying on the transfer of tens of thousands of dollars. Hahn Decl. Ex. A ¶¶ 4–5. To accept the Commission's argument—to seize these significant assets based on these alleged transfers—would be plain error.

Second, the Commission never attempted to trace affected property to its final destination. Ginn Decl. App. 025. Instead, the Commission showed a transfer into a company it wished to seize and stopped its analysis. *See id.* That method omits plainly available evidence of some of the key

18

transfers being immediately returned as errors. Def. Ex. F. ¶¶ 14–41. It also omits that—in the care of JMJ Management LLC—the company was receiving—on a net basis—substantial funds from the real estate projects the Commission now wants to seize. *Id.* at ¶ 6.The undisputed evidence in the record is that, under applicable accounting standards, property can and should be traced through to where it is. Ginn Decl. at App. 25–26; Ginn Test., Tr. 150:2–15; 159:20–160:1. Otherwise, the Government is not seizing the subject property, but instead using it to capture the entirety of every company it stopped at along the way.

**5.    The Commission Did Not Account for Legitimate Payments to Companies**

To seize the property of a corporation, the Government must show the company possesses the subject property and has no legitimate claim to it. *Heden*, 51 F. Supp. 2d at, 302 n.4; *Cherif*, 933 F.2d at 413–14 & n.11. The undisputed evidence in the record is that JMJ Development (for example) advanced expenses for and performed work progressing the Wall Entity Projects. Those reimbursements and payments for service were coded in the accounting system. Also importantly, the Wall Entities accounting according to the SEC's allegations—received no more than $26 million in loan proceeds. The accounting system, however, shows more than $5 million of receipts into these entities. Ginn Decl. App. 33–34; Ginn Test.161:15–163:14.

The Commission's—and the Receiver's—attempted accounting analyses made no effort to account for any of this. *Id.*; *see also* Thomas Test. Tr. 46:24–48:13 (admitting that neither the Receiver nor his accounting team has done a full analysis of the $9 million difference).  Instead, the analyses assumed that any transfer from the Wall Entities—or its managing member, Carnegie Development—was an illegitimate out flow of lender funds. *Id.* In doing so, the Commission leaps over a fundamental question in the tracing analysis and undermines any conclusion that it is tracing the property of the loan proceeds. Ginn. Test. 163:2–15.

19

### D. The flaws in the Commission's Tracing Analysis Particularly Undermine Efforts to Seize Several Major Classes of Assets

The Commission wishes to leap from the Wall Entities, over the acknowledged replacement projects, past the main operating entities, to companies managing and owning real estate projects and assets far remote from the Chinese lender funds. The above-detailed errors manifest in the invalid Commission efforts to stretch into conveyance and assets.

### 1.  The Commission Has No Legitimate Claim to the  HUD-Financed Apartment Buildings

Barton-controlled and owned companies previously took out loans guaranteed by the Department of Housing and Urban Development and mezzanine financing from Southern Properties Capital to build four large apartment complexes in Texas and Alabama. They are Bellweather Ridge (D4DS, LLC), Windmill Farms (D4FR, LLC), Ingleside (D4IN, LLC), and Opelika (D4OP, LLC). Together, these projects cost nearly $100 million. Today, the buildings are worth more than $100 million. After secured HUD and mezzanine debt is paid, they are worth tens of millions of dollars. Thomas Decl. ¶¶ 10, 85, 90, 92, 94, 96, 100.

There is no question the Commission went to seize these assets to starve the Defendant of resources and the Receiver went after them for nearly guaranteed payment of his fees. The Commission's entire case here turns on transfers of tens of thousands of dollars—less than 1% of the construction costs of the project—which it seeks to leverage into seizing the entire asset. Hahn Decl. ¶¶ 4, 15.

The Commission and Receiver did not disclose—but presumably was fully-aware given their review of bank statements—that the identified transfers to the companies performing the development of the apartment buildings were in error, were unnecessary, and were thus promptly returned to JMJ Development. Even if the Court were to assume these transfers as subject property,

20

the record shows that the property is not in the D4 entities and, frankly, did not benefit them. Thomas Decl. ¶¶ 10, 85, 90, 92, 94, 96, 100.

The record also demonstrates that these HUD-financial apartment projects were not some drain on resources for JMJ Development or other upstream Barton-companies. These projects were underway before any Chinese-national loan occurred, and net revenue positive for JMJ Development, which was being paid from the HUD-facility for its development services. These projects did not need to be, and were not, financially propped up by other Barton-related entities. *Id.*

As for the assertion that these companies received Chinese-lender proceeds, the Commission and Receiver's analyses reflect a parade of the errors identified by expert accountant Mr. Ginn. They failed to start the tracing with Chinese lender proceeds and failed to account for the relative percentage of other proceeds and subsequent withdrawals. The transfers in question came from JMJ Development—the main operating entity. But neither Ms. Hahn nor the diagram fragments in the Receiver's report explain how they disaggregated lender funds from other funds within JMJ Development. Nor did they provide a method for tracing the fungible proceeds. Nor do they reach a conclusion about the final distribution of the funds, a shortcoming very real here as "following" the transfer shows the *Res* is not traced in the D4 entities.

It is unsurprising that the Receiver abandons tracing funds into the HUD property, and argues they benefitted from ambient existence of JMJ Development. Thomas Decl. ¶ 81. JMJ employees worked on the projects, with JMJ's roof over their head, using JMJ's electricity. Thomas Test. Tr. 68–72. This "benefit" is not grounded in any law. *See* Supra Section II A. It also does even less to account for JMJ's unaffected revenues, totaling more than $17 million according to the undisputed evidence in the record. Ginn Decl. at ¶¶ 26–27; 49–54. The Receiver's concept

of benefits is conceived from whole cloth and is unknown to well accepted accounting standards. Ginn Test. Tr. 160:11–161:12. And reasoning like this pervades the Receiver's tracing conclusions, burying legal error in any reliance on them.

### 2. The Commission Has Not Demonstrated the Frisco Company and Project Possesses Lender Funds

In 2018, FHC Acquisitions LLC purchased a promising property for a hotel in Frisco, Texas. This project was well and adequately financed by third-party lenders having nothing to do with the Chinese-nationals that are the subject of this case. The asset is significant even in the Receiver's haste to fuel his fees, the Receiver attempted to sell it for $9 million, generating $2 million after the payment of third-party debt. Thomas Decl. ¶¶ 73, 76.

The Commission claims it is entitled to this $8 million asset because of a transfer to a title company in escrow for purchase of the property of $100,000. Hahn Decl. Ex. A ¶ 9. Although Ms. Hahn did not identify the documents relied on for her conclusions, Mr. Ginn – in the days the Commission made corporate bank statements available prior to the due date of the opposition and his declaration – found the relevant bank statements for Carnegie Development and JMJ Development. Ginn Decl. at App. 063; Ginn Test. Tr. 145:15–146:14, 156:20–157:3. Ms. Hahn claimed to trace the $100k from the wall entities to Carnegie, then to JMJ, then to the title company. But the claim did not account for substantial other funds, in the Carnegie bank account, from another source prior to the transfer to JMJ. *Id.* Even more strikingly, it did not account for another $100,000 deposit into the JMJ bank account from a different source, on the same day as the Carnegie deposit. *Id.* Ms. Hahn cannot say that the $100,000 deposited with Chicago Title was Wall or even Carnegie money, and her effort to do so amidst the other documented financial statements undermines her credibility. At a minimum, Ms. Hahn's assertion shows the perils of

relying on her report, which explains neither her methodology nor how she decided to include or omit transactions in her financial analysis.

The Receiver's diagram fragments regarding FHC Acquisitions raises more questions than they answer. Thomas Decl. 120. This diagram – accompanied by no information about who prepared it, how it was prepared, from what it was prepared – purports to trace funds from the Marine Creek project through to a company called Broadview Holdings to FHC Acquisition. The alleged proceeds arrive at Broadview on March 24, 2022 – some three years after the last Chinese National loan was made. Five days later, the diagram seems to imply that a portion of those funds - $168,146.67 – is transferred to FHC Acquisition. But the notes to the diagram acknowledge that the same Broadview account – in those intervening 5 days – received $2.917 million in other deposits, some 18 times the $167k it claims to trace out of that account. The diagram makes no effort to account for these other funds.

The Commission put the accountant purportedly responsible for these diagram, Mr. Anthony Cecil, on the stand. He was questioned about this diagram, and had no facility with the details. He did not even know what FHC Acquisitions was. Cecil Test., Tr. 102: 23-25. And he acknowledged that the analysis did not account for these intervening deposits. Cecil Test., Tr. 102: 9-22.

Beyond these clear flaws, the Commission is again trying to leverage a relatively small transfer into seizure of a property that cost millions, was financed by completely unrelated third parties, and is today worth between $10 and $12 million. If these tracings were not so manifestly flawed, they would not justify seizure of this whole company and all of its assets.

23

**3. The Commission Did Not Demonstrate That the Villita Towers Project in San Antonio Possesses Loan Proceeds**

Villita Towers is an apartment development in San Antonio, Texas, which began in 2015, two years prior to the first Chinese national loans. Ginn Decl. at 28. The Commission is eager to have that asset (and the Receiver is eager to sell that valuable interest for real-time payment of his fees). An appeal of the order approving the sale is pending.

Ms. Hahn claimed that several transfers from JMJ Development, in 2017, 2018, and 2019, were actually subject loan proceeds. But, again, Ms. Hahn made no effort to disaggregate loan proceeds in JMJ's possession from other funds. Ginn Decl. at 065. Indeed, Ms. Hahn did not even make an assertion about what other funds were available, leaving blank the column in her spreadsheet regarding the beginning balance at the relevant JMJ account. She also asserts that some money into JMJ Development came from the closing of 2999 Turtle Creek, without doing any analysis to determine the extent to which that property was tainted and whether the funds in question were (the 2999 project had millions of dollars in third party investment, having absolutely nothing to do with the third party lenders in this matter). Hahn Decl. at 24; Ginn Decl. at 065. The Government put on no rebuttal evidence regarding these criticisms, either in its reply brief or at the evidentiary hearing. *See generally* Hahn Tran.

**4. The Commission failed to Show That the Amerigold Hotel Possesses Loan Proceeds**

The Amerigold Suites Hotel was purchased in 2010 and all its units were converted into long-term rentals. Ginn Decl. App. at 28. The Commission asserts that the company holding and managing the facility—Goldmark Hospitality—received subject lender funds. The basis for this assertion is a single transfer—on September 28, 2021—of money from JMJ Development. The Commission claims those funds come from the Wall Entities, through Carnegie Development.

That assertion, however, makes no effort to distinguish between loan proceeds and other funds in JMJ's possession.

Nor does the Commission trace those funds to their final destination. And there is no sense of proportion, as the Commission claims a multi-million-dollar asset and company on the on the basis of a single transfer.

**5. The Commission Has Not Shown That the 2999 Turtle Creek Project Possesses Lender Funds**

The Commission has not given the Court nearly enough to seize the 2999 Turtle Creek project. 2999 Turtle Creek Boulevard is one of the most prominent properties in Dallas which the 2999 companies planned to develop into a hotel. It is valued at an excess of $70 million. And it was purchased through millions of in equity investment by companies and individuals having absolutely nothing to do with the Chinese-national lenders at issue in this case.

The Commission claims lender funds made their way into the company. It says a $4 million loan was taken out "secured at least in part by Wall 11's property" and then a third of those loan proceeds were shared with the 2999 operating company. Hahn Decl. Ex A ¶20. The Commission, however, provides absolutely no detail on this loan, and its use of the term "in part" suggests a substantial portion of the loan originated from assets having nothing to do with the Chinese-national lenders. Ginn Decl. at App. 67. Again, the Commission makes no effort to distinguish between clean and unaffected funds, for use of a fraction of commingled proceeds. Ginn Decl. at App. 24–26, 49–54; Ginn Test. Tr. 153:2–157:24. Nor does it provide the Court with the underlying loan documentation to unpack its "in part" hedge.

The Commission makes another transfer assertion, this time through JMJ Development. Hahn Decl. Ex. A ¶ 20. Again, though, this claim tells us nothing about whether the Commission

tried to disaggregate JMJ's affected and unaffected assets, much less what methodology it used to do so. Ginn Decl. at App. 67. This unilateral lob cannot be considered competent evidence.

