UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § § § | |
| *Plaintiff*, | § § | |
| v. | § § | |
| TIMOTHY BARTON, CARNEGIE DEVELOPMENT, LLC, WALL007, LLC, WALL009, LLC, WALL010, LLC, WALL011, LLC, WALL012, LLC, WALL016, LLC, WALL017, LLC, WALL018, LLC, WALL019, LLC, HAOQIANG FU (a/k/a MICHAEL FU), STEPHEN T. WALL, | § § § § § § § § § § § § § § | Civil Action No. 3:22-cv-2118-X |
| *Defendants*, | § § § | |
| DJD LAND PARTNERS, LLC, and LDG001, LLC, | § § § | |
| *Relief Defendants*. | § | |

## MEMORANDUM OPINION AND ORDER

The Securities and Exchange Commission ("SEC") accused Timothy Barton of committing securities fraud and sought a receivership. (Doc. 309). One year ago, the Court imposed one but used a standard for the receivership the Fifth Circuit later held to be incorrect (the *First Financial* standard). The Fifth Circuit held the correct standard to be the *Netsphere* standard. The Court now engages in the analysis it

1

should have done the first time, determines a receivership should exist, and determines its scope under the Fifth Circuit standard as set forth below. Accordingly, the Court **GRANTS IN PART** the SEC's motion.[1]

## I.   Background

The SEC alleges in its complaint that Timothy Barton, a Texas-based real-estate developer, defrauded over 100 Chinese investors of over $26 million through supposed real-estate investments in Texas.[2]   Barton worked with a Texas home builder, Stephen T. Wall, and a Chinese businessman, Haoqiang Fu, to offer investment loans to Chinese investors, through a series of "Wall Entities."[3]   The loan agreements promised to "purchase specific parcels of lands at specific prices" with the Wall Investor Funds.[4]   Instead, the land purchase prices were inflated, so Barton, Wall, and Fu could raise more money.[5]   And with those funds and the Wall Entities, which Barton controlled, Barton "misappropriated nearly all the investor funds, misusing them to, among other things, purchase properties in the name of other

---

[1] The SEC seeks to include 82 entities in a new receivership.  Of the 82, the Court finds that the following 28 entities are excluded from this Receivership Order for insufficient evidence of having received or benefited from Wall Investor Funds: 2999TC Acquisitions MZ, LLC fka MO 2999TC MZ, LLC; Broadview Holdings Trust; D4AVEG, LLC; D4OPM, LLC; Dallas Real Estate Investors, LLC; Dallas Real Estate Lenders, LLC (Delaware); Five Star MM, LLC (Delaware); Five Star MM, LLC (Texas); Five Star TC, LLC (Delaware); JMJ Residential, LLC; JMJD4, LLC (non-Delaware); MF Container, LLC (Delaware); Middlebury Trust; MXBA, LLC; One MF Residential, LLC; One MFD4, LLC; One Pass Investments, LLC (Delaware); One RL Trust; One SF Residential, LLC; The MXBA Trust; The Timothy L. Barton Irrevocable Life Insurance; TLB 2012 IRR Trust; TLB 2018 Trust; TLB 2019 Trust; TLB 2020 Trust; TRTX Properties, LLC; TRWF LODGE, LLC; and TRWF, LLC.

[2] Doc. 1 at 2.

[3] *Id.*

[4] *Id.*

[5] *Id.*

entities he controlled, pay undisclosed fees and commissions to Fu, pay expenses associated with unrelated real estate development projects, and fund his lifestyle."[6]

On September 23, 2022, the SEC sued Barton, Wall, Fu, the Wall Entities, Carnegie Development, LLC, and the Relief Defendants for violating securities law.[7] The SEC sought a permanent injunction, disgorgement order, and civil penalties.[8] Days later, the SEC moved to appoint a receiver.[9]   The SEC argued that a receivership was warranted, relying on the standard in *SEC v. First Financial Group of Texas* that allows for the appointment of a receiver on a prima facie showing of fraud and mismanagement.[10]

On October 18, 2022, the Court granted the SEC's motion and appointed Cortney C. Thomas as Receiver over twenty-nine entities and "any other entities that Defendant Timothy Barton directly or indirectly controls."[11]   The initial Order Appointing Receiver took "exclusive jurisdiction and possession" of all Barton-controlled entities.[12]   The Receiver then moved to supplement the Order Appointing

---

[6] *Id.* at 2–3.

[7] Doc. 1.

[8] *Id.* at 27–28.

[9] Doc. 6.

[10] *Id.* at 18 (discussing *First Fin.*, 645 F.2d 429, 438 (5th Cir. 1981)).

[11] Doc. 29 ¶ 1.  In that Order, the Court including the following entities in the receivership: Wall007, LLC; Wall009, LLC; Wall010, LLC; Wall011, LLC; Wall012, LLC; Wall016, LLC, Wall017, LLC; Wall018, LLC; Wall019, LLC; Carnegie Development, LLC; DJD Land Partners, LLC; LDG001, LLC, BM318 LLC; D4DS, LLC; D4FR, LLC; D4KL, LLC; Enoch Investments, LLC; FHC Acquisition, LLC; Goldmark Hospitality, LLC; JMJ Acquisitions, LLC; JMJ Development, LLC; JMJAV, LLC; JMR100, LLC; LaJolla Construction Management, LLC; Mansions Apartment Homes at Marine Creek, LLC; MO 2999TC, LLC; Orchard Farms Village, LLC; Villita Towers, LLC; and 126 Villita, LLC.

[12] *Id.*

Receiver to expressly identify over 130 newly discovered Barton-controlled entities.[13]

On November 16, 2022, the Court entered its first Supplemental Order Appointing

Receiver designating an additional 126 Receivership Entities, *nunc pro tunc*.[14]  The

Court noted that it needed more briefing to determine whether certain entities (the

"Max Barton Entities") should be identified in the Receivership as entities that

---

[13] Doc. 41.

