IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § § § | |
| *Plaintiff,* | § § | |
| v. | § § | No. 3:22-CV-2118-X |
| TIMOTHY LYNCH BARTON CARNEGIE DEVELOPMENT, LLC WALL007, LLC WALL009, LLC WALL010, LLC WALL011, LLC WALL012, LLC WALL016, LLC WALL017, LLC WALL019, LLC HAOQIANG FU (a/k/a MICHAEL FU) STEPHEN T. WALL | § § § § § § § § § § § § | |
| *Defendants,* | § § | |
| DJD LAND PARTNERS, LLC LDG001, LLC | § § § | |
| *Relief Defendants.* | § § | |

**DEFENDANT TIMOTHY LYNCH BARTON'S CONSOLIDATED OPPOSITION TO RECEIVER'S MOTIONS FOR AUTHORIZATION TO SELL THREE <u>RECEIVERSHIP PROPERTIES</u>**

Michael J. Edney
Virginia Bar No. 48253
DC Bar No. 492024 (*admitted to N.D. Tex.*)
medney@huntonak.com
**HUNTON ANDREWS KURTH LLP**
2200 Pennsylvania Avenue NW
Washington, DC 20037

**TABLE OF CONTENTS**

ARGUMENT ................................................................................................................ 1

I.   This Court Cannot Approve the Sale of Realty Based on Stale, Year-Old Evidence. ....... 2

II.  This Court Should Not Approve Liquidation of Estate Assets at this Stage of the Proceedings. ............................................................................................................. 5

III. The Defendant's Historical Objections to These Proposed Sales Continue to be Valid. 8

   A. The Rock Creek Property............................................................................... 9

   B. Amerigold Suites .......................................................................................... 11

   C. Frisco Gate .................................................................................................. 12

CONCLUSION & PRAYER .......................................................................................... 13

## TABLE OF AUTHORITIES

**Cases**                                                                                   **Page(s)**

*Coastal Corp. v. Tex. E. Corp.*,
   869 F.2d 817 (5th Cir. 1989) ...................................................................................6, 10

*Falcon v. Gen. Tel. Co.*,
   815 F.2d 317 (5th Cir. 1987) ..............................................................................................4

*Griggs v. Provident Consumer Discount Co.*,
   459 U.S. 56 (1982)................................................................................................................6

*Lebus v. Seafarer's Int'l Union, Etc.*,
   398 F.2d 281 (5th Cir. 1968) ..............................................................................................5

*Los Angeles Trust Deed & Mortg. Exch. v. SEC*,
   285 F.2d 162 (9th Cir. 1960) ..............................................................................................5

*McClatchy Newspapers v. Cent. Valley Typographical Union No. 46, Intern.*
   *Typographical Union*,
   686 F.2d 731 (9th Cir. 1982) ..............................................................................................6

*SEC v. Am. Bd. of Trade, Inc.*,
   830 F.2d 431 (2d Cir. 1987).................................................................................................5

*SEC v. Barton*,
   79 F.4th 573 (5th Cir. 2023) ....................................................................................1, 4, 6, 7

*SEC v. Current Fin. Servs., Inc.*,
   783 F. Supp. 1441 (D.D.C. 1992) .......................................................................................5

*SEC v. S & P Nat'l Corp.*,
   360 F.2d 741 (2d Cir. 1966).................................................................................................5

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
   No. C 07-01827 SI, 2013 WL 6055079 (N.D. Cal. Nov. 13, 2013).......................................6

*Troy State Univ. v. Dickey*,
   402 F.2d 515 (5th Cir. 1968) ..............................................................................................5

**Statutes**

28 U.S.C. § 2001..................................................................................................................3, 5

On November 29, 2023, the Court construed the Receiver's requests to ratify orders sought by the vacated receivership to sell three properties as motions to appoint appraisers, approve appraisals, and set hearings for authorizing the sale of the Rock Creek Property, the Frisco Gate Property, and the Amerigold Suites.  Dkt. No. 420.  Defendant Timothy Barton ("Defendant" or "Barton") opposes those motions, as construed by the Court, and what essentially amounts to a revival of the original motions to which the Court's order refers.  Dkt. Nos. 374, 376, and 378.

## ARGUMENT

On August 31, 2023, the United States Court of Appeals for the Fifth Circuit ("Fifth Circuit") held that the Court erred when it seized the Defendant's property and appointed a receiver over it.  It thus vacated this Court's order appointing a receiver.  *See SEC v. Barton*, 79 F.4th 573, 581–82 (5th Cir. 2023).  On remand, this Court chose to appoint a new receivership (with the very same Receiver at its helm) over, among other things, companies that own the properties at issue here.  Dkt. No. 417.  Those properties are the Defendant's home (antiseptically referred to by the Court as the "Rock Creek Property"), a valuable parcel in Frisco, Texas (the "Frisco Gate Property"), and an apartment hotel that has been owned by the Defendants' companies for decades, well before any of the allegations in this case took place (the "Amerigold Suites Property").

This Court should deny the Receiver's motion to sell these properties, on this record, pursuant to these proposed terms, at this time.  First, the record supporting these sale requests is stale and cannot now form the basis of an order approving their sale.  Whatever appraisals or assessments of the fair value exist for these transactions are nine months to one year old.  Moreover, the Receiver's justification for these sales was some sort of purported cash emergency that was preventing basic maintenance of other properties in the estate that could not be sold immediately.  But since the Receiver made that case, it has raked in cash from other transactions approved by this Court.  Experience has shown that, far from necessary to pay utilities and property

taxes, the cash raised by these sales goes directly to the Receiver's law firm to perform—on the dime of the estate—the bulk of Government's investigation of Barton. That may be in the interests of the Government, but is clearly not in the interests of the receivership estate, whose potential beneficiaries are the alleged Chinese national lenders and the Defendant.

Second, the Receiver should not be permitted to permanently change the ownership and status quo of these properties at this stage of the proceedings. The outer limits of the role of a prejudgment receiver is to conserve assets, in place, until the Government can prove its entitlement to them after discovery and trial. That has far from happened here. Moreover, there are serious questions as to whether the new receivership—and its attendant seizure of these assets—is error. At minimum, the Court should hold these assets in place, as they are, until the forthcoming appeal of that order is resolved.

Third, each of the proposed transactions suffers from the defects identified in the Defendant's historical oppositions to them. The Court should take note of those historical infirmities as they are just as acute now, if not more so, than they were one year ago.

I.      **This Court Cannot Approve the Sale of Realty Based on Stale, Year-Old Evidence.**

This Court should deny the motions to appoint appraisers, approve appraisals, and ultimately to authorize sale *on this record*. That is because the construed motions recall evidence presented and arguments made in December 2022 (Rock Creek and Frisco Gate) and March 2023 (Amerigold), in two cases nearly one year ago and in one case nearly nine months ago. And the Receiver has not supplemented its request for authorization to sell these properties with new evidence, or even evidence or competent assertions that the now-year-old evidence is still a valid assessment of current circumstances.

This is a particularly significant problem here, as Congress has required a fresh assessment of the fairness of a proposed private transaction for sale through the "appointment of three

2

disinterested appraisers" to ensure that the sale is within an appropriate range of that appraise value. 28 U.S.C. § 2001. And the market value of a property can change significantly over the course of a year.

This is not just a theoretical issue. One of the properties the Receiver is seeking to sell is an undeveloped parcel in Frisco, Texas, the so-called Frisco Gate property. Since the Receiver's motion for authorization to sell the property in a private transaction, a $3 billion "mixed experience community" of retail, office, and residential space—called "The Mix"—was announced for development directly adjacent to that property. Attachment A, *JVP greenlighted for $3B The Mix in Frisco*, The Real Deal (Sept. 20, 2023). And a Universal Studios amusement park just recently made significant new advancements nearby in Frisco. This park would be the only Universal-sponsored park between Orlando and Los Angeles and a magnet for tourists from the middle third of the United States. Attachment B, Frank Heinz and Maria Guerrero, *Frisco, Universal share new details about family, kids theme park and resort coming in 2026*, NBCDFW (Dec. 1, 2023). There is absolutely no question that these developments would positively affect the value of the property.

Nor has the Receiver presented any type of update to the alleged tale of woe he presented in February 2023 regarding the Amerigold Suites apartment hotel development. At that time, he described the need for repairs and a pending lawsuit by a resident. But also in the record was the transition—occurring when the Receiver seized the property—to remove delinquent tenants (no longer subsidized by Covid-era Government rent payments) and to replace them with paying tenants. Has that transition stabilized the property and, if not, why has the Receiver not completed it?

Beyond the valuation of these properties, the Receiver's justification for not conserving these assets in place and disrupting the status quo was that other Receivership entities were in a dire liquidity crisis and that the cash from these sales was needed to keep their lights on. *See e.g.*, Dkt. Nos. 67 at ¶ 8, 119 at ¶ 3; Tr. 15:14-18. Since the Receiver sought approval of these sales, however, he has obtained funds through other approved transactions. The sacrifice of value to the estate from these other transactions in exchange for a quick cash influx was so overwhelming that the counterparties paid for the properties despite the fact that a dark cloud of a challenge to the receivership and the Receiver's transactions hung over them. *See e.g.*, Dkt. Nos. 97 and 106. Moreover, experience since the Receiver moved for these sales has shown that the use of the funds has not been for alleged care and maintenance of the properties. The lion's share has gone, instead, to the Receiver's law firm to fuel investigation of the Defendant. Dkt. Nos. 156, pgs. 2-4; 237, pgs. 2-4; and 300, pgs. 2-4. These are costs more appropriately borne by the United States Government, and liquidating these properties will only promote the financial burden shifting from the Securities and Exchange Commission to the beneficiaries of the receivership estate, in principle to include the alleged Chinese national lenders.

These serious deficiencies of current, up-to-date information in the record supporting these sales cannot be ignored amid cries of administrative expediency. We cannot bypass these problems because some believe these sales would already be done if it were not for the pesky appellate challenge to the receivership. The appeal was not just an inconvenience: The Fifth Circuit found reversible error in the seizure of these properties and vacated the receivership. *Barton*, 79 F.4th at 581–82. As such, it is simply not an option to rubber stamp these old motions *nunc pro tunc*, because the old receiver had no authority to ask for approval and this Court had no authority to approve these proposed sales under the old receivership. *Falcon v. Gen. Tel. Co.*, 815

4

F.2d 317, 320 (5th Cir. 1987) ("[T]o vacate a judgment 'is to take away from it any precedential affect.' In essence, when a judgment is vacated '[a]ll is effectually extinguished.'" (internal citation omitted) (quoting *Troy State Univ. v. Dickey*, 402 F.2d 515, 517 (5th Cir. 1968), and *Lebus v. Seafarer's Int'l Union, Etc.*, 398 F.2d 281, 283 (5th Cir. 1968))). Reaching back and reviving year-old motions and orders is particularly inappropriate in the particular context of a receiver selling "realty" through a "private sale" given Congress's single minded focus that the sale be proven to be at market rates *at the time the sale is proposed to occur.* 28 U.S.C. § 2001. That is not a year ago, it is today. And to go forward, the Receiver must put forth evidence from today.

## II.      This Court Should Not Approve Liquidation of Estate Assets at this Stage of the Proceedings.

This Court should not approve the sale of these three properties at this stage of the proceedings. First, permitting these sales now would permanently change the status quo of these properties, forever converting them from the unique assets they are into fungible cash. Such permanent alterations of unique real property are outside the outer limits of permitted activities for a prejudgment receiver. Prejudgment receivers, instead, are charged with gathering and converting assets, as they are, for safekeeping pending a final judgment. *See, e.g.*, *SEC v. Current Fin. Servs., Inc.*, 783 F. Supp. 1441, 1445 (D.D.C. 1992) (finding liquidation neither "necessary to protect [the defendant's] investors" nor "appropriate prior to the entry of final judgment"); *SEC v. Am. Bd. of Trade, Inc.*, 830 F.2d 431, 436 (2d Cir. 1987) ("We have in the past criticized the use of receivers to effect the liquidiation [sic] of a defendant firm in litigation under the Securities Act or the Securities Exchange Act") (citing *SEC v. S & P Nat'l Corp.*, 360 F.2d 741, 750 (2d Cir. 1966)); *Los Angeles Trust Deed & Mortg. Exch. v. SEC*, 285 F.2d 162, 182 (9th Cir. 1960) (criticizing "additional penalty" by proposed liquidation). There are no special circumstances here that justify a prejudgment liquidation of assets under receivership. In the meantime, the Government either

will prove its allegations at trial and establish an entitlement to the property held in receivership or it will fail to do so and that property will be returned to the Defendant. Absent extraordinary circumstances, this Court cannot permit a Receiver to permanently dispose of or change the status of that property prior to trial and a final judgment.

Second, this Court, at a minimum, should not approve these sales until the forthcoming appeal of this Court's new receivership order has been resolved. Experience has shown that the Government's seeking of a prejudgment receivership raises serious legal questions that deserve a full airing at the Court of Appeals. *Barton*, 79 F.4that 580–81. It is black letter law that District Courts, when having resolved serious legal questions for which an appeal is pending or forthcoming, should avoid actions that cannot be later undone if the appeal is successful. *Coastal Corp. v. Tex. E. Corp.*, 869 F.2d 817, 820 (5th Cir. 1989) (holding that district courts must "maintain[] the status quo" pending appeal); *Griggs v. Provident Consumer Discount Co.,* 459 U.S. 56, 58 (1982) ("The filing of a notice of appeal is an event of jurisdictional significance—it confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal."); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. C 07-01827 SI, 2013 WL 6055079, at *2 (N.D. Cal. Nov. 13, 2013) (citing *McClatchy Newspapers v. Cent. Valley Typographical Union No. 46, Intern. Typographical Union*, 686 F.2d 731, 735 (9th Cir. 1982)) ("During the pendency of an appeal, the Court may act to preserve the status quo, but may not take actions that alter any substantial rights on appeal or that cannot later be undone."). There are few things more permanent and less remediable in arrears than the sale of real property, including (in this case) the Defendant's only home.

This Court previously has declined to slow receivership activities to alter the status quo in this case, confident that appeals have an insufficient likelihood of success. Those predictions were

incorrect, this Court's orders were reversed, and the Fifth Circuit installed stays pending appeal to prevent further alterations of the status quo. *Barton*, 79 F.4th at 580–81. This Court should defer the approval of these sales pending the resolution of the forthcoming appeal in light of that experience.

At issue in the appeal will be a nearly unprecedented Government prejudgment seizure through receivership of all a Defendant's businesses, not on behalf of shareholders but on behalf of allegedly wronged unsecured lenders. The seizure is primarily of stationary real estate assets at no imminent risk of flight. The Defendant will challenge the imposition of the receivership generally, but also the inclusion of the three companies (and attendant assets) in question in that receivership for failure of the Government to prove that those companies possessed substantial amounts of subject lender funds. These properties, in particular, lay at the frontiers of the Government's tracing claims. *Barton*, 79 F.4th at 580–81. The Fifth Circuit held that the "court lacks jurisdiction to impose a receivership over property that is not the subject of an underlying claim or controversy." *Id.* at 580.

Claims that the company holding the Defendant's only home possessed lender funds, for example, turned on an aggressive benefits theory of tracing that will be the subject of intense scrutiny at the Fifth Circuit. The Commission asserted that the Rock Creek property received some money traced to Small Business Administration loans, not even lender funds, and that obtaining those loans was assisted by listing Wall-related projects as among those the main development entity was working on. Dkt. 390 at ¶ 59.

The Government's attempted tracing for the Frisco Gate property suffered from particularly acute failures to distinguish funds allegedly associated with the Chinese national lenders from other funds. The Commission claimed that this $9+ million asset was infected with

lender funds because of a $100,000 transfer to the title company for purchase of the property. Dkt. 310-2, Hahn Decl. Ex. A ¶ 9. Ms. Hahn claimed to trace the $100k from the wall entities to Carnegie, then to JMJ, then to the title company. But the claim did not account for another $100,000 deposit into the JMJ bank account from a different source, on the same day as the Carnegie deposit. Ginn Decl. at App. 063; Ginn Test. Tr. 145:15–146:14, 156:20–157:3. As for the Receiver's efforts to trace lender funds into FHC Acquisitions, it claims that $168,146.67 associated with Chinese-national lender funds (albeit years after the last Chinese-national loan was made) made their way to FHC Acquisitions. Thomas Decl. at 120. As the Receiver's accountant acknowledged, the tracing exercise made no attempt to account for $2.917 million in deposits received into the last account through which the alleged lender funds passed. *Id.*; Cecil Test., Tr. 102: 9-22.[1]

### III.    The Defendant's Historical Objections to These Proposed Sales Continue to be Valid.

In addition to the issues outlined above, there were a multitude of problems with two of these three transactions, Rock Creek and Amerigold Suites, when they were first approved and offered for sale approximately one year ago. Those problems are just as, if not more, acute now as they were then. While Barton previously consented to the sale of Frisco Gate, he no longer consents to such sale given the changed market conditions, placement of the property into what he argues is an illegal receivership, and significant likelihood that any proceeds of such a sale would simply go towards paying the Receiver's legal bills. Given the repurposing of these original sale orders here, the Court should take this historical context into account.

---

[1] The Receiver's effort to trace funds into the Rock Creek property suffers from similar shortcomings, failing to explain why the funds repaying the house loan did not come from the intervening $2 million deposit in the ten days the funds allegedly associated with the Chinese lenders sat in the account. Thomas Decl. at 118 (reflecting a $2 million deposit from the sale of Winter Haven on May 10).

### A. The Rock Creek Property

Perhaps most problematically, and an exemplification of the flawed nature of this entire suite of motions, are the motions related to the Rock Creek property. These would involve the sale of Mr. Barton's family home (his only home), and for a price that was, at the time of the initial sale order, hundreds of thousands of dollars less than market price, which would generate at most "between $100,000 and $200,000," prior to the Receiver charging his own legal fees, expert costs, and other expenses against the recovery. The Receiver seeks to sell Barton's home for an amount $600,000 shy of a conservative appraisal Barton received last year. App. to Response in Opposition to Motion to Supplement Order Appointing Receiver (Dkt. 58) at 7; Receiver's Initial Status Report (Dkt. 67) at 15–16. There is simply no justifiable reason for continuing to oust a Defendant from his sole residence in hopes of recovering a fraction of the Receiver's fees when other receivership properties that are exponentially more valuable could potentially accomplish a similar purpose. The sale price would now likely be even more grossly disproportionate to current market prices and certainly at least different, warranting a renewed round of appraisal. *See, e.g.*, Attachment C, Mitchell Parton, *US Home Prices Reach All Time High as Dallas-Fort Worth Prices Plateau*, Dallas Morning News, (Sept. 26, 2023).

As set forth in Barton's original opposition to the Receiver's sale of Rock Creek (Barton's sole family residence) and appendix in support (Dkt. Nos. 91 and 92, respectively), the Receiver lacked proper legal authority to make this sale, a proposition later confirmed as fact by the Fifth Circuit. A receiver's sole legitimate purpose is to identify and secure assets for preservation to compensate alleged victims if and only if the defendant is later found liable for securities fraud. But, instead, the Receiver sought to sell this property primarily for the purpose of paying his own fees—as he does again today. Even then, before the Receivership fees ballooned to their current epic proportions, the net proceeds from the sale of Barton's home would hardly have made a dent

9

in covering those fees.  In the meantime, the Receiver bypassed other potential commercial real estate sales—sales that would not have deprived the Barton and his family of their sole residence—that would generate millions.  Critically, Rock Creek had no connection to Barton's real estate business and its ownership by a special-purpose corporation was a recent development, *see* Dkt. No. 92, App. 004 (showing 2022 taxes assessed against Timothy Barton in his personal capacity for the Rock Creek property) done for personal reasons.

The Receiver also incorrectly contended that his "underlying purpose" was to *disgorge* property and assets from Mr. Barton, before any finding of liability by the Court.  *See* Dkt. No. 73 at 14 n.11.  Disgorgement is no business of a pre-judgment receiver; it is a post-judgment remedy to *potentially* follow conclusion of the matter, but only after the Commission proved its claims and established liability.  The Receiver also sought approval of the sale of Rock Creek while appeal of its sale was pending, which would have deprived the Fifth Circuit of jurisdiction to consider that sale. *See Coastal Corp. v. Tex. E. Corp.*, 869 F.2d 817, 820 (5th Cir. 1989) (explaining that district court must "maintain[] the status quo" pending appeal).

Additionally, the Receiver failed to demonstrate the necessity of selling Rock Creek, as he did not demonstrate that selling it would materially advance any needs of the receivership estate. Indeed, the Receiver contended that selling the home at the previously sought price would only net "between $100,000 and $200,000" after paying off property liens, taxes, closing costs, and broker commissions.  *See* Receiver's Initial Status Report Dkt. No. 67 at 15-16.  And the Receiver's assertions that creditor claims, administrative expenses, or economic uncertainty justified a rapid sale of the home were unmeritorious, as creditor claims were previously stayed. *See, e.g.*, Receivership Order, Dkt. No. 29 ¶¶ 15, 32, 34-35.  This is further evidence that seizing and selling Barton's family home was primarily punitive.

Finally, the price the Receiver sought to sell Rock Creek at was far below market price. The Receiver sought to sell it for a mere $1.4 million, or $365 per square foot. Receiver's Mot., Dkt. No. 76, at 3. Yet comparable homes in the surrounding area were listed for between $506-$684 per square foot. Barton's Response and Objection, Dkt. No. 91, at 9. And the appraisal reports the Receiver relied on were full of factual inaccuracies. *Id.* at 10-12.

### B. Amerigold Suites

Amerigold Suites is a 70-unit extended stay hotel owned by Goldmark Hospitality, LLC. See Dkt. No. 167. The Receiver has previously failed to meaningfully market this property or seriously consider other purchasers' offers to buy it, instead contracting to sell the property for a mere $5,500,000. Dkt. No. 167 ¶¶ 7–8. Valuations of the property by major real estate services firms with knowledge of the Dallas market have estimated its worth to be $7 million, meaning the Receiver is apparently content with leaving $1.5 million on the table. Attachment D.

The Receiver neither "listed nor widely marketed" Amerigold Suites before prior to putting it under contract. Dkt. No. 165-1 at 67. Instead, the Receiver, as with other receivership estate properties, sought to rush its sale to its handpicked buyer. Had this property been fully and adequately marketed, the Receiver would certainly have obtained better offers than it did. There was not then, and still is not now, any reason to rush an inferior offer on this property in light of that fact, particularly when other qualified buyers would have potentially been willing to make more substantial offers. As such, the proposed sale of Amerigold Suites was never shown to be in the best interest of the receivership estate. The Receiver's purported cash crisis then—while vague and lacking any context—surely cannot be the justification for the same snap sale now.

Moreover, the entity owning Amerigold Suites, Goldmark Hospitality LLC ("Goldmark"), was not and is not a defendant or even a relief defendant to this lawsuit, nor did the Commission otherwise allege that Goldmark acquired properties that were purchased with lender funds.

11

*Compare* Dkt. No. 7-1 at ¶ 33, *with* ¶ 34 (asserting that other entities purchased properties with Wall lender funds, but not Goldmark).  Amerigold Suites was purchased in 2007, Dkt. No. 168 at APP060, **ten years before** any Chinese lender loaned money to a Wall entities.  *See* Dkt. No. 7-1 at APP006.  At most, the Commission made a conclusory assertion that it "believed" Goldmark was a beneficiary of lender funds.  *See, e.g.,* Dkt. No. 7-1 at APP014; *see also id.* APP010 & APP015.  But as this Court knows, that was not enough and was among the reasons that the Fifth Circuit vacated the receivership.

### C. Frisco Gate

As for Frisco Gate, Barton initially did not oppose the Receiver's sale of that property, as it was originally arranged with Barton's cooperation and through a broker retained by Barton.  But Barton did take issue with the fact that this sale was not disclosed for a period of approximately nine days.  *See* Dkt. No. 123.  Barton now takes issue with the sale of Frisco Gate on the grounds that it is completely unnecessary at this juncture and the fact that the receivership estate would be better served by the Receiver's simply holding and maintaining it in place.  Barton also takes issue with the staleness of the valuation, which the Receiver now moves for the Court to bless.  This sale would be based upon the fact that the proceeds of such sale would not be retained by the receivership estate, or even expended solely for the maintenance of estate properties, but instead would pay the Receiver's fees and fund the continued investigation of Barton, which the Commission appears to have largely farmed out to the Receiver.  Accordingly, as with Amerigold Suites, the sale of Frisco Gate should be postponed until updated valuation is completed, sale of the property is deemed by the Court to be necessary and to the benefit of eventual beneficiaries of the estate, and an opinion is rendered in Barton's forthcoming appeal.

Finally, Barton reiterates the arguments made in opposition to the Receiver's "blessing" motion regarding the various summary actions requested by the Receiver.  Dkt. No. 397.

**CONCLUSION & PRAYER**

For the foregoing reasons, Defendant Timothy Barton respectfully requests that the Court deny the Receiver's Motion to Appoint Appraisers, Approve Appraisals, and Set Hearings for the Rock Creek Property, the Frisco Gate Property, and the Amerigold Suites (Dkt. Nos. 374, 376, and 378).

Dated: December 6, 2023                        Respectfully submitted,

                                               By: */s/ Michael J. Edney*
                                               Michael J. Edney
                                               Virginia Bar No. 48253
                                               DC Bar No. 492024 (*admitted to N.D. Tex.*)
                                               medney@huntonak.com
                                               **HUNTON ANDREWS KURTH LLP**
                                               2200 Pennsylvania Avenue NW
                                               Washington, DC 20037
                                               Phone: (202) 955-1500
                                               Facsimile: (202) 778-2201

                                               **COUNSEL FOR TIMOTHY LYNCH BARTON**

**CERTIFICATE OF SERVICE**

On December 6, 2023, I filed the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas.  I hereby certify that I have served the document on all counsel and/or pro se parties of record by a manner authorized by Federal Rules of Civil Procedure 5(b)(2).

                                               */s/ Michael J. Edney*
                                               Michael J. Edney

# ATTACHMENT A

TRENDING

 SL Green closes 625…

 Sol Goldman heirs…

 Lender seeks to foreclo…

 As multifam distres…



TEXAS

# JVP greenlighted for $3B The Mix in Frisco

First phase will include 100K sf of retail and 653 apartments

**You have 2 free articles left**

Advertisement

All Markets > Sectors > THE REAL DEAL REAL ESTATE NEWS                Sign in          Subscribe



*A rendering of The Mix development in Frisco (JVP)*

**By TRD Staff**

*SEP 20, 2023, 7:15 PM*

JVP Management got the green light to build The Mix, one of several megadevelopments on the way in Frisco.

Frisco's City Council gave final approval to the $3 billion, 112-acre project earlier this week, the Dallas Morning News <u>reported</u>. The ambitious redevelopment of Wade Park calls for roughly 2 million square feet of office, 375,000 square feet of retail, two hotels, for-sale townhomes and more than 3,000 multifamily units.

The first phase of the project, located at Dallas Parkway and Lebanon Road, will span 23 acres and be completed over the next three years. It will include 100,000 square feet of retail space, a 120,000-square-foot medical building, 653 apartments and a portion of the 9-acre central park, around which the development will revolve.



The city's approval brings a sigh of relief to local residents, as the development site has been one of Frisco's biggest eyesores for years. Construction of the Wade Park redevelopment started in 2014, but development setbacks and a lengthy <u>legal battle</u> between Gamma Real Estate and Wade Park Land stalled the project, leaving an unsightly hole in the ground.



# Sign Up for the National Weekly Newsletter

| Enter Your Email | SIGN UP |

By signing up, you agree to TheRealDeal Terms of Use and acknowledge the data practices in our Privacy Policy.

A judge dismissed the case in March, allowing JVP, which took control of the property in 2019, to ramp up discussions with Frisco officials.

"Right now, what's out there looks like the moon – you have a giant hole and some half-completed buildings," JVP Management's Tim Campbell told the outlet. "It's been six or seven years that the residents of Frisco have been looking at that, and it's time to get something beautiful in its place."

Frisco's development pipeline is loaded with large-scale mixed-use projects. Hall Group, for instance, is leading a $7 billion development called **Hall Park**, a 15-building complex with a luxury hotel, residential towers and office towers. Across the street is the Dallas Cowboys' **Star**, a $1.5 billion project spanning 91 acres along the Dallas North Tollway.

*—Quinn Donoghue*

---

**READ MORE**

**DALLAS**



**JVP wants density at the Mix in Frisco**

**DALLAS**



**The Mix $3B Frisco development starts next month**

**TEXAS**

**Wade Park suit tossed, JVP to start the Mix**

COMPANIES AND PEOPLE

JVP Management    Tim Campbell

TAGS

Commercial    Redevelopment    Residential

---

📧 **Top stories delivered to your inbox**

**FEATURED**

☐ COMMERCIAL

☐ RESIDENTIAL

**WEEKLY**

☐ NATIONAL

☐ CHICAGO

VIEW ALL NEWSLETTERS

Enter Your Email                                                    SIGN UP

ABOUT US

CONTACT US

PRIVACY POLICY

TERMS AND CONDITIONS

SUBSCRIBE

CORPORATE SUBSCRIPTIONS

ADVERTISE

HELP CENTER

CAREERS

SHOP

All rights reserved © 2023 The Real Deal is a registered Trademark of Korangy Publishing Inc.

