## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § § § | |
| *Plaintiff*, | § § | |
| v. | § § | No. 3:22-cv-2118-X |
| TIMOTHY BARTON, et al. | § § § | |
| *Defendants*. | § | |

## RECEIVER'S REPLY TO DEFENDANT TIMOTHY BARTON'S CONSOLIDATED OPPOSITION TO RECEIVER'S VERIFIED MOTIONS FOR AUTHORIZATION TO SELL THREE RECEIVERSHIP PROPERTIES

Charlene C. Koonce
 Texas Bar No. 11672850
 charlene@brownfoxlaw.com
Timothy B. Wells
 Texas Bar No. 24131941
 tim@brownfoxlaw.com
BROWN FOX PLLC
8111 Preston Road, Suite 300
Dallas, TX  75225
Tel. 214.327.5000
Fax. 214.327.5001

*Attorneys for Receiver Cortney C. Thomas*

**TABLE OF CONTENTS**

I.     SUMMARY .................................................................................................................. 1

II.    ARGUMENT .............................................................................................................. 2

       A.    Each Entity and Property Are Appropriately Included in the Receivership.............. 3

             1.    SF Rock Creek Received Investor Funds ........................................................... 6

             2.    FHC Received Investor Funds ............................................................................ 7

             3.    Goldmark Received and Benefited from Investor Funds ................................ 9

       B.    The Record Is Not Stale And Continues to Support Each Sale .............................. 10

             1.    Accruing Interest is Eroding Value................................................................... 10

             2.    Lenders Have and Will Continue Seeking Permission to Foreclose ............. 11

             3.    Property Values are Falling While Interest Rates Rise................................... 12

             4.    Barton Ignores the Receiver's Testimony About the Status of the
                   Amerigold Suites .............................................................................................. 12

             5.    The "New" Developments in Frisco That Baton Contends Increase
                   the Value of the Frisco Gate Property Were Known Before the
                   Court Initially Approved the Sale................................................................... 14

             6.    Publicized Notice of the Sales and the Hearings Seeks Competing,
                   Qualified Offers ............................................................................................... 15

       C.    Approving These Sales, Now, Falls Well Within the Court's Broad
             Discretion and the Receiver's Mandate .................................................................. 16

             1.    Prejudgment Sales Are Permissible and Necessary...................................... 16

             2.    Barton's Pending Appeal of the Receivership Order Does Not
                   Divest This Court of Authority to Approve Sales and Otherwise
                   Administer the Receivership Estate. .............................................................. 18

       D.    Barton's Historical Objections Are No More Compelling Now Than
             When First Raised................................................................................................... 20

             1.    The Estate is Still Cash-Starved...................................................................... 20

             2.    The Receiver is Not Conducting the Government's Investigation,

and the Limited Payment of His Fees Authorized To Date Does
Not Justify Rejecting the Sales ......................................................................... 21

3.    Barton's Historical Objections to Sale of the Rock Creek Property Are
Baseless ............................................................................................................. 23

4.    Barton's Objections to Sale of the Amerigold Suites Are Meritless .............. 28

5.    Barton Did Not Seek Permission to Withdraw His Consent to Sale
of the Frisco Gate Property And Should Not Be Permitted to Do So Now.... 30

III.    CONCLUSION.............................................................................................................. 31

## TABLE OF AUTHORITIES

Cases

*ADT, LLC v. Capital Connect, Inc.*
 145 F. Supp. 3d 671 (N.D. Tex. 2015) ................................................................... 5

*CFTC v. TMTE, Inc.*
 No. 3:20-cv-2910, slip op. 548 (N.D.Tex. May 18, 2023) ................................ 18, 27

*Coastal Corp. v. Tex. E. Corp.*
 869 F.2d 817 (5th Cir. 1989) ............................................................................ 19

*FTC v. Consumer Def., LLC*
 No. 2:18-CV-30 JCM, 2019 WL 266287  (D. Nev. Jan. 18, 2019).......................... 17

*FTC v. Johnson*
 No. 2:10-CV-02203-RLH, 2011 WL 3841039 (D. Nev. Aug. 26, 2011)................................ 17

*Griggs v. Provident Consumer Disc. Co.*
 459 U.S. 56, 103 S. Ct. 400,  74 L. Ed. 2d 225 (1982)............................................. 19

*In re 1960 Family Practice, P.A.*
 652 B.R. 154 (Bankr. S.D. Tex. 2023) .................................................................. 30

*In re TFT-LCD (Flat Panel) Antitrust Litig.*
 No. C 07-01827 SI, 2013 WL 6055079 (N.D. Cal. Nov. 13, 2013)......................................... 20

*Los Angeles Tr. Deed & Mortg. Exch. v. Sec. & Exch. Comm'n*
 285 F.2d 162 (9th Cir. 1960) ............................................................................. 17

*Netsphere, Inc. v. Baron*
 703 F.3d 296 (5th Cir. 2012) ......................................................................... 2, 18

*SEC v. Am. Bd. of Trade, Inc.*
 830 F.2d 431 (2d Cir. 1987)............................................................................... 17

*SEC v. Amerifirst Funding, Inc.*
 No. 3:07-cv-1188, slip op. 280 (N.D.Tex. Mar. 11, 2008)................................ 18, 27

*SEC v. Banner Fund Int'l*
 211 F.3d 602 (D.C. Cir. 2000) ............................................................................ 6

*SEC v. Barton*
 79 F.4th 573 (5th Cir. 2023) ..................................................................... 2, 6, 25

*SEC v. Complete Bus. Sols. Group, Inc.*
 44 F.4th 1326 (11th Cir. 2022) ......................................................................... 18

*SEC v. Current Fin. Services, Inc.*
  783 F. Supp. 1441 (D.D.C. 1992) ........................................................................ 16

*SEC v. Erwin*
  553 F. Supp. 3d 895 (D. Colo. 2021) ..................................................................... 6

*SEC v. Gallagher*
  No. 3:19-cv-0575, slip op. 136 (N.D.Tex. March 10, 2020) ................................... 18

*SEC v. Path Am., LLC*
  No. C15-1350JLR, 2016 WL 1588384 (W.D. Wash. Apr. 20, 2016) ...................... 17

*SEC v. Stanford Int'l Bank*
  No. 3-09-cv-0298, slip op. 979 (N.D.Tex. Jan. 25, 2010) ...................................... 18

*SEC v. TLC Investments & Trade Co.*
  147 F. Supp. 2d 1031 (C.D. Cal. 2001) ............................................................ 17, 27

*United States v. City of New Orleans*
  947 F. Supp. 2d 601 (E.D. La. 2013), *aff'd*, 731 F.3d 434 (5th Cir. 2013).............................. 30

*United States v. Davis*
  53 F.4th 833 (5th Cir. 2022), *cert. denied*, No. 22-945, 2023 WL 6377805
  (U.S. Oct. 2, 2023) ............................................................................................. 5

*US Bank Nat. Ass'n v. Verizon Communications, Inc.*
  761 F.3d 409 (5th Cir. 2014), *as revised* (Sept. 2, 2014)....................................... 5

Rules

FED. R. CIV. P. 62 ................................................................................................... 19

Cort Thomas, as the court appointed Receiver, submits this Reply to Defendant Timothy Barton's Consolidated Opposition to Receiver's Verified Motions for Authorization to Sell Three Receivership Properties (the "Opposition") [Dkt. 428], and in support thereof respectfully shows the Court as follows:

## I.    SUMMARY

In three verified motions, each supported by lengthy appendices, (collectively, the "Verified Sale Motions"),[1] the Receiver sought the Court's permission to sell three properties the Cout had previously authorized the Receiver to sell.[2]  In an opposition written to the Fifth Circuit (which will be unaware of the *many, many* inaccuracies obvious to this Court), and while apparently abandoning deference and respect for this Court in anticipation of the impending appeal, Barton implores the Court to disallow the sales.  The sales, however, are crucial to the continued administration of the Receivership Estate, and as demonstrated by the Verified Sale Motions, continue to be in the best interests of the Estate.  Moreover, none of Barton's arguments justify denying the requested relief, nor indeed, support issuance of the stay that Barton will soon request from the Fifth Circuit.  Neither is the Receiver nor the Court seeking to "bypass *any* deficiencies" or justifying sales based on "cries of administrative expediency."[3]

As Benjamin Franklin observed, "half a truth is often a great lie."  Barton's Objection avoids the import of this idiom by, in many instances, failing to offer even *half*-truths.  As discussed below and in each Verified Sale Motion, the benefit to the Receivership Estate and the justification for each sale is potentially more compelling today than when the Court originally

---

[1] Dkt. Nos. 374–379.

[2] Dkt. Nos. 104, 142, 202.

