UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

CASE NO. 3:22-cv-2118-X

-----------------------------------------x

SECURITIES & EXCHANGE COMMISSION,

                    Plaintiffs,

v.

TIMOTHY BARTON, et al.,

                    Defendants.

-----------------------------------------x


TRANSCRIPT OF THE HEARING

BEFORE THE HONORABLE BRANTLEY STARR

UNITED STATES DISTRICT JUDGE



Dallas, Texas

December 14, 2023

1:36 p.m.

A P P E A R A N C E S:


FOR THE PLAINTIFF:

        SECURITIES & EXCHANGE COMMISSION
                801 Cherry Street
                Suite 1900
                Fort Worth, Texas 76102
        BY:   KEEFE M. BERNSTEIN, ESQ.
                bernsteink@sec.gov
                (817) 900-2607


FOR THE DEFENDANT BARTON:

        HUNTON ANDREWS KURTH, LLP
                2200 Pennsylvania Avenue NW
                Suite 905
                Washington, DC  20037
        BY:   MICHAEL J. EDNEY, ESQ.
                TED HUFFMAN, ESQ.
                medney@HuntonAK.com
                (202) 778-2204


FOR THE RECEIVER:

        BROWN FOX, LLP
                8111 Preston Road
                Suite 300
                Dallas, Texas  75225
        BY:   CHARLENE KOONCE, ESQ.
                TIM WELLS, ESQ.
                charlene@brownfoxlaw.com
                (214) 327-5000

SECURITIES & EXCHANGE COMMISSION vs THOMAS LYNCH BARTON
3:22-cv-2118-X                        December 14, 2023                        Page 3

FOR TEXAS REPUBLIC BANK:

        SCHEEF & STONE, LLP
                2600 Network Boulevard
                Suite 400
                Frisco, Texas 75034
        BY:   PATRICK JOSEPH SCHURR, ESQ.
                patrick.schurr@solidcounsel.com
                214-472-2100


FOR PALISADES-TC, LLC:

        TILLOTSON JOHNSON & PATTON
                1201 Main Street
                Suite 1300
                Dallas, Texas 75202
        BY:   JONATHAN PATTON, ESQ.
                jpatton@tillotsonlaw.com
                214-382-3041


FOR DAVID RAMOLIA:

        CHANDLER & SHAVIN PLLC
                12377 Merit Drive
                Suite 880
                Dallas, Texas 75251
        BY:   DANIEL RASOUL ALEXANDER, ESQ.
                alexander@chandlershavin.com

COURT REPORTER:   MS. KELLI ANN WILLIS, RPR, CRR, CSR
                  United States Court Reporter
                  1100 Commerce Street
                  Room 1528
                  Dallas, Texas  75242
                  livenotecrr@gmail.com


        Proceedings reported by mechanical

stenography and transcript produced by computer.


                    * * * *

- P R O C E E D I N G S -

-o-

THE COURT SECURITY OFFICER:  All rise.

THE COURT:  Thank you.

You can be seated.

Okay.  I am calling for a hearing on whether or not to approve property sales.  Case No. 3:22-CV-2118-X.  That is SEC versus Barton, et al.

Let's do appearances, first for the SEC.

MR. BERNSTEIN:  Good afternoon, your Honor.  Keefe Bernstein for the SEC.

THE COURT:  Thank you, Mr. Bernstein.

And how about for the Receiver?

MS. KOONCE:  Good afternoon, your Honor.

Charlene Koonce and Tim Wells for the Receiver, Cort Thomas.

THE COURT:  Thank you, Ms. Koonce.

Okay.  And how about for Barton?

MR. EDNEY:  Michael Edney for the Defendant, your Honor.

THE COURT:  Thank you, Mr. Edney.

Okay.  And is anyone else here who wants to make an appearance?

MR. ALEXANDER:  Yes.  I'm Daniel Alexander.  I represent the judgment creditor, David

Ramolia.

THE COURT:  Thank you, sir.

Who else is here for an appearance?

MR. PATTON:  John Patton on behalf the Palisades-TC, LLC.

THE COURT:  Thank you.

And who else?

MR. SCHURR:  Patrick Schurr on behalf of the Texas Republic Bank.

THE COURT:  Okay.  Thank you.

Anyone else?

I know we've got someone listening in by phone, hard to make an appearance.

Okay.  They are not on the phone.  Never mind.  The phone connection got cut to the courthouse.

Okay.  So let me say, I know we got three properties that are at issue here.  We have got Rock Creek, Frisco Gate, and Marigold Suites.

So what I want to do is take these one in turn, and then I'm going to pretend to end a hearing and start all over again but we don't have to appearances all over again.  I will cross apply those.  But I'm just trying to be a stickler.  And when the statute says we get a hearing on each one,

I don't want to commingle them all.

So I intend to take up Rock Creek as this first hearing and then we will do Frisco Gate next and then Marigold Suites third.

Okay.  So with that batting order, we are now talking about Rock Creek and whether or not to approve the closing of the sale of the Rock Creek property.

Ms. Koonce, let my ask you lay it out. And then we can figure out if you need to put Mr. Thomas on the stand or not.  Just tell me what you think we should do at this posture of the case.

MS. KOONCE:  Thank you, your Honor.

I'm prepared to address all of the objections.  And I'm going to try to do this sitting down.  I think that that's your preference, if that is okay.

THE COURT:  Sitting down is great because you are closer to the microphone.  If you really love standing up and want to stand up at the podium, that is fine, too.

MS. KOONCE:  Okay.  I'm going to try to do it from here.

I'm fully prepared to address all of the objections.  But I do want to ask the Court if you

have any specific questions that you want me to address first?

THE COURT:  So what I will at least say is this:  I understand that the notice was reposted after I had the new receivership order.  So I guess maybe we should at least talk through timelines and what happened when.

I know the appraisals happened under the old receivership order.  I'm curious to hear if there is anything indicating from the appraisers or anyone else if that appraisal information is stale. I know that is one of the criticisms, one of the objections going on here.  So if there is any information on that, I would love to hear that.

And then I would love to hear if there is any competing offer that came in, whether it is not 10 percent higher than your highest offer that you have in hand.  I would love to hear if you got any competing offers.

So do you mind just maybe doing a basic layout when it comes to Rock Creek.  And then we can hear if you have got any information whether the appraisals or stale or fresh.

MS. KOONCE:  Sure, your Honor.

So the Court originally approved the Rock

Creek sale on December 20, 2022.  In advance of the sale, the Receiver had obtained three appraisals.  I think one of them at least was an opinion of value. Those were obtained November 29th, 2022.  And that appraisal valued the property at 1.385.

The second opinion of value or appraisal was November 17th, 2022.  And that was the same value, 1.385.

The third was dated November 18th, 2022, and it valued the property at 1.410.

So the average appraised value of the property, as of the date that the Court first considered the sale, was 1,393,330.33.

As you noted, we did not obtain new appraisals in advance of this hearing, but we did -- the Receiver did conduct an investigation and has continued to follow the real estate market generally.

In addition, Mr. Barton submitted evidence, which was an objection which demonstrated, as the Receiver's own testimony did in the verified motion that was submitted, that real estate sales in particular have slowed.  And because of rising interest rates that have been occurring over the last year, the market has continued to slow while

prices have also fallen.

So while the appraisals are a year old, we don't think that there is any change of value, except possibly a decrease, your Honor.

With respect to the timeline, in addition to the date that the Court first approved this sale, as you noted, when we filed these motions, the Court treated them as a motion to appoint appraisers, approve the appraisals and the sales.  And we published notice in the Dallas Morning News on December 1st of the hearing that was originally set for December 11th.

When the Court reset that hearing, we published notice again on December 5th.  Both of those publications included the terms of the sale and the information, the contact information for the Receiver and they solicited any competing orders.

None have been received.  There have been no inquiries whatsoever.

So in the time that the property has been approved for sale, although we have been unable to close, there has been quite a bit of publication about this case, including additional articles that were published in the Dallas Morning News following the Court's entry of the new receivership order.

And that article also provided notice that the Court was going to consider these sales.

We got no interested offers.  We got no got inquiries whatsoever, suggesting that sale price, which is 1.4 million, it is almost exactly the average appraised value is an appropriate value.

In addition, as the Court is acutely aware, based on all of the filings that we have submitted, the Rock Creek property, like all other properties in the estate, continues to erode in value based on the secured interest that is held by a lender.  Every single property that we have, your Honor, is losing value daily.

And as we stated in the motion, just with the three properties that are at issue here, using the standard rate, we are losing $40,000 a month; using the default rate, that's $91,000 a month.

And just for Rock Creek, the monthly interest that accrues is $8,687, at the standard rate.  That is the amount by which the property continues to lose value.

Mr. Barton has objected that the value of the house, based on the appraisals that we submitted a year ago, are inaccurate.  He submitted an appraisal of his own.  And it is even older than the

ones that are in the record that were submitted by the Receiver.  It was dated June 1st, 2022.  And he proposed a net appraisal that the value was 2,061,228 (sic).

But that appraisal, your Honor, uses a cost basis, instead of a market or sales comparison, which is not appropriate for a residential value.

But even if the Court used Barton's appraisal and dropped out one of the Receiver's appraisals, the value, the averaged appraised becomes approximately 1.6 million.  And the statute that governs, 228 USC 2001 requires that the Court cannot approve a sale if it is less than two-thirds of the averaged appraised value.

Using Barton's appraisal, the average appraised value becomes 1,066,000.

So, again, the 1.4 million sales price exceeds what the statute requires by far.

In addition, Barton raises some of the same objections that the Court considered and overruled at the first hearing.  That this is his only home.  But your Honor, the Deed of Trust that secures this property prohibited Barton from occupying this property.

Additionally, Barton had listed the

property for sale in advance of the Receiver's appointment.  So the extent to which he held it near and dear is at least subject to consideration based on that sale.

Additionally, Barton has complained that the sale was not widely marketed, that there was something inappropriate about the sales process.

But as the Receiver stated in his verified motion and in the motion that was originally submitted last year, we hired a broker.  There was a standard sales process.  The property was marketed for several weeks.  Multiple offers were received. And the 1.4 that is the contracted price was the best offer.

Barton also attacked the appraisals that the Receiver has submitted at the time that they were submitted and again renews those objections contending that the listing prices of properties that were nearby demonstrate that the value is higher.  But as the Court must be aware, a listing price is not indicative of value; the selling price indicates value.

Additionally, the comparable properties that Barton relied on this historical objection were far more attractive and they were of higher quality

than the Rock Creek property.  It is not a huge mansion, your Honor, which is evident from the selling price and the location.

Additionally, although Barton continues to object to the sale of this property, he offers no solution to the Receiver's quandary, which is that the interest continues to erode the value and we have continuing costs.  For instance, taxes, property taxes.

He's never offered to pay rent or taxes.  And he will not agree to the sale of any other property, including art, that Barton had swore was worth $12 million in advance of the receivership and he still refuses to disclose the location of that art.

In other words, we nothing else to sell, and yet we have continuing expenses, including real property taxes that have to be sold.

I think I have covered all of the things that you have asked me to.  There have been no competing offers.  The notices of publication were 10 days in advance of this property and they published the terms of the sale.

We do not believe that the appraisals are stale.  If they are at all stale, it is that they

are high, given what the changes in the market have demonstrated.

We do not believe that Mr. Barton has raised any valid objections that preclude the best interest of the estate, which is what governs this test.

There were some additional sort of global considerations that he raised.  I don't know if the Court would like me to address the affect of the appeal of the receivership order or his contention that it is inappropriate to sell realty before there is a final judgment, but I can address those.

THE COURT:  I think I have already ruled on those issues previously.  But if you want to take a second or two to talk about them, then it is fine by me.

MS. KOONCE:  Well, just very, very briefly, then, the contention is the Court is divested of jurisdiction essentially by appeal of the receivership order.

We know that that is not true.  None of the authorities that Barton cited make that true.  Rule 62(c)(1) specifically says that absent a stay, the appeal of a receivership order does not stay the receivership.

And we submitted multiple authorities that support the sale, while there is an appeal pending. But we also know from the Fifth Circuit's denial of Barton's first emergency motion to stay in January 2023, after this Court had approved the Rock Creek sale, and it again denied his second emergency stay of the settlement of the HNG and Capital last June, we know that the Court has continuing authority and jurisdiction to approve the sales, despite the appeal.

And then with respect to whether it is appropriate to approve sales before a final judgment is entered, again, none of the authorities that are cited in the papers demonstrate that that is not to be the case, that you cannot approve absent a final judgment.

In fact, those cases address a total liquidation in advance of a final judgment or the Second Circuit's very strong preference for bankruptcy procedures, which is not the law in the Fifth Circuit.

In the court, we know Judge Cummings, Judge Godbey, numerous other judges have approved liquidation of limited properties when it is necessary and in the best interest of the estate in

advance of a final judgment.

And Judge Rosenthal, in the Southern District just did the exact same thing in CFTC versus Brisco, approved the sale of realty far in advance of any final judgment.

So it is absolutely appropriate for the Court to authorize the sale of these properties when it is necessary. And here we know it is absolutely necessary, based on the eroding value, the lenders that are pressing the Receiver to sell these, the falling property values, the interest rates, and the fact that the estate continues to be cash strapped and needs to be able to pay things, for instance, real property taxes.

THE COURT: Okay. Thank you, Ms. Koonce.

Okay. Mr. Edney, can I hear from you on Barton's position on Rock Creek?

MR. EDNEY: Thank you, your Honor.

Your Honor, I do have several arguments that apply to all three of these sales, and perhaps I will lay them out here and may we --

THE COURT: You can incorporate them by reference.

MR. EDNEY: We can incorporate them by reference going forward, so I don't -- I'm not too

incredibly redundant this afternoon.

THE COURT:  That is fine by me.  And I will let the Receiver do that as well.

MR. EDNEY:  Is that fine, your Honor?

THE COURT:  That is fine by me.

MR. EDNEY:  Okay.  Great.

Your Honor, I think our objections here, our main objections fall into really into two categories.  We don't think that this sale should be approved on this record and we don't think that this sale should be approved now.

And let me turn to the first category.

Not on this record.

The Receiver is urging a private sale.  We have a statute that governs this.  This is the § 2001(b) of Title 28.  There are strict requirements for such a private sale.

