**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § § § | |
| *Plaintiff*, | § § | |
| v. | § § | No. 3:22-cv-2118-X |
| TIMOTHY BARTON, CARNEGIE DEVELOPMENT, LLC, WALL007, LLC, WALL009, LLC, WALL010, LLC, WALL011, LLC, WALL012, LLC, WALL016, LLC, WALL017, LLC, WALL018, LLC, WALL019, LLC, HAOQIANG FU (A/K/A MICHAEL FU), STEPHEN T. WALL, | § § § § § § § § § § § § § § | |
| *Defendants*, | § § | |
| DJD LAND PARTNERS, LLC, and LDG001, LLC, | § § § | |
| *Relief Defendants*. | § | |

## <u>RECEIVER'S SEVENTH STATUS REPORT (1Q24)</u>

Cortney C. Thomas, as the court-appointed Receiver in the above-referenced case, submits

the following quarterly status report for the First Quarter of 2024 pursuant to this Court's Order

Appointing Receiver [Dkt. 417] (the "Receivership Order" or "RO").

The Receiver previously filed his Initial Status Report [Dkt. 67], covering the period

October 18, 2022, through November 17, 2022; his Second Status Report [Dkt. 139], covering the

period November 18, 2022, through December 31, 2022; his Third Status Report [Dkt. 225],

covering the period January 1, 2023, through March 31, 2023; his Fourth Status Report [Dkt. 299],

<u>RECEIVER'S SEVENTH STATUS REPORT – PAGE 1</u>

covering the period April 1, 2023, through June 30, 2023, his Fifth Status Report [Dkt. 373], covering the period July 1, 2023, through September 30, 2023,[1] and his Sixth Status Report [Dkt. 456] covering the period October 1, 2023, through December 31, 2023. This Seventh Status Report provides an updated summary of the Receivership for the period spanning January 1, 2024, through March 31, 2024. Where possible, the Receiver has incorporated background and other information from prior status reports and previous briefing from this case to most cost-effectively summarize the activities of the Receivership from the prior Quarter.

Pursuant to the Receivership Order, the Receiver is directed to submit quarterly reports that contain the following information:

A.    A summary of the operations of the Receiver;

B.    A description of all known Receivership Property, including approximate or actual valuations, anticipated or proposed dispositions, and reasons for retaining assets where no disposition is intended;

C.    The amount of cash on hand, the amount and nature of accrued administrative expenses, and the amount of unencumbered funds in the estate;

D.    A schedule of all the Receiver's receipts and disbursements (attached as **Exhibit A** to the Quarterly Status Report), with one column for the quarterly period covered and a second column for the entire duration of the receivership;

E.    A description of liquidated and unliquidated claims held by the Receivership Estate, including the need for forensic and/or investigatory resources; approximate valuations of claims; and anticipated or proposed methods of enforcing such claims (including likelihood of success in; (i) reducing the claims to judgment; and, (ii) collecting such judgments);

F.    A list of all known creditors with their addresses and the amounts of their claims;

G.    The status of Creditor Claims Proceedings, after such proceedings have been commenced; and

H.    The Receiver's recommendations for a continuation or discontinuation of the receivership and the reasons for the recommendations."

---

[1] On September 5, 2023, the Receiver also filed a Declaration and Interim Report [Dkt. 308] at the Court's request.

RO at ¶ 59.

# I.
# SUMMARY OF THE OPERATIONS OF THE RECEIVER AND DESCRIPTION OF ALL KNOWN RECEIVERSHIP PROPERTY

As outlined below, considerable work was performed by the Receiver and his team during the First Quarter of 2024. This Section of the Quarterly Status Report includes (A) a summary of the SEC's allegations and the procedural posture of the case; (B) a summary of the Receiver's efforts to identify, sell, develop, hold, or otherwise dispose of real estate assets; (C) a summary of the Receiver's efforts to identify, sell, hold, or otherwise dispose of other property; (D) a summary of the efforts expended by the accountants engaged by the Receiver's counsel (the "Receiver's Accountants"), including an update on their forensic accounting; and (E) a summary of other Receivership Activities from the Quarter.

## A.    Summary of SEC Allegations and Status of Proceedings

### 1.    The SEC's Lawsuit

On September 23, 2022, the SEC filed its Complaint [Dkt. 1] against Defendants Timothy Barton ("Barton"), Carnegie Development, LLC ("Carnegie Development"), Wall007, LLC, Wall009, LLC, Wall010, LLC, Wall011, LLC, Wall012, LLC, Wall016, LLC, Wall017, LLC, Wall018, LLC, Wall019, LLC (collectively, the "Wall Entities"), Haoqiang Fu (a/k/a Michael Fu) ("Fu"), and Stephen T. Wall ("Wall" and together with Barton, Carnegie Development, the Wall Entities, and Fu, the "Defendants").

Among other things, the SEC alleges that between March 2017 and June 2019, Barton "raised approximately $26 million from over 100 investors . . . in unregistered, fraudulent securities offerings related to real-estate investments in Texas." Compl. ¶ 1. The SEC further alleges that Barton "partnered with Wall . . . and Fu . . . to offer and sell investment loans issued by" the Wall Entities. *Id.* ¶ 2. More specifically, the SEC alleges that Defendants promised that

funds raised by the Wall Entities would be used to purchase specific parcels of land at specific prices set forth in the offering materials, those parcels would then be developed by Barton into residential lots, and then Wall would build homes on the lots and sell them. *Id.* ¶ 3.

While the Wall Entities purportedly promised investors that they would receive their principal back in two years along with annual interest payments, the SEC contends that Defendants misappropriated nearly all of the investor funds and misused them to, among other things:

- pay personal expenses of Barton and his family, including credit card bills, rent, and to buy a plane;

- pay Fu undisclosed and unauthorized commissions and fees;

- make Ponzi payments to earlier investors (as well as other interest payments to investors using commingled funds);

- make political contributions;

- acquire properties not related to the offerings in the names of other Barton companies;

- acquire properties identified in a Wall offering but in the name of other Barton companies and using funds from a different Wall Entity;

- pay professional fees (such as engineering, surveying, and land development) related to, in most cases, properties unrelated to the offerings; and

- make payments to Wall.

*Id.* ¶¶ 3-5, 35. In the end, the SEC alleges that the Wall Entities "were left with little or no assets, the projects were not developed, and the investors were never paid back." *Id.* ¶ 5.

### 2. The Appointment of the Receiver

On September 26, 2022, the SEC filed a Motion for Appointment of Receiver [Dkt. 6], requesting that United States District Judge Brantley Starr appoint a federal equity receiver over the Wall Entities, Carnegie Development, certain Relief Defendants (DJD Land Partners, LLC and LDG001, LLC) and "[a]ny other entities that Barton directly or indirectly controls, including, but not limited to" BM318 LLC; D4DS LLC; D4FR LLC; D4KL LLC; Enoch Investments LLC; FHC

Acquisition LLC; Goldmark Hospitality LLC; JMJ Acquisitions LLC; JMJ Development LLC; JMJAV LLC; JMR100 LLC; Lajolla Construction Management LLC; Mansions Apartment Homes at Marine Creek LLC; MO 2999TC, LLC; Orchard Farms Village LLC; Villita Towers LLC; and 126 Villita LLC (collectively, the "Receivership Entities"). On October 17, 2022, Barton filed a Response [Dkt. 24] in opposition to the appointment of a Receiver. On October 18, 2022, the Court entered the Receivership Order [Dkt. 29] (the "Initial Receivership Order"), which appointed the undersigned to serve as Receiver over the Receivership Entities.

### 3.    Original Supplementation of the Receivership Order

The Receivership Order states that the Court assumed "exclusive jurisdiction and possession of the assets . . . of . . . any other entities that Defendant Timothy Barton directly or indirectly controls . . . ." RO ¶ 1. While several entities controlled by Defendant Barton are included in the Receivership Order, the Receiver quickly discovered from a review of formation binders in the Turtle Creek Office that over 100 entities controlled by Defendant Barton had not been specifically listed in the Receivership Order. Because certain banks and lenders had refused to follow the Receivership Order's mandates absent specific identification of certain companies as "Receivership Entities," on November 1, 2022, the Receiver filed a Motion to Supplement Order Appointing Receiver [Dkt. 41], asking the Court to supplement its Order to specifically list each of these entities. Defendant Barton opposed the motion [Dkt. 55], as did his son Maximilien Barton ("Max Barton") [Dkt. 53]. On November 16, 2022, the Court entered an Order Granting Receiver's Motion to Supplement Order Appointing Receiver [Dkt. 62] (the "First Supplemental Order") as to the vast majority of these entities and directed the Receiver to file supplemental briefing addressing certain Max Barton-related entities.

On November 30, 2022, the Receiver filed his Supplemental Brief in Support of the Motion to Supplement [Dkt. 73], asking the Court to specifically identify the following entities as

Receivership Entities because they were controlled by Defendant Barton: Gillespie Villas, LLC; Venus 59, LLC; TRTX Properties, LLC; MXBA, LLC; Titan Investments, LLC; TC Hall, LLC; and Titan 2022 Investment, LLC.  Defendant Barton filed a Response [Dkt. 81] opposed to the requests contained in the supplemental brief.  Max Barton similarly filed a Response [Dkt. 82] the same day opposed to the requested relief.  On December 13, 2022, the Court entered an Order Granting Receiver's Motion to Supplement Order Appointing Receiver [Dkt. 88] (the "Second Supplemental Order").

### 4.    Stay of the SEC Case and Barton's Attempts to Stay the Receivership

On November 2, 2022, the United States Department of Justice filed an Unopposed Motion to Intervene and to Stay Proceedings, whereby it sought to stay the SEC's civil enforcement lawsuit pending resolution of certain Defendants' criminal proceedings.  On November 16, 2022, the Court entered an Order Granting Motion to Intervene and Stay Proceedings [Dkt. 64], but ordered that "[n]othing in this Order shall preclude the Court-appointed Receiver from performing the duties and obligations, and from exercising the powers and rights, set forth in the Court's Order Appointing Receiver."

As detailed in the Receiver's Third Quarterly Report, Defendant Barton filed motions with both the District Court and the Fifth Circuit to stay the Receivership Order pending his appeal. These motions were both denied during the First Quarter of 2023.  Additional motions to stay were denied during the Second Quarter of 2023.

### 5.    Barton's Appeal of the Initial Receivership Order

On November 17, 2022, Defendant Barton filed a Notice of Appeal [Dkt. 66] concerning the Receivership Order, the First Supplemental Order, and other orders entered by the Court.  Case No. 22-11132.  The Fifth Circuit Court of Appeals heard oral argument on May 1, 2023, and on June 28, 2023, that court issued a published opinion that vacated the Receivership Order effective

90 days after the issuance of the Fifth Circuit's mandate and remanded back to the district court for further proceedings.  The Fifth Circuit issued its mandate on August 31, 2023.

The Fifth Circuit also suspended the Receiver's ability to sell or dispose of any property not previously approved by the Court; however, initially the court expressly authorized the Receiver to engage in "activities in furtherance of sales or dispositions of property that have already occurred or been approved by the district court."  The Fifth Circuit later modified its prior opinion and suspended the Receiver's ability to sell or dispose of any property, including those properties that the District Court had previously authorized the Receiver to sell.

### 6.    The SEC's Second Motion to Appoint Receiver

On July 5, 2023, the District Court entered an order noting the Fifth Circuit's remand for further proceedings and directing the SEC and Barton, in the interest of expediency, to meet and confer and inform the Court whether they would agree to proceed before a mandate issued from the Fifth Circuit.  On July 12, 2023, the SEC and Barton submitted a joint status report in which the SEC indicated that they were willing to proceed before the mandate issued, but Barton indicated that he was not willing to so proceed.  On July 16, 2023, the District Court entered an order (a) stating that because the parties did not consent to proceed before the mandate issues, the Court lacked jurisdiction to order the parties to proceed; (b) indicating that once the mandate issues, the Court intends to order the SEC to move for appointment of a receiver; and (c) noting that, consistent with the Fifth Circuit's opinion, the Court will require the SECs motion to (1) request appointment of a receiver under the factors set out in *Netsphere, Inc. v. Baron*, 703 F.3d 296, 305 (5th Cir. 2012); (2) request injunctive relief; and (3) provide a basis for the inclusion of entities in the receivership that complies with the Fifth Circuits standard, *i.e.*, that limits the receivership to entities that received or benefitted from assets traceable to Barton's alleged fraudulent activities that are the subject of this litigation."  Finally, the Court indicated that the

SEC's motion would be due within one week of the Fifth Circuit's mandate issuing and that it will set a briefing schedule after issuance of the mandate.

The Fifth Circuit's mandate issued on August 31, 2023. That same day, the District Court ordered [Dkt. 305] the SEC to move for entry of a new Receivership Order on or before September 7, 2023, with Barton's response due September 25, 2023, and the SEC's reply due October 5, 2023. The Court also directed [Dkt. 305] the Receiver to submit a declaration "providing all information obtained since his appointment that he believes is relevant to the Court's consideration of a proposed new receivership order, or anything else he believes will assist the Court or help inform the Court's deliberation on this matter."

The Receiver filed his Declaration and Interim Report [Dkt. 308][2] on September 5, 2023. As detailed more fully in the Declaration and Interim Report, the significant time and expense of preparing the Declaration and Interim Report were justified, among other things, because the filing was mandated by the District Court, complied with the Receiver's duties under the Receivership Order, and most importantly, gave the Receivership (and thus defrauded investors and creditors) the best chance to maximize and accurately identify the assets to be included in the Receivership Estate given the Receiver's extensive efforts during the first months of the Receivership.

The SEC filed its Motion for Appointment of a Receiver, for a Preliminary Injunction and Ancillary Relief, and to Lift Stay for Limited Purpose [Dkt. 309] (the "Second Motion to Appoint Receiver") on September 7, 2023. On September 27, 2023, the Court granted Barton's request for additional time to respond to the Second Motion to Appoint Receiver and set a hearing on the motion for October 11, 2023. Barton and interested parties Max Barton and Southern Properties

---

[2] The Receiver's Declaration and Interim Report, together with all prior Quarterly Status Reports of the Receiver, are hereby incorporated by reference as if fully set forth herein.

Capital, Ltd. ("SPC") all filed responses opposed to the SEC's Motion. The hearing occurred on October 11, 2023.

### 7. The Second Receivership Order

On November 29, 2023, the District Court entered several orders, including (1) its Memorandum Opinion and Order [Dkt. 416], which grants the SEC's Second Motion to Appoint Receiver as to 54 of the 82 entities included in the motion; (2) an Order Appointing Receiver (the "Second Receivership Order") [Dkt. 417], which re-appointed the undersigned to administer the Receivership Estate for the 54 entities; and (3) a Preliminary Injunction Order [Dkt. 418], which, among other things, freezes the assets of any other entity that Barton directly or indirectly controls, including almost all of the Initial Receivership Entities that were not included in the Second Receivership Order.

### 8. Approval of the Receiver's Blessing Motion

On October 27, 2023, the Receiver filed an Expedited Motion to Approve, Ratify, Adopt, and Otherwise "Bless" Previous Actions of Receiver and Orders Issued Prior to Effective Date of Vacatur of Initial Receivership Order [Dkt. 372] (the "Blessing Motion"). The purpose of the Blessing Motion was to preserve Receivership Estate Assets and prevent confusion in light of vacatur of the Initial Receivership Order and the anticipated entrance of a second receivership order. More specifically, the Blessing Motion asked the Court to ratify certain prior actions in order to minimize the costs related to performance of a new Receivership Order—for instance the necessity of filing amended Notices of Stay in each of the ancillary cases stayed in reliance on the Initial Receivership Order as well as many other similar tasks—and to foreclose Barton's ability to sue the Receiver individually[3] or otherwise seek to unwind sales, settlements, and other

---

[3] Barton had intimated this intent. *See* Dkt. 223 at 9; *SEC v. Barton*, Appeal No. 22-11132, ECF No. 113 at 7.

activities previously approved by the Court under the Initial Receivership Order.  Alternatively, in the event the Court decided not to enter a new Receivership Order, the Receiver requested a discharge and the related and incidental relief related to discharge.

