UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § § § | |
| Plaintiff, | § § | Case No. 3:22-CV-2118-X |
| v. | § § § | |
| TIMOTHY BARTON, *et al.*, | § § | |
| Defendants. | § | |

---

APPENDIX IN SUPPORT OF
SOUTHERN STAR CAPITAL, LLC MOTION
TO MODIFY STAY PROVISION SET FORTH IN RECEIVER ORDER

---

| EXHIBIT | DESCRIPTION | APP. NO. |
|---|---|---|
| Exhibit 1 | DJD Land Partners Note | App. 1 |
| Exhibit 2 | DJD Land Partners Modification and Extension on Note | App. 6 |
| Exhibit 3 | DJD Land Partners Second Modification and Extension | App. 9 |
| Exhibit 4 | Deed of Trust on DJD Land Partners Loan | App. 12 |
| Exhibit 5 | Payoff statement on DJD Land Partners Note | App. 51 |
| Exhibit 6 | Appraisal on DJD Land Partners Land | App. 52 |
| Exhibit 7 | Johnson County Tax Map of DJD Land Partners Property | App. 185 |
| Exhibit 8 | Wall009 Note | App. 186 |
| Exhibit 9 | Deed of Trust on Wall009 Loan | App. 191 |
| Exhibit 10 | Payoff statement on Wall009 Note | App. 208 |

| Exhibit 11 | Appraisal on Wall009 Land | App. 209 |
| Exhibit 12 | Deed of Property to Lynco Ventures from Wall009 | App. 329 |
| Exhibit 13 | Johnson County Tax Map of Wall009 Property | App. 337 |
| Exhibit 14 | Note on Underlying Loan - DJD | App. 338 |
| Exhibit 15 | Payment History on Underlying Loan – DJD | App. 341 |
| Exhibit 16 | Note on Underlying Loan – Wall009 | App. 343 |
| Exhibit 17 | Payment History on Underlying Loan – Wall009 | App. 376 |
| Exhibit 18 | Past Settlement Agreement | App. 380 |
| Exhibit 19 | Declaration of Al Keller | App. 392 |

Respectfully submitted,

**THE LAW OFFICE OF ROBERT W. BUCHHOLZ, P.C.**

By: */s/ Robert W. Buchholz*
Robert W. Buchholz
Texas Bar No. 03290600
bob@attorneybob.com
5220 Spring Valley Road, Suite 618
Dallas, Texas 75254
214-754-5500 Telephone
214-754-9100 Facsimile
**ATTORNEY FOR**
**SOUTHERN STAR CAPITAL, LLC.**

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 24th day of May 2024, a true and correct copy of the foregoing Motion was filed with the Clerk of the Court using the CM/ECF system, which will send a notice of such filing to all counsel of record.

/s/ Robert W. Buchholz
Robert W. Buchholz
Attorney for Southern Star Capital, LLC

## Promissory Note

Date: November 27, 2018.

Borrower: DJD Land Partners, LLC

Borrower's Mailing Address:    DJD Land Partners, LLC, 9911 Champa Drive, Dallas, Texas 75218, attention Michael Matthews

Lender: Southern Star Capital, LLC d/b/a Reliance Mortgage Company

Place for Payment:

5220 Spring Valley Road, Suite 602
Dallas, Texas 75254.
or any other place that Lender may designate in writing.

Principal Amount: One Hundred Twenty-Seven Thousand Five Hundred Dollars, ($127,500.00).

Annual Interest Rate: Eleven Percent (11.0%)

Maturity Date: January 1, 2020.

Annual Interest Rate on Matured, Unpaid Amounts: Eighteen Percent (18%) or the highest lawful rate, whichever is less.

Terms of Payment (principal and interest):

The Principal Amount and all accrued and unpaid interest is due and payable on January 1, 2020, and the interest is due and payable monthly as it accrues.

The monthly interest payments are One Thousand One Hundred Sixty-Eight and 75/100 dollars ($1,168.75) and are due and payable on the first day of each month with the first payment due on January 1, 2019.

Late Charge:

If any installment becomes overdue for more than ten days, at Lender's option a late payment charge equal to five percent (5%) of the amount of the late payment may be charged in order to defray the expense of handling the delinquent payment.

Security for Payment: This note is secured by a deed of trust and security agreement (the "deed of trust") dated November 27, 2018, from DJD Land Partners, LLC to Robert W. Buchholz, trustee on the following described real property.

The property described in the attached Exhibit "A" which is which is incorporated herein by

Promissory Note                                                                                                    Page - 1

App.001

reference.

**Other Security for Payment:**
None.

**Promise to Pay**
Borrower promises to pay to the order of Lender the Principal Amount plus interest at the Annual Interest Rate. This note is payable at the Place for Payment and according to the Terms of Payment. All unpaid amounts are due by the Maturity Date. If any amount is not paid either when due under the Terms of Payment or on acceleration of maturity, Borrower promises to pay any unpaid amounts plus interest from the date the payment was due to the date of payment at the Annual Interest Rate on Matured, Unpaid Amounts.

**Waivers**
Borrower waives, to the extent permitted by law, all (1) demand for payment, (2) presentation for payment, (3) notice of intention to accelerate maturity, (4) notice of acceleration of maturity, (5) protest, (6) notice of protest, (7) rights under sections 51.003, 51.004 and 51.005 of the Texas Property Code, (8) rights under section 17.001 and chapter 43 of the Texas Civil Practice and Remedies Code and rule 31 of the Texas Rules of Civil Procedure.

**Attorney's Fees**
Borrower also promises to pay reasonable attorney's fees and court and other costs if an attorney is retained to collect or enforce the note. These expenses will bear interest from the date of advance at the Annual Interest Rate on Matured, Unpaid Amounts. Borrower will pay Lender these expenses and interest on demand at the Place for Payment. These expenses and interest will become part of the debt evidenced by the note and will be secured by any security for payment.

**Prepayment:** Borrower may prepay this note in any amount at any time before the Maturity Date without penalty or premium.

**Application of Prepayment:** Prepayments will be applied to installments on the last maturing principal, and interest on that prepaid principal will immediately cease to accrue.

**Usury Savings**
It is the intention of the parties hereto to act in strict compliance with "Applicable Law" (hereafter defined). Accordingly, it is agreed that notwithstanding any provision to the contrary in this note, "deed of trust" (defined above), or any other instrument securing or evidencing the indebtedness evidenced by this note, or in any other arrangements or agreements, no such provision shall ever be construed to create a contract to pay, as consideration for use, forbearance or detention of money, "interest," as that term may be defined by Applicable Law, at a rate in excess of the maximum lawful rate of nonusurious interest permitted by Applicable Law. If any excess of interest in such respect is provided for, or shall be adjudicated to be so provided for, in this note, the deed of trust, or in any other instrument securing or evidencing the indebtedness evidenced by this note, then in such event (a) the provisions of this paragraph shall govern and control; (b) neither Borrower nor its successors or assigns or any other party liable for the payment of the indebtedness shall be obligated to pay the amount of such interest to the extent that it is in excess of the maximum lawful amount of nonusurious interest permitted by Applicable Law, and the same shall be construed as a

Promissory Note                                                        Page - 2

App.002

mutual mistake of the parties hereto, and of any legal holder of this note, and (c) such excess of interest over the maximum lawful rate of nonusurious interest permitted by Applicable Law shall either be applied as credit against the then unpaid principal amount of the indebtedness owed under this note or refunded to Borrower. Any commitment, extension, brokerage, loan or other fees or sums paid pursuant to this note, the loan evidenced hereby, or the deed of trust and which under Applicable Law are deemed to constitute interest shall be treated as interest and taken into account in calculating the maximum lawful rate of nonusurious interest permitted by Applicable Law. If the holder of this note shall ever receive anything of value that is characterized as interest under Applicable Law and that would apart from this provision be in excess of the maximum lawful rate of nonusurious interest permitted by Applicable Law, an amount equal to the amount that would have been excessive interest shall, without penalty, be applied to the reduction of the principal amount owing on the indebtedness evidenced by this note in the inverse order of its maturity and not to the payment of interest, or refunded to Borrower or the other payor thereof if and to the extent such amount, which would have been excessive, exceeds such unpaid principal. The right to accelerate maturity of this note, or any other indebtedness, does not include the right to accelerate any interest that has not otherwise accrued on the date of such acceleration, and the holder hereof does not intend to charge or receive any unearned interest in the event of acceleration. All interest paid or agreed to be paid to the holder hereof shall, to the extent permitted by Applicable Law, be amortized, prorated, allocated, and spread throughout the full stated term (including any renewal or extension) of such indebtedness so that the amount of interest on account of such indebtedness does not exceed the maximum lawful amount of nonusurious interest permitted by Applicable Law. Further, notwithstanding anything to the contrary contained herein, if the indebtedness evidenced by this note or the or the deed of trust is paid in full by Borrower or its successors or assigns prior to the full stated term of this note (as such term may have been extended pursuant to the terms hereof) and the interest received for the actual period of the existence of the indebtedness evidenced by this note exceeds the maximum lawful rate of nonusurious interest permitted by Applicable Law, then Lender, or its successors or assigns, shall refund to Borrower, or its successors or assigns, the amount of the excess of such interest over the maximum amount of nonusurious interest permitted under Applicable Law, and neither Lender, nor its successors or assigns, shall be subject to any of the penalties, if any, provided by Applicable Law for contracting for, charging, or receiving interest in excess of the maximum lawful rate of nonusurious interest permitted by Applicable Law. To the extent that Title 4 of the Texas Finance Code is relevant for purposes of determining the maximum lawful rate of nonusurious interest permitted by Applicable Law, the parties hereby elect to determine the applicable rate ceiling under such article by using the indicated (weekly) rate ceiling from time to time in effect, subject to Lender's right subsequently to change such method in accordance with Applicable Law.

"Applicable Law" shall mean that law (including, without limitation, Texas law), regulation, or judicial determination in effect from time to time and applicable to this note (including future changes in law), which lawfully permits the contracting for, charging and collection of the highest permissible rate of interest on this note and the loan evidenced hereby, including laws, regulations, and judicial determinations of the State of Texas and of the United States of America.

**Other Clauses**

Each Borrower is responsible for all obligations represented by this note.

Promissory Note                                                                 Page - 3

App.003

When the context requires, singular nouns and pronouns include the plural.

A default exists under this note if (1) (a) Borrower or (b) any other person liable on any part of this note or who grants a lien or security interest on property as security for any part of this note (an "Other Obligated Party") fails to timely pay or perform any obligation or covenant in any written agreement between Lender and Borrower or any Other Obligated Party; (2) any representation in this note or in any other written agreement between Lender and Borrower or any Other Obligated Party is materially false when made; (3) a receiver is appointed for Borrower, any Other Obligated Party, or any property on which a lien or security interest is created as security (the "Collateral Security") for any part of this note; (4) any Collateral Security is assigned for the benefit of creditors; (5) a bankruptcy or insolvency proceeding is commenced by Borrower, a partnership of which Borrower is a general partner, or an Other Obligated Party; (6) (a) a bankruptcy or insolvency proceeding is commenced against Borrower, a partnership of which Borrower is a general partner, or an Other Obligated Party and (b) the proceeding continues without dismissal for sixty days, the party against whom the proceeding is commenced admits the material allegations of the petition against it, or an order for relief is entered; (7) any of the following parties is terminated, begins to wind up its affairs, suffers a forfeiture of right to do business, is authorized to terminate or wind up its affairs by its governing body or persons, or any event occurs or condition exists that permits the termination or winding up of the affairs of any of the following parties: Borrower, a partnership of which Borrower is a general partner, or an Other Obligated Party; (8) any Collateral Security is impaired by loss, theft, damage, levy and execution, issuance of an official writ or order of seizure, or destruction, unless it is promptly replaced with collateral security of like kind and quality or restored to its former condition; or (9) any attachment, sequestration or similar writ is levied upon any property of Borrower or Other Obligated Party and is not discharged within a period of thirty days; (10) any final money judgment against Borrower or any Other Obligated Party is not paid within thirty days; (11) Borrower abandons any portion of the property of Borrower; or (12) if Borrower is an individual, the death or disability of Borrower or Other Obligated Party, if Other Obligated Party is an individual.

**BORROWER waives its rights under the Texas Deceptive Trade Practices–Consumer Protection Act, section 17.41 *et seq.* of the Texas Business and Commerce Code, a law that gives consumers special rights and protections. After consultation with an attorney of its own selection, BORROWER voluntarily consents to this waiver.**

If any provision of this note conflicts with any provision of a loan agreement, deed of trust, or security agreement of the same transaction between Lender and Borrower, the provisions of the deed of trust will govern to the extent of the conflict.

Borrower and Lender acknowledge that they were represented by competent counsel in connection with the negotiation, drafting and execution of this Note, deed of trust, and all other documents executed in connection with the same transaction between Lender and Borrower and that this Note, the deed of trust and all other documents executed in connection with the same transaction between Lender and Borrower shall not be subject to the principle of construing their meaning against the party which drafted same.

**BORROWER, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, HEREBY KNOWINGLY, INTENTIONALLY, IRREVOCABLY, UNCONDITIONALLY**

Promissory Note                                                                                        Page - 4

App.004

AND VOLUNTARILY, WITH AND UPON THE ADVICE OF COMPETENT COUNSEL, WAIVES, RELINQUISHES AND FOREVER FORGOES THE RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING BASED UPON, ARISING OUT OF, OR IN ANY WAY RELATING TO THIS NOTE OR ANY CONDUCT, ACT OR OMISSION OF LENDER OR BORROWER, OR ANY OF THEIR DIRECTORS, OFFICERS, PARTNERS, MEMBERS, EMPLOYEES, AGENTS OR ATTORNEYS, OR ANY OTHER PERSONS AFFILIATED WITH LENDER OR BORROWER, IN EACH OF THE FOREGOING CASES, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE.

Borrower warrants to Lender and agrees that the proceeds of the Note will be used primarily for business or commercial purposes and not primarily for personal, family, or household purposes.

This note will be construed under the laws of the state of Texas, without regard to choice-of-law rules of any jurisdiction.

DJD Land Partners, LLC


Michael Matthews
Its Manager

Promissory Note                                                                        Page - 5

App.005

## Modification and Extension Agreement

### Basic Information

Date: January 9, 2020

Holder of Note and Lien: Southern Star Capital, LLC d/b/a Reliance Mortgage Company

Holder's Mailing Address: 5220 Spring Valley road, Suite 602. Dallas, Texas 75254.

Obligor: DJD Land Partners, LLC

Obligor's Mailing Address: 9911 Champa Drive, attention Mark S. Adams, President.

Note:

      Date: November 27, 2018.

      Original principal amount: $127,500.00.

      Borrower: DJD Land Partners, LLC

      Lender: Southern Star Capital, LLC d/b/a Reliance Mortgage Company

      Maturity date: January 1, 2020.

Unpaid Principal and Interest on Note: $127,500.00.

Lien Documents: Deed of Trust filed on December 5, 2018 in Johnson County, Texas, Document No. 2018-33077.

Property (including any improvements): 1025 N FM 157, Venus, Texas, further described in Exhibit A.

Extended Maturity Date of Note: January 1, 2021.

Modified Terms: Note shall bear interest rate at 12% (twelve percent) per annum from January 1, 2020 until December 31, 2020.

The Principal Amount and all accrued and unpaid interest are due and payable on January 1, 2021, and the interest is due and payable monthly as it accrues.

The monthly interest payments are One Thousand Two Hundred Seventy-Five and 00/100 dollars ($1,275.00) and are due and payable on the first day of each month with the first payment due on January 1, 2020.

### Obligor's Covenants and Warranties

App.006

The Note is secured by liens against the Property. Whether Obligor is primarily liable on the Note or not, Obligor nevertheless agrees to pay the Note and comply with the obligations expressed in the Lien Documents.

For value received, Obligor renews the Note and promises to pay to the order of Holder of Note and Lien, according to the Modified Terms, the Unpaid Principal and Interest on Note. All unpaid amounts are due by the Extended Maturity Date of Note. Obligor also extends the liens described in the Lien Documents.

The Note and the Lien Documents continue as written, except as provided in this agreement.

Obligor warrants to Holder of Note and Lien that the Note and the Lien Documents, as modified, are valid and enforceable and represents that they are not subject to rights of offset, rescission, or other claims.

When the context requires, singular nouns and pronouns include the plural.

DJD Land Partners, LLC

Michael Matthews,
Its Manager

App.007

Doc 33077

## EXHIBIT A

### LEGAL DESCRIPTION OF THE PROPERTY

Being a 0.977 acre tract of land situated in the Absolam Williams Survey, Abstract No. 857, Johnson County, Texas and being all of that certain called 0.979 acre tract of land described in Deed from JLRJ, Inc. to Jason Alan Williams and recorded in Instrument No. 2013012640 of the Deed Records of Johnson County, Texas, said 0.977 acre tract to more particularly described by metes and bounds as follows:

THENCE South 60°23'32"West with South line of said 0.979 acre tract same being the East line of said that certain called Tract Three, 128.30 acre tract of land described in Deed from Henry C. Hill to Anastasia Energy, LLC and recorded in Volume 3969, Page 264 of said Deed Records a distance of 118.31 feet to a 1/2" iron rod cap found for corner at the Southwest corner of said 0.979 acre;

THENCE North 30°02' 19"West with West line of said 0.979 acre tract and the East line of said 128.30 acre tract a distance 504.00 to a Rail Road Spike found for corner in the centerline of County Road 501 at the Northwest corner of said 0.979 acre tract.

THENCE North 37°39'29" East with the North line of said 0.979 acre tract and the center line of said County Road 501 a distance of 16.66 feet to a Rail Road Spike found for corner at Northeast corner of said 0.979 acre tract and being in the West line of Farm to Market Road 157 and also being at the beginning of a non-tangent curve to the right;

THENCE in a Southeasterly direction with said curve to the right having a radius of 1404.92 feet, whose chords bears South 41 °30' 19" East- 523.30 feet for an arc length of 526.37 feet back to the Point of Beginning and Containing 42,577 Square Feet or 0.977 acre of land more or less.

AFTER RECORDING RETURN TO:

OTD LAND ACQUITION
1755 Wittington Place, Suite 340
Dallas, Texas 75234-1930

11-20-18

- 3 -

App.008

## Second Modification and Extension Agreement

### Basic Information

Date: July 1, 2021

Holder of Note and Lien: Southern Star Capital, LLC d/b/a Reliance Mortgage Company

Holder's Mailing Address: 5220 Spring Valley Road, Suite 602. Dallas, Texas 75254.

Obligor: DJD Land Partners, LLC

Obligor's Mailing Address: 1755 Wittington Place, Suite 340. Dallas, TX 75234, attention Tim Barton, Manager.

Note:

> Date: November 27, 2018.
>
> Original principal amount: $127,500.00.
>
> Borrower: DJD Land Partners, LLC
>
> Lender: Southern Star Capital, LLC d/b/a Reliance Mortgage Company
>
> Maturity date: January 1, 2020.
>
> Maturity date Extended and Modified by instrument dated January 9, 2020 to January 1, 2021.

Unpaid Principal and Interest on Note: $127,500.00.

Lien Documents: Deed of Trust filed on December 5, 2018 in Johnson County, Texas, Document No 2018-33077; additionally Deed of Trust filed February 21, 2020 in Johnson County, Texas, Document No 2020-4968.

Property (including any improvements): 1025 N FM 157, Venus, Texas, further described in Exhibit A.

Extended Maturity Date of Note: January 1, 2022.

Modified Terms: Note shall bear interest rate at 12% (twelve percent) per annum from January 1, 2021 until December 31, 2021.

The Principal Amount and all accrued and unpaid interest from the date of the original note are due and payable on January 1, 2022, and the interest is due and payable monthly as it accrues.

App.009

The monthly interest payments are One Thousand Two Hundred Seventy-Five and 00/100 dollars ($1,275.00) and are due and payable on the first day of each month with the first payment due on January 1, 2021, and on the 1ˢᵗ day of each month thereafter until the date of maturity.

### Obligor's Covenants and Warranties

The Note is secured by liens against the Property. Whether Obligor is primarily liable on the Note or not, Obligor nevertheless agrees to pay the Note and comply with the obligations expressed in the Lien Documents.

For value received, Obligor renews the Note and promises to pay to the order of Holder of Note and Lien, according to the Modified Terms, the Unpaid Principal and Interest on Note. All unpaid amounts are due by the Extended Maturity Date of Note. Obligor also extends the liens described in the Lien Documents.

The Note and the Lien Documents continue as written, except as provided in this agreement.

Obligor warrants to Holder of Note and Lien that the Note and the Lien Documents, as modified, are valid and enforceable and represents that they are not subject to rights of offset, rescission, or other claims.

When the context requires, singular nouns and pronouns include the plural.

DJD Land Partners, LLC

Tim Barton
Its Manager

App.010

# EXHIBIT A

1025 N FM 157, Venus Texas 76084

GEO Num: 126.0857.00030

Legal description of land:

Being a 0.977 acre tract of land situated in the Absolam Williams Survey, Abstract No. 857, Johnson County, Texas and being all of that certain called 0.979 acre tract of land described in Deed from JLRJ, Inc. to Jason Alan Williams and recorded in Instrument No. 2013012640 of the Deed Records of Johnson County, Texas, said 0.977 acre tract to more particularly described by metes and bounds as follows:

THENCE South 60°23'32"West with South line of said 0.979 acre tract same being the East line of said that certain called Tract Three, 128.30 acre tract of land described in Deed from Henry C. Hill to Anastasia Energy, LLC and recorded in Volume 3969, Page 264 of said Deed Records a distance of 118.31 feet to a 1/2" iron rod cap found for corner at the Southwest corner of said 0.979 acre;

THENCE North 30°02' 19"West with West line of said 0.979 acre tract and the East line of said 128.30 acre tract a distance 504.00 to a Rail Road Spike found for corner in the centerline of County Road 501 at the Northwest corner of said 0.979 acre tract;

THENCE North 37°39'29" East with the North line of said 0.979 acre tract and the center line of said County Road 501 a distance of 16.66 feet to a Rail Road Spike found for corner at Northeast corner of said 0.979 acre tract and being in the West line of Farm to Market Road 157 and also being at the beginning of a non tangent curve to the right;

THENCE in a Southeasterly direction with said curve to the right having a radius of 1404.92 feet, whose chords bears South 41 °30' 19" East- 523.30 feet for an arc length of 526.37 feet back to the Point of Beginning and Containing 42,577 Square Feet or 0.977 acre of land more or less.

I do hereby certify that this is a true and correct copy of the original
record now on file in the Official Public Records of Johnson County, Texas.
To verify the authenticity of this copy please visit:
https://johnson.tx.publicsearch.us/verifycert/9j3srxGg

**Johnson County Clerk**

Digitally signed
by Becky Ivey
Date: 2020.08.03
09:01:59 -05:00

2020 – 4968  02/21/2020  11:38AM  Page 1 of 39

# RECORDING COVER PAGE TO PREVIOUSLY FILED DEED OF TRUST IMMEDIATELY FOLLOWING THIS PAGE

**THIS DOCUMENT IS BEING REFILED FOR THE SOLE PURPOSE OF CORRECTING THE LEGAL DESCRIPTION OF THE PROPERTY ENCUMBERED BY THIS DEED OF TRUST RECORDED IN INSTRUMENT NO. 4555 IN THE JOHNSON COUNTY CLERK REAL PROPERTY TO THAT LEGAL DESCRIPTION ATTACHED HERETO AS EXHIBIT "B". SAID PROPERTY IN EXHIBIT "B" SUPERSEDES IN ITS ENTIRETY THAT PROPERTY SET FORTH IN EXHIBIT "A".**

App.012

I do hereby certify that this is a true and correct copy of the original record now on file in the Official Public Records of Johnson County, Texas. To verify the authenticity of this copy please visit: https://johnson.tx.publicsearch.us/verifycert/9j3srxGg

**Johnson County Clerk**

Digitally signed by Becky Ivey
Date: 2020.08.03 09:01:59 -05:00

2020 - 4968 02/21/2020 11:38AM Page 2 of 39
2020 - 4555 02/18/2020 3:08PM Page 1 of 18

**NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OR ALL OF THE FOLLOWING INFORMATION FROM ANY INSTRUMENT THAT TRANSFERS AN INTEREST IN REAL PROPERTY BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.**

### Deed of Trust

### Basic Information

**Date:** February 11, 2020.

**Grantor:** DJD Land Partners, LLC, and LDG001, LLC

**Grantor's Mailing Address:**

9911 Champa Drive
Dallas, Texas 75218
c/o Michael Matthews, Manager

**Trustee:** Robert W. Buchholz.

**Trustee's Mailing Address:**

420 S. Cesar Chavez Blvd., Suite 300
Dallas, Texas 75201

**Lender:** Southern Star Capital LLC d/b/a Reliance Mortgage Company

**Lender's Mailing Address:**

5220 Spring Valley Road, Suite 602
Dallas, Texas 75254

**Obligation:**

Note:
Date: November 27, 2018.
Original principal amount: $127,500.00.
Borrower: DJD Land Partners, LLC

Lender: Southern Star Capital LLC d/b/a Reliance Mortgage Company
Maturity date: Original January 1, 2020, Extended to January 1, 2021.
Terms of Payment: As provided in the Modification and Extension Agreement of January 10, 2020 note.

**Deed of Trust Security Agreement**                                        **Page - 1**

App.013

I do hereby certify that this is a true and correct copy of the original record now on file in the Official Public Records of Johnson County, Texas. To verify the authenticity of this copy please visit: https://johnson.tx.publicsearch.us/verifycert/9j3srxGg

**Johnson County Clerk**

Digitally signed by Becky Ivey Date: 2020.08.03 09:01:59 -05:00

2020 - 4968 02/21/2020 11:38AM Page 3 of 39
2020 - 4555 02/18/2020 3:08PM Page 2 of 18

Note:
Date: November 14, 2018.
Original principal amount: $135,000.00.
Borrower: LDG001, LLC

Lender: Southern Star Capital LLC d/b/a Reliance Mortgage Company
Maturity date: Original November 14, 2019, Extended to November 14, 2020.
Terms of Payment: As provided in the Modification and Extension Agreement of January 10, 2020 note.

**Property (including any improvements):**

The properties described in the attached Exhibit "A" which is incorporated herein by reference.

**Exceptions to Conveyance and Warranty:**

None.

**A. Granting Clause**

For value received and to secure payment of both Obligations, each Grantor conveys the Property to Trustee in trust. Grantor warrants and agrees to defend the title to the Property, subject to the Other Exceptions to Conveyance and Warranty. On payment of all Obligations stated herein and all other amounts secured by this deed of trust, this deed of trust will have no further effect, and Lender will release it at Grantor's expense.

This Deed of Trust is given as additional collateral to secure the Notes referenced herein and is not given in lieu of the Prior Deeds of Trust recorded at:

1. Deed of Trust filed on December 5, 2018 in Johnson County Texas Document No 2018-33077.
2. Deed of Trust filed on November 26, 2018 in Johnson County Texas Document No 2018-32085.

**B. Grantor's Obligations**

*B.1.* Grantor agrees to maintain all property and liability insurance coverages with respect to the Property, revenues generated by the Property, and operations on the Property that Lender reasonably requires ("Required Insurance Coverages"), issued by insurers and written on policy forms acceptable to Lender, and as to property loss, that are payable to Lender under policies containing standard mortgage clauses, and deliver evidence of the Required Insurance Coverages in a form acceptable to Lender before execution of this deed of trust and again at least ten days before the expiration of the Required Insurance Coverages.

*B.2* Grantor agrees to-

**Deed of Trust Security Agreement**                                    **Page - 2**

App.014

I do hereby certify that this is a true and correct copy of the original record now on file in the Official Public Records of Johnson County, Texas. To verify the authenticity of this copy please visit: https://johnson.tx.publicsearch.us/verifycert/9j3srxGg

**Johnson County Clerk**

Digitally signed by Becky Ivey Date: 2020.08.03 09:01:59 -05:00

2020 - 4968 02/21/2020 11:38AM Page 4 of 39
2020 - 4555 02/18/2020 3:08PM Page 3 of 18

a. keep the Property in good repair and condition;

b. pay all taxes and assessments on the Property before delinquency, not authorize a taxing entity to transfer its tax lien on the Property to anyone other than Lender, and not request a deferral of the collection of taxes pursuant to section 33.06 of the Texas Tax Code;

c. defend title to the Property subject to the Other Exceptions to Conveyance and Warranty and preserve the lien's priority as it is established in this deed of trust;

d. obey all laws, ordinances, and restrictive covenants applicable to the Property;

e. keep any buildings occupied as required by the Required Insurance Coverages;

f. if the lien of this deed of trust is not a first lien, pay or cause to be paid all prior lien notes and abide by or cause to be abided by all prior lien instruments;

g. notify Lender of any change of address; and

**C. Lender's Rights**

*C.1.* Lender or Lender's mortgage servicer may appoint in writing one or more substitute trustees, succeeding to all rights and responsibilities of Trustee.

*C.2.* If the proceeds of the Obligation are used to pay any debt secured by prior liens, Lender is subrogated to all the rights and liens of the holders of any debt so paid.

*C.3.* Lender may apply any proceeds received under the property insurance policies covering the Property either to reduce the Obligation or to repair or replace damaged or destroyed improvements covered by the policy. If the Property is Grantor's primary residence and Lender reasonably determines that repairs to the improvements are economically feasible, Lender will make the property insurance proceeds available to Grantor for repairs.

*C.4.* Notwithstanding the terms of the Note to the contrary, and unless applicable law prohibits, all payments received by Lender from Grantor with respect to the Obligation or this deed of trust may, at Lender's discretion, be applied first to amounts payable under this deed of trust and then to amounts due and payable to Lender with respect to the Obligation, to be applied to late charges, principal, or interest in the order Lender in its discretion determines.

*C.5.* If Grantor fails to perform any of Grantor's obligations, Lender may perform those obligations and be reimbursed by Grantor on demand for any amounts so paid, including attorney's fees, plus interest on those amounts from the dates of payment at the rate stated in the Note for matured, unpaid amounts. The amount to be reimbursed will be secured by this deed of trust.

*C.6.* **COLLATERAL PROTECTION INSURANCE NOTICE**

I do hereby certify that this is a true and correct copy of the original record now on file in the Official Public Records of Johnson County, Texas. To verify the authenticity of this copy please visit: https://johnson.tx.publicsearch.us/verifycert/9j3srxGg

**Johnson County Clerk**

Digitally signed by Becky Ivey
Date: 2020.08.03 09:01:59 -05:00

2020 - 4968 02/21/2020  11:38AM  Page 5 of 39
2020 - 4555 02/18/2020  3:08PM  Page 4 of 18

    **(A) the Grantor is required to:**

        **(i) keep the collateral insured against damage in the amount the Lender specifies;**

        **(ii) purchase the insurance from an insurer that is authorized to do business in the state of Texas or an eligible surplus lines insurer; and**

        **(iii) name the Lender as the persons to be paid under the policy in the event of a loss;**

    **(B) the Grantor must, if required by the Lender, deliver to the Lender a copy of the policy and proof of the payment of premiums; and**

    **(C) if the Grantor fails to meet any requirement listed in Paragraph (A) or (B), the Lender may obtain collateral protection insurance on behalf of the Grantor at the Grantor's expense.**

*C.7.* If a default exists in payment of either Obligation or performance of Grantor obligations and the default continues after any required notice of the default and the time allowed to cure, Lender may-

    a. declare the unpaid principal balance and earned interest on both Obligations immediately due;

    b. exercise Lender's rights with respect to rent under the Texas Property Code as then in effect;

    c. direct Trustee to foreclose this lien, in which case Lender or Lender's agent will cause notice of the foreclosure sale to be given as provided by the Texas Property Code as then in effect; and

    d. purchase the Property at any foreclosure sale by offering the highest bid and then have the bid credited on the Obligation.

*C.8.* If Grantor fails to pay any part of principal or interest secured by a prior lien or liens on the Property when it becomes payable or defaults on any prior lien instrument, the entire debt secured by this deed of trust will immediately become payable at the option of Lender.

*C.9.* Any act or occurrence that would constitute default under the terms of any lien superior to the lien securing the Note will constitute a default under this Deed of Trust securing the Note.

*C.10.* Lender may remedy any default without waiving it and may waive any default without waiving any prior or subsequent default.

I do hereby certify that this is a true and correct copy of the original record now on file in the Official Public Records of Johnson County, Texas. To verify the authenticity of this copy please visit: https://johnson.tx.publicsearch.us/verifycert/9j3srxGg

Johnson County Clerk

Digitally signed by Becky Ivey
Date: 2020.08.03 09:01:59 -05:00

2020 - 4968 02/21/2020 11:38AM Page 6 of 39
2020 - 4555 02/18/2020 3:08PM Page 5 of 18

If directed by Lender to foreclose this lien, Trustee will-

*D.1.* either personally or by agent give notice of the foreclosure sale as required by the Texas Property Code as then in effect;

*D.2.* sell and convey all or part of the Property "AS IS" to the highest bidder for cash with a general warranty binding Grantor, subject to the Prior Liens and to the Other Exceptions to Conveyance and Warranty and without representation or warranty, express or implied, by Trustee;

*D.3.* from the proceeds of the sale, pay, in this order-

    a. expenses of foreclosure, including a reasonable commission to Trustee;
    b. to Lender, the full amount of principal, interest, attorney's fees, and other charges due and unpaid;
    c. any amounts required by law to be paid before payment to Grantor; and
    d. to Grantor, any balance; and

*D.4.* be indemnified, held harmless, and defended by Lender against all costs, expenses, and liabilities incurred by Trustee for acting in the execution or enforcement of the trust created by this deed of trust, which includes all court and other costs, including attorney's fees, incurred by Trustee in defense of any action or proceeding taken against Trustee in that capacity.

**E. General Provisions**

*E.1.* If any of the Property is sold under this deed of trust, Grantor must immediately surrender possession to the purchaser. If Grantor does not, Grantor will be a tenant at sufferance of the purchaser, subject to an action for forcible detainer.

*E.2.* Recitals in any trustee's deed conveying the Property will be presumed to be true.

*E.3.* Proceeding under this deed of trust, filing suit for foreclosure, or pursuing any other remedy will not constitute an election of remedies.

*E.4.* This lien will remain superior to liens later created even if the time of payment of all or part of the Obligation is extended or part of the Property is released.

*E.5.* If any portion of the Obligation cannot be lawfully secured by this deed of trust, payments will be applied first to discharge that portion.

*E.6.* Grantor assigns to Lender all amounts payable to or received by Grantor from condemnation of all or part of the Property, from private sale in lieu of condemnation, and from damages caused by public works or construction on or near the Property. After deducting any expenses incurred, including attorney's fees and court and other costs, Lender will either release any remaining amounts to Grantor or apply such amounts to reduce the Obligation. Lender will not be liable for failure to collect or to exercise diligence in collecting any such amounts. Grantor will immediately

Case 3:22-cv-02118-X    Document 499    Filed 05/24/24    Page 21 of 397    PageID 17467

I do hereby certify that this is a true and correct copy of the original record now on file in the Official Public Records of Johnson County, Texas. To verify the authenticity of this copy please visit: https://johnson.tx.publicsearch.us/verifycert/9j3srxGg

Johnson County Clerk

Digitally signed by Becky Ivey Date: 2020.08.03 09:01:59 -05:00

*E.7.* Grantor collaterally assigns to Lender all present and future rent from the Property and its proceeds. Grantor warrants the validity and enforceability of the assignment. Grantor will apply all rent to payment of the Obligation and performance of this deed of trust, but if the rent exceeds the amount due with respect to the Obligation and the deed of trust, Grantor may retain the excess. If a default exists in payment of the Obligation or performance of this deed of trust, Lender may exercise Lender's rights with respect to rent under the Texas Property Code as then in effect. Lender neither has nor assumes any obligations as lessor or landlord with respect to any occupant of the Property. Lender may exercise Lender's rights and remedies under this paragraph without taking possession of the Property. Lender will apply all rent collected under this paragraph as required by the Texas Property Code as then in effect. Lender is not required to act under this paragraph, and acting under this paragraph does not waive any of Lender's other rights or remedies.

*E.8.* Interest on the debt secured by this deed of trust will not exceed the maximum amount of nonusurious interest that may be contracted for, taken, reserved, charged, or received under law. Any interest in excess of that maximum amount will be credited on the principal of the debt or, if that has been paid, refunded. On any acceleration or required or permitted prepayment, any such excess will be canceled automatically as of the acceleration or prepayment or, if already paid, credited on the principal of the debt or, if the principal of the debt has been paid, refunded.

*E.9.* In no event may this deed of trust secure payment of any debt that may not lawfully be secured by a lien on real estate or create a lien otherwise prohibited by law.

*E.10.* When the context requires, singular nouns and pronouns include the plural.

*E.11.* The term *Note* includes all extensions, modifications, and renewals of the Note and all amounts secured by this deed of trust.

*E.12.* Grantor warrants that the extension of credit evidenced by the Note secured hereby is solely for business or commercial purposes, other than agricultural purposes. The Grantor further warrants that the credit transaction evidenced by the Note is specifically exempted under Regulation Z issued by the Board of Governors of the Federal Reserve System and Title I of the Consumer Credit Protection Act and that no disclosures are required to be given under such regulations and federal laws in connection with the above transaction. Grantor does not claim any part of the Property as residential or business homestead. Grantor acknowledges that Lenders rely on the truth of representations in this paragraph in making the Note secured by this deed of trust.

*E.13.* Grantor will furnish to Lender or other holder of the Note annually, before January 31st of each year, copies of tax receipts showing that all taxes on the Property have been paid. Failure to comply with the foregoing for any reason whatsoever shall constitute a default.

If Grantor fails to pay all taxes on the Property prior to January 31st of each year for the tax period covering the preceding calendar year for any reason whatsoever, including, but not limited to, protests of value, processing of tax account split-out requests, or failure of the tax authorities to certify the tax roll or account, at the option of Lender, Grantor shall immediately deposit with

I do hereby certify that this is a true and correct copy of the original record now on file in the Official Public Records of Johnson County, Texas. To verify the authenticity of this copy please visit: https://johnson.tx.publicsearch.us/verifycert/9j3srxGg

Digitally signed by Becky Ivey
Date: 2020.08.03 09:01:59 -05:00

Johnson County Clerk

2020 - 4968 02/21/2020 11:38AM Page 8 of 39
2020 - 4555 02/18/2020 3:08PM Page 7 of 18

All such funds shall bear no interest whatsoever, may be mingled with the general funds of Lender and shall be applied by Lender toward the payment of taxes and assessments; provided, however, that, if a Default shall have occurred hereunder, such funds may at Lender's option be applied to the payment of the Obligation in the order determined by Lender in its sole discretion, and that Lender may at any time, in its sole discretion, apply all or any part of such funds toward the payment of any such taxes, assessments, charges, legal fees, penalties or premiums which are past due, together with any penalties or late charges with respect thereto.

Lender shall have the right to rely upon tax information furnished by applicable taxing authorities in the payment of such taxes and assessments and Lender shall have no obligation to make any protest of any such taxes or assessments. Any excess over the amounts required for such purposes shall be held by Lender for future use, applied to the Obligation or refunded to Grantor, at Lender's option, and any deficiency in such funds so deposited shall be made up by Grantor upon demand by Lender.

The conveyance or transfer of Grantor's interest in the Property for any reason (including, without limitation, the foreclosure of a lien or security interest or a transfer by operation of law) shall constitute an assignment or transfer of Grantor's interest in and rights to such funds held by Lender under this subparagraph but subject to the rights of Lender hereunder.

Grantor will annually furnish to Lender or other holder of the Note evidence of current paid-up Required Insurance Coverage naming Lender or other holder of the Note as an insured.

**E.14. GRANTOR MAY FURNISH ANY INSURANCE REQUIRED BY THIS DEED OF TRUST EITHER THROUGH EXISTING POLICIES OWNED OR CONTROLLED BY GRANTOR OR THROUGH EQUIVALENT COVERAGE FROM ANY INSURANCE COMPANY AUTHORIZED TO TRANSACT BUSINESS IN TEXAS.**

*E.15.* If all or any part of the Property is sold, transferred, or conveyed without the prior written consent of Lender or other holder of the Note, Lender or other holder of the Note may, at its sole option, declare the outstanding principal balance of the Note plus accrued interest immediately due and payable. Lender or other holder of the Note has no obligation to consent to any such sale or conveyance of the Property, and Lender or other holder of the Note is entitled to condition any consent on a change in the interest rate that will thereafter apply to the Note and any other change in the terms of the Note or Deed of Trust that Lender or other holder of the Note in its sole discretion deems appropriate. A lease for a period longer than one year, a lease with an option to purchase, or a contract for deed will be deemed to be a sale, transfer, or conveyance of the Property for purposes of this provision. The creation of a subordinate lien without the consent of Lender or other holder of the Note will be construed as a sale or conveyance of the Property, but any subsequent sale under a subordinate lien to which Lender or other holder of the Note has consented will not be construed as a sale or conveyance of the Property.

*E.16.* Grantor agrees not to grant any lien or security interest in the Property or to permit any junior

App.019

I do hereby certify that this is a true and correct copy of the original record now on file in the Official Public Records of Johnson County, Texas. To verify the authenticity of this copy please visit: https://johnson.tx.publicsearch.us/verifycert/9j3srxGg

**Johnson County Clerk**

Digitally signed by Becky Ivey
Date: 2020.08.03
09:01:59 -05:00

2020 - 4968 02/21/2020 11:38AM Page 9 of 39
2020 - 4555 02/18/2020 3:08PM Page 8 of 18

days, to either remove the involuntary encumbrance or provide a bond acceptable to Lender against the involuntary encumbrance.

*E.17.* This deed of trust binds, benefits, and may be enforced by the successors in interest of all parties.

*E.18.* If Grantor and Borrower are not the same person, the term *Grantor* includes Borrower.

*E.19.* Grantor and each surety, endorser, and guarantor of the Obligation waive, to the extent permitted by law, all (a) demand for payment, (b) presentation for payment, (c) notice of intention to accelerate maturity, (d) notice of acceleration of maturity, (e) protest, (f) notice of protest and (g) rights under sections 51.003, 51.004, and 51.005 of the Texas Property Code.

*E.20.* Grantor will have full recourse liability for repayment of the principal and interest of the Note and the performance of all covenants and agreements of Grantor in this Deed of Trust.

*E.21.* Grantor agrees to pay reasonable attorney's fees, trustee's fees, and court and other costs of enforcing Lender's rights under this deed of trust if an attorney is retained for its enforcement.

*E.22.* Grantor agrees to execute, acknowledge, and deliver to Lender any document requested by Lender, at Lender's request from time to time, to

(a) correct any defect, error, omission, or ambiguity in this deed of trust or in any other document executed in connection with the Note or this deed of trust;
(b) comply with Grantor's obligations under this deed of trust and other documents;
(c) subject to and perfect the liens and security interests of this deed of trust and other documents any property intended to be covered thereby; and
(d) protect, perfect, or preserve the liens and the security interests of this deed of trust and other documents against third persons or make any recordings, file any notices, or obtain any consents requested by Lender in connection therewith. Grantor agrees to pay all costs of the foregoing.

*E.23.* Lender, as a matter of right and without regard to the sufficiency of the security for repayment of the Note and performance and discharge of the Obligations, without notice to Grantor and without any showing of insolvency, fraud, or mismanagement on the part of Grantor, and without the necessity of filing any judicial or other proceeding other than the proceeding for appointment of a receiver, shall be entitled to the appointment of a receiver or receivers of the Property or any part thereof, and of the Rents, and Grantor hereby irrevocably consents to the appointment of a receiver or receivers. Any receiver appointed pursuant to the provisions of this subsection shall have the usual powers and duties of receivers in such matters.

*E.24* Grantor shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances on or in the Property. Grantor shall not do, nor allow anyone else to do, anything affecting the Property that is in violation of any Environmental Law. The first sentence of this Section shall not apply to the presence, use, or storage on the Property of small quantities

App.020

I do hereby certify that this is a true and correct copy of the original record now on file in the Official Public Records of Johnson County, Texas. To verify the authenticity of this copy please visit: https://johnson.tx.publicsearch.us/verifycert/9j3srxGg

**Johnson County Clerk**

Digitally signed by Becky Ivey Date: 2020.08.03 09:01:59 -05:00

Grantor shall promptly give Lender written notice of any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Grantor has actual knowledge. If Grantor learns, or is notified by any governmental or regulatory authority, that any removal or other remediation of Hazardous Substance affecting the Property is necessary, Grantor shall promptly take all necessary remedial actions in accordance with Environmental Law.

As used in this paragraph, "Hazardous Substances" are those substances defined as toxic or hazardous substances by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials. As used in this paragraph, "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection.

*E.25.* If any provision of this deed of trust is determined to be invalid or unenforceable, the validity or enforceability of any other provision will not be affected.

*E.26.* The term Lender includes any mortgage servicer for Lender.

*E.27.* Grantor hereby grants Lenders a right of first refusal with respect to Grantor's power to authorize any third party (other than Lenders pursuant to its rights as set forth in this instrument) to pay ad valorem taxes on the Property and authorize a taxing entity to transfer its tax lien on the Property to that third party. Grantor's authorization to any third party (other than Lenders) to pay the ad valorem taxes and receive transfer of a taxing entity's lien for ad valorem taxes shall be null and void and of no force and effect unless Lenders, within ten days after receiving written notice from Grantor, fail to pay the ad valorem taxes pursuant to Lenders' rights as set forth in this instrument.

*E.28.* Grantor warrants that the execution of this deed of trust shall not impair or affect any other security, which may be given to secure the payment of the Obligation secured hereby, and all such additional security shall be considered as cumulative. The taking of additional security, execution of releases and partial releases of the security (regardless of consideration for the release or partial release) or any extension of time of payment of the Obligation secured hereby shall not diminish the force, effect, or lien of this deed of trust and shall not affect or impair the liability of any maker, surety, or endorser for the payment of said Obligation.

*E.29.* In the event of any conflict between the provisions of this Deed of Trust and the Note, guaranty (if any) and any of the other documents executed in connection with this transaction, it is the intent of the parties hereto that the provisions of this Deed of Trust shall control. The parties hereto acknowledge that they were represented by competent counsel in connection with the negotiation, drafting and execution of the Deed of Trust, the Note, guaranty (if any) and any of the other documents executed in connection with this transaction and that such Deed of Trust, Note, guaranty (if any) and all of the other documents executed in connection with this transaction shall not be subject to the principle of construing their meaning against the party which drafted same.

I do hereby certify that this is a true and correct copy of the original record now on file in the Official Public Records of Johnson County, Texas. To verify the authenticity of this copy please visit: https://johnson.tx.publicsearch.us/verifycert/9j3srxGg

**Johnson County Clerk**

Digitally signed by Becky Ivey
Date: 2020.08.03 09:01:59 -05:00

**SELECTION (WHICH COUNSEL WAS NOT DIRECTLY OR INDIRECTLY IDENTIFIED, SUGGESTED, OR SELECTED BY THE OTHER PARTY), VOLUNTARILY WAIVES A TRIAL BY JURY OF ANY ISSUE ARISING IN AN ACTION OR PROCEEDING BETWEEN THE PARTIES OR THEIR SUCCESSORS, UNDER OR CONNECTED WITH THIS CONTRACT OR ITS PROVISIONS. GRANTOR AND LENDER ACKNOWLEDGE TO EACH OTHER THAT GRANTOR AND LENDER ARE NOT IN SIGNIFICANTLY DISPARATE BARGAINING POSITIONS.**

*E.31* Additional Definitions used in this paragraph:

"Constituent Party": any (a) shareholder, member, general partner or managing member of Grantor, as applicable, or (b) any signatory to this Deed of Trust that signs on Grantor's behalf that is a corporation, general partnership, limited partnership, limited liability company, joint venture, trust, or other type of business organization, or(c) any Guarantor.

"Loan Documents": The Note, this Deed of Trust, the Guaranty, and any and all other documents now or hereafter executed by Grantor, Guarantor, or any other person or party in connection with the loan evidenced by the Note or in connection with the payment of the Obligation or the performance and discharge of the Obligations.

**GRANTOR SHALL INDEMNIFY, DEFEND, PROTECT AND HOLD HARMLESS LENDER AND TRUSTEE, THEIR RESPECTIVE PARENTS, SUBSIDIARIES, DIRECTORS, OFFICERS, EMPLOYEES, REPRESENTATIVES, AGENTS, MEMBERS, SUCCESSORS, AND ASSIGNS FROM AND AGAINST ANY AND ALL LIABILITY, DAMAGE, LOSS, COST, OR EXPENSE (INCLUDING, WITHOUT LIMITATION, ATTORNEYS' FEES AND EXPENSES), ACTION, PROCEEDING, CLAIM OR DISPUTE INCURRED OR SUFFERED BY THE FOREGOING PARTIES SO INDEMNIFIED WHETHER OR NOT AS THE RESULT OF THE NEGLIGENCE OF ANY PARTY SO INDEMNIFIED, WHETHER VOLUNTARILY OR INVOLUNTARILY INCURRED OR SUFFERED, IN RESPECT OF THE FOLLOWING:**

**(i) ANY LITIGATION CONCERNING THIS DEED OF TRUST, THE OTHER LOAN DOCUMENTS OR THE PROPERTY, OR ANY INTEREST OF GRANTOR OR LENDER THEREIN, OR THE RIGHT OF OCCUPANCY THEREOF BY GRANTOR OR LENDER, WHETHER OR NOT ANY SUCH LITIGATION IS PROSECUTED TO A FINAL, NON-APPEALABLE JUDGMENT;**

**(ii) ANY DISPUTE, INCLUDING DISPUTES AS TO THE DISBURSEMENT OF PROCEEDS OF THE NOTE NOT YET DISBURSED, AMONG OR BETWEEN ANY OF THE CONSTITUENT PARTIES OR OTHER PARTNERS OR VENTURERS OF GRANTOR IF GRANTOR IS A GENERAL OR LIMITED PARTNERSHIP, OR AMONG OR BETWEEN ANY EMPLOYEES, OFFICERS, DIRECTORS, SHAREHOLDERS, MEMBERS OR MANAGERS OF GRANTOR IF GRANTOR IS A CORPORATION OR LIMITED LIABILITY COMPANY, OR**

I do hereby certify that this is a true and correct copy of the original record now on file in the Official Public Records of Johnson County, Texas. To verify the authenticity of this copy please visit: https://johnson.tx.publicsearch.us/verifycert/9j3srxGg

Johnson County Clerk

Digitally signed by Becky Ivey
Date: 2020.08.03 09:01:59 -05:00

2020 - 4968 02/21/2020 11:38AM Page 12 of 39
2020 - 4555 02/18/2020 3:08PM Page 11 of 18

OTHER ENTITY;

(iii) ANY ACTION TAKEN OR NOT TAKEN BY LENDER OR TRUSTEE WHICH IS ALLOWED OR PERMITTED UNDER THIS DEED OF TRUST OR ANY OF THE OTHER LOAN DOCUMENTS RELATING TO GRANTOR, THE PROPERTY, ANY CONSTITUENT PARTIES OR OTHERWISE IN CONNECTION WITH THE LOAN DOCUMENTS, INCLUDING WITHOUT LIMITATION, THE PROTECTION OR ENFORCEMENT OF ANY LIEN, SECURITY INTEREST OR OTHER RIGHT, REMEDY OR RECOURSE CREATED OR AFFORDED BY THIS DEED OF TRUST OR THE OTHER LOAN DOCUMENTS;

(iv) ANY ACTION BROUGHT BY LENDER OR TRUSTEE AGAINST GRANTOR UNDER THIS DEED OF TRUST OR THE OTHER LOAN DOCUMENTS, WHETHER OR NOT SUCH ACTION IS PROSECUTED TO A FINAL, NON-APPEALABLE JUDGMENT;

(v) ALL CLAIMS, CAUSES OF ACTION, LEGAL PROCEEDINGS, LIABILITY, OR DISPUTES ARISING OUT OF OR IN ANY WAY RELATED TO THE PROPERTY AND ITS IMPROVEMENTS;

(vi) ALL CLAIMS, CAUSES OF ACTION, LEGAL PROCEEDINGS, LIABILITY, OR DISPUTES ARISING OUT OF OR IN ANY WAY RELATED TO THE SALE AND PURCHASE OF THE PROPERTY AS WELL AS ANY AGREEMENTS RELATED THERETO AS WELL AS ANY SUBSEQUENT RESALE AND/OR TRANSFER OF THE PROPERTY BY GRANTOR; AND

(vii) ANY AND ALL LOSS, DAMAGE, COSTS, EXPENSE, ACTION, CAUSES OF ACTION, OR LIABILITY (INCLUDING ATTORNEYS' FEES AND COSTS) DIRECTLY OR INDIRECTLY ARISING FROM OR ATTRIBUTABLE TO THE USE, GENERATION, MANUFACTURE, PRODUCTION, STORAGE, RELEASE, THREATENED RELEASE, DISCHARGE, DISPOSAL, OR PRESENCE OF A HAZARDOUS SUBSTANCE ON, IN, UNDER OR ABOUT THE PROPERTY, WHETHER KNOWN OR UNKNOWN AT THE TIME OF THE EXECUTION HEREOF, INCLUDING WITHOUT LIMITATION (A) ALL FORESEEABLE CONSEQUENTIAL DAMAGES OF ANY SUCH USE, GENERATION, MANUFACTURE, PRODUCTION, STORAGE, RELEASE, THREATENED RELEASE, DISCHARGE, DISPOSAL, OR PRESENCE, AND (B) THE COSTS OF ANY REQUIRED OR NECESSARY ENVIRONMENTAL INVESTIGATION OR MONITORING, ANY REPAIR, CLEANUP, 13 OR DETOXIFICATION OF THE PROPERTY, AND THE PREPARATION AND IMPLEMENTATION OF ANY CLOSURE, REMEDIAL, OR OTHER REQUIRED PLANS.

LENDER AND/OR TRUSTEE MAY EMPLOY AN ATTORNEY OR ATTORNEYS TO PROTEST OR ENFORCE ITS RIGHTS, REMEDIES AND RECOURSES UNDER THIS

I do hereby certify that this is a true and correct copy of the original record now on file in the Official Public Records of Johnson County, Texas. To verify the authenticity of this copy please visit: https://johnson.tx.publicsearch.us/verifycert/9j3srxGg

**Johnson County Clerk**

Digitally signed by Becky Ivey Date: 2020.08.03 09:01:59 -05:00

2020 - 4968 02/21/2020 11:38AM Page 13 of 39
2020 - 4555 02/18/2020 3:08PM Page 12 of 18

AND OTHER MATTERS. GRANTOR SHALL REIMBURSE LENDER AND/OR TRUSTEE FOR THEIR RESPECTIVE ATTORNEYS' FEES AND EXPENSES (INCLUDING EXPENSES AND COSTS FOR EXPERTS) IMMEDIATELY UPON RECEIPT OF A WRITTEN DEMAND THEREFOR, WHETHER ON A MONTHLY OR OTHER TIME INTERVAL, AND WHETHER OR NOT AN ACTION IS ACTUALLY COMMENCED OR CONCLUDED. ALL OTHER REIMBURSEMENT AND INDEMNITY OBLIGATIONS HEREUNDER SHALL BECOME DUE AND PAYABLE WHEN ACTUALLY INCURRED BY LENDER AND/OR TRUSTEE. ANY PAYMENTS NOT MADE WITHIN FIVE (5) DAYS AFTER WRITTEN DEMAND THEREFOR SHALL BEAR INTEREST AT THE ANNUAL INTEREST RATE ON MATURED, UNPAID AMOUNTS FROM THE DATE OF SUCH DEMAND UNTIL FULLY PAID. THE PROVISIONS OF THIS SECTION E.31 SHALL SURVIVE REPAYMENT OF THE NOTE AND PERFORMANCE OF THE OBLIGATIONS, THE RELEASE OF THE LIEN OF THIS DEED OF TRUST, ANY FORECLOSURE (OR ACTION IN LIEU OF FORECLOSURE), THE TRANSFER BY GRANTOR OF ANY OR ALL OF ITS RIGHT, TITLE AND INTEREST IN OR TO THE PROPERTY AND THE EXERCISE BY LENDER OF ANY AND ALL REMEDIES SET FORTH HEREIN OR IN THE LOAN DOCUMENTS.

*E.32.* GRANTOR WAIVES ITS RIGHTS UNDER THE TEXAS DECEPTIVE TRADE PRACTICES–CONSUMER PROTECTION ACT, SECTION 17.41 ET SEQ. OF THE TEXAS BUSINESS AND COMMERCE CODE, A LAW THAT GIVES CONSUMERS SPECIAL RIGHTS AND PROTECTIONS. AFTER CONSULTATION WITH AN ATTORNEY OF ITS OWN SELECTION, GRANTOR VOLUNTARILY CONSENTS TO THIS WAIVER.

### NOTICE

THE WRITTEN LOAN AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.

THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

NOTICE OF INDEMNIFICATION: GRANTOR HEREBY ACKNOWLEDGES AND AGREES THAT THIS DEED OF TRUST CONTAINS CERTAIN INDEMNIFICATION PROVISIONS (INCLUDING, WITHOUT LIMITATION, THOSE CONTAINED IN SECTION E.31 HEREOF) WHICH, IN CERTAIN CIRCUMSTANCES, COULD INCLUDE AN INDEMNIFICATION BY GRANTOR OF LENDER FROM CLAIMS OR LOSSES ARISING AS A RESULT OF LENDER'S OWN NEGLIGENCE.

DJD Land Partners, LLC

_____
Michael Matthews
Its Manager

Deed of Trust Security Agreement                    Page - 12

App.024

I do hereby certify that this is a true and correct copy of the original
record now on file in the Official Public Records of Johnson County, Texas.
To verify the authenticity of this copy please visit:
https://johnson.tx.publicsearch.us/verifycert/9j3srxGg

**Johnson County Clerk**

Digitally signed
by Becky Ivey
Date: 2020.08.03
09:01:59 -05:00

2020 - 4968 02/21/2020 11:38AM Page 14 of 39
2020 - 4555 02/18/2020 3:08PM Page 13 of 18

STATE OF TEXAS         §
                       §
COUNTY OF DALLAS       §

Before me, the undersigned notary public, on this day personally appeared Michael Matthews, known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he executed the same as the Manager and authorized agent for DJD Land Partners, LLC for the purposes and consideration therein expressed.

Given under my hand and seal of office this 13 day of February, 2020.

_____
Notary Public, State of Texas

Bella D Khusal
My Commission Expires
09/24/2022
ID No 131734480

**LDG001, LLC**

_____
Michael Matthews
Its Manager

STATE OF TEXAS         §
                       §
COUNTY OF DALLAS       §

Before me, the undersigned notary public, on this day personally appeared Michael Matthews, known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he executed the same as the Manager and authorized agent for LDG001, LLC for the purposes and consideration therein expressed.

Given under my hand and seal of office this 13 day February 2020.

_____
Notary Public, State of Texas

Bella D Khusal
My Commission Expires
09/24/2022
ID No 131734480

App.025

I do hereby certify that this is a true and correct copy of the original record now on file in the Official Public Records of Johnson County, Texas. To verify the authenticity of this copy please visit: https://johnson.tx.publicsearch.us/verifycert/9j3srxGg

Johnson County Clerk

Digitally signed by Becky Ivey
Date: 2020.08.03 09:01:59 -05:00

2020 - 4968 02/21/2020 11:38AM Page 15 of 39
2020 - 4555 02/18/2020 3:08PM Page 14 of 18

AFTER RECORDING RETURN DOCUMENT TO:

Brittney Martin
Citizens Bank
5151 Headquarters Dr., Suite 165
Plano, Texas  75024

**Deed of Trust Security Agreement**                    **Page - 14**

App.026

I do hereby certify that this is a true and correct copy of the original record now on file in the Official Public Records of Johnson County, Texas. To verify the authenticity of this copy please visit: https://johnson.tx.publicsearch.us/verifycert/9j3srxGg

**Johnson County Clerk**

Digitally signed by Becky Ivey Date: 2020.08.03 09:01:59 -05:00

2020 - 4968 02/21/2020 11:38AM Page 16 of 39
2020 - 4555 02/18/2020 3:08PM Page 15 of 18

# EXHIBIT "A"

TRACT ONE:

Being a 153.9273 acre tract of land situated in the B.B.B. & C.R.R, Co. Survey, Abstract No. 93, being part of that certain called 156 acre tract of land described in from Henry C. Griffin, JR to Patrick M. Griffin and recorded in Volume 3130, Page 714, of the Deed Records of Johnson County, Texas, said 153.9273 acre tract to be more particularly described by meets and bounds as follows;

BEGINNING at a 1/2" iron rod found for corner at Southwest corner of the B.B.B. & C. Railroad Company Survey, the Northwest corner of the Jackson Smith Survey, Abstract No, 758 and being in the East line of Philip P. Barnes Survey, same being the Southwest corner of said 156 acre tract, the Northwest corner of Lot 2 of Plainview Acres, Phase 3, to the Johnson County, Texas and recorded in Volume 8, Page 248 of said Deed Records and also being in the East line of that certain called 94.26 Acre tract of land form Edco Farms, Inc. and Fairview Farms, Inc. to Harper Cattle, LLC and recorded in Volume 2304, Page 895 and also being at the intersection of County Road 213 (60' right-of-way) and County Road 110 (60' right-ofway);

THENCE North 30°31'39" West with said County Road 213, the West line of said 156 acre tract and the East line of said 94,26 acre tract a distance of 2,640.00 feet to a point for corner at the Northwest corner of said 156 acre tract, the Southwest corner of that. certain called 1.074 acre tract described in deed from called 1.074 acre tract from J.W. Martin to H.C. Griffin and recorded in Volume 1583, Page241 of said Deed Records;

THENCE North 59°28'21" East with the North line of said 156 acre tract and the South line of said 1.074 acre tract at a distance of 30.00 feet passing a 1/2' iron rod with plastic marked "SANDS" set for reference corner in said Right-of-Way and continuing a total distance of 869.98 feet to a 1/2' iron rod with plastic marked "SANDS" set for corner in the North line of said 156 acre tract, the East corner of said 1.074 acre tract and also being in the South line of G.C. & S.F. Railroad (100 foot wide Right-of-Way):

THENCE North 66°32'57" East with the South line of said Railroad a distance of 682.02 feet to a 1/2' iron rod with plastic marked "SANDS" set for corner in said South line at the beginning of a curve to the right;

THENCE in a Northeasterly direction with said curve to the right having a radius of 2595.97 feet, whose chord bears North 70°50'32" East-388.67 feet for an arc length of 389.03 feet to 1/2" iron rod with plastic marked "SANDS" set for corner in South line of said Railroad;

THENCE North 75°08'08" East with said South line a distance of756.88 feet to a 1/2' iron rod with plastic marked "SANDS" set for corner in the East line of said 156 acre tract and being in the West line of that certain called 184.887 acre tract of land conveyed to Billy C. Roten by deed recorded in Volume 1248, Page 742 of said Deed Records;

I do hereby certify that this is a true and correct copy of the original record now on file in the Official Public Records of Johnson County, Texas. To verify the authenticity of this copy please visit: https://johnson.tx.publicsearch.us/verifycert/9j3srxGg

Johnson County Clerk

Digitally signed by Becky Ivey Date: 2020.08.03 09:01:59 -05:00

THENCE South 30°31'39" East with the East line of said 156 acre tract and the West Line of said 184.887 acre tract at a distance of 2,245.02 feet passing a 1/2' iron rod with plastic marked "SANDS" set for reference in the North Right-of-Way of said County Road No. 110 and continuing a total distance of 2,275.02 feet a point for corner at the Southeast corner of said 156 acre Inlet and being in the Southerly edge of County Road 110 (60' right-of-way);

THENCE South 59°28'21" West with said road and the South line of said 156 acre tract a distance of 860.80 feet a point for corner in said road and being at the Southeast corner of that certain called 1.003 acre tract of land described In deed from Patrick M. Griffin to Kaleb L. Hazard and recorded in Instrument No. 201000025372 of said Deed Records:

THENCE North 30°31'39" West across said 156 acre tract and with the East line of said 1.003 Acre tract at a distance of 30.00 feet passing a 1/2' iron rod with plastic marked "SANDS" set for reference in the East line of said 1.003 acre tract and continuing a total distance of 226.67 feet to a 1/2' iron rod with plastic marked "SANDS" set for corner at the Northeast corner of said 1.003 acre tract;

THENCE South 59°32'03" West across said 156 acre tract and the North line of said 1,003 acre tract a distance of 192.78 feet to a 1/2' iron rod with plastic marked "SANDS" set for corner at the Northwest corner of said 1.003 acre tract;

THENCE South 30°31'39" East across said 156 acre tract and the West line of said 1.003 acre tract at a distance or196.88 feet to a 1/2' iron rod with plastic marked "SANDS" set for reference in the West line of said 1.003 acre tract and continuing a total distance of 226.88 a point for corner at the Southwest corner of said 1,003 acre tract and in the Southerly line of County Road 110;

THENCE South 59°28'21" West with said County Road 110 and the South line of said 156 acre tract a distance of 1603.10 feet back to the Point of Beginning and Containing 6,705,073 Square feet and 153.9273 acres of land of which 14944 acres lie within County Roads, leaving a net acreage of 150.4329 acres of land, more or less.

TRACT TWO:
Being a 47.8572 acre tract of land situated in the Jackson Smith Survey, Abstract No. 758, Johnson County, Texas, being all of that certain called 47-1/2 acre tract of land described in deed from Henry C. Griffin, Jr. to Patrick M. Griffin and recorded in Volume 3130, Page 714 of the Deed Records of Johnson County, Texas said 46,9003 acre tract to be more particularly described by meets and bounds as follows:

COMMENCING at a 1/2" iron rod found for corner at the Northwest corner of said Jackson Smith Survey, same being the Southwest corner of the B.B.B. & C.R.R. Co. Survey, Abstract No. 93 and being at the intersection of County Road No. 213 (60' right-of-way) with County Road No. 110 (60' right-of-way);

THENCE with the North line of said Jackson Smith Survey and the South line of said B.B.B. & C.R.R. Co. Survey and with County Road No, 110 a distance of 2,656.62 feet to a point for corner in the Southerly line of said County Road 110, same being the Northwest corner of said 47-1/2

I do hereby certify that this is a true and correct copy of the original record now on file in the Official Public Records of Johnson County, Texas.
To verify the authenticity of this copy please visit:
https://johnson.tx.publicsearch.us/verifycert/9j3srxGg

**Johnson County Clerk**

Digitally signed
by Becky Ivey
Date: 2020.08.03
09:01:59 -05:00

2020 - 4968 02/21/2020  11:38AM  Page 18 of 39
2020 - 4555 02/18/2020  3:08PM  Page 17 of 18

acre tract, the Northeast corner of that certain called 50 acre tract described in deed from Elzy Ray Brown to Judith Louise Brown and recorded in Volume 3119, Page 27 of said Deed Records, the Southeast corner of that certain called 156 acre tract described in deed from Henry C. Griffin Jr. to Patrick M. Griffin and recorded in Volume 3130, Page 714 of said Deed Records and the Southwest corner of that certain called 184.887 acre tract described in deed to Bill C. Roten and recorded in Volume 1248, Page 472 of said Deed Records and being at the POINT OF BEGINNING;

THENCE North 59°2821" East with the North line of said 47-1/2 acre tract and with said County Road 110 a distance of 826,39 feet to a point for corner at the Northeast corner of said 47-1/2 acre tract, the Northwest corner of that certain called 70.74 acres tract of land described in deed from Schifano-Regan, JV to Duane Schifano and recorded in instrument No. 201200024756 of said Deed Records and also being in the South line of said 184.887acre tract;

THENCE South 30°31'39'1 East with the East line of said 474/2 acre tract and the West line of said 70.74 acre tract at a distance of 30.00 feet passing a 1/2' Iron rod with plastic marked "SANDS" set for reference and counting at a distance of 1,721.56 feet passing a 1" iron found the corner at the Southwest corner of said 70.74 acre tract, same being the Northwest corner of that certain called 15.004 acre tract of land described in Deed from Walter Glenn Carisle of RES Land Holding and recorded in Volume 3507, Page 398 of said Deed Records and continuing at a distance of 2,088.49 feet passing a 1" iron bar found for corner the Southwest corner of said 15.004 acre tract, same being the Northwest corner of that certain called 0.78 acre tract land described in deed from Erica Denise Vesper to Daniel H. Vesper, Sr. and recorded in Instrument No. 201000011279 of said Deed Records and counting at a distance of 2442.17 feet passing a 1/2' iron rod with plastic marked "SANDS" set for reference and continuing a total distance of 2,472.17 feet to a point for corner at the Southeast corner of said 47.5 acre tract, the Southwest corner of said 0.78 acre tract, and being in County Road 109 (60' right-of-way) and also being in the North line of Southwest Acres, Phase 1, an addition to Johnson County, Texas;

THENCE South 59°2821" West with the South line of said 47.5 acre tract and the North line of said Southern Acres a distance of 843.25 Feet to a point tor corner of said County Road 109 and being in the North line of that certain called Lot 2R-I, Block 1 of Harden Estates, an addition to Johnson County, Texas, according to the Plat thereof recorded in Volume 10, Page 463 of said Deed Records, same being the Southeast corner of said above mentioned 50 acre tract;

THENCE North 30°31'39" West with the West line of said 47-1/2 acre tract and the West line of said 50 acre tract a distance of 30.00 feet passing to a 1/2' iron rod With plastic marked "SANDS" set for reference and counting, a total distance of 2472.17 feet back to the Point of Beginning and Containing 2,084,662 Square feet or 47.8572 acres of which 1.1616 acre lie within County Road leaving a net acreage of 47.8572 acres of land, more or less.

I do hereby certify that this is a true and correct copy of the original record now on file in the Official Public Records of Johnson County, Texas. To verify the authenticity of this copy please visit: https://johnson.tx.publicsearch.us/verifycert/9j3srxGg

**Johnson County Clerk**

Digitally signed by Becky Ivey Date: 2020.08.03 09:01:59 -05:00

2020 - 4968 02/21/2020 11:38AM Page 19 of 39

2020-4555 02/18/2020 3:08 PM Page 18 of 18

**Johnson County**
**Becky Ivey**
Johnson County
Clerk

---

**Instrument Number:** 4555

eRecording - Real Property

Deed of Trust

Recorded On: February 18, 2020 03:08 PM          Number of Pages: 18

---

**" Examined and Charged as Follows: "**

Total Recording: $90.00

---

*********** **THIS PAGE IS PART OF THE INSTRUMENT** ***********
Any provision herein which restricts the Sale, Rental or use of the described REAL PROPERTY
because of color or race is invalid and unenforceable under federal law.

| File Information: | | Record and Return To: |
|---|---|---|
| Document Number: | 4555 | Simplifile |
| Receipt Number: | 20200218000121 | 5072 North 300 West |
| Recorded Date/Time: | February 18, 2020 03:08 PM | |
| User: | Leslie S | PROVO UT |
| Station: | ccl83 | |

---



**STATE OF TEXAS**
**COUNTY OF JOHNSON**

I hereby certify that this Instrument was FILED In the File Number sequence on the date/time printed hereon, and was duly RECORDED in the Official Records of Johnson County, Texas.

Becky Ivey
Johnson County Clerk
Johnson County, TX

App.030

I do hereby certify that this is a true and correct copy of the original record now on file in the Official Public Records of Johnson County, Texas. To verify the authenticity of this copy please visit: https://johnson.tx.publicsearch.us/verifycert/9j3srxGg

Johnson County Clerk

Digitally signed by Becky Ivey Date: 2020.08.03 09:01:59 -05:00

2020 - 4968 02/21/2020 11:38AM Page 20 of 39

**NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OR ALL OF THE FOLLOWING INFORMATION FROM ANY INSTRUMENT THAT TRANSFERS AN INTEREST IN REAL PROPERTY BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.**

### Deed of Trust

### Basic Information

**Date:** February 11, 2020.

**Grantor:** DJD Land Partners, LLC, and LDG001, LLC

**Grantor's Mailing Address:**

9911 Champa Drive
Dallas, Texas 75218
c/o Michael Matthews, Manager

**Trustee:** Robert W. Buchholz.

**Trustee's Mailing Address:**

420 S. Cesar Chavez Blvd., Suite 300
Dallas, Texas 75201

**Lender:** Southern Star Capital LLC d/b/a Reliance Mortgage Company

**Lender's Mailing Address:**

5220 Spring Valley Road, Suite 602
Dallas, Texas 75254

**Obligation:**

Note:
Date: November 27, 2018.
Original principal amount: $127,500.00.
Borrower: DJD Land Partners, LLC

Lender: Southern Star Capital LLC d/b/a Reliance Mortgage Company
Maturity date: Original January 1, 2020, Extended to January 1, 2021.
Terms of Payment: As provided in the Modification and Extension Agreement of January 10, 2020 note.

**Deed of Trust Security Agreement**                                            **Page - 1**

App.031

I do hereby certify that this is a true and correct copy of the original record now on file in the Official Public Records of Johnson County, Texas.
To verify the authenticity of this copy please visit:
https://johnson.tx.publicsearch.us/verifycert/9j3srxGg

Johnson County Clerk

Digitally signed by Becky Ivey
Date: 2020.08.03
09:01:59 -05:00

2020 - 4968 02/21/2020 11:38AM Page 21 of 39

Note:
Date: November 14, 2018.
Original principal amount: $135,000.00.
Borrower: LDG001, LLC

Lender: Southern Star Capital LLC d/b/a Reliance Mortgage Company
Maturity date: Original November 14, 2019, Extended to November 14, 2020.
Terms of Payment: As provided in the Modification and Extension Agreement of January 10, 2020 note.

**Property (including any improvements):**

The properties described in the attached Exhibit "A" which is incorporated herein by reference.

**Exceptions to Conveyance and Warranty:**

None.

**A. Granting Clause**

For value received and to secure payment of both Obligations, each Grantor conveys the Property to Trustee in trust. Grantor warrants and agrees to defend the title to the Property, subject to the Other Exceptions to Conveyance and Warranty. On payment of all Obligations stated herein and all other amounts secured by this deed of trust, this deed of trust will have no further effect, and Lender will release it at Grantor's expense.

This Deed of Trust is given as additional collateral to secure the Notes referenced herein and is not given in lieu of the Prior Deeds of Trust recorded at:

1. Deed of Trust filed on December 5, 2018 in Johnson County Texas Document No 2018-33077.
2. Deed of Trust filed on November 26, 2018 in Johnson County Texas Document No 2018-32085.

**B. Grantor's Obligations**

*B.1.* Grantor agrees to maintain all property and liability insurance coverages with respect to the Property, revenues generated by the Property, and operations on the Property that Lender reasonably requires ("Required Insurance Coverages"), issued by insurers and written on policy forms acceptable to Lender , and as to property loss, that are payable to Lender under policies containing standard mortgage clauses, and deliver evidence of the Required Insurance Coverages in a form acceptable to Lender before execution of this deed of trust and again at least ten days before the expiration of the Required Insurance Coverages.

*B.2* Grantor agrees to-

**Deed of Trust Security Agreement**                                    **Page - 2**

App.032

Case 3:22-cv-02118-X    Document 499    Filed 05/24/24    Page 36 of 397    PageID 17483

I do hereby certify that this is a true and correct copy of the original record now on file in the Official Public Records of Johnson County, Texas. To verify the authenticity of this copy please visit: https://johnson.tx.publicsearch.us/verifycert/9j3srxGg

Johnson County Clerk

Digitally signed by Becky Ivey Date: 2020.08.03 09:01:59 -05:00

a. keep the Property in good repair and condition;

b. pay all taxes and assessments on the Property before delinquency, not authorize a taxing entity to transfer its tax lien on the Property to anyone other than Lender, and not request a deferral of the collection of taxes pursuant to section 33.06 of the Texas Tax Code;

c. defend title to the Property subject to the Other Exceptions to Conveyance and Warranty and preserve the lien's priority as it is established in this deed of trust;

d. obey all laws, ordinances, and restrictive covenants applicable to the Property;

e. keep any buildings occupied as required by the Required Insurance Coverages;

f. if the lien of this deed of trust is not a first lien, pay or cause to be paid all prior lien notes and abide by or cause to be abided by all prior lien instruments;

g. notify Lender of any change of address; and

## C. Lender's Rights

*C.1.* Lender or Lender's mortgage servicer may appoint in writing one or more substitute trustees, succeeding to all rights and responsibilities of Trustee.

*C.2.* If the proceeds of the Obligation are used to pay any debt secured by prior liens, Lender is subrogated to all the rights and liens of the holders of any debt so paid.

*C.3.* Lender may apply any proceeds received under the property insurance policies covering the Property either to reduce the Obligation or to repair or replace damaged or destroyed improvements covered by the policy. If the Property is Grantor's primary residence and Lender reasonably determines that repairs to the improvements are economically feasible, Lender will make the property insurance proceeds available to Grantor for repairs.

*C.4.* Notwithstanding the terms of the Note to the contrary, and unless applicable law prohibits, all payments received by Lender from Grantor with respect to the Obligation or this deed of trust may, at Lender's discretion, be applied first to amounts payable under this deed of trust and then to amounts due and payable to Lender with respect to the Obligation, to be applied to late charges, principal, or interest in the order Lender in its discretion determines.

*C.5.* If Grantor fails to perform any of Grantor's obligations, Lender may perform those obligations and be reimbursed by Grantor on demand for any amounts so paid, including attorney's fees, plus interest on those amounts from the dates of payment at the rate stated in the Note for matured, unpaid amounts. The amount to be reimbursed will be secured by this deed of trust.

*C.6.* **COLLATERAL PROTECTION INSURANCE NOTICE**

App.033

I do hereby certify that this is a true and correct copy of the original record now on file in the Official Public Records of Johnson County, Texas. To verify the authenticity of this copy please visit: https://johnson.tx.publicsearch.us/verifycert/9j3srxGg

Johnson County Clerk

Digitally signed by Becky Ivey Date: 2020.08.03 09:01:59 -05:00

2020 - 4968 02/21/2020 11:38AM Page 23 of 39

**(A) the Grantor is required to:**

> **(i) keep the collateral insured against damage in the amount the Lender specifies;**
>
> **(ii) purchase the insurance from an insurer that is authorized to do business in the state of Texas or an eligible surplus lines insurer; and**
>
> **(iii) name the Lender as the persons to be paid under the policy in the event of a loss;**

**(B) the Grantor must, if required by the Lender, deliver to the Lender a copy of the policy and proof of the payment of premiums; and**

**(C) if the Grantor fails to meet any requirement listed in Paragraph (A) or (B), the Lender may obtain collateral protection insurance on behalf of the Grantor at the Grantor's expense.**

*C.7.* If a default exists in payment of either Obligation or performance of Grantor obligations and the default continues after any required notice of the default and the time allowed to cure, Lender may-

> a. declare the unpaid principal balance and earned interest on both Obligations immediately due;
>
> b. exercise Lender's rights with respect to rent under the Texas Property Code as then in effect;
>
> c. direct Trustee to foreclose this lien, in which case Lender or Lender's agent will cause notice of the foreclosure sale to be given as provided by the Texas Property Code as then in effect; and
>
> d. purchase the Property at any foreclosure sale by offering the highest bid and then have the bid credited on the Obligation.

*C.8.* If Grantor fails to pay any part of principal or interest secured by a prior lien or liens on the Property when it becomes payable or defaults on any prior lien instrument, the entire debt secured by this deed of trust will immediately become payable at the option of Lender.

C.9. Any act or occurrence that would constitute default under the terms of any lien superior to the lien securing the Note will constitute a default under this Deed of Trust securing the Note.

*C.10.* Lender may remedy any default without waiving it and may waive any default without waiving any prior or subsequent default.

I do hereby certify that this is a true and correct copy of the original record now on file in the Official Public Records of Johnson County, Texas. To verify the authenticity of this copy please visit: https://johnson.tx.publicsearch.us/verifycert/9j3srxGg

**Johnson County Clerk**

Digitally signed by Becky Ivey Date: 2020.08.03 09:01:59 -05:00

2020 - 4968 02/21/2020 11:38AM Page 24 of 39

If directed by Lender to foreclose this lien, Trustee will-

*D.1.* either personally or by agent give notice of the foreclosure sale as required by the Texas Property Code as then in effect;

*D.2.* sell and convey all or part of the Property "AS IS" to the highest bidder for cash with a general warranty binding Grantor, subject to the Prior Liens and to the Other Exceptions to Conveyance and Warranty and without representation or warranty, express or implied, by Trustee;

*D.3.* from the proceeds of the sale, pay, in this order-

> a. expenses of foreclosure, including a reasonable commission to Trustee;
> b. to Lender, the full amount of principal, interest, attorney's fees, and other charges due and unpaid;
> c. any amounts required by law to be paid before payment to Grantor; and
> d. to Grantor, any balance; and

*D.4.* be indemnified, held harmless, and defended by Lender against all costs, expenses, and liabilities incurred by Trustee for acting in the execution or enforcement of the trust created by this deed of trust, which includes all court and other costs, including attorney's fees, incurred by Trustee in defense of any action or proceeding taken against Trustee in that capacity.

**E. General Provisions**

*E.1.* If any of the Property is sold under this deed of trust, Grantor must immediately surrender possession to the purchaser. If Grantor does not, Grantor will be a tenant at sufferance of the purchaser, subject to an action for forcible detainer.

*E.2.* Recitals in any trustee's deed conveying the Property will be presumed to be true.

*E.3.* Proceeding under this deed of trust, filing suit for foreclosure, or pursuing any other remedy will not constitute an election of remedies.

*E.4.* This lien will remain superior to liens later created even if the time of payment of all or part of the Obligation is extended or part of the Property is released.

*E.5.* If any portion of the Obligation cannot be lawfully secured by this deed of trust, payments will be applied first to discharge that portion.

*E.6.* Grantor assigns to Lender all amounts payable to or received by Grantor from condemnation of all or part of the Property, from private sale in lieu of condemnation, and from damages caused by public works or construction on or near the Property. After deducting any expenses incurred, including attorney's fees and court and other costs, Lender will either release any remaining amounts to Grantor or apply such amounts to reduce the Obligation. Lender will not be liable for failure to collect or to exercise diligence in collecting any such amounts. Grantor will immediately

I do hereby certify that this is a true and correct copy of the original record now on file in the Official Public Records of Johnson County, Texas. To verify the authenticity of this copy please visit: https://johnson.tx.publicsearch.us/verifycert/9j3srxGg

Johnson County Clerk

Digitally signed by Becky Ivey Date: 2020.08.03 09:01:59 -05:00

2020 - 4968 02/21/2020 11:38AM Page 25 of 39

*E.7.* Grantor collaterally assigns to Lender all present and future rent from the Property and its proceeds. Grantor warrants the validity and enforceability of the assignment. Grantor will apply all rent to payment of the Obligation and performance of this deed of trust, but if the rent exceeds the amount due with respect to the Obligation and the deed of trust, Grantor may retain the excess. If a default exists in payment of the Obligation or performance of this deed of trust, Lender may exercise Lender's rights with respect to rent under the Texas Property Code as then in effect. Lender neither has nor assumes any obligations as lessor or landlord with respect to any occupant of the Property. Lender may exercise Lender's rights and remedies under this paragraph without taking possession of the Property. Lender will apply all rent collected under this paragraph as required by the Texas Property Code as then in effect. Lender is not required to act under this paragraph, and acting under this paragraph does not waive any of Lender's other rights or remedies.

*E.8.* Interest on the debt secured by this deed of trust will not exceed the maximum amount of nonusurious interest that may be contracted for, taken, reserved, charged, or received under law. Any interest in excess of that maximum amount will be credited on the principal of the debt or, if that has been paid, refunded. On any acceleration or required or permitted prepayment, any such excess will be canceled automatically as of the acceleration or prepayment or, if already paid, credited on the principal of the debt or, if the principal of the debt has been paid, refunded.

*E.9.* In no event may this deed of trust secure payment of any debt that may not lawfully be secured by a lien on real estate or create a lien otherwise prohibited by law.

*E.10.* When the context requires, singular nouns and pronouns include the plural.

*E.11.* The term *Note* includes all extensions, modifications, and renewals of the Note and all amounts secured by this deed of trust.

*E.12.* Grantor warrants that the extension of credit evidenced by the Note secured hereby is solely for business or commercial purposes, other than agricultural purposes. The Grantor further warrants that the credit transaction evidenced by the Note is specifically exempted under Regulation Z issued by the Board of Governors of the Federal Reserve System and Title I of the Consumer Credit Protection Act and that no disclosures are required to be given under such regulations and federal laws in connection with the above transaction. Grantor does not claim any part of the Property as residential or business homestead. Grantor acknowledges that Lenders rely on the truth of representations in this paragraph in making the Note secured by this deed of trust.

*E.13.* Grantor will furnish to Lender or other holder of the Note annually, before January 31st of each year, copies of tax receipts showing that all taxes on the Property have been paid. Failure to comply with the foregoing for any reason whatsoever shall constitute a default.

If Grantor fails to pay all taxes on the Property prior to January 31st of each year for the tax period covering the preceding calendar year for any reason whatsoever, including, but not limited to, protests of value, processing of tax account split-out requests, or failure of the tax authorities to certify the tax roll or account, at the option of Lender, Grantor shall immediately deposit with

App.036

Case 3:22-cv-02118-X    Document 499    Filed 05/24/24    Page 40 of 397    PageID 17486

I do hereby certify that this is a true and correct copy of the original record now on file in the Official Public Records of Johnson County, Texas. To verify the authenticity of this copy please visit: https://johnson.tx.publicsearch.us/verifycert/9j3srxGg

Johnson County Clerk

Digitally signed by Becky Ivey
Date: 2020.08.03 09:01:59 -05:00

2020 - 4968 02/21/2020 11:38AM Page 26 of 39

All such funds shall bear no interest whatsoever, may be mingled with the general funds of Lender and shall be applied by Lender toward the payment of taxes and assessments; provided, however, that, if a Default shall have occurred hereunder, such funds may at Lender's option be applied to the payment of the Obligation in the order determined by Lender in its sole discretion, and that Lender may at any time, in its sole discretion, apply all or any part of such funds toward the payment of any such taxes, assessments, charges, legal fees, penalties or premiums which are past due, together with any penalties or late charges with respect thereto.

Lender shall have the right to rely upon tax information furnished by applicable taxing authorities in the payment of such taxes and assessments and Lender shall have no obligation to make any protest of any such taxes or assessments. Any excess over the amounts required for such purposes shall be held by Lender for future use, applied to the Obligation or refunded to Grantor, at Lender's option, and any deficiency in such funds so deposited shall be made up by Grantor upon demand by Lender.

The conveyance or transfer of Grantor's interest in the Property for any reason (including, without limitation, the foreclosure of a lien or security interest or a transfer by operation of law) shall constitute an assignment or transfer of Grantor's interest in and rights to such funds held by Lender under this subparagraph but subject to the rights of Lender hereunder.

Grantor will annually furnish to Lender or other holder of the Note evidence of current paid-up Required Insurance Coverage naming Lender or other holder of the Note as an insured.

**E.14. GRANTOR MAY FURNISH ANY INSURANCE REQUIRED BY THIS DEED OF TRUST EITHER THROUGH EXISTING POLICIES OWNED OR CONTROLLED BY GRANTOR OR THROUGH EQUIVALENT COVERAGE FROM ANY INSURANCE COMPANY AUTHORIZED TO TRANSACT BUSINESS IN TEXAS.**

*E.15.* If all or any part of the Property is sold, transferred, or conveyed without the prior written consent of Lender or other holder of the Note, Lender or other holder of the Note may, at its sole option, declare the outstanding principal balance of the Note plus accrued interest immediately due and payable. Lender or other holder of the Note has no obligation to consent to any such sale or conveyance of the Property, and Lender or other holder of the Note is entitled to condition any consent on a change in the interest rate that will thereafter apply to the Note and any other change in the terms of the Note or Deed of Trust that Lender or other holder of the Note in its sole discretion deems appropriate. A lease for a period longer than one year, a lease with an option to purchase, or a contract for deed will be deemed to be a sale, transfer, or conveyance of the Property for purposes of this provision. The creation of a subordinate lien without the consent of Lender or other holder of the Note will be construed as a sale or conveyance of the Property, but any subsequent sale under a subordinate lien to which Lender or other holder of the Note has consented will not be construed as a sale or conveyance of the Property.

*E.16.* Grantor agrees not to grant any lien or security interest in the Property or to permit any junior

App.037

I do hereby certify that this is a true and correct copy of the original
record now on file in the Official Public Records of Johnson County, Texas.
To verify the authenticity of this copy please visit:
https://johnson.tx.publicsearch.us/verifycert/9j3srxGg

Johnson County Clerk

Digitally signed
by Becky Ivey
Date: 2020.08.03
09:01:59 -05:00

days, to either remove the involuntary encumbrance or provide a bond acceptable to Lender against the involuntary encumbrance.

*E.17.* This deed of trust binds, benefits, and may be enforced by the successors in interest of all parties.

*E.18.* If Grantor and Borrower are not the same person, the term *Grantor* includes Borrower.

*E.19.* Grantor and each surety, endorser, and guarantor of the Obligation waive, to the extent permitted by law, all (a) demand for payment, (b) presentation for payment, (c) notice of intention to accelerate maturity, (d) notice of acceleration of maturity, (e) protest, (f) notice of protest and (g) rights under sections 51.003, 51.004, and 51.005 of the Texas Property Code.

*E.20.* Grantor will have full recourse liability for repayment of the principal and interest of the Note and the performance of all covenants and agreements of Grantor in this Deed of Trust.

*E.21.* Grantor agrees to pay reasonable attorney's fees, trustee's fees, and court and other costs of enforcing Lender's rights under this deed of trust if an attorney is retained for its enforcement.

*E.22.* Grantor agrees to execute, acknowledge, and deliver to Lender any document requested by Lender, at Lender's request from time to time, to

> (a) correct any defect, error, omission, or ambiguity in this deed of trust or in any other document executed in connection with the Note or this deed of trust;
> (b) comply with Grantor's obligations under this deed of trust and other documents;
> (c) subject to and perfect the liens and security interests of this deed of trust and other documents any property intended to be covered thereby; and
> (d) protect, perfect, or preserve the liens and the security interests of this deed of trust and other documents against third persons or make any recordings, file any notices, or obtain any consents requested by Lender in connection therewith. Grantor agrees to pay all costs of the foregoing.

*E.23.* Lender, as a matter of right and without regard to the sufficiency of the security for repayment of the Note and performance and discharge of the Obligations, without notice to Grantor and without any showing of insolvency, fraud, or mismanagement on the part of Grantor, and without the necessity of filing any judicial or other proceeding other than the proceeding for appointment of a receiver, shall be entitled to the appointment of a receiver or receivers of the Property or any part thereof, and of the Rents, and Grantor hereby irrevocably consents to the appointment of a receiver or receivers. Any receiver appointed pursuant to the provisions of this subsection shall have the usual powers and duties of receivers in such matters.

*E.24* Grantor shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances on or in the Property. Grantor shall not do, nor allow anyone else to do, anything affecting the Property that is in violation of any Environmental Law. The first sentence of this Section shall not apply to the presence, use, or storage on the Property of small quantities

I do hereby certify that this is a true and correct copy of the original record now on file in the Official Public Records of Johnson County, Texas.
To verify the authenticity of this copy please visit:
https://johnson.tx.publicsearch.us/verifycert/9j3srxGg

Johnson County Clerk

Digitally signed by Becky Ivey
Date: 2020.08.03 09:01:59 -05:00

2020 - 4968 02/21/2020 11:38AM Page 28 of 39

Grantor shall promptly give Lender written notice of any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Grantor has actual knowledge. If Grantor learns, or is notified by any governmental or regulatory authority, that any removal or other remediation of Hazardous Substance affecting the Property is necessary, Grantor shall promptly take all necessary remedial actions in accordance with Environmental Law.

As used in this paragraph, "Hazardous Substances" are those substances defined as toxic or hazardous substances by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials. As used in this paragraph, "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection.

*E.25.* If any provision of this deed of trust is determined to be invalid or unenforceable, the validity or enforceability of any other provision will not be affected.

*E.26.* The term Lender includes any mortgage servicer for Lender.

*E.27.* Grantor hereby grants Lenders a right of first refusal with respect to Grantor's power to authorize any third party (other than Lenders pursuant to its rights as set forth in this instrument) to pay ad valorem taxes on the Property and authorize a taxing entity to transfer its tax lien on the Property to that third party. Grantor's authorization to any third party (other than Lenders) to pay the ad valorem taxes and receive transfer of a taxing entity's lien for ad valorem taxes shall be null and void and of no force and effect unless Lenders, within ten days after receiving written notice from Grantor, fail to pay the ad valorem taxes pursuant to Lenders' rights as set forth in this instrument.

*E.28.* Grantor warrants that the execution of this deed of trust shall not impair or affect any other security, which may be given to secure the payment of the Obligation secured hereby, and all such additional security shall be considered as cumulative. The taking of additional security, execution of releases and partial releases of the security (regardless of consideration for the release or partial release) or any extension of time of payment of the Obligation secured hereby shall not diminish the force, effect, or lien of this deed of trust and shall not affect or impair the liability of any maker, surety, or endorser for the payment of said Obligation.

*E.29.* In the event of any conflict between the provisions of this Deed of Trust and the Note, guaranty (if any) and any of the other documents executed in connection with this transaction, it is the intent of the parties hereto that the provisions of this Deed of Trust shall control. The parties hereto acknowledge that they were represented by competent counsel in connection with the negotiation, drafting and execution of the Deed of Trust, the Note, guaranty (if any) and any of the other documents executed in connection with this transaction and that such Deed of Trust, Note, guaranty (if any) and all of the other documents executed in connection with this transaction shall not be subject to the principle of construing their meaning against the party which drafted same.

App.039

I do hereby certify that this is a true and correct copy of the original record now on file in the Official Public Records of Johnson County, Texas. To verify the authenticity of this copy please visit: https://johnson.tx.publicsearch.us/verifycert/9j3srxGg

Johnson County Clerk

Digitally signed by Becky Ivey Date: 2020.08.03 09:01:59 -05:00

2020 - 4968 02/21/2020 11:38AM Page 29 of 39

SELECTION (WHICH COUNSEL WAS NOT DIRECTLY OR INDIRECTLY IDENTIFIED, SUGGESTED, OR SELECTED BY THE OTHER PARTY), VOLUNTARILY WAIVES A TRIAL BY JURY OF ANY ISSUE ARISING IN AN ACTION OR PROCEEDING BETWEEN THE PARTIES OR THEIR SUCCESSORS, UNDER OR CONNECTED WITH THIS CONTRACT OR ITS PROVISIONS. GRANTOR AND LENDER ACKNOWLEDGE TO EACH OTHER THAT GRANTOR AND LENDER ARE NOT IN SIGNIFICANTLY DISPARATE BARGAINING POSITIONS.

*E.31* Additional Definitions used in this paragraph:

"Constituent Party": any (a) shareholder, member, general partner or managing member of Grantor, as applicable, or (b) any signatory to this Deed of Trust that signs on Grantor's behalf that is a corporation, general partnership, limited partnership, limited liability company, joint venture, trust, or other type of business organization, or(c) any Guarantor.

"Loan Documents": The Note, this Deed of Trust, the Guaranty, and any and all other documents now or hereafter executed by Grantor, Guarantor, or any other person or party in connection with the loan evidenced by the Note or in connection with the payment of the Obligation or the performance and discharge of the Obligations.

GRANTOR SHALL INDEMNIFY, DEFEND, PROTECT AND HOLD HARMLESS LENDER AND TRUSTEE, THEIR RESPECTIVE PARENTS, SUBSIDIARIES, DIRECTORS, OFFICERS, EMPLOYEES, REPRESENTATIVES, AGENTS, MEMBERS, SUCCESSORS, AND ASSIGNS FROM AND AGAINST ANY AND ALL LIABILITY, DAMAGE, LOSS, COST, OR EXPENSE (INCLUDING, WITHOUT LIMITATION, ATTORNEYS' FEES AND EXPENSES), ACTION, PROCEEDING, CLAIM OR DISPUTE INCURRED OR SUFFERED BY THE FOREGOING PARTIES SO INDEMNIFIED WHETHER OR NOT AS THE RESULT OF THE NEGLIGENCE OF ANY PARTY SO INDEMNIFIED, WHETHER VOLUNTARILY OR INVOLUNTARILY INCURRED OR SUFFERED, IN RESPECT OF THE FOLLOWING:

(i) ANY LITIGATION CONCERNING THIS DEED OF TRUST, THE OTHER LOAN DOCUMENTS OR THE PROPERTY, OR ANY INTEREST OF GRANTOR OR LENDER THEREIN, OR THE RIGHT OF OCCUPANCY THEREOF BY GRANTOR OR LENDER, WHETHER OR NOT ANY SUCH LITIGATION IS PROSECUTED TO A FINAL, NON-APPEALABLE JUDGMENT;

(ii) ANY DISPUTE, INCLUDING DISPUTES AS TO THE DISBURSEMENT OF PROCEEDS OF THE NOTE NOT YET DISBURSED, AMONG OR BETWEEN ANY OF THE CONSTITUENT PARTIES OR OTHER PARTNERS OR VENTURERS OF GRANTOR IF GRANTOR IS A GENERAL OR LIMITED PARTNERSHIP, OR AMONG OR BETWEEN ANY EMPLOYEES, OFFICERS, DIRECTORS, SHAREHOLDERS, MEMBERS OR MANAGERS OF GRANTOR IF GRANTOR IS A CORPORATION OR LIMITED LIABILITY COMPANY, OR

I do hereby certify that this is a true and correct copy of the original record now on file in the Official Public Records of Johnson County, Texas. To verify the authenticity of this copy please visit: https://johnson.tx.publicsearch.us/verifycert/9j3srxGg

Johnson County Clerk

Digitally signed by Becky Ivey
Date: 2020.08.03 09:01:59 -05:00

2020 - 4968 02/21/2020 11:38AM Page 30 of 39

OTHER ENTITY;

(iii) ANY ACTION TAKEN OR NOT TAKEN BY LENDER OR TRUSTEE WHICH IS ALLOWED OR PERMITTED UNDER THIS DEED OF TRUST OR ANY OF THE OTHER LOAN DOCUMENTS RELATING TO GRANTOR, THE PROPERTY, ANY CONSTITUENT PARTIES OR OTHERWISE IN CONNECTION WITH THE LOAN DOCUMENTS, INCLUDING WITHOUT LIMITATION, THE PROTECTION OR ENFORCEMENT OF ANY LIEN, SECURITY INTEREST OR OTHER RIGHT, REMEDY OR RECOURSE CREATED OR AFFORDED BY THIS DEED OF TRUST OR THE OTHER LOAN DOCUMENTS;

(iv) ANY ACTION BROUGHT BY LENDER OR TRUSTEE AGAINST GRANTOR UNDER THIS DEED OF TRUST OR THE OTHER LOAN DOCUMENTS, WHETHER OR NOT SUCH ACTION IS PROSECUTED TO A FINAL, NON-APPEALABLE JUDGMENT;

(v) ALL CLAIMS, CAUSES OF ACTION, LEGAL PROCEEDINGS, LIABILITY, OR DISPUTES ARISING OUT OF OR IN ANY WAY RELATED TO THE PROPERTY AND ITS IMPROVEMENTS;

(vi) ALL CLAIMS, CAUSES OF ACTION, LEGAL PROCEEDINGS, LIABILITY, OR DISPUTES ARISING OUT OF OR IN ANY WAY RELATED TO THE SALE AND PURCHASE OF THE PROPERTY AS WELL AS ANY AGREEMENTS RELATED THERETO AS WELL AS ANY SUBSEQUENT RESALE AND/OR TRANSFER OF THE PROPERTY BY GRANTOR; AND

(vii) ANY AND ALL LOSS, DAMAGE, COSTS, EXPENSE, ACTION, CAUSES OF ACTION, OR LIABILITY (INCLUDING ATTORNEYS' FEES AND COSTS) DIRECTLY OR INDIRECTLY ARISING FROM OR ATTRIBUTABLE TO THE USE, GENERATION, MANUFACTURE, PRODUCTION, STORAGE, RELEASE, THREATENED RELEASE, DISCHARGE, DISPOSAL, OR PRESENCE OF A HAZARDOUS SUBSTANCE ON, IN, UNDER OR ABOUT THE PROPERTY, WHETHER KNOWN OR UNKNOWN AT THE TIME OF THE EXECUTION HEREOF, INCLUDING WITHOUT LIMITATION (A) ALL FORESEEABLE CONSEQUENTIAL DAMAGES OF ANY SUCH USE, GENERATION, MANUFACTURE, PRODUCTION, STORAGE, RELEASE, THREATENED RELEASE, DISCHARGE, DISPOSAL, OR PRESENCE, AND (B) THE COSTS OF ANY REQUIRED OR NECESSARY ENVIRONMENTAL INVESTIGATION OR MONITORING, ANY REPAIR, CLEANUP, 13 OR DETOXIFICATION OF THE PROPERTY, AND THE PREPARATION AND IMPLEMENTATION OF ANY CLOSURE, REMEDIAL, OR OTHER REQUIRED PLANS.

LENDER AND/OR TRUSTEE MAY EMPLOY AN ATTORNEY OR ATTORNEYS TO PROTEST OR ENFORCE ITS RIGHTS, REMEDIES AND RECOURSES UNDER THIS

Case 3:22-cv-02118-X    Document 499    Filed 05/24/24    Page 45 of 397    PageID 17491
I do hereby certify that this is a true and correct copy of the original
record now on file in the Official Public Records of Johnson County, Texas.
To verify the authenticity of this copy please visit:
https://johnson.tx.publicsearch.us/verifycert/9j3srxGg

Johnson County Clerk

Digitally signed
by Becky Ivey
Date: 2020.08.03
09:01:59 -05:00

AND OTHER MATTERS. GRANTOR SHALL REIMBURSE LENDER AND/OR TRUSTEE FOR THEIR RESPECTIVE ATTORNEYS' FEES AND EXPENSES (INCLUDING EXPENSES AND COSTS FOR EXPERTS) IMMEDIATELY UPON RECEIPT OF A WRITTEN DEMAND THEREFOR, WHETHER ON A MONTHLY OR OTHER TIME INTERVAL, AND WHETHER OR NOT AN ACTION IS ACTUALLY COMMENCED OR CONCLUDED. ALL OTHER REIMBURSEMENT AND INDEMNITY OBLIGATIONS HEREUNDER SHALL BECOME DUE AND PAYABLE WHEN ACTUALLY INCURRED BY LENDER AND/OR TRUSTEE. ANY PAYMENTS NOT MADE WITHIN FIVE (5) DAYS AFTER WRITTEN DEMAND THEREFOR SHALL BEAR INTEREST AT THE ANNUAL INTEREST RATE ON MATURED, UNPAID AMOUNTS FROM THE DATE OF SUCH DEMAND UNTIL FULLY PAID. THE PROVISIONS OF THIS SECTION E.31 SHALL SURVIVE REPAYMENT OF THE NOTE AND PERFORMANCE OF THE OBLIGATIONS, THE RELEASE OF THE LIEN OF THIS DEED OF TRUST, ANY FORECLOSURE (OR ACTION IN LIEU OF FORECLOSURE), THE TRANSFER BY GRANTOR OF ANY OR ALL OF ITS RIGHT, TITLE AND INTEREST IN OR TO THE PROPERTY AND THE EXERCISE BY LENDER OF ANY AND ALL REMEDIES SET FORTH HEREIN OR IN THE LOAN DOCUMENTS.

*E.32.* GRANTOR WAIVES ITS RIGHTS UNDER THE TEXAS DECEPTIVE TRADE PRACTICES–CONSUMER PROTECTION ACT, SECTION 17.41 ET SEQ. OF THE TEXAS BUSINESS AND COMMERCE CODE, A LAW THAT GIVES CONSUMERS SPECIAL RIGHTS AND PROTECTIONS. AFTER CONSULTATION WITH AN ATTORNEY OF ITS OWN SELECTION, GRANTOR VOLUNTARILY CONSENTS TO THIS WAIVER.

### NOTICE

THE WRITTEN LOAN AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.

THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

NOTICE OF INDEMNIFICATION: GRANTOR HEREBY ACKNOWLEDGES AND AGREES THAT THIS DEED OF TRUST CONTAINS CERTAIN INDEMNIFICATION PROVISIONS (INCLUDING, WITHOUT LIMITATION, THOSE CONTAINED IN SECTION E.31 HEREOF) WHICH, IN CERTAIN CIRCUMSTANCES, COULD INCLUDE AN INDEMNIFICATION BY GRANTOR OF LENDER FROM CLAIMS OR LOSSES ARISING AS A RESULT OF LENDER'S OWN NEGLIGENCE.

DJD Land Partners, LLC

_____
Michael Matthews
Its Manager

Deed of Trust Security Agreement                    Page - 12

App.042

I do hereby certify that this is a true and correct copy of the original record now on file in the Official Public Records of Johnson County, Texas. To verify the authenticity of this copy please visit: https://johnson.tx.publicsearch.us/verifycert/9j3srxGg

**Johnson County Clerk**

Digitally signed by Becky Ivey
Date: 2020.08.03 09:01:59 -05:00

2020 - 4968 02/21/2020 11:38AM Page 32 of 39

STATE OF TEXAS        §
                      §
COUNTY OF DALLAS      §

Before me, the undersigned notary public, on this day personally appeared Michael Matthews, known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he executed the same as the Manager and authorized agent for DJD Land Partners, LLC for the purposes and consideration therein expressed.

Given under my hand and seal of office this 13 day of February, 2020.

_____
Notary Public, State of Texas

Bella D Khusal
My Commission Expires
09/24/2022
ID No 131734480

**LDG001, LLC**

_____
Michael Matthews
Its Manager

STATE OF TEXAS        §
                      §
COUNTY OF DALLAS      §

Before me, the undersigned notary public, on this day personally appeared Michael Matthews, known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he executed the same as the Manager and authorized agent for LDG001, LLC for the purposes and consideration therein expressed.

Given under my hand and seal of office this 13 day February 2020.

_____
Notary Public, State of Texas

Bella D Khusal
My Commission Expires
09/24/2022
ID No 131734480

App.043

I do hereby certify that this is a true and correct copy of the original
record now on file in the Official Public Records of Johnson County, Texas.
To verify the authenticity of this copy please visit:
https://johnson.tx.publicsearch.us/verifycert/9j3srxGg

**Johnson County Clerk**

Digitally signed
by Becky Ivey
Date: 2020.08.03
09:01:59 -05:00

2020 - 4968  02/21/2020  11:38AM  Page 33 of 39

AFTER RECORDING RETURN DOCUMENT TO:

Brittney Martin
Citizens Bank
5151 Headquarters Dr., Suite 165
Plano, Texas    75024

**Deed of Trust Security Agreement**                                    **Page - 14**

App.044

I do hereby certify that this is a true and correct copy of the original record now on file in the Official Public Records of Johnson County, Texas.
To verify the authenticity of this copy please visit:
https://johnson.tx.publicsearch.us/verifycert/9j3srxGg

**Johnson County Clerk**

Digitally signed by Becky Ivey
Date: 2020.08.03
09:01:59 -05:00

2020 - 4968 02/21/2020 11:38AM Page 34 of 39

# EXHIBIT "A"

TRACT ONE:

Being a 153.9273 acre tract of land situated in the B.B.B. & C.R.R, Co. Survey, Abstract No. 93, being part of that certain called 156 acre tract of land described in from Henry C. Griffin, JR to Patrick M. Griffin and recorded in Volume 3130, Page 714, of the Deed Records of Johnson County, Texas, said 153.9273 acre tract to be more particularly described by meets and bounds as follows;

BEGINNING at a 1/2" iron rod found for corner at Southwest corner of the B.B.B. & C. Railroad Company Survey, the Northwest comer of the Jackson Smith Survey, Abstract No, 758 and being in the East line of Philip P. Barnes Survey, same being the Southwest corner of said 156 acre tract, the Northwest comer of Lot 2 of Plainview Acres, Phase 3, to the Johnson County, Texas and recorded in Volume 8, Page 248 of said Deed Records and also being in the East line of that certain called 94.26 Acre tract of land form Edco Farms, Inc. and Fairview Farms, Inc. to Harper Cattle, LLC and recorded in Volume 2304, Page 895 and also being at the intersection of County Road 213 (60' right-of-way) and County Road 110 (60' right-ofway);

THENCE North 30°31'39" West with said County Road 213, the West line of said 156 acre tract and the East line of said 94,26 acre tract a distance of 2,640.00 feet to a point for corner at the Northwest corner of said 156 acre tract, the Southwest corner of that. certain called 1.074 acre tract described in deed from called 1.074 acre tract from J.W. Martin to H.C. Griffin and recorded in Volume 1583, Page241 of said Deed Records;

THENCE North 59°28'21" East with the North line of said 156 acre tract and the South line of said 1.074 acre tract at a distance of 30.00 feet passing a 1/2' iron rod with plastic marked "SANDS" set for reference comer in said Right-of-Way and continuing a total distance of 869.98 feet to a 1/2' iron rod with plastic marked "SANDS" set for corner in the North line of said 156 acre tract, the East corner of said 1.074 acre tract and also being in the South line of G.C. & S.F. Railroad (100 foot wide Right-of-Way):

THENCE North 66°32'57" East with the South line of said Railroad a distance of 682.02 feet to a 1/2' iron rod with plastic marked "SANDS" set for corner in said South line at the beginning of a curve to the right;

THENCE in a Northeasterly direction with said curve to the right having a radius of 2595.97 feet, whose chord bears North 70°50'32" East-388.67 feet for an arc length of 389.03 feet to 1/2" iron rod with plastic marked "SANDS" set for corner in South line of said Railroad;

THENCE North 75°08'08" East with said South line a distance of756.88 feet to a 1/2' iron rod with plastic marked "SANDS" set for corner in the East line of said 156 acre tract and being in the West line of that certain called 184.887 acre tract of land conveyed to Billy C. Roten by deed recorded in Volume 1248, Page 742 of said Deed Records;

I do hereby certify that this is a true and correct copy of the original record now on file in the Official Public Records of Johnson County, Texas. To verify the authenticity of this copy please visit: https://johnson.tx.publicsearch.us/verifycert/9j3srxGg

Johnson County Clerk

Digitally signed by Becky Ivey
Date: 2020.08.03
09:01:59 -05:00

2020 - 4968 02/21/2020 11:38AM Page 35 of 39

THENCE South 30°31'39" East with the East line of said 156 acre tract and the West Line of said 184.887 acre tract at a distance of 2,245.02 feet passing a 1/2' iron rod with plastic marked "SANDS" set for reference in the North Right-of-Way of said County Road No. 110 and continuing a total distance of 2,275.02 feet a point for corner at the Southeast corner of said 156 acre Inlet and being in the Southerly edge of County Road 110 (60' right-of-way);

THENCE South 59°28'21" West with said road and the South line of said 156 acre tract a distance of 860.80 feet a point for corner in said road and being at the Southeast corner of that certain called 1.003 acre tract of land described In deed from Patrick M. Griffin to Kaleb L. Hazard and recorded in Instrument No. 201000025372 of said Deed Records:

THENCE North 30°31'39" West across said 156 acre tract and with the East line of said 1.003 Acre tract at a distance of 30.00 feet passing a 1/2' iron rod with plastic marked "SANDS" set for reference in the East line of said 1.003 acre tract and continuing a total distance of 226.67 feet to a 1/2' iron rod with plastic marked "SANDS" set for corner at the Northeast corner of said 1.003 acre tract;

THENCE South 59°32'03" West across said 156 acre tract and the North line of said 1,003 acre tract a distance of 192.78 feet to a 1/2' iron rod with plastic marked "SANDS" set for corner at the Northwest corner of said 1.003 acre tract;

THENCE South 30°31'39" East across said 156 acre tract and the West line of said 1.003 acre tract at a distance or196.88 feet to a 1/2' iron rod with plastic marked "SANDS" set for reference in the West line of said 1.003 acre tract and continuing a total distance of 226.88 a point for corner at the Southwest corner of said 1,003 acre tract and in the Southerly line of County Road 110;

THENCE South 59°28'21" West with said County Road 110 and the South line of said 156 acre tract a distance of 1603.10 feet back to the Point of Beginning and Containing 6,705,073 Square feet and 153.9273 acres of land of which 14944 acres lie within County Roads, leaving a net acreage of 150.4329 acres of land, more or less.

TRACT TWO:
Being a 47.8572 acre tract of land situated in the Jackson Smith Survey, Abstract No. 758, Johnson County, Texas, being all of that certain called 47-1/2 acre tract of land described in deed from Henry C. Griffin, Jr. to Patrick M. Griffin and recorded in Volume 3130, Page 714 of the Deed Records of Johnson County, Texas said 46,9003 acre tract to be more particularly described by meets and bounds as follows:

COMMENCING at a 1/2" iron rod found for corner at the Northwest corner of said Jackson Smith Survey, same being the Southwest corner of the B.B.B. & C.R.R. Co. Survey, Abstract No. 93 and being at the intersection of County Road No. 213 (60' right-of-way) with County Road No. 110 (60' right-of-way);

THENCE with the North line of said Jackson Smith Survey and the South line of said B.B.B. & C.R.R. Co. Survey and with County Road No, 110 a distance of 2,656.62 feet to a point for corner in the Southerly line of said County Road 110, same being the Northwest corner of said 47-1/2

App.046

I do hereby certify that this is a true and correct copy of the original record now on file in the Official Public Records of Johnson County, Texas.
To verify the authenticity of this copy please visit:
https://johnson.tx.publicsearch.us/verifycert/9j3srxGg

Johnson County Clerk

Digitally signed by Becky Ivey
Date: 2020.08.03
09:01:59 -05:00

2020 - 4968 02/21/2020 11:38AM Page 36 of 39

acre tract, the Northeast corner of that certain called 50 acre tract described in deed from Elzy Ray Brown to Judith Louise Brown and recorded in Volume 3119, Page 27 of said Deed Records, the Southeast corner of that certain called 156 acre tract described in deed from Henry C. Griffin Jr. to Patrick M. Griffin and recorded in Volume 3130, Page 714 of said Deed Records and the Southwest corner of that certain called 184.887 acre tract described in deed to Bill C. Roten and recorded in Volume 1248, Page 472 of said Deed Records and being at the POINT OF BEGINNING;

THENCE North 59°2821" East with the North line of said 47-1/2 acre tract and with said County Road 110 a distance of 826,39 feet to a point for corner at the Northeast corner of said 47-1/2 acre tract, the Northwest corner of that certain called 70.74 acres tract of land described in deed from Schifano-Regan, JV to Duane Schifano and recorded in instrument No. 201200024756 of said Deed Records and also being in the South line of said 184.887acre tract;

THENCE South 30°31'39'1 East with the East line of said 474/2 acre tract and the West line of said 70.74 acre tract at a distance of 30.00 feet passing a 1/2' Iron rod with plastic marked "SANDS" set for reference and counting at a distance of 1,721.56 feet passing a 1" iron found the corner at the Southwest corner of said 70.74 acre tract, same being the Northwest corner of that certain called 15.004 acre tract of land described in Deed from Walter Glenn Carisle of RES Land Holding and recorded in Volume 3507, Page 398 of said Deed Records and continuing at a distance of 2,088.49 feet passing a 1" iron bar found for corner the Southwest corner of said 15.004 acre tract, same being the Northwest corner of that certain called 0.78 acre tract land described in deed from Erica Denise Vesper to Daniel H. Vesper, Sr. and recorded in Instrument No. 201000011279 of said Deed Records and counting at a distance of 2442.17 feet passing a 1/2' iron rod with plastic marked "SANDS" set for reference and continuing a total distance of 2,472.17 feet to a point for corner at the Southeast corner of said 47.5 acre tract, the Southwest corner of said 0.78 acre tract, and being in County Road 109 (60' right-of-way) and also being in the North line of Southwest Acres, Phase 1, an addition to Johnson County, Texas;

THENCE South 59°2821" West with the South line of said 47.5 acre tract and the North line of said Southern Acres a distance of 843.25 Feet to a point tor corner of said County Road 109 and being in the North line of that certain called Lot 2R-I, Block 1 of Harden Estates, an addition to Johnson County, Texas, according to the Plat thereof recorded in Volume 10, Page 463 of said Deed Records, same being the Southeast corner of said above mentioned 50 acre tract;

THENCE North 30°31'39" West with the West line of said 47-1/2 acre tract and the West line of said 50 acre tract a distance of 30.00 feet passing to a 1/2' iron rod With plastic marked "SANDS" set for reference and counting, a total distance of 2472.17 feet back to the Point of Beginning and Containing 2,084,662 Square feet or 47.8572 acres of which 1.1616 acre lie within County Road leaving a net acreage of 47.8572 acres of land, more or less.

I do hereby certify that this is a true and correct copy of the original record now on file in the Official Public Records of Johnson County, Texas. To verify the authenticity of this copy please visit: https://johnson.tx.publicsearch.us/verifycert/9j3srxGg

**Johnson County Clerk**

Digitally signed by Becky Ivey Date: 2020.08.03 09:01:59 -05:00

2020 - 4968 02/21/2020 11:38AM Page 37 of 39

# EXHIBIT "B"

TRACT ONE:

940 County Road 110, Venus Texas;

Being a 1.00 acre tract of land situated in the B.B.B. & C. Railroad Company Survey, Abstract No. 93 and being all that certain called 1.003 acre tract of land described in Deed from Patrick M. Griffin to Kaleb L. Hazard and recorded by Instrument No. 201000025372 of the Deed Records of Johnson County, Texas and also being part of that certain called 156 acre tract of land described in Deed from Henry C. Griffin, JR to Patrick M. Griffin and recorded in Volume 3130, Page 714, of the Deed Records of Johnson County, Texas, said 1.00 acre tract to be more particularly described by meets and bounds as follows:

COMMENCING at a 1/2: iron rod found for corner at Southwest corner of the B.B.B. & C. Railroad Company Survey, the Northwest corner of Jackson Smith Survey and being in the East line of Plilip P. Barnes Survey, same being the Southwest corner of said 156 acre tract, the Northwest corner of Lot 2 of Plainview Acres, Phase 3, to the Johnson County, Texas and recorded in Volume 8, Page 248 of said Deed Records, the East line of that certain called 94.26 Acre tract of land from Edco Farms, Inc., and Fairview Farms, Inc., to Harper Cattle, LLC, and recorded in Volume 2304, Page 895 and also being at the intersection of County Road 213 (60' right-of-way) and County Road 110 (60' right-of-way);

THENCE North 59° 28' 21" East with the South line of said 156 acre tract of land, the South line of said B.B.B. & C. Railroad Company Survey a distance of 1603.10 feet to a point for corner at the Southeast corner of said 1.003 tract and being at the PLACE OF BEGINNING;

THENCE North 30° 31' 39" West with the West line of said 1.003 acre tract a distance of 30.00 feet to a 1/2" iron rod with plastic cap marked "SANDS" set for reference and continuing a total distance of 226.88 feet to a 1/2" iron rod with plastic cap marked "SANDS" set for corner at the Northeast corner of said 1.003 acre tract;

THENCE North 59° 32' 03" East with the North line of said 1.003 acre tract a distance of 192.78 feet to a 1/2" iron rod with plastic cap marked "SANDS" set for corner at the Northeast corner of said 1.003 acre tract of land;

THENCE South 30° 31' 39" East with the East line of said 1.003 acre tract a distance of 196.67 feet to a 1/2" iron rod with plastic cap marked "SANDS" set for reference and continuing a total distance of 226.67 feet to a point for corner in the South line of said B.B.B. & C. Railroad Company Survey, same being the Southeast corner of said 1.003 acre tract;

THENCE South 59° 28' 21" West with the South line of said 1.003 acre tract and the South line of said B.B.B. & C. Railroad Survey a distance of 192.78 feet back to the POINT OF BEGINNING and CONTAINING 1.00 acres of land of which 0.13 acres lie within County Road 110, leaving a net acreage of 0.87 acres of land, more or less.

I do hereby certify that this is a true and correct copy of the original record now on file in the Official Public Records of Johnson County, Texas. To verify the authenticity of this copy please visit: https://johnson.tx.publicsearch.us/verifycert/9j3srxGg

**Johnson County Clerk**

Digitally signed by Becky Ivey
Date: 2020.08.03 09:01:59 -05:00

2020 - 4968 02/21/2020 11:38AM Page 38 of 39

TRACT TWO:

1025 N FM 157, Venus Texas 76084

Being a 0.977 acre tract of land situated in the Absolam Williams Survey, Abstract No. 857, Johnson County, Texas and being all of that certain called 0.979 acre tract of land described in Deed from JLRJ, Inc. to Jason Alan Williams and recorded in Instrument No. 2013012640 of the Deed Records of Johnson County, Texas, said 0.977 acre tract to more particularly described by metes and bounds as follows:

THENCE South 60°23'32"West with South line of said 0.979 acre tract same being the East line of said that certain called Tract Three, 128.30 acre tract of land described in Deed from Henry C. Hill to Anastasia Energy, LLC and recorded in Volume 3969, Page 264 of said Deed Records a distance of 118.31 feet to a 1/2" iron rod cap found for corner at the Southwest corner of said 0.979 acre;

THENCE North 30°02' 19"West with West line of said 0.979 acre tract and the East line of said 128.30 acre tract a distance 504.00 to a Rail Road Spike found for corner in the centerline of County Road 501 at the Northwest corner of said 0.979 acre tract;

THENCE North 37°39'29" East with the North line of said 0.979 acre tract and the center line of said County Road 501 a distance of 16.66 feet to a Rail Road Spike found for corner at Northeast corner of said 0.979 acre tract and being in the West line of Farm to Market Road 157 and also being at the beginning of a non tangent curve to the right;

THENCE in a Southeasterly direction with said curve to the right having a radius of 1404.92 feet, whose chords bears South 41 °30' 19" East- 523.30 feet for an arc length of 526.37 feet back to the Point of Beginning and Containing 42,577 Square Feet or 0.977 acre of land more or less.

App.049

I do hereby certify that this is a true and correct copy of the original record now on file in the Official Public Records of Johnson County, Texas.
To verify the authenticity of this copy please visit:
https://johnson.tx.publicsearch.us/verifycert/9j3srxGg

**Johnson County Clerk**

Digitally signed by Becky Ivey
Date: 2020.08.03 09:01:59 -05:00

2020-4968 02/21/2020 11:38 AM Page 39 of 39

**Johnson County
Becky Ivey
Johnson County
Clerk**

**Instrument Number:**  4968

eRecording – Real Property

Deed of Trust

Recorded On: February 21, 2020 11:38 AM                Number of Pages: 39

**" Examined and Charged as Follows: "**

Total Recording: $174.00

*********** **THIS PAGE IS PART OF THE INSTRUMENT** ***********
Any provision herein which restricts the Sale, Rental or use of the described REAL PROPERTY
because of color or race is invalid and unenforceable under federal law.

**File Information:**                                     **Record and Return To:**

Document Number:    4968                                  Simplifile

Receipt Number:     20200221000091                        5072 North 300 West

Recorded Date/Time: February 21, 2020 11:38 AM

User:               Linda B                                PROVO UT

Station:            ccl30



**STATE OF TEXAS
COUNTY OF JOHNSON**

**I hereby certify** that this Instrument was FILED **In the File Number sequence on the date/time printed hereon, and was duly** RECORDED **in the Official Records of Johnson County, Texas.**

Becky Ivey
Johnson County Clerk
Johnson County, TX

App.050

**Southern Star Capital LLC d/b/a/ Reliance Mortgage Company**
**5220 Spring Valley Road, Suite 602**
**Dallas, TX 75254**
**(214) 346-5204**

**Date Prepared:**                                                                 **4/29/2024**

**Borrower Name:**                                                    **DJD Land Partners, LLC**
**Property Address:**

| | 5/1/2024 | | | $ 127,500.00 |
|---|---|---|---|---|
| **Total Principal Balance** | | | | |
| **Plus:** | **Principal Balance** | **Interest Rate** | **# days** | |
| Accrued Interest 2/1/22 to 05/01/2024) | $127,500.00 | 11.00% | 821 | $31,546.64 |
| Late Fees (5% Monthly P+I = $1,275.00/month *5%) | $63.75 | | 27 | $1,721.25 |
| | | | | |
| Appraisal Fee | | | | $4,500.00 |
| Legal Fees | | | | $21,383.43 |

| | |
|---|---|
| **Total Principal, Accrued Interest, Late Fees and Other Costs - <span style="color:red">Good Through May 1, 2024</span>** | **$186,651.32** |

**<span style="color:red">Daily Interest Per Diem</span>**                          **<span style="color:red">$38.42  per day</span>**

**For additional information on this matter please contact:**
**Southern Star Capital, LLC**
**Attn:  Al J. Keller**
**email:  Al@rmcdfw.com**
**Phone: (214) 346 - 5204**

*A domestic wire transfer is the preferred method of payment since it is faster, more convenient and safer for our customers than*
*other options.  To make a payment please include the borrower's last name, property address and loan number on all remittances.*
*Please send your payment to Southern Star Capital, LLC per the following wire transfer instructions.*

**Southern Star Capital LLC d/b/a/ Reliance Mortgage Company**
**5220 Spring Valley Road, Suite 602**
**Dallas, TX 75254**
**(214) 360 - 9000**

**Domestic Wire Transfer Instructions**

| | |
|---|---|
| Receiving Bank | Business First Bank |
| | 500 Laurel Street |
| | Baton Rouge, LA |
| ABA Routing No.: | 65405420 |
| | |
| Credit To (Beneficiary) | 080030065624 |
| Account No.: | Southern Star Capital, LLC |
| Account Name: | 5220 Spring Valley Road, Ste 100 |
| Account Address: | Dallas, TX 75254 |

App.051

**NEWMARK VALUATION & ADVISORY**

# Industrial Building

1025 North Farm-to-Market 157
Venus, Johnson County, TX 76084

Newmark Job No.: 23-0195611-1

**Appraisal Report Prepared For:**

Al J. Keller
Southern Star Capital, LLC
5220 Spring Valley Ste 602
Dallas, TX  75254

**Prepared By:**

**Newmark Valuation & Advisory**
2515 McKinney Avenue, Suite 1300
Dallas, TX 75201



App.052

**NEWMARK VALUATION & ADVISORY**

November 30, 2023

Al J. Keller
Southern Star Capital, LLC
5220 Spring Valley Ste 602
Dallas, TX  75254

RE:    Appraisal Of An Industrial Property Located At 1025 North Farm-to-Market 157, Venus,
       Johnson County, TX 76084, Prepared By Newmark Valuation & Advisory, LLC (herein
       "Firm" or "Newmark")

Newmark Job No.:  23-0195611-1

Dear Mr. Keller:

The "Subject Property" is a 1,500 square foot vacant, 1-story single tenant industrial building located at 1025 Farm-to-Market Road 157 in Venus, TX. The site is at the southwest corner of Farm  to Market Road 157 and County Road 501. The building is in poor condition, is of low quality and tenant appeal, and was built in 1995. The site encompasses approximately 1.010 acres (43,996 square feet). The property is currently vacant.

Based on the analysis contained in the following report, the opinion of value for the subject is:

| Value Conclusions | | | |
|---|---|---|---|
| **Appraisal Premise** | **Interest Appraised** | **Date of Value** | **Value Conclusion** |
| Market Value "As Is" | Fee Simple | 11/7/2023 | $120,000 |

*Compiled by Newmark*

**Extraordinary Assumptions**

An extraordinary assumption is defined in USPAP as an assignment-specific assumption as of the effective date regarding uncertain information used in an analysis which, if found to be false, could alter the appraiser's opinions or conclusions. The value conclusions are subject to the following extraordinary assumptions that may affect the assignment results.

1.    Access to the interior of the building was not available on the date of the site visit.  We were able to observe the interior through the window.  The interior appeared to be in poor condition.  Should a more detailed inspection be allowed at a later date, we reserve the right to amend this report accordingly.

The use of this extraordinary assumption might have affected assignment results.



Newmark Valuation & Advisory
2515 McKinney Avenue, Suite 1300
Dallas, TX 75201
www.nmrk.com/valuation

App.053

**November 30, 2023**
**AL J. KELLER**

**Hypothetical Conditions**

A hypothetical condition is defined in USPAP as a condition, directly related to a specific assignment, which is contrary to what is known by the appraiser to exist on the effective date of the assignment results, but is used for the purpose of analysis. The value conclusions are based on the following hypothetical conditions that may affect the assignment results.

1.    None

The appraisal was developed based on, and this report has been prepared in conformance with the Client's appraisal requirements, the guidelines and recommendations set forth in the Uniform Standards of Professional Appraisal Practice (USPAP), the requirements of the Code of Professional Ethics and Standards of Professional Appraisal Practice of the Appraisal Institute, Title XI of the Financial Institution Reform, Recovery and Enforcement Act (FIRREA) of 1989, and the Interagency Appraisal and Evaluation Guidelines (December 2, 2010).



# Certification

We certify that, to the best of our knowledge and belief:

1. The statements of fact contained in this report are true and correct.

2. The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and are our personal, impartial and unbiased professional analyses, opinions, and conclusions.

3. We have no present or prospective interest in the property that is the subject of this report and no personal interest with respect to the parties involved.

4. We have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.

5. Our engagement in this assignment was not contingent upon developing or reporting predetermined results.

6. Our compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

7. This appraisal assignment was not based upon a requested minimum valuation, a specific valuation, or the approval of a loan.

8. Our analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice, as well as the requirements of the State of

9. The reported analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Code of Professional Ethics and Standards of Professional Appraisal Practice of the Appraisal Institute.

10. The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.

11. Hayden Littlefield Jr made a personal inspection of the property that is the subject of this report.

12. The Firm operates as an independent economic entity.  Although employees of other service lines or affiliates of the Firm may be contacted as a part of our routine market research investigations, absolute client confidentiality and privacy were maintained at all times with regard to this assignment without conflict of interest.

13. Within this report, "Newmark", "Newmark Valuation & Advisory", "Newmark, Inc.", and similar forms of reference refer only to the appraiser(s) who have signed this certification and any persons noted above as having provided significant real property appraisal assistance to the persons signing this report.

14. Hayden Littlefield Jr has not performed any services, as an appraiser or in any other capacity, regarding the property that is the subject of this report within the three-year period immediately preceding the agreement to perform this assignment.





Hayden Littlefield Jr
Senior Director
Certified General Real Estate Appraiser
Texas # 1324546-G
Telephone: 469-467-2073
Email: hayden.littlefield@nmrk.com

**NEWMARK**

Industrial Building

# Table of Contents

**Appraisal Transmittal and Certification**
Certification
Table of Contents
Subject Maps
Subject Photographs

**Executive Summary ...................................10**

**Introduction..............................................12**

**Economic Analysis ...................................15**
National Trends and Uncertainties.......15
Area Analysis ......................................17
Neighborhood Analysis........................24
Industrial Market Analysis....................30

**Land and Site Analysis .............................37**

**Improvements Analysis .............................42**

**Real Estate Taxes.....................................45**

**Highest and Best Use ...............................47**

**Appraisal Methodology.............................49**

**Sales Comparison Approach ...................50**
Sales Comparison Approach Conclusion
............................................................54

**Income Capitalization Approach.............56**
Market Rent Analysis............................56
Operating Expense Analysis................64
Direct Capitalization ............................68
Direct Capitalization Summary ............70

**Reconciliation of Value............................72**

**Assumptions and Limiting Conditions ..74**

**Addenda**
A.   Glossary of Terms

B.   Engagement Letter
C.   Legal Description
D.   Financials and Property Information
E.   Comparable Data
         Improved Sales
         Lease Comparables
F.   Précis Metro Report - Economy.Com, Inc.

**NEWMARK**

**SUBJECT MAPS**                                                                                        **7**



**Aerial Photo**



**Location Map**

**NEWMARK**

Industrial Building
App.058

**SUBJECT PHOTOGRAPHS**                                                    **8**



Front View of Subject



Front View



Side View



Side View



Rear View



Typical View

**SUBJECT PHOTOGRAPHS**    **9**



Typical View



Typical View



View of Interior



Street View



Street View along Farm-to-Market Road 157 facing
South



Street View along Farm-to-Market Road 157 facing
North

**NEWMARK**

Industrial Building
App.060

# Executive Summary

| Industrial Building | |
|---|---|
| Property Type: | Industrial-Light Manufacturing |
| Street Address: | 1025 North Farm-to-Market 157 |
| City, State & Zip: | Venus, Johnson County, TX 76084 |
| Gross Building Area (SF): | 1,500 |
| Net Rentable Area (SF): | 1,500 |
| Year Built: | 1995 |
| Current Owner-Occupancy: | 100.0% |
| Land Area: | 1.010 acres; 43,996 SF |
| Zoning: | Not Zoned |
| Assessor's Parcel ID(s): | 126.0026.00298; 25443 |
| Highest and Best Use - As Vacant: | An Industrial Use |
| Highest and Best Use - As Improved: | Industrial Use |
| **Analysis Details** | |
| Valuation Date: | |
|     Market Value "As Is" | November 7, 2023 |
| Inspection Date and Date of Photos: | November 7, 2023 |
| Report Date: | November 30, 2023 |
| Report Type: | Appraisal Report |
| Client: | Southern Star Capital LLC |
| Intended Use: | Internal Business Decisions |
| Intended User: | Southern Star Capital, LLC |
| Appraisal Premise: | Market Value "As Is" |
| Intended Use and User: | The intended use and user of our report are specifically identified in our report as agreed upon in our contract for services and/or reliance language found in the report. No other use or user of the report is permitted by any other party for any other purpose. Dissemination of this report by any party to non-client, non-intended users does not extend reliance to any other party and Newmark will not be responsible for unauthorized use of the report, its conclusions or contents used partially or in its entirety. |
| Interest Appraised: | Fee Simple |

*Compiled by Newmark*



| Valuation Summary | | | |
|---|---|---|---|
| Sales Comparison Approach | | $/SF | $ Total |
| **Segment 1: Industrial-Light Manufacturing** | |  | **1025 North Farm-to-Market 157 - 1,500 SF** |
| Number of Sales | | | 4 |
| Range of Sale Dates | | | May-22 to Nov-23 |
| Adjusted Range of Comparables ($/SF) | | | $61.96 to $98.43 |
| Value Conclusion: | | $80.00 | $120,000 |
| Income Capitalization Approach - Direct Capitalization Method | | $/SF | $ Total |
| **Capitalization Rate Indicators and Conclusion** | | | **Indication** |
| Comparable Sales | | | 8.0% - 13.53% |
| Investor Surveys | | | 7.00% - 9.00% |
| Market Participants | | | 8.25% - 9.50% |
| Concluded Going-In Capitalization Rate | | | 9.00% |
| **Stabilized Income Estimate** | | | |
| Potential Gross Income | | $9.70 | $14,550 |
| Stabilized % Vacancy & Collection Loss | | -6.00% | ($873) |
| Effective Gross Income | | $9.12 | $13,677 |
| Operating Expenses | | $2.45 | $3,675 |
| Operating Expense Ratio | | | 26.9% |
| Net Operating Income | | $6.67 | $10,002 |
| Capitalization Rate | | | 9.00% |
| Indicated Direct Capitalization Value | As Is | $73.33 | $110,000 |
| Indicated Income Capitalization Approach Value | As Is | $73.33 | $110,000 |
| **Market Value Conclusions** | **As Is** | **$80.00** | **$120,000** |
| **Exposure / Marketing Time** | | | |
| Concluded Exposure Time | | 5 Months or Less | |
| Concluded Marketing Time | | 5 Months or Less | |

*Compiled by Newmark*

## Extraordinary Assumptions and Hypothetical Conditions

An extraordinary assumption is defined in USPAP as an assignment-specific assumption as of the effective date regarding uncertain information used in an analysis which, if found to be false, could alter the appraiser's opinions or conclusions. The value conclusions are subject to the following extraordinary assumptions that may affect the assignment results.

1. Access to the interior of the building was not available on the date of the site visit. We were able to observe the interior through the window. The interior appeared to be in poor condition. Should a more detailed inspection be allowed at a later date, we reserve the right to amend this report accordingly.

The use of this extraordinary assumption might have affected assignment results.

A hypothetical condition is defined in USPAP as a condition, directly related to a specific assignment, which is contrary to what is known by the appraiser to exist on the effective date of the assignment results, but is used for the purpose of analysis. The value conclusions are based on the following hypothetical conditions that may affect the assignment results.

1. None

*Compiled by Newmark*



# Introduction

## OWNERSHIP HISTORY

The current owner is Djd Land Partners, LLC. The current owners have held the property since January 2007, a period exceeding three years.

To the best of our knowledge, no sale or transfer of ownership has taken place within a three-year period prior to the effective date of the appraisal.

## INTENDED USE AND USER

The intended use and user of our report are specifically identified in our report as agreed upon in our contract for services and/or reliance language found in the report. No other use or user of the report is permitted by any other party for any other purpose. Dissemination of this report by any party to non-client, non-intended users does not extend reliance to any other party and Newmark will not be responsible for unauthorized use of the report, its conclusions or contents used partially or in its entirety.

–    The intended use of the appraisal is for Internal Decision Making purposes.

–    The client is Southern Star Capital, LLC

–    The intended user is Southern Star Capital, LLC and no other users are permitted by any other party for any other purpose.

## DEFINITION OF VALUE

Market value is defined as:

"The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

–    Buyer and seller are typically motivated;

–    Both parties are well informed or well advised, and acting in what they consider their own best interests;

–    A reasonable time is allowed for exposure in the open market;

–    Payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and



–   The price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale."

*(Source: Code of Federal Regulations, Title 12, Chapter I, Part 34.42[g]; also Interagency Appraisal and Evaluation Guidelines, Federal Register, 75 FR 77449, December 10, 2010, page 77472)*

## APPRAISAL REPORT

This appraisal is presented in the form of an appraisal report, which is intended to comply with the reporting requirements set forth under Standards Rule 2-2(a) of USPAP. This report incorporates sufficient information regarding the data, reasoning and analysis that were used to develop the opinion of value in accordance with the intended use and user.

## PURPOSE OF THE APPRAISAL

The primary purpose of the appraisal is to develop an opinion of the Market Value "As Is" of the Fee Simple Estate in the subject.

| Purpose of the Appraisal | | |
| --- | --- | --- |
| Appraisal Premise | Interest Appraised | Date of Value |
| Market Value "As Is" | Fee Simple | 11/7/2023 |

*Compiled by Newmark*

## SCOPE OF WORK

### Extent to Which the Property is Identified

–   Physical characteristics

–   Legal characteristics

–   Economic characteristics

### Extent to Which the Property is Inspected

Newmark inspected the subject property on November 7, 2023 as per the defined scope of work. Hayden Littlefield Jr made a personal inspection of the property that is the subject of this report.

**NEWMARK**

## Type and Extent of the Data Researched

- Exposure and marketing time;
- Neighborhood and land use trends;
- Demographic trends;
- Market trends relative to the subject property type;
- Physical characteristics of the site and applicable improvements;
- Flood zone status;
- Zoning requirements and compliance;
- Real estate tax data;
- Relevant applicable comparable data; and
- Investment rates

## Type and Extent of Analysis Applied

We analyzed the property and market data gathered through the use of appropriate, relevant, and accepted market-derived methods and procedures. Further, we employed the appropriate and relevant approaches to value, and correlated and reconciled the results into an estimate of market value, as demonstrated within the appraisal report.



# Economic Analysis

## NATIONAL TRENDS AND UNCERTAINTIES

Interest rates have continued to rise with the 10-year Treasury now at levels last seen in 2007. This bond rate is foundational to commercial real estate in terms of both debt and equity. The continued increase was at least somewhat unexpected and has changed investor expectations as to future interest rate levels. Commercial real estate transaction volumes are anemic with capitalization rates increasing and prices falling. Although a few positive trends were beginning to emerge over the past few months, the continued interest rate increases and the indication that the Fed plans to maintain the higher rate level are reversing them.

In an effort to curtail inflation, The Federal Reserve embarked on an aggressive strategy. In spite of three major bank failures, the Fed raised rates another 25 basis points in May 2023 followed by 25 basis points more in July 2023. The total increase from 2022 into 2023 is now 525 basis points. The Fed now targets a range of 5.25% to 5.50% for the Federal Funds Rate – the highest since June 2006. This has been the fastest increase in rates the Federal Reserve has engineered over the past few decades. But, the recent rise in interest rates such as the 10 year Treasury can be traced more to other factors such as global turmoil. Although the Fed did not increase the rates in September, they indicated that their key rate would stay higher in 2024 than most analysts had expected. This is creating negativity in the CRE marketplace as investors were anticipating lower rates sooner than now expected.

Transaction markets now show clear increases in transaction cap rates, belatedly following the public markets. These effects are a function of the unfavorable credit conditions and inflation as well as other factors such as impacts to office use driven in part by hybrid work from home policies of many companies. Credit tightening, which includes wider credit spreads and lower loan-to-value ratios, is arising due to uncertain economic outlooks, deterioration in real estate collateral values, and concerns about bank liquidity. According to Real Capital Analytics (RCA), regional and local banks have sharply curtailed lending partly as a result the Signature Bank failure and attendant regulatory attention as well as the expectation of distress that has not yet been witnessed. RCA also reported that commercial transaction volume was down 63% YOY in the second quarter of 2023 over the same period in 2022. The quarterly transaction volume is approximately 35% lower than the average from 2015 to 2019.

It will take time for investors to reach the point of price discovery that will, in turn, allow transaction volume to increase assuming debt availability. Investors are grappling with the reality that capitalization rates will continue to increase into the near term and that the debt market and costs will remain unfavorable. We have considered, and will address, these issues throughout this appraisal and report including in our determinations of overall capitalization rates, discount rates,



market rent assumptions, market conditions adjustments, and growth of rents and expenses where applicable.



## AREA ANALYSIS



**Area Map**

The subject is located within Venus and Johnson County, Texas.  It is part of the Fort Worth Arlington  metro area (Fort Worth MSA).

Moody's Analytics' Economy.com provides the following economic summary for the Fort Worth MSA as of August, 2023.

| **Moody's Analytics Précis® Metro Indicators: Fort Worth MSA** | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **2017** | **2018** | **2019** | **2020** | **2021** | **2022** | **INDICATORS** | **2023** | **2024** | **2025** | **2026** | **2027** | **2028** |
| 126.7 | 132.0 | 133.7 | 127.5 | 138.4 | 145.7 | Gross metro product (C12$ bil) | 152.3 | 155.5 | 161.4 | 168.5 | 175.7 | 182.7 |
| 4.0 | 4.2 | 1.3 | -4.6 | 8.6 | 5.3 | % change | 4.5 | 2.1 | 3.7 | 4.4 | 4.3 | 4.0 |
| 1,037.0 | 1,066.9 | 1,096.3 | 1,055.9 | 1,097.6 | 1,161.7 | Total employment (ths) | 1,206.3 | 1,223.7 | 1,237.5 | 1,251.1 | 1,264.2 | 1,277.6 |
| 2.5 | 2.9 | 2.8 | -3.7 | 4.0 | 5.8 | % change | 3.8 | 1.4 | 1.1 | 1.1 | 1.0 | 1.1 |
| 3.8 | 3.5 | 3.3 | 7.3 | 5.2 | 3.6 | Unemployment rate (%) | 3.7 | 3.5 | 3.5 | 3.5 | 3.5 | 3.5 |
| 7.4 | 5.9 | 3.0 | 4.9 | 9.2 | 5.5 | Personal income growth (%) | 6.6 | 5.2 | 5.2 | 5.3 | 5.1 | 4.9 |
| 64.2 | 65.9 | 68.4 | 70.5 | 71.4 | 73.0 | Median household income ($ ths) | 75.8 | 78.0 | 80.7 | 83.5 | 86.4 | 89.3 |
| 2,485.5 | 2,527.1 | 2,557.8 | 2,586.2 | 2,618.7 | 2,669.5 | Population (ths) | 2,714.9 | 2,753.3 | 2,789.7 | 2,826.2 | 2,863.2 | 2,900.8 |
| 1.9 | 1.7 | 1.2 | 1.1 | 1.3 | 1.9 | % change | 1.7 | 1.4 | 1.3 | 1.3 | 1.3 | 1.3 |
| 29.4 | 26.4 | 16.4 | 17.7 | 25.0 | 41.1 | Net migration (ths) | 33.0 | 25.4 | 23.7 | 23.9 | 24.8 | 25.7 |
| 8,976 | 10,125 | 9,849 | 12,646 | 13,649 | 12,979 | Single-family permits (#) | 10,428 | 10,809 | 12,428 | 13,255 | 13,080 | 12,773 |
| 5,647 | 6,086 | 9,500 | 5,778 | 7,927 | 8,982 | Multifamily permits (#) | 6,521 | 7,269 | 7,189 | 7,693 | 7,808 | 7,454 |

*Source: Moody's Analytics Précis® US Metro*

Moody's summarizes the area's economic performance in recent months as follows:

## Recent Performance

Job growth in Fort Worth-Arlington has strengthened in recent months following a deceleration at the beginning of 2023. Leading the way have been financial services, healthcare and core manufacturing. Year over year, total employment is up twice as much as that of the nation because of strong gains back in the second half of 2022. Additionally, growth in the number of high-wage jobs has been substantially higher than in the nation. The unemployment rate has risen to 3.8%, up nearly 0.5 percentage point over the past year. However, one reason has been the above-average increase in the labor force amid solid job growth during that time. Housing market data have been mixed, with house prices declining but new permits rebounding since the start of 2023.

## Market Comparison

The following table illustrates key economic indicators and a comparison of the Fort Worth MSA to the regional grouping as a whole. As indicated, Fort Worth is projected to outperform the National Region Metros in six of eight performance categories shown over the next five years.

| Comparison of Key Economic Indicators - Fort Worth MSA Metro to National Region | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Fort Worth MSA | | | Annual Growth | | National | | | Annual Growth | |
| Indicator | 2017 | 2022 | 2027 | 2017 - 2022 | 2022 - 2027 | 2017 | 2022 | 2027 | 2017 - 2022 | 2022 - 2027 |
| Gross metro product (C12$ bil) | 126.7 | 145.7 | 175.7 | 2.8% | 3.8% | 18,077 | 19,965 | 22,356 | 2.0% | 2.3% |
| Total employment (ths) | 1,037.0 | 1,161.7 | 1,264.2 | 2.3% | 1.7% | 146,606 | 152,045 | 157,507 | 0.7% | 0.7% |
| Unemployment rate (%) | 3.8% | 3.6% | 3.5% | | | 4.4% | 3.7% | 4.1% | | |
| Personal income growth (%) | 7.4% | 5.5% | 5.1% | | | 4.6% | 2.3% | 4.6% | | |
| Population (ths) | 2,485.5 | 2,669.5 | 2,863.2 | 1.4% | 1.4% | 325,122 | 332,391 | 339,637 | 0.4% | 0.4% |
| Single-family permits (#) | 8,976 | 12,979 | 13,080 | 7.7% | 0.2% | 848,500 | 1,019,048 | 1,319,656 | 3.7% | 5.3% |
| Multifamily permits (#) | 5,647 | 8,982 | 7,808 | 9.7% | -2.8% | 356,167 | 547,574 | 448,038 | 9.0% | -3.9% |
| Fort Worth MSA outperforming National Region Metros | | | | | | | | | | |
| Fort Worth MSA underperforming National Region Metros | | | | | | | | | | |

*Source: Moody's Analytics Précis® US Metro; Compiled by Newmark*



## Employment Sectors and Trends

Employment data by occupation and business/industry sectors provides an indication of the amount of diversification and stability in the local economy.  Job sector composition also gives an indication of the predominant drivers of current and future demand for supporting commercial real estate sectors.  The following tables display employment data by occupation sector and by business/industry sector for the area and region.

### Current Employment by Occupation Sector

| Occupation Sector | 76084 | | Venus town | | Johnson County | | Dallas-Fort Worth-Arlington, TX MSA | | Texas | |
|---|---|---|---|---|---|---|---|---|---|---|
| Administrative Support | 510 | 7.7% | 167 | 6.7% | 8,691 | 9.3% | 454,833 | 10.9% | 1,525,256 | 10.5% |
| Management/Business/Financial | 1,128 | 17.1% | 414 | 16.5% | 13,158 | 14.1% | 856,193 | 20.5% | 2,581,724 | 17.8% |
| Professional | 1,064 | 16.1% | 314 | 12.5% | 15,862 | 17.0% | 1,003,670 | 24.0% | 3,440,230 | 23.7% |
| Sales and Sales Related | 425 | 6.5% | 159 | 6.3% | 6,978 | 7.5% | 376,344 | 9.0% | 1,312,601 | 9.0% |
| Construction/Extraction | 533 | 8.1% | 197 | 7.9% | 5,863 | 6.3% | 232,971 | 5.6% | 926,228 | 6.4% |
| Farming/Fishing/Forestry | 0 | 0.0% | 0 | 0.0% | 194 | 0.2% | 5,109 | 0.1% | 43,799 | 0.3% |
| Installation/Maintenance/Repair | 349 | 5.3% | 138 | 5.5% | 3,330 | 3.6% | 121,090 | 2.9% | 471,102 | 3.2% |
| Production | 244 | 3.7% | 52 | 2.1% | 4,298 | 4.6% | 175,568 | 4.2% | 665,111 | 4.6% |
| Transportation/Material Moving | 1,600 | 24.3% | 736 | 29.3% | 21,951 | 23.6% | 358,305 | 8.6% | 1,203,137 | 8.3% |
| **Total Employees (16+ Occupation Base)** | **6,589** | **100.0%** | **2,509** | **100.0%** | **93,054** | **100.0%** | **4,184,108** | **100.0%** | **14,530,585** | **100.0%** |

*Source: ESRI; Compiled by Newmark*

### Current Employment by Industry Sector

| Industry Sector | 76084 | | Venus town | | Johnson County | | Dallas-Fort Worth-Arlington, TX MSA | | Texas | |
|---|---|---|---|---|---|---|---|---|---|---|
| Agriculture/Mining | 97 | 1.5% | 27 | 1.1% | 1,522 | 1.6% | 30,671 | 0.7% | 299,511 | 2.1% |
| Construction | 641 | 9.7% | 177 | 7.1% | 8,032 | 8.6% | 331,402 | 7.9% | 1,237,074 | 8.5% |
| Manufacturing | 505 | 7.7% | 134 | 5.3% | 10,516 | 11.3% | 378,969 | 9.1% | 1,252,266 | 8.6% |
| Wholesale Trade | 213 | 3.2% | 51 | 2.0% | 1,844 | 2.0% | 91,485 | 2.2% | 290,641 | 2.0% |
| Retail Trade | 666 | 10.1% | 328 | 13.1% | 15,943 | 17.1% | 433,338 | 10.4% | 1,511,297 | 10.4% |
| Transportation/Utilities | 1,071 | 16.3% | 541 | 21.6% | 6,785 | 7.3% | 330,635 | 7.9% | 1,036,874 | 7.1% |
| Information | 130 | 2.0% | 25 | 1.0% | 781 | 0.8% | 89,560 | 2.1% | 241,491 | 1.7% |
| Finance/Insurance/Real Estate | 475 | 7.2% | 182 | 7.3% | 4,593 | 4.9% | 394,491 | 9.4% | 1,026,381 | 7.1% |
| Services | 2,546 | 38.6% | 943 | 37.6% | 38,939 | 41.8% | 1,975,636 | 47.2% | 7,004,709 | 48.2% |
| Public Administration | 245 | 3.7% | 101 | 4.0% | 4,099 | 4.4% | 127,921 | 3.1% | 630,341 | 4.3% |
| **Total Employees (16+ Occupation Base)** | **6,589** | **100.0%** | **2,509** | **100.0%** | **93,054** | **100.0%** | **4,184,108** | **100.0%** | **14,530,585** | **100.0%** |

*Source: ESRI; Compiled by Newmark*

**NEWMARK**

**ECONOMIC ANALYSIS**                                                                                                  **20**

Comparing the industry sectors for the local market area (Venus town) to Dallas-Fort Worth-Arlington, TX MSA indicates the local market area is somewhat more heavily weighted toward the Transportation/Utilities, Retail Trade, Public Administration, and Agriculture/Mining sectors. By contrast, the industry employment totals for Dallas-Fort Worth-Arlington, TX MSA indicate somewhat higher proportions within the Services, Manufacturing, Finance/Insurance/Real Estate, Information, Construction, and Wholesale Trade sectors. The following graphic further illustrates this comparison.



*Source: ESRI; Compiled by Newmark*

**Unemployment**

The following table displays the historical unemployment data for the area derived from the US Department of Commerce, Bureau of Labor Statistics. The most recent reported unemployment rate for the Dallas-Fort Worth-Arlington, TX Metropolitan Statistical Area is 4.2% (August 2023).



**Unemployment Rate: Dallas-Fort Worth-Arlington, TX Metropolitan Statistical Area**

Bars represent beginning to end range of unemployment rates in each year

Orange bars denote increasing unemployment from beginning to end of year

Blue bars are declining unemployment from beginning to end of year

Arrows are extent of unemployment rates over the year

*Compiled by Newmark*



## Major Employers

The following table lists a number of major employers with the Fort Worth MSA as reported by Moody's. While not all-encompassing, this list provides further indication of the types of economic sectors that are drivers for the area.

| Selected Major Employers: Fort Worth MSA | | |
|---|---|---|
| **Rank** | **Employer** | **Employees** |
| 1 | AMR/American Airlines | 25,000 |
| 2 | Lockheed Martin | 13,690 |
| 3 | Texas Health Resources | 12,000 |
| 4 | NAS - Fort Worth - JRB | 10,000 |
| 5 | Arlington ISD | 10,000 |
| 6 | University of Texas at Arlington | 7,311 |
| 7 | JPS Health Network | 6,500 |
| 8 | Cook Children's Health Care System | 6,042 |
| 9 | Tarrant County College | 5,999 |
| 10 | Alcon Laboratories Inc. | 5,393 |
| 11 | Bell Helicopter Textron | 4,953 |
| 12 | BNSF Railway | 4,500 |
| 13 | General Motors | 4,125 |
| 14 | GM Financial | 3,820 |
| 15 | Fidelity | 3,700 |
| 16 | JPMorgan Chase | 3,678 |

Source: Fort Worth Chamber of Commerce, 2017

*Source: Moody's Analytics Précis® US Metro*

## Analysis

Further economic analysis from Moody's is detailed as follows:

## Manufacturing

New uncertainties surround the near-term outlook for the F-35, which is assembled in Fort Worth. At the beginning of the year, Lockheed had expected to deliver about 150 planes in 2023, close to the full capacity of output. However, problems with the TR-3 software system are causing significant delays because the Defense Department stated in June that it would not accept newly built F-35s until the problems are resolved. A separate IT issue has been that the Pentagon needs to vet the plane's capability in the Joint Simulation Environment, development of which has itself been delayed. The new projection is that only about 100 to 120 planes will be delivered this year. However, Lockheed has indicated that the pace of production will continue unabated and that deliveries will exceed production in 2024. On the positive side, demand fundamentally remains strong. Last year, the Pentagon agreed to buy 375 planes during 2023-2025, and in April 2023 awarded a substantial increase for contract modifications. Lockheed still projects that more than



2,000 planes will ultimately be built compared with about 900 delivered to date, supporting manufacturing in the metro division over the coming years.

**Financial Services**

The banking industry will push past current headwinds and continue to advance. Industry employment is up 2.2% since the end of 2022 and 5% year over year. Although the strong trend growth in banking in neighboring Dallas is well known, Fort Worth has matched up. The level of industry employment in each metro division has doubled over the past two decades. Whereas Dallas benefits from its high-profile investment banking and wealth management segments as well as conventional lending, Fort Worth has attracted a large number of small community-oriented banks, including new or growing regional operations of banks based in such states as Pennsylvania, Missouri, Arkansas and Oklahoma, where growth opportunities are fewer. Both metro divisions benefit from strong job and population growth that has boosted demand for credit.

**Homebuilding**

Residential construction has begun to bounce back and should rise slowly over the coming year. New permits for single-family homes declined more than 50% during 2022 but have now risen by about 20% since early 2023. Despite lower house prices, developers have been encouraged by the low inventory of existing homes for sale. Longer term, the Fort Worth housing market should grow at an above-average pace, lifted by higher relative affordability than in Dallas and strong demographics.

**Conclusion**

| Positive Attributes | Negative Attributes |
|---|---|
| – Central Southwest location near Latin America supports distribution industry. | – Large military procurement industry is sensitive to political winds. |
| – Relatively high housing affordability attracts homebuyers employed in Dallas. | – Exposure to motor vehicle and energy industries adds to cyclical volatility. |

Fort Worth-Arlington will outperform the nation over the coming year, led by manufacturing and financial services. The homebuilding outlook appears bright. Longer term, robust population growth, a diversified manufacturing base, and lower business costs and costs of living relative to Dallas will support above-average gains.

**NEWMARK**

## NEIGHBORHOOD ANALYSIS



**Neighborhood Map**

### Boundaries

The subject is located in the northwestern area of Venus Town. This area is part of the Johnson County submarket as defined by Costar and is generally delineated as follows:

| | |
|---|---|
| North | County Road 506 |
| South | US Highway 67 |
| East | VV Jones Road |
| West | County Road 213 |

### Surrounding Area of Influence Trends

#### Description

The subject's surrounding area is viewed as suburban with commercial and vacant land. The immediate area around the subject can be described as vacant land.

#### Characteristics

– The subject property is in the proximity of US Highway 67 which provide an easy access to the most parts of Fort Worth MSA.

– The subject property is in the vicinity of Mid-Way Regional Airport.

#### Fundamental Real Estate Cycle

The surrounding area is considered to be within the risk stage of its real estate cycle.

**NEWMARK**

Industrial Building
App.075

**New Development**

- – TBD Discovery Lane - Building C Midlothian Business Park is a proposed industrial building with a rentable building area of 154,440SF located 3.6 miles to the west of the subject. This project is expected to complete construction by July 2024.

- – TBD Brookhollow - Xchange at Rail port Building One is a proposed industrial building with a rentable building area of 711,360SF located 1.5 miles to the northeast of the subject. This project is expected to complete construction by May 2024.

- – 8636 East Highway 67 is a proposed industrial building with a rentable building area of 300,000 SF located 4.6 miles to the northeast of the subject. This project is expected to complete construction by September 2024.

**Conformity**

Land uses within the subject neighborhood consist of a mixture of commercial and residential developments.

**Nuisances or Hazards**

Our observation of the area revealed no evidence of significant nuisances or hazards.

## Access

**Primary Access and Major Thoroughfares**

Major thoroughfares in the area includes County Road 501, US Highway 67, Farm-to-Market Road 157, County Road 502. US Route 67 is a major U.S. Highway in the state of Texas. It runs from the U.S.–Mexico border west of Presidio to Texarkana at the Arkansas state line. US Route 67 is part of the La Entrada al Pacifico international trade corridor from its southern terminus to US Highway 385 in McCamey. US Highway 67 enters Texas from Mexico as Federal Highway 16 west of Presidio. US Highway 67 is in the vicinity of the subject providing primary access.

**Transportation**

Transportation is primarily via automobile. The subject is in the vicinity of County Road 502, US Highway 67, with frontage along Farm-to-Market Road 157.



**Distance from Key Locations**

The commute to the Venus city is about five to ten minutes and the drive to Mid-Way Regional Airport is about twenty minutes depending on the traffic.

The following illustrates the 30-minute drive time from the subject.



**Drive Time Map**

## Land Use

The land sues in the area immediately surrounding the subject site are comprised of vacant land with scattered residential and scattered commercial or industrial uses.



The land to the south, west and north is made up of vacant agricultural oriented tracts. To the east is an auto storage yard. Further north, east, west and south can be found several residential subdivisions. This area is considered rural at the moment but is in the process of being developed with residential developments.

**ECONOMIC ANALYSIS**

## Demographics

A demographic summary for the defined area is illustrated as follows:

| Demographic Analysis | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 3-Miles Radius | 5-Miles Radius | 10-Miles Radius | 76084 | Venus town | Johnson County | Dallas-Fort Worth-Arlington, TX MSA | Texas |
| **Population** | | | | | | | | |
| 2010 Total Population | 6,185 | 14,007 | 83,066 | 8,417 | 3,207 | 150,934 | 6,366,542 | 25,145,561 |
| 2023 Total Population | 9,484 | 18,934 | 128,912 | 13,868 | 5,539 | 192,587 | 8,058,326 | 30,506,523 |
| 2028 Total Population | 17,063 | 39,591 | 168,755 | 23,020 | 12,861 | 206,332 | 8,605,015 | 32,021,944 |
| Projected Annual Growth % | 12.5% | 15.9% | 5.5% | 10.7% | 18.4% | 1.4% | 1.3% | 1.0% |
| **Households** | | | | | | | | |
| 2010 Total Households | 1,679 | 4,081 | 27,169 | 2,384 | 733 | 52,193 | 2,296,410 | 8,922,933 |
| 2023 Total Households | 2,616 | 5,515 | 42,212 | 4,041 | 1,421 | 66,252 | 2,923,482 | 11,047,066 |
| 2028 Total Households | 4,981 | 12,008 | 55,593 | 6,906 | 3,652 | 71,358 | 3,135,223 | 11,696,400 |
| Projected Annual Growth % | 13.7% | 16.8% | 5.7% | 11.3% | 20.8% | 1.5% | 1.4% | 1.1% |
| **Income** | | | | | | | | |
| 2023 Median Household Income | $84,291 | $78,556 | $99,962 | $91,366 | $84,588 | $79,951 | $79,409 | $69,529 |
| 2023 Average Household Income | $97,140 | $97,386 | $122,850 | $111,738 | $99,031 | $99,101 | $115,034 | $102,636 |
| 2023 Per Capita Income | $28,361 | $28,521 | $40,135 | $32,670 | $25,681 | $34,116 | $41,785 | $37,264 |
| **Housing** | | | | | | | | |
| 2023 Owner Occupied Housing Units | 81.1% | 82.7% | 76.3% | 85.9% | 86.1% | 70.4% | 56.0% | 56.9% |
| 2023 Renter Occupied Housing Units | 14.7% | 13.3% | 19.4% | 11.0% | 10.0% | 24.2% | 37.6% | 33.5% |
| 2023 Median Home Value | $217,914 | $205,006 | $307,338 | $247,356 | $221,619 | $244,619 | $311,758 | $255,469 |
| Median Year Structure Built | 2002 | 2000 | 2001 | 2003 | 2003 | 1992 | 1989 | 1988 |
| **Miscellaneous Data Items** | | | | | | | | |
| 2023 Bachelor's Degree | 9.0% | 8.3% | 20.6% | 12.1% | 9.5% | 15.7% | 26.5% | 22.8% |
| 2023 Grad/Professional Degree | 4.1% | 5.0% | 11.3% | 8.3% | 4.4% | 7.3% | 14.0% | 12.1% |
| 2023 College Graduate % | 13.1% | 13.3% | 31.9% | 20.4% | 13.9% | 22.9% | 40.4% | 34.9% |
| 2023 Average Household Size | 3.38 | 3.25 | 3.00 | 3.18 | 3.18 | 2.86 | 2.73 | 2.71 |
| 2023 Median Age | 35.4 | 35.3 | 36.8 | 34.9 | 34.6 | 38.0 | 35.5 | 35.7 |

*Source: ESRI; Compiled by Newmark*

- As shown above, the current population within a 3-mile radius of the subject is 9,484 and the average household size 3.38. Population in the area has grown since the 2010 census, and this trend is projected to grow over the next five years.

- Median household income in 3-mile radius is $84,219, which is higher than the household income of Johnson County. Residents within a 3-mile radius have a lower level of educational attainment than those of Johnson County. Also, the median home values are lower in 3-mile radius.

- Population growth in the surrounding area has been high with income levels increasing. This has a positive effect on industrial real estate demand. This trend is projected to continue into the foreseeable future.

**NEWMARK**

### Conclusion

Given the history of the area and the growth trends illustrated in the surrounding area analysis, it is anticipated that property values will expand in the near future.



## INDUSTRIAL MARKET ANALYSIS

### Classification

The subject is in the Johnson County submarket of the Dallas/Ft Worth market.  The property is considered an Industrial property in this market.

### Industrial Market Overview

The following discussion outlines overall market performance in the surrounding Industrial market using Costar market metric data.  Presented first are market statistics of the Dallas/Ft Worth area and the subject Johnson County submarket overall.  The analysis is then further refined to focus on demand for the subject and the properties considered to be primary competition.



| Period | Dallas/Ft Worth | Johnson County |
|---|---|---|
| Q2 2020 | 93.1% | 97.8% |
| Q3 2020 | 93.0% | 97.7% |
| Q4 2020 | 92.5% | 97.2% |
| Q1 2021 | 93.1% | 96.8% |
| Q2 2021 | 93.6% | 98.1% |
| Q3 2021 | 94.4% | 98.8% |
| Q4 2021 | 94.7% | 98.0% |
| Q1 2022 | 94.2% | 97.3% |
| Q2 2022 | 94.4% | 96.9% |
| Q3 2022 | 94.4% | 96.6% |
| Q4 2022 | 94.6% | 97.2% |
| Q1 2023 | 93.6% | 97.6% |
| Q2 2023 | 92.7% | 98.1% |
| Q3 2023 | 91.9% | 97.1% |

*Source: Costar; Compiled by Newmark Valuation & Advisory*



## Asking Rent Per SF



| Period | Dallas/Ft Worth | Johnson County |
|---|---|---|
| Q2 2020 | $5.68 | $6.91 |
| Q3 2020 | $6.00 | $6.71 |
| Q4 2020 | $6.09 | $6.77 |
| Q1 2021 | $6.06 | $5.85 |
| Q2 2021 | $6.05 | $5.54 |
| Q3 2021 | $6.10 | $5.52 |
| Q4 2021 | $6.23 | $6.01 |
| Q1 2022 | $6.39 | $6.45 |
| Q2 2022 | $6.61 | $6.50 |
| Q3 2022 | $7.09 | $6.51 |
| Q4 2022 | $7.38 | $7.69 |
| Q1 2023 | $7.65 | $7.30 |
| Q2 2023 | $8.14 | $7.50 |
| Q3 2023 | $8.33 | $8.05 |

*Source: Costar; Compiled by Newmark Valuation & Advisory*

## Industrial Market Statistics

**Trailing Four Quarters Ended Q3 2023**

| Market / Submarket | Inventory (SF) | Completions (SF) | Vacancy (%) | Net Absorption (SF) | NNN Rent Overall / SF |
|---|---|---|---|---|---|
| Dallas/Ft Worth | 995,060,531 | 64,283,198 | 8.10% | 34,784,167 | $8.33 |
| Johnson County | 14,493,705 | 414,583 | 2.90% | 400,007 | $8.05 |

*Source: Costar; Compiled by Newmark Valuation & Advisory*

- The average vacancy rate for the subject submarket is lower than that of the overall market area .

- The average rental rate for the submarket is lower than the overall Dallas/Ft Worth market.  The subject Johnson County submarket is considered a similar tier submarket as compared to the other submarkets in the overall Dallas/Ft Worth area.

- Approximately 2.9% of the submarket inventory, and 6.5% of the market inventory, represents newer construction.

- Absorption for the last 12 months was positive for the overall market area and at the submarket level.



## Market and Submarket Trends

| Industrial Market Trends | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | **Dallas/Ft Worth** | | | | **Johnson County** | | | |
| | Inventory (SF) | Completions (SF) | Vacancy % | NNN Rent Overall / SF | Inventory (SF) | Completions (SF) | Vacancy % | NNN Rent Overall / SF |
| Q3 2021 | 893,291,727 | 6,178,973 | 5.6% | $6.10 | 13,613,964 | 0 | 1.2% | $5.52 |
| Q4 2021 | 902,126,841 | 9,621,695 | 5.3% | $6.23 | 13,713,964 | 100,000 | 2.0% | $6.01 |
| Q1 2022 | 910,051,727 | 8,327,080 | 5.8% | $6.39 | 13,756,954 | 42,990 | 2.7% | $6.45 |
| Q2 2022 | 918,519,183 | 10,106,492 | 5.6% | $6.61 | 14,160,194 | 403,240 | 3.1% | $6.50 |
| Q3 2022 | 931,648,926 | 13,452,339 | 5.6% | $7.09 | 14,165,794 | 5,600 | 3.4% | $6.51 |
| Q4 2022 | 940,208,970 | 9,038,318 | 5.4% | $7.38 | 14,079,122 | 0 | 2.8% | $7.69 |
| Q1 2023 | 960,914,484 | 21,137,997 | 6.4% | $7.65 | 14,244,622 | 165,500 | 2.4% | $7.30 |
| Q2 2023 | 977,264,359 | 16,356,239 | 7.3% | $8.14 | 14,364,422 | 119,800 | 1.9% | $7.50 |
| Q3 2023 | 995,060,531 | 17,750,644 | 8.1% | $8.33 | 14,493,705 | 129,283 | 2.9% | $8.05 |

*Source: Costar; Compiled by Newmark Valuation & Advisory*

- The overall market area has been decreasing and submarket have been fluctuating with respect to occupancy over the past year.

- Over the past several years, effective rental rates have been following an increasing trend but have fluctuating within the submarket in the past 12 months.

- As shown above, the submarket is underperforming against the market overall.

## Long Term Dallas/Ft Worth Market Metrics

The following provides a longer-term view of the market.

| Dallas/Ft Worth Market Metrics | | | | | | |
|---|---|---|---|---|---|---|
| Period | Inventory (SF) | Vacancy % | Net Absorption (SF) | Completions (SF) | Nnn Rent Overall | All Service Type Rent Overall |
| Q1 2021 | 879,127,873 | 6.9% | 10,980,112 | 6,988,113 | $6.06 | $6.17 |
| Q2 2021 | 887,312,817 | 6.4% | 12,683,774 | 8,197,845 | $6.05 | $6.22 |
| Q3 2021 | 893,291,727 | 5.6% | 12,081,908 | 6,178,973 | $6.10 | $6.23 |
| Q4 2021 | 902,126,841 | 5.3% | 11,609,101 | 9,621,695 | $6.23 | $6.42 |
| Q1 2022 | 910,051,727 | 5.8% | 2,595,397 | 8,327,080 | $6.39 | $6.65 |
| Q2 2022 | 918,519,183 | 5.6% | 9,908,562 | 10,106,492 | $6.61 | $6.89 |
| Q3 2022 | 931,648,926 | 5.6% | 12,507,139 | 13,452,339 | $7.09 | $7.35 |
| Q4 2022 | 940,208,970 | 5.4% | 10,131,172 | 9,038,318 | $7.38 | $7.61 |
| Q1 2023 | 960,914,484 | 6.4% | 9,686,312 | 21,137,997 | $7.65 | $7.96 |
| Q2 2023 | 977,264,359 | 7.3% | 6,807,318 | 16,356,239 | $8.14 | $8.41 |
| Q3 2023 | 995,060,531 | 8.1% | 8,159,365 | 17,750,644 | $8.33 | $8.61 |
| Y 2003 | 608,644,830 | 9.9% | 3,115,014 | 8,845,374 | $3.73 | $3.67 |
| Y 2004 | 620,800,144 | 10.4% | 7,480,296 | 12,441,822 | $3.68 | $3.77 |
| Y 2005 | 629,881,684 | 9.4% | 14,769,987 | 9,658,575 | $3.77 | $3.79 |
| Y 2006 | 644,995,800 | 8.6% | 18,842,457 | 15,631,382 | $3.76 | $3.86 |
| Y 2007 | 660,701,708 | 7.8% | 19,737,262 | 15,941,908 | $3.76 | $3.96 |
| Y 2008 | 681,757,321 | 9.3% | 8,825,196 | 23,974,431 | $3.82 | $3.97 |
| Y 2009 | 692,866,948 | 11.3% | -3,313,541 | 12,090,353 | $3.79 | $3.90 |
| Y 2010 | 693,747,093 | 11.1% | 1,676,042 | 2,489,456 | $3.65 | $3.77 |
| Y 2011 | 693,766,134 | 9.4% | 12,041,610 | 2,454,149 | $3.53 | $3.71 |
| Y 2012 | 695,919,208 | 8.2% | 10,371,566 | 3,415,160 | $3.64 | $3.81 |
| Y 2013 | 703,256,201 | 6.7% | 17,307,793 | 8,727,338 | $3.93 | $4.08 |
| Y 2014 | 720,090,198 | 6.9% | 13,694,310 | 18,537,276 | $4.15 | $4.27 |
| Y 2015 | 740,391,355 | 6.6% | 20,377,098 | 20,342,478 | $4.23 | $4.43 |
| Y 2016 | 762,514,786 | 6.1% | 24,154,574 | 22,505,506 | $4.47 | $4.73 |
| Y 2017 | 789,181,177 | 6.6% | 19,776,638 | 26,952,148 | $4.51 | $4.83 |
| Y 2018 | 808,671,177 | 6.4% | 19,525,659 | 25,017,111 | $4.92 | $5.38 |
| Y 2019 | 838,356,365 | 6.7% | 25,730,833 | 30,109,314 | $5.29 | $5.69 |
| Y 2020 | 872,215,383 | 7.5% | 24,787,823 | 34,379,059 | $6.09 | $6.21 |
| Y 2021 | 902,126,841 | 5.3% | 47,354,895 | 30,986,626 | $6.23 | $6.42 |
| Y 2022 | 940,208,970 | 5.4% | 35,142,270 | 40,924,229 | $7.38 | $7.61 |
| 5 Year Average | 872,315,747 | 6.3% | 30,508,296 | 32,283,268 | $5.98 | $6.26 |
| 10 Year Average | 807,701,245 | 6.4% | 24,785,189 | 25,848,109 | $5.12 | $5.37 |
| 15 Year Average | 769,004,610 | 7.6% | 18,496,851 | 20,193,642 | $4.64 | $4.85 |

*Source: Costar; Compiled by Newmark Valuation & Advisory*



## Construction Versus Absorption

| Construction/Absorption Change | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **Market / Submarket** | **Prior Calendar Years History** | | | | | | | | |
| | **Prior Calendar Year History** | | | **Prior Three Year History** | | | **Prior Five Year History** | | |
| | **SF Built** | **SF Absorbed** | **Const. / Abs. Ratio** | **SF Built** | **SF Absorbed** | **Const. / Abs. Ratio** | **SF Built** | **SF Absorbed** | **Const. / Abs. Ratio** |
| Dallas/Ft Worth | 40,924,229 | 35,142,270 | 1.2 | 106,289,914 | 107,284,988 | 1.0 | 161,416,339 | 152,541,480 | 1.1 |
| Johnson County | 451,830 | 244,525 | 1.8 | 891,559 | 784,945 | 1.1 | 1,551,099 | 1,220,865 | 1.3 |

*Source: Costar; Compiled by Newmark Valuation & Advisory*

– Absorption in the Johnson County submarket has kept pace with construction over the past five years as evidenced by the approximate one to one ratio of construction to absorption.

## Supply & Demand Conclusion

– The subject's overall market and submarket have been fluctuating with respect to occupancy. Overall, rental rates in the market appears to be increasing. Supply and demand are currently trying to improve and attain a balance.



## Competitive Properties



**Competitive Properties Map**

| Comparable Property Summary | | | | | |
|---|---|---|---|---|---|
| | **Subject** | **Comparable 1** | **Comparable 2** | **Comparable 3** | **Comparable 4** |
| Name | Industrial Building | Vacant Warehouse | Vacant Warehouse | Vacant Warehouse | Vacant Warehouse |
| Address | 1025 North Farm-to-Market 157 | 108 Gillum Street | 1748 North Main Street | 1104 Clay Street | 3030 South US Highway 77 |
| City, State | Venus, TX | Grandview, TX | Cleburne, TX | Ennis, TX | Waxahachie, TX |
| Rentable Area (SF) | 1,500 | 2,400 | 9,200 | 3,990 | 2,400 |
| Year Built | 1995 | 1985 | 1960 | 1987 | 2018 |
| Number of Floors | 1 | 1 | 1 | 1 | 1 |
| Exterior | Steel | Steel | Steel | Steel | Steel |
| Condition | Poor | Average | Average | Fair | Average |
| Occupancy | 0% | 0% | 0% | 0% | 0% |

*Compiled by Newmark Valuation & Advisory*

The subject is a single tenant building and would either be 100% vacant or 100% occupied at any one time. We have concluded a market-oriented vacancy to account for the potential vacancy during a typical holding period.

**NEWMARK**

Industrial Building

App.086

**ECONOMIC ANALYSIS**

## Trends and Projections

### Subject and Market Historical and Forecast Trends

| Market Vacancy Rate Indicators | | | | | |
|---|---|---|---|---|---|
| | Current | Most Recent Full Year | Trailing 3-Year | Trailing 5-Year | Trailing 10-Year |
| **Costar** | | | | | |
| Dallas/Ft Worth | 8.10% | 5.40% | 7.50% | 6.40% | 6.70% |
| Johnson County | 2.90% | 2.80% | 2.80% | 1.70% | 5.10% |
| | | | | | |
| Direct Competition | 100.00% | | | | |
| Subject | 100.00% | | | | |
| Concluded Subject Vacancy Rate | 5.00% | | | | |

*Source: Costar, Newmark Valuation & Advisory*

### Conclusion

| Occupancy Conclusions | |
|---|---|
| **Costar** | |
| Dallas/Ft Worth | 91.90% |
| Johnson County | 97.10% |
| | |
| Direct Competition | 100.00% |
| Subject Property's Current Occupancy | 0.00% |
| Subject Property's Stabilized Occupancy | 95.00% |

*Source: Costar, Newmark Valuation & Advisory*

– Our conclusion of stabilized occupancy is falls between the overall market and sub market indications and is considered reasonable.



# Land and Site Analysis



**NEWMARK**

Industrial Building

App.088

**LAND AND SITE ANALYSIS**                                                                38



| | | Flood Map | | |

**Flood Map**



Industrial Building



**Aerial Photo**

**NEWMARK**

Industrial Building

App.090

**LAND AND SITE ANALYSIS**                                                                    **40**

## Land Parcels

| Parcel Summary | Associated APN(s) | Classification | Land Area (SF) | Land Area (Acres) |
|---|---|---|---|---|
| Site 1 | 126.0026.00298 | Primary Site 1 | 43,996 | 1.01 |
| Total Gross Land Area | | | 43,996 | 1.01 |
| Total Usable Land Area | | | 43,996 | 1.01 |

*Compiled by Newmark*

## Land Description

| | |
|---|---|
| Total Land Area | 1.01 Acres; 43,996 SF |
| Usable Land Area | 1.01 Acres; 43,996 SF |
| Excess Land Area | None |
| Surplus Land Area | None |
| Source of Land Area | Public Data |
| **Site Characteristics** | |
| Primary Street Frontage | Farm-to-Market Road 157 |
| Secondary Street Frontage | County Road 501 |
| Traffic Control at Entry | None |
| Traffic Flow | Moderate |
| Accessibility Rating | Average |
| Visibility Rating | Average |
| Shape | Irregular |
| Corner | No |
| Rail Access | No |
| Topography | Generally Level |
| Site Vegetation | Typical |
| Other Site Characteristics | None noted |
| Easement/Encroachments | None Noted |
| Environmental Issue | None Noted |
| **Flood Zone Analysis** | |
| Flood Area Panel Number | 48251C0230K |
| Date | 9/21/2023 |
| Zone | Zone X |
| Description | Area of minimal flood hazard, usually depicted on Flood Insurance Rate Maps as above the 500-year flood level. |
| Insurance Required? | No |
| **Utilities** | |
| Utility Services | Water, Electricity with private septic tank |
| Utility Service Providers | |
| Water | Mountain Peak |
| Electricity | United Cooperative Services |

*Compiled by Newmark*



## ENVIRONMENTAL ISSUES

No environmental issues were observed or reported.  Newmark is not qualified to detect the existence of potentially hazardous issues such as soil contaminants, the presence of abandoned underground tanks, or other below-ground sources of potential site contamination.  The existence of such substances may affect the value of the property.  For this assignment, we have specifically assumed that any hazardous materials that would cause a loss in value do not affect the subject.

## ZONING AND LEGAL RESTRICTIONS

| Zoning Summary | |
| --- | --- |
| **Category** | **Description** |
| Zoning Jurisdiction | Outside City Limits |
| Zoning Designation | Not Zoned |
| Legally Conforming? | Yes |
| Zoning Change Likely? | Unlikely |

*Compiled by Newmark*



# Improvements Analysis

The subject is an industrial-light manufacturing development, located at 1025 North Farm-to-Market 157, Venus, TX  76084.  The subject was built in 1995.  It includes one industrial building. The improvements are more fully described in the following table.

| Improvements Description | |
|---|---|
| **Component Structures** | |
| General Improvement Type | Industrial |
| Use Description | Light Manufacturing |
| No. Buildings | 1 |
| GBA (SF) | 1,500 |
| Rentable SF | 1,500 |
| % Occupied | 100.00% |
| Construction Status | Existing, Sub-stabilized Operations |
| Quality | Low |
| Current Condition | Poor |
| **Age/Life Depreciation Analysis** | |
| Year Built | 1995 |
| Year Renovated | None |
| Actual Age (Yrs.) | 28 |
| Economic Life (Yrs.) | 55 |
| Effective Age (Yrs.) | 25 |
| Remaining Economic Life (Yrs.) | 30 |
| Percent Depreciation | 45.45% |
| **Floor Area Analysis** | |
| Number of Stories | 1 |
| Est. Ground Floor Area (GBA) | 1,500 |
| Attributed Site Area (SF) | 43,996 |
| Site Coverage | 3.4% |
| Land to Building Ratio | 29.331 |
| Parking Type | Open Surface |
| Parking Spaces | 10 |
| Parking Ratio Per 1,000 SF NRA | 6.67 |
| **Construction Details** | **Light Manufacturing** |
| Foundation | Reinforced Concrete |
| Structural Frame/Construction Summary | Steel Frame |
| Exterior Walls | Steel |
| Windows | Single pane glass with metal frames |
| Roof | Pitched |



| Industrial Building Details | Light Manufacturing |
|---|---|
| Percent Office | 13.00% |
| Number of Drive-in Doors | 2 |
| Total Loading Doors | 2 |
| Ratio of SF Per Loading Door | 750 |
| Clear Height (Feet) | 15 |
| Rail Access | No |
| Interior Finish | Light Manufacturing |
| Floors | Concrete |
| Walls | Metal |
| Ceilings | Open Steel Beams |
| Lighting | Fluorescent Fixtures |
| **Engineering & Mechanical** | **Light Manufacturing** |
| HVAC | None |
| Electrical | Assumed adequate |
| Plumbing | Assumed adequate |
| Rest Rooms | Assumed adequate |
| Fire Sprinklers | No |

*Compiled by Newmark*

## SPACE TYPE/CLASSIFICATION

| Improvements Summary | | | | | | |
|---|---|---|---|---|---|---|
| **Building Summary** | **Property Type** | **No. Buildings** | **GBA (SF)** | **Rentable SF** | **Occupied SF** | **% Occupied** |
| Industrial | Industrial-Light Manufacturing | 1 | 1,500 | 1,500 | 1,500 | 100.0% |
| **Property Type Subtotals** | | | | | | |
| Industrial-Light Manufacturing | | 1 | 1,500 | 1,500 | 1,500 | 100.0% |
| **Improvements Total** | | **1** | **1,500** | **1,500** | | **100.0%** |

*Compiled by Newmark*

### Functional Utility

Based on our inspection and consideration of its current and/or future use, there do not appear to be any significant items of functional obsolescence.

### Deferred Maintenance

Our observation of the property indicated no significant items of deferred maintenance.

### Planned Capital Expenditures

There are no reported planned capital expenditures.

### Personal Property

No personal property items were observed that would have any material contribution to market value.



## CONCLUSION

– The improvements are of low quality construction and are in poor condition. Maintenance appears to have been good over the years.

– The improvements are considered to be functional for the existing use.

– Overall, the improvements are well suited for the existing use.

– Overall, the quality, condition, and functional utility of the improvements are rated as average for their age and location.

# Real Estate Taxes

| Taxes and Assessments | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Tax Year 2023** | **Assessor's Market Value** | | | | **Tax Rates** | **Taxes and Assessments** | | |
| Tax ID | Land | Improvements | Total | Assessment Ratio | Land & Improvements | Ad Valorem Taxes | Direct Assessments | Total |
| 126.0026.00298 | $5,000 | $61,104 | $66,104 | 100.0% | 1.6080% | $1,063 | $0 | $1,063 |
| | $5,000 | $61,104 | $66,104 | 100.0% | 1.6080% | $1,063 | $0 | $1,063 |

*Compiled by Newmark*

The local assessor's methodology for valuation is market value. The property is assessed on a fee simple basis.

The local assessor's methodology for valuation is cost, sales, income. The property is assessed on a fee simple basis. Within the state of Texas properties are supposed to be assessed at 100% of market value, real estate and FF&E only. In addition, Texas recognizes equal and uniform, whereby tax comparables can be used to support the assessed values. The lower of the two takes precedence. The sale of the subject has some impact on its assessment. Texas is a nondisclosure state, but sale prices are becoming easier to confirm. Nevertheless, buyers will typically rely on tax comparables as outlined below.

## TAX COMPARABLES

| Tax Comparables | | | | |
|---|---|---|---|---|
| **Tax Year 2023** | **1** | **2** | **3** | **Subject (Actual)** |
| Location | 1925 FM 2738 #C | 9701 E Highway 67 | 4544 Maxey Rd | 1025 North Farm-to-Market |
| City, County, State | Alvarado, Johnson, TX | Alvarado, Johnson, TX | Alvarado, Johnson, TX | Venus, Johnson, TX |
| Improvements SF | 1,400 | 6,688 | 15,000 | 1,500 |
| Total Assessed Value | $82,486 | $312,895 | $636,367 | $66,104 |
| Assessed Value/SF | $58.92 | $46.78 | $42.42 | $44.07 |

*Compiled by Newmark*

**NEWMARK**

## SUBJECT TAX CONCLUSION

| Ad Valorem Tax Analysis | | | | |
|---|---|---|---|---|
| | **Comparable Data** | | **Subject History** | **Conclusion** |
| | Range | Average | 2023 | |
| Total Assessed Value | | | $66,104 | $66,104 |
| Total Assessed Value/SF | $42.42 - $58.92 | $49.38 | $44.07 | $44.07 |
| Direct Assessments | | | $0 | $0 |
| Tax Rate | | | 1.60800% | 1.6080% |
| Actual / Pro Forma Taxes | | | $1,063 | $1,063 |
| Reported Tax Delinquencies | | | None | None |
| Tax Exemptions or Abatements | | | None | None |

*Compiled by Newmark*

The subject's tax assessment falls somewhat below the average of the assessment comparables. Tax assessments for comparable properties range from $42.42 - $58.92 per square foot.  The subject's 2023 total assessed value of $44.07 per square foot is approximately 11% below the average of the comparable data.

The next reassessment of this County will occur next year at which point changes in the assessed value are likely to occur.

## MARGIN/FRANCHISE TAX

The Margin Tax is calculated by multiplying a taxable entity's taxable margin by the tax rate of 1%, or 0.5% for retailers and wholesalers. No tax is owed if the tax due is less than $1,000 or if the taxable entity's total revenue from its entire business does not exceed $1,230,000 subject to adjustment based on changes in the consumer price index. For businesses with less than $20 million of total revenue, a simplified computational formula call the E-Z computation can be used, whereby the tax is imposed at a rate of 0.331% of apportioned total revenue. Taxpayers that qualify must elect into the simplified treatment and waive the ability to take any credit, deduction or other adjustment. Based on the subject's pro forma EGI, the margin tax would not apply.



# Highest and Best Use

## AS VACANT

The site is not zoned. Based on available data and analysis, no other legal restrictions such as easements or deed covenants are present which would impair the utility of the site.  Given that surrounding properties have similar zoning and the future land use plan is focused on similar uses as well, it is unlikely that there would be a change of zoning classification.

The subject site contains 43,996 square feet (1.010 acres), has favorable topography, adequate access, and all necessary utilities to support the range of legally permissible uses.  No significant physical limitations were noted.  The size of the site is typical for the categories of uses allowed under zoning.  In total, the site is physically capable of supporting the legally permissible uses.

Of the legally permissible and physically possible uses, only industrial use is considered to be reasonably probable.  As presented in the Market Analysis section of this report, the subject submarket is supportive of this potential use.

Given the underlying market conditions and activity, it appears that an industrial development would have a sufficient degree of feasibility.

The financially feasible analysis has yielded the conclusion that development of an industrial development is feasible and reasonably probable.  The associated risk is typical and market conditions appear to be supportive.  Therefore, the highest and best use of the subject as though vacant is the development of an industrial development.  As noted, market and economic conditions are supportive of the near-term development of this use on the site.  The most likely buyer would be a developer or owner/user.  An investor is a potential buyer as land value appreciation would support speculation although near term development would also be likely.

## AS IMPROVED

The existing industrial improvements are legally conforming to zoning.  There are no known legal restrictions to the continued use of the improvements as they were designed. As previously discussed, the improvements are rated as low for their age and location.  The improvements conform to the expectations of the market and conform in general terms to the highest and best use as though vacant conclusion above.  The improvements were designed for this use.  Based on our analysis and review, the improvements do not appear to suffer from significant functional obsolescence.  Therefore, continuation of the existing industrial property use is reasonably probable and appropriate.



In this case, the subject is not an income producing property but is capable of generating sufficient income if it were to be leased to support the continuation and maintenance of the use.  This is demonstrated in the income capitalization approach by the fact that a positive income stream can be generated.  Since the concluded value as though improved exceeds the value of the underlying land, it follows that removal of the improvements for redevelopment or substantial conversion to an alternative use is not indicated.

The existing industrial improvements are legally permissible, physically possible, and financially feasible.  The concluded value as though improved exceeds the value of the underlying land and removal of the improvements for redevelopment or substantial conversion to an alternative use is not indicated based on current neighborhood trends.  Given no alternatives, the highest and best use of the subject as improved is the existing industrial property use.  Market and economic conditions are supportive of this continued use.  The most likely buyer would be an owner-user.



# Appraisal Methodology

## COST APPROACH

The cost approach is based on the proposition that the informed purchaser would pay no more for the subject than the cost to produce a substitute property with equivalent utility.  This approach is particularly applicable when the property being appraised involves relatively new improvements that represent the highest and best use of the land, or when it is improved with relatively unique or specialized improvements for which there exist few sales or leases of comparable properties.

## SALES COMPARISON APPROACH

The sales comparison approach utilizes sales of comparable properties, adjusted for differences, to indicate a value for the subject.  Valuation is typically accomplished using physical units of comparison such as price per square foot, price per unit, price per floor, etc., or economic units of comparison such as gross rent multiplier.  Adjustments are applied to the property units of comparison derived from the comparable sale.  The unit of comparison chosen for the subject is then used to yield a total value.

## INCOME CAPITALIZATION APPROACH

The income capitalization approach reflects the subject's income-producing capabilities.  This approach is based on the assumption that value is created by the expectation of benefits to be derived in the future.  Specifically estimated is the amount an investor would be willing to pay to receive an income stream plus reversion value from a property over a period of time.  The two common valuation techniques associated with the income capitalization approach are direct capitalization and the discounted cash flow (DCF) analysis.

| Application of Approaches to Value | |
| --- | --- |
| **Approach** | **Comments** |
| Cost Approach | The Cost Approach is not applicable and is not utilized in this appraisal. |
| Sales Comparison Approach | The Sales Comparison Approach is applicable and is utilized in this appraisal. |
| Income Capitalization Approach | The Income Capitalization Approach is applicable and is utilized in this appraisal. |

*Compiled by Newmark*

The cost approach was not used because market participants considering properties like the subject do not give consideration to the cost approach.  The exclusion of this approach is not considered to impact the reliability of the appraisal.



# Sales Comparison Approach

The sales comparison approach value is derived by analyzing closed sales, listings, or pending sales of properties that are similar to the subject. The unit of comparison applied in this sales comparison analysis is price per square foot as it mirrors the primary comparison method used by market participants.



**Comparable Map**

| Comparable Sales Summary | | | | | |
|---|---|---|---|---|---|
| | **Subject** | **Sale 1** | **Sale 2** | **Sale 3** | **Sale 4** |
| |  | | | | |
| Property Name | Industrial Building | Vacant Warehouse | Steel Warehouse | Vacant Warehouse | Burleson Office Warehouse |
| Address | 1025 North Farm-to-Market 157 | 1400 South Fm 157 | 8121 County Road 1016b | 1360 South Main Street | 2825 South Burleson Boulevard |
| City, State | Venus, TX | Venus, TX | Burleson, TX | Mansfield, TX | Burleson, TX |
| Land Size | 1.01 Acres | 1.00 Acres | 1.54 Acres | 1.87 Acres | 2.60 Acres |
| Rentable Area (SF) | 1,500 SF | 12,750 SF | 2,400 SF | 5,000 SF | 11,408 SF |
| Year Built (Renovated) | 1995 | 2002 | 1999 | 1985 | 1981 |
| Occupancy/Owner Occ. | 0% | 0% | 100% | 0% | 0% |
| Construction | | Steel | Steel | Steel | Masonry |
| Condition | Poor | Average | Average | Average | Average |
| Clear Height | 15 | 20 | 20 | 20 | 18 |
| Percent Office | 13% | 15% | 5% | 10% | 5% |
| Total Loading Doors | 2 | 4 | 2 | 1 | 3 |
| Buyer | -- | James Lisa A | Kellis Joint Venture Llc | Gaona Deyanira | Feghali Holdings, LLC |
| Seller | -- | JAMES STEVEN H | KAHLER RICHARD D | SANCHEZ ALBERTO | Marilyn Francis Bleeker |
| Interest Conveyed | Fee Simple | Fee Simple | Fee Simple | Fee Simple | Fee Simple |
| Transaction Status | -- | Closed | Closed | Closed | Closed |
| Transaction Date | -- | Feb-23 | Nov-23 | May-22 | Nov-22 |
| Price | -- | $790,000 | $425,000 | $430,000 | $1,247,631 |
| Price per SF | -- | $61.96 | $177.08 | $86.00 | $109.36 |

*Compiled by Newmark*

## ANALYSIS OF IMPROVED COMPARABLE DATA

### Comparable One

This comparable represents the sale of an owner occupied, free standing warehouse located at 1400 South FM 157 in Venus, Texas. The improvements were constructed in 2002 and are situated on a 1-acre site. The building consists of office space including 2 reception areas, lobby, private office, break room, restroom, shop has 6 lifts, supply room, restroom, plenty of warehouse space with high ceiling and 4 oversized bay doors. Easy access to HWY 67, plus house next door, storage sheds and carport included. The property sold for $790,000 ($61.96/SF) in February of 2022. The property was purchased for owner occupancy.

### Comparable Two

This comparable represents the sale of a vacant, free standing warehouse located at 8121 County Road 1016b in Burleson, Texas. The site is proximate to and has access to Chisholm Trail Parkway. The improvements were constructed in 1999 and are situated on a 1.54-acre site. The property sold for $425,000 ($177.08/SF) in August of 2022. It is currently 100% owner occupied and was purchased for owner occupancy.

### Comparable Three

This comparable represents the sale of a free standing warehouse located at 1360 S Main Street in Mansfield, Texas. The improvements were constructed in 1985 and are situated on a 1.87-acre site. It is considered to be in fair condition at the time of sale. The property sold for $430,000 ($86.00/SF) in May of 2022.

### Comparable Four

The property is a 11,408 square foot Industrial Warehouse building located at 2825 South Burleson Boulevard in Burleson, TX. The property was built in 1981 and is in average condition. This is a good location with IH-35 feeder road frontage. The property features 18-feet clear height, 2 drive-in bays, 1 dock high door and contains a 5 percent office build-out overall. The property was sold in November of 2022 at $1,247,631 or $109.36 per square foot.

### Summary of Adjustments / Adjustment Grid

Based on our comparative analysis, the following table summarizes the adjustments warranted to each comparable.



**SALES COMPARISON APPROACH**                                                                53

| Comparable Sales Adjustment Grid | | | | | |
|---|---|---|---|---|---|
| | **Subject** | **Sale 1** | **Sale 2** | **Sale 3** | **Sale 4** |
| Property Name | Industrial Building | Vacant Warehouse | Steel Warehouse | Vacant Warehouse | Burleson Office Warehouse |
| Address | 1025 North Farm-to-Market 157 | 1400 South Fm 157 | 8121 County Road 1016b | 1360 South Main Street | 2825 South Burleson Boulevard |
| City | Venus, TX | Venus, TX | Burleson, TX | Mansfield, TX | Burleson, TX |
| Land Size | 1.01 Acres | 1.00 Acres | 1.54 Acres | 1.87 Acres | 2.60 Acres |
| Size (Rentable Area) | 1,500 SF | 12,750 SF | 2,400 SF | 5,000 SF | 11,408 SF |
| Year Built (Renovated) | 1995 | 2002 | 1999 | 1985 | 1981 |
| Clear Height | 15 | 20 | 20 | 20 | 18 |
| Percent Office | 13% | 15% | 5% | 10% | 5% |
| Total Loading Doors | 2 | 4 | 2 | 1 | 3 |
| Transaction Type | -- | Closed | Closed | Closed | Closed |
| Transaction Date | -- | Feb-23 | Nov-23 | May-22 | Nov-22 |
| Actual Sale Price | -- | $790,000 | $425,000 | $430,000 | $1,247,631 |
| Price per SF | -- | $61.96 | $177.08 | $86.00 | $109.36 |
| Occupancy | 0% | 0% | 100% | 0% | 0% |
| **Transaction Adjustments** | | | | | |
| Property Rights | | 0% | 0% | 0% | 0% |
| Financing | | 0% | 0% | 0% | 0% |
| Conditions of Sale | | 0% | 0% | 0% | 0% |
| Market Conditions (Time) | 11/7/2023 | 0% | 0% | 0% | 0% |
| Subtotal (adjustments are multiplied) | | 0% | 0% | 0% | 0% |
| Transaction Adjusted Price per SF | | $61.96 | $177.08 | $86.00 | $109.36 |
| **Property Adjustments** | | | | | |
| Location | | 0% | -25% | -15% | -25% |
| Size | | 10% | 0% | 0% | 10% |
| Age/Condition | | -5% | 0% | 0% | 5% |
| Clear Height | | -5% | -5% | -5% | 0% |
| Quality | | 0% | -15% | 0% | 0% |
| Subtotal (adjustments are summed) | | 0% | -45% | -20% | -10% |
| Gross Adjustment | | 20% | 45% | 20% | 40% |
| Overall Adjustment | | 0% | -45.0% | -20.0% | -10.0% |
| **Indicated Price per SF** | | **$61.96** | **$97.40** | **$68.80** | **$98.43** |

*Compiled by Newmark*



Industrial Building
App.104

**Adjustments of Sale Comparables**

**Market Conditions**

– Recent listing and closed transaction data indicate net price appreciation has occurred since these properties sold. However, recent increases in interest rates by the government have resulted in a slowdown and fewer transactions. As such, we have not included any market condition adjustments. As such, an upward adjustment is applied to all comparables.

**Location**

– Comparables Two, Three, and Four are adjusted downward for being located in a superior location with higher traffic counts.

**Size**

– Comparables One and Four are adjusted for size due to economies of scale.

**Age/Condition**

– Comparable One and Four has been adjusted to account for differences in age.

**Clear Height**

– Comparables One, Two and Three are adjusted downward for superior clear height.

## SALES COMPARISON APPROACH CONCLUSION

– Market participants have indicated value trends have been on a positive trend due to limited supply which is creating significant upward pressure on market rents. However, the subject is in a rural area with lower demand.

– Prior to adjustments, the sales reflect a range of $61.96 to $177.08 per SF.

– After adjustment, the range is narrowed to $61.96 to $98.43 per SF, with an average of $81.65 per SF.

– To arrive at an indication of value, near weight was placed on the Comparables with greater emphasis placed on Comparable One because it required the least amount of overall adjustments and is located in Venus.

Based on the preceding analysis, the value indication by the sales comparison approach is as follows:

**NEWMARK**

| Sales Comparison Approach Conclusion | | |
|---|---|---|
| **Reconciliation of Price per SF Indication** | | **Value Indication** |
| Adjusted Value Range - Low | | $61.96 |
| Adjusted Value Range - High | | $98.43 |
| Reconciled As Stabilized Value - Price per SF | Effective Date:  11/7/2023 | $80.00 |
| Subject Rentable Area (SF) | | 1,500 |
| Reconciled As Stabilized Value - Sales Comparison Approach | Effective Date:  11/7/2023 | $120,000 |
| **As Is** | | **Value Indication** |
| As Is Value | Effective Date:  11/7/2023 | $120,000 |
| **Rounded** | | **$120,000** |

*Compiled by Newmark*



# Income Capitalization Approach

The income capitalization approach reflects the subject's income-producing capabilities. This approach is based on the assumption that value is created by the expectation of benefits to be derived in the future. Specifically estimated is the amount an investor would be willing to pay to receive an income stream plus reversion value from a property over a period of time. The two common valuation techniques associated with the income capitalization approach are direct capitalization and the discounted cash flow (DCF) analysis.

The direct capitalization method is normally more appropriate for properties with relatively stable operating histories and expectations. The DCF analysis is more appropriate for investment properties with multiple or long-term leases, particularly leases with cancellation clauses or renewal options, and especially in volatile markets.

In this analysis, we utilized only direct capitalization because investors and market participants typically rely more on this method.

## MARKET RENT ANALYSIS

In estimating market rent for the subject property, we considered data and opinions from the following:

– actual recent leases from comparable buildings;

– asking rents from competitive properties (presented in the industrial market analysis section of this report); and

– opinions of market rent derived from our interviews of leasing brokers active in the local market.





**Comparable Map**

| No. | Name | Address |
|---|---|---|
| Subject | Industrial Building | 1025 North Farm-to-Market 157, Venus, TX |
| 1 | Vacant Warehouse | 108 Gillum Street, Grandview, TX |
| 2 | Vacant Warehouse | 1748 North Main Street, Cleburne, TX |
| 3 | Vacant Warehouse | 1104 Clay Street, Ennis, TX |
| 4 | Vacant Warehouse | 3030 South US Highway 77, Waxahachie, TX |

*Compiled by Newmark*

**INCOME CAPITALIZATION APPROACH**                                                    **58**



Comparable One



Comparable Two



Comparable Three



Comparable Four

**NEWMARK**

## Analysis of Comparables

### Comparable One

This comparable represents a Single-tenant warehouse in Grandview, Texas. The property is located at 108 W Gilum Street. The property was constructed in 1985 and was in average condition. According to a property representative, the current rental rate is $1,300 per month on a triple net basis. This equates to $6.50 per square foot per year.

Compared to the subject this property is considered inferior overall. This is mostly attributed to age/condition. As a result, this property's lease rate requires upward adjustment in comparison to the subject.

### Comparable Two

This comparable represents a Single-tenant warehouse in Cleburne, Texas. The property is located at 1748 N Main Street #B. The property was constructed in 1960 and was in average condition. According to a property representative, the current rental rate is $1,315 per month on a triple net basis or $7.01 per square foot.

Compared to the subject this property is considered inferior overall. This is mostly attributed to age/condition. As a result, this property's lease rate requires upward adjustment in comparison to the subject.

### Comparable Three

This comparable represents a Single-tenant warehouse in Ennis, Texas. The property is located at 1104 S Clay Street. The property was constructed in 1987 and was in fair condition. According to a property representative, the current rental rate is $2,000 per month ($6.02 PSF/YR) on a triple net basis.

Compared to the subject this property is considered inferior overall. This is mostly attributed to its larger building size and age. As a result, this property's lease rate requires upward adjustment in comparison to the subject.

### Comparable Four

This comparable represents a Single-tenant warehouse in Waxahachie, Texas. The property is located at 3030 S Highway 77. The property was constructed in 2018 and was in average condition. According to a property representative, the current asking rental rate is $2,800 per month ($14.00 PSF per year) on a triple net basis.

Compared to the subject this property is considered superior overall. This is mostly attributed to location and age/condition.  As a result, this property's lease rate requires downward adjustment in comparison to the subject.



## Analysis of Market Rent for Industrial Space

| Comparable Leases Summary | | | | | |
|---|---|---|---|---|---|
| **Industrial Space** | **Subject** | **Lease 1** | **Lease 2** | **Lease 3** | **Lease 4** |
| Property Name | Industrial Building | Vacant Warehouse | Vacant Warehouse | Vacant Warehouse | Vacant Warehouse |
| Address | 1025 North Farm-to-Market 157 | 108 Gillum Street | 1748 North Main Street | 1104 Clay Street | 3030 South US Highway 77 |
| City, State | Venus, TX | Grandview, TX | Cleburne, TX | Ennis, TX | Waxahachie, TX |
| Rentable Area (SF) | 1,500 SF | 2,400 SF | 2,250 SF | 3,990 SF | 2,400 SF |
| Year Built (Renovated) | 1995 | 1985 | 1960 | 1987 | 2018 |
| Number of Stories | 1 | 1 | 1 | 1 | 1 |
| Exterior | Steel | Steel | Steel | Steel | Steel |
| Condition | Poor | Average | Average | Fair | Average |
| Clear Height (Feet) | 15 | 15 | 15 | 15 | 15 |
| Percent Office | 13.0% | 20.0% | 10.0% | 5.0% | 10.0% |
| **Lease Details** | | | | | |
| Lease Date | | Jun-22 | Mar-22 | Jun-22 | Sep-22 |
| Term (Mos.) | | 12 | 12 | 12 | 12 |
| Lease Size (SF) | | 2,400 | 2,250 | 3,990 | 2,400 |
| Full Building Lease | | Yes | No | Yes | Yes |
| **Rates and Measures** | | | | | |
| Base Rental Rate | | $6.50 | $7.01 | $6.02 | $14.00 |
| Lease Reimbursement Method | | Triple Net | Triple Net | Triple Net | Triple Net |

*Compiled by Newmark*

The following table summarizes the adjustments made to each comparable.

| Comparable Leases Adjustment Grid | | | | | |
| --- | --- | --- | --- | --- | --- |
| **Industrial Space** | **Subject** | **Comparable 1** | **Comparable 2** | **Comparable 3** | **Comparable 4** |
| Property Name | Industrial Building | Vacant Warehouse | Vacant Warehouse | Vacant Warehouse | Vacant Warehouse |
| Address | 1025 North Farm-to-Market 157 | 108 Gillum Street | 1748 North Main Street | 1104 Clay Street | 3030 South US Highway 77 |
| Lease Date | | Jun-22 | Mar-22 | Jun-22 | Sep-22 |
| Term (Mos.) | | 12 | 12 | 12 | 12 |
| Size (SF) | | 2,400 | 2,250 | 3,990 | 2,400 |
| Base Rental Rate | | $6.50 | $7.01 | $6.02 | $14.00 |
| Base Rent Escalation Type | | Fixed Steps | Fixed Steps | Fixed Steps | Fixed Steps |
| Lease Reimbursement Method | | Triple Net | Triple Net | Triple Net | Triple Net |
| **Financial Adjustments** | | | | | |
| Expense Structure | | 0% | 0% | 0% | 0% |
| Conditions of Lease | | 0% | 0% | 0% | 0% |
| Market Conditions (Time) | 11/7/2023 | 0% | 0% | 0% | 0% |
| Subtotal | | 0% | 0% | 0% | 0% |
| **Physical Adjustments** | | | | | |
| Location/Access/Exposure | | 0% | 0% | 0% | -15% |
| Size | | 0% | 0% | 5% | 0% |
| Age/Condition | | 5% | 15% | 5% | -15% |
| Clear Height | | 0% | 0% | 0% | 0% |
| Quality | | 0% | 0% | 0% | 0% |
| Subtotal | | 5% | 15% | 10% | -30% |
| Overall Adjustment | | 5% | 15% | 10% | -30% |
| Adjusted Rent Per SF | | $6.83 | $8.06 | $6.62 | $9.80 |
| Range of Adjusted Rents | $6.62 - $9.80 | | | | |
| Average | $7.83 | | | | |
| Indicated Rent | $7.25 | | | | |

*Compiled by Newmark*

## MARKET RENT CONCLUSION

### Base Rent Conclusions

After analysis, the overall range adjusted range and concluded market base rent for the subject is as follows:

| Base Rent Conclusions | | | | | |
| --- | --- | --- | --- | --- | --- |
| | **Adjusted Comparable Leases** | | | **Market** | |
| **MLA Category** | **Low** | **High** | **Average** | **Participants** | **Newmark Estimate** |
| Industrial Space: | $6.62 | $9.80 | $7.83 | $7.00- $7.75 | $7.25 |

*Compiled by Newmark*

– Near equal weight has been placed on Comparables One, Two and Three as they all required a similar level of adjustment.   Secondary weight has been applied to Comparable Four as it required the largest amount of adjustment. As such, we have concluded below the mean of the adjusted comparables.

NEWMARK

## Market Rent Conclusions

Based on the preceding analysis, the following is the concluded market lease terms for the subject:

| Concluded Market Lease Terms | | | | | | | |
|---|---|---|---|---|---|---|---|
| MLA Category | Rentable SF | Market Rent | Measure | Rent Escalations | Reimbursement Method | Term (Mos.) | Mos. Free |
| Industrial Space: | 1,500 | $7.25 | $/SF/Year | 2.00%/year | NNN | 60 | 0 |

*Compiled by Newmark*

# GROSS INCOME ESTIMATE

## Potential Gross Rent

Figures presented below reflect the 12-month period following the effective date of the appraisal.

| Potential Gross Rent | | | |
|---|---|---|---|
| | Leased | Potential Rent At Market | |
| MLA Category | SF | Annual | $/SF/Yr |
| Occupied Space | | | |
| Industrial Space: | 1,500 | $10,875 | $7.25 |
| Occupied Space Total | 1,500 | $10,875 | $7.25 |

*Compiled by Newmark*

For the direct capitalization analysis, potential gross rent is based on market rent.

## Expense Recoveries

| Expense Recoveries | | |
|---|---|---|
| Subject Projections | $/SF | Total |
| Newmark Projection | $2.45 | $3,675 |

*Compiled by Newmark*

– Our projection is based on a market triple net structure where all operating expenses are reimbursed to the landlord.

## Vacancy & Collection Loss Allowance

### Vacancy Allowance

| Vacancy Allowance | | | |
|---|---|---|---|
| Subject Projections | % of PGI | $/SF | Total |
| Newmark Projection | 5.00% | $0.49 | $728 |

*Compiled by Newmark*

The vacancy estimate for the subject was previously developed in the market analysis section of this report.

| Collection Allowance | | | |
|---|---|---|---|
| Subject Projections | % of PGI | $/SF | Total |
| Newmark Projection | 1.00% | $0.10 | $146 |

*Compiled by Newmark*

– Based on available data and analysis, the concluded collection loss allowance is 1.00%.

## Effective Gross Income

| Effective Gross Income | | |
|---|---|---|
| Subjec Projections | $/SF | Total |
| Newmark Projection | $9.12 | $13,677 |

*Compiled by Newmark*

Our pro forma estimate is based on market rent and expense reimbursements less vacancy.

**NEWMARK**

## OPERATING EXPENSE ANALYSIS

| Expense Analysis Per SF | | | | | |
|---|---|---|---|---|---|
| | Comp 1 | Comp 2 | Comp 3 | Comp 4 | Subject Projections |
| **Year Built** | 1991 | 1986 | 1999 | 2000 | 1995 |
| **SF** | 2,469 | 8,619 | 1,235 | 4,800 | 1,500 |
| **Operating Data Type** | In-Place | In-Place | In-Place | In-Place | **Newmark** |
| **Year** | 2022 | 2022 | 2022 | 2022 | **Projection** |
| **Effective Gross Income Per SF** | $14.22 | $9.00 | $9.57 | $10.50 | **$9.12** |
| **Operating Expenses Per SF** | | | | | |
| Real Estate Taxes | $1.80 | $0.52 | $1.11 | $0.79 | $0.71 |
| Insurance | $0.21 | $0.44 | $0.25 | $0.46 | $0.40 |
| Utilities | $0.44 | $0.28 | $0.46 | $0.39 | $0.30 |
| Repairs and Maintenance | $0.80 | $1.15 | $0.84 | $0.77 | $0.85 |
| General and Administrative | $0.06 | $0.11 | $0.15 | $0.10 | $0.10 |
| Management | $0.15 | $0.09 | $0.11 | $0.15 | $0.09 |
| Total Operating Expenses Per SF | $3.46 | $2.59 | $2.92 | $2.66 | **$2.45** |
| Net Operating Income Per SF | $10.76 | $6.41 | $6.65 | $7.84 | **$6.67** |
| **Operating Expense KPIs (% of EGI)** | | | | | |
| Management | 1.05% | 1.00% | 1.15% | 1.43% | 1.00% |
| Operating Expense Ratio (% of EGI) | 24.33% | 28.78% | 30.51% | 25.33% | 26.87% |
| Net Operating Income (% of EGI) | 75.67% | 71.22% | 69.49% | 74.67% | **73.13%** |

*Compiled by Newmark*

### Real Estate Taxes

| Real Estate Taxes | | | |
|---|---|---|---|
| Source | % of EGI | $/SF | Total |
| **Comparables Low** | 5.8% | $0.52 | |
| **Comparables High** | 12.7% | $1.80 | |
| **Comparables Average** | 9.4% | $1.06 | |
| Newmark Projection | 7.8% | $0.71 | $1,063 |

*Compiled by Newmark*

– This expense category includes all local, county, and state property tax levies. Our projection is based on the property assessment and tax rate for the subject, as discussed previously in the Real Estate Tax Analysis.

## Insurance

| Insurance | | | |
|---|---|---|---|
| **Source** | **% of EGI** | **$/SF** | **Total** |
| **Comparables Low** | 1.5% | $0.21 | |
| **Comparables High** | 4.9% | $0.46 | |
| **Comparables Average** | 3.3% | $0.34 | |
| Newmark Projection | 4.4% | $0.40 | $600 |

*Compiled by Newmark*

– Insurance expense includes property and casualty insurance for the subject. Our projection is similar to the comparable data.

## Utilities

| Utilities | | | |
|---|---|---|---|
| **Source** | **% of EGI** | **$/SF** | **Total** |
| **Comparables Low** | 3.1% | $0.28 | |
| **Comparables High** | 4.8% | $0.46 | |
| **Comparables Average** | 3.7% | $0.39 | |
| Newmark Projection | 3.3% | $0.30 | $450 |

*Compiled by Newmark*

– Utility charges include building utilities during tenant turnover but also limited expenses related to parking lot lighting. Our projection is bracketed by the comparables.

## Repairs and Maintenance

| Repairs and Maintenance | | | |
|---|---|---|---|
| **Source** | **% of EGI** | **$/SF** | **Total** |
| **Comparables Low** | 5.6% | $0.77 | |
| **Comparables High** | 12.8% | $1.15 | |
| **Comparables Average** | 8.6% | $0.89 | |
| Newmark Projection | 9.3% | $0.85 | $1,275 |

*Compiled by Newmark*

– Repairs and maintenance includes expenditures to repair and maintain mechanical systems and structural components, encompassing payroll and contract costs, as appropriate. Our projection is based on the comparable data. Excluded are alterations and major replacements, which are considered capital costs rather than periodic expenses.

## General and Administrative

| General and Administrative | | | |
|---|---|---|---|
| Source | % of EGI | $/SF | Total |
| **Comparables Low** | 0.4% | $0.06 | |
| **Comparables High** | 1.6% | $0.15 | |
| **Comparables Average** | 1.0% | $0.11 | |
| Newmark Projection | 1.1% | $0.10 | $150 |

*Compiled by Newmark*

– General and administrative expenses consist of legal, accounting and other professional fees, license fees, and business taxes. Our projection is consistent with the comparable data.

## Management

| Management | | | |
|---|---|---|---|
| Source | % of EGI | $/SF | Total |
| **Comparables Low** | 1.0% | $0.09 | |
| **Comparables High** | 1.4% | $0.15 | |
| **Comparables Average** | 1.2% | $0.13 | |
| Newmark Projection | 1.0% | $0.09 | $137 |

*Compiled by Newmark*

– Management fees are considered an expense of operation, whether the services are contracted or provided by the property owner. Typical management fees for properties of this type generally range from 1% to 3% depending on the size of the property and tenancy. Considering that the subject would be a single-tenant property, we have projected management at lower end of the range.

## Replacement Reserves

Replacement reserves are not projected in the direct capitalization analysis for consistency with the analysis of comparable sales and other sources for capitalization rate data – which exclude reserves.

**NEWMARK**

### Total Operating Expenses

| Total Operating Expenses | | | |
| --- | --- | --- | --- |
| Source | % of EGI | $/SF | Total |
| **Comparables Low** | 24.3% | $2.59 | |
| **Comparables High** | 30.5% | $3.46 | |
| **Comparables Average** | 27.2% | $2.91 | |
| Newmark Projection | 26.9% | $2.45 | $3,675 |

*Compiled by Newmark*

– The projected rate is lower than the comparable data on a per square foot basis because of lower projected tax and management expense.

## NET OPERATING INCOME

| Net Operating Income | | | |
| --- | --- | --- | --- |
| Source | % of EGI | $/SF | Total |
| **Comparables Low** | 69.5% | $6.41 | |
| **Comparables High** | 75.7% | $10.76 | |
| **Comparables Average** | 72.8% | $7.92 | |
| Newmark Projection | 73.1% | $6.67 | $10,002 |

*Compiled by Newmark*

– Our estimate is below the NOI of the comparable properties on a per square foot basis because the subject has a lower rental rate due to it being located in an outlying rural area.

## DIRECT CAPITALIZATION

The following subsections represent different techniques for deriving an overall capitalization rate.

The sales utilized in the Sales Comparison Approach were all vacant or owner occupied at the time of sale. Therefore, no overall rates could be derived from the sales. We have compiled industrial sales from across the DFW Metroplex from which overall rates were reported and these are summarized in the following table.

### Comparable Sales

| Comparable Industrial Sales Summary | | | | | | | |
|---|---|---|---|---|---|---|---|
| No. | Property Location | Yr. Built | Sale Date | Rentable Area | Occ. % | Price per SF | OAR |
| 1 | 2309, 2317 & 2329 Franklin Drive, Mesquite, TX | 1970 | May-2022 | 31,100 | 100% | $75 | 8.18% |
| 2 | 1601 West Business 380, Decatur, TX | 2004 | Sep-2023 | 15,600 | 100% | $101 | 8.40% |
| 3 | 930 Trinity Drive, Mansfield, TX | 2000 | May-2022 | 19,139 | 100% | $45 | 13.53% |
| 4 | 801 Augusta St - 362, Red Oak, TX | 2001 | Jan-2022 | 10,200 | 0% | $98 | 8.00% |
| Average (Mean) Cap Rate: | | | | | | | 9.53% |

*Compiled by Newmark*

- Based on this information, a capitalization rate within a range of 8.00% to 13.53% could be expected for the subject.

- The capitalization rate conclusion is near the upper end of the comparable properties due to its location in a rural area, the age and condition of the improvements and rising interest rates placing upward pressure on capitalization rates.

**NEWMARK**

Industrial Building
App.119

## Investor Surveys

| Investor Surveys - Capitalization Rates | | | | |
|---|---|---|---|---|
| **Source** | **Period** | **Low** | **High** | **Average** |
| Newmark V&A Mkt Survey - National Industrial - Whse/Logistics A | Q2 2023 | N/A | N/A | 5.35% |
| PwC - National Warehouse - Overall | Q3 2023 | 3.00% | 6.50% | 4.97% |
| Situs RERC - National Industrial - Warehouse | Q3 2023 | 4.30% | 6.50% | 5.30% |
| Real Capital Analytics - National Industrial - Warehouse | Q3 2023 | N/A | N/A | 5.92% |

*Compiled by Newmark*



- – The most current national survey data indicates that going-in capitalization rates range from 3.00% to 11.32% and average 5.88%.

- – The rate appropriate to the subject is considered to be above the average rate in the survey data because of its location in a rural area.

- – Accordingly, based on the survey data, a capitalization rate within a range of 8.00% to 9.50% could be expected for the subject.

## Market Participants

| Market Participant Survey - Capitalization Rates | | |
|---|---|---|
| **Respondent** | **Cap Rate** | **Comments** |
| Stream Realty | 8.25% - 9.25% | Located in a rural area, poor condition, rising interest rates |
| Newmark | 8.75% - 9.50% | Rural location, poor interior finish out |
| Subject Indication | 8.25% - 9.50% | |

*Compiled by Newmark*

- Market participants generally viewed the subject property with average favorability due to its rural location which is offset by its poor condition.

- Based on these responses, a capitalization rate within a range of 8.25% to 9.50% is indicated for the subject

## Capitalization Rate Conclusion

| **Positive Attributes** | **Negative Attributes** |
|---|---|
| - Low quality and appeal, and space is suitable for various commercial and shop or storage purposes. | - Concerns over inflation and rising construction costs. |
| - Corner Influence provides easy access to the subject. | - Rising interest rates could deter some investors. |
| - Rural location prevents risk of competition from new construction. | - Located in a rural area |
| | - Poor condition |

| Capitalization Rate Conclusion | |
|---|---|
| **Source** | **Indication** |
| Comparable Sales | 8.0% - 13.53% |
| Investor Surveys | 7.00% - 9.00% |
| Market Participants | 8.25% - 9.50% |
| Concluded Going-In Capitalization Rate | 9.00% |

*Compiled by Newmark*

## Direct Capitalization Summary

Net operating income is divided by the capitalization rate to derive the stabilized value of the subject. Valuation of the subject by direct capitalization is shown in the table immediately following.

## Income Capitalization Approach

### Summary of Stabilized Net Operating Income

| Item Description | % of Income | $ / SF | Total $ |
|---|---|---|---|
| **Industrial Income** | | 1,500 SF | |
| Potential Base Rent | | $7.25 | $10,875 |
| Scheduled Base Rent | | $7.25 | $10,875 |
| Expense Recoveries | | $2.45 | $3,675 |
| Potential Gross Income | | $9.70 | $14,550 |
| Vacancy Allowance | -5.00% | ($0.49) | ($728) |
| Collection Allowance | 1.00% | ($0.10) | ($146) |
| **Effective Gross Income** | | **$9.12** | **$13,677** |
| **Operating Expenses** | | 1,500 SF | |
| Real Estate Taxes | | $0.71 | $1,063 |
| Insurance | | $0.40 | $600 |
| Utilities | | $0.30 | $450 |
| Repairs and Maintenance | | $0.85 | $1,275 |
| General and Administrative | | $0.10 | $150 |
| Management | 1.00% | $0.09 | $137 |
| Total Operating Expenses | 26.87% | $2.45 | $3,675 |
| **Net Operating Income** | | **$6.67** | **$10,002** |

### Direct Capitalization Method

| Value Indication | | $ / SF | Total $ |
|---|---|---|---|
| Stabilized Net Operating Income | | $6.67 | $10,002 |
| Overall Capitalization Rate | | | 9.00% |
| As Stabilized Value | Effective Date: 11/7/2023 | | $111,136 |
| **Rounded** | | **$73.33** | **$110,000** |

**Valuation Matrix**

| OAR | Value |
|---|---|
| 8.50% | $117,674 |
| 8.75% | $114,312 |
| **9.00%** | **$111,136** |
| 9.25% | $108,133 |
| 9.50% | $105,287 |

### As Is

| | | | Total $ |
|---|---|---|---|
| As Stabilized Value | Effective Date: 11/7/2023 | | $111,136 |
| Deferred Maintenance | | | $0 |
| As Is Value | Effective Date: 11/7/2023 | | $111,136 |
| **Rounded** | | **$73.33** | **$110,000** |

*Compiled by Newmark*

# Reconciliation of Value

The values indicated by our analyses are as follows:

| Market Value Indications | |
| --- | --- |
| **Market Value Premise** <br> **As of Date:** | **As Is** <br> **November 7, 2023** |
| Cost Approach: | Not Used |
| Sales Comparison Approach: | $120,000 |
| Income Capitalization Approach: | $110,000 |
| Market Value Conclusion | $120,000 |

*Compiled by Newmark*

## Cost Approach

The Cost Approach has best applicability for properties with new or nearly new improvements. It is a summation approach in that the underlying land value is added to the depreciated replacement cost for the indicated value. In this case, the cost approach was not utilized due to market participants not relying on this approach when making their purchase decisions.

## Sales Comparison Approach

The Sales Comparison Approach is focused on comparing the subject to sale and other market transactions with the aim to develop an indication of value that is founded on the theory of substitution. Basically, the intention is to determine value through considering the prices of properties which would be a substitute property to the subject. In this case, a selection of reasonably similar sales were obtained and the adjustment process was well founded by reasoning and direct evidence. This analysis is considered to be well founded and reliable, the subject property is a vacant property and the sales comparison approach, is considered a reliable approach. Accordingly, primary weight is given to the sales comparison approach.

## Income Capitalization Approach

The subject property was an owner-occupied industrial property. It is not an income producing property and this approach is specifically designed to address the value income producing properties. Only the direct capitalization was developed. Market rent was well established by reasonably similar lease data. Capitalization rates were developed from a number of sources. Even though the subject is not leased, market participants could lease it if acquired as vacant. As such, the income capitalization approach is considered to be applicable to the subject and most reliable. This approach is given secondary weight for that reason.



| Value Conclusions | | | |
|---|---|---|---|
| **Appraisal Premise** | **Interest Appraised** | **Date of Value** | **Value Conclusion** |
| Market Value "As Is" | Fee Simple | 11/7/2023 | $120,000 |

*Compiled by Newmark*

### Extraordinary Assumptions and Hypothetical Conditions

An extraordinary assumption is defined in USPAP as an assignment-specific assumption as of the effective date regarding uncertain information used in an analysis which, if found to be false, could alter the appraiser's opinions or conclusions. The value conclusions are subject to the following extraordinary assumptions that may affect the assignment results.

1. Access to the interior of the building was not available on the date of the site visit. We were able to observe the interior through the window. The interior appeared to be in poor condition. Should a more detailed inspection be allowed at a later date, we reserve the right to amend this report accordingly.

The use of this extraordinary assumption might have affected assignment results.

A hypothetical condition is defined in USPAP as a condition, directly related to a specific assignment, which is contrary to what is known by the appraiser to exist on the effective date of the assignment results, but is used for the purpose of analysis. The value conclusions are based on the following hypothetical conditions that may affect the assignment results.

1. None

*Compiled by Newmark*


## EXPOSURE TIME

Exposure time is the estimated length of time the subject property would have been offered on the market prior to the hypothetical consummation of a sale at market value on the effective date of the appraisal. It is a retrospective estimate based on an analysis of past events assuming a competitive and open market.

Recent sales transaction data for similar properties, supply and demand characteristics for the local industrial market, and the opinions of local market participants were reviewed and analyzed. Based on this data and analysis, it is our opinion that the probable exposure time for the subject at the concluded market values stated previously is 5 months.

## MARKETING TIME

Marketing time is an opinion of the amount of time it might take to sell a real or personal property interest at the concluded market value level during the period immediately after the effective date of an appraisal. Marketing time differs from exposure time, which is always presumed to precede the effective date of an appraisal. As no significant changes in market conditions are foreseen in the near term, it is our opinion that a reasonable marketing period for the subject is likely to be the same as the exposure time. Accordingly, we estimate the subject's marketing period at 5 months.



# Assumptions and Limiting Conditions

The Appraisal contained in this Report (herein "Report") is subject to the following assumptions and limiting conditions:

1.  Unless otherwise stated in this report, title to the property which is the subject of this report (herein "Property") is assumed to be good and marketable and free and clear of all liens and encumbrances and that there are no recorded or unrecorded matters or exceptions to title that would adversely affect marketability or value. No responsibility is assumed for the legal description, zoning, condition of title or any matters which are legal in nature or otherwise require expertise other than that of a professional real estate appraiser. This report shall not constitute a survey of the Property.

2.  Unless otherwise stated in this report, it is assumed: that the improvements on the Property are structurally sound, seismically safe and code conforming; that all building systems (mechanical/electrical, HVAC, elevator, plumbing, etc.) are in good working order with no major deferred maintenance or repair required; that the roof and exterior are in good condition and free from intrusion by the elements; that the Property and improvements conform to all applicable local, state, and federal laws, codes, ordinances and regulations including environmental laws and regulations. No responsibility is assumed for soil or subsoil conditions or engineering or structural matters. The Property is appraised assuming that all required licenses, certificates of occupancy, consents, or other legislative or administrative authority from any local, state, or national government or private entity or organization have been or can be obtained or renewed for any use on which the value estimates contained in this report is based, unless otherwise stated. The physical condition of the Property reflected in this report is solely based on a visual inspection as typically conducted by a professional appraiser not someone with engineering expertise. Responsible ownership and competent property management are assumed.

3.  Unless otherwise stated in this report, this report did not take into consideration the existence of asbestos, PCB transformers or other toxic, hazardous, or contaminated substances or underground storage tanks, or the cost of encapsulation, removal or remediation thereof. Real estate appraisers are not qualified to detect such substances. The presence of substances such as asbestos, urea formaldehyde foam insulation, contaminated groundwater or other potentially hazardous materials and substances may adversely affect the value of the Property. Unless otherwise stated in this report, the opinion of value is predicated on the assumption that there is no such material or substances at, on or in the Property.



Industrial Building

4. All statements of fact contained in this report as a basis of the analyses, opinions, and conclusions herein are true and correct to the best of the appraiser's actual knowledge and belief.  The appraiser is entitled to and relies upon the accuracy of information and material furnished by the owner of the Property or owner's representatives and on information and data provided by sources upon which members of the appraisal profession typically rely and that are deemed to be reliable by such members. Such information and data obtained from third party sources are assumed to be reliable and have not been independently verified. No warranty is made as to the accuracy of any of such information and data. Any material error in any of the said information or data could have a substantial impact on the conclusions of this Report.  The appraiser reserves the right to amend conclusions reported if made aware of any such error.

5. The opinion of value stated in this report is only as of the date of value stated in this report. An appraisal is inherently subjective and the conclusions stated apply only as of said date of value, and no representation is made as to the effect of subsequent events.  This report speaks only as of the date hereof.

6. Any projected cash flows included in the analysis are forecasts of estimated future operating characteristics and are predicated on the information and assumptions contained within this report.  Any projections of income, expenses and economic conditions utilized in this report are not predictions of the future.  Rather, they are estimates of market expectations of future income and expenses.  The achievement of any financial projections will be affected by fluctuating economic conditions and is dependent upon other future occurrences that cannot be assured.  Actual results may vary from the projections considered herein.  There is no warranty or assurances that these forecasts will occur.  Projections may be affected by circumstances beyond anyone's knowledge or control. Any income and expense estimates contained in this report are used only for the purpose of estimating value and do not constitute predictions of future operating results.

7. The analyses contained in this report may necessarily incorporate numerous estimates and assumptions regarding Property performance, general and local business and economic conditions, the absence of material changes in the competitive environment and other matters. Some estimates or assumptions, however, inevitably will not materialize, and unanticipated events and circumstances may occur; therefore, actual results achieved during the period covered by the analysis will vary from estimates, and the variations may be material.

8. All prospective value opinions presented in this report are estimates and forecasts which are prospective in nature and are subject to considerable risk and uncertainty. In addition to the contingencies noted in the preceding paragraphs, several events may occur that could substantially alter the outcome of the estimates such as, but not limited to changes



**ASSUMPTIONS AND LIMITING CONDITIONS**                                                76

in the economy, interest rates, capitalization rates, behavior of consumers, investors and lenders, fire and other physical destruction, changes in title or conveyances of easements and deed restrictions, etc.  In making prospective estimates and forecasts, it is assumed that conditions reasonably foreseeable at the present time are consistent or similar with the future.

9.  The allocations of value for land and improvements must not be used in conjunction with any other appraisal and are invalid if so used.  This report shall be considered only in its entirety.  No part of this report shall be utilized separately or out of context.

10. Neither all nor any part of the contents of this report (especially any conclusions as to value, the identity of the appraiser, or any reference to the Appraisal Institute) shall be disseminated through advertising media, public relations media, news media or any other means of communication (including without limitation prospectuses, private offering memoranda and other offering material provided to prospective investors) without the prior written consent of the Firm. Possession of this report, or a copy hereof, does not carry with it the right of publication.

11. Client and any other Intended User identified herein should consider this report and the opinion of value contained herein as only one factor together with its own independent considerations and underwriting guidelines in making any decision or investment or taking any action regarding the Property.  Client agrees that Firm shall not be responsible in any way for any decision of Client or any Intended User related to the Property or for the advice or services provided by any other advisors or contractors.  The use of this report and the appraisal contained herein by anyone other than an Intended User identified herein, or for a use other than the Intended Use identified herein, is strictly prohibited. No party other than an Intended User identified herein may rely on this report and the appraisal contained herein.

12. Unless otherwise stated in the agreement  to prepare this report, the appraiser shall not be required to participate in or prepare for or attend any judicial, arbitration, or administrative proceedings.

13. The Americans with Disabilities Act (ADA) became effective January 26, 1992. No survey or analysis of the Property has been made in connection with this report to determine whether the physical aspects of the improvements meet the ADA accessibility guidelines. No expertise in ADA issues is claimed, and the report renders no opinion regarding the Property's compliance with ADA regulations. Inasmuch as compliance matches each owner's financial ability with the cost to cure the non-conforming physical characteristics of a property, a specific study of both the owner's financial ability and the cost to cure any deficiencies would be needed for the Department of Justice to determine compliance.



14. Acceptance and/or use of this report constitutes full acceptance of these Assumptions and Limiting Conditions and any others contained in this report, including any Extraordinary Assumptions and Hypothetical Conditions, and is subject to the terms and conditions contained in the agreement to prepare this report and full acceptance of any limitation of liability or claims contained therein.

**ADDENDA**

# Addendum B

# Engagement Letter

NEWMARK VALUATION & ADVISORY

October 24, 2023

Al J. Keller
Leed - AP
SOUTHERN STAR CAPITAL, LLC
5220 Spring Valley Road
Suite 602
Dallas, Texas 75254
Phone: 214.507.1147
Email: Al@rmcdfw.com

Re:    Appraisal of the property described as:
       Metal Industrial Building – 1025 North FM 157, Venus, Texas 76084 ("**Property**")

Dear Mr. Keller:

Newmark Valuation & Advisory, LLC ("**Firm**") agrees to provide Southern Star Capital, LLC ("**Client**") an appraisal of the above-referenced Property in accordance with, and subject to, the terms and conditions set forth below and in the attached Schedules (collectively, "**Agreement**").

| | |
|---|---|
| APPRAISAL FEE: | $4,500.00 (inclusive of expenses). |
| ADDITIONAL HOURLY FEES: | Should court time and preparation be required, it will be billed at $500.00/hr plus expenses. |
| RETAINER: | None |
| REPORT DELIVERABLES: | The appraisal, draft and/or final, shall be delivered in electronic format (typically, pdf). One original hard copy of the final appraisal will be provided to Client upon request. |
| COMMENCEMENT AND DELIVERY DATE: | Delivery is as follows: |
| | Final appraisal report: two (2) weeks |
| | The appraisal process will commence upon receipt by the Firm of (i) this Agreement, signed by Client, (ii) the retainer, and (iii) information and materials identified in Schedule "B."  The appraisal process will conclude upon delivery of the final appraisal report, unless terminated sooner by the Firm or Client or as provided herein. |

**NEWMARK**

Al J. Keller
SOUTHERN STAR CAPITAL, LLC
October 24, 2023
PAGE 2 OF 11

| | |
|---|---|
| REPORT TYPE: | Appraisal Report |
| VALUATION PREMISE: | Market Value |
| INTEREST IN THE PROPERTY APPRAISED: | Fee Simple Estate |
| DATE(S) OF VALUE: | As Is Market Value |
| INTENDED USER(S): | Intended users of the appraisal include only Southern Star Capital, LLC ("**Intended User(s)**"), and no other party is permitted to use or rely on the appraisal. The identification of Intended User(s) of the appraisal is to determine the type and extent of research, analysis and reporting appropriate for the assignment.  Designation of a party other than Client as an Intended User is not intended to confer upon such party any rights under this Agreement. |
| INTENDED USE: | The intended use of the appraisal is solely for internal decision making purposes ("**Intended Use**") and no other use. |
| RELIANCE LANGUAGE: | None |
| GUIDELINES: | The analyses, opinions and conclusions are to be developed based on, and the appraisal will be prepared in conformance with the Uniform Standards of Professional Appraisal Practice (USPAP) as published by the Appraisal Foundation. |
| SCOPE OF WORK: | The appraiser will use and properly apply all applicable and appropriate approaches to value sufficient to produce credible assignment results. The scope of the analysis will be appropriate for the appraisal problem. |
| APPRAISAL REPORT SIGNATORY: | Hayden Littlefield |
| ASSUMPTIONS/ LIMITING CONDITIONS: | The appraisal will be subject to Firm's standard Assumptions and Limiting Conditions, which will be incorporated into the appraisal report. In addition, the appraisal may be subject to, and the appraisal report may contain, Extraordinary Assumptions and Hypothetical Conditions. |
| ACCEPTANCE: | This shall constitute a binding agreement only if countersigned by the Client, or by an officer, director or other representative of Client who, by signing and accepting this Agreement, represents and warrants that he/she is authorized by Client to do so. |

**NEWMARK**

2601 Olive Street Suite 1600 | Dallas, Texas 75201
PHONE: 469.467.2073 | WEB: www.nmrk.com

App.131

Al J. Keller
SOUTHERN STAR CAPITAL, LLC
October 24, 2023
PAGE 3 OF 11

---

| | |
|---|---|
| PAYMENT: | Client will be invoiced the appraisal fee (and any expenses) which will be earned in full upon initial delivery of the appraisal report (draft or final), with such appraisal fee (and expenses) payable within 30 days of invoicing. |
| | Payment of the fee is not contingent upon any predetermined value or on an action or event resulting from the analysis, opinions, conclusions or use of the appraisal. |
| CHANGES TO THE AGREEMENT: | Any significant changes to the assignment as outlined in this Agreement, such as the identity of the Client, Intended User, or Intended Use, will require the preparation and execution of a new agreement. |
| CANCELLATION OF ASSIGNMENT: | Client may cancel this Agreement at any time prior to the Firm's delivery of the appraisal upon written notification to the Firm. Client shall pay Firm for all work completed on the assignment prior to Firm's receipt of such written cancellation notice, unless otherwise agreed upon by Firm and Client in writing. The Firm may withdraw without penalty or liability from the assignment(s) contemplated by the Agreement before completion or reporting if the Firm determines, in the Firm's sole discretion, that incomplete information was provided to the Firm prior to the engagement, that Client or other parties have not or cannot provide documentation or information necessary to the Firm's analysis or reporting, that conditions of the Property render the original scope of work inappropriate, that a conflict of interest has arisen, or that Client has not complied with its payment obligations under this Agreement. The Firm shall notify Client of such withdrawal in writing. |
| NO THIRD-PARTY BENEFICIARIES: | Nothing in the Agreement shall create a contractual relationship or any legal duty between Firm or Client and any third party, nor any cause of action, right, or claim in favor of any third party and against Firm or Client. In addition, this Agreement is not intended to, and shall not be construed to, render any person or entity a third-party beneficiary of this Agreement. Client acknowledges and agrees that the appraisal report shall reflect the foregoing. In addition, the appraisal report shall state that no party other than an Intended User identified in the Agreement is entitled to rely upon the appraisal. |

NEWMARK

2601 Olive Street Suite 1600 | Dallas, Texas 75201
PHONE: 469.467.2073 | WEB: www.nmrk.com

App.132

Al J. Keller
**SOUTHERN STAR CAPITAL, LLC**
October 24, 2023
PAGE 4 OF 11

This Agreement may be rescinded by the Firm unless signed and returned to the undersigned within 10 days from the date hereof.

If this Agreement correctly sets forth the Client's understanding of the services to be rendered, and if the terms are satisfactory, please execute and return the Agreement together with any required retainer.

Respectfully,

Hayden Littlefield
*Senior Director*
Certified General Appraiser
License No. TX 1324546 G
Hayden.Littlefield@nmrk.com
469.467.2073 Office Direct
713.725.0365 Cell

Agreed:
SOUTHERN STAR CAPITAL, LLC

SIGNATURE:

PRINT NAME:

TITLE:

DATE:

**NEWMARK**

2601 Olive Street Suite 1600 | Dallas, Texas 75201
PHONE: 469.467.2073 | WEB: www.nmrk.com

App.133

Al J. Keller
**SOUTHERN STAR CAPITAL, LLC**
October 24, 2023
**PAGE 5 OF 11**

Schedule "A"

# TERMS AND CONDITIONS

ATTACHED TO AND A PART OF THE AGREEMENT DATED OCTOBER 24, 2023 TO
PROVIDE APPRAISAL SERVICES FOR SOUTHERN STAR CAPITAL, LLC

1.  These Terms and Conditions are attached to and incorporated into the above referenced Agreement as though fully set forth in full therein. Capitalized terms if not defined herein shall have the same meaning as defined in the Agreement.

2.  With respect to any appraisal report, use of or reliance on the appraisal by any party, regardless of whether the use or reliance is authorized or known by the Firm, constitutes acceptance of these Terms and Conditions as well as acceptance of all other appraisal statements, limiting conditions and assumptions stated in the Agreement and appraisal report.

3.  It is assumed that there are no matters affecting the Property that would require the expertise of other professionals, such as engineers or an environmental consultant, for Firm to provide the appraisal. If such additional expertise is required, it shall be provided by other parties retained by Client at Client's sole cost and expense.

4.  Client acknowledges that the Firm is being retained as an independent contractor to provide the services described herein and nothing in this Agreement shall be deemed to create any other relationship between Firm and Client, including but not limited to an agency relationship. The parties neither intend nor have any expectation that any such relationship will arise as a matter of law or as a result of this Agreement. This assignment shall be deemed concluded and the services hereunder completed upon delivery of the appraisal described herein to Client.

5.  All statements of fact contained in the appraisal report as a basis of the appraiser's analyses, opinions, and conclusions will be true and correct to the best of the appraiser's actual knowledge and belief. The appraiser is entitled to, and shall rely upon the accuracy of information and material furnished to the Firm by Client. Appraiser is also entitled to, and shall, rely on information provided by sources upon which members of the appraisal profession typically rely and that are deemed to be reliable by members of that profession without independent verification.

6.  The Firm and the appraiser shall have no responsibility for legal matters, or questions or issues involving survey or title, soil or subsoil conditions, engineering, zoning, buildability, environmental contamination, structural matters, construction defects, material or methodology, or other similar technical matters with regarding the Property. Furthermore, the appraisal will not constitute a survey of the Property.

7.  The appraisal and the data and information gathered in its preparation (other than the confidential data and information provided by Client) is and will remain, the property of the Firm. The Firm shall not violate the confidential nature of the appraiser-client relationship by improperly disclosing any confidential information furnished by Client to the Firm. Notwithstanding the foregoing, the Firm and the appraiser are authorized by Client to disclose all or any portion of the appraisal and appraisal report and the related data and information, including confidential data and information provided by Client, to appropriate representatives of the Appraisal Institute if such disclosure is required to comply with the Standards, Bylaws and Regulations of the Appraisal Institute, as well as, such disclosure as required  by law and regulations, including compliance with a subpoena and licensing authority regulatory inquiries. The Firm is also authorized to include both confidential and non-confidential data assembled in the course of preparing the appraisal and which may be incorporated into the appraisal report in a database controlled by the Firm for the aggregation of such data and information to produce analytics and other metrics or products.

8.  Unless specifically noted in the appraisal report, the appraisal will not take into consideration the possibility or probability of the existence of asbestos, PCB transformers, other toxic, hazardous, or contaminated substances

**NEWMARK**

2601 Olive Street Suite 1600 | Dallas, Texas 75201
PHONE: 469.467.2073 | WEB: www.nmrk.com

App.134

Al J. Keller
SOUTHERN STAR CAPITAL, LLC
October 24, 2023
PAGE 6 OF 11

and/or underground storage tanks (hazardous material) at on or in the Property, or the cost of encapsulation, removal or remediation thereof.

9.  Client shall indemnify, defend (by counsel to be selected by Firm), protect, and hold Firm and Firm's appraisers, agents, employees, affiliates, representatives, successors and assigns (each, a "**Firm Party**"), free and harmless from any and all claims, liabilities, losses, penalties, fines, forfeitures, amounts paid in settlement, judgments, and all reasonable attorneys' fees and related litigation costs, fees and expenses incurred by the any of such indemnitees, which result from (i) any failure by Client or Client's agents or representatives to provide Firm with complete and accurate information regarding the Property; (ii) any material breach by Client of the provisions of the Agreement; (iii) if delivery of the appraisal to a third party is permitted by the Firm, Client providing an incomplete copy of the appraisal to such third party; or (iv) arising from Client or Client's agents or representatives providing a copy of the appraisal to a party not authorized by the Firm to receive such copy.

10. In preparing the appraisal, it is possible that the appraiser will discover conflicting information. In that event, appraiser will utilize information and data considered to be the most authoritative and for critical information will document the source. Information and data referred to may include, but is not limited to, legal descriptions; physical street addresses; assessor parcel numbers; property history; dimensions and areas of the site/land; dimensions and areas of the building improvements; physical unit counts; rent rolls; leases; lease abstracts; income and expense data; and any other related data. Any material discrepancy and/or error in any of the above data could have a substantial impact on the conclusions reported, and the Firm therefore reserves the right to amend conclusions reported if the Firm is made aware of any such discrepancy and/or error.

11. The appraisal may not be used, included or referenced, in whole or in part, in any offering or other materials without the prior written consent of the Firm, which consent may be conditioned upon the receipt by the Firm of an indemnity agreement, in form and content, satisfactory to Firm and provided by an indemnitor satisfactory to Firm. Client agrees to pay the fees of the Firm's legal counsel for review of any materials which is the subject of the requested consent. Except as agreed by the Firm expressly in writing, the Firm disclaims liability to any party other than Client.

12. The Firm shall not provide a copy of the appraisal to, or disclose the results of the appraisal to, any party other than Client, unless Client authorizes same, except as provided in the Confidentiality Section of the ETHICS RULE of the Uniform Standards of Professional Appraisal Practice (USPAP) or as otherwise required by law or regulations.

13. Client and any other identified Intended User should consider the appraisal as only one factor together with its own independent considerations and underwriting guidelines in making any decision or investment or taking any action regarding the Property. Client agrees that Firm shall not be responsible in any way for any decision of Client or any Intended User related to the Property or for the advice or services provided by any other advisors or contractors.

14. Unless otherwise stated in this Agreement, Client agrees that the services pursuant to this Agreement shall not include participation in or preparation for, or attendance at, any legal, judicial, administrative, or arbitration proceeding relating to this assignment. In the event the Firm or any Firm Party is required, whether through the service of a subpoena or otherwise, to produce documents or participate in or prepare for any discovery, testimony or attendance, relating to the appraisal or this assignment, where the Firm or Firm Party is not a party to the action or proceedings involved, Client agrees to reimburse expenses incurred by the Firm or Firm Party, including attorney's fees, in responding to such subpoena or other legal process and compensate the Firm therefor based upon the appraiser's prevailing hourly or daily rate for providing services as an expert consultant or witness.

15. Except as expressly provided herein, Firm makes no representations or warranties to Client or to any other person or entity with respect to the appraisal and the services to be provided by Firm under this Agreement. To the maximum extent permitted under applicable law, in no event will the Firm or any Firm Party be liable to Client or any third party (regardless of whether such party's claimed use or reliance on the appraisal was authorized by the



2601 Olive Street Suite 1600 | Dallas, Texas 75201
PHONE: 469.467.2073 | WEB: www.nmrk.com

App.135

Al J. Keller
SOUTHERN STAR CAPITAL, LLC
October 24, 2023
PAGE 7 OF 11

Firm or a Firm Party) for any indirect, special, exemplary, incidental, or consequential damages (including loss of profits) arising from or relating to this Agreement or the appraisal, even if such party knew or should have known of the possibility of, or could reasonably have prevented, such damages. In no event shall the total liability of the Firm or any Firm Party to Client or any third party (regardless of whether such party's claimed use or reliance on the appraisal was authorized by the Firm or a Firm Party) arising from or relating to this Agreement or the appraisal, whether based on tort, contract, or any other legal theory, exceed the amount of fees paid to the Firm for the appraisal and the services described herein. Legal claims or causes of action relating to the appraisal are not assignable, except: (i) as the result of a merger, consolidation, sale or purchase of a legal entity, (ii) with regard to the collection of a bona fide existing debt for services but then only to the extent of the total compensation for the appraisal plus reasonable interest, or (iii) in the case of an appraisal performed in connection with the origination of a mortgage loan, as part of the transfer or sale of the mortgage before an event of default on the mortgage or note or its legal equivalent.

16. Federal banking regulations require banks and other lending institutions to engage appraisers where FIRREA compliant appraisals must be used in connection with mortgage loans or other transactions involving federally regulated lending institutions. In view of that requirement, the appraisal may not be accepted by a federally regulated financial institution.

17. In the event Client fails to make payments of any fees or sums when due and payable under this Agreement; then from the date due and payable until paid, the amount due and payable shall bear interest at the maximum rate permitted under the laws of the state in which the Property is located. If the Firm is required to undertake collection efforts including institution of legal action against Client relating to the Agreement, the Firm shall be entitled to recover attorney's fees, litigation expenses, and costs from Client.

18. To the extent permitted under applicable law, any legal action or lawsuit or other proceeding by Client or any Intended User of the appraisal against Firm or a Firm Party whether based in contract, tort, warranty, indemnity or otherwise, relating to the appraisal shall be commenced within two (2) years from the date of delivery of the appraisal to the claimant in such action or proceeding, unless the applicable law provides for a shorter period, and any such claimant waives the right to a jury in any such legal action or lawsuit or other proceeding. Notwithstanding the state of domicile or residency of either party to this Agreement, this Agreement shall be governed and construed under the laws of the state in which the Property is located, and venue for any action or proceeding arising out of this Agreement shall be deemed proper only in the court of competent jurisdiction located in the state in which the Property is located.

19. Throughout the performance of services under this Agreement, the Firm shall maintain at its sole cost and expense the following insurance:

    (a) Workers' Compensation, so as to provide statutory benefits as required by the laws of each state within the United States in which the Firm's services are being provided, and Employer's Liability insurance with limits of liability of $1,000,000 each accident, $1,000,000 disease each employee and $1,000,000 disease policy limit covering all employees of the Firm engaged in the performance of such services.

    (b) Fidelity insurance or bond with a limit of $1,000,000 to insure the Firm against loss of its or Client's assets caused from the dishonest acts of the Firm's employees.

    (c) Professional Liability insurance with a limit of liability of $1,000,000 each claim and $1,000,000 aggregate, which limits may be provided by a combination of primary and excess policies.

    (d) Commercial General Liability insurance providing coverage against damages due to bodily injury (including death), property damage and personal and advertising injury arising in connection with the Firm's services provided under this Agreement, which insurance coverage shall: (i) be occurrence-based; (ii) provide limits of liability in an amount of $1,000,000 each occurrence and $1,000,000 aggregate (including excess and/or umbrella limits), (iii) include at least those coverages generally included in the most current ISO Commercial



2601 Olive Street Suite 1600 | Dallas, Texas 75201
PHONE: 469.467.2073 | WEB: www.nmrk.com

App.136

**Al J. Keller**
**SOUTHERN STAR CAPITAL, LLC**
**October 24, 2023**
**PAGE 8 OF 11**

General Liability insurance policy form (or its equivalent); and (iv) include Client, and such other persons or entities as Client has identified in writing, as additional insureds solely with regard to claims arising out of this Agreement.

(e)  Commercial automobile liability for owned, hired and non-owned motor vehicles, with a $1,000,000 combined single limit.



2601 Olive Street Suite 1600 | Dallas, Texas 75201
PHONE: 469.467.2073 | WEB: www.nmrk.com

App.137

Al J. Keller
SOUTHERN STAR CAPITAL, LLC
October 24, 2023
PAGE 9 OF 11

Schedule "B"

# PROPERTY INFORMATION LIST

ATTACHED TO AND A PART OF THE AGREEMENT DATED OCTOBER 24, 2023 TO
PROVIDE APPRAISAL SERVICES FOR SOUTHERN STAR CAPITAL, LLC

The following information is requested to be delivered to the Firm so we can provide the proposed services and prepare the Appraisal within the agreed upon time frame. Please forward the physical data such as the site plan, previous engineering reports and/or property reports describing the physical attributes of the Property and all financial information such as rent roll and income and expense statements first as these items are the most time sensitive and should be received immediately to meet the time requirements of this assignment. If, at this time, you are certain you will not be providing any specific items noted below, please cross out the item and mark "NA" next to the item so that we will be notified that the information is not available and will not be forthcoming.

1.  **Please indicate whether Newmark is sales broker, leasing broker, mortgage broker or property manager for the subject property.**

2.  Site plan, if available. (Preferably, an AS BUILT PLAN showing an outline of building/s drawn to scale. Please do not send reductions so original scale may be used for measurement purposes.

3.  Building plans, if available.

4.  Prior engineering report or physical descriptions from prior appraisals or asset management report, if available.

5.  Leasing brochures and/or other marketing materials, if available.

6.  If the Property has been offered for sale within the last two years, a copy of the offering memorandum or investment book.

7.  Past feasibility or market studies and economic impact studies as well as any relevant information collected from third party sources.

8.  Agreements of Sale/Options to Buy (current or during last three years), if any.

9.  Income and expense statements for the past three years plus year-to-date income and expense statements.

10. Operating budget for current and next year, if available.

11. Current property insurance binder or last property insurance billing statement.

12. Management contracts.

13. Copy of most recent real estate tax bill. Please advise if there has been a notice or inquiry by either the County Assessment Board or the School Board regarding the property assessment. Is there any pending litigation or negotiations with these parties that could result in an assessment increase or decrease?

14. Title report, Legal Description, or copy of deed. Provide a written statement of five-year history of legal property owner. Please advise, if there any deed restrictions or encumbrances, easements or cross easements.

15. Personal property inventory, if available.

16. Occupancy rates for the last three years, if not revealed in the financial statements.

17. Ground leases, if any.




**NEWMARK**

2601 Olive Street Suite 1600 | Dallas, Texas 75201
PHONE: 469.467.2073 | WEB: www.nmrk.com

App.138

Al J. Keller
SOUTHERN STAR CAPITAL, LLC
October 24, 2023
PAGE 10 OF 11

18. Approximate actual construction costs, if built during the past three years.

19. Environmental audits and studies disclosing any wetlands, hazardous wastes or other environmental conditions such as asbestos or radon.

20. List of any known major repairs and improvements needed.

21. Three-year history of capital improvements.

22. Name of contact person for the on-site physical inspection.

## FOR APARTMENT PROPERTY

23. Unit mix showing rentable area and asking rent by unit type

24. Scaled apartment unit plans showing layouts and measurements so that rentable area can be confirmed, if available.

25. Rent roll showing tenant name, apartment number, dates of leases and the type of apartment, asking/market rents for each apartment, and contractual rent for each apartment unit. (It would be greatly appreciated if you can provide the rent roll in Excel.)

26. Terms of leases and/rent roll for leased commercial space or roof top rentals. Copies of commercial leases are desirable. If any commercial leases provide for pass through of operating expenses over a base year stop, please provide the dollar amount of the base year stop.

## FOR INDUSTRIAL, OFFICE, RETAIL PROPERTY

27. Rent Roll (please sign and date) and copies of leases, including addenda and all amendments. Please indicate which leases may have early termination provisions, expansion and/or purchase options. Please identify any tenants who have initiated discussions to renew, terminate or renegotiate/modify their lease(s), or who have given notice to terminate. Proposed terms for such re-negotiations should be revealed.

28. Provide letters of intent to lease or other any outstanding lease proposals that have a reasonable likelihood of being finalized into executed leases.

29. Prior Argus files, if any.

30. List of outstanding leasing commissions brokers and terms of future payments.

31. Financial information such as Annual Statements or credit report/ratings on any major tenant in the building.

32. CAM and real estate tax reimbursement worksheets or listing of base year operating expenses, if applicable.

33. Three-year history of tenant retail sales, if available.

## FOR LODGING PROPERTY

34. Terms of leases if any and/rent roll for leased commercial space or roof top rentals.

35. ADR and Occupancy rates for the last three years, if not revealed in the financial statements.

36. Business Plan and Marketing Strategy, if any for the upcoming fiscal year.

37. Terms of franchise agreement and management agreement, if any.



Al J. Keller
SOUTHERN STAR CAPITAL, LLC
October 24, 2023
PAGE 11 OF 11

## FOR RESIDENTIAL SUBDIVISION PROPERTY

38. Building plans for the proposed single family, townhouse, age-restricted, and condominium residences. Please do not send reductions so original scale may be used for measurement purposes.

39. Market Surveys and Feasibility Analyses, if any, for the proposed development program.

40. Marketing materials for the proposed single family, townhouse, age-restricted, and condominium residences.

**NEWMARK**

2601 Olive Street Suite 1600 | Dallas, Texas 75201
PHONE: 469.467.2073 | WEB: www.nmrk.com

App.140

**Addendum C**

**Legal Description**

**ADDENDA**

Legal Description: Tract 8, A857, A Williams Survey, Johnson County, Texas



**ADDENDA**

**Addendum D**

**Financials and Property Information**

**NEWMARK**



# Central Appraisal District of Johnson County

109 North Main St
Cleburne, Texas 76033
Phone: (817) 648-3000
Fax: (817) 645-3105

## Account Details for 126.0857.00030

Open 2023 Notice

### Ownership

| | |
|---|---|
| **Owner Name:** | Djd Land Partners Llc |
| **Owner Address:** | 13901 Midway Rd Ste 102 Lb243, Dallas, TX 752440000 |
| **Property Location:** | 1025 N Fm 157 |
| **Ownership Interest:** | 1.000000 |
| **Description:** | ABST 857<br>TR 8<br>A WILLIAMS<br>126.5544.00438 |
| **Deed Date:** | 2018-12-07 |
| **Deed Type:** | Correction Of Deed |
| **Page #:** | |
| **Volume #:** | |
| **Instrument #:** | 33304 |
| **Exemptions** | |
| **Tax Entities** | <ul><li>Johnson County</li><li>Venus ISD</li><li>Hill College VES</li><li>Lateral Road</li><li>Johnson Co ESD#1</li><li>Venus Fire Dept</li><li>Precinct3</li></ul> |
| **Improvement State Code:** | F1 - Real, Commercial |
| **Land State Code:** | F1 - Real, Commercial |

App.144

Case 3:22-cv-02118-X     Document 499     Filed 05/24/24     Page 148 of 397     PageID 17594

| | |
|---|---|
| **Productivity State Code:** | |
| **GEO Num:** | 126.0857.00030 |
| **Last Update:** | Sep 18 2023 2:56PM |

**A zero value indicates that the property record has not yet been completed for the indicated tax year.**
**† Appraised value may be less than market value due to state-mandated limitations on value increases.**

### Value

| | |
|---|---|
| **Improvement Value** | $61,104 |
| **Land Market Value:** | $5,000 |
| **AG Market Value:** | $0 |
| **AG Value:** | $0 |
| **Prod Loss:** | $0 |
| **Total Market Value:** | $66,104 |
| **† Appraised Value:** | $66,104 |
| **Land Acres** | 1.0000 |
| **Impr Area Size** | 0 |
| **Year Built** | 0 |

### Appraisal History  +

| Year | Impr HS | Impr NHS | Land HS | Land NHS | Ag Market | Ag Value | Total Market |
|---|---|---|---|---|---|---|---|
| 2022 | $0 | $48,883 | $0 | $5,000 | $0 | $0 | $53,883 |
| 2021 | $0 | $48,883 | $0 | $32,000 | $0 | $0 | $80,883 |
| 2020 | $0 | $48,883 | $0 | $20,000 | $0 | $0 | $68,883 |
| 2019 | $0 | $48,883 | $0 | $20,000 | $0 | $0 | $68,883 |

App.145

| Year | | | | | | | |
|------|------|------|--------|--------|-----|-----|--------|
| 2018 | $0 | $48,883 | $0 | $20,000 | $0 | $0 | $68,883 |
| 2017 | $0 | $48,883 | $0 | $20,000 | $0 | $0 | $68,883 |
| 2016 | $0 | $26,035 | $0 | $20,000 | $0 | $0 | $46,035 |
| 2015 | $0 | $26,035 | $0 | $20,000 | $0 | $0 | $46,035 |
| 2014 | $0 | $28,338 | $0 | $20,000 | $0 | $0 | $48,338 |
| 2013 | $0 | $28,338 | $0 | $20,000 | $0 | $0 | $48,338 |
| 2012 | $0 | $28,338 | $0 | $20,000 | $0 | $0 | $48,338 |
| 2011 | $0 | $39,674 | $0 | $12,500 | $0 | $0 | $52,174 |
| 2010 | $0 | $39,674 | $0 | $12,500 | $0 | $0 | $52,174 |
| 2009 | $0 | $39,674 | $0 | $12,500 | $0 | $0 | $52,174 |
| 2008 | $39,674 | $0 | $12,500 | $0 | $0 | $0 | $52,174 |
| 2007 | $39,674 | $0 | $12,500 | $0 | $0 | $0 | $52,174 |
| 2006 | $22,800 | $0 | $12,500 | $0 | $0 | $0 | $35,300 |
| 2005 | $18,000 | $0 | $12,500 | $0 | $0 | $0 | $30,500 |
| 2004 | $18,000 | $0 | $8,500 | $0 | $0 | $0 | $26,500 |
| 2003 | $18,000 | $0 | $6,000 | $0 | $0 | $0 | $24,000 |
| 2002 | $0 | $0 | $6,000 | $0 | $0 | $0 | $6,000 |
| 2001 | $0 | $0 | $6,000 | $0 | $0 | $0 | $6,000 |

* This information is intended for reference only and is subject to change. It may not accurately reflect the complete status of the account as actually carried in Johnson Appraisal District's database and may not be used as a basis of protest or appeal.

Copyright 2009-13 Thomson Reuters

App.146

ADDENDA

# Addendum E

# Comparable Data

NEWMARK

Industrial Building
App.147

# Industrial Sale



## 1400 South Fm 157
### Vacant Warehouse

### Location & Property Info

| | |
|---|---|
| Property Name | Vacant Warehouse |
| Property Type | Industrial |
| Sub Type | Warehouse/Distribution |
| Major Market | TX - Dallas/Fort Worth |
| Sub Market | Outside Metro Area |
| Address | 1400 South Fm 157, Venus, TX 76084 |
| County | Johnson |
| Country | USA |
| Location | West of FM 157 |
| Latitude | 32.41808000 |
| Longitude | -97.09082000 |
| MSA | Dallas-Fort-Worth MSA |
| Legal/Tax/Parcel ID | 126.0026.00298 |
| Market Orientation | Small Town - Non Metro |
| Verification Type | Confirmed-Other |
| Verification Source | Broker |
| Event ID | 984887 |



### Land Parcels

PRIMARY LAND

| ROW NUMBER | ASSOCIATED APN(S) | CLASSIFICATION | LAND AREA (SF) | LAND AREA (ACRES) |
|---|---|---|---|---|
| 1 | 126.0026.00298 | Usable Land Area | 43,560 | 1.0000 |
| | | Total Gross Land Area | 43,560 | 1.0000 |

| | | |
|---|---|---|
| Total Gross Land Area | 43,560 | 1.0000 |
| Total Usable Land Area | 43,560 | 1.0000 |

### Site Details

| | |
|---|---|
| Source Of Land Info | Public Data |
| Usable/Gross Ratio | 1.00 |
| Flood Map | 48251C0240K |
| Flood Map Date | 09/21/2023 |
| Flood Insurance Required | No |
| Site Shape | Irregular |
| Site Topography | Generally Level |
| Vegetation | Typical |
| Traffic Control At Entry | None |
| Traffic Flow | Moderate |

App.148

Utilities
• Electricity
• Gas
• Sewer
• Water

Corner Lot                         No
Accessibility Rating               Average
Visibility Rating                  Average

## Improvement Details

| | | | | | |
|---|---|---|---|---|---|
| Rentable Area SF | 12,750 | **PRIMARY CONSTRUCTION COMPONENTS** | | Number Of Stories/Floors | 1.00 |
| Gross Building Area | 12,750 | Foundation | Concrete Slab | Ceiling Height Max | 20 |
| Construction Status | Completed | Basement | None | Fire Sprinkler Type | Wet |
| Construction Purpose | Build-to-suit | Construction Type | Steel | HVAC Comments | N/A |
| Year Built | 2002 | Exterior Walls | Metal | Parking Description | Open Surface |
| Economic Life (Years) | 50 | Roof Description | Flat | Land To Building Ratio | 3.42 |
| Investment Class | Class C | | | | |
| Construction Class | S | | | | |
| Condition | Average | | | | |
| Construction Quality | Average | | | | |
| Construction Description | Metal Frame, Metal Skin, Flat Roof, Concrete Slab | | | | |
| Number Of Buildings | 1 | | | | |

## Industrial Building Details

| | |
|---|---|
| Percent Office | 15% |
| Drive In Doors | 4 |
| Total Loading Doors | 4 |
| Ratio Of SF Per Loading Door | 3,188 |
| Clear Height | 20 |

## Sale Information

| | |
|---|---|
| Sale Status | Closed |
| Sale Date | 02/27/2023 |
| Sale Price | $790,000 |
| Grantor (Seller) | JAMES STEVEN H |
| Grantee (Buyer) | James Lisa A |
| Property Rights | Fee Simple |
| Document Type | Deed |
| Recording Number | 2021-19456 |
| Financing Type | Cash to seller |
| Effective Sales Price | $790,000.00 |
| Price Per SF GBA | $61.96 |
| Price Per SF NRA | $61.96 |
| Price Per Land SF (Gross) | $18.14 |
| Price Per Acre (Gross) | $790,000.00 |
| Price Per Land SF (Usable) | $18.14 |
| Price Per Acre (Usable) | $790,000.00 |

## Operations at Date of Sale

| | |
|---|---|
| Operations Status Type | Vacant |

## Comments

This comparable represents the sale of a owner occupied, free standing warehouse located at 1400 South FM 157 in Venus, Texas. The improvements were constructed in 2002 and are situated on a 1-acre site. The building consists of office space including 2 reception areas, lobby, private office, break room, restroom, shop has 6 lifts, supply room, restroom, plenty of warehouse space with high ceiling and 4 oversized bay doors.

App.149

Case 3:22-cv-02118-X    Document 499    Filed 05/24/24    Page 153 of 397    PageID 17599

Easy access to HWY 67, plus house next door, storage sheds and carport included. The property sold for $790,000 ($61.96/SF) in Febuary of 2022. The property was purchased for owner occupancy.

App.150

# Industrial Sale

**NEWMARK**

## 8121 County Road 1016b
### Steel Warehouse

### Location & Property Info

| | |
|---|---|
| Property Name | Steel Warehouse |
| Property Type | Industrial |
| Sub Type | Warehouse/Distribution |
| Major Market | TX - Dallas/Fort Worth |
| Sub Market | Outside Metro Area |
| Address | 8121 County Road 1016b, Burleson, TX 76028 |
| County | Johnson |
| Country | USA |
| Location | East of Chisolm Trail Pkwy |
| Latitude | 32.49924000 |
| Longitude | -97.42262500 |
| MSA | Dallas-Fort-Worth MSA |
| Legal/Tax/Parcel ID | R000095558 |
| Market Orientation | Small Town - Non Metro |
| Verification Type | Confirmed-Other |
| Verification Source | Broker |
| Event ID | 984889 |



### Land Parcels

**PRIMARY LAND**

| ROW NUMBER | ASSOCIATED APN(S) | CLASSIFICATION | LAND AREA (SF) | LAND AREA (ACRES) |
|---|---|---|---|---|
| 1 | R000095558 | Usable Land Area | 67,082 | 1.5400 |
| | | **Total Gross Land Area** | **67,082** | **1.5400** |

| | | | | |
|---|---|---|---|---|
| Total Gross Land Area | | | 67,082 | 1.5400 |
| Total Usable Land Area | | | 67,082 | 1.5400 |

### Site Details

| | |
|---|---|
| Source Of Land Info | Public Data |
| Usable/Gross Ratio | 1.00 |
| Zoning Designation | Industrial |
| Flood Map | 48251C0160J |
| Flood Map Date | 12/04/2012 |
| Flood Insurance Required | No |
| Site Shape | Irregular |
| Site Topography | Generally Level |
| Flood Zone Designation | X |
| Vegetation | Typical |
| Traffic Control At Entry | None |

App.151

Traffic Flow | Moderate
Utilities |
| • Electricity
| • Water
Frontage Street Name | County Road 1016
Corner Lot | No
Accessibility Rating | Average
Visibility Rating | Average

## Improvement Details

| | | PRIMARY CONSTRUCTION COMPONENTS | | | |
|---|---|---|---|---|---|
| Rentable Area SF | 2,400 | | | Number Of Stories/Floors | 1.00 |
| Gross Building Area | 2,400 | Foundation | Concrete Slab | | |
| Construction Status | Completed | Construction Type | Steel | Ceiling Height Max | 20 |
| Construction Purpose | Build-to-suit | Exterior Walls | Steel | Fire Sprinkler Type | Wet |
| | | Roof Description | Pitched | HVAC Comments | N/a |
| Year Built | 1999 | | | Parking Description | Open Surface |
| Economic Life (Years) | 50 | | | Land To Building Ratio | 27.95 |
| Investment Class | Class C | | | | |
| Condition | Average | | | | |
| Construction Quality | Average | | | | |
| Construction Description | Concrete Slab, Pitched Roof | | | | |
| Number Of Buildings | 1 | | | | |

## Industrial Building Details

| | |
|---|---|
| Percent Office | 5% |
| Drive In Doors | 2 |
| Total Loading Doors | 2 |
| Ratio Of SF Per Loading Door | 1,200 |
| Clear Height | 20 |

## Sale Information

| | |
|---|---|
| Sale Status | Closed |
| Sale Date | 11/27/2023 |
| Sale Price | $425,000 |
| Grantor (Seller) | KAHLER RICHARD D |
| Grantee (Buyer) | Kellis Joint Venture Llc |
| Property Rights | Fee Simple |
| Document Type | Deed |
| Recording Number | 2022-29199 |
| Financing Type | Cash to seller |
| Effective Sales Price | $425,000.00 |
| Price Per SF GBA | $177.08 |
| Price Per SF NRA | $177.08 |
| Price Per Land SF (Gross) | $6.34 |
| Price Per Acre (Gross) | $275,974.03 |
| Price Per Land SF (Usable) | $6.34 |
| Price Per Acre (Usable) | $275,974.03 |

## Operations at Date of Sale

| | |
|---|---|
| Operations Status Type | Not Applicable |
| Actuals Occupancy | 100.00% |

## Comments

This comparable represents the sale of a vacant, free standing warehouse located at 8121 County Road 1016b in Burleson, Texas. The site is proximate to and has access to Chisholm Trail Parkway. The improvements were constructed in 1999 and are situated on a 1.54-acre site. The property sold for $425,000 ($177.08/PSF) in August of 2022. It is currently 100% owner occupied and was purchased for owner occupancy.

App.152

Case 3:22-cv-02118-X      Document 499      Filed 05/24/24      Page 156 of 397      PageID 17692

# Industrial Sale



## 1360 South Main Street
### Vacant Warehouse

## Location & Property Info



| | |
|---|---|
| Property Name | Vacant Warehouse |
| Property Type | Industrial |
| Sub Type | Warehouse/Distribution |
| Major Market | TX - Dallas/Fort Worth |
| Sub Market | Outside Metro Area |
| Address | 1360 South Main Street, Mansfield, TX 76063 |
| County | Johnson |
| Country | USA |
| Location | South of South Main Street |
| Latitude | 32.53956000 |
| Longitude | -97.11373000 |
| MSA | Dallas-Fort-Worth MSA |
| Legal/Tax/Parcel ID | 126.4066.01010 |
| Market Orientation | Small Town - Non Metro |
| Verification Type | Confirmed-Other |
| Verification Source | Broker |
| Event ID | 984891 |

## Land Parcels

### PRIMARY LAND

| ROW NUMBER | ASSOCIATED APN(S) | CLASSIFICATION | LAND AREA (SF) | LAND AREA (ACRES) |
|---|---|---|---|---|
| 1 | 126.4066.01010 | Usable Land Area | 81,457 | 1.8700 |
| | | **Total Gross Land Area** | **81,457** | **1.8700** |

| | | |
|---|---|---|
| Total Gross Land Area | 81,457 | 1.8700 |
| Total Usable Land Area | 81,457 | 1.8700 |

## Site Details

| | |
|---|---|
| Source Of Land Info | Public Data |
| Usable/Gross Ratio | 1.00 |
| Zoning Designation | Industrial |
| Flood Map | 48251C0115K |
| Flood Map Date | 09/21/2023 |
| Flood Insurance Required | No |
| Site Shape | Irregular |
| Site Topography | Generally Level |
| Flood Zone Designation | X |
| Vegetation | Typical |
| Traffic Control At Entry | None |

App.153

| | |
|---|---|
| Traffic Flow | Moderate |
| Utilities | • Electricity |
| | • Sewer |
| | • Water |
| Frontage Street Name | S Main Street |
| Corner Lot | No |
| Accessibility Rating | Average |

## Improvement Details

| | | | | | |
|---|---|---|---|---|---|
| Rentable Area SF | 5,000 | **PRIMARY CONSTRUCTION COMPONENTS** | | Number Of Stories/Floors | 1.00 |
| Gross Building Area | 5,000 | Foundation | Concrete Slab | | |
| Construction Status | Completed | Construction Type | Steel | Ceiling Height Max | 20 |
| Construction Purpose | Build-to-suit | Exterior Walls | Steel | Fire Sprinkler Type | Wet |
| Year Built | 1985 | Roof Description | Pitched | HVAC Comments | N/a |
| Economic Life (Years) | 50 | | | Parking Description | Open Surface |
| Investment Class | Class C | | | Land To Building Ratio | 16.29 |
| Condition | Average | | | | |
| Construction Quality | Average | | | | |
| Construction Description | Concrete Slab, Pitched Roof | | | | |
| Number Of Buildings | 1 | | | | |

## Industrial Building Details

| | |
|---|---|
| Percent Office | 10% |
| Drive In Doors | 1 |
| Total Loading Doors | 1 |
| Ratio Of SF Per Loading Door | 5,000 |
| Clear Height | 20 |

## Sale Information

| | |
|---|---|
| Sale Status | Closed |
| Sale Date | 05/27/2022 |
| Sale Price | $430,000 |
| Grantor (Seller) | SANCHEZ ALBERTO |
| Grantee (Buyer) | Gaona Deyanira |
| Property Rights | Fee Simple |
| Document Type | Deed |
| Recording Number | 2022-19310 |
| Financing Type | Cash to seller |
| Effective Sales Price | $430,000.00 |
| Price Per SF GBA | $86.00 |
| Price Per SF NRA | $86.00 |
| Price Per Land SF (Gross) | $5.28 |
| Price Per Acre (Gross) | $229,946.52 |
| Price Per Land SF (Usable) | $5.28 |
| Price Per Acre (Usable) | $229,946.52 |

## Operations at Date of Sale

| | |
|---|---|
| Operations Status Type | Vacant |

## Comments

This comparable represents the sale of a free standing warehouse located at 1360 S Main Street in Mansfield, Texas. The improvements were constructed in 1985 and are situated on a 1.87-acre site. The property sold for $430,000 ($86.00/SF) in May of 2022. The property was in average condition at the time of sale. This property was vacant at the time of sale and purchased for owner occupancy.

App.154

# Industrial Sale

# NEWMARK



## 2825 South Burleson Boulevard
### Burleson Office Warehouse



## Location & Property Info

| | |
|---|---|
| Property Name | Burleson Office Warehouse |
| Property Type | Industrial |
| Sub Type | Warehouse/Distribution |
| Address | 2825 South Burleson Boulevard, Burleson, TX 76028 |
| County | Johnson |
| Country | USA |
| Latitude | 32.47809500 |
| Longitude | -97.27432060 |
| MSA | Dallas-Fort Worth-Arlington, TX |
| Legal/Tax/Parcel ID | 126-0728-00025 |
| Market Orientation | Suburban |
| Verification Type | Confirmed-Other |
| Verification Source | Confidential Third Party |
| Event ID | 972562 |

## Land Parcels

| PARCEL | | | | |
|---|---|---|---|---|
| **ROW NUMBER** | **ASSOCIATED APN(S)** | **CLASSIFICATION** | **LAND AREA (SF)** | **LAND AREA (ACRES)** |
| 1 | 126-0728-00025 | Usable Land Area | 113,256 | 2.6000 |
| | | **Total Gross Land Area** | **113,256** | **2.6000** |

| | | | |
|---|---|---|---|
| Total Gross Land Area | | 113,256 | 2.6000 |
| Total Usable Land Area | | 113,256 | 2.6000 |

## Site Details

| | |
|---|---|
| Source Of Land Info | Public records |
| Usable/Gross Ratio | 1.00 |
| Zoning Designation | C |
| Zoning Description | Commercial |
| Flood Map | 48251C0200J |
| Flood Map Date | 12/04/2012 |

App.155

| | |
|---|---|
| Flood Insurance Required | No |
| Potential Bldg To Land Ratio FAR | 0.10 |
| Site Shape | Irregular |
| Site Topography | Sloping |
| Flood Zone Designation | X |
| Vegetation | Minimal |
| Traffic Control At Entry | None |
| Traffic Flow | Moderate |
| Utilities | • Electricity |
| | • Gas |
| | • Sewer |
| | • Water |
| Frontage Street Name | South Burleson Boulevard |
| Frontage Feet | 301 |
| Frontage Type | Two way, two lanes each way |
| Corner Lot | No |
| Accessibility Rating | Average |
| Visibility Rating | Average |

## Improvement Details

| | | | | | |
|---|---|---|---|---|---|
| Rentable Area SF | 11,408 | **PRIMARY CONSTRUCTION COMPONENTS** | | Number Of Stories/Floors | 2.00 |
| Gross Building Area | 11,408 | Construction Type | Masonry | Ceiling Height Max | 18 |
| Demised Unit Of Comparison | Tenants | Roof Description | Pitched | HVAC Comments | Central |
| Construction Status | Completed | | | Parking Description | Surface |
| Construction Purpose | Build-to-suit | | | Open Parking Spaces | 10 |
| Year Built | 1981 | | | Total Parking Spaces | 10 |
| Investment Class | Class C | | | Spaces/1,000 SF NRA Ratio | 0.88 |
| Construction Class | C | | | Land To Building Ratio | 9.93 |
| Condition | Average | | | | |
| Construction Quality | Average | | | | |
| Construction Description | Masonry | | | | |
| Number Of Buildings | 1 | | | | |

## Industrial Building Details

| | |
|---|---|
| Percent Office | 5% |
| Drive In Doors | 2 |
| Dock High Doors | 1 |
| Total Loading Doors | 3 |
| Ratio Of SF Per Loading Door | 3,803 |
| Clear Height | 18 |

## Sale Information

| | |
|---|---|
| Sale Status | Closed |
| Sale Date | 11/14/2022 |
| Sale Price | $1,247,631 |
| Grantor (Seller) | Marilyn Francis Bleeker |
| Grantee (Buyer) | Feghali Holdings, LLC |
| Recording Date | 11/14/2022 |
| Property Rights | Fee Simple |
| Document Type | Special Warranty Deed |
| Recording Number | 38986 |
| Financing Type | Cash to seller |
| Effective Sales Price | $1,247,631.00 |
| Price Per SF GBA | $109.36 |
| Price Per SF NRA | $109.36 |
| Price Per Potential FAR | $110.16 |
| Price Per Land SF (Gross) | $11.02 |

App.156

Case 3:22-cv-02118-X   Document 499   Filed 05/24/24   Page 160 of 397   PageID 17606

| | |
|---|---|
| Price Per Acre (Gross) | $479,858.08 |
| Price Per Land SF (Usable) | $11.02 |
| Price Per Acre (Usable) | $479,858.08 |

## Operations at Date of Sale

| | |
|---|---|
| Operations Status Type | Vacant |

## Comments

The property is a 11,408 square foot Industrial Warehouse building located at 2825 South Burleson Boulevard in Burleson, TX. The property was built in 1981 and is in average condition. This is a good location with IH-35 feeder road frontage. The property features 18-feet clear height, 2 drive-in bays, 1 dock high door and contains a 5 percent office build-out overall. The property was sold in November of 2022 at $1,247,631 or $109.36 per square foot.

App.157

**Improved Sales**



**ADDENDA**

# Lease Comparables



Industrial Building

# Industrial Lease Summary

# NEWMARK

## Location & Property Info

| | |
|---|---|
| Property Name | Vacant Warehouse |
| Property Type | Industrial |
| Sub Type | Warehouse/Distribution |
| Major Market | TX - Dallas/Fort Worth |
| Sub Market | Outside Metro Area |
| Address | 108 Gillum Street, Grandview, TX 76050 |
| County | Johnson |
| Country | USA |
| Location | South of Gilum Street |
| Latitude | 32.27449000 |
| Longitude | -97.18541500 |
| MSA | Dallas-Fort-Worth MSA |
| Legal/Tax/Parcel ID | 126059100460 |
| Market Orientation | Small Town - Non Metro |
| Verification Type | Confirmed-Other |
| Verification Source | Broker |
| Event ID | 985272 |



## Land Parcels

### PRIMARY LAND

| ROW NUMBER | ASSOCIATED APN(S) | CLASSIFICATION | LAND AREA (SF) | LAND AREA (ACRES) |
|---|---|---|---|---|
| 1 | 126059100460 | Usable Land Area | 14,593 | 0.3350 |
| | | Total Gross Land Area | 14,593 | 0.3350 |

| | | |
|---|---|---|
| Total Gross Land Area | 14,593 | 0.3350 |
| Total Usable Land Area | 14,593 | 0.3350 |

## Site Details

| | |
|---|---|
| Source Of Land Info | Public Data |
| Usable/Gross Ratio | 1.00 |
| Zoning Designation | M-1 |
| Site Shape | Irregular |
| Site Topography | Generally Level |
| Vegetation | Typical |
| Traffic Control At Entry | None |
| Traffic Flow | Moderate |
| Utilities | • Sewer<br>• Water |
| Corner Lot | No |
| Accessibility Rating | Average |
| Visibility Rating | Average |

## Improvement Details

App.160

| | | | | | |
|---|---|---|---|---|---|
| Rentable Area SF | 2,400 | **PRIMARY CONSTRUCTION COMPONENTS** | | Number Of Stories/Floors | 1.00 |
| Gross Building Area | 2,400 | Foundation | Concrete Slab | Ceiling Height Max | 20 |
| Construction Status | Completed | Construction Type | Steel | Fire Sprinkler Type | Wet |
| Construction Purpose | Build-to-suit | Exterior Walls | Steel | HVAC Comments | Central |
| Year Built | 1985 | Roof Description | Pitched | Parking Description | Open Surface |
| Economic Life (Years) | 55 | | | Open Parking Spaces | 10 |
| Investment Class | Class C | | | Total Parking Spaces | 10 |
| Condition | Average | | | Spaces/1,000 SF NRA Ratio | 4.17 |
| Construction Quality | Average | | | Land To Building Ratio | 6.08 |
| Construction Description | Concrete Slab, Pitched Roof | | | | |
| Number Of Buildings | 1 | | | | |

## Lease Availability Information

| | |
|---|---|
| Survey Date | 11/27/2023 |

## Industrial Building Details

| | |
|---|---|
| Percent Office | 20 % |
| Drive In Doors | 3 |
| Total Loading Doors | 3 |
| Ratio Of SF Per Loading Door | 800 |
| Clear Height | 15 |

## Lease Summary

| START DATE | TERM | SPACE TYPE | LESSEE | LESSEE TYPE | LEASE SF | ALTERNATE SF | EFF. RATE | RENT MEASURE | BASE ESC. TYPE | REIMB. METHOD | TI $/SF |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 6/29/2022 | 12 | Office/Warehouse | | | 2,400 | 2,400 | $6.50 | $/SF/Yr | Fixed Steps | Triple Net | |

## Comments

This comparable represents a Single-tenant warehouse in Grandview, Texas. The property is located at 108 W Gilum Street. The property was constructed in 1985 and was in average condition. According to a property representative, the current asking rental rate is $1,300 per month ($6.50/psf) on a triple net basis.

## Specific Lease Details: Asking Rent

### Description of Premises

| | |
|---|---|
| Rentable Area | 2,400 |
| Alternate SF | 2,400 |
| Full Building Lease | Yes |
| Space Type | Office/Warehouse |

### Industrial Space Details

| | |
|---|---|
| Typical Ceiling Height | 20 |
| Percentage Office | 10 % |

### Lease Details

| | |
|---|---|
| Lease Status | Asking Rent |
| Lease Start/Available Date | 6/29/2022 |
| Term Of Lease (Months) | 12 |

App.161

## Rates & Measures

| | |
|---|---|
| Measure | $/SF/Yr |
| Face Rental Rate | $6.50 |
| Effective Rental Rate | $6.50 |
| Base Rent Escalation Type | Fixed Steps |
| Lease Reimbursement Method | Triple Net |
| Tenant Improvement Type | New Tenant |

App.162

# Industrial Lease Summary

# NEWMARK

## Location & Property Info



| | |
|---|---|
| Property Name | Vacant Warehouse |
| Property Type | Industrial |
| Sub Type | Warehouse/Distribution |
| Major Market | TX - Dallas/Fort Worth |
| Sub Market | Outside Metro Area |
| Address | 1748 North Main Street, Cleburne, TX 76031 Johnson |
| County | |
| Country | USA |
| Location | East of N Main Street |
| Latitude | 32.37370000 |
| Longitude | -97.39302000 |
| MSA | Dallas-Fort-Worth MSA |
| Legal/Tax/Parcel ID | 126.3707.00010 |
| Market Orientation | Small Town - Non Metro |
| Verification Type | Confirmed-Other |
| Verification Source | Broker |
| Event ID | 985278 |

## Land Parcels

### PRIMARY LAND

| ROW NUMBER | ASSOCIATED APN(S) | CLASSIFICATION | LAND AREA (SF) | LAND AREA (ACRES) |
|---|---|---|---|---|
| 1 | 126.3707.00010 | Usable Land Area | 332,798 | 7.6400 |
| | | Total Gross Land Area | 332,798 | 7.6400 |

| | | |
|---|---|---|
| Total Gross Land Area | 332,798 | 7.6400 |
| Total Usable Land Area | 332,798 | 7.6400 |

## Site Details

| | |
|---|---|
| Source Of Land Info | Public Data |
| Usable/Gross Ratio | 1.00 |
| Zoning Designation | Commercial |
| Site Shape | Irregular |
| Site Topography | Generally Level |
| Vegetation | Typical |
| Traffic Control At Entry | None |
| Traffic Flow | Moderate |
| Utilities | • Electricity<br>• Sewer |
| Corner Lot | No |
| Accessibility Rating | Average |
| Visibility Rating | Average |

## Improvement Details

App.163

| | | PRIMARY CONSTRUCTION COMPONENTS | | | |
|---|---|---|---|---|---|
| Rentable Area SF | 9,200 | | | Number Of Stories/Floors | 1.00 |
| Gross Building Area | 9,200 | Foundation | Concrete Slab | | |
| Construction Status | Completed | Construction Type | Steel | Ceiling Height Max | 20 |
| Construction Purpose | Build-to-suit | Exterior Walls | Steel | Fire Sprinkler Type | Wet |
| Year Built | 1960 | Roof Description | Flat | HVAC Comments | Central |
| Economic Life (Years) | 55 | | | Open Parking Spaces | 15 |
| Investment Class | Class C | | | Total Parking Spaces | 15 |
| Condition | Average | | | Spaces/1,000 SF NRA Ratio | 1.63 |
| Construction Quality | Average | | | Land To Building Ratio | 36.17 |
| Construction Description | Flat Roof, Concrete Slab | | | | |
| Number Of Buildings | 2 | | | | |

## Lease Availability Information

| | |
|---|---|
| Survey Date | 11/27/2023 |

## Industrial Building Details

| | |
|---|---|
| Percent Office | 10 % |
| Drive In Doors | 2 |
| Dock High Doors | 2 |
| Total Loading Doors | 4 |
| Ratio Of SF Per Loading Door | 2,300 |
| Clear Height | 15 |

## Lease Summary

| START DATE | TERM | SPACE TYPE | LESSEE | LESSEE TYPE | LEASE SF | ALTERNATE SF | EFF. RATE | RENT MEASURE | BASE ESC. TYPE | REIMB. METHOD | TI $/SF |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 3/4/2022 | 12 | Warehouse | | | 9,200 | 9,200 | $1.72 | $/SF/Yr | Fixed Steps | Triple Net | |

## Comments

This comparable represents a Single-tenant warehouse in Cleburne, Texas. The property is located at 1748 N Main Street #B. The property was constructed in 1960 and was in average condition. According to a property representative, the current asking rental rate is $1,315 per month ($1.72/psf) on a triple net basis.

## Specific Lease Details: Asking Rent

## Description of Premises

| | |
|---|---|
| Rentable Area | 9,200 |
| Alternate SF | 9,200 |
| Full Building Lease | No |
| Space Type | Warehouse |
| Suite/Space Number | B |
| No. Parking Spaces | 15 |

## Industrial Space Details

| | |
|---|---|
| Typical Ceiling Height | 20 |

## Lease Details

| | |
|---|---|
| Lease Status | Asking Rent |
| Lease Start/Available Date | 3/4/2022 |
| Term Of Lease (Months) | 12 |

App.164

Case 3:22-cv-02118-X     Document 499     Filed 05/24/24     Page 168 of 397     PageID 17614

## Rates & Measures

| | |
|---|---|
| Measure | $/SF/Yr |
| Face Rental Rate | $1.72 |
| Effective Rental Rate | $1.72 |
| Base Rent Escalation Type | Fixed Steps |
| Lease Reimbursement Method | Triple Net |
| Tenant Improvement Type | New Tenant |

App.165

# Industrial Lease Summary



## Location & Property Info

| | |
|---|---|
| Property Name | Vacant Warehouse |
| Property Type | Industrial |
| Sub Type | Warehouse/Distribution |
| Major Market | TX - Dallas/Fort Worth |
| Sub Market | Outside Metro Area |
| Address | 1104 Clay Street, Ennis, TX 75119 |
| County | Ellis |
| Country | USA |
| Location | East of Clay Street |
| Latitude | 32.31625000 |
| Longitude | -96.62744000 |
| MSA | Dallas-Fort-Worth MSA |
| Legal/Tax/Parcel ID | 184916 |
| Market Orientation | Small Town - Non Metro |
| Verification Type | Confirmed-Other |
| Verification Source | Broker |
| Event ID | 985534 |



## Land Parcels

PRIMARY LAND

| ROW NUMBER | ASSOCIATED APN(S) | CLASSIFICATION | LAND AREA (SF) | LAND AREA (ACRES) |
|---|---|---|---|---|
| 1 | 184916 | Usable Land Area | 12,720 | 0.2920 |
| | | Total Gross Land Area | 12,720 | 0.2920 |

| | | |
|---|---|---|
| Total Gross Land Area | 12,720 | 0.2920 |
| Total Usable Land Area | 12,720 | 0.2920 |

## Site Details

| | |
|---|---|
| Source Of Land Info | Public Data |
| Usable/Gross Ratio | 1.00 |
| Zoning Designation | Commercial |
| Site Shape | Irregular |
| Site Topography | Generally Level |
| Vegetation | Typical |
| Traffic Control At Entry | None |
| Traffic Flow | Moderate |
| Utilities | • Electricity |
| | • Gas |
| | • Sewer |
| | • Water |
| Corner Lot | No |
| Accessibility Rating | Average |
| Visibility Rating | Average |

App.166

Case 3:22-cv-02118-X       Document 499       Filed 05/24/24       Page 170 of 397       PageID 17616

## Improvement Details

| | | | |
|---|---|---|---|
| Rentable Area SF | 3,990 | | |
| Gross Building Area | 3,990 | | |
| Construction Status | Completed | | |
| Construction Purpose | Build-to-suit | | |
| Year Built | 1987 | | |
| Economic Life (Years) | 55 | | |
| Investment Class | Class C | | |
| Condition | Fair | | |
| Construction Quality | Average | | |
| Construction Description | Concrete Slab, Flat Roof | | |
| Number Of Buildings | 1 | | |

**PRIMARY CONSTRUCTION COMPONENTS**

| | |
|---|---|
| Foundation | Concrete Slab |
| Construction Type | Steel |
| Exterior Walls | Steel |
| Roof Description | Flat |

| | |
|---|---|
| Number Of Stories/Floors | 1.00 |
| Ceiling Height Max | 20 |
| Fire Sprinkler Type | Wet |
| HVAC Comments | Central |
| Parking Description | Open Surface |
| Open Parking Spaces | 10 |
| Total Parking Spaces | 10 |
| Spaces/1,000 SF NRA Ratio | 2.51 |
| Land To Building Ratio | 3.19 |

## Lease Availability Information

| | |
|---|---|
| Survey Date | 11/28/2023 |

## Industrial Building Details

| | |
|---|---|
| Percent Office | 5 % |
| Clear Height | 15 |

## Lease Summary

| START DATE | TERM | SPACE TYPE | LESSEE | LESSEE TYPE | LEASE SF | ALTERNATE SF | EFF. RATE | RENT MEASURE | BASE ESC. TYPE | REIMB. METHOD | TI $/SF |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 6/29/2022 | 12 | Warehouse | | | 3,990 | 3,990 | $6.02 | $/SF/Yr | Fixed Steps | Triple Net | |

## Comments

This comparable represents a Single-tenant warehouse in Ennis, Texas. The property is located at 1104 S Clay Street. The property was constructed in 1987 and was in fair condition. According to a property representative, the current asking rental rate is $2,000 per month ($6.02/psf) on a triple net basis.

## Specific Lease Details: Asking Rent

### Description of Premises

| | |
|---|---|
| Rentable Area | 3,990 |
| Alternate SF | 3,990 |
| Full Building Lease | Yes |
| Space Type | Warehouse |
| No. Parking Spaces | 10 |

### Industrial Space Details

| | |
|---|---|
| Percentage Office | 10 % |

### Lease Details

| | |
|---|---|
| Lease Status | Asking Rent |
| Lease Start/Available Date | 6/29/2022 |
| Term Of Lease (Months) | 12 |

### Rates & Measures

| | |
|---|---|
| Measure | $/SF/Yr |

App.167

Case 3:22-cv-02118-X    Document 499    Filed 05/24/24    Page 171 of 397    PageID 17617

| | |
|---|---|
| Face Rental Rate | $6.02 |
| Effective Rental Rate | $6.02 |
| Base Rent Escalation Type | Fixed Steps |
| Lease Reimbursement Method | Triple Net |
| Tenant Improvement Type | New Tenant |

App.168

# Industrial Lease Summary

**NEWMARK**



## Location & Property Info

| | |
|---|---|
| Property Name | Vacant Warehouse |
| Property Type | Industrial |
| Sub Type | Warehouse/Distribution |
| Major Market | TX - Dallas/Fort Worth |
| Sub Market | Outside Metro Area |
| Address | 3030 South US Highway 77, Waxahachie, TX 75165 |
| County | Ellis |
| Country | USA |
| Location | West of Highway 77, East of I35 |
| Latitude | 32.31027000 |
| Longitude | -96.85830000 |
| MSA | Dallas-Fort-Worth MSA |
| Legal/Tax/Parcel ID | 198242 |
| Market Orientation | Small Town - Non Metro |
| Verification Type | Confirmed-Other |
| Verification Source | Broker |
| Event ID | 985580 |

## Land Parcels

**PRIMARY LAND**

| ROW NUMBER | ASSOCIATED APN(S) | CLASSIFICATION | LAND AREA (SF) | LAND AREA (ACRES) |
|---|---|---|---|---|
| 1 | 198242 | Usable Land Area | 217,800 | 5.0000 |
| | | Total Gross Land Area | 217,800 | 5.0000 |

| | | |
|---|---|---|
| Total Gross Land Area | 217,800 | 5.0000 |
| Total Usable Land Area | 217,800 | 5.0000 |

## Site Details

| | |
|---|---|
| Source Of Land Info | Public Data |
| Usable/Gross Ratio | 1.00 |
| Zoning Designation | Light Industrial |
| Site Shape | Irregular |
| Site Topography | Generally Level |
| Vegetation | Typical |
| Traffic Control At Entry | None |
| Traffic Flow | Moderate |
| Utilities | • Electricity |
| | • Gas |
| | • Sewer |
| | • Water |
| Corner Lot | No |
| Accessibility Rating | Average |
| Visibility Rating | Average |

App.169

Case 3:22-cv-02118-X     Document 499     Filed 05/24/24     Page 173 of 397     PageID 17619

## Improvement Details

| | | | |
|---|---|---|---|
| Rentable Area SF | 2,400 | **PRIMARY CONSTRUCTION COMPONENTS** | |
| Gross Building Area | 2,400 | Foundation | Concrete Slab |
| Construction Status | Completed | Construction Type | Steel |
| Construction Purpose | Build-to-suit | Exterior Walls | Steel |
| Year Built | 2018 | Roof Description | Pitched |
| Economic Life (Years) | 55 | | |
| Investment Class | Class C | | |
| Condition | Average | | |
| Construction Quality | Average | | |
| Construction Description | Pitched Roof, Concrete Slab | | |
| Number Of Buildings | 1 | | |

| | |
|---|---|
| Number Of Stories/Floors | 1.00 |
| Ceiling Height Max | 20 |
| Fire Sprinkler Type | Wet |
| HVAC Comments | Central |
| Parking Description | Open Surface |
| Open Parking Spaces | 10 |
| Total Parking Spaces | 10 |
| Spaces/1,000 SF NRA Ratio | 4.17 |
| Land To Building Ratio | 90.75 |

## Lease Availability Information

| | |
|---|---|
| Survey Date | 11/28/2023 |

## Industrial Building Details

| | |
|---|---|
| Percent Office | 10 % |
| Drive In Doors | 2 |
| Total Loading Doors | 2 |
| Ratio Of SF Per Loading Door | 1,200 |
| Clear Height | 15 |

## Lease Summary

| START DATE | TERM | SPACE TYPE | LESSEE | LESSEE TYPE | LEASE SF | ALTERNATE SF | EFF. RATE | RENT MEASURE | BASE ESC. TYPE | REIMB. METHOD | TI $/SF |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 9/1/2022 | 12 | Warehouse | | | 2,400 | 2,400 | $14.00 | $/SF/Yr | Fixed Steps | Triple Net | |

## Comments

This comparable represents a Single-tenant warehouse in Waxahachie, Texas. The property is located at 3030 S Highway 77. The property was constructed in 2018 and was in average condition. According to a property representative, the current asking rental rate is $2,800 ($14.00/psf) per month on a triple net basis.

## Specific Lease Details: Asking Rent

### Description of Premises

| | |
|---|---|
| Rentable Area | 2,400 |
| Alternate SF | 2,400 |
| Full Building Lease | Yes |
| Space Type | Warehouse |
| No. Parking Spaces | 10 |

### Industrial Space Details

| | |
|---|---|
| Typical Ceiling Height | 15 |
| Percentage Office | 10 % |
| No. Loading Doors | 2 |

### Lease Details

| | |
|---|---|
| Lease Status | Asking Rent |

Case 3:22-cv-02118-X   Document 499     Filed 05/24/24     Page 174 of 397     PageID 17620

Lease Start/Available Date          9/1/2022

Term Of Lease (Months)              12

## Rates & Measures

| | |
|---|---|
| Measure | $/SF/Yr |
| Face Rental Rate | $14.00 |
| Effective Rental Rate | $14.00 |
| Base Rent Escalation Type | Fixed Steps |
| Lease Reimbursement Method | Triple Net |
| Tenant Improvement Type | New Tenant |

App.171

ADDENDA

**Addendum F**

**Précis Metro Report - Economy.Com, Inc.**



# MOODY'S ANALYTICS

# FORT WORTH-ARLINGTON TX

Data Buffet® MSA code: IUSA_DMFTW

## ECONOMIC DRIVERS

 MANUFAC-TURING

 LOGISTICS

## EMPLOYMENT GROWTH RANK

| 2022-2024 | 2022-2027 |
|---|---|
| **19** | **20** |
| 1st quintile | 1st quintile |

Best=1, Worst=410

## RELATIVE COSTS

| LIVING | BUSINESS |
|---|---|
| **105%** | **97%** |

U.S.=100%

## VITALITY

RELATIVE
**0.54**
Rank: 52

Best=1, Worst=403

## QUALITY

OF LIFE
**171**

Best=1, Worst=378

## BUSINESS CYCLE STATUS



## STRENGTHS & WEAKNESSES

### STRENGTHS
» Central Southwest location near Latin America supports distribution industry.
» Relatively high housing affordability attracts homebuyers employed in Dallas.

### WEAKNESSES
» Large military procurement industry is sensitive to political winds.
» Exposure to motor vehicle and energy industries adds to cyclical volatility.

## FORECAST RISKS

| SHORT TERM  | LONG TERM  |
|---|---|

| RISK EXPOSURE 2023-2028 | **49** | 1st quintile | Most=1 Least=403 |
|---|---|---|---|

### UPSIDE
» Homebuilding rebounds faster because of low supply of existing homes for sale.
» Military aircraft production rebounds more strongly as supply-chain issues resolve.

### DOWNSIDE
» Banking weakens because of elevated interest rates.
» Energy-related manufacturing is slow to rebound because of the decline in oil prices.

## MOODY'S RATING

**Aaa**  COUNTY AS OF DEC 15, 2022

## ANALYSIS

**Recent Performance.** Job growth in Fort Worth-Arlington has strengthened in recent months following a deceleration at the beginning of 2023. Leading the way have been financial services, healthcare and core manufacturing. Year over year, total employment is up twice as much as that of the nation because of strong gains back in the second half of 2022. Additionally, growth in the number of high-wage jobs has been substantially higher than in the nation. The unemployment rate has risen to 3.8%, up nearly 0.5 percentage point over the past year. However, one reason has been the above-average increase in the labor force amid solid job growth during that time. Housing market data have been mixed, with house prices declining but new permits rebounding since the start of 2023.

**Manufacturing.** New uncertainties surround the near-term outlook for the F-35, which is assembled in FTW. At the beginning of the year, Lockheed had expected to deliver about 150 planes in 2023, close to the full capacity of output. However, problems with the TR-3 software system are causing significant delays because the Defense Department stated in June that it would not accept newly built F-35s until the problems are resolved. A separate IT issue has been that the Pentagon needs to vet the plane's capability in the Joint Simulation Environment, development of which has itself been delayed. The new projection is that only about 100 to 120 planes will be delivered this year. However, Lockheed has indicated that the pace of production will continue unabated and that deliveries will exceed production in 2024. On the positive side, demand fundamentally remains strong. Last year, the Pentagon agreed to buy 375 planes during 2023-2025, and in April 2023 awarded a substantial increase for contract modifications. Lockheed still projects that more than 2,000 planes will ultimately be built compared with about 900 delivered to date, supporting manufacturing in the metro division over the coming years.

**Financial services.** The banking industry will push past current headwinds and continue to advance. Industry employment is up 2.2% since the end of 2022 and 5% year over year. Although the strong trend growth in banking in neighboring Dallas is well known, FTW has matched up. The level of industry employment in each metro division has doubled over the past two decades. Whereas Dallas benefits from its high-profile investment banking and wealth management segments as well as conventional lending, FTW has attracted a large number of small community-oriented banks, including new or growing regional operations of banks based in such states as Pennsylvania, Missouri, Arkansas and Oklahoma, where growth opportunities are fewer. Both metro divisions benefit from strong job and population growth that has boosted demand for credit.

**Homebuilding.** Residential construction has begun to bounce back and should rise slowly over the coming year. New permits for single-family homes declined more than 50% during 2022 but have now risen by about 20% since early 2023. Despite lower house prices, developers have been encouraged by the low inventory of existing homes for sale. Longer term, the FTW housing market should grow at an above-average pace, lifted by higher relative affordability than in Dallas and strong demographics.

**Fort Worth-Arlington will outperform the nation over the coming year, led by manufacturing and financial services. The homebuilding outlook appears bright. Longer term, robust population growth, a diversified manufacturing base, and lower business costs and costs of living relative to Dallas will support above-average gains.**

*Edward Friedman*
*August 2023*

1-866-275-3266
helpeconomy@moodys.com

| 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | INDICATORS | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 126.7 | 132.0 | 133.7 | 127.5 | 138.4 | 145.7 | Gross metro product (C12$ bil) | 152.3 | 155.5 | 161.4 | 168.5 | 175.7 | 182.7 |
| *4.0* | *4.2* | *1.3* | *-4.6* | *8.6* | *5.3* | *% change* | *4.5* | *2.1* | *3.7* | *4.4* | *4.3* | *4.0* |
| 1,037.0 | 1,066.9 | 1,096.3 | 1,055.9 | 1,097.6 | 1,161.7 | Total employment (ths) | 1,206.3 | 1,223.7 | 1,237.5 | 1,251.1 | 1,264.2 | 1,277.6 |
| *2.5* | *2.9* | *2.8* | *-3.7* | *4.0* | *5.8* | *% change* | *3.8* | *1.4* | *1.1* | *1.1* | *1.0* | *1.1* |
| 3.8 | 3.5 | 3.3 | 7.3 | 5.2 | 3.6 | Unemployment rate (%) | 3.7 | 3.5 | 3.5 | 3.5 | 3.5 | 3.5 |
| 7.4 | 5.9 | 3.0 | 4.9 | 9.2 | 5.5 | Personal income growth (%) | 6.6 | 5.2 | 5.2 | 5.3 | 5.1 | 4.9 |
| 64.2 | 65.9 | 68.4 | 70.5 | 71.4 | 73.0 | Median household income ($ ths) | 75.8 | 78.0 | 80.7 | 83.5 | 86.4 | 89.3 |
| 2,485.5 | 2,527.1 | 2,557.8 | 2,586.2 | 2,618.7 | 2,669.5 | Population (ths) | 2,714.9 | 2,753.3 | 2,789.7 | 2,826.2 | 2,863.2 | 2,900.9 |
| *1.9* | *1.7* | *1.2* | *1.1* | *1.3* | *1.9* | *% change* | *1.7* | *1.4* | *1.3* | *1.3* | *1.3* | *1.3* |
| 29.4 | 26.4 | 16.4 | 17.7 | 25.0 | 41.1 | Net migration (ths) | 33.0 | 25.4 | 23.7 | 23.9 | 24.8 | 25.7 |
| 8,976 | 10,125 | 9,849 | 12,646 | 13,649 | 12,979 | Single-family permits (#) | 10,428 | 10,809 | 12,428 | 13,255 | 13,080 | 12,773 |
| 5,647 | 6,086 | 9,500 | 5,778 | 7,927 | 8,982 | Multifamily permits (#) | 6,521 | 7,269 | 7,189 | 7,693 | 7,808 | 7,454 |
| *10.0* | *8.1* | *5.0* | *4.5* | *15.3* | *22.0* | *FHFA house price index (% change)* | *1.6* | *-5.3* | *-4.0* | *-1.1* | *0.7* | *1.1* |

App.173



## ECONOMIC HEALTH CHECK

| 3-MO MA | Feb 23 | Mar 23 | Apr 23 | May 23 | Jun 23 | Jul 23 |
|---|---|---|---|---|---|---|
| Employment, change, ths | 2.9 | 1.8 | 3.0 | 3.7 | 6.1 | 5.1 |
| Unemployment rate, % | 3.5 | 3.6 | 3.7 | 3.8 | 3.8 | 3.7 |
| Labor force participation rate, % | 66.8 | 67.0 | 67.3 | 67.6 | 67.8 | 67.9 |
| Average weekly hours, # | 36.9 | 37.1 | 36.9 | 36.9 | 36.7 | 36.6 |
| Industrial production, 2012=100 | 101.5 | 101.9 | 102.2 | 102.7 | 102.9 | 103.2 |
| Residential permits, single-family, # | 7,675 | 9,167 | 10,484 | 12,272 | 11,783 | 12,379 |
| Residential permits, multifamily, # | 4,841 | 5,098 | 4,763 | 4,701 | 4,915 | 5,087 |
| Dec/Dec | Dec 17 | Dec 18 | Dec 19 | Dec 20 | Dec 21 | Dec 22 |
| Employment, change, ths | 28.4 | 29.5 | 31.8 | -42.8 | 62.7 | 58.3 |

| Better than prior 3-mo MA | Unchanged from prior 3-mo MA | Worse than prior 3-mo MA |
|---|---|---|

Sources: BLS, Census Bureau, Moody's Analytics

## BUSINESS CYCLE INDEX

JAN 2013=100

## CURRENT EMPLOYMENT TRENDS

% CHANGE YR AGO

Sources: BLS, Moody's Analytics

% CHANGE YR AGO, 3-MO MA

| | Jul 22 | Jan 23 | Jul 23 |
|---|---|---|---|
| Total | 6.0 | 5.2 | 4.5 |
| Mining | 4.4 | 12.0 | 10.9 |
| Construction | 5.8 | 4.2 | 3.3 |
| Manufacturing | 5.3 | 6.7 | 4.9 |
| Trade | 3.7 | 3.2 | 3.9 |
| Trans/Utilities | 6.4 | 2.0 | 3.1 |
| Information | 13.8 | 7.6 | 2.7 |
| Financial Activities | 7.3 | 6.5 | 4.8 |
| Prof & Business Svcs. | 14.1 | 9.0 | 8.9 |
| Edu & Health Svcs. | 4.1 | 5.9 | 3.7 |
| Leisure & Hospitality | 7.6 | 6.3 | 4.1 |
| Other Services | 3.7 | 6.5 | 5.4 |
| Government | 1.4 | 2.1 | 2.4 |

Sources: BLS, Moody's Analytics

## DIFFUSION INDEX

3-DIGIT NAICS LEVEL, 6-MO MA

Sources: BLS, Moody's Analytics

## RELATIVE EMPLOYMENT PERFORMANCE

JAN 2013=100

FORECAST VS. 6 MO PRIOR

| | 2-Yr | 5-Yr |
|---|---|---|

Sources: BLS, Moody's Analytics

## HOUSE PRICE

1998Q1=100, NSA

Sources: FHFA, Moody's Analytics

## RENTAL AFFORDABILITY

GREATER THAN 100=MORE AFFORDABLE

Sources: Census Bureau, BLS, Moody's Analytics

## HOUSE PRICE TRENDS

%

Overvalued   Undervalued

Source: Moody's Analytics

## HOUSING AFFORDABILITY

GREATER THAN 100=MORE AFFORDABLE

Sources: NAR, Moody's Analytics

App.174

Case 3:22-cv-01818-X   Document 499   Filed 05/24/24   Page 178 of 397   PageID 17624



## EMPLOYMENT AND INDUSTRY

### TOP EMPLOYERS

| | |
|---|---|
| AMR/American Airlines | 25,000 |
| Lockheed Martin | 13,690 |
| Texas Health Resources | 12,000 |
| NAS - Fort Worth - JRB | 10,000 |
| Arlington ISD | 10,000 |
| University of Texas at Arlington | 7,311 |
| JPS Health Network | 6,500 |
| Cook Children's Health Care System | 6,042 |
| Tarrant County College | 5,999 |
| Alcon Laboratories Inc. | 5,393 |
| Bell Helicopter Textron | 4,953 |
| BNSF Railway | 4,500 |
| General Motors | 4,125 |
| GM Financial | 3,820 |
| Fidelity | 3,700 |
| JPMorgan Chase | 3,678 |

Source: Fort Worth Chamber of Commerce, 2017

### PUBLIC

| | |
|---|---|
| Federal | 16,957 |
| State | 13,518 |
| Local | 109,335 |

2022

### INDUSTRIAL DIVERSITY

Most Diverse (U.S.)

0.67

Least Diverse

### EMPLOYMENT VOLATILITY

| Due to U.S. fluctuations | Relative to U.S. |
|---|---|
| 97% | 88 / 100 |

Not due to U.S. ▪ Due to U.S. ▪ FTW ▪ U.S.

## ENTREPRENEURSHIP

### BROAD-BASED START-UP RATE
U.S.=100
2021

FTW ▪ TX

Sources: Census Bureau, Moody's Analytics

## EXPORTS

NOT AVAILABLE

## COMPARATIVE EMPLOYMENT AND INCOME

| | % OF TOTAL EMPLOYMENT | | | AVERAGE ANNUAL EARNINGS | | |
|---|---|---|---|---|---|---|
| Sector | FTW | TX | U.S. | FTW | TX | U.S. |
| Mining | 0.8 | 1.5 | 0.4 | $51,069 | $202,521 | $140,972 |
| Construction | 5.7 | 5.8 | 5.1 | $81,596 | $70,189 | $74,543 |
| Manufacturing | 9.2 | 6.9 | 8.4 | $96,589 | $104,973 | $95,006 |
| *Durable* | 73.1 | 63.3 | 62.2 | nd | $102,268 | $98,900 |
| *Nondurable* | 26.9 | 36.7 | 37.8 | nd | $109,432 | $88,725 |
| Transportation/Utilities | 8.9 | 5.2 | 4.7 | nd | $69,502 | $62,962 |
| Wholesale Trade | 5.0 | 4.7 | 3.9 | nd | $105,177 | $104,126 |
| Retail Trade | 10.6 | 10.2 | 10.1 | $41,648 | $42,393 | $43,812 |
| Information | 1.0 | 1.7 | 2.0 | $71,236 | $109,036 | $167,037 |
| Financial Activities | 6.5 | 6.5 | 5.9 | $41,365 | $54,316 | $65,977 |
| Prof. and Bus. Services | 13.2 | 15.4 | 14.8 | nd | $77,456 | $86,343 |
| Educ. and Health Services | 12.7 | 13.4 | 16.0 | $66,020 | $62,824 | $66,256 |
| Leisure and Hosp. Services | 10.8 | 10.5 | 10.4 | $28,620 | $30,678 | $36,373 |
| Other Services | 3.5 | 3.3 | 3.7 | $38,133 | $37,962 | $42,808 |
| Government | 12.0 | 14.8 | 14.5 | $81,652 | $79,985 | $90,556 |

Sources: Percent of total employment — BLS, Moody's Analytics, 2022, Average annual earnings — BEA, Moody's Analytics, 2021

### PRODUCTIVITY
REAL OUTPUT PER WORKER, $

| FTW | TX | U.S. |
|---|---|---|
| 87,016 | 97,018 | 92,043 |

Sources: BEA, Moody's Analytics, 2021

## BUSINESS COSTS
U.S.=100

Total, Unit labor, Energy, State and local taxes, Office rent

2016 ▪ 2021

Source: Moody's Analytics

### HIGH-TECH EMPLOYMENT

| | Ths | % of total |
|---|---|---|
| FTW | 36.7 | 3.2 |
| U.S. | 8,388.4 | 5.5 |

### HOUSING-RELATED EMPLOYMENT

| | Ths | % of total |
|---|---|---|
| FTW | 124.9 | 10.8 |
| U.S. | 15,202.5 | 10.0 |

Source: Moody's Analytics, 2022

## LEADING INDUSTRIES BY WAGE TIER

| | NAICS | Industry | Location Quotient | Employees (ths) |
|---|---|---|---|---|
| HIGH | 4811 | Scheduled air transportation | 8.9 | 28.4 |
| HIGH | 3364 | Aerospace product & parts manuf. | 6.9 | 24.6 |
| HIGH | 6211 | Offices of physicians | 1.0 | 19.6 |
| HIGH | GVF | Federal Government | 0.8 | 16.9 |
| MID | GVL | Local Government | 1.0 | 107.6 |
| MID | 6221 | General medical and surgical hospitals | 0.9 | 30.0 |
| MID | 2382 | Building equipment contractors | 1.1 | 18.6 |
| MID | GVS | State Government | 0.4 | 14.0 |
| LOW | 7225 | Restaurants and other eating places | 1.2 | 91.7 |
| LOW | 5613 | Employment services | 1.3 | 36.5 |
| LOW | 4931 | Warehousing and storage | 1.6 | 22.4 |
| LOW | 4451 | Grocery stores | 0.8 | 17.2 |

Source: Moody's Analytics, 2022

App.175

Case 3:22-cv-01818-X   Document 199   Filed 05/24/24



## GEOGRAPHIC PROFILE

### POPULATION DENSITY

Residents per square mile

12 — 37,348

| County | Distribution, % | | |
|---|---|---|---|
| | Pop. | Emp. | Permits |
| Hood TX | 2.5 | 2.2 | 0.5 |
| Johnson TX | 7.3 | 6.5 | 10.4 |
| Parker TX | 6.2 | 5.5 | 4.1 |
| Somervell TX | 0.4 | 0.3 | 0.1 |
| Tarrant TX | 80.8 | 83.0 | 82.8 |
| Wise TX | 2.8 | 2.5 | 2.0 |

*Sources: Census Bureau, BLS, Moody's Analytics, 2022*



### MEDIAN HOUSEHOLD INCOME

U.S. Dollars

5,491 — 233,713

### MEDIAN COMMUTE TIME

Minutes

8 — 60

*Sources: ACS, Moody's Analytics*

### POPULATION & HOUSING CHARACTERISTICS

| | Units | Value | Rank* |
|---|---|---|---|
| Total area | sq mi | 4,098.2 | 71 |
| Total water area | sq mi | 94.8 | 137 |
| Total land area | sq mi | 4,003.3 | 66 |
| Land area - developable | sq mi | 3,099.0 | 26 |
| Land area - undevelopable | sq mi | 904.4 | 149 |
| | | | |
| Population density | pop. to developable land | 666.2 | 43 |
| Total population | ths | 2,667.0 | 23 |
| U.S. citizen at birth | % of population | 83.1 | 334 |
| Naturalized U.S. citizen | % of population | 6.4 | 78 |
| Not a U.S. citizen | % of population | 9.0 | 51 |
| | | | |
| Median age | | 37.7 | 259 |
| | | | |
| Total housing units | ths | 980.8 | 30 |
| Owner occupied | % of total | 51.0 | 350 |
| Renter occupied | % of total | 34.2 | 94 |
| Vacant | % of total | 6.6 | 295 |
| | | | |
| 1-unit, detached | % of total | 64.6 | 249 |
| 1-unit, attached | % of total | 4.2 | 213 |
| Multifamily | % of total | 26.3 | 106 |
| Median year built | | 1995 | |

*\* Areas & pop. density, out of 410 metro areas/divisions, including metros in Puerto Rico; all others, out of 403 metros.*

*Sources: Census Bureau, Moody's Analytics, 2021 except land area 2010*

## About Moody's Analytics

Moody's Analytics provides financial intelligence and analytical tools supporting our clients' growth, efficiency and risk management objectives. The combination of our unparalleled expertise in risk, expansive information resources, and innovative application of technology helps today's business leaders confidently navigate an evolving marketplace. We are recognized for our industry-leading solutions, comprising research, data, software and professional services, assembled to deliver a seamless customer experience. Thousands of organizations worldwide have made us their trusted partner because of our uncompromising commitment to quality, client service, and integrity.

Concise and timely economic research by Moody's Analytics supports firms and policymakers in strategic planning, product and sales forecasting, credit risk and sensitivity management, and investment research. Our economic research publications provide in-depth analysis of the global economy, including the U.S. and all of its state and metropolitan areas, all European countries and their subnational areas, Asia, and the Americas. We track and forecast economic growth and cover specialized topics such as labor markets, housing, consumer spending and credit, output and income, mortgage activity, demographics, central bank behavior, and prices. We also provide real-time monitoring of macroeconomic indicators and analysis on timely topics such as monetary policy and sovereign risk. Our clients include multinational corporations, governments at all levels, central banks, financial regulators, retailers, mutual funds, financial institutions, utilities, residential and commercial real estate firms, insurance companies, and professional investors.

Moody's Analytics added the economic forecasting firm Economy.com to its portfolio in 2005. This unit is based in King of Prussia PA, a suburb of Philadelphia, with offices in London, Prague and Sydney. More information is available at www.economy.com.

Moody's Analytics is a subsidiary of Moody's Corporation (NYSE: MCO). Further information is available at www.moodysanalytics.com.

DISCLAIMER: Moody's Analytics, a unit of Moody's Corporation, provides economic analysis, credit risk data and insight, as well as risk management solutions. Research authored by Moody's Analytics does not reflect the opinions of Moody's Investors Service, the credit rating agency. To avoid confusion, please use the full company name "Moody's Analytics", when citing views from Moody's Analytics.

## About Moody's Corporation

Moody's Analytics is a subsidiary of Moody's Corporation (NYSE: MCO). MCO reported revenue of $5.5 billion in 2022, employs approximately 14,000 people worldwide and maintains a presence in more than 40 countries. Further information about Moody's Analytics is available at www.moodysanalytics.com.

App.178

© 2023 Moody's Corporation, Moody's Investors Service, Inc., Moody's Analytics, Inc. and/or their licensors and affiliates (collectively, "MOODY'S"). All rights reserved.

CREDIT RATINGS ISSUED BY MOODY'S CREDIT RATINGS AFFILIATES ARE THEIR CURRENT OPINIONS OF THE RELATIVE FUTURE CREDIT RISK OF ENTITIES, CREDIT COMMITMENTS, OR DEBT OR DEBT-LIKE SECURITIES, AND MATERIALS, PRODUCTS, SERVICES AND INFORMATION PUBLISHED BY MOODY'S (COLLECTIVELY, "PUBLICATIONS") MAY INCLUDE SUCH CURRENT OPINIONS. MOODY'S DEFINES CREDIT RISK AS THE RISK THAT AN ENTITY MAY NOT MEET ITS CONTRACTUAL FINANCIAL OBLIGATIONS AS THEY COME DUE AND ANY ESTIMATED FINANCIAL LOSS IN THE EVENT OF DEFAULT OR IMPAIRMENT. SEE APPLICABLE MOODY'S RATING SYMBOLS AND DEFINITIONS PUBLICATION FOR INFORMATION ON THE TYPES OF CONTRACTUAL FINANCIAL OBLIGATIONS ADDRESSED BY MOODY'S CREDIT RATINGS. CREDIT RATINGS DO NOT ADDRESS ANY OTHER RISK, INCLUDING BUT NOT LIMITED TO: LIQUIDITY RISK, MARKET VALUE RISK, OR PRICE VOLATILITY. CREDIT RATINGS, NON-CREDIT ASSESSMENTS ("ASSESSMENTS"), AND OTHER OPINIONS INCLUDED IN MOODY'S PUBLICATIONS ARE NOT STATEMENTS OF CURRENT OR HISTORICAL FACT. MOODY'S PUBLICATIONS MAY ALSO INCLUDE QUANTITATIVE MODEL-BASED ESTIMATES OF CREDIT RISK AND RELATED OPINIONS OR COMMENTARY PUBLISHED BY MOODY'S ANALYTICS, INC. AND/OR ITS AFFILIATES. MOODY'S CREDIT RATINGS, ASSESSMENTS, OTHER OPINIONS AND PUBLICATIONS DO NOT CONSTITUTE OR PROVIDE INVESTMENT OR FINANCIAL ADVICE, AND MOODY'S CREDIT RATINGS, ASSESSMENTS, OTHER OPINIONS AND PUBLICATIONS ARE NOT AND DO NOT PROVIDE RECOMMENDATIONS TO PURCHASE, SELL, OR HOLD PARTICULAR SECURITIES. MOODY'S CREDIT RATINGS, ASSESSMENTS, OTHER OPINIONS AND PUBLICATIONS DO NOT COMMENT ON THE SUITABILITY OF AN INVESTMENT FOR ANY PARTICULAR INVESTOR. MOODY'S ISSUES ITS CREDIT RATINGS, ASSESSMENTS AND OTHER OPINIONS AND PUBLISHES ITS PUBLICATIONS WITH THE EXPECTATION AND UNDERSTANDING THAT EACH INVESTOR WILL, WITH DUE CARE, MAKE ITS OWN STUDY AND EVALUATION OF EACH SECURITY THAT IS UNDER CONSIDERATION FOR PURCHASE, HOLDING, OR SALE.

MOODY'S CREDIT RATINGS, ASSESSMENTS, OTHER OPINIONS, AND PUBLICATIONS ARE NOT INTENDED FOR USE BY RETAIL INVESTORS AND IT WOULD BE RECKLESS AND INAPPROPRIATE FOR RETAIL INVESTORS TO USE MOODY'S CREDIT RATINGS, ASSESSMENTS, OTHER OPINIONS OR PUBLICATIONS WHEN MAKING AN INVESTMENT DECISION. IF IN DOUBT YOU SHOULD CONTACT YOUR FINANCIAL OR OTHER PROFESSIONAL ADVISER.

ALL INFORMATION CONTAINED HEREIN IS PROTECTED BY LAW, INCLUDING BUT NOT LIMITED TO, COPYRIGHT LAW, AND NONE OF SUCH INFORMATION MAY BE COPIED OR OTHERWISE REPRODUCED, REPACKAGED, FURTHER TRANSMITTED, TRANSFERRED, DISSEMINATED, REDISTRIBUTED OR RESOLD, OR STORED FOR SUBSEQUENT USE FOR ANY SUCH PURPOSE, IN WHOLE OR IN PART, IN ANY FORM OR MANNER OR BY ANY MEANS WHATSOEVER, BY ANY PERSON WITHOUT MOODY'S PRIOR WRITTEN CONSENT.

MOODY'S CREDIT RATINGS, ASSESSMENTS, OTHER OPINIONS AND PUBLICATIONS ARE NOT INTENDED FOR USE BY ANY PERSON AS A BENCHMARK AS THAT TERM IS DEFINED FOR REGULATORY PURPOSES AND MUST NOT BE USED IN ANY WAY THAT COULD RESULT IN THEM BEING CONSIDERED A BENCHMARK.

All information contained herein is obtained by MOODY'S from sources believed by it to be accurate and reliable. Because of the possibility of human or mechanical error as well as other factors, however, all information contained herein is provided "AS IS" without warranty of any kind. MOODY'S adopts all necessary measures so that the information it uses in assigning a credit rating is of sufficient quality and from sources MOODY'S considers to be reliable including, when appropriate, independent third-party sources. However, MOODY'S is not an auditor and cannot in every instance independently verify or validate information received in the credit rating process or in preparing its Publications.

To the extent permitted by law, MOODY'S and its directors, officers, employees, agents, representatives, licensors and suppliers disclaim liability to any person or entity for any indirect, special, consequential, or incidental losses or damages whatsoever arising from or in connection with the information contained herein or the use of or inability to use any such information, even if MOODY'S or any of its directors, officers, employees, agents, representatives, licensors or suppliers is advised in advance of the possibility of such losses or damages, including but not limited to: (a) any loss of present or prospective profits or (b) any loss or damage arising where the relevant financial instrument is not the subject of a particular credit rating assigned by MOODY'S.

To the extent permitted by law, MOODY'S and its directors, officers, employees, agents, representatives, licensors and suppliers disclaim liability for any direct or compensatory losses or damages caused to any person or entity, including but not limited to by any negligence (but excluding fraud, willful misconduct or any other type of liability that, for the avoidance of doubt, by law cannot be excluded) on the part of, or any contingency within or beyond the control of, MOODY'S or any of its directors, officers, employees, agents, representatives, licensors or suppliers, arising from or in connection with the information contained herein or the use of or inability to use any such information.

NO WARRANTY, EXPRESS OR IMPLIED, AS TO THE ACCURACY, TIMELINESS, COMPLETENESS, MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE OF ANY CREDIT RATING, ASSESSMENT, OTHER OPINION OR INFORMATION IS GIVEN OR MADE BY MOODY'S IN ANY FORM OR MANNER WHATSOEVER.

Moody's Investors Service, Inc., a wholly-owned credit rating agency subsidiary of Moody's Corporation ("MCO"), hereby discloses that most issuers of debt securities (including corporate and municipal bonds, debentures, notes and commercial paper) and preferred stock rated by Moody's Investors Service, Inc. have, prior to assignment of any credit rating, agreed to pay to Moody's Investors Service, Inc. for credit ratings opinions and services rendered by it fees ranging from $1,000 to approximately $5,000,000. MCO and Moody's Investors Service also maintain policies and procedures to address the independence of Moody's Investors Service credit ratings and credit rating processes. Information regarding certain affiliations that may exist between directors of MCO and rated entities, and between entities who hold credit ratings from Moody's Investors Service, Inc. and have also publicly reported to the SEC an ownership interest in MCO of more than 5%, is posted annually at www.moodys.com under the heading "Investor Relations — Corporate Governance — Charter Documents Director and Shareholder Affiliation Policy."

Additional terms for Australia only: Any publication into Australia of this document is pursuant to the Australian Financial Services License of MOODY'S affiliate, Moody's Investors Service Pty Limited ABN 61 003 399 657AFSL 336969 and/or Moody's Analytics Australia Pty Ltd ABN 94 105 136 972 AFSL 383569 (as applicable). This document is intended to be provided only to "wholesale clients" within the meaning of section 761G of the Corporations Act 2001. By continuing to access this document from within Australia, you represent to MOODY'S that you are, or are accessing the document as a representative of, a "wholesale client" and that neither you nor the entity you represent will directly or indirectly disseminate this document or its contents to "retail clients" within the meaning of section 761G of the Corporations Act 2001. MOODY'S credit rating is an opinion as to the creditworthiness of a debt obligation of the issuer, not on the equity securities of the issuer or any form of security that is available to retail investors.

Additional terms for Japan only: Moody's Japan K.K. ("MJKK") is a wholly-owned credit rating agency subsidiary of Moody's Group Japan G.K., which is wholly-owned by Moody's Overseas Holdings Inc., a wholly-owned subsidiary of MCO. Moody's SF Japan K.K. ("MSFJ") is a wholly-owned credit rating agency subsidiary of MJKK. MSFJ is not a Nationally Recognized Statistical Rating Organization ("NRSRO"). Therefore, credit ratings assigned by MSFJ are Non-NRSRO Credit Ratings. Non-NRSRO Credit Ratings are assigned by an entity that is not a NRSRO and, consequently, the rated obligation will not qualify for certain types of treatment under U.S. laws. MJKK and MSFJ are credit rating agencies registered with the Japan Financial Services Agency and their registration numbers are FSA Commissioner (Ratings) No. 2 and 3 respectively.

MJKK or MSFJ (as applicable) hereby disclose that most issuers of debt securities (including corporate and municipal bonds, debentures, notes and commercial paper) and preferred stock rated by MJKK or MSFJ (as applicable) have, prior to assignment of any credit rating, agreed to pay to MJKK or MSFJ (as applicable) for credit ratings opinions and services rendered by it fees ranging from JPY100,000 to approximately JPY550,000,000.

MJKK and MSFJ also maintain policies and procedures to address Japanese regulatory requirements.

App.179

**ADDENDA**

# Addendum G

# Appraiser Qualifications and License



# Hayden D. Littlefield

*Senior Director*

t   469-467-2073
m 713-725-0365
hayden.littlefield@nmrk.com

**YEARS OF EXPERIENCE**
## 30+

**AREAS OF SPECIALTY**

Industrial

Office

Multifamily

Complex Mixed-Use Assets

Retail

Farm and Ranch

Marinas

Subdivisions/Land

Appraisal Review Services

Hayden D. Littlefield joined Newmark Valuation & Advisory in 2017 and currently serves as a Senior Director in Dallas, Texas. In this role, Hayden is responsible for performing appraisals on a variety of commercial and special use properties, business development, third party appraisal review services; providing valuation and consulting services for the acquisition, disposition, and financing of investment grade real estate. Additionally, Hayden oversees a team of appraisers within the North Texas and West Texas regions served by Newmark.

Hayden's experience extends over numerous property types including; Apartments (proposed, investment grade, garden style), Industrial (warehouse, flex, self storage, manufacturing/distribution facilities), Professional and Medical Office (high rise, garden style, mid-rise), Retail (strip, neighborhood, big box, lifestyle, regional mall, single tenant), Land (raw, finished lots), and Special Purpose/Use (marinas, shipyards, mining facilities, farms and ranches).

Since beginning his career in valuation in 1989, Hayden has worked with clients on a wide variety of property types and has provided valuation analyses on historic tax credits and tax increment financing (TIF) arrangements. Hayden also has significant experience in litigation assignments, including the preparation of appraisals and providing expert witness testimony.

He began his career in real estate in 1984 when he obtained his Texas real estate salesman license.  He began his appraisal career in 1989 with Rhodes Appraisal Service. In 1994 he became a senior appraiser for Aaron & Wright in Houston. From 2002 through 2017 Hayden served as Vice President with CBRE Valuation Services.

Over his career, Hayden has acted as a real estate broker or appraiser on a wide variety of properties throughout Arizona, Alabama, Arkansas, California, Colorado, Ohio, District of Columbia, Georgia, Florida, Indiana, Illinois, Texas, Maine, Maryland, Michigan, Missouri, Mississippi, Nebraska, Nevada, Washington, Oregon, North Carolina, North Carolina, South Carolina, Tennessee, South Dakota, North Dakota, Kansas, Kentucky, Louisiana, Oklahoma, Pennsylvania, Nevada, New Mexico, New York, Utah, Virginia, and Wisconsin.

**Professional Affiliations**
– Candidate for Designation, Appraisal Institute

**Licenses and Designations**
– Certified general real estate appraiser, states of Texas, Oklahoma and Louisiana

**Education**
Hayden earned a Bachelor of Business Administration degree in Marketing from The University of Texas.

App.181

HAYDEN DEE LITTLEFIELD
4904 COMANCHE DRIVE
GRANBURY, TX 76049



# Certified General Real Estate Appraiser

TEXAS APPRAISER LICENSING & CERTIFICATION BOARD

Appraiser:  **Hayden Dee Littlefield**

License #:  **TX 1324546 G**          License Expires: **12/31/2024**

Having provided satisfactory evidence of the qualifications required by the Texas Appraiser Licensing and Certification Act, Occupations Code, Chapter 1103, authorization is granted to use this title: Certified General Real Estate Appraiser

For additional information or to file a complaint please contact TALCB at www.talcb.texas.gov.

**Chelsea Buchholtz**
**Commissioner**

App.182



# David O. Thibodeaux

MAI

*Senior Managing Director*
*Co-Market Leader – TX, LA*

t  512-676-5538
m 512-619-0341
david.thibodeaux@ngkf.com

**YEARS OF EXPERIENCE**

25+

**AREAS OF SPECIALTY**

Industrial

Office

Retail

Condominium Sellout

Complex Mixed-Use Assets

Property Tax Appeals

Expert Witness Testimony

Appraisal Review Services

David Thibodeaux MAI, is an accomplished commercial real estate professional and manager with over 25 years of experience. David joined Newmark Valuation & Advisory in 2017 as Senior Managing Director of Valuation & Advisory Services for the South Central Region. The region includes Texas and Louisiana.

David has performed consulting, review and appraisal services on most significant commercial real estate transactions and development projects in the Texas. Additionally, he has provided expert witness testimony in US Bankruptcy Court, US District Court, various County District Courts and in various County Property Tax Appraisal disputes. His experience ranges across property lines and has acted to establish his reputation as a prominent player in the South Central Region.

From 1997 to 2017 David worked at CBRE, Inc. During his time at CBRE David served as Director of the Financial Consulting Group (FCG), Managing Director of Valuation and Advisory Services (VAS) and First Vice President in charge of The Investment Properties Team.

Prior to his career at CBRE, David spent three years with National Facilities Corporation as an Acquisition Analyst and served in positions as a commercial real estate analyst with Lee Burns and Company and The Harris County Appraisal District.

### Licenses and Designations

– MAI designation, Appraisal Institute

– Certified general real estate appraiser, states of Texas and Louisiana

– Licensed Real Estate Agent, state of Texas

### Education

David earned a Bachelor of Business Administration degree with a concentration in Finance and Accounting from Lamar University.

App.183

DAVID ODEUS THIBODEAUX
2708 SOUTH 5TH STREET
UNIT A
AUSTIN, TX 78704



# Certified General
# Real Estate Appraiser

Appraiser: **David Odeus Thibodeaux**

License #: **TX 1328395 G**          License Expires: **01/31/2025**

Having provided satisfactory evidence of the qualifications required
by the Texas Appraiser Licensing and Certification Act, Occupations
Code, Chapter 1103, authorization is granted to use this title:
Certified General Real Estate Appraiser

**Chelsea Buchholtz**
**Commissioner**

For additional information or to file a complaint please contact TALCB
at www.talcb.texas.gov.

App.184



Johnson CAD Web Map

County Road 501

N FM 157

N FM 157

126.0026.00161

126.0857.00030

5/3/2024, 9:18:51 AM

R000020419

Parcels

Abstracts

1:1,128

0        0.01      0.01              0.03 mi

0        0.01      0.03              0.05 km

Esri Community Maps Contributors, Baylor University, Texas Parks & Wildlife,
© OpenStreetMap, Microsoft, CONANP, Esri, TomTom, Garmin, SafeGraph,

Johnson Central Appraisal District, BIS Consulting www.bisconsulting.com

App.185

Disclaimer: This product is for informational purposes only and has not been prepared for or be suitable for legal, engineering, or surveying purposes. It does not represent an on-the-ground survey and represents only the approximate relative location of boundaries.

## Promissory Note

**Date:** September 11, 2019.

**Borrower:** WALL009, LLC, a Texas limited liability company.

**Borrower's Mailing Address:** WALL009, LLC, 1755 Wittington Place, Suite 340, Dallas Texas 75234, attention Tim Barton.

**Lender:** Southern Star Capital, LLC d/b/a Reliance Mortgage Company

**Place for Payment:**

5220 Spring Valley Road, Suite 602
Dallas, Texas 75254.
or any other place that Lender may designate in writing.

**Principal Amount:** Nine Hundred Thousand Dollars, ($900,000.00).

**Annual Interest Rate:** Twelve Percent (12.0%)

**Maturity Date:** September 1, 2020.

**Annual Interest Rate on Matured, Unpaid Amounts:** Eighteen Percent (18%) or the highest lawful rate, whichever is less.

**Terms of Payment (principal and interest):**

The Principal Amount and all accrued and unpaid interest is due and payable on September 1, 2020, and the interest is due and payable monthly as it accrues.

The monthly interest payments are Nine Thousand and 00/100 dollars ($9,000.00) and are due and payable on the first day of each month with the first payment due on October 1, 2019.

**Late Charge:**

If any installment becomes overdue for more than ten days, at Lender's option a late payment charge equal to five percent (5%) of the amount of the late payment may be charged in order to defray the expense of handling the delinquent payment.

**Security for Payment:** This note is secured by a deed of trust and security agreement (the "deed of trust") dated September 11, 2019, WALL009, LLC, a Texas limited liability company to Robert W. Buchholz, trustee on the following described real property.

The property described in the attached Exhibit "A" which is which is incorporated herein by reference.

App.186

**Other Security for Payment:**
None.

**Promise to Pay**
Borrower promises to pay to the order of Lender the Principal Amount plus interest at the Annual Interest Rate. This note is payable at the Place for Payment and according to the Terms of Payment. All unpaid amounts are due by the Maturity Date. If any amount is not paid either when due under the Terms of Payment or on acceleration of maturity, Borrower promises to pay any unpaid amounts plus interest from the date the payment was due to the date of payment at the Annual Interest Rate on Matured, Unpaid Amounts.

**Waivers**
Borrower waives, to the extent permitted by law, all (1) demand for payment, (2) presentation for payment, (3) notice of intention to accelerate maturity, (4) notice of acceleration of maturity, (5) protest, (6) notice of protest, (7) rights under sections 51.003, 51.004 and 51.005 of the Texas Property Code, (8) rights under section 17.001 and chapter 43 of the Texas Civil Practice and Remedies Code and rule 31 of the Texas Rules of Civil Procedure.

**Attorney's Fees**
Borrower also promises to pay reasonable attorney's fees and court and other costs if an attorney is retained to collect or enforce the note. These expenses will bear interest from the date of advance at the Annual Interest Rate on Matured, Unpaid Amounts. Borrower will pay Lender these expenses and interest on demand at the Place for Payment. These expenses and interest will become part of the debt evidenced by the note and will be secured by any security for payment.

**Prepayment:** Borrower may prepay this note in any amount at any time before the Maturity Date without penalty or premium.

**Application of Prepayment:** Prepayments will be applied to installments on the last maturing principal, and interest on that prepaid principal will immediately cease to accrue.

**Usury Savings**
It is the intention of the parties hereto to act in strict compliance with "Applicable Law" (hereafter defined). Accordingly, it is agreed that notwithstanding any provision to the contrary in this note, "deed of trust" (defined above), or any other instrument securing or evidencing the indebtedness evidenced by this note, or in any other arrangements or agreements, no such provision shall ever be construed to create a contract to pay, as consideration for use, forbearance or detention of money, "interest," as that term may be defined by Applicable Law, at a rate in excess of the maximum lawful rate of nonusurious interest permitted by Applicable Law. If any excess of interest in such respect is provided for, or shall be adjudicated to be so provided for, in this note, the deed of trust, or in any other instrument securing or evidencing the indebtedness evidenced by this note, then in such event (a) the provisions of this paragraph shall govern and control; (b) neither Borrower nor its successors or assigns or any other party liable for the payment of the indebtedness shall be obligated to pay the amount of such interest to the extent that it is in excess of the maximum lawful amount of nonusurious interest permitted by Applicable Law, and the same shall be construed as a mutual mistake of the parties hereto, and of any legal holder of this note,

**Promissory Note**                                            '                              **Page - 2**

App.187

and (c) such excess of interest over the maximum lawful rate of nonusurious interest permitted by Applicable Law shall either be applied as credit against the then unpaid principal amount of the indebtedness owed under this note or refunded to Borrower. Any commitment, extension, brokerage, loan or other fees or sums paid pursuant to this note, the loan evidenced hereby, or the deed of trust and which under Applicable Law are deemed to constitute interest shall be treated as interest and taken into account in calculating the maximum lawful rate of nonusurious interest permitted by Applicable Law. If the holder of this note shall ever receive anything of value that is characterized as interest under Applicable Law and that would apart from this provision be in excess of the maximum lawful rate of nonusurious interest permitted by Applicable Law, an amount equal to the amount that would have been excessive interest shall, without penalty, be applied to the reduction of the principal amount owing on the indebtedness evidenced by this note in the inverse order of its maturity and not to the payment of interest, or refunded to Borrower or the other payor thereof if and to the extent such amount, which would have been excessive, exceeds such unpaid principal. The right to accelerate maturity of this note, or any other indebtedness, does not include the right to accelerate any interest that has not otherwise accrued on the date of such acceleration, and the holder hereof does not intend to charge or receive any unearned interest in the event of acceleration. All interest paid or agreed to be paid to the holder hereof shall, to the extent permitted by Applicable Law, be amortized, prorated, allocated, and spread throughout the full stated term (including any renewal or extension) of such indebtedness so that the amount of interest on account of such indebtedness does not exceed the maximum lawful amount of nonusurious interest permitted by Applicable Law. Further, notwithstanding anything to the contrary contained herein, if the indebtedness evidenced by this note or the or the deed of trust is paid in full by Borrower or its successors or assigns prior to the full stated term of this note (as such term may have been extended pursuant to the terms hereof) and the interest received for the actual period of the existence of the indebtedness evidenced by this note exceeds the maximum lawful rate of nonusurious interest permitted by Applicable Law, then Lender, or its successors or assigns, shall refund to Borrower, or its successors or assigns, the amount of the excess of such interest over the maximum amount of nonusurious interest permitted under Applicable Law, and neither Lender, nor its successors or assigns, shall be subject to any of the penalties, if any, provided by Applicable Law for contracting for, charging, or receiving interest in excess of the maximum lawful rate of nonusurious interest permitted by Applicable Law. To the extent that Title 4 of the Texas Finance Code is relevant for purposes of determining the maximum lawful rate of nonusurious interest permitted by Applicable Law, the parties hereby elect to determine the applicable rate ceiling under such article by using the indicated (weekly) rate ceiling from time to time in effect, subject to Lender's right subsequently to change such method in accordance with Applicable Law.

"Applicable Law" shall mean that law (including, without limitation, Texas law), regulation, or judicial determination in effect from time to time and applicable to this note (including future changes in law), which lawfully permits the contracting for, charging and collection of the highest permissible rate of interest on this note and the loan evidenced hereby, including laws, regulations, and judicial determinations of the State of Texas and of the United States of America.

**Other Clauses**

Each Borrower is responsible for all obligations represented by this note.

Promissory Note                                                    Page - 3

App.188

When the context requires, singular nouns and pronouns include the plural.

A default exists under this note if (1) (a) Borrower or (b) any other person liable on any part of this note or who grants a lien or security interest on property as security for any part of this note (an "Other Obligated Party") fails to timely pay or perform any obligation or covenant in any written agreement between Lender and Borrower or any Other Obligated Party; (2) any representation in this note or in any other written agreement between Lender and Borrower or any Other Obligated Party is materially false when made; (3) a receiver is appointed for Borrower, any Other Obligated Party, or any property on which a lien or security interest is created as security (the "Collateral Security") for any part of this note; (4) any Collateral Security is assigned for the benefit of creditors; (5) a bankruptcy or insolvency proceeding is commenced by Borrower, a partnership of which Borrower is a general partner, or an Other Obligated Party; (6) (a) a bankruptcy or insolvency proceeding is commenced against Borrower, a partnership of which Borrower is a general partner, or an Other Obligated Party and (b) the proceeding continues without dismissal for sixty days, the party against whom the proceeding is commenced admits the material allegations of the petition against it, or an order for relief is entered; (7) any of the following parties is terminated, begins to wind up its affairs, suffers a forfeiture of right to do business, is authorized to terminate or wind up its affairs by its governing body or persons, or any event occurs or condition exists that permits the termination or winding up of the affairs of any of the following parties: Borrower, a partnership of which Borrower is a general partner, or an Other Obligated Party; (8) any Collateral Security is impaired by loss, theft, damage, levy and execution, issuance of an official writ or order of seizure, or destruction, unless it is promptly replaced with collateral security of like kind and quality or restored to its former condition; or (9) any attachment, sequestration or similar writ is levied upon any property of Borrower or Other Obligated Party and is not discharged within a period of thirty days; (10) any final money judgment against Borrower or any Other Obligated Party is not paid within thirty days; (11) Borrower abandons any portion of the property of Borrower; or (12) if Borrower is an individual, the death or disability of Borrower or Other Obligated Party, if Other Obligated Party is an individual.

**BORROWER waives its rights under the Texas Deceptive Trade Practices–Consumer Protection Act, section 17.41 *et seq.* of the Texas Business and Commerce Code, a law that gives consumers special rights and protections. After consultation with an attorney of its own selection, BORROWER voluntarily consents to this waiver.**

If any provision of this note conflicts with any provision of a loan agreement, deed of trust, or security agreement of the same transaction between Lender and Borrower, the provisions of the deed of trust will govern to the extent of the conflict.

Borrower and Lender acknowledge that they were represented by competent counsel in connection with the negotiation, drafting and execution of this Note, deed of trust, and all other documents executed in connection with the same transaction between Lender and Borrower and that this Note, the deed of trust and all other documents executed in connection with the same transaction between Lender and Borrower shall not be subject to the principle of construing their meaning against the party which drafted same.

**BORROWER, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, HEREBY KNOWINGLY, INTENTIONALLY, IRREVOCABLY, UNCONDITIONALLY**

**Promissory Note**                                                          **Page - 4**

AND VOLUNTARILY, WITH AND UPON THE ADVICE OF COMPETENT COUNSEL, WAIVES, RELINQUISHES AND FOREVER FORGOES THE RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING BASED UPON, ARISING OUT OF, OR IN ANY WAY RELATING TO THIS NOTE OR ANY CONDUCT, ACT OR OMISSION OF LENDER OR BORROWER, OR ANY OF THEIR DIRECTORS, OFFICERS, PARTNERS, MEMBERS, EMPLOYEES, AGENTS OR ATTORNEYS, OR ANY OTHER PERSONS AFFILIATED WITH LENDER OR BORROWER, IN EACH OF THE FOREGOING CASES, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE.

Borrower warrants to Lender and agrees that the proceeds of the Note will be used primarily for business or commercial purposes and not primarily for personal, family, or household purposes.

This note will be construed under the laws of the state of Texas, without regard to choice-of-law rules of any jurisdiction.

**WALL009, LLC, a Texas limited liability company.**

**BY:   ITS MANAGERS:**

TRWF LODGE, LLC, a Texas limited liability company.

_____
Tim Barton
Its Managing Member

**and**

CARNEGIE DEVELOPMENT, LLC, a Delaware limited liability company.

_____
Tim Barton
Its Managing Member

App.190

I do hereby certify that this is a true and correct copy of the original
record now on file in the Official Public Records of Johnson County, Texas.
To verify the authenticity of this copy please visit:
https://johnson.tx.publicsearch.us/verifycert/c3LXK3Wt

**Johnson County Clerk**

Digitally signed
by Becky Ivey
Date: 2020.11.03
10:05:51 -06:00

Doc-24729

***** Electronically Recorded Document *****

# Johnson County

## Becky Ivey
### Johnson County Clerk
### Cleburne, TX

---

**Document Number:** 2019-24729

**Recorded As** : **ERX-DEED OF TRUST**

**Recorded On:**          September 12, 2019

**Recorded At:**          02:49:11 pm

**Number of Pages:**      17

**Recording Fee:**        $86.00

**Parties:**

            Direct-

            Indirect-

**Receipt Number:**       175438

**Processed By:**         Linda Bailey

---

### ***THIS PAGE IS PART OF THE INSTRUMENT***

I hereby certify that this instrument was filed on the date and time stamped hereon and was duly
recorded in the Volume and Page of the named records in Johnson County, Texas.

Any provision herein which restricts the sale, rental or use of the described Real Estate because of
color race is invalid and unenforceable under Federal law.

BECKY IVEY, COUNTY CLERK
JOHNSON COUNTY, TEXAS

App.191

I do hereby certify that this is a true and correct copy of the original record now on file in the Official Public Records of Johnson County, Texas. To verify the authenticity of this copy please visit: https://johnson.tx.publicsearch.us/verifycert/c3LXK3Wt

**Johnson County Clerk**



Digitally signed by Becky Ivey
Date: 2020.11.03 10:05:51 -06:00

Doc-24729

Sendera Title

GF# *1903059-VVJA*

**NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OR ALL OF THE FOLLOWING INFORMATION FROM ANY INSTRUMENT THAT TRANSFERS AN INTEREST IN REAL PROPERTY BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.**

### Deed of Trust

### Basic Information

**Date:** September 11, 2019.

**Grantor:** WALL009, LLC, a Texas limited liability company.

**Grantor's Mailing Address:**

1755 Wittington Place, Suite 340
Dallas, Texas 75234
c/o Tim Barton

**Trustee:** Robert W. Buchholz.

**Trustee's Mailing Address:**

420 S. Cesar Chavez Blvd., Suite 300
Dallas, Texas 75201

**Lender:** Southern Star Capital LLC d/b/a Reliance Mortgage Company

**Lender's Mailing Address:**

5220 Spring Valley Road, Suite 602
Dallas, Texas 75254

**Obligation**

Note:
Date: September 11, 2019.
Original principal amount: $900,000.00.
Borrower: WALL009, LLC, a Texas limited liability company.

Lender: Southern Star Capital LLC d/b/a Reliance Mortgage Company
Maturity date: September 1, 2020.
Terms of Payment: As provided in the note.

**Property (including any improvements):**

Deed of Trust Security Agreement                                  Page - 1

App.192

I do hereby certify that this is a true and correct copy of the original record now on file in the Official Public Records of Johnson County, Texas. To verify the authenticity of this copy please visit: https://johnson.tx.publicsearch.us/verifycert/c3LXK3Wt

**Johnson County Clerk**



Digitally signed by Becky Ivey Date: 2020.11.03 10:05:51 -06:00

Doc-24729

The property described in the attached Exhibit "A" which is incorporated herein by reference.

**Exceptions to Conveyance and Warranty:**

None.

**A. Granting Clause**

For value received and to secure payment of the Obligation, Grantor conveys the Property to Trustee in trust. Grantor warrants and agrees to defend the title to the Property, subject to the Other Exceptions to Conveyance and Warranty. On payment of the Obligation and all other amounts secured by this deed of trust, this deed of trust will have no further effect, and Lender will release it at Grantor's expense.

**B. Grantor's Obligations**

*B.1.* Grantor agrees to maintain all property and liability insurance coverages with respect to the Property, revenues generated by the Property, and operations on the Property that Lender reasonably requires ("Required Insurance Coverages"), issued by insurers and written on policy forms acceptable to Lender , and as to property loss, that are payable to Lender under policies containing standard mortgage clauses, and deliver evidence of the Required Insurance Coverages in a form acceptable to Lender before execution of this deed of trust and again at least ten days before the expiration of the Required Insurance Coverages.

*B.2* Grantor agrees to-

    a. keep the Property in good repair and condition;

    b. pay all taxes and assessments on the Property before delinquency, not authorize a taxing entity to transfer its tax lien on the Property to anyone other than Lender, and not request a deferral of the collection of taxes pursuant to section 33.06 of the Texas Tax Code;

    c. defend title to the Property subject to the Other Exceptions to Conveyance and Warranty and preserve the lien's priority as it is established in this deed of trust;

    d. obey all laws, ordinances, and restrictive covenants applicable to the Property;

    e. keep any buildings occupied as required by the Required Insurance Coverages;

    f. if the lien of this deed of trust is not a first lien, pay or cause to be paid all prior lien notes and abide by or cause to be abided by all prior lien instruments;

    g. notify Lender of any change of address; and

**C. Lender's Rights**

*C.1.* Lender or Lender's mortgage servicer may appoint in writing one or more substitute trustees,

**Deed of Trust Security Agreement**                                                  Page - 2

App.193

I do hereby certify that this is a true and correct copy of the original record now on file in the Official Public Records of Johnson County, Texas.
To verify the authenticity of this copy please visit:
https://johnson.tx.publicsearch.us/verifycert/c3LXK3Wt

**Johnson County Clerk**

Digitally signed by Becky Ivey
Date: 2020.11.03
10:05:51 -06:00

Doc-24729

succeeding to all rights and responsibilities of Trustee.

*C.2.* If the proceeds of the Obligation are used to pay any debt secured by prior liens, Lender is subrogated to all the rights and liens of the holders of any debt so paid.

*C.3.* Lender may apply any proceeds received under the property insurance policies covering the Property either to reduce the Obligation or to repair or replace damaged or destroyed improvements covered by the policy. If the Property is Grantor's primary residence and Lender reasonably determines that repairs to the improvements are economically feasible, Lender will make the property insurance proceeds available to Grantor for repairs.

*C.4.* Notwithstanding the terms of the Note to the contrary, and unless applicable law prohibits, all payments received by Lender from Grantor with respect to the Obligation or this deed of trust may, at Lender's discretion, be applied first to amounts payable under this deed of trust and then to amounts due and payable to Lender with respect to the Obligation, to be applied to late charges, principal, or interest in the order Lender in its discretion determines.

*C.5.* If Grantor fails to perform any of Grantor's obligations, Lender may perform those obligations and be reimbursed by Grantor on demand for any amounts so paid, including attorney's fees, plus interest on those amounts from the dates of payment at the rate stated in the Note for matured, unpaid amounts. The amount to be reimbursed will be secured by this deed of trust.

### *C.6.* COLLATERAL PROTECTION INSURANCE NOTICE

**In accordance with the provisions of Section 307.052(a) of the Texas Finance Code, the Beneficiary hereby notifies the Grantor as follows:**

**(A) the Grantor is required to:**

**(i) keep the collateral insured against damage in the amount the Lender specifies;**

**(ii) purchase the insurance from an insurer that is authorized to do business in the state of Texas or an eligible surplus lines insurer; and**

**(iii) name the Lender as the persons to be paid under the policy in the event of a loss;**

**(B) the Grantor must, if required by the Lender, deliver to the Lender a copy of the policy and proof of the payment of premiums; and**

**(C) if the Grantor fails to meet any requirement listed in Paragraph (A) or (B), the Lender may obtain collateral protection insurance on behalf of the Grantor at the Grantor's expense.**

*C.7.* If a default exists in payment of the Obligation or performance of Grantor obligations and the default continues after any required notice of the default and the time allowed to cure, Lender may-

**Deed of Trust Security Agreement**                                                    Page - 3

App.194

I do hereby certify that this is a true and correct copy of the original record now on file in the Official Public Records of Johnson County, Texas. To verify the authenticity of this copy please visit: https://johnson.tx.publicsearch.us/verifycert/c3LXK3Wt

**Johnson County Clerk**



Digitally signed by Becky Ivey
Date: 2020.11.03
10:05:51 -06:00

Doc-24729

a. declare the unpaid principal balance and earned interest on the Obligation immediately due;

b. exercise Lender's rights with respect to rent under the Texas Property Code as then in effect;

c. direct Trustee to foreclose this lien, in which case Lender or Lender's agent will cause notice of the foreclosure sale to be given as provided by the Texas Property Code as then in effect; and

d. purchase the Property at any foreclosure sale by offering the highest bid and then have the bid credited on the Obligation.

C.8. If Grantor fails to pay any part of principal or interest secured by a prior lien or liens on the Property when it becomes payable or defaults on any prior lien instrument, the entire debt secured by this deed of trust will immediately become payable at the option of Lender.

C.9. Any act or occurrence that would constitute default under the terms of any lien superior to the lien securing the Note will constitute a default under this Deed of Trust securing the Note.

C.10. Lender may remedy any default without waiving it and may waive any default without waiving any prior or subsequent default.

**D. Trustee's Rights and Duties**
If directed by Lender to foreclose this lien, Trustee will-

D.1. either personally or by agent give notice of the foreclosure sale as required by the Texas Property Code as then in effect;

D.2. sell and convey all or part of the Property "AS IS" to the highest bidder for cash with a general warranty binding Grantor, subject to the Prior Liens and to the Other Exceptions to Conveyance and Warranty and without representation or warranty, express or implied, by Trustee;

D.3. from the proceeds of the sale, pay, in this order-

a. expenses of foreclosure, including a reasonable commission to Trustee;
b. to Lender, the full amount of principal, interest, attorney's fees, and other charges due and unpaid;
c. any amounts required by law to be paid before payment to Grantor; and
d. to Grantor, any balance; and

D.4. be indemnified, held harmless, and defended by Lender against all costs, expenses, and liabilities incurred by Trustee for acting in the execution or enforcement of the trust created by this deed of trust, which includes all court and other costs, including attorney's fees, incurred by Trustee in defense of any action or proceeding taken against Trustee in that capacity.

App.195

I do hereby certify that this is a true and correct copy of the original record now on file in the Official Public Records of Johnson County, Texas. To verify the authenticity of this copy please visit: https://johnson.tx.publicsearch.us/verifycert/c3LXK3Wt

Johnson County Clerk

Digitally signed by Becky Ivey
Date: 2020.11.03 10:05:51 -06:00

Doc-24729

## E. General Provisions

E.1. If any of the Property is sold under this deed of trust, Grantor must immediately surrender possession to the purchaser. If Grantor does not, Grantor will be a tenant at sufferance of the purchaser, subject to an action for forcible detainer.

E.2. Recitals in any trustee's deed conveying the Property will be presumed to be true.

E.3. Proceeding under this deed of trust, filing suit for foreclosure, or pursuing any other remedy will not constitute an election of remedies.

E.4. This lien will remain superior to liens later created even if the time of payment of all or part of the Obligation is extended or part of the Property is released.

E.5. If any portion of the Obligation cannot be lawfully secured by this deed of trust, payments will be applied first to discharge that portion.

E.6. Grantor assigns to Lender all amounts payable to or received by Grantor from condemnation of all or part of the Property, from private sale in lieu of condemnation, and from damages caused by public works or construction on or near the Property. After deducting any expenses incurred, including attorney's fees and court and other costs, Lender will either release any remaining amounts to Grantor or apply such amounts to reduce the Obligation. Lender will not be liable for failure to collect or to exercise diligence in collecting any such amounts. Grantor will immediately give Lender notice of any actual or threatened proceedings for condemnation of all or part of the Property.

E.7. Grantor collaterally assigns to Lender all present and future rent from the Property and its proceeds. Grantor warrants the validity and enforceability of the assignment. Grantor will apply all rent to payment of the Obligation and performance of this deed of trust, but if the rent exceeds the amount due with respect to the Obligation and the deed of trust, Grantor may retain the excess. If a default exists in payment of the Obligation or performance of this deed of trust, Lender may exercise Lender's rights with respect to rent under the Texas Property Code as then in effect. Lender neither has nor assumes any obligations as lessor or landlord with respect to any occupant of the Property. Lender may exercise Lender's rights and remedies under this paragraph without taking possession of the Property. Lender will apply all rent collected under this paragraph as required by the Texas Property Code as then in effect. Lender is not required to act under this paragraph, and acting under this paragraph does not waive any of Lender's other rights or remedies.

E.8. Interest on the debt secured by this deed of trust will not exceed the maximum amount of nonusurious interest that may be contracted for, taken, reserved, charged, or received under law. Any interest in excess of that maximum amount will be credited on the principal of the debt or, if that has been paid, refunded. On any acceleration or required or permitted prepayment, any such excess will be canceled automatically as of the acceleration or prepayment or, if already paid, credited on the principal of the debt or, if the principal of the debt has been paid, refunded.

E.9. In no event may this deed of trust secure payment of any debt that may not lawfully be secured by a lien on real estate or create a lien otherwise prohibited by law.

**Deed of Trust Security Agreement**                                    Page - 5

App.196

I do hereby certify that this is a true and correct copy of the original
record now on file in the Official Public Records of Johnson County, Texas.
To verify the authenticity of this copy please visit:
https://johnson.tx.publicsearch.us/verifycert/c3LXK3Wt

**Johnson County Clerk**

Digitally signed
by Becky Ivey
Date: 2020.11.03
10:05:51 -06:00

Doc-24729

*E.10.* When the context requires, singular nouns and pronouns include the plural.

*E.11.* The term *Note* includes all extensions, modifications, and renewals of the Note and all amounts secured by this deed of trust.

*E.12.* Grantor warrants that the extension of credit evidenced by the Note secured hereby is solely for business or commercial purposes, other than agricultural purposes. The Grantor further warrants that the credit transaction evidenced by the Note is specifically exempted under Regulation Z issued by the Board of Governors of the Federal Reserve System and Title I of the Consumer Credit Protection Act and that no disclosures are required to be given under such regulations and federal laws in connection with the above transaction. Grantor does not claim any part of the Property as residential or business homestead. Grantor acknowledges that Lenders rely on the truth of representations in this paragraph in making the Note secured by this deed of trust.

*E.13.* Grantor will furnish to Lender or other holder of the Note annually, before January 31st of each year, copies of tax receipts showing that all taxes on the Property have been paid. Failure to comply with the foregoing for any reason whatsoever shall constitute a default.

If Grantor fails to pay all taxes on the Property prior to January 31st of each year for the tax period covering the preceding calendar year for any reason whatsoever, including, but not limited to, protests of value, processing of tax account split-out requests, or failure of the tax authorities to certify the tax roll or account, at the option of Lender, Grantor shall immediately deposit with Lender, a sum equal to taxes, assessments and charges against the Property in the amount as estimated by Lender.

All such funds shall bear no interest whatsoever, may be mingled with the general funds of Lender and shall be applied by Lender toward the payment of taxes and assessments; provided, however, that, if a Default shall have occurred hereunder, such funds may at Lender's option be applied to the payment of the Obligation in the order determined by Lender in its sole discretion, and that Lender may at any time, in its sole discretion, apply all or any part of such funds toward the payment of any such taxes, assessments, charges, legal fees, penalties or premiums which are past due, together with any penalties or late charges with respect thereto.

Lender shall have the right to rely upon tax information furnished by applicable taxing authorities in the payment of such taxes and assessments and Lender shall have no obligation to make any protest of any such taxes or assessments. Any excess over the amounts required for such purposes shall be held by Lender for future use, applied to the Obligation or refunded to Grantor, at Lender's option, and any deficiency in such funds so deposited shall be made up by Grantor upon demand by Lender.

The conveyance or transfer of Grantor's interest in the Property for any reason (including, without limitation, the foreclosure of a lien or security interest or a transfer by operation of law) shall constitute an assignment or transfer of Grantor's interest in and rights to such funds held by Lender under this subparagraph but subject to the rights of Lender hereunder.

**Deed of Trust Security Agreement**                                    Page - 6

App.197

I do hereby certify that this is a true and correct copy of the original record now on file in the Official Public Records of Johnson County, Texas. To verify the authenticity of this copy please visit: https://johnson.tx.publicsearch.us/verifycert/c3LXK3Wt

**Johnson County Clerk**

Digitally signed by Becky Ivey Date: 2020.11.03 10:05:51 -06:00

Doc-24729

Grantor will annually furnish to Lender or other holder of the Note evidence of current paid-up Required Insurance Coverage naming Lender or other holder of the Note as an insured.

**E.14. GRANTOR MAY FURNISH ANY INSURANCE REQUIRED BY THIS DEED OF TRUST EITHER THROUGH EXISTING POLICIES OWNED OR CONTROLLED BY GRANTOR OR THROUGH EQUIVALENT COVERAGE FROM ANY INSURANCE COMPANY AUTHORIZED TO TRANSACT BUSINESS IN TEXAS.**

*E.15.* If all or any part of the Property is sold, transferred, or conveyed without the prior written consent of Lender or other holder of the Note, Lender or other holder of the Note may, at its sole option, declare the outstanding principal balance of the Note plus accrued interest immediately due and payable. Lender or other holder of the Note has no obligation to consent to any such sale or conveyance of the Property, and Lender or other holder of the Note is entitled to condition any consent on a change in the interest rate that will thereafter apply to the Note and any other change in the terms of the Note or Deed of Trust that Lender or other holder of the Note in its sole discretion deems appropriate. A lease for a period longer than one year, a lease with an option to purchase, or a contract for deed will be deemed to be a sale, transfer, or conveyance of the Property for purposes of this provision. The creation of a subordinate lien without the consent of Lender or other holder of the Note will be construed as a sale or conveyance of the Property, but any subsequent sale under a subordinate lien to which Lender or other holder of the Note has consented will not be construed as a sale or conveyance of the Property.

*E.16.* Grantor agrees not to grant any lien or security interest in the Property or to permit any junior encumbrance to be recorded or any claim to otherwise become an encumbrance against the Property. If an involuntary encumbrance is filed against the Property, Grantor agrees, within thirty days, to either remove the involuntary encumbrance or provide a bond acceptable to Lender against the involuntary encumbrance.

*E.17.* This deed of trust binds, benefits, and may be enforced by the successors in interest of all parties.

*E.18.* If Grantor and Borrower are not the same person, the term *Grantor* includes Borrower.

*E.19.* Grantor and each surety, endorser, and guarantor of the Obligation waive, to the extent permitted by law, all (a) demand for payment, (b) presentation for payment, (c) notice of intention to accelerate maturity, (d) notice of acceleration of maturity, (e) protest, (f) notice of protest and (g) rights under sections 51.003, 51.004, and 51.005 of the Texas Property Code.

*E.20.* Grantor will have full recourse liability for repayment of the principal and interest of the Note and the performance of all covenants and agreements of Grantor in this Deed of Trust.

*E.21.* Grantor agrees to pay reasonable attorney's fees, trustee's fees, and court and other costs of enforcing Lender's rights under this deed of trust if an attorney is retained for its enforcement.

*E.22.* Grantor agrees to execute, acknowledge, and deliver to Lender any document requested by Lender, at Lender's request from time to time, to

**Deed of Trust Security Agreement**                                          Page - 7

App.198

I do hereby certify that this is a true and correct copy of the original record now on file in the Official Public Records of Johnson County, Texas. To verify the authenticity of this copy please visit: https://johnson.tx.publicsearch.us/verifycert/c3LXK3Wt

Johnson County Clerk

Digitally signed by Becky Ivey Date: 2020.11.03 10:05:51 -06:00

Doc-24729

(a) correct any defect, error, omission, or ambiguity in this deed of trust or in any other document executed in connection with the Note or this deed of trust;

(b) comply with Grantor's obligations under this deed of trust and other documents;

(c) subject to and perfect the liens and security interests of this deed of trust and other documents any property intended to be covered thereby; and

(d) protect, perfect, or preserve the liens and the security interests of this deed of trust and other documents against third persons or make any recordings, file any notices, or obtain any consents requested by Lender in connection therewith. Grantor agrees to pay all costs of the foregoing.

E.23. Lender, as a matter of right and without regard to the sufficiency of the security for repayment of the Note and performance and discharge of the Obligations, without notice to Grantor and without any showing of insolvency, fraud, or mismanagement on the part of Grantor, and without the necessity of filing any judicial or other proceeding other than the proceeding for appointment of a receiver, shall be entitled to the appointment of a receiver or receivers of the Property or any part thereof, and of the Rents, and Grantor hereby irrevocably consents to the appointment of a receiver or receivers. Any receiver appointed pursuant to the provisions of this subsection shall have the usual powers and duties of receivers in such matters.

E.24 Grantor shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances on or in the Property. Grantor shall not do, nor allow anyone else to do, anything affecting the Property that is in violation of any Environmental Law. The first sentence of this Section shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to the repair and maintenance of the Property.

Grantor shall promptly give Lender written notice of any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Grantor has actual knowledge. If Grantor learns, or is notified by any governmental or regulatory authority, that any removal or other remediation of Hazardous Substance affecting the Property is necessary, Grantor shall promptly take all necessary remedial actions in accordance with Environmental Law.

As used in this paragraph, "Hazardous Substances" are those substances defined as toxic or hazardous substances by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials. As used in this paragraph, "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection.

E.25. If any provision of this deed of trust is determined to be invalid or unenforceable, the validity or enforceability of any other provision will not be affected.

E.26. The term Lender includes any mortgage servicer for Lender.

E.27. Grantor hereby grants Lenders a right of first refusal with respect to Grantor's power to authorize any third party (other than Lenders pursuant to its rights as set forth in this instrument)

**Deed of Trust Security Agreement**                                        Page - 8

App.199

I do hereby certify that this is a true and correct copy of the original record now on file in the Official Public Records of Johnson County, Texas. To verify the authenticity of this copy please visit: https://johnson.tx.publicsearch.us/verifycert/c3LXK3Wt

**Johnson County Clerk**

Digitally signed by Becky Ivey Date: 2020.11.03 10:05:51 -06:00

Doc-24729

to pay ad valorem taxes on the Property and authorize a taxing entity to transfer its tax lien on the Property to that third party. Grantor's authorization to any third party (other than Lenders) to pay the ad valorem taxes and receive transfer of a taxing entity's lien for ad valorem taxes shall be null and void and of no force and effect unless Lenders, within ten days after receiving written notice from Grantor, fail to pay the ad valorem taxes pursuant to Lenders' rights as set forth in this instrument.

*E.28.* Grantor warrants that the execution of this deed of trust shall not impair or affect any other security, which may be given to secure the payment of the Obligation secured hereby, and all such additional security shall be considered as cumulative. The taking of additional security, execution of releases and partial releases of the security (regardless of consideration for the release or partial release) or any extension of time of payment of the Obligation secured hereby shall not diminish the force, effect, or lien of this deed of trust and shall not affect or impair the liability of any maker, surety, or endorser for the payment of said Obligation.

*E.29.* In the event of any conflict between the provisions of this Deed of Trust and the Note, guaranty (if any) and any of the other documents executed in connection with this transaction, it is the intent of the parties hereto that the provisions of this Deed of Trust shall control. The parties hereto acknowledge that they were represented by competent counsel in connection with the negotiation, drafting and execution of the Deed of Trust, the Note, guaranty (if any) and any of the other documents executed in connection with this transaction and that such Deed of Trust, Note, guaranty (if any) and all of the other documents executed in connection with this transaction shall not be subject to the principle of construing their meaning against the party which drafted same.

*E.30.* **GRANTOR AFTER CONSULTATION WITH AN ATTORNEY OF ITS OWN SELECTION (WHICH COUNSEL WAS NOT DIRECTLY OR INDIRECTLY IDENTIFIED, SUGGESTED, OR SELECTED BY THE OTHER PARTY), VOLUNTARILY WAIVES A TRIAL BY JURY OF ANY ISSUE ARISING IN AN ACTION OR PROCEEDING BETWEEN THE PARTIES OR THEIR SUCCESSORS, UNDER OR CONNECTED WITH THIS CONTRACT OR ITS PROVISIONS. GRANTOR AND LENDER ACKNOWLEDGE TO EACH OTHER THAT GRANTOR AND LENDER ARE NOT IN SIGNIFICANTLY DISPARATE BARGAINING POSITIONS.**

*E.31* Additional Definitions used in this paragraph:

"Constituent Party": any (a) shareholder, member, general partner or managing member of Grantor, as applicable, or (b) any signatory to this Deed of Trust that signs on Grantor's behalf that is a corporation, general partnership, limited partnership, limited liability company, joint venture, trust, or other type of business organization, or (c) any Guarantor.

"Loan Documents": The Note, this Deed of Trust, the Guaranty, and any and all other documents now or hereafter executed by Grantor, Guarantor, or any other person or party in connection with the loan evidenced by the Note or in connection with the payment of the Obligation or the performance and discharge of the Obligations.

**GRANTOR SHALL INDEMNIFY, DEFEND, PROTECT AND HOLD HARMLESS**

**Deed of Trust Security Agreement**                                          Page - 9

App.200

I do hereby certify that this is a true and correct copy of the original record now on file in the Official Public Records of Johnson County, Texas. To verify the authenticity of this copy please visit: https://johnson.tx.publicsearch.us/verifycert/c3LXK3Wt

**Johnson County Clerk**



Digitally signed by Becky Ivey
Date: 2020.11.03
10:05:51 -06:00

Doc-24729

LENDER AND TRUSTEE, THEIR RESPECTIVE PARENTS, SUBSIDIARIES, DIRECTORS, OFFICERS, EMPLOYEES, REPRESENTATIVES, AGENTS, MEMBERS, SUCCESSORS, AND ASSIGNS FROM AND AGAINST ANY AND ALL LIABILITY, DAMAGE, LOSS, COST, OR EXPENSE (INCLUDING, WITHOUT LIMITATION, ATTORNEYS' FEES AND EXPENSES), ACTION, PROCEEDING, CLAIM OR DISPUTE INCURRED OR SUFFERED BY THE FOREGOING PARTIES SO INDEMNIFIED WHETHER OR NOT AS THE RESULT OF THE NEGLIGENCE OF ANY PARTY SO INDEMNIFIED, WHETHER VOLUNTARILY OR INVOLUNTARILY INCURRED OR SUFFERED, IN RESPECT OF THE FOLLOWING:

(i) ANY LITIGATION CONCERNING THIS DEED OF TRUST, THE OTHER LOAN DOCUMENTS OR THE PROPERTY, OR ANY INTEREST OF GRANTOR OR LENDER THEREIN, OR THE RIGHT OF OCCUPANCY THEREOF BY GRANTOR OR LENDER, WHETHER OR NOT ANY SUCH LITIGATION IS PROSECUTED TO A FINAL, NON-APPEALABLE JUDGMENT;

(ii) ANY DISPUTE, INCLUDING DISPUTES AS TO THE DISBURSEMENT OF PROCEEDS OF THE NOTE NOT YET DISBURSED, AMONG OR BETWEEN ANY OF THE CONSTITUENT PARTIES OR OTHER PARTNERS OR VENTURERS OF GRANTOR IF GRANTOR IS A GENERAL OR LIMITED PARTNERSHIP, OR AMONG OR BETWEEN ANY EMPLOYEES, OFFICERS, DIRECTORS, SHAREHOLDERS, MEMBERS OR MANAGERS OF GRANTOR IF GRANTOR IS A CORPORATION OR LIMITED LIABILITY COMPANY, OR AMONG OR BETWEEN ANY MEMBERS, TRUSTEES OR OTHER RESPONSIBLE PARTIES IF GRANTOR IS AN ASSOCIATION, TRUST OR OTHER ENTITY;

(iii) ANY ACTION TAKEN OR NOT TAKEN BY LENDER OR TRUSTEE WHICH IS ALLOWED OR PERMITTED UNDER THIS DEED OF TRUST OR ANY OF THE OTHER LOAN DOCUMENTS RELATING TO GRANTOR, THE PROPERTY, ANY CONSTITUENT PARTIES OR OTHERWISE IN CONNECTION WITH THE LOAN DOCUMENTS, INCLUDING WITHOUT LIMITATION, THE PROTECTION OR ENFORCEMENT OF ANY LIEN, SECURITY INTEREST OR OTHER RIGHT, REMEDY OR RECOURSE CREATED OR AFFORDED BY THIS DEED OF TRUST OR THE OTHER LOAN DOCUMENTS;

(iv) ANY ACTION BROUGHT BY LENDER OR TRUSTEE AGAINST GRANTOR UNDER THIS DEED OF TRUST OR THE OTHER LOAN DOCUMENTS, WHETHER OR NOT SUCH ACTION IS PROSECUTED TO A FINAL, NON-APPEALABLE JUDGMENT;

(v) ALL CLAIMS, CAUSES OF ACTION, LEGAL PROCEEDINGS, LIABILITY, OR DISPUTES ARISING OUT OF OR IN ANY WAY RELATED TO THE PROPERTY AND ITS IMPROVEMENTS;

(vi) ALL CLAIMS, CAUSES OF ACTION, LEGAL PROCEEDINGS, LIABILITY,

**Deed of Trust Security Agreement**                                    **Page - 10**

App.201

I do hereby certify that this is a true and correct copy of the original record now on file in the Official Public Records of Johnson County, Texas. To verify the authenticity of this copy please visit: https://johnson.tx.publicsearch.us/verifycert/c3LXK3Wt

Johnson County Clerk

Digitally signed by Becky Ivey Date: 2020.11.03 10:05:51 -06:00

Doc-24729

OR DISPUTES ARISING OUT OF OR IN ANY WAY RELATED TO THE SALE AND PURCHASE OF THE PROPERTY AS WELL AS ANY AGREEMENTS RELATED THERETO AS WELL AS ANY SUBSEQUENT RESALE AND/OR TRANSFER OF THE PROPERTY BY GRANTOR; AND

(vii) ANY AND ALL LOSS, DAMAGE, COSTS, EXPENSE, ACTION, CAUSES OF ACTION, OR LIABILITY (INCLUDING ATTORNEYS' FEES AND COSTS) DIRECTLY OR INDIRECTLY ARISING FROM OR ATTRIBUTABLE TO THE USE, GENERATION, MANUFACTURE, PRODUCTION, STORAGE, RELEASE, THREATENED RELEASE, DISCHARGE, DISPOSAL, OR PRESENCE OF A HAZARDOUS SUBSTANCE ON, IN, UNDER OR ABOUT THE PROPERTY, WHETHER KNOWN OR UNKNOWN AT THE TIME OF THE EXECUTION HEREOF, INCLUDING WITHOUT LIMITATION (A) ALL FORESEEABLE CONSEQUENTIAL DAMAGES OF ANY SUCH USE, GENERATION, MANUFACTURE, PRODUCTION, STORAGE, RELEASE, THREATENED RELEASE, DISCHARGE, DISPOSAL, OR PRESENCE, AND (B) THE COSTS OF ANY REQUIRED OR NECESSARY ENVIRONMENTAL INVESTIGATION OR MONITORING, ANY REPAIR, CLEANUP, 13 OR DETOXIFICATION OF THE PROPERTY, AND THE PREPARATION AND IMPLEMENTATION OF ANY CLOSURE, REMEDIAL, OR OTHER REQUIRED PLANS.

LENDER AND/OR TRUSTEE MAY EMPLOY AN ATTORNEY OR ATTORNEYS TO PROTEST OR ENFORCE ITS RIGHTS, REMEDIES AND RECOURSES UNDER THIS DEED OF TRUST AND THE OTHER LOAN DOCUMENTS, AND TO ADVISE AND DEFEND LENDER AND/OR TRUSTEE WITH RESPECT TO ANY SUCH ACTIONS AND OTHER MATTERS. GRANTOR SHALL REIMBURSE LENDER AND/OR TRUSTEE FOR THEIR RESPECTIVE ATTORNEYS' FEES AND EXPENSES (INCLUDING EXPENSES AND COSTS FOR EXPERTS) IMMEDIATELY UPON RECEIPT OF A WRITTEN DEMAND THEREFOR, WHETHER ON A MONTHLY OR OTHER TIME INTERVAL, AND WHETHER OR NOT AN ACTION IS ACTUALLY COMMENCED OR CONCLUDED. ALL OTHER REIMBURSEMENT AND INDEMNITY OBLIGATIONS HEREUNDER SHALL BECOME DUE AND PAYABLE WHEN ACTUALLY INCURRED BY LENDER AND/OR TRUSTEE. ANY PAYMENTS NOT MADE WITHIN FIVE (5) DAYS AFTER WRITTEN DEMAND THEREFOR SHALL BEAR INTEREST AT THE ANNUAL INTEREST RATE ON MATURED, UNPAID AMOUNTS FROM THE DATE OF SUCH DEMAND UNTIL FULLY PAID. THE PROVISIONS OF THIS SECTION E.31 SHALL SURVIVE REPAYMENT OF THE NOTE AND PERFORMANCE OF THE OBLIGATIONS, THE RELEASE OF THE LIEN OF THIS DEED OF TRUST, ANY FORECLOSURE (OR ACTION IN LIEU OF FORECLOSURE), THE TRANSFER BY GRANTOR OF ANY OR ALL OF ITS RIGHT, TITLE AND INTEREST IN OR TO THE PROPERTY AND THE EXERCISE BY LENDER OF ANY AND ALL REMEDIES SET FORTH HEREIN OR IN THE LOAN DOCUMENTS.

E.32. GRANTOR WAIVES ITS RIGHTS UNDER THE TEXAS DECEPTIVE TRADE PRACTICES–CONSUMER PROTECTION ACT, SECTION 17.41 ET SEQ. OF THE TEXAS BUSINESS AND COMMERCE CODE, A LAW THAT GIVES CONSUMERS

**Deed of Trust Security Agreement**                                          **Page - 11**

App.202

Case 3:22-cv-02118-X   Document 499   Filed 05/24/24   Page 206 of 397   PageID 17652

I do hereby certify that this is a true and correct copy of the original
record now on file in the Official Public Records of Johnson County, Texas.
To verify the authenticity of this copy please visit:
https://johnson.tx.publicsearch.us/verifycert/c3LXK3Wt

**Johnson County Clerk**

Digitally signed
by Becky Ivey
Date: 2020.11.03
10:05:51 -06:00

Doc-24729

SPECIAL RIGHTS AND PROTECTIONS. AFTER CONSULTATION WITH AN ATTORNEY OF ITS OWN SELECTION, GRANTOR VOLUNTARILY CONSENTS TO THIS WAIVER.

### NOTICE

THE WRITTEN LOAN AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.

THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

NOTICE OF INDEMNIFICATION: GRANTOR HEREBY ACKNOWLEDGES AND AGREES THAT THIS DEED OF TRUST CONTAINS CERTAIN INDEMNIFICATION PROVISIONS (INCLUDING, WITHOUT LIMITATION, THOSE CONTAINED IN SECTION E.31 HEREOF) WHICH, IN CERTAIN CIRCUMSTANCES, COULD INCLUDE AN INDEMNIFICATION BY GRANTOR OF LENDER FROM CLAIMS OR LOSSES ARISING AS A RESULT OF LENDER'S OWN NEGLIGENCE.

WALL009, LLC, a Texas limited liability company.

BY:   ITS MANAGERS:

TRWF LODGE, LLC, a Texas limited liability company.

_____
Tim Barton
Its Managing Member

and

CARNEGIE DEVELOPMENT, LLC, a Delaware limited liability company.

_____
Tim Barton
Its Managing Member

**Deed of Trust Security Agreement**                    Page - 12

App.203

I do hereby certify that this is a true and correct copy of the original record now on file in the Official Public Records of Johnson County, Texas. To verify the authenticity of this copy please visit: https://johnson.tx.publicsearch.us/verifycert/c3LXK3Wt

**Johnson County Clerk**

Digitally signed by Becky Ivey
Date: 2020.11.03
10:05:51 -06:00

Doc-24729

STATE OF TEXAS        §
                      §
COUNTY OF DALLAS      §

Before me, the undersigned notary public, on this day personally appeared Tim Barton, known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he executed the same as the Manager and authorized agent for TRWF LODGE, LLC and CARNEGIE DEVELOPMENT, LLC, for the purposes and consideration therein expressed.

Given under my hand and seal of office this __11__ day of September 2019.

_____
Notary Public, State of Texas

Bella D Khusal
My Commission Expires
09/24/2022
ID No. 131734480

**Deed of Trust Security Agreement**                                    **Page - 13**

App.204

I do hereby certify that this is a true and correct copy of the original record now on file in the Official Public Records of Johnson County, Texas. To verify the authenticity of this copy please visit: https://johnson.tx.publicsearch.us/verifycert/c3LXK3Wt

**Johnson County Clerk**

Digitally signed by Becky Ivey Date: 2020.11.03 10:05:51 -06:00

Doc-24729

## EXHIBIT "A"

TRACT I

BEING a 27.262 acre tract of land situated in the John Haigler Survey, Abstract No. 358 and the Absalom Williams Survey, Abstract No. 857, City of Venus, Johnson County, Texas and being a part of that certain called 101.49 acre tract of land described in Special Warranty Deed from Lynco Ventures, LLC to Wall009, LLC and recorded by Document No. 2017-16584 of the Deed Records of Johnson County, Texas, said 27.262 acres of land to be more particularly described by metes and bounds as follows:

BEGINNING at a 1/2" capped iron rod found for corner in the southeast line of said 101.49 acre tract of land, same being the northwest line of County Road 501 (60 foot Right-of-Way) and being at the east corner of Venus Ridge Phase IV Addition, an addition to the City of Venus, Johnson County, Texas, according to the Plat thereof recorded in Volume 11, Page 544 of the Plat Records of Johnson County, Texas;

THENCE North 30° 13' 50" West with the northeast line of said Addition, a distance of 1,128.01 feet to a 1/2' capped iron rod marked "SANDS" set for corner;

THENCE North 59° 46' 10" East across said 101.49 acre tract a distance of 110.00 feet to a 1/2" capped iron rod marked "SANDS" set for corner;

THENCE North 30° 13' 50" West, a distance of 5.00 feet to a 1/2" capped iron rod marked "SANDS" set for corner;

THENCE North 59° 46' 10" East, a distance of 50.00 feet to a 1/2" capped iron rod marked "SANDS" set for corner;

THENCE North 30° 13' 50" West, a distance of 26.19 feet to a 1/2" capped iron rod marked "SANDS" set for corner;

THENCE North 59° 46' 10" East, at a distance of 858.80 feet to a 1/2" capped iron rod marked "SANDS" set for corner in the northeast line of said 101.49 acre tract, same being the northeast line of the above referenced John Haigler Survey and being in the southwest line of the above referenced 126.2407 acre tract, same being the southwest line of the above referenced Absalom Williams Survey;

THENCE South 30° 13' 50" East with said northeast and southwest lines, a distance of 1,181.38 feet to a 1/2" capped iron rod marked "FORT WORTH SURVEYING" set for corner in the northwest line of the above referenced County Road 501 at the east corner of said 101.49 acre tract;

THENCE South 60° 01' 00" West continuing with said County Road and the southeast line of said 101.49 acre tract, a distance of 1,019.04 feet back to the Point of beginning and containing 1,187,549 square feet, or 27.262 acres of land, more or less.

I do hereby certify that this is a true and correct copy of the original record now on file in the Official Public Records of Johnson County, Texas. To verify the authenticity of this copy please visit: https://johnson.tx.publicsearch.us/verifycert/c3LXK3Wt

**Johnson County Clerk**

Digitally signed by Becky Ivey
Date: 2020.11.03 10:05:51 -06:00

Doc-24729

**TRACT II:**

BEING a 36.502 acre tract of land situated in the John Haigler Survey, Abstract No. 358 and the Absalom Williams Survey, Abstract No. 857, City of Venus, Johnson County, Texas and being a part of that certain 101.49 acre tract of land described in Special Warranty Deed from Lynco Ventures, LLC to Wall009, LLC and recorded by Document No. 2017-16584 of the Deed Records of Johnson County, Texas, said 27.262 acres of land to me more particularly described by metes and bounds as follows:

COMMENCING at a 1/2" capped iron rod found for corner in the southeast line of said 101.49 acre tract of land, same being the northwest line of County Road 501 (60 foot Right-of-Way) and being at the east corner of Venus Ridge Phase IV Addition, an addition to the City of Venus, Johnson County, Texas, according to the plat thereof recorded in Volume 11, Page 544 of the Plat Records of Johnson County, Texas;

THENCE North 30° 13' 50" West with the northeast line of said Venus Ridge, Phase IV and southwest line of said 101.19 acre tract, a distance of 1,128.01 feet to a 1/2" capped iron rod set for corner at the Point of Beginning;

THENCE continuing with said northeast and southwest lines the following:

North 30° 13' 50" West, a distance of 1,063.25 feet to a 1/2" capped iron rod found for corner;

North 00° 26' 19" West, a distance of 112.41 feet to a 1/2" capped iron rod found for corner;

South 89° 33' 41" West, a distance of 33.74 feet to a 1/2" capped iron rod found for corner at the beginning of a curve to the left;

THENCE continuing with said northeast and southwest lines in a Southwesterly direction with said curve to the left having a radius of 270.00 feet, a chord that bears South 74° 39' 55" West, a distance of 138.81 feet for an arc length of 140.39 feet to a 1/2" capped iron rod found for corner;

THENCE North 30° 13' 50" West, a distance of 242.77 feet to a 1/2" capped iron rod found for corner;

THENCE South 89° 33' 41" West, a distance of 183.97 feet to a 1/2" capped iron rod found for corner in the northwest line of said 101.49 acre tract, the northwest line of said Haigler Survey, same being the southeast line of that certain called 144.38 acre tract of land described in Deed from Wayne Hood and Eleanor Hood and recorded in Volume 2616, Page 156 of said Deed Records, same being the southeast line of the B.B.B. & C. R.R Survey, Abstract No. 92;

THENCE North 59° 45' 40" East with said southeast and northwest lines a distance of 1,286.03 feet to a capped iron rod found for corner at the north corner of said 101.49 acre tract of land, same being the north corner of said Haigler Survey, the east corner of said B.B.B. & C. R.R. Survey, and bing in the southwest line of that certain called 62.7 acre

I do hereby certify that this is a true and correct copy of the original record now on file in the Official Public Records of Johnson County, Texas. To verify the authenticity of this copy please visit: https://johnson.tx.publicsearch.us/verifycert/c3LXK3Wt

**Johnson County Clerk**

Digitally signed by Becky Ivey
Date: 2020.11.03
10:05:51 -06:00

Doc-24729

tract of land described in Deed to Fielder Farm Partnership, et al and recorded in Volume 4302, Page 538 of said Deed Records, same being the southwest line of the Absolam Williams Survey, Abstract No. 857;

THENCE South 30° 13' 50" East with the northeast line of said 101.49 acre tract, same being the northeast line of said Haigler Survey and the southwest line of said 62.7 acre tract, same being the southwest line of said Williams Survey, at a distance of 11,219.39 feet passing a 1/2" capped iron rod found for corner at the south corner of said 62.7 acre tract, same being the west corner of that certain called 128.8645 acre tract of land described in Deed from Anastasia Energy, LLC to DJD Land Partners, LLC and recorded in County Clerk's File No. 2018-18134 of said Deed Records and continuing a total distance of 1,516.42 feet 1/2" capped iron rod found for corner;

THENCE across said 101.49 acre tract the following:

South 59° 46' 10" West, a distance of 858.80 feet to a 1/2" capped iron rod set for corner;

South 30° 13' 50" East, a distance of 26.19 feet to a 1/2" capped iron rod set for corner;

South 59° 46' 10" West, a distance of 50.00 feet to a 1/2" capped iron rod set for corner;

South 30° 13' 50" East, a distance of 5.00 feet to a 1/2" capped iron rod set for corner;

THENCE South 59° 46' 10" West, a distance of 110.00 feet back to the Point of Beginning and containing 1,590,029 square feet or 36.502 acres of land, more or less.

App.207

**Southern Star Capital LLC d/b/a/ Reliance Mortgage Company**
**5220 Spring Valley Road, Suite 602**
**Dallas, TX 75254**
**(214) 346-5204**

| | | |
|---|---|---|
| **Date Prepared:** | **4/29/2024** | |
| | | |
| **Borrower Name:** | **Wall 009, LLC** | |
| **Property Address:** | | |
| **Note Date:** | **9/11/2019** | |

| | 5/1/2024 | Principal Balance | Interest Rate | # days | $810,000.00 |
|---|---|---|---|---|---|
| **Total Principal Balance** | | | | | |
| Plus: | | **Principal Balance** | **Interest Rate** | **# days** | |
| Accrued Interest 2/1/22 to 3/29/22 | | $900,000.00 | 12.00% | 57 | $16,865.75 |
| Principal Reduction 3/29/22 | | -$90,000.00 | | | |
| Balance 3/29/22 | | **$810,000.00** | | | |
| Accrued Interest (3/29/22 to 05/01/2024) | | $810,000.00 | 12.00% | 794 | $211,443.29 |
| | | | | | |
| **Total Accrued Interest Due** | | | | | **$228,309.04** |
| Late Fees (5% monthly payment - $8,100 *5% = | | $405.00 | | 25 | $10,125.00 |
| | | | | | |
| **Other Costs:** | | | | | |
| Appraisal Fee | | | | | $4,000.00 |
| Legal Fees (thru 3/31/24) | | | | | $18,839.30 |

| | |
|---|---|
| **Total Principal, Accrued Interest, Late Fees and Other Costs - <span style="color:red">Good Through May 1, 2024</span>** | **$1,071,273.34** |

<span style="color:red">**Daily Interest Per Diem**</span>        <span style="color:red">**$266.30  per day**</span>

**For additional information on this matter please contact:**
**Southern Star Capital, LLC**
**Attn:  Al J. Keller**
**email:  Al@rmcdfw.com**
**Phone: (214) 346 - 5204**

App.208

**NEWMARK VALUATION & ADVISORY**

# Vacant Land

1209 County Road 501
Venus, Johnson County, TX 76084

Newmark Job No.: 23-0195609-1

### Appraisal Report Prepared For:

Al J. Keller
Southern Star Capital LLC
5220 Spring Valley Road
Dallas, TX   75254

### Prepared By:

**Newmark Valuation & Advisory**
2601 Olive Street, Suite 1600
Dallas, TX 75201



App.209

**NEWMARK VALUATION & ADVISORY**

November 28, 2023

Al J. Keller
Southern Star Capital LLC
5220 Spring Valley Road
Dallas, TX   75254

RE:   Appraisal Of Vacant Land Located at 1209 County Road 501, Venus, Johnson County,
       TX 76084, Prepared By Newmark Valuation & Advisory, LLC (herein "Firm" or
       "Newmark")

Newmark Job No.:  23-0195609-1

Dear Mr. Keller:

The "Subject Property" is a 63.760 acre tract of vacant land.  The subject is physically located
along the northern line of County Road 501 in Venus, Johnson County, Texas.  The site is zoned
R-1 Single Family Residential by the City of Venus, has an irregular shape, with slightly rolling
terrain. The subject site is adjacent to a single family "ranchette" style subdivision known as
"Northstar".   The Subject has access to water connections through Mountain Peak Water and
sewer connections through the City of Venus. The subject is not located within a Flood Hazard
Zone. The subject has good access and visibility along County Road 501. Currently, the property
is used for crop production.

Based on the analysis contained in the following report, the opinion of value for the subject is:

| Value Conclusions | | | |
|---|---|---|---|
| **Appraisal Premise** | **Interest Appraised** | **Date of Value** | **Value Conclusion** |
| Market Value "As Is" | Fee Simple | 11/7/2023 | $1,210,000 |

*Compiled by Newmark*



Newmark Valuation & Advisory
2601 Olive Street, Suite 1600
Dallas, TX 75201
www.nmrk.com/valuation

App.210

**November 28, 2023**
**AL J. KELLER**

---

**Extraordinary Assumptions**

An extraordinary assumption is defined in USPAP as an assignment-specific assumption as of the effective date regarding uncertain information used in an analysis which, if found to be false, could alter the appraiser's opinions or conclusions. The value conclusions are subject to the following extraordinary assumptions that may affect the assignment results.

1.     Although requested, a survey was not provided. The size of the property is based on the tax card provided by the Johnson County Appraisal District as well as a legal description provided by the client. Should this

The use of this extraordinary assumption might have affected assignment results.

**Hypothetical Conditions**

A hypothetical condition is defined in USPAP as a condition, directly related to a specific assignment, which is contrary to what is known by the appraiser to exist on the effective date of the assignment results, but is used for the purpose of analysis. The value conclusions are based on the following hypothetical conditions that may affect the assignment results.

1.     None

The appraisal was developed based on, and this report has been prepared in conformance with the Client's appraisal requirements, the guidelines and recommendations set forth in the Uniform Standards of Professional Appraisal Practice (USPAP), the requirements of the Code of Professional Ethics and Standards of Professional Appraisal Practice of the Appraisal Institute, Title XI of the Financial Institution Reform, Recovery and Enforcement Act (FIRREA) of 1989, and the Interagency Appraisal and Evaluation Guidelines (December 2, 2010).



# Certification

We certify that, to the best of our knowledge and belief:

1.  The statements of fact contained in this report are true and correct.

2.  The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and are our personal, impartial and unbiased professional analyses, opinions, and conclusions.

3.  We have no present or prospective interest in the property that is the subject of this report and no personal interest with respect to the parties involved.

4.  We have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.

5.  Our engagement in this assignment was not contingent upon developing or reporting predetermined results.

6.  Our compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

7.  This appraisal assignment was not based upon a requested minimum valuation, a specific valuation, or the approval of a loan.

8.  Our analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice, as well as the requirements of the State of Texas.

9.  The reported analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Code of Professional Ethics and Standards of Professional Appraisal Practice of the Appraisal Institute.

10.  The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.

11.  As of the date of this report, Hayden Littlefield Jr has completed the Standards and Ethics Education Requirements for Candidates of the Appraisal Institute.

12.  Hayden Littlefield Jr made a personal inspection of the property that is the subject of this report.

13.  No one provided significant real property appraisal assistance to the person(s) signing this certification.

14.  The Firm operates as an independent economic entity.  Although employees of other service lines or affiliates of the Firm may be contacted as a part of our routine market research investigations, absolute client confidentiality and privacy were maintained at all times with regard to this assignment without conflict of interest.

15.  Within this report, "Newmark", "Newmark Valuation & Advisory", "Newmark, Inc.", and similar forms of reference refer only to the appraiser(s) who have signed this certification and any persons noted above as having provided significant real property appraisal assistance to the persons signing this report.

16.  Hayden Littlefield Jr has not performed any services, as an appraiser or in any other capacity, regarding the property that is the subject of this report within the three-year period immediately preceding the agreement to perform this assignment.



Hayden Littlefield Jr
Senior Director
Certified General Real Estate Appraiser
Texas # 1324546-G
Telephone: 469-467-2073
Email: hayden.littlefield@nmrk.com

# Table of Contents

**Appraisal Transmittal and Certification**
Certification
Table of Contents
Subject Maps
Subject Photographs

**Executive Summary ................................. 10**

**Introduction............................................. 11**

**Economic Analysis ................................. 15**

    National Trends and Uncertainties.......15

    Area Analysis .......................................17

    Neighborhood Analysis ........................24

**Single Family Market Analysis ............... 30**

**Land and Site Analysis............................ 50**

**Zoning and Legal Restrictions ............... 55**

**Real Estate Taxes.................................... 57**

**Highest and Best Use .............................. 60**

**Appraisal Methodology ............................ 62**

**Sales Comparison Approach.................... 63**

**Reconciliation of Value............................ 67**

**Assumptions and Limiting Conditions.. 69**

**Addenda**
A.  Glossary of Terms
B.  Engagement Letter
C.  Property Information
D.  Comparable Data
      Land Sales
E.  Précis Metro Report - Economy.Com, Inc.
F.  Appraiser Qualifications and Licenses





**Aerial Photo**



**Location Map**

**SUBJECT PHOTOGRAPHS**                                                8


Entrance to Subject


Typical View


Typical View


Typical View


Typical View


Typical View

**SUBJECT PHOTOGRAPHS**                                                           **9**


Typical View


Typical View


View of Subject from Street


View of Subject from Street


Street View Along CR 501 Facing East


Street View Along CR 501 Facing West

**NEWMARK**

Vacant Land
App.217

# Executive Summary

| Vacant Land | |
| --- | --- |
| Property Type: | Land-Agriculture |
| Street Address: | 1209 County Road 501 |
| City, State & Zip: | Venus, Johnson County, TX 76084 |
| Land Area: | 63.760 acres; 2,777,386 SF |
| Zoning: | R-1 Single Family Residential |
| Highest and Best Use - As Vacant: | Future Single Family Development - Interim Agricultural Use |

| Analysis Details | |
| --- | --- |
| Valuation Date: | |
|   Market Value "As Is" | November 7, 2023 |
| Inspection Date and Date of Photos: | November 7, 2023 |
| Report Date: | November 28, 2023 |
| Report Type: | Appraisal Report |
| Client: | Southern Star Capital LLC |
| Intended Use: | Internal Business Decisions |
| Intended User: | Southern Star Capital LLC |
| Appraisal Premise: | Market Value "As Is" |
| Intended Use and User: | The intended use and user of our report are specifically identified in our report as agreed upon in our contract for services and/or reliance language found in the report. No other use or user of the report is permitted by any other party for any other purpose. Dissemination of this report by any party to non-client, non-intended users does not extend reliance to any other party and Newmark will not be responsible for unauthorized use of the report, its conclusions or contents used partially or in its entirety. |
| Interest Appraised: | Fee Simple |
| Exposure Time (Marketing Period) Estimate: | 12 Months (12 Months) |

*Compiled by Newmark*

| Valuation Summary | |
| --- | --- |
| Land Value | $1,210,000 |

| Market Value Conclusions | Market Value "As Is" | | | $18,977 | $1,210,000 |
| --- | --- | --- | --- | --- | --- |
| Exposure / Marketing Time | Min | Max | Average | | |
| Comparable Sales | 1 | 18 | 12.0 | | |
| Market Participants | 1 | 18 | 12.0 | | |

*Compiled by Newmark*

## Extraordinary Assumptions and Hypothetical Conditions

An extraordinary assumption is defined in USPAP as an assignment-specific assumption as of the effective date regarding uncertain information used in an analysis which, if found to be false, could alter the appraiser's opinions or conclusions. The value conclusions are subject to the following extraordinary assumptions that may affect the assignment results.

1.    Although requested, a survey was not provided. The size of the property is based on the tax card provided by the Johnson County Appraisal District as well as a legal description provided by the client. Should this

The use of this extraordinary assumption might have affected assignment results.

A hypothetical condition is defined in USPAP as a condition, directly related to a specific assignment, which is contrary to what is known by the appraiser to exist on the effective date of the assignment results, but is used for the purpose of analysis. The value conclusions are based on the following hypothetical conditions that may affect the assignment results.

1.    None

*Compiled by Newmark*



# Introduction

## OWNERSHIP HISTORY

Per the Johnson County Appraisal District Records, the current owner of record is Lynco Ventures, LLC. (controlled by Tim Barton). The previous owner (Wall009, LLC.) reportedly purchased the property as a much larger 101-acre tract on July 10, 2017 for $2,900,000 or $28,713 per acre). The recording number was 2017-16584 and the Grantor at that time was Lynco Ventures, LLC. We did not go any further in our deed history to see who the 101-acre parent tract was purchased from.

The previous owner (Wall009, LLC.) signed a Deed of Trust for $900,000 on September 11, 2019 to Southern Star Capital, LLC. dba Reliance Mortgage Company as the Lender.

The current owner (Lynco Ventures, LLC.) executed a Special Warranty Deed in January 2020 with the Grantor shown as Wall009, LLC. (the previous owner, also controlled by Tim Barton) and the Grantee as Lynco Ventures, LLC. This promissory note was for the 63.76 acres of the subject property and totaled $4,780,090 or $74,970 per acre.

It is apparent from a simple Google Search of "Tim Barton", "Lynco Ventures, LLC." and "Wall009, LLC." that these are related entities. Therefore, the most recent ownership transfer was between related parties and would not be considered an "arms-length" transaction.

The following summarizes a three-year history of ownership, the current listing status, and pending transactions for the subject property (as applicable).

| Ownership History | | |
| --- | --- | --- |
| To the best of our knowledge, no other sale or transfer of ownership has taken place within the three-year period prior to the effective date of the appraisal. | | |
| **Previous Sales** | | |
| Sales in the Previous Three Years: | 1 | |
| Most Recent Reported Sale: | August 17, 2022 | |
|   Buyer: | Lynco Ventures, LLC | |
|   Seller: | Wall009, LLC | |
|   Purchase Price: | $4,780,090 | $74,970 Per SF (Net Rentable Area) |
|   Deed Information: | 2022-29088 | |

*Compiled by Newmark*

Lynco Ventures purchased the property from Wall009, LLC for $4,780,090 in August 2022.

The subject is not currently listed for sale, being actively marketed, nor is it under contract.



To the best of our knowledge, no other sale or transfer of ownership has taken place within a three-year period prior to the effective date of the appraisal.

## INTENDED USE AND USER

The intended use and user of our report are specifically identified in our report as agreed upon in our contract for services and/or reliance language found in the report. No other use or user of the report is permitted by any other party for any other purpose. Dissemination of this report by any party to non-client, non-intended users does not extend reliance to any other party and Newmark will not be responsible for unauthorized use of the report, its conclusions or contents used partially or in its entirety.

- – The intended use of the appraisal is for Internal Business Decisions and no other use is permitted.
- – The client is Southern Star Capital LLC.
- – The intended user is Southern Star Capital LLC and no other user is permitted by any other party for any other purpose.

## DEFINITION OF VALUE

Market value is defined as:

"The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

- – Buyer and seller are typically motivated;
- – Both parties are well informed or well advised, and acting in what they consider their own best interests;
- – A reasonable time is allowed for exposure in the open market;
- – Payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and
- – The price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale."

**NEWMARK**

*(Source: Code of Federal Regulations, Title 12, Chapter I, § 34.42[h]; also Interagency Appraisal and Evaluation Guidelines, Federal Register, 75 FR 77449, December 10, 2010, page 77472)*

## APPRAISAL REPORT

This appraisal is presented in the form of an appraisal report, which is intended to comply with the reporting requirements set forth under Standards Rule 2-2(a) of USPAP. This report incorporates sufficient information regarding the data, reasoning and analysis that were used to develop the opinion of value in accordance with the intended use and user.

## PURPOSE OF THE APPRAISAL & INTEREST APPRAISED

The primary purpose of the appraisal is to develop an opinion of the As Is Market Value of the Fee Simple interest in the property.  (Please see Glossary of Terms for definition(s) of interest(s) appraised)

| Purpose of the Appraisal | | |
|---|---|---|
| **Appraisal Premise** | **Interest Appraised** | **Date of Value** |
| Market Value "As Is" | Fee Simple | 11/7/2023 |

*Compiled by Newmark*

## SCOPE OF WORK

### Extent to Which the Property is Identified

- – Physical characteristics
- – Legal characteristics
- – Economic characteristics

### Extent to Which the Property is Inspected

Newmark inspected the subject property on November 7, 2023 as per the defined scope of work. Hayden Littlefield Jr made a personal inspection of the property that is the subject of this report.

### Type and Extent of the Data Researched

- – Exposure and marketing time;
- – Neighborhood and land use trends;
- – Demographic trends;
- – Market trends relative to the subject property type;
- – Physical characteristics of the site and applicable improvements;
- – Flood zone status;
- – Zoning requirements and compliance;
- – Real estate tax data;
- – Relevant applicable comparable data; and
- – Investment rates

**NEWMARK**

## Type and Extent of Analysis Applied

We analyzed the property and market data gathered through the use of appropriate, relevant, and accepted market-derived methods and procedures. Further, we employed the appropriate and relevant approaches to value, and correlated and reconciled the results into an estimate of market value, as demonstrated within the appraisal report. The applied scope of work is appropriate and sufficient to produce credible assignment results for the intended use of this report.



# Economic Analysis

## NATIONAL TRENDS AND UNCERTAINTIES

Interest rates have continued to rise with the 10-year Treasury now at levels last seen in 2007. This bond rate is foundational to commercial real estate in terms of both debt and equity. The continued increase was at least somewhat unexpected and has changed investor expectations as to future interest rate levels. Commercial real estate transaction volumes are anemic with capitalization rates increasing and prices falling. Although a few positive trends were beginning to emerge over the past few months, the continued interest rate increases and the indication that the Fed plans to maintain the higher rate level are reversing them.

In an effort to curtail inflation, The Federal Reserve embarked on an aggressive strategy. In spite of three major bank failures, the Fed raised rates another 25 basis points in May 2023 followed by 25 basis points more in July 2023. The total increase from 2022 into 2023 is now 525 basis points. The Fed now targets a range of 5.25% to 5.50% for the Federal Funds Rate – the highest since June 2006. This has been the fastest increase in rates the Federal Reserve has engineered over the past few decades. But, the recent rise in interest rates such as the 10 year Treasury can be traced more to other factors such as global turmoil. Although the Fed did not increase the rates in September, they indicated that their key rate would stay higher in 2024 than most analysts had expected. This is creating negativity in the CRE marketplace as investors were anticipating lower rates sooner than now expected.

Transaction markets now show clear increases in transaction cap rates, belatedly following the public markets. These effects are a function of the unfavorable credit conditions and inflation as well as other factors such as impacts to office use driven in part by hybrid work from home policies of many companies. Credit tightening, which includes wider credit spreads and lower loan-to-value ratios, is arising due to uncertain economic outlooks, deterioration in real estate collateral values, and concerns about bank liquidity. According to Real Capital Analytics (RCA), regional and local banks have sharply curtailed lending partly as a result the Signature Bank failure and attendant regulatory attention as well as the expectation of distress that has not yet been witnessed. RCA also reported that commercial transaction volume was down 63% YOY in the second quarter of 2023 over the same period in 2022. The quarterly transaction volume is approximately 35% lower than the average from 2015 to 2019.

It will take time for investors to reach the point of price discovery that will, in turn, allow transaction volume to increase assuming debt availability. Investors are grappling with the reality that capitalization rates will continue to increase into the near term and that the debt market and costs will remain unfavorable. We have considered, and will address, these issues throughout this appraisal and report including in our determinations of overall capitalization rates, discount rates,



market rent assumptions, market conditions adjustments, and growth of rents and expenses where applicable.

## AREA ANALYSIS



**Area Map**

The subject is located within Venus and Johnson County, Texas.  It is part of the Fort Worth-Arlington  metro area (Fort Worth MSA).

Moody's Analytics' Economy.com provides the following economic summary for the Fort Worth MSA as of August, 2023.

| Moody's Analytics Précis® Metro Indicators: Fort Worth MSA | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | INDICATORS | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 |
| 126.7 | 132.0 | 133.7 | 127.5 | 138.4 | 145.7 | Gross metro product (C12$ bil) | 152.3 | 155.5 | 161.4 | 168.5 | 175.7 | 182.7 |
| 4.0 | 4.2 | 1.3 | -4.6 | 8.6 | 5.3 | % change | 4.5 | 2.1 | 3.7 | 4.4 | 4.3 | 4.0 |
| 1,037.0 | 1,066.9 | 1,096.3 | 1,055.9 | 1,097.6 | 1,161.7 | Total employment (ths) | 1,206.3 | 1,223.7 | 1,237.5 | 1,251.1 | 1,264.2 | 1,277.6 |
| 2.5 | 2.9 | 2.8 | -3.7 | 4.0 | 5.8 | % change | 3.8 | 1.4 | 1.1 | 1.1 | 1.0 | 1.1 |
| 3.8 | 3.5 | 3.3 | 7.3 | 5.2 | 3.6 | Unemployment rate (%) | 3.7 | 3.5 | 3.5 | 3.5 | 3.5 | 3.5 |
| 7.4 | 5.9 | 3.0 | 4.9 | 9.2 | 5.5 | Personal income growth (%) | 6.6 | 5.2 | 5.2 | 5.3 | 5.1 | 4.9 |
| 64.2 | 65.9 | 68.4 | 70.5 | 71.4 | 73.0 | Median household income ($ ths) | 75.8 | 78.0 | 80.7 | 83.5 | 86.4 | 89.3 |
| 2,485.5 | 2,527.1 | 2,557.8 | 2,586.2 | 2,618.7 | 2,669.5 | Population (ths) | 2,714.9 | 2,753.3 | 2,789.7 | 2,826.2 | 2,863.2 | 2,900.8 |
| 1.9 | 1.7 | 1.2 | 1.1 | 1.3 | 1.9 | % change | 1.7 | 1.4 | 1.3 | 1.3 | 1.3 | 1.3 |
| 29.4 | 26.4 | 16.4 | 17.7 | 25.0 | 41.1 | Net migration (ths) | 33.0 | 25.4 | 23.7 | 23.9 | 24.8 | 25.7 |
| 8,976 | 10,125 | 9,849 | 12,646 | 13,649 | 12,979 | Single-family permits (#) | 10,428 | 10,809 | 12,428 | 13,255 | 13,080 | 12,773 |
| 5,647 | 6,086 | 9,500 | 5,778 | 7,927 | 8,982 | Multifamily permits (#) | 6,521 | 7,269 | 7,189 | 7,693 | 7,808 | 7,454 |

*Source: Moody's Analytics Précis® US Metro*

Moody's summarizes the area's economic performance in recent months as follows:

## Recent Performance

Job growth in Fort Worth MSAhas strengthened in recent months following a deceleration at the beginning of 2023. Leading the way have been financial services, healthcare and core manufacturing. Year over year, total employment is up twice as much as that of the nation because of strong gains back in the second half of 2022. Additionally, growth in the number of high-wage jobs has been substantially higher than in the nation. The unemployment rate has risen to 3.8%, up nearly 0.5 percentage point over the past year. However, one reason has been the above-average increase in the labor force amid solid job growth during that time. Housing market data have been mixed, with house prices declining but new permits rebounding since the start of 2023.

## Market Comparison

The following table illustrates key economic indicators and a comparison of the Fort Worth MSA to the regional grouping as a whole.  As indicated, Fort Worth is projected to outperform the National Region Metros in six of eight performance categories shown over the next five years.

| Comparison of Key Economic Indicators - Fort Worth MSA Metro to National Region | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Fort Worth MSA | | | Annual Growth | | National | | | Annual Growth | |
| Indicator | 2017 | 2022 | 2027 | 2017 - 2022 | 2022 - 2027 | 2017 | 2022 | 2027 | 2017 - 2022 | 2022 - 2027 |
| Gross metro product (C12$ bil) | 126.7 | 145.7 | 175.7 | 2.8% | 3.8% | 18,077 | 19,965 | 22,356 | 2.0% | 2.3% |
| Total employment (ths) | 1,037.0 | 1,161.7 | 1,264.2 | 2.3% | 1.7% | 146,606 | 152,045 | 157,507 | 0.7% | 0.7% |
| Unemployment rate (%) | 3.8% | 3.6% | 3.5% | | | 4.4% | 3.7% | 4.1% | | |
| Personal income growth (%) | 7.4% | 5.5% | 5.1% | | | 4.6% | 2.3% | 4.6% | | |
| Population (ths) | 2,485.5 | 2,669.5 | 2,863.2 | 1.4% | 1.4% | 325,122 | 332,391 | 339,637 | 0.4% | 0.4% |
| Single-family permits (#) | 8,976 | 12,979 | 13,080 | 7.7% | 0.2% | 848,500 | 1,019,048 | 1,319,656 | 3.7% | 5.3% |
| Multifamily permits (#) | 5,647 | 8,982 | 7,808 | 9.7% | -2.8% | 356,167 | 547,574 | 448,038 | 9.0% | -3.9% |
| Fort Worth MSA outperforming National Region Metros | | | | | | | | | |
| Fort Worth MSA underperforming National Region Metros | | | | | | | | | |

*Source: Moody's Analytics Précis® US Metro; Compiled by Newmark*

**NEWMARK**

Vacant Land

App.226

## Employment Sectors and Trends

Employment data by occupation and business/industry sectors provides an indication of the amount of diversification and stability in the local economy.  Job sector composition also gives an indication of the predominant drivers of current and future demand for supporting commercial real estate sectors. The following tables display employment data by occupation sector and by business/industry sector for the area and region.

| Current Employment by Occupation Sector | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Occupation Sector | 76084 | | Venus town | | Johnson County | | Dallas-Fort Worth-Arlington, TX MSA | | Texas | |
| Administrative Support | 510 | 7.7% | 167 | 6.7% | 8,691 | 9.3% | 454,833 | 10.9% | 1,525,256 | 10.5% |
| Management/Business/Financial | 1,128 | 17.1% | 414 | 16.5% | 13,158 | 14.1% | 856,193 | 20.5% | 2,581,724 | 17.8% |
| Professional | 1,064 | 16.1% | 314 | 12.5% | 15,862 | 17.0% | 1,003,670 | 24.0% | 3,440,230 | 23.7% |
| Sales and Sales Related | 425 | 6.5% | 159 | 6.3% | 6,978 | 7.5% | 376,344 | 9.0% | 1,312,601 | 9.0% |
| Construction/Extraction | 533 | 8.1% | 197 | 7.9% | 5,863 | 6.3% | 232,971 | 5.6% | 926,228 | 6.4% |
| Farming/Fishing/Forestry | 0 | 0.0% | 0 | 0.0% | 194 | 0.2% | 5,109 | 0.1% | 43,799 | 0.3% |
| Installation/Maintenance/Repair | 349 | 5.3% | 138 | 5.5% | 3,330 | 3.6% | 121,090 | 2.9% | 471,102 | 3.2% |
| Production | 244 | 3.7% | 52 | 2.1% | 4,298 | 4.6% | 175,568 | 4.2% | 665,111 | 4.6% |
| Transportation/Material Moving | 1,600 | 24.3% | 736 | 29.3% | 21,951 | 23.6% | 358,305 | 8.6% | 1,203,137 | 8.3% |
| **Total Employees (16+ Occupation Base)** | **6,589** | **100.0%** | **2,509** | **100.0%** | **93,054** | **100.0%** | **4,184,108** | **100.0%** | **14,530,585** | **100.0%** |

*Source: ESRI; Compiled by Newmark*

| Current Employment by Industry Sector | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Industry Sector | 76084 | | Venus town | | Johnson County | | Dallas-Fort Worth-Arlington, TX MSA | | Texas | |
| Agriculture/Mining | 97 | 1.5% | 27 | 1.1% | 1,522 | 1.6% | 30,671 | 0.7% | 299,511 | 2.1% |
| Construction | 641 | 9.7% | 177 | 7.1% | 8,032 | 8.6% | 331,402 | 7.9% | 1,237,074 | 8.5% |
| Manufacturing | 505 | 7.7% | 134 | 5.3% | 10,516 | 11.3% | 378,969 | 9.1% | 1,252,266 | 8.6% |
| Wholesale Trade | 213 | 3.2% | 51 | 2.0% | 1,844 | 2.0% | 91,485 | 2.2% | 290,641 | 2.0% |
| Retail Trade | 666 | 10.1% | 328 | 13.1% | 15,943 | 17.1% | 433,338 | 10.4% | 1,511,297 | 10.4% |
| Transportation/Utilities | 1,071 | 16.3% | 541 | 21.6% | 6,785 | 7.3% | 330,635 | 7.9% | 1,036,874 | 7.1% |
| Information | 130 | 2.0% | 25 | 1.0% | 781 | 0.8% | 89,560 | 2.1% | 241,491 | 1.7% |
| Finance/Insurance/Real Estate | 475 | 7.2% | 182 | 7.3% | 4,593 | 4.9% | 394,491 | 9.4% | 1,026,381 | 7.1% |
| Services | 2,546 | 38.6% | 943 | 37.6% | 38,939 | 41.8% | 1,975,636 | 47.2% | 7,004,709 | 48.2% |
| Public Administration | 245 | 3.7% | 101 | 4.0% | 4,099 | 4.4% | 127,921 | 3.1% | 630,341 | 4.3% |
| **Total Employees (16+ Occupation Base)** | **6,589** | **100.0%** | **2,509** | **100.0%** | **93,054** | **100.0%** | **4,184,108** | **100.0%** | **14,530,585** | **100.0%** |

*Source: ESRI; Compiled by Newmark*

**NEWMARK**

Comparing the industry sectors for the local market area (Venus town) to Dallas-Fort Worth-Arlington, TX MSA indicates the local market area is somewhat more heavily weighted toward the Transportation/Utilities, Retail Trade, Public Administration, and Agriculture/Mining sectors. By contrast, the industry employment totals for Dallas-Fort Worth-Arlington, TX MSA indicate somewhat higher proportions within the Services, Manufacturing, Finance/Insurance/Real Estate, Information, Construction, and Wholesale Trade sectors. The following graphic further illustrates this comparison.



*Source: ESRI; Compiled by Newmark*

**Unemployment**

The following table displays the historical unemployment data for the area derived from the US Department of Commerce, Bureau of Labor Statistics.  The most recent reported unemployment rate for the Dallas-Fort Worth-Arlington, TX Metropolitan Statistical Area is 4.2% (August 2023).



**Unemployment Rate: Dallas-Fort Worth-Arlington, TX Metropolitan Statistical Area**

Bars represent beginning to end range of unemployment rates in each year

Orange bars denote increasing unemployment from beginning to end of year

Blue bars are declining unemployment from beginning to end of year

Arrows are extent of unemployment rates over the year

*Compiled by Newmark*

**NEWMARK**

Vacant Land
App.229

## Major Employers

The following table lists a number of major employers with the Fort Worth MSA as reported by Moody's.  While not all-encompassing, this list provides further indication of the types of economic sectors that are drivers for the area.

| Selected Major Employers: Fort Worth MSA | |
|---|---|
| **Rank  Employer** | **Employees** |
| 1   AMR/American Airlines | 25,000 |
| 2   Lockheed Martin | 13,690 |
| 3   Texas Health Resources | 12,000 |
| 4   NAS - Fort Worth - JRB | 10,000 |
| 5   Arlington ISD | 10,000 |
| 6   University of Texas at Arlington | 7,311 |
| 7   JPS Health Network | 6,500 |
| 8   Cook Children's Health Care System | 6,042 |
| 9   Tarrant County College | 5,999 |
| 10  Alcon Laboratories Inc. | 5,393 |
| 11  Bell Helicopter Textron | 4,953 |
| 12  BNSF Railway | 4,500 |
| 13  General Motors | 4,125 |
| 14  GM Financial | 3,820 |
| 15  Fidelity | 3,700 |
| 16  JPMorgan Chase | 3,678 |

Source: Fort Worth Chamber of Commerce, 2017

*Source: Moody's Analytics Précis® US Metro*

## Analysis

Further economic analysis from Moody's is detailed as follows:

### Manufacturing

New uncertainties surround the near-term outlook for the F-35, which is assembled in Fort Worth. At the beginning of the year, Lockheed had expected to deliver about 150 planes in 2023, close to the full capacity of output. However, problems with the TR-3 software system are causing significant delays because the Defense Department stated in June that it would not accept newly built F-35s until the problems are resolved. A separate IT issue has been that the Pentagon needs to vet the plane's capability in the Joint Simulation Environment, development of which has itself been delayed. The new projection is that only about 100 to 120 planes will be delivered this year. However, Lockheed has indicated that the pace of production will continue unabated and that deliveries will exceed production in 2024. On the positive side, demand fundamentally remains strong. Last year, the Pentagon agreed to buy 375 planes during 2023-2025, and in April 2023 awarded a substantial increase for contract modifications. Lockheed still projects that more than

**NEWMARK**

Vacant Land
App.230

2,000 planes will ultimately be built compared with about 900 delivered to date, supporting manufacturing in the metro division over the coming years.

**Financial Services**

The banking industry will push past current headwinds and continue to advance. Industry employment is up 2.2% since the end of 2022 and 5% year over year. Although the strong trend growth in banking in neighboring Dallas is well known, Fort Worth has matched up. The level of industry employment in each metro division has doubled over the past two decades. Whereas Dallas benefits from its high-profile investment banking and wealth management segments as well as conventional lending, Fort Worth has attracted a large number of small community-oriented banks, including new or growing regional operations of banks based in such states as Pennsylvania, Missouri, Arkansas and Oklahoma, where growth opportunities are fewer. Both metro divisions benefit from strong job and population growth that has boosted demand for credit.

**Homebuilding**

Residential construction has begun to bounce back and should rise slowly over the coming year. New permits for single-family homes declined more than 50% during 2022 but have now risen by about 20% since early 2023. Despite lower house prices, developers have been encouraged by the low inventory of existing homes for sale. Longer term, the Fort Worth housing market should grow at an above-average pace, lifted by higher relative affordability than in Dallas and strong demographics.

### Conclusion

| Positive Attributes | Negative Attributes |
|---|---|
| – Central Southwest location near Latin America supports distribution industry. | – Large military procurement industry is sensitive to political winds. |
| – Relatively high housing affordability attracts homebuyers employed in Dallas. | – Exposure to motor vehicle and energy industries adds to cyclical volatility. |

Fort Worth MSAwill outperform the nation over the coming year, led by manufacturing and financial services. The homebuilding outlook appears bright. Longer term, robust population growth, a diversified manufacturing base, and lower business costs and costs of living relative to Dallas will support above-average gains.

**NEWMARK**

## NEIGHBORHOOD ANALYSIS



**Neighborhood Map**

### Boundaries

The subject is located in the northwestern area of Venus Town. This area is part of the Johnson County submarket as defined by Costar and is generally delineated as follows:

| | |
|---|---|
| North | County Road 506 |
| South | US Highway 67 |
| East | US Highway 287 |
| West | Farm-to-Market Road 2738 |

### Surrounding Area of Influence Trends

#### Description

The subject's surrounding area is viewed as suburban with commercial uses and vacant land. The immediate area around the subject can be described as vacant land.

#### Characteristics

- The subject property is in the proximity of US Highway 67 which provide an easy access to the most parts of Fort Worth MSA.
- The subject property is in the vicinity of Mid-Way Regional Airport.

#### Fundamental Real Estate Cycle

The surrounding area is considered to be within the risk stage of its real estate cycle.

**NEWMARK**

Vacant Land
App.232

**New Development**

- TBD Brookhollow - Xchange at Rail port Building One is a proposed industrial building with a rentable building area of 711,360SF located 1.5 miles to the northeast of the subject. This project is expected to complete construction by May 2024.

- 8636 East Highway 67 is a proposed industrial building with a rentable building area of 300,000 SF located 4.6 miles to the northeast of the subject. This project is expected to complete construction by September 2024.

- 8228 US Highway 67 is a proposed industrial building with a rentable building area of 210,000 SF located 4.8 miles to the southwest of the subject. This project is expected to complete construction by July 2025.

## Conformity

Land uses within the subject neighborhood consist of a mixture of commercial and residential developments.

## Nuisances or Hazards

Our observation of the area revealed no evidence of significant nuisances or hazards.

## Access

### Primary Access and Major Thoroughfares

Major thoroughfares in the area includes County Road 501, US Highway 67, Farm to Market Road 157, County Road 615. US Route 67 is a major U.S. Highway in the state of Texas. It runs from the U.S.–Mexico border west of Presidio to Texarkana at the Arkansas state line. US Route 67 is part of the La Entrada al Pacifico international trade corridor from its southern terminus to US 385 in McCamey. US Highway 67 enters Texas from Mexico as Federal Highway 16 west of Presidio. US Highway 67 is in the vicinity of the subject providing primary access.

### Transportation

Transportation is primarily via automobile. The subject is in the vicinity of County Road 502, US Highway 67, Farm to Market Road 157, County Road 502. The nearby bus stop is a South Park and Ride bus stop. Fort Worth Meacham Int'l Airport provides air services in subject area.



**Distance from Key Locations**

The commute to the Venus city is about five to ten minutes and the drive to Mid-Way Regional Airport is about twenty minutes depending on the traffic.

The following illustrates the 30-minute drive time from the subject.



**Drive Time Map**

### Land Use

The following was developed from Costar data for the major property types in the surrounding 5.0 mile radius around the subject.



*Souce: Costar; Compiled by Newmark*

Within the immediate area of the subject, property uses include the following:

– Within a 5.0-mile radius, Costar recognizes a total of 88 commercial use properties.

– Costar recognizes 51 Industrial, 16 retail, 9 multifamily, 5 flex , 4 office  and 3 specialty properties in this radius. Retail and industrial properties dominate the subject surrounding area in terms of number of properties.

– Within the radius there are currently 6,991,110 square feet of industrial property developments.

## Demographics

A demographic summary for the defined area is illustrated as follows:

| Demographic Analysis | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 3-Miles Radius | 5-Miles Radius | 10-Miles Radius | 76084 | Venus town | Johnson County | Dallas-Fort Worth-Arlington, TX MSA | Texas |
| **Population** | | | | | | | | |
| 2010 Total Population | 6,890 | 15,455 | 85,873 | 8,417 | 3,207 | 150,934 | 6,366,542 | 25,145,561 |
| 2023 Total Population | 10,153 | 20,785 | 129,964 | 13,868 | 5,539 | 192,587 | 8,058,326 | 30,506,523 |
| 2028 Total Population | 17,677 | 38,373 | 170,118 | 23,020 | 12,861 | 206,332 | 8,605,015 | 32,021,944 |
| Projected Annual Growth % | 11.7% | 13.0% | 5.5% | 10.7% | 18.4% | 1.4% | 1.3% | 1.0% |
| **Households** | | | | | | | | |
| 2010 Total Households | 1,854 | 4,407 | 28,403 | 2,384 | 733 | 52,193 | 2,296,410 | 8,922,933 |
| 2023 Total Households | 2,787 | 5,877 | 42,988 | 4,041 | 1,421 | 66,252 | 2,923,482 | 11,047,066 |
| 2028 Total Households | 5,136 | 11,323 | 56,509 | 6,906 | 3,652 | 71,358 | 3,135,223 | 11,696,400 |
| Projected Annual Growth % | 13.0% | 14.0% | 5.6% | 11.3% | 20.8% | 1.5% | 1.4% | 1.1% |
| **Income** | | | | | | | | |
| 2023 Median Household Income | $81,598 | $78,390 | $97,433 | $91,366 | $84,588 | $79,951 | $79,409 | $69,529 |
| 2023 Average Household Income | $96,801 | $96,095 | $121,190 | $111,738 | $99,031 | $99,101 | $115,034 | $102,636 |
| 2023 Per Capita Income | $28,100 | $28,240 | $39,971 | $32,670 | $25,681 | $34,116 | $41,785 | $37,264 |
| **Housing** | | | | | | | | |
| 2023 Owner Occupied Housing Units | 81.5% | 81.9% | 73.9% | 85.9% | 86.1% | 70.4% | 56.0% | 56.9% |
| 2023 Renter Occupied Housing Units | 14.3% | 13.9% | 21.3% | 11.0% | 10.0% | 24.2% | 37.6% | 33.5% |
| 2023 Median Home Value | $211,822 | $195,654 | $305,239 | $247,356 | $221,619 | $244,619 | $311,758 | $255,469 |
| Median Year Structure Built | 2002 | 1999 | 2001 | 2003 | 2003 | 1992 | 1989 | 1988 |
| **Miscellaneous Data Items** | | | | | | | | |
| 2023 Bachelor's Degree | 8.3% | 8.8% | 20.3% | 12.1% | 9.5% | 15.7% | 26.5% | 22.8% |
| 2023 Grad/Professional Degree | 4.2% | 4.6% | 11.0% | 8.3% | 4.4% | 7.3% | 14.0% | 12.1% |
| 2023 College Graduate % | 12.5% | 13.4% | 31.4% | 20.4% | 13.9% | 22.9% | 40.4% | 34.9% |
| 2023 Average Household Size | 3.39 | 3.35 | 2.97 | 3.18 | 3.18 | 2.86 | 2.73 | 2.71 |
| 2023 Median Age | 35.3 | 35.2 | 36.8 | 34.9 | 34.6 | 38.0 | 35.5 | 35.7 |

*Source: ESRI; Compiled by Newmark*

– As shown above, the current population within a 3-mile radius of the subject is 10,153 and the average household size 3.39. Population in the area has grown since the 2010 census, and this trend is projected to grow over the next five years.

– Median household income in 3-mile radius is $81,598, which is higher than the household income of Johnson County. Residents within a 3-mile radius have a lower level of educational attainment than those of Johnson County. Also, the median home values are lower in 3-mile radius.

– Population growth in the surrounding area has been high with income levels increasing. This has a positive effect on industrial real estate demand. This trend is projected to continue into the foreseeable future.

### Demand Generators

The University of Texas at Arlington is a public research university in Arlington, Texas. The university was founded in 1895 and was in the Texas A&M University System for several decades until joining the University of Texas System in 1965. UT Arlington is the third-largest producer of college graduates in Texas and offers over 180 baccalaureate, masters, and doctoral degree programs. Arlington College was established as a private school for primary through secondary level students, equivalent to the modern 1st to 10th grades. At the time, the public school system in the city of Arlington was underfunded and understaffed. The 420-acre main campus is at the southern edge of downtown Arlington, which also includes the largest branch of the public library, City Hall, Theatre Arlington, Levitt Pavilion, Arlington Museum of Art, churches, and numerous types of businesses just south of the Texas and Pacific Railway line, around which the city was established. The company has daytime employment of nearly 7,311. It is located 31 miles (35 minutes) northwest of the subject.

The origins of JPS Health Network go back to October of 1877. Future Fort Worth mayor, John Peter Smith, deeded five acres of land for medical facilities for families in Fort Worth and in Tarrant County. JPS is a teaching facility. It is the site of the nation's largest hospital-based Family Medicine residency program. JPS Health Network operates John Peter Smith Hospital, which is a 573-bed acute care facility in Fort Worth, Texas. John Peter Smith Hospital provides emergency services and Level 1 trauma care. The hospital is the only psychiatric emergency services site in Tarrant County. More than 5,000 babies are born each year at John Peter Smith Hospital. JPS is a certified Chest Pain Center, Certified Primary Stroke Center, and an Accredited American College of Surgery Cancer Center. Joint Commission Disease Specific Certification in Sepsis and Geriatrics. JPS has a Level lll Neonatal Intensive Care Center. The company has daytime employment of nearly 6,500. It is located 30 miles (30 minutes) northwest of the subject.

### Conclusion

Given the history of the area and the growth trends illustrated in the surrounding area analysis, it is anticipated that property values will expand in the near future.

# Single Family Market Analysis

## Classification

The subject is in the Parker County submarket of the Dallas/Ft Worth market.  The subject is a tract of vacant land and will most likely be developed as a mixed use development at some point in the future.  Thus, we have included this single family market analysis.

Metrostudy's September 2023 report on Dallas-Fort Worth-Arlington, TX MSA market data covers all of the new housing activity in Dallas, Denton, Collin, Tarrant, Johnson, Rockwall and Parker counties. Included in this data are single family detached and single family attached homes (townhomes and duplexes). This information is intended to summarize the For-Sale housing market in the Dallas-Fort Worth-Arlington, TX MSA.

## Market Report | September 2023

# Dallas-Fort Worth-Arlington, TX

Dallas' shortfall in existing housing supply has not been as acute as many other metros. Active listings are considerably higher than year-ago levels as of mid-year and days to sell have increased to more than two months. However, overall housing demand has been strong enough to boost new home sales. By the end of 2022, new home sales began to climb and surpass 2021 and 2022 levels. With mortgage rates headed higher, home prices will face additional headwinds. Affordability is at or near record lows so home builders could be seeing thinner margins as they cut prices or buy mortgage rates down. As a result, builder confidence has been souring.

**Strengths**

Dallas remains one of the hottest housing markets in the nation and the hottest in the state. Strong job growth and favorable demographic trends underlie the metro area's dynamism. Texas ranks near the top for U-Haul moves and the number of corporate HQs.

**Weaknesses**

Declining affordability may be shaping new developments as lot sizes are under pressure. Homes on 50-foot to 70-foot lots dominate the landscape but they are also the ones seeing the biggest declines in starts. Lots that are 40-foot to 49-foot increased by 2.1%.

**NEWMARK**

## New Home Pending Sales Index



## Valuation Patterns

























## Top Active Projects

| | MAP KEY | PROJECT NAME | BUILDER | CITY | TYPICAL LOT SIZE (SQ FT) | AVG. PRICE | AVG. SIZE | AVG. $/SQ FT | SALES RATE ↓ |
|---|---|---|---|---|---|---|---|---|---|
| | | Averages | | | | $378,606 | 2,019 | $190 | 19.8 |
| 1 | | Silverado/Tradition | D.R. Horton, Inc. | Aubrey | 5,750 | $392,377 | 2,140 | $190 | 32.7 |
| 2 | | Winchester Crossing/Tradition | D.R. Horton, Inc. | Princeton | 6,050 | $364,997 | 1,924 | $190 | 27.4 |
| 3 | | Magnolia Pointe/Express | D.R. Horton, Inc. | Josephine | 7,200 | $285,190 | 1,638 | $188 | 25.7 |
| 4 | | Trails of Elizabeth Creek/Tradition | D.R. Horton, Inc. | Justin | 5,500 | $413,836 | 2,114 | $198 | 19.9 |
| 5 | | Cypress Creek/Cottage | Lennar | Princeton | 4,800 | $287,856 | 1,448 | $200 | 16.6 |
| 6 | | Edgewood Creek | First Texas Homes | Celina | 5,750 | $570,763 | 2,798 | $212 | 16.5 |
| 7 | | Greenway Trails/Tradition | D.R. Horton, Inc. | Midlothian | 7,800 | $491,448 | 2,381 | $206 | 15.5 |
| 8 | | Liberty Trails/Express | D.R. Horton, Inc. | Justin | 5,500 | $333,172 | 1,930 | $175 | 14.8 |
| 9 | | Willow Springs | Ashton Woods Homes | Haslet | 5,500 | $337,101 | 1,919 | $175 | 14.4 |
| 10 | | Wildcat Ranch/Express | D.R. Horton, Inc. | Crandall | 4,400 | $309,323 | 1,905 | $169 | 14.0 |

## Top 15 Active Builders

| # | BUILDER | # OF PROJECTS | AVG. PRICE | # OF YTD SALES ↓ | MARKET SHARE | AVG. SALES RATE | REMAINING UNITS |
|---|---|---|---|---|---|---|---|
| | Averages/Totals | 536 | $520,137 | 17,372 | 66% | 4.26 | 30,534 |
| 1 | D.R. Horton, Inc. | 53 | $368,518 | 3,819 | 14.7% | 8.01 | 7,269 |
| 2 | Lennar | 67 | $377,628 | 2,203 | 8.5% | 5.74 | 5,422 |
| 3 | Bloomfield Homes | 54 | $514,985 | 1,565 | 6.0% | 3.17 | 3,624 |
| 4 | Highland Homes | 70 | $668,406 | 1,557 | 6.0% | 2.84 | 1,226 |
| 5 | Green Brick Partners, Inc. | 50 | $559,623 | 1,510 | 5.8% | 3.72 | 2,137 |
| 6 | PulteGroup Inc. | 27 | $424,292 | 1,082 | 4.2% | 5.38 | 1,507 |
| 7 | Meritage Homes | 23 | $422,933 | 904 | 3.5% | 6.05 | 1,065 |
| 8 | First Texas Homes | 32 | $645,007 | 854 | 3.3% | 3.01 | 2,067 |
| 9 | Ashton Woods Homes | 17 | $405,422 | 787 | 3.0% | 6.12 | 680 |
| 10 | David Weekley Homes | 35 | $545,946 | 603 | 2.3% | 2.54 | 1,419 |
| 11 | M/I Homes | 18 | $417,244 | 600 | 2.3% | 4.06 | 928 |
| 12 | Perry Homes | 35 | $652,161 | 593 | 2.3% | 2.06 | 822 |
| 13 | LGI Homes | 8 | $385,085 | 435 | 1.7% | 6.96 | 1,255 |
| 14 | Taylor Morrison | 20 | $706,094 | 431 | 1.7% | 2.38 | 645 |
| 15 | American Legend Homes | 27 | $708,713 | 429 | 1.7% | 1.84 | 468 |

**NEWMARK**





**LAND AND SITE ANALYSIS**                                                                                        **43**







# Community

The current population for the Dallas-Fort Worth-Arlington, TX metropolitan area is approximately 8,104,310 people. Population in the area is projected to increase by 1.5% in 2023. There are approximately 3,013,870 households in the region which is up 1.5% year-over-year. Forecasts show that current household formation is expected to increase by an annual growth rate of 5.2% for 2028. Incomes increased by 5% from the previous year to $83,659.

## Community Highlights

| Population | Households |
|---|---|
| 8,104,310 1.5% | 3,013,870 1.5% |

| Median Household Income | Housing Costs as % Income |
|---|---|
| $83,659 5% | 56.2% ↑ |

**Median Household Income**



## Market Health

### Forecast

| | 2022 | YOY CHANGE | 2023E | YOY CHANGE | 2024F | YOY CHANGE | 2025F | YOY CHANGE |
|---|---|---|---|---|---|---|---|---|
| Total Jobs | 4,094,692 | 6.6% | 4,254,248 | 3.9% | 4,287,946 | 0.8% | 4,378,967 | 2.1% |
| Households | 2,969,480 | 2.2% | 3,013,870 | 1.5% | 3,068,310 | 1.8% | 3,118,830 | 1.6% |
| Single-Family Permits | 43,942 | -15.5% | 36,858 | -16.1% | 38,956 | 5.7% | 42,220 | 8.4% |
| Multifamily Permits | 34,249 | 28.2% | 18,481 | -46.0% | 17,807 | -3.6% | 19,464 | 9.3% |
| Units Over/Under Built | -68,923 | – | -139,905 | – | -110,272 | . | -120,951 | . |
| % Over/Under Built | 2.2% Underbuilt | | 4.4% Underbuilt | | 3.4% Underbuilt | = | 3.6% Underbuilt | - |
| Median Household Income | $79,700 | 2.6% | $83,659 | 5.0% | $86,835 | 3.8% | $89,995 | 3.6% |
| Median Existing Det. Price | $376,757 | 15.6% | $373,727 | -0.8% | $357,800 | -4.3% | $352,799 | -1.4% |
| Over/Undervalued | 35.5% Overvalued | – | 37.6% Overvalued | – | 24.3% Overvalued | - | 17.8% Overvalued | - |

## Market Health

### History

| | 2022 | YOY CHANGE | CURRENT MONTH/QUARTER | YOY CHANGE | 10-Year Annual History AVG. | MIN. | MAX. |
|---|---|---|---|---|---|---|---|
| Future Lots | 440,611 | 13.1% | 432,991 | 2.5% | 292,537 | 220,060 | 440,611 |
| Lot Deliveries | 52,908 | 1.8% | 16,216 | 20.2% | 34,139 | 12,112 | 55,889 |
| Vacant Developed Lots | 64,617 | 14.8% | 78,311 | 37.7% | 52,408 | 45,747 | 64,617 |
| VDL Months of Supply | 17.3 | 38.1% | 23.1 | 78.5% | 19.8 | 11.0 | 32.4 |
| Starts | 44,907 | -16.9% | 13,297 | -1.6% | 33,788 | 18,920 | 54,612 |
| Housing Inventory | 31,761 | -3.4% | 29,699 | -20.1% | 20,303 | 10,042 | 37,188 |
| New Home Sales | 25,423 | -20.9% | 3,319 | 22.3% | 28,011 | 21,082 | 37,612 |
| Deed Closings - New | 22,671 | -51.6% | 4,344 | 1.0% | 32,210 | 21,721 | 46,866 |
| Median New Closing Price | $450,238 | 25.1% | $441,149 | -2.2% | $326,355 | $250,667 | $450,238 |
| Affordability Ratio - New | 34.9% | -34.3% | 32.4% | 4.2% | 51.9% | 34.9% | 59.6% |
| Foreclosures | 91 | -22.2% | 20 | 100.0% | 1,646 | 91 | 5,274 |

### Residential Building Permits

Building permits offer foresight into future real estate supply levels. A high volume indicates the construction industry will be active, which forecasts more jobs and, again, an increase in GDP. The housing market is generally seen as one of the first economic sectors to rise or fall when economic conditions improve or degrade, and housing permits and starts can be early indicators of activity in the housing market. New residential housing construction generally leads to other types of economic production. The new-housing market is sensitive to interest rate changes and therefore sensitive to changes in interest rates initiated by the Federal Reserve. Locally, the new-housing market is affected by those same national interest rate fluctuations, but it also may be



influenced by strictly local factors. Investors typically interpret steady growth in building permit numbers as an indication that Americans have confidence in the economy and their own personal financial positions. Likewise, they watch the month-to-month and year-over-year trend for any indication of weakness that might suggest a spending contraction on the part of consumers.





**NEWMARK**

| Date | Number of Dwelling Units | | Average Value per Dwelling Unit | |
| --- | --- | --- | --- | --- |
| | Units | Percent Change | Value ($) | Percent Change |
| | Annual Data | | | |
| 2010 | 437 | -15.1% | $145,100 | 4.5% |
| 2011 | 415 | -5% | $154,300 | 6.3% |
| 2012 | 558 | 34.5% | $168,400 | 9.1% |
| 2013 | 691 | 23.8% | $175,800 | 4.4% |
| 2014 | 775 | 12.2% | $182,400 | 3.8% |
| 2015 | 558 | -28% | $196,300 | 7.6% |
| 2016 | 516 | -7.5% | $208,900 | 6.4% |
| 2017 | 604 | 17.1% | $219,000 | 4.8% |
| 2018 | 683 | 13.1% | $204,400 | -6.7% |
| 2019 | 712 | 4.2% | $205,900 | 0.7% |
| 2020 | 1,365 | 91.7% | $217,700 | 5.7% |
| 2021 | 1,358 | -0.5% | $232,000 | 6.6% |
| 2022 | 1,292 | -4.9% | $248,500 | 7.1% |

Permits in Johnson County have been increasing at a historic rate since 2020, reaching an all time high in 2021.  The Average Value has increased this year as well.
.

**NEWMARK**

# Land and Site Analysis





**Aerial Map**



**Flood Map**

## Land Parcels

| Parcel Summary | Associated APN(s) | Land Area (SF) | Land Area (Acres) |
|---|---|---|---|
| Site 1 | R000009595 | 2,733,390.00 | 62.7500 |
| Site 2 | R000009594 | 43,995.60 | 1.0100 |
| Total Gross Land Area | | 2,777,385.60 | 63.7600 |
| Total Usable Land Area | | 2,777,385.60 | 63.7600 |

*Compiled by Newmark*

## Land Description

| | |
|---|---|
| Total Land Area | 63.7600 Acres; 2,777,386 SF |
| Usable Land Area | 63.7600 Acres; 2,777,386 SF |
| Excess Land Area | None |
| Surplus Land Area | None |
| Source of Land Area | Tax Card |
| **Site Characteristics** | |
| Secondary Street Frontage | County Road 501 |
| Traffic Control at Entry | None |
| Traffic Flow | Moderate |
| Accessibility Rating | Average |
| Visibility Rating | Average |
| Shape | Irregular |
| Corner | No |
| Rail Access | No |
| Topography | Rolling terrain |
| Site Vegetation | Typical |
| Other Site Characteristics | None noted |
| Environmental Issue | None Noted |
| **Flood Zone Analysis** | |
| Flood Area Panel Number | 48183C0235F |
| Date | 9/21/2023 |
| Zone | Zone X |
| Description | Area of minimal flood hazard, usually depicted on Flood Insurance Rate Maps as above the 500-year flood level. |
| Insurance Required? | No |
| **Utilities** | |
| Utility Services | Water, Sewer |
| Utility Service Providers | |
| Water | Mountain Peak Water |
| Sewer | City of Venus |

*Compiled by Newmark*

## EXCESS OR SURPLUS LAND

There is no excess or surplus land area.

## EASEMENTS, ENCROACHMENTS AND RESTRICTIONS

We were not provided a current title report to review. Further, there do not appear to be any easements, encroachments, or restrictions that would adversely affect value. Our valuation assumes no adverse impacts from easements, encroachments, or restrictions, and further assumes that the subject has clear and marketable title.

## ENVIRONMENTAL ISSUES

No environmental issues were observed or reported. Newmark is not qualified to detect the existence of potentially hazardous issues such as soil contaminants, the presence of abandoned underground tanks, or other below-ground sources of potential site contamination. The existence of such substances may affect the value of the property. For this assignment, we have specifically assumed that any hazardous materials that would cause a loss in value do not affect the subject.

## FLOOD PLAIN

All of the subject is located in Zone X per FEMA Map 48251C0230K dated September 21, 2023.

## CONCLUSION

The subject site has an irregular shape and is of rolling terrain topography. The subject has access and visibility along County Road 501 Road. There are no adverse influences preventing the site from being developed to its highest and best use.

**NEWMARK**

# Zoning and Legal Restrictions

| Zoning Summary | |
|---|---|
| **Category** | **Description** |
| Zoning Jurisdiction | City of Venus |
| Zoning Designation | R-1 Single Family Residential |
| Description | Single Family Residential |
| Legally Conforming? | Yes |
| Permitted Uses | Limited primarily to single-family dwellings and certain community and recreational facilities to serve residents of the district. |

*Compiled by Newmark*



| Zoning Map |
|---|





The preceding Future Land Use Map published by the City of Venus shows the subject site will be utilized for single family development.

**Future Land Use Map**

# Real Estate Taxes

| Taxes and Assessments | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Tax Year 2023** | | **Assessor's Market Value** | | | | | **Assessed Value** | | | **Tax Rates** | **Taxes and Assessments** |
| Tax ID | Land | Improvements | Ag Exempt | Total | Assessment Ratio | Land | Improvements | Ag Exempt | Total | Land & Improvements | Ad Valorem Taxes | Total |
| R000009595 | $658,875 | $0 | $647,705 | $11,170 | 100.0% | $658,875 | $0 | $647,705 | $11,170 | 2.3628% | $1,557 | $1,557 |
| R000009594 | $10,500 | $0 | $0 | $10,500 | 100.0% | $10,500 | $0 | $0 | $10,500 | 2.3628% | $25 | $25 |
| | $669,375 | $0 | $647,705 | $21,670 | 100.0% | $669,375 | $0 | $647,705 | $21,670 | 2.3628% | $1,582 | $1,582 |

*Compiled by Newmark*

The property is assessed on a fee simple basis.  Within the state of Texas properties are supposed to be assessed at 100% of market value, real estate and FF&E only.  In addition, Texas recognizes equal and uniform, whereby tax comparables can be used to support the assessed values.  The lower of the two takes precedence.  The sale of the subject has some impact on its assessment.  Texas is a non-disclosure state, but sale prices are becoming easier to confirm.  Nevertheless, buyers will typically rely on tax comparables as outlined below.

Under The Texas Property Tax Code, assessed value is intended to represent 100% of market value via the use of all three approaches to value. However, equal and uniform (tax comparables) regulations make this difficult. Additionally, Texas is a non-disclosure state and the sales price is not on any public document and does not have to be divulged. Finally, the owners of the subject property have the ability to protest the subject's valuation in any given tax year regardless of whether or not there is an increase.

Properties within the state of Texas are assessed as of January 1 and taxes are due January 31 of the following year and after that penalties are due.  The subject's current assessment is based on a vacant tract.

## SUBJECT TAX CONCLUSION

| Ad Valorem Tax Analysis | | |
|---|---|---|
| | **Subject History** | **Conclusion** |
| | 2023 | |
| Total Assessed Value | $1,582 | $1,582 |
| Total Assessed Value/SF | $24.81 | $24.81 |
| Tax Rate | 2.3628% | 2.3628% |
| Actual / Pro Forma Taxes | $1,582 | $37 |
| Reported Tax Delinquencies | None | None |
| Tax Exemptions or Abatements | None | None |

*Compiled by Newmark*

Our projection is based on the subject's history. Under the Texas Property Tax Code, assessed value is intended to represent 100% of market value via the use of all three approaches to value. However, equal and uniform regulations make this difficult. Additionally, Texas is a non-disclosure

state and the sales price is not on any public document and doesn't have to be divulged. Finally, the owners of the subject property have the ability to protest the subject's valuation in any given tax year regardless of whether or not there is any increase.

January 1 marks the beginning of property appraisal.  What a property is used for on January 1, market conditions at that time and who owns the property on that date determine whether the property is taxed, its value, and who is responsible for paying the tax.  Between January 1 and April 30, the appraisal district processes applications for tax exemptions, agricultural appraisals and other tax relief.

Around May 15, the appraisal review board (ARB) begins hearing protests from property owners who believe their property values are incorrect.  The ARB is an independent panel of citizens responsible for handling protests about the appraisal districts work.  When the ARB finishes its work, the appraisal district gives each taxing unit a list of taxable property.  In August or September, the elected officials of each taxing unit adopt tax rates for their operations and debt payments.  Several taxing units are responsible for taxing property in their jurisdictions.  The county and the local school district tax every property.  Taxes may also be paid to a city and special districts such as hospital, junior college, water, fire and others.  Tax collection starts around October 1 as tax bills go out.  Taxpayers have until January 31 of the following year to pay their taxes.  On February 1, penalty and interest charges begin accumulating on most unpaid tax bills.  Tax collectors may start legal action to collect unpaid taxes on February 1.

**Rollback Taxes**

The subject is currently assessed under an agricultural use which lowers the assessed value resulting in a lower tax liability. If the site were to sell and be developed with a commercial use, the agricultural exemption would be lost, and the property would be subject to roll back taxes. The subject is a rural acreage site. We have appraised the site as is with no future development plans in mind.

**Agricultural Exemption**

The qualifications for land to be Ag exempt include:

• the land must be in use currently, and for agricultural purposes, which must be the main purpose of the land;

• the land must be used to the intensity of other land in the area, it must be devoted primarily to agricultural use for five of the preceding seven years;

• the property owner must file a valid application with the appraisal district and reapply every five years unless otherwise told.



Under Article VIII, section 1-D-1, the owner of the land does not have to make their living from the land, and their primary occupation does not have to be farming or ranching. The Tax Code defines agriculture as:

• "cultivating the soil, producing crops for human food, animal feed or planting seed or for the production of fibers; floriculture, viticulture, and horticulture;

• raising or keeping livestock; raising or keeping exotic animals for the production of human food or of fiber, leather, pelts, or other tangible products having a commercial value;

• and planting cover crops or leaving land idle for the purpose of participating in any governmental program or normal crop or livestock rotation procedure and wildlife management." Some activities that would not qualify include, harvesting native plants, hunting native wild animals such as deer or turkey, and processing activities that take place after the crop or animal has been harvested such as slaughter operations or cotton ginning.

There are minimum numbers of average and amount of agricultural produce required to qualify as well. Properties with less than 10 acres generally will not qualify. Depending on the county, you may need one animal unit per 5-10 acres of improved land.

**Rollback Texas for Agricultural Exempt Land Tracts**

In the State of Texas if you change the use of an ag exempt tract, you could be subject to five years of rollback taxes + 7% interest. Buyers frequently look for land with an "Ag exemption" for the low taxes without realizing that if they build or cease agricultural activities on the property, they can receive a huge tax bill for back taxes. This is basically the difference between the property being taxed at the lower Ag rate and the normal rate for 5 years plus interest. Since no change in use is expected, no rollback taxes have been projected.



# Highest and Best Use

## AS VACANT

### Legally Permissible

The is located within City of Venus and is subject to local zoning ordinances.  The subject site is zoned R-1, Single Family Residential District.  Thus, the site could be developed with a single-family use.  Based on available data and analysis, no other legal restrictions such as easements or deed covenants are present which would impair the utility of the site.  Given that surrounding properties are similarly zoned, and the future surrounding land use plan is focused on similar interim uses until such time single family development is warranted, it is unlikely that there would be a change of zoning classification.  Further information and analysis about the legal restrictions to the subject property is included in the Site Analysis and Zoning and Legal Restrictions sections of this report.

### Physically Possible

The subject site contains 2,777,386 square feet (63.760 acres), has favorable topography, adequate access and access to utilities to support the range of legally permissible uses.  No significant physical limitations were noted.  The size of the site is typical for the categories of uses allowed under zoning.  In total, the site is physically capable of supporting the legally permissible uses.

### Financially Feasible

The test of feasibility is only to those uses that are legally permissible and physically possible. If the property is capable of generating a sufficient net income to cover the required return on investment while also providing an adequate return to the land, then the usage is financially feasible within a defined price limit. Based on current supply (vacant land) and other developments in the immediate neighborhood, it appears that the market is capable of providing a sufficient income stream to justify continued use as an agricultural property and to hold for future single-family development, as demand warrants.

### Maximally Productive

The test of maximum productivity is to determine the actual use of the property that results in the highest land value and/or the highest return to the land.  It is important to consider the risk of potential uses as a use that may generate the highest returns in cash could also be the riskiest and thus not as likely for a developer to consider.  Maximally productive usage is the development which produces the highest value of the site, as if vacant. Based on the subject's exposure, accessibility, shape and size, the maximally productive usage of the site is thought to be for



continued use as an agricultural property and to hold for development of a single family development property once time and circumstance warrant such development.

### Highest and Best Use Conclusion – As Vacant

At present, vacant land sites within the immediate area are primarily used for residential or agricultural development. As the area is less than 25% built-up, an ample amount of land remains for development. Under the prevailing market conditions, it is estimated the highest and best use of the site, "as if vacant", would be for continued agricultural use with future single-family development, as demand warrants.

The most likely buyer would be an end user or future developer who would hold the property in the interim use until development is feasible.



# Appraisal Methodology

## COST APPROACH

The cost approach is based on the proposition that the informed purchaser would pay no more for the subject than the cost to produce a substitute property with equivalent utility.  This approach is particularly applicable when the property being appraised involves relatively new improvements that represent the highest and best use of the land, or when it is improved with relatively unique or specialized improvements for which there exist few sales or leases of comparable properties.

## SALES COMPARISON APPROACH

The sales comparison approach utilizes sales of comparable properties, adjusted for differences, to indicate a value for the subject.  Valuation is typically accomplished using physical units of comparison such as price per square foot, price per unit, price per floor, etc., or economic units of comparison such as gross rent multiplier.  Adjustments are applied to the property units of comparison derived from the comparable sale.  The unit of comparison chosen for the subject is then used to yield a total value.

## INCOME CAPITALIZATION APPROACH

The income capitalization approach reflects the subject's income-producing capabilities.  This approach is based on the assumption that value is created by the expectation of benefits to be derived in the future.  Specifically estimated is the amount an investor would be willing to pay to receive an income stream plus reversion value from a property over a period of time.  The two common valuation techniques associated with the income capitalization approach are direct capitalization and the discounted cash flow (DCF) analysis.

| Application of Approaches to Value | |
| --- | --- |
| **Approach** | **Comments** |
| Cost Approach | The Cost Approach is not applicable and is not utilized in this appraisal. |
| Sales Comparison Approach | The Sales Comparison Approach is applicable and is utilized in this appraisal. |
| Income Capitalization Approach | The Income Capitalization Approach is not applicable and is not utilized in this |

*Compiled by Newmark*

The subject property is a tract of vacant land.  In the absence of ground leases, subdivision, or other income sources, the sales comparison approach is viewed as most applicable in the valuation of land parcels.  Therefore, the sales comparison approach is the sole approach to value utilized in this appraisal.  The exclusion of the other two approaches does not impact the reliability of the appraisal.



# Sales Comparison Approach

Land value can be developed from a number of different methodologies.  In this case, we have employed the sales comparison as sufficient comparable data exists from which to derive a reliable indication of value.  Sales comparison includes the following steps.

- Research and verify information on properties in the market that are similar to the subject and that have recently sold, are listed for sale, or are under contract.
- Select the most relevant units of comparison in the market and develop a comparative analysis.
- Examine and quantify via adjustments differences between the comparable sales and the subject property using all appropriate elements of comparison.
- Reconcile the various value indications to a value indication.

Based on a review of market activity, the appropriate unit of comparison is price per gross land acre.



**Land Comparables Map**

**NEWMARK**

Vacant Land
App.271

**Comparable Land Sales Summary**

| | Subject | Sale 1 | Sale 2 | Sale 3 | Sale 4 | Sale 5 |
|---|---|---|---|---|---|---|
| Address | 1209 County Road | 3772 Fm 3136 | 8430 East Fm 916 | 1500 County Road 602 | 3200 County Road 805 | 13762 County Road 108 |
| City, State | Venus, TX | Cleburne, TX | Grandview, TX | Burleson, TX | Keene, TX | Venus, TX |
| Proposed Use | Agriculture | Agriculture | Agriculture | Agriculture | Agriculture | Agriculture |
| Gross Acres | 63.76 Acres | 52.78 Acres | 95.85 Acres | 58.50 Acres | 50.77 Acres | 99.29 Acres |
| Gross Land SF | 2,777,386 SF | 2,299,097 SF | 4,175,313 SF | 2,548,260 SF | 2,211,541 SF | 4,325,072 SF |
| Useable Acres | 63.76 Acres | 52.78 Acres | 95.85 Acres | 58.50 Acres | 50.77 Acres | 99.29 Acres |
| Useable Land SF | 2,777,386 SF | 2,299,097 SF | 4,175,313 SF | 2,548,260 SF | 2,211,541 SF | 4,325,072 SF |
| Shape/Topography | Irregular/Rolling | Irregular/Generally Level | Irregular/Generally Level | Irregular/Generally Level | Irregular/Generally Level | Rectangular/Generally |
| Utilities Available | Water, Sewer | Electricity, Gas, Water | Water, Electricity | Electricity, Sewer, Water | Electricity, Water | Electricity, Water |
| Transaction Type | | Recorded | Closed | Closed | Closed | Listing |
| Buyer | | Cody Lee | GILLUM STREET II LLC | BURLESON 602 ESTATES | Miosi Mark | TBD |
| Seller | | HEAD DONALD A | LDR LAND & CATTLE LLC | STANFORD BILLY D | KIM JIEN SUP TR | Sue Maner |
| Interest Conveyed | Fee Simple | Fee Simple | Fee Simple | Fee Simple | Fee Simple | Fee Simple |
| Transaction Date | | Sep-23 | Dec-22 | Nov-22 | Jun-22 | Nov-23 |
| Price | | $900,000 | $1,700,000 | $1,515,000 | $900,000 | $1,588,576 |
| Adj. Sale Price | | $900,000 | $1,700,000 | $1,515,000 | $900,000 | $1,588,576 |
| Price per Gross Land Acre | | $17,052 | $17,736 | $25,897 | $17,727 | $15,999 |
| Price per Usable Land Acre | | $17,052 | $17,736 | $25,897 | $17,727 | $15,999 |

*Compiled by Newmark*

## ANALYSIS OF LAND COMPARABLES

The following paragraphs analyze the most relevant comparable data against the subject property.

### Comparable One

This comparable represents the sale of 52.78 acres of land situated at 3772 Fm 3136 in Cleburne TX. The site has an irregular shape with generally level topography and no floodplain; it has not been zoned by the City of Cleburne. Co-op Water, Electricity, and Gas are available to the site. The property sold in September 2023 for $900,000 or $17,051 per acre.

### Comparable Two

This comparable represents the sale of 95.852 acres of land situated at 8430 E Farm-to-Market Road 916 in Grandview, TX. The site has an irregular shape with generally level topography and no floodplain; it has not been zoned by the City of Grandview. County Water and Electricity are available to the site. The property sold in December 2022 for $1,7000,000 or $17,735 per acre.

### Comparable Three

This comparable represents the sale of 58.50 acres of land situated at 31500 County Road 602 in Burleson TX. The site has an irregular shape with generally level topography and no floodplain; it has not been zoned by the City of Burleson. Co-op Water, Electricity, and Private sewer access are available to the site. The property sold in November 2022 for $1,515,000 or $25,897 per acre.

### Comparable Four

This comparable represents the sale of 50.770 acres of land situated at 3200 County Road 805 in northern Keene TX. The site has an irregular shape with generally level topography and no

**NEWMARK**

floodplain; it has not been zoned by the City of Keene. City Water and Electricity are available to the site. The property sold in June 2022 for $900,000 or $17,727 per acre.

## Comparable Five

This transaction represents the listing of a 99.29-acre tract of vacant land located at 13762 County Road 108 in Venus, TX. The tract is on the southern line of County Road 108 between Farm-to-Market Road 157 and County Road 213. The property is listed for $1,588,576 or $ 15,999 per acre. The land is not zoned and partially located in an A designated flood zone.

## Summary of Adjustments / Adjustment Grid

Based on our comparative analysis, the following table summarizes the adjustments warranted to each land sale.

| Comparable Land Sales Adjustment Grid | | | | | | |
|---|---|---|---|---|---|---|
| | Subject | Sale 1 | Sale 2 | Sale 3 | Sale 4 | Sale 5 |
| Address | 1209 County Road 501 | 3772 Fm 3136 | 8430 East Fm 916 | 1500 County Road 602 | 3200 County Road 805 | 13762 County Road 108 |
| City, State | Venus, TX | Cleburne, TX | Grandview, TX | Burleson, TX | Keene, TX | Venus, TX |
| Gross Land SF | 2,777,386 SF | 2,299,097 SF | 4,175,313 SF | 2,548,260 SF | 2,211,541 SF | 4,325,072 SF |
| Usable Land Area (Acres) | 63.76 Acres | 52.78 Acres | 95.85 Acres | 58.50 Acres | 50.77 Acres | 99.29 Acres |
| Usable Land Area (SF) | 2,777,386 SF | 2,299,097 SF | 4,175,313 SF | 2,548,260 SF | 2,211,541 SF | 4,325,072 SF |
| Transaction Type | -- | Recorded | Closed | Closed | Closed | Listing |
| Transaction Date | -- | Sep-23 | Dec-22 | Nov-22 | Jun-22 | Nov-23 |
| Price per Gross Land Acre | | $17,052 | $17,736 | $25,897 | $17,727 | $15,999 |
| Transaction Adjustments | | | | | | |
| Property Rights | | 0% | 0% | 0% | 0% | 0% |
| Financing | | 0% | 0% | 0% | 0% | 0% |
| Conditions of Sale | | 0% | 0% | 0% | 0% | -10% |
| Market Conditions (Time) | | 0% | 0% | 0% | 0% | 0% |
| Subtotal (adjustments are multiplied) | | 0% | 0% | 0% | 0% | -10.0% |
| Transaction Adjusted Price per Gross Land Acre | | $17,052 | $17,736 | $25,897 | $17,727 | $14,399 |
| Physical Adjustments | | | | | | |
| Location | | 0% | 0% | -15% | 0% | 0% |
| Size | | 0% | 10% | 0% | 0% | 10% |
| Flood/Topography | | 0% | 0% | 0% | 0% | 10% |
| Utilities | | 5% | 5% | 0% | 5% | 0% |
| Subtotal (adjustments are summed) | | 5% | 15% | -15% | 5% | 20% |
| Overall Adjustment | | 5.0% | 15.0% | -15.0% | 5.0% | 8.0% |
| **Indicated Price per Gross Land Acre** | | **$17,905** | **$20,396** | **$22,012** | **$18,613** | **$17,279** |

*Compiled by Newmark*

## ADJUSTMENTS TO SALES COMPARABLES

### Conditions of Sale

– Comparable 5 has been adjusted downward to account for the property being actively listed for sale to reflect typical negotiations between buyers and sellers.

### Location

– Comparable Three is located closer to the DFW Metro area and is in higher demand, a downward adjustment for location is warranted.

**NEWMARK**

Vacant Land
App.273

**Size**

–   Comparables 2 and 5 are adjusted for differences in size compared to the subject to account for economies of scale.

**Flood/Topography**

–   Comparables 5 is adjusted to account for being located within a Flood Hazard Zone.

**Utilities**

–   Comparables 1, 2, and 4 are adjusted to account for differences in access to utilities.

## LAND VALUE CONCLUSION

–   Market participants have indicated land value trends have been relatively flat over the recent past.

–   Prior to adjustments, the sales reflect a range of $15,999 to $25,897 per gross land acre.

–   After adjustment, the range is narrowed to $17,279 to $22,012 per gross land acre, with an average of $19,241 per gross land acre.

–   More weight was applied to Comparables 1, 2 and 4 because they required the least amount for overall adjustment. These three sales average $18,971 per acre. Secondary weight has been applied to Comparable 4 and Listing 5 (which is not a closed transaction).

| Land Value Conclusion | | |
|---|---|---|
| Gross Acres | | 63.760 |
| **Comparable Sales Indications** | **Range** | **Average** |
| Unadjusted Price per Gross Land Acre | $15,999 - $25,897 | $18,882 |
| Adjusted Price per Gross Land Acre | $17,279 - $22,012 | $19,241 |
| Reconciled Value per Gross Land Acre | | $18,900 |
| Total Indicated Value | | $1,205,064 |
| | Rounded | $1,210,000 |

*Compiled by Newmark*

**NEWMARK**

# Reconciliation of Value

The values indicated by our analyses are as follows:

| Land Value Conclusion | |
|---|---|
| **Market Value "As Is"** | |
| Land Value Conclusion | $1,210,000 |
| Market Value "As Is" | $1,210,000 |

*Compiled by Newmark*

## Cost Approach

As previously discussed, the Cost Approach was not utilized for valuation of the subject property as it is land.

## Sales Comparison Approach

The Sales Comparison Approach is focused on comparing the subject to sale and other market transactions with the aim to develop an indication of value that is founded on the theory of substitution.  Basically, the intention is to determine value through considering the prices of properties which would be a substitute property to the subject.  In this case, a selection of reasonably similar sales were obtained and the adjustment process was well founded by reasoning and direct evidence.  In the absence of ground leases, subdivision, or other income sources, the sales comparison approach is viewed as most applicable in the valuation of land parcels.  Therefore, the sales comparison approach is the sole approach to value utilized in this appraisal.

## Income Capitalization Approach

As the subject property is a tract of land and is not leased (or has any other reasonable income source), the Income Capitalization Approach was not applicable and not utilized.

## FINAL VALUE CONCLUSIONS

| Value Conclusions | | | |
|---|---|---|---|
| **Appraisal Premise** | **Interest Appraised** | **Date of Value** | **Value Conclusion** |
| Market Value "As Is" | Fee Simple | 11/7/2023 | $1,210,000 |

*Compiled by Newmark*



## Extraordinary Assumptions and Hypothetical Conditions

An extraordinary assumption is defined in USPAP as an assignment-specific assumption as of the effective date regarding uncertain information used in an analysis which, if found to be false, could alter the appraiser's opinions or conclusions. The value conclusions are subject to the following extraordinary assumptions that may affect the assignment results.

1.    Although requested, a survey was not provided. The size of the property is based on the tax card provided by the Johnson County Appraisal District as well as a legal description provided by the client. Should this

The use of this extraordinary assumption might have affected assignment results.

A hypothetical condition is defined in USPAP as a condition, directly related to a specific assignment, which is contrary to what is known by the appraiser to exist on the effective date of the assignment results, but is used for the purpose of analysis. The value conclusions are based on the following hypothetical conditions that may affect the assignment results.

1.    None

*Compiled by Newmark*

## EXPOSURE TIME

Exposure time is the estimated length of time the subject property would have been offered on the market prior to the hypothetical consummation of a sale at market value on the effective date of the appraisal. It is a retrospective estimate based on an analysis of past events assuming a competitive and open market.

Recent sales transaction data for similar properties, supply and demand characteristics for the local single family market, and the opinions of local market participants were reviewed and analyzed. Based on this data and analysis, it is our opinion that the probable exposure time for the subject at the concluded market value stated previously is 12 months.

## MARKETING TIME

Marketing time is an opinion of the amount of time it might take to sell a real or personal property interest at the concluded market value level during the period immediately after the effective date of an appraisal. Marketing time differs from exposure time, which is always presumed to precede the effective date of an appraisal.



# Assumptions and Limiting Conditions

The Appraisal contained in this Report (herein "Report") is subject to the following assumptions and limiting conditions:

1.  Unless otherwise stated in this report, title to the property which is the subject of this report (herein "Property") is assumed to be good and marketable and free and clear of all liens and encumbrances and that there are no recorded or unrecorded matters or exceptions to title that would adversely affect marketability or value.  No responsibility is assumed for the legal description, zoning, condition of title or any matters which are legal in nature or otherwise require expertise other than that of a professional real estate appraiser.  This report shall not constitute a survey of the Property.

2.  Unless otherwise stated in this report, it is assumed: that the improvements on the Property are structurally sound, seismically safe and code conforming; that all building systems (mechanical/electrical, HVAC, elevator, plumbing, etc.)  are in good working order with no major deferred maintenance or repair required; that the roof and exterior are in good condition and free from intrusion by the elements; that the Property and improvements conform to all applicable local, state, and federal laws, codes, ordinances and regulations including environmental laws and regulations.  No responsibility is assumed for soil or subsoil conditions or engineering or structural matters. The Property is appraised assuming that all required licenses, certificates of occupancy, consents, or other legislative or administrative authority from any local, state, or national government or private entity or organization have been or can be obtained or renewed for any use on which the value estimates contained in this report is based, unless otherwise stated.  The physical condition of the Property reflected in this report is solely based on a visual inspection as typically conducted by a professional appraiser not someone with engineering expertise. Responsible ownership and competent property management are assumed.

3.  Unless otherwise stated in this report, this report did not take into consideration the existence of asbestos, PCB transformers or other toxic, hazardous, or contaminated substances or underground storage tanks, or the cost of encapsulation, removal or remediation thereof. Real estate appraisers are not qualified to detect such substances. The presence of substances such as asbestos, urea formaldehyde foam insulation, contaminated groundwater or other potentially hazardous materials and substances may adversely affect the value of the Property.  Unless otherwise stated in this report, the opinion of value is predicated on the assumption that there is no such material or substances at, on or in the Property.



4.  All statements of fact contained in this report as a basis of the analyses, opinions, and conclusions herein are true and correct to the best of the appraiser's actual knowledge and belief.  The appraiser is entitled to and relies upon the accuracy of information and material furnished by the owner of the Property or owner's representatives and on information and data provided by sources upon which members of the appraisal profession typically rely and that are deemed to be reliable by such members. Such information and data obtained from third party sources are assumed to be reliable and have not been independently verified. No warranty is made as to the accuracy of any of such information and data. Any material error in any of the said information or data could have a substantial impact on the conclusions of this Report.  The appraiser reserves the right to amend conclusions reported if made aware of any such error.

5.  The opinion of value stated in this report is only as of the date of value stated in this report. An appraisal is inherently subjective and the conclusions stated apply only as of said date of value, and no representation is made as to the effect of subsequent events.  This report speaks only as of the date hereof.

6.  Any projected cash flows included in the analysis are forecasts of estimated future operating characteristics and are predicated on the information and assumptions contained within this report.  Any projections of income, expenses and economic conditions utilized in this report are not predictions of the future.  Rather, they are estimates of market expectations of future income and expenses.  The achievement of any financial projections will be affected by fluctuating economic conditions and is dependent upon other future occurrences that cannot be assured.  Actual results may vary from the projections considered herein.  There is no warranty or assurances that these forecasts will occur.  Projections may be affected by circumstances beyond anyone's knowledge or control. Any income and expense estimates contained in this report are used only for the purpose of estimating value and do not constitute predictions of future operating results.

7.  The analyses contained in this report may necessarily incorporate numerous estimates and assumptions regarding Property performance, general and local business and economic conditions, the absence of material changes in the competitive environment and other matters. Some estimates or assumptions, however, inevitably will not materialize, and unanticipated events and circumstances may occur; therefore, actual results achieved during the period covered by the analysis will vary from estimates, and the variations may be material.

8.  All prospective value opinions presented in this report are estimates and forecasts which are prospective in nature and are subject to considerable risk and uncertainty. In addition to the contingencies noted in the preceding paragraphs, several events may occur that could substantially alter the outcome of the estimates such as, but not limited to changes



in the economy, interest rates, capitalization rates, behavior of consumers, investors and lenders, fire and other physical destruction, changes in title or conveyances of easements and deed restrictions, etc.  In making prospective estimates and forecasts, it is assumed that conditions reasonably foreseeable at the present time are consistent or similar with the future.

9.  The allocations of value for land and improvements must not be used in conjunction with any other appraisal and are invalid if so used.  This report shall be considered only in its entirety.  No part of this report shall be utilized separately or out of context.

10. Neither all nor any part of the contents of this report (especially any conclusions as to value, the identity of the appraiser, or any reference to the Appraisal Institute) shall be disseminated through advertising media, public relations media, news media or any other means of communication (including without limitation prospectuses, private offering memoranda and other offering material provided to prospective investors) without the prior written consent of the Firm. Possession of this report, or a copy hereof, does not carry with it the right of publication.

11. Client and any other Intended User identified herein should consider this report and the opinion of value contained herein as only one factor together with its own independent considerations and underwriting guidelines in making any decision or investment or taking any action regarding the Property.  Client agrees that Firm shall not be responsible in any way for any decision of Client or any Intended User related to the Property or for the advice or services provided by any other advisors or contractors.  The use of this report and the appraisal contained herein by anyone other than an Intended User identified herein, or for a use other than the Intended Use identified herein, is strictly prohibited. No party other than an Intended User identified herein may rely on this report and the appraisal contained herein.

12. Unless otherwise stated in the agreement  to prepare this report, the appraiser shall not be required to participate in or prepare for or attend any judicial, arbitration, or administrative proceedings.

13. The Americans with Disabilities Act (ADA) became effective January 26, 1992. No survey or analysis of the Property has been made in connection with this report to determine whether the physical aspects of the improvements meet the ADA accessibility guidelines. No expertise in ADA issues is claimed, and the report renders no opinion regarding the Property's compliance with ADA regulations. Inasmuch as compliance matches each owner's financial ability with the cost to cure the non-conforming physical characteristics of a property, a specific study of both the owner's financial ability and the cost to cure any deficiencies would be needed for the Department of Justice to determine compliance.



14. Acceptance and/or use of this report constitutes full acceptance of these Assumptions and Limiting Conditions and any others contained in this report, including any Extraordinary Assumptions and Hypothetical Conditions, and is subject to the terms and conditions contained in the agreement to prepare this report and full acceptance of any limitation of liability or claims contained therein.

**ADDENDA**

## Addendum A

## Glossary of Terms

**ADDENDA**

---

The following definitions are derived from The Dictionary of Real Estate Appraisal, 7th ed. (Chicago: Appraisal Institute, 2022).

♦ ***Absorption Period:*** The actual or expected period required from the time a property, group of properties, or commodity is initially offered for lease, purchase, or use by its eventual users until all portions have been sold or stabilized occupancy has been achieved.

♦ ***Absorption Rate:*** 1) Broadly, the rate at which vacant space in a property or group of properties for sale or lease has been or is expected to be successfully sold or leased over a specified period of time. 2) In subdivision analysis, the rate of sales of lots or units in a subdivision.

♦ ***Ad Valorem Tax:*** A tax levied in proportion to the value of the thing(s) being taxed. Exclusive of exemptions, use-value assessment provisions, and the like, the property tax is an ad valorem tax. (IAAO)

♦ ***As Is Market Value:*** The estimate of the market value of real property in its current physical condition, use, and zoning as of the appraisal date. (Interagency Appraisal and Evaluation Guidelines) Note that the use of the "as is" phrase is specific to appraisal regulations pursuant to FIRREA applying to appraisals prepared for regulated lenders in the United States. The concept of an "as is" value is not included in the Standards of Valuation Practice of the Appraisal Institute, Uniform Standards of Professional Appraisal Practice, or International Valuation Standards.

♦ ***Assessed Value:*** The value of a property according to the tax rolls in ad valorem taxation; may be higher or lower than market value, or based on an assessment ratio that is a percentage of market value.

♦ ***Cash Equivalency Analysis:*** An analytical process in which the sale price of a  transaction with atypical financing or financing with unusual conditions or incentives is converted into a price equivalent or consistent with what a cash buyer would pay with all other factors the same.

♦ ***Cash-Equivalent Price:*** The sale price of a property that is equivalent to what a cash buyer would pay.

♦ ***Contract Rent:*** The actual rental income specified in a lease.

♦ ***Disposition Value:*** The most probable price that a specified interest in property should bring under the following conditions:  1) Consummation of a sale within a specified time, which is shorter than the typical exposure time for such a property in that market.  2) The property is subjected to market conditions prevailing as of the date of valuation.  3) Both the buyer and seller are acting prudently and knowledgeably.  4) The seller is under compulsion to sell.  5) The buyer is typically motivated.  6) Both parties are acting in what they consider to be their best interests.  7) An adequate marketing effort will be made during the exposure time.  8) Payment will be made in cash in US dollars (or the local currency) or in terms of financial arrangements comparable thereto.  9) The price represents the normal consideration for the property sold, unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.  This definition can also be modified to provide for valuation with specified financing terms.

♦ ***Economic Life:*** The period over which improvements to real estate contribute to property value.

♦ ***Effective Gross Income (EGI):*** The anticipated income from all operations of the real estate after an allowance is made for vacancy and collection losses and an addition is made for any other income.

♦ ***Effective Rent:*** Total base rent, or minimum rent stipulated in a lease, over the specified lease term minus rent concessions; the rent that is effectively paid by a tenant net of financial concessions provided by a landlord.

♦ ***Excess Land:*** Land that is not needed to serve or support the existing use. The highest and best use of the excess land may or may not be the same as the highest and best use of the improved parcel. Excess land has the potential to be sold separately and is valued separately. See also *surplus land*.

♦ ***Excess Rent:*** The amount by which contract rent exceeds market rent at the time of the appraisal; created by a lease favorable to the landlord (lessor) and may reflect unusual management, unknowledgeable or unusually motivated parties, a lease execution in an earlier, stronger rental market, or an agreement of the parties.



**ADDENDA**

- **_Exposure Time:_** 1) The time a property remains on the market. 2 An opinion, based on supporting market data, of the length of time that the property interest being appraised would have been offered on the market prior to the hypothetical consummation of a sale at market value on the effective date of the appraisal. (USPAP, 2020-2021 ed.)

- **_Extraordinary Assumption:_** An assignment-specific assumption as of the effective date regarding uncertain information used in an analysis which, if found to be false, could alter the appraiser's opinions or conclusions. Comment: Uncertain information might include physical, legal, or economic characteristics of the subject property, or conditions external to the property, such as market conditions or trends, or about the integrity of data used in an analysis. (USPAP, 2020-2021 ed.)

- **_Fee Simple Estate:_** Absolute ownership unencumbered by any other interest or estate, subject only to the limitations imposed by the governmental powers of taxation, eminent domain, police power, and escheat.

- **_Floor Area Ratio (FAR):_** The relationship between the above-ground floor area of a building, as described by the zoning or building code, and the area of the plot on which it stands; in planning and zoning, often expressed as a decimal, e.g., a ratio of 2.0 indicates that the permissible floor area of a building is twice the total land area.

- **_Frictional Vacancy:_** The amount of vacant space needed in a market for its orderly operation. Frictional vacancy allows for move-ins and move-outs.

- **_Full Service (Gross) Lease:_** See _gross lease_.

- **_General Vacancy:_** A method of calculating any remaining vacancy and collection loss considerations when using discounted cash flow (DCF) analysis, where turnover vacancy has been used as part of the income estimate. The combined effects of turnover vacancy and general vacancy relate to total vacancy and collection loss.

- **_Going-Concern Premise:_** One of the premises under which the total assets of a business can be valued; the assumption that a company is expected to continue operating well into the future (usually indefinitely).

- **_Going-Concern Value:_** An outdated label for the market value of all the tangible and intangible assets of an established and operating business with an indefinite life, as if sold in aggregate; more accurately termed the market value of the going concern or market value of the total assets of the business. See also _Market Value of the Going Concern_ and _Market Value of the Total Assets of the Business (MVTAB)_.

- **_Going-In Capitalization Rate ($R_o$):_** The overall capitalization rate obtained by dividing a property's net operating income for the first year after purchase by the present value of the property.

- **_Gross Building Area (GBA):_** 1) Total floor area of a building, excluding unenclosed areas, measured from the exterior of the walls of the above grade area. This includes mezzanines and basements if and when typically included in the market area of the type of property involved. 2) Gross leasable area plus all common areas. 3) For residential space, the total area of all floor levels measured from the exterior of the walls and including the superstructure and substructure basement; typically does not include garage space.

- **_Gross Lease:_** A lease in which the landlord receives stipulated rent and is obligated to pay all of the property's operating and fixed expenses; also called full-service lease.

- **_Hypothetical Condition:_** 1) A condition that is presumed to be true when it is known to be false. (Appraisal Institute: The Standards of Valuation Practice [SVP]) 2) A condition, directly related to a specific assignment, which is contrary to what is known by the appraiser to exist on the effective date of the assignment results, but is used for the purpose of analysis. Comment: Hypothetical conditions are contrary to known facts about physical, legal, or economic characteristics of the subject property; or about conditions external to the property, such as market conditions or trends; or about the integrity of data used in an analysis. (USPAP, 2020-2021 ed.)

- **_Intended Use:_** 1) The valuer's intent as to how the report will be used. (SVP) 2) The use(s) of an appraiser's reported appraisal or appraisal review assignment results, as identified by the appraiser based on communication with the client at the time of the assignment. (USPAP, 2020-2021 ed.)



**ADDENDA**

- ♦ **_Intended Users:_** 1) The party or parties the valuer intends will use the report. (SVP)  2) The client and any other party as identified, by name or type, as users of the appraisal or appraisal review report by the appraiser, based on communication with the client at the time of the assignment. (USPAP, 2020-2021 ed.)

- ♦ **_Investment Value:_** 1) The value of a property to a particular investor or class of investors based on the investor's specific requirements. Investment value may be different from market value because it depends on a set of investment criteria that are not necessarily typical of the market.  2) The value of an asset to the owner or a prospective owner given individual investment or operational objectives (may also be known as worth). (International Valuation Standards [IVS])

- ♦ **_Land-to-Building Ratio:_** The proportion of land area to gross building area; one of the factors determining comparability of properties. See also _floor area ratio._

- ♦ **_Lease:_** A contract in which the rights to use and occupy land, space, or structures are transferred by the owner to another for a specified period of time in return for a specified rent.

- ♦ **_Leased Fee Interest:_** The ownership interest held by the lessor, which includes the right to receive the contract rent specified in the lease plus the reversionary right when the lease expires.

- ♦ **_Leasehold Estate:_** The right held by the lessee to use and occupy real estate for a stated term and under the conditions specified in the lease.

- ♦ **_Lessee:_** One who has the right to occupancy and use of the property of another for a period of time according to a lease agreement.

- ♦ **_Lessor:_** One who conveys the rights of occupancy and use to others under a lease agreement.

- ♦ **_Liquidation Value:_** The most probable price that a specified interest in property should bring under the following conditions: 1) Consummation of a sale within a short time period.  2) The property is subjected to market conditions prevailing as of the date of valuation.  3) Both the buyer and seller are acting prudently and knowledgeably. 4) The seller is under extreme compulsion to sell.  5) The buyer is typically motivated.  6) Both parties are acting in what they consider to be their best interests.  7) A normal marketing effort is not possible due to the brief exposure time. 8) Payment will be made in cash in US dollars (or the local currency) or in terms of financial arrangements comparable thereto.  9) The price represents the normal consideration for the property sold, unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.  This definition can also be modified to provide for valuation with specified financing terms.

- ♦ **_Market Rent:_** The most probable rent that a property should bring in a competitive and open market under all conditions requisite to a fair lease transaction, the lessee and lessor each acting prudently and knowledgeably, and assuming the rent is not affected by undue stimulus. Implicit in this definition is the execution of a lease as of a specified date under conditions whereby • Lessee and lessor are typically motivated; • Both parties are well informed or well advised, and acting in what they consider their best interests; • Payment is made in terms of cash or in terms of financial arrangements comparable thereto; and •  The rent reflects specified terms and conditions typically found in that market, such as permitted uses, use restrictions, expense obligations, duration, concessions, rental adjustments and revaluations, renewal and purchase options, frequency of payments (annual, monthly, etc.), and tenant improvements (TIs).

- ♦ **_Market Value:_** A type of value that is the major focus of most real property appraisal assignments. Both economic and legal definitions of market value have been developed and refined.[1]

- ♦ **_Market Value of the Going Concern:_** The market value of an established and operating business including the real property, personal property, financial assets, and the intangible assets of the business.

- ♦ **_Market Value of the Total Assets of the Business (MVTAB):_** The market value of all of the tangible and intangible assets of a business as if sold in aggregate as a going concern.

- ♦ **_Modified Gross Lease:_** A lease in which the landlord receives stipulated rent and is obligated to pay some, but not all, of the property's operating and fixed expenses.  Since assignment of expenses varies among modified

---

[1] The actual definition of value used for this appraisal is contained within the body of the report.



gross leases, expense responsibility must always be specified. In some markets, a modified gross lease may be called a double net lease, net net lease, partial net lease, or semi-gross lease.  See also *net lease*.

♦ **Net Lease:**  A lease in which the landlord passes on all expenses to the tenant. See also *gross lease*; *modified gross lease*.

♦ **Net Net Net Lease:**  An alternative term for a type of net lease. In some markets, a net net net lease is defined as a lease in which the tenant assumes all expenses (fixed and variable) of operating a property except that the landlord is responsible for structural maintenance, building reserves, and management; also called *NNN lease, triple net lease,* or *fully net lease*.

♦ **Net Operating Income (NOI or $I_o$):** The actual or anticipated net income that remains after all operating expenses are deducted from effective gross income but before mortgage debt service and book depreciation are deducted. Note: This definition mirrors the convention used in corporate finance and business valuation for EBITDA (earnings before interest, taxes, depreciation, and amortization).

♦ **Occupancy Rate:**  1) The relationship or ratio between the potential income from the currently rented units in a property and the income that would be received if all the units were occupied.  2) The ratio of occupied space to total rentable space in a building.

♦ **Operating Expenses:** The periodic expenditures necessary to maintain the real estate and continue production of the effective gross income, assuming prudent and competition management.

♦ **Overage Rent:**  The percentage rent paid over and above the guaranteed minimum rent or base rent; calculated as a percentage of sales in excess of a specified breakpoint sales volume.

♦ **Percentage Rent:**  Rental income received in accordance with the terms of a percentage lease; typically derived from retail store and restaurant tenants and based on a certain percentage of their gross sales.

♦ **Prospective Opinion of Value:**  A value opinion effective as of a specified future date. The term does not define a type of value. Instead, it identifies a value opinion as being effective at some specific future date. An opinion of value as of a prospective date is frequently sought in connection with projects that are proposed, under construction, or under conversion to a new use, or those that have not yet achieved sellout or a stabilized level of long-term occupancy.

♦ **Rentable Area:**  For office or retail buildings, the tenant's pro rata portion of the entire office floor, excluding elements of the building that penetrate through the floor to the areas below. The rentable area of a floor is computed by measuring to the inside finished surface of the dominant portion of the permanent building walls, excluding any major vertical penetrations of the floor. Alternatively, the amount of space on which the rent is based; calculated according to local practice.

♦ **Retrospective Value Opinion:**  A value opinion effective as of a specified historical date. The term retrospective does not define a type of value. Instead, it identifies a value opinion as being effective at some specific prior date. Value as of a historical date is frequently sought in connection with property tax appeals, damage models, lease renegotiation, deficiency judgments, estate tax, and condemnation. Inclusion of the type of value with this term is appropriate, e.g., "retrospective market value opinion."

♦ **Shell Rent:**  The typical rent paid for retail, office, or industrial tenant space based on minimal "shell" interior finishes (called vanilla finish or white wall finish in some areas). Usually the landlord delivers the main building shell space or some minimum level of interior build-out, and the tenant completes the interior finish, which can include wall, ceiling, and floor finishes, mechanical systems, interior electricity, and plumbing. Typically these are long-term leases with tenants paying all or most property expenses.

♦ **Surplus Land:**  Land that is not currently needed to support the existing use but cannot be separated from the property and sold off for another use. Surplus land does not have an independent highest and best use and may or may not contribute value to the improved parcel. See also *excess land*.

♦ **Turnover Vacancy:**  A method of calculating vacancy allowance that is estimated or considered as part of the potential income estimate when using discounted cash flow (DCF) analysis. As units or suites turn over and are available for re-leasing, the periodic vacancy time frame (vacancy window) to release the space is considered.



**ADDENDA**

---

♦ **Usable Area:**  1) For office buildings, the actual occupiable area of a floor or an office space; computed by measuring from the finished surface of the office side of corridor and other permanent walls, to the center of partitions that separate the office from adjoining usable areas, and to the inside finished surface of the dominant portion of the permanent outer building walls. Sometimes called net building area or net floor area. See also floor area.  2) The area that is actually used by the tenants measured from the inside of the exterior walls to the inside of walls separating the space from hallways and common areas.

♦ **Usable Site Area:** The area of a site that can legally and physically accommodate buildings or significant site improvements. The usable site area equals the total site area less certain obstructions, such as flood hazard areas, required natural buffers, cemeteries, archeologically restricted areas, ecologically restricted areas, areas within certain restrictive easements, and other obstructions. The net site area or usable site area should be more precisely defined in each appraisal because the significance of improvements or the obstruction depends on the specific assignment.

♦ **Use Value:**  The value of a property based on a specific use, which may or may not be the property's highest and best use. If the specified use is the property's highest and best use, use value will be equivalent to market value. If the specified use is not the property's highest and best use, use value will be equivalent to the property's market value based on the hypothetical condition that the only possible use is the specified use.

♦ **Value In Use:**  1. The amount determined by discounting the future cash flows (including the ultimate proceeds of disposal) expected to be derived from the use of an asset at an appropriate rate that allows for the risk of the activities concerned. (FASB Accounting Standards Codification, Master Glossary)  2. Formerly used in valuation practice as a synonym for contributory value or use value. See also *use value*.

**NEWMARK**

Vacant Land
App.286

## Addendum B

## Engagement Letter

NEWMARK

NEWMARK VALUATION & ADVISORY

October 24, 2023

Al J. Keller
Leed - AP
SOUTHERN STAR CAPITAL, LLC
5220 Spring Valley Road
Suite 602
Dallas, Texas 75254
Phone: 214.507.1147
Email: Al@rmcdfw.com

Re:    Appraisal of the property described as:
        Vacant Land 63.764 Acres - 1209 County Road 501, Venus, Texas 76084 ("**Property**")

Dear Mr. Buchholz:

Newmark Valuation & Advisory, LLC ("**Firm**") agrees to provide Southern Star Capital, LLC ("**Client**") an appraisal of the above-referenced Property in accordance with, and subject to, the terms and conditions set forth below and in the attached Schedules (collectively, "**Agreement**").

| | |
|---|---|
| APPRAISAL FEE: | $4,000.00 (inclusive of expenses). |
| ADDITIONAL HOURLY FEES: | Should court time and preparation be required, it will be billed at $500.00/hr plus expenses. |
| RETAINER: | None |
| REPORT DELIVERABLES: | The appraisal, draft and/or final, shall be delivered in electronic format (typically, pdf). One original hard copy of the final appraisal will be provided to Client upon request. |
| COMMENCEMENT AND DELIVERY DATE: | Delivery is as follows: |

Final appraisal report: two (2) weeks

The appraisal process will commence upon receipt by the Firm of (i) this Agreement, signed by Client, (ii) the retainer, and (iii) information and materials identified in Schedule "B."  The appraisal process will conclude upon delivery of the final appraisal report, unless terminated sooner by the Firm or Client or as provided herein.

**NEWMARK**

2601 Olive Street Suite 1600 | Dallas, Texas 75201
PHONE: 469.467.2073 | WEB: www.nmrk.com

App.288

Al J. Keller
SOUTHERN STAR CAPITAL, LLC
October 24, 2023
PAGE 2 OF 11

---

REPORT TYPE:                Appraisal Report

VALUATION PREMISE:          Market Value

INTEREST IN THE             Fee Simple Estate
PROPERTY APPRAISED:

DATE(S) OF VALUE:           As Is Market Value

INTENDED USER(S):           Intended users of the appraisal include only Southern Star Capital, LLC
                            ("**Intended User(s)**"), and no other party is permitted to use or rely on the
                            appraisal. The identification of Intended User(s) of the appraisal is to
                            determine the type and extent of research, analysis and reporting
                            appropriate for the assignment.  Designation of a party other than Client as
                            an Intended User is not intended to confer upon such party any rights
                            under this Agreement.

INTENDED USE:               The intended use of the appraisal is solely for Internal decision making
                            purposes ("**Intended Use**") and no other use.

RELIANCE LANGUAGE:          None

GUIDELINES:                 The analyses, opinions and conclusions are to be developed based on,
                            and the appraisal will be prepared in conformance with the Uniform
                            Standards of Professional Appraisal Practice (USPAP) as published by the
                            Appraisal Foundation.

SCOPE OF WORK:              The appraiser will use and properly apply all applicable and appropriate
                            approaches to value sufficient to produce credible assignment results. The
                            scope of the analysis will be appropriate for the appraisal problem.

APPRAISAL REPORT            Hayden Littlefield
SIGNATORY:

ASSUMPTIONS/                The appraisal will be subject to Firm's standard Assumptions and Limiting
LIMITING CONDITIONS:        Conditions, which will be incorporated into the appraisal report. In addition,
                            the appraisal may be subject to, and the appraisal report may contain,
                            Extraordinary Assumptions and Hypothetical Conditions.

ACCEPTANCE:                 This shall constitute a binding agreement only if countersigned by the
                            Client, or by an officer, director or other representative of Client who, by
                            signing and accepting this Agreement, represents and warrants that he/she
                            is authorized by Client to do so.

---

**NEWMARK**

Al J. Keller
SOUTHERN STAR CAPITAL, LLC
October 24, 2023
PAGE 3 OF 11

---

| | |
|---|---|
| PAYMENT: | Client will be invoiced the appraisal fee (and any expenses) which will be earned in full upon initial delivery of the appraisal report (draft or final), with such appraisal fee (and expenses) payable within 30 days of invoicing. |
| | Payment of the fee is not contingent upon any predetermined value or on an action or event resulting from the analysis, opinions, conclusions or use of the appraisal. |
| CHANGES TO THE AGREEMENT: | Any significant changes to the assignment as outlined in this Agreement, such as the identity of the Client, Intended User, or Intended Use, will require the preparation and execution of a new agreement. |
| CANCELLATION OF ASSIGNMENT: | Client may cancel this Agreement at any time prior to the Firm's delivery of the appraisal upon written notification to the Firm. Client shall pay Firm for all work completed on the assignment prior to Firm's receipt of such written cancellation notice, unless otherwise agreed upon by Firm and Client in writing. The Firm may withdraw without penalty or liability from the assignment(s) contemplated by the Agreement before completion or reporting if the Firm determines, in the Firm's sole discretion, that incomplete information was provided to the Firm prior to the engagement, that Client or other parties have not or cannot provide documentation or information necessary to the Firm's analysis or reporting, that conditions of the Property render the original scope of work inappropriate, that a conflict of interest has arisen, or that Client has not complied with its payment obligations under this Agreement. The Firm shall notify Client of such withdrawal in writing. |
| NO THIRD-PARTY BENEFICIARIES: | Nothing in the Agreement shall create a contractual relationship or any legal duty between Firm or Client and any third party, nor any cause of action, right, or claim in favor of any third party and against Firm or Client. In addition, this Agreement is not intended to, and shall not be construed to, render any person or entity a third-party beneficiary of this Agreement. Client acknowledges and agrees that the appraisal report shall reflect the foregoing. In addition, the appraisal report shall state that no party other than an Intended User identified in the Agreement is entitled to rely upon the appraisal. |

NEWMARK

2601 Olive Street Suite 1600 | Dallas, Texas 75201
PHONE: 469.467.2073 | WEB: www.nmrk.com

App.290

Al J. Keller
**SOUTHERN STAR CAPITAL, LLC**
October 24, 2023
**PAGE 4 OF 11**

This Agreement may be rescinded by the Firm unless signed and returned to the undersigned within 10 days from the date hereof.

If this Agreement correctly sets forth the Client's understanding of the services to be rendered, and if the terms are satisfactory, please execute and return the Agreement together with any required retainer.

Respectfully,

Hayden Littlefield
*Senior Director*
Certified General Appraiser
License No. TX 1324546 G
Hayden.Littlefield@nmrk.com
469.467.2073 Office Direct
713.725.0365 Cell

Agreed:
SOUTHERN STAR CAPITAL, LLC

SIGNATURE:

PRINT NAME:

TITLE:

DATE:

**NEWMARK**

2601 Olive Street Suite 1600 | Dallas, Texas 75201
PHONE: 469.467.2073 | WEB: www.nmrk.com

App.291

Al J. Keller
SOUTHERN STAR CAPITAL, LLC
October 24, 2023
PAGE 5 OF 11

Schedule "A"

# TERMS AND CONDITIONS

## ATTACHED TO AND A PART OF THE AGREEMENT DATED OCTOBER 24, 2023 TO PROVIDE APPRAISAL SERVICES FOR SOUTHERN STAR CAPITAL, LLC

1.  These Terms and Conditions are attached to and incorporated into the above referenced Agreement as though fully set forth in full therein. Capitalized terms if not defined herein shall have the same meaning as defined in the Agreement.

2.  With respect to any appraisal report, use of or reliance on the appraisal by any party, regardless of whether the use or reliance is authorized or known by the Firm, constitutes acceptance of these Terms and Conditions as well as acceptance of all other appraisal statements, limiting conditions and assumptions stated in the Agreement and appraisal report.

3.  It is assumed that there are no matters affecting the Property that would require the expertise of other professionals, such as engineers or an environmental consultant, for Firm to provide the appraisal. If such additional expertise is required, it shall be provided by other parties retained by Client at Client's sole cost and expense.

4.  Client acknowledges that the Firm is being retained as an independent contractor to provide the services described herein and nothing in this Agreement shall be deemed to create any other relationship between Firm and Client, including but not limited to an agency relationship. The parties neither intend nor have any expectation that any such relationship will arise as a matter of law or as a result of this Agreement. This assignment shall be deemed concluded and the services hereunder completed upon delivery of the appraisal described herein to Client.

5.  All statements of fact contained in the appraisal report as a basis of the appraiser's analyses, opinions, and conclusions will be true and correct to the best of the appraiser's actual knowledge and belief. The appraiser is entitled to, and shall rely upon the accuracy of information and material furnished to the Firm by Client. Appraiser is also entitled to, and shall, rely on information provided by sources upon which members of the appraisal profession typically rely and that are deemed to be reliable by members of that profession without independent verification.

6.  The Firm and the appraiser shall have no responsibility for legal matters, or questions or issues involving survey or title, soil or subsoil conditions, engineering, zoning, buildability, environmental contamination, structural matters, construction defects, material or methodology, or other similar technical matters with regarding the Property. Furthermore, the appraisal will not constitute a survey of the Property.

7.  The appraisal and the data and information gathered in its preparation (other than the confidential data and information provided by Client) is and will remain, the property of the Firm. The Firm shall not violate the confidential nature of the appraiser-client relationship by improperly disclosing any confidential information furnished by Client to the Firm. Notwithstanding the foregoing, the Firm and the appraiser are authorized by Client to disclose all or any portion of the appraisal and appraisal report and the related data and information, including confidential data and information provided by Client, to appropriate representatives of the Appraisal Institute if such disclosure is required to comply with the Standards, Bylaws and Regulations of the Appraisal Institute, as well as, such disclosure as required by law and regulations, including compliance with a subpoena and licensing authority regulatory inquiries. The Firm is also authorized to include both confidential and non-confidential data assembled in the course of preparing the appraisal and which may be incorporated into the appraisal report in a database controlled by the Firm for the aggregation of such data and information to produce analytics and other metrics or products.

8.  Unless specifically noted in the appraisal report, the appraisal will not take into consideration the possibility or probability of the existence of asbestos, PCB transformers, other toxic, hazardous, or contaminated substances

**NEWMARK**

2601 Olive Street Suite 1600 | Dallas, Texas 75201
PHONE: 469.467.2073 | WEB: www.nmrk.com

App.292

Al J. Keller
**SOUTHERN STAR CAPITAL, LLC**
October 24, 2023
PAGE 6 OF 11

and/or underground storage tanks (hazardous material) at on or in the Property, or the cost of encapsulation, removal or remediation thereof.

9.  Client shall indemnify, defend (by counsel to be selected by Firm), protect, and hold Firm and Firm's appraisers, agents, employees, affiliates, representatives, successors and assigns (each, a *Firm Party*), free and harmless from any and all claims, liabilities, losses, penalties, fines, forfeitures, amounts paid in settlement, judgments, and all reasonable attorneys' fees and related litigation costs, fees and expenses incurred by the any of such indemnitees, which result from (i) any failure by Client or Client's agents or representatives to provide Firm with complete and accurate information regarding the Property; (ii) any material breach by Client of the provisions of the Agreement; (iii) if delivery of the appraisal to a third party is permitted by the Firm, Client providing an incomplete copy of the appraisal to such third party; or (iv) arising from Client or Client's agents or representatives providing a copy of the appraisal to a party not authorized by the Firm to receive such copy.

10. In preparing the appraisal, it is possible that the appraiser will discover conflicting information. In that event, appraiser will utilize information and data considered to be the most authoritative and for critical information will document the source. Information and data referred to may include, but is not limited to, legal descriptions; physical street addresses; assessor parcel numbers; property history; dimensions and areas of the site/land; dimensions and areas of the building improvements; physical unit counts; rent rolls; leases; lease abstracts; income and expense data; and any other related data. Any material discrepancy and/or error in any of the above data could have a substantial impact on the conclusions reported, and the Firm therefore reserves the right to amend conclusions reported if the Firm is made aware of any such discrepancy and/or error.

11. The appraisal may not be used, included or referenced, in whole or in part, in any offering or other materials without the prior written consent of the Firm, which consent may be conditioned upon the receipt by the Firm of an indemnity agreement, in form and content, satisfactory to Firm and provided by an indemnitor satisfactory to Firm. Client agrees to pay the fees of the Firm's legal counsel for review of any materials which is the subject of the requested consent. Except as agreed by the Firm expressly in writing, the Firm disclaims liability to any party other than Client.

12. The Firm shall not provide a copy of the appraisal to, or disclose the results of the appraisal to, any party other than Client, unless Client authorizes same, except as provided in the Confidentiality Section of the ETHICS RULE of the Uniform Standards of Professional Appraisal Practice (USPAP) or as otherwise required by law or regulations.

13. Client and any other identified Intended User should consider the appraisal as only one factor together with its own independent considerations and underwriting guidelines in making any decision or investment or taking any action regarding the Property. Client agrees that Firm shall not be responsible in any way for any decision of Client or any Intended User related to the Property or for the advice or services provided by any other advisors or contractors.

14. Unless otherwise stated in this Agreement, Client agrees that the services pursuant to this Agreement shall not include participation in or preparation for, or attendance at, any legal, judicial, administrative, or arbitration proceeding relating to this assignment. In the event the Firm or any Firm Party is required, whether through the service of a subpoena or otherwise, to produce documents or participate in or prepare for any discovery, testimony or attendance, relating to the appraisal or this assignment, where the Firm or Firm Party is not a party to the action or proceedings involved, Client agrees to reimburse expenses incurred by the Firm or Firm Party, including attorney's fees, in responding to such subpoena or other legal process and compensate the Firm therefor based upon the appraiser's prevailing hourly or daily rate for providing services as an expert consultant or witness.

15. Except as expressly provided herein, Firm makes no representations or warranties to Client or to any other person or entity with respect to the appraisal and the services to be provided by Firm under this Agreement. To the maximum extent permitted under applicable law, in no event will the Firm or any Firm Party be liable to Client or any third party (regardless of whether such party's claimed use or reliance on the appraisal was authorized by the

**NEWMARK**

2601 Olive Street Suite 1600 | Dallas, Texas 75201
PHONE: 469.467.2073 | WEB: www.nmrk.com

App.293

Al J. Keller
SOUTHERN STAR CAPITAL, LLC
October 24, 2023
PAGE 7 OF 11

---

Firm or a Firm Party) for any indirect, special, exemplary, incidental, or consequential damages (including loss of profits) arising from or relating to this Agreement or the appraisal, even if such party knew or should have known of the possibility of, or could reasonably have prevented, such damages. In no event shall the total liability of the Firm or any Firm Party to Client or any third party (regardless of whether such party's claimed use or reliance on the appraisal was authorized by the Firm or a Firm Party) arising from or relating to this Agreement or the appraisal, whether based on tort, contract, or any other legal theory, exceed the amount of fees paid to the Firm for the appraisal and the services described herein. Legal claims or causes of action relating to the appraisal are not assignable, except: (i) as the result of a merger, consolidation, sale or purchase of a legal entity, (ii) with regard to the collection of a bona fide existing debt for services but then only to the extent of the total compensation for the appraisal plus reasonable interest, or (iii) in the case of an appraisal performed in connection with the origination of a mortgage loan, as part of the transfer or sale of the mortgage before an event of default on the mortgage or note or its legal equivalent.

16. Federal banking regulations require banks and other lending institutions to engage appraisers where FIRREA compliant appraisals must be used in connection with mortgage loans or other transactions involving federally regulated lending institutions. In view of that requirement, the appraisal may not be accepted by a federally regulated financial institution.

17. In the event Client fails to make payments of any fees or sums when due and payable under this Agreement; then from the date due and payable until paid, the amount due and payable shall bear interest at the maximum rate permitted under the laws of the state in which the Property is located. If the Firm is required to undertake collection efforts including institution of legal action against Client relating to the Agreement, the Firm shall be entitled to recover attorney's fees, litigation expenses, and costs from Client.

18. To the extent permitted under applicable law, any legal action or lawsuit or other proceeding by Client or any Intended User of the appraisal against Firm or a Firm Party whether based in contract, tort, warranty, indemnity or otherwise, relating to the appraisal shall be commenced within two (2) years from the date of delivery of the appraisal to the claimant in such action or proceeding, unless the applicable law provides for a shorter period, and any such claimant waives the right to a jury in any such legal action or lawsuit or other proceeding. Notwithstanding the state of domicile or residency of either party to this Agreement, this Agreement shall be governed and construed under the laws of the state in which the Property is located, and venue for any action or proceeding arising out of this Agreement shall be deemed proper only in the court of competent jurisdiction located in the state in which the Property is located.

19. Throughout the performance of services under this Agreement, the Firm shall maintain at its sole cost and expense the following insurance:

    (a) Workers' Compensation, so as to provide statutory benefits as required by the laws of each state within the United States in which the Firm's services are being provided, and Employer's Liability insurance with limits of liability of $1,000,000 each accident, $1,000,000 disease each employee and $1,000,000 disease policy limit covering all employees of the Firm engaged in the performance of such services.

    (b) Fidelity insurance or bond with a limit of $1,000,000 to insure the Firm against loss of its or Client's assets caused from the dishonest acts of the Firm's employees.

    (c) Professional Liability insurance with a limit of liability of $1,000,000 each claim and $1,000,000 aggregate, which limits may be provided by a combination of primary and excess policies.

    (d) Commercial General Liability insurance providing coverage against damages due to bodily injury (including death), property damage and personal and advertising injury arising in connection with the Firm's services provided under this Agreement, which insurance coverage shall: (i) be occurrence-based; (ii) provide limits of liability in an amount of $1,000,000 each occurrence and $1,000,000 aggregate (including excess and/or umbrella limits), (iii) include at least those coverages generally included in the most current ISO Commercial



2601 Olive Street Suite 1600 | Dallas, Texas 75201
PHONE: 469.467.2073 | WEB: www.nmrk.com

App.294

**Al J. Keller**
**SOUTHERN STAR CAPITAL, LLC**
**October 24, 2023**
**PAGE 8 OF 11**

General Liability insurance policy form (or its equivalent); and (iv) include Client, and such other persons or entities as Client has identified in writing, as additional insureds solely with regard to claims arising out of this Agreement.

(e) Commercial automobile liability for owned, hired and non-owned motor vehicles, with a $1,000,000 combined single limit.



Al J. Keller
SOUTHERN STAR CAPITAL, LLC
October 24, 2023
PAGE 9 OF 11

Schedule "B"

# PROPERTY INFORMATION LIST

ATTACHED TO AND A PART OF THE AGREEMENT DATED OCTOBER 24, 2023 TO
PROVIDE APPRAISAL SERVICES FOR SOUTHERN STAR CAPITAL, LLC

The following information is requested to be delivered to the Firm so we can provide the proposed services and prepare the Appraisal within the agreed upon time frame. Please forward the physical data such as the site plan, previous engineering reports and/or property reports describing the physical attributes of the Property and all financial information such as rent roll and income and expense statements first as these items are the most time sensitive and should be received immediately to meet the time requirements of this assignment. If, at this time, you are certain you will not be providing any specific items noted below, please cross out the item and mark "NA" next to the item so that we will be notified that the information is not available and will not be forthcoming.

1. Please indicate whether Newmark is sales broker, leasing broker, mortgage broker or property manager for the subject property.

2. Site plan, if available. (Preferably, an AS BUILT PLAN showing an outline of building/s drawn to scale. Please do not send reductions so original scale may be used for measurement purposes.

3. Building plans, if available.

4. Prior engineering report or physical descriptions from prior appraisals or asset management report, if available.

5. Leasing brochures and/or other marketing materials, if available.

6. If the Property has been offered for sale within the last two years, a copy of the offering memorandum or investment book.

7. Past feasibility or market studies and economic impact studies as well as any relevant information collected from third party sources.

8. Agreements of Sale/Options to Buy (current or during last three years), if any.

9. Income and expense statements for the past three years plus year-to-date income and expense statements.

10. Operating budget for current and next year, if available.

11. Current property insurance binder or last property insurance billing statement.

12. Management contracts.

13. Copy of most recent real estate tax bill. Please advise if there has been a notice or inquiry by either the County Assessment Board or the School Board regarding the property assessment. Is there any pending litigation or negotiations with these parties that could result in an assessment increase or decrease?

14. Title report, Legal Description, or copy of deed. Provide a written statement of five-year history of legal property owner. Please advise, if there any deed restrictions or encumbrances, easements or cross easements.

15. Personal property inventory, if available.

16. Occupancy rates for the last three years, if not revealed in the financial statements.

17. Ground leases, if any.



2601 Olive Street Suite 1600 | Dallas, Texas 75201
PHONE: 469.467.2073 | WEB: www.nmrk.com

App.296

Al J. Keller
SOUTHERN STAR CAPITAL, LLC
October 24, 2023
PAGE 10 OF 11

18. Approximate actual construction costs, if built during the past three years.

19. Environmental audits and studies disclosing any wetlands, hazardous wastes or other environmental conditions such as asbestos or radon.

20. List of any known major repairs and improvements needed.

21. Three-year history of capital improvements.

22. Name of contact person for the on-site physical inspection.

## FOR APARTMENT PROPERTY

23. Unit mix showing rentable area and asking rent by unit type

24. Scaled apartment unit plans showing layouts and measurements so that rentable area can be confirmed, if available.

25. Rent roll showing tenant name, apartment number, dates of leases and the type of apartment, asking/market rents for each apartment, and contractual rent for each apartment unit. (It would be greatly appreciated if you can provide the rent roll in Excel.)

26. Terms of leases and/rent roll for leased commercial space or roof top rentals. Copies of commercial leases are desirable. If any commercial leases provide for pass through of operating expenses over a base year stop, please provide the dollar amount of the base year stop.

## FOR INDUSTRIAL, OFFICE, RETAIL PROPERTY

27. Rent Roll (please sign and date) and copies of leases, including addenda and all amendments. Please indicate which leases may have early termination provisions, expansion and/or purchase options. Please identify any tenants who have initiated discussions to renew, terminate or renegotiate/modify their lease(s), or who have given notice to terminate. Proposed terms for such re-negotiations should be revealed.

28. Provide letters of intent to lease or other any outstanding lease proposals that have a reasonable likelihood of being finalized into executed leases.

29. Prior Argus files, if any.

30. List of outstanding leasing commissions brokers and terms of future payments.

31. Financial information such as Annual Statements or credit report/ratings on any major tenant in the building.

32. CAM and real estate tax reimbursement worksheets or listing of base year operating expenses, if applicable.

33. Three-year history of tenant retail sales, if available.

## FOR LODGING PROPERTY

34. Terms of leases if any and/rent roll for leased commercial space or roof top rentals.

35. ADR and Occupancy rates for the last three years, if not revealed in the financial statements.

36. Business Plan and Marketing Strategy, if any for the upcoming fiscal year.

37. Terms of franchise agreement and management agreement, if any.



**NEWMARK**

2601 Olive Street Suite 1600 | Dallas, Texas 75201
PHONE: 469.467.2073 | WEB: www.nmrk.com

App.297

Al J. Keller
SOUTHERN STAR CAPITAL, LLC
October 24, 2023
PAGE 11 OF 11

## FOR RESIDENTIAL SUBDIVISION PROPERTY

38. Building plans for the proposed single family, townhouse, age-restricted, and condominium residences. Please do not send reductions so original scale may be used for measurement purposes.

39. Market Surveys and Feasibility Analyses, if any, for the proposed development program.

40. Marketing materials for the proposed single family, townhouse, age-restricted, and condominium residences.







**NEWMARK**

2601 Olive Street Suite 1600 | Dallas, Texas 75201
PHONE: 469.467.2073 | WEB: www.nmrk.com

App.298

**ADDENDA**

# Addendum C

# Property Information



# Central Appraisal District of Johnson County

109 North Main St
Cleburne, Texas 76033
Phone: (817) 648-3000
Fax: (817) 645-3105

## Account Details for 126.0358.00060

Open 2023 Notice

### Ownership

| | |
|---|---|
| **Owner Name:** | Lynco Ventures Llc |
| **Owner Address:** | 13901 Midway Rd No 102 Lb 2436, Farmers Branch, TX 752440000 |
| **Property Location:** | 11209 Cr 501 |
| **Ownership Interest:** | 1.000000 |
| **Description:** | ABST 358<br>TR 3<br>J HAIGLER |
| **Deed Date:** | 2022-08-17 |
| **Deed Type:** | Warranty Deed |
| **Page #:** | |
| **Volume #:** | |
| **Instrument #:** | 2022-29088 |
| **Exemptions** | |
| **Tax Entities** | <ul><li>City Of Venus</li><li>Johnson County</li><li>Venus ISD</li><li>Hill College VES</li><li>Lateral Road</li><li>Johnson Co ESD#1</li><li>Venus Fire Dept</li><li>Precinct3</li></ul> |
| **Improvement State Code:** | |
| **Land State Code:** | E4 - Non-Prod Undeveloped |

App.300

Case 3:22-cv-02118-X     Document 499     Filed 05/24/24     Page 304 of 397     PageID 17750

| | |
|---|---|
| **Productivity State Code:** | |
| **GEO Num:** | 126.0358.00060 |
| **Last Update:** | Sep 18 2023 2:56PM |

**A zero value indicates that the property record has not yet been completed for the indicated tax year.**
**† Appraised value may be less than market value due to state-mandated limitations on value increases.**

## Value

| | |
|---|---|
| **Improvement Value** | $0 |
| **Land Market Value:** | $10,500 |
| **AG Market Value:** | $0 |
| **AG Value:** | $0 |
| **Prod Loss:** | $0 |
| **Total Market Value:** | $10,500 |
| **† Appraised Value:** | $10,500 |
| **Land Acres** | 1.0000 |
| **Impr Area Size** | 0 |
| **Year Built** | 0 |

## Appraisal History   +

| Year | Impr HS | Impr NHS | Land HS | Land NHS | Ag Market | Ag Value | Total Market |
|---|---|---|---|---|---|---|---|
| 2022 | $0 | $0 | $10,500 | $0 | $0 | $0 | $10,500 |
| 2021 | $0 | $0 | $4,000 | $0 | $0 | $0 | $4,000 |
| 2020 | $0 | $0 | $4,000 | $0 | $0 | $0 | $4,000 |
| 2019 | $0 | $0 | $4,000 | $0 | $0 | $0 | $4,000 |

App.301

Case 3:22-cv-02118-X   Document 499   Filed 05/24/24   Page 305 of 397   PageID 17751

| Year | | | | | | | |
|---|---|---|---|---|---|---|---|
| 2018 | $0 | $0 | $4,000 | $0 | $0 | $0 | $4,000 |
| 2017 | $0 | $0 | $4,000 | $0 | $0 | $0 | $4,000 |
| 2016 | $0 | $0 | $4,000 | $0 | $0 | $0 | $4,000 |
| 2015 | $0 | $0 | $4,000 | $0 | $0 | $0 | $4,000 |
| 2014 | $0 | $0 | $4,000 | $0 | $0 | $0 | $4,000 |
| 2013 | $0 | $0 | $4,000 | $0 | $0 | $0 | $4,000 |
| 2012 | $0 | $0 | $4,000 | $0 | $0 | $0 | $4,000 |
| 2011 | $0 | $0 | $2,500 | $0 | $0 | $0 | $2,500 |
| 2010 | $0 | $0 | $2,500 | $0 | $0 | $0 | $2,500 |
| 2009 | $0 | $0 | $2,500 | $0 | $0 | $0 | $2,500 |
| 2008 | $0 | $0 | $2,500 | $0 | $0 | $0 | $2,500 |
| 2007 | $0 | $0 | $1,500 | $0 | $0 | $0 | $1,500 |
| 2006 | $0 | $0 | $1,500 | $0 | $0 | $0 | $1,500 |
| 2005 | $0 | $0 | $1,500 | $0 | $0 | $0 | $1,500 |
| 2004 | $0 | $0 | $1,500 | $0 | $0 | $0 | $1,500 |
| 2003 | $3,840 | $0 | $1,500 | $0 | $0 | $0 | $5,340 |
| 2002 | $3,840 | $0 | $1,500 | $0 | $0 | $0 | $5,340 |
| 2001 | $3,850 | $0 | $1,500 | $0 | $0 | $0 | $5,350 |

\* This information is intended for reference only and is subject to change. It may not accurately reflect the complete status of the account as actually carried in Johnson Appraisal District's database and may not be used as a basis of protest or appeal.

Copyright 2009-13 Thomson Reuters

App.302



## Central Appraisal District of Johnson County

109 North Main St
Cleburne, Texas 76033
Phone: (817) 648-3000
Fax: (817) 645-3105

## Account Details for 126.0358.00070

Open 2023 Notice

### Ownership

| | |
|---|---|
| **Owner Name:** | Lynco Ventures Llc |
| **Owner Address:** | 13901 Midway Rd No 102 Lb 2436, Farmers Branch, TX 752440000 |
| **Property Location:** | 11209 Cr 501 |
| **Ownership Interest:** | 1.000000 |
| **Description:** | ABST 358<br>TR 3<br>J HAIGLER |
| **Deed Date:** | 2022-08-17 |
| **Deed Type:** | Warranty Deed |
| **Page #:** | |
| **Volume #:** | |
| **Instrument #:** | 2022-29088 |
| **Exemptions** | |
| **Tax Entities** | ○ City Of Venus<br>○ Johnson County<br>○ Venus ISD<br>○ Hill College VES<br>○ Lateral Road<br>○ Johnson Co ESD#1<br>○ Venus Fire Dept<br>○ Precinct3 |
| **Improvement State Code:** | |
| **Land State Code:** | |

App.303

| Productivity State Code: | D3 - Farmland |
|---|---|
| GEO Num: | 126.0358.00070 |
| Last Update: | Sep 18 2023 2:56PM |

**A zero value indicates that the property record has not yet been completed for the indicated tax year.**
**† Appraised value may be less than market value due to state-mandated limitations on value increases.**

### Value

| Improvement Value | $0 |
|---|---|
| Land Market Value: | $658,875 |
| AG Market Value: | $658,875 |
| AG Value: | $12,613 |
| Prod Loss: | $646,262 |
| Total Market Value: | $658,875 |
| † Appraised Value: | $12,613 |
| Land Acres | 62.7500 |
| Impr Area Size | 0 |
| Year Built | 0 |

### Appraisal History +

| Year | Impr HS | Impr NHS | Land HS | Land NHS | Ag Market | Ag Value | Total Market |
|---|---|---|---|---|---|---|---|
| 2022 | $0 | $0 | $0 | $0 | $658875 | $11170 | $11,170 |
| 2021 | $0 | $0 | $0 | $0 | $251000 | $13491 | $13,491 |
| 2020 | $0 | $0 | $0 | $0 | $251000 | $13491 | $13,491 |
| 2019 | $0 | $0 | $0 | $0 | $251000 | $13491 | $13,491 |

App.304

| 2018 | $0 | $0 | $0 | $0 | $377028 | $20359 | $20,359 |
|------|-----|-----|-----|-----|----------|---------|---------|
| 2017 | $0 | $0 | $0 | $0 | $398720 | $14254 | $14,254 |
| 2016 | $0 | $0 | $0 | $0 | $398720 | $9968 | $9,968 |
| 2015 | $0 | $0 | $0 | $0 | $398720 | $9569 | $9,569 |
| 2014 | $0 | $0 | $0 | $0 | $398720 | $9868 | $9,868 |
| 2013 | $0 | $0 | $0 | $0 | $398720 | $9669 | $9,669 |
| 2012 | $0 | $0 | $0 | $0 | $398720 | $9270 | $9,270 |
| 2011 | $0 | $0 | $0 | $0 | $249200 | $9569 | $9,569 |
| 2010 | $0 | $0 | $0 | $0 | $249200 | $10068 | $10,068 |
| 2009 | $0 | $0 | $0 | $0 | $249200 | $9470 | $9,470 |
| 2008 | $0 | $0 | $0 | $0 | $249200 | $9769 | $9,769 |
| 2007 | $0 | $0 | $0 | $0 | $149520 | $9569 | $9,569 |
| 2006 | $0 | $0 | $0 | $0 | $149520 | $10965 | $10,965 |
| 2005 | $0 | $0 | $0 | $0 | $149520 | $16450 | $16,450 |
| 2004 | $0 | $0 | $0 | $0 | $149520 | $16450 | $16,450 |
| 2003 | $0 | $0 | $0 | $0 | $149520 | $16450 | $16,450 |
| 2002 | $0 | $0 | $0 | $0 | $149520 | $16450 | $16,450 |
| 2001 | $0 | $0 | $0 | $0 | $149520 | $16447 | $16,447 |

* This information is intended for reference only and is subject to change. It may not accurately reflect the complete status of the account as actually carried in Johnson Appraisal District's database and may not be used as a basis of protest or appeal.

Copyright 2009-13 Thomson Reuters

App.305

## Addendum D

## Comparable Data

# Land Sales



Vacant Land
App.307

# Land Sale

# NEWMARK

## 3772 Fm 3136

### Ranch Land



## Location & Property Info

| | |
|---|---|
| Property Name | Ranch Land |
| Property Type | Land |
| Sub Type | Agriculture |
| Major Market | TX - Dallas/Fort Worth |
| Sub Market | Dallas/Fort Worth |
| Address | 3772 Fm 3136, Cleburne, TX 76031 |
| County | Johnson |
| Country | USA |
| Location | South of FM 3136 |
| Latitude | 32.35695500 |
| Longitude | -97.30736500 |
| MSA | Dallas-Fort-Worth MSA |
| Legal/Tax/Parcel ID | 126056300650 |
| Market Orientation | Small Town - Non Metro |
| Verification Type | Confirmed-Other |
| Verification Source | Broker |
| Event ID | 979262 |

## Land Parcels

### PRIMARY LAND

| ROW NUMBER | ASSOCIATED APN(S) | CLASSIFICATION | LAND AREA (SF) | LAND AREA (ACRES) |
|---|---|---|---|---|
| 1 | 126056300650 | Usable Land Area | 2,299,097 | 52.7800 |
| | | Total Gross Land Area | 2,299,097 | 52.7800 |

App.308

| | | |
|---|---|---|
| Total Gross Land Area | 2,299,097 | 52.7800 |
| Total Usable Land Area | 2,299,097 | 52.7800 |

## Site Details

| | |
|---|---|
| Source Of Land Info | Public Data |
| Usable/Gross Ratio | 1.00 |
| Zoning Designation | Not Zoned |
| Flood Map | 48251C0325J |
| Flood Map Date | 12/04/2012 |
| Flood Insurance Required | No |
| Site Shape | Irregular |
| Site Topography | Generally Level |
| Flood Zone Designation | X |
| Vegetation | Typical |
| Traffic Control At Entry | None |
| Traffic Flow | Moderate |
| Utilities | • Electricity<br>• Gas<br>• Water |
| Corner Lot | No |
| Accessibility Rating | Average |
| Visibility Rating | Average |

## Sale Information

| | |
|---|---|
| Sale Status | Closed |
| Sale Date | 09/22/2023 |
| Sale Price | $900,000 |
| Grantor (Seller) | HEAD DONALD A |
| Grantee (Buyer) | Cody Lee |
| Property Rights | Fee Simple |
| Document Type | Deed |
| Recording Number | 2023-26959 |
| Financing Type | Cash to seller |
| Effective Sales Price | $900,000.00 |
| Price Per Land SF (Gross) | $0.39 |
| Price Per Acre (Gross) | $17,051.91 |
| Price Per Land SF (Usable) | $0.39 |
| Price Per Acre (Usable) | $17,051.91 |

## Comments

This comparable represents the sale of 52.78 acres of land situated at 3772 Fm 3136 in Cleburne TX. The site has an irregular shape with generally level topography and no floodplain; it has not been zoned by the City of Cleburne. Co-op Water, Electricity, and Gas are available to the site. The property sold in September 2023 for $900,000 or $17,051 per acre.

App.309

Case 3:22-cv-02118-X    Document 499    Filed 05/24/24    Page 313 of 397    PageID 17759

# Land Sale



## 8430 East Fm 916

### Vacant Land

### Location & Property Info



| | |
|---|---|
| Property Name | Vacant Land |
| Property Type | Land |
| Sub Type | Agriculture |
| Major Market | TX - Dallas/Fort Worth |
| Sub Market | Dallas/Fort Worth |
| Address | 8430 East Fm 916, Grandview, TX 76050 |
| County | Johnson |
| Country | USA |
| Location | South of FM 916, Wrapping County Road 403 |
| Latitude | 32.27509000 |
| Longitude | -97.19558500 |
| MSA | Dallas-Fort-Worth MSA |
| Legal/Tax/Parcel ID | 126066300060 |
| Market Orientation | Small Town - Non Metro |
| Verification Type | Confirmed-Other |
| Verification Source | Broker |
| Event ID | 979330 |

### Land Parcels

PRIMARY LAND

| ROW NUMBER | ASSOCIATED APN(S) | CLASSIFICATION | LAND AREA (SF) | LAND AREA (ACRES) |
|---|---|---|---|---|
| 1 | 126066300060 | Usable Land Area | 4,175,313 | 95.8520 |
| | | Total Gross Land Area | 4,175,313 | 95.8520 |

App.310

| | | |
|---|---|---|
| Total Gross Land Area | 4,175,313 | 95.8520 |
| Total Usable Land Area | 4,175,313 | 95.8520 |

## Site Details

| | |
|---|---|
| Source Of Land Info | Public Data |
| Usable/Gross Ratio | 1.00 |
| Zoning Designation | Not Zoned |
| Flood Map | 48251C0450J |
| Flood Map Date | 12/04/2012 |
| Flood Insurance Required | No |
| Site Shape | Irregular |
| Site Topography | Generally Level |
| Flood Zone Designation | X |
| Vegetation | Typical |
| Traffic Control At Entry | None |
| Traffic Flow | Moderate |
| Utilities | • Electricity<br>• Water |
| Corner Lot | No |
| Accessibility Rating | Average |
| Visibility Rating | Average |

## Sale Information

| | |
|---|---|
| Sale Status | Closed |
| Sale Date | 12/21/2022 |
| Sale Price | $1,700,000 |
| Grantor (Seller) | LDR LAND & CATTLE LLC |
| Grantee (Buyer) | GILLUM STREET II LLC |
| Property Rights | Fee Simple |
| Document Type | Deed |
| Recording Number | 2022-42669 |
| Financing Type | Cash to seller |
| Effective Sales Price | $1,700,000.00 |
| Price Per Land SF (Gross) | $0.41 |
| Price Per Acre (Gross) | $17,735.68 |
| Price Per Land SF (Usable) | $0.41 |
| Price Per Acre (Usable) | $17,735.68 |

## Comments

This comparable represents the sale of 95.852 acres of land situated at 8430 E Farm-to-Market Road 916 in Grandview, TX. The site has an irregular shape with generally level topography and no floodplain; it has not been zoned by the City of Grandview. County Water and Electricity are available to the site. The property sold in December 2022 for $1,7000,000 or $17,735 per acre.

App.311

Case 3:22-cv-02118-X    Document 499    Filed 05/24/24    Page 315 of 397    PageID 17761

# Land Sale



## 1500 County Road 602

### Vacant Land

### Location & Property Info



| | |
|---|---|
| Property Name | Vacant Land |
| Property Type | Land |
| Sub Type | Agriculture |
| Major Market | TX - Dallas/Fort Worth |
| Sub Market | Dallas/Fort Worth |
| Address | 1500 County Road 602, Burleson, TX 76028 |
| County | Johnson |
| Country | USA |
| Location | West of CR 602 |
| Latitude | 32.51892500 |
| Longitude | -97.27699700 |
| MSA | Dallas-Fort-Worth MSA |
| Legal/Tax/Parcel ID | 126014001755 |
| Market Orientation | Small Town - Non Metro |
| Verification Type | Confirmed-Other |
| Verification Source | Broker |
| Event ID | 979326 |

### Land Parcels

**PRIMARY LAND**

| ROW NUMBER | ASSOCIATED APN(S) | CLASSIFICATION | LAND AREA (SF) | LAND AREA (ACRES) |
|---|---|---|---|---|
| 1 | 126014001755 | Usable Land Area | 2,548,260 | 58.5000 |
| | | Total Gross Land Area | 2,548,260 | 58.5000 |

| | | | |
|---|---|---|---|
| Total Gross Land Area | | 2,548,260 | 58.5000 |

App.312

## Site Details

| | |
|---|---|
| Source Of Land Info | Public Data |
| Usable/Gross Ratio | 1.00 |
| Zoning Designation | Not Zoned |
| Flood Map | 48251C0070J |
| Flood Map Date | 12/04/2012 |
| Flood Insurance Required | No |
| Site Shape | Irregular |
| Site Topography | Generally Level |
| Flood Zone Designation | X |
| Vegetation | Typical |
| Traffic Control At Entry | None |
| Traffic Flow | Moderate |
| Utilities | • Electricity<br>• Sewer<br>• Water |
| Corner Lot | No |
| Accessibility Rating | Average |
| Visibility Rating | Average |

## Sale Information

| | |
|---|---|
| Sale Status | Closed |
| Sale Date | 11/17/2022 |
| Sale Price | $1,515,000 |
| Grantor (Seller) | STANFORD BILLY D |
| Grantee (Buyer) | BURLESON 602 ESTATES LLC |
| Property Rights | Fee Simple |
| Document Type | Deed |
| Recording Number | 2022-39657 |
| Financing Type | Cash to seller |
| Effective Sales Price | $1,515,000.00 |
| Price Per Land SF (Gross) | $0.59 |
| Price Per Acre (Gross) | $25,897.44 |
| Price Per Land SF (Usable) | $0.59 |
| Price Per Acre (Usable) | $25,897.44 |

## Comments

This comparable represents the sale of 58.50 acres of land situated at 31500 County Road 602 in Burleson TX. The site has an irregular shape with generally level topography and no floodplain; it has not been zoned by the City of Burleson. Co-op Water, Electricity, and Private sewer access are available to the site. The property sold in November 2022 for $1,515,000 or $25,897 per acre.

App.313

# Land Sale

# NEWMARK

## 3200 County Road 805
### Vacant Land

### Location & Property Info



| | |
|---|---|
| Property Name | Vacant Land |
| Property Type | Land |
| Sub Type | Agriculture |
| Major Market | TX - Dallas/Fort Worth |
| Sub Market | Dallas/Fort Worth |
| Address | 3200 County Road 805, Keene, TX 76031 |
| County | Johnson |
| Country | USA |
| Location | East of Old Mansfield Road |
| Latitude | 32.40891380 |
| Longitude | -97.33231150 |
| MSA | Dallas-Fort-Worth MSA |
| Legal/Tax/Parcel ID | 126022305530 |
| Market Orientation | Small Town - Non Metro |
| Verification Type | Confirmed-Other |
| Verification Source | Broker |
| Event ID | 979244 |

### Land Parcels

PRIMARY LAND

| ROW NUMBER | ASSOCIATED APN(S) | CLASSIFICATION | LAND AREA (SF) | LAND AREA (ACRES) |
|---|---|---|---|---|
| 1 | 126022305530 | Usable Land Area | 2,211,541 | 50.7700 |
| | | Total Gross Land Area | 2,211,541 | 50.7700 |

| | | | | |
|---|---|---|---|---|
| Total Gross Land Area | | | 2,211,541 | 50.7700 |

App.314

## Site Details

| | |
|---|---|
| Source Of Land Info | Public Data |
| Zoning Designation | Not Zoned |
| Flood Map | 48251C0190J |
| Flood Map Date | 12/04/2012 |
| Flood Insurance Required | No |
| Site Shape | Irregular |
| Site Topography | Generally Level |
| Flood Zone Designation | X |
| Vegetation | Typical |
| Traffic Control At Entry | None |
| Traffic Flow | Moderate |
| Utilities | • Electricity |
| | • Water |
| Corner Lot | No |
| Accessibility Rating | Average |
| Visibility Rating | Average |

## Sale Information

| | |
|---|---|
| Sale Status | Closed |
| Sale Date | 06/30/2022 |
| Sale Price | $900,000 |
| Grantor (Seller) | KIM JIEN SUP TR |
| Grantee (Buyer) | Miosi Mark |
| Property Rights | Fee Simple |
| Document Type | Deed |
| Recording Number | 2022-23729 |
| Financing Type | Cash to seller |
| Effective Sales Price | $900,000.00 |
| Price Per Land SF (Gross) | $0.41 |
| Price Per Acre (Gross) | $17,727.00 |
| Price Per Land SF (Usable) | $0.41 |
| Price Per Acre (Usable) | $17,727.00 |

## Comments

This comparable represents the sale of 50.770 acres of land situated at 3200 County Road 805 in northern Keene TX. The site has an irregular shape with generally level topography and no floodplain; it has not been zoned by the City of Keene. City Water and Electricity are available to the site. The property sold in June 2022 for $900,000 or $17,727 per acre.

App.315

# Land Sale (Listing)



## 13762 County Road 108
### Vacant Land

### Location & Property Info

| | |
|---|---|
| Property Name | Vacant Land |
| Property Type | Land |
| Sub Type | Agriculture |
| Major Market | TX - Dallas/Fort Worth |
| Sub Market | Dallas/Fort Worth |
| Address | 13762 County Road 108, Venus, TX 76009 |
| County | Johnson |
| Country | USA |
| Latitude | 32.39112600 |
| Longitude | -97.08927100 |
| MSA | Dallas-Fort Worth MSA |
| Legal/Tax/Parcel ID | 126.1115.00050 |
| Verification Type | Confirmed-Confidential |
| Event ID | 942325 |



### Land Parcels

GROUP 1

| ROW NUMBER | ASSOCIATED APN(S) | CLASSIFICATION | LAND AREA (SF) | LAND AREA (ACRES) |
|---|---|---|---|---|
| 1 | 126.1115.00050 | Usable Land Area | 4,325,072 | 99.2900 |
| | | Total Gross Land Area | 4,325,072 | 99.2900 |

| | | |
|---|---|---|
| Total Gross Land Area | 4,325,072 | 99.2900 |
| Total Usable Land Area | 4,325,072 | 99.2900 |

App.316

Case 3:22-cv-02118-X     Document 499     Filed 05/24/24     Page 320 of 397     PageID 17766

## Site Details

| | |
|---|---|
| Usable/Gross Ratio | 1.00 |
| Zoning Designation | Not Zoned |
| Flood Map | 48251C0250J |
| Flood Map Date | 12/04/2012 |
| Flood Insurance Required | No |
| Site Shape | Rectangular |
| Site Topography | Generally Level |
| Flood Zone Designation | X |
| Traffic Flow | Low |
| Frontage Street Name | County Road 108 |
| Frontage Feet | 1,350 |
| Frontage Type | 2 way, 1 lane each |
| Corner Lot | No |
| Accessibility Rating | Average |
| Visibility Rating | Average |

## Sale Information

| | |
|---|---|
| Listing Date | 07/26/2023 |
| Listing Price | $1,588,576 |
| Sale Status | Listing |
| Sale Date | 11/01/2023 |
| Sale Price | $1,588,576 |
| Grantor (Seller) | Sue Maner |
| Grantee (Buyer) | TBD |
| Property Rights | Fee Simple |
| Document Type | Listing |
| Recording Number | Listing |
| Financing Type | Cash to seller |
| Effective Sales Price | $1,588,576.00 |
| Price Per Land SF (Gross) | $0.37 |
| Price Per Acre (Gross) | $15,999.36 |
| Price Per Land SF (Usable) | $0.37 |
| Price Per Acre (Usable) | $15,999.36 |

## Comments

This transaction represents the listing of a 99.29-acre tract of vacant land located at 13762 County Road 108 in Venus, TX. The tract is on the southern line of County Road 108 between Farm-to-Market Road 157 and County Road 213. The property is listed for $1,588,576 or $0.37/SF. The land is not zoned and partially located in an A designated flood zone.

App.317

ADDENDA

Addendum E

Précis Metro Report - Economy.Com, Inc.



# FORT WORTH-ARLINGTON TX

Data Buffet® MSA code: IUSA_DMFTW

## ECONOMIC DRIVERS



MANUFAC-TURING

LOGISTICS

## EMPLOYMENT GROWTH RANK

| 2022-2024 | 2022-2027 |
|---|---|
| **19** | **20** |
| 1st quintile | 1st quintile |

Best=1, Worst=410

## RELATIVE COSTS

| LIVING | BUSINESS |
|---|---|
| **105%** | **97%** |

U.S.=100%

## VITALITY

RELATIVE

**0.54**

Rank: 52

Best=1, Worst=403

## QUALITY

OF LIFE

**171**

Best=1, Worst=378

## BUSINESS CYCLE STATUS



Mid Expansion — Late Expansion — Recovery — In Recession — **At Risk**

## STRENGTHS & WEAKNESSES

### STRENGTHS
» Central Southwest location near Latin America supports distribution industry.
» Relatively high housing affordability attracts homebuyers employed in Dallas.

### WEAKNESSES
» Large military procurement industry is sensitive to political winds.
» Exposure to motor vehicle and energy industries adds to cyclical volatility.

## FORECAST RISKS

| SHORT TERM  | LONG TERM  |
|---|---|

| RISK EXPOSURE 2023-2028 | **49** | 1st quintile | Most=1 Least=403 |
|---|---|---|---|

### UPSIDE
» Homebuilding rebounds faster because of low supply of existing homes for sale.
» Military aircraft production rebounds more strongly as supply-chain issues resolve.

### DOWNSIDE
» Banking weakens because of elevated interest rates.
» Energy-related manufacturing is slow to rebound because of the decline in oil prices.

## MOODY'S RATING

**Aaa**

COUNTY
AS OF DEC 15, 2022

## ANALYSIS

**Recent Performance.** Job growth in Fort Worth-Arlington has strengthened in recent months following a deceleration at the beginning of 2023. Leading the way have been financial services, healthcare and core manufacturing. Year over year, total employment is up twice as much as that of the nation because of strong gains back in the second half of 2022. Additionally, growth in the number of high-wage jobs has been substantially higher than in the nation. The unemployment rate has risen to 3.8%, up nearly 0.5 percentage point over the past year. However, one reason has been the above-average increase in the labor force amid solid job growth during that time. Housing market data have been mixed, with house prices declining but new permits rebounding since the start of 2023.

**Manufacturing.** New uncertainties surround the near-term outlook for the F-35, which is assembled in FTW. At the beginning of the year, Lockheed had expected to deliver about 150 planes in 2023, close to the full capacity of output. However, problems with the TR-3 software system are causing significant delays because the Defense Department stated in June that it would not accept newly built F-35s until the problems are resolved. A separate IT issue has been that the Pentagon needs to vet the plane's capability in the Joint Simulation Environment, development of which has itself been delayed. The new projection is that only about 100 to 120 planes will be delivered this year. However, Lockheed has indicated that the pace of production will continue unabated and that deliveries will exceed production in 2024. On the positive side, demand fundamentally remains strong. Last year, the Pentagon agreed to buy 375 planes during 2023-2025, and in April 2023 awarded a substantial increase for contract modifications. Lockheed still projects that more than 2,000 planes will ultimately be built compared with about 900 delivered to date, supporting manufacturing in the metro division over the coming years.

**Financial services.** The banking industry will push past current headwinds and continue to advance. Industry employment is up 2.2% since the end of 2022 and 5% year over year. Although the strong trend growth in banking in neighboring Dallas is well known, FTW has matched up. The level of industry employment in each metro division has doubled over the past two decades. Whereas Dallas benefits from its high-profile investment banking and wealth management segments as well as conventional lending, FTW has attracted a large number of small community-oriented banks, including new or growing regional operations of banks based in such states as Pennsylvania, Missouri, Arkansas and Oklahoma, where growth opportunities are fewer. Both metro divisions benefit from strong job and population growth that has boosted demand for credit.

**Homebuilding.** Residential construction has begun to bounce back and should rise slowly over the coming year. New permits for single-family homes declined more than 50% during 2022 but have now risen by about 20% since early 2023. Despite lower house prices, developers have been encouraged by the low inventory of existing homes for sale. Longer term, the FTW housing market should grow at an above-average pace, lifted by higher relative affordability than in Dallas and strong demographics.

**Fort Worth-Arlington will outperform the nation over the coming year, led by manufacturing and financial services. The homebuilding outlook appears bright. Longer term, robust population growth, a diversified manufacturing base, and lower business costs and costs of living relative to Dallas will support above-average gains.**

*Edward Friedman*
*August 2023*

*1-866-275-3266*
*helpeconomy@moodys.com*

| 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | INDICATORS | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 126.7 | 132.0 | 133.7 | 127.5 | 138.4 | 145.7 | Gross metro product (C12$ bil) | 152.3 | 155.5 | 161.4 | 168.5 | 175.7 | 182.7 |
| *4.0* | *4.2* | *1.3* | *-4.6* | *8.6* | *5.3* | *% change* | *4.5* | *2.1* | *3.7* | *4.4* | *4.3* | *4.0* |
| 1,037.0 | 1,066.9 | 1,096.3 | 1,055.9 | 1,097.6 | 1,161.7 | Total employment (ths) | 1,206.3 | 1,223.7 | 1,237.5 | 1,251.1 | 1,264.2 | 1,277.6 |
| *2.5* | *2.9* | *2.8* | *-3.7* | *4.0* | *5.8* | *% change* | *3.8* | *1.4* | *1.1* | *1.1* | *1.0* | *1.1* |
| 3.8 | 3.5 | 3.3 | 7.3 | 5.2 | 3.6 | Unemployment rate (%) | 3.7 | 3.5 | 3.5 | 3.5 | 3.5 | 3.5 |
| 7.4 | 5.9 | 3.0 | 4.9 | 9.2 | 5.5 | Personal income growth (%) | 6.6 | 5.2 | 5.2 | 5.3 | 5.1 | 4.9 |
| 64.2 | 65.9 | 68.4 | 70.5 | 71.4 | 73.0 | Median household income ($ ths) | 75.8 | 78.0 | 80.7 | 83.5 | 86.4 | 89.3 |
| 2,485.5 | 2,527.1 | 2,557.8 | 2,586.2 | 2,618.7 | 2,669.5 | Population (ths) | 2,714.9 | 2,753.3 | 2,789.7 | 2,826.2 | 2,863.2 | 2,900.9 |
| *1.9* | *1.7* | *1.2* | *1.1* | *1.3* | *1.9* | *% change* | *1.7* | *1.4* | *1.3* | *1.3* | *1.3* | *1.3* |
| 29.4 | 26.4 | 16.4 | 17.7 | 25.0 | 41.1 | Net migration (ths) | 33.0 | 25.4 | 23.7 | 23.9 | 24.8 | 25.7 |
| 8,976 | 10,125 | 9,849 | 12,646 | 13,649 | 12,979 | Single-family permits (#) | 10,428 | 10,809 | 12,428 | 13,255 | 13,080 | 12,773 |
| 5,647 | 6,086 | 9,500 | 5,778 | 7,927 | 8,982 | Multifamily permits (#) | 6,521 | 7,269 | 7,189 | 7,693 | 7,808 | 7,454 |
| *10.0* | *8.1* | *5.0* | *4.5* | *15.3* | *22.0* | FHFA house price index (% change) | *1.6* | *-5.3* | *-4.0* | *-1.1* | *0.7* | *1.1* |

Case 3:22-cv-01818-X   Document 499   Filed 05/24/24



Case 3:22-cv-01128-X  Document 499  Filed 05/24/24



## EMPLOYMENT AND INDUSTRY

### TOP EMPLOYERS

| | |
|---|---|
| AMR/American Airlines | 25,000 |
| Lockheed Martin | 13,690 |
| Texas Health Resources | 12,000 |
| NAS - Fort Worth - JRB | 10,000 |
| Arlington ISD | 10,000 |
| University of Texas at Arlington | 7,311 |
| JPS Health Network | 6,500 |
| Cook Children's Health Care System | 6,042 |
| Tarrant County College | 5,999 |
| Alcon Laboratories Inc. | 5,393 |
| Bell Helicopter Textron | 4,953 |
| BNSF Railway | 4,500 |
| General Motors | 4,125 |
| GM Financial | 3,820 |
| Fidelity | 3,700 |
| JPMorgan Chase | 3,678 |

Source: Fort Worth Chamber of Commerce, 2017

### PUBLIC

| | |
|---|---|
| Federal | 16,957 |
| State | 13,518 |
| Local | 109,335 |

2022

### INDUSTRIAL DIVERSITY

Most Diverse (U.S.)

0.67

Least Diverse

### EMPLOYMENT VOLATILITY

Due to U.S. fluctuations: 97%

Relative to U.S.: FTW 88, U.S. 100

Not due to U.S. / Due to U.S. / FTW / U.S.

### COMPARATIVE EMPLOYMENT AND INCOME

| Sector | % OF TOTAL EMPLOYMENT | | | AVERAGE ANNUAL EARNINGS | | |
|---|---|---|---|---|---|---|
| | FTW | TX | U.S. | FTW | TX | U.S. |
| Mining | 0.8 | 1.5 | 0.4 | $51,069 | $202,521 | $140,972 |
| Construction | 5.7 | 5.8 | 5.1 | $81,596 | $70,189 | $74,543 |
| Manufacturing | 9.2 | 6.9 | 8.4 | $96,589 | $104,973 | $95,006 |
| *Durable* | *73.1* | *63.3* | *62.2* | *nd* | *$102,268* | *$98,900* |
| *Nondurable* | *26.9* | *36.7* | *37.8* | *nd* | *$109,432* | *$88,725* |
| Transportation/Utilities | 8.9 | 5.2 | 4.7 | nd | $69,502 | $62,962 |
| Wholesale Trade | 5.0 | 4.7 | 3.9 | nd | $105,177 | $104,126 |
| Retail Trade | 10.6 | 10.2 | 10.1 | $41,648 | $42,393 | $43,812 |
| Information | 1.0 | 1.7 | 2.0 | $71,236 | $109,036 | $167,037 |
| Financial Activities | 6.5 | 6.5 | 5.9 | $41,365 | $54,316 | $65,977 |
| Prof. and Bus. Services | 13.2 | 15.4 | 14.8 | nd | $77,456 | $86,343 |
| Educ. and Health Services | 12.7 | 13.4 | 16.0 | $66,020 | $62,824 | $66,256 |
| Leisure and Hosp. Services | 10.8 | 10.5 | 10.4 | $28,620 | $30,678 | $36,373 |
| Other Services | 3.5 | 3.3 | 3.7 | $38,133 | $37,962 | $42,808 |
| Government | 12.0 | 14.8 | 14.5 | $81,652 | $79,985 | $90,556 |

Sources: Percent of total employment — BLS, Moody's Analytics, 2022, Average annual earnings — BEA, Moody's Analytics, 2021

## ENTREPRENEURSHIP

### BROAD-BASED START-UP RATE
U.S.=100
2021

FTW / TX

Sources: Census Bureau, Moody's Analytics

## EXPORTS

NOT AVAILABLE

## PRODUCTIVITY

### REAL OUTPUT PER WORKER, $

| FTW | TX | U.S. |
|---|---|---|
| 87,016 | 97,018 | 92,043 |

Sources: BEA, Moody's Analytics, 2021

## BUSINESS COSTS

U.S.=100

Total, Unit labor, Energy, State and local taxes, Office rent

2016 / 2021

Source: Moody's Analytics

## HIGH-TECH EMPLOYMENT

| | Ths | % of total |
|---|---|---|
| FTW | 36.7 | 3.2 |
| U.S. | 8,388.4 | 5.5 |

## HOUSING-RELATED EMPLOYMENT

| | Ths | % of total |
|---|---|---|
| FTW | 124.9 | 10.8 |
| U.S. | 15,202.5 | 10.0 |

Source: Moody's Analytics, 2022

## LEADING INDUSTRIES BY WAGE TIER

| | NAICS | Industry | Location Quotient | Employees (ths) |
|---|---|---|---|---|
| HIGH | 4811 | Scheduled air transportation | 8.9 | 28.4 |
| | 3364 | Aerospace product & parts manuf. | 6.9 | 24.6 |
| | 6211 | Offices of physicians | 1.0 | 19.6 |
| | GVF | Federal Government | 0.8 | 16.9 |
| MID | GVL | Local Government | 1.0 | 107.6 |
| | 6221 | General medical and surgical hospitals | 0.9 | 30.0 |
| | 2382 | Building equipment contractors | 1.1 | 18.6 |
| | GVS | State Government | 0.4 | 14.0 |
| LOW | 7225 | Restaurants and other eating places | 1.2 | 91.7 |
| | 5613 | Employment services | 1.3 | 36.5 |
| | 4931 | Warehousing and storage | 1.6 | 22.4 |
| | 4451 | Grocery stores | 0.8 | 17.2 |

Source: Moody's Analytics, 2022

Case 3:22-cv-01616-X Document 499 Filed 05/24/24



## GEOGRAPHIC PROFILE

### POPULATION DENSITY



**Residents per square mile**

12 — 37,348

|  | Distribution, % | | |
|---|---|---|---|
| County | Pop. | Emp. | Permits |
| Hood TX | 2.5 | 2.2 | 0.5 |
| Johnson TX | 7.3 | 6.5 | 10.4 |
| Parker TX | 6.2 | 5.5 | 4.1 |
| Somervell TX | 0.4 | 0.3 | 0.1 |
| Tarrant TX | 80.8 | 83.0 | 82.8 |
| Wise TX | 2.8 | 2.5 | 2.0 |

*Sources: Census Bureau, BLS, Moody's Analytics, 2022*

### MEDIAN HOUSEHOLD INCOME

U.S. Dollars

5,491 — 233,713

### MEDIAN COMMUTE TIME

Minutes

8 — 60

*Sources: ACS, Moody's Analytics*

### POPULATION & HOUSING CHARACTERISTICS

|  | Units | Value | Rank* |
|---|---|---|---|
| Total area | sq mi | 4,098.2 | 71 |
| Total water area | sq mi | 94.8 | 137 |
| Total land area | sq mi | 4,003.3 | 66 |
| Land area - developable | sq mi | 3,099.0 | 26 |
| Land area - undevelopable | sq mi | 904.4 | 149 |
|  |  |  |  |
| Population density | pop. to developable land | 666.2 | 43 |
| Total population | ths | 2,667.0 | 23 |
| U.S. citizen at birth | % of population | 83.1 | 334 |
| Naturalized U.S. citizen | % of population | 6.4 | 78 |
| Not a U.S. citizen | % of population | 9.0 | 51 |
|  |  |  |  |
| Median age |  | 37.7 | 259 |
|  |  |  |  |
| Total housing units | ths | 980.8 | 30 |
| Owner occupied | % of total | 51.0 | 350 |
| Renter occupied | % of total | 34.2 | 94 |
| Vacant | % of total | 6.6 | 295 |
|  |  |  |  |
| 1-unit, detached | % of total | 64.6 | 249 |
| 1-unit, attached | % of total | 4.2 | 213 |
| Multifamily | % of total | 26.3 | 106 |
| Median year built |  | 1995 |  |

*\* Areas & pop. density, out of 410 metro areas/divisions, including metros in Puerto Rico; all others, out of 403 metros.*

*Sources: Census Bureau, Moody's Analytics, 2021 except land area 2010*

## About Moody's Analytics

Moody's Analytics provides financial intelligence and analytical tools supporting our clients' growth, efficiency and risk management objectives. The combination of our unparalleled expertise in risk, expansive information resources, and innovative application of technology helps today's business leaders confidently navigate an evolving marketplace. We are recognized for our industry-leading solutions, comprising research, data, software and professional services, assembled to deliver a seamless customer experience. Thousands of organizations worldwide have made us their trusted partner because of our uncompromising commitment to quality, client service, and integrity.

Concise and timely economic research by Moody's Analytics supports firms and policymakers in strategic planning, product and sales forecasting, credit risk and sensitivity management, and investment research. Our economic research publications provide in-depth analysis of the global economy, including the U.S. and all of its state and metropolitan areas, all European countries and their subnational areas, Asia, and the Americas. We track and forecast economic growth and cover specialized topics such as labor markets, housing, consumer spending and credit, output and income, mortgage activity, demographics, central bank behavior, and prices. We also provide real-time monitoring of macroeconomic indicators and analysis on timely topics such as monetary policy and sovereign risk. Our clients include multinational corporations, governments at all levels, central banks, financial regulators, retailers, mutual funds, financial institutions, utilities, residential and commercial real estate firms, insurance companies, and professional investors.

Moody's Analytics added the economic forecasting firm Economy.com to its portfolio in 2005. This unit is based in King of Prussia PA, a suburb of Philadelphia, with offices in London, Prague and Sydney. More information is available at www.economy.com.

Moody's Analytics is a subsidiary of Moody's Corporation (NYSE: MCO). Further information is available at www.moodysanalytics.com.

DISCLAIMER: Moody's Analytics, a unit of Moody's Corporation, provides economic analysis, credit risk data and insight, as well as risk management solutions. Research authored by Moody's Analytics does not reflect the opinions of Moody's Investors Service, the credit rating agency. To avoid confusion, please use the full company name "Moody's Analytics", when citing views from Moody's Analytics.

## About Moody's Corporation

Moody's Analytics is a subsidiary of Moody's Corporation (NYSE: MCO). MCO reported revenue of $5.5 billion in 2022, employs approximately 14,000 people worldwide and maintains a presence in more than 40 countries. Further information about Moody's Analytics is available at www.moodysanalytics.com.

App.324

© 2023 Moody's Corporation, Moody's Investors Service, Inc., Moody's Analytics, Inc. and/or their licensors and affiliates (collectively, "MOODY'S"). All rights reserved.

CREDIT RATINGS ISSUED BY MOODY'S CREDIT RATINGS AFFILIATES ARE THEIR CURRENT OPINIONS OF THE RELATIVE FUTURE CREDIT RISK OF ENTITIES, CREDIT COMMITMENTS, OR DEBT OR DEBT-LIKE SECURITIES, AND MATERIALS, PRODUCTS, SERVICES AND INFORMATION PUBLISHED BY MOODY'S (COLLECTIVELY, "PUBLICATIONS") MAY INCLUDE SUCH CURRENT OPINIONS. MOODY'S DEFINES CREDIT RISK AS THE RISK THAT AN ENTITY MAY NOT MEET ITS CONTRACTUAL FINANCIAL OBLIGATIONS AS THEY COME DUE AND ANY ESTIMATED FINANCIAL LOSS IN THE EVENT OF DEFAULT OR IMPAIRMENT. SEE APPLICABLE MOODY'S RATING SYMBOLS AND DEFINITIONS PUBLICATION FOR INFORMATION ON THE TYPES OF CONTRACTUAL FINANCIAL OBLIGATIONS ADDRESSED BY MOODY'S CREDIT RATINGS. CREDIT RATINGS DO NOT ADDRESS ANY OTHER RISK, INCLUDING BUT NOT LIMITED TO: LIQUIDITY RISK, MARKET VALUE RISK, OR PRICE VOLATILITY. CREDIT RATINGS, NON-CREDIT ASSESSMENTS ("ASSESSMENTS"), AND OTHER OPINIONS INCLUDED IN MOODY'S PUBLICATIONS ARE NOT STATEMENTS OF CURRENT OR HISTORICAL FACT. MOODY'S PUBLICATIONS MAY ALSO INCLUDE QUANTITATIVE MODEL-BASED ESTIMATES OF CREDIT RISK AND RELATED OPINIONS OR COMMENTARY PUBLISHED BY MOODY'S ANALYTICS, INC. AND/OR ITS AFFILIATES. MOODY'S CREDIT RATINGS, ASSESSMENTS, OTHER OPINIONS AND PUBLICATIONS DO NOT CONSTITUTE OR PROVIDE INVESTMENT OR FINANCIAL ADVICE, AND MOODY'S CREDIT RATINGS, ASSESSMENTS, OTHER OPINIONS AND PUBLICATIONS ARE NOT AND DO NOT PROVIDE RECOMMENDATIONS TO PURCHASE, SELL, OR HOLD PARTICULAR SECURITIES. MOODY'S CREDIT RATINGS, ASSESSMENTS, OTHER OPINIONS AND PUBLICATIONS DO NOT COMMENT ON THE SUITABILITY OF AN INVESTMENT FOR ANY PARTICULAR INVESTOR. MOODY'S ISSUES ITS CREDIT RATINGS, ASSESSMENTS AND OTHER OPINIONS AND PUBLISHES ITS PUBLICATIONS WITH THE EXPECTATION AND UNDERSTANDING THAT EACH INVESTOR WILL, WITH DUE CARE, MAKE ITS OWN STUDY AND EVALUATION OF EACH SECURITY THAT IS UNDER CONSIDERATION FOR PURCHASE, HOLDING, OR SALE.

MOODY'S CREDIT RATINGS, ASSESSMENTS, OTHER OPINIONS, AND PUBLICATIONS ARE NOT INTENDED FOR USE BY RETAIL INVESTORS AND IT WOULD BE RECKLESS AND INAPPROPRIATE FOR RETAIL INVESTORS TO USE MOODY'S CREDIT RATINGS, ASSESSMENTS, OTHER OPINIONS OR PUBLICATIONS WHEN MAKING AN INVESTMENT DECISION. IF IN DOUBT YOU SHOULD CONTACT YOUR FINANCIAL OR OTHER PROFESSIONAL ADVISER.

ALL INFORMATION CONTAINED HEREIN IS PROTECTED BY LAW, INCLUDING BUT NOT LIMITED TO, COPYRIGHT LAW, AND NONE OF SUCH INFORMATION MAY BE COPIED OR OTHERWISE REPRODUCED, REPACKAGED, FURTHER TRANSMITTED, TRANSFERRED, DISSEMINATED, REDISTRIBUTED OR RESOLD, OR STORED FOR SUBSEQUENT USE FOR ANY SUCH PURPOSE, IN WHOLE OR IN PART, IN ANY FORM OR MANNER OR BY ANY MEANS WHATSOEVER, BY ANY PERSON WITHOUT MOODY'S PRIOR WRITTEN CONSENT.

MOODY'S CREDIT RATINGS, ASSESSMENTS, OTHER OPINIONS AND PUBLICATIONS ARE NOT INTENDED FOR USE BY ANY PERSON AS A BENCHMARK AS THAT TERM IS DEFINED FOR REGULATORY PURPOSES AND MUST NOT BE USED IN ANY WAY THAT COULD RESULT IN THEM BEING CONSIDERED A BENCHMARK.

All information contained herein is obtained by MOODY'S from sources believed by it to be accurate and reliable. Because of the possibility of human or mechanical error as well as other factors, however, all information contained herein is provided "AS IS" without warranty of any kind. MOODY'S adopts all necessary measures so that the information it uses in assigning a credit rating is of sufficient quality and from sources MOODY'S considers to be reliable including, when appropriate, independent third-party sources. However, MOODY'S is not an auditor and cannot in every instance independently verify or validate information received in the credit rating process or in preparing its Publications.

To the extent permitted by law, MOODY'S and its directors, officers, employees, agents, representatives, licensors and suppliers disclaim liability to any person or entity for any indirect, special, consequential, or incidental losses or damages whatsoever arising from or in connection with the information contained herein or the use of or inability to use any such information, even if MOODY'S or any of its directors, officers, employees, agents, representatives, licensors or suppliers is advised in advance of the possibility of such losses or damages, including but not limited to: (a) any loss of present or prospective profits or (b) any loss or damage arising where the relevant financial instrument is not the subject of a particular credit rating assigned by MOODY'S.

To the extent permitted by law, MOODY'S and its directors, officers, employees, agents, representatives, licensors and suppliers disclaim liability for any direct or compensatory losses or damages caused to any person or entity, including but not limited to by any negligence (but excluding fraud, willful misconduct or any other type of liability that, for the avoidance of doubt, by law cannot be excluded) on the part of, or any contingency within or beyond the control of, MOODY'S or any of its directors, officers, employees, agents, representatives, licensors or suppliers, arising from or in connection with the information contained herein or the use of or inability to use any such information.

NO WARRANTY, EXPRESS OR IMPLIED, AS TO THE ACCURACY, TIMELINESS, COMPLETENESS, MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE OF ANY CREDIT RATING, ASSESSMENT, OTHER OPINION OR INFORMATION IS GIVEN OR MADE BY MOODY'S IN ANY FORM OR MANNER WHATSOEVER.

Moody's Investors Service, Inc., a wholly-owned credit rating agency subsidiary of Moody's Corporation ("MCO"), hereby discloses that most issuers of debt securities (including corporate and municipal bonds, debentures, notes and commercial paper) and preferred stock rated by Moody's Investors Service, Inc. have, prior to assignment of any credit rating, agreed to pay to Moody's Investors Service, Inc. for credit ratings opinions and services rendered by it fees ranging from $1,000 to approximately $5,000,000. MCO and Moody's Investors Service also maintain policies and procedures to address the independence of Moody's Investors Service credit ratings and credit rating processes. Information regarding certain affiliations that may exist between directors of MCO and rated entities, and between entities who hold credit ratings from Moody's Investors Service, Inc. and have also publicly reported to the SEC an ownership interest in MCO of more than 5%, is posted annually at www.moodys.com under the heading "Investor Relations — Corporate Governance — Charter Documents Director and Shareholder Affiliation Policy."

Additional terms for Australia only: Any publication into Australia of this document is pursuant to the Australian Financial Services License of MOODY'S affiliate, Moody's Investors Service Pty Limited ABN 61 003 399 657AFSL 336969 and/or Moody's Analytics Australia Pty Ltd ABN 94 105 136 972 AFSL 383569 (as applicable). This document is intended to be provided only to "wholesale clients" within the meaning of section 761G of the Corporations Act 2001. By continuing to access this document from within Australia, you represent to MOODY'S that you are, or are accessing the document as a representative of, a "wholesale client" and that neither you nor the entity you represent will directly or indirectly disseminate this document or its contents to "retail clients" within the meaning of section 761G of the Corporations Act 2001. MOODY'S credit rating is an opinion as to the creditworthiness of a debt obligation of the issuer, not on the equity securities of the issuer or any form of security that is available to retail investors.

Additional terms for Japan only: Moody's Japan K.K. ("MJKK") is a wholly-owned credit rating agency subsidiary of Moody's Group Japan G.K., which is wholly-owned by Moody's Overseas Holdings Inc., a wholly-owned subsidiary of MCO. Moody's SF Japan K.K. ("MSFJ") is a wholly-owned credit rating agency subsidiary of MJKK. MSFJ is not a Nationally Recognized Statistical Rating Organization ("NRSRO"). Therefore, credit ratings assigned by MSFJ are Non-NRSRO Credit Ratings. Non-NRSRO Credit Ratings are assigned by an entity that is not a NRSRO and, consequently, the rated obligation will not qualify for certain types of treatment under U.S. laws. MJKK and MSFJ are credit rating agencies registered with the Japan Financial Services Agency and their registration numbers are FSA Commissioner (Ratings) No. 2 and 3 respectively.

MJKK or MSFJ (as applicable) hereby disclose that most issuers of debt securities (including corporate and municipal bonds, debentures, notes and commercial paper) and preferred stock rated by MJKK or MSFJ (as applicable) have, prior to assignment of any credit rating, agreed to pay to MJKK or MSFJ (as applicable) for credit ratings opinions and services rendered by it fees ranging from JPY100,000 to approximately JPY550,000,000.

MJKK and MSFJ also maintain policies and procedures to address Japanese regulatory requirements.

App.325

ADDENDA

## Addendum F

## Appraiser Qualifications and Licenses

NEWMARK



# Hayden D. Littlefield

*Senior Director*

t   469-467-2073
m 713-725-0365
hayden.littlefield@nmrk.com

**YEARS OF EXPERIENCE**

## 30+

**AREAS OF SPECIALTY**

Industrial

Office

Multifamily

Complex Mixed-Use Assets

Retail

Farm and Ranch

Marinas

Subdivisions/Land

Appraisal Review Services

Hayden D. Littlefield joined Newmark Valuation & Advisory in 2017 and currently serves as a Senior Director in Dallas, Texas. In this role, Hayden is responsible for performing appraisals on a variety of commercial and special use properties, business development, third party appraisal review services; providing valuation and consulting services for the acquisition, disposition, and financing of investment grade real estate. Additionally, Hayden oversees a team of appraisers within the North Texas and West Texas regions served by Newmark.

Hayden's experience extends over numerous property types including; Apartments (proposed, investment grade, garden style), Industrial (warehouse, flex, self storage, manufacturing/distribution facilities), Professional and Medical Office (high rise, garden style, mid-rise), Retail (strip, neighborhood, big box, lifestyle, regional mall, single tenant), Land (raw, finished lots), and Special Purpose/Use (marinas, shipyards, mining facilities, farms and ranches).

Since beginning his career in valuation in 1989, Hayden has worked with clients on a wide variety of property types and has provided valuation analyses on historic tax credits and tax increment financing (TIF) arrangements. Hayden also has significant experience in litigation assignments, including the preparation of appraisals and providing expert witness testimony.

He began his career in real estate in 1984 when he obtained his Texas real estate salesman license.  He began his appraisal career in 1989 with Rhodes Appraisal Service. In 1994 he became a senior appraiser for Aaron & Wright in Houston. From 2002 through 2017 Hayden served as Vice President with CBRE Valuation Services.

Over his career, Hayden has acted as a real estate broker or appraiser on a wide variety of properties throughout Arizona, Alabama, Arkansas, California, Colorado, Ohio, District of Columbia, Georgia, Florida, Indiana, Illinois, Texas, Maine, Maryland, Michigan, Missouri, Mississippi, Nebraska, Nevada, Washington, Oregon, North Carolina, North Carolina, South Carolina, Tennessee, South Dakota, North Dakota, Kansas, Kentucky, Louisiana, Oklahoma, Pennsylvania, Nevada, New Mexico, New York, Utah, Virginia, and Wisconsin.

### Professional Affiliations
– Candidate for Designation, Appraisal Institute

### Licenses and Designations
– Certified general real estate appraiser, states of Texas, Oklahoma and Louisiana

### Education
Hayden earned a Bachelor of Business Administration degree in Marketing from The University of Texas.

App.327

HAYDEN DEE LITTLEFIELD
4904 COMANCHE DRIVE
GRANBURY, TX 76049



# Certified General
# Real Estate Appraiser

Appraiser:  **Hayden Dee Littlefield**

License #:  **TX 1324546 G**          License Expires: **12/31/2024**

Having provided satisfactory evidence of the qualifications required
by the Texas Appraiser Licensing and Certification Act, Occupations
Code, Chapter 1103, authorization is granted to use this title:
Certified General Real Estate Appraiser

For additional information or to file a complaint please contact TALCB
at www.talcb.texas.gov.

**Chelsea Buchholtz**
**Commissioner**

App.328

**After Recording Return to:**

13901 Midway Rd

Suite 102

Dallas, Texas 75244

**NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OR ALL OF THE FOLLOWING INFORMATION FROM THIS INSTRUMENT BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.**

## SPECIAL WARRANTY DEED

| | | |
|---|---|---|
| STATE OF TEXAS | § | KNOW ALL MEN BY THESE PRESENTS: |
| | § | |
| COUNTY OF JOHNSON | § | |

WHEREAS Grantor acquired certain property from Grantee subject to Grantee's right to reacquire any portion of the property that was not developed by a certain date on the same terms as sold to Grantor along with the assumption of any debt related to any predevelopment work .

WHEREAS _____

_____

_____

_____

THAT, **WALL009, LLC** ("Grantor"), for and in consideration of the sum of Ten Dollars ($10.00) and other good and valuable consideration to Grantor in hand paid by **LYNCO Ventures, LLC** ("Grantee"), the receipt and sufficiency of which is hereby acknowledged by Grantor; and further consideration of that certain Promissory Note ("Note") by Grantee payable to the order of Grantor in the original principal sum of:

Four Million Seven Hundred Eighty Thousand and Ninety Dollars ($4,780,090.00), which is secured by that certain Subordinate Deed of Trust, Assignment of Rents, Security Agreement, and Fixture Filing ("Deed of Trust") herewith covering the Property to be recorded contemporaneously with this instrument but which is subject and subordinate to the following which shall be a debt of the Grantee as secured by the Property (hereafter collectively referred to as the "Existing Debt"):

(i) The Deed of Trust, Assignment of Lease and Rents and Security Agreement recorded on January 29, 2020 as doc number 2020-2485 in the real property records of Johnson County , Texas and (ii) Deed of Trust recorded on September 12, 2019 as doc number 2019-24729 in the real property records of Johnson County, Texas to the extent not otherwise released in whole or part thereafter,

Grantor has GRANTED, SOLD AND CONVEYED, and by these presents does hereby GRANT, SELL AND CONVEY unto Grantee, the following described real property situated in

App.329

Johnson County, Texas, as further described below and on **Exhibit "A"** as attached hereto and incorporated by reference.

Real property totaling 63.764 acres which consists of a 27.262 acre tract and a 36.502 acre tract

Any and all payments on the Note and Deed of Trust (collectively, "Grantor Loan") shall be first paid to reduce the Existing Debt until all such debt has been paid and released as further described in such instruments and as a result, the Grantor Loan is not a cumulative debt with the Existing Debt and the Grantor Loan may be collaterally assigned or transferred only to the existing creditors under the Existing Debt and may not be transferred or assigned to any other party.

This conveyance is made by the Grantor and accepted by the Grantee subject to the validly existing and enforceable rights, interests and estates of third parties in connection with the items filed of record in the real property records of Johson County, Texas including those certain deeds of trust as described above along with any and all recorded encumbrances and exceptions which are made part hereof for all purposes and are considered permitted exceptions.

By acceptance of this Deed, Grantee hereby agrees and acknowledges that:

EXCEPT AS EXPRESSLY SET FORTH IN ANY CONTRACT OF SALE BETWEEN GRANTOR AND GRANTEE INCLUDING THOSE RIGHTS AND OBLIGATIONS WHICH SURVIVED CLOSING (THE "CONTRACT") AND GRANTOR'S SPECIAL WARRANTY OF TITLE SET FORTH HEREIN, GRANTEE ACKNOWLEDGES AND AGREES THAT GRANTOR HAS NOT MADE, DOES NOT MAKE AND SPECIFICALLY NEGATES AND DISCLAIMS ANY REPRESENTATIONS, WARRANTIES, PROMISES, COVENANTS, AGREEMENTS OR GUARANTIES OF ANY KIND OR CHARACTER WHATSOEVER, WHETHER EXPRESS OR IMPLIED, ORAL OR WRITTEN, PAST, PRESENT OR FUTURE, OF, AS TO, CONCERNING OR WITH RESPECT TO (A) THE VALUE, NATURE, QUALITY OR CONDITION OF THE PROPERTY, INCLUDING, WITHOUT LIMITATION, THE WATER, SOIL AND GEOLOGY, (B) THE INCOME TO BE DERIVED FROM THE PROPERTY, (C) THE SUITABILITY OF THE PROPERTY FOR ANY AND ALL ACTIVITIES AND USES WHICH GRANTEE MAY CONDUCT THEREON, (D) THE COMPLIANCE OF OR BY THE PROPERTY OR ITS OPERATION WITH ANY LAWS, RULES, ORDINANCES OR REGULATIONS OF ANY APPLICABLE GOVERNMENTAL AUTHORITY OR BODY, (E) THE HABITABILITY, MERCHANTABILITY, MARKETABILITY, PROFITABILITY OR FITNESS FOR A PARTICULAR PURPOSE OF THE PROPERTY, (F) THE MANNER OR QUALITY OF THE CONSTRUCTION OR MATERIALS, IF ANY, INCORPORATED INTO THE PROPERTY, (G) THE MANNER, QUALITY, STATE OF REPAIR OR LACK OF REPAIR OF THE PROPERTY, (H) THE STATUS OF GRANTOR'S TITLE TO THE PROPERTY OR THE ACCURACY OF ANY SURVEY, OR (I) ANY OTHER MATTER WITH RESPECT TO THE PROPERTY, AND SPECIFICALLY, THAT GRANTOR HAS NOT MADE, DOES NOT MAKE, AND SPECIFICALLY DISCLAIMS ANY REPRESENTATIONS REGARDING COMPLIANCE WITH ANY ENVIRONMENTAL PROTECTION, POLLUTION OR LAND USE LAWS, RULES, REGULATIONS, ORDERS OR REQUIREMENTS, OR THE DISPOSAL OR EXISTENCE, IN OR ON THE PROPERTY, OF ANY HAZARDOUS MATERIALS. EXCEPT AS EXPRESSLY SET FORTH IN THIS CONTRACT, GRANTEE

---

Special Warranty Deed                                                                 Page 2

UNCONDITIONALLY AND IRREVOCABLY WAIVES AND RELEASES ANY AND ALL ACTUAL OR POTENTIAL RIGHTS GRANTEE MIGHT HAVE (INCLUDING CONTRACTUAL AND/OR STATUTORY ACTIONS FOR CONTRIBUTION OR INDEMNITY) REGARDING THE NATURE, CONDITION OR SUITABILITY OF THE PROPERTY OR ANY FORM OF WARRANTY WITH RESPECT TO THE PROPERTY, EXPRESS OR IMPLIED OR ARISING BY OPERATION OF LAW. **THE FOREGOING RELEASE INCLUDES A RELEASE OF GRANTOR FROM CLAIMS BASED ON GRANTOR'S NEGLIGENCE IN WHOLE OR IN PART AND CLAIMS BASED ON STRICT LIABILITY**. GRANTEE FURTHER ACKNOWLEDGES AND AGREES THAT HAVING BEEN GIVEN THE OPPORTUNITY TO INSPECT THE PROPERTY, GRANTEE IS RELYING SOLELY ON ITS OWN INVESTIGATION OF THE PROPERTY AND NOT ON ANY INFORMATION PROVIDED BY GRANTOR UNLESS SUCH INFORMATION IS EXPRESSLY INCORPORATED INTO THE REPRESENTATIONS AND WARRANTIES OF GRANTOR SET FORTH IN THE CONTRACT. GRANTEE ASSUMES THE RISK THAT ADVERSE MATTERS, INCLUDING, BUT NOT LIMITED TO, ADVERSE PHYSICAL AND ENVIRONMENTAL CONDITIONS MAY NOT HAVE BEEN REVEALED BY GRANTEE'S INSPECTIONS AND INVESTIGATIONS. GRANTEE FURTHER ACKNOWLEDGES AND AGREES THAT ANY INFORMATION PREPARED BY THIRD PARTIES PROVIDED WITH RESPECT TO THE PROPERTY WAS PROVIDED OR MADE AVAILABLE AS A COURTESY ONLY AND WAS OBTAINED FROM A VARIETY OF SOURCES AND THAT GRANTOR HAS NOT MADE ANY INDEPENDENT INVESTIGATION OR VERIFICATION OF SUCH INFORMATION AND MAKES NO REPRESENTATIONS OR WARRANTIES AS TO THE ACCURACY OR COMPLETENESS OF SUCH INFORMATION. EXCEPT AS EXPRESSLY SET FORTH IN THE CONTRACT, GRANTOR SHALL NOT BE LIABLE OR BOUND IN ANY MANNER BY ANY VERBAL OR WRITTEN STATEMENTS, REPRESENTATIONS OR INFORMATION PERTAINING TO THE PROPERTY, OR THE OPERATION THEREOF, PREPARED OR FURNISHED BY ANY REAL ESTATE BROKER, AGENT, EMPLOYEE, SERVANT, CONTRACTOR OR THIRD PARTY. GRANTEE FURTHER ACKNOWLEDGES AND AGREES THAT THE SALE OF THE PROPERTY AS PROVIDED FOR HEREIN IS MADE ON AN "AS IS" CONDITION AND BASIS WITH ALL FAULTS. IT IS UNDERSTOOD AND AGREED THAT THE PURCHASE PRICE HAS BEEN ADJUSTED BY PRIOR NEGOTIATION TO REFLECT THAT ALL OF THE PROPERTY IS SOLD BY GRANTOR AND PURCHASED BY GRANTEE SUBJECT TO THE FOREGOING.

TO HAVE AND TO HOLD the above described premises, together with all and singular the rights and appurtenances thereof in anywise belonging unto Grantee, its successors and assigns forever, and Grantor does hereby bind itself, its successors and assigns to WARRANT AND FOREVER DEFEND, all and singular such premises unto Grantee, its successors and assigns, against every person whomsoever lawfully claiming or to claim the same or any part thereof, by, through or under the Grantor, but not otherwise.

Whenever used, the singular number shall include the plural, and the plural the singular.

**[Signatures appear on the following page]**

Special Warranty Deed    Page 3

App.331

EXECUTED this _30_ day of _JANUARY_ , 20_20_ .

**GRANTOR:**

_A Texas limited liability company_

By: _WALLOO9 LLC_
Name: _TIM BARTON_
Its: _PRESIDENT_

STATE OF TEXAS                                    §
                                                 §
COUNTY OF _DALLAS_                        §

_TIM Barton_   This instrument was acknowledged before me on _January 30, 2020_ by _TIM Barton_ , the _president_ of _Wall009 LLC_ , on behalf of said company.

_____
Notary Public, State of Texas

Bella D Khusal
My Commission Expires
09/24/2022
ID No. 131734480

---

Special Warranty Deed                                                Page 4

App.332

## EXHIBIT "A"
## PROPERTY DESCRIPTION

*[SEE ATTACHED]*

App.333

## EXHIBIT A

BEING a 27.262 acre tract of land acre tract of land situated in the John Haigler Survey, Abstract No. 358 and the Absalom Williams Survey, Abstract No. 857, City of Venus, Johnson County, Texas and being a part of that certain called 101.49 acre tract of land described in Special Warranty Deed from Lynco Ventures, LLC to Wall009, LLC and recorded by Document No. 2017-16584 of the Deed Records of Johnson County, Texas said 27.262 acres of land to be more particularly described by metes and bounds as follows:

BEGINNING at a 1/2" capped iron rod found for corner in the Southeast line of said 101.49 acre tract of land, same being the Northwest line of County Road 501 (60 foot Right-of-Way) and being at the East corner of Venus Ridge Phase IV Addition an Addition to the City of Venus, Johnson County, Texas according to the Plat thereof recorded Volume 11, Page 544 of the Plat Records of Johnson County, Texas;

THENCE North 30°13'50" West with the Northeast line of said Addition a distance of 1,128.01 feet to a 1/2" capped iron rod marked "SANDS" set for corner;

THENCE North 59°46'10" East across said 101.49 acre tract a distance of 110.00 feet to a 1/2" capped iron rod marked "SANDS" set for corner;

THENCE North 30°13'50" West a distance of 5.00 feet to a 1/2" capped iron rod marked "SANDS" set for corner;

THENCE North 59°46'10" East a distance of 50.00 feet to a 1/2" capped iron rod marked "SANDS" set for corner;

THENCE North 30°13'50" West a distance of 26.19 feet to a 1/2" capped iron rod marked "SANDS" set for corner;

THENCE North 59°46'10" East at a distance of 858.80 feet to a 1/2" capped iron rod marked "SANDS" set for corner in the Northeast line of said 101.49 acre tract, same being the Northeast line of the above referenced John Haigler Survey and being in the Southwest line of the above referenced 126.2407 acre tract, same being the Southwest line of the above referenced Absalom Williams Survey;

THENCE South 30°13'50" East with said Northeast and Southwest lines a distance of 1,181.38 feet to a 1/2" capped iron rod marked "FORT WORTH SURVEYING" set for corner in the Northwest line of the above referenced County Road 501 at the East corner of said 101.49 acre tract;

THENCE South 60°01'00" West continuing with said County Road and the Southeast line of said 101.49 acre tract a distance of 1,019.04 feet back to the POINT OF BEGINNING and CONTAINING 1,187,549 square feet, or 27.262 acres of land, more or less.

App.334

BEING a 36.502 acre tract of land situated in the John Haigler Survey, Abstract No. 358 and the Absalom Williams Survey, Abstract No. 857, City of Venus, Johnson County, Texas and being a part of that certain called 101.49 acre tract of land described in Special Warranty Deed from Lynco Ventures, LLC to Wall009, LLC and recorded by Document No. 2017-16584 of the Deed Records of Johnson County, Texas said 27.262 acres of land to be more particularly described by metes and bounds as follows:

COMMENCING at a 1/2" capped iron rod found for corner in the Southeast line of said 101.49 acre tract of land, same being the Northwest line of County Road 501 (60 foot Right-of-Way) and being at the East corner of Venus Ridge Phase IV Addition an Addition to the City of Venus, Johnson County, Texas according to the Plat thereof recorded Volume 11, Page 544 of the Plat Records of Johnson County, Texas;

THENCE North 30°13'50" West with the Northeast line of said Venus Ridge, Phase IV and the Southwest line of said 101.19 acre tract a distance of 1,128.01 feet to a 1/2" capped iron rod set for corner at the POINT OF BEGINNING;

THENCE continuing with said Northeast and Southwest lines the following:
    North 30°13'50" West a distance of 1,063.25 feet to a 1/2" capped iron rod found for corner;
    North 00°26'19" West a distance of 112.41 feet to a 1/2" capped iron rod found for corner;
    South 89°33'41" West a distance of 33.74feet to a 1/2" capped iron rod found for corner at the beginning of a curve to the left;

THENCE continuing with said Northeast and Southwest lines in a Southwesterly direction with said curve to the left having a radius of 270.00 feet, a chord that bears South 74°39'55" West a distance of 138.81 feet for an arc length of 140.39 feet to a 1/2" capped iron rod found for corner;

THENCE North 30°13'50" West a distance of 242.77 feet to a 1/2" capped iron rod found for corner;

THENCE South89°33'41" West a distance of 183.97 feet to a 1/2" capped iron rod found for corner in the Northwest line of said 101.49 acre tract, the Northwest line of said Haigler Survey, same being the Southeast line of that certain called 144.38 acre tract of land described in Deed from Wayne Hood and Eleanor Hood and recorded in Volume 2616, Page 156of said Deed Records, same being the Southeast line of the B.B.B. & C.R.R. Survey, Abstract No. 92;

THENCE North 59°45'40" East with said Southeast and Northwest lines a distance of 1,286.03 feet to a capped iron rod found for corner at the North corner of said 101.49 acre tract of land, same being the North corner of said Haigler Survey, the East corner of said B.B.B. & C.R.R. Survey, and being in the Southwest line of that certain called 62.7 acre tract of land described in Deed to Fielder Farm Partnership, et al and recorded in Volume 4302, Page 538 of said Deed Records, same being the Southwest line of the Absolam Williams Survey, Abstract No. 857;

THENCE South 30°13'50" East with the Northeast line of said 101.49 acre tract, same being the Northeast line of said Haigler Survey and the Southwest line of said 62.7 acre tract, same being the Southwest line of said Williams Survey at a distance of 11219.39 feet passing a 1/2" capped iron rod found for corner at the South corner of said 62.7 acre tract, same being the West corner of that certain called 128.8645 acre tract of land described in Deed from Anastasia Energy, LLC to DJD Land Partners, LLC and recorded in County Clerks File No. 2018-18134 of said Deed Records and continuing a total distance of 1,516.42 feet 1/2" capped iron rod found for corner;

THENCE across said 101.49 acre tract a the following
    South 59°46'10" West a distance of 858.80 feet to a 1/2" capped iron rod set for corner;
    South 30°13'50" East a distance of 26.19feet to a 1/2" capped iron rod set for corner;
    South 59°46'10" West a distance of 50.00feet to a 1/2" capped iron rod set for corner;
    South 30°13'50" East a distance of 5.00 feet to a 1/2" capped iron rod set for corner;

THENCE South 59°46'10" West a distance of 110.00 feet back to the POINT OF BEGINNING and CONTAINNING 1,590,029 square feet or 36.502 acres of land, more or less.

App.335

## Johnson County
### Becky Ivey
**Johnson County**
**Clerk**

---

**Instrument Number:**  2022 - 29088

eRecording - Real Property

Warranty Deed

Recorded On: August 17, 2022 08:11 AM                    Number of Pages: 8

---

**" Examined and Charged as Follows: "**

Total Recording: $50.00

---

*********** **THIS PAGE IS PART OF THE INSTRUMENT** ***********
Any provision herein which restricts the Sale, Rental or use of the described REAL PROPERTY
because of color or race is invalid and unenforceable under federal law.

| File Information: | | Record and Return To: |
|---|---|---|
| Document Number: | 2022 - 29088 | Simplifile |
| Receipt Number: | 20220817000004 | 5072 North 300 West |
| Recorded Date/Time: | August 17, 2022 08:11 AM | |
| User: | Leslie S | PROVO UT |
| Station: | ccl83 | |

---



**STATE OF TEXAS**
**COUNTY OF JOHNSON**

**I hereby certify that this Instrument was** FILED **In the File Number sequence on the date/time printed hereon, and was duly** RECORDED **in the Official Records of Johnson County, Texas.**

Becky Ivey
Johnson County Clerk
Johnson County, TX

App.336



Johnson CAD Web Map

126.0092.00011

126.0857.00060

County Ro

126.0857.00040

126.0092.00018

A-92

126.0857.00045

126.0857.00053

126.4454.06160

126.4454.07150

126.4454.05160

126.4454.06090

126.4454.05170

126.4454.04150

126.4454.07120

126.0358.00070

off Shell

126.4454.05190

126.4454.00550

126.4454.05120

126.0857.00052

126.0857.00050

454.00520

126.4454.03150

126.4454.07090

126.0857.00051

126.4454.04120

126.4454.05220

126.4454.03170

126.4454.05090

126.4454.00160

126.4454.04200

126.4454.07060

126.4454.00170

126.4454.04090

126.4454.05250

126.4472.00320

126.4454.03200

126.4454.05260

126.0857.00052

126.4377

126.0

A-358

126.4454.04230

126.4454.07030

126.4454.00190

126.4454.05040  126.4454.07020

126.0093.00055

472.00110

126.4454.00380

126.4454.07010

126.4472.00290

126.4454.04250

126.4454.05020

126.0093.00062

126.4454.00220

126.0093.00061

126.4472.00080

126.4454.00350

126.4454.05010

County Road 501

Grassy Creek

126.4472.00260

126.4454.03260

126.0093.00065

5/24/2024, 10:26:17 AM

R000009595

Parcels

Abstracts

1:9,028

0    0.05    0.1        0.2 mi

0    0.1    0.2        0.4 km

Esri Community Maps Contributors, Baylor University, Texas Parks & Wildlife,
© OpenStreetMap, Microsoft, CONANP, Esri, TomTom, Garmin, SafeGraph,

Johnson Central Appraisal District, BIS Consulting.com    App. 337

Disclaimer: This product is for informational purposes only and has not been prepared for or be suitable for legal, engineering, or surveying purposes. It does not represent an on-the-ground survey and represents only the approximate relative location of boundaries.

*000000002735533240095506302021*

# PROMISSORY NOTE

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $127,500.00 | 06-30-2021 | 06-30-2026 | 2735533240 | | 2735533 | WEL | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item. Any item above containing "***" has been omitted due to text length limitations.

**Borrower:** Southern Star Capital, LLC
5220 Spring Valley, Suite 602
Dallas, TX 75254

**Lender:** Texas Brand Bank
1919 S. Shiloh Road
Suite 100
Garland, TX 75042
(972) 494-9800

**Principal Amount: $127,500.00** **Date of Note: June 30, 2021**

**PROMISE TO PAY. Southern Star Capital, LLC ("Borrower") promises to pay to Texas Brand Bank ("Lender"), or order, in lawful money of the United States of America, the principal amount of One Hundred Twenty-seven Thousand Five Hundred & 00/100 Dollars ($127,500.00), together with interest on the unpaid principal balance from June 30, 2021, until maturity.**

**PAYMENT. Borrower will pay this loan in full immediately upon Lender's demand. If no demand is made, subject to any payment changes resulting from changes in the Index, Borrower will pay this loan in 59 regular payments of $1,046.98 each and one irregular last payment estimated at $97,181.45. Borrower's first payment is due July 30, 2021, and all subsequent payments are due on the same day of each month after that. Borrower's final payment will be due on June 30, 2026, and will be for all principal and all accrued interest not yet paid. Payments include principal and interest. Unless otherwise agreed or required by applicable law, payments will be applied first to any accrued unpaid interest; then to principal; then to any late charges; and then to any unpaid collection costs. Any accrued interest not paid when due is added to principal and thereafter will accrue interest as principal.**

**VARIABLE INTEREST RATE.** The interest rate on this Note is subject to change from time to time based on changes in an independent index which is the Wall Street Journal Prime Rate as published in the Money Rate Section of the Wall Street Journal (the "Index"). The Index is not necessarily the lowest rate charged by Lender on its loans. Lender will tell Borrower the current Index rate upon Borrower's request. The interest rate change will not occur more often than each day. Borrower understands that Lender may make loans based on other rates as well. **The Index currently is 3.250% per annum.** Interest prior to maturity on the unpaid principal balance of this Note will be calculated as described in the "INTEREST CALCULATION METHOD" paragraph using a rate of 1.000 percentage point over the Index (the "Margin"), adjusted if necessary for any minimum and maximum rate limitations described below, resulting in an initial rate of 5.500%. If Lender determines, in its sole discretion, that the Index has become unavailable or unreliable, either temporarily, indefinitely, or permanently, during the term of this Note, Lender may amend this Note by designating a substantially similar substitute index. Lender may also amend and adjust the Margin to accompany the substitute index. The change to the Margin may be a positive or negative value, or zero. In making these amendments, Lender may take into consideration any then-prevailing market convention for selecting a substitute index and margin for the specific Index that is unavailable or unreliable. Such an amendment to the terms of this Note will become effective and bind Borrower 10 business days after Lender gives written notice to Borrower without any action or consent of the Borrower. NOTICE: Under no circumstances will the interest rate on this Note be less than 5.500% per annum or more than the maximum rate allowed by applicable law. For purposes of this Note, the "maximum rate allowed by applicable law" means the greater of (A) the maximum rate of interest permitted under federal or other law applicable to the indebtedness evidenced by this Note, or (B) the "Weekly Ceiling" as referred to in Sections 303.002 and 303.003 of the Texas Finance Code. Whenever increases occur in the interest rate, Lender, at its option, may do one or more of the following: (A) increase Borrower's payments to ensure Borrower's loan will pay off by its original final maturity date, (B) increase Borrower's payments to cover accruing interest, (C) increase the number of Borrower's payments, and (D) continue Borrower's payments at the same amount and increase Borrower's final payment.

**INTEREST CALCULATION METHOD. Interest on this Note is computed on a 365/360 basis; that is, by applying the ratio of the interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding (but not including February 29 in leap years), unless such calculation would result in a usurious rate, in which case interest shall be calculated on a per diem basis of a year of 365 days. All interest payable under this Note is computed using this method. This calculation method results in a higher effective interest rate than the numeric interest rate stated in this Note.**

**RECEIPT OF PAYMENTS.** All payments must be made in U.S. dollars and must be received by Lender at:

Texas Brand Bank
1919 S. Shiloh Road
Suite 100
Garland, TX 75042

All payments must be received by Lender consistent with any written payment instructions provided by Lender. If a payment is made consistent with Lender's payment instructions but received after 5:00 PM Central Time on a business day, Lender will credit Borrower's payment on the next business day.

**PREPAYMENT.** Borrower agrees that all loan fees and other prepaid finance charges are earned fully as of the date of the loan and will not be subject to refund upon early payment (whether voluntary or as a result of default), except as otherwise required by law. Except for the foregoing, Borrower may pay without penalty all or a portion of the amount owed earlier than it is due. Prepayment in full shall consist of payment of the remaining unpaid principal balance together with all accrued and unpaid interest and all other amounts, costs and expenses for which Borrower is responsible under this Note or any other agreement with Lender pertaining to this loan, and in no event will Borrower ever be required to pay any unearned interest. Early payments will not, unless agreed to by Lender in writing, relieve Borrower of Borrower's obligation to continue to make payments under the payment schedule. Rather, early payments will reduce the principal balance due and may result in Borrower's making fewer payments. Borrower agrees not to send Lender payments marked "paid in full", "without recourse", or similar language. If Borrower sends such a payment, Lender may accept it without losing any of Lender's rights under this Note, and Borrower will remain obligated to pay any further amount owed to Lender. **All written communications concerning disputed amounts, including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to: Texas Brand Bank, 1919 S. Shiloh Road Garland, TX 75042.**

**PROMISSORY NOTE**

Loan No: 2735533240

**(Continued)**

Page 2

**LATE CHARGE.** If a payment is 11 days or more late, Borrower will be charged 5.000% of the unpaid portion of the regularly scheduled payment.

**INTEREST AFTER DEFAULT.** Upon default, including failure to pay upon final maturity, the total sum due under this Note will continue to accrue interest at the interest rate under this Note.

**DEFAULT.** Each of the following shall constitute an event of default ("Event of Default") under this Note:

**Payment Default.** Borrower fails to make any payment when due under this Note.

**Other Defaults.** Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Note or in any of the related documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**Default in Favor of Third Parties.** Borrower or any Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's property or Borrower's ability to repay this Note or perform Borrower's obligations under this Note or any of the related documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Note or the related documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Death or Insolvency.** The dissolution of Borrower (regardless of whether election to continue is made), any member withdraws from Borrower, or any other termination of Borrower's existence as a going business or the death of any member, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the loan. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any guaranty of the indebtedness evidenced by this Note.

**Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of this Note is impaired.

**Cure Provisions.** If any default, other than a default in payment, is curable and if Borrower has not been given a notice of a breach of the same provision of this Note within the preceding twelve (12) months, it may be cured if Borrower, after Lender sends written notice to Borrower demanding cure of such default: (1) cures the default within thirty (30) days; or (2) if the cure requires more than thirty (30) days, immediately initiates steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**LENDER'S RIGHTS.** Upon default, Lender may declare the entire indebtedness, including the unpaid principal balance under this Note, all accrued unpaid interest, and all other amounts, costs and expenses for which Borrower is responsible under this Note or any other agreement with Lender pertaining to this loan, immediately due, without notice, and then Borrower will pay that amount. Upon default, after giving any required notice of default and after Borrower's failure to cure the default during any required cure period, Lender may declare due the entire indebtedness, including the unpaid principal balance, accrued unpaid interest, and all other amounts, costs and expenses for which Borrower is responsible under this Note or any other agreement with Lender pertaining to this loan and Borrower will then pay that amount.

**ATTORNEYS' FEES; EXPENSES.** Lender may hire an attorney to help collect this Note if Borrower does not pay, and Borrower will pay Lender's reasonable attorneys' fees. Borrower also will pay Lender all other amounts Lender actually incurs as court costs, lawful fees for filing, recording, releasing to any public office any instrument securing this Note; the reasonable cost actually expended for repossessing, storing, preparing for sale, and selling any security; and fees for noting a lien on or transferring a certificate of title to any motor vehicle offered as security for this Note, or premiums or identifiable charges received in connection with the sale of authorized insurance.

**GOVERNING LAW.** This Note will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Texas without regard to its conflicts of law provisions. This Note has been accepted by Lender in the State of Texas.

**CHOICE OF VENUE.** If there is a lawsuit, and if the transaction evidenced by this Note occurred in Dallas County, Borrower agrees upon Lender's request to submit to the jurisdiction of the courts of Dallas County, State of Texas.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Borrower's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Borrower holds jointly with someone else and all accounts Borrower may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Borrower authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the indebtedness against any and all such accounts.

**TAX LIEN LOAN.** (a) Borrower shall obtain a loan to pay all or any portion of the ad valorem taxes accrued and/or accruing against the Property or any portion thereof (a "Tax Lien Loan"), (b) Borrower shall execute a deed of trust or other lien instrument encumbering the Property or any portion thereof to secure a Tax Lien Loan, or (c) any taxing authority shall assign its lien securing the payment of ad valorem taxes accrued and/or accruing against the Property or any portion thereof to a third party to secure or collateralize a Tax Lien Loan.

**SUCCESSOR INTERESTS.** The terms of this Note shall be binding upon Borrower, and upon Borrower's heirs, personal representatives, successors and assigns, and shall inure to the benefit of Lender and its successors and assigns.

**NOTIFY US OF INACCURATE INFORMATION WE REPORT TO CONSUMER REPORTING AGENCIES.** Borrower may notify Lender if Lender reports any inaccurate information about Borrower's account(s) to a consumer reporting agency. Borrower's written notice describing the specific inaccuracy(ies) should be sent to Lender at the following address: Texas Brand Bank 1919 S. Shiloh Road Garland, TX 75042.

**GENERAL PROVISIONS.** This Note is payable on demand. The inclusion of specific default provisions or rights of Lender shall not preclude Lender's right to declare payment of this Note on its demand. If any part of this Note cannot be enforced, this fact will not affect the rest of the Note. Borrower does not agree or intend to pay, and Lender does not agree or intend to contract for, charge, collect, take, reserve or receive

App.339

**PROMISSORY NOTE**
**(Continued)**

Loan No: 2735533240

Page 3

(collectively referred to herein as "charge or collect"), any amount in the nature of interest or in the nature of a fee for this loan, which would in any way or event (including demand, prepayment, or acceleration) cause Lender to charge or collect more for this loan than the maximum Lender would be permitted to charge or collect by federal law or the law of the State of Texas (as applicable). Any such excess interest or unauthorized fee shall, instead of anything stated to the contrary, be applied first to reduce the principal balance of this loan, and when the principal has been paid in full, be refunded to Borrower. The right to accelerate maturity of sums due under this Note does not include the right to accelerate any interest which has not otherwise accrued on the date of such acceleration, and Lender does not intend to charge or collect any unearned interest in the event of acceleration. All sums paid or agreed to be paid to Lender for the use, forbearance or detention of sums due hereunder shall, to the extent permitted by applicable law, be amortized, prorated, allocated and spread throughout the full term of the loan evidenced by this Note until payment in full so that the rate or amount of interest on account of the loan evidenced hereby does not exceed the applicable usury ceiling. Lender may delay or forgo enforcing any of its rights or remedies under this Note without losing them. Borrower and any other person who signs, guarantees or endorses this Note, to the extent allowed by law, waive presentment, demand for payment, notice of dishonor, notice of intent to accelerate the maturity of this Note, and notice of acceleration of the maturity of this Note, provided, however, that Borrower shall be entitled to any required notice of default and shall be given all opportunity to cure as required by applicable law. Upon any change in the terms of this Note, and unless otherwise expressly stated in writing, no party who signs this Note, whether as maker, guarantor, accommodation maker or endorser, shall be released from liability. All such parties agree that Lender may renew or extend (repeatedly and for any length of time) this loan or release any party or guarantor or collateral; or impair, fail to realize upon or perfect Lender's security interest in the collateral without the consent of or notice to anyone. All such parties also agree that Lender may modify this loan without the consent of or notice to anyone other than the party with whom the modification is made. The obligations under this Note are joint and several.

PRIOR TO SIGNING THIS NOTE, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS NOTE, INCLUDING THE VARIABLE INTEREST RATE PROVISIONS. BORROWER AGREES TO THE TERMS OF THE NOTE.

BORROWER ACKNOWLEDGES RECEIPT OF A COMPLETED COPY OF THIS PROMISSORY NOTE.

BORROWER:

SOUTHERN STAR CAPITAL, LLC

By: _____
Michael D. Anderson, Manager of Southern Star
Capital, LLC

LaserPro, Ver. 21.1.0.222 Copr. Finastra USA Corporation 1997, 2021. All Rights Reserved. - TX Z:\CFI\LPL\D20.FC TR-4828 PR-2

LNS TRANSACTION HISTORY REPORT FOR SOUTHERN STAR CAPITAL LLC  2735533 - 240 Public ID: JEANNINE

| NAME AND ADDRESS | BORROWER # | 2735533 | 5/1/2024 |
|---|---|---|---|

SOUTHERN STAR CAPITAL LLC

5220 SPRING VALLEY STE 602
DALLAS TX 75254

PHONE #                                    (214) 346-5201
PRIMARY DDA #                          000000000000
PRIMARY OFFICER                                    WEL
F/S CODE

NOTE #  240

| LOAN AMOUNT | LOAN DATE | MATURITY DATE | INTEREST RATE | REAL ESTATE LOCATION |
|---|---|---|---|---|
| $127,500.00 | 06/30/2021 | 07/10/2026 | 9.5000000% | N/R 940 COUNTY RD 110 |

| DATE NEXT DUE | | |
|---|---|---|
| 05/10/2024 | CURRENT BALANCE | $113,742.62 |
| | INTEREST FOR YEAR | $3,693.97 |
| | LATE CHARGES FOR YEAR | $0.00 |

| EFFECTIVE DATE | TOTAL AMOUNT | | PRINCIPAL | INTEREST | ESC/LATE/FEE | ESCROW BALANCE | LOAN BALANCE | PUBLIC ID |
|---|---|---|---|---|---|---|---|---|
| 04/09/2024 | $1,320.75 | P | $387.34 | $933.41 | $0.00 | $0.00 | $113,742.62 | |
| 03/08/2024 | $1,320.75 | P | $443.64 | $877.11 | $0.00 | $0.00 | $114,129.96 | |
| 02/13/2024 | $1,320.75 | P | $380.56 | $940.19 | $0.00 | $0.00 | $114,573.60 | |
| 01/08/2024 | $1,320.75 | P | $377.49 | $943.26 | $0.00 | $0.00 | $114,954.16 | |
| 12/08/2023 | $1,320.75 | P | $404.89 | $915.86 | $0.00 | $0.00 | $115,331.65 | |
| 11/06/2023 | $1,320.75 | P | $370.93 | $949.82 | $0.00 | $0.00 | $115,736.54 | |
| 10/10/2023 | $1,320.75 | P | $398.31 | $922.44 | $0.00 | $0.00 | $116,107.47 | |
| 09/11/2023 | $1,320.75 | P | $353.58 | $967.17 | $0.00 | $0.00 | $116,505.78 | |
| 08/08/2023 | $1,303.54 | P | $369.37 | $934.17 | $0.00 | $0.00 | $116,859.36 | |
| 07/27/2023 | | | 0002 FM: INTEREST RATE | | TO: 095000000C | | FROM: 092500000C | |
| 07/14/2023 | $1,368.72 | P | $395.75 | $907.79 | $65.18 LC | $0.00 | $117,228.73 | |
| 06/22/2023 | $1,303.54 | P | $357.51 | $946.03 | $0.00 | $0.00 | $117,624.48 | |
| 05/15/2023 | $1,350.34 | P | $397.17 | $888.87 | $64.30 LC | $0.00 | $117,981.99 | |
| 05/03/2023 | | | 0002 FM: INTEREST RATE | | TO: 092500000C | | FROM: 090000000C | |
| 04/21/2023 | $1,286.04 | P | $375.80 | $910.24 | $0.00 | $0.00 | $118,379.16 | |
| 03/22/2023 | | | 0002 FM: INTEREST RATE | | TO: 090000000C | | FROM: 087500000C | |
| 03/08/2023 | $1,269.23 | P | $450.78 | $818.45 | $0.00 | $0.00 | $118,754.96 | |
| 02/16/2023 | $1,251.68 | P | $376.49 | $875.19 | $0.00 | $0.00 | $119,205.74 | |
| 02/02/2023 | | | 0002 FM: INTEREST RATE | | TO: 087500000C | | FROM: 085000000C | |
| 01/09/2023 | $1,251.68 | P | $380.12 | $871.56 | $0.00 | $0.00 | $119,582.23 | |
| 12/14/2022 | | | 0002 FM: INTEREST RATE | | TO: 085000000C | | FROM: 080000000C | |
| 12/12/2022 | $1,217.03 | P | $394.16 | $822.87 | $0.00 | $0.00 | $119,962.35 | |
| 11/14/2022 | $1,165.88 | P | $411.73 | $754.15 | $0.00 | $0.00 | $120,356.51 | |
| 11/02/2022 | | | 0002 FM: INTEREST RATE | | TO: 080000000C | | FROM: 072500000C | |
| 10/12/2022 | $1,165.88 | P | $463.53 | $702.35 | $0.00 | $0.00 | $120,768.24 | |
| 09/22/2022 | | | 0002 FM: INTEREST RATE | | TO: 072500000C | | FROM: 065000000C | |

App.341

**LNS TRANSACTION HISTORY REPORT FOR SOUTHERN STAR CAPITAL LLC - 2735533 - 240 Public ID: JEANNINE**

| EFFECTIVE DATE | TOTAL AMOUNT | | PRINCIPAL | INTEREST | ESC/LATE/FEE | ESCROW BALANCE | LOAN BALANCE | PUBLIC ID |
|---|---|---|---|---|---|---|---|---|
| | | | TRANSACTION BREAKDOWN | | | | | |
| 09/13/2022 | $1,114.99 | P | $398.75 | $716.24 | $0.00 | $0.00 | $121,231.77 | |
| 08/08/2022 | $1,065.26 | P | $461.12 | $604.14 | $0.00 | $0.00 | $121,630.52 | |
| 07/27/2022 | | | 0002 FM: INTEREST RATE | | TO: 065000000C 0 | | FROM: 057500000C | |
| | | | DATE POSTED: 07/28/2022 | | | | | |
| 07/05/2022 | $1,065.26 | P | $482.75 | $582.51 | $0.00 | $0.00 | $122,091.64 | |
| 06/15/2022 | | | 0002 FM: INTEREST RATE | | TO: 057500000C | | FROM: 055000000C | |
| 06/02/2022 | $1,046.98 | P | $464.33 | $582.65 | $0.00 | $0.00 | $122,574.39 | |
| 05/09/2022 | $1,046.98 | P | $481.27 | $565.71 | $0.00 | $0.00 | $123,038.72 | |
| 04/04/2022 | $1,046.98 | P | $459.79 | $587.19 | $0.00 | $0.00 | $123,519.99 | |
| 03/10/2022 | $1,046.98 | P | $514.43 | $532.55 | $0.00 | $0.00 | $123,979.78 | |
| 02/10/2022 | $1,046.98 | P | $454.65 | $592.33 | $0.00 | $0.00 | $124,494.21 | |
| 01/18/2022 | $1,046.98 | P | $453.56 | $593.42 | $0.00 | $0.00 | $124,948.86 | |
| 12/03/2021 | $1,046.98 | P | $470.41 | $576.57 | $0.00 | $0.00 | $125,402.42 | |
| 11/05/2021 | $1,046.98 | P | $448.56 | $598.42 | $0.00 | $0.00 | $125,872.83 | |
| 10/12/2021 | $1,046.98 | P | $466.08 | $580.90 | $0.00 | $0.00 | $126,321.39 | |
| 09/07/2021 | $1,046.98 | P | $444.72 | $602.26 | $0.00 | $0.00 | $126,787.47 | |
| 08/02/2021 | $1,046.98 | P | $267.81 | $779.17 | $0.00 | $0.00 | $127,232.19 | |
| 06/30/2021 | $127,500.00 | A | $127,500.00 | | $0.00 | $0.00 | $127,500.00 | LYNNB |
| | | | DATE POSTED: 07/01/2021 | | | | | |

CODES P = PAYMENT. R = PAYMENT REVERSAL. D = DISBURSEMENT. LC = LATE CHARGE. F = FEE
E = DISBURSEMENT REVERSAL. A = ADJUSTMENT. U = UNAPPLIED FUNDS. V = ADVANCE

| LIFE TOTALS: | | | YTD TOTALS: | | |
|---|---|---|---|---|---|
| | PRINCIPAL | $13,757.38 | | PRINCIPAL | $1,589.03 |
| | INTEREST | $25,374.99 | | INTEREST | $3,693.97 |
| | ESCROW | $0.00 | | ESCROW | $0.00 |
| | LATE CHARGE | $129.48 | | LATE CHARGE | $0.00 |

App.342



*000000002735533185095503092024*

# PROMISSORY NOTE

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $620,036.13 | 03-09-2024 | 06-07-2024 | 2735533185 | A | 2735533 | WEL | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "****" has been omitted due to text length limitations.

**Borrower:**  Southern Star Capital, LLC
5220 Spring Valley, Suite 602
Dallas, TX 75254

**Lender:**  Harmony Bank
1919 S. Shiloh Road
Suite 100
Garland, TX 75042
(972) 494-9800

---

**Principal Amount: $620,036.13**                                   **Date of Note: March 9, 2024**

**PROMISE TO PAY.** Southern Star Capital, LLC ("Borrower") promises to pay to Harmony Bank ("Lender"), or order, in lawful money of the United States of America, the principal amount of Six Hundred Twenty Thousand Thirty-six & 13/100 Dollars ($620,036.13), together with interest on the unpaid principal balance from March 9, 2024, until maturity.

**PAYMENT.** Borrower will pay this loan in full immediately upon Lender's demand. If no demand is made, Borrower will pay this loan in one principal payment of $620,036.13 plus interest on June 7, 2024. This payment due on June 7, 2024, will be for all principal and all accrued interest not yet paid. In addition, Borrower will pay regular monthly payments of all accrued unpaid interest due as of each payment date, beginning April 9, 2024, with all subsequent interest payments to be due on the same day of each month after that. Unless otherwise agreed or required by applicable law, payments will be applied first to any accrued unpaid interest; then to principal; and then to any unpaid collection costs. Any accrued interest not paid when due is added to principal and thereafter will accrue interest as principal.

**VARIABLE INTEREST RATE.** The interest rate on this Note is subject to change from time to time based on changes in an independent index which is the Wall Street Journal Prime Rate as published in the Money Rate Section of the Wall Street Journal (the "Index"). The Index is not necessarily the lowest rate charged by Lender on its loans. Lender will tell Borrower the current Index rate upon Borrower's request. The interest rate change will not occur more often than each day. Borrower understands that Lender may make loans based on other rates as well. **The Index currently is 8.500% per annum.** Interest prior to maturity on the unpaid principal balance of this Note will be calculated as described in the "INTEREST CALCULATION METHOD" paragraph using a rate of 1.000 percentage point over the Index (the "Margin"), adjusted if necessary for any minimum and maximum rate limitations described below, resulting in an initial rate of 9.500%. If Lender determines, in its sole discretion, that the Index has become unavailable or unreliable, either temporarily, indefinitely, or permanently, during the term of this Note, Lender may amend this Note by designating a substantially similar substitute index. Lender may also amend and adjust the Margin to accompany the substitute index. The change to the Margin may be a positive or negative value, or zero. In making these amendments, Lender may take into consideration any then-prevailing market convention for selecting a substitute index and margin for the specific Index that is unavailable or unreliable. Such an amendment to the terms of this Note will become effective and bind Borrower 10 business days after Lender gives written notice to Borrower without any action or consent of the Borrower. NOTICE: Under no circumstances will the interest rate on this Note be less than 8.500% per annum or more than the maximum rate allowed by applicable law. For purposes of this Note, the "maximum rate allowed by applicable law" means the greater of (A) the maximum rate of interest permitted under federal or other law applicable to the indebtedness evidenced by this Note, or (B) the "Weekly Ceiling" as referred to in Sections 303.002 and 303.003 of the Texas Finance Code.

**INTEREST CALCULATION METHOD.** Interest on this Note is computed on a 365/360 basis; that is, by applying the ratio of the interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding (but not including February 29 in leap years), unless such calculation would result in a usurious rate, in which case interest shall be calculated on a per diem basis of a year of 365 days. All interest payable under this Note is computed using this method. This calculation method results in a higher effective interest rate than the numeric interest rate stated in this Note.

**RECEIPT OF PAYMENTS.** All payments must be made in U.S. dollars and must be received by Lender at:

Harmony Bank
1919 S. Shiloh Road
Suite 100
Garland, TX 75042

All payments must be received by Lender consistent with any written payment instructions provided by Lender. If a payment is made consistent with Lender's payment instructions but received after 5:00 PM Central Time on a business day, Lender will credit Borrower's payment on the next business day.

**PREPAYMENT.** Borrower agrees that all loan fees and other prepaid finance charges are earned fully as of the date of the loan and will not be subject to refund upon early payment (whether voluntary or as a result of default), except as otherwise required by law. Except for the foregoing, Borrower may prepay this Note in part or in full at any time before final maturity, whether by cash, a new loan, renewal, or otherwise. Prepayment in full shall consist of payment of the remaining unpaid principal balance together with all accrued and unpaid interest and all other amounts, costs and expenses for which Borrower is responsible under this Note or any other agreement with Lender pertaining to this loan, and in no event will Borrower ever be required to pay any unearned interest. Early payments will not, unless agreed to by Lender in writing, relieve Borrower of Borrower's obligation to continue to make payments under the payment schedule. Rather, early payments will reduce the principal balance due. Borrower agrees not to send Lender payments marked "paid in full", "without recourse", or similar language. If Borrower sends such a payment, Lender may accept it without losing any of Lender's rights under this Note, and Borrower will remain obligated to pay any further amount owed to Lender. **All written communications concerning disputed amounts, including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to: Harmony Bank, 1919 S. Shiloh Road, Suite 100 Garland, TX 75042.**

**INTEREST AFTER DEFAULT.** Upon default, including failure to pay upon final maturity, the total sum due under this Note will continue to accrue interest at the interest rate under this Note.

**DEFAULT.** Each of the following shall constitute an event of default ("Event of Default") under this Note:

**Payment Default.** Borrower fails to make any payment when due under this Note.

App.343

**PROMISSORY NOTE**
**(Continued)**

Loan No: 2735533185                                                                          Page 2

**Other Defaults.** Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Note or in any of the related documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**Default in Favor of Third Parties.** Borrower or any Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's property or Borrower's ability to repay this Note or perform Borrower's obligations under this Note or any of the related documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Note or the related documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Death or Insolvency.** The dissolution of Borrower (regardless of whether election to continue is made), any member withdraws from Borrower, or any other termination of Borrower's existence as a going business or the death of any member, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the loan. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any guaranty of the indebtedness evidenced by this Note.

**Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of this Note is impaired.

**Cure Provisions.** If any default, other than a default in payment, is curable and if Borrower has not been given a notice of a breach of the same provision of this Note within the preceding twelve (12) months, it may be cured if Borrower, after Lender sends written notice to Borrower demanding cure of such default: (1) cures the default within thirty (30) days; or (2) if the cure requires more than thirty (30) days, immediately initiates steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**LENDER'S RIGHTS.** Upon default, Lender may declare the entire indebtedness, including the unpaid principal balance under this Note, all accrued unpaid interest, and all other amounts, costs and expenses for which Borrower is responsible under this Note or any other agreement with Lender pertaining to this loan, immediately due, without notice, and then Borrower will pay that amount.

**ATTORNEYS' FEES; EXPENSES.** Lender may hire an attorney to help collect this Note if Borrower does not pay, and Borrower will pay Lender's reasonable attorneys' fees. Borrower also will pay Lender all other amounts Lender actually incurs as court costs, lawful fees for filing, recording, releasing to any public office any instrument securing this Note; the reasonable cost actually expended for repossessing, storing, preparing for sale, and selling any security; and fees for noting a lien on or transferring a certificate of title to any motor vehicle offered as security for this Note, or premiums or identifiable charges received in connection with the sale of authorized insurance.

**GOVERNING LAW.** This Note will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Texas without regard to its conflicts of law provisions. This Note has been accepted by Lender in the State of Texas.

**CHOICE OF VENUE.** If there is a lawsuit, and if the transaction evidenced by this Note occurred in Dallas County, Borrower agrees upon Lender's request to submit to the jurisdiction of the courts of Dallas County, State of Texas.

**DISHONORED CHECK CHARGE.** Borrower will pay a processing fee of $30.00 if any check given by Borrower to Lender as a payment on this loan is dishonored.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Borrower's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Borrower holds jointly with someone else and all accounts Borrower may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Borrower authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the indebtedness against any and all such accounts.

**COLLATERAL.** Borrower acknowledges this Note is secured by the following collateral described in the security instruments listed herein: Collateral Assignment of Note, Loan Documents and Liens dated 09/11/2019 and filed in Johnson County Texas under document number 2019-24811 on September 13, 2019 to Texas Brand Bank now Harmony Bank and any renewals and modifications. Assignment of Deposit Account originally dated September 11, 2019 in original principal amount of $900,000.00.

**RENEWAL AND EXTENSION.** This Note is given in renewal and extension and not in novation of the following described indebtedness: Promissory Note # 2735533-185 dated September 11, 2019 in the original principal amount of $900,000.00 and any renewals Modification and Extension Agreements.

**SUCCESSOR INTERESTS.** The terms of this Note shall be binding upon Borrower, and upon Borrower's heirs, personal representatives, successors and assigns, and shall inure to the benefit of Lender and its successors and assigns.

**NOTIFY US OF INACCURATE INFORMATION WE REPORT TO CONSUMER REPORTING AGENCIES.** Borrower may notify Lender if Lender reports any inaccurate information about Borrower's account(s) to a consumer reporting agency. Borrower's written notice describing the specific inaccuracy(ies) should be sent to Lender at the following address: Harmony Bank 1919 S. Shiloh Road, Suite 100 Garland, TX 75042.

**WAIVER AND RELEASE OF CLAIMS.** In consideration of the renewal and extension of this Note and the renewal and extension of the obligations underlying this Note, including, but not limited to the liens and security interests securing this Note, Borrower and Guarantors hereby, jointly and severally, waive any and all rights which any of them may now or hereafter have, to the fullest extent permitted by the laws of the State of Texas, to raise in defense of Bank's/Lender's enforcement of its rights and remedies granted pursuant to this Note and the Loan Documents. Furthermore, Borrower and Guarantors hereby voluntarily and knowingly release and forever discharge Bank/Lender, its agents, employees, officers, directors, attorneys, successors and assigns from all possible claims, demands, actions, causes of action, damages, costs, expenses, and liabilities whatsoever, known or unknown, anticipated or unanticipated, suspected or unsuspected, fixed, contingent or conditional, at law

App.344

**PROMISSORY NOTE**
**(Continued)**

Loan No: 2735533185

Page 3

or in equity, originating in whole or in part on or before the date this Note is executed, which the Borrower and Guarantors may now or hereafter have against Bank/Lender, its agents, employees, officers, directors, attorneys, successors and assigns, if any, and irrespective of whether any such claims arise out of contract, tort, violation of law or regulations, or otherwise.

**GENERAL PROVISIONS.** This Note is payable on demand. The inclusion of specific default provisions or rights of Lender shall not preclude Lender's right to declare payment of this Note on its demand. If any part of this Note cannot be enforced, this fact will not affect the rest of the Note. Borrower does not agree or intend to pay, and Lender does not agree or intend to contract for, charge, collect, take, reserve or receive (collectively referred to herein as "charge or collect"), any amount in the nature of interest or in the nature of a fee for this loan, which would in any way or event (including demand, prepayment, or acceleration) cause Lender to charge or collect more for this loan than the maximum Lender would be permitted to charge or collect by federal law or the law of the State of Texas (as applicable). Any such excess interest or unauthorized fee shall, instead of anything stated to the contrary, be applied first to reduce the principal balance of this loan, and when the principal has been paid in full, be refunded to Borrower. The right to accelerate maturity of sums due under this Note does not include the right to accelerate any interest which has not otherwise accrued on the date of such acceleration, and Lender does not intend to charge or collect any unearned interest in the event of acceleration. All sums paid or agreed to be paid to Lender for the use, forbearance or detention of sums due hereunder shall, to the extent permitted by applicable law, be amortized, prorated, allocated and spread throughout the full term of the loan evidenced by this Note until payment in full so that the rate or amount of interest on account of the loan evidenced hereby does not exceed the applicable usury ceiling. Lender may delay or forgo enforcing any of its rights or remedies under this Note without losing them. Borrower and any other person who signs, guarantees or endorses this Note, to the extent allowed by law, waive presentment, demand for payment, notice of dishonor, notice of intent to accelerate the maturity of this Note, and notice of acceleration of the maturity of this Note, provided, however, that Borrower shall be entitled to any required notice of default and shall be given all opportunity to cure as required by applicable law. Upon any change in the terms of this Note, and unless otherwise expressly stated in writing, no party who signs this Note, whether as maker, guarantor, accommodation maker or endorser, shall be released from liability. All such parties agree that Lender may renew or extend (repeatedly and for any length of time) this loan or release any party or guarantor or collateral; or impair, fail to realize upon or perfect Lender's security interest in the collateral without the consent of or notice to anyone. All such parties also agree that Lender may modify this loan without the consent of or notice to anyone other than the party with whom the modification is made. The obligations under this Note are joint and several.

PRIOR TO SIGNING THIS NOTE, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS NOTE, INCLUDING THE VARIABLE INTEREST RATE PROVISIONS. BORROWER AGREES TO THE TERMS OF THE NOTE.

BORROWER ACKNOWLEDGES RECEIPT OF A COMPLETED COPY OF THIS PROMISSORY NOTE.

BORROWER:

SOUTHERN STAR CAPITAL, LLC

By: _____
Cathy Anderson, Manager of Southern Star Capital,
LLC

LaserPro, Ver. 23.2.10.005  Copr. Finastra USA Corporation 1997, 2024.  All Rights Reserved.  - TX  Z:\CFI\LPL\D20.FC  TR-5525  PR-2

App.345



*000000002735533185095512102023*

# PROMISSORY NOTE

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|-----------|-----------|----------|---------|-------------|---------|---------|----------|
| $642,887.31 | 12-10-2023 | 03-09-2024 | 2735533185 | A | 2735533 | WEL | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "****" has been omitted due to text length limitations.

**Borrower:** Southern Star Capital, LLC
5220 Spring Valley, Suite 602
Dallas, TX 75254

**Lender:** Harmony Bank
1919 S. Shiloh Road
Suite 100
Garland, TX 75042
(972) 494-9800

---

**Principal Amount: $642,887.31**                    **Date of Note: December 10, 2023**

**PROMISE TO PAY.** Southern Star Capital, LLC ("Borrower") promises to pay to Harmony Bank ("Lender"), or order, in lawful money of the United States of America, the principal amount of Six Hundred Forty-two Thousand Eight Hundred Eighty-seven & 31/100 Dollars ($642,887.31), together with interest on the unpaid principal balance from December 10, 2023, until maturity.

**PAYMENT.** Borrower will pay this loan in full immediately upon Lender's demand. If no demand is made, Borrower will pay this loan in one principal payment of $642,887.31 plus interest on March 9, 2024. This payment due on March 9, 2024, will be for all principal and all accrued interest not yet paid. In addition, Borrower will pay regular monthly payments of all accrued unpaid interest due as of each payment date, beginning January 10, 2024, with all subsequent interest payments to be due on the same day of each month after that. Unless otherwise agreed or required by applicable law, payments will be applied first to any accrued unpaid interest; then to principal; and then to any unpaid collection costs. Any accrued interest not paid when due is added to principal and thereafter will accrue interest as principal.

**VARIABLE INTEREST RATE.** The interest rate on this Note is subject to change from time to time based on changes in an independent index which is the Wall Street Journal Prime Rate as published in the Money Rate Section of the Wall Street Journal (the "Index"). The Index is not necessarily the lowest rate charged by Lender on its loans. Lender will tell Borrower the current Index rate upon Borrower's request. The interest rate change will not occur more often than each day. Borrower understands that Lender may make loans based on other rates as well. The Index currently is 8.500% per annum. Interest prior to maturity on the unpaid principal balance of this Note will be calculated as described in the "INTEREST CALCULATION METHOD" paragraph using a rate of 1.000 percentage point over the Index (the "Margin"), adjusted if necessary for any minimum and maximum rate limitations described below, resulting in an initial rate of 9.500%. If Lender determines, in its sole discretion, that the Index has become unavailable or unreliable, either temporarily, indefinitely, or permanently, during the term of this Note, Lender may amend this Note by designating a substantially similar substitute index. Lender may also amend and adjust the Margin to accompany the substitute index. The change to the Margin may be a positive or negative value, or zero. In making these amendments, Lender may take into consideration any then-prevailing market convention for selecting a substitute index and margin for the specific Index that is unavailable or unreliable. Such an amendment to the terms of this Note will become effective and bind Borrower 10 business days after Lender gives written notice to Borrower without any action or consent of the Borrower. NOTICE: Under no circumstances will the interest rate on this Note be less than 8.500% per annum or more than the maximum rate allowed by applicable law. For purposes of this Note, the "maximum rate allowed by applicable law" means the greater of (A) the maximum rate of interest permitted under federal or other law applicable to the indebtedness evidenced by this Note, or (B) the "Weekly Ceiling" as referred to in Sections 303.002 and 303.003 of the Texas Finance Code.

**INTEREST CALCULATION METHOD.** Interest on this Note is computed on a 365/360 basis; that is, by applying the ratio of the interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding (but not including February 29 in leap years), unless such calculation would result in a usurious rate, in which case interest shall be calculated on a per diem basis of a year of 365 days. All interest payable under this Note is computed using this method. This calculation method results in a higher effective interest rate than the numeric interest rate stated in this Note.

**RECEIPT OF PAYMENTS.** All payments must be made in U.S. dollars and must be received by Lender at:

Harmony Bank
1919 S. Shiloh Road
Suite 100
Garland, TX 75042

All payments must be received by Lender consistent with any written payment instructions provided by Lender. If a payment is made consistent with Lender's payment instructions but received after 5:00 PM Central Time on a business day, Lender will credit Borrower's payment on the next business day.

**PREPAYMENT.** Borrower agrees that all loan fees and other prepaid finance charges are earned fully as of the date of the loan and will not be subject to refund upon early payment (whether voluntary or as a result of default), except as otherwise required by law. Except for the foregoing, Borrower may prepay this Note in part or in full at any time before final maturity, whether by cash, a new loan, renewal, or otherwise. Prepayment in full shall consist of payment of the remaining unpaid principal balance together with all accrued and unpaid interest and all other amounts, costs and expenses for which Borrower is responsible under this Note or any other agreement with Lender pertaining to this loan, and in no event will Borrower ever be required to pay any unearned interest. Early payments will not, unless agreed to by Lender in writing, relieve Borrower of Borrower's obligation to continue to make payments under the payment schedule. Rather, early payments will reduce the principal balance due. Borrower agrees not to send Lender payments marked "paid in full", "without recourse", or similar language. If Borrower sends such a payment, Lender may accept it without losing any of Lender's rights under this Note, and Borrower will remain obligated to pay any further amount owed to Lender. **All written communications concerning disputed amounts, including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to: Harmony Bank, 1919 S. Shiloh Road, Suite 100 Garland, TX 75042.**

**INTEREST AFTER DEFAULT.** Upon default, including failure to pay upon final maturity, the total sum due under this Note will continue to accrue interest at the interest rate under this Note.

**DEFAULT.** Each of the following shall constitute an event of default ("Event of Default") under this Note:

**Payment Default.** Borrower fails to make any payment when due under this Note.

App.346

## PROMISSORY NOTE
### (Continued)

Loan No: 2735533185                                                                Page 2

**Other Defaults.** Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Note or in any of the related documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**Default in Favor of Third Parties.** Borrower or any Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's property or Borrower's ability to repay this Note or perform Borrower's obligations under this Note or any of the related documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Note or the related documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Death or Insolvency.** The dissolution of Borrower (regardless of whether election to continue is made), any member withdraws from Borrower, or any other termination of Borrower's existence as a going business or the death of any member, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the loan. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any guaranty of the indebtedness evidenced by this Note.

**Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of this Note is impaired.

**Cure Provisions.** If any default, other than a default in payment, is curable and if Borrower has not been given a notice of a breach of the same provision of this Note within the preceding twelve (12) months, it may be cured if Borrower, after Lender sends written notice to Borrower demanding cure of such default: (1) cures the default within thirty (30) days; or (2) if the cure requires more than thirty (30) days, immediately initiates steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**LENDER'S RIGHTS.** Upon default, Lender may declare the entire indebtedness, including the unpaid principal balance under this Note, all accrued unpaid interest, and all other amounts, costs and expenses for which Borrower is responsible under this Note or any other agreement with Lender pertaining to this loan, immediately due, without notice, and then Borrower will pay that amount.

**ATTORNEYS' FEES; EXPENSES.** Lender may hire an attorney to help collect this Note if Borrower does not pay, and Borrower will pay Lender's reasonable attorneys' fees. Borrower also will pay Lender all other amounts Lender actually incurs as court costs, lawful fees for filing, recording, releasing to any public office any instrument securing this Note; the reasonable cost actually expended for repossessing, storing, preparing for sale, and selling any security; and fees for noting a lien on or transferring a certificate of title to any motor vehicle offered as security for this Note, or premiums or identifiable charges received in connection with the sale of authorized insurance.

**GOVERNING LAW. This Note will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Texas without regard to its conflicts of law provisions. This Note has been accepted by Lender in the State of Texas.**

**CHOICE OF VENUE.** If there is a lawsuit, and if the transaction evidenced by this Note occurred in Dallas County, Borrower agrees upon Lender's request to submit to the jurisdiction of the courts of Dallas County, State of Texas.

**DISHONORED CHECK CHARGE.** Borrower will pay a processing fee of $30.00 if any check given by Borrower to Lender as a payment on this loan is dishonored.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Borrower's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Borrower holds jointly with someone else and all accounts Borrower may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Borrower authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the indebtedness against any and all such accounts.

**COLLATERAL.** Borrower acknowledges this Note is secured by the following collateral described in the security instruments listed herein: Collateral Assignment of Note, Loan Documents and Liens dated 09/11/2019 and filed in Johnson County Texas under document number 2019-24811 on September 13, 2019 to Texas Brand Bank now Harmony Bank and any renewals and modifications. Assignment of Deposit Account originally dated September 11, 2019 in original principal amount of $90,000.00

**RENEWAL AND EXTENSION.** This Note is given in renewal and extension and not in novation of the following described indebtedness: Promissory Note # 2735533-185 dated September 11, 2019 in the original principal amount of $900,000.00 and any renewals Modification and Extension Agreements.

**SUCCESSOR INTERESTS.** The terms of this Note shall be binding upon Borrower, and upon Borrower's heirs, personal representatives, successors and assigns, and shall inure to the benefit of Lender and its successors and assigns.

**NOTIFY US OF INACCURATE INFORMATION WE REPORT TO CONSUMER REPORTING AGENCIES.** Borrower may notify Lender if Lender reports any inaccurate information about Borrower's account(s) to a consumer reporting agency. Borrower's written notice describing the specific inaccuracy(ies) should be sent to Lender at the following address: Harmony Bank 1919 S. Shiloh Road, Suite 100 Garland, TX 75042.

**WAIVER AND RELEASE OF CLAIMS.** In consideration of the renewal and extension of this Note and the renewal and extension of the obligations underlying this Note, including, but not limited to the liens and security interests securing this Note, Borrower and Guarantors hereby, jointly and severally, waive any and all rights which any of them may now or hereafter have, to the fullest extent permitted by the laws of the State of Texas, to raise in defense of Bank's/Lender's enforcement of its rights and remedies granted pursuant to this Note and the Loan Documents. Furthermore, Borrower and Guarantors hereby voluntarily and knowingly release and forever discharge Bank/Lender, its agents, employees, officers, directors, attorneys, successors and assigns from all possible claims, demands, actions, causes of action, damages, costs, expenses, and liabilities whatsoever, known or unknown, anticipated or unanticipated, suspected or unsuspected, fixed, contingent or conditional, at law

App.347

# PROMISSORY NOTE
## (Continued)

**Loan No: 2735533185**                                                                                          **Page 3**

or in equity, originating in whole or in part on or before the date this Note is executed, which the Borrower and Guarantors may now or hereafter have against Bank/Lender, its agents, employees, officers, directors, attorneys, successors and assigns, if any, and irrespective of whether any such claims arise out of contract, tort, violation of law or regulations, or otherwise.

**GENERAL PROVISIONS.** This Note is payable on demand. The inclusion of specific default provisions or rights of Lender shall not preclude Lender's right to declare payment of this Note on its demand. If any part of this Note cannot be enforced, this fact will not affect the rest of the Note. Borrower does not agree or intend to pay, and Lender does not agree or intend to contract for, charge, collect, take, reserve or receive (collectively referred to herein as "charge or collect"), any amount in the nature of interest or in the nature of a fee for this loan, which would in any way or event (including demand, prepayment, or acceleration) cause Lender to charge or collect more for this loan than the maximum Lender would be permitted to charge or collect by federal law or the law of the State of Texas (as applicable). Any such excess interest or unauthorized fee shall, instead of anything stated to the contrary, be applied first to reduce the principal balance of this loan, and when the principal has been paid in full, be refunded to Borrower. The right to accelerate maturity of sums due under this Note does not include the right to accelerate any interest which has not otherwise accrued on the date of such acceleration, and Lender does not intend to charge or collect any unearned interest in the event of acceleration. All sums paid or agreed to be paid to Lender for the use, forbearance or detention of sums due hereunder shall, to the extent permitted by applicable law, be amortized, prorated, allocated and spread throughout the full term of the loan evidenced by this Note until payment in full so that the rate or amount of interest on account of the loan evidenced hereby does not exceed the applicable usury ceiling. Lender may delay or forgo enforcing any of its rights or remedies under this Note without losing them. Borrower and any other person who signs, guarantees or endorses this Note, to the extent allowed by law, waive presentment, demand for payment, notice of dishonor, notice of intent to accelerate the maturity of this Note, and notice of acceleration of the maturity of this Note, provided, however, that Borrower shall be entitled to any required notice of default and shall be given all opportunity to cure as required by applicable law. Upon any change in the terms of this Note, and unless otherwise expressly stated in writing, no party who signs this Note, whether as maker, guarantor, accommodation maker or endorser, shall be released from liability. All such parties agree that Lender may renew or extend (repeatedly and for any length of time) this loan or release any party or guarantor or collateral; or impair, fail to realize upon or perfect Lender's security interest in the collateral without the consent of or notice to anyone. All such parties also agree that Lender may modify this loan without the consent of or notice to anyone other than the party with whom the modification is made. The obligations under this Note are joint and several.

PRIOR TO SIGNING THIS NOTE, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS NOTE, INCLUDING THE VARIABLE INTEREST RATE PROVISIONS. BORROWER AGREES TO THE TERMS OF THE NOTE.

BORROWER ACKNOWLEDGES RECEIPT OF A COMPLETED COPY OF THIS PROMISSORY NOTE.

BORROWER:

SOUTHERN STAR CAPITAL, LLC

By: _____
Cathy Anderson, Manager of Southern Star Capital, LLC

LaserPro, Ver. 23.2.10.005  Copr. Finastra USA Corporation 1997, 2023.  All Rights Reserved.  - TX  Z:\CFI\LPL\D20.FC  TR-5525  PR-2

App.348



*00000000273553318509550310 2023*

# PROMISSORY NOTE

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|-----------|-----------|----------|---------|-------------|---------|---------|----------|
| $678,887.31 | 03-10-2023 | 06-10-2023 | 2735533185 | A | 2735533 | WEL | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "****" has been omitted due to text length limitations.

**Borrower:**  Southern Star Capital, LLC
5220 Spring Valley, Suite 602
Dallas, TX 75254

**Lender:**  Texas Brand Bank
1919 S. Shiloh Road
Suite 100
Garland, TX 75042
(972) 494-9800

---

**Principal Amount: $678,887.31**                    **Date of Note: March 10, 2023**

**PROMISE TO PAY.** Southern Star Capital, LLC ("Borrower") promises to pay to Texas Brand Bank ("Lender"), or order, in lawful money of the United States of America, the principal amount of Six Hundred Seventy-eight Thousand Eight Hundred Eighty-seven & 31/100 Dollars ($678,887.31), together with interest on the unpaid principal balance from March 10, 2023, until maturity.

**PAYMENT.** Borrower will pay this loan in full immediately upon Lender's demand. If no demand is made, Borrower will pay this loan in one principal payment of $678,887.31 plus interest on June 10, 2023. This payment due on June 10, 2023, will be for all principal and all accrued interest not yet paid. In addition, Borrower will pay regular monthly payments of all accrued unpaid interest due as of each payment date, beginning April 10, 2023, with all subsequent interest payments to be due on the same day of each month after that. Unless otherwise agreed or required by applicable law, payments will be applied first to any accrued unpaid interest; then to principal; then to any late charges; and then to any unpaid collection costs. Any accrued interest not paid when due is added to principal and thereafter will accrue interest as principal.

**VARIABLE INTEREST RATE.** The interest rate on this Note is subject to change from time to time based on changes in an independent index which is the Wall Street Journal Prime Rate as published in the Money Rate Section of the Wall Street Journal (the "Index"). The Index is not necessarily the lowest rate charged by Lender on its loans. Lender will tell Borrower the current Index rate upon Borrower's request. The interest rate change will not occur more often than each day. Borrower understands that Lender may make loans based on other rates as well. The Index currently is 7.750% per annum. Interest prior to maturity on the unpaid principal balance of this Note will be calculated as described in the "INTEREST CALCULATION METHOD" paragraph using a rate of 1.000 percentage point over the Index (the "Margin"), adjusted if necessary for any minimum and maximum rate limitations described below, resulting in an initial rate of 8.750%. If Lender determines, in its sole discretion, that the Index has become unavailable or unreliable, either temporarily, indefinitely, or permanently, during the term of this Note, Lender may amend this Note by designating a substantially similar substitute index. Lender may also amend and adjust the Margin to accompany the substitute index. The change to the Margin may be a positive or negative value, or zero. In making these amendments, Lender may take into consideration any then-prevailing market convention for selecting a substitute index and margin for the specific Index that is unavailable or unreliable. Such an amendment to the terms of this Note will become effective and bind Borrower 10 business days after Lender gives written notice to Borrower without any action or consent of the Borrower. NOTICE: Under no circumstances will the interest rate on this Note be less than 7.500% per annum or more than the maximum rate allowed by applicable law. For purposes of this Note, the "maximum rate allowed by applicable law" means the greater of (A) the maximum rate of interest permitted under federal or other law applicable to the indebtedness evidenced by this Note, or (B) the "Weekly Ceiling" as referred to in Sections 303.002 and 303.003 of the Texas Finance Code.

**INTEREST CALCULATION METHOD.** Interest on this Note is computed on a 365/360 basis; that is, by applying the ratio of the interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding (but not including February 29 in leap years), unless such calculation would result in a usurious rate, in which case interest shall be calculated on a per diem basis of a year of 365 days. All interest payable under this Note is computed using this method. This calculation method results in a higher effective interest rate than the numeric interest rate stated in this Note.

**RECEIPT OF PAYMENTS.** All payments must be made in U.S. dollars and must be received by Lender at:

Texas Brand Bank
1919 S. Shiloh Road
Suite 100
Garland, TX 75042

All payments must be received by Lender consistent with any written payment instructions provided by Lender. If a payment is made consistent with Lender's payment instructions but received after 5:00 PM Central Time on a business day, Lender will credit Borrower's payment on the next business day.

**PREPAYMENT.** Borrower agrees that all loan fees and other prepaid finance charges are earned fully as of the date of the loan and will not be subject to refund upon early payment (whether voluntary or as a result of default), except as otherwise required by law. Except for the foregoing, Borrower may prepay this Note in part or in full at any time before final maturity, whether by cash, a new loan, renewal, or otherwise. Prepayment in full shall consist of payment of the remaining unpaid principal balance together with all accrued and unpaid interest and all other amounts, costs and expenses for which Borrower is responsible under this Note or any other agreement with Lender pertaining to this loan, and in no event will Borrower ever be required to pay any unearned interest. Early payments will not, unless agreed to by Lender in writing, relieve Borrower of Borrower's obligation to continue to make payments under the payment schedule. Rather, early payments will reduce the principal balance due. Borrower agrees not to send Lender payments marked "paid in full", "without recourse", or similar language. If Borrower sends such a payment, Lender may accept it without losing any of Lender's rights under this Note, and Borrower will remain obligated to pay any further amount owed to Lender. **All written communications concerning disputed amounts, including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to: Texas Brand Bank, 1919 S. Shiloh Road Garland, TX 75042.**

**LATE CHARGE.** If a payment is 11 days or more late, Borrower will be charged **5.000% of the unpaid portion of the regularly scheduled payment.**

**INTEREST AFTER DEFAULT.** Upon default, including failure to pay upon final maturity, the total sum due under this Note will continue to accrue interest at the interest rate under this Note.

App.349

**PROMISSORY NOTE**
**(Continued)**

Loan No: 2735533185                                                                      Page 2

**DEFAULT.** Each of the following shall constitute an event of default ("Event of Default") under this Note:

**Payment Default.** Borrower fails to make any payment when due under this Note.

**Other Defaults.** Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Note or in any of the related documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**Default in Favor of Third Parties.** Borrower or any Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's property or Borrower's ability to repay this Note or perform Borrower's obligations under this Note or any of the related documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Note or the related documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Death or Insolvency.** The dissolution of Borrower (regardless of whether election to continue is made), any member withdraws from Borrower, or any other termination of Borrower's existence as a going business or the death of any member, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the loan. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any guaranty of the indebtedness evidenced by this Note.

**Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of this Note is impaired.

**Cure Provisions.** If any default, other than a default in payment, is curable and if Borrower has not been given a notice of a breach of the same provision of this Note within the preceding twelve (12) months, it may be cured if Borrower, after Lender sends written notice to Borrower demanding cure of such default: (1) cures the default within thirty (30) days; or (2) if the cure requires more than thirty (30) days, immediately initiates steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**LENDER'S RIGHTS.** Upon default, Lender may declare the entire indebtedness, including the unpaid principal balance under this Note, all accrued unpaid interest, and all other amounts, costs and expenses for which Borrower is responsible under this Note or any other agreement with Lender pertaining to this loan, immediately due, without notice, and then Borrower will pay that amount.

**ATTORNEYS' FEES; EXPENSES.** Lender may hire an attorney to help collect this Note if Borrower does not pay, and Borrower will pay Lender's reasonable attorneys' fees. Borrower also will pay Lender all other amounts Lender actually incurs as court costs, lawful fees for filing, recording, releasing to any public office any instrument securing this Note; the reasonable cost actually expended for repossessing, storing, preparing for sale, and selling any security; and fees for noting a lien on or transferring a certificate of title to any motor vehicle offered as security for this Note, or premiums or identifiable charges received in connection with the sale of authorized insurance.

**GOVERNING LAW. This Note will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Texas without regard to its conflicts of law provisions. This Note has been accepted by Lender in the State of Texas.**

**CHOICE OF VENUE.** If there is a lawsuit, and if the transaction evidenced by this Note occurred in Dallas County, Borrower agrees upon Lender's request to submit to the jurisdiction of the courts of Dallas County, State of Texas.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Borrower's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Borrower holds jointly with someone else and all accounts Borrower may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Borrower authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the indebtedness against any and all such accounts.

**COLLATERAL.** Borrower acknowledges this Note is secured by the following collateral described in the security instruments listed herein: Collateral Assignment of Note, Loan Documents and Liens dated 09/11/2019 and filed in Johnson County Texas under document number 2019-24811 on September 13, 2019 to Texas Brand Bank and it's renewals and modifications.

**RENEWAL AND EXTENSION.** This Note is given in renewal and extension and not in novation of the following described indebtedness: Promissory Note # 2735533-185 dated September 11, 2019 in the original principal amount of $900,000.00 and it's Modification and Extension Agreements.

**SUCCESSOR INTERESTS.** The terms of this Note shall be binding upon Borrower, and upon Borrower's heirs, personal representatives, successors and assigns, and shall inure to the benefit of Lender and its successors and assigns.

**NOTIFY US OF INACCURATE INFORMATION WE REPORT TO CONSUMER REPORTING AGENCIES.** Borrower may notify Lender if Lender reports any inaccurate information about Borrower's account(s) to a consumer reporting agency. Borrower's written notice describing the specific inaccuracy(ies) should be sent to Lender at the following address: Texas Brand Bank 1919 S. Shiloh Road Garland, TX 75042.

**WAIVER AND RELEASE OF CLAIMS.** In consideration of the renewal and extension of this Note and the renewal and extension of the obligations underlying this Note, including, but not limited to the liens and security interests securing this Note, Borrower and Guarantors hereby, jointly and severally, waive any and all rights which any of them may now or hereafter have, to the fullest extent permitted by the laws of the State of Texas, to raise in defense of Bank's/Lender's enforcement of its rights and remedies granted pursuant to this Note and the Loan Documents. Furthermore, Borrower and Guarantors hereby voluntarily and knowingly release and forever discharge Bank/Lender, its agents, employees, officers, directors, attorneys, successors and assigns from all possible claims, demands, actions, causes of action, damages, costs, expenses, and liabilities whatsoever, known or unknown, anticipated or unanticipated, suspected or unsuspected, fixed, contingent or conditional, at law or in equity, originating in whole or in part on or before the date this Note is executed, which the Borrower and Guarantors may now or hereafter

App.350

**PROMISSORY NOTE**
**(Continued)**

Loan No: 2735533185                                                    Page 3

have against Bank/Lender, its agents, employees, officers, directors, attorneys, successors and assigns, if any, and irrespective of whether any such claims arise out of contract, tort, violation of law or regulations, or otherwise.

**GENERAL PROVISIONS.** This Note is payable on demand. The inclusion of specific default provisions or rights of Lender shall not preclude Lender's right to declare payment of this Note on its demand. If any part of this Note cannot be enforced, this fact will not affect the rest of the Note. Borrower does not agree or intend to pay, and Lender does not agree or intend to contract for, charge, collect, take, reserve or receive (collectively referred to herein as "charge or collect"), any amount in the nature of interest or in the nature of a fee for this loan, which would in any way or event (including demand, prepayment, or acceleration) cause Lender to charge or collect more for this loan than the maximum Lender would be permitted to charge or collect by federal law or the law of the State of Texas (as applicable). Any such excess interest or unauthorized fee shall, instead of anything stated to the contrary, be applied first to reduce the principal balance of this loan, and when the principal has been paid in full, be refunded to Borrower. The right to accelerate maturity of sums due under this Note does not include the right to accelerate any interest which has not otherwise accrued on the date of such acceleration, and Lender does not intend to charge or collect any unearned interest in the event of acceleration. All sums paid or agreed to be paid to Lender for the use, forbearance or detention of sums due hereunder shall, to the extent permitted by applicable law, be amortized, prorated, allocated and spread throughout the full term of the loan evidenced by this Note until payment in full so that the rate or amount of interest on account of the loan evidenced hereby does not exceed the applicable usury ceiling. Lender may delay or forgo enforcing any of its rights or remedies under this Note without losing them. Borrower and any other person who signs, guarantees or endorses this Note, to the extent allowed by law, waive presentment, demand for payment, notice of dishonor, notice of intent to accelerate the maturity of this Note, and notice of acceleration of the maturity of this Note, provided, however, that Borrower shall be entitled to any required notice of default and shall be given all opportunity to cure as required by applicable law. Upon any change in the terms of this Note, and unless otherwise expressly stated in writing, no party who signs this Note, whether as maker, guarantor, accommodation maker or endorser, shall be released from liability. All such parties agree that Lender may renew or extend (repeatedly and for any length of time) this loan or release any party or guarantor or collateral; or impair, fail to realize upon or perfect Lender's security interest in the collateral without the consent of or notice to anyone. All such parties also agree that Lender may modify this loan without the consent of or notice to anyone other than the party with whom the modification is made. The obligations under this Note are joint and several.

**PRIOR TO SIGNING THIS NOTE, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS NOTE, INCLUDING THE VARIABLE INTEREST RATE PROVISIONS. BORROWER AGREES TO THE TERMS OF THE NOTE.**

**BORROWER ACKNOWLEDGES RECEIPT OF A COMPLETED COPY OF THIS PROMISSORY NOTE.**

BORROWER:

SOUTHERN STAR CAPITAL, LLC

By: _____
Michael D. Anderson, Manager of Southern Star
Capital, LLC

LaserPro, Ver. 22.2.10.018 Copr. Finastra USA Corporation 1997, 2023. All Rights Reserved. - TX Z:\CFI\LPL\D20.FC TR-4405 PR-2

App.351

*0000000027355331850955512102022*

# PROMISSORY NOTE

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|-----------|-----------|----------|---------|-------------|---------|---------|----------|
| $710,387.31 | 12-10-2022 | 03-10-2023 | 2735533185 | A | 2735533 | WEL | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "****" has been omitted due to text length limitations.

**Borrower:**  Southern Star Capital, LLC
5220 Spring Valley, Suite 602
Dallas, TX  75254

**Lender:**  Texas Brand Bank
1919 S. Shiloh Road
Suite 100
Garland, TX  75042
(972) 494-9800

---

**Principal Amount: $710,387.31**                                   **Date of Note:  December 10, 2022**

**PROMISE TO PAY.**  Southern Star Capital, LLC ("Borrower") promises to pay to Texas Brand Bank ("Lender"), or order, in lawful money of the United States of America, the principal amount of Seven Hundred Ten Thousand Three Hundred Eighty-seven & 31/100 Dollars ($710,387.31), together with interest on the unpaid principal balance from December 10, 2022, until maturity.

**PAYMENT.**  Borrower will pay this loan in full immediately upon Lender's demand. If no demand is made, Borrower will pay this loan in one principal payment of $710,387.31 plus interest on March 10, 2023. This payment due on March 10, 2023, will be for all principal and all accrued interest not yet paid.  In addition, Borrower will pay regular monthly payments of all accrued unpaid interest due as of each payment date, beginning January 10, 2023, with all subsequent interest payments to be due on the same day of each month after that.  Unless otherwise agreed or required by applicable law, payments will be applied first to any accrued unpaid interest; then to principal; then to any late charges; and then to any unpaid collection costs.  Any accrued interest not paid when due is added to principal and thereafter will accrue interest as principal.

**VARIABLE INTEREST RATE.**  The interest rate on this Note is subject to change from time to time based on changes in an independent index which is the Wall Street Journal Prime Rate as published in the Money Rate Section of the Wall Street Journal (the "Index").  The Index is not necessarily the lowest rate charged by Lender on its loans.  Lender will tell Borrower the current Index rate upon Borrower's request.  The interest rate change will not occur more often than each day.  Borrower understands that Lender may make loans based on other rates as well. **The Index currently is 7.500% per annum.**  Interest prior to maturity on the unpaid principal balance of this Note will be calculated as described in the "INTEREST CALCULATION METHOD" paragraph using a rate of 1.000 percentage point over the Index (the "Margin"), adjusted if necessary for any minimum and maximum rate limitations described below, resulting in an initial rate of 8.500%.  If Lender determines, in its sole discretion, that the Index has become unavailable or unreliable, either temporarily, indefinitely, or permanently, during the term of this Note, Lender may amend this Note by designating a substantially similar substitute index.  Lender may also amend and adjust the Margin to accompany the substitute index.  The change to the Margin may be a positive or negative value, or zero.  In making these amendments, Lender may take into consideration any then-prevailing market convention for selecting a substitute index and margin for the specific Index that is unavailable or unreliable.  Such an amendment to the terms of this Note will become effective and bind Borrower 10 business days after Lender gives written notice to Borrower without any action or consent of the Borrower.  NOTICE:  Under no circumstances will the interest rate on this Note be less than 5.500% per annum or more than the maximum rate allowed by applicable law.  For purposes of this Note, the "maximum rate allowed by applicable law" means the greater of  (A)  the maximum rate of interest permitted under federal or other law applicable to the indebtedness evidenced by this Note, or  (B)  the "Weekly Ceiling" as referred to in Sections 303.002 and 303.003 of the Texas Finance Code.

**INTEREST CALCULATION METHOD.**  Interest on this Note is computed on a 365/360 basis; that is, by applying the ratio of the interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding (but not including February 29 in leap years), unless such calculation would result in a usurious rate, in which case interest shall be calculated on a per diem basis of a year of 365 days.  All interest payable under this Note is computed using this method.  This calculation method results in a higher effective interest rate than the numeric interest rate stated in this Note.

**RECEIPT OF PAYMENTS.**  All payments must be made in U.S. dollars and must be received by Lender at:

Texas Brand Bank
1919 S. Shiloh Road
Suite 100
Garland, TX  75042

All payments must be received by Lender consistent with any written payment instructions provided by Lender. If a payment is made consistent with Lender's payment instructions but received after 5:00 PM Central Time on a business day, Lender will credit Borrower's payment on the next business day.

**PREPAYMENT.**  Borrower agrees that all loan fees and other prepaid finance charges are earned fully as of the date of the loan and will not be subject to refund upon early payment (whether voluntary or as a result of default), except as otherwise required by law.   Except for the foregoing, Borrower may prepay this Note in part or in full at any time before final maturity, whether by cash, a new loan, renewal, or otherwise.  Prepayment in full shall consist of payment of the remaining unpaid principal balance together with all accrued and unpaid interest and all other amounts, costs and expenses for which Borrower is responsible under this Note or any other agreement with Lender pertaining to this loan, and in no event will Borrower ever be required to pay any unearned interest.  Early payments will not, unless agreed to by Lender in writing, relieve Borrower of Borrower's obligation to continue to make payments under the payment schedule.  Rather, early payments will reduce the principal balance due.  Borrower agrees not to send Lender payments marked "paid in full", "without recourse", or similar language. If Borrower sends such a payment, Lender may accept it without losing any of Lender's rights under this Note, and Borrower will remain obligated to pay any further amount owed to Lender.  **All written communications concerning disputed amounts, including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to:  Texas Brand Bank, 1919 S. Shiloh Road Garland, TX 75042.**

**LATE CHARGE.**  If a payment is 11 days or more late, Borrower will be charged **5.000% of the unpaid portion of the regularly scheduled payment.**

**INTEREST AFTER DEFAULT.**  Upon default, including failure to pay upon final maturity, the total sum due under this Note will continue to accrue

**PROMISSORY NOTE**

Loan No: 2735533185                                      **(Continued)**                                                      Page 2

interest at the interest rate under this Note.

**DEFAULT.** Each of the following shall constitute an event of default ("Event of Default") under this Note:

**Payment Default.** Borrower fails to make any payment when due under this Note.

**Other Defaults.** Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Note or in any of the related documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**Default in Favor of Third Parties.** Borrower or any Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's property or Borrower's ability to repay this Note or perform Borrower's obligations under this Note or any of the related documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Note or the related documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Death or Insolvency.** The dissolution of Borrower (regardless of whether election to continue is made), any member withdraws from Borrower, or any other termination of Borrower's existence as a going business or the death of any member, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the loan. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any guaranty of the indebtedness evidenced by this Note.

**Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of this Note is impaired.

**Cure Provisions.** If any default, other than a default in payment, is curable and if Borrower has not been given a notice of a breach of the same provision of this Note within the preceding twelve (12) months, it may be cured if Borrower, after Lender sends written notice to Borrower demanding cure of such default: (1) cures the default within thirty (30) days; or (2) if the cure requires more than thirty (30) days, immediately initiates steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**LENDER'S RIGHTS.** Upon default, Lender may declare the entire indebtedness, including the unpaid principal balance under this Note, all accrued unpaid interest, and all other amounts, costs and expenses for which Borrower is responsible under this Note or any other agreement with Lender pertaining to this loan, immediately due, without notice, and then Borrower will pay that amount.

**ATTORNEYS' FEES; EXPENSES.** Lender may hire an attorney to help collect this Note if Borrower does not pay, and Borrower will pay Lender's reasonable attorneys' fees. Borrower also will pay Lender all other amounts Lender actually incurs as court costs, lawful fees for filing, recording, releasing to any public office any instrument securing this Note; the reasonable cost actually expended for repossessing, storing, preparing for sale, and selling any security; and fees for noting a lien on or transferring a certificate of title to any motor vehicle offered as security for this Note, or premiums or identifiable charges received in connection with the sale of authorized insurance.

**GOVERNING LAW. This Note will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Texas without regard to its conflicts of law provisions. This Note has been accepted by Lender in the State of Texas.**

**CHOICE OF VENUE.** If there is a lawsuit, and if the transaction evidenced by this Note occurred in Dallas County, Borrower agrees upon Lender's request to submit to the jurisdiction of the courts of Dallas County, State of Texas.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Borrower's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Borrower holds jointly with someone else and all accounts Borrower may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Borrower authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the indebtedness against any and all such accounts.

**COLLATERAL.** Borrower acknowledges this Note is secured by the following collateral described in the security instruments listed herein: Collateral Assignment of Note, Loan Documents and Liens dated 09/11/2019 and filed in Johnson County Texas under document number 2019-24811 on September 13, 2019 to Texas Brand Bank and it's renewals and modifications.

**RENEWAL AND EXTENSION.** This Note is given in renewal and extension and not in novation of the following described indebtedness: Promissory Note # 2735533-185 dated September 11, 2019 in the original principal amount of $900,000.00 and it's Modification and Extension Agreements.

**SUCCESSOR INTERESTS.** The terms of this Note shall be binding upon Borrower, and upon Borrower's heirs, personal representatives, successors and assigns, and shall inure to the benefit of Lender and its successors and assigns.

**NOTIFY US OF INACCURATE INFORMATION WE REPORT TO CONSUMER REPORTING AGENCIES.** Borrower may notify Lender if Lender reports any inaccurate information about Borrower's account(s) to a consumer reporting agency. Borrower's written notice describing the specific inaccuracy(ies) should be sent to Lender at the following address: Texas Brand Bank 1919 S. Shiloh Road Garland, TX 75042.

**WAIVER AND RELEASE OF CLAIMS.** In consideration of the renewal and extension of this Note and the renewal and extension of the obligations underlying this Note, including, but not limited to the liens and security interests securing this Note, Borrower and Guarantors hereby, jointly and severally, waive any and all rights which any of them may now or hereafter have, to the fullest extent permitted by the laws of the State of Texas, to raise in defense of Bank's/Lender's enforcement of its rights and remedies granted pursuant to this Note and the Loan Documents. Furthermore, Borrower and Guarantors hereby voluntarily and knowingly release and forever discharge Bank/Lender, its agents, employees, officers, directors, attorneys, successors and assigns from all possible claims, demands, actions, causes of action, damages, costs, expenses, and liabilities whatsoever, known or unknown, anticipated or unanticipated, suspected or unsuspected, fixed, contingent or conditional, at law

App.353

## PROMISSORY NOTE
**Loan No: 2735533185**                    **(Continued)**                    **Page 3**

or in equity, originating in whole or in part on or before the date this Note is executed, which the Borrower and Guarantors may now or hereafter have against Bank/Lender, its agents, employees, officers, directors, attorneys, successors and assigns, if any, and irrespective of whether any such claims arise out of contract, tort, violation of law or regulations, or otherwise.

**GENERAL PROVISIONS.** This Note is payable on demand. The inclusion of specific default provisions or rights of Lender shall not preclude Lender's right to declare payment of this Note on its demand. If any part of this Note cannot be enforced, this fact will not affect the rest of the Note. Borrower does not agree or intend to pay, and Lender does not agree or intend to contract for, charge, collect, take, reserve or receive (collectively referred to herein as "charge or collect"), any amount in the nature of interest or in the nature of a fee for this loan, which would in any way or event (including demand, prepayment, or acceleration) cause Lender to charge or collect more for this loan than the maximum Lender would be permitted to charge or collect by federal law or the law of the State of Texas (as applicable). Any such excess interest or unauthorized fee shall, instead of anything stated to the contrary, be applied first to reduce the principal balance of this loan, and when the principal has been paid in full, be refunded to Borrower. The right to accelerate maturity of sums due under this Note does not include the right to accelerate any interest which has not otherwise accrued on the date of such acceleration, and Lender does not intend to charge or collect any unearned interest in the event of acceleration. All sums paid or agreed to be paid to Lender for the use, forbearance or detention of sums due hereunder shall, to the extent permitted by applicable law, be amortized, prorated, allocated and spread throughout the full term of the loan evidenced by this Note until payment in full so that the rate or amount of interest on account of the loan evidenced hereby does not exceed the applicable usury ceiling. Lender may delay or forgo enforcing any of its rights or remedies under this Note without losing them. Borrower and any other person who signs, guarantees or endorses this Note, to the extent allowed by law, waive presentment, demand for payment, notice of dishonor, notice of intent to accelerate the maturity of this Note, and notice of acceleration of the maturity of this Note, provided, however, that Borrower shall be entitled to any required notice of default and shall be given all opportunity to cure as required by applicable law. Upon any change in the terms of this Note, and unless otherwise expressly stated in writing, no party who signs this Note, whether as maker, guarantor, accommodation maker or endorser, shall be released from liability. All such parties agree that Lender may renew or extend (repeatedly and for any length of time) this loan or release any party or guarantor or collateral; or impair, fail to realize upon or perfect Lender's security interest in the collateral without the consent of or notice to anyone. All such parties also agree that Lender may modify this loan without the consent of or notice to anyone other than the party with whom the modification is made. The obligations under this Note are joint and several.

**PRIOR TO SIGNING THIS NOTE, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS NOTE, INCLUDING THE VARIABLE INTEREST RATE PROVISIONS. BORROWER AGREES TO THE TERMS OF THE NOTE.**

**BORROWER ACKNOWLEDGES RECEIPT OF A COMPLETED COPY OF THIS PROMISSORY NOTE.**

**BORROWER:**

**SOUTHERN STAR CAPITAL, LLC**

By: _____

Michael D. Anderson, Manager of Southern Star Capital, LLC

LaserPro, Ver. 22.2.10.018  Copr. Finastra USA Corporation 1997, 2022.  All Rights Reserved.  - TX  Z:\CFI\LPL\D20.FC  TR-4405  PR-2

App.354



*0000000027355331850955091020222*

# PROMISSORY NOTE

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $732,887.31 | 09-10-2022 | 12-10-2022 | 2735533185 | A | 2735533 | WEL | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item. Any item above containing "****" has been omitted due to text length limitations.

**Borrower:** Southern Star Capital, LLC
5220 Spring Valley, Suite 602
Dallas, TX 75254

**Lender:** Texas Brand Bank
1919 S. Shiloh Road
Suite 100
Garland, TX 75042
(972) 494-9800

**Principal Amount: $732,887.31** **Date of Note: September 10, 2022**

**PROMISE TO PAY. Southern Star Capital, LLC ("Borrower") promises to pay to Texas Brand Bank ("Lender"), or order, in lawful money of the United States of America, the principal amount of Seven Hundred Thirty-two Thousand Eight Hundred Eighty-seven & 31/100 Dollars ($732,887.31), together with interest on the unpaid principal balance from September 10, 2022, until maturity.**

**PAYMENT. Borrower will pay this loan in full immediately upon Lender's demand. If no demand is made, Borrower will pay this loan in one principal payment of $732,887.31 plus interest on December 10, 2022. This payment due on December 10, 2022, will be for all principal and all accrued interest not yet paid. In addition, Borrower will pay regular monthly payments of all accrued unpaid interest due as of each payment date, beginning October 10, 2022, with all subsequent interest payments to be due on the same day of each month after that. Unless otherwise agreed or required by applicable law, payments will be applied first to any accrued unpaid interest; then to principal; then to any late charges; and then to any unpaid collection costs. Any accrued interest not paid when due is added to principal and thereafter will accrue interest as principal.**

**VARIABLE INTEREST RATE.** The interest rate on this Note is subject to change from time to time based on changes in an independent index which is the Wall Street Journal Prime Rate as published in the Money Rate Section of the Wall Street Journal (the "Index"). The Index is not necessarily the lowest rate charged by Lender on its loans. Lender will tell Borrower the current Index rate upon Borrower's request. The interest rate change will not occur more often than each day. Borrower understands that Lender may make loans based on other rates as well. **The Index currently is 5.500% per annum.** Interest prior to maturity on the unpaid principal balance of this Note will be calculated as described in the "INTEREST CALCULATION METHOD" paragraph using a rate of 1.000 percentage point over the Index (the "Margin"), adjusted if necessary for any minimum and maximum rate limitations described below, resulting in an initial rate of 6.500%. If Lender determines, in its sole discretion, that the Index has become unavailable or unreliable, either temporarily, indefinitely, or permanently, during the term of this Note, Lender may amend this Note by designating a substantially similar substitute index. Lender may also amend and adjust the Margin to accompany the substitute index. The change to the Margin may be a positive or negative value, or zero. In making these amendments, Lender may take into consideration any then-prevailing market convention for selecting a substitute index and margin for the specific Index that is unavailable or unreliable. Such an amendment to the terms of this Note will become effective and bind Borrower 10 business days after Lender gives written notice to Borrower without any action or consent of the Borrower. NOTICE: Under no circumstances will the interest rate on this Note be less than 5.500% per annum or more than the maximum rate allowed by applicable law. For purposes of this Note, the "maximum rate allowed by applicable law" means the greater of (A) the maximum rate of interest permitted under federal or other law applicable to the indebtedness evidenced by this Note, or (B) the "Weekly Ceiling" as referred to in Sections 303.002 and 303.003 of the Texas Finance Code.

**INTEREST CALCULATION METHOD. Interest on this Note is computed on a 365/360 basis; that is, by applying the ratio of the interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding (but not including February 29 in leap years), unless such calculation would result in a usurious rate, in which case interest shall be calculated on a per diem basis of a year of 365 days. All interest payable under this Note is computed using this method. This calculation method results in a higher effective interest rate than the numeric interest rate stated in this Note.**

**RECEIPT OF PAYMENTS.** All payments must be made in U.S. dollars and must be received by Lender at:

Texas Brand Bank
1919 S. Shiloh Road
Suite 100
Garland, TX 75042

All payments must be received by Lender consistent with any written payment instructions provided by Lender. If a payment is made consistent with Lender's payment instructions but received after 5:00 PM Central Time on a business day, Lender will credit Borrower's payment on the next business day.

**PREPAYMENT.** Borrower agrees that all loan fees and other prepaid finance charges are earned fully as of the date of the loan and will not be subject to refund upon early payment (whether voluntary or as a result of default), except as otherwise required by law. Except for the foregoing, Borrower may prepay this Note in part or in full at any time before final maturity, whether by cash, a new loan, renewal, or otherwise. Prepayment in full shall consist of payment of the remaining unpaid principal balance together with all accrued and unpaid interest and all other amounts, costs and expenses for which Borrower is responsible under this Note or any other agreement with Lender pertaining to this loan, and in no event will Borrower ever be required to pay any unearned interest. Early payments will not, unless agreed to by Lender in writing, relieve Borrower of Borrower's obligation to continue to make payments under the payment schedule. Rather, early payments will reduce the principal balance due. Borrower agrees not to send Lender payments marked "paid in full", "without recourse", or similar language. If Borrower sends such a payment, Lender may accept it without losing any of Lender's rights under this Note, and Borrower will remain obligated to pay any further amount owed to Lender. **All written communications concerning disputed amounts, including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to: Texas Brand Bank, 1919 S. Shiloh Road Garland, TX 75042.**

**LATE CHARGE.** If a payment is 11 days or more late, Borrower will be charged **5.000% of the unpaid portion of the regularly scheduled payment.**

**INTEREST AFTER DEFAULT.** Upon default, including failure to pay upon final maturity, the total sum due under this Note will continue to accrue

**PROMISSORY NOTE**
**(Continued)**

Loan No: 2735533185                                                                                Page 2

interest at the interest rate under this Note.

**DEFAULT.** Each of the following shall constitute an event of default ("Event of Default") under this Note:

**Payment Default.** Borrower fails to make any payment when due under this Note.

**Other Defaults.** Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Note or in any of the related documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**Default in Favor of Third Parties.** Borrower or any Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's property or Borrower's ability to repay this Note or perform Borrower's obligations under this Note or any of the related documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Note or the related documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Death or Insolvency.** The dissolution of Borrower (regardless of whether election to continue is made), any member withdraws from Borrower, or any other termination of Borrower's existence as a going business or the death of any member, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the loan. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any guaranty of the indebtedness evidenced by this Note.

**Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of this Note is impaired.

**Cure Provisions.** If any default, other than a default in payment, is curable and if Borrower has not been given a notice of a breach of the same provision of this Note within the preceding twelve (12) months, it may be cured if Borrower, after Lender sends written notice to Borrower demanding cure of such default: (1) cures the default within thirty (30) days; or (2) if the cure requires more than thirty (30) days, immediately initiates steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**LENDER'S RIGHTS.** Upon default, Lender may declare the entire indebtedness, including the unpaid principal balance under this Note, all accrued unpaid interest, and all other amounts, costs and expenses for which Borrower is responsible under this Note or any other agreement with Lender pertaining to this loan, immediately due, without notice, and then Borrower will pay that amount.

**ATTORNEYS' FEES; EXPENSES.** Lender may hire an attorney to help collect this Note if Borrower does not pay, and Borrower will pay Lender's reasonable attorneys' fees. Borrower also will pay Lender all other amounts Lender actually incurs as court costs, lawful fees for filing, recording, releasing to any public office any instrument securing this Note; the reasonable cost actually expended for repossessing, storing, preparing for sale, and selling any security; and fees for noting a lien on or transferring a certificate of title to any motor vehicle offered as security for this Note, or premiums or identifiable charges received in connection with the sale of authorized insurance.

**GOVERNING LAW. This Note will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Texas without regard to its conflicts of law provisions. This Note has been accepted by Lender in the State of Texas.**

**CHOICE OF VENUE.** If there is a lawsuit, and if the transaction evidenced by this Note occurred in Dallas County, Borrower agrees upon Lender's request to submit to the jurisdiction of the courts of Dallas County, State of Texas.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Borrower's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Borrower holds jointly with someone else and all accounts Borrower may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Borrower authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the indebtedness against any and all such accounts.

**COLLATERAL.** Borrower acknowledges this Note is secured by the following collateral described in the security instruments listed herein: Collateral Assignment of Note, Loan Documents and Liens dated 09/11/2019 and filed in Johnson County Texas under document number 2019-24811 on September 13, 2019 to Texas Brand Bank and it's renewals and modifications.

**RENEWAL AND EXTENSION.** This Note is given in renewal and extension and not in novation of the following described indebtedness: Promissory Note # 2735533-185 dated September 11, 2019 in the original principal amount of $900,000.00 and it's Modification and Extension Agreements.

**SUCCESSOR INTERESTS.** The terms of this Note shall be binding upon Borrower, and upon Borrower's heirs, personal representatives, successors and assigns, and shall inure to the benefit of Lender and its successors and assigns.

**NOTIFY US OF INACCURATE INFORMATION WE REPORT TO CONSUMER REPORTING AGENCIES.** Borrower may notify Lender if Lender reports any inaccurate information about Borrower's account(s) to a consumer reporting agency. Borrower's written notice describing the specific inaccuracy(ies) should be sent to Lender at the following address: Texas Brand Bank 1919 S. Shiloh Road Garland, TX 75042.

**WAIVER AND RELEASE OF CLAIMS.** In consideration of the renewal and extension of this Note and the renewal and extension of the obligations underlying this Note, including, but not limited to the liens and security interests securing this Note, Borrower and Guarantors hereby, jointly and severally, waive any and all rights which any of them may now or hereafter have, to the fullest extent permitted by the laws of the State of Texas, to raise in defense of Bank's/Lender's enforcement of its rights and remedies granted pursuant to this Note and the Loan Documents. Furthermore, Borrower and Guarantors hereby voluntarily and knowingly release and forever discharge Bank/Lender, its agents, employees, officers, directors, attorneys, successors and assigns from all possible claims, demands, actions, causes of action, damages, costs, expenses, and liabilities whatsoever, known or unknown, anticipated or unanticipated, suspected or unsuspected, fixed, contingent or conditional, at law

App.356

**PROMISSORY NOTE**
(Continued)

Loan No: 2735533185                                                                    Page 3

or in equity, originating in whole or in part on or before the date this Note is executed, which the Borrower and Guarantors may now or hereafter have against Bank/Lender, its agents, employees, officers, directors, attorneys, successors and assigns, if any, and irrespective of whether any such claims arise out of contract, tort, violation of law or regulations, or otherwise.

**GENERAL PROVISIONS.** This Note is payable on demand. The inclusion of specific default provisions or rights of Lender shall not preclude Lender's right to declare payment of this Note on its demand. If any part of this Note cannot be enforced, this fact will not affect the rest of the Note. Borrower does not agree or intend to pay, and Lender does not agree or intend to contract for, charge, collect, take, reserve or receive (collectively referred to herein as "charge or collect"), any amount in the nature of interest or in the nature of a fee for this loan, which would in any way or event (including demand, prepayment, or acceleration) cause Lender to charge or collect more for this loan than the maximum Lender would be permitted to charge or collect by federal law or the law of the State of Texas (as applicable). Any such excess interest or unauthorized fee shall, instead of anything stated to the contrary, be applied first to reduce the principal balance of this loan, and when the principal has been paid in full, be refunded to Borrower. The right to accelerate maturity of sums due under this Note does not include the right to accelerate any interest which has not otherwise accrued on the date of such acceleration, and Lender does not intend to charge or collect any unearned interest in the event of acceleration. All sums paid or agreed to be paid to Lender for the use, forbearance or detention of sums due hereunder shall, to the extent permitted by applicable law, be amortized, prorated, allocated and spread throughout the full term of the loan evidenced by this Note until payment in full so that the rate or amount of interest on account of the loan evidenced hereby does not exceed the applicable usury ceiling. Lender may delay or forgo enforcing any of its rights or remedies under this Note without losing them. Borrower and any other person who signs, guarantees or endorses this Note, to the extent allowed by law, waive presentment, demand for payment, notice of dishonor, notice of intent to accelerate the maturity of this Note, and notice of acceleration of the maturity of this Note, provided, however, that Borrower shall be entitled to any required notice of default and shall be given all opportunity to cure as required by applicable law. Upon any change in the terms of this Note, and unless otherwise expressly stated in writing, no party who signs this Note, whether as maker, guarantor, accommodation maker or endorser, shall be released from liability. All such parties agree that Lender may renew or extend (repeatedly and for any length of time) this loan or release any party or guarantor or collateral; or impair, fail to realize upon or perfect Lender's security interest in the collateral without the consent of or notice to anyone. All such parties also agree that Lender may modify this loan without the consent of or notice to anyone other than the party with whom the modification is made. The obligations under this Note are joint and several.

PRIOR TO SIGNING THIS NOTE, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS NOTE, INCLUDING THE VARIABLE INTEREST RATE PROVISIONS. BORROWER AGREES TO THE TERMS OF THE NOTE.

BORROWER ACKNOWLEDGES RECEIPT OF A COMPLETED COPY OF THIS PROMISSORY NOTE.

BORROWER:

SOUTHERN STAR CAPITAL, LLC

By: _____
Michael D. Anderson, Manager of Southern Star
Capital, LLC

LaserPro, Ver. 22.2.10.018  Copr. Finastra USA Corporation 1997, 2022.  All Rights Reserved.  - TX  Z:\CFI\LPL\D20.FC  TR-4405  PR-2

App.357



*00000000273553318509550610 2022*

# PROMISSORY NOTE

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $756,252.59 | 06-10-2022 | 09-01-2022 | 2735533185 | A | 2735533 | WEL | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item. Any item above containing "***" has been omitted due to text length limitations.

**Borrower:** Southern Star Capital, LLC
5220 Spring Valley, Suite 602
Dallas, TX 75254

**Lender:** Texas Brand Bank
1919 S. Shiloh Road
Suite 100
Garland, TX 75042
(972) 494-9800

**Principal Amount: $756,252.59** **Date of Note: June 10, 2022**

**PROMISE TO PAY. Southern Star Capital, LLC ("Borrower") promises to pay to Texas Brand Bank ("Lender"), or order, in lawful money of the United States of America, the principal amount of Seven Hundred Fifty-six Thousand Two Hundred Fifty-two & 59/100 Dollars ($756,252.59), together with interest on the unpaid principal balance from June 10, 2022, until maturity.**

**PAYMENT. Borrower will pay this loan in full immediately upon Lender's demand. If no demand is made, Borrower will pay this loan in one principal payment of $756,252.59 plus interest on September 1, 2022. This payment due on September 1, 2022, will be for all principal and all accrued interest not yet paid. In addition, Borrower will pay regular monthly payments of all accrued unpaid interest due as of each payment date, beginning July 10, 2022, with all subsequent interest payments to be due on the same day of each month after that. Unless otherwise agreed or required by applicable law, payments will be applied first to any accrued unpaid interest; then to principal; then to any late charges; and then to any unpaid collection costs. Any accrued interest not paid when due is added to principal and thereafter will accrue interest as principal.**

**VARIABLE INTEREST RATE.** The interest rate on this Note is subject to change from time to time based on changes in an independent index which is the Wall Street Journal Prime Rate as published in the Money Rate Section of the Wall Street Journal (the "Index"). The Index is not necessarily the lowest rate charged by Lender on its loans. Lender will tell Borrower the current Index rate upon Borrower's request. The interest rate change will not occur more often than each day. Borrower understands that Lender may make loans based on other rates as well. **The Index currently is 4.000% per annum.** Interest prior to maturity on the unpaid principal balance of this Note will be calculated as described in the "INTEREST CALCULATION METHOD" paragraph using a rate of 1.000 percentage point over the Index (the "Margin"), adjusted if necessary for any minimum and maximum rate limitations described below, resulting in an initial rate of 5.000%. If Lender determines, in its sole discretion, that the Index has become unavailable or unreliable, either temporarily, indefinitely, or permanently, during the term of this Note, Lender may amend this Note by designating a substantially similar substitute index. Lender may also amend and adjust the Margin to accompany the substitute index. The change to the Margin may be a positive or negative value, or zero. In making these amendments, Lender may take into consideration any then-prevailing market convention for selecting a substitute index and margin for the specific Index that is unavailable or unreliable. Such an amendment to the terms of this Note will become effective and bind Borrower 10 business days after Lender gives written notice to Borrower without any action or consent of the Borrower. NOTICE: Under no circumstances will the interest rate on this Note be less than 5.000% per annum or more than the maximum rate allowed by applicable law. For purposes of this Note, the "maximum rate allowed by applicable law" means the greater of (A) the maximum rate of interest permitted under federal or other law applicable to the indebtedness evidenced by this Note, or (B) the "Weekly Ceiling" as referred to in Sections 303.002 and 303.003 of the Texas Finance Code.

**INTEREST CALCULATION METHOD. Interest on this Note is computed on a 365/360 basis; that is, by applying the ratio of the interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding (but not including February 29 in leap years), unless such calculation would result in a usurious rate, in which case interest shall be calculated on a per diem basis of a year of 365 days. All interest payable under this Note is computed using this method. This calculation method results in a higher effective interest rate than the numeric interest rate stated in this Note.**

**RECEIPT OF PAYMENTS.** All payments must be made in U.S. dollars and must be received by Lender at:

Texas Brand Bank
1919 S. Shiloh Road
Suite 100
Garland, TX 75042

All payments must be received by Lender consistent with any written payment instructions provided by Lender. If a payment is made consistent with Lender's payment instructions but received after 5:00 PM Central Time on a business day, Lender will credit Borrower's payment on the next business day.

**PREPAYMENT.** Borrower agrees that all loan fees and other prepaid finance charges are earned fully as of the date of the loan and will not be subject to refund upon early payment (whether voluntary or as a result of default), except as otherwise required by law. Except for the foregoing, Borrower may prepay this Note in part or in full at any time before final maturity, whether by cash, a new loan, renewal, or otherwise. Prepayment in full shall consist of payment of the remaining unpaid principal balance together with all accrued and unpaid interest and all other amounts, costs and expenses for which Borrower is responsible under this Note or any other agreement with Lender pertaining to this loan, and in no event will Borrower ever be required to pay any unearned interest. Early payments will not, unless agreed to by Lender in writing, relieve Borrower of Borrower's obligation to continue to make payments under the payment schedule. Rather, early payments will reduce the principal balance due. Borrower agrees not to send Lender payments marked "paid in full", "without recourse", or similar language. If Borrower sends such a payment, Lender may accept it without losing any of Lender's rights under this Note, and Borrower will remain obligated to pay any further amount owed to Lender. **All written communications concerning disputed amounts, including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to: Texas Brand Bank, 1919 S. Shiloh Road Garland, TX 75042.**

**LATE CHARGE.** If a payment is 11 days or more late, Borrower will be charged **5.000% of the unpaid portion of the regularly scheduled payment.**

**INTEREST AFTER DEFAULT.** Upon default, including failure to pay upon final maturity, the total sum due under this Note will continue to accrue

**PROMISSORY NOTE**
**(Continued)**

Loan No: 2735533185                                                                    Page 2

interest at the interest rate under this Note.

**DEFAULT.** Each of the following shall constitute an event of default ("Event of Default") under this Note:

**Payment Default.** Borrower fails to make any payment when due under this Note.

**Other Defaults.** Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Note or in any of the related documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**Default in Favor of Third Parties.** Borrower or any Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's property or Borrower's ability to repay this Note or perform Borrower's obligations under this Note or any of the related documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Note or the related documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Death or Insolvency.** The dissolution of Borrower (regardless of whether election to continue is made), any member withdraws from Borrower, or any other termination of Borrower's existence as a going business or the death of any member, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the loan. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any guaranty of the indebtedness evidenced by this Note.

**Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of this Note is impaired.

**Cure Provisions.** If any default, other than a default in payment, is curable and if Borrower has not been given a notice of a breach of the same provision of this Note within the preceding twelve (12) months, it may be cured if Borrower, after Lender sends written notice to Borrower demanding cure of such default: (1) cures the default within thirty (30) days; or (2) if the cure requires more than thirty (30) days, immediately initiates steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**LENDER'S RIGHTS.** Upon default, Lender may declare the entire indebtedness, including the unpaid principal balance under this Note, all accrued unpaid interest, and all other amounts, costs and expenses for which Borrower is responsible under this Note or any other agreement with Lender pertaining to this loan, immediately due, without notice, and then Borrower will pay that amount.

**ATTORNEYS' FEES; EXPENSES.** Lender may hire an attorney to help collect this Note if Borrower does not pay, and Borrower will pay Lender's reasonable attorneys' fees. Borrower also will pay Lender all other amounts Lender actually incurs as court costs, lawful fees for filing, recording, releasing to any public office any instrument securing this Note; the reasonable cost actually expended for repossessing, storing, preparing for sale, and selling any security; and fees for noting a lien on or transferring a certificate of title to any motor vehicle offered as security for this Note, or premiums or identifiable charges received in connection with the sale of authorized insurance.

**GOVERNING LAW. This Note will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Texas without regard to its conflicts of law provisions. This Note has been accepted by Lender in the State of Texas.**

**CHOICE OF VENUE.** If there is a lawsuit, and if the transaction evidenced by this Note occurred in Dallas County, Borrower agrees upon Lender's request to submit to the jurisdiction of the courts of Dallas County, State of Texas.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Borrower's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Borrower holds jointly with someone else and all accounts Borrower may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Borrower authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the indebtedness against any and all such accounts.

**COLLATERAL.** Borrower acknowledges this Note is secured by the following collateral described in the security instruments listed herein: Collateral Assignment of Note, Loan Documents and Liens dated 09/11/2019 and filed in Johnson County Texas under document number 2019-24811 on September 13, 2019 to Texas Brand Bank and it's renewals and modifications.

**RENEWAL AND EXTENSION.** This Note is given in renewal and extension and not in novation of the following described indebtedness: Promissory Note # 2735533-185 dated September 11, 2019 in the original principal amount of $900,000.00.

**SUCCESSOR INTERESTS.** The terms of this Note shall be binding upon Borrower, and upon Borrower's heirs, personal representatives, successors and assigns, and shall inure to the benefit of Lender and its successors and assigns.

**NOTIFY US OF INACCURATE INFORMATION WE REPORT TO CONSUMER REPORTING AGENCIES.** Borrower may notify Lender if Lender reports any inaccurate information about Borrower's account(s) to a consumer reporting agency. Borrower's written notice describing the specific inaccuracy(ies) should be sent to Lender at the following address: Texas Brand Bank 1919 S. Shiloh Road Garland, TX 75042.

**WAIVER AND RELEASE OF CLAIMS.** In consideration of the renewal and extension of this Note and the renewal and extension of the obligations underlying this Note, including, but not limited to the liens and security interests securing this Note, Borrower and Guarantors hereby, jointly and severally, waive any and all rights which any of them may now or hereafter have, to the fullest extent permitted by the laws of the State of Texas, to raise in defense of Bank's/Lender's enforcement of its rights and remedies granted pursuant to this Note and the Loan Documents. Furthermore, Borrower and Guarantors hereby voluntarily and knowingly release and forever discharge Bank/Lender, its agents, employees, officers, directors, attorneys, successors and assigns from all possible claims, demands, actions, causes of action, damages, costs, expenses, and liabilities whatsoever, known or unknown, anticipated or unanticipated, suspected or unsuspected, fixed, contingent or conditional, at law or in equity, originating in whole or in part on or before the date this Note is executed, which the Borrower and Guarantors may now or hereafter

App.359

**PROMISSORY NOTE**
**(Continued)**

Loan No: 2735533185                                                                          Page 3

have against Bank/Lender, its agents, employees, officers, directors, attorneys, successors and assigns, if any, and irrespective of whether any such claims arise out of contract, tort, violation of law or regulations, or otherwise.

**GENERAL PROVISIONS.** This Note is payable on demand. The inclusion of specific default provisions or rights of Lender shall not preclude Lender's right to declare payment of this Note on its demand. If any part of this Note cannot be enforced, this fact will not affect the rest of the Note. Borrower does not agree or intend to pay, and Lender does not agree or intend to contract for, charge, collect, take, reserve or receive (collectively referred to herein as "charge or collect"), any amount in the nature of interest or in the nature of a fee for this loan, which would in any way or event (including demand, prepayment, or acceleration) cause Lender to charge or collect more for this loan than the maximum Lender would be permitted to charge or collect by federal law or the law of the State of Texas (as applicable). Any such excess interest or unauthorized fee shall, instead of anything stated to the contrary, be applied first to reduce the principal balance of this loan, and when the principal has been paid in full, be refunded to Borrower. The right to accelerate maturity of sums due under this Note does not include the right to accelerate any interest which has not otherwise accrued on the date of such acceleration, and Lender does not intend to charge or collect any unearned interest in the event of acceleration. All sums paid or agreed to be paid to Lender for the use, forbearance or detention of sums due hereunder shall, to the extent permitted by applicable law, be amortized, prorated, allocated and spread throughout the full term of the loan evidenced by this Note until payment in full so that the rate or amount of interest on account of the loan evidenced hereby does not exceed the applicable usury ceiling. Lender may delay or forgo enforcing any of its rights or remedies under this Note without losing them. Borrower and any other person who signs, guarantees or endorses this Note, to the extent allowed by law, waive presentment, demand for payment, notice of dishonor, notice of intent to accelerate the maturity of this Note, and notice of acceleration of the maturity of this Note, provided, however, that Borrower shall be entitled to any required notice of default and shall be given all opportunity to cure as required by applicable law. Upon any change in the terms of this Note, and unless otherwise expressly stated in writing, no party who signs this Note, whether as maker, guarantor, accommodation maker or endorser, shall be released from liability. All such parties agree that Lender may renew or extend (repeatedly and for any length of time) this loan or release any party or guarantor or collateral; or impair, fail to realize upon or perfect Lender's security interest in the collateral without the consent of or notice to anyone. All such parties also agree that Lender may modify this loan without the consent of or notice to anyone other than the party with whom the modification is made. The obligations under this Note are joint and several.

PRIOR TO SIGNING THIS NOTE, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS NOTE, INCLUDING THE VARIABLE INTEREST RATE PROVISIONS. BORROWER AGREES TO THE TERMS OF THE NOTE.

BORROWER ACKNOWLEDGES RECEIPT OF A COMPLETED COPY OF THIS PROMISSORY NOTE.

BORROWER:

SOUTHERN STAR CAPITAL, LLC

By: _____
    Michael D. Anderson, Manager of Southern Star
    Capital, LLC

LaserPro, Ver. 21.1.0.222  Copr. Finastra USA Corporation 1997, 2022.  All Rights Reserved.  - TX  Z:\CFI\LPL\D20.FC  TR-4405  PR-2

App.360



*000000002735533185095503112022*

# PROMISSORY NOTE

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $778,752.59 | 03-11-2022 | 06-11-2022 | 2735533185 | A | 2735533 | WEL | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "***" has been omitted due to text length limitations.

**Borrower:**  Southern Star Capital, LLC
5220 Spring Valley, Suite 602
Dallas, TX 75254

**Lender:**  Texas Brand Bank
1919 S. Shiloh Road
Suite 100
Garland, TX 75042
(972) 494-9800

---

**Principal Amount: $778,752.59**                    **Date of Note: March 11, 2022**

**PROMISE TO PAY.** Southern Star Capital, LLC ("Borrower") promises to pay to Texas Brand Bank ("Lender"), or order, in lawful money of the United States of America, the principal amount of Seven Hundred Seventy-eight Thousand Seven Hundred Fifty-two & 59/100 Dollars ($778,752.59), together with interest on the unpaid principal balance from March 10, 2022, until maturity.

**PAYMENT.** Borrower will pay this loan in full immediately upon Lender's demand. If no demand is made, subject to any payment changes resulting from changes in the Index, Borrower will pay this loan in accordance with the following payment schedule, which calculates interest on the unpaid principal balances as described in the "INTEREST CALCULATION METHOD" paragraph using the interest rates described in this paragraph: 2 monthly consecutive interest payments, beginning April 11, 2022, with interest calculated on the unpaid principal balances using an interest rate based on the Wall Street Journal Prime Rate as published in the Money Rate Section of the Wall Street Journal (currently 3.500%), plus a margin of 1.000 percentage points, adjusted if necessary for the minimum and maximum rate limitations for this loan, resulting in an initial interest rate of 5.000%; and one principal and interest payment of $782,105.55 on June 11, 2022, with interest calculated on the unpaid principal balances using an interest rate based on the Wall Street Journal Prime Rate as published in the Money Rate Section of the Wall Street Journal (currently 3.500%), plus a margin of 1.000 percentage points, adjusted if necessary for the minimum and maximum rate limitations for this loan, resulting in an initial interest rate of 5.000%. This estimated final payment is based on the assumption that all payments will be made exactly as scheduled and that the Index does not change; the actual final payment will be for all principal and accrued interest not yet paid, together with any other unpaid amounts under this Note. Unless otherwise agreed or required by applicable law, payments will be applied first to any accrued unpaid interest; then to principal; then to any late charges; and then to any unpaid collection costs. Any accrued interest not paid when due is added to principal and thereafter will accrue interest as principal.

**VARIABLE INTEREST RATE.** The interest rate on this Note is subject to change from time to time based on changes in an independent index which is the Wall Street Journal Prime Rate as published in the Money Rate Section of the Wall Street Journal (the "Index"). The Index is not necessarily the lowest rate charged by Lender on its loans. If Lender determines, in its sole discretion, that the Index for this Note has become unavailable or unreliable, either temporarily, indefinitely, or permanently, during the term of this Note, Lender may amend this Note by designating a substantially similar substitute index. Lender may also amend and adjust any margin corresponding to the Index being substituted to accompany the substitute index. Margins corresponding to the Index are described in the "Payments" section. The change to the margin may be a positive or negative value, or zero. In making these amendments, Lender may take into consideration any then-prevailing market convention for selecting a substitute index and margin for the specific Index that is unavailable or unreliable. Such an amendment to the terms of this Note will become effective and bind Borrower 10 business days after Lender gives written notice to Borrower without any action or consent of the Borrower. Lender will tell Borrower the current Index rate upon Borrower's request. The interest rate change will not occur more often than each day. Borrower understands that Lender may make loans based on other rates as well. **The Index currently is 3.500% per annum.** The interest rate or rates to be applied to the unpaid principal balance during this Note will be the rate or rates set forth herein in the "Payment" section. Notwithstanding any other provision of this Note, after the first payment stream, the interest rate for each subsequent payment stream will be effective as of the due date of the last payment in the just-ending payment stream. NOTICE: Under no circumstances will the interest rate on this Note be less than 5.000% per annum or more than the maximum rate allowed by applicable law. For purposes of this Note, the "maximum rate allowed by applicable law" means the greater of (A) the maximum rate of interest permitted under federal or other law applicable to the indebtedness evidenced by this Note, or (B) the "Weekly Ceiling" as referred to in Sections 303.002 and 303.003 of the Texas Finance Code. Whenever increases occur in the interest rate, Lender, at its option, may do one or more of the following: (A) increase Borrower's payments to ensure Borrower's loan will pay off by its original final maturity date, (B) increase Borrower's payments to cover accruing interest, (C) increase the number of Borrower's payments, and (D) continue Borrower's payments at the same amount and increase Borrower's final payment.

**INTEREST CALCULATION METHOD.** Interest on this Note is computed on a 365/360 basis; that is, by applying the ratio of the interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding (but not including February 29 in leap years), unless such calculation would result in a usurious rate, in which case interest shall be calculated on a per diem basis of a year of 365 days. All interest payable under this Note is computed using this method. This calculation method results in a higher effective interest rate than the numeric interest rates stated in this Note.

**RECEIPT OF PAYMENTS.** All payments must be made in U.S. dollars and must be received by Lender at:

Texas Brand Bank
1919 S. Shiloh Road
Suite 100
Garland, TX 75042

All payments must be received by Lender consistent with any written payment instructions provided by Lender. If a payment is made consistent with Lender's payment instructions but received after 5:00 PM Central Time on a business day, Lender will credit Borrower's payment on the next business day.

**PREPAYMENT.** Borrower agrees that all loan fees and other prepaid finance charges are earned fully as of the date of the loan and will not be subject to refund upon early payment (whether voluntary or as a result of default), except as otherwise required by law. Except for the foregoing, Borrower may prepay this Note in part or in full at any time before final maturity, whether by cash, a new loan, renewal, or otherwise. Prepayment in full shall consist of payment of the remaining unpaid principal balance together with all accrued and unpaid interest and all other amounts, costs and expenses for which Borrower is responsible under this Note or any other agreement with Lender pertaining to

App.361

**PROMISSORY NOTE**
**(Continued)**

Loan No: 2735533185                                                                    Page 2

this loan, and in no event will Borrower ever be required to pay any unearned interest. Early payments will not, unless agreed to by Lender in writing, relieve Borrower of Borrower's obligation to continue to make payments under the payment schedule. Rather, early payments will reduce the principal balance due and may result in Borrower's making fewer payments. Borrower agrees not to send Lender payments marked "paid in full", "without recourse", or similar language. If Borrower sends such a payment, Lender may accept it without losing any of Lender's rights under this Note, and Borrower will remain obligated to pay any further amount owed to Lender. **All written communications concerning disputed amounts, including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to: Texas Brand Bank, 1919 S. Shiloh Road Garland, TX 75042.**

**LATE CHARGE.** If a payment is 11 days or more late, Borrower will be charged **5.000%** of the unpaid portion of the regularly scheduled payment.

**INTEREST AFTER DEFAULT.** Upon default, including failure to pay upon final maturity, the total sum due under this Note will continue to accrue interest at the interest rate under this Note, with the final interest rate described in this Note applying after maturity, or after maturity would have occurred had there been no default.

**DEFAULT.** Each of the following shall constitute an event of default ("Event of Default") under this Note:

**Payment Default.** Borrower fails to make any payment when due under this Note.

**Other Defaults.** Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Note or in any of the related documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**Default in Favor of Third Parties.** Borrower or any Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's property or Borrower's ability to repay this Note or perform Borrower's obligations under this Note or any of the related documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Note or the related documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Death or Insolvency.** The dissolution of Borrower (regardless of whether election to continue is made), any member withdraws from Borrower, or any other termination of Borrower's existence as a going business or the death of any member, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the loan. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any guaranty of the indebtedness evidenced by this Note.

**Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of this Note is impaired.

**Cure Provisions.** If any default, other than a default in payment, is curable and if Borrower has not been given a notice of a breach of the same provision of this Note within the preceding twelve (12) months, it may be cured if Borrower, after Lender sends written notice to Borrower demanding cure of such default: (1) cures the default within thirty (30) days; or (2) if the cure requires more than thirty (30) days, immediately initiates steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**LENDER'S RIGHTS.** Upon default, Lender may declare the entire indebtedness, including the unpaid principal balance under this Note, all accrued unpaid interest, and all other amounts, costs and expenses for which Borrower is responsible under this Note or any other agreement with Lender pertaining to this loan, immediately due, without notice, and then Borrower will pay that amount.

**ATTORNEYS' FEES; EXPENSES.** Lender may hire an attorney to help collect this Note if Borrower does not pay, and Borrower will pay Lender's reasonable attorneys' fees. Borrower also will pay Lender all other amounts Lender actually incurs as court costs, lawful fees for filing, recording, releasing to any public office any instrument securing this Note; the reasonable cost actually expended for repossessing, storing, preparing for sale, and selling any security; and fees for noting a lien on or transferring a certificate of title to any motor vehicle offered as security for this Note, or premiums or identifiable charges received in connection with the sale of authorized insurance.

**GOVERNING LAW. This Note will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Texas without regard to its conflicts of law provisions. This Note has been accepted by Lender in the State of Texas.**

**CHOICE OF VENUE.** If there is a lawsuit, and if the transaction evidenced by this Note occurred in Dallas County, Borrower agrees upon Lender's request to submit to the jurisdiction of the courts of Dallas County, State of Texas.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Borrower's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Borrower holds jointly with someone else and all accounts Borrower may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Borrower authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the indebtedness against any and all such accounts.

**COLLATERAL.** Borrower acknowledges this Note is secured by the following collateral described in the security instruments listed herein: .

**RENEWAL AND EXTENSION.** This Note is given in renewal and extension and not in novation of the following described indebtedness: Promissory Note # 2735533-185 dated September 11, 2019 in the original principal amount of $900,000.00.

**SUCCESSOR INTERESTS.** The terms of this Note shall be binding upon Borrower, and upon Borrower's heirs, personal representatives, successors and assigns, and shall inure to the benefit of Lender and its successors and assigns.

**NOTIFY US OF INACCURATE INFORMATION WE REPORT TO CONSUMER REPORTING AGENCIES.** Borrower may notify Lender if Lender

App.362

## PROMISSORY NOTE
(Continued)

**Loan No: 2735533185**                                                              **Page 3**

reports any inaccurate information about Borrower's account(s) to a consumer reporting agency. Borrower's written notice describing the specific inaccuracy(ies) should be sent to Lender at the following address: Texas Brand Bank 1919 S. Shiloh Road Garland, TX 75042.

**WAIVER AND RELEASE OF CLAIMS.** In consideration of the renewal and extension of this Note and the renewal and extension of the obligations underlying this Note, including, but not limited to the liens and security interests securing this Note, Borrower and Guarantors hereby, jointly and severally, waive any and all rights which any of them may now or hereafter have, to the fullest extent permitted by the laws of the State of Texas, to raise in defense of Bank's/Lender's enforcement of its rights and remedies granted pursuant to this Note and the Loan Documents. Furthermore, Borrower and Guarantors hereby voluntarily and knowingly release and forever discharge Bank/Lender, its agents, employees, officers, directors, attorneys, successors and assigns from all possible claims, demands, actions, causes of action, damages, costs, expenses, and liabilities whatsoever, known or unknown, anticipated or unanticipated, suspected or unsuspected, fixed, contingent or conditional, at law or in equity, originating in whole or in part on or before the date this Note is executed, which the Borrower and Guarantors may now or hereafter have against Bank/Lender, its agents, employees, officers, directors, attorneys, successors and assigns, if any, and irrespective of whether any such claims arise out of contract, tort, violation of law or regulations, or otherwise.

**GENERAL PROVISIONS.** This Note is payable on demand. The inclusion of specific default provisions or rights of Lender shall not preclude Lender's right to declare payment of this Note on its demand. If any part of this Note cannot be enforced, this fact will not affect the rest of the Note. Borrower does not agree or intend to pay, and Lender does not agree or intend to contract for, charge, collect, take, reserve or receive (collectively referred to herein as "charge or collect"), any amount in the nature of interest or in the nature of a fee for this loan, which would in any way or event (including demand, prepayment, or acceleration) cause Lender to charge or collect more for this loan than the maximum Lender would be permitted to charge or collect by federal law or the law of the State of Texas (as applicable). Any such excess interest or unauthorized fee shall, instead of anything stated to the contrary, be applied first to reduce the principal balance of this loan, and when the principal has been paid in full, be refunded to Borrower. The right to accelerate maturity of sums due under this Note does not include the right to accelerate any interest which has not otherwise accrued on the date of such acceleration, and Lender does not intend to charge or collect any unearned interest in the event of acceleration. All sums paid or agreed to be paid to Lender for the use, forbearance or detention of sums due hereunder shall, to the extent permitted by applicable law, be amortized, prorated, allocated and spread throughout the full term of the loan evidenced by this Note until payment in full so that the rate or amount of interest on account of the loan evidenced hereby does not exceed the applicable usury ceiling. Lender may delay or forgo enforcing any of its rights or remedies under this Note without losing them. Borrower and any other person who signs, guarantees or endorses this Note, to the extent allowed by law, waive presentment, demand for payment, notice of dishonor, notice of intent to accelerate the maturity of this Note, and notice of acceleration of the maturity of this Note, provided, however, that Borrower shall be entitled to any required notice of default and shall be given all opportunity to cure as required by applicable law. Upon any change in the terms of this Note, and unless otherwise expressly stated in writing, no party who signs this Note, whether as maker, guarantor, accommodation maker or endorser, shall be released from liability. All such parties agree that Lender may renew or extend (repeatedly and for any length of time) this loan or release any party or guarantor or collateral; or impair, fail to realize upon or perfect Lender's security interest in the collateral without the consent of or notice to anyone. All such parties also agree that Lender may modify this loan without the consent of or notice to anyone other than the party with whom the modification is made. The obligations under this Note are joint and several.

**PRIOR TO SIGNING THIS NOTE, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS NOTE, INCLUDING THE VARIABLE INTEREST RATE PROVISIONS. BORROWER AGREES TO THE TERMS OF THE NOTE.**

**BORROWER ACKNOWLEDGES RECEIPT OF A COMPLETED COPY OF THIS PROMISSORY NOTE.**

**BORROWER:**

**SOUTHERN STAR CAPITAL, LLC**

By: _____
Michael D. Anderson, Manager of Southern Star
Capital, LLC

LaserPro, Ver. 21.1.0.222  Copr. Finastra USA Corporation 1997, 2022.  All Rights Reserved.  - TX  Z:\CFI\LPL\D20.FC  TR-4405  PR-2

App.363



*0000000027355331850955503102021*

# PROMISSORY NOTE

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|-----------|-----------|----------|---------|-------------|---------|---------|----------|
| $868,752.59 | 03-10-2021 | 03-10-2022 | 2735533185 | A | 2735533 | WEL | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "***" has been omitted due to text length limitations.

**Borrower:**  Southern Star Capital, LLC
5220 Spring Valley, Suite 602
Dallas, TX  75254

**Lender:**  Texas Brand Bank
1919 S. Shiloh Road
Suite 100
Garland, TX  75042
(972) 494-9800

**Principal Amount: $868,752.59**                             **Date of Note:  March 10, 2021**

**PROMISE TO PAY.**  Southern Star Capital, LLC ("Borrower") promises to pay to Texas Brand Bank ("Lender"), or order, in lawful money of the United States of America, the principal amount of Eight Hundred Sixty-eight Thousand Seven Hundred Fifty-two & 59/100 Dollars ($868,752.59), together with interest on the unpaid principal balance from March 10, 2021, until maturity.

**PAYMENT.**  Borrower will pay this loan in full immediately upon Lender's demand. If no demand is made, subject to any payment changes resulting from changes in the Index, Borrower will pay this loan in accordance with the following payment schedule, which calculates interest on the unpaid principal balances as described in the "INTEREST CALCULATION METHOD" paragraph using the interest rates described in this paragraph:  11 monthly consecutive interest payments, beginning April 10, 2021, with interest calculated on the unpaid principal balances using an interest rate based on the Wall Street Journal Prime Rate as published in the Money Rate Section of the Wall Street Journal (currently 3.250%), plus a margin of 1.000 percentage points, adjusted if necessary for the minimum and maximum rate limitations for this loan, resulting in an initial interest rate of 5.000%; 3 quarterly consecutive principal payments of $22,500.00 each, beginning June 10, 2021, during which interest continues to accrue on the unpaid principal balances using an interest rate based on the Wall Street Journal Prime Rate as published in the Money Rate Section of the Wall Street Journal (currently 3.250%), plus a margin of 1.000 percentage points, adjusted if necessary for the minimum and maximum rate limitations for this loan, resulting in an initial interest rate of 5.000%; and one principal and interest payment of $804,368.57 on March 10, 2022, with interest calculated on the unpaid principal balances using an interest rate based on the Wall Street Journal Prime Rate as published in the Money Rate Section of the Wall Street Journal (currently 3.250%), plus a margin of 1.000 percentage points, adjusted if necessary for the minimum and maximum rate limitations for this loan, resulting in an initial interest rate of 5.000%.  This estimated final payment is based on the assumption that all payments will be made exactly as scheduled and that the Index does not change; the actual final payment will be for all principal and accrued interest not yet paid, together with any other unpaid amounts under this Note. Notwithstanding the foregoing, the rate of interest accrual described for the principal only payment stream applies only to the extent that no other interest rate for any other payment stream applies.  Unless otherwise agreed or required by applicable law, payments will be applied first to any accrued unpaid interest; then to principal; then to any late charges; and then to any unpaid collection costs.

**VARIABLE INTEREST RATE.**  The interest rate on this Note is subject to change from time to time based on changes in an independent index which is the Wall Street Journal Prime Rate as published in the Money Rate Section of the Wall Street Journal (the "Index").  The Index is not necessarily the lowest rate charged by Lender on its loans.  If Lender determines, in its sole discretion, that the Index for this Note has become unavailable or unreliable, either temporarily, indefinitely, or permanently, during the term of this Note, Lender may amend this Note by designating a substantially similar substitute index.  Lender may also amend and adjust any margin corresponding to the Index being substituted to accompany the substitute index.  Margins corresponding to the Index are described in the "Payments" section.  The change to the margin may be a positive or negative value, or zero.  In making these amendments, Lender may take into consideration any then-prevailing market convention for selecting a substitute index and margin for the specific Index that is unavailable or unreliable.  Such an amendment to the terms of this Note will become effective and bind Borrower 10 business days after Lender gives written notice to Borrower without any action or consent of the Borrower.  Lender will tell Borrower the current Index rate upon Borrower's request.  The interest rate change will not occur more often than each day.  Borrower understands that Lender may make loans based on other rates as well.  **The Index currently is 3.250% per annum.**  The interest rate or rates to be applied to the unpaid principal balance during this Note will be the rate or rates set forth herein in the "Payment" section.  Notwithstanding any other provision of this Note, after the first payment stream, the interest rate for each subsequent payment stream will be effective as of the due date of the last payment in the just-ending payment stream.  NOTICE:  Under no circumstances will the interest rate on this Note be less than 5.000% per annum or more than the maximum rate allowed by applicable law.  For purposes of this Note, the "maximum rate allowed by applicable law" means the greater of  (A)  the maximum rate of interest permitted under federal or other law applicable to the indebtedness evidenced by this Note, or  (B)  the "Weekly Ceiling" as referred to in Sections 303.002 and 303.003 of the Texas Finance Code.  Whenever increases occur in the interest rate, Lender, at its option, may do one or more of the following:  (A) increase Borrower's payments to ensure Borrower's loan will pay off by its original final maturity date,  (B)  increase Borrower's payments to cover accruing interest,  (C)  increase the number of Borrower's payments, and  (D)  continue Borrower's payments at the same amount and increase Borrower's final payment.

**INTEREST CALCULATION METHOD.**  Interest on this Note is computed on a 365/360 basis; that is, by applying the ratio of the interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding (but not including February 29 in leap years), unless such calculation would result in a usurious rate, in which case interest shall be calculated on a per diem basis of a year of 365 days.  All interest payable under this Note is computed using this method.  This calculation method results in a higher effective interest rate than the numeric interest rates stated in this Note.

**RECEIPT OF PAYMENTS.**  All payments must be made in U.S. dollars and must be received by Lender at:

Texas Brand Bank
1919 S. Shiloh Road
Suite 100
Garland, TX  75042

All payments must be received by Lender consistent with any written payment instructions provided by Lender. If a payment is made consistent with Lender's payment instructions but received after 5:00 PM Central Time on a business day, Lender will credit Borrower's payment on the next business day.

**PREPAYMENT.**  Borrower agrees that all loan fees and other prepaid finance charges are earned fully as of the date of the loan and will not be subject to refund upon early payment (whether voluntary or as a result of default), except as otherwise required by law.   Except for the foregoing, Borrower may pay without penalty all or a portion of the amount owed earlier than it is due.  Prepayment in full shall consist of payment of the remaining unpaid principal balance together with all accrued and unpaid interest and all other amounts, costs and expenses for which Borrower is responsible under this Note or any other agreement with Lender pertaining to this loan, and in no event will Borrower ever be required to pay any unearned interest.  Early payments will not, unless agreed to by Lender in writing, relieve Borrower of Borrower's obligation to continue to make payments under the payment schedule.  Rather, early payments will reduce the principal balance due and may result in Borrower's making fewer payments.  Borrower agrees not to send Lender payments marked "paid in full", "without recourse", or similar language.  If Borrower sends such a payment, Lender may accept it without losing any of Lender's rights under this Note, and Borrower will remain obligated to pay any further amount owed to Lender.  **All written communications concerning disputed amounts, including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to:  Texas Brand Bank, 1919 S. Shiloh Road Garland, TX  75042.**

**LATE CHARGE.**  If a payment is 11 days or more late, Borrower will be charged **5.000% of the unpaid portion of the regularly scheduled payment.**

**INTEREST AFTER DEFAULT.**  Upon default, including failure to pay upon final maturity, the total sum due under this Note will continue to accrue interest at the interest rate under this Note, with the final interest rate described in this Note applying after maturity, or after maturity would have occurred had there been no default.

**DEFAULT.**  Each of the following shall constitute an event of default ("Event of Default") under this Note:

**Payment Default.**  Borrower fails to make any payment when due under this Note.

**Other Defaults.**  Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Note or in any of the related documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

App.364

**PROMISSORY NOTE**
Loan No: 2735533185                                    (Continued)                                                        Page 2

**Default in Favor of Third Parties.** Borrower or any Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's property or Borrower's ability to repay this Note or perform Borrower's obligations under this Note or any of the related documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Note or the related documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Death or Insolvency.** The dissolution of Borrower (regardless of whether election to continue is made), any member withdraws from Borrower, or any other termination of Borrower's existence as a going business or the death of any member, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the loan. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any guaranty of the indebtedness evidenced by this Note.

**Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of this Note is impaired.

**Cure Provisions.** If any default, other than a default in payment, is curable and if Borrower has not been given a notice of a breach of the same provision of this Note within the preceding twelve (12) months, it may be cured if Borrower, after Lender sends written notice to Borrower demanding cure of such default: (1) cures the default within thirty (30) days; or (2) if the cure requires more than thirty (30) days, immediately initiates steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**LENDER'S RIGHTS.** Upon default, Lender may declare the entire indebtedness, including the unpaid principal balance under this Note, all accrued unpaid interest, and all other amounts, costs and expenses for which Borrower is responsible under this Note or any other agreement with Lender pertaining to this loan, immediately due, without notice, and then Borrower will pay that amount.

**ATTORNEYS' FEES; EXPENSES.** Lender may hire an attorney to help collect this Note if Borrower does not pay, and Borrower will pay Lender's reasonable attorneys' fees. Borrower also will pay Lender all other amounts Lender actually incurs as court costs, lawful fees for filing, recording, releasing to any public office any instrument securing this Note; the reasonable cost actually expended for repossessing, storing, preparing for sale, and selling any security; and fees for noting a lien on or transferring a certificate of title to any motor vehicle offered as security for this Note, or premiums or identifiable charges received in connection with the sale of authorized insurance.

**GOVERNING LAW.** This Note will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Texas without regard to its conflicts of law provisions. This Note has been accepted by Lender in the State of Texas.

**CHOICE OF VENUE.** If there is a lawsuit, and if the transaction evidenced by this Note occurred in Dallas County, Borrower agrees upon Lender's request to submit to the jurisdiction of the courts of Dallas County, State of Texas.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Borrower's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Borrower holds jointly with someone else and all accounts Borrower may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Borrower authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the indebtedness against any and all such accounts.

**COLLATERAL.** Borrower acknowledges this Note is secured by the following collateral described in the security instruments listed herein: .

**RENEWAL AND EXTENSION.** This Note is given in renewal and extension and not in novation of the following described indebtedness: Promissory Note # 2735533-185 dated September 11, 2019 in the original principal amount of $900,000.00.

**SUCCESSOR INTERESTS.** The terms of this Note shall be binding upon Borrower, and upon Borrower's heirs, personal representatives, successors and assigns, and shall inure to the benefit of Lender and its successors and assigns.

**NOTIFY US OF INACCURATE INFORMATION WE REPORT TO CONSUMER REPORTING AGENCIES.** Borrower may notify Lender if Lender reports any inaccurate information about Borrower's account(s) to a consumer reporting agency. Borrower's written notice describing the specific inaccuracy(ies) should be sent to Lender at the following address: Texas Brand Bank 1919 S. Shiloh Road Garland, TX 75042.

**WAIVER AND RELEASE OF CLAIMS.** In consideration of the renewal and extension of this Note and the renewal and extension of the obligations underlying this Note, including, but not limited to the liens and security interests securing this Note, Borrower and Guarantors hereby, jointly and severally, waive any and all rights which any of them may now or hereafter have, to the fullest extent permitted by the laws of the State of Texas, to raise in defense of Bank's/Lender's enforcement of its rights and remedies granted pursuant to this Note and the Loan Documents. Furthermore, Borrower and Guarantors hereby voluntarily and knowingly release and forever discharge Bank/Lender, its agents, employees, officers, directors, attorneys, successors and assigns from all possible claims, demands, actions, causes of action, damages, costs, expenses, and liabilities whatsoever, known or unknown, anticipated or unanticipated, suspected or unsuspected, fixed, contingent or conditional, at law or in equity, originating in whole or in part on or before the date this Note is executed, which the Borrower and Guarantors may now or hereafter have against Bank/Lender, its agents, employees, officers, directors, attorneys, successors and assigns, if any, and irrespective of whether any such claims arise out of contract, tort, violation of law or regulations, or otherwise.

**GENERAL PROVISIONS.** This Note is payable on demand. The inclusion of specific default provisions or rights of Lender shall not preclude Lender's right to declare payment of this Note on its demand. If any part of this Note cannot be enforced, this fact will not affect the rest of the Note. Borrower does not agree or intend to pay, and Lender does not agree or intend to contract for, charge, collect, take, reserve or receive (collectively referred to herein as "charge or collect"), any amount in the nature of interest or in the nature of a fee for this loan, which would in any way or event (including demand, prepayment, or acceleration) cause Lender to charge or collect more for this loan than the maximum Lender would be permitted to charge or collect by federal law or the law of the State of Texas (as applicable). Any such excess interest or unauthorized fee shall, instead of anything stated to the contrary, be applied first to reduce the principal balance of this loan, and when the principal has been paid in full, be refunded to Borrower. The right to accelerate maturity of sums due under this Note does not include the right to accelerate any interest which has not otherwise accrued on the date of such acceleration, and Lender does not intend to charge or collect any unearned interest in the event of acceleration. All sums paid or agreed to be paid to Lender for the use, forbearance or detention of sums due hereunder shall, to the extent permitted by applicable law, be amortized, prorated, allocated and spread throughout the full term of the loan evidenced by this Note until payment in full so that the rate or amount of interest on account of the loan evidenced hereby does not exceed the applicable usury ceiling. Lender may delay or forgo enforcing any of its rights or remedies under this Note without losing them. Borrower and any other person who signs, guarantees or endorses this Note, to the extent allowed by law, waive presentment, demand for payment, notice of dishonor, notice of intent to accelerate the maturity of this Note, and notice of acceleration of the maturity of this Note, provided, however, that Borrower shall be entitled to any required notice of default and shall be given all opportunity to cure as required by applicable law. Upon any change in the terms of this Note, and unless otherwise expressly stated in writing, no party who signs this Note, whether as maker, guarantor, accommodation maker or endorser, shall be released from liability. All such parties agree that Lender may renew or extend (repeatedly and for any length of time) this loan or release any party or guarantor or collateral; or impair, fail to realize upon or perfect Lender's security interest in the collateral without the consent of or notice to anyone. All such parties also agree that Lender may modify this loan without the consent of or notice to anyone other than the party with whom the modification is made. The obligations under this Note are joint and several.

App.365

**PROMISSORY NOTE**
Loan No: 2735533185                    (Continued)                                    Page 3

═══════════════════════════════════════════════════════════════════════════════════

PRIOR TO SIGNING THIS NOTE, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS NOTE, INCLUDING THE VARIABLE INTEREST RATE PROVISIONS. BORROWER AGREES TO THE TERMS OF THE NOTE.

BORROWER ACKNOWLEDGES RECEIPT OF A COMPLETED COPY OF THIS PROMISSORY NOTE.

BORROWER:


SOUTHERN STAR CAPITAL, LLC

By: _____
Michael D. Anderson, Manager of Southern Star
Capital, LLC


═══════════════════════════════════════════════════════════════════════════════════

LaserPro, Ver. 19.4.10.036 Copr. Finastra USA Corporation 1997, 2021. All Rights Reserved. - TX Z:\CFI\LPL\D20.FC TR-4405 PR-2

═══════════════════════════════════════════════════════════════════════════════════

App.366

*00000000273553318509551211202O*

## PROMISSORY NOTE

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $891,450.00 | 12-11-2020 | 03-11-2021 | 2735533185 | A | 2735533 | WEL | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "****" has been omitted due to text length limitations.

**Borrower:** Southern Star Capital, LLC
5220 Spring Valley, Suite 602
Dallas, TX  75254

**Lender:** Texas Brand Bank
1919 S. Shiloh Road
Suite 100
Garland, TX  75042
(972) 494-9800

---

**Principal Amount: $891,450.00**                        **Date of Note: 12/11/2020**

**PROMISE TO PAY.** Southern Star Capital, LLC ("Borrower") promises to pay to Texas Brand Bank ("Lender"), or order, in lawful money of the United States of America, the principal amount of Eight Hundred Ninety-one Thousand Four Hundred Fifty & 00/100 Dollars ($891,450.00), together with interest on the unpaid principal balance from December 11, 2020, until maturity.

**PAYMENT.** Borrower will pay this loan in full immediately upon Lender's demand. If no demand is made, Borrower will pay this loan in one principal payment of $891,450.00 plus interest on March 11, 2021. This payment due on March 11, 2021, will be for all principal and all accrued interest not yet paid. In addition, Borrower will pay regular monthly payments of all accrued unpaid interest due as of each payment date, beginning January 11, 2021, with all subsequent interest payments to be due on the same day of each month after that. Unless otherwise agreed or required by applicable law, payments will be applied first to any accrued unpaid interest; then to principal; then to any late charges; and then to any unpaid collection costs.

**VARIABLE INTEREST RATE.** The interest rate on this Note is subject to change from time to time based on changes in an independent index which is the Wall Street Journal Prime Rate as published in the Money Rate Section of the Wall Street Journal (the "Index"). The Index is not necessarily the lowest rate charged by Lender on its loans. Lender will tell Borrower the current Index rate upon Borrower's request. The interest rate change will not occur more often than each day. Borrower understands that Lender may make loans based on other rates as well. The Index currently is 3.250% per annum. Interest prior to maturity on the unpaid principal balance of this Note will be calculated as described in the "INTEREST CALCULATION METHOD" paragraph using a rate of 1.000 percentage point over the Index (the "Margin"), adjusted if necessary for any minimum and maximum rate limitations described below, resulting in an initial rate of 5.000%. If Lender determines, in its sole discretion, that the Index has become unavailable or unreliable, either temporarily, indefinitely, or permanently, during the term of this Note, Lender may amend this Note by designating a substantially similar substitute index. Lender may also amend and adjust the Margin to accompany the substitute index. The change to the Margin may be a positive or negative value, or zero. In making these amendments, Lender may take into consideration any then-prevailing market convention for selecting a substitute index and margin for the specific Index that is unavailable or unreliable. Such an amendment to the terms of this Note will become effective and bind Borrower 10 business days after Lender gives written notice to Borrower without any action or consent of the Borrower. NOTICE: Under no circumstances will the interest rate on this Note be less than 5.000% per annum or more than the maximum rate allowed by applicable law. For purposes of this Note, the "maximum rate allowed by applicable law" means the greater of (A) the maximum rate of interest permitted under federal or other law applicable to the indebtedness evidenced by this Note, or (B) the "Weekly Ceiling" as referred to in Sections 303.002 and 303.003 of the Texas Finance Code.

**INTEREST CALCULATION METHOD.** Interest on this Note is computed on a 365/360 basis; that is, by applying the ratio of the interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding (but not including February 29 in leap years), unless such calculation would result in a usurious rate, in which case interest shall be calculated on a per diem basis of a year of 365 days. All interest payable under this Note is computed using this method. This calculation method results in a higher effective interest rate than the numeric interest rate stated in this Note.

**RECEIPT OF PAYMENTS.** All payments must be made in U.S. dollars and must be received by Lender at:

Texas Brand Bank
1919 S. Shiloh Road
Suite 100
Garland, TX  75042

All payments must be received by Lender consistent with any written payment instructions provided by Lender. If a payment is made consistent with Lender's payment instructions but received after 5:00 PM Central Time on a business day, Lender will credit Borrower's payment on the next business day.

**PREPAYMENT.** Borrower agrees that all loan fees and other prepaid finance charges are earned fully as of the date of the loan and will not be subject to refund upon early payment (whether voluntary or as a result of default), except as otherwise required by law. Except for the foregoing, Borrower may prepay this Note in part or in full at any time before final maturity, whether by cash, a new loan, renewal, or otherwise. Prepayment in full shall consist of payment of the remaining unpaid principal balance together with all accrued and unpaid interest and all other amounts, costs and expenses for which Borrower is responsible under this Note or any other agreement with Lender pertaining to this loan, and in no event will Borrower ever be required to pay any unearned interest. Early payments will not, unless agreed to by Lender in writing, relieve Borrower of Borrower's obligation to continue to make payments under the payment schedule. Rather, early payments will reduce the principal balance due. Borrower agrees not to send Lender payments marked "paid in full", "without recourse", or similar language. If Borrower sends such a payment, Lender may accept it without losing any of Lender's rights under this Note, and Borrower will remain obligated to pay any further amount owed to Lender. All written communications concerning disputed amounts, including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to: Texas Brand Bank, 1919 S. Shiloh Road Garland, TX 75042.

**LATE CHARGE.** If a payment is 11 days or more late, Borrower will be charged 5.000% of the unpaid portion of the regularly scheduled payment.

**INTEREST AFTER DEFAULT.** Upon default, including failure to pay upon final maturity, the total sum due under this Note will continue to accrue interest at the interest rate under this Note.

**DEFAULT.** Each of the following shall constitute an event of default ("Event of Default") under this Note:

**Payment Default.** Borrower fails to make any payment when due under this Note.

**Other Defaults.** Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Note or in any of the related documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**Default in Favor of Third Parties.** Borrower or any Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's property or Borrower's ability to repay this Note or perform Borrower's obligations under this Note or any of the related documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Note or the related documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Death or Insolvency.** The dissolution of Borrower (regardless of whether election to continue is made), any member withdraws from Borrower, or any other termination of Borrower's existence as a going business or the death of any member, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the loan. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate

App.367

**PROMISSORY NOTE**
**(Continued)**

Loan No: 2735533185                                                                          Page 2

reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any guaranty of the indebtedness evidenced by this Note.

**Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of this Note is impaired.

**Cure Provisions.** If any default, other than a default in payment, is curable and if Borrower has not been given a notice of a breach of the same provision of this Note within the preceding twelve (12) months, it may be cured if Borrower, after Lender sends written notice to Borrower demanding cure of such default: (1) cures the default within thirty (30) days; or (2) if the cure requires more than thirty (30) days, immediately initiates steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**LENDER'S RIGHTS.** Upon default, Lender may declare the entire indebtedness, including the unpaid principal balance under this Note, all accrued unpaid interest, and all other amounts, costs and expenses for which Borrower is responsible under this Note or any other agreement with Lender pertaining to this loan, immediately due, without notice, and then Borrower will pay that amount.

**ATTORNEYS' FEES; EXPENSES.** Lender may hire an attorney to help collect this Note if Borrower does not pay, and Borrower will pay Lender's reasonable attorneys' fees. Borrower also will pay Lender all other amounts Lender actually incurs as court costs, lawful fees for filing, recording, releasing to any public office any instrument securing this Note; the reasonable cost actually expended for repossessing, storing, preparing for sale, and selling any security; and fees for noting a lien on or transferring a certificate of title to any motor vehicle offered as security for this Note, or premiums or identifiable charges received in connection with the sale of authorized insurance.

**GOVERNING LAW.** This Note will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Texas without regard to its conflicts of law provisions. This Note has been accepted by Lender in the State of Texas.

**CHOICE OF VENUE.** If there is a lawsuit, and if the transaction evidenced by this Note occurred in Dallas County, Borrower agrees upon Lender's request to submit to the jurisdiction of the courts of Dallas County, State of Texas.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Borrower's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Borrower holds jointly with someone else and all accounts Borrower may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Borrower authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the indebtedness against any and all such accounts.

**COLLATERAL.** Borrower acknowledges this Note is secured by the following collateral described in the security instrument listed herein:.

**RENEWAL AND EXTENSION.** This Note is given in renewal and extension and not in novation of the following described indebtedness: Promissory Note # 2735533-185 dated September 11, 2019 in the original principal amount of $900,000.00.

**SUCCESSOR INTERESTS.** The terms of this Note shall be binding upon Borrower, and upon Borrower's heirs, personal representatives, successors and assigns, and shall inure to the benefit of Lender and its successors and assigns.

**NOTIFY US OF INACCURATE INFORMATION WE REPORT TO CONSUMER REPORTING AGENCIES.** Borrower may notify Lender if Lender reports any inaccurate information about Borrower's account(s) to a consumer reporting agency. Borrower's written notice describing the specific inaccuracy(ies) should be sent to Lender at the following address: Texas Brand Bank 1919 S. Shiloh Road Garland, TX 75042.

**WAIVER AND RELEASE OF CLAIMS.** In consideration of the renewal and extension of this Note and the renewal and extension of the obligations underlying this Note, including, but not limited to the liens and security interests securing this Note, Borrower and Guarantors hereby, jointly and severally, waive any and all rights which any of them may now or hereafter have, to the fullest extent permitted by the laws of the State of Texas, to raise in defense of Bank's/Lender's enforcement of its rights and remedies granted pursuant to this Note and the Loan Documents. Furthermore, Borrower and Guarantors hereby voluntarily and knowingly release and forever discharge Bank/Lender, its agents, employees, officers, directors, attorneys, successors and assigns from all possible claims, demands, actions, causes of action, damages, costs, expenses, and liabilities whatsoever, known or unknown, anticipated or unanticipated, suspected or unsuspected, fixed, contingent or conditional, at law or in equity, originating in whole or in part on or before the date this Note is executed, which the Borrower and Guarantors may now or hereafter have against Bank/Lender, its agents, employees, officers, directors, attorneys, successors and assigns, if any, and irrespective of whether any such claims arise out of contract, tort, violation of law or regulations, or otherwise.

**GENERAL PROVISIONS.** This Note is payable on demand. The inclusion of specific default provisions or rights of Lender shall not preclude Lender's right to declare payment of this Note on its demand. If any part of this Note cannot be enforced, this fact will not affect the rest of the Note. Borrower does not agree or intend to pay, and Lender does not agree or intend to contract for, charge, collect, take, reserve or receive (collectively referred to herein as "charge or collect"), any amount in the nature of interest or in the nature of a fee for this loan, which would in any way or event (including demand, prepayment, or acceleration) cause Lender to charge or collect more for this loan than the maximum Lender would be permitted to charge or collect by federal law or the law of the State of Texas (as applicable). Any such excess interest or unauthorized fee shall, instead of anything stated to the contrary, be applied first to reduce the principal balance of this loan, and when the principal has been paid in full, be refunded to Borrower. The right to accelerate maturity of sums due under this Note does not include the right to accelerate any interest which has not otherwise accrued on the date of such acceleration, and Lender does not intend to charge or collect any unearned interest in the event of acceleration. All sums paid or agreed to be paid to Lender for the use, forbearance or detention of sums due hereunder shall, to the extent permitted by applicable law, be amortized, prorated, allocated and spread throughout the full term of the loan evidenced by this Note until payment in full so that the rate or amount of interest on account of the loan evidenced hereby does not exceed the applicable usury ceiling. Lender may delay or forgo enforcing any of its rights or remedies under this Note without losing them. Borrower and any other person who signs, guarantees or endorses this Note, to the extent allowed by law, waive presentment, demand for payment, notice of dishonor, notice of intent to accelerate the maturity of this Note, and notice of acceleration of the maturity of this Note, provided, however, that Borrower shall be entitled to any required notice of default and shall be given all opportunity to cure as required by applicable law. Upon any change in the terms of this Note, and unless otherwise expressly stated in writing, no party who signs this Note, whether as maker, guarantor, accommodation maker or endorser, shall be released from liability. All such parties agree that Lender may renew or extend (repeatedly and for any length of time) this loan or release any party or guarantor or collateral; or impair, fail to realize upon or perfect Lender's security interest in the collateral without the consent of or notice to anyone. All such parties also agree that Lender may modify this loan without the consent of or notice to anyone other than the party with whom the modification is made. The obligations under this Note are joint and several.

**PRIOR TO SIGNING THIS NOTE, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS NOTE, INCLUDING THE VARIABLE INTEREST RATE PROVISIONS. BORROWER AGREES TO THE TERMS OF THE NOTE.**

**BORROWER ACKNOWLEDGES RECEIPT OF A COMPLETED COPY OF THIS PROMISSORY NOTE.**

**BORROWER:**

**SOUTHERN STAR CAPITAL, LLC**

By: _____

Michael D. Anderson, Manager of Southern Star
Capital, LLC

LaserPro, Ver. 19.4.10.036 Copr. Finastra USA Corporation 1997, 2020. All Rights Reserved. - TX Z:\CFI\LPL\D20.FC TR-4405 PR-2

App.368

## Promissory Note

**Date:** September 11, 2019.

**Borrower:** WALL009, LLC, a Texas limited liability company.

**Borrower's Mailing Address:**   WALL009, LLC, 1755 Wittington Place, Suite 340, Dallas Texas 75234, attention Tim Barton.

**Lender:** Southern Star Capital, LLC d/b/a Reliance Mortgage Company

**Place for Payment:**

5220 Spring Valley Road, Suite 602
Dallas, Texas 75254.
or any other place that Lender may designate in writing.

**Principal Amount:** Nine Hundred Thousand Dollars, ($900,000.00).

**Annual Interest Rate:** Twelve Percent (12.0%)

**Maturity Date:** September 1, 2020.

**Annual Interest Rate on Matured, Unpaid Amounts:** Eighteen Percent (18%) or the highest lawful rate, whichever is less.

**Terms of Payment (principal and interest):**

The Principal Amount and all accrued and unpaid interest is due and payable on September 1, 2020, and the interest is due and payable monthly as it accrues.

The monthly interest payments are Nine Thousand and 00/100 dollars ($9,000.00) and are due and payable on the first day of each month with the first payment due on October 1, 2019.

**Late Charge:**

If any installment becomes overdue for more than ten days, at Lender's option a late payment charge equal to five percent (5%) of the amount of the late payment may be charged in order to defray the expense of handling the delinquent payment.

**Security for Payment:** This note is secured by a deed of trust and security agreement (the "deed of trust") dated September 11, 2019, WALL009, LLC, a Texas limited liability company to Robert W. Buchholz, trustee on the following described real property.

The property described in the attached Exhibit "A" which is which is incorporated herein by reference.

Promissory Note                                                          Page - 1

App.369

**Other Security for Payment:**
None.

**Promise to Pay**
Borrower promises to pay to the order of Lender the Principal Amount plus interest at the Annual Interest Rate. This note is payable at the Place for Payment and according to the Terms of Payment. All unpaid amounts are due by the Maturity Date. If any amount is not paid either when due under the Terms of Payment or on acceleration of maturity, Borrower promises to pay any unpaid amounts plus interest from the date the payment was due to the date of payment at the Annual Interest Rate on Matured, Unpaid Amounts.

**Waivers**
Borrower waives, to the extent permitted by law, all (1) demand for payment, (2) presentation for payment, (3) notice of intention to accelerate maturity, (4) notice of acceleration of maturity, (5) protest, (6) notice of protest, (7) rights under sections 51.003, 51.004 and 51.005 of the Texas Property Code, (8) rights under section 17.001 and chapter 43 of the Texas Civil Practice and Remedies Code and rule 31 of the Texas Rules of Civil Procedure.

**Attorney's Fees**
Borrower also promises to pay reasonable attorney's fees and court and other costs if an attorney is retained to collect or enforce the note. These expenses will bear interest from the date of advance at the Annual Interest Rate on Matured, Unpaid Amounts. Borrower will pay Lender these expenses and interest on demand at the Place for Payment. These expenses and interest will become part of the debt evidenced by the note and will be secured by any security for payment.

**Prepayment:** Borrower may prepay this note in any amount at any time before the Maturity Date without penalty or premium.

**Application of Prepayment:** Prepayments will be applied to installments on the last maturing principal, and interest on that prepaid principal will immediately cease to accrue.

**Usury Savings**
It is the intention of the parties hereto to act in strict compliance with "Applicable Law" (hereafter defined). Accordingly, it is agreed that notwithstanding any provision to the contrary in this note, "deed of trust" (defined above), or any other instrument securing or evidencing the indebtedness evidenced by this note, or in any other arrangements or agreements, no such provision shall ever be construed to create a contract to pay, as consideration for use, forbearance or detention of money, "interest," as that term may be defined by Applicable Law, at a rate in excess of the maximum lawful rate of nonusurious interest permitted by Applicable Law. If any excess of interest in such respect is provided for, or shall be adjudicated to be so provided for, in this note, the deed of trust, or in any other instrument securing or evidencing the indebtedness evidenced by this note, then in such event (a) the provisions of this paragraph shall govern and control; (b) neither Borrower nor its successors or assigns or any other party liable for the payment of the indebtedness shall be obligated to pay the amount of such interest to the extent that it is in excess of the maximum lawful amount of nonusurious interest permitted by Applicable Law, and the same shall be construed as a mutual mistake of the parties hereto, and of any legal holder of this note,

**Promissory Note**                                                        **Page - 2**

and (c) such excess of interest over the maximum lawful rate of nonusurious interest permitted by Applicable Law shall either be applied as credit against the then unpaid principal amount of the indebtedness owed under this note or refunded to Borrower. Any commitment, extension, brokerage, loan or other fees or sums paid pursuant to this note, the loan evidenced hereby, or the deed of trust and which under Applicable Law are deemed to constitute interest shall be treated as interest and taken into account in calculating the maximum lawful rate of nonusurious interest permitted by Applicable Law. If the holder of this note shall ever receive anything of value that is characterized as interest under Applicable Law and that would apart from this provision be in excess of the maximum lawful rate of nonusurious interest permitted by Applicable Law, an amount equal to the amount that would have been excessive interest shall, without penalty, be applied to the reduction of the principal amount owing on the indebtedness evidenced by this note in the inverse order of its maturity and not to the payment of interest, or refunded to Borrower or the other payor thereof if and to the extent such amount, which would have been excessive, exceeds such unpaid principal. The right to accelerate maturity of this note, or any other indebtedness, does not include the right to accelerate any interest that has not otherwise accrued on the date of such acceleration, and the holder hereof does not intend to charge or receive any unearned interest in the event of acceleration. All interest paid or agreed to be paid to the holder hereof shall, to the extent permitted by Applicable Law, be amortized, prorated, allocated, and spread throughout the full stated term (including any renewal or extension) of such indebtedness so that the amount of interest on account of such indebtedness does not exceed the maximum lawful amount of nonusurious interest permitted by Applicable Law. Further, notwithstanding anything to the contrary contained herein, if the indebtedness evidenced by this note or the or the deed of trust is paid in full by Borrower or its successors or assigns prior to the full stated term of this note (as such term may have been extended pursuant to the terms hereof) and the interest received for the actual period of the existence of the indebtedness evidenced by this note exceeds the maximum lawful rate of nonusurious interest permitted by Applicable Law, then Lender, or its successors or assigns, shall refund to Borrower, or its successors or assigns, the amount of the excess of such interest over the maximum amount of nonusurious interest permitted under Applicable Law, and neither Lender, nor its successors or assigns, shall be subject to any of the penalties, if any, provided by Applicable Law for contracting for, charging, or receiving interest in excess of the maximum lawful rate of nonusurious interest permitted by Applicable Law. To the extent that Title 4 of the Texas Finance Code is relevant for purposes of determining the maximum lawful rate of nonusurious interest permitted by Applicable Law, the parties hereby elect to determine the applicable rate ceiling under such article by using the indicated (weekly) rate ceiling from time to time in effect, subject to Lender's right subsequently to change such method in accordance with Applicable Law.

"Applicable Law" shall mean that law (including, without limitation, Texas law), regulation, or judicial determination in effect from time to time and applicable to this note (including future changes in law), which lawfully permits the contracting for, charging and collection of the highest permissible rate of interest on this note and the loan evidenced hereby, including laws, regulations, and judicial determinations of the State of Texas and of the United States of America.

**Other Clauses**

Each Borrower is responsible for all obligations represented by this note.

**Promissory Note**                                                                 Page - 3

App.371

When the context requires, singular nouns and pronouns include the plural.

A default exists under this note if (1) (a) Borrower or (b) any other person liable on any part of this note or who grants a lien or security interest on property as security for any part of this note (an "Other Obligated Party") fails to timely pay or perform any obligation or covenant in any written agreement between Lender and Borrower or any Other Obligated Party; (2) any representation in this note or in any other written agreement between Lender and Borrower or any Other Obligated Party is materially false when made; (3) a receiver is appointed for Borrower, any Other Obligated Party, or any property on which a lien or security interest is created as security (the "Collateral Security") for any part of this note; (4) any Collateral Security is assigned for the benefit of creditors; (5) a bankruptcy or insolvency proceeding is commenced by Borrower, a partnership of which Borrower is a general partner, or an Other Obligated Party; (6) (a) a bankruptcy or insolvency proceeding is commenced against Borrower, a partnership of which Borrower is a general partner, or an Other Obligated Party and (b) the proceeding continues without dismissal for sixty days, the party against whom the proceeding is commenced admits the material allegations of the petition against it, or an order for relief is entered; (7) any of the following parties is terminated, begins to wind up its affairs, suffers a forfeiture of right to do business, is authorized to terminate or wind up its affairs by its governing body or persons, or any event occurs or condition exists that permits the termination or winding up of the affairs of any of the following parties: Borrower, a partnership of which Borrower is a general partner, or an Other Obligated Party; (8) any Collateral Security is impaired by loss, theft, damage, levy and execution, issuance of an official writ or order of seizure, or destruction, unless it is promptly replaced with collateral security of like kind and quality or restored to its former condition; or (9) any attachment, sequestration or similar writ is levied upon any property of Borrower or Other Obligated Party and is not discharged within a period of thirty days; (10) any final money judgment against Borrower or any Other Obligated Party is not paid within thirty days; (11) Borrower abandons any portion of the property of Borrower; or (12) if Borrower is an individual, the death or disability of Borrower or Other Obligated Party, if Other Obligated Party is an individual.

**BORROWER waives its rights under the Texas Deceptive Trade Practices–Consumer Protection Act, section 17.41 *et seq*. of the Texas Business and Commerce Code, a law that gives consumers special rights and protections. After consultation with an attorney of its own selection, BORROWER voluntarily consents to this waiver.**

If any provision of this note conflicts with any provision of a loan agreement, deed of trust, or security agreement of the same transaction between Lender and Borrower, the provisions of the deed of trust will govern to the extent of the conflict.

Borrower and Lender acknowledge that they were represented by competent counsel in connection with the negotiation, drafting and execution of this Note, deed of trust, and all other documents executed in connection with the same transaction between Lender and Borrower and that this Note, the deed of trust and all other documents executed in connection with the same transaction between Lender and Borrower shall not be subject to the principle of construing their meaning against the party which drafted same.

**BORROWER, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, HEREBY KNOWINGLY, INTENTIONALLY, IRREVOCABLY, UNCONDITIONALLY**

**Promissory Note**                                                    **Page - 4**

App.372

AND VOLUNTARILY, WITH AND UPON THE ADVICE OF COMPETENT COUNSEL, WAIVES, RELINQUISHES AND FOREVER FORGOES THE RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING BASED UPON, ARISING OUT OF, OR IN ANY WAY RELATING TO THIS NOTE OR ANY CONDUCT, ACT OR OMISSION OF LENDER OR BORROWER, OR ANY OF THEIR DIRECTORS, OFFICERS, PARTNERS, MEMBERS, EMPLOYEES, AGENTS OR ATTORNEYS, OR ANY OTHER PERSONS AFFILIATED WITH LENDER OR BORROWER, IN EACH OF THE FOREGOING CASES, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE.

Borrower warrants to Lender and agrees that the proceeds of the Note will be used primarily for business or commercial purposes and not primarily for personal, family, or household purposes.

This note will be construed under the laws of the state of Texas, without regard to choice-of-law rules of any jurisdiction.

**WALL009, LLC, a Texas limited liability company.**

**BY:     ITS MANAGERS:**

TRWF LODGE, LLC, a Texas limited liability company.

_____

Tim Barton
Its Managing Member

**and**

CARNEGIE DEVELOPMENT, LLC, a Delaware limited liability company.

_____

Tim Barton
Its Managing Member

**Promissory Note**                                                                 **Page - 5**

App.373

*000000002735533185095509112019*

## PROMISSORY NOTE

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $900,000.00 | 09-11-2019 | 09-11-2020 | 2735533185 | A | 2735533 | WEL | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "***" has been omitted due to text length limitations.

**Borrower:** Southern Star Capital, LLC
5220 Spring Valley, Suite 602
Dallas, TX 75254

**Lender:** Texas Brand Bank
1919 S. Shiloh Road
Suite 100
Garland, TX 75042
(972) 494-9800

---

**Principal Amount: $900,000.00**                        **Date of Note: September 11, 2019**

**PROMISE TO PAY.** Southern Star Capital, LLC ("Borrower") promises to pay to Texas Brand Bank ("Lender"), or order, in lawful money of the United States of America, the principal amount of Nine Hundred Thousand & 00/100 Dollars ($900,000.00), together with interest on the unpaid principal balance from September 11, 2019, until maturity.

**PAYMENT.** Borrower will pay this loan in full immediately upon Lender's demand. If no demand is made, Borrower will pay this loan in one principal payment of $900,000.00 plus interest on September 11, 2020. This payment due on September 11, 2020, will be for all principal and all accrued interest not yet paid. In addition, Borrower will pay regular monthly payments of all accrued unpaid interest due as of each payment date, beginning October 11, 2019, with all subsequent interest payments to be due on the same day of each month after that. Unless otherwise agreed or required by applicable law, payments will be applied first to any accrued unpaid interest; then to principal; then to any late charges; and then to any unpaid collection costs.

**VARIABLE INTEREST RATE.** The interest rate on this Note is subject to change from time to time based on changes in an independent index which is the Wall Street Journal Prime Rate as published in the Money Rate Section of the Wall Street Journal (the "Index"). The Index is not necessarily the lowest rate charged by Lender on its loans. If the Index becomes unavailable during the term of this loan, Lender may designate a substitute index after notifying Borrower. Lender will tell Borrower the current Index rate upon Borrower's request. The interest rate change will not occur more often than each day. Borrower understands that Lender may make loans based on other rates as well. **The Index currently is 5.250% per annum.** Interest prior to maturity on the unpaid principal balance of this Note will be calculated as described in the "INTEREST CALCULATION METHOD" paragraph using a rate of 1.000 percentage point over the Index, adjusted if necessary for any minimum and maximum rate limitations described below, resulting in an initial rate of 6.250%. NOTICE: Under no circumstances will the interest rate on this Note be less than 6.000% per annum or more than the maximum rate allowed by applicable law. For purposes of this Note, the "maximum rate allowed by applicable law" means the greater of (A) the maximum rate of interest permitted under federal or other law applicable to the indebtedness evidenced by this Note, or (B) the "Weekly Ceiling" as referred to in Sections 303.002 and 303.003 of the Texas Finance Code.

**INTEREST CALCULATION METHOD.** Interest on this Note is computed on a 365/360 basis; that is, by applying the ratio of the interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding, unless such calculation would result in a usurious rate, in which case interest shall be calculated on a per diem basis of a year of 365 or 366 days, as the case may be. All interest payable under this Note is computed using this method. This calculation method results in a higher effective interest rate than the numeric interest rate stated in this Note.

**RECEIPT OF PAYMENTS.** All payments must be made in U.S. dollars and must be received by Lender at:

Texas Brand Bank
1919 S. Shiloh Road
Suite 100
Garland, TX 75042

All payments must be received by Lender consistent with any written payment instructions provided by Lender. If a payment is made consistent with Lender's payment instructions but received after 5:00 PM Central Time on a business day, Lender will credit Borrower's payment on the next business day.

**PREPAYMENT.** Borrower agrees that all loan fees and other prepaid finance charges are earned fully as of the date of the loan and will not be subject to refund upon early payment (whether voluntary or as a result of default), except as otherwise required by law. Except for the foregoing, Borrower may pay without penalty all or a portion of the amount owed earlier than it is due. Prepayment in full shall consist of payment of the remaining unpaid principal balance together with all accrued and unpaid interest and all other amounts, costs and expenses for which Borrower is responsible under this Note or any other agreement with Lender pertaining to this loan, and in no event will Borrower ever be required to pay any unearned interest. Early payments will not, unless agreed to by Lender in writing, relieve Borrower of Borrower's obligation to continue to make payments under the payment schedule. Rather, early payments will reduce the principal balance due. Borrower agrees not to send Lender payments marked "paid in full", "without recourse", or similar language. If Borrower sends such a payment, Lender may accept it without losing any of Lender's rights under this Note, and Borrower will remain obligated to pay any further amount owed to Lender. **All written communications concerning disputed amounts, including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to: Texas Brand Bank, 1919 S. Shiloh Road Garland, TX 75042.**

**LATE CHARGE.** If a payment is 11 days or more late, Borrower will be charged **5.000% of the unpaid portion of the regularly scheduled payment.**

**POST MATURITY RATE.** The Post Maturity Rate on this Note is the lesser of (A) the maximum rate allowed by law or (B) the interest rate under this Note. Borrower will pay interest on all sums due after final maturity, whether by acceleration or otherwise, at that rate.

**DEFAULT.** Each of the following shall constitute an event of default ("Event of Default") under this Note:

**Payment Default.** Borrower fails to make any payment when due under this Note.

**Other Defaults.** Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Note or in any of the related documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**Default in Favor of Third Parties.** Borrower or any Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's property or Borrower's ability to repay this Note or perform Borrower's obligations under this Note or any of the related documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Note or the related documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Death or Insolvency.** The dissolution of Borrower (regardless of whether election to continue is made), any member withdraws from Borrower, or any other termination of Borrower's existence as a going business or the death of any member, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the loan. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any guaranty of the indebtedness evidenced by this Note.

**Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or

**PROMISSORY NOTE**
**(Continued)**

Loan No: 2735533185                                                                            Page 2

performance of this Note is impaired.

**Cure Provisions.** If any default, other than a default in payment, is curable and if Borrower has not been given a notice of a breach of the same provision of this Note within the preceding twelve (12) months, it may be cured if Borrower, after Lender sends written notice to Borrower demanding cure of such default: (1) cures the default within thirty (30) days; or (2) if the cure requires more than thirty (30) days, immediately initiates steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**LENDER'S RIGHTS.** Upon default, Lender may declare the entire indebtedness, including the unpaid principal balance under this Note, all accrued unpaid interest, and all other amounts, costs and expenses for which Borrower is responsible under this Note or any other agreement with Lender pertaining to this loan, immediately due, without notice, and then Borrower will pay that amount.

**ATTORNEYS' FEES; EXPENSES.** Lender may hire an attorney to help collect this Note if Borrower does not pay, and Borrower will pay Lender's reasonable attorneys' fees. Borrower also will pay Lender all other amounts Lender actually incurs as court costs, lawful fees for filing, recording, releasing to any public office any instrument securing this Note; the reasonable cost actually expended for repossessing, storing, preparing for sale, and selling any security; and fees for noting a lien on or transferring a certificate of title to any motor vehicle offered as security for this Note, or premiums or identifiable charges received in connection with the sale of authorized insurance.

**GOVERNING LAW. This Note will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Texas without regard to its conflicts of law provisions. This Note has been accepted by Lender in the State of Texas.**

**CHOICE OF VENUE.** If there is a lawsuit, and if the transaction evidenced by this Note occurred in Dallas County, Borrower agrees upon Lender's request to submit to the jurisdiction of the courts of Dallas County, State of Texas.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Borrower's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Borrower holds jointly with someone else and all accounts Borrower may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Borrower authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the indebtedness against any and all such accounts.

**SUCCESSOR INTERESTS.** The terms of this Note shall be binding upon Borrower, and upon Borrower's heirs, personal representatives, successors and assigns, and shall inure to the benefit of Lender and its successors and assigns.

**NOTIFY US OF INACCURATE INFORMATION WE REPORT TO CONSUMER REPORTING AGENCIES.** Borrower may notify Lender if Lender reports any inaccurate information about Borrower's account(s) to a consumer reporting agency. Borrower's written notice describing the specific inaccuracy(ies) should be sent to Lender at the following address: Texas Brand Bank 1919 S. Shiloh Road Garland, TX 75042.

**WAIVER AND RELEASE OF CLAIMS.** In consideration of this Note and the obligations underlying this Note, including, but not limited to the liens and security interests securing this Note, Borrower and Guarantors hereby, jointly and severally, waive any and all rights which any of them may now or hereafter have, to the fullest extent permitted by the laws of the State of Texas, to raise in defense of Bank's/Lender's enforcement of its rights and remedies granted pursuant to this Note and the Loan Documents. Furthermore, Borrower and Guarantors hereby voluntarily and knowingly release and forever discharge Bank/Lender, its agents, employees, officers, directors, attorneys, successors and assigns from all possible claims, demands, actions, causes of action, damages, costs, expenses, and liabilities whatsoever, known or unknown, anticipated or unanticipated, suspected or unsuspected, fixed, contingent or conditional, at law or in equity, originating in whole or in part on or before the date this Note is executed, which the Borrower and Guarantors may now or hereafter have against Bank/Lender, its agents, employees, officers, directors, attorneys, successors and assigns, if any, and irrespective of whether any such claims arise out of contract, tort, violation of law or regulations, or otherwise.

**GENERAL PROVISIONS.** This Note is payable on demand. The inclusion of specific default provisions or rights of Lender shall not preclude Lender's right to declare payment of this Note on its demand. If any part of this Note cannot be enforced, this fact will not affect the rest of the Note. Borrower does not agree or intend to pay, and Lender does not agree or intend to contract for, charge, collect, take, reserve or receive (collectively referred to herein as "charge or collect"), any amount in the nature of interest or in the nature of a fee for this loan, which would in any way or event (including demand, prepayment, or acceleration) cause Lender to charge or collect more for this loan than the maximum Lender would be permitted to charge or collect by federal law or the law of the State of Texas (as applicable). Any such excess interest or unauthorized fee shall, instead of anything stated to the contrary, be applied first to reduce the principal balance of this loan, and when the principal has been paid in full, be refunded to Borrower. The right to accelerate maturity of sums due under this Note does not include the right to accelerate any interest which has not otherwise accrued on the date of such acceleration, and Lender does not intend to charge or collect any unearned interest in the event of acceleration. All sums paid or agreed to be paid to Lender for the use, forbearance or detention of sums due hereunder shall, to the extent permitted by applicable law, be amortized, prorated, allocated and spread throughout the full term of the loan evidenced by this Note until payment in full so that the rate or amount of interest on account of the loan evidenced hereby does not exceed the applicable usury ceiling. Lender may delay or forgo enforcing any of its rights or remedies under this Note without losing them. Borrower and any other person who signs, guarantees or endorses this Note, to the extent allowed by law, waive presentment, demand for payment, notice of dishonor, notice of intent to accelerate the maturity of this Note, and notice of acceleration of the maturity of this Note, provided, however, that Borrower shall be entitled to any required notice of default and shall be given all opportunity to cure as required by applicable law. Upon any change in the terms of this Note, and unless otherwise expressly stated in writing, no party who signs this Note, whether as maker, guarantor, accommodation maker or endorser, shall be released from liability. All such parties agree that Lender may renew or extend (repeatedly and for any length of time) this loan or release any party or guarantor or collateral; or impair, fail to realize upon or perfect Lender's security interest in the collateral without the consent of or notice to anyone. All such parties also agree that Lender may modify this loan without the consent of or notice to anyone other than the party with whom the modification is made. The obligations under this Note are joint and several.

PRIOR TO SIGNING THIS NOTE, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS NOTE, INCLUDING THE VARIABLE INTEREST RATE PROVISIONS. BORROWER AGREES TO THE TERMS OF THE NOTE.

BORROWER ACKNOWLEDGES RECEIPT OF A COMPLETED COPY OF THIS PROMISSORY NOTE.

BORROWER:

SOUTHERN STAR CAPITAL, LLC

By _____
Michael D. Anderson, Manager of Southern Star
Capital, LLC

LaserPro, Ver. 19.1.0.048  Copr. Finastra USA Corporation 1997, 2019.  All Rights Reserved.  - TX  Z:\CFI\LPL\D20.FC  TR-4405  PR-2

App.375

**LNS TRANSACTION HISTORY REPORT FOR SOUTHERN STAR CAPITAL LLC  2735533 - 185 Public ID: JEANNINE**

| NAME AND ADDRESS | | BORROWER # | 2735533 | 5/1/2024 |
|---|---|---|---|---|
| SOUTHERN STAR CAPITAL LLC | | | | |
| | | PHONE # | | (214) 346-5201 |
| | | PRIMARY DDA # | | 000000000000 |
| 5220 SPRING VALLEY STE 602 | | PRIMARY OFFICER | | WEL |
| DALLAS TX 75254 | | F/S CODE | | |

NOTE #   185

| LOAN AMOUNT | LOAN DATE | MATURITY DATE | INTEREST RATE | REAL ESTATE LOCATION |
|---|---|---|---|---|
| $900,000.00 | 09/11/2019 | 06/07/2024 | 9.5000000% | N/R 63 ACRES FM501 VENUS |

| | DATE NEXT DUE | CURRENT BALANCE | $620,036.13 |
|---|---|---|---|
| | 05/09/2024 | INTEREST FOR YEAR | $20,671.59 |
| | | LATE CHARGES FOR YEAR | $0.00 |

| EFFECTIVE DATE | TOTAL AMOUNT | | PRINCIPAL | INTEREST | ESC/LATE/FEE | ESCROW BALANCE | LOAN BALANCE | PUBLIC ID |
|---|---|---|---|---|---|---|---|---|
| 04/04/2024 | $5,072.24 | P | $0.00 | $5,072.24 | $0.00 | $0.00 | $620,036.13 | |
| 03/09/2024 | $27,247.63 | P | $22,500.00 | $4,747.63 | $0.00 | $0.00 | $620,036.13 | LYNNB |
| | | | DATE POSTED: 03/11/2024 | | | | | |
| 02/13/2024 | $5,258.72 | P | $0.00 | $5,258.72 | $0.00 | $0.00 | $642,536.13 | |
| 01/08/2024 | $5,593.00 | P | $0.00 | $5,593.00 | $0.00 | $0.00 | $642,536.13 | |
| 12/10/2023 | $0.00 | P | $0.00 | | $0.00 | $0.00 | $642,536.13 | LYNNB |
| | | | DATE POSTED: 12/11/2023 | | | | | |
| 12/08/2023 | $5,267.65 | P | $351.18 | $4,916.47 | $0.00 | $0.00 | $642,536.13 | |
| 12/08/2023 | $22,500.00 | A | $22,500.00 | | $0.00 | $0.00 | $642,887.31 | LYNNB |
| 11/06/2023 | $5,443.24 | P | $0.00 | $5,443.24 | $0.00 | $0.00 | $665,387.31 | |
| 10/10/2023 | $5,267.64 | P | $0.00 | $5,267.64 | $0.00 | $0.00 | $665,387.31 | |
| 09/11/2023 | $5,507.93 | P | $0.00 | $5,507.93 | $0.00 | $0.00 | $665,387.31 | |
| 08/08/2023 | $5,300.00 | P | $0.00 | $5,300.00 | $0.00 | $0.00 | $665,387.31 | |
| 07/27/2023 | | | 0002 FM: INTEREST RATE | | TO: 095000000C | FROM: 092500000C | | |
| 07/14/2023 | $5,501.87 | P | $0.00 | $5,129.03 | $372.84 LC | $0.00 | $665,387.31 | |
| 06/22/2023 | $5,512.65 | P | $0.00 | $5,512.65 | $0.00 | $0.00 | $665,387.31 | |
| 06/10/2023 | $22,500.00 | P | $22,500.00 | | $0.00 | $0.00 | $665,387.31 | MARIES |
| | | | DATE POSTED: 06/29/2023 | | | | | |
| 05/15/2023 | $5,422.84 | P | $0.00 | $5,159.15 | $263.69 LC | $0.00 | $687,887.31 | |
| 05/03/2023 | | | 0002 FM: INTEREST RATE | | TO: 092500000C | FROM: 090000000C | | |
| 04/21/2023 | $5,273.80 | P | $0.00 | $5,273.80 | $0.00 | $0.00 | $687,887.31 | |
| 03/22/2023 | | | 0002 FM: INTEREST RATE | | TO: 090000000C | FROM: 087500000C | | |
| 03/10/2023 | $27,374.05 | P | $22,500.00 | $4,874.05 | $0.00 | $0.00 | $687,887.31 | MARIES |
| | | | DATE POSTED: 03/13/2023 | | | | | |
| 02/16/2023 | $5,199.64 | P | $0.00 | $5,199.64 | $0.00 | $0.00 | $710,387.31 | |
| 02/02/2023 | | | 0002 FM: INTEREST RATE | | TO: 087500000C | FROM: 085000000C | | |

App.376

**LNS TRANSACTION HISTORY REPORT FOR SOUTHERN STAR CAPITAL LLC - 2735533 - 185 Public ID: JEANNINE**

| EFFECTIVE DATE | TOTAL AMOUNT | | PRINCIPAL | INTEREST | ESC/LATE/FEE | ESCROW BALANCE | LOAN BALANCE | PUBLIC ID |
|---|---|---|---|---|---|---|---|---|
| | | | TRANSACTION BREAKDOWN | | | | | |
| 01/09/2023 | $5,199.64 | P | $0.00 | $5,199.64 | $0.00 | $0.00 | $710,387.31 | |
| 12/14/2022 | | | 0002 FM: INTEREST RATE | | TO: 085000000C | | FROM: 085000000C | |
| | | | DATE POSTED: 12/19/2022 | | | | | |
| 12/14/2022 | | | 0002 FM: INTEREST RATE | | TO: 085000000C  X | | FROM: 080000000C | |
| | | | | | X | | | |
| 12/12/2022 | $5,008.06 | P | $0.00 | $5,008.06 | $0.00 | $0.00 | $710,387.31 | |
| 12/10/2022 | | | 0002 FM: INTEREST RATE | | TO: 085000000C 4 | | FROM: 080000000C | LYNNB |
| 12/10/2022 | $22,500.00 | P | $22,500.00 | | $0.00 | $0.00 | $710,387.31 | LYNNB |
| | | | DATE POSTED: 12/19/2022 | | | | | |
| 11/14/2022 | $4,371.71 | P | $0.00 | $4,371.71 | $0.00 | $0.00 | $732,887.31 | |
| 11/02/2022 | | | 0002 FM: INTEREST RATE | | TO: 080000000C | | FROM: 072500000C | |
| 09/22/2022 | | | 0002 FM: INTEREST RATE | | TO: 072500000C | | FROM: 065000000C | |
| 09/13/2022 | $4,448.39 | P | $0.00 | $4,448.39 | $0.00 | $0.00 | $732,887.31 | |
| 09/10/2022 | $26,948.39 | P | $22,500.00 | $4,448.39 | $0.00 | $0.00 | $732,887.31 | LYNNB |
| | | | DATE POSTED: 09/15/2022 | | | | | |
| 08/08/2022 | $3,740.22 | P | $0.00 | $3,740.22 | $0.00 | $0.00 | $755,387.31 | |
| 07/27/2022 | | | 0002 FM: INTEREST RATE | | TO: 065000000C 0 | | FROM: 057500000C | |
| | | | DATE POSTED: 07/28/2022 | | | | | |
| 07/05/2022 | $4,383.32 | P | $0.00 | $4,383.32 | $0.00 | $0.00 | $755,387.31 | LYNNB |
| | | | DATE POSTED: 07/06/2022 | | | | | |
| 06/15/2022 | | | 0002 FM: INTEREST RATE | | TO: 057500000C | | FROM: 050000000C | |
| 06/10/2022 | $0.00 | P | $0.00 | | $0.00 | $0.00 | $755,387.31 | LYNNB |
| 06/03/2022 | $22,500.00 | A | $22,500.00 | | $0.00 | $0.00 | $755,387.31 | LYNNB |
| 06/02/2022 | $3,244.80 | P | $865.28 | $2,379.52 | $0.00 | $0.00 | $777,887.31 | |
| 05/09/2022 | $3,244.80 | P | $0.00 | $3,244.80 | $0.00 | $0.00 | $778,752.59 | |
| 04/13/2022 | $3,464.25 | P | $0.00 | $3,464.25 | $0.00 | $0.00 | $778,752.59 | |
| 04/05/2022 | $500.00 | A | $0.00 | | $500.00 LC | $0.00 | $778,752.59 | JEANNINE |
| 03/11/2022 | $22,500.00 | P | $22,500.00 | | $0.00 | $0.00 | $778,752.59 | KARIR |
| | | | DATE POSTED: 03/28/2022 | | | | | |
| 03/10/2022 | $3,115.98 | P | $0.00 | $3,115.98 | $0.00 | $0.00 | $801,252.59 | |
| 02/10/2022 | $3,449.84 | P | $0.00 | $3,449.84 | $0.00 | $0.00 | $801,252.59 | |
| 01/18/2022 | $3,427.96 | P | $0.00 | $3,427.96 | $0.00 | $0.00 | $801,252.59 | |
| 12/03/2021 | $25,932.31 | P | $22,500.00 | $3,432.31 | $0.00 | $0.00 | $801,252.59 | |
| 11/05/2021 | $3,546.71 | P | $0.00 | $3,546.71 | $0.00 | $0.00 | $823,752.59 | |
| 10/12/2021 | $3,422.93 | P | $0.00 | $3,422.93 | $0.00 | $0.00 | $823,752.59 | |
| 09/07/2021 | $26,143.59 | P | $22,500.00 | $3,643.59 | $0.00 | $0.00 | $823,752.59 | |
| 08/06/2021 | $3,643.59 | P | $0.00 | $3,643.59 | $0.00 | $0.00 | $846,252.59 | |
| 07/12/2021 | $3,526.05 | P | $0.00 | $3,526.05 | $0.00 | $0.00 | $846,252.59 | |
| 06/14/2021 | $3,740.46 | P | $0.00 | $3,740.46 | $0.00 | $0.00 | $846,252.59 | |
| 06/10/2021 | $22,500.00 | P | $22,500.00 | | $0.00 | $0.00 | $846,252.59 | |
| 05/05/2021 | $3,619.80 | P | $0.00 | $3,619.80 | $0.00 | $0.00 | $868,752.59 | |

App.377

**LNS TRANSACTION HISTORY REPORT FOR SOUTHERN STAR CAPITAL LLC-2735533-185 Public ID: JEANNINE**

| EFFECTIVE DATE | TOTAL AMOUNT | | TRANSACTION BREAKDOWN PRINCIPAL | INTEREST | ESC/LATE/FEE | ESCROW BALANCE | LOAN BALANCE | PUBLIC ID |
|---|---|---|---|---|---|---|---|---|
| 04/07/2021 | $3,740.47 | P | $0.00 | $3,740.47 | $0.00 | $0.00 | $868,752.59 | |
| 03/10/2021 | $22,747.57 | P | $22,500.00 | $247.57 | $0.00 | $0.00 | $868,752.59 | LYNNB |
| | | | DATE POSTED: 03/15/2021 | | | | | |
| 03/08/2021 | $3,416.53 | P | $197.41 | $3,219.12 | $0.00 | $0.00 | $891,252.59 | |
| 02/04/2021 | $3,714.38 | P | $0.00 | $3,714.38 | $0.00 | $0.00 | $891,450.00 | |
| 01/11/2021 | $3,838.22 | P | $0.00 | $3,838.22 | $0.00 | $0.00 | $891,450.00 | |
| 12/23/2020 | $4,523.69 | P | $0.00 | $4,523.69 | $0.00 | $0.00 | $891,450.00 | JEANNINE |
| | | | DATE POSTED: 12/28/2020 | | | | | |
| 12/23/2020 | $4,523.69 | R | $3,609.74 | $913.95 | $0.00 | $0.00 | $891,450.00 | JEANNINE |
| | | | DATE POSTED: 12/28/2020 | | | | | |
| 12/23/2020 | $4,523.69 | P | $3,609.74 | $913.95 | $0.00 | $0.00 | $887,840.26 | JEANNINE |
| 12/21/2020 | $38.08 | A | $0.00 | | $38.08 LC | $0.00 | $891,450.00 | LYNNB |
| | | | DATE POSTED: 12/28/2020 | | | | | |
| 12/17/2020 | $5,483.70 | R | $0.00 | $5,483.70 | $0.00 | $0.00 | $891,450.00 | JEANNINE |
| | | | DATE POSTED: 12/23/2020 | | | | | |
| 12/17/2020 | $5,483.70 | P | $0.00 | $5,483.70 | $0.00 | $0.00 | $891,450.00 | JEANNINE |
| | | | DATE POSTED: 12/18/2020 | | | | | |
| 12/11/2020 | | | 0002 FM: INTEREST RATE | | TO: 050000000C 4 | FROM: 060000000C | | LYNNB |
| 12/11/2020 | $22,546.02 | P | $22,500.00 | $46.02 | $0.00 | $0.00 | $891,450.00 | LYNNB |
| | | | DATE POSTED: 12/28/2020 | | | | | |
| 12/01/2020 | $412.50 | | MISC FEE # 01 | | $412.50 F | $0.00 | $913,950.00 | JEANNINE |
| 11/04/2020 | $4,722.08 | P | $0.00 | $4,722.08 | $0.00 | $0.00 | $913,950.00 | |
| 10/13/2020 | $4,569.75 | P | $0.00 | $4,569.75 | $0.00 | $0.00 | $913,950.00 | |
| 09/08/2020 | $4,722.07 | P | $0.00 | $4,722.07 | $0.00 | $0.00 | $913,950.00 | |
| 08/05/2020 | $5,063.13 | P | $0.00 | $4,563.13 | $500.00 LC | $0.00 | $913,950.00 | JEANNINE |
| 07/22/2020 | $4,650.00 | P | $0.00 | $4,650.00 | $0.00 | $0.00 | $913,950.00 | JEANNINE |
| 07/22/2020 | $18,300.00 | R | $12,200.00 | $6,100.00 | $0.00 | $0.00 | $913,950.00 | JEANNINE |
| 07/22/2020 | $18,300.00 | P | $12,200.00 | $6,100.00 | $0.00 | $0.00 | $901,750.00 | JEANNINE |
| 06/11/2020 | $4,650.00 | A | $0.00 | $4,650.00 | $0.00 | $0.00 | $913,950.00 | JEANNINE |
| | | | DATE POSTED: 06/30/2020 | | | | | |
| 06/11/2020 | $4,650.00 | A | $4,650.00 | | $0.00 | $0.00 | $913,950.00 | JEANNINE |
| | | | DATE POSTED: 06/30/2020 | | | | | |
| 05/11/2020 | $4,650.00 | A | $0.00 | $4,650.00 | $0.00 | $0.00 | $909,300.00 | JEANNINE |
| | | | DATE POSTED: 06/30/2020 | | | | | |
| 05/11/2020 | $4,650.00 | A | $4,650.00 | | $0.00 | $0.00 | $909,300.00 | JEANNINE |
| | | | DATE POSTED: 06/30/2020 | | | | | |
| 04/11/2020 | $4,650.00 | A | $0.00 | $4,650.00 | $0.00 | $0.00 | $904,650.00 | JEANNINE |
| | | | DATE POSTED: 06/30/2020 | | | | | |
| 04/11/2020 | $4,650.00 | A | $4,650.00 | | $0.00 | $0.00 | $904,650.00 | JEANNINE |
| | | | DATE POSTED: 06/30/2020 | | | | | |
| 03/16/2020 | $4,350.00 | P | $0.00 | $4,350.00 | $0.00 | $0.00 | $900,000.00 | |

App.378

**LNS TRANSACTION HISTORY REPORT FOR SOUTHERN STAR CAPITAL LLC  2735533 - 195 Public ID: JEANNINE**

| EFFECTIVE DATE | TOTAL AMOUNT | | PRINCIPAL | INTEREST | ESC/LATE/FEE | ESCROW BALANCE | LOAN BALANCE | PUBLIC ID |
|---|---|---|---|---|---|---|---|---|
| | | | TRANSACTION BREAKDOWN | | | | | |
| 02/14/2020 | $4,650.00 | P | $0.00 | $4,650.00 | $0.00 | $0.00 | $900,000.00 | |
| 01/13/2020 | $4,650.00 | P | $0.00 | $4,650.00 | $0.00 | $0.00 | $900,000.00 | |
| 12/09/2019 | $4,500.00 | P | $0.00 | $4,500.00 | $0.00 | $0.00 | $900,000.00 | |
| 11/20/2019 | $4,650.00 | P | $0.00 | $4,650.00 | $0.00 | $0.00 | $900,000.00 | |
| 10/15/2019 | $4,393.75 | P | $0.00 | $4,393.75 | $0.00 | $0.00 | $900,000.00 | |
| 09/19/2019 | | | 0002 FM: INTEREST RATE | | TO: 060000000C | | FROM: 062500000C | |
| 09/11/2019 | $900,000.00 | A | $900,000.00 | | $0.00 | $0.00 | $900,000.00 | LYNNB |

DATE POSTED: 09/12/2019

CODES P = PAYMENT. R = PAYMENT REVERSAL. D = DISBURSEMENT. LC = LATE CHARGE. F = FEE
E = DISBURSEMENT REVERSAL. A = ADJUSTMENT. U = UNAPPLIED FUNDS. V = ADVANCE

| LIFE TOTALS: | | | YTD TOTALS: | | |
|---|---|---|---|---|---|
| | PRINCIPAL | $293,913.87 | | PRINCIPAL | $22,500.00 |
| | INTEREST | $227,262.96 | | INTEREST | $20,671.59 |
| | ESCROW | $0.00 | | ESCROW | $0.00 |
| | LATE CHARGE | $1,136.53 | | LATE CHARGE | $0.00 |

App.379

## AGREEMENT OF SETTLEMENT AND RELEASE

THIS AGREEMENT OF SETTLEMENT AND RELEASE (this "**Agreement**") is made and entered into on and as of March 22, 2021, among BM318, LLC, a Texas limited liability company ("**BM318**"), JMR100, LLC, a Texas limited liability company ("**JMR**"), LDG001, LLC, a Texas limited liability company ("**LDG**"), WALL009, LLC, a Texas limited liability company ("**WALL009**"), DJD Land Partners, LLC, a Texas limited liability company ("**DJD**"), Tim Barton, an individual ("**Barton**") and JMJ Development, LLC, a Texas limited liability company ("**JMJ**") (collectively, "**Borrowers**" with each being referred to as a "**Borrower**") joined by Southern Star Capital, LLC d/b/a Reliance Mortgage Company ("**Southern Star**" or "Lender",) along with Mike Anderson ("**Anderson**"), individually which, together with Borrowers, are sometimes referred to collectively as the "**Parties**" and each, individually, as a "**Party**") in order to resolve certain claims between Lender related to certain loans from Lender to certain Borrowers. To the extent required any Borrowers in a bankruptcy proceedings may require bankruptcy court approval to make this Agreement effective. It is contemplated and agreed that the Borrowers in bankruptcy will dismiss their bankruptcy cases once this Agreement is executed by all Parties.

## W I T N E S S E T H:

WHEREAS Southern Star has made the following independent loans to the Borrowers which have matured and remain unpaid:

(1) $1,650,000 to BM318 secured by a deed of trust on approximately 118 acres in Parker County, Texas recorded as document number 201911244 in the real property records of Parker County, Texas which is guaranteed by Tim Barton which Lender collaterally assigned to Citizens Bank;

(2) $1,400,000 to LDG001 secured by a deed of trust on approximately 201.7845 acres in Johnson County, Texas recorded as document number 2019-18287 in the real property records of Johnson County, Texas which is guaranteed by Tim Barton and which Lender collaterally assigned to Citizens Bank;

(3) $135,000 to LDG001 secured by a deed of trust on approximately 1.00 acre in Johnson County, Texas recorded as document number 2018-32085 and corrected at 2020-4968 in the real property records of Johnson County, Texas which is collaterally assigned to Citizens Bank;

(4) $900,000 to Wall009, LLC secured by a deed of trust on approximately 63.764 acres in Johnson County, Texas recorded as document number 2019-24729 in the real property records of Johnson County, Texas which is guaranteed by Tim Barton and which Lender collaterally assigned to Texas Brand Bank;

(5) $1,942,500 to JMR100 secured by a deed of trust on approximately 99.963 acres in Parker County, Texas recorded as document number 201903456 in the real property records of

---

Settlement Agreement – Southern Star and BM318 et al                                          1

Parker County, Texas and modified by Modification and Extension Agreement recorded as document number 202006669 in the property records of Parker County, Texas which is guaranteed by Tim Barton and all of which is collaterally assigned to Texas Republic Bank, N.A. under document number 201904211;

(6) $127,500 to DJD Land Partners, LLC, secured by a deed of trust on approximately 0.977 acre in Johnson County, Texas recorded as document number 2018-33077 and corrected at 2020-4968 in the real property records of Johnson, County, Texas which is collaterally assigned to Citizens Bank and

(7) an unsecured loan from Lender to JMJ Development of $100,000 (collectively, "Loans"). Each Loan may be referred to as the "Entity Loan."

No Loan is cross collateralized with any other Loan except that the $135,000 loan of LDG001 and the $127,500 loan of DJD Land Development are collateralized by a corrected deed of trust recorded in Johnson County Texas as document number 20204698 with the same property.

WHEREAS Lender had previously posted the properties owned by LDG001, BM318, JMR100, WALL009 and DJD for foreclosure sales.

WHEREAS, on July 24, 2020, BM318 and JMR100 filed suit in Parker County, Texas under Cause No. CV-20-0923, styled *JMR100, LLC and BM318, LLC v. Southern Star Capital, LLC d/b/a Reliance Mortgage Company, Mark Adams, Mike Anderson, and Robert W. Buchholz*, in the 415 Judicial District Court of Parker County, Texas, ("Parker County Case") including filing for a temporary restraining order to enjoin the foreclosures in Parker County which was denied;

WHEREAS on July 24, 2020 LDG filed suit in Johnson County, Texas under Cause No DC-C202000421 styled *LDG001, LLC v. Southern Star Capital, LLC d/b/a Reliance Mortgage Company, Mike Anderson, Mark Adams, and Robert W. Buchholz*, and later amended to include DJD Land Partners, LLC as a party Plaintiff and Citizens Bank as a party Defendant in the 249th Judicial District Court of Johnson County, Texas; including filing for a temporary restraining order which was denied and which was appealed by LDG and DJD on October 2, 2020 in the Texas 10th Court of Appeals under case nos. 10-20-00257 and 10-20-00258 of which 10-20-00258 was denied (collectively the "Johnson County Case" and the "Parker County Case" and the "Appellate Cases" being referred to as the "Cases").

WHEREAS prior to any foreclosures sales, the following Borrowers filed for bankruptcy (Chapter 11) in the following cases: (1) cause number 20-BK-42789 filed in the Northern District of Texas (Fort Worth Division) by BM318; (2) cause number 20-bk-42790 filed in the Northern District of Texas (Fort Worth Division) by JMR100; and (3) cause number 20-bk-43110 filed in the Northern District of Texas (Fort Worth Division) by LDG001. (collectively, "Bankruptcy Cases")

---

Settlement Agreement – Southern Star and BM318 et al                                                    2

WHEREAS, the Parties hereto desire to enter into an arrangement to provide for a full and final settlement of any and all claims asserted or which could have been asserted in the Cases and Bankruptcy Cases, as well as terminating and dismissing all such litigation and Bankruptcy Cases;

ACCORDINGLY, for and in consideration of the agreements described herein, the dismissal of the items of litigation and bankruptcy cases, and other good and valuable consideration, the receipt, sufficiency and adequacy of which are hereby acknowledged and confessed by each of the Parties hereto, and of the premises and mutual promises contained herein and subject to compliance by the Parties hereto with the matters set forth below, it is hereby agreed by all of the Parties hereto as follows:

1.  Incorporation of Recitals.  The foregoing recitals are hereby adopted, ratified, confirmed and approved by the Parties and incorporated into this binding Agreement.

2.  Obligations of the Parties.  Each Borrower below will pay the following corresponding Loan Principal Amount in addition to the unpaid non-default contract rate interest as stated in the loan documents less the amount of any certificate of deposit (along with its accrued interest at the time of payment), in full accord and satisfaction of all claims and amounts owed for each of the Loans, including the Principal amount under each Borrower's promissory note and all accrued interest at the non-default contract rate as agreed. The Total Payoff Amount will be paid within the specified number of "Days to Remit Payoff Amount" following the date this Agreement is executed by all parties. The CDs, which are being held by the certain banks with whom Lender has entered into underlying loan agreements, will be released to Lender concurrently with the payment of the Total Payoff Amount. Release of the CDs is to be arranged by the Lender with its own lenders and in any event Borrowers shall receive credit for the CD amounts plus all accrued interest on same at the time of Payoff whether Lender receives the CDs or not. Borrower shall execute such documents as required by any institution in order to release any CD to Lender. No Borrower shall be liable for the obligations or payments of another Borrower.

| Borrower | Note Principal | C. D. | Date of First Missed Payment | Fees & Costs | Days to Remit Payoff Amount |
|---|---|---|---|---|---|
| BM318, LLC | $1,650,000. | $165,000. | 9/3/2019 | | 60 days from date of execution. |
| JMR100, LLC | $1,942,500. | $259,000. | 9/12/2019 | | 180 days from date of execution. |
| Wall009, LLC | $900,000. | $90,000. | 9/15/2019 | | 180 days from date of execution. |
| LDG001, LLC | $1,400,000. | $140,000. | 10/15/2019 | | 180 days from date of execution. |
| LDG001, LLC | $135,000. | $0. | 9/1/2019 | | 60 days from date of execution. |
| DJD Land Partners, LLC | $127,500. | $0. | 9/1/2019 | | 60 days from date of execution. |

App.382

In addition, to the first loan paid by any borrower, the sum of $40,000.00 shall be added to the payoff amount and paid at the time of the payoff to Lender.

All payments which have been made by a Borrower to Lender since the filing of the applicable bankruptcy cases, shall be deemed credited to the applicable Payoff Amount.

Interest shall accrue on the Loans at the contract rate of interest from the date of default until the Payoff Date. Borrowers shall make interest only payments on each loan commencing no later than the 7th of April, 2021 and shall continue to make such payments monthly on the 7th day of each month, until the Payoff Date when the entire balance of principal and all unpaid interest, calculated at the non-default contract rate, from the inception of the notes, shall be due and payable.

The amount of the interest only payments due on the 7th day of each month are:

| | |
|---|---|
| BM318 | $10,000.00 |
| JMR100 | $10,500.00 |
| Wall009 | $3,850.00 |
| LDG001 1.4 million note | $7,400.00 |
| LDG001 135k note and | |
| DJD Land Partners | $1,750.00 |

Additionally, the alleged balance remaining on the unsecured loan from Lender to JMJ Development in the original amount of $100,000 including all interest along with the alleged balance remaining on the unsecured loan from BM318 to Lender in the original amount of $258,030.15 including all interest shall be forgiven in full by the applicable lending Parties and all claims related thereto released by the applicable Parties.

Upon the receipt of each Total Payoff Amount, including unpaid interest, Lender including Anderson shall release the applicable Borrower and its related persons from any and all claims and liabilities related to such Loan, void the original Note or otherwise return the original Note to the applicable Borrower, release the applicable Borrower guarantor(s) and related persons, and shall file a release of the applicable deed of trust for each associated property including ensuring that each underlying bank releases any collateral liens.

3.      Default. In the event of a default of any monthly payment prior to the Payoff Date under the terms of this Agreement Borrowers shall be afforded two notices of default and failing to cure such default after 5 days will permit the Lender to seek all available state law remedies against the Borrowers and their collateral. In the event of an uncured default the Borrowers shall not seek further bankruptcy relief or oppose any foreclosure sale by seeking any injunctive relief in any court of competent jurisdiction. In the event the Payoff amount is not received on or before the payoff date then Lender shall be allowed to seek all available state law remedies against the Borrowers and their collateral.

4.      Lender Release. Except as related to the rights, representations, and obligations in this Agreement, Lender, acting on its own behalf and on behalf of its parents, subsidiaries, successors and assigns and all of their officers, directors, employees, members, managers, owners,

---

Settlement Agreement – Southern Star and BM318 et al                                    4

affiliates, agents, successors, representatives, assigns, trustees, substitute trustees, attorneys, and representatives (collectively, "Lender Parties") does hereby release, remise, acquit, resign and forever discharge the Borrowers including their respective officers, directors, employees, members, managers, affiliates, agents, successors, assigns, heirs, legal representatives and subsidiaries, as appropriate, and severally, of and from all manner of action, causes of action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, covenants, contracts, controversies, agreements, promises, damages, expenses, claims and demands whatsoever existing at (or at any time prior to) the date hereof, in law, in equity or otherwise, which Lender had or have or may ever have against the Borrowers, upon or by reason of anything, cause or matter whatsoever occurring or arising prior to the date of this Agreement, relating to or involving the Loans and Cases described herein, the allegations made in connection with such items of litigation, and any facts, circumstances, allegations or controversies related to or involving the Loans and Cases and any positions held or taken by any of the Parties to such litigation or any other matter involving any relationship of Lender with or relating to Borrowers, in contract, tort or otherwise.

5.    Borrowers Release. Except as related to the rights, representations, and obligations in this Agreement, Borrowers, acting on their own behalf and on behalf of themselves, their predecessors, successors, direct and indirect parent companies, direct and indirect subsidiary companies, companies under common control with any of the foregoing, affiliates, heirs and assigns, and their past, present and future officers, directors, shareholders, interest holders, members, partners, attorneys, agents, employees, managers, representatives, assigns and successors in interest, and all persons acting by, through, under or in concert with them, and each of them, hereby release, remise, acquit, resign and forever discharge the Lender Parties specifically including Southern Star Capital, LLC d/b/a Reliance Mortgage Company, Mike Anderson and Robert W. Buchholz, jointly and severally, together with their predecessors, successors, direct and indirect parent companies, direct and indirect subsidiary companies, companies under common control with any of the foregoing, affiliates, heirs and assigns and their past, present and future officers, directors, shareholders, interest holders, members, partners, attorneys, agents, employees, managers, representatives, assigns and successors in interest, and all persons acting by, through, under or in concert with them, and each of them, of and from all known and unknown charges, complaints, claims, grievances, liabilities, obligations, promises, agreements, controversies, damages, actions, manner of action, causes of action, suits, rights, demands, costs, losses, debts, penalties, fees, wages, dues, sums of money, accounts, reckonings, bonds, bills, covenants, contracts, controversies, agreements, promises, damages, expenses (including attorneys' fees and costs actually incurred) punitive damages, claims and demands of any nature whatsoever, known or unknown, existing at (or at any time prior to) the date hereof, in law, or in equity or otherwise, which Borrowers or any of their respective successors, assigns, heirs and legal representatives had or have or may ever have, upon or by reason of anything, cause or matter whatsoever occurring or arising prior to the date of this Agreement, relating to or involving the Loans and Cases, the allegations made in connection with such items of litigation, and any facts, circumstances, allegations or controversies related to or involving the Loans and Cases and any positions held or taken by any of the Parties to such litigation or any other matter involving any relationship of Borrowers with or relating to Lender, in contract, tort or otherwise. Notwithstanding the foregoing,

App.384

this section shall not apply to Mark Adams ("Adams") nor to any claims of any Borrower against Adams and as such, no release or waiver of Adams is granted in this Agreement.

6.      Adams. Except for information pertaining directly to the Borrowers in furtherance of the Loans disclosed to Lender, Lender including the Lender Parties shall not disclose or utilize any other information made available to or provided to Lender or Lender Parties by Adams related to any related entity or person of any Borrower including their contacts, financials, sources, clients, projects, properties, processes, agreements, documents, renderings, brochures, materials, proposals, offers, plans, proformas, projections, or any other work product as such information is the intellectual property of JMJ Development or its related entities all of which is confidential.

7.      No Admission. Nothing contained herein shall be deemed to be or construed as an admission of liability by any of the Parties hereto with respect to the claims and subject matter of the Loans and Cases.

8.      Dismissal of Litigation. Each of the Parties hereto which or who may be a Party to or intervener in the Cases hereby agrees to take all necessary and appropriate action to cause dismissal with prejudice of the Cases, including any appeal as to Lender, only, including the preparation and filing of any appropriate motion(s) to dismiss and agreement(s) to order(s) or dismissal with prejudice or nonsuit with prejudice or any other action(s) necessary or appropriate to effectuate such dismissal, with costs to be paid by each Party incurring such cost. Dismissal is subject to approval of all Bankruptcy courts and execution of the Agreement. Notwithstanding the forgoing, no Borrower shall have any obligation to dismiss any claims against Adams and any dismissal of the Litigation shall be without prejudice only as it pertains to Adams.

9.      No Assignment of Claims. Each of the undersigned hereby represents and warrants to the other that each has not transferred or assigned its claims or causes of action or any part thereof, if any, against the other, whether or not asserted in the Cases.

10.      No Other Inducements; Voluntary Execution. In making this Agreement, all of the Parties hereto understand and represent to each other that they have relied solely on their own judgment, belief and knowledge of the nature and extent of any damages alleged, as well as the liability questions involved in the Loans and Cases, and each of the Parties hereto represents and covenants that they have not been influenced to any extent whatsoever in making this Agreement by any representations or statements made by any person or entity hereby released except as reflected herein. Each of the Parties hereto acknowledges by their respective signatures below and represents to each other that they have read this Agreement, that they fully understand it, that they have had the benefit of the advice of counsel of their own choosing, that they have relied solely and completely upon their own judgment and the advice of their own counsel in entering into this Agreement, that no promise, inducement or agreement not herein expressed has been made to them, that they are each authorized to execute this Agreement, and that they have each executed it of their own free will and accord. It is expressly understood and agreed by all of the Parties hereto that the terms of this Agreement are contractual and not merely recitals.

App.385

11.    Authority. Each of the Parties hereto which is an entity hereby expressly represents and warrants to all other Parties to this Agreement that the person executing on behalf of each of such entities is authorized and is the proper person to sign this Agreement, that they have not assigned, pledged or otherwise sold or transferred, either by written instrument or otherwise, any right, title, interest or claim they have or may have in connection with or arising out of the Note Case or the Garnishment Case.

12.    Miscellaneous. The following provisions are part of this Agreement:

(a)    Amendments. Neither this Agreement nor any term hereof may be changed, waived, discharged or terminated orally, but only by written agreement among the Parties hereto.

(b)    Termination of Agreements. Any and all written or oral agreements among Southern Star, on the one hand, and Borrowers, on the other hand, other than this Agreement, are hereby terminated in all respects for all purposes, and no Party shall have any obligation to or be required to perform any work (including warranty work) on behalf of any other Party to this Agreement.

(c)    Headings. The headings of sections or paragraphs of this Agreement are inserted for convenience of reference only and shall not be deemed to constitute a part of this Agreement.

(d)    Binding Effect. All terms and provisions of this Agreement shall be binding upon and inure to the benefit of and be enforceable by the heirs, legal representatives, successors and assigns of the Parties hereto, wherever applicable to such Party.

(e)    Notices. Any notice or other communication required or permitted to be given by this Agreement or any other document or instrument referred to herein or executed in connection herewith must be given in writing (which may be by Telecopier, facsimile transmission or electronic transmission, followed by mail or personal delivery) and must be personally delivered or mailed, by prepaid certified or registered mail, to the Party to whom such notice or communication is directed, at the address of such Party set forth opposite his or its name on the signature page to this Agreement. Subject to the other provisions of this Agreement, any party may change its address (or re-designate the person to whom such notice shall be delivered) for purposes of this Agreement by giving notice of such change to the other Parties pursuant to this provision. In all instances, any notice or other communication required or permitted to be given by this Agreement shall only be effective upon actual receipt thereof by the person intended to receive same.

(f)    Entire Agreement. This Agreement constitutes the entire Agreement by and among the Parties hereto, supersedes any and all prior understandings and agreements, and may not be modified or amended except on or after the date hereof by a writing executed by the Party against whom such modification or amendment is to be enforced. The failure

of any of the Parties to this Agreement to insist upon strict adherence to any term of this Agreement on one or more occasions shall not be deemed to be a waiver or deprive such person or entity of the right thereafter to insist upon strict adherence to that term or any other term of this Agreement. No waiver of this Agreement, the obligations or conditions herein shall be valid unless the writing is signed by the Party against whom said waiver is to be enforced.

(g)    Effectiveness. This Agreement shall be effective upon the later of the execution of all Parties and the receipt of the approvals from all necessary courts in the Bankruptcy Cases.

(h)    Governing Law This Agreement shall be construed and enforced in accordance with the laws of the State of Texas with exclusive jurisdiction and venue being in Dallas County, Texas. Should any clause, sentence or paragraph of this Agreement be judicially or administratively declared to be invalid, unenforceable or void, such decision shall not have the effect of invalidating or voiding the remainder of this Agreement, and the Parties hereto agree that the part or parts of this Agreement so held to be invalid, unenforceable or void shall be deemed to have been deleted here from, and the remainder shall have been included herein. In the event any Party hereto shall fail to perform any of its obligations under this Agreement, such Party hereby agrees to pay all reasonable expenses, including reasonable attorneys' fees, which may be incurred by any Party hereto which is successful in enforcing this Agreement, whether or not any suit or legal proceeding shall be brought.

(i)    Enforcement. The rights and obligations herein between each Borrower and Lender shall be enforced separately and independently from those between the other Borrowers and Lender. Any event of default by one Borrower shall not cause an event of default by any other Borrower, and upon such an event, this Agreement shall remain in good standing and enforceable as between the other Borrowers and the Lender. No Borrower has any authority to bind or represent any other Borrower or perform the obligations of any other Borrower. The Parties may declare an event of default under this Agreement upon any breach by the other Party following the expiration of five (5) business days following the delivery of written notice to the defaulting Party upon which the non-defaulting Party may pursue any available remedies available in equity, at law, or under this Agreement.

(j)    No Third-Party Beneficiaries. This Agreement does not create and shall not be construed as creating any rights enforceable by any person other than the undersigned Parties and their respective lawful successors and assigns and other persons named herein and does not release and shall not be construed as releasing any rights enforceable against any person or entity other than the undersigned Parties and their respective successors and assigns and persons named herein.

---

Settlement Agreement – Southern Star and BM318 et al                                          8

App.387

(k)    Counterparts. This Agreement may be executed in several counterparts, each of which shall be deemed to be an original for all purposes and all of which constitute one and the same instrument, and it shall not be necessary for the proof of this Agreement that any Party produces or accounts for more than one such counterpart.

(l)    Facsimile; Electronic Transmission. This Agreement or any notices hereunder may be transmitted by facsimile or electronic transmission, and it is the intent of the Parties for the facsimile of any autograph reproduced by a receiving facsimile machine or computer to be an original signature and for the facsimile or computer generated copy and any complete photocopy of this Agreement or notice to be deemed an original counterpart.

(m)    Fees. All Parties shall be responsible for their own costs and fees including legal fees including as related to this Agreement, the Loans, the Cases, and the Bankruptcy Cases unless otherwise provided for herein.

*[Signature Pages to Follow]*

---

Settlement Agreement – Southern Star and BM318 et al                                           9

App.388

**BM318, LLC**
a Texas limited liability company

By: Tim Barton
Its: President

**LDG001, LLC**
a Texas limited liability company

By: Tim Barton
Its: President

**DJD LAND PARTNERS, LLC**
a Texas limited liability company

Tim Barton
Its: President

**WALL009, LLC**
a Texas limited liability company

By: Tim Barton
Its: President

**JMR100, LLC**
a Texas limited liability company

By: Tim Barton
Its: President

**JMJ DEVELOPMENT, LLC**
a Texas limited liability company

By: Tim Barton
Its: President

**TIM BARTON**
Individually

App.389

STATE OF TEXAS          §
                        §
COUNTY OF DALLAS        §

Before me, the undersigned notary public, on this day personally appeared Tim Barton in his capacity of President of BM318, LLC; LDG001, LLC; DJD Land Partners, LLC; WALL009, LLC; JMR100, LLC; JMJ Development, LLC; and in his individual capacity, known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he executed the same on behalf of the entities and individually for the purposes and consideration therein expressed.

Given under my hand and seal of office this 24th day of March 2021.



ASHLEY A. MINES
My Notary ID # 130551641
Expires February 23, 2024

Notary Public, State of Texas

*[Lender Signature Page to Follow]*

---

Settlement Agreement – Southern Star and BM318 et al                                    11

App.390

**SOUTHERN STAR CAPITAL, LLC d/b/a RELIANCE MORTGAGE COMPANY**
A Texas limited liability company

By: _Mike D. Anderson_
Name: _Mike D. Anderson_
Its: _Owner/manager_

_Mike D. An__

**MIKE ANDERSON**
Individually

STATE OF TEXAS          §
                        §
COUNTY OF DALLAS        §

     Before me, the undersigned notary public, on this day personally appeared Michael D. Anderson in his capacity of President of Southern Star Capital, LLC d/b/a Reliance Mortgage Company and in his individual capacity, known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he executed the same on behalf of the entities and individually for the purposes and consideration therein expressed.

    Given under my hand and seal of office this _22nd_ day of March 2021.

_[signature]_

Notary Public, State of Texas

CODY W. OLYNYK
Notary ID #129405339
My Commission Expires
April 29, 2021

Settlement Agreement — Southern Star and BM318 et al                                                12

App.391



**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § § § | |
| | § | **Case No. 3:22-CV-2118-X** |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| TIMOTHY BARTON, *et al.*, | § | |
| | § | |
| Defendants. | § | |

---

### DECLARATION OF AL KELLER IN SUPPORT OF MOTION AND BRIEF IN SUPPORT OF INTERESTED PARTY SOUTHERN STAR CAPITAL, LLC TO MODIFY STAY PROVISION SET FORTH IN RECEIVER ORDER

---

I, Al Keller, do hereby declare under penalty of perjury, in accordance with 28 U.S.C. §1746, that the following is true and correct, and that I am competent to testify to the matters stated herein:

1,    I am currently the Chief Financial Officer of Southern Star Capital, LLC. (referred to herein as "SSC") I have been in this position since November 2014.

2.    The facts set forth herein are based upon my personal knowledge gained through dealing with the issues concerning the loans made to DJD Land Partners, LLC and Wall009, LLC and various other loans and dealings with Mr. Tim Barton and entities under his control. Further knowledge has been gained from other information and documents contained in the files of SSC.

3.    I am the person responsible at SSC for keeping the records on loans made by SSC to various customers and I personally track payment information and amounts due on the various loans due to SSC.

App.392

4.      The exhibits attached to the Motion of SSC as Exhibits 1 through 6, 7 through 11, and 14 through 18 are true and correct copies of the originals that are maintained by SSC in regard to the loans made to DJD Land Partners, LLC and Wall009, LLC.  In regard to these records I am the  Chief Financial Officer of Southern Star Capital, LLC.  I am familiar with the manner in which its records are created and maintained by virtue of my duties and responsibilities. These exhibits are the original records or exact duplicates of the original records. It is the regular practice of the business to make this type of record at or near the time of each act, event, condition, opinion, or diagnosis set forth in the record. It is the regular practice of the business for this type of record to be made by, or from information transmitted by persons with knowledge of the matters set forth in the record. It is the regular practice of the business to keep this type of record in the course of regularly conducted business activity. It is the regular practice of the business to make or obtain the records.

5.      The exhibits attached to the Motion of SSC as Exhibits 5 and 10 are the calculations of the amounts due on the subject loans.  I personally prepared these from information contained in the files of SSC and it has been my responsibility to create such documents since the inception of the loans.  The amounts stated in said exhibits are the amounts that are currently due on said loans and such amounts are true and correct after allowing for all payments, offsets and credits. These loans have matured and are currently due and payable.

6.      I have personally reviewed the Motion of Southern Star Capital, LLC.  I have reviewed all of the factual statements contained therein.  If called to testify before this Court I would testify to the substance of each and every factual statement as true and correct as every statement contained therein is within my personal knowledge as the CFO of SSC and is true and correct.

<div align="center">Page 2 of 3</div>

<div align="right">App.393</div>

7. Due to the death of Mr. Michael D. Anderson, who was the sole member of SSC, Southern Star Capital, LLC has ceased business operations. It is in the process of wrapping up its remaining affairs. Currently SSC has no income and is not generating any new loans. The burden of making the payments on the loans used to fund the loans to DJD and Wall009 are being made by the Estate of Mr. Anderson due to his personal guarantees on these loans.

8. SSC has lost over $3,500,000.00 in its dealings with Mr. Tim Barton and Mr. Steve Wall. It is continuing to suffer further damage due to the non-performance of these loans.

9. The continued non-performance of these loans is causing a substantial injury to SSC.

10. Even though SSC is not currently obtaining new business I have remained as the CFO of SSC in order to assist in the resolution of its remaining affairs, including these two loans.

I state under penalty of perjury that the foregoing is true and correct.

Dated: May 24, 2024

_____
Al Keller

Page 3 of 3

App.394