**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § § § | |
| *Plaintiff*, | § § | |
| v. | § § | No. 3:22-cv-2118-X |
| TIMOTHY BARTON, CARNEGIE DEVELOPMENT, LLC, WALL007, LLC, WALL009, LLC, WALL010, LLC, WALL011, LLC, WALL012, LLC, WALL016, LLC, WALL017, LLC, WALL018, LLC, WALL019, LLC, HAOQIANG FU (A/K/A MICHAEL FU), STEPHEN T. WALL, | § § § § § § § § § § § § § § | |
| *Defendants*, | § § | |
| DJD LAND PARTNERS, LLC, and LDG001, LLC, | § § § | |
| *Relief Defendants*. | § § | |

**RECEIVER'S VERIFIED MOTION FOR
APPOINTMENT OF APPRAISERS, APPROVAL OF APPRAISALS,
APPROVAL HEARING, AND APPROVAL OF SALE OF AMERIGOLD SUITES**

Cort Thomas, as the court-appointed Receiver, respectfully moves the Court as follows:

## I.   SUMMARY

As the Court is likely keenly aware, this is the third time the Receiver has moved this Court to approve the sale of the Amerigold Suites (defined below). Twice before, this Court has approved the sale of this property. But due to repeated appeals by Defendant Barton, the title company would not close on the sale, and ultimately, the previous buyer walked away from

– 1 –

purchasing the property, costing the Receivership Estate a net recovery of at least $700,000. After a renewed marketing process, the Receiver has since contracted with a new buyer for the Amerigold Suites. Accordingly, in compliance with the Court's Order Appointing Receiver (defined below) and 28 U.S.C. § 2001 (the "Statute"), the Receiver requests appointment of three appraisers, approval of the appraisals, a hearing regarding approval of the sale of certain property, and, ultimately, the approval of the sale discussed below.

## II.      FACTUAL BACKGROUND

### A.      The Receivership Order and the Amerigold Suites.

1.      On October 18, 2022, the Court entered an Order Appointing Receiver (the "Initial Receivership Order") by which Cortney C. Thomas was appointed as Receiver for certain entities. The Court directed the Receiver to take possession and control of all Receivership Assets and Receivership Records defined in the Initial Receivership Order.

2.      On November 16, 2022, the Court entered the Order Governing the Administration of the Receivership ("Administrative Order") which also established procedures for sales of real property in conformity with the Statute. [Dkt. 63].

3.      Following the Fifth Circuit's vacatur of the Initial Receivership Order, this Court solicited briefing and conducted a hearing to consider entry of a new receivership order, which the Court entered on November 29, 2023 (the "Receivership Order") [Dkt. 417]. The Receivership Order directed the Receiver to take "possession of all Receivership Property" including "all real property of the Receivership Entities." Receivership Order ¶¶ 6, 17.

4.      On November 29, 2023, this Court entered an order adopting several orders entered under the Initial Receivership Order, including the Administrative Order, making them effective under the Receivership Order [Dkt. 419].

5.        Goldmark Hospitality, LLC ("Goldmark") is identified in the Receivership Order as a Receivership Entity that "received or benefited from assets traceable to Barton's alleged fraudulent activities." *Id.* ¶1. Examples of investor funds traced to Goldmark were submitted to the Court [Dkt. 308], and since that time, additional tracing examples have been discovered.[1]

6.        Goldmark owns the Amerigold Suites—a 70 unit extended stay hotel located at 13636 Goldmark Drive, Dallas, Texas (the "Amerigold Suites").

**B.        The Amerigold Suites and Prior Sale Orders**

7.        In the months prior to the institution of the Receivership, the Amerigold Suites had negative cashflow, in part because of a high number of vacant units and the generally poor condition of several units.  Within days of the Receiver's appointment, he learned, among other things, that insurance on the property was on the verge of cancellation, that electricity was on the verge of being shut off, and that significant water bills were long overdue, even under a prior negotiated settlement.  The Receiver was forced to expend scarce Receivership resources to preserve this asset and ensure that operations continued.  The Receiver also learned the Amerigold Suites is encumbered by significant debt.  But–for the Initial Receivership Order's automatic stay on foreclosure and other lender remedies, the lender would likely have been entitled to foreclosure after the Receiver's appointment since insufficient assets existed (and continue to exist) to make mortgage payments (whether on this property or any of the other properties owned by the Receivership Entities).  Indeed, as discussed below, the lender has sought permission to foreclose from this Court, twice.  Moreover, as detailed in the Receiver's status reports, the Amerigold Suites takes significant time from the Receiver and his team to manage.  *See, e.g.*, Dkt. 491, pp. 33–39.

