## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § § § | |
| *Plaintiff*, | § § § | |
| v. | § § | No. 3:22-cv-2118-X |
| | § | |
| TIMOTHY BARTON, | § | |
| CARNEGIE DEVELOPMENT, LLC, | § | |
| WALL007, LLC, | § | |
| WALL009, LLC, | § | |
| WALL010, LLC, | § | |
| WALL011, LLC, | § | |
| WALL012, LLC, | § | |
| WALL016, LLC, | § | |
| WALL017, LLC, | § | |
| WALL018, LLC, | § | |
| WALL019, LLC, | § | |
| HAOQIANG FU (A/K/A MICHAEL FU), | § | |
| STEPHEN T. WALL, | § | |
| | § | |
| *Defendants*, | § | |
| | § | |
| DJD LAND PARTNERS, LLC, and | § | |
| LDG001, LLC, | § | |
| | § | |
| *Relief Defendants*. | § | |

**APPENDIX IN SUPPORT OF RECEIVER'S VERIFIED MOTION FOR
APPOINTMENT OF APPRAISERS, APPROVAL OF APPRAISALS,
APPROVAL HEARING, AND APPROVAL OF SALE OF AMERIGOLD SUITES**

Respectfully submitted,


By: _/s/ Timothy B. Wells_

    Charlene C. Koonce
     Texas Bar No. 11672850
     charlene@brownfoxlaw.com
    Timothy B. Wells
     Texas Bar No. 24131941
     tim@brownfoxlaw.com
    BROWN FOX PLLC
    8111 Preston Road, Suite 300
    Dallas, TX  75225
    Tel. 214.327.5000
    Fax. 214.327.5001

    *Attorneys for Receiver Cortney C. Thomas*

| Exhibit | Description | APP #s |
|---|---|---|
| A | Purchase and Sale Agreement between Cort Thomas, as Receiver for Goldmark Hospitality, LLC and Centeridge LLC, dated June 3, 2024 | APP000001-045 |
| B-1 | NVC Appraisal Report dated May 7, 2024 | APP000046-186 |
| B-2 | IRR Appraisal Report dated May 7, 2024 | APP000187-327 |
| B-3 | Walker & Dunlop Broker's Opinion of Value dated January 4, 2024 | APP000328-337 |

# EXHIBIT A

APP000001

PURCHASE AND SALE AGREEMENT

between

**CORT THOMAS, AS RECEIVER FOR GOLDMARK HOSPITALITY, LLC**
a Texas limited liability company
("Receiver")

and

**CENTERIDGE LLC**
and/or permitted assigns
("Buyer")

DATED: June 3, 2024

For property generally located at:

13636 Goldmark Drive, Dallas, Texas 75240
(Amerigold Suites)

APP000002

## PURCHASE AND SALE AGREEMENT

**THIS PURCHASE AND SALE AGREEMENT** (the "**Agreement**") is made as of June 3, 2024 (the "**Effective Date**"), by and between Centeridge LLC, a Delaware limited liability company, and/or permitted assigns ("**Buyer**") and Cort Thomas, solely in his capacity as the receiver, and not in his individual capacity (the "**Receiver**") for, and on behalf of, Goldmark Hospitality LLC, a Texas limited liability company, ("**Goldmark**"). Buyer and Receiver are collectively referred to as the "**Parties**" and each individually as a "**Party**."

**WHEREAS**, Goldmark is the owner of the Property (defined below) and pursuant to the Order Appointing Receiver, dated October 18, 2022 (the "**Receivership Order**"), entered by the United States District Court for the Northern District of Texas, Dallas Division (the "**Court**") in Case No. 3:22-cv-2118-X (the "**Receivership Action**"), the Court appointed and authorized Receiver to, among other things, (a) take possession, custody and control of all of Goldmark's business operations, assets, and property, and (b) market and sell Goldmark's business operations, assets, and property, all subject to the conditions contained in the Receivership Order;

**WHEREAS**, Buyer desires to purchase the Property, and Receiver desires to sell the Property to Buyer for and on behalf of Goldmark, in each case for the consideration and upon the terms and subject to the conditions set forth herein; and

**WHEREAS**, Receiver's obligations under this Agreement, and the transactions contemplated by this Agreement, are expressly subject to the approval of the Court and will be consummated only pursuant to orders to be entered in the Receivership Action.

**NOW THEREFORE**, in consideration of the foregoing and other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

### Article I
### PROPERTY/PURCHASE PRICE

1.1.    *Parties.* Below is a summary of the Parties to, or involved in, this Agreement:

    (a)    <u>Buyer and Notice Address</u>:

| | |
|---|---|
| Centeridge LLC | With a copy to: Firsel Ross Gussis & |
| Attn: Neel Jain | Alexander |
| 4735 Purdue Ave. | Attn: Samuel P. Gussis |
| Dallas, TX 75209 | 10 Parkway North Blvd. Ste 110 |
| Email: neeljain97@gmail.com | Deerfield, IL 60015 |
| | Email: SGussis@firselross.com |

and to:

Aaron Friedman
139 Tennyson Drive
Short Hills, NJ 07078

    (b)    <u>Receiver and Notice Address</u>:

| | |
|---|---|
| c/o Cort Thomas, as receiver of | With a copy to: Brown Fox PLLC |
| Goldmark Hospitality, LLC | Attn: Adam Fox |
| 8111 Preston Road, Suite 300 | 6303 Cowboys Way, Suite 450 |

31994070v.2

APP000003

Dallas, Texas 75225                 Frisco, Texas 75034
cort@brownfoxlaw.com                adam@brownfoxlaw.com

    (c)    Title Company:
Capital Title
Attn: Vicki G. Hoodwin, Vice President/Escrow Officer
7001 Preston Road, Suite 120
Dallas, Texas  75205
VHoodwin@ctot.com

    (d)    Escrow Agent:
Capital Title
Attn: Vicki G. Hoodwin, Vice President/Escrow Officer
7001 Preston Road, Suite 120
Dallas, Texas  75205
VHoodwin@ctot.com

1.2.    ***Property***. Subject to the terms of this Agreement, Receiver agrees to sell to Buyer, and Buyer agrees to purchase from Receiver, the following property (collectively the "**Property**"):

    (a)    All of Goldmark's right, title, and interest, in and to the real property described in **Exhibit A** (the "**Land**"), having an address of 13636 Goldmark Drive, Dallas, TX 75240, together with all of Goldmark's right title and interest in: (i) the buildings and improvements thereon (the "**Improvements**"); (ii) all appurtenances of the Land, including easements and/or rights-of-way relating thereto; and (iii) any land lying in the bed of any street, road or access way, opened or proposed, on the Land; (collectively, with the Land, the "**Real Property**"). The Real Property shall be conveyed subject to the matters which are, or are deemed to be, Exceptions (defined below).

    (b)    All of Goldmark's right, title, and interest, in and to all fixtures, furniture, equipment, inventory, and other tangible personal property, if any, located on the Real Property and used in connection with the operation of same, in each case to the extent assignable, and without warranty, but expressly excluding any items of personal property owned by each tenant, any managing agent, or any other party (the "**Tangible Personal Property**").

    (c)    All of Goldmark's rights or interest, as landlord, in the "**Leases**," being defined as all those certain leases regarding the Improvements, and all amendments thereto, and including all leases which may be made by Receiver after the Effective Date and before Closing as permitted by this Agreement; in each case of the foregoing, to the extent assignable and without warranty.

    (d)    All of Goldmark's right, title, and interest, if any, in and to all of the following items, in each case to the extent assignable or transferrable, and without warranty (the "**Intangible Personal Property**"): (i) licenses and permits relating to the operation of the Real Property; (ii) the right to use the name "Amerigold Suites" in connection with the Real Property; and (iii) if still in effect, each guaranty and warranty from any general contractor, subcontractor, or manufacturer in connection with the construction or maintenance of the Real Property or associated with the Tangible Personal Property, provided, however, if there is any cost or fee to transfer any such guaranty and warranty to Buyer, Buyer must pay the same as a condition precedent to any such assignment by Receiver. The Tangible Personal Property and the Intangible Personal Property are collectively referred to herein as the "**Personal Property**."

2

**APP000004**

1.3.    *Purchase Price.* The purchase price for the Property will be Four Million, Eight Hundred Thousand and no/100 Dollars ($4,800,000.00) (the "**Purchase Price**"), which shall be due and payable by Buyer in full at Closing by wire transfer of immediately available federal funds to a bank account designated by Escrow Agent in writing to Buyer prior to Closing.

1.4.    *Earnest Money.*

(a)    Deposit of Earnest Money. Within four (4) days following execution of this Agreement, Buyer shall deposit one hundred thousand and no/100 dollars ($100,000.00) (the "**Initial Earnest Money**") with the Escrow Agent in immediately available federal funds, it being understood and agreed that the Initial Earnest Money shall be refundable until the expiration of the Due Diligence Period, at which point the Initial Earnest Money shall become non-refundable, in each case subject to the terms and conditions contained herein. Deposits of additional earnest money shall be made upon the occurrence of each of the following events, in the following amounts, and within the timelines specified (each a deposit of "**Additional Earnest Money**" and all actual deposits of Additional Earnest Money together with the Initial Earnest Money, the "**Earnest Money**":

(i)    Twenty-five thousand and no/100 dollars ($25,000.00) may be deposited with the Escrow Agent at any time prior to the Closing Date if Buyer desires to extend the initial Closing Date for an additional thirty (30) day period (the "**Closing Extension**"), in which case, the Closing Date shall be extended by thirty (30) days.

(ii)    If Buyer fails to timely deliver any portion of the Earnest Money and such failure is not remedied within three (3) business days following Buyer's receipt of written notice thereof from Receiver to Buyer, Receiver may declare this Agreement to be terminated, in which case this Agreement shall be terminated and of no force and effect (except for sections hereof described to survive such termination) and the refundable portion of the Earnest Money, if any, shall be refunded to Buyer and the non-refundable portion shall be retained by Receiver. The Earnest Money shall be applicable to the Purchase Price at Closing, unless otherwise forfeited within the terms herein.

(b)    Independent Consideration. The Escrow Agent shall hold and disburse the Earnest Money (including any portion thereof) in accordance with the terms and conditions of this Agreement. In connection with any termination made in accordance with this Agreement, One Hundred and 00/100 Dollars ($100.00) of the Earnest Money shall be paid to Receiver as independent consideration for Buyer's right to purchase the Property and for Receiver's execution, delivery and performance of this Agreement (the "**Independent Consideration**"). The Independent Consideration is in addition to and independent of any other consideration or payment provided for in this Agreement, is non-refundable and shall be retained by Receiver notwithstanding any other provision of this Agreement. Receiver acknowledges and agrees that the Independent Consideration is sufficient for Receiver's covenants and obligations under this Agreement. The terms and provisions set forth in this Section shall survive the termination of this Agreement. Independent Consideration is applicable toward the Purchase Price at Closing.

(c)    Disposition of Earnest Money. Except as otherwise provided to the contrary in **Sections 1.5** (Court Approval), **3.2** (Title Review and Cure), **4.4** (i.e., damage/condemnation), **5.2(b)** (i.e., inability to satisfy Buyer's closing conditions), and **8.2** (i.e., a Receiver default) providing for the refundability of the Earnest Money upon certain events following the Due Diligence Period, the refundable portion of the Earnest Money shall be fully refundable until the expiration of the Due Diligence Period, at which point the Earnest Money shall become non-refundable to Buyer. In each of the foregoing cases, once the Earnest Money becomes non-refundable to Buyer, each such

3

APP000005

deposit shall be considered consideration for Buyer's exclusive right to inspect and purchase the Property under this Agreement. The Earnest Money shall be held and disbursed by the Escrow Agent pursuant to **Article IX** of this Agreement.

(d)     Buyer Acknowledgement. Buyer hereby acknowledges and agrees that the Earnest Money held by Escrow Agent does not and shall not constitute property of the estate of Buyer within the meaning of Section 541 of title 11 of the United States Code (the "**Bankruptcy Code**"), or substantially similar provisions of state law, and Buyer's interest in such Earnest Money is limited to the right to have the Earnest Money returned if and when the conditions for the return of the Earnest Money to Buyer are satisfied as set forth herein. Buyer hereby acknowledges and agrees that: (i) the proper giving of notice by Receiver to release the Earnest Money as provided hereunder; and/or (ii) the proper release of the Earnest Money to Receiver as provided hereunder shall not be a violation of any provision of the Bankruptcy Code, including, without limitation, Section 362 of the Bankruptcy Code, or require the approval of any court with jurisdiction over any case in which Buyer or any affiliate of Buyer is a debtor. Buyer hereby waives any provision of the Bankruptcy Code necessary to invoke the foregoing, including, without limitation, Sections 105 and 362, and waives any right to defend against any motion for relief from the automatic stay that may be filed by Receiver.

1.5.    ***Court Approval and Due Diligence Period***:

(a)     Court Approval.  This Agreement shall not be deemed an offer or binding upon Receiver or Buyer until this Agreement is fully executed and delivered by Receiver and Buyer and the Court has entered an order in the Receivership Action authorizing Receiver to sell the Property on the terms and conditions herein ("**Court Approval**").  Receiver agrees to use commercially reasonable to obtain Court Approval.  For avoidance of doubt, notwithstanding the receipt of Court Approval, Closing shall remain subject to the satisfaction of all conditions to Closing set forth elsewhere in this Agreement, including as set forth in **Section 5.9**. If the Court Approval does not occur by or on the date that is sixty (60) days following the Effective Date of this Agreement, this Agreement may be terminated by either Party and, in the event of such termination, the Earnest Money shall be returned to the Buyer less the Independent Consideration.

(b)     Due Diligence Period.  The "**Due Diligence Period**" shall be the period commencing on the Effective Date and ending on the later to occur of: (i) the forty-fifth (45th) day thereafter and (ii) the business day after Court Approval is obtained and notice thereof is provided to Buyer.

**Article II**
INSPECTIONS

2.1.    ***Property Information***. Not later than three (3) Business Days after the Effective Date, Receiver will use commercially reasonable efforts to make available to Buyer, to the extent in Receiver's possession, to the extent Receiver is able to locate such documents following a reasonable search, or to the extent readily obtainable or ascertainable from the Property's property management company, copies of, or Receiver's permission to access with the right to copy, the following information with respect to the Property (collectively the "**Property Information**"):

(a)     Unaudited financial statements for the last two (2) calendar years of the Property's operation, along with a year-to-date financial statement.

(b)     All third-party due diligence including appraisals, PCA and Phase 1.

4

APP000006

(c)     Most recent capital and operating budget.

(d)     Copies of all leases now in effect and all related correspondence and a copy of the standard lease.

(e)     Copies of all LIHTC and LURA documentation, compliance, and correspondence (If Applicable)

(f)     Current rent roll, delinquency report and general ledger for the past and current month., and billing register. All service agreements, easements, CCRs (or similar), permits, licenses, equipment leases, contracts, or other agreements with respect to the ownership, operation and maintenance of the Property, and all maintenance records, to the extent reasonably available.

(g)     Copies of all reports, inspections and correspondence with the City of Dallas including but not limited to: Crime, Code and Fire Compliance department.

(h)     All environmental studies.

(i)     All fire inspection reports (the "**Fire Reports**"), together with documentation demonstrating that the fire alarm system is monitored by a third party central station that receives signals from the fire panel.

(j)     A schedule of Personal Property.

(k)     As-built plans, if available

(l)     Any zoning ordinances, variances or special approvals relating to the site.

(m)     Most recent title policy.

(n)     Most recent survey (the "**Existing Survey**") along with any soil tests, topographical maps, etc.

(o)     A current list of security deposits and accounts receivable schedule.

(p)     Tax bills, value renditions and assessment statements for the last two (2) years.

(q)     Utility invoices, including electric, gas and water for the last two (2) years.

(r)     Historical capital improvements during ownership period.

(s)     List of personnel and wages and benefit information, if applicable.

(t)     All Certificates of Occupancy, if available.

(u)     Any guaranties and warranties.

(v)     Existing insurance coverage and list of claims including loss runs for the last three years.

(w)     Copies of all Assumed Service Contracts (below defined).

(x)     All sprinkler inspection reports (the "**Sprinkler Reports**").

5

APP000007

(y)      Any other reports, documents or information related to the Property reasonably requested by Buyer.

2.2.      *Confidentiality*. The Property Information and all other information (other than matters of public record or matters generally known to the public) furnished to, or obtained through inspection of the Property by Buyer, its affiliates, lenders, employees, attorneys, accountants and other professionals or agents ("**Buyer's Representatives**") relating to the Property, will be treated by Buyer and Buyer's Representatives as confidential, and will not be disclosed to anyone other than on a need-to-know basis who agree to maintain the confidentiality of such information pursuant to this **Section 2.2**, and all originals and copies will be returned to Receiver by Buyer if the Closing does not occur, or will be otherwise destroyed and confirmed by Buyer as destroyed in writing. Buyer at all times agrees to remain responsible for itself and the Buyer's Representatives, as well as any third parties that access Property Information as a result of Buyer's disclosure. Without limiting the foregoing, Buyer acknowledges that the Leases and the rent roll may contain personal information relating to the respective tenants thereto (including, names, postal addresses, phone numbers, etc.), and Buyer agrees that all such personal information shall be treated as confidential information by Buyer. Buyer further agrees to implement and maintain adequate and appropriate administrative, physical, and technical safeguards to ensure the confidentiality and security of such confidential information and to protect against any threats, hazards and unauthorized access or use of such confidential information. Buyer agrees to promptly notify Receiver of any requested disclosure or known or suspected unauthorized access to or loss, breach, damage, or theft of any confidential information and, in such event, take such additional measures to mitigate the loss, breach, damage, or theft and indemnify, defend, and hold harmless Receiver in such event. The confidentiality provisions of this **Section 2.2** shall not apply to any disclosures made by Buyer as required by law, by court order, or in connection with any subpoena served upon Buyer; provided Buyer shall provide Receiver with written notice before making any such disclosure to enable Receiver to seek an appropriate protective order. The provisions of this paragraph shall survive the termination of this Agreement.

2.3.      *Inspections in General*. During the Due Diligence Period, Buyer and Buyer's Representatives shall have the right to enter upon the Property for the purpose of making non-invasive inspections at Buyer's sole risk, cost and expense.  Further, Buyer shall have the right to inspect all vacant units at the Property during the Due Diligence Period and Receiver shall (or shall cause the property manager to) facilitate such inspections. Notwithstanding the foregoing, no inspection of occupied units shall be permitted without Receiver or property manager's express approval and opportunity for accompaniment. All such entries upon the Property shall be at reasonable times during normal business hours with prior written notice to Receiver or Receiver's agent (which notice shall describe the scope of the inspections Buyer intends to conduct during Buyer's inspection), and Receiver or Receiver's agent shall have the right, but not the obligation, to accompany Buyer during any activities performed by Buyer on the Property. Buyer shall not contact any tenant of the Property, any employee of Receiver or the property management company, any governmental agency or instrumentality (except (a) to obtain a zoning compliance letter or in connection with Buyer's zoning report, (b) to obtain information on code compliance, and (c) to obtain information on criminal and/or nuisance matters), or any other third person regarding the Property without the prior written consent of Receiver.  Following each entry by Buyer or Buyer's Representatives with respect to inspections and/or tests on the Property made by Buyer or Buyer's Representatives, Buyer shall, to the extent of any damage caused by Buyer's inspections or tests, restore the Property in the same condition that existed immediately prior to any such inspections and/or tests to Receiver's reasonable satisfaction. Such obligation to restore shall survive the termination of this Agreement.

2.4.      *Environmental Inspections*. The inspections under **Section 2.3** may include a non-invasive Phase I environmental inspection of the Property, but no Phase II environmental inspection or other invasive inspection or sampling of soils, water, air or other materials (other than standard radon testing), including

6

APP000008

without limitation construction materials, for analytical testing, either as part of the Phase I inspection or any other inspection, shall be performed without the prior written consent of Receiver not to be unreasonably withheld, conditioned or delayed; and, if consented to by Receiver, the proposed scope of work and the party who will perform the work shall be subject to Receiver's review and approval. Buyer agrees, for itself and for Buyer's Representatives, not to engage in any activities that would violate any permits, licenses, entitlements, environmental, wetlands or other regulations pertaining to the Property, or any terms or provisions set forth in any Exception documents.

2.5.    ***Termination Prior to Expiration of Due Diligence Period.*** If prior to the expiration of the Due Diligence Period Buyer determines, in its sole and absolute discretion, that the Property is unacceptable for Buyer's purposes, Buyer shall have the right to terminate this Agreement by giving to Receiver written notice of termination before the expiration of the Due Diligence Period, in which case the Earnest Money shall be refunded to Buyer pursuant to the terms of this Agreement, and neither Receiver nor Buyer shall have any further rights or obligations under this Agreement, other than those that expressly survive a termination of this Agreement. If Buyer does not give written notice of termination prior to the expiration of the Due Diligence Period, this Agreement shall continue in full force and effect subject to the provisions of this Agreement.

2.6.    ***Receiver Expense.*** At no third-party expense to Receiver, Receiver shall reasonably cooperate with Buyer in its due diligence investigations conducted in accordance with this Article II.

2.7.    ***Indemnification.*** Buyer agrees to indemnify, defend, and hold Receiver and its disclosed or undisclosed, agents, affiliates, representatives, consultants, accountants, contractors, and attorneys or other advisors, and any successors or assigns of the foregoing (collectively with Receiver, the "**Receiver Parties**") harmless from and against any and all losses, costs, damages, liens, claims, liabilities, or expenses (including, but not limited to, reasonable attorneys' fees, court costs, and disbursements) (each a "**Claim**") incurred by any Receiver Parties arising from or by reason of Buyer's and/or Buyer's Representatives' access to, or inspection of, the Property, or any tests, inspections, or other due diligence conducted by or on behalf of Buyer; provided, however, that Buyer shall not hereunder be obligated to indemnify, defend or hold harmless for any Claims resulting from the mere discovery of matters that are not exacerbated by any Buyer Representatives or Claims are caused by the gross negligence or willful misconduct of any of the Receiver Parties. The provisions of this **Section 2.7** shall survive the Closing or any termination of this Agreement.

2.8.    ***Receiver Cooperation.*** Receiver shall reasonably cooperate with and support Buyer, at no material cost to Receiver, in connection with Buyer's efforts to obtain approval from the City of Dallas (and/or Dallas County, Texas) for Buyer's intended use of the property for multifamily residential use. Receiver will promptly execute all applications and other instruments reasonably acceptable to Receiver as the same may be requested by Buyer in connection therewith. Seller acknowledges that Buyer intends to apply for a change in use in Certificate of Occupancy prior to Closing.

**Article III**
**TITLE AND SURVEY REVIEW**

3.1.    ***Delivery of Title Commitment.*** Within ten (10) days following the commencement of the Due Diligence Period, Buyer shall cause to be delivered to Buyer and Receiver a preliminary report or title commitment issued by the Title Company on the form promulgated by the Texas Department of Insurance (the "**Title Commitment**") covering the Real Property, together with true, complete, and legible copies of all applicable exception documents referenced in the Title Commitment. The Title Commitment shall be issued by the Title Company or other underwriter acceptable to the Title Company.

7

APP000009

3.2.  *Title Review and Cure.*

(a)   On or before the date that is ten (10) days after the delivery to Buyer of the Title Commitment and receipt by Buyer of a new Survey ("**Survey**") of the Property (the "**Objection Deadline**"), Buyer shall provide a copy of the Survey and Title Commitment to Receiver and give written notice (the "**Objection Notice**") to Receiver of any matter set forth in the Title Commitment and Survey (or, if a new Survey is not obtained, the Existing Survey) to which Buyer objects (the "**Objections**"), which shall specifically exclude any Exceptions or Claims created due to the acts or omissions of Buyer or Buyer's Representatives. Notwithstanding anything to the contrary herein, in no event shall the Objection Deadline be later than the end of the Due Diligence Period.

(b)   Any item contained in the Title Commitment, or any matter shown on the Survey (if any), which Receiver does not elect in writing to cure prior to the Objection Deadline, shall be deemed individually an "**Exception**", and collectively, the "**Exceptions**" and shall include any and all other Exceptions as described in this Agreement hereafter created at or prior to Closing. In the event Buyer notifies Receiver of an Objection, Receiver shall have the right, but not the obligation, to cure such Objection.  Notwithstanding anything to the contrary in **Section 3.2(b)** or elsewhere in this Agreement, following written request by Buyer prior to Closing, Receiver shall be obligated to remove or satisfy at Closing and at Receiver's sole cost and expense any of the following that are of record in the Dallas County Property Records: (i) any deeds of trust and other financing documents securing any financing which encumber the Property; (ii) any and all mechanics or materialmens liens or other monetary liens encumbering or affecting the Property; (iii) any and all judgment liens encumbering the Property; (iv) all new title defects arising after the issuance of the Title Commitment unless consented to by Buyer in writing (collectively, the "**Required Cure Items**"). If Receiver timely notifies Buyer in writing of a good faith dispute regarding any Required Cure Item, then Buyer agrees to permit Receiver a sufficient amount of time to diligently and continuously pursue satisfaction or removal of such Required Cure Item from the Dallas County Property Records and, for so long as Receiver is diligently and continuously pursuing satisfaction or removal of such Required Cure Item, upon a written request by Receiver, the Parties agree to delay Closing until the date that is three (3) business days after such Required Cure Item is satisfied or removed from the Dallas County Property Records. Receiver's failure to timely dispute or cure all such Required Cure Items at or prior to Closing in accordance with this **Section 3.2b** shall be an event of default by Receiver under this Agreement and entitle Buyer to pursue its rights and remedies hereunder provided, however, that Buyer may elect to waive such default and proceed to Closing with the right to deduct from the Purchase Price a sum equal to the amount required to discharge all liens or encumbrances of a definite or ascertainable amount described in (i) through (iv) of this **Section 3.2(b)**.

(c)   If Buyer fails to tender an Objection Notice on or before the Objection Deadline, Buyer shall be deemed to have approved and waived any objections to any matters covered by the Title Commitment and the Survey (or Existing Survey, as applicable), other than the Required Cure Items. On or before five (5) Business Days after receipt of the Objections (the "**Response Deadline**") in writing, Receiver may give Buyer notice (the "**Response Notice**") of those Objections that Receiver is willing to cure, if any.

(d)   If Receiver fails to deliver a Response Notice by the Response Deadline, Receiver shall be deemed to have elected not to cure or otherwise resolve any matter set forth in the Objection Notice, other than the Required Cure Items. Receiver shall have no obligation to take any steps or bring any action or proceeding or otherwise to incur any effort or expense whatsoever to eliminate or modify any Exceptions or any Objections thereto, except with respect to any items that Receiver

8

APP000010

agrees in writing to cure and with respect to the Required Cure Items. If Receiver elects to cure any of the foregoing items and this Agreement is not otherwise terminated as provided herein, Receiver shall have until Closing to remove, satisfy, or cure the same.

(e)    If Buyer is dissatisfied with the Response Notice or the lack of Response Notice or Receiver's failure to cure any Exception or Objection, then, in each case, Buyer may, as its exclusive remedies, accept a conveyance of the Property subject to the Exceptions, specifically including any matter objected to by Buyer which Receiver is unwilling or unable to cure, or exercise its right to terminate this Agreement on or before five (5) Business Days after receipt of the Response Notice or, if no Response Notice is given prior to the Response Deadline, on or before five (5) Business Days after the Response Deadline. If Buyer provides such notice, this Agreement shall terminate and be of no further force and effect, except for the matters that expressly survive the termination of this Agreement, the Escrow Agent shall refund the Earnest Money to Buyer pursuant to the terms of this Agreement, and Buyer shall be deemed to have waived and released Receiver and Property from any and all Claims. If Buyer fails to timely exercise such right, Buyer shall be deemed to accept the Title Commitment and Survey (and, if not obtained, the Existing Survey) with resolution, if any, of the Objections set forth in the Response Notice (or if no Response Notice is tendered, without any resolution of the Objections) and without any reduction or abatement of the Purchase Price, except as expressly set forth in **Section 3.2(b)** hereof.

(f)    The term "**Permitted Exceptions**" shall mean: the Exceptions (exceptions that are not part of the promulgated title insurance form) in the Title Commitment that the Title Company has not agreed to insure over or remove from the Title Commitment prior to Closing and that Receiver is not required to, or has not agreed to, remove as provided above and all items shown on the Existing Survey, or if obtained, the Survey.

3.3.    *Conveyance of Title at Closing*. At Closing, Receiver shall convey fee simple title to the Property, on behalf of Goldmark, to Buyer, subject to the Permitted Exceptions. Subject to Receiver's Knowledge (defined herein) and the truth of any matter, Receiver shall execute Title Company's customary affidavit of debt, liens and parties in possession at Closing.

**Article IV**
**OPERATIONS AND RISK OF LOSS**

4.1.    *Ongoing Operations*. During the pendency of this Agreement, Receiver shall use commercially reasonable efforts to, and shall use commercially reasonable efforts to cause the property manager to, carry on its business and activities relating to the Property, including leasing of the Property and payment of all indebtedness secured by the Property, in substantially the same manner as it did before the Effective Date. Receiver will maintain in full force and effect through Closing its existing insurance coverage for the Property, including maintaining in full force and effect Receiver's property insurance.

4.2.    *Performance under Leases and Service Contracts*. During the pendency of this Agreement, Receiver shall use commercially reasonable efforts to, and shall use commercially reasonable efforts to cause the property manager to, perform its material obligations under the Leases and Service Contracts relating to the Property in substantially the same manner as it did before the Effective Date.

4.3.    *Service Contracts*. Buyer agrees to assume at Closing the Service Contracts serving the Property (the "**Assumed Service Contracts**"), to the extent assignable and/or transferrable, other than those service contracts that are terminable in accordance with their terms and which Buyer notifies Receiver in writing prior to the expiration of the Due Diligence Period that Buyer would like terminated. Notwithstanding the foregoing, Buyer shall not have the right to assume any Service Contract that is pursuant to a master contract

9

APP000011

with Receiver's property manager unless Buyer retains the current property manager and obtains such property manager's written approval. Buyer shall pay any transfer or assignment charges due in connection with its assumption of any Assumed Service Contracts.  Receiver shall cause its existing property management agreement to be terminated effective as of the Closing Date unless Buyer provides written notice to Receiver prior to the expiration of the Due Diligence Period that Buyer wishes to assume the related property management agreement (to the extent assignable).   All service contracts not assumed by Buyer in accordance with this **Section 4.3** shall be terminated by Receiver effective as of the Closing Date.

4.4.     ***Damage or Condemnation***. Risk of loss resulting from any condemnation or eminent domain proceeding which is commenced before the Closing, and risk of loss to the Property due to fire, flood, or any other cause before the Closing, shall remain with Receiver. If before the Closing the Property or any portion thereof shall be materially damaged, or if the Property or any material portion thereof shall be subjected to a bona fide threat of condemnation or shall become the subject of any proceedings, judicial, administrative or otherwise, with respect to the taking by eminent domain or condemnation, then either Receiver or Buyer may terminate this Agreement by providing proof thereof and written notice to the other Party, as applicable, given within five (5) days after such Party learns of the damage or taking, in which event the Earnest Money, less the Independent Consideration, shall be returned to Buyer. If the Closing Date is within the aforesaid five (5) day period, then Closing shall be extended to the next Business Day following the end of said five (5) day period. If no such election is made, and in any event if the damage is not material, this Agreement shall remain in full force and effect and the purchase contemplated hereby, less any interest taken by eminent domain or condemnation, shall be effected with no further adjustment, and upon the Closing of this purchase, Receiver shall assign, transfer, and set over to Buyer all of the right, title, and interest of Receiver in and to any awards that have been or that may thereafter be made for such taking, and Receiver shall assign, transfer and set over to Buyer any insurance proceeds that may thereafter be made for such damage or destruction giving Buyer a credit at Closing for any deductible under such policies. For the purposes of this paragraph, the phrases "**material damage**" and "**materially damaged**" means damage reasonably estimated by Receiver to have a cost exceeding five percent (5%) of the Purchase Price to repair.

4.5.     ***No Back-Up Offers***.  From and after the Effective Date, so long as this Agreement is in full force and effect and except as may be required by the Court or as part of the Court Approval process, Receiver shall not execute any "back-up" contracts for the sale of the Property or list the property with any broker or otherwise solicit, negotiate or accept any offers to purchase any or all of the Property.

**Article V**
**CLOSING**

5.1.     ***Closing***. The closing, funding, and otherwise consummation of the transactions contemplated hereby (the "**Closing**") shall, subject to the Closing Extension, occur on a mutually agreed date no later than thirty (30) days following the expiration of the Due Diligence Period (the "**Closing Date**"), at the offices of the Title Company. Notwithstanding anything to the contrary herein, both Parties agree any deposit of Additional Earnest Money for a Closing Extension shall be non-refundable to Buyer except as otherwise provided to the contrary in **Sections 1.5** (Court Approval), **3.2** (Title Review and Cure), **4.4** (i.e., casualty/condemnation), **5.2(b)** (i.e., inability to satisfy Buyer's closing conditions), and **8.2** (i.e., a Receiver default).  The Closing shall occur with all deliveries required hereunder being made to Escrow Agent on or before the Closing Date, in accordance with the escrow instructions consistent with the terms and conditions of this Agreement given by or on behalf of Receiver and Buyer, respectively; whereby escrow arrangements mutually acceptable to Receiver and Buyer shall allow Receiver, Buyer and their respective attorneys to consummate the Closing without being physically present and to exchange closing documents through such escrow, via electronic means, and/or .pdf (except with regard to recordable documents or other instruments

10

APP000012

reasonably requested by the Parties to be provided in original "wet ink" form), which shall be physically delivered to the Escrow Agent on or before the Closing Date.

5.2.    ***Conditions to Closing.***

(a)    Receiver's Closing Conditions. The obligation of Receiver to consummate the transactions contemplated hereby is contingent upon the following, any or all of which may be waived by Receiver in its sole discretion:

(i)    Buyer's representations and warranties expressly set forth in this Agreement shall be true and correct in all material respects as of the Effective Date and the Closing Date;

(ii)    As of the Closing Date, Buyer shall have performed and observed, in all material respects, all material obligations, agreements, and covenants expressly set forth in this Agreement and all deliveries to be made at Closing as expressly set forth in this Agreement have been tendered;

(iii)    Buyer shall have timely deposited with Escrow Agent on the Closing Date, the Purchase Price, as adjusted pursuant to and payable in the manner provided for in this Agreement; and

(iv)    Closing can occur hereunder in a manner compliant with orders of the Court, as contemplated in **Section 5.9**.

(b)    Buyer's Closing Conditions. The obligation of Buyer to consummate the transactions contemplated hereby is contingent upon the following, any or all of which may be waived by Buyer in its sole discretion:

(i)    Receiver's representations and warranties expressly set forth in this Agreement shall be true and correct in all material respects as of the Effective Date and the Closing Date;

(ii)    As of the Closing Date, Receiver shall have performed its material obligations expressly set forth in this Agreement and all deliveries to be made at Closing as expressly set forth in this Agreement have been tendered;

(iii)    Closing can occur hereunder in a manner compliant with orders of the Court, as contemplated in **Section 5.9**; and

(iv)    Title Company is prepared to issue, upon the condition and payment of its scheduled premium, a standard form of Texas Land Title Association owner's policy (the "**Title Policy**") as of the date and time of the recording of the Deed, in the amount of the Purchase Price, insuring Buyer as owner of good and indefeasible fee simple title to the Property, subject to the Permitted Exceptions.

So long as a Party is not in default hereunder pursuant to **Article VIII** (in which case, the terms set forth in said **Article VIII** shall apply), if any condition to such Party's obligation to proceed with the Closing hereunder has not been satisfied as of the Closing Date, such Party shall give the other Party written notice of same with at least three (3) Business Days to cure such condition and the Closing Date shall be extended until the next Business Day following the three (3) Business Day cure period provided herein. Thereafter, if any condition to such Party's obligation to proceed with

11

APP000013

the Closing has not been satisfied, such Party may, in its sole discretion, either (i) terminate this Agreement by delivering written notice to the other Party on or before the Closing Date, in which event the Earnest Money less the Independent Consideration shall be paid as follows: (1) to Buyer if Buyer terminates pursuant to Section 5.2(b) herein or 2) to Receiver if Receiver terminates pursuant to Section 5.2(a) herein, or (ii) elect to close without alteration of the Purchase Price, notwithstanding the non-satisfaction of such condition, in which event such Party shall be deemed to have waived any such condition. If such Party elects to close, notwithstanding the nonsatisfaction of such condition, there shall be no liability on the part of the other Party for nonsatisfaction of such condition or for breaches of representations and warranties of which the Party electing to close had knowledge as of the Closing.

5.3.    ***Receiver's Deliveries in Escrow***. Not later than the Closing Date, subject to Buyer's timely and proper satisfaction of the terms and conditions set forth in **Section 5.4** and **Section 5.9** below, Receiver shall deliver in escrow to the Title Company the following:

(a)    Deed. A special warranty deed in the form of **Exhibit B** attached hereto (the "**Deed**"), executed and acknowledged by Receiver, conveying Receiver's title to the Real Property, subject to the Permitted Exceptions.

(b)    Bill of Sale and Assignment of Leases and Contracts. A Bill of Sale and Assignment of Leases and Assumed Service Contracts in the form of **Exhibit C** attached hereto (the "**Assignment**"), executed by Receiver.

(c)    Rent Roll. A current copy of the Rent Roll, true and correct to Receiver's Knowledge as of five (5) days prior to Closing.

(d)    FIRPTA. A non-foreign affidavit sufficient in form and substance to relieve Purchaser of any and all withholding obligations under Section 1445 of the Internal Revenue Code.

(e)    Additional Documents. Any additional documents that Escrow Agent or Title Company may reasonably require for the proper consummation of the transactions contemplated by this Agreement.

5.4.    ***Buyer's Deliveries in Escrow***. Not later than the Closing Date, subject to Receiver's timely and proper satisfaction of the terms and conditions set forth in **Section 5.3** above and **Section 5.9** below, Buyer shall deliver in escrow to the Title Company the following:

(a)    Purchase Price. The Purchase Price, less the Earnest Money deposited by Buyer, plus or minus applicable prorations, deposited by Buyer with the Escrow Agent in immediate, same day federal funds wired for credit into the Title Company's escrow account at a bank satisfactory to Receiver.

(b)    Bill of Sale and Assignment of Leases and Contracts. The Assignment, duly executed by Buyer.

(c)    Additional Documents. Any additional documents that the Title Company may reasonably require for the proper consummation of the transactions contemplated by this Agreement.

5.5.    ***Possession, Lease Files and Assumed Contracts***. Receiver shall deliver possession of the Property to Buyer at the Closing, subject to the Permitted Exceptions. To the extent reasonably available to Receiver,

12

APP000014

Receiver agrees to use commercially reasonable efforts to deliver, or cause to be delivered, originals or copies of the Leases, Assumed Service Contracts, lease files, warranties, guaranties, operating manuals, keys to the Property, most recent rent roll, and books and records regarding the Property at Closing or, if delivery is not possible at Closing, within a reasonable period of time after Closing.

5.6.     ***Notice to Residents***. Receiver and Buyer agree to work together in good faith to deliver to each tenant within a commercially practicable timeframe following Closing, a notice regarding the sale in substantially the form of **Exhibit D** attached hereto, or such other form as may be required by applicable state law.

5.7.     ***Closing Costs***.

(a)      Receiver shall pay on behalf of Goldmark at Closing: (i) the fees of any counsel representing it in connection with this transaction, subject to the provisions of this Agreement in the event a dispute arises under or in connection with this Agreement; (ii) one-half of the Escrow Costs; (iii) prorated Ad Valorem Property taxes; (iv) all Broker Commission pursuant to **Section 6.6** and (v) any other costs, fees, or expenses approved by Receiver under the terms of this Agreement or the settlement statement delivered at Closing.

(b)      Buyer shall pay: (i) the fees of any counsel representing it in connection with this transaction, subject to the provisions of this Agreement in the event a dispute arises under or in connection with this Agreement; (ii) the cost of obtaining a new Survey or updating the Existing Survey and other third party reports relating to the conducting its due diligence review; (iii) the basic premium for the Title Policy and any title endorsements; (iv) the recordation fee for the Deed and any other documents, instruments or agreements to be recorded at Closing (other than curative matters); (v) one-half of the Escrow Costs; (vi) all fees and costs incurred by Buyer's lender; (vii) prorated Ad Valorem Property taxes; and (viii) any other commissions, costs, fees or expenses approved by Buyer under the terms of this Agreement or the settlement statement delivered at Closing.

(c)      Below is a summary of the allocation of Closing costs in this Agreement. In the event of a conflict between this **Section 5.7(c)** and the remainder of this Agreement, the remainder of this Agreement shall control. Any other costs not outlined below shall be the responsibility of the Party as expressly outlined in this Agreement, or if not outlined in the Agreement, of Buyer.

13

APP000015

| Cost | Responsible Party |
|---|---|
| Title Commitment, search, and exam fee for Title Policy | Buyer |
| Premium for standard/basic form of Title Policy | Buyer |
| Premium for any upgrade of Title Policy for extended or additional coverage and any endorsements desired by Buyer, any inspection fee charged by the Title Company, tax certificates, municipal and utility lien certificates, and any other Title Company charges (in each case specifically excluding costs for any exceptions specifically agreed to by Receiver to cure) | Buyer |
| Costs of any update to the Existing Survey commissioned by Buyer, or any new Survey obtained by Buyer | Buyer |
| Costs for UCC searches, Environmental Phase I and all other inspections and reports, site visit(s) of Buyer and Buyer Representatives | Buyer |
| Recording fees for the Deed and any other documents, instruments, or agreements to be recorded at Closing | Buyer |
| Ad Valorem Property Taxes | Prorated as of Closing Date on a calendar year basis |
| Any escrow fee charged by the Escrow Agent for holding the Earnest Money and Additional Earnest Money or conducting the Closing | ½ Buyer ½ Receiver |
| Broker Commission to Broker | Receiver |
| Buyer's Attorney Fees | Buyer |
| Receiver's Attorney Fees | Receiver |

5.8.     *Close of Escrow.* The Title Company shall agree in writing with Receiver and Buyer that (a) recordation of the Deed constitutes its representation that it is holding the closing documents, closing funds, and closing statement and is prepared and irrevocably committed to disburse the closing funds in accordance with the closing statements and (b) release of funds to Receiver shall irrevocably commit it to issue the Title Policy in accordance with this Agreement. Upon satisfaction or completion of the foregoing conditions and deliveries, the Parties shall direct the Title Company to immediately record and deliver the documents described above to the appropriate parties and make disbursements according to the closing statements executed by Receiver and Buyer and in accordance with escrow instructions by each Party consistent with this Agreement.

5.9.     *Court Approval.* Notwithstanding anything to the contrary herein, Buyer acknowledges that the transactions contemplated by this Agreement are expressly subject in all respects to: (a) Court Approval; (b) any applicable order of the Court in the Receivership Action; and (c) compliance with Applicable Laws (defined below).

5.10.     *Obligations of Buyer.* Buyer acknowledges that conveyance of title to the Property may be subject to certain covenants, conditions, and restrictions, all of which shall be disclosed in writing to Buyer not less than ten (10) days prior to the expiration of the Due Diligence Period solely to the extent in Receiver's possession, to the extent Receiver is able to locate such covenants, conditions, and restrictions following a reasonable search, or to the extent readily obtainable or ascertainable from the Property's property management company. Buyer covenants and agrees to continue to reasonably cooperate in good faith with Receiver (at no cost to Buyer) to execute, deliver, and record (if necessary) such documents required with respect to such covenants, conditions, and restrictions, which such obligation shall survive Closing.

## Article VI
### PRORATIONS; PAYMENTS AT CLOSING

14

6.1.    *Prorations*. The day of Closing shall belong to Buyer and all prorations hereinafter provided to be made as of the Closing shall each be made as of the end of the day before the Closing. In each such proration set forth below, the portion thereof applicable to periods beginning as of Closing shall be credited or charged to Buyer and the portion thereof applicable to periods ending as of Closing shall be credited or charged to Receiver.

(a)    Taxes and Assessments.

(i)    General real estate taxes and assessments imposed by governmental authority and any assessments imposed by private covenant constituting a lien or charge on the Property for the then current calendar year or other current tax period (collectively, "**Taxes**") not yet due and payable shall be prorated. If the Closing occurs prior to the receipt by Receiver of the tax bill for the calendar year or other applicable tax period in which the Closing occurs, Buyer and Receiver shall prorate Taxes for such calendar year or other applicable tax period based upon one hundred twenty percent (120%) of the most recent ascertainable assessed values and tax rates.

(ii)    Any refund or rebate of Taxes resulting from a tax protest, challenge, or appeal (an "**Appeal**") for a tax year ending prior to the Closing Date shall belong to Receiver, whether received before or after Closing, and Receiver shall have the sole authority to prosecute such Appeals. Any refund or rebate of Taxes resulting from an Appeal for the tax year in which the Closing Date occurs shall belong to Buyer, and Buyer shall have the sole authority to prosecute such appeals.

(iii)    If this sale or a change in use of the Property or denial of any special use valuation of the Property after the Closing would result in the assessment after the Closing of additional taxes and interest applicable to the period of time before the Closing (the "**Rollback Taxes**"), then Buyer shall be responsible for payment of all Rollback Taxes.

(b)    Collected Rent; Tenant Receivables. All collected rent and other collected income (and any applicable state or local tax on rent) under Leases in effect on the Closing Date shall be prorated. Receiver agrees to deliver to Buyer at Closing any rent and other income collected by Receiver (both before and after) Closing, but applicable to any period of time after Closing. Any rents from tenants received by Buyer after the Closing Date that are in excess of amounts then outstanding to Buyer shall be retained by Buyer as Receiver's accounts receivables being sold to Buyer hereunder. Receiver makes no representations or warranties as to the current status or collectability of the accounts receivable as of Closing, but agrees to use its commercially reasonable efforts, where appropriate, to provide Buyer with any relevant information or documentation reasonably available to Receiver as requested by Buyer.  The terms of this paragraph shall survive Closing.

(c)    Utilities. Utilities, including water, sewer, electric, and gas, based upon the last reading of meters prior to the Closing shall be prorated. Receiver shall use commercially reasonable efforts to obtain meter readings within the five (5) Business Day period before the Closing Date, and if such readings are obtained, there shall be no proration of such items. Receiver shall pay at Closing the bills therefore for the period preceding the Closing, and Buyer shall pay the bills therefore for the period subsequent thereto. If the utility company will not issue separate bills, or Receiver is unable to obtain same, Buyer will receive a credit against the Purchase Price for Receiver's portion and will pay the entire bill prior to delinquency after Closing. If Receiver has paid any utilities no more than thirty (30) days in advance in the ordinary course of business, then Buyer shall be charged its portion of such payment at Closing. Recoveries from the reimbursement of utility expenses collected by Buyer or Receiver (or a third-party service provider) shall be prorated based upon, and shall relate back to, the months in which the billed expenses were incurred. Buyer shall be

15

responsible for the payment of all deposits necessary to continue utility services for the period beginning on the Closing Date, and Receiver shall be entitled to apply for return of any deposits that Receiver had paid to such utility companies.

(d)    Fees and Charges under Assumed Service Contracts, Licenses and Permits. Fees and charges under the Assumed Service Contracts, licenses, and permits as are being assigned to and assumed by Buyer at the Closing shall be prorated on the basis of the periods to which such Assumed Service Contracts, licenses and permits relate.

(e)    Nonrefundable Deposits, Fees, Upfront Payments, and Prepaid Amounts. Nonrefundable deposits, fees and upfront payments, bonuses, door fees, and prepaid amounts received by Receiver under laundry, telecommunications, cable, internet and other similar leases and concessions shall not be prorated at Closing, it being the agreement of Receiver and Buyer that Receiver shall have the right to keep all of the same.

6.2.    **Final Adjustments**. The Parties agree to use good faith efforts to make final prorations as of the Closing Date. The Parties agree there will be no final adjustments after the Closing except as specifically set forth in **Section 6.1**.

6.3.    **Service Contracts**. Buyer will assume the obligations arising from and after the Closing Date under the Assumed Service Contracts.

6.4.    **Tenant Deposits**. All refundable tenant security deposits, pet deposits and similar deposits from tenants that are in Receiver's possession (which are to be reflected on a rent roll delivered to Buyer), together with interest thereon if required by law or contract to be earned thereon, and not theretofore applied to tenant obligations under the Leases, shall be credited to Buyer at Closing. As of the Closing, Buyer shall assume Receiver's obligations related to tenant security deposits under the applicable lease agreements and applicable law, and to the extent such deposits were accounted in this proration between the Parties at Closing.

6.5.    **Utility Deposits**. Buyer shall be responsible for making any deposits required with utility companies or, if elected by Receiver, crediting to Receiver at Closing the amount of such deposits in which case Receiver shall assign to Buyer at Closing its rights to same.

6.6.    **Broker Commissions**. Upon the Closing of the transaction contemplated in this Agreement, Receiver shall pay to Walker & Dunlop Investment Sales, LLC, a Texas limited liability company (Attn: Jeff Price) ("**Broker**") a commission ("**Broker's Commission**") pursuant to the terms of a separate written agreement between Receiver and Broker. If Closing does not occur for any reason, then Receiver shall not owe or be obligated to pay Broker's Commission. Under no circumstances shall Receiver or Buyer owe a commission, fee, or other compensation to any other broker, agent, finder, or person. Buyer and Receiver each hereby represent and warrant to the other that, other than Broker's Commission payable to Broker by Receiver, no other brokers, agents, finder's fees, or commissions are due or arising in connection with Buyer or Receiver entering into this Agreement or the consummation of transactions contemplated herein, and each Party hereby agrees to indemnify, defend and hold the other harmless from and against all Claims arising from such warranties whether or not such Claim is meritorious, for any compensation with respect to the entering into of this Agreement, the sale and purchase of the Property, or the consummation of transactions contemplated herein. The provisions of this Section shall survive Closing or earlier termination of this Agreement.

16

APP000018

## Article VII
### REPRESENTATIONS AND WARRANTIES

7.1.    ***Receiver's Representations and Warranties.*** As a material inducement to Buyer to enter into this Agreement and consummate this transaction, Receiver represents and warrants to Buyer the following are true and correct as of the date hereof, and shall be materially true and correct as of Closing:

    (a)    Receiver has been duly appointed by the Court pursuant to the Receivership Order and, as of the Closing Date and subject to the conditions set forth in Section 5.9 herein, (i) Receiver shall have full authority and right, and shall have received all consents required, to consummate the transactions described herein, and (ii) this Agreement shall be a valid and binding obligation of Receiver, enforceable in accordance with its terms.

    (b)    Receiver's obligations under this Agreement, and the transactions contemplated by this Agreement, are expressly subject to the approval of the Court and will be consummated only pursuant to a Confirmation of Sale to be entered in the Receivership Action.

    (c)    To Receiver's Knowledge, other than matters before the Court in this receivership that Receiver has notified Purchaser , there is no action, investigation, or similar proceeding materially affecting Receiver's rights to enter into this Agreement.

    (d)    To Receiver's Knowledge, there is no written notice of any pending or threatened condemnation or eminent domain proceedings against the Property.

    (e)    To Receiver's Knowledge, the rent roll delivered to Buyer pursuant to Section 2.1 is true, correct and complete in all material respects.

As used in this **Section 7.1**, the phrases "**to Receiver's Knowledge**" and "**Knowledge**" shall mean the current, actual knowledge of Receiver gained through his receivership of the Property.

Buyer acknowledges that, by virtue of Receiver's limited knowledge and involvement in managing the Property, Receiver's Knowledge is limited.  Receiver shall have no duty to make an independent investigation or inquiry as to the truthfulness of his representations and warranties. Notwithstanding the foregoing, Receiver has made a reasonable inquiry of the Property's property manager as to the truthfulness of the above representations and warranties.

Unless otherwise stated to the contrary, each of Receiver's representations and warranties in this Agreement shall be true and correct in all material respects as of the date of Closing and shall survive Closing for a period of twelve (12) months.

7.2.    ***Buyer's Representations and Warranties***. As a material inducement to Receiver to execute this Agreement and consummate this transaction, Buyer represents and warrants to Receiver that the following shall be materially true and correct as of Closing:

    (a)    <u>Organization and Authority</u>. Buyer has been duly organized and is validly existing as a limited liability company in good standing in the state in which it has been incorporated, and is (or will at closing) be qualified to do business in the state in which the Property is located (to the extent Buyer is not organized in such state). Buyer has the full right and authority and has obtained any and all consents required to enter into this Agreement and to consummate or cause to be consummated the transactions contemplated hereby. This Agreement has been, and all of the

17

APP000019

documents to be delivered by Buyer at the Closing will be, authorized and properly executed and constitutes, or will constitute, as appropriate, the valid and binding obligation of Buyer, enforceable in accordance with their terms.

(b)     Conflicts and Pending Action. There is no agreement to which Buyer is a party or to Buyer's knowledge binding on Buyer which is in conflict with this Agreement. There is no action or proceeding pending or, to Buyer's knowledge, threatened against Buyer which challenges or impairs Buyer's ability to execute or perform its obligations under this Agreement. The execution and delivery of this Agreement and the consummation by Buyer of the transactions contemplated by this Agreement will not (i) conflict with or result in a breach of or default under any of the terms, conditions, or provisions of any note, bond, mortgage, indenture, license, agreement, or other instrument or obligation to which Buyer is a party, or (ii) violate any order, injunction, decree, statute, rule, or regulation applicable to Buyer.

(c)     Intentionally Deleted.

(d)     ERISA. Buyer is not: (i) a plan which is subject to Title I of the Employee Retirement Income Security Act of 1974, as amended ("**ERISA**"), as defined in Section 3(3) of ERISA, nor a plan as defined in Section 4975I(1) of the Internal Revenue Code of 1986, as amended (each of the foregoing hereinafter referred to collectively as a "**Plan**"); or (ii) a "governmental plan" as defined in Section 3(32) of ERISA. Buyer is acting on its own behalf and not on account of or for the benefit of any Plan. Buyer shall not transfer the Property to any entity, person or Plan which will cause a violation of ERISA. Buyer shall not assign its interest under this Agreement to any entity, person, or Plan which, if the assignee acquires the Property, will cause a violation of ERISA.

(e)     Bankruptcy. Buyer has not (i) commenced a voluntary case, or had entered against it a petition, for relief under any federal bankruptcy act or any similar petition, order or decree under any federal or state law or statute relative to bankruptcy, insolvency or other relief for debtors, (ii) caused, suffered or consented to the appointment of a receiver, trustee, administrator, conservator, liquidator or similar official in any federal, state or foreign judicial or non-judicial proceeding, to hold, administer and/or liquidate all or substantially all of its property, or (iii) made an assignment for the benefit of creditors.

(f)     Patriot Act. Buyer is in compliance with all applicable anti-money laundering and anti-terrorist laws, regulations, rules, executive orders and government guidance, including the reporting, record keeping and compliance requirements of the Patriot Act and other authorizing statutes, executive orders and regulations administered by OFAC, and related Securities and Exchange Commission, SRO or other agency rules and regulations, and has policies, procedures, internal controls and systems that are reasonably designed to ensure such compliance.

(g)     OFAC. Neither (i) Buyer, any Affiliate of Buyer, nor any Person controlled by Buyer; nor (ii) to the best of Buyer's knowledge, after making due inquiry, any Person who owns a controlling interest in or otherwise controls Buyer; nor (iii) to the best of Buyer's knowledge, after making due inquiry, if Buyer is a privately held entity, any Person otherwise having a direct or indirect beneficial interest (other than with respect to an interest in a publicly traded entity) in Buyer; nor (iv) any Person for whom Buyer is acting as agent or nominee in connection with this investment, is a country, territory, Person, organization, or entity named on an OFAC List, nor is a prohibited country, territory, Person, organization, or entity under any economic sanctions program administered or maintained by OFAC.

18

APP000020

(h)     Return of Information. Should this Agreement terminate prior to the Closing Date, Buyer shall, at its sole cost and expense, upon written request, immediately (i) return or cause to be returned to Receiver all copies of any information or documents received from Receiver and any other Receiver Parties in hard copy form, and (ii) delete from its computer and other electronic storage devices any information or documents received from Receiver and any other Receiver Parties received from Receiver electronically.

(i)     No Agency. Before Closing, Buyer agrees not to solicit, negotiate, or enter into any document, agreement or instrument that is binding upon Receiver or Receiver's interest in the Property, or the Property, or any portion thereof.

(j)     ADA/FHA Disclosure. Buyer acknowledges that the Property may be subject to the federal Americans With Disabilities Act (the "**ADA**") and the federal Fair Housing Act (the "**FHA**"). The ADA requires, among other matters, that tenants and/or owners of "public accommodations" remove barriers in order to make the Property accessible to disabled persons and provide auxiliary aids and services for hearing, vision or speech impaired persons. Receiver makes no warranty, representation or guarantee of any type or kind with respect to the Property 's compliance with the ADA or the FHA (or any similar state or local law), and Receiver expressly disclaims any such representation. Buyer acknowledges that it is solely responsible for determining whether the Property complies with the ADA and the FHA. The provisions of this Section shall survive indefinitely the Closing or earlier termination of this Agreement and shall not be merged into the Deed or other closing documents.

(k)     Sophisticated Buyer. Buyer is and will at Closing be comprised of principals who are sophisticated and experienced buyers of commercial properties and have participated in and are familiar with the acquisition, development, redevelopment, ownership, management, and operation of real estate projects similar to the Property.

Unless otherwise stated to the contrary, each of Buyer's representations and warranties in this Agreement shall be true and correct in all material respects as of the date of Closing and shall survive Closing for a period of twelve (12) months.

### Article VIII
### DEFAULT AND DAMAGES

8.1.    *Default by Buyer.* If Buyer shall default in its obligation to close or any other material pre-Closing obligation hereunder (for the avoidance of doubt, Receiver's failure to satisfy (or Buyer's failure to waive) a condition to close in **Section 5.2(b)** shall not be deemed a Buyer default), or if at Closing any one or more of Buyer's representations or warranties are not materially correct, and such default was not caused by a prior default by Receiver hereunder, Buyer agrees that Receiver shall have the right, as Receiver's sole and exclusive remedy, to (a) waive such failure or breach and proceed to Closing without reduction in Purchase Price; or (b) terminate this Agreement and to have the Escrow Agent deliver the Earnest Money deposited by Buyer, to Receiver as liquidated damages to recompense Receiver for time spent, labor and services performed, and the loss of Receiver's bargain. Buyer and Receiver agree that it would be impracticable or extremely difficult to affix damages if Buyer so defaults and that the disbursement to Receiver of the Earnest Money deposited by Buyer represents a reasonable estimate of Receiver's damages. Receiver agrees to accept such deposits and fees as Receiver's total damages and relief hereunder if Buyer defaults in its obligation to close or any other material pre-Closing obligation hereunder, Receiver waiving all other rights and remedies for a default set forth in this **Section 8.1**. In addition to the foregoing rights of Receiver, Receiver shall retain the right to pursue against Buyer any Claim for any indemnification obligation of Buyer set forth in this Agreement.

APP000021

8.2.    ***Default by Receiver.*** If Receiver defaults in its obligation to sell and convey the Property to Buyer pursuant to this Agreement or in any other material pre-Closing obligation hereunder, or if at Closing any one or more of Receiver's representations or warranties are not materially correct, and such default was not caused by a prior default by Buyer hereunder or not a permitted termination of this Agreement, Buyer's sole and exclusive remedy shall be to elect one of the following:

(a)    to terminate this Agreement, in which event Buyer shall be entitled to the return by the Escrow Agent to Buyer of the Earnest Money deposited by Buyer, less the Independent Consideration; or

(b)    to commence an action for specific performance, provided, however that if specific performance is unavailable, Buyer shall be entitled to all exercise any and all remedies available at law or in equity; or

(c)    to waive such failure or breach and proceed to Closing without any reduction in the Purchase Price.

8.3.    ***Notice of Default.*** Except for a Party's failure to close on the Closing Date (for which the cure period shall be one (1) Business Day), neither Party shall have the right to declare a default by the other Party or terminate this Agreement because of a failure by such other Party to perform under the terms of this Agreement, unless the other Party shall fail to cure such failure to perform within five (5) Business Days after its receipt of written notice of such failure to perform.

**Article IX**
**EARNEST MONEY PROVISIONS**

9.1.    ***Earnest Money account.*** The Escrow Agent shall deposit the Earnest Money in government insured account(s).

9.2.    ***Contract Terminations.*** Upon a termination of this Agreement pursuant to the terms of the Agreement, either Party (the "**Terminating Party**") may give written notice to the Escrow Agent and the other Party (the "**Non-Terminating Party**") of such termination and the reason for such termination. Such request shall also designate who the Terminating Party believes is entitled to the Earnest Money deposited by Buyer. The Non-Terminating Party shall then have five (5) Business Days within which to object in writing to the release of the Earnest Money deposited by Buyer to the Terminating Party, if applicable. If the non-Terminating Party provides such an objection, then the Escrow Agent shall retain the Earnest Money deposited by Buyer until it receives written instructions executed by both Receiver and Buyer as to the disposition and disbursement of the Earnest Money deposited by Buyer, or until ordered by final court order, decree or judgment, which is not subject to appeal, to deliver the Earnest Money deposited by Buyer to a particular party, in which event the Earnest Money deposited by Buyer shall be delivered in accordance with such instructions, order, decree or judgment.

9.3.    ***Interpleader.*** Receiver and Buyer mutually agree that if any controversy regarding the Earnest Money deposited by Buyer, unless mutual written instructions are received by the Escrow Agent directing the disposition of the Earnest Money deposited by Buyer, the Escrow Agent shall not take any action, but instead shall await the disposition of any proceeding relating to the Earnest Money deposited by Buyer or, at the Escrow Agent's option, the Escrow Agent may interplead all Parties and deposit the Earnest Money deposited by Buyer with a court of competent jurisdiction in which event the Escrow Agent may recover all of its court costs and reasonable attorneys' fees. Receiver or Buyer, whichever loses in any such

20

APP000022

interpleader action, shall be solely obligated to pay such costs and fees of the Escrow Agent, as well as the reasonable attorneys' fees of the prevailing Party in accordance with the other provisions of this Agreement.

9.4.    *Liability of Escrow Agent.* The Parties acknowledge that the Escrow Agent is acting solely as a stakeholder at their request and for their convenience, that the Escrow Agent shall not be deemed to be the agent of either of the Parties, and that the Escrow Agent shall not be liable to either of the Parties for any action or omission on its part taken or made in good faith, and not in disregard of this Agreement, but shall be liable for its negligent acts and for any loss, cost or expense incurred by Receiver or Buyer resulting from the Escrow Agent's mistake of law respecting the Escrow Agent's scope or nature of its duties. Receiver and Buyer shall jointly and severally indemnify and hold the Escrow Agent harmless from and against all costs, claims and expenses, including reasonable attorneys' fees, incurred in connection with the performance of the Escrow Agent's duties hereunder, except with respect to actions or omissions taken or made by the Escrow Agent in bad faith, in disregard of this Agreement or involving negligence on the part of the Escrow Agent.

9.5.    *Failure to Satisfy Closing Conditions.* Notwithstanding anything contained herein to the contrary, if this Agreement fails to close under this Agreement due to the failure of a Party to satisfy its respective conditions to Closing described in **Section 5.2(a)** or **(b)**, as applicable, then the remaining provisions of **Section 5.2** shall apply in full for resolution of such Party's failure to satisfy conditions to Closing, which shall specifically include distribution of Earnest Money.

### Article X
### DISCLAIMERS AND WAIVERS

10.1.    *Certain Definitions.* The following terms shall have the definitions indicated below:

(a)    "**Environmental Law**" shall mean any federal, state, or local laws, ordinances, permits, or regulations, or any common law, regarding health, safety, radioactive materials, or the environment, including, but not limited to, the following federal statutes: Clean Air Act (42 U.S.C. § 7401 et seq.) ("**CAA**"), Clean Water Act (42 U.S.C. § 1251 et seq.) ("**CWA**"), Resource Conservation and Recovery Act (42 U.S.C. § 6901 et seq.) ("**RCRA**"), Comprehensive Environmental Response, Compensation, and Liability Act (42 U.S.C. § 9601 et seq.) ("**CERCLA**"), Emergency Planning and Community Right-to-Know Act (42 U.S.C. § 11001 et seq.) ("**EPCRA**"), Safe Drinking Water Act (42 U.S.C. § 300f et seq.) ("**SDWA**"), Toxic Substances Control Act (15 U.S.C. § 2601 et seq.) ("**TSCA**"), Endangered Species Act of 1973 (16 U.S.C. § 1531 et seq.) ("**ESA**"), Federal Insecticide, Fungicide and Rodenticide Act (7 U.S.C. § 136 et seq.) ("**FIFRA**"), and the Occupational Safety and Health Act (29 U.S.C. § 651 et seq.) ("**OSHA**"), each as amended, and any regulations promulgated thereunder, guidance and directives issued with respect thereto, or policies adopted by authority thereunder.

(b)    "**Environmental Matter**" shall mean any of the following: (i) the Release of any Hazardous Material on or at the Property or any other property; (ii) the migration of any Hazardous Material onto or from the Property; (iii) the environmental, health, or safety aspects of the transportation, storage, treatment, handling, use, or Release, whether any of the foregoing occurs on or off the Property, of Hazardous Materials in connection with the operations or past operations of the Property; (iv) the violation, or alleged violation, of any Environmental Law, order, permit, or license of or from any governmental authority, agency, or court relating to environmental, health, or safety matters; (v) the presence of any underground storage tanks within the confines of the Property; (vi) the presence of wetlands within the confines of the Property; (vii) the presence of any endangered species on, in, or around the Property; or (viii) the characterization of the Property as historical in nature in any way.

21

APP000023

(c)     "**Hazardous Material**" shall mean: (i) any radioactive materials; (ii) any substance or material the transportation, storage, treatment, handling, use, removal, or Release of which is subject to any Environmental Law; or (iii) any substance or material for which standards of conduct are imposed under any Environmental Law. Without limiting the generality of the foregoing, "Hazardous Materials" shall include: asbestos and asbestos-containing materials (whether or not friable); urea-formaldehyde in any of its forms; polychlorinated biphenyls; oil; used oil; petroleum products and their by-products; lead based paint; radon; and any substances defined as "hazardous waste", "hazardous substances", "pollutants or contaminants", "toxic substances", "hazardous chemical", "hazardous air pollutants", or "toxic chemical" under the CAA, CWA, RCRA, CERCLA, EPCRA, SDWA, TSCA, or OSHA, or any other Environmental Law.

(d)     "**Release**" shall mean the discharge, disposal, deposit, injection, dumping, spilling, leaking, leaching, placing, presence, pumping, pouring, emitting, emptying, escaping, or other release of any Hazardous Material.

10.2.   *Disclaimer of Warranties.*

(a)     Buyer acknowledges that Receiver has acquired the rights and obligations to sell the Property due solely to the Receivership Action, and consequently Receiver has little or no knowledge of the condition of the Property and the surrounding areas. ACCORDINGLY, BUYER ACKNOWLEDGES AND AGREES THAT BUYER IS PURCHASING THE PROPERTY "AS-IS", "WHERE-IS", AND "WITH ALL FAULTS" AS OF THE EFFECTIVE DATE AND AS OF THE CLOSING DATE, BASED EXCLUSIVELY ON ITS OWN EXPERTISE AND THAT OF ITS CONSULTANTS AND OR ITS OWN INVESTIGATIONS AND EXAMINATIONS, AND BUYER FURTHER ACKNOWLEDGES AND AGREES THAT RECEIVER HEREBY EXPRESSLY DISCLAIMS ANY AND ALL IMPLIED WARRANTIES CONCERNING THE CONDITION OF THE PROPERTY AND ANY PORTIONS THEREOF, INCLUDING, BUT NOT LIMITED TO, THE IMPLIED WARRANTIES OF HABITABILITY, MERCHANTABILITY, OR FITNESS FOR A PARTICULAR PURPOSE. BUYER FURTHER ACKNOWLEDGES AND AGREES THAT BUYER WILL INSPECT THE PROPERTY AND BUYER WILL RELY SOLELY ON ITS OWN INVESTIGATION AND INSPECTIONS OF THE PROPERTY IN ITS ACQUISITION THEREOF. RECEIVER SHALL HAVE NO OBLIGATION HEREUNDER TO ALTER, REPAIR, OR IMPROVE THE PROPERTY UNLESS SPECIFICALLY SET FORTH IN THIS AGREEMENT.

(b)     Buyer further agrees that Buyer will not rely upon any: (i) representations or warranties (oral or written) made by, or purportedly on behalf of, Receiver unless expressly set forth in this Agreement, or (ii) documents or other information (oral or written) supplied by, or purportedly on behalf of, Receiver. BUYER ACKNOWLEDGES THAT, EXCEPT CONTAINED HEREIN, RECEIVER HAS NOT MADE AND HEREBY SPECIFICALLY NEGATES AND DISCLAIMS ANY WARRANTY, REPRESENTATION, COVENANT, AGREEMENT, OR GUARANTEE OF ANY KIND OR CHARACTER, WHETHER EXPRESS, IMPLIED, STATUTORY, WRITTEN, ORAL, PAST, PRESENT, OR FUTURE, OF, AS TO, CONCERNING, OR WITH RESPECT TO ANY MATTER PERTAINING TO THE PROPERTY, INCLUDING, WITHOUT LIMITATION, THE VALUE OF THE PROPERTY, INCOME TO BE DERIVED FROM THE PROPERTY, SUITABILITY OF THE PROPERTY, HABITABILITY, MERCHANTABILITY, MARKETABILITY, PROFITABILITY, OR FITNESS FOR A PARTICULAR PURPOSE, THE MANNER, STATE OF REPAIR, OR LACK OF REPAIR OF THE PROPERTY, THE NATURE, QUALITY, OR CONDITION OF THE PROPERTY (INCLUDING WATER, WATER RIGHTS, SOIL, OR GEOLOGICAL), COMPLIANCE OF THE PROPERTY OR THE OPERATION ON THE PROPERTY WITH ANY CODES, LAWS, RULES, ORDINANCES, OR REGULATIONS, THE NATURE, MANNER, OR QUALITY OF CONSTRUCTION OR MATERIALS INCORPORATED INTO THE PROPERTY, THE DESIGN OF THE PROPERTY, AND COMPLIANCE WITH APPLICABLE LAWS, INCLUDING HEALTH, SAFETY, AND

22

LAND USE LAWS. BUYER FURTHER ACKNOWLEDGES AND AGREES THAT ANY DOCUMENTS OR INFORMATION PROVIDED TO BUYER BY RECEIVER, A RECEIVER PARTY, ON RECEIVER'S BEHALF, OR PURPORTEDLY ON BEHALF OF RECEIVER, HAVE BEEN OBTAINED FROM A VARIETY OF SOURCES, HAVE NOT BEEN INDEPENDENTLY INVESTIGATED OR VERIFIED BY RECEIVER, AND ARE NOT TO BE RELIED UPON BY BUYER IN ENTERING INTO THIS AGREEMENT OR PURCHASING THE PROPERTY. OTHER THAN AS CONTAINED HEREIN, RECEIVER MAKES NO EXPRESS REPRESENTATIONS OR WARRANTIES, AND DISCLAIMS ANY AND ALL IMPLIED WARRANTIES, CONCERNING THE TRUTH, ACCURACY, AND COMPLETENESS OF ANY DOCUMENTS OR INFORMATION SUPPLIED TO BUYER BY RECEIVER, ANY RECEIVER PARTY, OR ANYONE ACTING OR PURPORTING TO ACT ON RECEIVER'S BEHALF.

(c)    EXCEPT TO THE EXTENT EXPRESSLY PROVIDED IN THIS AGREEMENT, RECEIVER MAKES NO REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, CONCERNING ANY MATTERS INVOLVING THE PROPERTY. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, RECEIVER HEREBY AFFIRMATIVELY DISCLAIMS ANY EXPRESS OR IMPLIED REPRESENTATIONS OR WARRANTIES CONCERNING ANY OF THE FOLLOWING MATTERS:

(i)    EXCEPT AS EXPRESSLY SET FORTH IN THE DEED, ANY MATTERS AFFECTING TITLE TO THE PROPERTY;

(ii)    THE COMPLIANCE OF THE PROPERTY OR ANY PORTION THEREOF WITH ANY AND ALL APPLICABLE FEDERAL, STATE, AND LOCAL LAWS, ORDINANCES, PERMITS, RULES, REGULATIONS, OR REQUIREMENTS, INCLUDING, BUT NOT LIMITED TO, ENVIRONMENTAL LAWS;

(iii)    THE SUITABILITY OR APPROPRIATENESS OF THE PROPERTY OR ANY PORTION THEREOF FOR FUTURE DEVELOPMENT OR RENOVATION OR FOR THE CONDUCT OF ANY USES OR ACTIVITIES THAT BUYER MAY ELECT TO CONDUCT THEREON;

(iv)    THE CONDITION OF THE PROPERTY OR ANY PORTION THEREOF;

(v)    THE EXISTENCE, QUALITY, NATURE, ADEQUACY, OR PHYSICAL CONDITION OF ANY UTILITIES SERVING THE PROPERTY; OR

(vi)    THE PRESENCE OR ABSENCE OF ANY HAZARDOUS MATERIALS OR ENVIRONMENTAL MATTERS.

10.3.    *Waiver and Release of Liability.*

(a)    BUYER, FOR ITSELF AND ITS HEIRS, SUCCESSORS, AND ASSIGNS AND ANYONE ELSE CLAIMING BY, THROUGH, OR UNDER BUYER, HEREBY EXPRESSLY WAIVES THE CLAIMS DESCRIBED BELOW IN THIS SECTION 10.3 (WHETHER OR NOT SUCH CLAIMS ARE KNOWN OR DISCOVERABLE AS OF THE EFFECTIVE DATE), AND RELEASES THE RECEIVER PARTIES FROM ANY AND ALL LIABILITY BASED IN WHOLE OR IN PART UPON ANY SUCH CLAIMS BASED UPON ANY OF THE MATTERS SET FORTH IN SECTION 10.2 ABOVE.

(b)    Notwithstanding the intent of the Parties hereto that the waiver and release provisions contained in **Section 10.3(a)** above bar all claims by Buyer and Buyer's heirs, successors, and assigns and anyone else claiming by, through, or under Buyer, should a court of competent jurisdiction deem otherwise, Buyer hereby agrees that the presence of the waiver and release

23

APP000025

provisions in **Section 10.3(a)** should serve as the overwhelming, primary factor in any equitable apportionment of costs under applicable federal, state, or local laws, ordinances, or regulations.

(c)    Buyer acknowledges and agrees that the waiver and release provisions contained in this **Section 10.3** are each reasonable and acceptable to Buyer and an essential component of the consideration for the sale of the Property hereunder and Receiver would not otherwise sell the Property without such provisions.

(d)    Buyer acknowledges and agrees that Buyer's sole recourse for claims of the nature described in this Article X shall be to or against parties other than Receiver Parties and that economic recovery may not be possible against some or all of such parties.

(e)    Notwithstanding anything to the contrary, each of the provisions of this Article X shall survive Closing and the execution and delivery of the Deed by Receiver and shall not be merged therein.

**Article XI**
**MISCELLANEOUS**

11.1.    *Parties Bound.* Except for an assignment pursuant to **Section 11.2**, neither Party may assign this Agreement without the prior written consent of the other Party, and any such prohibited assignment shall be void. No assignment permitted under this Agreement shall relieve the assigning Party of any liability hereunder, whether arising before or after the date of such assignment, unless expressly agreed upon herein. Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the respective legal representatives, successors, assigns, heirs, and devisees of the Parties.

11.2.    *Assignment.*

(a)    At any time prior to Closing, Buyer shall be permitted to assign this Agreement and the Earnest Money deposited by Buyer, and the rights of Buyer in connection therewith, to a Buyer's Affiliate upon written notice to Receiver. "**Buyer's Affiliate**" means (i) any entity that directly or indirectly controls, is controlled by or is under common control with Buyer, or (ii) any entity at least a majority of whose economic interest is owned by Buyer; and the term "control" means the power to direct the management of such entity through voting rights, ownership, or contractual obligations. Notwithstanding the foregoing, no entity in which Timothy Barton has any direct or indirect ownership interest shall be deemed a Buyer's Affiliate.  If Buyer assigns this Agreement, Buyer agrees to deliver a fully executed assignment of this Agreement and assumption by the assignee of Buyer's obligations hereunder. Any such assignment must include the assignee's tax identification number. Any assignee of Buyer's interest in this Agreement shall be bound by all approvals and waivers, actual and deemed, by the original Buyer prior to the assignment. The original Buyer shall not be released of any duties, obligations, or liability for any Claims arising under the terms of this Agreement. Notwithstanding anything to the contrary herein, in no event shall Buyer's Affiliate or any assignee of Buyer include any entity owned, in whole or in part, or under control of, Receiver or any defendant of the Receivership Action.

(b)    Receiver (at its sole cost) may transfer and convey the Property, and otherwise assign, transfer and delegate its rights, duties and obligations under this Agreement and any post-Closing agreement to any Receiver Parties without Buyer's consent; provided, however, Receiver shall not be released of any duties, obligations or liabilities for any Claims arising under the terms of this Agreement which are not expressly assumed by Receiver's assignee. Upon such transfer, assignment and conveyance, the original Receiver shall be immediately released of any and all

24

duties, obligations, and liability for any Claims arising under the terms of this Agreement and any post-Closing agreements (or otherwise) which are expressly assumed by Receiver's assignee, and all references in this Agreement and any post-Closing agreement to Receiver shall thereafter mean and refer to Receiver's assignee, to the extent the context requires. The Parties hereto agree that all representations, warranties, covenants, and indemnifications shall inure to the benefit of any permitted assignee of Buyer and Receiver, as applicable.

11.3.    *Headings*. The article and paragraph headings of this Agreement are for convenience only and in no way limit or enlarge the scope or meaning of the language hereof.

11.4.    *Exhibits and Schedules*. All exhibits and schedules annexed hereto are a part of this Agreement for all purposes.

11.5.    *Invalidity and Waiver*. If any portion of this Agreement is held invalid or inoperative, then so far as is reasonable and possible the remainder of this Agreement shall be deemed valid and operative, and effect shall be given to the intent manifested by the portion held invalid or inoperative. The failure by either Party to enforce against the other any term or provision of this Agreement shall not be deemed to be a waiver of such Party's right to enforce against the other Party the same or any other such term or provision in the future.

11.6.    *Jurisdiction and Venue*. **BUYER AND RECEIVER AGREE THAT ANY SUIT, ACTION, COUNTERACTION OR PROCEEDING ARISING OUT OF THE SUBJECT MATTER HEREOF (EACH, A "<u>PROCEEDING</u>"), SHALL BE INSTITUTED IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION (THE "<u>ACCEPTABLE FORUM</u>"). BUYER AND RECEIVER AGREE THAT THE ACCEPTABLE FORUM IS CONVENIENT TO THEM; IRREVOCABLY SUBMIT TO THE JURISDICTION OF THE ACCEPTABLE FORUM; AND WAIVE ANY AND ALL OBJECTIONS TO JURISDICTION OR VENUE THAT THEY MAY HAVE UNDER THE LAWS OF THE STATE WHERE THE PROPERTY IS LOCATED OR OTHERWISE IN THOSE COURTS IN ANY PROCEEDING. SHOULD ANY PROCEEDING BE INITIATED IN ANY OTHER FORUM BY RECEIVER OR BUYER, THE INITIATING PARTY WAIVES ANY RIGHT TO OPPOSE ANY MOTION OR APPLICATION MADE BY THE OTHER PARTY TO TRANSFER VENUE, DISMISS OR SEEK OTHER APPROPRIATE RELIEF AS A CONSEQUENCE OF SUCH PROCEEDING HAVING BEEN COMMENCED IN A FORUM OTHER THAN AN ACCEPTABLE FORUM.**

11.7.    *Governing Law*. This Agreement shall in all respects be solely governed by, and construed in accordance with, the substantive federal laws of the United States (expressly including 28 U.S. Code § 2001 and § 2002, as applicable) and the laws of the State of Texas (collectively the "<u>**Applicable Laws**</u>").

11.8.    *No Third-Party Beneficiary*. This Agreement is not intended to give or confer any benefits, rights, privileges, claims, actions, or remedies to any person or entity as a third-party beneficiary, whether by decree or otherwise.

11.9.    *Entirety and Amendments*. This Agreement embodies the entire agreement between the Parties and supersedes all prior agreements and understandings, oral or written, relating to the Property. This Agreement may be amended or supplemented only by an instrument in writing executed by the Party against whom enforcement is sought.

11.10.    *Time*. Time is of the essence in the performance of this Agreement.

25

APP000027

11.11. *Attorneys' Fees*. In the event either Party hereto employs an attorney for the purpose of enforcing or construing this Agreement, or any judgment based on this Agreement, in any legal proceeding whatsoever, including insolvency, bankruptcy, arbitration, declaratory relief or other litigation, including appeals and rehearings, the Prevailing Party in such litigation shall be entitled to recover from the other Party its reasonable attorneys' and consultants' fees and expenses incidental to such litigation (including, without limitation, service of process costs, filing fees, court reporter costs, investigative costs, expert witness fees, the cost of any bonds, and any and all other similar fees incurred in connection with the action or proceeding) and all court costs and fees through all trial and appellate levels. Attorneys' fees under this **Section 11.11** shall include reasonable attorneys' fees on appeal and, in addition, a Party entitled to attorneys' fees shall be entitled to all other reasonable, out-of-pocket, third-party costs and expenses actually incurred or otherwise payable in connection with such action or proceeding. In addition to the foregoing award of attorneys' fees to the Prevailing Party, the Prevailing Party in any lawsuit shall be entitled to its reasonable attorneys' fees actually incurred or otherwise payable in any post-judgment proceedings to collect or enforce the judgment. The "**Prevailing Party**" means the Party determined by the final, non-appealable judgment of court of competent jurisdiction to most nearly prevail and not necessarily the one in whose favor a judgment is rendered. This provision is separate and several and shall survive the merger of this Agreement into any judgment with respect hereto.

11.12. *Notices and Deliveries*. All notices required or permitted hereunder shall be in writing and shall be served on the Parties at the addresses set forth in **Section 1.1**. Any such notices shall be either (a) sent by overnight delivery using a nationally recognized overnight courier, in which case notice shall be deemed delivered one (1) Business Day after deposit with such courier, (b) sent by e-mail, with written confirmation or (c) sent by personal delivery, in which case notice shall be deemed delivered upon receipt. Any notice sent by e-mail or personal delivery and delivered after 5:00 p.m. local time where the Property is located shall be deemed received on the next Business Day. A Party's address may be changed by written notice to the other Party; provided, however, that no notice of a change of address shall be effective until actual receipt of such notice. Copies of notices are for informational purposes only, and a failure to give or receive copies of any notice shall not be deemed a failure to give notice. Notices given by counsel to Buyer shall be deemed given by Buyer; notices given by counsel to Receiver shall be deemed given by Receiver; and notices given to a Party's counsel shall be deemed given to the Party.

11.13. *Construction*. The Parties acknowledge that the Parties and their counsel have reviewed and revised this Agreement and that the normal rule of construction – to the effect that any ambiguities are to be resolved against the drafting Party – shall not be employed in the interpretation of this Agreement or any exhibits or amendments hereto.

11.14. *Business Days; Calculation of Time Periods*. "**Business Day**" (or "**business day**") means, as to any Party, any day that is not a Saturday, Sunday, or legal holiday for national banks in the location where the Property is located. If the last day of any time period hereunder, or the last day of performance of any obligation, or for the giving of notice, or for taking any other action falls on a day that is not a Business Day, then such last day shall be extended to the first day thereafter that is a Business Day, and any such day shall be deemed to end at 5:00 p.m. local time where the Property is located. Subject to the foregoing, in computing any time period described herein, the day of the act or event after which the designated period of time begins to run is not to be included and the last day of the period so computed is to be included.

11.15. *Execution in Counterparts*. This Agreement may be executed in one or more counterparts, each of which is an original, and all of which together constitute only one agreement between the parties. The signatures of all the parties do not need to be on the same counterpart for it to be effective. Delivery of an executed counterpart of this Agreement by electronic mail in portable document format (.pdf), or by any other electronic means intended to preserve the original graphic and pictorial appearance of a document, has the same effect as delivery of an executed original of this Agreement.

26

APP000028

11.16. *Waiver of Jury Trial.* TO THE EXTENT PERMITTED BY APPLICABLE LAW, THE PARTIES HEREBY WAIVE ANY RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

11.17. *Limitation of Liability.* No partner, member, manager, officer, director, shareholder, beneficial owner, agent, or employee of either Buyer or Receiver or any affiliate thereof shall be personally liable for any obligation of Buyer or Receiver, as applicable, hereunder. Buyer agrees Receiver's liability arising hereunder or related hereto shall at all times be strictly limited to Receiver's interest in the Property, or proceeds from the sale thereof. No liability shall accrue to Receiver for breach of the covenants, indemnification, warranties, or representations in this Agreement or any document executed by Receiver hereunder pursuant to this Agreement unless such liability accrues, in the aggregate, in excess of $25,000.00. Receiver's aggregate liability for all claims arising out of such covenants, indemnities, representations, and warranties with respect to the Property shall not exceed an amount equal to $450,000.00 (the "**Liability Limitation**") once the initial $25,000 aggregate limit has been reached. Notwithstanding anything to the contrary in this Agreement, neither Party shall be liable to the other Party for consequential, punitive, and/or exemplary damages of any nature whatsoever. Buyer agrees to provide written notice of such breach to Receiver and allow Receiver thirty (30) days to cure the same. If Receiver fails to cure such breach after written notice and after such cure period, Buyer's sole remedy shall be an action at law for actual damages as a consequence thereof, provided, however, that any action at law shall only be enforceable and actionable if and only if written notice of such claim is delivered to Receiver within nine (9) months after the Closing Date (the "**Notice Period**"), Buyer hereby waiving the right to file any such claim, suit, proceeding, litigation, or action at law at any later date. The Notice Period applies to known and unknown breaches of covenants, indemnities, warranties, or representations. This Section shall survive indefinitely the termination of this Agreement or Closing and shall not be merged into the Deed or other closing documents.

11.18. *Termination of Agreement.* It is understood and agreed that if either Buyer or Receiver terminates this Agreement pursuant to a right of termination granted hereunder, such termination shall operate to relieve Receiver and Buyer from all obligations under this Agreement, except for such obligations as are specifically stated herein to survive the termination of this Agreement.

11.19. *No Recording.* Neither this Agreement nor any memorandum or short form thereof may be recorded by either Party.

11.20. *No Partnership.* The relationship of the Parties hereto is solely that of a seller and buyer with respect to the Property and no joint venture or other partnership exists between the Parties hereto. Neither Party has any fiduciary relationship hereunder to the other.

11.21. *Further Assurances.* Each Party agrees that it will without further consideration execute and deliver such other documents and take such other action, whether prior or subsequent to Closing, as may be reasonably requested by the other Party to consummate more effectively the purposes or subject matter of this Agreement. The provisions of this Section shall survive Closing.

11.22. *Waiver of Consumer Rights.* BUYER WAIVES ITS RIGHTS UNDER THE DECEPTIVE TRADE PRACTICES-CONSUMER PROTECTION ACT, SECTION 17.41 ET SEQ., BUSINESS & COMMERCE CODE, A LAW THAT GIVES CONSUMERS SPECIAL RIGHTS AND PROTECTIONS. AFTER CONSULTATION WITH AN ATTORNEY OF BUYER'S OWN SELECTION, BUYER VOLUNTARILY CONSENTS TO THIS WAIVER AS EVIDENCED BY BUYER'S EXECUTION OF THIS AGREEMENT.

27

11.23.  *Incorporation of Recitals*. The Recitals set forth above constitute an integral part of this Agreement and are incorporated herein by this reference with the same force and effect as if set forth herein as agreements of the Parties.

11.24.  *Certain Disclosures.* The following disclosures are made for the purpose of complying with specific statutory provisions of Texas law, and such disclosures are not intended to and do not hereby alter or affect the rights and obligations of Buyer and Receiver:

(a)  Statutory Tax Districts. If the Property is situated in a utility or other statutorily created district providing water, sewer, drainage, or flood control facilities and services, Chapter 49, Texas Water Code, requires Receiver to deliver and Buyer to sign the statutory notice relating to the tax rate, bonded indebtedness, or standby fee of the district prior to final execution of this Agreement.

(b)  Tide Waters. If the Property abuts the tidally influenced waters of the State of Texas, Section 33.135 of the Texas Natural Resources Code requires a notice regarding coastal area property to be included in this Agreement.

(c)  Annexation. If the Property is located outside the limits of a municipality, Receiver notifies Buyer under Section 5.011 of the Texas Property Code, that the Property may now or later be included in the extraterritorial jurisdiction of a municipality and may now or later be subject to annexation by the municipality. Each municipality maintains a map that depicts its boundaries and extraterritorial jurisdiction. To determine if the Property is located within a municipality's extraterritorial jurisdiction or is likely to be located within a municipality's extraterritorial jurisdiction, contact all municipalities located in the general proximity of the Property for further information.

(d)  Property Located in a Certified Service Area of a Utility Service Provider. The Property may be located in a certificated water or sewer service area, which is authorized by law to provide water or sewer service to the properties in the certificated area. If the Property is located in a certificated area there may be special costs or charges the Buyer will be required to pay before you can receive water or sewer service. There may be a period required to construct lines or other facilities necessary to provide water or sewer service to the Property. The Buyer is advised to determine if the Property is in a certificated area and contact the utility service provider to determine the cost that Buyer will be required to pay and the period, if any, that is required to provide water or sewer service to the Property. Buyer hereby acknowledges receipt of the foregoing notice at or before the execution of a binding contract for the purchase of the Property or at the Closing.

(e)  Public Improvement District. If the Property is in a public improvement district, Section 5.014 of the Property Code requires Receiver to notify Buyer as follows: As a Buyer of this parcel of real property you are obligated to pay an assessment to a municipality or county for an improvement project undertaken by a public improvement district under Chapter 372 Local Government Code. The assessment may be due annually or in periodic installments. More information concerning the amount of the assessment and the due dates of that assessment may be obtained from the municipality or county levying the assessment. The amount of the assessments is subject to change. Your failure to pay the assessments could result in a lien on and the foreclosure of the Property.

(f)  Notice of Water Level Fluctuations. If the Property adjoins an impoundment of water, including a reservoir or lake, constructed under Chapter 11 of the Texas Water Code, that has a storage capacity of at least 5,000 acre-feet at the impoundment's normal operating level, Receiver hereby notifies Buyer: "The water level of the impoundment of water adjoining the Property

28

APP000030

fluctuates for various reasons, including as a result of: (1) an entity lawfully exercising its right to use the water stored in the impoundment; or (2) drought or flood conditions."

(g)     Transfer Fees. If the Property is subject to a private transfer fee obligation, Section 5.205 of the Texas Property Code requires Receiver to notify Buyer as follows: The private transfer fee obligation may be governed by Chapter 5, Subchapter G of the Texas Property Code.

(h)     Notice to Buyer Regarding Restrictive Covenants. Pursuant to the Texas Local Government Code, if the Property is located within a municipality whose governing body has required any person who sells or conveys restricted property located within its jurisdiction to first give written notice to the Buyer of: (i) the restrictions and (ii) the municipality's right to enforce compliance with the restrictions, written notice must be given to by Receiver to Buyer on or before the final closing, and the notice document must be signed and acknowledged by both Receiver and Buyer, then recorded in the real property records in the county where the real property is located. The requirements and text of the notice may be found at 30 Tex. Loc. Gov't Code Ann. § 212.155.

(i)     Notice to Buyer of Property Seaward of Gulf Intracoastal Waterway. Pursuant to the Texas Natural Resources Code, if the Property is located seaward of the Gulf Intracoastal waterway to its southernmost point and then seaward of the longitudinal line also known as 97 degrees, 12'19" which runs southerly to the international boundary from the intersection of the centerline of the Gulf Intracoastal waterway and the Brownsville Ship Channel, then this information must be disclosed by Receiver to Buyer before the transaction closes. The requirements and text of the notice may be found at Tex. Nat. Res. Code Ann. § 61.025.

(j)     Storage Tanks Disclosure Provider. If the Property contains an underground storage tank or tank system or an aboveground tank or tank system subject to regulation by the Texas Commission on Environmental Quality, statutory notice must be given by Receiver to Buyer prior to closing pursuant to the Texas Administrative Code. The requirements and text of the notice may be found at 30 Tex. Admin. Code Ann. § 334.9.

(k)     Notice to Buyer of Property Located in Certain Annexed Water Districts. This form sets out the mandatory notice provisions under the Texas Water Code. If the Property is located in a water or sanitary sewer district that entered into a contract with a city, other than a city with a population of more than one million in a county of more than two million, that allows the city to set rates in the district after annexation that are different from rates charged to other residents of the city, Receiver at or before closing must deliver to Buyer a separate written notice, executed and acknowledged by Receiver, containing the information in this notice. Buyer must sign the notice to evidence receipt. Tex. Water Code Ann. § 49.452(g)-(p) applies to this notice provision, including Buyer's right to seek damages if the sale or conveyance of the Property is not made in compliance with this statute. The requirements and text of the notice may be found at Tex. Water Code Ann. § 54.016(h)(4) and § 49.452(g)-(p).

(l)     Notice to Buyer that Property is Located within the Area of the Alignment of a Transportation Project. Pursuant to the Texas Local Government Code, if the Property is within the area of the alignment of a transportation project, as shown on the final environmental decision document applicable to the future transportation corridor identified in an agreement between the Texas Department of Transportation and the county under Tex. Transp. Code Ann. § 201.619, Receiver must provide a conspicuous statement in the Agreement. The requirements and text of the notice may be found at Tex. Loc. Gov't Code Ann. § 232.0033.

*[Signature Page Follows]*

29

APP000031

DocuSign Envelope ID: 68FC268E-F5AC-4DD8-A44A-A179B9CDFB51

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the Effective Date.

**RECEIVER:**

CORT THOMAS, AS RECEIVER FOR GOLDMARK HOSPITALITY, LLC, A TEXAS LIMITED LIABILITY COMPANY

Signature: *Cort Thomas, Receiver for Goldmark Hospitality, LLC*
Printed Name: Cort Thomas
Title: Receiver for Goldmark Hospitality, LLC
Date: 5/28/2024 _____, 2024

**BUYER:**

CENTERIDGE LLC, A DELAWARE LIMITED LIABILITY COMPANY

Signature: _____
Printed Name: _____
Title: _____
Date: _____, 2024

Signature Page 1

APP000032

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the Effective Date.

**RECEIVER:**

CORT THOMAS, AS RECEIVER FOR GOLDMARK HOSPITALITY, LLC, A TEXAS LIMITED LIABILITY COMPANY

Signature:       _____
Printed Name:    Cort Thomas
Title:           Receiver for Goldmark Hospitality, LLC
Date:            _____, 2024

**BUYER:**

CENTERIDGE LLC, A DELAWARE LIMITED LIABILITY COMPANY

Signature:       *Aaron Friedman*
Printed Name:    Aaron Friedman
Title:           Manager
Date:            June 3 _____, 2024

Signature Page 1

APP000033

## ESCROW AGENT ACCEPTANCE

Escrow Agent has executed this Agreement in order to confirm that the Escrow Agent has received executed counterparts of the Agreement and the Earnest Money and shall hold the Earnest Money deposited by Buyer, and any interest earned thereon, in escrow, and shall disburse the Earnest Money and the interest earned thereon, pursuant to the provisions of the Agreement.

June 3rd, 2024 ("Effective Date")

CAPITAL TITLE

Signature:
Printed Name:
Title:
Date:

Vicki Hoodwin
Capital Title of Texas, LLC
7001 Preston Road, Ste. 120
Dallas, TX 75205
Phone 214-219-7300
Fax 214-219-7305

Signature Page 2

APP000034

## EXHIBIT A

### LEGAL DESCRIPTION

BEING all of Lot 3, Block A/7761 of CARLETON HOUSE, an addition to the City of Dallas, Dallas County, Texas recorded in Volume 80137, Page 261, of the Map Records of Dallas County, Texas, and being all of that same tract of land described in Foreclosure Deed to Goldmark Hospitality, LLC, recorded in Instrument Number 201100196546 of the Deed Records of Dallas County, Texas, and said lot being more particularly described as follows:

BEGINNING at a 5/8" iron rod found at the northernmost corner of a corner cut-off line at the intersection of the southeast R.O.W. line of Goldmark Drive (a 60' R.O.W.) with the southwest R.O.W. line of Midpark Road (a 60' R.O.W.); said point being the beginning of a curve to the right having a central angle of 1 3° 1 8'00" and a radius of 320.00' bearing S 32°19'00" W;

THENCE around said curve and along the southwest line of Midpark Road, a distance of 74.11' to a ½" iron rod found for corner;

THENCE S 44°23'00" E, 179.69' along the southwest line of Midpark Road to a PK nail found at the north corner of Lot 1, Block A/7761 of La Quinta-Midpark Addition, an addition to the City of Dallas, Texas, recorded in Volume 76201, Page 1 of the Map Records of Dallas County, Texas;

THENCE S 45°37'00" W, 590.05' along the northwest line of said Lot 1 to a cross found for corner in a northeast line of Lot 4, Block A/7761 of Section Five, Keystone Park Addition, an addition to the City of Dallas, Texas, recorded in Volume 92208, Page 2836 of the Map Records of Dallas County, Texas;

THENCE N44°23'00" W, 263.00' along a northeast line of said Lot 4 to a 5/8" iron rod found for corner in the southeast line of Goldmark Drive;

THENCE N 45°37'00" E, 569.02' along the southeast line of Goldmark Drive to a 5/8" iron rod found at the south corner of a corner cut-off line;

THENCE N 83°31'43" E, 15.77' along said cut-off line to the POINT OF BEGINNING and CONTAINING 154,828.37 square feet or 3.5544 acres of land, more or less.

A - 1

APP000035

EXHIBIT B
FORM OF DEED

AFTER RECORDING RETURN TO: _____

_____

(Space Above This Line for Recorder's Use Only)

NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OF THE FOLLOWING INFORMATION FROM THIS INSTRUMENT BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.

## SPECIAL WARRANTY DEED

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | |
| | § | KNOW ALL MEN BY THESE PRESENTS: |
| COUNTY OF DALLAS | § | |

THIS SPECIAL WARRANTY DEED, dated _____, 2024, by Cort Thomas, solely in his capacity as Receiver for, and on behalf of, Goldmark Hospitality, LLC, a Texas limited liability company, with its principal office at 8111 Preston Road, Suite 300, Dallas, Texas 75225 ("**Grantor**"), for the benefit of _____, a _____ ("**Grantee**"), whose mailing address is _____:

WITNESSETH, that Grantor, for good and valuable consideration, has granted bargained, sold, and conveyed and by these presents does grant, bargain, sell, convey and confirm unto Grantee, its successors, and assigns, forever, all the following described lot or parcel of land, situated, lying and being in the County of Dallas, State of Texas, and being more particularly described on Exhibit "A" attached hereto and made a part hereof (the "**Land**");

TOGETHER with Grantor's rights, title and interest (if any) in and to the following relating to the Land: (i) the buildings and improvements thereon (the "**Improvements**"); (ii) land lying in the bed of any street, road or access way, opened or proposed, on the Land; (iii) roads, alleys, rights-of-way and ingress and egress easements relating to the Land, whether surface, subsurface or otherwise; (iv) all water and water rights under or otherwise pertaining to the Land; and (v) all governmental or quasi-governmental permits, approvals, authorities, licenses and consents, if any, of any kind or character pertaining to the Land (collectively (ii) through (v), the "**Appurtenances**" and together with the Land and Improvements, the "**Property**"); AND SUBJECT TO any Permitted Exception (as such term is defined in that certain Purchase and Sale Agreement between Grantor and Grantee dated _____, 2024) and those matters listed and described on Exhibit "B" attached hereto (collectively, the "**Permitted Exceptions**").

TO HAVE AND TO HOLD the Property unto Grantee, its successors and assigns, subject to the Permitted Exceptions, reservations, and exclusions set forth herein, forever, and Grantor binds Grantor and Grantor's successors and assigns to WARRANT AND FOREVER DEFEND all and singular the Property to Grantee and Grantee's successors and assigns against all and every person or persons lawfully claiming or to claim the whole or any part thereof, when the claim is by, through or under Grantor, but not otherwise.

B - 1

APP000036

BY ACCEPTANCE OF THIS SPECIAL WARRANTY DEED, GRANTEE ACKNOWLEDGES THAT IT HAS INSPECTED AND ASSESSED THE PROPERTY AND HAS SATISFIED ITSELF AS TO THE CONDITION OF SAME AND IS TAKING THE PROPERTY "AS-IS", "WHERE-IS", AND "WITH ALL FAULTS", AND WITHOUT ANY REPRESENTATIONS OR WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED, WRITTEN OR ORAL, OTHER THAN THE WARRANTY OF TITLE HEREIN CONTAINED AND/OR IN THAT CERTAIN PURCHASE AND SALE AGREEMENT DATED ____, 2024, BETWEEN GRANTOR AND GRANTEE (THE "PURCHASE AGREEMENT"). IT BEING THE INTENTION OF GRANTOR AND GRANTEE TO EXPRESSLY NEGATE AND EXCLUDE ALL REPRESENTATIONS AND WARRANTIES, INCLUDING, BUT NOT LIMITED TO: (1) THE PHYSICAL CONDITION OF THE PROPERTY OR ANY ELEMENT THEREOF, INCLUDING, WITHOUT LIMITATION, WARRANTIES RELATED TO HABITABILITY, SUITABILITY, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR FITNESS FOR ANY PURPOSE; (2) THE NATURE OR QUALITY OF CONSTRUCTION, STRUCTURAL DESIGN, AND ENGINEERING OF ANY IMPROVEMENTS; (3) THE QUALITY OF THE LABOR AND MATERIALS INCLUDED IN ANY IMPROVEMENTS; (4) THE SOIL CONDITIONS (BOTH SURFACE AND SUBSURFACE), DRAINAGE, OR OTHER CONDITIONS EXISTING AT THE PROPERTY WITH RESPECT TO ANY PARTICULAR PURPOSE, DEVELOPMENTAL POTENTIAL, OR OTHERWISE; (5) ALL WARRANTIES CREATED BY ANY AFFIRMATION OF FACT OR PROMISE OR BY ANY DESCRIPTION OF THE PROPERTY; AND (6) ALL OTHER WARRANTIES AND REPRESENTATIONS, WHATSOEVER, EXCEPT THE SPECIAL WARRANTY OF TITLE EXPRESSLY SET FORTH IN THIS DEED AND/OR REPRESENTATIONS AND WARRANTIES CONTAINED IN THE PURCHASE AGREEMENT.

[Signature Page Follows]

B - 2

APP000037

IN WITNESS WHEREOF, Grantor has executed this deed on the date set forth above.

**GOLDMARK HOSPITALITY, LLC:**

GOLDMARK HOSPITALITY, LLC, a Texas limited liability company

Signature: _____
Printed Name:    Cort Thomas
Title:    Receiver for, and on behalf of, Goldmark Hospitality, LLC
Date: _____

THE STATE OF TEXAS          §
                            §
COUNTY OF DALLAS            §

This instrument was acknowledged before me on this the _____ day of _____, 2024, by Cort Thomas, Receiver for, and on behalf of, Goldmark Hospitality, LLC, a Texas limited liability company.

_____
Notary Public in and for the State of Texas

My Commission Expires:

_____

(SEAL)

B - 3

APP000038

Exhibit A

Legal Description

B - 1

APP000039

Exhibit B

Permitted Exceptions

B - 2

APP000040

<u>EXHIBIT C</u>

**BILL OF SALE AND ASSIGNMENT OF LEASES AND CONTRACTS**

This instrument is executed and delivered as of the _____ day of _____, 20___ pursuant to that certain Purchase and Sale Agreement (the "**Agreement**"), dated _____, 2024, by and between Cort Thomas, solely in his capacity as the receiver, and not in his individual capacity ("**Receiver**") for, and on behalf of, GOLDMARK HOSPITALITY, LLC, a Texas limited liability company, ("**Goldmark**"), and _____, a _____ ("**Buyer**"), covering the real property described in **Exhibit A** attached hereto (the "**Real Property**").

1.    <u>Sale of Personalty</u>. For good and valuable consideration, Receiver hereby sells, transfers, sets over and conveys to Buyer the following (the "**Personal Property**"):

    (a)    *Tangible Personalty*. All of Goldmark's right, title and interest in and to all fixtures, furniture, equipment, and other tangible personal property, if any, presently located on the Real Property and used in connection with the operation of same, in each case to the extent assignable and without warranty (the "**Tangible Personal Property**") but excluding any items of personal property owned by tenants, any managing agent or any other party.

    (b)    *Intangible Personalty*. All of Goldmark's right, title, and interest, if any, in and to all of the following items, in each case to the extent assignable or transferrable, and without warranty (the "**Intangible Personal Property**"): (i) licenses and permits relating to the operation of the Real Property; (ii) the right to use the name "Amerigold Suites" in connection with the Real Property; and (iii) if still in effect, each guaranty and warranty received by Receiver from any general contractor, subcontractor, or manufacturer in connection with the construction or maintenance of the Real Property or associated with the Tangible Personal Property, provided, however, if there is any cost or fee to transfer any such guaranty and warranty to Buyer, Buyer must pay the same as a condition precedent to any such assignment by Receiver.

Notwithstanding anything to the contrary contained in this Agreement, under no circumstances shall the Personal Property include (i) any marketing information, market and other analyses, reports, investigations or other documents which constitute proprietary information of Receiver or Receiver's affiliates, including, without limitation any architectural plans, designs or other plans and designs for any houses, townhomes, apartments, casitas and other buildings, or any other vertical improvements of any type, (ii) any information which is privileged or confidential pursuant to a recognized legal privilege (such as attorney-client communication and/or attorney work product) and (iii) any property management software and related hardware, and the data contained therein.

2.    <u>Assignment of Leases and Contracts</u>. For good and valuable consideration, Receiver hereby assigns, transfers, sets over and conveys to Buyer, and Buyer hereby accepts such assignment of, the following (the "**Assigned Property**"):

    (a)    *Leases*. All of the Goldmark's right, title and interest, as landlord, in and to the tenant leases (the "**Leases**") covering the Real Property, to the extent assignable and without warranty, and Buyer hereby assumes all of the landlord's obligations under the Leases arising from and after the Closing Date (as defined in the Agreement); and

    (b)    *Service Contracts*. All of Goldmark's rights, title and interest in and to the service contracts described in **Exhibit B** attached hereto (the "**Service Contracts**"), to the extent assignable and without warranty.

C - 1

APP000041

Subject to the limitations, thresholds, terms, and conditions set forth in the Agreement, Receiver shall defend, indemnify and hold harmless Buyer from and against any liability, damages, causes of action, expenses, and reasonable attorneys' fees incurred by Buyer by reason of the failure of Receiver to fulfill, perform, discharge, and observe its obligations with respect to the Leases or the Service Contracts arising prior to the Closing Date.

3.      Assumption. Buyer hereby assumes the obligations of Receiver under the Leases and Service Contracts arising from and after the Closing Date and shall defend, indemnify and hold harmless Receiver from and against any liability, damages, causes of action, expenses, and reasonable attorneys' fees incurred by Receiver by reason of the failure of Buyer to fulfill, perform, discharge, and observe its obligations with respect to the Leases or the Service Contracts arising on and after the Closing Date.

4.      Agreement Applies. The covenants, agreements, representations, warranties, indemnities and limitations provided in the Agreement with respect to the property conveyed hereunder (including, without limitation, the limitations of liability provided in the Agreement), are hereby incorporated herein by this reference as if herein set out in full and shall inure to the benefit of and shall be binding upon Buyer and Receiver and their respective successors and assigns.

IN WITNESS WHEREOF, the undersigned have caused this Bill of Sale and Assignment of Leases and Contracts to be executed as of the date written above.

**RECEIVER:**

CORT THOMAS, AS RECEIVER FOR GOLDMARK HOSPITALITY, LLC, A TEXAS LIMITED LIABILITY COMPANY

Signature:              _____
Printed Name:       Cort Thomas
Title:                      Receiver for Goldmark Hospitality, LLC
Date:                     _____

**BUYER:**

_____
a ___ limited liability company

Signature: _____

Printed Name: _____
Title: _____
Date: _____

C - 2

APP000042

Exhibit A

Legal Description

C - 3

APP000043

Exhibit B

List of Service Contracts Being Assumed

C - 4

APP000044

<u>**EXHIBIT D**</u>

**NOTICE TO RESIDENTS**

_____, 2024

*Re:    Unit No. _____*

Dear Residents:

Notice is hereby given to the tenants of Amerigold Suites (the "**Property**") that Goldmark Hospitality, LLC, the current owner of the Property, has sold the Property to _____ ("**Buyer**") effective as of this date. Buyer has assumed all of the obligations of landlord under your lease, and Buyer acknowledges that it has received and is responsible for your security deposit in the amount of $_____. You will be receiving a separate letter from Buyer's management company providing, among other things, their contact information and to whom and where your rent should be paid. The privacy policy and practices of Buyer will apply to the collection, use and sharing of your personal information on a going-forward basis.

Sincerely,

**RECEIVER:**
CORT THOMAS, AS RECEIVER FOR GOLDMARK HOSPITALITY, LLC, A TEXAS LIMITED LIABILITY COMPANY

| | |
|---|---|
| Signature: | _____ |
| Printed Name: | Cort Thomas |
| Title: | Receiver for GOLDMARK HOSPITALITY, LLC |
| Date: | _____ |

**BUYER:**
[_____]
a ___ limited liability company

Signature: _____

Date: _____

D - 1

APP000045

# EXHIBIT B-1

APP000046

# NVC

## National Valuation Consultants, Inc.

## An Appraisal Report of:

Amerigold Suites
13636 Goldmark Drive
Dallas, Texas 75038

**Latitude/Longitude:**
32.833968,  96.956886

**NVC File Number:**
DAL2404901

**Effective Date of Value:**
"As Is" - April 5, 2024



**Prepared For:**
Mr. Cort Thomas
Receiver
Goldmark Hospitality, LLC, c/o Cort Thomas, Receiver
8111 Preston Road, Suite 300
Dallas, Texas 75225

**WEST**
Seattle
San Francisco
Los Angeles

**SOUTHWEST**
Denver
Dallas
Houston
San Antonio

**MIDWEST**
Chicago
Cincinnati
Columbus

**NORTHEAST**
Boston
NY/NJ Metro

**SOUTHEAST**
Atlanta
Savannah
South Florida

**Prepared By:**
National Valuation Consultants, Inc.
7807 E. Peakview Avenue, Suite 200
Centennial, Colorado 80111

APP000047



May 7, 2024

Mr. Cort Thomas
Receiver
Goldmark Hospitality, LLC, c/o Cort Thomas, Receiver
8111 Preston Road, Suite 300
Dallas, Texas 75225
cort@brownfoxlaw.com

Re:  Amerigold Suites, 13636 Goldmark Drive, Dallas, Texas 75038
     Latitude  32.833968 & Longitude  96.956886
     NVC File No.:  DAL2404901

Dear Mr. Thomas:

In compliance with your request, enclosed is an appraisal report of the above-referenced property.  The purpose of the appraisal is to provide our market value opinion of the valuation scenarios summarized below.

| Valuation Scenarios | | |
| --- | --- | --- |
| Scenario | Interest Appraised | Effective Date of Appraisal |
| "As Is" Market Value | Fee Simple | April 5, 2024 |

Briefly described, the subject is a 70-unit apartment facility built in 1981 on a 3.56 acre site located in North Dallas, just west of US-75 freeway and north of IH-635 freeway, surrounded by other lodging and apartment communities and close to various retail, restaurant, office, and other commercial facilities.

The property is operated as a hybrid between an apartment and an extended stay lodging facility, but as the suites are not furnished and it leases by the month, it is more comparable to an apartment complex.

The property contains 11, two-story garden-style buildings with two unit types, built in 1981.  Per management, there are 60 single-story one bedroom units of 660 SF, and 10 two-story, two bedroom units of 1,200 SF for a total size of 51,600 SF. In addition, there is a leasing center with restrooms, office, kitchen area and community room, and a separate maintenance building with garage and workshop is located at the rear of the property.

Units are carpeted in the bedroom areas, with tile in the entries, bathrooms and kitchens, the latter being equipped with electric range, fridge/freezer and dishwasher.  Project amenities include landscaped grounds, community pool, and a small on-site fitness center, although this has been closed due to liability concerns.  All units have a small patio area or balcony.

7807 E. Peakview Ave. Suite 200 | Centennial CO 80111 | (303) 753-6900 | NVCINC.COM

APP000048

Mr. Cort Thomas
May 7, 2024
Page 3

Rates are quoted on a monthly basis and are all-inclusive of utilities (except electricity and cable). On the date of inspection, average base rates were quoted at $1,200 per month for the one-bedroom suites and $1,800 per month for the two-bedroom units. The minimum rental period is one month, but some agreements are for several months or more, and most tenants have been in place much longer. Rents are due in full in advance and there are no leases signed and no credit checks taken, although criminal background checks are conducted.

There are a variety of customers at this facility, including monthly residents and long-time residents, with some reportedly having been in occupancy for around 10 years. Per the manager, occupancy had generally been around 100% until Covid-19 became rampant in March 2020. Following that, occupancy had dropped as a number of residents were evicted and damaged units have had to be repaired. Nevertheless, all of the habitable units are advised to be occupied with a waiting list.

As of our inspection date, three units were under repair and were out of commission and two were about to become vacant so that occupancy was around 95.7%, but repairs are needed to make these units habitable again, but funds are reportedly very limited at this time.

At the time of our prior appraisal 15 months ago, the property was under contract to a local real estate investor for a price of $5,500,000, but this did not close. However, per our client, a contract is now under negotiation at a figure of around $4,800,000 or $68,571 per unit. It is likely that the buyer will conduct renovations in order to generate higher rental rates and increase occupancy, but no further details have been provided.

It is our opinion that this report complies fully with the current Uniform Standards of Professional Appraisal Practice (USPAP) adopted by the Appraisal Standards Board of the Appraisal Foundation. A copy of the engagement letter can be found in the Addenda.

It must be noted that our opinion of value is subject to other standard and typical assumptions and limiting conditions which are referenced in the accompanying appraisal report. The one ***extraordinary assumption (there are no hypothetical conditions)***, which may have affected the appraisal assignment results, is summarized as follows:

**Extraordinary Assumption:**

> *During our inspection of the property, a random sampling of the subject's units was inspected. For the purposes of this appraisal, we have assumed that the condition and decor of the remaining units (those not inspected) is similar to those inspected and described within this report. If it is determined that the condition and/or decor of the remaining units is significantly different than described herein, a re-valuation of the subject could be required.*

**Hypothetical Conditions:**

> *None*

NVC | National Valuation Consultants, Inc.

APP000049

Mr. Cort Thomas
May 7, 2024
Page 4

Based upon the data, analyses and reasoning contained in the attached report, and subject to the assumptions and limiting conditions set forth in this analysis, our market value opinions are set forth below:

| Summary of Value Conclusions | | | |
|---|---|---|---|
| Scenario | Interest Appraised | Effective Date of Appraisal | Reconciled Value |
| "As Is" Market Value | Fee Simple | April 5, 2024 | $4,170,000 |

Real estate transaction volume has been subdued as investors seek greater clarity in pricing to bridge the gap between the expectations of buyers and sellers. Borrowing costs continue to be a primary concern despite signals from the Fed that rates hikes have likely ended and that rates will start to decline this year, although with inflation reluctant to fall, this is likely to be delayed until the summer of this year.  For more information, please refer to the *U.S. Economic Indicators* section in the attached report.

Please note that our value opinions include personal property such as appliances, office furniture, pool furniture and other personal property.  We have included all personal property in the appraised value of the subject property since we have determined from our analysis that it is typically traded with apartments in the market area. Therefore, in accordance with appraisal requirements, the value is allocated between the real estate and the personal property as follows:

| Allocation of Value | |
|---|---|
| Value Scenario | "As Is" |
| Date of Valuation | April 5, 2024 |
| Interest Appraised | Fee Simple |
| Total Value | $4,170,000 |
| Allocation of Real Property | $3,970,000 |
| Allocation of Personal Property | $200,000 |

We appreciate the opportunity to serve you and trust you will advise us if we can be of further assistance.

Respectfully submitted,

NATIONAL VALUATION CONSULTANTS, INC.

Charles G. Dannis, MAI, SRA
Senior Managing Director
Texas Certified General Appraiser
License No.: TX 1321531 G
Phone: 214-932-1818
Email: cdannis@nvcinc.com

Simon  D. Neame, MRICS
Senior Vice President
Texas Certified General Appraiser
License No.: TX 1330329 G
Phone: 214-932-1821
Email: sneame@nvcinc.com

APP000050

## TABLE OF CONTENTS

**SUBJECT PHOTOGRAPHS** ...........................................................................................................**6**

   Subject Photograph ........................................................................................................... 7

   Property Aerial................................................................................................................... 8

   Executive Summary .......................................................................................................... 9

**PREMISES OF THE APPRAISAL**..............................................................................................**12**

   Scope of Work ................................................................................................................. 13

   Definitions of Terminology ............................................................................................. 16

   Identification and History of the Property ...................................................................... 19

   Standard Assumptions and Limiting Conditions............................................................. 20

   Extraordinary Assumptions and Hypothetical Conditions.............................................. 22

**PRESENTATION OF DATA**.......................................................................................................**23**

   U.S. Economic Indicators ................................................................................................ 24

   Area / Subject Map.......................................................................................................... 28

   Economic and Demographic Profile ................................................................................ 29

   Market Area Map ............................................................................................................ 36

   Market Area Analysis ...................................................................................................... 37

   Tax and Assessment Analysis.......................................................................................... 37

   Description of the Property ............................................................................................. 47

   Subject Photographs........................................................................................................ 49

**ANALYSIS OF DATA AND CONCLUSIONS**.............................................................................**52**

   Apartment Market Analysis:........................................................................................... 53

   Apartment Submarket Analysis ...................................................................................... 62

   Highest and Best Use Analysis ........................................................................................ 68

   The Valuation Process ..................................................................................................... 70

   Cost Approach ................................................................................................................. 71

   Sales Comparison Approach ............................................................................................ 73

   Income Capitalization Approach...................................................................................... 81

   Reconciliation and Final Value........................................................................................ 105

   Reasonable Exposure Time and Marketing Period.......................................................... 107

   Certification .................................................................................................................... 109

**ADDENDA** ...............................................................................................................................**111**

Appraiser Qualifications
Improved Sale Abstracts
Legal Description
Site Plan / Floor Plans
Rent Roll
Operating Statements
Engagement Letter

APP000051

SUBJECT PHOTOGRAPHS

APP000052

## Subject Photograph

Case 3:22-cv-02118-X    Document 501    Filed 06/05/24    Page 56 of 340    PageID 17914



Amerigold Suites – Typical Apartment Building

APP000053

NVC | National Valuation Consultants, Inc.

8

## Property Aerial



Amerigold Suites

Subject Photographs

DAL2404901

APP000054

Amerigold Suites                                              NVC | National Valuation Consultants, Inc.

## Executive Summary

**CLIENT**:                              Mr. Cort Thomas
                                         Receiver
                                         Goldmark Hospitality, LLC, c/o Cort Thomas, Receiver
                                         8111 Preston Road, Suite 300
                                         Dallas, Texas 75225
                                         cort@brownfoxlaw.com

**PROPERTY IDENTIFICATION**:             Amerigold Suites located at 13636 Goldmark Drive in
                                         Dallas**,** Texas 75038

**PURPOSE OF APPRAISAL**:                The purpose of this assignment is to provide the
                                         following market value opinion(s):

| Valuation Scenarios | | |
|---|---|---|
| Scenario | Interest Appraised | Effective Date of Appraisal |
| "As Is" Market Value | Fee Simple | April 5, 2024 |

**DATE OF INSPECTION**:                  April 5, 2024

**DATE OF REPORT PREPARATION**:          May 7, 2024

**EXTRAORDINARY ASSUMPTIONS**:           This report is subject to the extraordinary assumptions
                                         mentioned in the letter of transmittal and in the attached
                                         report.

**ZONING**:                              The property is zoned MU-3, Mixed Use 3 under the
                                         authority of City of Dallas. Multifamily is a permitted land
                                         use under this zoning.

**SITE SIZE**:                           3.56 acres (±155,074 SF) per ALTA Survey

**IMPROVEMENTS DESCRIPTION:**
    Year of Construction:       1981
    Number of Buildings:        11 residential buildings and a clubhouse and
                                         maintenance shop.
    Net Rentable Area:          51,600 SF
    Average Unit Size:          737 SF
    Current Occupancy:          95.7%
    Parking:                    90 total parking spaces, for a parking ratio of 1.3 spaces
                                         per unit.

APP000055

Amerigold Suites                                                NVC | National Valuation Consultants, Inc.

**UNIT MIX**:

| Unit Mix By Size and Unit Type | | | | |
|---|---|---|---|---|
| Unit Type | Unit Size (SF) | No. of Units | % of Total | Rentable Area (SF) |
| 1/1 | 660 | 60 | 86% | 39,600 |
| 2/2 | 1,200 | 10 | 14% | 12,000 |
| Average/Total | 737 | 70 | 100% | 51,600 |

**PROPERTY STRENGTHS AND WEAKNESSES**

| Strengths And Weaknesses |
|---|
| **Strengths** |
| • Walkable location close to employment & commercial services |
| • Location offers good access and visibility |
| • All units have balconies/patios |
| • Above-average project amenities |
| • Value-add potential to renovate unit interiors |
| • Class C vacancy in submarket (6.1%) is below the DFW Metro market (8.8%) |
| • Class C rental rates have increased an average 5.6%/year in the last 10 years |
| • Limited new supply planned or under construction |
| • High mortgage rates pushing occupiers towards renting |
| **Weaknesses** |
| • Located in a secondary submarket |
| • Small average unit size |
| • Aging property in need of updating |
| • Aging property may have higher maintenance in future years |
| • Property taxes and other expenses have increased significantly |
| • Limited availability of debt capital |

**HIGHEST AND BEST USE:**

As If Vacant:     Multi-family development
As Improved:     Continued operation as a for-rent apartment project.

APP000056

Amerigold Suites                                        NVC | National Valuation Consultants, Inc.

**MARKET VALUE OPINION SUMMARY:**

| Final Value Reconciliation | |
|---|---|
| Value Scenario | "As Is" Market Value |
| Date of Valuation | April 5, 2024 |
| Interest Appraised | Fee Simple |
| Cost Approach | NA |
| Sales Comparison Approach | $4,040,000 |
| Income Capitalization Approach | |
|   Direct Capitalization | $4,170,000 |
|   DCFA | NA |
|   Reconciled | $4,170,000 |
| **Market Value Opinion** | **$4,170,000** |
| Market Value Opinion /Unit | $59,571 |

**KEY UNITS OF COMPARISON:**

| Key Units of Comparison | |
|---|---|
| Valuation Premise | "As Is" |
| Effective Date | April 5, 2024 |
| Indicated Value | $4,170,000 |
| Indicated Value - $/SF (51,600) | $80.81 |
| Indicated Value - $/Unit (70) | $59,571 |
| Vacancy/Credit Loss | 8.00% |
| Concessions | 3.00% |
| Average Rent/ Unit / Month | $1,414 |
| Annual Expense / Unit (including reserves) | $8,361 |
| Operating Expenses Ratio | 56.75% |
| Direct Capitalization Rate (Going In Rate) | 7.00% |

APP000057

Amerigold Suites                                          NVC | National Valuation Consultants, Inc.

PREMISES OF THE APPRAISAL

APP000058

Amerigold Suites                                              NVC | National Valuation Consultants, Inc.

## Scope of Work

**SCOPE OF WORK DEFINED**

The Scope of Work requirement within the Uniform Standards of Professional Appraisal Practice (USPAP) of the Appraisal Standards Board states that the appraiser must provide the following information within each appraisal, appraisal review, or appraisal consulting assignment:

1.    Identify the problem to be solved;

2.    Determine and perform the scope of work necessary to develop credible assignment results; and

3.    Disclose the scope of work in the report.

While the scope of work is addressed within many sections of this report, the following is a summary of the Scope of Work for this assignment.

**APPRAISAL ELEMENTS**

There are six key assignment elements that need to be addressed when identifying the appraisal problem. These include:

1.    Client and any other intended users;

2.    Intended use of the appraiser's opinions and conclusions;

3.    Type and definition of value;

4.    Effective date of the appraiser's opinions and conclusions;

5.    Subject of the assignment and its relevant characteristics (e.g. interest valued, physical and legal characteristics); and

6.    Assignment conditions (e.g. hypothetical conditions, extraordinary assumptions, supplemental standards, and jurisdictional exceptions).

**CLIENT, INTENDED USERS AND INTENDED USE**

This appraisal is prepared at the request of Goldmark Hospitality, LLC, c/o Cort Thomas, Receiver, for the purpose of internal decision-making and may be filed with the court.  The intended users of this appraisal are Goldmark Hospitality, LLC, and Mr. Cort Thomas, Receiver.    This report has no other intended use and National Valuation Consultants, Inc. is not responsible for the use of this report by any third parties.

APP000059

Amerigold Suites                                    NVC | National Valuation Consultants, Inc.

**PURPOSE OF APPRAISAL**

The purpose of the appraisal is to provide our market value opinion of the valuation scenarios summarized below.

| Valuation Scenarios | | |
|---|---|---|
| Scenario | Interest Appraised | Effective Date of Appraisal |
| "As Is" Market Value | Fee Simple | April 5, 2024 |

**PROPERTY RIGHTS APPRAISED**

The property rights appraised are those of the fee simple interest in the subject real property.  No opinion of value is provided for mineral rights, water rights or other non-realty items which may or may not be associated with the property.

**ANALYSIS PERFORMED IN THE ASSIGNMENT**

The engagement letter, included at the end of the addenda of this report, requests that the appraisers perform a comprehensive appraisal that includes a detailed explanation of all material factors that relate to the valuation of the subject property.  This type of analysis was formerly referred to as a "self-contained" report format by many clients.

The work performed within this appraisal assignment includes a number of independent investigations and analyses.  The methods and sources utilized are listed as follows:

- **Approaches to Value**: The three traditional valuation approaches – cost, income, and sales comparison – were considered in the appraisal along with the subdivision development approach. Value indications were derived from those considered applicable, which is discussed later in this report.

- **Market Area Analysis**:  Mr. Neame inspected the subject's market area, evaluated demographic and economic statistics, reviewed city zoning maps, aerial photographs and other market data in analyzing the characteristics of the subject area.

- **Site Description and Analysis**: This description is based on an on-site inspection and review of documents provided by the property contacts.  Specific documents used in the description are cited in the Site Analysis section of this report.

- **Improvement Description and Analysis**:  This description is also based on an on-site inspection and review of building information provided by the property contacts.  Specific documents used in the description are cited in the Description of the Improvements section of this report.

- **Market Analysis**: Macro and micro market analysis sections and industry overview sections were prepared by many individuals through a cooperative effort between the appraisers and professional research staff of National Valuation Consultants, Inc. (NVC).  We have cited our sources within these sections which typically include related trade industry associations, state and local government sources, and interviews with market participants.

DAL2404901                              Scope of Work                                    14

APP000060

Amerigold Suites                                                              NVC | National Valuation Consultants, Inc.

- **Market Data**:  All market data were derived from multiple conversations with many individuals through a cooperative effort between the appraisers and professional research staff of National Valuation Consultants, Inc. (NVC).

- **Comparable Sales**:  The appraisers assembled data on comparable improved property sales and land sales from abstracts provided by CoStar COMPS; public deed records; multiple listing service data; newspaper articles and news releases; file sources; and conversations with numerous real estate buyers, sellers, and agents active in the marketplace.

- **Property Inspection:** The subject property was personally inspected by Mr. Neame on April 5, 2024 as part of the scope of work for this assignment.  Mr. Dannis did not inspect the property as part of the previous or current appraisals.  Please refer to the *Description of the Improvements* section of this report for more information regarding property condition and subject photographs.

**ASSIGNMENT CONDITIONS**

In two separate sections of this appraisal report, we have included the Standard Assumptions and Limiting Conditions as well as one Extraordinary Assumption, but no Hypothetical Conditions, used in the preparation of the appraisal assignment.

**CONTACTS**

In addition to public records and other sources cited in this appraisal, we have relied on the following parties for information pertaining to the subject:

| Property Contacts | | | |
|---|---|---|---|
| Contact Name | Title | Company | Email |
| Tim Wells | - | Brown Fox, PLLC | tim@brownfoxlaw.com |
| Joanna Roberts | Property Manager | Goldmark Hospitality, LLC | jroberts5863@gmail.com> |

APP000061

## Definitions of Terminology

**APPRAISAL** — (noun) the act or process of developing an opinion of value. (adjective) of or pertaining to appraising and related functions such as appraisal practice or appraisal services. Comment: An appraisal must be numerically expressed as a specific amount, as a range of numbers, or as a relationship to a previous value opinion or numerical benchmark.[1]

**ASSIGNMENT** —a valuation service that is provided by an appraiser as a consequence of an agreement with a client.[2]

**MARKET VALUE** — The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

1. Buyer and seller are typically motivated.
2. Both parties are well informed or well advised, and acting in what they consider their own best interests.
3. A reasonable time is allowed for exposure in the open market.
4. Payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto.
5. The price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.[3]

**AS IS MARKET VALUE** — The estimate of the market value of real property in its current physical condition, use, and zoning as of the appraisal date. (Interagency Appraisal and Evaluation Guidelines, OCC) [4]

**FEE SIMPLE ESTATE** — Absolute ownership unencumbered by any other interest or estate, subject only to the limitations imposed by the governmental powers of taxation, eminent domain, police power, and escheat.[5]

**LEASED FEE INTEREST** — The ownership interest held by the lessor, which includes the right to receive the contract rent specified in the lease plus the reversionary right when the lease expires. .[6]

**PROJECTION** — In market analysis, a prediction of the future that is an extension of current and historical trends.[7]

**EFFECTIVE DATE** —The date to which an appraiser's analyses, opinions, and conclusions apply; also referred to as date of value.[8]

---

[1] USPAP 2024 Edition, Page 3.
[2] USPAP 2024 Edition, Page 4.
[3] Source: Code of Federal Regulations; Title 12--Banks And Banking; Chapter I--Comptroller Of The Currency, Department Of The Treasury; Part 34--Real Estate Lending And Appraisals--Subpart C—Appraisals Sec. 34.42 Definitions; Revised January 1, 2000.
[4] Appraisal Institute, *The Dictionary of Real Estate Appraisal*, 7th edition.
[5] Appraisal Institute, *The Dictionary of Real Estate Appraisal*, 7th edition.
[6] Appraisal Institute, *The Dictionary of Real Estate Appraisal*, 7th edition.
[7] Appraisal Institute, *The Dictionary of Real Estate Appraisal*, 7th edition.
[8] USPAP 2024 Edition, Page 4.

APP000062

Amerigold Suites                                                 NVC | National Valuation Consultants, Inc.

**PROSPECTIVE OPINION OF VALUE** — A value opinion effective as of a specified future date. The term does not define a type of value. Instead, it identifies a value opinion as being effective at some specific future date. An opinion of value as of a prospective date is frequently sought in connection with projects that are proposed, under construction, or under conversion to a new use, or those that have not yet achieved sellout or a stabilized level of long-term occupancy.[9]

**EXTRAORDINARY ASSUMPTION** — An assignment-specific assumption as of the effective date regarding uncertain information used in an analysis which, if found to be false, could alter the appraiser's opinions or conclusions. Uncertain information might include physical, legal, or economic characteristics of the subject property, or conditions external to the property, such as market conditions or trends, or about the integrity of data used in an analysis. [10]

**HYPOTHETICAL CONDITION** —A condition, directly related to a specific assignment, which is contrary to what is known by the appraiser to exist on the effective date of the assignment results but is used for the purpose of analysis. Comment: Hypothetical conditions are contrary to known facts about physical, legal, or economic characteristics of the subject property; or about conditions external to the property, such as market conditions or trends; or about the integrity of data used in an analysis.[11]

**EXPOSURE TIME** — Estimated length of time that the property interest being appraised would have been offered on the market prior to the hypothetical consummation of a sale at market value on the effective date of the appraisal.[12]

**MARKETING TIME** — Opinion of the amount of time it might take to sell a real or personal property interest at the concluded market value level during the period immediately after the effective date of an appraisal. [13]

**INTENDED USE -** the use(s) of an appraiser's reported appraisal or appraisal review assignment results, as identified by the appraiser based on communication with the client at the time of the assignment. [14]

**INTENDED USER** - the client and any other party as identified, by name or type, as users of the appraisal or appraisal review report by the appraiser, based on communication with the client at the time of the assignment. [15]

**PERSONAL PROPERTY** — any tangible or intangible article that is subject to ownership and not classified as real property, including identifiable tangible objects that are considered by the general public as being "personal," such as furnishings, artwork, antiques, gems and jewelry, collectibles, machinery and equipment; and intangible property that is created and stored electronically such as plans for installation art, choreography, emails, or designs for digital tokens.[16]

---

[9] Appraisal Institute, *The Dictionary of Real Estate Appraisal*, 7th edition.
[10] Appraisal Institute, *The Dictionary of Real Estate Appraisal*, 7th edition.
[11] USPAP 2024 Edition, Page 4.
[12] USPAP 2024 Edition, Page 4.
[13] USPAP 2024 Edition, Advisory Opinion 7, Page 16.
[14] USPAP 2024 Edition, Page 5.
[15] USPAP 2024 Edition, Page 5.
[16] USPAP 2024 Edition, Page 5.

APP000063

**PERSONAL INSPECTION**: (for an appraisal assignment) the appraiser's in-person observation of the subject property performed as part of the scope of work; (for an appraisal review assignment) the reviewer's in-person observation of the subject of the work under review, performed as part of the scope of work. <u>Comment</u>: An appraiser's personal inspection is typically limited to those things readily observable without the use of special testing or equipment. Appraisals of some types of property, such as gems and jewelry, may require the use of specialized equipment. A personal inspection is not the equivalent of an inspection by an inspection professional (e.g., a structural engineer, home inspector, or art conservator). [17]

---

[17] USPAP 2024 Edition, Page 5.

APP000064

Amerigold Suites                                    NVC | National Valuation Consultants, Inc.

## Identification and History of the Property

| | |
|---|---|
| **PROPERTY NAME:** | Amerigold Suites |
| **LOCATION:** | Located on the south corner of Goldmark Drive and Midpark Way. |
| **ADDRESS:** | 13636 Goldmark Drive, Dallas, Texas 75038 |
| **COUNTY:** | Dallas |
| **PROPERTY I.D. NUMBER:** | 00000769000800000 |
| **OWNER OF RECORD:** | Goldmark Hospitality, LLC |
| **LEGAL DESCRIPTION:** | Please refer to the *Addenda.* |
| **LATITUDE / LONGITUDE:** | 32.833968 / 96.956886 |
| **HISTORY OF THE PROPERTY:** | The subject was built in 1981.  We are not aware of any ownership transfers within the past 3 years.  However, per our client, the property has been listed for sale for the last two years and was under contract of sale early last year at a figure of $5,500,000, but the sale did not close and the property was re-marketed. |
| | The receiver is currently negotiating a sale contract at a price of $4,800,000 and this appraisal is understood to be required to assist in these negotiations. |

APP000065

Amerigold Suites                                                    NVC | National Valuation Consultants, Inc.

## Standard Assumptions and Limiting Conditions

1. Disclosure of the contents of the appraisal report is governed by the bylaws and regulations of the professional appraisal organizations with which the appraiser is affiliated:  specifically, the Appraisal Institute.

2. This Report should be relied upon only by the Intended User(s) and only for the Intended Use(s) identified at the time of the assignment.  Furthermore, the Report is to be used in whole and not in part.  The Report shall not be duplicated or provided to any third party in whole or in part without the written consent of NVC. Exempt from this restriction is duplication for the internal use of the Intended User and its attorneys, accountants, or advisors for the sole benefit of the Intended User. Also exempt from this restriction is transmission of the Report pursuant to any requirement of any court, governmental authority, or regulatory agency having jurisdiction over the intended user, provided that the Report and its contents shall not be published, in whole or in part, in any public document without the written consent of NVC. Written consent and approval from NVC must be obtained before this appraisal report can be conveyed by anyone to the public through advertising, public relations, news, sales, or other media.  Any third party, not covered by the exemptions herein, who may possess this report, is advised that they should rely on their own independently secured advice for any decision in connection with this property.  NVC shall have no accountability or responsibility to any such third party.

3. The appraiser will not be required to give testimony or appear in court because of having made this appraisal, with reference to the property in question, unless previous arrangements have been made.

4. The distribution of the total valuation in this report between land and improvements applies only under the stated highest and best use of the property.  The separate allocation of value for land and improvements must not be used in conjunction with any other appraisal and is invalid if so used.

5. The legal description used in this report is assumed to be correct.

6. No survey of the property has been made by the appraiser and no responsibility is assumed in connection with such matters. Maps and sketches are included only to assist the reader in visualizing the property.

7. No responsibility is assumed for matters of a legal nature affecting title to the property, nor is an opinion of title rendered.  The title is assumed to be good and merchantable unless otherwise stated.

8. It is assumed that there are no hidden or unapparent conditions of the property, subsoil, (including termite infestations) or structures which would render it more or less valuable.  No responsibility is assumed for such conditions or for engineering which may be required to discover such.

9. All mechanical components are assumed to be in operable condition as would be considered standard for properties similar to the subject in type and age.  The heating, cooling, ventilation, plumbing and electrical equipment are considered to be in similar condition to the observable elements of the improvements unless otherwise stated. The insulation and energy efficiency of the improvements are assumed to be adequate and standard for the subject type and age unless otherwise noted.

APP000066

Amerigold Suites                                                NVC | National Valuation Consultants, Inc.

10. Information furnished by others is assumed to be true, correct and reliable.  A reasonable effort has been made to verify such information; however, no responsibility for its accuracy is assumed by the appraiser.

11. The opinion of value assumes responsible ownership and competent management.

12. Unless otherwise stated in this report, the existence of hazardous substances, including without limitation asbestos, polychlorinated biphenyls, petroleum leakage, or agricultural chemicals, which may or may not be present on the property, or other environmental conditions, were not called to the attention of nor did the appraiser become aware of such during the appraiser's inspection. The appraiser has no knowledge of the existence of such materials on or in the property unless otherwise stated. The appraiser, however, is not qualified to test such substances or conditions.  If the presence of such substances, such as asbestos, urea formaldehyde foam insulation, or other hazardous substances or environmental conditions, may affect the value of the property, the opinion of value is predicated on the assumption that there is no such condition on or in the property or in such proximity thereto that it would cause a loss in value.  No responsibility is assumed for any such conditions, nor for any expertise or engineering knowledge required to discover them.

13. The values contained in this report are opinions.  There is no guarantee, written or implied, that the subject property will sell or lease for the indicated amounts.

14. The appraisers of National Valuation Consultants, Inc. reserve the right to amend and/or alter statements, analyses, conclusions and opinions of value if information pertinent to this assignment is made known to us after the completion of the report.

15. National Valuation Consultants, Inc., as well as any employee, agent or officer thereof, shall be completely indemnified against any and all losses, claims, damages, liabilities, costs or expenses to which the recipient and/or third party user may become subject, but only if neither National Valuation Consultants, Inc. nor any other indemnified person shall have been grossly negligent or shall have taken or omitted to take any action in bad faith in connection with the preparation of this report.

16. The Americans with Disabilities Act ("ADA") became effective January 26, 1992.  We have not made a specific compliance survey and analysis of this property to determine whether or not it is in conformity with the various detailed requirements of the ADA.  It is possible that a compliance survey of the property, together with a detailed analysis of the requirements of the ADA, could reveal that the property is not in compliance with one or more of the requirements of the Act.  If so, this fact could have a negative effect upon the value of the property.  Since we have no direct evidence relating to this issue, we did not consider possible noncompliance with the requirements of ADA in estimating the value of the property.

17. Unless otherwise noted, all prospective values, if any, in this appraisal, are based on the market conditions which exist at the date of inspection combined with an informed forecast, based on current trends in supply and demand for the property type under appraisal, as to what such conditions will be at the future date of property completion and or stabilization.  The appraiser cannot be held responsible for unforeseeable events, such as unexpected new construction, unanticipated changes in economic conditions, or any other such events which might occur and which would alter market conditions prior to the effective date of the appraisal.

APP000067

Amerigold Suites                                                                 NVC | National Valuation Consultants, Inc.

## Extraordinary Assumptions and Hypothetical Conditions

Our market value opinion is subject to certain standard assumptions and limiting conditions which are referenced in the accompanying appraisal report.  In addition, there is one Extraordinary Assumption, but no Hypothetical Conditions that may have affected the assignment results, as follows:

**EXTRAORDINARY ASSUMPTION**

> *During our inspection of the property, a random sampling of the subject's units was inspected. For the purposes of this appraisal, we have assumed that the condition and decor of the remaining units (those not inspected) is similar to those inspected and described within this report.  If it is determined that the condition and/or decor of the remaining units is significantly different than described herein, a re-valuation of the subject could be required.*

**HYPOTHETICAL CONDITIONS**

> *None*

APP000068

Amerigold Suites

NVC | National Valuation Consultants, Inc.

PRESENTATION OF DATA

APP000069

Amerigold Suites                                    NVC | National Valuation Consultants, Inc.

## U.S. Economic Indicators

### Real Gross Domestic Product

As of early 2Q 2024, the U.S. economy is considered generally stable, as labor market conditions, household incomes, and business margins all display signs of relative health.  It appears that policy makers have executed a soft landing by avoiding the recession that was expected to occur last year.  Real gross domestic product (GDP) increased at an annual rate of 3.3% in the fourth quarter of 2023.  The deceleration in real GDP in the fourth quarter reflected slowdowns in private inventory investment, federal government spending, residential fixed investment, and consumer spending. Imports decelerated.



### Inflation

The Consumer Price Index for all items index rose 3.2% for the 12 months ending February, a larger increase than the 3.1% increase for the 12 months ending January.  The all items less food and energy index rose 3.8% over the last 12 months.  The energy index decreased 1.9% for the 12 months ending February, while the food index increased 2.2% over the last year.



DAL2404901                          U.S. Economic Indicators                                    24

APP000070

Amerigold Suites                                                  NVC | National Valuation Consultants, Inc.

### *Market Indicators*

Key interest rates by sector are detailed below.

| Category | As of | Latest | 1 Month Ago | 1 Month % Chg. | | 1 Year Ago | 1 Year % Chg. | | Freq. |
|---|---|---|---|---|---|---|---|---|---|
| Market Indicators | | | | | | | | | |
| Key Interest Rates | | | | | | | | | |
| 1 Month Treasury | 4/5/2024 | 5.47% | 5.51% | ▼ | (0.7%) | 4.66% | ▲ | 17.4% | Daily |
| 2 Year Treasury | 4/5/2024 | 4.68% | 4.61% | ▲ | 1.5% | 3.84% | ▲ | 21.9% | Daily |
| 10 Year Treasury | 4/5/2024 | 4.36% | 4.22% | ▲ | 3.3% | 3.30% | ▲ | 32.1% | Daily |
| 30 Year Treasury | 4/5/2024 | 4.51% | 4.27% | ▲ | 5.6% | 3.56% | ▲ | 26.7% | Daily |
| 30 Year Mortgage | 4/5/2024 | 6.82% | 6.88% | ▼ | (0.9%) | 6.28% | ▲ | 8.6% | Weekly |
| US Corporate AAA | 4/5/2024 | 4.86% | 4.77% | ▲ | 1.9% | 4.17% | ▲ | 16.5% | Daily |
| US Corporate BBB | 4/5/2024 | 5.61% | 5.58% | ▲ | 0.5% | 5.35% | ▲ | 4.9% | Daily |
| US High Yield Index | 4/5/2024 | 3.24% | 3.31% | ▼ | (2.1%) | 4.84% | ▼ | (33.1%) | Daily |
| Effective Federal Funds | 4/5/2024 | 5.33% | 5.33% | = | 0.0% | 4.83% | ▲ | 10.4% | Daily |
| SOFR | 4/5/2024 | 5.32% | 5.31% | ▲ | 0.2% | 4.81% | ▲ | 10.6% | Daily |

Source:  FRED - St. Louis FED.  2024.

### *Consumer Sentiment Index*

Consumer sentiment recorded an incremental increase of less than three index points from February, well within the margin of error and stable since January.  Critically, consumers exhibited confidence that inflation will continue to soften.  Assessments and expectations of personal finances improved modestly from last month, as the perceived negative effects of high prices and expenses on living standards eased. Strong stock market performance this month supported sentiment gains only for those with the largest holdings, with little impact on the index.  Overall, sentiment is essentially unchanged throughout the first quarter of 2024, remaining just above the midpoint between the pre-pandemic level of sentiment and the historic trough from June 2022.  This stability reflects a perception among consumers that the economy has been holding steady in its current state.



APP000071

Amerigold Suites                                                    NVC | National Valuation Consultants, Inc.

*Investment*

Early 2Q 2024, the S&P 500 index has crossed the key 5,200 level for the first time, as Fed officials have kept interest rates unchanged and maintained their forecast for three rate cuts this year.



*NCREIF Property Index*

The market value index declined by 3.74% during the fourth quarter and 14.39% since the peak in the 2nd quarter of 2022.  The total return for the quarter was -3.02% and the unleveraged return for the past four quarters was -7.95%.

The negative 3.02% total quarterly return consisted of 1.11% from income and -4.13% from negative property appreciation.  Appreciation is after the deduction of capital expenditures.

Hotels were the only sector to achieve a positive return for the second straight quarter although there are very few hotels in the NCREIF Property Index which are primarily core funds.  Office had by far the most negative return at -5.45% as office continues to suffer from work-at-home trends.



APP000072

Amerigold Suites                                                                    NVC | National Valuation Consultants, Inc.

*Capital Markets*

According to CoStar Analytics, having decreased in 2020 by 28.5%, total commercial real estate sales volume reached a new record of $585B in 2021.  However, sales volume fell -9.9% in 2022 and closed 2023 down -56.1%, with $231B.



**CONCLUSION**

Looking forward, there is now more optimism in the market as inflation has returned to reasonable levels and the Fed has indicated that it may now consider rate reductions in 2024.  However, some market observers predict that the Fed won't cut rates until inflation, currently about 3.2% a year, falls closer to its 2.0% target and with the latest inflation figures not showing any declines in inflation, it may be several more months until any rate reductions will be made.  As it is, the Fed continues to hold its benchmark lending rate at 5.25%, and is now emphasizing that it will keep one eye on fighting inflation and the other on maintaining economic growth, attempting to balance the two objectives.  This is a change from the prior year when its focus was entirely on reducing inflation.

Within the real estate sector, industrial and apartment remain the most desirable categories and are considered the safest product types in today's shifting economy.  At the same time, the fundamentals of retail have improved, though suburban locations continue to outperform central cities.  The office market is the weakest sector as it will require some time for supply and demand to adjust to the new structural market realities from the pandemic.  Finally, the residential markets are healthy and should perform well in 2024 if interest rates trend downward as expected, though affordability remains a top concern in many markets.

APP000073

Amerigold Suites                                           NVC | National Valuation Consultants, Inc.

## Area / Subject Map



APP000074

## Dallas-Fort Worth-Arlington, TX MSA Economic and Demographic Profile

**MSA Defined**

According to the U.S. Office of Management and Budget, the Dallas-Fort Worth-Arlington, TX Metropolitan Statistical Area (#19100) is defined as follows.

*Principal Cities:*  Dallas, Fort Worth, Arlington, Plano, Irving, Denton, Richardson, Grapevine.

*Constituent Counties:* Collin County, Dallas County, Denton County, Ellis County, Hunt County, Kaufman County, Rockwall County, Johnson County, Parker County, Tarrant County, Wise County.

**Locational and Linkages Attributes**

The cities of Dallas and Fort Worth are the two central cities of the metroplex.  Dallas and its suburbs have one of the highest concentrations of corporate headquarters in the United States and is the largest growing metropolitan economy in the nation.  Its major industries include Information Technology and Conducting Business.  Fort Worth's economy is fueled by defense and aircraft manufacturing, as well as the Texas farming and ranching industry.

The Dallas-Fort Worth Metroplex is home to over 220 publicly traded companies and roughly 700 total corporate headquarters, one of the largest concentrations in the United States.  As a whole, the region has over 20 Fortune 500 companies and approximately 40 Fortune 1,000 companies.  Among these companies in Dallas are AT&T, Southwest Airlines, Texas Instruments, and Exxon Mobil; Fort Worth is home to American Airlines and several major defense manufacturers including Lockheed Martin and Bell Helicopter Textron.

The Dallas-Fort Worth region's attractive quality of life, low cost of living, skilled labor force, pro-business mindset and absence of corporate and personal income taxes all contribute to a strong regional and state economy.  The region's central location allows it to function as a logistics and distribution hub, giving businesses an edge by putting key markets within easy reach of both truck and rail shipping.

**Ground Transportation**

*Highways*

The Dallas-Fort Worth area has multiple different freeways and interstates.  Major north-south Interstates include I-35 and I-45/I-75.  I-35 splits into I-35E and I-35W from Denton to Hillsboro.  I-35W goes through Fort Worth while I-35E goes through Dallas.  I-45 connects Dallas to Houston.  I-75 connects Dallas to Durant Oklahoma.  East-west routes include I-30 and I-20.  The North Central Texas Council of Governments is a cooperative effort of all the counties impacted by the continued population growth and resulting traffic congestion, with the charter to help plan and coordinate future transportation needs of the region.  Two major turnpikes have been opened in the last 10 years to address this growth: the Sam Rayburn Tollway, which links north Tarrant County to Collin County and the President George Bush Turnpike, which links I-20 and I-30, south of DFW Airport, to the Dallas North Tollway and I-75.

APP000075

Amerigold Suites                                                NVC | National Valuation Consultants, Inc.

*Public Transportation*

Public transit options continue to expand significantly, though in several outlying suburbs, it remains limited. Dallas County and parts of Collin and Rockwall Counties have bus service and light rail operated by Dallas Area Rapid Transit, (DART), covering thirteen cities. The Red Line extends north to Plano and southwest to Westmoreland Road. The Blue Line reaches from Rowlett in the northeast to Ledbetter Road in south Dallas. An additional three miles south to the University of North Texas near I-20 recently opened. DART's 28-mile Green Line connects Carrollton in the northwest through Downtown Dallas to Pleasant Grove in the southeast. The Orange Line is being extended in phases from Northwest Hwy to Las Colinas, in Irving, and finally to DFW International Airport.

*Rail*

Tarrant County has bus service operated by the Fort Worth Transportation Authority (known as 'The T'), available only in Fort Worth. The commuter train that serves Fort Worth and its eastern suburbs is operated as the Trinity Railway Express. It connects downtown Fort Worth to downtown Dallas, where it links to the DART light rail system. A station near its midpoint, Centerport, serves DFW Airport via a free airport shuttle bus.

The Dallas-Fort Worth-Arlington area is served by the Burlington Northern and Santa Fe Railway's Intermodal freight transport yard, the Yellow Freight Systems' cross-docking facility and the Union Pacific intermodal facility, all located adjacent to I-45, southeast of Dallas.

**Air Transportation**

*Dallas-Fort Worth International Airport*

Commercial air transportation is handled through the Dallas-Fort Worth International Airport (DFW). DFW, located midway between Dallas and Fort Worth, is the world's largest in terms of land area, covers in excess of 18,000 acres. According to the airport's website, DFW Airport provides non-stop access to 193 U.S. and 67 international cities. During 2022 DFW served over 61.7 million passengers and over 1.8 billion tons of cargo a significant increase over the 39.3 million passengers and 872,000 tons of cargo served by the same date in 2021. DFW currently ranks 3rd in the world in terms of operations, and 2nd in terms of passengers. The airport also provides employment for close to 228,000 individuals. A map of non-stop flights from DFW is presented below.



APP000076

Amerigold Suites                                            NVC | National Valuation Consultants, Inc.

### *Demographic Overview*

The following table provides a summary of key demographic characteristics within the Dallas-Fort Worth MSA, the State of Texas, and the nation.



| Regional Demographic Summary | | | |
|---|---|---|---|
| | Dallas-Fort Worth MSA | State of Texas | United States |
| **Population** | | | |
| 2020 Census | 7,637,387 | 29,145,505 | 331,449,281 |
| 2024 Estimate | 8,126,208 | 30,665,339 | 336,157,119 |
| 2029 Projection | 8,541,837 | 32,119,807 | 344,209,992 |
| 2020 - 2024 % Annual Change | 1.6% | 1.3% | 0.4% |
| 2024 - 2029 % Annual Change | 1.0% | 0.9% | 0.5% |
| Average Age | 37.7 | 38.1 | 40.6 |
| Median Age | 36.6 | 36.7 | 39.7 |
| **Households** | | | |
| 2020 Census | 2,760,991 | 10,491,147 | 126,817,580 |
| 2024 Estimate | 2,938,027 | 11,081,289 | 129,079,042 |
| 2029 Projection | 3,091,922 | 11,644,207 | 132,563,817 |
| 2020 - 2024 % Annual Change | 1.6% | 1.4% | 0.4% |
| 2024 - 2029 % Annual Change | 1.0% | 1.0% | 0.5% |
| 2024 Average Household Size | 2.7 | 2.7 | 2.5 |
| **Income** | | | |
| 2024 Estimated Median Household | $82,998 | $73,203 | $75,781 |
| 2024 Estimated Avg. Household | $116,476 | $104,373 | $108,671 |
| % Under $50,000 | 29.6% | 34.8% | 33.7% |
| % $50,000 - $100,000 | 29.3% | 28.9% | 28.4% |
| % Over $100,000 | 41.2% | 36.3% | 37.9% |

Environics Analytics, 2024

### *Population Trends*

The Dallas-Fort Worth MSA has experienced annual population growth of 1.6% since 2020, which has surpassed population growth in the State of Texas as a whole. Over the next five years, the Dallas-Fort Worth MSA is expected to see annual growth decline to 1.0%, which is higher than the projected rate of the State of Texas.

### *Income Demographics*

When compared to the State of Texas overall, a relatively large portion of households in the Dallas-Fort Worth MSA earn more than $100,000 annually (41.2%). Within the State of Texas, only 36.3% fall within this income bracket.

DAL2404901                          Economic and Demographic Profile                                31

Amerigold Suites                                              NVC | National Valuation Consultants, Inc.

### *Area Housing Stock*

The bulk of housing in the Dallas-Fort Worth MSA is concentrated in single-family homes which constitute 65.9% of inventory.  Overall, a higher share of households in the Dallas-Fort Worth MSA rent housing compared to the State of Texas; home-ownership levels are estimated at 58.7% and 61.4% in the Dallas-Fort Worth MSA and State of Texas, respectively.  At $352,921, the estimated value of owner-occupied homes in the Dallas-Fort Worth MSA is higher than the State of Texas median of $274,694.

| 2024 Housing Stock, Home Ownership, & Values | | | | |
|---|---|---|---|---|
| | Dallas-Fort Worth MSA | | State of Texas | |
| Housing Structure | Totals | % of Total | Totals | % of Total |
| 1 Unit Detached/Attached | 2,070,076 | 65.9% | 8,269,763 | 67.6% |
| 2-3-4 Units | 138,954 | 4.4% | 613,310 | 5.0% |
| 5-19 Units | 401,204 | 12.8% | 1,262,572 | 10.3% |
| 20 or more Units | 417,288 | 13.3% | 1,216,040 | 9.9% |
| Mobile Home, Trailer, Other | 112,004 | 3.6% | 867,534 | 7.1% |
| TOTAL | 3,139,526 | 100.0% | 12,229,219 | 100.0% |
| Home Ownership Levels | % Owner | 58.7% | % Owner | 61.4% |
| | % Renter | 41.3% | % Renter | 38.6% |
| Median Year Structure Built | | 1992 | | 1991 |
| Median Value of Owner-Occupied Homes | | $352,921 | | $274,694 |

Environics Analytics, 2024

### *Employment by Industry Sector*

Top employment sectors in the Dallas-Fort Worth MSA include Management (12.0%), Office/Admin Support (11.3%), and Sales/Related (9.9%).  Together, these three sectors make up 33.2% of total employment.  When compared with the State of Texas, the Dallas-Fort Worth MSA has a higher share of residents in the Computer/Mathematical occupation (4.9%).



DAL2404901                        Economic and Demographic Profile                        32

APP000078

Amerigold Suites                                                    NVC | National Valuation Consultants, Inc.

*Resident Employment Trends*

The Dallas-Fort Worth MSA is currently exhibiting an unemployment rate of 4.2% as of February 2024.  In 2023, the total number of employed residents in the Dallas-Fort Worth MSA increased by 151,928.  Over the 12-month trailing period through February 2024, resident employment growth slowed as the number of employed residents increased by 37,980.

The total number of employed residents in the Dallas-Fort Worth MSA is now 0.4% lower than the recent peak reached in 2023.  When compared to the State of Texas, the MSA's unemployment rate is lower, but unemployment in the Dallas-Fort Worth MSA is on-par with the nation.

| | Resident Employment Trends | | | |
|---|---|---|---|---|
| | Dallas-Fort Worth MSA | | State of Texas | United States |
| Year | Employment | Unemployment Rate | Unemployment Rate | Unemployment Rate |
| 2013 | 3,253,995 | 6.2% | 6.3% | 7.4% |
| 2014 | 3,350,325 | 5.1% | 5.2% | 6.2% |
| 2015 | 3,437,008 | 4.1% | 4.5% | 5.3% |
| 2016 | 3,559,384 | 3.9% | 4.6% | 4.9% |
| 2017 | 3,637,295 | 3.7% | 4.3% | 4.4% |
| 2018 | 3,721,911 | 3.6% | 3.9% | 3.9% |
| 2019 | 3,811,831 | 3.3% | 3.5% | 3.7% |
| 2020 | 3,694,881 | 7.1% | 7.7% | 8.1% |
| 2021 | 3,906,721 | 5.1% | 5.6% | 5.3% |
| 2022 | 4,105,694 | 3.5% | 3.9% | 3.6% |
| 2023 | 4,257,622 | 3.8% | 3.9% | 3.6% |
| | Most Current Data | | | |
| Feb 2023 | 4,203,127 | 4.1% | 4.4% | 3.9% |
| Feb 2024* | 4,241,107 | 4.2% | 4.4% | 4.2% |



Source: U.S. Bureau of Labor Statistics, 04/2024. The preceding data reflects all BLS revisions to date.
* - Preliminary data

APP000079

Amerigold Suites                                                NVC | National Valuation Consultants, Inc.

### *Consumer Price Index (CPI) Trends*

The Consumer Price Index (CPI) is a measure of the average change over time in the prices paid by urban consumers for consumer goods and services and serves as an economic indicator.  The CPI is the most widely used measure of inflation and provides information about price changes in the Nation's economy to government, business, and private citizens.

Price indexes are available for the U.S., the four Census regions, size of city, cross-classifications of regions and size-classes, and for 26 local areas.  Indexes are available for major groups of consumer expenditures (food and beverages, housing, apparel, transportation, medical care, recreation, education and communications, and other goods and services), for items within each group, and for special categories, such as energy.

The CPI for Dallas-Fort Worth CSA recorded an increase of 2.8% annually for "All Items" during the period 2014-2023, which was higher than the U.S. (Class A) increase of 2.6%.  From January 2023 to January 2024, the CPI for the Dallas-Fort Worth CSA increased by 5.3%, which was above the U.S. (Class A) CPI increase of 2.9% over the same time period.

| Comparative CPI Trends Dallas-Ft. Worth CSA and U.S. (Class A) | | |
|---|---|---|
| | All Items | |
| Year | DFW, TX CSA | U.S. (Class A) |
| 2014 | 218.4 | 216.1 |
| 2015 | 217.5 | 217.1 |
| 2016 | 220.7 | 220.3 |
| 2017 | 226.1 | 225.4 |
| 2018 | 232.8 | 231.3 |
| 2019 | 237.7 | 235.9 |
| 2020 | 239.1 | 239.0 |
| 2021 | 251.6 | 249.1 |
| 2022 | 273.9 | 268.6 |
| 2023 | 288.0 | 280.0 |
| Annual Change | 2.8% | 2.6% |
| 2022-2023 | 5.2% | 4.3% |
| Partial Year Comparison | | |
| Jan-23 | 281.1 | 275.9 |
| Jan-24 | 296.1 | 284.1 |
| Annual Change | 5.3% | 2.9% |

Source: U.S. Bureau of Labor Statistics. 2Q 2024
Not Seasonally Adjusted Data
DFW CSA Period: 1982-84=100
U.S. (Class A) Base Period: December 1986=100

The BLS divides the nation into several Combined Statistical Areas (CSA's).  CSA's are larger than Metropolitan Statistical areas (MSA's) because they are intended to give a regional picture.  For markets that do not fall within these CSA's, the BLS has defined these as being Class A, Class B/C, or Class D, depending on population.  Size Class A is defined as having a population of more than 1.5 million.  Size Class B/C is defined has having a population between 50,000 and 1.5 million.  Size Class D is defined as having a population of less than 50,000.

APP000080

Amerigold Suites                                                  NVC | National Valuation Consultants, Inc.

**CONCLUSION**

The Dallas-Fort Worth MSA encompasses 11 counties within the State of Texas. Residents of the area refer to it as the Dallas/Fort Worth Metroplex, DFW, or The Metroplex. It is the economic and cultural hub of the region commonly called North Texas or North Central Texas and is the largest land-locked metropolitan area in the United States.

Dallas-Fort Worth is a leader in economic and demographic growth in the country. The metro added 488,821 new residents from 2020 to 2024, taking the top spot at a national level. The local economy has added the most jobs since the latest downturn, up 616,000 since year-end 2020. Due to the region's low cost of doing business and highly skilled labor force, companies have relocated or expanded operations across various sectors. The financial services sector has made an outsized impact, with Goldman Sachs and Wells Fargo announcing the construction of regional campuses employing a combined 9,000 employees. Among recent examples, Caterpillar relocated its headquarters to Irving from Peoria, Illinois; the heavy equipment manufacturer first moved its electric power division to the area. Engineering giant AECOM announced relocating its global headquarters from Los Angeles to Dallas.

Another California transplant was MD7 LLC, a mobile infrastructure consultancy firm. The company is relocating from San Diego to Allen. The move is anticipated to create 218 jobs and bring $6.8 billion in capital investment. In late 2019, Charles Schwab announced acquiring TD Ameritrade in a $26 billion transaction, moving its headquarters to Tarrant County from San Francisco. Charles Schwab completed a new regional office, and TD Ameritrade completed a large project nearby. The two companies' combined will bring thousands of jobs to the region. TripActions, a Palo Alto based company specializing in corporate travel, expanded its presence in Downtown Dallas. McKesson Corp, the nation's largest pharmaceutical distributor, relocated its headquarters to Irving. USAA added a 150,000-SF office building adjacent to its existing Plano location to bring the total headcount to 2,000 in north Texas, up by 800 employees.

A flurry of economic development wins has defined growth in the region over the last decade. North Texas has attracted over 150 new corporate headquarters during this period. In 2017, Toyota moved into its 2.0 million SF North American headquarters at the Legacy West development in Plano. The company relocated its sales, engineering, and financial services operations from California, bringing about 4,000 jobs. It has plans to add thousands more. State Farm finished its regional expansion in 2016 and occupied 2.0 million SF in Richardson's CityLine development. Another major headliner is Liberty Mutual Insurance, which has added around 5,000 jobs in Legacy West. Existing employers like AT&T, 7-Eleven, JPMorgan Chase, USAA, and Fannie Mae are also expanding their local footprints.

The Dallas-Fort Worth metro economy continues to grow and attract more companies which has caused increased employment and demand for commercial real estate. However, the recent rise in unemployment seen throughout most of the country, as well as the rising inflation rates give the Dallas-Fort Worth MSA a cautiously optimistic outlook as 2024 moves into Spring..

APP000081

Amerigold Suites                                                    NVC | National Valuation Consultants, Inc.

## Market Area Map



APP000082

Amerigold Suites                                            NVC | National Valuation Consultants, Inc.

## Market Area Analysis

**Description of Market Area**

The subject is located at 13636 Goldmark Drive, in the City of Dallas, Dallas County, Texas. The market area is defined as a rough polygon bounded by U.S. 75 to the east, Belt Line Road to the north, Coit Road to the west and Interstate 635 to the south. A map of the market area was provided on the preceding page.

Dallas is the largest urban center of the Dallas-Fort Worth MSA, which is the fourth-most populous metropolitan area in the United States. Dallas has developed into a strong industrial and financial center, as well as a major inland port, due to the convergence of railroad lines, interstate highways, and the construction of the Dallas/Fort Worth International Airport, one of the largest and busiest airports in the world. Additionally, Dallas has one of the largest concentrations of corporate headquarters for publicly traded companies in the United States.

Retail use is fairly prevalent surrounding the outskirts of the subject location, as a number of restaurants and shopping centers can be found directly north and east of the subject property. Most of the market area covers residential neighborhoods to its immediate west and north, and the market area neighbors the City of Richardson and the Texas Instruments campus to the east. The Dallas College Richland Campus. The subject is not located within an Opportunity Zone.

**Linkages and Locational Attributes**

Interstate 635, U.S. Highway 75, and the Dallas North Tollway are the primary highways serving the market area. The Dallas North Tollway runs north-south from Interstate 35E near downtown Dallas to U.S. Highway 380 in Frisco. Interstate 635 forms a half loop around the City of Dallas, connecting to Dallas/Fort Worth International Airport in the west and Balch Springs in the southwestern portion of the metro area. Furthermore, U.S. 75 runs north to south and stretches from Downtown Dallas, north through Plano, connecting suburban markets to the market area. The market area is also well-served by a number of regional roads, including Forest Lane, Royal Lane, Preston Road, Hillcrest Road, and Greenville Avenue.

*Air Transportation* - Commercial air transportation is handled through two major facilities. DFW International Airport, located midway between Dallas and Fort Worth approximately 20 driving miles east of the subject, is the world's largest in terms of land area, covers in excess of 18,000 acres. Dallas Love Field, located about seven miles southwest of the market area, is a second option for air travelers. Love Field is home to Southwest Airlines. Delta Airlines and Virgin America also have service at Love Field at this time.

*Public Transit* - Public transportation in Dallas is operated by the Dallas Area Rapid Transit (DART) system, which includes a network of light rail lines, buses, streetcars, and a commuter rail line. DART is the largest and most comprehensive transit system in North Texas, serving Dallas and 12 surrounding cities.

The DART light rail system consists of four lines that cover a total of 93 miles. The Red Line runs north-south, the Blue Line runs northeast-south, the Green Line runs northwest-southeast, and the Orange Line runs northwest-north. The subject is five miles east of the Royal Lane DART rail and bus station.

APP000083

Amerigold Suites                                         NVC | National Valuation Consultants, Inc.

### *Demographic Overview*

The following table provides a summary of key demographic statistics for the subject's defined market area, along with comparable data for its one and five-mile radial areas, the City of Dallas, and Dallas County.

| Market Area Demographic Summary | | | | | |
|---|---|---|---|---|---|
| | Market Area | 3 Mile Radius | 5 Mile Radius | City of Dallas | Dallas County |
| **Population** | | | | | |
| 2020 Census | 23,015 | 148,842 | 406,698 | 1,304,379 | 2,613,539 |
| 2024 Estimate | 22,875 | 148,165 | 408,429 | 1,307,608 | 2,612,729 |
| 2029 Projection | 22,881 | 148,517 | 410,172 | 1,317,877 | 2,630,719 |
| 2020 - 2024 % Annual Change | (0.2%) | (0.1%) | 0.1% | 0.1% | (0.0%) |
| 2024 - 2029 % Annual Change | 0.0% | 0.0% | 0.1% | 0.2% | 0.1% |
| Average Age | 34.1 | 38.4 | 38.3 | 37.2 | 37.3 |
| Median Age | 33.0 | 37.0 | 36.0 | 35.1 | 35.7 |
| **Households** | | | | | |
| 2020 Census | 8,186 | 60,236 | 171,281 | 523,798 | 965,537 |
| 2024 Estimate | 8,198 | 59,973 | 172,362 | 530,095 | 971,311 |
| 2029 Projection | 8,247 | 60,178 | 173,720 | 538,713 | 983,747 |
| 2020 - 2024 % Annual Change | 0.0% | (0.1%) | 0.2% | 0.3% | 0.1% |
| 2024 - 2029 % Annual Change | 0.1% | 0.1% | 0.2% | 0.3% | 0.3% |
| 2024 Average Household Size | 2.8 | 2.5 | 2.3 | 2.4 | 2.7 |
| **Income** | | | | | |
| 2024 Estimated Median Household | $51,767 | $67,196 | $68,616 | $63,370 | $69,880 |
| 2024 Estimated Avg. Household | $71,071 | $107,679 | $109,373 | $99,297 | $102,126 |
| % Under $50,000 | 48.3% | 38.0% | 36.7% | 40.5% | 35.8% |
| % $50,000 - $100,000 | 30.0% | 27.5% | 28.7% | 29.2% | 30.5% |
| % Over $100,000 | 21.7% | 34.5% | 34.6% | 30.3% | 33.7% |

Annual Growth Projections (2024 - 2029) / Household Income Comparison

Environics Analytics, 2024

### *Population Trends*

The market area has posted annual population decline of 0.2% since 2020, which has remained below population growth in the City of Dallas as a whole.  Over the next five years, the market area is expected to its population stabilize, but it will remain lower than the projected growth rate of the City of Dallas.

### *Income Demographics*

When compared to the City of Dallas overall, a relatively large proportion of households in the market area earn less than $50,000 annually (48.3%).  Within the City of Dallas, only 40.5% fall within this income bracket.

APP000084

Amerigold Suites                                                    NVC | National Valuation Consultants, Inc.

### Area Housing Stock

The majority of housing in the market area is concentrated in multi-family homes which constitute 69.5% of inventory.  Overall, a higher percentage of households in the market area rent housing compared to the City of Dallas; home-ownership levels are estimated at 26.7% and 39.4% in the market area and City of Dallas, respectively.  At $347,639, the estimated value of owner-occupied homes in the market area is higher than the City of Dallas median of $337,869.

| 2024 Housing Stock, Home Ownership, & Values | | | | |
|---|---|---|---|---|
| | Market Area | | City of Dallas | |
| Housing Structure | Totals | % of Total | Totals | % of Total |
| 1 Unit Detached/Attached | 2,683 | 30.0% | 262,017 | 44.8% |
| 2-3-4 Units | 1,040 | 11.6% | 36,169 | 6.2% |
| 5-19 Units | 2,845 | 31.8% | 119,052 | 20.4% |
| 20 or more Units | 2,345 | 26.2% | 160,316 | 27.4% |
| Mobile Home, Trailer, Other | 45 | 0.5% | 6,768 | 1.2% |
| TOTAL | 8,958 | 100.0% | 584,322 | 100.0% |
| Home Ownership Levels | % Owner | 26.7% | % Owner | 39.4% |
| | % Renter | 73.3% | % Renter | 60.6% |
| Median Year Structure Built | 1973 | | 1980 | |
| Median Value of Owner-Occupied Homes | $347,639 | | $337,869 | |

Environics Analytics, 2024

### Resident Employment by Occupation

Top employment sectors in the market area include Construction/Extraction (15.2%), Food Prep/Serving (11.8%), and Office/Admin Support (9.0%).  Together, these three sectors make up 36.0% of total employment.  When compared with the City of Dallas, the market area has a higher proportion of residents in the Food Prep/Serving occupation.



---

DAL2404901                          Description of the Property                          39

APP000085

Amerigold Suites                                              NVC | National Valuation Consultants, Inc.

*Principal Employers*

A list of principal employers in City of Dallas, according to the city's most recently published *Comprehensive Annual Financial Report*, is provided below.

| Principal Employers - City of Dallas ||
| Employers | Employees |
| --- | --- |
| UT Southwestern Medical Center | 23,817 |
| Dallas Independent School District | 23,271 |
| City of Dallas | 16,000 |
| Southwest Airlines Co | 14,618 |
| Parkland Health & Hospital System | 13,000 |
| Medical City Dallas | 10,641 |
| Dallas County Community College | 8,230 |
| Texas Instruments Inc. | 7,722 |
| Dallas County Community College | 6,500 |
| Methodist Dallas Medical Center | 6,452 |

Source: City of Dallas CAFR, 2024.

*Market Drivers*

**Texas Instruments Inc.:**  Texas Instruments (TI) is a major semiconductor company headquartered in Dallas, directly southeast of the subject.  TI has become one of the largest semiconductor manufacturers globally, known for its innovations in analog and embedded processing technologies. The company's presence in Dallas, particularly its campus located in North Dallas, has been a vital hub for its operations and it one of the city's largest employers.

**Medical City Dallas Hospital:**  Medical City is a healthcare institution located Just south of the subject location.  It is one of the largest and most comprehensive medical centers in the metroplex, serving as a hub for advanced medical care, research, and education. The hospital is part of the Medical City Healthcare network, which is owned and operated by HCA Healthcare, one of the largest healthcare providers in the United States.  Medical City Dallas offers a wide range of medical services, including emergency care, specialized surgery, cancer treatment, cardiac care, women's health services, orthopedics, and neurology, among others.  In addition to its clinical services, Medical City Dallas is also known for its commitment to medical research and education.

**Texas Health Presbyterian Hospital:**  About 3.0 miles to the south of the subject, Texas Health Presbyterian Hospital Dallas offers a comprehensive range of medical services, including emergency care, surgery, cardiology, oncology, orthopedics, women's services, and neurology, among others.  Beyond its clinical services, Texas Health Presbyterian Hospital is actively involved in medical research and education. It collaborates with academic institutions and medical schools to train future healthcare professionals through residency and fellowship programs. Additionally, the hospital participates in research initiatives and clinical trials, contributing to advancements in healthcare and medical knowledge.

**City of Richardson:**  The subject is adjacent to the City of Richardson.  One of the defining features of Richardson is its robust economy, driven by a mix of industries including telecommunications, technology, healthcare, and finance. The city is home to numerous corporate headquarters and regional offices, contributing to its status as a major business center in North Texas. Major companies such as AT&T, Texas Instruments, and Blue Cross Blue Shield of Texas have a significant presence in Richardson, bolstering its reputation as a hub for innovation and entrepreneurship.

APP000086

Amerigold Suites                                    NVC | National Valuation Consultants, Inc.

### *Resident Employment Trends*

The City of Dallas is currently exhibiting an unemployment rate of 4.3% as of February 2024. In 2023, the total number of employed residents in the City of Dallas grew by 26,079. Over the 12-month trailing period through February 2024, resident employment growth slowed as the number of employed residents increased by 6,357.

The total number of employed residents in the City of Dallas is now 0.4% lower than the recent peak reached in 2023. When compared to Dallas County, the city's unemployment rate is similar, but unemployment in the City of Dallas is 0.1 percentage point higher than the nation.

| | City of Dallas | | Dallas County | | Dallas-Fort Worth MSA |
|---|---|---|---|---|---|
| Year | Employment | Unemployment Rate | Employment | Unemployment Rate | Unemployment Rate |
| 2013 | 580,276 | 6.5% | 1,150,663 | 6.6% | 6.2% |
| 2014 | 597,306 | 5.3% | 1,180,636 | 5.5% | 5.1% |
| 2015 | 612,229 | 4.2% | 1,208,806 | 4.3% | 4.1% |
| 2016 | 634,785 | 4.0% | 1,246,814 | 4.0% | 3.9% |
| 2017 | 644,448 | 3.9% | 1,264,990 | 4.0% | 3.7% |
| 2018 | 647,219 | 3.8% | 1,276,103 | 3.8% | 3.6% |
| 2019 | 652,325 | 3.5% | 1,286,431 | 3.5% | 3.3% |
| 2020 | 622,055 | 8.0% | 1,226,780 | 7.8% | 7.1% |
| 2021 | 658,667 | 5.7% | 1,299,051 | 5.6% | 5.1% |
| 2022 | 693,675 | 3.7% | 1,368,043 | 3.7% | 3.5% |
| 2023 | 719,754 | 3.9% | 1,419,452 | 3.9% | 3.8% |
| Most Current Data | | | | | |
| Feb 2023 | 710,564 | 4.3% | 1,401,295 | 4.3% | 4.1% |
| Feb 2024* | 716,921 | 4.3% | 1,413,868 | 4.3% | 4.2% |

*Table title: Resident Employment Trends*



Source: U.S. Bureau of Labor Statistics, 04/2024. The preceding data reflects all BLS revisions to date.
* - Preliminary data

---

DAL2404901                          Description of the Property                                    41

APP000087

Amerigold Suites                                                NVC | National Valuation Consultants, Inc.

**CONCLUSION**

With its strategic location and robust transportation network, including major highways, airports, and public transit systems like the Dallas Area Rapid Transit (DART), Dallas serves as a key industrial and financial hub, bolstered by the presence of numerous corporate headquarters and regional offices.

With the City of Richardson as an immediate neighbor to the market area, the local economy is buoyed by diverse sectors driven by telecommunications, technology, and healthcare.  Richardson's thriving business environment, coupled with its renowned educational institutions and cultural attractions, contributes significantly to the market area's overall popularity.

Moreover, the healthcare landscape in the market area is enhanced by institutions like Texas Instruments Inc., Medical City Dallas Hospital, and Texas Health Presbyterian Hospital, which play pivotal roles in providing advanced medical care, research, and education to residents across the metroplex.

The market area continues to navigate economic shifts and employment trends, maintaining a competitive edge in fostering innovation, supporting workforce development, and sustaining community well-being.  Despite challenges, the City of Dallas remains resilient, poised for continued growth and prosperity, supporting the market area and providing a favorable outlook.

APP000088

Amerigold Suites                                                    NVC | National Valuation Consultants, Inc.

## Tax and Assessment Analysis

***Property Tax Administration***

According to the State of Texas, administration of the property tax system in Texas involves both state and local entities and officials.  State law governs how the process works.

1.      The ***Comptroller of Public Accounts of the State of Texas*** adopts rules establishing minimum standards for the administration and operation of an appraisal district.  The minimum standards may vary according to the number of parcels and the kinds of property the district is responsible for appraising.

2.      The ***Board of Tax Professional Examiners*** is responsible for certifying tax professionals in Texas and  in setting standards for and approving curricula and materials for use in training and educating appraisers and assessor-collectors.

3.      An ***appraisal district*** is established in each county.  The district is responsible for appraising property in the district for ad valorem tax purposes of each taxing unit that imposes ad valorem taxes on property in the district.  An appraisal district is a political subdivision of the state.  With exceptions, the appraisal district's boundaries are the same as the county's boundaries.  The appraisal district is governed by a ***board of directors***.  A ***chief appraiser*** is the chief administrator.

4.      ***An appraisal review board*** settles any disagreements between the property owner and the appraisal district about the value of a property.  The appraisal review board is established for each appraisal district.

***Local taxing units***, which include the county, city, school district, and special districts, decide how much money they will spend.  This determines the total amount of taxes that property owners will pay.  The county assessor-collector shall assess and collect taxes on property in the county.
The county attorney or, if there is no county attorney, the district attorney shall represent the county to enforce the collection of delinquent taxes if the commissioners court does not contract with a private attorney.

***Assessment***

The assessment of property for taxation on the basis of a percentage of its appraised value is prohibited.  All property shall be assessed on the basis of 100% of its appraised value.  The market value of property shall be determined by the application of generally accepted appraisal methods and techniques.  If the appraisal district determines the appraised value of a property using mass appraisal standards, the mass appraisal standards must comply with the Uniform Standards of Professional Appraisal Practice.  The same or similar appraisal methods and techniques shall be used in appraising the same or similar kinds of property.  However, each property shall be appraised based upon the individual characteristics that affect the property's market value.  In determining the market value of property, the chief appraiser shall consider the cost, income, and market data comparison methods of appraisal and use the most appropriate method.

APP000089

Amerigold Suites                                                                NVC | National Valuation Consultants, Inc.

*Reassessment Cycle*

The appraisal district must repeat the appraisal process for property in the county at least once every three years.

*Tax Rates*

Local taxing units, which include the county, city, school district, and special districts, decide how much money they will spend.  This determines the total amount of taxes that property owners will pay.  The governing body of each taxing unit, before the later of September 30 or the 60th day after the date the certified appraisal roll is received by the taxing unit, shall adopt a tax rate for the current tax year and shall notify the assessor for the unit of the rate adopted.

State "truth-in-taxation" laws give taxpayers a voice in decisions that affect their property tax rates. Beginning in early August, taxing units take the first step toward adopting a tax rate by calculating and publishing the effective and rollback tax rates.

> The *effective tax* rate would provide the taxing unit with approximately the same amount of revenue it had the year before on properties taxed in both years.
>
> The *rollback* rate provides the taxing unit approximately the same amount of tax revenue it spent the previous year for day-to-day operations plus an extra 8-percent cushion, and sufficient funds to pay its debts in the coming year.  For school districts, the cushion is six cents per $100 of property value, not 8%.

The State of Texas has provided for a unified system of taxation for the assessment of real estate property taxes.  An appraisal district is established on a county basis for assessing real estate within the county. The individual taxing authorities within the county set their own tax rates.

According to the Dallas Central Appraisal District, the subject property falls under the taxing jurisdiction of numerous taxing entities, detailed below.  Because assessed value is typically the result of a mass appraisal process based more on statistical probability than individual property characteristics, it should be noted that there is frequently a difference between assessed value and market value for an individual property.  Tax rates for 2023, which are the basis for taxes payable in 2024 for each taxing entity, are as follows.

| Tax Rate Summary | | |
|---|---|---|
| Tax Year | Tax District | Tax Rate |
| 2023 | City of Dallas | 0.735700 |
| 2023 | Dallas County | 0.215718 |
| 2023 | Richardson ISD | 1.143100 |
| 2023 | Dallas College | 0.110028 |
| 2023 | Parkland Hospital | 0.219500 |
| **2023** | **Total** | **2.424046** |

APP000090

Amerigold Suites                                                          NVC | National Valuation Consultants, Inc.

### 2024 Proposed Assessments and Taxes

The property's proposed 2024 assessments and taxes are summarized in the following table. According to the Dallas Central Appraisal District, business personal property is included in the assessed value for hotels, motels, and apartments.

| | | | | | |
|---|---|---|---|---|---|
| **2024 Proposed Assessment and Taxes** | | | | | |
| Parcel Number | Land Value | Improved Value | Assessed Value | Tax Rate (%) | Total Taxes |
| 00000769000800000 | $930,440 | $4,645,810 | $5,576,250 | | $135,171 |
| $/Unit | | | $79,661 | | $1,931 |
| $/SF | | | $108.07 | | $2.62 |
| **Total Real Estate Taxes** | | | | | **$135,171** |
| Source: Dallas County Assessor's Office | | | | | |

The 2024 proposed assessment is 159% above the certified 2023 assessment and will likely be appealed. Given subject's age and condition, the proposed assessed value seems excessive, particularly as it is well above the current indicated contract price.

### Tax Comparables

In order to determine the validity of the subject's assessed value and real estate taxes, we have compiled the following taxes for three nearby apartment projects similar to the subject. This information is summarized in the following table.

| | | | | | | |
|---|---|---|---|---|---|---|
| **Tax Comparable Summary** | | | | | | |
| Property | Year Built | Avg. SF | # of Units | Actual Value | Value Per SF | Value Per Unit |
| Autumn Brook | 1980 | 741 | 60 | $6,276,130 | $141 | $104,602 |
| Oak Hollow | 1980 | 543 | 32 | $3,043,200 | $175 | $95,100 |
| West Creek | 1979 | 725 | 54 | $5,745,090 | $147 | $106,391 |
| Comps Averages | 1980 | 670 | 49 | $5,021,473 | $154 | $102,031 |
| Source: Dallas County Assessor's Office | | | | | | |

The subject property has a proposed assessed value of $79,661 per unit, with annual taxes of $1,931 per unit; this compares to the certified 2023 assessed value of $2,150,000 ($30,714/unit and taxes of $745/unit). The comparables' proposed assessed values indicate a much lower range of taxes per unit of $95,100 to $106,391, and these are also likely to be appealed and be reduced. Further, it is also noted that the subject has a higher unit count compared to the other apartment properties.

### Estimate of Proforma Taxes

Based on our knowledge of the property tax market in North Texas and given that our market value opinion is lower than the proposed 2024 assessed value, a prudent investor would base its proforma taxes on an assessed value of around 70% of market value, particularly as the property is under an LOI of sale. This produces an assumed assessed value of around $3,360,000, or $48,000/unit.

APP000091

Amerigold Suites                                                    NVC | National Valuation Consultants, Inc.

Considering the preceding, we estimate an assessed value for subject of $3,360,000 ($48,000/Unit), for our estimate of proforma taxes, based upon 70% of the projected sale price.  Using this assessed value, subject's proforma taxes are estimated to be **$81,500** (rounded) and this figure is used in our stabilized pro forma.

APP000092

Amerigold Suites                                              NVC | National Valuation Consultants, Inc.

## Description of the Property

In analyzing and describing the subject site, we have relied on our personal inspection of the property and surrounding area on April 5, 2024; information provided by ownership; and records on file with the county.

Briefly described, the subject is a Class C, Garden/Low Rise, apartment community with 11 residential buildings and a clubhouse. The improvements include 70 units with a total rentable area of 51,600 SF for an average unit size of 737 SF. There are 90 total parking spaces, for a parking ratio of 1.3 spaces per unit. The subject was built in 1981.

**SITE SIZE:**              3.56 acres (±155,074SF) per ALTA Survey.

**ADDRESS:**                13636 Goldmark Drive, Dallas, Texas

**FLOODPLAIN:**             According to CoreLogic, the subject property is located within FEMA Flood Insurance Rate Map Community Panel Number 48113C0195K, dated, July 7, 2014. The subject is situated in Zone X. First American Flood Data Services defines Zone X as an area that is determined to be outside the 100- and 500-year floodplains.

**ZONING:**                 The property is zoned MU-3, Mixed Use 3 under the authority of City of Dallas. Multifamily is a permitted land use under this zoning.

**SURROUNDING LAND USES:**  Current surrounding land uses are as follows:

                            North: Apartment homes
                            East:  Apartment homes
                            South: Restaurant, storage/rental facility
                            West:  Apartment homes (senior)

**IMPROVEMENT SUMMARY:**
    Year of Construction:    1981
    Total Units:             70
    Density:                 19.66 units/acre
    No. of Buildings:        11 residential buildings and a clubhouse
    Net Rentable Area:       51,600 SF per rent roll
    Average Unit Size:       737 SF

**PARKING**
    No. of Spaces:           90
    Spaces per unit:         1.29
    Description:             90 surface spaces
    Premiums:                Surface parking is free

APP000093

Amerigold Suites                                              NVC | National Valuation Consultants, Inc.

**UNIT MIX:**

| Unit Mix By Size and Unit Type | | | | |
|---|---|---|---|---|
| | Unit Size | | | Rentable |
| Unit Type | (SF) | No. of Units | % of Total | Area (SF) |
| 1/1 | 660 | 60 | 86% | 39,600 |
| 2/2 | 1,200 | 10 | 14% | 12,000 |
| Average/Total | 737 | 70 | 100% | 51,600 |

**PROJECT AMENITIES:**     BBQ Grills, Clubhouse, Community Conference Room, On-site Leasing Office and Pool

**UNIT AMENITIES:**     W/D hookups, W/D appliances (select units), Vaulted Ceilings (select units), AC, Balcony/Patio, Fireplace (select units), Crown molding and Walk-in closets

**OVERALL CONDITION:**     Overall, the property is in below-average condition for its age and immediate repairs may be required, particularly to exterior retaining walls.

**PERSONAL PROPERTY:**     The subject includes personal property, which is typical for an apartment project. This includes all appliances within the units, as well as management office and poolside furniture and equipment.

**AGE AND ECONOMIC LIFE**

Actual Age:                43 years (Built in 1981)
Effective Age:             25 years (Appraiser Estimate)
Life Expectancy:           55 years (per MVS)
Remaining Economic Life:   30 years

**RENOVATIONS:**

**CONCLUSION:**     The subject is a 90-unit, class C, apartment complex, which although some units have been renovated is in below-average condition. Renovations proposed by the prospective purchaser would likely improve the appeal of the property and enable it to increase rents and regain occupancy closer to 100%.

APP000094

Amerigold Suites                                    NVC | National Valuation Consultants, Inc.

## Subject Photographs



Main Community Entrance



Leasing Office/Clubhouse



Typical Building Exterior



Typical Building Exterior



Pool Area (Under Renovation)



Maintenance Building

APP000095

Amerigold Suites                                    NVC | National Valuation Consultants, Inc.



Entrance/Corridor Area



Living Room (Under Renovation)



Kitchen (Under Renovation)



Bathroom (Under Renovation)



Bedroom (Under Renovation)



Balcony

APP000096

Amerigold Suites                                        NVC | National Valuation Consultants, Inc.



Two-Story Unit (Under Renovation)



Fitness Room (Not in Use)



Community Room



Cracked Retaining Wall



Parking and Pole Sign



Goldmark Drive – Street View

APP000097

Amerigold Suites                                    NVC | National Valuation Consultants, Inc.

# ANALYSIS OF DATA AND CONCLUSIONS

APP000098

## Dallas-Fort Worth Metro Apartment Market Analysis:

A proper analysis and understanding of the market factors which influence the apartment market is necessary as a precursor to the appraisal process.  We have relied upon CoStar Analytics apartment market survey data and trends for rent, vacancy, and inventory levels in the Dallas-Fort Worth market and *data is specific to "market rate" units (i.e., effective rent per unit, after concessions)*.  Based upon data sources available, the following is an analysis of the factors which impact demand for apartment units.

### *Dallas-Fort Worth Metro Apartment Market Overview*

The Dallas-Fort Worth apartment market has seen a substantial influx of newly filled units in the early months of 2024, totaling 5,788 year-to-date, a figure more closely aligned with first-quarter averages observed from 2017 to 2019.  However, the surplus of supply over demand has led to an increase in vacancies, reaching 10.8% compared to the low of 6.2% recorded in 2021.  Rent growth has also experienced a downturn since peaking in 2021.

Suburban areas with a higher concentration of Class A properties, such as Frisco/Prosper, Denton, and Allen/McKinney, have exhibited stronger demand, partly fueled by population growth trends in Collin and Denton Counties.  Conversely, the Class B segment has shown signs of a delayed recovery, with vacancies persisting above pre-pandemic levels.  Economic challenges faced by mid-and-lower income households over the past two years have contributed to this residual demand response, despite easing inflationary pressures.

The apartment market in Dallas-Fort Worth continues to grapple with suppressed rent growth amidst elevated supply levels and heightened competition.  Submarkets adjacent to construction hotspots, particularly those with a heavy concentration of Class A properties, have witnessed negative rent growth, underscoring the challenges faced by owners and property managers in maintaining occupancy rates.  Even historically resilient segments like the Class B cohort have experienced negative rent growth, indicative of shifting pricing dynamics favoring tenants.  However, as supply and demand gradually rebalance, vacancies are expected to stabilize, with forecasts predicting a gradual rebound in rent growth by the end of 2024 and beyond.

### *Year-Over-Year Trend Summary*

From 1Q 2023 to 1Q 2024, vacancy within the market increased by 190 bps to a rate of 10.9%.  Over the same time frame, rental rates decreased by 1.7% to a rate of $1,518/unit.  In 1Q 2024, 4,819 apartment units were absorbed by the market, while 8,909 new units were added, a continuation of the imbalance demonstrated in 1Q 2023.

| Dallas-Fort Worth Metro Apartment Market Year-Over-Year Trend Summary | | | | |
|---|---|---|---|---|
| | 2024 Q1 | 2023 Q1 | YoY Change | Trend |
| Overall Vacancy | 10.9% | 9.0% | 190  bps | ⬆ |
| Market Rate Per Unit | $1,518 | $1,544 | (1.7%) | ⬇ |
| Absorbed Units | 4,819 | 2,193 | 2,626 | ⬆ |
| New Unit Deliveries | 8,909 | 6,932 | 1,977 | ⬆ |

Source: CoStar Properties Analytical Search, 04/04/2024.

APP000099

### Dallas-Fort Worth Metro Apartment Market Snapshot

The following table provides an overview of apartment market statistics by property subtype for the metropolitan Dallas-Fort Worth market.  As shown, vacancy is currently higher in the Class B segment at 11.9%.   By number of units, the Dallas-Fort Worth Metro apartment market exhibits the following composition: Class A-30.5%, Class B-46.6%, and Class C-22.9%.

| Dallas-Fort Worth Metro Apartment Market Snapshot | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Existing Inventory | | | Vacancy Rate | | Absorbed | Market Rate |
| Class | Total Inventory | Total Units | % of Units | Total Units | Vacancy | Units | Per Unit |
| Class A | 848 | 260,627 | 30.5% | 27,626 | 10.6% | 2,415 | $1,796 |
| Class B | 2,032 | 398,175 | 46.6% | 47,383 | 11.9% | 3,510 | $1,477 |
| Class C | 2,655 | 195,553 | 22.9% | 17,209 | 8.8% | (136) | $1,206 |
| Total | 5,535 | 854,355 | 100.0% | 92,218 | 10.8% | 5,788 | $1,517 |

Source: CoStar Properties Analytical Search, 04/04/2024. RBA = Rentable Building Area

### Product Class Definitions

Each class of apartment building is defined below, using parameters established by BOMA International.  Please note that these are primarily market classifications, not construction classifications:

**Class A**: Generally, garden product built within the last 10 years.  Properties with a physical age greater than 10 years but have been substantially renovated.  Commands rents within the range of Class "A" rents in the submarket.  Well merchandised with landscaping, attractive rental office and/or club building.  High-end exterior and interior amenities as dictated by other Class "A" products in the market.

**Class B**: Generally, product built within the last 20 years.  Exterior and interior amenity package is dated and less than what is offered by properties in the high end of the market.  Good quality construction with little deferred maintenance.  Commands rents within the range of Class "B" rents in the submarket.

**Class C**:  Generally, product built within the last 30 years.  Limited, dated exterior and interior amenity package.  Improvements show some age and deferred maintenance.  Commands rents below Class "B" rents in submarket.  Majority of appliances are "original".

APP000100

Amerigold Suites                                        NVC | National Valuation Consultants, Inc.

### Dallas-Fort Worth Metro Apartment Market Map

The following map shows apartment properties within the Dallas-Fort Worth metro. The blue markers are properties that are currently available: these properties are for sale, for lease, or both. The gray markers are properties that are not currently available. Please note that some markers overlap.



DAL2404901                    Apartment Market & Submarket Analysis                    55

APP000101

Amerigold Suites                                                      NVC | National Valuation Consultants, Inc.

### *Dallas-Fort Worth Metro Apartment Market – Total Trends*

Apartment demand is spooling up over the past year with renters filling more than 13,000 units last year, allowing vacancy expansion to slow.  While a positive signal for owners and managers, that level is below the pre-Pandemic five-year average of close to 19,000 units.  Rebounding consumer confidence and stabilizing inflation are thawing household formation in the market and allowing demand levels to rebound.  Even as demand stabilizes, new completions continue to outpace the level that renters are able to absorb.  Builders added 32,811 units in 2023, leading to vacancies rising to 10.5%, above the 10-year average of 8.3%.  At the start of 2023, this trend persists, lifting vacancy to 10.8% at the start of 2Q 2024.

| | Inventory | | Supply & Demand | | | Rents | |
|---|---|---|---|---|---|---|---|
| Period | Total Inventory | Total Units | New Unit Deliveries | Absorbed Units | Vacancy | Market Rate Per Unit | % Change |
| 2014 | 4,569 | 622,486 | 14,084 | 10,994 | 7.3% | $1,075 | N/A |
| 2015 | 4,612 | 637,693 | 16,870 | 18,126 | 6.7% | $1,137 | 5.8% |
| 2016 | 4,689 | 657,896 | 21,134 | 14,922 | 7.3% | $1,172 | 3.1% |
| 2017 | 4,788 | 686,046 | 29,314 | 14,409 | 9.0% | $1,196 | 2.0% |
| 2018 | 4,894 | 709,597 | 24,026 | 21,312 | 9.0% | $1,227 | 2.6% |
| 2019 | 5,004 | 735,199 | 25,697 | 24,292 | 8.9% | $1,272 | 3.7% |
| 2020 | 5,133 | 761,728 | 26,571 | 21,832 | 9.2% | $1,282 | 0.8% |
| 2021 | 5,236 | 788,061 | 26,547 | 47,115 | 6.2% | $1,474 | 15.0% |
| 2022 | 5,341 | 813,001 | 25,158 | 3,904 | 8.6% | $1,533 | 4.0% |
| 2023 | 5,497 | 844,866 | 32,811 | 13,123 | 10.5% | $1,512 | (1.4%) |
| CAGR/Averages | | 3.5% | 24,221 | 19,003 | 8.3% | $1,288 | 3.9% |
| **Current Year Data** | | | | | | | |
| 2024 Q1 | 5,533 | 853,775 | 8,909 | 4,819 | 10.9% | $1,518 | 0.4% |
| QTD | 5,535 | 854,355 | 580 | 969 | 10.8% | $1,517 | (0.1%) |
| YTD | 5,535 | 854,355 | 9,489 | 5,788 | 10.8% | $1,517 | 0.3% |
| **Forecasted Supply and Demand Trends** | | | | | | | |
| 2024 Estimate | | 903,740 | 49,385 | 17,911 | 9.1% | | |
| 2025 | | 913,230 | 9,490 | 878 | 8.8% | | |
| 2026 | | 917,837 | 4,607 | (99) | 9.3% | | |
| 2027 | | 931,842 | 12,977 | 11,658 | 9.3% | | |
| 2028 | | 947,750 | 15,592 | 15,493 | 9.1% | | |

Dallas-Fort Worth Metro Apartment Market Trends

Historical Supply and Demand Trends



Source: CoStar Properties Analytical Search, 04/04/2024. Annual numbers represent year-end statistics.

---

APP000102

Amerigold Suites                                      NVC | National Valuation Consultants, Inc.

### Dallas-Fort Worth Metro Apartment Market – Class A Trends

Vacancy rates are drifting higher across submarkets.  Even so, submarkets with healthy demographic tailwinds continue to drive demand in the market.  Frisco/Prosper and Denton led the market in net absorption last year, reflecting the continuous population growth in these areas.  But steady construction activity in the higher-quality Class A segment keeps vacancies higher at 10.6% in this segment, although vacancy remains below the five-year pre-Pandemic average of 12.7%.  As owners and leasing managers compete for occupancy across the market, the share of properties offering concessions has reportedly risen above 30% for the first time since the end of 2020.  The most generous specials are in pockets with heavy supply-side risk, including northern stretches of Collin and Denton counties and outlying pockets of north Fort Worth.

| Dallas-Fort Worth Metro Apartment Market Trends - Class A | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Inventory | | Supply & Demand | | | Rents | |
| Period | Total Inventory | Total Units | New Unit Deliveries | Absorbed Units | Vacancy | Market Rate Per Unit | % Change |
| 2014 | 345 | 111,714 | 9,263 | 6,638 | 10.6% | $1,373 | N/A |
| 2015 | 384 | 123,691 | 11,977 | 11,125 | 10.3% | $1,432 | 4.3% |
| 2016 | 433 | 137,793 | 14,102 | 11,259 | 11.3% | $1,458 | 1.8% |
| 2017 | 500 | 159,729 | 22,084 | 13,178 | 15.2% | $1,469 | 0.8% |
| 2018 | 565 | 180,008 | 20,279 | 18,879 | 14.3% | $1,489 | 1.4% |
| 2019 | 630 | 198,564 | 18,556 | 19,230 | 12.6% | $1,540 | 3.4% |
| 2020 | 702 | 217,424 | 18,860 | 15,701 | 13.0% | $1,530 | (0.6%) |
| 2021 | 750 | 232,606 | 15,182 | 26,423 | 7.3% | $1,783 | 16.5% |
| 2022 | 790 | 243,254 | 10,648 | 6,139 | 8.8% | $1,823 | 2.2% |
| 2023 | 836 | 256,325 | 13,071 | 8,708 | 10.1% | $1,785 | (2.1%) |
| CAGR/Averages | | 9.7% | 15,402 | 13,728 | 11.4% | $1,568 | 3.0% |
| Current Year Data | | | | | | | |
| 2024 Q1 | 847 | 260,369 | 4,044 | 2,041 | 10.7% | $1,796 | 0.6% |
| QTD | 848 | 260,627 | 258 | 374 | 10.6% | $1,796 | 0.0% |
| YTD | 848 | 260,627 | 4,302 | 2,415 | 10.6% | $1,796 | 0.6% |

| Q1 2024 Recent Trends | | | Historical Supply and Demand Trends | |
|---|---|---|---|---|
| | YoY | Prev. Quarter | | |
| Vacancy (bps) | ↑ 110 | ↑ 60 | | |
| Rents | ↓ (2.3%) | ↗ 0.6% | | |
| Absorption (SF) | → 639 | → 118 | | |
| Completions (SF) | → 367 | → 259 | | |

Source: CoStar Properties Analytical Search, 04/04/2024. Annual numbers represent year-end statistics.

DAL2404901                      Apartment Market & Submarket Analysis                      57

APP000103

Amerigold Suites

NVC | National Valuation Consultants, Inc.

### Dallas-Fort Worth Metro Apartment Market – Class B Trends

Meanwhile, demand is recovering in submarkets with greater concentrations of mid-tier, Class B units. For example, Irving, Arlington, Mesquite and Garland/Mesquite report rebalancing demand after underperforming over the past two years. The trend reflects the more direct impact that untamed inflation places on mid- and lower-income households. Still, vacancies among the Class B properties remain elevated at 11.9%, above the 10-year average of 7.7%, as supply-side pressure continues to create a heavy imbalance.

| Dallas-Fort Worth Metro Apartment Market Trends - Class B | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Inventory | | Supply & Demand | | | Rents | |
| Period | Total Inventory | Total Units | New Unit Deliveries | Absorbed Units | Vacancy | Market Rate Per Unit | % Change |
| 2014 | 1,550 | 315,310 | 4,437 | 4,342 | 6.4% | $1,033 | N/A |
| 2015 | 1,569 | 319,815 | 4,874 | 5,797 | 5.9% | $1,098 | 6.3% |
| 2016 | 1,597 | 325,986 | 6,730 | 3,720 | 6.5% | $1,134 | 3.3% |
| 2017 | 1,638 | 332,428 | 7,222 | 2,440 | 7.6% | $1,160 | 2.3% |
| 2018 | 1,677 | 335,816 | 3,701 | 3,010 | 7.6% | $1,195 | 3.0% |
| 2019 | 1,718 | 342,594 | 6,778 | 5,469 | 7.9% | $1,238 | 3.6% |
| 2020 | 1,768 | 350,216 | 7,622 | 6,094 | 8.1% | $1,254 | 1.3% |
| 2021 | 1,825 | 361,246 | 11,111 | 16,589 | 6.3% | $1,444 | 15.2% |
| 2022 | 1,900 | 374,921 | 13,675 | 1,465 | 9.4% | $1,501 | 3.9% |
| 2023 | 2,006 | 392,988 | 18,954 | 7,265 | 11.7% | $1,475 | (1.7%) |
| CAGR/Averages | | 2.5% | 8,510 | 5,619 | 7.7% | $1,253 | 4.0% |
| Current Year Data | | | | | | | |
| 2024 Q1 | 2,031 | 397,853 | 4,865 | 3,002 | 12.0% | $1,479 | 0.3% |
| QTD | 2,032 | 398,175 | 322 | 508 | 11.9% | $1,477 | (0.1%) |
| YTD | 2,032 | 398,175 | 5,187 | 3,510 | 11.9% | $1,477 | 0.1% |

| Q1 2024 Recent Trends | | | Historical Supply and Demand Trends |
|---|---|---|---|
| | YoY | Prev. Quarter | |
| Vacancy (bps) | ⬆ 250 | ⬆ 30 | |
| Rents | ⬇ (2.1%) | ➡ 0.3% | |
| Absorption (SF) | ⬆ 1,681 | ⬆ 1,337 | |
| Completions (SF) | ⬆ 1,877 | ⬇ (1,611) | |



Source: CoStar Properties Analytical Search, 04/04/2024. Annual numbers represent year-end statistics.

APP000104

Amerigold Suites                                                NVC | National Valuation Consultants, Inc.

### *Dallas-Fort Worth Apartment Market – Class C Trends*

Roughly 23% of the market's inventory is identified as Class C and these properties ended the year up only 1.0%, the first time this segment reported such slow growth over the past 10 years.  These properties are typically more immune from greater competition coming from new supply, but more renter neighborhoods report softening results, even in this cohort.  However, even weaker rent performances are found across the quality spectrum, led by Class A properties, which reduced rents last year while increasing concessions to draw tenants in.  The Dallas-Fort Worth market is anticipating a rebound in the next year, tracing a similar theme at the national level.

| Dallas-Fort Worth Metro Apartment Market Trends - Class C | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Inventory | | Supply & Demand | | | Rents | |
| Period | Total Inventory | Total Units | New Unit Deliveries | Absorbed Units | Vacancy | Market Rate Per Unit | % Change |
| 2014 | 2,674 | 195,462 | 384 | 14 | 6.9% | $742 | N/A |
| 2015 | 2,659 | 194,187 | 19 | 1,205 | 5.7% | $802 | 8.1% |
| 2016 | 2,659 | 194,117 | 302 | (57) | 5.7% | $852 | 6.2% |
| 2017 | 2,650 | 193,889 | 8 | (1,209) | 6.2% | $889 | 4.3% |
| 2018 | 2,652 | 193,773 | 46 | (576) | 6.5% | $923 | 3.8% |
| 2019 | 2,656 | 194,041 | 363 | (407) | 6.8% | $963 | 4.3% |
| 2020 | 2,663 | 194,088 | 89 | 36 | 6.8% | $990 | 2.8% |
| 2021 | 2,661 | 194,209 | 254 | 4,103 | 4.7% | $1,103 | 11.4% |
| 2022 | 2,651 | 194,826 | 835 | (3,699) | 6.9% | $1,192 | 8.1% |
| 2023 | 2,655 | 195,553 | 786 | (2,848) | 8.8% | $1,204 | 1.0% |
| CAGR/Averages | | 0.0% | 309 | (344) | 6.5% | $966 | 5.5% |
| Current Year Data | | | | | | | |
| 2024 Q1 | 2,655 | 195,553 | 0 | (224) | 8.9% | $1,206 | 0.2% |
| QTD | 2,655 | 195,553 | 0 | 88 | 8.8% | $1,206 | 0.0% |
| YTD | 2,655 | 195,553 | 0 | (136) | 8.8% | $1,206 | 0.2% |



| Q1 2024 Recent Trends | | | Historical Supply and Demand Trends |
|---|---|---|---|
| | YoY | Prev. Quarter | |
| Vacancy (bps) | ⬆ 160 | ↗ 10 | |
| Rents | ↗ 0.5% | ➡ 0.2% | |
| Absorption (SF) | ➡ 305 | ➡ 783 | |
| Completions (SF) | ➡ (267) | ➡ (316) | |

Source: CoStar Properties Analytical Search, 04/04/2024. Annual numbers represent year-end statistics.

APP000105

Amerigold Suites

NVC | National Valuation Consultants, Inc.

### *New Development*

Apartment construction in Dallas-Fort Worth is slowing as the cost to finance new projects is more expensive.  While many peer markets will face acute supply side pressure through the near term, Dallas-Fort Worth should be relatively well insulated.  Permitting activity and construction starts are tapering as the cost of construction financing is higher and rent growth is weaker, deterring developers' underwriting assumptions.  With construction levels rolling over and demand stabilizing, vacancies and rent growth are expected to recover faster than others in the southeast.

| Dallas-Fort Worth Metro Apartment Market - New Development by Submarket Cluster | | | | | |
|---|---|---|---|---|---|
| | Under Construction | | | Proposed | | |
| Submarket | # of Properties | # of Units | % of Units | # of Properties | # of Units | % of Units |
| Frisco/Prosper | 17 | 7,528 | 14.5% | 5 | 1,600 | 3.9% |
| Allen/McKinney | 18 | 4,686 | 9.0% | 8 | 2,288 | 5.6% |
| Denton | 13 | 4,021 | 7.7% | 5 | 1,079 | 2.6% |
| Northwest Fort Worth | 9 | 3,342 | 6.4% | 9 | 3,239 | 7.9% |
| Garland/Rowlett | 11 | 3,052 | 5.9% | 5 | 1,534 | 3.7% |
| Plano | 4 | 3,014 | 5.8% | 0 | 0 | 0.0% |
| Southwest Fort Worth | 18 | 2,817 | 5.4% | 10 | 3,168 | 7.7% |
| Farmers Branch/Carrollton | 8 | 2,518 | 4.8% | 1 | 264 | 0.6% |
| Rockwall/Wylie | 10 | 2,290 | 4.4% | 9 | 3,659 | 8.9% |
| East Dallas | 11 | 1,640 | 3.2% | 6 | 1,585 | 3.9% |
| West Dallas | 4 | 1,540 | 3.0% | 5 | 2,074 | 5.1% |
| Southeast Fort Worth | 4 | 1,339 | 2.6% | 8 | 2,385 | 5.8% |
| Far North Dallas | 5 | 1,279 | 2.5% | 4 | 1,351 | 3.3% |
| Uptown/Park Cities | 4 | 1,252 | 2.4% | 13 | 4,028 | 9.8% |
| Las Colinas | 4 | 1,069 | 2.1% | 0 | 0 | 0.0% |
| Downtown Dallas | 5 | 1,051 | 2.0% | 7 | 2,767 | 6.7% |
| Lewisville/Flower Mound | 4 | 1,039 | 2.0% | 1 | 207 | 0.5% |
| Ellis County | 5 | 1,011 | 1.9% | 0 | 0 | 0.0% |
| Mesquite | 3 | 974 | 1.9% | 1 | 78 | 0.2% |
| Northeast Outlying | 3 | 834 | 1.6% | 1 | 152 | 0.4% |
| Richardson | 2 | 734 | 1.4% | 2 | 457 | 1.1% |
| Arlington | 3 | 682 | 1.3% | 6 | 2,058 | 5.0% |
| Grand Prairie | 2 | 598 | 1.1% | 1 | 508 | 1.2% |
| Oak Cliff | 4 | 594 | 1.1% | 4 | 982 | 2.4% |
| Northwest Dallas | 3 | 550 | 1.1% | 1 | 300 | 0.7% |
| Parker County | 2 | 510 | 1.0% | 0 | 0 | 0.0% |
| North Fort Worth | 2 | 500 | 1.0% | 3 | 1,996 | 4.9% |
| Downtown Fort Worth | 1 | 302 | 0.6% | 1 | 330 | 0.8% |
| Southeast Outlying | 1 | 300 | 0.6% | 0 | 0 | 0.0% |
| East Fort Worth | 1 | 268 | 0.5% | 1 | 268 | 0.7% |
| Johnson County | 1 | 264 | 0.5% | 2 | 904 | 2.2% |
| North Dallas | 1 | 213 | 0.4% | 0 | 0 | 0.0% |
| Grapevine | 1 | 200 | 0.4% | 1 | 55 | 0.1% |
| Southeast Dallas | 0 | 0 | 0.0% | 4 | 1,010 | 2.5% |
| Irving | 0 | 0 | 0.0% | 1 | 194 | 0.5% |
| South Dallas County | 0 | 0 | 0.0% | 1 | 238 | 0.6% |
| Wise County | 0 | 0 | 0.0% | 1 | 282 | 0.7% |
| **TOTALS** | **184** | **52,011** | **100.0%** | **127** | **41,040** | **100.0%** |

Source: CoStar Properties Analytical Search, 04/04/2024.

| Dallas-Fort Worth Metro Apartment Market - New Development by Submarket Cluster | | | |
|---|---|---|---|
| | Final Planning | | |
| Submarket | # of Properties | # of Units | % of Units |
| Uptown/Park Cities | 1 | 250 | 63.1% |
| Rockwall/Wylie | 1 | 146 | 36.9% |
| **TOTALS** | **2** | **396** | **100.0%** |

Source: CoStar Properties Analytical Search, 04/04/2024.

APP000106

**CONCLUSION**

The long-run structural drivers found in Dallas-Fort Worth remain in place, keeping the market in an excellent position even during periods of elevated economic uncertainty and downturns.  From 2021 to 2022, the metro led the U.S. in population growth, adding 173,000 new residents, above the decade average of 133,000 residents.  Continued population growth and in migration will fuel demand for housing in the region.

Dallas-Fort Worth leads the country in job growth, adding over 520,000 jobs since February 2020.  Finally, elevated interest rates and a tight single-family market have created a higher barrier for households seeking homeownership, keeping more households in the renter pool.  The shift should provide a boon to renter retention across the market.

APP000107

Amerigold Suites                                                    NVC | National Valuation Consultants, Inc.

## Richardson Apartment Submarket Cluster Analysis

A proper analysis and understanding of the market factors which influence the apartment submarket are necessary as a precursor to the appraisal process.  We have relied upon CoStar Analytics apartment market survey data and trends for rent, vacancy, and inventory levels in Dallas-Fort Worth's Richardson submarket cluster.  **Please note that data is specific to "market rate" units (i.e., effective rent per unit, after concessions).**

The map below shows the location of apartment properties within the Richardson submarket cluster.  The blue markers are properties that are currently available: these properties are for sale, for lease, or both.  The gray markers are properties that are not currently available.  Please note that some markers overlap.



***Richardson Submarket Cluster Snapshot***

The table below provides a breakdown of apartment market statistics by property class for the Richardson submarket cluster.  As shown, vacancy is currently higher in the Class B segment at 12.5%.  By number of units, the Richardson submarket cluster displays the following composition: Class A-13.4%, Class B-59.2%, and Class C-27.3%.

| | Richardson Apartment Submarket Cluster Snapshot | | | | | | |
|---|---|---|---|---|---|---|---|
| | Existing Inventory | | | Vacancy Rate | | | |
| Class | Total Inventory | Total Units | % of Units | Total Units | Vacancy | Absorbed Units | Market Rate Per Unit |
| Class A | 12 | 3,431 | 13.4% | 192 | 5.6% | (10) | $1,614 |
| Class B | 63 | 15,130 | 59.2% | 1,891 | 12.5% | (32) | $1,200 |
| Class C | 56 | 6,981 | 27.3% | 426 | 6.1% | 9 | $1,231 |
| Total | 131 | 25,542 | 100.0% | 2,509 | 9.8% | (32) | $1,265 |

Source: CoStar Properties Analytical Search, 04/04/2024. RBA = Rentable Building Area

APP000108

Amerigold Suites                                              NVC | National Valuation Consultants, Inc.

### *Richardson Apartment Submarket Cluster Total Trends*

Within the Richardson submarket cluster, there are several DART light rail stops along US 75, and most new apartment developments along the highway are walkable to the nearest light rail stop. In addition, DART is expanding its service through the Silver Line, running west towards Carrollton with many developers eyeing more transit oriented development. Apartment demand peaked in the Richardson submarket cluster in 2021, and has since dried up. Vacancy rates in the submarket cluster have expanded to 9.8% as of YTD 2024, as supply outpaces demand in the area. Even so, the submarket cluster's vacancy rate remains below the Dallas-Fort Worth average of 10.8%.

| Richardson Apartment Submarket Cluster Trends | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Inventory | | Supply & Demand | | | Rents | |
| Period | Total Inventory | Total Units | New Unit Deliveries | Absorbed Units | Vacancy | Market Rate Per Unit | % Change |
| 2014 | 122 | 23,518 | 135 | 13 | 6.1% | $854 | N/A |
| 2015 | 123 | 23,926 | 408 | 416 | 5.9% | $919 | 7.6% |
| 2016 | 124 | 24,008 | 82 | 30 | 6.1% | $969 | 5.4% |
| 2017 | 126 | 24,668 | 660 | (97) | 9.0% | $996 | 2.8% |
| 2018 | 126 | 24,668 | 0 | 270 | 7.9% | $1,033 | 3.7% |
| 2019 | 127 | 24,746 | 78 | (82) | 8.3% | $1,077 | 4.3% |
| 2020 | 129 | 25,132 | 386 | (76) | 10.0% | $1,083 | 0.6% |
| 2021 | 130 | 25,181 | 49 | 966 | 6.3% | $1,205 | 11.3% |
| 2022 | 130 | 25,181 | 0 | (51) | 6.5% | $1,301 | 8.0% |
| 2023 | 130 | 25,181 | 0 | (473) | 8.4% | $1,264 | (2.8%) |
| CAGR/Averages | | 0.8% | 180 | 92 | 7.5% | $1,070 | 4.5% |
| Current Year Data | | | | | | | |
| 2024 Q1 | 131 | 25,542 | 361 | (44) | 9.9% | $1,269 | 0.4% |
| QTD | 131 | 25,542 | 0 | 12 | 9.8% | $1,265 | (0.3%) |
| YTD | 131 | 25,542 | 361 | (32) | 9.8% | $1,265 | 0.1% |
| Forecasted Supply and Demand Trends | | | | | | | |
| 2024 Estimate | | 26,253 | 711 | 77 | 9.4% | | |
| 2025 | | 26,637 | 384 | (20) | 9.3% | | |
| 2026 | | 26,646 | 9 | (91) | 9.7% | | |
| 2027 | | 26,737 | 91 | 111 | 9.5% | | |
| 2028 | | 26,853 | 116 | 146 | 9.3% | | |
| Historical Supply and Demand Trends | | | | | | | |



Source: CoStar Properties Analytical Search, 04/04/2024. Annual numbers represent year-end statistics.

APP000109

Amerigold Suites                                                                NVC | National Valuation Consultants, Inc.

### *Richardson Apartment Submarket Cluster Trends – Class A*

The smallest apartment segment in the Richardson submarket cluster is the Class A segment, which comprise only 13.4% of total units here.  Demand remained strong through 2021, and has flattened since.  In recent years, CityLine has made an outsized impact on the northern section of Richardson.  This mixed-use development provides a small-city feel with ample retail and entertainment space and thousands of apartment units anchored by major office users in the area.  State Farm is the largest office occupier, taking about 2.0 million SF in CityLine with a headcount of around 8,000.  Raytheon relocated its regional headquarters, bringing another 1,700 jobs.  Rents in the submarket cluster are bifurcated geographically by Belt Line Road, reflecting a difference in quality.  North of Beltline, the area has the majority of Class A units, and rents average roughly $1,725/unit.  South of Belt Line, where the majority of units exist, demonstrates rents more around $1,175/unit.  Rent growth on properties north of Belt Line has underperformed growth south of the road in recent years due to do heavier construction and more competition in the area.

| Richardson Apartment Submarket Cluster Trends - Class A | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Inventory | | Supply & Demand | | | Rents | |
| Period | Total Inventory | Total Units | New Unit Deliveries | Absorbed Units | Vacancy | Market Rate Per Unit | % Change |
| 2014 | 6 | 1,831 | 135 | 156 | 3.8% | $1,277 | N/A |
| 2015 | 7 | 2,239 | 408 | 199 | 12.4% | $1,340 | 4.9% |
| 2016 | 8 | 2,321 | 82 | 89 | 11.7% | $1,378 | 2.8% |
| 2017 | 10 | 2,981 | 660 | 340 | 19.8% | $1,330 | (3.5%) |
| 2018 | 10 | 2,981 | 0 | 404 | 6.3% | $1,362 | 2.4% |
| 2019 | 11 | 3,059 | 78 | 39 | 5.0% | $1,411 | 3.6% |
| 2020 | 12 | 3,431 | 372 | 39 | 14.4% | $1,396 | (1.1%) |
| 2021 | 12 | 3,431 | 0 | 339 | 4.3% | $1,636 | 17.2% |
| 2022 | 12 | 3,431 | 0 | (6) | 4.5% | $1,758 | 7.5% |
| 2023 | 12 | 3,431 | 0 | (28) | 5.3% | $1,636 | (6.9%) |
| CAGR/Averages | | 7.2% | 174 | 157 | 8.8% | $1,452 | 2.8% |
| Current Year Data | | | | | | | |
| 2024 Q1 | 12 | 3,431 | 0 | (8) | 5.5% | $1,621 | (0.9%) |
| QTD | 12 | 3,431 | 0 | (2) | 5.6% | $1,614 | (0.4%) |
| YTD | 12 | 3,431 | 0 | (10) | 5.6% | $1,614 | (1.3%) |
| Q1 2024 Recent Trends | | | | Historical Supply and Demand Trends | | | |
| | YoY | | Prev. Quarter | | | | |
| Vacancy (bps) | ↘ | (10) | ⬆ | 20 | | | |
| Rents | ⬇ | (4.6%) | ↘ | (0.9%) | | | |
| Absorption (SF) | ➔ | 31 | ➔ | (10) | | | |
| Completions (SF) | ➔ | 0 | ➔ | 0 | | | |

Source: CoStar Properties Analytical Search, 04/04/2024. Annual numbers represent year-end statistics.

APP000110

Amerigold Suites                                                                 NVC | National Valuation Consultants, Inc.

### *Richardson Apartment Submarket Cluster Trends – Class B*

The Richardson submarket cluster's Class B segment makes up the bulk of apartment supply, comprising 59.2% of total units in the submarket cluster.  However, recent demand has shifted to the newly built Class A units in CityLine, and transit-oriented developments along US 75, creating a lull for Class B properties in other parts of the submarket cluster.  Demand peaked in 2021, but has fallen deeply negative since.  As of YTD 2024, Class B product has the highest vacancy at 12.5%, after 361 new Class B units came online in the first quarter.  Class B rents fell by 3.2% in 2023, and have remained flat as of YTD 2024.  With deliveries expected to rise in the next year or so, future growth could be weighed down by additional supply-side pressure.  At a current rate of $1,200/unit, the average Class B rent is 18.8% lower than the metro market.

| Richardson Apartment Submarket Cluster Trends - Class B | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Inventory | | Supply & Demand | | | Rents | |
| Period | Total Inventory | Total Units | New Unit Deliveries | Absorbed Units | Vacancy | Market Rate Per Unit | % Change |
| 2014 | 61 | 14,720 | 0 | 86 | 7.0% | $808 | N/A |
| 2015 | 61 | 14,720 | 0 | 240 | 5.4% | $879 | 8.8% |
| 2016 | 61 | 14,720 | 0 | (94) | 6.0% | $930 | 5.8% |
| 2017 | 61 | 14,720 | 0 | (361) | 8.5% | $964 | 3.7% |
| 2018 | 61 | 14,720 | 0 | (79) | 9.0% | $1,000 | 3.7% |
| 2019 | 61 | 14,720 | 0 | (91) | 9.6% | $1,042 | 4.2% |
| 2020 | 61 | 14,720 | 0 | (208) | 11.0% | $1,047 | 0.5% |
| 2021 | 62 | 14,769 | 49 | 572 | 7.5% | $1,156 | 10.4% |
| 2022 | 62 | 14,769 | 0 | 35 | 7.2% | $1,240 | 7.3% |
| 2023 | 62 | 14,769 | 0 | (428) | 10.1% | $1,200 | (3.2%) |
| CAGR/Averages | | 0.0% | 5 | (33) | 8.1% | $1,027 | 4.5% |
| Current Year Data | | | | | | | |
| 2024 Q1 | 63 | 15,130 | 361 | (31) | 12.5% | $1,207 | 0.6% |
| QTD | 63 | 15,130 | 0 | (1) | 12.5% | $1,200 | (0.6%) |
| YTD | 63 | 15,130 | 361 | (32) | 12.5% | $1,200 | (0.0%) |

| Q1 2024 Recent Trends | | | | Historical Supply and Demand Trends | |
|---|---|---|---|---|---|
| | YoY | | Prev. Quarter | | |
| Vacancy (bps) | ⬆ 520 | | ⬆ 240 |  | |
| Rents | ⬇ (2.4%) | | ⬈ 0.6% | | |
| Absorption (SF) | ➡ (25) | | ➡ 41 | | |
| Completions (SF) | ➡ 361 | | ➡ 361 | | |

Source: CoStar Properties Analytical Search, 04/04/2024. Annual numbers represent year-end statistics.

APP000111

Amerigold Suites                                                          NVC | National Valuation Consultants, Inc.

### *Richardson Apartment Submarket Cluster Trends – Class C*

Located in the northwest quadrant of the submarket cluster, the University of Texas at Dallas (UT Dallas), which enrolls more than 26,000 students, would appear to be a boon to apartment demand in northern Richardson.  The university is adding additional housing and retail options along the north side of Synergy Park Boulevard.  While vacancy in the submarket cluster's Class C segment has risen above the 10-year average rate, at 6.1%, Class C vacancy falls well below the metro average of 8.8%.  Furthermore, this is the only segment that has been able to sustain rent growth, albeit much slower growth has been seen since 2023.



| Richardson Apartment Submarket Cluster Trends - Class C | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Inventory | | Supply & Demand | | | Rents | |
| Period | Total Inventory | Total Units | New Unit Deliveries | Absorbed Units | Vacancy | Market Rate Per Unit | % Change |
| 2014 | 55 | 6,967 | 0 | (228) | 4.6% | $743 | N/A |
| 2015 | 55 | 6,967 | 0 | (24) | 5.0% | $795 | 7.0% |
| 2016 | 55 | 6,967 | 0 | 34 | 4.5% | $850 | 6.9% |
| 2017 | 55 | 6,967 | 0 | (75) | 5.6% | $898 | 5.6% |
| 2018 | 55 | 6,967 | 0 | (56) | 6.4% | $938 | 4.5% |
| 2019 | 55 | 6,967 | 0 | (30) | 6.8% | $988 | 5.3% |
| 2020 | 56 | 6,981 | 14 | 94 | 5.7% | $1,006 | 1.8% |
| 2021 | 56 | 6,981 | 0 | 54 | 4.9% | $1,095 | 8.8% |
| 2022 | 56 | 6,981 | 0 | (81) | 6.0% | $1,206 | 10.1% |
| 2023 | 56 | 6,981 | 0 | (18) | 6.3% | $1,216 | 0.8% |
| CAGR/Averages | | 0.0% | 1 | (33) | 5.6% | $974 | 5.6% |
| Current Year Data | | | | | | | |
| 2024 Q1 | 56 | 6,981 | 0 | (6) | 6.4% | $1,231 | 1.2% |
| QTD | 56 | 6,981 | 0 | 15 | 6.1% | $1,231 | (0.0%) |
| YTD | 56 | 6,981 | 0 | 9 | 6.1% | $1,231 | 1.2% |

| Q1 2024 Recent Trends | | | Historical Supply and Demand Trends | |
|---|---|---|---|---|
| | YoY | Prev. Quarter | | |
| Vacancy (bps) | ⬆ 120 | ↗ 10 | | |
| Rents | ↗ 0.9% | ↗ 1.2% | | |
| Absorption (SF) | ➡ (61) | ➡ 10 | | |
| Completions (SF) | ➡ 0 | ➡ 0 | | |

Source: CoStar Properties Analytical Search, 04/04/2024. Annual numbers represent year-end statistics.

APP000112

Amerigold Suites                                                    NVC | National Valuation Consultants, Inc.

*New Development*

Apartment development is rising in the Richardson submarket cluster.  As of YTD 2024, there are 734 new units underway.  That level far exceeds the decade average of 180 units and the highest level reported in the submarket cluster.  Most new construction is located north of Belt Line road along US 75.  Apartment developers and office and retail developers have transformed the northern section of the submarket cluster with CityLine, with many new communities coming to the submarket cluster along US 75.  The mixed-use TOD project serves as a model for many other mixed-use projects in the metroplex and a source of inspiration for future projects.

| Richardson Apartment  Submarket Cluster - Under Construction | | | |
|---|---|---|---|
| Address | Name | City | Units |
| 1735 N Greenville Ave | The Caroline Eastside Apartments | Richardson | 384 |
| 150 W Main St | Belt & Main | Richardson | 350 |
| | | TOTALS | 734 |

| Richardson Apartment  Submarket Cluster - Proposed | | | |
|---|---|---|---|
| Address | Name | City | Units |
| 811 South Central Expy | Serene Plaza Apartments | Richardson | 160 |
| 111 W Spring Valley Rd | --- | Richardson | 297 |
| | | TOTALS | 457 |

Source: CoStar Properties Analytical Search, 04/04/2024.

**CONCLUSION**

Richardson is the home of the Telecom Corridor, which has attracted major national firms in the telecommunications and insurance industries for decades.  Several technology-focused employers are also concentrated in the southeastern section of the submarket cluster, most notably the Texas Instruments corporate campus.  Richardson features major employers like AT&T (with approximately 5,000 employees), Texas Instruments (employing around 10,000), Raytheon Technologies (with over 6,000 employees), and the University of Texas at Dallas (employing approximately 4,000 faculty and staff).  In recent years, Richardson has benefitted from companies like State Farm and Raytheon, which have moved to the CityLine mixed-use development at the intersection of the North Central Expressway and President George Bush Turnpike.

The Richardson apartment submarket cluster faces the challenge of expanding vacancy rates, reaching 9.8% as supply outpaces demand.  However, the submarket cluster's vacancy rate remains below the Dallas-Fort Worth average of 10.8%.  The significant impact of CityLine has reshaped the northern section of the submarket cluster, attracting major office users which in turn, has contributed to the demand for nearby apartment units.  Transit-oriented development further enhances accessibility and connectivity within the area.  Despite rent growth softening, the Richardson submarket cluster remains attainable with average rents below the metro average, though rents are bifurcated geographically.  Looking ahead, with increasing deliveries expected, future growth may be weighed down by supply-side pressures.  However, the submarket cluster's strategic location positions it as an area of continued interest for apartment development in the Dallas-Fort Worth metroplex.

APP000113

Amerigold Suites                                                    NVC | National Valuation Consultants, Inc.

## Highest and Best Use Analysis

The fundamental concept of highest and best use may be defined as:

"The reasonably probable use of property that results in the highest value."[18]

To test for highest and best use, all logical and feasible alternatives must be analyzed.  The appraiser should determine whether the proposed usage of the land is:

1. physically possible
2. legally permissible
3. economically feasible
4. maximally productive

If an affirmative answer may be given to these basic questions, it is determined that the highest and best use test has been satisfied.

The appraiser must recognize that land is generally appraised as if vacant and available for development to its highest and best use and that the appraisal of improvements is based on their actual contribution to the site.  Thus, the highest and best use of a site must be determined both 1) as if vacant and 2) as improved.  Highest and best use as vacant will be addressed first.

### HIGHEST AND BEST USE, AS IF VACANT

*Physically Possible Uses*

The subject site is of sufficient size to accommodate various types of development.  It has good exposure and visibility along surrounding roadways. It is convenient to residential and commercial development and close to a major freeway.  All relevant municipal utilities are available in adequate supply to service a variety of development.

*Legally Permissible Uses*

The property is zoned  MU-3, Mixed Use 3 under the authority of City of Dallas.  Multifamily is a permitted land use under this zoning.   There are no reasonable probable modifications of existing land use regulations to occur in the near future.  Subject to the current zoning, the legally permissible uses include multi-family residential.

*Economically Feasible Uses*

A multifamily residential use is physically possible and legally permissible for the subject, and we believe a change from this basic usage would probably be unlikely. We have discussed apartment market conditions at length in the preceding market analysis.  The metro apartment market is strong with substantial new development in the pipeline; thus, multi-family development is considered feasible at this time.

---

[18] Appraisal Institute, The Appraisal of Real Estate, 15th Edition, (Chicago: Appraisal Institute, 2020), page 305.

APP000114

Amerigold Suites                                                        NVC | National Valuation Consultants, Inc.

*Maximally Productive Use*

Based on our analysis, the most likely use of the site is development of either a multi-family or hospitality development, or a hybrid of the two such as the current use of the subject. Therefore, the maximally productive and highest and best use of the subject site as if vacant, is for the development of a multi-family and/or hospitality project similar to the existing subject.

**HIGHEST AND BEST USE AS IMPROVED**

The highest and best use *as improved* is also analyzed with regard to the four previously indicated criteria. The physical property is somewhat unique in its construction and operation as hybrid between an extended stay lodging facility and an apartment. It was constructed for this specific purpose almost 40 years ago and has been operated in this manner since. The units include a living area, bedroom(s), a fully-equipped kitchen, and one or more bathrooms; however, they are generally leased unfurnished.

A typical one-bedroom unit is 660 SF, making it much larger than a typical extended stay hotel suite and most comparable to apartment units. The two-bedroom units are reported at 1,200 SF, again much larger than typical suites. Further, the units are not furnished. Unlike a hotel, the project generally caters to residents who hold a job in the local area, as opposed to transient business.

Further, the property has been able to achieve occupancy levels which are higher than those of an extended stay hotel and similar to those of an apartment. Like apartments, the units rent on a monthly basis, but there are no leases signed, although many tenants have been in occupation for many years. Most utilities, including basic cable TV are included, but tenants do pay electricity and upgraded cable fees. Also a tenant will need to provide furniture. As there are no credit checks, all customers must pay in advance on a monthly basis using cash or credit cards.

Unlike a hotel, there are no linens or housekeeping service, and unit turnover is much lower than at a hotel. At a typical lodging facility, approximately one-quarter to one-third of the units will turnover in a typical month, but some customers will stay for more than a year, and ownership reports that some tenants at subject have been in occupation for around 10 years. For the most part, occupancy levels are reported to have been at, or very close to 100%, prior to the onset of Covid-19 in early 2000.

For these reasons, it is our opinion that the maximally productive and highest and best use for the property, *as improved*, is for continued operation under its current format as a hybrid between an apartment and an extended stay lodging facility, but most similar to an apartment.

*Most Likely Buyer*

In analyzing the subject and supported by market evidence, the most likely buyer of the subject apartment community would be a local or regional buyer seeking a value-add opportunity.

DAL2404901                            Highest and Best Use Analysis                                            69

APP000115

Amerigold Suites                                        NVC | National Valuation Consultants, Inc.

## The Valuation Process

The estimation of a real property's market value involves a systematic process in which the problem is defined; the work necessary to solve the problem is planned; and the data required are acquired, classified, analyzed and interpreted as an opinion of value.  In this process, three basic approaches, when applicable, are used by the appraiser: the sales comparison approach, the income capitalization approach and the cost approach.  When one or more of these approaches is not applicable in the appraisal process, full justification must be presented.  An explanation of each approach follows:

**COST APPROACH**

In the cost approach, the appraiser first values of the fee simple interest in the site.  The replacement or reproduction cost new of the improvements is then estimated.  Next, depreciation from all sources is determined and subtracted from the replacement or reproduction cost new of the improvements to arrive at their present value.  The present value of all improvements is added to the market value of the site, resulting in an indicated value by the cost approach.

**SALES COMPARISON APPROACH**

The sales comparison approach involves the comparison of the subject property to similar properties that have recently sold or that are currently offered for sale.  The sales prices of these properties are then adjusted to reflect the respective differences of each from the subject to indicate a value range.  This value range, as indicated by the adjusted comparable properties, is then used to establish an indicated value for the subject property.

**INCOME CAPITALIZATION APPROACH**

The income capitalization approach is a process in which the anticipated future benefits (actual dollar income or amenities) are reduced to a present value figure.  The appraiser is primarily concerned with the future benefits resulting from net income and reversionary proceeds.  This approach involves estimating potential gross income by comparison with competing properties and estimating expenses (derived from historical and/or market experience) to determine a projected net income stream.  The income stream is then capitalized into an indication of value by using capitalization rates extracted from competitive properties in the market or by using other techniques when applicable.  Alternatively, the income stream as well as the reversion of the property is converted into value by use of a discounted cash flow (DCF) analysis.  If both techniques are used, the resultant value indications must be reconciled.

**RECONCILIATION**

The final analytical step in the valuation process is reconciliation of the value indications obtained from the different approaches to value.  The appraisers must consider the relative dependability and applicability of each approach as dictated by the individual characteristics of the subject.  The final opinion of value reflects the results of such deliberation.

APP000116

Amerigold Suites                                                    NVC | National Valuation Consultants, Inc.

## Cost Approach

The cost approach is based on the principle of substitution, which "affirms that a knowledgeable buyer would pay no more for a property than the cost to acquire a similar site and construct improvements of equivalent desirability and utility without undue delay."[19] This approach often represents "market thinking" since buyers and sellers frequently relate value to cost.

The cost approach to value typically involves the following steps:

1. "Estimate the value of the site as though vacant and available to be developed to its highest and best use.
2. Determine which cost basis is most applicable to the assignment: reproduction cost or replacement cost.
3. Estimate the direct (hard) and indirect (soft) costs of the improvements as of the effective appraisal date.
4. Estimate an appropriate entrepreneurial incentive or profit from analysis of the market.
5. Add the estimated direct costs, indirect costs, and entrepreneurial incentive or profit to arrive at the total cost of the improvements.
6. Estimate the amount of accrued depreciation in the structure and, if necessary, allocate it among the three major categories: physical deterioration, functional obsolescence, and external obsolescence.
7. Deduct the estimated depreciation from the total cost of the improvements to derive an estimate of their depreciated cost.
8. Estimate the contributory value of any site improvements that have not already been considered. (Site improvements are often appraised at their contributory value, i.e., directly on a depreciated-cost basis – but may be included in the overall cost calculated in Step 3 and depreciated if necessary.)
9. Add land value to the total depreciated cost of all the improvements to arrive at the indicated value of the property.
10. If appropriate, adjust for the property interest being appraised to derive the indicated value of the specified interest in the property.
11. If the property will experience net income shortfalls during a lease-up period, then calculate a rent-up adjustment to account for the cost of leasing (distinct from leasing commissions.)
12. Adjust for personal property (e.g., furniture, fixtures, and equipment) or intangible assets that are included in the appraisal."[20]

Each of the preceding steps will be further explained in detail as they are utilized.

---

[19] Appraisal Institute, The Appraisal of Real Estate, 15th Edition, (Chicago: Appraisal Institute, 2020), page 528.
[20] Ibid, page 532-533.

APP000117

Amerigold Suites                                                    NVC | National Valuation Consultants, Inc.

**RELEVANCE OF COST APPROACH**

The cost approach is not applicable in this assignment considering the following:
- The age of the improvements (constructed in 1981) limits the reliability of our estimate of physical depreciation.
- Investors are not likely to rely on the cost approach when underwriting properties like the subject.

As the cost approach is not considered necessary to produce a credible value opinion, it is excluded herefrom.

APP000118

## Sales Comparison Approach

The sales comparison approach, also termed the market approach, involves the comparison of the subject property to similar properties which have already sold, or which are currently offered for sale, with consideration given to their respective differences from the subject.  This process tends to form a pattern of indicators from which the appraiser can estimate the value of the subject property.  The principle of substitution is an integral part of this approach since a purchaser will typically not pay more for a property than would be required to purchase an equally desirable substitute property.

The following procedures are used to apply the sales comparison approach.

1. "Research the competitive market for information on properties that are similar to the subject property and that have recently sold, are listed for sale, or are under contract.  Information on agreements of sale, options, listings, and bona fide offers may also be collected.  The characteristics of the properties such as property type, date of sale, size, physical condition, location, and land use constraints should be considered.  The goal is to find a set of comparable sales or other evidence such as property listings or contracts as similar as possible to the subject property to ensure they reflect the actions of similar buyers.  Market analysis and highest and best use analysis set the stage for the selection of appropriate comparable sales.

2. Verify the information by confirming that the data obtained is factually accurate and that the transactions reflect arm's-length market considerations.  Verification should elicit additional information about the property such as buyer motivation, economic characteristics (if the property is income-producing), value component allocations, and other significant factors as well as information about the market to ensure that comparisons are credible.

3. Select the most relevant units of comparison used by participants in the market (e.g., price per acre, price per square foot, price per front foot, price per dwelling unit) and develop a comparative analysis for each unit.  The appraiser's goal is to define and identify a unit of comparison that explains market behavior.

4. Look for differences between the comparable sale properties and the subject property using all appropriate elements of comparison.  Then adjust the price of each sale property, reflecting how it differs, to equate it to the subject property or eliminate that property as a comparable.  This step typically involves using the most similar sale properties and then adjusting for any remaining differences.  If a transaction does not reflect the actions of a buyer who would also be attracted to the subject property, the appraiser should be concerned about comparability and the wisdom of relying on that comparable as a basis for comparison.

5. Reconcile the various value indications produced from the analysis of comparables into a value conclusion.  A value opinion can be expressed as a single point estimate, as a range of values, or in terms of a relationship (e.g., more or less than a given amount)."[21]

---

[21] Appraisal Institute, The Appraisal of Real Estate, 15th Edition, (Chicago: Appraisal Institute, 2020), page 355.

APP000119

Each of the preceding steps will be further explained in detail as they are utilized.  Several units of comparison are typically developed in the valuation of income-producing properties.  Those units of comparison appropriate for this analysis are detailed as follows:

*Sales Price per Unit*

The sales price per unit is a unit of comparison which expresses the relationship between price/value and the size of a structure. This is a reliable indicator of value assuming a high degree of comparability among properties available for comparison.  The weakness of this unit of comparison is that it does not directly differentiate between the respective income-generating capabilities of somewhat dissimilar properties. For apartments, the price per apartment unit is the frequently utilized unit of comparison.  ***We will use price per unit as our unit of comparison.***

**SEARCH FOR COMPARABLE SALES**

The subject is a 70-unit, Class C,  Garden/Low Rise apartment complex.  We searched for sales of similar properties occurring within the past 30 months within the subject's market area.  Leading up to the coronavirus pandemic, the apartment market was strong and active with rising rents, and declining vacancies, but when the virus became an epidemic in March 2020, sales activity all but ground to a halt, due mainly to increased uncertainty and a wider gap between buyer and seller expectations.

We considered many of the recent sales comparables and narrowed the data down to the sales which we considered to be the most relevant.  Each of the sales were inspected by the appraiser, and then confirmed with buyer, seller, or broker, together with supplemental data from public records.   Although there may be additional sales available, it is our opinion that this represents an adequate sample from which an estimate of fair market value can be derived.

***Complete sale abstracts are contained in the Addenda.***  The sales are summarized in the table on a following page, with a location map following.  Please note that all represent arm's length transactions, and all are cash or cash equivalent transactions.

| Sale Comparable Summary | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Comp No. | Name/Location | Date of Sale | Year Built | Average Unit Size | Occupancy At Sale | Sale Price | Total Units | Cap Rate | Sale Price/SF | Sale Price/Unit |
| 1 | Casa San Luis 3155 Park Ln Dallas, Texas | 7/23 | 1967 | 1,016 | 93.2% | $7,000,000 | 63 | 5.10% | $109.39 | $111,111 |
| 2 | Metro @ 404 404 Andrews St Dallas, Texas | 3/23 | 1965 | 662 | 90.0% | $12,000,000 | 116 | 5.26% | $156.25 | $103,448 |
| 3 | McCallum Communities 7740 McCallum Blvd Dallas, Texas | 11/22 | 1984 | 595 | 92.3% | $52,000,000 | 419 | 4.42% | $208.48 | $124,105 |
| 4 | Clover on Park Lane 8780 Park Ln Dallas, Texas | 1/22 | 1975 | 610 | 95.0% | $38,500,000 | 343 | 3.50% | $184.06 | $112,245 |
| 5 | The Colony House 6235 Oram St Dallas, Texas | 12/21 | 1961 | 913 | 91.3% | $2,952,380 | 21 | 3.55% | $154.01 | $140,590 |
| | Comparable Avg. | | 1970 | 759 | 92.4% | $22,490,476 | 192 | 4.37% | $162.44 | $118,300 |
| | Subject | Contract | 1981 | 737 | 95.7% | $4,800,000 | 70 | - | $93.04 | $68,571 |

Please refer to the following page for a map of the comparables.

APP000120

Amerigold Suites                                                   NVC | National Valuation Consultants, Inc.

## Sale Comparables Map



APP000121

Amerigold Suites                                                    NVC | National Valuation Consultants, Inc.

### Sale No. 1 – Casa San Luis - 3155 Park Lane, Dallas, TX

Located in North Dallas, just south of Walnut Hill Lane and east of Harry Hines Blvd., this community sold in July 2023 for $7,000,000 or $111,111 per unit. The 63-unit apartment property was built in 1967 and thus, is older than subject.  It has a higher average unit size of 1,016 SF, larger than subject.  The cap rate was reported to be 5.10%.  The units are rented unfurnished and the tenant pays for satellite/cable, but, the community includes an on-site laundry and some carports.  *Overall, this property is slightly superior in comparison to the subject.*

### Sale No. 2 – Metro 404 – 404 Andrews Street, Dallas, TX

Located in South Dallas, just off W. Jefferson Blvd., within two miles of the CBD, this property sold in March 2023 for $12,000,000 or $103,448 per unit.  The 116-unit property was built in 1965, but appears to have been renovated in 2017.  All units are rented unfurnished and tenants only pay for cable/satellite utilities.  The average unit size is smaller than subject's at 662 SF.  Amenities are fairly similar as the property has a laundry, but no pool.  *Overall, this property is slightly inferior in comparison to the subject.*

### Sale No. 3 - McCallum Communities, 7740 McCallum Blvd., Dallas, TX

Located in Far North Dallas, off Coit Road, this property sold in November 2022 for $52,000,000 or $124,105 per unit. This much larger, 419-unit property was built in 1984 and has a smaller average unit size of 595 SF.  The units are rented unfurnished and the tenant pays for electric and cable.  The pro forma cap rate was projected to be 4.45%, reflecting almost $4.0 million in renovations which the buyer proposed. *Overall, this property is superior in comparison to the subject.*

### Sale No. 4 - Clover on Park Lane, 8780 Park Lane, Dallas, TX

Located around five miles south of subject, to the east of US-75, this property sold in January 2022 for $38,500,000 or $112,245 per unit. The 343-unit apartment property was built in 1975 and was renovated in 2007, and has an average unit size of 610 SF, smaller than subject.  The cap rate was reported to be 3.50%.  The units are rented unfurnished and the tenants pay for all utilities.  *Overall, this property is fairly similar in comparison to the subject.*

### Sale No. 5 - The Colony House, 6235 Oram Street, Dallas, TX

Located just a couple of miles northeast of Central Dallas, this property sold in December 2021 for $2,952,380 or $140,590 per unit. The 21-apartment community is smaller than subject and was built in 1961 and has an average unit size of 913 SF.  The units are rented unfurnished and the tenant pays for all utilities.  The cap rate was reported to be 3.55%.  *Overall, this property is significantly superior in comparison to the subject.*

APP000122

Amerigold Suites                                          NVC | National Valuation Consultants, Inc.

**ADJUSTMENTS & ANALYSIS**

Adjustments are made to the sale prices of the comparables to compensate for differences between each sale and the subject. Due to differences among the comparables and limited availability of comparable market data, matched pairs comparison (paired sales analysis) was unreliable. While this type of analysis and adjustment method is considered ideal, it is often not realistic. However, we have attempted, to the best extent possible, to quantify the individual adjustments to each sale comparable. Unlike other investment products, no two commercial-grade real estate products are exactly alike. There are multiple differences between properties, and this creates differences in value. Further, the market for investment-grade real estate in general is thinly traded relative to non-real estate investments.

The objective of this section is to adjust the comparables for their key differences with the subject so that we can make an informed estimate of fair market value of the subject. This can be accomplished via either a qualitative or quantitative process. Both are legitimate appraisal techniques. *However, in order to avoid implying an unrealistic level of precision in the analysis, we have focused on the qualitative method.*

According to the 15th edition of The Appraisal of Real Estate, published in 2020 by the Appraisal Institute, the use of the sales comparison approach in valuation involves the estimation of the degree of similarity or difference between the subject property and a comparable by considering various elements of comparison. Adjustments are then made to the prices of the comparables to compensate for differences between each sale and the subject. These elements of comparison are discussed as follows. It is noted that the comparisons are made assuming that subject has been renovated.

1. **PROPERTY RIGHTS CONVEYED:** The subject is being valued fee simple. All of the comparables were also sold conveying fee simple ownership.

2. **FINANCING TERMS** account for the impact on value that is produced by favorable or unfavorable financing.

3. **CONDITION OF SALE** adjustments reflect the motivations of the buyer and the seller. All sales are considered "arm's length." All of the buyers and sellers appeared to be free of duress with adequate exposure to the market for the property to sell at its market value.

4. **MARKET CONDITIONS (TIME)** account for value changes in properties between the date of the comparable sale and the effective date of this appraisal report. The older sales are adjusted downward to account for the increases in interest rates over the last two years.

5. **LOCATION** adjustments account for superiority/inferiority in terms of access, road frontage, surrounding land uses, the character of the neighborhood, micro-area trends in rents and occupancy rates, and other factors. This is a subjective process, although it is based on real differences in rents.

6. **OCCUPANCY** accounts for the impact of occupancy level on sales price. We project stabilized occupancy for the subject at 92.0%. Occupancy at the time of sale for the comparables ranged from 90.0% to 95.0%.

APP000123

Amerigold Suites                                                    NVC | National Valuation Consultants, Inc.

7. **PROPERTY AGE/CONDITION** adjustments are required when the subject and the comparables vary in terms of age and/or the general level of maintenance evident in the units and common areas. The subject was built in 1981. The comparable properties were built between 1961 and 1984.  Some adjustments are needed for differences in age/condition (assuming that subject has been renovated).

8. **DESIGN/QUALITY/APPEAL** adjustments account for such items as architectural appeal, construction quality, and project and unit amenities.  By nature, this is a subjective adjustment, based primarily on the judgment of the appraisers.

9. **AVERAGE UNIT SIZE** adjustments address the significant impact on value of this one factor unique to apartment properties. As we are using a "per unit" method of comparison, we adjust for the different sizes of the units. All else being equal, a project with an abundance of smaller one-bedroom units will sell at a lower price per unit than a project with a greater share of larger two-bedroom units. The average unit sizes among comparable properties range from 595 SF to 1,016 SF. The subject's average unit size is 737 SF.

10. **PROJECT DENSITY** adjustments account for the relationship between the number of units and the total site area of a property. Typically, properties with lower densities sell for higher prices/unit since the property is more appealing to tenants.

Please refer to the adjustment grid provided on the following page.

APP000124

| Comparable Sales Adjustment Grid | | | | | | |
|---|---|---|---|---|---|---|
| Comp No. | Subject | 1 | 2 | 3 | 4 | 5 |
| Asset Name | Amerigold Suites | Casa San Luis | Metro @ 404 | McCallum Communities | Clover on Park Lane | The Colony House |
| Address | 3636 Goldmark Drive | 3155 Park Ln | 404 Andrews St | 7740 McCallum Blvd | 8780 Park Ln | 6235 Oram St |
| City | Dallas | Dallas | Dallas | Dallas | Dallas | Dallas |
| State | Texas | Texas | Texas | Texas | Texas | Texas |
| Sale Price | - | $7,000,000 | $12,000,000 | $52,000,000 | $38,500,000 | $2,952,380 |
| Date of Sale | - | 7/23 | 3/23 | 11/22 | 1/22 | 12/21 |
| Year Built | 1981 | 1967 | 1965 | 1984 | 1975 | 1961 |
| Average Unit Size | 737 | 1,016 | 662 | 595 | 610 | 913 |
| Total Units | 70 | 63 | 116 | 419 | 343 | 21 |
| Unit Mix Density | 19.7 | 22.2 | 44.2 | 74.5 | 48.9 | 30.0 |
| Occupancy At Sale | 95.2% | 93.2% | 90.0% | 92.3% | 95.0% | 91.3% |
| Cap Rate | - | 5.10% | 5.26% | 4.42% | 3.50% | 3.55% |
| Sale Price/SF | - | $109.39 | $156.25 | $208.48 | $184.06 | $154.01 |
| **Sale Price/Unit** | **-** | **$111,111** | **$103,448** | **$124,105** | **$112,245** | **$140,590** |
| Property Rights | | - | - | - | - | - |
| Financing | | - | - | - | - | - |
| Condition of Sale | | - | - | - | - | - |
| Expenditures After Sale | | - | - | - | - | - |
| Market Conditions | | Slight Downward | Slight Downward | Slight Downward | Downward | Downward |
| Location | | Slight Downward | Slight Downward | Downward | Slight Downward | Downward |
| Occupancy | | - | Slight Upward | - | - | - |
| Age/Condition | | Slight Upward | Slight Upward | Slight Downward | - | Slight Upward |
| Design/Appeal | | - | Slight Upward | - | - | - |
| Average Unit Size | | Downward | Slight Upward | Upward | Upward | Slight Downward |
| Density | | - | Downward | Slight Upward | Slight Upward | - |
| **Overall Adjustment** | | Downward | - | Slight Downward | - | Significant Downward |

APP000125

Amerigold Suites                                                      NVC | National Valuation Consultants, Inc.

**CONCLUSION OF PRICE PER UNIT ANALYSIS**

The sales indicate an unadjusted range in prices from $103,448/unit to $140,590/unit.  Given all the factors, it is our opinion that the sales indicate the subject, as if renovated, would sell, in today's dollars, for a price between $100,000 and $110,000 per unit.  The following table summarizes our opinion of the "as is" market value of the subject property, after deductions for the costs of the proposed renovations and resulting lease-up lost income.

| "As Is" Value Via Sales Comparison, As of April 5, 2024 | |
|---|---|
| Value Indication | Price / Unit |
| NVC Conclusion/Unit | $105,000 |
| No. of Units | 70 |
| Total | $7,350,000 |
| Less: Cost of Proposed Renovations | -$3,192,000 |
| Less: Cost of Vacancy During Renovations | -$115,000 |
| Indicated Value | $4,043,000 |
| **Value Indication (Rounded)** | **$4,040,000** |
| $/Unit | $57,714 |
| $/SF | $78.29 |

APP000126

## Income Capitalization Approach

The income capitalization approach requires the appraiser to formulate a market value for the subject by converting projected net income into a single present value.  This process is known as capitalization.  The approach to value requires the following steps:

1. "Research the income and expense data for the subject property and comparable.

2. Estimate the potential gross income of the property by adding the rental income and any other potential income.

3. Estimate the vacancy and collection loss.

4. Subtract vacancy and collection loss from total potential gross income to arrive at the effective gross income of the subject property.

5. Estimate the total operating expenses for the subject by adding fixed expenses, variable expenses, and a replacement allowance (where applicable).

6. Subtract the estimate of total operating expenses from the estimate of effective gross income to arrive at net operating income.  (Deductions for capital items may also be necessary at various points in time through the projection period to calculate the cash flow used in discounted cash flow analysis.)

7. Apply one of the direct or yield capitalization techniques to this data to generate an estimate of value via the income capitalization approach.

8. If necessary, calculate a rent-up adjustment for the value indication that accounts for the cost of leasing up the property or for needed capital improvements (including an appropriate estimate of entrepreneurial incentive)."[22]

The preceding steps are discussed in detail below and in the following pages.  The preceding steps are discussed in detail below and in the following pages.

**POTENTIAL GROSS INCOME ESTIMATE**

The first step is to estimate market rent attainable for the subject.  This is accomplished via an analysis of competing properties in the market area.  It should be noted that the following comparables may not represent all competing properties within the submarket, but they are considered to form a reliable and representative data base from which we can obtain a reasonable estimate of market rent for the subject.

A summary table of the data and location map is presented on the following page.  All units are rented on an unfurnished basis.

---

[22] Appraisal Institute, The Appraisal of Real Estate, 15th Edition, (Chicago: Appraisal Institute, 2020), page 432.

APP000127

Amerigold Suites                                NVC | National Valuation Consultants, Inc.

*Rent per Square Foot and Gross Rent per Unit*

The rent per square foot is a unit of comparison which expresses the relationship between rent and the size of a unit. This is a reliable indicator of market rent assuming a high degree of comparability among properties available for comparison.

Overall, we believe that the square footage figures from the comparables are representative of livable area. While this issue may be of concern, we note that the typical apartment renter does not analyze rent on a per square foot basis. Rather, it is the gross monthly rent that is of primary concern. Minor differences in square footage tend to have little or no impact on the achievable rent for similar types of units. Therefore, within our analysis, we will place emphasis on both rent per livable square foot and gross monthly rent per unit.

| No. | Project Name | Year Built | Total Units | Unit Size (SF) | Type | Avg Monthly Rates | Utilities | Furnish-ings | Adjusted Full Service Rates |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Monthly Rates | | | |
| 1 | Autumn Brook Apartments | 1980 | 60 | 625 | 1 BR | $540 | $0 | $0 | $540 |
| | | | | 975 | 2 BR | $837 | $0 | $0 | $837 |
| 2 | Hillsdale Garden Apartments | 1969 / 1999 | 72 | 705 | 1 BR | $1,220 | $225 | $0 | $1,270 |
| | | | | 920 | 2 BR | $1,475 | $275 | $0 | $1,462 |
| | | | | 1,095 | 2 BR | $1,650 | $275 | $0 | $1,625 |
| 3 | Oak Hollow 1 Apartments | 1980 / 2004 | 55 | 400 | EFF | $650 | $150 | $0 | $800 |
| | | | | 528 | 1 BR | $725 | $175 | $0 | $900 |
| | | | | 625 | 1 BR | $800 | $175 | $0 | $975 |
| | | | | 750 | 2 BR | $1,050 | $200 | $0 | $1,250 |
| | | | | 930 | 2 BR | $1,200 | $250 | $0 | $1,450 |
| | | | | 1,000 | 2 BR | $1,350 | $250 | $0 | $1,600 |
| 4 | West Creek Villas Apartments | 1980 | 54 | 675 | 1 BR | $1,150 | $220 | $0 | $1,250 |
| | | | | 972 | 2 BR | $1,400 | $275 | $0 | $1,550 |
| | | | | 1,069 | 2 BR | $1,450 | $275 | $0 | $1,650 |
| | **Subject Property** | **1981** | **70** | **660** | **1 BR** | **$1,200** | **incl** | **$0** | **$1,200** |
| | | | | **1,200** | **2 BR** | **$1,800** | **incl** | **$0** | **$1,800** |

**Summary of Competitive Rate Survey – April 2024**

Note: Adjustments for utilities & furnishings are estimated when not available at the comparable

APP000128

Amerigold Suites                                                 NVC | National Valuation Consultants, Inc.

Apartment rents in this market are typically quoted on a monthly basis with lease terms averaging around twelve months. Quoted rent typically includes any premiums for location, floor-level, and views, although none are applicable to subject.  Tenants are typically responsible for the cost of some utilities, but most are paid by the owner.

A map showing the location of each of the rent comparables is below.



APP000129

Amerigold Suites                                             NVC | National Valuation Consultants, Inc.

*Market Rent Analysis*

The subject includes two primary unit types with several floor plan variations.  Thus, we have prepared rent comparison grids for the representative unit types.  In analyzing rents at the comparables we have focused on several key differences between the subject and the comparables, including:

- Location
- Quality/Condition
- Utilities
- Average Unit Size
- Parking
- Project Amenities
- Unit Amenities

As mentioned previously, per the Property Manager, current quoted average monthly base rates at the subject property are $1,200 for one-bedroom units and $1,800 for two-bedroom units.  However, apart from the three units which are under renovation, there are no other vacancies, although two units are becoming vacant very soon.  Thus, it is possible that rents could be increased slightly given the strength of demand in the market.  Further, a renovation of the property, as is reportedly proposed by the current purchaser, would generate increased rents.

In addition to the primary adjustments (location, age/condition, design/appeal, average unit size, etc.), adjustments for other intangibles are analyzed. As mentioned previously, the subject property is relatively unique, with an operation similar to an extended stay hotel and other characteristics more similar to an apartment complex. There are other intangibles that the subject property and the extended stay hotel offer that the apartment comparables do not. Other intangible items are primarily unfurnished units, no credit checks, low or zero deposits, and term flexibility.

At the subject property, the residents are not given credit checks, nor are lease agreements entered into like an apartment complex. This allows for a broader tenant base that may not be able to secure a lease at an apartment property due to credit issues. In addition, weekly payments allows for greater flexibility than a long-term apartment lease. Based upon the preceding, most of the apartment sales are adjusted upward for other intangibles.

*Market Rent Analysis*

Although the properties summarized above are competitive, the subject property is unique and therefore each property has characteristics that are different from the subject which affect rates.  Therefore, we have analyzed differences in location, quality and condition, unit size, available project amenities, and unit amenities in comparison to the subject.  The following are brief descriptions of each of the properties.

APP000130

Amerigold Suites                                    NVC | National Valuation Consultants, Inc.

*Competitive Property 1*

**Autumn Brook Apartments** is located close to the subject property to the west, a slightly inferior location. It is inferior to the subject in quality and condition as, to our knowledge, it has not been renovated.   As an apartment complex, the units are slightly smaller and a credit and background check is made for each application.  The property offers similar amenities, having a pool and laundry facility.

Adjustments to this comparable are summarized below.
Location:  Slight Upward
Quality and Condition:  Slight Upward
Unit Size:    Similar
Project Amenities:  Similar
Unit Amenities:  Similar

*The overall adjustment is upward.*


*Competitive Property 2*

**Hillsdale Garden** apartment community is located north of the subject property, a slightly inferior location to subject.  It is similar to the subject in quality and condition.  As an apartment complex, the units are larger overall and a credit and background check are made for each application.  Unit sizes average 886 square feet, compared to 737 square feet at the subject.  The property has a pool and a laundry, but no fitness center.  It is older than subject, but has been renovated, albeit 23 years ago.

Adjustments to this comparable are summarized below.
Location:  Slight Upward
Quality and Condition:  Similar
Unit Size:    Downward
Project Amenities:  Similar
Unit Amenities:  Upward

*The overall adjustment is slightly upward.*

APP000131

Amerigold Suites                                                    NVC | National Valuation Consultants, Inc.

*Competitive Property 3*

**Oak Hollow 1** apartments are located west of the subject property, close to No. 1 and is a slightly smaller project which is fully leased.  The property is slightly older, but was renovated in 2004, so is slightly inferior in condition to the subject. The units are slightly smaller in average size and a credit and background check are made for each application.  The property has two swimming pools, and a laundry room.  Units are similar in amenities to the subject units.

Adjustments to this comparable are summarized below.
Location:  Slightly Upward
Quality and Condition:  Slight Upward
Unit Size:  Slightly Upward
Project Amenities:  Similar
Unit Amenities:  Similar

***The overall adjustment is upward.***

*Competitive Property 4*

**West Creek Villas** are located northwest of the subject property along Spring Valley Road, a slightly inferior location.  The property is slightly older, but appears to have been renovated and is assumed in similar condition to the subject, as if renovated.  In this complex, the units are slightly larger and credit and background checks are made for each application.  The property has a  laundry room, but no swimming pool or  fitness center.  Units appear to have a similar level of finish and interior amenities to the subject units.

Adjustments to this comparable are summarized below.
Location:  Slight Upward
Quality and Condition:  Slight Upward
Unit Size:  Slight Downward
Project Amenities:  Slight Upward
Unit Amenities:  Similar

***The overall adjustment is upward.***

APP000132

Amerigold Suites                                              NVC | National Valuation Consultants, Inc.

### Conclusions of Market Rent

The subject's current asking rents are above the range of comparables, which is reasonable, given their respective characteristics, particularly that most utilities are included. Taking into consideration the previous adjustment grids, the subject's historical and current occupancy, and assumed renovation and stabilized occupancy, we adopt the current quoted rates as representative of market at present, as most of the units are leased at these rents. However, given the high occupancy, good demand, and proposed renovations, we will inflate the rents by 10.0% to reflect the cumulative effect of all these factors.

Competitive market rents reported in the previous tables are effective rents net of any concessions. Rents displayed for the subject are average contract rents as of the most recent rent roll provided.

The following table summarizes the estimated rental income for the subject property based on our conclusions of market rent, as renovated.

| NVC Estimated Trended Rental Income Amerigold Suites - Dallas | | | | |
|---|---|---|---|---|
| Unit Type | Size (SF) | No. of Units | Estimated Trended Monthly Rent | Estimated Stabilized Annual Rent |
| 1 BR 1 BA | 660 | 60 | $1,320 | $950,400 |
| 2 BR 1 BA | 1,200 | 10 | $1,980 | $237,600 |
| Totals/Averages | 737 | 70 | $1,414 | $1,188,000 |

### Concessions

Demand for apartments in this market remains generally strong, with submarket vacancy currently at 7.1%, slightly lower than the overall market's 8.5%. Income statements received indicate concessions as follows:

| Amerigold Suites - Concessions | | | | | | |
|---|---|---|---|---|---|---|
| Category | 2019 | 2020 | 2021 | 2022 | 2023 | NVC Projection |
| Concessions | $0 | $2,030 | $2,047 | $3,100 | $4,407 | $3,500 |
| Amount/Unit | $0.00 | $29.00 | $29.24 | $44.29 | $63.00 | $50.00 |

As can be seen, there were no concessions at subject in 2019, but likely due to Covid, concessions have been evident subsequently, as there were up to 17 vacancies, although this has now dropped to 3 units, all of which are under renovation, with two more becoming available imminently. Indeed, subject's property manager reports no leasable units available at present. As a result, and assuming likely renovations, nominal concessions of *$3,500* per annum are deducted.

APP000133

Amerigold Suites                                          NVC | National Valuation Consultants, Inc.

**OTHER INCOME ITEMS**

As noted earlier, other income is generated from various fees, including application fees, administration fees, late fees, pet fees, damage fees, utility reimbursements, and vending income.  The historical data for subject for 2019, 2020, 2021, 2022 and 2024 Trailing 12 Months are shown below, together with our stabilized projection:

| Amerigold Suites - Surcharge Income | | | | | | |
|---|---|---|---|---|---|---|
| Category | 2019 | 2020 | 2021 | 2022 | 4/2024 T12 | NVC Projection |
| Application Fee | $1,440 | $1,160 | $880 | $1,265 | $1,100 | $1,000 |
| Administration Fee | $150 | $0 | $0 | $138 | $443 | $500 |
| Late Fees | $0 | $0 | $350 | $970 | $200 | $500 |
| Pet Fees | $3,151 | $1,740 | $2,550 | $1,450 | $2,184 | $2,000 |
| Damage Fees | $0 | $4,276 | $1,932 | $6,208 | $2,902 | $4,000 |
| N/R Deposits | $13,582 | $12,475 | $8,100 | $11,000 | $11,300 | $12,000 |
| Utility Recoveries | $0 | $0 | $0 | $28,022 | $49,946 | $50,000 |
| **Totals** | **$18,323** | **$19,651** | **$13,812** | **$49,053** | **$68,075** | **$70,000** |
| Amount/Unit | $262 | $281 | $197 | $701 | $973 | $1,000 |

Taking historical operations into account, *we have projected stabilized other income of $1,000 per unit, or $70,000* (rounded).

The National Council of Real Estate Investment Fiduciaries (NCREIF) indicates that other income for garden apartment projects in the Southwest averaged $1,223 per unit per year as of 4Q 2023 with expense recoveries of $550/unit per annum.  These data are based upon a property count of 29 communities with an average occupancy of 94.3%.  However, these data relate to much higher quality, newer properties with higher rents and expenses.

*Room Tax*

The income and expense statements do not show any room tax amounts.  These typically apply to a hotel, and thus, these are excluded any Room Tax income or Room Tax Refund expense items in our projection as subject is considered most similar to an apartment community.

**ABSORPTION, VACANCY AND CREDIT LOSS**

*Absorption*

Absorption pertains to income loss due to the time required to lease vacant units at the subject to stabilization.  According to management, the subject was at or close to full occupancy in the years preceding 2020, but Covid-19 caused a drop in occupancy to around 76%, although this has recovered to nearly 96% as of the date of inspection.

APP000134

Amerigold Suites                                              NVC | National Valuation Consultants, Inc.

The three vacant units are either under repair/renovation or are unleasable due to damage and will likely not be leased until funds are available for renovations to these units.  Although occupancy is higher than early last year, management indicates that it lacks funds to spend on renovating units or other improvements, and this is hindering re-leasing.  Given that the property is operating at around stabilized occupancy, an absorption loss is not applicable.

### Vacancy and Credit Loss

Occupancy fluctuates over time but is generally high in this apartment market, although it has been reduced recently, due to the construction of new communities.  However, most of the new construction is Class A product and therefore doesn't impact subject.

Further, as it is operated effectively as an apartment project, it does not have the high level of turnover that an extended stay hotel might have.   A typical "suites" may have up to a quarter of its units turnover in a typical month which affords the opportunity for more frequent changes in occupancy in any given period.

There is limited credit loss since all customers are required to pay in cash or by credit card.  If a customer does not pay when rent is due, then the owner changes the lock and classifies that unit as vacant.  In this way, credit loss is incorporated within the vacancy figure.

Given subject's recent higher occupancy and proposed renovation, we consider stabilized occupancy at subject to be 93.0%. This equates to an *7.00% vacancy/credit loss* deduction.  Although higher than recent figures, this is what an investor might underwrite at present.

The subject Class C submarket has averaged 5.6% vacancy over the last 10 years and is currently at 6.1%. The overall DFW Class C market averaged 6.50%, with the latest vacancy figure at 8.80%.  Thus, at a total of *8.00%*, *vacancy is 7.00%, and 1.00% is allocated to credit loss*.

### Loss to Lease

The "quoted" rates are typically slightly higher than the actual income received.  On-site managers have incentives to maintain both occupancy and rent, so they are frequently tweaking rental rates to manipulate occupancy levels in an attempt to maximize income.  A customer will typically have a set rent for roughly a year and then management will make a change in the summer, often adjusting weekly rents by some ten dollars per unit.

There are also periods of high and low demand where the manager will adjust its quoted rates upward or downward to meet the market. Tenants who sign in this period are normally charged that same rent for the duration of the year. The impact of loss-to-lease is shown in the following table.

APP000135

Amerigold Suites                                    NVC | National Valuation Consultants, Inc.

| Amerigold Suites - Loss to Lease | | | |
|---|---|---|---|
| | | March 2024 – Trailing 12 Months | |
| 70 Units | | Amount | Per Unit Per Month |
| Current Gross Income at Market Rates | | $1,080,000 | $1,286 |
| Actual Gross Income Reported | $1,048,044 | | |
| Actual Occupancy Indicated | 97.0% | | |
| Implied Potential Gross Income | | $1,047,600 | $1,247 |
| Loss to Lease | | ($32,400) | ($38.57) |
| Percentage of Gross Potential | | -3.0% | -3.0% |

As can be seen, the recent numbers indicate a nominal loss to lease. Again, given the incompleteness of the operating information, over the course of a year, we estimate a 3,00% "loss to lease". This includes the two units which are at zero or reduced rents as they are occupied by management staff.

*Long-Term Concessions*

As referenced earlier, our rental analysis is net of any concessions. Long-term concessions are nominal and were addressed in the income section of this report. Thus, no long-term allowance for concessions is made within our overall economic vacancy factor.

*Combined Vacancy and Loss to Lease*

The combination of vacancy/credit loss and loss to lease indicates a total **11.00%** deduction from gross potential stabilized income.
*Income Summary*

The following table shows the various income sources from subject on a stabilized basis, including deductions for vacancy, credit loss, loss to lease, and concessions.

| Subject - Trended and Untrended Income | | | | |
|---|---|---|---|---|
| Total No. of Units: 70 | | | | |
| Total Rentable Square Footage: 51,600 | | | | |
| | NVC Proforma (Un-Trended) | | NVC Proforma (Trended - 4/25) | |
| Income/Expense Category | Amount | $/Unit | Amount | $/Unit |
| Gross Potential Rental Revenue | $1,080,000 | $15,429 | $1,188,000 | $16,971 |
| Vacancy / Collection Loss | ($86,400) | ($1,234) | ($95,040) | ($1,358) |
| Concessions | ($32,400) | ($463) | ($35,640) | ($509) |
| Parking Income | $0 | $0 | $0 | $0 |
| Utility Reimbursements | $50,000 | $714 | $51,500 | $736 |
| Other Income | $20,000 | $286 | $20,600 | $294 |
| Effective Gross Income | $1,031,200 | $14,731 | $1,129,420 | $16,135 |

APP000136

Amerigold Suites                                            NVC | National Valuation Consultants, Inc.

**OPERATING EXPENSES**

Operating expenses are the annual direct expenses or annual cash outflows borne by the owner/ investor of income producing properties as the necessary cost of generating gross income.  The expense figures used are typical of stabilized annual cash expenses to be paid by the owner of the property over the income projection period.  Before net operating income can be calculated, operating expenses are estimated and deducted from effective gross income.

To estimate the appropriate expenses for the subject property, we have examined several sources of information, including:

1.  Aggregated expense data from the most recent NCREIF survey for higher quality, investment grade properties in the subject's region.

2.  Analysis of actual expense data from several comparable multifamily projects, from which we have actual operating data. Please note that it was necessary to screen these projects to protect client confidentiality.

3.  An analysis of limited historical income and expenses for subject.  We note that a current budget was not available.

A summary of the subject's historical operating statements is provided following the summary of survey and comparable expense data below and on the following page.

**NCRIEF Expense Data**

The National Council of Real Estate Investment Fiduciaries (NCRIEF) collects quarterly income and expense data on hundreds of multi-family assets included within the NCRIEF Index.  The following table summarizes the average expenses for the Southwest region garden style for 4th Quarter 2023.

| Expense Details: Trailing 12 Months (per unit) | | | | | | |
|---|---|---|---|---|---|---|
| | <200 | 200-300 | 300-500 | 500-700 | >700 | Total |
| **Southwest** | | | | | | |
| Administrative | $ 3,768 | $ 1,465 | $ 972 | $ 926 | n/a | $ 1,295 |
| Marketing | 298 | 365 | 298 | 183 | n/a | 302 |
| Utilities | 1,459 | 813 | 675 | 533 | n/a | 758 |
| Maintenance | 1,524 | 1,175 | 856 | 1,031 | n/a | 1,003 |
| Insurance | 971 | 513 | 391 | 436 | n/a | 464 |
| Management Fee | 721 | 489 | 390 | 384 | n/a | 436 |
| Real Estate Tax | 4,334 | 2,968 | 2,376 | 2,692 | n/a | 2,679 |
| Other | 775 | 562 | 366 | 163 | n/a | 421 |
| Total | $ 13,850 | $ 8,350 | $ 6,324 | $ 6,348 | n/a | $ 7,357 |
| Average No. Units | 146 | 257 | 366 | 592 | n/a | 313 |
| Count | 29 | 48 | 52 | 6 | < 3 | 178 |

APP000137

Case 3:22-cv-02118-X   Document 501   Filed 06/05/24   Page 141 of 340   PageID 17999

APP000138

| Apartments - Expense Comparables | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| State | TX | | TX | | TX | | TX | | | |
| County | Dallas | | Denton | | Denton | | Dallas | | **Averages** | |
| Reporting Year | 2023 | | 2023 | | 2023 | | 2022 | | | |
| Year of Construction | 1986 | | 1983 | | 1985 | | 1979 | | | |
| Number of Units | 241 | | 252 | | 180 | | 120 | | 198 | |
| Avg Unit Size | 533 | | 866 | | 801 | | 866 | | 767 | |
| | $/Unit | $/SF | $/Unit | $/SF | $/Unit | $/SF | $/Unit | $/SF | $/Unit | $/SF |
| **Gross Potential Rental Revenue** | $10,757 | $20.18 | $16,774 | $19.37 | $16,569 | $20.69 | $13,452 | $15.53 | $14,388 | $18.94 |
| Vacancy/Collection Loss | ($3,488) | ($6.54) | ($1,217) | ($1.41) | ($1,780) | ($2.22) | ($622) | ($0.72) | ($1,777) | ($2.72) |
| Concessions | ($289) | ($0.54) | ($24) | ($0.03) | ($110) | ($0.14) | ($80) | ($0.09) | ($126) | ($0.20) |
| Parking Income | $0 | $0.00 | $0 | $0.00 | $0 | $0.00 | $0 | $0.00 | $0 | $0.00 |
| Utility Reimbursements | $0 | $0.00 | $0 | $0.00 | $0 | $0.00 | $0 | $0.00 | $0 | $0.00 |
| Commercial Income | $0 | $0.00 | $0 | $0.00 | $0 | $0.00 | $0 | $0.00 | $0 | $0.00 |
| Other Income | $1,721 | $3.23 | $1,609 | $1.86 | $1,525 | $1.90 | $1,387 | $1.60 | $1,560 | $2.15 |
| **Effective Gross Income** | **$8,702** | **$16.33** | **$17,142** | **$19.79** | **$16,205** | **$20.23** | **$14,137** | **$16** | **$14,046** | **$18.17** |
| **Operating Expenses** | | | | | | | | | | |
| Payroll | $1,582 | $2.97 | $1,671 | $1.93 | $1,726 | $2.15 | $2,171 | $2.51 | $1,787 | $2.39 |
| Management Fees | $207 | $0.39 | $425 | $0.49 | $398 | $0.50 | $424 | $0.49 | $364 | $0.47 |
| Administrative Expense | $415 | $0.78 | $359 | $0.41 | $487 | $0.61 | $416 | $0.48 | $419 | $0.57 |
| Advertising and Promotion | $174 | $0.33 | $306 | $0.35 | $458 | $0.57 | $273 | $0.32 | $303 | $0.39 |
| Maintenance/Building/Grounds | $540 | $1.01 | $678 | $0.78 | $960 | $1.20 | $857 | $0.99 | $759 | $1.00 |
| Utilities | $1,494 | $2.80 | $1,003 | $1.16 | $1,061 | $1.32 | $1,574 | $1.82 | $1,283 | $1.78 |
| Insurance | $339 | $0.64 | $552 | $0.64 | $533 | $0.66 | $506 | $0.58 | $482 | $0.63 |
| Other Expenses | $0 | $0.00 | $0 | $0.00 | $0 | $0.00 | $0 | $0.00 | $0 | $0.00 |
| *Subtotal Controllable Operating Expenses* | *$4,750* | *$8.91* | *$4,995* | *$5.77* | *$5,623* | *$7.02* | *$6,221* | *$7.18* | *$5,397* | *$7.22* |
| Property Taxes | $2,429 | $4.56 | $2,788 | $3.22 | $2,518 | $3.14 | $2,548 | $2.94 | $2,571 | $3.47 |
| **Total Operating Expenses** | $7,179 | $13.47 | $7,783 | $8.99 | $8,141 | $10.16 | $8,769 | $10.13 | $7,968 | $10.69 |
| **NET OPERATING INCOME** | $1,523 | $2.86 | $9,359 | $10.81 | $8,064 | $10.07 | $5,367 | $6.20 | $6,078 | $7.48 |
| Expense Ratio | | 82.5% | | 45.4% | | 50.2% | | 62.0% | | 56.7% |
| Management Fee as % of EGI | | 2.4% | | 2.5% | | 2.5% | | 3.0% | | 2.6% |
| Vacancy | | 32.4% | | 7.3% | | 10.7% | | 4.6% | | 13.8% |
| Utility Reimbursements as % of Expenses | | 0.0% | | 0.0% | | 0.0% | | 0.0% | | 0.0% |

*Source: NVC Internal Database*

Amerigold Suites                                                    NVC | National Valuation Consultants, Inc.

### Subject Recent Expenses

The following table shows subject's expenses for 2023 and First Quarter 2024; the latter are annualized, but this reduces their reliability.

| Amerigold Suites - Expenses | | | | |
|---|---|---|---|---|
| **Expense** | **2023 Annual Expense** | **2023 Annual/Unit** | **2024 Annualized Expense** | **2024 Annualized/Unit** |
| | | | | |
| Taxes | $40,998 | $586 | $72,600 | $1,037 |
| Insurance | $168,879 | $2,413 | $292,504 | $4,179 |
| Management | $40,035 | $572 | $39,760 | $568 |
| Repairs/Maintenance | $187,294 | $2,676 | $115,772 | $1,654 |
| Utilities | $235,000 | $3,357 | $304,600 | $4,351 |
| General & Administrative | $13,079 | $187 | $4,889 | $70 |
| TX Margin Tax | $0 | $0 | $0 | $0 |
| **Total** | **$685,285** | **$9,790** | **$830,125** | **$11,859** |

### NVC Expenses Estimate

*Advertising and Promotion*

Subject's annual cost for advertising and promotion is not known, as no specific data was included in the expenses provided.  Subject does not appear to have a website and likely has few, if any, funds available for advertising, relying on ground level and overhead pole signs.  However, despite this, it has a very high occupancy level, suggesting that significant advertising is not necessary in the current market.  The comparable apartment expenses show a range from $174 - 458/unit, and NCREIF shows an average of $298.  Most emphasis is placed upon subject (no expenses) and the apartment comparables.   A figure below the bottom of the range of the comps is considered reasonable, so we have estimated **$150 per unit**, or **$10,500** for advertising and promotion.

| Advertising and Promotion | | | | |
|---|---|---|---|---|
| | NCREIF 4Q 2023 | Apartment Comps | Subject 2023 | NVC Projection |
| Amount/Unit | $298 | $174-458 | $0 | $150 |
| Amount | - | - | - | $10,500 |

APP000139

Amerigold Suites                                                      NVC | National Valuation Consultants, Inc.

*Property Taxes*

As discussed in detail in the *Tax and Assessment Analysis* presented previously in this report, based upon the proposed assessed value and current tax rate, the subject's property taxes would be ***$135,171***, or $1,931 per unit. However, the comparables indicate a much lower value. If the property was sold (and it is the subject of an LOI at $4,800,000) the assessed value could be decreased closer to, or less than, the sale price. As a typical investor would probably assume an assessed value of around 65-75% of market value, we have utilized an assumed assessed value of $3,360,000 which produces a tax burden of **$81,500**.

*Insurance*

From the recent expenses provided (since the receivership), the cost for insurance last year appears to have been $168,879 ($2,412/unit). Although insurance costs have increased significantly in the last year and are continuing to rise, this cost seems excessive. The apartment comparables show a range of $339 to $552 per unit. The NCREIF insurance expense averages $971 for 4Q 2023, but this likely reflects superior quality properties. Placing most emphasis on the recent subject expenses and the apartment comparables, we have estimated ***$600 per unit***, or ***$42,000*** for insurance.

| Insurance | | | | |
|---|---|---|---|---|
| | NCREIF 4Q 2023 | Apartment Comps | Subject 2023 | NVC Projection |
| Amount/Unit | $971 | $339 - 552 | $2,412 | $600 |
| Amount | - | - | - | $42,000 |

*Management Fees*

This category includes items such as management fees, legal fees and other professional services. Property management fees are often treated as a separate expense category for apartments and are typically charged as a percentage of effective gross income. Fees tend to vary depending on a variety of factors including the market position and rent levels of a particular property. Generally, higher quality properties with higher unit rents have lower management fees (as a percentage) because they produce more income yet require the same amount of time and effort to manage as a property with average rents.

The subject is an individual property which is reportedly self-managed and has an on-site manger. It does not use a third-party management company so there has not historically been a management fee. This is atypical in the market for both apartments and hotels. Should the subject property sell, a new operator would likely contract a management company for management services, so we have included this as an expense.

The management expense appears to be principally, the salary and minor expenses for the on-site manager, which appears to equate to around ***4.00%***.

APP000140

Amerigold Suites                                                          NVC | National Valuation Consultants, Inc.

NCREIF data indicates an average management fee of 3.50% of EGI for investment grade garden style apartments in the Southwest region. Typical management fees for good quality apartment complexes range between 2.5% and 3.5% of EGI.  Considering that the subject is more management intensive than a typical apartment due to its weekly rent collection and frequent unit turnover, we adopt an additional management fee at **4.00% of effective gross income**.  This is designed to account for any added management services that a corporate office may provide.

*Repairs and Maintenance*

This category includes painting, cleaning, plumbing, electrical, and general maintenance associated with the buildings and common areas including turnover expenses and labor.  We note that this category also includes landscaping and pest control.  At the subject property, the annual cost per unit for repairs and maintenance last year was $2,676.  The apartment comparables show a range of $540-960/unit, but would be higher if labor was included.  The latest NCREIF expenses indicate $1,524.

Placing most emphasis on the subject's recent figures and the comparables, we have estimated **$2,000 per unit**, or **$140,000** for repairs and maintenance.

| Repairs and Maintenance | | | | |
|---|---|---|---|---|
| | NCREIF 4Q 2023 | Apartment Comps | Subject 2023 | NVC Projection |
| Amount/Unit | $2,676 | $450-1,001 | $2,676 | $2,000 |
| Amount | - | - | - | $140,000 |

*Utilities*

The utilities category includes gas, electricity, water/sewer and trash expenses paid for by the landlord.  At the subject property, the annualized cost for utilities in the last two months of 2022 was $2,413.  The suites comparables indicated a range of between $1,780 and $2,413 per unit for utilities, and the apartment comparables show a range of $800-1,088/unit, likely lower as most newer apartment units are directly metered so that the owner's direct expenses are reduced.  The NCREIF survey shows a cost of $1,459/unit and again likely reflects the age of the property.  Placing most emphasis on the subject annualized and suites data, we have estimated **$2,400 per unit**, or **$168,000** for utilities.

| Utilities | | | | |
|---|---|---|---|---|
| | NCREIF 4Q 2023 | Apartment Comps | Subject 2023 | NVC Projection |
| Amount/Unit | $1,459 | $1,003-1,574 | $3,357 | $2,400 |
| Amount | - | - | - | $168,000 |

APP000141

*General and Administrative*

General and administrative expenses include items such as phone service, postage and office supplies. At the subject property, the only costs for general and administrative are low at almost $13,100.  The NCREIF data indicating a much higher average amount of $3,768/unit; the apartment comps show a range of $359-487/unit.  Placing most emphasis on the subject's recent figures and the comparable property figures, we have estimated an amount between the subject's costs and the comparables, for ***$200 per unit***, or ***$14,000*** for general and administrative costs.

| **General and Administrative** | | | | |
|---|---|---|---|---|
| | NCREIF 4Q 2023 | Apartment Comps | Subject 2023 | NVC Projection |
| Amount/Unit | $3,768 | $359-487 | $187 | $200 |
| Amount | - | - | - | $14,000 |

*Replacement Reserves*

Replacement Reserves is an allowance that provides for expenditures of short-lived items or recurring expenses.  The deterioration of capital items occurs over a period of time, but are viewed as an annual expense to ownership.  This requires an annual deduction be made from income to reflect the statistical probability of their occurrence time.

The owner currently expenses all replacements of stoves/ovens, refrigerators, microwaves, heating/cooling units, carpet, furniture, etc. within the repairs and maintenance category.   Many times they will attempt to repair rather than replace.  As such, they employ three maintenance workers and have a storage unit on site with tools and some replacement units.  While we don't want to double-count what is already being expensed in these two categories, we do want to properly allow for replacement reserves.

Short-lived items such as appliances, carpeting, window coverings, and HVAC units are typically considered in replacement reserves.  Generally, for apartments, investors will select a reserve amount between $250 to $700 per unit depending upon the age/condition of the property and the amount estimated for general maintenance expense.  However, the subject has been maintained at a below-average level and now exhibits significant deferred maintenance.

Given the age of the property and the projected renovation, we will conclude with an additional reserve estimate of ***$300 per unit***, or ***$21,000*** for annual replacement reserves.

*Texas Margin Tax*

As subject's total annualized revenue is well below the 2024 threshold of $2,470,000, no margin tax is payable.

APP000142

Amerigold Suites                                                                    NVC | National Valuation Consultants, Inc.

### Total Operating Expenses Conclusion

NVC's estimation of operating expenses for the subject as of April 5, 2024, is shown in the following table.

| Summary of Operating Expense Estimates | | | |
|---|---|---|---|
| Total No. of Units: 70 | | | |
| Total Square Footage: 51,600 | | | |
| | As of 4/5/2024 | | |
| Expense Category | Amount | $/Unit | $/SF |
| Advertising & Promotion | $10,500 | $150 | $0.35 |
| Real Estate Taxes | $81,500 | $1,164 | $1.58 |
| Insurance | $42,000 | $600 | $0.81 |
| Management Fees @ 4.00% | $41,248 | $589 | $0.80 |
| Repairs & Maintenance | $140,000 | $2,000 | $3.26 |
| Utilities | $168,000 | $2,400 | $3.26 |
| General & Administrative | $14,000 | $200 | $0.27 |
| Replacement Reserves | $21,000 | $300 | $0.41 |
| TOTAL | $518,248 | $7,403 | $11.84 |

Our current, stabilized NOI is shown in the proforma on the following page.

APP000143

Amerigold Suites                                                        NVC | National Valuation Consultants, Inc.

## NET OPERATING INCOME

The net operating income for the subject "as is", is shown in the following table, together with last year's operations and our trended statement, as if renovated.

| Subject Operating History and NVC Proforma | | | | | | |
|---|---|---|---|---|---|---|
| Total No. of Units: 70 | | | | | | |
| Total Rentable Square Footage: 51,600 | | | | | | |
| | | | NVC Proforma | | NVC Proforma | |
| | 2023 | | (Un-Trended) | | (Trended - 4/25) | |
| Income/Expense Category | Amount | $/Unit | Amount | $/Unit | Amount | $/Unit |
| Gross Potential Rental Revenue | $971,752 | $13,882 | $1,080,000 | $15,429 | $1,188,000 | $16,971 |
| Vacancy / Collection Loss | ($173,607) | ($2,480) | ($86,400) | ($1,234) | ($95,040) | ($1,358) |
| Concessions | ($4,407) | ($63) | ($32,400) | ($463) | ($35,640) | ($509) |
| Parking Income | | $0 | $0 | $0 | $0 | $0 |
| Utility Reimbursements | $49,946 | $714 | $50,000 | $714 | $51,500 | $736 |
| Other Income | $19,039 | $272 | $20,000 | $286 | $20,600 | $294 |
| Effective Gross Income | $862,723 | $12,325 | $1,031,200 | $14,731 | $1,129,420 | $16,135 |
| **Operating Expenses** | | | | | | |
| Payroll | $0 | $0 | $0 | $0 | $0 | $0 |
| Management Fees | $40,035 | $572 | $41,248 | $589 | $45,177 | $645 |
| Administrative Expense | $13,079 | $187 | $14,000 | $200 | $14,420 | $206 |
| Advertising and Promotion | $0 | $0 | $10,500 | $150 | $10,815 | $155 |
| Maintenance/Building/Grounds | $187,294 | $2,676 | $140,000 | $2,000 | $144,200 | $2,060 |
| Utilities | $235,000 | $3,357 | $235,000 | $3,357 | $242,050 | $3,458 |
| Insurance | $168,879 | $2,413 | $42,000 | $600 | $43,260 | $618 |
| Property Taxes | $40,998 | $586 | $81,500 | $1,164 | $83,945 | $1,199 |
| Replacement Reserves | $0 | $0 | $21,000 | $250 | $21,630 | $309 |
| Total Operating Expenses | $685,285 | $9,790 | $585,248 | $8,361 | $605,497 | $8,650 |
| Net Operating Income (NOI) | $177,438 | $2,535 | $445,952 | $6,371 | $523,923 | $7,485 |
| Expense Ratio | | 79.43% | | 56.75% | | 53.61% |
| Vacancy/Collection loss | | 17.87% | | 8.00% | | 8.00% |
| Concessions | | 0.45% | | 3.00% | | 3.00% |
| Management Fee % of EGI | | 4.64% | | 4.00% | | 4.00% |
| Utility Reimbursements | | 21.25% | | 21.28% | | 21.28% |

As only limited data was provided, a complete analysis and comparison of subject's estimated expenses with projected figures, was not possible.

However, our NOI is fairly similar to that of subject's 2023 figures, although as the property is currently being operated by the receiver, the data may not be representative of typical market behavior.

The "trended" pro forma assumes the renovation, as discussed herein, is performed in a reasonable timeframe.

APP000144

Amerigold Suites                                                         NVC | National Valuation Consultants, Inc.

**CAPITALIZATION**

Capitalization is a process in which projected net income is converted into a single value estimate.  The two primary methods of capitalizing income are 1) direct capitalization and 2) yield capitalization.

**DIRECT CAPITALIZATION**

There are several methods of deriving an appropriate overall rate to use to capitalize NOI.  In determining the appropriate rate for the subject, we have utilized the following methods: A) market extraction, B) investor survey, and C) debt coverage ratio.  Each of these methods are considered in the following analysis.

*A) Market Extraction*

A market-extracted capitalization rate (overall rate) is market-oriented and can be determined by dividing the NOI of a comparable sale by its selling price.  If comparables are truly similar to the subject, they will produce a narrow range from which an appropriate rate can be selected and applied to the subject's NOI.

As a basis for comparison, the strengths and weaknesses of the subject are summarized below.

| Strengths And Weaknesses |
|---|
| **Strengths** |
| •    Walkable location close to employment & commercial services |
| •    Location offers good access and visibility |
| •    All units have balconies/patios |
| •    Above-average project amenities |
| •    Value-add potential to renovate unit interiors |
| •    Class C vacancy in submarket (6.1%) is below the DFW Metro market (8.8%) |
| •    Class C rental rates have increased an average 5.6%/year in the last 10 years |
| •    Limited new supply planned or under construction |
| •    High mortgage rates pushing occupiers towards renting |
| **Weaknesses** |
| •    Located in a secondary submarket |
| •    Small average unit size |
| •    Aging property in need of updating |
| •    Aging property may have higher maintenance in future years |
| •    Property taxes and other expenses have increased significantly |
| •    Limited availability of debt capital |

APP000145

Amerigold Suites                                                    NVC | National Valuation Consultants, Inc.

Recent sales of Dallas apartment properties are summarized in the following table.

| | | | | Summary of Sales for Capitalization Rate Extraction | | |
|---|---|---|---|---|---|---|
| Comp No. | Name/Location | Date of Sale | Year Built | Occupancy At Sale | Total Units | Cap Rate |
| 1 | Casa San Luis 3155 Park Ln Dallas, Texas | 7/23 | 1967 | 93.2% | 63 | 5.10% |
| 2 | Metro @ 404 404 Andrews St Dallas, Texas | 3/23 | 1965 | 90.0% | 116 | 5.26% |
| 3 | McCallum Communities 7740 McCallum Blvd Dallas, Texas | 11/22 | 1984 | 92.3% | 419 | 4.42% |
| 4 | Clover on Park Lane 8780 Park Ln Dallas, Texas | 1/22 | 1975 | 95.0% | 343 | 3.50% |
| 5 | The Colony House 6235 Oram St Dallas, Texas | 12/21 | 1961 | 91.3% | 21 | 3.55% |

These comparable sales indicate a range of capitalization rates of 3.50% to 5.26% on in-place income.

Based on the market data summarized above, we conclude to a range in capitalization rates from 6.50% to 7.50% via market extraction. Notably, the most recent transactions show the highest rates, reflecting the higher interest rates and weaker market conditions. Indeed, Nos. 4 and 5 took place when the "bell weather" 10-year UST was around 2.01%. The other three sales took place in a higher interest rate environment, generally between 3.50% and 4.00%. As of the date of this report, the current yield is approximately 4.60%.

*B) Investor Survey*

In preparation for this assignment we spoke with several brokers active in the subject's market area who specialize in institutional grade, Class A and B multi-family projects. We have recently also interviewed other multi-family market participants in other primary markets though out the region and nationally. The brokers active in the subject's market indicated a capitalization rate range of 6.50% to 7.00% for institutional grade multifamily properties.

APP000146

Amerigold Suites                                              NVC | National Valuation Consultants, Inc.

***National Highlights - Apartments***

·        *"The year-one market rent change rate is the trickiest assumption to estimate now, according to investors.  This key indicator declines to 3.83% from 4.10% last quarter but remains above the ten-year average of 2.56% for this market.*

•        *At the same time, this market's average overall cap rate rises from 4.45% last quarter to 4.75% this quarter; in response to the rising cost of capital, investors are slowing their pace of acquisitions, pausing to assess the market, or pivoting toward debt-structured deals.*

•        *A widening bid-ask pricing gap between buyers and sellers is a major impediment to deal flow in this market, followed by increased caution being shown by investors."*

The table below provides current and historical OAR trends (from the PwC Real Estate Investor Survey).  However, these rates likely relate to better quality institutional grade properties.  Subject's rate should be higher to reflect its age, condition and smaller project size.

| Overall Capitalization Rate (OAR) | | | |
|---|---|---|---|
| | National Apartment Market | | |
| Reporting Period | Low | High | Average |
| 2 Years Ago        1Q22 | 3.00% | 7.00% | 4.40% |
| 2Q22 | 3.00% | 7.00% | 4.45% |
| 3Q22 | 3.00% | 8.00% | 4.75% |
| 4Q22 | 3.25% | 8.00% | 4.89% |
| Year Ago            1Q23 | 3.50% | 8.00% | 5.01% |
| 2Q23 | 3.75% | 8.00% | 5.25% |
| 3Q23 | 3.75% | 8.00% | 5.28% |
| Last Quarter     4Q23 | 4.00% | 8.00% | 5.59% |
| Current             1Q24 | 4.00% | 7.50% | 5.42% |





PwC Real Estate Investor Survey 1Q24

In the latest survey, overall capitalization rates for institutional-grade apartment complexes averaged 5.42%. This is  up 41 basis points  from one year ago.  For non-institutional properties, PwC in its 1Q 2024 Survey reports national apartment cap rates averaging 250 bps above those for institutional properties.

Thus, given the subject's infill location, and factoring in that this survey is now slightly dated, we correlate the data to suggest an appropriate cap rate for the subject to range of 6.50% to 7.00% via the investor survey technique.

APP000147

**C) Debt Coverage Ratio (DCR) Method**

Due to the current state of the economy and overall trends in the real estate industry, more investors are looking at the relationship between debt and overall cap rates. Thus, we have included the following DCR analysis.

A debt coverage ratio is the ratio of NOI to annual debt service. The DCR method of deriving an overall rate involves factoring the debt coverage ratio that is typically required by a lender during the underwriting of the loan request. The estimated overall rate is derived by multiplying the debt coverage ratio, the loan-to-value ratio, and the mortgage constant.

To estimate an overall rate, the debt coverage ratio is multiplied by the mortgage constant and the loan-to-value ratio. The formula is as follows:

$$Ro = DCR \times Rm \times M$$

| | | |
|---|---|---|
| Ro | = | overall rate |
| DCR | = | debt coverage ratio |
| Rm | = | mortgage constant |
| M | = | loan-to-value ratio |

In order to gather the necessary information to calculate the OAR for a property similar to the subject, we have reviewed financing information from RealtyRates.com - Investor Survey. According to the most recent survey, current investment parameters applicable are as follows:

| RealtyRates.com Investor Survey - 1st Quarter 2024* Permanent Financing - Apartment | | | |
|---|---|---|---|
| Component | Minimum | Maximum | Average |
| Interest Rate | 3.47% | 7.76% | 5.68% |
| Amortization Period (years) | 15 | 40 | 26 |
| Mortgage Constant | 0.0856 | 0.0813 | 0.0737 |
| Loan to Value | 55.00% | 90.00% | 73.00% |
| Debt Coverage Ratio | 1.00 | 1.86 | 1.43 |

*4th Quarter 2023 - Realty Rates

As indicated, even though the survey is from 1st Quarter 2024, the data is from 4th Quarter 2023. More recent data is not available as PwC ceased publishing results for this category due to lack of responses.

Interest rates on loans for properties like the subject generally track the 10-year treasury with an approximate 200 to 300 basis point risk premium. The 10-year treasury yield has trended upward significantly over the past 27 months which translates to rising interest rates for commercial loans.

APP000148

Amerigold Suites                                                  NVC | National Valuation Consultants, Inc.

Based on the preceding and considering the characteristics of the subject and market conditions, we present a comparison of typical loan terms as of January 2022 and the current date of value.

| DCR Method Comparison | | |
|---|---|---|
| Lending Environment | Jan-22 | Apr-24 |
| Loan Terms Selected | | |
| Interest Rate | 4.25% | 7.50% |
| Amortization Period  (years) | 25 | 25 |
| Mortgage Constant (Rm) | 0.0650 | 0.0887 |
| Loan to Value (M) | 60% | 55% |
| Debt Coverage Ratio (DCR) | 1.25 | 1.30 |
| DCR Method OAR Indication | | |
| DCR  x  Rm  x  M  =  Ro | 4.88% | **6.34%** |
| Change (bps) | | 146 |

Due to rising interest rates, investors are likely to contribute greater equity to reduce the impact of higher interest rates and to ensure acceptable coverage ratios, resulting in a lower LTV.

The analysis above suggests that an interest rate increase of 225-basis points equates to a 118-basis point increase in the capitalization rate assuming a slightly higher DCR and a slightly lower LTV.  The DCR method further indicates a current cap rate of 6.06%.

**Conclusion of Capitalization Rate**

| Conclusion of Capitalization Rates | |
|---|---|
| Method | Indication |
| Market Extraction | 6.50%   -   7.50% |
| Investor Survey | 6.50%   -   7.00% |
| Debt Coverage Ratio | 6.34% |
| Band of Investments | 6.34% |

Of the two methods used in deriving a capitalization rate, market extraction is the most heavily weighted. Based on the varied data, we conclude a range of proforma capitalization rates of 6.50% to 7.00% for the subject.  This range takes assumes that the subject has been renovated.

As noted, the property exhibits significant deferred maintenance, with the eventual buyer likely to conduct major renovations which will enhance appeal and drive higher rental rates and occupancy.  Our client reports being in discussions with a potential buyer at a price of around $4,800,000, but no further details are available as no sale has been agreed.

Early last year, the property was under contract to a buyer at $5,500,000 (per our client), but this sale did not close.  The prospective buyer last year was reported to intend spending  some $3,040,000 of proposed renovations, $1,660,000 of which was for the exterior and $1,380,000 of which was for the interiors.  As we have no additional data on the cost of renovations, we have used these figures as a basis for estimating the deductions that the existing buyer might make in order to enhance the property and achieve higher rents, as estimated previously.   Consequently, in order to achieve the projected rents, the cost of these works must be deducted from our indicated value, as if stabilized, to arrive at our "as is" value.

APP000149

Amerigold Suites                                             NVC | National Valuation Consultants, Inc.

Also deducted is the lost rent while the property is renovated and units are unleasable. This is estimated by assuming that each month, 6 units are "down" while renovations are completed, reducing the potential current income by around 8.6%. Costs are also adjusted slightly, and the resulting loss of just over $125,000 is discounted at 10.0% for a present value of $115,000 (rounded). Thus, our final value, as of April 5, 2024, is projected as follows:

Based on the preceding, an overall rate of 6.75% is selected for the subject property. The indicated value for the subject is shown in the following table:

| Direct Capitalization - "Upon Completion" As of April 5, 2025 | |
|---|---:|
| NOI | $523,923 |
| Capitalization Rate | 7.00% |
| Indicated Value By Direct Capitalization | $7,480,000 |
| Less: Estimated Cost of Renovations | -$3,192,000 |
| Less: Cost of Rent Loss During Renovations | -$115,000 |
| Subtotal - Adjustments | -$3,307,000 |
| Indicated Value | $4,173,000 |
| Rounded | $4,170,000 |
| Value Per $/Unit (70) | $59,571 |

APP000150

Amerigold Suites                                                    NVC | National Valuation Consultants, Inc.

## Reconciliation and Final Value

In this valuation, the Sales Comparison and Income Capitalization Approach were used. The resultant values are provided in the following table.

| Final Value Reconciliation | |
| --- | --- |
| Value Scenario | "As Is" Market Value |
| Date of Valuation | April 5, 2024 |
| Interest Appraised | Fee Simple |
| Cost Approach | NA |
| Sales Comparison Approach | $4,040,000 |
| Income Capitalization Approach | |
| Direct Capitalization | $4,170,000 |
| DCFA | NA |
| Reconciled | $4,170,000 |
| **Market Value Opinion** | **$4,170,000** |
| Market Value Opinion /Unit | $59,571 |

### *Cost Approach*

The cost approach was not utilized to derive an opinion of market value via the replacement cost of the proposed improvements, plus land value. This is principally due to the age of the property and the difficulty of estimating not only the cost to complete the improvements, but also the amount of depreciation to apply. Further, it is not considered necessary to use this approach to develop a credible value opinion. Consequently, it is excluded herefrom.

### *Sales Comparison Approach*

The strength of this approach is that it is based entirely upon the actions of market participants. The sales were analyzed using a price per unit analysis. The weakness of this approach is that there has been limited market activity of truly comparable properties in the subject's area and it is difficult to quantify adjustments for each sale. Furthermore, most investors do not rely on this technique in making their purchase decisions, although it is considered as a test of reasonableness. Overall, minimal weight is accorded to the sales comparison approach.

APP000151

Amerigold Suites                                                        NVC | National Valuation Consultants, Inc.

*Income Capitalization Approach*

The income capitalization approach to value is predicated on the assumption that a strong relationship exists between the net income a property produces and its market value.  For this reason, the income capitalization approach focuses on the most important feature to an investor in an income-producing property, the potential net operating income.  The direct capitalization technique was utilized in this approach.  The quantity and quality of data available for this approach were considered good, thus we have a high level of confidence in the resulting value indication.  We have placed most weight on the income approach for our final value conclusion.

Our market value opinion is subject to certain standard assumptions and limiting conditions which are referenced in the accompanying appraisal report.  In addition, there is one Extraordinary Assumption, but no Hypothetical Conditions that may have affected the assignment results, as follows.

**EXTRAORDINARY ASSUMPTION**

> *During our inspection of the property, a random sampling of the subject's units were inspected. For the purposes of this appraisal, we have assumed that the condition and decor of the remaining units (those not inspected) is similar to those inspected and described within this report.  If it is determined that the condition and/or decor of the remaining units is significantly different than described herein, a re-valuation of the subject could be required.*

**HYPOTHETICAL CONDITIONS**

> *None*

APP000152

Amerigold Suites                                    NVC | National Valuation Consultants, Inc.

## Reasonable Exposure Time and Marketing Period

The Statement on Appraisal Standards No. 6 (SMT-6) define reasonable exposure time as follows:

"The estimated length of time the property interest being appraised would have been offered on the market prior to the hypothetical consummation of a sale at market value on the effective date of the appraisal."

In contrast, Advisory Opinion 7 (AO-7) marketing time as follows:

"an opinion of the amount of time it might take to sell a real or personal property interest at the concluded market value level during the period immediately after the effective date of an appraisal."

The key difference between the two is that exposure time is inherent in the market value and is always presumed to precede the effective date of value, whereas the marketing period is the estimated length of time immediately after the effective date of value that will be necessary to sell the property.

### *Market Context*

In level markets, the exposure time and marketing time should be identical.  In improving markets, the marketing period will probably be shorter than the exposure period, whereas in declining markets, the marketing period will probably be longer than the exposure period.  In the following table, we have considered average marketing times indicated in a national real estate investor survey conducted by PwC Real Estate.

APP000153

Amerigold Suites                                          NVC | National Valuation Consultants, Inc.

| Average Marketing Times | | | | |
| --- | --- | --- | --- | --- |
| National Apartment Market | | | | |
| Reporting Period | | Low | High | Avg. Months |
| 2 Years Ago | 1Q22 | 1.0 | 12.0 | 4.3 |
| | 2Q22 | 1.0 | 12.0 | 4.3 |
| | 3Q22 | 1.0 | 12.0 | 4.3 |
| | 4Q22 | 1.0 | 12.0 | 4.6 |
| Year Ago | 1Q23 | 1.0 | 12.0 | 4.8 |
| | 2Q23 | 1.0 | 12.0 | 5.8 |
| | 3Q23 | 2.0 | 12.0 | 6.0 |
| Last Quarter | 4Q23 | 2.0 | 15.0 | 6.3 |
| Current | 1Q24 | 3.0 | 15.0 | 6.3 |



PwC Real Estate Investor Survey 1Q24

As shown, the National Apartment market indicates average marketing times close to four months, which is lower than the average of all property types.

*Conclusion*

Considering both the macro context of the institutional real estate market in general, as well as the micro aspects of the subject property in particular, it is our opinion that the reasonable exposure period inherent in the market value estimate nine months.

We estimate that the forward-looking marketing period is also at nine months.  This is the length of time that we estimate it will take to sell the subject property at the appraised value.

| Exposure and Marketing Period Conclusions | |
| --- | --- |
| Exposure Period Implicit in Market Value Estimate | 9 Months |
| Forecasted Marketing Period | 9 Months |

APP000154

# Certification

We certify that, to the best of our knowledge and belief:

1. The statements of fact contained in this report are true and correct.

2. The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and are our personal, impartial, and unbiased professional analyses, opinions, and conclusions.

3. We have no present or prospective interest in the property that is the subject of this report and no personal interest with respect to the parties involved.

4. We have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.

5. Our engagement in this assignment was not contingent upon developing or reporting predetermined results.

6. Our compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

7. Our analyses, opinions and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice (USPAP), the requirements of the Code of Professional Ethics and the Standards of Professional Appraisal Practice of the Appraisal Institute.

8. Simon  D. Neame, MRICS made a personal inspection of the property that is the subject of this report. Charles G. Dannis, MAI, SRA did not inspect the subject property for the purpose of this specific report, but did view the property for the purpose of our prior appraisal in early 2023. Please refer to the *Scope of Work* section of this report for more information.

9. Additional employees of National Valuation Consultants, Inc. provided assistance with the preparation of this report. Specifically, Mr. Dennis Young and Ms. Cherylee Beller provided assistance with research, data gathering and confirmation of public records.  Otherwise, no one provided significant real property appraisal assistance to the persons signing this certification.

10. The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.

11. As of the date of this report, Charles G. Dannis, MAI, SRA has completed the continuing education program for Designated Members of the Appraisal Institute and Simon D. Neame, MRICS is current with the Continuing Professional Development program of the Royal Institution of Chartered Surveyors and the requirements for Practicing Affiliates of the Appraisal Institute.

APP000155

Amerigold Suites                                                    NVC | National Valuation Consultants, Inc.

12. We have performed appraisal services, regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment. The appraisers performed an appraisal of the subject property for the same client with an effective date of January 19, 2023.

Charles G. Dannis, MAI, SRA
Senior Managing Director
Texas Certified General Appraiser
License No.: TX 1321531 G
Phone: 214-932-1818
Email: cdannis@nvcinc.com

Simon D. Neame, MRICS
Senior Vice President
Texas Certified General Appraiser
License No.: TX 1330329 G
Phone: 214-932-1821
Email: sneame@nvcinc.com

APP000156

**ADDENDA**

APP000157

**APPRAISER QUALIFICATIONS**

APP000158

# Charles (Chuck) G. Dannis, MAI, SRA
## Senior Managing Director



Chuck has been a real estate appraiser and consultant since 1972.  In 1976, he co-founded the Dallas-based appraisal firm Crosson Dannis, Inc., which provided real estate appraisal and consultation services throughout the U.S. for more than 35 years.  In 2015, Crosson Dannis merged with National Valuation Consultants to create one of the largest privately held commercial real estate valuation and advisory firms in the United States.

Chuck currently serves as the Senior Managing Director of NVC's Dallas office, overseeing all aspects of its day-to-day operations including bidding, structuring and engaging appraisal assignments and managing the office's valuation team.



## PROFESSIONAL EXPERIENCE

NATIONAL VALUATION CONSULTANTS, INC.                    JANUARY 2015 - PRESENT

*One of the largest, privately held commercial real estate valuation and advisory companies in the United States with a focus on institutional real estate clients*

CROSSON DANNIS, INC.                    1977 – DECEMBER 2014

Served as co-founder and President of this full-service real estate appraisal and consulting firm operating throughout the United States.

FIRST TEXAS FINANCIAL CORPORATION AND MUTUAL SAVINGS                    1974 - 1976

Initially employed as Regional Supervisor, subsequently promoted to Assistant Vice President. Responsible for management and marketing of all company-owned real estate developments with concurrent responsibilities of all appraisal work on income-producing property loans. Residential developments included several single-family subdivisions and a large, planned unit development.

OAK CLIFF SAVINGS AND FIRST TEXAS FINANCIAL CORPORATION                    1972 - 1974

Employed as a Staff Appraiser for a statewide savings and loan holding company, involving real estate appraisal and consulting work on all types of properties.

## EDUCATION

SOUTHERN METHODIST UNIVERSITY                    B.B.A. – MANAGEMENT
GRADUATE STUDIES IN FINANCE AND REAL ESTATE

## CERTIFICATIONS AND LICENSES

Certified General Appraiser in the State of Texas

## PROFESSIONAL AFFILIATIONS

- Member of the Appraisal Institute (MAI and SRA)
- Chairman – Ethics Committee, Appraisal Institute[1]
- Chairman – Candidate Guidance, Appraisal Institute[1]
- Chairman – Public Relations, Appraisal Institute[1]
- Chairman – Symposium Committee, Appraisal Institute[2]
- Vice Chairman – Research Committee, Appraisal Institute[2]
- Member – Appraisal Standards Council, Appraisal Institute[2]

[1]Local Chapter
[2]National Appointment

**PHONE:**
Direct:   214.932.1818
Mobile: 214.707.1851

**EMAIL:**
cdannis@nvcinc.com

**WEBSITE:**
www.nvcinc.com

**NVC - DALLAS**
6060 North Central Expressway
Suite 740
Dallas, TX 75206

APP000159

# Charles (Chuck) G. Dannis, MAI, SRA
Senior Managing Director　　　　　　　　　　　　　　　　　　　　　　　　　　Page 2

## PROFESSIONAL AFFILIATIONS (CONT.)

- Chairman – Valuation Committee, National Council of Real Estate Investment Fiduciaries
- Chairman, Education Committee, National Council of Real Estate Investment Fiduciaries
- Board of Directors, National Council of Real Estate Investment Fiduciaries (1997-2001;2015-2023); Chairman of the Board (2020 -2022)
- Lecturer – Nuts & Bolts (Essentials) of Institutional Real Estate, National Council of Real Estate Investment Fiduciaries, 2001-
- Adjunct Professor of Practice in Real Estate, Edwin L. Cox School of Business, SMU, 1988-
- Chairman - City of Dallas, Economic Review Panel for the Landmark Commission, 2002, 2008
- Mayor's Real Estate Task Force for the City of Dallas, 2003-2006

## PUBLICATIONS, SPEECHES AND LECTURES

- Articles contributed to the following publications:

  *Appraisal Journal*　　　　　　　　　　　　　*Real Estate Finance*
  *Real Estate Review*　　　　　　　　　　　　*D Magazine (blog)*
  *Institutional Real Estate Letter*　　　　　　*Dallas Business Journal*

- Participation in various Educational Symposiums/Conferences including MBA (Texas, Louisiana and National Conferences), IPT, NCREIF, SMU, Appraisal Institute

## BOARDS, CIVIC AND PROFESSIONAL SERVICE (PAST AND PRESENT)

- Guest Lecturer at graduate business schools of: UT Austin, UT Arlington, Texas A&M, Harvard, DePaul, and UT Dallas
- Board of Trustees – The Dallas Marathon, benefiting The Texas Scottish Rite Hospital for Children (President/Chairman, 2005-2008; Chairman Emeritus, 2009-)
- Board of Directors – Folsom Institute for Real Estate, SMU/Cox, Vice Chair Education (2014 -)
- Host of "The Real Estate Hour", 1992 – 2008; 2020 - 2022 (CBS Radio Network, Dallas affiliate)
- Founder, SMU Real Estate Society at the SMU Cox School of Business
- Board of Governors, Chartered Realty Investor Society
- Board of Directors – Friends of The Katy Trail (2011 - 2016)
- Board of Trustees – The Shelton School (2013 -), an Internationally known school for children that learn differently
- Independent Director, TIER REIT (2003 - 2017); Chairman of the Board (2013 - 2015)
- Qualified as an expert witness in several states and courts throughout the U.S.

## AWARDS AND HONORS

- The Dallas Marathon's Victory Award for Excellence and Community Service, 2011
- First recipient of the Eugene T. Byrne Endowed Faculty Innovation Award, SMU Cox School of Business, 2006
- HOPE Professor Nominee, SMU Cox School of Business, 2008, 2009 and 2021
- Mortgage Bankers Association, Faculty Fellow Award, 1996-1997
- First Recipient of the Folsom Institute for Real Estate/SMU Real Estate Society's Distinguished Real Estate Alumni Award – 2015
- Appraisal Institute Education Trust's Dr. William N. Kinnard, Jr. Award in recognition of his professionalism and commitment to real estate appraisal education, 2016
- Commandant of the U.S. Marine Corps Quality Citizen Award, 2008
- North Texas Commercial Association of Realtors "Michael F. McAuley Lifetime Achievement Award" for his personal efforts to the community, to professional organizations committed to the real estate industry and to charitable pursuits, 2019
- Included in the 2023 and 2024 DCEO Dallas 500 Most Influential Business Leaders in North Texas



**NVC**
National Valuation Consultants, Inc.

APP000160

CHARLES GLENN DANNIS
6060 N CENTRAL EXPY STE 740
DALLAS, TX 75206



# Certified General
# Real Estate Appraiser

**Appraiser:  Charles Glenn Dannis**

**License #:  TX 1321531 G**          License Expires: **01/31/2026**

Having provided satisfactory evidence of the qualifications required by the Texas Appraiser Licensing and Certification Act, Occupations Code, Chapter 1103, authorization is granted to use this title: Certified General Real Estate Appraiser

For additional information or to file a complaint please contact TALCB at www.talcb.texas.gov.

**Chelsea Buchholtz
Executive Director**

APP000161

# Simon D. Neame, MRICS
## Senior Vice President



**National Valuation Consultants, Inc.**

Simon has been involved in commercial real estate appraisal for more than 30 years, and currently serves as a Senior Vice President for the Dallas office of National Valuation Consultants, Inc. He is involved in the counseling, feasibility analysis and appraisal of all types of income producing properties as well as vacant land.  Specialized areas of expertise include auto dealerships and schools.

## PROFESSIONAL EXPERIENCE

NATIONAL VALUATION CONSULTANTS, INC.                     JANUARY 2015 - PRESENT
*One of the largest privately held commercial real estate valuation and advisory firms in the United States with a focus on institutional real estate clients.*

CROSSON DANNIS, INC.                     1997 – DECEMBER 2014
Valuation and consultation of all types of commercial properties including retail, office, industrial, apartment, other commercial, special-use, and land/planned developments. Worked on portfolio and individual valuations, advising institutional, lending and private clients, as well as providing litigation support, on properties throughout the United States.

CHURSTON HEARD & CO.                     1988 - 1997
Employed as Associate Director/Head of Valuation, located in London, England.  Appraisal of all types of leasehold and freehold commercial property throughout the United Kingdom. Portfolio appraisal and analysis, management reporting and preparation of submissions for various litigation.  Promoted to Head of Valuation in October 1992.

CHURSTON HEARD & CO.                     1975 - 1988
Retail and commercial brokerage for leading London-based national real estate company. Responsible for acquisition, marketing, disposal and appraisal of London retail real estate for institutional investors, developers, and major retail companies.  Also handled lease renewal and rent review negotiations.  Appointed head of section in 1983.

## FORMAL EDUCATION

DULWICH COLLEGE – LONDON, ENGLAND        COLLEGE OF ESTATE MANAGEMENT, READING, ENGLAND

## REAL ESTATE APPRAISAL EDUCATION

Royal Institution of Chartered Surveyors: Parts 1, 2 and 3 - Valuation, Building Construction, Law of Property, Estate Agency – Marketing & Management and Urban Land Development. R.I.C.S. Test of Professional Competence.

Current compliance with R.I.C.S. Continuing Professional Development and State Appraiser Continuing Education requirements.

## PROFESSIONAL AFFILIATIONS AND LICENSING

- Member, Royal Institution of Chartered Surveyors
- Practicing Affiliate – Appraisal Institute
- Texas Certified General Appraiser
- Published contributor to *The Appraisal Journal*

**PHONE:**
Direct:   214.932.1821
Mobile: 469.556.2659

**EMAIL:**
sneame@nvcinc.com

**WEBSITE:**
www.nvcinc.com

**NVC – DALLAS**
6060 N. Central Expwy
Suite 740
Dallas, TX 75206

APP000162

SIMON DAVID NEAME



# Certified General
# Real Estate Appraiser

Appraiser: **SIMON DAVID NEAME**

License #: **TX 1330329 G**          License Expires: **08/31/2025**

Having provided satisfactory evidence of the qualifications required
by the Texas Appraiser Licensing and Certification Act, Occupations
Code, Chapter 1103, authorization is granted to use this title:
Certified General Real Estate Appraiser

For additional information or to file a complaint please contact TALCB
at www.talcb.texas.gov.

**Chelsea Buchholtz**
**Commissioner**

APP000163

**IMPROVED SALE ABSTRACTS**

APP000164

# Comparable Sale 1
## Apartment Garden/Low Rise
NVC # 272470

Casa San Luis • 3155 Park Ln, Dallas, Texas



### PROPERTY DATA

| | |
|---|---|
| Description | Two-store, Class C, Garden Apartment Community. |
| No. of Buildings | 1 |
| Year Built | 1967 |
| Total Units | 63 |
| Total SF | 63,989 |
| Average Unit Size | 1,016 SF |
| Land Size | 123,395 SF |
| Density | 22.24 |
| Project Amenities | Laundry Facility, On-site Leasing Office, Pool |
| Unit Amenities | AC, Balcony/Patio |
| Parking | Open and Carports |

### PROPERTY IDENTIFICATION

| | |
|---|---|
| Property Name | Casa San Luis |
| Address / Location | 3155 Park Ln |
| City, County, State | Dallas, Dallas, Texas |

### SALE DATA

| | |
|---|---|
| Sale Price | $7,000,000 |
| Sale Price/Unit | $111,111 |
| Sale Price/RSF | $109.39 |
| Cap Rate | 5.10% |
| Date of Sale | 07/31/2023 |
| Grantor | Casa Park Lane LLC |
| Grantee | SEG Park Lane, LLC |
| Document # | 2023001/53196 |
| Terms | Cash to seller |
| Marketing Time | NAV |
| Contract Time | N/AV |
| Occupancy at Sale | 93.2% |

APP000165

**Comparable 1 Cont...**

## APARTMENT UNIT MIX

| Unit Type | Quantity | Size (SF) | Monthly Rent | Rent/SF | Total SF | Total Rent |
|---|---|---|---|---|---|---|
| 3 BD/ 2 BA | 14 | 1,288 | | | 18,032 | |
| 2 BD/ 2 BA | 28 | 1,044 | | | 29,232 | |
| 1 BD/ 1.5 BA | 10 | 897 | | | 8,970 | |
| 1 BD/ 1 BA | 11 | 705 | | | 7,755 | |

**Total Monthly Rent:** $0

**Average Rent Per Unit:**

**Average Rent Per SF:**

*The data shown in this section reflects the unit mix and advertised rental rates as of the date of sale. These figures may differ from the actual contract rent shown in the income data section.*

## INCOME & EXPENSE DATA

| | Gross Amount | Per Unit | Per SF |
|---|---|---|---|
| Rental Income | | | |
| Other Income | | | |
| Vacancy (0.0%) | $0 | $0 | $0.00 |
| **Effective Gross Income** | **$0** | **$0** | **$0.00** |
| Expenses | | | |
| Reserves | | | |
| **Net Operating Income** | **$357,000** | **$5,667** | **$5.58** |

| | |
|---|---|
| **Overall Cap Rate** | 5.10% |
| **EGIM** | .00 |
| **Expense Ratio** | |
| **Sale Price Per Unit** | $111,111 |
| **Sale Price Per SF** | $109.39 |

**Source:** Historical T12

**Comments:** See comments

## SALE COMMENTS

According to confidential source the property sold for Approximately $7.0 million and the actual cap rate was 5.10% base on T3 income and T 12 expenses.

According to CoStar the property was 93.2% occupied at the time of sale.

2023 Demographics within one Mile:

Households: 6,257
Median Household Income: $45,910
Median Home Value: $283,896

CoStar " Star" rating: 2 star Garden Apartment Community
Walk Score: 35 (Car-Dependent)
Transit Score:  34 (Some Transit)

## VERIFICATION

| | |
|---|---|
| Verified By | Confidential |
| Telephone | N/A |
| Surveyed By | Dennis Young |
| Surveyed Date | 04/08/2024 |
| Reviewed By | Simon Neame |

APP000166

## Comparable Sale 2
### Apartment Garden/Low Rise
NVC # 272532

Metro @ 404 • 404 Andrews St, Dallas, Texas



### PROPERTY DATA

| | |
|---|---|
| Description | Two-story, Class C, Low-rise Apartment Community. |
| No. of Buildings | 1 |
| Year Built | 1965 |
| Year Renovated | 2017 |
| Total Units | 116 |
| Total SF | 76,800 |
| Average Unit Size | 662 SF |
| Land Size | 114,214 SF |
| Density | 44.24 |
| Project Amenities | BBQ Grills, Laundry Facility, On-site Leasing Office |
| Unit Amenities | AC |
| Parking | Open |
| Parking Ratio | 1.09     Per Unit |

### PROPERTY IDENTIFICATION

| | |
|---|---|
| Property Name | Metro @ 404 |
| Address / Location | 404 Andrews St |
| City, County, State | Dallas, Dallas County, Texas |

### SALE DATA

| | |
|---|---|
| Sale Price | $12,000,000 |
| Sale Price/Unit | $103,448 |
| Sale Price/RSF | $156.25 |
| Cap Rate | 5.26% |
| Date of Sale | 03/29/2023 |
| Grantor | 404 Andrews, LLC |
| Grantee | Metro 404 168, LLC |
| Document # | 2023000/62354 |
| Terms | Cash to seller |
| Marketing Time | N/AV |
| Contract Time | N/AV |
| Occupancy at Sale | 90.0% |

NVC, Inc. • 7807 E. Peakview Ave. Suite 200, Centennial, CO 80111 • www.nvcinc.com • 303.753.6900

APP000167

Comparable 2 Cont...

## APARTMENT UNIT MIX

| Unit Type | Quantity | Size (SF) | Monthly Rent | Rent/SF | Total SF | Total Rent |
|-----------|----------|-----------|--------------|---------|----------|------------|
| 1 BD/ 1 BA | 20 | 492 | | | 9,840 | |
| 1 BD/ 1 BA | 32 | 548 | | | 17,536 | |
| 2 BD/ 1 BA | 40 | 722 | | | 28,880 | |
| 2 BA/ 1 BA | 08 | 792 | | | 6,336 | |
| 2 BD/ 1.5 BA | 08 | 840 | | | 6,720 | |
| 3 BD/ 1.5 BA | 08 | 936 | | | 7,488 | |

| | | |
|---|---|---|
| **Total Monthly Rent:** | **$0** | The data shown in this section reflects the unit mix and advertised rental rates as |
| **Average Rent Per Unit:** | | of the date of sale. These figures may differ from the actual contract rent shown |
| **Average Rent Per SF:** | | in the income data section. |

## INCOME & EXPENSE DATA

| | Gross Amount | Per Unit | Per SF | | |
|---|---|---|---|---|---|
| Rental Income | | | | Overall Cap Rate | 5.26% |
| Other Income | | | | EGIM | .00 |
| Vacancy (0.0%) | $0 | $0 | $0.00 | Expense Ratio | |
| **Effective Gross Income** | **$0** | **$0** | **$0.00** | Sale Price Per Unit | $103,448 |
| Expenses | | | | Sale Price Per SF | $156.25 |
| Reserves | | | | Source: | |
| **Net Operating Income** | **$631,200** | **$5,441** | **$8.22** | **Comments:** See comments | |

## SALE COMMENTS

According to confidential source the property sold for $12.0 million and the actual cap rate was 5.26% base on T3 income and T 12 expenses.

According to ALN the property was 90% occupied at the time of sale.

2023 Demographics within one Mile:

Households: 4,622
Median Household Income: $49,103
Median Home Value: $145,684

CoStar " Star" rating: 2 star Low-rise Apartment Community
Walk Score: 61 (Somewhat Walkable)
Transit Score:  None available at time of survey.

## VERIFICATION

| | |
|---|---|
| Verified By | Confidential |
| Telephone | N/A |
| Surveyed By | Dennis Young |
| Surveyed Date | 04/12/2024 |
| Reviewed By | Simon Neame |

## Comparable Sale 3
### Apartment Garden/Low Rise
NVC # 263859

McCallum Communities • 7740 McCallum Blvd, Dallas, Texas



### PROPERTY DATA

| | |
|---|---|
| Description | Apartments - Far North Dallas Submarket |
| No. of Buildings | 14 |
| Year Built | 1984 |
| Total Units | 419 |
| Total SF | 249,426 |
| Average Unit Size | 595 SF |
| Land Size | 244,981 SF |
| Density | 74.50 |

### PROPERTY IDENTIFICATION

| | |
|---|---|
| Property Name | McCallum Communities |
| Address / Location | 7740 McCallum Blvd |
| City, County, State | Dallas, Dallas County, Texas |

### SALE DATA

| | |
|---|---|
| Sale Price | $52,000,000 |
| Sale Price/Unit | $124,105 |
| Sale Price/RSF | $208.48 |
| Cap Rate | 4.42% |
| Date of Sale | 11/04/2022 |
| Grantor | McCallum Multifamily Dallas DE LLC |
| Grantee | HC McCallum LLC |
| Document # | 0163066 |
| Occupancy at Sale | 92.3% |

## APARTMENT UNIT MIX

| Unit Type | Quantity | Size (SF) | Monthly Rent | Rent/SF | Total SF | Total Rent |
|---|---|---|---|---|---|---|
| Studio | 01 | 400 | | | 400 | |
| 1 BR | 390 | 577 | | | 225,030 | |
| 2 BR | 28 | 857 | | | 23,996 | |

**Total Monthly Rent:**     **$0**

**Average Rent Per Unit:**

**Average Rent Per SF:**

*The data shown in this section reflects the unit mix and advertised rental rates as of the date of sale. These figures may differ from the actual contract rent shown in the income data section.*

## INCOME & EXPENSE DATA

| | Gross Amount | Per Unit | Per SF | | |
|---|---|---|---|---|---|
| Rental Income | | | | **Overall Cap Rate** | 4.42% |
| Other Income | | | | **EGIM** | .00 |
| Vacancy (0.0%) | $0 | $0 | $0.00 | **Expense Ratio** | |
| **Effective Gross Income** | **$0** | **$0** | **$0.00** | **Sale Price Per Unit** | $124,105 |
| Expenses | | | | **Sale Price Per SF** | $208.48 |
| Reserves | | | | **Source:** | |
| **Net Operating Income** | **$0** | **$0** | **$0.00** | **Comments:** | Actual Cap Rate - 4.42%Pro Forma Cap - 4.45% |

## SALE COMMENTS

Year 1 projects for NOI are $2,314,563 or a 4.45% CAP rate with year 5 projections of $4,088,820.

The new owner was attracted to the yield and stability that the property offers and plans to renovate 402 of the units at $7,700 per unit including new appliances, paint and updated lighting. $815,000 will go to exterior renovations to address deferred maintenance and improve amenities for a total of $3,895,080 in Capex.

## VERIFICATION

| | |
|---|---|
| Verified By | Confidential |
| Telephone | N/A |
| Surveyed By | Bradley Kilgore |
| Surveyed Date | 12/15/2022 |

## Comparable Sale 4
### Apartment Garden/Low Rise
NVC # 261611

Clover on Park Lane • 8780 Park Ln, Dallas, Texas





### PROPERTY DATA

| | |
|---|---|
| Description | Three-Story, Class B, Garden Apartment Community. |
| No. of Buildings | 1 |
| Year Built | 1975 |
| Total Units | 343 |
| Total SF | 209,172 |
| Average Unit Size | 610 SF |
| Land Size | 305,468 SF |
| Density | 48.91 |
| Project Amenities | BBQ Grills, Clubhouse, Computer Lab/Business Center, Dog/Pet Park, Fitness Center, Hot Tub/Jacuzzi, Laundry Facility, Media Room/Movie Theater, On-site Leasing Office, Playground, Pool, Sauna |
| Unit Amenities | 9' Ceilings, AC, Balcony/Patio, Stainless Steel Appliances, W/D |
| Additional Amenities | Resort Style Infinity Pool and Hot Tub, Wood-style Flooring, and Quartz Countertops. |
| Parking | Open |

### PROPERTY IDENTIFICATION

| | |
|---|---|
| Property Name | Clover on Park Lane |
| Address / Location | 8780 Park Ln |
| City, County, State | Dallas, Dallas, Texas |

### SALE DATA

| | |
|---|---|
| Sale Price | $38,500,000 |
| Sale Price/Unit | $112,245 |
| Sale Price/RSF | $184.06 |
| Cap Rate | 3.50% |
| Date of Sale | 01/04/2022 |
| Grantor | Travertine North Park Investors, LLC |
| Grantee | Tides on Park Lane Owner, LLC |
| Document # | 2022000/07419 |
| Terms | Cash to seller |
| Marketing Time | N/AV |
| Contract Time | N/AV |
| Occupancy at Sale | 95.0% |

## APARTMENT UNIT MIX

| Unit Type | Quantity | Size (SF) | Monthly Rent | Rent/SF | Total SF | Total Rent |
|---|---|---|---|---|---|---|
| 1 BD/1 BA | 62 | 486 | | | 30,132 | |
| 1 BD/1 BA | 12 | 525 | | | 6,300 | |
| 1 BD/1 BA | 17 | 528 | | | 8,976 | |
| 1 BD/1 BA | 31 | 544 | | | 16,864 | |
| 1 BD/1 BA | 78 | 558 | | | 43,524 | |
| 1 BD/1 BA | 22 | 640 | | | 14,080 | |
| 1 BD/1 BA | 24 | 654 | | | 15,696 | |
| 2 BD/1 BA | 27 | 720 | | | 19,440 | |
| 2 BD/1 BA | 06 | 784 | | | 4,704 | |
| 2 BD/2 BA | 25 | 900 | | | 22,500 | |
| 2 BD/2 BA | 23 | 916 | | | 21,068 | |
| Studio | 16 | 368 | | | 5,888 | |

**Total Monthly Rent:** $0

**Average Rent Per Unit:**

**Average Rent Per SF:**

*The data shown in this section reflects the unit mix and advertised rental rates as of the date of sale. These figures may differ from the actual contract rent shown in the income data section.*

## INCOME & EXPENSE DATA

| | Gross Amount | Per Unit | Per SF | | | |
|---|---|---|---|---|---|---|
| Rental Income | | | | **Overall Cap Rate** | 3.50% | |
| Other Income | | | | **EGIM** | .00 | |
| Vacancy (0.0%) | $0 | $0 | $0.00 | **Expense Ratio** | | |
| **Effective Gross Income** | **$0** | **$0** | **$0.00** | **Sale Price Per Unit** | $112,245 | |
| Expenses | | | | **Sale Price Per SF** | $184.06 | |
| Reserves | | | | **Source:** | In Place | |
| **Net Operating Income** | **$1,347,500** | **$3,929** | **$6.44** | **Comments:** | See comments | |

## SALE COMMENTS

According to confidential source the property sold for a sale price of $38.5 million and the cap rate reported as being approximately    3.50%.

The property was renamed Tides on Park Lane after the sale.

2022 Demographics within one Mile:

Households: 14,141
Median Household Income: $41,929
Median Home Value: $283,450

CoStar " Star" rating: 3 star Garden Apartment Community
Walk Score: 61 (Somewhat Walkable)
Transit Score: 41(Some Transit)

**VERIFICATION**

| | |
|---|---|
| Verified By | Confidential |
| Telephone | N/A |
| Surveyed By | Dennis Young |
| Surveyed Date | 08/29/2022 |
| Reviewed By | Bradley Kilgore |

# Comparable Sale 5

## Apartment Garden/Low Rise

NVC # 257180

The Colony House • 6235 Oram St, Dallas, Texas



## PROPERTY DATA

| | |
|---|---|
| Description | Two-Story, Class B, Low-Rise Apartment Community. |
| No. of Buildings | 1 |
| Year Built | 1961 |
| Total Units | 21 |
| Total SF | 19,170 |
| Average Unit Size | 913 SF |
| Land Size | 30,456 SF |
| Density | 30.03 |
| Project Amenities | Laundry Facility, Pool |
| Unit Amenities | AC, Granite Counters, W/D |
| Parking | Open |

## PROPERTY IDENTIFICATION

| | |
|---|---|
| Property Name | The Colony House |
| Address / Location | 6235 Oram St |
| City, County, State | Dallas, Dallas, Texas |

## SALE DATA

| | |
|---|---|
| Sale Price | $2,952,380 |
| Sale Price/Unit | $140,590 |
| Sale Price/RSF | $154.01 |
| Cap Rate | 3.55% |
| Date of Sale | 12/13/2021 |
| Grantor | SMG Carriage, LP |
| Grantee | Wedgewood Commercial Holdings, LLC |
| Property Interest | Fee Simple |
| Document # | 2021003/71050 |
| Terms | Cash to seller |
| Marketing Time | N/AV |
| Contract Time | N/AV |
| Occupancy at Sale | 91.3% |

**Comparable 5 Cont...**

## APARTMENT UNIT MIX

| Unit Type | Quantity | Size (SF) | Monthly Rent | Rent/SF | Total SF | Total Rent |
|-----------|----------|-----------|--------------|---------|----------|------------|
| 2 BD/2 BA | 15 | 1,008 | | | 15,120 | |
| 1 BD/ 1 BA | 06 | 675 | | | 4,050 | |

**Total Monthly Rent:**   $0

**Average Rent Per Unit:**

**Average Rent Per SF:**

*The data shown in this section reflects the unit mix and advertised rental rates as of the date of sale. These figures may differ from the actual contract rent shown in the income data section.*

## INCOME & EXPENSE DATA

| | Gross Amount | Per Unit | Per SF | | |
|---|---|---|---|---|---|
| Rental Income | | | | **Overall Cap Rate** | 3.55% |
| Other Income | | | | **EGIM** | .00 |
| Vacancy (0.0%) | $0 | $0 | $0.00 | **Expense Ratio** | |
| **Effective Gross Income** | **$0** | **$0** | **$0.00** | **Sale Price Per Unit** | $140,590 |
| Expenses | | | | **Sale Price Per SF** | $154.01 |
| Reserves | | | | **Source:** | In Place |
| **Net Operating Income** | **$104,810** | **$4,991** | **$5.47** | **Comments:** | See comments |

## SALE COMMENTS

According to confidential source the sale price was $2,952,380 and the cap rate was reported  as being 3.55%.

2021 Demographics within one Mile:

Households: 8,901
Median Household Income: $87,378
Median Home Value: $511,778

CoStar " Star" rating: 3 star Low-Rise apartment community
Walk Score: 80 (Very Walkable)
Transit Score: 41 (Some Transit)

## VERIFICATION

| | |
|---|---|
| Verified By | Confidential |
| Telephone | N/A |
| Surveyed By | Dennis Young |
| Surveyed Date | 02/04/2022 |
| Reviewed By | Bradley Kilgore |

**FLOOD PLAIN MAP**

APP000176

 RiskMeter

## Overview Map



Flood Zones: ☐ X500 or B Zone  ■ A Zone  ☐ V Zone  ■ D Zone ▨ Floodway ▧ CBRA

© 2023 CoreLogic, Inc. All rights reserved. CORELOGIC, RISKMETER, PXPOINT and the CoreLogic logo are trademarks of CoreLogic, Inc. and/or its subsidiaries. All other trademarks are the property of their respective holders

Report generated Jan 17, 2023 by jstevens@nvcinc.com

APP000177



## RiskMeter

13636 GOLDMARK DR DALLAS, TX 75240-4246

LOCATION ACCURACY:  📍 Excellent

### Flood Zone Determination Report

**Flood Zone Determination: OUT**

| | | | |
|---|---|---|---|
| COMMUNITY | 480171 | PANEL | 0195K |
| PANEL DATE | July 07, 2014 | MAP NUMBER | 48113C0195K |



Legend:
- 🟨 X500 or B Zone
- 🟪 A Zone
- 🟦 V Zone
- 🟧 D Zone
- ▥ Floodway
- ▧ CBRA

© 2023 CoreLogic, Inc. All rights reserved. CORELOGIC, RISKMETER, PXPOINT and the CoreLogic logo are trademarks of CoreLogic, Inc. and/or its subsidiaries. All other trademarks are the property of their respective holders

Report generated Jan 17, 2023 by jstevens@nvcinc.com

APP000178

**RENT ROLL**

APP000179

**Amerigold Suites**

**Copy of Rent Roll Report - Enhanced**

Run Date
03/31/2024

**Portfolio: Amerigold Suites - Building: Amerigold**

| Unit | Lease Name | Lease Status | Rent | Total Recurring ( | Last Payment D | Move In Date | Lease Start [ | Lease End Da |
|------|-----------|-------------|------|------------------|----------------|--------------|--------------|--------------|
| 1100 | Trejo, A._1 | Active | $1,800.00 | $1,800.00 | 03/11/2024 | 01/01/2023 | 01/01/2023 | 01/31/2023 |
| 1101 | Williams, K._2 | Active | $1,200.00 | $1,200.00 | 03/11/2024 | 12/01/2023 | 12/01/2023 | 12/31/2023 |
| 1102 | Abelardo, L. | Active | $1,100.00 | $1,100.00 | 03/29/2024 | 11/01/2018 | 11/01/2018 | 11/30/2018 |
| 1103 | Dutton - Dutton | Active | $1,200.00 | $1,200.00 | 03/15/2024 | 09/22/2023 | 10/01/2023 | 10/31/2023 |
| 1104 | Cross-Dog, C. | Active | $1,050.00 | $1,050.00 | 03/04/2024 | 09/05/2015 | 09/05/2015 | 01/31/2021 |
| 1105 | Maddox, C._1 | Active | $1,150.00 | $1,150.00 | 03/26/2024 | 08/03/2023 | 08/03/2023 | 09/02/2023 |
| 1106 | Briones, D. | Active | $1,200.00 | $1,200.00 | 03/05/2024 | 01/20/2023 | 01/23/2023 | 02/28/2023 |
| 1200 | Green, T. | Active | - | $0.00 | 03/29/2024 | 04/01/2024 | 04/01/2024 | 04/30/2024 |
| 1201 | Jasensky, J. | Active | $1,188.00 | $1,188.00 | 03/14/2024 | 12/15/2022 | 12/15/2022 | 01/08/2023 |
| 1202 | Guzman, F._1 | Active | $1,200.00 | $1,200.00 | 03/07/2024 | 09/01/2023 | 09/01/2023 | 09/30/2023 |
| 1203 | Yancy - Walker | Active | $1,050.00 | $1,050.00 | 03/28/2024 | 12/27/2017 | 12/28/2017 | 01/27/2018 |
| 1204 | Mcguire, G. | Active | $1,200.00 | $1,200.00 | 03/25/2024 | 09/15/2023 | 10/01/2023 | 10/31/2023 |
| 1205 | Graham, R._1 | Active | $1,150.00 | $1,150.00 | 03/04/2024 | 11/25/2019 | 11/23/2019 | 06/30/2021 |
| 1206 | Smith, J. | Active | $1,200.00 | $1,200.00 | 03/26/2024 | 02/15/2023 | 02/15/2023 | 03/14/2023 |
| 1300 | Hutchins, M. | Active | $1,800.00 | $1,800.00 | 03/13/2024 | 10/01/2023 | 10/01/2023 | 10/31/2023 |
| 1301 | Carrasco, D. | Active | $1,200.00 | $1,200.00 | 03/11/2024 | 12/08/2023 | 12/08/2023 | 01/07/2024 |
| 1302 | Barnett, C. | Active | $1,200.00 | $1,200.00 | 03/22/2024 | 11/21/2023 | 11/24/2023 | 12/23/2023 |
| 1303 | Harris, K. | Active | $1,200.00 | $1,200.00 | 03/26/2024 | 10/16/2023 | 10/16/2023 | 11/15/2023 |
| 1304 | Trivedi, G. | Active | $1,100.00 | $1,100.00 | 03/01/2024 | 06/15/2018 | 06/15/2018 | 12/31/2020 |
| 1400 | Hilburn - Whitaker | Active | $1,800.00 | $1,800.00 | 03/21/2024 | 02/07/2023 | 02/07/2023 | 03/06/2023 |
| 1401 | Blackmon, D. | Active | $1,200.00 | $1,200.00 | 03/25/2024 | 06/01/2023 | 06/01/2023 | 06/30/2023 |
| 1402 | Greer, C. | Active - Notice | $1,150.00 | $1,150.00 | 02/27/2024 | 07/15/2021 | 07/15/2021 | 08/14/2021 |
| 1403 | Abron, K. | Active | $1,050.00 | $1,050.00 | 03/29/2024 | 08/15/2017 | 08/15/2017 | 03/31/2021 |
| 1404 | Tolliver, T. | Active | $1,200.00 | $1,200.00 | 03/16/2024 | 10/15/2023 | 11/01/2023 | 11/30/2023 |
| 1405 | Curey, J. | Active | $1,188.00 | $1,188.00 | 03/14/2024 | 12/15/2022 | 12/15/2022 | 01/08/2023 |
| 1406 | Witherspoon, A. | Active | $1,200.00 | $1,200.00 | 03/25/2024 | 12/15/2022 | 12/15/2022 | 01/14/2023 |
| 1500 | Vacant | | $1,800.00 | $0.00 | | | | |
| 1501 | Jones, J. | Active | $1,200.00 | $1,200.00 | 03/14/2024 | 05/02/2023 | 05/02/2023 | 06/01/2023 |
| 1502 | Brisby, F. | Active | $1,188.00 | $1,188.00 | 03/14/2024 | 12/15/2022 | 12/15/2022 | 01/14/2023 |
| 1503 | Johnson, C._2 | Active | - | $0.00 | 03/18/2024 | 04/01/2024 | 04/01/2024 | 04/30/2024 |
| 1504 | Grant, S. | Active | $1,200.00 | $1,200.00 | 03/28/2024 | 10/01/2022 | 10/01/2022 | 10/31/2022 |
| 1505 | Gallegos, J. | Active | $1,150.00 | $1,150.00 | 03/29/2024 | 07/22/2021 | 07/22/2021 | 08/21/2021 |
| 1506 | Owen, M. | Active | $1,150.00 | $1,150.00 | 03/25/2024 | 05/19/2022 | 05/19/2022 | 06/18/2022 |
| 1600 | Haney, R._1 | Active | $1,800.00 | $1,800.00 | 03/25/2024 | 07/15/2023 | 07/15/2023 | 08/14/2023 |
| 1601 | Goolsby, S. | Active | $1,050.00 | $1,050.00 | 03/15/2024 | 10/01/2012 | 10/01/2012 | 10/31/2012 |
| 1602 | Clark, A. | Active | $1,050.00 | $1,050.00 | 03/28/2024 | 04/15/2016 | 04/08/2016 | 05/07/2016 |
| 1603 | Mcdaniel, J. | Active | $1,150.00 | $1,150.00 | 03/11/2024 | 11/04/2022 | 11/05/2022 | 12/04/2022 |
| 1604 | Dozier, S. | Active | $1,200.00 | $1,200.00 | 03/01/2024 | 03/01/2024 | 03/01/2024 | 03/31/2024 |
| 1700 | Vacant | | $1,800.00 | $0.00 | | | | |
| 1701 | Martin, T. | Active | $1,200.00 | $1,200.00 | 02/28/2024 | 03/01/2024 | 03/01/2024 | 03/31/2024 |
| 1702 | Bickley, J. | Active | $1,048.00 | $1,048.00 | 03/26/2024 | 05/19/2022 | 05/19/2022 | 06/18/2022 |
| 1703 | Vacant | | $1,200.00 | $0.00 | | | | |
| 1704 | Johanson, C. | Active | $1,025.00 | $1,025.00 | 03/01/2024 | 09/09/2017 | 09/09/2017 | 06/30/2021 |
| 1705 | Taplin, M. | Active | $1,200.00 | $1,200.00 | 03/01/2024 | 03/01/2024 | 03/01/2024 | 03/31/2024 |
| 1706 | Vacant | | $1,200.00 | $0.00 | | | | |
| 1800 | Farlow, J. | Active | $1,800.00 | $1,800.00 | 03/25/2024 | 12/08/2023 | 12/08/2023 | 01/07/2024 |
| 1801 | Tylor, A. | Active | $1,050.00 | $1,050.00 | 03/29/2024 | 08/30/2019 | 09/01/2019 | 06/30/2021 |
| 1802 | Davis, D._1 | Active | $1,000.00 | $1,000.00 | 03/01/2024 | 07/01/2016 | 07/01/2016 | 07/31/2016 |
| 1803 | Venson, E. | Active | $1,200.00 | $1,200.00 | 02/28/2024 | 02/01/2024 | 02/01/2024 | 02/29/2024 |
| 1804 | Wills, S. | Active | $1,200.00 | $1,200.00 | 03/20/2024 | 06/20/2022 | 06/15/2022 | 07/14/2022 |
| 1805 | Haney - Vasquez | Active | $1,200.00 | $1,200.00 | 03/25/2024 | 07/15/2022 | 07/07/2022 | 09/14/2022 |
| 1806 | Stockton, D. | Active | $1,200.00 | $1,200.00 | 03/28/2024 | 12/12/2023 | 12/15/2023 | 01/14/2024 |
| 1900 | Marshall - Marshall | Active | $1,800.00 | $1,800.00 | 03/13/2024 | 06/03/2022 | 06/03/2022 | 07/02/2022 |

APP000180

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 1901 | Hynson - Hogue | Active | $1,200.00 | $1,200.00 | 03/04/2024 | 04/20/2023 | 04/19/2023 | 05/18/2023 |
| 1902 | Dworkin - Dworkin | Active | $1,050.00 | $1,050.00 | 03/01/2024 | 11/07/2014 | 11/10/2014 | 06/30/2021 |
| 1903 | Hilburn - Tran | Active | $1,200.00 | $1,200.00 | 03/14/2024 | 08/22/2023 | 09/01/2023 | 09/30/2023 |
| 1904 | Foster, T. | Active | $1,150.00 | $1,150.00 | 03/04/2024 | 02/10/2022 | 02/07/2022 | 03/06/2022 |
| 2000 | Little, C. | Active | $1,800.00 | $1,800.00 | 03/15/2024 | 01/17/2024 | 01/17/2024 | 02/16/2024 |
| 2001 | Wallpool, A. | Active | $1,150.00 | $1,150.00 | 03/28/2024 | 07/27/2020 | 07/24/2020 | 12/31/2020 |
| 2002 | Baker - Dwyer | Active | $1,100.00 | $1,100.00 | 03/26/2024 | 10/01/2012 | 10/01/2012 | 10/31/2012 |
| 2003 | Loyd - Thomas-Donahu | Active | $1,200.00 | $1,200.00 | 03/20/2024 | 08/15/2023 | 08/15/2023 | 09/14/2023 |
| 2004 | Pennington, D. | Active | $1,200.00 | $1,200.00 | 03/28/2024 | 11/03/2023 | 11/03/2023 | 12/02/2023 |
| 2005 | Lockhart, N. | Eviction | $1,150.00 | $1,150.00 | 01/17/2024 | 03/01/2021 | 03/01/2021 | 03/31/2021 |
| 2006 | Silvasan-Roberts, J. | Active | - | $0.00 | 03/01/2024 | 10/15/2017 | 10/15/2017 | 11/14/2017 |
| 2101 | Carter, J. | Active | $1,150.00 | $1,150.00 | 03/27/2024 | 06/03/2022 | 06/03/2022 | 07/02/2022 |
| 2102 | Roberts, L. | Active | $700.00 | $700.00 | 03/16/2024 | 01/08/2018 | 01/08/2018 | 02/07/2018 |
| 2103 | Bruffy, K. | Active | $1,200.00 | $1,200.00 | 03/28/2024 | 07/01/2023 | 07/01/2023 | 07/31/2023 |
| 2104 | Lopez, M. | Active | $1,150.00 | $1,150.00 | 03/18/2024 | 11/15/2020 | 11/15/2020 | 02/28/2021 |
| 2105 | Sanchez, K. | Active | $1,200.00 | $1,200.00 | 03/28/2024 | 03/15/2023 | 03/15/2023 | 04/14/2023 |
| 2106 | Alexander, S. | Active | $1,000.00 | $1,000.00 | 03/12/2024 | 10/01/2012 | 10/01/2012 | 06/30/2021 |
| **Totals** | | | **$82,637.00** | **$76,637.00** | | | | |

## Summary - Amerigold

| | | | |
|---|---|---|---|
| Total Units | 70 | Security Depo | $0.00 |
| Occupied | 66 | Rent | $76,637.00 |
| Vacant | 4 | Active Leases | 66 |
| Occupancy Percentage | 94% | MTM Leases | 61 |
| Gross Potential Rent | $85,875.00 | Eviction | 1 |
| Vacancy Loss | $6,000.00 | | |

## Portfolio:Amerigold Suites - Building: Drafts - 1

| Unit | Lease Name | Lease Status | Rent | Total Recurring ( | Last Payment D | Move In Date | Lease Start [ | Lease End Dat |
|---|---|---|---|---|---|---|---|---|
| Drafts - 1 | Vacant | | - | $0.00 | | | | |
| Totals | | | $0.00 | $0.00 | | | | |

## Summary - Drafts - 1

| | | | |
|---|---|---|---|
| Total Units | 1 | Security Depo | $0.00 |
| Occupied | 0 | Rent | $0.00 |
| Vacant | 1 | Active Leases | 0 |
| Occupancy Percentage | 0% | MTM Leases | 0 |
| Gross Potential Rent | $0.00 | Eviction | 0 |
| Vacancy Loss | $0.00 | | |

## Summary - Amerigold Suites

| | | | |
|---|---|---|---|
| Total Units | 71 | Security Depo | $0.00 |
| Occupied | 66 | Rent | $76,637.00 |
| Vacant | 5 | Active Leases | 66 |
| Occupancy Percentage | 92% | MTM Leases | 61 |
| Gross Potential Rent | $85,875.00 | Eviction | 1 |
| Vacancy Loss | $6,000.00 | | |

| | |
|---|---|
| Generated By: | Joanna Silvason |
| Generated On: | 3/29/2024 |
| Run Date: | 03/31/2024 |

APP000181

**ENGAGEMENT LETTER**

APP000182



**National Valuation Consultants, Inc.**

**Via email:** cort@brownfoxlaw.com

April 2, 2024

Cort Thomas, Receiver
Partner
Brown Fox PLLC
8111 Preston Road, Suite 300
Dallas, TX 75225
Phone No.: 214.367.6094

**Re: An Appraisal of Amerigold Suites located at 13636 Goldmark Drive in Dallas, Texas**

Dear Mr. Thomas:

This letter will confirm your request that National Valuation Consultants, Inc. prepare an appraisal of the above referenced property. The purpose of the assignment will be to estimate the fee simple market value of the subject property as of the date of our inspection. *and may be filed with the Court*

We understand that the intended use is for internal use. The intended user is ~~Brown Fox PLLC~~. *Goldmark Hospitality, LLC c/o Cort Thomas, Receiver*

The appraisal report will be prepared in conformance with the current Uniform Standards of Professional Appraisal Practice (USPAP) adopted by the Appraisal Standards Board of the Appraisal Foundation; and with the written appraisal requirements and guidelines established by the Appraisal Institute for an appraisal.

The requested appraisal will be delivered in approximately *two weeks from the receipt of the retainer*, provided all requested information is received in a timely manner. Please understand that this is our best estimate of the delivery date and may be subject to change because of conditions beyond our control. The fee is also subject to modification and/or change, by mutual agreement, should you require changes to the assignment described herein.

*The fee for our services will be $4,800. NVC will require a 100% retainer.* The retainer ($4,800) is due and payable at our offices in Centennial, Colorado before work will begin. In the event of cancellation of the assignment, or if the assignment is placed on hold for more than thirty (30) days, all applicable charges for services rendered by NVC to the date of such cancellation will be due within thirty (30) days from the date of invoice.

The fee quoted above is for the reports only and does not include court preparation or post-appraisal consultation, if any. Court preparation and consultation time are billed at the rate of $450 per hour for senior staff and $250 per hour for other staff. These fees are subject to increase after six months from the date of this agreement. It is also corporate policy that prior to any deposition or court testimony, we must be paid in full not only for current billings, but any outstanding past accounts as well.

It is mutually agreed that our acceptance of this assignment is not contingent upon any predetermined conclusions to value, marketability, or feasibility. Should the assignment be

**WEST**
Seattle
San Francisco
Los Angeles

**SOUTHWEST**
Denver
Dallas
Houston
San Antonio

**MIDWEST**
Chicago
Cincinnati
Columbus

**NORTHEAST**
Boston
NY/NJ Metro

**SOUTHEAST**
Atlanta
Savannah
South Florida

APP000183

Cort Thomas
April 2, 2024
Page 2

terminated, you agree to pay for our time and costs incurred prior to receipt of written notice of cancelation.

If this agreement is given to an attorney for collection or enforcement, the prevailing party shall be entitled to recover all costs, expenses and reasonable attorney's fees incurred because of the legal action.

Our report will contain numerous assumptions and limiting conditions which are requisite to the conclusions reached therein. The standard assumptions and limiting conditions are set forth in Exhibit "A" attached hereto and made a part hereof for all purposes. Your signature below acknowledges that you have read, understood, and agreed to these assumptions. In addition to these standard assumptions, there may be assumptions contained in our report which are specific to your property. Regarding these latter assumptions, your signature below acknowledges that, unless we have been notified in writing by you within twenty days of receipt of our report, you accept these assumptions as stated therein.

By signing hereafter, the client hereby acknowledges and agrees that National Valuation Consultants, Inc., as well as any employee or agents, shall be indemnified against any, and all losses, claims, damages, liabilities, costs or expenses to which the recipient and/or third-party user may become subject to in connection with the preparation of these reports.

We will deliver the report in PDF format. If requested, we will also deliver a hard copy at the cost of $250.00 per copy.

If the foregoing is agreeable, please sign where indicated on the enclosed copy of this letter and return to me along with the requested data. Please keep a copy for your files. We look forward to working with you on this assignment. Please feel free to contact me if you have any questions.

By:

Cort Thomas

4/3/24

Date

Charles G. Dannis, MAI, SRA
Senior Managing Director
National Valuation Consultants, Inc.

April 2, 2024

Date

APP000184

Exhibit "A"

## ASSUMPTIONS AND LIMITING CONDITIONS

1.  Disclosure of the contents of the appraisal report is governed by the bylaws and regulations of the professional appraisal organizations with which the appraiser is affiliated:  specifically, the Appraisal Institute.

2.  This Report should be relied upon only by the Intended User(s) and only for the Intended Use(s) identified at the time of the assignment.  Furthermore, the Report is to be used in whole and not in part.  The Report shall not be duplicated or provided to any third party in whole or in part without the written consent of NVC. Exempt from this restriction is duplication for the internal use of the Intended User and its attorneys, accountants, or advisors for the sole benefit of the Intended User. Also exempt from this restriction is transmission of the Report pursuant to any requirement of any court, governmental authority, or regulatory agency having jurisdiction over the intended user, provided that the Report and its contents shall not be published, in whole or in part, in any public document without the written consent of NVC. Written consent and approval from NVC must be obtained before this appraisal report can be conveyed by anyone to the public through advertising, public relations, news, sales, or other media.  Any third party, not covered by the exemptions herein, who may possess this report, is advised that they should rely on their own independently secured advice for any decision in connection with this property.  NVC shall have no accountability or responsibility to any such third party.

3.  The appraiser will not be required to give testimony or appear in court because of having made this appraisal, with reference to the property in question, unless previous arrangements have been made.

4.  The distribution of the total valuation in this report between land and improvements applies only under the stated highest and best use of the property.  The separate allocation of value for land and improvements must not be used in conjunction with any other appraisal and is invalid if so used.

5.  The legal description used in this report is assumed to be correct.

6.  No survey of the property has been made by the appraiser and no responsibility is assumed in connection with such matters. Maps and sketches are included only to assist the reader in visualizing the property.

7.  No responsibility is assumed for matters of a legal nature affecting title to the property, nor is an opinion of title rendered.  The title is assumed to be good and merchantable unless otherwise stated.

8.  It is assumed that there are no hidden or unapparent conditions of the property, subsoil, (including termite infestations) or structures which would render it more or less valuable.  No responsibility is assumed for such conditions or for engineering which may be required to discover such.

9.  All mechanical components are assumed to be in operable condition as would be considered standard for properties similar to the subject in type and age.  The heating, cooling, ventilation, plumbing and electrical equipment are considered to be in similar condition to the observable elements of the improvements unless otherwise stated. The insulation and energy efficiency of the improvements are assumed to be adequate and standard for the subject type and age unless otherwise noted.

10. Information furnished by others is assumed to be true, correct and reliable.  A reasonable effort has been made to verify such information; however, no responsibility for its accuracy is assumed by the appraiser.

APP000185

11.   The value estimate assumes responsible ownership and competent management.

12.   Unless otherwise stated in this report, the existence of hazardous substances, including without limitation asbestos, polychlorinated biphenyls, petroleum leakage, or agricultural chemicals, which may or may not be present on the property, or other environmental conditions, were not called to the attention of nor did the appraiser become aware of such during the appraiser's inspection. The appraiser has no knowledge of the existence of such materials on or in the property unless otherwise stated. The appraiser, however, is not qualified to test such substances or conditions.  If the presence of such substances, such as asbestos, urea formaldehyde foam insulation, or other hazardous substances or environmental conditions, may affect the value of the property, the value estimated is predicated on the assumption that there is no such condition on or in the property or in such proximity thereto that it would cause a loss in value.  No responsibility is assumed for any such conditions, or for any expertise or engineering knowledge required to discover them.

13.   Opinions of value contained in this report are estimates.  There is no guarantee, written or implied, that the subject property will sell or lease for the indicated amounts.

14.   The appraisers of National Valuation Consultants, Inc. reserve the right to amend and/or alter statements, analyses, conclusions and value estimates if information pertinent to this assignment is made known to us after the completion of the report.

15.   By signing hereafter, the client hereby acknowledges and agrees that National Valuation Consultants, Inc., as well as any employee, agent, or officer thereof, shall be completely indemnified against any and all losses, claims, damages, liabilities, costs or expenses to which the recipient and/or third party user may become subject but only if National Valuation Consultants, Inc. or any other indemnified person shall not have been negligent or shall not have taken or omitted to take any action in bad faith in connection with the preparation of this report.

16.   The Americans with Disabilities Act ("ADA") became effective January 26, 1992.  We have not made a specific compliance survey and analysis of this property to determine whether or not it is in conformity with the various detailed requirements of the ADA.  It is possible that a compliance survey of the property, together with a detailed analysis of the requirements of the ADA, could reveal that the property is not in compliance with one or more of the requirements of the Act.  If so, this fact could have a negative effect upon the value of the property.  Since we have no direct evidence relating to this issue, we did not consider possible noncompliance with the requirements of ADA in estimating the value of the property.

17.   Unless otherwise noted, all prospective value estimates, if any, in this appraisal, are based on the market conditions which exist at the date of inspection combined with an informed forecast, based on current trends in supply and demand for the property type under appraisal, as to what such conditions will be at the future date of property completion and or stabilization.  The appraiser cannot be held responsible for unforeseeable events, such as unexpected new construction, unanticipated changes in economic conditions, or any other such events which might occur, and which would alter market conditions prior to the effective date of the appraisal.

APP000186

# EXHIBIT B-2

APP000187

**Integra Realty Resources**
**Dallas**

**Appraisal of Real Property**

**Amerigold Suites**
Multifamily Property
13636 Goldmark Drive
Dallas, Dallas County, Texas 75240

**Prepared For:**
Goldmark Hospitality, LLC
c/o Cort Thomas, Receiver

**Date of the Report:**
May 7, 2024

**Report Format:**
Appraisal Report

**IRR - Dallas**
File Number: 191-2024-0279



APP000188

# Subject Photographs





**Amerigold Suites**
13636 Goldmark Drive
Dallas, Texas

APP000189

## Aerial Photograph



APP000190

Integra Realty Resources       1100 Mira Vista Boulevard       T 972.881.7191
Dallas                          Suite 300                       F 972.733.1403
                                Plano, TX, 75093                www.irr.com



May 7, 2024


Goldmark Hospitality, LLC
c/o Cort Thomas, Receiver
8111 Preston Road
Dallas, TX 75225

SUBJECT:       Market Value Appraisal
               Amerigold Suites
               13636 Goldmark Drive
               Dallas, Dallas County, Texas 75240
               IRR - Dallas File No. 191-2024-0279

Dear Goldmark Hospitality, LLC c/o Cort Thomas, Receiver:

Integra Realty Resources – Dallas is pleased to submit the accompanying appraisal of the referenced property. The purpose of the appraisal is to develop an opinion of the market value as is, pertaining to the fee simple interest in the property.

The client for the assignment is Goldmark Hospitality, LLC, c/o Cort Thomas, Receiver. The intended user of this report is the client. The intended use of the report is for internal decision-making purposes and may be filed with the court. No other party or parties may use or rely on the information, opinions, and conclusions contained in this report.

The subject is an existing multifamily property containing 70 dwelling units. The improvements were constructed in 1981 and are 94% leased as of the effective appraisal date. The site area is 3.56 acres or 155,074 square feet. It should be noted, the subject improvements are in below average condition and appear to need significant renovations. Based on discussions with ownership, there are currently no plans or official cost estimates. Accordingly, we utilize market data to estimate the cost to cure at approximately $20,000/unit or $1,400,000. We apply this deduction for deferred maintenance as an adjustment to reach our "as is" market value conclusion.

APP000191

Goldmark Hospitality, LLC
May 7, 2024
Page 2

The appraisal conforms to the Uniform Standards of Professional Appraisal Practice (USPAP), the Code of Professional Ethics and Standards of Professional Practice of the Appraisal Institute, applicable state appraisal regulations, and the appraisal guidelines of Goldmark Hospitality, LLC. The appraisal is also prepared in accordance with the appraisal regulations issued in connection with the Financial Institutions Reform, Recovery and Enforcement Act (FIRREA).

Standards Rule 2-2 (Content of a Real Property Appraisal Report) contained in the Uniform Standards of Professional Appraisal Practice (USPAP) requires each written real property appraisal report to be prepared as either an Appraisal Report or a Restricted Appraisal Report. This report is prepared as an Appraisal Report as defined by USPAP under Standards Rule 2-2(a), and incorporates practical explanation of the data, reasoning, and analysis that were used to develop the opinion of value.

Based on the valuation analysis in the accompanying report, and subject to the definitions, assumptions, and limiting conditions expressed in the report, the concluded opinions of value are as follows:

**Value Conclusion**

| Value Type & Appraisal Premise | Interest Appraised | Date of Value | Value Conclusion |
|---|---|---|---|
| Market Value As Is | Fee Simple | April 25, 2024 | $5,570,000 |

**Extraordinary Assumptions and Hypothetical Conditions**

The value conclusions are subject to the following extraordinary assumptions. An extraordinary assumption is an assignment-specific assumption as of the effective date regarding uncertain information used in an analysis which, if found to be false, could alter the appraiser's opinions or conclusions.

1. The market value conclusion herein is based upon the premise that the subject property is comprised of 51,240 square feet of rentable area. This is compared to the public records accounting of 30,962 square feet. As the discrepancy is substantial, we solely rely on the rent roll provided by the subject's receivership/ownership and assume this is an accurate representation of the subject property. We reserve the right to revisit our valuation if the building area is deemed to be inaccurate.
2. Based on discussions with the subject's receivership/ownership, there is no formal budget to cure the existing deferred maintenance. Accordingly, we utilize market data to derive an estimate of $20,000/unit or $1,400,000 in capital expenditures needed. This amount is applied as an adjustment to reach our "as is" market value conclusion. We reserve the right to revisit our valuation if a property conditions report or actual cost estimate is provided.

The value conclusions are based on the following hypothetical conditions. A hypothetical condition is a condition, directly related to a specific assignment, which is contrary to what is known by the appraiser to exist on the effective date of the assignment results, but is used for the purpose of analysis.

1. None

The use of any extraordinary assumption or hypothetical condition may have affected the assignment results.



APP000192

Goldmark Hospitality, LLC
May 7, 2024
Page 3

The opinions of value expressed in this report are based on estimates and forecasts which are prospective in nature and subject to considerable risk and uncertainty. Events may occur which could cause the performance of the property to differ materially from the estimates contained herein, such as changes in the economy, interest rates, capitalization rates, financial strength of tenants, and behavior of investors, lenders, and consumers. Additionally, the concluded opinions and forecasts are based partly on data obtained from interviews and third-party sources, which are not always completely reliable. Although the findings are considered reasonable based on available evidence, IRR is not responsible for the effects of future, unforeseen occurrences.

If you have any questions or comments, please contact the undersigned. Thank you for the opportunity to be of service.

Respectfully submitted,

**Integra Realty Resources - Dallas**

Stone Berger
Senior Director
Texas Certified General Real Estate Appraiser
TX 1381099 G
Telephone: 469.294.2930
Email: sberger@irr.com

Jimmy H. Jackson, MAI
Senior Managing Director
Texas Certified General Real Estate Appraiser
TX 1324004 G
Telephone: 972.725.7724
Email: jhjackson@irr.com



APP000193

# Table of Contents

| | |
|---|---|
| **Quality Assurance** | **1** |
| **Executive Summary** | **2** |
| **Identification of the Appraisal Problem** | **5** |
| Subject Description | 5 |
| Sale History | 5 |
| Pending Transactions | 5 |
| Appraisal Purpose | 6 |
| Value Type Definitions | 6 |
| Appraisal Premise Definitions | 6 |
| Property Rights Definitions | 7 |
| Client and Intended User(s) | 7 |
| Intended Use | 7 |
| Applicable Requirements | 7 |
| Report Format | 7 |
| Prior Services | 8 |
| Appraiser Competency | 8 |
| **Scope of Work** | **9** |
| **Economic Analysis** | **11** |
| Dallas County Area Analysis | 11 |
| Surrounding Area Analysis | 19 |
| Multifamily Market Analysis | 26 |
| Class B/C Multifamily Overview | 29 |
| **Property Analysis** | **41** |
| Land Description and Analysis | 41 |
| Improvements Description and Analysis | 47 |
| Real Estate Taxes | 56 |
| Highest and Best Use | 57 |
| **Valuation** | **59** |
| Valuation Methodology | 59 |
| Sales Comparison Approach | 60 |

| | |
|---|---|
| Analysis and Adjustment of Sales | 64 |
| Property Adjustments | 66 |
| Value Indication | 69 |
| Income Capitalization Approach | 71 |
| Occupancy and Rental Rates | 71 |
| Market Rent Analysis | 72 |
| Stabilized Income and Expenses | 80 |
| Capitalization Rate Selection | 82 |
| Direct Capitalization Analysis | 84 |
| Reconciliation and Conclusion of Value | 86 |
| Exposure Time | 87 |
| Marketing Period | 87 |
| **Certification** | **88** |
| **Assumptions and Limiting Conditions** | **90** |

**Addenda**
A.  Appraiser Qualifications
B.  IRR Quality Assurance Survey
C.  Financials and Property Information
D.  Comparable Data
     Improved Sales
     Rent Surveys
E.  Engagement Letter

Amerigold Suites

APP000194

# Quality Assurance

## IRR Quality Assurance Program

At IRR, delivering a quality report is a top priority. Integra has an internal Quality Assurance Program in which managers review material and pass an exam in order to attain IRR Certified Reviewer status. By policy, every Integra valuation assignment is assessed by an IRR Certified Reviewer who holds the MAI designation, or is, at a minimum, a named Director with at least ten years of valuation experience.

This quality assurance assessment consists of reading the report and providing feedback on its quality and consistency. All feedback from the IRR Certified Reviewer is then addressed internally prior to delivery. The intent of this internal assessment process is to maintain report quality.

## Designated IRR Certified Reviewer

The IRR Certified Reviewer who provided the quality assurance assessment for this assignment is Jimmy H. Jackson, MAI. An internal quality assurance assessment was conducted by an IRR Certified Reviewer prior to delivery of this appraisal report. This assessment should not be construed as an appraisal review as defined by USPAP.



Amerigold Suites

APP000195

# Executive Summary

| | |
|---|---|
| Property Name | Amerigold Suites |
| Address | 13636 Goldmark Drive |
| | Dallas, Dallas County, Texas  75240 |
| Property Type | Multifamily - Garden/Low Rise |
| Owner of Record | Goldmark Hospitality, LLC |
| Tax ID | 00000769000800000 |
| Legal Description | Block A/7761, Lot 3, Carleton House Garden Hotel Addition to the City of Dallas, Dallas County, Texas |
| Land Area | 3.56 acres; 155,074 SF |
| Number of Units | 70 |
| Rentable Floor Area | 51,240 SF |
| Percent Leased | 94% |
| Year Built | 1981 |
| Zoning Designation | MU-3, Mixed Use - 3 |
| Highest and Best Use - As if Vacant | Multifamily use |
| Highest and Best Use - As Improved | Continued multifamily use |
| Exposure Time; Marketing Period | 3 - 9 months; 3 - 9 months |
| Effective Date of the Appraisal | April 25, 2024 |
| Date of the Report | May 7, 2024 |
| Property Interest Appraised | Fee Simple |

| Market Value Indications | | |
|---|---|---|
| Cost Approach | Not Used | |
| Sales Comparison Approach | $5,600,000 | ($80,000/Unit) |
| Income Capitalization Approach | $5,540,000 | ($79,143/Unit) |
| Market Value Conclusion | $5,570,000 | ($79,571/Unit) |

The values reported above are subject to the definitions, assumptions, and limiting conditions set forth in the accompanying report of which this summary is a part. No party other than Goldmark Hospitality, LLC may use or rely on the information, opinions, and conclusions contained in the report. It is assumed that the users of the report have read the entire report, including all of the definitions, assumptions, and limiting conditions contained therein.



## Extraordinary Assumptions and Hypothetical Conditions

The value conclusions are subject to the following extraordinary assumptions. An extraordinary assumption is an assignment-specific assumption as of the effective date regarding uncertain information used in an analysis which, if found to be false, could alter the appraiser's opinions or conclusions.

1. The market value conclusion herein is based upon the premise that the subject property is comprised of 51,240 square feet of rentable area. This is compared to the public records accounting of 30,962 square feet. As the discrepancy is substantial, we solely rely on the rent roll provided by the subject's receivership/ownership and assume this is an accurate representation of the subject property. We reserve the right to revisit our valuation if the building area is deemed to be inaccurate.
2. Based on discussions with the subject's receivership/ownership, there is no formal budget to cure the existing deferred maintenance. Accordingly, we utilize market data to derive an estimate of $20,000/unit or $1,400,000 in capital expenditures needed. This amount is applied as an adjustment to reach our "as is" market value conclusion. We reserve the right to revisit our valuation if a property conditions report or actual cost estimate is provided.

The value conclusions are based on the following hypothetical conditions. A hypothetical condition is a condition, directly related to a specific assignment, which is contrary to what is known by the appraiser to exist on the effective date of the assignment results, but is used for the purpose of analysis.

1. None

The use of any extraordinary assumption or hypothetical condition may have affected the assignment results.

Amerigold Suites

APP000197

## Strengths, Weaknesses, Opportunities, Threats (SWOT Analysis)

The analyses presented in this report consider the internal strengths and weaknesses of the subject property, as well as opportunities and external threats. The overall valuation influences are summarized in the following table.

### Valuation Influences

**Strengths**

- The subject property has maintained a high occupancy rate in the past several years.

**Weaknesses**

- Newer developed competition, which is designed and finished to current market standards will likely be better accepted by the market.

**Opportunities**

- The subject site could be redeveloped to a higher density.

**Threats**

- Inflation has risen in the past year as the economy recovers from the pandemic economic shutdowns and demand shocks. This may tend to inflate operating costs diminishing profit on the project.
- Although Federal Reserve Chairman Powell remains non-committal, it is certain that the Federal Reserve will continue to closely monitor inflationary factors as well as unemployment in the US economy. Based on favorable and positive unemployment as well as other inflationary measures, the Fed could decide to keep interest rates stable or even implement a series of interest rate cuts beginning in mid-2024. This inflation/unemployment monitoring will continue on a quarterly basis throughout the remainder of 2024. As such, depending on inflation factors/unemployment figures, there could still be emerging upward pressure on lending interest rates as well as overall capitalization rates which could continue to impact improved properties similar to the subject.

APP000198

# Identification of the Appraisal Problem

## Subject Description

The subject is an existing multifamily property containing 70 dwelling units. The improvements were constructed in 1981 and are 94% leased as of the effective appraisal date. The site area is 3.56 acres or 155,074 square feet. It should be noted, the subject improvements are in below average condition and appear to need significant renovations. Based on discussions with ownership, there are currently no plans or official cost estimates. Accordingly, we utilize market data to estimate the cost to cure at approximately $20,000/unit or $1,400,000. We apply this deduction for deferred maintenance as an adjustment to reach our "as is" market value conclusion. A legal description of the property is provided below.

### Property Identification

| | |
|---|---|
| Property Name | Amerigold Suites |
| Address | 13636 Goldmark Drive |
| | Dallas, Texas 75240 |
| Tax ID | 00000769000800000 |
| Owner of Record | Goldmark Hospitality, LLC |
| Legal Description | Block A/7761, Lot 3, Carleton House Garden Hotel Addition to the City of Dallas, |
| | Dallas County, Texas |

## Sale History

The most recent closed sale of the subject is summarized as follows:

| | |
|---|---|
| Sale Date | July 27, 2011 |
| Seller | Kroopa Investment, LLC |
| Buyer | Goldmark Hospitality, LLC |
| Sale Price | Undisclosed |
| Recording Instrument Number | 201100196546 |

No known sales or transfers of ownership have taken place within a three-year period prior to the effective appraisal date.

## Pending Transactions

Based on discussions with the appropriate contacts, the property is not subject to an agreement of sale or an option to buy, nor is it listed for sale, as of the effective appraisal date.



APP000199

## Appraisal Purpose

The purpose of the appraisal is to develop the following opinion(s) of value:

- The market value as is of the fee simple interest in the subject property as of the effective date of the appraisal, April 25, 2024

The date of the report is May 7, 2024. The appraisal is valid only as of the stated effective date or dates.

## Value Type Definitions

The definitions of the value types applicable to this assignment are summarized below.

**Market Value**

The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

1. Buyer and seller are typically motivated;

2. Both parties are well informed or well advised, and acting in what they consider their own best interests;

3. A reasonable time is allowed for exposure in the open market;

4. Payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and

5. The price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale. [1]

## Appraisal Premise Definitions

The definitions of the appraisal premises applicable to this assignment are specified as follows.

**As Is Market Value**

The estimate of the market value of real property in its current physical condition, use, and zoning as of the appraisal date.[2]

---

[1] Code of Federal Regulations, Title 12, Chapter I, Part 34.42[h]; also Interagency Appraisal and Evaluation Guidelines, Federal Register, 75 FR 77449, December 10, 2010, page 77472

[2] Appraisal Institute, *The Dictionary of Real Estate Appraisal*, 7th ed. (Chicago: Appraisal Institute, 2022)



## Property Rights Definitions

The property rights appraised which are applicable to this assignment are defined as follows.

**Fee Simple Estate**
Absolute ownership unencumbered by any other interest or estate, subject only to the limitations imposed by the governmental powers of taxation, eminent domain, police power, and escheat.[3]

## Client and Intended User(s)

The client and intended user is Goldmark Hospitality, LLC. No other party or parties may use or rely on the information, opinions, and conclusions contained in this report.

## Intended Use

The intended use of the appraisal is for internal decision-making purposes and may be filed with the court. The appraisal is not intended for any other use.

## Applicable Requirements

This appraisal report conforms to the following requirements and regulations:

- Uniform Standards of Professional Appraisal Practice (USPAP);

- Code of Professional Ethics and Standards of Professional Practice of the Appraisal Institute;

- Applicable state appraisal regulations;

- Appraisal requirements of Title XI of the Financial Institutions Reform, Recovery and Enforcement Act of 1989 (FIRREA), revised April 9, 2018;

- Interagency Appraisal and Evaluation Guidelines issued December 10, 2010;

- Appraisal guidelines of Goldmark Hospitality, LLC.

## Report Format

Standards Rule 2-2 (Content of a Real Property Appraisal Report) contained in the Uniform Standards of Professional Appraisal Practice (USPAP) requires each written real property appraisal report to be prepared as either an Appraisal Report or a Restricted Appraisal Report. This report is prepared as an Appraisal Report as defined by USPAP under Standards Rule 2-2(a), and incorporates practical explanation of the data, reasoning, and analysis used to develop the opinion of value.

---

[3] Appraisal Institute, *The Dictionary of Real Estate Appraisal*, 7th ed. (Chicago: Appraisal Institute, 2022)

Amerigold Suites



APP000201

## Prior Services

USPAP requires appraisers to disclose to the client any other services they have provided in connection with the subject property in the prior three years, including valuation, consulting, property management, brokerage, or any other services. We have performed no services, as an appraiser or in any other capacity, regarding the property that is the subject of this report within the three-year period immediately preceding the agreement to perform this assignment.

## Appraiser Competency

No steps were necessary to meet the competency provisions established under USPAP. The assignment participants have appraised several properties similar to the subject in physical, locational, and economic characteristics, and are familiar with market conditions and trends; therefore, appraiser competency provisions are satisfied for this assignment. Appraiser qualifications and state credentials are included in the addenda of this report.

# Scope of Work

## Introduction

The appraisal development and reporting processes require gathering and analyzing information about the assignment elements necessary to properly identify the appraisal problem. The scope of work decision includes the research and analyses necessary to develop credible assignment results, given the intended use of the appraisal. Sufficient information includes disclosure of research and analyses performed and might also include disclosure of research and analyses not performed.

To determine the appropriate scope of work for the assignment, the intended use of the appraisal, the needs of the user, the complexity of the property, and other pertinent factors were considered. The concluded scope of work is described below.

## Research and Analysis

The type and extent of the research and analysis conducted are detailed in individual sections of the report. The steps taken to verify comparable data are disclosed in the addenda of this report. Although effort has been made to confirm the arms-length nature of each sale with a party to the transaction, it is sometimes necessary to rely on secondary verification from sources deemed reliable.

## Subject Property Data Sources

The legal and physical features of the subject property, including size of the site and improvements, flood plain data, seismic zone designation, property zoning, existing easements and encumbrances, access and exposure, and condition of the improvements (as applicable) were confirmed and analyzed.

The financial data of the subject, including revenue statistic reports, a rent roll, and tax and assessment records was analyzed. This information, as well as trends established by confirmed market indicators, is used to forecast future performance of the subject property.

## Inspection

Details regarding the property inspection conducted as part of this appraisal assignment are summarized as follows:

### Property Inspection

| Party | Inspection Type | Inspection Date |
|---|---|---|
| Stone Berger | On-site | April 25, 2024 |
| Jimmy H. Jackson, MAI | None | Did not inspect the subject property |

It is assumed the remaining units not personally inspected are similar in terms of condition and finish to those inspected.



## Valuation Methodology

Three approaches to value are typically considered when developing a market value opinion for real property. These are the cost approach, the sales comparison approach, and the income capitalization approach. Use of the approaches in this assignment is summarized as follows:

**Approaches to Value**

| Approach | Applicability to Subject | Use in Assignment |
|---|---|---|
| Cost Approach | Not Applicable | Not Utilized |
| Sales Comparison Approach | Applicable | Utilized |
| Income Capitalization Approach | Applicable | Utilized |

The income capitalization approach is the most reliable valuation method for the subject due to the following:

- The probable buyer of the subject would base a purchase price decision primarily on the income generating potential of the property and an anticipated rate of return.

- Sufficient market data regarding income, expenses, and rates of return is available for analysis.

The sales comparison approach is an applicable valuation method because:

- There is an active market for similar properties, and sufficient sales data is available for analysis.

- This approach directly considers the prices of alternative properties having similar utility.

The cost approach is not applicable to the assignment considering the following:

- The age of the property would limit the reliability of an accrued depreciation estimate.

- This approach is not typically used by market participants, except for new (or proposed) or nearly new properties.

Amerigold Suites

APP000204

# Economic Analysis

## Dallas County Area Analysis

Dallas County is located in Texas approximately 871 square miles in size and has a population density of 2,999 persons per square mile.

## Population

Dallas County has an estimated 2024 population of 2,612,729, which represents little to no change from the 2020 census of 2,613,539. The population trend in Dallas County contrasts with that of the State of Texas which had a 1.3% average annual increase in population over this time.

Looking forward, Dallas County's population is projected to increase at a 0.1% annual rate from 2024-2029, equivalent to the addition of an average of 3,598 residents per year.  Dallas County's growth rate is expected to lag that of Texas, which is projected to be 0.9%.

### Population Trends

|  | Population | | | Compound Ann. % Chng | |
|---|---|---|---|---|---|
|  | 2020 Census | 2024 Estimate | 2029 Projection | 2020 - 2024 | 2024 - 2029 |
| Dallas County, TX | 2,613,539 | 2,612,729 | 2,630,719 | 0.0% | 0.1% |
| Dallas, TX Metro | 7,637,387 | 8,126,208 | 8,541,837 | 1.6% | 1.0% |
| Texas | 29,145,505 | 30,665,339 | 32,119,807 | 1.3% | 0.9% |
| Source: Claritas | | | | | |

Amerigold Suites

## Employment

Total employment in Dallas County was estimated at 1,835,584 jobs as of June 2023. Between year-end 2013 and 2023, employment rose by 304,750 jobs, equivalent to a 19.9% increase over the entire period. There were gains in employment in eight out of the past ten years. Although Dallas County's employment rose over the last decade, it underperformed Texas, which experienced an increase in employment of 21.9% or 2,467,727 jobs over this period.

A comparison of unemployment rates is another way of gauging an area's economic health.  Over the past decade, the Dallas County unemployment rate has been slightly lower than that of Texas, with an average unemployment rate of 4.8% in comparison to a 4.9% rate for Texas.  A lower unemployment rate is a positive indicator.

Recent data shows that the Dallas County unemployment rate is 3.4% in comparison to a 3.5% rate for Texas, a positive sign for the Dallas County economy but one that must be tempered by the fact that Dallas County has underperformed Texas in the rate of job growth over the past two years.

**Employment Trends**

| Year | Total Employment (Year End) | | | | Unemployment Rate (Ann. Avg.) | |
| | Dallas County | % Change | Texas | % Change | Dallas County | Texas |
| --- | --- | --- | --- | --- | --- | --- |
| 2013 | 1,530,834 | | 11,248,559 | | 6.7% | 6.3% |
| 2014 | 1,592,969 | 4.1% | 11,672,985 | 3.8% | 5.5% | 5.2% |
| 2015 | 1,650,696 | 3.6% | 11,831,449 | 1.4% | 4.3% | 4.5% |
| 2016 | 1,689,422 | 2.3% | 11,972,594 | 1.2% | 4.0% | 4.6% |
| 2017 | 1,717,458 | 1.7% | 12,224,998 | 2.1% | 4.0% | 4.4% |
| 2018 | 1,742,213 | 1.4% | 12,539,711 | 2.6% | 3.8% | 3.9% |
| 2019 | 1,788,166 | 2.6% | 12,802,919 | 2.1% | 3.5% | 3.5% |
| 2020 | 1,704,984 | -4.7% | 12,264,651 | -4.2% | 7.9% | 7.7% |
| 2021 | 1,806,405 | 5.9% | 13,025,292 | 6.2% | 5.6% | 5.6% |
| 2022 | 1,840,907 | 1.9% | 13,591,394 | 4.3% | 3.7% | 3.9% |
| 2023* | 1,835,584 | -0.3% | 13,716,286 | 0.9% | 3.9% | 4.1% |
| Overall Change 2013-2023 | 304,750 | 19.9% | 2,467,727 | 21.9% | | |
| Avg Unemp. Rate 2013-2023 | | | | | 4.8% | 4.9% |
| Unemployment Rate - December 2023 | | | | | 3.4% | 3.5% |

*Total employment data is as of June 2023.

Source: U.S. Bureau of Labor Statistics and Moody's Analytics. Employment figures are from the Quarterly Census of Employment and Wages (QCEW). Unemployment rates are from the Current Population Survey (CPS). The figures are not seasonally adjusted.

Amerigold Suites



APP000206

## Employment Sectors

The composition of the Dallas County job market is depicted in the following chart, along with that of Texas. Total employment for both areas is broken down by major employment sector, and the sectors are ranked from largest to smallest based on the percentage of Dallas County jobs in each category.



Employment Sectors - 2023

Source: U.S. Bureau of Labor Statistics and Moody's Analytics

Dallas County has greater concentrations than Texas in the following employment sectors:

1. Professional and Business Services, representing 22.2% of Dallas County payroll employment compared to 15.4% for Texas as a whole. This sector includes legal, accounting, and engineering firms, as well as management of holding companies.

2. Trade; Transportation; and Utilities, representing 20.8% of Dallas County payroll employment compared to 19.9% for Texas as a whole. This sector includes jobs in retail trade, wholesale trade, trucking, warehousing, and electric, gas, and water utilities.

3. Financial Activities, representing 9.1% of Dallas County payroll employment compared to 6.4% for Texas as a whole. Banking, insurance, and investment firms are included in this sector, as are real estate owners, managers, and brokers.

Amerigold Suites

APP000207

4. Information, representing 2.5% of Dallas County payroll employment compared to 1.7% for Texas as a whole. Publishing, broadcasting, data processing, telecommunications, and software publishing are included in this sector.

Dallas County is underrepresented in the following sectors:

1. Education and Health Services, representing 11.4% of Dallas County payroll employment compared to 13.4% for Texas as a whole. This sector includes employment in public and private schools, colleges, hospitals, and social service agencies.

2. Government, representing 9.7% of Dallas County payroll employment compared to 14.2% for Texas as a whole. This sector includes employment in local, state, and federal government agencies.

3. Leisure and Hospitality, representing 9.3% of Dallas County payroll employment compared to 11.1% for Texas as a whole. This sector includes employment in hotels, restaurants, recreation facilities, and arts and cultural institutions.

4. Manufacturing, representing 6.7% of Dallas County payroll employment compared to 7.0% for Texas as a whole. This sector includes all establishments engaged in the manufacturing of durable and nondurable goods.

## Major Employers

Major employers in the Dallas metro are shown in the following table.

| Major Employers - DFW Metro | |
|---|---|
| Name | Number of Employees |
| 1 AMR Corporation | 24,700 |
| 2 Bank of America Corporation | 20,000 |
| 3 Texas Health Resources Inc. | 19,230 |
| 4 Dallas ISD | 18,314 |
| 5 Baylor Health Care System | 17,097 |
| 6 AT&T | 15,800 |
| 7 Lockheed Martin Aeronautics | 14,126 |
| 8 JP Morgan Chase & Co. | 13,500 |
| 9 UT-Southwestern Medical Center | 13,122 |
| 10 City of Dallas | 12,836 |

Source: http://www.destinationdfw.com/Largest-Employers-in-Dallas-Fort-Worth-Texas/

## Gross Domestic Product

Gross Domestic Product (GDP) is a measure of economic activity based on the total value of goods and services produced in a defined geographic area, and annual changes in Gross Domestic Product (GDP) are a gauge of economic growth.

Economic growth, as measured by annual changes in GDP, has been considerably higher in Dallas County than Texas overall during the past five years. Dallas County has grown at a 3.9% average annual rate while Texas has grown at a 2.9% rate. Dallas County continues to perform better than Texas. GDP for Dallas County rose by 5.7% in 2022 while Texas's GDP rose by 2.7%.

Dallas County has a per capita GDP of $115,260, which is 80% greater than Texas's GDP of $64,070. This means that Dallas County industries and employers are adding relatively more value to the economy than their counterparts in Texas.

### Gross Domestic Product

| Year | ($,000s) Dallas County | % Change | ($,000s) Texas | % Change |
|---|---|---|---|---|
| 2017 | 248,044,414 | – | 1,667,313,000 | – |
| 2018 | 258,127,596 | 4.1% | 1,746,543,300 | 4.8% |
| 2019 | 269,858,811 | 4.5% | 1,802,912,800 | 3.2% |
| 2020 | 263,514,185 | -2.4% | 1,772,185,600 | -1.7% |
| 2021 | 283,517,706 | 7.6% | 1,873,473,400 | 5.7% |
| 2022 | 299,773,355 | 5.7% | 1,924,007,500 | 2.7% |
| Compound % Chg (2017-2022) | | 3.9% | | 2.9% |
| GDP Per Capita 2022 | $115,260 | | $64,070 | |

Source: U.S. Bureau of Economic Analysis and Moody's Analytics; data released December 2023.
The release of state and local GDP data has a longer lag time than national data. The data represents inflation-adjusted ""real"" GDP stated in 2017 dollars.

## Household Income

Dallas County has a lower level of household income than Texas. Median household income for Dallas County is $69,306, which is 5.1% less than the corresponding figure for Texas.

### Median Household Income - 2024

|  | Median |
| --- | --- |
| Dallas County, TX | $69,306 |
| Texas | $72,993 |
| Comparison of Dallas County, TX to Texas | - 5.1% |
| Source: Claritas | |

The following chart shows the distribution of households across twelve income levels. Dallas County has a greater concentration of households in the lower income levels than Texas. Specifically, 36% of Dallas County households are below the $50,000 level in household income as compared to 35% of Texas households. A lesser concentration of households is apparent in the higher income levels, as 18% of Dallas County households are at the $150,000 or greater levels in household income versus 19% of Texas households.

### Household Income Distribution - 2024



Source: Claritas

Amerigold Suites



## Education and Age

Residents of Dallas County have a slightly higher level of educational attainment than those of Texas. An estimated 33% of Dallas County residents are college graduates with four-year degrees, versus 32% of Texas residents. People in Dallas County are slightly younger than their Texas counterparts. The median age for Dallas County is 36 years, while the median age for Texas is 37 years.

**Education & Age - 2024**



Source: Claritas

## Conclusion

The Dallas County economy will be affected by a stable to slightly growing population base and a higher level of educational attainment. Dallas County experienced growth in the number of jobs and has maintained a slightly lower unemployment rate than Texas over the past decade.  It is anticipated that the Dallas County economy will improve and employment will grow, strengthening the demand for real estate.

## Area Map



## Surrounding Area Analysis

The subject is located in the northern portion of Dallas County in the city of Dallas, Texas. Area boundaries and delineation are indicated in the following table. A map identifying the location of the property follows this section.

| Boundaries & Delineation | |
| --- | --- |
| **Boundaries** | |
| Market Area | Dallas-Fort Worth, TX |
| Submarket | Dallas |
| Area Type | Suburban |
| **Delineation** | |
| North | W Belt Line Road |
| South | IH-635 |
| East | US Hwy 75 |
| West | Coit Road |

### Access and Linkages

Primary access and linkages to the subject area, including highways, roadways, public transit, traffic counts, and airports, are summarized in the following table.

| Access & Linkages | |
| --- | --- |
| **Vehicular Access** | |
| Major Highways | US Hwy 75 & IH-635 |
| Primary Corridors | Coit Road, Spring Valley Road & Midpark Road |
| Vehicular Access Rating | Average |
| **Public Transit** | |
| Providers | DART |
| Transit Access Rating | Average |
| **Airport(s)** | |
| Name | Dallas Fort Worth International Airport |
| Distance | 21.2 miles |
| Driving Time | 32 minutes |
| Primary Transportation Mode | Automobile |

The subject benefits from average daily traffic counts. Furthermore, the Dallas Central Business District (CBD), the economic and cultural center of the region, is approximately 13 miles from the property.

### Demand Generators

The typical generators of demand affecting the subject property and its market are discussed and analyzed below.

Amerigold Suites



APP000213

**Life Cycle**

Real estate is affected by cycles involving development trends within a market area as well as market and economic forces. Trends in demand for development in a particular market are described by the Market Area Life Cycle, while market and economic trends are described by the Real Estate Cycle.

A Market Area Life Cycle typically evolves through four stages:[4]

- Growth – a period during which the market area gains public favor and acceptance

- Stability – a period of equilibrium without marked gains or losses

- Decline – a period of diminishing demand

- Revitalization – a period of renewal, redevelopment, modernization, and increasing demand

The subject's market area is in the growth stage of the Market Area Life Cycle.

The Real Estate Cycle also impacts a neighborhood. The stages of the Real Estate Cycle include:

- Expansion – Sustained growth in demand, increasing construction

- Hypersupply – Positive but falling demand, increasing vacancy

- Recession – Falling demand, increasing vacancy

- Recovery – Increasing demand, decreasing vacancy

These stages are illustrated below, along with a summary of common characteristics of each stage of the Real Estate Cycle. The subject is in the expansion stage of the Real Estate Cycle.



---

[4] Appraisal Institute, *The Appraisal of Real Estate*, 15th ed. (Chicago: Appraisal Institute, 2020)

**EXPANSION**

Decreasing Vacancy Rates
Moderate/High New Construction
High Absorption
Moderate/High Employment Growth
Med/High Rental Rate Growth

**HYPERSUPPLY**

Increasing Vacancy Rates
Moderate/High New Construction
Low/Negative Absorption
Moderate/Low Employment Growth
Med/Low Rental Rate Growth

**RECESSION**

Increasing Vacancy Rates
Moderate/Low New Construction
Low Absorption
Low/Negative Employment Growth
Low/Neg Rental Rate Growth

**RECOVERY**

Decreasing Vacancy Rates
Low New Construction
Moderate Absorption
Low/Moderate Employment Growth
Neg/Low Rental Rate Growth

## Demographics

A demographic profile of the surrounding area, including population, households, and income data, is presented in the following table.

**Surrounding Area Demographics**

| 2024 Estimates | 1-Mile Radius | 3-Mile Radius | 5-Mile Radius | Dallas County, TX | Dallas, TX Metro | Texas |
|---|---|---|---|---|---|---|
| Population 2020 | 23,999 | 148,842 | 406,698 | 2,613,539 | 7,637,387 | 29,145,505 |
| Population 2024 | 23,839 | 148,165 | 408,429 | 2,612,729 | 8,126,208 | 30,665,339 |
| Population 2029 | 23,840 | 148,517 | 410,172 | 2,630,719 | 8,541,837 | 32,119,807 |
| Compound % Change 2020-2024 | -0.2% | -0.1% | 0.1% | 0.0% | 1.6% | 1.3% |
| Compound % Change 2024-2029 | 0.0% | 0.0% | 0.1% | 0.1% | 1.0% | 0.9% |
| | | | | | | |
| Households 2020 | 8,426 | 60,236 | 171,281 | 965,537 | 2,760,991 | 10,491,147 |
| Households 2024 | 8,398 | 59,973 | 172,362 | 971,311 | 2,938,027 | 11,081,289 |
| Households 2029 | 8,428 | 60,178 | 173,720 | 983,747 | 3,091,922 | 11,644,207 |
| Compound % Change 2020-2024 | -0.1% | -0.1% | 0.2% | 0.1% | 1.6% | 1.4% |
| Compound % Change 2024-2029 | 0.1% | 0.1% | 0.2% | 0.3% | 1.0% | 1.0% |
| | | | | | | |
| Median Household Income 2024 | $50,630 | $67,196 | $68,616 | $69,306 | $82,381 | $72,993 |
| Average Household Size | 2.8 | 2.5 | 2.3 | 2.7 | 2.7 | 2.7 |
| College Graduate % | 22% | 44% | 47% | 33% | 38% | 32% |
| Median Age | 33 | 37 | 36 | 36 | 37 | 37 |
| Owner Occupied % | 23% | 42% | 38% | 48% | 59% | 61% |
| Renter Occupied % | 77% | 58% | 62% | 52% | 41% | 39% |
| Median Owner Occupied Housing Value | $335,390 | $443,525 | $458,076 | $293,526 | $351,083 | $273,092 |
| Median Year Structure Built | 1973 | 1977 | 1979 | 1982 | 1992 | 1991 |
| Average Travel Time to Work in Minutes | 27 | 28 | 27 | 30 | 30 | 29 |

Source: Claritas

As shown above, the current population within a 3-mile radius of the subject is 148,165, and the average household size is 2.5. Population in the area has declined since the 2020 census, but the trend is projected to be flat over the next five years. This differs from the population of Dallas County, which is projected to grow, as discussed previously.

Median household income is $67,196, which is lower than the household income for Dallas County. Residents within a 3-mile radius have a considerably higher level of educational attainment than those of Dallas County, while median owner-occupied home values are considerably higher.

Amerigold Suites

APP000215

## Land Use

Predominant land uses in the immediate vicinity of the subject include a mix of single family residential and commercial along major thoroughfares. Land use characteristics of the area are summarized below.

**Surrounding Area Land Uses**

| | |
|---|---|
| Character of Area | Suburban |
| Predominant Age of Improvements (Years) | 10 to 30 + |
| Predominant Quality and Condition | Average |
| Approximate Percent Developed | 95% + |
| Infrastructure and Planning | Average |
| Predominant Location of Undeveloped | North |
| Prevailing Direction of Growth | North |

**Immediate Surroundings**

| | |
|---|---|
| North | Multifamily |
| South | Hotel & Self-Storage |
| East | Vacant Walmart |
| West | Self-Storage & Warehouses |

## Development Activity and Trends

The subject neighborhood is influenced by several high-profile developments. The most important are discussed as follows:

**The Briscoe** is a 322-unit apartment complex located at the southwest corner of Coit Road and Banner Drive. The property features seven/7, 3-story apartment buildings and a mix of 1, 2, and 3- bedroom units. The complex was developed by Lennar Multifamily Investors LLC and opened in late 2017.

**NorthPark Center** is a large upscale shopping mall located at the intersection of Loop 12 (Northwest Highway) and US-75 (Central Expressway). The center has over 235 stores and restaurants and is ranked at number nineteen of the largest shopping malls in the United States. The center is home to Neiman Marcus NorthPark which continually competes with Neiman Marcus Beverly Hills for the number one ranking in sales volume while Dillard's NorthPark has traditionally been the chain's number one store. With 20 million visitors annually, NorthPark has consistently been names the top attraction in the Dallas-Fort Worth Metroplex by the Dallas Business Journal. NorthPark Center completed a massive two-year, $170 million expansion and renovation in 2006. Ten years in the planning, the expansion of NorthPark Center included a 200,000 square foot Nordstrom, new AMC- 15 Theatres, 110 new stores in 260,000 square feet of new two-story space, two new parking garages, and a new central 1.3-acre Central Park. With the completed expansion, NorthPark Center is expected to be one of the top five shopping centers in the United States. After the expansion, the mall totals approximately 1,926,250 square feet.

**Medical City Dallas Hospital** is a hospital located at 7777 Forest Lane, just west of N. Central Expressway in north Dallas. It is operated by Hospital Corporation of American (HCA). The property is a full-service hospital with over 700 beds and includes a 7-story, children's hospital that was added in 2010.

Amerigold Suites



APP000216

The **Shops at Park Lane** is a 33.5-acre development site located at the most shopped intersection in Dallas, at the southeast corner of US-75 (Central Expressway) and Park Lane. The development defines a new retail category: the mixed-use urban hybrid. Phase I features a mixture of designer value and traditional retail bringing a unique shopping experience to the area with premium stores, restaurants, and amenities including the largest Whole Foods Market in North Texas. Phase I represents 550,000 square feet of shopping and restaurants complemented by contemporary office and high-end residential units. Phase II includes approximately 226,167 square feet of Class A office space and 16,430 square feet of retail space.

**Crest at Park Central** is a 387-unit apartment complex located at the northwest corner of Coit Road and Churchill Way. The property was constructed in 2015 by Lennar Multifamily Investors LLC. The property features 8, 3-story apartment buildings and a mix of studio, 1, and 2-bedroom units.

**Costco** is a 146,000 SF store located at the northeast corner of Coit Road and Churchill Way. The property opened in 2017.

**Timber Creek Crossing** is a 52.49-acre retail development located at the northeast intersection of Northwest Highway and Skillman Street. The center totals approximately 470,000 square of retail space and includes anchor tenants Walmart, Sam's Club, and J.C. Penney. The center was originally built in 1982 and expanded in 2011 to include large-scale anchor space.

**High Point Crossing** is a 190,000 square foot community shopping center located at the northwest corner of Northwest Highway and Abrams Road. The center was built in 2018 and includes anchor tenants Marshall's and Academy Sports & Outdoors.

**Medallion Center** is a 330,000 square foot community shopping center located at the southwest corner of Northwest Highway and Abrams Road. The center was originally built in the 1960's and expanded in 2005. Anchor tenants include Kohl's and Target.

## Outlook and Conclusions

The neighborhood is located in the central quadrant of North Dallas County and has been one of the most stable market areas of the metroplex. The area has good roadway access, proximity to public transportation, and a support services system that make it a desirable locale for employees. Although the area is essentially fully developed, its close proximity to population growth attests to its attractiveness to employers and their families. Based on the foregoing, the subject neighborhood should continue to remain stable and mature, providing a positive environment in which to own real estate into the foreseeable future.

In comparison to other areas in the region, the area is rated as follows:

**Surrounding Area Ratings**

| | |
|---|---|
| Highway Access | Above Average |
| Demand Generators | Average |
| Convenience to Support Services | Average |
| Convenience to Medical Services | Average |
| Convenience to Public Transit | Average |
| Employment Stability | Average |
| Neighborhood Amenities | Below Average |
| Police and Fire Protection | Average |
| Barriers to Competitive Entry | Above Average |
| Price/Value Trends | Average |
| Property Compatibility | Above Average |

## Surrounding Area Map



## Multifamily Market Analysis

### Metro Area Overview

The subject is located in the Dallas metro area as defined by REIS. Supply and demand indicators, including inventory levels, absorption, vacancy, and rental rates for all classes of space are presented in the ensuing table.

**Dallas Multifamily Market Trends and Forecasts**

| Year | Inventory (Units) | Occupied (Units) | Vacancy (Units) | Vacancy (%) | Completions (Units) | Absorption (Units) | Effective Rent ($/Unit) | Effective Rental Rate (% Change) | Gross Revenue ($/Unit) |
|---|---|---|---|---|---|---|---|---|---|
| 2013 | 449,579 | 427,341 | 22,238 | 4.9% | 10,944 | 12,322 | $843 | 4.2% | $865 |
| 2014 | 461,908 | 439,564 | 22,344 | 4.8% | 12,389 | 12,223 | $885 | 5.0% | $908 |
| 2015 | 473,641 | 452,517 | 21,124 | 4.5% | 11,780 | 12,953 | $938 | 6.0% | $968 |
| 2016 | 488,546 | 469,544 | 19,002 | 3.9% | 15,591 | 17,027 | $1,002 | 6.9% | $1,035 |
| 2017 | 506,943 | 482,928 | 24,015 | 4.7% | 18,397 | 13,384 | $1,063 | 6.1% | $1,081 |
| 2018 | 527,183 | 498,569 | 28,614 | 5.4% | 20,557 | 15,641 | $1,127 | 6.0% | $1,136 |
| 2019 | 550,658 | 517,498 | 33,160 | 6.0% | 20,261 | 18,929 | $1,175 | 4.2% | $1,178 |
| 2020 | 569,362 | 531,450 | 37,912 | 6.7% | 18,704 | 13,952 | $1,164 | -0.9% | $1,159 |
| 2021 | 590,370 | 556,400 | 33,970 | 5.8% | 21,008 | 24,950 | $1,316 | 13.1% | $1,310 |
| 2022 | 603,393 | 567,174 | 36,219 | 6.0% | 13,023 | 10,774 | $1,478 | 12.3% | $1,460 |
| 2023 | 616,952 | 574,619 | 42,333 | 6.9% | 13,559 | 7,445 | $1,486 | 0.5% | $1,469 |
| 2024 Q1 | 619,638 | 576,171 | 43,467 | 7.0% | 2,686 | 1,552 | $1,492 | 0.4% | $1,473 |
| 2024 | 627,294 | 583,659 | 43,635 | 7.0% | 10,342 | 9,040 | $1,532 | 3.1% | $1,518 |
| 2025 | 632,693 | 592,474 | 40,219 | 6.4% | 5,399 | 8,815 | $1,579 | 3.1% | $1,578 |
| 2026 | 643,030 | 603,622 | 39,408 | 6.1% | 10,337 | 11,148 | $1,635 | 3.5% | $1,638 |
| 2027 | 653,914 | 614,790 | 39,124 | 6.0% | 10,884 | 11,168 | $1,689 | 3.3% | $1,696 |
| 2028 | 664,195 | 625,790 | 38,405 | 5.8% | 10,281 | 11,000 | $1,745 | 3.3% | $1,756 |
| 2013 - 2023 Average | 530,776 | 501,600 | 29,176 | 5.4% | 16,019 | 14,509 | $1,134 | 5.8% | $1,143 |

Source: Moody's Analytics REIS; compiled by Integra Realty Resources, Inc.

Amerigold Suites

**Dallas Metro Trends and Forecasts**



Source: Moody's Analytics REIS

- The current vacancy rate in the metro area is 7.0%; the vacancy rate has increased by 160 bps from 2018.

- Four-year forecasts project a vacancy rate of 5.8% for the metro area, representing a decrease of 120 bps by year-end 2028.

- Effective rent averages $1,492/unit in the metro area; future rent values are expected to increase by 17.0% to $1,745/unit by year-end 2028.

Amerigold Suites

APP000221



Source: Moody's Analytics REIS

- The inventory in the metro area has increased by 17.5% from 2018, while the occupied stock has increased by 15.6%.

- Between 2018 and 2023, completions averaged 17,852 units annually and reached a peak of 21,008 units in 2021.

- Between 2018 and 2023, absorption figures reached a peak of 24,950 units in 2021 and a low of 7,445 units in 2023.

## Class B/C Multifamily Overview

The subject is a Class C property as defined by REIS. Supply and demand indicators, including inventory levels, absorption, vacancy, and rental rates for all Class B/C space in the Dallas metro area are presented in the following table.

**Dallas Multifamily Class B/C Market Trends**

| Year | Inventory (Units) | Occupancy (Units) | Vacancy (Units) | Vacancy (%) | Completions (Units) | Absorption (Units) | Asking Rent ($/Unit) | Asking Rental Rate (% Change) | Gross Revenue ($/Unit) |
|---|---|---|---|---|---|---|---|---|---|
| 2013 | 240,362 | 229,039 | 11,323 | 4.7% | 1,327 | 4,044 | $685 | 2.1% | $653 |
| 2014 | 241,210 | 231,787 | 9,423 | 3.9% | 908 | 2,748 | $708 | 3.4% | $680 |
| 2015 | 243,784 | 235,887 | 7,897 | 3.2% | 2,621 | 4,100 | $740 | 4.5% | $716 |
| 2016 | 244,174 | 238,089 | 6,085 | 2.5% | 1,076 | 2,202 | $780 | 5.4% | $761 |
| 2017 | 246,054 | 237,917 | 8,137 | 3.3% | 1,880 | -172 | $815 | 4.5% | $788 |
| 2018 | 248,219 | 239,047 | 9,172 | 3.7% | 2,482 | 1,130 | $865 | 6.1% | $833 |
| 2019 | 252,552 | 242,368 | 10,184 | 4.0% | 1,519 | 3,321 | $915 | 5.8% | $878 |
| 2020 | 256,583 | 244,501 | 12,082 | 4.7% | 4,031 | 2,133 | $922 | 0.8% | $879 |
| 2021 | 261,438 | 250,744 | 10,694 | 4.1% | 4,855 | 6,243 | $1,036 | 12.4% | $994 |
| 2022 | 263,762 | 250,895 | 12,867 | 4.9% | 2,324 | 151 | $1,169 | 12.8% | $1,112 |
| 2023 | 266,975 | 250,734 | 16,241 | 6.1% | 3,213 | -161 | $1,189 | 1.7% | $1,117 |
| 2024 Q1 | 267,272 | 250,675 | 16,597 | 6.2% | 297 | -59 | $1,183 | -0.5% | $1,110 |
| 2013 - 2023 Average | 251,374 | 241,001 | 10,373 | 4.1% | 2,385 | 2,340 | $893 | 5.4% | $855 |

Source: Moody's Analytics REIS; compiled by Integra Realty Resources, Inc.

## Class B/C Multifamily Trends and Insights



Source: Moody's Analytics REIS

- The current vacancy rate for Class B/C properties in the metro area is 6.2%; the vacancy rate has increased by 250 bps from 2018.

- Asking rent currently averages $1,183/unit and has increased by 36.8% from 2018.

Amerigold Suites



Source: Moody's Analytics REIS

- Class B/C metro area inventory has increased by 7.7% from 2018, while the occupied stock has increased by 4.9%.

- Between 2018 and 2023, completions have averaged 3,071 units annually and reached a peak of 4,855 units in 2021.

- Between 2018 and 2023, absorption figures reached a peak of 6,243 units in 2021 and a low of -161 units in 2023.

- Between 2018 and 2023, gross revenue for Class B/C properties in the metro area averaged $969/unit and has increased by 34.0%.

Amerigold Suites

## Submarket Overview

The subject is located in the Richardson submarket. In order to evaluate the market appeal of the subject's submarket in comparison to others in the Dallas metro area, we compare key supply and demand indicators for all classes of space in the following table.

**Dallas Multifamily Submarket Comparison**

| Submarket | Inventory (Buildings) | Inventory (Units) | Asking Rent ($/Unit) | Vacancy (%) | Free Rent (mos) | Expenses % |
|---|---|---|---|---|---|---|
| Carrollton/Addison/Coppell | 154 | 39,846 | $1,354 | 4.2% | 0.36 | 43.6% |
| Central Dallas | 127 | 29,686 | $3,134 | 5.5% | 0.87 | 41.6% |
| East Dallas | 154 | 20,884 | $1,767 | 4.9% | 0.55 | 44.4% |
| Ellis County | 40 | 5,459 | $1,382 | 11.4% | 0.65 | 44.3% |
| Far North | 151 | 41,092 | $1,444 | 6.3% | 0.62 | 43.5% |
| Far Northeast | 53 | 14,229 | $1,085 | 8.1% | 0.58 | 44.0% |
| Far Northwest/Farmers Branch | 88 | 19,793 | $1,501 | 8.6% | 0.74 | 45.0% |
| Garland | 122 | 25,975 | $1,316 | 7.2% | 0.56 | 44.4% |
| Grand Prairie | 59 | 13,891 | $1,486 | 9.2% | 0.71 | 43.1% |
| Lewisville | 149 | 44,678 | $1,536 | 6.6% | 0.56 | 43.6% |
| Mesquite/Seagoville | 47 | 11,360 | $1,137 | 2.9% | 0.23 | 44.6% |
| North | 35 | 9,015 | $1,724 | 4.1% | 0.41 | 44.1% |
| North Irving | 176 | 50,317 | $1,657 | 5.4% | 0.40 | 44.3% |
| North White Rock | 182 | 50,827 | $1,491 | 5.3% | 0.66 | 45.7% |
| Northwest | 103 | 18,154 | $1,628 | 9.5% | 0.82 | 44.8% |
| Northwest Denton County | 144 | 33,841 | $1,708 | 11.5% | 0.98 | 43.8% |
| Oaklawn | 50 | 7,094 | $2,716 | 8.3% | 0.69 | 44.8% |
| Plano/Allen/McKinney | 283 | 84,951 | $1,702 | 9.9% | 1.07 | 44.1% |
| Richardson | 110 | 26,452 | $1,520 | 8.8% | 0.74 | 45.0% |
| South | 31 | 3,974 | $1,336 | 5.0% | 0.54 | 43.8% |
| South County | 40 | 8,206 | $1,207 | 5.7% | 0.39 | 43.1% |
| South Irving | 88 | 11,195 | $1,192 | 2.2% | 0.44 | 44.7% |
| South White Rock/I-30 | 72 | 14,501 | $1,033 | 5.7% | 0.33 | 44.7% |
| Southeast Dallas | 34 | 5,742 | $967 | 2.9% | 0.45 | 44.0% |
| Southwest Dallas | 146 | 28,476 | $1,204 | 6.8% | 1.04 | 46.6% |
| Market Averages/Totals | 2,535 | 619,638 | $1,584.49 | 7.0% | 0.70 | 44.2% |

Source: Moody's Analytics REIS; compiled by Integra Realty Resources, Inc.

### Richardson Submarket Comparison

- The submarket contains 4.3% of the metro building inventory and 4.3% of the metro unit inventory.

- The submarket's asking rent is $1,520/unit, which is less than the metro average of $1,584/unit.

- The submarket's vacancy rate is 8.8%, which is greater than the metro average of 7.0%.

- Operating expenses, as a percentage of potential rent revenue, average 45.0% in the submarket compared to 44.2% for the overall metro area.

- Average free rent in the subject property's submarket (0.7 months) is greater than the free rent for the metro area (0.7 months).

Amerigold Suites



In comparison to other submarkets in the region, the Richardson submarket is rated as follows:

### Submarket Attribute Ratings

| | |
|---|---|
| Market Size/Stature | Average |
| Market Demand | Stable |
| Vacancy Trends | Stable |
| Threat of New Supply | Average |
| Rental Trends | Stable |

### Richardson Submarket Trends and Forecasts

Supply and demand indicators for all classes of space in the Richardson submarket are displayed in the following table.

### Richardson Multifamily Submarket Trends and Forecasts

| Year | Inventory (Units) | Occupancy (Units) | Vacancy (Units) | Vacancy (%) | Completions (Units) | Absorption (Units) | Effective Rent ($/Unit) | Effective Rental Rate (% Change) | Gross Revenue ($/Unit) |
|---|---|---|---|---|---|---|---|---|---|
| 2013 | 16,555 | 15,892 | 663 | 4.0% | 416 | 399 | $842 | 3.6% | $872 |
| 2014 | 17,196 | 16,328 | 868 | 5.0% | 641 | 436 | $880 | 4.5% | $894 |
| 2015 | 19,002 | 17,670 | 1,332 | 7.0% | 1,806 | 1,342 | $959 | 9.0% | $951 |
| 2016 | 20,837 | 19,456 | 1,381 | 6.6% | 1,835 | 1,786 | $1,032 | 7.6% | $1,021 |
| 2017 | 21,784 | 20,270 | 1,514 | 7.0% | 947 | 814 | $1,069 | 3.6% | $1,071 |
| 2018 | 23,685 | 21,853 | 1,832 | 7.7% | 1,901 | 1,583 | $1,120 | 4.7% | $1,115 |
| 2019 | 24,637 | 22,823 | 1,814 | 7.4% | 952 | 970 | $1,178 | 5.2% | $1,180 |
| 2020 | 25,533 | 23,462 | 2,071 | 8.1% | 896 | 639 | $1,151 | -2.3% | $1,144 |
| 2021 | 26,452 | 24,550 | 1,902 | 7.2% | 919 | 1,088 | $1,294 | 12.5% | $1,280 |
| 2022 | 26,452 | 24,484 | 1,968 | 7.4% | 0 | -66 | $1,402 | 8.3% | $1,379 |
| 2023 | 26,452 | 24,217 | 2,235 | 8.4% | 0 | -267 | $1,433 | 2.2% | $1,394 |
| 2024 Q1 | 26,452 | 24,116 | 2,336 | 8.8% | 0 | -101 | $1,426 | -0.5% | $1,386 |
| 2024 | 27,504 | 25,029 | 2,475 | 9.0% | 1,052 | 812 | $1,446 | 0.9% | $1,421 |
| 2025 | 27,884 | 25,654 | 2,230 | 8.0% | 380 | 625 | $1,494 | 3.3% | $1,488 |
| 2026 | 28,110 | 26,034 | 2,076 | 7.4% | 226 | 380 | $1,538 | 3.0% | $1,543 |
| 2027 | 28,110 | 26,213 | 1,897 | 6.7% | 0 | 179 | $1,580 | 2.7% | $1,596 |
| 2028 | 28,110 | 26,268 | 1,842 | 6.6% | 0 | 55 | $1,623 | 2.7% | $1,642 |
| 2013 - 2023 Average | 22,599 | 21,000 | 1,598 | 6.9% | 938 | 793 | $1,124 | 5.4% | $1,118 |

Source: Moody's Analytics REIS; compiled by Integra Realty Resources, Inc.





Source: Moody's Analytics REIS

- The current vacancy rate in the submarket is 8.8%; the vacancy rate has increased by 110 bps from 2018.

- Four-year forecasts project a vacancy rate of 6.6% for the submarket, representing a decrease of 220 bps by year-end 2028.

- Effective rent averages $1,426/unit in the submarket; future rent values are expected to increase by 13.8% to $1,623/unit by year-end 2028.

Amerigold Suites



Source: Moody's Analytics REIS

- Current inventory level of 26,452 units is expected to increase by 6.3% through year-end 2028.

- The inventory in the submarket has increased by 11.7% from 2018, while the occupied stock has increased by 10.4%.

- Between 2018 and 2023, completions averaged 778 units annually and reached a peak of 1,901 units in 2018.

- Between 2018 and 2023, absorption figures reached a peak of 1,583 units in 2018 and a low of -267 units in 2023.

Amerigold Suites

## Class B/C Richardson Submarket Trends and Insights

Supply and demand indicators, including inventory levels, absorption, vacancy, and rental rates for Class B/C space in the submarket are presented in the following table.

**Richardson Multifamily Class B/C Submarket Trends**

| Year | Inventory (Units) | Occupancy (Units) | Vacancy (Units) | Vacancy (%) | Completions (Units) | Absorption (Units) | Asking Rent ($/Unit) | Asking Rental Rate (% Change) | Gross Revenue ($/Unit) |
|---|---|---|---|---|---|---|---|---|---|
| 2013 | 8,660 | 8,219 | 441 | 5.1% | 0 | 53 | $724 | 2.80% | $687 |
| 2014 | 8,660 | 8,236 | 424 | 4.9% | 0 | 17 | $748 | 3.30% | $711 |
| 2015 | 9,685 | 9,254 | 431 | 4.5% | 1,025 | 1,018 | $773 | 3.30% | $739 |
| 2016 | 10,218 | 9,741 | 477 | 4.7% | 533 | 487 | $817 | 5.70% | $779 |
| 2017 | 10,276 | 9,669 | 607 | 5.9% | 58 | -72 | $864 | 5.80% | $813 |
| 2018 | 10,619 | 10,003 | 616 | 5.8% | 343 | 334 | $879 | 1.70% | $828 |
| 2019 | 10,619 | 10,065 | 554 | 5.2% | 0 | 62 | $902 | 2.60% | $855 |
| 2020 | 11,100 | 10,250 | 850 | 7.7% | 481 | 185 | $911 | 1.00% | $841 |
| 2021 | 11,332 | 10,706 | 626 | 5.5% | 232 | 456 | $1,015 | 11.40% | $959 |
| 2022 | 11,332 | 10,653 | 679 | 6.0% | 0 | -53 | $1,106 | 9.00% | $1,040 |
| 2023 | 11,332 | 10,542 | 790 | 7.0% | 0 | -111 | $1,016 | -8.10% | $945 |
| 2024 Q1 | 11,332 | 10,529 | 803 | 7.1% | 0 | -13 | $1,005 | -1.10% | $934 |
| 2013 - 2023 Average | 10,348 | 9,758 | 590 | 5.7% | 243 | 216 | $887 | 3.50% | $836 |

Source: Moody's Analytics REIS; compiled by Integra Realty Resources, Inc.



Source: Moody's Analytics REIS

- The current vacancy for Class B/C properties in the submarket area is 7.1%; the vacancy rate has increased by 130 bps from 2018.

- Asking rent currently averages $1,005/unit and has increased by 14.3% from 2018.

Amerigold Suites

APP000229



Source: Moody's Analytics REIS

- Class B/C submarket inventory has increased by 6.7% from 2018, while the occupied stock has increased by 5.3%.

- Between 2018 and 2023, completions have averaged 176 units annually and reached a peak of 481 units in 2020.

- Between 2018 and 2023, absorption figures reached a peak of 456 units in 2021 and a low of -111 units in 2023.

- Between 2018 and 2023, gross revenue for Class B/C properties in the submarket area averaged $911/unit and increased by 14.1%.

## New and Proposed Construction

The following charts summarize the properties that have been completed in the Dallas metro area.



Source: Moody's Analytics REIS

APP000231



Source: Moody's Analytics REIS

The following table summarizes properties that are under construction, planned, and/or proposed in the Dallas metro area.

### Dallas Multifamily Construction by Phase and Subtype*

| Multifamily Subproperty Type | Under Construction | | Planned Construction | | Proposed Construction | |
|---|---|---|---|---|---|---|
| | Properties | Units | Properties | Units | Properties | Units |
| Apartment | 116 | 31,832 | 10 | 7,631 | 211 | 90,489 |
| Condominiums | 11 | 1,572 | 1 | 14 | 17 | 2,524 |
| Other | 18 | 1,635 | 0 | 0 | 16 | 656 |
| Totals | 145 | 35,039 | 11 | 7,645 | 244 | 93,669 |

*Excludes projects for which unit count was not reported.

Source: Moody's Analytics REIS; compiled by Integra Realty Resources, Inc.

**Dallas Multifamily Construction Insights**

- There are 145 properties under construction, 11 properties in the planned construction phase, and 244 properties in the proposed construction phase in the metro area.

- Apartment properties within the under-construction phase have an average size of 274 units and range in size between 0 units and 1,300 units.

- Apartment properties within the planned construction phase have an average size of 763 units and range in size between 245 units and 4,000 units.

- Apartment properties within the proposed construction phase have an average size of 429 units and range in size between 11 units and 6,000 units.

- Of the 35,039 units under construction, 90.8% are Apartment properties and 4.5% are Condominium properties.

- Of the 7,645 units planned for construction, 99.8% are Apartment properties and 0.2% are Condominium properties.

- Of the 93,669 units proposed for construction, 96.6% are Apartment properties and 2.7% are Condominium properties.

The following table summarizes properties that are under construction, planned, and/or proposed in the Richardson submarket.

**Richardson Submarket Construction by Phase and Subtype**

| Multifamily Subproperty Type | Under Construction Properties | Under Construction Units | Planned Construction Properties | Planned Construction Units | Proposed Construction Properties | Proposed Construction Units |
|---|---|---|---|---|---|---|
| Apartment | 6 | 2,086 | 2 | 4,325 | 12 | 2,281 |
| Condominiums | 2 | 178 | 0 | 0 | 0 | 0 |
| Other | 0 | 0 | 0 | 0 | 1 | 34 |
| Totals | 8 | 2,264 | 2 | 4,325 | 13 | 2,315 |

Source: Moody's Analytics REIS; compiled by Integra Realty Resources, Inc.

Amerigold Suites

APP000233

## Multifamily Market Outlook and Conclusions

Relevant vacancy rate indications are summarized as follows:

### Vacancy Rate Indications

| Market Segment | Vacancy Rates |
| --- | --- |
| Dallas Metro Area | 7.0% |
| Dallas Metro Area Class B/C | 6.2% |
| Richardson Submarket | 8.8% |
| Richardson Submarket Class B/C | 7.1% |

Based on the key metro and submarket area trends, construction outlook, and the performance of competing properties, IRR expects the mix of property fundamentals and economic conditions in the Dallas, TX metro area to have a positive impact on the subject property's performance in the near-term.

# Property Analysis

## Land Description and Analysis

### Land Description

| | |
|---|---|
| Land Area | 3.56 acres; 155,074 SF |
| Source of Land Area | Public Records |
| Primary Street Frontage | Goldmark Drive - 564 feet |
| Shape | Rectangular |
| Corner | Yes |
| Topography | Generally level and at street grade |
| Drainage | No problems reported or observed |
| Environmental Hazards | None reported or observed |
| Ground Stability | No problems reported or observed |
| Flood Area Panel Number | 48113C0195K |
| Date | July 7, 2014 |
| Zone | X |
| Description | Outside of 500-year floodplain |
| Insurance Required? | No |

### Zoning; Other Regulations

| | |
|---|---|
| Zoning Jurisdiction | City of Dallas |
| Zoning Designation | MU-3 |
| Description | Mixed Use - 3 |
| Legally Conforming? | Appears to be legally conforming |
| Zoning Change Likely? | No |
| Permitted Uses | High density retail, office, hotel, and/or multifamily residential uses in combination on single or contiguous building sites; to encourage innovative and energy conscious design, efficient circulation systems, the conservation of land, and the minimization of vehicular travel |
| Minimum Lot Area | None |
| Minimum Setbacks (Feet) | 15' in front, 20' on sides and rear |
| Maximum Building Height | 270' or 20 stories - Any portion of structure over 26 feet may not be located above a Residential Proximity Slope (RPS) |
| Maximum Site Coverage | 0.8 |
| Maximum Density | 4.0 FAR |
| Parking Requirement | Per city approval |
| Rent Control | No |
| Other Land Use Regulations | None reported or observed |

### Utilities

| Service | Provider |
|---|---|
| Water | City of Dallas |
| Sewer | City of Dallas |
| Electricity | TXU Energy, various providers |
| Natural Gas | ATMOS |
| Local Phone | AT&T, various providers |

 

### Zoning

We are not experts in the interpretation of zoning ordinances. An appropriately qualified land use attorney should be engaged if a determination of compliance with zoning is required.

### Rent Control Regulations

The subject is not affected by any type of regulation restricting the amount of rent the owner can charge to tenants.

### Easements, Encroachments and Restrictions

A current title report was not provided for review. There are no apparent easements, encroachments, or restrictions that would adversely affect value. This valuation assumes no adverse impacts from easements, encroachments, or restrictions, and further assumes that the subject has clear and marketable title.

### Conclusion of Site Analysis

Overall, the physical characteristics and the availability of utilities result in a functional site, suitable for a variety of uses including those permitted by zoning. Uses permitted by zoning include high density retail, office, hotel, and/or multifamily residential uses in combination on single or contiguous building sites; to encourage innovative and energy conscious design, efficient circulation systems, the conservation of land, and the minimization of vehicular travel. No other restrictions on development are apparent.



APP000236

## Aerial Photograph



Amerigold Suites

**Plat Map**



Amerigold Suites

## Flood Hazard Map



## Zoning Map



## Improvements Description and Analysis

### Overview

The subject is an existing multifamily property containing 70 dwelling units. The improvements were constructed in 1981 and are 94% leased as of the effective appraisal date. The site area is 3.56 acres or 155,074 square feet. It should be noted, the subject improvements are in below average condition and appear to need significant renovations. Based on discussions with ownership, there are currently no plans or official cost estimates. Accordingly, we utilize market data to estimate the cost to cure at approximately $20,000/unit or $1,400,000. We apply this deduction for deferred maintenance as an adjustment to reach our "as is" market value conclusion. The following description is based on the inspection of the property and discussions with ownership.

### Improvements Description

| | |
|---|---|
| Name of Property | Amerigold Suites |
| General Property Type | Multifamily |
| Property Sub Type | Garden/Low Rise |
| Competitive Property Class | C |
| Occupancy Type | Multi-Tenant |
| Percent Leased | 94% |
| Number of Buildings | 11 |
| Stories | 2 |
| Construction Class | D |
| Construction Type | Wood frame |
| Construction Quality | Average |
| Condition | Below Average |
| Number of Units | 70 |
| Units per Acre (Density) | 19.7 |
| Rentable Floor Area (SF) | 51,240 |
| Land Area (SF) | 155,074 |
| Floor Area Ratio (RFA/Land SF) | 0.33 |
| Building Area Source | Owner |
| Year Built | 1981 |
| Actual Age (Yrs.) | 43 |
| Estimated Effective Age (Yrs.) | 35 |
| Estimated Economic Life (Yrs.) | 50 |
| Remaining Economic Life (Yrs.) | 15 |
| Number of Parking Spaces | 90 |
| Source of Parking Count | Inspection |
| Parking Type | Off-street, surface |
| Parking Spaces/Unit | 1.3 |

Amerigold Suites



APP000241

## Construction Details

| | |
|---|---|
| Foundation | Concrete slab |
| Structural Frame | Wood |
| Exterior Walls | Wood siding |
| Roof | Pitched, composition shingle |
| Heating | Central |
| Air Conditioning | Central |
| Elevators | None |
| Sprinklers | None |

The property contains 11, two-story garden-style buildings with three/3 unit types, built in 1981. Per management, there are 59 single-story one bedroom units at 660 SF, and 10 two-story, two bedroom units at 1,200 SF, and one/1 efficiency unit at 300 SF, for a total size of 51,240 SF. In addition, there is a leasing center with restrooms, kitchen area and community room, and a separate maintenance building with garage and workshop is located at the rear of the property. The subject property includes a fitness center and swimming pool; however, both are closed.

All units are finished out with typical carpe in the bedroom areas, with tile in the entries, bathrooms, and kitchens. The units include kitchen appliances such as an electric range, fridge/freezer, and dishwasher. All units have a small patio area or balcony.

## Unit Mix

The subject's unit mix, building areas, and occupancy rate are detailed in the following table.

### Unit Mix and Occupancy

| Floor Plan | Units | % of Total | Avg. Unit Size | Total SF | Occupied Units | Vacant Units | % Occupied |
|---|---|---|---|---|---|---|---|
| **Efficiency Units** | | | | | | | |
| Efficiency | 1 | 1.4% | 300 | 300 | 1 | 0 | 100% |
| Total/Average | 1 | 1.4% | 300 | 300 | 1 | 0 | 100% |
| **1BR - 1BA Units** | | | | | | | |
| 1BR - 1BA | 59 | 84.3% | 660 | 38,940 | 56 | 3 | 95% |
| Total/Average | 59 | 84.3% | 660 | 38,940 | 56 | 3 | 95% |
| **2BR - 2BA Units** | | | | | | | |
| 2BR - 2BA | 10 | 14.3% | 1,200 | 12,000 | 9 | 1 | 90% |
| Total/Average | 10 | 14.3% | 1,200 | 12,000 | 9 | 1 | 90% |
| Total Units | 70 | 100.0% | 732 | 51,240 | 66 | 4 | 94% |

*Includes employee and model units, as applicable.

Current occupancy is 94%, which is generally consistent with the market.

Amerigold Suites



APP000242

## Unit Features and Project Amenities

Standard unit features and project amenities for this market are shown in the table below, followed by a notation of whether the features and amenities are present at the subject.

| Unit Features and Project Amenities | | | |
|---|---|---|---|
| Unit Features | At Subject | Project Amenities | At Subject |
| Patio/Balcony/Deck | X | Gated Entrance | |
| Central AC | X | Security/Door Staff | |
| Window/Sleeve AC | | Common Laundry | |
| Carpeting | X | Recreational Amenities | |
| Wood Floors | | Clubhouse Building | |
| Vinyl Plank Floors (LVT/LVP) | X | Fitness Center | X |
| Window Blinds/Shades | X | Playground | |
| 8' Ceiling Height | | Roofdeck/Sundeck | |
| 9'+ Ceiling Heights | X | Swimming Pool | X |
| Washer/Dryer Hookup | | BBQ Grill/Picnic Area | |
| Washer/Dryer In Unit | | Covered Parking | |
| Dishwasher | X | Garage/In Building | |
| Disposal | X | Garage/Detached | |
| Range | X | Electric Car Charging Station | |
| Range - Electric | | Bike Storage Room | |
| Range - Gas | | Dog Run/Spa | |
| Refrigerator | X | Extra Storage Area | |
| Microwave | X | Resident Lounge | |
| Stainless Steel Appliances | | Co-Working Space | |
| Granite/Quartz Counters | | Package System/Lockers/Rm | |
| Laminate Counters | X | LEED Certified | |
| Kitchen Island/Eating Counter | | Social Services Coordination | |
| Attached Garage | | Non-Shelter Services | |
| Grab Bars/Pull Cords | | | |

## Improvements Analysis

The subject property is improved with a 70-unit multifamily property, being a "Class C" garden style community. The improvements are of average quality construction and are in below average condition.

The quality of the subject is inferior to competing properties. Maintenance has been inferior to competing properties. Overall, the market appeal of the subject is inferior to competing properties, considering the significant deferred maintenance evident at time of inspection.

### Functional Utility

The improvements appear to be adequately suited to their current use. Based on the property inspection and consideration of the foregoing, there do not appear to be any significant items of functional obsolescence.

Amerigold Suites

APP000243

**Deferred Maintenance**

Deferred maintenance is identified based on the property inspection. It is noted that the subject ownership group had not yet created a budget for the necessary capital expenditures. To estimate the cost to cure deferred maintenance, reliance is placed on Marshall Valuation Service and expense comparables.

The subject property included several areas of deferred maintenance such as exterior siding, swimming pool area, fitness center, window replacement/repair, roof repairs, drive aisle/paving, landscaping, interior corridor updates, down units, replacement of various kitchen appliances, etc.

The below chart depicts seven/7 properties that underwent renovations to cure items of deferred maintenance. It is worth noting that several comps vary in degree of renovation. In other words, expense comparable 3 is a high-end full renovation of all units. Conversely, expense comparables 1 and 7 are low-end renovations, of which only select units are renovated in addition to exterior updates.

| Capital Expenditures - Cost Comparables | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Comp | Property Name | City | State | Year Built | Total Cap-Ex Budget | Units | $/Unit | Rentable Area (SF) | $/SF |
| 1 | Bungalows at Lake Arlington | Arlington | TX | 1984 | $456,750 | 64 | $7,137 | 57,495 | $7.94 |
| 2 | Bella Vida Apartments | Arlington | TX | 1984 | $650,000 | 84 | $7,738 | 56,040 | $11.60 |
| 3 | Versailles Apartments | Dallas | TX | 1960 | $250,000 | 12 | $20,833 | 9,984 | $25.04 |
| 4 | Legends at Chase Oaks | Plano | TX | 1997 | $1,575,000 | 105 | $15,000 | 102,060 | $15.43 |
| 5 | Texas Trails Apartments | Sulphur Springs | TX | 1960 | $326,000 | 33 | $9,879 | 30,350 | $10.74 |
| 6 | Shady Oaks Apartments | Mount Pleasant | TX | 1978 | $752,835 | 74 | $10,173 | 56,870 | $13.24 |
| 7 | Magnolia on 16th | Plano | TX | 1965 | $360,000 | 42 | $8,571 | 29,038 | $12.40 |
| | | | | | | **Average** | **$11,333** | | **$13.77** |

Accordingly, the estimated cost to cure deferred maintenance is estimated to be $20,000/unit or $1,400,000. It should be noted, a previous investment group with interest in acquiring the property had budgeted over $3,000,000 in capital expenditures. Therefore, we project on the high end of our expense comparable range and assume its adequate for bringing the condition of all units to average, including common area amenities and overall exterior of property.

**ADA Compliance**

Based on the property inspection and information provided, there are no apparent ADA issues. However, ADA matters are beyond the scope of expertise of the assignment participants, and further study by an appropriately qualified professional would be recommended to assess ADA compliance.

**Hazardous Substances**

An environmental assessment report was not provided for review, and environmental issues are beyond the scope of expertise of the assignment participants. No hazardous substances were observed during the inspection of the improvements; however, detection of such substances is outside the scope of expertise of the assignment participants. Qualified professionals should be consulted. Unless otherwise stated, it is assumed no hazardous conditions exist on or near the subject.

**Personal Property**

The appraisal assignment is specifically focused on the value of the real property only. Items of personal property are excluded from consideration.

Amerigold Suites



APP000244

## Conclusion of Improvements Analysis

In comparison to competitive properties in the market, the subject improvements are rated as follows:

| Improvements Ratings | |
| --- | --- |
| Design and Appearance | Below Average |
| Age/Condition | Below Average |
| Room Sizes and Layouts | Average |
| Bathrooms | Average |
| Kitchens | Average |
| Landscaping | Average |
| Unit Features | Average |
| Project Amenities | Below Average |

Overall, the quality, condition, and functional utility of the improvements are below average for their age and location.










Amerigold Suites

APP000246



















Amerigold Suites

APP000248










Amerigold Suites

## Real Estate Taxes

The Dallas Central Appraisal District does assessment on a countywide basis. Because assessed value is typical the result of a mass appraisal process based more on statistical probability than individual property characteristics, it should be noted that there is frequently a difference between assessed value and market value for an individual property. The tax rates are set in October of each year. The tax rates for 2024 for the taxing authorities are calculated to be 2.424046%. Real estate taxes and assessments for the current tax year are shown in the following table.

**Taxes and Assessments - 2024**

| | Assessed Value | | | | Taxes and Assessments | |
| | | | | | | Ad Valorem |
| Tax ID | Land | Improvements | Total | Taxable Value | Tax Rate | Taxes |
|---|---|---|---|---|---|---|
| 00000769000800000 | $930,440 | $4,645,810 | $5,576,250 | $2,580,000 | 2.424046% | $62,540 |

In the following analysis we compare the assessed value of comparable improved properties to the subject.

**Tax Comparables**

| No. | Property Name | Year Built | Number of Units | Total Assessed Value | Assessed Value/ Unit | Total Taxes | Taxes/ Unit |
|---|---|---|---|---|---|---|---|
| 1 | Vinings at Central | 1963 | 132 | $11,103,690 | $84,119 | $269,159 | $2,039 |
| 2 | Cottonwood at Park Central | 1985 | 270 | $38,849,870 | $143,888 | $941,739 | $3,488 |
| 3 | Vista Buena Apartments | 1976 | 416 | $29,040,000 | $69,808 | $703,943 | $1,692 |
| 4 | Tides on Esperanza | 1980 | 370 | $35,096,000 | $94,854 | $850,743 | $2,299 |
| 5 | Amber Dawn Apartments | 1970 | 157 | $21,448,600 | $136,615 | $520,894 | $3,318 |
| Subject | | 1981 | 70 | $5,576,250 | $79,661 | $62,540 | $893 |

Tax assessments for comparable properties range from $69,808 to $143,888 per Unit, as compared to the subject's current assessment of $79,661 per Unit. Accordingly, the subject falls within the tax comparable range, being on the low end. Based on the preceding information, the subject's assessment and corresponding taxes appear low, yet reasonable.

Texas is a non-disclosure state with a mandate to assess property at 100% of market value. Some Appraisal Districts are more successful at achieving the mandate than others. In Texas counties with little or no transaction activity, values can lag the market. However, there is no limit on increases in the event of a re-assessment. Property owners in Texas may protest ad valorem assessments using the one of two tests, Market Value or "Equal Appraisal".

Market Value is self-explanatory. "Equal Appraisal" means there is a burden on the Appraisal District to insure mass appraisal methods produce consistent results from property to property. To measure equality, the Appraisal Review Board will consider the assessed values of competing properties in the district. The process involves generation of a "ratio study" in which, after appropriate adjustments, the "median value" is the conclusion of "Equal Appraisal". It is unlikely that there would be a county-wide re-assessment; however, should the subject sell, it is probable that there will be some increase.

Amerigold Suites

APP000250

## Highest and Best Use

The highest and best use of a property is the reasonably probable use resulting in the highest value, and represents the use of an asset that maximizes its productivity.

### Process

Before a property can be valued, an opinion of highest and best use must be developed for the subject site, both as though vacant, and as improved or proposed. By definition, the highest and best use must be:

- Physically possible.

- Legally permissible under the zoning regulations and other restrictions that apply to the site.

- Financially feasible.

- Maximally productive, i.e., capable of producing the highest value from among the permissible, possible, and financially feasible uses.

### As Though Vacant

First, the property is evaluated as though vacant, with no improvements.

#### Physically Possible

The physical characteristics of the site do not appear to impose any unusual restrictions on development. Overall, the physical characteristics of the site and the availability of utilities result in functional utility suitable for a variety of uses.

#### Legally Permissible

The site is zoned MU-3, Mixed Use - 3. Permitted uses include high density retail, office, hotel, and/or multifamily residential uses in combination on single or contiguous building sites; to encourage innovative and energy conscious design, efficient circulation systems, the conservation of land, and the minimization of vehicular travel. There are no apparent legal restrictions, such as easements or deed restrictions, effectively limiting the use of the property. Given prevailing land use patterns in the area, only multifamily use is given further consideration in determining highest and best use of the site, as though vacant.

#### Financially Feasible

Based on the accompanying analysis of the market, there is currently adequate demand for multifamily use in the subject's area. It appears a newly developed multifamily use on the site would have a value commensurate with its cost. Therefore, multifamily use is considered to be financially feasible.

#### Maximally Productive

There does not appear to be any reasonably probable use of the site that would generate a higher residual land value than multifamily use. Accordingly, multifamily use, developed to the normal market density level permitted by zoning, is the maximally productive use of the property.

Amerigold Suites



APP000251

**Conclusion**

Development of the site for multifamily use is the only use which meets the four tests of highest and best use. Therefore, it is concluded to be the highest and best use of the property as though vacant.

## As Improved

The subject site is developed with multifamily, which is consistent with the highest and best use of the site as though vacant. The existing improvements are currently leased and produce a significant positive cash flow that is expected to continue. Several scenarios are examined to analyze feasibility, as follows:

## Most Probable Buyer

Taking into account the size and characteristics of the property and its occupancy, the likely buyer is a regional investor such as a partnership.



# Valuation

## Valuation Methodology

Appraisers usually consider three approaches to estimating the market value of real property. These are the cost approach, sales comparison approach and the income capitalization approach.

The **cost approach** assumes that the informed purchaser would pay no more than the cost of producing a substitute property with the same utility. This approach is particularly applicable when the improvements being appraised are relatively new and represent the highest and best use of the land or when the property has unique or specialized improvements for which there is little or no sales data from comparable properties.

The **sales comparison approach** assumes that an informed purchaser would pay no more for a property than the cost of acquiring another existing property with the same utility. This approach is especially appropriate when an active market provides sufficient reliable data. The sales comparison approach is less reliable in an inactive market or when estimating the value of properties for which no directly comparable sales data is available. The sales comparison approach is often relied upon for owner-user properties.

The **income capitalization approach** reflects the market's perception of a relationship between a property's potential income and its market value. This approach converts the anticipated net income from ownership of a property into a value indication through capitalization. The primary methods are direct capitalization and discounted cash flow analysis, with one or both methods applied, as appropriate. This approach is widely used in appraising income-producing properties.

Reconciliation of the various indications into a conclusion of value is based on an evaluation of the quantity and quality of available data in each approach and the applicability of each approach to the property type.

The methodology employed in this assignment is summarized as follows:

**Approaches to Value**

| Approach | Applicability to Subject | Use in Assignment |
|---|---|---|
| Cost Approach | Not Applicable | Not Utilized |
| Sales Comparison Approach | Applicable | Utilized |
| Income Capitalization Approach | Applicable | Utilized |

Amerigold Suites



APP000253

## Sales Comparison Approach

The sales comparison approach develops an indication of value by comparing the subject to sales of similar properties. The steps taken to apply the sales comparison approach are:

- Identify relevant property sales;

- Research, assemble, and verify pertinent data for the most relevant sales;

- Analyze the sales for material differences in comparison to the subject;

- Reconcile the analysis of the sales into a value indication for the subject.

To apply the sales comparison approach, the research focused on transactions within the following parameters:

- Property Type: Garden/Low-Rise Multifamily

- Location: Dallas – Fort Worth, TX MSA

- Size: 25 – 350 Units

- Age/Quality: Average/Average

- Transaction Date: Most Recent Available

For this analysis, price per unit is used as the appropriate unit of comparison because market participants typically compare sale prices and property values on this basis. The sales considered most relevant are summarized in the following table.

It should be noted, there is limited sales data of multifamily properties with existing deferred maintenance, as each transaction varies on a case by case basis. Accordingly, we utilize sales of multifamily properties in average age, condition, and quality. We then apply the deduction of costs to cure the beforementioned deferred maintenance. Thus, representing the subject's "as is" market value.

Amerigold Suites

APP000254

**Summary of Comparable Improved Sales**

| No. | Name/Address | Sale Date; Status | Yr. Blt.; # Stories; % Occ. | # Units; Rentable SF; Avg Unit SF | Effective Sale Price | $/Unit; $/SF | NOI/Unit; NOI/SF; Exp. Ratio | Cap Rate |
|---|---|---|---|---|---|---|---|---|
| 1 | Haymeadow Apartments 14140 Haymeadow Dr. Dallas Dallas County TX | May-24 Listing | 1982 2 98% | 34 36,412 1,071 | $4,750,000 | $139,706 $130.45 | $10,478 $9.78 46% | 7.50% |
| | Comments: The Haymeadow Condos are actively listed for sale as a portfolio sale of 34 condo units, representing a 100% fee simple interest in the subject property. The listing has been active for 199 days as of the date of this write-up, with a current list price of $4,750,000 or $139,706/unit. A market derived proforma suggests the property is listed at a 7.50% cap rate. | | | | | | | |
| 2 | Avanti on Central & Pipeline 805 Central Dr. Bedford Tarrant County TX | Mar-24 Closed | 1969 2 70% | 195 121,200 622 | $21,750,000 | $111,538 $179.46 | $7,685 $12.36 48% | 6.89% |
| | Comments: The Avanti on Central & Pipeline sold in March 2024 for $19,250,000 or $98,718/unit. However, we apply an adjustment of $2,500,000 in capital expenditures and lease-up costs to represent a stabilized sale. Thus, an effective sales price of $21,750,000 or $111,538/unit. The property was acquired based on a projected 6.89% cap rate. | | | | | | | |
| 3 | Garrett Gardens 2015 N. Garrett Ave. Dallas Dallas County TX | Dec-23 Closed | 1985 2 95% | 66 34,392 521 | $7,590,000 | $115,000 $220.69 | $5,750 $11.03 47% | 5.00% |
| | Comments: This 66-unit multifamily property was purchased for $7,590,000 or $115,000 per unit. The property was reportedly traded on a 5.00% cap rate. | | | | | | | |
| 4 | Casa San Luis Apartments 3155 Park Ln. Dallas Dallas County TX | Aug-23 Closed | 1967 2 93% | 63 66,040 1,048 | $7,000,000 | $111,111 $106.00 | $8,391 $8.00 40% | 7.55% |
| | Comments: The Casa San Luis Apartments sold in August 2023 for $7,000,000 or $111,111/unit at an in-place cap rate of 7.55%. | | | | | | | |
| 5 | Rise at Highland Meadows Apartments 13100 Pandora Dr. Dallas Dallas County TX | Feb-23 Closed | 1983 2 99% | 328 220,029 671 | $39,050,000 | $119,055 $177.48 | $6,778 $10.10 48% | 5.69% |
| | Comments: This multifamily property was purchased for $39,050,000 or $119055 per unit. At the time of sale, the property was 98.78% | | | | | | | |
| | **Subject** Amerigold Suites Dallas, TX | | 1981 2 94% | 70 51,240 732 | | | $6,442 $8.80 50% | |



## Comparable Improved Sales Map





Sale 1
Haymeadow Apartments



Sale 2
Avanti on Central & Pipeline



Sale 3
Garrett Gardens



Sale 4
Casa San Luis Apartments



Sale 5
Rise at Highland Meadows Apartments

Amerigold Suites

irr.

APP000257

## Analysis and Adjustment of Sales

Adjustments are based on a rating of each comparable sale in relation to the subject. The adjustment process is typically applied through either quantitative or qualitative analysis, or a combination of both analyses. Quantitative adjustments are often developed as dollar or percentage amounts, and are most credible when there is sufficient data to perform a paired sales analysis.

While percentage adjustments are presented in the adjustment grid, they are based on qualitative judgment rather than empirical research, as there is not sufficient data to develop a sound quantitative estimate. Although the adjustments appear to be mathematically precise, they are merely intended to illustrate an opinion of typical market activity and perception. With the exception of market conditions, the adjustments are based on a scale, with a minor adjustment in the range of 1-5% and a substantial adjustment considered to be 20% or greater.

The rating of each comparable sale in relation to the subject is the basis for the adjustments. If the comparable is superior to the subject, its sale price is adjusted downward to reflect the subject's relative attributes; if the comparable is inferior, its price is adjusted upward.

Transactional adjustments are applied for property rights conveyed, financing, conditions of sale, expenditures made immediately after purchase, and market conditions. In addition, property adjustments include – but are not limited to – location, access/exposure, size, quality, effective age, economic and legal characteristics, and non-realty components of value. Adjustments are considered for the following factors, in the sequence shown below.

## Transactional Adjustments

### Real Property Rights Conveyed

Property rights considerations encompass a wide range of factors including, for example, deed type, deed restrictions, and whether the property is encumbered by leases.

All of the comparables represent fee simple transactions, and adjustments for property rights are not necessary.

### Financing

In analyzing the comparables, it is necessary to adjust for financing terms that differ from market terms. Typically, if the buyer retained third-party financing (other than the seller) for the purpose of purchasing the property, a cash price is presumed and no adjustment is required. However, in instances where the seller provides financing as a debt instrument, a premium may have been paid by the buyer for below-market financing terms, or a discount may have been demanded by the buyer if the financing terms were above market. The premium or discounted price must then be adjusted to a cash equivalent basis. The comparable sales represented cash-to-seller transactions and, therefore, do not require adjustment.

Amerigold Suites



APP000258

**Conditions of Sale**

Adverse conditions of sale can account for a significant discrepancy from the sale price actually paid, compared to that of the market. This discrepancy in price is generally attributed to the motivations of the buyer and the seller. Certain conditions of sale are considered non-market and may include the following:

- a seller acting under duress (e.g., eminent domain, foreclosure);

- buyer motivation (e.g., premium paid for assemblage, certain 1031 exchanges);

- a lack of exposure to the open market;

- an unusual tax consideration;

- a sale at legal auction.

Comparable 1 is a current listing and is adjusted downward to reflect the likelihood the sale price will be below the list price, as actual sale prices are typically negotiated downward. No further adjustments are required for conditions of sale.

**Expenditures Made Immediately After Purchase**

This category considers expenditures incurred immediately after the purchase of a property. Sale 2 is adjusted upward to account for renovations and costs to stabilize the asset. There were no other issues of deferred maintenance reported for any other sale. No further adjustments are required for expenditures after sale.

**Market Conditions**

A market conditions adjustment is applied when market conditions at the time of sale differ from market conditions as of the effective date of value. Adjustments can be positive when prices are rising, or negative when markets are challenged by factors such as a deterioration of the economy or adverse changes in supply and/or demand in the market area. Consideration must also be given to when the property was placed under contract, versus when the sale actually closed.

In evaluating market conditions, changes between the comparable sale date and the effective date of this appraisal may warrant adjustment; however, if market conditions have not changed, then no adjustment is required.

The sales took place from February 2023 to May 2024. Market conditions have generally been stable given the rise in interest rates and overall cost of debt. The adjustment grid accounts for this trend with no adjustments applied over this period through the effective date of value.

Amerigold Suites



APP000259

## Property Adjustments

### Location

Factors considered in evaluating location include, but are not limited to, demographics, growth rates, surrounding uses and property values.

Sales 1 and 4 are similar to the subject. No adjustments are necessary. Sales 2, 3 and 5 are adjusted downward for superior location.

### Unit Count

Due to economies of scale, the market exhibits an inverse relationship between unit count and price per unit such that complexes with higher unit counts sell for a lower price per unit than smaller projects, all else being equal. To account for this relationship, applicable adjustments are applied for differences in unit count.

Sales 1, 2, 3 and 4 are similar to the subject and require no adjustment. Sale 5 has more units than the subject and requires an upward adjustment.

### Quality of Construction

This category accounts for construction quality, amenities, market appeal and functional utility.

Sales 2, 3, 4 and 5 are similar to the subject and require no adjustment. Sale 1 is superior to the subject. A downward adjustment is applied.

### Effective Age/Condition

While year built can give insight into the utility of a property, the more important consideration is the level of condition and modernization of the property. The subject was constructed in 1981, has an effective age of 35 years, and is in below average condition. Comparables exhibiting newer effective ages are adjusted downward to reflect the discrepancy in remaining economic life, and vice versa.

Sale 4 is similar to the subject and requires no adjustment. Sales 1, 2, 3 and 5 are newer than the subject, and downward adjustments are applied.

### Project and Unit Amenities

This category accounts for features internal to the residential units, such as patios or appliances, in addition to the amenities available to the entire complex (e.g. pool, covered parking, clubhouse, etc.).

Sales 1, 2, 3 and 4 are similar to the subject and require no adjustment. Sale 5 has more amenities and is superior. A downward adjustment is applied.



**Average Unit Size**

In determining the adjustment to be employed for average unit size, the best indicators are from properties that offer multiple selections of units with the same bed/bath count, but different size. Since these units are located within the same property, the difference in rent would be mostly attributable to unit size. Adjustments are applied by accounting for differences in unit size between the comparables and the subject, and the increment of additional rent/value that would be achieved for a larger versus smaller unit.

Sales 2 and 5 are similar to the subject and require no adjustment. Sales 1 and 4 have larger units and are superior. Downward adjustments are applied. Sale 3 has smaller units, and an upward adjustment is applied.

**Economic Characteristics**

Items considered in this category consist of non-stabilized occupancy, above/below market rents, tenant mix, and other economic factors. Excluded are differences in rent levels that are already considered in previous adjustments, such as for location or quality. Note: these adjustments are made as refinements. Care is made to avoid double-counting adjustments previously applied.

All of the comparables are similar to the subject. No adjustments are necessary.

**Legal Characteristics**

Legal characteristics may include zoning or development standards (e.g., use or density), environmental regulations, or differences in highest and best use.

All of the comparables are similar to the subject. No adjustments are necessary.

Amerigold Suites



APP000261

## Adjustments Summary

The following table summarizes the adjustments discussed above and applied to each sale.

**Improved Sales Adjustment Grid**

| | Subject | Comparable 1 | Comparable 2 | Comparable 3 | Comparable 4 | Comparable 5 |
|---|---|---|---|---|---|---|
| Property Name | Amerigold Suites | Haymeadow Apartments | Avanti on Central & Pipeline | Garrett Gardens | Casa San Luis Apartments | Rise at Highland Meadows Apartments |
| Address | 13636 Goldmark Drive | 14140 Haymeadow Dr. | 805 Central Dr. | 2015 N. Garrett Ave. | 3155 Park Ln. | 13100 Pandora Dr. |
| City | Dallas | Dallas | Bedford | Dallas | Dallas | Dallas |
| County | Dallas | Dallas | Tarrant | Dallas | Dallas | Dallas |
| State | Texas | TX | TX | TX | TX | TX |
| Sale Date | | May-24 | Mar-24 | Dec-23 | Aug-23 | Feb-23 |
| Sale Status | | Listing | Closed | Closed | Closed | Closed |
| Sale Price | | $4,750,000 | $19,250,000 | $7,590,000 | $7,000,000 | $39,050,000 |
| Expenditures After Purchase | | – | $2,500,000 | – | – | – |
| Effective Sale Price | | $4,750,000 | $21,750,000 | $7,590,000 | $7,000,000 | $39,050,000 |
| Rentable Floor Area | 51,240 | 36,412 | 121,200 | 34,392 | 66,040 | 220,029 |
| Number of Units | 70 | 34 | 195 | 66 | 63 | 328 |
| Year Built | 1981 | 1982 | 1969 | 1985 | 1967 | 1983 |
| Cap Rate | – | 7.50% | 6.89% | 5.00% | 7.55% | 5.69% |
| NOI per Unit | $6,442 | $10,478 | $7,685 | $5,750 | $8,391 | $6,778 |
| Avg SF Per Unit | 732 | 1,071 | 622 | 521 | 1,048 | 671 |
| **Price per Unit** | | **$139,706** | **$111,538** | **$115,000** | **$111,111** | **$119,055** |
| **Transactional Adjustments** | | | | | | |
| Property Rights | | Fee Simple | Fee Simple | Fee Simple | Fee Simple | Fee Simple |
|     % Adjustment | | – | – | – | – | – |
| Financing Terms | | Cash to seller | Cash to seller | Cash to seller | Cash to seller | Cash to seller |
|     % Adjustment | | – | – | – | – | – |
| Conditions of Sale | | Arm's-length | Arm's-length | Arm's-length | Arm's-length | Arm's-length |
|     % Adjustment | | -10% | – | – | – | – |
| Expenditures Made Immediately After Purchase | | | Cap-Ex & Lease-See Above | | | |
|     $ Adjustment | | – | | – | – | – |
| Market Conditions | 4/25/2024 | May-24 | Mar-24 | Dec-23 | Aug-23 | Feb-23 |
|     Annual % Adjustment | 0% | – | – | – | – | – |
| **Cumulative Adjusted Price** | | **$125,735** | **$111,538** | **$115,000** | **$111,111** | **$119,055** |
| **Property Adjustments** | | | | | | |
| Location | | – | -5% | -10% | – | -5% |
| Unit Count | | – | – | – | – | 5% |
| Quality of Construction | | -5% | – | – | – | – |
| Effective Age/Condition | | -5% | -5% | -5% | – | -10% |
| Project and Unit Amenities | | – | – | – | – | -5% |
| Average Unit Size | | -10% | – | 5% | -10% | – |
| Economic Characteristics | | – | – | – | – | – |
| Legal Characteristics | | – | – | – | – | – |
| Non-Realty Components of Value | | – | – | – | – | – |
| Net Property Adjustments ($) | | -$25,147 | -$11,154 | -$11,500 | -$11,111 | -$17,858 |
| Net Property Adjustments (%) | | -20% | -10% | -10% | -10% | -15% |
| **Final Adjusted Price** | | **$100,588** | **$100,385** | **$103,500** | **$100,000** | **$101,197** |

| | |
|---|---|
| **Range of Adjusted Prices** | $100,000 - $103,500 |
| **Average** | $101,134 |
| **Indicated Value** | $100,000 |

Amerigold Suites



## Value Indication

Prior to adjustment, the sales reflect a range of $111,111 - $139,706 per unit. After adjustment, the range is narrowed to $100,000 - $103,500 per unit, with an average of $101,134 per unit. We generally place equal weight on all sales as they represent a relatively tight range and do not require significant adjustments.

Based on the preceding analysis, the value indication by the sales comparison approach is as follows:

| Value Indication by Sales Comparison | |
|---|---|
| **Stabilized** | |
| Indicated Value per Unit | $100,000 |
| Subject Units | 70 |
| Indicated Value | $7,000,000 |
| Rounded | $7,000,000 |
| **As Is** | |
| Stabilized Value Indication | $7,000,000 |
| Adjustments | |
| Deferred Maintenance | -$1,400,000 |
| Indicated Value | $5,600,000 |
| Rounded | $5,600,000 |

Amerigold Suites

APP000263

**Deferred Maintenance**

Deferred maintenance is identified based on the property inspection. It is noted that the subject ownership group had not yet created a budget for the necessary capital expenditures. To estimate the cost to cure deferred maintenance, reliance is placed on Marshall Valuation Service and expense comparables.

The subject property included several areas of deferred maintenance such as exterior siding, swimming pool area, fitness center, window replacement/repair, roof repairs, drive aisle/paving, landscaping, interior corridor updates, down units, replacement of various kitchen appliances, etc.

The below chart depicts seven/7 properties that underwent renovations to cure items of deferred maintenance. It is worth noting that several comps vary in degree of renovation. In other words, expense comparable 3 is a high-end full renovation of all units. Conversely, expense comparables 1 and 7 are low-end renovations, of which only select units are renovated in addition to exterior updates.

**Capital Expenditures - Cost Comparables**

| Comp | Property Name | City | State | Year Built | Total Cap-Ex Budget | Units | $/Unit | Rentable Area (SF) | $/SF |
|------|---------------|------|-------|-----------|--------------------|-------|--------|---------------------|------|
| 1 | Bungalows at Lake Arlington | Arlington | TX | 1984 | $456,750 | 64 | $7,137 | 57,495 | $7.94 |
| 2 | Bella Vida Apartments | Arlington | TX | 1984 | $650,000 | 84 | $7,738 | 56,040 | $11.60 |
| 3 | Versailles Apartments | Dallas | TX | 1960 | $250,000 | 12 | $20,833 | 9,984 | $25.04 |
| 4 | Legends at Chase Oaks | Plano | TX | 1997 | $1,575,000 | 105 | $15,000 | 102,060 | $15.43 |
| 5 | Texas Trails Apartments | Sulphur Springs | TX | 1960 | $326,000 | 33 | $9,879 | 30,350 | $10.74 |
| 6 | Shady Oaks Apartments | Mount Pleasant | TX | 1978 | $752,835 | 74 | $10,173 | 56,870 | $13.24 |
| 7 | Magnolia on 16th | Plano | TX | 1965 | $360,000 | 42 | $8,571 | 29,038 | $12.40 |
| | | | | | | Average | $11,333 | | $13.77 |

Accordingly, the estimated cost to cure deferred maintenance is estimated to be $20,000/unit or $1,400,000. It should be noted, a previous investment group with interest in acquiring the property had budgeted over $3,000,000 in capital expenditures. Therefore, we project on the high end of our expense comparable range and assume its adequate for bringing the condition of all units to average, including common area amenities and overall exterior of property.

irr

APP000264

## Income Capitalization Approach

The income capitalization approach converts anticipated economic benefits of owning real property into a value estimate through capitalization. The steps taken to apply the income capitalization approach are:

- Analyze the revenue potential of the property.

- Consider appropriate allowances for vacancy, collection loss, and operating expenses.

- Calculate net operating income by deducting vacancy, collection loss, and operating expenses from potential income.

- Apply the most appropriate capitalization method, either direct capitalization or discounted cash flow analysis, or both, to convert anticipated net income to an indication of value.

The two most common capitalization methods are direct capitalization and discounted cash flow analysis. In direct capitalization, a single year's expected income is divided by an appropriate capitalization rate to arrive at a value indication. In discounted cash flow analysis, anticipated future net income streams and a future resale value are discounted to a present value at an appropriate yield rate.

In this analysis, we use only direct capitalization because investors in this property type typically rely more on this method.

### Occupancy and Rental Rates

The unit mix, occupancy status, and rental rates at the subject are shown in the following tables.

### Unit Mix and Occupancy

| Floor Plan | Units | % of Total | Avg. Unit Size | Total SF | Occupied Units | Vacant Units | % Occupied |
|---|---|---|---|---|---|---|---|
| **Efficiency Units** | | | | | | | |
| Efficiency | 1 | 1.4% | 300 | 300 | 1 | 0 | 100% |
| Total/Average | 1 | 1.4% | 300 | 300 | 1 | 0 | 100% |
| **1BR - 1BA Units** | | | | | | | |
| 1BR - 1BA | 59 | 84.3% | 660 | 38,940 | 56 | 3 | 95% |
| Total/Average | 59 | 84.3% | 660 | 38,940 | 56 | 3 | 95% |
| **2BR - 2BA Units** | | | | | | | |
| 2BR - 2BA | 10 | 14.3% | 1,200 | 12,000 | 9 | 1 | 90% |
| Total/Average | 10 | 14.3% | 1,200 | 12,000 | 9 | 1 | 90% |
| Total Units | 70 | 100.0% | 732 | 51,240 | 66 | 4 | 94% |

*Includes employee and model units, as applicable.

As of the effective valuation date, the subject is 94% leased and occupied. The property is considered to be at stabilized occupancy.

Amerigold Suites



APP000265

## Subject Rental Rates

| Unit Type | Average Unit Size | Total Units | Contract Rent Average | Avg. $/SF |
|---|---|---|---|---|
| Efficiency | 300 | 1 | $700 | $2.33 |
| 1BR - 1BA | 660 | 59 | $1,100 | $1.67 |
| 2BR - 2BA | 1,200 | 10 | $1,800 | $1.50 |
| TOTAL/AVG. | 732 | 70 | $1,208 | $1.63 |

1. Includes employee & model units, if any.

2. Figures are for tenant-occupied units only. Excludes any employee or model units.

## Utilities Expenses

| Tenant-Paid Utilities | Owner-Paid-Utilities |
|---|---|
| In-Unit Electric | Trash |
| Water | Common Area Water |
| Sewer | Common Area Electric |
| Cable | |
| Broadband | |

## Market Rent Analysis

In addition to contract rent, our analysis considers the market rent of each basic unit type within the subject. To estimate market rent, we analyze comparable rentals most relevant to the subject in terms of location, property type, building age, and quality. The comparables are summarized in the following table.

Amerigold Suites

APP000266

**Summary of Comparable Rentals**

| No. | Property Name; Address | Survey Date | Yr Built; Stories | Unit Mix | # Units; % Occ. | Avg. Unit SF | Avg. Rent/ Month | Avg. Rent/ SF |
|---|---|---|---|---|---|---|---|---|
| 1 | La Fortuna Apartments 14018 Brookgreen Dr. Dallas | 5/3/2024 | 1968 2 | | 230 85% | | | |
| | | | | Efficiency | 30 | 500 | $955 | $1.91 |
| | | | | 1BR - 1BA | 52 | 640 | $1,040 | $1.63 |
| | | | | 2BR - 2BA | 27 | 1,000 | $1,415 | $1.42 |
| | Tenant-Paid Utilities: | | | Cable, Broadband, In-Unit Electric, Sewer, Common Area Electric | | | | |
| | Unit Features: | | | 8' Ceiling Height, Carpeting, Central AC, Dishwasher, Laminate Counters, Microwave, Patio/Balcony/Deck, Range, Refrigerator, Vinyl Plank Floors (LVT/LVP), Window Blinds/Shades | | | | |
| | Project Amenities: | | | Clubhouse Building, Common Laundry, Fitness Center, Gated Entrance, Playground, Resident Lounge, Swimming Pool | | | | |
| | Comments: | | | 85% Occupied. | | | | |
| 2 | Vinings At Central 13447 N. Central Expressway Dallas | 5/3/2024 | 1963 2 | | 132 97% | | | |
| | | | | 1BR - 1BA | 8 | 636 | $866 | $1.36 |
| | | | | 2BR - 2BA | 16 | 1,196 | $1,281 | $1.07 |
| | Tenant-Paid Utilities: | | | Trash, Cable, Broadband, In-Unit Electric, Sewer, Water | | | | |
| | Unit Features: | | | 8' Ceiling Height, Carpeting, Central AC, Dishwasher, Disposal, Laminate Counters, Microwave, Patio/Balcony/Deck, Range, Refrigerator, Window Blinds/Shades | | | | |
| | Project Amenities: | | | Clubhouse Building, Common Laundry, Covered Parking | | | | |
| | Comments: | | | 97% Occupied. | | | | |
| 3 | Cottonwood at Park Central 13323 Esperanza Road Dallas | 5/3/2024 | 1985 3 | | 270 93% | | | |
| | | | | 1BR - 1BA | 64 | 690 | $1,195 | $1.73 |
| | | | | 2BR - 2BA | 34 | 1,189 | $1,908 | $1.60 |
| | Tenant-Paid Utilities: | | | Trash, Cable, Broadband, In-Unit Electric, Sewer, Water | | | | |
| | Unit Features: | | | 8' Ceiling Height, Carpeting, Central AC, Dishwasher, Disposal, Laminate Counters, Microwave, Patio/Balcony/Deck, Range, Refrigerator, Vinyl Plank Floors (LVT/LVP), Window Blinds/Shades | | | | |
| | Project Amenities: | | | BBQ Grill/Picnic Area, Clubhouse Building, Common Laundry, Fitness Center, Playground, Swimming Pool | | | | |
| | Comments: | | | 93% Occupied. | | | | |

Amerigold Suites



## Summary of Comparable Rentals

| No. | Property Name; Address | Survey Date | Yr Built; Stories | Unit Mix | # Units; % Occ. | Avg. Unit SF | Avg. Rent/ Month | Avg. Rent/ SF |
|---|---|---|---|---|---|---|---|---|
| 4 | Vista Buena Apartments 13350 Esperanza Rd. Dallas | 5/3/2024 | 1976 2 | | 416 80% | | | |
| | | | | 1BR - 1BA | 28 | 691 | $967 | $1.40 |
| | | | | 2BR - 2BA | 28 | 965 | $1,004 | $1.04 |
| | Tenant-Paid Utilities: | | | Cable, Broadband, In-Unit Electric, Sewer, Common Area Electric | | | | |
| | Unit Features: | | | 8' Ceiling Height, Carpeting, Central AC, Dishwasher, Laminate Counters, Microwave, Patio/Balcony/Deck, Range, Refrigerator, Vinyl Plank Floors (LVT/LVP), Window Blinds/Shades | | | | |
| | Project Amenities: | | | Clubhouse Building, Common Laundry, Fitness Center, Gated Entrance, Playground, Resident Lounge, Swimming Pool | | | | |
| | Comments: | | | 80% Occupied. | | | | |
| 5 | Tides on Esperanza 13450 Esperanza Rd. Dallas | 5/3/2024 | 1980 3 | | 370 91% | | | |
| | | | | Efficiency | 48 | 420 | $802 | $1.91 |
| | | | | 1BR - 1BA | 120 | 667 | $978 | $1.47 |
| | | | | 2BR - 2BA | 30 | 909 | $1,613 | $1.77 |
| | Tenant-Paid Utilities: | | | Cable, Broadband, In-Unit Electric, Sewer, Common Area Electric | | | | |
| | Unit Features: | | | 8' Ceiling Height, Carpeting, Central AC, Dishwasher, Laminate Counters, Microwave, Patio/Balcony/Deck, Range, Refrigerator, Vinyl Plank Floors (LVT/LVP), Window Blinds/Shades | | | | |
| | Project Amenities: | | | Clubhouse Building, Common Laundry, Fitness Center, Gated Entrance, Playground, Resident Lounge, Swimming Pool | | | | |
| | Comments: | | | 91% Occupied. | | | | |
| 6 | Amber Dawn Apartments 8542 W. Spring Valley Rd. Dallas | 5/3/2024 | 1970 2 | | 157 90% | | | |
| | | | | Efficiency | 3 | 410 | $926 | $2.26 |
| | | | | 1BR - 1BA | 28 | 700 | $1,223 | $1.75 |
| | | | | 2BR - 2BA | 96 | 980 | $1,430 | $1.46 |
| | Tenant-Paid Utilities: | | | Trash, Cable, Broadband, In-Unit Electric, Sewer, Water | | | | |
| | Unit Features: | | | 8' Ceiling Height, Carpeting, Central AC, Dishwasher, Disposal, Laminate Counters, Microwave, Patio/Balcony/Deck, Range, Refrigerator, Vinyl Plank Floors (LVT/LVP), Window Blinds/Shades | | | | |
| | Project Amenities: | | | BBQ Grill/Picnic Area, Clubhouse Building, Gated Entrance, Playground, Swimming Pool | | | | |
| | Comments: | | | 90% Occupied. | | | | |

Amerigold Suites



APP000268

## Comparable Rentals Map





Rent Survey 1
La Fortuna Apartments

Rent Survey 2
Vinings At Central





Rent Survey 3
Cottonwood at Park Central

Rent Survey 4
Vista Buena Apartments





Rent Survey 5
Tides on Esperanza

Rent Survey 6
Amber Dawn Apartments

## Rental Analysis Factors

Our analysis of the comparable rentals considers the following elements of comparison.

| Rental Analysis Factors | |
| --- | --- |
| Tenant Paid Utilities | Utilities costs for which tenants are responsible. |
| Unit Size | Floor area in square feet. |
| Location | Market or submarket area influences on rent; surrounding land use influences. |
| Age/Condition | Effective age; physical condition. |
| Quality | Construction quality, market appeal, functional utility. |
| Unit Features | Features included in individual residential units. |
| Project Amenities | Amenities available to the entire property. |

## Analysis of Comparable Rentals

**Rental Adjustment Grid - Efficiency**

| | Subject | Comparable 1 | Comparable 2 | Comparable 3 | Comparable 4 | Comparable 5 | Comparable 6 |
| --- | --- | --- | --- | --- | --- | --- | --- |
| Property Name | Amerigold Suites | La Fortuna Apartments | Vinings At Central | Cottonwood at Park Central | Vista Buena Apartments | Tides on Esperanza | Amber Dawn Apartments |
| Address | 13636 Goldmark Drive | 14018 Brookgreen Dr. | 13447 N. Central Expressway | 13323 Esperanza Road | 13350 Esperanza Rd. | 13450 Esperanza Rd. | 8542 W. Spring Valley Rd. |
| City | Dallas | Dallas | Dallas | Dallas | Dallas | Dallas | Dallas |
| County | Dallas | Dallas | Dalals | Dallas | Dallas | Dallas | Dallas |
| State | Texas | TX | TX | TX | TX | TX | TX |
| Survey Date | | May-24 | May-24 | May-24 | May-24 | May-24 | May-24 |
| Unit Type | Efficiency | Efficiency | 1BR - 1BA | 1BR - 1BA | 1BR - 1BA | Efficiency | Efficiency |
| Average Unit SF | 300 | 500 | 636 | 690 | 691 | 420 | 410 |
| Average Rent/Mo | $700 | $955 | $866 | $1,195 | $967 | $802 | $926 |
| Rent/SF | $2.33 | $1.91 | $1.36 | $1.73 | $1.40 | $1.91 | $2.26 |
| Year Built | 1981 | 1968 | 1963 | 1985 | 1976 | 1980 | 1970 |
| **Average Rent/Month** | | **$955** | **$866** | **$1,195** | **$967** | **$802** | **$926** |
| Utilities Adjustment | | | | | | | |
| $ Adjustment | | – | – | – | – | – | – |
| Size Adjustment | | | | | | | |
| % Adjustment | 50% | | | | | | |
| $ Adjustment | | -$191 | -$229 | -$338 | -$274 | -$115 | -$124 |
| **Cumulative Adjusted Rent** | | **$764** | **$637** | **$857** | **$693** | **$687** | **$802** |
| Location | | – | 10% | – | 10% | – | – |
| Age/Condition | | 5% | 5% | – | – | – | – |
| Quality | | 5% | – | – | 5% | – | 5% |
| Unit Features | | – | -5% | -5% | -5% | – | – |
| Project Amenities | | – | – | – | – | – | – |
| Net $ Adjustment | | $76 | $64 | -$43 | $69 | $0 | $40 |
| Net % Adjustment | | 10% | 10% | -5% | 10% | 0% | 5% |
| **Final Adjusted Price** | | **$840** | **$701** | **$814** | **$763** | **$687** | **$842** |
| Overall Adjustment | | -12% | -19% | -32% | -21% | -14% | -9% |

| Summary Indicators | Range | Average | Average/SF |
| --- | --- | --- | --- |
| Comparables - Adjusted | $687 - $842 | $775 | – |
| Subject Asking Rent | – – – | $700 | $2.33 |
| **Concluded Market Rent** | **$775 ($2.58/SF)** | | |

Amerigold Suites



**Rental Adjustment Grid - 1BR - 1BA**

| | Subject | Comparable 1 | Comparable 2 | Comparable 3 | Comparable 4 | Comparable 5 | Comparable 6 |
|---|---|---|---|---|---|---|---|
| Property Name | Amerigold Suites | La Fortuna Apartments | Vinings At Central | Cottonwood at Park Central | Vista Buena Apartments | Tides on Esperanza | Amber Dawn Apartments |
| Address | 13636 Goldmark Drive | 14018 Brookgreen Dr. | 13447 N. Central Expressway | 13323 Esperanza Road | 13350 Esperanza Rd. | 13450 Esperanza Rd. | 8542 W. Spring Valley Rd. |
| City | Dallas | Dallas | Dallas | Dallas | Dallas | Dallas | Dallas |
| County | Dallas | Dallas | Dalals | Dallas | Dallas | Dallas | Dallas |
| State | Texas | TX | TX | TX | TX | TX | TX |
| Survey Date | | May-24 | May-24 | May-24 | May-24 | May-24 | May-24 |
| Unit Type | 1BR - 1BA | 1BR - 1BA | 1BR - 1BA | 1BR - 1BA | 1BR - 1BA | 1BR - 1BA | 1BR - 1BA |
| Average Unit SF | 660 | 640 | 636 | 690 | 691 | 667 | 700 |
| Average Rent/Mo | $1,200 | $1,040 | $866 | $1,195 | $967 | $978 | $1,223 |
| Rent/SF | $1.82 | $1.63 | $1.36 | $1.73 | $1.40 | $1.47 | $1.75 |
| Year Built | 1981 | 1968 | 1963 | 1985 | 1976 | 1980 | 1970 |
| **Average Rent/Month** | | **$1,040** | **$866** | **$1,195** | **$967** | **$978** | **$1,223** |
| Utilities Adjustment | | | | | | | |
| $ Adjustment | | – | – | – | – | – | – |
| Size Adjustment | | | | | | | |
| % Adjustment | 50% | | | | | | |
| $ Adjustment | | $16 | $16 | -$26 | -$22 | -$5 | -$35 |
| **Cumulative Adjusted Rent** | | **$1,056** | **$882** | **$1,169** | **$945** | **$973** | **$1,188** |
| Location | | – | 10% | – | 10% | – | – |
| Age/Condition | | 5% | 5% | – | – | – | – |
| Quality | | 5% | – | – | 5% | – | 5% |
| Unit Features | | – | – | – | – | – | – |
| Project Amenities | | – | – | – | – | – | – |
| Net $ Adjustment | | $106 | $132 | $0 | $142 | $0 | $59 |
| Net % Adjustment | | 10% | 15% | 0% | 15% | 0% | 5% |
| **Final Adjusted Price** | | **$1,162** | **$1,015** | **$1,169** | **$1,087** | **$973** | **$1,247** |
| Overall Adjustment | | 12% | 17% | -2% | 12% | -1% | 2% |

| Summary Indicators | Range | Average | Average/SF |
|---|---|---|---|
| Comparables - Adjusted | $973 - $1,247 | $1,109 | – |
| Subject Asking Rent | $1,200 - $1,200 | $1,200 | $1.82 |
| **Concluded Market Rent** | **$1,100 ($1.67/SF)** | | |

Amerigold Suites



**Rental Adjustment Grid - 2BR - 2BA**

| | Subject | Comparable 1 | Comparable 2 | Comparable 3 | Comparable 4 | Comparable 5 | Comparable 6 |
|---|---|---|---|---|---|---|---|
| Property Name | Amerigold Suites | La Fortuna Apartments | Vinings At Central | Cottonwood at Park Central | Vista Buena Apartments | Tides on Esperanza | Amber Dawn Apartments |
| Address | 13636 Goldmark Drive | 14018 Brookgreen Dr. | 13447 N. Central Expressway | 13323 Esperanza Road | 13350 Esperanza Rd. | 13450 Esperanza Rd. | 8542 W. Spring Valley Rd. |
| City | Dallas | Dallas | Dallas | Dallas | Dallas | Dallas | Dallas |
| County | Dallas | Dallas | Dalals | Dallas | Dallas | Dallas | Dallas |
| State | Texas | TX | TX | TX | TX | TX | TX |
| Survey Date | | May-24 | May-24 | May-24 | May-24 | May-24 | May-24 |
| Unit Type | 2BR - 2BA | 2BR - 2BA | 2BR - 2BA | 2BR - 2BA | 2BR - 2BA | 2BR - 2BA | 2BR - 2BA |
| Average Unit SF | 1,200 | 1,000 | 1,196 | 1,189 | 965 | 909 | 980 |
| Average Rent/Mo | $1,800 | $1,415 | $1,281 | $1,908 | $1,004 | $1,613 | $1,430 |
| Rent/SF | $1.50 | $1.42 | $1.07 | $1.60 | $1.04 | $1.77 | $1.46 |
| Year Built | 1981 | 1968 | 1963 | 1985 | 1976 | 1980 | 1970 |
| **Average Rent/Month** | | **$1,415** | **$1,281** | **$1,908** | **$1,004** | **$1,613** | **$1,430** |
| Utilities Adjustment | | | | | | | |
|   $ Adjustment | | – | – | – | – | – | – |
| Size Adjustment | | | | | | | |
|   % Adjustment | 50% | | | | | | |
|   $ Adjustment | | $142 | $2 | $9 | $122 | $258 | $161 |
| **Cumulative Adjusted Rent** | | **$1,557** | **$1,283** | **$1,917** | **$1,126** | **$1,871** | **$1,591** |
| Location | | – | 10% | – | 10% | – | – |
| Age/Condition | | 5% | 5% | – | – | – | – |
| Quality | | 5% | – | – | 5% | – | 5% |
| Unit Features | | – | – | – | – | – | – |
| Project Amenities | | – | – | – | – | – | – |
| Net $ Adjustment | | $156 | $192 | $0 | $169 | $0 | $80 |
| Net % Adjustment | | 10% | 15% | 0% | 15% | 0% | 5% |
| **Final Adjusted Price** | | **$1,712** | **$1,476** | **$1,917** | **$1,295** | **$1,871** | **$1,670** |
| Overall Adjustment | | 21% | 15% | 0% | 29% | 16% | 17% |

| Summary Indicators | Range | Average | Average/SF |
|---|---|---|---|
| Comparables - Adjusted | $1,295 - $1,917 | $1,657 | – |
| Subject Asking Rent | $1,800 - $1,800 | $1,800 | $1.50 |
| **Concluded Market Rent** | **$1,700 ($1.42/SF)** | | |

## Market Rent Conclusion

Based on the preceding analysis of comparable rentals and trends evident in the market, market rent is estimated for each unit type as shown in the table that follows.

**Market Rent Conclusions**

| Unit Type | Total Units | Avg. Unit Size | Average Contract Rent | Market Rent/ Month | Market Rent/SF |
|---|---|---|---|---|---|
| Efficiency | 1 | 300 | $700 | $775 | $2.58 |
| 1BR - 1BA | 59 | 660 | $1,100 | $1,100 | $1.67 |
| 2BR - 2BA | 10 | 1,200 | $1,800 | $1,700 | $1.42 |
| Total/Avg. | 70 | 732 | $1,208 | $1,181 | $1.61 |

Amerigold Suites

irr.

APP000273

## Stabilized Income and Expenses

### Potential Gross Rent

The following table summarizes the potential gross rent of the subject based on contract rent from leased units plus market rent applied to vacant units. The total of these amounts is compared to the potential rent that would be generated if the entire property were leased at market rates.

**Potential Gross Rent**

| Unit Type | Total Units | Potential Rent at Contract (1) | Avg. Contract Rent/Unit | Market Rent/Unit | Potential Rent at Market | Contract As % of Market |
|---|---|---|---|---|---|---|
| **Leased Units** | | | | | | |
| Efficiency | 1 | $8,400 | $700 | $775 | $9,300 | 90% |
| 1BR - 1BA | 56 | $739,200 | $1,100 | $1,100 | $739,200 | 100% |
| 2BR - 2BA | 9 | $194,400 | $1,800 | $1,700 | $183,600 | 106% |
| Total Leased | 66 | $942,000 | $1,189 | $1,177 | $932,100 | 101% |
| | | | | | | |
| **Vacant Units** | | | | | | |
| 1BR - 1BA | 3 | $39,600 | $1,100 | $1,100 | $39,600 | 100% |
| 2BR - 2BA | 1 | $20,400 | $1,700 | $1,700 | $20,400 | 100% |
| Total Vacant | 4 | $60,000 | $1,250 | $1,250 | $60,000 | 100% |
| | | | | | | |
| Grand Total | 70 | $1,002,000 | $1,193 | $1,181 | $992,100 | 101% |

1 Contract rent for leased units; vacant and employee/model units, if any, at market.

In our stabilized income projection for the subject, rental income is based on market rent. Income is projected for the 12-month period following the effective date of the appraisal.

### Employee/Model Units

Market rent is assigned to employee and model units in our income projections. Rent loss attributable to these units is then deducted as an expense.

### Expense Reimbursements

Income is generated from tenant obligations to reimburse the owner for in-unit electric, which is projected to be approximately $50/month per unit, or $600/unit on an annual basis. This equates to $42,000 in total reimbursements for the subject property.

### Other Income

This category includes revenues from late fees, application fees and other miscellaneous sources. We generally project a revenue towards the low end of typical market standards, say $150/unit on an annual basis. This equates to $10,500 in annual revenue to the subject property.

### Vacancy & Collection Loss

Stabilized vacancy and collection loss is estimated at 7.0%. This estimate considers the submarket vacancy rate and vacancy rates at competing properties.



Amerigold Suites

APP000274

**Concessions**

A deduction is made to reflect income loss due to free rent and other tenant concessions that are customary at the subject and also typical in the market. We apply an adjustment of 2.0%, which is equivalent to approximately 2-weeks free on select leases on a case by case basis, or free rent.

**Expenses**

Operating expenses are estimated based on the operating history of the subject, expense data from comparable properties, and industry benchmarks, as summarized in the following tables.

### Operating History and Projections

|                                      | IRR Projection |
| ------------------------------------ | -------------: |
| **Income**                           |                |
| Rental Income                        |       $992,100 |
| Expense Reimbursements               |         42,000 |
| Potential Gross Income*              |     $1,034,100 |
| Vacancy & Collection Loss @ 7.0%     |        -72,387 |
| Concessions @ 2.0%                   |        -20,682 |
| Other Income                         |         10,500 |
| Effective Gross Income               |       $951,531 |
| **Expenses**                         |                |
| Real Estate Taxes                    |        $62,540 |
| Insurance                            |         52,500 |
| Utilities                            |        133,000 |
| Repairs/Maintenance                  |         52,500 |
| Payroll/Benefits                     |        105,000 |
| Advertising & Marketing              |         17,500 |
| General/Administrative               |         28,000 |
| Management                           |         28,546 |
| Replacement Reserves                 |         21,000 |
| Total Expenses                       |       $500,586 |
| **Net Operating Income**             |   **$450,945** |
| Operating Expense Ratio**            |          50.4% |

*IRR projected income is the total potential income attributable to the property before deduction of vacancy and collection loss. Historical income is the actual income that has been collected by the property owner.

**Replacement reserves, if any, are excluded from total expenses for purposes of determining the Operating Expense Ratio.



**Expense Analysis per Unit**

| | Comp Data* | | | | | Subject |
|---|---|---|---|---|---|---|
| | Comp 1 | Comp 2 | Comp 3 | Comp 4 | Comp 5 | Projected Expenses |
| Year Built | 1983 | 1985/2003 | 1978 | 1977 | 1984 | 1981 |
| Number of Units | 237 | 322 | 138 | 120 | 296 | 70 |
| Operating Data Type | Trailing-12 | Trailing-12 | Trailing-12 | Trailing-12 | Trailing-12 | |
| Year | 2023 | 2023 | 2023 | 2023 | 2023 | IRR Projection |
| Real Estate Taxes | $2,325 | $1,571 | $3,209 | $1,466 | $2,679 | $893 |
| Insurance | $1,048 | $408 | $771 | $566 | $533 | $750 |
| Utilities | $964 | $377 | $1,394 | $1,089 | $1,238 | $1,900 |
| Repairs/Maintenance | $354 | $244 | $406 | $818 | $236 | $750 |
| Payroll/Benefits | $1,464 | $924 | $1,941 | $1,792 | $891 | $1,500 |
| Advertising & Marketing | $105 | $415 | $21 | $137 | $442 | $250 |
| General/Administrative | $184 | $3 | $244 | $204 | $497 | $400 |
| Management | $493 | $234 | $539 | $382 | $445 | $408 |
| Replacement Reserves | $0 | $0 | $0 | $0 | $0 | $300 |
| Total | $6,936 | $4,176 | $8,525 | $6,455 | $6,960 | $7,151 |
| Operating Expense Ratio | 45.2% | 53.4% | 50.9% | 48.3% | 47.0% | 50.4% |

## Capitalization Rate Selection

A capitalization rate is used to convert net income into an indication of value. Selection of an appropriate capitalization rate considers the future income pattern of the property and investment risk associated with ownership. We consider the following data in selecting a capitalization rate for the subject.

**Capitalization Rate Comparables**

| No. | Property Name | Year Built | Sale Date | % Occup. | No. Units | Effective Price/Unit | Cap Rate |
|---|---|---|---|---|---|---|---|
| 1 | Haymeadow Apartments | 1982 | 5/3/2024 | 98% | 34 | $139,706 | 7.50% |
| 2 | Avanti on Central & Pipeline | 1969 | 3/1/2024 | 70% | 195 | $111,538 | 6.89% |
| 3 | Garrett Gardens | 1985 | 12/27/2023 | 95% | 66 | $115,000 | 5.00% |
| 4 | Casa San Luis Apartments | 1967 | 8/1/2023 | 93% | 63 | $111,111 | 7.55% |
| 5 | Rise at Highland Meadows | 1983 | 2/9/2023 | 99% | 328 | $119,055 | 5.69% |
| | Indicated Cap Rate Range: | | | | | | 5.00% - 7.55% |
| | Average (Mean) Cap Rate: | | | | | | 6.53% |

**Capitalization Rate Surveys – Multifamily Properties**

| | IRR-ViewPoint National Urban Multifamily | IRR-ViewPoint National Suburban Multifamily | PwC 4Q-23 National Apartment | ACLI 3Q-23 National Apartment |
|---|---|---|---|---|
| Range | 4.00% - 6.75% | 3.75% - 7.00% | 4.00% – 8.00% | NA |
| Average | 5.18% | 5.29% | 5.59% | 5.04% |

Source: IRR-Viewpoint 2023; PwC Real Estate Investor Survey; American Council of Life Insurers Investment

Amerigold Suites



APP000276



## Multifamily Capitalization Rate Trends

|        | 1Q-22 | 2Q-22 | 3Q-22 | 4Q-22 | 1Q-23 | 2Q-23 | 3Q-23 | 4Q-23 |
|--------|-------|-------|-------|-------|-------|-------|-------|-------|
| PwC    | 4.4   | 4.45  | 4.75  | 4.89  | 5.01  | 5.25  | 5.28  | 5.59  |
| ACLI   | 4.32  | 4.75  | 4.75  | 4.75  | 4.75  | 4.75  | 4.75  |       |

PwC- PwC Real Estate Investor Survey - National Apartment Market
ACLI - American Council of Life Insurers Investment Bulletin - Apartment Properties

Based on an analysis of the preceding data, a going-in capitalization rate for the subject is indicated within a range of 5.50% to 6.50%. To reach a capitalization rate conclusion, we consider each of the following investment risk factors to gauge its impact on the rate. The direction of each arrow in the following table indicates our judgment of an upward, downward, or neutral influence of each factor.

### Capitalization Rate Risk Factors

| Factor | Issues | Impact on Rate |
|--------|--------|----------------|
| Income Characteristics | Stability of occupancy, above/below market rents, rent control | ↑ |
| Competitive Market Position | Construction quality, market appeal, age/condition, functional utility | ↑ |
| Location | Market area demographics and life cycle trends; proximity issues; access and support | ↑ |
| Market | Vacancy rates and trends; rental rate trends; supply and demand | ↔ |
| Highest and Best Use | Upside potential from redevelopment, adaptation, and/or expansion | ↔ |
| Overall Impact | | ↑ |

Accordingly, we conclude a capitalization rate as follows:

### Capitalization Rate Conclusion

| Method | Capitalization Rate Indication |
|--------|--------------------------------|
| Analysis of Comparable Sales | 5.00% - 7.55% (6.53% Avg.) |
| IRR-ViewPoint National Suburban Multifamily | 3.75% - 7.00% (5.29% Avg.) |
| PwC 4Q-23 National Apartment | 4.00% - 8.00% (5.59% Avg.) |
| ACLI 3Q-23 National Apartment | (5.04% Avg.) |
| Conclusion | 6.50% |

Amerigold Suites

## Direct Capitalization Analysis

Net operating income is divided by the capitalization rate to indicate the stabilized value of the subject. Because the property has existing deferred maintenance, we apply appropriate adjustments to arrive at market value as is. Valuation of the subject by direct capitalization is shown in the table that follows.

### Direct Capitalization Analysis

|  |  | Annual | $/Unit |
|---|---|---|---|
| **INCOME** |  |  |  |
| Rental Income |  | $992,100 | $14,173 |
| Expense Reimbursements |  | $42,000 | $600 |
| Potential Gross Income |  | $1,034,100 | $14,773 |
| Vacancy & Collection Loss | 7.00% | -$72,387 | -$1,034 |
| Concessions | 2.00% | -$20,682 | -$295 |
| Other Income |  | $10,500 | $150 |
| Effective Gross Income |  | $951,531 | $13,593 |
| **EXPENSES** |  |  |  |
| Real Estate Taxes |  | $62,540 | $893 |
| Insurance |  | $52,500 | $750 |
| Utilities |  | $133,000 | $1,900 |
| Repairs/Maintenance |  | $52,500 | $750 |
| Payroll/Benefits |  | $105,000 | $1,500 |
| Advertising & Marketing |  | $17,500 | $250 |
| General/Administrative |  | $28,000 | $400 |
| Management | 3.00% | $28,546 | $408 |
| Replacement Reserves |  | $21,000 | $300 |
| Total Expenses |  | $500,586 | $7,151 |
| NET OPERATING INCOME |  | $450,945 | $6,442 |
| Capitalization Rate |  | 6.50% |  |
| **Stabilized Value Indication** |  | $6,937,611 | $99,109 |
| **As Is** |  |  |  |
| Stabilized Value Indication |  | $6,937,611 | $99,109 |
| Deferred Maintenance |  | -$1,400,000 | -$20,000 |
| **Indicated Value As Is** |  | $5,537,611 | $79,109 |
| **Rounded** |  | **$5,540,000** | **$79,143** |

Amerigold Suites



APP000278

**Deferred Maintenance**

Deferred maintenance is identified based on the property inspection. It is noted that the subject ownership group had not yet created a budget for the necessary capital expenditures. To estimate the cost to cure deferred maintenance, reliance is placed on Marshall Valuation Service and expense comparables.

The subject property included several areas of deferred maintenance such as exterior siding, swimming pool area, fitness center, window replacement/repair, roof repairs, drive aisle/paving, landscaping, interior corridor updates, down units, replacement of various kitchen appliances, etc.

The below chart depicts seven/7 properties that underwent renovations to cure items of deferred maintenance. It is worth noting that several comps vary in degree of renovation. In other words, expense comparable 3 is a high-end full renovation of all units. Conversely, expense comparables 1 and 7 are low-end renovations, of which only select units are renovated in addition to exterior updates.

| Capital Expenditures - Cost Comparables | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Comp | Property Name | City | State | Year Built | Total Cap-Ex Budget | Units | $/Unit | Rentable Area (SF) | $/SF |
| 1 | Bungalows at Lake Arlington | Arlington | TX | 1984 | $456,750 | 64 | $7,137 | 57,495 | $7.94 |
| 2 | Bella Vida Apartments | Arlington | TX | 1984 | $650,000 | 84 | $7,738 | 56,040 | $11.60 |
| 3 | Versailles Apartments | Dallas | TX | 1960 | $250,000 | 12 | $20,833 | 9,984 | $25.04 |
| 4 | Legends at Chase Oaks | Plano | TX | 1997 | $1,575,000 | 105 | $15,000 | 102,060 | $15.43 |
| 5 | Texas Trails Apartments | Sulphur Springs | TX | 1960 | $326,000 | 33 | $9,879 | 30,350 | $10.74 |
| 6 | Shady Oaks Apartments | Mount Pleasant | TX | 1978 | $752,835 | 74 | $10,173 | 56,870 | $13.24 |
| 7 | Magnolia on 16th | Plano | TX | 1965 | $360,000 | 42 | $8,571 | 29,038 | $12.40 |
| | | | | | | Average | $11,333 | | $13.77 |

Accordingly, the estimated cost to cure deferred maintenance is estimated to be $20,000/unit or $1,400,000. It should be noted, a previous investment group with interest in acquiring the property had budgeted over $3,000,000 in capital expenditures. Therefore, we project on the high end of our expense comparable range and assume its adequate for bringing the condition of all units to average, including common area amenities and overall exterior of property.

APP000279

## Reconciliation and Conclusion of Value

The values indicated by the preceding analyses are as follows:

### Summary of Value Indications

| | |
|---|---|
| Cost Approach | Not Used |
| Sales Comparison Approach | $5,600,000 |
| Income Capitalization Approach | $5,540,000 |
| Reconciled | $5,570,000 |

The income capitalization approach is given the greatest weight because it is the most reliable valuation method for the subject. The sales comparison approach is given less weight because it does not directly consider the income characteristics of the property. The cost approach is not applicable to the subject and is not used. Accordingly, our value opinion follows.

### Value Conclusion

| Value Type & Appraisal Premise | Interest Appraised | Date of Value | Value Conclusion |
|---|---|---|---|
| Market Value As Is | Fee Simple | April 25, 2024 | $5,570,000 |

### Extraordinary Assumptions and Hypothetical Conditions

The value conclusions are subject to the following extraordinary assumptions. An extraordinary assumption is an assignment-specific assumption as of the effective date regarding uncertain information used in an analysis which, if found to be false, could alter the appraiser's opinions or conclusions.

1. The market value conclusion herein is based upon the premise that the subject property is comprised of 51,240 square feet of rentable area. This is compared to the public records accounting of 30,962 square feet. As the discrepancy is substantial, we solely rely on the rent roll provided by the subject's receivership/ownership and assume this is an accurate representation of the subject property. We reserve the right to revisit our valuation if the building area is deemed to be inaccurate.

2. Based on discussions with the subject's receivership/ownership, there is no formal budget to cure the existing deferred maintenance. Accordingly, we utilize market data to derive an estimate of $20,000/unit or $1,400,000 in capital expenditures needed. This amount is applied as an adjustment to reach our "as is" market value conclusion. We reserve the right to revisit our valuation if a property conditions report or actual cost estimate is provided.

The value conclusions are based on the following hypothetical conditions. A hypothetical condition is a condition, directly related to a specific assignment, which is contrary to what is known by the appraiser to exist on the effective date of the assignment results, but is used for the purpose of analysis.

1. None

The use of any extraordinary assumption or hypothetical condition may have affected the assignment results.



APP000280

The opinions of value expressed in this report are based on estimates and forecasts that are prospective in nature and subject to considerable risk and uncertainty. Events may occur that could cause the performance of the property to differ materially from the stated estimates, such as changes in the economy, interest rates, capitalization rates, financial strength of tenants, and behavior of investors, lenders, and consumers. Additionally, these opinions and forecasts are based partly on data obtained from interviews and third-party sources, which are not always completely reliable. Although the findings are considered reasonable based on available evidence, the assignment participants are not responsible for the effects of future occurrences that cannot reasonably be foreseen at this time.

## Exposure Time

Exposure time is the length of time the subject property would have been exposed for sale in the market had it sold on the effective valuation date at the concluded market value. Based on the concluded market value stated previously, the probable exposure time is 3 - 9 months.

## Marketing Period

Marketing time is an estimate of the amount of time it might take to sell a property at the concluded market value immediately following the effective date of value. The subject's marketing period is estimated at 3 - 9 months.



# Certification

We certify that, to the best of our knowledge and belief:

1.    The statements of fact contained in this report are true and correct.

2.    The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and are our personal, impartial, and unbiased professional analyses, opinions, and conclusions.

3.    We have no present or prospective interest in the property that is the subject of this report and no personal interest with respect to the parties involved.

4.    We have performed no services, as an appraiser or in any other capacity, regarding the property that is the subject of this report within the three-year period immediately preceding the agreement to perform this assignment.

5.    We have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.

6.    Our engagement in this assignment was not contingent upon developing or reporting predetermined results.

7.    Our compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

8.    Our analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice as well as applicable state appraisal regulations.

9.    The reported analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the requirements of the Code of Professional Ethics and Standards of Professional Appraisal Practice of the Appraisal Institute.

10.    The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.

11.    Stone Berger has made a personal inspection of the property that is the subject of this report. Jimmy H. Jackson, MAI has not personally inspected the subject.

12.    No one provided significant real property appraisal assistance to the persons signing this certification.

13.    We have experience in appraising properties similar to the subject and are in compliance with the Competency Rule of USPAP.

Amerigold Suites

APP000282

14.    As of the date of this report, Jimmy H. Jackson, MAI has completed the continuing education program for Designated Members of the Appraisal Institute.

Stone Berger
Senior Director
Texas Certified General Real Estate Appraiser
TX 1381099 G

Jimmy H. Jackson, MAI
Senior Managing Director
Texas Certified General Real Estate Appraiser
TX 1324004 G

# Assumptions and Limiting Conditions

This appraisal and any other work product related to this engagement are limited by the following standard assumptions, except as otherwise noted in the report:

1.  The title is marketable and free and clear of all liens, encumbrances, encroachments, easements and restrictions. The property is under responsible ownership and competent management and is available for its highest and best use.

2.  There are no existing judgments or pending or threatened litigation that could affect the value of the property.

3.  There are no hidden or undisclosed conditions of the land or of the improvements that would render the property more or less valuable. Furthermore, there is no asbestos in the property.

4.  The revenue stamps placed on any deed referenced herein to indicate the sale price are in correct relation to the actual dollar amount of the transaction.

5.  The property is in compliance with all applicable building, environmental, zoning, and other federal, state and local laws, regulations and codes.

6.  The information furnished by others is believed to be reliable, but no warranty is given for its accuracy.

This appraisal and any other work product related to this engagement are subject to the following limiting conditions, except as otherwise noted in the report:

1.  An appraisal is inherently subjective and represents our opinion as to the value of the property appraised.

2.  The conclusions stated in our appraisal apply only as of the effective date of the appraisal, and no representation is made as to the effect of subsequent events.

3.  No changes in any federal, state or local laws, regulations or codes (including, without limitation, the Internal Revenue Code) are anticipated.

4.  No environmental impact studies were either requested or made in conjunction with this appraisal, and we reserve the right to revise or rescind any of the value opinions based upon any subsequent environmental impact studies. If any environmental impact statement is required by law, the appraisal assumes that such statement will be favorable and will be approved by the appropriate regulatory bodies.

5.  Unless otherwise agreed to in writing, we are not required to give testimony, respond to any subpoena or attend any court, governmental or other hearing with reference to the property without compensation relative to such additional employment.

Amerigold Suites

APP000284

6.    We have made no survey of the property and assume no responsibility in connection with such matters. Any sketch or survey of the property included in this report is for illustrative purposes only and should not be considered to be scaled accurately for size. The appraisal covers the property as described in this report, and the areas and dimensions set forth are assumed to be correct.

7.    No opinion is expressed as to the value of subsurface oil, gas or mineral rights, if any, and we have assumed that the property is not subject to surface entry for the exploration or removal of such materials, unless otherwise noted in our appraisal.

8.    We accept no responsibility for considerations requiring expertise in other fields. Such considerations include, but are not limited to, legal descriptions and other legal matters such as legal title, geologic considerations such as soils and seismic stability; and civil, mechanical, electrical, structural and other engineering and environmental matters. Such considerations may also include determinations of compliance with zoning and other federal, state, and local laws, regulations and codes.

9.    The distribution of the total valuation in the report between land and improvements applies only under the reported highest and best use of the property. The allocations of value for land and improvements must not be used in conjunction with any other appraisal and are invalid if so used. The appraisal report shall be considered only in its entirety. No part of the appraisal report shall be utilized separately or out of context.

10.   Neither all nor any part of the contents of this report (especially any conclusions as to value, the identity of the appraisers, or any reference to the Appraisal Institute) shall be disseminated through advertising media, public relations media, news media or any other means of communication (including without limitation prospectuses, private offering memoranda and other offering material provided to prospective investors) without the prior written consent of the persons signing the report.

11.   Information, estimates and opinions contained in the report and obtained from third-party sources are assumed to be reliable and have not been independently verified.

12.   Any income and expense estimates contained in the appraisal report are used only for the purpose of estimating value and do not constitute predictions of future operating results.

13.   If the property is subject to one or more leases, any estimate of residual value contained in the appraisal may be particularly affected by significant changes in the condition of the economy, of the real estate industry, or of the appraised property at the time these leases expire or otherwise terminate.

14.   Unless otherwise stated in the report, no consideration has been given to personal property located on the premises or to the cost of moving or relocating such personal property; only the real property has been considered.

15.   The current purchasing power of the dollar is the basis for the values stated in the appraisal; we have assumed that no extreme fluctuations in economic cycles will occur.

16.   The values found herein are subject to these and to any other assumptions or conditions set forth in the body of this report but which may have been omitted from this list of Assumptions and Limiting Conditions.

Amerigold Suites



APP000285

17. The analyses contained in the report necessarily incorporate numerous estimates and assumptions regarding property performance, general and local business and economic conditions, the absence of material changes in the competitive environment and other matters. Some estimates or assumptions, however, inevitably will not materialize, and unanticipated events and circumstances may occur; therefore, actual results achieved during the period covered by our analysis will vary from our estimates, and the variations may be material.

18. The Americans with Disabilities Act (ADA) became effective January 26, 1992. We have not made a specific survey or analysis of the property to determine whether the physical aspects of the improvements meet the ADA accessibility guidelines. We claim no expertise in ADA issues, and render no opinion regarding compliance of the subject with ADA regulations. Inasmuch as compliance matches each owner's financial ability with the cost to cure the non-conforming physical characteristics of a property, a specific study of both the owner's financial ability and the cost to cure any deficiencies would be needed for the Department of Justice to determine compliance.

19. The appraisal report is prepared for the exclusive benefit of you, your subsidiaries and/or affiliates. It may not be used or relied upon by any other party. All parties who use or rely upon any information in the report without our written consent do so at their own risk.

20. No studies have been provided to us indicating the presence or absence of hazardous materials on the subject property or in the improvements, and our valuation is predicated upon the assumption that the subject property is free and clear of any environment hazards including, without limitation, hazardous wastes, toxic substances and mold. No representations or warranties are made regarding the environmental condition of the subject property. IRR - Dallas, Integra Realty Resources, Inc., and their respective officers, owners, managers, directors, agents, subcontractors or employees (the "Integra Parties"), shall not be responsible for any such environmental conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist. Because we are not experts in the field of environmental conditions, the appraisal report cannot be considered as an environmental assessment of the subject property.

21. The persons signing the report may have reviewed available flood maps and may have noted in the appraisal report whether the subject property is located in an identified Special Flood Hazard Area. However, we are not qualified to detect such areas and therefore do not guarantee such determinations. The presence of flood plain areas and/or wetlands may affect the value of the property, and the value conclusion is predicated on the assumption that wetlands are non-existent or minimal.

22. We are not a building or environmental inspector. The Integra Parties do not guarantee that the subject property is free of defects or environmental problems. Mold may be present in the subject property and a professional inspection is recommended.

23. The appraisal report and value conclusions for an appraisal assume the satisfactory completion of construction, repairs or alterations in a workmanlike manner.

24. **IRR - Dallas is an independently owned and operated company. The parties hereto agree that Integra shall not be liable for any claim arising out of or relating to any appraisal report or any information or opinions contained therein as such appraisal report is the sole and exclusive responsibility of IRR - Dallas. In addition, it is expressly agreed that in any action which may be brought against the Integra Parties arising out of, relating to, or in any way pertaining to the engagement letter, the appraisal reports or any related work product, the Integra Parties shall not be responsible or liable for any incidental or consequential damages or losses, unless the appraisal was fraudulent or prepared with intentional misconduct. It is further expressly agreed that the collective liability of the Integra Parties in any such action shall not exceed the fees paid for the preparation of the assignment (unless the appraisal was fraudulent or prepared with intentional misconduct). It is expressly agreed that the fees charged herein are in reliance upon the foregoing limitations of liability.**

25. IRR - Dallas is an independently owned and operated company, which has prepared the appraisal for the specific intended use stated elsewhere in the report. The use of the appraisal report by anyone other than the Client is prohibited except as otherwise provided. Accordingly, the appraisal report is addressed to and shall be solely for the Client's use and benefit unless we provide our prior written consent. We expressly reserve the unrestricted right to withhold our consent to your disclosure of the appraisal report or any other work product related to the engagement (or any part thereof including, without limitation, conclusions of value and our identity), to any third parties. Stated again for clarification, unless our prior written consent is obtained, no third party may rely on the appraisal report (even if their reliance was foreseeable).

26. The conclusions of this report are estimates based on known current trends and reasonably foreseeable future occurrences. These estimates are based partly on property information, data obtained in public records, interviews, existing trends, buyer-seller decision criteria in the current market, and research conducted by third parties, and such data are not always completely reliable. The Integra Parties are not responsible for these and other future occurrences that could not have reasonably been foreseen on the effective date of this assignment. Furthermore, it is inevitable that some assumptions will not materialize and that unanticipated events may occur that will likely affect actual performance. While we are of the opinion that our findings are reasonable based on current market conditions, we do not represent that these estimates will actually be achieved, as they are subject to considerable risk and uncertainty. Moreover, we assume competent and effective management and marketing for the duration of the projected holding period of this property.

27. All prospective value opinions presented in this report are estimates and forecasts which are prospective in nature and are subject to considerable risk and uncertainty. In addition to the contingencies noted in the preceding paragraph, several events may occur that could substantially alter the outcome of our estimates such as, but not limited to changes in the economy, interest rates, and capitalization rates, behavior of consumers, investors and lenders, fire and other physical destruction, changes in title or conveyances of easements and deed restrictions, etc. It is assumed that conditions reasonably foreseeable at the present time are consistent or similar with the future.

Amerigold Suites

28.     The appraisal is also subject to the following:

### Extraordinary Assumptions and Hypothetical Conditions

The value conclusions are subject to the following extraordinary assumptions. An extraordinary assumption is an assignment-specific assumption as of the effective date regarding uncertain information used in an analysis which, if found to be false, could alter the appraiser's opinions or conclusions.

1.  The market value conclusion herein is based upon the premise that the subject property is comprised of 51,240 square feet of rentable area. This is compared to the public records accounting of 30,962 square feet. As the discrepancy is substantial, we solely rely on the rent roll provided by the subject's receivership/ownership and assume this is an accurate representation of the subject property. We reserve the right to revisit our valuation if the building area is deemed to be inaccurate.

2.  Based on discussions with the subject's receivership/ownership, there is no formal budget to cure the existing deferred maintenance. Accordingly, we utilize market data to derive an estimate of $20,000/unit or $1,400,000 in capital expenditures needed. This amount is applied as an adjustment to reach our "as is" market value conclusion. We reserve the right to revisit our valuation if a property conditions report or actual cost estimate is provided.

The value conclusions are based on the following hypothetical conditions. A hypothetical condition is a condition, directly related to a specific assignment, which is contrary to what is known by the appraiser to exist on the effective date of the assignment results, but is used for the purpose of analysis.

1.  None

The use of any extraordinary assumption or hypothetical condition may have affected the assignment results.

Addenda

**Addendum A**

**Appraiser Qualifications**

APP000289

# Stone Berger



**Integra Realty Resources - Dallas**

1100 Mira Vista Boulevard
Suite 300
Plano, TX 75093

F 972.733.1403

irr.com

## Experience

Senior Director with the Dallas office of Integra Realty Resources, a full-service real estate consulting and appraisal firm. Mr. Berger has over two years of appraisal experience. Prior to joining Integra Realty Resources, Mr. Berger worked in hospitality management, residential real estate sales, and property management. He graduated from Florida State University in 2018 with a Bachelor's Degree in Sports Management, with an emphasis in real estate and hospitality.

Mr. Berger has extensive experience in appraising commercial, industrial, multifamily, investment grade real property and related tangible assets to provide opinions of value for purposes of mortgage lending, sale or purchase, financial reporting, litigation support, allocation of purchase price, estate tax planning/settlement, ad valorem taxation, and internal planning.

Property types include limited and full-service hospitality, multifamily projects, self-storage facilities, vacant land, agricultural and ranch properties, shopping centers, single-tenant retail buildings, CBD and suburban office projects, light industrial facilities, distribution warehouses, surgery centers, medical office buildings, religious facilities, mixed-use developments, and convenience stores.

## Licenses

Texas, Certified General Real Estate Appraiser, TX 1381099 G, Expires May 2025
New Mexico, Certified General Real Estate Appraiser, 03813-G, Expires April 2025
Oklahoma, Certified General Real Estate Appraiser, 13645CGA, Expires February 2025

## Education

Mr. Berger is a graduate from Florida State University with a Bachelor's of Science Degree in Sports Management, with an emphasis on real estate and hospitality (2018). Mr. Berger has also successfully obtained his real estate sales associate license while attending Florida State University.

Appraisal Courses:
Basic Real Estate Appraisal Principles (2019)
Basic Valuation Appraisal Procedures (2019)
National USPAP Course (2019)
Commercial Appraisal Review (2020)
Expert Witness for Commercial Appraisers (2020)
General Appraiser Income Approach (2020)
Statistics, Modeling and Finance (2020)
General Report Writing and Case Studies (2020)
General Appraiser Sales Comparison Approach (2020)
General Appraiser Site Value and Cost Approach (2020)
General Appraiser Market Analysis Highest and Best Use (2020)
Expert Witness for Commercial Appraisers (2021)
Appraisal of Self-Storage Facilities (2023)
The Income Approach: An Overview (2023)
Income Approach Case Studies for Commercial Appraisal (2023)
Best Practices for Completing Bifurcated and Hybrid Appraisal (2023)
2022-2023 7-hour National USPAP Update Course (2023)

**sberger@irr.com - 469.294.2930**

APP000290



**Certified General
Real Estate Appraiser**

Appraiser: **Stone Ian Berger**
License #: **TX 1381099 G**          License Expires: **05/31/2025**

Having provided satisfactory evidence of the qualifications required
by the Texas Appraiser Licensing and Certification Act, Occupations
Code, Chapter 1103, authorization is granted to use this title:
Certified General Real Estate Appraiser

For additional information or to file a complaint please contact TALCB
at www.talcb.texas.gov.

**Chelsea Buchholtz
Commissioner**

APP000291

# Jimmy H. Jackson, MAI



## Experience

Senior Managing Director with the Dallas, Lubbock/West Texas and Oklahoma City offices of Integra Realty Resources, a full-service real estate consulting and appraisal firm.

Jimmy H. Jackson, MAI has over 38 years of experience as a commercial appraiser as well as years of experience as a seasoned real estate investor. Prior to joining Integra Realty Resources, Jackson was one of the original two founding partners of Jackson Claborn, Inc. (JCI), a real estate consulting/valuation firm that was established in 1992. JCI grew to have one of the largest staffs of commercial and residential appraisers in the Southwest and has performed valuation and consulting on a vast number of commercial property types across Texas as well as the United States. Mr. Jackson holds the MAI designation and has been involved in the analysis of virtually all types of commercial and residential properties. Mr. Jackson has experience in state and federal courts as an expert witness. Testimony has involved such varied issues as bankruptcy, taxation and condemnation. Mr. Jackson has also been involved in numerous real estate developments and personal real estate investments.

A major philanthropic achievement for Mr. Jackson was consulting with and influencing family members to provide the start-up expertise as well as the seed funding in 1994 for the formation of The Parent Project for Muscular Dystrophy/PPMD (www.parentprojectmd.org). The PPMD organization has developed into a worldwide non-profit centered to provide research funds for children suffering from Duchenne Muscular Dystrophy. Since inception, the PPMD organization has directly funded more than $50 million in direct research and assisted and helped leverage more than $500 million of other research related to other genetic diseases through government grants and other private funding sources. In 2008, Mr. Jackson received a Humanitarian Award from Texas Gov. Rick Perry for charitable work associated with National Jewish Hospital/NJH in Denver. Mr. Jackson currently serves as a national trustee for NJH which is the #1 respiratory care hospital in the world.

Mr. Jackson graduated from Texas Tech University in 1984 with a B.B.A. in Finance with a Real Estate Emphasis. Mr. Jackson has served on numerous professional boards, including serving on the Ethics and Counseling Panel of the North Texas Chapter of the Appraisal Institute as well as serving on the Board of Directors as well as being Chair and Co-Chair of the Public Relations Committee.

As a college student, Mr. Jackson was a member of Phi Delta Theta social fraternity and the Texas Tech Finance Association. Mr. Jackson served for eight (8) years on the Advisory Board for the Jerry Rawls College of Business Administration (COBA) at Texas Tech University. Mr. Jackson has also served as a guest lecturer on real estate entrepreneurship to upper-level COBA students at Texas Tech over the years.

**Integra Realty Resources - Dallas**

1100 Mira Vista Boulevard
Suite 300
Plano, TX 75093

T 972.881.7191
F 972.733.1403

**Integra Realty Resources - Lubbock**

6309 Indiana Avenue
Suite A
Lubbock, TX 79413

T 806.656.3058

**Integra Realty Resources - Oklahoma**

13913 Technology Drive
Suite A1
Oklahoma City, OK, 73134

T 405.422.0718

irr.com

jhjackson@irr.com  -  972.725.7724



APP000292

# Jimmy H. Jackson, MAI

## Experience (Cont'd)

**Basic Core Real Estate Appraisal Services**
Feasibility Studies, Absorption Studies & Demographic Studies
Highest & Best Use Studies for All Property Types
3rd Party Appraisal Reviews
Detrimental Conditions Valuation & Consulting
Encroachment Analysis
Land Use Studies & Planning/Zoning Studies
Litigation/Litigation Support
In-Depth Market Analysis for All Property Types
Tax Assessment & Mass Appraisal Analysis
Fair & Equitable Appraisal Analysis
Right of Way Analysis Appraisals
Mediation, Arbitration, & Dispute Resolution
Portfolio Valuation & Analysis
Retrospective Valuation Opinions

Appraisal of all property types including the following:

**Residential**
High-Rise Condominium and Garden-Style Multi-Family and Townhome Projects
High-End Residential Property
Historical Residential Property
All types of Single-Family Appraisals (Conventional, Relocation, Unique / Historical Property)

**Land**
Acreage (Commercial Mixed-Use)
Subdivided Land (Mixed-Use, Commercial and Industrial)
Standard Single-Family Subdivision Lot development appraisals
PID/MUD Single-Family Subdivision Lot development appraisals

**Commercial, Office & Retail**
Branch Banks / Financial Building
Convenience Stores / Service Stations
Convention Center / Hotel / Resort /Motel
Office Building (High Rise, over three stories)
Office Building (Low Rise, three stories or less)
Parking Facility (Lot or Garage)
Retail (Single Tenant or Free Standing)
Shopping Center (Local, Strip, Neighborhood, Community, Etc.)
Shopping Center (Power Center, Outlet Center, Lifestyle, Etc.)
Shopping Center (Super Regional, Regional Mall)

**Integra Realty Resources - Dallas**

1100 Mira Vista Boulevard
Suite 300
Plano, TX 75093

T 972.881.7191
F 972.733.1403

**Integra Realty Resources - Lubbock**

6309 Indiana Avenue
Suite A
Lubbock, TX 79413

T 806.656.3058

**Integra Realty Resources - Oklahoma**

13913 Technology Drive
Suite A1
Oklahoma City, OK, 73134

T 405.422.0718

irr.com

jhjackson@irr.com - 972.725.7724



APP000293

# Jimmy H. Jackson, MAI

## Experience (Cont'd)

**Industrial**
Industrial (Heavy (Manufacturing)
Industrial (Small Office Warehouse / Mfg.)
Industrial Light (Distribution, Storage)

**Special Purpose**
Automobile Dealerships
Church Facilities
Collegiate Student Housing
Self-Serve and Full-Service Car Wash Facilities
Self-Storage Facilities

## Professional Activities & Affiliations

Appraisal Institute, Member (MAI) Appraisal Institute

## Licenses

Texas, Certified General Real Estate Appraiser, TX 1324004 G, Expires November 2024
Oklahoma, Certified General Real Estate Appraiser, 13279CGA, Expires September 2026
New Mexico, Certified General Real Estate Appraiser, 03819-G, Expires April 2025

## Education

Mr. Jackson is a graduate of Texas Tech University where he received a Bachelor of Business Administration in Finance with a Real Estate Emphasis.

## Miscellaneous

Member of Region 8 Ethics and Counseling Regional Panel (1992-1995)
Chair - Public Relations North Texas Chapter (2003, 2004)
Co-Chair - Public Relations North Texas Chapter (2005)
Board Member - North Texas Chapter (2005-2007)

**Integra Realty Resources - Dallas**

1100 Mira Vista Boulevard
Suite 300
Plano, TX 75093

T 972.881.7191
F 972.733.1403

**Integra Realty Resources - Lubbock**

6309 Indiana Avenue
Suite A
Lubbock, TX 79413

T 806.656.3058

**Integra Realty Resources - Oklahoma**

13913 Technology Drive
Suite A1
Oklahoma City, OK, 73134

T 405.422.0718

irr.com

jhjackson@irr.com - 972.725.7724



APP000294



**Certified General Real Estate Appraiser**

Appraiser: **Jimmy Huel Jackson**

License #: **TX 1324004 G**    License Expires: **11/30/2024**

Having provided satisfactory evidence of the qualifications required by the Texas Appraiser Licensing and Certification Act, Occupations Code, Chapter 1103, authorization is granted to use this title: Certified General Real Estate Appraiser

For additional information or to file a complaint please contact TALCB at www.talcb.texas.gov.

Chelsea Buchholtz
Commissioner

APP000295

## About IRR

Integra Realty Resources, Inc. (IRR) provides world-class commercial real estate valuation, counseling, and advisory services. Routinely ranked among leading property valuation and consulting firms, we are now the largest independent firm in our industry in the United States, with local offices coast to coast and in the Caribbean.

IRR offices are led by MAI-designated Senior Managing Directors, industry leaders who have over 25 years, on average, of commercial real estate experience in their local markets. This experience, coupled with our understanding of how national trends affect the local markets, empowers our clients with the unique knowledge, access, and historical perspective they need to make the most informed decisions.

Many of the nation's top financial institutions, developers, corporations, law firms, and government agencies rely on our professional real estate opinions to best understand the value, use, and feasibility of real estate in their market.

*Local Expertise...Nationally!*

# irr.com



APP000296

**Addendum B**

**IRR Quality Assurance Survey**

**APP000297**

Addenda

# IRR Quality Assurance Survey

## We welcome your feedback!

At IRR, providing a quality work product and delivering on time is what we strive to accomplish. Our local offices are determined to meet your expectations. Please reach out to your local office contact so they can resolve any issues.

## Integra Quality Control Team

Integra does have a Quality Control Team that responds to escalated concerns related to a specific assignment as well as general concerns that are unrelated to any specific assignment. We also enjoy hearing from you when we exceed expectations! You can communicate with this team by clicking on the link below. If you would like a follow up call, please provide your contact information and a member of this Quality Control Team will call contact you.

Link to the IRR Quality Assurance Survey: quality.irr.com

Amerigold Suites



APP000298

**Addendum C**

**Financials and Property Information**



5/2/24, 6:41 PM                                          Commercial Account Details

### Land (2024 Proposed Values)

| # | State Code | Zoning | Frontage (ft) | Depth (ft) | Area | Pricing Method | Unit Price | Market Adjustment | Adjusted Price | Ag Land |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | COMMERCIAL IMPROVEMENTS | MIXED USE DISTRICT 3 | 0 | 0 | 155,074.0000 SQUARE FEET | STANDARD | $6.00 | 0% | $930,444 | N |

**\* All Exemption information reflects 2024 Proposed Values. \***

### Exemptions (2024 Proposed Values)
No Exemptions

### Estimated Taxes (2024 Proposed Values)

| | City | School | County and School Equalization | College | Hospital | Special District |
|---|---|---|---|---|---|---|
| **Taxing Jurisdiction** | DALLAS | RICHARDSON ISD | DALLAS COUNTY | DALLAS COLLEGE | PARKLAND HOSPITAL | UNASSIGNED |
| **Tax Rate per $100** | $0.7357 | $1.1431 | $0.215718 | $0.110028 | $0.2195 | N/A |
| **Taxable Value** | $2,580,000 | $2,580,000 | $2,580,000 | $2,580,000 | $2,580,000 | $0 |
| **Estimated Taxes** | $18,981.06 | $29,491.98 | $5,565.52 | $2,838.72 | $5,663.10 | N/A |
| **Tax Ceiling** | | | | | N/A | N/A |
| | | | | | Total Estimated Taxes: | $62,540.39 |

**DO NOT PAY TAXES BASED ON THESE ESTIMATED TAXES.** You will receive an **official tax bill** from the appropriate agency when they are prepared. Please note that if there is an Over65 or Disabled Person **Tax Ceiling** displayed above, **it is NOT reflected** in the Total Estimated Taxes calculation provided. Taxes are collected by the agency sending you the **official** tax bill. To see a listing of agencies that collect taxes for your property. **Click Here**

The estimated taxes are provided as a courtesy and should not be relied upon in making financial or other decisions. The Dallas Central Appraisal District (DCAD) does not control the tax rate nor the amount of the taxes, as that is the responsibility of each Taxing Jurisdiction. Questions about your taxes should be directed to the appropriate taxing jurisdiction. We cannot assist you in these matters. These tax estimates are calculated by using the most current certified taxable value multiplied by the most current tax rate. **It does not take into account other special or unique tax scenarios, like a tax ceiling, etc.**. If you wish to calculate taxes yourself, you may use the Tax Calculator to assist you.

### Building Footprint (Current 2024)



### History

**History**

---

© 2024 Dallas Central Appraisal District.
All Rights Reserved.

Amerigold Suites

APP000301

Addenda

**Addendum D**

**Comparable Data**

APP000302

Addenda

**Improved Sales**

Amerigold Suites



APP000303

# Multifamily Sale Profile                                    Sale No. 1

## Location & Property Identification

| | |
|---|---|
| Property Name: | Haymeadow Apartments |
| Sub-Property Type: | Conventional, Garden/Low Rise |
| Address: | 14140 Haymeadow Dr. |
| City/State/Zip: | Dallas, TX 75254 |
| County: | Dallas |
| Submarket: | Dallas |
| Market Orientation: | Suburban |
| IRR Event ID: | 3230432 |



## Sale Information

| | |
|---|---|
| Listing Price: | $4,750,000 |
| Effective Listing Price: | $4,750,000 |
| Listing Date: | 05/03/2024 |
| Sale Status: | Listing |
| $/SF GBA: | $130.45 |
| $/SF NRA: | $130.45 |
| $/Unit: | $139,706 /Apt. Unit |
| Grantor/Seller: | LISTING |
| Grantee/Buyer: | LISTING |
| Assets Sold: | Real estate only |
| Property Rights: | Fee Simple |
| % of Interest Conveyed: | 100.00 |
| Financing: | Cash to seller |
| Conditions of Sale: | Arm's-length |
| Document Type: | Warranty Deed |
| Rent Controlled: | No |
| Rent Subsidized: | No |
| Verified By: | Stone Berger |
| Verification Date: | 05/03/2024 |
| Verification Type: | Confirmed-Seller Broker |

## Operating Data and Key Indicators

| | |
|---|---|
| Operating Data Type: | IRR Projection |
| Potential Gross Income: | $700,000 |
| Vacancy Rate: | 7% |
| Other Income: | $5,000 |

| | |
|---|---|
| Effective Gross Income: | $656,000 |
| Operating Expenses: | $299,750 |
| Net Operating Income: | $ 356,250 |
| Expense Ratio: | 45.69% |
| Reserves Included: | Yes |
| Management Included: | Yes |
| Cap Rate - Derived: | 7.50% |
| GRM - Derived: | 6.79 |
| EGIM - Derived: | 7.24 |

## Occupancy

| | |
|---|---|
| Occupancy Type Before Sale: | Multi-Tenant |
| Occupancy Type After Sale: | Multi-Tenant |
| Occupancy at Time of Sale: | 98.00% |

## Improvement and Site Data

| | |
|---|---|
| MSA: | Dallas-Fort Worth-Arlington, TX |
| Legal/Tax/Parcel ID: | Account Number: 00000597589000000 |
| GBA-SF: | 36,412 |
| NRA-SF: | 36,412 |
| Acres(Usable/Gross): | 1.45/1.45 |
| Land-SF(Usable/Gross): | 63,162/63,162 |
| Usable/Gross Ratio: | 1.00 |
| Year Built: | 1982 |
| Property Class: | C |
| Construction Quality: | Average |

## Haymeadow Apartments

## Multifamily Sale Profile

## Sale No. 1

### Improvement and Site Data (Cont'd)

| | |
|---|---|
| Improvements Cond.: | Average |
| Exterior Walls: | Wood siding |
| No. of Buildings/Stories: | 6/2 |
| No. of Units/Unit Type: | 34/Apt. Units |
| Multi-Tenant/Condo.: | Yes/Yes |
| Parking Conformity: | Yes |
| Elevators/Count: | None |
| Air-Conditioning Type: | Central |
| Shape: | Rectangular |
| Topography: | Level |
| Corner Lot: | No |
| Frontage Type: | 2 way, 2 lanes each way |
| Traffic Flow: | Moderate |
| AccessibilityRating: | Average |
| Visibility Rating: | Average |
| Density-Unit/Gross Acre: | 23.45 |
| Density-Unit/Usable Acre: | 23.45 |
| Bldg. to Land Ratio FAR: | 0.58 |
| Zoning Code: | PD |
| Flood Plain: | No |
| Flood Zone Designation: | X |
| Utilities: | Electricity, Water Public, Sewer |
| Utilities Desc.: | All to site. |
| Bldg. Phy. Info. Source: | Public Records |
| Source of Land Info.: | Public Records |

The Haymeadow Condos are actively listed for sale as a portfolio sale of 34 condo units, representing a 100% fee simple interest in the subject property. The listing has been active for 199 days as of the date of this write-up, with a current list price of $4,750,000 or $139,706/unit. A market derived proforma suggests the property is listed at a 7.50% cap rate.

### Project & Unit Amenities

8' Ceiling Height
Carpeting
Central AC
Dishwasher
Disposal
Laminate Counters
Microwave
Patio/Balcony/Deck
Range
Refrigerator
Window Blinds/Shades

### Comments

**Haymeadow Apartments**



APP000305

# Multifamily Sale Profile

# Sale No. 2

## Location & Property Identification

| | |
|---|---|
| Property Name: | Avanti on Central & Pipeline |
| Sub-Property Type: | Conventional, Garden/Low Rise |
| Address: | 805 Central Dr. |
| City/State/Zip: | Bedford, TX 76022 |
| County: | Tarrant |
| Submarket: | Bedford |
| Market Orientation: | Suburban |
| IRR Event ID: | 3230434 |



## Sale Information

| | |
|---|---|
| Sale Price: | $19,250,000 |
| Effective Sale Price: | $21,750,000 |
| Sale Date: | 03/01/2024 |
| Sale Status: | Closed |
| $/SF GBA: | $179.46 |
| $/SF NRA: | $179.46 |
| $/Unit: | $111,538 /Apt. Unit |
| Grantor/Seller: | Pb Holdings III, LLC |
| Grantee/Buyer: | 805 Central Partners Owner, LLC |
| Assets Sold: | Real estate only |
| Property Rights: | Fee Simple |
| % of Interest Conveyed: | 100.00 |
| Financing: | Cash to seller |
| Conditions of Sale: | Arm's-length |
| Document Type: | Warranty Deed |
| Rent Controlled: | No |
| Rent Subsidized: | No |
| Verified By: | Stone Berger |
| Verification Date: | 05/03/2024 |
| Verification Type: | Confirmed-Seller Broker |

## Operating Data and Key Indicators

| | |
|---|---|
| Operating Data Type: | IRR Projection |
| Potential Gross Income: | $3,080,000 |
| Vacancy Rate: | 7% |
| Other Income: | $40,000 |
| Effective Gross Income: | $2,904,400 |
| Operating Expenses: | $1,405,825 |
| Net Operating Income: | $ 1,498,575 |
| Expense Ratio: | 48.40% |
| Reserves Included: | Yes |
| Management Included: | Yes |
| Cap Rate - Derived: | 6.89% |
| GRM - Derived: | 7.06 |
| EGIM - Derived: | 7.49 |

## Sale Analysis

| | |
|---|---|
| Expenditures After Purchase: | $2,500,000 |
| Expenditures Description: | Cap-Ex & Lease-Up |

## Occupancy

| | |
|---|---|
| Occupancy Type Before Sale: | Multi-Tenant |
| Occupancy Type After Sale: | Multi-Tenant |
| Occupancy at Time of Sale: | 70.00% |

## Improvement and Site Data

| | |
|---|---|
| MSA: | Dallas-Fort Worth-Arlington, TX |
| Legal/Tax/Parcel ID: | Account Number: 00912107 |
| GBA-SF: | 121,200 |
| NRA-SF: | 121,200 |
| Acres(Usable/Gross): | 7.64/7.64 |

**Avanti on Central & Pipeline**



APP000306

## Multifamily Sale Profile

## Sale No. 2

### Improvement and Site Data (Cont'd)

| | |
|---|---|
| Land-SF(Usable/Gross): | 332,798/332,798 |
| Usable/Gross Ratio: | 1.00 |
| Year Built: | 1969 |
| Property Class: | C |
| Construction Quality: | Average |
| Improvements Cond.: | Average |
| Exterior Walls: | Wood siding |
| No. of Buildings/Stories: | 14/2 |
| No. of Units/Unit Type: | 195/Apt. Units |
| Multi-Tenant/Condo.: | Yes/No |
| Parking Conformity: | Yes |
| Elevators/Count: | None |
| Air-Conditioning Type: | Central |
| Shape: | Rectangular |
| Topography: | Level |
| Corner Lot: | No |
| Frontage Type: | 2 way, 2 lanes each way |
| Traffic Flow: | Moderate |
| AccessibilityRating: | Average |
| Visibility Rating: | Average |
| Density-Unit/Gross Acre: | 25.52 |
| Density-Unit/Usable Acre: | 25.52 |
| Bldg. to Land Ratio FAR: | 0.36 |
| Zoning Code: | R1 |
| Flood Plain: | No |
| Flood Zone Designation: | X |
| Utilities: | Electricity, Water Public, Sewer |
| Utilities Desc.: | All to site. |
| Bldg. Phy. Info. Source: | Public Records |
| Source of Land Info.: | Public Records |

### Project & Unit Amenities

Common Laundry
Swimming Pool
Playground

8' Ceiling Height
Carpeting
Central AC
Dishwasher
Disposal
Laminate Counters
Microwave
Patio/Balcony/Deck
Range
Refrigerator
Window Blinds/Shades

### Comments

The Avanti on Central & Pipeline sold in March 2024 for $19,250,000 or $98,718/unit. However, we apply an adjustment of $2,500,000 in capital expenditures and lease-up costs to represent a stabilized sale. Thus, an effective sales price of $21,750,000 or $111,538/unit. The property was acquired based on a projected 6.89% cap rate.

**Avanti on Central & Pipeline**



APP000307

# Multifamily Sale Profile

# Sale No. 3

## Location & Property Identification

| | |
|---|---|
| Property Name: | Garrett Gardens |
| Sub-Property Type: | Conventional, Garden/Low Rise |
| Address: | 2015 N. Garrett Ave. |
| City/State/Zip: | Dallas, TX 75206 |
| County: | Dallas |
| Submarket: | Dallas |
| Market Orientation: | Suburban |
| IRR Event ID: | 3201433 |



## Sale Information

| | |
|---|---|
| Sale Price: | $7,590,000 |
| Effective Sale Price: | $7,590,000 |
| Sale Date: | 12/27/2023 |
| Sale Status: | Closed |
| $/SF GBA: | $214.41 |
| $/SF NRA: | $220.69 |
| $/Unit: | $115,000 /Apt. Unit |
| Grantor/Seller: | Ronald C. Maddox |
| Grantee/Buyer: | PGH Acadia, LLC |
| Property Rights: | Fee Simple |
| % of Interest Conveyed: | 100.00 |
| Financing: | Cash to seller |
| Conditions of Sale: | Arm's-length |
| Document Type: | Warranty Deed |
| Recording No.: | 202300257283 |
| Verified By: | Joe Ponder |
| Verification Date: | 02/15/2024 |
| Confirmation Source: | Matthew Cassidy |
| Verification Type: | Confirmed-Buyer Broker |
| Secondary Verific. Source: | Assessor, Data Service, Deed |

## Operating Data and Key Indicators

| | |
|---|---|
| Operating Data Type: | In Place |
| Potential Gross Income: | $709,346 |
| Effective Gross Income: | $709,346 |
| Operating Expenses: | $329,846 |

| | |
|---|---|
| Net Operating Income: | $ 379,500 |
| Expense Ratio: | 46.50% |
| Cap Rate - Derived: | 5.00% |
| GRM - Derived: | 10.70 |
| EGIM - Derived: | 10.70 |

## Occupancy

| | |
|---|---|
| Occupancy at Time of Sale: | 95.00% |

## Improvement and Site Data

| | |
|---|---|
| Legal/Tax/Parcel ID: | Lots 7-12, Block 6/696, Monarch Place / Account ID: 00000121159000000 |
| GBA-SF: | 35,400 |
| NRA-SF: | 34,392 |
| Acres(Usable/Gross): | 1.19/1.19 |
| Land-SF(Usable/Gross): | 52,050/52,050 |
| Usable/Gross Ratio: | 1.00 |
| Year Built: | 1985 |
| Property Class: | C |
| Construction Quality: | Average |
| Improvements Cond.: | Average |
| Exterior Walls: | Brick |
| No. of Units/Unit Type: | 66/Apt. Units |
| Total Parking Spaces: | 66 |
| Park. Ratio 1000 SF GLA: | 1.92 |
| No. Surface Spaces: | 66 |
| Park. Ratio 1000 SF GBA: | 1.86 |

**Garrett Gardens**



APP000308

# Multifamily Sale Profile

# Sale No. 3

## Improvement and Site Data (Cont'd)

| | |
|---|---|
| Parking Ratio(/Unit): | 1.00 |
| Air-Conditioning Type: | Central |
| Shape: | Rectangular |
| Topography: | Level |
| Corner Lot: | Yes |
| Traffic Flow: | Moderate |
| AccessibilityRating: | Average |
| Visibility Rating: | Average |
| Density-Unit/Gross Acre: | 55.23 |
| Density-Unit/Usable Acre: | 55.23 |
| Bldg. to Land Ratio FAR: | 0.68 |
| Zoning Code: | PD 951 |
| Zoning Desc.: | Planned Development |
| Flood Plain: | No |
| Flood Zone Designation: | X |
| Utilities: | Electricity, Water Public, Sewer |
| Utilities Desc.: | All to site. |
| Bldg. Phy. Info. Source: | Public Records |
| Source of Land Info.: | Public Records |

## Project & Unit Amenities

| | |
|---|---|
| Swimming Pool | Carpeting |
| Common Laundry | Central AC |
| Gated Entrance | Dishwasher |
| | Laminate Counters |
| | Patio/Balcony/Deck |
| | Range - Electric |
| | Refrigerator |
| | Stainless Steel Appliances |
| | Vinyl Plank Floors (LVT/LVP) |

## Comments

This 66-unit multifamily property was purchased for $7,590,000 or $115,000 per unit. The property was reportedly traded on a 5.00% cap rate.

**Garrett Gardens**

irr.

APP000309

# Multifamily Sale Profile

**Sale No. 4**

## Location & Property Identification

| | |
|---|---|
| Property Name: | Casa San Luis Apartments |
| Sub-Property Type: | Conventional, Garden/Low Rise |
| Address: | 3155 Park Ln. |
| City/State/Zip: | Dallas, TX 75220 |
| County: | Dallas |
| Submarket: | Dallas |
| Market Orientation: | Suburban |
| IRR Event ID: | 3230431 |



## Sale Information

| | |
|---|---|
| Sale Price: | $7,000,000 |
| Effective Sale Price: | $7,000,000 |
| Sale Date: | 08/01/2023 |
| Sale Status: | Closed |
| $/SF GBA: | $109.88 |
| $/SF NRA: | $106.00 |
| $/Unit: | $111,111 /Apt. Unit |
| Grantor/Seller: | Casa Park Lane, LLC |
| Grantee/Buyer: | SEG Park Lane, LLC |
| Assets Sold: | Real estate only |
| Property Rights: | Fee Simple |
| % of Interest Conveyed: | 100.00 |
| Financing: | Cash to seller |
| Conditions of Sale: | Arm's-length |
| Document Type: | Warranty Deed |
| Recording No.: | 202300153196 |
| Rent Controlled: | No |
| Rent Subsidized: | No |
| Verified By: | Stone Berger |
| Verification Date: | 05/03/2024 |
| Verification Type: | Confirmed-Seller Broker |

## Operating Data and Key Indicators

| | |
|---|---|
| Operating Data Type: | In Place |
| Potential Gross Income: | $933,120 |
| Vacancy Rate: | 7% |
| Other Income: | $10,000 |
| Effective Gross Income: | $877,802 |
| Operating Expenses: | $349,196 |
| Net Operating Income: | $ 528,606 |
| Expense Ratio: | 39.78% |
| Reserves Included: | Yes |
| Management Included: | Yes |
| Cap Rate - Derived: | 7.55% |
| GRM - Derived: | 7.50 |
| EGIM - Derived: | 7.97 |

## Occupancy

| | |
|---|---|
| Occupancy Type Before Sale: | Multi-Tenant |
| Occupancy Type After Sale: | Multi-Tenant |
| Occupancy at Time of Sale: | 93.00% |

## Improvement and Site Data

| | |
|---|---|
| MSA: | Dallas-Fort Worth-Arlington, TX |
| Legal/Tax/Parcel ID: | Account Number: 00000597589000000 |
| GBA-SF: | 63,705 |
| NRA-SF: | 66,040 |
| Acres(Usable/Gross): | 2.83/2.83 |
| Land-SF(Usable/Gross): | 123,275/123,275 |
| Usable/Gross Ratio: | 1.00 |
| Year Built: | 1967 |
| Property Class: | C |

**Casa San Luis Apartments**



APP000310

## Multifamily Sale Profile                                    Sale No. 4

### Improvement and Site Data (Cont'd)

| | |
|---|---|
| Construction Quality: | Average |
| Improvements Cond.: | Average |
| Exterior Walls: | Wood siding |
| No. of Buildings/Stories: | 7/2 |
| No. of Units/Unit Type: | 63/Apt. Units |
| Multi-Tenant/Condo.: | Yes/No |
| Parking Conformity: | Yes |
| Elevators/Count: | None |
| Air-Conditioning Type: | Central |
| Shape: | Rectangular |
| Topography: | Level |
| Corner Lot: | No |
| Frontage Type: | 2 way, 2 lanes each way |
| Traffic Flow: | Moderate |
| AccessibilityRating: | Average |
| Visibility Rating: | Average |
| Density-Unit/Gross Acre: | 22.26 |
| Density-Unit/Usable Acre: | 22.26 |
| Bldg. to Land Ratio FAR: | 0.52 |
| Zoning Code: | PD |
| Flood Plain: | No |
| Flood Zone Designation: | X |
| Utilities: | Electricity, Water Public, Sewer |
| Utilities Desc.: | All to site. |
| Bldg. Phy. Info. Source: | Public Records |
| Source of Land Info.: | Public Records |

### Project & Unit Amenities

| | |
|---|---|
| Common Laundry | 8' Ceiling Height |
| Covered Parking | Carpeting |
| Swimming Pool | Central AC |
| | Dishwasher |
| | Disposal |
| | Laminate Counters |
| | Microwave |
| | Patio/Balcony/Deck |
| | Range |
| | Refrigerator |
| | Window Blinds/Shades |

### Comments

The Casa San Luis Apartments sold in August 2023 for $7,000,000 or $111,111/unit at an in-place cap rate of 7.55%.

**Casa San Luis Apartments**



APP000311

# Multifamily Sale Profile

# Sale No. 5

## Location & Property Identification

| | |
|---|---|
| Property Name: | Rise at Highland Meadows Apartments |
| Sub-Property Type: | Conventional, Garden/Low Rise |
| Address: | 13100 Pandora Dr. |
| City/State/Zip: | Dallas, TX 75238 |
| County: | Dallas |
| Submarket: | Dallas |
| Market Orientation: | Suburban |
| IRR Event ID: | 3213947 |



## Sale Information

| | |
|---|---|
| Sale Price: | $39,050,000 |
| Effective Sale Price: | $39,050,000 |
| Sale Date: | 02/09/2023 |
| Sale Status: | Closed |
| $/SF GBA: | $176.71 |
| $/SF NRA: | $177.48 |
| $/Unit: | $119,055 /Apt. Unit |
| Grantor/Seller: | Paces Cove Multifamily Instrs |
| Grantee/Buyer: | Rise Highland LP |
| Property Rights: | Fee Simple |
| % of Interest Conveyed: | 100.00 |
| Financing: | Cash to seller |
| Conditions of Sale: | Arm's-length |
| Document Type: | Warranty Deed |
| Recording No.: | 202300024470 |
| Rent Subsidized: | No |
| Verified By: | Joe Ponder |
| Verification Date: | 03/18/2024 |
| Confirmation Source: | Northmarq |
| Verification Type: | Confirmed-Seller Broker |
| Secondary Verific. Source: | Assessor, Data Service, Deed |

## Operating Data and Key Indicators

| | |
|---|---|
| Operating Data Type: | IRR Projection |

| | |
|---|---|
| Potential Gross Income: | $4,362,528 |
| Vacancy Rate: | 2% |
| Effective Gross Income: | $4,275,277 |
| Operating Expenses: | $2,052,133 |
| Net Operating Income: | $ 2,223,144 |
| Expense Ratio: | 48.00% |
| Cap Rate - Derived: | 5.69% |
| GRM - Derived: | 8.95 |
| EGIM - Derived: | 9.13 |

## Occupancy

| | |
|---|---|
| Occupancy Type Before Sale: | Multi-Tenant |
| Occupancy Type After Sale: | Multi-Tenant |
| Occupancy at Time of Sale: | 98.78% |

## Improvement and Site Data

| | |
|---|---|
| MSA: | Dallas-Fort Worth-Arlington, TX |
| Legal/Tax/Parcel ID: | Account: 00000738186900000 |
| GBA-SF: | 220,989 |
| NRA-SF: | 220,029 |
| Acres(Usable/Gross): | 12.94/12.94 |
| Land-SF(Usable/Gross): | 563,842/563,842 |
| Usable/Gross Ratio: | 1.00 |
| Year Built: | 1983 |
| Most Recent Renovation: | Various |

**Rise at Highland Meadows Apartments**



APP000312

# Multifamily Sale Profile

**Sale No. 5**

## Improvement and Site Data (Cont'd)

| | |
|---|---|
| Property Class: | C |
| Construction Quality: | Average |
| Improvements Cond.: | Average |
| Exterior Walls: | Brick |
| No. of Buildings/Stories: | 19/2 |
| No. of Units/Unit Type: | 328/Apt. Units |
| Multi-Tenant/Condo.: | Yes/No |
| Total Parking Spaces: | 373 |
| Park. Ratio 1000 SF GLA: | 1.70 |
| No. Surface Spaces: | 45 |
| No. Covered Spaces: | 328 |
| Park. Ratio 1000 SF GBA: | 1.69 |
| Parking Ratio(/Unit): | 1.14 |
| Air-Conditioning Type: | Electric |
| Shape: | Irregular |
| Topography: | Level |
| Corner Lot: | No |
| Frontage Type: | 2 way, 2 lanes each way |
| Traffic Flow: | Moderate |
| AccessibilityRating: | Average |
| Visibility Rating: | Average |
| Density-Unit/Gross Acre: | 25.34 |
| Density-Unit/Usable Acre: | 25.34 |
| Bldg. to Land Ratio FAR: | 0.39 |
| Zoning Code: | MF-1(A) |
| Zoning Desc.: | Multifamily District |
| Easements: | No |
| Environmental Issues: | No |
| Flood Plain: | No |
| Flood Zone Designation: | X |
| Utilities: | Electricity, Water Public, Sewer |
| Bldg. Phy. Info. Source: | Public Records |
| Source of Land Info.: | Public Records |

## Project & Unit Amenities

Clubhouse Building
Common Laundry
Fitness Center
Gated Entrance
Swimming Pool

Carpeting
Central AC
Dishwasher
Disposal
Microwave
Patio/Balcony/Deck
Range
Refrigerator
Washer/Dryer Hookup
Window Blinds/Shades

## Comments

This multifamily property was purchased for $39,050,000 or $119055 per unit. At the time of sale, the property was 98.78% occupied.

**Rise at Highland Meadows Apartments**



APP000313

Addenda

**Rent Surveys**



**APP000314**

# Multifamily Rent Survey Profile

# Rent Survey No. 1

## Location & Property Identification

| | |
|---|---|
| Property Name: | La Fortuna Apartments |
| Sub-Property Type: | Conventional, Garden/Low Rise |
| Address: | 14018 Brookgreen Dr. |
| City/State/Zip: | Dallas, TX 75240 |
| County: | Dallas |
| Submarket: | Dallas |
| Market Orientation: | Urban |
| IRR Event ID: | 3230250 |



## Property Data

| | |
|---|---|
| Survey Date: | 05/03/2024 |
| No. of Buildings/Stories: | 15/2 |
| No. of Units/Unit Type: | 230/Apt. Units |
| Multi-Tenant/Condo.: | Yes/No |
| Property Class: | C |
| Vacancy @ Survey: | 15.00% |
| Yr. Built/Yr. Renov.: | 1968/2000 |
| Land Size (Ac.): | 10.35 |

## Project & Unit Amenities

| | |
|---|---|
| Project Amenities: | Clubhouse Building, Common Laundry, Fitness Center, Gated Entrance, Playground, Resident Lounge, Swimming Pool |
| Unit Amenities: | 8' Ceiling Height, Carpeting, Central AC, Dishwasher, Laminate Counters, Microwave, Patio/Balcony/Deck, Range, Refrigerator, Vinyl Plank Floors (LVT/LVP), Window Blinds/Shades |
| Tenant Pays: | Cable, Broadband, In-Unit Electric, Sewer, Common Area Electric |

## Unit Mix

| Unit Information | Rms/BR/ Bth | No. of Units | Vacant Units | SF Per Unit | Base Rent | $/SF Effective | Unit Comments |
|---|---|---|---|---|---|---|---|
| Efficiency | 2/0/1.0 | 30 | INA | 500 | $955 | $1.91 | |
| 1BR - 1BA | 3/1/1.0 | 52 | INA | 640 | $1040 | $1.63 | |
| 2BR - 2BA | 4/2/2.0 | 27 | INA | 1,000 | $1415 | $1.42 | |

## Comments

85% Occupied.

**La Fortuna Apartments**



APP000315

# Multifamily Rent Survey Profile

# Rent Survey No. 2

## Location & Property Identification

| | |
|---|---|
| Property Name: | Vinings At Central |
| Sub-Property Type: | Conventional, Garden/Low Rise |
| Address: | 13447 N. Central Expressway |
| City/State/Zip: | Dallas, TX 75243 |
| County: | Dallas |
| Submarket: | Dallas |
| Market Orientation: | Suburban |
| IRR Event ID: | 3230265 |



## Property Data

| | |
|---|---|
| Survey Date: | 05/03/2024 |
| No. of Buildings/Stories: | 21/2 |
| No. of Units/Unit Type: | 132/Apt. Units |
| Property Class: | C |
| Vacancy @ Survey: | 3.00% |
| Yr. Built/Yr. Renov.: | 1963/1993 |
| Construction Type: | Wood frame |
| Land Size (Ac.): | 6.72 |

## Project & Unit Amenities

| | |
|---|---|
| Project Amenities: | Clubhouse Building, Common Laundry, Covered Parking |
| Unit Amenities: | 8' Ceiling Height, Carpeting, Central AC, Dishwasher, Disposal, Laminate Counters, Microwave, Patio/Balcony/Deck, Range, Refrigerator, Window Blinds/Shades |
| Tenant Pays: | Trash, Cable, Broadband, In-Unit Electric, Sewer, Water |

## Unit Mix

| Unit Information | Rms/BR/ Bth | No. of Units | Vacant Units | SF Per Unit | Base Rent | $/SF Effective | Unit Comments |
|---|---|---|---|---|---|---|---|
| 1BR - 1BA | 3/1/1.0 | 8 | INA | 636 | $866 | $1.36 | |
| 2BR - 2BA | 4/2/2.0 | 16 | INA | 1,196 | $1281 | $1.07 | |

## Comments

97% Occupied.

**Vinings At Central**



APP000316

# Multifamily Rent Survey Profile

# Rent Survey No. 3

## Location & Property Identification

| | |
|---|---|
| Property Name: | Cottonwood at Park Central |
| Sub-Property Type: | Conventional, Garden/Low Rise |
| Address: | 13323 Esperanza Road |
| City/State/Zip: | Dallas, TX 75240 |
| County: | Dallas |
| Submarket: | Dallas |
| Market Orientation: | Suburban |
| IRR Event ID: | 3230276 |



## Property Data

| | |
|---|---|
| Survey Date: | 05/03/2024 |
| No. of Buildings/Stories: | 16/3 |
| No. of Units/Unit Type: | 270/Apt. Units |
| Multi-Tenant/Condo.: | Yes/No |
| Property Class: | C |
| Vacancy @ Survey: | 7.00% |
| Yr. Built/Yr. Renov.: | 1985/2019 |
| Land Size (Ac.): | 8.38 |

## Project & Unit Amenities

| | |
|---|---|
| Project Amenities: | BBQ Grill/Picnic Area, Clubhouse Building, Common Laundry, Fitness Center, Playground, Swimming Pool |
| Unit Amenities: | 8' Ceiling Height, Carpeting, Central AC, Dishwasher, Disposal, Laminate Counters, Microwave, Patio/Balcony/Deck, Range, Refrigerator, Vinyl Plank Floors (LVT/LVP), Window Blinds/Shades |
| Tenant Pays: | Trash, Cable, Broadband, In-Unit Electric, Sewer, Water |

## Unit Mix

| Unit Information | Rms/BR/ Bth | No. of Units | Vacant Units | SF Per Unit | Base Rent | $/SF Effective | Unit Comments |
|---|---|---|---|---|---|---|---|
| 1BR - 1BA | 3/1/1.0 | 64 | INA | 690 | $1195 | $1.73 | |
| 2BR - 2BA | 4/2/2.0 | 34 | INA | 1,189 | $1908 | $1.60 | |

## Comments

93% Occupied.

**Cottonwood at Park Central**



APP000317

# Multifamily Rent Survey Profile

# Rent Survey No. 4

## Location & Property Identification

| | |
|---|---|
| Property Name: | Vista Buena Apartments |
| Sub-Property Type: | Conventional, Garden/Low Rise |
| Address: | 13350 Esperanza Rd. |
| City/State/Zip: | Dallas, TX 75240 |
| County: | Dallas |
| Submarket: | Dallas |
| Market Orientation: | Urban |
| IRR Event ID: | 3230281 |



## Property Data

| | |
|---|---|
| Survey Date: | 05/03/2024 |
| No. of Buildings/Stories: | 2/2 |
| No. of Units/Unit Type: | 416/Apt. Units |
| Multi-Tenant/Condo.: | Yes/No |
| Property Class: | C |
| Vacancy @ Survey: | 20.00% |
| Yr. Built/Yr. Renov.: | 1976/ |
| Land Size (Ac.): | 14.71 |

## Project & Unit Amenities

| | |
|---|---|
| Project Amenities: | Clubhouse Building, Common Laundry, Fitness Center, Gated Entrance, Playground, Resident Lounge, Swimming Pool |
| Unit Amenities: | 8' Ceiling Height, Carpeting, Central AC, Dishwasher, Laminate Counters, Microwave, Patio/Balcony/Deck, Range, Refrigerator, Vinyl Plank Floors (LVT/LVP), Window Blinds/Shades |
| Tenant Pays: | Cable, Broadband, In-Unit Electric, Sewer, Common Area Electric |

## Unit Mix

| Unit Information | Rms/BR/ Bth | No. of Units | Vacant Units | SF Per Unit | Base Rent | $/SF Effective | Unit Comments |
|---|---|---|---|---|---|---|---|
| 1BR - 1BA | 3/1/1.0 | 28 | INA | 691 | $967 | $1.40 | |
| 2BR - 2BA | 4/2/2.0 | 28 | INA | 965 | $1004 | $1.04 | |

## Comments

80% Occupied.

**Vista Buena Apartments**



APP000318

# Multifamily Rent Survey Profile

# Rent Survey No. 5

## Location & Property Identification

| | |
|---|---|
| Property Name: | Tides on Esperanza |
| Sub-Property Type: | Conventional, Garden/Low Rise |
| Address: | 13450 Esperanza Rd. |
| City/State/Zip: | Dallas, TX 75240 |
| County: | Dallas |
| Submarket: | Dallas |
| Market Orientation: | Urban |
| IRR Event ID: | 3230288 |



## Property Data

| | |
|---|---|
| Survey Date: | 05/03/2024 |
| No. of Buildings/Stories: | 18/3 |
| No. of Units/Unit Type: | 370/Apt. Units |
| Multi-Tenant/Condo.: | Yes/No |
| Property Class: | C |
| Vacancy @ Survey: | 9.00% |
| Yr. Built/Yr. Renov.: | 1980/ |
| Land Size (Ac.): | 10.78 |

## Project & Unit Amenities

| | |
|---|---|
| Project Amenities: | Clubhouse Building, Common Laundry, Fitness Center, Gated Entrance, Playground, Resident Lounge, Swimming Pool |
| Unit Amenities: | 8' Ceiling Height, Carpeting, Central AC, Dishwasher, Laminate Counters, Microwave, Patio/Balcony/Deck, Range, Refrigerator, Vinyl Plank Floors (LVT/LVP), Window Blinds/Shades |
| Tenant Pays: | Cable, Broadband, In-Unit Electric, Sewer, Common Area Electric |

## Unit Mix

| Unit Information | Rms/BR/ Bth | No. of Units | Vacant Units | SF Per Unit | Base Rent | $/SF Effective | Unit Comments |
|---|---|---|---|---|---|---|---|
| Efficiency | 2/0/1.0 | 48 | INA | 420 | $802 | $1.91 | |
| 1BR - 1BA | 3/1/1.0 | 120 | INA | 667 | $978 | $1.47 | |
| 2BR - 2BA | 4/2/2.0 | 30 | INA | 909 | $1613 | $1.77 | |

## Comments

91% Occupied.

**Tides on Esperanza**



# Multifamily Rent Survey Profile

# Rent Survey No. 6

## Location & Property Identification

| | |
|---|---|
| Property Name: | Amber Dawn Apartments |
| Sub-Property Type: | Conventional, Garden/Low Rise |
| Address: | 8542 W. Spring Valley Rd. |
| City/State/Zip: | Dallas, TX 75240 |
| County: | Dallas |
| Submarket: | Dallas |
| Market Orientation: | Suburban |
| IRR Event ID: | 3230294 |



## Property Data

| | |
|---|---|
| Survey Date: | 05/03/2024 |
| No. of Buildings/Stories: | 24/2 |
| No. of Units/Unit Type: | 157/Apt. Units |
| Multi-Tenant/Condo.: | Yes/No |
| Property Class: | C |
| Vacancy @ Survey: | 10.00% |
| Yr. Built/Yr. Renov.: | 1970/1995 |
| Land Size (Ac.): | 8.58 |

## Project & Unit Amenities

| | |
|---|---|
| Project Amenities: | BBQ Grill/Picnic Area, Clubhouse Building, Gated Entrance, Playground, Swimming Pool |
| Unit Amenities: | 8' Ceiling Height, Carpeting, Central AC, Dishwasher, Disposal, Laminate Counters, Microwave, Patio/Balcony/Deck, Range, Refrigerator, Vinyl Plank Floors (LVT/LVP), Window Blinds/Shades |
| Tenant Pays: | Trash, Cable, Broadband, In-Unit Electric, Sewer, Water |

## Unit Mix

| Unit Information | Rms/BR/ Bth | No. of Units | Vacant Units | SF Per Unit | Base Rent | $/SF Effective | Unit Comments |
|---|---|---|---|---|---|---|---|
| Efficiency | 2/0/1.0 | 3 | INA | 410 | $926 | $2.26 | |
| 1BR - 1BA | 3/1/1.0 | 28 | INA | 700 | $1223 | $1.75 | |
| 2BR - 2BA | 4/2/2.0 | 96 | INA | 980 | $1430 | $1.46 | |

## Comments

90% Occupied.

**Amber Dawn Apartments**



APP000320

Addenda

**Addendum E**

**Engagement Letter**

APP000321



Integra Realty Resources
Dallas

1100 Mira Vista Boulevard
Suite 300
Plano, Texas 75093

T (972) 881-7191
F (972) 733-1403
www.irr.com

March 26, 2024

Mr. Cort Thomas
Brown Fox, PLLC
8111 Preston Road, Suite 300
Dallas, Texas 75225

SUBJECT:     Proposal/Authorization for Valuation and Consulting Services
13636 Goldmark Drive, Irving, Texas (the "Subject Property")

Dear Mr. Thomas,

**Integra Realty Resources – Dallas** appreciates the opportunity to provide this proposal for valuation and counseling services for the above-captioned property. It is our mutual understanding that the appraisal is to be provided under the following terms:

**Value Premise:** Market Value of the Subject Property

**Property Rights:** Fee Simple

**Report Type:** Standard Format

**Intended Use:** The intended use of the appraisal is for internal decision-making purposes *and may be filed with the Court.*

**Client and Intended User:** ~~Brown Fox PLLC~~ *Goldmark Hospitality LLC c/o Cort Thomas, Receiver* is the client and intended user.

**Appraisal Fee:** $6,700

**Retainer Fee Requested:** $6,700 to be received in our office before the commencement of the report.

**Due Date:** Delivery in four (4) weeks, provided the expedited return of the signed agreement and receipt of the retainer fee. Subject to extension based upon late delivery of requested data and access for inspection.

**Property Information:** If property information deemed necessary by the appraiser to complete the appraisal is not provided by the property owner or tenant, the appraiser may terminate this contract and issue an invoice reflecting the percentage of work completed as of that date.

Amerigold Suites

Mr. Cort Thomas
Brown Fox, PLLC
Page 2

**Additional Fees Related to Cancellation:** If a cancellation of the assignment is requested by the client, Integra Realty Resources – Dallas will bill appropriately based upon the percentage of work completed upon cancellation.

**Additional Fees Related to Report Changes:** If changes or additions to the report are required or requested due to a request by the client, they will be responsible for paying an additional $175 per hour of additional appraisal work plus $50 per reprinted report copy.

**Conformance:** The appraisal and report will be prepared in conformance with and subject to, the Standards of Professional Practice and Code of Ethics of the Appraisal Institute and the *Uniform Standards of Professional Appraisal Practice* (USPAP) developed by the Appraisal Standards Board of the Appraisal Foundation.

**Other Terms and Conditions:** The terms of Attachment I apply to this engagement and are hereby incorporated by reference. The appraisal report will be limited by our standard Assumptions and Limiting Conditions and any Extraordinary Assumptions and Limiting Conditions, which become apparent or necessary during the course of the assignment. A copy of the standard Assumptions and Limiting Conditions is set forth in Attachment I.

If this proposal is acceptable, please authorize us to proceed by executing this letter agreement as noted below and returning one copy to the undersigned. Thank you for considering us for this assignment. We look forward to working with you. Please call if you wish to discuss this proposal or the assignment any further.

Sincerely,

**INTEGRA REALTY RESOURCES – DALLAS**

Jimmy H. Jackson, MAI
Senior Managing Director

AGREED & ACCEPTED THIS 2nd DAY OF April , 2024.

BY:     ~~Brown Fox, PLLC~~ Goldmark Hospitality, LLC

_____, Receur
**AUTHORIZED SIGNATURE**

Cort Thomas, Receiver
**NAME (PRINT)**

Amerigold Suites

APP000323

## ATTACHMENT I

### STANDARD ASSUMPTIONS & LIMITING CONDITIONS

The appraisal report and any work product related to the engagement will be limited by the following standard assumptions:

1. The title is marketable and free and clear of all liens, encumbrances, encroachments, easements and restrictions. The Subject Property is under responsible ownership and competent management and is available for its highest and best use.

2. There are no existing judgments or pending or threatened litigation that could affect the value of the Subject Property.

3. There are no hidden or undisclosed conditions of the land or of the improvements that would render the Subject Property more or less valuable. Furthermore, there is no asbestos in the Subject Property.

4. The revenue stamps placed on any deed referenced herein to indicate the sale price are in correct relation to the actual dollar amount of the transaction.

5. The Subject Property is in compliance with all applicable building, environmental, zoning, and other federal, state and local laws, regulations and codes.

6. The information furnished by others is believed to be reliable, but no warranty is given for its accuracy.

The appraisal report and any work product related to the engagement will be subject to the following limiting conditions, except as otherwise noted in the report:

1. An appraisal is inherently subjective and represents our opinion as to the value of the Subject Property appraised.

2. The conclusions stated in our appraisal apply only as of the effective date of the appraisal, and no representation is made as to the effect of subsequent events.

3. No changes in any federal, state or local laws, regulations or codes (including, without limitation, the Internal Revenue Code) are anticipated.

4. No environmental impact studies were either requested or made in conjunction with this appraisal, and we reserve the right to revise or rescind any of the value opinions based upon any subsequent environmental impact studies. If any environmental impact statement is required by law, the appraisal assumes that such statement will be favorable and will be approved by the appropriate regulatory bodies.

5. Unless otherwise agreed to in writing, we are not required to give testimony, respond to any subpoena or attend any court, governmental or other hearing with reference to the Subject Property without compensation relative to such additional employment.

6. We have made no survey of the Subject Property and assume no responsibility in connection with such matters. Any sketch or survey of the Subject Property included in this report is for illustrative purposes only and should not be considered to be scaled accurately for size. The appraisal covers the Subject Property as described in this report, and the areas and dimensions set forth are assumed to be correct.

7. No opinion is expressed as to the value of subsurface oil, gas or mineral rights, if any, and we have assumed that the Subject Property is not subject to surface entry for the exploration or removal of such materials, unless otherwise noted in our appraisal.

8. We accept no responsibility for considerations requiring expertise in other fields. Such considerations include, but are not limited to, legal descriptions and other legal matters such as legal title, geologic considerations, such as soils and seismic stability, and civil, mechanical, electrical, structural and other engineering and environmental matters. Such considerations may also include determinations of compliance with zoning and other federal, state, and local laws, regulations and codes.

9. The distribution of the total valuation in the report between land and improvements applies only under the reported highest and best use of the Subject Property. The allocations of value for land and improvements must not be used in conjunction with any other appraisal and are invalid if so used. The appraisal report shall be considered only in its entirety. No part of the appraisal report shall be utilized separately or out of context.

10. Neither all nor any part of the contents of this report (especially any conclusions as to value, the identity of the appraisers, or any reference to the Appraisal Institute) shall be disseminated through advertising media, public relations media, news media or any other means of communication (including without limitation prospectuses, private offering memoranda and other offering material provided to prospective investors) without the prior written consent of the persons signing the report.

11. Information, estimates and opinions contained in the report and obtained from third-party sources are assumed to be reliable and have not been independently verified.

12. Any income and expense estimates contained in the appraisal report are used only for the purpose of estimating value and do not constitute predictions of future operating results.

13. If the Subject Property is subject to one or more leases, any estimate of residual value contained in the appraisal may be particularly affected by significant changes in the condition of the economy, of the real estate industry, or of the Subject Property at the time these leases expire or otherwise terminate.

14. Unless otherwise stated in the report, no consideration has been given to personal property located on the Subject Property or to the cost of moving or relocating such personal property; only the real property has been considered.

15. The current purchasing power of the dollar is the basis for the value stated in the appraisal; we have assumed that no extreme fluctuations in economic cycles will occur.

16. The values found herein are subject to these and to any other assumptions or conditions set forth in the body of this report, but which may have been omitted from this list of Assumptions and Limiting Conditions.

17. The analyses contained in the report necessarily incorporate numerous estimates and assumptions regarding property performance, general and local business and economic conditions, the absence of material changes in the competitive environment and other matters. Some estimates or assumptions, however, inevitably will not materialize, and unanticipated events and circumstances may occur; therefore, actual results achieved during the period covered by our analysis will vary from our estimates, and the variations may be material.

18. The Americans with Disabilities Act (ADA) became effective January 26, 1992. We have not made a specific survey or analysis of the Subject Property to determine whether the physical aspects of the improvements meet the ADA accessibility guidelines. We claim no expertise in ADA issues, and render no opinion regarding compliance of the Subject Property with ADA regulations. Inasmuch as compliance matches each owner's financial ability with the cost to cure the non-conforming physical characteristics of a property, a specific study of both the owner's financial ability and the cost to cure any deficiencies would be needed for the Department of Justice to determine compliance.

19. The appraisal report is prepared for the exclusive benefit of you, your subsidiaries and/or affiliates. It may not be used or relied upon by any other party. All parties who use or rely upon any information in the report without our written consent do so at their own risk.

20. No studies have been provided to us indicating the presence or absence of hazardous materials on the Subject Property or in the improvements, and our valuation is predicated upon the assumption that the Subject Property is free and clear of any environment hazards including, without limitation, hazardous wastes, toxic substances and mold. No representations or warranties are made regarding the environmental condition of the Subject Property. IRR – Dallas and/or any of its officers, owners, managers, directors, agents, subcontractors or employees (the "Integra Parties") shall not be responsible for any such environmental conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist. Because we are not experts in the field of environmental conditions, the appraisal report cannot be considered as an environmental assessment of the Subject Property.

21. The persons signing the report may have reviewed available flood maps and may have noted in the appraisal report whether the Subject Property is located in an identified Special Flood Hazard Area. However, we are not qualified to detect such areas and therefore do not guarantee such determinations. The presence of flood plain areas and/or wetlands may affect the value of the Subject Property, and the value conclusion is predicated on the assumption that wetlands are non-existent or minimal.

22. We are not a building or environmental inspector. The Integra Parties do not guarantee that the Subject Property is free of defects or environmental problems. Mold may be present in the Subject Property and a professional inspection is recommended.

23. The appraisal report and value conclusions for an appraisal assumes the satisfactory completion of construction, repairs or alterations in a workmanlike manner.

24. IRR – Dallas is an independently owned and operated company.  The parties hereto agree that Integra Realty Resources, Inc. ("Integra") shall not be liable for any claim arising out of or relating to any appraisal report or any information or opinions contained therein as such appraisal report is the sole and exclusive responsibility of IRR – Dallas.  In addition, it is expressly agreed that in any action which may be brought against the Integra Parties arising out of, relating to, or in any way pertaining to the engagement letter, the appraisal reports or any related work product, the Integra Parties shall not be responsible or liable for any incidental or consequential damages or losses, unless the appraisal was fraudulent or prepared with intentional misconduct.  It is further expressly agreed that the collective liability of the Integra Parties in any such action shall not exceed the fees paid for the preparation of the assignment (unless the appraisal was fraudulent or prepared with intentional misconduct).  It is expressly agreed that the fees charged herein are in reliance upon the foregoing limitations of liability.

25. IRR –Dallas is an independently owned and operated company, which has prepared the appraisal for the specific intended use stated elsewhere in the report.  The use of the appraisal report by anyone other than the Client is prohibited except as otherwise provided.  Accordingly, the appraisal report is addressed to and shall be solely for the Client's use and benefit unless we provide our prior written consent.  We expressly reserve the unrestricted right to withhold our consent to your disclosure of the appraisal report or any other work product related to the engagement (or any part thereof including, without limitation, conclusions of value and our identity), to any third parties. Stated again for clarification, unless our prior written consent is obtained, no third party may rely on the appraisal report (even if their reliance was foreseeable).

26. The conclusions of this report are estimates based on known current trends and reasonably foreseeable future occurrences.  These estimates are based partly on property information, data obtained in public records, interviews, existing trends, buyer-seller decision criteria in the current market, and research conducted by third parties, and such data are not always completely reliable. The Integra Parties are not responsible for these and other future occurrences that could not have reasonably been foreseen on the effective date of this assignment.  Furthermore, it is inevitable that some assumptions will not materialize and that unanticipated events may occur that will likely affect actual performance.  While we are of the opinion that our findings are reasonable based on current market conditions, we do not represent that these estimates will actually be achieved, as they are subject to considerable risk and uncertainty.  Moreover, we assume competent and effective management and marketing for the duration of the projected holding period of the Subject Property.

27. All prospective value opinions presented in this report are estimates and forecasts which are prospective in nature and are subject to considerable risk and uncertainty. In addition to the contingencies noted in the preceding paragraph, several events may occur that could substantially alter the outcome of our estimates such as, but not limited to changes in the economy, interest rates, capitalization rates, behavior of consumers, investors and lenders, fire and other physical destruction, changes in title or conveyances of easements and deed restrictions, etc. It is assumed that conditions reasonably foreseeable at the present time are consistent or similar with the future.

As will be determined during the course of the assignment, additional extraordinary or hypothetical conditions may be required in order to complete the assignment.  The appraisal shall also be subject to those assumptions.

Amerigold Suites

APP000327

# EXHIBIT B-3

APP000328

WALKER & DUNLOP
INVESTMENT SALES

Date:     January 4, 2024

To:     Cort Thomas

From:     WDIS Dallas Team

RE:     **Broker Opinion of Value (BOV) – AmeriGold Suites**

WDIS appreciates the opportunity to present an updated short-form BOV for **AmeriGold Suites**. The WDIS Team collectively has a tremendous amount of experience in the disposition of value-add assets, including the sale of thousands of units over nearly four decades and several market cycles.

We believe that the appetite for value-add properties such as **AmeriGold Suites** is considerably strong. We anticipate demand to further increase as we move into 2024 with fresh capital allocations, new entrants to the market, etc. The scale/size and profile of **AmeriGold Suites** in particular ($5M-$10M deals) is conducive to a much larger buyer pool (more buyers with the ability to execute) that will consist predominantly of private buyers, many of whom are the sole decision makers when considering potential acquisitions. The capital markets will have an impact on the breadth of the buyer pool and the ultimate sale price.

We prepared the BOV in accordance with customary valuation methodologies and market metrics employed by a wide array of buyers, along with our recent value-add sales experience in the DFW market.

We elected to develop a valuation for **AmeriGold Suites** by employing the following methodologies:

- **Value-Add (Multifamily Conversion)** – WDIS utilized our internal model to project **AmeriGold Suites Value-Add conversion from hospitality to Multifamily.** Our valuation is based upon our estimate of a buyers first stabilized year. Based upon our knowledge and conversations with value-add owners, we estimate that new ownership will spend roughly $35K/unit renovating the property.
    - Please note, based on our understanding, the current zoning of Mixed Use 3 (MU3) in Dallas County allows for multifamily.

- **Return Methodology – Direct Capitalization Analysis** – With the current environment of volatile interest rates, many buyers are focused on their first-year cap rate. Based upon this, our team determined it best to value this property using a direct capitalization analysis. Our cap rate assumptions are based upon recent sales and current investor appetite for properties such as **AmeriGold Suites**.

- **Levered & Unlevered IRR –** After valuing the property using a direct capitalization analysis, our team used the levered and unlevered IRRs as a reference point to validate our value. Value-add buyers today are commonly looking for levered returns in the high teens and unlevered returns in the low teens.

1

APP000329

- **Capital Markets Supporting Buyer Returns** – To further support the capitalization rates and return metrics we have utilized to derive our suggested pricing, WDIS has obtained feedback from several lenders and how much loan proceeds they would provide. With the feedback outlined below (please note that we are in a highly fluid capital market environment, and these fluctuate on a weekly if not daily basis) – understanding what returns buyers need to achieve based on the debt available furthers WDIS' conviction in obtaining the suggested pricing herein:

  - Bank Debt Interest Rate (Range): 8%-9%
    - Prime + 100-150 bps
    - 5-Year Note w/2 Years of I/O
    - LTV: 60%-65%
    - Full Recourse
  - Non-Recourse (if available) Debt Interest Rate: ±10%

- **Comparable Sales** - We prepared a schedule of comparable sales (age, location, size, renovation status, etc.) to **AmeriGold Suites as a fully converted market-rate multifamily property.**

  - Please note, while these comps can be viewed as "guideposts," the market has experienced a dramatic change and continues to experience fluidity; mainly driven by the current Federal Reserve Yield.
    - To further support our valuation in considering sales comparables, we have employed an additional methodology that backs out the renovation/conversion costs from the higher sales.
    - Ultimately, these are not like-kind sale comparables, they are more so acting as the potential sale upside for a buyer to achieve stabilization following the renovation and conversion to a fully operating market-rate multifamily property.

**WDIS Conclusion to Value – AmeriGold Suites**

To reflect the returns of a value-add asset such as **AmeriGold Suites**, WDIS solved to a 6.75%-7.25% Year 1 Cap Rate, along with a 7-Year Unlevered IRR of 10.85%-11.38% over the hold period.

- The Strike Price represents a value at which we believe there is strong pricing support
- The Premium Price is the number our team would attempt to push buyers toward and we believe that we can achieve
- The Floor Price is the floor for value that provides the highest return metrics for the buyer

2

APP000330

**Broker's Opinion of Value**

## AmeriGold Suites I FINANCIAL ANALYSIS

| VALUATION SUMMARY | Premium Price | Market Price | Floor Price |
|---|---|---|---|
| **Units: 70** | | | |
| **Avg Unit Size: 732** | | | |
| All-in Cost for Stabilization | $7,100,000 | $6,900,000 | $6,700,000 |
| Per Unit | $101,400 | $98,600 | $95,700 |
| Per Square Foot | $139 | $135 | $131 |
| Less: Renovations (35K/Unit) | -$2,450,000 | -$2,450,000 | -$2,450,000 |
| **Multifamily Sales Price** | **$4,650,000** | **$4,450,000** | **$4,250,000** |
| **Per Unit** | **$66,429** | **$63,571** | **$60,714** |
| **Per Square Foot** | **$91** | **$87** | **$83** |

| Cap Rate | | | |
|---|---|---|---|
| Cap Rate (Year 1) | 6.75% | 7.00% | 7.25% |

| Multifamily Return Metrics | | | |
|---|---|---|---|
| Loan To Value | 61.80% | 63.55% | 64.99% |
| Levered IRR | 14.52% | 15.40% | 16.30% |
| Unlevered IRR | 10.85% | 11.12% | 11.38% |
| Year 1 Cash-On-Cash (I/O) | 4.73% | 5.26% | 5.86% |
| Average Cash-on-Cash | 7.63% | 8.40% | 9.23% |

| Multifamily Terminal Value | | | |
|---|---|---|---|
| Terminal Cap Rate | 7.00% | 7.25% | 7.50% |
| Terminal Value | $9,300,000 | $9,000,000 | $8,800,000 |
| Per Unit | $132,857 | $128,571 | $125,714 |

| Operations | | | |
|---|---|---|---|
| Year 1 Market Rent | | $1,279 | |
| Year 1 Market Rent PSF | | $1.75 | |
| 7 Yr CAGR (Revenue) | | 3.6% | |
| Year 1 RE Taxes, per unit | | $2,087 | |
| Controllable Expenses Per Unit | | $4,950 | |
| 7 Yr CAGR (NOI) | | 4.5% | |

3

APP000331

**Summary of Exhibits:**

**Exhibit A –** Underwriting Assumptions
**Exhibit B –** Year 1 Proforma
**Exhibit C –** Premium Scenario Cash Flows
**Exhibit D –** Comparable Sales Analysis
**Exhibit E –** Rent Comparables

APP000332

**Exhibit A**                                                                                          **Underwriting Assumptions**

| AmeriGold Suites - Assumptions Grid | |
|---|---|
| Market Rent | The WDIS Proforma assumes Year 1 Market Rent of $1,272 or $1.74 PSF. This represents in-line market rents with comparable properties in the area and of the same vintage. Our primary focus is on effective rent given that the property operated on an effective rent pricing model. Therefore, market rent growth is used as a plug to get to our desired effective rent. |
| Renovated Units | The WDIS Proforma assumes that each unit is renovated for roughly $35,000 to achieve the market rents stated. |
| Loss to Lease | The WDIS Proforma assumes loss to lease of 0.00% in Year 1 and for the duration of the hold period. |
| Vacancy | The WDIS Proforma assumes a vacancy rate of 5.00% in Year 1. Following Year 1 operations, the WDIS Proforma assumes a 5.00% vacancy rate for the duration of the hold period. |
| Concessions | The WDIS Proforma assumes concessions of 4.00% in Year 1, followed by no concessions for the remaining duration of the hold period. |
| Non-Revenue Units | The WDIS Proforma assumes 0.00 non-revenue units at Market Rent. |
| Bad Debt | The WDIS Proforma assumes bad debt of 0.50% in Year 1, followed by 0.50% for the remaining duration of the hold period. |
| Effective Rent | Year 1 Effective Rent is calculated at $1,227 per unit or $1.68 PSF, in line with buyer underwriting in the market today considering 4.00% concessions assumed in the Proforma. |
| Utility Reimbursements | Based upon expense comparables for similar vintage multifamily properties; Utility Reimbursements are underwritten as 50% of Utility Expenses. |
| Parking & Storage Income | Parking & Storage Income is not considered in the WDIS Proforma. |
| Other Income | Based upon expense comparables for similar vintage multifamily properties and grown at 3.00%. |
| Controllable Expenses | Based upon expense comparables for similar vintage multifamily properties and grown at 2.75%. |
| Property Taxes | Property Taxes are based upon 85% of our conclusion to value in Year 1. Our team spoke with Alliance Tax Advisors to assume this conclusion. After discussing the current assessment with them and how sales are handled by taxing authorities, our team feels comfortable underwriting to an 85% assessment in Dallas County. |
| Management Fee | The WDIS Proforma assumes a management fee of 5.00% of total income. |
| Property Insurance | The WDIS Proforma assumes $800 per unit predicated on current buyer underwriting and conversations with insurance agencies. |
| Replacement Reserves | The WDIS Proforma assumes replacement reserves of $250/unit. |
| Financing Assumptions | The WDIS Proforma assumes a Bank Debt Interest Rate of 8.00% in the 7-year Proforma analysis. |

5

APP000333

**Exhibit B**                                                                                          **Year 1 Proforma**

**AmeriGold Suites ǀ PRO FORMA**

|  | Proforma | | |
|---|---|---|---|
|  |  | **% of** | **Per** |
| **INCOME:** | **Amount** | **Income** | **Unit** |
| Gross Scheduled Market Rent | $1,074,000 | 100% | $15,343 |
| **Gross Potential Rent** | **$1,074,000** | **100.0%** | **15,343** |
| Less: Vacancy | ($53,700) | -5.0% | (767) |
| Less: Concessions | ($42,960) | -4.0% | (614) |
| Less: Bad Debt | ($5,370) | -0.5% | (77) |
| **Net Rental Income** | **$971,970** | **90.5%** | **13,885** |
| *Market Rent/Unit* | *$1,272* |  |  |
| *Market Rent/SF* | *$1.74* |  |  |
| *Effective Rent/Unit* | *$1,227* |  |  |
| *Effective Rent/SF* | *$1.68* |  |  |
| Plus: Utility Reimbursements | $63,000 | 5.9% | 900 |
| Plus: Other Income | $68,564 | 6.4% | 979 |
| **Total Income** | **$1,103,534** | **102.7%** | **15,765** |
| *Monthly Collections* | *$91,961* |  |  |
| **EXPENSES:** |  |  |  |
| Utilities | $126,000 | 11.7% | 1,800 |
| Repairs and Maintenance | $35,000 | 3.3% | 500 |
| Apartment Make Ready | $14,000 | 1.3% | 200 |
| Contract Services | $24,500 | 2.3% | 350 |
| Marketing | $10,500 | 1.0% | 150 |
| Payroll Expenses | $126,000 | 11.7% | 1,800 |
| General and Administrative | $10,500 | 1.0% | 150 |
| Property Taxes | $146,096 | 13.6% | 2,087 |
| Insurance | $56,000 | 5.2% | 800 |
| Management Fees | $55,177 | 5.1% | 788 |
| **Total Expenses** | **$607,425** | **56.6%** | **8,677** |
| **Net Operating Income** | **$496,109** | **46.2%** | **7,087** |
| Replacement Reserves | ($17,500) | -1.6% | (250) |
| **Net Cash Flow** | **$478,609** | **44.6%** | **6,837** |

APP000334

**Exhibit C**                                                                                                 **Premium Cash Flow Statement**

*AmeriGold Suites* | **INTERNAL RATE OF RETURN ANALYSIS**                                                      **PREMIUM PRO FORMA**

| | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 |
|---|---|---|---|---|---|---|---|---|
| Gross Potential Rent, Net | $1,074,000 | $1,106,220 | $1,139,407 | $1,173,589 | $1,208,796 | $1,245,060 | $1,282,412 | $1,320,885 |
| **Total Gross Potential Rental Income** | **$1,074,000** | **$1,106,220** | **$1,139,407** | **$1,173,589** | **$1,208,796** | **$1,245,060** | **$1,282,412** | **$1,320,885** |
| Less: Vacancy | $53,700 | $55,311 | $56,970 | $58,679 | $60,440 | $62,253 | $64,121 | $66,044 |
| Less: Concession | $42,960 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Less: Credit Loss | $5,370 | $5,531 | $5,697 | $5,868 | $6,044 | $6,225 | $6,412 | $6,604 |
| **Net Rental Income** | **$971,970** | **$1,045,378** | **$1,076,739** | **$1,109,041** | **$1,142,313** | **$1,176,582** | **$1,211,879** | **$1,248,236** |
| Plus: Utility Reimbursements | $63,000 | $64,890 | $66,837 | $68,842 | $70,907 | $73,034 | $75,225 | $77,482 |
| Plus: Other Income | $68,564 | $70,621 | $72,740 | $74,922 | $77,169 | $79,484 | $81,869 | $84,325 |
| **Total Operating Income** | **$1,103,534** | **$1,180,889** | **$1,216,316** | **$1,252,805** | **$1,290,389** | **$1,329,101** | **$1,368,974** | **$1,410,043** |
| *Revenue Growth Rate (Over Y1)* | | *7.0%* | *10.2%* | *13.5%* | *16.9%* | *20.4%* | *24.1%* | *27.8%* |
| *Effective Rent* | *$1,227* | *$1,317* | *$1,356* | *$1,397* | *$1,439* | *$1,482* | *$1,527* | *$1,572* |
| *8 YR CAGR* | *3.6%* | | | | | | | |
| Expenses: | | | | | | | | |
| Management Fee | $55,177 | $59,044 | $60,816 | $62,640 | $64,519 | $66,455 | $68,449 | $70,502 |
| Property taxes | $149,748 | $154,022 | $158,267 | $162,630 | $167,112 | $171,719 | $176,452 | $181,316 |
| Operating Expenses | $402,500 | $413,569 | $424,942 | $436,628 | $448,635 | $460,973 | $473,649 | $486,675 |
| **Total Expenses** | **$607,425** | **$626,635** | **$644,025** | **$661,898** | **$680,267** | **$699,146** | **$718,550** | **$738,492** |
| **Net Operating Income** | **$496,109** | **$554,254** | **$572,291** | **$590,907** | **$610,122** | **$629,955** | **$650,424** | **$671,551** |
| Capital Reserves | $17,500 | $17,981 | $18,476 | $18,984 | $19,506 | $20,042 | $20,593 | $21,160 |
| **Net Operating Income After Capital** | **$478,609** | **$536,272** | **$553,815** | **$571,923** | **$590,616** | **$609,912** | **$629,831** | **$650,391** |
| *NOI Growth Rate* | | *12.0%* | *15.7%* | *19.5%* | *23.4%* | *27.4%* | *31.6%* | *35.9%* |
| *8 YR CAGR* | *4.5%* | | | | | | | |
| **Total Debt Service Amount** | **$350,530** | **$350,530** | **$350,530** | **$350,530** | **$350,530** | **$385,809** | **$385,809** | |
| **Net Cash Flow** | **$128,079** | **$185,743** | **$203,285** | **$221,394** | **$240,087** | **$224,103** | **$244,021** | |
| Cash on Cash | 4.73% | 6.86% | 7.50% | 8.17% | 8.86% | 8.27% | 9.01% | |
| Debt Service Coverage | 1.37x | 1.53x | 1.58x | 1.63x | 1.68x | 1.58x | 1.63x | |

| ASSUMPTIONS | | CLOSING ASSUMPTIONS | | REVERSION | |
|---|---|---|---|---|---|
| Total Capital Budget | $7,091,000 | Estimated Closing Date | June 2024 | Gross Selling Price | $9,291,000 |
| Total Purchase Price | $7,091,000 | Loan Amount at Closing | $4,382,000 | Less: Sales Expenses (1.50%) | ($139,365) |
| Total Renovation | $0 | Loan To Value At Closing | 62% | Less: Principal Outstanding | ($4,305,378) |
| Total Units | 70 | Term remaining on loan (Mos) | 84 | Net Proceeds | $4,846,257 |
| Stabilized Cap Rate | 6.75% | Amortization | 30 | LEVERAGED IRR | 14.52% |
| Terminal Cap Rate | 7.00% | IO Periods Remaining | 60 | UNLEVERAGED IRR | 10.85% |
| **FINANCING PARAMETERS** | | Loan Constant | 8.81% | AVERAGE CASH ON CASH | 7.63% |
| Loan Amount | $4,382,000 | Equity Requirement | $2,709,000 | % OF IRR FROM CASHFLOW | 47.47% |
| Date of Origination | June 2024 | Equity Multiple During Term | 2.32x | % OF IRR FROM RESIDUAL | 52.53% |
| Interest Rate | 8.00% | | | | |
| Debt Service Coverage Limit | 1.25x | | | | |

APP000335

**Exhibit D**                                                                                                          **Comparable Sales Analysis**

The following comparable sales are representative of pricing and cap rates for late 1970s/early 1980s vintage value-add multifamily properties. The exhibit provided below is solely to provide guidance if **AmeriGold Suites** was converted to a multifamily property in accordance with Dallas County zoning regulations. As shown above in the **AmeriGold Suites** Value Summary, our analysis assumes the asset would need a total all-in spend per door between $95.7k – $101.4k in order to achieve a pricing premium that is reflected in the following sales comparables.

## AmeriGold Suites
### COMPARABLE SALES ANALYSIS

| Property Name: | Courtyard Condominiums | Winding Way | Meadow Green | Wyngate Townhomes |
|---|---|---|---|---|
| City: | Dallas | Dallas | Grand Prairie | Garland |
| Address: | 6003 Ridgecrest Rd | 13266 Emily Rd | 3001 East Avenue K | 1601 Wynn Joyce Rd |
| Year Built/ Renovated: | 1983 | 1979 | 1980 | 1983 |
| Number of Units: | 32 | 50 | 99 | 45 |
| Square Feet/Unit: | 739 | 498 | 945 | 1121 |
| Sale Date: | Nov-23 | Sep-23 | Dec-23 | Mar-23 |
| Buyer: | Private Buyer | Tri-City Equity Group | Forest Management One LLC | TBD |
| Seller: | Wedgewood LLC | The Egyptian Boys, LLC | Yu Han | DHOND Multifamily LLC |
| **Price:** | **$3,800,000** | **$4,800,000** | **$11,025,000** | **$6,800,000** |
| Price/Unit: | **$118,750** | **$96,000** | **$111,364** | **$151,111** |
| Price/SF: | **$161** | **$193** | **$118** | **$135** |
| Cap Rate: | 4.63% | 5.73% | 6.13% | 6.11% |
| Effective Rent/SF: | $1.94 | $1.62 | $1.36 | $1.48 |
| Effective Rent Multiplier: | 6.9 | 9.9 | 7.2 | 7.6 |
| Notes: | Cap Rate based on T3/T12 financials annualized, renovated property, attached single-car garages | Cap Rate based upon T12 financials, unrenovated property, long term owner of 15+ years | Cap Rate based upon T12 financials | Cap Rate based on T3/T12 financials annualized, fully renovated property, large units with attached garages |

8

APP000336

**Exhibit E**                                                                                           **Rent Comparables**

### AmeriGold Suites
### CURRENT RENT COMPARISON

| Property Name | Year Built | # Units | Avg. Sq. Ft. | % Occ. | Mar. per Unit | Mar. per SF | Concessions/Comments |
|---|---|---|---|---|---|---|---|
| Cottonwood Dallas | 1985 | 270 | 770 | 91% | $1,372 | $1.78 | Partially Renovated Units |
| Casa De Arroyo | 1968 | 50 | 782 | 94% | $1,348 | $1.72 | Renovated Units |
| Hunters Court | 1980 | 184 | 695 | 97% | $1,305 | $1.88 | Fully Renovated Units |
| AmeriGold Suites | 1981 | 70 | 732 | 85% | $1,279 | $1.75 | Units Unrenovated |
| La Fortuna | 1968 | 230 | 745 | 94% | $1,245 | $1.67 | Partially Renovated Units |
| The Thread | 1978 | 606 | 791 | 94% | $1,060 | $1.34 | Partially Renovated Units |
| Comp Averages | 1976 | 268 | 765 | 94% | $1,199 | $1.57 | |

9

APP000337