## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § § § | |
| *Plaintiff*, | § § § | |
| v. | § § | No. 3:22-cv-2118-X |
| | § | |
| TIMOTHY BARTON, | § | |
| CARNEGIE DEVELOPMENT, LLC, | § | |
| WALL007, LLC, | § | |
| WALL009, LLC, | § | |
| WALL010, LLC, | § | |
| WALL011, LLC, | § | |
| WALL012, LLC, | § | |
| WALL016, LLC, | § | |
| WALL017, LLC, | § | |
| WALL018, LLC, | § | |
| WALL019, LLC, | § | |
| HAOQIANG FU (A/K/A MICHAEL FU), | § | |
| STEPHEN T. WALL, | § | |
| | § | |
| *Defendants*, | § | |
| | § | |
| DJD LAND PARTNERS, LLC, and | § | |
| LDG001, LLC, | § | |
| | § | |
| *Relief Defendants*. | § | |

## APPENDIX IN SUPPORT OF RECEIVER'S VERIFIED MOTION FOR APPOINTMENT OF APPRAISERS, APPROVAL OF APPRAISALS, APPROVAL HEARING, AND APPROVAL OF SALE OF HALL STREET PROPERTY

Respectfully submitted,


By: /s/ Timothy B. Wells
    Charlene C. Koonce
     Texas Bar No. 11672850
     charlene@brownfoxlaw.com
    Timothy B. Wells
     Texas Bar No. 24131941
     tim@brownfoxlaw.com
    BROWN FOX PLLC
    8111 Preston Road, Suite 300
    Dallas, TX  75225
    Tel. 214.327.5000
    Fax. 214.327.5001

*Attorneys for Receiver Cortney C. Thomas*

| Exhibit | Description | APP #s |
|---|---|---|
| A | Purchase and Sale Agreement between Cort Thomas, as Receiver for TC Hall, LLC and Glacier Development Partners LLC, dated May 30, 2024 | APP000001-042 |
| B-1 | NVC Appraisal Report dated January 16, 2024 | APP000043-150 |
| B-2 | IRR Appraisal Report dated December 29, 2023 | APP000151-243 |
| B-3 | JLL Broker's Opinion of Value dated March 27, 2024 | APP000244-250 |

# EXHIBIT A

APP000001

PURCHASE AND SALE AGREEMENT

AMONG

Cort Thomas

As Receiver for TC Hall, LLC, a Texas Limited Liability Company

AS RECEIVER,

AND

Glacier Development Partners LLC
A New York Limited Liability Company

AS PURCHASER

Dated as of May 30 , 2024

APP000002

# PURCHASE AND SALE AGREEMENT

THIS PURCHASE AND SALE AGREEMENT (the "**Agreement**") is made as of the Effective Date (as defined below), by and among Glacier Development Partners LLC, a New York Limited Liability Company, with its principal place of business at 220 East 42nd Street, Suite 3002, New York, New York 10017 ("**Glacier**") (the "**Purchaser**") and Cort Thomas, solely in his capacity as the receiver, and not in his individual capacity (the "**Receiver**") for, and on behalf of, TC Hall LLC, a Texas Limited Liability Company, with its principal place of business at 8111 Preston Road, Suite 300, Dallas, Texas 75225 ("**TCH**").. Purchaser and Receiver are collectively referred to as the "**Parties**" and each individually as a "**Party**."

WHEREAS, TCH is the owner of that certain tract or parcel of land consisting of approximately .515 acres described as Lots 15 and 16, Block A/992, of CULLUM'S SUBDIVISION OF BLOCK 992, an Addition to the City of Dallas, Dallas County, Texas, according to the Plat thereof recorded in Volume 1, Page 82, Map Records, Dallas, County, Texas, and further described in **Exhibit A**, which is attached hereto and incorporated herein as if fully set forth (the "**Land**"), together with all right, title, and interest, if any, of TCH, without warranty, at Closing in and to any and all of the following related thereto: (i) all improvements located thereon, if any ("**Improvements**"), (ii) all and singular the rights, benefits, privileges, easements, tenements, hereditaments, and appurtenances thereon or in any way pertaining thereto, (iii) all strips and gores and any land lying in the bed of any street, road or alley, open or proposed, adjoining such Land; (iv) all water and water rights under or otherwise pertaining to the Land; and (v) all governmental or quasi-governmental permits, approvals, authorities, licenses and consents, if any, of any kind or character pertaining to the Land (collectively the Land with (i) through (v), the "**Property**");

WHEREAS, pursuant to the Order Appointing Receiver, dated October 18, 2022 (the "**Receivership Order**"), entered by the United States District Court for the Northern District of Texas, Dallas Division (the "**Court**") in Case No. 3:22-cv-2118-X (the "**Receivership Action**"), the Court appointed and authorized Receiver to, among other things, (a) take possession, custody and control of all of TCH's business operations, assets, and property, and (b) market and sell TCH's business operations, assets, and property, all subject to the conditions contained in the Receivership Order;

WHEREAS, Purchaser desires to purchase the Property, and Receiver desires to sell Property to Purchaser for and on behalf of TCH, in each case for the consideration and upon the terms and subject to the conditions set forth herein; and

WHEREAS, Receiver's obligations under this Agreement, and the transactions contemplated by this Agreement, are expressly subject to the approval of the Court and will be consummated only pursuant to a Confirmation of Sale to be entered in the Receivership Action.

NOW THEREFORE, in consideration of the foregoing and other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

## I. CERTAIN BASIC TERMS

APP000003

1.1.    <u>Certain Basic Terms</u>. Below is a summary of certain basic terms in this Agreement. In the event of a conflict between this Section 1.1 and remainder of this Agreement, the remainder of this Agreement shall govern and control.

| Term | Definition | Controlling Section |
|---|---|---|
| TCH | TC Hall LLC, a Texas Limited Liability Company | Preamble |
| Receiver | Cort Thomas, solely in his capacity as Receiver, and not in his individual capacity, for, and on behalf of, TC Hall LLC | Preamble |
| Purchaser | Glacier Development Partners LLC, a New York Limited Liability Company | Preamble |
| Receiver's Attorney | Brown Fox PLLC<br>Attn: Adam Fox<br>6303 Cowboys Way, Suite 450<br>Frisco, Texas 75034<br>Email: adam@brownfoxlaw.com | Section 10.5 |
| Purchaser's Attorney | Tomlin & Associates Law<br>Attn: John S. Tomlin, Esq.<br>34 South Broadway, Suite 716<br>White Plains, New York 10601<br>Email: JST@Tal.Law | Section 10.5 |
| Purchase Price | $6,000,000.00 | Section 2.3 |
| Escrow Agent | Everest Abstract Services, LLC, insured through First American<br>271 Madison Ave, Suite 905<br>New York, NY 10016<br>Attn: Ilan Bruhim<br>Telephone: 212.684.3030 x 301<br>Email: ilanb@everestabstract.com | Section 2.5 |
| Earnest Money | $200,000.00 is to be deposited by Purchaser with the Title Company within seven (7) business days after the Effective Date.<br>$10,000.00 shall be released by Escrow Agent to Receiver upon Receiver delivering written proof of filing with the court to obtain the Confirmation of Sale and a further $10,000 shall be released by Escrow Agent to Receiver upon Receiver delivering the Confirmation of Sale to Purchaser such funds being for reimbursement of Receiver's legal fees and court costs to apply for and obtain the Confirmation of Sale, which amount shall be non-refundable to Purchaser | Section 2.5 |
| Title Company | Same as Escrow Agent | Section 3.1 |
| Title Exam Deadline | 5:00 p.m., Central time, on the Fifteenth (15th) business day after the later of (1) the date that the Feasibility Period commences and (2) the date Purchaser has received the Title Commitment, as such date may extended as further described in Section 3.3. | Section 3.3 |
| Feasibility Period | Sixty (60) calendar days after the date of Confirmation of Sale is delivered to Purchaser. | Section 4.1 |

APP000004

| | | |
|---|---|---|
| Closing | On or about Sixty (60) calendar days after the expiration of the Feasibility Period, subject to receipt of the Receivership Court's order of Confirmation of Sale and satisfaction or waiver of all other terms and conditions set forth herein, in each case in compliance with the remainder of the Agreement.<br><br>Purchaser shall have the option of extending the Closing by an additional Thirty (30) calendar days, by delivering written notice to the Receiver at least seven (7) days prior to the agreed upon Closing Date together with an additional $50,000.00 deposit, which shall be nonrefundable and deemed part of the Earnest Money and be applicable towards the balance of the Purchaser Price at Closing. | Section 5.1 |

1.2.    Closing Costs. Below is a summary of the allocation of Closing costs in this Agreement. In the event of a conflict between this Section 1.2 and remainder of this Agreement, the remainder of this Agreement shall govern and control.

| Cost | Responsible Party |
|---|---|
| Ad valorem property taxes, tax assessments | Prorated between Receiver and Purchaser as of the Closing Date on a calendar year basis (365 days) |
| All other closing costs, expenses, charges and fees | Per Section 5.5 |
| Any endorsements, additional coverage, or changes to the Owner's Title Policy desired by Purchaser or Purchaser's lender, if any | Purchaser |
| Costs for UCC Searches, Environmental Phase I and all other inspections and reports, Site visit(s) of Purchaser and Purchaser Representatives (as defined below) | Purchaser |
| Escrow fees charged by Title Company | ½ Receiver<br>½ Purchaser |
| Payoffs (Secured Creditors, Liens (as defined below), Judgments, Mortgages), subject to Exceptions | Receiver |
| Purchaser's Attorney's Fees | Purchaser |
| Receiver's Attorney's Fees | Receiver |
| Transfer Taxes and Deed Stamps | ½ Receiver<br>½ Purchaser |
| New/Updated Survey | Purchaser |
| Title Commitment, Search and Exam Fees, Basic Premium for Owner's Title Policy promulgated by the Texas Department of Insurance | Purchaser |
| Broker Fees | Receiver |

## II. PURCHASE AND SALE

2.1.    Agreement of Purchase and Sale. Subject to the terms and conditions hereinafter set forth, Receiver agrees to sell and convey to Purchaser, and Purchaser agrees to purchase from Receiver, the Property, in each case (a) free and clear of all title matters Receiver has elected to cure as further described in Article

III and (b) delivered in accordance with this Agreement with all Court Conditions satisfied or waived by Purchaser.

2.2.    Exceptions. The Property shall be conveyed subject to the matters which are, or are deemed to be, Exceptions (as defined below) pursuant to Section 3.3 and Article 3 herein.

2.3.    Purchase Price. The purchase price for the Property will be Six Million and 00/100 Dollars ($6,000,000.00) (the "**Purchase Price**");

2.4.    Payment of Purchase Price. The Purchase Price, as increased or decreased by prorations and adjustments as herein provided, shall be due and payable, by Purchaser, in full at Closing by wire transfer of immediately available federal funds to a bank account designated by Escrow Agent (as defined below) in writing to Purchaser prior to the Closing.

2.5.    Earnest Money.

(a)    *Earnest Money*. Purchaser agrees to deposit with Everest Abstract Services, LLC ("**Escrow Agent**") an initial earnest money deposit in the amount of Two Hundred Thousand and 00/100 Dollars ($200,000.00) within seven (7) business days after the Effective Date (the "**Earnest Money**"). If Purchaser fails to timely deliver any portion of the Earnest Money, Receiver may terminate this Agreement and this Agreement shall be automatically deemed *void ab initio* and of no further force or effect, at Receiver's sole discretion upon delivery of written notice by Receiver to Purchaser. The Earnest Money shall upon receipt be placed in an interest-bearing account at a federally insured bank and shall be deemed non-refundable to Purchaser upon delivery to the Escrow Agent, except in the event of termination of this Agreement (including termination pursuant to Article IV (Feasibility Period)) and as otherwise provided under the terms of this Agreement, subject to Section 7.1 herein. The Earnest Money shall be applicable to the Purchase Price at Closing. All interest on the Earnest Money shall become part of the Earnest Money and will be reported to the Internal Revenue Service as income to Purchaser.

(b)    *Partial Release of Escrow Money to Receiver*. Upon receipt of the initial Earnest Money deposit, Receiver shall promptly commence application to the Court for the Confirmation of Sale and provide written proof thereof and diligently pursue obtaining the Confirmation of Sale. Upon Purchaser's receipt of written proof of Receiver's application to the Court , Escrow Agent shall promptly release a portion of that Earnest Money in the amount of Ten Thousand and No/100 Dollars ($10,000.00) to the Receiver and upon Purchaser's receipt of the Confirmation of Sale (in accordance with Section 5.9) a further Ten Thousand and No/100 Dollars ($10,000.00) to Receiver ("2nd Payment") with such payments being for reimbursement of a portion of Receiver's legal fees and costs to, among other things, apply for and/or obtain the Confirmation of Sale. In the event that Receiver does not deliver the Confirmation of Sale (in accordance with Section 5.9) within sixty (60) days of the Effective Date (the "Court Order Outside Date") then Purchaser shall have the right to terminate this Agreement and Receiver shall not be entitled to the 2nd Payment (and Escrow Agent shall not release same to Receiver from the Escrow Money) and upon such termination the balance of the Escrow Money in the amount of $190,000 shall be returned to Purchaser. The $20,000.00 disbursement contemplated by this Section 2.5(b) shall be non-refundable in the event

this Agreement is terminated except if this Agreement is terminated by Purchaser if Receiver does not deliver the Confirmation of Sale by the Court Order Outside Date in which case only the initial $10,000 disbursement shall be non-refundable to Purchaser. Any reference in this Agreement to the portion of the Escrow Money applicable to the disbursements contemplated by this Section 2.5(b) shall be deemed $10,000 in the event that Receiver does not deliver the Confirmation of Sale by the Court Order Outside Date or $20,000 if Receiver does deliver the Confirmation of Sale by the Court Order Outside Date, whichever is applicable.

(c)    *Additional Escrow Instructions*. The Escrow Agent shall hold and disburse the Earnest Money in accordance with the terms and conditions of this Agreement. The terms and provisions set forth in this Section 2.5(b) shall survive the termination of this Agreement.

(d)    *Purchaser Acknowledgment*. Purchaser hereby acknowledges and agrees that the Earnest Money held by Escrow Agent does not and shall not constitute property of the estate of Purchaser within the meaning of Section 541 of title 11 of the United States Code (the "**Bankruptcy Code**"), or substantially similar provisions of state law, and Purchaser's interest in such Earnest Money Deposit is limited to the right to have the Earnest Money returned if and when the conditions for the return of the Earnest Money to Purchaser are satisfied as set forth herein. Purchaser hereby acknowledges and agrees that: (i) the proper giving of notice by Receiver to release the Earnest Money as provided hereunder; and/or (ii) the proper release of the Earnest Money to Receiver as provided hereunder shall not be a violation of any provision of the Bankruptcy Code, including, without limitation, Section 362 of the Bankruptcy Code, or require the approval of any court with jurisdiction over any case in which Purchaser or any affiliate of Purchaser is a debtor. Purchaser hereby waives any provision of the Bankruptcy Code necessary to invoke the foregoing, including, without limitation, Sections 105 and 362, and waives any right to defend against any motion for relief from the automatic stay that may be filed by Receiver.

2.6.    <u>Escrow Agent</u>.

(a)    All checks, money orders or drafts received by Escrow Agent will be processed for collection in the normal course of business. Escrow Agent covenants and agrees to hold and disburse the Earnest Money in accordance with the terms and conditions of this Agreement; provided, however, in the event Escrow Agent receives an order issued by a court of competent jurisdiction instructing Escrow Agent not to release and deliver the Earnest Money to Receiver or Purchaser (as applicable), then Escrow Agent shall continue to hold such Earnest Money until after receipt of mutual agreed upon written instructions from the Parties, or otherwise instructed by court order. Other than for the performance of Escrow Agent's duties and obligations in accordance with the terms and conditions of this Agreement, Escrow Agent shall be without liability to either Receiver or Purchaser and is hereby otherwise fully and unconditionally released from any responsibility or liability related to the holding and disbursement of the Earnest Money under the terms of this Agreement.

(b)    The Escrow Agent shall not be liable for any damage, liability or loss arising out of its services pursuant to this Agreement, except for damage, liability or loss to either Receiver or

Purchaser resulting from the breach of the terms of this Agreement, or the willful or negligent conduct or omission of the Escrow Agent or any of its officers or employees. Each of Receiver and Purchaser also hereby authorize and direct Escrow Agent to accept, comply with and obey any and all writs, orders, judgments or decrees entered or issued by any court with jurisdiction with respect to either Receiver or Purchaser; and in case the Escrow Agent obeys or complies with any such writ, order, judgment or decree, it shall not be liable to any of the Parties hereto or any other person, by reason of such compliance. In case the Escrow Agent is a party to any suit or proceedings regarding the Earnest Money, Receiver and Purchaser agree to be jointly responsible for all reasonable attorney's fees and expenses incurred with respect thereto if Escrow Agent is found upon a final judgment issued by a court of competent jurisdiction to not be in breach of the terms of this Agreement, or not to have caused any damage, liability or loss to be incurred or suffered by either Receiver or Purchaser due to the willful or negligent conduct of the Escrow Agent or any of its officers or employees.

(c)      Escrow Agent shall invest the Earnest Money on behalf of the Purchaser in a federally insured, separately denominated account, and all interest earned in connection therewith (if any) shall become part of the "Earnest Money", provided that the Escrow Agent is in receipt of a fully executed W-9 containing the Purchaser's taxpayer's identification number and required investment instructions. Escrow Agent will, upon request, furnish information concerning its procedures and fee schedules for investment. In the event the Escrow Agent is requested to invest Earnest Money hereunder, Escrow Agent shall not be held responsible for any loss of principal or interest which may be incurred as a result of making the investment or redeeming said investment for the purposes of this Agreement, except to the extent arising in connection with the breach of the terms of this Agreement, or the negligence or willful misconduct of the Escrow Agent or any of its officers or employees.

(d)      The terms and provisions set forth in this Section 2.6 shall survive the termination of this Agreement.

### III. TITLE AND SURVEY

3.1.    Title Examination; Commitment for Title Insurance. Promptly after the Effective Date, Purchaser shall cause Everest Abstract Services, LLC (the "**Title Company**") to deliver to Receiver and Purchaser a Commitment for Title Insurance on the form promulgated by the Texas Department of Insurance for the Property (the "**Title Commitment**"), together with true, complete, and legible copies of the applicable exception documents. The Title Commitment shall be issued by the Title Company or other underwriter acceptable to the Title Company.

3.2.    Survey. Within Ten (10) business days after receipt of the Court Approval of Sale, Receiver shall provide Purchaser, to the extent in Receiver's possession, with the most current survey of the Property in Receiver's possession ("**Current Survey**"), if any.

3.3.    Title Objections; Cure of Title Objections.

APP000008

(a)    The "**Title Exam Deadline**" shall be 5:00 p.m., Central time, on the fifteenth (15th) business day following the later of (i) commencement of the Feasibility Period and (ii) date Purchaser has received the Title Commitment, Current Survey to the extent in Receiver's possession, and copies of all title exception documents referenced therein (the "**Supporting Documents**"). Purchaser shall have until the Title Exam Deadline to notify Receiver, in writing, of any objection as Purchaser may have regarding the condition and status of the title to the Property and any matter contained in the Title Commitment and, if applicable, the Current Survey or new survey obtained by Purchaser, excluding any Exceptions or Claims created due to the acts or omissions of Purchaser or any Purchaser Representative ("**Purchaser Objection**").

(b)    Subject to Purchaser's right to terminate this Agreement as set forth in this Article III, any item contained in the Title Commitment, or any matter shown on the Current Survey or new survey (if any), which Receiver does not elect in writing to cure, shall be deemed individually an "**Exception**", and collectively, the "**Exceptions**" and shall include any and all other Exceptions as described in this Agreement hereafter created at or prior to Closing. In the event Purchaser notifies Receiver of a Purchaser Objection, Receiver shall have the right, but not the obligation, to cure such Purchaser Objection. Only Exceptions shall be listed on Exhibit B to the Special Warranty Deed.

(c)    Within ten (10) business days after receipt of Purchaser's written notice of a Purchaser Objections, Receiver may notify Purchaser in writing of Receiver's election to cure or not cure such Purchaser Objections. If Receiver fails to give Purchaser such notice of election prior to expiration of such  ten (10) business day period, then Receiver shall be deemed to have elected not to cure such Purchaser Objection. If Receiver elects to cure any Purchaser Objection and this Agreement is not otherwise terminated as provided herein, Receiver shall have until Closing to remove, satisfy or cure the same. In the event that Receiver elects not to cure all items set forth in Purchaser Objections, does not provide notice to Purchaser within such 10 business day period, or elects to cure any item set forth in the Purchaser Objections and fails to do so at or prior to Closing, Purchaser shall have a right as its sole and exclusive remedy, to terminate this Agreement and receive a return of the refundable portion of the Earnest Money within three (3) business days, thereby waiving and releasing Receiver and the Property of and from any and all Claims, and thereafter neither Receiver nor Purchaser shall have any further rights, obligations or liabilities hereunder except to the extent that any right, obligation or liability set forth herein expressly survives termination of this Agreement.

(d)    Purchaser shall have until the expiration of the Feasibility Period to accept or reject those matters Receiver has elected to cure, not to cure or deemed not to cure subject to Section 3.6 herein. If Purchaser has not provided such notice to Receiver by the expiration of the Feasibility Period of such rejection or approval, Purchaser shall be deemed to have accepted the form and substance of the Current Survey, all matters shown thereon, and all other then-existing Exceptions, including without limitation, all exceptions to the Title Commitment and other items shown thereon. If Receiver elects (or is deemed to have elected) not to cure any of the items in Purchaser Objection specified in Purchaser's notice, or if Receiver is unable to effect a cure of a Purchaser Objection which Receiver has elected in writing to cure prior to the Closing, Purchaser shall, as its sole and

APP000009

exclusive remedy (and hereby waiving and releasing Receiver and the Property of and from any and all Claims), either: (i) accept a conveyance of the Property subject to the Exceptions, specifically including any matter objected to by Purchaser which Receiver is unwilling or unable to cure; or (ii) terminate this Agreement by delivering written notice thereof to Receiver on or before the expiration of the Feasibility Period. If the Title Commitment is thereafter updated and reflects a new Exception (other than an existing or permitted Exception), then Purchaser may terminate this Agreement by delivering written notice thereof to Receiver on or before the expiration of such date that is five (5) days after the date of such updated Title Commitment which reflects such new exception that Receiver has not agreed in writing to cure by Closing, and was not otherwise already an Exception (or deemed Exception) to title as provided under the terms of this Agreement. Upon delivery of such notice of termination, Purchaser shall receive a return of the refundable portion of the Earnest Money within three (3) business days, thereby waiving and releasing Receiver and the Property of and from any and all Claims, and thereafter neither Receiver nor Purchaser shall have any further rights, obligations or liabilities hereunder except to the extent that any right, obligation or liability set forth herein expressly survives termination of this Agreement.

(e)      Receiver shall have no obligation to take any steps or bring any action or proceeding or otherwise to incur any effort or expense whatsoever to eliminate or modify any Exceptions or any Purchaser Objections thereto, except with respect to any items that Receiver agrees in writing to cure.

For purposes of this Agreement, in addition to the foregoing, the term "Exception" or "Exceptions" shall also specifically include: (i) any and all general real estate taxes and assessments, special taxes and assessments, franchise taxes, levies and personal property taxes imposed by any governmental or quasi-governmental authority and any assessments, dues or charges by private covenant that do not constitute a lien or charge on the Property which are, on the Closing Date, not yet due and payable; (ii) supplemental taxes, if any, hereinafter assessed by any governmental authority against the Property to the extent due to a change in ownership and/or use of the Property as a result of this sale; (iii) any other access, telecommunication, cabling and/or utility agreements, memorandums of agreements, licenses or rights-of-way either filed of public record against title to or otherwise effects, the Property, whether prior to or after the Effective Date; (iv) any license, contract, instrument or other agreement entered into between Receiver and/or Receiver's affiliate (on the one hand), and the City, the FEDC, the FCDC, or any other administrative body, governmental or quasi-governmental authority, or utility provider (on the other hand), which is either filed of public record against title to or otherwise effects, the design, entitlement, zoning, development, construction, ownership, operation, management, maintenance, use and/or occupancy of the Property, whether prior to or after the Effective Date; (v) the permits, approvals and conditions which have been or must be obtained for the design, entitlement, zoning, development, construction, ownership, operation, management, maintenance, use and/or occupancy of the Property, including without limitation, and any document, instrument and/or agreement related to same (including, without limitation, any replat of the Property or any portion thereof), whether or not filed of record or otherwise effecting the Property, either prior to or after the Effective Date. If Receiver receives a written request from Purchaser after the Effective Date requesting any of the

APP000010

foregoing, or if Receiver receives actual Knowledge of the existence of the foregoing after the Effective Date, Receiver agrees to communicate the same to Purchaser in writing and provide any of the foregoing in Receiver's actual possession electronically to Purchaser; provided, however, Receiver shall be under no obligation to deliver any such items not actually in Receiver's possession. Notwithstanding the foregoing or anything to the contrary herein, nothing in this Section 3.3(e) shall be interpreted as (x) a waiver of Purchaser's ability to notify Receiver of a Purchaser Objection regarding any matter set forth in this Section 3.3(e) or (y) otherwise limiting Purchaser's ability to terminate this Agreement prior to the Title Exam Deadline.

(f)     Secured Liens not Exceptions. Exceptions shall not include, and Receiver shall cause to be removed and satisfied of record on or before the Closing, any (i) secured liens (including mechanic's liens), mortgages, or similar security instruments which are of public record and encumbering the Property, (ii) any judgment of public record affecting the Property, and (iii) any other secured liens or encumbrances of a liquidated sum, in each case of the foregoing which are in a public record and encumber the Property, but excluding any of the foregoing that are not of public record or which are not yet due and payable (collectively "**Liens**").

(g)     Court Conditions not Exceptions. Exceptions shall not include Court Conditions described in Section 5.10 below unless otherwise waived in writing by Purchaser.

3.4.     <u>Conveyance of Title</u>. At Closing, Receiver shall convey fee simple title to the Property, by Special Warranty Deed on behalf of TCH, to Purchaser, in accordance with this Agreement and subject only to the Exceptions.

3.5.     <u>Assignment of Contractual Rights</u>. During the Feasibility Period Purchaser shall have the right to provide to Receiver a list of any agreements, instruments, contracts, permits, licenses, or approvals benefiting TCH or to which TCH is a party and Receiver shall make reasonable efforts to cause an assignment of same to Purchaser at or prior to the Closing. Receiver shall have no obligation to bring any action or proceeding or otherwise to incur any expense in order to obtain an assignment of the foregoing.

3.6.     <u>Pre-Closing "Gap" Title Matters</u>. Provided the Agreement has not otherwise been terminated, after the expiration of the Feasibility Period, Purchaser may, prior to the Closing Date, notify Receiver in writing of any objections to title first appearing on the Title Commitment or the Current Survey (or an updated/new Survey) after the expiration of the Feasibility Period, other than any Exceptions. Purchaser must provide Receiver written notice of any such objections within five (5) business days after receipt of notice thereof (whether reflected in the updated Title Commitment or the Current Survey or and updated/new Survey, receipt of a recorded copy of such instrument, or otherwise), failing which Purchaser shall be deemed to have waived its right to object and such new title exception shall be deemed an Exception under the terms of this Agreement. With respect to any objections to title set forth in such notice, Receiver shall have the same option to cure, and Purchaser shall have the same option to accept title subject to such matters or to terminate this Agreement as those which apply to any notice of objections made by Purchaser before the Title Exam Deadline or updated Title Commitment.

APP000011

## IV. FEASIBILITY PERIOD

4.1.    <u>Feasibility Period</u>.

(a)    From and after the Effective Date and up until the earlier of the termination of this Agreement or sixty (60) calendar days from the date Receiver delivers the Confirmation of Sale to Purchaser (the "**Feasibility Period**"), Purchaser and its agents, employees, consultants, inspectors, appraisers, surveyors, engineers, and contractors (collectively the "**Purchaser's Representatives**") shall have the right to conduct all reasonable due diligence and inspections as the Purchaser shall deem commercially reasonable, necessary, or appropriate with respect to the Property and with respect to the feasibility of Purchaser's intended development of the Property including  physical and environmental inspections of the Property and to examine such other information that Purchaser reasonably requests and Receiver agrees in writing to provide. Within Ten (10) business days from receiving written request therefor from Purchaser or Purchaser's Representatives, Receiver shall use commercially reasonable efforts to deliver or make available to Purchaser or Purchaser's Representatives all requested documents or other information related to the Property, in each case to the extent in Receiver's possession (collectively, "**Property Information**"). At Receiver's option, the Property Information may be delivered or made available electronically or other commercially reasonable means. In the event that this Agreement is not terminated Purchaser and Purchaser's Representatives shall still have the right to access the Property and to continue to conduct due diligence, inspections and testing up to the Closing Date. Purchaser shall also have the right to access the Property and commence its due diligence, inspections and testing immediately following the Effective Date (in each case subject to Purchaser's obligations set forth in this Article IV).

(b)    Purchaser understands and agrees that any on-site inspections and testing of the Property shall be conducted upon reasonable advance notice to Receiver, which may be made via email only. Purchaser and Purchaser's Representatives shall have the right to perform intrusive testing and subsurface investigations at the Property including without limitation a Phase I and/or Phase II environmental site assessment of the Property and geotechnical inspections and surveys of the Land without Receiver's consent. Notwithstanding the foregoing Purchaser and Purchaser's Representatives shall have the right to access the Property only for visual examination without advanced notice to Receiver.  Purchaser and Purchaser's Representatives shall not engage in any activities that would violate any permits, licenses, entitlements, environmental, wetlands or other regulations pertaining to the Property, or any terms or provisions set forth in any Exception documents. Following each entry by Purchaser or Purchaser's Representatives with respect to inspections and/or tests on the Property made by Purchaser or Purchaser's Representatives, Purchaser shall, to the extent of any damage caused by Purchaser's inspections or tests, restore the Property in the same condition that existed immediately prior to any such inspections and/or tests to Receiver's reasonable satisfaction. Such obligation to restore shall survive the termination of this Agreement. During the Feasibility Period (and up to the Closing Date if this Agreement is not terminated), Purchaser shall also have the right to perform commercially reasonable studies, including researching and discussing potential for rezoning and development of the Property (without making an actual application therefor) with applicable governmental agencies, and

APP000012

generally determine if the Property is suitable for the Purchaser's intended use. Upon reasonable advance notice to Receiver, which may be made via email only Receiver shall use commercially reasonable efforts to cause obstructions (including but not limited to any parked cars) to be removed or moved from areas that Purchaser or Purchaser's Representatives intend to conduct surveys, testing, investigations or other due diligence and to allow Purchaser's Representatives to access the Property to carry out same.. Within ten (10) calendar days of the delivery of a form of consent by Purchaser, Receiver shall provide Purchaser with written authorization to discuss and meet with applicable governmental agencies regarding the potential for rezoning and development of the Property (without making actual application therefor) in a form mutually acceptable to Receiver and such governmental authorities. The Feasibility Period shall be extended for each day that Purchaser or Purchaser's Representatives access to the Property or ability to conduct inspections, testing or other due diligence is impaired or prevented.

(c)      In no event shall Purchaser be responsible to repair or cure any pre-existing conditions on the Property so long as the existing condition is not worsened by Purchaser or by any Purchaser Representative. At no third-party expense to Receiver, Receiver shall reasonably cooperate with Purchaser in its due diligence investigations conducted in accordance with this Section 4.1.

(d)      Purchaser agrees to indemnify, defend, and hold Receiver and its disclosed or undisclosed, agents, affiliates, representatives, consultants, accountants, contractors, and attorneys or other advisors, and any successors or assigns of the foregoing (collectively with Receiver, the "**Receiver Parties**") harmless from and against any and all losses, costs, damages, liens, claims, liabilities, or expenses (including, but not limited to, reasonable attorneys' fees, court costs, and disbursements) (each a "**Claim**") incurred by any Receiver Parties arising from or by reason of Purchaser's and/or Purchaser's Representatives' access to, or inspection of, the Property, or any tests, inspections, or other due diligence conducted by or on behalf of Purchaser, except to the extent such Claims are caused by the gross negligence or willful misconduct of any of the Receiver Parties or are related to any pre-existing conditions on the Property so long as the existing condition is not worsened by Purchaser or by any Purchaser Representative. The provisions of this Section 4.1(d) shall survive the Closing or any termination of this Agreement.

4.2.    <u>Right of Termination</u>. Purchaser shall have the right to terminate this Agreement, in Purchaser's sole and absolute discretion, for any reason or no reason, by giving written notice thereof (the "**Termination Notice**") to Receiver on or before the date that is five (5) days following the expiration of the Feasibility Period (the "**Termination Notice Deadline**"). If Purchaser gives such Termination Notice to Receiver on or before the Termination Notice Deadline, this Agreement shall automatically terminate upon Receiver's receipt of such Termination Notice, and in such event the Earnest Money shall be promptly returned to Purchaser within Five (5) business days of either the Termination Notice or the Termination Notice Deadline, as applicable, and neither Receiver nor Purchaser shall have any further rights or obligations under this Agreement, other than those that expressly survive a termination of this Agreement. If Purchaser fails to give Receiver a written Termination Notice prior to the Termination Notice Deadline, Purchaser shall be deemed to have accepted the Property and the Property Information in their present condition, be satisfied with its inspection of the Property, and waived its right to terminate this Agreement pursuant to this Section 4.2 except that the foregoing shall not be deemed a waiver of Receiver's obligations under this Agreement.

APP000013

**V. CLOSING**

5.1.    <u>Time and Place</u>.

(a)    The closing, funding and otherwise consummation of the transactions contemplated hereby (the "**Closing**") shall occur on or before 4:00 p.m. (Central time) on the date which is Sixty (60) calendar days after expiration of the Feasibility Period subject to the remainder of this Article V (the "**Closing Date**"). Closing shall not be contingent upon re-zoning of the Property.

(b)    The Closing shall occur with all deliveries required hereunder being made to Escrow Agent on or before the Closing Date, in accordance with escrow instructions consistent with the terms and conditions of this Agreement given by or on behalf of Receiver and Purchaser, respectively; whereby escrow arrangements mutually acceptable to Receiver and Purchaser shall allow Receiver, Purchaser and their respective attorneys to consummate the Closing without being physically present and to exchange closing documents through such escrow, via electronic means, and/or .pdf (except with regard to recordable documents or other instruments reasonably requested by the Parties to be provided in original "wet ink" form), which shall be physically delivered to the Escrow Agent on or before the Closing Date.

(c)    At any time Purchaser shall have the option of extending the Closing by an additional thirty (30) calendar days, by delivering written notice to the Receiver at least seven (7) days prior to the agreed upon Closing Date, together with an additional $50,000.00 deposit, which shall be deemed non-refundable and part of the Earnest Money and be applicable towards the balance of the Purchase Price at Closing.

5.2.    <u>Receiver's Obligations at Closing</u>. At Closing, subject to Purchaser's timely and proper satisfaction of the terms and conditions set forth in Section 5.3 below and Court approval pursuant to Section 5.9 below, Receiver shall:

(a)    deliver to the Title Company for delivery to Purchaser the duly executed recordable Special Warranty Deed for the Land, in substantially the form attached hereto as **<u>Exhibit B</u>** (the "**Deed**") and incorporated herein as if fully set forth;

(b)    deliver to the Title Company such evidence as the Title Company may reasonably require as to the authority of the person or persons executing documents on behalf of Receiver;

(c)    deliver to Purchaser possession and occupancy of the Property, subject to the Exceptions;

(d)    execute a closing statement in form and content satisfactory to the Parties;

(e)    execute and deliver such documents and other information as may be reasonably required by the Title Company to issue an owner's title insurance policy in the form promulgated by the Texas Department of Insurance for the Property (the "**Title Policy**");

APP000014

(f)    pay to Broker a commission pursuant to Section 8.1 herein, if applicable;

(g)    pay all secured creditors, Liens, judgments, and mortgages, against the Property including without limitation Receiver's obligations set forth in Article III and the Court Conditions, in each case of the foregoing subject to the Exceptions;

(h)    execute and deliver a FIRPTA (Foreign Investment Real Property Tax Act) affidavit, if applicable, in form and substance as mutually agreed upon;

(i)    execute and deliver such additional documents as shall be reasonably required to consummate the transactions expressly contemplated by this Agreement; and

(j)    Deliver the Confirmation of Sale in recordable form reasonably acceptable to the Title Company.

5.3.    Purchaser's Obligations at Closing. At Closing, subject to Receiver's timely and proper satisfaction of the terms and conditions set forth in Section 5.2 above and Court approval pursuant to Section 5.9 below, Purchaser shall:

(a)    pay to Escrow Agent the full amount of the Purchase Price, as increased or decreased by prorations and adjustments as herein provided, in immediately available wire transferred funds pursuant to Section 2.6 above;

(b)    execute a closing statement in form and content satisfactory to the Parties;

(c)    deliver to the Title Company such evidence as the Title Company may reasonably require as to the authority of the person or persons executing documents on behalf of Purchaser; and

(d)    execute and deliver such additional documents as shall be reasonably required to consummate the transactions contemplated by this Agreement.

5.4.    Credits and Prorations. The following shall be apportioned with respect to the Property as of 12:01 a.m. (Central time), on the Closing Date, as if Purchaser were vested with title to the Property during the entire day upon which Closing occurs which such prorations shall be final and binding with no further adjustment and shall survive Closing:

(a)    Any real estate tax or real estate tax assessments levied against or otherwise applicable to the Property;

(b)    If this sale or a change in use of the Property or denial of any special use valuation of the Property after the Closing would result in the assessment after the Closing of additional taxes and interest applicable to the period of time before the Closing (the "**Rollback Taxes**"), then Purchaser shall be responsible for payment of all Rollback Taxes; and

APP000015

(c)     Assessments for the calendar year in which the Closing occurs shall be prorated at the Closing based upon actual days involved. If the actual amount of such assessments are not known as of such date, either because tax bills for the calendar year of the Closing have not been issued or because such tax bills cover real property in addition to the Property, the proration at the Closing will be based on the most current and accurate tax billing information available, subject to allocation of prorated assessments being proportionate to the gross square feet (GSF) size of the Property compared to any other real property included in the tax bills.

5.5.    <u>Closing Costs</u>.

(a)     Receiver shall pay on behalf of TCH: (i) the fees of any counsel representing it in connection with this transaction, subject to the provisions of this Agreement in the event a dispute arises under or in connection with this Agreement; (ii) one-half of State, County and City transfer taxes which become payable by reason of the transfer of the Property from Receiver to Purchaser; (iii) one-half of the Escrow Costs charged by the Title Company; (iv) all secured creditors, liens, judgments, mortgages, if any, together with penalty and interest, in each case of the foregoing subject to the Exceptions; and (v) any other costs, fees or expenses approved by Receiver under the terms of this Agreement or the settlement statement delivered at Closing.

(b)     Purchaser shall pay: (i) the fee for the Title Commitment, search, exam fee and the basic premium for Title Policy; (ii) the fees of any counsel representing it in connection with this transaction, subject to the provisions of this Agreement in the event a dispute arises under or in connection with this Agreement; (iii) the cost of obtaining a new survey or updating the Current Survey and other third party reports relating to the conducting its due diligence review; (iv) pay the cost for any title endorsements; (v) the recordation fee for the Deed and any other documents, instruments or agreements to be recorded at Closing; (vi) one-half of the Escrow Costs charged by the Title Company; (vii) all fees and costs associated with Purchaser's loan or otherwise incurred by Purchaser's lender; (viii) one-half of State, County and City transfer taxes which become payable by reason of the transfer of the Property from Receiver to Purchaser; and (ix) any other commissions, costs, fees or expenses approved by Purchaser under the terms of this Agreement or the settlement statement delivered at Closing.

(c)     All other costs and expenses incident to this transaction and the closing thereof shall be paid in accordance with Section 1.1 of this Agreement; if not enumerated in this Section 5.5 or in Section 1.1, such costs and expenses shall be paid by the Party incurring such costs and expenses. In the event of a conflict between this Section 5.5 and Section 1.1, then this Section 5.5 shall control. The provisions of this Section 5.5 shall survive the Closing or any early termination of this Agreement.

5.6.    <u>Conditions Precedent to Obligation of Purchaser</u>.

(a)     The obligation of Purchaser to consummate the transaction hereunder shall be subject to the fulfillment on or before the date of Closing of all of the following conditions, any or all of

APP000016

which may be waived by Purchaser in its sole discretion (individually, a "**Purchaser's Condition Precedent**" and collectively, the "**Purchaser's Conditions Precedent**"):

> (i)    All of the representations and warranties of Receiver contained in this Agreement, if any, shall be true and correct in all material respects on the Closing Date;

> (ii)    All of the title Exceptions and or title matters which Receiver has agreed in writing to cure shall be cured on the Closing Date (or shall have been cured prior to the Closing Date);

> (iii)    Receiver shall have performed and observed, in all material respects, all covenants and agreements of this Agreement to be performed and observed by Receiver as of the Closing Date; and

> (iv)    The Court has issued a Confirmation of Sale approving the transactions contemplated hereby pursuant to Section 5.9 herein (including the Court Conditions) and it has been delivered in recordable form at the Closing.

(b)    Purchaser agrees that, as soon as Purchaser has notice of the failure of a Purchaser's Condition Precedent (except for iv), Purchaser shall notify Receiver thereof and Receiver shall have three (3) business days after the receipt of such notice within which to cure such failure (no obligation to do so being implied hereby) and, if required, the Closing Date shall automatically be extended to the next business day occurring after such three (3) business day period; provided, however, in no event shall the Closing Date be further extended under the terms of this Agreement (including, without limitation, by virtue of the notice and cure period set forth in Section 7.2) unless Purchaser and Receiver agree in writing to such extension.

(c)    In the event (i) each and all of Receiver's Conditions Precedent are timely and completely satisfied (or, if applicable, waived in writing by Receiver), and (ii) each and all of the Purchaser's Conditions Precedent are not fully and completely satisfied or waived on or before the dates specified above or, if applicable, on the first business day occurring after the three (3) business day cure period mentioned in the immediately preceding paragraph (which shall not be further extended without Purchaser's and Receiver's prior written agreement), then Purchaser shall have the option, as its sole and exclusive remedy, to either: (A) waive all or any of such Purchaser's Conditions Precedent and proceed with Closing; or (B) pursue its other rights and remedies against Receiver as provided for and in accordance with the terms and conditions set forth in Section 7.2. The provisions set forth in this Section 5.6(c) shall survive the termination of this Agreement.

5.7.    <u>Conditions Precedent to Obligation of Receiver</u>.

(a)    The obligation of Receiver to consummate the transaction hereunder shall be subject to the fulfillment on or before the date of Closing of all of the following conditions, any or all of which

APP000017

may be waived by Receiver in its sole discretion (individually, a "**Receiver's Condition Precedent**" and collectively, the "**Receiver's Conditions Precedent**"):

(i)      Purchaser shall have timely deposited with Escrow Agent on or before 1:00 p.m. (Central time) on the Closing Date, the Purchase Price as adjusted pursuant to and payable in the manner provided for in this Agreement;

(ii)      All of the representations and warranties of Purchaser contained in this Agreement shall be true and correct in all material respects as of the Closing Date;

(iii)      Purchaser shall have performed and observed, in all material respects, all covenants and agreements of this Agreement to be performed and observed by Purchaser as of the Closing Date; and

(iv)      The Court has issued a Confirmation of Sale approving the transactions contemplated hereby pursuant to Section 5.9 herein.

(b)      Receiver agrees that, as soon as Receiver has notice of the failure of a Receiver's Condition Precedent other than Purchaser's failure to deliver the remaining portion of the Purchase Price or any other amounts required to be delivered herein by Purchaser (which event shall be deemed an automatic default by Purchaser without any notice or cure rights), Receiver shall notify Purchaser thereof and Purchaser shall have three (3) business days after the receipt of such notice within which to cure such failure (no obligation to do so being implied hereby) and, if required, the Closing Date shall automatically be extended to the next business day occurring after such three (3) business day period; provided, however, in no event shall the Closing Date be further extended under the terms of this Agreement (including, without limitation, by virtue of the notice and cure period set forth in Section 7.1) unless Purchaser and Receiver agree in writing to such extension.

(c)      In the event each and all of the Receiver's Conditions Precedent are not fully and completely satisfied or waived on or before the dates specified above or, if applicable, on the first business day occurring after the three (3) business day cure period mentioned in the immediately preceding paragraph (which shall not be further extended without Purchaser's and Receiver's prior written agreement), then Receiver shall have the option, as its sole and exclusive remedy, to either: (A) waive all or any of such Receiver's Conditions Precedent and proceed with Closing; or (B) pursue its other rights and remedies against Purchaser as provided for and in accordance with the terms and conditions set forth in Section 7.1, and, if applicable, pursue any Claim against Purchaser related to any indemnity obligations arising under the terms of this Agreement. The provisions set forth in this Section 5.7(c) shall survive the termination of this Agreement.

5.8.    Obligations of Purchaser. Purchaser acknowledges that conveyance of title to the Property may be subject to certain covenants, conditions, and restrictions. Purchaser covenants and agrees to continue to cooperate in good faith with Receiver to execute, deliver and record (if necessary) such documents required with respect to such covenants, conditions, and restrictions, which such obligation shall survive Closing. The foregoing shall not relieve Receiver from delivering title to the Property at the Closing in compliance with its obligations under this Agreement or Purchaser's rights with respect to same.

APP000018

5.9.    Court Approval. Notwithstanding anything to the contrary herein, Purchaser acknowledges that the transactions contemplated by this Agreement are expressly subject in all respects to: (a) approval and confirmation by the Court through the issuance of an order approving the sale (the "**Confirmation of Sale**"); (b) any other applicable order of the Court in the Receivership Action; and (c) compliance with Applicable Laws (defined below).

5.10.    Purchaser shall have no obligation to consummate the transactions contemplated hereby if the Confirmation of Sale does not include the following orders or approvals of the Court to deliver the Property to Purchaser ("Court Conditions") free and clear of:

(a)  Claims and encumbrances
(b)  Mortgages
(c)  Rights of any secured lienholders
(d)  Liens

5.11.    A Confirmation of Sale sufficient in form to be filed by Title Company shall be delivered to Purchaser at or before the Closing in recordable form reasonably acceptable to the Title Company.

5.12.    In the event that the Confirmation of Sale obtained and delivered to Purchaser does not include all of the foregoing Court Conditions Purchaser shall have the right to immediately terminate this Agreement and receive the return of all refundable Earnest Money.

## VI. REPRESENTATIONS, WARRANTIES, AND COVENANTS

6.1.    Representations, Warranties and Covenants of Purchaser. Purchaser hereby makes the following representations, warranties and covenants for the benefit of Receiver as of the Effective Date and the Closing Date:

(a)      Purchaser is validly existing, in good standing under the laws of the state of its formation, and duly qualified to do business in the State of Texas. Purchaser has the full right, power and authority to purchase the Property as provided in this Agreement and to carry out Purchaser's obligations hereunder, and all requisite action necessary to authorize Purchaser to enter into this Agreement and to carry out its obligations hereunder have been, or by the Closing will have been, taken. Any permitted assignee of Purchaser shall be an entity which, prior to the Closing, is validly existing and in good standing under the laws of the state of its formation and duly qualified to do business in the State of Texas. The person signing this Agreement on behalf of Purchaser is authorized to do so. No consent of any partner, member, manager, shareholder, creditor, investor, judicial or administrative body, governmental or quasi-governmental authority or other third party is required for Purchaser to enter into this Agreement and to consummate the transactions contemplated hereby which has not already been obtained.

(b)      There is no action, suit, arbitration, unsatisfied order or judgment, government investigation or proceeding pending or, to Purchaser's knowledge, threatened against Purchaser

APP000019

which, if adversely determined, could materially interfere with the consummation by Purchaser of the transactions contemplated by this Agreement.

(c)    The execution and delivery of this Agreement or the consummation by Purchaser of the transactions contemplated by this Agreement will not (i) conflict with or result in a breach of or default under any of the terms, conditions, or provisions of any note, bond, mortgage, indenture, license, agreement, or other instrument or obligation to which Purchaser is a party, or (ii) violate any order, injunction, decree, statute, rule, or regulation applicable to Purchaser.

(d)    Purchaser has, or has available to it, funds adequate to pay the Purchase Price at Closing and to perform its other obligations under this Agreement.

(e)    Purchaser is not: (i) a plan which is subject to Title I of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), as defined in Section 3(3) of ERISA, nor a plan as defined in Section 4975(e)(1) of the Internal Revenue Code of 1986, as amended (each of the foregoing hereinafter referred to collectively as a "Plan"); or (ii) a "governmental plan" as defined in Section 3(32) of ERISA. Purchaser is acting on its own behalf and not on account of or for the benefit of any Plan. Purchaser shall not transfer the Property to any entity, person or Plan which will cause a violation of ERISA. Purchaser shall not assign its interest under this Agreement to any entity, person or Plan which, if the assignee acquires the Property, will cause a violation of ERISA.

(f)    Neither Purchaser, nor to Purchaser's knowledge any individual or entity having an interest in Purchaser, is, nor will become, a person and/or entity with whom U.S. persons or entities are restricted from doing business under the International Emergency Economic Powers Act, 50 U.S.C. § 1701 et seq.; the Trading with the Enemy Act, 50 U.S.C. App. §5; any executive orders promulgated thereunder; any implementing regulations promulgated thereunder by OFAC (including those persons and/or entities named on the SDN List); or any other applicable law of the United States, including Executive Order 13224 or the USA Patriot Act.

(g)    Should this Agreement terminate prior to the Closing Date, Purchaser shall, at its sole cost and expense, immediately (i) return or cause to be returned to Receiver all copies of any information or documents received from Receiver and any other Receiver Parties in hard copy form, and (ii) delete from its computer and other electronic storage devices any information or documents received from Receiver and any other Receiver Parties received from Receiver electronically.

(h)    Before Closing, Purchaser agrees (whether individually or by and through an entity which is directly or indirectly owned or controlled by Purchaser) not to solicit, negotiate or enter into any document, agreement or instrument that is binding upon Receiver or Receiver's interest in the Property, or the Property, or any portion thereof.

6.2.    <u>Representations, Warranties and Covenants of Receiver</u>. As a material inducement to Purchaser to enter into this Agreement and consummate the transactions contemplated herein, Receiver hereby represents and warrants the following shall be materially true as of the Closing Date:

APP000020

(a)      Receiver has been duly appointed by the Court pursuant to the Receivership Order and, as of the Closing Date and subject to the conditions set forth in Section 5.9 herein, (i) Receiver shall have full authority and right, and shall have received all consents required, to consummate the transactions described herein, and (ii) this Agreement shall be a valid and binding obligation of Receiver.

(b)      Receiver's obligations under this Agreement, and the transactions contemplated by this Agreement, are expressly subject to the approval of the Court and will be consummated only pursuant to a Confirmation of Sale to be entered in the Receivership Action.

(c)      To Receiver's Knowledge, other than matters before the Court in this receivership that Receiver has notified Purchaser , there is no action, investigation, or similar proceeding materially affecting the Property or Receiver's rights to enter into this Agreement.

(d)      Receiver has no Knowledge of (i) any service contracts affecting the Property other than those disclosed to Purchaser in the Property Information, if any, or (ii) any default or unresolved material matter of non-compliance arising under any such service contract affecting the Property.

(e)      To Receiver's Knowledge, there is no written notice of any pending or threatened condemnation or eminent domain proceedings against the Property.

As used in this Section 6.2, the phrases "To Receiver's Knowledge" or "Knowledge" shall mean the current, actual knowledge of Receiver gained through his receivership of the Property. Purchaser acknowledges that, by virtue of Receiver's limited knowledge and involving in owning and/or managing the Property, Receiver's Knowledge is limited. Receiver shall have no duty to make an independent investigation or inquiry as to the truthfulness of the representations and warranties set forth herein.

6.3.    <u>Survival of Representations, Warranties and Covenants</u>. The representations, warranties and covenants of Purchaser and Receiver set forth in Sections 6.1 and 6.2, as applicable, shall survive Closing for a period of six (6) months.

## VII. DEFAULT

7.1.    <u>Default by Purchaser</u>. In the event that Purchaser fails to perform its obligations prior to Closing pursuant to this Agreement for any reason other than a default by Receiver or the permitted termination of this Agreement by either Receiver or Purchaser as herein expressly provided, or if prior to Closing any one or more of Purchaser's representations or warranties are breached in any material respect, then if such failure or breach is not cured by Closing (which date for Closing shall, upon prior written notice to Receiver, be extended by a reasonable additional time to effect such a cure, but in no event shall such extension exceed Five (5) business days after the original date for Closing set forth in Section 5.1 hereof), unless otherwise stated in this Agreement to the contrary, Receiver shall be entitled as its sole and exclusive remedy, either to: (a) waive said failure or breach and proceed to Closing without any reduction in the Purchase Price; or (b) terminate this Agreement and receive or retain (as applicable) the Earnest Money as

APP000021

liquidated damages for Purchaser's breach of this Agreement, it being agreed between the Parties hereto that determining the actual damages to Receiver in the event of such breach are impractical to ascertain and the amount of the Earnest Money is a reasonable estimate thereof. In addition to the foregoing rights of Receiver, Receiver shall retain the right to pursue against Purchaser any Claim for any indemnification obligation of Purchaser set forth in this Agreement. IN NO EVENT SHALL PURCHASER'S DIRECT OR INDIRECT PARTNERS, SHAREHOLDERS, MEMBERS, OWNERS OR AFFILIATES, OR ANY OFFICER, DIRECTOR, EMPLOYEE OR AGENT OF THE FOREGOING, OR ANY AFFILIATE OR CONTROLLING PERSON THEREOF WHO, (WHETHER INDIVIDUALLY OR COLLECTIVELY) ARE NOT A PARTY TO ANY AGREEMENT WITH RECEIVER (OR ANY ENTITY CONSTITUTING RECEIVER, AS APPLICABLE) HAVE ANY LIABILITY FOR ANY CLAIM, CAUSE OF ACTION OR OTHER LIABILITY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE PROPERTY, WHETHER BASED ON CONTRACT, COMMON LAW, STATUTE, EQUITY OR OTHERWISE. The provisions of this Section 7.1 shall survive Closing or the earlier termination of this Agreement.

7.2.    Default by Receiver. In the event that Receiver fails to perform prior to Closing its obligations under this Agreement for any reason other than Purchaser's default, or the permitted termination of this Agreement by either Receiver or Purchaser as herein expressly provided, or if prior to Closing any one or more of Receiver's representations or warranties are breached in any material respect, then if such failure or breach is not cured by Closing (which date for Closing shall, upon prior written notice to Purchaser, be extended by a reasonable additional time to effect such a cure, but in no event shall such extension exceed five (5) days after the original date for Closing set forth in Section 5.1 hereof), Purchaser shall elect, as its sole and exclusive remedy, either to: (a) waive said failure or breach and proceed to Closing without any reduction in the Purchase Price; or (b) terminate this Agreement and receive the return of the Earnest Money. The provisions of this Section 7.2 shall survive Closing or the earlier termination of this Agreement.

7.3.    Provisions Applicable to Claims. Any pre- or post-judgment claims shall bear interest at the lesser of ten percent (10%) per annum, or the highest rate of interest allowed by law. If Closing is consummated, then the Parties shall have all remedies available to each respective Party as provided under the terms of this Agreement which are applicable to the alleged default (including, without limitation, the remedies provided in Article V above) in the event either Party fails to perform any obligation under this Agreement that survives the Closing; provided, however, in no event shall either Party be liable to the other Party for any incidental, consequential or punitive damages. The provisions of this Section 7.3 shall survive Closing or the earlier termination of this Agreement.

## VIII. COMMISSIONS

8.1.    Brokerage Commissions.

(a)    Upon the Closing of the transaction contemplated in this Agreement, Receiver shall pay to Jones Lang LaSalle Americas, Inc. ("**Broker**") a commission ("**Broker's Commission**") pursuant to the terms of a separate written agreement. If Closing does not occur for any reason, then Receiver shall not owe or be obligated to pay the Broker's Commission. Receiver represents and warrants to

APP000022

Purchaser that no other broker, agent, or finder shall be due any commissions with regards to the transactions contemplated by this Agreement other than the Broker's Commission.

(b)    Under no circumstances shall Receiver or Purchaser owe a commission or other compensation to any other broker, agent, or person. Purchaser hereby represents and warrants to Receiver that no brokers, agents, finder's fees, or commissions are due or arising in connection with Purchaser entering into this Agreement or the consummation of transactions contemplated herein by Purchaser, and Purchaser hereby agrees to indemnify, defend and hold Receiver harmless from and against all Claims arising from such warranties whether or not such Claim is meritorious, for any compensation with respect to Purchaser entering into this Agreement, Purchaser's purchase of the Property, or the consummation of transactions contemplated herein. The provisions of this Section 8.1 shall survive Closing or earlier termination of this Agreement.

## IX. DISCLAIMERS AND WAIVERS

9.1.    Certain Definitions. The following terms shall have the definitions indicated below:

(a)    "**Environmental Law**" shall mean any federal, state, or local laws, ordinances, permits, or regulations, or any common law, regarding health, safety, radioactive materials, or the environment, including, but not limited to, the following federal statutes: Clean Air Act (42 U.S.C. § 7401 et seq.) ("**CAA**"), Clean Water Act (42 U.S.C. § 1251 et seq.) ("**CWA**"), Resource Conservation and Recovery Act (42 U.S.C. § 6901 et seq.) ("**RCRA**"), Comprehensive Environmental Response, Compensation, and Liability Act (42 U.S.C. § 9601 et seq.) ("**CERCLA**"), Emergency Planning and Community Right-to-Know Act (42 U.S.C. § 11001 et seq.) ("**EPCRA**"), Safe Drinking Water Act (42 U.S.C. § 300f et seq.) ("**SDWA**"), Toxic Substances Control Act (15 U.S.C. § 2601 et seq.) ("**TSCA**"), Endangered Species Act of 1973 (16 U.S.C. § 1531 et seq.) ("**ESA**"), Federal Insecticide, Fungicide and Rodenticide Act (7 U.S.C. § 136 et seq.) ("**FIFRA**"), and the Occupational Safety and Health Act (29 U.S.C. § 651 et seq.) ("**OSHA**"), each as amended, and any regulations promulgated thereunder, guidance and directives issued with respect thereto, or policies adopted by authority thereunder.

(b)    "**Environmental Matter**" shall mean any of the following: (i) the Release of any Hazardous Material on or at the Property or any other property; (ii) the migration of any Hazardous Material onto or from the Property; (iii) the environmental, health, or safety aspects of the transportation, storage, treatment, handling, use, or Release, whether any of the foregoing occurs on or off the Property, of Hazardous Materials in connection with the operations or past operations of the Property; (iv) the violation, or alleged violation, of any Environmental Law, order, permit, or license of or from any governmental authority, agency, or court relating to environmental, health, or safety matters; (v) the presence of any underground storage tanks within the confines of the Property; (vi) the presence of wetlands within the confines of the Property; (vii) the presence of any endangered species on, in, or around the Property; or (viii) the characterization of the Property as historical in nature in any way.

APP000023

(c)   "**Hazardous Material**" shall mean: (i) any radioactive materials; (ii) any substance or material the transportation, storage, treatment, handling, use, removal, or Release of which is subject to any Environmental Law; or (iii) any substance or material for which standards of conduct are imposed under any Environmental Law. Without limiting the generality of the foregoing, "Hazardous Materials" shall include: asbestos and asbestos-containing materials (whether or not friable); urea-formaldehyde in any of its forms; polychlorinated biphenyls; oil; used oil; petroleum products and their by-products; lead based paint; radon; and any substances defined as "hazardous waste", "hazardous substances", "pollutants or contaminants", "toxic substances", "hazardous chemical", "hazardous air pollutants", or "toxic chemical" under the CAA, CWA, RCRA, CERCLA, EPCRA, SDWA, TSCA, or OSHA, or any other Environmental Law.

(d)   "**Release**" shall mean the discharge, disposal, deposit, injection, dumping, spilling, leaking, leaching, placing, presence, pumping, pouring, emitting, emptying, escaping, or other release of any Hazardous Material.

9.2.   <u>Disclaimer of Warranties</u>.

(a)   Purchaser acknowledges that Receiver has acquired the rights and obligations to sell the Property due solely to the Receivership Action, and consequently Receiver has little or no knowledge of the condition of the Property and the surrounding areas. **ACCORDINGLY, PURCHASER ACKNOWLEDGES AND AGREES THAT PURCHASER IS PURCHASING THE PROPERTY "AS-IS", "WHERE-IS", AND "WITH ALL FAULTS" AS OF THE EFFECTIVE DATE AND AS OF THE CLOSING DATE, AND PURCHASER FURTHER ACKNOWLEDGES AND AGREES THAT RECEIVER HEREBY EXPRESSLY DISCLAIMS (WITH EXCEPTION TO THE EXPRESS WARRANTIES IN SECTION 6.2 ABOVE) ANY AND ALL IMPLIED WARRANTIES CONCERNING THE CONDITION OF THE PROPERTY AND ANY PORTIONS THEREOF, INCLUDING, BUT NOT LIMITED TO, THE IMPLIED WARRANTIES OF HABITABILITY, MERCHANTABILITY, OR FITNESS FOR A PARTICULAR PURPOSE. PURCHASER FURTHER ACKNOWLEDGES AND AGREES THAT PURCHASER WILL INSPECT THE PROPERTY AND PURCHASER WILL RELY SOLELY ON ITS OWN INVESTIGATION AND INSPECTIONS OF THE PROPERTY IN ITS ACQUISITION THEREOF. RECEIVER SHALL HAVE NO OBLIGATION HEREUNDER TO ALTER, REPAIR, OR IMPROVE THE PROPERTY UNLESS SPECIFICALLY SET FORTH IN THIS AGREEMENT.**

(b)   Purchaser further agrees that Purchaser will not rely upon any: (i) representations or warranties (oral or written) made by, or purportedly on behalf of, Receiver unless expressly set forth in this Agreement, or (ii) documents or other information (oral or written) supplied by, or purportedly on behalf of, Receiver. **PURCHASER FURTHER ACKNOWLEDGES AND AGREES THAT ANY DOCUMENTS OR INFORMATION PROVIDED TO PURCHASER BY RECEIVER, A RECEIVER PARTY, OR ON RECEIVER'S BEHALF, HAVE BEEN OBTAINED FROM A VARIETY OF SOURCES, HAVE NOT BEEN INDEPENDENTLY INVESTIGATED OR VERIFIED BY RECEIVER, AND ARE NOT TO BE RELIED UPON BY PURCHASER IN ENTERING INTO THIS AGREEMENT OR PURCHASING THE PROPERTY. RECEIVER MAKES NO EXPRESS REPRESENTATIONS OR WARRANTIES, AND DISCLAIMS ANY AND ALL IMPLIED WARRANTIES, CONCERNING THE TRUTH, ACCURACY, AND COMPLETENESS OF ANY DOCUMENTS OR INFORMATION SUPPLIED TO PURCHASER BY**

APP000024

RECEIVER, ANY RECEIVER PARTY, OR ANYONE ACTING OR PURPORTING TO ACT ON RECEIVER'S BEHALF.

(c)    EXCEPT TO THE EXTENT EXPRESSLY PROVIDED IN SECTION 6.2 OF THIS AGREEMENT, RECEIVER MAKES NO REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, CONCERNING ANY MATTERS INVOLVING THE PROPERTY. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, RECEIVER HEREBY AFFIRMATIVELY DISCLAIMS ANY EXPRESS OR IMPLIED REPRESENTATIONS OR WARRANTIES CONCERNING ANY OF THE FOLLOWING MATTERS:

(i)    EXCEPT AS EXPRESSLY SET FORTH IN THE DEED, ANY MATTERS AFFECTING TITLE TO THE PROPERTY;

(ii)    THE COMPLIANCE OF THE PROPERTY OR ANY PORTION THEREOF WITH ANY AND ALL APPLICABLE FEDERAL, STATE, AND LOCAL LAWS, ORDINANCES, PERMITS, RULES, REGULATIONS, OR REQUIREMENTS, INCLUDING, BUT NOT LIMITED TO, ENVIRONMENTAL LAWS;

(iii)    THE SUITABILITY OR APPROPRIATENESS OF THE PROPERTY OR ANY PORTION THEREOF FOR FUTURE DEVELOPMENT OR RENOVATION OR FOR THE CONDUCT OF ANY USES OR ACTIVITIES THAT PURCHASER MAY ELECT TO CONDUCT THEREON;

(iv)    THE EXISTING PHYSICAL CONDITION OF THE PROPERTY OR ANY PORTION THEREOF;

(v)    THE EXISTENCE, QUALITY, NATURE, ADEQUACY, OR PHYSICAL CONDITION OF ANY UTILITIES SERVING THE PROPERTY; OR

(vi)    THE PRESENCE OR ABSENCE OF ANY HAZARDOUS MATERIALS OR ENVIRONMENTAL MATTERS.

9.3.    Waiver and Release of Liability; Indemnification.

(a)    PURCHASER, FOR ITSELF AND ITS HEIRS, SUCCESSORS, AND ASSIGNS AND ANYONE ELSE CLAIMING BY, THROUGH, OR UNDER PURCHASER, HEREBY EXPRESSLY WAIVES THE CLAIMS DESCRIBED BELOW IN THIS SECTION 9.3 (WHETHER OR NOT SUCH CLAIMS ARE KNOWN OR DISCOVERABLE AS OF THE EFFECTIVE DATE), AND RELEASES THE RECEIVER PARTIES FROM ANY AND ALL LIABILITY BASED IN WHOLE OR IN PART UPON ANY SUCH CLAIMS:

(i)    CLAIMS BASED UPON ANY OF THE MATTERS SET FORTH IN SECTION 9.2 ABOVE; AND

(ii)    NOTWITHSTANDING ANY OTHER PROVISIONS OF THIS AGREEMENT, CLAIMS BASED UPON ANY ACTUAL OR ALLEGED FAILURE BY RECEIVER OR ANY RECEIVER PARTY TO SATISFY A DUTY TO DISCLOSE INFORMATION TO PURCHASER CONCERNING

APP000025

**THE PROPERTY, INCLUDING, BUT NOT LIMITED TO, INFORMATION CONCERNING THE PRESENCE OF ANY PATENT OR LATENT DEFECTS, DEFICIENCIES IN OR AFFECTING THE PROPERTY, OR THE PRESENCE OF ANY PATENT OR LATENT ENVIRONMENTAL MATTERS OR HAZARDOUS MATERIALS.**

(b)      Notwithstanding the intent of the Parties hereto that the waiver and release provisions contained in Section 9.3(a) above bar all Claims by Purchaser and Purchaser's heirs, successors, and assigns and anyone else claiming by, through, or under Purchaser, should a court of competent jurisdiction deem otherwise, Purchaser hereby agrees that the presence of the waiver and release provisions in Section 9.3(a) should serve as the overwhelming, primary factor in any equitable apportionment of costs under applicable federal, state, or local laws, ordinances, or regulations.

(c)      Purchaser shall indemnify, defend, and hold Receiver Parties harmless from and against all Claims (including cleanup or remediation costs, deficiencies, interest, fines, penalties, court costs, and consultants' and attorneys' fees and disbursements) that Receiver Parties suffer, incur, or may potentially suffer or incur, as a result of any Claims made or brought by any party other than Purchaser (including, without limitation, any governmental or quasi-governmental agency, instrumentality, or authority, or one or more private parties) on the basis of any of the matters set forth in this Article IX.

(d)      Purchaser acknowledges and agrees that the waiver, release, and indemnification provisions contained in this Section 9.3 are each reasonable and acceptable to Purchaser and an essential component of the consideration for the sale of the Property hereunder and Receiver would not otherwise sale the Property without such provisions.

(e)      Purchaser acknowledges and agrees that Purchaser's sole recourse for Claims of the nature described in this Article IX shall be to or against parties other than Receiver Parties and that economic recovery may not be possible against some or all of such parties.

(f)      Notwithstanding anything to the contrary, each of the provisions of this Article IX shall survive Closing and the execution and delivery of the Deed by Receiver and shall not be merged therein.

## X. MISCELLANEOUS

10.1.    <u>Other Statutory Disclosure Provisions</u>. The following disclosures are made for the purpose of complying with specific statutory provisions of Texas law, and such disclosures are not intended to and do not hereby alter or affect the rights and obligations of Purchaser and Receiver:

(a)      *Notice Regarding Possible Annexation*. If the Property is located outside the limits of a municipality, the Property may now or later be included in the extra-territorial jurisdiction of a municipality and may now or later be subject to annexation by the municipality. Each municipality maintains a map that depicts its boundaries and extraterritorial jurisdiction. To determine if the Property is located within a municipality's extraterritorial jurisdiction or is likely to be located within a municipality's extraterritorial jurisdiction, contact all municipalities located in the general

APP000026

proximity of the Property for further information. The complete requirements for the notice may be found at Tex. Prop. Code Ann. § 5.011.

(b)      *Notice to Purchaser Regarding Restrictive Covenants*. Pursuant to the Texas Local Government Code, if the Property is located within a municipality whose governing body has required any person who sells or conveys restricted property located within its jurisdiction to first give written notice to the Purchaser of: (i) the restrictions and (ii) the municipality's right to enforce compliance with the restrictions, written notice must be given to by Receiver to Purchaser on or before the final closing, and the notice document must be signed and acknowledged by both Receiver and Purchaser, then recorded in the real property records in the county where the real property is located. The requirements and text of the notice may be found at 30 Tex. Loc. Gov't Code Ann. § 212.155.

(c)      *Notice to Purchaser Regarding Coastal Area Property*. Pursuant to the Texas Natural Resources Code, if the Property adjoins and abuts the tidally influenced waters of the state, this information must be disclosed by Receiver to Purchaser before the transaction closes. The requirements and text of the notice may be found at Tex. Nat. Res. Code Ann. § 33.135.

(d)      *Notice to Purchaser of Property Seaward of Gulf Intracoastal Waterway*. Pursuant to the Texas Natural Resources Code, if the Property is located seaward of the Gulf Intracoastal waterway to its southernmost point and then seaward of the longitudinal line also known as 97 degrees, 12'19" which runs southerly to the international boundary from the intersection of the centerline of the Gulf Intracoastal waterway and the Brownsville Ship Channel, then this information must be disclosed by Receiver to Purchaser before the transaction closes. The requirements and text of the notice may be found at Tex. Nat. Res. Code Ann. § 61.025.

(e)      *Storage Tanks Disclosure Provider*. If the Property contains an underground storage tank or tank system or an aboveground tank or tank system subject to regulation by the Texas Commission on Environmental Quality, statutory notice must be given by Receiver to Purchaser prior to closing pursuant to the Texas Administrative Code. The requirements and text of the notice may be found at 30 Tex. Admin. Code Ann. § 334.9.

(f)      *Utility District Notice*. If the Property is situated in a utility or other statutorily created district providing water, sewer, drainage, or flood control facilities and services, Chapter 49 of the Texas Water Code requires Receiver to deliver and Purchaser to sign the statutory notice relating to the tax rate, bonded indebtedness, or standby fee of the district prior to final execution of this Agreement. The requirements and text of the notice may be found at Tex. Water Code Ann. § 49.452.

(g)      *Notice to Purchaser of Property Located in Certain Annexed Water Districts*. This form sets out the mandatory notice provisions under the Texas Water Code. If the Property is located in a water or sanitary sewer district that entered into a contract with a city, other than a city with a population of more than one million in a county of more than two million, that allows the city to set rates in the district after annexation that are different from rates charged to other residents of the city, Receiver at or before closing must deliver to Purchaser a separate written notice, executed

APP000027

and acknowledged by Receiver, containing the information in this notice. Purchaser must sign the notice to evidence receipt. Tex. Water Code Ann. § 49.452(g)-(p) applies to this notice provision, including Purchaser's right to seek damages if the sale or conveyance of the Property is not made in compliance with this statute. The requirements and text of the notice may be found at Tex. Water Code Ann. § 54.016(h)(4) and § 49.452(g)-(p).

(h)      *Notice to Purchaser that Property is Located within the Area of the Alignment of a Transportation Project*. Pursuant to the Texas Local Government Code, if the Property is within the area of the alignment of a transportation project, as shown on the final environmental decision document applicable to the future transportation corridor identified in an agreement between the Texas Department of Transportation and the county under Tex. Transp. Code Ann. § 201.619, Receiver must provide a conspicuous statement in the Agreement. The requirements and text of the notice may be found at Tex. Loc. Gov't Code Ann. § 232.0033.

(i)      *Notice Required by §13.257, Texas Water Code*. Receiver hereby notifies Purchaser that the Property may be located in a certificated water or sewer service area, which is authorized by law to provide water or sewer service to the properties in the certificated area. If the Property is located in a certificated area, there may be special costs or charges that Purchaser will be required to pay before Purchaser can receive water or sewer service. There may be a period required to construct lines or other facilities necessary to provide water or sewer service to the Property. Purchaser is advised to determine if the Property is in a certificated area and contact the utility service provider to determine the cost that Purchaser will be required to pay and the period, if any, that is required to provide water or sewer service to the Property. By execution of this Agreement, Purchaser acknowledges receipt of this notice. Receiver and Purchaser agree that the provisions of this 10.1 shall survive Closing.

(j)      *Statutory Tax Districts*. If the Property is situated in a utility or other statutorily created district providing water, sewer, drainage, or flood control facilities and services, Chapter 49, Texas Water Code, requires Receiver to deliver and Purchaser to sign the statutory notice relating to the tax rate, bonded indebtedness, or standby fee of the district prior to final execution of this Agreement.

(k)      *Public Improvement District*. If the Property is in a public improvement district, Section 5.014 of the Property Code requires Receiver to notify Purchaser as follows: As a Purchaser of this parcel of real property you are obligated to pay an assessment to a municipality or county for an improvement project undertaken by a public improvement district under Chapter 372 Local Government Code. The assessment may be due annually or in periodic installments. More information concerning the amount of the assessment and the due dates of that assessment may be obtained from the municipality or county levying the assessment. The amount of the assessments is subject to change. Your failure to pay the assessments could result in a lien on and the foreclosure of the Property.

(l)      *Notice of Water Level Fluctuations*. If the Property adjoins an impoundment of water, including a reservoir or lake, constructed under Chapter 11 of the Texas Water Code, that has a storage capacity of at least 5,000 acre-feet at the impoundment's normal operating level, Receiver

APP000028

hereby notifies Purchaser: *"The water level of the impoundment of water adjoining the Property fluctuates for various reasons, including as a result of: (1) an entity lawfully exercising its right to use the water stored in the impoundment; or (2) drought or flood conditions.*

(m)   *Transfer Fees*. If the Property is subject to a private transfer fee obligation, Section 5.205 of the Texas Property Code requires Receiver to notify Purchaser as follows: The private transfer fee obligation may be governed by Chapter 5, Subchapter G of the Texas Property Code.

10.2.   <u>Public Disclosure</u>. Subject to Section 5.9, prior to Closing, any release to the public of information with respect to the sale contemplated herein or any matters set forth in this Agreement that would disclose the Purchase Price will be made only in the form approved by each of Purchaser and Receiver, except to the extent such release of information is to a party entitled to receive such information hereunder. The provisions of this Section 10.2 shall survive any early termination of this Agreement.

10.3.   <u>Jury Waiver</u>. EACH PARTY TO THIS AGREEMENT HEREBY EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM ARISING OUT OF THIS AGREEMENT OR ANY INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH, OR THE TRANSACTIONS RELATED HERETO OR THERETO. THIS SECTION 10.3 SHALL SURVIVE THE CLOSING OR EARLIER TERMINATION OF THIS AGREEMENT.

10.4.   <u>Assignment</u>.

(a)   Purchaser may not assign or transfer its rights or obligations under this Agreement without the prior written consent of Receiver. In the event that Purchaser desires to assign its rights under this Agreement, Purchaser shall send written notice to Receiver at least five (5) business days prior to the Closing, and upon any permitted assignment of this Agreement at Closing, Purchaser shall promptly deliver to Receiver a copy of the fully executed assignment of this Agreement and the assumption by the assignee of Purchaser's obligations hereunder. Any such assignment must include the assignee's tax identification number. Any assignee of Purchaser's interest in this Agreement shall be bound by all approvals and waivers, actual and deemed, by the original Purchaser prior to the assignment. The original Purchaser shall not be released of any duties, obligations, or liability for any Claims arising under the terms of this Agreement, unless otherwise expressly agreed upon by Receiver. Notwithstanding the foregoing, Purchaser shall have the right to assign its rights and obligations under this Agreement to an entity owned in part by Purchaser or its owners and affiliates and/or controlled by Purchaser or its owners and affiliates upon receiving written consent by Receiver, which such consent shall not be unreasonably withheld, conditioned, or delayed so long as Purchaser affirms in writing that the assignee shall not involve Timothy Barton or any entity affiliated therewith, or any other entity subject to the Receivership Action, as a direct or indirect, actual or beneficial owner thereof.

(b)   Receiver (at its sole cost) may transfer and convey the Property, and otherwise assign, transfer and delegate its rights, duties and obligations under this Agreement and any post-Closing agreement to any Receiver Parties without Purchaser's consent; provided, however, Receiver shall not be released of any duties, obligations or liabilities for any Claims arising under the terms of this Agreement which are not expressly assumed by Receiver's assignee. Upon such transfer,

APP000029

assignment and conveyance, the original Receiver shall be immediately released of any and all duties, obligations and liability for any Claims arising under the terms of this Agreement and any post-Closing agreements (or otherwise) which are expressly assumed by Receiver's assignee, and all references in this Agreement and any post-Closing agreement to Receiver shall thereafter mean and refer to Receiver's assignee, to the extent the context requires. The Parties hereto agree that all representations, warranties, covenants and indemnifications shall inure to the benefit of any permitted assignee of Purchaser and Receiver, as applicable.

10.5.    <u>Notices</u>. Any notice, request, demand, instruction or other communication to be given to either Party hereunder, except those required to be delivered at Closing or as otherwise stated in this Agreement, shall be in writing, and shall be deemed to be delivered, whether actually received or not, upon: (a) deposit with a courier service for personal delivery (whether by local or overnight courier service); or (b) deposit in a regularly maintained official depository of the United States Mail located in the continental United States, and sent by registered or certified mail, postage prepaid, return receipt requested, addressed as set forth below; or (c) electronic transmission to the email address set forth below, so long as an original of same is sent within one (1) business day thereafter by either of the methods described in (a) or (b) above to the address as set forth below.

| | |
|---|---|
| If to Receiver: | c/o Cort Thomas, as receiver of TC Hall LLC<br>8111 Preston Road<br>Suite 300<br>Dallas, Texas 75225<br>Email: Cort@brownfoxlaw.com |
| with a copy to: | Brown Fox PLLC<br>Attn: Adam Fox<br>6303 Cowboys Way, Suite 450<br>Frisco, Texas 75034<br>Email: adam@brownfoxlaw.com |
| If to Purchaser: | Glacier Development Partners LLC<br>220 East 42nd Street, Suite 3002<br>New York, New York 10017<br>Attention: Yaniv Blumenfeld<br>E-mail: yblumenfeld@glaciergp.com<br>With Copy to:<br>Elad Nachum<br>E-mail: enachum@glaciergp.com |
| with a copy to: | Tomlin & Associates Law<br>34 South Broadway, Suite 716<br>White Plains, New York 10601<br>Attention: John S. Tomlin, Esq.<br>E-mail: jst@tal.law |

APP000030

If to Escrow Agent:   Everest Abstract Services, LLC
271 Madison Ave, Suite 905
New York, NY 10016
Attn: Ilan Bruhim
Telephone: 212.684.3030 x 301
Email: ilanb@everestabstract.com

Any notice hereunder sent by counsel to either Receiver or Purchaser hereunder shall be deemed transmitted by Receiver or Purchaser, respectively. Either Party may change the address for purposes of notice by giving notice of such change to the other Party and the Title Company as set forth above.

10.6. Modifications. This Agreement cannot be changed orally, and no executory agreement shall be effective to waive, change, modify or discharge it in whole or in part, unless such executory agreement is in writing and is signed by the Parties against whom enforcement of any waiver, change, modification or discharge is sought.

10.7. Calculation of Time Periods. As used herein, and unless otherwise defined herein, the term "day" or "calendar day" means each calendar day including a Saturday, Sunday or federal holiday or those days on which national banks in the State of Texas are closed. Unless otherwise specified, in computing any period of time described in this Agreement, the day of the act or event after which the designated period of time begins to run is not to be included and the last day of the period so computed is to be included. Unless otherwise set forth herein, the close of business is deemed to be 5:00 p.m. (Central time).

10.8. Successors and Assigns. The terms and provisions of this Agreement are binding upon the Parties hereto and are to apply to and bind the permitted successors and assigns of the Parties hereto.

10.9. Entire Agreement. This Agreement, including the Exhibits, contains the entire agreement between the Parties pertaining to the subject matter hereof and fully supersedes all prior written or oral agreements and understandings between the Parties pertaining to such subject matter.

10.10. Further Assurances. Each Party agrees that it will without further consideration execute and deliver such other documents and take such other action, whether prior or subsequent to Closing, as may be reasonably requested by the other Party to consummate more effectively the purposes or subject matter of this Agreement. The provisions of this Section 10.10 shall survive Closing.

10.11. Counterparts/Manners of Delivery. This Agreement and further documentation may be executed in counterparts, and may be delivered by first class mail, electronic conveyance and/or pdf. All such executed counterparts shall constitute the same agreement, when delivered by any of the methods described in this Section 10.11. All electronic signatures shall be deemed original signatures.

10.12. Severability. If any provision of this Agreement is determined by a court of competent jurisdiction to be invalid or unenforceable, the remainder of this Agreement shall nonetheless remain in full force and effect.

APP000031

10.13.  Applicable Law. This Agreement shall in all respects be solely governed by, and construed in accordance with, the substantive federal laws of the United States (expressly including 28 U.S. Code § 2001 and § 2002, as applicable) and the laws of the State of Texas (collectively the "**Applicable Laws**"). **EACH PARTY HEREBY AGREES THAT ANY SUIT, ACTION, COUNTERACTION OR PROCEEDING ARISING OUT OF THE SUBJECT MATTER HEREOF (EACH, A "PROCEEDING"), SHALL BE INSTITUTED IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION (THE "ACCEPTABLE FORUM"). PURCHASER AND RECEIVER AGREE THAT THE ACCEPTABLE FORUM IS CONVENIENT TO THEM; IRREVOCABLY SUBMIT TO THE JURISDICTION OF THE ACCEPTABLE FORUM; AND WAIVE ANY AND ALL OBJECTIONS TO JURISDICTION OR VENUE THAT THEY MAY HAVE UNDER THE LAWS OF THE STATE WHERE THE PROPERTY IS LOCATED OR OTHERWISE IN THOSE COURTS IN ANY PROCEEDING. SHOULD ANY PROCEEDING BE INITIATED IN ANY OTHER FORUM BY RECEIVER OR PURCHASER, THE INITIATING PARTY WAIVES ANY RIGHT TO OPPOSE ANY MOTION OR APPLICATION MADE BY THE OTHER PARTY TO TRANSFER VENUE, DISMISS OR SEEK OTHER APPROPRIATE RELIEF AS A CONSEQUENCE OF SUCH PROCEEDING HAVING BEEN COMMENCED IN A FORUM OTHER THAN AN ACCEPTABLE FORUM. THE PARTIES AGREE THE PROVISIONS OF THIS SECTION SHALL SURVIVE THE TERMINATION OF THIS AGREEMENT OR THE CLOSING OF THE TRANSACTION CONTEMPLATED BY THIS AGREEMENT.**

10.14.  No Third-Party Beneficiary. Except as otherwise expressly provided herein, the provisions of this Agreement and of the documents to be executed and delivered at Closing are and will be for the benefit of Receiver and Purchaser only and are not for the benefit of any third party, and accordingly, no third party shall have the right to enforce the provisions of this Agreement or of the documents to be executed and delivered at Closing.

10.15.  Exhibits and Schedules. All schedules and exhibits attached to this Agreement shall be deemed to be an integral part of this Agreement.

> Exhibit A:    Depiction of the Land
> Exhibit B:    Form of Deed

10.16.  Captions. The section headings appearing in this Agreement are for convenience of reference only and are not intended, to any extent and for any purpose, to limit or define the text of any section or any subsection hereof.

10.17.  Construction. Each Party acknowledges that such Party has had adequate opportunity to review this Agreement with their counsel, that their counsel has reviewed and revised this Agreement and that the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting Party shall not be employed in the interpretation of this Agreement or any exhibits or amendments hereto.

APP000032

10.18.  Termination of Agreement. It is understood and agreed that if either Purchaser or Receiver terminates this Agreement pursuant to a right of termination granted hereunder, such termination shall operate to relieve Receiver and Purchaser from all obligations under this Agreement, except for such obligations as are specifically stated herein to survive the termination of this Agreement.

10.19.  Litigation Expenses. In the event either Party hereto employs an attorney for the purpose of enforcing or construing this Agreement, or any judgment based on this Agreement, in any legal proceeding whatsoever, including insolvency, bankruptcy, arbitration, declaratory relief or other litigation, including appeals and rehearings, the Prevailing Party in such litigation shall be entitled to recover from the other Party its reasonable attorneys' and consultants' fees and expenses incidental to such litigation (including, without limitation, service of process costs, filing fees, court reporter costs, investigative costs, expert witness fees, the cost of any bonds, and any and all other similar fees incurred in connection with the action or proceeding) and all court costs and fees through all trial and appellate levels. Attorneys' fees under this Section 10.19 shall include reasonable attorneys' fees on appeal and, in addition, a Party entitled to attorneys' fees shall be entitled to all other reasonable, out-of-pocket, third-party costs and expenses actually incurred or otherwise payable in connection with such action or proceeding. In addition to the foregoing award of attorneys' fees to the Prevailing Party, the Prevailing Party in any lawsuit shall be entitled to its reasonable attorneys' fees actually incurred or otherwise payable in any post-judgment proceedings to collect or enforce the judgment. The "**Prevailing Party**" means the Party determined by the final, non-appealable judgment of court of competent jurisdiction to most nearly prevail and not necessarily the one in whose favor a judgment is rendered. This provision is separate and several and shall survive the merger of this Agreement into any judgment with respect hereto.

10.20.  Time is of the Essence. Each Party acknowledges and agrees that, except as otherwise expressly provided in this Agreement, TIME IS OF THE ESSENCE for the performance of all actions (including, without limitation, the giving of notices, the delivery of documents, and the funding of money) required or permitted to be taken under this Agreement.

10.21.  No Offer. This Agreement shall not be deemed an offer or binding upon Receiver or Purchaser until this Agreement is fully executed and delivered by Receiver and Purchaser and the Court has entered an order in the Receivership Action approving the Agreement and the transactions contemplated hereby.

10.22.  Waiver of Consumer Rights. **PURCHASER WAIVES ITS RIGHTS UNDER THE DECEPTIVE TRADE PRACTICES-CONSUMER PROTECTION ACT, SECTION 17.41 ET SEQ., BUSINESS & COMMERCE CODE, A LAW THAT GIVES CONSUMERS SPECIAL RIGHTS AND PROTECTIONS. AFTER CONSULTATION WITH AN ATTORNEY OF THE PURCHASER'S OWN SELECTION, PURCHASER VOLUNTARILY CONSENTS TO THIS WAIVER AS EVIDENCED BY THE PURCHASER'S EXECUTION OF THIS AGREEMENT.**

10.23.  Incorporation of Recitals. The Recitals set forth herein constitute an integral part of this Agreement and are incorporated herein by this reference with the same force and effect as if set forth herein as agreements of the Parties.

[SIGNATURES ON NEXT PAGE]

APP000033

DocuSign Envelope ID: 243C57B2-86C4-47DF-860B-836E06BC1A6F

IN WITNESS WHEREOF, the Parties hereto have duly executed this Agreement as of the Effective Date.

**RECEIVER**:

CORT THOMAS, AS RECEIVER FOR TC HALL, LLC, A TEXAS LIMITED LIABILITY COMPANY

Signature: _Cort Thomas, Receiver for TC Hall, LLC_

Printed Name:     Cort Thomas

Title:     Receiver for TC Hall, LLC

Date:     5/28/2024

**PURCHASER**:

Glacier Development Partners LLC
a New York limited liability company

Signature: _____

Printed Name: _____

Title: _____

Date: _____

---

PURCHASE AND SALE AGREEMENT                                                                 SIGNATURE PAGE

**APP000034**

IN WITNESS WHEREOF, the Parties hereto have duly executed this Agreement as of the Effective Date.

**RECEIVER**:

CORT THOMAS, AS RECEIVER FOR TC HALL, LLC, A TEXAS LIMITED LIABILITY COMPANY

Signature:          _____

Printed Name:       Cort Thomas

Title:              Receiver for TC Hall, LLC

Date:               _____

**PURCHASER**:

Glacier Development Partners LLC
a New York limited liability company

Signature:          _____

Printed Name:       Yaniv Blumenfeld

Title:              Managing Member

Date:               May 28, 2024

APP000035

**ESCROW AGENT ACCEPTANCE**

The undersigned agrees to serve as the Escrow Agent and to be bound by the provisions of Sections 2.4, 2.5, 2.6, and 10.5 of this Agreement. The Escrow Agent acknowledges receiving counterparts of this Agreement signed by both Receiver and Purchaser on the date shown below, which is the Effective Date of this Agreement and agrees to insert this date on the cover page of this Agreement.

05/30/2024
_____, 2024 ("**Effective Date**")


~~EVEREST ABSTRACT SERVICES, LLC:~~  TitleEQ:

Signature: _____

Printed Name:     Amber Pfromm

Title:     Director/Senior Escrow Officer

Date:     05/30/2024

**EXHIBIT A**
**LEGAL DESCRIPTION OF THE LAND**

Lots 15 and 16, Block A/992, of CULLUM'S SUBDIVISION OF BLOCK 992, an Addition to the City of Dallas, Dallas County, Texas, according to the Plat thereof recorded in Volume 1, Page 82, Map Records, Dallas, County, Texas

**EXHIBIT B**
**FORM OF DEED**

AFTER RECORDING RETURN TO:

_____

_____

_____

_____

(Space Above This Line for Recorder's Use Only)

NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OF THE FOLLOWING INFORMATION FROM THIS INSTRUMENT BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.

## SPECIAL WARRANTY DEED

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | |
| | § | KNOW ALL MEN BY THESE PRESENTS: |
| COUNTY OF DALLAS | § | |

THIS SPECIAL WARRANTY DEED, dated _____, ____, by Cort Thomas, solely in his capacity as Receiver for, and on behalf of, TC Hall, LLC, a Texas limited liability company, with its principal office at 8111 Preston Road, Suite 300, Dallas, Texas 75225 ("**Grantor**"), for the benefit of Glacier Development Partners LLC, a New York Limited Liability Company , with its principal office at 220 East 42nd Street, Suite 3002, New York, New York 10017 ( "**Grantee**"):

WITNESSETH, that Grantor, for good and valuable consideration, has granted bargained, sold, and conveyed and by these presents does grant, bargain, sell, convey and confirm unto Grantee, its successors, and assigns, forever, all the following described lot or parcel of land, situated, lying and being in the County of Dallas, State of Texas, and being more particularly described on Exhibit "A" attached hereto and made a part hereof (the "**Land**");

TOGETHER with Grantor's rights, title and interest (if any) in and to the following relating to the Land: (i) land lying in the bed of any street, road or access way, opened or proposed, on the Land; (ii) roads, alleys, rights-of-way and ingress and egress easements relating to the Land, whether surface, subsurface or otherwise; (iii) all water and water rights under or otherwise pertaining to the Land; and (iv) all governmental or quasi-governmental permits, approvals, authorities, licenses and consents, if any, of any kind or character pertaining to the Land (collectively, the "**Appurtenances**" and together with the Land, the "**Property**"); AND SUBJECT TO those matters listed and described on Exhibit "B" attached hereto (collectively, the "**Exceptions**").

TO HAVE AND TO HOLD the Property unto Grantee, its successors and assigns, subject to the Exceptions, reservations, and exclusions set forth herein, forever, and Grantor binds Grantor and Grantor's successors

APP000038

and assigns to WARRANT AND FOREVER DEFEND all and singular the Property to Grantee and Grantee's successors and assigns against all and every person or persons lawfully claiming or to claim the whole or any part thereof, when the claim is by, through or under Grantor, but not otherwise.

**BY ACCEPTANCE OF THIS SPECIAL WARRANTY DEED, GRANTEE ACKNOWLEDGES THAT IT HAS INSPECTED AND ASSESSED THE PROPERTY AND HAS SATISFIED ITSELF AS TO THE CONDITION OF SAME AND IS TAKING THE PROPERTY "AS-IS", "WHERE-IS", AND "WITH ALL FAULTS", AND WITHOUT ANY REPRESENTATIONS OR WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED, WRITTEN OR ORAL, IT BEING THE INTENTION OF GRANTOR AND GRANTEE TO EXPRESSLY NEGATE AND EXCLUDE ALL REPRESENTATIONS AND WARRANTIES, INCLUDING, BUT NOT LIMITED TO: (1) THE PHYSICAL CONDITION OF THE PROPERTY OR ANY ELEMENT THEREOF, INCLUDING, WITHOUT LIMITATION, WARRANTIES RELATED TO HABITABILITY, SUITABILITY, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR FITNESS FOR ANY PURPOSE; (2) THE NATURE OR QUALITY OF CONSTRUCTION, STRUCTURAL DESIGN, AND ENGINEERING OF ANY IMPROVEMENTS; (3) THE QUALITY OF THE LABOR AND MATERIALS INCLUDED IN ANY IMPROVEMENTS; (4) THE SOIL CONDITIONS (BOTH SURFACE AND SUBSURFACE), DRAINAGE, OR OTHER CONDITIONS EXISTING AT THE PROPERTY WITH RESPECT TO ANY PARTICULAR PURPOSE, DEVELOPMENTAL POTENTIAL, OR OTHERWISE; (5) ALL WARRANTIES CREATED BY ANY AFFIRMATION OF FACT OR PROMISE OR BY ANY DESCRIPTION OF THE PROPERTY; AND (6) ALL OTHER WARRANTIES AND REPRESENTATIONS, WHATSOEVER, EXCEPT THE SPECIAL WARRANTY OF TITLE EXPRESSLY SET FORTH IN THIS DEED.**

[Signature Page Follows]

IN WITNESS WHEREOF, Grantor has executed this deed on the date set forth above.

**TC HALL LLC**:

TC HALL LLC, a Texas limited liability company

Signature:           _____

Printed Name:      Cort Thomas

Title:                    Receiver for, and on behalf of, TC Hall, LLC

Date:                   _____


THE STATE OF TEXAS          §
                                          §
COUNTY OF DALLAS            §

This instrument was acknowledged before me on this the _____ day of _____, _____, by Cort Thomas, Receiver for, and on behalf of, TC HALL LLC, a Texas limited liability company.

_____
Notary Public in and for the State of Texas

My Commission Expires:

_____

(SEAL)

**Exhibit A to Special Warranty Deed**
**Legal Description**

APP000041

<u>**Exhibit B to Special Warranty Deed**</u>
**Exceptions**

**APP000042**

# EXHIBIT B-1

APP000043

# NVC
## National Valuation Consultants, Inc.

**An Appraisal Report of:**

3407 - 3409 N Hall Street
Dallas, TX 75219

**Latitude/Longitude:**
32.807128,  -96.804119

**NVC File Number:**
DAL2312069

**Effective Date(s) of Value:**
"As Is" (Vacant Land) - January 7, 2024



**Prepared For:**
Cort Thomas, Receiver
Brown Fox PLLC
8111 Preston Road, Ste. 300
Dallas, TX 75225

**Prepared By:**
National Valuation Consultants, Inc.
7807 E. Peakview Avenue, Suite 200
Centennial, Colorado 80111

**WEST**
Seattle
San Francisco
Los Angeles

**SOUTHWEST**
Denver
Dallas
Houston
San Antonio

**MIDWEST**
Chicago
Cincinnati
Columbus

**NORTHEAST**
Boston
NY/NJ Metro

**SOUTHEAST**
Atlanta
Savannah
South Florida

APP000044



January 16, 2024

Cort Thomas, Receiver
Brown Fox PLLC
8111 Preston Road, Ste. 300
Dallas, TX 75225


Re:  3407 - 3409 N Hall Street
     Dallas, TX 75219
     Latitude: 32.807128 & Longitude: -96.804119
     NVC File No.:  DAL2312069


Dear Mr. Thomas:

In compliance with your request, enclosed is an appraisal report of the above-referenced property.  The purpose of the appraisal is to provide our market value opinion under the following scenario.

| Valuation Scenario | | |
|---|---|---|
| Value Premise | Interest Appraised | Effective Date of Appraisal |
| "As Is" (Vacant Land) | Fee Simple | January 7, 2024 |

It is our opinion that this report complies fully with the current Uniform Standards of Professional Appraisal Practice (USPAP) adopted by the Appraisal Standards Board of the Appraisal Foundation.

Briefly described, the subject consists of 0.515 acres in Oak Lawn, across from Turtle Creek Park.  The subject is rectangular in shape, not located within a flood zone, and is zoned "PD-193, O-2" Planned Development 193, Office-2 District. The property features visibility from North Hall Street and Turtle Creek Boulevard.  The subject is located next to the Renaissance on Turtle Creek and is one of the few commercially zoned land parcels left in the Turtle Creek area.

APP000045

Cort Thomas, Receiver
January 16, 2024
Page 3

The market value opinion is subject to certain standard assumptions and limiting conditions which are referenced in the accompanying appraisal report. In addition, there are no Extraordinary Assumptions and Hypothetical Conditions that may have affected the assignment results.

*Extraordinary Assumptions*

■   *None.*

*Hypothetical Conditions*

■   *None.*

Based upon the data, analyses and reasoning contained in the attached report, and subject to the assumptions and limiting conditions set forth in this analysis, our market value opinion is set forth below.

| Summary of Value Conclusion | | | | |
|---|---|---|---|---|
| Value Premise | Interest Appraised | Effective Date of Appraisal | Reconciled Value | $/SF |
| "As Is" (Vacant Land) | Fee Simple | January 7, 2024 | **$5,300,000** | $236.20 |

We appreciate the opportunity to provide appraisal services and trust you will advise us if we can be of further assistance.

Respectfully submitted,

NATIONAL VALUATION CONSULTANTS, INC.

Charles G. Dannis, MAI, SRA
Senior Managing Director
Texas Certified General Appraiser
License No.: TX 1321531 G
Phone: 214-932-1818
Email: cdannis@nvcinc.com

NVC | National Valuation Consultants, Inc.

APP000046

## TABLE OF CONTENTS

Subject Photograph ....................................................................................................................5

Subject Aerial............................................................................................................................6

Executive Summary ..................................................................................................................7

**PREMISES OF THE APPRAISAL**.............................................................................................**9**

Scope of Work .........................................................................................................................10

Definitions of Terminology .....................................................................................................13

Identification and History of the Property ..............................................................................15

Standard Assumptions and Limiting Conditions......................................................................16

Extraordinary Assumptions and Hypothetical Conditions......................................................18

**PRESENTATION OF DATA**......................................................................................................**19**

U.S. Economic Indicators .......................................................................................................20

Dallas-Fort Worth-Arlington, TX MSA Economic and Demographic Profile...........................25

Market Area Analysis ..............................................................................................................34

Zoning Analysis .......................................................................................................................41

State of Texas Tax and Assessment Analysis ..........................................................................42

Site Analysis............................................................................................................................44

Parcel Map / Site Survey.........................................................................................................46

Subject Photographs...............................................................................................................47

**ANALYSIS OF DATA AND CONCLUSIONS**............................................................................**49**

Market Analysis ......................................................................................................................50

Dallas-Fort Worth Commercial Market Analysis ....................................................................51

Uptown Commercial Submarket Analysis ...............................................................................62

Highest and Best Use Analysis ................................................................................................72

The Valuation Process .............................................................................................................73

Sales Comparison Approach ...................................................................................................74

Reconciliation and Final Value................................................................................................81

Reasonable Exposure Time and Marketing Period..................................................................82

Certification ............................................................................................................................83

**ADDENDA**

Appraiser Qualifications

Land Sale Abstracts

ALTA / Title Survey

Engagement Letter

APP000047



Subject Photograph

Subject Photograph

DAL2312069

APP000048

NVC | National Valuation Consultants, Inc.

Subject Aerial



3407-3409 N Hall Street

Subject Aerial

6

DAL2312069

3407-3409 N Hall Street                                                  NVC | National Valuation Consultants, Inc.

## Executive Summary

**CLIENT**:                              Cort Thomas, Receiver
                                         Brown Fox PLLC
                                         8111 Preston Road, Ste. 300
                                         Dallas, TX 75225

**PROPERTY IDENTIFICATION:**            3407-3409 N Hall Street

**PHYSICAL ADDRESS:**                   3407 - 3409 N Hall Street
                                         Dallas, TX 75219

**PURPOSE OF APPRAISAL:**               The purpose of this assignment is to provide the
                                         following market value opinion.

| Valuation Scenario | | |
|---|---|---|
| Value Premise | Interest Appraised | Effective Date of Appraisal |
| "As Is" (Vacant Land) | Fee Simple | January 7, 2024 |

**DATE OF INSPECTION**:                 January 7, 2024

**DATE OF REPORT PREPARATION**:         January 16, 2024

**EXTRAORDINARY ASSUMPTIONS:**          None

**ZONING:**                             PD-193, O-2 (Oak Lawn Special Purpose District, Office-2
                                         District) by the City of Dallas. Office and Mixed-use office
                                         with limited retail and service uses are permitted land
                                         uses under this zoning.

**SITE SIZE**:                          0.52 acres (±22,439 SF) per ALTA Survey

**TRANSFERS IN THE LAST THREE YEARS:**  There are two known sales of the appraised property in
                                         the previous three-year period. These sales are discussed
                                         more in the Identification and History of the Property
                                         section in the report.

                                         To the best of our knowledge, the subject is not currently
                                         listed for sale or under contract, but is available to
                                         purchase with court approval.

**HIGHEST AND BEST USE:**

As Vacant:                Development of a medium density mixed-use office building with limited
                          retail and service uses.

As Improved:              Development of a medium density mixed-use office building with  retail.

APP000050

3407-3409 N Hall Street                                                    NVC | National Valuation Consultants, Inc.

**STRENGTHS AND WEAKNESSES:**

| Strengths And Weaknesses |
|---|
| **Strengths** |
| • Highly sought after location |
| • Views of Turtle Creek Park |
| • Flexible zoning can accommodate a broad range of multifamily options |
| • Walkable envirnment |
| **Weaknesses** |
| • Interest rate hikes and rise in alternative yields has placed upward pressure on cap rates which has resulted in volatility, market softening, and slowed sales volume |
| • The subject is surrounded by high-density development |
| • The subject's office submarket has a vacancy rate of 22.9% |
| • Located in a planned development district which requires site plan approval for new development |

**MARKET VALUE SUMMARY AND CONCLUSION:**

Based upon the data, analyses and reasoning contained herein, our market value opinion is summarized as follows:

| Final Value Reconciliation | |
|---|---|
| Value Premise | "As Is" (Vacant Land) |
| Date of Valuation | January 7, 2024 |
| Interest Appraised | Fee Simple |
| Site Area (SF) | 22,439 |
| Cost Approach | NA |
| Sales Comparison Approach | $5,300,000 |
| Income Capitalization Approach | NA |
| **Market Value Opinion** | **$5,300,000** |
| Market Value Opinion $/SF | $236.20 |

APP000051

# PREMISES OF THE APPRAISAL

APP000052

3407-3409 N Hall Street                                    NVC | National Valuation Consultants, Inc.

## Scope of Work

**SCOPE OF WORK DEFINED**

The Scope of Work requirement within the Uniform Standards of Professional Appraisal Practice (USPAP) of the Appraisal Standards Board states that the appraiser must provide the following information within each appraisal, appraisal review, or appraisal consulting assignment:

1.    Identify the problem to be solved;

2.    Determine and perform the scope of work necessary to develop credible assignment results; and

3.    Disclose the scope of work in the report.

While the scope of work is addressed within many sections of this report, the following is a summary of the Scope of Work for this assignment.

**APPRAISAL ELEMENTS**

There are six key assignment elements that need to be addressed when identifying the appraisal problem. These include:

1.    Client and any other intended users;

2.    Intended use of the appraiser's opinions and conclusions;

3.    Type and definition of value;

4.    Effective date of the appraiser's opinions and conclusions;

5.    Subject of the assignment and its relevant characteristics (e.g. interest valued, physical and legal characteristics); and

6.    Assignment conditions (e.g. hypothetical conditions, extraordinary assumptions, supplemental standards, and jurisdictional exceptions).

**CLIENT, INTENDED USERS, AND INTENDED USE**

Client:              Brown Fox PLLC
Intended Users:      Brown Fox PLLC and affiliates.
Intended Use:        Assist in the sale of the property.

This report has no other intended use and National Valuation Consultants, Inc. is not responsible for the use of this report by any third parties.

APP000053

3407-3409 N Hall Street                                                    NVC | National Valuation Consultants, Inc.

**PURPOSE OF APPRAISAL**

The purpose of the appraisal is to provide our market value opinion of the valuation scenario summarized below.

| Valuation Scenario | | |
|---|---|---|
| Value Premise | Interest Appraised | Effective Date of Appraisal |
| "As Is" (Vacant Land) | Fee Simple | January 7, 2024 |

Please note that no opinion of value is provided for mineral rights, water rights or other non-realty items which may or may not be associated with the property.

**ANALYSIS PERFORMED IN THE ASSIGNMENT**

The work performed within this appraisal assignment include a number of independent investigations and analyses. The methods and sources utilized are listed as follows.

■ **Approaches to Value**: The three traditional valuation approaches – cost, income, and sales comparison – were considered in the appraisal. Value indications were derived from those considered applicable, which is discussed later in this report.

■ **Market Area Analysis:** The appraisers inspected the subject's market area, evaluated demographic and economic statistics, reviewed city zoning maps, aerial photographs and other market data in analyzing the characteristics of the subject area.

■ **Site Description and Analysis:** This description is based on an on-site inspection and review of documents provided by the property contacts. Specific documents used in the description are cited in the Site Analysis section of this report.

■ **Improvement Description and Analysis**: This description is also based on an on-site inspection and review of building information provided by the property contacts. Specific documents used in the description are cited in the Description of the Improvements section of this report.

■ **Market Analysis**: Macro and micro market analysis sections and industry overview sections were prepared by many individuals through a cooperative effort between the appraisers and professional research staff of National Valuation Consultants, Inc. (NVC). We have cited our sources within these sections which typically include related trade industry associations, state and local government sources, and/or interviews with market participants.

■ **Market Data**: All market data were derived from multiple conversations with many individuals through a cooperative effort between the appraisers and professional research staff of National Valuation Consultants, Inc. (NVC).

■ **Comparable Sales:** The appraisers assembled data on comparable improved property sales and land sales from abstracts provided by CoStar COMPS; public deed records; multiple listing service data; newspaper articles and news releases; file sources; and conversations with numerous real estate buyers, sellers, and/or agents active in the marketplace.

APP000054

3407-3409 N Hall Street                                    NVC | National Valuation Consultants, Inc.

**ASSIGNMENT CONDITIONS**

In two separate sections of this appraisal report, we have included the Standard Assumptions and Limiting Conditions as well as any Extraordinary Assumptions and Hypothetical Conditions used in the preparation of the appraisal assignment.

APP000055

## Definitions of Terminology

**APPRAISAL** — (noun) the act or process of developing an opinion of value.  (adjective) of or pertaining to appraising and related functions such as appraisal practice or appraisal services.  Comment:  An appraisal must be numerically expressed as a specific amount, as a range of numbers, or as a relationship to a previous value opinion or numerical benchmark.[1]

**ASSIGNMENT** —a valuation service that is provided by an appraiser as a consequence of an agreement with a client.[2]

**MARKET VALUE** — The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus.  Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

1. Buyer and seller are typically motivated.
2. Both parties are well informed or well advised, and acting in what they consider their own best interests.
3. A reasonable time is allowed for exposure in the open market.
4. Payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto.
5. The price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.[3]

**AS IS MARKET VALUE** — The estimate of the market value of real property in its current physical condition, use, and zoning as of the appraisal date. (Interagency Appraisal and Evaluation Guidelines, OCC) [4]

**FEE SIMPLE ESTATE** — Absolute ownership unencumbered by any other interest or estate, subject only to the limitations imposed by the governmental powers of taxation, eminent domain, police power, and escheat.[5]

**LEASED FEE INTEREST** — The ownership interest held by the lessor, which includes the right to receive the contract rent specified in the lease plus the reversionary right when the lease expires.[6]

**PROJECTION** — In market analysis, a prediction of the future that is an extension of current and historical trends.[7]

**TANGIBLE PROPERTY** - Property that can be perceived with the senses; includes land, fixed improvements, furnishings, merchandise, cash, and other items of working capital used in an enterprise. [8]

---

[1] USPAP 2024 Edition, Page 3.
[2] USPAP 2024 Edition, Page 4.
[3] Source: Code of Federal Regulations; Title 12--Banks And Banking; Chapter I--Comptroller Of The Currency, Department Of The Treasury; Part 34--Real Estate Lending And Appraisals--Subpart C—Appraisals Sec. 34.42 Definitions; Revised January 1, 2000.
[4] Appraisal Institute, *The Dictionary of Real Estate Appraisal*, 7th edition.
[5] Appraisal Institute, *The Dictionary of Real Estate Appraisal*, 7th edition.
[6] Appraisal Institute, *The Dictionary of Real Estate Appraisal*, 7th edition.
[7] Appraisal Institute, *The Dictionary of Real Estate Appraisal*, 7th edition.
[8] Appraisal Institute, *The Dictionary of Real Estate Appraisal*, 7th edition.

APP000056

3407-3409 N Hall Street                                    NVC | National Valuation Consultants, Inc.

**PROSPECTIVE OPINION OF VALUE** — A value opinion effective as of a specified future date. The term does not define a type of value. Instead, it identifies a value opinion as being effective at some specific future date. An opinion of value as of a prospective date is frequently sought in connection with projects that are proposed, under construction, or under conversion to a new use, or those that have not yet achieved sellout or a stabilized level of long-term occupancy.[9]

**EXTRAORDINARY ASSUMPTION** — An assignment-specific assumption as of the effective date regarding uncertain information used in an analysis which, if found to be false, could alter the appraiser's opinions or conclusions. Uncertain information might include physical, legal, or economic characteristics of the subject property, or conditions external to the property, such as market conditions or trends, or about the integrity of data used in an analysis. [10]

**HYPOTHETICAL CONDITION** —A condition, directly related to a specific assignment, which is contrary to what is known by the appraiser to exist on the effective date of the assignment results but is used for the purpose of analysis. Comment: Hypothetical conditions are contrary to known facts about physical, legal, or economic characteristics of the subject property; or about conditions external to the property, such as market conditions or trends; or about the integrity of data used in an analysis.[11]

**EXPOSURE TIME** — Estimated length of time that the property interest being appraised would have been offered on the market prior to the hypothetical consummation of a sale at market value on the effective date of the appraisal.[12]

**MARKETING TIME** — Opinion of the amount of time it might take to sell a real or personal property interest at the concluded market value level during the period immediately after the effective date of an appraisal. [13]

**INTENDED USE -** the use(s) of an appraiser's reported appraisal or appraisal review assignment results, as identified by the appraiser based on communication with the client at the time of the assignment. [14]

**INTENDED USER** - the client and any other party as identified, by name or type, as users of the appraisal or appraisal review report by the appraiser, based on communication with the client at the time of the assignment. [15]

**PERSONAL PROPERTY** — any tangible or intangible article that is subject to ownership and not classified as real property, including identifiable tangible objects that are considered by the general public as being "personal," such as furnishings, artwork, antiques, gems and jewelry, collectibles, machinery and equipment; and intangible property that is created and stored electronically such as plans for installation art, choreography, emails, or designs for digital tokens.[16]

**EFFECTIVE DATE** — 1. The date on which the appraisal opinion applies. (SVP) 2. The date to which an appraiser's analyses, opinions, and conclusions apply; also referred to as date of value. (USPAP)  3. The date that a lease goes into effect.[17]

---

[9] Appraisal Institute, *The Dictionary of Real Estate Appraisal*, 7th edition.
[10] Appraisal Institute, *The Dictionary of Real Estate Appraisal*, 7th edition.
[11] USPAP 2004 Edition, Page 4.
[12] USPAP 2024 Edition, Page 4.
[13] USPAP 2024 Edition, Advisory Opinion 7, Page 16.
[14] USPAP 2024 Edition, Page 5.
[15] USPAP 2024 Edition, Page 5.
[16] USPAP 2024 Edition, Page 5.
[17] Appraisal Institute, *The Dictionary of Real Estate Appraisal*, 7th edition.

APP000057

3407-3409 N Hall Street                                    NVC | National Valuation Consultants, Inc.

## Identification and History of the Property

**PROPERTY NAME:**              3407-3409 N Hall Street

**LOCATION:**                   Off of N Hall St & Turtle Creek Blvd. across the street from Turtle Creek Park

**ADDRESS:**                    3407 - 3409 N Hall Street
                                Dallas, TX 75219

**COUNTY:**                     Dallas

**PROPERTY I.D. NUMBER:**       00000137545000000, 00000137548000000

**OWNER OF RECORD:**            TC HALL LLC

**LEGAL DESCRIPTION:**          Lots 15 and 16, Block A/992, Cullum's Subdivision, Dallas, Dallas County, Texas

**LATITUDE / LONGITUDE:**       32.807128 / -96.804119

**HISTORY OF THE PROPERTY:**

The subject was acquired by TC HALL LLC on August 24, 2022 for $5,300,000 or $236.20/SF.  The transaction is recorded in Dallas County's public records in document number 22011220092.

Previously, the subject was acquired by Turtle Creek Tower LLC on February 22, 2021.  The purchase price was not provided, nor is there a listed broker.

The subject did have two Letters of Intent to purchase the subject property.  MILESTONE CRE 3, LLC offered to purchase the subject from TC HALL LLC for $5,250,000 or $233.97/SF.  The other Letter of Intent indicates the purchaser, Premier American Financial, LLC, offers to purchase the subject property for $5,200,000 or $231.74/SF. According to Cort Thomas (receiver), one of the LOIs was later implicitly withdrawn, while the remaining LOI the counterparty ownership is currently finalizing an agreement to purchase.  Mr. Thomas also negotiated with adjoining condominium HOA to buy the subject in 2023, but no agreement could be reached.  The prior sale price (8/22) and Letters of Intent are consistent with our conclusion of market value.

APP000058

3407-3409 N Hall Street                                           NVC | National Valuation Consultants, Inc.

## Standard Assumptions and Limiting Conditions

1. Disclosure of the contents of the appraisal report is governed by the bylaws and regulations of the professional appraisal organizations with which the appraiser is affiliated:  specifically, the Appraisal Institute.

2. This Report should be relied upon only by the Intended User(s) and only for the Intended Use(s) identified at the time of the assignment.  Furthermore, the Report is to be used in whole and not in part.  The Report shall not be duplicated or provided to any third party in whole or in part without the written consent of NVC. Exempt from this restriction is duplication for the internal use of the Intended User and its attorneys, accountants, or advisors for the sole benefit of the Intended User. Also exempt from this restriction is transmission of the Report pursuant to any requirement of any court, governmental authority, or regulatory agency having jurisdiction over the intended user, provided that the Report and its contents shall not be published, in whole or in part, in any public document without the written consent of NVC. Written consent and approval from NVC must be obtained before this appraisal report can be conveyed by anyone to the public through advertising, public relations, news, sales, or other media.  Any third party, not covered by the exemptions herein, who may possess this report, is advised that they should rely on their own independently secured advice for any decision in connection with this property.  NVC shall have no accountability or responsibility to any such third party.

3. The appraiser will not be required to give testimony or appear in court because of having made this appraisal, with reference to the property in question, unless previous arrangements have been made.

4. The distribution of the total valuation in this report between land and improvements applies only under the stated highest and best use of the property.  The separate allocation of value for land and improvements must not be used in conjunction with any other appraisal and is invalid if so used.

5. The legal description used in this report is assumed to be correct.

6. No survey of the property has been made by the appraiser and no responsibility is assumed in connection with such matters. Maps and sketches are included only to assist the reader in visualizing the property.

7. No responsibility is assumed for matters of a legal nature affecting title to the property, nor is an opinion of title rendered.  The title is assumed to be good and merchantable unless otherwise stated.

8. It is assumed that there are no hidden or unapparent conditions of the property, subsoil, (including termite infestations) or structures which would render it more or less valuable.  No responsibility is assumed for such conditions or for engineering which may be required to discover such.

9. All mechanical components are assumed to be in operable condition as would be considered standard for properties similar to the subject in type and age.  The heating, cooling, ventilation, plumbing and electrical equipment are considered to be in similar condition to the observable elements of the improvements unless otherwise stated. The insulation and energy efficiency of the improvements are assumed to be adequate and standard for the subject type and age unless otherwise noted.

10. Information furnished by others is assumed to be true, correct and reliable.  A reasonable effort has been made to verify such information; however, no responsibility for its accuracy is assumed by the appraiser.

APP000059

11. The opinion of value assumes responsible ownership and competent management.

12. Unless otherwise stated in this report, the existence of hazardous substances, including without limitation asbestos, polychlorinated biphenyls, petroleum leakage, or agricultural chemicals, which may or may not be present on the property, or other environmental conditions, were not called to the attention of nor did the appraiser become aware of such during the appraiser's inspection. The appraiser has no knowledge of the existence of such materials on or in the property unless otherwise stated. The appraiser, however, is not qualified to test such substances or conditions.  If the presence of such substances, such as asbestos, urea formaldehyde foam insulation, or other hazardous substances or environmental conditions, may affect the value of the property, the opinion of value is predicated on the assumption that there is no such condition on or in the property or in such proximity thereto that it would cause a loss in value.  No responsibility is assumed for any such conditions, nor for any expertise or engineering knowledge required to discover them.

13. The values contained in this report are opinions.  There is no guarantee, written or implied, that the subject property will sell or lease for the indicated amounts.

14. The appraisers of National Valuation Consultants, Inc. reserve the right to amend and/or alter statements, analyses, conclusions and opinions of value if information pertinent to this assignment is made known to us after the completion of the report.

15. National Valuation Consultants, Inc., as well as any employee, agent or officer thereof, shall be completely indemnified against any and all losses, claims, damages, liabilities, costs or expenses to which the recipient and/or third party user may become subject, but only if neither National Valuation Consultants, Inc. nor any other indemnified person shall have been grossly negligent or shall have taken or omitted to take any action in bad faith in connection with the preparation of this report.

16. The Americans with Disabilities Act ("ADA") became effective January 26, 1992.  We have not made a specific compliance survey and analysis of this property to determine whether or not it is in conformity with the various detailed requirements of the ADA.  It is possible that a compliance survey of the property, together with a detailed analysis of the requirements of the ADA, could reveal that the property is not in compliance with one or more of the requirements of the Act.  If so, this fact could have a negative effect upon the value of the property.  Since we have no direct evidence relating to this issue, we did not consider possible noncompliance with the requirements of ADA in estimating the value of the property.

17. Unless otherwise noted, all prospective values, if any, in this appraisal, are based on the market conditions which exist at the date of inspection combined with an informed forecast, based on current trends in supply and demand for the property type under appraisal, as to what such conditions will be at the future date of property completion and or stabilization.  The appraiser cannot be held responsible for unforeseeable events, such as unexpected new construction, unanticipated changes in economic conditions, or any other such events which might occur and which would alter market conditions prior to the effective date of the appraisal.

APP000060

3407-3409 N Hall Street                                              NVC | National Valuation Consultants, Inc.

## Extraordinary Assumptions and Hypothetical Conditions

Our market value opinion is subject to certain standard assumptions and limiting conditions which are referenced in the accompanying appraisal report.  In addition, there are no Extraordinary Assumptions and Hypothetical Conditions that may have affected the assignment results.

### *Extraordinary Assumptions*

- ■ *None.*

### *Hypothetical Conditions*

- ■ *None.*

APP000061

3407-3409 N Hall Street                                    NVC | National Valuation Consultants, Inc.

# PRESENTATION OF DATA

APP000062

3407-3409 N Hall Street                                    NVC | National Valuation Consultants, Inc.

## U.S. Economic Indicators

### *Real Gross Domestic Product*

Real gross domestic product (GDP) increased at an annual pace of 4.9% in the third quarter of 2023, ahead of the 4.7% estimate.  The sharp increase came due to contributions from consumer spending, increased inventories, exports, residential investment, and government spending.



### *Inflation*

The Consumer Price Index for All Urban Consumers rose 3.1% for the 12 months ending November, a smaller increase than the 3.2% increase for the 12 months ending October.  The all items less food and energy index rose 4.0% over the last 12 months, as it did for the 12 months ending October.  The energy index decreased 5.4% for the 12 months ending November, while the food index increased 2.9% over the last year.



DAL2312069                          U.S. Economic Indicators                                20

APP000063

3407-3409 N Hall Street                                      NVC | National Valuation Consultants, Inc.

### *U.S. 10-Year Treasury Yield*

In 4Q 23 the benchmark 10-year UST yield moved steadily downward, falling below 4.0%. This essentially offset the previous upward movement in 3Q 23, returning the rate to about the same place that it was at the start of 2023.



### *Consumer Sentiment Index*

Consumer sentiment soared 13% in December, erasing all declines from the previous four months, primarily on the basis of improvements in the expected trajectory of inflation. Sentiment is now about 39% above the all-time low measured in June of 2022 but still well below pre-pandemic levels. All five index components rose this month, led by surges of over 24% for both the short and long-run outlook for business conditions. There was a broad consensus of improved sentiment across age, income, education, geography, and political identification. A growing share of consumers—about 14%—spontaneously mentioned the potential impact of next year's elections. Sentiment for these consumers appears to incorporate expectations that the elections will likely yield results favorable to the economy.



APP000064

3407-3409 N Hall Street                                    NVC | National Valuation Consultants, Inc.

*Investment*

The S&P 500 index, a benchmark commonly used to measure how U.S. stocks are doing overall, notched up for the fourth straight positive week YTD 4Q 2023, and has reached the highest level since August.



*NCREIF Property Index*

The market value index declined by 2.12% during the third quarter and 11.03% since the peak in the 2nd quarter of 2022. The total return for the quarter was -1.37% and the unleveraged return for the past four quarters was -8.35%.

The negative 1.37% total quarterly return consisted of 1.07% from income and -2.44% from negative property appreciation. Appreciation is after the deduction of capital expenditures.

Hotels were the only sector to achieve a positive return for the quarter although there are very few hotels held in the funds in the NCREIF Property Index which are primarily core funds. Office had by far the most negative return at -3.67% as office continues to suffer from work-at-home trends.



APP000065

3407-3409 N Hall Street                                                    NVC | National Valuation Consultants, Inc.

*Capital Markets*

According to CoStar Analytics, having decreased in 2020 by 27.4%, total commercial real estate sales volume reached a new record of $585B in 2021. Through year-end 2022, total CRE sales volume fell 10.2% for the year, reaching $526B. Thus far in 2023, total CRE sales have fallen 56.9% YTD, to $281B.



**CONCLUSION**

Looking forward, there is now more optimism in the market as inflation has returned to reasonable levels and the Fed has indicated that it may now consider rate reductions in 2024. However, some market observers predict that the Fed won't cut rates until inflation, currently about 3.0% a year, falls closer to its 2.0% target. As it is, the Fed is now emphasizing that it will keep one eye on fighting inflation and the other on maintaining economic growth, attempting to balance the two objectives. This is a change from the prior year when its focus was entirely on reducing inflation.

Within the real estate sector, industrial and apartment remain the most desirable categories and are considered the safest product types in today's shifting economy. At the same time, the fundamentals of retail have improved, though suburban locations continue to outperform central cities. The office market is the weakest sector as it will require some time for supply and demand to adjust to the new structural market realities from the pandemic. Finally, the residential markets are healthy and should perform well in 2024 if interest rates trend downward as expected, though affordability remains a top concern in many markets.

APP000066

3407-3409 N Hall Street　　　　　　　　　　　　　　　　NVC | National Valuation Consultants, Inc.

## AREA/SUBJECT MAP



APP000067

## Dallas-Fort Worth-Arlington, TX MSA Economic and Demographic Profile

***MSA Defined***

According to the U.S. Office of Management and Budget, the Dallas-Fort Worth-Arlington, TX Metropolitan Statistical Area (#19100) is defined as follows.

*Principal Cities:* Dallas, Fort Worth, Arlington, Plano, Irving, Denton, Richardson, Grapevine. *Constituent Counties:* Collin County, Dallas County, Denton County, Ellis County, Hunt County, Kaufman County, Rockwall County, Johnson County, Parker County, Tarrant County, Wise County.

***Locational and Linkages Attributes***

The cities of Dallas and Fort Worth are the two central cities of the metroplex. Dallas and its suburbs have one of the highest concentrations of corporate headquarters in the United States and is the largest growing metropolitan economy in the nation. Its major industries include Information Technology and Conducting Business. Fort Worth's economy is fueled by defense and aircraft manufacturing, as well as the Texas farming and ranching industry.

The Dallas-Fort Worth Metroplex is home to over 220 publicly traded companies and roughly 700 total corporate headquarters, one of the largest concentrations in the United States. As a whole, the region has over 20 Fortune 500 companies and approximately 40 Fortune 1,000 companies. Among these companies in Dallas are AT&T, Southwest Airlines, Texas Instruments, and Exxon Mobil; Fort Worth is home to American Airlines and several major defense manufacturers including Lockheed Martin and Bell Helicopter Textron.

The Dallas-Fort Worth region's attractive quality of life, low cost of living, skilled labor force, pro-business mindset and absence of corporate and personal income taxes all contribute to a strong regional and state economy. The region's central location allows it to function as a logistics and distribution hub, giving businesses an edge by putting key markets within easy reach of both truck and rail shipping.

***Ground Transportation***

*Highways*

The Dallas-Fort Worth area has multiple different freeways and interstates. Major north-south Interstates include I-35 and I-45/I-75. I-35 splits into I-35E and I-35W from Denton to Hillsboro. I-35W goes through Fort Worth while I-35E goes through Dallas. I-45 connects Dallas to Houston. I-75 connects Dallas to Durant Oklahoma. East-west routes include I-30 and I-20. The North Central Texas Council of Governments is a cooperative effort of all the counties impacted by the continued population growth and resulting traffic congestion, with the charter to help plan and coordinate future transportation needs of the region. Two major turnpikes have been opened in the last 10 years to address this growth: the Sam Rayburn Tollway, which links north Tarrant County to Collin County and the President George Bush Turnpike, which links I-20 and I-30, south of DFW Airport, to the Dallas North Tollway and I-75.

APP000068

3407-3409 N Hall Street                                    NVC | National Valuation Consultants, Inc.

*Public Transportation*

Public transit options continue to expand significantly, though in several outlying suburbs, it remains limited.  Dallas County and parts of Collin and Rockwall Counties have bus service and light rail operated by Dallas Area Rapid Transit, (DART), covering thirteen cities.  The Red Line extends north to Plano and southwest to Westmoreland Road.  The Blue Line reaches from Rowlett in the northeast to Ledbetter Road in south Dallas.  An additional three miles south to the University of North Texas near I-20 recently opened.  DART's 28-mile Green Line connects Carrollton in the northwest through Downtown Dallas to Pleasant Grove in the southeast.  The Orange Line is being extended in phases from Northwest Hwy to Las Colinas, in Irving, and finally to DFW International Airport.

*Rail*

Tarrant County has bus service operated by the Fort Worth Transportation Authority (known as 'The T'), available only in Fort Worth.  The commuter train that serves Fort Worth and its eastern suburbs is operated as the Trinity Railway Express.  It connects downtown Fort Worth to downtown Dallas, where it links to the DART light rail system.  A station near its midpoint, Centerport, serves DFW Airport via a free airport shuttle bus.

The Dallas-Fort Worth-Arlington area is served by the Burlington Northern and Santa Fe Railway's Intermodal freight transport yard, the Yellow Freight Systems' cross-docking facility and the Union Pacific intermodal facility, all located adjacent to I-45, southeast of Dallas.

**Air Transportation**

*Dallas-Fort Worth International Airport*

Commercial air transportation is handled through the Dallas-Fort Worth International Airport (DFW). DFW, located midway between Dallas and Fort Worth, is the world's largest in terms of land area, covers in excess of 18,000 acres.  According to the airport's website, DFW Airport provides non-stop access to 193 U.S. and 67 international cities.  During 2022 DFW served over 61.7 million passengers and over 1.8 billion tons of cargo a significant increase over the 39.3 million passengers and 872,000 tons of cargo served by the same date in 2021.  DFW currently ranks 3rd in the world in terms of operations, and 2nd in terms of passengers.  The airport also provides employment for close to 228,000 individuals.  A map of non-stop flights from DFW is presented below.



DAL2312069                        Economic and Demographic Profile                        26

APP000069

3407-3409 N Hall Street                                          NVC | National Valuation Consultants, Inc.

### Demographic Overview

The following table provides a summary of key demographic characteristics within the Dallas-Fort Worth MSA, the State of Texas, and the nation.



| Regional Demographic Summary | | | |
|---|---|---|---|
| | Dallas-Fort Worth MSA | State of Texas | United States |
| **Population** | | | |
| 2020 Census | 7,637,387 | 29,145,505 | 331,449,281 |
| 2024 Estimate | 8,126,208 | 30,665,339 | 336,157,119 |
| 2029 Projection | 8,541,837 | 32,119,807 | 344,209,992 |
| 2020 - 2024 % Annual Change | 1.6% | 1.3% | 0.4% |
| 2024 - 2029 % Annual Change | 1.0% | 0.9% | 0.5% |
| Average Age | 37.7 | 38.1 | 40.6 |
| Median Age | 36.6 | 36.7 | 39.7 |
| **Households** | | | |
| 2020 Census | 2,760,991 | 10,491,147 | 126,817,580 |
| 2024 Estimate | 2,938,027 | 11,081,289 | 129,079,042 |
| 2029 Projection | 3,091,922 | 11,644,207 | 132,563,817 |
| 2020 - 2024 % Annual Change | 1.6% | 1.4% | 0.4% |
| 2024 - 2029 % Annual Change | 1.0% | 1.0% | 0.5% |
| 2024 Average Household Size | 2.7 | 2.7 | 2.5 |
| **Income** | | | |
| 2024 Estimated Median Household | $82,998 | $73,203 | $75,781 |
| 2024 Estimated Avg. Household | $116,476 | $104,373 | $108,671 |
| % Under $50,000 | 29.6% | 34.8% | 33.7% |
| % $50,000 - $100,000 | 29.3% | 28.9% | 28.4% |
| % Over $100,000 | 41.2% | 36.3% | 37.9% |

Environics Analytics, 2024

### Population Trends

The Dallas-Fort Worth MSA has experienced annual population growth of 1.6% since 2020, which has surpassed population growth in the State of Texas as a whole.  Over the next five years, the Dallas-Fort Worth MSA is expected to see annual growth decline to 1.0%, which is higher than the projected rate of the State of Texas.

### Income Demographics

When compared to the State of Texas overall, a relatively large portion of households in the Dallas-Fort Worth MSA earn more than $100,000 annually (41.2%).  Within the State of Texas, only 36.3% fall within this income bracket.

APP000070

3407-3409 N Hall Street                                    NVC | National Valuation Consultants, Inc.

*Area Housing Stock*

The bulk of housing in the Dallas-Fort Worth MSA is concentrated in single-family homes which constitute 65.9% of inventory.  Overall, a higher share of households in the Dallas-Fort Worth MSA rent housing compared to the State of Texas; home-ownership levels are estimated at 58.7% and 61.4% in the Dallas-Fort Worth MSA and State of Texas, respectively.  At $352,921, the estimated value of owner-occupied homes in the Dallas-Fort Worth MSA is higher than the State of Texas median of $274,694.

| 2024 Housing Stock, Home Ownership, & Values | | | | |
|---|---|---|---|---|
| | Dallas-Fort Worth MSA | | State of Texas | |
| Housing Structure | Totals | % of Total | Totals | % of Total |
| 1 Unit Detached/Attached | 2,070,076 | 65.9% | 8,269,763 | 67.6% |
| 2-3-4 Units | 138,954 | 4.4% | 613,310 | 5.0% |
| 5-19 Units | 401,204 | 12.8% | 1,262,572 | 10.3% |
| 20 or more Units | 417,288 | 13.3% | 1,216,040 | 9.9% |
| Mobile Home, Trailer, Other | 112,004 | 3.6% | 867,534 | 7.1% |
| TOTAL | 3,139,526 | 100.0% | 12,229,219 | 100.0% |
| Home Ownership Levels | % Owner | 58.7% | % Owner | 61.4% |
| | % Renter | 41.3% | % Renter | 38.6% |
| Median Year Structure Built | 1992 | | 1991 | |
| Median Value of Owner-Occupied Homes | $352,921 | | $274,694 | |

Environics Analytics, 2024

*Employment by Industry Sector*

Top employment sectors in the Dallas-Fort Worth MSA include Management (12.0%), Office/Admin Support (11.3%), and Sales/Related (9.9%).  Together, these three sectors make up 33.2% of total employment.  When compared with the State of Texas, the Dallas-Fort Worth MSA has a higher share of residents in the Computer/Mathematical occupation (4.9%).



DAL2312069                    Economic and Demographic Profile                    28

APP000071

### *Resident Employment Trends*

The Dallas-Fort Worth MSA is currently exhibiting an unemployment rate of 3.6% as of October 2023.  In 2022, the total number of employed residents in the Dallas-Fort Worth MSA increased by 198,973.  Over the 12-month trailing period through October 2023, resident employment growth slowed as the number of employed residents increased by 162,085.

The total number of employed residents in the Dallas-Fort Worth MSA is now 5.0% above the recent peak reached in 2022.  When compared to the State of Texas, the Dallas-Fort Worth MSA's unemployment rate is lower, but unemployment in the Dallas-Fort Worth MSA is 0 percentage points above the nation.

| Resident Employment Trends | | | | |
|---|---|---|---|---|
| | Dallas-Fort Worth MSA | | State of Texas | United States |
| Year | Employment | Unemployment | Unemployment | Unemployment Rate |
| 2012 | 3,188,765 | 6.5% | 6.7% | 8.1% |
| 2013 | 3,253,995 | 6.2% | 6.3% | 7.4% |
| 2014 | 3,350,325 | 5.1% | 5.2% | 6.2% |
| 2015 | 3,437,008 | 4.1% | 4.5% | 5.3% |
| 2016 | 3,559,384 | 3.9% | 4.6% | 4.9% |
| 2017 | 3,637,295 | 3.7% | 4.3% | 4.4% |
| 2018 | 3,721,911 | 3.6% | 3.9% | 3.9% |
| 2019 | 3,811,831 | 3.3% | 3.5% | 3.7% |
| 2020 | 3,694,881 | 7.1% | 7.7% | 8.1% |
| 2021 | 3,906,721 | 5.1% | 5.6% | 5.3% |
| 2022 | 4,105,694 | 3.5% | 3.9% | 3.6% |
| Most Current Data | | | | |
| Oct 2022 | 4,148,996 | 3.4% | 3.7% | 3.4% |
| Oct 2023* | 4,311,081 | 3.6% | 3.8% | 3.6% |



Source: U.S. Bureau of Labor Statistics, 01/2024. The preceding data reflects all BLS revisions to date.

* - Preliminary data

APP000072

*Consumer Price Index (CPI) Trends*

The Consumer Price Index (CPI) is a measure of the average change over time in the prices paid by urban consumers for consumer goods and services and serves as an economic indicator. The CPI is the most widely used measure of inflation and provides information about price changes in the Nation's economy to government, business, and private citizens.

Price indexes are available for the U.S., the four Census regions, size of city, cross-classifications of regions and size-classes, and for 26 local areas. Indexes are available for major groups of consumer expenditures (food and beverages, housing, apparel, transportation, medical care, recreation, education and communications, and other goods and services), for items within each group, and for special categories, such as energy.

The CPI for Dallas-Fort Worth CSA recorded an increase of 2.4% annually for "All Items" during the period 2013-2022, which was the same as the U.S. (Class A) increase. From November 2022 to November 2023, the CPI for the Dallas-Fort Worth CSA increased by 5.2%, which was above the U.S. (Class A) CPI increase of 3.4% over the same time period.

| Comparative CPI Trends Dallas CSA & U.S. (Class A) | | |
|---|---|---|
| | All Items | |
| Year | Dallas CSA | U.S. (Class A) |
| 2013 | 216.0 | 212.6 |
| 2014 | 218.4 | 216.1 |
| 2015 | 217.5 | 217.1 |
| 2016 | 220.7 | 220.3 |
| 2017 | 226.1 | 225.4 |
| 2018 | 232.8 | 231.3 |
| 2019 | 237.7 | 235.9 |
| 2020 | 239.1 | 239.0 |
| 2021 | 251.6 | 249.1 |
| 2022 | 273.9 | 268.6 |
| Ann % Chg | 2.4% | 2.4% |
| 2021-'22 Chg | 8.9% | 7.8% |
| Year-over-Year Comparison | | |
| November-22 | 279.0 | 273.2 |
| November-23 | 293.6 | 282.4 |
| % Chg | 5.2% | 3.4% |

Source: U.S. Bureau of Labor Statistics. 1Q 2024.
Not Seasonally Adjusted Data
Dallas CSA Base Period: 1982 - 84 = 100
U.S. (Class A) Base Period: December 1986 = 100

The BLS divides the nation into several Combined Statistical Areas (CSA's). CSA's are larger than Metropolitan Statistical areas (MSA's) because they are intended to give a regional picture. For markets that do not fall within these CSA's, the BLS has defined these as being Class A, Class B/C, or Class D, depending on population. Size Class A is defined as having a population of more than 1.5 million. Size Class B/C is defined has having a population between 50,000 and 1.5 million. Size Class D is defined as having a population of less than 50,000.

APP000073

***Market News***

*Goldman Sachs*

New York-based financial firm Goldman Sachs announced a truly transformative project. The $480 million, 950,000 SF regional campus will be adjacent to the Perot Museum of Nature and Science. When completed, it will house nearly 5,000 employees a redefine the Dallas skyline. The campus will anchor an 11-acre mixed-use development being built by Dallas based Hunt Realty Investments on what are now low-rise apartments. The city of Dallas approved an economic incentive package valued at about $18 million. As part of the deal, the company signed a lease with a minimum term of 15 years for the new project. Construction began in February 2023, with an anticipated delivery of 2026.

*Texas Live!*

Texas Live!, a partnership between The Cordish Companies and the Texas Rangers, is a dynamic $250 million world-class dining, entertainment and hospitality district nestled between the Texas Rangers' Globe Life Park and the Dallas Cowboys AT&T Stadium in the heart of Arlington, TX. The now completed project is part of a greater $1.25 billion vision for the Arlington stadium district that features a new Rangers ballpark; 200,000 square feet of best-in-class restaurants, retail and entertainment venues; a full-service 300-room convention hotel; 35,000 square feet of meeting/convention space; and a 5,000-capacity outdoor event pavilion. The Rangers previous stadium, Globe Life Park, will remain open near Texas Live!, where it will be used for soccer games, football games, as well as some concerts.

*High-Speed Dallas-to-Houston Train*

A project to construct a high-speed train in-between Dallas and Houston is in the works as a $16 billion contract was enacted in June 2021. Texas Central and Milan-based Webuild will work together to construct the rail line, which will allow passengers to travel between Dallas and Houston in 90 minutes. This will be the single biggest infrastructure investment of its kind in the United States by value and will be the first true high-speed rail service in the county. The project has seen multiple setbacks and delays, primarily due to political and community opposition, however in June 2022, the Texas Supreme Court handed the company what could be a watershed victory, ruling that Texas Central can use eminent domain for this project.

*Trina Solar*

A smart solar products and solutions supplier is making a big bet on the North Texas community of Wilmer. Trina Solar plans to build a more than 1 million-square-foot facility to manufacture photovoltaic modules, specifically large power output Vertex modules. PV modules can come into play across a variety of products, and will be used, for instance, to create a net-zero development for Wells Fargo's forthcoming regional campus in Irving. The facility is expected to begin production in 2024 and will provide 1,500 jobs. Trina plans to invest more than $200 million in property and equipment tied to the project. Trina said that this is its first module factory in the Western Hemisphere.

APP000074

3407-3409 N Hall Street                                                    NVC | National Valuation Consultants, Inc.

**CONCLUSION**

The Dallas-Fort Worth MSA encompasses 11 counties within the State of Texas. Residents of the area refer to it as the Dallas/Fort Worth Metroplex, DFW, or The Metroplex. It is the economic and cultural hub of the region commonly called North Texas or North Central Texas and is the largest land-locked metropolitan area in the United States.

Dallas-Fort Worth is a leader in economic and demographic growth in the country. The metro added 488,821 new residents from 2020 to 2024, taking the top spot at a national level. The local economy has added the most jobs since the latest downturn, up 616,000 since year-end 2020. Due to the region's low cost of doing business and highly skilled labor force, companies have relocated or expanded operations across various sectors. The financial services sector has made an outsized impact, with Goldman Sachs and Wells Fargo announcing the construction of regional campuses employing a combined 9,000 employees. Among recent examples, Caterpillar relocated its headquarters to Irving from Peoria, Illinois; the heavy equipment manufacturer first moved its electric power division to the area. Engineering giant AECOM announced relocating its global headquarters from Los Angeles to Dallas.

Another California transplant was MD7 LLC, a mobile infrastructure consultancy firm. The company is relocating from San Diego to Allen. The move is anticipated to create 218 jobs and bring $6.8 billion in capital investment. In late 2019, Charles Schwab announced acquiring TD Ameritrade in a $26 billion transaction, moving its headquarters to Tarrant County from San Francisco. Charles Schwab completed a new regional office, and TD Ameritrade completed a large project nearby. The two companies' combined will bring thousands of jobs to the region. TripActions, a Palo Altobased company specializing in corporate travel, expanded its presence in Downtown Dallas. McKesson Corp, the nation's largest pharmaceutical distributor, relocated its headquarters to Irving. USAA added a 150,000-SF office building adjacent to its existing Plano location to bring the total headcount to 2,000 in north Texas, up by 800 employees.

A flurry of economic development wins has defined growth in the region over the last decade. North Texas has attracted over 150 new corporate headquarters during this period. In 2017, Toyota moved into its 2.0 million SF North American headquarters at the Legacy West development in Plano. The company relocated its sales, engineering, and financial services operations from California, bringing about 4,000 jobs. It has plans to add thousands more. State Farm finished its regional expansion in 2016 and occupied 2.0 million SF in Richardson's CityLine development. Another major headliner is Liberty Mutual Insurance, which has added around 5,000 jobs in Legacy West. Existing employers like AT&T, 7-Eleven, JPMorgan Chase, USAA, and Fannie Mae are also expanding their local footprints.

The Dallas-Fort Worth metro economy continues to grow and attract more companies which has caused increased employment and demand for commercial real estate. However, the recent rise in unemployment seen throughout most of the country, as well as the rising inflation rates give the Dallas-Fort Worth MSA a cautiously optimistic outlook as 2024 gets underway.

APP000075

3407-3409 N Hall Street                                        NVC | National Valuation Consultants, Inc.

## MARKET AREA MAP



APP000076

## Market Area Analysis

### Description of Market Area

The subject property is located at 3409 N Hall Street, in the City of Dallas, Dallas County, Texas.  For the purposes of this analysis, the subject's market area has been defined by a polygon that correlates with the city-defined "Uptown" Dallas district.  The area is bounded by Hawthorne Avenue to the north, North Central Expressway to the east, Woodall Rodgers Freeway to the south, and Harry Hines Boulevard to the west. A map of the market area's location and boundaries is provided on the previous page.

The City of Dallas is the third-largest city in the United States by land area and the ninth-largest by population.  Established in 1841, Dallas has grown into a major economic and cultural hub in the southern region of the country.  The city is known for its vibrant arts scene, diverse culinary offerings, and thriving business community.  Dallas is a major center for banking, telecommunications, and healthcare.  The city is home to several notable landmarks, including the iconic Reunion Tower, the historic Dealey Plaza, and the Dallas Arts District, one of the largest arts districts in the nation.

The subject is in Dallas' Uptown neighborhood, which is situated just north of downtown Dallas. Renowned for its upscale atmosphere and vibrant lifestyle, Uptown is characterized by a mix of high-rise residential buildings, commercial developments, and a lively entertainment scene.  Uptown Dallas is also home to a number of cultural attractions, including the Perot Museum of Nature and Science and the Dallas Museum of Art. With its strategic location and accessibility, Uptown serves as a hub for professionals, offering a blend of urban living and a dynamic business environment.  The subject property is not located in an Opportunity Zone.

### Linkages and Locational Attributes

Uptown is accessed by Woodall Rogers Freeway, which spans east from Singleton Boulevard in West Dallas via the Margaret Hunt Hill Bridge to IH-35E before tunneling and connecting to US-75.  This significant highway and bridge project have served commuters and the residents through increased access and connection between developing downtown core neighborhoods such as Victory Park, the Arts District, and Uptown.  Other routes of significance in the market area include McKinney Avenue, Cedar Springs Road, and Lemmon Avenue.

### Airport Transportation

Commercial air transportation circulates through two major airports.  DFW International Airport is located midway between Dallas and Fort Worth, approximately 18 driving miles northwest of the subject. DFW Airport provides non-stop access to 148 U.S. and 51 international cities.  Dallas Love Field is located approximately 4.0 driving miles northwest of the subject and is a convenient option for many business travelers.  Dallas Love Field is home to Southwest Airlines and serves as the front door to Dallas for over 14.0 million passengers a year.

APP000077

3407-3409 N Hall Street                                      NVC | National Valuation Consultants, Inc.

### *Passenger Rail*

The McKinney Avenue Transit Authority operates the M-Line Trolley, a convenient and free transit option with expanded routes from Blackburn to the north, down to Ross Avenue in the downtown Arts District. The trolley provides direct access to Klyde Warren Park, several DART transfer stations, and many nearby office and residential buildings throughout Uptown and parts of downtown.  The M-Line route has over 30 stops in Uptown while the subject property "M-Line Tower", is a stop itself. A map of the M-Line route is provided below.



APP000078

3407-3409 N Hall Street                                          NVC | National Valuation Consultants, Inc.

### *Demographic Overview*

The following table provides a summary of key demographic statistics for the subject's defined polygonal market area, its one- and three-mile radial areas, and comparable data for the City of Dallas and Dallas County.

| Market Area Demographic Summary | | | | | |
|---|---|---|---|---|---|
| | 1 Mile Radius | Market Area | 3 Mile Radius | City of Dallas | Dallas County |
| **Population** | | | | | |
| 2020 Census | 42,445 | 55,808 | 188,418 | 1,304,379 | 2,613,539 |
| 2024 Estimate | 44,426 | 57,723 | 195,640 | 1,307,608 | 2,612,729 |
| 2029 Projection | 46,592 | 60,152 | 203,981 | 1,317,877 | 2,630,719 |
| 2020 - 2024 % Annual Change | 1.1% | 0.8% | 0.9% | 0.1% | (0.0%) |
| 2024 - 2029 % Annual Change | 1.0% | 0.8% | 0.8% | 0.2% | 0.1% |
| Average Age | 38.7 | 38.5 | 37.6 | 37.2 | 37.3 |
| Median Age | 33.6 | 33.7 | 33.9 | 35.1 | 35.7 |
| **Households** | | | | | |
| 2020 Census | 28,323 | 36,350 | 100,777 | 523,798 | 965,537 |
| 2024 Estimate | 29,528 | 37,416 | 106,323 | 530,095 | 971,311 |
| 2029 Projection | 30,889 | 38,843 | 112,187 | 538,713 | 983,747 |
| 2020 - 2024 % Annual Change | 1.0% | 0.7% | 1.3% | 0.3% | 0.1% |
| 2024 - 2029 % Annual Change | 0.9% | 0.8% | 1.1% | 0.3% | 0.3% |
| 2024 Average Household Size | 1.5 | 1.5 | 1.8 | 2.4 | 2.7 |
| **Income** | | | | | |
| 2024 Estimated Median Household | $96,574 | $94,468 | $85,600 | $63,370 | $69,880 |
| 2024 Estimated Avg. Household | $139,405 | $135,799 | $130,536 | $99,297 | $102,126 |
| % Under $50,000 | 21.5% | 21.3% | 27.9% | 40.5% | 35.8% |
| % $50,000 - $100,000 | 30.0% | 31.2% | 28.7% | 29.2% | 30.5% |
| % Over $100,000 | 48.4% | 47.5% | 43.5% | 30.3% | 33.7% |



Annual Growth Projections (2024 - 2029) — Household Income Comparison

Environics Analytics, 2024

### *Population Trends*

The market area has experienced annual population growth of 0.8% since 2020, which has outpaced population growth in the City of Dallas as a whole. Over the next five years, the market area is expected to see annual growth remain at 0.8%, which is higher than the projected rate of the City of Dallas.

### *Income Demographics*

When compared to the City of Dallas overall, a relatively large proportion of households in the market area earn more than $100,000 annually (47.5%). Within the City of Dallas, only 30.3% fall within this income bracket.

APP000079

3407-3409 N Hall Street                                            NVC | National Valuation Consultants, Inc.

### *Area Housing Stock*

The bulk of housing in the market area is concentrated in multi-family homes which comprise 88.4% of inventory. Overall, a higher proportion of households in the market area rent housing compared to the City of Dallas; home-ownership levels are estimated at 19.7% and 39.4% in the market area and City of Dallas, respectively. At $507,816, the estimated value of owner-occupied homes in the market area is above the City of Dallas median of $337,869.

| 2024 Housing Stock, Home Ownership, & Values | | | | |
|---|---|---|---|---|
| | Market Area | | City of Dallas | |
| Housing Structure | Totals | % of Total | Totals | % of Total |
| 1 Unit Detached/Attached | 4,858 | 11.6% | 262,017 | 44.8% |
| 2-3-4 Units | 1,472 | 3.5% | 36,169 | 6.2% |
| 5-19 Units | 4,614 | 11.0% | 119,052 | 20.4% |
| 20 or more Units | 31,043 | 73.9% | 160,316 | 27.4% |
| Mobile Home, Trailer, Other | 32 | 0.1% | 6,768 | 1.2% |
| TOTAL | 42,019 | 100.0% | 584,322 | 100.0% |
| Home Ownership Levels | % Owner | 19.7% | % Owner | 39.4% |
| | % Renter | 77.9% | % Renter | 60.6% |
| Median Year Structure Built | 2002 | | 1980 | |
| Median Value of Owner-Occupied Homes | $507,816 | | $337,869 | |

Environics Analytics, 2024

### *Resident Employment by Occupation*

Top employment sectors in the market area include Business/Financial Ops (18.2%), Management (17.4%), and Sales/Related (11.0%). Together, these three sectors account for 46.6% of total employment. When compared with the City of Dallas, the market area has a higher portion of residents in the Business/Financial Ops occupation (18.2%).



DAL2312069                              Market/Trade Area Analysis                              37

APP000080

3407-3409 N Hall Street                                                    NVC | National Valuation Consultants, Inc.

*Principal Employers*

The table below presents the principal employers within the City of Dallas, according to the city's most recent Comprehensive Annual Financial Report (CAFR).

| City of Dallas - Principal Employers | |
|---|---|
| Company | # of Employees |
| Dallas Independent School District | 23,271 |
| City of Dallas | 13,000 |
| AT&T | 12,600 |
| Medical City Dallas | 10,864 |
| Parkland Health and Hospital System | 10,406 |
| Texas Instruments | 9,800 |
| Dallas County Community College | 8,230 |
| Methodist Dallas Medical Center | 6,887 |
| Dallas County Community College | 6,500 |
| Childrens Health | 6,276 |

Source: City of Dallas CAFR, 2024.

*Market Drivers*

*American Airlines Center*:  The American Airlines Center is a multi-purpose arena, located in the Victory Park neighborhood in downtown Dallas.  The arena serves as the home to the Dallas Mavericks of the National Basketball Association, and the Dallas Stars of the National Hockey League.  The arena is also used for concerts and other live entertainment.

*Katy Trail*:  The Katy Trail is a jogging, walking, inline skating, and bicycling path that runs through the Uptown and Oak Lawn areas of Dallas.  Privately funded and supported by the community, the historic Katy Trail follows the path of the old Missouri-Kansas-Texas Railroad line, which was known as MKT or the Katy.  The trail runs 3.5 miles from the American Airlines Center in Victory Park to Mockingbird Station near Southern Methodist University.

*Victory Park*:  Victory Park is a master planned development in downtown Dallas, along Interstate 35E.  Victory Park is home to over 2,000 residences, 620,000 SF of office space, and various street-front retailers and restaurants.  The area is also home to the American Airlines Center, House of Blues, and Perot Museum of Nature and Science.

*Perot Museum of Nature and Science*: The Perot Museum of Nature and Science, located in Victory Park, is a prominent science and nature museum known for its innovative exhibits and educational programs. Designed by architect Thom Mayne, the building itself is an architectural marvel, featuring a distinctive cube-shaped structure with a dynamic and modern design.  The Perot Museum aims to inspire curiosity and a love for learning through its engaging displays that cover a wide range of topics, including paleontology, earth sciences, astronomy, and robotics.  The museum is equipped with state-of-the-art technology, interactive exhibits, and hands-on activities, making it a popular destination for families, students, and science enthusiasts.

APP000081

### Resident Employment Trends

The City of Dallas is currently exhibiting an unemployment rate of 3.4% as of November 2023.  In 2022, the total number of employed residents in the City of Dallas increased by 35,008.  Over the 12-month trailing period through November 2023, resident employment growth slowed as the number of employed residents increased by 30,731.

The total number of employed residents in the City of Dallas is now 6.0% higher than the recent peak reached in 2022.  When compared to Dallas County, the City of Dallas' unemployment rate is similar, but unemployment in the City of Dallas is 0.1 percentage points below the nation.

| | City of Dallas | | Dallas County | | Dallas-Fort Worth MSA |
|---|---|---|---|---|---|
| Year | Employment | Unemployment Rate | Employment | Unemployment Rate | Unemployment Rate |
| 2012 | 570,666 | 7.0% | 1,133,951 | 7.1% | 6.5% |
| 2013 | 580,276 | 6.5% | 1,150,663 | 6.6% | 6.2% |
| 2014 | 597,306 | 5.3% | 1,180,636 | 5.5% | 5.1% |
| 2015 | 612,229 | 4.2% | 1,208,806 | 4.3% | 4.1% |
| 2016 | 634,785 | 4.0% | 1,246,814 | 4.0% | 3.9% |
| 2017 | 644,448 | 3.9% | 1,264,990 | 4.0% | 3.7% |
| 2018 | 647,219 | 3.8% | 1,276,103 | 3.8% | 3.6% |
| 2019 | 652,325 | 3.5% | 1,286,431 | 3.5% | 3.3% |
| 2020 | 622,055 | 8.0% | 1,226,780 | 7.8% | 7.1% |
| 2021 | 658,667 | 5.7% | 1,299,051 | 5.6% | 5.1% |
| 2022 | 693,675 | 3.7% | 1,368,043 | 3.7% | 3.5% |
| **Most Current Data** | | | | | |
| Nov 2022 | 704,910 | 3.5% | 1,390,209 | 3.5% | 3.4% |
| Nov 2023* | 735,641 | 3.4% | 1,450,832 | 3.4% | 3.3% |

*Resident Employment Trends*



Source: U.S. Bureau of Labor Statistics, 01/2024. The preceding data reflects all BLS revisions to date.
* - Preliminary data

APP000082

3407-3409 N Hall Street                                    NVC | National Valuation Consultants, Inc.

**CONCLUSION**


Uptown is a high-density urban district located to the north of the Dallas Art District, Victory Park, and the CBD.  The neighborhood has experienced tremendous growth as a business center with a mix of residential options including apartment homes, condominiums, high-rise towers and historic homes.  The pedestrian-oriented street encompasses commands some of the highest office and residential per-square-foot prices in the region.   The integration of public transit within the district and complimentary roadways surrounding Uptown provide residents and commuters with high accessibility.  The market area has registered an annual population growth of 0.8% since 2020.  Over the next five years, the market area is expected to see population growth remain at 0.8% annually, a pace that exceeds the projected rate of both the city and county.

Most Uptown residents hold a bachelor's degree or higher, and the median household income is currently averaging $135,799. The educated nature of the residents greatly benefits elite firms also located in the area, such as Goldman Sachs, Bain & Company, and PwC.  This attracts many individuals and businesses into migrating to the area, on top of the accessibility to many other nearby attractions.  As one of the most pedestrian-friendly areas in the City of Dallas, residents and visitors alike can enjoy hot restaurants, the best shopping in town, and the elite nightlife scene along McKinney Avenue.

The market area also has a stock of almost 300 office buildings scattered along the busy corridors of McKinney Avenue, Cedar Springs Road, and Turtle Creek Boulevard.  Both office and residential high-rise developments are densely situated along the Turtle Creek natural waterway and park, and the 3.5-mile Katy Trail.

The transformation of Uptown from a low-rise residential area into a dense mixed-use urban district is attributed to the success of public-private partnerships, strategic pedestrian-oriented infrastructure investment, and strong speculative development.  Going forward, the outlook for Uptown remains favorable for continued growth.

APP000083

## Zoning Analysis

The property is zoned PD-193, O-2 (Oak Lawn Special Purpose District, Office-2 District) under the authority of City of Dallas. Office and Mixed-use office with limited retail and service uses are permitted land uses under this zoning. The subject's zoning requirements are summarized below.

| Zoning Requirements | |
|---|---|
| Zoning Jurisdiction | City of Dallas |
| Zoning Designation | PD-193, O-2 (Oak Lawn Special Purpose District, Office-2 District) |
| Description | PD 193 is established on property generally bounded by Woodall Rodgers Freeway, North Central Expressway, the Missouri, Kansas, and Texas Railroad, the city limits of the City of Highland Park, Bordeaux Avenue, Inwood Road, Denton Drive Cut-off, Maple Avenue, Cedar Springs Branch Creek, Harry Hines Boulevard, Oak Lawn Avenue, and Stemmons Freeway but excluding existing PD's and conservation districts within those boundaries. The purpose of the PD is to provide flexibility in the planning and construction of development projects by allowing a combination of land uses developed under a uniform plan that protects contiguous land uses and preserves significant natural features . Site plan approcval is required for all development. |
| | The area standards provided in the O-1 and O-2 districts anticipate that office uses will be located in close proximity to residential uses. Yards , signs, building bulk, and off-street parking regulations are provided to as sure that office uses will be compatible with adjacent residential districts. Where office buildings higher than 36 feet are anticipated or constructed, greater setbacks are required in order to protect the light and air to adjacent properties. Limited retail and service uses related to the operation of an office building such as a tobacco shop, barber shop, or restaurant are permitted in the O-2 district, but only when such uses are contained within the main building and are arranged to serve the building occupants and not the general public. |

| Lot | |
|---|---|
| Maximum Lot Coverage | 75% |
| **Setbacks** | |
| Front (Feet) | 10 |
| Side (Feet) | 10 |
| Rear (Feet) | 10 |
| **Building** | |
| Maximum Building Height (Feet) | 240 |
| Maximum Floor Area Ratio | 4:1 |

Source: Dallas Municipal Code

Site plan approval is required for all new development. The setbacks, maximum lot coverage, maximum building height, and maximum FAR are presented in the table above. Buildings higher than 36 feet require greater setbacks in order to protect the light and air to adjacent properties. According to the local planning department, there are no pending or prospective zoning changes.



APP000084

## State of Texas Tax and Assessment Analysis

***Property Tax Administration***

According to the State of Texas, administration of the property tax system in Texas involves both state and local entities and officials.  State law governs how the process works.

1. The ***Comptroller of Public Accounts of the State of Texas*** adopts rules establishing minimum standards for the administration and operation of an appraisal district.  The minimum standards may vary according to the number of parcels and the kinds of property the district is responsible for appraising.

2. The ***Board of Tax Professional Examiners*** is responsible for certifying tax professionals in Texas and  in setting standards for and approving curricula and materials for use in training and educating appraisers and assessor-collectors.

3. An ***appraisal district*** is established in each county.  The district is responsible for appraising property in the district for ad valorem tax purposes of each taxing unit that imposes ad valorem taxes on property in the district.  An appraisal district is a political subdivision of the state.  With exceptions, the appraisal district's boundaries are the same as the county's boundaries.  The appraisal district is governed by a ***board of directors***.  A ***chief appraiser*** is the chief administrator.

4. ***An appraisal review board*** settles any disagreements between the property owner and the appraisal district about the value of a property.  The appraisal review board is established for each appraisal district.

***Local taxing units***, which include the county, city, school district, and special districts, decide how much money they will spend.  This determines the total amount of taxes that property owners will pay.  The county assessor-collector shall assess and collect taxes on property in the county.

The county attorney or, if there is no county attorney, the district attorney shall represent the county to enforce the collection of delinquent taxes if the commissioners court does not contract with a private attorney.

***Assessment***

The assessment of property for taxation on the basis of a percentage of its appraised value is prohibited.  All property shall be assessed on the basis of 100% of its appraised value.  The market value of property shall be determined by the application of generally accepted appraisal methods and techniques.  If the appraisal district determines the appraised value of a property using mass appraisal standards, the mass appraisal standards must comply with the Uniform Standards of Professional Appraisal Practice.  The same or similar appraisal methods and techniques shall be used in appraising the same or similar kinds of property.  However, each property shall be appraised based upon the individual characteristics that affect the property's market value.  In determining the market value of property, the chief appraiser shall consider the cost, income, and market data comparison methods of appraisal and use the most appropriate method.

APP000085

3407-3409 N Hall Street                                                    NVC | National Valuation Consultants, Inc.

*Reassessment Cycle*

The appraisal district must repeat the appraisal process for property in the county at least once every three years.

*Tax Rates*

Local taxing units, which include the county, city, school district, and special districts, decide how much money they will spend.  This determines the total amount of taxes that property owners will pay.  The governing body of each taxing unit, before the later of September 30 or the 60th day after the date the certified appraisal roll is received by the taxing unit, shall adopt a tax rate for the current tax year and shall notify the assessor for the unit of the rate adopted.

State "truth-in-taxation" laws give taxpayers a voice in decisions that affect their property tax rates. Beginning in early August, taxing units take the first step toward adopting a tax rate by calculating and publishing the effective and rollback tax rates.

> The *effective tax* rate would provide the taxing unit with approximately the same amount of revenue it had the year before on properties taxed in both years.

> The *rollback* rate provides the taxing unit approximately the same amount of tax revenue it spent the previous year for day-to-day operations plus an extra 8-percent cushion, and sufficient funds to pay its debts in the coming year.  For school districts, the cushion is six cents per $100 of property value, not 8%.

*Assessment and Real Estate Taxes*

The 2023 assessments and real estate taxes for the subject are summarized as follows.

| 2023 Assessment and Taxes | | | | | |
|---|---|---|---|---|---|
| 3407 - 3409 N Hall Street | Land | Improvements | Assessed | Tax Rate | |
| Tax ID | Value | Value | Value | Per $100 | Taxes |
| 00000137545000000 | $1,391,280 | $0 | $1,391,280 | 2.294781 | $31,927 |
| 00000137548000000 | $946,000 | $0 | $946,000 | 2.294781 | $21,709 |
| Total | | | $2,337,280 | | $53,635 |
| $/SF - (22,439 SF) | | | $104.16 | | $2.39 |

Based upon the 2023 sale price and our estimated current market value, the subject is clearly under-assessed from a market value viewpoint.

APP000086

3407-3409 N Hall Street                                         NVC | National Valuation Consultants, Inc.

## Site Analysis

In analyzing and describing the subject site, we have relied on our personal inspection of the property and surrounding area on January 7, 2024; information provided by ownership; and records on file with the county.

| | |
|---|---|
| **SIZE:** | 0.52 acres (±22,439SF) per ALTA Survey. |
| **ADDRESS:** | 3407 - 3409 N Hall Street<br>Dallas, TX 75219 |
| **LOCATION:** | Off of N Hall St & Turtle Creek Blvd. across the street from Turtle Creek Park |
| **TOPOGRAPHY:** | The site slopes downward from the west to the east, with some existing, concrete retaining walls in place. |
| **SHAPE / UTILITY:** | Rectangular shape with no unusual features limiting utility. |
| **ACCESS:** | The site is accessible via N Hall St. |
| **VISIBILITY/EXPOSURE:** | The site is visible from N Hall St. |
| **FRONTAGE:** | The site has frontage along N Hall St. |
| **UTILITIES:** | All public utilities are available and in adequate supply. |
| **EASEMENT / ENCUMBRANCES:** | A title policy and ALTA Survey were provided. As is the case with most major commercial sites, easements and encumbrances are common place and predominately utility-related. This appraisal is based on the standard assumption that no title exceptions, recorded or unrecorded, are present that would have a negative impact on the subject site. |
| **HAZARDOUS SUBSTANCES:** | The appraisers were not provided with a Phase I Environmental Site Assessment. This appraisal specifically assumes that the property is not affected by environmental conditions that would significantly impact the usability, or marketability of the site. |
| **SURROUNDING LAND USES:** | North:  Turtle Creek Park, Office, and Multifamily<br>East:    Multifamily, Turtle Creek, Katy Trail, and Retail<br>South:  Mixed use Multifamily and Office<br>West:   Retail, Multifamily, Senior Living Facility, and Office |

APP000087

3407-3409 N Hall Street                                                    NVC | National Valuation Consultants, Inc.

**FLOODPLAIN:**                      According to Site To Do Business (STDB), the subject property is located within FEMA Flood Insurance Rate Map Community Panel Number 0345J, dated, August 23, 2001. The subject is situated in Zone X. First American Flood Data Services defines Zone X as an area that is determined to be outside the 100- and 500-year floodplains. A flood map follows.



**DRAINAGE:**                        Based on our inspection of the site, drainage appears adequate.

**CONCLUSION:**                      The site is located within an established neighborhood, across the street from a well-known City park, with mainly multifamily land uses nearby. All public utilities are available, and the physical character of the site is similar to neighborhood land alternatives. The site is surrounded on three sides by a high-rise luxury apartment complex. These buildings will block all views from the subject except to the north to the park. We are unaware of any other unusual or detrimental site characteristics that adversely affect site utility or potential development.

APP000088

NVC | National Valuation Consultants, Inc.

Parcel Map / Site Survey

3407-3409 N Hall Street



Parcel Map / Site Survey

DAL2312069

APP000089

3407-3409 N Hall Street                                    NVC | National Valuation Consultants, Inc.

## Subject Photographs



View of subject from N Hall St



View of subject from Southeast

APP000090

3407-3409 N Hall Street                                    NVC | National Valuation Consultants, Inc.



View of subject from southeast corner



View of subject from South end



View of subject from Southwest



View of subject from Northwest



View of subject from North end



View of subject from Northeast corner

APP000091

# ANALYSIS OF DATA AND CONCLUSIONS

APP000092

3407-3409 N Hall Street                                          NVC | National Valuation Consultants, Inc.

## Market Analysis

Given the subject's zoning allows both office and separate retail usages, we will provide a market analysis section for each of these property sections for both the metropolitan area and the submarket.

APP000093

## Dallas-Fort Worth Commercial Market Analysis

Office, retail, and apartment market data provided by CoStar Group is used within this analysis to support our commentary on metropolitan commercial market trends.  CoStar tracks office, office condominium, office loft, office medical, all classes and all sizes of buildings, both multi-tenant and single-tenant buildings.  We will examine factors that have the potential to impact demand for office space.  All office rental rates reported by CoStar are Full Service (F/S) rental rates.  In addition, the CoStar Properties Database calculate retail statistics using CoStar Group's base of existing, under construction and under renovation retail buildings in each given metropolitan area.  All retail rental rates reported by CoStar are Triple Net (NNN) quoted rental rates.  ***Please note that owner-occupied data has been excluded for this analysis.***  We have also relied upon CoStar Analytics apartment market survey data and trends for rent, vacancy, and inventory levels in the Dallas-Fort Worth market and ***data is specific to "market rate" units (i.e., effective rent per unit, after concessions).***

A map of the Dallas-Fort Worth market and its commercial properties is shown below.  The blue markers are properties that are currently available: these properties are for sale, for lease, or both.  The gray markers are properties that are not currently available.  The map below includes all office, multifamily, and retail space.



APP000094

### Dallas-Fort Worth Office Market Year-Over-Year Trend Summary

From 4Q 2022 to 4Q 2023, vacancy within the market increased by 80 bps to a rate of 21.9%. Over the same time period, average rental rates increased by 1.0% to a rate of $29.69/SF. In 4Q 2023, absorption levels were negative with 113,901 SF of office space being returned to the market. However, 337,723 SF of new office supply added to the market.

| Dallas-Fort Worth Office Market Year-Over-Year Trend Summary | | | | |
|---|---|---|---|---|
| | 2023 Q4 | 2022 Q4 | YoY Change | Trend |
| Overall Vacancy | 21.9% | 21.1% | 80 bps | |
| (FS) Avg. Rate | $29.69 | $29.41 | 1.0% | |
| Net Absorption (in SF) | (113,901) | (1,906,967) | 1,793,066 | |
| Completions (in SF) | 337,723 | 196,606 | 141,117 | |

Source: CoStar Properties Analytical Search, 01/09/2024.

### Dallas-Fort Worth Office Market Snapshot

The following table provides an overview of office market statistics by property class for the metropolitan Dallas-Fort Worth market. As shown, vacancy is currently highest in the Class A segment at 27.6%. By rentable building area, the Dallas-Fort Worth office market exhibits the following composition: Class A-47.1%, Class B-43.3%, and Class C-9.6%.

| Dallas-Fort Worth Office Market Snapshot | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Existing Inventory | | | Vacancy Rate | | YTD Net Absorption | (FS) Avg. Rate |
| Class | # of Bldgs | Total RBA | % of RBA | Total SF | Vac% | | |
| Class A | 670 | 151,918,523 | 47.1% | 41,929,512 | 27.6% | 132,004 | $33.43 |
| Class B | 5,234 | 139,743,148 | 43.3% | 26,970,428 | 19.3% | (46,554) | $24.33 |
| Class C | 4,386 | 30,887,731 | 9.6% | 1,915,039 | 6.2% | (20,066) | $21.64 |
| Total | 10,290 | 322,549,402 | 100.0% | 70,814,979 | 21.9% | 65,384 | $29.63 |

Source: CoStar Properties Analytical Search, 01/09/2024. RBA = Rentable Building Area

### Product Class Definitions

Each class of office building is defined below, using parameters established by BOMA International. Please note that these are primarily market classifications, not construction classifications:

**Class A:** Excellent location and accessibility; high-quality structure and management; new or competitive with new buildings; minimum size 100,000 SF (CBD) or 50,000 SF (suburbs); rental rates in the upper 20% of the market sector's range.

**Class B:** Good location and access; structure showing very little obsolescence or deterioration; minimum size 50,000 SF (CBD) or 25,000 SF (suburbs); rental rates in the upper 50% of the market sector's range.

**Class C:** Buildings generally more than 15 years old, with rental rates in the lower 50% of the market sector's range.

APP000095

3407-3409 N Hall Street                                    NVC | National Valuation Consultants, Inc.

### *Dallas-Fort Worth Office Market – Total Trends*

Dallas-Fort Worth's office market continues to face headwinds with fragile demand and rising availabilities. Vacancies have shifted to a 20-year high of 21.9% at the end of 2023 and the glut of available sublease space is trending at approximately 9.9 million SF. The trend comes as the market has historically carried a structurally higher vacancy rate compared to the U.S. norm, an artifact coming out of the boom-and-bust of the mid-1980s. Additionally, the COVID-19 pandemic has further led to corporations giving up physical space, as employees continue to prefer to work at home.

Vacancy rates in the Dallas-Fort Worth office market trended higher over the past year due to greater move-outs throughout most of 2023. The market reported 1.6 million SF of negative absorption in 2023, causing vacancy rates to rise to 21.9%, where they remain year-to-date. Office demand is expected to remain tepid through the near term as firms continue to assess their office utilization, which will keep office vacancy rates elevated through most of 2024. Local experts are predicting that vacancy rates will rise to rates around 24.0% through 2024. Despite continued increases in vacancy, average rental rates for the market has increased in each year between 2014 and 2023, however, rates only grew by 1.0% in 2023 as demand weakened.

| Dallas-Fort Worth Office Market Trends | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | Inventory (SF) | | Supply & Demand (SF) | | | Rents | |
| Period | # of Bldgs | RBA | New Supply | Net Absorption | Vacancy | (FS) Avg. Rate | % Change |
| 2014 | 9,591 | 295,655,176 | 3,487,513 | 4,770,637 | 16.4% | $22.09 | N/A |
| 2015 | 9,680 | 301,175,909 | 7,263,689 | 5,270,700 | 16.1% | $23.37 | 5.8% |
| 2016 | 9,804 | 304,804,535 | 5,023,693 | 2,566,200 | 16.2% | $24.05 | 2.9% |
| 2017 | 9,941 | 309,378,752 | 5,072,081 | 2,052,179 | 16.7% | $25.07 | 4.2% |
| 2018 | 10,020 | 313,427,937 | 4,578,476 | 1,711,110 | 17.2% | $25.94 | 3.5% |
| 2019 | 10,077 | 316,462,005 | 3,674,878 | 2,105,291 | 17.4% | $26.38 | 1.7% |
| 2020 | 10,158 | 318,498,858 | 3,052,430 | (4,128,555) | 19.2% | $27.54 | 4.4% |
| 2021 | 10,192 | 320,362,765 | 2,442,702 | (3,441,858) | 20.7% | $28.19 | 2.4% |
| 2022 | 10,227 | 321,219,818 | 1,686,294 | (597,511) | 21.1% | $29.41 | 4.3% |
| 2023 | 10,287 | 322,316,114 | 2,606,055 | (1,626,624) | 21.9% | $29.69 | 1.0% |
| CAGR/Averages | | 1.0% | 3,888,781 | 868,157 | 18.3% | $26.17 | 3.3% |
| Current Year Data | | | | | | | |
| YTD | 10,290 | 322,549,402 | 233,288 | 65,384 | 21.9% | $29.63 | (0.2%) |
| Forecasted Supply and Demand Trends | | | | | | | |
| 2024 Estimate | | 323,417,115 | 867,713 | (6,234,193) | 23.7% | | |
| 2025 | | 324,043,330 | 626,215 | (2,243,396) | 24.3% | | |
| 2026 | | 324,816,667 | 773,337 | (1,437,988) | 25.0% | | |
| 2027 | | 326,075,468 | 1,205,784 | 720,729 | 25.0% | | |
| 2028 | | 327,098,407 | 1,341,024 | 1,769,462 | 24.8% | | |
| Historical Supply and Demand Trends | | | | | | | |

Source: CoStar Properties Analytical Search, 01/09/2024. Annual numbers represent year-end statistics.

APP000096

3407-3409 N Hall Street                                              NVC | National Valuation Consultants, Inc.

### *Dallas-Fort Worth Office Market – New Development*

The pace of construction in Dallas-Fort Worth is moving at a manageable pace, with 7.4 million SF underway and with construction levels remaining flat since the beginning of 2022.  Elevated uncertainty surrounding the office market, rising levels of available sublease space, supply chain disruptions, and ongoing construction labor shortages weigh on office development.  Meanwhile, market participants in the lending space have cited more restrictive financing for building office space given more risk in the market.

According to CoStar, there are 140 office properties currently under construction within the market.  Once completed, these properties will add over 7.4 million SF of new office space to the market.  CoStar also notes 373 office properties that have been proposed for construction, with the potential to add over 61.0 million SF of new office space, if completed.  Additionally, there are no office properties in the final planning development stage in the market.

| Dallas-Fort Worth Office Market - New Development by Submarket | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Under Construction | | | | Proposed | | |
| Submarket | # of Properties | RBA | % of RBA | % Leased | # of Properties | RBA | % of RBA | % Leased |
| Uptown/Turtle Creek | 4 | 1,962,640 | 26.4% | 53.3% | 9 | 3,056,710 | 5.0% | 13.3% |
| Frisco/The Colony | 16 | 1,885,063 | 25.4% | 44.6% | 26 | 4,878,319 | 8.0% | 34.2% |
| Urban Center/Wingren | 13 | 931,035 | 12.5% | 92.2% | 0 | 0 | 0.0% | - |
| Upper Tollway/West Plano | 5 | 725,741 | 9.8% | 42.1% | 38 | 8,677,770 | 14.2% | 26.3% |
| Alliance | 15 | 408,395 | 5.5% | 53.8% | 23 | 1,857,092 | 3.0% | 14.5% |
| Allen/McKinney | 23 | 382,823 | 5.2% | 39.9% | 41 | 7,688,375 | 12.6% | 10.7% |
| Lewisville | 5 | 244,216 | 3.3% | 21.7% | 19 | 1,893,083 | 3.1% | 3.8% |
| Westlake/Grapevine | 13 | 165,139 | 2.2% | 26.8% | 36 | 1,129,573 | 1.9% | 16.2% |
| Outlying Collin County | 15 | 124,539 | 1.7% | 71.7% | 6 | 96,296 | 0.2% | 48.1% |
| Parker County | 3 | 106,955 | 1.4% | 4.7% | 6 | 59,000 | 0.1% | 83.1% |
| Arlington/Mansfield | 2 | 103,190 | 1.4% | 8.2% | 9 | 189,567 | 0.3% | 55.7% |
| Stemmons Freeway | 1 | 66,504 | 0.9% | 100.0% | 6 | 1,039,100 | 1.7% | 78.4% |
| Denton | 5 | 60,819 | 0.8% | 88.8% | 8 | 109,397 | 0.2% | 34.2% |
| Rockwall | 3 | 57,522 | 0.8% | 54.8% | 3 | 63,500 | 0.1% | 95.3% |
| Quorum/Bent Tree | 1 | 40,000 | 0.5% | 76.6% | 3 | 789,909 | 1.3% | 30.3% |
| West Southwest Ft Worth | 3 | 36,449 | 0.5% | 34.1% | 15 | 1,016,861 | 1.7% | 10.1% |
| Outlying Denton County | 4 | 24,803 | 0.3% | 42.8% | 3 | 97,200 | 0.2% | 53.7% |
| Southeast Ft Worth | 1 | 20,000 | 0.3% | 100.0% | 0 | 0 | 0.0% | - |
| Hunt County | 1 | 17,810 | 0.2% | 100.0% | 1 | 4,600 | 0.0% | 100.0% |
| Mesquite/Forney/Terrell | 1 | 15,000 | 0.2% | 100.0% | 12 | 78,935 | 0.1% | 88.2% |
| Plano | 1 | 12,500 | 0.2% | 0.0% | 29 | 4,032,074 | 6.6% | 33.6% |
| HEB/Mid-Cities | 2 | 11,200 | 0.2% | 33.0% | 3 | 20,141 | 0.0% | 9.2% |
| Preston Center | 1 | 10,434 | 0.1% | 100.0% | 1 | 150,000 | 0.2% | 100.0% |
| Hood County | 1 | 6,232 | 0.1% | 0.0% | 2 | 28,202 | 0.0% | 50.0% |
| Richardson | 1 | 4,940 | 0.1% | 100.0% | 11 | 6,433,360 | 10.5% | 48.8% |
| South Irving | 0 | 0 | 0.0% | - | 2 | 72,000 | 0.1% | 16.7% |
| DFW Freeport/Coppell | 0 | 0 | 0.0% | - | 7 | 2,115,072 | 3.5% | 7.5% |
| Ellis County | 0 | 0 | 0.0% | - | 5 | 51,920 | 0.1% | 0.0% |
| Northwest Ft Worth | 0 | 0 | 0.0% | - | 2 | 10,995 | 0.0% | 42.6% |
| Grand Prairie | 0 | 0 | 0.0% | - | 1 | 5,000 | 0.0% | 0.0% |
| Garland | 0 | 0 | 0.0% | - | 1 | 9,600 | 0.0% | 0.0% |
| Southwest Dallas | 0 | 0 | 0.0% | - | 5 | 897,280 | 1.5% | 66.2% |
| Office Ctr/West LBJ Ext | 0 | 0 | 0.0% | - | 9 | 5,508,100 | 9.0% | 46.5% |
| Johnson County | 0 | 0 | 0.0% | - | 5 | 37,577 | 0.1% | 100.0% |
| Outlying Kaufman County | 0 | 0 | 0.0% | - | 1 | 10,000 | 0.0% | 0.0% |
| West LBJ Freeway | 0 | 0 | 0.0% | - | 1 | 8,000 | 0.0% | 100.0% |
| Southeast Dallas | 0 | 0 | 0.0% | - | 1 | 100,000 | 0.2% | 100.0% |
| Ft Worth CBD | 0 | 0 | 0.0% | - | 1 | 450,000 | 0.7% | 100.0% |
| Central Expressway | 0 | 0 | 0.0% | - | 4 | 1,429,472 | 2.3% | 7.9% |
| East LBJ Freeway | 0 | 0 | 0.0% | - | 8 | 2,757,276 | 4.5% | 60.9% |
| Dallas CBD | 0 | 0 | 0.0% | - | 8 | 3,669,317 | 6.0% | 24.3% |
| White Rock | 0 | 0 | 0.0% | - | 2 | 496,600 | 0.8% | 0.0% |
| **TOTALS** | **140** | **7,423,949** | **100.0%** | **52.5%** | **373** | **61,017,273** | **100.0%** | **30.4%** |

Source: CoStar Properties Analytical Search, 01/09/2024.

APP000097

3407-3409 N Hall Street    NVC | National Valuation Consultants, Inc.

***Dallas-Fort Worth Apartment Market Year-Over-Year Trend Summary***

From 4Q 2022 to 4Q 2023, vacancy within the Dallas-Fort Worth apartment market increased by 170 bps to a rate of 10.3%.  Over the same time, rental rates decreased by 1.3% to an average rate of $1,512/unit.  In 4Q 2023, 2,701 apartment units were absorbed by the market, while 9,331 new units were added.

| Dallas-Fort Worth Apartment Market Year-Over-Year Trend Summary | | | | |
|---|---|---|---|---|
| | 2023 Q4 | 2022 Q4 | YoY Change | Trend |
| Overall Vacancy | 10.3% | 8.6% | 170 bps | |
| Market Rate Per Unit | $1,512 | $1,532 | (1.3%) | |
| Absorbed Units | 2,701 | (1,656) | 4,357 | |
| New Unit Deliveries | 9,331 | 4,950 | 4,381 | |

Source: CoStar Properties Analytical Search, 01/09/2024.

***Dallas-Fort Worth Apartment Market Snapshot***

The following table provides an overview of apartment market statistics by property subtype for the metropolitan Dallas-Fort Worth market.  As shown, vacancy is currently higher in the Class B segment at 11.5%.  By number of units, the Dallas-Fort Worth apartment market exhibits the following composition: Class A-30.9%, Class B-46.1%, and Class C-23.0%.

| Dallas-Fort Worth Apartment Market Snapshot | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Existing Inventory | | | Vacancy Rate | | | |
| Class | Total Inventory | Total Units | % of Units | Total Units | Vacancy | Absorbed Units | Market Rate Per Unit |
| Class A | 846 | 259,932 | 30.9% | 26,253 | 10.1% | 38 | $1,793 |
| Class B | 1,981 | 388,098 | 46.1% | 44,631 | 11.5% | 97 | $1,471 |
| Class C | 2,627 | 193,837 | 23.0% | 16,476 | 8.5% | (4) | $1,201 |
| Total | 5,454 | 841,867 | 100.0% | 87,361 | 10.4% | 131 | $1,512 |

Source: CoStar Properties Analytical Search, 01/09/2024. RBA = Rentable Building Area

***Product Class Definitions***

Each class of apartment building is defined below, using parameters established by BOMA International.  Please note that these are primarily market classifications, not construction classifications:

***Class A****:* Generally, garden product built within the last 10 years.  Properties with a physical age greater than 10 years but have been substantially renovated.  Commands rents within the range of Class "A" rents in the submarket.  Well merchandised with landscaping, attractive rental office and/or club building.  High-end exterior and interior amenities as dictated by other Class "A" products in the market.

***Class B****:* Generally, product built within the last 20 years.  Exterior and interior amenity package is dated and less than what is offered by properties in the high end of the market.  Good quality construction with little deferred maintenance.  Commands rents within the range of Class "B" rents in the submarket.

***Class C****:*  Generally, product built within the last 30 years.  Limited, dated exterior and interior amenity package.  Improvements show some age and deferred maintenance.  Commands rents below Class "B" rents in submarket.  Majority of appliances are "original".

APP000098

3407-3409 N Hall Street                                    NVC | National Valuation Consultants, Inc.

### *Dallas-Fort Worth Apartment Market – Total Trends*

Demand for multifamily units was marked by improvement in 2023 with 13,500 units filled. In turn, the pace of vacancy expansion is slowing, but remains elevated. Vacancy rates in the Dallas-Fort Worth market are at 10.4%, above the 10-year average of 8.2%. Vacancy rates are drifting higher across submarkets. Even so, submarkets with healthy demographic tailwinds continue to drive demand in the market. Frisco/Prosper and Denton led the market in net absorption last year, reflecting the continuous population growth in these areas. Meanwhile, demand is recovering in submarkets with a greater concentration of renters by necessity. For example, Irving, Arlington, Mesquite and Garland/Mesquite report fewer move-outs, slowing vacancy expansion. These areas reported the most dramatic vacancy expansion due to softener demand.

| Dallas-Fort Worth Apartment Market Trends | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Inventory | | Supply & Demand | | | Rents | |
| Period | Total Inventory | Total Units | New Unit Deliveries | Absorbed Units | Vacancy | Market Rate Per Unit | % Change |
| 2014 | 4,545 | 620,628 | 14,084 | 11,002 | 7.3% | $1,073 | N/A |
| 2015 | 4,588 | 635,835 | 16,870 | 17,995 | 6.7% | $1,134 | 5.7% |
| 2016 | 4,664 | 655,899 | 20,995 | 15,136 | 7.2% | $1,170 | 3.2% |
| 2017 | 4,764 | 684,313 | 29,578 | 14,536 | 9.0% | $1,194 | 2.1% |
| 2018 | 4,870 | 707,568 | 23,730 | 21,147 | 9.0% | $1,224 | 2.5% |
| 2019 | 4,979 | 732,853 | 25,380 | 24,269 | 8.8% | $1,269 | 3.7% |
| 2020 | 5,104 | 759,325 | 26,514 | 21,622 | 9.1% | $1,279 | 0.8% |
| 2021 | 5,203 | 785,739 | 26,628 | 47,049 | 6.2% | $1,473 | 15.2% |
| 2022 | 5,305 | 810,335 | 24,814 | 3,649 | 8.6% | $1,532 | 4.0% |
| 2023 | 5,451 | 841,212 | 31,519 | 13,517 | 10.3% | $1,512 | (1.3%) |
| CAGR/Averages | | 3.4% | 24,011 | 18,992 | 8.2% | $1,286 | 3.9% |
| Current Year Data | | | | | | | |
| YTD | 5,454 | 841,867 | 0 | 131 | 10.4% | $1,512 | 0.0% |
| Forecasted Supply and Demand Trends | | | | | | | |
| 2024 Estimate | | 888,841 | 46,974 | 11,092 | 8.8% | | |
| 2025 | | 897,350 | 8,509 | (1,073) | 8.8% | | |
| 2026 | | 903,432 | 6,082 | 880 | 9.3% | | |
| 2027 | | 917,605 | 13,272 | 11,106 | 9.4% | | |
| 2028 | | 929,904 | 15,864 | 15,167 | 9.3% | | |
| Historical Supply and Demand Trends | | | | | | | |

Source: CoStar Properties Analytical Search, 01/09/2024. Annual numbers represent year-end statistics.

APP000099

***Dallas-Fort Worth Apartment Market – New Development***

Northern suburban areas drive construction activity, tracing demographic and economic growth in the metroplex.  Frisco/Prosper has reported more construction starts in the past year, tracing continued population growth and in-migration in northern Collin and Denton counties.  The area represents the leading edge of demographic growth, and developers are adding more projects in budding communities, including Little Elm, Prosper and Celina.  In the past two decades, suburbs in Collin County have enjoyed some of the fastest population growth in the country.  That demographic growth has also spilled over into sections of Denton and Tarrant counties.  The volume of new residents and companies looking to move into Plano, Frisco, Allen, and McKinney should foster continued demand in this section of the metroplex.  With few natural barriers to supply, willing lenders, and municipalities that are generally cooperative about zoning, new supply often pops up relatively quickly

According to CoStar, there are 194 apartment properties currently under construction within the Dallas-Fort Worth apartment market.  Once completed, these properties will add 55,087 new apartment units.  There are an additional 126 apartment properties currently proposed for construction, with the potential to add 42,364 units to the market if completed as planned.  CoStar also notes of 396 units across two apartment properties in the final planning stage of development.

| Dallas-Fort Worth Apartment Market - New Development by Submarket Cluster | | | | | | |
|---|---|---|---|---|---|---|
| | Under Construction | | | Proposed | | |
| Submarket | # of Properties | # of Units | % of Units | # of Properties | # of Units | % of Units |
| **TOTALS** | **194** | **55,087** | **100.0%** | **126** | **42,364** | **100.0%** |

Source: CoStar Properties Analytical Search, 01/09/2024.

| Dallas-Fort Worth Apartment Market - New Development by Submarket Cluster | | | |
|---|---|---|---|
| | Final Planning | | |
| Submarket | # of Properties | # of Units | % of Units |
| Uptown/Park Cities | 1 | 250 | 63.1% |
| Rockwall/Wylie | 1 | 146 | 36.9% |
| **TOTALS** | **2** | **396** | **100.0%** |

Source: CoStar Properties Analytical Search, 01/09/2024.

APP000100

*Dallas-Fort Worth Retail Market Year-Over-Year Trend Summary*

Between 4Q 2022 and 4Q 2023, vacancy within the Dallas-Fort Worth retail market decreased by 10 basis points to a rate of 5.4%.  As a result, rental rates have increased by 4.6% to an average of $18.38/SF over the same period.  In 4Q 2023, 358,878 SF of retail space was absorbed by the market while 340,429 SF of new RBA was added.

| Dallas-Fort Worth Retail Market Year-Over-Year Trend Summary | | | | |
|---|---|---|---|---|
| | 2023 Q4 | 2022 Q4 | YoY Change | Trend |
| Overall Vacancy | 5.4% | 5.5% | (10) bps | |
| (NNN) Avg. Rate | $18.38 | $17.57 | 4.6% | |
| Net Absorption (in SF) | 358,878 | 496,302 | (137,424) | |
| Completions (in SF) | 340,429 | 500,621 | (160,192) | |

Source: CoStar Properties Analytical Search, 01/09/2024.

*Dallas-Fort Worth Retail Market Snapshot*

The following table provides an overview of retail market statistics by property subtype for the metropolitan Dallas-Fort Worth market.  As shown, vacancy is currently higher in the shopping centers segment at 7.0%.  By rentable building area, the Dallas-Fort Worth retail market exhibits the following composition: shopping centers-59.7% and general retail-40.3%.

| Dallas-Fort Worth Retail Market Snapshot | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Existing Inventory | | | Vacancy Rate | | | |
| Class | # of Bldgs | Total RBA | % of RBA | Total SF | Vac% | YTD Net Absorption | (NNN) Avg. Rate |
| Shopping Centers | 7,245 | 194,435,724 | 59.7% | 13,610,501 | 7.0% | (168,878) | $17.88 |
| General Retail | 16,698 | 131,321,776 | 40.3% | 4,070,975 | 3.1% | 42,823 | $21.08 |
| Total | 23,943 | 325,757,500 | 100.0% | 17,681,476 | 5.4% | (126,055) | $18.70 |

Source: CoStar Properties Analytical Search, 01/09/2024. RBA = Rentable Building Area

*Product Class Definitions*

CoStar's analytic search feature can segment the data for properties which are located in a shopping center, or those which are not (general retail):

Analytic searches for properties which are located in a **shopping center** include: airport retail, neighborhood and community centers, strip centers, lifestyle centers, outlet malls, power centers, regional centers, specialty centers, and super regional malls (include any in-line retail, restaurants, and out-parcels which are part of a shopping center).

Analytic searches for **general retail** properties include downtown storefront retail, free-standing retail, restaurants, pharmacies, gas stations, etc.

3407-3409 N Hall Street                                      NVC | National Valuation Consultants, Inc.

### *Dallas-Fort Worth Retail Market – Total Trends*

Over the past two years, leasing activity in Dallas-Fort Worth has been consistent with pre-crisis norms, placing the market as the national leader for net absorption.  In turn, vacancy and availability rates are trending near or below pre-pandemic norms through the first quarter of 2024.  The outlook for Dallas-Fort Worth's retail market remains bright, thanks to the structural economic and demographic tailwinds, and both trends are expected to support retail demand in the long run.

| Dallas-Fort Worth Retail Market Trends | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Inventory (SF) | | Supply & Demand (SF) | | | Rents | |
| Period | # of Bldgs | RBA | New Supply | Net Absorption | Vacancy | (NNN) Avg. Rate | % Change |
| 2014 | 23,082 | 312,877,034 | 3,022,033 | 4,492,297 | 7.3% | $14.06 | N/A |
| 2015 | 23,244 | 316,327,777 | 4,081,816 | 5,168,184 | 6.7% | $14.86 | 5.7% |
| 2016 | 23,396 | 319,156,353 | 3,859,145 | 5,385,058 | 5.8% | $14.90 | 0.3% |
| 2017 | 23,548 | 319,544,090 | 3,629,911 | 1,651,430 | 5.5% | $15.50 | 4.0% |
| 2018 | 23,688 | 323,350,555 | 4,810,267 | 4,832,788 | 5.1% | $16.27 | 5.0% |
| 2019 | 23,786 | 324,753,223 | 1,924,173 | 502,191 | 5.4% | $16.23 | (0.2%) |
| 2020 | 23,884 | 325,549,229 | 1,138,336 | (5,201,927) | 7.2% | $16.22 | (0.1%) |
| 2021 | 23,933 | 325,053,274 | 989,646 | 1,961,127 | 6.5% | $16.38 | 1.0% |
| 2022 | 23,859 | 324,592,822 | 1,586,514 | 2,560,640 | 5.5% | $17.57 | 7.3% |
| 2023 | 23,942 | 325,750,096 | 1,479,064 | 1,514,091 | 5.4% | $18.38 | 4.6% |
| CAGR/Averages | | 0.4% | 2,652,091 | 2,286,588 | 6.0% | $16.04 | 3.0% |
| Current Year Data | | | | | | | |
| YTD | 23,943 | 325,757,500 | 7,404 | (126,055) | 5.4% | $18.70 | 1.7% |
| Forecasted Supply and Demand Trends | | | | | | | |
| 2024 Estimate | | 330,737,207 | 4,979,707 | 10,803 | 5.4% | | |
| 2025 | | 330,819,701 | 82,494 | 1,559,857 | 5.6% | | |
| 2026 | | 333,630,931 | 2,811,230 | 2,062,017 | 5.7% | | |
| 2027 | | 336,578,283 | 2,923,699 | 2,349,632 | 5.8% | | |
| 2028 | | 338,862,769 | 3,014,577 | 2,553,430 | 5.9% | | |
| Historical Supply and Demand Trends | | | | | | | |

Source: CoStar Properties Analytical Search, 01/09/2024. Annual numbers represent year-end statistics.

DAL2312069                         Submarket Analysis                                    59

APP000102

*Dallas-Fort Worth Retail Market – New Development*

Construction activity is concentrated to the north in Denton and Collin Counties in communities such as Allen, McKinney, Frisco, and Prosper, where developers are chasing robust demographic growth and pushing the northern boundary of the market.  About 65% of the space underway is located in Denton and Collin Counties, while Dallas County accounts for 15%.  Grocers and big-box retailers are following population growth in the northern suburbs.  San Antonio-based grocer H-E-B entered the market with several new locations in Plano and Frisco, with another location in Allen currently underway.  Meanwhile, Costco is bringing a 160,000 SF location in Prosper, a town of 38,000 that has grown 25% since 2020 and also pushes the northern boundary of the market.

According to CoStar, there are 295 retail properties currently under construction within the Dallas-Fort Worth retail market.  Once completed, these properties will add over 5.0 million SF of new retail space.  There are an additional 482 retail properties currently proposed for construction, with the potential to add over 10.2 million SF of new retail space to the market if completed as planned.  CoStar also notes of 15,200 SF across two retail properties in the final planning stage of development.

| Dallas-Fort Worth Retail Market - New Development by Submarket | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Under Construction | | | | Proposed | | | |
| Submarket | # of Properties | RBA | % of RBA | % Leased | # of Properties | RBA | % of RBA | % Leased |
| **TOTALS** | **295** | **5,049,597** | **100.0%** | **65.5%** | **482** | **10,222,746** | **100.0%** | **62.9%** |

Source: CoStar Properties Analytical Search, 01/09/2024.

| Dallas-Fort Worth Retail Market - New Development by Submarket | | | | |
|---|---|---|---|---|
| | Final Planning | | | |
| Submarket | # of Properties | RBA | % of RBA | % Leased |
| Frisco | 2 | 15,200 | 100.0% | 100.0% |
| **TOTALS** | **2** | **15,200** | **100.0%** | **100.0%** |

Source: CoStar Properties Analytical Search, 01/09/2024.

APP000103

3407-3409 N Hall Street                                NVC | National Valuation Consultants, Inc.

**CONCLUSION**

Dallas-Fort Worth's office market faces continued challenges, including fragile demand and elevated availability.  There is nearly 79 million SF available for lease, a record level that has risen 25% since the end of 2019.  The vacancy rate is holding near a 20-year high of 21.9%, expanding by 4.5 percentage points since the end of 2019.  That expansion is below the U.S. norm, which has risen 4.8 percentage points, and Austin, where vacancies have expanded by 8.1 percentage points.  While the vacancy rate ranks among the highest in the country, the Metroplex has historically carried a structurally higher vacancy rate compared to the U.S. norm, a trend coming out of the boom-and-bust of the mid-1980s.

Multifamily demand is returning in Dallas-Fort Worth, and it is an encouraging sign that more households are willing to sign new leases.  Demand has increased with 13,500 units filled in 2023, on par with levels from 2016 to 2017.  Even so, supply continues to outpace demand as vacancies have shifted to 10.4% from a low point of 6.2% in 2021.  Rent growth slipped by 1.3% in 2023, pulled lower by supply-side pressure in construction heavy suburban submarkets.

Dallas-Fort Worth's retail market is on firm footing thanks to consistent demand with minimal store closures in the past year.  The volume of available space has fallen to 18.7 million SF, translating to 5.5% of inventory, the lowest share on record.  Steady demand outpaces retailers giving back space.  Since 2021, tenants have filled a cumulative 6.0 million square feet, while vacating just 3.55 million SF.  Market participants share retailers' continued interest in opening new locations or expanding their presence in the Metroplex.  Big box retailers, national and regional grocers, discounters, and food and beverage tenants continue to drive demand.

According to CoStar data, retail product types have been maintaining healthy fundamentals in recent years, compared to the office and apartment sector.  Of note, the COVID-19 pandemic caused considerable disruption within the market, with these property types experiencing fluctuating levels of demand.  However, the retail segment has shown the most recovery, followed by the apartment market.  Positive population growth and income patterns are creating more opportunities for new development within both the retail and apartment market.  On the other hand, the expanded remote and hybrid working arrangements and societal changes will likely continue to negatively impact the long-term outlook within the office segment moving forward.  As a result, the overall outlook for the Dallas-Fort Worth commercial market is one of caution for the office segment, and one of optimism for the retail and apartment segments.

APP000104

3407-3409 N Hall Street                                                NVC | National Valuation Consultants, Inc.

## Uptown Commercial Submarket Analysis

The following analysis provides office, retail, and apartment market conditions within the Dallas-Fort Worth market's Uptown submarket.  All office rental rates reported by CoStar are Full Service (F/S) rental rates.  All retail rental rates reported by CoStar are Triple Net (NNN) quoted rental rates.  ***Please note that owner-occupied data has been excluded for this analysis.***  We have also relied upon CoStar Analytics apartment market survey data and trends for rent, vacancy, and inventory levels in the Uptown submarket and ***data is specific to "market rate" units (i.e., effective rent per unit, after concessions).***

A map of the Uptown submarket's commercial properties is shown below.  The blue markers are properties that are currently available: these properties are for sale, for lease, or both.  The gray markers are properties that are not currently available.  The map below includes all office, apartment, and retail space accounted for by CoStar.  A majority of commercial product is located near major arterials and population centers in the submarket.



APP000105

3407-3409 N Hall Street                                     NVC | National Valuation Consultants, Inc.

### *Uptown Office Submarket Year-Over-Year Trend Summary*

From 4Q 2022 to 4Q 2023, vacancy within the Uptown submarket increased by 430 bps to a rate of 22.9%. Over the same time period, average rental rates decreased by 0.1% to a rate of $43.93/SF.  In 4Q 2023, absorption levels were negative with 328,702 SF of office space being returned to the submarket. Approximately 136,883 SF of new space was added to the submarket in 4Q 2023.

| Uptown Office Submarket Year-Over-Year Trend Summary | | | | |
|---|---|---|---|---|
| | 2023 Q4 | 2022 Q4 | YoY Change | Trend |
| Overall Vacancy | 22.9% | 18.6% | 430 bps | ⬆ |
| (FS) Avg. Rate | $43.93 | $43.96 | (0.1%) | ➡ |
| Net Absorption (in SF) | (328,702) | 146,821 | (475,523) | ⬇ |
| Completions (in SF) | 136,883 | 0 | 136,883 | ⬆ |

Source: CoStar Properties Analytical Search, 01/09/2024.

### *Uptown Office Submarket Snapshot*

The table below provides a breakdown of office market statistics by property class for the Uptown submarket.  As shown, vacancy is currently highest in the Class A segment at 24.8%.  By rentable building area, the Uptown submarket displays the following composition: Class A-81.4%, Class B-12.9%, and Class C-5.7%.

| Uptown Office Submarket Snapshot | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Existing Inventory | | | Vacancy Rate | | | |
| Class | # of Bldgs | Total RBA | % of RBA | Total SF | Vac% | YTD Net Absorption | (FS) Avg. Rate |
| Class A | 62 | 13,039,959 | 81.4% | 3,233,910 | 24.8% | 8,793 | $46.37 |
| Class B | 49 | 2,064,352 | 12.9% | 328,232 | 15.9% | 2,937 | $33.92 |
| Class C | 150 | 913,003 | 5.7% | 82,170 | 9.0% | #VALUE! | $31.83 |
| Total | 261 | 16,017,314 | 100.0% | 3,644,312 | 22.8% | 11,730 | $44.11 |

Source: CoStar Properties Analytical Search, 01/09/2024. RBA = Rentable Building Area

APP000106

3407-3409 N Hall Street

NVC | National Valuation Consultants, Inc.

### *Uptown Office Submarket – Total Trends*

The Uptown submarket is beginning to show signs of a recovery, but headwinds persist. As a result of the previous negative net absorption and several significant deliveries in late 2021, the vacancy rate remains stubbornly high at 22.8%. One major moveout captured in 1Q 2023 is One West Village, the former headquarters for The Richards Group. The 240,000 SF building is undergoing renovation after its acquisition at the end of 2022.

| Uptown Office Submarket Trends | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Inventory (SF) | | Supply & Demand (SF) | | | Rents | |
| Period | # of Bldgs | RBA | New Supply | Net Absorption | Vacancy | (FS) Avg. Rate | % Change |
| 2014 | 282 | 12,897,172 | 0 | (89,811) | 11.0% | $35.32 | N/A |
| 2015 | 265 | 13,195,604 | 413,696 | 147,321 | 11.9% | $37.09 | 5.0% |
| 2016 | 266 | 13,877,535 | 692,521 | 521,395 | 12.4% | $37.91 | 2.2% |
| 2017 | 265 | 13,872,235 | 0 | (65,866) | 12.9% | $38.77 | 2.3% |
| 2018 | 269 | 14,961,832 | 1,089,597 | 369,671 | 16.7% | $39.16 | 1.0% |
| 2019 | 269 | 15,031,682 | 330,000 | 351,367 | 14.8% | $40.30 | 2.9% |
| 2020 | 269 | 15,031,682 | 0 | (546,941) | 18.4% | $41.63 | 3.3% |
| 2021 | 266 | 15,643,019 | 656,719 | 172,781 | 20.5% | $41.08 | (1.3%) |
| 2022 | 259 | 15,520,517 | 0 | 195,265 | 18.6% | $43.96 | 7.0% |
| 2023 | 261 | 16,017,314 | 496,797 | (272,654) | 22.9% | $43.93 | (0.1%) |
| CAGR/Averages | | 2.4% | 367,933 | 78,253 | 16.0% | $39.92 | 2.5% |
| Current Year Data | | | | | | | |
| YTD | 261 | 16,017,314 | 0 | 11,730 | 22.8% | $44.11 | 0.4% |
| Forecasted Supply and Demand Trends | | | | | | | |
| 2024 Estimate | | 16,651,739 | 634,425 | 145,468 | 21.7% | | |
| 2025 | | 17,277,954 | 626,215 | 43,868 | 21.5% | | |
| 2026 | | 17,462,545 | 184,591 | 43,324 | 22.1% | | |
| 2027 | | 17,713,210 | 250,665 | 247,797 | 21.8% | | |
| 2028 | | 17,984,786 | 271,576 | 242,741 | 21.6% | | |
| Historical Supply and Demand Trends | | | | | | | |

Source: CoStar Properties Analytical Search, 01/09/2024. Annual numbers represent year-end statistics.

APP000107

### Uptown Office Submarket – New Development

Construction activity within the Uptown submarket has shifted higher over recent quarters. Through the first quarter of 2024, there is nearly 2.0 million SF underway, accounting for 30% of total construction volume in the Metroplex. Uptown's office inventory skews newer, with 6.5 million SF of the 17.9 million SF office space in the submarket built after 2000.

The largest project under construction is Goldman Sach's 700,000 SF campus along Field Street, with an expected headcount of 5,000. Meanwhile, the 626,215 SF 23Springs tower is led by Granite Properties. The project broke ground on the 26-story building in June 2022 and has an expected delivery date of mid-2025. The flight to quality narrative remains a major theme in office leasing. Developers have become more comfortable breaking ground on speculative projects in Uptown because the rents can support the cost of new construction.

| Uptown Office  Submarket - Under Construction | | | | | |
|---|---|---|---|---|---|
| Address | Name | Class | City | RBA | % Leased |
| 2699 Howell St | The Quad | A | Dallas | 345,425 | 32.4% |
| 2323 Cedar Springs Rd | 23Springs | A | Dallas | 626,215 | 30.9% |
| 2323 N Field St | Goldman Sachs | B | Dallas | 702,000 | 100.0% |
| 4040 Maple Ave | Old Parkland | A | Dallas | 289,000 | 13.1% |
| | | | TOTALS | 1,962,640 | 53.3% |

Source: CoStar Properties Analytical Search, 01/09/2024.

| Uptown Office  Submarket - Proposed | | | | | |
|---|---|---|---|---|---|
| Address | Name | Class | City | RBA | % Leased |
| 2371 Victory Ave | Victory Center | A | Dallas | 466,000 | 4.0% |
| 2500 Cedar Springs Rd | --- | A | Dallas | 591,488 | 0.0% |
| 2626 McKinney Ave | --- | A | Dallas | 181,017 | 0.0% |
| 1919 McKinney Ave | Proposed Expansion | B | Dallas | 14,439 | 0.0% |
| 2601 Field St | Harwood XII | A | Dallas | 541,640 | 0.0% |
| 3000 Harry Hines Blvd | Chalk Hill | A | Dallas | 400,000 | 6.3% |
| 2850 Lemmon | --- | A | Dallas | 280,000 | 44.5% |
| 3500 McKinney Ave | McKinney & Lemon | A | Dallas | 82,000 | 0.0% |
| 1919 Woodall Rodgers Fwy | Bank of America Tower at Parkside | A | Dallas | 500,126 | 47.6% |
| | | | TOTALS | 3,056,710 | 13.3% |

Source: CoStar Properties Analytical Search, 01/09/2024.

APP000108

***Uptown Apartment Submarket Year-Over-Year Trend Summary***

From 4Q 2022 to 4Q 2023, vacancy within the Uptown apartment submarket decreased by 240 bps to a rate of 7.6%.  Over the same time, rental rates decreased by 0.4% to an average rate of $2,226/unit.  In 4Q 2023, 70 apartment units were returned the submarket, while no new units were added.

| Uptown Apartment Submarket Cluster Year-Over-Year Trend Summary | | | | |
|---|---|---|---|---|
| | 2023 Q4 | 2022 Q4 | YoY Change | Trend |
| Overall Vacancy | 7.6% | 10.0% | (240) bps | |
| Market Rate Per Unit | $2,226 | $2,235 | (0.4%) | |
| Absorbed Units | (70) | (525) | 455 | |
| New Unit Deliveries | 0 | 146 | (146) | |

Source: CoStar Properties Analytical Search, 01/09/2024.

***Uptown Apartment Submarket Snapshot***

The table below provides a breakdown of apartment market statistics by property class for the Uptown submarket cluster.  As shown, vacancy is currently higher in the Class C segment at 11.6%.  By number of units, the Uptown submarket cluster displays the following composition: Class A-58.9%, Class B-33.8%, and Class C-7.3%.

| Uptown Apartment Submarket Cluster Snapshot | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Existing Inventory | | | Vacancy Rate | | | |
| Class | Total Inventory | Total Units | % of Units | Total Units | Vacancy | Absorbed Units | Market Rate Per Unit |
| Class A | 65 | 16,915 | 58.9% | 1,201 | 7.1% | (2) | $2,549 |
| Class B | 72 | 9,687 | 33.8% | 727 | 7.5% | 0 | $1,851 |
| Class C | 101 | 2,095 | 7.3% | 243 | 11.6% | 4 | $1,229 |
| Total | 238 | 28,697 | 100.0% | 2,171 | 7.6% | 2 | $2,235 |

Source: CoStar Properties Analytical Search, 01/09/2024. RBA = Rentable Building Area

APP000109

3407-3409 N Hall Street                                    NVC | National Valuation Consultants, Inc.

### *Uptown Apartment Submarket Cluster – Total Trends*

Vacancy rates in the Uptown submarket cluster are holding firm thanks to stable demand for urban living. At 7.6%, the submarket cluster's vacancy is below the Dallas-Fort Worth average of 10.4% and is trending at the lowest point in over a decade.  Rents fell by 0.4% in 2023, compared to the Dallas-Fort Worth market where rents fell by 1.3%.  With asking rents of $2,235, Uptown is the most expensive submarket cluster in Dallas-Fort Worth, carrying a premium of around $750 a month above the metro average.  Construction activity is manageable with 1,200 units underway, falling below the swell of development from 2014 to 2017.  Over the past decade, developers have added nearly 12,000 units, growing inventory over 40%.

| | Uptown Apartment Submarket Cluster Trends | | | | | | |
|---|---|---|---|---|---|---|---|
| | Inventory | | Supply & Demand | | | Rents | |
| Period | Total Inventory | Total Units | New Unit Deliveries | Absorbed Units | Vacancy | Market Rate Per Unit | % Change |
| 2014 | 204 | 20,370 | 2,835 | 2,065 | 10.5% | $1,825 | N/A |
| 2015 | 209 | 21,996 | 1,650 | 1,679 | 9.5% | $1,885 | 3.3% |
| 2016 | 217 | 24,181 | 2,288 | 1,817 | 10.1% | $1,862 | (1.2%) |
| 2017 | 222 | 25,970 | 1,851 | 1,306 | 11.3% | $1,874 | 0.6% |
| 2018 | 228 | 27,235 | 1,265 | 1,178 | 11.1% | $1,876 | 0.1% |
| 2019 | 233 | 28,134 | 899 | 1,510 | 8.6% | $1,950 | 3.9% |
| 2020 | 232 | 28,126 | 0 | 56 | 8.3% | $1,889 | (3.1%) |
| 2021 | 233 | 28,574 | 529 | 495 | 8.0% | $2,194 | 16.1% |
| 2022 | 236 | 29,219 | 645 | 30 | 10.0% | $2,235 | 1.9% |
| 2023 | 238 | 28,697 | 5 | 219 | 7.6% | $2,226 | (0.4%) |
| CAGR/Averages | | 3.9% | 1,197 | 1,036 | 9.5% | $1,982 | 2.2% |
| Current Year Data | | | | | | | |
| YTD | 238 | 28,697 | 0 | 2 | 7.6% | $2,235 | 0.4% |
| Forecasted Supply and Demand Trends | | | | | | | |
| 2024 Estimate | | 29,956 | 1,259 | (82) | 7.8% | | |
| 2025 | | 30,143 | 187 | (95) | 8.0% | | |
| 2026 | | 30,285 | 142 | 13 | 8.4% | | |
| 2027 | | 30,599 | 314 | 294 | 8.4% | | |
| 2028 | | 30,976 | 377 | 405 | 8.1% | | |
| Historical Supply and Demand Trends | | | | | | | |

Source: CoStar Properties Analytical Search, 01/09/2024. Annual numbers represent year-end statistics.

APP000110

3407-3409 N Hall Street                                                NVC | National Valuation Consultants, Inc.

***Uptown Apartment Submarket – New Development***

Construction activity in the Uptown submarket cluster is manageable so it does not cause heavy supply-side pressure on vacancies.  As of 1Q 2024, there are nearly 1,200 units underway, accounting for 4.2% of inventory.  That level is below the 3,000 to 5,000 units under construction reported during 2012–2016. New multifamily communities saturated the area in the past decade, growing existing inventory over 75% during that time.  With new apartments and office buildings flooding the area over the past 20 years, tighter land availability, escalating prices, and zoning and density are front burner issues for planners and developers for future projects.

Among the most notable projects underway, Hines broke ground on Maple Terrace, a 345-unit project along Maple Avenue.  The mixed-use project will incorporate the original Maple Terrace building, including 157,000 square feet of office space and 12,000 square feet of ground-floor retail.  The project is slated to be completed in early 2024.  The largest project underway is Hanover Turtle Creek, a 664-unit high-rise.  The project began in late 2022 and is expected to deliver in the summer of 2025.

| Uptown Apartment  Submarket Cluster - Under Construction | | | |
|---|---|---|---|
| Address | Name | City | Units |
| 3001 Maple Ave | Maple Terrace | Dallas | 345 |
| 2811 Maple Ave | The Residences at 2811 Maple | Dallas | 187 |
| 2525 Turtle Creek Blvd | Hanover Turtle Creek | Dallas | 664 |
| | | TOTALS | 1,196 |

Source: CoStar Properties Analytical Search, 01/09/2024.

| Uptown Apartment  Submarket Cluster - Proposed | | | |
|---|---|---|---|
| Address | Name | City | Units |
| 4115 Gilbert Ave | --- | Dallas | 4 |
| 3500 McKinney Ave | McKinney & Lemon | Dallas | 800 |
| 2801 Wycliff Ave | Braniff Multifamily | Dallas | 46 |
| 3515 Brown St | Hood & Brown Apartments | Dallas | 109 |
| 3012 Fairmount St | Fairmount Tower | Dallas | 268 |
| 2353 N Field St | North End Park - Northend Redevelopment | Dallas | 895 |
| 3000 Throckmorton St | Ablon at Cedar Springs | Dallas | 450 |
| 2371 Victory Ave | Aire | Dallas | 350 |
| | | TOTALS | 2,922 |

Source: CoStar Properties Analytical Search, 01/09/2024.

| Uptown Apartment  Submarket Cluster - Final Planning | | | |
|---|---|---|---|
| Address | Name | City | Units |
| 2727 Turtle Creek Blvd | --- | Dallas | 250 |
| | | TOTALS | 250 |

Source: CoStar Properties Analytical Search, 01/09/2024.

APP000111

3407-3409 N Hall Street                                                                    NVC | National Valuation Consultants, Inc.

*Uptown Retail Submarket Year-Over-Year Trend Summary*

Between 4Q 2022 and 4Q 2023, vacancy within the Uptown retail submarket increased by 60 basis points to a rate of 3.5%. Despite the rise in vacancy, rental rates increased by 6.2% to an average of $35.30/SF over the same period. In 4Q 2023, 20,038 SF of retail space was absorbed by the submarket while no new RBA was added.

| Uptown Retail Submarket Year-Over-Year Trend Summary | | | | |
|---|---|---|---|---|
| | 2023 Q4 | 2022 Q4 | YoY Change | Trend |
| Overall Vacancy | 3.5% | 2.9% | 60 bps | ⇑ |
| (NNN) Avg. Rate | $35.30 | $33.23 | 6.2% | ⇑ |
| Net Absorption (in SF) | 20,038 | 19,784 | 254 | ⇒ |
| Completions (in SF) | 0 | 0 | 0 | ⇒ |

Source: CoStar Properties Analytical Search, 01/09/2024.

*Uptown Retail Submarket Snapshot*

The table below provides a breakdown of retail market statistics by property subtype for the Uptown submarket. As shown, vacancy is currently higher in the shopping centers segment at 3.8%. By rentable building area, the Uptown submarket displays the following composition: shopping centers-35.1% and general retail-64.9%.

| Uptown Retail Submarket Snapshot | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Existing Inventory | | | Vacancy Rate | | YTD Net | (NNN) Avg. |
| Class | # of Bldgs | Total RBA | % of RBA | Total SF | Vac% | Absorption | Rate |
| Shopping Centers | 54 | 868,242 | 35.1% | 32,993 | 3.8% | 0 | $43.39 |
| General Retail | 253 | 1,604,441 | 64.9% | 44,924 | 2.8% | 9,109 | $31.91 |
| Total | 307 | 2,472,683 | 100.0% | 77,918 | 3.1% | 9,109 | $34.60 |

Source: CoStar Properties Analytical Search, 01/09/2024. RBA = Rentable Building Area

APP000112

3407-3409 N Hall Street                                    NVC | National Valuation Consultants, Inc.

***Uptown Retail Submarket – Total Trends***

Retail properties have the lowest vacancy rate of all property types within the Uptown commercial submarket.  The retail segment's inventory has only grown at an average annual rate of 0.1% since 2014.  Vacancy has been able to edge down in recent years, even though net absorption has generally ended each of the last four years in negative territory.  Vacancy currently sits at 3.1%, down by 40 bps from year-end 2023.  Rental rates have generally decreased over the past 10 years.  Rents currently sit at $34.60/SF within the retail segment, which is down by 2.0% from 2023.  There have been no new deliveries within the retail segment over the last four years.

| Uptown Retail Submarket Trends | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Inventory (SF) | | Supply & Demand (SF) | | | Rents | |
| Period | # of Bldgs | RBA | New Supply | Net Absorption | Vacancy | (NNN) Avg. Rate | % Change |
| 2014 | 332 | 2,457,066 | 4,970 | (28,994) | 5.5% | $38.43 | N/A |
| 2015 | 328 | 2,498,191 | 64,945 | 34,220 | 5.7% | $40.62 | 5.7% |
| 2016 | 330 | 2,517,176 | 28,146 | 71,729 | 3.5% | $41.72 | 2.7% |
| 2017 | 330 | 2,517,176 | 0 | 1,939 | 3.5% | $35.52 | (14.9%) |
| 2018 | 331 | 2,602,551 | 85,375 | 80,467 | 3.5% | $33.92 | (4.5%) |
| 2019 | 329 | 2,591,122 | 2,000 | (8,729) | 3.4% | $33.74 | (0.5%) |
| 2020 | 327 | 2,558,886 | 0 | (44,373) | 4.0% | $35.72 | 5.9% |
| 2021 | 325 | 2,549,899 | 0 | (10,872) | 4.0% | $31.96 | (10.5%) |
| 2022 | 307 | 2,472,683 | 0 | (44,585) | 2.9% | $33.23 | 4.0% |
| 2023 | 307 | 2,472,683 | 0 | (16,317) | 3.5% | $35.30 | 6.2% |
| CAGR/Averages | | 0.1% | 18,544 | 3,449 | 4.0% | $36.02 | (0.9%) |
| Current Year Data | | | | | | | |
| YTD | 307 | 2,472,683 | 0 | 9,109 | 3.1% | $34.60 | (2.0%) |
| Forecasted Supply and Demand Trends | | | | | | | |
| 2024 Estimate | | 2,472,683 | 0 | 4,519 | 3.4% | | |
| 2025 | | 2,472,683 | 0 | 16,383 | 3.7% | | |
| 2026 | | 2,502,983 | 30,300 | 25,008 | 3.8% | | |
| 2027 | | 2,534,436 | 31,453 | 28,163 | 3.9% | | |
| 2028 | | 2,566,857 | 32,421 | 29,811 | 3.9% | | |
| Historical Supply and Demand Trends | | | | | | | |



Source: CoStar Properties Analytical Search, 01/09/2024. Annual numbers represent year-end statistics.

***Uptown Retail Submarket – New Development***

According to CoStar, there are no retail properties currently under construction or within the final planning stage within the Uptown retail submarket.  CoStar does note however, that there are two retail properties currently proposed for construction, with the potential to add over 17,959 SF of new retail space to the submarket if completed as planned.

APP000113

**CONCLUSION**

The Uptown submarket is the premier office node in Dallas-Fort Worth, offering transportation, infrastructure, and amenity advantages of a central business district while featuring newer stock than the neighboring Dallas CBD.  The area is the premier live/work/play environment, home to over 200 restaurants and 160 shops, making it one of the most pedestrian-friendly places in Texas.  Since 2010, more than 10,000 apartment units have been delivered, among the most in any submarket in the nation.  High-end apartment construction complements Uptown as the premier office node in Dallas-Fort Worth, adding new households, greater density, and higher incomes.

Although there is some positive attributes within the office sector if the Uptown submarket there is still uncertainty surrounding the pandemic's long-term impact on office space with many employers implementing hybrid work models and right sizing their office footprint.  Just like the broader metro Dallas-Fort Worth market, office availabilities have reached an all-time high and as such, landlords are now facing competition from existing space as well in the form of sublet listings.  Many companies looking to offload space are cutting prices to attract prospective tenants.  Overall, macroeconomic trends have largely hampered the development of the Uptown office submarket and office vacancies now sit near decade high at 22.8%.

Vacancies in the Uptown submarket cluster fell below the Dallas-Fort Worth norm for the first time in a decade.  A contributing factor is Hunt Realty demolishing the North End apartment community to make way for the Goldman Sachs office project at the end of 2022 and is among the only examples of a developer removing an existing multifamily project to make way for office space.  Over the previous development cycle, vacancy rates spiked in 2014 when a flood of new developments saturated the submarket cluster.  Demand in the submarket cluster has held steady over the past year, keeping vacancies relatively stable.  Local brokers forecast the vacancy rate to hold firm below the market average through the near term.

Uptown is the premier live/work/play submarket in Dallas.  From the lens of retail, the benefits are plentiful.  Incomes are high, and due to the incredible growth in the multifamily sector in recent years, the area has developed a dense, urban feel.  Vacancy rates remain stable, trending below the market average.  The area is seeing more demolitions to make way for mixed-use projects.  The submarket reports an availability rate of 4.0%, below the Dallas-Fort Worth average of 5.7%.

Geographically, the Uptown submarket benefits from connectivity due to the multiple highways surrounding the area.  As a result, the overall outlook for the submarket appears to be mixed, with a positive outlook for apartment and retail properties but a cautious outlook for the office segment.

APP000114

## Highest and Best Use Analysis

The fundamental concept of highest and best use may be defined as:

"The reasonably probable use of property that results in the highest value."[18]

To test for highest and best use, all logical and feasible alternatives must be analyzed.  The appraiser should determine whether the proposed usage of the land is:

1.  Legally permissible
2.  Physically possible
3.  Economically feasible
4.  Maximally productive

If an affirmative answer may be given to these basic questions, it is determined that the highest and best use test has been satisfied. The appraiser must recognize that land is generally appraised as if vacant and available for development to its highest and best use and that the appraisal of improvements is based on their actual contribution to the site.  Because subject is vacant land, no improvements need to be considered.

**HIGHEST AND BEST USE AS VACANT**

■ *Legally Permissible Uses*

The property is zoned  PD-193, O-2 (Oak Lawn Special Purpose District, Office-2 District) under the authority of City of Dallas. Office and Mixed-use office with limited retail and service uses are permitted land uses under this zoning.  Future development requires site plan approval.  There are no reasonable probable modifications of existing land use regulations to occur in the near future.

■ *Physically Possible Uses*

The land area is 0.52 acres or 22,439 SF.  It has very good access, is slightly sloping in topography, has adequate soil conditions, is not located within the flood plain, and has no apparent environmental contamination.  Thus, the subject site has adequate utility to accommodate a variety of uses.

■ *Economically Feasible and Maximally Productive Use*

Based on our review of the market, it appears that the value of a new commercial use on the subject site would be commensurate with its cost to build. Demand in the area is adequate to justify new construction, and near-term development of a commercial use is financially feasible and the maximally productive use of the site as vacant.  The maximally productive use of the site as vacant is a built-to-suit medium density, mixed-use office with retail.

*Most Probable Buyer*

The most likely buyer of the subject property would be a developer. The sale comparables analyzed in the Sales Comparison Approach generally support this conclusion.

---

[18] Appraisal Institute, The Appraisal of Real Estate, 15th Edition, (Chicago: Appraisal Institute, 2020), page 305.

## The Valuation Process

The estimation of a real property's market value involves a systematic process in which the problem is defined; the work necessary to solve the problem is planned; and the data required are acquired, classified, analyzed and interpreted as an opinion of value. In this process, three basic approaches, when applicable, are used by the appraiser: the sales comparison approach, the income capitalization approach and the cost approach. When one or more of these approaches is not applicable in the appraisal process, full justification must be presented. An explanation of each approach follows.

**COST APPROACH**

In the Cost Approach, the appraiser first values of the fee simple interest in the site. The replacement or reproduction cost new of the improvements is then estimated. Next, depreciation from all sources is determined and subtracted from the replacement or reproduction cost new of the improvements to arrive at their present value. The present value of all improvements is added to the market value of the site, resulting in an indicated value by the Cost Approach.

**SALES COMPARISON APPROACH**

The sales comparison approach involves the comparison of the subject property to similar properties that have recently sold or that are currently offered for sale. The sales prices of these properties are then adjusted to reflect the respective differences of each from the subject to indicate a value range. This value range, as indicated by the adjusted comparable properties, is then used to establish an indicated value for the subject property.

**INCOME CAPITALIZATION APPROACH**

The income capitalization approach is a process in which the anticipated future benefits (actual dollar income or amenities) are reduced to a present value figure. The appraiser is primarily concerned with the future benefits resulting from net income and reversionary proceeds. This approach involves estimating potential gross income by comparison with competing properties and estimating expenses (derived from historical and/or market experience) to determine a projected net income stream. The income stream is then capitalized into an indication of value by using capitalization rates extracted from competitive properties in the market or by using other techniques when applicable. Alternatively, the income stream as well as the reversion of the property is converted into value by use of a discounted cash flow (DCF) analysis. If both techniques are used, the resultant value indications must be reconciled.

**RECONCILIATION**

The final analytical step in the valuation process is reconciliation of the value indications obtained from the different approaches to value. The appraisers must consider the relative dependability and applicability of each approach as dictated by the individual characteristics of the subject. The final opinion of value reflects the results of such deliberation.

APP000116

## Sales Comparison Approach

The sales comparison approach, also termed the market approach, involves the comparison of the subject property to similar properties which have already sold, or which are currently offered for sale, with consideration given to their respective differences from the subject.  This process tends to form a pattern of indicators from which the appraiser can estimate the value of the subject property.  The principle of substitution is an integral part of this approach since a purchaser will typically not pay more for a property than would be required to purchase an equally desirable substitute property.

The following procedures are used to apply the sales comparison approach.

1. "Research the competitive market for information on properties that are similar to the subject property and that have recently sold, are listed for sale, or are under contract.  Information on agreements of sale, options, listings, and bona fide offers may also be collected.  The characteristics of the properties such as property type, date of sale, size, physical condition, location, and land use constraints should be considered.  The goal is to find a set of comparable sales or other evidence such as property listings or contracts as similar as possible to the subject property to ensure they reflect the actions of similar buyers.  Market analysis and highest and best use analysis set the stage for the selection of appropriate comparable sales.

2. Verify the information by confirming that the data obtained is factually accurate and that the transactions reflect arm's-length market considerations.  Verification should elicit additional information about the property such as buyer motivation, economic characteristics (if the property is income-producing), value component allocations, and other significant factors as well as information about the market to ensure that comparisons are credible.

3. Select the most relevant units of comparison used by participants in the market (e.g., price per acre, price per square foot, price per front foot, price per dwelling unit) and develop a comparative analysis for each unit.  The appraiser's goal is to define and identify a unit of comparison that explains market behavior.

4. Look for differences between the comparable sale properties and the subject property using all appropriate elements of comparison.  Then adjust the price of each sale property, reflecting how it differs, to equate it to the subject property or eliminate that property as a comparable.  This step typically involves using the most similar sale properties and then adjusting for any remaining differences.  If a transaction does not reflect the actions of a buyer who would also be attracted to the subject property, the appraiser should be concerned about comparability and the wisdom of relying on that comparable as a basis for comparison.

5. Reconcile the various value indications produced from the analysis of comparables into a value conclusion.  A value opinion can be expressed as a single point estimate, as a range of values, or in terms of a relationship (e.g., more or less than a given amount)."[19]

Each of the preceding steps will be explained as they are utilized.  First, we consider the applicability of the sales comparison approach.

---

[19] Appraisal Institute, The Appraisal of Real Estate, 15th Edition, (Chicago: Appraisal Institute, 2020), page 355.

APP000117

**APPLICABILITY OF SALES COMPARISON APPROACH**

Given the status of the subject land as well as the availability of land sales comparable enough in nature to the subject and we value the subject in bulk using available sales.

**SALES COMPARISON APPROACH DATA**

All available data sources were researched to identify sales and offerings of sites which are similar to the subject's site.  Market participants were also surveyed regarding available offerings and general market activity.

Below, we have provided a summary of the sales selected for this analysis.  A map of the sales relative to the subject location follows the summary table below. Note that complete abstracts and plat maps for each sale may be found in the Addenda.

Units of comparison vary in the valuation of land and can be based on price per acre, per square foot, or per lot.  ***We choose the price per square foot indication to value the subject.***

**Site Summary**

The subject site is 0.515 gross acres, zoned PD-193, O-2, and located in Oak Lawn across the street from Turtle Creek Park at the southwest quadrant of Hall Street and Turtle Creek Boulevard.

Since our last appraisal dated March 14, 2023, we were able to confirm two additional sales for comparison, Nos. 1 and 3. Please note that Sale No. 4 is the most recent previous sale of the subject property.  The table on the following page summarizes the comparables.

APP000118

NVC | National Valuation Consultants, Inc.

Case 3:22-cv-02118-X    Document 503    Filed 06/05/24    Page 122 of 253    PageID 18331

APP000119

| Land Sale Summary | | | | | | | |
|---|---|---|---|---|---|---|---|
| Comp No. | Name/Location | Date of Sale | Sale Price | Acreage | Site Area SF | $/SF | Zoning Code |
| 1 | West side of Brown St. Between Hood St. and Enid St<br>3515 Brown St<br>Dallas, Texas | 6/23 | $20,000,000 | 1.59 | 69,260 | $288.77 | PD No. 193 (MF-3), Oak Lawn Special Purpose District, Multifamily Residential Three Subdistrict) |
| 2 | North Side Boll St.; East of Howell St.<br>2718 Boll St<br>Dallas, Texas | 2/20 | $5,000,000 | 0.48 | 21,026 | $237.80 | PD 193 Oak Lawn Special Propose District - GR Zoning |
| 3 | 6306 Diamond Head Circle<br>Dallas, Texas | 3/23 | $10,342,080 | 1.01 | 43,996 | $235.07 | PD 15 - Subarea 1 |
| 4 | 3409 N Hall St<br>Dallas, Texas | 8/22 | $5,300,000 | 0.52 | 22,438 | $236.21 | PD 193, O-2 |
| 5 | 4205-4221 Herschel Ave<br>Dallas, Texas | 9/21 | $6,188,000 | 0.66 | 28,676 | $215.79 | PD 193, PDS 134 |
| | Subject | | | 0.52 | 22,439 | | PD 193, O-2 |

## Land Sale Map

APP000120

**DISCUSSION OF ADJUSTMENTS**

The comparables summarized in the preceding table are used to value the subject land.  Adjustments are made to the sale prices of the comparables to compensate for differences between them and the subject.  A discussion of the adjustments, and their impact on the comparables, follows.

- **REAL PROPERTY RIGHTS CONVEYED -** The subject site is being valued in fee simple.  Each of the comparables were sold conveying fee simple ownership.  Thus, no adjustment is required for real property rights conveyed.

- **FINANCING TERMS** account for the impact on value that is produced by favorable financing.  Adjustments are not required since all sales are based on cash or a cash equivalency basis.

- **CONDITION OF SALE** adjustments reflect the motivations of the buyer and the seller.  All sales are considered "arm's length".  The buyers and sellers appeared to be free of duress with adequate exposure to the market for the property to sell at its fair value.  No adjustments are made.

- **MARKET CONDITIONS (TIME)** account for value changes in properties between the date of the comparable sale and the effective date of this appraisal report.  Despite the recent increase in interest rates and inflation, demand for commercial land remains strong in the subject's market area.  NVC has tracked office and retail demand factors in the Uptown market since our first sales transacted in early 2021.  Since that time, both office and retail rental rates have generally increased.  These increases, however, have been offset to some extent by increased required returns as a result of higher interest rates.  We also note that the client has received two, unsolicited LOI's in the $5.2 million range (see History Section), similar to the last known sales price of the subject.  Considering all of the preceding and due to the lack of consensus on the impact on development land, as well as the lack recent transactional data within the higher interest rate environment, no adjustments are made for market conditions to this specific data set, at this specific time.

- **LOCATION** adjustments account for superiority/inferiority in terms of the impact on value of aesthetic appeal and time-distance relationships between a site and common origins/destinations as compared to the subject.  Within this category we also consider the micro and macro location of the subject and the comparable sales.  Each of the sales are located in Dallas.  No. 2 is located in a residential area, but on a highly traveled street; its location is considered similar. Sale No. 5 is adjusted upward due to its residential in nature location with no opportunity for commercial use.

- **FUNCTIONAL (SITE) UTILITY -** adjustments may account for differences in a site's shape, dimensions, street frontage, width and site preparation.  Demolition of existing improvements is reflected in site utility; however, the purchase prices all of the sales that required demolition were already adjusted to reflect those costs.  No Adjustments are necessary for site utility.

- **SIZE** adjustments account for differences in a site's size.  Typically, market data suggest that the size of a tract (all other factors being equal) is inversely proportional to the price per acre of comparison (i.e., the larger the tract, the lower the sale price per unit of comparison, and vice versa).  In the Uptown/Turtle Creek neighborhoods, a larger tract is often of greater utility than a smaller site that is similar in other characteristics. This is due in part to the likelihood of a larger site possessing frontage on numerous streets as well as its greater development potential.  A downward adjustment is made to the largest sale, No. 1 at 1.59 acres.

APP000121

- **ZONING / LAND USE** adjustments account for the intensity and flexibility of uses and allowed development with those projects providing for higher densities and greater uses being superior to those with less.  The subject project allows for office and mixed-use office with limited retail and service uses.  Nos. 1, 3 and 5 are zoned for high density residential uses; Nos. 2 and 4 are zoned for commercial uses (No. 4 being prior sale of subject).  Once locational differences are accounted for, there does not appear to be any material value (per SF) difference between zonings.  No adjustments for this factor are observed at this time.

**DISCUSSION OF ADJUSTMENTS**

**Comparable Sale No 1**  is a 69,260 SF (1.59 acres) site that sold in June 2023.  There is a 26 unit single family condominium complex currently on the parcel, but the property will be demolished in preparation for the buyers future development of a 24-story (280 unit) multifamily building. Sale No. 1 received a downward adjustment for size.

*Overall, a downward adjustment is applied to Sale 1.*

**Comparable Sale No 2**  is a 21,026 SF (0.48 acres) site that sold in February of 2020.  The site is located on the North side of Boll Street and East of Howell Street.  The existing restaurant was demolished after closing.  The site will eventually become part of the sizable redo of the Quadrangle across the street.

*Overall, Sale 2 is considered similar to the subject value.*

**Comparable Sale No 3**  is a 43,996 SF (1.01 acres) site that sold in March 2023.  The site is situated east of North Dallas Tollway with frontage on Northwest Highway. This ±43,996 square foot site located in the City of Dallas and with recent rezoning of the PD-15 Sub district now allows for high rise development on the land. The site is currently improved with a twenty-unit condominium building. The property is being redeveloped into a 213 unit multifamily project. The project is expected the be delivered in Q2 2025.

*Overall, Sale 3 is considered similar to the subject value.*

**Comparable Sale No 4** is the previous sale of the subject property. The subject sold for $5,300,000 or $236.20/SF.  The sale took place on August 24, 2022. There has not been any zoning changes or improvements to the subject since the previous sale.  Two recent, unsolicited offers have been received at slightly under this price.

*Overall, Sale 4 is considered similar to the subject value.*

**Comparable Sale No 5** is a 28,676 SF (0.66 acre) site that sold in September of 2021.  The site is located off of Herschel Avenue and Throckmorton St.  This location is residential in nature and has little appeal to commercial uses.  The site was proposed for a 76-unit senior living complex at the time of purchase.  Sale No. 4 received an upward adjustment for location.

*Overall, an upward adjustment is applied to Sale 5.*

APP000122

3407-3409 N Hall Street                                                NVC | National Valuation Consultants, Inc.

Based on the preceding discussion, we have prepared the adjustment grid on the following page.

| Comp No. | Subject | 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|---|---|
| | | **Land Sales Adjustment Grid** | | | | |
| Sale Price | | $20,000,000 | $5,000,000 | $10,342,080 | $5,300,000 | $6,188,000 |
| Date of Sale | | 6/23 | 2/20 | 3/23 | 8/22 | 9/21 |
| Acreage | 0.52 | 1.59 | 0.48 | 1.01 | 0.52 | 0.66 |
| Site Area (SF) | 22,439 | 69,260 | 21,026 | 22,439 | 22,438 | 28,676 |
| Zoning Code | PD-193 | PD No. 193 (MF-3), Oak Lawn Special Purpose District, Multifamily Residential Three Subdistrict) | PD 193 Oak Lawn Special Propose District - GR Zoning | PD 15 - Subarea 1 | PD 193, O-2 | PD 193, PDS 134 |
| $/SF | | $288.77 | $237.80 | $235.07 | $236.20 | $215.80 |
| Property Rights | | - | - | - | - | - |
| Financing | | - | - | - | - | - |
| Condition of Sale | | - | - | - | - | - |
| Market Conditions | | - | - | - | - | - |
| Location | | - | - | - | - | Upward |
| Site Utility | | - | - | - | - | - |
| Size | Downward | - | - | - | - | - |
| Zoning | | - | - | - | - | - |
| **Overall Adjustment** | | **Downward** | - | - | - | **Upward** |

Since our last appraisal dated March 14, 2023, we were able to confirm two additional sales for comparison, Nos. 1 ($288.77/SF) and 3 ($235.07/SF). Before adjustments, the land sales indicate a range of values from $216 to $289/SF. After adjustments, the value of the subject should be similar to Nos. 2-4 (No. 4 being subject), which indicate a narrow range of $236.20 to $237.80/SF.

**VALUE CONCLUSION**

Based upon the data, analyses and reasoning contained herein, our market value opinion is summarized as follows:

| Land Value Conclusion | |
|---|---|
| SF of Land | 22,439 |
| Indicated Value Per SF | $235.00 - $245.00 |
| Indicated Value | $5,273,165 - $5,497,555 |
| **Land Value** | **$5,300,000** |
| Value / SF | $236.20 |

As noted previously, there is interest at or near this value by a prospective developer.

APP000123

## Reconciliation and Final Value

In estimating the market value of the subject, we utilized only the Sales Comparison Approach.  Thus, reconciliation is not necessary.  The indicated market value is summarized in the following table.

| Final Value Reconciliation | |
|---|---:|
| Value Premise | "As Is" (Vacant Land) |
| Date of Valuation | January 7, 2024 |
| Interest Appraised | Fee Simple |
| Site Area (SF) | 22,439 |
| Cost Approach | NA |
| Sales Comparison Approach | $5,300,000 |
| Income Capitalization Approach | NA |
| **Market Value Opinion** | **$5,300,000** |
| Market Value Opinion $/SF | $236.20 |

### Sales Comparison Approach

NVC conducted an extensive search for land sales within the subject submarket.  There are sufficient sales to analyze and compare to the subject property and to derive market values of the subject property.

Our market value opinion is subject to certain standard assumptions and limiting conditions which are referenced in the accompanying appraisal report. There are no Extraordinary Assumptions and Hypothetical Conditions that may have affected the assignment results.

### EXTRAORDINARY ASSUMPTIONS

*None.*

### HYPOTHETICAL CONDITIONS

*None.*

APP000124

## Reasonable Exposure Time and Marketing Period

Advisory Opinion G-7 of the USPAP defines reasonable exposure time as follows:

"The estimated length of time the property interest being appraised would have been offered on the market prior to the hypothetical consummation of a sale at market value on the effective date of the appraisal; a retrospective estimate based upon an analysis of past events assuming a competitive and open market."

In contrast, the same Advisory Opinion defines marketing time as follows:

"An estimate of the amount of time it might take to sell a property interest in real estate at the estimated market value level during the period immediately after the effective date of an appraisal."

The key difference is that exposure time is inherent in the market value and is always presumed to precede the effective date of value, whereas the marketing period is the estimated length of time immediately after the effective date of value that will be necessary to sell the property.

In level markets, the exposure time and marketing time should be identical. In improving markets, the marketing period will probably be shorter than the exposure period, whereas in declining markets, the marketing period will probably be longer than the exposure period.

### Conclusion

Despite the recent increase in interest rates and inflation, demand for commercial land remains strong in the subject's market area.

Considering both the macro context of the institutional real estate market in general, as well as the micro aspects of the subject property in particular including recent sales and listings, it is our opinion that the reasonable exposure period inherent in the market value estimate is *nine to twelve months.*

Looking ahead, the near term environment is not expected to materially different from the recent past. We estimate that the forward-looking marketing period may also be estimated at *nine to twelve months*. This is the length of time that we estimate it will take to sell the subject property at the appraised value.

Our projected exposure and marketing period for the property are as follows.

| Exposure and Marketing Period Conclusions | |
|---|---|
| Exposure Period Implicit in Market Value Estimate | 9-12 Months |
| Forecasted Marketing Period | 9-12 Months |

APP000125

## Certification

We certify that, to the best of our knowledge and belief:

1.  The statements of fact contained in this report are true and correct.

2.  The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and are our personal, impartial, and unbiased professional analyses, opinions, and conclusions.

3.  I have no present or prospective interest in the property that is the subject of this report and no personal interest with respect to the parties involved.

4.  I have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.

5.  My engagement in this assignment was not contingent upon developing or reporting predetermined results.

6.  My compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

7.  My analyses, opinions and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice (USPAP), the requirements of the Code of Professional Ethics and the Standards of Professional Appraisal Practice of the Appraisal Institute.

8.  Charles G. Dannis, MAI, SRA made a personal inspection of the property that is the subject of this report for prior appraisal dated March 24, 2023 with an effective date Match 14, 2023 but not for this update. Brad Kilgore with NVC reinspected for this appraisal.

9.  Additional employees of National Valuation Consultants, Inc. provided assistance with the preparation of this report. Specifically, Brad Kilgore provided significant real property appraisal assistance under the direction and supervision of the persons signing this report. This included property inspection & description, comparable data research, market analysis, highest & best use, application of valuation approaches and reconciliation.  Otherwise, no one provided significant real property appraisal assistance to the persons signing this certification.

10. The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.

11. As of the date of this report, Charles G. Dannis, MAI, SRA has completed the continuing education program for Designated Members of the Appraisal Institute.

12. As noted, we have performed appraisal services, regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment.

APP000126

Charles G. Dannis, MAI, SRA
Senior Managing Director
Texas Certified General Appraiser
License No.: TX 1321531 G
Phone: 214-932-1818
Email: cdannis@nvcinc.com

APP000127

**ADDENDA**

APP000128

**APPRAISER QUALIFICATIONS**

APP000129

# Charles (Chuck) G. Dannis, MAI, SRA
## Senior Managing Director



Chuck has been a real estate appraiser and consultant since 1972. In 1976, he co-founded the Dallas-based appraisal firm Crosson Dannis, Inc., which provided real estate appraisal and consultation services throughout the U.S. for more than 35 years. In 2015, Crosson Dannis merged with National Valuation Consultants to create one of the largest privately held commercial real estate valuation and advisory firms in the United States.

Chuck currently serves as the Senior Managing Director of NVC's Dallas office, overseeing all aspects of its day-to-day operations including bidding, structuring and engaging appraisal assignments and managing the office's valuation team.

## PROFESSIONAL EXPERIENCE



NATIONAL VALUATION CONSULTANTS, INC.                JANUARY 2015 - PRESENT

*One of the largest, privately held commercial real estate valuation and advisory companies in the United States with a focus on institutional real estate clients*

CROSSON DANNIS, INC.                1977 – DECEMBER 2014

Served as co-founder and President of this full-service real estate appraisal and consulting firm operating throughout the United States.

FIRST TEXAS FINANCIAL CORPORATION AND MUTUAL SAVINGS        1974 - 1976

Initially employed as Regional Supervisor, subsequently promoted to Assistant Vice President. Responsible for management and marketing of all company-owned real estate developments with concurrent responsibilities of all appraisal work on income-producing property loans. Residential developments included several single-family subdivisions and a large, planned unit development.

OAK CLIFF SAVINGS AND FIRST TEXAS FINANCIAL CORPORATION        1972 - 1974

Employed as a Staff Appraiser for a statewide savings and loan holding company, involving real estate appraisal and consulting work on all types of properties.

## EDUCATION

SOUTHERN METHODIST UNIVERSITY                B.B.A. – MANAGEMENT
GRADUATE STUDIES IN FINANCE AND REAL ESTATE

## CERTIFICATIONS AND LICENSES

Certified General Appraiser in the State of Texas

## PROFESSIONAL AFFILIATIONS

- Member of the Appraisal Institute (MAI and SRA)
- Chairman – Ethics Committee, Appraisal Institute[1]
- Chairman – Candidate Guidance, Appraisal Institute[1]
- Chairman – Public Relations, Appraisal Institute[1]
- Chairman – Symposium Committee, Appraisal Institute[2]
- Vice Chairman – Research Committee, Appraisal Institute[2]
- Member – Appraisal Standards Council, Appraisal Institute[2]

[1]Local Chapter
[2]National Appointment

**PHONE:**
Direct:  214.932.1818
Mobile: 214.707.1851

**EMAIL:**
cdannis@nvcinc.com

**WEBSITE:**
www.nvcinc.com

**NVC - DALLAS**
6060 North Central Expressway
Suite 740
Dallas, TX 75206

APP000130

# Charles (Chuck) G. Dannis, MAI, SRA
Senior Managing Director                                                              Page 2

## PROFESSIONAL AFFILIATIONS (CONT.)

- Chairman – Valuation Committee, National Council of Real Estate Investment Fiduciaries
- Chairman, Education Committee, National Council of Real Estate Investment Fiduciaries
- Board of Directors, National Council of Real Estate Investment Fiduciaries (1997-2001;2015-2023); Chairman of the Board (2020 -2022)
- Lecturer – Nuts & Bolts (Essentials) of Institutional Real Estate, National Council of Real Estate Investment Fiduciaries, 2001-
- Adjunct Professor of Practice in Real Estate, Edwin L. Cox School of Business, SMU, 1988-
- Chairman - City of Dallas, Economic Review Panel for the Landmark Commission, 2002, 2008
- Mayor's Real Estate Task Force for the City of Dallas, 2003-2006

## PUBLICATIONS, SPEECHES AND LECTURES

- Articles contributed to the following publications:

| | |
|---|---|
| *Appraisal Journal* | *Real Estate Finance* |
| *Real Estate Review* | *D Magazine (blog)* |
| *Institutional Real Estate Letter* | *Dallas Business Journal* |

- Participation in various Educational Symposiums/Conferences including MBA (Texas, Louisiana and National Conferences), IPT, NCREIF, SMU, Appraisal Institute

## BOARDS, CIVIC AND PROFESSIONAL SERVICE (PAST AND PRESENT)

- Guest Lecturer at graduate business schools of: UT Austin, UT Arlington, Texas A&M, Harvard, DePaul, and UT Dallas
- Board of Trustees – The Dallas Marathon, benefiting The Texas Scottish Rite Hospital for Children (President/Chairman, 2005-2008; Chairman Emeritus, 2009-)
- Board of Directors – Folsom Institute for Real Estate, SMU/Cox, Vice Chair Education (2014 -)
- Host of "The Real Estate Hour", 1992 – 2008; 2020 - 2022 (CBS Radio Network, Dallas affiliate)
- Founder, SMU Real Estate Society at the SMU Cox School of Business
- Board of Governors, Chartered Realty Investor Society
- Board of Directors – Friends of The Katy Trail (2011 - 2016)
- Board of Trustees – The Shelton School (2013 -), an Internationally known school for children that learn differently
- Independent Director, TIER REIT (2003 - 2017); Chairman of the Board (2013 - 2015)
- Qualified as an expert witness in several states and courts throughout the U.S.

## AWARDS AND HONORS

- The Dallas Marathon's Victory Award for Excellence and Community Service, 2011
- First recipient of the Eugene T. Byrne Endowed Faculty Innovation Award, SMU Cox School of Business, 2006
- HOPE Professor Nominee, SMU Cox School of Business, 2008, 2009 and 2021
- Mortgage Bankers Association, Faculty Fellow Award, 1996-1997
- First Recipient of the Folsom Institute for Real Estate/SMU Real Estate Society's Distinguished Real Estate Alumni Award – 2015
- Appraisal Institute Education Trust's Dr. William N. Kinnard, Jr. Award in recognition of his professionalism and commitment to real estate appraisal education, 2016
- Commandant of the U.S. Marine Corps Quality Citizen Award, 2008
- North Texas Commercial Association of Realtors "Michael F. McAuley Lifetime Achievement Award" for his personal efforts to the community, to professional organizations committed to the real estate industry and to charitable pursuits, 2019
- Included in the 2023 DCEO Dallas 500



**NVC**
National Valuation Consultants, Inc.

APP000131

CHARLES GLENN DANNIS
6060 N CENTRAL EXPY STE 740
DALLAS, TX 75206



# Certified General
# Real Estate Appraiser

**Appraiser:  Charles Glenn Dannis**

**License #:   TX 1321531 G**          **License Expires: 01/31/2026**

Having provided satisfactory evidence of the qualifications required
by the Texas Appraiser Licensing and Certification Act, Occupations
Code, Chapter 1103, authorization is granted to use this title:
Certified General Real Estate Appraiser

For additional information or to file a complaint please contact TALCB
at www.talcb.texas.gov.

**Chelsea Buchholtz**
**Executive Director**

APP000132

**LAND SALE ABSTRACTS**

APP000133

## Comparable Sale 1

### Land Other and Special Purpose

NVC #261651

West side of Brown St. Between Hood St. and Enid St • 3515 Brown St, Dallas, Texas




## PROPERTY DATA

| | |
|---|---|
| Size | 1.59 Acres / 69,260 SF |
| Land Use Type | Other and Special Purpose |
| Status at Sale | Finished Site |
| Entitlement Status | No Entitlements/Approvals |
| Improvements | 26 parcels with 26 existing condominiums Units. |
| Utilities | All available |
| Zoning | PD No. 193 (MF-3), Oak Lawn Special Purpose District, Multifamily Residential Three Subdistrict)  - City of Dallas |
| Site Utility Issues | None |
| Frontage (Ft) | 390 |
| Topography | Level |

## SUMMARY OF SALIENT CHARACTERISTICS

| | |
|---|---|
| Sale Price Per Acre | $12,578,616 |
| Sale Price Per SF | $288.77 |
| Intended Use | Multifamily |

## PROPERTY IDENTIFICATION

| | |
|---|---|
| Property Name | West side of Brown St. Between Hood St. and Enid St |
| Address / Location | 3515 Brown St |
| City, County, State | Dallas, Dallas, Texas |
| Legal Description | Lots 10 through 18; Block 10/1016, Wimbledon Place Condominiums. |
| Assessor ID | 00000138448500000  thru 00000138449000000 - 1.59 Acres |

## SALE DATA

| | |
|---|---|
| Sale Price | $20,000,000 |
| Date of Sale | 06/05/2023 |
| Grantor | Wimbledon Place Townhome Condominium  Association |
| Grantee | Brown Land LLC |
| Document # | 2023001/10926 |
| Terms | Cash to seller |
| Marketing Time | N/AV |
| Contract Time | N/AV |

## SALE COMMENTS

According to confidential source the property was sold for $20.0 million. Grantee plans to clear the site and develop a 24-Story luxury apartment tower on the site with approximately 180 units ($27,778/unit).

According to attached flood plain map the property id located outside the flood plain,

## VERIFICATION

| | |
|---|---|
| Verified By | Confidential |
| Telephone | N/A |
| Surveyed By | Dennis Young |
| Surveyed Date | 08/29/2023 |
| Reviewed By | Simon Neame |



# Comparable Sale 2

**Land Retail**
NVC #249626

North Side Boll St.; East of Howell St. • 2718 Boll St, Dallas, Texas

 

## PROPERTY DATA

| | |
|---|---|
| Size | 0.48 Acres / 21,026 SF |
| Land Use Type | Retail |
| Entitlement Status | No Entitlements/Approvals |
| Improvements | Restaurant converted from residence, 3,244/SF built in 1940. |
| Utilities | All available |
| Zoning | PD 193 Oak Lawn Special Propose District - GR Zoning - City of Dallas |
| Site Utility Issues | None |
| Frontage (Ft) | 179 |
| Topography | Level |

## SUMMARY OF SALIENT CHARACTERISTICS

| | |
|---|---|
| Sale Price Per Acre | $10,358,401 |
| Sale Price Per SF | $237.80 |

## PROPERTY IDENTIFICATION

| | |
|---|---|
| Property Name | North Side Boll St.; East of Howell St. |
| Address / Location | 2718 Boll St |
| City, County, State | Dallas, Dallas, Texas |
| Legal Description | Part of Lot 6, Block 2/955, A. Bowen's Addition. |
| Assessor ID | 00000135583000000 - 0.48 Acres |

## SALE DATA

| | |
|---|---|
| Sale Price | $5,000,000 |
| Date of Sale | 02/03/2020 |
| Grantor | Pubs Land, Ltd. |
| Grantee | SRPF B/Gingerman Property, LLC |
| Property Interest | Fee Simple |
| Document # | 2020000/32684 |
| Terms | Cash to seller |
| Marketing Time | N/AV |
| Contract Time | N/AV |

APP000136

**Comparable 2 Cont...**

## SALE COMMENTS

The existing restaurant (the Ginger Man) was to be demolished after closing.

## VERIFICATION

| | |
|---|---|
| Verified By | Appraiser's Files |
| Telephone | N/A |
| Surveyed By | Dennis Young |
| Surveyed Date | 02/26/2021 |
| Reviewed By | Allison Wilson |

NVC, Inc. • 7807 E. Peakview Ave. Suite 200, Centennial, CO 80111 • www.nvcinc.com • 303.753.6900

APP000137

# Comparable Sale 3

**Land**

NVC #270929

6306 Diamond Head Circle - Royal Orleans Condominiums • 6306 Diamond Head Circle, Dallas, Texas





## PROPERTY DATA

| | |
|---|---|
| Size | 1.01 Acres / 43,996 SF |
| Status at Sale | Finished Site |
| Entitlement Status | Approved Final Plan |
| Improvements | Two-story, 20 unit Condominium project with underground parking. |
| Utilities | All avaiklable |
| Zoning | PD 15 - Subarea 1 - City of Dallas |
| Site Utility Issues | None |
| Frontage (Ft) | 183 |
| Topography | Level |

## SUMMARY OF SALIENT CHARACTERISTICS

| | |
|---|---|
| Sale Price Per Acre | $10,239,683 |
| Sale Price Per SF | $235.07 |
| Intended Use | Condominium |

## PROPERTY IDENTIFICATION

| | |
|---|---|
| Property Name | 6306 Diamond Head Circle - Royal Orleans Condominiums |
| Address / Location | 6306 Diamond Head Circle |
| City, County, State | Dallas, Dallas, Texas |
| Legal Description | Royal Orleans Condominiums |
| Assessor ID | 00000405124100000 thru 00000405126200000 - 1.01 Acres |

## SALE DATA

| | |
|---|---|
| Sale Price | $10,342,080 |
| Date of Sale | 03/02/2023 |
| Grantor | See comments |
| Grantee | CP Hollow, LP |
| Document # | See comments |
| Terms | Cash to seller |
| Marketing Time | N/AV |
| Contract Time | N/AV |

**Comparable 3 Cont...**

## SALE COMMENTS

According to confidential source the property was sold for land value only $10,342,080 or $235.07/SF. Grantee plans to remove existing improvements and build a new highrise multi-family property on this site along with site next to this property; 213 units for rent ($48,554/unit).

Grantor varies per deed for each unit or set of units. Deed Numbers recorded:
202300040094, 202300040095, 202300040096, 202300040097, 202300040098, 202300040099, 202300040109, 202300040113, 202300040114, 202300040115, 202300040215, 202300040635, 202300040108, 202300081956, 202300040110, 202300040111, and 202300040112.

## VERIFICATION

| | |
|---|---|
| Verified By | Confidential |
| Telephone | N/A |
| Surveyed By | Dennis Young |
| Surveyed Date | 01/09/2024 |
| Reviewed By | Bradley Kilgore |

APP000139

## Comparable Sale 4

**Land**
NVC #265480

Hall Street Land • 3409 N Hall St, Dallas, Texas



### PROPERTY DATA

| | |
|---|---|
| Size | 0.52 Acres / 22,439 SF |
| Zoning | PD 193, O-2 - City of Dallas |

### PROPERTY IDENTIFICATION

| | |
|---|---|
| Property Name | Hall Street Land |
| Address / Location | 3409 N Hall St |
| City, County, State | Dallas, Dallas County, Texas |
| Assessor ID | 00000137545000000 00000137548000000 |

### SUMMARY OF SALIENT CHARACTERISTICS

| | |
|---|---|
| Sale Price Per Acre | $10,289,264 |
| Sale Price Per SF | $236.20 |

### SALE DATA

| | |
|---|---|
| Sale Price | $5,300,000 |
| Date of Sale | 08/24/2022 |
| Grantor | Turtle Creek Tower, LLC |
| Grantee | Stratford Ventures, LLC |
| Property Interest | Fee Simple |
| Document # | 22011220092 |

**Comparable 4 Cont...**

## SALE COMMENTS

Purchase of developed commercial land purchased for land value. Located across the street from Turtle Creek Park.

## VERIFICATION

| | |
|---|---|
| Verified By | Confidential |
| Telephone | N/A |
| Surveyed By | Rylie Hardman |
| Surveyed Date | 03/13/2023 |

**Comparable Sale 5**
**Land Senior Housing**
NVC #265476

4205-4221 Herschel Ave • 4205-4221 Herschel Ave, Dallas, Texas





## PROPERTY DATA

| | |
|---|---|
| Size | 0.66 Acres / 28,675 SF |
| Land Use Type | Senior Housing |
| Utilities | Typical utilities and municipal servicesavailable to site |
| Zoning | PD 193, PDS 134 - City of Dallas |
| Density | 115.15 Units per Ac |
| Topography | Level |

## SUMMARY OF SALIENT CHARACTERISTICS

| | |
|---|---|
| Sale Price Per Acre | $9,399,970 |
| Sale Price Per SF | $215.80 |
| Sale Price Per Unit | $81,421 |
| Size of Intended Use | 76  Units |
| Intended Use | Senior Housing |

## PROPERTY IDENTIFICATION

| | |
|---|---|
| Property Name | 4205-4221 Herschel Ave |
| Address / Location | 4205-4221 Herschel Ave |
| City, County, State | Dallas, Dallas County, Texas |
| Assessor ID | 00000196135000000 00000196132000000 00000196129000000 00000196126000000 |

## SALE DATA

| | |
|---|---|
| Sale Price | $6,188,000 |
| Date of Sale | 09/08/2021 |
| Grantor | SBM FORWARD LLC |
| Grantee | CA Senior Dallas Herschel TX Property Owners, LLC |
| Property Interest | Fee Simple |
| Document # | 202100266884 |

APP000142

**Comparable 5 Cont...**

### SALE COMMENTS

Purchase of land for proposed senior living complex with 76 units, which equates to $81,421/unit.

### VERIFICATION

| | |
|---|---|
| Verified By | Confidential |
| Telephone | N/A |
| Surveyed By | Rylie Hardman |
| Surveyed Date | 03/13/2023 |

APP000143

**ALTA/TITLE SURVEY**

APP000144



**ENGAGEMENT LETTER**

APP000146

# NVC
## National Valuation Consultants, Inc.

**Via email:** cort@brownfoxlaw.com

December 19, 2023

Cort Thomas
Brown Fox PLLC
8111 Preston Road, Ste. 300
Dallas, TX  75225
Phone: 214-367-6094

**Re:** **An Appraisal of a vacant tract of land located at 3407-3409 Hall Street, Dallas, Texas**

Dear Mr. Thomas:

This letter will confirm your request that National Valuation Consultants, Inc. prepare an appraisal of the above referenced property. The purpose of the assignment will be to provide our opinion of the "as-is" market value of the subject property as of the date of our inspection. This is an updated appraisal of the property we previously appraised for you.

We understand that the intended use is to assist in the sale of the property.

The appraisal report will be prepared in conformance with the current Uniform Standards of Professional Appraisal Practice (USPAP) adopted by the Appraisal Standards Board of the Appraisal Foundation; and with the written appraisal requirements and guidelines established by the Appraisal Institute for an appraisal.

The requested appraisal will be delivered in approximately *three weeks from the receipt of the retainer*, provided all requested information is received in a timely manner.  Please understand that this is our best estimate of the delivery date and may be subject to change because of conditions beyond our control.  The fee is also subject to modification and/or change, by mutual agreement, should you require changes to the assignment described herein.

*The fee for our services will be $1,750.  NVC will require a 100% retainer.* The retainer ($1,750) is due and payable at our offices in Centennial, Colorado before work will begin.  In the event of cancellation of the assignment, or if the assignment is placed on hold for more than thirty (30) days, all applicable charges for services rendered by NVC to the date of such cancellation will be due within thirty (30) days from the date of invoice.

The fee quoted above is for the report only and does not include court preparation or post-appraisal consultation, if any.  Court preparation and consultation time are billed at the rate of $450 per hour for senior staff and $250 per hour for other staff.  These fees are subject to increase after six months from the date of this agreement. It is also corporate policy that prior to any deposition or court testimony, we must be paid in full not only for current billings, but any outstanding past accounts as well.

It is mutually agreed that our acceptance of this assignment is not contingent upon any predetermined conclusions to value, marketability, or feasibility.  Should the assignment be terminated, you agree to pay for our time and costs incurred prior to receipt of written notice of cancelation.

If this agreement is given to an attorney for collection or enforcement, the prevailing party shall be entitled to recover all costs, expenses and reasonable attorney's fees incurred because of the legal action.

Atlanta ▪ Boston ▪ Chicago ▪ Cincinnati ▪ Dallas ▪ Denver ▪ Houston ▪ NY/NJ Metro ▪ San Francisco ▪ SoCal ▪ South Florida

Corporate Headquarters: 7807 E. Peakview Ave., Suite 200, Centennial, CO 80111 ▪ 303.753.6900 ▪ nvcinc.com

APP000147

Cort Thomas
December 19, 2023
Page 2

Our report will contain numerous assumptions and limiting conditions which are requisite to the conclusions reached therein. The standard assumptions and limiting conditions are set forth in Exhibit "A" attached hereto and made a part hereof for all purposes. Your signature below acknowledges that you have read, understood, and agreed to these assumptions. In addition to these standard assumptions, there may be assumptions contained in our report which are specific to your property. Regarding these latter assumptions, your signature below acknowledges that, unless we have been notified in writing by you within twenty days of receipt of our report, you accept these assumptions as stated therein.

By signing hereafter, the client hereby acknowledges and agrees that National Valuation Consultants, Inc., as well as any employee or agents, shall be indemnified against any, and all losses, claims, damages, liabilities, costs or expenses to which the recipient and/or third-party user may become subject to in connection with the preparation of these reports.

We will deliver the report in PDF format. If requested, we will also deliver a hard copy at the cost of $250.00 per copy.

If the foregoing is agreeable, please sign where indicated on the enclosed copy of this letter and return to me along with the requested data. Please keep a copy for your files. We look forward to working with you on this assignment. Please feel free to contact me if you have any questions.

By:

Cort Thomas
Brown Fox PLLC

Charles G. Dannis, MAI, SRA
Senior Managing Director
National Valuation Consultants, Inc.

December 19, 2023
Date

December 19, 2023
Date

APP000148

Exhibit "A"

## ASSUMPTIONS AND LIMITING CONDITIONS

1.  Disclosure of the contents of the appraisal report is governed by the bylaws and regulations of the professional appraisal organizations with which the appraiser is affiliated:  specifically, the Appraisal Institute.

2.  This Report should be relied upon only by the Intended User(s) and only for the Intended Use(s) identified at the time of the assignment.  Furthermore, the Report is to be used in whole and not in part.  The Report shall not be duplicated or provided to any third party in whole or in part without the written consent of NVC. Exempt from this restriction is duplication for the internal use of the Intended User and its attorneys, accountants, or advisors for the sole benefit of the Intended User. Also exempt from this restriction is transmission of the Report pursuant to any requirement of any court, governmental authority, or regulatory agency having jurisdiction over the intended user, provided that the Report and its contents shall not be published, in whole or in part, in any public document without the written consent of NVC. Written consent and approval from NVC must be obtained before this appraisal report can be conveyed by anyone to the public through advertising, public relations, news, sales, or other media.  Any third party, not covered by the exemptions herein, who may possess this report, is advised that they should rely on their own independently secured advice for any decision in connection with this property.  NVC shall have no accountability or responsibility to any such third party.

3.  The appraiser will not be required to give testimony or appear in court because of having made this appraisal, with reference to the property in question, unless previous arrangements have been made.

4.  The distribution of the total valuation in this report between land and improvements applies only under the stated highest and best use of the property.  The separate allocation of value for land and improvements must not be used in conjunction with any other appraisal and is invalid if so used.

5.  The legal description used in this report is assumed to be correct.

6.  No survey of the property has been made by the appraiser and no responsibility is assumed in connection with such matters. Maps and sketches are included only to assist the reader in visualizing the property.

7.  No responsibility is assumed for matters of a legal nature affecting title to the property, nor is an opinion of title rendered.  The title is assumed to be good and merchantable unless otherwise stated.

8.  It is assumed that there are no hidden or unapparent conditions of the property, subsoil, (including termite infestations) or structures which would render it more or less valuable.  No responsibility is assumed for such conditions or for engineering which may be required to discover such.

9.  All mechanical components are assumed to be in operable condition as would be considered standard for properties similar to the subject in type and age.  The heating, cooling, ventilation, plumbing and electrical equipment are considered to be in similar condition to the observable elements of the improvements unless otherwise stated. The insulation and energy efficiency of the improvements are assumed to be adequate and standard for the subject type and age unless otherwise noted.

10. Information furnished by others is assumed to be true, correct and reliable.  A reasonable effort has been made to verify such information; however, no responsibility for its accuracy is assumed by the appraiser.

APP000149

11.    The value estimate assumes responsible ownership and competent management.

12.    Unless otherwise stated in this report, the existence of hazardous substances, including without limitation asbestos, polychlorinated biphenyls, petroleum leakage, or agricultural chemicals, which may or may not be present on the property, or other environmental conditions, were not called to the attention of nor did the appraiser become aware of such during the appraiser's inspection. The appraiser has no knowledge of the existence of such materials on or in the property unless otherwise stated. The appraiser, however, is not qualified to test such substances or conditions.  If the presence of such substances, such as asbestos, urea formaldehyde foam insulation, or other hazardous substances or environmental conditions, may affect the value of the property, the value estimated is predicated on the assumption that there is no such condition on or in the property or in such proximity thereto that it would cause a loss in value.  No responsibility is assumed for any such conditions, or for any expertise or engineering knowledge required to discover them.

13.    Opinions of value contained in this report are estimates.  There is no guarantee, written or implied, that the subject property will sell or lease for the indicated amounts.

14.    The appraisers of National Valuation Consultants, Inc. reserve the right to amend and/or alter statements, analyses, conclusions and value estimates if information pertinent to this assignment is made known to us after the completion of the report.

15.    By signing hereafter, the client hereby acknowledges and agrees that National Valuation Consultants, Inc., as well as any employee, agent, or officer thereof, shall be completely indemnified against any and all losses, claims, damages, liabilities, costs or expenses to which the recipient and/or third party user may become subject but only if National Valuation Consultants, Inc. or any other indemnified person shall not have been negligent or shall not have taken or omitted to take any action in bad faith in connection with the preparation of this report.

16.    The Americans with Disabilities Act ("ADA") became effective January 26, 1992.  We have not made a specific compliance survey and analysis of this property to determine whether or not it is in conformity with the various detailed requirements of the ADA.  It is possible that a compliance survey of the property, together with a detailed analysis of the requirements of the ADA, could reveal that the property is not in compliance with one or more of the requirements of the Act.  If so, this fact could have a negative effect upon the value of the property.  Since we have no direct evidence relating to this issue, we did not consider possible noncompliance with the requirements of ADA in estimating the value of the property.

17.    Unless otherwise noted, all prospective value estimates, if any, in this appraisal, are based on the market conditions which exist at the date of inspection combined with an informed forecast, based on current trends in supply and demand for the property type under appraisal, as to what such conditions will be at the future date of property completion and or stabilization.  The appraiser cannot be held responsible for unforeseeable events, such as unexpected new construction, unanticipated changes in economic conditions, or any other such events which might occur, and which would alter market conditions prior to the effective date of the appraisal.

APP000150

# EXHIBIT B-2

APP000151

**Integra Realty Resources**
**Dallas**

**Appraisal of Real Property**

**TC Hall, LLC - Land Value**
Vacant Land
3407 Hall Street
Dallas, Dallas County, Texas 75219

**Prepared For:**
Brown Fox, PLLC

**Date of the Report:**
December 29, 2023

**Report Format:**
Appraisal Report

**IRR - Dallas**
File Number: 191-2023-1038



APP000152

# Subject Photographs





**TC Hall, LLC - Land Value**
3407 Hall Street
Dallas, Texas

## Aerial Photograph





Integra Realty Resources
Dallas

1100 Mira Vista Boulevard
Suite 300
Plano, TX 75093

T 972.881.7191
F 972.733.1403
www.irr.com

December 29, 2023


Mr. Cort Thomas
Receiver
Brown Fox, PLLC
8111 Preston Road
Dallas, TX 75225

SUBJECT:     Market Value Appraisal
             TC Hall, LLC - Land Value
             3407 Hall Street
             Dallas, Dallas County, Texas 75219
             IRR - Dallas File No. 191-2023-1038

Dear Mr. Thomas:

Integra Realty Resources – Dallas is pleased to submit the accompanying appraisal of the referenced property. The purpose of the appraisal is to develop an opinion of the market value as is, pertaining to the fee simple interest in the property. The client for the assignment is Brown Fox, PLLC. The intended user of this report is the client. The intended use of the report is for portfolio valuation purposes. No other party or parties may use or rely on the information, opinions, and conclusions contained in this report.

The subject is a parcel of vacant land containing an area of 0.49 acres or 21,248 square feet. The property is zoned PD-193 (Planned Development), Multi-family, which permits office and multi-family. However, the subject is restricted to multi-family.

The appraisal conforms to the Uniform Standards of Professional Appraisal Practice (USPAP), the Code of Professional Ethics and Standards of Professional Practice of the Appraisal Institute, and applicable state appraisal regulations.

APP000155

Mr. Cort Thomas
Brown Fox, PLLC
December 29, 2023
Page 2

Standards Rule 2-2 (Content of a Real Property Appraisal Report) contained in the Uniform Standards of Professional Appraisal Practice (USPAP) requires each written real property appraisal report to be prepared as either an Appraisal Report or a Restricted Appraisal Report. This report is prepared as an Appraisal Report as defined by USPAP under Standards Rule 2-2(a), and incorporates practical explanation of the data, reasoning, and analysis that were used to develop the opinion of value.

Based on the valuation analysis in the accompanying report, and subject to the definitions, assumptions, and limiting conditions expressed in the report, the concluded opinions of value are as follows:

**Value Conclusion**

| Value Type & Appraisal Premise | Interest Appraised | Date of Value | Value Conclusion |
|---|---|---|---|
| Market Value As Is | Fee Simple | December 27, 2023 | $4,780,000 |

**Extraordinary Assumptions and Hypothetical Conditions**

The value conclusions are subject to the following extraordinary assumptions. An extraordinary assumption is an assignment-specific assumption as of the effective date regarding uncertain information used in an analysis which, if found to be false, could alter the appraiser's opinions or conclusions.

1. A survey was not provided. As such, we assume the land size obtained from Dallas Central Appraisal District is correct.

The value conclusions are based on the following hypothetical conditions. A hypothetical condition is a condition, directly related to a specific assignment, which is contrary to what is known by the appraiser to exist on the effective date of the assignment results, but is used for the purpose of analysis.

1. None

The use of any extraordinary assumption or hypothetical condition may have affected the assignment results.



APP000156

Mr. Cort Thomas
Brown Fox, PLLC
December 29, 2023
Page 3

If you have any questions or comments, please contact the undersigned. Thank you for the opportunity to be of service.

Respectfully submitted,

**Integra Realty Resources - Dallas**

Ernest E. Gatewood, III
Senior Director
Certified General Real Estate Appraiser
Texas Certificate TX #1324355 G
Telephone: (972) 725-7755
Email: egatewood@irr.com

Jimmy H. Jackson, MAI
Senior Managing Director
Certified General Real Estate Appraiser
Texas Certificate TX #1324004-G
Telephone: (972) 725-7724
Email: jhjackson@irr.com



APP000157

# Table of Contents

| | |
|---|---|
| **Quality Assurance** | **1** |
| **Executive Summary** | **2** |
| **Identification of the Appraisal Problem** | **4** |
| Subject Description | 4 |
| Sale History | 4 |
| Pending Transactions | 4 |
| Appraisal Purpose | 4 |
| Value Type Definitions | 5 |
| Appraisal Premise Definitions | 5 |
| Property Rights Definitions | 5 |
| Client and Intended User(s) | 5 |
| Intended Use | 6 |
| Applicable Requirements | 6 |
| Report Format | 6 |
| Prior Services | 6 |
| Appraiser Competency | 6 |
| **Scope of Work** | **7** |
| **Economic Analysis** | **9** |
| Dallas County Area Analysis | 9 |
| Multifamily Market Analysis | 17 |
| Surrounding Area Analysis | 24 |
| Surrounding Area Map | 31 |
| **Property Analysis** | **32** |
| Land Description and Analysis | 32 |
| Real Estate Taxes | 40 |
| Highest and Best Use | 41 |
| **Valuation** | **43** |
| Valuation Methodology | 43 |
| Sales Comparison Approach | 44 |
| Analysis and Adjustment of Sales | 47 |
| Property Adjustments | 49 |
| Land Value Conclusion | 51 |
| Reconciliation and Conclusion of Value | 52 |
| Exposure Time | 52 |
| Marketing Time | 52 |
| **Certification** | **53** |
| **Assumptions and Limiting Conditions** | **55** |

**Addenda**
A.   Appraiser Qualifications
B.   IRR Quality Assurance Survey
C.   Definitions
D.   Property Information
E.   Comparable Data

TC Hall, LLC - Land Value



APP000158

# Quality Assurance

## IRR Quality Assurance Program

At IRR, delivering a quality report is a top priority. Integra has an internal Quality Assurance Program in which managers review material and pass an exam in order to attain IRR Certified Reviewer status. By policy, every Integra valuation assignment is assessed by an IRR Certified Reviewer who holds the MAI designation, or is, at a minimum, a named Director with at least ten years of valuation experience.

This quality assurance assessment consists of reading the report and providing feedback on its quality and consistency. All feedback from the IRR Certified Reviewer is then addressed internally prior to delivery. The intent of this internal assessment process is to maintain report quality.

## Designated IRR Certified Reviewer

The IRR Certified Reviewer who provided the quality assurance assessment for this assignment is Jimmy H. Jackson, MAI.

TC Hall, LLC - Land Value



APP000159

# Executive Summary

| | |
|---|---|
| Property Name | TC Hall, LLC - Land Value |
| Address | 3407 Hall Street |
| | Dallas, Dallas County, Texas  75219 |
| Property Type | Land - Multi-family |
| Owner of Record | TC Hall, LLC |
| Tax ID | 00000137548000000 and 00000137545000000 |
| Legal Description | Lots 15 and 16, Block 992, Collums Subdivision |
| Land Area | 0.49 acres; 21,248 SF |
| Zoning Designation | PD-193 (Planned Development), Multi-family |
| Highest and Best Use | Multi-family |
| Exposure Time; Marketing Period | 9-12 months; 9-12 months |
| Effective Date of the Appraisal | December 27, 2023 |
| Date of the Report | December 29, 2023 |
| Property Interest Appraised | Fee Simple |
| Sales Comparison Approach | |
| Number of Sales | 3 |
| Range of Sale Dates | Jan 23 to Jun 23 |
| Range of Prices per SF (Unadjusted) | $227.27 - $286.65 |
| Market Value Conclusion | $4,780,000                    ($224.96/SF) |

The values reported above are subject to the definitions, assumptions, and limiting conditions set forth in the accompanying report of which this summary is a part. No party other than Brown Fox, PLLC may use or rely on the information, opinions, and conclusions contained in the report. It is assumed that the users of the report have read the entire report, including all of the definitions, assumptions, and limiting conditions contained therein.

## Extraordinary Assumptions and Hypothetical Conditions

The value conclusions are subject to the following extraordinary assumptions. An extraordinary assumption is an assignment-specific assumption as of the effective date regarding uncertain information used in an analysis which, if found to be false, could alter the appraiser's opinions or conclusions.

1. A survey was not provided. As such, we assume the land size obtained from Dallas Central Appraisal District is correct.

The value conclusions are based on the following hypothetical conditions. A hypothetical condition is a condition, directly related to a specific assignment, which is contrary to what is known by the appraiser to exist on the effective date of the assignment results, but is used for the purpose of analysis.

1. None

The use of any extraordinary assumption or hypothetical condition may have affected the assignment results.

TC Hall, LLC - Land Value



APP000160

## Strengths, Weaknesses, Opportunities, Threats (SWOT Analysis)

The analyses presented in this report consider the internal strengths and weaknesses of the subject property, as well as opportunities and external threats. The overall valuation influences are summarized in the following table.

---

**Valuation Influences**

**Strengths**
- Limited amount of available land in market area
- Continued demand for residential and commercial sites in market area
- Unobstructed view of Lee Park

**Weaknesses**
- Potential competition from other developments
- Limited site size

**Opportunities**
- Demand for multi-family housing continues
- Demand for commercial properties

**Threats**
- Although Federal Reserve Chairman Powell remains non-committal, it is widely believed that the Federal Reserve will keep interest rates stable through the remainder of this year and into 2024. However, there is still upward pressure on lending rates and for land development sites like the subject.
- Inflation has risen in the past year as the economy recovers from the pandemic economic shutdowns and demand shocks. This may tend to inflate operating costs diminishing profit on the project.
- Continued economic downturn/inflation pressures testing the U.S. and local economies

---

TC Hall, LLC - Land Value



APP000161

# Identification of the Appraisal Problem

## Subject Description

The subject is a parcel of vacant land containing an area of 0.49 acres or 21,248 square feet. The property is zoned PD-193 (Planned Development), Multi-family, which permits office and multi-family. However, the subject is restricted to multi-family.

A legal description of the property was requested but not provided.

| Property Identification | |
| --- | --- |
| Property Name | TC Hall, LLC - Land Value |
| Address | 3407 Hall Street |
| | Dallas, Texas 75219 |
| Tax ID | 00000137548000000 and 00000137545000000 |
| Owner of Record | TC Hall, LLC |

## Sale History

The most recent closed sale of the subject is summarized as follows:

| | |
| --- | --- |
| Sale Date | August 25, 2022 |
| Seller | Turtle Creek Tower, LLC |
| Buyer | TC Hall, LLC |
| Sale Price | N/A |
| Recording Instrument Number | INT202200230642 |
| Expenditures Since Purchase | N/A |

The appraisers were unable to verify the most recent sales price.

## Pending Transactions

Based on discussions with the appropriate contacts, the property is not subject to an agreement of sale or an option to buy, nor is it listed for sale, as of the effective appraisal date.

## Appraisal Purpose

The purpose of the appraisal is to develop the following opinion(s) of value:

- The market value as is of the fee simple interest in the subject property as of the effective date of the appraisal, December 27, 2023

The date of the report is December 29, 2023. The appraisal is valid only as of the stated effective date or dates.

TC Hall, LLC - Land Value



APP000162

## Value Type Definitions

The definitions of the value types applicable to this assignment are summarized below.

### Market Value

The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

1.    Buyer and seller are typically motivated;

2.    Both parties are well informed or well advised, and acting in what they consider their own best interests;

3.    A reasonable time is allowed for exposure in the open market;

4.    Payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and

5.    The price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale. [1]

## Appraisal Premise Definitions

The definitions of the appraisal premises applicable to this assignment are specified as follows.

### As Is Market Value

The estimate of the market value of real property in its current physical condition, use, and zoning as of the appraisal date.[2]

## Property Rights Definitions

The property rights appraised which are applicable to this assignment are defined as follows.

### Fee Simple Estate

Absolute ownership unencumbered by any other interest or estate, subject only to the limitations imposed by the governmental powers of taxation, eminent domain, police power, and escheat.[3]

## Client and Intended User(s)

The client and intended user is Brown Fox, PLLC. No other party or parties may use or rely on the information, opinions, and conclusions contained in this report.

---

[1] Code of Federal Regulations, Title 12, Chapter I, Part 34.42[h]; also Interagency Appraisal and Evaluation Guidelines, Federal Register, 75 FR 77449, December 10, 2010, page 77472

[2] Appraisal Institute, *The Dictionary of Real Estate Appraisal*, 7th ed. (Chicago: Appraisal Institute, 2022)

[3] Appraisal Institute, *The Dictionary of Real Estate Appraisal*, 7th ed. (Chicago: Appraisal Institute, 2022)



## Intended Use

The intended use of the appraisal is for portfolio valuation purposes. The appraisal is not intended for any other use.

## Applicable Requirements

This appraisal report conforms to the following requirements and regulations:

- Uniform Standards of Professional Appraisal Practice (USPAP)

- Code of Professional Ethics and Standards of Professional Practice of the Appraisal Institute

- Applicable state appraisal regulations

## Report Format

Standards Rule 2-2 (Content of a Real Property Appraisal Report) contained in the Uniform Standards of Professional Appraisal Practice (USPAP) requires each written real property appraisal report to be prepared as either an Appraisal Report or a Restricted Appraisal Report. This report is prepared as an Appraisal Report as defined by USPAP under Standards Rule 2-2(a), and incorporates practical explanation of the data, reasoning, and analysis used to develop the opinion of value.

## Prior Services

USPAP requires appraisers to disclose to the client any other services they have provided in connection with the subject property in the prior three years, including valuation, consulting, property management, brokerage, or any other services. We have previously appraised the property that is the subject of this report for the current client. We have provided no other services, as an appraiser or in any other capacity, regarding the property that is the subject of this report within the three-year period immediately preceding the agreement to perform this assignment.

## Appraiser Competency

No steps were necessary to meet the competency provisions established under USPAP. The assignment participants have appraised several properties similar to the subject in physical, locational, and economic characteristics, and are familiar with market conditions and trends; therefore, appraiser competency provisions are satisfied for this assignment. Appraiser qualifications and state credentials are included in the addenda of this report.

# Scope of Work

## Introduction

The appraisal development and reporting processes require gathering and analyzing information about the assignment elements necessary to properly identify the appraisal problem. The scope of work decision includes the research and analyses necessary to develop credible assignment results, given the intended use of the appraisal. Sufficient information includes disclosure of research and analyses performed and might also include disclosure of research and analyses not performed.

To determine the appropriate scope of work for the assignment, the intended use of the appraisal, the needs of the user, the complexity of the property, and other pertinent factors were considered. The concluded scope of work is described below.

## Research and Analysis

The type and extent of the research and analysis conducted are detailed in individual sections of the report. The steps taken to verify comparable data are disclosed in the addenda of this report. Although effort has been made to confirm the arms-length nature of each sale with a party to the transaction, it is sometimes necessary to rely on secondary verification from sources deemed reliable.

## Inspection

Details regarding the property inspection conducted as part of this appraisal assignment are summarized as follows:

**Property Inspection**

| Party | Inspection Type | Inspection Date |
|---|---|---|
| Ernest Gatewood | On-site | December 27, 2023 |
| Jimmy H. Jackson, MAI | None | N/A |

TC Hall, LLC - Land Value



APP000165

## Valuation Methodology

Three approaches to value are typically considered when developing a market value opinion for real property. These are the cost approach, the sales comparison approach, and the income capitalization approach. Use of the approaches in this assignment is summarized as follows:

**Approaches to Value**

| Approach | Applicability to Subject | Use in Assignment |
|---|---|---|
| Cost Approach | Not Applicable | Not Utilized |
| Sales Comparison Approach | Applicable | Utilized |
| Income Capitalization Approach | Not Applicable | Not Utilized |

In developing an opinion of value for the subject, only the sales comparison approach is used. This approach is applicable to the subject because there is an active market for similar properties, and sufficient sales data is available for analysis.

The cost approach is not applicable because there are no improvements that contribute value to the property, and the income approach is not applicable because the subject is not likely to generate rental income in its current state.

TC Hall, LLC - Land Value

APP000166

# Economic Analysis

## Dallas County Area Analysis

Dallas County is located in Texas. It is 871 square miles in size and has a population density of 2,999 persons per square mile.

## Population

Dallas County has an estimated 2023 population of 2,612,622, which represents little to no change from the 2020 census of 2,613,539. The population trend in Dallas County contrasts with that of the Dallas MSA which had a 1.3% average annual increase in population over this time.

Looking forward, Dallas County's population is projected to increase at a 0.3% annual rate from 2023-2028, equivalent to the addition of an average of 6,856 residents per year.  Dallas County's growth rate is expected to lag that of the Dallas MSA, which is projected to be 1.0%.

**Population Trends**

|  | Population | | | Compound Ann. % Chng | |
| --- | --- | --- | --- | --- | --- |
|  | 2020 Census | 2023 Estimate | 2028 Projection | 2020 - 2023 | 2023 - 2028 |
| Dallas County, TX | 2,613,539 | 2,612,622 | 2,646,900 | 0.0% | 0.3% |
| Dallas-Fort Worth-Arlington, TX | 7,637,387 | 7,933,171 | 8,329,332 | 1.3% | 1.0% |
| Texas | 29,145,505 | 30,065,904 | 31,310,079 | 1.0% | 0.8% |
| USA | 331,449,281 | 334,500,069 | 341,662,969 | 0.3% | 0.4% |
| Source: Claritas | | | | | |

TC Hall, LLC - Land Value

APP000167

## Employment

Total employment in Dallas County was estimated at 1,786,266 jobs as of June 2022. Between year-end 2012 and 2022, employment rose by 284,993 jobs, equivalent to a 19.0% increase over the entire period. There were gains in employment in eight out of the past ten years. Although Dallas County's employment rose over the last decade, it underperformed the Dallas MSA, which experienced an increase in employment of 26.0% or 791,091 jobs over this period.

A comparison of unemployment rates is another way of gauging an area's economic health.  Over the past decade, the Dallas County unemployment rate has been consistently higher than that of the Dallas MSA, with an average unemployment rate of 5.1% in comparison to a 4.7% rate for the Dallas MSA.  A higher unemployment rate is a negative indicator.

Recent data shows that the Dallas County unemployment rate is 4.0% in comparison to a 3.9% rate for the Dallas MSA, a negative sign that is consistent with the fact that Dallas County has underperformed the Dallas MSA in the rate of job growth over the past two years.

### Employment Trends

| Year | Total Employment (Year End) | | | | Unemployment Rate (Ann. Avg.) | |
| | Dallas County | % Change | Dallas MSA | % Change | Dallas County | Dallas MSA |
| --- | --- | --- | --- | --- | --- | --- |
| 2012 | 1,501,273 | | 3,044,114 | | 7.1% | 6.5% |
| 2013 | 1,530,834 | 2.0% | 3,127,712 | 2.7% | 6.7% | 6.2% |
| 2014 | 1,592,969 | 4.1% | 3,254,583 | 4.1% | 5.5% | 5.1% |
| 2015 | 1,650,696 | 3.6% | 3,360,668 | 3.3% | 4.3% | 4.1% |
| 2016 | 1,689,422 | 2.3% | 3,441,839 | 2.4% | 4.0% | 3.9% |
| 2017 | 1,717,458 | 1.7% | 3,526,930 | 2.5% | 4.0% | 3.7% |
| 2018 | 1,742,213 | 1.4% | 3,606,436 | 2.3% | 3.8% | 3.6% |
| 2019 | 1,788,166 | 2.6% | 3,719,023 | 3.1% | 3.5% | 3.3% |
| 2020 | 1,704,984 | -4.7% | 3,595,494 | -3.3% | 7.8% | 7.1% |
| 2021 | 1,806,405 | 5.9% | 3,829,259 | 6.5% | 5.6% | 5.1% |
| 2022* | 1,786,266 | -1.1% | 3,835,205 | 0.2% | 3.9% | 3.6% |
| Overall Change 2012-2022 | 284,993 | 19.0% | 791,091 | 26.0% | | |
| Avg Unemp. Rate 2012-2022 | | | | | 5.1% | 4.7% |
| Unemployment Rate - September 2023 | | | | | 4.0% | 3.9% |

*Total employment data is as of June 2022; unemployment rate data reflects the average of 11 months of 2022.

Source: U.S. Bureau of Labor Statistics and Moody's Analytics. Employment figures are from the Quarterly Census of Employment and Wages (QCEW). Unemployment rates are from the Current Population Survey (CPS). The figures are not seasonally adjusted.

## Employment Sectors

The composition of the Dallas County job market is depicted in the chart below. A complete data set is not available for the Dallas MSA, so Dallas County will be compared to the United States. Total employment for the two areas is broken down by major employment sector, and the sectors are ranked from largest to smallest based on the percentage of Dallas County jobs in each category.

**Employment Sectors - 2022**



Source: U.S. Bureau of Labor Statistics and Moody's Analytics

TC Hall, LLC - Land Value

APP000169

Dallas County has greater concentrations than the United States in the following employment sectors:

1.  Professional and Business Services, representing 22.3% of Dallas County payroll employment compared to 15.0% for the nation overall. This sector includes legal, accounting, and engineering firms, as well as management of holding companies.

2.  Trade; Transportation; and Utilities, representing 21.3% of Dallas County payroll employment compared to 18.8% for the nation overall. This sector includes jobs in retail trade, wholesale trade, trucking, warehousing, and electric, gas, and water utilities.

3.  Financial Activities, representing 9.2% of Dallas County payroll employment compared to 5.7% for the nation overall. Banking, insurance, and investment firms are included in this sector, as are real estate owners, managers, and brokers.

4.  Information, representing 2.6% of Dallas County payroll employment compared to 2.0% for the nation overall. Publishing, broadcasting, data processing, telecommunications, and software publishing are included in this sector.

Dallas County is underrepresented in the following sectors:

1.  Education and Health Services, representing 11.2% of Dallas County payroll employment compared to 15.4% for the nation overall. This sector includes employment in public and private schools, colleges, hospitals, and social service agencies.

2.  Government, representing 9.7% of Dallas County payroll employment compared to 14.2% for the nation overall. This sector includes employment in local, state, and federal government agencies.

3.  Leisure and Hospitality, representing 8.9% of Dallas County payroll employment compared to 10.8% for the nation overall. This sector includes employment in hotels, restaurants, recreation facilities, and arts and cultural institutions.

4.  Manufacturing, representing 6.8% of Dallas County payroll employment compared to 8.5% for the nation overall. This sector includes all establishments engaged in the manufacturing of durable and nondurable goods.

TC Hall, LLC - Land Value



APP000170

## Major Employers

Major employers in Dallas County are shown in the following table.

| **Major Employers - Dallas County, TX** | |
|---|---|
| Name | Number of Employees |
| 1  AMR Corporation | 24,700 |
| 2  Bank of America Corporation | 20,000 |
| 3  Texas Health Resources Inc. | 19,230 |
| 4  Dallas ISD | 18,314 |
| 5  Baylor Health Care System | 17,097 |
| 6  AT&T | 15,800 |
| 7  Lockheed Martin Aeronautics | 14,126 |
| 8  JP Morgan Chase & Co. | 13,500 |
| 9  UT-Southwestern Medical Center | 13,122 |
| 10  City of Dallas | 12,836 |

## Gross Domestic Product

Gross Domestic Product (GDP) is a measure of economic activity based on the total value of goods and services produced in a defined geographic area, and annual changes in Gross Domestic Product (GDP) are a gauge of economic growth.

Economic growth, as measured by annual changes in GDP, has been somewhat lower in Dallas County than the Dallas MSA overall during the past decade. Dallas County has grown at a 3.1% average annual rate while the Dallas MSA has grown at a 3.5% rate. Consistent with national trends, both areas experienced declines in 2020 followed by a rebound in 2021. Dallas County continues to underperform the Dallas MSA. GDP for Dallas County rose by 6.6% in 2021 while the Dallas MSA's GDP rose by 6.9%.

Dallas County has a per capita GDP of $99,716, which is 51% greater than the Dallas MSA's GDP of $66,238. This means that Dallas County industries and employers are adding relatively more value to the economy than their counterparts in the Dallas MSA.

**Gross Domestic Product**

| Year | ($,000s) Dallas County | % Change | ($,000s) Dallas MSA | % Change |
|---|---|---|---|---|
| 2011 | 189,977,425 | | 365,601,169 | |
| 2012 | 194,258,511 | 2.3% | 377,846,407 | 3.3% |
| 2013 | 199,249,886 | 2.6% | 388,536,307 | 2.8% |
| 2014 | 205,383,360 | 3.1% | 402,787,824 | 3.7% |
| 2015 | 216,201,170 | 5.3% | 422,048,089 | 4.8% |
| 2016 | 222,697,886 | 3.0% | 435,497,728 | 3.2% |
| 2017 | 228,099,541 | 2.4% | 450,467,241 | 3.4% |
| 2018 | 236,377,335 | 3.6% | 469,741,026 | 4.3% |
| 2019 | 246,221,845 | 4.2% | 486,572,160 | 3.6% |
| 2020 | 241,901,337 | -1.8% | 480,618,181 | -1.2% |
| 2021 | 257,870,247 | 6.6% | 513,979,216 | 6.9% |
| Compound % Chg (2011-2021) | | 3.1% | | 3.5% |
| GDP Per Capita 2021 | $99,716 | | $66,238 | |

Source: U.S. Bureau of Economic Analysis and Moody's Analytics; data released December 2022.
The release of state and local GDP data has a longer lag time than national data. The data represents inflation-adjusted ""real"" GDP stated in 2012 dollars.

TC Hall, LLC - Land Value

## Household Income

Dallas County has a considerably lower level of household income than the Dallas MSA. Median household income for Dallas County is $67,269, which is 17.0% less than the corresponding figure for the Dallas MSA.

### Median Household Income - 2023

|  | Median |
| --- | --- |
| Dallas County, TX | $67,269 |
| Dallas-Fort Worth-Arlington, TX | $81,082 |
| Comparison of Dallas County, TX to Dallas-Fort Worth-Arlington, | - 17.0% |

Source: Claritas

The following chart shows the distribution of households across twelve income levels. Dallas County has a greater concentration of households in the lower income levels than the Dallas MSA. Specifically, 24% of Dallas County households are below the $35,000 level in household income as compared to 19% of Dallas MSA households. A lesser concentration of households is apparent in the higher income levels, as 45% of Dallas County households are at the $75,000 or greater levels in household income versus 54% of Dallas MSA households.

**Household Income Distribution - 2023**



Source: Claritas

APP000173

## Education and Age

Residents of Dallas County have a lower level of educational attainment than those of the Dallas MSA. An estimated 32% of Dallas County residents are college graduates with four-year degrees, versus 36% of Dallas MSA residents. People in Dallas County are slightly younger than their Dallas MSA counterparts. The median age for Dallas County is 35 years, while the median age for the Dallas MSA is 36 years.

**Education & Age - 2023**



Percent College Graduate



Median Age

Source: Claritas

## Conclusion

The Dallas County economy will be affected by a stable to slightly growing population base and lower income and education levels. Dallas County experienced growth in the number of jobs over the past decade, and it is reasonable to assume that employment growth will occur in the future. It is anticipated that the Dallas County economy will improve, and employment will grow, strengthening the demand for real estate.

TC Hall, LLC - Land Value

## Multifamily Market Analysis

### Metro Area Overview

The subject is located in the Dallas-Fort Worth - TX metro area as defined by CoStar. Trended supply and demand statistics, including inventory levels, absorption, vacancy, and rental rates for all classes of space are presented in the ensuing table.

**All Multifamily Dallas-Fort Worth - TX Metro Trends**

| Period | Stock | Demand | Vacancy | Net Completions 12 Months | Under Construction Stock | Net Absorption 12 Months | Asking Rent | Rent Growth 12 Month | Price Growth | Cap Rate |
|---|---|---|---|---|---|---|---|---|---|---|
| 2013 Q3 | 614,408 | 571,930 | 6.91% | 8,636 | 22,655 | 12,309 | $1,029 | 3.50% | 3.86% | 6.51% |
| 2014 Q3 | 627,307 | 584,314 | 6.85% | 12,899 | 24,648 | 12,385 | $1,058 | 2.81% | 7.77% | 6.30% |
| 2015 Q3 | 645,583 | 600,335 | 7.01% | 18,276 | 27,468 | 16,028 | $1,121 | 5.94% | 9.26% | 6.04% |
| 2016 Q3 | 664,752 | 618,043 | 7.03% | 19,169 | 32,965 | 17,708 | $1,166 | 4.04% | 6.30% | 5.93% |
| 2017 Q3 | 688,645 | 632,173 | 8.20% | 23,893 | 35,081 | 14,150 | $1,201 | 3.01% | 5.94% | 5.82% |
| 2018 Q3 | 714,425 | 653,987 | 8.46% | 25,780 | 38,837 | 21,823 | $1,231 | 2.49% | 6.99% | 5.68% |
| 2019 Q3 | 736,920 | 675,824 | 8.29% | 22,495 | 41,406 | 21,845 | $1,264 | 2.68% | 7.66% | 5.53% |
| 2020 Q3 | 763,135 | 696,756 | 8.70% | 26,215 | 39,329 | 20,942 | $1,275 | 0.85% | 7.38% | 5.25% |
| 2021 Q3 | 790,728 | 743,957 | 5.91% | 27,592 | 40,950 | 47,220 | $1,434 | 12.46% | 22.06% | 4.65% |
| 2022 Q3 | 815,547 | 754,011 | 7.55% | 24,819 | 52,228 | 10,043 | $1,540 | 7.37% | 4.72% | 4.75% |
| 2023 Q3 | 841,539 | 762,674 | 9.37% | 25,992 | 58,653 | 8,670 | $1,524 | -1.00% | -10.25% | 5.36% |
| 2024 Q3 | 868,568 | 783,426 | 9.80% | 27,029 | 0 | 21,162 | $1,538 | 0.91% | -13.27% | 6.21% |
| 2025 Q3 | 890,441 | 806,019 | 9.48% | 21,873 | 0 | 22,592 | $1,601 | 4.07% | 4.52% | 6.21% |
| 2026 Q3 | 902,311 | 820,632 | 9.05% | 11,870 | 0 | 14,615 | $1,658 | 3.60% | 9.00% | 5.93% |
| 2027 Q3 | 915,003 | 833,683 | 8.89% | 12,692 | 0 | 13,050 | $1,708 | 3.00% | 9.31% | 5.60% |

Source: CoStar, Inc.; compiled by Integra Realty Resources, Inc.

### Dallas-Fort Worth - TX Metro Trends and Forecasts



Source: CoStar, Inc.; compiled by Integra Realty Resources, Inc.

- The current vacancy rate in the metro area is 9.37%; the vacancy rate has increased by 346 bps from 2021 Q3.

- Two-year Base Case forecasts project a 9.48% vacancy rate in the metro area, representing an increase of 11 bps by 2025 Q3.

- Asking rent averages $1,524/unit in the metro area, and values have increased by 6.29% from 2021 Q3.

- Two-year Base Case forecasts project a $1,601/unit asking rent in the metro area, representing an increase of 5.04% by 2025 Q3.



Source: CoStar, Inc.; compiled by Integra Realty Resources, Inc.

- The total stock (units) has increased by 6.43% from 2021 Q3, while the demand has increased by 2.52%.

- Between 2018 Q4 and 2023 Q3, net completions in the metro area have averaged 25,423 units annually and reached a peak of 9,421 units in 2022 Q3.

- Between 2018 Q4 and 2023 Q3, net absorption in the metro area has averaged 21,744 units annually and reached a peak of 16,881 units in 2021 Q2.

TC Hall, LLC - Land Value

## Submarket Overview

The subject is located in the Uptown/Park Cities submarket as defined by CoStar. Submarket boundaries are illustrated in the map below.



Trended supply and demand statistics, including inventory levels, absorption, vacancy, and rental rates for all classes of space are presented in the following table.

TC Hall, LLC - Land Value

**All Multifamily Uptown/Park Cities Submarket Trends**

| Period | Stock | Demand | Vacancy | Net Completions 12 Months | Under Construction Stock | Net Absorption 12 Months | Asking Rent | Rent Growth 12 Month | Price Growth | Cap Rate |
|---|---|---|---|---|---|---|---|---|---|---|
| 2013 Q3 | 16,227 | 15,213 | 6.25% | 401 | 4,834 | 523 | $1,905 | 3.74% | 4.07% | 5.94% |
| 2014 Q3 | 18,608 | 16,715 | 10.18% | 2,381 | 3,394 | 1,501 | $1,964 | 3.13% | 7.23% | 5.76% |
| 2015 Q3 | 20,928 | 18,532 | 11.45% | 2,320 | 2,784 | 1,818 | $2,031 | 3.41% | 7.45% | 5.57% |
| 2016 Q3 | 22,763 | 20,349 | 10.61% | 1,835 | 4,016 | 1,818 | $2,044 | 0.63% | 2.89% | 5.58% |
| 2017 Q3 | 24,578 | 21,684 | 11.77% | 1,815 | 2,750 | 1,336 | $2,057 | 0.64% | 3.52% | 5.56% |
| 2018 Q3 | 26,333 | 23,092 | 12.31% | 1,755 | 1,437 | 1,409 | $2,077 | 0.94% | 1.51% | 5.58% |
| 2019 Q3 | 27,412 | 24,699 | 9.90% | 1,079 | 675 | 1,608 | $2,111 | 1.65% | 5.26% | 5.51% |
| 2020 Q3 | 27,425 | 25,029 | 8.74% | 13 | 1,846 | 330 | $2,078 | -1.55% | 3.77% | 5.34% |
| 2021 Q3 | 28,516 | 26,417 | 7.36% | 1,091 | 1,685 | 1,388 | $2,330 | 12.09% | 17.47% | 4.81% |
| 2022 Q3 | 29,700 | 27,348 | 7.92% | 1,184 | 501 | 930 | $2,471 | 6.05% | 5.08% | 5.00% |
| 2023 Q3 | 29,277 | 27,339 | 6.62% | -423 | 1,561 | -10 | $2,451 | -0.80% | -9.02% | 5.67% |
| 2024 Q3 | 29,640 | 27,384 | 7.61% | 363 | 0 | 46 | $2,458 | 0.30% | -13.24% | 6.53% |
| 2025 Q3 | 30,730 | 28,069 | 8.66% | 1,090 | 0 | 685 | $2,559 | 4.12% | 4.55% | 6.53% |
| 2026 Q3 | 30,820 | 28,500 | 7.53% | 90 | 0 | 431 | $2,653 | 3.67% | 8.87% | 6.25% |
| 2027 Q3 | 31,159 | 28,885 | 7.30% | 339 | 0 | 383 | $2,735 | 3.08% | 9.13% | 5.92% |

Source: CoStar, Inc.; compiled by Integra Realty Resources, Inc.

- The Uptown/Park Cities submarket comprises 3.5% of the metro building stock and 3.6% of the metro building demand.

- The vacancy rate in the Uptown/Park Cities submarket is 6.62%, which is less than the metro area's average of 9.37%.

- Uptown/Park Cities market rate is $2,451/unit which is greater than the metro area's average rate of $1,524/unit.

**Uptown/Park Cities Submarket Trends and Forecasts**



Source: CoStar, Inc.; compiled by Integra Realty Resources, Inc.

TC Hall, LLC - Land Value

- The current vacancy rate in the submarket area is 6.62%; the vacancy rate has decreased by 74 bps from 2021 Q3.

- Two-year Base Case forecasts project a 8.66% vacancy rate in the submarket area, representing an increase of 204 bps by 2025 Q3.

- Asking rent averages $2,451/unit in the submarket area, and values have increased by 5.18% from 2021 Q3.

- Two-year Base Case forecasts project a $2,559/unit asking rent in the submarket area, representing an increase of 4.43% by 2025 Q3.



Source: CoStar, Inc.; compiled by Integra Realty Resources, Inc.

- The total stock (units) has increased by 2.67% from 2021 Q3, while the demand has increased by 3.49%.

- Between 2018 Q4 and 2023 Q3, net completions in the submarket area have averaged 589 units annually and reached a peak of 596 units in 2021 Q2.

- Between 2018 Q4 and 2023 Q3, net absorption in the submarket area has averaged 849 units annually and reached a peak of 614 units in 2021 Q2.

TC Hall, LLC - Land Value

**Multifamily Market Forecast Comparisons**



Source: CoStar, Inc.; compiled by Integra Realty Resources, Inc.



Source: CoStar, Inc.; compiled by Integra Realty Resources, Inc.



Source: CoStar, Inc.; compiled by Integra Realty Resources, Inc.

## Multifamily Market Outlook and Conclusions

Based on the key metro and submarket area trends, construction outlook, and the performance of competing properties, IRR expects the mix of property fundamentals and economic conditions in the DFW metro area to have a positive impact on the subject property's performance in the near-term.

TC Hall, LLC - Land Value

APP000181

## Surrounding Area Analysis

The subject is located in the "Oak Lawn/Turtle Creek" area of Dallas, an affluent neighborhood adjacent to "Uptown" and located north of the Dallas Central Business District. This area is one of the wealthiest areas of Dallas with upscale townhomes, condos, apartments, and mid- to high-rise offices. Area boundaries and delineation are indicated in the following table. A map identifying the location of the property follows this section.

| Boundaries & Delineation | |
| --- | --- |
| **Boundaries** | |
| Market Area | Dallas-Fort Worth, TX |
| Submarket | Dallas |
| Area Type | Urban |
| **Delineation** | |
| North | Lemmon Avenue |
| South | Woodall Rogers Freeway |
| East | US-75 (N. Central Expressway) |
| West | Dallas North Tollway |

## Access and Linkages

Primary access and linkages to the subject area, including highways, roadways, public transit, traffic counts, and airports, are summarized in the following table.

| Access & Linkages | |
| --- | --- |
| **Vehicular Access** | |
| Major Highways | US-75 / Woodall Rogers Freeway / North Dallas Tollway |
| Primary Corridors | Oak Lawn Avenue / Lemmon Avenue / Turtle Creek Boulevard |
| Vehicular Access Rating | Good |
| **Public Transit** | |
| Providers | Dallas Area Rapid Transit (DART) |
| Transit Access Rating | Average |
| **Airport(s)** | |
| Name | 4 miles (Love Field), 18 miles (DFW Airport) |
| Driving Time | 11 minutes (Love Field), 22 minutes (DFW) |
| Primary Transportation Mode | Automobile |

Furthermore, the Dallas, TX Central Business District (CBD), the economic and cultural center of the region, is approximately two/2 miles from the property.

TC Hall, LLC - Land Value

APP000182

## Demand Generators

Uptown and Oak Law/Turtle Creek are upscale neighborhoods that are one of the most pedestrian-friendly areas of Dallas. The district is one of the densest in Dallas with a diverse mix of office, residential towers, apartment complexes, retail centers, night life, and hotels. The area is an attractive destination with significant drawing power for the region. The daytime population is estimated between 18.000 to 30,000. The typical generators of demand affecting the subject property and its market are discussed and analyzed below.

## Demographics

A demographic profile of the surrounding area, including population, households, and income data, is presented in the following table.

**Surrounding Area Demographics**

| 2023 Estimates | 5-Minute Drive Time | 10-Minute Drive Time | 15-Minute Drive Time | Dallas County, TX | Dallas-Fort Worth-Arlington, TX |
|---|---|---|---|---|---|
| Population 2020 | 30,958 | 280,697 | 750,818 | 2,613,539 | 7,637,387 |
| Population 2023 | 31,286 | 284,170 | 753,485 | 2,612,622 | 7,933,171 |
| Population 2028 | 32,146 | 293,067 | 767,434 | 2,646,900 | 8,329,332 |
| Compound % Change 2020-2023 | 0.4% | 0.4% | 0.1% | 0.0% | 1.3% |
| Compound % Change 2023-2028 | 0.5% | 0.6% | 0.4% | 0.3% | 1.0% |
| | | | | | |
| Households 2020 | 17,835 | 144,536 | 326,568 | 965,537 | 2,760,991 |
| Households 2023 | 18,014 | 146,980 | 329,676 | 968,801 | 2,867,378 |
| Households 2028 | 18,519 | 152,599 | 338,584 | 986,837 | 3,013,369 |
| Compound % Change 2020-2023 | 0.3% | 0.6% | 0.3% | 0.1% | 1.3% |
| Compound % Change 2023-2028 | 0.6% | 0.8% | 0.5% | 0.4% | 1.0% |
| | | | | | |
| Median Household Income 2023 | $99,657 | $79,809 | $66,368 | $67,269 | $81,082 |
| Average Household Size | 1.7 | 1.9 | 2.2 | 2.7 | 2.7 |
| College Graduate % | 73% | 59% | 44% | 32% | 36% |
| Median Age | 35 | 36 | 35 | 35 | 36 |
| Owner Occupied % | 33% | 31% | 38% | 50% | 60% |
| Renter Occupied % | 67% | 69% | 62% | 50% | 40% |
| Median Owner Occupied Housing Value | $641,271 | $608,917 | $424,238 | $266,954 | $318,993 |
| Median Year Structure Built | 1999 | 1989 | 1979 | 1981 | 1990 |
| Average Travel Time to Work in Minutes | 25 | 26 | 28 | 31 | 31 |

Source: Claritas

As shown above, the current population within a 10-minute drive time of the subject is 284,170, and the average household size is 1.9. Population in the area has grown since the 2020 census, and this trend is projected to continue over the next five years. Compared to Dallas County overall, the population within a 10-minute drive time is projected to grow at a faster rate.

Median household income is $79,809, which is higher than the household income for Dallas County. Residents within a 10-minute drive time have a considerably higher level of educational attainment than those of Dallas County, while median owner-occupied home values are considerably higher.

TC Hall, LLC - Land Value

APP000183

## Land Use

The Uptown and Oak Lawn/Turtle Creek neighborhoods are densely developed with a mix of residential properties converted to commercial use, mid-rise and high-rise office, apartments, retail establishments, restaurants, bars, and hotels. Improvements range in age dating back to the 1920's.

Immediate land use characteristics of the area are summarized below.

### Immediate Surroundings

| | |
|---|---|
| North | Residential condominium |
| South | Residential condominium |
| East | Lee Park |
| West | Residential condominium |



## Development Activity and Trends

There is a growing presence of multi-family residential in the subject neighborhood which are typically housed in low to mid-rise buildings. However, several high-rise projects have been developed over the past decade. The subject neighborhood is densely developed with little vacant land available for new development. Developers are increasingly looking to assemble properties to building mid-to high-rise mixed-used developments. The subject neighborhood has several high-profile developments. The most important are discussed as follows:

- **West Village & Knox Henderson** is located between "Uptown" and "Greenville", is one of the city's most vibrant nightlife districts. The shopping scene centers on high-end home furnishings. The **Katy Trail**, a former railroad that's now a popular jogging and cycling route, runs along the area's west edge.

- **Knox Street Mixed-Use Project** – The high-rise Knox Street project is under construction on four-acres located adjacent to the Katy Trail and Highland Park and is expected to open in 2026. The one million square-foot project will feature a luxury hotel and condominiums, a 27-story multifamily building, nine floors of offices above two stories of retail and restaurants, and a half-acre park connected to the Katy Trail. The Knox Hotel and Residences will feature a 140-room hotel and 48 ultra-luxury condominiums ranging from 2,500 square feet to more than 15,000 square feet. The hotel will include restaurants, bars and lounges, expansive event spaces, a full-floor spa and wellness destination connected to an outdoor pool and bar with expansive views of downtown Dallas. The private residential amenities include a clubroom, a bar and lounge, entertaining spaces, a fitness center, and an indoor pool. The multifamily development will include a 27-story, 173-unit multifamily building featuring expansive amenity spaces, ultra-luxury interiors, and oversized balconies. Fronting Knox Street, the development's 150,000 square-foot office building will rise nine stories with amenities to include a fitness center, a tenant lounge, and a café. The project represents a joint venture partnership of MSC Partners, Trammell Crow Company, The Retail Connection, and Highland Park Village Associates.

- **Oak Lawn** is one of the wealthier parts of Dallas, with many professionals and urban types living in upscale townhouses, condos, apartments, and duplexes. Along the Uptown portion on McKinney Avenue and along Turtle Creek Boulevard, there are many new high-rise condominiums and apartments. It is also a very diverse neighborhood with well-established areas of older, single-family homes. Oak Lawn is known for its premium restaurants as well as its many bars and clubs. Running through the center of Oak Lawn from downtown to Love Field is Cedar Springs Road. The first luxury high-rise along Turtle Creek, 3525 Turtle Creek Boulevard, was announced in 1957, a strip that has since become Dallas' version of Chicago's Gold Coast.

- **Uptown** is a public improvement district north of and adjacent to downtown Dallas and is bordered by US-75 (Central Expressway) on the east, N. Haskell Avenue on the northeast, the Katy Trail on the northwest, Bookhout Street and Cedar Springs Road on the west, N. Akard Street on the southwest and Spur 366 (Woodall Rodgers Freeway) on the south. The district is one of the most dense in Dallas and is home to a diverse set of establishments including office buildings, residential towers, apartment complexes, retail centers, nightlife strips, and hotels. This mixed-use development practice leads to an urban lifestyle for its residents.

TC Hall, LLC - Land Value



APP000185

- **Granite Properties and Gables Residential** have partnered to develop two towers, one residential and one office, as part of a development at the northwest intersection of McKinney Avenue, North Akard Street, and Cedar Springs Road. The 2.2-acre site, known as 1717 McKinney, is on the edge of downtown and Uptown. The 26-story, residential tower will offer 20 stories of living space over six floors of parking. Because of differences in construction requirements, the residential high-rise is about the same height as the office tower and will have 292 units with balconies. Residences will have views of Uptown, downtown and the future Woodall Rodgers Park and Calatrava Bridge. The Granite office tower will contain 19 stories of office space on top of six levels of parking with a total of 361,524 square feet of space. Plans also call for a one-acre, heavily landscaped amenity deck on the seventh-floor level between the towers. The deck will feature a 4,000 square foot fitness center and outdoor infinity-edge pool in a park-like setting that overlooks Victory Park and downtown.

- **Crescent Hotel** located in the "Uptown Oak Lawn and Turtle Creek" area of downtown Dallas represents one of the finest luxury hotels in Dallas. Accommodations range from single rooms to lavish two-story suites with private kitchens. The hotel features a year-round outdoor pool and spa/fitness centre, a variety of dining options, as well as two ballrooms with outdoor space for large receptions, a series of boardrooms, and small meeting rooms.

- **1999 McKinney Avenue Apartments** have sweeping views of Downtown and Turtle Creek which are the focal points of each two-story loft home. Impeccable craftsmanship, spacious balconies, sleek modern appliances, sophisticated amenities, impressive features, and genuine personal service are the finishing touches to superior city living. Easy Uptown access is available to the American Airlines Center, the "Arts District", restaurants, retail shops, and museums. With the trolley at the front door, residents can consider themselves well-connected —in a very Uptown sort of way.

- **3500 McKinney Avenue** is the site of a former Tom Thumb grocery store that is planned for redevelopment to Central Market anchored mixed-use development that will include 800 apartment units and commercial space. The development is still in the planning phase with completion expected in late 2023 and early 2024.

- **McKinney and Olive** is a 530,000+ square foot, 20-story mixed-use project built in 2016. It was built on one of the last large empty blocks north of downtown Dallas. The office tower's lower floors include retail and restaurant space with almost one-acre of outdoor public space. McKinney and Olive is located across from the Ritz-Carlton Hotel and Residences. Retail and office rents in the building are in the mid $40s to $50s per square foot.

- **Harwood District**, located in the heart of "Uptown" includes more than 5 million square feet of Class A office, residential, and retail space in a park like campus with gardens and a museum. The District of Harwood began in 1984 with the opening of Harwood No. 1 (subject property).

- **23 Springs** is a Class AA office building under construction along Cedar Springs Road across from The Crescent. The building broke ground in 2022 with an expected completion date in Summer 2025. The property will include 625,000 +/- SF of office space, high-end fitness center, and 17,000 SF of ground level restaurant space.

TC Hall, LLC - Land Value

**irr**

APP000186

- **Ardan West Village** is a 23-story, 393-unit luxury residential towner located at 2975 Blackburn Street. The project opened in mid-2018 and features 25 penthouses and more than 10,000 square feet of indoor amenities and an outdoor pool deck with cabana lounges, grilling stations, bistro seating, and fire pits.

- **Park District** is a two-tower, mixed-use development with more than 900,000 square feet of Class A office space, restaurants, and luxury residences. The development is located at 2121 Woodall Rodgers Freeway across from Klyde Warren Park. The project was complete in 2018 and offers residents pedestrian access to restaurants, retail, performing arts venues, and urban green space.

- **Residences at The Ritz-Carlton**, Dallas, are a unique urban oasis. The Tower Residences feature 95 luxury homes of one to three bedrooms as well as two spacious penthouses, all located in Uptown's most exclusive neighborhood. This 23-story Regency-style building created by renowned architect Robert A.M. Stern and Hayslip Interior Design Company complements the Ritz-Carlton neighborhood. Its state-of-the-art features and amenities include an outdoor resort style pool, winetasting room, manicured grounds, and the legendary Ritz-Carlton service. Nearby art galleries and high-end retailers make The Tower Residences lifestyle even richer and more exciting.

- **Boston based Carpenter & Company Inc.** has made a deal with Hillwood to buy a 3-acre site across from Hillwood's headquarters on Turtle Creek. Although a 17-story, 360,000-square-foot office building was previously being planned on the site, the new partners have planned a 250- room Four Seasons hotel that will be part of a larger mixed-use project that would include about 100 luxury condos, 100,000 square feet of office space and numerous amenities including restaurants, bars, a spa, health club and a small ballroom. The project is expected to cost around $750 million to build and will require a rezoning.

- **Klyde Warren Park** is a 5.2-acre deck park designed to create an urban green space over Woodall Rodgers Freeway between Pearl and St. Paul Streets. It provides connectivity to the city's flourishing Arts District from other neighborhoods, brings together cultural events and experiences, and serves as a central public gathering space for Dallas residents and visitors to enjoy. Designed by landscape architecture firm (The Office of James Burnett), the park features flexible, pedestrian-oriented design, offering a mix of active and passive spaces, which include a children's park, reading room, great lawn, restaurant, performance pavilion, fountain plaza, games area, urban dog park, and botanical garden around a sweeping pedestrian promenade. A 6,000 square-foot restaurant and performance stage, designed by Thomas Phifer and Partners, is in the center of the park. In addition, it provides jogging trails, a children's playground, and an area for games.

- **American Airlines Center**, constructed in 2001, resulted in increased interest in residential and supporting retail uses. This major sports arena is the home of two major professional sporting teams (Dallas Stars and Dallas Mavericks). The neighborhood is a strong commercial based area that is a major employment center for the residential areas in Dallas and surrounding suburban cities. Surrounding the American Airlines Center is a master-planned development which will include office, retail, and residential properties. The "W" Hotel is a 251-room luxury hotel with 94 upscale residential condominium units.

TC Hall, LLC - Land Value



APP000187

- **Victory Park**, a 75-acre neighborhood located at the northeast quadrant of IH-35 and Woodall Rodgers Freeway, is filled with options for upscale shopping, dining, entertainment and nightlife, yet only steps away from jogging trails like the Katy Trail and green spaces. Victory Park is in the heart of the "new Dallas" – an area on the northwest side of downtown. More than $6.5 billion in new construction is now under development in Victory Park and the area surrounding it, from the Calatrava Bridges to the Arts District and Woodall Rodgers Park to the Perot Museum of Nature and Science. The Victory Park neighborhood is the crossroads for nearby urban districts, from Uptown to the Design District to the Central Business District and steps away from the DART commuter rail station and the Trinity Railway Express connecting Victory Park to Dallas and Fort Worth. Today, Victory Park is one of the "greenest" developments in the country. More than 1,000 trees have been planted in the neighborhood and all of the electricity in Victory Park is purchased from providers generating 100% renewable energy.

- There is continued growth and expansion of **Children's Medical Hospital**, **Parkland Hospital**, and the **University of Texas Southwestern Medical School**. This medical district is reported to have over 20,000 employees with over 4,000 students.

- The **Trinity River Corridor Project** will transform a flood protection solution into an opportunity for community revitalization with the proposed construction of three signature bridges by Santiago Calatrava, a 20,000 square foot Audubon Center, a trail system, and a Horse Park. At 10,000 acres, Dallas is creating one of the largest urban parks in America.

## Outlook and Conclusions

In conclusion, the subject neighborhood is situated in an upscale area of Dallas which is also complemented with the highly affluent residential neighborhoods of Highland Park and University Park. The neighborhood is highly accessible from nearby highways, tollway, and other major localized thoroughfares and is readily accessible to various employment centers. In addition, schools, hospitals, neighborhood shopping, recreation areas, and cultural activities are in the immediate area or located nearby. The neighborhood is in its stable to revitalization cycle. The steady development in and around the subject neighborhood provides attractive environs for future development. We anticipate that property values will increase in the near future.

TC Hall, LLC - Land Value



## Surrounding Area Map



APP000189

# Property Analysis

## Land Description and Analysis

### Location

The property is located on the west side of Hall Street, approximately 50 feet north of its intersection with Turtle Creek Boulevard.

### Land Area

As discussed, a survey was not provided. As such, we have utilized the land size as obtained from the Dallas Central Appraisal District. The following table summarizes the subject's land area.

**Land Area Summary**

| Tax ID | SF | Acres |
|---|---|---|
| 00000137548000000 | 8,600 | 0.20 |
| 00000137545000000 | 12,648 | 0.29 |
| Total | 21,248 | 0.49 |

Source: Public Records

### Shape and Dimensions

The site is rectangular in shape, with dimensions of approximately 118 feet in width and 225 feet in depth. Site utility based on shape and dimensions is average.

### Topography

The site is generally level and at street grade. The topography does not result in any particular development limitations.

### Drainage

No particular drainage problems were observed or disclosed at the time of field inspection. This appraisal assumes that surface water collection, both on-site and in public streets adjacent to the subject, is adequate.

## Flood Hazard Status

The following table indicates applicable flood hazard information for the subject property, as determined by review of available flood maps obtained from the Federal Emergency Management Agency (FEMA).

| Flood Hazard Status | |
| --- | --- |
| Community Panel Number | 48113C0345J |
| Date | August 23, 2001 |
| Zone | X |
| Description | Outside of 500-year floodplain |
| Insurance Required? | No |

## Environmental Hazards

An environmental assessment report was not provided for review, and during the inspection, no obvious signs of contamination on or near the subject were observed. However, environmental issues are beyond the scope of expertise of the assignment participants. It is assumed the property is not adversely affected by environmental hazards.

## Ground Stability

A soils report was not provided for review. Based on the inspection of the subject and observation of development on nearby sites, there are no apparent ground stability problems. However, soils analyses are beyond the scope of expertise of the assignment participants. It is assumed the subject's soil bearing capacity is sufficient to support a variety of uses, including those permitted by zoning.

## Streets, Access and Frontage

Details pertaining to street access and frontage are provided in the following table.

| Streets, Access and Frontage | |
| --- | --- |
| Street | Hall |
| Frontage Feet | 118 |
| Paving | Concrete |
| Curbs | Yes |
| Sidewalks | Yes |
| Lanes | 2 way, 1 lane each way |
| Direction of Traffic | North/South |
| Condition | Average |
| Traffic Levels | Moderate |
| Signals/Traffic Control | None |
| Access/Curb Cuts | None |
| Visibility | Above average |

## Utilities

Utilities available to the subject are summarized below.

| Utilities | |
|---|---|
| Service | Provider |
| Water | City of Dallas |
| Sewer | City of Dallas |

## Zoning

The subject is within PD-193 (planned development district) and subject to the restrictions within the Multi-family zone, which is intended for office, multi-family and other commercial uses. The following table summarizes the applicable zoning requirements affecting the subject.

| Zoning Summary | |
|---|---|
| Zoning Jurisdiction | City of Dallas |
| Zoning Designation | PD-193 (Planned Development) |
| Description | Multi-family |
| Legally Conforming? | N/A |
| Zoning Change Likely? | Possible |
| Permitted Uses | Office and multi-family |
| Category | Zoning Requirement |
| Maximum Floor Area Ratio | 4.5:1 |

According to the local planning department, there are no pending or prospective zoning changes.

Interpretation of zoning ordinances is beyond the scope of expertise of the assignment participants. An appropriately qualified land use attorney should be engaged if a determination of compliance is required.

## Other Land Use Regulations

There are no other known land use regulations that would affect the property.

## Easements, Encroachments and Restrictions

Based upon a review of the deed and property survey, there are no apparent easements, encroachments, or restrictions that would adversely affect value. This valuation assumes no adverse impacts from easements, encroachments, or restrictions, and further assumes that the subject has clear and marketable title.

TC Hall, LLC - Land Value



APP000192

## Conclusion of Site Analysis

Overall, the physical characteristics and the availability of utilities result in a functional site, suitable for a variety of uses including those permitted by zoning. Uses permitted by zoning include office and multi-family. No other restrictions on development are apparent.

TC Hall, LLC - Land Value











TC Hall, LLC - Land Value

## Aerial Photograph



**Tax Plat Map**





**Flood Hazard Map**



APP000197

## Real Estate Taxes

The Dallas Central Appraisal District does assessment on a countywide basis. Because assessed value is typical the result of a mass appraisal process based more on statistical probability than individual property characteristics, it should be noted that there is frequently a difference between assessed value and market value for an individual property. The tax rates are set in October of each year. The tax rates for 2023 for the taxing authorities are calculated to be 2.294781%.

Real estate taxes and assessments for the current tax year are shown in the following table.

**Taxes and Assessments - 2023**

| Tax ID | Assessed Value | | | Taxes and Assessments | | |
| | Land | Improvements | Total | Tax Rate | Ad Valorem Taxes | Total |
|---|---|---|---|---|---|---|
| 00000137548000000 | $946,000 | $0 | $946,000 | 2.294781% | $21,709 | $21,709 |
| 00000137545000000 | $1,391,280 | $0 | $1,391,280 | 2.294781% | $31,927 | $31,927 |
| | $2,337,280 | $0 | $2,337,280 | | $53,635 | $53,635 |

The subject is currently assessed as part of two tax accounts that total 0.49 acres, or 21,248 square feet. Utilizing the tax district's per acre assessment of $2,337,280, the subject is assessed at a value of $110.00 per gross square foot. Based on the concluded market value of the subject, the assessed value appears low.

Texas is a non-disclosure State with a mandate to assess property at 100% of market value. Some Texas County Assessors are more successful at achieving the mandate than others. In Texas Counties with little or no transaction activity, values can lag the market. However, there is no limit on increases in the event of a re-assessment.

Property owners in Texas may protest ad valorem assessments using the one of two tests, 1) Market Value or 2) "Equal Appraisal". Market Value is self-explanatory. "Equal Appraisal" means there is a burden on the District's Assessor to ensure mass appraisal methods produce consistent results from property to property. To measure equality, the Appraisal Review Board will consider the assessed values of competing properties in the District. The process involves generation of "ratio study" in which, after appropriate adjustments, the "median value" is the conclusion of "Equal Appraisal".

irr

APP000198

## Highest and Best Use

The highest and best use of a property is the reasonably probable use resulting in the highest value, and represents the use of an asset that maximizes its productivity.

### Process

Before a property can be valued, an opinion of highest and best use must be developed for the subject site, both as though vacant, and as improved or proposed. By definition, the highest and best use must be:

- Physically possible.

- Legally permissible under the zoning regulations and other restrictions that apply to the site.

- Financially feasible.

- Maximally productive, i.e., capable of producing the highest value from among the permissible, possible, and financially feasible uses.

### As Though Vacant

First, the property is evaluated as though vacant, with no improvements.

**Physically Possible**

The physical characteristics of the site do not appear to impose any unusual restrictions on development. Overall, the physical characteristics of the site and the availability of utilities result in functional utility suitable for a variety of uses.

**Legally Permissible**

The site is zoned PD-193 (Planned Development), Multi-family. Permitted uses include office and multi-family. There are no apparent legal restrictions, such as easements or deed restrictions, effectively limiting the use of the property. Given current zoning and prevailing land use patterns in the area, only multi-family is given further consideration in determining highest and best use of the site, as though vacant.

**Financially Feasible**

Based on the accompanying analysis of the market, there is currently adequate demand for multi-family in the subject's area. It appears a newly developed multi-family on the site would have a value commensurate with its cost. Therefore, multi-family is considered to be financially feasible.

**Maximally Productive**

There does not appear to be any reasonably probable use of the site that would generate a higher residual land value than multi-family. Accordingly, multi-family, developed to the normal market density level permitted by zoning, is the maximally productive use of the property.

TC Hall, LLC - Land Value



APP000199

**Conclusion**

Development of the site for multi-family is the only use which meets the four tests of highest and best use. Therefore, it is concluded to be the highest and best use of the property as though vacant.

**Most Probable Buyer**

Taking into account the characteristics of the site, as well as area development trends, the probable buyer is a developer.



# Valuation

## Valuation Methodology

Appraisers usually consider three approaches to estimating the market value of real property. These are the cost approach, sales comparison approach and the income capitalization approach.

The **cost approach** assumes that the informed purchaser would pay no more than the cost of producing a substitute property with the same utility. This approach is particularly applicable when the improvements being appraised are relatively new and represent the highest and best use of the land or when the property has unique or specialized improvements for which there is little or no sales data from comparable properties.

The **sales comparison approach** assumes that an informed purchaser would pay no more for a property than the cost of acquiring another existing property with the same utility. This approach is especially appropriate when an active market provides sufficient reliable data. The sales comparison approach is less reliable in an inactive market or when estimating the value of properties for which no directly comparable sales data is available. The sales comparison approach is often relied upon for owner-user properties.

The **income capitalization approach** reflects the market's perception of a relationship between a property's potential income and its market value. This approach converts the anticipated net income from ownership of a property into a value indication through capitalization. The primary methods are direct capitalization and discounted cash flow analysis, with one or both methods applied, as appropriate. This approach is widely used in appraising income-producing properties.

Reconciliation of the various indications into a conclusion of value is based on an evaluation of the quantity and quality of available data in each approach and the applicability of each approach to the property type.

The methodology employed in this assignment is summarized as follows:

**Approaches to Value**

| Approach | Applicability to Subject | Use in Assignment |
|---|---|---|
| Cost Approach | Not Applicable | Not Utilized |
| Sales Comparison Approach | Applicable | Utilized |
| Income Capitalization Approach | Not Applicable | Not Utilized |



## Sales Comparison Approach

To develop an opinion of the subject's land value, as though vacant and available to be developed to its highest and best use, the sales comparison approach is used. This approach develops an indication of value by researching, verifying, and analyzing sales of similar properties. The research focused on transactions within the following parameters:

- Location: Immediate Market Area

- Size: 2.0 Acres or Less

- Use: Multi-family or Mixed-use

- Transaction Date: Past 12 Months

For this analysis, price per square foot is used as the appropriate unit of comparison because market participants typically compare sale prices and property values on this basis. The most relevant sales are summarized in the following table:

**Summary of Comparable Land Sales**

| No. | Name/Address | Sale Date; Status | Sale Price | SF; Acres | Units; Density (Units/Ac.) | Zoning | $/Unit | $/SF Land |
|---|---|---|---|---|---|---|---|---|
| 1 | Wimbledon Place Condominiums | Jun-23 | $20,000,000 | 69,772 | 139 | PD 193 (Planned | $143,885 | $286.65 |
|  | South corner of Brown Street and Hood Street | Closed |  | 1.60 | 86.8 | Development) |  |  |
|  | Dallas |  |  |  |  |  |  |  |
|  | Dallas County |  |  |  |  |  |  |  |
|  | TX |  |  |  |  |  |  |  |
|  | Comments: This 26-unit condominium project was purchased for land value. Plans are for multi-family development at a higher density. Sale was subject to rezoning to allow for 139 units. | | | | | | | |
| 2 | Multi-family site - Dallas CBD | Jun-23 | $12,886,746 | 47,729 | 375 | CA-1 | $34,365 | $270.00 |
|  | West side of N. Pearl Street, north of Bryan Street; also fronts east side of Olive Street | Closed |  | 1.10 | 342.2 |  |  |  |
|  | Dallas |  |  |  |  |  |  |  |
|  | Dallas County |  |  |  |  |  |  |  |
|  | TX |  |  |  |  |  |  |  |
|  | Comments: This property is to be a 375-unit residential tower with 37 floors. The building will include 7,300 square feet of ground-floor restaurant space and a 2,500-square-foot outdoor plaza overlooking a small park. The site allows for a 20:10 FAR. | | | | | | | |
| 3 | Land - Dallas, TX | Jan-23 | $6,500,000 | 28,600 | 33 | PD-193 (Planned | $196,970 | $227.27 |
|  | East side of McKinney Avenue, south of Monticello Avenue | Closed |  | 0.66 | 50.3 | Development) |  |  |
|  | Dallas |  |  |  |  |  |  |  |
|  | Dallas County |  |  |  |  |  |  |  |
|  | TX |  |  |  |  |  |  |  |
|  | Comments: The site is located in PD 193 allowing for only a 36' height but is expected to be rezoned with the adjacent property that has a higher density allowance. The site presently does not have a maximum FAR, but is restricted to 36' in height which would translate to a very low FAR. We have estimated the density to be approximately 50 units per acre. This site was purchased by the adjacent property owner for redevelopment as a mixed-use project. It is noted that the adjacent property is zoned LC and allows for a 4.5:1 FAR. | | | | | | | |
| | **Subject** | | | 21,248 | 0 | PD-193 (Planned | | |
| | TC Hall, LLC - Land Value | | | 0.49 | 0.0 | Development) | | |
| | Dallas, TX | | | | | | | |



APP000202

## Comparable Land Sales Map



APP000203



Sale 1
Wimbledon Place Condominiums



Sale 2
Multi-family site - Dallas CBD



Sale 3
Land - Dallas, TX

TC Hall, LLC - Land Value

APP000204

## Analysis and Adjustment of Sales

Adjustments are based on a rating of each comparable sale in relation to the subject. The adjustment process is typically applied through either quantitative or qualitative analysis, or a combination of both analyses. Quantitative adjustments are often developed as dollar or percentage amounts and are most credible when there is sufficient data to perform a paired sales analysis.

While percentage adjustments are presented in the adjustment grid, they are based on qualitative judgment rather than empirical research, as there is not sufficient data to develop a sound quantitative estimate. Although the adjustments appear to be mathematically precise, they are merely intended to illustrate an opinion of typical market activity and perception. With the exception of market conditions, the adjustments are based on a scale, with a minor adjustment in the range of 1-5% and a substantial adjustment considered to be 20% or greater.

The rating of each comparable sale in relation to the subject is the basis for the adjustments. If the comparable is superior to the subject, its sale price is adjusted downward to reflect the subject's relative attributes; if the comparable is inferior, its price is adjusted upward.

Transactional adjustments are applied for property rights conveyed, financing, conditions of sale, expenditures made immediately after purchase, and market conditions. In addition, property adjustments include – but are not limited to – location, access/exposure, size, quality, effective age, economic and legal characteristics, and non-realty components of value. Adjustments are considered for the following factors, in the sequence shown below.

## Transactional Adjustments

### Real Property Rights Conveyed

The opinion of value in this report is based on a fee simple estate, subject only to the limitations imposed by the governmental powers of taxation, eminent domain, police power and escheat, as well as non-detrimental easements, community facility districts, and conditions, covenants and restrictions (CC&Rs). All the comparables represent fee simple estate transactions. Therefore, adjustments for property rights are not necessary.

### Financing Terms

In analyzing the comparables, it is necessary to adjust for financing terms that differ from market terms. Typically, if the buyer retained third-party financing (other than the seller) for the purpose of purchasing the property, a cash price is presumed and no adjustment is required. However, in instances where the seller provides financing as a debt instrument, a premium may have been paid by the buyer for below-market financing terms, or a discount may have been demanded by the buyer if the financing terms were above market. The premium or discounted price must then be adjusted to a cash equivalent basis. The comparable sales represented cash-to-seller transactions and, therefore, do not require adjustment.

TC Hall, LLC - Land Value



**Conditions of Sale**

Adverse conditions of sale can account for a significant discrepancy from the sale price actually paid, compared to that of the market. This discrepancy in price is generally attributed to the motivations of the buyer and the seller. Certain conditions of sale are considered non-market and may include the following:

- a seller acting under duress (e.g., eminent domain, foreclosure);

- buyer motivation (e.g., premium paid for assemblage, certain 1031 exchanges);

- a lack of exposure to the open market;

- an unusual tax consideration;

- a sale at legal auction.

None of the comparable sales had atypical or unusual conditions of sale. Thus, adjustments are not necessary.

**Expenditures Made Immediately After Purchase**

This category considers expenditures incurred immediately after the purchase of a property. There were no issues of deferred maintenance reported for any of the properties. No adjustments are required for expenditures after sale.

*Market Conditions*

A market conditions adjustment is applied when market conditions at the time of sale differ from market conditions as of the effective date of value. Adjustments can be positive when prices are rising, or negative when markets are challenged by factors such as a deterioration of the economy or adverse changes in supply and/or demand in the market area. Consideration must also be given to when the property was placed under contract, versus when the sale actually closed.

In evaluating market conditions, changes between the comparable sale date and the effective date of this appraisal may warrant adjustment; however, if market conditions have not changed, then no adjustment is required.

In addition to transaction data, which is slowly materializing, we have interviewed market participants (developers, investors, lenders, brokers) as a leading indicator of where the market is currently, and where they believe the market is heading. These survey results have been analyzed and incorporated into our analysis and conclusions.

The sales took place from November 2021 to September 2022. Until mid-year 2022, market conditions had generally been strengthening in the subject's market area. However, since the rapid increase in interest rates during 2022, value increases have been tempered and currently remain flat. Thus, the adjustment grid accounts for this trend with upward adjustments through June 1, 2022, with no change through the date of valuation.

TC Hall, LLC - Land Value



APP000206

## Property Adjustments

### Location

Factors considered in evaluating location include, but are not limited to, demographics, growth rates, surrounding uses and property values.

All of the comparables are similar to the subject. No adjustments are necessary.

### Access/Exposure

Convenience to transportation facilities, ease of site access, and overall visibility of a property can have a direct impact on property value. High visibility, however, may not translate into higher value if it is not accompanied by good access. In general, high visibility and convenient access, including proximity to major linkages, are considered positive amenities when compared to properties with inferior attributes.

Sale 2 is similar to the subject and requires no adjustment. Sales 1 and 3 are superior to the subject. Downward adjustments are applied.

### Size

Due to economies of scale, the market exhibits an inverse relationship between land area and price per square foot, such that larger sites generally sell for a lower price per square foot than smaller lots, all else being equal. To account for this relationship, applicable adjustments are applied for differences in land area. The comparables that are larger than the subject are adjusted upward, and vice versa.

All of the comparables are similar to the subject. No adjustments are necessary.

### Shape and Topography

This category accounts for the shape of the site influencing its overall utility and/or development potential, as well as the grade of the land.

All of the comparables are similar to the subject. No adjustments are necessary.

### Zoning

This element of comparison accounts for government regulations that can affect the types and intensities of uses allowable on a site. Moreover, this category includes considerations such as allowable density or floor area ratio, structure height, setbacks, parking requirements, landscaping, and other development standards. The subject has a zoning designation of PD-193 (Planned Development) - Multi-family.

Sale 2 is superior to the subject. A downward adjustment is applied. Sales 1 and 3 are inferior to the subject. Upward adjustments are applied.

TC Hall, LLC - Land Value



APP000207

## Adjustments Summary

The sales are compared to the subject and adjusted to account for material differences that affect value. The following table summarizes the adjustments applied to each sale.

### Land Sales Adjustment Grid

| | Subject | Comparable 1 | Comparable 2 | Comparable 3 |
|---|---|---|---|---|
| Address | 3407 Hall Street | South corner of Brown Street and Hood Street | West side of N. Pearl Street, north of Bryan Street; also fronts east side of Olive Street | East side of McKinney Avenue, south of Monticello Avenue |
| City | Dallas | Dallas | Dallas | Dallas |
| County | Dallas | Dallas | Dallas | Dallas |
| State | Texas | TX | TX | TX |
| Sale Date | | Jun-23 | Jun-23 | Jan-23 |
| Sale Status | | Closed | Closed | Closed |
| Sale Price | | $20,000,000 | $12,886,746 | $6,500,000 |
| Acres | 0.49 | 1.60 | 1.10 | 0.66 |
| FAR | 4.50 | 2.00 | 20.00 | 0.00 |
| **Price per Square Foot** | | **$286.65** | **$270.00** | **$227.27** |
| **Transactional Adjustments** | | | | |
| Property Rights | | Fee Simple | Fee Simple | Fee Simple |
| % Adjustment | | – | – | – |
| Financing Terms | | Cash to seller | Cash to seller | Cash to seller |
| % Adjustment | | – | – | – |
| Conditions of Sale | | | | |
| % Adjustment | | – | – | – |
| Expenditures Made Immediately After Purchase | | | | |
| $ Adjustment | | – | – | – |
| Market Conditions | 12/27/2023 | Jun-23 | Jun-23 | Jan-23 |
| Annual % Adjustment | 0% | – | – | – |
| **Cumulative Adjusted Price** | | **$286.65** | **$270.00** | **$227.27** |
| **Property Adjustments** | | | | |
| Location | | – | – | – |
| Access/Exposure | | -40% | – | -20% |
| Size | | – | – | – |
| Shape and Topography | | – | – | – |
| Zoning | | 20% | -20% | 20% |
| Net Property Adjustments ($) | | -$57.33 | -$54.00 | $0.00 |
| Net Property Adjustments (%) | | -20% | -20% | 0% |
| **Final Adjusted Price** | | **$229.32** | **$216.00** | **$227.27** |

| | |
|---|---|
| **Range of Adjusted Prices** | **$216.00 - $229.32** |
| **Average** | **$224.20** |
| **Indicated Value** | **$225.00** |

TC Hall, LLC - Land Value

### Land Value Conclusion

Prior to adjustments, the sales reflect a range of $227.27 - $286.65 per square foot. After adjustment, the range is narrowed to $216.00 - $229.32 per square foot, with an average of $224.20 per square foot. To arrive at an indication of value, equal weight is given to all sales.

Based on the preceding analysis, the land value conclusion for the subject is presented as follows:

| Land Value Conclusion | |
| --- | --- |
| Indicated Value per Square Foot | $225.00 |
| Subject Square Feet | 21,248 |
| Indicated Value | $4,780,800 |
| Rounded | $4,780,000 |

TC Hall, LLC - Land Value

## Reconciliation and Conclusion of Value

As discussed previously, only the sales comparison approach is used to develop an opinion of value for the subject. The cost and income approaches are not applicable and are not used.

Based on the preceding valuation analysis and subject to the definitions, assumptions, and limiting conditions expressed in the report, the concluded opinion of value is as follows:

**Value Conclusion**

| Value Type & Appraisal Premise | Interest Appraised | Date of Value | Value Conclusion |
|---|---|---|---|
| Market Value As Is | Fee Simple | December 27, 2023 | $4,780,000 |

**Extraordinary Assumptions and Hypothetical Conditions**

The value conclusions are subject to the following extraordinary assumptions. An extraordinary assumption is an assignment-specific assumption as of the effective date regarding uncertain information used in an analysis which, if found to be false, could alter the appraiser's opinions or conclusions.

1. A survey was not provided. As such, we assume the land size obtained from Dallas Central Appraisal District is correct.

The value conclusions are based on the following hypothetical conditions. A hypothetical condition is a condition, directly related to a specific assignment, which is contrary to what is known by the appraiser to exist on the effective date of the assignment results, but is used for the purpose of analysis.

1. None

The use of any extraordinary assumption or hypothetical condition may have affected the assignment results.

## Exposure Time

Exposure time is the length of time the subject property would have been exposed for sale in the market had it sold on the effective valuation date at the concluded market value. Exposure time is always presumed to precede the effective date of the appraisal. Based on review of recent sales transactions for similar properties and analysis of supply and demand in the local land market, the probable exposure time for the subject at the concluded market value stated previously is 9-12 months.

## Marketing Time

Marketing time is an estimate of the amount of time it might take to sell a property at the concluded market value immediately following the effective date of value. As no significant changes in market conditions are foreseen in the near term, a reasonable marketing period for the subject is likely to be the same as the exposure time. Accordingly, the subject's marketing period is estimated at 9-12 months.

TC Hall, LLC - Land Value



APP000210

# Certification

We certify that, to the best of our knowledge and belief:

1.  The statements of fact contained in this report are true and correct.

2.  The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and are our personal, impartial, and unbiased professional analyses, opinions, and conclusions.

3.  We have no present or prospective interest in the property that is the subject of this report and no personal interest with respect to the parties involved.

4.  We have previously appraised the property that is the subject of this report for the current client. We have provided no other services, as an appraiser or in any other capacity, regarding the property that is the subject of this report within the three-year period immediately preceding the agreement to perform this assignment.

5.  We have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.

6.  Our engagement in this assignment was not contingent upon developing or reporting predetermined results.

7.  Our compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

8.  Our analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice as well as applicable state appraisal regulations.

9.  The reported analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the requirements of the Code of Professional Ethics and Standards of Professional Appraisal Practice of the Appraisal Institute.

10. The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.

11. Ernest Gatewood has made a personal inspection of the property that is the subject of this report. Jimmy H. Jackson, MAI has not personally inspected the subject.

12. No one provided significant real property appraisal assistance to the persons signing this certification.

13. We have experience in appraising properties similar to the subject and are in compliance with the Competency Rule of USPAP.

14. As of the date of this report, Jimmy H. Jackson, MAI has completed the continuing education program for Designated Members of the Appraisal Institute.

15. As of the date of this report, Ernest Gatewood has completed the continuing education program for Practicing Affiliates of the Appraisal Institute.

Ernest E. Gatewood, III
Senior Director
Certified General Real Estate Appraiser
Texas Certificate TX #1324355 G
Telephone: (972) 725-7755
Email: egatewood@irr.com

Jimmy H. Jackson, MAI
Senior Managing Director
Certified General Real Estate Appraiser
Texas Certificate TX #1324004-G
Telephone: (972) 725-7724
Email: jhjackson@irr.com

APP000212

# Assumptions and Limiting Conditions

This appraisal and any other work product related to this engagement are limited by the following standard assumptions, except as otherwise noted in the report:

1.    The title is marketable and free and clear of all liens, encumbrances, encroachments, easements and restrictions. The property is under responsible ownership and competent management and is available for its highest and best use.

2.    There are no existing judgments or pending or threatened litigation that could affect the value of the property.

3.    There are no hidden or undisclosed conditions of the land or of the improvements that would render the property more or less valuable. Furthermore, there is no asbestos in the property.

4.    The revenue stamps placed on any deed referenced herein to indicate the sale price are in correct relation to the actual dollar amount of the transaction.

5.    The property is in compliance with all applicable building, environmental, zoning, and other federal, state and local laws, regulations and codes.

6.    The information furnished by others is believed to be reliable, but no warranty is given for its accuracy.

This appraisal and any other work product related to this engagement are subject to the following limiting conditions, except as otherwise noted in the report:

1.    An appraisal is inherently subjective and represents our opinion as to the value of the property appraised.

2.    The conclusions stated in our appraisal apply only as of the effective date of the appraisal, and no representation is made as to the effect of subsequent events.

3.    No changes in any federal, state or local laws, regulations or codes (including, without limitation, the Internal Revenue Code) are anticipated.

4.    No environmental impact studies were either requested or made in conjunction with this appraisal, and we reserve the right to revise or rescind any of the value opinions based upon any subsequent environmental impact studies. If any environmental impact statement is required by law, the appraisal assumes that such statement will be favorable and will be approved by the appropriate regulatory bodies.

5.    Unless otherwise agreed to in writing, we are not required to give testimony, respond to any subpoena or attend any court, governmental or other hearing with reference to the property without compensation relative to such additional employment.

TC Hall, LLC - Land Value

APP000213

6.  We have made no survey of the property and assume no responsibility in connection with such matters. Any sketch or survey of the property included in this report is for illustrative purposes only and should not be considered to be scaled accurately for size. The appraisal covers the property as described in this report, and the areas and dimensions set forth are assumed to be correct.

7.  No opinion is expressed as to the value of subsurface oil, gas or mineral rights, if any, and we have assumed that the property is not subject to surface entry for the exploration or removal of such materials, unless otherwise noted in our appraisal.

8.  We accept no responsibility for considerations requiring expertise in other fields. Such considerations include, but are not limited to, legal descriptions and other legal matters such as legal title, geologic considerations such as soils and seismic stability; and civil, mechanical, electrical, structural and other engineering and environmental matters. Such considerations may also include determinations of compliance with zoning and other federal, state, and local laws, regulations and codes.

9.  The distribution of the total valuation in the report between land and improvements applies only under the reported highest and best use of the property. The allocations of value for land and improvements must not be used in conjunction with any other appraisal and are invalid if so used. The appraisal report shall be considered only in its entirety. No part of the appraisal report shall be utilized separately or out of context.

10. Neither all nor any part of the contents of this report (especially any conclusions as to value, the identity of the appraisers, or any reference to the Appraisal Institute) shall be disseminated through advertising media, public relations media, news media or any other means of communication (including without limitation prospectuses, private offering memoranda and other offering material provided to prospective investors) without the prior written consent of the persons signing the report.

11. Information, estimates and opinions contained in the report and obtained from third-party sources are assumed to be reliable and have not been independently verified.

12. Any income and expense estimates contained in the appraisal report are used only for the purpose of estimating value and do not constitute predictions of future operating results.

13. If the property is subject to one or more leases, any estimate of residual value contained in the appraisal may be particularly affected by significant changes in the condition of the economy, of the real estate industry, or of the appraised property at the time these leases expire or otherwise terminate.

14. Unless otherwise stated in the report, no consideration has been given to personal property located on the premises or to the cost of moving or relocating such personal property; only the real property has been considered.

15. The current purchasing power of the dollar is the basis for the values stated in the appraisal; we have assumed that no extreme fluctuations in economic cycles will occur.

16. The values found herein are subject to these and to any other assumptions or conditions set forth in the body of this report but which may have been omitted from this list of Assumptions and Limiting Conditions.

TC Hall, LLC - Land Value



17.  The analyses contained in the report necessarily incorporate numerous estimates and assumptions regarding property performance, general and local business and economic conditions, the absence of material changes in the competitive environment and other matters. Some estimates or assumptions, however, inevitably will not materialize, and unanticipated events and circumstances may occur; therefore, actual results achieved during the period covered by our analysis will vary from our estimates, and the variations may be material.

18.  The Americans with Disabilities Act (ADA) became effective January 26, 1992. We have not made a specific survey or analysis of the property to determine whether the physical aspects of the improvements meet the ADA accessibility guidelines. We claim no expertise in ADA issues, and render no opinion regarding compliance of the subject with ADA regulations. Inasmuch as compliance matches each owner's financial ability with the cost to cure the non-conforming physical characteristics of a property, a specific study of both the owner's financial ability and the cost to cure any deficiencies would be needed for the Department of Justice to determine compliance.

19.  The appraisal report is prepared for the exclusive benefit of you, your subsidiaries and/or affiliates. It may not be used or relied upon by any other party. All parties who use or rely upon any information in the report without our written consent do so at their own risk.

20.  No studies have been provided to us indicating the presence or absence of hazardous materials on the subject property or in the improvements, and our valuation is predicated upon the assumption that the subject property is free and clear of any environment hazards including, without limitation, hazardous wastes, toxic substances and mold. No representations or warranties are made regarding the environmental condition of the subject property. IRR - Dallas, Integra Realty Resources, Inc., and their respective officers, owners, managers, directors, agents, subcontractors or employees (the "Integra Parties"), shall not be responsible for any such environmental conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist. Because we are not experts in the field of environmental conditions, the appraisal report cannot be considered as an environmental assessment of the subject property.

21.  The persons signing the report may have reviewed available flood maps and may have noted in the appraisal report whether the subject property is located in an identified Special Flood Hazard Area. However, we are not qualified to detect such areas and therefore do not guarantee such determinations. The presence of flood plain areas and/or wetlands may affect the value of the property, and the value conclusion is predicated on the assumption that wetlands are non-existent or minimal.

22.  We are not a building or environmental inspector. The Integra Parties do not guarantee that the subject property is free of defects or environmental problems. Mold may be present in the subject property and a professional inspection is recommended.

23.  The appraisal report and value conclusions for an appraisal assume the satisfactory completion of construction, repairs or alterations in a workmanlike manner.

24. **IRR - Dallas is an independently owned and operated company. The parties hereto agree that Integra shall not be liable for any claim arising out of or relating to any appraisal report or any information or opinions contained therein as such appraisal report is the sole and exclusive responsibility of IRR - Dallas. In addition, it is expressly agreed that in any action which may be brought against the Integra Parties arising out of, relating to, or in any way pertaining to the engagement letter, the appraisal reports or any related work product, the Integra Parties shall not be responsible or liable for any incidental or consequential damages or losses, unless the appraisal was fraudulent or prepared with intentional misconduct. It is further expressly agreed that the collective liability of the Integra Parties in any such action shall not exceed the fees paid for the preparation of the assignment (unless the appraisal was fraudulent or prepared with intentional misconduct). It is expressly agreed that the fees charged herein are in reliance upon the foregoing limitations of liability.**

25. IRR - Dallas is an independently owned and operated company, which has prepared the appraisal for the specific intended use stated elsewhere in the report. The use of the appraisal report by anyone other than the Client is prohibited except as otherwise provided. Accordingly, the appraisal report is addressed to and shall be solely for the Client's use and benefit unless we provide our prior written consent. We expressly reserve the unrestricted right to withhold our consent to your disclosure of the appraisal report or any other work product related to the engagement (or any part thereof including, without limitation, conclusions of value and our identity), to any third parties. Stated again for clarification, unless our prior written consent is obtained, no third party may rely on the appraisal report (even if their reliance was foreseeable).

26. The conclusions of this report are estimates based on known current trends and reasonably foreseeable future occurrences. These estimates are based partly on property information, data obtained in public records, interviews, existing trends, buyer-seller decision criteria in the current market, and research conducted by third parties, and such data are not always completely reliable. The Integra Parties are not responsible for these and other future occurrences that could not have reasonably been foreseen on the effective date of this assignment. Furthermore, it is inevitable that some assumptions will not materialize and that unanticipated events may occur that will likely affect actual performance. While we are of the opinion that our findings are reasonable based on current market conditions, we do not represent that these estimates will actually be achieved, as they are subject to considerable risk and uncertainty. Moreover, we assume competent and effective management and marketing for the duration of the projected holding period of this property.

27. All prospective value opinions presented in this report are estimates and forecasts which are prospective in nature and are subject to considerable risk and uncertainty. In addition to the contingencies noted in the preceding paragraph, several events may occur that could substantially alter the outcome of our estimates such as, but not limited to changes in the economy, interest rates, and capitalization rates, behavior of consumers, investors and lenders, fire and other physical destruction, changes in title or conveyances of easements and deed restrictions, etc. It is assumed that conditions reasonably foreseeable at the present time are consistent or similar with the future.

TC Hall, LLC - Land Value

APP000216

28.     The appraisal is also subject to the following:

**Extraordinary Assumptions and Hypothetical Conditions**

The value conclusions are subject to the following extraordinary assumptions. An extraordinary assumption is an assignment-specific assumption as of the effective date regarding uncertain information used in an analysis which, if found to be false, could alter the appraiser's opinions or conclusions.

1. A survey was not provided. As such, we assume the land size obtained from Dallas Central Appraisal District is correct.

The value conclusions are based on the following hypothetical conditions. A hypothetical condition is a condition, directly related to a specific assignment, which is contrary to what is known by the appraiser to exist on the effective date of the assignment results, but is used for the purpose of analysis.

1. None

The use of any extraordinary assumption or hypothetical condition may have affected the assignment results.

TC Hall, LLC - Land Value



Addenda

**Addendum A**

**Appraiser Qualifications**

APP000218

Addenda

# Jimmy H. Jackson, MAI



## Experience

Senior Managing Director with the Dallas, Lubbock/West Texas and Oklahoma City offices of Integra Realty Resources, a full-service real estate consulting and appraisal firm.

Jimmy H. Jackson, MAI has over 38 years of experience as a commercial appraiser as well as years of experience as a seasoned real estate investor. Prior to joining Integra Realty Resources, Jackson was one of the original two founding partners of Jackson Claborn, Inc. (JCI), a real estate consulting/valuation firm that was established in 1992. JCI grew to have one of the largest staffs of commercial and residential appraisers in the Southwest and has performed valuation and consulting on a vast number of commercial property types across Texas as well as the United States. Mr. Jackson holds the MAI designation and has been involved in the analysis of virtually all types of commercial and residential properties. Mr. Jackson has experience in state and federal courts as an expert witness. Testimony has involved such varied issues as bankruptcy, taxation and condemnation. Mr. Jackson has also been involved in numerous real estate developments and personal real estate investments.

A major philanthropic achievement for Mr. Jackson was consulting with and influencing family members to provide the start-up expertise as well as the seed funding in 1994 for the formation of The Parent Project for Muscular Dystrophy/PPMD (www.parentprojectmd.org). The PPMD organization has developed into a worldwide non-profit centered to provide research funds for children suffering from Duchenne Muscular Dystrophy. Since inception, the PPMD organization has directly funded more than $50 million in direct research and assisted and helped leverage more than $500 million of other research related to other genetic diseases through government grants and other private funding sources. In 2008, Mr. Jackson received a Humanitarian Award from Texas Gov. Rick Perry for charitable work associated with National Jewish Hospital/NJH in Denver. Mr. Jackson currently serves as a national trustee for NJH which is the #1 respiratory care hospital in the world.

Mr. Jackson graduated from Texas Tech University in 1984 with a B.B.A. in Finance with a Real Estate Emphasis. Mr. Jackson has served on numerous professional boards, including serving on the Ethics and Counseling Panel of the North Texas Chapter of the Appraisal Institute as well as serving on the Board of Directors as well as being Chair and Co-Chair of the Public Relations Committee.

As a college student, Mr. Jackson was a member of Phi Delta Theta social fraternity and the Texas Tech Finance Association. Mr. Jackson served for eight (8) years on the Advisory Board for the Jerry Rawls College of Business Administration (COBA) at Texas Tech University. Mr. Jackson has also served as a guest lecturer on real estate entrepreneurship to upper-level COBA students at Texas Tech over the years.

**Integra Realty Resources - Dallas**

1100 Mira Vista Boulevard
Suite 300
Plano, TX 75093

T 972.881.7191
F 972.733.1403

**Integra Realty Resources - Lubbock**

6309 Indiana Avenue
Suite A
Lubbock, TX 79413

T 806.656.3058

**Integra Realty Resources - Oklahoma**

13913 Technology Drive
Suite A1
Oklahoma City, OK, 73134

T 405.422.0718

irr.com

**jhjackson@irr.com  -  972.725.7724**

TC Hall, LLC - Land Value

APP000219

Addenda

# Jimmy H. Jackson, MAI

## Experience (Cont'd)

**Basic Core Real Estate Appraisal Services**
Feasibility Studies, Absorption Studies & Demographic Studies
Highest & Best Use Studies for All Property Types
3rd Party Appraisal Reviews
Detrimental Conditions Valuation & Consulting
Encroachment Analysis
Land Use Studies & Planning/Zoning Studies
Litigation/Litigation Support
In-Depth Market Analysis for All Property Types
Tax Assessment & Mass Appraisal Analysis
Fair & Equitable Appraisal Analysis
Right of Way Analysis Appraisals
Mediation, Arbitration, & Dispute Resolution
Portfolio Valuation & Analysis
Retrospective Valuation Opinions

Appraisal of all property types including the following:

**Residential**
High-Rise Condominium and Garden-Style Multi-Family and Townhome Projects
High-End Residential Property
Historical Residential Property
All types of Single-Family Appraisals (Conventional, Relocation, Unique / Historical Property)

**Land**
Acreage (Commercial Mixed-Use)
Subdivided Land (Mixed-Use, Commercial and Industrial)
Standard Single-Family Subdivision Lot development appraisals
PID/MUD Single-Family Subdivision Lot development appraisals

**Commercial, Office & Retail**
Branch Banks / Financial Building
Convenience Stores / Service Stations
Convention Center / Hotel / Resort /Motel
Office Building (High Rise, over three stories)
Office Building (Low Rise, three stories or less)
Parking Facility (Lot or Garage)
Retail (Single Tenant or Free Standing)
Shopping Center (Local, Strip, Neighborhood, Community, Etc.)
Shopping Center (Power Center, Outlet Center, Lifestyle, Etc.)
Shopping Center (Super Regional, Regional Mall)

**Integra Realty Resources - Dallas**

1100 Mira Vista Boulevard
Suite 300
Plano, TX 75093

T 972.881.7191
F 972.733.1403

**Integra Realty Resources - Lubbock**

6309 Indiana Avenue
Suite A
Lubbock, TX 79413

T 806.656.3058

**Integra Realty Resources - Oklahoma**

13913 Technology Drive
Suite A1
Oklahoma City, OK, 73134

T 405.422.0718

irr.com

**jhjackson@irr.com  -  972.725.7724**

TC Hall, LLC - Land Value



APP000220

# Jimmy H. Jackson, MAI

## Experience (Cont'd)

**Industrial**
Industrial (Heavy (Manufacturing)
Industrial (Small Office Warehouse / Mfg.)
Industrial Light (Distribution, Storage)

**Special Purpose**
Automobile Dealerships
Church Facilities
Collegiate Student Housing
Self-Serve and Full-Service Car Wash Facilities
Self-Storage Facilities

## Professional Activities & Affiliations

Appraisal Institute, Member (MAI) Appraisal Institute

## Licenses

Texas, Certified General Real Estate Appraiser, TX 1324004 G, Expires November 2024
Oklahoma, Certified General Real Estate Appraiser, 13279CGA, Expires September 2026
New Mexico, Certified General Real Estate Appraiser, 03819-G, Expires April 2025

## Education

Mr. Jackson is a graduate of Texas Tech University where he received a Bachelor of Business Administration in Finance with a Real Estate Emphasis.

## Miscellaneous

Member of Region 8 Ethics and Counseling Regional Panel (1992-1995)
Chair - Public Relations North Texas Chapter (2003, 2004)
Co-Chair - Public Relations North Texas Chapter (2005)
Board Member - North Texas Chapter (2005-2007)

---

**Integra Realty Resources - Dallas**

1100 Mira Vista Boulevard
Suite 300
Plano, TX 75093

T 972.881.7191
F 972.733.1403

**Integra Realty Resources - Lubbock**

6309 Indiana Avenue
Suite A
Lubbock, TX 79413

T 806.656.3058

**Integra Realty Resources - Oklahoma**

13913 Technology Drive
Suite A1
Oklahoma City, OK, 73134

T 405.422.0718

irr.com

---

jhjackson@irr.com  -  972.725.7724

TC Hall, LLC - Land Value

APP000221

Addenda



**Certified General Real Estate Appraiser**

Appraiser: **Jimmy Huel Jackson**

License #: **TX 1324004 G**     License Expires: **11/30/2024**

Having provided satisfactory evidence of the qualifications required by the Texas Appraiser Licensing and Certification Act, Occupations Code, Chapter 1103, authorization is granted to use this title: Certified General Real Estate Appraiser

For additional information or to file a complaint please contact TALCB at www.talcb.texas.gov.

**Chelsea Buchholtz**
**Commissioner**

TC Hall, LLC - Land Value

APP000222

Addenda

# Ernest Gatewood



## Experience

Senior Director PID/MUD/SF Lot Development Valuation Specialist with the Dallas office of Integra Realty Resources DFW, a full-service real estate consulting and appraisal firm.

Mr. Gatewood has been in the appraisal field for over 40 years. This extensive experience has formed knowledge of the Texas real estate market as well as select areas throughout the entire United States. This experience has formed an understanding of the dynamics of market forces in both increasing, as well as declining markets. Mr. Gatewood began his appraisal career in 1980 at Crosson Dannis, Inc. where he spent 10 years specializing in master-planned communities. Mr. Gatewood's appraisals were utilized in the funding of Legacy Business Park in Plano, Texas as well as Stonebridge Ranch in McKinney, Texas. In 1991, Mr. Gatewood joined Heartland (Seattle, Washington) as Acquisitions Director for Texas. In this role, Mr. Gatewood was key to the development of several single-family subdivisions, a property type which he still specializes into this day. From 1992 until 2017, Mr. Gatewood represented Jackson Claborn, Inc. as the Vice President of the Commercial Division where he has helped manage the production of the commercial appraisal practice which has enhanced JCI's strong commitment to client services.

Mr. Gatewood has experience in appraising commercial, industrial, multifamily, and investment-grade real property and related tangible assets to provide opinions of value for purposes of mortgage lending, sale or purchase, financial reporting, federal tax, capital lease testing, litigation support, allocation of purchase price, estate tax planning/settlement, ad valorem taxation, property exchange, internal planning, and partial taking/just compensation by eminent domain agencies.

Property types include vacant land, agricultural land, rights of way (road and pipeline), shopping centers, single-tenant retail buildings, CBD and suburban office projects, air rights, truck terminals, light industrial facilities, heavy manufacturing plants, corporate headquarters, hospitals, surgery centers, medical office buildings, self-storage facilities, religious facilities, hotels, mixed-use developments, apartment projects, convenience stores, and single-family subdivision analyses.

1100 Mira Vista Boulevard
Plano, TX 75093

T 972.881.7191
F 972.733.1403

irr.com

## Licenses

Texas, Certified General Real Estate Appraiser, TX 1324355 G, Expires December 2024
Texas, Licensed Real Estate Salesman, 277705, Expires December 2023

## Education

Richland Junior College, Dallas, Texas
The University of North Texas, Denton, Texas

## Miscellaneous

An affiliate of the Appraisal Institute

egatewood@irr.com  -  972.725.7755

TC Hall, LLC - Land Value

irr



**Certified General Real Estate Appraiser**

Appraiser: **Ernest Elva Gatewood III**

License #: **TX 1324355 G**          License Expires: **12/31/2024**

Having provided satisfactory evidence of the qualifications required by the Texas Appraiser Licensing and Certification Act, Occupations Code, Chapter 1103, authorization is granted to use this title: Certified General Real Estate Appraiser

For additional information or to file a complaint please contact TALCB at www.talcb.texas.gov.

Chelsea Buchholtz
Commissioner

## About IRR

Integra Realty Resources, Inc. (IRR) provides world-class commercial real estate valuation, counseling, and advisory services. Routinely ranked among leading property valuation and consulting firms, we are now the largest independent firm in our industry in the United States, with local offices coast to coast and in the Caribbean.

IRR offices are led by MAI-designated Senior Managing Directors, industry leaders who have over 25 years, on average, of commercial real estate experience in their local markets. This experience, coupled with our understanding of how national trends affect the local markets, empowers our clients with the unique knowledge, access, and historical perspective they need to make the most informed decisions.

Many of the nation's top financial institutions, developers, corporations, law firms, and government agencies rely on our professional real estate opinions to best understand the value, use, and feasibility of real estate in their market.

*Local Expertise...Nationally!*

# irr.com



APP000225

**Addendum B**

**IRR Quality Assurance Survey**

# IRR Quality Assurance Survey

## We welcome your feedback!

At IRR, providing a quality work product and delivering on time is what we strive to accomplish. Our local offices are determined to meet your expectations. Please reach out to your local office contact so they can resolve any issues.

## Integra Quality Control Team

Integra does have a Quality Control Team that responds to escalated concerns related to a specific assignment as well as general concerns that are unrelated to any specific assignment. We also enjoy hearing from you when we exceed expectations! You can communicate with this team by clicking on the link below. If you would like a follow up call, please provide your contact information and a member of this Quality Control Team will call contact you.

Link to the IRR Quality Assurance Survey: quality.irr.com

TC Hall, LLC - Land Value



APP000227

**Addendum C**

**Definitions**

Addenda

# Definitions

The source of the following definitions is the Appraisal Institute, *The Dictionary of Real Estate Appraisal*, 7th ed. (Chicago: Appraisal Institute, 2022), unless otherwise noted.

**As Is Market Value**
The estimate of the market value of real property in its current physical condition, use, and zoning as of the appraisal date.

**Disposition Value**
The most probable price that a specified interest in property should bring under the following conditions:

1.    Consummation of a sale within a specified time, which is shorter than the typical exposure time for such a property in that market.

2.    The property is subjected to market conditions prevailing as of the date of valuation.

3.    Both the buyer and seller are acting prudently and knowledgeably.

4.    The seller is under compulsion to sell.

5.    The buyer is typically motivated.

6.    Both parties are acting in what they consider to be their best interests.

7.    An adequate marketing effort will be made during the exposure time.

8.    Payment will be made in cash in U.S. dollars (or the local currency) or in terms of financial arrangements comparable thereto.

9.    The price represents the normal consideration for the property sold, unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.

This definition can also be modified to provide for valuation with specified financing terms.

**Effective Date**
1.    The date on which the appraisal opinion applies. (SVP)

2.    The date to which an appraiser's analysis, opinions, and conclusions apply; also referred to as *date of value*. (USPAP, 2020-2021 ed.)

3.    The date that a lease goes into effect.

**Entitlement**
In the context of ownership, use, or development of real estate, governmental approval for annexation, zoning, utility extensions, number of lots, total floor area, construction permits, and occupancy or use permits.

TC Hall, LLC - Land Value

APP000229

**Entrepreneurial Incentive**
The amount an entrepreneur expects or wants to receive as compensation for providing coordination and expertise and assuming the risks associated with the development of a project. Entrepreneurial incentive is the expectation of future reward as opposed to the profit actually earned on the project.

**Entrepreneurial Profit**
1.  A market-derived figure that represents the amount an entrepreneur receives for his or her contribution to a past project to compensate for his or her time, effort, knowledge, and risk; the difference between the total cost of a property (cost of development) and its market value (property value after completion), which represents the entrepreneur's compensation for the risk and expertise associated with development. An entrepreneur is motived by the prospect of future value enhancement (i.e., the entrepreneurial incentive). An entrepreneur who successfully creates value through new development, expansion, renovation, or an innovation change of use is rewarded by entrepreneurial profit. Entrepreneurs may also fail and suffer losses.

2.  In economics, the actual return on successful management practices, often identified with coordination, the fourth factor of production following land, labor, and capital; also called entrepreneurial return or entrepreneurial reward.

**Exposure Time**
1.  The time a property remains on the market.

2.  An opinion, based on supporting market data, of the length of time that the property interest being appraised would have been offered on the market prior to the hypothetical consummation of a sale at market value on the effective date of the appraisal.

**Fee Simple Estate**
Absolute ownership unencumbered by any other interest or estate, subject only to the limitations imposed by the governmental powers of taxation, eminent domain, police power, and escheat.

**Floor Area Ratio (FAR)**
The relationship between the above-ground floor area of a building, as described by the zoning or building code, and the area of the plot on which it stands; in planning and zoning, often expressed as a decimal, e.g., a ratio of 2.0 indicates that the permissible floor area of a building is twice the total land area.

**Highest and Best Use**
1.  The reasonably probable use of property that results in the highest value. The four criteria that the highest and best use must meet are legal permissibility, physical possibility, financial feasibility, and maximum productivity.

2.  The use of an asset that maximizes its potential and that is possible, legally permissible, and financially feasible. The highest and best use may be for continuation of an asset's existing use or for some alternative use. This is determined by the use that a market participant would have in mind for the asset when formulating the price that it would be willing to bid. (ISV)

TC Hall, LLC - Land Value

APP000230

3.    [The] highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future. (Uniform Appraisal Standards for Federal Land Acquisitions)

**Investment Value**
1.    The value of a property to a particular investor or class of investors based on the investor's specific requirements. Investment value may be different from market value because it depends on a set of investment criteria that are not necessarily typical of the market.

2.    The value of an asset to the owner or a prospective owner given individual investment or operational objectives (may also be known as worth). (IVS)

**Lease**
A contract in which rights to use and occupy land, space, or structures are transferred by the owner to another for a specified period of time in return for a specified rent.

**Leased Fee Interest**
The ownership interest held by the lessor, which includes the right to receive the contract rent specified in the lease plus the reversionary right when the lease expires.

**Leasehold Estate**
The right held by the lessee to use and occupy real estate for a stated term and under the conditions specified in the lease.

**Liquidation Value**
The most probable price that a specified interest in real property should bring under the following conditions:

1.    Consummation of a sale within a short time period.

2.    The property is subjected to market conditions prevailing as of the date of valuation.

3.    Both the buyer and seller are acting prudently and knowledgeably.

4.    The seller is under extreme compulsion to sell.

5.    The buyer is typically motivated.

6.    Both parties are acting in what they consider to be their best interests.

7.    A normal marketing effort is not possible due to the brief exposure time.

8.    Payment will be made in cash in U.S. dollars (or the local currency) or in terms of financial arrangements comparable thereto.

9.    The price represents the normal consideration for the property sold, unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.

This definition can also be modified to provide for valuation with specified financing terms.

**Marketing Time**

An opinion of the amount of time to sell a property interest at the concluded market value or at a benchmark price during the period immediately after the effective date of an appraisal. Marketing time differs from exposure time, which precedes the effective date of an appraisal.

**Market Value**

The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

- buyer and seller are typically motivated;

- both parties are well informed or well advised, and acting in what they consider their own best interests;

- a reasonable time is allowed for exposure in the open market;

- payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and

- the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.

*(Source: Code of Federal Regulations, Title 12, Chapter I, Part 34.42[h]; also Interagency Appraisal and Evaluation Guidelines, Federal Register, 75 FR 77449, December 10, 2010, page 77472)*

**Prospective Opinion of Value**

A value opinion effective as of a specified future date. The term does not define a type of value. Instead, it identifies a value opinion as being effective at some specific future date. An opinion of value as of a prospective date is frequently sought in connection with projects that are proposed, under construction, or under conversion to a new use, or those that have not yet achieved sellout or a stabilized level of long-term occupancy.

**Retrospective Value Opinion**

A value opinion effective as of a specified historical date. The term *retrospective* does not define a type of value. Instead, it identifies a value opinion as being effective at some specific prior date. Value as of a historical date is frequently sought in connection with property tax appeals, damage models, lease renegotiation, deficiency judgments, estate tax, and condemnation. Inclusion of the type of value with this term is appropriate, e.g., "retrospective market value opinion."

TC Hall, LLC - Land Value

APP000232

Addenda

**Addendum D**

**Property Information**

**APP000233**

Addenda



**Dallas Central Appraisal District**

Home | Find Property | Contact Us

**Commercial Account #00000137545000000**

Location  Owner  Legal Desc  Value  Improvements  Land  Exemptions  Estimated Taxes  Building Footprint  History

**Location (Current 2024)**
Address: 3409 N HALL ST
Market Area: 0
Mapsco: 35-X (DALLAS)

**DCAD Property Map**

**View Photo**

**2023 Appraisal Notice**

**Electronic Documents (ENS)**

**Print Homestead Exemption Form**

**Owner (Current 2024)**
TC HALL LLC
2701 SUNSET RIDGE DE STE 607
ROCKWALL, TEXAS 750320000

**Multi-Owner (Current 2024)**

| Owner Name | Ownership % |
|---|---|
| TC HALL LLC | 100% |

**Legal Desc (Current 2024)**
1: COLLUMS SUBDIVISION
2: BLK A/992 LT 15
3:
4: INT202200230642 DD08242022 CO-DC
5: 00013754500015 1000992 A00
Deed Transfer Date: 8/25/2022

**Value**

| 2023 Certified Values | |
|---|---|
| Improvement: | $0 |
| Land: | + $1,391,280 |
| Market Value: | = $1,391,280 |
| Tax Agent: BA PROPERTY TAX | |
| Revaluation Year: | 2023 |
| Previous Revaluation Year: | 2021 |

**Improvements (Current 2024)**
No Improvements.

TC Hall, LLC - Land Value

Addenda

---

Land (2023 Certified Values)

| # | State Code | Zoning | Frontage (ft) | Depth (ft) | Area | Pricing Method | Unit Price | Market Adjustment | Adjusted Price | Ag Land |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | COMMERCIAL – VACANT PLOTTED LOTS/TRACTS | PLANNED DEVELOPMENT DISTRICT | 68 | 0 | 12,648.0000 SQUARE FEET | STANDARD | $110.00 | 0% | $1,391,280 | N |

**\* All Exemption information reflects 2023 Certified Values. \***

Exemptions (2023 Certified Values)
No Exemptions

Estimated Taxes (2023 Certified Values)

| | City | School | County and School Equalization | College | Hospital | Special District |
|---|---|---|---|---|---|---|
| Taxing Jurisdiction | DALLAS | DALLAS ISD | DALLAS COUNTY | DALLAS COLLEGE | PARKLAND HOSPITAL | UNASSIGNED |
| Tax Rate per $100 | $0.7357 | $1.013835 | $0.215718 | $0.110028 | $0.2195 | N/A |
| Taxable Value | $1,391,280 | $1,391,280 | $1,391,280 | $1,391,280 | $1,391,280 | $0 |
| Estimated Taxes | $10,235.65 | $14,105.28 | $3,001.24 | $1,530.80 | $3,053.86 | N/A |
| Tax Ceiling | | | | | N/A | N/A |
| | | | | | Total Estimated Taxes: | $31,926.83 |

**DO NOT PAY TAXES BASED ON THESE ESTIMATED TAXES.** You will receive an **official tax bill** from the appropriate agency when they are prepared. Please note that if there is an Over65 or Disabled Person **Tax Ceiling** displayed above, **it is NOT reflected** in the Total Estimated Taxes calculation provided. Taxes are collected by the agency sending you the **official** tax bill. To see a listing of agencies that collect taxes for your property. Click Here

The estimated taxes are provided as a courtesy and should not be relied upon in making financial or other decisions. The Dallas Central Appraisal District (DCAD) does not control the tax rate nor the amount of the taxes, as that is the responsibility of each Taxing Jurisdiction. Questions about your taxes should be directed to the appropriate taxing jurisdiction. We cannot assist you in these matters. These tax estimates are calculated by using the most current certified taxable value multiplied by the most current tax rate. **It does not take into account other special or unique tax scenarios, like a tax ceiling, etc..** If you wish to calculate taxes yourself, you may use the Tax Calculator to assist you.

Building Footprint (Current 2024)

Building Footprint Not Available

History
History

---

© 2023 Dallas Central Appraisal District.
All Rights Reserved.

TC Hall, LLC - Land Value

Addenda



**Dallas Central Appraisal District**

Home | Find Property | Contact Us

**Commercial Account #00000137548000000**

Location  Owner  Legal Desc  Value  Improvements  Land  Exemptions  Estimated Taxes  Building Footprint  History

**Location (Current 2024)**
Address: 3407 N HALL ST
Market Area: 0
Mapsco: 35-X (DALLAS)

**DCAD Property Map**

**View Photo**

**2023 Appraisal Notice**

**Electronic Documents (ENS)**

**Print Homestead Exemption Form**

**Owner (Current 2024)**
TC HALL LLC
2701 SUNSET RIDGE DE STE 607
ROCKWALL, TEXAS 750320000

**Multi-Owner (Current 2024)**

| Owner Name | Ownership % |
|---|---|
| TC HALL LLC | 100% |

**Legal Desc (Current 2024)**
1: COLLUMS
2: BLK 0992 LT 16 ACS 0.197
3: HALL & ALLEY
4: INT202200230642 DD08242022 CO-DC
5: 0992 000 01600 1000992 000
Deed Transfer Date: 8/25/2022

**Value**

| 2023 Certified Values | |
|---|---|
| Improvement: | $0 |
| Land: | + $946,000 |
| Market Value: | = $946,000 |

| Tax Agent: | BA PROPERTY TAX |
|---|---|
| Revaluation Year: | 2023 |
| Previous Revaluation Year: | 2021 |

**Improvements (Current 2024)**
No Improvements.

TC Hall, LLC - Land Value

APP000236

Addenda

**Land (2023 Certified Values)**

| # | State Code | Zoning | Frontage (ft) | Depth (ft) | Area | Pricing Method | Unit Price | Market Adjustment | Adjusted Price | Ag Land |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | COMMERCIAL – VACANT PLOTTED LOTS/TRACTS | PLANNED DEVELOPMENT DISTRICT | 50 | 0 | 8,600.0000 SQUARE FEET | STANDARD | $110.00 | 0% | $946,000 | N |

\* All Exemption information reflects 2023 Certified Values. \*

**Exemptions (2023 Certified Values)**
No Exemptions

**Estimated Taxes (2023 Certified Values)**

| | City | School | County and School Equalization | College | Hospital | Special District |
|---|---|---|---|---|---|---|
| Taxing Jurisdiction | DALLAS | DALLAS ISD | DALLAS COUNTY | DALLAS COLLEGE | PARKLAND HOSPITAL | UNASSIGNED |
| Tax Rate per $100 | $0.7357 | $1.013835 | $0.215718 | $0.110028 | $0.2195 | N/A |
| Taxable Value | $946,000 | $946,000 | $946,000 | $946,000 | $946,000 | $0 |
| Estimated Taxes | $6,959.72 | $9,590.88 | $2,040.69 | $1,040.86 | $2,076.47 | N/A |
| Tax Ceiling | | | | | N/A | N/A |
| | | | | | Total Estimated Taxes: | $21,708.63 |

**DO NOT PAY TAXES BASED ON THESE ESTIMATED TAXES.** You will receive an **official tax bill** from the appropriate agency when they are prepared. Please note that if there is an Over65 or Disabled Person **Tax Ceiling** displayed above, **it is NOT reflected** in the Total Estimated Taxes calculation provided. Taxes are collected by the agency sending you the **official** tax bill. To see a listing of agencies that collect taxes for your property. Click Here

The estimated taxes are provided as a courtesy and should not be relied upon in making financial or other decisions. The Dallas Central Appraisal District (DCAD) does not control the tax rate nor the amount of the taxes, as that is the responsibility of each Taxing Jurisdiction. Questions about your taxes should be directed to the appropriate taxing jurisdiction. We cannot assist you in these matters. These tax estimates are calculated by using the most current certified taxable value multiplied by the most current tax rate. **It does not take into account other special or unique tax scenarios, like a tax ceiling, etc..** If you wish to calculate taxes yourself, you may use the Tax Calculator to assist you.

**Building Footprint (Current 2024)**

Building Footprint Not Available

**History**

History

© 2023 Dallas Central Appraisal District.
All Rights Reserved.

TC Hall, LLC - Land Value

APP000237

Addenda

**Addendum E**

**Comparable Data**

# Land Sale Profile

# Sale No. 1

## Location & Property Identification

| | |
|---|---|
| Property Name: | Wimbledon Place Condominiums |
| Sub-Property Type: | Residential, Multifamily Land |
| Address: | South corner of Brown Street and Hood Street |
| City/State/Zip: | Dallas, TX 75219 |
| County: | Dallas |
| Submarket: | Dallas |
| Market Orientation: | Urban |
| Property Location: | 3515 Brown Street |
| IRR Event ID: | 2789748 |



## Sale Information

| | |
|---|---|
| Sale Price: | $20,000,000 |
| Effective Sale Price: | $20,000,000 |
| Sale Date: | 06/06/2023 |
| Contract Date: | 05/04/2022 |
| Sale Status: | Closed |
| $/Acre(Gross): | $12,486,733 |
| $/Land SF(Gross): | $286.65 |
| $/Acre(Usable): | $12,486,733 |
| $/Land SF(Usable): | $286.65 |
| $/Unit (Potential): | $143,885 /Unit |
| Grantor/Seller: | Wimbledon Place Townhome Condominium Association, Inc. |
| Grantee/Buyer: | Brown Land LLC |
| Property Rights: | Fee Simple |
| Financing: | Cash to seller |
| Document Type: | Warranty Deed |
| Recording No.: | 202300110926 |
| Verified By: | Ernest Gatewood |
| Verification Date: | 03/09/2022 |
| Confirmation Source: | Vicki Shumake (214-394-3122) |
| Verification Type: | Confirmed-Seller |

| | |
|---|---|
| Legal/Tax/Parcel ID: | Wimbledon Place Condominium/ Tax #00000138448680000 |
| Acres(Usable/Gross): | 1.60/1.60 |
| Land-SF(Usable/Gross): | 69,772/69,772 |
| Usable/Gross Ratio: | 1.00 |
| No. of Units (Potential): | 139 |
| Shape: | Rectangular |
| Topography: | Level |
| Corner Lot: | Yes |
| Frontage Type: | 2 way, 1 lane each way |
| Zoning Code: | PD 193 (Planned Development) |
| Zoning Desc.: | Multi-family - 3 |
| Flood Plain: | No |
| Utilities: | Water Public, Sewer |
| Source of Land Info.: | Engineering Report |

## Comments

This 26-unit condominium project was purchased for land value. Plans are for multi-family development at a higher density. Sale was subject to rezoning to allow for 139 units.

## Improvement and Site Data

## Wimbledon Place Condominiums

irr.

APP000239

# Land Sale Profile

**Sale No. 2**

## Location & Property Identification

| | |
|---|---|
| Property Name: | Multi-family site - Dallas CBD |
| Sub-Property Type: | Residential, Multifamily Land |
| Address: | West side of N. Pearl Street, north of Bryan Street; also fronts east side of Olive Street |
| City/State/Zip: | Dallas, TX 75201 |
| County: | Dallas |
| Submarket: | Dallas |
| Market Orientation: | Urban |
| IRR Event ID: | 3019609 |



## Sale Information

| | |
|---|---|
| Sale Price: | $12,886,746 |
| Effective Sale Price: | $12,886,746 |
| Sale Date: | 06/19/2023 |
| Sale Status: | Closed |
| $/Acre(Gross): | $11,761,199 |
| $/Land SF(Gross): | $270.00 |
| $/Acre(Usable): | $11,761,199 |
| $/Land SF(Usable): | $270.00 |
| $/Unit (Potential): | $34,365 /Unit |
| Grantor/Seller: | Olive Pearl Park LP |
| Grantee/Buyer: | Erius Acquisition Propco 3 LLC |
| Property Rights: | Fee Simple |
| Financing: | Cash to seller |
| Terms of Sale Comments: | Price quoted at $280/SF. |
| Document Type: | Warranty Deed |
| Recording No.: | 202300120849 |
| Verified By: | Ernest Gatewood |
| Verification Date: | 06/22/2023 |
| Confirmation Source: | Michael Swaldi |
| Verification Type: | Confirmed-Seller Broker |

| | |
|---|---|
| MSA: | Dallas-Fort Worth-Arlington, TX |
| Legal/Tax/Parcel ID: | Tracts 5, 9, and 12, Block 252, / Tax #00000105433000000, #00000105442000000, #00025200000120000 |
| Acres(Usable/Gross): | 1.10/1.10 |
| Land-SF(Usable/Gross): | 47,729/47,729 |
| Usable/Gross Ratio: | 1.00 |
| No. of Units (Potential): | 375 |
| Shape: | Rectangular |
| Topography: | Level |
| Corner Lot: | No |
| Frontage Type: | 2 way, 3 lanes each way |
| Zoning Code: | CA-1 |
| Zoning Desc.: | Central Area District |
| Flood Plain: | No |
| Utilities: | Water Public, Sewer |
| Source of Land Info.: | Public Records |

## Comments

This property is to be a 375-unit residential tower with 37 floors. The building will include 7,300 square feet of ground-floor restaurant space and a 2,500-square-foot outdoor plaza overlooking a small park. The site allows for a 20:10 FAR.

## Improvement and Site Data

**Multi-family site - Dallas CBD**



APP000240

## Land Sale Profile

## Sale No. 2

### Comments (Cont'd)

The property is zoned for a maximum of 950,000 square feet of construction.

**Multi-family site - Dallas CBD**



APP000241

# Land Sale Profile

# Sale No. 3

## Location & Property Identification

| | |
|---|---|
| Property Name: | Land - Dallas, TX |
| Sub-Property Type: | Commercial, Other |
| Address: | East side of McKinney Avenue, south of Monticello Avenue |
| City/State/Zip: | Dallas, TX 75205 |
| County: | Dallas |
| Submarket: | Dallas |
| Market Orientation: | Urban |
| Property Location: | 49810 McKinney Avenue |
| IRR Event ID: | 3184246 |



## Sale Information

| | |
|---|---|
| Sale Price: | $6,500,000 |
| Effective Sale Price: | $6,500,000 |
| Sale Date: | 01/10/2023 |
| Sale Status: | Closed |
| $/Acre(Gross): | $9,899,482 |
| $/Land SF(Gross): | $227.27 |
| $/Acre(Usable): | $9,899,482 |
| $/Land SF(Usable): | $227.27 |
| $/Unit (Potential): | $196,970 /Unit |
| Grantor/Seller: | Chelsea Corner Properties LLC |
| Grantee/Buyer: | Dallas 4810 LP |
| Property Rights: | Fee Simple |
| Financing: | Cash to seller |
| Document Type: | Warranty Deed |
| Recording No.: | INT202300005910 |
| Verified By: | Ernest Gatewood |
| Verification Date: | 12/21/2023 |
| Confirmation Source: | Confidential |
| Verification Type: | Confirmed-Confidential |

## Improvement and Site Data

| | |
|---|---|
| Legal/Tax/Parcel ID: | Lots 12-15, Block F/1623, Fairland Addition / Tax #001623000F0120000 |
| Acres(Usable/Gross): | 0.66/0.66 |
| Land-SF(Usable/Gross): | 28,600/28,600 |
| Usable/Gross Ratio: | 1.00 |
| No. of Units (Potential): | 33 |
| Shape: | Rectangular |
| Topography: | Level |
| Corner Lot: | No |
| Frontage Type: | 1 way, 2 lanes |
| Zoning Code: | PD-193 (Planned Development) |
| Zoning Desc.: | MF-2 (Multi-Family) |
| Flood Plain: | No |
| Utilities: | Water Public, Sewer |
| Source of Land Info.: | Public Records |

## Comments

The site is located in PD 193 allowing for only a 36' height but is expected to be rezoned with the adjacent property that has a higher density allowance. The site presently does not have a maximum FAR, but is restricted to 36' in height which would translate to a very low FAR. We have estimated the density to be approximately 50 units per acre. This site was purchased by the adjacent property owner for redevelopment as a mixed-use project. It is noted that the adjacent property is zoned LC and allows for a 4.5:1 FAR.

Land - Dallas, TX



APP000242

Addenda



# EXHIBIT B-3

APP000244

# 3407-3409 N HALL STREET
## BROKER OPINION OF VALUE
March 27, 2024







This Broker Opinion of Value document ("BOV") is JLL's broker opinion of the estimated sale value for the real property identified herein. This BOV is based upon JLL's preliminary review of the property, its existing use, current zoning and other restrictions in place, the surrounding neighborhood, current economic and real estate market conditions, and, as applicable, sales of other comparable properties. It is subject to change due to changes in the local and national real property markets, changes in the credit and money markets, changes in the laws and regulations impacting the property and lawful uses thereof, and changes in any other facts regarding the property. JLL has not made a survey or analysis of the property to determine whether it complies with any law, including the Americans with Disabilities Act, Stark law or any anti-kickback laws, and this BOV renders no opinion regarding any such compliance.

This opinion is not an appraisal of the market value of the property and may not be used in lieu of an appraisal. If an appraisal is desired, the services of a licensed or certified appraiser shall be obtained. This opinion may not be used by any party as the primary basis to determine the value of a parcel of or interest in real property for a mortgage loan origination, including first and second mortgages, refinances, or equity lines of credit.

JLL expressly disclaims any liability to any party for any reliance on this BOV for any purpose unless otherwise provided in a separate written agreement between such party and JLL.

APP000245

# HIGH LEVEL VALUATION – PROPERTY OVERVIEW



Address:                      3407-3409 N Hall Street
                              Dallas, TX  75219

Ownership:                    TC Hall LLC

Lot Size:                     0.515 Acres (22,439 SF) Per ALTA Survey

Zoning:                       PD-193 (O-2)

Primary Uses Permitted:       Office, Hotel, Multifamily/Residential, Limited Retail

APP000246



# HIGH LEVEL VALUATION – SUMMARY

In reviewing the subject properties as potential future offerings, JLL Capital Markets generated a Comparative Market Analysis ("CMA"), a Multifamily return on cost analysis ("ROC") to establish an estimated asking price. The CMA reports the performance of market transactions and current offerings, the ROC demonstrates what a typical developer can afford to pay for land assuming established project and return parameters.

The CMA identified three comparable properties sold within the last few years that ranged in price from $220/SF to $287/SF and three properties available for purchase from $300/SF to $400/SF. Each of the sites that have been sold are generally situated in the subject properties' submarket but JLL notes that the properties available for purchase are larger than the subject property. Considering only the CMA data, the recommended asking price for both properties is **$270/SF** ($6M).

JLL completed a ROC analysis assuming the properties are developed for rent Multifamily use. The Multifamily ROC assumes a boutique 55 units development, at $4.70/SF rents with average unit sizes of 1,500 SF. The Multifamily ROC model concludes that a developer can budget approximately **$250/SF** ($6M) for land, equal to $101K/unit, resulting in a 6.38% return on cost.

Considering the CMA and Multifamily ROC model, JLL recommends guiding the market to **$275/SF.**

APP000247



# HIGH LEVEL VALUATION – PRICING SUMMARY

## PROPERTY OVERVIEW

| | |
|---|---|
| **Address** | 3407-3409 N Hall Street<br>Dallas, TX 75219 |
| **Product Type** | Development Site |
| **Land (AC)** | 0.515 Acres |
| **Land SF** | 22,439 (Per ALTA) |
| **Building SF** | NA |

## SALE PROCESS

| | |
|---|---|
| **Timeline** | 6 - 9 Months |
| **Pricing** | Prospective purchasers would be guided towards $275/SF. |
| **JLL Feedback** | Prospective purchasers will include residential, hospitality, senior care developers, limited retail, etc. Purchasers will assume acquiring the parcels free of encumbrances |



APP000248



# HIGH LEVEL VALUATION – CMA

## Property Overview



| Address: | 3407-3409 N Hall Street |
| | Dallas, TX 75219 |
| Land Gross Acres: | 0.52 |
| Land SF: | 22,439 |
| Land Submarket: | Turtle Creek/Oak Lawn |
| Flood Plain | None |
| Commercial Utilities | Yes |
| Topo | Level |
| Zoning | PD-193 (O-2) |
| | |
| | |

*Notes* : *Land SF per ALTA*

## Market Data

### SELECT LAND SALE COMPARABLES

| 3614 Brown Street | 3140 N Hall Street | 3515 Brown Str. |
| Dallas, TX | Dallas, TX | Dallas, TX |
| Sale Date: Jun-22 | Sale Date: Mar-22 | Sale Date: Mar-23 |
| Size Acres: 0.84 | Size Acres: 2.83 | Size Acres: 1.60 |
| Size SF: 36,590 | Size SF: 123,275 | Size SF: 69,696 |
| Price: $9,879,408 | Price: $27,120,456 | Price: $20,002,752 |
| Price PSF: $270 | Price PSF: $220.00 | Price PSF: $287.00 |
| Proposed Multifamily | Proposed Multifamily, requires rezoning | Proposed low density Multifamily |

### SELECT AVAILABLE LAND FOR SALE

| 3601 Cedar Springs | 2735 Turtle Creek | 3130 Lemmon Ave |
| Dallas, TX | Dallas, TX | Dallas, TX |
| Size Acres: 1.28 | Size Acres: 1.50 | Size Acres: 1.00 |
| Size SF: 55,757 | Size SF: 65,340 | Size SF: 43,560 |
| Price: $16,727,040 | Price: $26,136,000 | Price: $15,246,000 |
| Price PSF: $300.00 | Price PSF: $400.00 | Price PSF: $350.00 |
| Proposed Multifamily | Proposed Office/Condo | Site being Marketed |

## Market Summary

### SELECT LAND SALE COMPARABLES

| Land Address | Land Size | Price/ SF |
| --- | --- | --- |
| 3614 Brown Street | 0.84 | $270.00 |
| 3140 N Hall Street | 2.83 | $220.00 |
| 3515 Brown Str. | 1.60 | $287.00 |
| Average Comparable Land Sale Value (PSF): | | $259.00 |
| Adjustment: | | $0.00 |
| Comparable Average Land Sale Value (PSF): | | **$259.00** |

### SELECT AVAILABLE LAND FOR SALE

| Land Address | Land Size | Price/ SF |
| --- | --- | --- |
| 3601 Cedar Springs | 1.28 | $300.00 |
| 2735 Turtle Creek | 1.50 | $400.00 |
| 3130 Lemmon Ave | 1.00 | $350.00 |
| Average Comparable Land Sale Value (PSF): | | $350.00 |
| Adjustment: Subject site size/setback consideration | | $80.00 |
| Comparable Average Land Asking Price (PSF): | | **$270.00** |

| Approach | Value PSF | | Value | | |
| --- | --- | --- | --- | --- | --- |
| List Price: | $270 | | $6,058,530 | | |
| Strike Range: | $240.00 | to $260.00 | $5,385,360 | to | $5,834,140 |

APP000249

# HIGH LEVEL VALUATION – MULTIFAMILY ROC



**Property Specifications**

| | | | |
|---|---|---|---|
| Units | 55 | Rent Per Square Foot | $4.70 |
| Density | 107 | Rent Per Month | $7,050 |
| AVG Unit Size | 1,500 | Acreage | 0.515 |
| Rentable Square Footage | 82,500 | Millage Rate (90%) | 2.26% |
| Gross Square Footage (15% Factor) | 94,875 | | |
| Floor Area Ration (FAR) | 4.2:1 | | |

**Pro-Forma**

| INCOME | Total | Per Unit |
|---|---|---|
| **Effective Rental Income** | | |
| Current Market Rents | $4,653,000 | $84,600 |
| Loss / Gain to Lease | -$93,060 | -2.0% |
| **Gross Potential Income** | **$4,559,940** | **$82,908** |
| Vacancy | -$182,398 | -4.0% |
| Bad Debt | -$9,120 | -0.2% |
| Model / Office / Employee Units | -$22,800 | -0.5% |
| Concessions | -$91,199 | -2.0% |
| **Effective Rental Income** | **$4,254,424** | **$77,353** |

| Other Income | Total | Per Unit |
|---|---|---|
| Other Income | $165,000 | $3,000 |
| **Total Other Income** | $165,000 | $3,000 |
| **EFFECTIVE GROSS INCOME** | **$4,419,424** | **$80,353** |

| EXPENSES | Total | Per Unit |
|---|---|---|
| **Controllable Expenses** | | |
| Payroll & Burden | $220,000 | $4,000 |
| Contract/Landscape | $41,250 | $750 |
| Security | $55,000 | $1,000 |
| Turnover | $13,750 | $250 |
| Repairs & Maintenance | $27,500 | $500 |
| Utilities | $49,500 | $900 |
| Advertising & Marketing | $27,500 | $500 |
| Administrative | $16,500 | $300 |
| **Total Controllable Expenses** | **$451,000** | **$8,200** |
| **Non-Controllable Expenses** | | |
| Management Fee | $132,583 | 3.00% |
| Real Estate Taxes | $821,881 | $14,943 |
| Property/Liability Insurance | $44,000 | $800 |
| Franchise Tax | $14,628 | 0.331% |
| **Total Non-Controllable Expenses** | **$1,013,092** | **$18,420** |
| **TOTAL EXPENSES** | **$1,464,092** | **$26,620** |
| *Expense Ratio* | 33.1% | |
| **NET OPERATING INCOME** | **$2,955,332** | **$53,733** |
| **CAPITAL EXPENDITURES** | | |
| Capital Replacement/Capital Reserves | $16,500 | $300 |
| **CASH FLOW FROM OPERATIONS** | **$2,938,832** | **$53,433** |

| Pro Forma Summary | Total | Per Unit |
|---|---|---|
| **Total Income** | **$4,419,424** | **$80,353** |
| **Total Expenses** | **$1,480,592** | **$26,920** |
| **Cash Flow From Operations** | **$2,938,832** | **$53,433** |

| COST ESTIMATES | Total | Per Unit | PSF |
|---|---|---|---|
| Land Costs (per FAR): | $5,609,750 | $101,995 | $68 |
| Hard Costs: | $35,887,500 | $652,500 | $435 |
| Soft Costs: | $4,537,500 | $82,500 | $55 |
| Total Cost less Land: | **$40,425,000** | **$735,000** | **$490** |
| Total Cost with Land: | **$46,034,750** | **$836,995** | **$558** |

*Assumes Average Rents Per Square Foot of $4.70*

| Land Price | Land/Unit | Land PSF | Return on Cost |
|---|---|---|---|
| $5,160,970 | $93,836 | $230 | 6.45% |
| $5,385,360 | $97,916 | $240 | 6.42% |
| $5,609,750 | $101,995 | $250 | 6.38% |
| $5,834,140 | $106,075 | $260 | 6.35% |
| $6,058,530 | $110,155 | $270 | 6.32% |
| $6,282,920 | $114,235 | $280 | 6.29% |

| Return on Cost | 6.38% | |
|---|---|---|
| | | Per Unit |
| Total Development Cost | $46,034,750 | $836,995 |
| Total Land Cost | $5,609,750 | $101,995 |
| Value of Land per Unit | | $101,995 |
| **Land Price Per Foot** | **$250** | |

| Market Apartments (Year Built) | Market Rent | Units |
|---|---|---|
| Selene (2022) | $4.80 | 146 |
| The McKeinzie (2018) | $4.70 | 183 |
| Novel Turtle Creek (2022) | $4.50 | 228 |
| Average | $4.67 | |