**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § § § | |
| *Plaintiff*, | § § | |
| v. | § § | No. 3:22-cv-2118-X |
| TIMOTHY BARTON, et al. | § § | |
| *Defendants*. | § § | |

**APPENDIX IN SUPPORT OF RECEIVER'S VERIFIED MOTION TO RATIFY
BM318, LLC's SETTLEMENT AGREEMENTS
<u>WITH THE DIXON WATER FOUNDATION AND LUMAR LAND & CATTLE, LLC</u>**

Cortney C. Thomas, as the Court-appointed Receiver, respectfully submits this Appendix

in support of his contemporaneously filed motion seeking an order ratifying settlement agreements

between BM318, LLC, through the Receiver, with The Dixon Water Foundation and Lumar Land

& Cattle, LLC.

July 8, 2024

Respectfully submitted,

By: */s/ C. Alan Carrillo*
   Charlene C. Koonce
    State Bar No. 11672850
    charlene@brownfoxlaw.com
   C. Alan Carrillo
    State Bar No. 24109693
    alan@brownfoxlaw.com
   BROWN FOX PLLC
   8111 Preston Road, Suite 300
   Dallas, Texas 75225
   T: (214) 327-5000
   F: (214) 327-5001

*Attorneys for Receiver Cortney C. Thomas*

## CERTIFICATE OF SERVICE

Pursuant to Fed. R. Civ. P. 5(d)(1)(B), as amended, no certificate of service is necessary, because this document is being filed with the Court's electronic-filing system.

**EXHIBITS**

| Exhibit | Document Description | APP# |
|---------|---------------------|------|
| 1 | Bankr. Dkt. 147 – Joint Motion of BM318 and The Dixon Water Foundation for Approval of Compromise and Settlement of Adversary Proceeding No. 21-04051 | APP001-010 |
| 2 | Bankr. Dkt. 147-1 – Lift Stay Order | APP011-015 |
| 3 | Bankr. Dkt. 147-2 – Settlement Agreement | APP016-021 |
| 4 | Bankr. Dkt. 147-3 – Proposed Order | APP022-024 |
| 5 | Bankr. Dkt. 147-4 – Proposed Judgment | APP025-064 |
| 6 | Bankr. Dkt. 147-5 – Service List | APP065-066 |
| 7 | Bankr. Dkt. 149 – Joint Motion of BM318 and Lumar Land & Cattle, LLC for Approval of Compromise and Settlement of Adversary Proceeding No. 21-04051 | APP067-078 |
| 8 | Bankr. Dkt. 149-1 – Settlement Agreement | APP079-123 |
| 9 | Bankr. Dkt. 149-2 – Proposed Order | APP124-127 |
| 10 | Bankr. Dkt. 149-3 – Proposed Judgment | APP128-133 |
| 11 | Bankr. Dkt. 149-4 – Service List | APP134-135 |
| 12 | Bankr. Dkt. 155 – Transcript of Evidentiary Hearing | APP136-233 |
| 13 | Bankr. Dkt. 162 – Transcript of Bankruptcy Court's Findings | APP234-253 |
| 14 | Bankr. Dkt. 163 – Order Approving Compromise and Settlement Between BM318, LLC and The Dixon Water Foundation | APP254-257 |
| 15 | Bankr. Dkt. 164 – Order Approving Compromise and Settlement Between BM318, LLC and Lumar Land & Cattle, LLC | APP258-261 |

# EXHIBIT 1

APP001

Deborah M. Perry
Texas Bar No. 24002755
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 4000
Dallas, Texas 75201
Telephone: (214) 855-7500
Facsimile:  (214) 855-7584
Email:  dperry@munsch.com

***Attorneys for The Dixon Water Foundation***

Charlene C. Koonce
Texas Bar No. 11672850
C. Alan Carrillo
Texas Bar No. 24109693
BROWN FOX PLLC
8111 Preston Road, Suite 300
Dallas, Texas 75225
Telephone:  (214) 327-5000
Facsimile:  (214) 327-5001
Email:  charlene@brownfoxlaw.com
Email:  alan@brownfoxlaw.com

***Attorneys for Receiver for BM318, LLC***

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### FORT WORTH DIVISION

| | | |
|---|---|---|
| In re:<br><br>BM318, LLC,<br><br>Debtor. | §<br>§<br>§<br>§<br>§<br>§ | Chapter 11<br><br>Case No. 20-42789-MXM<br><br>Hearing Date:  May 20, 2024<br>Hearing Time:  9:30 a.m. (CT) |

### JOINT MOTION OF BM318, LLC AND THE DIXON WATER FOUNDATION FOR APPROVAL OF COMPROMISE AND SETTLEMENT OF <u>ADVERSARY PROCEEDING NO. 21-04051</u>

**NO HEARING WILL BE CONDUCTED HEREON UNLESS A WRITTEN RESPONSE IS FILED WITH THE CLERK OF THE UNITED STATES BANKRUPTCY COURT AT 500 W. TENTH STREET, FORT WORTH, TEXAS 76102-3643 BEFORE CLOSE OF BUSINESS ON MAY 16, 2024, WHICH IS AT LEAST 21 DAYS FROM THE DATE OF SERVICE HEREOF.**

**ANY RESPONSE SHALL BE IN WRITING AND FILED WITH THE CLERK, AND A COPY SHALL BE SERVED UPON COUNSEL FOR THE MOVING PARTY PRIOR TO THE DATE AND TIME SET FORTH HEREIN. IF A RESPONSE IS FILED A HEARING WILL BE HELD ON MAY 20, 2024 AT 9:30 A.M. (CT) WITH NOTICE ONLY TO THE OBJECTING PARTY.**

**IF NO HEARING ON SUCH NOTICE OR MOTION IS TIMELY REQUESTED, THE RELIEF REQUESTED SHALL BE DEEMED TO BE UNOPPOSED, AND THE COURT MAY ENTER AN ORDER GRANTING THE RELIEF SOUGHT OR THE NOTICED ACTION MAY BE TAKEN.**

1

4870-6591-8905v.1 018527.00001

TO THE HONORABLE MARK X. MULLIN, U.S. BANKRUPTCY JUDGE:

COME NOW, BM318, LLC ("BM318") and The Dixon Water Foundation, a Texas non-profit corporation ("Dixon"), and file this their *Joint Motion of BM318, LLC and The Dixon Water Foundation for Approval of Compromise and Settlement of Adversary Proceeding No. 21-04051* (the "Motion"), and in support of the Motion, would respectfully show the Court as follows:

## I.    BACKGROUND

1.    On September 1, 2020, BM318 filed a voluntary petition under Chapter 11 of the United States Bankruptcy Code initiating the above-captioned bankruptcy proceeding (the "Bankruptcy Case").

2.    On November 19, 2020, BM318 filed the *Debtor's First Amended Plan of Reorganization* [BK Doc. No. 39], which was modified by the *First Modification to Debtor's First Amended Plan of Reorganization* [BK Doc. No. 79] and the *Third Modification to Debtor's First Amended Plan of Reorganization* [BK Doc. No. 100] (together, the "Plan").

3.    On August 2, 2021, the Court entered the order confirming the Plan [BK Doc. No. 106].

4.    On August 10, 2021, BM318 filed its *Complaint to Avoid and Recover Preferential and/or Fraudulent Transfer Pursuant to 11 U.S.C. §§ 548 and 550*, commencing adversary proceeding No. 21-04051 (the "Adversary Proceeding").

5.    On October 18, 2022, the United States District Court for the Northern District of Texas (the "District Court") entered an *Order Appointing Receiver* (the "Initial Receivership Order") in the case of *Securities and Exchange Commission v. Timothy Barton, et al.*, Case No. 3:22-cv-2118-X (N.D.Tex.) (the "Receivership Proceeding").  The receivership order placed into receivership all entities controlled, directly or indirectly, by Timothy Barton, including BM318. The District Court appointed Cortney C. Thomas as receiver (the "Receiver").

2

APP003

6. On April 25, 2023, Dixon and the Receiver engaged in a mediation conducted by the Honorable Harlin D. Hale (Ret.) and reached a mediated settlement of the Adversary Proceeding, which is the subject of this Motion.

7. Confirmation of the settlement was interrupted by a vacatur of the Initial Receivership Order by the Fifth Circuit.

8. On remand, this was remedied by the entry of a new receivership order that the District Court entered on November 29, 2023 (the "Receivership Order"). The Receivership Order continued the receivership with regard to BM318.

9. On January 5, 2024, the Receiver filed the *Receiver's Motion to Lift Litigation Stay of BM318 Bankruptcy Case* (the "Lift Stay Motion") [Doc No. 450]. On April 15, 2024, the District Court entered its *Order* granting the Lift Stay Motion so that this Bankruptcy Court may consider the Settlement Agreement, entered into between the Receiver and Dixon (the "Lift Stay Order") [Doc. 486] (copy attached hereto as Exhibit "A".)

## II.    JURISDICTION

10. This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. § 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief requested herein are Section 105(a) of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 9019.

## III.    RELIEF REQUESTED

11. BM318 and Dixon (the "Parties") have negotiated the material terms of an agreement providing for the compromise and resolution of the claims brought by BM318 against Dixon in the Adversary Proceeding. Pursuant to § 105(a) of the Bankruptcy Code and Bankruptcy Rule 9019(a), the Parties request that the Bankruptcy Court approve those terms and authorize

4870-6591-8905v.1 018527.00001

APP004

them to enter into such agreement, which shall be substantially identical in form and substance to the settlement agreement attached hereto as Exhibit "B" (the "Settlement Agreement").

12.   As more fully set forth therein, the terms of the Settlement Agreement provide for the following:[1]

    a.   Payment by Dixon to BM318 of $100,000.00;

    b.   Mutual release of all claims between Dixon and BM318 (the "Claims");

    c.   Final judgment entered in the Adversary Proceeding that provides for dismissal of the Adversary Proceeding with prejudice;

    d.   Release of lis pendens by BM318 concerning the property that is the subject of the Adversary Proceeding; and

    e.   Reservation by the Receiver of certain alleged non-debtor claims.

### IV.   THE LEGAL STANDARDS

13.   For the reasons discussed below, BM318 has determined that it is in the best interest of BM318, as the Reorganized Debtor,[2] and its creditors if the Claims are compromised and resolved under the terms of the Settlement Agreement.

14.   Under the terms of the Plan, the Reorganized Debtor has the right to pursue and to resolve certain preserved claims of BM318 and the Debtor's Estate.  See Plan § 8.01.

15.   Bankruptcy Rule 9019(a) provides, in pertinent part: "On motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement."  Fed. R. Bankr. P. 9019(a).  Section 105(a) of the Bankruptcy Court further provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

---

[1] The following is only meant as a summary of the material terms of the Settlement Agreement. To the extent of an inconsistency between the summary and the Settlement Agreement, the terms of the Settlement Agreement control.

[2] All capitalized terms not otherwise defined shall have the meaning provided in the Plan.

4

APP005

16. In reviewing proposed settlements, the Fifth Circuit has instructed courts to apply the following factors, in addition to reviewing the terms and conditions of the settlement itself:

    a.    The probability of success in the litigation with due consideration for the uncertainty in fact and law;

    b.    The complexity and likely duration of the litigation and any attendant expense, inconvenience and delay; and

    c.    All other factors bearing on the wisdom of the compromise.

*Connecticut General Life Ins. Co. v. United Companies Fin. Corp. (In re Foster Mortgage Corp.), 68 F.3d 914, 917 (5th Cir. 1995)* (citing *Jackson Brewing Co.,* 624 F.2d at 602). The Parties submit that those settlement factors weigh in favor of approval of the Settlement Agreement.

17. The Fifth Circuit has further supplemented the provisions of Bankruptcy Rule 9019 to require, as a condition to approval of a settlement, that the settlement is "fair and equitable and in the best interest of the estate." *Rivercity v. Herpel (In re Jackson Brewing Co.)*, 624 F.2d 599, 602 (5th Cir. 1980); see also *Connecticut General Life Ins. Co. v. United Companies Fin. Corp. (In re Foster Mortgage Corp.)*, 68 F.3d 914, 917 (5th Cir. 1995).

18. Moreover, as set forth above, the standards by which a court evaluates a proposed compromise and settlement are well established. A court need not conduct an independent investigation in formulating an opinion as to the reasonableness of a settlement. Rather, a court is permitted to defer to the judgment of the parties, and the court's responsibility is to canvass the issues to see whether the proposed settlement "falls below the lowest point in the range of reasonableness." *In re Pennsylvania Truck Lines, Inc.,* 150 B.R. 595, 601 (E.D. Pa. 1992), *aff'd*, 8 F.3d 812 (3d Cir. 1993); *In re Grant Broadcasting of Philadelphia, Inc.,* 71 B.R. 390, 395 (Bankr. E.D. Pa. 1987). Approval of a compromise is committed to the sound discretion of the trial court

4870-6591-8905v.1 018527.00001

and will not be disturbed unless such court has abused its discretion. *Rivercity v. Herpel (In re Jackson Brewing Co.,* 624 F.2d 599, 602-03 (5th Cir. 1980)).

19.    <u>Probability of Success</u>.    First, in relation to the probability of success in the litigation, it is unnecessary for a court to conduct a mini-trial on the various claims and defenses to be resolved under the settlement. "[T]he approval of a proposed settlement does not depend on establishing as a matter of legal certainty that the subject claim or counterclaim is or is not worthless or valuable." *Jackson Brewing Co.*, 624 F.2d at 604. "The judge need only apprise himself of the relevant facts and law so that he can make an informed and intelligent decision." *Official Committee of Unsecured Creditors v. Cajun Elec. Power Coop., Inc. (In re Cajun Elec. Power Coop., Inc.)*, 119 F.3d 349, 356 (5th Cir. 1997) (quoting *La Salle Nat'l Bank v. Holland (In re American Reserve Corp.)*, 841 F.2d 159, 163 (7th Cir. 1987)); see also *Official Committee of Unsecured Creditors of Int'l Distrib. Ctrs., Inc. v. James Talcott, Inc. (In re International Distrib. Ctrs., Inc.)*, 103 B.R. 420, 423 (S.D.N.Y. 1989); *In re Drexel Burnham Lambert Group, Inc.*, 134 B.R. 493, 496-97 (Bankr. S.D.N.Y. 1991).

20.    The Adversary Proceeding was pending for over one year prior to the institution of the Receivership Proceeding.  Substantial written discovery was engaged in and the Court held multiple hearings in connection with a Motion to Compel filed by Dixon.  The Court also held multiple hearings on BM318's Motion to Amend its Complaint which the Court ultimately denied.  As a result of the foregoing activity and the types of common bankruptcy claims brought by BM318 against Dixon pursuant to §§ 547, 548 and 550 in the Adversary Proceeding, the Court is well situated to assess the probability of success in the litigation with due consideration for the uncertainty in fact and law.

4870-6591-8905v.1 018527.00001

21.   The Parties submit that the payment provided for in the Settlement Agreement duly reflects BM318's probability of success on its Claims.  While neither party admits or denies the assertions of the other, BM318 recognizes that there are substantial disputes and potential defenses to the Claims it has asserted in the Adversary Proceeding.

22.   <u>Complexity and Expense Of Litigation</u>.  As explained by the Fifth Circuit, "compromises are a normal part of the process of reorganization, oftentimes desirable and wise methods of bringing to a close proceedings otherwise lengthy, complicated and costly."  *Cajun Elec.*, 119 F.3d at 354 (quoting *Jackson Brewing Co*., 624 F.2d at 602).  The issues raised in the Adversary Proceeding would require the expenditure of substantial additional fees and expenses in connection with both fact discovery and expert discovery as well as trying the Adversary Proceeding and appellate proceedings that might flow therefrom.

23.   Finally, as for all other factors bearing on the wisdom of the compromise, the Fifth Circuit has identified at least two such other factors:  (a) the best interests of the creditors with proper deference to their reasonable views; and (b) the extent to which the settlement is truly the product of arms-length bargaining, and not fraud or collusion.  *See Cajun Elec.,* 119 F.3d at 354, 356; *See also Foster Mortgage Corp*., 68 F.3d at 917. First the settlement came about as a result of a mediation conducted by the Honorable Harlin D. Hale (Ret.) which was conducted at arms-length and was intensely negotiated by the Parties.  Second, the Settlement is in the best interests of the creditors of the Reorganized Debtor given the amount of the settlement and the Claims that will be resolved.

## V.   CONCLUSION

24.   The Settlement Agreement, as set forth in the attached Exhibit "B", is the product of arm's-length negotiations between the Parties.  The Settlement Agreement represents a fair and reasonable resolution of the Claims and the Adversary Proceeding in relation to the Parties.  Thus,

4870-6591-8905v.1 018527.00001

the Settlement Agreement is fair and reasonable, is in the best interests of the Reorganized Debtor and its creditors, and is the result of the exercise of sound business judgment.

WHEREFORE, PREMISES CONSIDERED, the Parties request that this Court (a) enter an order: substantially in the form of the order attached hereto as Exhibit "C": (i) approving the material terms set forth in the Settlement Agreement; (ii) authorizing BM318 to enter into a settlement and compromise agreement in substantially the same form as the Settlement Agreement; (b) enter Final Judgment in the Adversary Proceeding in substantially the same form as the Final Judgment attached hereto as Exhibit "D," and (c) grant such other and further relief as is just and proper.

RESPECTFULLY SUBMITTED this 25th day of April, 2024.

**BROWN FOX PLLC**

By:    */s/ C. Alan Carrillo*
Charlene C. Koonce
State Bar No. 11672850
charlene@brownfoxlaw.com
C. Alan Carrillo
State Bar No. 24109693
alan@brownfoxlaw.com
BROWN FOX PLLC
8111 Preston Road, Suite 300
Dallas, Texas 75225
Telephone: (214) 327-5000
Fax: (214) 327-5001

*Attorneys for Receiver for BM318, LLC*

8

4870-6591-8905v.1 018527.00001

APP009

**MUNSCH HARDT KOPF & HARR, P.C.**

By:    */s/ Deborah M. Perry*
    Deborah M. Perry
    Texas Bar No. 24002755
    MUNSCH HARDT KOPF & HARR, P.C.
    500 N. Akard Street, Suite 4000
    Dallas, Texas 75201
    Telephone: (214) 855-7500
    Facsimile: (214) 855-7584
    Email: dperry@munsch.com

*Attorneys for The Dixon Water Foundation*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that, on this the 25th day of April, 2024, true and correct copies of this document were served via the Court's ecf system on parties entitled to receive electronic notice in the Bankruptcy Case and by regular U.S. first class mail on the parties on the attached Service List.

*/s/ Deborah M. Perry*
Deborah M. Perry

9

4870-6591-8905v.1 018527.00001

APP010

# EXHIBIT 2

APP011

Case 3:22-cv-02118-X    Document 525    Filed 07/08/24    Page 15 of 264    PageID 18657
Case 20-42789-mxm11    Doc 147-1    Filed 04/25/24    Entered 04/25/24 14:53:16    Desc
Case 3:22-cv-02118-X Order Lifting Stay 486 Filed 04/15/24 Proceeding 1 Page 1 of 4 17262

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

SECURITIES AND EXCHANGE
COMMISSION,

     *Plaintiff,*

v.

TIMOTHY BARTON, et al.,

     *Defendants,*

DJD LAND PARTNERS, LLC, and
LDG001, LLC,

     *Relief Defendants.*

§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§

Civil Action No. 3:22-CV-2118-X

**ORDER**

Before the Court is the Receiver's motion to lift the litigation stay of the BM318 bankruptcy case. (Doc. 450). After carefully considered the motion, the Court **GRANTS** the motion and **LIFTS THE STAY** of *In re BM318, LLC*, Case No. 20-042789-mxm in the U.S. Bankruptcy Court for the Northern District of Texas, Fort Worth Division (the "Bankruptcy Case") and *BM318, LLC, Plaintiff v. The Dixon Water Foundation, Defendant, Lumar Land & Cattle, LLC, Plaintiff-in-intervention*, Adv. No. 21-04051-mxm in the U.S. Bankruptcy Court for the Northern District of Texas, Fort Worth Division (the "Adversary Proceeding"), so that the Bankruptcy Court may consider the settlement agreements from litigation that progressed before the litigation stay.

1

APP012

Case 3:22-cv-02118-X    Document 525    Filed 07/08/24    Page 16 of 264    PageID 18658
Case 20-42789-mxm11    Doc 147-1    Filed 04/25/24    Entered 04/25/24 14:53:16    Desc
Case 3:22-cv-02118-X Order Lifting Stay 36 Filed 04/15/24    Page 2 of 4 17263

The Court's Receivership Order imposed a blanket stay of litigation, including over "bankruptcy proceedings."[1]  The Receiver seeks to lift the stay of a bankruptcy proceeding and a related adversary proceeding, both involving BM318, LLC, a Receivership Entity, "to allow the Bankruptcy Court to consider the settlement agreements because litigation in the Bankruptcy Case had progressed for several years prior to the Litigation Stay and the Bankruptcy Court is very familiar with the facts and merits of the claims."[2]

The Court looks to the *Wencke* factors to "determine whether an exception should be made to a stay of proceedings in a case such as this": "(1) whether refusing to lift the stay genuinely preserves the status quo or whether the moving party will suffer substantial injury if not permitted to proceed; (2) the time in the course of the receivership at which the motion for relief from the stay is made; and (3) the merit of the moving party's underlying claim."[3]  The Court finds the three *Wencke* factors weigh in favor of granting the motion.  The first factor looks at the moving party's interests.[4]  Here, the Receiver is the moving party, and he argues "he has had ample time to get up to speed on the Bankruptcy Case and to address it."[5]  As the Receiver, "is in the best position to decide[] whether the . . . litigation would interfere with the

---

[1] Doc. 417 at 19–20.

[2] Doc. 450 at 2.

[3] *SEC v. Stanford Int'l Bank, Ltd.*, 424 F. App'x 338, 341 (5th Cir. 2011) (quoting *SEC v. Wencke*, 742 F.2d 1230, 1231 (9th Cir. 1984) (*Wencke II*)).

[4] *SEC v. Provident Royalties, L.L.C.*, No. 3:09-cv-1238-l, 2011 WL 2678840, at *2 (N.D. Tex. July 7, 2011).

[5] Doc. 458 at 4.

2

Case 3:22-cv-02118-X    Document 525    Filed 07/08/24    Page 17 of 264    PageID 18659
Case 20-42789-mxm11    Doc 147-1    Filed 04/25/24    Entered 04/25/24 14:53:16    Desc
Case 3:22-cv-02118-X Order Lifting Stay of Receivership Proceeding    Page 3 of 4 17264

interests of the receivership,"[6] the Court finds this factor to weigh in favor of lifting the stay for the limited proceedings sought here.  As for the timing factor, the underlying parties mediated in May 2023, entered settlement agreements in June 2023, and have since been waiting for bankruptcy court approval and ratification in this Court.  The Court finds that the timing warrants granting the motion.  The merits factor too weighs in favor of lifting the litigation stay for the bankruptcy and related adversary proceedings.  Because the parties entered into settlement agreements, it stands to reason that there are "colorable claims that justify lifting the stay."[7]

Barton raises three arguments in objection.  First, Barton claims the Court should maintain the status quo and not make determinations as to real property while his Fifth Circuit appeal of the Receivership Order is pending.[8]  Importantly, there is no stay in this case while Barton's appeal is pending.  And lifting the litigation stay for the bankruptcy proceeding and related adversary proceeding is not a determination by this Court as to any real property, it's allowing the bankruptcy court to do so.  Further, the Receiver claims that BM318 holds no real property because "Barton lost possession of BM318's real property prior to the appointment of the Receiver as a result of defaulting on the 'First Buyback Contract' with Dixon."[9]  Barton's second and third objections are premature.  Barton's next objection is that

---

[6] *Provident Royalties*, 2011 WL 2678840, at *2.

[7] *SEC v. Provident Royalties, L.L.C.*, No. 3:09-CV-1238-L, 2011 WL 2678840, at *2 (N.D. Tex. July 7, 2011) (citing *Wencke II*, 472 F.2d at 1232).

[8] Doc. 455 at 2–3.

[9] Doc. 458 at 6 n. 5.

3

Case 3:22-cv-02118-X    Document 525    Filed 07/08/24    Page 18 of 264    PageID 18660
Case 20-42789-mxm11    Doc 147-1    Filed 04/25/24    Entered 04/25/24 14:53:16    Desc
Case 3:22-cv-02118-X Exhibit Order Lifting Stay to Receivership Proceeding Page 4 of 4 PageID 17265

the underlying settlement is not in the best interest of the Receivership Estate—or at least that the Receiver hasn't argued such sufficiently.[10]  Whether the settlement agreement is in the Receivership Estate's best interest is a determination the Court will make after the Bankruptcy Court issues its opinion and this Court decides to ratify "any approval of the agreements by the Bankruptcy Court."[11]  And finally, Barton claims that the Court must hold a 28 U.S.C. § 2001 hearing before making any disposition of the property, such as a settlement agreement.[12]  The Court previously disagreed with this argument outright.[13]

Accordingly, the Court **OVERRULES** Barton's objections and **GRANTS** the Receiver's motion.

**IT IS SO ORDERED** this 15th day of April, 2024.

_____
BRANTLEY STARR
UNITED STATES DISTRICT JUDGE

---

[10] Doc. 455 at 3.

[11] Doc. 458 at 6.

[12] Doc. 455 at 3–4.

[13] *See* Doc. 163 (Order Granting Receiver's Motion to Ratify Agreement with Lumar Land & Cattle) (the Court held that 28 U.S.C. § 2001 "which governs the sale of real property by a receiver, does not apply to settlement agreements or contractual compromises like the one at issue here.").

4

APP015

# EXHIBIT 3

APP016

## SETTLEMENT AGREEMENT AND RELEASE

This SETTLEMENT AGREEMENT AND RELEASE (the "Settlement Agreement") is entered into between BM318, LLC ("BM318") and The Dixon Water Foundation ("Dixon") as of the last date of the signature of the Parties and it shall become binding on the Parties as of the Effective Date (defined herein). BM318 and Dixon may be collectively referred to as the "Parties" or individually referred to as a "Party."

WHEREAS, on or about August 10, 2021, BM318 filed its *Complaint to Avoid and Recover Preferential and/or Fraudulent Transfer Pursuant to 11 U.S.C. §§ 548 and 550,* commencing Adv. Pro. No. 21-04051 (the "Adversary Proceeding") which is related to Bankruptcy Case No. 20-42789-MXM, *In re BM318, LLC* (the "Bankruptcy Case"), pending in the United States Bankruptcy Court for the Northern District of Texas, Fort Worth Division (the "Bankruptcy Court");

WHEREAS, in the Adversary Proceeding, BM318 has asserted claims against Dixon under §§ 547, 548 and 550 of the Bankruptcy Code related to 1,531.75 acres of land, being a part of the Bear Creek Ranch, located in Parker County, Texas (the "Property");

WHEREAS, subsequent to the filing of the Adversary Proceeding, the United States District Court for the Northern District of Texas (the "District Court"), in connection with a civil enforcement action captioned *Securities and Exchange Commission v. Timothy Barton, et al.* and numbered Case No. 3:22-cv-2118-X (the "Receivership Proceeding"), appointed Cortney C. Thomas as Receiver for BM318 and other entities controlled by Timothy Barton (the "Receiver");

WHEREAS, the Receiver expressly reserves any claims to recover from Dixon funds allegedly diverted from investors as alleged in the Receivership Proceeding (the "Investor Funds");

WHEREAS, in the Adversary Proceeding, Dixon disputes the allegations asserted against it, and denies any liability to BM318 for any claim asserted against it;

WHEREAS Dixon continues to maintain that it is not liable to BM318;

WHERAS, Dixon denies it has any liability to the Receiver in respect of any Investor Funds and expressly reserves all rights and defenses of any kind;

WHEREAS, without making any admissions of liability or other concessions, the Parties enter into this Settlement Agreement solely to avoid the cost, expense, and inconvenience of litigation.

NOW THEREFORE, in consideration of the foregoing Recitals which are incorporated into and are a part of this Settlement Agreement, and the promises, conditions, and covenants contained in this Settlement Agreement, and other good and valuable consideration, the adequacy of which is acknowledged, the Parties agree as follows:

1.     **Court Approval.** This Settlement Agreement is subject to, and it shall not be effective until, an order approving this Settlement Agreement is entered by the Bankruptcy Court and an order ratifying this Settlement Agreement is entered by the District Court ("Court

1

Approval"). Upon the Parties' execution of this Settlement Agreement, the Receiver shall file a motion in the Receivership Proceeding seeking an order from the District Court lifting the stay of the Bankruptcy Case for the purpose of the Parties seeking approval of this Settlement Agreement by the Bankruptcy Court. Upon the District Court's entry of an order lifting of the stay of the Bankruptcy Case, the Parties shall file a motion (and shall attach an executed copy of this Settlement Agreement thereto) seeking an order from the Bankruptcy Court approving this Settlement Agreement pursuant to Federal Rule of Bankruptcy Procedure 9019. Upon the Bankruptcy Court's entry of an order approving the Settlement Agreement, the Receiver shall file a motion in the Receivership Proceeding (and shall attach an executed copy of this Settlement Agreement thereto) seeking an order from the District Court ratifying this Settlement Agreement. The Parties agree to cooperate in good faith to effectuate the terms and conditions of this Settlement Agreement, including taking all necessary actions to acquire Court Approval. If this Settlement Agreement does not receive Court Approval, it shall be null and void.

2.    **Payment.** Dixon agrees to pay BM318 the total sum of ONE HUNDRED THOUSAND DOLLARS ($100,000.00) (the "Settlement Payment"). The Settlement Payment is to be made by a check payable to "Cortney C. Thomas, as Receiver for BM318, LLC." The Settlement Payment is to be delivered to the Receiver within seven (7) days after this Settlement Agreement receives Court Approval ("Payment Deadline").

3.    **Event of Default; Right to Cure and Remedies.** Dixon's failure to make the Settlement Payment by the Payment Deadline shall constitute an "Event of Default" under this Settlement Agreement. Dixon shall have seven (7) days to cure an Event of Default for failing to make the timely Settlement Payment. If Dixon fails to make the Settlement Payment, then the Receiver, at his sole discretion, may bring suit against Dixon to enforce this Settlement Agreement.

4.    **Release by BM318.** Effective as of the Effective Date, BM318 on its own behalf and on behalf of its creditors (collectively, the "BM318 Releasors") hereby releases Dixon and any of Dixon's past and/or present employees, agents, attorneys, representatives, assigns, members, directors, officers, shareholders, guarantors, insurers, subsidiaries, affiliated entities, related corporations, corporate parents, predecessors, successors and any other persons acting or purporting to act on behalf of Dixon (collectively, the "Dixon Released Parties"), from any and all liability for any and all claims, causes of action, demands, judgments, omissions, duties, obligations, losses, debts, promises, damages, costs, attorneys' fees and expenses, whether in law or in equity, whether known or unknown, direct or contingent, asserted or unasserted, suspected or unsuspected, choate or inchoate, however arising, which any of the BM318 Releasors has or had against any of the Dixon Released Parties, including, but not limited to, those asserted or which could have been asserted in the Adversary Proceeding. It is expressly understood, however, that the Receiver is not a party to this release and accordingly the Receiver is not providing any release of any claims he may hold, including but not limited to, claims for the recovery of any Investor Funds that may have been transferred to Dixon by BM318 or other Receivership Entities.[1]

---

[1] "Receivership Entities" includes all entities subject to administration in the Receivership Proceeding including, but not limited to, those entities identified in the District Court's *Order Appointing Receiver* [Receivership Proceeding, Docket No. 29] and later supplemental orders entered in the Receivership Proceeding [Receivership Proceeding, Docket Nos. 62, 88, etc.].

APP018

5.      **Release by Dixon.** Effective as of the Effective Date, Dixon, on its own behalf and on behalf of its agents, attorneys, representatives, assigns, guarantors, and/or creditors (collectively, the "Dixon Releasors"), hereby releases BM318, from any and all liability for any and all claims, causes of action, demands, judgments, omissions, duties, obligations, losses, debts, promises, damages, costs, attorneys' fees and expenses, whether in law or in equity, whether known or unknown, direct or contingent, asserted or unasserted, suspected or unsuspected, choate or inchoate, however arising, which Dixon has or had against BM318, including, but not limited to, those asserted or which could have been asserted in the Adversary Proceeding. It is expressly understood, however, that Dixon does not release any defense whatsoever to any potential claim by the Receiver or any other person seeking to recover any Investor Funds that may have been transferred to Dixon.

6.      **No Admissions of Liability by Dixon.** This Settlement Agreement is intended to be and is a compromise between BM318 and Dixon to avoid the cost, expense and inconvenience of litigation and shall not be construed as an admission of liability; nor shall this Settlement Agreement be construed as a waiver, modification, or retraction of the positions of the Parties with respect to the claims asserted by BM318 in the Adversary Proceeding.

7.      **Dismissal of the Adversary Proceeding as Against Dixon.** BM318 agrees that within five (5) business days of this Settlement Agreement receiving Court Approval, BM318 shall make all appropriate filings to dismiss, with prejudice, the Adversary Proceeding as against Dixon, with each Party to bear its own costs, expenses, and attorneys' fees. Such filings shall be subject to Dixon's approval.

8.      **Release of Lis Pendens.** BM318 agrees that within five (5) business days of this Settlement Agreement receiving Court Approval, BM318 shall file a release of the lis pendens BM318 filed against the Property. Such filing shall be subject to Dixon's approval. To the extent that Timothy Barton or anyone purporting to act on behalf of Mr. Barton files any additional lis pendens against the Property, BM318 will promptly cooperate with Dixon to obtain removal of any such lis pendens.

9.      **Authority.** The Parties represent that, subject to Court Approval, they have the legal right and authority required to compromise and settle all claims under the terms and conditions set forth herein. The Parties also represent that the signatures on behalf of the Parties, or their counsel, to this Settlement Agreement, are sufficient, without further approval of third parties, other than Court Approval, to fully bind such party to the terms hereof, including without limitation, the Settlement Payment and releases set forth herein.

10.     **Sufficiency of Consideration.** The Parties acknowledge the sufficiency of the consideration referenced herein to compromise and settle all claims, causes of action, demands, judgments, costs, and attorneys' fees and expenses, whatsoever settled, discharged, and/or released herein. The Parties further warrant that no promise or inducement has been offered other than the consideration referenced herein and that this Settlement Agreement is being executed without reliance on any statement or representation by any Party being released herein or by its representatives concerning the nature and extent of losses and damages or the liability therefore or any further future payment.

11.    **Counterparts.** This Settlement Agreement may be executed by each of the Parties in counterparts with the same effect as if the Parties had signed the same original. Facsimile signatures or signatures transmitted via electronic means shall be accepted as original signatures.

12.    **General.** This Settlement Agreement shall be governed in accordance with the laws of the State of Texas and shall inure to the benefit of and be binding upon the Parties and their respective successors, and assigns. Any litigation arising from this Settlement Agreement shall be brought in the Receivership Proceeding. The Recitals set forth in the beginning of this Settlement Agreement are incorporated herein.

13.    **Notice.** Any notice required under this Settlement Agreement shall be submitted in writing and sent via email and overnight delivery service or express mail next day delivery and addressed to:

| BM318 | DIXON |
|---|---|
| Courtney C. Thomas | Deborah M. Perry |
| BROWN FOX PLLC | MUNSCH HARDT KOPF & HARR, P.C. |
| 8111 Preston Road, Suite 300 | 500 N. Akard Street, Suite 3800 |
| Dallas, Texas 75225 | Dallas, Texas 75201 |
| Telephone: (214) 327-5000 | Telephone: (214) 855-7500 |
| Email: cort@brownfoxlaw.com | Email: dperry@munsch.com |

14.    **Entire Agreement.** Any and all prior understandings and agreements between the Parties with respect to the subject matter of this Settlement Agreement are merged into and with this Settlement Agreement, which fully and completely expresses the entire agreement and understanding of the Parties with respect to the subject matter of the Settlement Agreement. Neither Party is relying and hereby disclaims reliance on any other representation, omission, or document not expressly contained in this Agreement.

15.    **Successors and Assigns.** This Settlement Agreement shall be binding upon and inure to the benefit of the Parties' respective successors and assigns.

16.    **Modifications.** This Settlement Agreement shall not be modified except by an instrument in writing signed by the Party against whom the enforcement of any modification is sought.

17.    **Necessary Actions.** The Parties shall take any and all steps and actions and execute any and all documents necessary to effectuate the terms and conditions of this Settlement Agreement.

18.    **Severability.** All provisions within this Settlement Agreement are to be read in conjunction with each other. Provisions should be read together so as to harmonize the whole. Before declaring any provision of this Settlement Agreement invalid, a court shall first attempt to construe all provisions valid to the fullest extent possible consistent with applicable precedents. If any provision of this Settlement Agreement is found by a court to be void, voidable, or otherwise unenforceable, all remaining provisions of this Settlement Agreement shall remain in full force

4

APP020

and effect so as to carry out the expressed intent of the Parties herein, and the Parties shall promptly attempt in good faith to negotiate a suitable replacement provision.

19.    **Headings.**    All headings within the Settlement Agreement are provided for convenience and reference only and shall not affect the interpretation of this Settlement Agreement in any way.

20.    **Effective Date of Settlement Agreement.**    This Settlement Agreement is expressly conditioned on it receiving Court Approval.  The "Effective Date" of this Settlement Agreement shall be the date on which the District Court enters an order in the Receivership Proceeding ratifying this Settlement Agreement, following the Bankruptcy Court's entry of an order approving this Settlement Agreement in the Bankruptcy Case, at which time this Settlement Agreement shall become immediately binding on each of the Parties.

**AGREED:**

**BM318, LLC**

By: _____
Cortney C. Thomas, in his
capacity as Receiver

Dated: 6/20/23

**THE DIXON WATER FOUNDATION**

DocuSigned by:
By: _____
5DF4F5511AAD475...

Printed Name: Casey Wade

Its: President/CEO

Dated: 6/21/2023

5

APP021

# EXHIBIT 4

APP022

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | |
|---|---|
| In re:<br><br>BM318, LLC,<br><br>    Debtor. | §<br>§  Case No. 20-42789-MXM<br>§<br>§<br>§  Chapter 11<br>§<br>§<br>§ |

**<u>ORDER APPROVING DIXON COMPROMISE AND SETTLEMENT</u>**

CAME ON FOR CONSIDERATION the *Joint Motion of BM318, LLC and The Dixon Water Foundation for Approval of Compromise and Settlement of Adversary Proceeding No. 21-04051* (the "<u>Motion</u>"), and the Court, having considered the Motion and any responses and replies thereto, finds that the Settlement Agreement, as set forth in Exhibit "B" attached to the Motion, is the product of arm's-length negotiations between the Parties; the Settlement Agreement represents a fair and reasonable resolution of the Claims and the Adversary Proceeding in relation to the Parties; and, thus, the Settlement Agreement is fair and reasonable, is in the best interests of the Reorganized Debtor and its creditors, and is the result of the exercise of sound business judgment. It is therefore

4882-8128-2915v.2 018527.00001

**APP023**

ORDERED that the relief requested in the Motion is GRANTED; it is further

ORDERED  that the terms of the Settlement Agreement are APPROVED; it is further

ORDERED that BM318, LLC is authorized to enter into a settlement and compromise substantially in the same form as the Settlement Agreement and authorized to take any and all actions deemed necessary and/or appropriate to consummate the settlement set forth therein; and it is further

ORDERED that this Court shall retain jurisdiction over any and all disputes that may arise in relation to the terms and/or enforcement of the Settlement Agreement and/or this Order.

### END OF ORDER ###

Order Submitted By:
MUNSCH HARDT KOPF & HARR, P.C.
Deborah M. Perry
Texas Bar No. 24002755
500 N. Akard Street, Suite 4000
Dallas, Texas 75201-6659
Telephone: (214) 855-7500
Facsimile: (214) 855-7584
Email:  dperry@munsch.com

**ATTORNEYS FOR THE DIXON WATER**
**FOUNDATION**

and

BROWN FOX PLLC
Charlene C. Koonce
Texas Bar No. 11672850
C. Alan Carrillo
Texas Bar No. 24109693
8111 Preston Road, Suite 300
Dallas, Texas 75225
Telephone:  (214) 327-5000
Facsimile:  (214) 327-5001
Email:  charlene@brownfoxlaw.com
Email:  alan@brownfoxlaw.com

**ATTORNEYS FOR RECEIVER FOR BM318, LLC**

4882-8128-2915v.2 018527.00001

APP024

# EXHIBIT 5

APP025

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| In re: | § § § | Chapter 11 |
| BM318, LLC, | § § § | Case No. 20-42789-MXM |
| Debtor | § | |
| BM318, LLC, | § § § | |
| Plaintiff, | § § | |
| v. | § § | Adv. Pro. No. 21-04051-MXM |
| THE DIXON WATER FOUNDATION, | § § § | |
| Defendant. | § § | |
| LUMAR LAND & CATTLE, LLC | § § § | |
| Plaintiff-in-Intervention | § | |

**FINAL AGREED JUDGMENT DISMISSING THE ADVERSARY PROCEEDING**

This adversary proceeding was commenced by BM318, LLC ("BM318"), as the plaintiff, against The Dixon Water Foundation ("Dixon"), as the defendant. Thereafter, Lumar Land & Cattle, LLC ("Lumar") was granted leave to intervene in this adversary proceeding. Cortney C. Thomas ("Receiver") has been appointed as Receiver for BM318 through the following lawsuit ("Receivership Lawsuit"):

> *Securities and Exchange Commission v. Timothy Barton, et al.*,
> Case 3:22-cv-2118-X, in the United States District Court for the
> Northern District of Texas, Dallas Division.

The Receiver (acting on behalf of BM318) and Dixon have entered into a settlement agreement ("Dixon Settlement Agreement") which fully resolves all matters pending between them in this adversary proceeding. Lumar is not a party to the Dixon Settlement Agreement.

1

The Dixon Settlement Agreement has been approved by this Court by Order entered as Docket No. __ in the above-captioned chapter 11 bankruptcy case, and has been ratified on behalf of the Receiver, acting on behalf of BM318, by the district court in the Receivership Lawsuit.  Pursuant to the Dixon Settlement Agreement, the Receiver and Dixon have agreed to entry of this Final Agreed Judgment fully and finally settling and dismissing all claims and disputes between them in this adversary proceeding.

The Receiver (acting on behalf of BM318) and Lumar have entered into a separate settlement agreement ("Lumar Settlement Agreement") which fully resolves all claims and disputes pending between them in this adversary proceeding.  Dixon is not a party to the Lumar Settlement Agreement.  The Lumar Settlement Agreement has been approved by this Court by Order entered as Docket No. __ in the above-captioned chapter 11 bankruptcy case, and has been ratified on behalf of the Receiver, acting on behalf of BM318, by the district court in the Receivership Lawsuit.  Pursuant to the Lumar Settlement Agreement, the Receiver and Lumar have agreed to the entry of this Final Agreed Judgment fully and finally settling and dismissing all claims and disputes between them in this adversary proceeding.

ACCORDINGLY, it is hereby ORDERED, ADJUDGED and DECREED that:

1.      All claims, causes of action, or other claims for any form of relief asserted in this adversary proceeding by any party are hereby dismissed with prejudice to the refiling of the same.  This dismissal with prejudice shall encompass not only the claims actually asserted by any party in this adversary proceeding, but also any claim, cause of action or claim for relief which could have been asserted based upon the transactions or occurrences which form the subject matter of this adversary proceeding.

2

2.    All attorney's fees and costs of court shall be borne by the party initially incurring the same.

3.    This judgment is a final judgment fully and finally disposing of all claims, causes of action, or claims for relief asserted by any party in this adversary proceeding.

4.    Upon the entry of this judgment, the lis pendens filed by BM318 and recorded under Instrument No. 202142097 in the official real property records of Parker County, Texas is hereby dissolved.

5.    The form of Release of Lis Pendens attached hereto as Exhibit 1 is confirmed, approved, and legally effective.

6.    All relief not specifically granted herein is denied.

7.    The Court retains jurisdiction to construe and enforce this Final Agreed Judgment.


### ### END OF ORDER ###


**Approved for Entry**:


_____
Charlene C. Koonce
State Bar No. 11672850
Email:  charlene@brownfoxlaw.com
C. Alan Carillo
State Bar No. 24109693
Email:  alan@brownfoxlaw.com
**BROWN FOX PLLC**
8111 Preston Road, Suite 300
Dallas, Texas 75225
Telephone:  (214) 327-5000
Facsimile:  (214) 327-5001

**ATTORNEYS FOR CORTNEY C. THOMAS, RECEIVER FOR BM318, LLC, ET AL.**

APP028

_____
Deborah M. Perry
Texas Bar No. 24002755
Email:  dperry@munsch.com
**MUNSCH HARDT KOPF & HARR, P.C.**
500 N. Akard Street, Suite 4000
Dallas, Texas 75201-6659
Telephone: (214) 855-7500
Facsimile: (214) 855-7584

**ATTORNEYS FOR THE DIXON WATER
FOUNDATION**


_____
J. Robert Forshey
Texas Bar No. 07264200
Email:  bforshey@forsheyprostok.com
**FORSHEY & PROSTOK, LLP**
777 Main Street, Suite 1550
Fort Worth, Texas 76102
Telephone:  (817) 877-8855
Facsimile:   (817) 877-4151

and

Kimberly P. Harris
Texas Bar No. 24002234
Email: kharris@qslwm.com
Joshua L. Shepherd
Texas Bar No. 24058104
Email: jshepherd@qslwm.com
**QUILLING, SELANDER, LOWNDS,
WINSLETT & MOSER, PC**
2001 Bryan Street, Suite 1800
Dallas, Texas 75201
Telephone: (214) 871-2100
Facsimile: (214) 871-2111

**ATTORNEYS FOR LUMAR LAND AND CATTLE, LLC**

4

**EXHIBIT 1 TO JUDGMENT**

<u>**RELEASE OF LIS PENDENS**</u>

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF PARKER | § |

On October 27, 2021, BM318, LLC filed a Notice of Lis Pendens in the real property records of Parker County, Texas, pursuant to an adversary proceeding filed in the United States Bankruptcy Court for the Northern District of Texas as a part of the Chapter 11 Case *In re BM318, LLC,* Case No. 20-42789 with the adversary proceeding itself being styled *BM318, LLC v. Dixon Water Foundation* and numbered Adversary Proceeding 21-04051-MXM (the "<u>Notice of Lis Pendens</u>").

A.      The Notice of Lis Pendens was recorded under Instrument No. 202142097, in the official real property records of Parker County, Texas.

B.      The lawsuit described above has been settled, and the approval of the settlement pursuant to Bankruptcy Rule 9019 has been entered on the docket of the adversary proceeding.

**RELEASE**

NOW, THEREFORE, BM318, LLC, by and through its Receiver Cortney C. Thomas (appointed in case of *Securities and Exchange Commission v. Timothy Barton, et al.*, Case No. 3:22-cv-2118-X (N.D. Tex.))[1] cancels and releases the Notice of Lis Pendens previously filed upon the property more particularly described as:

> 2055.70 acres of land situated in the JAMES BRADY SURVEY, ABSTRACT No. 119, JAMES BRADLEY SURVEY, ABSTRACT No. 120, JOHN D. BAY SURVEY, ABSTRACT NO. 195, J.H. REAM SURVEY, ABSTRACT No. 1106, T.J. BENDERMAN SURVEY, ABSTRACT No. 2519, I. & G.N. RR. CO., SECTION NO. 3, BLOCK 1, ABSTRACT NO. 1799 and the PETER B. HOLDER SURVEY, ABSTRACT No. 614, Parker County, Texas, being a portion of those certain tracts of land described in deed as Parcel No. 1 and Parcel No. 2, said 2055.70 acres being more particularly described as Tract 1 on the attached Exhibit

---

[1] A copy of the Order appointing the Receiver is attached hereto as Exhibit B.

**RELEASE OF LIS PENDENS - PAGE 1 OF 7**

4883-3651-4487v.2 018527.00001

**EXHIBIT 1 TO JUDGMENT**

A, and the access easement more particularly described as Tract 2 on the attached Exhibit A.

Witness my hand, this _____ day of _____, 2024.

**BM318, LLC**

/s/ _____
Its Receiver Courtney C. Thomas

c/o Charlene C. Koonce
charlene@brownfoxlaw.com
BROWN FOX PLLC
8111 Preston Road, Suite 300
Dallas, Texas 75225
Telephone: (214) 327-5000

## ACKNOWLEDGMENT

STATE OF TEXAS          §
                        §
COUNTY OF DALLAS        §

This instrument was acknowledged before me on the _____ day of _____, 2024 by Courtney C. Thomas, Receiver for BM318, LLC.

_____

Name: _____

Notary Public, State of Texas

My commission expires: _____

After Recording Return to:          Seal:

Munsch Hardt Kopf & Harr, P.C.
c/o Deborah M. Perry
500 N. Akard Street, Suite 4000
Dallas, Texas 75201
(214) 855-7500

**RELEASE OF LIS PENDENS - PAGE 2 OF 7**

4883-3651-4487v.2 018527.00001

APP031

**EXHIBIT 1 TO JUDGMENT**

EXHIBIT A

PROPERTY DESCRIPTION

## TRACT 1

**2055.70 acres of land situated in the JAMES BRADY SURVEY, ABSTRACT No. 119, JAMES BRADLEY SURVEY, ABSTRACT No. 120, JOHN D. BAY SURVEY, ABSTRACT NO. 195, J.H. REAM SURVEY, ABSTRACT No. 1106, T.J. BENDERMAN SURVEY, ABSTRACT No. 2519, I. & G.N. RR. CO., SECTION NO. 3, BLOCK 1, ABSTRACT NO. 1799 and the PETER B. HOLDER SURVEY, ABSTRACT No. 614, Parker County, Texas, being a portion of those certain tracts of land described in deed as Parcel No. 1 and Parcel No. 2, said 2055.70 acres being more particularly described as follows:**

BEGINNING at the most westerly northwest corner of said Parcel No. 2, in Bear Creek Road (Right-of-Way varies), from which a 2" steel fence corner post found in the south line of said Bear Creek Road bears S 01°12'56" E, a distance of 40.00 feet, for reference, said BEGINNING point having a NAD 83, Zone 4202 (Grid) coordinate value of NORTH: 6918277.984 and EAST: 2233063.538, for reference;

THENCE along Bear Creek Road, as follows:
S 67°36'03" E, a distance of 3869.57 feet to the most northerly northeast corner of said Parcel No. 2;
S 02°12'27" E, a distance of 1472.57 feet to a point;
S 55°59'27" E, a distance of 1165.45 feet to a point;
S 71°46'27" E, a distance of 801.00 feet to a point;
S 70°43'19" E, a distance of 221.91 feet to a point;
S 70°45'54 E, a distance of 1742.88 feet to a point for the most northerly northeast corner of the herein described 2055.70 acre tract;

THENCE S 24°06'27" W, leaving said Bear Creek Road, passing the northwest corner of that certain tract of land described in deed to Kevin Reeves, recorded in Instrument Number 2017-02400, Official Public Records, Parker County, Texas, and continuing along the most west line of said Reeves tract, in all, a distance of 1186.42 feet to a point from which a 5/8" iron rod found bears N 60°42'50" W, a distance of 0.42 feet, for reference;

THENCE along the southwesterly lines of said Reeves tract as follows:

S 60°42'50" E, a distance of 230.94 feet to a 5/8" iron rod found;
S 14°49'14" E, a distance of 744.61 feet to a 5/8" iron rod found;
N 72°21'34" E, a distance of 390.26 feet to a point from which a 3" steel pipe fence post bears N 06°43'26" W, a distance of 1.25 feet for reference;
S 00°10'37" W, a distance of 764.25 feet to a 1/2" iron rod found at the southwest corner of said Reeves tract, being in the north line of a Seventy (70) foot wide Transmission Easement and Right-of-Way recorded in Book 2684, Page 531 and Book 2734, Page 1161, Official Public Records, Parker County, Texas;

**RELEASE OF LIS PENDENS - PAGE 3 OF 7**

4883-3651-4487v.2 018527.00001

APP032

**EXHIBIT 1 TO JUDGMENT**

THENCE along the south line of said Reeves tract and the north line of said Transmission Easement and Right-of-Way, as follows:

N 89°17'27" E, a distance of 766.57 feet to a point;
S 87°58'20" E, a distance of 852.96 feet to a point;
S 87°37'59" E, a distance of 500.58 feet to a point in the west occupied line of said Bear Creek Road, at the southeast corner of said Reeves tract;

THENCE S 20°01'40" E, along the west occupied line of said Bear Creek Road, a distance of 75.70 feet to a 5/8" capped iron rod found stamped "Brooks Baker", being in the most easterly south line of said Parcel No. 2;

THENCE along the most easterly south line of said Parcel No. 2, as follows:

N 87°38'33" W, a distance of 529.23 feet to a point;
N 87°58'55" W, a distance of 851.08 feet to a point;
S 89°16'51" W, a distance of 765.97 feet to a point at the most southerly southwest corner of said Parcel No. 2 and being in the east line of said Parcel No. 1;

THENCE S 03°54'04" E, along the east line of said Parcel No. 1 and along the called east line of said BENDERMAN SURVEY, a distance of 10017.79 feet to a 2" pipe in concrete at the southeast corner of said Parcel No. 1 and being the called southeast corner of said BENDERMAN SURVEY;

THENCE S 89°26'10" W, along the south line of said Parcel No. 1 and along the called south line of said BENDERMAN SURVEY, a distance of 1606.98 feet to a 5/8" capped iron rod found stamped "Brooks Baker";

THENCE S 89°48'07" W, continuing along the south line of said Parcel No. 1 and continuing along the called south line of said BENDERMAN SURVEY, a distance of 3711.27 feet to a 2" pipe in concrete found at the most southerly southwest corner of said Parcel No. 1;

THENCE N 01°35'25" W, along the most southerly west line of said Parcel No. 1, a distance of 1216.91 feet to a 2" pipe in concrete found at an interior corner of said Parcel No. 1 and being in the called south line of said J.H. REAN SURVEY;

THENCE N 89°19'15" W, along the most westerly south line of said Parcel No. 1 and along the called south line of said J.H. REAN SURVEY, a distance of 660.00 feet to a 2" pipe in concrete found at the most westerly southwest corner of said Parcel No. 1 and being the called southwest corner of said J.H. REAN SURVEY;

THENCE along the west line of said Parcel No. 1 and along the called west line of said J.H. REAN SURVEY, as follows:

N 00°01'41" W, a distance of 2676.89 feet to a 5/8" iron rod found;
N 00°04'03" W, a distance of 1981.74 feet to a 5/8" iron rod found;



**RELEASE OF LIS PENDENS - PAGE 4 OF 7**

4883-3651-4487v.2 018527.00001

**EXHIBIT 1 TO JUDGMENT**

N 00°10'29" E, a distance of 1520.50 feet to a 5/8" iron rod found;

N 00°04'43" W, a distance of 1097.99 feet to a 5/8" iron rod found;

N 00°02'24" W, a distance of 901.55 feet to a 1/2" capped iron rod set stamped "C.F. Stark RPLS 5084";

N 00°25'07" W, a distance of 984.78 feet to a 2" pipe in concrete found at an interior corner of said Parcel No. 1;

THENCE N 89°37'52" W along the most northerly south line of said Parcel No. 1, a distance of 2013.88 feet to a 1/2" capped iron rod set stamped "C.F. Stark RPLS 5084, at the most westerly southwest corner of said Parcel No. 1;

THENCE N 00°45'08" W, along the most westerly west line of said Parcel No. 1, a distance of 1196.14 feet to a 5/8" rod found;

THENCE N 01°17'22" W, continuing along the most westerly west line of said Parcel No. 1, a distance of 1964.12 to a 5/8" capped iron rod found stamped "Brooks Baker" at the northwest corner of said Parcel No. 1 and being the southwest corner of said Parcel No. 2, from which a 5/8" capped iron rod found (not legible) bears S 88°46'12" E, a distance of 728.31 feet for reference;

THENCE N 01°17'05" W, along the west line of said Parcel 2, a distance of 3591.76 feet to the POINT OF BEGINNING and containing 2055.70 acres, more or less.

**SAVE AND EXCEPT** that certain 381.66 acres tract of land as conveyed to GH Lumar JV in Warranty Deed, filed 09/13/2019, recorded in cc#2019-24134, Real Property Records, Parker County, Texas.

**SAVE AND EXCEPT** that certain 23.95 acres of land, situated in Parker County, Texas, out of the JAMES BRADLEY SURVEY, ABSTRACT NUMBER 119, the JAMES BRADLEY SURVEY, ABSTRACT NUMBER 120, the JOHN D. BAY SURVEY, ABSTRACT NUMBER 195 and the J. H. REAN SURVEY, ABSTRACT NUMBER 1106, and being part of a 2055.70 acre tract of land that is described in a deed from The Dixon Water Foundation to BM 318, LLC, dated November 26, 2018, recorded in Instrument No. 201829926, Official Public Records of Parker County, Texas and further described as follows:

BEGINNING at a railroad spike set in Bear Creek Road, and being an internal corner of said 2055.70 acre tract, and being in the East line of a 381.66 acres tract of land that is described in a deed from BM 318, LLC to GH Lumar JV, dated September 11, 2019, recorded in Instrument No. 201924134, Official Public Records of Parker County, Texas, for the Northwest corner of this tract;

THENCE South 55 degrees 59 minutes 27 seconds East, 840.04 feet, along Bear Creek Road, with the North line of said 2055.70 acre tract, to a railroad spike set at the calculated Northeast corner of a 60 foot wide access easement that is described in deed to GH Lumar JV, for the Northeast corner of this tract;

**RELEASE OF LIS PENDENS - PAGE 5 OF 7**

4883-3651-4487v.2 018527.00001

**EXHIBIT 1 TO JUDGMENT**

THENCE South 33 degrees 46 minutes 16 seconds West, 811.29 feet, to a 1/2 inch iron rod set, South 09 degrees 44 minutes 07 seconds West, 103.49 feet to a 1/2 inch iron rod set, South 32 degrees 59 minutes 06 seconds East 349.92 feet, to a 1/2 inch iron rod set, South 09 degrees 47 minutes 14 seconds East, 797.08 feet, to a 1/2 inch iron rod set, and South 00 degrees 31 minutes 28 seconds East, 655.53 feet, to a 1/2 inch iron rod set, for the Southeast corner of this tract;

THENCE North 80 degrees 56 minutes 20 seconds West, 369.25 feet, to a 1/2 inch iron rod set in the East line of said 381.66 acre tract, for the Southwest corner of this tract;

THENCE with the East line of said 381.66 acre tract, as follows North 02 degrees 12 minutes 27 seconds West, 1405.48 feet, to a 1/2 inch iron rod set, North 69 degrees 20 minutes 36 seconds West, 89.55 feet, to a 1/2 inch iron rod set, and North 02 degrees 12 minutes 27 seconds West, 1487.68 feet, to the Point of Beginning and containing 23.95 acres of land.

## SAVE AND EXCEPT

BEING 118.34 acres situated in the JAMES BRADLEY SURVEY, ABSTRACT NO. 120, Parker County, Texas, being a portion of that certain tract of land described in deed as Parcel No. 2, to The Dixon Foundation, recorded in Book 2416, Page 417, Official Public Records, Parker County, Texas, said 118.34 acres being more particularly described as follows:

BEGINNING at the most westerly northwest corner of said Parcel No. 2, in Bear Creek Road (Right-of-Way varies), from which a 2" steel

fence corner post found in the south line of said Bear Creek Road bears S 01°12'56" E, a distance of 40.00 feet, for reference, said BEGINNING point having a NAD 83, Zone 4202 (Grid) coordinate value of NORTH: 6918277.984 and EAST: 2233063.538, for reference;

THENCE S 67°36'03" E, along the approximate centerline of said Bear Creek Road and along the most north line of said Parcel No. 2, a distance of 2856.45 feet to a point for the northeast corner of the herein described 118.34 acre tract;

THENCE S 24°50'49" W, leaving the approximate centerline of said Bear Creek Road, and being along the west line of a Fifty (50) foot wide Right-of-Way Agreement to ONEOK Arbuckle Pipeline, L.L.C., recorded in Book 2651, Page 405, Official Public Records, Parker County, Texas, at a distance of 23.85 feet, passing a 1/2" capped iron rod set stamped "C.F. Stark RPLS 5084", and continuing, along the west line of said Fifty (50) foot wide Right-of-Way Agreement, in all, a distance of 205.78 feet to a 1/2" capped iron rod set stamped "C.F. Stark RPLS 5084";

THENCE S 04°46'43" W, continuing along the west line of said Fifty (50) foot wide Right-of-Way Agreement, a distance of 1684.81 feet to a point in the approximate centerline of Bear Creek for the southeast corner of the herein described 118.34 acre tract;

THENCE along the approximate centerline of said Bear Creek, as follows:

N 61°36'37" W, a distance of 807.44 feet to a point;

**RELEASE OF LIS PENDENS - PAGE 6 OF 7**

4883-3651-4487v.2 018527.00001

APP035

**EXHIBIT 1 TO JUDGMENT**

N 71°14'04" W, a distance of 217.93 feet to a point;

N 85°16'07" W, a distance of 121.44 feet to a point;

S 77°05'53" W, a distance of 141.01 feet to a point;

S 82°12'59" W a distance of 239.64 feet to a point;

S 49°32'26" W, a distance of 208.64 feet to a point;

N 86°11'59" W, a distance of 114.28 feet to a point;

N 53°45'49" W a distance of 175.97 feet to a point;

N 47°13'56" W, a distance of 200.18 feet to a point;

N 80°08'35" W, a distance of 392.40 feet to a point in the west line of said Parcel No. 2, for the southwest corner of the herein described 118.34 acre tract, from which a 5/8" capped iron rod found at the southwest corner of said Parcel No. 2 bears S 01°17'05" E, a distance of 1216.41 feet, for reference;

THENCE N 01°17'05" W, along the west line of said Parcel No. 2, a distance of 2375.35 to the POINT OF BEGINNING and containing 118.34 acres of land, more or less.

---

## TRACT 2

TOGETHER WITH ACCESS EASEMENT CREATED BY THAT CERTAIN ACCESS EASEMENT, FILED 02/06/2020, RECORDED IN CC#202003138, REAL PROPERTY RECORDS, PARKER COUNTY, TEXAS.

**RELEASE OF LIS PENDENS - PAGE 7 OF 7**

4883-3651-4487v.2 018527.00001

Case 3:22-cv-02118-X    Document 525    Filed 07/08/24    Page 40 of 264    PageID 18682
Case 20-42789-mxm11    Doc 147-4    Filed 04/25/24    Entered 04/25/24 14:53:16    Desc
Case 3:22-cv-02118Exhibit D Du Proposed Judgment 14/29/23 Page 12 of 39 28    PageID 15209

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § § § § § | |
| *Plaintiff,* | § § § | |
| v. | § § § | Civil Action No. 3:22-CV-2118-X |
| TIMOTHY BARTON, CARNEGIE DEVELOPMENT, LLC, WALL007, LLC, WALL009, LLC, WALL010, LLC, WALL011, LLC, WALL012, LLC, WALL016, LLC, WALL017, LLC, WALL018, LLC, WALL019, LLC, HAOQIANG FU (a/k/a MICHAEL FU), STEPHEN T. WALL, | § § § § § § § § § § § § § § § | |
| *Defendants,* | § § | |
| DJD LAND PARTNERS, LLC, and LDG001, LLC, | § § § | |
| *Relief Defendants.* | § § | |

**ORDER APPOINTING RECEIVER**

For the reasons set out in a memorandum opinion and order filed today, the Court enters the following order.

**WHEREAS** this matter has come before this Court upon motion of Plaintiff Securities and Exchange Commission ("SEC") to appoint a receiver in the above-captioned action; and,

1

Case 3:22-cv-02118-X    Document 525    Filed 07/08/24    Page 41 of 264    PageID 18683
Case 20-42789-mxm11    Doc 147-4    Filed 04/25/24    Entered 04/25/24 14:53:16    Desc
Case 3:22-cv-02118-Exhibit D Document Proposed Judgment Page 19 of 28    PageID 15210

**WHEREAS** the Court finds that, based on the record in these proceedings, the appointment of a receiver in this action is necessary and appropriate for the purposes of marshaling and preserving all assets of the Receivership Entities (defined below);

**WHEREAS** the Court finds that: (a) there is a clear necessity for the receivership to protect defrauded investors' interest in property; (b) legal and less drastic equitable remedies are inadequate; and (c) the benefits of a receivership outweigh the burdens on the affected parties.

**WHEREAS** the Court finds that: (a) a receiver is necessary to manage the Receivership Entities' properties to preserve and protect the value of such properties; (b) Defendant Timothy Barton ("Barton") has misused and mismanaged the Receivership Entities' properties and has, and is likely to continue to, misuse, dissipate and/or conceal investor funds and assets obtained with, or that otherwise benefited from, investor funds; (c) certain Receivership Entities and their assets are subject to liens, lawsuits, and foreclosures that threaten to further diminish their value without the protection of a receiver that would have the power to stay litigation and foreclosures, among other powers; (d) there is a substantial risk that Barton, the Receivership Entities, and other entities that Barton directly or indirectly controls do not hold assets sufficient to satisfy the potential disgorgement of ill-gotten gains for the benefit of investors; (e) absent a receiver to manage, maximize, and protect the value of the Receivership Entities' assets, the investors' interest in these properties is at substantial risk; and (f) these benefits outweigh the burden on Barton.

**WHEREAS** the Court finds that each of the Receivership Entities received or

2

APP038

Case 3:22-cv-02118-X    Document 525    Filed 07/08/24    Page 42 of 264    PageID 18684
Case 20-42789-mxm11    Doc 147-4    Filed 04/25/24    Entered 04/25/24 14:53:16    Desc
Case 3:22-cv-02118Exhibit D – Proposed Judgment 11/29/23 Page 14 of 39 28    PageID 15211

benefited from assets traceable to Barton's alleged fraudulent activities that are the subject of this litigation.

**WHEREAS** this Court has subject matter jurisdiction over this action and personal jurisdiction over the Receivership Entities, and venue properly lies in this district.

**WHEREAS**, the Court finds that the SEC has brought this action to enforce the federal securities laws, in furtherance of the SEC's police and regulatory powers, and the relief sought by the SEC and provided in this Order is in the public interest by preserving the illicit proceeds of fraudulent conduct, penalizing past unlawful conduct and deterring future wrongdoing, and is not in furtherance of a pecuniary purpose, and therefore, the Court concludes that the entry of this Order is excepted from the automatic stay pursuant to 11 U.S.C. §362(b)(4).

**NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

1.    The Court hereby takes exclusive jurisdiction and possession of the assets, of whatever kind and wherever situated, of the following entities, each of which received or benefited from assets traceable to Barton's alleged fraudulent activities that are the subject of this litigation (collectively, "Receivership Entities"):

2.    126 Villita, LLC

3.    2999TC Acquisitions LLC

4.    2999TC JMJ CMGR, LLC (Delaware)

5.    AVG West, LLC

6.    BEE2019, LLC

3

Case 3:22-cv-02118-X    Document 525    Filed 07/08/24    Page 43 of 264    PageID 18685
Case 20-42789-mxm11   Doc 147-4   Filed 04/25/24   Entered 04/25/24 14:53:16   Desc
Case 3:22-cv-02118Exhibit D – Proposed Judgment/23 Page 15 of 439 28   PageID 15212

7.   BM318, LLC

8.   Broadview Holdings Trust

9.   Carnegie Development, LLC

10.   D4DS LLC

11.   D4FR LLC

12.   D4IN, LLC (Texas)

13.   D4KL, LLC

14.   D4MC, LLC (Texas)

15.   D4OP, LLC

16.   DJD Land Partners, LLC

17.   Enoch Investments, LLC

18.   FHC Acquisition, LLC

19.   Gillespie Villas, LLC

20.   Goldmark Hospitality, LLC

21.   HR Sterling, LLC

22.   JMJ Acquisitions, LLC

23.   JMJ Development LLC (f/k/a JMJ Development, Inc.)

24.   JMJ Hospitality, LLC

25.   JMJ VC Management, LLC

26.   JMJAV, LLC

27.   JMJD4, LLC (Delaware)

28.   JMR100, LLC

29.   LaJolla Construction Management, LLC

4

APP040

Case 3:22-cv-02118-X    Document 525    Filed 07/08/24    Page 44 of 264    PageID 18686
Case 20-42789-mxm11    Doc 147-4    Filed 04/25/24    Entered 04/25/24 14:53:16    Desc
Case 3:22-cv-02118Exhibit D - Proposed Judgment11/29/2Page 46 of 539 28    PageID 15213

30.     LC Aledo TX, LLC

31.     LDG001, LLC

32.     Lynco Ventures, LLC

33.     Mansions Apartment Homes at Marine Creek, LLC

34.     Marine Creek SP, LLC

35.     MO 2999TC, LLC

36.     Northstar PM, LLC (Texas)

37.     Orchard Farms Village, LLC

38.     Ridgeview Addition, LLC (Texas)

39.     Seagoville Farms, LLC

40.     SF Rock Creek, LLC

41.     TC Hall, LLC

42.     Titan Investments, LLC a/k/a Titan 2022 Investments, LLC

43.     Venus59, LLC

44.     Villita Development, LLC

45.     Villita Towers, LLC

46.     WALL007, LLC

47.     WALL009, LLC

48.     WALL010, LLC

49.     WALL011, LLC

50.     WALL012, LLC

51.     WALL016, LLC

52.     WALL017, LLC

APP041

Case 3:22-cv-02118-X    Document 525    Filed 07/08/24    Page 45 of 264    PageID 18687
Case 20-42789-mxm11    Doc 147-4    Filed 04/25/24    Entered 04/25/24 14:53:16    Desc
Case 3:22-cv-02118Exhibit D - Proposed Judgment 9/23 Page 17 of 28    PageID 15214

53.    WALL018, LLC

54.    WALL019, LLC

55.    WRL2019, LLC (Texas)

2.    Until further Order of this Court, Cortney C. Thomas is hereby appointed to serve without bond as receiver (the "Receiver") of the Receivership Entities.

3.    The Receiver shall have all powers, authorities, rights, and privileges heretofore possessed by the officers, directors, trustees, managers and general and limited partners of the entity Receivership Entities under applicable state and federal law, by the governing charters, by-laws, articles and/or agreements in addition to all powers and authority of a receiver at equity, and all powers conferred upon a receiver by the provisions of 28 U.S.C. §§ 754, 959 and 1692, and Rule 66 of the Federal Rules of Civil Procedure.

## I.    GENERAL POWERS AND DUTIES OF RECEIVER

4.    The trustees, directors, officers, managers, employees, investment advisers, accountants, attorneys and other agents of the Receivership Entities are hereby dismissed and the powers of any general partners, directors and/or managers are hereby suspended. Such persons and entities shall have no authority with respect to the Receivership Entities' operations or assets, except to the extent as may hereafter be expressly granted by the Receiver. The Receiver shall assume and control the operations of the Receivership Entities and shall pursue and preserve all of their claims.

APP042

Case 3:22-cv-02118-X    Document 525    Filed 07/08/24    Page 46 of 264    PageID 18688
Case 20-42789-mxm11    Doc 147-4    Filed 04/25/24    Entered 04/25/24 14:53:16    Desc
Case 3:22-cv-02118-X  Exhibit D - Proposed Judgment  Filed 11/29/23  Page 18 of 39  28  PageID 15215

5.  No person holding or claiming any position of any sort with any of the Receivership Entities shall possess any authority to act by or on behalf of any of the Receivership Entities.

6.  Subject to the specific provisions in Sections II through XII below, the Receiver shall have the following general powers and duties:

A.  To use reasonable efforts to determine the nature, location, and value of all property interests of the Receivership Entities, including, but not limited to, monies, funds, securities, credits, effects, goods, chattels, lands, premises, leases, claims, rights and other assets, together with all rents, profits, dividends, interest or other income attributable thereto, of whatever kind, which the Receivership Entities own, possess, have a beneficial interest in, or control directly or indirectly ("Receivership Property" or, collectively, the "Receivership Estates");

B.  To take custody, control, and possession of all Receivership Property and records relevant thereto from the Receivership Entities; to sue for and collect, recover, receive, and take into possession from third parties all Receivership Property and records relevant thereto;

C.  To manage, control, operate, and maintain the Receivership Estates and hold in his possession, custody, and control all Receivership Property, pending further Order of this Court;

D.  To use Receivership Property for the benefit of the Receivership Estates, making payments and disbursements and incurring expenses as may be necessary or advisable in the ordinary course of business in discharging his duties as Receiver;

E.  To take any action which, prior to the entry of this Order, could have been taken by the officers, directors, partners, managers, trustees, and agents of the Receivership Entities;

F.  To engage and employ persons in his discretion to assist him in carrying out his duties and responsibilities hereunder, including, but not limited to, accountants, attorneys, securities traders, registered representatives, financial or business advisers, liquidating agents, real estate agents, forensic experts, brokers, traders, or auctioneers;

7

Case 3:22-cv-02118-X    Document 525    Filed 07/08/24    Page 47 of 264    PageID 18689
Case 20-42789-mxm11    Doc 147-4    Filed 04/25/24    Entered 04/25/24 14:53:16    Desc
Case 3:22-cv-02118-X Document 447 Filed 11/29/23 Page 19 of 28    PageID 15216
Exhibit D - Proposed Judgment    Page 19 of 39

G.       To take such action as necessary and appropriate for the preservation of Receivership Property or to prevent the dissipation, concealment, or inequitable distribution of Receivership Property;

H.       Enter into and cancel contracts and purchase insurance as the Receiver deems necessary or advisable;

G.       The Receiver is authorized to issue subpoenas for documents and testimony consistent with the Federal Rules of Civil Procedure;

I.       To bring such legal actions based in law or equity in any state, federal, or foreign court as the Receiver deems necessary or appropriate in discharging his duties as Receiver;

J.       To pursue, resist, defend, compromise or otherwise dispose of all suits, actions, claims, and demands which may now be pending or which may be brought by or asserted against the Receivership Entities; and,

K.       To take such other action as may be approved by this Court.

## II.       ACCESS TO INFORMATION

7.       The individual Receivership Entities and the past and/or present officers, directors, agents, managers, general and limited partners, trustees, attorneys, accountants, and employees of the entity Receivership Entities, as well as those acting in their place, are hereby ordered and directed to preserve and turn over to the Receiver forthwith all paper and electronic information of, and/or relating to, the Receivership Entities and/or all Receivership Property; such information shall include but not be limited to books, records, documents, accounts, and all other instruments and papers.

8.       Within ten (10) days of the entry of this Order, the Receivership Entities shall file with the Court and serve upon the Receiver and the SEC a sworn statement, listing: (a) the identity, location, and estimated value of all Receivership Property; (b) all employees (and job titles thereof), other personnel, attorneys, accountants, and

APP044

any other agents or contractors of the Receivership Entities; and, (c) the names, addresses, and amounts of claims of all known creditors of the Receivership Entities.

9.      Within twenty (20) days of the entry of this Order, the Receivership Entities shall file with the Court and serve upon the Receiver and the SEC a sworn statement and accounting, with complete documentation, covering the period from January 1, 2017 to the present:

A.      Of all Receivership Property, wherever located, held by or in the name of the Receivership Entities, or in which any of them, directly or indirectly, has or had any beneficial interest, or over which any of them maintained or maintains and/or exercised or exercises control, including, but not limited to: (a) all securities, investments, funds, real estate, automobiles, jewelry, and other assets, stating the location of each; and (b) any and all accounts, including all funds held in such accounts, with any bank, brokerage, or other financial institution held by, in the name of, or for the benefit of any of them, directly or indirectly, or over which any of them maintained or maintains and/or exercised or exercises any direct or indirect control, or in which any of them had or has a direct or indirect beneficial interest, including the account statements from each bank, brokerage, or other financial institution;

B.      Identifying every account at every bank, brokerage, or other financial institution: (a) over which Receivership Entities have signatory authority; and (b) opened by, in the name of, or for the benefit of, or used by, the Receivership Entities;

C.      Identifying all credit, bank, charge, debit, or other deferred payment card issued to or used by each Receivership Defendant, including but not limited to the issuing institution, the card or account number(s), all persons or entities to which a card was issued and/or with authority to use a card, the balance of each account and/or card as of the most recent billing statement, and all statements for the last twelve (12) months;

D.      Of all assets received by any of them from any person or entity, including the value, location, and disposition of any assets so received;

E.      Of all funds received by the Receivership Entities, and each of them, in any way related, directly or indirectly, to the conduct alleged in the SEC's Complaint. The submission must clearly identify, among other things,

9

Case 3:22-cv-02118-X    Document 525    Filed 07/08/24    Page 49 of 264    PageID 18691
Case 20-42789-mxm11    Doc 147-4    Filed 04/25/24    Entered 04/25/24 14:53:16    Desc
Case 3:22-cv-02118Exhibit DocumProposed Filedgm11/20/2Page 21 of 139 28    PageID 15218

all investors, the securities they purchased, the date and amount of their investments, and the current location of such funds;

  F.  Of all expenditures exceeding $1,000 made by any of them, including those made on their behalf by any person or entity; and

  G.  Of all transfers of assets made by any of them.

10.  Within thirty (30) days of the entry of this Order, the Receivership Entities shall provide to the Receiver and the SEC copies of the Receivership Entities' federal income tax returns for the years 2017 through 2021 with all relevant and necessary underlying documentation.

11.  The Receivership Entities and the Receivership Entities' past and/or present officers, directors, agents, attorneys, managers, shareholders, employees, accountants, debtors, creditors, managers and general and limited partners, and other appropriate persons or entities shall answer under oath to the Receiver all questions which the Receiver may put to them and produce all documents as required by the Receiver regarding the business of the Receivership Entities, or any other matter relevant to the operation or administration of the receivership or the collection of funds due to the Receivership Entities.

12.  The Receivership Entities are required to assist the Receiver in fulfilling his duties and obligations. As such, they must respond promptly and truthfully to all requests for information and documents from the Receiver.

### III.  ACCESS TO BOOKS, RECORDS, AND ACCOUNTS

13.  The Receiver is authorized to take immediate possession of all assets, bank accounts or other financial accounts, books and records, and all other documents or instruments relating to the Receivership Entities. All persons and entities having

APP046

Case 3:22-cv-02118-X    Document 525    Filed 07/08/24    Page 50 of 264    PageID 18692
Case 20-42789-mxm11    Doc 147-4    Filed 04/25/24    Entered 04/25/24 14:53:16    Desc
Case 3:22-cv-02118-ExhibDoCumenPrupdsed Filed 11/20/2Bag Page 22 of 28   PageID 15219

control, custody, or possession of any Receivership Property are hereby directed to turn such property over to the Receiver.

14.    The Receivership Entities, as well as their agents, servants, employees, attorneys, any persons acting for or on behalf of the Receivership Entities, and any persons receiving notice of this Order by personal service, email, facsimile transmission, or otherwise, having possession of the property, business, books, records, accounts, or assets of the Receivership Entities are hereby directed to deliver the same to the Receiver, his agents, and/or employees.

15.    All banks, brokerage firms, financial institutions, and other persons or entities which have possession, custody, or control of any assets or funds held by, in the name of, or for the benefit of, directly or indirectly, any of the Receivership Entities that receive actual notice of this Order by personal service, email, facsimile transmission, or otherwise shall:

A.    Not liquidate, transfer, sell, convey, or otherwise transfer any assets, securities, funds, or accounts in the name of or for the benefit of the Receivership Entities except upon instructions from the Receiver;

B.    Not exercise any form of set-off, alleged set-off, lien, or any form of self-help whatsoever, or refuse to transfer any funds or assets to the Receiver's control without the permission of this Court;

C.    Within five (5) business days of receipt of that notice, file with the Court and serve on the Receiver and counsel for the SEC a certified statement setting forth, with respect to each such account or other asset, the balance in the account or description of the assets as of the close of business on the date of receipt of the notice; and,

D.    Cooperate expeditiously in providing information and transferring funds, assets, and accounts to the Receiver or at the direction of the Receiver.

11

Case 3:22-cv-02118-X    Document 525    Filed 07/08/24    Page 51 of 264    PageID 18693
Case 20-42789-mxm11   Doc 147-4   Filed 04/25/24   Entered 04/25/24 14:53:16   Desc
Case 3:22-cv-02118-X Document 457 Filed 11/20/23 Page 23 of 39   Exhibit D - Proposed Judgment Page 23 of 28   PageID 15220

## IV.    ACCESS TO REAL AND PERSONAL PROPERTY

16.    The Receiver is authorized to take immediate possession of all personal property of the Receivership Entities, wherever located, including but not limited to electronically stored information, computers, laptops, hard drives, external storage drives, and any other such memory, media or electronic storage devices, books, papers, data processing records, evidence of indebtedness, bank records and accounts, savings records and accounts, brokerage records and accounts, certificates of deposit, stocks, bonds, debentures, and other securities and investments, contracts, mortgages, furniture, office supplies, and equipment.

17.    The Receiver is authorized to take immediate possession of all real property of the Receivership Entities, wherever located, including but not limited to all ownership and leasehold interests and fixtures. Upon receiving actual notice of this Order by personal service, email, facsimile transmission or otherwise, all persons other than law enforcement officials acting within the course and scope of their official duties, are (without the express written permission of the Receiver) prohibited from: (a) entering such premises; (b) removing anything from such premises; or, (c) destroying, concealing, or erasing anything on such premises.

18.    The Receivership Entities, all persons acting on behalf of any Receivership Defendant, and any person who receives actual or constructive notice of this Order who has or had possession or control over any Receivership Assets, is directed to:

A.    Hold and retain any such Receivership Assets that are within his or her control and prohibit any person or entity from assigning, concealing, converting, disbursing, dissipating, encumbering, liquidating, loaning,

Case 3:22-cv-02118-X    Document 525    Filed 07/08/24    Page 52 of 264    PageID 18694
Case 20-42789-mxm11    Doc 147-4    Filed 04/25/24    Entered 04/25/24 14:53:16    Desc
Case 3:22-cv-02118Exhibit Document Proposed Judgment 11/09/2Page 24 of 39of 28    PageID 15221

pledging, selling, spending, transferring, or withdrawing any such Asset except:

 1. As directed by further order of the Court; or

 2. As directed in writing by the Receiver.

B. Within five (5) business days after being served a copy of this Order, provide the Receiver a sworn statement setting forth:

 1. The account number and other identifying information for any such Receivership Asset belonging to, for the use or benefit of, under the control of, or subject to access by any Defendant or Receivership Defendant;

 2. The balance of each such account, or a description of the nature and value of such Asset as of the close of business on the day on which this Order is received, and, if the account or other Asset has been closed or removed, or more than $5,000 withdrawn or transferred from it, on or after March 1, 2021, the date of the closure or removal of the funds, the total funds removed or transferred, and the name of the person or entity to whom such account or other Asset was remitted;

 3. All keys, codes, and passwords, entry codes, combinations to locks, and information or devices required to open or gain access to any Asset or Document, including, but not limited to, access to the business premises, computer servers, networks, or databases, or telecommunications systems or devices;

 4. The identification and location of any safe deposit box, commercial mailbox, or storage facility belonging to, for the use or benefit of, under the control of, or subject to access by any Defendant or Receivership Entity, and if the safe deposit box, storage facility, commercial mailbox, or storage facility has been closed or removed, the date closed or removed;

 5. Within five (5) business days of a written request from the Receiver, provide the Receiver copies of all Documents relating to each Receivership Asset, including, but not limited to account applications, statements, corporate resolutions, signature cards, checks, drafts, deposit tickets, transfers to and from the accounts, all other debit and credit instruments or slips, currency transaction reports, 1099 forms, and safe deposit box logs.

13

APP049

Case 3:22-cv-02118-X    Document 525    Filed 07/08/24    Page 53 of 264    PageID 18695
Case 20-42789-mxm11    Doc 147-4    Filed 04/25/24    Entered 04/25/24 14:53:16    Desc
Case 3:22-cv-02118Exhibit Document Proposed Judgment 09/2 Page 25 of 139 f 28    PageID 15222

19.    In order to execute the express and implied terms of this Order, the Receiver is authorized to change door locks to the premises described above. The Receiver shall have exclusive control of the keys. The Receivership Entities, or any other person acting or purporting to act on their behalf, are ordered not to change the locks in any manner, nor to have duplicate keys made, nor shall they have keys in their possession during the term of the receivership.

20.    The Receiver is authorized to open all mail directed to or received by or at the offices or post office boxes of the Receivership Entities, and to inspect all mail opened prior to the entry of this Order, to determine whether items or information therein fall within the mandates of this Order.

21.    Upon the request of the Receiver, the United States Marshal Service, in any judicial district, is hereby ordered to assist the Receiver in carrying out his duties to take possession, custody, and control of, or identify the location of, any assets, records, or other materials belonging to the Receivership Estate.

## V.    REPATRIATION OF ASSETS AND DOCUMENTS

22.    Immediately upon service of this Order, any person or entity with possession or control over any Receivership Assets shall:

A.    Take such steps as are necessary to transfer to the United States all Documents and Assets that are located outside the United States and belong to, are for the use or benefit of, under the control of, or subject to access by any Defendant or Receivership Entity; and

B.    Hold and retain all repatriated Assets and prevent the disposition, transfer, or dissipation of such Assets except as required by this Order.

14

APP050

Case 3:22-cv-02118-X    Document 525    Filed 07/08/24    Page 54 of 264    PageID 18696
Case 20-42789-mxm11    Doc 147-4    Filed 04/25/24    Entered 04/25/24 14:53:16    Desc
Case 3:22-cv-02118Exhibit Document Proposed Filed Judgment 11/20/2Page 26 of 539 of 28    PageID 15223

23. Receivership Entities, their officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, are preliminarily restrained and enjoined from taking any action that may result in the encumbrance or dissipation of foreign Assets, or in the hindrance of the repatriation required by this Order, including:

A. Sending any statement, letter, fax, email or wire transmission, telephoning, or engaging in any other act, directly or indirectly, that results in a determination by a foreign trustee or other entity that a "duress" event has occurred under the terms of a foreign trust agreement until such time as all Assets have been fully repatriated according to Section VIII of this Order; or

B. Notifying any trustee, protector, or other agent of any Defendant or Receivership Entity of the existence of this Order, or of the fact that repatriation is required under a court Order, until such time as all Assets have been fully repatriated according to Section VIII of this Order.

## VI. <u>NOTICE TO THIRD PARTIES</u>

24. Defendants and the Receivership Entities shall immediately provide a copy of this Order to each affiliate, sales entity, successor, assign, member, officer, director, employee, agent, independent contractor, client, servant, attorney, subsidiary, division, and representative of any Defendant or Receivership Defendant. Within ten (10) business days following service of this Order, Defendants and Receivership Entities shall serve on the Receiver a declaration identifying the name, title, address, telephone number, date of service, and manner of service of each person Defendants or Receivership Entities served with a copy of this Order in compliance with this provision.

15

APP051

Case 3:22-cv-02118-X    Document 525    Filed 07/08/24    Page 55 of 264    PageID 18697
Case 20-42789-mxm11    Doc 147-4    Filed 04/25/24    Entered 04/25/24 14:53:16    Desc
Case 3:22-cv-02118Exhibit Document Proposed Judgmen/29/2Page 27 of 139 28    PageID 15224

25.    Copies of this Order may be served by the Receiver by any means, including U.S. first class mail, overnight delivery, facsimile, electronic mail, or personally by agents or employees of the Receiver, by any law enforcement agency, or by process server, upon any person, including financial institutions, that may have possession, custody, or control over any Asset or Document belonging to, for the use or benefit of, under the control of, or subject to access by any Receivership Defendant, or that may otherwise be subject to any provision of this Order. Service upon any branch or office of any financial institution shall constitute service upon the entire financial institution.

26.    The Receiver shall promptly give notice of his appointment to all known officers, directors, agents, employees, shareholders, creditors, debtors, managers, and general and limited partners of the Receivership Entities, as the Receiver deems necessary or advisable to effectuate the operation of the receivership.

27.    All persons and entities owing any obligation, debt, or distribution with respect to an ownership interest to any Receivership Defendant shall, until further ordered by this Court, pay all such obligations in accordance with the terms thereof to the Receiver and its receipt for such payments shall have the same force and effect as if the Receivership Defendant had received such payment.

28.    In furtherance of his responsibilities in this matter, the Receiver is authorized to communicate with, and/or serve this Order upon, any person, entity, or government office that he deems appropriate to inform them of the status of this matter and/or the financial condition of the Receivership Estates. All government

16

Case 3:22-cv-02118-X    Document 525    Filed 07/08/24    Page 56 of 264    PageID 18698
Case 20-42789-mxm11    Doc 147-4    Filed 04/25/24    Entered 04/25/24 14:53:16    Desc
Case 3:22-cv-02118Exhibit D Proposed Judgment 20/2Page 28 of 73 of 28    PageID 15225

offices which maintain public files of security interests in real and personal property shall, consistent with such office's applicable procedures, record this Order upon the request of the Receiver or the SEC.

29.    The Receiver is authorized to instruct the United States Postmaster to hold and/or reroute mail which is related, directly or indirectly, to the business, operations, or activities of any of the Receivership Entities (the "Receiver's Mail"), including all mail addressed to, or for the benefit of, the Receivership Entities.

30.    The Postmaster shall not comply with, and shall immediately report to the Receiver, any change of address or other instruction given by anyone other than the Receiver concerning the Receiver's Mail. The Receivership Entities shall not open any of the Receiver's Mail and shall immediately turn over such mail, regardless of when received, to the Receiver. All personal mail of any individual Receivership Entities, and/or any mail appearing to contain privileged information, and/or any mail not falling within the mandate of the Receiver, shall be released to the named addressee by the Receiver. The foregoing instructions shall apply to any proprietor, whether individual or entity, of any private mailbox, depository, business or service, or mail courier or delivery service, hired, rented, or used by the Receivership Entities. The Receivership Entities shall not open a new mailbox, or take any steps or make any arrangements to receive mail in contravention of this Order, whether through the U.S. mail, a private mail depository, or courier service.

31.    Subject to payment for services provided, any entity furnishing water, electric, telephone, sewage, garbage, or trash removal services to the Receivership

17

APP053

Case 3:22-cv-02118-X    Document 525    Filed 07/08/24    Page 57 of 264    PageID 18699
Case 20-42789-mxm11   Doc 147-4   Filed 04/25/24   Entered 04/25/24 14:53:16   Desc
Case 3:22-cv-02118 Exhibit Document Proposed Filed 11/20/2 Page 29 of 30f 28   PageID 15226

Entities shall maintain such service and transfer any such accounts to the Receiver

unless instructed to the contrary by the Receiver.

## VII.    <u>INJUNCTION AGAINST INTERFERENCE WITH RECEIVER</u>

32.    The Receivership Entities and all persons receiving notice of this Order

by personal service, email, facsimile or otherwise, are hereby restrained and enjoined

from directly or indirectly taking any action or causing any action to be taken, without

the express written agreement of the Receiver, which would:

A.    Interfere with the Receiver's efforts to take control, possession, or management of any Receivership Property; such prohibited actions include but are not limited to using self-help or executing or issuing or causing the execution or issuance of any court attachment, subpoena, replevin, execution, or other process for the purpose of impounding or taking possession of or interfering with or creating or enforcing a lien upon any Receivership Property;

B.    Hinder, obstruct, or otherwise interfere with the Receiver in the performance of his duties; such prohibited actions include but are not limited to concealing, destroying, or altering records or information;

C.    Dissipate or otherwise diminish the value of any Receivership Property; such prohibited actions include but are not limited to releasing claims or disposing, transferring, exchanging, assigning, or in any way conveying any Receivership Property, enforcing judgments, assessments, or claims against any Receivership Property or any Receivership Defendant, attempting to modify, cancel, terminate, call, extinguish, revoke, or accelerate (the due date), of any lease, loan, mortgage, indebtedness, security agreement, or other agreement executed by any Receivership Defendant or which otherwise affects any Receivership Property;

D.    Create, operate, or exercise any control over any new business entity, whether newly formed or previously inactive, including any partnership, limited partnership, joint venture, sole proprietorship or corporation, without first providing the Receiver with a written statement disclosing: (1) the name of the business entity; (2) the address, telephone number, e-mail address, and website address of the business entity; (3) the names of the business entity's officers, directors, principals, managers, and employees; and (4) a detailed description of the business entity's intended activities; or,

APP054

Case 3:22-cv-02118-X    Document 525    Filed 07/08/24    Page 58 of 264    PageID 18700
Case 20-42789-mxm11    Doc 147-4    Filed 04/25/24    Entered 04/25/24 14:53:16    Desc
Case 3:22-cv-02118-X Document 417 Filed 11/20/23 Page 30 of 28   PageID 15227

E.      Interfere with or harass the Receiver, or interfere in any manner with the exclusive jurisdiction of this Court over the Receivership Estates.

## VIII.   **COOPERATION WITH THE RECEIVER**

33.    Defendants and Receivership Entities, and their officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, whether acting directly or indirectly and all persons who receive actual notice of this Order, shall fully cooperate with and assist the Receiver in taking and maintaining possession, custody, or control of the Assets and Documents of the Receivership Entities. This cooperation and assistance shall include, but is not limited to:

A.      Providing information to the Receiver as directed above or that the Receiver deems necessary to exercise the authority and discharge the responsibilities delegated to the Receiver under this Order;

B.      Advising all persons who owe money to the Receivership Entities that all debts should be paid directly to the Receiver; and

C.      Transferring funds at the Receiver's direction and producing Documents related to the Assets and sales of the Receivership Entities. The entities obligated to cooperate with the Receiver under this provision include financial institutions and persons that have transacted business with the Receivership Entities. The Receiver shall promptly notify the Court and SEC counsel of any failure or apparent failure of any person or entity to comply in any way with the terms of this Order.

## IX.    **STAY OF LITIGATION**

34.    As set forth in detail below, the following proceedings, excluding the instant proceeding and all police or regulatory actions and actions of the SEC related to the above-captioned enforcement action, are stayed until further Order of this Court:

19

All civil legal proceedings of any nature, including, but not limited to, bankruptcy proceedings, arbitration proceedings, foreclosure actions, default proceedings, or other actions of any nature involving: (a) the Receiver, in his capacity as Receiver; (b) any Receivership Property, wherever located; (c) any of the Receivership Entities, including subsidiaries and partnerships; or, (d) any of the Receivership Entities' past or present officers, directors, managers, agents, parent or affiliated entities, or general or limited partners sued for, or in connection with, any action taken by them while acting in such capacity of any nature, whether as plaintiff, defendant, third-party plaintiff, third-party defendant, or otherwise (such proceedings are hereinafter referred to as "Ancillary Proceedings").

35.    The parties to any and all Ancillary Proceedings are enjoined from commencing or continuing any such legal proceeding, or from taking any action, in connection with any such proceeding, including, but not limited to, the issuance or employment of process.

36.    All Ancillary Proceedings are stayed in their entirety, and all Courts having any jurisdiction thereof are enjoined from taking or permitting any action until further Order of this Court. Further, as to a cause of action accrued or accruing in favor of one or more of the Receivership Entities against a third person or party, any applicable statute of limitation is tolled during the period in which this injunction against commencement of legal proceedings is in effect as to that cause of action.

## X.    MANAGING ASSETS

37.    For each of the Receivership Estates, the Receiver shall establish one or more custodial accounts at a federally insured bank to receive and hold all cash equivalent Receivership Property (the "Receivership Funds").

38.    The Receiver's deposit account shall be entitled "Receiver's Account, Estate of Barton Companies" together with the name of the action.

APP056

Case 3:22-cv-02118-X   Document 525   Filed 07/08/24   Page 60 of 264   PageID 18702
Case 20-42789-mxm11   Doc 147-4   Filed 04/25/24   Entered 04/25/24 14:53:16   Desc
Case 3:22-cv-02118Exhibit D Document 417 Filed 11/20/2Page 32 of 130f 28   PageID 15229

39.     The Receiver may, without further Order of this Court, transfer, compromise, or otherwise dispose of any Receivership Property, other than real estate, in the ordinary course of business, on terms and in the manner the Receiver deems most beneficial to the Receivership Estate, and with due regard to the realization of the true and proper value of such Receivership Property.

40.     Subject to Paragraph 42 immediately below, the Receiver is authorized to locate, list for sale or lease, engage a broker for sale or lease, cause the sale or lease, and take all necessary and reasonable actions to cause the sale or lease of all real property in the Receivership Estates, either at public or private sale, on terms and in the manner the Receiver deems most beneficial to the Receivership Estate, and with due regard to the realization of the true and proper value of such real property.

41.     Upon further Order of this Court, pursuant to such procedures as may be required by this Court and additional authority such as 28 U.S.C. §§ 2001 and 2004, the Receiver will be authorized to sell, and transfer clear title to, all real property in the Receivership Estates.

42.     The Receiver is authorized to take all actions to manage, maintain, and/or wind-down business operations of the Receivership Estates, including making legally required payments to creditors, employees, and agents of the Receivership Estates and communicating with vendors, investors, governmental and regulatory authorities, and others, as appropriate.

APP057

Case 3:22-cv-02118-X    Document 525    Filed 07/08/24    Page 61 of 264    PageID 18703
Case 20-42789-mxm11   Doc 147-4   Filed 04/25/24   Entered 04/25/24 14:53:16   Desc
Case 3:22-cv-02118 Exhibit D Proposed Judgment Page 22 of 30 f 28   PageID 15230

43.     The Receiver shall take all necessary steps to enable the Receivership Funds to obtain and maintain the status of a taxable "Settlement Fund," within the meaning of Section 468B of the Internal Revenue Code and of the regulations.

## XI.     INVESTIGATE AND PROSECUTE CLAIMS

44.     The Receiver is authorized, empowered, and directed to investigate, prosecute, defend, intervene in or otherwise participate in, compromise, and/or adjust actions in any state, federal, or foreign court or proceeding of any kind as may in his discretion, and in consultation with SEC counsel, be advisable or proper to recover and/or conserve Receivership Property.

45.     Subject to his obligation to expend receivership funds in a reasonable and cost-effective manner, the Receiver is authorized, empowered, and directed to investigate the manner in which the financial and business affairs of the Receivership Entities were conducted and (after obtaining leave of this Court) to institute such actions and legal proceedings, for the benefit and on behalf of the Receivership Estate, as the Receiver deems necessary and appropriate; the Receiver may seek, among other legal and equitable relief, the imposition of constructive trusts, disgorgement of profits, asset turnover, avoidance of fraudulent transfers, rescission and restitution, collection of debts, and such other relief from this Court as may be necessary to enforce this Order. Where appropriate, the Receiver should provide prior notice to Counsel for the SEC before commencing investigations and/or actions.

46.     The Receiver hereby holds, and is therefore empowered to waive, all privileges, including the attorney-client privilege, held by all entity Receivership Entities.

APP058

Case 3:22-cv-02118-X    Document 525    Filed 07/08/24    Page 62 of 264    PageID 18704
Case 20-42789-mxm11    Doc 147-4    Filed 04/25/24    Entered 04/25/24 14:53:16    Desc
Case 3:22-cv-02118Exhibit Document 417 Filed 11/20/2Page 34 of 139f 28    PageID 15231

47.    The Receiver has a continuing duty to ensure that there are no conflicts of interest between the Receiver, his Retained Personnel (as that term is defined below), and the Receivership Estate.

## XII.    BANKRUPTCY FILING

48.    Effective immediately, the Receiver, as sole and exclusive officer, director and managing member of Wall007, LLC, Wall009, LLC, Wall010, LLC, Wall011, LLC, Wall012, LLC, Wall016, LLC, Wall017, LLC, Wall018, LLC, and Wall019, LLC (collectively, "Wall Entities"), shall possess sole and exclusive authority and control over the Wall Entities, as debtors-in-possession, in their respective Chapter 11 cases titled *In re WALL007 LLC, et al.*, No. 22-41049 (Bankr. E.D. Tex.) (the "Bankruptcy Cases") pending in the U.S. Bankruptcy Court for the Eastern District of Texas (the "Bankruptcy Court"). The employment of any and all other officers, directors, managers or other employees of the Wall Entities is and are hereby terminated by the Court. All such persons shall comply with the applicable provisions of this Order.

49.    Within thirty (30) days of the entry of this Order, the Receiver shall report to this Court as to whether the Bankruptcy Cases should continue in Chapter 11, or be converted to Chapter 7, dismissed or suspended during the course of the receivership. The Receiver shall file the appropriate pleadings with the Court and the Bankruptcy Court effectuating this Order.

50.    The Receiver may seek authorization of this Court to file voluntary petitions for relief under Title 11 of the United States Code (the "Bankruptcy Code") for other Receivership Entities. If a Receivership Defendant is (or has been) placed in

APP059

Case 3:22-cv-02118-X    Document 525    Filed 07/08/24    Page 63 of 264    PageID 18705
Case 20-42789-mxm11    Doc 147-4    Filed 04/25/24    Entered 04/25/24 14:53:16    Desc
Case 3:22-cv-02118Exhibit D – Proposed Judgment 09/2Page 35 of 489f 28    PageID 15232

bankruptcy proceedings, the Receiver may become, and may be empowered to operate each of the Receivership Estates as, a debtor in possession. In such a situation, the Receiver shall have all of the powers and duties as provided a debtor in possession under the Bankruptcy Code to the exclusion of any other person or entity. Pursuant to Paragraph 3 above, the Receiver is vested with management authority for all entity Receivership Entities and may therefore file and manage a Chapter 11 petition.

51.    All persons and entities, other than the Receiver, are barred from commencing any bankruptcy proceedings against any of the Receivership Entities.

## XIII.  <u>LIABILITY OF RECEIVER</u>

52.    Until further Order of this Court, the Receiver shall not be required to post bond or give an undertaking of any type in connection with his fiduciary obligations in this matter.

53.    The Receiver and his agents, acting within scope of such agency ("Retained Personnel"), are entitled to rely on all rules of law and Orders of this Court and shall not be liable to anyone for their own good faith compliance with any order, rule, law, judgment, or decree. In no event shall the Receiver or Retained Personnel be liable to anyone for their good faith compliance with their duties and responsibilities as Receiver or Retained Personnel.

54.    This Court shall retain jurisdiction over any action filed against the Receiver or Retained Personnel based upon acts or omissions committed in their representative capacities.

55.    In the event the Receiver decides to resign, the Receiver shall first give written notice to the SEC's counsel of record and the Court of its intention, and the

APP060

Case 3:22-cv-02118-X    Document 525    Filed 07/08/24    Page 64 of 264    PageID 18706
Case 20-42789-mxm11    Doc 147-4    Filed 04/25/24    Entered 04/25/24 14:53:16    Desc
Case 3:22-cv-02118Exhibit D Proposed Judgment 20/2Page 36 of 28    PageID 15233

resignation shall not be effective until the Court appoints a successor. The Receiver

shall then follow such instructions as the Court may provide.

## XIV.  RECOMMENDATIONS AND REPORTS

56.    The Receiver is authorized, empowered, and directed to develop a plan

for the fair, reasonable, and efficient recovery and liquidation of all remaining,

recovered, and recoverable Receivership Property (the "Liquidation Plan").

57.    Within ninety (90) days of the entry date of this Order, the Receiver shall

file the Liquidation Plan in the above-captioned action, with service copies to counsel

of record.

58.    Within thirty (30) days after the end of each subsequent calendar

quarter following the date on which the Receiver files his Liquidation Plan, the

Receiver shall file and serve a full report and accounting of each Receivership Estate

(the "Quarterly Status Report"), reflecting (to the best of the Receiver's knowledge as

of the period covered by the report) the existence, value, and location of all

Receivership Property, and of the extent of liabilities, both those claimed to exist by

others and those the Receiver believes to be legal obligations of the Receivership

Estates.

59.    The Quarterly Status Report shall contain the following:

A.    A summary of the operations of the Receiver;

B.    The amount of cash on hand, the amount and nature of accrued administrative expenses, and the amount of unencumbered funds in the estate;

C.    A schedule of all the Receiver's receipts and disbursements (attached as Exhibit A to the Quarterly Status Report), with one column for the quarterly period covered and a second column for the entire duration of the receivership;

APP061

Case 3:22-cv-02118-X    Document 525    Filed 07/08/24    Page 65 of 264    PageID 18707
Case 20-42789-mxm11    Doc 147-4    Filed 04/25/24    Entered 04/25/24 14:53:16    Desc
Case 3:22-cv-02118Exhibit D Proposed Judgment11/20/2Page 37e 21 of 28    PageID 15234

D.    A description of all known Receivership Property, including approximate or actual valuations, anticipated or proposed dispositions, and reasons for retaining assets where no disposition is intended;

E.    A description of liquidated and unliquidated claims held by the Receivership Estate, including the need for forensic and/or investigatory resources; approximate valuations of claims; and anticipated or proposed methods of enforcing such claims (including likelihood of success in: (i) reducing the claims to judgment; and, (ii) collecting such judgments);

F.    A list of all known creditors with their addresses and the amounts of their claims;

G.    The status of Creditor Claims Proceedings, after such proceedings have been commenced; and,

H.    The Receiver's recommendations for a continuation or discontinuation of the receivership and the reasons for the recommendations.

60.    On the request of the SEC, the Receiver shall provide the SEC with any documentation that the SEC deems necessary to meet its reporting requirements, that is mandated by statute or Congress, or that is otherwise necessary to further the SEC's mission.

## XV.    FEES, EXPENSES, AND ACCOUNTINGS

61.    Subject to the paragraphs below, the Receiver need not obtain Court approval prior to the disbursement of Receivership Funds for expenses in the ordinary course of the administration and operation of the receivership. Further, prior Court approval is not required for payments of applicable federal, state, or local taxes.

62.    Subject to the paragraph immediately below, the Receiver is authorized to solicit persons and entities ("Retained Personnel") to assist him in carrying out the duties and responsibilities described in this Order. The Receiver shall not engage any

APP062

Case 3:22-cv-02118-X    Document 525    Filed 07/08/24    Page 66 of 264    PageID 18708
Case 20-42789-mxm11    Doc 147-4    Filed 04/25/24    Entered 04/25/24 14:53:16    Desc
Case 3:22-cv-02118 Exhibit D — Proposed Judgment Page 38 of 730f 28    PageID 15235

Retained Personnel without first obtaining an Order of the Court authorizing such engagement.

63.     The Receiver and Retained Personnel are entitled to reasonable compensation and expense reimbursement from the Receivership Estates. Such compensation shall require the prior approval of the Court.

64.     Within forty-five (45) days after the end of each calendar quarter, the Receiver and Retained Personnel shall apply to the Court for compensation and expense reimbursement from the Receivership Estates (the "Quarterly Fee Applications"). At least thirty (30) days prior to filing each Quarterly Fee Application with the Court, the Receiver will serve upon counsel for the SEC a complete copy of the proposed Application, together with all exhibits and relevant billing information in a format to be provided by SEC staff.

65.     All Quarterly Fee Applications will be interim and will be subject to cost benefit and final reviews at the close of the receivership. At the close of the receivership, the Receiver will file a final fee application, describing in detail the costs and benefits associated with all litigation and other actions pursued by the Receiver during the course of the receivership.

66.     Quarterly Fee Applications may be subject to a holdback in the amount of 20% of the amount of fees and expenses for each application filed with the Court. The total amounts held back during the course of the receivership will be paid out at the discretion of the Court as part of the final fee application submitted at the close of the receivership.

APP063

Case 3:22-cv-02118-X    Document 525    Filed 07/08/24    Page 67 of 264    PageID 18709
Case 20-42789-mxm11    Doc 147-4    Filed 04/25/24    Entered 04/25/24 14:53:16    Desc
Case 3:22-cv-02118 Exhibit Document Proposed 417 Judgment Filed 11/20/23 Page 39 of 28 PageID 15236

67.    Each Quarterly Fee Application shall:

A.    Contain representations that: (i) the fees and expenses included therein were incurred in the best interests of the Receivership Estate; and, (ii) unless previously disclosed to and approved by the Court, the Receiver has not entered into any agreement, written or oral, express or implied, with any person or entity concerning the amount of compensation paid or to be paid from the Receivership Estate, or any sharing thereof.

68.    At the close of the Receivership, the Receiver shall submit a Final Accounting, in a format to be provided by SEC staff, as well as the Receiver's final application for compensation and expense reimbursement.

**IT IS SO ORDERED**, this 29th day of November, 2023.

_____

BRANTLEY STARR
UNITED STATES DISTRICT JUDGE

APP064

# EXHIBIT 6

APP065

| | | |
|---|---|---|
| BM318, LLC<br>13901 Midway Road<br>Suite 102<br>Dallas, TX 75244-4388 | Joyce W. Lindauer Attorney, PLLC<br>c/o Ross & Smith, PC<br>Attn:  Frances A. Smith<br>700 N. Pearl Street, Ste. 1610<br>Dallas, TX 75201-7549 | Citizens Bank<br>c/o Scott A. Ritcheson<br>Ritcheson, Lauffer & Vincent, P.C.<br>821 ESE Loop 323, Ste. 530<br>Tyler, TX 75701-9779 |
| First Bank Texas<br>100 Willow Bend Dr.<br>Willow Park, TX 76008-5746 | Parker CAD<br>Linebarger Goggan Blair & Sampson<br>c/o John Turner<br>2777 Stemmons Frwy., Ste. 1000<br>Dallas, TX 75207-2328 | Attorney General of Texas<br>Bankruptcy Div.<br>P. O. Box 12548<br>Austin, TX 78711-2548 |
| Barron Stark Engineers<br>6221 Southwest Blvd., Ste. 100<br>Fort Worth, TX 76132-1078 | Carnegie Development LLC<br>1755 Wittington Pl., Ste. 340<br>Dallas, TX 75234-1930 | Coats Rose<br>14755 Preston Rd., Ste. 600<br>Dallas, TX 75254-6825 |
| Texas Comptroller of Public Accounts<br>Revenue Accounting Div. – Bankruptcy Section<br>P. O. Box 13528<br>Austin, TX 78711-3528 | Dixon Water Foundation<br>c/o Josh Botts<br>Munsch Hardt Kopf & Harr, P.C.<br>500 N. Akard St., Ste. 4000<br>Dallas, TX 75201-6659 | GEO Services LLC<br>P. O. Box 32564<br>Knoxville, TX 37930-2564 |
| HR Sterling LLC<br>14819 Frisco Ranch Dr.<br>Little Elm TX 75058-2753 | Internal Revenue Service<br>Mail Code DAL-5020<br>1100 Commerce St.<br>Dallas, TX 75242-1100 | JMJ Development LLC<br>1755 Wittington Pl., Ste. 340<br>Dallas, TX 75234-1930 |
| Khudabuksh Walji<br>Law Office of K. Walji<br>10701 Corporate Dr., Ste. 350<br>Stafford, TX 77477-4091 | Robert W. Buchholz<br>420 S. Cesar Chavez Blvd., Ste. 300<br>Dallas, TX 75201-5817 | South Central Water Company<br>P. O. Box 570177<br>Houston, TX 77257-0177 |
| Southern Star Capital<br>d/b/a Reliance Mortgage Company<br>5220 Spring Valley Rd., Ste. 602<br>Dallas, TX 75254-1952 | Southern Star Capital, LLC<br>c/o Robert W. Buchholz<br>555 Republic Dr., Ste. 490<br>Plano, TX 75074-8848 | U. S. Trustee's Office<br>1100 Commerce St., Rm. 9C60<br>Dallas, TX 75242-1011 |
| U. S. Attny. General<br>10th and Constitution Ave., NW<br>Main Justice Bldg., Rm. 5111<br>Washington, DC 20530-0001 | United States Trustee<br>1100 Commerce St., Rm. 976<br>Dallas, TX 75242-1011 | Joyce W. Lindauer<br>Joyce W. Lindauer Attorney, PLLC<br>1412 Main St., Ste. 500<br>Dallas, TX 75202-4042 |
| Cort Thomas<br>c/o Charlene Koonce<br>Brown Fox PLLC<br>8111 Preston Rd., Ste. 300<br>Dallas, TX 75225 | Lumar Land & Cattle<br>c/o Bobby Forshey<br>Forshey & Prostok, LLP<br>777 Main Street, Suite 1550<br>Fort Worth, TX 76102 | Lumar Land & Cattle<br>c/o Kimberly Harris, Josh Shephard<br>Quilling Selander<br>2001 Bryan St., Suite 1800<br>Dallas, TX 75201 |
| First Bank Texas<br>c/o Mark Petrocchi<br>Griffith, Jay & Michel, LLP<br>2200 Forest Park Blvd.<br>Fort Worth, TX 76110 | | |

4864-3347-5768v.1 .

APP066

# EXHIBIT 7

APP067

Charlene C. Koonce
State Bar No. 11672850
C. Alan Carrillo
Texas Bar No. 24109693
Brown Fox PLLC
8111 Preston Road, Suite 300
Dallas, Texas 75225
Telephone: (214) 327-5000
Facsimile: (214) 327- 5001
Email: charlene@brownfoxlaw.com
Email: alan@brownfoxlaw.com

**Attorney for Second Receiver
for BM318, LLC, Cortney C. Thomas**

J. Robert Forshey
State Bar No. 07264200
Forshey & Prostok, LLP
777 Main Street, Suite 1550
Fort Worth, Texas 76102
Telephone: (817) 877-8855
Facsimile:  (817) 877-4151
Email:  bforshey@forsheyprostok.com

**Attorney for Lumar Land & Cattle, LLC**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| In re: | § § § | Case No. 20-42789-MXM |
| BM318, LLC, | § § § | Chapter 11 |
| Debtor. | § § | |

**JOINT MOTION OF BM318, LLC AND LUMAR LAND & CATTLE, LLC
FOR APPROVAL OF COMPROMISE AND SETTLEMENT OF
ADVERSARY PROCEEDING NO. 21-04051**

**NO HEARING WILL BE CONDUCTED HEREON UNLESS A WRITTEN RESPONSE IS FILED WITH THE CLERK OF THE UNITED STATES BANKRUPTCY COURT AT 500 W. TENTH STREET, FORT WORTH, TEXAS 76102-3643 BEFORE CLOSE OF BUSINESS ON MAY 16, 2024, WHICH IS AT LEAST 21 DAYS FROM THE DATE OF SERVICE HEREOF.**

**ANY RESPONSE SHALL BE IN WRITING AND FILED WITH THE CLERK, AND A COPY SHALL BE SERVED UPON COUNSEL FOR THE MOVING PARTY PRIOR TO THE DATE AND TIME SET FORTH HEREIN. IF A RESPONSE IS FILED A HEARING MAY BE HELD WITH NOTICE ONLY TO THE OBJECTING PARTY.**

**IF NO HEARING ON SUCH NOTICE OR MOTION IS TIMELY REQUESTED, THE RELIEF REQUESTED SHALL BE DEEMED TO BE UNOPPOSED, AND THE COURT MAY ENTER AN ORDER GRANTING THE RELIEF SOUGHT OR THE NOTICED ACTION MAY BE TAKEN.**

TO THE HONORABLE MARK X. MULLIN, UNITED STATES BANKRUPTCY JUDGE:

COME NOW, BM318, LLC[1] ("BM318") and Lumar Land & Cattle, LLC ("Lumar" and, collectively with BM318, the "Parties") and file this *Joint Motion of BM318, LLC and Lumar Land & Cattle, LLC for Approval of Compromise and Settlement of Adversary Proceeding No. 21-04051* (the "Motion").

## I.    BACKGROUND

### A.    The Chapter 11 bankruptcy case

1.    On September 1, 2020, BM318 filed a voluntary petition under Chapter 11 of the Bankruptcy Code initiating this bankruptcy case.

2.    On November 19, 2020, BM318 filed the *Debtor's First Amended Plan of Reorganization* [Doc. No. 39], which was modified by the *First Modification to Debtor's First Amended Plan of Reorganization* [Doc. No. 79] and the *Third Modification to Debtor's First Amended Plan of Reorganization* [Doc. No. 100] (collectively, the "Plan").

3.    On August 2, 2021, the Court entered an order confirming the Plan [Doc. No. 106].

### B.    The Adversary Proceeding

4.    On August 10, 2021, BM318 filed its *Complaint to Avoid and Recover Preferential and/or Fraudulent Transfer Pursuant to 11 U.S.C. §§ 548 and 550* ("Complaint"), commencing adversary proceeding No. 21-04051 ("Adversary Proceeding") against The Dixon Water Foundation ("Dixon").

5.    The Adversary Proceeding arises out of a sale of a tract of land (the "Dixon Land") by Dixon to BM318.  The sale was owner financed by Dixon.  When BM318 defaulted, most of the Dixon Land was reconveyed by BM318 to Dixon through a deed in lieu of foreclosure.  Dixon then sold a 204-acre tract (the "Lumar Land") out of the Dixon Land to Lumar.

---

[1] BM318 files this Motion under the control of Cortney C. Thomas as its duly appointed receiver.

6.      After Lumar acquired the Lumar Land, BM318 commenced the Adversary

Proceeding, asserting in the Complaint various claims against Dixon relating to the Dixon Land,

including that the conveyance of the Dixon Land by BM318 to Dixon was avoidable pursuant to

sections 547 and 548 of the Bankruptcy Code (11 U.S.C. §§ 101, *et seq.*) as either a preference

or fraudulent transfer.  Thereafter, BM318 filed a Notice of Lis Pendens ("Lis Pendens") in the

real estate records of Parker County, Texas, reflecting the claims asserted by BM318 in the

Adversary Proceeding in relation to the Dixon Land.

7.      The Lis Pendens burdened the Lumar Land as a part of the larger tract of the

Dixon Land.  Because the Lumar Land was so burdened, Lumar sought and received leave

from this Court to intervene in the Adversary Proceeding.

C.      The SEC Receivership

8.      On October 18, 2022, the United States District Court for the Northern District of

Texas entered an *Order Appointing Receiver* ("First Receiver Order") in the following case

("Receivership Lawsuit"):

> *Securities and Exchange Commission,* Plaintiff v. *Timothy Barton,*
> *et al.*, Defendants, Civil Action No. 3:22-cv-2118-X, United States
> District Court for the Northern District of Texas, Dallas Division

9.      The First Receiver Order placed into receivership all entities controlled, directly or

indirectly, by Timothy Barton ("Barton"), including BM318.  Cortney C. Thomas was appointed as

receiver ("First Receiver") pursuant to the First Receiver Order.

10.     On April 25, 2023, Lumar and the First Receiver engaged in a mediation

conducted by the Honorable Harlin D. Hale (Ret.) and reached a mediated settlement of the

Adversary Proceeding, which settlement agreement is the subject of this Motion.  Lumar and the

First Receiver each executed a Settlement and Release Agreement ("Settlement Agreement")

reflecting the mediated settlement between them.  The Settlement Agreement is subject to, and

a part of, an Agreement to Reaffirm and Adopt the Settlement and Release Agreement

("Reaffirmation and Adoption Agreement"), a true and accurate copy of which is attached as

**Exhibit "A."**  The Settlement Agreement, as reaffirmed in the Reaffirmation and Adoption

Agreement, is hereinafter referred to as the "Reaffirmed and Adopted Settlement Agreement."

11.    Dixon also participated in the mediation and reached a separate settlement with

the First Receiver relating to the Adversary Proceeding.  It is expected that BM318 and Dixon

will file a separate motion with the Court to approve that settlement.

12.    The First Receiver Order was appealed by Barton.  Barton's appeal was

docketed in the Fifth Circuit as follows ("Fifth Circuit Appeal"):

> *Securities Exchange Commission*, Plaintiff Appellee v. *Timothy Barton*, Defendant Appellant, Case No. 22-11132 in the Fifth Circuit Court of Appeals

13.    The Settlement Agreement was executed by the First Receiver, on behalf of

BM318, on June 20, 2023, and thereafter by Lumar on June 26, 2023.

14.    On June 28, 2023, before the First Receiver and Lumar could take steps to

obtain the required approval of the settlement through the Receivership Lawsuit and this

bankruptcy case, the Fifth Circuit published an opinion ("Original Opinion") in the Fifth Circuit

Appeal vacating the First Receiver Order effective 90 days after the issuance of the mandate.

The Original Opinion was reported as *SEC v. Barton*, 74 F.4th 640 (5th Cir. 2023).

15.    After the Original Opinion was published, Barton filed a petition with the Fifth

Circuit seeking a panel rehearing.  On August 31, 2023, the Original Opinion was withdrawn by

the Fifth Circuit and a second opinion ("Second Opinion") was published denying Barton's

request for rehearing and substituting the Second Opinion in place of the Original Opinion.  The

Second Opinion is reported as *SEC v. Barton*, 2023 U.S. App. LEXIS 23125, 79 F.4th 573 (5th

Cir. Aug. 31, 2023).  The Second Opinion also vacated the First Receiver Order 90 days after

the issuance of the mandate and granted, in part, Barton's motion for a stay - - with such stay to

remain in place until the First Receiver Order was vacated.  2023 U.S. App. LEXIS 23125 *19-

20.  However, the Second Opinion also states that, if a new receivership order were to be

entered before the First Receiver Order is vacated, the stay granted in favor of Barton would

have no effect on the actions of the new receiver under the new receivership order.  *Id*.  The mandate in the Fifth Circuit Appeal was issued on August 31, 2023.

16.    The Securities Exchange Commission, as the plaintiff in the Receivership Lawsuit, filed a *Second Motion to Appoint a Receiver* [Docket No. 309] in the Receivership Lawsuit.  This second motion was granted pursuant to an *Order Appointing Receiver* [Docket No. 417] ("Second Receiver Order") entered in the Receivership Lawsuit on November 29, 2023.  Cortney C. Thomas has been appointed to act as the receiver ("Second Receiver") pursuant to the Second Receiver Order.

17.    The Second Receiver wishes to consummate the compromise settlement reflected in the Reaffirmed and Adopted Settlement Agreement.  To this purpose, the Second Receiver filed in the Receivership Lawsuit a *Motion to Lift Litigation Stay of BM318 Bankruptcy Case* [Docket no. 450] ("Stay Motion"), which sought to modify the litigation stay contained in the Second Receiver Order to allow for BM318 and Lumar to file this Motion seeking approval by this Court of the Reaffirmed and Adopted Settlement Agreement.  The Stay Motion was granted pursuant to an Order [Docket No. 486] entered in the Receivership Lawsuit on April 15, 2024.

## II.  JURISDICTION

18.    This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. § 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief requested herein are Section 105(a) of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 9019.

## III.  RELIEF REQUESTED

19.    The Parties have entered into the Reaffirmed and Adopted Settlement Agreement providing for the compromise and resolution of the claims brought by BM318 against Lumar in the Adversary Proceeding.  Pursuant to § 105(a) of the Bankruptcy Code and APP072

Bankruptcy Rule 9019(a), the Parties request that the Bankruptcy Court approve those terms and authorize them to enter into such agreement, which shall be substantially identical in form and substance to the Reaffirmed and Adopted Settlement Agreement attached hereto as **Exhibit "A"**.

20.    As more fully set forth therein, the terms of the Reaffirmed and Adopted Settlement Agreement provide for the following:[2]

    a.    A payment by Lumar to BM318 of $75,000.00;

    b.    Mutual release of all claims (collectively, the "Claims") between Lumar and BM318 and between Lumar and the Receiver;

    c.    Final judgment entered in the Adversary Proceeding that provides for dismissal of the Adversary Proceeding with prejudice; and

    d.    Release of the Lis Pendens.

## IV. THE LEGAL STANDARDS

21.    For the reasons discussed below, BM318 has determined that it is in the best interest of BM318, as the Reorganized Debtor, and its creditors if the Claims are compromised and resolved under the terms of the Reaffirmed and Adopted Settlement Agreement.

22.    Under the terms of the Plan, BM318, as the Reorganized Debtor has the right to pursue and to resolve all preserved claims of BM318 and the Debtor's Estate.  See Plan § 8.01.

23.    Bankruptcy Rule 9019(a) provides, in pertinent part: "On motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement."  Fed. R. Bankr. P. 9019(a).  Section 105(a) of the Bankruptcy Court further provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).

---

[2] The following is only meant as a summary of the material terms of the Reaffirmed and Adopted Settlement Agreement. To the extent of an inconsistency between the summary and the Reaffirmed and Adopted Settlement Agreement, the terms of the Reaffirmed and Adopted Settlement Agreement control. APP073

24. In reviewing proposed settlements, the Fifth Circuit has instructed courts to apply the following factors, in addition to reviewing the terms and conditions of the settlement itself:

    a. The probability of success in the litigation with due consideration for the uncertainty in fact and law;

    b. The complexity and likely duration of the litigation and any attendant expense, inconvenience and delay; and

    c. All other factors bearing on the wisdom of the compromise.

*Connecticut Gen. Life Ins. v. United Cos. Fin. Corp.* (*In re Foster Mortgage Corp*.), 68 F.3d 914, 917 (5th Cir. 1995), citing *In re Jackson Brewing Co.,* 624 F.2d 599, 602 (5th Cir. 1980). The settlement must be "fair and equitable and in the best interest of the estate." *In re Jackson Brewing Co.*, 624 F.2d at 602; *Foster Mortgage Corp*, 68 F.3d at 917. These settlement factors weigh heavily in favor of approval of the Reaffirmed and Adopted Settlement Agreement.

25. Moreover, as set forth above, the standards by which a court evaluates a proposed compromise and settlement are well established. A court need not conduct an independent investigation in formulating an opinion as to the reasonableness of a settlement. Rather, a court is permitted to defer to the judgment of the parties, and the court's responsibility is to canvass the issues to see whether the proposed settlement "falls below the lowest point in the range of reasonableness." *In re Pennsylvania Truck Lines, Inc.,* 150 B.R. 595, 601 (E.D. Pa. 1992), *aff'd*, 8 F.3d 812 (3d Cir. 1993); *In re Grant Broadcasting of Philadelphia, Inc.,* 71 B.R. 390, 395 (Bankr. E.D. Pa. 1987). Approval of a compromise is committed to the sound discretion of the trial court and will not be disturbed unless such court has abused its discretion. *Jackson Brewing Co.,* 624 F.2d at 602-03.

26. Probability of Success. In relation to the probability of success in the litigation, it is unnecessary for a court to conduct a mini-trial on the various claims and defenses to be resolved under the settlement. "[T]he approval of a proposed settlement does not depend on establishing as a matter of legal certainty that the subject claim or counterclaim is or is not worthless or valuable." *Jackson Brewing Co.*, 624 F.2d at 604. "The judge need only apprise

APP074

himself of the relevant facts and law so that he can make an informed and intelligent decision." *Official Committee of Unsecured Creditors v. Cajun Elec. Power Coop., Inc. (In re Cajun Elec. Power Coop., Inc.)*, 119 F.3d 349, 356 (5th Cir. 1997) (quoting *La Salle Nat'l Bank v. Holland (In re American Reserve Corp.)*, 841 F.2d 159, 163 (7th Cir. 1987)); see also *Official Committee of Unsecured Creditors of Int'l Distrib. Ctrs., Inc. v. James Talcott, Inc. (In re International Distrib. Ctrs., Inc.)*, 103 B.R. 420, 423 (S.D.N.Y. 1989); *In re Drexel Burnham Lambert Group, Inc.*, 134 B.R. 493, 496-97 (Bankr. S.D.N.Y. 1991).

27.    The Adversary Proceeding was pending for over one year prior to the institution of the Receivership Proceeding.  Substantial written discovery was engaged in and the Court held multiple hearings in connection with a Motion to Compel filed by Dixon.  The Court also held multiple hearings on BM318's Motion to Amend its Complaint which the Court ultimately denied.  As a result of the foregoing activity and the types of common bankruptcy claims brought by BM318 against Dixon in the Adversary Proceeding pursuant to §§ 547, 548 and 550, the Court is well situated to assess the probability of success in the litigation with due consideration for the uncertainty in fact and law.

28.    The payment provided for in the Reaffirmed and Adopted Settlement Agreement is fair and reasonable, especially taking into account the complexity and cost of the litigation as discussed below.  While neither party admits the assertions of the other, BM318 recognizes that there are substantial disputes and potential defenses to the claims it has asserted in the Adversary Proceeding and as discussed below, the cost of proceeding with the litigation would be substantial.

29.    <u>Complexity and Expense Of Litigation</u>.  As explained by the Fifth Circuit, "compromises are a normal part of the process of reorganization, oftentimes desirable and wise methods of bringing to a close proceeding otherwise lengthy, complicated and costly."  *Cajun Elec.*, 119 F.3d at 354 (quoting *Jackson Brewing Co.*, 624 F.2d at 602).  The issues raised in the Adversary Proceeding would require the expenditure of substantial additional fees and

APP075

expenses in connection with both fact discovery and expert witnesses, both in terms of the costs

of the experts and expert discovery, as well as the substantial costs of a trial of the Adversary

Proceeding and any appeals that might flow from the judgment resolving the Adversary

Proceeding.

30.     Other Factors.  Finally, as for all other factors bearing on the wisdom of the

compromise, the Fifth Circuit has identified at least two such other factors: (a) the best interests

of the creditors with proper deference to their reasonable views; and (b) the extent to which the

settlement is truly the product of arms-length bargaining, and not fraud or collusion.  *See Cajun*

*Elec.,* 119 F.3d at 354, 356; *See also Foster Mortgage Corp*., 68 F.3d at 917. First the

settlement came about as a result of a mediation conducted by the Honorable Harlin D. Hale

(Ret.) which was conducted at arms-length and was intensely negotiated by the Parties.

Second, the Reaffirmed and Adopted Settlement Agreement is in the best interests of the

creditors of BM318 given the amount of the settlement and the Claims that will be resolved.

## V.  CONCLUSION

31.     The Reaffirmed and Adopted Settlement Agreement is the product of arm's-

length negotiations between the Parties, and represents a fair and reasonable resolution of the

Claims asserted between BM318 and Lumar in the Adversary Proceeding based on the

exercise of the Reorganized Debtor's sound business judgment.  Approval of the Reaffirmed

and Adopted Settlement Agreement is in the best interests of the Reorganized Debtor and its

creditors.

## VI. PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, the Parties request that this Court (a) enter

an order: substantially in the form of the order attached hereto as **Exhibit "B"**:  (i) approving the

material terms set forth in the Reaffirmed and Adopted Settlement Agreement; and (ii)

authorizing BM318 to enter into a settlement and compromise agreement in substantially the

same form as the Reaffirmed and Adopted Settlement Agreement; (b) enter a Final Judgment in

the Adversary Proceeding in substantially the same form as the Final Judgment attached hereto

as **Exhibit "C"**, and (c) grant such other and further relief as is just and proper.

Dated:  April 25, 2024

**BROWN FOX PLLC**

By: /s/ C. Alan Carrillo
Charlene C. Koonce
State Bar No. 11672850
charlenet@brownfoxlaw.com
C. Alan Carrillo
State Bar No. 24109693
alan@brownfoxlaw.com
8111 Preston Road, Suite 300
Dallas, Texas 75225
Telephone: (214) 327-5000
Fax: (214) 327-5001

*Counsel to the Second Receiver for BM318, LLC,
Cortney C. Thomas*

**FORSHEY & PROSTOK, LLP**

By: /s/ J. Robert Forshey
J. Robert Forshey
Texas Bar No. 07264200
777 Main Street, Suite 1550
Fort Worth, Texas 76102
Telephone: (817) 877-8855
Facsimile: (817) 877-4151
Email: bforshey@forsheyprostok.com

and

**QUILLING, SELANDER, LOWNDS,
WINSLETT & MOSER, PC**
Kimberly P. Harris
Texas Bar No. 24002234
Joshua L. Shepherd
Texas Bar No. 24058104
2001 Bryan Street, Suite 1800
Dallas, Texas 75201
Telephone: (214) 871-2100
Facsimile: (214) 871-2111
Email: kharris@qslwm.com
Email: jshepherd@qslwm.com

*Counsel for Lumar Land & Cattle, LLC*    APP077

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on this the 25th day of April, 2024, true and correct copies of this document were served via the Court's ECF system and by U.S. Mail first class postage prepaid on the parties on the attached Service List.

/s/ J. Robert Forshey
J. Robert Forshey

L:\BFORSHEY\Lumar Land & Cattle, LLC (BM318)(non-bnkrptcy)#6323\Pleadings- 20-42789\Lumar- 9019 Motion- (BF  JLS 3v) 4.16.24 (bf - 4.22.24).docx

APP078

# EXHIBIT 8

APP079

# EXHIBIT A

## AGREEMENT TO REAFFIRM AND ADOPT THE SETTLEMENT AND RELEASE AGREEMENT

### I.    Parties

A.    The parties (individually, a "Party" and, collectively, the "Parties") to this Agreement to Reaffirm and Adopt the Settlement and Release Agreement (Reaffirmation and Adoption Agreement") are as follows:

   i.    Cortney C. Thomas, in his capacity as the receiver ("Second Receiver") pursuant to the Second Receiver Order (as defined below); and

   ii.    Lumar Land & Cattle, LLC ("Lumar"), a Texas limited liability company.

### II.    Definitions

B.    As used in this Reaffirmation and Adoption Agreement, the following terms shall have the respective meanings set forth below:

   i.    The term "Settlement Agreement" shall mean the Settlement and Release Agreement executed among Cortney C. Thomas, in his capacity as the First Receiver (as defined below), and Lumar, a copy of which is attached as **Exhibit "1"** to this Reaffirmation and Adoption Agreement;

   ii.    The term "First Receiver Order" shall mean the Order Appointing Receiver entered as document no. 29 in the Receiver Lawsuit on October 18, 2022.

   iii.    The term "First Receiver" shall refer to Cortney C. Thomas acting in his capacity as the receiver pursuant to the First Receiver Order.

   iv.    The term "Second Receiver Order" shall mean the Order Appointing Receiver entered as document no. 417 in the Receiver Lawsuit on November 29, 2023.

   v.    The term "Fifth Circuit Appeal" shall refer to the following cause:

   *Securities and Exchange Commission, Plaintiff-Appellee v. Timothy Barton, Defendant-Appellant,* Cause No. 22-11132 in the Fifth Circuit Court of Appeals.

   vi.    All defined terms in the Settlement Agreement shall be given the same meaning in this Reaffirmation and Adoption Agreement, except that any term specifically defined in this Reaffirmation and Adoption Agreement shall be given the meaning set forth herein even if different from the definition in the Settlement Agreement.

### III.    Recitals

C.    Pursuant to the First Receiver Order, the First Receiver was appointed as receiver for various entities, including BM318.

D.    The First Receiver Order was appealed by Timothy Barton ("Barton"), one of the defendants in the Receiver Lawsuit.  Barton filed a Defendant's Notice of Appeal on November

APP081

17, 2022 as document no. 66 in the Receiver Lawsuit.  The resulting appeal was docketed by the Fifth Circuit Court of Appeals ("Fifth Circuit") as the Fifth Circuit Appeal.

E.      The Settlement Agreement was executed by the First Receiver on behalf of BM318 and by Lumar, respectively, on June 20, 2023 and June 26, 2023.

F.      On June 28, 2023, the Fifth Circuit published an opinion ("Original Opinion") in the Fifth Circuit of Appeal vacating the First Receiver Order effective 90 days after the issuance of the mandate.  The Original Opinion was reported as *SEC v. Barton*, 74 F.4th 640 (5th Cir. 2023).

G.      After the Original Opinion was published, Barton filed a petition with the Fifth Circuit seeking a panel rehearing.  On August 31, 2023, the Original Opinion was withdrawn by the Fifth Circuit and a second opinion ("Second Opinion") was published denying Barton's request for rehearing and substituting the Second Opinion in place of the Original Opinion.  The Second Opinion is reported as *SEC v. Barton*, 2023 U.S. App. LEXIS 23125, 79 F.4th 573 (5th Cir. Aug. 31, 2023).  The Second Opinion also vacated the First Receiver Order 90 days after the issuance of the mandate and granted in part Barton's motion for a stay which will remain in place until the First Receiver Order was vacated.  2023 U.S. App. LEXIS 23125 *19-20.  However, the Second Opinion also states that, if a new receivership order were to be entered before the First Receiver Order is vacated, the stay granted in favor of Barton would have no effect on the actions of the new receiver under the new receivership order.  *Id*.  The mandate in the Fifth Circuit Appeal was issued on August 31, 2023.

H.      The Securities and Exchange Commission, as the plaintiff in the Receiver Lawsuit, filed a Second Motion to Appoint a Receiver as document no. 309 in the Receiver Lawsuit.  This second motion was granted pursuant to the Second Receiver Order.  Cortney C. Thomas has been appointed to act as the Second Receiver pursuant to the Second Receiver Order.

I.      As a result of the Original Opinion and Second Opinion vacating the First Receiver Order, the First Receiver and Lumar were unable to complete the process to obtain "Court Approval" of the Settlement Agreement, as such term is defined and described in section 2 of the Settlement Agreement.

J.      The Second Receiver and Lumar both desire to complete and consummate the settlement reflected in the Settlement Agreement.  For this purpose, the Parties desire to reaffirm and adopt the Settlement Agreement as set forth herein, and to proceed with the process for obtaining Court Approval and to thereafter complete and consummate the settlement contained in the Settlement Agreement.

### IV.    Terms and Conditions

   **ACCORDINGLY**, for value received, including in consideration of the mutual covenants contained herein, the receipt and sufficiency of which is hereby acknowledged by each of the Parties with all Parties intending to be legally bound, they hereby agree as follows:

   1.      **Recitals True and Correct.**  The above recitals are true and correct and are hereby incorporated as an integral and substantive part of this Reaffirmation and Adoption Agreement.

   2.      **Reference to Settlement Agreement**.  Reference is made to the Settlement Agreement for all purposes in relation to this Reaffirmation and Adoption Agreement.  A true,

APP082

accurate, and complete copy of the Settlement Agreement, including all exhibits thereto, is attached as **Exhibit "1"** to this Reaffirmation and Adoption Agreement.

3.       **Reaffirmation of Certain Terms**.  The following terms of the Settlement Agreement are hereby restated and modified as follows:

3.1      Recital J is revised to read as follows:

J.   Pursuant to paragraph 1 on pages 3 through 6 of 28 of the Second Receiver Order, the Second Receiver is appointed as receiver for BM318 as one of the "Receivership Entities", thereby granting the Second Receiver exclusive control and possession of BM318's assets of whatever kind and wherever located, including all intangible and tangible property, and which are included as a part of the "Receivership Property", as defined in paragraph 6.A. the Second Receiver Order.  Paragraph 3 of the Second Receiver Order clothes the Second Receiver with all power, right, and authority possessed by the officers, directors, and managers of each of the Receivership Entities, including BM318.  Paragraph 6 of the Second Receiver Order grants the Second Receiver broad powers over the Receivership Property, including the right to take any action which, prior to the entry of the Second Receiver Order, could have been taken by the officers, directors, managers, and agents of any of the Receivership Entities.  BM318's claims and rights in relation to the Adversary Proceeding, including in the relation to the Lis Pendens, constitute Receivership Property subject to the Second Receiver's control pursuant to the Second Receiver Order.  This includes the authority by the Second Receiver, subject to Court Approval, to fully settle and resolve all Claims asserted by BM318 in the Adversary Proceeding.

3.2      References in the Settlement Agreement to the "Receiver" shall mean the Second Receiver, and references to the "Receiver Order" shall mean the Second Receiver Order;

3.3      The term "Receivership Entities" shall include all entities subject to administration in the Receiver Lawsuit including, but not limited to, those identified in the Second Receiver Order and any supplements thereto, and expressly including BM318;

3.4      The "General Release" referred to in section 4 of the Settlement Agreement shall be in the form of the **Exhibit "2"** to this Reaffirmation and Adoption Agreement, which form of document shall replace the **Exhibit "B"** to the Settlement Agreement; and

3.5      The "Release of Lis Pendens" referred to in section 5 of the Settlement Agreement shall be in the form of the **Exhibit "3"** to this Reaffirmation and Adoption Agreement, which form of document shall replace the **Exhibit "C"** to the Settlement Agreement.

APP083

4. **Exhibits**.  Reference is hereby made to all exhibits to this Reaffirmation and Adoption Agreement, all of which are hereby incorporated for all purposes as a part of this Reaffirmation and Adoption Agreement.

5. **Settlement Agreement Adopted**.  As restated and modified in section 3 above, the Settlement Agreement is hereby adopted and reaffirmed by both Parties.  In the event of any conflict between the Settlement Agreement and the exhibits thereto and this Reaffirmation and Adoption Agreement and the exhibits hereto, the Reaffirmation and Adoption Agreement and its exhibits shall control.

6. **Entire Agreement**.  This Reaffirmation and Adoption Agreement constitutes the entire agreement between the Parties relating to the subject matter of this agreement and supersedes and replaces all prior negotiations, proposals or agreements, written or oral, of any nature or substance relating thereto.  In entering into this Reaffirmation and Adoption Agreement, neither Party is relying upon, and hereby disclaims reliance on, any other representation, omission, or document not expressly contained in this Reaffirmation and Adoption Agreement.

7. **Binding Effect**.  This Reaffirmation and Adoption Agreement shall be binding upon all Parties and their respective successors and assigns, although the effective date of the Settlement Agreement shall still be subject to first obtaining Court Approval.

8. **Representation by Counsel**.  Each Party acknowledges that it was represented by and consulted with legal counsel of its own choosing before executing and delivering this Reaffirmation and Adoption Agreement, and that each Party had a reasonable and sufficient opportunity to consult with such legal counsel.

9. **Counterparts**.  This Reaffirmation and Adoption Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  The Parties agree that copies of this Reaffirmation and Adoption Agreement shall have the same effect and may be accepted with the same authority as the original and that this Reaffirmation and Adoption Agreement may be executed electronically and in counterparts.

10. **Authority**.  Each Party represents to the other that, subject to Court Approval, they have the full legal right and authority required to enter into this Reaffirmation and Adoption Agreement and to compromise and settle all claims under the terms and conditions set forth herein. The Parties also represent that the signatures on behalf of the Parties, or their counsel, to this Reaffirmation and Adoption Agreement is sufficient, without further approval of third parties (other than Court Approval) to fully bind such Party to the terms hereof.

11. **Amendment**.  This Reaffirmation and Adoption Agreement may only be amended, modified, or supplemented by a separate written document duly executed by authorized representatives of all Parties or their legal successors in interest.

12. **Governing Law**.  This Reaffirmation and Adoption Agreement shall be construed in accordance with and governed by the laws of the State of Texas (excluding the laws applicable to conflicts or choice of law). The Parties agree that jurisdiction to adjudicate any dispute arising out of or related to performance of this Reaffirmation and Adoption Agreement lies solely in the Receivership Court.

APP084

13.    **Headings**.  Section or paragraph headings herein are for convenience of reference only and shall not impact or affect the interpretation of this Reaffirmation and Adoption Agreement.

14.    **Interpretation**.  This Reaffirmation and Adoption Agreement has been jointly drafted by counsel for both Parties and shall not be strictly interpreted or construed against either Party.

15.    **Notices**.  Any notice or communication required or permitted by this Reaffirmation and Adoption Agreement shall be given, made or sent as set forth in section 14 of the Settlement Agreement.

**IN WITNESS WHEREOF**, each of the Parties has executed this document on the dates reflected below.

**SECOND RECEIVER**:

By:    _____
          Cortney C. Thomas, Second Receiver

Executed on this _____ day of _____, 2024

**LUMAR**:

Lumar Land & Cattle, LLC

By:    _____
          Jim Martin, its Manager

Executed on this _____ day of _____, 2024

L:\BFORSHEY\Lumar Land & Cattle, LLC (BM318)(non-bnkrptcy)#6323\Barton - SEC Civil Suit 22-cv-02118 (Receivership)\Agreement to Reaffirm and Adopt the Settlement  Release Agmt (FP) 4.23.24 (bf comments - 4.25.24).docx

APP085

**Exhibit "1"**
**to**
**Reaffirmation and Adoption Agreement**

**Settlement and Release Agreement**

APP086

## SETTLEMENT AND RELEASE AGREEMENT

### I.    Parties

A.    The parties (individually, a "Party" and, collectively, the "Parties") to this Settlement and Release Agreement (collectively with all exhibits attached hereto, the "Settlement Agreement") are as follows:

    i.    Cortney C. Thomas, in his capacity as a receiver ("Receiver") pursuant to the Receiver Order entered in the Receiver Lawsuit (both as defined below); and

    ii.    Lumar Land & Cattle, LLC ("Lumar"), a Texas limited liability company.

### II.    Definitions

B.    As used in this Settlement Agreement, the following terms shall have the respective meanings set forth below:

    i.    The term "Adversary Proceeding" shall refer to the following adversary proceeding commenced by BM318 as a part of the Bankruptcy Case:

> BM318, LLC, Plaintiff v. The Dixon Water Foundation, Defendant,
> Lumar Land & Cattle, LLC, Plaintiff-in-intervention, Adv. No. 21-
> 04051-mxm, United States Bankruptcy Court for the Northern
> District of Texas, Fort Worth Division.

    ii.    The term "Bankruptcy Case" shall refer to the following bankruptcy case commenced by BM318:

> In re BM318, LLC, Case No. 20-4789-mxm, United States
> Bankruptcy Court for the Northern District of Texas, Fort Worth
> Division.

    iii.    The term "Bankruptcy Court" shall mean the United States Bankruptcy Court for the Northern District of Texas, the bankruptcy court before which the Bankruptcy Case is pending.

1

APP087

iv.    The term "BM318" shall mean BM318, LLC, a Texas limited liability company, the debtor in the Bankruptcy Case and the plaintiff in the Adversary Proceeding.

v.    The term "Business Day" shall mean a day which is not a Saturday, Sunday, or legal holiday.

vi.    The term "Claim" shall be broadly construed and shall include any claim, demand, action, liability, cause of action, obligation, damage, controversy, or right to payment, whether or not reduced to judgment, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, legal or equitable, secured or unsecured, whether known or unknown, suspected or unsuspected, and whether based on any contract or agreement or grounded in tort law or the common law, and whether arising under any law, regulation, or statute of the United States or any state or any subdivision thereof, as well as any equitable right or remedy and all remedial rights or claims of any kind, existing as of the date of this Settlement Agreement.  This shall include any Claim by any Party asserted in, or sought to be asserted in, or which arises out of the transactions or occurrences which are the subject of, the Adversary Proceeding.

vii.    The term "Closing" shall mean the transactions, payments, and deliveries among the Parties to consummate and perform the settlement pursuant to this Settlement Agreement.

viii.    The term "Court Approval" shall mean the Bankruptcy Court's order approving this Settlement Agreement and the Receivership Court's order ratifying this Settlement Agreement (collectively, the "Approval Orders").

ix.    The term "Dixon" shall mean The Dixon Water Foundation, f/k/a The Dixon Foundation, a non-profit foundation, the original defendant in the Adversary Proceeding.

x.    The term "Effective Date" shall mean the date on which the Receivership Court enters an order in the Receiver Lawsuit ratifying this Settlement Agreement, following an order from the Bankruptcy Court approving this Settlement Agreement.

2

xi.    The term "Lis Pendens" shall mean the Notice of Lis Pendens relating to BM318's claims in the Adversary Proceeding filed by BM318 on October 27, 2021, as Document no. 202142097 in the Official Records of Parker County, Texas.

xii.    The term "Lumar Deed" shall mean the Special Warranty Deed with Vendor's Lien executed by Dixon, as grantor, to Lumar, as grantee, covering the Lumar Land and recorded on April 23, 2021, as Document no. 202116538 in the Official Records of Parker County, Texas.

xiii.    The term "Lumar Land" shall refer to the 204.50-acre tract located in Parker County, Texas, and which is the subject of the Lumar Deed.

xiv.    The term "Receivership Court" shall mean the United States District Court for the Northern District of Texas, the district court before which the Receiver Lawsuit is pending.

xv.    The term "Receiver Lawsuit" shall refer to the following lawsuit in which the Receiver was appointed:

> *Securities and Exchange Commission, v. Timothy Barton, et al.,*
>
> Case 3:22-CV-2118-X, in the United States District Court for the
>
> Northern District of Texas, Dallas Division.

xvi.    The term "Receiver Order" shall refer to the *Order Appointing Receiver* entered as Docket no. 29 in the Receiver Lawsuit on October 18, 2022.

xvii.    The term "Receivership Entities" includes all entities subject to administration in the Receiver Lawsuit including, but not limited to, those entities identified in Receiver Order and later supplemental orders entered in the Receiver Lawsuit, including Docket nos. 62, 88, etc.

xviii.    The term "Remaining Land" shall mean the 1,531.75-acre tract of land located in Parker County, Texas, which is the subject of BM318's claims in the Adversary Proceeding, but excluding therefrom the Lumar Land.

3

xix.    The term "Special Warranty Deed" shall mean the deed conveying the Remaining Land from BM318, as grantor, to Dixon, as grantee, and recorded on July 2, 2020, as Document no. 202019524 in the Official Records of Parker County, Texas.

### III.    Recitals

C.    Dixon sold a tract of land consisting of approximately 2,055.77 acres to BM318 during 2018. The majority of the purchase price for this original tract was provided through owner financing by Dixon and was secured by a deed of trust against most of this land. The Remaining Land constitutes a portion of the original tract sold by Dixon to BM318. Dixon asserts that BM318 defaulted in the repayment of this debt. Ultimately, BM318 conveyed the Remaining Land to Dixon pursuant to the Special Warranty Deed which was recorded on July 2, 2020.

D.    On September 1, 2020, BM318 commenced the Bankruptcy Case and acted as a debtor-in-possession. The Bankruptcy Court ultimately confirmed a plan of reorganization proposed by BM318 in the Bankruptcy Case which became effective on or about August 2, 2021.

E.    On April 23, 2021, Dixon sold the Lumar Land to Lumar. This land was conveyed to Lumar pursuant to the Lumar Deed. The Lumar Land constitutes a part of the Remaining Land.

F.    On August 10, 2021, BM318 commenced the Adversary Proceeding against Dixon seeking to avoid the transfer of the Remaining Land by BM318 to Dixon pursuant to the Special Warranty Deed as a preferential or fraudulent transfer pursuant to sections 547 and 548 of the Bankruptcy Code. Dixon asserts that these avoidance claims by BM318 are without merit.

G.    On October 27, 2021, BM318 filed the Lis Pendens which relates to its claims in the Adversary Proceeding against Dixon in relation to the Remaining Land. The Lis Pendens covers the Lumar Land as a part of the Remaining Land.

H.    Lumar sought to intervene in the Adversary Proceeding based on the Lis Pendens, which burdens the Lumar Land. The Bankruptcy Court granted Lumar leave to intervene in the

4

APP090

Adversary Proceeding. In the Adversary Proceeding, Lumar asserts that BM318's avoidance claims as to the Remaining Land are without merit, and further asserts that it is also entitled to the protections of section 550(b)(1) and (2) of the Bankruptcy Code. BM318 contests Lumar's assertions.

I.    On September 23, 2022, the Receiver Lawsuit was filed. Thereafter, the Receiver was appointed to serve in such capacity through the Receiver Order. Based on the Receiver Order, further proceedings in the Adversary Proceeding are stayed.

J.    Pursuant to paragraph 1 on pages 2 and 3 of 25 of the Receiver Order, the Receiver is appointed as receiver for BM318 as one of the "Receivership Entities," thereby granting the Receiver exclusive control and possession of BM318's assets of whatever kind and wherever located, including all tangible and intangible property, and which are included as a part of the "Receivership Assets" as defined in the Receivership Order. Paragraph 3 of the Receiver Order clothes the Receiver with all power, right, and authority possessed by the officers, directors, and managers of each of the Receivership Entities, including BM318. Paragraph 6 grants the Receiver broad powers over the Receivership Assets, including the right to take any action which, prior to the entry of the Receiver Order, could have been taken by the officers, directors, managers, and agents of any of the Receivership Entities. BM318's claims and rights in relation to the Adversary Proceeding, including in relation to the Lis Pendens, constitute Receivership Assets subject to the Receiver's control pursuant to the Receiver Order. This includes the authority by the Receiver, subject to Court Approval, to fully settle and resolve all Claims asserted by BM318 in the Adversary Proceeding.

K.    The Receiver and Lumar have entered into an Agreement for Sale of Land and Delivery of Partial Releases ("Sale Agreement") effective as of January 31, 2023, by which the Receiver agreed to the release of certain tracts of land subject to the Lis Pendens, thereby permitting Lumar to sell such tracts of land subject to the further terms of the Sale Agreement. The Sale Agreement was approved through an Order entered in the Receiver Lawsuit on February 22,

5

2023. The Sale Agreement provides a procedure to release the Lis Pendens as to certain specific tracts to facilitate sales of portions of the Lumar Land. However, the Sale Agreement does not release any of the Receiver's rights except as to specific portions of the Lumar Land identified in Certifications made by Lumar to the Receiver and for which the Receiver has agreed to execute a Partial Release.

L.      On April 25, 2023, a mediation was held in Dallas, Texas, among the Receiver, Lumar, and Dixon. The Receiver and Lumar agreed in principle to settlement terms which are incorporated in this Settlement Agreement, although subject to Court Approval. At the mediation, Dixon and the Receiver also negotiated in principle a separate agreement to resolve the disputes and issues between them in relation to the Adversary Proceeding, which agreement will be the subject of a separate settlement agreement between Dixon and the Receiver. Dixon is not a party to this Settlement Agreement.

**IV.    Terms and Conditions**

ACCORDINGLY, for value received, including in consideration of the mutual covenants set forth below, the receipt and sufficiency of which is hereby acknowledged by each of the Parties, they hereby agree as follows:

1.      Recitals True and Correct. The above recitals are true and correct and are incorporated as an integral and substantive part of this Settlement Agreement.

2.      Court Approval. This Settlement Agreement is subject to, and it shall not be effective until, an order approving this Settlement Agreement is entered by the Bankruptcy Court and an order ratifying this Settlement Agreement is entered by the Receivership Court ("Court Approval"). Upon the Parties' execution of this Settlement Agreement, the Receiver shall file a motion in the Receivership Lawsuit seeking an order from the Receivership Court lifting the stay of the Bankruptcy Case for the purpose of the Parties seeking approval of this Settlement Agreement by the Bankruptcy Court. Upon the Receivership Court's entry of an order lifting of the stay of the Bankruptcy Case, the Parties shall file a motion (and shall attach an executed

6

APP092

copy of this Settlement Agreement thereto) seeking an order from the Bankruptcy Court approving this Settlement Agreement pursuant to Federal Rule of Bankruptcy Procedure 9019. Upon the Bankruptcy Court's entry of an order approving the Settlement Agreement, the Receiver shall file a motion in the Receivership Lawsuit (and shall attach an executed copy of this Settlement Agreement thereto) seeking an order from the Receivership Court ratifying this Settlement Agreement. The Parties agree to cooperate in good faith to effectuate the terms and conditions of this Settlement Agreement, including taking all necessary actions to acquire Court Approval. If this Settlement Agreement does not receive Court Approval, it shall be null and void.

3.    Dismissal of Adversary Proceeding. BM318 agrees that within five (5) business days of this Settlement Agreement receiving Court Approval, BM318 shall make all appropriate filings to dismiss, with prejudice, the Adversary Proceeding as against Lumar, with each Party to bear its own costs, expenses, and attorneys' fees. The judgment ("Final Judgment") dismissing the Adversary Proceeding shall be in form and substance substantially identical to the attached **Exhibit "A"**. Because Dixon is believed to desire the entry of a single Final Judgment dismissing the Adversary Proceeding, the attached proposed form of the Final Judgment encompasses the dismissal of the Adversary Proceeding as to Dixon, even though Dixon is not a party to this Settlement Agreement. The Receiver shall reasonably cooperate with Lumar to devise a form of Final Judgment reasonably acceptable to the Receiver, Lumar and Dixon. However, if Lumar, in the exercise of its sole discretion, determines that it wishes to proceed to dismiss the Adversary Proceeding as between BM318 and Lumar without including Dixon in the Final Judgment, the Receiver shall cooperate with Lumar to sever the Claims pending in the Adversary Proceeding between BM318 and Lumar and to enter a Final Judgment on that basis.

4.    Mutual Releases. The Parties shall each execute and deliver to the other at Closing a mutual general release ("General Release") releasing all Claims against all Parties, which shall be in form and substance substantially identical to the attached **Exhibit "B."**

7

APP093

5.    Release of Lis Pendens.  The Receiver shall execute and deliver to Lumar at Closing a release ("Release of Lis Pendens") releasing both the Lis Pendens and all other rights, claims, and interests in the Lumar Land, which release shall be in form and substance substantially identical to the attached **Exhibit "C."**

6.    The Closing.  The Closing shall occur within seven (7) days of this Settlement Agreement receiving Court Approval.  At the Closing, the Parties shall make the following deliveries as required by this Settlement Agreement:

6.1    Lumar shall pay to the Receiver the sum of $75,000 via wire transfer or through certified funds which the Receiver agrees to hold in trust until each Approval Order is final and non-appealable (the "Settlement Payment");

6.2    Both Parties shall approve the Final Judgment for entry, and the fully executed Final Judgment shall be delivered to legal counsel for Lumar for entry in the Adversary Proceeding;

6.3    All Parties shall execute and deliver, each to the other, a duplicate original of the General Release; and

6.4    The Receiver shall execute, acknowledge, and deliver to Lumar in recordable form the Release of Lis Pendens.

7.    Event of Default; Right to Cure and Remedies. Lumar's failure to make the Settlement Payment by the Closing shall constitute an "Event of Default" under this Settlement Agreement.  Lumar shall have seven (7) days to cure an Event of Default for failing to make the timely Settlement Payment.  If Lumar fails to make the Settlement Payment, then the Receiver, at his sole discretion, may bring suit against Lumar to: (a) enforce this Settlement Agreement; or (b) bring any avoidance claims he may hold for the recovery of any funds that may have been transferred to Lumar by BM318 or other Receivership Entities.

8

APP094

8.    Attorneys' Fees and Costs. Each Party shall bear its own attorneys' fees and expenses in connection with the Adversary Proceeding, the Receiver Lawsuit, and the negotiation, preparation, and execution of this Settlement Agreement.

9.    Cooperation and Further Assurances.  The Parties shall cooperate in good faith to close and effectuate the transactions contemplated by this Settlement Agreement.  This cooperation shall include the execution and delivery of all documents and the performance of all acts reasonably necessary to consummate and/or perform this Settlement Agreement.  This shall include, if necessary, reasonable cooperation between the Receiver and Lumar to agree to a form of Final Judgment acceptable to Dixon or, if a separate Final Judgment is entered which does not include Dixon, reasonable cooperation to agree to an appropriate form of the Final Judgment on that basis.

10.    Dixon. Dixon is neither a party to this Settlement Agreement nor a third-party beneficiary hereof.  The use of the defined terms "Party" or "Parties" herein does not include Dixon.

11.    Entire Agreement.  This Settlement Agreement constitutes the entire agreement between the Parties hereto and supersedes and replaces all prior negotiations, proposals or agreements, written or oral, of any nature or substance relative thereto.  Neither Party is relying upon, and hereby disclaims reliance on, any other representation, omission, or document not expressly contained in this Settlement Agreement.

12.    Binding Effect. Subject to approval by the Receivership Court and the Bankruptcy Court, this Settlement Agreement shall be binding upon all Parties and their respective successors and assigns.

13.    Representation by Counsel. The Parties acknowledge and understand that they are executing and delivering this Settlement Agreement with full knowledge of any and all rights which they may have with respect to the Claims herein settled and released.  Each acknowledges that it was represented by and consulted with an attorney of its own choosing

9

before executing and delivering this Settlement Agreement to review this document and the claims being settled and released, and that each Party had a reasonable and sufficient opportunity to do so.

14.    Notices.  Unless otherwise specifically provided herein, any communication pursuant to this Settlement Agreement shall be in writing addressed to the respective Party as set forth below and may be (a) personally served, (b) sent by overnight courier service or certified or registered United States mail, or (c) transmitted by e-mail, and shall be deemed to have been given (x) if delivered in person, when delivered, (y) if delivered by e-mail, on the date of transmission if transmitted on a business day before 5:00 p.m. (Central time) or, if not, on the next succeeding business day, and (z) if delivered by courier or certified or registered United States mail, when received. Such communications shall be addressed as follows:

If to the Receiver:

> Cort C. Thomas
> Brown Fox PLLC
> 8111 Preston Road, Suite 300
> Dallas, Texas  75225
> E-mail:  cort@brownfoxlaw.com

With a copy to:

> Charlene C. Koonce
> C. Alan Carrillo
> Brown Fox PLLC
> 8111 Preston Road, Suite 300
> Dallas, Texas  75225
> E-mail:  charlene@brownfoxlaw.com
> E-mail:  alan@brownfoxlaw.com

If to Lumar:

> Lumar Land & Cattle, LLC
> 5189 E I-20 Service Road N, Suite 106
> Willow Park, Texas  76087
> Attention:  Jim Martin
> E-Mail:  jim@martinlandsales.com
> E-Mail:  ron@railheadrealty.com

With a copy to:

10

APP096

J. Robert Forshey
Forshey & Prostok, LLP
777 Main Street, Suite 1550
Fort Worth, Texas 76102
E-mail: bforshey@forsheyprostok.com

Kimberly P. Harris
Joshua L. Shepherd
2001 Bryan Street, Suite 1800
Dallas, Texas 75201
E-mail: kharris@qslwm.com
E-mail: jshepherd@qslwm.com

15.    Counterparts. This Settlement Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. The Parties agree that copies of this Settlement Agreement shall have the same effect and may be accepted with the same authority as the original and that this Settlement Agreement may be executed electronically and in counterparts.

16.    Authority. Each Party represents to the other that, subject to Court Approval, they have the full legal right and authority required to enter into this Settlement Agreement and to compromise and settle all claims under the terms and conditions set forth herein. The Parties also represent that the signatures on behalf of the Parties, or their counsel, to this Settlement Agreement is sufficient, without further approval of third parties, other than Court Approval, to fully bind such Party to the terms hereof, including without limitation, each of the payment obligations and releases set forth herein.

17.    Amendments. This Settlement Agreement may only be amended, modified, or supplemented by a separate written document duly executed by authorized representatives of the Parties or their legal successors in interest.

18.    Severability. If any provision of this Settlement Agreement shall be held to be invalid or unenforceable, the validity or enforceability of the remaining provisions shall not in any way be affected or impaired thereby, but rather this Settlement Agreement shall be construed as if not containing the invalid or unenforceable provision. However, if such provision is an essential

11

element of this Settlement Agreement, such as the release provisions, then the Parties shall promptly attempt in good faith to negotiate a suitable replacement provision.

19.    Governing Law.  This Settlement Agreement shall be construed in accordance with and governed by the laws of the State of Texas (excluding the laws applicable to conflicts or choice of law). The parties agree that jurisdiction to interpret any dispute arising out of or related to performance of this Settlement Agreement lies solely in the Receivership Court.

20.    Headings.  Section or paragraph headings are for convenience of reference only and shall not impact or affect the interpretation of this Settlement Agreement.

21.    Interpretation.  This Settlement Agreement has been jointly drafted by counsel for both Parties and shall not be strictly interpreted or construed against either Party.

22.    Exhibits.  Reference is here made to all exhibits which are hereby incorporated as a part of this Settlement Agreement.

**IN WITNESS WHEREOF**, each of the Parties has executed this instrument on the dates indicated below.

Executed on this 26th day of June, 2023

Lumar Land & Cattle, LLP co., LLC

By: _____
Jim Martin, its Manager


Executed on this 20th day of June, 2023

Receiver:

By: _____
Cortney C. Thomas, Receiver

12

APP098

**Exhibit A**
**to**
**Settlement Agreement**

13

APP099

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| In re: | § | |
| | § | Chapter 11 |
| BM318, LLC, | § | |
| | § | Case No. 20-42789-MXM |
| Debtor | § | |
| | | |
| BM318, LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Adv. Pro. No. 21-04051-MXM |
| | § | |
| THE DIXON WATER FOUNDATION, | § | |
| | § | |
| Defendant. | § | |
| | § | |
| LUMAR LAND & CATTLE, LLC | § | |
| | § | |
| Plaintiff-in-Intervention | § | |

**FINAL JUDGMENT**

This adversary proceeding was commenced by BM318, LLC ("BM318"), as the plaintiff,

against The Dixon Water Foundation ("Dixon"), as the defendant.  Thereafter, Lumar Land &

Cattle, LLC ("Lumar") was granted leave to intervene in this adversary proceeding.  Cortney C.

Thomas ("Receiver") has been appointed as Receiver for BM318 through the following lawsuit

("Receivership Lawsuit"):

> *Securities and Exchange Commission, Plaintiff v. Timothy Barton,
> et al., Defendants*, Case 3:22-cv-2118-X, in the United States
> District Court for the Northern District of Texas, Dallas Division.

The Receiver (acting on behalf of BM318) and Lumar have entered into a Settlement

Release Agreement ("Lumar Settlement Agreement") which fully resolves all claims and

disputes pending between them in this adversary proceeding.  Dixon is not a party to the Lumar

Settlement Agreement.  The Lumar Settlement Agreement has been approved on behalf of the

Receiver, acting on behalf of BM318, by both the district court in the Receivership Lawsuit and

APP100

by this Court as part of this bankruptcy case.  Pursuant to the Lumar Settlement Agreement, the Receiver and Lumar have agreed to the entry of this Final Judgment fully and finally settling and dismissing all claims and disputes between them in this adversary proceeding.

The Receiver (also acting on behalf of BM318) and Dixon have entered into a separate Settlement Agreement ("Dixon Settlement Agreement") which fully resolves all matters pending between them in this adversary proceeding.  Lumar is not a party to the Dixon Settlement Agreement.  The Dixon Settlement Agreement has been approved on behalf of the Receiver, acting on behalf of BM318, by both the district court in the Receivership Lawsuit and by this Court in this bankruptcy case.  Pursuant to the Dixon Settlement Agreement, the Receiver and Dixon have agreed to the entry of this Final Judgment fully and finally settling and dismissing all claims and disputes between them in this adversary proceeding.

ACCORDINGLY, it is hereby ORDERED, ADJUDGED and DECREED that:

1.    All claims, causes of action, or other claims for any form of relief asserted in this adversary proceeding by any party are hereby dismissed with prejudice to the refiling of the same.  This dismissal with prejudice shall encompass not only the claims actually asserted by any party in this adversary proceeding, but also any claim, cause of action or claim for relief which could have been asserted based upon the transactions or occurrences which form the subject matter of this adversary proceeding.

2.    All attorney's fees and costs of court shall be borne by the party initially incurring the same.

3.    This judgment is a final judgment fully and finally disposing of all claims, causes of action, or claims for relief asserted by any party in this adversary proceeding.

4.    The Court retains jurisdiction to construe and enforce this Final Judgment.

APP101

**Approved for Entry**:

_____
Deborah Perry
Munsch Hardt Kopf & Harr, P.C.
500 N. Akard Street, Ste. 3800
Dallas, TX 75201

**Counsel for The Dixon Water Foundation**

_____
Charlene C. Koonce
Brown Fox PLLC
8111 Preston Road, Suite 300
Dallas, TX 75225

**Counsel for Receiver, Cortney C. Thomas**

_____
J. Robert Forshey
Forshey & Prostok, LLP
777 Main Street, Suite 1550
Fort Worth, Texas 76102

**Counsel for Intervenor, Lumar Land & Cattle, LLC**

L:\BFORSHEY\Lumar Land & Cattle, LLC (BM318)(non-bnkrptcy)#6323\Barton - SEC Civil Suit 22-cv-02118 (Receivership)\Final
Judgment (BF & KPH v) 5.18.23.doc

**Exhibit B**
**to**
**Settlement Agreement**

14

APP103

## Mutual General Release

### I. Parties

A.      The parties (individually, a "Party" and, collectively, the "Parties") to this Mutual General

Release ("Release") are as follows:

 i.      Cortney C. Thomas, in his capacity as a receiver ("Receiver") pursuant to the

 Receiver Order entered in the Receiver Lawsuit (both as defined below); and

 ii.     Lumar Land & Cattle, LLC ("Lumar"), a Texas limited liability company.

### II. Definitions

B.      As used in this Release, the following terms shall have the respective meanings set forth

below:

 i.      The term "Adversary Proceeding" shall refer to the following adversary

proceeding commenced by BM318 as a part of the Bankruptcy Case:

> *BM318, LLC, Plaintiff v. The Dixon Water Foundation, Defendant,*
>
> *Lumar Land & Cattle, LLC, Plaintiff-in-intervention*, Adv. No. 21-
>
> 04051-mxm, United States Bankruptcy Court for the Northern
>
> District of Texas, Fort Worth Division.

 ii.     The term "Bankruptcy Case" shall refer to the following bankruptcy case

commenced by BM318:

> *In re BM318, LLC*, Case No. 20-4789-mxm, United States
>
> Bankruptcy Court for the Northern District of Texas, Fort Worth
>
> Division.

 iii.    The term "Bankruptcy Court" shall mean the United States Bankruptcy Court for

the Northern District of Texas, the court before whom the Bankruptcy Case is pending.

 iv.     The term "BM318" shall mean BM318, LLC, a Texas limited liability company, the

debtor in the Bankruptcy Case and the Plaintiff in the Adversary Proceeding.

1

APP104

v.        The term "Claim" shall be broadly construed and shall include any claim,

demand, action, liability, cause of action, obligation, damage, controversy, or right to payment,

whether or not reduced to judgment, liquidated or unliquidated, fixed or contingent, matured or

unmatured, disputed or undisputed, legal or equitable, secured or unsecured, whether known or

unknown, suspected or unsuspected, and whether based on any contract or agreement or

grounded in tort law or the common law, and whether arising under any law, regulation or

statute of the United States or any of state or any subdivision thereof, as well as any equitable

right or remedy and all remedial rights or claims of any kind.  This shall include any Claim by

any Party asserted in, or sought to be asserted in, or which arises out of the transactions or

occurrences which are the subject of, the Adversary Proceeding.

vi.        The term "Lumar Affiliates" shall include the following persons or entities:  (i)

Jimmy Ray Martin, (ii) G.H. Lumar JV, (iii) Aledo West, LLC, (iv) G.H. Lumar LLC, (v) the Estate

of Gary Z. Luker Sr., (vi) Ronald Hughes, (vii) Railhead Realty, LLC, and (ix) Lumar's members,

managers, officers, representatives, employees, agents, attorneys (including Forshey &

Prostok, LLP and Quilling, Selander, Lownds, Winslett & Moser, PC), accountants and other

professionals (including Republic Title of Texas and New Reunion Title LLC d/b/a Reunion

Title), both past or present, as to any Claim in any way related to or arising out of Lumar, the

Lumar Land, the Receivership, or the Adversary Proceeding.

vii.        The term "Receiver Affiliates" shall include (i) the Receivership Entities, and (ii)

the Receiver's agents, representatives, attorneys, accountants, and other professionals, both

past or present, as to any Claim relating to or arising out of the Receivership, Lumar, the Lumar

Land, or the Adversary Proceeding.

viii.        The term "Receivership Court" shall mean the United States Bankruptcy Court for

the Northern District of Texas, the District Court before whom the Receiver Lawsuit is pending.

ix.        The term "Receiver Lawsuit" shall refer to the following lawsuit in which the

Receiver was appointed:

2

*Securities and Exchange Commission, Plaintiff v. Timothy Barton,*

*et al., Defendants*, Case 3:22-CV-2118-X, in the United States

District Court for the Northern District of Texas, Dallas Division.

### III. <u>Recitals</u>

C.      The Receiver and Lumar have entered into a Settlement and Release Agreement

("<u>Settlement Agreement</u>") which has been approved by the Receivership Court pursuant to an

order entered in the Receiver Lawsuit on _____, 2023, and by the Bankruptcy Court

in an order entered on _____, 2023 in the Bankruptcy Case.  Reference is here

made to the Settlement Agreement and the orders respectively entered by the Receivership

Court and Bankruptcy Court approving the Settlement Agreement.

D.      Pursuant to the Settlement Agreement, the Parties have agreed to the execution and

delivery, each to the other, of this Release.

### IV. <u>Mutual Release</u>

ACCORDINGLY, pursuant to the terms of the Settlement Agreement, and for other good

and valuable consideration, including the mutual releases by the Parties herein, the receipt and

sufficiency of which is hereby acknowledged by each Party, they hereby agree and release

each other as set forth below:

1.      Reference is here made to the Settlement Agreement for all purposes.  The

above recitals are true and correct and are hereby incorporated as an integral and substantive

part of this Release.

2.      Lumar hereby releases all Claims against the Receiver and each of the Receiver

Affiliates.

3.      The Receiver hereby releases all Claims against Lumar and each of the Lumar

Affiliates.

APP106

4.      This Release shall be immediately binding and effective as between the Parties upon execution and delivery, and all conditions precedent to the effectiveness of this Release have been satisfied by the occurrence, waiver, or performance thereof.

5.      This Release shall be construed pursuant to Texas law.

6.      This Release shall be binding upon, and inure to the benefit of, the Receiver and Lumar and their respective successors in interest and assignees.

7.      This Release shall be effective on the date on which it has been signed by both Parties.

Executed this _____ day of _____, 2023.

**RECEIVER**:

_____
Cortney C. Thomas, Receiver

Executed this _____ day of _____, 2023

**LUMAR**:

Lumar Land & Cattle, LLC

By: _____
        Jim Martin, its manager

L:\BFORSHEY\Lumar Land & Cattle, LLC (BM318)(non-bnkrptcy)#6323\Barton - SEC Civil Suit 22-cv-02118 (Receivership)\Mutual General Release (BF & KPH v) 5.18.23.docx

4

**Exhibit C**
**to**
**Settlement Agreement**

15

## RELEASE OF LIS PENDENS

### I.    Parties

A.    This Release of Lis Pendens Release is executed by Cortney C. Thomas, in his capacity as Receiver ("Receiver") pursuant to the Receiver Order entered in the Receiver Lawsuit (as both are defined below), to release the Lis Pendens (as defined below) and all other rights, title, interest, claims, and causes of action which encumber certain land owned by Lumar Land & Cattle, LLC ("Lumar"), a Texas limited liability company.

### II.    Definitions

B.    As used in this Partial Release, the following terms shall have the respective meanings set forth below:

i.    The term "Adversary Proceeding" shall refer to the following adversary proceeding commenced by BM318 as a part of the Bankruptcy Case:

*BM318, LLC, Plaintiff v. The Dixon Water Foundation, Defendant, Lumar Land & Cattle, LLC, Plaintiff-in-intervention*, Adv. No. 21-04051-mxm, United States Bankruptcy Court for the Northern District of Texas, Fort Worth Division.

ii.    The term "Bankruptcy Case" shall refer to the following bankruptcy case commenced by BM318:

*In re BM318, LLC*, Case No. 20-4789-mxm, United States Bankruptcy Court for the Northern District of Texas, Fort Worth Division

iii.    The term "BM318" shall mean BM318, LLC, a Texas limited liability company, the debtor in the Bankruptcy Case and the plaintiff in the Adversary Proceeding.

iv.    The term "Dixon" shall mean The Dixon Water Foundation, f/k/a The Dixon Foundation, a non-profit foundation, the original defendant in the Adversary Proceeding.

v.    The term "Lis Pendens" shall mean the Notice of Lis Pendens relating to BM318's claims in the Adversary Proceeding and filed by BM318 on October 27, 2021, as Document No. 202142097 in the Official Records of Parker County, Texas.

vi.    The term "Lumar Deed" shall mean the Special Warranty Deed with Vendor's Lien executed by Dixon, as grantor, to Lumar, as grantee, covering the Lumar Land and recorded on April 23, 2021, as Document no. 202116538 in the Official Records of Parker County, Texas.

vii.    The term "Lumar Land" shall refer to the 204.50-acre tract located in Parker County, Texas, which is more fully described in the Lumar Deed and in the attached **Exhibit "A"**.

viii.    The term "Original Tract" shall mean the 2,055.77-acre tract located in Parker County, Texas, which was sold by Dixon to BM318 in 2018.

**1**

APP109

ix.        The term "Receiver Lawsuit" shall refer to the following lawsuit in which the Receiver was appointed:

> *Securities and Exchange Commission, Plaintiff v. Timothy Barton, et al., Defendants*, Case 3:22-CV-2118-X, in the United States District Court for the Northern District of Texas, Dallas Division.

x.        The term "Receiver Order" shall refer to an *Order Appointing Receiver* entered as Docket no. 29 in the Receiver Lawsuit on October 18, 2022, a true and accurate copy of which is attached hereto as **Exhibit "B"**.

xi.        The term "Remaining Land" shall mean the 1,531.75 acre tract of land located in Parker County, Texas, which is the subject of BM318's claims in the Adversary Proceeding but excluding therefrom the Lumar Land.

xii.        The term "Special Warranty Deed" shall mean the deed conveying the Remaining Land from BM318, as grantor, to Dixon, as grantee, and recorded on July 2, 2020 as Document no. 202019524 in the Official Records of Parker County, Texas.

### III.    Recitals

C.        Dixon sold the Original Tract to BM318 during 2018.  The majority of the purchase price for the Original Tract was provided through owner financing by Dixon and secured by a deed of trust against most of the Original Tract.  The Remaining Land constitutes a portion of the Original Tract.  Dixon asserts that BM318 defaulted in the repayment of this debt.  Ultimately, BM318 conveyed the Remaining Land to Dixon pursuant to the Special Warranty Deed which was recorded on July 2, 2020.

D.        On September 1, 2020, BM318 commenced the Bankruptcy Case and acted as a debtor-in-possession.  The Bankruptcy Court ultimately confirmed a plan of reorganization proposed by BM318 in the Bankruptcy Case which became effective on August 2, 2021.

E.        On April 23, 2021, Dixon sold the Lumar Land to Lumar.  The land was conveyed to Lumar pursuant to the Lumar Deed.  The Lumar Land constitutes a part of the Remaining Land. Lumar financed a portion of the purchase price through loans from the Bank evidenced by Note 1, which Lumar represents is secured by both Deed of Trust 1 and Deed of Trust 2.  Lumar financed some of the costs to develop the Lumar Land for sale through a second loan from the Bank evidenced by Note 2, which Lumar represents is also secured by both Deed of Trust 1 and Deed of Trust 2.

F.        On August 10, 2021, BM318 commenced the Adversary Proceeding against Dixon seeking to avoid the transfer of the Remaining Land by BM318 to Dixon pursuant to the Special Warranty Deed as a preferential or fraudulent transfer pursuant to sections 547 and 548 of the Bankruptcy Code.  Dixon asserts that these avoidance claims by BM318 are without merit

G.        On October 27, 2021, BM318 filed the Lis Pendens which relates to its claims in the Adversary Proceeding against Dixon in relation to the Remaining Land.

H.        Lumar sought to intervene in the Adversary Proceeding based on the Lis Pendens which burdens the Lumar Tract as a part of the Remaining Land.  The Bankruptcy Court granted Lumar leave to intervene in the Adversary Proceeding.  In the Adversary Proceeding, Lumar

**2**

asserts that BM318's avoidance claims as to the Remaining Land are without merit, and further asserts that it is also entitled to the protections of section 550(b)(1) and (2) of the Bankruptcy Code.  Lumar further asserts that, in addition to the lack of merit in BM318's avoidance claims, the Bank's rights in the Lumar Land pursuant to the Deed of Trust 1 and Deed of Trust 2 are further protected by section 550(b)(2) of the Bankruptcy Code.  BM318 contests Lumar's assertions.

I.      On September 23, 2022, the Receiver Lawsuit was filed.  Thereafter, the Receiver was appointed to serve in such capacity through the Receiver Order.  Based on the Receiver Order, further proceedings in the Adversary Proceeding are stayed.

J.      Pursuant to paragraph 1 of the Receiver Order, the Receiver is appointed as receiver for BM318, as one of the "Receivership Entities," with exclusive control and possession of the BM318 assets, of whatever kind and wherever located, including all tangible and intangible property, and which are included as part of the "Receivership Assets".  Paragraph 3 of the Receiver Order clothes the Receiver with all power, right and authority possessed by the officers, directors, and managers of each of the Receivership Entities, which includes BM318.  Paragraph 6 grants the Receiver broad powers over the Receivership Assets, including the right to take any action which, prior to the entry of the Receiver Order, could have been taken by the officers, directors, managers, and agent of any of the Receivership Entities.

K.      BM318's claims and rights in relation to the Adversary Proceeding, including in relation to the Lis Pendens, constitute Receivership Assets subject to the Receiver's control pursuant to the Receiver Order.  This allows the Receiver to settle and resolve the Adversary Proceeding and release the Lis Pendens.

L.      The Receiver has entered into this Partial Release based on the provisions of the Receiver Order, his control of BM318 as one of the Receivership Entities, and his control of all property of BM318 as part of the Receivership Assets.

M.      The Receiver (acting on behalf of BM318) has entered into a Settlement Agreement ("Settlement Agreement") with Lumar to settle and resolve all claims among them in the Adversary Proceeding.  This Settlement Agreement has been approved by the Receivership Court pursuant to an order entered on _____, 2023, and by the Bankruptcy Court pursuant to an order entered on _____, 2023.

N.      This Release is executed and delivered by the Receiver pursuant to the Settlement Agreement.

#### IV.    Release of Lis Pendens

FOR VALUE RECEIVED, pursuant to the terms of the Settlement Agreement, acting with regard to the Receivership Assets of BM318 as one of the Receivership Entities subject to the Receiver Order, the Receiver hereby releases the Lis Pendens as against the Lumar Land.  By so releasing the Lis Pendens against the Lumar Land, the Receiver also releases all rights, title, interest, claims, and causes of action against the Lumar Land, including all claims relating to the Lumar Land asserted or which could have been asserted in the Adversary Proceeding.

Any other term hereof notwithstanding, by this Release the Receiver does not release, impair or impact any right, title, interest, claims, and causes of action of or by BM318 against any portion of the Remaining Land.

**3**

APP111

Executed and effective as of this _____ day of _____, 2023.

**RECEIVER**:

_____
Cortney C. Thomas, as Receiver
Pursuant to the Receivership Order

**ACKNOWLEDGMENT**:

STATE OF TEXAS

COUNTY OF DALLAS

This instrument was acknowledged before me on the _____ day of _____, 202__, by Cortney C. Thomas, as Receiver for BM318, LLC.

My commission expires: _____

_____
Notary Public, State of Texas

**WHEN RECORDED, RETURN TO:**

J. Robert Forshey
Forshey & Prostok, LLP
777 Main Street, Suite 1550
Fort Worth, Texas 76102

L:\BFORSHEY\Lumar Land & Cattle, LLC (BM318)(non-bnkrptcy)#6323\Barton - SEC Civil Suit 22-cv-02118
(Receivership)\Release of Lis Pendens 5.3.23.docx

**4**

APP112

**EXHIBIT "A"**

The Lumar Land is described as follows:

APP113

APP114

**EXHIBIT "B"**

Receivership Order entered on October 18, 2022 in the following lawsuit:

*Securities and Exchange Commission, Plaintiff v. Timothy Barton, et al., Defendants*, Case 3:22-CV-2118-X, in the United States District Court for the Northern District of Texas, Dallas Division.

**6**

**Exhibit "2"**
**to**
**Reaffirmation and Adoption Agreement**

**<u>Mutual General Release</u>**

## Mutual General Release

### I.  Parties

K.      The parties (individually, a "Party" and, collectively, the "Parties")[1] to this Mutual General Release ("Release") are as follows:

   iii.    Cortney C. Thomas, in his capacity as a receiver (" Second Receiver") pursuant to the Second Receiver Order entered in the Receiver Lawsuit (both as defined below); and

   iv.     Lumar Land & Cattle, LLC ("Lumar"), a Texas limited liability company.

### II.  Definitions

L.      As used in this Release, the following terms shall have the respective meanings set forth below:

   vii.         The term "Adversary Proceeding" shall refer to the following adversary proceeding commenced by BM318 as a part of the Bankruptcy Case:

> *BM318, LLC, Plaintiff v. The Dixon Water Foundation, Defendant, Lumar Land & Cattle, LLC, Plaintiff-in-intervention*, Adv. No. 21-04051-mxm, United States Bankruptcy Court for the Northern District of Texas, Fort Worth Division.

   viii.        The term "Bankruptcy Case" shall refer to the following bankruptcy case commenced by BM318:

> *In re BM318, LLC*, Case No. 20-4789-mxm, United States Bankruptcy Court for the Northern District of Texas, Fort Worth Division.

   ix.         The term "Bankruptcy Court" shall mean the United States Bankruptcy Court for the Northern District of Texas, which is the court before whom the Bankruptcy Case is pending.

    x.          The term "BM318" shall mean BM318, LLC, a Texas limited liability company, the debtor in the Bankruptcy Case and the Plaintiff in the Adversary Proceeding.

    xi.          The term "Claim" shall be broadly construed and shall include any claim, demand, action, liability, cause of action, obligation, damage, controversy, or right to payment, whether or not reduced to judgment, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, legal or equitable, secured or unsecured, whether known or unknown, suspected or unsuspected, and whether based on any contract or agreement or grounded in tort law or the common law, and whether arising under any law, regulation or statute of the United States or any of state or any subdivision thereof, as well as any equitable right or remedy and all remedial rights or claims of any kind.  This shall include any Claim by

---

[1] The Dixon Water Foundation, f/k/a The Dixon Foundation, a non-profit foundation, the original defendant in the Adversary Proceeding ("Dixon"), is neither a party to the Settlement Agreement (as defined herein) nor a third-party beneficiary hereof.  The use of the defined terms "Party" or "Parties" herein does not include Dixon.

any Party asserted in, or sought to be asserted in, or which arises out of, the transactions or occurrences which are the subject of, the Adversary Proceeding.

xii.        The term "Lumar Affiliates" shall include the following persons or entities:  (i) Jimmy Ray Martin, (ii) G.H. Lumar JV, (iii) Aledo West, LLC, (iv) G.H. Lumar LLC, (v) the Estate of Gary Z. Luker Sr., (vi) Ronald Hughes, (vii) Railhead Realty, LLC, and (ix) Lumar's members, managers, officers, representatives, employees, agents, attorneys (including Forshey & Prostok, LLP and Quilling, Selander, Lownds, Winslett & Moser, PC), accountants and other professionals (including Republic Title of Texas and New Reunion Title LLC d/b/a Reunion Title), both past or present, as to any Claim in any way related to or arising out of Lumar, the Lumar Land, the Receivership, or the Adversary Proceeding.

xiii.        The term "Second Receiver Affiliates" shall include (i) the Receivership Entities, and (ii) the Receiver's agents, representatives, attorneys, accountants, and other professionals, both past or present, as to any Claim relating to or arising out of the Receivership, Lumar, the Lumar Land, or the Adversary Proceeding.

xiv.        The term "Receivership Court" shall mean the United States District Court for the Northern District of Texas, which is the district court before whom the Receiver Lawsuit is pending.

xv.        The term "Receiver Lawsuit" shall refer to the following lawsuit in which the Receiver was appointed:

> *Securities and Exchange Commission v. Timothy Barton, et al.*, Case 3:22-CV-2118-X, in the United States District Court for the Northern District of Texas, Dallas Division.

xvi.        The term "Second Receiver Order" shall mean the Order Appointing Receiver entered on November 29, 2023, as Document no. 417 in the Receiver Lawsuit appointing the Second Receiver.

### III.  Recitals

M.      The Second Receiver and Lumar have entered into a Settlement and Release Agreement ("Settlement Agreement").  The Settlement Agreement is subject to the Agreement to Reaffirm and Adopt the Settlement and Release Agreement (the "Reaffirmation and Adoption Agreement") among the Receiver and Lumar.  References herein to the Settlement Agreement refer to the Settlement Agreement as restated and adopted through the Reaffirmation and Adoption Agreement.

N.      The Receivership Court has entered an Order on _____, 2024, as docket no. ____, modifying the litigation stay to allow the Parties to obtain approval of the Settlement Agreement.

O.      The Settlement Agreement has been approved by the Bankruptcy Court pursuant to an order entered in the Bankruptcy Case on _____, 2024 as docket no. ____, and ratified by the Receivership Court in an order entered on _____, 2024, as docket no. ____ in the Receivership Lawsuit.  Reference is here made to the Settlement Agreement and the orders respectively entered by the Receivership Court and Bankruptcy Court approving or ratifying the Settlement Agreement.

APP117

P.    Pursuant to the Settlement Agreement, the Parties have agreed to the execution and delivery, each to the other, of this Release.

### IV.  Mutual Release

ACCORDINGLY, pursuant to the terms of the Settlement Agreement, and for other good and valuable consideration, including the mutual releases by the Parties herein, the receipt and sufficiency of which is hereby acknowledged by each Party, they hereby agree and release each other as set forth below:

1.    The above recitals are true and correct and are hereby incorporated as an integral and substantive part of this Release.

2.    Lumar hereby releases all Claims against the Second Receiver and each of the Second Receiver Affiliates.

3.    The Second Receiver hereby releases all Claims against Lumar and each of the Lumar Affiliates.

4.    This Release shall be immediately binding and effective as between the Parties upon execution and delivery, and all conditions precedent to the effectiveness of this Release have been satisfied by the occurrence, waiver, or performance thereof.

5.    This Release shall be construed pursuant to Texas law.

6.    This Release shall be binding upon, and inure to the benefit of, the Receiver and Lumar and their respective successors in interest and assignees.

7.    This Release shall be effective on the date on which it has been signed by both Parties.

**RECEIVER:**

_____
Cortney C. Thomas, Second Receiver

Executed this _____ day of _____, 2024.

**LUMAR**:

Lumar Land & Cattle, LLC

By: _____
      Jim Martin, its manager

Executed this _____ day of _____, 2024

APP118

**Exhibit "3"**
**to**
**Reaffirmation and Adoption Agreement**

**Release of Lis Pendens**

## RELEASE OF LIS PENDENS

### I.    Parties

A.    This Release of Lis Pendens, ("Release") is executed by Cortney C. Thomas, in his capacity as Receiver ("Second Receiver") pursuant to the Second Receiver Order entered in the Receiver Lawsuit (as both are defined below), to release the Lis Pendens (as defined below) and all other rights, title, interest, claims, and causes of action which encumber certain land owned by Lumar Land & Cattle, LLC ("Lumar"), a Texas limited liability company.

### II.    Definitions

B.    As used in this Partial Release, the following terms shall have the respective meanings set forth below:

i.    The term "Adversary Proceeding" shall refer to the following adversary proceeding commenced by BM318 as a part of the Bankruptcy Case:

> *BM318, LLC, Plaintiff v. The Dixon Water Foundation, Defendant, Lumar Land & Cattle, LLC, Plaintiff-in-intervention*, Adv. No. 21-04051-mxm, United States Bankruptcy Court for the Northern District of Texas, Fort Worth Division.

ii.    The term "Bankruptcy Case" shall refer to the following bankruptcy case commenced by BM318:

> *In re BM318, LLC*, Case No. 20-4789-mxm, United States Bankruptcy Court for the Northern District of Texas, Fort Worth Division.

iii.    The term "BM318" shall mean BM318, LLC, a Texas limited liability company, the debtor in the Bankruptcy Case and the plaintiff in the Adversary Proceeding.

iv.    The term "Dixon" shall mean The Dixon Water Foundation, f/k/a The Dixon Foundation, a non-profit foundation, the original defendant in the Adversary Proceeding.

v.    The term "Lis Pendens" shall mean the Notice of Lis Pendens relating to BM318's claims in the Adversary Proceeding and filed by BM318 on October 27, 2021, as Document No. 202142097 in the Official Records of Parker County, Texas.

vi.    The term "Lumar Deed" shall mean the Special Warranty Deed with Vendor's Lien executed by Dixon, as grantor, to Lumar, as grantee, covering the Lumar Land and recorded on April 23, 2021, as Document no. 202116538 in the Official Records of Parker County, Texas.

vii.    The term "Lumar Land" shall refer to the 204.50-acre tract located in Parker County, Texas, which is more fully described in the Lumar Deed and in the attached **Exhibit "A."**

viii.    The term "Original Tract" shall mean the 2,055.77-acre tract located in Parker County, Texas, which was sold by Dixon to BM318 in 2018.

APP120

ix.        The term "<u>Receiver Lawsuit</u>" shall refer to the following lawsuit in which the Receiver was appointed:

*Securities and Exchange Commission v. Timothy Barton, et al.,* Case 3:22-CV-2118-X, in the United States District Court for the Northern District of Texas, Dallas Division.

x.        The term "<u>Second Receiver Order</u>" shall refer to an Order Appointing Receiver entered as Docket no. 417 in the Receiver Lawsuit on November 29, 2023, a true and accurate copy of which is attached hereto as **Exhibit "B"** appointing the Second Receiver.

xi.        The term "<u>Remaining Land</u>" shall mean the 1,531.75 acre tract of land located in Parker County, Texas, which is the subject of BM318's claims in the Adversary Proceeding but excluding therefrom the Lumar Land.

xii.        The term "<u>Special Warranty Deed</u>" shall mean the deed conveying the Remaining Land from BM318, as grantor, to Dixon, as grantee, and recorded on July 2, 2020 as Document no. 202019524 in the Official Records of Parker County, Texas.

### III.    Recitals

C.        Dixon sold the Original Tract to BM318 during 2018.  The majority of the purchase price for the Original Tract was provided through owner financing by Dixon and secured by a deed of trust against most of the Original Tract.  The Remaining Land constitutes a portion of the Original Tract.  Dixon asserts that BM318 defaulted in the repayment of this debt.  Ultimately, BM318 conveyed the Remaining Land to Dixon pursuant to the Special Warranty Deed which was recorded on July 2, 2020.

D.        On September 1, 2020, BM318 commenced the Bankruptcy Case and acted as a debtor-in-possession.  The Bankruptcy Court ultimately confirmed a plan of reorganization proposed by BM318 in the Bankruptcy Case which became effective on August 2, 2021.

E.        On April 23, 2021, Dixon sold the Lumar Land to Lumar.  The land was conveyed to Lumar pursuant to the Lumar Deed.  The Lumar Land constitutes a part of the Remaining Land. Lumar financed a portion of the purchase price through loans from a third party lender.

F.        On August 10, 2021, BM318 commenced the Adversary Proceeding against Dixon seeking to avoid the transfer of the Remaining Land by BM318 to Dixon pursuant to the Special Warranty Deed as a preferential or fraudulent transfer pursuant to sections 547 and 548 of the Bankruptcy Code.  Dixon asserts that these avoidance claims by BM318 are without merit.

G.        On October 27, 2021, BM318 filed the Lis Pendens which relates to its claims in the Adversary Proceeding against Dixon in relation to the Remaining Land.

H.        Lumar sought to intervene in the Adversary Proceeding based on the Lis Pendens, which burdens the Lumar Tract as a part of the Remaining Land.  The Bankruptcy Court granted Lumar leave to intervene in the Adversary Proceeding.  In the Adversary Proceeding, Lumar asserts that BM318's avoidance claims as to the Remaining Land are without merit, and further asserts that it is also entitled to the protections of section 550(b)(1) and (2) of the Bankruptcy Code.  Lumar further asserts that, in addition to the lack of merit in BM318's avoidance claims,

APP121

the lender's rights in the Lumar Land pursuant to its deeds of trust are further protected by section 550(b)(2) of the Bankruptcy Code.  BM318 contests Lumar's assertions.

I.      On September 23, 2022, the Receiver Lawsuit was filed.  Thereafter, the Second Receiver was appointed to serve in such capacity through the Second Receiver Order.  Based on the Second Receiver Order, further proceedings in the Adversary Proceeding are stayed.

J.      Pursuant to paragraph 1 of the Second Receiver Order, the Second Receiver is appointed as receiver for BM318, as one of the "Receivership Entities," with exclusive control and possession of the BM318 assets, of whatever kind and wherever located, including all tangible and intangible property, and which are included as part of the "Receivership Property".  Paragraph 3 of the Second Receiver Order clothes the Second Receiver with all power, right and authority possessed by the officers, directors, and managers of each of the Receivership Entities, which includes BM318.  Paragraph 6 grants the Second Receiver broad powers over the Receivership Property, including the right to take any action which, prior to the entry of the Second Receiver Order, could have been taken by the officers, directors, managers, and agent of any of the Receivership Entities.

K.      BM318's claims and rights in relation to the Adversary Proceeding, including in relation to the Lis Pendens, constitute Receivership Assets subject to the Second Receiver's control pursuant to the Second Receiver Order.  This allows the Receiver to settle and resolve the Adversary Proceeding and release the Lis Pendens.

L.      The Second Receiver has executed this Release based on the provisions of the Second Receiver Order, his control of BM318 as one of the Receivership Entities, and his control of all property of BM318 as part of the Receivership Assets.

M.      The Second Receiver (acting on behalf of BM318) has entered into a Settlement and Release Agreement ("Settlement Agreement") with Lumar to settle and resolve all claims among them in the Adversary Proceeding.  The Settlement Agreement is subject to the Agreement to Reaffirm and Adopt the Settlement and Release Agreement ("Reaffirmation and Adoption Agreement") among the Second Receiver and Lumar.  References herein to the Settlement Agreement refer to the Settlement Agreement subject to the Reaffirmation and Adoption Agreement.

N.      The District Court has entered an Order on _____, 2024, as docket no. _____, modifying the litigation stay contained in the Second Receiver Order to allow the Parties to seek approval of the Settlement Agreement and the Reaffirmation and Adoption Agreement.  This Settlement Agreement has been approved by the Bankruptcy Court pursuant to an order entered on _____, 2024, as docket no. _____, and ratified by the Receivership Court pursuant to an order entered on _____, 2024, as docket no. _____.

O.      This Release is executed and delivered by the Second Receiver pursuant to the Settlement Agreement.

## IV.    Release of Lis Pendens

FOR VALUE RECEIVED, pursuant to the terms of the Settlement Agreement, acting with regard to the Receivership Assets of BM318 as one of the Receivership Entities subject to the Second Receiver Order, the Second Receiver hereby releases the Lis Pendens as against the Lumar Land.  By so releasing the Lis Pendens against the Lumar Land, the Second Receiver

also releases all rights, title, interest, claims, and causes of action against the Lumar Land, including all claims relating to the Lumar Land asserted or which could have been asserted in the Adversary Proceeding.

Any other term hereof notwithstanding, by this Release the Second Receiver does not release, impair or impact any right, title, interest, claims, and causes of action of or by BM318 against any portion of the Remaining Land.

Executed and effective as of this _____ day of _____, 2024.

**SECOND RECEIVER**:

_____
Cortney C. Thomas, as Second Receiver
Pursuant to the Second Receivership Order

**ACKNOWLEDGMENT**:

STATE OF TEXAS

COUNTY OF DALLAS

This instrument was acknowledged before me on the _____ day of _____, 2024, by Cortney C. Thomas, as Receiver for BM318, LLC.

My commission expires: _____

_____
Notary Public, State of Texas

**WHEN RECORDED, RETURN TO:**

J. Robert Forshey
Forshey & Prostok, LLP
777 Main Street, Suite 1550
Fort Worth, Texas 76102

APP123

# EXHIBIT 9

# EXHIBIT B

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| BM318, LLC | § | Case No. 20-42789-mxm |
| | § | |
| Debtor. | § | Chapter 11 |
| | § | |
| | § | |
| | § | |

**ORDER APPROVING COMPROMISE AND SETTLEMENT BETWEEN BM318, LLC
AND LUMAR LAND & CATTLE, LLC**

Came on for consideration the *Joint Motion of BM318, LLC and Lumar Land & Cattle,
LLC for Approval of Compromise and Settlement of Adversary Proceeding No. 21-40451* [Dkt.
No. ___] (the "Motion")[1] jointly filed by BM318, LLC ("BM318")[2] and Lumar Land & Cattle, LLC
("Lumar").  The Court, having reviewed the Motion, the Reaffirmed and Adopted Settlement
Agreement attached to the Motion, and the records in this case, and after due deliberation and
sufficient cause appearing therefor, the Court finds as follows: (a) the Court has jurisdiction over

---

[1] Capitalized terms not defined herein shall have the same meanings given to them in the Motion.
[2] BM318 files this Motion under the control of Cortney C. Thomas as its duly appointed receiver.

ORDER APPROVING COMPROMISE AND SETTLEMENT

**APP126**

this matter pursuant to 28 U.S.C. §§ 157 and 1334; (b) the Reaffirmed and Adopted Settlement Agreement is fair and reasonable resolution of the Claims in the Adversary Proceeding between BM318 and Lumar; (c) the Reaffirmed and Adopted Settlement Agreement is a result of the arms-length negotiations between BM318 and Lumar and an exercise of sound business judgment, and (d) the agreement is fair and equitable and is in the best interests of BM318 and its creditors.  The Court is of the opinion that the settlement and compromise between BM318 and Lumar should be  GRANTED.  It is hereby,

ORDERED, ADJUDGED AND DECREED that

1. The Motion shall be and is hereby GRANTED.

2. The Reaffirmed and Adopted Settlement Agreement is APPROVED, and BM318 is authorized to take all reasonable and necessary actions to effectuate the Reaffirmed and Adopted Settlement Agreement.

3. This Court retains jurisdiction to enforce and construe this Order.

# # # END OF ORDER # # #

**Order submitted by**:

Charlene C. Koonce
Brown Fox PLLC
8111 Preston Road, Suite 300
Dallas, TX 75225
**Counsel for Receiver, Cortney C. Thomas**

 - and -

J. Robert Forshey
Forshey & Prostok, LLP
777 Main Street, Suite 1550
Fort Worth, Texas 76102
**Counsel for Intervenor, Lumar Land & Cattle, LLC**

# EXHIBIT 10

APP128

# EXHIBIT C

APP129

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| In re: | § § § | Chapter 11 |
| BM318, LLC, | § § | Case No. 20-42789-MXM |
| Debtor | § § | |
| BM318, LLC, | § § § | |
| Plaintiff, | § § | |
| v. | § § | Adv. Pro. No. 21-04051-MXM |
| THE DIXON WATER FOUNDATION, | § § § | |
| Defendant. | § § | |
| LUMAR LAND & CATTLE, LLC | § § § | |
| Plaintiff-in-Intervention | § | |

**FINAL AGREED JUDGMENT DISMISSING THE ADVERSARY PROCEEDING**

This adversary proceeding was commenced by BM318, LLC ("BM318"), as the plaintiff, against The Dixon Water Foundation ("Dixon"), as the defendant.  Thereafter, Lumar Land & Cattle, LLC ("Lumar") was granted leave to intervene in this adversary proceeding.  Cortney C. Thomas ("Receiver") has been appointed as Receiver for BM318 through the following lawsuit ("Receivership Lawsuit"):

> *Securities and Exchange Commission v. Timothy Barton, et al.*,
> Case 3:22-cv-2118-X, in the United States District Court for the
> Northern District of Texas, Dallas Division.

The Receiver (acting on behalf of BM318) and Dixon have entered into a settlement agreement ("Dixon Settlement Agreement") which fully resolves all matters pending between them in this adversary proceeding.  Lumar is not a party to the Dixon Settlement Agreement.

1

APP130

The Dixon Settlement Agreement has been approved by this Court by Order entered as Docket No. __ in the above-captioned chapter 11 bankruptcy case, and has been ratified on behalf of the Receiver, acting on behalf of BM318, by the district court in the Receivership Lawsuit.  Pursuant to the Dixon Settlement Agreement, the Receiver and Dixon have agreed to entry of this Final Agreed Judgment fully and finally settling and dismissing all claims and disputes between them in this adversary proceeding.

The Receiver (acting on behalf of BM318) and Lumar have entered into a separate settlement agreement ("Lumar Settlement Agreement") which fully resolves all claims and disputes pending between them in this adversary proceeding.  Dixon is not a party to the Lumar Settlement Agreement.  The Lumar Settlement Agreement has been approved by this Court by Order entered as Docket No. __ in the above-captioned chapter 11 bankruptcy case, and has been ratified on behalf of the Receiver, acting on behalf of BM318, by the district court in the Receivership Lawsuit.  Pursuant to the Lumar Settlement Agreement, the Receiver and Lumar have agreed to the entry of this Final Agreed Judgment fully and finally settling and dismissing all claims and disputes between them in this adversary proceeding.

ACCORDINGLY, it is hereby ORDERED, ADJUDGED and DECREED that:

1.      All claims, causes of action, or other claims for any form of relief asserted in this adversary proceeding by any party are hereby dismissed with prejudice to the refiling of the same.  This dismissal with prejudice shall encompass not only the claims actually asserted by any party in this adversary proceeding, but also any claim, cause of action or claim for relief which could have been asserted based upon the transactions or occurrences which form the subject matter of this adversary proceeding.

2.      All attorney's fees and costs of court shall be borne by the party initially incurring the same.

3.      This judgment is a final judgment fully and finally disposing of all claims, causes of action, or claims for relief asserted by any party in this adversary proceeding.

4.      Upon the entry of this judgment, the lis pendens filed by BM318 and recorded under Instrument No. 202142097 in the official real property records of Parker County, Texas is hereby dissolved.

5.      The form of Release of Lis Pendens attached hereto as Exhibit 1 is confirmed, approved, and legally effective.

6.      All relief not specifically granted herein is denied.

7.      The Court retains jurisdiction to construe and enforce this Final Agreed Judgment.


# # #   END OF ORDER   # # #


**Approved for Entry**:


_____
Charlene C. Koonce
State Bar No. 11672850
Email:  charlene@brownfoxlaw.com
C. Alan Carillo
State Bar No. 24109693
Email:  alan@brownfoxlaw.com
**BROWN FOX PLLC**
8111 Preston Road, Suite 300
Dallas, Texas 75225
Telephone:  (214) 327-5000
Facsimile:  (214) 327-5001

**ATTORNEYS FOR CORTNEY C. THOMAS, RECEIVER FOR BM318, LLC, ET AL.**

3

APP132

_____
Deborah M. Perry
Texas Bar No. 24002755
Email:  dperry@munsch.com
**MUNSCH HARDT KOPF & HARR, P.C.**
500 N. Akard Street, Suite 4000
Dallas, Texas 75201-6659
Telephone: (214) 855-7500
Facsimile: (214) 855-7584

**ATTORNEYS FOR THE DIXON WATER
FOUNDATION**

_____
J. Robert Forshey
Texas Bar No. 07264200
Email:  bforshey@forsheyprostok.com
**FORSHEY & PROSTOK, LLP**
777 Main Street, Suite 1550
Fort Worth, Texas 76102
Telephone:  (817) 877-8855
Facsimile:   (817) 877-4151

and

Kimberly P. Harris
Texas Bar No. 24002234
Email: kharris@qslwm.com
Joshua L. Shepherd
Texas Bar No. 24058104
Email: jshepherd@qslwm.com
**QUILLING, SELANDER, LOWNDS,
WINSLETT & MOSER, PC**
2001 Bryan Street, Suite 1800
Dallas, Texas 75201
Telephone: (214) 871-2100
Facsimile: (214) 871-2111

**ATTORNEYS FOR LUMAR LAND AND CATTLE, LLC**

4

APP133

# EXHIBIT 11

| | | |
|---|---|---|
| BM318, LLC<br>13901 Midway Road<br>Suite 102<br>Dallas, TX 75244-4388 | Joyce W. Lindauer Attorney, PLLC<br>c/o Ross & Smith, PC<br>Attn:  Frances A. Smith<br>700 N. Pearl Street, Ste. 1610<br>Dallas, TX 75201-7549 | Citizens Bank<br>c/o Scott A. Ritcheson<br>Ritcheson, Lauffer & Vincent, P.C.<br>821 ESE Loop 323, Ste. 530<br>Tyler, TX 75701-9779 |
| First Bank Texas<br>100 Willow Bend Dr.<br>Willow Park, TX 76008-5746 | Parker CAD<br>Linebarger Goggan Blair & Sampson<br>c/o John Turner<br>2777 Stemmons Frwy., Ste. 1000<br>Dallas, TX 75207-2328 | Attorney General of Texas<br>Bankruptcy Div.<br>P. O. Box 12548<br>Austin, TX 78711-2548 |
| Barron Stark Engineers<br>6221 Southwest Blvd., Ste. 100<br>Fort Worth, TX 76132-1078 | Carnegie Development LLC<br>1755 Wittington Pl., Ste. 340<br>Dallas, TX 75234-1930 | Coats Rose<br>14755 Preston Rd., Ste. 600<br>Dallas, TX 75254-6825 |
| Texas Comptroller of Public Accounts<br>Revenue Accounting Div. – Bankruptcy<br>Section<br>P. O. Box 13528<br>Austin, TX 78711-3528 | Dixon Water Foundation<br>c/o Josh Botts<br>Munsch Hardt Kopf & Harr, P.C.<br>500 N. Akard St., Ste. 4000<br>Dallas, TX 75201-6659 | GEO Services LLC<br>P. O. Box 32564<br>Knoxville, TX 37930-2564 |
| HR Sterling LLC<br>14819 Frisco Ranch Dr.<br>Little Elm TX 75058-2753 | Internal Revenue Service<br>Mail Code DAL-5020<br>1100 Commerce St.<br>Dallas, TX 75242-1100 | JMJ Development LLC<br>1755 Wittington Pl., Ste. 340<br>Dallas, TX 75234-1930 |
| Khudabuksh Walji<br>Law Office of K. Walji<br>10701 Corporate Dr., Ste. 350<br>Stafford, TX 77477-4091 | Robert W. Buchholz<br>420 S. Cesar Chavez Blvd., Ste. 300<br>Dallas, TX 75201-5817 | South Central Water Company<br>P. O. Box 570177<br>Houston, TX 77257-0177 |
| Southern Star Capital<br>d/b/a Reliance Mortgage Company<br>5220 Spring Valley Rd., Ste. 602<br>Dallas, TX 75254-1952 | Southern Star Capital, LLC<br>c/o Robert W. Buchholz<br>555 Republic Dr., Ste. 490<br>Plano, TX 75074-8848 | U. S. Trustee's Office<br>1100 Commerce St., Rm. 9C60<br>Dallas, TX 75242-1011 |
| U. S. Attny. General<br>10th and Constitution Ave., NW<br>Main Justice Bldg., Rm. 5111<br>Washington, DC 20530-0001 | United States Trustee<br>1100 Commerce St., Rm. 976<br>Dallas, TX 75242-1011 | Joyce W. Lindauer<br>Joyce W. Lindauer Attorney, PLLC<br>1412 Main St., Ste. 500<br>Dallas, TX 75202-4042 |
| Cort Thomas<br>c/o Charlene Koonce<br>Brown Fox PLLC<br>8111 Preston Rd., Ste. 300<br>Dallas, TX 75225 | Lumar Land & Cattle<br>c/o Bobby Forshey<br>Forshey & Prostok, LLP<br>777 Main Street, Suite 1550<br>Fort Worth, TX 76102 | Lumar Land & Cattle<br>c/o Kimberly Harris, Josh Shephard<br>Quilling Selander<br>2001 Bryan St., Suite 1800<br>Dallas, TX 75201 |
| First Bank Texas<br>c/o Mark Petrocchi<br>Griffith, Jay & Michel, LLP<br>2200 Forest Park Blvd.<br>Fort Worth, TX 76110 | | |

4864-3347-5768v.1 .

APP135

# EXHIBIT 12

1

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

IN RE:                    )   BK. NO:  20-42789-MXM

                          )

BM318, LLC                )

     D E B T O R.         )

                    *  *  *  *  *  *  *  *  *  *

                    TRANSCRIPT OF PROCEEDINGS

                    *  *  *  *  *  *  *  *  *  *

     BE IT REMEMBERED, that on the 20th day of May, 2024, before the HONORABLE MARK X. MULLIN, United States Bankruptcy Judge at Fort Worth, Texas, the above styled and numbered cause came on for hearing, and the following constitutes the transcript of such proceedings as hereinafter set forth:

CINDY SUMNER, CSR (214) 802-7196

APP137

2

                    I N D E X

                                                    PAGE

COURTNEY THOMAS

    DIRECT EXAMINATION
        BY:  Mr. Carrillo                      26

    CROSS-EXAMINATION
        BY:  Mr. Forshey                       33
        BY:  Ms. Lindauer                      37
        BY:  Mr. Coker                         45
        BY:  Ms. Perry                         63

    RECROSS-EXAMINATION
        BY:  Mr. Forshey                       67
        BY:  Mr. Coker                         68


            E X H I B I T   I N D E X

                                    PAGE FIRST REFERENCED

Exhibit 1                                      33

Exhibit E                                      65

CINDY SUMNER, CSR (214) 802-7196

APP138

3

PROCEEDINGS

THE COURT:  All right.  Here's going for the Court's 9:30 docket.  And this morning we have the BM318, LLC case.  We're going to take appearances here in the courtroom first and then we'll venture off to the video.

MS. PERRY:  Good morning, Your Honor.  Deborah Perry on behalf of the Dixon Water Foundation.

THE COURT:  Good morning.

MS. CHOU:  Good morning, Your Honor.  Emily Chou, Forshey Prostok, for Lumar Land & Capital -- Lumar Land & Cattle, LLC.  And on video is my partner, Bobby Forshey.

THE COURT:  All right.  Good morning to you too.  Good morning, Mr. Forshey.

MR. CARRILLO:  Good morning --

MR. FORSHEY:  Good morning, Your Honor.

MR. CARRILLO:  Alan Carrillo on behalf of Brown Fox representing the Receiver, Courtney Thomas, for the debtor BM318.

THE COURT:  Thank you, sir.

Good morning.

MR. COKER:  Good morning, Your Honor.  Kyle Coker on behalf of Tim Barton individually.

THE COURT:  All right.  Good morning, sir.

All right.  Now we'll venture off to the video. Mr. Forshey has already made his appearance.  And we have --

CINDY SUMNER, CSR (214) 802-7196

APP139

4

hold on.  We have Mr. Shepherd.  Good morning to you, sir.

MR. SHEPHERD:  Good morning, Your Honor.  John Shepherd on behalf of Lumar Land & Cattle.

THE COURT:  All right.  Any other counsel wish to make an appearance this morning?

All right.  I see some counsel there.  I'll give you another 5 seconds to un-mute.

Ms. Lindauer, good morning.  Ms. Lindauer, can you hear us?

All right.  It looks like Ms. Lindauer is having some technical issues.

All right.  While Ms. Lindauer is trying to figure out her technical issues, do we have any other counsel on video that would like to make an appearance?

Ms. Lindauer, can you hear us?  You're on mute on your end.   You're still on mute on your end.

Want to shoot her a quick message to see if she can hear us?

Ms. Lindauer, can you hear us?  If you do please -- there you go.  Can you hear us now?

MS. LINDAUER:  I can.  I can.  I'm trying to pull out the audio from the Webex to get rid of it.

THE COURT:  Okay.  Let's make a note that Ms. Lindauer has made her appearance.  And she can hear us.

MS. LINDAUER:  Yeah.

CINDY SUMNER, CSR (214) 802-7196

APP140

5

THE COURT:  So -- all right.  Perfect.  Now we hear you just fine.

All right.  So with that --

MS. LINDAUER:  Thank you, Judge.

THE COURT:  Thank you, Ms. Lindauer.

All right.  How would we like to proceed?  We have two different motions.  Ms. Perry.

MS. PERRY:  Good morning, Your Honor.  Deborah Perry on behalf of the Dixon Water Foundation.

I think what we would propose, Your Honor, is that all of the evidence -- that we take up the two motions in one evidentiary presentation.  Meaning that all of the exhibits that are entered with respect to the motion filed by Dixon and the motion filed by Lumar would be admitted into evidence for purposes of the Court's consideration of both motions, as well as any testimony that is elicited today would be utilized for purposes of both motions so that we're not having to basically do the same thing twice, because there are so many overlapping issues, if that's acceptable to the Court.

THE COURT:  All right.  Of course.  Makes perfect sense.

MS. PERRY:  Thank you, Your Honor.

I think how we propose to proceed is I would make my opening.  Mr. Forshey would make an opening.  Then any other

CINDY SUMNER, CSR (214) 802-7196

6

party who wants to make an opening could proceed.  And then we would proceed into the evidence.

THE COURT:  All right.  You may proceed.

MS. PERRY:  Thank you, Your Honor.

As a housekeeping matter, I'd like to offer into evidence Dixon's Exhibits A through Q, which were filed on the docket at docket number 154.  And these are actually joint exhibits between the Receiver and Dixon.  And in addition, we did courier over a hard copy to Your Honor on Friday.  Hopefully you received that.

THE COURT:  All right.  The technical is just fine.

So any objection to Dixon Exhibits A through Q, which can be found at docket 154?

Hearing none, seeing no reaction, the Court will admit Dixon Exhibits A through Q.  Again, those are at docket 154.

MS. PERRY:  Thank you, Your Honor.  And with that I would proceed into opening.

THE COURT:  All right.  What about -- so are those the same exhibits that Mr. Forshey had proposed?

MS. PERRY:  Mr. Forshey has separate exhibits.

THE COURT:  Okay.  Why don't we go ahead and offer those, as well.

Mr. Forshey, or, Ms. Chou, would you like to --

MR. FORSHEY:  Thank you.

CINDY SUMNER, CSR (214) 802-7196

APP142

7

THE COURT:  -- would you like to offer your exhibits into evidence at this time?

MR. FORSHEY:  We would, Your Honor.  We'd like to offer Lumar Exhibits 1 through 21.  And Ms. Chou has hard copies for the Court, if the Court wishes one.

THE COURT:  All right.  Any objection to Lumar Exhibits 1 through 21?  And those can each be found at docket 152.

Seeing no objection, then Lumar Exhibits 1 through 21 are each admitted.  And, again, those are at docket 152.

All right.  With that, we will proceed.

MS. PERRY:  Thank you, Your Honor.  Good morning.  As previously mentioned, Deborah Perry with Munsch Hardt Kopf & Harr on behalf of the Dixon Water Foundation, a non-profit corporation.

This Court is well aware of the standards applicable to a Rule 9019 settlement motion, as well as the well-settled governing case law in the Fifth Circuit with regard to standards for approving a settlement agreement.  The adversary proceeding was initially filed in August of 2021 and was stayed in the fall of 2022 when the SEC proceeding was initiated and Mr. Thomas was appointed the Receiver over many entities, including BM318 who is the debtor in this bankruptcy case and the plaintiff in the related adversary proceeding brought against the Dixon Water Foundation, in

CINDY SUMNER, CSR (214) 802-7196

8

which Lumar Land & Cattle intervened.

In April 2023, the Receiver, Dixon, and BM318 engaged in an all-day mediation with the Honorable Harlin Hale. Judge Hale went between the three parties multiple times and it was a hard-fought and arm's length negotiation. As the parties were preparing to seek relief from the District Court to lift the stay so that they could bring their 9019 motions before this Court, the Fifth Circuit vacated the order appointing Mr. Thomas as Receiver effective 90 days from the issuance of the mandate to allow the District Court to consider and make more fulsome findings under the standards articulated by the Fifth Circuit. The District Court did so. Mr. Thomas was reappointed as the Receiver. And actions taken prior to the entry of the second receivership order were ratified.

For almost three years land owned by Dixon, a non-profit, has been tied up in this litigation. And has had a lis pendens imposed on it. The impact of this has been to impede Dixon's mission. Dixon has been forced to steadily circumscribe its work at a time when the need for and interest in sustainable watershed management and ranching practices is substantial and growing. Since the filing of the adversary proceeding, Dixon has limited its bestowing of grants and providing educational programs out of financial necessity, as Dixon's primary financial asset for funding its

APP144

9

work is the Bearcreek Ranch, which is the subject of the adversary proceeding.

On January 5th, 2024, the Receiver filed a motion to lift the stay to allow this Court to consider approval of the settlements with Dixon and with Lumar.  On April 15th, 2024, the District Court granted that motion.

As Your Honor knows, the Fifth Circuit has set out the following test with regard to considering approval of a settlement under Rule 9019 of the Bankruptcy Rules of Procedure.  The probability of success in the litigation with due consideration for the uncertainty in fact and law, the complexity and likely duration of the litigation and any attended expense, inconvenience, and delay, and all other factors bearing on the wisdom of the compromise.  Which element has been interpreted to include consideration of the best interest of the creditors with proper deference to their reasonable views, and to the extent to which the settlement is truly the product of arm's length bargaining and not fraud or collusion.

Taking those forgoing elements in turn.  The probability of success in the litigation with due consideration for the uncertainty in fact and law.  The claims brought by BM318 are for avoidance as either a preference or a constructive fraudulent transfer.  Lumar's counsel has done an excellent job briefing some of the issues

CINDY SUMNER, CSR (214) 802-7196

APP145

that relate to the probability of success in the litigation. And that brief can be found in the exhibits, in Dixon's exhibits at Exhibit Q, docket 154.

Namely the following; the fact that the debtor, itself, has admitted solvency in multiple pleadings filed in the bankruptcy case, as evidenced in Dixon Exhibits G, H, I, J, K, L, and M. Second, the fact that at best the only title that BM318 held during the preference period was bare legal title, which will not support a 547 or 548 claim, because there is no interest in property to avoid. Third, the fact that BM318 would be unable to meet the element of subsection 547(b)(5), because it cannot demonstrate that the transfer enabled Dixon to receive more than it would have, if the bankruptcy case had been one under Chapter 7. The transfer had never been made. And Dixon received payment of its debt, to the extent provided by the provisions of the Bankruptcy Code. It's blackletter law that a creditor who receives its own collateral receives no more than it would have received had the transfer been retained by the debtor, subject to the creditor's security interest.

Fourth, the third modification to the plan at Exhibit D, which was negotiated between counsel for Dixon and counsel for BM318 specifically preserves all of Dixon's rights under the deed and escrow, should the transfer be avoided. More specifically, the third modification at Exhibit D states in

APP146

part, if the transfer of the property from the debtor to Dixon is voided, avoided, or set aside for any reason whatsoever in whole or in part, then all of the liens and security interests that evidenced or secured the payment of the indebtedness owned and held by Dixon, said indebtedness being described in Exhibit C attached to the special warranty deed, including without implied limitation the liens and security interests described in Exhibit C attached to the special warranty deed, and other liens and security interests related thereto shall be automatically revived and reinstated as part of such action.  Dixon shall have the right to exercise all of its rights and remedies under the loan documents.

As determined by a Court of competent jurisdiction, the property shall be subject to the legal, equitable, and contractual rights and claims of Dixon pursuant to the loan documents between the debtor and Dixon.  And all costs incurred by Dixon in connection with enforcement of the liens may be deemed to be a part of the indebtedness secured by the liens.  Further, nothing in the debtors first amended plan of reorganization dated November 19, 2020 as amended or modified, or in the order confirming the plan shall operate to nullify, strip, remove, count, cancel, or otherwise release any lien, claim, interest, or encumbrance that Dixon may possess should the debtor or any assignee of the debtor

12

avoid the transfer of the property in whole or in part.

These four elements that I've referenced are not exhaustive. And as Your Honor knows, the Court is not required to conduct a mini trial in order to approve a settlement. However, the foregoing are indicative of the probability of Dixon succeeding in defeating the claims brought by BM318.

Second, the complexity and likely duration of the litigation a,nd the attendant expense. As the Court could see from the fact that the litigation had already gone on for over one year with significant discovery disputes -- as the Court may recall, we were here three or four times on one motion to compel. And the fact that either side would assuredly appeal any judgment, the litigation would likely be protracted for years and expensive.

As mentioned, the negotiations were conducted through a mediation conducted by the Honorable Harlin Hale, retired bankruptcy judge. Those negotiations were conducted without collusion and at arm's length. Given the issues in dispute, the chances of success, the intendant cost, it is Dixon's position that it's in the best interest of the estate and its creditors for this Court to approve the settlement. Therefore, today we're asking this Court to approve the settlement as set forth in the motion was filed by Dixon at docket 147 under the terms of the settlement agreement

CINDY SUMNER, CSR (214) 802-7196

APP148

13

attached thereto.

I'll cede the podium.  Thank you, Your Honor.

THE COURT:  All right.  Thank you.

Mr. Forshey.

MR. FORSHEY:  Thank you, Your Honor.

I'm going to try not to go over and replough ground that Ms. Perry had very ably already done that.

I'd like the Court to note that our Exhibits 5, 6, and 7 are schedules that were filed by the debtor in which it's stated that it was solvent by various amounts, seven figures in excess of a million dollars.  Exhibits 10 and 11 are MORs; one filed pre-confirmation, one filed post-effective date, again which shows solvency by seven figures.

Exhibit Number 12 is perhaps the most damning exhibit in terms of solvency.  In the disclosure statement, which was signed by both Mr. Barton and Ms. Lindauer, they represented that on a going-concern basis, the debtor had a solvency of approximately 1.2 million.  And then behind that is a liquidation analysis wherein they concluded that even on a liquidation analysis, there would be $173,276 left after a complete liquidation.

So based on that, Your Honor, it's very difficult to see how someone can assert a preference action when you have sworn in your schedules, your MORs, and to get your disclosure statement approved and your plan put out for a

CINDY SUMNER, CSR (214) 802-7196

14

vote, you have represented solvency.

Exhibit Number 21 is -- pardon me.  16 is the third modification.  And that's a loan document and I think Ms. Perry hit on it.  But I want to make sure that we've explained the significance of that to the Court.  Is the way this was structured, is that the debtor, BM318, put a deed into escrow under an escrow agreement.  And all that's being attacked here under their preference action is the delivery of the deed out of escrow.  And the reason that had to be true is because all of the other transactions took place outside the 90 days.  So the only thing that was within 90 days which could be attacked by the debtor as a 547 preference was the delivery of the deed out of escrow.

The third modification to the plan basically says that if for any reason the transfer of the escrow is avoided, that things go back to where they were before.  And that means that where you stand is that Dixon, based upon the delivery of the deed and the escrow, holds equitable title.  And that the debtor only has a bare legal title.  And presumably, since there would be no automatic stay, Dixon can simply take the deed and go re-record it again.

So we tried -- we filed a brief with the Court.  We wanted to illustrate what we thought were the absolute lack of merit that these claims had.  And our basis for that is really pretty straightforward.  The first one is, one, the

15

U.S. Supreme Court has held in the Bazhay (phonetic) case that a bare legal title will not support an avoidance action. That's all that BM318 had here was a bare legal title. The equitable title passed to the Dixon Water Company based upon the deed and escrow.

The second problem that they have is this simply a solvency? And showing that Dixon got more from the conveyance than it would have otherwise. According to the documents that were filed by the debtor to obtain approval of its disclosure statement and send the plan out for a vote to creditors, they were solvent both on a going concern and liquidation basis. So it's really hard to see how if Dixon simply got back its collateral, how that would possibly constitute a (inaudible word due to audio cutting out).

And then lastly we have the third modification, Your Honor, that we've just alluded to. If you were to avoid that, it would be a vain act. You would just simply be back where you are. Lumar got dragged into this because we bought 204 acres from Dixon. And then basically this is a case to get rid of a lis pendens. That's what we're paying the money for is to get a release of the lis pendens that's been filed. Lumar has been just like Dixon. We can't go sell our land. Our title is clouded. For that reason, we have negotiated this particular agreement.

I think the testimony will show you that this was an

CINDY SUMNER, CSR (214) 802-7196

APP151

16

arm's length mediation. Judge Hale was very active. There were multiple sessions and multiple offers back and forth. It's arm's length. I think the testimony is going to show that Mr. Thomas is an experienced Receiver. He understands the rules of the game and how it's played. And he understands litigation settlements. This fits all the three prongs which show the merits of this are very doubtful. The costs of going forward we think the estate would be extreme.

Finally, the last thing is I noted Ms. Lindauer's objection filed Friday. Obviously we're in sympathy for counsel not getting paid. We've all been there before. But the issue of what to do with the money is different from that of approving the settlement.

And then the other point that I think we would make to the Court is Exhibit 21, we've introduced the second receivership order. The receivership order is pretty clear -- it's not pretty clear, it's absolutely clear that anything that is owned by BM318 is going to be sucked into that receivership estate. So that once this gets approved, if anybody wants to make an issue out of who gets the money, I think they have to go to Judge Starr in the receivership action. Otherwise, Your Honor, we would ask the Court to approve this based upon the record and overrule any objections that may be made.

Thank you.

CINDY SUMNER, CSR (214) 802-7196

APP152

THE COURT:  All right.  Thank you.

All right.  Any counsel in support of the motions like to be heard?

MR. CARRILLO:  Your Honor, Alan Carrillo on behalf of Court Thomas, the Receiver of the debtor.

I have nothing further to add.  I just want to note for the record that the Receiver agreed with representations made by the Dixon Water Foundation and Lumar Land & Cattle this morning.

Thank you for your consideration to the motions.

THE COURT:  All right.  Terrific.  Thank you very much.

All right.  Any other counsel wish to be heard in support of one or both motions?

All right.  How about counsel opposing one or both motions?

MS. LINDAUER:  Your Honor, Joyce Lindauer here on behalf of my firm.

And we raised just two issues in our objection.  And one of them I think counsel mentioned was what happens with the money.  And, of course, we believe if the Court approves the settlement, that the money needs to stay in the bankruptcy estate because these were claims of the bankruptcy estate that were settled and there are creditors in the bankruptcy case that should have the right to receive payment

CINDY SUMNER, CSR (214) 802-7196

18

from those funds.  So if the Court does approve a settlement, we would request that the funds remain in the bankruptcy case.

I heard Mr. Forshey say, you know, the funds get sucked up into the receivership.  Well, maybe, maybe not.  We have the same issue before Judge Everett in a case called -- what is it -- 299TC where Mr. Phelan and I have raised exactly the same issue, which is when you have a confirmed plan and you have priorities for creditors under that confirmed plan and you have creditors that have not been paid under the confirmed plan, we don't believe that the Receiver has the right to strip that money out of the estate and upstream it to the receivership estate, or at least that issue needs to be ruled on, I think, by an appropriate Court.  We think you're the appropriate Court.

So one issue is obviously we think any settlement of the funds need to stay here.  And it may require other Court orders to be obtained.  But I do think, given that there are unpaid creditors here, that the funds stay here.

Second is I spent with Mr. -- Ms. Perry and others about a year and a half doing the discovery and litigating this case.  And while I hear everybody's claims, none of those things have actually been decided, whether the debtor was, in fact, insolvent at the time of the transfer, various issues that they've raised.  So those are very much live

CINDY SUMNER, CSR (214) 802-7196

APP154

issues for this Court to ultimately decide, if the adversary were to go forward.

My only concern, Your Honor -- and you'll hear some more information about this, but the value on these claims was way more than what's being offered for the settlement. So we think the settlement number tends to be a bit on the low side. And let me explain what we think would have happened.

If, in fact, the conveyance to Dixon had been -- was set aside, they're exactly right, under the third modification to the plan, Dixon would have all of its lien rights back. Okay. And then -- but here's the big difference is the debtor would then have the, or Receiver, whatever, would have the ability to sell that property, which we think is worth a lot more now than what Dixon would be owed, even with interest and fees. And so the debtor would have the ability to pay off Dixon and recover any excess funds, which I think we believe would be significant. So that was the ultimate I guess position of the debtor in the lawsuit was that we would get the right back to sell the property. And if the property were sold, even paying off Dixon what they would be owed, there would be significant funds left. And I'm talking in the millions of dollars of funds left. I understand you have to win the lawsuit or reach some kind of an agreement. But that was the ultimate

20

thought.

As far as the mediation was concerned, of course the BM318 entity wasn't included. We weren't included. Mr. Barton wasn't included. So there were some pretty important people that were missing from the mediation that maybe should have been involved.

The other thing too is, is the Receiver has never contacted my firm or Mr. Cowagi's (phonetic) firm, anybody's firm that was on the debtor side of that litigation to get our side of the story. Now, they may have conferred with Ms. Perry and various counsel on the other side, but none of them ever called us and said, tell me about this lawsuit. Tell me the pros and cons. Nothing. Zero. So this settlement is being approved without the Receiver having done what we contend is proper due diligence. Because, again, there were no conferences, no calls, nothing with anybody on the debtor's side of the adversary to ask, give us the pros and cons. Tell us the good news, the bad news, whatever. No discussion.

So, Your Honor, we're concerned that, one, this is a valuable asset of this estate being sold -- or settled for what we think is insignificant dollars. And then ultimately the money, we believe, needs to stay in the bankruptcy case. Put in the Registry of the Bankruptcy Court, or whatever, until there's a decision on who that money ultimately would

APP156

21

go to.  That doesn't affect Ms. Perry or Mr. Forshey.  I'm sure they don't care where the money goes, if you approve a settlement.  But I will tell you that I care and I think the creditors that have not been paid in the BM318 case, we care.

So, Your Honor, that was the two issues we raised in the objection I filed.

THE COURT:  All right.  Thank you, Ms. Lindauer.

I typically don't ask questions in opening statements, but I do have one question for you.  You mentioned that there was the issue in front of Judge Everett.  Has that issue -- has Judge Everett ruled on that issue?  Has there been a hearing on that issue?

MS. LINDAUER:  There's -- no.  And it's interesting you should raise that question.

So in the 2999TC -- I should have remembered that name right -- case, very similar to this one, there was a plan confirmed.  There was a settlement between the Receiver and an entity also called 29 -- I think it was 29TC.  But any way, it was essentially the secured creditor.  They reached a settlement.  They did not file anything with the District Court to  go back to the Bankruptcy Court.  In fact, what they did was they asked the District Court to consider and approve the settlement.  That settlement was for a little over 2 1/2 -- I think it was $2 1/2 million.  The issue that

CINDY SUMNER, CSR (214) 802-7196

APP157

22

Judge Everett still has live in front of him that Mr. Phelan and I have raised is where does that $2 1/2 million go?

Again, like this case, we have a confirmed plan. We have creditors that have not been paid. And so -- so, yes, to answer your question, Judge Everett hasn't ruled on that issue. It actually has come up at status conferences, and so it's been basically kicked down the road many times. But Mr. Phelan and I both have argued the same issue to Judge Everett and he has not ruled on it yet.

And I don't -- he doesn't actually -- I wouldn't say he has it under advisement because, again, it's come up at status conferences where we've raised the issue of where does the money go when you have a confirmed bankruptcy plan and some sort of settlement proceeds. So, yes, to answer your question --

THE COURT: All right. Thank you, Ms. Lindauer.

All right. Yes. Yes, sir, Mr. Coker.

MR. COKER: Good morning, Your Honor. I'm here to join in Ms. Lindauer's objections here. And I hate being the one to do this this morning, but we -- we did just this morning get an offer to purchase the claims against the Dixon's. I believe Gary Corley is on the call now and he's the one that put that forward. And it's for cumulative $25,000 more than the other offer. And this was in part, in

CINDY SUMNER, CSR (214) 802-7196

APP158

23

the timing here to go get a greater offer.  And the reason we were able to do that is because the valuation of these claims is just off here.

And as far as Ms. Lindauer's objections go, when it relates to the value of these properties, I believe that Lumar, themselves, valued this property at $30 an acre.  It was purchased for about 17.50, I believe.  Now we're talking about the value of this claim, if we prevail, is worth $175,000.  If it's frivolous claim, you don't pay $175,000.  But $175,000 certainly isn't the millions in additional value that's sitting there.  And so I'd like Mr. Barton to testify to those issues, because he was central here.  He's, I believe, the principal/president of BM318 at the time of these events.  And so he's kind of a critical piece of the puzzle here just to understand what happened, because I think this all boils down to having BM's broker be the one to go take the deal from them at the end of the day.  And I know that that is (indecipherable word).  I'm not making assertions one way or another.  But just the background with that I think is important before this Court.  Because if there's any chance to prevail, there's other 0s to get added on to the value of this claim.

And so I provided the offer letter to Mr. Thomas.  I haven't spoken to Mr. Corley.  I think it would be valuable to hear that out, as well, as we consider this Court's

APP159

24

approval of the existing offer on the table to settle those claims.

THE COURT:  All right.  Thank you.

MR. COKER:  Thank you, Your Honor.

THE COURT:  All right.  Any other counsel wishing to be heard before we get into the evidence?

All right.  Ms. Perry, it's to you.  How would you like to begin?

MS. PERRY:  Yes.  I guess I would say one thing, Your Honor, just to preview.

I'm assuming that Mr. Coker represents Mr. Barton.  He didn't necessarily say.

THE COURT:  He made his appearance as counsel for Mr. Barton.

MS. PERRY:  All right.  Excellent.

So Dixon's position would be that Mr. Barton does not have standing to object to this settlement.  He's not a creditor of the bankruptcy estate.  He has not filed an objection.  And the objection deadline passed on Thursday. In addition, any potential offer should also be excluded, given that if there is an offer that's going to be made, that party also would not have standing for purposes of this hearing.  So just to preview that, Your Honor.

THE COURT:  Understood.  We'll get to that. We'll get to that.  To the extent any party wishes to offer

25

something into evidence, we'll obviously take those issues up as evidentiary issues.

MS. PERRY:  Thank you, Your Honor.  Because we will also object to Mr. Barton being called, given that no witness and exhibit list was filed --

THE COURT:  Understood.

MS. PERRY:  -- in this case.  Thank you.

I believe -- I'll turn it over to Mr. Carrillo now.  I believe he's going to call Mr. Thomas to the stand.

THE COURT:  All right.  Mr. Carrillo.

MR. CARRILLO:  Good morning, again, Your Honor.  I'd like to call the Receiver of the debtor, BM318, Court Thomas to the stand.

THE COURT:  All right.  Please come forward, sir, and stand right over here.  I'll swear you in and then you may have a seat.

Please raise your right hand.

(The witness was sworn by the Court.)

THE COURT:  Thank you, sir.  You may have a seat right there.

(no omission)

CINDY SUMNER, CSR (214) 802-7196

APP161

26

COURTNEY CHRISTOPHER THOMAS

The witness, having been duly sworn to tell the truth,

testified on his oath as follows:

DIRECT EXAMINATION

BY MR. CARRILLO:

Q.   Good morning, Mr. Thomas.

Can you please state your name for the record.

A.   Courtney Christopher Thomas.

Q.   And, Mr. Thomas, what is your role with the debtor in this case?

A.   So I'm the Court-appointed Receiver over BM318.

Q.   And how long have you been the Receiver of BM318?

A.   Since October of 2023.

Q.   Could you briefly describe why BM318 is in receivership?

A.   Sure.  So the SEC has alleged that various entities controlled by Mr. Barton raised funds from investors and those funds were misappropriated.  And so Judge Starr entered a receivership order back in October of 2022.  There's since been a second receivership order November of '23 that reconfirms that BM318 is a part of the receivership.

Q.   And in addition to serving as Receiver over the debtor in this case and its related entities, have you served as a Receiver in any other matters?

A.   Yes.  I've served as a Receiver in one other case.

CINDY SUMNER, CSR (214) 802-7196

APP162

27

Q.    How long have you been a practicing attorney?

A.    Since 2010.

Q.    And in the course of your law practice, have you advised clients in connection with entering into settlement agreements?

A.    Yes.

Q.    How many -- well, first, have you entered into any settlements before as a Receiver in this case or in any others?

A.    So, yes.  Both in this receivership and the prior one.

Q.    And approximately how many settlements have you entered into in your capacity as a Court-appointed Receiver?

A.    So on the Barton receiverships, maybe five or six.  In the Gallagher receivership, it was dozens and dozens.

Q.    Now going back to this case, Mr. Thomas.  Are you familiar with the issues that were raised in the adversary proceeding which were briefly discussed this morning?

A.    Yes.  I'm generally aware of them.

Q.    And how -- how are you aware of them?

A.    So I don't remember the exact timing when I became Receiver in October of 2022.  At some point after that, in the months after counsel for Dixon and Lumar reached out to me.  There's roughly three dozen lawsuits that were pending at the time of my appointment as Receiver.  And so counsel

CINDY SUMNER, CSR (214) 802-7196

APP163

28

for parties reached out. Getting everything going on, it took quite a bit of time to reach back out to them. And we set up a meeting in my office some time last spring. So prior to that meeting, I went through and tried to read up on not each and every thing that happened in the bankruptcy case in front of Judge Mullin, but as much as I could to get ready for that meeting. And then from that meeting we quickly realized we weren't going to be able to reach an agreement just among the parties. We needed a mediator involved. And so the parties selected Judge Hale. And during that interim period between the informal settlement conference, or informal conference and the mediation, I read up on the case more in connection with your preparation of the mediation statement and my reading of documents associated with that.

Q. Could you describe -- you mentioned this in your prior answer. But could you briefly describe a little bit more of the negotiation process with Dixon and Lumar on the debtor's alleged claims as well as Dixon and Lumar's alleged defenses in the adversary proceeding?

A. Sure. So we had that informal meeting. Like I said, it didn't go anywhere. It appeared pretty clearly that if anything was going to be resolved, it needed to be with a mediator. And so we mediated with Judge Hale. It was a full-day mediation. Lots and lots of back and forth. Just like any good mediator, lots of pressure from Judge Hale, at

CINDY SUMNER, CSR (214) 802-7196

29

least in our room.  I assume there was lots of pressure in the other room, as well.  And then by late afternoon, we reached a settlement.  So fully -- the epitome of a typical arm's length mediation.

Q.    And just to confirm for the record, did you -- you had -- did you attend the mediation with Judge Hale and the other parties?

A.    Yes, I was there.  I was -- I'm the party, for lack of -- I mean, I stand in the shoes of BM318 pursuant to the receivership order.

Q.    And could you briefly describe a little bit more of that mediation process?  You mentioned discussing things with Judge Hale.  But were there multiple sessions?

A.    Yes.  Multiple, multiple sessions.  Like I said, it lasted all day.  And Judge Hale is not the type that he was sitting in a room doing nothing while the parties sat there and did nothing.  It was -- it was very active all day.

Q.    And so ultimately BM318 settled with Dixon and Lumar, correct?

A.    That is correct.

Q.    And why -- why did you ultimately decide to settle the adversary proceeding and all claims against Lumar as part of that mediation?

A.    So ultimately my role as Receiver is to maximize the assets of the receivership estate.  So specifically with

CINDY SUMNER, CSR (214) 802-7196

APP165

30

BM318 and its claims against Dixon and Lumar, having reviewed everything, I would say the challenges presented by the lawsuit, or by the adversary proceeding compared to the cost it would cost the receivership estate to go pursue those claims to completion, I think the risks -- I determined the risks outweighed the benefits of pursuing those claims.

Q.   And at any point did you receive any offers to buy the claims in this bankruptcy case?

A.   So Mr. Coker referenced this about 5 minutes before the hearing.  Yes, I received an email offer that seemed to come from Mr. Gary Corley.

Q.   And is that the only offer you've received in this case?

A.   It is the only offer.  And --

Q.   Go ahead.

A.   So the offer, from me looking at earlier sitting over there on my phone, appears to be for $200,000, which is $25,000 more than the settlements we've reached with Dixon and Lumar.  It calls for a due diligence period, so it's not a hard offer.  It's a contingent offer on this due diligence. Again, in the 5 minutes before the hearing, I didn't have adequate time to really -- I've never met Mr. Corley.  I don't know who he is.  As I sit here, I still think it's in the best interest of the receivership, best interest of BM318 to go ahead and settle these claims for the settlement for

CINDY SUMNER, CSR (214) 802-7196

31

all the reasons that we decided to settle in the first place. The risk of an extra $25,000 that may never materialize is not -- it doesn't seem appropriate in my role as Receiver today.

Q.    You mentioned earlier that in your experience as a Receiver you've reached dozens of settlements.  Just in terms of your personal experience, you know -- in your personal experience and your personal opinion, were all the negotiations between you as the Receiver with Lumar and you as the Receiver with Dixon conducted at arm's length?

A.    Yes, 100 percent.  We were adverse the entire time until we reached a settlement.

Q.    And, Mr. Thomas, are you generally familiar with the standards applicable for obtaining approval of settlement agreements in bankruptcy court?

A.    Yes.

Q.    And with that knowledge, what did you all consider when you took into account reaching a settlement with Lumar and then the settlement with Dixon?

A.    So we consider all sorts of things.  We've already gone through some of them.  I guess the only thing I left out is we actually reached out to Ms. Lindauer's office.  We received all of the discovery that had happened in the underlying case.  I had my team actually review that underlying discovery in preparation -- I don't know if it was

CINDY SUMNER, CSR (214) 802-7196

APP167

32

in preparation for the informal settlement conference or for the mediation itself to see the validity of the claims.  And, again, assess the cost benefit of continuing to pursue those claims.

Q.  And one final question, Mr. Thomas.  You've given all of your -- you said dozens of settlements you've reached in your experience as a Receiver in two different cases.  In your personal experience and personal opinion, would you consider that the terms of these settlements are fair and equitable and in the best interest of the bankruptcy estate and its creditors?

A.  Yes.

Q.  And why is that?

A.  For all the reasons we've talked about.  I don't think the -- the risk of the amount of fees that would be spent -- some Receivers go and just spend, spend, spend on lawsuits.  They spend 300 grand to pursue 200 grand.  Here analyzing the risk of the spend versus the benefit of -- and the likelihood of success, the risk far outweigh the benefits.

Q.  Thank you, Mr. Thomas.

MR. CARRILLO:  Your Honor, I pass the witness.

THE COURT:  All right.  Thank you.

All right.  Who would like to go next?

Mr. Forshey -- well, those in favor of the -- of the

CINDY SUMNER, CSR (214) 802-7196

33

settlement go first and then I'll give those who oppose it the opportunity.

Mr. Forshey, do you have any cross-examination questions for the Receiver?

You're on mute, sir.

MR. FORSHEY:  I apologize, Your Honor.  It would probably be better to let Ms. Perry go first, who is in the courtroom, and then I'll follow up very briefly, if that's acceptable to the Court.

THE COURT:  Of course.

Ms. Perry.

MS. PERRY:  Your Honor, I don't have any questions.

THE COURT:  All right.

MS. PERRY:  Thank you.

THE COURT:  That was quick and easy.

Mr. Forshey, back to you.

CROSS-EXAMINATION

BY MR. FORSHEY:

Q.  A couple of things I wanted to ask you.

On Exhibit 1 --

MR. FORSHEY:  Ms. Chou, could you take an Exhibit 1 up to the --

A.  I have it here.

MR. FORSHEY:  -- please?

CINDY SUMNER, CSR (214) 802-7196

APP169

34

Q.   Okay.  Our Exhibit 1, that's our settlement agreement, correct?

A.   Yes, sir, it appears to be.

Q.   That was heavily negotiated at arm's length, as well, correct?

A.   Correct.

Q.   Each of us had our own counsel and we did a lot of back and forth and drafting on that; would you agree with that, sir?

A.   Yes, sir.

Q.   And then the mediation, it was arm's length both as to Lumar and to Dixon; is that your testimony?

A.   Yes, that's correct.

Q.   The process we had to go through to get here, first we had to get the litigation stay lifted.  Do you remember that?

A.   Yes, I remember that.

Q.   Would you explain to the Court what the significance of that was and why we had to do that?

A.   Sure.  So upon my appointment in these receiverships, there's very often pending litigation.  Like I referenced, there were three dozen lawsuits.  Mr. Barton's business was in commercial real estate, generally speaking. And so in a receivership like this, a litigation stay is put in place to keep lenders from foreclosing on properties, to

CINDY SUMNER, CSR (214) 802-7196

35

keep judgments from being entered in lawsuits.  So there's an automatic litigation stay put on all litigation involving the receivership entities.  In order to get any sort of settlement approved, we either, like we did in that HNGH settlement, we got the District Court to ratify or approve the settlement.  Here Dixon and Lumar assisted as part of the settlement.  They wanted to come before Your Honor first and go through the 9019 process before -- if Your Honor were to approve the settlement, it would then go in front of Judge Starr to be ratified, which was -- I was insisting on Judge Starr ratifying it, because that's where my power comes from.  And Dixon and Lumar really want this to come before Your Honor.  I don't know legally which one's correct -- or both are correct.  But that's why we went through the process and that's why the litigation stay had to be lifted to end up back in front of Your Honor.

Q.   We filed a motion -- or rather, you filed a motion with Judge Starr in the receivership to lift the litigation stay, correct?

A.   Correct.

Q.   And that was filed in early January of this year?

A.   That sounds right.

Q.   And then it was granted on April 15th of this year; would you agree with that being approximately correct, sir?

A.   That's right, mid April, yes.

CINDY SUMNER, CSR (214) 802-7196

36

Q.   Okay.  So the proposed settlement that we're running up the flag pole to the judge today has been in the public record for Mr. Barton since early January of this year?

A.   That's fair.  I don't have the motion to ratify in front of me.  So he was aware the settlement.   I can't remember if we attached the settlement or not to that motion to ratify.  But the general terms were definitely in the motion to ratify.

Q.   Okay.  All right.  Now you basically testified for Mr. Carrillo that you did a cost benefit analysis on the lawsuit and concluded that it didn't make sense to pursue. Is that an accurate summation?

A.   Yes, it is, correct.

Q.   And you did that independently for Lumar, as well?

A.   Yes.

Q.   And reached the same conclusion?

A.   That's correct.

Q.   Okay.

MR. FORSHEY:  Thank you, Your Honor.  Pass the witness.

THE COURT:  All right.  Thank you, Mr. Forshey.

Any other counsel in support of the motions have any cross-examination questions for Mr. Thomas?

CINDY SUMNER, CSR (214) 802-7196

APP172

37

All right.  What about Ms. Lindauer first.  You filed an objection.  Do you have any cross-examination questions?

MS. LINDAUER:  A few, Your Honor.

CROSS-EXAMINATION

BY MS. LINDAUER:

Q.   Mr. Thomas, what's the current status of your receivership order with the Fifth Circuit?

A.   So the receivership order is currently on appeal.  Mr. Barton filed an appeal.  I believe he filed his initial brief maybe last week or the week before.  I believe it was last week.  Maybe two weeks ago.  And so briefing is pending.  No oral argument has been set.  I assume it will happen some time in the fall.

Q.   And there was a prior appeal to the Fifth Circuit from the receivership order entered by the District Court and that resulted in the receivership order being vacated; is that correct?

A.   Correct.

Q.   Okay.  And the second appeal to the Fifth Circuit also seeks to vacate the receivership order; is that right?

A.   That is correct.

Q.   Okay.  All right.  Counsel asked you about buyers of claims.  Have you offered for sale to anyone the claims that are part of the BM318 adversary proceeding?

A.   So, no, we have not marketed the claims that we've

CINDY SUMNER, CSR (214) 802-7196

APP173

38

settled, no.

Q. All right. And you mentioned that you received from us some documents, I think some of the discovery in the adversary proceeding. Did anyone from your firm talk to us about the pros and cons of that adversary?

A. So I definitely did not. And I don't know if any member of my team did or not. But you mentioned they didn't, so I don't have any reason or basis to dispute it. But I can't say that it never happened. I don't know that. I know my office reached out, you know, about the litigation. I don't know if they ever spoke.

Q. And -- okay. And I know, Mr. Thomas, you are not a bankruptcy attorney; is that right?

A. That is correct.

Q. And I don't believe you all have a bankruptcy attorney at your firm; is that right?

A. So Mr. Carrillo was in Akin Gump's bankruptcy group before he joined our firm. He does some bankruptcy work still. I think he would rather do commercial litigation. But that's more for him to answer.

Q. Okay. All right. And as far as the mediation, you would agree with me that Mr. Barton nor anybody from the actual BM318 group was present at that mediation?

A. Typical lawyer, I would take exception to the actual BM318 group. But I agree that you weren't there and

CINDY SUMNER, CSR (214) 802-7196

39

Mr. Barton was not there. Anyone prior to the receivership order was not there.

Q. And, Mr. Thomas, have you spoken to Mr. Barton at all about this particular litigation, the pros and cons of going forward with that litigation?

A. So in the first months of the receivership we made several attempts to talk to Mr. Barton. I was able to speak with him once over the phone. It was more through his lawyers, but Mr. Barton was in the room and Mr. Barton did answer some questions. We certainly discussed pending litigations. I don't remember anything distinctive from this lawsuit, other than there being the potential opportunity to recover funds. But, again, as Receiver, I was interested in what are the lawsuits where there's potential recovery versus lawsuits where other parties have sued us. Because in the lawsuits where other parties have sued us, that's a simple process. That's just they become a part of the process. We don't need to pursue that litigation. And usually attorneys and litigants are happy with that. It's different when there is a chance for a recovery where we have to go through this process that we've gone through determining whether to litigate those claims or not.

Q. All right. And you mentioned, I wrote it down, that SEC receivership focuses in part, at least, on what are called misappropriated funds; is that right?

CINDY SUMNER, CSR (214) 802-7196

APP175

40

A.   I -- sure.  I know I was trying to give a very quick overview of the SEC's lawsuit.  So I'm not the SEC --

Q.   Sure.

A.   I'm the Court-appointed Receiver.  We'd have to look at their complaint to see what language they used.  But, yes, in general I'm sure I used those words.

Q.   Okay.  Do you know how much money BM318 or any of its affiliates paid to Dixon Water Foundation prior to the filing of the bankruptcy?

A.   Sorry, can you ask the question one more time?

Q.   Sure.  So in doing your due diligence and research, do you know how much money BM318 or any of its affiliates paid to Dixon Water Foundation prior to the filing of the BM318 bankruptcy?

A.   Sure.  So I can speak in generalities.  I don't have the specific numbers in front of me.  I remember some of them.  So part of what happened -- I'll give a little bit of back story and I'll give you the specific numbers.  So part of this appeal of the initial receivership order was an argument that Judge Starr applied the wrong standard.  That because there was no injunction in place, he couldn't rely on this first financial standard, instead he needed to rely on this Netsphere standard where Judge Starr had to trace money from the investors into the entities that received the funds.  And so when the Fifth Circuit last summer entered an order

CINDY SUMNER, CSR (214) 802-7196

APP176

saying they would -- the receivership order would be vacated 90 days after the mandate unless Judge Starr -- and gave Judge Starr an opportunity to enter a new receivership order. The idea was, okay, we need -- Judge Starr determined he needed to apply the new standard, this Netsphere standard. And so as part of that process, my firm's accountants went in and traced, okay, here are the funds that flowed into or benefited the different entities. And so as part of that process combined with the work getting ready for the mediation, we determined, specifically as to Dixon, I think it was $2 million flowed from Carnegie Development into Dixon. And 1.8 of that went to Dixon.

Now, this -- I -- the way that this settlement works with Dixon is those claims, my fraudulent transfer claims as Receiver on behalf of those payments made by non-debtor, non-BM318 entities on behalf of BM318, my fraudulent transfer claims have not been released as part of the settlement. And those will be dealt with separately in the -- in the receivership in terms of Carnegie Development's payment on behalf of BM318's debt. But so I think the number you're getting at is, sure, it's about 1.8. There was a $100,000 escrow payment. I can't remember which entity that came from for the benefit of BM318. And there may have been two other payments that were made. So roughly $2 million.

Q. And so just to be clear, your proposed settlement

CINDY SUMNER, CSR (214) 802-7196

APP177

42

here with the Bankruptcy Court, I think you just clarified, does not include releasing Dixon Water for claims that can still relate to the possible fraudulent conveyance of funds to Dixon Water; is that what I'm understanding?

A.   So I'm not quite sure on your questions.  So the -- my claims as Receiver are excepted.  Those are not being released.

Q.   Right.

A.   So my fraudulent transfer claims I hold as Receiver are not being released.  But the -- the bankruptcy claims are being released.

Q.   Okay.  And is that also true for Lumar, that whatever claims might exist against Lumar that you hold as Receiver are not being released?

A.   So, no, that's not correct.  Lumar is a different situation.  So Lumar did not receive the funds directly from the receivership.  Or if it did, it was smaller -- smaller amount, if I remember right.  So the claims that were brought against Lumar in the adversary proceeding were common law state law claims; breach of fiduciary duty, tortuous interference, claims like that.  And so those aren't -- we determined it was in the best interest of the receivership to go ahead and settle those claims.

Q.   You would agree with me those types of claims don't necessarily require a proof that BM318 was insolvent in order

CINDY SUMNER, CSR (214) 802-7196

43

to pursue those claims?

A. So I do not know that one way or the other.

Q. Okay. But, again, I think you mentioned more like state law claims that were brought against Lumar and those, as brought in the adversary, you're asking that those be released also as part of the settlement; is that right?

A. That's correct.

Q. And do you know if the debtor, BM318, also had state law types of claims against Dixon Water Foundation?

A. That were asserted or that could have been asserted? Sorry, I just wanted to clarify.

Q. Either. The first -- well, let's start with were asserted.

A. So as I sit here, I don't remember seeing any state law claims that were asserted. I could be mis-remembering. But I was pretty sure it was the avoidance claims. I don't remember any discussion of state law claims that could have been asserted but weren't.

Q. And what investigation did you do on the question of insolvency, whether, in fact, the debtor was insolvent at the time that the transfers that are at issue were made?

A. I didn't do any evaluation of whether or not the debtor was insolvent.

Q. Okay. I know that you've been offered $200,000 for the claims that you are proposing to settle. And I think you

CINDY SUMNER, CSR (214) 802-7196

44

told us you really haven't made an effort to try to market those claims. At this point would it benefit you or your estate to try to market those claims and see if anybody has an interest in buying them?

A. So I would say, no. Now, for $25,000, certainly not, for a delta of $25,000. If someone had come in and said, hey, we'll pay you $4 million for these claims, I would have to sit there and analyze it and determine whether or not I can even assign those claims. It would be very unique in the context of a receivership where under the receivership order all assets have been put under my control. Other than kind of post-judgment trying to wind up a receivership, I've seen assignments in that context. But I haven't seen it in the context of if these claims are valid and worth pursuing, the Receiver wouldn't assign them. The Receiver would bring them him or herself.

MS. LINDAUER: Your Honor, I'll pass the witness.

THE COURT: All right. Thank you, Ms. Lindauer.

Any other counsel wish to be heard?

Yes, Mr. Coker.

MR. COKER: Thank you, Your Honor.

MS. PERRY: Your Honor, I think we renew what we mentioned to Your Honor earlier. Mr. Barton is not a

CINDY SUMNER, CSR (214) 802-7196

45

creditor in the bankruptcy case.  He has not timely filed an objection to this settlement motion.  And so we would object to his counsel asking the witness questions or him participating in this proceeding.

THE COURT:  All right.  The Court will overrule that in part.  The Court will allow Mr. Coker to develop the record.  But in the Court's ultimate ruling, the Court will make it very clear whether or not the Court considered any evidence that was elicited.  So for purposes of just making sure the record is as wholesome as possible, I'll allow Mr. Coker to go forward.

All right.  You may proceed.

MR. COKER:  Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. COKER:

Q.  So first -- and I'm new to this Court so --

THE COURT:  By the way so it's clear, that's why I said, in part.  I'm going to allow the questions and then we can take up whether or not the Court should consider the evidence in closing arguments.  The Court will consider that and then its ultimate ruling with make it clear.

Sorry for interrupting.  You may proceed.

Q.  Mr. Thomas, I've come into this late in the ball game, so let me know if there's something that doesn't make sense to you, because I'm probably misunderstanding something

CINDY SUMNER, CSR (214) 802-7196

and need to ask my question differently.  Okay?

A.    Okay.

Q.    All right.  So we talked about earlier the first appeal to the receivership.  And that order came down from the Fifth Circuit vacated the receivership; is that correct?

A.    Ultimately, yes.  It was remanded to the District Court and said that the first receivership order would be vacated within 90 days of the mandate.  And so if the District Court didn't enter a new receivership order, there would be no receivership after late November of 2023.

Q.    And heading into that appeal, you believed that the SEC was going to prevail and not Mr. Barton; is that correct?

A.    Sure.  I did think that.

Q.    Okay.  And so, you know, I guess you were wrong the first time around on whether that appeal would be successful; is that correct?

A.    So -- that's right.  The first time around Mr. Barton's challenge was that Netsphere had not been applied.

Q.    And as you understand it, because I know you kind of see the pleadings go back and forth, there's a second appeal in place right now over the very, very similar issues, substantially similar; would that be correct?

A.    That's not quite correct, no.

Q.    Okay.  What's the difference with this (inaudible

CINDY SUMNER, CSR (214) 802-7196

47

word)?

A.   So the -- the second time around Judge Starr had an evidentiary hearing.  There were hundreds of pages of briefing that were filed while Netsphere standard was applied.  And so Mr. Barton's appeal this time is not that the wrong standard was applied.  It's that now the standard has been implied improperly.  And so it's going to be an evidentiary challenge whether or not Judge Starr did the full amount of work or not.

Q.   Understood.  So my understanding is that there's a challenge on whether proper tracing took place by the SEC to put on evidence to establish a receivership.  Does that sound right?

A.   That's right.

Q.   Okay.  And there was no tracing done the first time around; is that correct?

A.   I don't know if it was no tracing.  The SEC did some limited tracing the first time around.

Q.   Okay.  The Fifth Circuit found that it was substantially lacking as far as the tracing analysis went; is that correct?

A.   The Fifth Circuit decided that Netsphere had not bee satisfied, correct.

Q.   Okay.  And part -- you were called in, I think the second time around, the second hearing on establishing the

CINDY SUMNER, CSR (214) 802-7196

receivership to help the Court or assist the Court in some of the background with these entities; is that right?

A.    So Judge Starr asked me, I forgot the exact ruling, but, yes.  Judge Starr asked me to submit a declaration of my position on the tracing.

Q.    And you presented a, what would be a pretty lengthy explanation as to what's gone on thus far, correct?

A.    It was -- yeah, it was something around 100 page declaration.

Q.    Have you established -- let me back up.  How many entities are under the receivership right now roughly?

MR. CARRILLO:  Your Honor, may I object?

I understand there's a reason why counsel is asking these questions.  And if it's helpful for the Court -- we obviously defer to the Court.  But all of these questions and all of the answers to these questions are available on public dockets for the Fifth Circuit and for Judge Starr's court. You know, I'm not sure it's appropriate just to have Mr. Thomas opine on the Court's opinions when they're available for the Court's consideration as entered by Judge Starr and the Fifth Circuit.

THE COURT:  I guess I'll -- response?

MR. COKER:  Your Honor, standing has been challenged today, so a lot of these questions go -- and I'm getting there as to why we have standing in this court right

49

now.

THE COURT: All right. Based on that the Court will overrule the objection without prejudice to raising, re-raising the objection or any other that you might have.

You may proceed.

A. So I think your question is how many entities are in receivership?

Q. Sure.

A. I believe there are 55 under the second receivership order.

Q. Okay. And out of those 55, do you -- do you have a rough understanding of where the 20 some odd million dollars that you're tasked with recovering have gone as far as how much money has gone to which entity?

A. So it's a complicated answer. So, again, I filed about a 100 page declaration.

Q. Uh-huh.

A. Traced funds into each receivership entity. The standard for the Fifth Circuit was entities where funds could be traced or that benefited from investor funds. And so each of these 55 entities, yes, we've traced investor funds into them. The forensic accounting is not complete. So we have examples where money flowed into BM318. Do I have all of those investigated today? No. And I would say that that's

CINDY SUMNER, CSR (214) 802-7196

APP185

50

not the most cost effective use of the forensic accountant's time.  We will have -- we're getting closer to having kind of the buckets of here's where the funds went.

Q.   Uh-huh.

A.   But as of right now, no, I don't -- we have not traced every single dollar to see which entities it flowed into.

Q.   Okay.  What happens if the -- if the receivership is vacated again by the Fifth Circuit?

A.   I have no idea what will happen.

Q.   Does -- do these assets go back to the control of Mr. Barton, the JMJ entities, and so on and so forth that are currently held up in the receivership?

A.   So it will depend.  If it's similar to the last order where it was vacated, but giving Judge Starr time to enter a new receivership order --

Q.   Uh-huh.

A.   -- then, no, that won't happen.  If it's vacated immediately or if Judge Starr decides not to enter a new receivership order, then I'm sent out of the picture, so it would go to wherever.  Some entities, I think there were multiple owners, potentially.  So that might be a little more complicated.  But for entities wholly owned by Mr. Barton, yes, it would return to Mr. Barton.

Q.   Okay.  And how much fund wise have you recovered in

CINDY SUMNER, CSR (214) 802-7196

51

this receivership the first go round with what's been ratified and then now in the second receivership?

A.   So if you'll look at my status reports, it will give you the most accurate number.  As I sit here, I can sort of ball park it from some of the settlements.  The issue is this was a commercial real estate enterprise.

Q.   Uh-huh.

A.   Mr. Barton has appealed every sale of receivership property so far.  And so we've been unable to sell any property.  So there's a chance for substantial recoveries.  Roughly 2 million in interest gets lost every year.  So I don't know -- it's on my report.

Q.   Sure.

A.   So if we went and found that, I could give you exact numbers.

Q.   I just -- I really didn't know.  I was asking for a general number.  Is it a couple of million dollars?  Is it -- or we in the hundreds of thousands of dollars?

A.   So it was -- the HNGH settlement was referenced.  That's $2 1/2 million.  But that's paid out over time.  So we haven't recovered that full amount.  So I would say between a million and $2 million is probably the most accurate guess as we sit here.

Q.   Okay.  So I'll move on from the receivership.  I needed the background.  And I apologize for that, because I

52

know you've been through that a few times.

So let's talk about this -- this settlement leading up to it.  What was your first demand to their side at mediation?

MS. PERRY:  Your Honor, I guess I'm going to just object here, because of mediation privilege.  So --

THE COURT:  Sustained.

Q.   Okay.  Was your demand substantially higher than the settlement value, your first demand at mediation?

MS. PERRY:  Your Honor, I'm going to object again.  I mean --

THE COURT:  Sustained.  We're not going to get into the specifics of what happened during the mediation.

MR. COKER:  Okay.

Q.   Leading up to mediation, did you believe that this claim was worth far in excess of what the settlement value is?

A.   So, no.  Leading up to mediation, I was hopeful that we could find some path towards, hey, let's just have the property sold.  If it sells for a lot more than the note on the property was, then, hey, maybe we can find a path forward and we figure out how we split that.  I was trying to be practical.  Dixon and Lumar, understandably, weren't interested in that because the position they're in is if I were to succeed on my claims, my understanding is we -- well,

CINDY SUMNER, CSR (214) 802-7196

APP188

53

I think it's all -- it's been talked about today, we're back in the shoes of where we were pre-receivership.  And the receivership doesn't have funds to service the debt that would be there, so we'd be right back starting the wheel over again.  And, again, I don't feel in good conscience that I can then go spend more receivership money pursuing claims to end up in the -- probably a worse seat than I was at that point.

Q.    Okay.  Leading up to mediation, did you believe this was one of the larger claims in the receivership control at the time?

A.    No.

Q.    Okay.

A.    Well, I should clarify.  There were three dozen lawsuits.

Q.    Uh-huh.

A.    Maybe five or six -- maybe a few more.  There was just a small handful that involved claims where there could be a recovery.  Of those, I guess it was in the upper -- it was in the upper half.  So it's all relative what we're talking about.  I didn't think this was multi-million dollar claims.  But it was more substantial than some of the other claims that we've settled.

Q.    Was your understanding that Ms. Lindauer believed that these claims were multi-million dollar claims leading up

CINDY SUMNER, CSR (214) 802-7196

54

to mediation?

A.   I don't --

Q.   Had she ever communicated that to you?

A.   I don't remember her communicating that to me. When I first -- I'm going to try to be careful.  So as Receiver, when I step into the shoes of the receivership entities, I hold the privilege of the entities.  And so during that first day I spoke with Mr. McMurray, who worked in Mr. Barton's office.  I spoke with him briefly and then members of my team spoke with him in depth about the different litigations that were pending and assessment of the value.  And he did indicate that the -- generally speaking that these claims could be substantial, if they were successful.

Q.   Okay.

A.   But expressed his own doubts about ultimate recovery.

Q.   And you spoke to the defendant's counsel in this case, I guess to get their view of this at mediation and probably leading up to it; is that right?

A.   When you said defendant's -- when you said defendant's counsel, I thought you meant Mr. Barton in the receivership.  You're talking about Dixon and Lumar?

Q.   Yes.

A.   So I met with them informally.

CINDY SUMNER, CSR (214) 802-7196

55

Q.   Uh-huh.

A.   And then we set up mediation.  And I don't remember there being any discussion really back and forth between those two meetings.  I only met with them once prior to the mediation.

Q.   And have you interacted much with, or had many cases with Ms. Lindauer?

A.   Prior to this receivership, no.

Q.   Okay.  Did you know who she was leading up to this receivership?

A.   No, I did not.

Q.   Okay.  Would it surprise you that she had a good reputation as an attorney?

A.   No.

Q.   And why wouldn't you want her side of the story and ask her why she was bringing these claims in the first place before deciding what their value was?

A.   So -- so, like I said, there were roughly three dozen cases when we took over the case.  Specifically with this case, we asked for the discovery.  I felt like it was in the best interest of the receivership to make our own independent examination of the pleadings, the lawsuit.  Generally speaking, a defendant in a receivership is prior counsel, always view claims in a more inflated way.  And so I guess I didn't even -- I didn't think through, okay, that it

CINDY SUMNER, CSR (214) 802-7196

56

would be a big benefit and worth the time spent talking to prior counsel about this particular case.

Q.   And Dixon and Lumar haven't produced much in the form of discovery in this case thus far, right?  And I'm genuinely asking that question.

A.   So I remember they did produce some documents, because I had Mr. Carrillo review those documents.  I can't remember if we're talking about hundreds or thousands or tens of thousands, but I know he spent time reviewing those records prior to that initial informal meeting.

Q.   And as of today, discovery is not complete because it's been stayed -- the case has been stayed; is that your understanding?

A.   No discovery has happened since October of 2022 when the case was submitted.

Q.   All right.  So we spoke a little bit about, yes, I did come in this morning.  I was the -- I was the bad guy that had to show up with a piece of paper that we got this morning.  And I apologize for not having more notice on that.  But I want to ask you about that -- that settlement offer.  It was for $200,000; is that correct?

A.   Contingently, but, yes, it's for $200,000.

Q.   Okay.  And is it your belief that because -- or in your experience as a Receiver in settling these cases, do you believe that Dixon or Lumar would be willing to potentially

CINDY SUMNER, CSR (214) 802-7196

57

put on more money now that there's a competing offer on the table?

A.    You're asking as the Receiver -- so my guess is if I said, oh, I might be willing to do that, sure, they would pay $25,000 extra to get this done today.  But that's not my role as Receiver.  I'm maximizing the value of the estate, but I'm doing so in a way that honors Judge Starr, who I'm his agent.  And I -- I would have a hard time believing Judge Starr would want me to engage in those kind of settlement practices at a hearing.

Q.    But -- and I understand that.  But we have all the time in the world, because -- in this case, because there's a stay in place, isn't there?  There's no rush to liquidate this property today, or this claim against this property today.

A.    All right.  So we're not looking to liquidate any property -- to liquidate the claim.  Could we wait a week?  Sure, as the Receiver we could wait a week.  At the same time, I've got three dozen lawsuits and a whole lot of other issues.  And so I do need to start buttoning up issues, which is part of why we've been cleaning up the litigation matters over the last few months.

Q.    So if Mr. Barton and Ms. Lindauer believe that this, this claim is worth far in excess of $175,000 and have incentive to bring other offers, wouldn't that help you as

CINDY SUMNER, CSR (214) 802-7196

APP193

58

the Receiver vet out whether the other side is willing to put more money on the table to benefit the, you know, allegedly defrauded investors in this SEC case?

A.    So in the abstract, yes.  But in the practicality, no.  So, for instance, we had a property we contracted to sell last year in far North Dallas.  And I believe the price was $5 1/2 million.  Mr. Barton objected and said that it was worth substantially more than that.  I think he said it should be worth 7 million.  He ultimately -- Judge Starr approved the sale.  It got appealed.  The buyer walked.  And so we went through and marketed the property earlier this year widely, nationally.  And the highest offer we received was several hundred thousand dollars less.  So I give that as an example of I understand I'd probably be having similar views as Mr. Barton in terms of a more inflated view of the value of assets.  But my job is to try to maximize the value of the assets.  And I don't think an extra $25,000 does that here today.

Q.    Well, I mean, there's at least one individual, Mr. Corley, that believes that this claim is worth more than what's currently in that settlement offer; is that correct, by the piece of paper that you have on that?

A.    So that's not correct.  It's $200,000 subject to doing due diligence.  And so I have no idea if he really views it that way or not.  He could go -- I would argue there

CINDY SUMNER, CSR (214) 802-7196

59

would be no due diligence needed to be done.  He could look at the pleadings and determine the value -- the claims.  But he feels the need to do due diligence so that -- that combined with the fact that it was given to me 5 minutes before the hearing after it had been pending since early January makes me skeptical.  But I've never met Mr. Corley. He could be the most honest man in the world and he really wants to pay 200,000 and that statement about due diligence was just accidentally put in there.  I have no idea.

Q.  Wouldn't -- wouldn't take too long to ask whether the due diligence term was going to be a hold up in proceeding to Mr. Corley, would it?

A.  Well, that's what I'm saying.

Q.  Yeah.

A.  The timing is just skeptical.  Five minutes before the hearing, I don't know why he couldn't have asked this a month ago.

Q.  Okay.  A couple of final questions.  Mr. -- to your understanding, Mr. Barton hasn't been convicted of anything or had any adverse ruling as to the merits of the SEC and DOJ cases that are pending; is that correct?

A.  So the DOJ case has not gone to trial.  There's been no adjudication of guilt in the SEC case.  As to Mr. Barton's civil liability, it's been stayed.

Q.  Okay.

CINDY SUMNER, CSR (214) 802-7196

60

A.    In terms of other issues, I probably shouldn't speak to those.

Q.    As far as this BM318 entity, do you understand how this is connected to Mr. Barton, or his ownership or control? Or I guess let me -- let me switch that question around.

How is BM318 connected to Mr. Barton?

A.    In this receivership?

Q.    Uh-huh.

A.    So I don't have my declaration in front of me. Like I said, we went through each entity. And so there was money that flowed from the Wall investors into BM318. And so that's why it's part of the receivership.

Q.    So you wouldn't necessarily have a problem, or anything in front of you right now that would indicate otherwise that Mr. Barton is not a derivative beneficial owner or beneficiary of BM318?

A.    So there were over 100 entities initially part of the receivership. We went through each of those to tie to Mr. Barton in some way in terms of his ownership. So I don't have those documents in front of me. But I would assume that he -- whether it's individually or through the flow of entities that he is the ultimate owner or one of the ultimate beneficial owners of BM318. I'm sorry, I'm being the typical lawyer and trying to talk --

Q.    It's fine. That's -- I'm just asking what's your

CINDY SUMNER, CSR (214) 802-7196

61

knowledge based on that issue is.  So let's assume for a second that he's a beneficial owner in a derivative form of BM318.  If he prevails on his case before the SEC, which has not been adjudicated on the merits yet, he would -- and this Receiver has already taken action to dispose of this, he won't be able to unwind those actions even though he's been found innocent later on in the SEC case; is that your understanding?

A.  I would say generally speaking, yes.  But generally speaking, that's the case in every receivership.  That's the nature of the receiverships.

Q.  Understood.  And with that in mind, you are tasked with recovering how much in assets as far as this receivership?  Is it 26 million?

A.  So not quite.  So I'm tasked with maximizing the receivership assets.  There will potentially be a claims process where everyone who has a claim against any of the receivership entities comes in -- it's similar to a bankruptcy process --

Q.  Okay.

A.  -- and submits proofs of claim.  So you will have the Wall investors, I assume, will submit proofs of claim.  But then also the other creditors who have lost money submit proofs of claim.  And so I don't know how much that will reach.  The Turtle Creek property, there were lots of other

CINDY SUMNER, CSR (214) 802-7196

APP197

62

investors who put money into that that I assume will want to be part of the claims process. And so the number -- the overall number will be much higher than the, I think 26 or 28 that's alleged in the SEC's complaint. And that's typical. In the Gallagher receivership, they alleged 12. And just the investors ended up being, I think, 26 million.

Q. And Mr. -- assuming you get in excess of whatever that claims number is, Mr. Barton or the Barton entities in the receivership would be entitled to the excess of what is recovered; is that correct?

A. So I actually don't know the answer to that. Very rarely do receiverships recover in excess of the amount of losses.

Q. Didn't the SEC early on in this case represent that there were over $80 million worth of assets under the receivership order?

A. So we had to look at it. As best I recall, they're talking about the value of the properties was $80 million. The problem is, every single property is heavily leveraged.

Q. Okay.

A. And so while the properties may be worth 80 million, the net value to the receivership is nowhere near the 26 million, unless these HUD properties are included in the ultimate receivership.

Q. Understood.

CINDY SUMNER, CSR (214) 802-7196

APP198

63

MR. COKER:  No further questions, Your Honor. Thank you.

THE COURT:  All right.  Thank you.

Any other counsel have any first round of questions for Mr. Thomas?

All right.  We'll go back to redirect.

MS. PERRY:  Your Honor, I'll try to keep this limited to just a few questions.

CROSS-EXAMINATION

BY MS. PERRY:

Q.  Mr. Thomas, I know that Mr. Coker was asking you about the second receivership order and the fact that it's on appeal.  Is there a stay pending appeal that's been entered by the Fifth Circuit?

A.  No.

Q.  And did Mr. Barton seek a stay pending appeal?

A.  He sought one with the first receivership order that was denied.  He has not sought one with the second receivership order.

Q.  All right.  So no -- no stay pending appeal currently.

With respect to -- there was some discussion --

MS. PERRY:  I apologize, but I don't have a copy of the settlement agreement to put in front of you. But, Your Honor, at docket 147, 147-2, it's Exhibit B to the

CINDY SUMNER, CSR (214) 802-7196

APP199

64

motion, there's page 2 of 5.

Are you there, Your Honor?

THE COURT:  I am, yes.

MS. PERRY:  Okay.  Great.

Q.  Okay.  So, Mr. Thomas, you spoke about this a little bit.  There is this release by BM318 in paragraph 4 of the settlement agreement.  And, I'm sorry, I don't have a copy to give you.  But essentially there is a release -- and obviously the language speaks for itself -- but there is a release of all of the claims and causes of action that were brought in the adversary proceeding, or could have been brought in the adversary proceeding.  But there is also a provision at the end, and you spoke about this a little bit with Ms. Lindauer, is expressing understood, however, that the Receiver is not a party to this release.  And accordingly, the Receiver is not providing any release of any claims he may hold, including but not limited to claims for the recovery of any investor funds that may have been transferred to Dixon by BM318 or other receivership entities.

Does that sound familiar?

A.  Yes, that's correct.

Q.  And so that's what you were talking about with Ms. Lindauer about there is this carveout for potential claims that you, as the Receiver, might have separate from claims that BM318 has that are being released, correct?

CINDY SUMNER, CSR (214) 802-7196

65

A.   That's correct.  Because the claims on behalf of these other receivership entities that had Wall investor funds that went for the benefit of BM318.  So they wouldn't be BM318 claims.

Q.   Right.

So Dixon still may end up in litigation with you as the Receiver with respect to those claims, potentially?

A.   That is correct.

Q.   Also can you please turn to Exhibit E in the Dixon exhibits?  So it's docket number 154-5, Exhibit E.  And if you'll turn to page 3 of 44 in that document.

A.   Okay.

Q.   So in the first single spaced paragraph you can see about midway down it says, for purposes herein, the defined term, final payoff shall mean an amount equal to 27.5 million in principal and accrued interest plus any and all costs and expenses of lender as of the date of such payment.

Do you see that?

A.   I do.

Q.   Is it your understanding that at the time that Dixon entered into the deed and escrow agreement, that was the estimated final payoff?

A.   Yes.  I mean, having not looked at this particular document since last spring.

Q.   Understood.

APP201

66

A.    But the 27 million number is what is in my head.

Q.    And you recall that it's Dixon's position that since that time interest and attorney's fees have continued to accrue on this amount and that's in the ten -- millions of dollars since -- and it's just our position -- above the $27.5 million amount?

A.    Yes, I understand.

Q.    And in addition, this matter was settled back in 2023, correct?

A.    Correct.  Shortly before the Fifth Circuit's order came down.

Q.    So we've been waiting for over a year now to now be thankfully in front of the Bankruptcy Court today?

A.    That's correct.

Q.    Thank you.

        MS. PERRY:  Thank you.

        THE COURT:  All right.  Thank you.

        MS. PERRY:  Pass the witness.

        THE COURT:  Mr. Carrillo, any further questions?

        MR. CARRILLO:  No, Your Honor.

        THE COURT:  All right.  Mr. Forshey, any other questions for Mr. Thomas?

        MR. FORSHEY:  Very briefly, Your Honor.

        THE COURT:  All right.


            CINDY SUMNER, CSR (214) 802-7196

67

RECROSS-EXAMINATION

BY MR. FORSHEY:

Q. Mr. Thomas, the Corley offer letter, when was the first time you saw that?

A. About 5 minutes before the hearing Mr. Coker emailed it to me after we met this morning.

Q. So you had never seen that before or had any communications on that?

A. That's correct.

Q. Now, I've got a note down that you said something to the effect that the settlement's been out there since January and you were somewhat skeptical of that offer 5 minutes before the hearing. What did you mean before -- about that?

A. Just what I testified about. That there was plenty -- if this was a genuine offer to be negotiated, I would think it would be raised more than 5 minutes before the hearing. Just -- it's just general skepticism timing wise. No other basis for that skepticism.

Q. Thank you.

MR. FORSHEY: Pass the witness, Your Honor.

THE COURT: Yes, sir, Mr. Coker.

MR. COKER: Thank you, Your Honor.

(no omission)

CINDY SUMNER, CSR (214) 802-7196

**APP203**

68

RECROSS-EXAMINATION

BY MR. COKER:

Q.    Just a couple of questions, Mr. Thomas.

First one, when was the motion to confirm this settlement filed?

A.    The motion to ratify the settlement?

Q.    The motion to ratify, yeah, sure.

A.    I believe it was in January of this year.

Q.    For this hearing?

A.    Well, so we filed a motion to ratify in the district court.  It's actually a motion to lift stay for Judge Mullin to consider this.  So let me step back.  We have not file a motion to ratify yet, I don't believe.  I think it was a motion to lift stay for Judge Mullin to consider approval of the settlement agreement.  That was filed in January, if I remember right.  And then Judge Starr granted the motion to lift stay in April.

Q.    Okay.  So it's -- it hasn't been a imminent issue before this Court until Judge Starr lifted the stay on that in April; is that fair to say?

A.    I don't believe anything was filed with this particular Court until April.

Q.    Okay.

A.    That sounds -- that sounds right.  But in terms of Ms. Lindauer and Mr. Barton having knowledge of it, I think

CINDY SUMNER, CSR (214) 802-7196

APP204

69

it would have been earlier.

Q.   And just now counsel was asking about some of the claims involved going both directions, both -- any potential claims that Dixon would have against BM318, as well as going back any claims reserved by the receivership.  So I want to ask you about those two things.

First off, in the year, or a little bit over a year since the case was pending prior to the receivership being in place, so BM318 is the case we're talking about, did they bring any counterclaims?

A.   Did Dixon bring --

Q.   Did Dixon bring any counterclaims?

A.   As I sit here, I don't remember.  I don't remember any.  So --

Q.   Okay.  Knowing if Dixon brought counterclaims would be important in evaluating whether the settlement was a good settlement, if the release had any value with that; is that fair to say?

A.   So, yes and no, but largely, no.  In a receivership, if they had claims that survived they wanted to assert against the receivership, those would be brought in the claims process.

Q.   Okay.

A.   And I would guess -- it's ultimately Judge Starr's discretion.  But I would guess that any claims Dixon might

CINDY SUMNER, CSR (214) 802-7196

70

have against the receivership estate would be subordinated to claims of the Wall investors and other creditors where they wouldn't receive anything.  And so I put limited value on any counterclaims they might have.  And I don't -- I'd have -- I don't have the settlement agreement in front of me.  I'd have to look at it.  I don't remember them reserving claims against the receivership.  I think they were just reserving maybe defenses they could bring to my claims for fraudulent transfer.  But I don't remember the release not being a total release.

Q.   And that's -- I apologize.  That's what I'm asking about.  So counsel, I think, was trying to show that a full release here was more valuable than what Mr. Corley's offer that did not contain a full release of those claims.  But you're not aware of any counterclaims at this time?

A.   As I sit here, I'm not aware of any.

Q.   Okay.  And then on the other side of that, I guess leading up to the last few months, the -- your office has filed a number of lawsuits for statute of limitations purposes to preserve claims related to potential fraudulent transfers; is that correct?

A.   Our office has brought a number of lawsuits.

Q.   Uh-huh.

A.   We brought certain lawsuits, keeping in mind that there is a statute of limitations argument that could

APP206

71

potentially be made.

Q.    Uh-huh.

A.    I am not going to say that Dixon's statute of limitations has already run.  I would argue very stridently it hasn't.  But we have not pursued a claim against Dixon yet.

Q.    Okay.  But you pursued a claim against all of Mr. Barton's attorneys between the years of 2019 and I believe 2020; is that fair to say?

A.    I don't think we've sued all of his lawyers.  We've sued the ones that knew of --

Q.    Five or six of them, I believe.  Does that sound right?

A.    It sounds about right.

Q.    And you sued his son, his daughter, and his ex-wife, as well, to preserve potential claims.  Does that sound familiar?

A.    We did sue a bunch of recipients of funds, yes.

Q.    But you haven't brought any claims against the (indecipherable word) related to fraudulent transfer?

A.    Not at this time.

Q.    So to -- in summary, you can't say that there's any value to release counterclaims you're not even aware of, or for fraudulent transfer claims that you haven't brought despite suing, I believe, four attorneys, two law firms, and

CINDY SUMNER, CSR (214) 802-7196

72

his kids and ex-wife. So it doesn't sound like that -- the idea of a release really impacted your decision on the settlement, did it?

A.    No. 100 percent impacted my view of the settlement at the time.

Q.    So I guess what -- what factor am I missing? If there's no counterclaims that you're aware of and you didn't feel that you needed to file a fraudulent transfer suit to preserve the statute like you did on the, I guess 16 or 18 other individuals and entities, what's different here?

A.    So as of last May, my accounting was very limited. I had not been given access to accounting records. From May through November, we were able to get access to accounting records and did a much more fulsome analysis of the amount of funds that flowed to Dixon and how they flowed to Dixon. As I sit here, I'll tell you the investigation is still pending. And so they're -- I'm not willing to testify in front of Dixon how I value those claims.

Q.    Understood. Well, I'll ask you a different question.

So for the case against Dixon, there are deadlines in that case. And the deadline to bring a counterclaim, unless there's new information made available, leave of Court had already run; isn't that correct?

A.    That sounds right.

CINDY SUMNER, CSR (214) 802-7196

APP208

73

Q.   Okay.  So you weren't really worried about any counterclaims coming back in your direction.  You didn't have a reason to, I guess I would ask?

A.   So there is some value to buttoning everything up.

Q.   Uh-huh.

A.   But generally speaking, my view of counterclaims as a Receiver, I'm not terribly worried about counterclaims.  It's an unfortunate reality of receiverships.  But there is -- there is some value.  I just -- I wouldn't ascribe tons and tons of weight to it.

Q.   Okay.  Thank you, Mr. Thomas.

MR. COKER:  Pass the witness, Your Honor.

THE COURT:  Thank you, Mr. Coker.

Any final redirect?

All right.  Thank you, Mr. Thomas, for your testimony.  You're excused as a witness.

All right.  Mr. Carrillo, Ms. Perry, Mr. Forshey, any other witnesses you'd like to call at this time?  I guess I'll go in that order.

MR. CARRILLO:  None from the Receiver, Your Honor.

THE COURT:  All right.

MS. PERRY:  None on behalf of Dixon, Your Honor.

THE COURT:  All right.  Mr. Forshey, any other

CINDY SUMNER, CSR (214) 802-7196

APP209

74

witnesses you'd like to call?

MR. FORSHEY:  No, sir.  None on behalf of Lumar.

THE COURT:  All right.  So the movants rest on evidence?

MS. PERRY:  Yes, Your Honor.

MR. CARRILLO:  Yes, Your Honor.

MR. FORSHEY:  Yes, Your Honor.

THE COURT:  All right.  So then we'll go to Ms. Lindauer.  Any witnesses or exhibits?

MS. LINDAUER:  Your Honor, no -- there you go. No witnesses and no exhibits at this time.

THE COURT:  All right.  Thank you.

All right.  I'll just ask for the record, any other counsel wishing to offer any evidence?  Mr. Coker?

MR. COKER:  No, Your Honor.  I don't -- I don't think we need anything further.  Thank you.

THE COURT:  All right.  Thank you.  So the evidentiary record is now closed.  We can go to final argument.

Who would like to go first?  We'll go with the two movants first and then anyone in support and we'll end up with those opposing.

So, Ms. Perry.

MS. PERRY:  Thank you, Your Honor.  Deborah

CINDY SUMNER, CSR (214) 802-7196

**APP210**

75

Perry on behalf of the Dixon Water Foundation.

So I will just try to address some of the -- some of the points and not re-hash my opening, which I think laid out the elements. And I know Your Honor has read all of the -- all of the pleadings here.

I do -- I do think that with respect to Ms. Lindauer's objection on her firm's behalf with respect to what happens with the money, I defer somewhat to the Receiver's counsel on that issue. However, I don't think that it's an impediment to Your Honor making a decision with regard to the settlement today. It's very akin to a situation where say you have a sale and there's not a determination yet of how the proceeds are going to be distributed. It's the same -- the same analysis. And Courts approve sales all the time where there's not a decision on the priorities of the lienholders, for example. So I think here today, you know, we're asking Your Honor to approve this settlement under the 9019 standards.

And as Your Honor knows, we're kind of doing all -- say a Texas three step today. My law firm actually had that as a slogan one time. It wasn't my favorite, because we'd opened a Houston office. The Texas three step, Dallas, Houston, Austin. But I'll use it today.

So Texas three step from the standpoint of the Receiver went to Judge Starr in January and filed a motion to lift the

CINDY SUMNER, CSR (214) 802-7196

APP211

stay. Mr. Barton actually opposed that. Judge Starr in a thoughtful, well-reasoned opinion overruled that objection and entered an order in April lifting the stay to allow Your Honor to consider this. And one of the basis for that is that Your Honor is uniquely positioned to consider this settlement. Why is that? Because Your Honor has been the one who has overseen the bankruptcy case, which went on actively for over a year. Your Honor is the one who oversaw the adversary proceeding which went on for about a year and a half until it was stayed. And it was an active adversary proceeding.

I mean, Your Honor, I think, certainly remembers our disputes on the motion to compel and also the motion for leave to amend that BM318 filed that was overruled and then, also, Your Honor's opinion was affirmed on appeal to the District Court. And that appellate order is final. So it was an active case.

In addition, these are the types of claims that Bankruptcy Courts deal with every day; preference actions and fraudulent transfer actions. They are core bankruptcy proceedings. And Your Honor through practice and on the bench has seen hundreds, if not thousands of these types of claims.

In addition, as we've mentioned, we -- the parties had the great benefit of having Judge Hale as our mediator here.

77

And I was there.  I can definitely say that it was a vigorous mediation.  Judge Hale going back and forth amongst the rooms.  And we were there all day in our separate corners, so to speak.  So we appreciate -- we appreciate Judge Hale's assistance in getting us to this point.

Your Honor has -- has heard today and seen the evidence of the third modification that was part of the -- that was added to the plan.  In that regard, we saw that in the deed and escrow agreement, the final payoff amount.  And that is Exhibit D which is entered into evidence.  But at the time that the deed and escrow was put in, it was about 27 1/2 million.  I'll represent to the Court that in April of 2023, our calculations show that with interest, that would have arisen to almost $39 million.  And that just continues to rise.  So for purposes of assessing things like the likelihood of success on the merits, and the position that the parties would be in if it were avoided and came back, you have a substantial debt that would -- that is accruing interest on a daily basis with respect to this property that has been tied up now for several years.

Therefore, Your Honor, we would ask respectfully that you approve this settlement.  We think that the issue of how the proceeds are distributed is certainly appropriate to be dealt with by Judge Starr.  And as you can see from the procedural posture that we have pitched this, should Your

APP213

78

Honor approve the motion today, then the next step will be to go to Judge Starr and move to ratify that approval.  And at that point in time, or at some later step, then it can be dealt with with respect to how the settlement proceeds are distributed.

Thank you, Your Honor.

THE COURT:  All right.  Thank you.

All right.  Who would like to go first, Mr. Carrillo, or, Mr. Forshey?  I'll let you both speak.

MR. CARRILLO:  Your Honor, if Mr. Forshey has any comments, I'll defer to him and then I'm happy to wrap up.

THE COURT:  Makes sense.

Mr. Forshey.

MR. FORSHEY:  Thank you, Your Honor.

First point is that the objecting parties have brought forward no evidence.  They have raised objections.  They have asked questions.  They have not adduced any evidence before the Court.  The evidence before the Court is very clear.  That, one, these claims have severe issues in terms of their merit.  The third modification to the plan is in evidence. The various statements, Ms. Lindauer signed a disclosure statement, so did her client, stating that the debtor was solvent both on a going concern and on a liquidation basis. We've also introduced the monthly operating reports also

CINDY SUMNER, CSR (214) 802-7196

79

sworn which state that the debtor was solvent.

You've heard a very experienced Receiver testify here today that he has analyzed this. He doesn't think it works on a cost benefit basis. And, Your Honor, that should be it. It's a good faith, arm's length settlement. It was negotiated after a lot of back and forth through a receivership. You've heard him testify our documents were negotiated after a lot of back and forth between the counsel. And it's a valid exercise of business judgment here that there are very huge issues with these. And that he's made an economic judgment that's in the best interest of the receivership. And there's no evidence to the contrary that's been adduced by Ms. Lindauer or by Mr. Barton.

The second thing I'd point out is that while they ask a lot of questions, they offer no answers. We've marked as Exhibit 16 the third amendment to the plan, third modification to the plan. And if the Court looks at that, and I know you have, is it basically if they set aside the delivery of that deed out of escrow, all they're going to be back is where they were. And Ms. Lindauer says, well, we'll go sell the land. How would that ever happen? Is -- the title is already subject to an escrow agreement. Beneficial equitable title has already been passed to Dixon. I'm not sure how you could possibly go in and do any type of sale. She also said, well, there's never been a determination that

CINDY SUMNER, CSR (214) 802-7196

APP215

80

the debtor was insolvent.  And that's probably true.  But what you have is both Mr. Barton and her, either Mr. Barton swearing to schedules and signing MORs and such, or her tendering pleadings to this Court that were based upon the concept that this debtor was solvent both on a going-concern basis and liquidation.  Point of fact, she had to get that disclosure statement approved in order to send it out to be approved by the creditors.  We would submit that there's overwhelming evidence that there was -- that they were solvent under these questions.

Finally on the issue of the offer that came in today 5 minutes before the hearing.  We would object to that being considered in any way.  Our offer was put on the table publicly back in January when the motion was filed with Judge Starr to lift the litigation stay.  As you can see in the order, without a lift of the litigation stay, we could not come to you to ask you to approve this.  They've known what this is now for five months.  And we are very, very skeptical when they walk in the morning of the hearing with a letter and nothing else.  We'd ask the Court to disregard that.  It's not reliable and it should not be considered.

Finally, Ms. Lindauer made the comment that we really don't care who gets the money.  And she's right.  That's another argument for another day.  We merely want to point out to the Court what's before you today is the approval of

APP216

81

the settlement.  The issue of what's going to be done with the money is another argument for another day and we don't have a dog in that hunt.  So thank you.  Thank you for the Court's time, Your Honor.

THE COURT:  All right.  Thank you, Mr. Forshey.

Mr. Carrillo.

MR. CARRILLO:  Thank you, Your Honor.

This morning, Your Honor, you've heard from two very esteemed bankruptcy lawyers here, Ms. Perry and Mr. Forshey. I'm here to share that Dixon provided a great perspective on the length of this case and their involvement in this case. Lumar provided the perspective of the bankruptcy claims themselves.  As counsel to the Receiver and a recovering bankruptcy lawyer, my job, Your Honor, is to help represent the interest of the receivership and why this settlement ought to be approved today by Your Honor.

Before I do that, Ms. Lindauer had made some comments about another proceeding that's before Judge Everett that I'd like to just give a little bit of perspective on, because I represent the Receiver in that matter.  The case number is 21-31954.  It's 2999TC Acquisitions.

Your Honor, the procedural posture of that case is that the settlement between the Receiver and the receivership entity and the creditor in that case was approved by Judge

CINDY SUMNER, CSR (214) 802-7196

APP217

Starr. The procedural posture of that case is a motion to close the case. And so the question before Judge Everett and what Judge Everett has been wrestling with is whether or not the assets belong to the receivership or the bankruptcy estate.

At our last hearing in January -- and more than happy to file the transcript of those proceedings, if it would be helpful for Your Honor -- Judge Everett essentially opined that he wanted Judge Starr to provide a perspective on where those receivership assets should go. But the difference between that case, Your Honor, and the decision before you today is in that case, Judge Everett was concerned about Judge Starr opining on where the assets should go. And secondly, making any decision on to close the case. Not to approve a settlement, but to close the case while the Fifth Circuit considers the appeal of the receivership order.

The difference is today Your Honor has the judgment, the experience, and the knowledge of the claims at issue in this case. To rule on the settlement, if you pass on those findings and conclusions to Judge Starr, he'd then make a judgment in receivership case on where assets should go. And so the questions that are open in the 2999TC bankruptcy case on whether or not to close the case are really in opposite to the questions here before Your Honor.

And I mention all that to say if Ms. Lindauer appeals

APP218

to that case, as well, to, you know, ask Your Honor to delay the ruling on the settlement motions, or to wait for the Fifth Circuit to rule, we would argue that the procedural posture is very different.  And actually favors a hearing on the settlement today, because we've gone directly to you here in the bankruptcy court.  You've dealt with the claims.  You know the parties.  You know the procedural history.  You know the law.  You can offer those findings to Judge Starr who can then make a determination how it applies in the receivership case.

THE COURT:  So let me ask a question on that.

MR. CARRILLO:  Yes, Your Honor.

THE COURT:  So if the Court were to approve the settlement, what's your understanding of what happens to the settlement proceeds?

MR. CARRILLO:  Your Honor, we'd argue that under the receivership order --

THE COURT:  I mean, if I approved it, at the end of the day are you saying that this Court holds those proceeds until there's another resolution, or they automatically go?

MR. CARRILLO:  When you approve a settlement, the proceeds -- there are no proceeds immediately.  The settlement agreements require Judge Starr to ratify the agreement first before any transfer of consideration.  And so

CINDY SUMNER, CSR (214) 802-7196

84

that's how the procedure works, Your Honor.

THE COURT:  I understand.

MR. CARRILLO:  And so with all of that, unless you have any other questions --

THE COURT:  I don't.

MR. CARRILLO:  -- we would ask you to approve the settlement.  And thank you so much.

THE COURT:  All right.  Terrific.  Thank you.  All right.  First we'll go to Ms. Lindauer.

MS. LINDAUER:  Thank you, Your Honor.

Going back and looking at where we are in this case -- and everybody agrees that the adversary was being hotly contested.  There was no question about that.  And counsel pointed out there were motions to compel.  There was a ton of discovery being done.  But one thing that was missing as I look through the docket was there really was no -- there was no motion for summary judgment.  Anything of that nature.  So one thing that concerns me is the fact that the Receiver really didn't -- he says he did his homework on this case.  But he really didn't.  He didn't speak to me.  He didn't speak to any of the counsel representing BM318 to see what our side of the story was on some of these issues.  To talk to us about the numbers, the amounts at issue, and all of that.  So that I find troubling.  I mean, the fact that we may have sent them part of our file really doesn't answer the

CINDY SUMNER, CSR (214) 802-7196

APP220

85

bigger question there.

So for you to approve a settlement, you're really getting pretty much one side of the story. You're getting the story of Lumar and Dixon who, of course, want the settlement approved. They're willing to pay what we think is a small amount of money to get rid of this claim or case and be able to move on.

Delay, let's talk about that for a second. The notice of the Receiver's stay was November 2nd, 2022. Almost a year and a half ago. That wasn't a delay caused by BM318 or any of the creditors of BM318, or its counsel. That was the delay created by the receivership. So I know Dixon complains that, well, we're going to be owed a lot more money. Maybe yes, maybe no. I mean, that ultimately will be a question for the Court to ultimately decide. All we did in the third amended modification to the plan is we preserved their right to assert a claim and for the Court to ultimately decide that claim.

In a nutshell, Your Honor, we think that the evidence doesn't show that this is an adequate settlement. You didn't hear anything about values of the claims. You didn't hear anything about current pending litigation. You heard about a mediation that didn't include Mr. Barton or parties -- I mean, basically you had the Receiver and Dixon and Lumar mediating. And so the Receiver is looking for money. Lumar

CINDY SUMNER, CSR (214) 802-7196

APP221

and Dixon are looking to get out of this litigation, so they put some money on the table.  And we've objected to that in saying, we don't think it's adequate.  That there should be additional monies considered here, or the case should be litigated.  Okay.  And that's one thing Mr. Thomas didn't do, is he didn't come and ask us, would you be willing to stay on and continue to litigate this case?  Would Mr. Cowagi be willing to stay on and continue to litigate this case?  We had multiple lawyers that were working on this adversary proceeding at the time that it was stayed.  I put in my objection that we had spent over $168,000 in legal fees on the adversary proceeding.  So you can see, this was not a just lay down, roll over process.

So I do have serious concerns about the amount of the settlement.  I do have serious concerns about where the funds will go.  I don't see anything that they stay -- if you approve it, that they stay with your Court until some other Court, perhaps, tells you they need to go somewhere else. But, again, we're clearly settling something that's property of this bankruptcy estate.  There is no question that these claims are property of this bankruptcy estate and that you're being asked to settle those claims for what we think is not enough money.

I just don't think the evidence -- I've seen a lot of 9019s proved up.  I don't see enough evidence here to approve

87

this settlement and walk away from the potential that there were not a few hundred thousands of dollars, millions of dollars. And, again, it's interesting to me that the Receiver said, well, we think there was a couple of million dollars paid to Dixon before the bankruptcy was filed and we're looking at trying to recover that. Well, that's the same claims that the debtors have too. I mean, to the extent there were avoidable transfers that were made, along with the property, those would also be property of the estate and claims of this estate.

So we would ask you to not approve this settlement. Have them go back to the drawing board. Have counsel for the Receiver do a little more homework. Talk to us and we can explain to them why we think these claims are worth so much money and why they should be pursued. At least pursue them to the point where you get some rulings, like a summary judgment or something like that where you get a better understanding of what's at issue here. We never got to that point. The case stopped at discovery. And so, Your Honor, I have serious concerns about the amount at issue and also where those funds go. So thank you.

THE COURT: All right. Thank you, Ms. Lindauer.

All right, to Mr. Coker.

MR. COKER: Thank you, Your Honor.

CINDY SUMNER, CSR (214) 802-7196

**APP223**

First I'd like to say that I think as counsel stated earlier that there was no evidence put on by Ms. Lindauer or by the parties objecting and joining in her objections.  The issue here is that Mr. Thomas testified to exactly what our case was.  And I think in summary it comes down to there were too many cases.  I think when asked several different times about some of the details it was, I can't remember, because there were too many lawsuits that I was trying to resolve.  That's no fault of his.  But it's not the Court's problem and it's not a valid excuse or justification for pushing through this settlement.

There's no reason that this Court can't wait to rule on this or to send the Receiver back to do additional due diligence, including something that hasn't been done.  And what hasn't been done is the marketing of these claims.  Even though there was an assertion that, well, there's some value on having additional release language that wasn't present in Mr. Corley's offer, Mr. Thomas couldn't come up with what that value was.  It was just a, well, it helped to wrap things up.  And I do understand that.  But it's not of great value.

And so what you do have is Mr. Corley put on a greater -- greater value to this claim than what was brought in the settlement.  And as far as the timing, I've noticed that counsel has thrown -- from all sides has thrown, I

89

guess, allegations of there must be some kind of wrongdoing. What they haven't done, even after I pointed it out several times, is called Mr. Corley to ask him how he came about that or anything else to substantiate that. And so I think before this Court considers any type of malfeasance, that since that witness who testified -- submitted the offer was here and ready to testify, that the fact that counsel did not call him and vet out those claims means that, you know, they had the opportunity and they didn't put on any evidence themselves that this Court should consider as far as the timing goes.

Ultimately, Mr. Thomas didn't speak to counsel for Mr. Barton or any of the attorneys bringing this. He couldn't remember anybody in his office speaking to them. They may have received some files. That's what is in evidence before this Court. He claims that he spoke to somebody with Mr. Barton's office early on in the receivership about all of the claims, but he couldn't even remember what they spoke -- spoke about related to this one, or any details related to that. He couldn't remember whether there were any counterclaims filed in this case, even though he's here to testify that this is to settle these claims. This release has value. And he really couldn't remember several of the underlying facts. And I'd submit to this Court it's not because Mr. Thomas is a bad Receiver. It's because Mr. Thomas has a lot on his plate. Like I said and

90

like he said, too many cases.

And the issue here is if he's wrong, this is disposing of the only assets before this Court, or a substantial amount. And correct me if I'm wrong on that. But we've got to be right on this one because every single creditor is going to be hurt if the Court's wrong. And the beneficiaries are going to be wrong -- remaining from BM318. So what we have is oral argument coming in July in the Fifth Circuit case. This Court can wait until then and allow the Receiver more time to vet out these claims. In fact, the Court's ruling today, as the Receiver testified, it's not even going to allow any action to be taken, because they still have to go back to Judge Starr for anything to take place.

I would ask the Court to allow the benefit of time here that already exists. The stay's already here. We don't have to move on these claims. They're not expending money from the receivership assets to litigate these claims, because they're all stayed. Give time to vet out other offers. Give time to market the claims. And if there's not a greater amount that comes back out of the settlement, then I think everybody's objections are going to be null and void. And by the way, in that time period, nothing has harmed anybody, but it potentially in a substantial way has allowed for the creditors and the beneficiary owners of BM318 to have their ability to receive a greater amount in this court just from

CINDY SUMNER, CSR (214) 802-7196

APP226

91

the benefit of the time we already have, Your Honor.  And so that's what we're asking is just allow the time to work in favor of the creditors and the beneficial owners before this Court.

THE COURT:  All right.  Thank you.

MR. COKER:  Thank you, Your Honor.

THE COURT:  Final word.

Ms. Perry.

MS. PERRY:  Your Honor, just a couple of points.

Ms. Lindauer keeps using the word, we.  We say this, we think that.  I don't know who the, we, is.  Because her objection is filed on behalf of Joyce W. Lindauer, Attorney PLLC.  So clearly that's not an objection on behalf of BM318.  It can't be, because the Receiver is effectively BM318.  Also, her comments aren't evidence.  Just as my comments aren't evidence.  What Your Honor has in front of you is the evidence in the form of all of the exhibits that have been introduced and admitted.  And you have the testimony of Mr. Thomas here today.

It is incorrect for Ms. Lindauer to say that Dixon would just have a claim that the Court would decide.  It's very clear from that third modification that all of the liens and security interests would spring back into existence.  And we would find ourselves back in the same place we were now

CINDY SUMNER, CSR (214) 802-7196

APP227

92

with interest rates rising and it more difficult to sell property.

In addition, as Your Honor knows, you're not required to conduct an independent investigation in formulating an opinion as to the reasonableness of the settlement. You're permitted to defer to the judgment of the parties and approval of the compromise is committed to the sound discretion of this Court.

And in addition, you know, one of the things the Receiver did testify to -- and there were many things that he took into account. His testimony speaks for itself. But one thing that he did discuss was the cost benefit analysis, the risk versus the cost. And you've heard here today from Ms. Lindauer that BM318 had incurred at least $186,000 in attorney's fee prior to the stay being put into place. If this case were to go to trial, and I can assure Your Honor that we would try it, we're talking about hundreds of thousands of dollars in attorney's fees, if not up into the millions. And expert witnesses, expert retainers, and so forth. So I think that Mr. Thomas', you know, testimony certainly supports that the Receiver has exercised business judgment in this -- in arriving at the decision during a mediation in front of a retired bankruptcy judge who beat up on all of the parties to reach this settlement and bring it to Your Honor for approval. And so we would ask Your Honor

CINDY SUMNER, CSR (214) 802-7196

APP228

93

to approve it today so that we can continue to proceed forward with the next steps with regard to the settlement in front of Judge Starr.

Thank you.

THE COURT:  All right.  Thank you, Ms. Perry.  Mr. Forshey.

MR. FORSHEY:  Three brief points, Your Honor.

Point one, no evidence.  There's been on evidence introduced by Ms. Lindauer in support of her objection.  Her comments are not evidence and cannot be taken as such.

Two, they raised the point, Ms. Lindauer did, and to some extent Mr. Barton's counsel, that they needed to tell their side of the story.  That is what today's hearing is for.  If they wish to assert that there were issues with the settlement, then they needed to put up evidence and bring witnesses.  They chose not to do so.  Mr. Barton filed no objection.  Ms. Lindauer filed a limited objection.

And finally, third, we filed a brief and explained in detail why these claims are very, very weak on the merits.  They didn't even respond.  They didn't take the trouble to respond.  And today they have never addressed the problems that they have in this lawsuit.  What Ms. Perry says is exactly correct.  They raised various issues around the periphery.  But what they never addressed is really the core issues in this adversary proceeding and that's how do they

CINDY SUMNER, CSR (214) 802-7196

APP229

94

get around solvency?  How do they get around the third amendment?  How do they deal with those things?  They provided no answer.

You had good testimony from an experienced Receiver that he did a cost benefit analysis.  He didn't like it.  And he chose to settle.  That's what the Court needs here and the Court should approve the settlement as requested.

As always, thank you for your courtesy and your time this morning, Your Honor.

THE COURT:  All right.  Thank you, Mr. Forshey.

I'll give you the last word.

MR. CARRILLO:  Your Honor, the Receiver echoes the words of Dixon and Lumar and asks that you approve both joint motions and send the settlements up to Judge Starr for ratification.

THE COURT:  All right.

MR. CARRILLO:  Thank, Your Honor.

THE COURT:  Thank you very much.  With that closing arguments have concluded.

Whenever I have an evidentiary hearing like this, especially with the history of these cases, I think it warrants a thoughtful recitation of facts and conclusions that the Court makes as opposed to just trying to do it off the top of my head just hearing the evidence and the

CINDY SUMNER, CSR (214) 802-7196

APP230

95

arguments of counsel. So I'm going to take it under advisement. But I plan to rule this week in an oral ruling. And I'm considering -- and, again, you don't have to be here. You can all log in if you want to hear the oral ruling. But to make sure I have sufficient time, I'm thinking either 11:00 on Thursday or 1:00 on Thursday.

Does that work for your respective calendars, or is there another time that might work better?

MS. LINDAUER: Your Honor, my only concern is I am in Judge Larson's court right now for the whole day on Thursday on a motion to dismiss. So I don't think I would be available either of those times on Thursday. Wednesday, Friday are fine. But Thursday is just a bad day right now.

THE COURT: Understood. I was just trying to give myself a bit more time. Give me one second.

How about Wednesday at 1:30 or 1? It doesn't matter, Wednesday 1 -- any time between 1 and 2?

MS. PERRY: That's fine with Dixon, Your Honor.

MR. FORSHEY: It's fine with Lumar. We'll make that work, Your Honor.

THE COURT: Alrighty.

Mr. Coker, is that time okay, works for you?

MR. COKER: Yes, Your Honor.

THE COURT: 1:00? How about, Mr. Carrillo?

CINDY SUMNER, CSR (214) 802-7196

APP231

96

MR. CARRILLO:  Yes, Your Honor.  That time works for us.

THE COURT:  All right.  So why don't we just go ahead and set this for oral ruling on Wednesday, May 22nd, 2024 at 1 p.m.

And with that, the Court will be in recess.  Thank you all very much.

(End of Proceedings.)

CINDY SUMNER, CSR (214) 802-7196

C E R T I F I C A T E

I, CINDY SUMNER, do hereby certify that the foregoing constitutes a full, true, and complete transcription of the proceedings as heretofore set forth in the above-captioned and numbered cause in typewriting before me.

_____

CINDY SUMNER, CSR #5832
Expires 10-31-2024
Cindy Sumner, CSR
5001 Vineyard Lane
McKinney, Texas 75070
214 802-7196

CINDY SUMNER, CSR (214) 802-7196

# EXHIBIT 13

APP234

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION


In re:                      .      Case No. 20-42789-mxm11
                            .
BM318, LLC                  .      Eldon B. Mahon U.S. Courthouse
                            .      501 W. 10th St.
                            .      Fort Worth, TX 76102-3643
                            .
                            .      May 22, 2024
                            .      1:00 p.m.
. . . . . . . . . . . . . ..      (In Court, Video, and Phone)



RULING
BEFORE THE HONORABLE MARK X. MULLIN
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For Court Appointed      ALAN CARRILLO, ESQ.
Receiver:                Brown Fox
                         8111 Preston Road, Ste. 300
                         Dallas, Texas 75225


For Dixon Water          DEBORAH M. PERRY, ESQ.
Foundation:              Munsch Hardt Kopf & Harr, P.C.
                         3800 Lincoln Plaza
                         500 North Akard Street
                         Dallas, Texas 75201-6659


For Lumar Land & Castle: JOSHUA L. SHEPHERD, ESQ.
                         Quilling, Selander, Lownds, Winslett
                         & Moser, PC
                         2001 Bryan Street, Ste. 1800
                         Dallas, Texas 75201

                         EMILY CHOU, ESQ.
                         ForsheyProstok, LLP
                         777 Main Street, Ste. 1550
                         Fort Worth, Texas 76102

APP235

2

APPEARANCES (CONT.):

For Joyce W. Lindauer        JOYCE W. LINDAUER, ESQ.
Attorney, PLLC:              Joyce W. Lindauer Attorney, PLLC
                             1412 Main Street, Ste. 500
                             Dallas, Texas 75202

Transcribed by:              GILLIAN LAWRENCE, CER-255, CET-255
                             Lawrence Court Transcription & Video
                             P.O. Box 530790
                             DeBary, FL 32753

                 Proceedings recorded by electronic sound
         recording, transcript produced by transcription service.

3

FORT WORTH, TEXAS - MAY 22, 2024 - 1:00 P.M.

THE COURT:  Good afternoon, everyone.  This is Judge Mullin.  We're here this afternoon for our one o'clock docket.  And this afternoon all we have is the BM318 LLC matter, and the only purpose for the hearing today is for the Court to issue its oral ruling on the two motions found at Dockets 147 and 149.

There's no -- noone is in the courtroom so -- other than my staff.  So if you'd like to make an appearance as counsel of record, we can do that at this time.  If your video is on, I'll recognize you.  There we go.

And I see we have Mr. Carrillo.  Good afternoon, to you, sir.

MR. CARRILLO:  Good afternoon, sir.  Alan Carrillo for -- of Brown Fox on behalf of the court appointed receiver, Courtney Thomas for the debtor.

THE COURT:  All right.  Thank you, sir.

Ms. Perry, good afternoon.

MS. PERRY:  Good afternoon, Your Honor.  Deborah Perry on behalf of the Dixon Water Foundation.

THE COURT:  All right.

Mr. Shepherd, good afternoon.

MR. SHEPHERD:  Thank you, Your Honor.  Webex trolls this morning, so I had to dial in.  Josh Shepherd on behalf of Lumar Land and Cattle.

4

THE COURT:  All right.  You're coming in loud and clear.  Thank you.

Ms. Lindauer, good afternoon.  And you're on mute.

MS. LINDAUER:  Is that picking up?

THE COURT:  There go.  Now we hear you.

MS. LINDAUER:  Can you hear me now?

THE COURT:  Yes.

MS. LINDAUER:  And Joyce Lindauer, I'm here on behalf of my firm.  Thank you.

THE COURT:  All right.

Any other counsel wish to make an appearance?

MS. CHOU:  Your Honor, this Emily Chou of ForsheyProstok on behalf of Lumar.  And I apologize, I just dialed in on the telephone.

THE COURT:  No worries.  All right.  Thank you, Ms. Cho.  And good afternoon to you as well.

Any other counsel wish to make an appearance?

All right.  With that then, the Court will get --

MR. BARTON:  Excuse me, Your Honor.  This is Tim Barton.  I'd just like to be on the record that I'm here as well.

THE COURT:  All right.  Good afternoon.  Good afternoon to you, sir, and thank you for making your appearance.  The record will reflect that you are in presence as well.  Thank you for that appearance.

5

Any other -- any other party or counsel wishing to make an appearance?

All right.  With that then, the Court will get right to the Court's ruling.

This Oral Ruling shall constitute the Court's findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure, as incorporated by Rules 7052 and 9014 of the Federal Rules of Bankruptcy Procedure.

Before the Court are the following motions:  Number 1, the Joint Motion of BM318, LLC and the Dixon Water Foundation for Approval of Compromise and Settlement of Adversary Proceeding No. 21-04051.  And that is filed at ECF No. 147.  And I'll refer to it as the "Dixon Motion."

And 2, the Joint Motion of BM318 LLC and Lumar Land & Cattle, LLC for Approval of Compromise and Settlement of Adversary Proceeding No. 21-04051.  And that can be found and is filed at ECF No. 149.  I'll refer to that motion as the "Lumar Motion."  And in this oral ruling, I'll refer to both the Dixon Motion and Lumar Motions together as the "Motions."

In addition to the Motions, the Court also reviewed, analyzed, and carefully considered the objection to filed to each of the motions by Joyce W. Lindauer, PLLC, filed at ECF No. 153, which I'll refer to as the "Lindauer Objection."  And the Court also considered the oral objection raised during the hearing on behalf of Mr. Timothy L. Barton, which I'll refer to

6

as the "Barton Objection."

Finally, the Court reviewed, analyzed, and carefully considered the testimony of Mr. Courtney C. Thomas, Receiver for BM318, LLC; the exhibits submitted into evidence; and the arguments of counsel for each of the parties.

And after due deliberation, the Court finds and concludes as follows:  The Court has subject matter jurisdiction to consider the Motions pursuant to 28 U.S.C. §§ 157and 1334.  The Motions constitute core proceedings over which the Court has both statutory and constitutional authority to enter final orders pursuant to 28 U.S.C. §§ 157(b)(2)(A),(B),(F),(H), and (O).

Notice of the Motions and the Hearing on the Motions was proper, timely, adequate, and sufficient.  A reasonable opportunity to conduct discovery, object, and to be heard was afforded to all creditors and parties-in-interest in this case.

Bankruptcy Rule 9019 governs the proposed compromise and settlement agreements south in the Motions.

Approval of a proposed compromise and settlement should be given only if the settlement is "fair and equitable and in the best interest of the estate."  That's from the Official Committee of Unsecured Creditors vs. Cajun Elec. Power Coop., Inc. found at 119 F.3d 349, page 355 (5th Cr. 1997).

When considering whether a compromise meets this standard, the Court must weigh the "terms of the compromise

7

with the likely rewards of litigation." See Rivercity v. Herpel, which is In re Jackson Brewing Co, 624 F.2d 599, at page 502 [sic]. That's a 5th Cir. in 1980.

Even though the settlement need not result in the best possible outcome for the estate, it must not "fall beneath the lowest point in the range of reasonableness." And that can be found at In re Idearc Inc., 423 B.R. 138, page 182, which is a District Court opinion from the Northern District of Texas, 2009.

When reviewing settlements and compromises, courts in the 5th Circuit consider the following factors:

i.  the probability of success in the litigation, with due consideration for the uncertainty in fact and law,

ii.  the complexity and likely duration of the litigation and any attendant expenses, inconvenience, and delay,

iii. the interest of creditors with proper deference to their reasonable views,

iv.  the extent to which the settlement is truly the product of arm's length negotiations, and

v.   all other factors bearing on the wisdom of the compromise. See Canjun Elect., 119 F.3d at pages 355-56, as well as Official Committee of Unsecured Creditors v. Moeller (In re Age Refining, Inc.), 801 F.3d 530, page 540. And that's a 5th Circuit decision out of 2015.

8

It is not necessary to conduct a mini-trial to determine the probable outcome of claims waived, released, or compromised in the settlement.  The Court need only apprise itself of the relevant facts and law so that the Court can make an informed and intelligent decision.  See La Salle Nat'l Bank v. Holland (In re American Reserve Corp.), 841 F.2d 159, page 163.  And that is a 7th Circuit case in 1987.

Here, Mr. Thomas, the Receiver, and Dixon Water Foundation, and Lumar Land &Cattle, LLC bear the burden of establishing that the proposed -- that the balance of the above factors Courts consider and support -- to support a finding that the proposed compromises are fair and reasonable, and in the best interest of the estate.  See In re Roqumore, 393 B.R. 474, page 480, a Bankruptcy Court decision out of the Southern District of Texas, 2008.

First, the Court finds and concludes that the Receiver, Mr. Thomas, was credible and largely uncontroverted. Mr. Thomas has been appointed to serve as a Federal Court Appointed Receiver in two unrelated matters:  (i) the SEC v. Barton action currently pending before Judge Starr in the Northern District of Texas, which includes BM318, LLC, the Debtor currently before this Court; and (ii) Mr. Thomas also serves as a Federal Court Appointed Receiver in a second SEC actions that is not related to this case.

In his role as a Federal Court Appointed Receiver,

9

Mr. Thomas testified that he has negotiated and entered into dozens of compromise and settlement agreements and that he is very familiar with the elements he must satisfy to obtain approval of such compromise and settlement agreements.

Mr. Thomas testified further that he, with the assistance and in consultation with his professionals, personally performed sufficient due diligence in the case to become familiar with BM318, LLC's financial matters, relevant affairs, and more specifically, the Debtor's disputes with Dixon and Lumar.

Mr. Thomas testified further that he analyzed the Debtor's potential claims and causes of actions against Dixon and Lumar as well as their alleged defenses to such claims. Mr. Thomas also considered the likelihood of success, if any, the Debtor might obtain in prosecuting through litigation the Debtor's claims against Dixon and Lumar.

Mr. Thomas testified further that he also considered the complexity and likely direction of litigation against Dixon and Lumar and any attendant expense, inconvenience, and delay in prosecuting the Debtor's claims against Dixon and Lumar.

Finally, Mr. Thomas testified that, based on his analysis of each of the abo e factors, he has concluded, in his business judgment that the proposed settlement agreements with Dixon and Lumar are in the best of interest of the BM318, LLC bankruptcy estate.

10

The Court finds and concludes that Mr. Thomas's testimony in explaining his analysis and resulting conclusion to enter into the proposed settlement agreements with Dixon and Lumar was clear, concise, and credible.

In support of Mr. Thomas's testimony, both Dixon and Lumar offered several exhibits into evidence to support their contentions that they believe both Dixon and Lumar would be successful in defending against the Debtor's alleged claims and causes of action.

For example, but not by way of limitation, both Dixon and Lumar contend that the Debtor's claims for preferences would fail because BM318, LLC was solvent at the time of the alleged transfers to Dixon and Lumar.  In support of their contention, Dixon and Lumar point to the Debtor's own admissions, some of which were made under penalty of perjury, included in the following exhibits:  Dixon Exhibits G, H, I, J, K, and M, as well as Lumar Exhibits 5, 6, 7, 10, 11, and 12.

Neither Ms. Lindauer nor Mr. Barton called any witnesses or offered into evidence any exhibits to controvert the contentions made by Dixon and Lumar in these Exhibits.

Additionally, Dixon and Lumar contend that the Debtor holds, at best, only bare legal title to the  underlying real property that is the subject of the dispute between the Debtor and Dixon.  And, in turn, the portion of the real property acquired by Lumar from Dixon.  Therefore, Dixon and Lumar

11

contend that the Debtor's claims against them fail under applicable law, and to that they point to Dixon Exhibit Q and the authorities cited therein to support their contentions. Additionally, Dixon and Lumar also point to the following exhibits: Dixon Exhibits D, E, and F, as well as Lumar Exhibits 4 and 16 as further support for their contention on this point.

Again, neither Ms. LIndauer nor Mr. Barton called any witnesses or offered any exhibits into evidence, or filed any briefs citing to any case law controverting the contentions made by Dixon and Lumar on those points.

Finally, Dixon and Lumar contend that they have other substantial legal and factual arguments in opposition to the Debtor's claims against them, again, as detailed in Dixon Exhibit Q. And, finally, again, neither Ms. Lindauer nor Mr. Barton called any witnesses, offered into -- exhibits in -- offered any exhibits into evidence, or filed any pleading controverting the contentions made by the Receiver, Mr. Thomas, Dixon, and Lumar.

Both Ms. Lindauer and Mr. Barton object to the Motions and contend that the Motions should be denied. In contesting the Motions, Ms. Lindauer first argued that Mr. Thomas did not reach out to her or her office to discuss the disputes with Dixon and Lumar; therefore, he did not conduct sufficient due diligence to arrive at his business judgment conclusions.

12

In response, Mr. Thomas testified, credibly, that he did reach out to Mr. Barton and had a general conversation with Mr. Barton and primarily with his counsel about the entities that are the subject of the Receivership, but neither Mr. Barton nor his attorneys provided him with useful information specifically related to BM318, LLC.

Additionally, Mr. Thomas testified, credibly, that he did no believe it was necessary for him to reach out to Ms. Lindauer or her office because he made his own independent investigation of the claims asserted by the Debtor against Dixon and Lumar by reviewing all the pleadings and discovery that had taken place prior to his appointment as Receiver.

Further Mr. Thomas testified, credibly, that in his experience as a Receiver, prior counsel in litigation many times have an inflated view of the merits of claims and lawsuits. And, typically, he believes, it is not in the best interest of the Receivership for him as Receiver to expend funds interviewing prior counsel.

The Court notes further that there was no evidence in the rec ord to suggest that Ms. Lindauer ever attempted to reach out to Mr. Thomas about the disputes the debtor had with Dixon and Lumar. Further, Ms. Lindauer offered no credible evidence that she or her office had specific information that could have been provided to Mr. Thomas that would cause him to question or change his business judgment relevant to the

13

Motions.

The Court finds and concludes that Ms. Lindauer's and Mr. Barton's contention that Mr. Thomas failed to conduct sufficient due diligence prior to arriving at his informed business judgment conclusion, fails.

The Court further finds and concludes that the credible evidence in the record established that Mr. Thomas conducted sufficient due process -- or excuse me, conducted sufficient due diligence to arrive at his reasonable business judgment conclusions.

Next, Ms. Lindauer and Mr. Barton argue that Mr. Thomas, as Receiver, failed to attempt to sell or convey BM318, LLC's claims and causes of action against Dixon and Lumar. Therefore, the Motions must fail.

In support of their contention, both Ms. Lindauer and Mr. Barton alluded to an alleged "offer" purportedly made approximately five minutes before the start of the hearing by a third party to allegedly purchase the Debtor's claims against Dixon and Lumar for $200,000, which on its face, is $25,000 more than the proposed settlements that are the subject of the Motions.

The Court first notes that this alleged "offer" made by an alleged third party was never offered into evidence by either Ms. Lindauer or Mr. Barton. Nor did Ms. Lindauer or Mr. Barton attempt to call the third party maker of the alleged

14

"offer" as a witness.

Next, Mr. Thomas testified, credibly, that he -- that the alleged "offer" he received by email minutes before the start of the hearing, on its face was contingent on the third party conducting due diligence on the Debtor's alleged claims against Dixon and Lumar.  Consequently, Mr. Thomas testified that the viability of the "offer" is suspect, at best, and the risk of the "offer" would be -- the risk that the "offer" would be withdrawn following the third party's completion of "due diligence" far outweighed the cost and expense of delay, especially since the "offer" was only $25,000 more consideration than the terms of the proposed settlements with Dixon and Lumar.

The Court agrees and this is not a close call -- again, the terms of the proposed settlement have been known to parties, including potentially Ms. Lindauer and certainly to Mr. Barton, since January of 2024.  And the last minute arrival of the "offer" five minutes prior to the start of the hearing is dubious, at best, and is not credible.  And, again, the alleged "offer" touted by Ms. Lindauer and Mr. Barton was never offered into evidence nor was the third-party maker of the "offer" called as a witness.

Finally, Mr. Thomas testified, credibly, that he believed the claims against Dixon and Lumar -- if he believed the claims against Dixon and Lumar had significant value, he,

15

as Receiver, would pursue those claims as opposed to seeking to sell or assign those clams.

Finally, Ms. Lindauer and Mr. Barton contend that there is no reason to proceed with the proposed settlement at this time because the Receiver should attempt to sell the real estate at issue in the disputes against Dixon and Lumar. Setting aside the many legal defenses that Dixon and Lumar have raised in opposition to the Receiver having the ability to convey title to the real estate, neither Ms. Lindauer nor Mr. Barton offered a shred of evidence to suggest that the real estate had sufficient value and could be marketed and sold in a reasonable period of time at a sale price that would payoff Dixon's liens and claims, and any potential claims of Lumar, with sufficient excess funds that would exceed the $175,000 that is being offered in the proposed settlement agreements.

Finally, Ms. Lindauer and Mr. Barton contend that there is no reason to proceed with the proposed settlements at this time because the Receiver should attempt to sell the real estate at issue in the disputes against Dixon and Lumar. Setting aside the many legal defenses that Dixon and Lumar have raised in opposition to the Receiver having the ability to convey title to the real estate, neither Ms. Lindauer nor Mr. Barton offered a shred of evidence to suggest that the real estate had sufficient value and could be marketed and sold in a reasonable period of time at a sale price that would payoff

16

Dixon's liens and claims (and any potential claims of Lumar) with excess funds exceeding the $175,000 that is being offered in the proposed settlement agreements.

Additionally, the Court disagrees with Ms. Lindauer's and Mr. Barton's contentions that neither Dixon nor Lumar would be harmed by a further delay to market the real estate with the mere hope that an offer from a viable purchaser might materialize.

Finally, the evidence in the record supports, and this Court so finds and concludes, that the negotiations of the proposed Settlement Agreement between Receiver Thomas, Dixon, and Lumar were at arm's length and in good faith and ultimately achieved -- and were ultimately achieved through a full day mediation process.

On this point, Ms. Lindauer and Mr. Barton argue that they were not parties to the mediation; therefore, the mediation was somehow defective.  But given the Receivership and the appointment of Mr. Thomas as the Receiver for BM318, LLC, neither Ms. Lindauer nor Mr. Barton had a right to attend the mediation.  Consequently, this objection by Ms. Lindauer and Mr. Barton has no merit and also fails.

In conclusion and based upon the evidentiary record before the Court, the Court finds and concludes that the Receiver's decision to seek approval to enter into the proposed compromise and settlement agreements with Dixon and Lumar

17

constitutes (i) the reasonable -- or the exercise of the Receiver's reasonable and sound business judgment consistent with the Debtor's fiduciary duties, (ii) is in the best interest of the BM318, LLC bankruptcy estate, its creditors and parties in interest; and (iii) is clearly within the range of reasonableness necessary for approval of a compromise agreement under Bankruptcy Rule 9019.

Therefore, based upon the Court's findings of fact and conclusions of law, the Court overrules both the Lindauer Objection at ECF No. 153 and the oral Barton Objection.  And the Court grants the Dixon Motion at ECF No. 147 and the Lumar Motion at ECF No. 149.

That concludes the Court's finding -- oral findings of fact and conclusions of law regarding the Motions.  The Court, however, does reserve the right to supplement these findings of fact and conclusions of law.  That concludes the oral ruling today.

So with that, since the Court is granting the Motion, would one of the parties for either the Receiver Dixon or Lumar care to draft the order granting the motion?  You can simply -- you don't need to recite all the findings and conclusions just made.  You can certainly incorporate by reference this oral ruling.

But if any of the movants do have additional findings and conclusions that you proposed that the Court didn't

18

address, you may include those in your proposed order.  The Court will review those, and if the Court agrees that those are additional findings that I'm willing to make, or conclusions I'm willing to make, I will, of course, include them or strike them and enter a revised form of order.

But who would like to take that laboring oar?

MR. CARRILLO:  Your Honor, this Alan Carrillo for the Receiver.  I'm happy to take the oar and work with Lumar and Dixon to provide a joint proposed order for you.

THE COURT:  All right.  Terrific.  And once you do that I guess -- you can also just share it with Ms. Lindauer and counsel for Mr. Barton so that they -- they will have an opportunity to make comments.  But once that's uploaded, then the Court will review it, and if the Court finds it acceptable, the Court will sign it and enter it quickly.

All right.  Anything else for today?

All right.  Hearing none, thank you for appearing, everyone, today.  And with that the Court will be in recess.

(The proceeding concluded at 1:21 p.m.)

19

# C E R T I F I C A T I O N

I, Gillian Lawrence, CER-255, CET-255, court approved transcriber, certify that the foregoing pages 1 to 18 is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and to the best of my ability.

*Gillian Lawrence*

_____

CER-255, CET-255, COURT TRANSCRIBER    DATE: May 22, 2024

APP253

# EXHIBIT 14





CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed May 28, 2024**

_____
**United States Bankruptcy Judge**

_____

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| BM318, LLC | § | Case No. 20-42789-mxm |
| | § | |
| Debtor. | § | Chapter 11 |
| | § | |
| _____ | § | |
| | § | |

**ORDER APPROVING COMPROMISE AND SETTLEMENT BETWEEN
BM318, LLC AND THE DIXON WATER FOUNDATION**

On May 20, 2024, came on for hearing (the "Hearing") the *Joint Motion of BM318, LLC and the Dixon Water Foundation for Approval of Compromise and Settlement of Adversary Proceeding No. 21-40451* [Docket No. 147] (the "Motion")[1] jointly filed by BM318, LLC ("BM318") and The Dixon Water Foundation ("Dixon"). As reflected in the Motion, Cortney C. Thomas ("Receiver") acts as the Receiver for BM318 pursuant to an *Order Appointing Receiver* entered in the following lawsuit:  *Securities Exchange Commission, Plaintiff, v. Timothy Barton,*

_____

[1] Defined terms not specifically defined herein shall be given the same meanings given to them in the Motion.

_____

ORDER APPROVING COMPROMISE AND SETTLEMENT
4886-4168-7489v.2

**APP255**

*et al., Defendants*, Civil Action No. 3:22-CV-2118-X in the United States District Court for the Northern District of Texas, Dallas Division.

An *Objection* [Docket No. 153] ("Lindauer Objection") to the Motion was filed by Joyce W. Lindauer, PLLC ("Lindauer"), former bankruptcy counsel to BM318.  In addition, Timothy Barton ("Barton") appeared through counsel at the Hearing on the Motion, but did not file a formal written objection.  No other objections were filed or asserted at the Hearing with regard to the Motion.

In support of the Motion, counsel appeared for BM318 (acting through the Receiver) and The Dixon Water Foundation ("Dixon").  Counsel on behalf of both Lindauer and Barton also appeared at the Hearing in opposition to the Motion.  At the Hearing, exhibits were offered and received into evidence from Dixon and BM318 (acting through the Receiver) (Exhibits A through Q, which are included in Dixon's Exhibit List filed at Docket No. 154).  The Settlement Agreement between BM318 (acting through the Receiver) and Dixon was attached as an exhibit to the Motion.  The Receiver testified in support of the Motion.  No testimonial or documentary evidence was offered by either Lindauer or Barton, although counsel for both cross examined the Receiver and made arguments to the Court.

On May 22, 2024, the Court made on the record findings of fact and conclusions of law (collectively, the "Findings") with respect to the Motion.  The Findings are hereby incorporated into this Order as if fully set forth verbatim herein.  In the Findings, the Court granted the Motion and denied both the Lindauer Objection and the oral objection by Barton.

The Court, as set forth in and based upon the Findings, hereby finds and concludes that the Motion should be granted and both the Lindauer Objection and the oral objection by Barton should be overruled.

**ACCORDINGLY, it is hereby ORDERED that**:

1.      The Motion shall be and is hereby **GRANTED**.

2.     The Settlement Agreement is **APPROVED**, and BM318 is hereby authorized to take all reasonable and necessary actions to effectuate the Settlement Agreement.

3.     The Lindauer Objection and the oral objection by Barton are both in all respects overruled.

4.     This Court retains jurisdiction to enforce and construe this Order.

**# # # END OF ORDER # # #**

**Order submitted by:**

Alan Carrillo
Texas Bar No. 24109693
Brown Fox PLLC
8111 Preston Road, Suite 300
Dallas, TX 75225

**Counsel for Receiver of BM318, LLC, Cortney C. Thomas**

- and -

Deborah M. Perry
Texas Bar No. 24002755
Munsch Hardt Kopf & Harr, P.C.
500 N. Akard Street, Suite 4000
Dallas, Texas 75201

**Counsel for The Dixon Water Foundation**

# EXHIBIT 15

APP258





CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed May 28, 2024**

*Mark X. Mullin*
**United States Bankruptcy Judge**

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| BM318, LLC | § | Case No. 20-42789-mxm |
| | § | |
| Debtor. | § | Chapter 11 |
| | § | |
| _____ | § | |
| | § | |

## ORDER APPROVING COMPROMISE AND SETTLEMENT BETWEEN
## BM318, LLC AND LUMAR LAND & CATTLE, LLC

On May 20, 2024, came on for hearing (the "Hearing") the *Joint Motion of BM318, LLC and Lumar Land & Cattle, LLC for Approval of Compromise and Settlement of Adversary Proceeding No. 21-40451* [Docket No. 149] (the "Motion")[1] jointly filed by BM318, LLC ("BM318") and Lumar Land & Cattle, LLC ("Lumar"). As reflected in the Motion, Cortney C. Thomas ("Receiver") acts as the Receiver for BM318 pursuant to an *Order Appointing Receiver* entered in the following lawsuit: *Securities Exchange Commission, Plaintiff, v. Timothy Barton,*

---

[1] Defined terms not specifically defined herein shall be given the same meanings given to them in the Motion.

---

ORDER APPROVING COMPROMISE AND SETTLEMENT

APP259

*et al., Defendants*, Civil Action No. 3:22-CV-2118-X in the United States District Court for the Northern District of Texas, Dallas Division.

An *Objection* [Docket No. 153] ("Lindauer Objection") to the Motion was filed by Joyce W. Lindauer, PLLC ("Lindauer"), former bankruptcy counsel to BM318.  In addition, Timothy Barton ("Barton") appeared through counsel at the Hearing on the Motion, but did not file a formal written objection.  No other objections were filed or asserted at the Hearing with regard to the Motion.

In support of the Motion, counsel appeared for BM318 (acting through the Receiver), and Lumar.  Counsel on behalf of both Lindauer and Barton also appeared at the Hearing in opposition to the Motion.  At the Hearing, exhibits were offered and received into evidence from Lumar and BM318 (acting through the Receiver) (Exhibits 1 through 21, which are included in Lumar's Exhibit List filed at Docket No. 152).  The Agreement to Reaffirm and Adopt Settlement and Release Agreement ("Settlement Agreement") between BM318 (acting through the Receiver) and Lumar was admitted into evidence as Lumar Exhibit 1.  The Receiver testified in support of the Motion.  No testimonial or documentary evidence was offered by either Lindauer or Barton, although counsel for both cross examined the Receiver and made arguments to the Court.

On May 22, 2024, the Court made on the record findings of fact and conclusions of law (collectively, the "Findings") with respect to the Motion.  The Findings are hereby incorporated into this Order as if fully set forth verbatim herein.  In the Findings, the Court granted the Motion and denied both the Lindauer Objection and the oral objection by Barton.

The Court, as set forth in and based upon the Findings, hereby finds and concludes that the Motion should be granted and both the Lindauer Objection and the oral objection by Barton should be overruled.

**ACCORDINGLY, it is hereby ORDERED that**:

1.      The Motion shall be and is hereby **GRANTED**.

ORDER APPROVING COMPROMISE AND SETTLEMENT

APP260

2.　　The Settlement Agreement is **APPROVED**, and BM318 is hereby authorized to take all reasonable and necessary actions to effectuate the Settlement Agreement.

3.　　The Lindauer Objection and the oral objection by Barton are both in all respects overruled.

4.　　This Court retains jurisdiction to enforce and construe this Order.

**# # # END OF ORDER # # #**

<u>**Order submitted by**</u>**:**

Alan Carrillo
Texas Bar No. 24109693
Brown Fox PLLC
8111 Preston Road, Suite 300
Dallas, TX 75225

**Counsel for Receiver of BM318, LLC, Cortney C. Thomas**

  - and -

J. Robert Forshey
Texas Bar No. 07264200
Forshey & Prostok, LLP
777 Main Street, Suite 1550
Fort Worth, Texas 76102

Kimberly P. Harris
Texas Bar No. 24002234
Joshua L. Shepherd
Texas Bar No. 24058104
Quilling, Selander, Lownds, Winslett & Moser, PC
2001 Bryan Street, Suite 1800
Dallas, Texas 75201

**Counsel for Intervenor, Lumar Land & Cattle, LLC**