IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

|  |  |  |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § § § | |
| *Plaintiff,* | § § | |
| v. | § § | No. 3:22-CV-2118-X |
| TIMOTHY LYNCH BARTON | § § | Hearing Requested |
| CARNEGIE DEVELOPMENT, LLC | § | |
| WALL007, LLC | § | |
| WALL009, LLC | § | |
| WALL010, LLC | § | |
| WALL011, LLC | § | |
| WALL012, LLC | § | |
| WALL016, LLC | § | |
| WALL017, LLC | § | |
| WALL018, LLC | § | |
| WALL019, LLC | § | |
| HAOQIANG FU (a/k/a MICHAEL FU) | § | |
| STEPHEN T. WALL | § § | |
| *Defendants,* | § § | |
| DJD LAND PARTNERS, LLC | § | |
| LDG001, LLC | § § | |
| *Relief Defendants.* | § | |

**DEFENDANT BARTON'S RESPONSE TO RECEIVER'S VERIFIED MOTION TO
RATIFY BM318, LLC'S SETTLEMENT AGREEMENTS WITH THE DIXON WATER
FOUNDATION AND LUMAR LAND & CATTLE, LLC AND BRIEF IN SUPPORT**

Michael J. Edney
Virginia Bar No. 48253
DC Bar No. 492024 (*admitted to N.D. Tex.*)
medney@huntonak.com
**HUNTON ANDREWS KURTH LLP**
2200 Pennsylvania Avenue NW
Washington, DC 20037

**COUNSEL FOR TIMOTHY LYNCH BARTON**

**TABLE OF CONTENTS**

I.   INTRODUCTION ................................................................................................................. 1

II.  BACKGROUND ................................................................................................................. 3

III. ARGUMENT & AUTHORITIES ...................................................................................... 7

    A.   The Receiver Fails to Show the Proposed Transaction is in the Receivership's Best Interests. .......................................................................................................... 7

    B.   The Court Should Not Permit the Permanent Disposition of Property While the Legality of the Receivership is On Appeal. ............................................................ 11

    C.   Granting the Motion Would Result in Disposal of Real Property Interests and, Thus, Improperly Circumvent 28 U.S.C. § 2001. .................................................. 12

IV.  CONCLUSION & PRAYER ........................................................................................... 16

# TABLE OF AUTHORITIES

**Cases**                                                                                          **Page(s)**

*Anadarko E & P Co., LP v. Clear Lake Pines, Inc.*,
   No. 03-04-00600-CV, 2005 WL 1583506 (Tex. App. —Austin July 7, 2005, no pet.)..........13

*Cane Tenn., Inc. v. United States*,
   60 Fed. Cl. 694 (2004) ....................................................................................................13

*City of Cookeville, Tenn. v. Upper Cumberland Elec. Membership Corp.*,
   484 F.3d 380 (6th Cir. 2007) .........................................................................................14

*Coastal Corp. v. Tex. E. Corp.*,
   869 F.2d 817 (5th Cir. 1989) .........................................................................................11

*Coinmach Corp. v. Aspenwood Apartment Corp.*,
   417 S.W.3d 909 (Tex. 2013)..............................................................................................8

*Conocophillips Co. v. Dahlberg*,
   No. CIV.A. C-10-285, 2011 WL 710604 (S.D. Tex. Feb. 22, 2011) ......................................13

*In re Fort Worth Chamber of Com.*,
   100 F.4th 528 (5th Cir. 2024) ........................................................................................14

*Gil Ramirez Grp. L.L.C. v. Houston Indep. Sch. Dist.*,
   786 F.3d 400 (5th Cir. 2015) ............................................................................................8

*Griggs v. Provident Consumer Disc. Co.*,
   459 U.S. 56 (1982)..........................................................................................................11

*Los Angeles Tr. Deed & Mortg. Exch. v. SEC*,
   285 F.2d 162 (9th Cir. 1960) ......................................................................................9, 10

*McClatchy Newspapers v. Cent. Valley Typographical Union No. 46, Intern.*
   *Typographical Union*,
   686 F.2d 731 (9th Cir. 1982) .........................................................................................11