The Receiver's effort suffers from the same problems, here not even explaining how the last diagram started with Chinese lender funds. Thomas Decl. at Ex. 15.

In all events, the Commission is trying to leverage relatively small transfers to seize a project in which tens of millions of dollars were invested by Mr. Barton and others who never ever heard of the Chinese-national lenders. Seizing this entire asset – even if the Commission's tracing analysis were valid – is not the least drastic remedy. *Netsphere*, 703 F.3d 305 (5th Cir. 2012). At most, if the Commission were to prove any of this, it should have a lien on the asset for the amount of the alleged transfer.

### 6. The Commission Provides No Justification for Seizing the Defendant's House or the Real Estate Projects Owned By His Son and the Trammel Crow Family

The Commission's ambitions extend beyond Mr. Barton's core businesses. Today, they continue to seek the seizure of his home (held by a special purpose entity- SF Rock Creek LLC), despite offering no analysis tracing lender funds into that home's purchase. Hahn Decl. Ex. B and A. The thesis appears to be that everything Barton touches or lived in is tainted by lender funds, as it falls into the category of "additional Barton controlled entities" that "the Commission cannot yet confirm . . . received, or otherwise benefitted from, Barton's alleged fraudulent activities that are the subject of this litigation." Hahn Decl. ¶ 6.

That should be the end of the matter. The Receiver, though, is certainly worked up about having asked this Court to kick an American citizen out of his only house and then to sell it. So it stretches into some tracing theories, talking not about actual lender funds but entities that received some Small Business Administration ("SBA") loans while mentioning their associations with Wall properties. Even those SBA loan proceeds were "commingled" with assets whose provenance is

26

not determined. Thomas at ¶ 49. That's not enough, in the Fifth Circuit on its face. *United States v. Loe*, 248 F.3d 449, 466 (5th Cir. 2001) (requiring some accounting method to distinguish "dirty" from "clean" funds in a commingled account); *Barton*, 79 F.4th at 580–81; *Netsphere*, 703 F.3d 296 (5th Cir. 2012).

The Receiver also claims the house benefitted from sale of Marine Creek, which was purchased with investor funds. Thomas Decl. at ¶59. But the Receiver makes no effort to distinguish between affected and unaffected funds in the Marine Creek entity. And when a diagram appeared reflecting this "tracing," for which no witness would take responsibility, nobody explained why the funds repaying the house loan did not come from the intervening $2 million deposit in the ten days the alleged Marine Creek funds sat in the account. Thomas Decl. at p. 118 (reflecting a $2 million deposit from the sale of Winter Haven on May 10).

The Commission should not have asked the Court to seize Mr. Barton's home, and it is long past time that it is returned to him.

Next, the Commission continues to desire a series of companies and assets owned by his son, Max Barton, and the Trammel Crow family. This was always a stretch, and the Max Barton and Crow family briefing before this Court dispelling the attempted tracing is incorporated herein. In any event, no one has bothered to prove that the receipt of any funds by these third parties was illegitimate, as the Government must. *Janvey v. Adams*, 588 F.3d 831, 834 (5th Cir. 2009). The correct, less drastic, measure is that if entities are placed to receivership that are the lenders to those properties. Those entities should enforce the terms of those laws and recover principal and interest. There is no justification for seizing the extra property from these third parties.

### III.    The Commission Failed to Establish Its Jurisdiction Over This Case

Every problem with a business loan is not a matter for the Securities and Exchange Commission. To the contrary, the Commission only has jurisdiction over "securities," a defined

27

term in federal law. And courts have vigilantly turned back efforts to convert business loans into securities.

This case demonstrates why. The federal Government has numerous tools to prosecute alleged fraud with business loans; they are being used here, with the Justice Department using its wire fraud authorities to address that same bundle of facts. The federal Government clearly thinks that is the primary method for addressing whatever went wrong with the Chinese national lenders, so it asked this Court to stay the discovery and merits of the SEC's case. ECF No. 44. This parallel action is an inefficient use of this District's scarce resources.

That is because the Commission has put zero effort into proving the Chinese national loans at issue here are securities. The documents use all the language of loans and lending, and none of the language of investment—a key indicator that the loans are not the type of notes that qualify as securities. *Kirschner v. J.P. Morgan Chase Bank*, N.A., 79 F.4th 290, 308 (2d Cir. 2023); Dkt. 335-App. 70–77 (Agency Loan Agreement). Also relevant is the intent of the lender and borrower. *Reves v. Ernst & Young*, 494 U.S. 56, 63–64 (1990); *Kirschner*, 79 F.4th at 305. The borrower's intent was clearly to take a short term business loan to bridge from pre-development of a real estate project to construction financing, a purpose inconsistent with the loans governing securities. Dkt. 334 at 20.

Where was the Commission's evidence on the intention of the Chinese national lenders? We did not hear from a single one of them at the evidentiary hearing. This is not new—not a single one of the lenders showed for the involuntary bankruptcy proceedings initiated by Government witness and lender agent, Michael Fu, and the Bankruptcy Court dismissed it for that reason. *In re: WALL007 LLC, et al.*, No. 20-31131 (HDH) (Bankr. N.D. Tex., Dec. 7, 2020), Dkt. 310. There is no evidence in the record that the intention of the Chinese-national lenders was to invest in the

success or failure of Mr. Wall's endeavor.  Rather, the undisputed evidence in this record is that the purpose of these loans was as a waystation or excuse to patriate money from China (which controls money leaving that country) to the United States. Dkt. 340 at 102–03; Barton Test. 332:1–333:4. For that reason, Fu insisted that principal and interest payments be made to the U.S.-based accounts of his choosing, rather than returned to the Chinese accounts from where they came. *Id.* And he maintained that position, in the face of documented U.S. anti-money laundering and tax compliance issues. *Id.* The point of these loans, from the lender perspective, was to circumvent Chinese controls on sending money to the U.S.—to launder funds—a purpose discovered by the borrower mid-stream. The crickets—the lack of appearance of claimants or witnesses—in the bankruptcy proceedings or in the evidentiary hearing in this Court reinforces that laundering purpose. And the laundering purpose is contrary to the investment purpose required for these loans to begin to be considered securities. The Commission's "investment contract" long-ball should also be rejected.

The Commission hopes the Court will adopt the Commission's "pretty much anything can be a security because it is an investment contract" approach.  The Court should not entertain such notions.  This is especially the case because a *Howey* analysis is a particularly fact-intensive consideration and the Commission has failed to provide essentially any facts supporting its investment contract claim. *See In re Bibox Grp. Holdings Ltd. Sec. Litig.*, 534 F. Supp. 3d 326 (S.D.N.Y. 2021) ("Additionally, the issue of whether a particular token is in fact a security has significant consequences for each of the claims alleged in the complaint, and that determination involves an application of the Supreme Court's *Howey* test. That test is a fact intensive inquiry and will reach a result that depends on the unique characteristics of each token.").

The Court, and the defendant, are simply left with too many open questions to endorse the Commission's broad and sweeping claims. Why has the Commission not provided testimony of a single lender, to elucidate the intensions of the parties involved in the transaction? Why has the Commission not shown a single instance in which the loan agreements were solicited or sold on secondary markets? And why has the Commission not provided any factual showing that the lenders expected anything in return for their loan other than payments from a fixed interest rate? The answer to those questions is, perhaps, that the facts do not support the Commission's claims. As much as the Commission might wish it to be so, a financial instrument is not a security just because the Commission says it is. That is a question that requires a significant factual foundation laying and the Commission has failed to do so.

To establish that the loan agreements at issue here are investment contracts and, thus, subject to the Commission's jurisdiction, the Commission must meet each factor of the test set forth by the U.S. Supreme Court's in *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946). The Commission must show that there was (1) an investment of money; (2) in a common enterprise; (3) with a reasonable expectation of profits to be derived from the efforts of others. Failure to satisfy any of those factors is fatal. *Living Bens. Asset Mgmt., L.L.C. v. Kestrel Aircraft Co. (In re Living Bens. Asset Mgmt., L.L.C.)*, 916 F.3d 528, 535 (5th Cir. 2019). While it is the Commission's burden to satisfy the *Howey* factors, it is worth briefly addressing each.

First, the loans were not investments. As explained elsewhere in this brief, they loans were much more likely used as opportunities for Chinese foreign nationals to patriate money in the United States and, at the same time, receive interest on their money while it was located outside of China. Nothing in the course of these loan transactions was "purchased or otherwise acquired in exchange for value[,]" as would be common with an equity interest. *See* SEC, Framework for

"Investment Contract" Analysis of Digital Assets.  Instead, money was simply lent in exchange for interest payments.  In fact, as this brief details, neither the loan agreements nor any other implied or formal agreements suggested that the Chinese lenders would ever receive anything other than their principle plus interest.  That is because they never were intended to or, in fact, would. Again, the Commission has failed to provide any factual evidence to the contrary.

Further, there was no "common enterprise" into which the monies lent pursuant to the loan agreements went.  Each loan agreement was associated with a single real estate project.  A commercial operation receiving multiple loans for a single project does not make those multiple, discrete contractual arrangements a "common enterprise."  Moreover, the loan agreements were not conditioned on the success of the Wall entity projects, any other Barton entities, or Barton's efforts. Rather, "repayment of the loans was merely a function of the [Wall Properties'] ability to repay the loans," and the Commission does not allege that the Chinese lenders would "accept or that the [Wall Properties] could force [them] to accept any less than the amounts loaned." *Wolfe v. Bellos*, No. 3:11-CV-02015-L, 2012 WL 652090, at *8 (N.D. Tex. Feb. 28, 2012) (citing *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 838 (1975)).

Interest paid on loans is clearly distinct from the "profits" envisioned by the Supreme Court in *Howey*.  And there is no indication or evidence presented (in the form of lender testimony or otherwise) that the loan agreements held any value other than return of principle plus interest.  The Commission has not shown, or even alleged, that the loan agreements were saleable for gains in some secondary market.  The loan agreements entitled the lenders to a fixed rate of interest.

The "efforts of others" in this instance were totally inconsequential, as nothing Barton (or any other person working on the Wall entity projects) did would impact the obligation or amount of loan repayment or interest payment.  The Fifth Circuit takes a broad vertical approach to the

31

question of commonality, "focus[ing] on the expertise of the promoter in the industry of the alleged security.   If the investor relies on the promoter's expertise, then the transaction or scheme represents a common enterprise and satisfies the second prong of the *Howey* test."   Ryan Borneman, *Why the Common Enterprise Test Lacks a Common Definition A Look Into the Supreme Court's Decision of* SEC v. Edwards, 5 U.C. Davis Bus. L.J. 16 (2005).  Here again, no lender has been put forward by the Commission claiming that he or she was relying upon Barton's real estate prowess and expertise to ensure repayment of the loan.  It is not even clear that many of the lenders knew who Barton was.

### IV. The Court Should Not Impose a Receivership; If It Does, Several Features of the Previous Order Must Be Changed

The attached findings of fact and conclusion of law propose an order for a receivership, should the Court (contrary to law and the facts in this record) impose one. We highlight certain modifications from the Court's prior order and the Commission's proposed order here.

### A. Cort Thomas Should Not Be Reappointed

One thing is clear from these proceedings: The Commission—using public resources—have not made a case for taking all of the Defendant's assets. Phrased most generously to the Government, the Commission has leaned on the Receiver to try to build its case in lieu of the Commission doing serious work. It has not been, and would not be, in the interests of the Chinese national lenders, third-party creditors, or the Defendant to have the Receiver burn through estate assets—with the meter running at hundreds of dollars per hour—doing the Government's job of investigating.

If there is a new receiver (and there should not be), that receiver should be focused on preserving known assets in place and advancing them through the development process. That will require a different skill set than Mr. Thomas's. It was in the heartland of his skill set to investigate,

to advocate, and to litigate, in lieu of the Commission doing its job. As for a hammer, everything seems like a nail for Mr. Thomas and Ms. Koonce, every task seemed like a dispute in need of scorched-earth litigation.

Any new receiver should be a real estate development professional, and the record so demonstrates. Mr. Thomas was right there, with a 60-page declaration trying to do the Commission's job and advocating for his law firm's continued retention.