[14] Doc. 62 at 3–6. In that Order, the Court identified the following entities in the receivership: AVEG WW, LLC (Delaware); AVG West, LLC fka JMJ Acquisitions, LLC (Texas); Barton Texas Water District, LLC; Barton Water District, LLC (Delaware); BC Acquisitions, LLC (Delaware); BEE2019, LLC; Broadview Holdings, LLC (Texas); Broadview Holdings Trust; BSJ Trading, LLC; BUILD VIOLET, LLC; Carnegie Development, Inc.; D4AT, LLC; D4AVEG, LLC; D4BM, LLC; D4BR, LLC (Texas); D4IN, LLC (Texas); D4MC, LLC (Texas); D4OP, LLC; D4OPM, LLC (Texas); D4SMC, LLC; D4WP, LLC; Dallas Real Estate Investors, LLC; Dallas Real Estate Lenders, LLC (Delaware); Dallas Real Estate Management, LLC; Five Star GM, LLC (Delaware); Five Star MM, LLC (Delaware); FIVE STAR MM, LLC (Texas); Five Star TC, LLC (Delaware); Glenwood (18340) Property, LLC (Delaware); HR Sterling, LLC; Illuminate Dallas, LLC (Texas); JB Special Asset, LLC; JMJ Acquisitions Mgmt, LLC; JMJ Aviation, LLC (Texas); JMJ BLUES TX, LLC; JMJ Centre, LLC; JMJ Development Brasil, LTDA; JMJ Development, Inc.; JMJ Development Fund; JMJ Development Fund, Inc.; JMJ EB5 Fund, LP (Delaware); JMJ EB5 Fund GP, LLC (Delaware); JMJ Holdings, LLC; JMJ Holdings US LLC; JMJ Holdings USA, Inc.; JMJ Home Building Inc (Nevada); JMJ Hospitality, LLC; JMJ Hospitality General Trading FZE; JMJ Hospitality UAE; JMJ Investments Limited; JMJ Land Acquisition, Inc (Nevada); JMJ Land Development, Inc (Nevada); JMJ Land Venture, LLC; JMJ MF Development, LLC; JMJ Mezzanine, Inc (Nevada); JMJ Multifamily, Inc (Nevada); JMJ Offshore, LTD; JMJ Regional Center, LLC (Delaware); JMJ Residential, LLC; JMJ Valley Center, LLC; JMJ VC Management, LLC; JMJ148, LLC (Texas); JMJAV, LLC; JMJD4, LLC (Delaware); JMJD4Allensville LLC; JMJDWG, LLC (Texas); JMJKH, LLC; LC Aledo TX, LLC; Lynco Ventures, LLC; Lynn Investments, LLC; Lynco Ventures, LLC; Mansion Apartment Homes at Marine Creek, LLC; MCFW, LLC; MCRS2019, LLC (Texas); Middlebury Trust (Texas); MMCYN, LLC; MXBA Managed, LLC; MXBA Services, LLC; Myra Park 635, LLC; Northstar 114, LLC (Delaware); Northstar PM, LLC (Delaware); One Agent, LLC (Delaware); One Agent Texas, LLC (Texas); ONE FHC, LLC (Texas); One MFD4, LLC; One Pass Investments, LLC (Delaware); One RL Trust; ONE SF Residential, LLC; Residential MF Assets, LLC (Delaware); Ridgeview Addition, LLC (Texas); Riverwalk Invesco, LLC (Delaware); Riverwalk Opportunity Management, LLC (Delaware); Riverwalk OZFM, LLC (Delaware); Riverwalk OZFV, LLV (Delaware); Riverwalk QOZBJ, LLC (Delaware); Riverwalk QOZBM, LLC (Delaware); Riverwalk QOZBV, LLC (Delaware); Seagoville Farms, LLC; SF Rock Creek, LLC; SK Carnegie, LLC; STL Park, LLC (Delaware); The MXBA Trust; The Timothy L. Barton Irrevocable Life Insurance Trust; TLB 2018 Trust; TLB 2019 Trust; TLB 2020 Trust; TRWF, LLC; TRWF LODGE, LLC; VenusBK195, LLC (Texas); VenusPark201, LLC (Delaware); WRL2019, LLC (Texas); 126 Villita Towers, LLC (Delaware); 2999 Acquisitions, LLC (Delaware); 2999 Middlebury, LLC (Delaware); 2999 Roxbury, LLC (Delaware); 2999TC Acquisitions, LLC fka 2999TC, LLC; 2999TC Acquisitions MZ, LLC fka MO 2999TC MZ, LLC; 2999TC Founders, LLC (Delaware); 2999TC JMJ, LLC (Delaware); 2999TC JMJ, LLC (Texas); 2999TC JMJ CMGR, LLC (Delaware); 2999TC JMJ Equity, LLC; 2999TC LP, LLC (Delaware); 2999TC JMJ MGR, LLC (Delaware); 2999TC MM, LLC; 2999TC MZ, LLC (Delaware).

Barton controlled.[15]  The Receiver provided supplemental briefing,[16] and the Court, having carefully considered the Second Motion to Supplement the Order Appointing Receiver, identified nine entities in the Receivership, *nunc pro tunc*, including the Max Barton Entities.[17]

The Receivership was underway (and had been since October 18, 2022).  The Receiver was busy moving to sell real property to maximize assets for the defrauded investors, and Barton was busy appealing the Order Appointing Receiver and the Supplemental Orders.  The Receiver and Barton both had good cause for these acts, as explained below.

On appeal, the Fifth Circuit held that, because the SEC had not first obtained an injunction against Barton before moving for a receivership, the proper test for appointment of a receivership is the three-factor test in *Netsphere, Inc. v. Baron*, not the test in *First Financial*.[18]  *Netsphere* outlines that a receivership is justified when: (1) there is a clear necessity for the receivership to protect defrauded investors' interest in property; (2) legal and less drastic equitable remedies are inadequate, and (3) the benefits of a receivership outweigh the burdens on the affected parties.[19]  The

---

[15] *Id.* at 2.

[16] Doc. 73.

[17] Doc. 88.  With each supplemental order, the Court did not add entities to the Receivership, rather it just "recognize[d] entities the Receivership already contain[ed]" under the general rule that the Receiver included entities Barton owned or controlled.  *Id.* at 5.  In this Supplemental Order Appointing Receiver, the Court identified the following identities in the receivership: Gillespie Villas, LLC; Venus59, LLC; TRTX Properties, LLC; MXBA, LLC; Titan Investments, LLC; TC Hall, LLC; Titan 2022 Investment, LLC; Marine Creek SP, LLC; Aledo TX, LLC.

[18] *SEC v. Barton*, 79 F.4th 573, 578–79 (5th Cir. 2023) (discussing *Netsphere, Inc. v. Baron*, 703 F.3d 296, 305 (5th Cir. 2012)).