450 West 31st Street, New York, NY 10001 Phone: 212-260-1332



# ATTACHMENT B

53°

TRENDING   Holiday Events 🧑🕎   HS playoff pairings 🏈   Cowboys vs. Eagles 📺   Good News Newsletter🙂   Watch us 24/7 🖥️

**FRISCO**

# Frisco, Universal share new details about family, kids theme park and resort coming in 2026

Construction is underway in Frisco for Universal Kids Resort — the project is expected to open sometime in 2026

By **Frank Heinz** and **Maria Guerrero** • Published December 1, 2023 • Updated on December 1, 2023 at 7:46 pm



It's the big reveal in Frisco. Universal Destinations and Experiences announced new details about its theme park, including the official name.

Universal Destinations & Experiences revealed Friday new details about the theme park being built in Frisco, including the park's official name -- Universal Kids Resort.

In January, the company announced it was bringing a family-focused theme park and a 300-room themed resort hotel to North Texas. On Friday, executives with Universal Destinations & Experiences, a division of Comcast NBCUniversal, the parent company of NBC 5, confirmed Friday they'd received zoning approval to move the project forward and announced the park's official name.

The theme park will be the company's first park designed specifically for families with young children, catering to riders up to 46 inches tall.

*Get DFW local news, weather forecasts and entertainment stories to your inbox.*
### *Sign up for NBC DFW newsletters.*

"The whole resort will have a very lush landscape feel and we have buffer trees," pointed out Page Thompson, president of new ventures for Universal Destinations & Experiences.

"The characters that children in this community will grow up loving and get see and touch and be around every single day, it's going to grow into being the very essence of growing up and living in Frisco," said Frisco Mayor Jeff Cheney.

The final rendering presented Friday morning differs from the original vision proposed in January 2023 (compare the January and December renderings below).



**Photo Credits: Before** Universal Parks **After** Universal Parks

The footprint is about one-quarter the size of the parks in Orlando, scaled smaller to be more "intimate and engaging" for younger guests. The company said in January the theme park will have a completely different look, feel, and scale compared to Universal's existing parks but will still carry the same quality as the larger resort destinations.

The city estimates Universal Kids Resort will generate $200 million in annual spending in Frisco.

Molly Murphy, president of Universal Creative, described the park's design as one with young children in mind.

"We'll have playful shows, meet-and-greets, fun food and beverage. We're designing it with the unbridled creativity of children in mind," said Murphy. "From a kid's perspective. What does it look, feel, smell, taste like? Tapping into their imagination and their sense of discovery and play."

Cheney added Friday that the road leading into the park will be named Universal Parkway.



*NBC 5 News*

Frisco will name the road in front of Universal Kids Resort after the company -- Universal Parkway.

City leaders and Universal executives spoke of their dedication to including the community in the process.

"Honestly, this was probably the longest zoning case ever done for a project of this magnitude," said Cheney to the audience.

Residents attended community and city council meetings, voicing their concerns over the proposed theme park, including its size, increased traffic and the potential impact on crime.

"Concerns came up about traffic but as we started showing [residents] how the roads were going to be increased to have the flow, the community was very supportive of the project," said Cheney.

Some residents of the Cobb Hill neighborhood, which is next to the proposed site, were among the vocal opponents, fearing home values would be impacted and that homes in their subdivision would become short-term rentals for visitors.

The company broke ground on the park in November and expects vertical construction to begin early in 2024. Construction crews were seen Friday building a section of cinderblock wall lining the entrance to Cobb Hill, enclosing a section of the subdivision previously open. The project is expected to take about two years to complete and will bring about 2,500 construction jobs to the area.

UNIVERSAL KIDS RESORT FRISCO

**APR 8**
Texas Wants to Know: How Did Universal Pick Frisco for its New Theme Park?

**MAR 7**

Frisco City Council Approves Universal Theme Park

---

This article tagged under:

**FRISCO • COLLIN COUNTY • UNIVERSAL**

---

ONLINE SHOPPING TOOLS | SPONSORED

**No More Free Returns? Amazon Releases New Fees**

PRIME PROMETICS | SPONSORED

**Rediscover Confidence: Women 40+ are Loving this "Miracle" Mascara**

HEALTH-REVIEW24 | SPONSORED

**Diabetes Is Not From Sweets! Meet The Main Enemy Of Diabetes**

TRUTHFINDER | SPONSORED

**Locate Almost Anyone By Entering Their Name (This Is Addicting!)**

BUZZDAILY WINNERS | SPONSORED

**2 Steps To Tell When A Slot is Close To Hitting The Jackpot**

## Weather Forecast

DALLAS, TX

# 53°

Partly Cloudy
0% Precip

TONIGHT

## 45°

TOMORROW

# 70°

 **NBCDFW**

CONTACT US

OUR NEWS STANDARDS

NEWSLETTERS

TV LISTINGS

SUBMIT PHOTOS OR VIDEO

KXAS Public Inspection File

KXAS Accessibility

KXAS Employment Information

FCC Applications

Privacy Policy

Your Privacy Choices

TERMS OF SERVICE

Advertise with us

Send Feedback

CA Notice

Ad Choices

Copyright © 2023 NBCUniversal Media, LLC. All rights reserved



# ATTACHMENT C

# U.S. home prices reach all-time high as Dallas-Fort Worth prices plateau

🌐 **dallasnews.com**/business/real-estate/2023/09/26/us-home-prices-reach-all-time-high-as-dallas-fort-worth-prices-plateau

September 26, 2023



Dallas-Fort Worth home sale prices increased 0.3% from June to July, according to the S&P CoreLogic Case-Shiller home price index. (Smiley N. Pool / Staff Photographer)

A key measure of the U.S. housing market showed July as the sixth month in a row where home prices grew slightly locally and nationally from the previous month. National prices reached a new all-time high, despite higher mortgage rates than in previous years.

Dallas-Fort Worth sale prices increased 0.3% from June to July, a slower growth rate than the 0.7% reported from May to June, according to the S&P CoreLogic Case-Shiller home price index. U.S. prices grew 0.6% to a new all-time high on the index, while D-FW prices haven't yet surpassed their record high in June 2022.

Despite the slight gain on the July report, a separate report based on more recent transactions showed D-FW prices finally began to decline in August. Those numbers, from North Texas Real Estate Information Systems, the listing service used by real estate agents, showed the median sale price of a local single-family home was $406,000 in August, down 2% from July.

1/3

"After a strong 5% cumulative U.S. home price gain since the early spring, monthly increases are plateauing to a seasonal average, which reflects the pressure that higher mortgage rates have put on affordability," CoreLogic chief economist Selma Hepp said in a statement. "As a result of the early 2023 growth, annual price appreciation should accelerate in the coming months before slowing again. Areas in the Midwest continue to lead the national gains given their relative affordability."

The Case-Shiller index is a three-month moving average that compares sales-price changes of specific properties over time. While it is a couple of months behind current market conditions, the index's price estimate is considered more accurate than data from agents, which can be influenced by the type of properties that are selling each month.

In March, D-FW prices fell 1.2% to mark the first year-over-year decline on the Case-Shiller index since February 2012. The index shows local prices were still down 3.8% in July from their pandemic peak in June 2022.

"I really don't see [home prices] going down much more," Belinda Epps, president of the MetroTex Association of Realtors and broker and owner of Epps Realty in Mesquite and Royse City, told The Dallas Morning News earlier in September. "We don't have enough houses yet. Even though inventory is picking up, it's still not where it needs to be in order to balance out this market. It's just not there yet."

U.S. home prices were up 1% in July from a year before while D-FW prices were down 3.4%, according to the Case-Shiller index, which tracks 20 local markets. D-FW is the only Texas housing market included on the list.

Nationally, "buyer demand continues to outmatch housing supply, creating upward pressure on home prices despite the fact that home purchase costs are taking up an outsized share of household incomes," Realtor.com economist Danielle Hale said about the data.

Chicago, Cleveland and New York home prices were up the most from a year ago, but by no more than 4.4%. Las Vegas, Phoenix and San Francisco saw the biggest declines of, at most, 7.2%.

"Markets that saw home prices reset following the recent surge in mortgage rates are expected to see stronger gains over the next 12 months, particularly those in the West," CoreLogic's Hepp said.

All of the metro areas that did not hit all-time highs in July were in the Pacific or Mountain time zones except for D-FW and Tampa.

Despite higher home prices than in previous years, D-FW remains a relocation hotspot, ranking No. 8 on a Redfin report showing how many people on the search platform looked to leave their metro areas for other regions during the summer months. Redfin's research

showed Los Angeles as the top origin of people who looked to move to North Texas.

Mitchell Parton, Residential Real Estate Reporter. Mitchell covers residential real estate across North Texas for The Dallas Morning News. He previously covered commercial and residential real estate for the San Antonio Business Journal and is a graduate of the University of Cincinnati.

✉ mitchell.parton@dallasnews.com      🐦 mitchellparton      in mitchellparton

# ATTACHMENT D



# BBG

**Third-party reports by a true third party**

**Appraisal Report**

## Amerigold Suites

13636 Goldmark Drive
Dallas, Texas  75240

BBG File #0121021758

### Prepared For
Ms. Jane Sadler
Greystone Servicing Company LLC
1715 Aaron Brenner Drive
Memphis, TN 38120

### Report Date
November 24, 2021

### Prepared By
BBG, Inc., Dallas Office
8300 Douglas Avenue
Dallas, TX  75225
214.739.0700

Client Manager:  Mary Ann Barnett, MAI
MBarnett@bbgres.com

   



November 24, 2021

Ms. Jane Sadler
Analyst
Greystone Servicing Company LLC
1715 Aaron Brenner Drive
Memphis, TN 38120

Re:      Appraisal of Real Property
          **Amerigold Suites**
          13636 Goldmark Drive
          Dallas, Texas  75240
          **BBG File No.** 0121021758

Dear Ms.  Sadler:

In accordance with your authorization, we have conducted the investigation necessary to form an opinion of the market value of the leased fee estate in the subject property, as referenced above.

The subject property consists of a 11-building, 2-story Apartment built in 1981 containing 70 dwelling units (50,760 square feet NRA) on a 3.56-acre parcel of land. Building construction consists of a wood frame buildings, brick and vinyl siding exteriors and pitched composition shingle roofs.

This report is for the use and benefit of, and may be relied upon by,
    a)   Greystone Servicing Company LLC, Freddie Mac, and any successors and assigns ("Lender");
    b)   Independent auditors, accountants, attorneys and other professionals acting on behalf of Lender;
    c)   Governmental agencies having regulatory authority over Lender;
    d)   Designated persons pursuant to an order or legal process of any court or governmental agency;
    e)   Prospective purchasers of the Mortgage; and
    f)   With respect to any debt (or portion thereof) and/or securities secured, directly or indirectly, by the Property which is subject of this report, the following parties and their respective successors and assigns:
         •   Any placement agent or broker/dealer and any of their respective affiliates, agents or advisors;
         •   Any initial purchaser or subsequent holder of such debt and/or securities;
         •   Any Servicer or other agent acting on behalf of the holders of such debt and/or securities;
         •   Any indenture trustee
         •   Any rating agency; and
         •   Any institutional provider from time to time of any liquidity facility or credit support for such financings.

In addition, this report, or a reference to this report, may be included or quoted in any offering circular, information circular, offering memorandum, registration statement, private placement memorandum, prospectus or sales brochure (in either electronic or hard copy format) in connection with a securitization or transaction involving such debt (or portion thereof) and/or securities.

This is an appraisal report, which is intended to conform with the requirements of the Uniform Standards of Professional Appraisal Practice (USPAP), as well as your institution's guidelines and requirements, and the appraisal guidelines set forth in Title XI of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA), and the December 2010 Interagency Appraisal and Evaluation Guidelines.

Ms. Sadler
November 24, 2021
Page 2

| EXTRAORDINARY ASSUMPTION(S) AND HYPOTHETICAL CONDITION(S) |
|---|
| The values presented within this appraisal report are subject to the extraordinary assumptions and hypothetical conditions listed below. Pursuant to the requirement within Uniform Standards of Professional Appraisal Practice Standards, it is stated here that the use of any extraordinary assumptions and/or hypothetical conditions might have affected the assignment results. |

| Extraordinary Assumption(s) | This appraisal employs no extraordinary assumptions. |
|---|---|
| Hypothetical Condition(s) | This appraisal employs no hypothetical conditions. |

Based on our inspection of the property and the investigation and the analysis undertaken, we have developed the following value opinion(s).

| MARKET VALUE CONCLUSION(S) | | | |
|---|---|---|---|
| Appraisal Premise | Interest Appraised | Date of Value | Value Conclusion |
| As Is | leased fee | November 10, 2021 | $7,000,000 |

Based on recent market transactions, as well as discussions with market participants, a sale of the subject property at the above-stated opinion of market value would have required an exposure time of approximately 6 to 12. Furthermore, a marketing time of approximately 6 to 12 is currently warranted for the subject property.

This letter must remain attached to the report, which should be transmitted in its entirety, in order for the value opinion set forth to be considered valid.

Our firm appreciates the opportunity to have performed this appraisal assignment on your behalf. If we may be of further service, please contact us.

Sincerely,
**BBG, Inc.**

**DRAFT**             **DRAFT**

Mary Ann Barnett, MAI              Billy Horton
TX Certified General Appraiser      TX Certified General Appraiser
License #: TX-1326580-G             License #: 1380740
214-269-0522                        214-890-6496
MBarnett@bbgres.com                 bhorton@bbgres.com

# TABLE OF CONTENTS

Subject Property ........................................................................................................................... 1

Summary of Salient Facts ............................................................................................................ 3

Property History ......................................................................................................................... 5

Scope of Work ............................................................................................................................ 6

Regional Analysis ..................................................................................................................... 10

Primary Market Area Analysis ................................................................................................. 11

Apartment Market Analysis .................................................................................................... 13

Site Description ....................................................................................................................... 18

Improvements Description ...................................................................................................... 22

Real Property Taxes and Assessment ...................................................................................... 25

Highest and Best Use .............................................................................................................. 27

Valuation Process ................................................................................................................... 28

Sales Comparison Approach .................................................................................................... 29

Income Capitalization Approach ............................................................................................. 35

Reconciliation ......................................................................................................................... 48

Insurable Value ....................................................................................................................... 50

Certification ............................................................................................................................ 51

Standard Assumptions and Limiting Conditions ...................................................................... 52

Addenda .................................................................................................................................. 56

# SUBJECT PROPERTY





## AERIAL PHOTOGRAPH



# SUMMARY OF SALIENT FACTS

| PROPERTY DATA | |
|---|---|
| **Property Name** | Amerigold Suites |
| **Address** | 13636 Goldmark Drive<br>Dallas, Texas  75240 |
| **Location** | South Side of Goldmark Drive, West of Midpark Road |
| **Property Description** | Apartment |
| **Parcel Number** | 00000769000800000 |
| **Census Tract No.** | 0192.13 |
| **Legal Description** | BLK A/7761 LOT 3 ACS 3.56 |
| **Site Area** | |
| **Primary Site** | 155,074 square feet     (3.56 acres) |
| **Zoning** | MU-3 ; Mixed Use - 3 |
| **Flood Status** | |
| | Zone X (Unshaded) is a Non-Special Flood Hazard Area (NSFHA) of minimal flood hazard, usually depicted on Flood Insurance Rate Maps (FIRM) as above the 500-year flood level. This is an area in a low to moderate risk flood zone that is not in any immediate danger from flooding caused by overflowing rivers or hard rains. In communities that participate in the National Flood Insurance Program (NFIP), flood insurance is available to all property owners and renters in this zone. |
| **Year Built** | 1981 |
| **Type of Construction** | Wood frame |
| **Number of Buildings** | 11 |
| **Gross Building Area** | 50,760 square feet |
| **Net Rentable Area** | 50,760 square feet |
| **Total Number of Units** | 70 |
| **Occupancy** | 95.7% |
| **Overall Condition** | Average |
| **Overall Quality** | Average |
| **Overall Design/Functionality** | Average/Good |

| RISK SUMMARY | |
|---|---|
| **Advantages** | The demographics of the area are relatively strong in comparison to nearby submarkets.<br>The area is mature, which impedes new competitive development due to in-fill construction costs.<br>Rental rates are increasing and vacancy rates are low in subject's market.<br>The subject is located in a primary market. |
| **Challenges** | The subject property is of older construction and may require more ongoing upkeep to maintain its economic life. |

| VALUE INDICATIONS | | | |
|---|---|---|---|
| **As Is as of November 10, 2021** | | | |
| Sales Comparison Approach | $6,950,000 | $99,286 | Per Dwelling Unit |
| Income Capitalization Approach | | | |
|    Direct Capitalization | $7,000,000 | $100,000 | Per Dwelling Unit |
| Approach Reliance | **Direct Capitalization** | | |
| **Value Conclusion - As Is** | **$7,000,000** | **$100,000** | **Per Dwelling Unit** |
| Insurable Value | $3,710,000 | | |
| Exposure Time (Months) | 6 to 12 | | |
| Marketing Time (Months) | 6 to 12 | | |

# PROPERTY HISTORY

| PROPERTY HISTORY | |
|---|---|
| **Recent Transaction** | |
| Sale Date | July 27, 2011 |
| Deed Book/Page | INT201100196546 |
| Sale Price | N/A |
| per Unit | N/A |
| per SF NRA | N/A |
| Grantor | Kroopa Investment LLC |
| Grantee | Goldmark Hospitality LLC |

No other sales of the subject property have occurred within the past 3 years prior to the date of this appraisal, nor are we aware of the pending transactions regarding the subject. Please note this information is included only to satisfy the requirements of USPAP. It is not intended as a guarantee to the chain of title, and a title search should be performed by a title company should a definitive abstract be desired.

# SCOPE OF WORK

| APPRAISAL INFORMATION | |
|---|---|
| Client | Greystone Servicing Company LLC |
| | 1715 Aaron Brenner Drive, |
| | Memphis, TN 38120 |
| Intended User(s) | Greystone Servicing Company, LLC, Freddie Mac, and related entities, successors and all assigns |
| Intended Use | This appraisal is to be used for refinance purposes. |
| Premise Summary | As Is Market Value - November 17, 2021 |
| Date of Inspection | November 20, 2021 |
| Marketing Time | 6 to 12 |
| Exposure Time | 6 to 12 |
| Owner of Record | Goldmark Hospitality, LLC. |
| Highest and Best Use | |
|   If Vacant | Hold for multifamily development |
|   As Improved | As currently developed |

| PROPERTY IDENTIFICATION | |
|---|---|
| Property Name | Amerigold Suites |
| Address | 13636 Goldmark Drive |
| | Dallas, Texas 75240 |
| Location | South Side of Goldmark Drive, West of Midpark Road |
| Property Description | Apartment |
| Parcel Number | 00000769000800000 |
| Census Tract No. | 0192.13 |
| Legal Description | BLK A/7761 LOT 3 ACS 3.56 |

BBG

| SCOPE OF THE INVESTIGATION | |
|---|---|
| **General and Market Data Analyzed** | ▪ Regional economic data and trends |
| | ▪ Market analysis data specific to the subject property type |
| | ▪ Published survey data |
| | ▪ Neighborhood demographic data |
| | ▪ Comparable cost, sale, rental, expense, and capitalization rate data |
| | ▪ Floodplain status |
| | ▪ Zoning information |
| | ▪ Assessor's information |
| | ▪ Interviewed professionals knowledgeable about the subject's property type and market |

**Inspection Details**

| SUMMARY OF UNITS INSPECTED | | | | |
|---|---|---|---|---|
| Unit No. | Floorplan Type | Size (SF) | Status | Make-Ready Cost |
| 1100 | 2BR-2BA | 1,200 | Occupied | Ready |
| 1800 | 2BR-2BA | 1,200 | Occupied | Ready |
| 2102 | Studio | 300 | Occupied | Ready |
| 2106 | 1BR-1BA | 660 | Occupied | Ready |

**Property Specific Data Requested and Received**

| PROPERTY DATA RECEIVED |
|---|
| Historical operating statements |
| Rent roll |

**Data Requested, but not Provided**

| DATA REQUESTED, BUT NOT PROVIDED |
|---|
| None |

**Data Sources**

| DATA SOURCES | |
|---|---|
| Site Size | Assessor |
| Building Size | Assessor, Property Manager |
| Tax Data | Assessor |
| Zoning Information | Planning Dept |
| Flood Status | FEMA |
| Subject Historical Expenses | Property Contact |
| Rent Roll | Property Contact |
| Comparable Improved Sales | CoStar, Internal Database, Brokers |
| Construction Cost Data | Marshall and Swift |

BBG

| VALUATION METHODOLOGY | |
|---|---|
| **Most Probable Purchaser** | To apply the most relevant valuation methods and data, the appraiser must first determine the most probable purchaser of the subject property. |
| | The most probable purchaser of the subject property "As Is" is an investor because it is leased to third-party tenants. |
| **Valuation Methods Utilized** | This appraisal employs the Sales Comparison Approach and the Income Capitalization Approach. Based on our analysis and knowledge of the subject property type and relevant investor profiles, it is our opinion that these approaches would be considered applicable and/or necessary for market participants. The subject's age makes it difficult to accurately form an opinion of depreciation and tends to make the Cost Approach unreliable. Investors do not typically rely on the Cost Approach when purchasing a property such as the subject of this report. Therefore, we have not employed the Cost Approach to develop an opinion of market value; this exclusion does not affect the credibility of the assignment results herein. |

| EXTRAORDINARY ASSUMPTION(S) AND HYPOTHETICAL CONDITION(S) | |
|---|---|
| The values presented within this appraisal report are subject to the extraordinary assumptions and hypothetical conditions listed below. Pursuant to the requirement within Uniform Standards of Professional Appraisal Practice Standards, it is stated here that the use of any extraordinary assumptions and/or hypothetical conditions might have affected the assignment results. | |
| **Extraordinary Assumption(s)** | This appraisal employs no extraordinary assumptions. |
| **Hypothetical Condition(s)** | This appraisal employs no hypothetical conditions. |

| DEFINITIONS | |
|---|---|
| Pertinent definitions, including the definition of market value, are included in the glossary, located in the Addenda to this report. The following definition of market value is used by agencies that regulate federally insured financial institutions in the United States: | |
| **Market Value** | The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition are the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby: |

- Buyer and seller are typically motivated;
- Both parties are well informed or well advised, and acting in what they consider their best interests;
- A reasonable time is allowed for exposure in the open market;
- Payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and
- The price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale. [1]

[1] (Interagency Appraisal and Evaluation Guidelines; December 10, 2010, Federal Register, Volume 75 Number 237, Page 77472)

## LEVEL OF REPORTING DETAIL

Standards Rule 2-2 (Real Property Appraisal, Reporting) contained in USPAP requires each written real property appraisal report to be prepared as either an Appraisal Report or a Restricted Appraisal Report.

This report is prepared as an **Appraisal Report.** An Appraisal Report must at a minimum summarize the appraiser's analysis and the rationale for the conclusions. This format is considered most similar to what was formerly known as a Self-Contained Appraisal Report in prior versions of USPAP.



# REGIONAL ANALYSIS

## AREA OVERVIEW

The subject is located within the city limits of Dallas, Texas in the northern portion of the Dallas-Plano-Irving metropolitan statistical area (MSA).

## REGIONAL MAP



## ECONOMIC & DEMOGRAPHIC PROFILE

A full detailed economic and demographic report can be found as an addendum to this report.

## CONCLUSION

According to Moody's, "The Dallas-Plano-Irving economy will accelerate in coming months, led by growth in professional services, housing, and the recovery of hospitality. Longer term, the concentration of corporate headquarters, technology businesses, financial services, and above-average population growth will contribute to above-average performance. The recovery of the Fort Worth-Arlington economy will firm this year, led by the boom in housing, reviving travel, and manufacturing. Longer term, above-average population growth, a diversified manufacturing base, and lower business costs and costs of living relative to Dallas will help support above-average gains."

# PRIMARY MARKET AREA ANALYSIS



The market area has excellent access with respect to major and minor arteries. East/west access is provided by George Bush Turnpike, I-635, Renner/Frankford Road, Campbell Road, Arapaho Road, Belt Line Road, Spring Valley Road, and Alpha Road, each of which traverses the market area and has exits from the Dallas North Tollway (just to the west of market area). In addition to the Dallas North Tollway and US 75, north/south access is provided primarily by Preston Road (US 289), Greenville Road, Plano Road, Hillcrest Road, and Coit Road. These streets are four to six-lane, divided thoroughfares. US 75 is a major influence on the market area and is located near the eastern boundary. US 75 is an eight-lane, median-divided highway and is a predominant traffic carrier throughout the Dallas area. Much of the area's employment centers are located along US 75. The highway also gives easy access from Downtown Dallas north to Oklahoma.

The subject market area is suburban in nature and is estimated to be approximately 95% developed. Market area retail/commercial development is along the major roadways in the residential areas. The vacant, undeveloped land in the area is a mixture of zoning districts that appear to follow the pattern of the existing development. That is, commercial and retail along the primary roadways and intersections, and single family residential in the interior with higher density residential and rental properties as a "buffer" between the two. Continuation of the recent new development of single family, multifamily, retail, and office is expected to continue into the future, resulting in changing land uses from vacant to developed.

## SUMMARY

The market area is in the northern portion of Dallas near the intersection of US 75 and IH 635. The area is approximately 95% developed and is a mix of moderate- to high-end residential and commercial/office/retail uses. The market area commercial development is centered along US 75 with residential uses becoming less dense as the market area radiates from this center. The location characteristics relative to employment centers and supportive development ensure future growth as economic conditions improve because of the desirability of this market area and surrounding areas. Overall, the prospects for the market area are excellent.

# APARTMENT MARKET ANALYSIS

## RICHARDSON MULTI-FAMILY MARKET

### KEY INDICATORS *AT A GLANCE*

|  | PRIOR QUARTER | CURRENT QUARTER | COMPARISON |
|---|---|---|---|
| Vacancy (%) | 9.99% | 8.60% | decreased 139 Basis Points |
| Absorption (Units) | 59 | 333 | increased 274 Units |
| Quoted Rental Rates ($/Unit/Month) | $1,068 | $1,122 | increased $54 Per Unit |
| Inventory (Units) | 23,887 | 23,887 | no change  Units |
| Net Deliveries (Units) | 0 | 0 | no change  Units |
| Under Construction (Units) | 0 | 0 | no change  Units |
| Overall Comparison | *Overall, vacancy has declined while rental rates have increased in the submarket over the past 3 months.* | | |

## RICHARDSON MULTI-FAMILY MARKET STATISTICS

| PERIOD | EXISTING INVENTORY (UNITS) | VACANCY % | NET ABSORPTION (UNITS) | NET COMPLETIONS (UNITS) | UNDER CONST. (UNITS) | QUOTED RATES ($/UNIT/MONTH) |
|---|---|---|---|---|---|---|
| 2021 Q2 | 23,887 | 8.60% | 333 | 0 | 0 | $1,122 |
| 2021 Q1 | 23,887 | 9.99% | 59 | 0 | 0 | $1,068 |
| 2020 Q4 | 23,887 | 10.24% | -157 | 0 | 0 | $1,049 |
| 2020 Q3 | 23,887 | 9.58% | 325 | 372 | 0 | $1,049 |
| 2020 | 23,887 | 10.24% | -65 | 372 | 0 | $1,049 |
| 2019 | 23,515 | 8.55% | -115 | 0 | 372 | $1,040 |
| 2018 | 23,515 | 8.06% | 265 | 0 | 372 | $1,006 |
| 2017 | 23,515 | 9.19% | -103 | 660 | 0 | $973 |
| 2016 | 22,855 | 6.11% | 53 | 82 | 660 | $936 |
| 2015 | 22,773 | 6.00% | 405 | 408 | 363 | $891 |
| 2014 | 22,365 | 6.10% | 24 | -177 | 408 | $823 |
| 2013 | 22,542 | 6.94% | 306 | 0 | 135 | $794 |
| 2012 | 22,542 | 8.29% | 257 | -36 | 135 | $780 |

The Richardson Multi-Family market ended the second quarter with a vacancy rate of 8.60%. The vacancy rate decreased over the previous quarter, with net absorption totaling 333 units in the second quarter. Rental rates increased compared to the previous quarter, ending second quarter at $1,122. A total of 0 units was delivered to the market, with 0 units still under construction at the end of the quarter.

## ABSORPTION



Net absorption for the overall Richardson Multi-Family market was 333 units in second quarter 2021. That compares to 59 units in first quarter 2021, -157 units in fourth quarter 2020, and 325 units in third quarter 2020. Net absorption in the market over the prior 12 months totaled 560 units.

The Class A (4 & 5 Star) Multi-Family market recorded net absorption of 130 units in the second quarter 2021, compared to 83 units in the first quarter 2021, -82 units in the fourth quarter 2020, and 133 units in the third quarter 2020.

The Class B (3 Star) Multi-Family market recorded net absorption of 167 units in the second quarter 2021, compared to -37 units in the first quarter 2021, -54 units in the fourth quarter 2020, and 182 units in the third quarter 2020.

The Class C (1 & 2 Star) Multi-Family market recorded net absorption of 37 units in the second quarter 2021, compared to 13 units in the first quarter 2021, -21 units in the fourth quarter 2020, and 10 units in the third quarter 2020.

## VACANCY



Vacancy for the overall Richardson Multi-Family market decreased to 8.60% in the second quarter 2021. That compares to 9.99% in the first quarter 2021, 10.24% in the fourth quarter 2020, and 9.58% in the third quarter 2020.

Class A (4 & 5 Star) projects reported a vacancy rate of 7.37% at the end of the second quarter 2021, 10.61% at the end of the first quarter 2021, 12.67% at the end of the fourth quarter 2020, and 10.64% at the end of the third quarter 2020.