[3] Barton apparently elevates himself to the Court's status in raising certain false or misleading arguments he contends "we" should not bypass. *See* Opposition, p. 4.  The Court, however, should absolutely bypass all such false and misleading statements and arguments in considering whether to approve the sales at issue.

approved each sale.  The Court should overrule Barton's objections and approve each sale.

## II.    ARGUMENT[4]

In reversing the Initial Receivership Order,[5] the Fifth Circuit did not hold that this Court erred "when it seized the Defendant's property and appointed a receiver."[6]  It held this Court utilized the wrong standard in creating a receivership because the SEC did not request an injunction and remanded the issue for this Court's reconsideration of the same relief.  *SEC v. Barton*, 79 F.4th 573, 578-79; 581-582 (5th Cir. 2023).  In considering the SEC's Second Motion for Appointment of a Receiver ("Motion for Appointment),[7] this Court faithfully followed the Fifth Circuit's instructions in determining that the correct test, provided by *Netsphere, Inc. v. Baron*, 703 F.3d 296, 305 (5th Cir. 2012), was satisfied and that a receivership was justified.[8] This Court also carefully evaluated the mountain of evidence tracing Investor funds or their benefit into each entity and property at issue, and determined that 55 entities were appropriately included within the scope of the new receivership (collectively, the "Receivership Entities"), including but not limited to:

- SF Rock Creek, LLC ("SF Rock Creek"), which is the entity that owns a residential property, not surprisingly referenced as the "Rock Creek Property,"[9] with an average appraised value of $1,393,333, and which the Receiver contracted to sell for $1.4 million;[10]

---

[4] Rather than suggesting that this Court lacks familiarity with its own docket and a truthful recitation of the facts, the comprehensive nature of this Reply results from attempting to address *each* misrepresentation or factual inaccuracy in the Opposition.

[5] Dkt. 29.

[6] Opposition, p. 1.

[7] Dkt. Nos. 309, 310.

[8] Dkt. Nos. 416, 417.

[9] Barton claims that the Court "antiseptically" refers to this property as the Rock Creek Property when in reality it is his "only home."  *See* Opposition at 1.  Setting aside Barton's unsolicited and ill-advised attack on the Court, as noted in the Receiver's prior reports and other filings, Barton was actually prohibited from living in the Rock Creek Property. Dkt. 373 at 16.

[10] Dkt. Nos. 76, 374.

- FHC Acquisition, LLC ("FHC"), which is the entity that owns the "Frisco Gate Property," with an average appraised value of $9,302,823, and which the Receiver contracted to sell for $9 million (without any obligation to pay a broker's fee);[11] and

- Goldmark Hospitality, LLC, ("Goldmark"), which is the entity that owns the Amerigold Suites, with an average appraised value of $4,366,667, and which the Receiver contracted to sell $5.5 Million.[12]

The Court did not err in including these entities and these properties within the scope of the new Receivership Order and will not err if it approves the requested sales.

### A.    Each Entity and Property Are Appropriately Included in the Receivership

In a collateral attack on the Receivership Order framed as a preview of his appeal and motion to stay, Barton contends the SEC (and this Court) utilized an "aggressive benefits theory"[13] in its tracing analysis and echoes his arguments raised in response to the SEC's Motion for Appointment and at the hearing on that Motion (the "Hearing"), that the analysis used by the SEC's staff accountant, the Receiver, and the Receiver's accountant, was deficient and therefore unreliable.   But with regard to Barton's expert's opinion (as set out in the Ginn Declaration[14] and provided during Mr. Ginn's testimony at the Hearing), the Receiver's accountant, Mr. Cecil, testified that (a) professional accounting standards, such as GAAP or GAAS (which apply to distributions and audits) did not apply to the tracing analysis;[15] (b) the "lowest intermediate balance" and other similar tracing methods had no application, because in evaluating benefit, the two accountants and the Receiver, "took the exact amount of the balance on any particular day [from bank records] and followed it through on the ending day. So we used the beginning balance

---

[11] Dkt. Nos. 110, 376.

[12] Dkt. Nos. 416, 417.

[13] Opposition, p. 7.

[14] Dkt. 335.

[15] Dkt. 359 (hereinafter, "TR"), TR. pp. 92–93.  Barton's expert agreed such methodologies do not apply to Certified Fraud Examiners or Investigators.  *Id.* at p. 176.

and ending balance just to guide us;"[16] (c) funds from sources other than the Investors that were present in the entity accounts at the time the tracing snap-shot was examined had no bearing on the tracing analysis because again, the accountants were "actually trac[ing] the funds coming into WALL entities into the non-WALL entities."[17]

Likewise, although Barton contends "the Receiver's accountant acknowledged the tracing exercise made no attempt to account for $2.917 million in deposits received into the last account through which the alleged lender funds passed,"[18] as discussed at the Hearing[19] and more fully below, the bank records included in the SEC's Motion to Supplement the Record demonstrated that the additional funds Barton points to left the account on the same day they were deposited.[20]

And finally, although Barton's expert asserted that the SEC's conclusion about comingling as a basis for tracing was incorrect, he based that opinion on how transactions were recorded in the Barton companies' books.[21] On cross examination Ginn agreed that the manner in which the transactions were recorded did not establish whether "funds were actually commingled by or among the bank accounts Barton controlled for the various entities."[22] Nor did Barton's expert evaluate any benefit—aside from funds traced directly—received by any entity, or conclude that

---

[16] TR. P. 93; *see also* Hahn Testimony at p. 17 (lowest intermediate balance methodology not used because "I wasn't trying to estimate amount of commingling funds that attributed to investor funds or some other source. I was trying to show situations where investor funds were sent to a Barton-controlled entity."); and Receiver's Testimony at pp. 29–30. Barton's accountant agreed that no methodology was necessary when specifically identified funds were traced into and out of an account on a given day. TR. pp. 170–71.

[17] TR. p. 95. As the Court is aware, the "Wall Entities" are Defendants in this case, which received directly Investor Funds.

[18] Opposition, p. 8, citing TR. 102: 9-22.

[19] TR. pp. 182–83.

[20] Dkt. 363, REC0446–0451 (pdf. pp. 137–42) (showing, among other things, the receipt of $2,500,000 from the refinance of Venus land purchased with Investor Funds on March 25, 2022 (REC0446) and the same-day withdrawal by Tim Barton of $2,500,000 from "HNGH" (REC0451), the lender on the Turtle Creek Property.

[21] Dkt. 335, App. 023 (pdf. p. 23).

[22] TR. p. 180.

any entity proposed for inclusion in the receivership did not receive investor funds.[23]  In short, the forthcoming scrutiny Barton will seek from the Fifth Circuit regarding the testimony, tracing methodology and results will not yield any error committed by this Court.  *See United States v. Davis*, 53 F.4th 833, 848 (5th Cir. 2022), *cert. denied*, No. 22-945, 2023 WL 6377805 (U.S. Oct. 2, 2023) (Affirming admission of lay witness testimony that "relied on basic math," using bank records to trace and calculate the flow of funds into certain purchases); *see also US Bank Nat. Ass'n v. Verizon Communications, Inc.*, 761 F.3d 409, 430 (5th Cir. 2014), *as revised* (Sept. 2, 2014) ("A trial court has broad discretion in determining the admissibility of evidence based on relevance and materiality, and that determination will be overturned only when the abuse of that discretion is clearly shown from the record."); *ADT, LLC v. Capital Connect, Inc.*, 145 F. Supp. 3d 671, 682 (N.D. Tex. 2015) ("The law is well-settled that because the procedures governing a preliminary injunction are generally less formal than those at trial, the court may rely upon otherwise inadmissible evidence when considering a preliminary injunction.").

Nonetheless, Barton contends his appeal will challenge the inclusion of the three entities that own the Properties at issue here (collectively, the "Sale Entities" and the "Properties"), arguing the "Government failed to prove that those companies possessed *substantial* amounts of subject lender funds."[24]  But the Fifth Circuit did not instruct this Court to include in the receivership only entities that *currently* possess *substantial* amounts of subject lender funds.  It instructed the Court to include entities that "received or benefitted from assets traceable to Barton's alleged fraudulent activities that are the subject of this litigation."  *SEC v. Barton*, 79 F.4th 573, 580–81 (5th Cir.

---

[23] *Id.*

[24] Opposition, p. 7.