One of the requirements is this hearing, but another of the requirements is that this Court approve three dis-interested persons to appraise the property.  And the point of it, which is made clear in the statute itself, is to determine its appraised market value.

A natural implication of the statute is that the appraisals and assessments of market value

be current, but we don't have a fresh appraisal of this property or any of the others.

And with the greatest amount of respect to the Receiver, I think the Receiver had an opportunity to put another appraisal before this Court, had an opportunity to put forward competent evidence that we can rely on a year-old appraisal. Things do change in the real estate market.

We have heard evidence from the Receiver, assertions from the Receiver about the state of real estate in Dallas. Every property, of course, is different. This is home, for example, is in a very highly sought after part of Dallas.

But beyond that, the evidence in the record is that in the last year, property values have gone up. They might be plateauing, I think that is the article to which the Receiver pointed in her presentation. But -- but they have gone up over the last year.

And I think this is -- this is what the statute wanted to get at. The Congress was skeptical of private sales by Receivers. It required the Receiver to turn square corners. And here, we do not have evidence in the record of current market value. We have evidence in the

record of market value a year to a year-and-a-half ago.

So you know, I would respectfully suggest to your Honor that this is -- this is not one of those things that is a judgment call.  This is a statutory mandate.  It is within the Receiver's power to fix this issue by bringing evidence to the Court's attention.

But I would urge the Court to deny this motion, which is a carryover from December of 2022, which has not been supplemented by any evidence or any evidence by which we can carry over the appraisal from December 2022, and require the Receiver to go back and turn those square corners.

Our second category of objections is not now.  And I want to be very clear about our position with this.  It really does break it down into two parts.

First and foremost, we believe this Court should not disrupt the status quo of these properties while our appeal of your Honor's order appointing a new receiver is pending.

We -- I want to be very clear about this. We are not saying that the property should be returned to us now.  They should be held in

safekeeping by the Receiver pending the outcome of this appeal.

Your Honor, with the greatest amount of respect to this Court, this appeal will raise serious issues and these properties at the intersection of some of the most serious issues in the appeal.

A section of the court's -- of the Fifth Circuit's opinion in July was focused on what constitutes property that is the subject of the litigation and over which this Court has jurisdiction to order a receivership. There was a line in that about potentially reaching property that has benefited from loan proceeds and properties subject to the litigation.

That is -- that is a phrase that we have not seen in prior opinions from the Fifth Circuit. It is not one that has been elaborated upon and certainly the Fifth Circuit didn't undertake to demarcate exactly the meaning of that. I think that is going to be a significant issue that's in front of the Fifth Circuit this time.

I think the Receiver and the SEC put before your Honor and your Honor adopted several -- several theories of having benefited assets that are

aggressive.  And -- and -- and I do believe that the Court got it wrong, but I mean that is not what I'm asking the Court to determine now.

I'm asking the Court to recognize that serious legal issues are presented with regard to this.  And with regard to the Rock Creek property in particular, several of the bases for claiming that it is within the jurisdiction of a potential receiver were on this benefit theory.

It benefited from SBA loans.  There is an assertion that there were proceeds that came -- came back in through one of the HUD guaranteed and sponsored apartment complexes, that that itself, that claim itself was on a benefits theory in many circumstances.  And it is one that is going to be going in front of the Fifth Circuit.

So our argument here is -- now is not the right time.  We are going to have a process to make sure that these issues are fully ventilated, that they come to rest.

And we would have a very different position on this, if we were dealing with cash or stock or bearer bonds or things that are really interchangeable with money.

I mean, court after court has held that a

real estate sale is one of those things that is both unique, one is not like the other, you can't just give somebody another piece of property back just because -- because one of them was taken.  And it is very difficult to unwind, if some of this got wrong.

So I think that -- I think the best course, we are urging on the Court the best course here is -- is to maintain the status quo, let the appeal get resolved.  It does not take forever.  And then we can reassess at that time.

We do have a more general objection to this, though, which is -- which is, you know, generally speaking, we think the purpose of these prejudgment receiverships should be to safeguard the property in place, pending proof of liability and final judgment for -- after which the property can either be used by the Plaintiff or returned to the Defendant.

And -- and we have put authority before your Honor that says that really we need to look for extraordinary circumstances to deviate from that presumption.

It is possible to deviate from it.  There is no question.  You know, it is a rebuttable presumption.  But even -- even the Receiver's

offered authorities in their brief filed the night before last so indicate.

And I direct the Court to FTC versus Johnson.  This is a case cited --

THE COURT:  I'm not trying to do a motion for reconsideration of the receivership order.  I'm here on Rock Creek.  So can you focus on Rock Creek, Mr. Edney?

MR. EDNEY:  Well, yes, your Honor.

But I -- your Honor entered a receivership and --

THE COURT:  And the camel's nose is under the tent and you are now re-litigating it.

I get that.

MR. EDNEY:  Your Honor ordered a receivership.

And the question is now, what do we do with the property in the receivership.  And I'm urging your Honor to keep the property that is in the receivership as it is until there is a final judgment in this matter.

So I'm not -- this argument is not going after or criticizing or suggesting that, you know, there is a problem with the new receivership order.  This argument is about what do we do now.

And I think -- I think the authorities say that, you know, absent pretty exceptional circumstances, the job of a prejudgment receiver is to keep, especially real property, as it is unless there are exceptional circumstances.

And I don't think we have that showing here.  There have been -- the ground has shifted since -- since -- the ground has shifted since authorization was sought to sell the Defendant's home.  There have been sales that have generated operating cash for the receivership estate.

As we note in our papers, we do have concerns about what this money is going to be used for.  And I know that is a separate issue than authorizing a sale, but it isn't.  Because -- because, again, it is our view that we really do need to show exceptional need and circumstances to authorize a sale prior to final judgment.

And -- and I think experience has shown that is not necessarily the case here.  The greatest amount of respect for the Receiver and the SEC.  I think the Receiver has been doing yeoman's work to try to meet the SEC's burdens.

When we went to this hearing, your Honor, the SEC's tracing exercise was not the main event.

The Receiver's efforts that it was, it dropped a phone book on this Court that I'm sure cost a fortune. And you know, I think there are a lot of -- there are a lot of Government objectives here that should be paid for by the Government that are getting taxed to the receivership estate.

And I have a feeling that when this sale and some of the other sales we are talking about today are approved, it is going to go to fund that or to pay for that. And I don't think that that is the type of exceptional circumstances that are warranted here.

I want to talk briefly about the debt service issue, which is something that applies to all three of these sales.

I would direct your Honor to the verified motions the Receiver filed on November 1st, 2023. Therein, in each of them, you see two or three pages of authorities about your Honor's ability to deal with accruing debt service during the receivership, to reform the lender contracts that call for that debt.

And they are simultaneously asking for that to happen, and saying, well, we have to sell these things, otherwise the debt will just grow and

grow and take all of the value.  There are other options than selling these properties to deal with the debt.

I can assure you that if Mr. Barton's home were returned to him at the end of this process, if we were to prevail in this matter, which we are certainly hopeful that we do and I think we need to keep an open mind as to that -- the -- we would certainly argue that the seizure of this property was a force majeure that deals with some of these lending contracts and the amount that is owed under it.

This Court has similar authorities that the Receiver is invoking now to deal with some of these interest issues.  And I don't think that that option has been fully explored and -- and in of itself doesn't merit the sale of this property.

Finally, with regard to this particular property, your Honor, I note that there has been skepticism about, you know, whether this property is near and dear to my client's heart, whether it really is his homestead.

The fact of the matter is, he has no other house.  It is where he lived.  I think if you listen to the Fifth Circuit oral argument transcript, the

seizure of his home was a significant issue.  And I think the safest course of action, pending this appeal, is to put a pin in this, take it back up, if the appeal is unsuccessful, and make sure that the serious legal issues at play here are fully ventilated before we permanently change the status quo.

Thank you, your Honor.

I have nothing further on this, if you don't have any questions.

THE COURT:  Thank you, Mr. Edney.

I don't have anything further.

MR. EDNEY:  Thank you, your Honor.

THE COURT:  Okay.

So let me ask if there is anyone else who wants to be heard on Rock Creek?  I think everyone else is here for Frisco Gate, right?

Anything you need to say in response?

I know the one argument that I hadn't heard you touch on was debt service and my ability to compel a restructuring, Ms. Koonce.

MS. KOONCE:  Yes.  I would like to touch on several things that were raised here.

But with respect to the debt service, I can assure the Court that has there ample

exploration of all avenues in which we can address the accruing debt.  And to date, we are unaware of any possibility of either reforming or squelching, at a minimum, the standard interest that accrues for these secured lenders.

While we have asked the Court to stay the accrual of default interest, and there is some limited authority in some instances for staying the other interest, we don't think that that is going to be something that would be upheld in this instance.

So while it is possible and we have certainly requested that the Court stay the default rate interest, the standard interest rate, which on Rock Creek is 9.9 percent, I believe, is going to continue to accrue, is accruing.  And at that rate, it is still accrues at, I think, at $8,600 month.  That is the amount that is eroding the value of this property.

And the same is true with every other property.  And in some of those instances, the standard rate is higher.

So what we have -- and certainly would love to be able to present to the Court some strategy by which we can stop all interest accruing, we don't think that that is something that is within

the Court's equity in this instance.

I would like to remind the Court with respect to what Mr. Edney continues to refer to as the seizure of this house, when the Receiver received notice from a neighbor, I think it was on the second day of the receivership, that Mr. Barton was moving art out of the house.  That is when this came to our attention.

And at that time the Receiver was forced to request Mr. Barton to stop moving art out of the house and we changed the locks.  We also discovered at that time that the property was listed for sale.

This was not an intentional act to deprive Mr. Barton of his home, but to preserve the value of the property.  And that is the Receiver's intent and has been.

I think Mr. Edney has also raised the issue of there are no exceptional circumstances here.  And he addressed, I think, some limited settlements that we have been able to obtain over objection, but there have been no sales that have closed.

The Court approved three.  We were not able to close any.  So the estate still has very, very limited access and it is unable to satisfy the

obligations that are arising.  Not just real property taxes but, for instance, we have unexpected obligations that come up.  I think we addressed -- one of them is the repayment of a SBA loan.  We had to pay that in order to get cost certification to keep the HUD loan in place at another one of the properties.

As the Court is also aware, there is a privilege protocol in place that authorizes and requires in fact that we review documents and provide access to them.  That is going to require the involvement of a very expensive IT analysis.

We have not done that.  We don't have the money to pay for it, your Honor.  But if the Court -- if we have to move the case forward and we need to do that with these documents, we are going to have to pay the IT vendor.  We cannot do that.

The argument has also been that it is not appropriate to authorize the sale of this property now and that there was no demarcation in the opinion from the Fifth Circuit with respect to what does the phrase "properties that benefited from investor funds."

We think that is a pretty clear instruction, "benefited from."  I think it gives the

Court very broad discretion.  But with respect to Rock Creek, we have $500,000 of investor funds that are directly traced into the payment of the first mortgage on this property.  We don't even have to rely on "benefit from."

And with respect to the obligation to safeguard these properties, that is exactly what the Receiver is trying to do.  We are trying to safeguard the value of the property and the value of the remainder of the estate.

And finally, with respect to the complaint that this record does not support the sale, that the appraisals are stale, I would like to point the Court to paragraph 21 of the motion, the verified motion that was filed.  It is Document 374, in which the Receiver testified that the real estate market in the Dallas area has not improved since the Rock Creek property orders were entered.  That is with respect to no improvement since the original at appraisals were provided to the Court.

There is absolutely no evidence that suggests that this property value has increased. But even if it had increased, your Honor, there is no evidence that whatever increase there could possibly be is going to make the sale of 1.4 million

less than two-thirds of the average appraised value. There is nothing that suggests that.

These appraisals are -- they are appropriate today and the evidence that we have shows that the real property sales, especially real estate property, has slowed down considerably because of rising interest.

We do think it is appropriate for the Court to approve this sale and we think it is appropriate to do so now on this record.

THE COURT:  Okay.  Thank you, Ms. Koonce.

Okay.  I need to some finding on Rock Creek.

First, I will say that there is that predicate on what does "benefit" mean.  And I will say that "benefit" -- I guess people could argue "benefit" means any number of different things, but as to this property, I did rely on the tracing of the 500,000 that went to the initial payment of this property.

Generally speaking, I think I tried to take a narrow view of "benefit."  I know you complained that it is too broad in your view. Whitaker v. Filburn is too broad, in my view, right?  Whitaker is one things affects another and

everything is now under a federal regulation.

What I didn't want to do is have a Whitaker-type analysis that said everything benefits everything else.  So I think that's why you saw over 10 entities drop out of my second receivership order that were in the scope of the original one under "owns or controls."

So I tried to take a narrow view of benefit, but certainly this property doesn't rely on the benefit standard at all.

So when it comes to the other things I need to find on Rock Creek, I do find that there was -- the appraisals that were previously done in this case, I will go ahead and accept them now.  I know that there is the argument that they are stale.

I think the only evidence I have to rely on is that evidence from the Receiver's argument that you recited to earlier.  That is paragraph 21 of Docket 374, that the real estate market has not improved in the last year.

That is the competent evidence I have to rely to note that there is not a reason to go make the Receiver spend more money getting current appraisals when there is not an indication that the property has gone anywhere but down.

I don't want to spend the Receivership assets into oblivion.  I want to preserve them as much as possible for either a return to Barton, if he wins, or sending back to the Wall investors, if Mr. Barton loses.

The next thing I need to find is that there was a Publication of Notice in this case, December 1st, the initial one; December 5th, the revised one, after we moved this hearing date.

And based upon on those appraisals, the average certainly is at that $1.39 million amount, which is about the $1.4 million offer.  It needs to be, under the statute, at least two-thirds, the offer, and here it is 100 percent.  So I think it does meet that statutory threshold.

I find that there has been no competing offers that have come in since posting the notice in the Dallas Morning News and the time of this hearing.

So the last thing I need to find is I do believe that the proposed sale is in the best interest of the receivership.

I certainly think that if we were dealing with different types of property other than thinly-capitalized, highly-leveraged real estate,

that in some cases is deteriorating, at a minimum has standard interest or property taxes accruing, that that would be a different matter.  I wish they were bearer bonds, right?  And we would put it all under lock and key and resolve it at the end in the final judgment.  But it is not.