On November 29, 2023, the District Court entered its Order Granting in Part Receiver's Blessing Motion [Dkt. 419] (the "Blessing Order"), which, among other things, (1) ratifies all activities undertaken by the Receiver and his retained professionals in good faith under the Initial Receivership Order (and provided immunity for such acts); (2) approved the carryover of accrued fees and expenses and authorized the Receiver to file one Final Accounting at the end of the Receivership; and (3) specifically ratified the following prior Orders:

- Orders Ratifying or Approving Agreements with DLP Capital [Dkt. 109] and HNGH Turtle Creek [Dkt. 236];

- Order Ratifying Agreement with Lumar Land and Cattle [Dkt. 163];

- Order Granting Motion for Order Governing Administration of the Receivership Estate [Dkt. 63];

- Order Declaring Lis Pendens Void (as included in the Order Approving the Sale of the Rock Creek Property) [Dkt. 104];

- Order Granting Motion to Compel and Establishing Privilege Protocol [Dkt. 235];

- Orders Granting Fee Petitions [Dkts. 195, 287]; and

- Order Approving Engagement Agreements [Dkt. 38].

9.    **Denial Without Prejudice of All Other Pending Motions**

On August 31, 2023, the District Court ordered [Dkt. 306] that all pending motions in the case as of August 31, 2023, were denied without prejudice and directed the parties to refile any such motions after the Court resolved the SEC's Second Motion to Appoint Receiver.  On

November 29, 2023, concurrent with issuing the Second Receivership Order, the District Court entered a similar Order [Dkt. 421].

### 10.    Barton's Appeal of the Second Receivership Order

On December 7, 2023, Defendant Barton filed an interlocutory appeal of the Memorandum Opinion and Order, the Second Receivership Order, the Preliminary Injunction and Freeze Order, and the Blessing Order. Fifth Circuit Case No. 23-11237.  On February 28, 2024, Barton filed a Motion to Consolidate Case Nos. 23-11237 and 24-10004 (discussed below).  The Motion was later granted, as were subsequent requests for extensions of time to file Barton's appellant's brief. As of the date of this Report, Barton's deadline to file his appellant's brief is May 7, 2024.

### 11.    Other Dismissed and Pending Appeals Relating to First Receivership Order

In addition to the main appeals of the Initial Receivership Order and the Second Receivership Order, Defendant Barton and others have filed appeals of other orders granting motions filed by the Receiver.[4]  These other appeals include the following:

On December 21, 2022, Defendant Barton filed a Notice of Appeal of the Rock Creek Sale Order.  Case No. 22-11226.  On June 19, 2023, the Fifth Circuit entered an Order dismissing the appeal.  On September 1, 2023, the Fifth Circuit withdrew its prior opinion and entered a new opinion that dismissed the appeal as moot.  The mandate issued on October 24, 2023.  This appeal is no longer pending, but, as discussed below, during the Fourth Quarter of 2023, Barton appealed the Second Rock Creek Sale Order. Case No. 24-10004.

On December 23, 2022, Defendant Barton filed a Notice of Appeal of the District Court's Order Granting the Receiver's Motion to Ratify Agreement with DLP Capital and Other DLP

---

[4]As discussed below, Barton opposed the Receiver's request that the appellate docket reflect the Receiver as an appellee or other real party in interest, despite the order on appeal having been issued based on the Receiver's motion. Accordingly, the Receiver has sought to be heard in those appeals as an amicus.

Entities.  Case No. 22-11242 (the "DLP Appeal").  The parties initially fully briefed the appeal.  While the case was tentatively scheduled for oral argument for the week of October 2, 2023, the Fifth Circuit notified the parties that the panel assigned to the case had determined that oral argument was not required for the case.  During the Fourth Quarter of 2023, the Fifth Circuit later directed the parties to submit supplemental briefing regarding the appeal.  On March 13, 2023, the Fifth Circuit dismissed the DLP Appeal as moot.

On January 12, 2023, Max Barton filed a Notice of Appeal of the Second Supplemental Order. Case No. 23-10046.  The parties fully briefed the appeal.  During the Fourth Quarter of 2023, the Fifth Circuit asked the parties for supplemental briefing, specifically on the question of whether the appeal should be dismissed as moot in light of the Second Receivership Order.  On January 3, 2024, the Fifth Circuit entered an unpublished opinion dismissing the appeal as moot.

On May 16, 2023, Defendant Barton filed a Notice of Appeal of the District Court's Sale Order approving the sale of the Amerigold Property.  Case No. 23-10515.  On July 17, 2023, the Fifth Circuit entered an Order dismissing the appeal.  On October 12, 2023, the Fifth Circuit withdrew its prior opinion and entered a new opinion that dismissed the appeal as moot.  The mandate issued on October 20, 2023.  This appeal is no longer pending, but, as discussed below, during the Fourth Quarter of 2023, Barton appealed the Second Amerigold Suites Sale Order. Case No. 24-10004.

On May 16, 2023, Defendant Barton also filed a Notice of Appeal of the District Court's Order Granting the Receiver's Motion to Approve Settlement Agreement with HNGH Turtle Creek, LLC.  Case No. 23-10516.  On July 17, 2023, the Fifth Circuit entered an Order dismissing this appeal as well.  On October 12, 2023, the Fifth Circuit withdrew its prior opinion and stated that the opposed motion to dismiss the appeal would instead be carried with the case.  As of the

RECEIVER'S SEVENTH STATUS REPORT – PAGE 12

filing of this Report, briefing in the appeal is ripe, and oral argument has not yet been set. The appeal and a variety of matters concerning 2999 Turtle Creek are discussed further below.

On June 21, 2023, Defendant Barton filed a pro se direct appeal to the Fifth Circuit from the 2999TC Acquisitions, LLC bankruptcy case. Case No. 23-10648. Counsel from two separate law firms later appeared on his behalf. While oral argument was initially set for February 7, 2024, the Fifth Circuit later determined that oral argument was not necessary in the case. On March 26, 2024, the Fifth Circuit dismissed Barton's appeal for lack of jurisdiction and taxed costs against Barton.

### 12. Barton's Appeal of Second Sale Orders

On December 29, 2023, Defendant Barton filed a Notice of Appeal of the Second Rock Creek Sale Order, the Second Frisco Gate Sale Order, and the Second Amerigold Suites Sale Order. Case No. 24-10004 (the "Second Sale Orders Appeal"). On February 28, 2024, the SEC filed a Motion to Dismiss this appeal, and Barton later responded. Barton also filed a motion to consolidate the appeal with his appeal of the Second Receivership Order. On March 18, 2024, the Fifth Circuit consolidated the two appeals. The Fifth Circuit has also decided to carry the SEC's motion to dismiss with the case. Barton's appellant's brief is due May 7, 2024. Until the appeal of the sale orders is dismissed, title companies have indicated that they will be unable to issue a title policy and close the transactions.

### 13. Status of Defendants Barton and Fu's Criminal Trial

On September 20, 2022, at the United States Department of Justice's request, a grand jury indicted Defendant Barton for wire fraud, conspiracy to commit wire fraud, and securities fraud. *See United States v. Barton, et al.*, No. 3:22-cr-352-K (N.D. Tex.). On October 13, 2022, Defendant Fu, rather than being similarly indicted, instead waived indictment and pleaded guilty to the sale of unregistered securities.

During the First Quarter of 2023, Defendant Barton sought and received a continuance of his criminal trial from May 8, 2023, to February 5, 2024. During the Fourth Quarter of 2023, Defendant Barton sought and received another continuance of this criminal trial, which is now set for September 9, 2024. Defendant Fu's sentencing has been rescheduled for October 30, 2024.

On December 12, 2023, the Department of Justice filed its First Superseding Indictment, which names Tim Barton, Stephen Wall, and Saskya Bedoya as co-defendants. The Court subsequently found that "in the interest of justice" all three co-defendants should be tried together. As of the date of this Report, the joint trial remains set for September 9, 2024.

**B.      Status of Receiver's Efforts to Sell, Develop, Hold or Otherwise Dispose of Real Estate.**

To-date, the overwhelming majority of the Receiver's time—and a substantial portion of his counsel's time, when not responding to Defendant Barton's filings—has been spent identifying real estate-related assets of the Receivership Entities, reaching out to lenders and other interested parties on each property, determining insurance, utility, tax, and other payments coming due on each of the properties, identifying and communicating with a host of potential purchasers of each of the properties, identifying brokers and other professionals willing to assist in the initial valuation and eventual sale of these properties, identifying appraisers who will be able to help carry out the mandates of 28 U.S.C. § 2001, and reviewing lien reports and title commitments on the properties.

As originally outlined in the Receiver's Initial Report and then further illustrated in every Report that followed, without exception, the real estate assets held by the Receivership Entities face significant challenges. All but one of the real property assets are heavily leveraged,[5] with some having favorable interest rates and others having abnormally high rates. Additionally, as to

---

[5] The one property that is not "heavily" leveraged—the Gillespie Property discussed below—still has a sizeable loan on the property ($500,000 loan compared to $1.1 million value).

the most valuable assets at one time owned by the Receivership Entities (2999 Turtle Creek and the HUD apartments described below), significant legal challenges have complicated potential dispositions of such properties, making recovery uncertain. Finally, as of the date of this Report, the economic environment remains uncertain and interest rates have remained at high levels.

Additionally, the Receivership has been cash-starved from the outset. These cash-flow issues still exist today—despite the Receiver's best efforts to increase liquidity and the District Court and Fifth Circuit's repeated denials of Barton's requested stays—because Barton's practice of appealing sale orders has caused title companies to refuse to issue title policies. For the majority of 2023, sales that would net over $4 million to the Receivership sat approved; to date, however, these sales still have not closed. Even worse, as outlined below, this delay and associated uncertainty have already caused the purchaser of the Amerigold Suites to walk away from the previously approved (and re-approved) sale. The market has changed markedly since last Spring, and even with a fully brokered process, the highest bidder in 2024 is paying hundreds of thousands of dollars less.

Stated differently, with every passing month, accruing interest collectively for all Receivership Assets is between approximately $170,000 (at standard interest rates) and $260,000 (at default interest rates). As a result, if the Receivership Estate does not sell any of the real estate assets (the freeze Barton has repeatedly insisted is appropriate here)[6], between $2 million and $3 million in interest alone accrues annually, further reducing the assets that may ultimately be available to defrauded investors and creditors. Looking at just the three property sales previously approved by the District Court and delayed by Barton's improper interlocutory appeals of sale

---

[6] Of note, while Barton's requested stays have been denied by the District Court and the Fifth Circuit, the effect of his improper appeals has had the practical effect of a stay.

orders, the monthly interest cost is between $40,791.92 (standard rates) and $91,533.66 (default rates)—meaning that as of April 30, 2024, using the original agreed, approved closing dates for each transaction, the delayed closing of just these three properties has already cost the Receivership Estate between roughly $600,000 (standard rates) and $1.3 million (default rates). Meanwhile, liquidity concerns have prevented the Receiver from servicing any of the outstanding debt, which in turn has led to multiple motions to lift stay filed by secured lenders. But for the automatic stay, given the significant debt on virtually all properties, significant foreclosures would have happened months ago on nearly every real estate asset of the Receivership.

Based on the information now known by the Receiver, the Receiver believes the following real estate assets may result in a net recovery for the receivership estate and provides an update to his proposed plan for the fair, reasonable, and efficient disposition of the properties:

### 1.    4107 Rock Creek Drive

As detailed in the Initial Status Report, while reviewing documents at the Turtle Creek Office, the Receiver's team discovered documents indicating loans and insurance payments on a property located at 4107 Rock Creek Drive in Dallas (the "Rock Creek Property"). Upon further examination, the Receiver determined that this property was owned by SF Rock Creek, LLC, a Receivership Entity controlled by Defendant Barton. *See* Dkt. 41 ¶¶ 6-7. Wall Investor Funds have been traced into the Rock Creek Property, and accordingly the Rock Creek Property is a Receivership Asset. *See* Mem. Op. and Order [Dkt. 416] at 13-14 & n. 63.

The Receiver obtained an initial opinion of value that the property is worth approximately $1.45 million. Because (1) the property was financed with a "house flipping loan" that included a high interest rate (9.99%), in addition to being saddled with continuing obligations to pay utilities, insurance, and taxes; (2) the Receivership faced a general dearth of liquid assets with which to administer its ongoing needs; and (3) the relative ease and efficiency in selling residential

properties versus commercial properties, the Receiver listed this property for sale as expeditiously as possible through a respected, independent broker during the first weeks of the Receivership.

After receiving several offers on the property, the Receiver ultimately agreed, subject to Court approval, to sell the Rock Creek Property "AS IS" to the potential purchaser with the highest offer for a total payment price of $1.4 million. In accordance with 28 U.S.C. § 2001 and the Court's Administration Order [Dkt. 63], the Receiver obtained three separate appraisals that resulted in an average appraised value of $1,393,333. The contracted sales price not only exceeded two-thirds of the average appraised value of the Property as required by 28 U.S.C. § 2001(b) but exceeded the average appraised value.

On December 2, 2022, the Receiver filed a Motion for Appointment of Appraisers, Approval of Appraisals of Rock Creek Property, and Setting Hearing Regarding Approval of Sale of Rock Creek Property [Dkt. 76], contending that the sale of the Rock Creek Property for $1.4 million was in the best interest of the Receivership. The Court set a hearing to consider approval of the sale for December 19, 2022. Barton filed a Response in opposition to the Receiver's proposed sale [Dkt. 91].

Shortly before the December 19 hearing, the title company assisting the Receiver with the sale of the Rock Creek Property notified the Receiver that on December 1, 2022—after the Receiver had discussed his efforts to sell the Rock Creek Property in his Initial Status Report and the same day that the Receiver's counsel conferred on the sale of the property—Defendant Barton recorded a lis pendens on the property. Because the title company was unwilling to issue a title policy with the existence of the lis pendens, the Receiver was forced to file an Emergency Motion to Declare Lis Pendens Void [Dkt. 96] on December 16, 2022.

At the December 19 hearing, which started at 10 am and concluded shortly before lunch, the Court found that the sale was in the best interest of the Receivership, giving the Receiver authority to complete the sale at the scheduled December 28 closing.  The Court also ordered Barton to pay for the Receiver's fees (totaling $1,200) in seeking to have the lis pendens declared void.

However, just hours after the conclusion of the hearing, Defendant Barton reached out to the purchaser (unsolicited and without permission from the Court or the Receiver) to notify the purchaser of purported past foundation and flooding issues Barton claims to have had with the property.  In light of Barton's communication, the purchaser requested an extension of the closing date.

Moreover, on December 21, 2022, Defendant Barton filed a Notice of Appeal of the Rock Creek Sale Order.  Case No. 22-11226.  The title company refused to issue a title policy while the appeal of the sale order was pending.  Because of the title company's unwillingness to close (and the fact that the motion to approve the sale was filed by the Receiver), the Receiver initially sought to intervene in the appeal, be treated as an appellee, or alternatively be treated as an amicus and submitted a motion to dismiss.  The Fifth Circuit denied the request to be treated as appellee or an intervenor, but granted the Receiver leave to file as an amicus.  During the Second Quarter of 2023, the Receiver sought leave to file a second amicus brief in response to arguments by Barton relating to tracing of funds into the Rock Creek Property.  This motion was opposed by Barton and denied. However, on June 19, 2022, the Fifth Circuit entered an Order dismissing the appeal based on the absence of jurisdiction.  On September 1, 2023, the Fifth Circuit withdrew its prior opinion and entered a new opinion that dismissed the appeal as moot in light of its opinion vacating the Initial Receivership Order.  The mandate in that appeal issued on October 24, 2023.