---

[1] These examples were not, and are not, exhaustive.

8.      In light of these challenges, and to avoid using limited Receivership assets to continue operating the Amerigold Suites at a loss, the Receiver believed (and continues to believe) that selling the Amerigold Suites was in the best interest of the Receivership Estate. After consulting multiple industry professionals and brokers regarding the Amerigold Suites' potential value, the Receiver engaged a broker to market the Amerigold Suites in late 2022 and early 2023. The Receiver eventually contracted with a buyer to purchase the Amerigold Suites for $5,500,000.

9.      On March 2, 2023, the Receiver filed his Verified Motion for Appointment of Appraisers, Approval of Appraisals, Approval Hearing, and Approval of Sale of Amerigold Suites [Dkt. 167] (the "Amerigold Sale Motion"). Barton objected to the sale [Dkt. 185]. On March 20, 2023, the Court held a hearing on the Amerigold Suites Sale Motion, and after determining the sale was in the best interest of the Receivership, on March 29, 2023, entered an Order approving the sale [Dkt. 202] ("Amerigold Suites Sale Order").

10.      Barton appealed the Amerigold Suites Sale Order,[2] and while the appeal was pending, the title company was unwilling to issue title insurance. On July 17, 2023, the Fifth Circuit dismissed the Amerigold Suites Sale Order appeal for lack of jurisdiction, but on October 12, 2023, in light of the vacatur of the Initial Receivership Order and following Barton's motion for reconsideration and rehearing en banc, the Fifth Circuit dismissed the Amerigold Suits Sale Order appeal as moot.[3]

11.      On November 1, 2023, the Receiver filed his Verified and Expedited Motion to Ratify the Amerigold Sale Order [Dkt. 378] ("Amerigold Suites Ratification Motion"). The Court ultimately construed the Amerigold Suites Ratification Motion as a new sale motion, re-appointed

---

[2] *See SEC v. Barton*, Appeal No. 23-10515 in the Fifth Circuit.

[3] *Id.* at Dkt. Nos. 48, 68.

the Receiver's appraisers, and set a hearing on the motion.  The hearing was held on December 14, 2023, and on December 15, 2023, the Court entered its Order approving the sale of the Amerigold Suites [Dkt. 436] (the "Second Amerigold Suites Sale Order"), determining that the sale of the property was still in the best interest of the Receivership.

12.    In connection with the Amerigold Suites Ratification Motion, the Receiver and the lender on the Amerigold Suites, McCormick 101, LLC ("McCormick") entered a joint stipulation and agreed order, whereby the parties agreed that at closing, McCormick would be paid the principal due under its note ($2,481,098.27) as well as all interest accrued under the Standard Interest Rate.[4]  The parties further agreed that any claims for amounts in excess of this amount (e.g., for default rate interest or attorneys' fees) can be submitted by McCormick in connection with an eventual claims process, though the Receiver may object to the priority of any such claim.

13.    On December 29, 2023, Barton filed an interlocutory appeal of the Second Amerigold Suites Sale Order (and two other sale orders).  Fifth Circuit Case No. 24-10004. Because of Barton's improper interlocutory appeal of the Second Amerigold Suites Sale Order, the title company was once again unwilling to issue a title policy with the appeal pending. The purchaser also indicated that it was no longer willing to close the transaction because of the continued uncertainty surrounding the transaction and what it believes is a much more buyer-friendly market today compared to when it first contracted to purchase the Amerigold Suites.