*Quigley v. Bennett*,
   227 S.W.3d 51 (Tex. 2007)............................................................................................13

*Santander Consumer USA, Inc. v. Zeigler Chrysler Dodge Jeep-Downers Grove, LLC*,
   No. 3:16-CV-3310-B, 2017 WL 2729998 (N.D. Tex. June 26, 2017) ....................................8

*SEC v. Am. Bd. of Trade, Inc.*,
   830 F.2d 431 (2d Cir. 1987)...........................................................................................10

*SEC v. Current Fin. Servs., Inc.*,
   783 F. Supp. 1441 (D.D.C. 1992).................................................................................9, 10

-iv-

*SEC v. Kirkland*,
     No. 606CV-183-ORL-28KRS, 2006 WL 3333672 (M.D. Fla. Nov. 16, 2006)......................15

*SEC v. S & P Nat'l Corp.*,
     360 F.2d 741 (2d Cir. 1966)................................................................................................10

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
     No. C 07-01827 SI, 2013 WL 6055079 (N.D. Cal. Nov. 13, 2013).......................................11

**Statutes**

28 U.S.C. § 2001.................................................................................................... *passim*

Tex. Bus. Comm. Code § 27.01...............................................................................4, 7

Defendant Timothy Barton files this Response in opposition to the Receiver's Verified Motion to Ratify BM318, LLC's Settlement Agreements with the Dixon Water Foundation and Lumar Land & Cattle, LLC ("Motion") and Brief in Support, Dkt. 524, and requests an evidentiary hearing on this matter, as follows.

## I.    INTRODUCTION

The Court should deny the Receiver's request to permanently dispose of any receivership estate assets, including the legal claims at issue here, while the United States Court of Appeals for the Fifth Circuit actively considers the legality of his appointment.   Such a disposition is inequitable, unnecessary, and not in the best interest of the estate (nor is it in the best interest of the subject matter lenders or the Defendant), and this Court lacks jurisdiction to approve it.

Notwithstanding the Receiver's misguided urging for the Court to rely upon the bankruptcy court's prior determinations involving these legal claims, in *In re BM318, LLC, Case No. 20 42789-MXM*, the bankruptcy court determined what it deemed to be in the best interest only of the *bankruptcy estate*.  It is this Court's duty, and its alone, to determine what is in the best interest of the *receivership estate*.

The Receiver has not come close to showing that the proposed settlement agreement at issue—and the release of realty rights it entails—is in the best interests of the receivership estate. The Receiver is proposing to release any and all claims to the Bear Creek property for just $175,000.  This is property the Defendant in the action the Receiver now proposes to settle is currently seeking to sell for more than $47 million.  And, it is property to which BM318 has a hard fought right, having paid the Dixon Water Foundation for $2,100,000 in cash to purchase the property, in addition to making $7,960,822 in principal and interest payments servicing seller-provided financing for the transaction.  This investment was expressly a replacement real estate

-1-

development project for money from the Chinese national lenders at issue in this case, when other identified projects faced insurmountable difficulties. The combination of the financial paralysis of the COVID-19 pandemic and litigation fomented by Michael Fu led to BM318 falling behind on payments for the seller-financed portion of the transaction. To address this situation, BM318 entered into a workout agreement, returning the title to the property to Dixon in exchange for a right to purchase the title back for $27 million.

When the time came for BM318 to purchase the title back, Jim Martin (a real estate broker), who was already engaged by BM318 from the initial transaction, was tasked with presenting the offer to the Dixon board. Instead of doing so, Martin organized a group of alternative purchasers, under the name of Lumar Land & Cattle, LLC to purchase the property for himself. He now is proposing to sell it for more than $47 million, a $20 million premium over BM318's contracted-for purchase price. Martin and Lumar plainly breached their fiduciary duty to Dixon. And the litigation and realty claim the Receiver proposes to release was directed at returning that property to BM318, at the agreed purchase price, and (if successful) provide a more than $20 million return to the receivership estate. This would largely solve the lender principal that the SEC is seeking to hang on the receivership estate. And the Receiver—with the benefit of no serious inquiry or investigation—is proposing to release that claim for fractions of pennies on the dollar for some quick cash. This proposed settlement would create a massive hole in the receivership estate, when it has the potential to largely solve any and all of its problems.