But, when it came to tending the farm, Mr. Thomas was at sea. Just as an example, the undisputed evidence in the record is that the Venus properties would be substantially increased in value—by two or three times—if further advanced through government approvals. Decl. of Mr. Kirk Wilson, Dkt. 335 at App. 78–84; Thomas Test. Tr. 50:22–51:5, 52:8–53:13. This is the primary direct asset procured by lender funds. Yet Mr. Thomas had little grasp on the details of how to do so. *Id.*; Thomas Test. 53:2–54:6.

Perhaps to fit the Commission's narrative, Mr. Thomas testified that current asset values would fall short if paying back Chinese-national lenders. Thomas Decl. at 81–82; Thomas Test., Tr. 36:7–38:2. But his chart needing this conclusion failed to value more than a third of the properties, carrying them at zero. *Id.*; Thomas Test. 48:14–50:21. On cross-examination, he had no information on what these were worth and how they should be advanced. Mr. Thomas and his litigation colleagues have been long on using "other people's money" to support the Commission's investigatory and litigation needs, but short on the running of the real estate development business he seized.

Any new receiver must be a real estate development professional as the Commission proposed in 2022. Not even the Commission endorsed Mr. Thomas's retention, making no recommendation in its briefs and leaving blank the identity of a new receiver in its proposed order.

**B. Any Receivership Order Should Focus on Conserving Assets Pending a Final Judgment**

Any new receivership order should curtail the investigatory aspects of the Commission's proposed order. If there is a new receivership, it should be focused on conservation of assets in place. Those assets include real estate and contractual rights, which can be significant. Any receiver should not be permitted to cash them in without serious scrutiny and Court approval.

Any other approach assures a final judgment in the Commission's favor. On what grounds? There has been no merits discovery, much less adversarial testing of the Commission's alleged evidence. Altering the status quo of the assets in question, without the highest showing of necessity, is inexcusable on this record. Defendant's proposed order implements this conservatory focus.

Much of the SEC's proposed order is focused on the Receiver's investigatory powers. Those should recede. The Commission and the Receiver have tens of thousands of pages of bank records. The Receiver – on day one – seized a trove of physical business records. The Receiver long ago gained access to the company's accounting system (for which the Defendant had to ask the Receiver). The Receiver has access to the companies' email database. Most of this information was illegally seized, under an erroneous receivership order. For that reason, the Court should not rely on the Receiver's conclusions to backfill the Commission's paltry evidentiary showing, as they are all fruit of an illegal government seizure.

What else, at this point, does the Commission want the Receiver to do? The answer is clear: it wants the Receiver to use its automatic compulsory inquiry powers to interrogate the Defendant, as the Receiver has attempted in the past. To these, the Commission wants to add some accounting order that would accomplish largely the same purpose. At the same time, the Commission wants its own evidence and witness hidden behind a discovery stay.

The Court should say "no" to all of this. It is grossly unilateral and unfair, demanding the Defendant to answer questions or to invoke the Fifth Amendment blind, without access to discovery into the Commission's evidence and witnesses.

As important, it descends this Court into a constitutional quagmire under the Fifth Amendment's Self-Incrimination and Due Process clauses, given the pending parallel criminal prosecution the Government arranged. As detailed in our Opposition brief, courts have not hesitated to stay civil discovery, in parallel civil enforcement actions, when the criminal prosecution already has been initiated, precisely to avoid these constitutional problems. Dkt. 339 at 32; *SEC v. Dresser Indus., Inc.*, 628 F.2d 1368, 1376 (D.C. Cir. 1980); *SEC v. Alexander*, No. 10-CV-04535-LHK, 2010 WL 5388000, at \*3 (N.D. Cal. Dec. 22, 2010). The Commission is taking this to a whole new level: It wants a discovery stay for inquiries of the Government, but open season on the Defendant. Even better the Government wants to use the Defendant's seized assets to pay for the hunting. With the parallel prosecution, that rips at so many layers of the constitutional order to again bury reversible error in granting the Commission's request. The Defendant's proposed findings strip these provisions from the order.

On top of all this, using estate assets to do government investigation work, is contrary to the interest of any of the estate's beneficiaries. $1.2 million has been burned so far. Probably, the Receiver's biggest bill is to come; its submission the Receiver ominously is postponing. Any receivership needs to set investigation aside and focus on conservation and advancement of real estate assets. If more investigation is needed, the SEC can take it up using tax payer dollars.

## C. Any Outcome Must Provide The Defendant with the Resources to Defend Himself

When the Commission asked this Court to seize everything days after filing a complaint, without doing any tracing work, one had to wonder if the point was to break the Defendant and

35

make defending against the Government's criminal and civil allegations impossible. Even today, the Commission wants almost everything, but only bothered to attempt a highly flawed tracing analysis into a third of its targets.

Courts long have been concerned about this unseemly objective when the Government seeks sweeping pre-judgment seizures: That the Government is trying to skip the proof phase by disabling its opponent for defending himself. As detailed in our opposition brief, courts have routinely provided as exception to receiverships and seizures to pay the Defendant's legal fees for defending himself. Dkt. 339 at 26–27; *Fed. Sav. & Loan Ins. Corp. v. Dixon*, 835 F.2d 554, 565 (5th Cir. 1987).

On this record, the Court must obviate this issue by rejecting the receivership or excluding substantial assets from it or any other remedy. If it errs by not doing so, the Court must make a provision for the Defendant's attorney fees to be paid from the seized assets. Any other course would raise significant due process and right to Counsel issues, undermining any outcome in this case or the criminal proceedings.

Dated: November 11, 2023

Respectfully submitted,

By: */s/*

Michael J. Edney
Virginia Bar No. 48253
DC Bar No. 492024 (*admitted to N.D. Tex.*)
medney@huntonak.com
**HUNTON ANDREWS KURTH LLP**
2200 Pennsylvania Avenue NW
Washington, DC 20037
Phone: (202) 955-1500
Facsimile: (202) 778-2201

**COUNSEL FOR TIMOTHY LYNCH BARTON**

## **CERTIFICATE OF SERVICE**

On November 11, 2023, I electronically submitted the foregoing document with the clerk of court for the United States District Court for the Northern District of Texas, using the electronic case filing system of the court. I hereby certify that I have served all counsel of record electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

/s/
Michael J. Edney

\*\*\*

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § § § | |
| Plaintiff, | § § | |
| v. | § § | No. 3:22-CV-2118-X |
| TIMOTHY LYNCH BARTON CARNEGIE DEVELOPMENT, LLC WALL007, LLC WALL009, LLC WALL010, LLC WALL011, LLC WALL012, LLC WALL016, LLC WALL017, LLC WALL018, LLC WALL019, LLC HAOQIANG FU (a/k/a MICHAEL FU) STEPHEN T. WALL | § § § § § § § § § § § § § | |
| Defendants, | § § | |
| DJD LAND PARTNERS, LLC LDG001, LLC | § § | |
| Relief Defendants. | § § § | |

**DEFENDANT TIMOTHY LYNCH BARTON'S PROPOSED
FINDINGS OF FACTS AND CONCLUSIONS OF LAW AND PROPOSED ORDERS**

Defendant Timothy Lynch Barton (the "Defendant" or "Barton") submits these Proposed

Findings of Fact and Conclusions of Law.

## I.    BACKGROUND

1. On September 23, 2022, the United States Securities and Exchange Commission

("Plaintiff" or the "Commission") sued Defendant, Steve Wall, Michael Fu, the Wall

Entities, Carnegie Development (the managing member of the Wall entities), and the Relief

Defendants for securities violations, seeking a permanent injunction, disgorgement of ill-gotten gains, and civil penalties.  [Dkt. 1].

2.  On September 26, 2022, the Commission moved for the Court to appoint a receiver over the Wall entities, Carnegie Development, the Relief Defendants, and any other entities that Barton directly or indirectly controlled.  [Dkt. 6].

3.  On October 18, 2022 ("Initial Receivership Order"), the Court granted the Commission's request for appointment of a receiver over Defendant's objections.  [Dkt. 29].

    a.  The order gave the receiver numerous powers, including the power to determine the nature of the property interests, take possession of any property belonging to receivership entities, and take any actions necessary to preserve receivership property or prevent its dissipation, concealment, or inequitable distribution.  *Id.*

4.  On November 1, 2022, the receiver moved for the Court to supplement its receivership order to include over one hundred Barton-controlled entities by name.  [Dkt. 41].

    a.  The Court supplemented its order *nunc pro tunc* to expressly identify 126 receivership entities.  [Dkt. 62].

    b.  The receiver then moved for the Court to set procedures for the disposition of personal property in the custody of receivership entities.  [Dkt. 47].

    c.  The Court granted the motion and adopted the procedures proposed by the receiver. Barton timely appealed the order appointing the receiver and both follow-up orders. Dkt. 63].

5. On November 28, 2022, Barton moved for a stay pending appeal of the receivership order. [Dkt. 71].

    a. While that motion was still pending, Barton also moved in the Fifth Circuit for a stay pending appeal. *SEC v. Barton*, No. 22-11132 (5th Cir. Dec. 28, 2022) ("22-11132 Appeal" Dkt. 20).

    b. A motions panel of the Fifth Circuit denied Barton's request on January 6, 2023 (22-11132 Appeal Dkt. 46), and the district court denied his request on January 17, 2023. [Dkt. 132].

6. On June 28, 2023, the Fifth Circuit ruled that the Court had applied the incorrect legal test in its consideration of and before imposing a receivership and, as a result, vacated the Court's Initial Receivership Order ("Vacatur Order"). 22-11132 Appeal Dkt. 134.

    a. The Vacatur Order granted Barton's motion for a partial stay pending appeal. It immediately suspended the receiver's power to sell or dispose of property belonging to receivership entities, including the power to complete sales or disposals of property already approved by the district court. *Id.*

    b. The suspension was placed into effect until the receivership order is vacated 90 days from the issuance of this Vacatur Order's mandate. The Fifth Circuit clarified that the suspension did not apply to activities in furtherance of sales or dispositions of property that had already occurred or been approved by the district court. *Id.*

7. On August 31, 2023, the Fifth Circuit withdrew its opinion issued with the Vacatur Order and substituted with a new one that was substantially similar, but newly clarified that

"activities in furtherance" did not include the completion of the sale of any property. 22-11132 Appeal Dkt. 150.

8.  On September 7, 2023, the Commission filed a Motion for Appointment of a Receiver, for a Preliminary Injunction and Ancillary Relief, and to Lift Stay for Limited Purpose, and Brief in Support ("Motion for New Receiver"). Dkt. 309.

    a.  The Motion for New Receiver requested the Court to put 82 of the receivership entities into a new receivership. *Id.*

    b.  The Commission further asked the court to subject all funds, assets, and entities that Barton directly or indirectly controls that are not placed into a new receivership to a preliminary injunction, enjoining him from transferring, selling, dissipating, assigning, concealing, pledging, withdrawing, alienating, encumbering, incurring debt upon, disposing of, or diminishing the value of such. *Id.*

    c.  Finally, the Commission asked that the Court require Barton to provide a sworn accounting and subject him to a preservation order. *Id.*

9.  On October 23, 2023, Defendant, subject to the Court's allowance of a short extension of time, timely filed an opposition to the Motion for New Receiver ("Opposition Motion"). [Dkt. 334, 339].

    a.  Defendant's Opposition Motion argued that the Court lacked jurisdiction in the first instance, as the Commission failed establish that the loans at issue are "securities" for the purposes of establishing a claim under the federal securities statutes the Commission's lawsuit was brought. *Id.*

b.  The motion also argued that no new receivership was warranted, as the Commission failed to establish the necessary factors set forth in *Netsphere, Inc. v. Baron*, 703 F.3d 296, 305 (5th Cir. 2012). *Id.*

c.  Barton further argued that the Commission's request for a preliminary injunction, as well as ancillary items such as mandating a sworn accounting and document retention, should be denied on the grounds that the Commission failed to establish that the entities subject of the Commission's preliminary injunction request received any subject lender funds. *Id.*

10. On October 11, 2023, the Court held a hearing on the Motion for New Receiver at which both parties called witnesses to testify as to various factual considerations and to, in the instance of certain witnesses, provide expert opinions.  [Dkt. 356].

## II.    FINDINGS OF FACT

1.  Barton is one of the owners and/or operator of the vast majority of the entities subject to the Commission's Motion for New Receiver.  [Dkt. 334 at 4].