[19] *Barton*, 79 F.4th at 578–79.

Fifth Circuit then vacated this Court's prior appointment of the Receiver, effective 90 days from its mandate on August 31, 2023, and remanded it.[20]

## II.     Basis for Receivership

With the Fifth Circuit's marching orders, the Court turns to the *Netsphere* test. The Court finds that the three *Netsphere* factors are met, and a receivership is justified for the following reasons.

### A.  Clear Necessity to Protect the Defrauded Investors' Interests

When the Receiver was previously appointed, the bank accounts for the initial receivership entities held less than a combined $75,000.[21]  All but one piece of real estate subject to the receivership had "sizeable debt" and multiple properties were facing foreclosures.[22]  The Receiver explained that "[b]ut for the initial Receivership Order's stay of foreclosures on these properties and my extensive efforts to mollify secured creditors' concerns . . . foreclosures would have eliminated millions of dollars in property value otherwise available for satisfaction of Investor claims."[23]  Such is *still* the case as many of the assets and entities with traceable Wall Investor Funds "continue to be mired in liens, lawsuits, and foreclosures that threaten to further diminish the value of the assets."[24]  A receivership is necessary now, as it was a year

---

[20] *Id.* at 581.

[21] Doc. 308 ¶ 191.  The Court relies on the Receiver's declaration, not on Mr. Cecil's testimony about the declaration during the October 11, 2023 hearing for the appointment of a receivership.

[22] *Id.*

[23] *Id.*

[24] Doc. 309 at 26.

ago, to stay third-party litigation and foreclosures, allowing for the assets to retain as much value as possible.[25]

The Court is also concerned about the real risk that Barton would conceal or dissipate assets if left in control.  This is no imaginary threat.  Last fall, *after* the SEC filed its complaint on September 23, 2022, Barton spent at least $225,000 of traceable Wall Investor Funds, paying lawyers and moving funds to other entities.[26]  At other times, Barton used Wall Investor Funds to make payments on his personal credit card and spent Wall Investor Funds on "meals, car payments, educational expenses, airplane repair expenses, payments to Barton's ex-wife and children, and mortgage payments on the residence Barton lived in."[27]  But wait, there's more!  Barton even used Wall Investor Funds to purchase a plane.[28]  Barton is alleged to have committed widespread fraud and misused Wall Investor Funds.  But the Court must now look at those facts through the lens of the *Netsphere* factors.  And so the Court finds here

---

[25] Approximately thirty-five lawsuits were stayed through the prior Receivership Order's litigation stay.  Doc. 308 ¶ 216.

[26] *Id.* ¶ 200.

[27] *Id.* ¶ 202.

[28] *Id.* ¶ 204.

that a receivership is necessary to protect the defrauded investors' interests by staying litigation and foreclosures and preventing further dissipation of assets.

### B. Legal and Less Drastic Remedies are Inadequate

Barton claims that other remedies, such as a monitorship or temporary injunction freezing asset transfer, would be sufficient to preserve assets.[29] The Court disagrees.

Let's start with a monitorship. This is a bad idea. Barton claims that a monitor "must approve a class of the subject corporation's major business decisions, including asset transfers."[30] If the Court creates a monitorship, Barton is put back in charge. It would be up to Barton what a "major business decision" is and then hopefully the monitor would be looped in.[31] Such a gamble of a remedy is insufficient to protect investors' interests. The Court already found Barton in contempt for his violation of disclosure obligations under the prior Receivership Order.[32] Should Barton be placed in the primary management position (as he once was), the Court is concerned about mismanagement and misuse of Wall Investor Funds (as he once did). Worse yet, a monitor couldn't stay litigation or foreclosures or even investigate or trace assets.[33]

So, too, an asset freeze alone is inadequate. A number of the properties require active management, including an operating hotel, apartment complexes, and

---

[29] Doc. 400 at 6.

[30] *Id.*

[31] *See* Doc. 308 ¶¶ 218–220; Doc. 390 at 36.

[32] Doc. 235.

[33] *See* Doc. 308 ¶ 220; Doc. 390 at 39.

properties in development.[34]  A receiver has the power to sell properties and assets. But without a receivership, assets are abandoned, subject to liens with increasing accrued interest and property taxes.[35]  So while a temporary injunction alone would freeze the sale or transfer of any properties or assets, it wouldn't freeze the alive-and-well accruing interest rates or taxes.  Such a limited remedy would fail to preserve assets for defrauded investors.  The prior Receivership Entities have insufficient cash to pay the ongoing expenses.[36]  The Receiver pointed to examples of ongoing expenses related to the properties, such as "the cost certification of D4OP, insurance and management for Amerigold . . . property taxes. . . costs related to physical and electronic document and data storage and electronic document review and management, and fees for accountants and lawyers."[37]  Put simply, it's not enough to only enjoin Barton from transferring assets or funds or to freeze such  assets.

## C. Benefits of a Receivership Outweigh the Burdens on the Affected Parties

The benefits of a receivership are significant in a case like this.  At bottom, a receiver would be able to maximize, marshal, and preserve the assets in the receivership.[38]  A receivership would put an independent, proficient person in charge.

---

[34] Doc. 390 at 35.

[35] Every piece of real property but one in the initial receivership is encumbered by debt.  Doc. 308 ¶ 20.  Every month, an additional $165,000 in interest (at standard, non-default rates) accrues collectively on these loans, further eroding the value of the assets held in the receivership.  Doc. 359 at 83:20–25.

[36] Doc. 308 ¶ 231.

[37] *Id.*

[38] Doc. 309 at 27.

In addition, a receivership would stay third-party litigation and foreclosure, further protecting assets.

Barton makes arguments about the burdens of a receivership.[39]  The Court isn't persuaded by them.  For example, Barton claims there is a "cost" that the Receivership "does not appear equipped to advance the real estate development projects."[40]  The purpose of a receivership is to protect the interests of defrauded investors.  And the previous Receiver was doing so, netting over four million dollars in sales of properties (though the closings of those sales were stayed on numerous appeals by Barton).[41]  Barton also points to the "cost of violently wresting property rights from the companies' owners before discovery much less a trial proving wrongdoing and liability."[42]  The Court is mindful of this—which is exactly why the Court undertakes a thorough analysis below to ensure that only those entities that met the Fifth Circuit's standard for the jurisdiction of a receivership are included.[43]  The Court finds that any burden Barton claims to be imposed by a receivership is outweighed by the benefits of a receivership.