Class B (3 Star) projects reported a vacancy rate of 9.67% at the end of the second quarter 2021, 10.68% at the end of the first quarter 2021, 10.45% at the end of the fourth quarter 2020, and 10.12% at the end of the third quarter 2020.

Class C (1 & 2 Star) projects reported a vacancy rate of 4.85% at the end of the second quarter 2021, 5.92% at the end of the first quarter 2021, 6.33% at the end of the fourth quarter 2020, and 5.70% at the end of the third quarter 2020.

## RENTAL RATES



The average asking rental rate for available Multi-Family space, all classes, was $1,122 per unit per month at the end of the second quarter 2021 in the Richardson market area. This represented a 5.0% increase in quoted rental rates from the end of the first quarter 2021, when rents were reported at $1,068 per unit.

The average quoted rate within the Class A (4 & 5 Star) sector was $1,568 at the end of the second quarter 2021, while Class B (3 Star) rates stood at $1,033, and Class C (1 & 2 Star) rates at $1,015. At the end of the first quarter 2021, Class A (4 & 5 Star) rates were $1,435 per unit, Class-B (3 Star) rates were $992, and Class C (1 & 2 Star) rates were $997.

## INVENTORY & CONSTRUCTION

During the second quarter 2021, a total of 0 units was completed in the Richardson market area. This compares to a total of 0 units completed in the first quarter 2021, a total of 0 units completed in the fourth quarter 2020, and 372 units completed in the third quarter 2020.

There were 0 units of Multi-Family space under construction at the end of the second quarter 2021.

| SUBTYPE | EXISTING INVENTORY (UNITS) | NET DELIVERIES (12 MONTHS) | UNDER CONSTRUCTION (UNITS) |
|---|---|---|---|
| Class A (4 & 5 Star) | 4,000 | 372 | 0 |
| Class B (3 Star) | 16,493 | 0 | 0 |
| Class C (1 & 2 Star) | 3,394 | 0 | 0 |
| **Total** | **23,887** | **372** | **0** |

## RICHARDSON MARKET OUTLOOK

The Richardson Multi-Family market ended the second quarter 2021 with an overall vacancy rate of 8.60%. The vacancy rate decreased over the previous quarter, with net absorption totaling 333 units in the second quarter 2021. Rental rates increased $53.69 per unit per month over the previous quarter and ended at $1,122 per unit per month. A total of 0 units was delivered in the quarter, with 0 units still under construction at the end of the quarter.

BBG

# SITE DESCRIPTION

## SIZE/SHAPE/DIMENSIONS

The subject site consists of one tract totaling 3.56 acres per the Dallas County Appraisal District.

| GENERAL SITE DESCRIPTION OVERVIEW | |
|---|---|
| **Location** | South Side of Goldmark Drive, West of Midpark Road |
| **Parcel Number** | 00000769000800000 |
| **Legal Description** | BLK A/7761 LOT 3 ACS 3.56 |
| **Site Area** | |
|    **Primary Site** | 155,074 square feet                    (3.56 acres) |
| **Configuration** | Rectangular |
| **Topography** | Level |
| **Drainage** | Appears adequate |
| **Utilities/Municipal Services** | All available to site. |
| **Floodplain** | **Zone**      **Map**      **Date** |
| | Zone X (Unshaded)     48113C0195K     July 8, 2014 |
| | Zone X (Unshaded) is a Non-Special Flood Hazard Area (NSFHA) of minimal flood hazard, usually depicted on Flood Insurance Rate Maps (FIRM) as above the 500-year flood level. This is an area in a low to moderate risk flood zone that is not in any immediate danger from flooding caused by overflowing rivers or hard rains. In communities that participate in the National Flood Insurance Program (NFIP), flood insurance is available to all property owners and renters in this zone. |
| **Census Tract No.** | 0192.13 |
| **Latitude Longitude** | 32.93552, -96.75462 |
| **Soil/Subsoil Conditions** | We did not receive nor review a soil report. However, we assume that the soil's load-bearing capacity is sufficient to support existing and/or proposed structure(s). We did not observe any evidence to the contrary during our physical inspection of the property. |
| **Environmental Concerns** | No unusual conditions observed. No studies were provided. Site is assumed to be free of any environmental concerns. |
| **Land Use Restrictions** | None detrimental known |
| **Hazards Nuisances** | None detrimental known |
| **Frontage** | Goldmark Drive, Midpark Road |
| **Access** | Two curb cuts on Goldmark Drive |
| **Visibility** | Average/Good |
| **Surrounding Land Uses** | Multifamily apartments to the north and northwest, grocery retail to the northeast, storage facility to the southwest, hotel and retail to the southeast |
| **Opportunity Zone** | No |

| ZONING | |
|---|---|
| **General** | |
| **Property Jurisdiction** | City of Dallas |
| **Zoning Classification** | MU-3 |
| **Description** | Mixed Use - 3 |
| **Zoning Intent/Purpose** | To provide for the development of high density retail, office, hotel, and/or multifamily residential uses in combination on single or contiguous building sites; to encourage innovative and energy conscious design, efficient circulation systems, the conservation of land, and the minimization of vehicular travel. |
| **Compliance Conclusion** | The subject appears to be a legal conforming use in this zoning district. |
| **Other** | None noted |

| ZONING REQUIREMENTS | | | |
|---|---|---|---|
| **Category** | **Required** | **Actual** | **Conforming?** |
| Current Use: | Residential | Multi-family residential | Legal Conforming |
| Maximum Density/Units: | No Maximum | 19.66 units per acre | Legal Conforming |
| Minimum Lot Size: | No Minimum | 2,800 SF per dwelling unit | Legal Conforming |
| Minimum Lot Width: | N/A | 150 feet | Legal Conforming |
| Maximum Bldg. Height: | 270 feet | 35 feet | Legal Conforming |
| Minimum Open Space: | N/A | 0.6 | Legal Conforming |
| Minimum Front Yard: | 15 feet | 20 feet (estimated) | Legal Conforming |
| Minimum Rear Yard: | 20 feet | 20 feet (estimated) | Legal Conforming |
| Minimum Side Yard : | 20 feet | 10 feet | Legal Conforming |
| Minimum Parking: | 1 space per BR | 1.65 spaces per BR | Legal Conforming |
| | 80 sapces | 130 spaces | Legal Conforming |

According to the Unified Development Code for the City of Dallas, the subject is required to provide a minimum number of 80 parking spaces. Per the client, the development is improved with 130 spaces. As such, the improvements are a legal conforming use in the MU-3 zoning district.

## CONCLUSION

The site consists of a well-located tract in the Dallas-Plano-Irving MSA. The site is currently zoned to permit multifamily land uses. For more information regarding the subject site, please refer to the Subject Photographs located in the Exhibits section of this report.

| SUBJECT MAPS |
| --- |

**Aerial Photograph**

**Parcel Map**



**Flood Map**



# IMPROVEMENTS DESCRIPTION

## GENERAL IMPROVEMENT DESCRIPTION OVERVIEW

| | |
|---|---|
| **Address** | 13636 Goldmark Drive<br>Dallas, Texas  75240 |
| **Property Description** | Apartment |
| **Year Built** | 1981 |
| **Year Renovated** | N/A |
| **Number of Buildings** | 11 |
| **Number of Stories** | 2 |
| **Total Number of Units** | 70 |
| **Net Rentable Area** | 50,760 square feet |
| **Gross Building Area** | 50,760 square feet |
| **Density** | 19.66 units per acre |
| **Ingress/Egress** | Two curb cuts on Goldmark Drive |
| **Ceiling Heights** | 9' |
| **Utility Metering** | Units individually metered for electricity |
| **Parking Ratio** | 1.86 spaces per dwelling unit. |
| **Elevator(s)** | None |
| **ADA Compliance** | The property is assumed to be fully ADA compliant. |
| **Amenities (Unit)** | Air Conditioning, Ceiling Fans, Patio/Balcony, Microwave, Dishwasher, Exterior Entry, Interior Entry, Fireplace, Carpet, Tile Flooring, Solar Panels |
| **Amenities (Project)** | Pool, Clubhouse, On-Site Maintenance, On-Site Management, Furnished Units Available |

| UNIT SUMMARY | | | |
|---|---|---|---|
| **Type** | **No.** | **Size (SF)** | **NRA (SF)** |
| Studio | 1 | 300 | 300 |
| 1BR-1BA | 3 | 500 | 1,500 |
| 1BR-1BA | 56 | 660 | 36,960 |
| 2BR-2BA | 10 | 1,200 | 12,000 |
| **Total/Avg** | **70** | **725** | **50,760** |

## CONSTRUCTION DETAIL

| | |
|---|---|
| **General Layout** | The layout of the buildings are square with common areas/sidewalks. |
| **Foundation** | Poured concrete slab |
| **Construction** | Wood frame |
| **Floor Structure** | Reinforced concrete |
| **Exterior Walls** | Brick |
| **Roof Type** | Sloped |
| **Roof Cover** | Shingle |
| **Windows** | Single-pane, vinyl |
| **Balcony/Patios:** | Second story units have patios |

## INTERIOR DETAIL

| | |
|---|---|
| **Walls** | Drywall |
| **Ceilings** | Drywall |
| **Floor Coverings** | Vinyl Flooring and carpet |
| **Doors** | Hollow-core wood with wood frames |
| **Lighting** | Fluorescent |
| **Ceiling Heights** | 9' |
| **Kitchen Finish** | Wood cabinets, wood countertops, stainless steel appliances (electric range/oven), single-bowl stainless steel sink |
| **Bathroom Finish** | Porcelain sink in laminate vanity, bathroom cabinets with mirror, porcelain commode, fiberglass tub and shower combination |

## MECHANICAL DETAIL

| | |
|---|---|
| **Heating** | Forced Air |
| **Cooling** | HVAC |
| **Plumbing** | Assumed to code and adequate. |
| **Electrical** | Assumed to code and adequate. |
| **Fire Protection** | Smoke detectors are present in each unit |

## SITE IMPROVEMENTS

| | |
|---|---|
| **Parking Type** | Surface |
| **Surface Parking Spaces** | 130 |
| **Landscaping** | Low maintenance shrubs and grass |
| **Fencing** | concrete barrier around perimter |

## RENOVATION/DEFERRED MAINTENANCE

| | |
|---|---|
| **Recent Renovations or Replacements** | N/A |
| **Deferred Maintenance** | N/A |
| **Cost to Cure** | N/A |

## SUMMARY

| | |
|---|---|
| **Building Condition** | Average; The subject property has been well-maintained and competes well relative to other properties in the neighborhood |
| **Building Quality** | Average; The subject property is of overall average quality and offers similar amenities as other properties in the neighborhood. |
| **Design and Functionality** | Average/Good |
| **Actual Age** | 40 years |
| **Expected Economic Life** | 55 years |
| **Effective Age** | 40 years |
| **Remaining Economic Life** | 15 years |

## CONCLUSION

The design and layout of the respective buildings are well suited for the market area and should, therefore, maintain high occupancy rates within the market. Units are similar to that of the competition.

BBG

# REAL PROPERTY TAXES AND ASSESSMENT

## PROPERTY ASSESSMENT

Assessment and real estate tax information was provided by the Dallas County Appraisal District's Office. In the state of Texas, multifamily properties are assessed at 100.0% of market value, as estimated by the assessor. The subject property is identified by parcel number #00000769000800000, as shown in the parcel map below.

Following is a summary of the historical property assessment.

| REAL ESTATE ASSESSMENT AND TAXES | | | | |
|---|---|---|---|---|
| | 2019 | 2020 | 2021 | BBG Proj. |
| Assessor's Appraised Value | $951,000 | $951,000 | $951,000 | $5,600,000 |
| Assessed Value | $951,000 | $951,000 | $951,000 | $5,600,000 |
| Taxable Value | $951,000 | $951,000 | $951,000 | $5,600,000 |
| Effective Tax Rate (per $100) | 2.8316 | 2.8108 | 2.7707 | 2.7707 |
| **Property Taxes** | $26,928 | $26,731 | $26,349 | $155,157 |
| Special Assessments | - | - | - | - |
| **Total Property Taxes** | $26,928 | $26,731 | $26,349 | $155,157 |
| per Unit | $385 | $382 | $376 | $2,217 |

## ASSESSMENT COMPARISONS

In order to determine whether the assessment of the subject property is reasonable, we have examined assessments of similar market rate properties in the area, summarized in the following table.

| REAL ESTATE TAX COMPARABLES | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| No. | Property Name | No. Units | Year Built / Renovated | Avg Unit Size (SF) | Assessor's Appraised Value (2020) | per SF | per Unit | Assessor's Appraised Value (2021) | per SF | per Unit |
| | **Subject Property** | **70** | **1981** | **725** | **$951,000** | **$18.74** | **$13,586** | **$951,000** | **$18.74** | **$13,586** |
| | **Subject Property (Concluded)** | **70** | **1981** | **725** | **-** | **-** | **-** | **$5,600,000** | **$110.32** | **$80,000** |
| 1 | Gateway Apartments (ABP) | 76 | 1970 / 2004 | 954 | $5,600,000 | $77.24 | $73,684 | $6,230,000 | $85.93 | $81,974 |
| 2 | Autumn Brook | 60 | 1980 | 698 | $2,950,000 | $70.44 | $49,167 | $3,683,000 | $87.94 | $61,383 |
| 3 | Winding Way | 50 | 1985 | 498 | $2,150,000 | $86.35 | $43,000 | $2,728,360 | $109.57 | $54,567 |
| 4 | West Creek Villas | 54 | 1979 | 770 | $3,500,000 | $84.18 | $64,815 | $4,028,810 | $96.89 | $74,608 |
| 5 | Spring Creek | 72 | 1978 | 1,042 | $6,495,930 | $86.58 | $90,221 | $6,984,000 | $93.09 | $97,000 |
| | **Low** | 50 | 1978 | 498 | $2,150,000 | $70.44 | $43,000 | $2,728,360 | $85.93 | $54,567 |
| | **High** | 76 | 1985 | 1,042 | $6,495,930 | $86.58 | $90,221 | $6,984,000 | $109.57 | $97,000 |
| | **Average** | 62 | 1981 | 792 | $2,069,593 | $40.48 | $32,089 | $2,365,417 | $47.34 | $36,953 |

The 2021 assessments of the tax comparables range from $54,567 to $97,000/unit with a mean of $36,953/unit, and from $85.93 to $109.57/SF with a mean of $47.34/SF. In the state of Texas, brokers typically proforma taxes 80% to 95% of purchase price. Given such, we have concluded an assessed value based on 80% of value ($6,900,000) or $5,680,000. The subject property is within the range of comparables in terms of vintage, number of units, average unit size and amenities. It should be noted, the subject's assessment is below the range of comparables on per Unit and SF basis. This is mainly due to the subject being classified as a motel by the appraisal district, however the property is currently operating as a multifamily property. For the purpose of the report, we are analyzing the property as it is currently being operated.

## CONCLUSION

Taxes for the following 12 months are projected as shown in the following table.

| TAX PROJECTION | |
| --- | --- |
| Assessor's Appraised Value | $5,600,000 |
| Assessed Value | $5,600,000 |
| Taxable Value | $5,600,000 |
| Tax Rate (per $100) | 2.7707 |
| **Property Taxes** | $155,157 |
| Special Assessments | - |
| **Total Property Taxes** | $155,157 |
| per Unit | $2,217 |

# HIGHEST AND BEST USE

## HIGHEST AND BEST USE AS VACANT

Legal restrictions include deed restrictions, CC&R's, lease encumbrances, zoning requirements, building codes, historic district controls and environmental regulations, and were previously analyzed to determine legally permitted uses. Legally, the subject is zoned MU-3 (Mixed Use). Allowable uses include multifamily. No other legal restrictions have been identified that would limit development of the property beyond the development standards stipulated by municipal code.

Size, shape, topography, soil condition, availability of utilities, transportation access, surrounding uses, and locational characteristics were previously analyzed to determine which legal land uses are physically possible and which are best to conform to the physical and locational aspects of the site and its setting with respect to the neighborhood and community. Overall, the physical site attributes result in adequate utility, and the property could be developed with a variety of legally-conforming uses. Given the surrounding uses and location, the site is best suited for multifamily property use.

Financial feasibility is determined by the relationship of supply and demand for the legally probable land uses versus the cost to create them. The market analysis section reveals that multifamily uses in the subject's market are generally stabilized. Recent and planned multifamily developments in the market area serve as direct evidence that new multifamily development is financially feasible. Comparisons of rental rates, operating expenses and construction costs indicate the property is capable of providing an adequate return on investment to warrant new multifamily development in the current market. This assertion is supported by the fact that the property has the potential to generate rental income as shown in the income approach. Therefore, multifamily use is considered financially feasible.

The final test of highest and best use of the site as vacant is that the use be maximally productive, yielding the highest return to the land. In order to determine the maximally productive use, a comparison of rental rates, occupancy, operating expenses, and rates of return for the financially feasible uses have been made. Based on this analysis, multifamily use renders the highest residual land value; therefore, multifamily development on the subject's site is the maximally productive use of the subject as vacant.

## HIGHEST AND BEST USE AS IMPROVED

The subject is currently improved with a 70-unit multifamily property on a 50,760 square foot site that conforms to its surrounding uses. Continued used of the improvements for multifamily use is physically possible.

The subject appears to be a legal conforming use in this zoning district.

Financial feasibility as an income-producing investment is based on the amount of rental income it can generate net of the required operating expenses. If the resulting net operating income motivates continued operation, then the land is being put to a productive and financially feasible use. The subject is capable of producing positive net cash flow to an investor. The existing improvements provide contributory value to the site, and there is no alternate use that would result in a greater value. Therefore, utilization of the existing improvements is financially feasible.

The maximally productive use should conform to neighborhood trends and be consistent with existing nearby land uses. The single use that produces the greatest return on investment and usually the highest price and value is typically the highest and best use. As shown in the applicable valuation sections, properties like the subject have been acquired and continue to be used for multifamily use. None of the comparable properties were acquired for conversion to an alternative use. This provides evidence suggesting that the current multifamily use is maximally productive.

# VALUATION PROCESS

## OVERVIEW

The three traditional approaches to valuing improved properties are:

- Sales Comparison Approach - a comparison of the property appraised with reasonable similar, recently conveyed properties for which the price, terms and conditions of sale are known;

- Income Capitalization Approach - the processing of a projected net income into an opinion of value via one or more capitalization techniques; and

- Cost Approach - an estimate of the replacement cost of all structural improvements as if new, less loss in value attributable to depreciation from all causes plus the value of the land as if vacant.

The Sales Comparison Approach is founded upon the principle of substitution that holds that the cost to acquire an equally desirable substitute property without undue delay ordinarily sets the upper limit of value. At any given time, prices paid for comparable properties are construed by many to reflect the value of the property appraised. The validity of a value indication derived by this approach is heavily dependent upon the availability of data on recent sales of properties similar in location, size, and utility to the appraised property.

The Income Capitalization Approach is based on the principle of anticipation that recognizes the present value of the future income benefits to be derived from ownership in a particular property. The Income Capitalization Approach is most applicable to properties that are bought and sold for investment purposes, and is considered very reliable when adequate income and expense data are available. Since income producing real estate is most often purchased by investors, this approach is valid and is generally considered the most applicable when the property being appraised was designed for, or is easily capable of producing a rental income.

The Cost Approach is based on the premise that the value of a property can be indicated by the current cost to construct a reproduction or replacement for the improvements minus the amount of depreciation evident in the structures from all causes plus the value of the land and entrepreneurial profit. This approach to value is particularly useful for appraising new or nearly new improvements.

## SUMMARY

This appraisal employs the Sales Comparison Approach and the Income Capitalization Approach. Based on our analysis and knowledge of the subject property type and relevant investor profiles, it is our opinion that these approaches would be considered applicable and/or necessary for market participants. The subject's age makes it difficult to accurately form an opinion of depreciation and tends to make the Cost Approach unreliable. Investors do not typically rely on the Cost Approach when purchasing a property such as the subject of this report. Therefore, we have not employed the Cost Approach to develop an opinion of market value; this exclusion does not affect the credibility of the assignment results herein.

The valuation process is concluded by analyzing each approach to value used in the appraisal. When more than one approach is used, each approach is judged based on its applicability, reliability, and the quantity and quality of its data. A final value opinion is chosen that either corresponds to one of the approaches to value, or is a correlation of all the approaches used in the appraisal.

# SALES COMPARISON APPROACH

The most widely used and market-oriented unit of comparison for properties such as the subject is the sales price per unit. All comparable sales were analyzed on this basis.

Due to the nature of the subject property and the level of detail available for the comparable data, we have elected to analyze the comparables through application of a traditional adjustment grid utilizing percentage adjustments.

## COMPARABLE IMPROVED SALES

On the following pages, we present a summary of the improved properties that we compared to the subject property, a map showing their locations, and the adjustment process.



BBG

## COMPARABLE IMPROVED SALES SUMMARY

| No. | Property / Location | Date of Sale | Transaction Status | Property Rights | Year Built/ Renovated | Bldg. Size (SF Net) | No. Units | Avg Unit Size (SF) | Occup. | Sales Price | Sales Price per $/SF (Net) | Sales Price per $/Unit | NOI /Unit | NOI PSF (Net) | Overall Rate |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **SUMMARY OF IMPROVED SALES** | | | | | | | | | | | | | | |
| 1 | 98Fifty 9850 Whitehurst Drive Dallas, TX | Jun-21 | Closed | Leased Fee | 1981 | 164,040 | 196 | 836 | 87% | $20,600,000 | $125.58 | $105,102 | $4,876 | $5.83 | 4.64% |
| 2 | Apex 9911 Whitehurst Drive Dallas, TX | Jun-21 | Closed | Leased Fee | 1979 / 2013 | 177,376 | 244 | 726 | 89% | $24,800,000 | $139.82 | $101,639 | $4,961 | $6.82 | 4.88% |
| 3 | Overlook Ranch 3440 Timberglen Road Dallas, TX | Oct-20 | Closed | Leased Fee | 1984 / 2017 | 504,732 | 580 | 870 | 92% | $60,500,000 | $119.87 | $104,310 | $5,476 | $6.29 | 5.25% |
| 4 | McCallum Communities 7740 & 7777 McCallum Boulevard Dallas, TX | Aug-20 | Closed | Leased Fee | 1985 | 249,900 | 419 | 596 | 93% | $39,000,000 | $156.06 | $93,079 | $5,161 | $8.66 | 5.54% |
| 5 | Frankford Flats 2601 Frankford Dallas, TX | Jan-20 | Closed | Leased Fee | 1983 | 267,801 | 334 | 801 | 93% | $38,300,000 | $143.02 | $114,671 | - | - | - |
| **Subj.** | **Amerigold Suites 13636 Goldmark Drive Dallas, Texas** | --- | --- | **Leased Fee** | **1981** | **50,760** | **70** | **725** | **96%** | **---** | | | **---** | **---** | **4.50%** |

## ADJUSTMENT PROCESS

The sales that we have utilized represent the best available information that could be compared to the subject property. The major elements of comparison for an analysis of this type include the property rights conveyed, the financial terms incorporated into a particular transaction, the conditions or motivations surrounding the sale, changes in market conditions since the sale, the location of the real estate, its physical traits and the economic characteristics of the property.

## MARKET CONDITIONS

This adjustment category accounts for differences in economic conditions between the effective date of appraisal and the transaction date of the comparable, such as may be caused by changing supply and demand factors, rental rates, vacancy rates and/or capitalization rates. Over the past 12 months, capitalization rates have compressed and multifamily fundamentals in the Dallas market have also improved over the same period. Given such, we have adjusted the comparables based on an annual rate of 3% from the date of sale of the comparables to the effective date of the report.

Sale No. 1 was judged inferior to the subject and received an upward adjustment of 1.0%. Sale No. 2 was judged inferior to the subject and received an upward adjustment of 1.0%. Sale No. 3 was judged inferior to the subject and received an upward adjustment of 1.0%. Sale No. 4 was judged inferior to the subject and received an upward adjustment of 2.0%. Sale No. 5 was judged inferior to the subject and received an upward adjustment of 5.0%.

## LOCATION

The appeal of a property's location to users of and/or investors in a particular property type can influence value significantly. This factor broadly considers the impact of demographics, geographical attributes, access to transportation networks and local land use trends on pricing. Comparisons of location can often be derived, or even quantified, by examining rent, vacancy, capitalization rate, and land value trends in the subject and directly competitive areas.

All of the comparables were considered similar to the subject and no adjustments were required for this category.

## AVERAGE UNITS SIZE (SF)

The value of vacant land is largely contingent upon its potential use. This factor considers the uses permitted by the applicable development standards, per the subject's zoning designation. The maximum density to which a property can be developed typically impacts total value positively; however, depending upon property type, location, and type of construction higher permitted densities can have an inverse relationship to pricing on a per-unit or per-square-foot basis. The comparables were adjusted based on 5% difference for every 100 SF difference compared to the subject.

Comparable No. 1 was regarded superior to the subject and received a downward adjustment of 6%. Comparable No. 3 was regarded superior to the subject and received a downward adjustment of 7%. Comparable No. 4 was judged inferior to the subject and received an upward adjustment of 6%. Comparable No. 5 was regarded superior to the subject and received a downward adjustment of 4%.

## YEAR BUILT / RENOVATED

Sites with a higher density allow for a larger building area, and are considered superior to similar sites with a lower building area allowance.

Comparable No. 2 was regarded superior to the subject and received a downward adjustment of 5%. Comparable No. 3 was regarded superior to the subject and received a downward adjustment of 5%.

## PROJECT AMENITIES

The prices of properties located within flood prone areas tend to be proportionately less than otherwise similar parcels not adversely affected by flood plain locations. This is due to the increased development costs associated with alleviating the problem as well as the fact that portions of the site may not be able to be developed or higher expenses related to insurance for buildings located in flood prone areas.

Comparable No. 3 was regarded superior to the subject and received a downward adjustment of 5%. Comparable No. 4 was regarded superior to the subject and received a downward adjustment of 5%. Comparable No. 5 was regarded superior to the subject and received a downward adjustment of 10%.

## UNIT AMENITIES

This category may be used to illustrate differences in additional legal requirements (outside of zoning) such as reciprocal parking and/or access agreements, deed restrictions, easements, CCR's and other.

All of the comparables were considered similar to the subject and no adjustments were required for this category.

## OCCUPANCY

All other factors being equal, properties that exhibit higher occupancy command premiums over those with lower occupancy ratios.

Comparable No. 1 was judged inferior to the subject and received an upward adjustment of 5%. Comparable No. 2 was judged inferior to the subject and received an upward adjustment of 5%.

## SUMMARY OF PROPERTY ADJUSTMENTS

Comparable No. 1 was regarded superior to the subject and received a downward adjustment of 1%. Comparable No. 3 was regarded superior to the subject and received a downward adjustment of 17%. Comparable No. 4 was judged inferior to the subject and received an upward adjustment of 1%. Comparable No. 5 was regarded superior to the subject and received a downward adjustment of 14%.