5

2023). In including Goldmark, FHC, and Rock Creek and the Properties in the Receivership, this Court utilized and adhered to the governing test.[25]

### 1.    SF Rock Creek Received Investor Funds

Barton's assertion that SF Rock Creek received "only money traced to Small Business Administration loans, not even lender funds,"[26] is flat wrong. As one example of the contrary, Investor Funds were used to purchase the Mansion Apartment Homes at Marine Creek and Winter Haven, and when those properties were sold, $500,000 of the proceeds were used to pay off the original loan on Rock Creek, with Barton then taking out a second, interest only loan secured by the property.[27] Barton also used loan proceeds from Greystone (the servicer on HUD loans secured by certain apartment developments and which were obtained through use of properties purchased with Investor Funds), which were intended for Receivership Entity D4DS to build the Parc at Bellwether Ridge apartments,[28] to pay the mortgage for the Rock Creek Property.[29] SF Rock Creek also received commingled Investor Funds from BM318, LLC, through Carnegie Development, LLC.[30]

---

[25] Dkt. 418, p. 11. Further, in a similar context, wise courts have rejected the standard Barton implicitly argues the Court should have applied as encouraging a "speedy spending" defense. *See SEC v. Erwin*, 553 F. Supp. 3d 895, 906–07 (D. Colo. 2021) (rejecting relief defendant's contention that ongoing possession of the ill-gotten funds is a predicate to liability for the value received, since to conclude otherwise, would "'would lead to absurd results' and would 'perpetuate rather than correct an inequity,'" and declining to "encourage such inequity by sanctioning . . . [the Relief Defendant's] choice to pay down his living expenses with investors' funds rather than his own assets") (quoting *SEC v. Banner Fund Int'l*, 211 F.3d 602, 617 (D.C. Cir. 2000)).

[26] Opposition, p. 7

[27] Dkt. 308, ¶ 59; and Exh. 3 from Dkt. 308 at 118. Barton appears to argue that the $2 million deposit from the sale of Winter Haven did not involve Investor Funds. Opposition, p. 8 n. 1. However, Investor Funds were traced into Winter Haven. Dkt. 308, ¶ 148, and Exh. 18.

[28] Dkt. 308, ¶ 10.

[29] Dkt. 308, ¶ 112.

[30] Dkt. 308 ¶ 59; Dkt. Nos. 76, 77. As explained in the Receiver's Interim Report and Declaration [Dkt. 308], these examples represent only some but not all examples of the Investor Funds or their proceeds traced to SF Rock Creek.

6

### 2.    FHC Received Investor Funds

Barton similarly contends the tracing analysis for the Frisco Gate Property "suffered from particularly acute failures" to distinguish Investor Funds from other funds.[31]  First, in challenging a $100,000 transfer from the Wall Entities which had initially received Investor Funds, transferred to Carnegie Development, then to JMJ Development, and finally to the title company handling the purchase of the Frisco Gate Property,[32]  Barton contends the SEC's Staff Accountant, Carol Hahn, failed to account for a second $100,000 deposit made to JMJ, from a different source, on the same date as the Carnegie deposit.[33]

As Hahn testified at the Hearing, however, Barton's money laundering efforts did not invalidate the tracing analysis conducted.  When asked repeatedly whether her tracing analysis accounted for other funds present in the subject accounts or whether she merely concluded that JMJ "spent . . . [Investor Fund]," Ms. Hahn testified,

> So as I said, in No. 27, it would have been commingled investor funds because a lot of times there were other funds that might have been present, whether a beginning balance on a particular date or transferred in on the same day. But the majority of the funds would have been WALL investor funds or the loan proceeds.[34]

The evidence provided to this Court demonstrated that FHC used Investor Funds to pay down the loan secured by the Frisco Gate Property.  One example of such a transaction reflects the

---

[31] Opposition pp. 7–8.

[32] *See* Dkt. 308, Exh. 4 (pdf p. 120); and Dkt. 361-2, pdf. pp. 93–112.

[33] Opposition, p. 8.

[34] TR. p. 133, ll. 20-25.  Similarly, when asked about what steps she took to review and summarize the information included in Exhibit A to her Supplemental Declaration, [Dkt. 310-2], which included the tracing analysis reflecting Investor funds flowing into FHC, Ms. Hahn testified, "So mainly, I referenced the analysis I did last year, before we filed, which was to take the bank records, identify investor deposits and then trace those investor funds through the bank accounts to see how they were used. And due to extensive transfers in, commingling, I typically looked at transactions where either there were only investor funds involved, where the beginning account balance was insufficient to make a transfer without using investor funds, which would include the beginning account balance comprised of investor funds as well, or where there was a matching transfer to an amount of investor funds that were transferred in."  TR. p. 114, ll. 5-23.

use of $168,000 towards the loan.[35] Barton argues the $168,000, however, is not traceable to Investor Funds because of intervening deposits that were not accounted for in the analysis, relying on three deposits between March 23, 2022 and March 29, 2022 as reflected in the Receiver's analysis. Again, Barton ignores the supporting bank records and other evidence. The summary chart reflecting the flow of funds demonstrated the following:



| Beg Balance | Date | Entity | Bank | Acct # | Amount | Transfer To | Transfer From | Transfer To/From Entity | Description |
|---|---|---|---|---|---|---|---|---|---|
| 7,050.08 | 3/14/2022 | Mansions Apartment Homes at Marine Creek LLC | Chase | 9592 | 800,000.00 | | | | Fedwire Credit B/O: Marine Creek Ventures LLC. Marine Creek Partial Holdback release |
| 232,050.08 | 3/24/2022 | Mansions Apartment Homes at Marine Creek LLC | Chase | 9592 | -232,000.00 | 4611 | | Broadview Holdings | Domestic Wire Transfer via Texas Brand Bank A/C Broadview Holdings |
| 28,568.58 | 3/24/2022 | Broadview Holdings | Texas Brand Bank | 4611 | 232,000.00 | | | | Wire transfer from Mansions Apartment Homes at Marine |
| | 3/29/2022 | Broadview Holdings | Texas Brand Bank | 4611 | -168,146.67 | | | | Check #1083 payable to Texas Republic Bank. Check memo states: "Loan #49799" (FHC Acquisition, LLC) |
| 5,300.75 | 3/29/2022 | FHC Acquisition, LLC | Texas Republic Bank | 1427 | 168,146.67 | | | | Deposit |

Note: Between March 2022 and October 2022, the funds presented in the above schedule were used for payments on Texas Republic's loan on the property.

*Besides the deposit of $800,000 on 03/14/2022, no other deposits were received between 03/14/2022 and 03/24/2022 for Mansions Apartment Homes at Marine Creek, LLC account no. 9592.
Regarding Broadview Holdings Texas Brand Bank account no. 4611, the following deposits were received between 03/24/2022 and 03/29/2022 in addition to the deposit of $232,000 presented in the schedule on 03/24/2022: 1) $100,000 Advance from Loans #8464699-15 on 03/24/2022; 2) $2,500,000 Wire Transfer from Capital Title of Texas, LLC on 03/25/2022; and 3) $35,000 Wire Transfer from Capital Title of Texas, LLC on 03/28/2022.

Between March 23, 2022 and March 29, three deposits were made into an account for Broadview Holdings: (a) $232,000 on March 24, from the sale of the Mansions at Marine Creek, which is the source of funds used in the Receiver's tracing example;[36] (which was purchased at least in part with Investor Funds); (b) $2.5 million received on March 25, from Receivership Entity LDG001 in connection with the refinance of land located in Venus, Texas (which was purchased

---

[35] Dkt. 308, ¶ 71, and Exh. 4; Dkt. 361-2, pdf p. 88.

[36] Dkt. 308, Exh. 4 (p. 120).

with Investor Funds),[37] which was used on the same day, to pay a different lender, HNGH Capital, under Agreed Orders relating to the Turtle Creek Property in Dallas;[38] and (c) a $35,000 payment received on March 28, 2022, also from LDG001 in connection with the same refinance loan. Regardless of the source of these additional funds, the March 25 and March 28 transfers are irrelevant to the tracing analysis, because the same bank records reflect that on March 23, 2022, Broadview Holdings had only $28,568.58 in its account before the March 24 transfer from Marine Creek, and a balance of $234,086.71 on March 28, 2022 before transferring $168,146.67 to FHC. Thus, the March 24 Marine Creek funds necessarily were used to pay the mortgage for the Frisco Gate Property, on March 29, 2022.  And again, Investors Funds have been traced to all three additional transfers on which Barton rests his argument, further mooting Barton's challenge.

### 3.    Goldmark Received and Benefited from Investor Funds

Goldmark Hospitality purchased the Amerigold Suites before Barton began soliciting Investor Funds, but as with virtually every entity he controlled and property those entities owned, used Investor Funds for the benefit of the property.  For instance, Investor Funds were used to purchase at least $250,000 in solar panels installed at the Amerigold Suites.[39]  Moreover, the on-site employee who manages the property was regularly paid by HR Sterling, LLC (another Receivership Entity used primarily to manage payroll for most other Receivership Entities), which on many occasions used Wall Investor Funds to make such payments.[40]  And contractors who provided services for the benefit of the Amerigold Suites, and bills incident to operating the

---

[37] Dkt. 308, ¶¶ 31, 121, and Exh. 4; *see also* Dkt. 308 at Exh. 15 (p.149) (explaining LDG001's refinance with Pioneer Finance, LLC); Exh. 12 (p.140) (tracing Investor Funds into LDG001's acquisition of the Griffin Properties in Venus).