So I think faced with what we are faced with here, the best option for the receivership estate is to post this property for sale.

I would rely on the Receiver's materials so far when it comes to whether or not it was his residence or house.  There was that assertion in the note that it couldn't be his residence.  So I find that, as fact one.  And then fact two is the fact that it was getting ready to be listed for sale. Whether that goes to his, you know, emotional attachment to the house, I think that is a telling fact.

So overall, I think it in the best interest of the receivership estate for the sale to be completed.  So I will approve the Motion for Sale of the Property based on the property at Rock Creek.

And there is also the joint stipulation between the Receiver and the Rama Fund LLC that governs this property as well.  I will authorize the

Receiver to sell and convey title to the Rock Creek property, free and clear of mortgages, liens, claims and encumbrances, after paying the secured lienholders in accordance with the contractual terms in that joint stipulation.

I will include a written order probably tomorrow morning that spells that out, just so you have something to point to without waiting for a transcript.

Okay.  So that concludes Rock Creek property.

What I will do is pretend we are in recess and now we are back.  We are back to talk about the Frisco Gate property and a hearing to consider an offer of sale in Case No. 3:22-cv-2118-X.

I will just copy and paste our appearances from the prior hearing into this one.

And then I will ask you, Ms. Koonce, if you can lay out the elements for the Frisco Gate property, and I know we have other individuals here who might want to be heard after Barton is on Frisco Gate.

MS. KOONCE:  Okay.  Thank you, your Honor.

First of all, I would like incorporate by reference the arguments that were just raised with

respect to the sale of the Rock Creek property regarding the Court's authority to consider and approve this sale while there is a pending appeal of the receivership order.

Likewise, I would like to incorporate the same arguments that address the Court's authority to authorize a sale before there was a final judgment entered.

Any of the other arguments that were raised with respect to Rock Creek that specifically would also apply with respect to the Frisco Gate property, I would like to adopt those.

As the Court is aware, this is the second time the Court has considered the sale of the Frisco Gate property.  This is about four and a half acres of undeveloped land in Frisco.  The average appraised value of the property is $9,302,823.  That is based on three appraisals that were conducted; two of them in November of 2022, and one in December of 2022.

The principal owed to the one lender that is here today, Texas Republic Bank, is $2.9 million. There is also a contention by another entity, Palisades, that it is owed three and a half million for a purchase money interest as well.

The Court conducted a hearing on this sale originally on January 31, 2023, and approved the sale.

At that time, we believed that the net recovery to the estate would be well over $2 million.  But since we have been unable to close since that time, the delay has cost the estate somewhere between 189,000, at the standard interest rate, or $450,000, at the 18 percent maturity rate that the lender seeks to recover.

The property is also burdened by a parking obligation that obligates either the current owner, FHC, or the buyer to construct parking on the property, a parking structure.  And that is an obligation that runs to a third party.

There have been continuing negotiations about that obligation.  It was not disclosed before we contracted for the sale.

At the time that the Court first considered this sale, Mr. Barton not only consented to it but he urged it.  He brought the buyer to the Receiver's attention and the Receiver was able to contract for the sale, which is at $9 million, without the cost of a broker, which is at least $270,000.

At the time, Mr. Barton consented to the original sale.  There were two developments in the Frisco area that had been publicized, the mixed development and a Universal theme park project.

Mr. Barton nonetheless contends now that those projects have certainly, have absolutely increased the value since the Court approved the sale first.  But because those projects were known at the time the Court approved the sale, the Receiver contends that that is not accurate.

And if it had been accurate, Mr. Barton, as an experienced real estate developer, would have been aware of them as well and yet he consented to the sale in advance of the Court's approval the last time.

Now, again, interest rates are still climbing and we do not believe that this record is stale.  Although property values have at least leveled off, there is no indication that this property has increased in value since the Court first considered the sale and since the original appraisals were submitted.

There have been no competing offers with respect to the timeline and the publication.  Just as with the Rock Creek property, your Honor.  We

published notice of this sale, including the specific terms and the contact information for the Receiver, the date, the time, and the location of the hearing. We published that on December 1st and we published it again on December 5th.

Again, no competing offers, not even any inquiries, your Honor.

With respect to the additional objections regarding this particular sale, there has been the contention that this is an illegal receivership. I think that is an issue that the Court has already addressed. And to the extent that it would like additional argument on that, I can certainly address that. But it is in the briefing, and I think I would incorporate what we just discussed with Rock Creek.

I would also note that in the event that the Court is inclined to not approve this sale, given the appeal or any other issues, because this is a commercial property, the sales process is a lot lengthier than with respect to residential.

There was a six-month process here before the Fifth Circuit stayed the sale. Actually, I think it was more than that. And part of is that is a diligence, a due diligence period that is required

for the buyer.  And then again, we have this parking obligation.

If we do not approve this sale -- and the buyer has stood by and is waiting to close the sale, we will again suffer the cost of continuing accruing interest that erodes the value on this property.  At the standard interest rate, which is what we believe should not apply, not the default rate, that is $18,000 a month that is eroding value.

I think those are the only specifics with respect to the Frisco property, but I'm certainly happy to address any questions that the Court may have.

THE COURT:  Understood.

Let me just ask what may come up with Texas Republic and Palisades.  I have the written briefing on file.  I know there are competing concerns there on whether Palisades should be paid as the compromise agreement suggests or not.  And then there is the Texas Republic issue.

I'm intending on ruling on those on paper. I just want to make sure that there is nothing that I'm missing in the paper record on that topic that you are aware of.

MS. KOONCE:  Not that I'm aware, your

Honor.

And I would say, you recited this before, and one of the objections that Texas Republic had was that our order didn't recite that the lien, to the extent that there is any lien remaining, is transferred to the proceeds of the sale.  We certainly are not objecting to that at all.  We think that that is appropriate.

So we also think it is important for the Court to know that, to the extent that Texas Republic contends that it is entitled to recover the default rate interest, that is something that the Court defers to a claims process, there is still more than sufficient assets to pay Palisades out of the closing here and, again, have approximately less -- it is going to be less than this -- about $2 million, even if we hold the delta from the default rate and the standard rate, if we hold that in trust, as we would have to, based on the transfer of the lien to the proceeds.

THE COURT:  Thank you, Ms. Koonce.

Okay.  Mr. Edney, I should ask you next. And I will have to ask Palisades and Texas Republic if they have any issues, but let me ask you to layout your issues next.

MR. EDNEY:  Thank you, your Honor.

Let me begin by incorporating by reference my general arguments with respect to these sales that I mentioned during our hearing on the Rock Creek property.

THE COURT:  Absolutely.

MR. EDNEY:  So I'm just going to augment those arguments by two -- by highlighting two issues from our papers that are specific to the Frisco Gate property.

And the first one is with regard to the staleness of the record.  You know, here, I think in particular we are not speaking in general terms. Since -- since the March process, both the Universal Studios theme park project and the mixed, "mixed development" that they are -- that is being stood up adjacent to the Frisco Gate property have made significant steps forward through the approval process.  The city council made a significant step forward in the Universal Studios -- I'm sorry -- in the mixed development by providing kind of key final approvals, which were up in the air when last we spoke.

With regard Universal Studios, the zoning approval came through.  The ideas and plans have

been drawn up, and, you know, are real and tangible.

And you know, these two really significant adjacent developments have gone from concept to closer to reality.  And that was always the value of this property.  I think that is one of the reasons that it was bought in the first place.  It was anticipated to increase in value as some of -- some of the activity in Frisco became more and more real, closer and closer to actually happening.

And I think, as we all know in real estate, as we are finding out in this case, even the best-laid plans can often fall apart.

Here, the evidence that we've put in the record is that, you know, significant steps forward have been made in the last nine months.  I think the safer course under § 2001 would be to -- would be to obtain fresh appraisals to make sure that this very significant asset of the receivership's estate is still being sold within the zone of reasonableness.

That is what Congress expected when a receiver chooses to proceed through private sale.  I think it absolutely needs to happen here with regard to this particular property.

With regard to my not-now category of objections to these sales, you know, as your Honor

knows, we are appealing the imposition of the new receivership.  That appeal goes both to the existence of the receivership itself and the jurisdiction over certain companies and properties.

The Frisco Gate tracing analysis is, I think is a difficult one.  It is a contentious one. I'm not going to criticize your Honor's reasoning at the moment.  We have done it in the papers.  But it does raise significant issues about -- about the methodology that the Court needs to use to deal with commingled assets and, you know, tracing them through a company that is receiving payments that -- that the parties are alleging to be connected to the property subject to the litigation and other unconnected income streams.

And that was a significant issue with regard to the Frisco Gate property.  It will be a significant issue in the appeal.  And I do believe that the safer course is to maintain the status quo of this property so that it can be returned to the Defendant in the event that that appeal is successful.

Those are my arguments specific to this property.  Again, I incorporate by reference our general objections discussed in the previous

hearing.

Thank you, your Honor.

THE COURT:  Thank you, Mr. Edney.

Okay.  Let me ask if Texas Republic or Palisades wants to speak.  Y'all know from my e-order on the docket that I'm not getting into the individual preferential treatment issue, but I'm trying figure out if this sale is in the best interest of the Receivership.

But you are here; it affects you.  So if you need to say something about that, then I would love to hear you.

MR. SCHURR:  Good afternoon, your Honor.

Patrick Schurr on behalf of Texas Republic Bank.

We do not oppose the sale.  And I believe in our response, the issue is the contractual rate of interest and what that actually means vis-a-vis the loan documents.

And then also the issue of Palisades, which as the Court said before I walked up here, we are not addressing that.  But we would support the sale of the property.

Thank you.

THE COURT:  Okay.  Thank you, Mr. Schurr.

MR. PATTON:  Good afternoon, your Honor.

John Patton on behalf of Palisades.

So Palisades provided three and a half million dollars to buy this plot in January of 2020.

As we have detailed in our papers, it is obviously interested in the sale of this property. And just to add to the record that we are in favor of the sale as proposed by the Receiver, given our interest in this and based on the Court's ruling this morning.

We won't address any other elements of it, unless the Court has any questions.

THE COURT:  Thank you for letting me know. I appreciate that.  I don't have any further questions.

Okay.  Ms. Koonce, anything you need to say at the end before I make some findings?

MS. KOONCE:  Thank you, your Honor.  Just very, very briefly.

I'm not sure that I said that the sales price here is $9 million.

I would like to point out that Mr. Edney stated that this sales process was first considered in March.  That is not accurate.  It was considered at the end of January.

And again, the two developments that he's referencing, while they are significant developments, they were known at the time.

And Mr. Barton had apparently been in negotiation with the buyer before he forwarded that buyer on to the Receiver.

Again, Mr. Barton, as an experienced developer, would have known about these developments.  And yet, he provided full-throated support of this sale.  In fact, he consented to it, your Honor.

And we contend that it is inappropriate for him at this time to try to withdraw that consent based on just the fact that he consented to it and the Court approved it already.

But we do think that the record that is before the Court, again, we have the same testimony from the Receiver.  I don't have the specific paragraph in front of me, but it is the same testimony with respect to the sale of this property, that the property values in the Dallas area have not improved since we submitted these original appraisals, your Honor.

So we believe for the same reasons that the Rock Creek property, that selling that property

is in the best interest of the estate, the same is true here.  The value is eroding and the estate has many expenses to pay.

The lenders are pressing and pressing and pressing.  And that is going to continue.  And if we don't sell some of these properties at some point, there is going to be a lender who comes to the Court and they are under-secured and the property will be entirely lost, the value of the property will be lost to the estate.

So we think it is appropriate to approve the sale and we think it is appropriate to approve the sale now.

THE COURT:  Okay.  Thank you, Ms. Koonce.

Okay.  I have some findings to make, then, on Frisco Gate.

First, I will find that I believe the appraisal average was $9.3 million here of those three appraisals.  I don't think they are too stale for me to rely on.  I will go back and say that for the same testimony I heard from the Receiver that I relied on in the Rock Creek hearing, I will rely on here on general property values in real estate in the Dallas area.

The only question is, are the two

developments that are nearby of such a unique circumstance that they compel reappraisals.  And I don't think they are because they were known at the time.

Sure, they have progressed.  At the time because they were known at the time that this offer came in, I think that is what is driving the $9 million offer to the level that it is, which normally we would see something closer to a 70 or 80 percent threshold of an offer compared to an average appraisal value.

Here, it is a $9 million offer against a $9.3 million average appraisal value.  So it is fairly high.

So I have no evidence in front of me that suggests that the appraisal values would shoot up to the level where $9 million is not two-thirds of the average appraised value.  And that is really the threshold I'm looking at.

A new, higher appraisal by $100,000 doesn't compel the person who is wanting to buy the property to pay a higher price.  It just decides if I can sell the property or not.  And so here, I have no evidence to suggest that the appraisal value currently would shoot up so significantly that it

would make me stop the sale for that $9 million offer.

As far as notice goes, here notice was published originally on December 1st; then again on December 5th, when we moved the hearing date.  And we have had no competing offers come in since notice was published, so that to me is the most telling thing.

If it were a really hot market for development, then I would expect to see another proposal come across that would beat that 9 million. I haven't seen that.

Is that sale in the best interest of the receivership property?  I think it is.  Here, the existing interest rate, the non-default standard interest rate being $18,000 a month is eroding that property value.

So I do think that there is a need to sell this property so it can fund the remainder of the property in the receivership estate and keep from losing value there.  So I do think it is in the interest of the receivership estate to make the sale.

What I will say is, when I'm approving the sale, I'm reserving those issues on what happens at

closing as to the interest of Texas Republic Bank and Palisades.  And I will rule on that on paper but before the closing date is set to occur.

So I'm going to turn to that next.

If I have any open questions based on the paper filings, then I will put out a written notice on the docket and ask for an expedited answer for that.  I would rather not move the closing date on y'all.  I know closing dates are important.  So I will make sure that I'm diligence with regard to that.

That concludes all of my findings on Frisco Gate property.  So we should end that portion of the hearing and start up with the hearing on the Marigold Suites request to sell property in 3:22-CV-2118-X.  SEC versus Barton, et al.  I will cross-apply all of our appearances because we are all the same ones in the courtroom that were here before.