On November 1, 2023, the Receiver filed his Verified and Expedited Motion to Ratify [Dkt. 374] the Rock Creek Sale Order. In the Motion, the Receiver also sought permission to sell the property free and clear of all liens and to stay accrual of post-Receivership Default Rates of Interest. The Court ultimately construed the Rock Creek Ratification Motion as a new sale motion, re-appointed the Receiver's appraisers, and set a hearing on the Motion. The hearing was held on December 14, 2023. On December 15, 2023, the Court entered its Order approving the sale of the Rock Creek Property [Dkt. 437] (the "Second Rock Creek Sale Order"), determining that the sale of the property was still in the best interest of the Receivership.

In connection with the Rock Creek Ratification Motion, the Receiver and the lender on the Rock Creek Property, The Rama Fund, LLC ("Rama") entered a joint stipulation and agreed order, whereby the parties agreed that at closing, Rama would be paid the principal due under its note ($1,053,000) as well as all interest accrued under the Standard Interest Rate. The parties further agreed that any claims for amounts in excess of this amount (e.g., for default rate interest or attorneys' fees) can be submitted by Rama in connection with an eventual claims process, though the Receiver may object to the priority of any such claim.

On December 29, 2023, Barton filed an interlocutory appeal of the Second Rock Creek Sale Order (and two other sale orders). Fifth Circuit Case No. 24-10004. Because of Barton's improper interlocutory appeal of the Second Rock Creek Sale Order, the title company has indicated that it once again cannot issue a title policy until that appeal is dismissed (just as the first appeal was dismissed in 2023). While the Receiver anticipates that this appeal is likely to be dismissed by the Fifth Circuit as well, as of the date of this Report, the Fifth Circuit has decided to carry the pending motion to dismiss with the case.

In the months since the District Court's issuance of the First Rock Creek Sale Order, the Receiver and the Rock Creek purchaser have entered into several extensions of the closing date. Pending closing, the Rock Creek purchaser continues to rent the property subject to a long-term lease.

In the interim, the financial problems that plagued the Rock Creek Property from the outset persist. As stated in prior status reports, the Receiver has confirmed that the loan on the Rock Creek Property was not a traditional homeowner's loan. To the contrary, Defendant Barton agreed that during the term of the Loan, SF Rock Creek would "not occupy any portion of the Mortgaged Property in any manner" and that "persons with a direct or indirect ownership interest in [SF Rock Creek] shall not occupy any portion of the Mortgaged Property in any manner throughout the term of the loan." Interest continues to accrue daily. While the Receiver has leased the Rock Creek Property to the approved purchaser to salvage (hopefully) the sale, the lender has taken the position that all rent payments should go to the lender.

After payment of the principal balance of the existing loan ($1,053,000), interest at the standard rate (at least $159,940.60 as of April 30, 2024), 2024 taxes ($21,815.10), broker commissions ($84,000), and closing costs, the Receiver still anticipates net proceeds flowing into the Receivership Estate. However, given the continued uncertainty surrounding the closing date, it is still impossible to accurately predict the amount of funds that will flow into the Receivership Estate. Regardless, the funds flowing into the Receivership if closing occurs in 2024 will be considerably less than they otherwise would have been had closing occurred in December 2022 or January 2023.

### 2. Frisco Gate Property

Receivership Entity FHC Acquisitions, LLC is the record owner of approximately 4.5 acres at the corner of the Dallas North Tollway and John Hickman Parkway in Frisco (the "Frisco Gate

Property"). Wall Investor Funds have been traced into the Frisco Gate Property, and accordingly the Frisco Gate Property is a Receivership Asset. *See* Mem. Op. & Order [Dkt. 416] at 13-14 & n. 61.

Early in the Receivership, the Receiver obtained multiple broker's opinions of value for this property that generally estimated the property's value between $8.9MM and $10.8MM. Through a broker previously retained by Barton, and with Barton's cooperation, a potential purchaser of the Frisco Gate Property approached the Receiver about acquiring the Frisco Gate Property for $9,000,000. The parties entered a Letter of Intent on October 31, 2022. Between October 31 and December 13, 2022, the parties negotiated a purchase and sale agreement.

Pursuant to 28 U.S.C. § 2001, the Receiver sought three appraisals on the property—two broker opinions of value and one formal appraisal. The three appraisals valued the Property at $9,016,920 - $10,018,800, $8,896,365 - $9,884,850, and $9,000,000, respectively. After receiving the formal appraisal on December 16, 2022, the Receiver and his team prepared a Motion for Appointment of Appraisers, Approval of Appraisals, and a Hearing Regarding Approval of Sale of Frisco Gate Property [Dkt. 110], which was filed on December 22, 2022. Barton filed a Notice of Non-Opposition [Dkt. 123]. On January 31, 2023, the Court held a hearing to approve the sale of the Frisco Gate Property and entered an Order [Dkt. 142] approving the sale the same day.

Because of certain challenges regarding potential parking commitments on the property and obligations under certain master development agreements, on January 24, 2023, the Receiver and purchaser entered an Addendum to the purchase and sale agreement. The Addendum did not materially alter the agreement, but simply (1) extended the Feasibility Period defined in the Agreement by an additional 30 days, (2) extended the closing date in proportion to the Feasibility Period, and (3) made certain Earnest Money nonrefundable if specified conditions are met.

Pursuant to the Addendum, the Feasibility Period would end on February 13, 2023, with Closing set to occur on or before April 14, 2023. The Receiver and purchaser ultimately entered similar Second and Third Amendments that extended the Feasibility Period and Closing Date because the parking issues remained unresolved. Pursuant to a Fourth Amendment, the purchaser agreed to let the feasibility period expire, with closing set to occur in late September 2023. However, prior to the closing date, the purchaser indicated it would not be able to close in September, and the Fifth Circuit suspended any ability to close on the transaction prior to a new Receivership. Moreover, additional parking complications have arisen since the Fourth Amendment was entered.

On November 1, 2023, the Receiver filed his Verified and Expedited Motion to Ratify [Dkt. 376] the Frisco Gate Sale Order. In the Motion, the Receiver also sought permission to sell the property free and clear of all liens and to stay accrual of post-Receivership Default Rates of Interest. The Court ultimately construed the Frisco Gate Ratification Motion as a new sale motion, re-appointed the Receiver's appraisers, and set a hearing on the Motion. The hearing was held on December 14, 2023. On December 15, 2023, the Court entered its Order approving the sale of the Frisco Gate Property [Dkt. 438] (the "Second Frisco Gate Sale Order"), determining that the sale of the property was still in the best interest of the Receivership.

On January 8, 2024, the District Court entered a separate order regarding the Receiver's dispute with the lender on the Frisco Gate Property, Texas Republic Bank, finding that at closing, Texas Republic Bank would be paid the principal due under its note as well as all interest accrued under the Standard Interest Rate. The Court also found that Palisades' purchase money funds ($3,500,000) would be paid at closing as well. Any default interest, penalties, attorneys' fees, or other costs would be handled as part of an eventual claims process, though the Receiver may object to the priority of any such claim.

On December 29, 2023, despite previously *not objecting* to the sale and in fact originally bringing the sale to the Receiver's attention, Barton filed an interlocutory appeal of the Second Frisco Gate Sale Order (and two other sale orders). Fifth Circuit Case No. 24-10004. Because of Barton's improper interlocutory appeal of the Second Frisco Gate Sale Order, the title company has indicated that it once again cannot issue a title policy until that appeal is dismissed. While the Receiver anticipates that this appeal is likely to be dismissed by the Fifth Circuit as well, as of the date of this Report, the Fifth Circuit has decided to carry the pending motion to dismiss with the case.

The Receiver continues to believe that this sale is in the best interest of the Receivership because, among other things, it allows the Receiver to accomplish a sale of the property (a) without a listing process, (b) without having to pay any broker fees (the potential purchaser of the property has agreed to pay its broker separately and outside of the sale proceeds), and (c) with a purchaser who is willing to work through and take the risk of the various parking and master development issues. However, if the parking issues persist, the Receiver may be forced to take the property through a fully brokered process that accounts for the parking challenges.

After payment of the principal balance of the existing loan ($2,981,661.92), interest at the standard rate (at least $390,893.62 as of April 30, 2024), Palisades' purchase money of approximately $3.5 million, 2023 taxes ($174,883.28), 2024 taxes ($116,956.35), and closing costs, the Receiver anticipates this sale resulting in net proceeds of approximately $1.8 million into the Receivership Estate. However, continued delays caused by Barton's improper interlocutory appeal and the non-disclosed parking issues continue to decrease the equity ultimately available to the Receivership. As of the date of this Report, the Receiver is still uncertain whether and when closing will actually occur.

### 3.    2999 Turtle Creek

At one time, Receivership Entity 2999TC Acquisitions, LLC[7] was the owner of 2999 Turtle Creek Boulevard in Dallas (the "Turtle Creek Office"), having purchased the property in or around September of 2019.    In connection with this purchase, 2999TC Acquisitions, LLC or its predecessor secured a loan in the amount of $32,500,000.    Through protracted litigation in the bankruptcy court—and millions of dollars in payments from other Receivership Entities to the lender, HNGH Turtle Creek, LLC ("HNGH")—the Bankruptcy Court eventually entered an Order (the "Order Enforcing Agreed Orders") on September 28, 2022 that found, among other things, that HNGH, not 2999TC Acquisitions, LLC "owned" the Turtle Creek Office.    That Order was appealed shortly after it was entered, and the appeal, which was also with this Court, was automatically stayed upon the Receiver's October 18, 2022 appointment.

On November 25, 2022, HNGH filed a Motion to Intervene and to Confirm Ownership of Property Located at 2999 Turtle Creek Boulevard [Dkt. 69].    Among other things, HNGH claimed that the Bankruptcy Court's September 28 order confirmed that as of May 2022, HNGH owned the Turtle Creek Office.    The Receiver filed a Response [Dkt. 94] on December 15, 2022, in which he indicated that he was not opposed to HNGH's request to intervene as a party in interest but was opposed to HNGH's requested confirmation of any ownership interest in 2999 Turtle Creek and HNGH's implicit request to lift the stay of litigation imposed by the Receivership Order to permit resolution of the pending bankruptcy appeal.    Defendant Barton also filed a Response [Dkt. 97] opposed to HNGH's request.

---

[7] Wall Investor Funds have been traced into 2999TC Acquisitions, LLC, and accordingly 2999TC Acquisitions, LLC is a Receivership Entity.  *See* Mem. Op. & Order [Dkt. 416] at 20 & n. 100.

The Court ultimately granted [Dkt. 154] HNGH's motion to intervene but denied HNGH's request that the Court confirm ownership of the property. Instead, the Court ordered the parties to mediate the dispute and appointed Retired Bankruptcy Judge Harlin Hale as mediator. Mediation occurred on March 10, 2023.

As detailed more fully in the Receiver's Verified Motion to Approve Settlement Agreement with HNGH [Dkt. 210], the Receiver and HNGH settled their dispute as a result of the mediation. Pursuant to the terms of the Settlement Agreement, HNGH agreed to pay the Receiver a total of $2.5 million in the following intervals following the Court's approval of the Settlement Agreement: (i) $500,000 paid within seven days; (ii) $500,000 paid within one year; (iii) $750,000 paid within eighteen months; and (iv) $750,000 paid within two years (collectively, the "Settlement Payments").

The Receiver entered the Settlement Agreement and presented the Motion to the Court because the settlement with HNGH was in the best interest of the Receivership. More specifically,

(1)     After an extensive investigation, the Receiver determined that there were significant, potentially impossible hurdles to unwinding the bankruptcy court's prior Agreed Orders, the confirmed and effective Plan, and the Order Enforcing Agreed Orders. The Appeal would likely be unsuccessful, given the bankruptcy court's thoroughly examined factual record "in a hearing that lasted over fifty hours, stretched out over two months" and the requisite "clear error" standard of review for a bankruptcy court's findings of fact.

(2)     Even if the Receiver were to succeed on the Appeal—after an indefinite amount of time for the District Court's decision and then HNGH's inevitable appeal to the

Fifth Circuit—the likely amount due under the Loan Documents would far exceed the value of the Property and the likely selling price of the Property.

(3)     The Receiver contended that $3.95 million of the $4.735 million that the Receivership Entities paid to HNGH under the Loan Documents were arguably fraudulent transfers, although $3.8 million of that was paid in accordance with obligations incurred by 2999TC under the Agreed Orders (albeit by non-Debtor Receivership Entities), which obligations were incorporated into the confirmed and now-effective Plan, approved in the Bankruptcy Case. Even if the payments were made with actual or constructive fraudulent intent, the Receiver faced the significant hurdle of overcoming HNGH's good-faith defense because these payments were made by Receivership Entities on behalf of the Debtor pursuant to court orders. The substantial financial costs and delay of litigating these fraudulent transfer claims would only deplete the Receivership Estate with no guarantee of success. Consequently, the Receivership Estate's receipt of $2.5 million of potentially $3.95 million in fraudulent transfer amounts was a fair and equitable result.

The Court ultimately granted [Dkt. 236] the Motion to Approve Settlement Agreement with HNGH on May 15, 2023. On May 16, 2023, Defendant Barton filed a Notice of Appeal of the Court's Order approving the HNGH Settlement Agreement. Fifth Circuit Case No. 23-10516. On May 26, 2023, Barton separately filed a motion to stay with the Fifth Circuit that, among other things, sought a stay of the HNGH Settlement, including the Receiver's transfer of possession of the Turtle Creek Office to HNGH. On June 8 and June 9, 2023, the Fifth Circuit denied the motion to stay to the extent it sought to suspend the HNGH Settlement. On July 17, 2023, the Fifth Circuit

dismissed Barton's separate appeal of the Order approving the HNGH Settlement Agreement.  On October 12, 2023, the Fifth Circuit withdrew its prior opinion and stated that the opposed motion to dismiss the appeal would instead be carried with the case.  The Fifth Circuit separately required supplemental briefing from the parties.  As of the date of this Report, this appeal is still pending.

As of the date of this Report, certain ancillary matters in the Bankruptcy Court remain pending, with a status conference set for May 1, 2024.  The second $500,000 payment under the HNGH Settlement is due on or before May 15, 2024, with the remaining $1.5 million being paid over two payments thereafter.  HNGH has requested an extension of these payment obligations pending resolution of Barton's appeal of the Second Receivership Order and the Blessing Order; to date, the Receiver has opposed any such extension.

### 4.      HUD Apartments

Receivership Entities D4DS, LLC, D4FR, LLC, DRIN, LLC, and D4OP, LLC, are the record owners and HUD borrowers on four separate apartment complexes in Texas and Alabama (collectively, the "HUD Apartments").  These properties include Bellwether Ridge in DeSoto, Texas (owned by D4DS, LLC), the Parc at Windmill Farms in Forney, Texas (owned by D4FR, LLC), the Parc at Ingleside near Corpus Christi, Texas (owned by D4IN, LLC), and the Parc at Opelika in Alabama (owned by D4OP, LLC).  The HUD Apartments each received or benefitted from Wall Investor Funds, and accordingly the HUD Apartments are Receivership Assets.  *See* Mem. Op. & Order at 14-19.