14.    Meanwhile, interest on the property has continued to accrue at over $13,000 per month, the necessity for significant repairs have continued, property tax and insurance bills remain high, totaling over $100,000 per year, and the Receiver and his team are required to continue

---

[4] A Note with a principal balance of $2,481,098.27 encumbers the Amerigold Suites (the "Note") and interest at the rate of 6.5% has accrued on the Note (the "Standard Interest Rate").

devoting significant attention to overseeing the property. While the previous purchaser's sense of a shifting market in favor of buyers is proving correct—leading to a lower sales price this time compared to the prior sale—the continued costs of managing the property and the ever present possibility of another personal injury (two of which have already occurred) reinforced the Receiver's belief that selling the Amerigold Suites now, as opposed to speculating on the real estate market which is not a receiver's job, is in the best interest of the Receivership Estate.

15.    Accordingly, the Receiver retained a broker to widely market the property and find a replacement purchaser.  During the First Quarter of 2024, the broker spent significant efforts marketing the sale widely and soliciting bids.

**C.    The Proposed Sale of the Amerigold Suites.**

16.    The broker obtained multiple offers on the Amerigold Suites, the highest of which was a submitted by Neel Jain and Aaron Friedman and their affiliated entity Centeridge, LLC ("Buyer") at a purchase price of $4,750,000.[5]   The Buyer (and affiliated members) have extensive experience rehabilitating distressed multifamily assets.

17.    The Receiver and the Buyer engaged in negotiations regarding a purchase and sale agreement for the Amerigold Suites, and on June 3, 2024, the Receiver and the Buyer entered into a Purchase and Sale Agreement (the "Contract"),[6] pursuant to which the Receiver agreed, subject to Court approval, to sell the Amerigold Suites to the Buyer for $4,800,000.

18.    The Contract requires an initial earnest money deposit of $100,000 within four days after full execution of the Contract.  Provided certain conditions are met, the earnest money

---

[5] The Buyer is not related to, nor controlled by any of the parties to this lawsuit, and is not related to, nor controlled by the Receiver, or any of his agents, employees, or attorneys.

[6] A true and correct copy of the Contract is included in the Appendix submitted with this Motion as Exhibit A, APP000001–45.

becomes non-refundable at the end of the due diligence period.  The Contract requires closing no later than 30 days after the expiration of the due diligence period, subject to a 30-day extension based on additional events.

19.    The Receiver believes that this sale is in the best interest of the Receivership Estate and accordingly seeks permission to sell the Amerigold Suites pursuant to the Contract and in accordance with the Administration Order and the Statute.  Further, the Receiver requests authorization to sell and to convey title to the Amerigold Suites free and clear of mortgages, liens, claims and encumbrances, save and except those secured liens discussed in this Motion.

### III.    ARGUMENT AND AUTHORITIES

**A.    Legal Standard**

Pursuant to the Statute, the Court may order the sale of real property by private sale "if it finds that the best interests of the estate will be conserved thereby."  Before the confirmation of any private sale, (1) "the court shall appoint three disinterested persons to appraise such property or different groups of three appraisers each to appraise properties of different classes or situated in different localities[, and] [n]o private sale shall be confirmed at a price less than two-thirds of the appraised value;" (2) "the terms [of the sale] shall be published in such newspaper or newspapers of general circulation as the court directs at least ten days before confirmation" and a hearing held, "of which notice to all interested parties shall be given by publication or otherwise as the court directs;" and (3) "[t]he private sale shall not be confirmed if a bona fide offer is made, under conditions prescribed by the court, which guarantees at least a 10 per centum increase over the price offered in the private sale."  28 U.S.C. § 2001(b).

**B.    The Court Should Appoint the Identified Appraisers and Accept Their Appraisals.**

In accordance with this Court's Orders and the Statute, the Receiver obtained three independent appraisals of the Amerigold Suites. One is an informal broker's opinion of value, and

two are certified appraisals (collectively, the "Appraisals").[7]  True and correct copies of the three Appraisals are included in the Appendix as Exhibits B-1, B-2, and B-3 (APP000046–186, APP000187–327, and APP000328–337).  The Receiver requests that the Court appoint the appraisers for the purpose of providing the attached Appraisals and accept these three Appraisals as required by the Statute.