Finally, because the settlement is releasing a realty interest belonging to the receivership estate, the Court must conduct the public hearing required by 28 U.S.C. § 2001 prior to accepting it.

## II.    BACKGROUND

The Receiver asks the Court to release valuable realty interests held by BM318, LLC ("BM318"), a Barton-related entity currently overseen by the Receiver. The interests arise from an action brought against Lumar Land & Cattle, LLC ("Lumar") and The Dixon Water Foundation ("Dixon").

The property in question consists of about 1,400 acres of land located in Bear Creek, Parker County, Texas, with a market value today of more than $47 million.

In 2018, Barton, through BM318, set out to purchase the land in Parker County from Dixon. In November 2018, BM318 entered into a contract with Dixon to purchase the Bear Creek land for $35,461,480. BM318 paid $2,100,000 in cash, and Dixon agreed to finance $32,946,900 of the purchase. Title to the Bear Creek land transferred from Dixon to BM318. BM318 subsequently made $7,960,822 in principal and interest payments on the Dixon loan, bringing the total principal due to Dixon down to $27,500,658 and BM318's cash equity in the property to $7,960,822. App. 003, Lindauer Affidavit at 1.

Then, the COVID-19 pandemic hit and froze the cycle of property sales and third-party financing on which real estate development depends. In addition, the Chinese lender's agent— and now co-defendant—initiated bankruptcy proceedings that made refinancing difficult. The headwinds led BM318 to fall behind on payments on the seller financing facility. Unable to make the next scheduled payment as a result of these exigent and unforeseen circumstances, BM318 and Dixon entered into a workout plan where the title to the Bear Creek property was transferred back to Dixon and, in exchange, BM318 was authorized to buy it back at a later date for a mutually-agreed upon purchase price of $27 million (an amount representing the original purchase price less the payments made by BM318).

-3-

When Barton's businesses, and BM318 specifically, got back on their feet after being significantly impacted by the pandemic and the Fu litigation, Barton laid the groundwork to repurchase the Bear Creek land from Dixon, as contemplated by the workout plan. To do this, Barton had Jim Martin and Lumar continue to act as BM318's broker. Per the broker contract between BM318 and Lumar, Lumar was to present the offer to Dixon on behalf of BM318 at Dixon's next scheduled board meeting. Unbeknownst to BM318 or its leadership, though, Lumar had no intention of fulfilling its duty as BM318's broker. Recognizing that the deal to purchase the Bear Creek land was a highly desirable one, Lumar organized its own equity group, pocketed the BM318 transaction, and surreptitiously engaged with Dixon to purchase the Bear Creek land for itself.

On September 1, 2020, as a result of the above-described litigation attacks launched by Michael Fu and his simultaneous and coordinated efforts to place the Wall entities into a chapter 7 bankruptcy, as well as the onslaught of the COVID-19 pandemic, BM318 filed a petition for voluntary chapter 11 bankruptcy. On August 8, 2021, BM318 filed claims in the United States Bankruptcy Court for the Northern District of Texas, Fort Worth Division, against both Dixon and Lumar for tortious interference, breach of fiduciary duties, fraud, conversion, conspiracy, and Fraud in Real Estate Transaction under Tex. Bus. Comm. Code § 27.01. *See* App. 017-040, *BM318, LLC v. Lumar Land & Cattle, LLC*. The adversary proceeding sought to enforce the repurchase contract and to recover the land from Lumar, which purports to own it today only through the breaches of fiduciary duty and self-dealing of its broker agent in pocketing the BM318 repurchase and pursuing a purchase of the property on its own. The bankruptcy court approved the litigation against Dixon and Lumar as valid and proper for the estate to pursue and BM318's attorney, Joyce Lindauer, agreed to pursue such claims.

Rather than simply holding on to these legal claim assets at zero cost to the receivership estate, or, better yet, pursuing them on behalf of the entity he currently oversees, the Receiver seeks to terminate all of BM318's claims against Dixon and Lumar for $175,000. This proposal does not square with the magnitude of the claim or of the property. Lumar is currently marketing the property at a price of $35,000 per acre or more than $47 million for the entire parcel. App. 041-045, Sworn Affidavit of Debbie Farah at 1-3, Exhibit A. If the claim were successful in enforcing the $27 million repurchase agreement and recovering title from Lumar on grounds of its self-dealing and breach of fiduciary duty, the estate stands to make more than $20 million.