2.  In the case of certain entities subject to the Commission's Motion for New Receiver, Barton's son, Maximillian Barton, is the owner and or operator of such entities.  [Dkt. 326].

3.  Barton is a real estate developer, operating primarily in the Dallas-Fort Worth metroplex and specializing in developing land for single family homes, multifamily units, apartment complexes, and short- and long-term stay hotels.  Barton's business operations have operated for several decades, primarily through his main operating company, JMJ Development LLP ("JMJ Development").  [Dkt. 334 at 3].

4. Barton, as is commonplace in the real estate business, incorporated or otherwise formed and at various times utilized various special purpose business entities – most frequently in the form of limited liability corporations – in the course of his operation of his real estate development business, largely (but not in all instances) managed, supervised, and operated by JMJ Development. *Id.* at 4.

5. The receivership entities subject to the Motion for New Receiver primarily consist of either Barton's primary business ventures (e.g., JMJ Development) or, as is the case for the majority them, were created as special purpose business entities and either remained owned by Barton's business enterprise or were transferred to new owner-operators. *Id.* at 3.

6. The entities subject to the Commission's Motion for New Receiver are currently active or were active prior to the implementation of the initial receivership, in terms of generating revenue, holding valuable legal rights, or serving in some commercial capacity (e.g., lending funds to other operating entities within the Barton business enterprise), while others have either never been operational (i.e., were created for some business purpose that never materialized) or are now dormant with no plans for future use (i.e., were created for some business purpose that has since concluded). [Dkt. 334 at 3-4].

7. Barton's primary business ventures and the special purpose entities, at various different times, lent cash to or borrowed cash from one another. Tr. 60:20-24; 64:7-14; 69:20-24.

8. The companies' accounting ledgers reflect loans between the various entities recorded as intercompany loans in the businesses' books and records. Tr. 64:7-14.

9. Barton, from time to time, through his business ventures, would engage with other real estate proprietors in formal or informal joint ventures. Barton would serve as the developer in the course of these ventures, utilizing his experience, contacts, and expertise, to advance these projects.

10. Around 2015, the so-called Wall entities were created as special purpose entities to function as real estate development vehicles for joint-venture projects around the Dallas–Fort Worth metroplex, led by Steve Wall and Michael Fu. *SEC v. Barton*, 79 F.4th 573, 575, 576 (5th Cir. 2023).

11. Barton was brought in by Wall and Fu to serve as the developer on these Wall entity projects. *Id.*

12. About 100 lenders, mostly Chinese nationals, lent over $26 million dollars to the Wall entities in exchange for a fixed rate of return on their loans. *Id.*

13. These loans were subject to individual loan agreement contracts. In each individual loan agreement contract, Platinum Investment Corporation ("Platinum"), a company owned and controlled by Michael Fu, was listed as the "lender," and the relevant Chinese national as the "co-lender." [Dkt. 334 at 4].

14. These various loan agreements operated separately from one another (e.g., default on one did not impact performance on another), with the exception that the borrowers, the Wall entities, interacted with the lenders through a master loan agreement with Platinum. As part of this arrangement, Fu acted as the agent to the lenders. *Id.* 4-5.

15. These contracts, both the master loan agreement and the co-lender agreements, never referred to the role of the Chinese nationals as "investors," nor did they refer to the loan proceeds provided as "investments." *Id.* at 4, 21.

16. The loan agreements did not provide the lenders with any equity interest, or option for equity interest, nor did the borrowers obligation for repayment of the loans depend on the success of the projects or prowess or expertise of Barton or any of the other parties involved. *Id.* at 21.

17. In many of the agreements, the rate of interest would increase if the loans were not paid back within two years. App. 70-77.  No aspect of the co-lender agreements provided the co-lender with any greater interest, or any other compensation, if any of the Wall Entities performed better than expected.  [Dkt. 334 at 4].

18. Likewise, under many of the co-lender agreements, the borrower – one of the Wall entities – agreed to make an annual interest payment and either to repay principal within two years or to accrue interest at a fourteen percent rate.  *Id.* at 4, 7.

19. The co-lender agreements identified a purpose for each of the loans, most often this was to acquire and develop a particular piece of property.  *Id.* at 20.

20. In each property, the Wall entity in question took substantial steps to advance the subject property. *Id.* at 5.  In some cases, the projects succeeded: The property proved feasible for residential development, key government approvals were obtained, and the Wall entity executed on the contracted option to buy the land and to progress it further in the development process.  *Id.*

21. Several of the Wall entity projects encountered difficulties, largely due to external factors (i.e., COVID-19, economic downturn, etc.), and, in attempts to ensure that funds, both those originating from the subject loans and from other, unrelated sources, in those distressed projects were not lost, Barton on various occasions redeployed such into replacement projects, largely through some of the special purpose vehicles that he controlled. [Dkt. 335 at 28].

22. Initially, the Wall entities made some of the annual interest payments back to the accounts in China from which the loan proceeds were drawn. Later in the process, the Wall entity management was advised that it must withhold U.S. taxes from the remittances. Barton Testimony, Page 332, Lines 1-25, Page 33, Lines 1-4. Around the same time, the lender's agent – Platinum and Michael Fu – rejected the return of funds to the China-based bank accounts from which the loans were funded. *Id.* Instead, Mr. Fu demanded payments to U.S.-based accounts, designated by him, directly, contrary to the terms of the receipt of funds provided to the co-lenders. [Dkt. 334 at 7]. The Wall Entity managers were advised that redirecting funds to an unrelated account designated by Mr. Fu would raise money laundering issues. The Wall Entity contemporaneously reported Mr. Fu's demands to redirect the funds to U.S. law enforcement, including the United States Department of the Treasury and the United States Department of Justice, which opened inquiries. *Id.*

23. The Fifth Circuit made clear that the prior receivership order were error. And it was up to the Securities and Exchange Commission to demonstrate on remand which entities received the Chinese-national lender funds, as a prerequisite of extending the receivership to that entity. *Sec. & Exch. Comm'n v. Barton*, 79 F.4th 573, 580 (5th Cir. 2023).

47

24. It is not disputed that the Wall entities received subject lender funds.  It is also not disputed that some of the projects of those Wall entities encountered difficulties and the funds were redeployed to certain replacement projects managed by other special purpose entities.

25. The Commission's Motion for New Receiver, which included a supplemental declaration from SEC staff accountant, Ms. Carol Hahn (Dkt. 310), provided partial tracing analysis "examples" for 28 receivership entities.  [Dkt. 309].  This partial tracing was in addition to partial tracing that Ms. Hahn provided in her initial declaration (Dkt. 7) that was submitted in conjunction with the Commission's first request for a receivership over Barton's assets for the nine Wall entities, Carnegie Development, LLC, JMJ Development, JMJ Hospitality, LLC, and JMJAV, LLC.

   a.  The Commission's financial inquiry into the receivership entities was undertaken, as far as the Court is aware, exclusively by Ms. Hahn.  Ms. Hahn, a staff accountant for the Commission, is not a Certified Public Accountant ("CPA") and does not hold any certifications or have any specific expertise in forensic tracing.  [Dkt. 359 at 122:1-12].

26. At the October 11, 2023 Hearing, the Commission called upon Ms. Hahn and Mr. Cecil to testify.  The Commission did not designate either Ms. Hahn or Mr. Cecil as expert witnesses, nor did it establish that either, particularly in the case of Ms. Hahn, was qualified on the subject of their testimony. *See* Federal Rule of Evidence 702.

27. Neither the Commission, nor the initial receiver, relied on any specific accounting method in the course of their tracing efforts.  [Dkt. 359 at 114:24-115:1].

28. The Receiver did not submit the opinion of or any declaration from an accountant, nor did the Commission's accountant validate, endorse, or even formally incorporate by reference the Receiver's accounting and asset tracing claims.

29. Each instance of tracing provided to the Court was presented in the form of a snapshot (or sample set of transactions), purportedly showing that funds had moved from one or more of the Wall entities, through one or more of the receivership entities.

   a. Tracing analyses were not provided, including in the form described above, for every one of the entities the Commission's Motion for New Receiver now moves to be placed in a new receivership.

   b. The Commission's tracing analyses did not include any accounting work papers supporting the tracing claims regarding a number of the entities. Ginn Decl. at 5. Nor does the Commission's analysis identify the particular data relied on for each claim.  Ginn Decl. at 5.

   c. In most instances, the provided tracing does not purport that the subject lender funds currently reside in the highlighted example entity.  In other words, neither the Commission, nor the Receiver, make any meaningful attempt to show that funds flowed to a surviving entity.  Rather, much of the tracing provided purports to show that the given receivership entity, at some point in time, temporarily some amount of funds (not necessarily subject lender funds) from an entity that itself, at some point, had held funds from a Wall entity or from another entity that at some point had received funds from an entity that held subject loan proceeds.

30. In several instances, the tracing provided by the Commission or Receiver is rebutted by evidence provided by Defendant. The U.S. Department of Housing and Urban Development ("HUD")-financed properties are prime examples of such instances.

    a. All funds for construction or initial operations of Bellwether Ridge, Windmill Farms, and Ingleside came from the primary HUD loan or loans provided by Southern Property Capital ("SPC"). SPC cash advances either equaled or exceeded reported equity for the projects. *See* Receiver's Exhibit 7 (SPC Reconciliation of Project Equity to SPC Convertible Loans 12/31/2022 [D4FR, LLC/Windmill Farms]; [D4DS, LLC/Bellwether Ridge]; [D4IN, LLC/Ingleside]; and [D4OP, LLC/Opelika]). Dkt. 385, 330 at App. 2-184.

    b. Examples of persuasive rebuttals to the Commission's and Receiver's tracing is provided in the Declaration of Erik Johnson of Southern Property Capital. *Id.* These examples show that, in many instances, the purported tracing provided omits financial records showing that alleged *de minimis* transactions regarding the HUD owned apartments were immediately reversed.

31. Nor does the Commission account for the third-party financing responsible for the purchase of the property in Frisco, Texas by FHC Acquisitions LLC. Ginn Decl. at Selected Tracing No. 9.

32. The Commission's and the Receiver's tracing analyses discount or disregard permitted uses of the loan proceeds. Ginn Decl. at 5.

33. This analysis does not account for what the Defendant's development operating entities did to advance expenses for the projects specified in the co-lender agreements, including for the work of engineers, lawyers, government approval specialists, and other development professionals necessary to progress those projects closer to construction financing. Dkt. 334 at 16, 17.

34. One analysis provided to the Court, Mr. Ginn's, shows receipt of more than $35 million into the Wall entities, when the Commission claims that only $26.3 million of Chinese loan proceeds were received. Ginn Decl. at Schedule 3.

35. The Court can only determine, from briefing on the Motion for New Receiver and the subsequent October 11, 2023 hearing, that the following entities were, at some point in time, received subject lender proceeds, or were replacement projects (or operating vehicles for such) where such funds were redeployed and, thus, received subject lender funds:

| | |
|---|---|
| 1. WALL007, LLC | 10. Carnegie Development, LLC |
| 2. WALL009, LLC | 11. Orchard Farms Village, LLC |
| 3. WALL010, LLC | 12. BM318, LLC |
| 4. WALL011, LLC | 13. Northstar PM, LLC (Texas) |
| 5. WALL012, LLC | 14. Lynco Ventures, LLC |
| 6. WALL016, LLC | 15. DJD Land Partners, LLC |
| 7. WALL017, LLC | 16. LDG001, LLC |
| 8. WALL018, LLC | 17. Seagoville Farms, LLC |
| 9. WALL019, LLC | 18. Ridgeview Addition, LLC (Texas) |

36. Barton's businesses, and, as a result, his various business entities also brought in significant funds that the Commission has not proven to derive from the subject lender funds. [Dkt. 335]. The Commission's witnesses did not provide a methodology for distinguishing these funds from the alleged lender funds, as is required in cases of alleged commingling.

37. The Commission made no argument that there is any, much less a significant, risk of asset flight, absent implementation of a receivership.  Nor is there any reason to believe that there is any risk of asset flight.  [Dkt. 334 at 22].

38. The vast majority of the assets at issue are stationary in nature (i.e., real property) and, thus, would be exceedingly difficult to secret away or quickly and covertly liquidate or otherwise dispose of.  *Id.* at 23.