Here, there is a clear necessity to protect defrauded investors' interests, no less drastic remedy is adequate, and the benefits of the receivership outweigh the burdens to affected parties.  The Court acknowledges that a receivership "is an extraordinary

---

[39] Doc. 334 at 28–31.

[40] *Id.* at 29.

[41] Doc. 308 ¶ 21.

[42] Doc. 334 at 29.

[43] *See infra* III.

remedy that should be employed with the utmost caution," but the Court also finds that the situation with Barton is an extraordinary one.[44]

### III.   Scope of Receivership

Now that the Court has found that a new receivership is justified under the *Netsphere* factors, it needs to determine the scope of the receivership.  The Court follows the Fifth Circuit's directive to extend the receivership to only "entities that received or benefit[]ed from assets traceable to Barton's alleged fraudulent activities that are the subject of this litigation."[45]   This standard adopts language Barton proposed.[46]  The Court's job is to ascertain whether and which entities received or benefited from ill-gotten Wall Investor Funds.  As such, the Court finds that the following entities meet the Fifth Circuit's standard and categorized the entities accordingly.[47]

### A. Entities that the Parties Agree Received or Benefited from Wall Investor Funds

First, both the SEC and Barton agree that eighteen entities received Wall Investor Funds.  As Barton puts it, "[t]here is no question that several companies received the subject loan proceeds."[48]  Consistent with Barton's statement, the Court

---

[44] *Netsphere*, 703 F.3d at 305.

[45] *Barton*, 79 F.4th at 580–81.

[46] *See id.* at 580 ("Barton next argues that the district court erred by placing multiple entities he controls in the receivership without any showing that they received or benefit[]ed from ill-gotten investor funds.").

[47] These categories are not mutually exclusive, and where there is overlap between categories, the Court notes it.

[48] Doc. 400 at 11–12; *see* Doc. 335 at 21.

finds that the following entities "received or benefited from"[49] assets traceable to Barton's alleged fraudulent activities that are the subject of this litigation: WALL007, LLC;[50] WALL009, LLC; WALL010, LLC; WALL011, LLC; WALL012, LLC; WALL016, LLC; WALL017, LLC; WALL018, LLC; WALL019, LLC; Carnegie Development, LLC;[51] Orchard Farms Village, LLC;[52] BM318, LLC;[53] Northstar PM,

---

[49] *See Barton*, 79 F.4th at 580–81 (relying on language from Barton, *id.* at 580).

[50] For all ten of the collective "Wall Entities," each directly received Wall Investor Funds. Doc. 310-1 ¶¶ 3–5; Doc. 308 ¶¶ 56–57.

[51] Carnegie Development, LLC ("Carnegie Development") received and transferred Wall Investor Funds on numerous occasions. For example, in February 2019, Carnegie Development received $2.5 million from Wall017, LLC and then transferred over $2 million to multiple Barton-controlled entities. Doc. 310-1 ¶¶ 3–5; Doc. 310-2 at 1–6; Doc. 308 ¶¶ 23–24 & Ex. 1.

[52] A Wall entity (Wall007, LLC) purchased a property with Wall Investor Funds and then transferred ownership of the property to Orchard Farms Village, LLC. Doc. 310-2 at 6; Doc. 308 ¶ 146 & Ex. 17.

[53] BM318, LLC received Wall Investor Funds to purchase a property in Aledo, Texas known as the "Bear Creek Ranch." Doc. 310-2 at 1; Doc. 308 ¶ 154 & Ex. 21.

LLC (Texas);[54] Lynco Ventures, LLC;[55] DJD Land Partners, LLC;[56] LDG001, LLC;[57] Seagoville Farms, LLC;[58] Ridgeview Addition, LLC (Texas).[59]

## B. Entities Holding Properties Purchased with, or that Otherwise Benefited from Wall Investor Funds

The Courts finds that ten additional entities currently hold property purchased with, or that otherwise benefited from Wall Investor Funds, and therefore "received or benefited from"[60] assets traceable to Barton's alleged fraudulent activities that are the subject of this litigation.  These entities are: FHC Acquisition, LLC;[61] Goldmark

---

[54] NorthStar PM, LLC received Wall Investor Funds to purchase the "NorthStar Property" in Venus, Texas.  Doc. 308 ¶ 121 & Ex. 10.

[55] Lynco Ventures, LLC ("Lynco Ventures") is the record owner of property in Venus, Texas, and it received Wall Investor Funds to purchase the property from a third-party and sell it to Wall009, LLC at an inflated price.  In August 2022, Lynco Ventures acquired the property again.  Doc. 310-2 at 5; Doc. 308 ¶ 122 & Ex. 11.

[56] DJD Land Partners, LLC is the record owner of property in Venus, Texas and received Wall Investor Funds toward the purchase of the property.  Doc. 308 ¶ 121 & Ex. 10.

[57] LDG001, LLC is the record owner of a property ("the Griffin Property") in Venus, Texas.  Wall Investor Funds from Wall0016, LLC and Wall012, LLC were used to purchase the Griffin Property.  Doc. 310-2 at 4; Doc. 308 ¶ 123 & Ex. 12.

[58] Wall Investor Funds were used to purchase a property in Seagoville, Texas that Seagoville Farms, LLC once owned.  Doc. 310-2 at 6; Doc. 308 ¶ 158 & Ex. 23.

[59] Ridgeview Addition, LLC owns the "Ridgeview Property," and Wall Investor Funds have been traced both to the entity and the property.  Doc. 310-2 at 1; Doc 308 ¶ 126 & Ex. 14.

[60] *See Barton*, 79 F.4th at 580–81 (relying on language from Barton, *id.* at 580).

[61] Wall Investor Funds were used to pay down FHC Acquisition, LLC's loan on a property in Frisco, Texas.  Doc. 310-2 at 3; Doc. 308 ¶ 71 & Ex. 4.

Hospitality, LLC;[62] SF Rock Creek, LLC;[63] Gillespie Villas, LLC;[64] TC Hall, LLC;[65] Venus59, LLC;[66] and D4DS, LLC; D4FR, LLC; D4IN, LLC (Texas); D4OP, LLC (collectively, the "D4 entities" and individually, "D4DS," "D4FR," "D4IN," and "D4OP").