## COMPARABLE IMPROVED SALES ADJUSTMENT GRID

| COMPARABLE SALE SUMMARIES AND ADJUSTMENTS | | | | | | |
|---|---|---|---|---|---|---|
| | **Subject** | **Sale 1** | **Sale 2** | **Sale 3** | **Sale 4** | **Sale 5** |
| Property / Location | Amerigold Suites 13636 Goldmark Drive Dallas, Texas | 98Fifty 9850 Whitehurst Drive Dallas, TX | Apex 9911 Whitehurst Drive Dallas, TX | Overlook Ranch 3440 Timberglen Road Dallas, TX | McCallum Communities 7740 & 7777 McCallum Boulevard Dallas, TX | Frankford Flats 2601 Frankford Dallas, TX |
| Date of Sale | ----- | Jun-21 | Jun-21 | Oct-20 | Aug-20 | Jan-20 |
| Transaction Status | ----- | Closed | Closed | Closed | Closed | Closed |
| Bldg. Size (SF Net) | 50,760 | 164,040 | 177,376 | 504,732 | 249,900 | 267,801 |
| Bldg. Size (SF Gross) | 50,760 | 189,420 | 198,640 | 535,162 | 262,421 | 267,801 |
| No. Units | 70 | 196 | 244 | 580 | 419 | 334 |
| Avg. Unit Size (SF) | 725 | 836 | 726 | 870 | 596 | 801 |
| Site Size (SF) | 155,074 | 361,210 | 370,737 | 1,274,130 | 273,557 | 533,479 |
| Site Size (Acres) | 3.56 | 8.29 | 8.51 | 29.25 | 6.28 | 12.25 |
| Occup. | 96% | 87% | 89% | 92% | 93% | 93% |
| Sale Price | ----- | $20,600,000 | $24,800,000 | $60,500,000 | $39,000,000 | $38,300,000 |
| NOI per SF | | $5.83 | $6.82 | $6.29 | $8.66 | $0.00 |
| NOI per Unit | $4,423 | $4,876 | $4,961 | $5,476 | $5,161 | $0 |
| Overall Rate | 4.50% | 4.64% | 4.88% | 5.25% | 5.54% | 0.00% |
| **Unadjusted Price ($ per Unit)** | ----- | **$105,102** | **$101,639** | **$104,310** | **$93,079** | **$114,671** |
| **Transactional Adjustments** | | | | | | |
| **Property Rights Conveyed** | *Leased Fee* | *Leased Fee* | *Leased Fee* | *Leased Fee* | *Fee Simple* | *Fee Simple* |
| Adjustment | | **Similar** | **Similar** | **Similar** | **Similar** | **Similar** |
| **Financing** | | | | | | |
| Adjustment | | **Similar** | **Similar** | **Similar** | **Similar** | **Similar** |
| **Terms/Conditions of Sale** | | | | | | |
| Adjustment | | **Superior** | **Similar** | **Similar** | **Similar** | **Similar** |
| **Expenditures After Sale** | | | | | | |
| Adjustment | | **Similar** | **Similar** | **Similar** | **Similar** | **Similar** |
| **Market Conditions** | *Nov-21* | *Jun-21* | *Jun-21* | *Oct-20* | *Aug-20* | *Jan-20* |
| Adjustment | | **1%** | **1%** | **3%** | **4%** | **5%** |
| *Subtotal* | | $106,153 | $102,656 | $107,440 | $96,802 | $120,404 |
| **Comparison** | | **Inferior** | **Inferior** | **Inferior** | **Inferior** | **Inferior** |
| **Adjusted Price ($ per Unit)** | | **$106,153** | **$102,656** | **$107,440** | **$96,802** | **$120,404** |
| **Property Adjustments** | | | | | | |
| | *Good* | *Similar* | *Similar* | *Similar* | *Similar* | *Similar* |
| **Location** | | **0%** | **0%** | **0%** | **0%** | **0%** |
| | *70* | *196* | *244* | *580* | *419* | *334* |
| **Project Size - Units** | | **0%** | **0%** | **0%** | **0%** | **0%** |
| | *725* | *836* | *726* | *870* | *596* | *801* |
| **Average Unit Size (SF)** | | **-6%** | **0%** | **-7%** | **6%** | **-4%** |
| | *1981* | *1981* | *1979 / 2013* | *1984 / 2017* | *1985* | *1983* |
| **Year Built / Renovated** | | **0%** | **-5%** | **-5%** | **0%** | **0%** |
| | *Average* | *Similar* | *Similar* | *Superior* | *Superior* | *Superior* |
| **Project Amenities** | | **0%** | **0%** | **-5%** | **-5%** | **-10%** |
| | *Average* | *Similar* | *Similar* | *Similar* | *Similar* | *Similar* |
| **Unit Amenities** | | **0%** | **0%** | **0%** | **0%** | **0%** |
| *NOI/Unit* | *$4,423* | *$4,876* | *$4,961* | *$5,476* | *$0* | *$0* |
| | *96%* | *87%* | *89%* | *92%* | *93%* | *93%* |
| **Occupancy** | | **5%** | **5%** | **0%** | **0%** | **0%** |
| **Total Property Adjustments** | | **-1%** | **0%** | **-17%** | **1%** | **-14%** |
| **Indication for Subject:** | | **$105,092** | **$102,656** | **$89,175** | **$97,770** | **$103,548** |

## CONCLUSION OF SALES COMPARISON APPROACH

After adjustments the comparable improved sales reflect prices ranging from $89,175 to $105,092 per unit with an average adjusted price of $99,648 per unit. Primary weight was placed on the adjusted mean of the data set. All things considered, we conclude that the indicated value by the Sales Comparison Approach is $99,000 per unit.

## VALUE INDICATION FROM SALES COMPARISON

Our conclusion via the Sales Comparison Approach is as follows, as previously discussed.

| SALES COMPARISON APPROACH VALUE CONCLUSION | |
|---|---:|
| Indicated Value Per Unit | $99,000 |
| No. Units | x 70 |
| **Indicated Value** | **$6,930,000** |
| **Rounded to nearest $50,000** | **$6,950,000** |
| **Per Unit** | **$99,286** |



# INCOME CAPITALIZATION APPROACH

## GENERAL PROCESS

In the Income Capitalization Approach, the value indication is based on the property's capacity to generate income. The following steps are taken to capitalize estimated net operating income into an opinion of value.

- Estimate potential gross income.

- Estimate vacancy and collection loss.

- Estimate anticipated operating expenses.

- Select and apply the appropriate capitalization and discount techniques.

## INCOME ANALYSIS

The subject's potential gross income is a function of rental payments under the terms of current and anticipated leases. This can include base rent as well as expense reimbursements and ancillary income.

## MARKET RENT

### Quoted Rental Rates

The subject property offers studio, one-bedroom and two-bedroom units, in four floor plans. All of the units have standard appliances and interior entries within an enclosed corridor in 2-story, garden style buildings. All units have a balcony or patio. The subject rental rates includes the electricity, water, sewer, cable/internet and trash expenses. Following is a summary of the rents currently being quoted by the property management and the current contract rents by unit type.

| SUBJECT RENT SUMMARY | | | QUOTED RENTAL RATES | |
|---|---|---|---|---|
| Type | No. | Size (SF) | Rent/Mo. | Rent/SF |
| Studio | 1 | 300 | $700 | $2.33 |
| 1BR-1BA | 3 | 500 | $1,050 | $2.10 |
| 1BR-1BA | 56 | 660 | $1,150 | $1.74 |
| 2BR-2BA | 10 | 1,200 | $1,675 | $1.40 |
| **Total/Avg** | **70** | **725** | **$1,214** | **$1.67** |

Comparable rental data will be relied upon to estimate market rental rates for the subject's units.

### Comparable Rents

The comparable rentals are all located within 1.50 miles of the subject property. None of the Rental Comparables were offering rental concessions. All 5 comparable properties offer a similar level of unit and project amenity package. All five comparables are similar with regard to located and are all garden design, which is considered similar to the subject's design.

## COMPARABLE RENTAL MAP



| | | | | COMPARABLE RENTAL SURVEY | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | No. | Year Built / | Avg Unit | Avg Asking Rent | | Avg Effective Rent | | |
| No. | Property Name | Units | Renovated | Size (SF) | ($/mo.) | ($/SF) | ($/mo.) | ($/SF) | Occup. |
| 1 | Gateway Apartments (ABP) | 76 | 1970 / 2004 | 954 | $1,197 | $1.25 | $1,197 | $1.25 | 100% |
| 2 | Autumn Brook | 60 | 1980 | 698 | $909 | $1.30 | $909 | $1.30 | 100% |
| 3 | Winding Way | 50 | 1985 | 498 | $498 | $1.00 | $498 | $1.00 | 98% |
| 4 | West Creek Villas | 54 | 1979 | 770 | $857 | $1.11 | $857 | $1.11 | 100% |
| 5 | Spring Creek | 72 | 1978 | 1,042 | $1,416 | $1.36 | $1,416 | $1.36 | 100% |
| | Minimum | 50 | --- | 498 | $498 | $1.00 | $498 | $1.00 | 98% |
| | Maximum | 76 | --- | 1,042 | $1,416 | $1.36 | $1,416 | $1.36 | 100% |
| | Average | 62 | --- | 792 | $975 | $1.20 | $975 | $1.20 | 99.7% |
| | **Subject (Concluded)** | **70** | **---** | **725** | **-** | **-** | **$1,190** | **$1.64** | **95.7%** |

The preceding comparable properties are analyzed in the following tables in order to estimate market rent for the subject property. The subject's asking rent is shown in the tables that follow, and a market rent is then concluded for each unit type.

*Studio/1BR Units*

| Comp No. | Property Name | Year Built / Renovated | Unit Type | Size (SF) | Rental Rate ($/mo.) | Rental Rate ($/SF) | Utilities Paid | Utility Adjustment | Adjusted Rental Rate ($/mo.) | Adjusted Rental Rate ($/SF) |
|---|---|---|---|---|---|---|---|---|---|---|
| **UNIT-BY-UNIT ANALYSIS − Studio/One-Bedrooom** | | | | | | | | | | |
| 3 | Winding Way | 1985 | 1BR-1BA | 486 | $486 | $1.33 | W, S, T | $59 | $545 | $1.12 |
| **Subject** | **Amerigold Suites** | **1981** | **Studio** | **300** | **$700** | **$2.33** | **E, W, S, T** | **-** | **$700** | **$2.33** |
| 4 | West Creek Villas | 1979 | 1BR/1BA | 675 | $808 | $1.33 | W, S, T | $59 | $867 | $1.28 |
| 2 | Autumn Brook | 1980 | 1BR/1BA | 652 | $866 | $1.33 | W, S, T | $59 | $925 | $1.42 |
| 1 | Gateway Apartments (ABP) | 1970/2004 | 1BR/1BA | 721 | $975 | $1.35 | E, W, S, T | $0 | $975 | $1.35 |
| **Subject** | **Amerigold Suites** | **1981** | **1BR-1BA** | **500** | **$1,035** | **$2.07** | **E, W, S, T** | **-** | **$1,035** | **$2.07** |
| **Subject** | **Amerigold Suites** | **1981** | **1BR-1BA** | **660** | **$1,120** | **$1.70** | **E, W, S, T** | **-** | **$1,120** | **$1.70** |
| 5 | Spring Creek | 1978 | 1BR-1BA | 720 | $1,125 | $1.33 | None | $112 | $1,237 | $1.72 |
| 5 | Spring Creek | 1978 | 1BR-1BA | 905 | $1,155 | $1.33 | None | $112 | $1,267 | $1.40 |

Rental Range ($/mo.):  $486 to $1,120          Average: $856
Rental Range ($/SF):  $1.33 to $2.33          Average: $1.63
Unit Size (SF):  300 to 721          Average: 571

Given the lack of comparable Studio floor plans in the market, we have compared the subject's Studio floor plan to 1BR floor plans. The subject's studio unit size lies outside the range presented by the comparables properties. According to the rent roll, the only Studio unit leases for $700 per month. Additionally, we have adjusted the comparables for any difference in the utility structure when compared to the subject, based on the most recent utility allowances per the Dallas County Housing Authority. Given the historical leasing of the property and consideration of comparable rents, we reconciled the average market rent for this unit type at **$700 per month** ($2.33 per square foot). The reconciled rental rate is below the comparable rentals due to the significantly smaller unit size. Additionally, the concluded rate is near the asking rental rate and the in place average and considered reasonable.

The subject's 1BR unit size lies within the range presented by the comparables properties. According to the rent roll, contract rents range from $1,000 to $1,150 per month with an average rental rate of $1,182 per month. Additionally, we have adjusted the comparables for any difference in the utility structure when compared to the subject, based on the most recent utility allowances per the Dallas County Housing Authority. Given the historical leasing of the property and consideration of comparable rents, we reconciled the average market rent for this unit type at **$1,035 per month** ($2.07 per square foot) for the 500 SF plan and **$1,120 per month** ($1.70 per square foot). The reconciled rental rate is within the comparable rentals. Additionally, the concluded rate is near the asking rental rate and the in place average and considered reasonable.

BBG

*2BR-2BA Units*

| Comp No. | Property Name | Year Built / Renovated | Unit Type | Size (SF) | Rental Rate ($/mo.) | Rental Rate ($/SF) |
|---|---|---|---|---|---|---|
| UNIT-BY-UNIT ANALYSIS – Two-Bedroom |||||||
| 3 | Winding Way | 1985 | 2BR-2BA | 780 | $780 | $1.00 |
| 1 | Gateway Apartments (ABP) | 1970/2004 | 2BR/2BA | 901 | $1,217 | $1.35 |
| 1 | Gateway Apartments (ABP) | 1970/2004 | 2BR/2BA | 953 | $1,190 | $1.25 |
| 4 | West Creek Villas | 1979 | 2BR-2BA | 972 | $985 | $1.01 |
| 5 | Spring Creek | 1978 | 2BR-2BA | 1,048 | $1,385 | $1.32 |
| 4 | West Creek Villas | 1979 | 2BR-2BA | 1,067 | $985 | $0.92 |
| 2 | Autumn Brook | 1980 | 2BR-1.5BA | 1,075 | $1,239 | $1.15 |
| **Subject** | **Amerigold Suites** | **1981** | **2BR-2BA** | **1,200** | **$1,675** | **$1.40** |
| 5 | Spring Creek | 1978 | 2BR-2BA | 1,258 | $1,705 | $1.36 |

Rental Range ($/mo.):  $780 to $1,705     Average: $1,240

Rental Range ($/SF):  $0.92 to $1.40     Average: $1.20

Unit Size (SF):  780 to 1,258     Average:  1,028

The subject's unit size lies outside the range presented by the comparables properties. According to the rent roll, contract rents range from $980 to $1,650 per month with an average rental rate of $1,182 per month. Additionally, we have adjusted the comparables for any difference in the utility structure when compared to the subject, based on the most recent utility allowances per the Dallas County Housing Authority. Given the historical leasing of the property and consideration of comparable rents, we reconciled the average market rent for this unit type at **$1,195 per month** ($0.98 per square foot). The reconciled rental rate is above the comparable rentals due to the significantly larger unit size and the subject is superior to the comparables in terms of vintage. Additionally, the concluded rate is near the asking rental rate and the in place average and considered reasonable.

## MARKET RENT CONCLUSIONS

Following are the concluded market rents for the subject property:

| Type | No. | Size (SF) | Rent/Mo. | Rent/SF | Total |
|---|---|---|---|---|---|
| MARKET RENTAL RATES ||||||
| Studio | 1 | 300 | $700 | $2.33 | $700 |
| 1BR-1BA | 3 | 500 | $1,035 | $2.07 | $3,105 |
| 1BR-1BA | 56 | 660 | $1,120 | $1.70 | $62,720 |
| 2BR-2BA | 10 | 1,200 | $1,675 | $1.40 | $16,750 |
| **Total/Avg** | **70** | **725** | **$1,190** | **$1.64** | **$83,275** |

The concluded average rental rate per square foot is above the average of the range presented by the comparable rental properties, but is considered reasonable due to the subject's small unit size, while the concluded rental rate per unit is within the comparable range. The concluded market rents are considered to be consistent with the market. The gross potential rents—i.e., vacancies and employee units included at market rent—per the rent roll dated 26-Aug-2021, sum to $82,955  with an occupancy of 95.7%.

The valuation analysis of the subject is leased fee, so the gross annual potential rent utilized for the subject property is $995,460  ($82,955 /mo. × 12 months). As previously noted, we have included the occupied units at the contract rents and any vacant units at the reconciled market rent, as shown in the following tables.

| POTENTIAL GROSS INCOME - VACANT UNITS AT MARKET RENTS | | | | | |
| | No. Units | | | Market | Total Rent | |
| Type | Total | Leased | Vacant* | Rent/Mo. | per Mo. | per Year |
|---|---|---|---|---|---|---|
| Studio | 1 | 1 | 0 | $700 | $0.00 | $0.00 |
| 1BR-1BA | 3 | 3 | 0 | $1,035 | $0.00 | $0.00 |
| 1BR-1BA | 56 | 52 | 2 | $1,120 | $2,240 | $26,880 |
| 2BR-2BA | 10 | 9 | 1 | $1,675 | $1,675 | $20,100 |
| Total/Avg | 70 | 65 | 3 | | $3,915 | $46,980 |

* Includes non-revenue and employee units

An adjustment is required for any employee units that are generating some level of rent, which is already included as contract rent.

| TOTAL POTENTIAL GROSS INCOME | | |
| | Monthly | Annual |
|---|---|---|
| Contract Rent* | $77,800 | $933,600 |
| Vacancies | $3,915 | $46,980 |
| Employee Units Adjustment | $1,240 | $14,880 |
| Total | $82,955 | $995,460 |

*per Rent Roll

## VACANCY AND COLLECTION LOSS

As discussed previously in the report, the overall vacancy in the subject's area has remained strong. We surveyed 5 competitive market-rate rental properties in the general vicinity, which comprised a total of 312  units—of which 312  units reported occupancy levels.

| OCCUPANCY SUMMARY | | |
| No. | Property Name | Occup. Rate |
|---|---|---|
| 1 | Gateway Apartments (ABP) | 100% |
| 2 | Autumn Brook | 100% |
| 3 | Winding Way | 98% |
| 4 | West Creek Villas | 100% |
| 5 | Spring Creek | 100% |
| | Minimum | 98% |
| | Maximum | 100% |
| Subject's Actual Occupancy | | 95.7% |
| Subject's Forecast Occupancy | | 95.0% |

At the time of inspection, the subject property was 95% occupied, which is within the range of the comparable properties in the area. As previously stated, the subject is currently operating on all month to month leases, which is atypical in the market, with most properties signing 12 month leases. As such, we project a total vacancy loss for the subject property of 5%.

## BAD DEBT / COLLECTION LOSS

In addition to physical vacancy loss and losses attributable to concessions, Loss to lease, the subject will also suffer losses due to rental write offs, bad debt, etc. Typically, discounted employee-occupied units are included as a payroll expense, and model units are accounted for in administrative expenses. Investors typically expect credit losses of 0.15% to 3.00% for apartment projects with the lower end of the range representative of Class A communities. We have included a bad debt/collection loss deduction of 2% in our proforma. Contract rent is being used in the valuation analysis, so loss to lease was not applicable. Currently, the subject is not offering any concessions nor are comparable properties in the vicinity of the subject. Thus, no concession deduction is warranted for the subject property.

## OTHER INCOME

This income category includes services such as late charges, damage, and cleaning fees. This income category can fluctuate due to any number of reasons including rental market, the economy, or increased turnover. The subject's ancillary income is shown in the following table.

| ANCILLARY INCOME (PER UNIT) | | | | | |
|---|---|---|---|---|---|
| Income Item | IREM | 2019 | 2020 | T6 June 2021 Annualized | BBG Forecast |
| Miscellaneous | - | 401 | 288 | - | 290 |
| Total Ancillary Income | 820 | 401 | 288 | - | 290 |

Miscellaneous income includes pet fees, late fees, and various application fees, as well as move out charges of vacating residents. We estimate miscellaneous income of $290 per unit (net of vacancy and collection loss), which is near the historical operations at the subject.

## EFFECTIVE GROSS INCOME

The summation of the preceding income analysis results in what is commonly referred to as the *effective gross income* (EGI).

We have estimated the market rents and ancillary income based on comparable market data and historical operations. Following is a comparison of historical performance of the property. It should be noted, the owner did not report a vacancy loss for the provided operating statements of YE 2019 and 2020, as well as YTD June 2021. The projected EGI employs market rents that are consistent with market data, which are also supported by the most recent leases at the subject. The projected EGI is 8.6% higher than the YE 2020 operating statement, which is due in large part to increase in rental rates at the subject over the past several months, which mirrors the rental rate growth seen in the Dallas market.

| EGI COMPARISON | | |
|---|---|---|
| Year | Amount | Change |
| 2019 | $890,607 | — |
| 2020 | $871,098 | -2.2% |
| T6 June 2021 Annualized | $858,124 | -1.5% |
| Forecast | $946,078 | 8.6% |

| HISTORICAL & PRO FORMA OPERATING ANALYSIS | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | **2019** | | **2020** | | **T6 June 2021 Annualized** | | **BBG Projection*** | |
| | Total | per Unit | Total | per Unit | Total | per Unit | Total | per Unit |
| **INCOME** | | | | | | | | |
| Base Rental Income | $862,544 | $12,322 | $850,920 | $12,156 | $858,124 | $12,259 | $995,460 | $14,221 |
| Miscellaneous | 28,063 | 401 | 20,178 | 288 | 0 | 0 | 20,300 | 290 |
| **Total Potential Gross Income** | $890,607 | $12,723 | $871,098 | $12,444 | $858,124 | $12,259 | $1,015,760 | $14,511 |
| Physical Vacancy | 0 | 0 | 0 | 0 | 0 | 0 | (49,773) | (711) |
| Bad Debt / Collection Loss | 0 | 0 | 0 | 0 | 0 | 0 | (19,909) | (284) |
| Gain/Loss to Lease | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Concessions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Vacancy & Collection Loss | 0 | 0 | 0 | 0 | 0 | 0 | (69,682) | (995) |
| **EFFECTIVE GROSS INCOME** | $890,607 | $12,723 | $871,098 | $12,444 | $858,124 | $12,259 | $946,078 | $13,515 |
| **OPERATING EXPENSES** | | | | | | | | |
| Real Estate Taxes | $13,489 | $193 | $26,826 | $383 | $0 | $0 | $155,157 | $2,217 |
| Insurance | 25,909 | 370 | 31,445 | 449 | 33,424 | 477 | 31,445 | 449 |
| Gas | 0 | 0 | 0 | 0 | 0 | 0 | 6,650 | 95 |
| Electricity | 95,996 | 1,371 | 179,500 | 2,564 | 183,448 | 2,621 | 106,750 | 1,525 |
| Water/Sewer | 42,453 | 606 | 0 | 0 | 0 | 0 | 45,500 | 650 |
| Cable/Internet | 13,377 | 191 | 0 | 0 | 0 | 0 | 14,000 | 200 |
| Trash Removal | 6,747 | 96 | 0 | 0 | 0 | 0 | 6,650 | 95 |
| Exterminating | 3,315 | 47 | 4,162 | 59 | 4,188 | 60 | 4,200 | 60 |
| Maintenance & Repairs | 173,463 | 2,478 | 44,576 | 637 | 35,990 | 514 | 44,450 | 635 |
| Painting & Decorating | 4,459 | 64 | 8,883 | 127 | 4,264 | 61 | 8,750 | 125 |
| Grounds | 10,600 | 151 | 9,300 | 133 | 6,000 | 86 | 9,450 | 135 |
| Management | 0 | 0 | 0 | 0 | 0 | 0 | 28,382 | 405 |
| Payroll | 166,730 | 2,382 | 120,316 | 1,719 | 128,060 | 1,829 | 119,000 | 1,700 |
| Advertising | 0 | 0 | 0 | 0 | 0 | 0 | 7,000 | 100 |
| General Administration | 59,095 | 844 | 22,762 | 325 | 20,282 | 290 | 21,000 | 300 |
| Replacement Reserves | 0 | 0 | 0 | 0 | 0 | 0 | 21,000 | 300 |
| **TOTAL EXPENSES** | $615,632 | $8,795 | $447,770 | $6,397 | $415,656 | $5,938 | $629,384 | $8,991 |
| **NET OPERATING INCOME** | $274,975 | $3,928 | $423,328 | $6,048 | $442,468 | $6,321 | $316,694 | $4,524 |

* Fiscal Year Beginning Nov-21

## OPERATING EXPENSE ANALYSIS

Typically, the best source of information to estimate pro forma operations for the property is the actual historical performance of the subject. We have been provided with three years of historical operations (2019 and 2020), as well as trailing twelve months through June 2021. A summary of historical operations for the subject, as well as our projections, are found on the preceding page. Each of the respective expense items is estimated in the following analysis with consideration given to comparable expense data from the local market.

## COMPARABLE EXPENSE DATA

Each of the respective expense items is projected in consideration of actual historical operations and market data. The following table summarizes the expenses from multifamily properties in the general vicinity of the subject property. Although an attempt was made to categorize expenses on a similar basis to the subject, the nature of the raw data prevented such in some categories, especially with regard to the level of detail. The management fee for a property is typically based upon a percentage of the EGI, which is denoted separately. Property insurance is also shown on the basis of per square foot of building area, which is shown separately in the table.

| COMPARABLE EXPENSES | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Comp #1 | | | Comp #2 | | | Comp #3 | | | Comp #4 | | |
| Property Name | Centerpointe | | | Confidential | | | The Ashlar | | | Heatherstone | | |
| City | Dallas | | | Dallas | | | Dallas | | | Dallas | | |
| County, St | Denton, TX | | | Dallas, TX | | | Denton, TX | | | Denton, TX | | |
| Project Type | Garden | | | Garden | | | Garden | | | Garden | | |
| No. Stories | 3 | | | 2 | | | 3 | | | 2 | | |
| Year Built | 1985 | | | 1979 | | | 1985 | | | 1985 | | |
| No. Units | 461 | | | 292 | | | 264 | | | 152 | | |
| Rentable Area | 240,647 | | | 232,668 | | | 206,308 | | | 115,900 | | |
| Average Unit Size (SF) | 522 | | | 797 | | | 781 | | | 763 | | |
| Year Operations | June 2020 T12 | | | April 2020 T12 | | | March 2019 T12 | | | March 2019 T12 | | |
| **INCOME** | | per Unit | | | per Unit | | | per Unit | | | per Unit | |
| Rental Income | 4,206,777 | | | 3,485,947 | | | 2,719,728 | | | 1,591,288 | | |
| Parking | - | | | 9,687 | | | 58,069 | | | 41,301 | | |
| Utility Reimbursements | 253,175 | | | 215,927 | | | 249,668 | | | 156,340 | | |
| Other Income | 425,196 | 13.9% | | 228,547 | 11.5% | | 265,207 | 17.4% | | 146,757 | 17.8% | |
| **Effective Gross Income** | 4,885,148 | 10,597 | | 3,940,108 | 13,494 | | 3,292,671 | 12,472 | | 1,935,686 | 12,735 | |
| **EXPENSES** | | | | | | | | | | | | |
| Advertising | 38,962 | 85 | | 88,556 | 303 | | 68,086 | $258 | | 44,407 | $292 | |
| Management | 189,499 | 411 | 3.88% | 87,111 | 298 | 2.21% | 92,599 | 351 | 2.81% | 54,250 | 357 | 2.80% |
| General Admin. | 211,329 | 458 | | 113,025 | 387 | | 88,443 | 335 | | 64,481 | 424 | |
| Elevator | - | - | | - | - | | - | - | | - | - | |
| Cable/Internet | 111,153 | 241 | | - | - | | - | - | | - | - | |
| Electricity | 34,946 | 76 | | 35,533 | 122 | | 28,132 | 107 | | 14,788 | 97 | |
| Water/Sewer | 216,841 | 470 | | 157,331 | 539 | | 108,872 | 412 | | 76,324 | 502 | |
| Gas | 31,464 | 68 | | 27,577 | 94 | | 21,095 | 80 | | 20,888 | 137 | |
| Trash Removal | 25,535 | 55 | | 43,956 | 151 | | 49,117 | 186 | | 27,169 | 179 | |
| Payroll | 866,542 | 1,880 | | 360,669 | 1,235 | | 367,739 | 1,393 | | 231,481 | 1,523 | |
| Security | 58,367 | 127 | | 54,825 | 188 | | 50,955 | 193 | | 29,177 | 192 | |
| Painting & Decorating | - | - | | - | - | | - | - | | - | - | |
| Maintenance & Repairs | 249,102 | 540 | | 64,992 | 223 | | 92,752 | 351 | | 65,505 | 431 | |
| Exterminating | 20,343 | 44 | | 13,465 | 46 | | 8,536 | 32 | | 4,216 | 28 | |
| Insurance | 116,490 | 253 | 0.48 | 75,066 | 257 | 0.32 | 41,794 | 158 | 0.20 | 24,886 | 164 | 0.21 |
| Grounds | 27,844 | 60 | | 19,592 | 67 | | 30,425 | 115 | | 22,849 | 150 | |
| Other Services | - | - | | - | - | | - | - | | - | - | |
| Real Estate Taxes | 655,391 | 1,422 | | 421,358 | 1,443 | | 409,830 | 1,552 | | 240,670 | 1,583 | |
| Other Taxes | 16,520 | 36 | | 9,198 | 31 | | - | - | | - | - | |
| **Total Expenses** | 2,870,328 | 6,226 | 11.93 | 1,572,254 | 5,384 | 6.76 | 1,458,376 | 5,524 | 7.07 | 921,089 | 6,060 | |
| **NET OPERATING INCOME** | 2,014,820 | 4,371 | | 1,946,574 | 6,666 | | 1,638,836 | 6,208 | | 916,691 | 6,031 | |

Additionally, an annual survey of apartment operating property data is published by IREM (Institute of Real Estate Management). The most recent survey of such data was published in 2019, which contains 2018 operating data from 501 garden apartment communities in the Region 6 metropolitan area, representing a total of 128,089 units. According to the published data, the apartment communities surveyed average 256 dwelling units per property with



an average unit size of 882 square feet. As is the case with the previous operating expense data, various methods of categorization—both by the property management and IREM—preclude an exact item-by-item comparison for all expenses. Nevertheless, the IREM data provides a good basis for comparison with regard to the general metropolitan market.

## TOTAL EXPENSES & REPLACEMENT RESERVES

For all expenses, we relied upon the subject's actual operating history and market data. In order to provide a more equitable basis of comparison, taxes and reserves are excluded from the comparable properties and the subject.

Total Utilities (electric, water, sewer and gas) was concluded to $2,565 per unit which is near the reported expense from the 2020-year end data. It should be noted, the reported expense is well above the range reported by the expense comparables, due to the subject being all bills paid, while the expense comparables are not similar in this regard.

The management fee was reconciled at a rate of 3.0% of EGI, which is within the range exhibited by the comparables. It should be noted, the subject did not report a management fee and we have relied on the expense comparables to conclude this expense.

Advertising was reconciled at $100 per unit, which is within the range of comparables and considered reasonable. The subject did not report an Advertising expense and our projection is supported the expense comparables.

| EXPENSE COMPARISON* | | | |
|---|---|---|---|
| Source | $/SF | $/Unit | Expense Ratio |
| Expense Comps | $4.91–$9.14 | $3,910–$4,769 | 29.0%–45.0% |
| Average | $6.25 | $4,282 | 35.2% |
| IREM | $5.64 | $4,807 | 45.3% |
| 2019 | $11.86 | $8,602 | 67.6% |
| 2020 | $8.29 | $6,013 | 48.3% |
| T6 June 2021 Annualized | $8.19 | $5,938 | 48.4% |
| Forecast | $8.93 | $6,475 | 47.9% |

* Taxes and replacement reserves are excluded as basis of comparison.

The forecast figures are within the range of the historical operations on a per square foot basis and a per unit basis. The figures are also within the range of the comparable expense data on a per SF basis, although it is outside the range on a per Unit basis. The forecasted expense ratio is considered reasonable with regard to the historical operations of the property and based on the utility structure at the subject.