[38] Dkt. 363, REC0443–0451. REC0443–0451 shows the three deposits and subsequent withdrawals made between March 23 and March 29, 2023. REC0452–53 are incorrectly placed in the appendix and are not associated with transaction #3; these pages belong with transaction #2.

[39] Dkt. 308, Exh. 9.

[40] Dkt. 308, ¶ 103.

property were regularly paid by JMJ Development (which received *extensive* Investor Funds)[41]

and later booked as intercompany transactions.[42]

### B.    The Record Is Not Stale And Continues to Support Each Sale

Barton contends the Receiver failed to provide current evidence supporting the wisdom of

re-approving the sales, given the lapse of time since each was first approved.  Again, this is not

true.  The *Verified* Sale Motions provided the Receiver's testimony in support of approving the

sales anew, and included appendices which supplemented the original evidence submitted in

support of each proposed sale.[43]  Similarly, the Hearing and the Receiver's lengthy Declaration

and Report submitted in advance of the Hearing also provided evidence regarding why and how

these sales are in the best interest of the Receivership Estate.[44]

Barton nonetheless asserts that "market value of property *can* change significantly over the

course of year,"[45] but fails to provide any evidence that the value of these properties has increased

such that the Court should disregard the prior appraisals or reject the sales.  Instead, all of the

evidence, including the scant "evidence" provided by Barton, supports sales even more strongly

today.

### 1.    Accruing Interest is Eroding Value

The continued accrual of interest which erodes the recoverable value of each property

provides the most compelling reason, common to all Properties, why a sale now preserves assets

and is in the best interest of the Receivership Estate.

---

[41] *Id.*

[42] *Id.*

[43] Dkt. Nos. 374, 376, and 378.  Each Verified Sale Motion incorporated by reference the appendix submitted in support of each original motion by which the Receiver requested approval for each respective sale.  *See id,* at notes 6, 8, and 5 respectively.

[44] Dkt. 308, ¶ 109.

[45] Opposition, p. 3 (emphasis added).

As attested in each of the Verified Sale Motions, significant debt encumbers all but one property owned by the Receivership Entities, and the Receivership Estate lacks cash to service that debt.[46]  With every passing month, accruing interest collectively for all Receivership Assets is between approximately $167,899.06 (at the standard interest rates) and $256,529.13 (at the default interest rates sought by the lenders).[47]  Thus, failing to sell the real estate assets for any given year results in a net loss to the Receivership Estate of between $2 and $3 million.[48]

The monthly interest cost for just the three Properties at issue is between $40,791.92 (standard rates) and $91,533.66 (default rates).  Thus, as of the date of the Initial Receivership Order's vacatur, and using the original agreed, approved closing dates for each transaction, the delayed closing of just these three Properties has already cost the Receivership Estate between roughly $340,000 (standard rates) and $753,000 (default rates).[49]  Denying approval for these sales or staying them will thus erode rather than preserve the value of these assets.

### 2.      Lenders Have and Will Continue Seeking Permission to Foreclose

As the Receiver has reported and this Court has seen in the docket, lenders are impatient for the Receiver to sell properties that are secured by their loans and satisfy their liens, abandon

---

[46] Dkt. Nos. 374, 376, and 378; *see also* Dkt. 308, ¶¶ 191, 231.  Barton's complaints that funds received to date were intended only to fund the Receiver's fees is addressed below.

[47] Verified Sale Motions, Dkt. 374, p. 2; Dkt. 376, p. 2; Dkt. 378, p. 2.  The Receiver has requested the Court's declaration that default interest did not accrue on these or any other property owned by a Receivership Entity.  *Id.* With respect to the Amerigold Suites and Rock Creek, the Receiver was able to negotiate an agreement with the respective lenders, submitted to the Court as a proposed Stipulated Judgment, reflecting those lenders' agreement that they will not seek or receive default rate interest in connection with the closing on each such property, but instead will seek the recovery of that interest in connection with a claims process. Dkt. 392, 409.  The Receiver reserved his right to object to the priority in which default rate interest would be considered in a claims process, as well as objecting to other fees and costs these lenders seek from the sale proceeds.  *Id.* The lender on the Frisco Gate Property continues to seek default rate interest—accruing at 18%—following entry of the Initial Receivership Order.  *See* Dkt. Nos. 393, 410, 425.

[48] *Id.*

[49] The ranges of standard versus default interest rates for each of the three properties is as follows: Rock Creek Property ($97,000–$177,000); Frisco Gate Property ($161,000–$386,000); and Amerigold Suites ($82,000–$190,000).

11

Receivership Properties to the lenders, or otherwise permit the foreclosures that have been stayed since October 18, 2022.[50] Thus, while the Receiver is concerned about the loss of value to the Receivership Estate caused by accruing interest that erodes value, lenders are pressing for permission to lift the stay of enforcement and extract properties from the Estate. Denying permission to sell these properties or staying their sale will thus lend support to these lenders' eventual entitlement to relief, again resulting in a deprivation of value for the Receivership Estate.

### 3. Property Values are Falling While Interest Rates Rise

Rising interest rates have slowed real property sales and begun to decrease values. As *Barton's own evidence demonstrates*,

> "Despite the slight gain on the July report, a separate report based on more recent transactions **showed D-FW prices finally began to decline in August** . . ."

> In March, D-FW prices fell 1.2% to mark the first year-over-year decline on the Case-Shiller index since February 2012. **The index shows local prices were still down 3.8% in July from their pandemic peak in June 2022**."[51]

The Receiver testified to the same thing: "The real estate market in the Dallas area has not improved since the Rock Creek [Frisco Gate and Amerigold] Property Orders were entered. Instead, interest rates have risen, and demand has fallen. Nonetheless, the contracted buyer has continued to wait until closing the sale is possible."[52] Delaying approval of these sales is thus likely to result in lower sales prices and a lower recovery for the Receivership Estate.

### 4. Barton Ignores the Receiver's Testimony About the Status of the Amerigold Suites

In contending the record is stale with respect to sale of the Amerigold Suites, Barton puzzles over whether evictions of non-paying residents at the Amerigold Suites has occurred so as

---

[50] *See* Dkt. 348, Dkt. 391, and Dkt. Nos. 139, 225, 299, 308, and 373.

[51] Opposition, pdf pp. 31–32.

[52] Dkt. 374, ¶ 21; Dkt. 376, ¶ 16; Dkt. 378, ¶ 17.

to "stabilize" income.[53]  As reflected in the Receiver's Declaration and Report,[54] as well as the Receiver's testimony at the Hearing to consider the Motion for a new Receivership Order,[55] despite the Receiver's work to staunch the drain on Receivership Assets in keeping the Amerigold Suites insured and habitable,[56] many of the units still require substantial renovations to make them habitable, the property still loses money many months, and cash flow is barely sufficient to pay property taxes and insurance—on top of $0 paid to the lender on the Property during the last year.[57] During the summer of 2023, the Texas heat caused the demise of many of the property's air conditioning units, which is likely to occur again next summer if the Property remains in the Estate,[58] and an injury occurred at the Property during 2023 that may result in a second lawsuit or another claim against the Amerigold Suites' insurance.[59]  Thus, while the Receiver's efforts have improved cash flow for the Amerigold Suites, selling it will nonetheless preserve the value of the Property, as well as additional Receivership Assets.

The Receiver determined that, as when he first sought approval to sell the Amerigold Suites, selling the Property now is still in the best interest of the Receivership Estate.[60]  Further, despite rising interest rates that would likely drive the price down if this sale is lost, the proposed sale exceeds the average appraised value by $1,000,000.

---

[53] Opposition, p. 3.

[54] Dkt. 308, ¶¶ 104, 108.

[55] TR. p. 16, ll. 3-6.

[56] The premium for the stop gap insurance on the property is $14,000 per month.  Dkt. 378, ¶ 11.

[57] TR. p. 55, ll. 13-17; *see also* Dkt. 378, ¶ 11.

[58] Dkt. 308, ¶ 108.

[59] *Id.* ¶ 107.

[60] Dkt. 378, ¶ 11.