And I would ask you, Ms. Koonce, if you can just layout the Marigold Suites for us.

MS. KOONCE:  Thank you, your Honor.

Again, I would like to incorporate by reference the arguments that apply to this property that were made earlier with respect to Rock Creek or

with respect to the Frisco Gate property, particularly with respect to the propriety of the Court considering and approving these sales while there is an appeal of the receivership order pending.  And then additionally, in advance of the entry of a final judgment, your Honor.

As the Court is aware from many, many filings, the Marigold Suites is a property owned by receivership entity, Goldmark Hospitality.  It is a short-stay apartment complex.  I think it is in Richardson.

The Court first considered the sale of this property on February 29th.  We had a leap year in 2023.  The sales price that is contracted for is $5.5 million.  The average appraised value of this property is 4,366,000 and 6,600.

$4,366,667.  There we go.

The three appraisals were dated January 19th.  That's by NBC.  That property -- that appraisal was at 4.4 million.

There is an appraisal or an opinion of value, which was by JLL and it appraised at 3.5 million on November 9th.

The third was dated November 30th, 2022.  And that appraised -- that is an opinion of value

between 4.9 million and 5.5 million.

Again, the average appraised value is 4.3.

Your Honor, on this property, monthly interest accrues at the standard rate of $13,400 month.  At the default rate, 15 percent, it accrues at $31,000 per month.

So in the interim that we have experienced here when we were unable to close this sale, the receivership estate has lost between $111,000 and $256,000 in the interest expense.

Nonetheless, because of the sale that was obtained here through a broker, through competing offers, the Receiver was able to contract to sell the property for 5.5 million, which is a million dollars over the average appraised value.

The property, like in the sale, like the others that have been discussed today was advertised and published in notice in the Dallas Morning News, published on December 1st, and again on December 5th.

The terms of the sale, the Receiver's contact information, a request for competing offers was provided in those publications.  There were no competing offers and there have been no additional inquiries.

I do believe when we published this for the first sale, we did have some interest.  We never got any competing offers, though.  We had people who inquired about it and spoke with the Receiver, but we did not have any competing offers.

With respect to this particular property, Mr. Barton has objected that the valuation based on the Receiver's appraisals are low.  He submitted a competing appraisal that is dated two years before the Receiver's appraisals.  It is dated November 24th, 2021.

And that sales -- that appraisal uses a sales comparison method, which was also utilized by the Receiver's NBC appraisal.

But unlike NBC, the appraisal that Mr. Barton submitted failed to subtract the $3 million in renovation costs to reach the appraised price of 4.2.  So Barton's appraisal here put the property at 6.9 million.  Again, in 2021.

NBC, at least a year later, valued it at 7.3, and then subtracted the renovation costs to reach 4.2.

The same is true with respect to the appraisal that Mr. Barton submitted.  It is the same appraisal and they utilize a direct capitalization

method.

Under that method, the appraisal that Mr. Barton submitted valued the property at $7 million. Again, failed to subtract the cost of renovation and this property is very rundown.

Using the NBC appraisal, which also used a direct capitalization method, we had the appraisal at 7.5.  But again, subtracting the same $3 million in renovations, reached a 4.4 value that was submitted with the Receiver's appraisal.

Additionally, the appraisal that Defendant Barton has submitted, again, was older and it used a 4.5 percent capitalization rate.  In the interim, as the Court is aware, interest rates have increased substantially.

And the NBC appraisal then used a capitalization rate of 6.5 percent, which is far more appropriate, given the increase in interest.

As the Court is aware, this property in particular has been a drain on the receivership assets.  While it does now sometimes cover its own expenses, it doesn't always.  Insurance is still $14,000 a month to keep this property insured.  And that's important because we also had another injury on the property.

There is a lawsuit pending with respect to an injury that had occurred before the receivership was instituted.

The Texas summer was horrible on the air conditioning units.  We had many that failed.  That is very expensive.  And we anticipate the same will be necessary next summer.

It takes a lot of the Receiver's time and his counsel's time to manage the managers and supervise the expenses and make decisions about what we can and cannot do with this property.

The bottom line is that we have a sale that is proposed, based on appraisals that are more recent than the one that Barton has submitted and that we contend still provide a very appropriate value for this property.  The Receiver has testified, again, with respect to this property that the values in Dallas have not increased based on the increase in interest rates.

This sale, again, has -- exceeds the average appraised value by at least $1 million.  However, so even if there had been some increases, it is highly unlikely that we would have any increase or any change that would mean that $5.5 million is not at least two-thirds of the averaged

appraised value that's before the Court.

Again, your Honor, like all of our other properties, this property is eroding in value based on the continuing interest. The lender on this property, McCormick, they had filed a motion to lift the stay, seeking to foreclose, in advance of the Court's consideration of the new receivership order.

As the Court is aware, we entered into a stipulation with respect to the treatment of the default interest with McCormick. But like all other lenders, McCormick and every other lender is continuing to press that they should be entitled to extract these properties from the estate or at least extract their value.

So it is in the best interest of the estate to preserve the value by selling it and recover the value that we can before interest continues to erode or before we have to spend more money fighting with lenders about how to treat their secured interest.

We believe that this is the appropriate time to sell this property and that it is absolutely in the best interest of the estate to do so and that the Court is fully authorized to sell this property.

So that is what we request that the Court

do.

THE COURT: Thank you, Ms. Koonce.

Okay. Mr. Edney, can I hear from you on Marigold?

And I will let you incorporate by reference everything you have said in the prior two proceedings on Rock Creek and Frisco Gate, as it applies here. So you can tell me what new things you want to tell me on Marigold.

MR. EDNEY: Thank you, your Honor.

We do oppose the sale, as we did the last time. And I want to go to two issues that are specific to this property.

First, we hear again that the sale is warrantied now because of the erosion of property value through accruing interest.

Historically, this property, you know, with some exceptions during the -- during the pandemic, has been able to generate income necessary to both service its operation and its debt. And unlike some of the other assets we talked to today that are sitting there and aren't making money day after day, month after month, this is generating income.

I think you heard from the Receiver, in

some months, it covers the operating expenses.

But we saw in the reply that came out the night before last that, you know, when I raised the question about what is going on with this property in our -- in our opposition brief, they said, well, geez, you know, it is -- it is a bad situation.  And you know, we barely make our operating expenses and we can't pay the debt.

But what the Receiver didn't tell you is that they have made absolutely no effort, since at least March of 2023, to fill any of the rooms in this place, any of the apartments.

And the reason that is, is because of section 4.1 of the sales agreement, which your Honor can find at appendix page 11 of Docket No. 168. This is their March 2nd Motion to Approve the Original Sale.  That prevents the Receiver, the Receiver agreed not to rent out any further units.

And there is absolutely no question that -- that if we let the vacancy rate rise, if we do not continue the process of -- of -- of pulling out of that -- pulling out of that facility, the folks that weren't paying their rent due to the pandemic Government benefits programs and replacing them with rent-paying folks, those folks had been

pulled out.  They were being replaced, yes, it is not going to cover its debt service.

But that is not a -- that is a reflection of, I think, a bad agreement that the Receiver made. That is a reflection of the sale process.  It is not a reflection of -- of the fact that the property is going to lose money.  It can't even service its debt.  It is going to erode its value, if it is held and managed as it was.

And so this brings me back to what we were talking about a bit earlier.  You know, the cases that we have cited, the cases that the Receiver has cited says that -- says in the mine-run of instances, a prejudgment receivership is supposed to hold real property in place, safeguard it, not liquidate it, pending final judgment and the plaintiff proving and establishing an entitlement of that property or safeguarding it for a return to Mr. Barton, because it is not -- real property isn't fungible like cash.

In this particular case, I don't think that the Receiver has made the showing -- I don't think the Receiver has done so with regard to the other properties either -- but with regard to this particular property, it hasn't made the showing that

the debt service is an, you know, existential threat to the property's value.

It can be run in a manner that keeps it safe in the Receiver's hands and maintains its value.  The Receiver has just chosen not to do so. And I think your Honor will need to grapple with when the Receiver has made the showing necessary to overcome the presumption that we are supposed to keep real property in place absent a very good reason not to do so.

That is a proposition shown in our cases. It is a proposition shown in the Receiver's cases, if the Receiver chooses to quote all the reasoning that is stated in those cases.

Now, with regard to the -- with regard to the appeal issue, this -- this property does raise, you know, particularly acute questions with regard to the appeal.

I understand your Honor's ruling putting it in the Receiver estate, but this property was one that was purchased long before any of the lenders that are the subject of this case ever came into contact with Mr. Barton or Mr. Wall or Mr. Fu.

It is a property that has been owned for 10 years.  We see assertions in the SEC and the

receivership tracing analysis that money was used to put a quarter million dollars worth of solar panels on the roof, that there were -- that were benefits from paying salaries of folks that worked on the property.

We have asserted in our papers that that is a very slender reed on which to seize the whole property and give it to the receivership estate and in fact sell it forever.

And I would -- I would respectfully suggest to the Court that this property in particular and the receivership in general raise serious enough legal questions that the proper course is to maintain the status quo until the resolution of the appeal.

Your Honor, unless you have any questions, I don't have any further things I want to highlight from our papers on this particular property.

THE COURT:  Thank you, Mr. Edney.

I don't have any further questions.

MR. EDNEY:  Thank you.

THE COURT:  Ms. Koonce, final word?

MS. KOONCE:  Very briefly.

As your Honor is definitely aware, at the inception of the case this property was such dire

condition -- and I have to question whether it was generating -- I don't know what kind of income because they hadn't even been paying the electric bill.  The trash service had been shut out.  We had to negotiate with the City of Dallas to keep the lights on.  The property was in dire condition.

So I don't know what kind of income it was generating previously, but if it had been generating any, it wasn't being used to maintain the property.

Similarly, so many of the units were in such bad shape, they weren't habitable.  It wasn't possible to rent them out.

And while the Receiver has worked with the property manager to improve the value, there is not money to make these units habitable.  I don't know how it is that the Receiver should be expected to work magic when he hasn't had the money to do that.

We do put the money for -- that comes into this property back into it when we can.  But your Honor, we can't just create money out of whole cloth here.  There has to got to be some way to pay these bills.  And the way to do that is to sell some of these properties.

Again, the lender on this property in particular has pressed and pressed and pressed for a

turnover of the rents.  That was long before we got the contract for sale.  There is an assignment of rents provision in the mortgage on this property. And we have had to fight with this lender.  We cannot turn over the rents to them because we needed them to pay the manager; we needed to them to pay the lights.

Moreover, there is absolutely no evidence whatsoever that the Receiver has not used his best efforts to improve and maintain this property and increase the value and to bring in as much money as we can with respect to keep it in place.

We had to get stopgap insurance, which was absolutely essential given the additional injury that occurred on the property.

Mr. Edney has also argued here that there is no authority that authorizes the Court to allow the sale of properties.

That is absolutely not true.  It is cited in the papers, your Honor, that where holding properties results in a decrease in their value and it harms the estate in its ability to maintain other properties, the Court absolutely has the authority to authorize the sale of those properties prejudgment, during an appeal, or otherwise.

This is not uncommon in the context of receiverships.

And finally with respect to the contention that this property has some unique quality with respect to the investor funds that were traced into it or the manner of tracing, we certainly understand that there is a contention regarding the manner of tracing.  It was math.

And the math here demonstrated that investor proceeds were traced directly into this property to purchase the solar panels, to pay the management, to pay contractors, in some instances.  It is not -- it is not questionable.  It is not methodology, your Honor.  It is money in and money out.  That is what we traced.

Again, this property, in particular is a big drain.  The sales price exceeds the average appraised value by more than $1 million, when compared with the drain on the value of the property, which will continue at $13,000 a month, if we don't sell this property.

So again, the Receiver asks that the Court appoint the appraisers, approve the appraisals, approve the sale and authorize the sale in conformity with the stipulated judgment that was

submitted with the lender on this property.

THE COURT:  Okay.  Thank you, Ms. Koonce.

Okay.  I need to make some findings as it comes to Marigold Suites.

So the findings I will make are that the average appraised value here was $4.36 million. Those appraisals were done last year, but I do have that evidence from the Receiver, from the testimony at doc 374, paragraph 21 on the values of real estate in the Dallas-Fort Worth area have only dropped because of rising interest rates.  So I think those appraisals are good enough for me to rely on.

Here, the offer that we have in hand is $5.5 million.  So that is over a million dollars above the average value of those three appraisals.

Is it in the best interest of the receivership to actually do that?

I believe it is.  Because of recurring monthly costs on insurance and interests, interest being 13,400 a month, insurance being 14,000 a month, and then facing potentially another summer of air conditioner breaking heat, I think it is in the interest of the receivership to sell it.

Was there adequate notice published in

this case?

Here, we had notice like in the other two, on December 1st and December 5th.  Interest but no offers in the meantime that we have seen.

So I don't -- I don't think there is any reason not to go ahead and accept the $5.5 million offer.

So I will approve the Receiver's motion for sale of the Marigold Suites property.

In accordance with that joint stipulation that the Receiver has with McCormick 101, LLC, I will authorize the Receiver to sell and can make title to Marigold Suites free and clear of mortgages, liens, claims and encumbrances, after paying all secured lienholders in accordance with the contractual terms as addressed in the stipulation.

And I will include a written order on that so that you have something in the record to point to aside from a transcript that you will get after the sale has closed.

Okay.  That is all I have on my list.

So I need to obviously turn to the Frisco Gate property and address on paper the issues that you two have brought up on paper.

Again, if I have any questions when I'm combing through the paper record, as it pertains to Frisco Gate, then I will put out a request for briefing on a specific issue, if I encounter it.

Hopefully, I won't.

And then I am mindful of the closing dates, so I will go with all deliberate speed on that.

Okay.  Any questions?

Okay.  Thank you for being here.  Thank you for working with us on the notice and moving the hearing dates to accommodate y'all's scheduling reasons.

And Merry Christmas, if I don't see y'all before then.  I don't think we have a hearing set before then, but you never know in this case, things can come up.  So happy holidays to everyone and thank you for being here.

Court is in recess.

THE COURT SECURITY OFFICER:  All rise.