Each of these properties was developed under (and is currently encumbered by) separate sizeable HUD loans administered through Greystone.  Third-Party Southern Properties Capital, Ltd. ("SPC") provided a smaller second loan for each of the properties.  SPC claims that its mezzanine loans were "convertible" in nature, whereby it had the option to convert its debt position into equity ownership of certain affiliated Receivership Entities and, indirectly, ownership of the

HUD Apartments. SPC further claims that as to the DeSoto, Forney, and Ingleside HUD Apartments, it exercised conversion options prior to the appointment of the Receiver.

During the First Quarter of 2023, the Receiver entered into contracts to sell the DeSoto and Forney HUD Apartments owned by D4DS and D4FR, respectively, and filed motions to approve these sales free and clear of SPC's purported "ownership" premised on the claimed conversion of its debt into equity. [Dkts. 161 & 164]. SPC responded that the Receiver had no right to sell the DeSoto and Forney HUD Apartments [Dkt. 178]. The Court ultimately continued the hearing on the Receiver's motions to sell these properties and ordered the Receiver and SPC to file summary judgment briefing on the issue of ownership of the HUD Apartments. The Receiver filed his motion for summary judgment on April 13, 2023 [Dkt. 207], and SPC filed its response on May 30, 2023 [Dkts. 246 &247]. The Receiver's deadline to file a reply brief was originally stayed in light of the Fifth Circuit's opinion regarding the Receivership Order, and the Court has since dismissed without prejudice all pending motions, including the sale motion and the motion for summary judgment. While the Receiver is optimistic that he will ultimately succeed on the question of ownership of the HUD Apartments, if SPC is successful in its challenge, the possibility exists that the Receivership Entities will not obtain any recovery on these properties.

As noted in prior Reports, Defendant Barton has suggested in various filings that the sale of one, two, or three of these properties would result in the recovery of sufficient funds to pay a 100% recovery to the Wall Investors. However, as the Receiver has detailed in prior filings, this position not only ignores SPC's arguments regarding its equity position in the properties, but, even assuming that SPC's loans are treated as debt, ignores the existing HUD and SPC debt. If SPC is determined to be the owner of the HUD Apartments, the Receivership will receive $0. If the Receivership Entities are the owners of these properties, the current best estimate net value to the

Receivership Estate would be between $15 million and $18 million;[8] a substantial amount, but still far less than the $26 million alleged in the SEC's complaint. Barton's suggestion also ignores the non-Wall creditors who would participate in the Receivership's eventual claims process, increasing total losses well in excess of $26 million.

Finally, at the hearing on the Motion to Approve the sale of the Amerigold Suites (discussed below), Barton indicated (through counsel) that contrary to prior assertions regarding the use of sale proceeds from these properties, Barton now contends he should receive the proceeds from the sale of any HUD Apartments rather than the Receivership Estate. Barton's change of heart was later confirmed by his challenges to the HUD Apartments (and other properties) being included in any new Receivership Order, as well as by argument at the hearing related to the Second Receivership Order.

Similar to prior Quarterly Reports, each of the HUD Apartments is dealt with in turn:

### a. Bellwether Ridge (DeSoto)

Receivership Entity D4DS, LLC is the record owner and HUD borrower on a certain apartment complex located at 841 S. Polk Street in DeSoto, Texas ("Bellwether Ridge"). In accordance with this Court's Orders and 28 U.S.C. § 2001, the Receiver obtained three independent appraisals of the Property. One is a certified appraisal, and two are informal broker opinions of value. The three appraisals value Bellwether Ridge at $28,000,000, $27,750,000 - $29,750,000, and $28,800,000 - $31,900,000 resulting in an average appraised value of $29,033,333.[9]

---

[8] Note that all values provided below are based upon opinions of value that the Receiver obtained in early 2023. As discussed elsewhere in this report, markets have changed considerably since that time. Moreover, while the HUD loan balances for each HUD property have decreased, such decrease likely will not be a 1:1 correlation, because the low-interest debt on the properties is actually accretive to the properties' value.

[9] On November 14, 2022, Defendant Barton filed an opinion of value—from an individual who is connected to Barton on at least one other transaction—that estimates the value of Bellwether Ridge to be between $26.7 million and $28.0

After the Receiver's appointment, he consulted multiple industry professionals and brokers regarding the potential value of the Property and three other similar projects (Parc at Windmill Farms in Forney, the Parc at Ingleside outside of Corpus Christi, and the Parc at Opelika in Alabama) that involve both HUD loans serviced by Greystone and additional loans from SPC to JMJ. Due to the uncertainty surrounding the outstanding dispute with SPC, the Receiver ultimately was unable to reach agreement to engage the brokers, who expressed unease in marketing the properties due to SPC's ownership claims.

Despite difficulties listing the Property with a broker, the Receiver communicated with dozens of potential interested purchasers. While most of the potential purchasers ultimately were unwilling to submit offers on the Property, the Receiver obtained multiple offers on the Property, the highest of which was a letter of intent submitted by Palmetto Capital Partners, LLC—on behalf of a joint venture (Polk Street 2023, LLC) between Palmetto and i3 Interests LLC (collectively, "Palmetto/i3")—on November 30, 2023 at a purchase price of $27,000,000.

During the following months, the Receiver and Palmetto/i3 engaged in protracted negotiations regarding the purchase and sale agreements for the Property and one other related property. During this time, the Receiver continued to communicate with other potential interested purchasers, none of whom provided higher offers than that received from Palmetto/i3. Finally, on February 21, 2023 the Receiver and Palmetto/i3 entered into a Purchase and Sale Agreement, whereby the Receiver agreed, subject to Court approval and certain other contingencies, to sell the Property to Palmetto/i3, which will assume the existing HUD loan, for a total of $27,000,000.[10]

---

million. [Dkt. 57 at 7]. As of January 1, 2024, the balance on the HUD loan for this property was $16,977,943. As of January 23, 2024, SPC claims that the balance of its second loan for this property remained $3,797,758.95.

[10] SPC's claimed ownership was a significant factor in the purchase price.

The Receiver remains hopeful, albeit increasingly pessimistic in light of the protracted and thorough summary judgment briefing, that he will be able to reach agreement with SPC to treat its loan as just that—a loan that will be paid at closing. Regardless of any ultimate agreement, SPC's claims to the proceeds from the sale of Bellwether Ridge can be administered through a claims process, where the adjudication of its claim to the proceeds from the sale of any HUD Apartment complex could range from treatment as an unsecured creditor, to the Court's determination that SPC is entitled to 100% of the sale proceeds.

As of the date of this Report, the contract for the sale of Bellwether Ridge remains pending, but the Sale Motion has been denied without prejudice. Pursuant to the parties' contract, because several months have passed since the execution of the agreement, either of the parties to the contract may terminate at any time. Once the issue of SPC's claimed ownership has been resolved, court approval for any sale will still be necessary pursuant to 28 U.S.C. § 2001. Assuming that SPC is ultimately treated as a lender, and if the Court approves the sale, after discounting the HUD loan balance ($16,977,943), the SPC loan balance ($3,797,758.95), and the fee to buyer's broker ($270,000), the sale would result in a net benefit of approximately $5.9 million to the Receivership Estate prior to other closing costs.

### b.    Parc at Windmill Farms (Forney)

Receivership Entity D4FR, LLC is the record owner and HUD borrower on a certain apartment complex located at 1003 Windmill Farms Blvd., Forney, TX 75126 ("Windmill Farms"). In accordance with this Court's Orders and 28 U.S.C. § 2001, the Receiver obtained three independent appraisals of Windmill Farms. One is a certified appraisal, and two are informal broker opinions of value. The three appraisals value Windmill Farms at $50,000,000, $52,000,000 - $56,000,000, $53,000,000 - $58,000,000 resulting in an average appraised value of $53,166,666.

Despite difficulties listing the Property with a broker (as outlined above), after communicating with dozens of potential interested purchasers, the Receiver ultimately entered into a Purchase and Sale Agreement with Palmetto/i3 whereby the Receiver agreed, subject to Court approval, to sell the Property to Palmetto/i3, which will assume the existing HUD loan, for a total of $51,000,000.

As of the date of this Report, the contract for the sale of Windmill Farms remains pending, but the Sale Motion has been denied without prejudice. Assuming that SPC is ultimately treated as a lender, and if the Court ultimately approves the sale, after discounting the Greystone loan balance ($33,883,539), the SPC loan balance ($7,885,547.12), and the fee to buyer's broker ($510,000), the sale will result in a net benefit of approximately $8.7 million to the Receivership Estate prior to other closing costs.

### c.      Parc at Ingleside (Corpus Christi area)

Receivership Entity D4IN, LLC is the record owner and HUD borrower on a certain apartment complex located at 2850 Ave. J, Ingleside, TX, 78362 ("Parc at Ingleside"). The Receiver is still gathering opinions of value and appraisal(s) on this property and anticipates discussing those in future status reports. To date, he has received opinions of value ranging between $28 million and $31.1 million. As of January 1, 2024, the balance on the HUD loan for this property was $23,623,821. As of January 23, 2024, SPC claims that the balance of its second loan for this property was $3,759,163.65. While the Receiver is hopeful that the value of this property compared to its loans will continue to increase in the coming months while the ownership dispute with SPC is resolved, the estimates above indicate that the sale of this property would result in the infusion of between $600,000 and $3.5 million into the Receivership Estate. However, the Receiver is optimistic that this property's value will increase over the coming months.

#### d.    Parc at Opelika (Alabama)

Receivership Entity D4OP, LLC is the record owner and HUD borrower on a certain apartment complex located at 1375 McCoy Street, Opelika, AL 36801 (the "Parc at Opelika). Construction on Opelika is complete and the rent stabilization process continues.  While the Receiver encountered multiple challenges that delayed final endorsement of the HUD loan on the property—including construction liens, interest payments that had to be made when draw requests were delayed, and ongoing challenges surrounding the Receiver's lack of access to QuickBooks and the Receivership Entities' digital files (as outlined below) and most recently Barton's refusal to sign cost certification documents—final endorsement of the HUD loan finally occurred during the Fourth Quarter of 2023.  As noted in prior Reports, pre-Receivership findings identified by auditors—regarding repayment of an SBA loan and repayment of monies sent to other Receivership Entities—have been cured.

Similar to Bellwether Ridge, Windmill Farms, and Ingleside, Opelika has both a HUD loan as well as additional funding from SPC.  As of November 27, 2023, the balance on the HUD loan for this property was $22,705,216.37.  As of January 23, 2024, SPC claims that the balance of its second loan for this property was $3,189,659.90.  SPC claims that while it has not yet converted its debt to equity, its convertible loan will allow it to do so in the future.  While the Receiver believes that Opelika presents significant value to the Receivership Estate, at this time it is impossible to predict what that value will be.

#### 5.    Amerigold Suites

Receivership Entity Goldmark Hospitality, LLC is the record owner of a 70-unit extended-stay hotel located at 13636 Goldmark Dr. in Dallas, Texas (the "Amerigold Suites").  Wall Investor Funds have been traced into the Amerigold Suites, and accordingly the Amerigold Suites is a Receivership Asset.  *See* Mem. Op. & Order [Dkt. 416] at 13-14 & n. 62.

While the HUD Apartments have third-party property managers, Goldmark Hospitality, LLC and other Receivership Entities coordinated with contractors to manage the Amerigold Suites. As discussed in his Initial Report, in the months prior to the institution of the Receivership, the Amerigold Suites had negative cashflow, in part because of a high number of vacant units and the generally poor condition of several units. Within days of the Receiver's appointment, he learned, among other things, that insurance on the property was on the verge of cancellation, that electricity was on the verge of being shut off, and that significant water bills were long overdue, even under a prior negotiated settlement. The Receiver was forced to expend scarce Receivership resources to preserve this asset and ensure that operations continued. Moreover, but–for the Receivership Order's automatic stay on foreclosure and other lender remedies, the lender, Texas Brand Bank, would likely have been entitled to foreclosure after the Receiver's appointment since insufficient assets existed (and continue to exist) to make mortgage payments (whether on this property or any of the other properties owned by the Initial Receivership Entities).

During the Fourth Quarter of 2022 and continuing into the First Quarter of 2023, the Receiver and his team were forced to expend considerable effort (1) convincing electrical and water utility companies not to shut off services to the property; (2) securing property and liability insurance despite the history of the property and the existence of the Receivership; (3) meeting with the property manager to discuss the ongoing maintenance and repair needs of the property; and (4) analyzing various options to maximize the value of the Amerigold Suites.

In December 2022, Texas Brand Bank sold the note secured by the Amerigold Suites to a third party. The Receiver is aware of at least one other smaller loan on the property, as well as a few other smaller liabilities.

During the First Quarter of 2024, the plaintiff in a personal injury lawsuit involving Amerigold—a lawsuit that has been stayed upon the Receiver's appointment—requested that the Court lift the stay in that proceeding in order to pursue settlement with the insurance carrier.[11] During the First Quarter of 2023, the Receiver was notified of a second potential personal injury claim that occurred because of a recent storm.  The insurance carrier has been notified of this incident, and the Receiver's investigation of the incident is ongoing.

During the Second Quarter of 2023, a City of Dallas fire inspector visited Amerigold and discovered a host of items that were out of compliance.  Over several weeks the Amerigold property manager resolved each of the findings in the inspection report and eventually received a clean bill of health from the fire inspector.  On or about July 6, 2023, a small fire occurred at the property.  The Dallas Fire Department was called to the property, and the fire was extinguished with minimal property damage.

During the Third and Fourth Quarters of 2023, the Texas heat took its toll on the unit's air conditioning units, resulting in significant repair costs.  Meanwhile, interest on the property has continued to accrue, the necessity for significant repairs have continued, property tax and insurance bills remain high, and the Receiver and his team are required to continue devoting significant attention to this property.  The majority of these challenges have been present from the outset of the Receivership.

During the First Quarter of 2024, Defendant Barton once again violated the Receivership Order and arrived unannounced at the Amerigold Suites to question its property manager.  The Receiver's counsel was subsequently forced to send Barton a cease and desist letter.

---

[11] In April 2024, the Court lifted the stay for the limited purpose of allowing a mediation to proceed between the plaintiff in that case and the insurance carrier.

In light of these challenges, and to avoid using limited receivership assets to continue operating the Property at a loss, the Receiver continues to believe that selling the Property is in the best interest of the Receivership Estate. After consulting multiple industry professionals and brokers regarding the Property's potential value, the Receiver engaged a broker to market the Property in late 2022 and early 2023.

The broker obtained multiple offers on the Property, the highest of which was a letter of intent submitted by Matthew Flume (the "First Amerigold Purchaser") on January 25, 2023 at a purchase price of $5,500,000. The First Amerigold Purchaser (and his affiliated entities) have extensive experience rehabilitating distressed multifamily assets.

The Receiver and the First Amerigold Purchaser engaged in negotiations regarding a purchase and sale agreement for the Property, and on March 1, 2023, the Receiver and the Buyer entered into a Purchase and Sale Agreement (the "Amerigold Contract"), pursuant to which the Receiver agreed, subject to Court approval, to sell the Property to the Amerigold Purchaser for $5,500,000.

In connection with the sale and pursuant to 28 U.S.C. § 2001, the Receiver obtained three independent appraisals of the Property. Two are informal broker opinions of value, and one is a certified appraisal (collectively, the "Appraisals"). The three Appraisals valued the Property at $4,400,000, $3,500,000, and $4,900,000 - $5,500,000, resulting in an average appraised value of $4,366,667.[12] Thus, the contracted sales price, $5,500,000, not only greatly exceeded two-thirds of the average appraised value of the Property ($2.9 million) as required by 28 U.S.C. § 2001, but also exceeds the average appraised value by over $1 million.

---

[12] The averaged appraised value was calculated using the average of the WDIS Broker Opinion of Value, $5,200,00.