The three Appraisals value the Amerigold Suites at $4,170,000,[8] $5,570,000,[9] and $6,700,000–$7,100,000,[10] resulting in an average appraised value of $5,546,667.[11]  Thus, the contracted sales price, $4,800,000, greatly exceeds two-thirds of the average appraised value of the Amerigold Suites ($3.7 million) as required.  The Receiver contends the proposed sale satisfies the two-thirds threshold and is in the best interest of the Receivership Estate.

**C.    The Court Should Set a Hearing on the Proposed Sale**

The Statute also requires that the Court conduct a hearing to consider the proposed sale. At least ten days before the hearing, the Statute further requires publication of the terms of the proposed sale so that bona fide interested purchasers can submit competing bids of not less than 10% more than the Contract price.  Any competing offers should be accompanied by proof of funds for a cash sale, or confirmation of approved financing to allow an immediate closing on the same basis provided in the Contract.

---

[7] In accordance with the Court's Administrative Order, the Receiver is using an informal opinion of value as an appraisal due to the cost of a certified appraisal on commercial property. Dkt. 63 at 9 ("Similarly, the Receiver may in his discretion utilize informal "opinions of value" received from respected brokers in the respective industries related to the subject property, as one or more of the "appraisals" required by § 2001(b).")

[8] The appraisal was issued by National Valuation Consultants, Inc. and is dated as of April 5, 2024. APP000047.

[9] The appraisal was issued by Integra Realty Resources and is dated as of April 25, 2024.  APP000192.

[10] The Broker Opinion of Value was issued by Walker & Dunlop and is dated as of January 4, 2024.  APP000329.

[11] The averaged appraised value was calculated using the average of the Walker & Dunlop Broker Opinion of Value, $6,900,000.

The Receiver requests that the Court schedule a hearing on or before July 12, 2024, to consider the sale. The Receiver will publish notice of the hearing at least ten (10) days prior to the hearing as required by the Statute and provide notice of the hearing through the receivership website. Additionally, the Receiver requests that the Court require that any objections to the proposed sale be filed no later than ten days after the date of an order setting the hearing, or fourteen days before such hearing, whichever date is earlier.

The Receiver requests that any bona fide offers for purchase of the Amerigold Suites which exceed by ten percent (10%) the Contract sales price of $4,800,000 be served on the Receiver and filed with the Court not later than two days before the hearing scheduled to consider the sale.

**D.     After the Hearing, the Court Should Approve the Sale, or Any Bona Fide Offers Exceeding 10% of the Sales Price, as in the Best Interest of the Receivership.**

For the same reasons the sale was in the best interests of the Receivership Estate when approved twice before, ratifying the sale now continues to serve the Receivership Estate's best interests. As discussed previously, numerous issues plagued the Amerigold Suites before the Receiver was appointed, and several issues continue. Based on a market survey conducted as part of the sales process, the current occupancy rate lags behind similarly situated properties. The Amerigold Suites also needs substantial renovations and requires monthly repairs but does not generate sufficient income to make those repairs.

Moreover, in its current state, the property does not generate enough revenue to service the mounting interest debt owed on the Note. But for the litigation stay in the Receivership Order, the lien holder on the Note would have long ago foreclosed on the Amerigold Suites.[12] While protected from foreclosure, interest on the Note continues to accrue, and thus the net proceeds

---

[12]*See* Dkt. 311and Dkt. 463.

available to the Receivership Estate upon closing will be less than if the sale had closed when approved. Even at the stipulated Standard Interest Rate, interest is accruing at over $13,000 per month. The delayed closing from the date of the Amerigold Suites Sale Order to present has cost the Receivership Estate over $189,000 in additional interest.