The Receiver is proposing to release this interest in realty for less than one percent of the effective recovery sought. And there is no analysis in the motion to show that this claim is so meritless as to deserve such a radical discount. The Motion contains no analysis whatsoever of the facts underlying BM318's claims or the circumstances that prompted the litigation in the first instance. And it appears that no reasonable investigation of the claims has occurred: The Receiver has not attempted, for example, to speak to Joyce Lindauer, the attorney prosecuting the case against Lumar on behalf of BM318, to gauge the viability of the legal claims. App. 004, Sworn Affidavit of Joyce Lindauer at 2, ¶ 8.[1]

This motion requires more investigation and more detail. It comes to this Court undercooked, particularly as it is about a claim poised to address much of the alleged shortfall between estate assets and alleged principal from the lenders that are the subject of this litigation.

---

[1] If the Receiver had conducted its due diligence by contacting Ms. Lindauer, he would have learned, for example, that, despite his repeated claims that BM318 did not have the resources to pursue the legal claims at issue, Ms. Lindauer's firm was carrying the costs associated with pursuing these claims at no immediate cost to BM318 (it is also unclear how BM318's financial ability to pursue claims nearly three years ago impact the value of those same claims today, pursued by the Receiver or otherwise).

The Receiver's proposed settlement also fails to consider the enormously valuable Municipal Utility District ("MUD") designation on the property, which was secured by Barton, that provided zoning and authorization to develop the property. This special (and, as it turns out, highly valuable) designation occurred several months after BM318's purchase of the Bear Creek land and has not been identified or considered in any of the Receiver's valuations.

The Receiver, again, inexplicably attempts to rush through this proceeding where there is no immediate need to resolve BM318's claims against Lumar and Dixon. The transaction proposed by the Motion is as unnecessary as it is unsupported by the law and facts. Most troublingly, the release of these legal claims proposed by the Receiver's Motion would completely shortchange the eventual beneficiary of the receivership estate—whether it be Barton, the subject matter lenders, or someone else. The land at issue here, as the parties have previously stipulated, is one of the "replacement projects" that was designated for the lender funds that are the subject of this litigation after the specific project(s) those lender funds had initially targeted became unfeasible.

Moreover, per the terms of the bankruptcy order, any sale proceeds—including the proposed $175,000—would be immediately applied to BM318's creditors, netting zero to the estate. The Receiver moves for this instead of simply letting BM318's claim sit dormant while the Fifth Circuit—and the judicial process more broadly—adjudicates the underlying issues and matters, at no cost or risk to the estate, or pursuing the claim himself and potentially bringing property worth tens of millions of dollars into the receivership estate's coffers for eventual release or distribution.

The Receiver has even publicly repudiated good faith attempts by third parties to purchase BM318's legal claims for *more than* the $175,000 discharge it proposes here and thus provide

-6-

greater value to the receivership estate than contemplated by this Motion. Specifically, at a bankruptcy court hearing on May 20, 2024, a buyer presented an offer to purchase BM318's legal claims for $200,000. App. 004-005, Sworn Affidavit of Joyce Lindauer at ¶ 9.

### III.    ARGUMENT & AUTHORITIES

**A.    The Receiver Fails to Show the Proposed Transaction is in the Receivership's Best Interests.**

The Receiver proposes to settle legitimate and strong legal claims to property valued at more than $47 million for just $175,000.