39. The Commission has not established that court-ordered management of the receivership entities, in the form of a new receiver, would better protect any assets held by those entities from dissipation or disposal.

40. It is not the job of courts to replace corporate management simply because it or the government thinks someone else would do a better job at managing a corporate enterprise.

41. A receivership runs the risk of stalling the development of pending real estate projects and threatening asset value.  Because of capability limitations, the Receiver has taken the course of attempting to liquidate the receivership entities and has expended significant receivership estate resources engaging in extensive investigations of Barton.

42. Because asset flight is not a significant risk, it is not clear that a receivership is necessary to protect anyone's interest in the assets held by the receivership entities.

43. Through the end of the second quarter of 2023, the initial receivership has cost the receivership entities, and therefore Barton, well over $1 million. *See* Receiver's Fee Applications [Dkt. 156, 237, 300].

## III.    CONCLUSIONS OF LAW

1. The Court finds that it does not have jurisdiction over this matter, as the Commission has not established that the loans at issue are securities or investment contracts under the federal securities laws.

   a. The Commission failed to establish under the test set forth in the U.S. Supreme Court's *Reves v. Ernst & Young* decision that the loans are securities. 494 U.S. 56, 63-64 (1990).  As the Supreme Court made clear in that case, not all loans are securities.  *Reves*, 494 U.S. at 63-65.

      i. The loans at issue in this case closely resemble at least one of the *Reves* Court's examples of loans that are not securities – "short-term note[s] secured by a lien on a small business or some of its assets." *Id.* at 65.

      ii. Additionally, the Court finds that several other *Reves* factors, which the Supreme Court laid out as alternative grounds for a finding that certain loans are not securities in the absence of a specifically-identified "family resemblance" example, weigh against a determination that the loans qualify as securities.

      iii. The Commission has not proven that the co-lender agreements were not designed for investment purposes. *Id.* at 66.  In making that determination, the Court must consider both the seller's and buyer's perspective to determine their "motivations" to enter into the transaction. *Kirschner v. JP Morgan Chase Bank, N.A.*, 79 F.4th 290, 305 (2d Cir. 2023).

iv.  The borrower's purpose here was to fund pre-development and property acquisition expenses until the loan could be refinanced, or repaid, through conventional construction financing.  That is not an example of a borrower seeking a loan for "investment purposes." *Shiny Investments, LLC v. Zeoli*, 2021 IL App (1st) 201353-U, ¶ 94 (citing *Reves*, 494 U.S. at 66) ("[Borrowers'] motivation, however, was to obtain short-term cash to purchase and refinance properties[.]").

v.  The Commission had an opportunity to prove the lender's purpose, but chose not to bring any evidence from a Chinese national lender. The evidence in the record suggests some intent to use the loans as opportunities for Chinese foreign nationals to patriate money in the United States and then move it to other U.S. accounts, which is contrary to an investment purpose.

vi.  The loan agreements did not give the lenders any interest or stake in the profits of a Wall entity performing better than expected (or performing at all).  The interest rates on the loans were fixed annual percentage rates. These facts cut significantly against the loans being for an investment purpose. *Reves*, 494 U.S. at 66.

vii.  Members of the investing public were not likely to have regarded the co-lender agreements at issue to be investments rather than loans.  There is no language in the co-lender agreements about "investments" or "equity interests," "shares," or "ownership."  Such language gives "ample notice

54

that the instruments were [agreements] in loans and not investments in a business enterprise." *Kirschner*, 79 F.4th at 308.

viii. The Court further also finds that there was no "plan of distribution" for the co-lender agreements. The loans were not offered or sold to a broad segment of the public or designed to be traded on a secondary market. *Reves*, 494 U.S. at 68.

b. The Commission also failed to establish under the test set forth in the U.S. Supreme Court's *SEC v. W.J. Howey Co.* decision that the loans are investment contracts. 328 U.S. 293 (1946). The Commission has not shown the Court that there was an investment of money in a common enterprise with a reasonable expectation of profits to be derived from the efforts of others.

i. The loans were not investments. They were more likely used as opportunities for Chinese foreign nationals to patriate money in the United States.

ii. Nothing in the course of these loan transactions was "purchased or otherwise acquired in exchange for value[,]" as would be common with an equity interest. *See* SEC, Framework for "Investment Contract" Analysis of Digital Assets. Instead, money was simply lent in exchange for interest payments.

iii. Further, there was no "common enterprise" into which the monies lent pursuant to the loan agreements went. Each loan agreement was associated

with a single real estate project. A commercial operation receiving multiple loans for a single project does not make those multiple, discrete contractual arrangements a "common enterprise."

    iv. Moreover, the loan agreements were not conditioned on the success of the Wall entity projects, any other Barton entities, or Barton's efforts. Rather, "repayment of the loans was merely a function of the [Wall Properties'] ability to repay the loans," and the Commission does not allege that the Chinese lenders would "accept or that the [Wall Properties] could force [them] to accept any less than the amounts loaned." *Wolfe v. Bellos*, No. 3:11-CV-02015-L, 2012 WL 652090, at *8 (N.D. Tex. Feb. 28, 2012) (citing *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 838 (1975)).

    v. Finally, the interest paid on loans is distinct from the "profits" envisioned by the Supreme Court in *Howey*. For example, there is no indication that the loan agreements were saleable for gains in some secondary market. The loan agreements entitled the lenders to a fixed rate of interest. The "efforts of others" in this instance were totally inconsequential, as nothing Barton (or any other person working on the Wall entity projects) did would impact the obligation or amount of loan repayment or interest payment.

2. The Fifth Circuit's Vacatur Order mandated that, in order for a new receivership to be imposed over any of the Barton entities, the Commission would be required to satisfy each

of the factors set forth in *Netsphere, Inc. v. Baron*, 703 F.3d 296, 305 (5th Cir. 2012) for each of the entities. *SEC v. Barton*, 79 F.4th 573, 579 (5th Cir. 2023).

3. *Netsphere* established that "[r]eceivership is 'an extraordinary remedy that should be employed with the utmost caution' and is justified only where there is a clear necessity to protect a party's interest in property, legal and less drastic equitable remedies are inadequate, and the benefits of receivership outweigh the burdens on the affected parties.'" *Barton*, 79 F.4th at 578 (quoting *Netsphere,* 703 F.3d at 305).

4. The Court finds that the Commission's Motion for New Receiver fails to satisfy the *Netsphere* factors in relation to any of the entities it seeks to place into a new receivership.

5. First, as set forth in the Findings of Fact, this Court finds that there is no meaningful risk of asset flight and, thus, finds there is no clear necessity to protect a party's interest in property. Preserving assets for potential future damages or disgorgement, as the Commission suggests is necessary (*see* Dkt. 309, stating that "[t]he property interests could potentially result in a recovery for investors"), is not adequate to establish clear necessity for a receivership. *See Netsphere*, 703 F.3d at 305 ("In none of those situations was the receiver named simply to secure or preserve funds for the satisfaction of a potential later judgment."). The Commission provided this Court with no caselaw showing that poor corporate management (to the extent that that portrayal is even an accurate one), particularly when the Commission is not acting on behalf of shareholder-owners, should result in a finding of clear necessity. As such, the Court rejects that argument. The "clear necessity" element of *Netsphere* is not established.

6. Second, the Commission has not proven that "legal and less drastic equitable remedies are inadequate." *Barton*, 79 F.4th at 578; *Netsphere*, 703 F.3d at 305; *Spence & Green*, 612 F.2d at 904.    An injunction against transfer without sufficient third-party or judicial permission, if determined to be warranted, would clearly be an adequate legal and less drastic equitable remedy.  The Commission does not argue that an injunction against certain transfers or alienation would be insufficient to prevent any risk of asset flight and has not presented any evidence that the Defendant or other owners of the companies in question would violate an injunction against sales or transfers.  The "legal and less drastic equitable remedies are inadequate" element of *Netsphere* is not established.

   a. Further, notwithstanding the Commission's claims to the contrary, this Court has ample authority to order a stay of litigation against the entities that it subjects to a preliminary injunction.  *See, e.g.*, *Wolf Designs, Inc. v. Donald McEvoy Ltd., Inc.*, 341 F. Supp. 2d 639, 642–43 (N.D. Tex. 2004) (explaining "inherent power" of district courts to stay proceedings before them in deference to related actions).

7. Third, the Commission has not proven that the benefits of implementing a receivership outweigh the burdens on the affected parties.  *Barton*, 79 F.4th at 578 (citing *Netsphere*, 703 F.3d at 305).  The value of the real estate assets depend on their further advancement in the development process.  A receivership will not so assist and will drain resources on investigations, costs that should be borne by the Government not but the estate.

8. The Fifth Circuit's Vacatur Order also clearly mandated that, "[s]hould the district court decide that a new receivership is justified on remand, it can only extend over entities that received or benefitted from assets traceable to Barton's alleged fraudulent activities that

58

are the subject of this litigation." The Commission failed to perform adequate asset tracing to impose a receivership over the entities identified in the Motion for New Receiver.

9. As set forth in the Findings of Fact, the Commission's and the Receiver's attempts at asset tracing result only in partial snapshots of financial transactions that potentially omit other probative factual information and that, ultimately, this Court finds do not meet the standard set forth by the Fifth Circuit.

10. The Commission cannot seize and place into receivership portions of assets that were not the result of "ill-gotten gains." *SEC v. Heden*, 51 F. Supp. 2d 296, 302 n.4 (S.D.N.Y. 1999); *S.E.C. v. Cherif*, 933 F.2d 403, 413-14 & n.11 (7th Cir. 1991) (allowing equitable relief against a non-party to the litigation—and each of the ten entities in dispute are not parties—only to the extent "it is established that the non-party possesses illegally obtained profits but has no legitimate claim to them"). Simply showing that a corporate entity, at some point in time, received some of the subject funds is not enough to place the entirety of that entity into receivership.

11. The Court finds that identifying the methodology for an accounting exercise, including in the context of a asset tracing analysis, is a prerequisite for any admissible expert testimony. *United States v. Kuhrt*, 788 F.3d 403, 420 (5th Cir. 2015) ("The relevance prong requires the proponent to demonstrate that the expert's 'reasoning or methodology can be properly applied to the facts in issue.'"). Without it, it is impossible even to begin testing the expert's assertions through the adversarial process. The Commission and the Receiver failed to identify any methodology underlying their tracing analyses and, as such, the Court rejects any conclusions they would have the Court draw from them.

12. The Commission did not designate either Ms. Hahn or Dr. Cecil as experts on the issue of asset tracing. Given the significant complexity and volume of transactions at issue here, and need for application of some accounting methodology to make sense of cash flows, expert testimony is required. As such, the Court gives little or no weight to the testimony of Ms. Hahn and Dr. Cecil. Given the absence of any indication that an established expert preparation the various tracing analyses relied upon by the Commission, those too do meet the standards required for them to be submitted into evidence.

13. The Fifth Circuit's opinion in *United States v. Davis* does not bind this Court in regard to the issue on whether the Commission's tracing witness must be qualified as an expert witness. 53 F.4 833 (5th Cir. 2022). In *Davis*, the Fifth Circuit rejected the defendant's argument that a Government's forensic auditor must be qualified as an expert witness in order for testimony on mathematical calculations for a single Government agency to be admissible. *Id.* at 848. Instead, the Fifth Circuit reasoned that the testimony relied on basic math – addition and subtraction – which does not require scientific, technical, or specialized knowledge within the scope of Fed. R. Evid. 702. *Id.* at 848–49. Thus, the district court was not incorrect in requiring the witness to be qualified as an expert witness because the Fifth Circuit merely stated that qualification was not necessary when denying the defendant's argument.

    a. Moreover, *Davis* dealt with just a few, large financial transactions emanating from a single source, the U.S. Department of Veteran's Affairs. *Id.* at 844. While those transactions might have resulted in voluminous documentation, they did not deal with hundreds of corporate entities, analyzing those companies books and records,

and drawing conclusions about the nature of their bookkeeping (e.g., recordation as intercompany loans).

   b. Unlike the witness in *Davis*, Ms. Hahn's testimony requires technical and specialized knowledge in order to properly conduct reliable asset tracing. *United States v. Tao*, No. 19-20052-JAR, 2022 WL 252019, at *12 (D. Kansas Jan. 27, 2022) ("one could argue that . . . asset tracing is specialized knowledge that must be offered by a 702 witness. This case is clearly more complex than Davis, and as such, these witnesses should be qualified as a 702 witness before offering testimony on complex financial asset tracing regarding hundreds of entities and potentially thousands of transactions. *See id.* at *12 (directing the Government to provide a supplementation to comply with Fed. R. Crim. P. Rule 16 expert witness disclosure).

   c. The factual circumstances in *Davis* are clearly distinguishable from those at issue here. As such, the Court's determination that both Ms. Hahn and Dr. Cecil needed to be offered as expert witnesses to submit evidence on and testify as to the nature of their asset tracing efforts is not impacted by *Davis*.