The Court turns to the D4 entities. The D4 entities are the record owners and HUD borrowers of four separate apartment complexes[67]—Bellwether Ridge in DeSoto Texas (owned by D4DS);[68] the Parc at Windmill Farms in Forney, Texas (owned by D4FR);[69] the Parc at Ingleside in Ingleside, Texas (owned by D4IN),[70] and the Parc

---

[62] Goldmark Hospitality, LLC is the record owner of a 70-unit extended-stay hotel in Dallas, Texas (the "Amerigold Suites"). Wall Investor Funds were used to make improvements to the hotel, fund hotel operations, and pay the manager of the hotel. In addition, Goldmark Hospitality, LLC received $200,000 of Wall Investor Funds. Doc. 310-2 at 3; Doc. 308 ¶ 103 & Ex. 9.

[63] SF Rock Creek, LLC is the record owner of a home in Dallas, Texas. Wall Investor Funds were used to fund the purchase of the home. Doc. 308 ¶ 59 & Ex. 3.

[64] Gillespie Villas, LLC owns a residential multi-family property in Dallas, Texas. The property was purchased using the proceeds from the sale of two properties—the "Marine Creek Property" and the "Winter Haven Property"—both of which were purchased using Wall Investor Funds. Doc. 308 ¶ 164 & Ex. 25.

[65] TC Hall, LLC ("TC Hall") owns property (the "Hall Property") in Dallas, Texas. Wall Investor Funds have been traced to the purchase of the Hall Property. TC Hall also received at least $1.4 million from other entities Broadview Holdings, LLC and JMJ Development, LLC (discussed elsewhere), both of which also received commingled Wall Investor Funds. Doc. 308 ¶¶ 167, 169 & Ex. 26.

[66] Venus59, LLC ("Venus59") owns land in Venus, Texas. Before the initial receivership, several entities controlled by Barton "were in the process of developing single-family communities around Venus and were negotiating a development agreement with the City of Venus." Doc. 308 ¶ 117. Venus59 benefited from "extensive engineering and other-predevelopment expenses" used to turn the properties into a single development. *Id.* ¶¶ 170, 171 & Ex. 27. Venus59 also received $23,325.62 from Broadview Holdings, LLC which received Wall Investor Funds. *Id.* ¶ 171.

[67] Doc. 390 at 19; Doc. 308 ¶ 77.

[68] D4DS is the record owner of the Bellwether Ridge apartment complex in DeSoto, Texas. Doc. 310-2 at 1; Doc. 308 ¶ 84 & Ex. 5.

[69] D4FR is the record owner of the Parc at Windmill Farms apartment complex in Forney, Texas. Doc. 310-2 at 2; Doc. 308 ¶ 91 & Ex. 6.

[70] D4IN is the record owner of the Parc at Ingleside apartment complex in Ingleside, Texas. Doc. 308 ¶ 95 & Ex. 7

at Opelika in Opelika, Alabama (owned by D4OP).[71]  Each of these apartment complexes was in large part funded by a HUD loan and a secondary mezzanine loan from Southern Properties Capital, Ltd. ("SPC").[72]

Let's start with the primary benefit the D4 entities received from Wall Investor Funds.  The D4 entities were able to secure HUD loans for the four apartment complexes by relying on assets that were purchased with or received Wall Investor Funds.[73]  For example, the four loan packets submitted to the lender listed properties that received Wall Investor Funds.[74]  As the Receiver testified during the hearing for the underlying motion, "the primary reason these developments exist is because of the HUD loans.  And the only reason those HUD loans exist is because in the loan application, it was the properties purchased with Wall investor monies [that] were used to support that."[75]

The Court finds that each D4 entity benefited from Wall Investor Funds in this manner and such a benefit is sufficient for these entities to be included in the new receivership.  But since the inclusion of the D4 entities in the receivership is in

---

[71] D4OP is the record owner of the Parc at Opelika apartment complex in Opelika, Alabama. Doc. 308 ¶ 97 & Ex. 8.

[72] Doc. 390 at 20; Doc. 308 ¶ 78.

[73] Doc. 308 ¶ 81(d).

[74] To access HUD benefits, D4DS and D4FR relied on real property assets owned by Wall009, LLC and Seagoville Farms, LLC into which the Receiver's "accountants have traced substantial Wall Investor Funds." *Id.*  So, too, did D4IN and D4OP.  The applications for D4IN and D4OP relied on other assets with traced Wall Investor Funds to justify their HUD loans.  *Id.*

[75] Doc. 359 at 77: 5–14.  The Receiver further stated that to secure the HUD loan, "by far the biggest contributor to the development of these properties," Barton filed HUD applications in which he listed "properties that were purchased with Wall Investor Funds."  *Id.* at 28: 8–9, 15–16.

dispute, not just with Barton, but also SPC, the Court will provide further examples of the D4 entities receiving or benefiting from Wall Investor Funds.

SPC argues that these four apartment complexes shouldn't be included in the receivership.[76]  It relies on two arguments: (1) Wall Investor Funds cannot be traced to the four apartment complexes;[77] and (2) the SPC loans were convertible to equity in the parent companies of the D4 entities, and that SPC exercised that right and converted its loans into equity in D4DS, D4FR, and D4IN, and therefore owns the Bellwether Ridge, Windmill Farms, and Ingleside properties.[78]  The Court will address each entity and argument in turn.

First, D4DS received commingled funds from a loan secured, at least in part, by a property purchased with Wall Investor Funds.[79]  The SEC and the Receiver traced Wall Investor Funds into D4DS through two transactions from an entity that received Wall Investor Funds, JMJ Development, LLC ("JMJ Development"): $25,000 on August 1, 2019 and $30,000 on August 12, 2019.[80]  SPC claims that those examples don't tell the whole story.  Specifically, SPC claims that the $25,000 and $30,000 payments were "made in error" and were, in fact, "in-and-out/cancelled

---

[76] *See generally* Docs. 247, 329, and 330.

[77] Doc. 330 at 8–14.

[78] *Id*. at 15–17; Doc. 247 at 33–37.

[79] Doc. 308 ¶ 84 & Ex. 5; Doc. 310-2 at 1.