## NET OPERATING INCOME

Following is a summary of the income and expense projections for the subject as of the date of valuation, November 10, 2021, which is a summation of the preceding analysis. The subject property is operating at stabilized occupancy and is realizing a positive net operating income—and has consistently done so for the recent past.

| DIRECT CAPITALIZATION – | | |
|---|---|---|
| **Income** | **FY 2022** | **$/Unit** |
| Base Rental Income | $995,460 | $14,221 |
| Miscellaneous | 20,300 | 290 |
| **Total Potential Gross Income** | **$1,015,760** | **14,511** |
| Physical Vacancy (-5.0%) | (49,773) | (711) |
| Bad Debt / Collection Loss ( -2.0%) | (19,909) | (284) |
| Gain/Loss to Lease (0.0%) | - | 0 |
| Concessions (0.0%) | - | 0 |
| Vacancy & Collection Loss (-7.0%) | (69,682) | (995) |
| **Effective Gross Income** | **$946,078** | **$13,515** |
| **Operating Expenses** | | |
| Real Estate Taxes | $155,157 | $2,217 |
| Insurance | 31,445 | 449 |
| Gas | 6,650 | 95 |
| Electricity | 106,750 | 1,525 |
| Water/Sewer | 45,500 | 650 |
| Cable/Internet | 14,000 | 200 |
| Trash Removal | 6,650 | 95 |
| Exterminating | 4,200 | 60 |
| Maintenance & Repairs | 44,450 | 635 |
| Painting & Decorating | 8,750 | 125 |
| Grounds | 9,450 | 135 |
| Management (3.0%) | 28,382 | 405 |
| Payroll | 119,000 | 1,700 |
| Advertising | 7,000 | 100 |
| General Administration | 21,000 | 300 |
| Replacement Reserves | 21,000 | 300 |
| **Total Expenses** | **$629,384** | **$8,991** |
| **NET OPERATING INCOME (NOI)** | **$316,694** | **$4,524** |

## INCOME CAPITALIZATION

Capitalization is the process of converting a net income stream into an indication of value. This approach to valuation can be accomplished by: (1) by dividing a single year's net operating income by an appropriate overall capitalization rate, i.e., Direct Capitalization; or (2) by discounting to present value a net income stream and property reversion over a projected holding period, i.e., Discounted Cash Flow Analysis. Since no single income or expense item is expected to fluctuate significantly in future operations, the Discounted Cash Flow Analysis is not employed.

The selection of the most appropriate overall capitalization rate ($R_o$) in Direct Capitalization can be accomplished by several methods.



## MARKET DERIVATION

When adequate data is available, the overall rate is best derived from the comparable sales employed in the Sales Comparison Approach. The table on the following page summarized capitalization rates extracted from the comparable sales transactions.

| No. | Property / Location | Date of Sale | Year Built | Capitalization Rate |
|-----|---------------------|--------------|------------|---------------------|
| | CAPITALIZATION RATE SUMMARY | | | |
| 1 | 98Fifty, Dallas, TX | Jun-21 | 1981 | 4.64% |
| 2 | Apex, Dallas, TX | Jun-21 | 1979 | 4.88% |
| 3 | Overlook Ranch, Dallas, TX | Oct-20 | 1984 | 5.25% |
| 4 | McCallum Communities, Dallas, TX | Aug-20 | 1985 | 5.54% |
| 5 | Frankford Flats, Dallas, TX | Jan-20 | 1983 | -- |
| Low | | | | 4.64% |
| High | | | | 5.54% |
| Median | | | | 5.07% |
| Average | | | | 5.08% |

The sales above indicate a wide range of capitalization rates from 4.64% to 5.54% with an average of 5.08%, including replacement reserves. The lowest capitalization rate is reported by Sale #1, which was considered similar to the subject in terms of amenities, location and vintage. The highest capitalization rate is reported by Sale #4, which is considered superior to the subject in terms of amenities. Overall, capitalization rates have declined in the past 12 months, as shown by the declining cap rates trend in the sales. All things considered, the subject should achieve a capitalization rate below the average of the sales. As such, the subject warrants a capitalization rate near 4.50%.

## INVESTOR SURVEYS

| Survey/Investment Type | OAR Range | Average |
|------------------------|-----------|---------|
| INVESTOR SURVEYS | | |
| Situs RERC Real Estate Report (4Q20) | | |
| Apartment | 4.00% - 6.50% | 4.80% |
| RealtyRates.com Investor Survey (4Q20) | | |
| Apartments | 4.65% - 13.11% | 8.69% |
| Garden/Suburban TH | 4.65% - 11.86% | 7.96% |
| **Indicated OAR:** | **4.00% - 13.11%** | **6.67%** |

The subject property represents a Class C property in a primary market. Due to the size of the property, it would not likely attract the attention of institutional investors as well as regional and local investors. However, the subject is located in a primary market, with high demand for multifamily housing assets by investors. Thus, the subject property warrants a capitalization rate below the reported average of investor surveys.

## MARKET PARTICIPANT INTERVIEWS

The following market participants were surveyed relative to capitalization rates for the subject and similar properties.

| MARKET PARTICIPANT INTERVIEWS | | | | |
|---|---|---|---|---|
| **Respondent** | **Company** | **Income** | **Survey Date** | **Cap Rate Range** |
| Confidential, Broker | Confidential | Market | Nov-21 | 4.50% - 5.00% |
| **Reported Range** | | | | **4.50% - 5.00%** |

## BAND OF INVESTMENT

The band of investment technique is utilized as a check for reasonableness with respect to the extracted market indications. The band of investment represents the build-up of a capitalization rate by using a weighted average return to the equity and the debt. Typical market loan parameters for a property such as the subject would likely entail an 80% loan-to-value at an annual interest rate of about 3.25%. The amortization period for this loan is 30 years. Based upon a 3.25% interest rate (payable monthly), the resultant mortgage constant is 0.05222.

The following table indicates the cap rate employing the assumptions indicated above, and a typical investor equity return of around 4.00% .

| BAND OF INVESTMENT | |
|---|---|
| **Loan Parameters** | |
| Loan-to-Value (LTV) | 80% |
| Amortization Period (yrs) | 30 |
| Interest Rate | 3.25% |
| Mortgage Constant | 0.05222 |
| Equity Dividend Rate | 4.00% |
| **Calculation** | |
| 0.80 LTV      x 0.05222 Mortgage Constant  = | 0.04178 |
| 0.20 Equity x 0.04000 Equity Dividend Rate      = | 0.00800 |
| **Capitalization Rate** | **4.98%** |

## DEBT COVERAGE ANALYSIS

Although seldom used in the marketplace by buyers, sellers, and brokers, the debt coverage ratio is frequently used by institutional lenders who are generally fiduciaries that manage the assets and finances of others. The overall rate is calculated by multiplying the debt coverage ratio by the loan-to-value-ratio and the mortgage constant: DCR × LTV × Rm. The following table indicates the cap rate employing a loan-to-value ratio of 80%.

| DEBT COVERAGE ANALYSIS | | | | |
|---|---|---|---|---|
| **DCR** | **LTV** | **Rm** | | **Cap Rate** |
| 1.25      x | 80%      x | 0.05222 | = | **5.22%** |

## CONCLUDED OVERALL RATE

Based upon the range of overall rates suggested by comparable sales, we reconciled an overall capitalization rate of 4.50% is appropriate for the subject property.

## VALUE INDICATION FROM DIRECT CAPITALIZATION

An opinion of market value is indicated by the Direct Capitalization Method by dividing the net operating income (NOI), derived earlier in this section by the appropriate capitalization rate. Our conclusion via the Direct Capitalization Method is as follows, as previously discussed.

| DIRECT CAPITALIZATION METHOD VALUE CONCLUSION | | |
|---|---|---|
| NET OPERATING INCOME | $316,694 | $4,524 |
| Based on Most Probable Rate of 4.50% | $7,037,650 | $100,538 |
| Reconciled Value | $7,037,650 | $100,538 |
| Rounded to nearest  $100,000 | $7,000,000 | $100,000 |

# RECONCILIATION

## SUMMARY OF VALUE INDICATIONS

This appraisal employs the Sales Comparison Approach and the Income Capitalization Approach. Based on our analysis and knowledge of the subject property type and relevant investor profiles, it is our opinion that these approaches would be considered applicable and/or necessary for market participants. The subject's age makes it difficult to accurately form an opinion of depreciation and tends to make the Cost Approach unreliable. Investors do not typically rely on the Cost Approach when purchasing a property such as the subject of this report. Therefore, we have not employed the Cost Approach to develop an opinion of market value; this exclusion does not affect the credibility of the assignment results herein.

| VALUE INDICATIONS | | | |
|---|---|---|---|
| **As Is as of November 10, 2021** | | | |
| Sales Comparison Approach | $6,950,000 | $99,286 | Per Dwelling Unit |
| Income Capitalization Approach | | | |
| Direct Capitalization | $7,000,000 | $100,000 | Per Dwelling Unit |
| **Approach Reliance** | **Direct Capitalization** | | |
| **Value Conclusion - As Is** | **$7,000,000** | **$100,000** | **Per Dwelling Unit** |
| Insurable Value | $3,710,000 | | |
| Exposure Time (Months) | 6 to 12 | | |
| Marketing Time (Months) | 6 to 12 | | |

The Cost Approach is generally reliable for newer properties that have not been impacted by a significant level of accrued depreciation. Since the property was constructed in 1981, incurable depreciation has begun to accrue to consequential levels. As previously stated, the Cost Approach does not serve as a good indicator of value for a property of this vintage.

The Sales Comparison Approach is compromised by the fact that many physical differences exist between the subject property and the comparable sale properties. The Sales Comparison Approach serves as a complement to the Income Capitalization Approach, and is relied upon as a check of reasonableness.

In the Income Capitalization Approach, the Direct Capitalization Method was used, for which ample market data was available. We utilized historical operating data, as well as market surveys and published comparable expense data to estimate an anticipated net operating income. Direct capitalization rates were extracted from local sales, which were compared to national investor surveys of anticipated performance. The Income Capitalization Approach is often given primary reliance by market participants when evaluating investment properties such as the subject. Thus, the opinion of value by the Income Capitalization Approach is given primary reliance in the final reconciliation of value.

## FINAL OPINION OF VALUE

Based on our inspection of the property, the investigation and the analysis undertaken, subject to the assumptions and limiting conditions, certifications, extraordinary assumptions and hypothetical conditions, we have developed the following value opinion(s).

 

| MARKET VALUE CONCLUSION(S) | | | |
|---|---|---|---|
| Appraisal Premise | Interest Appraised | Date of Value | Value Conclusion |
| As Is | leased fee | November 10, 2021 | $7,000,000 |

## MARKETING TIME AND EXPOSURE TIME

We believe the concluded market value for the subject property is consistent with an anticipated marketing time and exposure time of 6 to 12. Our opinion of value is consistent with recent sales and the return parameters are considered adequate to generate investor interest in the property. Our estimate is reasonably consistent with historic exposure times, and is considered a reasonable estimate of the exposure time for the subject. Additionally, a time of 6 to 12 is typically quoted as an adequate marketing time by area brokers, given proper pricing and an adequate commitment to marketing. Furthermore, market conditions are not expected to change dramatically in the short term, so a marketing time equal to the historic exposure time is considered a reasonable expectation. Based on these factors, our conclusion of 6 to 12 for an adequate marketing time and exposure time is considered reasonable.

# INSURABLE VALUE

Insurable Value is directly related to the portion of the real estate which is covered under the asset's insurance policy. We have based this opinion on the building's replacement cost new (RCN) which has no direct correlation with its actual market value.

The replacement cost new is the total construction cost of a new building built using modern technology, materials, standards and design, but built to the same specifications of and with the same utility as the building being appraised. For insurance purposes, replacement cost new includes all direct costs necessary to construct the building improvements. Items which are not considered include land value, site improvements, indirect costs, accrued depreciation and entrepreneurial profit. To develop an opinion of insurable value, exclusions for below-grade foundations and architectural fees must be deducted from replacement cost new.

We developed an opinion of replacement cost new by using the Calculator Cost Method developed by Marshall Valuation Service, a nationally recognized cost estimating company which estimates construction costs for all types of improvements. Marshall Valuation Service revises its cost factors monthly and adjusts them to reflect regional and local cost variations.

| INSURABLE REPLACEMENT COST | | | |
|---|---|---|---|
| Replacement Cost New (RCN) | Area (SF) | $/SF | Subtotal |
| Building Improvements | | | |
| Base Cost | 50,760 | $78.00 | $3,959,280 |
| Balconies/Patios | 6,720 | $19.50 | 131,040 |
| Appliances | 70 | $1,800 | 126,000 |
| Subtotal | | | $4,216,320 |
| Multipliers | | | |
| Current Cost | | 1.100 | |
| Local Area | | 0.860 | |
| Area Multiplier | | 1.034 | |
| Story Height | | 1.000 | |
| Product of Multipliers | | | x 0.978 |
| **Adjusted Base Building Cost** | | | $4,123,561 |
| **Less: Insurance Exclusions** | | | |
| Total Insurance Exclusion Adjustment | | 10.00% | (412,356) |
| **Insurable Replacement Cost** | | | $3,711,205 |
| **Rounded to nearest  $10,000** | | | **$3,710,000** |
| Source: Marshall Valuation Service | | | |
| Type: Multiple Residences | Section: 12 | Class: D | |
| Date: Sep-2021 | Page: 16 | Quality: Average | |

The opinion of insurable value is included at the request of the client and has not been performed by a qualified insurance agent or risk management underwriter. This cost estimate should not be solely relied upon for insurable value purposes. The appraisers are not familiar with the definition of insurable value from the insurance provider, the local governmental underwriting regulations, or the types of insurance coverage available. These factors can impact cost estimates and are beyond the scope of the intended use of this appraisal. The appraisers are not cost experts in cost estimating for insurance purposes.

# CERTIFICATION

We certify that, to the best of our knowledge and belief:

1 The statements of fact contained in this report are true and correct.

2 The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and are our personal, impartial, and unbiased professional analyses, opinions, and conclusions.

3 We have no present or prospective interest in the property that is the subject of this report and no personal interest with respect to the parties involved with this assignment.

4 We have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.

5 Our engagement in this assignment was not contingent upon developing or reporting predetermined results.

6 Our compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

7 This appraisal assignment was not based upon a requested minimum valuation, a specific valuation, or the approval of a loan.

8 Our analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice, as well as the requirements of the state of Texas.

9 The reported analyses, opinions, and Value Indications were developed, and this report has been prepared, in conformity with the requirements of the Code of Professional Ethics, the Standards of Professional Practice of the Appraisal Institute.

10 The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.

11 As of the date of this report, Mary Ann Barnett, MAI has completed the continuing education program for Designated Members of the Appraisal Institute.

12 Mary Ann Barnett, MAI has not and Billy Horton has made a personal inspection of the property that is the subject of this report.

13 No one provided significant real property appraisal assistance to the person signing this certification.

14 Mary Ann Barnett, MAI has not and Billy Horton has not provided services, as an appraiser or in any other capacity, regarding the property that is the subject of this report within the three-year period immediately preceding the agreement to perform this assignment.

**DRAFT**          **DRAFT**

Mary Ann Barnett, MAI                    Billy Horton
TX Certified General Appraiser           TX Certified General Appraiser
License #: TX-1326580-G                   License #: 1380740
214-269-0522                              214-890-6496
MBarnett@bbgres.com                       bhorton@bbgres.com

# STANDARD ASSUMPTIONS AND LIMITING CONDITIONS

This appraisal report has been made with the following general assumptions:

1) Notwithstanding that Appraiser may comment on, analyze or assume certain conditions in the appraisal, BBG, Inc. shall have no monetary liability or responsibility for alleged claims or damages pertaining to: (a) title defects, liens or encumbrances affecting the property; (b) the property's compliance with local, state or federal zoning, planning, building, disability access and environmental laws, regulations and standards; (c) building permits and planning approvals for improvements on the property; (d) structural or mechanical soundness or safety; (e) contamination, mold, pollution, storage tanks, animal infestations or other hazardous conditions affecting the property; and (f) other conditions and matters for which licensed real estate appraisers are not customarily deemed to have professional expertise. Accordingly:

   a) The Appraiser has not conducted any engineering or architectural surveys in connection with this appraisal assignment. Information reported pertaining to dimensions, sizes, and areas is either based on measurements taken by the Appraiser or the Appraiser's staff or was obtained or taken from referenced sources and is considered reliable. The Appraiser and BBG, Inc. shall not be monetarily liable or responsible for or assume the costs of preparation or arrangement of geotechnical engineering, architectural, or other types of studies, surveys, or inspections that require the expertise of a qualified professional.

   b) Unless otherwise stated in the report, only the real property is considered, so no consideration is given to the value of personal property or equipment located on the premises or the costs of moving or relocating such personal property or equipment. Further, unless otherwise stated, it is assumed that there are no subsurface oil, gas or other mineral deposits or subsurface rights of value involved in this appraisal, whether they are gas, liquid, or solid. Further, unless otherwise stated, it is assumed that there are no rights associated with extraction or exploration of such elements considered. Unless otherwise stated it is also assumed that there are no air or development rights of value that may be transferred.

   c) Any legal description or plats reported in the appraisal are assumed to be accurate. Any sketches, surveys, plats, photographs, drawings or other exhibits are included only to assist the intended user to better understand and visualize the subject property, the environs, and the competitive data. BBG, Inc. has made no survey of the property and assumes no monetary liability or responsibility in connection with such matters.

   d) Title is assumed to be good and marketable, and in fee simple, unless otherwise stated in the report. The property is considered to be free and clear of existing liens, easements, restrictions, and encumbrances, except as stated. Further, BBG, Inc. assumes there are no private deed restrictions affecting the property which would limit the use of the subject property in any way.

   e) The appraisal report is based on the premise that there is full compliance with all applicable federal, state, and local environmental regulations and laws unless otherwise stated in the appraisal report; additionally, that all applicable zoning, building, and use regulations and restrictions of all types have been complied with unless otherwise stated in the appraisal report. Further, it is assumed that all required licenses, consents, permits, or other legislative or administrative authority, local, state, federal and/or private entity or organization have been or can be obtained or renewed for any use considered in the value opinion. Moreover, unless otherwise stated herein, it is assumed that there are no encroachments or violations of any zoning or other regulations affecting the subject property, that the utilization of the land and improvements is within the boundaries or property lines of the property described, and that there are no trespasses or encroachments.

BBG

f)  The American Disabilities Act (ADA) became effective January 26, 1992. The Appraiser has not made a specific compliance survey or analysis of the property to determine whether or not it is in conformity with the various detailed requirements of ADA. It is possible that a compliance survey of the property and a detailed analysis of the requirements of the ADA would reveal that the property is not in compliance with one or more of the requirements of the Act. If so, this fact could have a negative impact upon the value of the property. Since the Appraiser has no direct evidence relating to this issue, possible noncompliance with the requirements of ADA was not considered in estimating the value of the property.

g)  No monetary liability or responsibility is assumed for conformity to specific governmental requirements, such as fire, building, safety, earthquake, or occupancy codes, except where specific professional or governmental inspections have been completed and reported in the appraisal report.

h)  It is assumed the subject property is not adversely affected by the potential of floods; unless otherwise stated herein. Further, it is assumed all water and sewer facilities (existing and proposed) are or will be in good working order and are or will be of sufficient size to adequately serve any proposed buildings.

i)  Unless otherwise stated within the appraisal report, the depiction of the physical condition of the improvements described therein is based on visual inspection. No monetary liability or responsibility is assumed for (a) the soundness of structural members since no engineering tests were conducted; (b) the condition of mechanical equipment, plumbing, or electrical components, as complete tests were not made; and (c) hidden, unapparent or masked property conditions or characteristics that were not clearly apparent during the Appraiser's inspection.

j)  If building improvements are present on the site, it is assumed that no significant evidence of termite damage or infestation was observed during physical inspection, unless so stated in the appraisal report. Further, unless so stated in the appraisal report, no termite inspection report was available. No monetary liability or responsibility is assumed for hidden damages or infestation.

k)  Unless subsoil opinions based upon engineering core borings were furnished, it is assumed there are no subsoil defects present, which would impair development of the land to its maximum permitted use or would render it more or less valuable. No monetary liability or responsibility is assumed for such conditions or for engineering which may be required to discover them.

l)  BBG, Inc. is not an expert in determining the presence or absence of hazardous substances, defined as all hazardous or toxic materials, wastes, pollutants or contaminants (including, but not limited to, asbestos, PCB, UFFI, or other raw materials or chemicals) used in construction or otherwise present on the property. BBG, Inc. assumes no monetary liability or responsibility for the studies or analyses which would be required to determine the presence or absence of such substances or for loss as a result of the presence of such substances. Appraiser is not qualified to detect such substances. The Client is urged to retain an expert in this field; however, Client retains such expert at Client's own discretion, and any costs and/or expenses associated with such retention are the responsibility of Client.

m)  BBG, Inc. is not an expert in determining the habitat for protected or endangered species, including, but not limited to, animal or plant life (such as bald eagles, gophers, tortoises, etc.) that may be present on the property. BBG, Inc. assumes no monetary liability or responsibility for the studies or analyses which would be required to determine the presence or absence of such species or for loss as a result of the presence of such species. The Appraiser hereby reserves the right to alter, amend, revise, or rescind any of the value opinions contained within the appraisal repot based upon any subsequent endangered species impact studies, research, and investigation that may be provided. However, it is assumed that no environmental impact studies were either requested or made in conjunction with this analysis, unless otherwise stated within the appraisal report.

2) If the Client instructions to the Appraiser were to inspect only the exterior of the improvements in the appraisal process, the physical attributes of the property were observed from the street(s) as of the inspection date of the appraisal. Physical characteristics of the property were obtained from tax assessment records, available plans, if any, descriptive information, and interviewing the client and other knowledgeable persons. It is assumed the interior of the subject property is consistent with the exterior conditions as observed and that other information relied upon is accurate.

3) If provided, the estimated insurable value is included at the request of the Client and has not been performed by a qualified insurance agent or risk management underwriter. This cost estimate should not be solely relied upon for insurable value purposes. The Appraiser is not familiar with the definition of insurable value from the insurance provider, the local governmental underwriting regulations, or the types of insurance coverage available. These factors can impact cost estimates and are beyond the scope of the intended use of this appraisal. The Appraiser is not a cost expert in cost estimating for insurance purposes.

4) The dollar amount of any value opinion herein rendered is based upon the purchasing power and price of the United States Dollar as of the effective date of value. This appraisal is based on market conditions existing as of the date of this appraisal.

5) The value opinions reported herein apply to the entire property. Any proration or division of the total into fractional interests will invalidate the value opinions, unless such proration or division of interests is set forth in the report. Any division of the land and improvement values stated herein is applicable only under the program of utilization shown. These separate valuations are invalidated by any other application.

6) Any projections of income and expenses, including the reversion at time of resale, are not predictions of the future. Rather, they are BBG, Inc.'s best estimate of current market thinking of what future trends will be. No warranty or representation is made that such projections will materialize. The real estate market is constantly fluctuating and changing. It is not the task of an appraiser to estimate the conditions of a future real estate market, but rather to reflect what the investment community envisions for the future in terms of expectations of growth in rental rates, expenses, and supply and demand. The forecasts, projections, or operating estimates contained herein are based on current market conditions, anticipated short-term supply and demand factors, and a continued stable economy. These forecasts are, therefore, subject to changes with future conditions.

7) The Appraiser assumes no monetary liability or responsibility for any changes in economic or physical conditions which occur following the effective date of value within this report that would influence or potentially affect the analyses, opinions, or conclusions in the report. Any subsequent changes are beyond the scope of the report.

8) Any proposed or incomplete improvements included in the appraisal report are assumed to be satisfactorily completed in a workmanlike manner or will be thus completed within a reasonable length of time according to plans and specifications submitted.

9) If the appraisal report has been prepared in a so-called "public non-disclosure" state, real estate sales prices and other data, such as rents, prices, and financing, are not a matter of public record. If this is such a "non-disclosure" state, although extensive effort has been expended to verify pertinent data with buyers, sellers, brokers, lenders, lessors, lessees, and other sources considered reliable, it has not always been possible to independently verify all significant facts. In these instances, the Appraiser may have relied on verification obtained and reported by appraisers outside of our office. Also, as necessary, assumptions and adjustments have been made based on comparisons and analyses using data in the report and on interviews with market participants. The information furnished by others is believed to be reliable, but no warranty is given for its accuracy.

10) Although the Appraiser has made, insofar as is practical, every effort to verify as factual and true all information and data set forth in this report, no responsibility is assumed for the accuracy of any information furnished the Appraiser either by the Client or others. If for any reason, future

investigations should prove any data to be in substantial variance with that presented in this report, the Appraiser reserves the right to alter or change any or all analyses, opinions, or conclusions and/or opinions of value.

11) The right is reserved by the Appraiser to make adjustments to the analyses, opinions, and conclusions set forth in the appraisal report as may be required by consideration of additional or more reliable data that may become available. No change of this report shall be made by anyone other than the Appraiser. The Appraiser shall have no monetary liability or responsibility for any unauthorized change(s) to the report.

12) The submission of the appraisal report constitutes completion of the services authorized and agreed upon. Such appraisal report is submitted on the condition the Client will provide reasonable notice and customary compensation, including expert witness fees, relating to any subsequent required attendance at conferences, depositions, or judicial or administrative proceedings. In the event the Appraiser is subpoenaed for either an appearance or a request to produce documents, a best effort will be made to notify the Client immediately. The Client has the sole responsibility for obtaining a protective order, providing legal instruction not to appear with the appraisal report and related work files, and will answer all questions pertaining to the assignment, the preparation of the report, and the reasoning used to formulate the opinion of value. Unless paid in whole or in part by the party issuing the subpoena or by another party of interest in the matter, the Client is responsible for all unpaid fees resulting from the appearance or production of documents regardless of who orders the work.

BBG



# Third-party reports by a true third party.

## BBG OVERVIEW

BBG is one of the nation's largest real estate due diligence firms with more than 35+ offices across the country serving more than 2,700 clients. We deliver best-in-class valuation, advisory and assessment services with a singular focus of meeting our clients' needs.

Our professional team offers broad industry expertise and deep market knowledge to help clients meet their objectives throughout the real estate life cycle.

BBG clients include commercial real estate professionals, investors, lenders, attorneys, accountants and corporations.

## THE BBG DIFFERENCE

**National Footprint.** BBG is one of only two national firms offering in-house valuation and environmental and property condition assessment services for all commercial property types.

**Customer-focused Growth.** BBG is one of the largest national due diligence firms because we deliver best-in-class work product and provide excellent customer care.

**Qualified Team.** Over 50 percent of BBG appraisers are MAI designated and offer deep industry expertise gained through real-world experience.

**Unbiased Independence.** By focusing exclusively on due diligence services, BBG guarantees an independent perspective free from potential conflicts of interest.

**Innovative Technology.** BBG has made significant analytics and IT investments to continually improve our data and report quality.

## SERVICES

### Valuation
+ Single Asset Valuation
+ Portfolio Valuation
+ Institutional Asset Valuation
+ Appraisal Review
+ Appraisal Management
+ Lease and Cost Analysis
+ Insurance Valuation
+ Arbitration & Consulting
+ Feasibility Studies
+ Highest and Best Use Studies
+ Evaluation
+ Investment analysis
+ Tax appeals
+ Litigation Support
+ Manufactured Housing and Campgrounds

### Advisory
+ ASC 805 Business combinations
+ ASC 840 Leases
+ Purchase Price Allocations
+ Portfolio Valuations for reporting net asset values (NAV)
+ Public and non-traded REIT valuations
+ Valuations for litigation and litigation support
+ Sale-leaseback valuation analysis
+ Valuations for bankruptcy/fresh start accounting
+ Cost segregation analysis

### Assessment
+ Environmental due diligence
+ Property condition consulting
+ Small loan services
+ Energy consulting
+ Environmental consulting
+ Zoning
+ ALTA Surveys

 **VALUATION**    **ADVISORY**    **ASSESSMENT**    **ZONING**

# ADDENDA

**Letter of Engagement** ...................................................................................................................................A

**Metropolitan Area Description** .......................................................................................................................B

**Subject Photographs**......................................................................................................................................C

**Rent Roll** ........................................................................................................................................................ D

**Operating Statements**....................................................................................................................................E

**Comparable Improved Sales** ......................................................................................................................... F

**Comparable Rents** ........................................................................................................................................ G

# LETTER OF ENGAGEMENT



Atlanta, GA
Bethesda, MD
Chicago, IL
Dallas, TX
Los Angeles, CA
Memphis, TN
New York, NY
Philadelphia, PA
Portland, ME
San Francisco, CA

Tuesday, November 02, 2021

Mary Ann Barnett
BBG, Inc-Dallas
8300 Douglas Avenue, Suite 701
Dallas, TX 75225
mbarnett@bbgres.com

RE:            **Appraisal Engagement Agreement**

               Property Name: Amerigold Suites
               Address: 13636 Goldmark Dr
               Address: Dallas, TX  75240
               Units: 70

Dear Mary Ann Barnett,

This letter agreement will confirm the terms and conditions upon which **BBG, Inc-Dallas** ("Vendor") has agreed to provide to **Greystone Servicing Company LLC** ("Greystone") a full narrative appraisal of the Property and market and an estimate of the market value of the Property that is based upon and supported by market data, logical analysis and sound, professional judgement.