**5.     The "New" Developments in Frisco That Barton Contends Increase the Value of the Frisco Gate Property Were Known Before the Court Initially Approved the Sale**

Barton argues "absolutely no question" exists that two developments in Frisco, Texas "would positively affect the value of" the Frisco Gate Property.[61]  He is correct in that half-truth, but fails to disclose that both developments were public knowledge before the Court approved the sale the first time.  The "Mix" project for which the Frisco City Council just greenlighted *zoning*,[62] was well-publicized by November 2022,[63] weeks before the Receiver contracted with the buyer who had already been in discussions with Barton about the sale.[64] Similarly, the Universal project has been known by the public since at least January 11, 2023, again, weeks before the Court first approved the sale.[65]  If these projects had (or have) increased the value of the Frisco Gate Property following the date of the contracted sale, based on publication discussed below, interested buyers have had an opportunity to make competing offers.  None has.

Further, as an experienced real estate developer, Barton was surely also aware of these developments, and could, but did not discuss them in his Notice of Non-Opposition ("Notice") filed regarding to the original sale motion for the Frisco Gate Property, or subsequently at the

---

[61] Opposition, p. 3.

[62] Opposition, pdf p. 19.

[63] *See* https://communityimpact.com/dallas-fort-worth/frisco/development/2022/11/30/frisco-to-get-3-billion-project-the-mix-at-former-wade-park/.

[64] The contract for the Frisco Gate Property was signed on December 13, 2022.  Dkt. 111.  The motion to approve that sale was filed on December 22, and the court conducted a hearing on that proposed sale on January 31, 2023.  Dkt. 140.  Between filing and the hearing, the Receiver also published notice of the sale and the hearing, which would have permitted any qualified competing buyer to bid on the Property.  Dkt. 137.

[65]     *See*     https://corporate.universaldestinationsandexperiences.com/universal-parks-resorts-plans-to-bring-new-concept-for-families-with-young-children-to-frisco-texas/)

January 31, 2023 Hearing to approve the sale.[66]  Moreover, in his Notice, *and despite his then-pending appeal and emergency motion for a stay* requested from the Fifth Circuit,[67] Barton argued:

> "[t]he Motion notably reflects the first reasonable effort by the Receiver to secure value from any of the real estate development assets under his remit. The Frisco Gate Property is also one of the few critical properties that Mr. Barton has pressed the Receiver to contract and sell . . ."[68]

Given his full-throated approval of the sale when initially proposed, the Court should lend no weight to Barton's Objection, purportedly premised on the existence of developments that were known to the public (and certainly competing purchasers) before the Court initially approved the sale.

Importantly, what the Receiver was unaware of and was not disclosed by Barton to either the Receiver or the purchaser prior to execution of the purchase and sale agreement for the Frisco Gate Property was the existence of costly parking obligations on the Property.  As detailed in the Receiver's prior Quarterly Reports, the Frisco purchaser and the Receiver have continued to attempt to work through these issues. However, there is no doubt that the purported parking obligations negatively impact the value of the property.

### 6.  Publicized Notice of the Sales and the Hearings Seeks Competing, Qualified Offers

As required by the governing statute,[69] in advance of the Court's initial consideration, for each proposed sale and at least ten days in advance of each initial hearing, the Receiver published notice of the terms of the sale and the date and time of the respective hearing.[70]  The published

---

[66] Dkt. 123.

[67] *See* Appeal No. 22-11132. Doc. 5, filed December 28, 2022.

[68] *Id.*

[69] 28 U.S.C. § 2001.

[70] Dkt. 100; Dkt. 137; Dkt. 193

15

notices invited competing, qualified offers.  Although in a few instances, interested parties reached out to discuss terms or a potential offer,[71] no competing offers were made.[72]

The same is true now.  On December 1, 2023, the Receiver published notice of the original hearing date and the terms of each sale in the Dallas Morning News. Subsequently, when the hearing was reset, the Receiver again published notice of the terms of each sale, solicited competing offers, and provided the new hearing date.[73]  Despite such publication,[74] no competing offers, for any of the three properties have been received as of the date of this Reply.

The fulsome record supports sale of each Property, necessary to preserve their value, preserve the remainder of the Receivership Assets, and allow for continued administration of the Receivership Estate.

**C.**     **Approving These Sales, Now, Falls Well Within the Court's Broad Discretion and the Receiver's Mandate**

Barton asserts that permitting sale of the Properties prior to entry of a final judgment reaches the "outer limits of permitted activities for a prejudgment receiver." [75]  In support, Barton cites cases that are neither analogous nor persuasive, and which were also implicitly rejected when Barton relied on them in support of his first Emergency Motion for Stay filed in the Fifth Circuit.[76]

**1.**     **Prejudgment Sales Are Permissible and Necessary**

Barton cites *SEC v. Current Fin. Services, Inc.*, 783 F. Supp. 1441, 1445–46 (D.D.C. 1992)

---

[71] Dkt. 193, p. 4.

[72] Dkt. 100; Dkt. 137; Transcript of March 20, 2023 Hearing at 7.

[73] As with the initial motions to approve these sales, the Receiver will file a Notice Regarding Publication.

[74] Nor was the Receiver's published notice the only publication regarding these sales.  On December 6, 2023, the Dallas Morning News also published a feature article about the new Receivership Order, and noted, "[T]he Receiver has also been charged to move ahead with sales of three properties." https://www.dallasnews.com/business/real-estate/2023/12/01/court-puts-multiple-dallas-area-real-estate-companies-and-properties-into-receivership/

[75] Opposition, p. 5.

[76] *See* Appeal No. 22-11132. Dkt. 20, pp. 18–20.

(denying authority to wholly liquidate the defendant entity and place it in bankruptcy at the inception of a receivership); *SEC v. Am. Bd. of Trade, Inc.*, 830 F.2d 431, 436 (2d Cir. 1987) (reiterating in *dicta,* Second Circuit's strong preference for bankruptcy procedures over receivership);[77] and, *Los Angeles Tr. Deed & Mortg. Exch. v. SEC*, 285 F.2d 162, 179 (9th Cir. 1960) (rejecting "total liquidation" as a penalty for failure to comply with registration provisions). None of these cases addressed a receiver's authority to sell specific and limited assets before entry of final judgment.

In contrast, district courts can, and when necessary, do approve pre-judgment sales or limited liquidation, even for realty. *See FTC v. Consumer Def., LLC*, No. 2:18-CV-30 JCM, 2019 WL 266287, at *3 (D. Nev. Jan. 18, 2019) ("Courts regularly . . . authorize the sale of those [frozen] assets prior to finding liability in order to preserve the value of the estate."); *SEC v. Path Am., LLC*, No. C15-1350JLR, 2016 WL 1588384, at *5 (W.D. Wash. Apr. 20, 2016) (authorizing pre-judgment sale of real estate assets, due to high costs of maintaining "stasis," impending expiration of master use permits necessary for development, and timeline for a third-party purchaser to comply with building requirements); *FTC v. Johnson*, No. 2:10-CV-02203-RLH, 2011 WL 3841039, at *2 (D. Nev. Aug. 26, 2011) (granting the Receiver's motion to sell property after "the Receiver ha[d] adequately shown the Court that liquidating the[] assets w[ould] limit expenses and avoid further deterioration or loss of value."); *SEC v. TLC Investments & Trade Co.*, 147 F. Supp. 2d 1031, 1036 (C.D. Cal. 2001)**Error! Bookmark not defined.** ("[L]iquidation . . . prior to entry of judgment, is appropriate because the evidence  . . . demonstrated that the . . .

---

[77] Notably, in *American Bd. Of Trade,* the Second Circuit affirmed the trial court's appointment of a receiver and the receiver's asset liquidation, despite that Court's "strong preference" for bankruptcy procedures. *Am. Bd. of Trade, Inc.*, 830 F.2d at 437–38.    The Fifth Circuit, however, has not expressed the same "strong preference" in cases instituted by Government agencies.

entities' liabilities were greater than their assets and  . . . ongoing management alone will drain money out of the estate . . . that otherwise could be returned to investors.").  Indeed, this Court, has previously authorized the sale of realty prior to entry of a final judgment,[78]  as have other federal judges sitting in this District.[79]

Barton's assertion that "no special circumstances" justify prejudgment sales of *some* properties, or indeed these Properties, ignores all evidence to the contrary, including the erosion of value based on accruing interest.

### 2.  Barton's Pending Appeal of the Receivership Order Does Not Divest This Court of Authority to Approve Sales and Otherwise Administer the Receivership Estate.