(Proceedings concluded at 3:34 p.m.)

**C E R T I F I C A T E**

I, Kelli Ann Willis, RPR, CRR, CSR certify that the foregoing is a transcript from the record of the proceedings in the foregoing entitled matter.

I further certify that the transcript fees format comply with those prescribed by the Court and the Judicial Conference of the United States.

This 10th day of January 2024.

s/ Kelli Ann Willis
Official Court Reporter
Northern District of Texas
Dallas Division

## $

**$1**  58:21 67:18

**$1.39**  35:11

**$1.4**  35:12

**$100,000**  51:20

**$111,000**  55:9

**$12**  14:13

**$13,000**  67:20

**$13,400**  55:4

**$14,000**  57:23

**$18,000**  42:9 52:16

**$2**  39:6 43:17

**$2.9**  38:22

**$256,000**  55:10

**$270,000**  39:25

**$3**  56:16 57:8

**$31,000**  55:6

**$4,366,667**  54:17

**$4.36**  68:6

**$40,000**  11:16

**$450,000**  39:9

**$5.5**  54:15 58:24 68:15 69:6

**$500,000**  32:2

**$7**  57:3

**$8,600**  29:16

**$8,687**  11:19

**$9**  39:23 48:21 51:8,12, 17 52:1

**$9,302,823**  38:17

**$9.3**  50:18 51:13

**$91,000**  11:17

## -

**-o-**  5:2

## 1

**1,066,000**  12:16

**1,393,330.33**  9:13

**1.385**  9:5,8

**1.4**  11:5 12:17 13:13 32:25

**1.410**  9:10

**1.6**  12:11

**10**  8:17 14:22 34:5 63:25

**100**  35:14

**101**  69:11

**11**  61:15

**11th**  10:12

**13,400**  68:21

**14,000**  68:21

**15**  55:5

**168**  61:15

**17th**  9:7

**18**  39:9

**189,000**  39:8

**18th**  9:9

**19th**  54:19

**1st**  10:11 12:2 26:17 35:8 41:4 52:4 55:19 69:3

## 2

**2,061,228**  12:4

**20**  9:1

**2001**  12:12 45:16

**2001(b)**  18:16

**2020**  48:4

**2021**  56:11,19

**2022**  9:1,4,7,9 12:2 20:10,13 38:19,20 54:24

**2023**  16:5 26:17 39:2 54:14 61:11

**21**  32:14 34:18 68:9

**228**  12:12

**24th**  56:11

**28**  18:16

**29th**  9:4 54:13

**2nd**  61:16

## 3

**3.5**  54:23

**30th**  54:24

**31**  39:2

**374**  32:15 34:19 68:9

**3:22-cv-2118-x**  5:8 37:15 53:16

**3:34**  70:21

## 4

**4,366,000**  54:16

**4.1**  61:14

**4.2**  56:18,22

**4.3**  55:2

**4.4**  54:20 57:9

**4.5**  57:13

**4.9**  55:1

## 5

**5.5**  55:1,14

**500,000**  33:19

**5th**  10:14 35:8 41:5 52:5 55:20 69:3

## 6

**6,600**  54:16

**6.5**  57:17

**6.9**  56:19

## 7

**7.3**  56:21

**7.5**  57:8

**70**  51:9

## 8

**80**  51:10

## 9

**9**  52:11

**9.9**  29:14

**9th**  54:23

## A

**ability**  26:19 28:20 66:22

**absent**  15:23 16:15 25:2 63:9

**absolutely**  17:6,8 32:21 40:6 44:6 45:22 59:22 61:10,19 66:8,14, 19,23

**accept**  34:14 69:6

**access**  30:25 31:11

**accommodate**  70:12

**accordance**  37:4 69:10,15

**accrual**  29:7

**accrue**  29:15

**accrues**  11:19 29:4,16 55:4,5

**accruing**  26:20 29:2, 15,24 36:2 42:5 60:16

**accurate**  40:10,11 48:24

**acres**  38:15

**act**  30:13

**62(c)(1)**  15:23

**action** 28:2

**activity** 45:8

**acute** 63:17

**acutely** 11:7

**add** 48:7

**addition** 9:19 10:5 11:7 12:19

**additional** 10:23 15:7 41:8,13 55:24 66:14

**additionally** 12:25 13:5,23 14:4 54:5 57:11

**address** 7:14,24 8:2 15:9,12 16:17 29:1 38:6 41:13 42:12 48:11 69:24

**addressed** 30:19 31:3 41:12 69:16

**addressing** 47:22

**adequate** 68:25

**adjacent** 44:17 45:3

**adopt** 38:12

**adopted** 21:24

**advance** 9:1,15 13:1 14:13,22 16:18 17:1,5 40:14 54:5 59:6

**advertised** 55:17

**affect** 15:9

**affects** 33:25 47:10

**afternoon** 5:10,14 18:1 47:13 48:1

**aggressive** 22:1

**agree** 14:11

**agreed** 61:18

**agreement** 42:19 61:14 62:4

**ahead** 34:14 69:6

**air** 44:22 58:4 68:23

**Alexander** 5:24,25

**alleging** 46:13

**amount** 11:20 19:3 21:3 25:21 27:11 29:17

35:11

**ample** 28:25

**analysis** 31:12 34:3 46:5 64:1

**anticipate** 58:6

**anticipated** 45:7

**apartment** 22:13 54:10

**apartments** 61:12

**apparently** 49:4

**appeal** 15:10,19,24 16:2,10 20:21 21:2,4,7 23:9 28:3,4 38:3 41:19 46:2,18,21 54:4 63:16, 18 64:15 66:25

**appealing** 46:1

**appearance** 5:23 6:3, 13

**appearances** 5:9 6:23 37:16 53:17

**appendix** 61:15

**applies** 26:14 60:8

**apply** 6:23 17:20 38:11 42:8 53:24

**appoint** 10:8 67:23

**appointing** 20:22

**appointment** 13:2

**appraisal** 8:11 9:5,6 11:25 12:3,5,9,15 19:1, 5,7 20:13 50:18 51:11, 13,16,20,24 54:20,21 56:9,12,14,15,18,24,25 57:2,6,7,10,11,16

**appraisals** 8:8,23 9:2, 15 10:2,9 11:23 12:10 13:15 14:24 18:25 32:13,20 33:3 34:13,24 35:10 38:18 40:22 45:17 49:23 50:19 54:18 56:8,10 58:13 67:23 68:7,12,16

**appraise** 18:20

**appraised** 9:11 11:6 12:10,14,16 18:22 33:1 38:17 51:18 54:15,22, 25 55:2,15 56:17 58:21

59:1 67:18 68:6

**appraisers** 8:10 10:8 67:23

**approval** 40:14 44:18, 25

**approvals** 44:22

**approve** 5:7 7:7 10:9 12:13 16:9,12,15 18:20 33:9 36:21 38:3 41:18 42:3 50:11,12 61:16 67:23,24 69:8

**approved** 8:25 10:6,21 16:5,23 17:4 18:10,11 26:9 30:23 39:2 40:7,9 49:15

**approving** 52:24 54:3

**approximately** 12:11 43:15

**area** 32:17 40:3 49:21 50:24 68:10

**argue** 27:9 33:16

**argued** 66:16

**argument** 22:17 24:22, 25 27:25 28:19 31:18 34:15,17 41:13

**arguments** 17:19 37:25 38:6,9 44:3,8 46:23 53:24

**arising** 31:1

**art** 14:12,15 30:7,10

**article** 11:1 19:17

**articles** 10:23

**asks** 67:22

**asserted** 64:6

**assertion** 22:11 36:12

**assertions** 19:10 63:25

**assessments** 18:25

**asset** 45:18

**assets** 21:25 35:2 43:14 46:11 57:21 60:21

**assignment** 66:2

**assure** 27:4 28:25

**attachment** 36:17

**attacked** 13:15

**attention** 20:8 30:8 39:22

**attractive** 13:25

**augment** 44:7

**authorities** 15:22 16:1, 13 24:1 25:1 26:19 27:13

**authority** 16:9 23:19 29:8 38:2,6 66:17,23

**authorization** 25:9

**authorize** 17:7 25:18 31:19 36:25 38:7 66:24 67:24 69:12

**authorized** 59:24

**authorizes** 31:9 66:17

**authorizing** 25:15

**avenues** 29:1

**average** 9:11 11:6 12:15 33:1 35:11 38:16 50:18 51:11,13,18 54:15 55:2,15 58:21 67:17 68:6,16

**averaged** 12:10,14 58:25

**aware** 11:8 13:20 31:8 38:13 40:13 42:24,25 54:7 57:14,19 59:8 64:24

---

**B**

**back** 20:14 22:12 23:3 28:3 35:4 37:13 50:20 62:10 65:19

**bad** 61:6 62:4 65:11

**Bank** 6:9 38:22 47:15 53:1

**bankruptcy** 16:20

**barely** 61:7

**Barton** 5:8,18 9:19 11:22 12:19,23,25 13:5,

SECURITIES & EXCHANGE COMMISSION vs THOMAS LYNCH BARTON
3:22-cv-2118-X                    December 14, 2023                    Index: Barton's..construct

15,24 14:4,12 15:3,22 30:6,10,14 35:3,5 37:21 39:20 40:1,5,11 49:4,7 53:16 56:7,16,24 57:3, 12 58:14 62:19 63:23

**Barton's** 12:8,15 16:4 17:17 27:4 56:18

**based** 11:8,11,23 13:3 17:9 35:10 36:22 38:18 43:19 48:9 49:14 53:5 56:7 58:13,18 59:3

**bases** 22:7

**basic** 8:20

**basis** 12:6

**batting** 7:5

**bearer** 22:23 36:4

**beat** 52:11

**begin** 44:2

**behalf** 6:4,8 47:14 48:2

**believed** 39:4

**benefit** 22:9 32:5 33:15,16,17,22 34:9,10

**benefited** 21:14,25 22:10 31:22,25

**benefits** 22:14 34:3 61:24 64:3

**Bernstein** 5:10,11,12

**best-laid** 45:12

**big** 67:17

**bill** 65:4

**bills** 65:22

**bit** 10:22 62:11

**bonds** 22:23 36:4

**book** 26:2

**bottom** 58:12

**bought** 45:6

**break** 20:17

**breaking** 68:23

**briefing** 41:14 42:17 70:4

**briefly** 15:18 26:13

48:19 64:23

**bring** 66:11

**bringing** 20:7

**brings** 62:10

**Brisco** 17:4

**broad** 32:1 33:23,24

**broker** 13:10 39:24 55:12

**brought** 39:21 69:25

**burdened** 39:11

**burdens** 25:23

**buy** 48:4 51:21

**buyer** 39:13,21 42:1,4 49:5,6

---

## C

**call** 20:5 26:21

**calling** 5:6

**camel's** 24:12

**Capital** 16:7

**capitalization** 56:25 57:7,13,17

**carry** 20:12

**carryover** 20:10

**case** 5:7 7:12 10:23 16:15 24:4 25:20 31:15 34:14 35:7 37:15 45:11 62:21 63:22 64:25 69:1 70:16

**cases** 16:17 36:1 62:11,12 63:11,12,14

**cash** 17:12 22:22 25:11 62:20

**categories** 18:9

**category** 18:12 20:15 45:24

**certification** 31:5

**CFTC** 17:3

**change** 10:3 19:8 28:6 58:24

**changed** 30:11

**Charlene** 5:15

**chooses** 45:21 63:13

**chosen** 63:5

**Christmas** 70:14

**Circuit** 16:21 21:17,19, 22 22:16 27:25 31:21 41:23

**Circuit's** 16:3,19 21:9

**circumstance** 51:2

**circumstances** 22:15 23:21 25:3,5,17 26:11 30:18

**cited** 15:22 16:14 24:4 62:12,13 66:19

**city** 44:19 65:5

**claim** 22:14

**claiming** 22:7

**claims** 37:2 43:13 69:14

**clear** 18:21 20:16,23 31:24 37:2 69:13

**client's** 27:21

**climbing** 40:17

**close** 10:22 30:24 39:6 42:4 55:8

**closed** 30:22 69:21

**closer** 7:19 45:4,9 51:9

**closing** 7:7 43:15 53:1, 3,8,9 70:6

**cloth** 65:20

**combing** 70:2

**commercial** 41:20

**commingle** 7:1

**commingled** 46:11

**companies** 46:4

**company** 46:12

**comparable** 13:23

**compared** 51:10 67:19

**comparison** 12:6

56:13

**compel** 28:21 51:2,21

**competent** 19:6 34:21

**competing** 8:16,19 10:17 14:21 35:16 40:23 41:6 42:17 52:6 55:12,22,24 56:3,5,9

**complained** 13:5 33:23

**complaint** 32:11

**completed** 36:21

**complex** 54:10

**complexes** 22:13

**compromise** 42:19

**concept** 45:3

**concerns** 25:13 42:18

**concluded** 70:21

**concludes** 37:10 53:12

**condition** 65:1,6

**conditioner** 68:23

**conditioning** 58:5

**conduct** 9:16

**conducted** 38:18 39:1

**conformity** 67:25

**Congress** 19:21 45:20

**connected** 46:13

**connection** 6:15

**consent** 49:13

**consented** 39:20 40:1, 13 49:10,14

**considerably** 33:6

**consideration** 13:3 59:7

**considerations** 15:8

**considered** 9:13 12:20 38:14 39:20 40:21 48:23,24 54:12

**constitutes** 21:10

**construct** 39:13

**contact** 10:16 41:2 55:22 63:23

**contend** 49:12 58:15

**contending** 13:18

**contends** 40:5,10 43:11

**contention** 15:10,18 38:23 41:10 67:3,7

**contentious** 46:6

**context** 67:1

**continue** 29:15 50:5 61:21 67:20

**continued** 9:17,25

**continues** 11:10,21 14:4,7 17:12 30:3 59:18

**continuing** 14:8,17 16:8 39:16 42:5 59:4,12

**contract** 39:23 55:13 66:2

**contracted** 13:13 39:18 54:14

**contractors** 67:12

**contracts** 26:21 27:11

**contractual** 37:4 47:17 69:16

**controls** 34:7

**convey** 37:1

**copy** 37:16

**corners** 19:23 20:14

**Cort** 5:16

**cost** 12:6 26:2 31:5 39:7,24 42:5 57:4

**costs** 14:8 56:17,21 68:20

**council** 44:19

**counsel's** 58:9

**court** 5:3,4,12,17,21 6:2,6,10 7:18,25 8:3,25 9:12 10:6,7,13 11:1,7 12:8,12,20 13:20 15:9, 13,18 16:5,8,22 17:7, 15,22 18:2,5,19 19:6 20:9,19 21:4,11 22:2,3,