On March 2, 2023, the Receiver filed his Verified Motion for Appointment of Appraisers, Approval of Appraisals, Approval Hearing, and Approval of Sale of Amerigold Suites [Dkt. 167] (the "Amerigold Sale Motion"). Barton objected to the sale [Dkt. 185]. On March 20, 2023, the Court held a hearing on the Amerigold Sale Motion, and, on March 29, 2023, entered an Order approving the sale [Dkt. 202].

On May 16, 2023, Defendant Barton filed a Notice of Appeal of the District Court's Sale Order approving the sale of the Amerigold Property. Case No. 23-10515. Similar to the Rock Creek Property, the title company refused to issue a title policy so long as the appeal of the sale order was pending. Because of the title company's unwillingness to close (and the fact that the motion to approve the sale was filed by the Receiver, not the SEC) and the particular issues outlined above prompting the expeditious sale of this property, the Receiver once again sought to intervene or be treated as appellee. The Fifth Circuit denied the request to be treated as appellee or an intervenor, instead inviting the Receiver to file an amicus brief. The SEC ultimately filed a motion to dismiss, and on July 17, 2023, the Fifth Circuit granted the motion and dismissed the appeal. On October 12, 2023, the Fifth Circuit withdrew its prior opinion and entered a new opinion that dismissed the appeal as moot in light of the separate Opinion vacating the Initial Receivership Order. The mandate issued on October 20, 2023.

On November 1, 2023, the Receiver filed his Verified and Expedited Motion to Ratify [Dkt. 378] the Amerigold Suites Sale Order. In the Motion, the Receiver also sought permission to sell the property free and clear of all liens and to stay accrual of post-Receivership Default Rates of Interest. The Court ultimately construed the Amerigold Suites Ratification Motion as a new sale motion, re-appointed the Receiver's appraisers, and set a hearing on the Motion. The hearing was held on December 14, 2023. On December 15, 2023, the Court entered its Order approving

the sale of the Amerigold Suites [Dkt. 436] (the "Second Amerigold Suites Sale Order"), determining that the sale of the property was still in the best interest of the Receivership.

In connection with the Amerigold Suites Ratification Motion, the Receiver and the lender on the Amerigold Suites, McCormick 101, LLC ("McCormick") entered a joint stipulation and agreed order, whereby the parties agreed that at closing, McCormick would be paid the principal due under its note ($2,481,098.27) as well as all interest accrued under the Standard Interest Rate. The parties further agreed that any claims for amounts in excess of this amount (e.g., for default rate interest or attorneys' fees) can be submitted by McCormick in connection with an eventual claims process, though the Receiver may object to the priority of any such claim.

On December 29, 2023, Barton filed an interlocutory appeal of the Second Amerigold Suites Sale Order (and two other sale orders). Fifth Circuit Case No. 24-10004. Because of Barton's improper interlocutory appeal of the Second Amerigold Suites Sale Order, the title company has indicated that it once again cannot issue a title policy until that appeal is dismissed (just as the first appeal was dismissed in 2023).

At the end of the Fourth Quarter of 2023, the First Amerigold Suites Purchaser indicated that it was no longer willing to close the transaction because of the continued uncertainty surrounding the transaction and what it believes is a much more buyer-friendly market today compared to when they first contracted to purchase the Amerigold Suites. Accordingly, the Receiver retained a broker to widely market the property and find a replacement purchaser. During the First Quarter of 2024, the broker spent significant efforts marketing the sale widely and soliciting bids. As will be detailed in forthcoming filings, the Receiver is currently finalizing a purchase and sale agreement with a replacement buyer. Unfortunately, however, the high bidder for the property has offered to pay $4.8 million, which is $700,000 less than the initial buyer.

After payment of the principal balance of the existing loan ($2,481,098.27), interest at the standard rate (approximately $247,430.07 as of April 30, 2024), broker commissions (approximately $190,000), and closing costs, the Receiver still anticipates net proceeds flowing into the Receivership Estate. If the sale to the First Amerigold Suites Purchaser had closed, the sale would have resulted in a net benefit of approximately $1.9 million to the Receivership Estate.[13]

### 6.    Venus Development

Prior to the Receiver's appointment, several Initial Receivership Entities were in the process of developing single-family communities around Venus, Texas and were negotiating a development agreement with the City of Venus. The properties included in this potential development, including the Initial Receivership Entity that currently owns the properties is detailed below:[14]

| Project Name | Current Owner | Approximate Address | CAD Geographic ID | Acres |
|---|---|---|---|---|
| Northstar | DJD Land Partners, LLC | 11417 CR 501, Venus, TX | 126.0857.00050 | 1 |
| Northstar | DJD Land Partners, LLC | 11417 CR 501, Venus, TX | 126.0857.00051 | 110.9 |
| Northstar | DJD Land Partners, LLC | 11417 CR 501, Venus, TX | 126.0857.00052 | 14.25 |
| Northstar | DJD Land Partners, LLC | 1025 N FM 157, Venus, TX | 126.0857.00030 | 1 |
| Northstar | Lynco Ventures, LLC | 1209 Cr 501, Venus, TX | 126.0358.00070 | 62.8 |

---

[13] Although not reflected in the title commitment or an independent review of the Dallas County property records, the Receiver has discovered a second loan for several hundred thousand dollars may encumber the Property. The Receiver will verify the status of the purported loan before closing. Even if the loan exists, the net to the Receivership Estate will likely be more than $2 million.

[14] Wall Investor Funds have been traced into each of the Venus properties outlined herein, and accordingly the Venus Properties are Receivership Assets. *See* Mem. Op. & Order [Dkt. 416] at 12-13 & nn. 54-57, 66.

| | | | | |
|---|---|---|---|---|
| Northstar | Lynco Ventures, LLC | 11209 Cr 501, Venus TX | 126.0358.00060 | 1 |
| Griffin I | LDG001, LLC | 980 CR 110, Venus, TX | 126.0093.00010 | 150.9 |
| Griffin II | LDG001, LLC | 324 W CR 109, Venus, TX | 126.0758.00100 | 46.9 |
| Griffin House | LDG001, LLC | 940 CR 110 Venus, TX | 126.0093.00009 | 1 |
| Berkowitz | Carnegie Development, LLC | 10901 CR 507, Venus, TX | 126.0261.00044 | 17.6 |
| Berkowitz | Carnegie Development, LLC | 10901 CR 507, Venus, TX | 126.0261.00039 | 86.9 |
| Berkowitz | Carnegie Development, LLC | 11129 CR 506, Venus, TX | 126.0261.00040 | 1 |
| Berkowitz | Carnegie Development, LLC | 11101 CR 506, Venus, TX | 126.0261.00041 | 30 |
| Berkowitz | Carnegie Development, LLC | 11129 N FM 157, Venus, TX | 126.0261.00042 | 30 |
| Berkowitz | Carnegie Development, LLC | 11129 N FM 157, Venus, TX | 126.0261.00043 | 30 |
| Johnston | Venus 59, LLC | 916 S Fm 157, Venus, TX | 126.0379.00110 | 3.4 |
| Johnston | Venus 59, LLC | 817 CR 214, Venus, TX | 126.0379.00040 | 59 |

At the time of the Receiver's appointment in October 2022, foreclosure proceedings initiated by secured lenders were in process regarding many of these properties. Those proceedings were automatically stayed upon entry of the Receivership Order, although the Receiver and his team had to expend effort to avoid scheduled foreclosure sales since not all lenders were aware of the stay included in the Receivership Order or even entry of the Receivership Order. Through the date of this Report, lenders on many of these properties have continued to

threaten (and some have actually filed) motions to intervene and lift the stay of enforcement to permit them to initiate foreclosure proceedings.[15]

Throughout 2023 and early 2024, the Receiver continued discussing the Venus Project with the representatives from the City of Venus, lenders and secured creditors, multiple developers who are potentially interested in developing the project, other potential interested purchasers of the land, and experts who have provided advice and opinions relating to the development. If the development agreements with the City are finalized, the value of the properties could increase significantly. However, as of the date of this Report, the Receiver remains unable to predict (1) whether the development agreements will ultimately be finalized with the City of Venus and (2) if the development agreements are finalized, what value will ultimately be realized by the Receivership Estate. Each of the properties associated with this development have significant debt (which debt collectively exceeds at least $11 million). The debt on certain properties exceeds the Receiver's independent appraisers' value of the property. While the Receiver has received cumulative offers to purchase the property that exceed the total debt, as of the date of this Report he has not yet found viable paths towards development. Thus, at this time, the Receiver still cannot determine if he will be able to recover any value for the Receivership Estate from the Venus Development or, if any net recoverable value exists, what that value will ultimately be. At this time, the Receiver does not expect significant recoveries for the Receivership under either path.

### 7. Ridgeview Addition

Receivership Entity Ridgeview Addition, LLC owns approximately 54 platted lots near Bulldog Road in Venus, Texas (the "Ridgeview Property"). Wall Investor Funds have been traced

---

[15] Another property (Venus Farms) was intended to be included in the development, but closing on the property never occurred.

into the Ridgeview Property, and accordingly the Ridgeview Property is a Receivership Asset. *See* Mem. Op. & Order [Dkt. 416] at 13 & n. 59.

On or around July 2021, Ridgeview Addition LLC entered into a Lot Take-Down Contract whereby it agreed to sell 54 developed lots to an affiliate of Lillian Homes at a price of $61,000 per lot (for a total purchase price of $3,294,000). The contract did not require conveyance of all lots at one time; rather twelve lots would be conveyed at closing, an additional twelve lots would be conveyed 120 days later, and three successive transfers of ten lots each would occur at 90 day intervals thereafter. All told, the contract contemplated that the take-down of the lots will occur over a thirteen-month period.

The Receiver is aware of one loan on Ridgeview Addition (to a separate SPC-related entity) and a second loan burdening the property, which is cross-collateralized (to a separate SPC-related entity). Collectively, these loans almost certainly exceed the value of the property. Moreover, the Receiver has discovered significant additional liens burdening the property that would require release or satisfaction prior to closing the Lot Take-Down Contract or other transfer of the lots. And finally, the City of Venus insists that Defendant Barton agreed to construct a playground at the development as part of a platting promise, but the playground has not yet been constructed. Thus, despite Defendant Barton's prior claim [Dkt. 56] that the sale of this property will bring in "approximately $265,000 in immediate cash equity" into the Receivership, significant challenges and uncertainties render predicting the net recovery, if any, based on the Lot Take-Down Contract impossible.

As of the date of this Report, it is uncertain whether the Receiver will be able to reach agreements with the lenders, the City of Venus, and Lillian Homes.

### 8. Gillespie Property

Receivership Entity Gillespie Villas, LLC owns a residential/multi-family property located at 3600 Gillespie Dr. in Dallas, Texas (the "Gillespie Property"). On December 13, 2022, the Court entered its Second Supplemental Order, which, among other things, confirmed that Gillespie Villas LLC is a Receivership Entity. Wall Investor Funds have been traced into the Gillespie Property, and accordingly the Gillespie Property is a Receivership Asset. *See* Mem. Op. & Order [Dkt. 416] at 13-14 & n. 64. Max Barton's appeal of the Second Supplemental Order has been dismissed as moot in light of the Second Receivership Order.

The Receiver has secured the necessary appraisals and opinions of value on the Gillespie Property, which on average value the property at approximately $1,100,000. The property remains in poor physical condition and without extensive repairs, is unrentable. During the First Quarter of 2024, the Receiver was forced to incur additional repair costs in order to fix roof leaks and otherwise comply with the institutions of Dallas Code Compliance Officers. The Gillespie Property is subject to a single promissory note, with an account balance exceeding $600,000, meaning if the property were to sell today, prior to closing costs and broker fees, it would result in a net benefit of approximately $500,000 to the Receivership.

### 9. Hall Property

Receivership Entity TC Hall, LLC owns approximately 0.5 acres of raw land located at 3407 & 3409 Hall Street in Dallas, Texas (the "Hall Property"). The Court's December 13, 2022, Second Supplemental Order clarified that TC Hall, LLC is a Receivership Entity controlled by Defendant Barton. Wall Investor Funds have been traced into the Hall Property, and accordingly the Hall Property is a Receivership Asset. *See* Mem. Op. & Order [Dkt. 416] at 13-14 & n. 65. Once again, Max Barton's appeal of the Second Supplemental Order was dismissed as moot in light of the Second Receivership Order.

Substantial debt exists on this property, in the form of a variable-rate loan from Louisiana National Bank. The most recent payoff statement received for the Hall Property shows a recurring balance of over $4.5 million as of April 29, 2024. During the Second Quarter of 2023, the Receiver's brokers listed the Hall Property for sale at a price of $6 million. In light of the Fifth Circuit's opinion, the Receiver's efforts to sell this property were paused until after the District Court entered the Second Receivership Order.

After the Second Receivership Order was entered, the Receiver's brokers redoubled their efforts in earnest. As will be detailed more fully in forthcoming filings, during the Fourth Quarter of 2023 and the First Quarter of 2024, the Receiver and his team have negotiated a purchase and sale agreement with a purchaser for $6 million. Prior to closing costs and broker fees, this sale would result in a net value to the Receivership Estate of approximately $1,500,000.

### 10.     Other Potential Real Estate Assets

As outlined further below and in the Receiver's original Motion to Compel (which was filed in January 2023 and granted during the Second Quarter of 2023), Defendant Barton still has not provided the overwhelming majority of the information required by the Initial Receivership Order, including a list of properties owned by the Receivership Entities. The Second Receivership Order contained the same requirements, and while Barton sought [Dkt. 424] and received [Dkt. 427] an extension of his deadline to comply with these requirements (including a list of assets), he did not provide any information before the deadline and still has not provided the requested information as of the date of this Report. While the Receiver has endeavored to identify separately all properties owned by the Receivership Entities, the Receiver has reason to believe other properties that received or benefitted from Wall Investor Funds and that are owned, either directly or indirectly, by Defendant Barton exist. The Receiver's investigation is ongoing.

C.    **Other Identified Assets of the Receivership.**

Although still subject to his on-going investigation, the Receiver believes the following assets may be additional sources of recovery for the receivership:

Artwork and other Contents of Turtle Creek Office.  The Turtle Creek office contained a large bronze casting of Michelangelo's Bacchus, along with other artwork and antiques.  During the early days of the Receivership, the Receiver was told by multiple individuals associated with Barton that more than $100,000 was paid for this sculpture and that an appraisal exists that indicates the sculpture is worth well in excess of that amount.  At one point, Defendant Barton and his lawyers suggested that the Receiver should liquidate this sculpture to help pay for administration of the Receivership.  However, Heritage Auctions has declined to assist the Receiver in selling this piece of art.  A professional art appraiser researched the bronze and estimates that its value at auction would likely be between $2,500 and $3,500.  The Receiver has contracted with a professional art and antiques auctioneer to sell this and certain other artwork and antiques from the Turtle Creek Office.  During the Second Quarter of 2023, these items were moved from the Turtle Creek Office to the auctioneer's warehouse.  During the First Quarter of 2024, the Receiver filed a notice of his intent to auction the artwork and antiques from the Turtle Creek Office (as well as certain Asian sculptures from the Rock Creek Property) [Dkts. 459, 483].  The Receiver anticipates this auction occurring during the Spring of 2024.

The remaining contents of the Turtle Creek Office were auctioned in May 2023.