While the Contract sales price of this sale is several hundred thousand dollars less than the previous sales price, any further delay, is only going to further erode the net recovery available to the Receivership Estate. There is a possibility that when interest rates subside, the commercial property market could rebound and the Receiver could find a buyer willing to pay a higher price, but the inverse is also possible, and the commercial real estate market could further deteriorate. The Receivership Estate, however, was not established to engage in real estate speculation. Had the receiver been able to sell the Amerigold Suites when he first approached the Court, he would have been able to capitalize not only on the higher sales price, but on the interest savings. But that is not what happened, and now the Receiver must take the data available to him and make the most informed decision possible that is in the best interest of the Receivership—which he is doing here. Additionally, in the recent round of strong storms that have impacted the Dallas area, the Amerigold Suites suffered damage to the roofs of multiple buildings, and several windows were broken, likely due to the winds produced by the storms, which gusted at over 70 mph.[13] The cost to repair these damages has not yet been determined. However, as long as the Receivership is responsible for the Amerigold Suites, the Receivership Estate is exposed to increased liability due to damage or personal injuries.

If the Court approves the sale, after subtracting the Note balance (approximately

---

[13] *See Dallas Weather: Storms Leave Trail of Damage in North Texas*, FOX 4 (May 28, 2024, 8:47 AM), https://www.fox4news.com/weather/dallas-weather-severe-thunderstorm-warning-effectmay-28.

$2,740,899 as of May 28, 2024), broker commissions (approximately $190,000), and closing costs, the sale will result in a net benefit of approximately $1.8 million to the Receivership Estate.[14]

Finally, the Receiver further requests that in the event the Court approves the sale contemplated in this Motion, but the Buyer ultimately terminates the Contract in accordance with its terms, the Court authorize the Receiver to sell the Amerigold Suites on substantially similar terms and at a price at or above the sales price of the Contract.

### IV.    CONCLUSION AND PRAYER

As set forth above, the Receiver requests that the Court (1) appoint the three appraisers identified above and in the Appraisals included in the Appendix; (2) approve and accept the Appraisals provided by each appraiser; (3) set this matter for hearing to consider approval of the sale on the terms provided by the Contract or as offered in any bona fide competing offer received after the date of this Motion; and, (4) provided no timely bona fide offers exceeding the Contract price by 10% are received at least two days before the date of the hearing, enter an order authorizing the Receiver to sell the Amerigold Suites pursuant to the terms of the Contract (or upon substantially similar terms in the event the Contract is terminated).  The Receiver also requests such other and further relief to which he is justly entitled.

---

[14] Although not reflected in the title commitment or an independent review of the Dallas County property records, the Receiver has discovered a second lien for several hundred thousand dollars may encumber the Amerigold Suites.  The Receiver will verify the status of the purported loan before closing.  Even if the loan exists, the net to the Receivership Estate will likely be more than $1.5 million.

– 12 –

Respectfully submitted,


By: */s/ Timothy B. Wells*

Charlene C. Koonce
  Texas Bar No. 11672850
  charlene@brownfoxlaw.com
Timothy B. Wells
  Texas Bar No. 24131941
  tim@brownfoxlaw.com
BROWN FOX PLLC
8111 Preston Road, Suite 300
Dallas, TX  75225
Tel. 214.327.5000
Fax. 214.327.5001

*Attorneys for Receiver Cortney C. Thomas*

## VERIFICATION

My name is Cortney C. Thomas.  I am over the age of 18 and am fully competent to make this verification. I declare under penalty of perjury that the facts stated above are within my personal knowledge and are true and correct.

 */s/ Cortney C. Thomas*
Cortney C. Thomas

## CERTIFICATE OF CONFERENCE

I hereby certify that on May 31, 2024, the Receiver conferred with counsel for Defendant Barton.  As of the filing of this Motion, no response has been received.  Because Barton has not responded to the Receiver's requested conference, the instant Motion is deemed opposed pursuant to L.R. 7.1.

I further certify that on June 4, 2024, I conferred with the SEC.  As of the filing of this Motion, the SEC was unable to confirm whether it was opposed or unopposed.  Based on L.R. 7.1, the SEC is deemed opposed; however, an amended certificate of conference may be filed at a later date.

*/s/ Timothy B. Wells*
Timothy B. Wells

## CERTIFICATE OF SERVICE

Pursuant to Fed. R. Civ. P. 5(d)(1)(B), as amended, no certificate of service is necessary, because this document is being filed with the Court's electronic-filing system.

*/s/ Timothy B. Wells*
Timothy B. Wells