As Ms. Lindauer illustrates in her affidavit submitted to this Court, the Receiver currently oversees claims that he could readily prosecute and, thereby, potentially secure the receivership estate's ownership rights to the Bear Creek land, resulting in tens of millions of dollars of value going back into the estate, rather than into the hands of the very same bad actors who are attempting to extract that value for themselves. As BM318 set forth in its counterclaim against Lumar, among other things, Lumar's self-dealing and deception of its principal, BM318, was a violation of Tex. Bus. Comm. Code § 27.01. Lumar, through Jim Martin, made false representations to BM318 that he would serve in good faith as the entity's agent in negotiating with Dixon, inducing BM318 to use him as the broker in the deal with Dixon. App. 036. Instead, as described in that counterclaim and throughout this brief, Lumar surreptitiously made a personal deal with Dixon for the property, undercutting BM318, ultimately and directly causing BM318's negotiations with Dixon to fail. *Id.* Lumar's actions constitute a violation of Texas law, as they included a false representation of material fact, made to a person for the purpose of inducing that person (in this case, BM318) to enter into a contract and BM318, indeed, relied on that inducement to enter into its contract with Lumar.

-7-

All of the various other claims set forth in BM318's counterclaim against Lumar likewise remain strong and well-founded. For example, BM318's tortious interference claims continue to have a high likelihood of success based on likely satisfaction of the elements of such a claim. The elements of a tortious interference claim with a prospective contract are: (1) there was a reasonable probability that the plaintiff would have entered into a business relationship with a third party; (2) the defendant either acted with a conscious desire to prevent the relationship from occurring or knew the interference was certain or substantially certain to occur as a result of the conduct; (3) the defendant's conduct was independently tortious or unlawful; (4) the interference proximately caused the plaintiff injury; and (5) the plaintiff suffered actual damage or loss as a result. *Gil Ramirez Grp. L.L.C. v. Houston Indep. Sch. Dist.*, 786 F.3d 400, 417 (5th Cir. 2015) (quoting *Coinmach Corp. v. Aspenwood Apartment Corp.*, 417 S.W.3d 909, 923 (Tex. 2013)); *Santander Consumer USA, Inc. v. Zeigler Chrysler Dodge Jeep-Downers Grove, LLC*, No. 3:16-CV-3310-B, 2017 WL 2729998, at *8-9 (N.D. Tex. June 26, 2017). BM318 was already engaged with Dixon and had a contract readying the repurchase of the Bear Creek land, thus there was an almost certitude that BM318 would enter into the contract at issue. Mr. Martin and Lumar, as active agents of BM318, were clearly aware of BM318's intention to enter into the repurchase agreement, as BM318 retained them to do just that on its behalf. And Martin and Lumar blew through plain fiduciary duties under the brokerage arrangement they had to BM318, taking the opportunity to deal it to themselves.

Before the Court can even consider approving this settlement agreement, it should, at a minimum, require the Receiver to provide and then subsequently examine the facts that would ensure that the settlement transaction proposed by the Receiver is indeed in the best interests of the receivership estate. As an initial matter, the fact that the Receiver's Motion is verified is of no

moment unless it is accompanied by sufficient factual detail to substantiate the conclusory assertions made in its Motion.

The analysis would be simple and the conclusion that these proposed settlements are *not* in the best interest of the estate are unavoidable: Leaving the claims at issue to lie dormant presents no risk and no harm to the estate. Pursuing the claims has tremendous upside and essentially no downside. Any settlement for a claim to property valued at around $50 million should be substantial and almost certainly in the millions of dollars. And settling these claims for $175,000 is unconscionable, would be immediately diminished (and thus present zero value to the estate) by the Receiver's legal fees accrued in the course of litigating this Motion and potential appeal of a grant of it, and would afford a windfall to bad actors at the expense of beneficiaries of the receivership estate.

Generally, courts that have considered the question have held that the business of prejudgment receiverships should not be the liquidation of assets, but instead their conservation in place. *See SEC v. Current Fin. Servs., Inc.*, 783 F. Supp. 1441, 1445 (D.D.C. 1992) ("The further step of liquidating Current's assets … is not necessary to protect Current's investors nor are such drastic measures appropriate prior to the entry of final judgment."); *Los Angeles Tr. Deed & Mortg. Exch. v. SEC*, 285 F.2d 162, 182 (9th Cir. 1960) (lamenting the "special additional penalty" that would result by allowing a Commission receiver to liquidate). Ratifying this settlement agreement would again fail to secure valuable assets held by an entity in the receivership estate in place for potential return to Barton, in the event the Commission does not prove its case. And the Receiver does not meaningfully attempt to establish that release of these claims will protect the subject lenders' potential interests or is otherwise in the best interest of the receivership estate.