14. A core aspect of reliable expert opinion is that it can be verified by others. *See* Fed. R. Civ. P 702 (expert testimony must be based on "sufficient facts or data"). The Commission's tracing analysis does not identify the particular data relied upon for each claim. Ginn Decl. at 5. As such, the Court finds both the Commission's and the Receiver's tracing analyses to fall short of the reliability standards the Court is bound by. As such, the Court gives the tracing analysis little weight.

15. The Commission also seeks to subject dozens of entities to a preliminary injunction, but it has failed to make the case for doing so. The Commission cites to the Fifth Circuit's Vacatur Order for its statement that "[u]nder *Faulkner*, the SEC could have sought an injunction freezing asset transfers while it traced the funds and determined which entities should be placed in the receivership." *See* Dkt 309 at 22 (citing Barton, 2023 WL 5618997, at *5). But, in *Faulkner*, the defendants had already been convicted of crimes relating to the property for which the FDIC and a receiver sought a preliminary injunction. *See F.D.I.C. v. Faulkner*, 991 F.2d 262, 264 (5th Cir. 1993). The Commissions primary basis for requesting a preliminary injunction, that it has not had enough time and information to trace loan proceeds in question, is unpersuasive. The Commission has been at this investigation for over two years now. Notwithstanding that lengthy investigation, it has only presented partial tracing analyses for 28 entities. Preliminary injunctions, particularly those that place significant burdens on those subjected to them, cannot be unlimited in temporal scope simply because an investigation is ongoing, with no end in sight. These tools must have some limiting principles, but the Commission has suggested none. As such, the Court finds the Commission's argument in support of preliminary injunction over a subset of entities unpersuasive.

16. The Court is also unpersuaded by the Commission's argument in support of its request for a sworn accounting and preservation order. Requiring these of the Defendant would be particularly inappropriate given the Government's parallel criminal proceeding. There are significant perils associated with the Government seeking civil discovery from a defendant while it is prosecuting him in a parallel proceeding. *SEC v. Dresser Indus., Inc.*, 628 F.2d 1368, 1376 (D.C. Cir. 1980) (*see also Afro-Lecon, Inc. v. United States*, 820 F.2d 1198,

1202 (Fed. Cir. 1987); *SEC v. Alexander*, Case No. 10-CV-04535-LHK, 2010 WL 5388000, at *10 (N.D. Cal. Dec. 22, 2010) (noting that, "the SEC's allegations in its civil complaint overlap significantly, if not entirely, with the criminal charges" and that the defendant's "Fifth Amendment concerns are significant, and this factor of the analysis strongly supports a stay.").

17. The Court finds that: (a) under the urging of Defendant, a new receivership is not warranted; or (b) although Defendant finds it unnecessary and not justified on this record, a new receivership is not warranted, but a properly-scoped preliminary injunction is warranted; or (c) over the objection of Defendant, a receivership is warranted, but only over certain entities limited in scope and substantive.

    a. Because the Commission failed to satisfy the *Netsphere* factors for any of the entities that the Motion for New Receiver seeks to place into a new receivership, the Court finds that imposition of a new receivership is neither appropriate nor warranted.

OR

    b. Because the Commission failed to satisfy the *Netsphere* factors for any of the entities that the Motion for New Receiver seeks to place into a new receivership, the Court finds that imposition of a new receivership is neither appropriate nor warranted. The Court is particularly persuaded that there are less drastic alternatives than a receivership to secure potential lender funds, including an injunction against transfers without permission of the SEC, the Court, or a Court-appointed third-party monitor. The Court decides to impose that alternative and

determines that it will be appropriate and will ensure that, during the pendency of this litigation, the lender funds held by the entities and identified below are stayed in place, overseen by the Court, and protected from third-party litigation and other external factors that might result in asset dissipation. Such a preliminary injunction would enjoin the transfer of entities or assets therein, with certain limited exceptions, without the approval of the Court and the Commission. Limited exceptions to the preliminary injunction would include allowance for the payment of Defendant's attorney fees and liquidation of assets to achieve such.

OR

    c. The Court finds that the Commission has satisfied the *Netsphere* factors for only certain entities and, therefore, would impose a partial receivership over solely those entities. For the reasons set forth above, this would be a significantly limited receivership only over the following entities:

1. WALL007, LLC
2. WALL009, LLC
3. WALL010, LLC
4. WALL011, LLC
5. WALL012, LLC
6. WALL016, LLC
7. WALL017, LLC
8. WALL018, LLC
9. WALL019, LLC
10. Carnegie Development, LLC
11. Orchard Farms Village, LLC
12. BM318, LLC
13. Northstar PM, LLC (Texas)
14. Lynco Ventures, LLC
15. DJD Land Partners, LLC
16. LDG001, LLC
17. Seagoville Farms, LLC
18. Ridgeview Addition, LLC (Texas)

    i. The Court finds that the Commission failed to show possession of lender funds for any of the remaining entities that the Motion for New Receiver seeks to place into a new receivership and, thus, imposition of a new receivership over those entities is neither appropriate nor warranted.

64

ii.  The Court finds that the structure of this receivership would need be that of a holding receivership, with a receiver serving in a largely passive role in the management of the entities and a significantly limited ability to engage in any disposition of assets without consent of the Court and the Defendant. Moreover, Court finds that the appointed receiver would not be mandated, nor permitted, to engaged in forensic accounting, tracing activities, or any other type of investigations.

iii.  The Court finds that any inquisitorial activities of the receiver, including further investigations, as well as demands for things like sworn accounting would raise significant and serious Fifth Amendment concerns, particularly in light of the government's parallel criminal proceeding.

Dated: November 10, 2023

Respectfully submitted,

By: */s/ Michael J. Edney*
Michael J. Edney
Virginia Bar No. 48253
DC Bar No. 492024 (*admitted to N.D. Tex.*)
medney@huntonak.com
**HUNTON ANDREWS KURTH LLP**
2200 Pennsylvania Avenue NW
Washington, DC 20037
Phone: (202) 955-1500
Facsimile: (202) 778-2201

**COUNSEL FOR TIMOTHY LYNCH BARTON**

## CERTIFICATE OF SERVICE

On November 10, 2023 I filed the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas. I hereby certify that I have served the document on all counsel and/or pro se parties of record by a manner authorized by Federal Rules of Civil Procedure

65

5(b)(2).

/s/ Michael J. Edney
Michael J. Edney

***

***

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § § § | |
| *Plaintiff,* | § § § | |
| v. | § § | No. 3:22-CV-2118-X |
| TIMOTHY LYNCH BARTON CARNEGIE DEVELOPMENT, LLC WALL007, LLC WALL009, LLC WALL010, LLC WALL011, LLC WALL012, LLC WALL016, LLC WALL017, LLC WALL019, LLC HAOQIANG FU (a/k/a MICHAEL FU) STEPHEN T. WALL | § § § § § § § § § § § § § § § | |
| *Defendants,* | § § | |
| DJD LAND PARTNERS, LLC LDG001, LLC | § § § | |
| *Relief Defendants.* | § § | |

### ORDER DENYING MOTION FOR APPOINTMENT OF A RECEIVER, FOR A PRELIMINARY INJUNCTION AND ANCILLARY RELIEF, AND TO LIFT STAY FOR <u>LIMITED PURPOSE</u>

This matter came before the Court upon Plaintiff Securities and Exchange Commission's ("Commission" or "Plaintiff") Motion for Appointment of a Receiver, for a Preliminary Injunction and Ancillary Relief, and to Lift Stay for Limited Purpose ("Plaintiff's Motion").

The Court, having considered the pleadings and submissions in this case, including the Plaintiff's Motion and Defendant Timothy Lynch Barton's ("Mr. Barton" or "Defendant")

Response ("Defendant's Response"), and the other evidence and argument presented to the Court, finds that:

1. This Court has jurisdiction to resolve this immediate matter involving whether a preliminary injunction of certain assets is appropriate. But a plaintiff's pretrial motion for an equitable remedy is not the proper means for the Court to consider or determine substantive questions, such as whether the Commission has jurisdiction or is the proper party to bring the underlying claims, which, particularly since the parties' motions in the immediate matter make clear there is significant dispute, should be addressed through separate, dedicated motions.

2. The Defendant has raised significant question as to the likelihood of the Commission's success on the merits of its claims that Mr. Barton, Wall007, LLC, Wall009, LLC, Wall010, LLC, Wall011, LLC, Wall012, LLC, Wall016, LLC, Wall017, LLC, Wall018, LLC, Wall019, LLC, and Carnegie Development, LLC violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)] and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

3. The Court finds that the Plaintiff has not met its burden with regards to satisfying the factors set forth in *Netsphere, Inc. v. Baron*, 703 F.3d 296, 305 (5th Cir. 2012), as the United States Court of Appeals for the Fifth Circuit clarified the Plaintiff must do prior to appointment of a receiver.

4. Specifically, the Court finds that necessary tracing analyses were not provided for the entities that the Commission claims should be put into receivership, and that the tracing

analyses the Commission did provide for some of those entities were inadequate, as, among other reasons, they did not comply with any identified standards and were incomplete.

5. The Commission failed to meet its burden of demonstrating a serious risk of flight with respect to the assets held by the entities subject to this Order, particularly given their stationary and illiquid nature.

6. The Commission failed to meet its burden of demonstrating a serious risk of alteration or destruction of documents relevant to this action, and thus a preservation order is neither necessary nor appropriate under these circumstances.  Mr. Barton is already subject to federal laws that would prevent such alteration or destruction.

7. The Commission failed to meet its burden of demonstrating a sworn accounting would be fair or feasible under the current circumstances.  Further, the Court believes that such an order would violate the Court's November 16, 2022, Order Granting Motion to Intervene and Stay Proceedings.  [Dkt. 64].  The vast majority, if not all, of the financial records belonging to Mr. Barton and relating to this matter appear to already have been seized by the Commission or the previously-appointed receiver.  As such, it is not at all clear that Mr. Barton could provide such a sworn accounting in a manner that would be helpful to the Court or in a manner that would not unfairly put Mr. Barton in a position where he would be forced to provide incomplete information to the Court.  Further, given the ongoing, parallel criminal prosecution of Mr. Barton, this would be inappropriate.

8. The Court finds that the Commission has not met its burden with regards to ordering a preliminary injunction over the remaining Barton entities, as it has made no showing that

these entities are in anyway related to the underlying claims. Therefore, a preliminary injunction over them is neither necessary nor appropriate.

**IT IS THEREFORE ORDERED** that the stay is lifted for the limited purpose of adjudicating Plaintiff's Motion, and Plaintiff's Motion is, hereby, **DENIED WITH PREJUDICE**.

### Retention of Jurisdiction

This Court shall retain jurisdiction over this action for the purpose of implementing and carrying out the terms of all orders and decrees which may be entered herein and to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

**IT IS SO ORDERED, this _____ day of _____, _____**

_____
**HONORABLE BRANTLEY STARR**
**UNITED STATES DISTRICT JUDGE**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF TEXAS
# DALLAS DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § § § § § | |
| *Plaintiff,* | § § | |
| v. | § § | No. 3:22-CV-2118-X |
| TIMOTHY LYNCH BARTON CARNEGIE DEVELOPMENT, LLC WALL007, LLC WALL009, LLC WALL010, LLC WALL011, LLC WALL012, LLC WALL016, LLC WALL017, LLC WALL019, LLC HAOQIANG FU (a/k/a MICHAEL FU) STEPHEN T. WALL | § § § § § § § § § § § § § § | |
| *Defendants,* | § § § | |
| DJD LAND PARTNERS, LLC LDG001, LLC | § § § | |
| *Relief Defendants.* | § § | |

## TEMPORARY INJUNCTION AGAINST TRANSFER OR SALE OF CORPORATE ASSETS

This matter came before the Court upon Plaintiff Securities and Exchange Commission's

("Commission" or "Plaintiff") Motion for Appointment of a Receiver, for a Preliminary Injunction

and Ancillary Relief, and to Lift Stay for Limited Purpose ("Plaintiff's Motion").