[80] *Id.*  Those in-and-out transactions are reminiscent of the 2017 incident in which D4DS received a $3,000,000 payment from SPC on May 5, 2017, and then just four days later the same amount was sent back to SPC, importantly just *days* after D4DS submitted documentation for a HUD deposit verification.  *See id.* ¶ 81(d).

transaction[s]."[81]  The Court's job on remand at this posture is to determine whether entities "received or benefited from"[82] Wall Investor Funds, and that occurred here— even if the funds were later transferred out.  D4DS received the $25,000 payment on August 1, 2019 and did not transfer it out to JMJ Development until September 9, 2019; and the $30,000 payment was received on August 12, 2019 and not returned until September 11, 2019.[83]   In other words, D4DS received commingled Wall Investor Funds on at least two separate occasions for over a month.

Now to D4FR.  The SEC's tracing analysis and the Receiver's tracing analysis show that on July 17, 2019, D4FR, LLC received $106,097.70 from JMJ Development which received funds from Wall investors.[84]  SPC has a similar argument as above, that the $106,097.70 payment was made in error and ultimately returned to JMJ Development (albeit weeks later).[85]  Again, the Fifth Circuit has only instructed that the Court look to whether entities "received or benefited from" Wall Investor Funds.[86] For the same reasons as with D4DS, the Court finds that D4FR received, or at least

---

[81] Doc. 330 at 8–9.

[82] *See Barton*, 79 F.4th at 580–81 (relying on language from Barton, *id.* at 580).  The phase of the litigation can change the analysis.  At the end of the case, the Receiver would have custody of commingled funds (some attributable to Wall Investors Funds and some not).  Different methodologies like the lowest intermediate balance test might be used to apportion those funds, and those methodologies have their own rules for handling arguments like SPC's arguments on refunded transactions.  But for now, the Court's marching orders are to determine whether entities like D4DS received Wall Investor Funds, and it did.

[83] *Compare* Doc. 308 at Ex. 5, *with* Doc. 330 at 8–9.

[84] Doc. 310-2 at 2; Doc. 308 ¶ 91 & Ex. 6.

[85] Doc. 330 at 10.

[86] *See Barton*, 79 F.4th at 580–81 (relying on language from Barton, *id.* at 580).

benefited from, Wall Investor Funds to construct the Windmill Farms apartment complex.

Third, D4IN also benefited from Wall Investor Funds.[87]  Wall Investor Funds benefited D4IN by paying the salaries of employees who worked on the development of the HUD apartments, as well as paying to maintain the D4IN office.[88]

Fourth, D4OP likewise received and benefited from Wall Investor Funds to build the Parc at Opelika.[89]  The Receiver found that D4OP received Wall Investor Funds through other entities that received investor funds in two separate transactions, $210,000 from Enoch Investments, LLC ("Enoch") on December 3, 2021, and $15,000 from JMJD4, LLC (Delaware) ("JMJD4") on June 23, 2021.[90]  SPC contends that those two payments were "in-and-out/cancelled transaction[s]" but for different reasons.[91]  SPC claims that the $210,000 payment from Enoch was actually a $210,000 payment in *return* that D4OP previously made in error *to* Enoch on November 10, 2021.[92]  And, as for the $15,000 payment, SPC further argues that it was of the same "in-and-out" vein as the transactions going towards the Bellwether Ridge and Windmill Farms properties.[93]  Regardless of SPC's grounds for refuting

---

[87] Doc. 308 ¶ 95 & Ex. 7.

[88] *See* Doc. 308 ¶ 81(a),(b); Doc. 390 at 20.  Notably, this benefit of Wall Investor Funds going towards paying employees' salaries and maintaining the offices likewise applies to D4DS, D4FR, and D4OP.  *Id.*

[89] Doc. 308 ¶ 97 & Ex. 8.

[90] *Id.* at Ex. 8.

[91] Doc. 330 at 13–14.

[92] Doc. 330 at 13.

[93] *See id.*

those transactions, the Receiver traced Wall Investor Funds into D4OP and, thus, D4OP received or benefited from those funds.

Finally, SPC claims that it owns the Bellwether Ridge, Windmill Farms, and Ingleside apartment complexes.[94]  This claim, largely contested, was the subject of a pending summary judgment proceeding between the Receiver and SPC until the Court denied without prejudice all previously pending motions while it resolved the motion at hand.[95]  As such, whether SPC had the right to convert its debt into equity and whether it did so for the Bellwether Ridge, Windmill Farms, and Ingleside properties is outside the scope of this motion.  Should the parties revisit this issue in a summary judgment motion after this ruling, the Court will address it then.

### C. Entities that Purchased Properties with Wall Investor Funds that Were then Sold Before the Prior Receivership Appointment

Next, the Court finds that eleven entities purchased property, in whole or in part, with Wall Investor Funds that have since been sold, and therefore "received or benefited from"[96] assets traceable to Barton's allegedly fraudulent activities that are the subject of this litigation.  Each of these entities currently holds contractual or legal rights related to those properties and the sales proceeds, including potential fraudulent transfer claims.  These entities include three of the uncontested entities

---

[94] SPC claims that, before the D4 entities were included in the previous receivership, it exercised its right to convert its debt into equity, did so for the Bellwether Ridge, Windmill Farms, and Ingleside properties, and therefore owns those properties.  SPC also claims that it reserves the right to convert its debt into equity in the Opelika property.  *See* Doc. 330 at 20.

[95] *See* Docs. 206, 207, 254 (Receiver's motion for summary judgment regarding SPC's claimed ownership interest in certain properties and SPC's response).

[96] *See Barton*, 79 F.4th at 580–81 (relying on language from Barton, *id.* at 580).

discussed at (A) above—BM318, LLC;[97] Orchard Farms Village, LLC;[98] and Seagoville Farms, LLC[99]—and the following eight additional entities: 2999TC Acquisitions, LLC;[100] Mansion Apartment Homes at Marine Creek, LLC;[101] AVG West, LLC;[102] D4KL, LLC;[103] 126 Villita, LLC;[104] LC Aledo TX, LLC;[105] Villita Towers, LLC;[106] and JMR100, LLC.[107]

## D. Additional Entities that Received Wall Investor Funds

The Court finds that several additional entities "received or benefited from"[108] assets traceable to Barton's alleged fraudulent activities that are the subject of this

---

[97] Discussed *supra* note 53; Doc. 310-2 at 1; Doc. 308 ¶ 154 & Ex. 21 (received Wall Investor Funds to purchase a property in the name of BM318, LLC).