**Intended User:** Greystone Servicing Company, LLC, **Freddie Mac**, and related entities, successors and/or assigns.  We request that you seek written authorization before releasing the report to any other party.

**Ownership Interest:** Leased Fee

**Scope of Work**: The appraisal report must estimate the market value of the Property, on an "as-is" basis and as of the effective date of the Appraisal subject to stated assumptions and limiting conditions. The appraisal must also contain any approach to value that is applicable and necessary to the assignment including, but not limited to, replacement cost and/or insurable value.

**IF Applicable:**
- **Small Balance Loan**
  The appraisal must comply in content and format with the **Freddie Mac Guidelines** for Small Balance Loans.

- **Affordable Loan**
  The appraisal must include three values: insurable, restricted, and unrestricted value. Also, a market study is required when more than twenty percent (20%) of the units have a project-based HAP Contract in order to identify an absorption rate and rent level for the submarket.
- **Seismic**
  If property is in a Seismic Zone (3) or Four (4), please provide a current estimated land value.
- **Restricted Units**
  If the Property has restricted units, the appraisal report must include a value with the restricted units in place and a value without the restricted units.
- **HUD Project-based Section 8**
  If the Property has HUD Project-based Section 8, the appraisal report must include the value using the project-based contract rents, and the value using the lower of market, Section 8 or achievable net LIHTC rents (if applicable), for each type of unit.
- **Occupancy**
  If the Property has not achieved the underwritten stabilized occupancy, the appraisal report must include the "as-is" and an "as-stabilized" value.
- **New Constructions**
  If the Property is to be built, the appraisal report must include the "as-stabilized" value; the "as is" value is not required.

**Appraisal Standards:** The appraisal must be prepared by a qualified, state licensed or certified appraiser, comply in content and format with the **Freddie Mac** Guide and conform to the requirements prescribed by the Uniform Standards of Professional Appraisal Practice (USPAP). The report must also meet any governmental regulations in effect when the Mortgage Loan was originated, including the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA).

**Compensation:** It is agreed that the fee to perform the services and prepare the required report(s) (the "Fee") is **$4,500.00**, which includes all cost (including, but not limited to, any travel, printing and copying costs) the Vendor may incur. Greystone agrees to pay the Fee upon our receipt and acceptance of the report(s) (each a "Report" and collectively the "Reports").

**Delivery & Completion:** Greystone must receive an unlocked draft of each Report via email on or before **11.24.2021** (the "Draft Delivery Date"). **In addition to the draft version of Report(s), please also provide the data schema (via .XML or. JSON) for direct upload/import into the Closer system.** All draft and final Report(s) must be either in Word, Excel or non-scanned PDF form, so that word searches are possible. Greystone reserves the right to impose a five percent (5%) penalty for each week the Report(s) is/are late unless an alternative delivery date is mutually agreed upon. After review and approval of each of the Report(s), the final signed electronic copy of each Report(s) will be promptly due thereafter, upon Greystone's request. Additionally, unexcused delays in the delivery of any Report(s) may require the Vendor, at no additional fee, cost or expense to Greystone, to revisit the Property or undertake other measures as required by Greystone to ensure the information contained in each Report(s) is/are within the timeframe permitted by **Freddie Mac**. The Appraiser understands and agrees that time is of the essence with respect to the performance of its obligations hereunder.

**Identity-of-Interest:** The Vendor represents and warrants to Greystone that neither the Vendor nor the individual conducting any assessment and preparing any of the Report(s) is/are affiliated with any

individual or entity involved in the Property nor involved in any way with respect to the proposed **Freddie Mac** loan for the Property, other than the engagement by Greystone hereunder to conduct the required appraisal and prepare the Report(s).

**Confidentiality:** The results of your engagement are to be communicated only in writing and only to Greystone.  All documents and information furnished to you by Greystone and/or Borrower in connection with this engagement are confidential information.

**Competency:** Your engagement is predicated on being able to complete the appraisal and prepare the Report(s) in compliance with the above requirements. If at any time in the course of your engagement you find that you will not be able to comply with any of the requirements outlined herein, please contact us immediately and do not proceed with any further performance of the appraisal and preparation of the Report(s) until we have discussed the matter.

**Access and Communication**: Access to the Property and additional information regarding its use, productivity, and history has been/will be provided to you.

**Requested Amendments:** It is agreed that the final Report(s) provided to Greystone hereunder will not be amended or otherwise revised without the written consent and approval of Greystone.

**Reliance Language:**

The Report(s) report must include the following reliance language in the letter of transmittal above the appraiser's signature and/or on the appraiser's Certification page above the appraiser's signature:

"This report is for the use and benefit of, and may be relied upon by,
- the Greystone Servicing Company LLC, **Freddie Mac** and any successors and assigns ("Lender")
- independent auditors, accountants, attorneys and other professionals acting on behalf of Lender;
- governmental agencies having regulatory authority over Lender;
- designated persons pursuant to an order or legal process of any court or governmental agency;
- prospective purchasers of the Mortgage; and
- with respect to any debt (or portion thereof) and/or securities secured, directly or indirectly, by the Property which is subject of this report, the following parties and their respective successors and assigns;
  - any placement agent or broker/dealer and any of their respective affiliates, agents and advisors;
  - any initial purchaser or subsequent holder of such debt and/or securities;
  - any Servicer or other agent acting on behalf of the holders of such debt and/or securities;
  - any indenture trustee;
  - any rating agency; and
  - any institutional provider from time to time of any liquidity facility or credit support for such financing

In addition, this report, or a reference to this report, may be included or quoted in any offering circular, information circular, offering memorandum, registration statement, private placement memorandum, prospectus or sales brochure (in either electronic or hard copy format) in connection with a securitization or transaction involving such debt (or portion thereof) and/or securities."

**Certification:** The Report(s) must include your personal certification.  Your signature must be in a personal capacity as well as in any business capacity and include your state licensing and certification information as well as any professional accreditation.  In addition, the appraisal report must include:

- All assumptions and limiting conditions
- A certification that complies with the requirements of the USPAP, promulgated by the Appraisal Standards Board of the Appraisal Foundation, in effect at the time of certification.
- A certification that the Appraisal complies with the current version of the Financial Institution Reform, recovery and Enforcement Act of 1989 (FIRREA), including its Title XI regulations

**Appraisal Acceptance, Appraisal Review, Subsequent Requests, and Supplemental Assignments**

**Acceptance Audit –** The Report(s) will be read, and the result compared to your responses to the requirements stated in this letter agreement and the **Freddie Mac** Guide

**Appraisal Review --** As part of our collateral valuation quality assurance effort, some Report(s) are subject to an appraisal review completed in accordance with the **Freddie Mac** Guide and USPAP requirements.

**Subsequent Requests --** You may be contacted to provide responses to questions resulting from our reading or review of the Report(s). By accepting this assignment, you agree to respond promptly to our subsequent requests. When the cause of our subsequent request is a deficiency in the Report(s) that was under your control, you agree to cure that deficiency promptly without any cost to Greystone.

**Supplemental Assignments --** If, during or following completion of your work, we determine a need for additional research, analysis, or supplemental appraisal information, that need may be addressed as a supplemental assignment.

**ENGAGEMENT / ASSIGNMENT CONTRACT ACCEPTANCE SIGNATURES**

Please consider this letter your notice to proceed based on the terms and conditions outlined above.  Please acknowledge your acceptance of these terms and conditions by signing and returning a copy of this letter agreement.  Greystone will provide the Vendor with the name of the on-site contact and Property operating data once Greystone obtains the information.  Should you need any further information, please do not hesitate to call me at 901-628-5952

I / We agree to the terms of the assignment stated in this engagement letter:

Greystone Servicing Company, LLC          Company Name: BBG, Inc-Dallas

Printed Name: Jane Sadler                 Printed Name: Mary Ann Barnett

Date: November 02, 2021                   Date: 11/3/2021

Signature: _Jane Sadler_                  Signature: _____

                                          **Mary Ann Barnett, MAI**
                                          **Senior Managing Director-Affordable Multifamily Practice Leader**
                                          **Valuation**
                                          8300 Douglas Avenue, Suite 600
                                          Dallas, TX 75225
                                          P 214-269-0522
                                          C 214-499-6992
                                          E MBarnett@bbgres.com

# METROPOLITAN AREA DESCRIPTION



# MOODY'S ANALYTICS

# DALLAS-PLANO-IRVING TX

Data Buffet® MSA code: IUSA_DMDAL

## ECONOMIC DRIVERS

LOGISTICS

HIGH TECH

FINANCIAL $ £ € CENTER

## EMPLOYMENT GROWTH RANK

| 2020-2022 | 2020-2025 |
|---|---|
| **60** 1st quintile | **36** 1st quintile |

Best=1, Worst=410

## RELATIVE COSTS

| LIVING | BUSINESS |
|---|---|
| **114%** | **98%** |

U.S.=100%

## VITALITY

RELATIVE

**1.05**

Rank: 11

Best=1, Worst=403

## QUALITY

OF LIFE

**171**

Best=1, Worst=378

## BUSINESS CYCLE STATUS



## STRENGTHS & WEAKNESSES

### STRENGTHS

» Stable demand for professional services because of many corporate headquarters.
» Well-positioned distribution center for Southwest as international trade grows.
» Favorable migration trends, age structure.

### WEAKNESSES

» Exposure to volatile high tech, which is sensitive to the business cycle.
» Diminished housing affordability as metro division matures.

## FORECAST RISKS

| SHORT TERM  | LONG TERM  |
|---|---|

| COVID-19 EXPOSURE AUGUST 2021 | **251** | 4th quintile | Most=1 Least=403 |
|---|---|---|---|

### UPSIDE

» Ability to work remotely buoys professional services more than expected.
» Demand for single-family housing rises more than expected.

### DOWNSIDE

» Weaker recovery in air travel than expected due to continuing concerns about infection.
» Reduced desire to go to stores weakens retail development.

## MOODY'S RATING

**Aaa**    COUNTY
AS OF JUN 26, 2015

## ANALYSIS

**Recent Performance.** Dallas-Plano-Irving is recovering faster than the national average. The metro division has recouped more than four-fifths of the jobs lost during the crisis, compared with less than three-fourths for the nation as a whole. Almost all industries have outperformed their national counterparts and some have fully recovered, including core professional and financial services. Though hospitality is still well below its precrisis level, the deficit is significantly less than the national average. The unemployment rate has declined slowly, down to 5.7% in June, largely because of the solid rebound in the labor force. Housing market data have been very strong, with house prices up at a double-digit pace year over year and new permits for single-family homes significantly higher than the peak during the previous boom in 2005, well above national performance.

**Company is coming.** Professional and financial services will grow at an above-average pace during the coming year, supported by corporate relocations, startups and expansions that include a variety of enterprises, with the most recent concentration in financial and real estate services. As the southwestern economy grows briskly, DAL has become the preeminent financial center, especially for local middle-market lending. CBRE announced that it was moving its corporate headquarters last fall and Schwab moved at the end of 2020 following its merger with TD Ameritrade. Also, Goldman is planning a major expansion of its regional operations and Vanguard intends to open an office in 2022. The share of financial services jobs in total employment has risen by 9% since 2015. However, the extent to which this growth will translate to office development is uncertain as employers reevaluate their need for office space amid the growing popularity of working from home. The historically high office-vacancy rate has climbed into the 25% range.

**Drivers.** The flow of corporate relocations and expansions will continue for the foreseeable future. A combination of factors propels this migration. First, the cost of doing business remains no more than half that of other expensive centers such as San Francisco and New York—and the same is true for the cost of living. Second is the sheer size of the well-educated labor pool. Approximately 38% of residents hold a bachelor's degree or better, somewhat more than the national average but lower than Austin's rate, which approaches 50%. However, because DAL's population is much larger, this translates into fully 1 million workers, compared with a bit under 400,000 in Austin.

**Hotels and air travel.** The hospitality and transportation industries should continue to recover in the coming year, though the surge in the Delta variant poses downside risks. Passenger traffic through Dallas/Fort Worth International Airport in May, the most recent data available, was up to 83% of its May 2019 level, higher than the national ratio and much improved over earlier in the year. However, despite recent gains, hotels in DAL recorded revenue per available room of only 37% of the 2019 level in June. Forty-four percent of Texas residents have been fully vaccinated, lower than the national average of around 50%, adding uncertainty.

**The Dallas-Plano-Irving economy will continue to recover, led by professional and financial services, housing, and the boost in hospitality, though the spread of the Delta variant poses downside risks. Longer term, the concentration of corporate headquarters, technology businesses, financial services, and above-average population growth will contribute to better-than-normal performance.**

*Edward Friedman*    1-866-275-3266
*August 2021*    help@economy.com

| 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | INDICATORS | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 311.1 | 324.1 | 339.4 | 352.7 | 360.2 | 351.4 | Gross metro product (C12$ bil) | 376.0 | 401.0 | 418.3 | 435.3 | 451.0 | 465.9 |
| *5.5* | *4.2* | *4.7* | *3.9* | *2.1* | *-2.5* | *% change* | *7.0* | *6.7* | *4.3* | *4.1* | *3.6* | *3.3* |
| 2,409.4 | 2,499.7 | 2,566.3 | 2,624.6 | 2,697.7 | 2,615.2 | Total employment (ths) | 2,712.3 | 2,837.0 | 2,908.3 | 2,954.9 | 2,987.6 | 3,022.5 |
| *4.2* | *3.7* | *2.7* | *2.3* | *2.8* | *-3.1* | *% change* | *3.7* | *4.6* | *2.5* | *1.6* | *1.1* | *1.2* |
| 4.0 | 3.8 | 3.7 | 3.6 | 3.3 | 7.1 | Unemployment rate (%) | 5.5 | 4.2 | 3.3 | 3.2 | 3.4 | 3.5 |
| 4.8 | 5.0 | 6.6 | 7.8 | 5.0 | 5.1 | Personal income growth (%) | 9.4 | 3.1 | 6.4 | 6.1 | 5.5 | 5.5 |
| 62.7 | 65.5 | 68.5 | 71.2 | 73.5 | 74.7 | Median household income ($ ths) | 77.1 | 77.2 | 79.7 | 82.4 | 85.0 | 87.8 |
| 4,709.8 | 4,815.0 | 4,914.3 | 4,996.8 | 5,081.9 | 5,148.0 | Population (ths) | 5,208.6 | 5,287.5 | 5,370.7 | 5,446.3 | 5,517.2 | 5,587.3 |
| *2.3* | *2.2* | *2.1* | *1.7* | *1.7* | *1.3* | *% change* | *1.2* | *1.5* | *1.6* | *1.4* | *1.3* | *1.3* |
| 66.4 | 64.7 | 60.4 | 46.1 | 49.3 | 34.6 | Net migration (ths) | 32.2 | 45.8 | 50.4 | 43.2 | 38.9 | 38.5 |
| 22,018 | 22,735 | 25,628 | 26,707 | 25,311 | 31,769 | Single-family permits (#) | 38,406 | 37,271 | 37,643 | 38,672 | 37,883 | 35,911 |
| 24,767 | 19,089 | 22,273 | 20,975 | 18,295 | 11,029 | Multifamily permits (#) | 23,836 | 24,831 | 25,924 | 27,077 | 24,250 | 19,384 |
| 202.7 | 223.3 | 245.5 | 261.6 | 272.4 | 282.8 | FHFA house price (1995Q1=100) | 301.0 | 308.1 | 308.6 | 306.0 | 302.7 | 298.2 |



## ECONOMIC HEALTH CHECK

| 3-MO MA | Feb 21 | Mar 21 | Apr 21 | May 21 | Jun 21 | Jul 21 |
|---|---|---|---|---|---|---|
| Employment, change, ths | 12.5 | 7.4 | 3.4 | 4.7 | 7.6 | 13.9 |
| Unemployment rate, % | 6.1 | 6.1 | 6.1 | 6.0 | 5.8 | 5.7 |
| Labor force participation rate, % | 68.2 | 68.0 | 67.8 | 68.0 | 68.1 | 68.3 |
| Average weekly hours, # | 35.9 | 36.0 | 35.9 | 36.4 | 36.3 | 36.1 |
| Industrial production, 2012=100 | 102.3 | 102.6 | 102.7 | 104.5 | 105.1 | 106.1 |
| Residential permits, single-family, # | 43,515 | 42,821 | 38,818 | 40,198 | 37,313 | 37,270 |
| Residential permits, multifamily, # | 15,549 | 18,789 | 15,960 | 16,509 | 19,903 | 18,456 |
| Dec/Dec | Dec 15 | Dec 16 | Dec 17 | Dec 18 | Dec 19 | Dec 20 |
| Employment, change, ths | 86.6 | 95.5 | 50.9 | 64.7 | 80.8 | -80.3 |

| Better than prior 3-mo MA | Unchanged from prior 3-mo MA | Worse than prior 3-mo MA |
|---|---|---|

*Sources: BLS, Census Bureau, Moody's Analytics*

## BUSINESS CYCLE INDEX

### JAN 2011=100

DAL — TX — U.S.

*Source: Moody's Analytics*

## CURRENT EMPLOYMENT TRENDS

### % CHANGE YR AGO

Government — Goods producing — Private services

*Sources: BLS, Moody's Analytics*

### % CHANGE YR AGO, 3-MO MA

| | Jul 20 | Jan 21 | Jul 21 |
|---|---|---|---|
| Total | -6.1 | -3.1 | 7.1 |
| Mining | -16.2 | -20.3 | 5.3 |
| Construction | -6.3 | -7.2 | 0.4 |
| Manufacturing | -5.0 | -3.0 | 3.0 |
| Trade | -5.1 | -2.3 | 6.6 |
| Trans/Utilities | 6.8 | 7.5 | 10.0 |
| Information | -5.3 | -3.8 | 4.1 |
| Financial Activities | 1.5 | 2.0 | 3.5 |
| Prof & Business Svcs. | -4.5 | -1.7 | 8.2 |
| Edu & Health Svcs. | -5.7 | -3.4 | 4.1 |
| Leisure & Hospitality | -25.3 | -16.6 | 26.3 |
| Other Services | -18.8 | -12.1 | 11.5 |
| Government | -3.2 | -0.5 | 3.4 |

*Sources: BLS, Moody's Analytics*

## DIFFUSION INDEX

### 3-DIGIT NAICS LEVEL, 6-MO MA

DAL — TX — U.S.

*Sources: BLS, Moody's Analytics*

## RELATIVE EMPLOYMENT PERFORMANCE

### JAN 2011=100

DAL — TX — U.S.

*Sources: BLS, Moody's Analytics*

### FORECAST VS. 6 MO PRIOR

| | 2-Yr | 5-Yr |
|---|---|---|
| | ↓ | ↓ |
| | ↓ | ↓ |
| | ↑ | ↔ |

## HOUSE PRICE

### 1998Q1=100, NSA

DAL — TX — U.S.

*Sources: FHFA, Moody's Analytics*

## RENTAL AFFORDABILITY

### GREATER THAN 100=MORE AFFORDABLE

DAL — TX — U.S.

*Sources: Census Bureau, BLS, Moody's Analytics*

## HOUSE PRICE TRENDS

### %

Overvalued — Undervalued

*Sources: FHFA, Moody's Analytics*

## HOUSING AFFORDABILITY

### GREATER THAN 100=MORE AFFORDABLE

DAL — TX — U.S.

*Sources: NAR, Moody's Analytics*

## EMPLOYMENT AND INDUSTRY

### TOP EMPLOYERS

| | |
|---|---|
| Walmart Inc. | 34,000 |
| American Airlines | 33,000 |
| Baylor Scott & White Health | 24,088 |
| Lockheed Martin | 20,500 |
| UT Southwestern Medical Center | 18,666 |
| AT&T | 17,000 |
| Medical City Healthcare | 17,000 |
| Bank of America Corp. | 14,465 |
| Texas Instruments Inc. | 12,901 |
| JPMorgan Chase & Co. | 12,600 |
| HCA North Texas Division | 11,612 |
| Parkland Hospital | 10,361 |
| Southwest Airlines Co. | 9,500 |
| Target Brands Inc. | 8,270 |
| Verizon | 8,100 |
| Raytheon Co. | 8,000 |
| Cook Children's Health Care System | 5,876 |
| The Kroger Co. | 5,732 |
| Methodist Health System | 5,723 |
| Albertsons Cos. LLC | 5,643 |

Sources: City of Dallas Economic Profile, 2019, Dallas Business Journal, 2019, Dallas Office of Economic Development, 2016, Dallas Regional Chamber, 2017

### PUBLIC

| | |
|---|---|
| Federal | 31,948 |
| State | 59,543 |
| Local | 219,078 |

2020

### INDUSTRIAL DIVERSITY

Most Diverse (U.S.)



0.78

Least Diverse

### EMPLOYMENT VOLATILITY



Due to U.S. fluctuations: 94%

Relative to U.S.: DAL 102, U.S. 100

Not due to U.S. | Due to U.S. | DAL | U.S.

## ENTREPRENEURSHIP

### BROAD-BASED START-UP RATE
U.S.=100, 4-QTR MA
2019

DAL | TX

Sources: Census Bureau, Moody's Analytics

## EXPORTS

| Product | $ mil |
|---|---|
| Food and kindred products | ND |
| Chemicals | 2,631.6 |
| Primary metal manufacturing | ND |
| Fabricated metal products | ND |
| Machinery, except electrical | 3,775.5 |
| Computer and electronic products | 8,499.1 |
| Transportation equipment | 13,880.6 |
| Miscellaneous manufacturing | ND |
| Other products | 9,082.6 |
| Total | 39,474.0 |

| Destination | $ mil |
|---|---|
| Africa | 521.2 |
| Asia | 14,096.2 |
| European Union | 7,714.8 |
| Canada & Mexico | 12,563.5 |
| South America | 1,514.7 |
| Rest of world | 3,063.6 |
| Total | 39,474.0 |

| | |
|---|---|
| % of GDP | 7.2 |
| Rank among all metro areas | 103 |

Sources: BEA, International Trade Administration, Moody's Analytics, 2019

## COMPARATIVE EMPLOYMENT AND INCOME

| Sector | % OF TOTAL EMPLOYMENT | | | AVERAGE ANNUAL EARNINGS | | |
|---|---|---|---|---|---|---|
| | DAL | TX | U.S. | DAL | TX | U.S. |
| Mining | 0.3 | 1.6 | 0.4 | nd | $240,222 | $152,860 |
| Construction | 4.9 | 6.0 | 5.1 | $77,374 | $69,275 | $71,226 |
| Manufacturing | 6.9 | 7.1 | 8.6 | $98,773 | $99,217 | $87,452 |
| *Durable* | 69.0 | 63.5 | 62.2 | nd | $95,340 | $90,347 |
| *Nondurable* | 31.0 | 36.5 | 37.8 | nd | $105,971 | $82,632 |
| Transportation/Utilities | 5.2 | 4.9 | 4.3 | $59,978 | $74,467 | $65,743 |
| Wholesale Trade | 5.7 | 4.8 | 4.0 | $102,122 | $95,847 | $92,590 |
| Retail Trade | 9.3 | 10.4 | 10.4 | $42,917 | $37,412 | $38,405 |
| Information | 2.6 | 1.6 | 1.9 | $114,708 | $88,925 | $136,729 |
| Financial Activities | 9.8 | 6.6 | 6.1 | $65,755 | $51,659 | $59,335 |
| Prof. and Bus. Services | 19.5 | 14.3 | 14.2 | $82,255 | $70,125 | $76,266 |
| Educ. and Health Services | 11.9 | 13.8 | 16.3 | $68,953 | $56,862 | $59,504 |
| Leisure and Hosp. Services | 8.6 | 9.6 | 9.4 | $30,883 | $27,373 | $31,046 |
| Other Services | 2.9 | 3.2 | 3.8 | $37,920 | $36,127 | $39,932 |
| Government | 11.9 | 16.0 | 15.4 | $78,952 | $74,895 | $83,178 |

Sources: Percent of total employment — BLS, Moody's Analytics, 2020, Average annual earnings — BEA, Moody's Analytics, 2019

## PRODUCTIVITY

### REAL OUTPUT PER WORKER, $



DAL 97,103 | TX 97,887 | U.S. 93,385

Sources: BEA, Moody's Analytics, 2019

## BUSINESS COSTS

U.S.=100



Total | Unit labor | Energy | State and local taxes | Office rent

2013 | 2018

Source: Moody's Analytics

## HIGH-TECH EMPLOYMENT

| | Ths | % of total |
|---|---|---|
| DAL | 213.6 | 8.2 |
| U.S. | 7,540.4 | 5.3 |

## HOUSING-RELATED EMPLOYMENT

| | Ths | % of total |
|---|---|---|
| DAL | 308.6 | 11.8 |
| U.S. | 14,373.7 | 10.1 |

Source: Moody's Analytics, 2020

## LEADING INDUSTRIES BY WAGE TIER

| | NAICS | Industry | Location Quotient | Employees (ths) |
|---|---|---|---|---|
| HIGH | 5415 | Computer systems design & related srvcs. | 2.0 | 65.9 |
| | 6211 | Offices of physicians | 1.2 | 50.7 |
| | 5511 | Management of companies & enterprises | 1.2 | 42.9 |
| | 5416 | Mgmnt., scientific & technical consult. srvcs. | 1.8 | 41.5 |
| MID | GVL | Local Government | 0.9 | 212.6 |
| | GVS | State Government | 0.6 | 48.5 |
| | 6221 | General medical and surgical hospitals | 0.6 | 47.2 |
| | 2382 | Building equipment contractors | 1.1 | 36.3 |
| LOW | 7225 | Restaurants and other eating places | 1.0 | 176.9 |
| | 5613 | Employment services | 1.5 | 91.4 |
| | 6216 | Home health care services | 1.7 | 38.3 |
| | 5617 | Services to buildings and dwellings | 1.1 | 36.6 |

Source: Moody's Analytics, 2020



### SKILLS MISMATCH

**% OF TOTAL**

Less than HS / High School / Some College / Associate's / Bachelor's / Graduate

■ Occupations  ■ Population

Sources: Census Bureau, ACS, Moody's Analytics, 2018

Undereducated — Balanced — Overeducated
▼ DAL   ▲ U.S.

### ECONOMIC DISENFRANCHISEMENT

| Index | 2019 | Rank* |
|---|---|---|
| Gini coefficient | 0.47 | 114 |
| Palma ratio | 3.1 | 181 |
| Poverty rate | 10.7% | 297 |

*Most unequal=1; Most equal=403

**HOUSEHOLDS BY INCOME, %**

0-19,999 / 20,000-39,999 / 40,000-59,999 / 60,000-74,999 / 75,000-99,999 / 100,000-124,999 / 125,000-149,999 / 150,000-199,999 / 200,000+

■ DAL  — U.S.

Sources: Census Bureau, ACS, Moody's Analytics, 2019

### PER CAPITA INCOME

**$ THS**

| 2020 | DAL $63,790 | TX $54,841 | U.S. $59,729 |
|---|---|---|---|

Sources: BEA, Moody's Analytics

### COMMUTER FLOWS

**RESIDENTS WHO WORK IN DAL**

92.2%

**Top Outside Sources of Jobs**

| Dallas TX | Share |
|---|---|
| Fort Worth TX | 5.8 |
| Houston TX | 0.2 |
| Sherman TX | 0.1 |
| Austin TX | 0.1 |

**WORKERS WHO LIVE IN DAL**

88.9%

**Top Outside Sources of Workers**

| Dallas TX | Share |
|---|---|
| Fort Worth TX | 8.2 |
| Sherman TX | 0.4 |
| Houston TX | 0.1 |
| Austin TX | 0.1 |
| San Antonio TX | 0.1 |

Sources: Census Bureau, Moody's Analytics, avg 2011-2015

### MIGRATION FLOWS

**INTO DALLAS TX**

| | Number of Migrants |
|---|---|
| Fort Worth TX | 38,554 |
| Houston TX | 9,274 |
| Austin TX | 5,049 |
| Los Angeles CA | 4,651 |
| New York NY | 3,804 |
| San Antonio TX | 3,563 |
| Chicago IL | 3,436 |
| Anaheim CA | 2,195 |
| Atlanta GA | 2,135 |
| Phoenix AZ | 2,095 |
| *Total in-migration* | *189,337* |

**FROM DALLAS TX**

| | |
|---|---|
| Fort Worth TX | 41,396 |
| Houston TX | 7,660 |
| Austin TX | 5,674 |
| Sherman TX | 3,515 |
| San Antonio TX | 3,043 |
| Denver CO | 2,300 |
| Los Angeles CA | 2,035 |
| Phoenix AZ | 1,856 |
| Seattle WA | 1,777 |
| New York NY | 1,743 |
| *Total out-migration* | *165,391* |
| **Net migration** | **23,946** |

**NET MIGRATION, #**

| | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|
| Domestic | 37,964 | 30,219 | 34,247 | 43,212 |
| Foreign | 23,043 | 16,545 | 16,239 | 12,974 |
| Total | 61,007 | 46,764 | 50,486 | 56,186 |

Sources: IRS (top), 2018, Census Bureau, Moody's Analytics

### GENERATIONAL BREAKDOWN

**POPULATION BY GENERATION, %**

Gen Z / Millennial / Gen X / Baby Boom / Silent & Greatest

■ DAL  ■ U.S.