Similarly, while Barton contends "black letter law" mandates that district courts should "avoid actions which cannot later be undone" while an appeal is pending, the argument fails on several fronts.   First, Barton ignores the scope of the jurisdictional divestiture incident to the appeal of an interlocutory order appointing a receiver.  Congress has created jurisdiction for interlocutory appeals of orders appointing receivers and orders that refuse to wind up receiverships, but not "mid-stream" orders governing the administration of receiverships. *Netsphere, Inc.*, 799 F.3d at 331-32 (5th Cir. 2015) (every circuit to address the meaning of § 1292(a)(2)'s 'refusing orders' interprets it to "permit[ ] appeals only from orders 'refusing . . . to take steps to accomplish the purposes of [winding up receiverships].'"); *SEC v. Complete Bus. Sols. Group, Inc.*, 44 F.4th 1326, 1332 (11th Cir. 2022) (recognizing absence of interlocutory jurisdiction for orders issued in administering receivership because "[w]ere we to immediately

---

[78] *See CFTC v. TMTE, Inc*., No. 3:20-cv-2910, slip op. 548 (N.D.Tex. May 18, 2023).

[79] *SEC v. Gallagher*, No. 3:19-cv-0575, slip op. 136 (N.D.Tex. March 10, 2020) (Cummings, J.) (ordering sale of real property by receiver prior to judgment of liability); *SEC v. Amerifirst Funding, Inc.*, No. 3:07-cv-1188, slip op. 280 (N.D.Tex. Mar. 11, 2008) (Fitzwater, J.) (ordering sale of real property by receiver prior to final judgment); *SEC v. Stanford Int'l Bank*, No. 3-09-cv-0298, slip op. 979 (N.D.Tex. Jan. 25, 2010) (Godbey, J.) (permitting the sale of real property by receiver prior to judgment of liability).

review all scope-related orders of the sort that this case entails, we would, in effect, become the micromanagers of district courts' day-to-day administration of receiverships."). If Barton's implicit assertion was correct and this Court was automatically divested of jurisdiction to enter orders administering the Receivership, Rule 62(c)(1) would have no meaning and litigants would automatically evade the carefully circumscribed appellate review of receivership orders by staying *every* order necessary to administer a receivership. Thus, while this Court certainly cannot dissolve or meaningfully amend the Receivership Order while the Fifth Circuit considers Barton's appeal, the Court is not stayed from issuing orders pursuant to which it administers the Receivership Estate. The Fifth Circuit's denial of Barton's first and second emergency motions for stay,[80] which also sought to stay the sale of the Rock Creek Property as well as a settlement with DLP Capital and a subsequent settlement with HGNH Capital,[81] underscore the fallacy of Barton's argument to the contrary.

Likewise, none of the cases cited by Barton in support of this argument involves the limited appeal of an order appointing a receiver. Such an appeal *does not* stay the order appointing a receiver and is likewise unbounded by the further limit of a district court's authority over an injunction during the pendency of a related appeal. *See* FED. R. CIV. P. 62(c)(1), and (d). Instead, *Coastal Corporation* discussed a district court's authority to *dissolve* an injunction while an appeal was pending. *Coastal Corp. v. Tex. E. Corp.*, 869 F.2d 817, 819 (5th Cir. 1989) (Discussing Rule 62(c)(1) and (d), and the district court's authority to dissolve an injunction pending an appeal of the injunction). *Griggs* involved an order denying an order to alter or amend a final judgment while that order was being appealed. *Griggs v. Provident Consumer Disc. Co.*, 459 U.S. 56, 57,

---

[80] Dkt. Nos. 122, 265.

[81] Appeal No. 22-11132, Dkt. 84.

103 S. Ct. 400, 401, 74 L. Ed. 2d 225 (1982).  And *In re TFT-LCD* discussed a motion to release

funds held in escrow during the pendency of an appeal. *In re TFT-LCD (Flat Panel) Antitrust*

*Litig.*, No. C 07-01827 SI, 2013 WL 6055079, at *1 (N.D. Cal. Nov. 13, 2013) ("LFG now moves

the Court to release the $28.2 million held in the escrow fund so that, when LFG requests the

sheriff to levy the account, the bank will permit payment from the escrow account.").

Barton's pending appeal of the Receivership Order offers no valid reason to deny or stay

the requested approval of the sales at issue, and his arguments are contrary to Congress' expressed

intent regarding the effect of an appeal on the administration of a receivership.

### D. Barton's Historical Objections Are No More Compelling Now Than When First Raised

#### 1. The Estate is Still Cash-Starved

Barton complains that the exigencies regarding the cash reserves available to the

Receivership that were present in December 2022 are no longer present today.[82]  Once again,

Barton is incorrect.  As an initial matter, the Receiver readily acknowledges that if and when he is

able to close the sale of the Frisco or Amerigold properties, the Receivership will be freed from its

present cash emergency (assuming briefing activity in the Receivership finally subsides).

However, as discussed throughout this Reply, the accruing interest on the secured debt that

encumbers each property will continue to counsel in favor of sales of most pieces of real estate.

In the interim, however, the Receiver has been unable to close *any* sales of real property in the 13+

months of the receivership.

Irrespective of the fact that the Receiver and his professionals have not been compensated

for any of their extensive efforts in furtherance of the Receiver's appointment over the past eight

---

[82] Opposition, p. 4.

months, and despite the fact that the Receiver has continued to refuse to service the debt on the Receivership Properties amidst lenders' calls for lifting the litigation stay, as of today, the Receivership very much remains cash-strapped. As of the date of this reply, less than $200,000 is available in the Receivership's accounts.[83] However, annual property taxes on the realty held by the Receivership alone currently amount to no less than $210,437.16. As detailed in the Receiver's prior reports, the Receivership continues to be saddled with both recurring administrative costs, as well as random, unexpected challenges (e.g., the repayment of D4OP's SBA loan in order to move forward with cost certification). In short, the Receivership Estate very much remains mired in challenging illiquidity, and the sale of Receivership property is both warranted and necessary.

> **2.     The Receiver is Not Conducting the Government's Investigation, and the Limited Payment of His Fees Authorized To Date Does Not Justify Rejecting the Sales**

Barton argues repeatedly that the Receiver is performing the SEC's work, and that rather than necessary for the reasons this Court articulated in its' Memorandum Opinion and Order,[84] the receivership instead provides only a vehicle for payment of fees billed by the Receiver.[85] As this Court is aware, however, the Receiver's work has not been for the Commission's benefit; it has been for the Court's benefit.[86] Nor was the Receiver's work solicited by Commission. As the Commission stated during the first hearing to consider sale of the Rock Creek Property, it has not suggested that the Receiver take any actions to "apply pressure," to Barton, and the Court rejected the receiver candidate proposed by the SEC, in part, to eliminate such a possibility.[87]

---

[83] This does not include restricted accounts for the four HUD properties, which at this time cannot be used for purposes other than operating these properties, nor does it include the Amerigold Suites, for which the Receiver maintains a separate operating account.

[84] Dkt. 416.

[85] Opposition, pp. 9, 12.

[86] *See* for example, Dkt. 308, ¶¶ 13–19.

[87] Dkt. 121, TR., 12-30-22 hearing, pp. 36–37.

Barton's lack of compelled cooperation has also resulted in extensive, but otherwise unnecessary fees.[88] Indeed, very little beyond an examination of the docket is necessary to explain the quantity of work necessary to perform the work incident to the Initial Receivership Order, and now the new Receivership Order. Certainly, no dispute exists that the Receiver and his attorneys have expended *thousands* of hours since inception of this case, much of that necessary to evaluate the status of the entities and properties that Barton would not discuss; obtain documents and access to data that Barton would not provide; fight appeals for which no jurisdiction existed and which challenged orders granting the Receiver's motions, but in which Barton would not consent to the Receiver's participation as the real party in interest;[89] seek to sell properties and reach settlements intended to provide cash to a Receivership Estate that had only $75,000 at inception; manage the HUD loan certification despite Barton's lack of cooperation in that process;[90] respond to creditor and lender inquiries and motions to lift the litigation stay;[91] evaluate the dozens of stayed cases in which Receivership Entities were parties; search for, compel, and then ultimately, again because of Barton's contempt, recreate financial records necessary to locate and trace Investor funds;[92] and more generally, respond or reply to Barton's continued, and generally inaccurate filings.[93]  Thus, while the fees incurred in connection with this matter have been extensive, Barton's own conduct caused much of the expense.

Further, the Receiver's standard $550 hourly rate has been discounted to $385 for this case,

---

[88] *See* for example Dkt. Nos. 133, 199, and *infra.*

[89] Appeal Nos. 22-11132; 22-11226; 22-11242.

[90] *See* Dkt. 308, ¶ 98.

[91] Dkt. Nos. 284, 316, and 370.

[92] Dkt. 308, ¶¶ 40-44.

[93] Dkt. Nos. 56, 71, 81, 106, 114, 155, 160, 223, etc.

and his lead counsel's rate is similarly discounted.[94]  And every dollar incurred by the Receiver and his retained professionals is reviewed by the Court prior to approval for payment.[95] Additionally, while the Court has authorized payment of some fees to date, no fees incurred since March 30, 2023 have been paid.