4,25 23:7 24:3,5,12 26:2 27:13 28:11,14,25 29:6,12,23 30:2,23 31:8,15 32:1,14,20 33:9,11 38:13,14 39:1, 19 40:7,9,20 41:11,18 42:12,14 43:10,13,21 44:6 46:10 47:3,21,25 48:12,13 49:15,17 50:7, 14 54:3,7,12 57:14,19 59:1,8,24,25 60:2 64:11,19,22 66:17,23 67:22 68:2 70:19,20

**court's** 10:25 20:8 21:8 30:1 38:2,6 40:14 48:9 59:7

**courthouse** 6:16

**courtroom** 53:18

**cover** 57:21 62:2

**covered** 14:19

**covers** 61:1

**create** 65:20

**creditor** 5:25

**Creek** 6:19 7:2,6,7 8:21 9:1 11:9,18 14:1 16:6 17:17 22:6 24:7 28:16 29:14 32:2,18 33:13 34:12 36:22 37:1,10 38:1,10 40:25 41:16 44:5 49:25 50:22 53:25 60:7

**criticisms** 8:12

**criticize** 46:7

**criticizing** 24:23

**cross** 6:23

**cross-apply** 53:17

**Cummings** 16:22

**curious** 8:9

**current** 19:1,25 34:23 39:12

**cut** 6:15

### D

**daily** 11:13

**Dallas** 10:10,24 19:11, 13 32:17 35:18 49:21 50:24 55:18 58:18 65:5

**Dallas-fort** 68:10

**Daniel** 5:24

**date** 9:12 10:6 29:2 35:9 41:3 52:5 53:3,8

**dated** 9:9 12:2 54:18,24 56:9,10

**dates** 53:9 70:7,12

**David** 5:25

**day** 30:6 60:22,23

**days** 14:22

**deal** 26:19 27:2,14 46:10

**dealing** 22:22 35:23

**deals** 27:10

**dear** 13:3 27:21

**debt** 26:13,20,22,25 27:3 28:20,24 29:2 60:20 61:8 62:2,8 63:1

**December** 9:1 10:11, 12,14 20:10,13 35:8 38:19 41:4,5 52:4,5 55:19,20 69:3

**decides** 51:22

**decisions** 58:10

**decrease** 10:4 66:21

**Deed** 12:22

**default** 11:17 29:7,12 42:8 43:12,18 55:5 59:10

**Defendant** 5:20 23:18 46:21 57:11

**Defendant's** 25:9

**defers** 43:13

**delay** 39:7

**deliberate** 70:7

**delta** 43:17

**demarcate** 21:20

**demarcation** 31:20

**demonstrate** 13:19 16:14

**demonstrated** 9:20 15:2 67:9

**denial** 16:3

**denied** 16:6

**deny** 20:9

**deprive** 30:13

**detailed** 48:5

**deteriorating** 36:1

**determine** 18:22 22:3

**developer** 40:12 49:8

**development** 40:4 44:16,21 52:10

**developments** 40:2 45:3 49:1,3,9 51:1

**deviate** 23:21,23

**difficult** 23:5 46:6

**diligence** 41:25 53:10

**dire** 64:25 65:6

**direct** 24:3 26:16 56:25 57:7

**directly** 32:3 67:10

**dis-interested** 18:20

**disclose** 14:14

**disclosed** 39:17

**discovered** 30:11

**discretion** 32:1

**discussed** 41:15 46:25 55:17

**disrupt** 20:20

**District** 17:3

**divested** 15:19

**doc** 68:9

**docket** 34:19 47:6 53:7 61:15

**Document** 32:15

**documents** 31:10,16 47:19

**dollars** 48:4 55:15 64:2 68:15

**drain** 57:20 67:17,19

**drawn** 45:1

**driving** 51:7

**drop** 34:5

**dropped** 12:9 26:1 68:11

**due** 41:25 61:23

**E**

**e-order** 47:6

**earlier** 34:18 53:25 62:11

**Edney** 5:19,21 17:16, 18,24 18:4,6 24:8,9,15 28:11,13 30:3,17 43:22 44:1,7 47:3 48:22 60:3, 10 64:19,21 66:16

**effort** 61:10

**efforts** 26:1 66:10

**elaborated** 21:18

**electric** 65:3

**elements** 37:19 48:11

**emergency** 16:4,6

**emotional** 36:16

**encounter** 70:4

**encumbrances** 37:3 69:14

**end** 6:21 27:5 36:5 48:17,25 53:13

**entered** 16:13 24:10 32:18 38:8 59:8

**entities** 34:5

**entitled** 43:11 59:12

**entitlement** 62:17

**entity** 38:23 54:9

**entry** 10:25 54:6

**equity** 30:1

**erode** 11:10 14:7 59:18 62:8

**erodes** 42:6

**eroding** 17:9 29:17 42:9 50:2 52:16 59:3

**erosion** 60:15

**essential** 66:14

**essentially** 15:19

**establishing** 62:17

**estate** 9:17,22 11:10 15:5 16:25 17:12 19:8, 11 23:1 25:11 26:6 30:24 32:10,16 33:6 34:19 35:25 36:9,20 39:5,7 40:12 45:11,18 50:1,2,10,23 52:20,22 55:9 59:13,16,23 63:20 64:8 66:22 68:10

**et al** 5:8 53:16

**event** 25:25 41:17 46:21

**evidence** 9:20 19:7,9, 14,24,25 20:7,11,12 32:21,24 33:4 34:16,17, 21 45:13 51:15,24 66:8 68:8

**evident** 14:2

**exact** 17:3

**exceeds** 12:18 58:20 67:17

**exceptional** 25:2,5,17 26:11 30:18

**exceptions** 60:18

**exercise** 25:25

**existence** 46:3

**existential** 63:1

**existing** 52:15

**expect** 52:10

**expected** 45:20 65:16

**expedited** 53:7

**expense** 55:10

**expenses** 14:17 50:3 57:22 58:10 61:1,7

**expensive** 31:12 58:6

**experience** 25:19

**experienced** 40:12 49:7 55:7

**exploration** 29:1

**explored** 27:16

**extent** 13:2 41:12 43:5, 10

**extract** 59:13,14

**extraordinary** 23:21

**F**

**faced** 36:7

**facility** 61:22

**facing** 68:22

**fact** 16:17 17:12 27:23 31:10 36:14,18 49:10, 14 62:6 64:9

**failed** 56:16 57:4 58:5

**fairly** 51:14

**fall** 18:8 45:12

**fallen** 10:1

**falling** 17:11

**favor** 48:7

**February** 54:13

**federal** 34:1

**feeling** 26:7

**FHC** 39:13

**fight** 66:4

**fighting** 59:19

**figure** 7:10 47:8

**Filburn** 33:24

**file** 42:17

**filed** 10:7 24:1 26:17 32:15 59:5

**filings** 11:8 53:6 54:8

**fill** 61:11

**final** 15:12 16:12,15,18 17:1,5 23:16 24:20 25:18 36:6 38:7 44:21 54:6 62:16 64:22

**finally** 27:18 32:11 67:3

**find** 34:12 35:6,16,20 36:13 50:17 61:15

**finding** 33:12 45:11

**findings** 48:17 50:15 53:12 68:3,5

**fine** 7:21 15:15 18:2,4,5

**fix** 20:7

**focus** 24:7

**focused** 21:9

**folks** 61:23,25 64:4

**follow** 9:17

**force** 27:10

**forced** 30:9

**foreclose** 59:6

**foremost** 20:19

**forever** 23:9 64:9

**fortune** 26:3

**forward** 17:25 19:6 31:15 44:18,20 45:14

**forwarded** 49:5

**free** 37:2 69:13

**fresh** 8:23 19:1 45:17

**Frisco** 6:19 7:3 28:17 37:14,19,21 38:11,14, 16 40:3 42:11 44:9,17 45:8 46:5,17 50:16 53:13 54:1 60:7 69:23 70:3

**front** 21:21 22:16 49:19 51:15

**FTC** 24:3

**Fu** 63:23

**full-throated** 49:9

**fully** 7:24 22:19 27:16 28:5 59:24

**fund** 26:9 36:24 52:19

**funds** 31:23 32:2 67:5

**fungible** 62:20

## G

**Gate** 6:19 7:3 28:17 37:14,19,22 38:11,15 44:9,17 46:5,17 50:16 53:13 54:1 60:7 69:24 70:3

**geez** 61:6

**general** 23:11 44:3,13 46:25 50:23 64:12

**generally** 9:18 23:13 33:21

**generate** 60:19

**generated** 25:10

**generating** 60:23 65:2, 8

**give** 23:3 64:8

**global** 15:7

**Godbey** 16:23

**Goldmark** 54:9

**good** 5:10,14 47:13 48:1 63:9 68:12

**Government** 26:4,5 61:24

**governs** 12:12 15:5 18:15 36:25

**grapple** 63:6

**great** 7:18 18:6

**greatest** 19:3 21:3 25:20

**ground** 25:7,8

**grow** 26:25 27:1

**guaranteed** 22:12

**guess** 8:5 33:16

## H

**habitable** 65:11,15

**half** 38:15,24 48:3

**hand** 8:18 68:14

**hands** 63:4

**happen** 26:24 45:22

**happened** 8:7,8

**happening** 45:9

**happy** 42:12 70:17

**hard** 6:13

**harms** 66:22

**hear** 8:9,14,15,18,22 17:16 47:12 60:3,14

**heard** 19:9 28:16,20 37:21 50:21 60:25

**hearing** 5:6 6:21,25 7:3 9:15 10:11,13 12:21 18:18 25:24 35:9,19 37:14,17 39:1 41:4 44:4 47:1 50:22 52:5 53:14 70:12,15

**heart** 27:21

**heat** 68:23

**held** 11:11 13:2 20:25 22:25 62:8

**high** 15:1 51:14

**higher** 8:17 13:20,25 29:21 51:20,22

**highest** 8:17

**highlight** 64:17

**highlighting** 44:8

**highly** 19:13 58:23

**highly-leveraged** 35:25

**hired** 13:10

**historical** 13:24

**Historically** 60:17

**HNG** 16:7

**hold** 43:17,18 62:15

**holding** 66:20

**holidays** 70:17

**home** 12:22 19:12 25:10 27:4 28:1 30:14

**homestead** 27:22

**Honor** 5:11,14,20 7:13 8:24 10:4 11:13 12:5,22

14:2 17:18,19 18:4,7 20:4 21:3,24 23:20 24:9,10,15,19 25:24 26:16 27:19 28:8,13 31:14 32:23 37:23 40:25 41:7 43:1 44:1 45:25 47:2,13 48:1,18 49:11,23 53:22 54:6 55:3 59:2 60:10 61:14 63:6 64:16,24 65:20 66:20 67:14

**Honor's** 20:21 26:19 46:7 63:19

**hopeful** 27:7

**horrible** 58:4

**Hospitality** 54:9

**hot** 52:9

**house** 11:23 27:24 30:4,7,11 36:12,17

**HUD** 22:12 31:6

**huge** 14:1

## I

**ideas** 44:25

**illegal** 41:10

**implication** 18:24

**important** 43:9 53:9 57:24

**imposition** 46:1

**improve** 65:14 66:10

**improved** 32:17 34:20 49:22

**improvement** 32:19

**inaccurate** 11:24

**inappropriate** 13:7 15:11 49:12

**inception** 64:25

**inclined** 41:18

**include** 37:6 69:18

**included** 10:15

**including** 10:23 14:12, 17 41:1

**income** 46:15 60:19,24 65:2,7

**incorporate** 17:22,24 37:24 38:5 41:15 46:24 53:23 60:5

**incorporating** 44:2

**increase** 32:24 45:7 57:18 58:19,24 66:11

**increased** 32:22,23 40:7,20 57:14 58:18

**increases** 58:22

**incredibly** 18:1

**indicating** 8:10

**indication** 34:24 40:19

**indicative** 13:21

**individual** 47:7

**individuals** 37:20

**information** 8:11,14, 22 10:16 41:2 55:22

**initial** 33:19 35:8

**injury** 57:24 58:2 66:14

**inquired** 56:4

**inquiries** 10:19 11:4 41:7 55:25

**instance** 14:8 17:13 29:10 30:1 31:2

**instances** 29:8,20 62:14 67:12

**instituted** 58:3

**instruction** 31:25

**insurance** 57:22 66:13 68:20,21

**insured** 57:23

**intend** 7:2

**intending** 42:21

**intent** 30:15

**intentional** 30:13

**interchangeable** 22:24

**interest** 9:24 11:11,19 14:7 15:5 16:25 17:11

SECURITIES & EXCHANGE COMMISSION vs THOMAS LYNCH BARTON
3:22-cv-2118-X                    December 14, 2023                    Index: interested..method

27:15 29:4,7,9,13,24 33:7 35:22 36:2,20 38:25 39:8 40:16 42:6,7 43:12 47:9,18 48:9 50:1 52:13,15,16,22 53:1 55:4,10 56:2 57:14,18 58:19 59:4,10,15,17,20,23 60:16 68:11,17,20,24 69:3

interested 11:3 48:6

interests 68:20

interim 55:7 57:13

intersection 21:6

investigation 9:16

investor 31:22 32:2 67:5,10

investors 35:4

invoking 27:14

involvement 31:12

issue 6:18 11:15 20:7 21:21 25:14 26:14 28:1 30:18 41:11 42:20 46:16,18 47:7,17,20 63:16 70:4

issues 15:14 21:5,6 22:5,19 27:15 28:5 41:19 43:24,25 44:8 46:9 52:25 60:12 69:24

J

January 16:5 39:2 48:4,25 54:19

JLL 54:22

job 25:3

John 6:4 48:2

Johnson 24:4

joint 36:23 37:5 69:10

Judge 16:22,23 17:2

judges 16:23

judgment 5:25 15:12 16:12,16,18 17:1,5 20:5 23:16 24:21 25:18 36:6 38:7 54:6 62:16 67:25