Artwork at Rock Creek Property.  As discussed in the Initial Report, upon securing possession of the Rock Creek Property, the Receiver noticed several holes in the wall confirming, as he had been told, that artwork had been removed prior to his visit to the residence.  Despite multiple oral and written requests, for several weeks, Defendant Barton provided no list of artwork.  However, on November 15, Defendant Barton disclosed, perhaps inadvertently, pictures of some

of the artwork that had been removed.  *See* Dkt. 58 at 29, 30, 33, 35.  Additionally, the Receiver located financial statements indicating that Barton believed the Receivership Entities owned artwork worth approximately $12 million.  In January 2023, the Receiver filed a Motion to Compel [Dkt. 133] Barton to disclose this and other information in accordance with the Receivership Order.  Barton has claimed that very little artwork was in either the Rock Creek Property or the Turtle Creek Property.  *See* Dkt. 160-1 at 23.  Without additional information regarding these pieces of art and their current location, it is impossible to ascertain the value of any such art.

Contents of Rock Creek Property.  In connection with approving the sale of the Rock Creek Property, the Court ordered that the Receiver move and store personal items belonging to Defendant Barton "before the Property is sold."  Because closing had yet to occur pending Barton's appeal of the sale order, the contents of the Rock Creek Property remained on site for over a year. Because the Receiver determined that storage expenses would quickly erode the limited recoverable value, during the First Quarter of 2024, the Receiver allowed Barton to use the Receiver's selected mover to remove the vast majority of the contents of the Rock Creek Property (washer/dryer equipment remains at the property pending any eventual sale).

Vehicles.  The Receiver has identified multiple vehicles that may have been purchased in whole or in part with Receivership Assets.  The Receiver is still determining what ownership interest the Receivership Entities have in these vehicles.

Airplane.  Receivership Entity JMJAV, LLC is the registered owner of a 1982 Learjet 55 located in Arlington, Texas.  The Receiver has received information indicating Third Coast Bank, SSB holds an approximately $350,000 note on the plane, and Elite Jet Solutions, LLC holds a $143,576.63 mechanic's lien.  The Receiver was informed that the aircraft has been parked at Elite

Jet Solutions since 2019.  Elite Jet Solutions estimates the plane needs approximately $355,000 in parts and repairs to make it airworthy.

The Receiver estimates the plane is worth approximately $65,000 in its current condition, and if taken apart and selectively sold for parts, it could be worth as much as $200,000.  If the plane is operational, third-parties have informed the Receiver it may be worth approximately $900,000 - $1 million.  The Receiver's investigation of value and discussions with Elite Jet and Third Coast Bank are ongoing.

Participation Interests.  During the twelve months prior to the appointment of the Receiver (or longer in some instances), Receivership Entities AVG West, LLC, Orchard Farms Village, LLC, Mansions Apartment Homes at Marine Creek, LLC, D4KL, LLC, and 126 Villita, LLC (or their affiliates) sold properties in Fort Worth, Killeen, San Antonio, and Winter Haven, Florida. In connection with these sales, the Receivership Entities often (though not always) received millions of dollars in sale proceeds, while also retaining a participation interest in the projects moving forward.

For example, the following funds were among those paid to Receivership Entities surrounding the sales of developments at Marine Creek, Orchard Farms, and Winter Haven:

- $800,000 on March 14, 2022 to Mansions Apartment Homes at Marine Creek, LLC

- $500,000 on March 14, 2022 to Orchard Farms Village, LLC

- $200,000 on May 6, 2022 to Mansions Apartment Homes at Marine Creek, LLC

- $2,000,000 on May 9, 2022 to AVG West, LLC (Winter Haven)

Although the Receiver's accountants still have not completed their forensic accounting, it appears that the majority of the above-described funds flowed into a bank account held at Texas Brand Bank in the name of Receivership Entity Broadview Holdings LLC.[16]

Certain Receivership Entities maintained participation interests of varying percentages with regard to some but not all of the above-referenced property sales (e.g., the Receiver does not believe a participation agreement exists for AVG West, LLC). The Receiver is still investigating and analyzing potential value of participation interests related to the Killeen and San Antonio properties. While it is impossible to predict the value these contractual interests may ultimately generate for the Receivership Estate, the Receiver is optimistic that some value will be realized.

Ratification of DLP Settlement. As detailed more fully in the Receiver's Verified Motion to Ratify Agreement with DLP Capital and Other Entities [Dkt. 95], the Receivership Entities sold certain properties in Fort Worth (Orchard Farms and the Mansions at Marine Creek) and Florida (Winter Haven) to DLP Capital in late 2021. As part of these transactions, the Receivership Entities (1) received several million dollars over a period of months, (2) transferred title to the properties, and (3) as to each of the Fort Worth properties, entered into a Construction Agreement, a Development Agreement, and a Participation Agreement. On October 18, 2022, the same day that the Receiver was appointed, DLP Capital sent default notices to the Receivership Entities regarding their obligations under the Construction Agreement and Development Agreement. After a meeting between counsel and protracted settlement negotiations, the Receiver and DLP Capital eventually agreed to a mutual release of claims and a payment of $750,000 from DLP Capital to the Receivership. Although the Receivership Order specifies that the Receiver does not need Court

---

[16] A bank statement from September 2022 indicates that over $100,000 in Receivership Entity funds were transferred from the Broadview Holdings Account to Defendant Barton's law firms.

approval for such agreements, the Receiver nevertheless filed a Motion to Ratify the agreement. The Court entered an Order ratifying the DLP agreement [Dkt. 109] over Barton's objection, and also denied Barton's motion to stay the Receiver's performance of the DLP agreement.

Barton has filed an interlocutory appeal of this Order. Case No. 22-11242. As of the filing of this Report, briefing in the DLP appeal is fully ripe. While the case was tentatively scheduled for oral argument for the week of October 2, 2023, during the Fourth Quarter of 2023, the Fifth Circuit notified the parties that the panel assigned to the case had determined that oral argument was not required for the case. The Fifth Circuit later requested supplemental briefing before ultimately dismissing the appeal as moot.

Walker Ranch. As detailed in prior reports, the Receiver previously engaged in extensive negotiations with Byron Walker regarding the return of certain fraudulent transfers. The Receiver remains optimistic that he and Walker will be able to reach agreement, but is waiting on completion of the forensic accounting to conclude any such settlement.

### D.     Status of Forensic Accounting and Other Accounting Work

Although the Receiver assumed possession of all documents and computers belonging to the Receivership Entities housed in the Turtle Creek Office on the first day of the Receivership, completion of the forensic accounting has been delayed for a variety of reasons, including (1) Barton's refusal to assist in identifying the location of or responsible persons for the Receivership Entities' QuickBooks accounts; (2) Intuit's delays in providing access to the Receivership Entities' online QuickBooks accounts, which were finally made available during the Second Quarter of 2023; (3) the Receivership Entities' banks providing bank statements and debit and credit information inconsistently and slowly; (4) the general lack of operating cash during the first months of the Receivership; (5) a temporary change in focus for the forensic accounting during the Summer and Fall of 2023 from its primary focus—determining potential fraudulent transferees

and identifying each Wall Investor and the size of their investment(s)—to a focus, in light of the Fifth Circuit's opinion, on finding tracing examples where Wall Investor Funds eventually flowed into the various assets described above; and (6) the Receiver's continued non-payment of his accountants and lawyers for time incurred since April 10, 2023.

The Receiver's counsel has retained Ahuja & Clark to prepare the forensic accounting, which when complete should enable tracing (1) the amount of funds flowing from each Wall-entity investor into other Receivership Entities and (2) potentially, the use of those investor funds (*i.e.*, whether they were saved, spent, or transferred to someone else).  As discussed in prior reports, however, the accountants have observed *extensive* comingling between various Receivership Entity funds and accounts, thereby complicating the process exponentially.  This forensic accounting is of paramount importance to the Receiver's duties in analyzing claims received from investors, identifying potential targets of fraudulent transfer claims, and determining the amounts owing to the Receivership on account of such claims.  It is also of particular importance in performing any sort of tracing analysis into the various Receivership Entities and assets.  During the First Quarter of 2024, the Receiver's accountants continued their work on the forensic accounting and continued identifying potential fraudulent transfers (albeit in a more limited fashion).  As of the date of this Report, the forensic accounting is still ongoing.

The Receiver remains hopeful that the online QuickBooks accounts, as well as certain Enterprise versions of QuickBooks, will enable his accounting team to avoid some of the time and expense associated with manually entering transactions from bank statements.  However, as the Receiver's accountants have slowly gained access to the Receivership Entities' various QuickBooks accounts, they have determined that the most accurate means of confirming the data in QuickBooks is electronically scanning bank records and comparing them against any

QuickBooks accounts that have been located. This process is costly and ongoing. During the First Quarter of 2024, the Receiver and his accountants also began an initial review of certain credit card statements (which also had to be scanned and converted to a usable format).

Separately, during the First Quarter of 2024, the Receiver's Accountants continued to spend significant time preparing various tax filings associated with the Receivership. After entrance of the Second Receivership Order, the Receiver and his Accountants began analyzing the impact of the new Receivership Order on the Receiver's tax obligations.

**E.     Other First Quarter 2024 Activities of the Receiver.**

Between January 1, 2024, and March 31, 2024, the Receiver and his attorneys also engaged in the following:

Maintenance of Receivership Website. During the First Quarter of 2024, the Receiver maintained www.bartonreceivership.com (the "Receivership Website"). The Receivership Website enables the Receiver to quickly, inexpensively, and broadly convey information regarding the Receivership, particularly to potentially impacted investors who live overseas. The Receiver continues to update the Receivership Website periodically as the Receivership progresses. The Receiver will post a copy of this Report on the Website and intends to continue posting periodic updates, information and links to any potential sales or auctions of real estate or other property.

Freeze Letters and Requests for Information. The Receiver and his attorneys continued to send freeze letters and requests for information to banks, creditors, and others as they became aware of additional persons who conducted business with the Receivership Entities.

Mail. The Receiver and his team have continued to review the substantial amount of mail received by the Receivership Entities, both at a UPS Store and from other forwarded addresses.

Other Miscellaneous Activities. Among other things, the Receiver and his team have also continued (1) securing access to the Receivership Entities' bank records, (2) communicating with

interested parties, potential purchasers of assets, litigation counter-parties, former employees, attorneys, creditors, and others and (3) identifying potential third-party claims and other sources of recovery.

## II.
## AMOUNT OF CASH ON HAND AND ACCRUED ADMINISTRATIVE EXPENSES, INCLUDING FIRST QUARTER RECEIPTS AND DISBURSEMENTS

During the initial 30 days of the Receivership, the Receiver opened bank accounts for the Receivership Estate at Veritex Bank in order to administer the receipt and disposition of monies in the Receivership. Additionally, because of the continued operations of the Amerigold Suites, the Receiver continued to maintain an accounts at Veritex Bank.[17]

As reflected more fully in the schedule of the Receiver's receipts and disbursements that is attached hereto as Exhibit A,[18] during the First Quarter of 2024, the Receiver deposited $70,557.79 into the Receivership Estate and also received rental income from the Amerigold Suites totaling $231,233.80. Total expenses during the First Quarter of 2024 were $340,679.77.

As of the end of the First Quarter of 2024, the balance held in the receivership bank accounts is $656,897.97.[19]

As of March 31, 2024, other than the outstanding property taxes referenced above, the only accrued and unpaid administrative expenses are fees and expenses incurred by the Receiver and his professionals for work performed during the Second, Third, Fourth Quarters of 2023 and the

---

[17] During the Fourth Quarter of 2023, the Receiver moved the Amerigold Suites accounts from Vista Bank to Veritex Bank at Vista's insistence.

[18] Included in Exhibit A are (1) the Standardized Fund Accounting Report ("SFAR") required by the Court, (2) an itemized list of receipts and disbursements to date in the Receivership accounts at Veritex Bank, (3) an itemized list of receipts and disbursements to date in the Amerigold Suites accounts; and (4) an itemized list of receipt and disbursements to date in the D4OP LLC account.

[19] Of the total deposits into the main Receivership bank account, $60,000 are funds related to the Walker Ranch transaction discussed above, and $400,192.49 related to funds held in the name of D4OP LLC that are currently unavailable to the other Receivership Entities.

First Quarter of 2024.  Given the length of time (April 1, 2023 to the present) since payment of the Receiver and his professionals' fees, combined with the large amount of work that has been required to maintain the receivership, these outstanding liabilities are extensive.

**A.      Description of Recoveries from First Quarter of 2024**

**1.      Deposits into Veritex Accounts (Main Receivership Accounts)**

The Receiver's deposits between January 1, 2024, and March 31, 2024, were comprised of the following:

Interest Deposits.  During the First Quarter of 2024, the Receiver received a total of $733.09 in interest payments.

Other Miscellaneous Deposits.  During the First Quarter of 2024, the Receiver also deposited $7,770.00 from Defendant Tim Barton as pre-payment of the Rock Creek personal property moving expenses and $25.00 from Capital One related to a refund.

**2.      Deposits into Vista and Veritex Accounts (Amerigold Suites)**

Between January 1, 2024, and March 31, 2024, the Amerigold Suites generated $231,233.80 in gross rental income.

**3.      Deposits into additional Veritex Account (D4OP LLC)**

Between January 1, 2024, and March 31, 2024, the Receiver deposited $62,762.79 related to final endorsement of the Opelika loan.  As discussed above, these funds are held in the name of D4OP LLC that are currently unavailable to the other Receivership Entities.

**B.      Description of Disbursements from First Quarter of 2024**

**1.      Disbursements from Veritex Accounts (Main Receivership Accounts)**

Between January 1, 2024, and March 31, 2024, the Receivership spent $75,623.72 on general Receivership (*i.e.*, non-Amerigold) expenses, comprised of the following:

Utility Fees.  The Receiver paid $44.03 to Dallas Water Utilities related to water and sewage at Gillespie during the Quarter.

Landscaping.  During the First Quarter of 2024, the Receiver paid $1,000 to landscapers related to mowing at the Gillespie, Hall, Frisco, and Ridgeview Properties.

Taxes.  During the First Quarter of 2024, the Receiver paid $50,019.69 related to property taxes for certain of the properties listed above.

Insurance.  During the First Quarter of 2024, the Receiver paid $1,125.34 related to insurance for the Gillespie Property.

IT Expenses.  Because the Receiver has been unable to pay his professionals for any time spent on this matter since April 1, 2023, the Receiver has been forced to incur certain expenses directly.  During the First Quarter of 2024, this included charges related to data hosting (of the Defendants email servers) and for converting bank and credit card statements from pdf to a useable format.

Gillespie Repairs.  During the First Quarter of 2024, the Receiver spent $650.00 in needed repairs at the Gillespie Property.

Other Miscellaneous Expenses.  During the First Quarter of 2024, the Receiver also paid (1) $6,189.75 in moving expenses related to the contents of the Rock Creek Property, (2) $1,750.00 to an appraiser in order to update the appraisal previously performed on the Hall property, (3) $2,875.00 to JAMS for a mediation fee, (4) $10,000 to a property advisor regarding the Venus properties; and (5) $0.54 in account analysis charges by the Receivership Bank.

## 2.     Disbursements from Veritex Accounts (Amerigold Suites)

Between January 1, 2024, and March 31, 2024, the Receivership spent $265,056.05 on the Amerigold Suites, comprised of the following:

Payments to Property Manager.  During this Quarter, the Receiver paid the property manager at Amerigold a total of $11,574.82.

Maintenance and Cleaning Payments.  During this Quarter, the Receiver paid maintenance and cleaning contractors a total of $12,957.50.

Landscaping.  During this Quarter, the Receiver paid $1,900.00 in landscaping and tree trimming invoices.

Repair Costs.  During this Quarter, the Receiver paid $8,181.95 in repairs to HVAC and flooring contractors.

Utility Payments.  During this Quarter, the Receiver paid $76,150.00 in utility payments for electricity, water, and internet.

Trash Payments.  During this Quarter, the Receiver paid $3,483.96 for trash collection at the property.

Pest Control.  During this Quarter, the Receiver paid $788.05 relating to pest control at the property.

Insurance Payments.  During this Quarter, the Receiver paid $73,126.08 in insurance premium payments.