Moreover, the Receiver has not even attempted to show that this transaction is necessary—failing to explain to the Court what risk pursuing the claims or simply allowing them to sit dormant would pose to the receivership estate. *See, e.g.*, *Current Fin. Servs.*, 783 F. Supp. at 1445 (finding liquidation neither "necessary to protect [the defendant's] investors" nor "appropriate prior to the entry of final judgment"); *SEC v. Am. Bd. of Trade, Inc.*, 830 F.2d 431, 436 (2d Cir. 1987) ("We have in the past criticized the use of receivers to effect the liquidation [sic] of a defendant firm in litigation under the Securities Act or the Securities Exchange Act") (citing *SEC v. S & P Nat'l Corp.*, 360 F.2d 741, 750 (2d Cir. 1966)). If anything, it is now evident that the property to which the claims are attached is only increasing in value and thus presenting even more potential upside to BM318 and, in turn, to the receivership estate. Lumar's recent solicitation of the Bear Creek land clearly illustrates that the property's value has more than doubled during the litigation over the receivership before this Court and the Fifth Circuit. *See* App. 043, 045, Sworn Affidavit of Debbie Farah at 3, Exhibit A. The receivership estate should enjoy the ongoing appreciation of value and the zero cost or risk of maintaining the status quo. But the Receiver's only discernable goal is to liquidate more property to generate cash to pay its own, ever-accruing legal bills. Again, as shown by one of its most recent filings, the Receiver continues to race to file its payment applications. Dkt. 539.

The Receiver improperly requests to permanently change the *status quo* of assets rather than preserve them for use or return upon final judgment. *See id.*; *Los Angeles Tr. Deed*, 285 F.2d at 182. Settlement and disposition of legal rights are extremely difficult to undue or otherwise claw back after settlement transactions of the type contemplated by the Motion are consummated. There is no stated or apparent urgency to do what the Receiver requests to do right now. The Receiver has identified no special circumstances, other than to pay itself, that justify a prejudgment

liquidation of assets under receivership, particularly when a cloud of legal uncertainty hangs over the entire process.

In the meantime, the Government either will prove its allegations at trial and establish an entitlement to the property and assets held in receivership or it will fail to do so and the property and assets will be returned to the Defendant.  Absent extraordinary circumstances, this Court cannot permit a Receiver to permanently dispose of or change the status of that property prior to trial and a final judgment.  The Receiver has established no such extraordinary circumstances.

**B.      The Court Should Not Permit the Permanent Disposition of Property While the Legality of the Receivership is On Appeal.**

While a receivership order is the subject of an active appeal—particularly following a previous appeal that vacated a similar receivership—a district court should not permit a receiver to permanently dispose of a defendant's assets.  That pending appeal also challenges the propriety of specific transactions undertaken by the Receiver and approved by this Court permanently disposing of receivership estate property.

It is black letter law that district courts, when having resolved serious legal questions for which an appeal is pending or forthcoming, should avoid actions that cannot be later undone if the appeal is successful.  *Coastal Corp. v. Tex. E. Corp.*, 869 F.2d 817, 820 (5th Cir. 1989) (holding that district courts must "maintain[] the status quo" pending appeal); *Griggs v. Provident Consumer Disc. Co.,* 459 U.S. 56, 58 (1982) ("The filing of a notice of appeal is an event of jurisdictional significance—it confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal."); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. C 07-01827 SI, 2013 WL 6055079, at *2 (N.D. Cal. Nov. 13, 2013) (citing *McClatchy Newspapers v. Cent. Valley Typographical Union No. 46, Intern. Typographical Union*, 686 F.2d 731, 735 (9th Cir. 1982), *amended sub nom. Mcclatchy Newspaper v. Local 46*

(9th Cir. Sept. 22, 1982)) ("During the pendency of an appeal, the Court may act to preserve the status quo, but may not take actions that alter any substantial rights on appeal or that cannot later be undone."). The ratification the Receiver seeks here is exactly the type of irrevocable action that courts have rightly and regularly steered clear of. It would be wholly inappropriate to allow further disposition of the receivership estate's legal rights, as the Motion at issue contemplates, during the pendency of Barton's appeal. Doing so would disregard the role and undermines the supremacy of the appellate court. If granted, the Receiver's request would set in motion a chain of events that would be exceedingly difficult and expensive to unwind, if such an outcome is ultimately even possible at all. As this Court has previously acknowledged, property rights are held sacred in our Country and not to be abridged without process. This Motion, if granted, would deny that process.