The Court, having considered the pleadings and submissions in this case, including the

Plaintiff's Motion and the Defendant Timothy Lynch Barton's ("Mr. Barton" or "Defendant")

72

Response ("Defendant's Response"), and the other evidence and argument presented to the Court, finds that:

1. The Court finds that a temporary injunction against the transfer or sale of assets from corporate entities holding the loan proceeds that are the subject of this case, with certain limited exceptions, is a sufficient means of protecting any assets held by those entities during the pendency of the Order. At the same time, the temporary injunction will allow the entities to operate and to progress real estate projects under the entities' administration, to the benefit of all stakeholders without drastically disrupting ownership rights prior to final judgment.

2. Such a temporary injunction would obviate any arguable need for more drastic equitable remedies, including the receivership requested by the Commission.

**IT IS THEREFORE ORDERED** that the stay is lifted for the limited purpose of adjudicating the Motion and **IT IS FURTHER ORDERED**:

The entities set forth herein and their officers, directors, managing members, and those otherwise controlling the entities that are subject to this Order are temporarily enjoined from transferring, selling, dissipating, assigning, pledging, withdrawing, alienating, encumbering, incurring debt upon, or disposing of any funds, property, or other assets of any entity that is subject to this Order, without permission of the Commission or of this Court.

The Commission shall propose to the Court, within 30-days of this order, a third-party monitor, qualified in real estate development matters, which may replace the role of the Commission as the front-line entity for approving any transfers or dispositions.

Legal disposition and use of the assets held by the entities subject to this Order is permitted only for the following purposes:

1. Payment of the Mr. Barton's legal defense in this matter or the parallel federal criminal action, including payment of attorneys, expert fees, and other similar expenditures.

2. The payment of certain operating expenses of the entity itself not to exceed $5000 per month.

The Court shall be informed, in writing, of any such authorized dispositions at least fourteen (14) days prior to such dispositions taking effect.

The entities subject to this Order are as follows:

1. WALL007, LLC
2. WALL009, LLC
3. WALL010, LLC
4. WALL011, LLC
5. WALL012, LLC
6. WALL016, LLC
7. WALL017, LLC
8. WALL018, LLC
9. WALL019, LLC
10. Carnegie Development, LLC
11. Orchard Farms Village, LLC
12. BM318, LLC
13. Northstar PM, LLC (Texas)
14. Lynco Ventures, LLC
15. DJD Land Partners, LLC
16. LDG001, LLC
17. Seagoville Farms, LLC
18. Ridgeview Addition, LLC (Texas)

The entities' owners and the Commission shall meet and confer on what third-party claims in litigation should be stayed to protect the entities' assets and to propose a detailed order to the Court that does so, within 10 days of this order.

**IT IS SO ORDERED**, this \_\_\_\_\_ day of _____, _____

 

_____

**HONORABLE BRANTLEY STARR**
**UNITED STATES DISTRICT JUDGE**

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

SECURITIES AND EXCHANGE COMMISSION,

                    Plaintiff,

v.

TIMOTHY BARTON,
CARNEGIE DEVELOPMENT, LLC,
WALL007, LLC,
WALL009, LLC,
WALL010, LLC,
WALL011, LLC,
WALL012, LLC,
WALL016, LLC,
WALL017, LLC,
WALL018, LLC,
WALL019, LLC,
HAOQIANG FU (A/K/A MICHAEL FU),
STEPHEN T. WALL,

                    Defendants,

DJD LAND PARTNERS, LLC, and
LDG001, LLC,

                    Relief Defendants.

C.A. No.: 3:22-cv-2118-X

Jury Trial Demanded

**ORDER APPOINTING RECEIVER[3]**

    **WHEREAS** this matter has come before this Court upon Plaintiff Securities and Exchange

Commission's ("SEC") Motion for Appointment of a Receiver, for a Preliminary Injunction and

---

[3] As outlined in detail in Defendant Barton's Motion Opposing the Commission's Motion for Appointment of a Receiver, for a Preliminary Injunction and Ancillary Relief, and to Lift Stay for Limited Purpose, the Commission has not met its burden to demonstrate that appointment of a receiver over any of the entities for which it seeks to do so is necessary or appropriate. But, should the court determine a receivership is warranted, Barton respectfully urges the Court to remove from the Commission's proposed order several unjustified provisions.

Ancillary Relief, and to Lift Stay for Limited Purpose.

**WHEREAS** the Court finds that, based on the record in these proceedings, the appointment of a receiver in this action is necessary and appropriate for the purposes of marshaling and preserving all assets of the Receivership Entities (defined below).

**WHEREAS** the Court finds that: (a) there is a clear necessity for the receivership to protect defrauded investors' interest in property; (b) legal and less drastic equitable remedies are inadequate; and (c) the benefits of a receivership outweigh the burdens on the affected parties.

**WHEREAS** the Court finds that: (a) a receiver is necessary to oversee the Receivership Entities' properties; (b) some showing has been made that the Receivership Entities' received and potentially hold some subject lender funds related to the SEC's underlying claims; (c) certain Receivership Entities and their assets are subject to liens, lawsuits, and foreclosures that threaten to further diminish their value without the protection of a receiver that would have the power to stay litigation and foreclosures, among other powers;[4] (d) an appropriately appointed receiver would protect the value of the Receivership Entities' assets; and (f) these benefits, of a receiver that solely oversees the Receivership Entities, with limited ability to dispose of such entities and assets, would outweigh the burden on Barton.

**WHEREAS** the Court finds that Barton directly or indirectly controls or controlled each of the Receivership Entities and that each of the Receivership Entities received or benefitted from assets traceable to Barton's alleged fraudulent activities that are the subject of this litigation.

**WHEREAS** the Court has  personal jurisdiction over the Receivership Entities and venue

---

[4] The Fifth Circuit made clear in its Vacatur Order that satisfaction of potential disgorgement or other damages are not appropriate considerations for appointment of a receiver. Receiverships are drastic remedies intended to marshal subject assets, not other unrelated assets that may or may not be sufficient or accessible for purpose of satisfying potential judgments.

properly lies in this district.[5]

**WHEREAS** the Court finds that the relief sought by the SEC and provided in this Order is in the public interest by preserving the illicit proceeds of fraudulent conduct and is not in furtherance of a pecuniary purpose, and, therefore, the Court concludes that the entry of this Order is excepted from the automatic stay pursuant to 11 U.S.C. § 362(b)(4).

**NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

1.      The Court hereby takes exclusive jurisdiction and possession of the assets, of whatever kind and wherever situated, of the following entities that Barton directly or indirectly controls and that each received or benefitted from assets traceable to the Commission's underlying claims in this litigation (collectively, "Receivership Entities"):[6]

| | |
|---|---|
| 1. | WALL007, LLC |
| 2. | WALL009, LLC |
| 3. | WALL010, LLC |
| 4. | WALL011, LLC |
| 5. | WALL012, LLC |
| 6. | WALL016, LLC |
| 7. | WALL017, LLC |
| 8. | WALL018, LLC |
| 9. | WALL019, LLC |
| 10. | Carnegie Development, LLC |
| 11. | Orchard Farms Village, LLC |
| 12. | BM318, LLC |
| 13. | Northstar PM, LLC (Texas) |
| 14. | Lynco Ventures, LLC |
| 15. | DJD Land Partners, LLC |

---

[5] The Plaintiff has not established subject matter jurisdiction. The Court's consideration of subject matter jurisdiction is best reserved for future, individual motions. Further, determinations of subject matter jurisdiction would likely conflict with the Court's November 16, 2022 Order Granting Motion to Intervene and Stay Proceedings [Dkt. 64], as securities fraud is also alleged in that parallel criminal matter.

[6] The Commission has made no case for tracing assets into the 82 entities over which it seeks a receivership.

    16.     LDG001, LLC
    17.     Seagoville Farms, LLC
    18.     Ridgeview Addition, LLC (Texas)

2.     Until further Order of this Court, _____ is hereby appointed to serve without bond as receiver (the "Receiver") for the estates of the Receivership Entities.

### I. General Powers and Duties of Receiver

3.     The Receiver shall have all powers, authorities, rights, and privileges heretofore possessed by the officers, directors, managers and general and limited partners of the entity Receivership Entities under applicable state and federal law, by the governing charters, by-laws, articles and/or agreements in addition to all powers and authority of a receiver at equity, and all powers conferred upon a receiver by the provisions of 28 U.S.C. §§ 754, 959 and 1692, and FED. R. CIV. P. 66.

4.     The Receiver does not have general investigatory powers, beyond what is absolutely necessary to determine the nature and location of assets held by the Receivership Entities for purposes of passive management and maintenance. Specifically, the Receiver does not have powers to investigate financial transactions or other activities by Barton or the Receivership Entities for purposes of supporting or refuting legal claims or charges against Barton by the SEC or other government litigants. The Receiver shall not, without notifying Barton's counsel and receiving approval of the Court, request or demand information from Barton.[7]

5.     The trustees, directors, officers, managers, employees, investment advisers, accountants, attorneys, and other agents of the Receivership Entities are hereby dismissed and the

---

[7] This receivership limited in scope solely to overseeing and passively maintaining the Receivership Entities and assets therein. A receiver is not supposed to act as an investigatory arm of the government in a manner that aides in its investigation at the expense of Barton.

powers of any general partners, directors, and/or managers are hereby suspended. Such persons and entities shall have no authority with respect to the Receivership Entities' operations or assets, except to the extent as may hereafter be expressly granted by the Receiver. The Receiver shall assume and control the operations of the Receivership Entities and shall pursue and preserve all of their claims.

6. No person holding or claiming any position of any sort with any of the Receivership Entities shall possess any authority to act by or on behalf of any of the Receivership Entities.

7. Subject to the specific provisions in Sections II through X below, the Receiver shall have the following general powers and duties:

> A. To take custody, control, and possession of all Receivership Property and records relevant thereto from the Receivership Entities; to sue for and collect, recover, receive, and take into possession from third parties all Receivership Property and records relevant thereto;
>
> C. To manage, control, operate, and maintain the Receivership Estates and hold in his possession, custody, and control all Receivership Property, pending further Order of this Court;
>
> D. To use Receivership Property for the benefit of the Receivership Estates, making payments and disbursements and incurring expenses as may be necessary or advisable in the ordinary course of business in discharging his duties as Receiver;
>
> E. To take any action which, prior to the entry of this Order, could have been taken by the officers, directors, partners, managers, trustees, and agents of the Receivership Entities;
>
> F. As is reasonable and necessary, to engage and employ persons in his discretion to assist him in carrying out his duties and responsibilities hereunder, including, but not limited to, accountants, attorneys, securities traders, registered representatives, financial or business advisers, liquidating agents, real estate agents, forensic experts, brokers, traders, or auctioneers;
>
> G. To take such action as necessary and appropriate for the preservation of Receivership Property or to prevent the dissipation or concealment of Receivership Property;

I.    To bring such legal actions based in law or equity in any state, federal, or foreign court as is necessary to conduct the operations of the Receivership entities;

J.    To pursue, resist, and defend all suits, actions, claims, and demands which may now be pending or which may be brought by or asserted against the Receivership Estates; and

K.    To take such other action as may be approved by this Court.

## II.  Access to Information

8.    Within thirty (30) days of the entry of this Order, the Receivership Entities shall provide to the Receiver and the SEC copies of the Receivership Entities' federal income tax returns for the years 2017 through 2021 with all relevant and necessary underlying documentation.[8]

9.    The Receiver is authorized to take immediate possession of all personal property of the Receivership Entities, wherever located, including but not limited to electronically stored information, computers, laptops, hard drives, external storage drives, and any other such memory, media or electronic storage devices, books, papers, data processing records, evidence of indebtedness, bank records and accounts, savings records and accounts, brokerage records and accounts, certificates of deposit, stocks, bonds, debentures, and other securities and investments, contracts, mortgages, furniture, office supplies, and equipment.