[98] Discussed *supra* note 52; Doc. 310-2 at 6; Doc. 308 ¶ 146 & Ex. 17 (Wall Investor Funds were used to purchase a property that was transferred to Orchard Farms Village, LLC).

[99] Discussed *supra* note 58; Doc. 310-2 at 5–6; Doc. 308 ¶ 158 & Ex. 23 (received Wall Investor Funds to purchase a property in the name of Seagoville Farms, LLC).

[100] Doc. 308 ¶ 131 & Ex. 15. (2999TC Acquisitions, LLC previously owned the 2999 Turtle Creek Boulevard office in Dallas, Texas that was purchased, at least in part, with Wall Investor Funds).

[101] Doc. 310-2 at 5; Doc. 308 ¶ 139 & Ex. 16 (Mansions Apartment Homes at Marine Creek, LLC received loan proceeds from a Wall Entity loan).

[102] Doc. 308 ¶ 148 & Ex. 18 (AVG West, LLC used to own property in Winter Haven, Florida (the "Winter Haven Property") and Wall Investor Funds have been traced to the purchase of the Winter Haven Property).

[103] Doc. 310-2 at 2; Doc. 308 ¶ 150 & Ex. 19 (Wall Investor Funds were used to purchase a property in Killeen, Texas that was transferred to D4KL, LLC).

[104] Doc. 310-2 at 6; Doc. 308 ¶ 152 & Ex. 20 (126 Villita, LLC used to own a property in San Antonio, Texas (the "Villita Property") that was purchased and developed with Wall Investor Funds).

[105] Doc. 308 ¶ 156 & Ex. 22 (Wall010, LLC assigned rights to LC Aledo TX, LLC and Wall Investor Funds were used to purchase a property in Aledo, Texas by providing earnest money payments and loans for the property).

[106] Doc. 310-2 at 6; Doc. 308 ¶ 152 & Ex. 20 (Villita Towers, LLC used to own a property in San Antonio, Texas (the "Villita Property") that was purchased and developed with Wall Investor Funds).

[107] Doc. 310-2 at 4; Doc. 308 ¶ 160 & Ex. 24 (JMR100, LLC received Wall Investor Funds, and investor funds were wired to a title company for the purchase of a property in Aledo, Texas).

[108] *See Barton*, 79 F.4th at 580–81 (relying on language from Barton, *id.* at 580).

litigation. These entities either received funds: from Wall investors or the Wall Entities' bank accounts, from other Barton Entities that received Wall Investor Funds, through proceeds of the sales of properties that were originally purchased with or benefited by Wall Investor Funds, or through receiving Wall Loan Proceeds. These entities are: 126 Villita, LLC (discussed elsewhere);[109] 2999TC JMJ CMGR, LLC (Delaware);[110] BEE2019, LLC;[111] Broadview Holdings, LLC (Texas);[112] Carnegie Development, LLC (discussed elsewhere);[113] D4MC, LLC (Texas);[114] Enoch Investments, LLC;[115] HR Sterling, LLC;[116] JMJ Acquisitions, LLC;[117] JMJ

---

[109] Discussed *supra* note 104; Doc. 310-2 at 6; Doc. 308 ¶ 152 & Ex. 20 (126 Villita, LLC used to own a property in San Antonio, Texas (the "Villita Property") that was purchased and developed with Wall Investor Funds).

[110] Doc. 310-2 at 5 (2999TC JMJ CMGR, LLC (Delaware) benefited from receiving Wall Loan Proceeds).

[111] Doc. 310-2 at 1 (BEE2019, LLC benefited from receiving Wall Loan Proceeds).

[112] Doc. 308 ¶¶ 34, 142, 169 & Ex. 25 (Broadview Holdings, LLC (Texas) benefited by receiving proceeds of the sale of property owned by Mansions Apartment Homes at Marine Creek, LLC and other properties which were purchased with Wall Investor Funds).

[113] Discussed *supra* note 51; Doc. 310-2 at 1 (Carnegie Development, LLC ("Carnegie Development") directly benefited from the use of Wall Investor Funds to purchase a property previously owned by Carnegie Development, and loan proceeds from a loan secured by a Wall Entity helped pay off a loan of Carnegie Development).

[114] Doc. 310-2 at 5 (A signed agreement between Mansions Apartment at Marine Creek, LLC and D4MC, LLC stipulates that D4MC, LLC has ownership of the Marine Creek Property which benefited from Wall Entity Loan proceeds).

[115] Doc. 310-2 at 2 (Enoch received $250,000 through other entities that received Wall Investor Funds (Carnegie Development and JMJ Development)).

[116] Doc. 310-2 at 3; Doc. 308 ¶ 81(a) (HR Sterling, LLC received funds from JMJ Development and Carnegie Development that received Wall Investor Funds or Wall Entity Loan proceeds).

[117] Doc. 310-2 at 3 (JMJ Acquisitions, LLC benefited by receiving commingled Wall Investor Funds).

Development LLC (f/k/a JMJ Development, Inc.);[118] JMJ Hospitality, LLC;[119] JMJ VC Management, LLC;[120] JMJAV, LLC;[121] JMJD4;[122] LaJolla Construction Management, LLC;[123] MO 2999TC, LLC;[124] Titan Investments, LLC (a/k/a Titan 2022 Investments LLC);[125] and WRL2019, LLC (Texas).[126]

### E. Entities that Benefited from Wall Investor Funds by Receiving a Participation Interest in a Development that Received Wall Investor Funds

The Court finds that several additional entities received and are holding participation interests in continuing development projects that received Wall Investor Funds, therefore "benefit[ing] from"[127] assets traceable to Barton's fraudulent activities that are the subject of this litigation. Wall Investor Funds have

---

[118] *See* Doc. 308 at Exs. 3, 5, 6, 9, 13, 15, 16, 18, 19, 20, 24, 27; *see also* Doc. 7-1 at 16 (JMJ Development, LLC received extensive Wall Investor Funds through other entities, often from Carnegie Development).

[119] Doc. 310-2 ¶¶ 3–5; Doc. 7-1 at 5–6 (Wall Investor Funds were traced into JMJ Hospitality LLC's account).

[120] Doc. 308 at Ex. 7 (commingled Wall Investor Funds were transferred to JMJ VC Management, LLC).