Sources: Census Bureau, Moody's Analytics, 2019

### EDUCATIONAL ATTAINMENT

**% OF ADULTS 25 AND OLDER**

| | DAL | TX | U.S. |
|---|---|---|---|
| Graduate school | 14 | 11 | 13 |
| College | 24 | 20 | 20 |
| Some college | 27 | 29 | 29 |
| High school | 21 | 25 | 27 |
| < High school | 14 | 15 | 11 |

■ < High school  ■ High school  ■ Some college  ■ College  ■ Graduate school

Sources: Census Bureau, ACS, Moody's Analytics, 2019

### POPULATION BY AGE, %

≥75 / 70-74 / 65-69 / 60-64 / 55-59 / 50-54 / 45-49 / 40-44 / 35-39 / 30-34 / 25-29 / 20-24 / 15-19 / 10-14 / 5-9 / 0-4

■ DAL  — U.S.

Sources: Census Bureau, Moody's Analytics, 2020

Case 3:22-cv-02118-X Document 42 Filed 12/06/23 Page 107 of 143 PageID 15381

## GEOGRAPHIC PROFILE

### POPULATION DENSITY



| County | Distribution, % | | |
|---|---|---|---|
| | Pop. | Emp. | Permits |
| Collin TX | 20.7 | 17.1 | 34.6 |
| Dallas TX | 51.0 | 66.8 | 24.8 |
| Denton TX | 17.8 | 10.3 | 23.3 |
| Ellis TX | 3.7 | 2.1 | 6.4 |
| Hunt TX | 1.9 | 1.1 | 2.1 |
| Kaufman TX | 2.8 | 1.3 | 2.5 |
| Rockwall TX | 2.1 | 1.3 | 6.3 |

*Sources: Census Bureau, BLS, Moody's Analytics, 2020*

Residents per square mile

11                    75,049

### MEDIAN HOUSEHOLD INCOME

U.S. Dollars

9,052        250,001

### MEDIAN COMMUTE TIME

Minutes

7        76

*Sources: ACS, Moody's Analytics*

### POPULATION & HOUSING CHARACTERISTICS

| | Units | Value | Rank* |
|---|---|---|---|
| Total area | sq mi | 5,537.8 | 37 |
| Total water area | sq mi | 261.2 | 80 |
| Total land area | sq mi | 5,274.5 | 41 |
| Land area - developable | sq mi | 4,887.8 | 7 |
| Land area - undevelopable | sq mi | 388.8 | 218 |
| Population density | pop. to developable land | 1,002.0 | 51 |
| Total population | ths | 5,171.9 | 6 |
| U.S. citizen at birth | % of population | 77.3 | 365 |
| Naturalized U.S. citizen | % of population | 7.6 | 57 |
| Not a U.S. citizen | % of population | 13.8 | 14 |
| Median age | | 35.1 | 329 |
| Total housing units | ths | 1,946.6 | 7 |
| Owner occupied | % of total | 53.1 | 321 |
| Renter occupied | % of total | 38.5 | 37 |
| Vacant | % of total | 8.4 | 281 |
| 1-unit; detached | % of total | 60.2 | 315 |
| 1-unit; attached | % of total | 2.8 | 275 |
| Multifamily | % of total | 34.2 | 35 |
| Median year built | | 1989 | |

*\* Areas & pop. density, out of 410 metro areas/divisions, including metros in Puerto Rico; all others, out of 403 metros.*

*Sources: Census Bureau, Moody's Analytics, 2019 except land area 2010*

## About Moody's Analytics

Moody's Analytics provides financial intelligence and analytical tools supporting our clients' growth, efficiency and risk management objectives. The combination of our unparalleled expertise in risk, expansive information resources, and innovative application of technology helps today's business leaders confidently navigate an evolving marketplace. We are recognized for our industry-leading solutions, comprising research, data, software and professional services, assembled to deliver a seamless customer experience. Thousands of organizations worldwide have made us their trusted partner because of our uncompromising commitment to quality, client service, and integrity.

Concise and timely economic research by Moody's Analytics supports firms and policymakers in strategic planning, product and sales forecasting, credit risk and sensitivity management, and investment research. Our economic research publications provide in-depth analysis of the global economy, including the U.S. and all of its state and metropolitan areas, all European countries and their subnational areas, Asia, and the Americas. We track and forecast economic growth and cover specialized topics such as labor markets, housing, consumer spending and credit, output and income, mortgage activity, demographics, central bank behavior, and prices. We also provide real-time monitoring of macroeconomic indicators and analysis on timely topics such as monetary policy and sovereign risk. Our clients include multinational corporations, governments at all levels, central banks, financial regulators, retailers, mutual funds, financial institutions, utilities, residential and commercial real estate firms, insurance companies, and professional investors.

Moody's Analytics added the economic forecasting firm Economy.com to its portfolio in 2005. This unit is based in West Chester PA, a suburb of Philadelphia, with offices in London, Prague and Sydney. More information is available at www.economy.com.

Moody's Analytics is a subsidiary of Moody's Corporation (NYSE: MCO). Further information is available at www.moodysanalytics.com.

DISCLAIMER: Moody's Analytics, a unit of Moody's Corporation, provides economic analysis, credit risk data and insight, as well as risk management solutions. Research authored by Moody's Analytics does not reflect the opinions of Moody's Investors Service, the credit rating agency. To avoid confusion, please use the full company name "Moody's Analytics", when citing views from Moody's Analytics.

## About Moody's Corporation

Moody's Analytics is a subsidiary of Moody's Corporation (NYSE: MCO). MCO reported revenue of $5.4 billion in 2020, employs more than 11,400 people worldwide and maintains a presence in more than 40 countries. Further information about Moody's Analytics is available at www.moodysanalytics.com.

© 2021 Moody's Corporation, Moody's Investors Service, Inc., Moody's Analytics, Inc. and/or their licensors and affiliates (collectively, "MOODY'S"). All rights reserved.

CREDIT RATINGS ISSUED BY MOODY'S CREDIT RATINGS AFFILIATES ARE THEIR CURRENT OPINIONS OF THE RELATIVE FUTURE CREDIT RISK OF ENTITIES, CREDIT COMMITMENTS, OR DEBT OR DEBT-LIKE SECURITIES, AND MATERIALS, PRODUCTS, SERVICES AND INFORMATION PUBLISHED BY MOODY'S (COLLECTIVELY, "PUBLICATIONS") MAY INCLUDE SUCH CURRENT OPINIONS. MOODY'S DEFINES CREDIT RISK AS THE RISK THAT AN ENTITY MAY NOT MEET ITS CONTRACTUAL FINANCIAL OBLIGATIONS AS THEY COME DUE AND ANY ESTIMATED FINANCIAL LOSS IN THE EVENT OF DEFAULT OR IMPAIRMENT. SEE APPLICABLE MOODY'S RATING SYMBOLS AND DEFINITIONS PUBLICATION FOR INFORMATION ON THE TYPES OF CONTRACTUAL FINANCIAL OBLIGATIONS ADDRESSED BY MOODY'S CREDIT RATINGS. CREDIT RATINGS DO NOT ADDRESS ANY OTHER RISK, INCLUDING BUT NOT LIMITED TO: LIQUIDITY RISK, MARKET VALUE RISK, OR PRICE VOLATILITY. CREDIT RATINGS, NON-CREDIT ASSESSMENTS ("ASSESSMENTS"), AND OTHER OPINIONS INCLUDED IN MOODY'S PUBLICATIONS ARE NOT STATEMENTS OF CURRENT OR HISTORICAL FACT. MOODY'S PUBLICATIONS MAY ALSO INCLUDE QUANTITATIVE MODEL-BASED ESTIMATES OF CREDIT RISK AND RELATED OPINIONS OR COMMENTARY PUBLISHED BY MOODY'S ANALYTICS, INC. AND/OR ITS AFFILIATES. MOODY'S CREDIT RATINGS, ASSESSMENTS, OTHER OPINIONS AND PUBLICATIONS DO NOT CONSTITUTE OR PROVIDE INVESTMENT OR FINANCIAL ADVICE, AND MOODY'S CREDIT RATINGS, ASSESSMENTS, OTHER OPINIONS AND PUBLICATIONS ARE NOT AND DO NOT PROVIDE RECOMMENDATIONS TO PURCHASE, SELL, OR HOLD PARTICULAR SECURITIES. MOODY'S CREDIT RATINGS, ASSESSMENTS, OTHER OPINIONS AND PUBLICATIONS DO NOT COMMENT ON THE SUITABILITY OF AN INVESTMENT FOR ANY PARTICULAR INVESTOR. MOODY'S ISSUES ITS CREDIT RATINGS, ASSESSMENTS AND OTHER OPINIONS AND PUBLISHES ITS PUBLICATIONS WITH THE EXPECTATION AND UNDERSTANDING THAT EACH INVESTOR WILL, WITH DUE CARE, MAKE ITS OWN STUDY AND EVALUATION OF EACH SECURITY THAT IS UNDER CONSIDERATION FOR PURCHASE, HOLDING, OR SALE.

MOODY'S CREDIT RATINGS, ASSESSMENTS, OTHER OPINIONS, AND PUBLICATIONS ARE NOT INTENDED FOR USE BY RETAIL INVESTORS AND IT WOULD BE RECKLESS AND INAPPROPRIATE FOR RETAIL INVESTORS TO USE MOODY'S CREDIT RATINGS, ASSESSMENTS, OTHER OPINIONS OR PUBLICATIONS WHEN MAKING AN INVESTMENT DECISION. IF IN DOUBT YOU SHOULD CONTACT YOUR FINANCIAL OR OTHER PROFESSIONAL ADVISER.

ALL INFORMATION CONTAINED HEREIN IS PROTECTED BY LAW, INCLUDING BUT NOT LIMITED TO, COPYRIGHT LAW, AND NONE OF SUCH INFORMATION MAY BE COPIED OR OTHERWISE REPRODUCED, REPACKAGED, FURTHER TRANSMITTED, TRANSFERRED, DISSEMINATED, REDISTRIBUTED OR RESOLD, OR STORED FOR SUBSEQUENT USE FOR ANY SUCH PURPOSE, IN WHOLE OR IN PART, IN ANY FORM OR MANNER OR BY ANY MEANS WHATSOEVER, BY ANY PERSON WITHOUT MOODY'S PRIOR WRITTEN CONSENT.

MOODY'S CREDIT RATINGS, ASSESSMENTS, OTHER OPINIONS AND PUBLICATIONS ARE NOT INTENDED FOR USE BY ANY PERSON AS A BENCHMARK AS THAT TERM IS DEFINED FOR REGULATORY PURPOSES AND MUST NOT BE USED IN ANY WAY THAT COULD RESULT IN THEM BEING CONSIDERED A BENCHMARK.

All information contained herein is obtained by MOODY'S from sources believed by it to be accurate and reliable. Because of the possibility of human or mechanical error as well as other factors, however, all information contained herein is provided "AS IS" without warranty of any kind. MOODY'S adopts all necessary measures so that the information it uses in assigning a credit rating is of sufficient quality and from sources MOODY'S considers to be reliable including, when appropriate, independent third-party sources. However, MOODY'S is not an auditor and cannot in every instance independently verify or validate information received in the rating process or in preparing its Publications.

To the extent permitted by law, MOODY'S and its directors, officers, employees, agents, representatives, licensors and suppliers disclaim liability to any person or entity for any indirect, special, consequential, or incidental losses or damages whatsoever arising from or in connection with the information contained herein or the use of or inability to use any such information, even if MOODY'S or any of its directors, officers, employees, agents, representatives, licensors or suppliers is advised in advance of the possibility of such losses or damages, including but not limited to: (a) any loss of present or prospective profits or (b) any loss or damage arising where the relevant financial instrument is not the subject of a particular credit rating assigned by MOODY'S.

To the extent permitted by law, MOODY'S and its directors, officers, employees, agents, representatives, licensors and suppliers disclaim liability for any direct or compensatory losses or damages caused to any person or entity, including but not limited to by any negligence (but excluding fraud, willful misconduct or any other type of liability that, for the avoidance of doubt, by law cannot be excluded) on the part of, or any contingency within or beyond the control of, MOODY'S or any of its directors, officers, employees, agents, representatives, licensors or suppliers, arising from or in connection with the information contained herein or the use of or inability to use any such information.

NO WARRANTY, EXPRESS OR IMPLIED, AS TO THE ACCURACY, TIMELINESS, COMPLETENESS, MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE OF ANY CREDIT RATING, ASSESSMENT, OTHER OPINION OR INFORMATION IS GIVEN OR MADE BY MOODY'S IN ANY FORM OR MANNER WHATSOEVER.

Moody's Investors Service, Inc., a wholly-owned credit rating agency subsidiary of Moody's Corporation ("MCO"), hereby discloses that most issuers of debt securities (including corporate and municipal bonds, debentures, notes and commercial paper) and preferred stock rated by Moody's Investors Service, Inc. have, prior to assignment of any credit rating, agreed to pay to Moody's Investors Service, Inc. for credit ratings opinions and services rendered by it fees ranging from $1,000 to approximately $5,000,000. MCO and Moody's Investors Service also maintain policies and procedures to address the independence of Moody's Investors Service credit ratings and credit rating processes. Information regarding certain affiliations that may exist between directors of MCO and rated entities, and between entities who hold credit ratings from Moody's Investors Service and have also publicly reported to the SEC an ownership interest in MCO of more than 5%, is posted annually at www.moodys.com under the heading "Investor Relations — Corporate Governance — Director and Shareholder Affiliation Policy."

Additional terms for Australia only: Any publication into Australia of this document is pursuant to the Australian Financial Services License of MOODY'S affiliate, Moody's Investors Service Pty Limited ABN 61 003 399 657AFSL 336969 and/or Moody's Analytics Australia Pty Ltd ABN 94 105 136 972 AFSL 383569 (as applicable). This document is intended to be provided only to "wholesale clients" within the meaning of section 761G of the Corporations Act 2001. By continuing to access this document from within Australia, you represent to MOODY'S that you are, or are accessing the document as a representative of, a "wholesale client" and that neither you nor the entity you represent will directly or indirectly disseminate this document or its contents to "retail clients" within the meaning of section 761G of the Corporations Act 2001. MOODY'S credit rating is an opinion as to the creditworthiness of a debt obligation of the issuer, not on the equity securities of the issuer or any form of security that is available to retail investors.

Additional terms for Japan only: Moody's Japan K.K. ("MJKK") is a wholly-owned credit rating agency subsidiary of Moody's Group Japan G.K., which is wholly-owned by Moody's Overseas Holdings Inc., a wholly-owned subsidiary of MCO. Moody's SF Japan K.K. ("MSFJ") is a wholly-owned credit rating agency subsidiary of MJKK. MSFJ is not a Nationally Recognized Statistical Rating Organization ("NRSRO"). Therefore, credit ratings assigned by MSFJ are Non-NRSRO Credit Ratings. Non-NRSRO Credit Ratings are assigned by an entity that is not a NRSRO and, consequently, the rated obligation will not qualify for certain types of treatment under U.S. laws. MJKK and MSFJ are credit rating agencies registered with the Japan Financial Services Agency and their registration numbers are FSA Commissioner (Ratings) No. 2 and 3 respectively.

MJKK or MSFJ (as applicable) hereby disclose that most issuers of debt securities (including corporate and municipal bonds, debentures, notes and commercial paper) and preferred stock rated by MJKK or MSFJ (as applicable) have, prior to assignment of any credit rating, agreed to pay to MJKK or MSFJ (as applicable) for credit ratings opinions and services rendered by it fees ranging from JPY125,000 to approximately JPY550,000,000.

MJKK and MSFJ also maintain policies and procedures to address Japanese regulatory requirements.

# SUBJECT PHOTOGRAPHS



**Goldmark Drive facing northeast**



**Goldmark Drive facing southwest**



**Subject exterior**



**Kitchen**



**Living room**



**Bedroom**



**Bathroom**

# RENT ROLL

|   | Unit | Lease Name | Lease Status | Rent | Sqft | Unit Type |
|---|------|------------|--------------|------|------|-----------|
| D | 1100 | Badgley, W. | Active | 1675 | 1200 | 2x2 |
| C | 1101 | Vacant | vacant | - | 660 | 1x1 |
| C | 1102 | Abelardo, L. | Active | 1100 | 660 | 1x1 |
| C | 1103 | Dunlap, D. | Active | 1150 | 660 | 1x1 |
| C | 1104 | Cross-Dog, C. | Active | 1050 | 660 | 1x1 |
| C | 1105 | Brooks | Active | 1150 | 660 | 1x1 |
| C | 1106 | Vacant | Active | | 660 | 1x1 |
| D | 1200 | Lopez | Active | 1675 | 1200 | 2x2 |
| C | 1201 | Moss, S. | Active | 1150 | 660 | 1x1 |
| C | 1202 | Shenk, C. | Active | 1050 | 660 | 1x1 |
| C | 1203 | Yancy - Walker | Active | 1050 | 660 | 1x1 |
| C | 1204 | Henry, L. | Active | 1150 | 660 | 1x1 |
| C | 1205 | Graham, R._1 | Active | 1150 | 660 | 1x1 |
| C | 1206 | Smith - Toulmin | Active | 1150 | 660 | 1x1 |
| D | 1300 | Maddox, C. | Active | 1675 | 1200 | 2x2 |
| C | 1301 | Jones, L._2 | Active | 1050 | 660 | 1x1 |
| C | 1302 | Moss, S. | Active | 1150 | 660 | 1x1 |
| C | 1303 | Marshall, A. | Active | 1150 | 660 | 1x1 |
| C | 1304 | Trivedi, G. | Active | 1100 | 660 | 1x1 |
| D | 1400 | Bell, W. | Active | 1675 | 1200 | 2x2 |
| C | 1401 | Vacant | vacant | | 660 | 1x1 |
| C | 1402 | Gray, K._1 | Active | 1150 | 660 | 1x1 |
| C | 1403 | Abron, K. | Active | 1050 | 660 | 1x1 |
| C | 1404 | Moore, A._1 | Active | 1150 | 660 | 1x1 |
| C | 1405 | Roesch, J. | Active | 1150 | 660 | 1x1 |
| C | 1406 | Jenkins, J. | Active | 1100 | 660 | 1x1 |
| D | 1500 | Guzman, F. | Active | 1000 | 1200 | 2x2 |
| C | 1501 | Delavega | Active | 1150 | 660 | 1x1 |
| C | 1502 | Cain, R. | Active | 1150 | 660 | 1x1 |
| C | 1503 | Garrison, S. | Active | 1150 | 660 | 1x1 |
| C | 1504 | Jackson, E._1 | Active | 1100 | 660 | 1x1 |
| C | 1505 | Bowline, B. | Active | 1150 | 660 | 1x1 |
| C | 1506 | Washington, T._1 | Active | 1150 | 660 | 1x1 |
| D | 1600 | Windham - Muessig_1 | Active | 1475 | 1200 | 2x2 |
| C | 1601 | Goolsby, S. | Active | 1050 | 660 | 1x1 |
| C | 1602 | Clark, A. | Active | 1050 | 660 | 1x1 |
| C | 1603 | Abron, J. | Active | 1150 | 660 | 1x1 |
| C | 1604 | Bellamy | Active | 1150 | 660 | 1x1 |
| D | 1700 | Julian, M. | Active | 1675 | 1200 | 2x2 |
| B | 1701 | Gordon | Active | 1050 | 500 | 1x1 |
| C | 1702 | Silva - Barakat | Active | 1150 | 660 | 1x1 |
| C | 1703 | Bolden, L. | Active | 1050 | 660 | 1x1 |
| C | 1704 | Johanson, C. | Active | 1025 | 660 | 1x1 |
| C | 1705 | Garner, A. | Active | 1150 | 660 | 1x1 |
| C | 1706 | Washington, T. | Active | 1150 | 660 | 1x1 |
| D | 1800 | Moore, D._1 | Active | 1675 | 1200 | 2x2 |

| C | 1801 | Tylor, A. | Active | 1050 | 660 | 1x1 |
|---|------|-----------|--------|------|-----|-----|
| B | 1802 | Davis, D._1 | Active | 1000 | 500 | 1x1 |
| B | 1803 | Sharma, A. | Active | 1050 | 500 | 1x1 |
| C | 1804 | Denman, A. | Active | 1150 | 660 | 1x1 |
| C | 1805 | Imeleta, A. | Active | 1050 | 660 | 1x1 |
| C | 1806 | Layer, P._1 | Active | 1150 | 660 | 1x1 |
| D | 1900 | Abernathy | Active | 1675 | 1200 | 2x2 |
| C | 1901 | Franklin, T. | Active | 1150 | 660 | 1x1 |
| C | 1902 | Dworkin - Dworkin | Active | 1050 | 660 | 1x1 |
| C | 1903 | Clayboren, T. | Active | 1150 | 660 | 1x1 |
| C | 1904 | Thierry | Active | 1150 | 660 | 1x1 |
| D | 2000 | Shumate, R. | Active | 1625 | 1200 | 2x2 |
| C | 2001 | Wallpool, A. | Active | 1150 | 660 | 1x1 |
| C | 2002 | Baker - Dwyer | Active | 1100 | 660 | 1x1 |
| C | 2003 | Moore, J. | Active | 1150 | 660 | 1x1 |
| C | 2004 | Woodard, J. | Active | 1150 | 660 | 1x1 |
| C | 2005 | Lackhart, N. | Active | 1150 | 660 | 1x1 |
| C | 2006 | Silvasan-Roberts, J. | Active | - | 660 | 1x1 |
| C | 2101 | Jauregui | Active | 1150 | 660 | 1x1 |
| A | 2102 | Roberts, L. | Active | 700 | 300 | 1x1 |
| C | 2103 | Badgley | Active | 1150 | 660 | 1x1 |
| C | 2104 | Lopez, M. | Active | 1150 | 660 | 1x1 |
| C | 2105 | Johnson, C._1 | Active | 1150 | 660 | 1x1 |
| C | 2106 | Alexander, S. | Active | 1000 | 660 | 1x1 |

# OPERATING STATEMENTS

**Goldmark Hospitality LLC**
**Income Statement**

| | | 2020 | 2021 HY |
|---|---|---|---|
| | Receipts | $ 850,920 | $429,062 |
| | SBA - EIDL Advance | $ 7,000 | |
| | Insurance Claim | $ 20,178 | |
| | | $ 871,097 | $429,062 |
| # 9 | Salary & Wages | $ 68,000 | $ 35,000 |
| # 15 | Interest | $ 113,907 | $ 98,682 |
| # 16a | Depreciation | $ 266,702 | $ 92,496 |
| # 20-6160 | Dues & Subscription | $ 2,042 | $ 717 |
| # 20-6170 | Repairs & Maintenance | $ 44,576 | $ 17,995 |
| # 20-6180 | Insurance | $ 31,445 | $ 16,712 |
| # 20-6300 | Telephone | $ 2,454 | $ 1,311 |
| # 20-6320 | Utilities | $ 179,500 | $ 91,724 |
| # 20-6370 | Misc Exp | $ 105 | $ 72 |
| # 20-6468 | Office Supplies | $ 2,451 | $ 973 |
| # 20-6500 | Flooring | $ 8,883 | $ 2,132 |
| # 20-6526 | Travel | $ 173 | |
| # 20-6600 | Legal & Professional | $ 2,630 | $ 505 |
| # 20-6615 | Landscaping | $ 9,300 | $ 3,000 |
| # 20-6802 | Security Services | $ 7,927 | $ 4,121 |
| # 20-7200 | Property Tax | $ 26,826 | |
| # 20-7554 | Permit/License | $ 226 | $ 45 |
| # 20-7608 | Housekeeping | | |
| # 20-7702 | Merchant Account Fees | $ 4,754 | $ 2,397 |
| # 20-7705 | Contract Labor | $ 52,316 | $ 29,030 |
| # 20-7712 | Pest Control | $ 4,162 | $ 2,094 |
| # 20-8100 | Computer Exp | | |
| | Total Exp | $ 828,379 | $399,005 |
| | Net Profit | $ 42,719 | $ 30,057 |

# Goldmark Hospitality LLC
# Profit and Loss
### January - December 2019

| | | Total |
|---|---|---|
| Income | | |
| 4650 LODGING SALES | | |
| 4654 Cash Sales | | 481,542.68 |
| 4658 Credit Cards Sales | | 381,001.36 |
| Total 4650 LODGING SALES | $ | 862,544.04 |
| 4670 Vending Machine Comm | | 2,911.57 |
| Total Income | $ | 865,455.61 |
| Gross Profit | $ | 865,455.61 |
| Expenses | | |
| 6130 Reimbursements | | 2,865.68 |
| 6170 Repairs and Maintenance | | 167,549.78 |
| 6180 Insurance Expense | | 25,908.73 |
| 6300 Telephone Expense | | 1,975.59 |
| 6320 Utilities | | |
| 6321 Cable TV | | 13,376.73 |
| 6322 Electricity & Gas | | 95,996.32 |
| 6323 Waste | | 6,746.95 |
| 6324 Water | | 42,452.61 |
| Total 6320 Utilities | $ | 158,572.61 |
| 6330 Cleaning /Janitorial | | 375.00 |
| 6400 Bank Service Charges | | 5.04 |
| 6401 Financing Fee | | 2,000.00 |
| 6435 License Fee | | 1,242.00 |
| 6450 Interest Expense | | 142,321.43 |
| 6466 Supplies | | 1,333.45 |
| 6468 Office Supplies | | 2,305.97 |
| 6469 General and Administrative | | 1,899.65 |
| 6500 Flooring | | 4,459.34 |
| 6512 Financing Fees | | 193,781.34 |
| 6560 Payroll Expenses | | 105,000.00 |
| 6570 Postage and Delivery | | 8.50 |
| 6600 Professional Fees | | |
| 6650 Accounting Fees | | 1,200.00 |
| 6667 Survey | | 5,547.81 |
| Total 6600 Professional Fees | $ | 6,747.81 |
| 6615 Landscaping and Groundskeeping | | 10,600.00 |
| 6802 Security Service | | 13,737.82 |
| 7200 Property Tax | | 13,488.51 |
| 7554 Business Licenses and Permits | | 47.00 |
| 7558 Credit Card Processing Fee | | 341.48 |
| 7608 Housekeeping Supplies | | 4,142.28 |

| | | |
|---|---|---|
| 7610 Insurance Claim | | -25,151.85 |
| 7702 Merchant Account Fees | | 2,865.79 |
| 7704 Office Supplies - Food Exp | | 468.02 |
| 7705 Labor Costs | | |
| 6626 Contract Labor | | 61,730.00 |
| **Total 7705 Labor Costs** | $ | **61,730.00** |
| 7708 Permits | | 47.00 |
| 7712 Pest Control | | 3,314.64 |
| 7717 Pool Supplies | | 62.73 |
| 8100 Computer Software | | 1,716.28 |
| 9030 Taxes | | 27,023.15 |
| 9040 Depreciation Expense | | 36,000.00 |
| **Total Expenses** | $ | **968,784.77** |
| **Net Operating Income** | -$ | **103,329.16** |
| **Net Income** | -$ | **103,329.16** |

Wednesday, Mar 18, 2020 04:06:43 PM GMT-7 - Accrual Basis

# COMPARABLE IMPROVED SALES

**BBG**



**Sale Comparable #1**
**98Fifty**
9850 Whitehurst Drive
Dallas, TX  75243
Dallas County
BBG Property #141543



## Property Data

*Improvement Details*

| | | | |
|---|---|---|---|
| Property Type/Use | Multi-Family Apartment | Lat/Long | 32.900030 / -96.7250 |
| Legal | Graystone Addition, Block D/8100, Lot 1, 82922 Acres | | |
| Parcel ID # | 00000791101550000 | Number of Buildings | 0 |
| Year Built | 1981 | Year Renovated | N/A |
| Quality | Average | Condition | Average |
| Class | | Construction Details | Wood frame, brick veneer and wood siding with pitched composition roofs |
| Gross Building Area | 189,420 SF | Rentable Area | 164,040 SF |
| Multifamily Units | 196 | | |
| Number of Stories | 2 | Floor Area Ratio | 0.52 |
| HAP Contract | No HAP in place | LIHTC | Property is not LIHTC |
| Opportunity Zone | No | Census Tract | 0078.11 |
| Parking | Surface: 74 Other: 222 Total: 296 | | |
| Site Size (Gross) | 361,210 SF (8.29 acres) | Site Size (Net) | 361,210 SF (8.29 acres) |
| Project Amenities | Laundry Room, On-Site Office, Playground, Pool, Security Gate | | |
| Unit Amenities | Ceiling Fans, Fireplace, Security System, Standard Appliances, Wood Flooring | | |
| Comments | fka Timmaron Ridge | | |

**Unit Mix**

| Unit Count | Unit Size (SF) | Unit Plan | Comments |
|---|---|---|---|
| 36 | 550 | Studio | |
| 48 | 705 | 1BR/1BA | |
| 64 | 966 | 2BR-1.5BA | |
| 48 | 1,012 | 2BR/2BA | |
| 196 | 836 SF Avg. | | |

| Sale Transaction Data for BBG Event #592272 on 6/10/2021 | | | | PSF (GBA) | PSF (Rentable) | Per Unit |
|---|---|---|---|---|---|---|
| Transaction Date | **6/10/2021** | Consideration | **$20,600,000** | **$108.75** | **$125.58** | **$105,102** |
| Sale Status | **Closed** | Adjustments | **$0** | **$0.00** | **$0.00** | **$0** |
| Occupancy at TOS | **87%** | Cash Equivalent Price | **$20,600,000** | **$108.75** | **$125.58** | **$105,102** |
| Property Rights | **Leased Fee** | | | | | |
| Grantor | **AV Apartments LP** | | | | | |
| Grantee | **98Fifty TIC LLC** | | | | | |
| Record Info | **202100172385** | | | | | |
| Comments | **Cap rate based on T3 income (assuming stabilized vacancy) and T12 expenses with taxes adjusted to 75% of PP.** | | | | | |
| Verification | **7/12/2021** | | | | | |
| | **Confidential** | | | | | |

| Financial Attributes | In-Place Income | | | Proforma Income | | |
|---|---|---|---|---|---|---|
| | *Amount* | *PSF (Rentable)* | *Per Unit* | *Amount* | *PSF (Rentable)* | *Per Unit* |
| Effective Gross Income | **$2,360,346** | **$0.00** | **$12,043** | **$0** | **$0.00** | **$0** |
| Expenses | **$1,345,900** | **$0.00** | **$6,867** | **$0** | **$0.00** | **$0** |
| Reserves | **$58,800** | **$0.00** | **$300** | **$0** | **$0.00** | **$0** |
| Net Operating Income | **$955,646** | **$0.00** | **$4,876** | **$0** | **$0.00** | **$0** |
| Overall Rate | **4.64%** | | | **0.00%** | | |
| Operating Expense Ratio | **59.51%** | | | **0.00%** | | |