Finally, the Receiver did not file a lawsuit alleging Barton committed securities fraud, nor did he seek this appointment. While he is honored to serve this Court and will continue to perform the necessary work to the best of his abilities, the Receiver is not the proper target of Barton's complaints.  Instead, Barton alone is to blame for the imposition and re-imposition of the Receivership, which the Court has concluded is supported by "significant record evidence."[96]  In short, Barton's conduct is the basis for the receivership, and he bears the responsibility for its existence, progress, and related expense.

### 3.    Barton's Historical Objections to Sale of the Rock Creek Property Are Baseless

Sale of a residential property that was first proposed as the most expeditious sale intended to raise cash, is just as necessary today as it was a year ago.  Barton's arguments in opposition to the sale, however, provide an excellent example of his willingness to ignore facts and manipulate information to support his false narrative.

First, Barton had listed the property for sale prior to the Receiver's appointment.[97]  Second, the Deed of Trust encumbering Barton's "*only home*" precluded him from using it as such.  More specifically, the Deed of Trust governing the property provided:

> FFF. NON-OWNER OCCUPIED PROPERTY.  Throughout the term of the Loan, Borrower shall not occupy any portion of the Mortgaged Property in any manner.

---

[94] *See* Dkt. Nos. 156, 237.

[95] *See* Dkt. 417, ¶ 63–67; and Dkt. Nos. 156, 195, 237, and 287.

[96] Dkt. 418.

[97] Dkt. 93.

> If Borrower is an entity other than a natural person, any persons with a direct or indirect ownership interest in Borrower shall not occupy any portion of the Mortgaged Property in any manner throughout the term of the loan.[98]

Third, the evidence Barton relies on for his assertion that the Receiver seeks "to sell Barton's home for an amount $600,000 shy of a *conservative* appraisal Barton received last year,"[99] illustrates, again, Franklin's observation about half-truths. The June 1, 2022 appraisal on which Barton relies valued the property at $2,061,228.[100] As the Receiver demonstrated at the time Barton first offered his misleading appraisal, the appraisal is *deeply* flawed since it uses a cost-basis (rather than sales comparison or market approach) which is not appropriate for residential appraisals.[101] Barton's arguments also ignore that despite the Property being on the market for several weeks and receiving multiple offers, the negotiated sales price of $1,400,000 was the highest offer received, thus indicating that market conditions were (and are) consistent with the Receiver's appraisers' valuations of the Property. Even if Barton's appraisal of $2,061,228 was accurate, two other independent appraisals obtained by the Receiver (which utilized the correct methodology) arrived at the same approximate value as the proposed sale. Further, utilizing Barton's flawed appraisal as one of the three required, a sale for $1,400,000 would still be authorized under 28 U.S.C. § 2001 because the price exceeds the 2/3 minimum ($1,374,152) of the averaged appraised value required by the statute. Finally, if the Property value was as high as Barton contends, pursuant to 28 U.S.C. § 2001 and the Receiver's publication of

---

[98] Dkt. 134, App. p. 10.

[99] Opposition, p. 9 (emphasis added).

[100] Dkt. 58, p. 7.

[101] Dkt. 76, n.6; Dkt. 93.

the sale, another independent buyer could purchase the Property by submitting a bona fide offer exceeding $1,540,000.[102]  No one, however, has made any higher competing offers.

Likewise, when he responded to Barton's initial objections to the sale, the Receiver debunked each assertion that Barton contends rendered the Receiver's appraisals defective.[103]  For instance, the price per square foot at which nearby properties *are listed* does not speak to value; the price at which those nearby properties *sell* does. And photos of higher priced homes on which Barton relied reflected a stark disparity in the quality and attractiveness of the properties when compared with Rock Creek.[104]  Further, the proposed sale was obtained through a traditional broker, who actively marketed the property, and the proposed sale represents the highest offer received.

Fourth, Barton's contention the Receiver lacked, and still lacks "legal authority" to make the sale based on Barton's appellate challenges to the Receivership Order,[105] was insufficient for this Court and the Fifth Circuit to stay the sale originally.  Instead, the Fifth Circuit did not stay the approved sale until it concluded the wrong standard had been used in entering the Initial Receivership Order, nearly six months after the sale was first approved.[106]

Fifth, Barton's contention that "there is simply no justifiable reason for continuing to oust a Defendant from his sole residence . . . when other receivership properties that are exponentially more valuable could potentially accomplish a similar purpose," [107] begs this Court to disregard

---

[102] Dkt. 77, *App.* pp. 2.

[103] Dkt. 93.

[104] Dkt. 91, pp. 8–9.

[105] Opposition p. 9.

[106] *SEC v. Barton,* 72 F.4th 640, 648 (5th Cir. 2023), *opinion withdrawn and superseded on denial of reh'g*, 79 F.4th 573 (5th Cir. 2023).

[107] Barton's contentions that sales are necessary to pay the Receiver's fees is addressed separately above.

Barton's opposition to even the one sale *he previously urged the Receiver to enter into.* Exactly which property is Barton suggesting he would consent to a sale of to fund administration of the Receivership Estate?[108] And how long would the Court need to wait until Barton then sought to withdraw such consent?  Given his refusal to disclose the location of *any other assets*, including art he swore was valued at more than $12 million,[109] and his opposition to and appeal of *every single order* approving a sale or settlement intended to bring cash into the Receivership Estate, Barton's argument that something else should be sold epitomizes hypocrisy.

In the same vein, Barton's assertion that the Receiver framed his "underlying purpose"[110] as disgorgement misconstrues or ignores the context and entirety of the statement.  In discussing Barton's prior collateral attack on the Initial Receivership Order, the Receiver argued an additional condition Barton sought to impose to obtaining appointment of a receiver was contrary to the SEC's authority to seek and obtain disgorgement, which underlies at least in part, the purpose of a receivership, which preserves assets available to satisfy Investor losses and the Court's ability to give effect to any judgment.  The assertion Barton references stated:

> "The Objection also appends an additional requirement, that the entity continues in possession of the ill-gotten funds it received.  Dkt. 53, p. 3. That requirement is absent, however, from the authorities on which the Objection relies, and would be contrary to the SEC's authority to obtain disgorgement, the underlying purpose of the receivership, without the necessity of tracing. *See SEC v. Camarco*, No. 19-1486, 2021 WL 5985058, at *14 (10th Cir. Dec. 16, 2021) ("[N]othing in the Supreme Court's description of disgorgement [in *Kokesh v. SEC*, 137 S. Ct. 1635 (2017)] suggests the party ordered to disgorge money must still possess the specific ill-gotten funds at the time of the disgorgement action. And imposing the strict

---

[108] For instance, although Barton originally argued that sale of certain apartment complexes would generate far more than the Investors' losses, he failed to disclose the *extensive* debt on those properties which reduced their potential net value to far less than the losses at issue, and also failed to disclose the competing ownership interest asserted by Southern Properties Capital ("SPC"). *See* Dkt. 57, pdf pp. 4–6.  More recently, Barton proffered the testimony of SPC's, Erik Johnson, president of Pillar Income Asset Management, SPC's parent company, in contending those same properties should not be included in the Receivership Estate.  TR. 188–89; Dkt. 330, pdf pp. 4–25.

[109] Dkt. 133, p. 8.

[110] Opposition, p. 10.

tracing requirement . . . would not further the goals of disgorgement because a savvy embezzler could quickly spend the money on luxury vacations, secrete ill-gotten funds away in a location or foreign bank account not detectable by authorities, *or so commingle tainted funds with untainted funds as to make it impossible to trace the tainted funds to their final resting plac*e.") (emphasis added)).[111]

Sixth, while Barton may scoff at the recovery of a "mere" $100,000 which he contends does not "materially advance the needs of the receivership estate," neither this Court nor the Receiver should follow suit. "Material advancement" does not provide the standard governing "best interests of the receivership estate," by which proposed sales and other activities are measured. *See  CFTC v. TMTE, Inc.*, No. 3:20-CV-2910-L, 2022 WL 20210406, at *1 (N.D. Tex. May 12, 2022) (utilizing "best interest of the estate" evaluation to consider sales of realty); *SEC v. AmeriFirst Funding, Inc.*, No. CIV.A.3:07-CV-1188-D, 2008 WL 706846, at *2 (N.D. Tex. Mar. 11, 2008) (same); *see also, e.g., SEC v. Safety Fin. Service, Inc.*, 674 F.2d 368, 372 (5th Cir. 1982) ("Any action by a trial court in supervising an equity receivership is committed to his sound discretion and will not be disturbed unless there is a clear showing of abuse.") (internal citation omitted).