July 21:9

June 12:2 16:8

jurisdiction 15:19 16:9 21:12 22:8 46:4

K

Keefe 5:11

key 36:5 44:21

kind 44:21 65:2,7

Koonce 5:14,15,17 7:9, 13,22 8:24 15:17 17:15 28:21,22 33:11 37:18, 23 42:25 43:21 48:16, 18 50:14 53:20,22 60:2 64:22,23 68:2

L

land 38:16

law 16:20

lawsuit 58:1

lay 7:9 17:21 37:19

layout 8:21 43:25 53:21

leap 54:13

legal 22:5 28:5 64:13

lender 11:12 26:21 38:21 39:10 50:7 59:4, 11 65:24 66:4 68:1

lenders 17:9 29:5 50:4 59:11,19 63:21

lending 27:11

lengthier 41:21

letting 48:13

level 51:8,17

leveled 40:19

liability 23:15

lien 43:4,5,20

lienholders 37:4 69:15

liens 37:2 69:14

lift 59:5

lights 65:6 66:7

Likewise 38:5

limited 16:24 29:8 30:19,25

liquidate 62:16

liquidation 16:18,24

list 69:22

listed 12:25 30:12 36:15

listen 27:24

listening 6:12

listing 13:18,20

litigation 21:11,15 46:14

lived 27:24

LLC 6:5 36:24 69:11

loan 21:14 31:4,6 47:19

loans 22:10

location 14:3,14 41:3

lock 36:5

locks 30:11

long 63:21 66:1

lose 11:21 62:7

loses 35:5

losing 11:13,16 52:21

lost 50:9,10 55:9

lot 26:3,4 41:20 58:8

love 7:20 8:14,15,18 29:23 47:12

low 56:8

M

made 18:21 44:17,19 45:15 53:25 61:10 62:4, 22,25 63:7

magic 65:17

main 18:8 25:25

maintain 23:8 46:19 64:14 65:9 66:10,22

maintains 63:4

majeure 27:10

make 5:23 6:13 15:22 22:18 28:4 32:25 34:22 42:22 45:17 48:17 50:15 52:1,22 53:10 58:10 61:7 65:15 68:3,5 69:12

making 60:22

manage 58:9

managed 62:9

management 67:12

manager 65:14 66:6

managers 58:9

mandate 20:6

manner 63:3 67:6,7

mansion 14:2

March 44:14 48:24 61:11,16

Marigold 6:19 7:4 53:15,21 54:8 60:4,9 68:4 69:9,13

market 9:17,25 12:6 15:1 18:23,25 19:8,25 20:1 32:16 34:19 52:9

marketed 13:6,11

materials 36:10

math 67:8,9

matter 24:21 27:6,23 36:3

maturity 39:9

Mccormick 59:5,10,11 69:11

meaning 21:20

means 33:17 47:18

meantime 69:4

meet 25:23 35:15

mentioned 44:4

merit 27:17

Merry 70:14

method 56:13 57:1,2,7

**methodology** 46:10
67:14

**Michael** 5:19

**microphone** 7:19

**million** 11:5 12:11,17
14:13 32:25 35:11,12
38:22,24 39:6,23 43:17
48:4,21 50:18 51:8,12,
13,17 52:1,11 54:15,20,
23 55:1,14 56:16,19
57:3,8 58:21,25 64:2
67:18 68:6,15 69:6

**mind** 6:15 8:20 27:8

**mindful** 70:6

**mine-run** 62:13

**minimum** 29:4 36:1

**missing** 42:23

**mixed** 40:3 44:15,21

**moment** 46:8

**money** 22:24 25:13
31:14 34:23 38:25
59:19 60:22 62:7 64:1
65:15,17,18,20 66:11
67:14

**month** 11:16,17 29:16
42:9 52:16 55:5,6 57:23
60:23 67:20 68:21,22

**monthly** 11:18 55:3
68:20

**months** 45:15 61:1

**morning** 10:10,24
35:18 37:7 48:10 55:18

**mortgage** 32:4 66:3

**mortgages** 37:2 69:14

**motion** 9:22 10:8 11:14
13:9 16:4 20:10 24:5
32:14,15 36:21 59:5
61:16 69:8

**motions** 10:7 26:17

**move** 31:15 53:8

**moved** 35:9 52:5

**moving** 30:7,10 70:11

**multiple** 13:12 16:1

### N

**narrow** 33:22 34:8

**natural** 18:24

**NBC** 54:19 56:14,15,20
57:6,16

**nearby** 13:19 51:1

**necessarily** 25:20

**needed** 66:5,6

**negotiate** 65:5

**negotiation** 49:5

**negotiations** 39:16

**neighbor** 30:5

**net** 12:3 39:4

**News** 10:10,24 35:18
55:18

**night** 24:1 61:3

**non-default** 52:15

**nonetheless** 40:5
55:11

**nose** 24:12

**not-now** 45:24

**note** 25:12 27:19 34:22
36:13 41:17

**noted** 9:14 10:7

**notice** 8:4 10:10,14
11:1 30:5 35:7,17 41:1
52:3,6 53:6 55:18 68:25
69:2 70:11

**notices** 14:21

**November** 9:4,7,9
26:17 38:19 54:23,24
56:11

**number** 33:17

**numerous** 16:23

### O

**object** 14:5

**objected** 11:22 56:7

**objecting** 43:7

**objection** 9:20 13:24
23:11 30:21

**objections** 7:15,25
8:13 12:20 13:17 15:4
18:7,8 20:15 41:8 43:3
45:25 46:25

**objectives** 26:4

**obligates** 39:12

**obligation** 32:6 39:12,
15,17 42:2

**obligations** 31:1,3

**oblivion** 35:2

**obtain** 9:14 30:20
45:17

**obtained** 9:2,4 55:12

**occupying** 12:24

**occur** 53:3

**occurred** 58:2 66:15

**occurring** 9:24

**offer** 8:16,17 13:14
35:12,14 37:15 51:6,8,
10,12 52:2 68:14 69:7

**offered** 14:10 24:1

**offers** 8:19 11:3 13:12
14:5,21 35:17 40:23
41:6 52:6 55:13,22,24
56:3,5 69:4

**OFFICER** 5:3 70:20

**older** 11:25 57:12

**open** 27:8 53:5

**operating** 25:11 61:1,7

**operation** 60:20

**opinion** 9:3,6 21:9
31:20 54:21,25

**opinions** 21:17

**opportunity** 19:5,6

**oppose** 47:16 60:11

**opposition** 61:5

**option** 27:16 36:8

**options** 27:2

**oral** 27:25

**order** 7:5 8:5,9 10:25
15:10,20,24 20:21
21:12 24:6,24 31:5 34:5
37:6 38:4 43:4 54:4
59:7 69:18

**ordered** 24:15

**orders** 10:17 32:18

**original** 32:19 34:6
40:2,21 49:22 61:17

**originally** 8:25 10:11
13:9 39:2 52:4

**outcome** 21:1

**overcome** 63:8

**overruled** 12:21

**owed** 27:11 38:21,24

**owned** 54:8 63:24

**owner** 39:12

**owns** 34:7

### P

**p.m.** 70:21

**pages** 26:18

**paid** 26:5 42:18

**Palisades** 38:24 42:16,
18 43:14,23 47:5,20
48:2,3 53:2

**Palisades-tc** 6:5

**pandemic** 60:19 61:24

**panels** 64:2 67:11

**paper** 42:21,23 53:2,6
69:24,25 70:2

**papers** 16:14 25:12
44:9 46:8 48:5 64:6,18
66:20

**paragraph** 32:14 34:18
49:19 68:9

**park** 40:4 44:15

**parking** 39:11,13,14
42:1

**part** 19:13 41:24

**parties** 46:13

**parts** 20:18

**party** 39:15

**paste** 37:16

**Patrick** 6:8 47:14

**Patton** 6:4 48:1,2

**pay** 14:10 17:13 26:10 31:5,14,17 43:14 50:3 51:22 61:8 65:21 66:6 67:11,12

**paying** 37:3 61:23 64:4 65:3 69:15

**payment** 32:3 33:19

**payments** 46:12

**pending** 16:2 20:22 21:1 23:15 28:2 38:3 54:5 58:1 62:16

**people** 33:16 56:3

**percent** 8:17 29:14 35:14 39:9 51:10 55:5 57:13,17

**period** 41:25

**permanently** 28:6

**person** 51:21

**persons** 18:20

**pertains** 70:2

**phone** 6:13,14,15 26:2

**phrase** 21:16 31:22

**piece** 23:3

**pin** 28:3

**place** 23:15 31:6,9 45:6 61:12 62:15 63:9 66:12

**plaintiff** 23:17 62:17

**plans** 44:25 45:12

**plateauing** 19:16

**play** 28:5

**plot** 48:4

**podium** 7:20

**point** 18:21 32:13 37:8 48:22 50:6 69:19

**pointed** 19:17

**portion** 53:13

**position** 17:17 20:16 22:22

**possibility** 29:3

**possibly** 10:4 32:25

**post** 36:9

**posting** 35:17

**posture** 7:12

**potential** 22:8

**potentially** 21:13 68:22

**power** 20:7

**preclude** 15:4

**predicate** 33:15

**preference** 7:16 16:19

**preferential** 47:7

**prejudgment** 23:14 25:3 62:14 66:25

**prepared** 7:14,24

**present** 29:23

**presentation** 19:18

**presented** 22:5

**preserve** 30:14 35:2 59:16

**press** 59:12

**pressed** 65:25

**pressing** 17:10 50:4,5

**presumption** 23:22,25 63:8

**pretend** 6:21 37:12

**pretty** 25:2 31:24

**prevail** 27:6

**prevents** 61:17

**previous** 46:25

**previously** 15:14 34:13 65:8

**price** 11:5 12:17 13:13, 21 14:3 48:21 51:22 54:14 56:17 67:17

**prices** 10:1 13:18

**principal** 38:21

**prior** 21:17 25:18 37:17 60:6

**private** 18:14,17 19:22 45:21

**privilege** 31:9

**problem** 24:24

**procedures** 16:20

**proceed** 45:21

**proceedings** 60:7 70:21

**proceeds** 21:14 22:11 43:6,20 67:10

**process** 13:7,11 22:18 27:5 41:20,22 43:13 44:14,19 48:23 61:21 62:5

**programs** 61:24

**progressed** 51:5

**prohibited** 12:23

**project** 40:4 44:15

**projects** 40:6,8

**proof** 23:15

**proper** 64:13

**properties** 6:18 11:10, 15 13:18,23 16:24 17:7 20:21 21:5,14 27:2 31:7,22 32:7 46:4 50:6 59:3,13 62:24 65:23 66:18,21,23,24

**property** 5:7 7:8 9:5, 10,12 10:20 11:9,12,20 12:23,24 13:1,11 14:1, 5,9,12,18,22 17:11,14 18:21 19:2,11,15 20:24 21:10,13 22:6 23:3,15, 16 24:18,19 25:4 27:9, 17,19,20 29:18,20 30:12,15 31:2,19 32:4, 9,18,22 33:5,6,18,20 34:9,25 35:24 36:2,9, 22,25 37:2,11,14,20 38:1,12,15,17 39:11,14 40:18,20,25 41:20 42:6, 11 44:5,10,17 45:5,23

46:14,17,20,24 47:23 48:6 49:20,21,25 50:8, 9,23 51:22,23 52:14,17, 19,20 53:13,15,24 54:1, 8,13,16,19 55:3,14,16 56:6,18 57:3,5,19,23,25 58:11,16,17 59:3,5,22, 24 60:13,15,17 61:4 62:6,15,18,19,25 63:9, 16,20,24 64:5,8,11,18, 25 65:6,9,14,19,24 66:3,10,15 67:4,11,16, 20,21 68:1 69:9,24

**property's** 63:2

**proposal** 52:11

**proposed** 12:3 35:21 48:8 58:13

**proposition** 63:11,12

**propriety** 54:2

**protocol** 31:9

**provide** 31:11 58:15

**provided** 11:1 32:20 48:3 49:9 55:23

**providing** 44:21

**proving** 62:17

**provision** 66:3

**publication** 10:22 14:21 35:7 40:24

**publications** 10:15 55:23

**publicized** 40:3

**published** 10:10,14,24 14:23 41:1,4,5 52:4,7 55:18,19 56:1 68:25

**pulled** 62:1

**pulling** 61:21,22

**purchase** 38:25 67:11

**purchased** 63:21

**purpose** 23:13

**put** 7:10 19:5,6 21:23 23:19 28:3 36:4 45:13 53:6 56:18 64:2 65:18 70:3

**putting** 63:19

## Q

**quality**  13:25 67:4

**quandary**  14:6

**quarter**  64:2

**question**  23:24 24:17 50:25 61:4,19 65:1

**questionable**  67:13

**questions**  8:1 28:10 42:12 48:12,15 53:5 63:17 64:13,16,20 70:1, 9

**quo**  20:20 23:8 28:7 46:19 64:14

**quote**  63:13

## R

**raise**  21:4 46:9 63:16 64:12

**raised**  15:4,8 28:23 30:17 37:25 38:10 61:3

**raises**  12:19

**Rama**  36:24

**Ramolia**  6:1

**rate**  11:16,17,20 29:13, 15,21 39:9 42:7,8 43:12,18 47:17 52:15, 16 55:4,5 57:13,17 61:20

**rates**  9:24 17:11 40:16 57:14 58:19 68:11

**re-litigating**  24:13

**reach**  56:17,22

**reached**  57:9

**reaching**  21:13

**ready**  36:15

**real**  9:17,22 14:17 17:14 19:8,10 23:1 25:4 31:1 32:16 33:5 34:19 35:25 40:12 45:1,8,10 50:23 62:15,19 63:9 68:9

**reality**  45:4

**realty**  15:11 17:4

**reappraisals**  51:2

**reason**  34:22 61:13 63:10 69:6

**reasonableness** 45:19

**reasoning**  46:7 63:13

**reasons**  45:5 49:24 70:13

**reassess**  23:10

**rebuttable**  23:24

**received**  10:18 13:12 30:5

**receiver**  5:13,16 9:2,16 10:17 12:2 13:8,16 17:10 18:3,14 19:4,9, 10,17,23 20:14,22 21:1, 23 22:9 25:3,21,22 26:17 27:14 30:4,9 32:8,16 34:23 36:24 37:1 39:22 40:10 41:3 45:21 48:8 49:6,18 50:21 55:13 56:4 58:16 60:25 61:9,17,18 62:4, 12,22,23 63:5,7,13,20 65:13,16 66:9 67:22 68:8 69:11,12