Taxes.  During this Quarter, the Receiver paid $76,696.83 to Dallas County, Richardson Independent School District, and a property tax advisor regarding property taxes related to Goldmark Hospitality LLC.

Bank Fees.  During this quarter, the Receiver paid $196.86 in check fees, wire fees, and other miscellaneous bank fees.

Other Miscellaneous Expenses.  During the First Quarter of 2024, there were no additional miscellaneous expenses.

## III.
## DEVELOPMENT OF CLAIMS HELD BY
## RECEIVERSHIP ESTATE AND OTHER PENDING LITIGATION

The Receiver continues to investigate potential claims against third parties and the likelihood of success of such claims.   On March 1, 2024, the Receiver filed his Motion for Leave to File Complaints against Third Parties [Dkt. 472].   The Court granted the motion [Dkt. 488]. Based upon his ongoing forensic accounting, the Receiver has determined that he has valid fraudulent conveyance claims against several transferees.   A summary of the lawsuits and developments from the First Quarter of 202 are discussed below:

A.     *Thomas v. Walji, et al.*, No. 3:24-cv-512-X

On March 1, 2024, the Receiver filed a Complaint in federal court against several attorneys who received significant payments from the Receivership Entities before the institution of the Receivership.  These attorneys include: Khudabuksh K. Walji, Law Office of K. Walji, Esq., P.C., Justin M. Guenley, Law Office of Justin Guenley PLLC, Joyce W. Lindauer, Joyce W. Lindauer Attorney, PLLC, Randy P. Marx, The Marx Firm, LLC, William V. McMurry individually and d/b/a McMurry Legal, PLLC, McMurray Law, PLLC, McMurry & McMurry, LLP, Steven C. Metzger, Metzger Law PLLC, and Metzger & McDonald, PLLC.  The Receiver filed a Motion to Stay or Abate this lawsuit, pending the disposition of the Appeal of the Second Receivership Order, and the requested stay was granted.  The case is assigned to United States District Judge Brantley Starr.

B.     *Thomas v. Fu. et al.*, No. 3:24-cv-612-X

On March 13, 2024, the Receiver filed a Complaint in federal court against another group of fraudulent transferees who received significant payments from the Receivership Entities before the institution of the Receivership.  These transferees include: Haoqiang Fu (a/k/a Michael Fu, "Fu"), PIC Consultant, LLC, Silverland Finance Limited, Stephen T. Wall, Carnegie Homes, LLC,

Saskya Bedoya Zuniga, Timothy L. Barton, Victoria L. Barton, V Strategies, LLC, Maximilien E. Barton, Martine G. Barton, Sada Cumber, individually, and dba Plumbrook Global Consulting Company, Murugan Venkatachalam, individually and dba Broward Accountants, Vincap, LLC, and Mark Adams. The Receiver filed a Motion to Stay or Abate this lawsuit, pending the disposition of the Appeal of the Second Receivership Order, and the requested stay was granted. This case is also assigned to United States District Judge Brantley Starr.

## IV.
## OTHER PENDING LITIGATION

During the first day of the Receivership, the Receiver and his team interviewed multiple lawyers who officed in the Turtle Creek office who were aware of (and in many respects involved in) dozens of active and closed litigation matters involving the Receivership Entities. As the Fourth Quarter of 2022 progressed, the Receiver and his team became aware of several additional active litigation matters involving the Receivership Entities and began speaking to counsel for counter-parties. These conversations continued throughout 2023, with one additional lawsuit against the Receivership Entities being filed (and stayed upon the Receiver's discovery of the proceeding) during the Fourth Quarter of 2024. Pursuant to ¶¶ 34-36 of the Receivership Order, all civil legal proceedings of any nature involving the Receivership Entities and the Receivership Entities' past or present officers, directors, managers, agents, parent or affiliated entities, are stayed until further order of the Receivership Court.

Included below is a list of the active (but stayed) litigation matters of which the Receiver is currently aware, as well as developments (if any) from the First Quarter of 2024 (*in italics*). After the Fifth Circuit's opinion was entered on June 28, 2023, the Receiver and his team generally paused efforts to resolve these disputes pending the Court's consideration of a renewed motion for entry of a new Receivership Order. In light of the Court's entrance of the Second Receivership

Order, the Receiver continues to methodically work through the dozens of pending cases and anticipates making recommendations on each of these cases on a rolling basis in future reports.

## A.    Wall-Related Litigation

### 1.    Wall Entity Bankruptcies[20] (Bankr. E.D. Tex.)

On August 19, 2022, the Wall Entities and Seagoville Farms, LLC filed voluntary Chapter 11 bankruptcy petitions in the Eastern District of Texas.  Prior to the Receiver's appointment, counsel for the Debtors and the US Trustee's office agreed that the bankruptcy filings should be dismissed.  The Receiver has been told by counsel to the debtors that the purpose of these bankruptcy filings was to identify all investors in the Wall Entities.  Assuming this to be the case, these bankruptcy filings are unnecessary because one of the central purposes of the claims process in the Receivership is to identify investors in the Wall entities.  Moreover, it does not appear that there is any monetary value to be gained by proceeding with those cases.

Accordingly, in the near future, the Receiver will likely concede to the lifting of the stay in the Wall Entities' bankruptcy cases to permit their agreed dismissal.

*No new updates from First Quarter of 2024.*

### 2.    *Sun Yun, Qu Yi, Ma Jinghui, Gao Huaizen v. WALL012, LLC, WALL016, LLC, WALL017, LLC, WALL018, LLC, Platinum Investment Corporation (PIC), JMJ Holdings, LLC*, No. DC-20-04575 (44th District Court, Dallas County, Texas)

Plaintiffs assert they loaned the various Wall Entities a total of $700,000 and claim Defendants defaulted on the loans. The Wall Defendants filed a third-party petition against Haoqiang Fu a/k/a Michael Fu his spouse, Jin Wang, and Silverland Finance, Ltd, and asserted

---

[20] These cases are styled *In re: WALL007, LLC*, No. 22-41049; *In re: WALL009, LLC*, No. 22-41113; *In re: WALL011, LLC*, No. 22-41114; *In re: WALL010, LLC*, No. 22-41125; *In re: WALL012, LLC*, No. 22-41135; *In re: WALL016, LLC*, No. 22-41136; *In re: WALL017, LLC*, No. 22-41137; *In re: WALL018, LLC*, No. 22-41176; *In re: WALL019, LLC*, No. 22-41177; *In re: Seagoville Farms, LLC*, No. 22-41181.

cross claims against Platinum Investment Corporation. On September 13, 2022, the Wall Defendants filed a notice of their Chapter 11 Bankruptcy.

*No new updates from First Quarter of 2024.*

**3.** ***Rone Engineering Services, Ltd. v. JMJ Development, LLC, WALL017, LLC, WALL009, LLC, and Seagoville Farms, LLC*, No. DC-19-20384 (116th District Court, Dallas County, Texas)**

Rone initiated this lawsuit for breach of contract for unpaid services related to engineering work performed on properties owned by Wall007, Wall009, and Seagoville Farms.  Rone asserts the work was contracted by JMJ. Wall007 filed bankruptcy in 2020 and on August 6, 2020, the Court administratively closed the case.  The case remains inactive.

*No new updates from First Quarter of 2024.*

**4.** ***JMJAV, LLC v. Michael Fu, Jin Wang, Lynn Zhou, Tidy Fan, Summer Tian, Shirley Qing, and Michele Guo*, No. 2020-00720 (281st District Court, Harris County, Texas)**

Plaintiff initiated this lawsuit to recover funds in excess of $1 million paid to defendants based on defendants' allegedly fraudulent representations they were Texas realtors.  Defendant Shirley Quing was dismissed, and Plaintiff nonsuited claims against defendants Jin Wang, Lynn Zhou, Tidy Fan, Summer Tian, and Michele Guo.  The case has been abated.

*No new updates from First Quarter of 2024.*

**B.     HNGH Bankruptcy Cases (2999 Turtle Creek)**

**1.     *2999TC Acquisitions, LLC*, Chap. 11 Bk, No. 3:21-bk-31954 (United States Bankruptcy Court for the Northern District of Texas, Dallas Division)**

Receivership Entity 2999TC Acquisitions borrowed $32.5M from HNGH to acquire property at 2999 Turtle Creek Blvd for the eventual construction of hotel but was unable to repay the loan.  Facing a deed in lieu of foreclosure, 2999TC Acquisitions filed chapter 11 bankruptcy.

*During the First Quarter of 2024, the Bankruptcy Court held another status conference regarding the Receiver's pending Motion for Final Decree.  As of the date of this Report, the Motion for Final Decree remains pending, and another status conference has been set for May 1, 2024.*

2.    ***2999TC Acquisitions, LLC v. HNGH***, **No. 22-03061-swe (United States Bankruptcy Court for the Northern District of Texas, Dallas Division)**

Related to 3:21-bk-31954, Plaintiff filed the adversarial proceeding based on breach of contract and a request for declaratory judgment that they are the rightful owner of the disputed property at 2999 Turtle Creek.

*No new updates from First Quarter of 2024.*

3.    ***2999 Turtle Creek, LLC v. Timothy Lynch Barton***, **No. DC-20-12133 (192nd District Court Dallas County, Texas)**

Plaintiff sued Defendant claiming he guaranteed $32.5M loan on 2999 Turtle Creek property and when borrower defaulted, Defendant refused to pay.  The parties filed an agreed motion to abate the case based on an order entered in the related bankruptcy case. The court granted an abatement until March 15, 2022.  Shortly after March 15, 2022, Defendant filed a motion to dismiss which is still pending.

*No new updates from First Quarter of 2024.*

C.    **Palisades Litigation (2999 Turtle Creek and Frisco Gate Property)**

1.    ***In Re: Dallas Real Estate Investors***, **No. 21-41488 (US Bk Ct, ND Fort Worth Division)**

2.    ***In Re: Dallas Real Estate Investors Palisades TC, LLC, Individually and on behalf of Five Star GM, LLC v. Dallas Real Estate Investors, LLC et al.***, **Nos. 21-04061, 21-04073 (United States District Court for the Northern District of Texas, Fort Worth Division)**

Cases 21-04061 and 21-04073 were adversary proceedings that were consolidated in October 2022 under 21-04061.  Palisades invested approximately $4M in 2999 Turtle Creek

Acquisition through Five Star MM, and approximately $3.5M in Frisco Gate property through FHC Acquisitions. Palisades alleges the money was a loan intended to be repaid and Defendants defaulted by not repaying. Defendants allege the money was a capital contribution. Parties engaged in settlement talks but could not come to an agreement.

*See discussion of Palisades in context of sale of Frisco Gate Property. No other updates for First Quarter of 2024.*

**D.     Hodges Litigation (2999 Turtle Creek)**

**1.     *Hodges III, L. Allen, as Independent Executor of the Estate of Leland A. Hodges, Jr., Tejas Group, Ltd., LAH III Family Specific Interests, Ltd., and Blackfoot Interest, Ltd. v. 2999TC LP, LLC, JMJ Development, LLC and Timothy Barton*, No. 141-316567-20, (141st District Court Tarrant County, Texas)**

In September 2019, Defendant 2999 TC LP, LLC borrowed $4,000,000 from Plaintiffs in connection with property at 2999 Turtle Creek. Timothy Barton, individually, and JMJ Development, LLC guaranteed the loan. According to Plaintiffs, 2999 TC defaulted, and Plaintiffs accelerated the note. Defendants counterclaimed asserting Plaintiffs slip sheeted the loan documents and changed terms. The Court granted Plaintiff's motion for summary judgment and awarded actual damages of $4.25M, pre and post judgment interest, costs of court, and $111,962 in attorney's fees. The Court also entered an order severing claims not covered by the summary judgment. Defendants appealed, and the case is pending in the Court of Appeals.

*No new updates from First Quarter of 2024.*

**2.     *In re 2999TC LP, LLC*, Chap. 11 BK, No. 4:20-BK-43204 (Bankr. N.D. Tex.)**

Related to 141-316567-20. A few months after the related case was filed, 2999 TC, the debtor, filed for Chapter 11 bankruptcy. In September 2022, the bankruptcy trustee filed a motion to dismiss or in the alternative convert to chapter 7, stating that the debtor was not likely to

successfully reorganize. Debtor objected and a hearing on the matter was postponed due to the

Receiver's stay.

*No new updates from First Quarter of 2024.*

3. ***Hodges III, L. Allen, as Independent Executor of the Estate of Leland A. Hodges, Jr., Tejas Group, Ltd., LAH III Family Specific Interests, Ltd., and Blackfoot Interest, Ltd. v. 2999TC LP, LLP, JMJ Development, LLC and Timothy Barton*, No. 141-328490-21 (141st District Court, Tarrant County, Texas)**

Related to 141-316567-20. This case originated when the Court in the related case entered

an order severing claims not covered by the Order granting MSJ in the related case. Defendants

appealed, and the case is pending in the Court of Appeals.

*No new updates from First Quarter of 2024.*

4. ***JMJ Development, LLC and Tim Barton v. L. Allen Hodges III, et al*., No. 02-21-00414-CV (Second Court of Appeals, Fort Worth Division)**

Appeal from 141-328490-21. On August 25, 2022, the Court of Appeals granted an order

consolidating appeals 02-21-0041 and 02-22-00288. The appeal is pending.

*No new updates from First Quarter of 2024.*

5. ***JMJ Development, LLC and Tim Barton v. L. Allen Hodges III, et al.*, No. 02-22-00288-CV (Tex. App.—Fort Worth)**

Appeal from 141-316567-20. On August 25, 2022, the Court of Appeals granted an order

consolidating appeals 02-21-0041 and 02-22-00288. The appeal is pending.

*No new updates from First Quarter of 2024.*

E. **Kirby Litigation (2999 Turtle Creek)**

1. ***Pamela Kirby v. Timothy L. Barton, John McElwee, JMJ Development, LLC, 2999TC Acquisitions, LLC, 2999TC Founders, LLC, 2999TC JMJ, LLC, 2999TC JMJ GM, LLC, 2999 Five Star GM, LLC, Five Star GM, LLC, Five Star MM, LLC, Five Star TC, LLC*, No. 3:22-CV-01447-M (N.D. Tex.)**

Pursuant to a subscription agreement, in 2019 Ms. Kirby invested $1M with 2999TC

Founders, LLC for the purchase and development of 2999 Turtle Creek. She contends her

investment was fraudulently induced, that Barton failed to disclose foreclosure proceedings, and misappropriated her funds which were comingled with the Chinese investor funds. She contends she is a victim of the crimes Barton has been charged with and requests a judicial determination of that fact so she can claim a tax credit for her loss. For any distributions, she also seeks treatment as an investor rather than a creditor. The Receiver's counsel has had several lengthy communications with Ms. Kirby's counsel and will continue to seek a fair resolution.

*No new updates from First Quarter of 2024.*

### 2. *In Re: 2999FC Finders, LLC* (Bk.), No. 22-40911 (Bankr. E.D. Tex.)

On July 21, 2022, 2999TC Founders filed for voluntary Chapter 11 bankruptcy. On October 7, 2022, debtor Pamela Kirby filed a Motion to Dismiss the Chapter 11 case. In light of the receivership, the Court entered an order Staying Debtor's Pending Motion to Dismiss and All Other Matters.

*No new updates from First Quarter of 2024.*

### F. Nitya Capital Litigation (2999 Turtle Creek)

### 1. *Nitya Capital, LLC v. 2999TC Acquisitions MZ, LLC*, No. DC-22-09841 (14th District Court, Dallas County, Texas)

Plaintiff made loan to Defendant for approximately $1.5M related to the development of 2999 Turtle Creek. When 2999TC Acquisitions filed for bankruptcy in 3:21-bk-31954, Nitya asserts this caused an event of default without opportunity to cure and called the loan. Defendant did not pay the loan balance and Nitya filed suit. Defendant has not filed an answer.