And unlike prior sale transactions this Court has confronted, the claims and interest at issue here are frozen and are costing the estate exactly nothing. There is no interest accruing. There is no value being destroyed by the passage of time. There is no need for speed.

**C.     Granting the Motion Would Result in Disposal of Real Property Interests and, Thus, Improperly Circumvent 28 U.S.C. § 2001.**

The Receiver also cannot dispose of any "realty or interest or any part thereof" without first complying with 28 U.S.C. § 2001. Yet, here, the Receiver's Motion makes only a passing and incorrect conclusion as to the statute's application.

There is no dispute—or at least there should not be—that the Receiver attempts to dispose of the receivership's realty interests. Encumbrances on the fee simple property are direct interests in realty, and their disposition is governed by 28 U.S.C. § 2001. To the extent the Receiver may argue in reply that 28 U.S.C. § 2001 only applies to the sale of an entire fee simple property, that argument would be incorrect. The statute not only applies to the sale of entire fee simple estates, but also to any "interest or any part thereof." 28 U.S.C. § 2001(b). And a party can buy, hold, and

sell many different types of interests in realty other than fee simple title.  For example, any "liens, claims, easements, [] servitudes" or other "encumbrance[s]" are "interest[s] in realty."  *Anadarko E & P Co., LP v. Clear Lake Pines, Inc.*, No. 03-04-00600-CV, 2005 WL 1583506, at *3 (Tex. App.–Austin July 7, 2005, no pet.).  Other examples of realty include unaccrued royalty interests, even if these interests are non-participating in nature.  *Id.; see also Quigley v. Bennett*, 227 S.W.3d 51, 54 (Tex. 2007) ("An overriding royalty interest in an oil and gas lease is considered an interest in real estate . . . .");  *Cane Tenn., Inc. v. United States*, 60 Fed. Cl. 694, 699 (2004) (addressing other state law that a "non-participating royalty interest" may be "classified as realty"). !  Participation agreements are also used to convey realty interests.  *See Conocophillips Co. v. Dahlberg*, No. CIV.A. C-10-285, 2011 WL 710604, at *7 (S.D. Tex. Feb. 22, 2011). !

Because the settlement agreement disposes of the receivership's real property interests for cash consideration, it constitutes a de facto sale of those interests and falls within the ambit of 28 U.S.C. § 2001.  The Court may not, therefore, merely approve of the settlement agreement without ensuring compliance with § 2001's requirements.

Because the receivership order is on appeal, this Court does not possess jurisdiction to modify the order and expand the scope of the Receiver's authority.  Because the Receiver is, as outlined above, required by 28 U.S.C. § 2001 to seek the Court's approval to expand the Receiver's authority to sell the real property (or, as is the case here, the interest therein) held in the receivership estate, without such approval he would unquestionably not be able to.  The Receiver is, for purposes of a jurisdictional analysis or otherwise, requesting the Court to expand his jurisdiction while an appeal of that very jurisdiction is pending before the Fifth Circuit.

According to the Fifth Circuit, "[t]he filing of a timely and sufficient notice of appeal transfers jurisdiction over matters involved in the appeal from the district court to the court of

appeals. The district court is divested of jurisdiction to take any action with regard to the matter except in aid of the appeal." *In re Fort Worth Chamber of Com.*, 100 F.4th 528, 536 (5th Cir. 2024). The Fifth Circuit reviewed other cases to determine whether procedural orders concern "the aspects of the case on appeal." *Id.* (considering whether a Texas federal court had jurisdiction to transfer a case to a District of Columbia federal court while an appeal of a failure to grant a preliminary injunction was pending). The question before this Court is much simpler, as it is incontrovertible that the District Court lacks jurisdiction to enlarge or alter one of the actual orders being appealed—here, the order imposing a receivership. *See, e.g.*, *City of Cookeville, Tenn. v. Upper Cumberland Elec. Membership Corp.*, 484 F.3d 380, 394 (6th Cir. 2007).