## III.  Notice to Third Parties

10.    The Receiver shall promptly give notice of his appointment to all known officers, directors, agents, employees, shareholders, creditors, debtors, managers, and general and limited partners of the Receivership Entities, as the Receiver deems necessary or advisable to effectuate the operation of the receivership.

---

[8] *See* n. 5.

11.    All persons and entities owing any obligation, debt, or distribution with respect to an ownership interest to any Receivership Defendant shall, until further ordered by this Court, pay all such obligations in accordance with the terms thereof to the Receiver and its receipt for such payments shall have the same force and effect as if the Receivership Defendant had received such payment.

12.    In furtherance of his responsibilities in this matter, the Receiver is authorized to communicate with, and/or serve this Order upon, any person, entity, or government office that he deems appropriate to inform them of the status of this matter and/or the financial condition of the Receivership Estates.   All government offices which maintain public files of security interests in real and personal property shall, consistent with such office's applicable procedures, record this Order upon the request of the Receiver or the SEC.

13.    The Receiver is authorized to instruct the United States Postmaster to hold and/or reroute mail which is related, directly or indirectly, to the business, operations, or activities of any of the Receivership Entities (the "Receiver's Mail"), including all mail addressed to, or for the benefit of, the Receivership Entities.

14.    The Postmaster shall not comply with, and shall immediately report to the Receiver, any change of address or other instruction given by anyone other than the Receiver concerning the Receiver's Mail.  The Receivership Entities shall not open any of the Receiver's Mail and shall immediately turn over such mail, regardless of when received, to the Receiver.  All personal mail of any individual Receivership Entities, and/or any mail appearing to contain privileged information, and/or any mail not falling within the mandate of the Receiver, shall be released to the named addressee by the Receiver.  The foregoing instructions shall apply to any proprietor, whether individual or entity, of any private mailbox, depository, business or service, or mail

82

courier or delivery service, hired, rented, or used by the Receivership Entities.  The Receivership

Entities shall not open a new mailbox or take any steps or make any arrangements to receive mail

in contravention of this Order, whether through the U.S. mail, a private mail depository, or courier

service.

15.    Subject to payment for services provided, any entity furnishing water, electric,

telephone, sewage, garbage, or trash removal services to the Receivership Entities shall maintain

such service and transfer any such accounts to the Receiver unless instructed to the contrary by the

Receiver.[9]

## IV.  Stay of Litigation

16.    As set forth in detail below, the following proceedings, excluding the instant

proceeding and all police or regulatory actions and actions of the SEC related to the above-

captioned enforcement action, are stayed until further Order of this Court:

> All civil legal proceedings of any nature, including, but not limited to, bankruptcy proceedings, arbitration proceedings, foreclosure actions, default proceedings, or other actions of any nature involving: (a) the Receiver, in his capacity as Receiver; (b) any Receivership Property, wherever located; (c) any of the Receivership Entities, including subsidiaries and partnerships; or (d) any of the Receivership Entities' past or present officers, directors, managers, agents, or general or limited partners sued for, or in connection with, any action taken by them while acting in such capacity of any nature, whether as plaintiff, defendant, third-party plaintiff, third-party defendant, or otherwise (such proceedings are hereinafter referred to as "Ancillary Proceedings").

17.    The parties to any and all Ancillary Proceedings are enjoined from commencing or

---

[9] To the extent a new receiver feels that its work, whatever the ultimate scope of that might be, is being interfered with as a result of third party interference, the receiver has the ability to seek relief from the Court in the form of a preliminary injunction or otherwise. As the parties now know from operation of the vacated receivership,  a blanket "no interference" order is very likely to be used as a bludgeon against the Defendant, preventing him from interacting with the receivership entities in any way.  There are sufficient remedies already available to a receiver that obviate the need for this additional and potentially punitive requirement.  Further, given the narrowly-tailored nature of the receivership proposed herein, the need for this section – to the degree there was any in the first instance – is no longer obvious.

continuing any such legal proceeding, or from taking any action, in connection with any such proceeding, including, but not limited to, the issuance or employment of process. All Ancillary Proceedings are stayed in their entirety, and all courts having any jurisdiction thereof are enjoined from taking or permitting any action until further Order of this Court. Further, as to a cause of action accrued or accruing in favor of one or more of the Receivership Entities against a third person or party, any applicable statute of limitations is tolled during the period in which this injunction against commencement of legal proceedings is in effect as to that cause of action.

## V. **Managing Assets**

18.    For each of the Receivership Estates, the Receiver shall establish one or more custodial accounts at a federally insured bank to receive and hold all cash equivalent Receivership Property (the "Receivership Funds").

19.    The Receiver's deposit account shall be entitled "Receiver's Account, Estate of Barton Companies" together with the name of the action.[10]

## VI. **Investigate and Prosecute Claims**

20.    The Receiver is authorized, empowered, and directed to investigate, prosecute, defend, intervene or otherwise participate in, compromise, and/or adjust actions in any state, federal, or foreign court or proceeding of any kind regarding claims a receivership entity may have against others or others may have against a receivership entity, except that (i) the Receiver may not dispose of any assets of a receivership entity through the resolution of any claim without Court approval and (ii) the Receiver may not institute a claim against Defendant Barton.

21.    The receiver has a continuing duty to ensure that there are no conflicts of interest

---

[10] Any receiver's role should be largely passive and thus, not include disposition of the Receivership Entities or assets held by such entities.

between the Receiver, his Retained Personnel (as that term is defined below), and the Receivership Estate.

## VII.  **Bankruptcy Filing**

22.    Effective immediately, the Receiver, as sole and exclusive officer, director, and managing member of Wall007, LLC, Wall009, LLC, Wall010, LLC, Wall011, LLC, Wall012, LLC, Wall016, LLC, Wall017, LLC, Wall018, LLC, and Wall019, LLC (collectively, "Wall Entities"), shall possess sole and exclusive authority and control over the Wall Entities, as debtors-in-possession, in their respective Chapter 11 cases titled *In re WALL007 LLC, et al.,* No. 22-41049 (Bankr. E.D. Tex.) (the "Bankruptcy Cases") pending in the U.S. Bankruptcy Court for the Eastern District of Texas (the "Bankruptcy Court").  The employment of any and all other officers, directors, managers, or other employees of the Wall Entities is and are hereby terminated by the Court.  All such persons shall comply with the applicable provisions of this Order.

23.    The Receiver shall file the appropriate pleadings with the Court and the Bankruptcy Court effectuating this Order.

24.    The Receiver may seek authorization of this Court to file voluntary petitions for relief under Title 11 of the United States Code (the "Bankruptcy Code") for other Receivership Entities.  If a Receivership Defendant is (or has been) placed into bankruptcy, the Receiver may become, and may be empowered to operate each of the Receivership Estates as, a debtor-in-possession.  In such a situation, the Receiver shall have all of the powers and duties as provided a debtor-in-possession under the Bankruptcy Code to the exclusion of any other person or entity.  Pursuant to Paragraph 3 above, the Receiver is vested with management authority for all Receivership Entities and may therefore file and manage a Chapter 11 petition.

25.    All persons and entities, other than the Receiver, are barred from commencing any bankruptcy proceedings against any of the Receivership Entities.

## VIII.  Liability of Receiver

26.     Until further Order of this Court, the Receiver shall not be required to post bond or give an undertaking of any type in connection with his fiduciary obligations in this matter.

27.     The Receiver and his agents, acting within the scope of such agency ("Retained Personnel"), are entitled to rely on all outstanding rules of law and Orders of this Court and shall not be liable to anyone for their own good faith compliance with any order, rule, law, judgment, or decree.  In no event shall the Receiver or Retained Personnel be liable to anyone for their good faith compliance with their duties and responsibilities as Receiver or Retained Personnel.

28.     This Court shall retain jurisdiction over any action filed against the Receiver or Retained Personnel based upon acts or omissions committed in their representative capacities.

29.     In the event that the Receiver decides to resign, the Receiver shall first give written notice to the SEC's counsel of record and the Court of its intention, and the resignation shall not be effective until the Court appoints a successor.  The Receiver shall then follow such instructions as the Court may provide.[11]

## IX.  Recommendations and Reports

30.     Within thirty (30) days after the end of each calendar quarter, the Receiver shall file and serve a full report and accounting of each Receivership Estate (the "Quarterly Status Report"), reflecting (to the best of the Receiver's knowledge as of the period covered by the report) the existence, value, and location of all Receivership Property, and of the extent of liabilities, both those claimed to exist by others and those the Receiver believes to be legal obligations of the Receivership Estates.

31.     The Quarterly Status Report shall contain the following:

---

[11] *See* n. 7.

A.    A summary of the operations of the Receiver;

B.    The amount of cash on hand, the amount and nature of accrued administrative expenses, and the amount of unencumbered funds in the estate;

C.    A schedule of all the Receiver's receipts and disbursements (attached as Exhibit A to the Quarterly Status Report), with one column for the quarterly period covered and a second column for the entire duration of the receivership;

D.    A description of all known Receivership Property, including approximate or actual valuations;

E.    A description of liquidated and unliquidated claims held by the Receivership Estate, including the need for forensic and/or investigatory resources; approximate valuations of claims; and anticipated or proposed methods of enforcing such claims (including likelihood of success in: (i) reducing the claims to judgment; and (ii) collecting such judgments);

F.    A list of all known creditors with their addresses and the amounts of their claims;

G.    The status of Creditor Claims Proceedings, after such proceedings have been commenced; and,

H.    The Receiver's recommendations for a continuation or discontinuation of the receivership and the reasons for the recommendations.

32.    On the request of the SEC, the Receiver shall provide the SEC with any documentation that the SEC deems necessary to meet its reporting requirements, that is mandated by statute or Congress, provided that the same information is produced to the Defendant at the same time it is provided to the SEC.

### X.  Fees, Expenses, and Accountings

33.    Subject to the paragraphs below, the Receiver must obtain Court approval prior to the disbursement of Receivership Funds in excess of $10,000 per month for expenses in the ordinary course of operating the receivership entities in question.  Prior Court approval is not required for payments of applicable federal, state, or local taxes.

34.     Subject to the paragraph immediately below, the Receiver is authorized to solicit persons and entities ("Retained Personnel") to assist him in carrying out the duties and responsibilities described in this Order.  The Receiver shall not engage any Retained Personnel without first obtaining an Order of the Court authorizing such engagement.

35.     The Receiver and Retained Personnel are entitled to reasonable compensation and expense reimbursement from the Receivership Estates as described in the "Billing Instructions for Receivers in Civil Actions Commenced by the U.S. Securities and Exchange Commission" (the "Billing Instructions").  Such compensation shall require the prior approval of the Court.

36.     Within forty-five (45) days after the end of each calendar quarter, the Receiver and Retained Personnel shall apply to the Court for compensation and expense reimbursement from the Receivership Estates (the "Quarterly Fee Applications").  At least thirty (30) days prior to filing each Quarterly Fee Application with the Court, the Receiver will serve upon counsel for the SEC a complete copy of the proposed Application, together with all exhibits and relevant billing information in a format to be provided by SEC staff.

37.     All Quarterly Fee Applications will be interim and will be subject to cost benefit and final reviews at the close of the receivership.  At the close of the receivership, the Receiver will file a final fee application, describing in detail the costs and benefits associated with all litigation and other actions pursued by the Receiver during the course of the receivership.

38.     Quarterly Fee Applications may be subject to a holdback in the amount of 20% of the amount of fees and expenses for each application filed with the Court.  The total amounts held back during the course of the receivership will be paid out at the discretion of the Court as part of the final fee application submitted at the close of the receivership.

39.     Each Quarterly Fee Application shall:

A.    Comply with the terms of the Billing Instructions agreed to by the Receiver; and,

B.    Contain representations (in addition to the Certification required by the Billing Instructions) that: (i) the fees and expenses included therein were incurred in the best interests of the Receivership Estate; and (ii) with the exception of the Billing Instructions, the Receiver has not entered into any agreement, written or oral, express or implied, with any person or entity concerning the amount of compensation paid or to be paid from the Receivership Estate, or any sharing thereof.

40.    At the close of the Receivership, the Receiver shall submit a Final Accounting, in a format to be provided by SEC staff, as well as the Receiver's final application for compensation and expense reimbursement.

**IT IS SO ORDERED, this _____ day of _____, _____**

_____
**HONORABLE BRANTLEY STARR**
**UNITED STATES DISTRICT JUDGE**