[121] Doc. 310-2 at 4; Doc. 308 ¶¶ 29, 204 & Exs. 13, 18 (JMJAV, LLC received Wall Investor Funds through other entities that received Wall Investor Funds, such as Carnegie Development and JMJ Development).

[122] Doc. 308 ¶ 38 & Exs. 7, 8 (JMJD4 both received Wall Investor Funds through other entities, as well as passed on investor funds to D4OP).

[123] Doc. 310-2 at 4; Doc 308 at Exs. 8, 14 (LaJolla Construction Management, LLC directly received proceeds from a Wall Entity loan).

[124] Doc. 310-2 at 5 (MO 2999TC, LLC benefited by receiving Wall Loan Proceeds).

[125] Doc. 308 ¶¶ 176–77 (Titan Investments, LLC received funds from Broadview Holdings that were the sale proceeds of properties acquired with or benefited from Wall Investor Funds, and Titan Investments received earnest money from Broadview Holdings).

[126] Doc. 310-2 at 6 (loan proceeds from a loan secured by property purchased in part with Wall Investor Funds were put toward the purchase of a Dallas, Texas property in the name of WRL 2019, LLC).

[127] *See Barton*, 79 F.4th at 580–81 (relying on language from Barton, *id.* at 580).

been traced to the Marine Creek, Orchard Farms, Killeen, and Villita properties. The Barton Entity that owned each property sold its ownership interests in these developments for several million dollars prior to the Court's initial Order Appointing Receiver.[128]   In connection with the sales, several entities retained some form of participation interest in each of the projects, including two of the entities discussed above—Orchard Farms Village, LLC;[129] and Enoch Investments, LLC[130]—as well as Marine Creek SP, LLC,[131] and Villita Development, LLC.[132]

## IV.   Limits of the Scope of Receivership

The SEC seeks to include other entities in the receivership on the basis that those entities received certain types of benefits from Wall Investor Funds. The Court finds these types of benefits are outside the current scope of the receivership. The first type of benefit comes from owning or being a managing member of entities that received Wall Investor Funds.[133]   The SEC claims that these entities "through the chain of ownership" benefited from Wall Investor Funds since they could control the entities that held the assets that received the Wall Investor Funds.[134]   In short, the SEC thinks the chain of ownership is like a Russian nesting doll of corporate control.

---

[128] Doc. 308 ¶¶ 140–44.

[129] Discussed *supra* notes 52, 98; Doc. 310-2 at 6; Doc. 308 ¶ 158 & Ex. 17.

[130] Discussed *supra* note 115; Doc. 310-2 at 5–6; Doc. 308 ¶ 158 & Ex. 23.

[131] Doc. 308 ¶ 34 (Marine Creek SP, LLC held a participation interest in the sale of the Marine Creek Property which was purchased, in part, with Wall Investor Funds).

[132] *Id.* ¶ 152 (Villita Property was purchased, in part, with Wall Investor Funds); ¶ 180 (Barton sold Villita Property but retained participation interest in the name of a wholly separate entity, Villita Development, LLC).

[133] Doc. 390 at 27.

[134] *Id.*

The Court finds that there is insufficient evidence in the present record to extend the receivership this far.  The Court is mindful of the *Netsphere* analysis, which includes discussion of whether a less restrictive tool will preserve assets.  Here, an asset freeze is a less restrictive tool that still preserves these particular assets in question.  Thus, the entities that are justified in the receivership solely under the owning/managing theory are not included in the Receivership.

The second type of benefit is for trusts that hold the ultimate beneficial interest in entities that hold property connected to Wall Investor Funds.[135]  The Court likewise sees no legally sufficient justification to extend the receivership this far, when an asset freeze will offer the needed protection to investors.  As such, the trusts justified solely on the ultimate-beneficial-interest theory will not be included in the receivership.[136]

## V.    Conclusion

The Court finds that a receivership is justified here because there is a clear necessity to protect defrauded investors' interests, legal and less drastic remedies are inadequate, and the benefits of the receivership outweigh the burdens to affected parties.[137]  The Court further finds the following 54 entities "received or benefited from"[138] Wall Investor Funds and, as detailed in the Court's separate Order

---

[135] Doc. 390 at 27.

[136] *Id*.

[137] *See Netsphere*, 703 F.3d at 305.

[138] *See Barton*, 79 F.4th at 580–81 (relying on language from Barton, *id.* at 580).

Appointing Receiver, appoints Cortney C. Thomas as Receiver without bond for the

estates of the following Receivership Entities:

- 126 Villita, LLC
- 2999TC Acquisitions LLC
- 2999TC JMJ CMGR, LLC (Delaware)
- AVG West, LLC
- BEE2019, LLC
- BM318, LLC
- Broadview Holdings, LLC (Texas)
- Carnegie Development, LLC
- D4DS, LLC
- D4FR LLC
- D4IN, LLC (Texas)
- D4KL, LLC
- D4MC, LLC (Texas)
- D4OP, LLC
- DJD Land Partners, LLC
- Enoch Investments, LLC
- FHC Acquisition, LLC
- Gillespie Villas, LLC
- Goldmark Hospitality, LLC
- HR Sterling, LLC
- JMJ Acquisitions, LLC
- JMJ Development LLC (f/k/a JMJ Development, Inc.)
- JMJ Hospitality, LLC
- JMJ VC Management, LLC
- JMJAV, LLC
- JMJD4, LLC (Delaware)
- JMR100, LLC
- LaJolla Construction Management, LLC
- LC Aledo TX, LLC
- LDG001, LLC
- Lynco Ventures, LLC
- Mansions Apartment Homes at Marine Creek, LLC
- Marine Creek SP, LLC
- MO 2999TC, LLC
- Northstar PM, LLC (Texas)
- Orchard Farms Village, LLC
- Ridgeview Addition, LLC (Texas)
- Seagoville Farms, LLC
- SF Rock Creek, LLC
- TC Hall, LLC

- Titan Investments, LLC a/k/a Titan 2022 Investments, LLC
- Venus59, LLC
- Villita Development, LLC
- Villita Towers, LLC
- WALL007, LLC
- WALL009, LLC
- WALL010, LLC
- WALL011, LLC
- WALL012, LLC
- WALL016, LLC
- WALL017, LLC
- WALL018, LLC
- WALL019, LLC
- WRL2019, LLC (Texas)

It is **SO ORDERED**, this 29th day of November, 2023.

_____
BRANTLEY STARR
UNITED STATES DISTRICT JUDGE