**BBG**



**Sale Comparable #2**
**Apex**
9911 Whitehurst Drive
Dallas, TX  75243
Dallas County
BBG Property #118730



## Property Data

*Improvement Details*

| | | | |
|---|---|---|---|
| Property Type/Use | Multi-Family Apartment | Lat/Long | 32.900120 / -96.7232 |
| Legal | HIGHLAND OAKS ADDITION, Block C/810, 8.5109 Acres, as recorded in Volume 78168, Page 0451, Dallas County Records | | |
| Parcel ID # | 00000791101500000 | Number of Buildings | 12 |
| Year Built | 1979 | Year Renovated | 2013 |
| Quality | Average | Condition | Average/Good |
| Class | | Construction Details | Wood frame with stucco exterior, wood siding, pitched roofs and individual HVAC units |
| Gross Building Area | 198,640 SF | Rentable Area | 177,376 SF |
| Multifamily Units | 244 | | |
| Number of Stories | 23 | Floor Area Ratio | 0.54 |
| HAP Contract | No HAP in place | LIHTC | Property is not LIHTC |
| Opportunity Zone | No | Census Tract | 0078.11 |
| Parking | Total: 0 | | |
| Site Size (Gross) | 370,737 SF (8.51 acres) | Site Size (Net) | 370,737 SF (8.51 acres) |
| Project Amenities | Business Center, Clubhouse, Laundry Room, Playground | | |
| Unit Amenities | Ceiling Fans, Dishwasher, Laundry Appliances, Laundry Connections | | |

**BBG**

**Unit Mix**

| Unit Count | Unit Size (SF) | Unit Plan | Comments |
|---|---|---|---|
| 8 | 443 | Studio | |
| 16 | 443 | Studio | |
| 17 | 553 | 1BR-1BA | |
| 43 | 553 | 1BR-1BA | |
| 26 | 717 | 1BR-1BA | |
| 58 | 717 | 1BR-1BA | |
| 9 | 821 | 1BR-1BA | |
| 15 | 821 | 1BR-1BA | |
| 4 | 871 | 2BR-2BA | |
| 12 | 871 | 2BR-2BA | |
| 5 | 1,034 | 2BR-2BA | |
| 19 | 1,034 | 2BR-2BA | |
| 3 | 1,240 | 2BR-2BA | |
| 9 | 1,240 | 2BR-2BA | |
| 244 | 726 SF Avg. | | |

| Sale Transaction Data for BBG Event #592545 on 6/10/2021 | | | | PSF (GBA) | PSF (Rentable) | Per Unit |
|---|---|---|---|---|---|---|
| Transaction Date | 6/10/2021 | Consideration | $24,800,000 | $124.85 | $139.82 | $101,639 |
| Sale Status | Closed | Adjustments | $0 | $0.00 | $0.00 | $0 |
| Occupancy at TOS | 89% | Cash Equivalent Price | $24,800,000 | $124.85 | $139.82 | $101,639 |
| Property Rights | Leased Fee | | | | | |
| Grantor | LB Apartments LP | | | | | |
| Grantee | Las Brisas TIC LLC | | | | | |
| Record Info | 202100172389 | | | | | |
| Comments | Cap rate based on T3 income (assuming stabilized vacancy) and T12 expenses with taxes adjusted to 75% of PP. | | | | | |
| Verification | 7/12/2021 | | | | | |
| | Confidential | | | | | |

| Financial Attributes | In-Place Income | | | Proforma Income | | |
|---|---|---|---|---|---|---|
| | Amount | PSF (Rentable) | Per Unit | Amount | PSF (Rentable) | Per Unit |
| Effective Gross Income | $2,753,849 | $0.00 | $11,286 | $0 | $0.00 | $0 |
| Expenses | $1,470,255 | $0.00 | $6,026 | $0 | $0.00 | $0 |
| Reserves | $73,200 | $0.00 | $300 | $0 | $0.00 | $0 |
| Net Operating Income | $1,210,394 | $0.00 | $4,961 | $0 | $0.00 | $0 |
| Overall Rate | 4.88% | | | 0.00% | | |
| Operating Expense Ratio | 56.05% | | | 0.00% | | |

**BBG**



**Sale Comparable #3**
**Overlook Ranch**
3440 Timberglen Road
Dallas, TX  75287
Denton County
BBG Property #141953



## Property Data

*Improvement Details*

| | | | |
|---|---|---|---|
| Property Type/Use | Multi-Family Apartment | Lat/Long | 33.000130 / -96.8609 |
| Legal | Lots 1 & 2, Block R/8751 | | |
| Parcel ID # | 111127 & 111128 | Number of Buildings | 31 |
| Year Built | 1984 | Year Renovated | 2017 |
| Quality | Average | Condition | Average |
| Class | | Construction Details | Concrete slab, wood frame, stucco and brick exterior, pitched roofs |
| Gross Building Area | 535,162 SF | Rentable Area | 504,732 SF |
| Multifamily Units | 580 | | |
| Number of Stories | 3 | Floor Area Ratio | 0.42 |
| HAP Contract | No HAP in place | LIHTC | Property is not LIHTC |
| Opportunity Zone | No | Census Tract | |
| Parking | Total: 0 | | |
| Site Size (Gross) | 1,274,130 SF (29.25 acres) | Site Size (Net) | 1,274,130 SF (29.25 acres) |
| Project Amenities | Fitness Center, Hot Tub, Laundry Room, Sauna, Security Gate, Tennis Court, Pool | | |
| Unit Amenities | Patio/Balcony, Ceiling Fans, Fireplace, Standard Appliances | | |

## Unit Mix

| Unit Count | Unit Size (SF) | Unit Plan | Comments |
|---|---|---|---|
| 112 | 689 | 1BR/1BA | |
| 112 | 700 | 1BR/1BA | |
| 68 | 732 | 1BR/1BA | |
| 132 | 864 | 2BR/1BA | |
| 116 | 1,141 | 2BR/2BA | |
| 24 | 1,211 | 3BR/2BA | |
| 16 | 1,495 | 3BR/2BA | |
| 580 | 870 SF Avg. | | |

**BBG**

**BBG**

| Sale Transaction Data for BBG Event #484446 on 10/7/2020 | | | | PSF (GBA) | PSF (Rentable) | Per Unit |
|---|---|---|---|---|---|---|
| Transaction Date | 10/7/2020 | Consideration | $60,500,000 | $113.05 | $119.87 | $104,310 |
| Sale Status | Closed | Adjustments | $0 | $0.00 | $0.00 | $0 |
| Occupancy at TOS | 92% | Cash Equivalent Price | $60,500,000 | $113.05 | $119.87 | $104,310 |
| Property Rights | Leased Fee | | | | | |
| Grantor | Sunset 320 LLC & Lodge 260 LLC | | | | | |
| Grantee | G&I X Overlook Ranch I LP and G&I X Overlook Ranch II LP | | | | | |
| Record Info | 2020-160008 and 2020-160021 | | | | | |
| Comments | Purchase was for two adjacent assets; however, they are operated as one and were sold as such. Confirming party indicated a 5.25% cap rate based on actuals, tax adjusted at 85% of PP. Of note, there was an above market debt assumption associated with the transaction that resulted in a slightly lower PP and higher cap rate. | | | | | |
| Verification | 1/12/2021 | | | | | |
| | Confidential | | | | | |

| Financial Attributes | In-Place Income | | | Proforma Income | | |
|---|---|---|---|---|---|---|
| | Amount | PSF (Rentable) | Per Unit | Amount | PSF (Rentable) | Per Unit |
| Effective Gross Income | $7,222,705 | $0.00 | $12,453 | $0 | $0.00 | $0 |
| Expenses | $3,901,455 | $0.00 | $6,727 | $0 | $0.00 | $0 |
| Reserves | $145,000 | $0.00 | $250 | $0 | $0.00 | $0 |
| Net Operating Income | $3,176,250 | $0.00 | $5,476 | $0 | $0.00 | $0 |
| Overall Rate | 5.25% | | | 0.00% | | |
| Operating Expense Ratio | 56.02% | | | 0.00% | | |

**BBG**



Court of McCallum

McCallum Glen

**Sale Comparable #4**
**McCallum Communities**
7740 & 7777 McCallum Boulevard
Dallas, TX  75252
Collin County
BBG Property #115311



| Property Data | | | |
|---|---|---|---|
| *Improvement Details* | | | |
| Property Type/Use | Multi-Family Apartment | Lat/Long | 32.987640 / -96.7730 |
| Legal | Third Street, Blk 12/8726, Lot 7a, 2.4 Acres (Courts of McCallum); Frankfurt #2, Blk 22/8199, Lot 12b Split By County Line; FRANKFURT ADDN NO 2 BLK 22/8199 LOT 12B.1 ACS 0.654 JURIS SPLIT REM IN COLLIN CO (McCallum Glen) | | |
| Parcel ID # | 1718038 & 008199002212B0100  (McCallum Glen); 1512081 (Court of McCallum) | Number of Buildings | 13 |
| Year Built | 1985 | Year Renovated | N/A |
| Quality | Average | Condition | Average |
| Class | | Construction Details | Brick veneer/wood panel siding, wood frame, pitched, composition shingled roof on concrete slab foundation; individual HVAC |
| Gross Building Area | 262,421 SF | Rentable Area | 249,900 SF |
| Multifamily Units | 419 | | |
| Number of Stories | 3 | Floor Area Ratio | 0.96 |
| HAP Contract | No HAP in place | LIHTC | Property is not LIHTC |
| Opportunity Zone | No | Census Tract | 0317.20 |
| Parking | Surface: 283 Other: 161 Total: 444 | | |
| Site Size (Gross) | 273,557 SF (6.28 acres) | Site Size (Net) | 273,557 SF (6.28 acres) |
| Project Amenities | Business Center, Fitness Center, Laundry Room, On-Site Office, Pool | | |

**BBG**

**BBG**

**Unit Mix**

| Unit Count | Unit Size (SF) | Unit Plan | Comments |
|---|---|---|---|
| 129 | 525 | 1BR/1BA | Courts |
| 15 | 575 | 1BR/1BA | Glen |
| 232 | 600 | 1BR/1BA | Courts |
| 6 | 675 | 1BR/1BA | Glen |
| 7 | 700 | 1BR/1BA | Courts |
| 2 | 725 | 1BR/1BA | Glen |
| 25 | 850 | 2BR/2BA | Courts |
| 3 | 900 | 2BR/2BA | Courts |
| 419 | 596 SF Avg. | | |

| Sale Transaction Data for BBG Event #407597 on 8/20/2020 | | | | PSF (GBA) | PSF (Rentable) | Per Unit |
|---|---|---|---|---|---|---|
| Transaction Date | 8/20/2020 | Consideration | $39,000,000 | $148.62 | $156.06 | $93,079 |
| Sale Status | Closed | Adjustments | $0 | $0.00 | $0.00 | $0 |
| Occupancy at TOS | 93% | Cash Equivalent Price | $39,000,000 | $148.62 | $156.06 | $93,079 |
| Property Rights | Fee Simple | | | | | |
| Grantor | MCCALLUM PORTFOLIO LLC | | | | | |
| Grantee | MCCALLUM MULTIFAMILY DALLAS DE LLC | | | | | |
| Record Info | Collin - 20200820001375130 | | | | | |
| | Dallas - 202000225129 | | | | | |
| Comments | Taxes were estimated at 78% of the purchase price. | | | | | |
| Verification | 12/15/2020 | | | | | |
| | CLR/Appraisal Files/PSA/Collin County Deed Records | | | | | |

| Financial Attributes | In-Place Income | | | Proforma Income | | |
|---|---|---|---|---|---|---|
| | Amount | PSF (Rentable) | Per Unit | Amount | PSF (Rentable) | Per Unit |
| Rental Income | $0 | $0.00 | $0 | $3,996,000 | $0.00 | $9,537 |
| Other Income | $0 | $0.00 | $0 | $583,248 | $0.00 | $1,392 |
| Gross Annual Income | $0 | $0.00 | $0 | $4,579,248 | $0.00 | $10,929 |
| Vacancy Expense | $0 | $0.00 | $0 | $269,730 | $0.00 | $644 |
| Effective Gross Income | $0 | $0.00 | $0 | $4,309,518 | $0.00 | $10,285 |
| Expenses | $0 | $0.00 | $0 | $2,042,440 | $0.00 | $4,875 |
| Reserves | $0 | $0.00 | $0 | $104,750 | $0.00 | $250 |
| Net Operating Income | $0 | $0.00 | $0 | $2,162,328 | $0.00 | $5,161 |

**BBG**

**BBG**



**Sale Comparable #5**
**Frankford Flats**
2601 Frankford
Dallas, TX  75287
Denton County
BBG Property #141948



## Property Data

*Improvement Details*

| | | | |
|---|---|---|---|
| Property Type/Use | Multi-Family Apartment | Lat/Long | 32.997500 / -96.8682 |
| Legal | Appleridge No1 Blk B Lot 1 | | |
| Parcel ID # | 86788 | Number of Buildings | 28 |
| Year Built | 1983 | Year Renovated | N/A |
| Quality | Average | Condition | Average |
| Class | | Construction Details | Concrete slab, wood frame, brick veneer and siding exterior, pitched roofs with composition shingles |
| Gross Building Area | 267,801 SF | Rentable Area | 267,801 SF |
| Multifamily Units | 0 | | |
| Number of Stories | 2 | Floor Area Ratio | 0.50 |
| HAP Contract | No HAP in place | LIHTC | Property is not LIHTC |
| Opportunity Zone | No | Census Tract | |
| Parking | Total: 0 | | |
| Site Size (Gross) | 533,479 SF (12.25 acres) | Site Size (Net) | 533,479 SF (12.25 acres) |
| Project Amenities | Business Center, Carport Parking, Fitness Center, Pool | | |
| Unit Amenities | Assigned Carport, Patio/Balcony, Ceiling Fans, Dishwasher, Fireplace, Laundry Connections, Standard Appliances | | |
| Comments | FKA: Kelly Crossing | | |

**BBG**

**Unit Mix**

| Unit Count | Unit Size (SF) | Unit Plan | Comments |
|---|---|---|---|
| 48 | 551 | 1BR/1BA | |
| 96 | 665 | 1BR/1BA | |
| 48 | 758 | 1BR/1BA | |
| 48 | 929 | 2BR/1BA | |
| 15 | 992 | 2BR/2BA | |
| 64 | 1,023 | 2BR/2BA | |
| 15 | 1,079 | 2BR/2BA | |
| 334 | 801 SF Avg. | | |

| Sale Transaction Data for BBG Event #299153 on 1/31/2020 | | | | PSF (GBA) | PSF (Rentable) | Per Unit |
|---|---|---|---|---|---|---|
| Transaction Date | 1/31/2020 | Consideration | $38,300,000 | $143.02 | $143.02 | $114,671 |
| Sale Status | Closed | Adjustments | $0 | $0.00 | $0.00 | $0 |
| Occupancy at TOS | 93% | Cash Equivalent Price | $38,300,000 | $143.02 | $143.02 | $114,671 |
| Property Rights | Fee Simple | | | | | |
| Grantor | Kelly 334, LLC | | | | | |
| Grantee | TS Asset Frankford LLC | | | | | |
| Record Info | 2020-14245 | | | | | |
| Comments | Confirming party was unable to provide an overall rate for this transaction. It was also noted there was a loan assumption that may have impacted the sale price. It was estimated that the sale price would likely have been $5-$7K higher were it free and clear, which would equate to a 5-6% increase in the sale price. | | | | | |
| | Approximately 2/3 of the units had received interior renovations (black appliances, resurfaced counters, new floors, fixtures, etc.) along with an exterior refresh. | | | | | |
| Verification | 8/18/2020 | | | | | |
| | Confidential | | | | | |

# COMPARABLE RENTS



**Multifamily Rent Comparable #1**
**Gateway Apartments (ABP)**
13455 Kit Lane
Dallas, TX  75240
Dallas County
BBG Property #142125



**Property Data**

*Improvement Details*

| | | | |
|---|---|---|---|
| Property Type/Use | Multi-Family Apartment | Lat/Long | 32.930630 / -96.7650 |
| Legal | Valley View Estates, Block B/7756, Portion of Lot 30 and Lots 31-34 | | |
| Parcel ID # | 00000767779000000 | Number of Buildings | 11 |
| Year Built | 1970 | Year Renovated | 2004 |
| Quality | Average | Condition | Average |
| Class | | Construction Details | Wood frame, brick exterior, wood siding, pitched roofs and individual HVAC units |
| Gross Building Area | 74,018 SF | Rentable Area | 72,516 SF |
| Multifamily Units | 0 | | |
| Number of Stories | 2 | Floor Area Ratio | 0.49 |
| HAP Contract | No HAP in place | LIHTC | Property is not LIHTC |
| Opportunity Zone | No | Census Tract | |
| Parking | Total: 0 | | |
| Site Size (Gross) | 151,497 SF (3.48 acres) | Site Size (Net) | 151,497 SF (3.48 acres) |
| Project Amenities | All Bills Paid, Laundry Room, On-Site Office, Playground, Pool | | |
| Unit Amenities | Ceiling Fans, Dishwasher, Standard Appliances | | |
| Comments | The property is located along the northern line of Kit Lane, west of U.S. Route 75. Amenities include two laundry facilities, volleyball, BBQ grill, playground, controlled access gates, ceiling fans, patios/balconies, walk-in closets and dishwashers. Currently no significant concessions are being offered. This property is marketed as "all bills paid." | | |

**Multifamily Rental Survey Details**

| | |
|---|---|
| Leasing Incentives | **None** |
| Rent Premiums | **Pets - $25/mo** |
| | **Parking - $25/mo** |
| Utilities Paid By | **Landlord pays Electric, Sewer, Trash, Water** |
| Occupancy Rate | **100%** |
| Confirmed By | **11/5/2021** |
| | **CoStar, 11/5/2021** |

**Rental Unit Detail**

| # Units | Unit Plan | Unit Size (SF) | % AMI | Quoted Rent Low | Quoted Rent High | Eff. Rent Low | Eff. Rent High | Comments |
|---|---|---|---|---|---|---|---|---|
| 16 | 1BR/1BA | 721 | 0.00 | $975 | $975 | $975 | $975 | |
| 12 | 2BR/2BA | 901 | 0.00 | $1,217 | $1,217 | $1,217 | $1,217 | |
| 24 | 2BR/2BA | 953 | 0.00 | $1,190 | $1,190 | $1,190 | $1,190 | |
| 8 | 3BR/2BA | 1,108 | 0.00 | $1,325 | $1,325 | $1,325 | $1,325 | |
| 16 | 3BR/2BA | 1,152 | 0.00 | $1,352 | $1,352 | $1,352 | $1,352 | |
| 76 | | 954 SF Avg. | | $1,197 Average per Unit $1.25 Average PSF | | $1,197 Average per Unit $1.25 Average PSF | | |

**BBG**



**Multifamily Rent Comparable #2**
**Autumn Brook**
13259 Emily Road
Dallas, TX  75240
Dallas County
BBG Property #142080



## Property Data

*Improvement Details*

| | | | |
|---|---|---|---|
| Property Type/Use | Multi-Family Apartment | Lat/Long | 32.927920 / -96.7652 |
| Parcel ID # | 00000767846000000 | Number of Buildings | 0 |
| Year Built | 1980 | Year Renovated | N/A |
| Quality | | Condition | |
| Class | | Construction Details | Two story, brick veneer, hip gable roof |
| Gross Building Area | 44,288 SF | Rentable Area | 41,904 SF |
| Multifamily Units | 60 | | |
| Number of Stories | 0 | Floor Area Ratio | 0.00 |
| HAP Contract | No HAP in place | LIHTC | Property is not LIHTC |
| Opportunity Zone | No | Census Tract | |
| Parking | Total: 0 | | |
| Site Size (Gross) | 0 SF (0.00 acres) | Site Size (Net) | 0 SF (0.00 acres) |
| Project Amenities | Laundry Room | | |
| Unit Amenities | Ceiling Fans, Dishwasher, Fireplace | | |
| Comments | Frost-free refrigerators are currently being installed as older units fail. Tax record shows the complex at 13243 Emily Road. Land size 2.12 acres. Security deposit $200-$300, application fee $35. Richardson ISD. 6 month lease initially, 12 month lease after first year. | | |

## Multifamily Rental Survey Details

| | |
|---|---|
| Leasing Incentives | **None** |
| Rent Premiums | **None** |
| Utilities Paid By | **Landlord pays Trash, Water** |
| Occupancy Rate | **100%** |
| Confirmed By | **11/5/2021** **CoStar, 11/5/2021** |

**BBG**

3

BBG

**Rental Unit Detail**

| # Units | Unit Plan | Unit Size (SF) | % AMI | Quoted Rent Low | Quoted Rent High | Eff. Rent Low | Eff. Rent High | Comments |
|---|---|---|---|---|---|---|---|---|
| 52 | 1BR/1BA | 652 | 0.00 | $866 | $866 | $866 | $866 | |
| 6 | 2BR/2BA | 975 | 0.00 | $1,173 | $1,173 | $1,173 | $1,173 | |
| 2 | 2BR-1.5BA | 1,075 | N/A | $1,239 | $1,239 | $1,239 | $1,239 | |
| 60 | | 698 SF Avg. | | $909 Average per Unit | | $909 Average per Unit | | |
| | | | | $1.30 Average PSF | | $1.30 Average PSF | | |

BBG

BBG



**Multifamily Rent Comparable #3**
**Winding Way**
13266 Emily Road
Dallas, TX  75240
Dallas County
BBG Property #142126



**Property Data**

*Improvement Details*

| | | | |
|---|---|---|---|
| Property Type/Use | Multi-Family Apartment | Lat/Long | 32.927500 / -96.7642 |
| Legal | VALLEY VIEW ESTATES BLK E/7756 LOT 15 ACS 1.1571 | | |
| Parcel ID # | 00000768022000000 | Number of Buildings | 3 |
| Year Built | 1985 | Year Renovated | N/A |
| Quality | Average | Condition | Average |
| Class | | Construction Details | Wood frame, stucco and wood panel siding exterior, pitched roofs, and individual HVAC. |
| Gross Building Area | 25,503 SF | Rentable Area | 24,888 SF |
| Multifamily Units | 0 | | |
| Number of Stories | 2 | Floor Area Ratio | 0.51 |
| HAP Contract | No HAP in place | LIHTC | Property is not LIHTC |
| Opportunity Zone | No | Census Tract | |
| Parking | Total: 0 | | |
| Site Size (Gross) | 50,403 SF (1.16 acres) | Site Size (Net) | 50,403 SF (1.16 acres) |
| Project Amenities | Laundry Room, Pool | | |
| Unit Amenities | Patio/Balcony, Dishwasher | | |
| Comments | There are currently no significant concessions available. | | |

**Multifamily Rental Survey Details**

| | |
|---|---|
| Leasing Incentives | **None** |
| Rent Premiums | **None** |
| Utilities Paid By | **Tenant pays Electric, Sewer, Trash, Water** |
| Occupancy Rate | **98%** |
| Confirmed By | **11/5/2021** |
| | **CoStar, 11/5/2021** |

**Rental Unit Detail**

| # Units | Unit Plan | Unit Size (SF) | % AMI | Quoted Rent Low | Quoted Rent High | Eff. Rent Low | Eff. Rent High | Comments |
|---|---|---|---|---|---|---|---|---|
| 48 | 1BR-1BA | 486 | 0.00 | $486 | $486 | $486 | $486 | |
| 2 | 2BR-2BA | 780 | 0.00 | $780 | $780 | $780 | $780 | |
| 50 | | 498 SF Avg. | | $498 Average per Unit | | $498 Average per Unit | | |
| | | | | $1.00 Average PSF | | $1.00 Average PSF | | |

**BBG**



**Multifamily Rent Comparable #4**
**West Creek Villas**
8444 Spring Valley Road
Dallas, TX  75240
Dallas County
BBG Property #11997

### Property Data

*Improvement Details*

| | | | |
|---|---|---|---|
| Property Type/Use | Multi-Family Apartment | Lat/Long | 32.939840 / -96.7570 |
| Legal | BLK 7760 TR 10 1.9586 AC SPRING VALLEY & E BRANCH COTTONWOOD CK VOL94189/1047 DD092894 CO-DALLAS | | |
| Parcel ID # | 00000768982000000 | Number of Buildings | 4 |
| Year Built | 1979 | Year Renovated | N/A |
| Quality | Average | Condition | Average |
| Class | | Construction Details | Wood frame, brick and wood panel siding exterior, pitched roof and individual HVAC units |
| Gross Building Area | 41,570 SF | Rentable Area | 41,570 SF |
| Multifamily Units | 54 | | |
| Number of Stories | 2 | Floor Area Ratio | 0.49 |
| HAP Contract | No HAP in place | LIHTC | Property is not LIHTC |
| Opportunity Zone | No | Census Tract | |
| Parking | Total: 0 | | |
| Site Size (Gross) | 85,316 SF (1.96 acres) | Site Size (Net) | 85,316 SF (1.96 acres) |
| Project Amenities | Laundry Room, On-Site Office, Security Gate | | |
| Unit Amenities | Patio/Balcony, Ceiling Fans | | |

### Multifamily Rental Survey Details

| | |
|---|---|
| Leasing Incentives | **None** |
| Rent Premiums | **None** |
| Utilities Paid By | **Tenant pays Electric, Trash** **Landlord pays Sewer, Water** |
| Occupancy Rate | **100%** |
| Confirmed By | **11/5/2021** **CoStar, 11/5/2021** |

7

**BBG**

BBG

**Rental Unit Detail**

| # Units | Unit Plan | Unit Size (SF) | % AMI | Quoted Rent Low | Quoted Rent High | Eff. Rent Low | Eff. Rent High | Comments |
|---|---|---|---|---|---|---|---|---|
| 39 | 1BR/1BA | 675 | 0.00 | $808 | $808 | $808 | $808 | |
| 8 | 2BR-2BA | 972 | N/A | $985 | $985 | $985 | $985 | |
| 7 | 2BR-2BA | 1,067 | 0.00 | $985 | $985 | $985 | $985 | |
| 54 | | 770 SF Avg. | | $857 Average per Unit | | $857 Average per Unit | | |
| | | | | $1.11 Average PSF | | $1.11 Average PSF | | |

**BBG**



**Multifamily Rent Comparable #5**
**Spring Creek**
14833 Spring Creek Road
Dallas, TX  75248
Dallas County
BBG Property #296723



## Property Data

*Improvement Details*

| | | | |
|---|---|---|---|
| Property Type/Use | Multi-Family Apartment | Lat/Long | 32.951710 / -96.7728 |
| Parcel ID # | 00000795889000000 | Number of Buildings | 0 |
| Year Built | 1978 | Year Renovated | N/A |
| Quality | | Condition | |
| Class | | Construction Details | |
| Gross Building Area | 0 SF | Rentable Area | 75,046 SF |
| Multifamily Units | 72 | | |
| Number of Stories | 0 | Floor Area Ratio | 0.00 |
| HAP Contract | No HAP in place | LIHTC | Property is not LIHTC |
| Opportunity Zone | No | Census Tract | |
| Parking | Total: 0 | | |
| Site Size (Gross) | 0 SF (0.00 acres) | Site Size (Net) | 0 SF (0.00 acres) |

## Multifamily Rental Survey Details

| | |
|---|---|
| Leasing Incentives | **None** |
| Rent Premiums | **None** |
| Utilities Paid By | **Tenant pays Electric, Sewer, Trash, Water** |
| Occupancy Rate | **100%** |
| Confirmed By | **11/5/2021** |
| | **CoStar, 11/5/2021** |

**BBG**

9

BBG

**Rental Unit Detail**

| # Units | Unit Plan | Unit Size (SF) | % AMI | Quoted Rent Low | Quoted Rent High | Eff. Rent Low | Eff. Rent High | Comments |
|---|---|---|---|---|---|---|---|---|
| 9 | 1BR-1BA | 720 | N/A | $1,125 | $1,125 | $1,125 | $1,125 | |
| 16 | 1BR-1BA | 905 | N/A | $1,155 | $1,155 | $1,155 | $1,155 | |
| 24 | 2BR-2BA | 1,048 | N/A | $1,385 | $1,385 | $1,385 | $1,385 | |
| 13 | 2BR-2BA | 1,258 | N/A | $1,705 | $1,705 | $1,705 | $1,705 | |
| 10 | 3BR-2BA | 1,258 | N/A | $1,795 | $1,795 | $1,795 | $1,795 | |
| 72 | | 1,042 SF Avg. | | $1,416 Average per Unit | | $1,416 Average per Unit | | |
| | | | | $1.36 Average PSF | | $1.36 Average PSF | | |