Seventh, Barton's disregard for a "mere" $100,000 recovery is likely informed by his prior, but false assertions that selling just one or two of the heavily encumbered properties in the Receivership Estate will suffice to reimburse the defrauded investors and the dozens of creditors (several of whom hold multi-million-dollar judgments against Barton and various Receivership Entities).[112]  Ownership of the most valuable properties is contested,[113] and as the Receiver stated

---

[111] Dkt. 73, p. 14, n. 11.

[112] *See* Dkt. 57, pdf pp. 4–6.

[113] *See* Dkt. 327–36.  Although Barton previously touted sale of two of the four apartment complexes SPC seeks to exclude from the Receivership as the quickest route to satisfy his obligation to the Investors, Barton now embraces SPC's claimed entitlement to these apartments as indicated by his embrace of the evidence offered by SPC at the hearing. TR. 188–89; *see also*, *supra* n. 105.

27

in both his Declaration and at the Hearing, even if those properties remain in the Estate, insufficient assets exist to satisfy all Investors and creditors.[114]

Finally, Barton complains that the Receiver has wrested away control of his "only home," yet still offers no viable alternative. Barton has repeatedly pleaded poverty in this case, from his purported inability to pay his lawyers, to his inability to pay the Court's sanctions.[115] Thus, Barton does not have the ability to pay any rent, much less sufficient rent to service the debt on the property and cover taxes and insurance. Perhaps it is for this very reason that Barton was endeavoring to list the Rock Creek Property for sale himself at the time of the Receiver's appointment.[116] While the Receiver has been able to recure a renter for the property (the previously approved purchaser), and while that rent covers the current taxes and insurance on the property, rent is not sufficient to service the significant debt on the property. Barton provides no justification for denying approval to sell the Rock Creek Property.

### 4.    Barton's Objections to Sale of the Amerigold Suites Are Meritless

Barton argues the Receiver failed to "meaningfully market" the Amerigold Suites, seriously consider other offers, and has contracted to sell it for $1.5 million less than what Barton contends it is worth. The evidence belies his arguments.

First, in support of his failure to "meaningfully market" assertion, Barton cites a valuation provided for the Bellwether Ridge Apartments,[117] which of course has *nothing* to do with the Amerigold Suites. In the Receiver's original verified motion through which he sought approval to

---

[114] Dkt. 308, ¶ 191.

[115] *See, e.g.*, Dkt. 244, pdf p. 5; TR. 60.

[116] Dkt. 84, p. 8; Dkt. 93, p. 6.

[117] Dkt. 165-1 at 67.

sell the Amerigold Suites, he testified that with respect to the Amerigold Suites, he engaged a broker, who obtained multiple offers, the highest of which was the one accepted.[118]

Second, as reported at the prior hearing, while the Receiver was contacted regarding certain *inquiries* about the Property after notice of the sale was publicized, no additional offers were received.[119]

Third, the competing valuation provided by Barton does not support his contention regarding value, but once again, lends credence to Benjamin Franklin's observation. Specifically, using a sales comparison method of valuation, the two-year old appraisal attached to Barton's Objection as Attachment D valued the property at $6,950,000 versus the Receiver's February 9, 2023 NVC appraisal, which valued the property at $7,350,000.[120] The NVC appraisal then discounted the value based on needed renovations, ending in a final valuation of $4.2 million. Barton's appraisal failed to account for the necessary renovations. Similarly, using an income capitalization method, Barton's appraisal valued the property at $7,000,000, versus the Receiver's NVC appraisal which set the value at $7,514,258 using the same method.[121] Again, however, Barton's appraisal failed to discount for the more than $3 million in necessary repairs, which results in NVC's final capitalization valuation of $4.4 million. Further, NVC used 6.5% as the capitalization rate, which is more in line with current costs and which NVC stated it used because of the increase in interest rates (which have only risen since), as compared with the appraisal Barton submitted, which used 4.5% as the capitalization rates.[122]

---

[118] Dkt. 167, ¶ 7–8.

[119] Transcript of March 20, 2023 Hearing at 7.

[120] Compare, Dkt. 168, pdf pp. 126–31 (NVC appraisal); and Opposition, pdf page 67–72.

[121] Compare, Dkt. 168, pdf pp. 132–52 (NVC appraisal); and Opposition, pdf page 73–85.

[122] *Id.*

Reliable and accurate appraisals valued the property, on average, at $4,366,667.[123]  The proposed contract exceeds that value by more than $1,000,000, and despite publication, no competing higher offers were or have been received.  The proposed sale is in the best interest of the Receivership Estate and should be approved.

### 5.    Barton Did Not Seek Permission to Withdraw His Consent to Sale of the Frisco Gate Property And Should Not Be Permitted to Do So Now

As noted above, Barton did not raise any objections regarding sale of the Frisco Gate Property when first proposed.  Instead, he touted his cooperation in arranging the sale (which certainly was unique in the context of this receivership), and complained only that the Receiver purportedly delayed in disclosing the sale.[124]  Barton now contends, however, in the context of his Objection, that he "withdraws" his consent,[125] given the "changed market conditions" (which existed when he provided his consent), placement of the property into what he contends is an illegal receivership (an argument he had also raised prior to consenting to the sale), and significant likelihood that any proceeds of such a sale would be used for the Receiver's legal bills (an argument Barton has made virtually since the case was filed, and certainly before consenting to the sale).

---

[123] Dkt. 378, ¶ 8.

[124] Dkt. 123.  Barton complained that the Receiver essentially hid the contract on the Frisco Property to justify seeking approval to sell residential property, which should have closed months in advance of the sale of the Frisco Gate Property.  *Id.* As the Receiver discussed multiple times, however, closing on commercial properties is generally a lengthy process, and with respect to the Frisco Gate Property, complicated by an issue related to an obligation to create a Parking facility, which delayed closing despite the absence of any objection or stay.  Dkt. 308, ¶ 74.

[125] The Court should decline to permit "withdrawal" of consent under these circumstances.  *See, e.g., In re 1960 Family Practice, P.A.*, 652 B.R. 154, 177 (Bankr. S.D. Tex. 2023) (considering and denying withdrawal of consent for bankruptcy judge to enter final orders); *see also US v. City of New Orleans*, 947 F. Supp. 2d 601, 628 (E.D. La. 2013), *aff'd*, 731 F.3d 434 (5th Cir. 2013) ("Parties' written agreement [to judgment] is enforceable and the City is not free to unilaterally withdraw its consent.").

As demonstrated above, none of these arguments are supported factually.  The valuation remains accurate, the sale price is 96% of the appraised value, but also provides for an additional 3% savings ($270,000) since no broker's fee will be owed by the Receivership Estate.  Thus, even assuming the property's value has increased (an assumption not supported by the record), if the Property was marketed through a broker, no evidence suggests any future sale would exceed the net return to the Receivership Estate from the proposed sale.  And as with all other properties, interest owed on the Note secured by the Property continues to accrue, at what the Frisco Gate lender contends is 18% per annum, or $44,724 per month.[126]  That accrual would quickly erode any increase in the selling price, if obtained, if the existing contract is rejected.[127]

The Court should overrule Barton's objections to the sale of the Frisco Gate Property and authorize the immediate sale.

### III.    CONCLUSION

For the reasons stated in the Verified Sale Motions and this Reply, the Receiver requests that the Court overrule each of Barton's objections and approve sales of the Properties based on the contracts presented to the Court. The Receiver additionally requests that the Court authorize sale of the Properties free and clear of all liens, stay accrual of post-Receivership default interest, and reserve payment of any other requested fees, costs, defaults, penalties, offsets, or other amounts, for the claims process.  The Receiver also requests such other and further relief to which he may show himself entitled.

---

[126] Dkt. 376, ¶ 2.

[127] Indeed, although the Court initially approved the sale on January 31, 2023, the sale had not closed as of the date the Fifth Circuit stayed all sales, August 31, 2023, largely because of a diligence period for the buyer, and issues related to a parking obligation.  Dkt. 308, ¶ 74.  Retaining a broker, marketing the property, negotiating a contract, and allowing for a diligence period would likely take at least the same six-month window, resulting in an additional loss of $111,810 (at the "standard" rate) or $268,344 (at the default rate).

Respectfully submitted,

By: /s/ Charlene C. Koonce

    Charlene C. Koonce
     Texas Bar No. 11672850
     charlene@brownfoxlaw.com
    Timothy B. Wells
     Texas Bar No. 24131941
     tim@brownfoxlaw.com
    BROWN FOX PLLC
    8111 Preston Road, Suite 300
    Dallas, TX  75225
    Tel. 214.327.5000
    Fax. 214.327.5001

*Attorneys for Receiver Cortney C. Thomas*

## CERTIFICATE OF SERVICE

Pursuant to Fed. R. Civ. P. 5(d)(1)(B), as amended, no certificate of service is necessary, because this document is being filed with the Court's electronic-filing system.

32