**Receiver's**  9:21 12:9 13:1 14:6 20:6 23:25 26:1 30:15 34:17 36:10 39:22 55:21 56:8,10,14 57:10 58:8 63:4,12 69:8

**Receivers**  19:22

**receivership**  8:5,9 10:25 14:13 15:10,20, 24,25 21:12 24:6,10,16, 18,20,24 25:11 26:6,20 30:6 34:5 35:1,22 36:8, 20 38:4 41:10 46:2,3 47:9 52:14,20,22 54:4,9 55:9 57:20 58:2 59:7 62:14 64:1,8,12 68:18, 24

**receivership's**  45:18

**receiverships**  23:14 67:2

**receiving**  46:12

**recent**  58:14

**recess**  37:12 70:19

**recite**  43:4

**recited**  34:18 43:2

**recognize**  22:4

**reconsideration**  24:6

**record**  12:1 18:10,13 19:15,24 20:1 32:12 33:10 40:17 42:23 44:12 45:14 48:7 49:16 69:19 70:2

**recover**  39:10 43:11 59:17

**recovery**  39:5

**recurring**  68:19

**redundant**  18:1

**reed**  64:7

**refer**  30:3

**reference**  17:23,25 37:25 44:2 46:24 53:24 60:6

**referencing**  49:2

**reflection**  62:3,5,6

**reform**  26:21

**reforming**  29:3

**refuses**  14:14

**regard**  22:5,6 27:18 44:11,24 45:22,24 46:17 53:10 62:23,24 63:15,17

**regulation**  34:1

**relied**  13:24 50:22

**rely**  19:7 32:5 33:18 34:9,16,22 36:10 50:20, 22 68:13

**remainder**  32:10 52:19

**remaining**  43:5

**remind**  30:2

**renews**  13:17

**renovation**  56:17,21

57:4

**renovations**  57:9

**rent**  14:10 61:18,23 65:12

**rent-paying**  61:25

**rents**  66:1,3,5

**repayment**  31:4

**replaced**  62:1

**replacing**  61:24

**reply**  61:2

**reposted**  8:4

**represent**  5:25

**Republic**  6:9 38:22 42:16,20 43:3,11,23 47:4,14 53:1

**request**  30:10 53:15 55:22 59:25 70:3

**requested**  29:12

**require**  20:13 31:11

**required**  19:23 41:25

**requirements**  18:16, 18,19

**requires**  12:12,18 31:10

**reserving**  52:25

**reset**  10:13

**residence**  36:12,13

**residential**  12:7 41:21

**resolution**  64:15

**resolve**  36:5

**resolved**  23:9

**respect**  10:5 16:11 19:3 21:4 25:21 28:24 30:3 31:21 32:1,6,11,19 38:1,10,11 40:24 41:8, 21 42:11 44:3 49:20 53:25 54:1,2 56:6,23 58:1,17 59:9 66:12 67:3,5

**respectfully**  20:3 64:10

**response** 28:18 47:17

**rest** 22:20

**restructuring** 28:21

**results** 66:21

**return** 35:3 62:18

**returned** 20:25 23:17 27:5 46:20

**review** 31:10

**revised** 35:9

**Richardson** 54:11

**rise** 5:3 61:20 70:20

**rising** 9:23 33:7 68:11

**Rock** 6:18 7:2,6,7 8:21, 25 11:9,18 14:1 16:5 17:17 22:6 24:7 28:16 29:14 32:2,17 33:12 34:12 36:22 37:1,10 38:1,10 40:25 41:15 44:4 49:25 50:22 53:25 60:7

**roof** 64:3

**rooms** 61:11

**Rosenthal** 17:2

**rule** 15:23 53:2

**ruled** 15:13

**ruling** 42:21 48:9 63:19

**run** 63:3

**rundown** 57:5

**runs** 39:15

---

**S**

---

**safe** 63:4

**safeguard** 23:14 32:7, 9 62:15

**safeguarding** 62:18

**safekeeping** 21:1

**safer** 45:16 46:19

**safest** 28:2

**salaries** 64:4

**sale** 7:7 9:1,2,13 10:6,

15,21 11:4 12:13 13:1, 4,6 14:5,11,23 16:2,6 17:4,7 18:9,11,14,17 23:1 25:15,18 26:7 27:17 30:12 31:19 32:12,25 33:9 35:21 36:9,15,20,21 37:15 38:1,3,7,14 39:1,3,18, 20,23 40:2,8,9,14,21 41:1,9,18,23 42:3,4 43:6 45:21 47:8,16,23 48:6,8 49:10,20 50:12, 13 52:1,13,23,25 54:12 55:8,11,16,21 56:2 58:12,20 60:11,14 61:17 62:5 66:2,18,24 67:24 69:9,21

**sales** 5:7 9:22 10:9 11:2 12:6,17 13:7,11 16:9,12 17:20 19:22 25:10 26:8,15 30:21 33:5 41:20 44:3 45:25 48:20,23 54:3,14 56:12, 13 61:14 67:17

**satisfy** 30:25

**SBA** 22:10 31:4

**scheduling** 70:12

**Schurr** 6:8 47:13,14,25

**scope** 34:6

**seated** 5:5

**SEC** 5:8,9,11 21:23 25:21 53:16 63:25

**SEC's** 25:23,25

**section** 21:8 61:14

**secured** 11:11 29:5 37:3 59:20 69:15

**secures** 12:23

**SECURITY** 5:3 70:20

**seeking** 59:6

**seeks** 39:10

**seize** 64:7

**seizure** 27:9 28:1 30:4

**sell** 14:16 15:11 17:10 25:9 26:24 37:1 50:6 51:23 52:18 53:15 55:13 59:22,24 64:9 65:22 67:21 68:24

69:12

**selling** 13:21 14:3 27:2 49:25 59:16

**sending** 35:4

**separate** 25:14

**service** 26:14,20 28:20, 24 60:20 62:2,7 63:1 65:4

**set** 10:11 53:3 70:15

**settlement** 16:7

**settlements** 30:20

**shape** 65:11

**shifted** 25:7,8

**shoot** 51:16,25

**short-stay** 54:10

**show** 25:17

**showing** 25:6 62:22,25 63:7

**shown** 25:19 63:11,12

**shows** 33:5

**shut** 65:4

**sic** 12:4

**significant** 21:21 28:1 44:18,19 45:2,14,18 46:9,16,18 49:2

**significantly** 51:25

**similar** 27:13

**Similarly** 65:10

**simultaneously** 26:23

**single** 11:12

**sir** 6:2

**sitting** 7:15,18 60:22

**situation** 61:6

**six-month** 41:22

**skeptical** 19:22

**skepticism** 27:20

**slender** 64:7

**slow** 9:25

**slowed** 9:23 33:6

**solar** 64:2 67:11

**sold** 14:18 45:19

**solicited** 10:17

**solution** 14:6

**sort** 15:7

**sought** 19:13 25:9

**Southern** 17:2

**speak** 47:5

**speaking** 23:13 33:21 44:13

**specific** 8:1 41:2 44:9 46:23 49:18 60:13 70:4

**specifically** 15:23 38:10

**specifics** 42:10

**speed** 70:7

**spells** 37:7

**spend** 34:23 35:1 59:18

**spoke** 44:23 56:4

**sponsored** 22:13

**square** 19:23 20:14

**squelching** 29:3

**stale** 8:11,23 14:25 32:13 34:15 40:18 50:19

**staleness** 44:12

**stand** 7:11,20

**standard** 11:16,19 13:11 29:4,13,21 34:10 36:2 39:8 42:7 43:18 52:15 55:4

**standing** 7:20

**start** 6:22 53:14

**state** 19:10

**stated** 11:14 13:8 48:23 63:14

**status** 20:20 23:8 28:6 46:19 64:14

**statute** 6:25 12:11,18 18:15,22,24 19:21 35:13

**statutory** 20:6 35:15

**stay** 15:23,24 16:4,7 29:6,12 59:6

**stayed** 41:23

**staying** 29:8

**step** 44:19

**steps** 44:18 45:14

**stickler** 6:24

**stipulated** 67:25

**stipulation** 36:23 37:5 59:9 69:10,17

**stock** 22:23

**stood** 42:4 44:16

**stop** 29:24 30:10 52:1

**stopgap** 66:13

**strapped** 17:12

**strategy** 29:24

**streams** 46:15

**strict** 18:16

**strong** 16:19

**structure** 39:14

**Studios** 44:15,20,24

**subject** 13:3 21:10,15 46:14 63:22

**submitted** 9:19,22 11:9,23,24 12:1 13:10, 16,17 16:1 40:22 49:22 56:8,16,24 57:3,10,12 58:14 68:1

**substantially** 57:15

**subtract** 56:16 57:4

**subtracted** 56:21

**subtracting** 57:8

**successful** 46:22

**suffer** 42:5

**sufficient** 43:14

**suggest** 20:3 51:24 64:11

**suggesting** 11:4 24:23

**suggests** 32:22 33:2 42:19 51:16

**Suites** 6:19 7:4 53:15, 21 54:8 68:4 69:9,13

**summer** 58:4,7 68:22

**supervise** 58:10

**supplemented** 20:11

**support** 16:2 32:12 47:22 49:10

**supposed** 62:14 63:8

**swore** 14:12

**T**

**takes** 58:8

**talk** 8:6 15:15 26:13 37:13

**talked** 60:21

**talking** 7:6 26:8 62:11

**tangible** 45:1

**taxed** 26:6

**taxes** 14:8,9,10,18 17:14 31:2 36:2

**telling** 36:17 52:7

**tent** 24:13

**terms** 10:15 14:23 37:4 41:2 44:13 55:21 69:16

**test** 15:6

**testified** 32:16 58:17

**testimony** 9:21 49:17, 20 50:21 68:8

**Texas** 6:9 38:22 42:16, 20 43:3,10,23 47:4,14 53:1 58:4

**theme** 40:4 44:15

**theories** 21:25

**theory** 22:9,14

**thing** 17:3 35:6,20 52:8

**things** 14:19 17:13 19:8 20:5 22:23 23:1 26:25 28:23 33:17,25 34:11 60:8 64:17 70:16

**thinly-capitalized** 35:25

**Thomas** 5:16 7:11

**threat** 63:1

**threshold** 35:15 51:10, 19

**Tim** 5:15

**time** 10:20 13:16 21:22 22:18 23:10 30:9,12 35:18 38:14 39:4,7,19 40:1,9,15 41:3 49:3,13 51:4,5,6 58:8,9 59:22 60:12

**timeline** 10:5 40:24

**timelines** 8:6

**title** 18:16 37:1 69:13

**today** 26:9 33:4 38:22 55:17 60:21

**tomorrow** 37:7

**topic** 42:23

**total** 16:17

**touch** 28:20,22

**traced** 32:3 67:5,10,15

**tracing** 25:25 33:18 46:5,11 64:1 67:6,8

**transcript** 27:25 37:9 69:20

**transfer** 43:19

**transferred** 43:6

**trash** 65:4

**treat** 59:19

**treated** 10:8

**treatment** 47:7 59:9

**true** 15:21,22 29:19 50:2 56:23 66:19

**trust** 12:22 43:19

**turn** 6:21 18:12 19:23 20:14 53:4 66:5 69:23

**turnover** 66:1

**two-thirds** 12:13 33:1 35:13 51:17 58:25

**type** 26:11

**types** 35:24

**U**

**unable** 10:21 30:25 39:6 55:8

**unaware** 29:2

**uncommon** 67:1

**unconnected** 46:15

**under-secured** 50:8

**understand** 8:4 63:19 67:6

**Understood** 42:14

**undertake** 21:19

**undeveloped** 38:16

**unexpected** 31:2

**unique** 23:2 51:1 67:4

**units** 58:5 61:18 65:10, 15

**Universal** 40:4 44:14, 20,24

**unlike** 56:15 60:21

**unsuccessful** 28:4

**unwind** 23:5

**upheld** 29:10

**urge** 20:9

**urged** 39:21

**urging** 18:14 23:7 24:19

**USC** 12:12

**utilize** 56:25

**utilized** 56:13

**V**

**vacancy** 61:20

**valid** 15:4

**valuation** 56:7

**valued** 9:5,10 56:20 57:3

SECURITIES & EXCHANGE COMMISSION vs THOMAS LYNCH BARTON
3:22-cv-2118-X                          December 14, 2023                          Index: values..zoning

**values**  17:11 19:15 40:18 49:21 50:23 51:16 58:18 68:9

**vendor**  31:17

**ventilated**  22:19 28:6

**verified**  9:21 13:8 26:16 32:14

**versus**  5:8 17:4 24:3 53:16

**view**  25:16 33:22,23,24 34:8

**vis-a-vis**  47:18

**Y**

**y'all**  47:5 53:9 70:14

**y'all's**  70:12

**year**  9:25 10:2 11:24 13:10 19:15,19 20:1 34:20 54:13 56:20 68:7

**year-and-a-half**  20:1

**year-old**  19:7

**years**  56:9 63:25

**yeoman's**  25:22

**W**

**waiting**  37:8 42:4

**walked**  47:21

**Wall**  35:4 63:23

**wanted**  19:21

**wanting**  51:21

**warranted**  26:12

**warrantied**  60:15

**weeks**  13:12

**Wells**  5:15

**whatsoever**  10:19 11:4 66:9

**Whitaker**  33:24,25

**Whitaker-type**  34:3

**widely**  13:6

**wins**  35:4

**withdraw**  49:13

**word**  64:22

**words**  14:16

**work**  25:22 65:17

**worked**  64:4 65:13

**working**  70:11

**worth**  14:13 64:2 68:10

**written**  37:6 42:16 53:6 69:18

**wrong**  22:2 23:5

**Z**

**zone**  45:19

**zoning**  44:24