*No new updates from First Quarter of 2024.*

G.    **Dowdall Litigation (2999 Turtle Creek)**

1.    *John Dowdall v. 2999TC JMJ MGR, LLC and Timothy Barton*, No. DC-22-14770 (193rd District Court, Dallas County, Texas)

Plaintiff initiated suit against the Defendants to recover $2M loaned to JMJ MGR which Barton guaranteed. Plaintiff alleges Defendants failed to make any payments and defaulted on the note. This case was filed October 21, 2022, after the Receiver was appointed, and no answer has been filed.

*No new updates from First Quarter of 2024.*

H.    **Amerigold-Related Litigation**

1.    *Serena Badgley, As Next Friend of Bryson Badgley, Minor v. Goldmark Hospitality, LLC*, No. CC-21-02991-B (County Court at Law No. 2, Dallas County, Texas)

Plaintiffs are mother and son who lived at Amerigold Suites owned by Defendant. Son fell from a second story window and was injured when a closed window gave way.

*During the First Quarter of 2024, the Receiver filed a motion to lift stay for the limited purpose of allowing the plaintiff in this lawsuit to mediate with Goldmark Hospitality's insurer. On April 19, 2024, the Court granted the motion and lifted the stay for the limited purpose of allowing the mediation to proceed.*

2.    *Stream SPE LTD. v. Goldmark Hospitality by and through its General Partner, TRTX Properties, LLC*, No. 2021-81644 (80th District Court, Harris County, Texas*

Plaintiff initiated suit against Defendant based on Defendant's failure to pay for contracted electrical service. Defendant has answered.

*No new updates from First Quarter of 2024.*

I.   **Ridgeview-Related Litigation**

1.   *Circle H Contractors, LP, v. La Jolla Construction Management, LLC, and Ridgeview Addition, LLC*, No. DC-C202200522 (18th Dist. Ct. Johnson Cnty., Tex.)

Plaintiff initiated this lawsuit to recover approximately $64,000 in fees owed for work done installing a PVC water main system and fire hydrant assemblies, with related testing, connection of manholes, and sewer services and installation of storm drain system for the Ridgeview Addition project. This lawsuit was filed after the Receiver was appointed, and no answer has been entered.

*No new updates from First Quarter of 2024.*

J.   **Windmill Farms-Related Litigation**

1.   *BGE, Inc. v. JMJ Development, LLC*, No. 471-03497-2020 (471st District Court, Collin County, Texas)

Plaintiff initiated suit against defendant to recover fees owed for surveying and engineering services provided for Windmill Farms Development in Kaufman County, Texas. Defendant contracted with Plaintiff to provide the services and allegedly refused to pay invoices sent by the Plaintiff. An order compelling discovery responses from Defendant was entered August 8, 2022. This case has been stayed.

*No new updates from First Quarter of 2024.*

K.   **Ramolia Litigation**

1.   *"David" Dhirah Ramolia, v. Timothy Barton and JMJ Development*, No. DC-19-11030 (191st District Court, Dallas County, Texas)

2.   *JMJ Development, LLC and Timothy Barton v. "David" Dhiraj Ramolia*, No. 05-21-01100-CV (From DC-19-11030, 5th Court of Appeals)

3.   *"David" Dhirah Ramolia, v. Timothy Barton and JMJ Development*, No. 02-0922 (Appellate Case (to Sup. Ct.) Supreme Court from 5th Court of Appeals)

Defendants each executed a $3M note payable to the Plaintiff in connection with the sale of real property and a settlement agreement in Bankruptcy Case Nos. 17-34255-SGJ-11 and 17-

34274-SGJ-11.   Defendants counterclaimed asserting that conditions to the note were not completed by the Plaintiff and that the notes were not valid.  After considering Plaintiff's motion for summary judgment, the court entered a judgment against each Defendant for $3M plus pre-judgment interest.

Defendants appealed the final judgment entered in DC-19-11030.  The Fifth Court of Appeals dismissed the case on the grounds that the appeal was not timely filed.  Defendants then appealed to the Texas Supreme Court on October 13, 2022.

*No new updates from First Quarter of 2024.*

**4.** **_Timothy Barton and JMJ Development, LLC v. A.J. Babaria, Bilal Khaleeq and Dan Morenoff_, No. DC-20-17086, (Related case DC-19-11030) (191st District Court, Dallas County, Texas)**

Plaintiffs in this case, (defendants in DC-19-11030) severed claims related to defendants from DC-19-11030.  Among the claims are violations of ethical obligations related to Khaleeq's role as a former attorney for JMJ, and legal malpractice claims against Morenoff as attorney for JMJ and Barton in the bankruptcy proceeding underlying this case and the related case.

*No new updates from First Quarter of 2024.*

**5.** **_TRTX Properties, LLC and JMJ Development v.  Dhirah "David" Ramolia_, No. 471-00033-2022 (471st District Court, Collin County, Texas)**

Tim Barton and JMJ Development allege they entered into an agreement with Defendant and a third party to purchase a piece of land involved in a dispute between the third party and the Defendant.  As part of the agreement Defendant was supposed to release his ownership claims to the property, but failed to do so, resulting in Barton and JMJ losing the property.  Barton assigned his claims to TRTX, making it a party.

*No new updates from First Quarter of 2024.*

L.      **Lost Creek-Related Litigation**

1.      *The Somerset-Lost Creek Golf Ltd. v. Timothy Barton, LC Aledo TX LLC, WALL010, LLC, JMJ Acquisitions*, **No. 096-319595-20 (96th District Court, Tarrant County, Texas)**

Defendants hold a $300,000 note secured by a Deed of Trust on a golf course. Plaintiffs initiated the lawsuit to set aside a prior foreclosure by the Wall Defendants while Plaintiff/a Third Party Trust also contemporaneously foreclosed their own senior lien. Plaintiff/Third Party Plaintiff contends they can sell the property free and clear of the Wall Note based on that foreclosure. Defendants' counterclaims for breach of contract and fraud in connection with real estate are pending. The case has been stayed.

*During the First Quarter of 2024, the Receiver and Somerset-Lost Creek mediated this dispute with retired United States Bankruptcy Judge Harlin Hale. The mediation was successful, and as will be detailed in future status reports, on April 17, 2024, the Receiver filed a motion to ratify his settlement agreement with Somerset-Lost Creek.*

M.      **BM318-Related Litigation**

1.      *BM318, LLC v. Dixon Water Foundation*, **No. 4:20-BK-42789 (Bankr. N.D. Tex.)**

BM318 purchased a tract of land from Dixon with $2M down and a seller financed note of $33 million held by Dixon. BM318 defaulted on the note, and Dixon recorded a special warranty deed transferring most of the property back to Dixon. BM318 then filed Chapter 11 bankruptcy and the Bankruptcy court confirmed the plan on August 2, 2021.

*During the First Quarter of 2024, the Receiver filed a motion to lift stay in the bankruptcy case in order for the Receiver, Dixon, and Lumar to present a settlement agreement to the bankruptcy court for approval. As will be detailed in future status reports, on April 15, 2024, the*

*Court granted the motion to lift stay to allow the Receiver, Dixon, and Lumar to present their*

*settlement to the bankruptcy court for approval.*

**2.**     ***BM318, LLC v. Dixon Water Foundation***, **Adversary No. 4:21-AP-4051, Related to 4:20-BK-42789 (United States Bankruptcy Court, Northern District of Texas, Dallas Division)**

After the Court approved the Chapter 11 plan in the related case, Plaintiff filed an

adversarial proceeding against Dixon alleging the special warranty deed was a preferential or

fraudulent transfer.  Plaintiff also filed a lis pendens.  Dixon filed a counterclaim requesting that

if the Court determines the transfer was void to find that Dixon still has a lien on the property.

*See above.*

**3.**     ***BM318, LLC v. Lumar Land Cattle, et al***., **AP: 4:21-AP-4051 (United States Bankruptcy Court, Northern District of Texas, Dallas Division, Related to 4:20-BK-42789)**

During the pending bankruptcy in the related case, but several months before the

adversarial proceeding was filed, Lumar bought a 204 acre tract of land from Dixon.  The land

later became part of the adversarial proceeding between BM318 and Dixon.  Lumar then

contracted to sell part of the land and the lis pendens was discovered causing the sale to fall

through.  After discovering the lis pendens, Lumar sought, and was granted, permission to

intervene in the adversarial proceeding and asserts it was a good faith purchaser and that the lis

pendens is an incorrect cloud on its title.  Lumar and the Receiver are currently in negotiations

regarding a settlement.

*See above.*

N.    **3820 Illinois-Related Litigation**

1.    *JMJ Development, LLC v. Tamamoi, LLC and 3820 Illinois, LLC*, No. DC-22-02622 (68th District Court, Dallas County)

Plaintiff obtained a $500,000 loan from Tamamoi to purchase land located at 3820 E. Illinois Ave.  After repeated missed payments and several extensions to the loan, Tamamoi foreclosed on the property.  Tamamoi then conveyed the property to 3820 Illinois, LLC.  Plaintiff asserts it was a wrongful foreclosure and initiated this lawsuit seeking to set aside the foreclosure. Defendants filed an MSJ shortly before the receivership.  The Receiver's counsel have had several conversations with Defendants' counsel and will continue to seek a fair resolution.

*During the First Quarter of 2024, the Receiver and Tamamoi revisited prior settlement discussions and agreed to mediate this dispute during the Second Quarter of 2024.  As will be detailed in future status reports, on April 23, 2024, the Receiver and Tamamoi successfully mediated their dispute with retired United States Bankruptcy Judge Harlin Hale.*

2.    *Deshazo Group v. Timothy Barton, JMJ Development*, No. CC-22-04381-B (County Court at Law No. 2, Dallas County, Texas)

Plaintiff sued Defendants in JP court on an unpaid invoice related to a traffic study that was performed for property owned by JMJ Development on Illinois Ave in Dallas.  A default was granted.  Defendants assert the JP suit was not properly served and appealed the judgment to the county court.

*No new updates from First Quarter of 2024.*

O.    **Other Pending Litigation Matters**

1.    *JMJAV v. Elite Jet*, No. 017-333443-22 (17th District Court, Tarrant County)

Plaintiff initiated this lawsuit asserting that defendants failed to provide reasonable estimates and overcharged Plaintiffs for work done to Plaintiff's Learjet 55.  Plaintiff refused to pay for the excess charges and in return defendant refused to release the aircraft, associated log

books, and other documentation pertaining to the aircraft.  Defendant filed counterclaims against Plaintiff and Tim Barton, as a third party, based on suit on a sworn account, breach of contract, and unjust enrichment.

*No new updates from First Quarter of 2024.*

2. ***In Re: FM 544 Park Vista, Ltd. and Pavist, LLC***, **No. 17-34255-SGJ-11/17-34274-SJG-11 (US Bk Ct, ND Dallas Division); on appeal, JMJ Development, LLC, et al. v. Roger Sefzik, et al., No. 3:22-cv-02254-L (N.D. Tex.)**

Dispute arose between Tim Barton, JMJ and TRTX, and Debtor FM 544, Debtor Pavist in connection with the ownership and development of certain real property, consisting of approximately 31.159 acres located in Plano, Collin County, Texas.  The Court entered a Chapter 11 reorganization plan which became final in September 2018.  As part of the plan, the parties agreed to release certain claims and not sue based on those claims.  JMJ and TRTX filed a lawsuit against debtors in this case, and others, in violation of the Court's order.  In response, the Court entered an injunction and contempt order against JMJ, TRTX, Tim Barton and the responsible attorneys (the "contemnors").  On October 4, 2022 the contemnors filed an appeal, which has been docketed but no other action has been taken.

*No new updates from First Quarter of 2024.*

3. ***Cardno, Inc. v. JMJ Development, LLC, Villita Towers, LLC and Tim Barton***, **No. DC-22-10928 (160th District Court, Dallas County)**

Plaintiff initiated this suit to recover approximately $84,000 in unpaid fees from Defendant related to Plaintiff's work as a structural engineer on the Villita Towers project.  Defendants have yet to file an answer.

*No new updates from First Quarter of 2024.*

4.      *Dallas County et al., v. TC Hall, LLC et al.*, No. TX-23-02224 (193rd District Court, Dallas County, Texas)

During the Fourth Quarter of 2023, Dallas County and its associated entities sued TC Hall, LLC for unpaid property taxes related to property TC Hall owns on Hall Street in Dallas. Upon learning of the proceeding, I filed a notice of stay, and the Court ordered the case be administratively closed.

*No new updates from First Quarter of 2024.*

## V.
## STATUS OF CLAIMS PROCEEDINGS FOR INVESTORS AND CREDITORS

The Receiver has not yet filed a Motion for Order Establishing Claims Adjudication Process.

### A.      Wall Investors

On November 7, 2022, the Receiver sent letters to approximately 100 investors who had previously been identified as potential investors in Wall Entities. The letters also included a request for information. This letter and request for information were also posted to the Receivership Website. Dozens of the investors have completed the information forms. If a claims process is initiated, the Receiver anticipates receiving additional information from these investors, other Wall investors, and other creditors. Through the forensic accounting process, the Receiver will continue to identify and cross-reference potential investors in the Wall Entities.

### B.      Other Investors and Creditors

In addition to investors in the Wall Entities, the Receiver has continued identifying other lenders, equity investors, and creditors (both secured and unsecured) of the Receivership Entities. While the Receiver's efforts to date have focused primarily upon identifying investors and assets, dozens of creditors have already been identified, and the Receiver anticipates receiving many more creditor claims when the Court commences a claims process.

## VI.
## PROPOSED PLAN FOR ADMINISTERING THE RECEIVERSHIP

The next immediate steps for administration of the Receivership include (1) continuing to secure and maintain the assets of the Receivership, including, liquidating assets of the Receivership where necessary to preserve and maximize their value; (2) completing a forensic accounting of the Receivership's bank accounts to (a) determine the amount of monies flowing into the Wall Entities from investors, (b) trace where those monies ultimately flowed, and (c) identify potential fraudulent transfers and transferees; and (3) completing the identification of investors in the Wall Entities.

The forensic accounting will greatly aid the Receiver in determining whether the Receivership Estate has other assets that have not yet been discovered. Because the Receiver has received limited information from Defendant Barton to date, the forensic accounting will likely be the best means of determining where investor monies flowed.

## VII.
## RECOMMENDATION FOR CONTINUATION OF RECEIVERSHIP

This is the seventh report from the Receiver and extensive work still remains. More specifically, the Receiver intends to (1) continue securing, maintaining, and selling assets; (2) continue pursuing potential fraudulent conveyances; (3) continue investigating potential damages claims against third parties; (4) petition the Court to establish an investor and creditor claims process; and, (5) upon a determination of liability, agreement of Defendants, or further order of this Court, eventually make distributions pursuant to a Court-approved distribution plan. Accordingly, the Receiver recommends that the Receivership continue.

Dated: April 30, 2024

Respectfully submitted,

**RECEIVER CORTNEY C. THOMAS**

By: _/s/ Cortney C. Thomas_
    Cortney C. Thomas
     State Bar No. 24075153
     cort@brownfoxlaw.com
    BROWN FOX PLLC
    8111 Preston Road, Suite 300
    Dallas, Texas 75225
    T: (214) 327-5000
    F: (214) 327-5001

**CERTIFICATE OF SERVICE**

Pursuant to Fed. R. Civ. P. 5(d)(1)(B), as amended, no certificate of service is necessary, because this document is being filed with the Court's electronic-filing system.

**RECEIVER'S SEVENTH STATUS REPORT – PAGE 73**