The Court's order imposing the current receivership authorizes and requires the Receiver to both "take such action as necessary and appropriate for the preservation of Receivership Property or to prevent the dissipation, concealment, or inequitable distribution of Receivership Property" and "pursue, resist, defend, compromise or otherwise dispose of all suits, actions, claims, and demands which may now be pending or which may be brought by or asserted against the Receivership Entities." Order Appointing Receiver (Dkt. No. 418) at 7-8. The Receiver asserts that the proposed settlement resolves an interest in property that is not real estate. As a result, he relies on a separate provision of the receivership order to contend that the Court's authorization is not necessary here. *See id.* ¶ 39. That provision allows the Receiver to, "without further Order of th[e] Court, transfer, compromise, or otherwise dispose of any Receivership Property, *other than real estate*, in the ordinary course of business, on terms and in the manner the Receiver deems most beneficial to the Receivership Estate, and with due regard to the realization of the true and proper value of such Receivership Property." *Id.* (emphasis added).

But, as discussed above, the interest here is indeed one in real estate, and the Receiver does not possess authority to transfer it without an appropriate order from this Court. The Receiver either intentionally or mistakenly miscategorized this transaction as one that would not require the Court's approval (and, thus, expand his current authority), but then nonetheless seeks such approval, apparently in accordance with the proposed deal he struck with Lumar and Dixon. Regardless, there are several steps in this process that would prevent execution of the transaction. First, the Receiver would need to seek the Court's approval of disposition of a real estate interest, then the Court would need to hold a hearing under 28 U.S.C. § 2001 to determine whether the sale was appropriate, and then the Court would need to wait until the pending appeal before the Fifth Circuit was resolved.

In reality, the Receiver attempts to expedite the dissipation of the relevant property by settling these claims at a significantly undervalued price. In doing so, the Receiver seeks to expand the power granted to it by acting contrarily to the Court's previous commands, indeed, while the existence and proper scope of the Receiver's authority is being challenged by a pending appeal. This Court lacks the authority to grant it. *Cf. SEC v. Kirkland*, No. 606CV-183-ORL-28KRS, 2006 WL 3333672, at *1 (M.D. Fla. Nov. 16, 2006) (reasoning that, where preexisting order required receiver to seek authority before selling real property, conferring such authority would constitute modification of the scope of the order on appeal).

The Receiver is requesting that this Court expand the scope of his authority to enter the settlement, but, as a result of appeal of the new receivership order pending before the Fifth Circuit, the Court cannot presently modify the scope of the receivership order for this purpose.

## IV.    CONCLUSION & PRAYER

For the foregoing reasons, Defendant Timothy Barton respectfully requests that the Court deny the Receiver's Verified Motion to Ratify BM318, LLC's Settlement Agreements with the Dixon Water Foundation and Lumar Land & Cattle, LLC.  At a minimum, the Court should require the settlement agreements to proceed under 28 U.S.C. § 2001, following an evidentiary hearing, and should delay approval of those settlements until such a time as the Receiver provides sufficient information to determine the value of the rights the receivership estate is trading away and the Receiver's efforts, if any, to preserve those rights.

Dated: July 29, 2024

Respectfully submitted,

By: */s/ Michael J. Edney*
Michael J. Edney
Virginia Bar No. 48253
DC Bar No. 492024 (*admitted to N.D. Tex.*)
medney@huntonak.com
**HUNTON ANDREWS KURTH LLP**
2200 Pennsylvania Avenue NW
Washington, DC 20037
Phone: (202) 955-1500
Facsimile: (202) 778-2201

**COUNSEL FOR TIMOTHY LYNCH BARTON**

## CERTIFICATE OF SERVICE

On July 29, 2024 I filed the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas. I hereby certify that I have served the document on all counsel and/or pro se parties of record by a manner authorized by Federal Rules of Civil Procedure 5(b)(2).

*/s/ Michael J. Edney*
Michael J. Edney

-16-