IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § § § | |
| *Plaintiff,* | § § § | |
| v. | § § § | No. 3:22-CV-2118-X |
| TIMOTHY LYNCH BARTON | § | |
| CARNEGIE DEVELOPMENT, LLC | § | **Jury Trial Demanded** |
| WALL007, LLC | § | |
| WALL009, LLC | § | |
| WALL010, LLC | § | |
| WALL011, LLC | § | |
| WALL012, LLC | § | |
| WALL016, LLC | § | |
| WALL017, LLC | § | |
| WALL018, LLC | § | |
| WALL019, LLC | § | |
| HAOQIANG FU (a/k/a MICHAEL FU) | § | |
| STEPHEN T. WALL | § | |
| | § | |
| *Defendants,* | § § | |
| DJD LAND PARTNERS, LLC | § | |
| LDG001, LLC | § | |
| | § | |
| *Relief Defendants.* | § | |

**APPENDIX IN SUPPORT OF DEFENDANT BARTON'S RESPONSE TO
RECEIVER'S VERIFIED MOTION TO RATIFY BM318, LLC'S SETTLEMENT
AGREEMENTS WITH THE DIXON WATER FOUNDATION AND
LUMAR LAND & CATTLE, LLC AND BRIEF IN SUPPORT**

Defendant Timothy L. Barton files this Appendix in Support of his Response in opposition

to the Receiver's Verified Motion to Ratify BM318, LLC's Settlement Agreements with the Dixon

Water Foundation and Lumar Land & Cattle, LLC and Brief in Support. The Appendix has been

consecutively paginated App. 001 –App. 050 as follows:

**App. 001**

| APPENDIX PAGE | DOCUMENT |
|---|---|
| App. 003 – 016 | Affidavit of Joyce W. Lindauer, dated July 29, 2024 |
| App. 017 - 040 | *BM318, LLC v. Lumar Land & Cattle, LLC*, No. 20-42789, Plaintiff's Original Answer to Plaintiff-on-Intervention Lumar Land and Cattle, LLC's Original Complaint in Intervention for Declaratory Judgment and Counterclaims Against Intervenor, dated March 21, 2022 |
| App. 041 – 050 | Affidavit of Debbie Farah, dated July 29, 2024 |

Dated: July 29, 2024

Respectfully submitted,

By: */s/ Michael J. Edney*
Michael J. Edney
Virginia Bar No. 48253
DC Bar No. 492024 *(Admitted to NDTX)*
medney@huntonak.com
**HUNTON ANDREWS KURTH LLP**
2200 Pennsylvania Avenue NW
Washington, DC 20037
Phone: (202) 955-1500
Facsimile: (202) 778-2201

**COUNSEL FOR TIMOTHY LYNCH BARTON**

## CERTIFICATE OF SERVICE

On July 29, 2024 I filed the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas. I hereby certify that I have served the document on all counsel and/or pro se parties of record by a manner authorized by Federal Rules of Civil Procedure 5(b)(2).

*/s/ Michael J. Edney*
Michael J. Edney

**RESPONSE APPENDIX – Page 2**

**App. 002**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

SECURITIES AND EXCHANGE      §
COMMISSION,                  §
    Plaintiff,               §
                             §
v.                           §    NO. 3:22-CV-2118-X
                             §
TIMOTHY LYNCH BARTON, et al., §
    Defendants.              §

### AFFIDAVIT OF JOYCE W. LINDAUER

STATE OF TEXAS          §
                        §
COUNTY OF DALLAS        §

I, Joyce W Lindauer, of Joyce W. Lindauer Attorney, PLLC, prior attorney for BM318 LLC, State Bar No. 21555700, located at 1412 Main St., Suite 500 Dallas, Texas 75202, do hereby swear under oath that:

1.    My name is Joyce W. Lindauer. I served as the attorney for BM318 in its bankruptcy case, Case No. 20-42789-mxm in the United States Bankruptcy Court for the Northern District of Texas, Fort Worth Division (the "Bankruptcy Court").

2.    A bankruptcy plan was duly approved, which included adversary litigation, and in such litigation I represented BM318 (Adversary No. 21-04051). A true and correct copy of the Complaint is attached hereto as **Exhibit "1"** and incorporated by this reference as if set forth in full.

3.    The litigation included seeking damages for wrongful acts by Dixon Water Foundation and Lumar Land & Cattle, LLC represented by Jim Martin. BM318 entered into a purchase and sale agreement for the property, involving a significant financial commitment, including millions of dollars paid at closing and ongoing interest payments on an aspect of the transaction with seller provided financing during the period of ownership. Additionally, tens of thousands of dollars were paid as deferment fees on those seller-provided financing.

Affidavit of Joyce W. Lindauer
Page 1

**App. 003**

4. During the Covid pandemic and the freezing of the residential real estate development market, BM318 LLC fell behind on its payments to the Dixon Water Foundation. To address this situation, BM318 agreed to return the title to the property to the Dixon Water Foundation, in exchange for the right to repurchase the property for $27 million within a certain period of time.

5. As the time for exercising the repurchase option approached in 2019, BM318 again relied on its previously-retained real estate broker named Jim Martin to present BM318's repurchase offer for the property. At the Dixon Board meeting convened for hearing BM318's offer, Martin did not present BM318's offer but instead presented an offer that he had arranged from a purchasing group that he led.

6. It was revealed during the discussions with Dixon Water Foundation that Jim Martin, the real estate broker with fiduciary responsibility to BM318, appeared to have engaged in self-dealing and obtained ownership of a property for his own benefit under the name Lumar Land & Cattle.

7. Jim Martin attended a Board meeting of the Dixon Water Foundation as BM318's representative. Without BM318's knowledge, he presented a competing offer and successfully negotiated the purchase of the property for himself, thereby causing harm to BM318 and breaching his fiduciary duty.

8. At no point did the receivership attorney Charlene Koonce, or the receiver, Mr. Cort Thomas, contact me to gain a good understanding of the original bankruptcy proceedings or the adversary proceeding, but seem to have relied exclusively on what the opposing parties may have told them. They did not request all the litigation files, seek my opinion, or review the case details with me. No attempts were made that I am aware of to get an update on the value of the claims or the reasons behind the litigation initiated by BM318 against Lumar Land & Cattle and the Dixon Water Foundation.

9. My firm would not pursue litigation without good cause. The settlement amount that

Affidavit of Joyce W. Lindauer
Page 2

**App. 004**

has been accepted is insufficient, as the legal fees alone exceeded the settlement amount. Furthermore, during the bankruptcy hearing to approve the settlement, an offer of $200,000 was presented to acquire the claims and was not accepted, despite being higher than the current settlement amount. There was no negotiation involving BM318, its principals or its prior attorneys to try to obtain the highest amount for the settlement.

10. Prior to the receivership, there had been discussions indicating that the Dixon Water Foundation may be open to a settlement which might include selling the property at an agreed price. After the Receiver's intervention there were no further discussions that I am aware of to pursue these types of options.

11. Based on my professional opinion, the current settlement that the Receiver has proposed for approval likely undervalues the pending litigation – even given that an offer was made to acquire the litigation for more than the settlement amounts.

12. Under penalty of perjury, I hereby declare and affirm that the above stated facts, to the best of my knowledge, are true and correct.

DATED this 29th day of July, 2024.

Joyce W. Lindauer

## NOTARY ACKNOWLEDGMENT

STATE OF TEXAS §
§
COUNTY OF DALLAS §

The foregoing instrument was acknowledged before me this 29th day of July, 2024, by Joyce W. Lindauer, who is personally known to me or satisfactorily proven to me to be the person whose name is subscribed to the within instrument.



Affidavit of Joyce W. Lindauer
Page 3

DIAN GWINNUP
Notary Public, State of Texas
Comm. Expires 01-22-2025
Notary ID 4210918

**App. 005**

Notary Public in and for the State of Texas
Notary ID No. __4210918_____
Printed Name: __Dian Gwinnup_____
My Commission Expires: January 22, 2025

Affidavit of Joyce W. Lindauer
Page 4

**App. 006**

# EXHIBIT "1"

Joyce W. Lindauer
State Bar No. 21555700
Kerry S. Alleyne
State Bar No. 24066090
Guy H. Holman
State Bar No. 24095171
Joyce W. Lindauer Attorney, PLLC
1412 Main Street, Suite 500
Dallas, Texas 75202
Telephone: (972) 503-4033
Facsimile: (972) 503-4034
ATTORNEYS FOR DEBTOR

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| **IN RE:** | § | |
| | § | |
| **BM318, LLC,** | § | **CASE NO. 20-42789-mxm-11** |
| | § | |
| **DEBTOR.** | § | **CHAPTER 11** |

| | | |
|---|---|---|
| **BM318, LLC,** | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **ADVERSARY PROCEEDING** |
| **THE DIXON WATER FOUNDATION,** | § | **NO. _____** |
| **Defendant.** | § | |

### COMPLAINT TO AVOID AND RECOVER PREFERENTIAL AND/OR
### FRAUDULENT TRANSFER PURSUANT TO 11 U.S.C. §§ 548 AND 550

Comes now BM318, LLC, debtor and plaintiff herein ("Plaintiff") and files this its

Complaint to Avoid and Recover Preferential and/or Fraudulent Transfer, and would show as

follows:

### I. NATURE OF THE CASE

1.      The Debtor filed its voluntary petition commencing its Chapter 11 bankruptcy case

on September 1, 2020.

2.      This adversary proceeding is commenced pursuant to sections 547, 548 and 550 of

chapter 11 of title 11 of the United States Code ("Bankruptcy Code") to avoid and recover from

Complaint to Avoid and Recover Preferential and/or
Fraudulent Transfer Pursuant to 11 U.S.C. §§ 548 and 550
Page 1

Defendant, or from any other person or entity for whose benefit the transfer was made, preferential and/or fraudulent transfers of property made by Debtor that occurred during the 90-day or two-year period, respectively, prior to the commencement of the Debtor's bankruptcy case.

## II.  JURISDICTION AND VENUE

3.      This Court has jurisdiction of this adversary proceeding, which arises under the Bankruptcy Code and relates to the above-captioned Chapter 11 Case pending in the United States Bankruptcy Court for the Northern District of Texas ("Court"), pursuant to 28 U.S.C. §§ 157 and 1334(b).

4.      This adversary proceeding is a "core" proceeding to be heard and determined by this Court, pursuant to 28 U.S.C. § 157(b)(2).

5.      Venue is proper in this district pursuant to 28 U.S.C. § 1409.

6.      The statutory and legal predicates for the relief sought herein are sections 547, 548 and 550 of the Bankruptcy Code and Rules 3007 and 7001 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules").

7.      Pursuant to Bankruptcy Rule 7008, the Plaintiff consents to entry of final orders or judgments by this Court.

## III.  PARTIES

8.      The Plaintiff is a limited liability company organized under the laws of the State of Texas.

9.      The Defendant is a non-profit corporation organized under the laws of the State of Texas, with offices located at 4528 County Road 398, Decatur, Texas 76234 and at P.O. Box 177, Marfa, Texas 79843.  The Defendant may also be served with process by first class U.S. mail at the address of its registered agent, David M. Rosenberg, 1722 Routh Street, Suite 1500, Dallas,

Complaint to Avoid and Recover Preferential and/or
Fraudulent Transfer Pursuant to 11 U.S.C. §§ 548 and 550
Page 2

**App. 009**

Texas 75201 or at the offices of the Defendant's President, Robert Potts, at either of the aforementioned addresses in Decatur and Marfa, Texas.

## IV. FACTS

10.     On November 26, 2018, the Plaintiff, pursuant to a Farm and Ranch Contract, purchased from the Defendant 2055.70 acres of unimproved real property in Parker County, Texas for $35,461,480.00 known as Bear Creek Ranch.   The Plaintiff paid $2,100,000.00 cash at closing and Defendant financed the remaining $32,946,900.00 over five years pursuant to a loan agreement (the "Loan") and promissory note (the "Note") maturing on November 26, 2023 which was secured by a Deed of Trust, Security Agreement and Financing Statement (the "Deed of Trust") on the 2055.70 acres save and except a 118.34 acre tract (which remained unencumbered) recorded under document number 2025-262749 in the real property records of Parker County, Texas.

11.     During the term of the Note, Plaintiff was required to make quarterly interest payments based on annual rate of 5.5% along with a principal reduction payment of $6,494,000.00 on May 25, 2019.

12.     Between July 26, 2019 and February 27, 2020, Plaintiff and Defendant entered into a series of Loan modification agreements under which certain payment deadlines were extended and under which Plaintiff was to sell certain parcels of land from 1,937.36 acres that were encumbered by the Deed of Trust from which payments were made to Defendant on the accrued interest and/or principal as follows:

> a.     On September 11, 2019, 381.66 acres were sold with $7,081,004 being paid
>
> to Defendant consisting of $6,494,000 in principal and $587,004 in interest.

Complaint to Avoid and Recover Preferential and/or
Fraudulent Transfer Pursuant to 11 U.S.C. §§ 548 and 550
Page 3

b.    January 30, 2020, 23.95 acres were sold with $407,150 of accrued interest being paid to Defendant leaving Plaintiff with 1,531.75 acres encumbered by the Deed of Trust ("Remaining Land").

13.    The last modification of the Loan occurred on February 27, 2020 which included a Deed in Escrow Agreement (the "Loan Amendment") which extended the deadline to remit the accrued interest and principal balance to July 1, 2020.  The Plaintiff executed a special warranty deed to Remaining Land (the "Deed") that was to be held in escrow unless and until Plaintiff defaulted upon which the Defendant would be permitted to record the deed in satisfaction of Plaintiff's obligations to Defendant.

14.    On June 26, 2020, in anticipation of Defendant recording the Deed, Defendant and JMJ Development, LLC ("JMJ"), an entity related to Plaintiff, entered into a "Real Estate Sales Agreement" ("Buyback Contract") for the purchase of the Remaining Land from Defendant for the purchase price of $27,500,658.00  which was to close on August 31, 2020.  Plaintiff had 3 options to extend the Closing Date by thirty (30) days each in exchange for depositing $50,000 with the title company for each option.    Under the Buyback Contract, Seller was to provide secondary financing at closing equal to $7,500,000 under a five year promissory note at 12% interest for pre-development, development, and other business purposes.

15.    On July 1, 2020, Plaintiff was unable to payoff the Note and amounts owed equal to $27,500,658.00 as modified and on July 2, 2020, the Defendant recorded the Deed pursuant to the Deed in Escrow Agreement, thus transferring the Property to the Defendant.

16.    After exercising one of the options to extend the Closing under the Buyback Contract, Defendant asserted a default and terminated the Buyback Contract on or about October 15, 2020.  Shortly thereafter, Defendant sold a portion of the Encumbered Land to the

Complaint to Avoid and Recover Preferential and/or
Fraudulent Transfer Pursuant to 11 U.S.C. §§ 548 and 550
Page 4

broker (or a related person or entity) who had represented Plaintiff under the original purchase agreement to acquire the 2055 acres from Defendant.

## V. CLAIMS FOR RELIEF

## COUNT I

### (Avoidance of Preferential Transfer – 11 U.S.C. § 547)

17.    Plaintiff hereby incorporates all previous allegations as though fully set forth herein.

18.    During the 90-day period prior to the filing of the Plaintiff's bankruptcy case (the "Preference Period"), pursuant to the Deed the Debtor transferred to the Defendant the Property (the "Transfer"), which had an approximate value of $27.5 million or more.

19.    The Transfer constituted a transfer of an interest in property of the Debtor.

20.    During the Preference Period, Defendant was a creditor at the time of the Transfer by virtue of the Loan and Note, for which the Plaintiff was obligated to pay.

21.    The Transfer was to or for the benefit of a creditor within the meaning of Section 547(b)(1) of the Bankruptcy Code, because the Transfer either reduced or fully satisfied a debt or debts then owed by the Plaintiff.

22.    The Transfer was made for, or on account of, an antecedent debt owed by the Plaintiff to Defendant before such Transfer was made, as asserted by Defendant and memorialized in the Deed in Escrow Agreement, which constituted a "debt" or "claim" (as those terms are defined in the Bankruptcy Code) of Defendant prior to being paid by the Plaintiff.

23.    The Transfer was made while the Plaintiff was insolvent. Plaintiff is entitled to the presumption of insolvency for the Transfer made during the Preference Period pursuant to Section 547(f) of the Bankruptcy Code.

Complaint to Avoid and Recover Preferential and/or
Fraudulent Transfer Pursuant to 11 U.S.C. §§ 548 and 550
Page 5

24.    The Transfer was made during the Preference Period.

25.    As a result of the Transfer, Defendant received more than Defendant would have received if: (i) the Plaintiff's bankruptcy case was under chapter 7 of the Bankruptcy Code; (ii) the Transfer had not been made; and (iii) Defendant received payments of its debts under the provisions of the Bankruptcy Code.

26.    In accordance with the foregoing, the Transfer is avoidable pursuant to Section 547(b) of the Bankruptcy Code.

27.    Defendant was the initial transferee of the Transfer.

28.    Based upon the foregoing, Plaintiff is entitled to an order and judgment against Defendant: (i) avoiding the Transfer under section 547(b) of the Bankruptcy Code; and (ii) entitling Plaintiff to recover the Transfer or the value of the Transfer from Defendant under Section 550(a) of the Bankruptcy Code, together with the award of pre- and post-judgment interest thereon from the date of demand to the date of payment or other satisfaction of such order and judgment and the costs of this action.

## COUNT II

### (Avoidance of Fraudulent Conveyance – 11 U.S.C. §§ 548(a)(1)(B))

29.    Plaintiff hereby incorporates all previous allegations as though fully set forth herein.

30.    To the extent that the Transfer was not on account of an antecedent debt, the Plaintiff did not receive reasonably equivalent value in exchange for such transfer ("Potentially Fraudulent Transfer"); and

      a.    The Plaintiff was insolvent on the date that the Transfer(s) was made or became insolvent as a result of the Transfer(s);

Complaint to Avoid and Recover Preferential and/or
Fraudulent Transfer Pursuant to 11 U.S.C. §§ 548 and 550
Page 6

b.  The Plaintiff was engaged in a business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the Plaintiff was an unreasonably small capital; or

c.  The Plaintiff intended to incur, or believed that it would incur, debts that would be beyond its ability to pay as such debts matured.

31.  The Potentially Fraudulent Transfer is avoidable pursuant to Section 548(a)(1)(B) of the Bankruptcy Code.

## COUNT III

### (Recovery of Avoided Transfers – 11 U.S.C. § 550)

32.  Plaintiff incorporates all preceding paragraphs as if fully re-alleged herein.

33.  Plaintiff is entitled to avoid the Transfer and any Potentially Fraudulent Transfer pursuant to Sections 547 and 548 of the Bankruptcy Code (collectively, "Avoided Transfer").

34.  Defendant was the initial transferee of the Avoided Transfer or the immediate or mediate transferee of such initial transferee or the person for whose benefit the Avoided Transfer was made.

35.  Pursuant to Section 550(a) of the Bankruptcy Code, Plaintiff is entitled to recover the Avoided Transfer from Defendant, plus the costs of this action.

## COUNT IV

### (Disallowance of All Claims – 11 U.S.C. § 502(d) and (j))

36.  Plaintiff incorporates all preceding paragraphs as if fully re-alleged herein.

37.  Defendant is an entity from which property is recoverable under Section 550 of the Bankruptcy Code.

Complaint to Avoid and Recover Preferential and/or
Fraudulent Transfer Pursuant to 11 U.S.C. §§ 548 and 550
Page 7

**App. 014**

38.    Defendant is a transferee of the Avoided Transfer avoidable under Sections 547 and/or 548 of the Bankruptcy Code.

39.    Defendant has not turned over the Property or paid the value of the Avoided Transfer, for which Defendant is liable under Section 550 of the Bankruptcy Code.

40.    Pursuant to Section 502(d) of the Bankruptcy Code, any and all claims of Defendant against the Plaintiff's chapter 11 estate must be disallowed until such time as Defendant turns over the Property to the Plaintiff or pays to Plaintiff an amount equal to the value of the Avoided Transfer, plus interest thereon and costs.

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that this Court grant relief and enter a judgment against Defendant as follows:

A.    that the Avoided Transfer avoidable under Sections 547 and/or 548 of the Bankruptcy Code, be avoided;

B.    that the Avoided Transfer, to the extent that it is avoided pursuant to Sections 547 and/or 548 of the Bankruptcy Code, be recovered by Plaintiff pursuant to Section 550 of the Bankruptcy Code;

C.    that any and all claims held by Defendant be disallowed in accordance with Section 502(d) of the Bankruptcy Code until Defendant satisfies the judgment;

D.    that pre-judgment interest be awarded at the maximum legal rate running from the date of filing of the Complaint to the date of judgment herein;

E.    that post-judgment interest be awarded at the maximum legal rate running from the date of judgment herein until the date the judgment is paid in full, plus costs;

Complaint to Avoid and Recover Preferential and/or
Fraudulent Transfer Pursuant to 11 U.S.C. §§ 548 and 550
Page 8

**App. 015**

F.    that Defendant be required to turn over the Property and/or pay forthwith the judgment amount awarded in favor of Plaintiff; and

G.    that the Plaintiff be granted such other and further relief as the Court deems just and proper.

Dated: August 10, 2021.

Respectfully submitted,

_/s/ Joyce W. Lindauer_
Joyce W. Lindauer
State Bar No. 21555700
Guy H. Holman
State Bar No. 24095171
Kerry S. Alleyne
State Bar No. 24066090
Joyce W. Lindauer Attorney, PLLC
1412 Main St., Suite 500
Dallas, Texas 75202
Telephone: (972) 503-4033
Facsimile: (972) 503-4034
Email: joyce@joycelindauer.com
        guy@joycelindauer.com
        kerry@joycelindauer.com

ATTORNEYS FOR BM318, LLC, PLAINTIFF
AND DEBTOR

Complaint to Avoid and Recover Preferential and/or
Fraudulent Transfer Pursuant to 11 U.S.C. §§ 548 and 550
Page 9

**App. 016**

Joyce W. Lindauer
State Bar No. 21555700
Sydney A. Ollar
State Bar No. 24125932
Austin Y. Taylor
Louisiana Bar No. 37325
Joyce W. Lindauer Attorney, PLLC
1412 Main St., Suite 500
Dallas, Texas 75202
Telephone: (972) 503-4033
Facsimile: (972) 503-4034
ATTORNEYS FOR DEBTOR/PLAINTIFF

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### FORT WORTH DIVISION

| | | |
|---|---|---|
| IN RE: | § § | |
| BM318, LLC, | § § | CASE NO. 20-42789-mxm-11 |
| DEBTOR. | § | CHAPTER 11 |

| | | |
|---|---|---|
| BM318, LLC, | § | |
| Plaintiff, | § § | |
| v. | § | ADVERSARY NO. 21-04051 |
| | § § | |
| DIXON WATER FOUNDATION, | § | |
| Defendant. | § § | |
| LUMAR LAND & CATTLE, LLC | § § | |
| Plaintiff-in-Intervention | § | |

### PLAINTIFF'S ORIGINAL ANSWER TO PLAINTIFF-IN-INTERVENTION LUMAR LAND AND CATTLE, LLC'S ORIGINAL COMPLAINT IN INTERVENTION FOR DECLARATORY JUDGMENT AND COUNTERCLAIMS AGAINST INTERVENOR

TO THE HONORABLE UNITED STATES BANKRUPTCY COURT:

COMES NOW BM318, LLC, Plaintiff in the above-styled and numbered cause, and files

this its *Original Answer to Plaintiff-in-Intervention Lumar Land & Cattle, LLC's Original*

*Complaint and Counterclaims Against Intervenor* (respectively, "**Lumar**", "**Answer**",

"**Complaint**," and "**Counterclaim**"), and would respectfully show the Court as follows:

Plaintiff's Original Answer to Plaintiff-in-Intervention Lumar Land & Cattle, LLC's Original
Complaint in Intervention for Declaratory Judgment and Counterclaims Against Intervenor
Page 1

**App. 017**

## I.     PARTIES

1.      Plaintiff admits the allegation in Paragraph 1 of the Complaint concerning Lumar's status as a Texas limited liability company.

2.      Plaintiff admits the allegation in Paragraph 2 of the Complaint concerning Plaintiff's status as a Texas limited liability company

3.      Plaintiff admits the allegation in Paragraph 3 of the Complaint concerning The Dixon Water Foundation's ("**Dixon**" or "**Defendant**") status as a Texas non-profit corporation.

## II.     JURISDICTION AND VENUE

4.      Plaintiff admits the allegations in Paragraph 4 of the Complaint regarding the Court's jurisdiction over this core adversary proceeding.

5.      Plaintiff admits the allegation in Paragraph 5 of the Complaint that the Court has jurisdiction over this declaratory judgment action pursuant to the referenced authorities, but denies that declaratory judgment is appropriate in this instance. Plaintiff denies that an actual and substantial controversy exists between the parties because Lumar is unable to qualify as a good faith transferee and bona fide purchaser for value of the real property implicated in this adversary proceeding.

6.      Plaintiff admits the allegation in Paragraph 6 of the Complaint that venue is proper in this district.

## III.     FACTUAL BACKGROUND

7.      Plaintiff admits the allegation in Paragraph 7 of the Complaint concerning Plaintiff's execution of a Special Warranty Deed to Dixon conveying approximately 1,531.75

Plaintiff's Original Answer to Plaintiff-in-Intervention Lumar Land & Cattle, LLC's Original
Complaint in Intervention for Declaratory Judgment and Counterclaims Against Intervenor
Page 2

**App. 018**

acres ("**Remaining Property**")[1], which remained out of the 2055,70 ("**Original Property**") acres that had been acquired by Plaintiff from Dixon, that occurred on February 18, 2020, but that such Deed was held in escrow and subsequently filed on the referenced date of July 2, 2020 upon which any conveyance under such deed became effective

8.      Plaintiff admits the allegation in Paragraph 8 of the Complaint regarding Dixon's execution of a Special Warranty Deed with Vendor's Lien conveying the referenced 204.50-acre parcel of the aforementioned tract to Lumar on the referenced date to the extent such document is an accurate reflection of such allegation.

9.      Plaintiff admits the allegations in Paragraph 9 concerning the facts that no adversary proceeding, lis pendens, or claims for possession of or title to the aforementioned parcel had been filed against Lumar at the time Lumar purchased the parcel. Notably, however, a right to avoid the transfer of the Remaining Property from Plaintiff to Dixon existed at the time of the subsequent transfer of the 204.50 parcel, and Lumar, knew or should have known that Plaintiff had a right to avoid the original transfer.  Such claims were identified in the bankruptcy case. Lumar is imputed with the knowledge of Jim Martin ("**Martin**") as its managing member. Martin represented, consulted to, and/or served as the real estate agent to Plaintiff, including with regard to the transaction giving rise to Plaintiff's adversary proceeding and who physically managed the Property including all tracts that had been originally acquired by Plaintiff and subsequently sold. Martin is a Texas licensed real estate agent (License #190058) for Railhead Realty, LLC ("**Railhead**"), whose real estate broker, Ron Hughes ("**Hughes**"), serves as his sponsoring broker. As a licensed real estate agent to Plaintiff, Martin owed certain fiduciary duties to Plaintiff

---

[1] As further described in this Complaint, the 1,531,75 acres making up the Remaining Property was the result of (i) Plaintiff acquiring an unencumbered 118.34 acres free and clear upon acquisition of the Original Property; (ii) conveying 381.66 acres to GH Lumar JV which is related to Lumar; (iii) conveying 23.95 acres also to GH Lumar JV.

Plaintiff's Original Answer to Plaintiff-in-Intervention Lumar Land & Cattle, LLC's Original Complaint in Intervention for Declaratory Judgment and Counterclaims Against Intervenor
Page 3

**App. 019**

including duties of loyalty and care, to maintain confidentiality and not use confidential information for his own purposes, and to disclose any relevant and material information to Plaintiff that was related to the Remaining Property. Martin also worked for Plaintiff to obtain a municipal utility district known as the Bear Creek Ranch Municipal Utility District No. 1 of Parker County ("**MUD**") on the Original Property. Furthermore, Martin, through Railhead, provided Plaintiff with valuations in the form of Broker's Opinions of Value regarding the Remaining Property. In so doing, Martin, on behalf of Plaintiff, corresponded with the attorney who set up the MUD on or about December 4, 2020 to get a status of the MUD in order to include the MUD as part of the valuation of the Remaining Property.

10.    Plaintiff admits the allegation in Paragraph 10 of the Complaint concerning Plaintiff's complaint seeking to avoid the preferential and/or fraudulent transfer of the Remaining Property but not the entire 2055.70 acres which were originally acquired by Plaintiff from Defendant.

11.    Plaintiff admits the allegation in Paragraph 11 of the Complaint to the extent that Dixon filed its Answer, Affirmative Defenses and Counterclaim to the Plaintiff's complaint on the referenced date, but denies the applicability of the defenses, affirmative defenses, and counterclaims contained therein.

12.    Plaintiff admits the allegation in Paragraph 12 of the Complaint concerning Plaintiff's filing of its Notice of Lis Pendens but which was filed against the Remaining Property and not the Original Property and allegations concerning the location and date of said filing. Plaintiff admits that Lumar did not receive Notice of the Lis Pendens to the extent notice is required under section of the Texas Property Code. Plaintiff can neither admit nor deny how much time

Plaintiff's Original Answer to Plaintiff-in-Intervention Lumar Land & Cattle, LLC's Original
Complaint in Intervention for Declaratory Judgment and Counterclaims Against Intervenor
Page 4

**App. 020**

passed "since Lumar's purchase of the Lumar Property and Lumar had begun development of the Lumar Property."

13.     Plaintiff is unable to admit or deny the allegation in Paragraph 13 of the Complaint as to when Lumar became aware of the Lis Pendens.  Despite this, Plaintiff would reiterate that Dixon's transfer of the 204.50-acre parcel out of the Remaining Property to Lumar occurred while Plaintiff had the right to avoid the transfer of the entire tract from Plaintiff to Dixon and that Lumar had knowledge that Plaintiff intended to dispute or assert certain rights and claims related to the Remaining Property prior to Lumar's acquisition of the 204.50-acre parcel. Plaintiff also restates that Lumar, through Martin, either knew or should have known of such encumbrance.

14.     Plaintiff denies the allegation in Paragraph 14 of the Complaint that the Lis Pendens was improperly filed or that Lumar is a good faith transferee and bona fide purchaser for value of the 204.50-acre parcel, and as such is not entitled to a declaration of such status by this Court. Plaintiff denies the allegation that the lis pendens should be expunged as to the 204.50-acre parcel for the aforementioned reasons.

15.     Plaintiff reasserts its admissions and denials to the allegations in Paragraph 15 of the Complaint as stated *supra*.

16.     Plaintiff admits the allegations in Paragraph 16 of the Complaint as to the timing of Lumar's purchase of the 204.50-acre parcel to the extent such purchase occurred as reflected in the documents referenced by Lumar, and that said real property is affected by the Adversary Proceeding and Lis Pendens. For reasons mentioned heretofore, Plaintiff's claims to this real property is not improper despite Lumar's assertion to the contrary.

17.     Plaintiff denies the allegations in Paragraph 17 concerning Lumar's status as a good faith transferee and bona fide purchaser since Lumar either knew or should have known of the

Plaintiff's Original Answer to Plaintiff-in-Intervention Lumar Land & Cattle, LLC's Original
Complaint in Intervention for Declaratory Judgment and Counterclaims Against Intervenor
Page 5

aforementioned encumbrance on the real property. Furthermore, Martin used Plaintiff's confidential information and breached his fiduciary duties to Plaintiff when he acquired the Property on behalf of Lumar. Lumar cannot be the beneficiary of such bad acts.

18.    Plaintiff admits the allegation in Paragraph 18 to the extent Plaintiff did not send actual written notice of the Lis Pendens to Lumar. Plaintiff denies the assertion that the lis pendens is improper for the reason that it further denies the assertion that Lumar is a good faith transferee and bona fide purchaser for value as previously mentioned.

19.    Plaintiff denies the allegation in Paragraph 19 of the Complaint to the extent that 11 U.S.C. § 550(b) is not applicable since Lumar is not a good faith transferee since it either knew or should have known of the aforementioned encumbrance on the real property and because Lumar was the beneficiary of the aforementioned bad acts of its managing member, Martin

20.    Plaintiff denies the allegation in Paragraph 20 of the Complaint noting that Lumar is neither a good faith transferee nor a bona fide purchaser of the real property, and that expunging the Lis Pendens as to that real property is inappropriate.

## IV.    PLAINTIFF'S COUNTERCLAIMS AGAINST INTERVENOR

21.    Plaintiff incorporates by reference the foregoing facts and allegations asserted by Plaintiff and further asserts the following.

22.    Lumar is managed by its managing member, Martin, and as such, all actions and conduct of Lumar occur through Martin. Furthermore, Lumar possesses and acts with the knowledge of Martin and is imputed with the actions of Martin.

23.    Since 2018, Martin has served as the exclusive real estate agent for Plaintiff and its related entities for the purpose of identifying potential real estate acquisitions in Parker County and the surrounding areas, contracting to acquire such properties, and selling such properties.

Plaintiff's Original Answer to Plaintiff-in-Intervention Lumar Land & Cattle, LLC's Original
Complaint in Intervention for Declaratory Judgment and Counterclaims Against Intervenor
Page 6

App. 022

During the period following Plaintiff's acquisition of the Original Property through the recording of the Deed in Lieu on the Remaining Property, Martin physically managed the Remaining Property along with all property owned by Plaintiff's related entities in Parker County and nearby areas, including controlling access and managing hunting and grazing leases. Martin assisted with certain predevelopment work on the Remaining Land and all properties owned by Plaintiff's related entities in Parker County and nearby areas such as surveying, platting, permitting, budgeting, and land planning. Martin was also tasked with securing proposals from builders to purchase lots once developed on the Remaining Property. Martin was further involved with Plaintiff's efforts to modify the Loan with Dixon and refinance the Loan with potential third party lenders.

24.    On September 25, 2018, Plaintiff entered into the contract to acquire the Original Property from Defendant on which Martin is designated as the real estate agent and Railhead is listed as the broker. Dixon agreed to provide seller financing ("**Loan**") on the acquisition of the Property and secured the Loan with a first lien deed of trust on the Original Property less 118.34 acres which Plaintiff acquired free and clear. Such contract closed on November 27, 2018 upon which Martin was paid a real estate agent fee. Martin has also served as the real estate agent for other related entities of Plaintiff and their principal before and after this date.

25.    Martin worked on behalf of Plaintiff to obtain the MUD on the Property which was approved by Parker county on February 25, 2019 and enacted by the state legislature on or about May 16, 2019. On December 8, 2020, Martin further obtained an opinion from the law firm of Coats Rose regarding the status of the MUD and necessary action to correct the failure to obtain approval from the city of Weatherford as required.

Plaintiff's Original Answer to Plaintiff-in-Intervention Lumar Land & Cattle, LLC's Original
Complaint in Intervention for Declaratory Judgment and Counterclaims Against Intervenor
Page 7

App. 023

26.    Martin worked with and/or retained Chris Chevreaux ("**Chevreaux**") of Chevreaux & Associates to obtain appraisals on multiple tracts within the Original Property including (i) 46 lots on 118.34 acres on April 15, 2019; (ii) 118.34 acres on May 26, 2019; (iii) 381.66 acres on May 30, 2019; (iv) 405.61 acres on May 29, 2020. Similarly, Martin worked through or with his broker, Hughes at Railhead, to provide a broker's opinion of value on (i) June 4, 2019 for 118.34 acres including development of two acre lots on such property and (ii) August 22, 2020 for the Remaining Property which was who valued the property at $51,633,001 (an average of $33,708.50 per acre). From around September 11, 2020 through January of 2021 Martin and Hughes, the individual broker at Railhead, were working with Chevreaux to obtain additional appraisals on the Remaining Tracts for Plaintiff.

27.    Prior to the end of May 2019, Martin represented Plaintiff as its real estate agent in attempts to negotiate the purchase of 95 acres which was adjacent to the Original Property. However, the parties were unable to agree on terms.

28.    On July 26, 2019, Plaintiff entered into a contract to sell 381.66 acres of the Original Property to Lumar. Martin was designated as the real estate agent for both the buyer and seller. On the same date, Plaintiff and Lumar executed a contract under which Plaintiff would buyback the 381.66 acres. Martin was also designated as the real estate agent for both the buyer and seller for this transaction. Martin, on behalf of Lumar, assigned such agreement to GH Lumar JV, a Texas joint venture and general partnership between Lumar and Aledo West, LLC[2] ("**Aledo West**") which is an assumed name of both Lumar and Aledo West according to separate assumed name certificates filed with the Texas Secretary of State on September 11, 2019. On or about

---

[2] Aledo West LLC is owned and managed by Gary Hazlewood.

Plaintiff's Original Answer to Plaintiff-in-Intervention Lumar Land & Cattle, LLC's Original
Complaint in Intervention for Declaratory Judgment and Counterclaims Against Intervenor
Page 8

**App. 024**

September 1, 2019, the 381 acres was conveyed to GH Lumar JV.[3] The Plaintiff and Dixon had amended the terms of the Loan under which the sale proceeds would be paid to Dixon. Given that the sale proceeds were to be paid to the lender, Lumar was actually a party to the "Tri-Party Agreement" related to the first amendment on the loan from Dixon, which also included a deed in lieu of foreclosure. Similarly on or about January 31, 2020, Plaintiff sold 23.95 acres to GH Lumar JV, the proceeds of which were paid to Dixon as part of a modification of the Loan.

29.    On or about February 27, 2020 Dixon and Plaintiff further modified the terms of the Loan which included a final payoff that was due on July 1, 2020 and which required a deed conveying the Remaining Property to Dixon to be held in escrow and recorded upon a default by Plaintiff ("**Deed in Lieu**").

30.    On or about March 18, 2020 Martin served as the real estate agent on a contract to sell 118.34 acres to "Gary Hazlewood and/or assigns" ("**Hazlewood**"), which did not close. Hazlewood and Martin are both managers and/or owners of GH Lumar JV.

31.    On or about June 26, 2020 Plaintiff and Dixon executed an agreement under which Plaintiff could buy back the Remaining Property for an amount equal to the remaining amount owed under the Loan in the event Plaintiff defaulted and Dixon recorded the Deed in Lieu ("**First Buy Back Agreement**"). The closing was scheduled for August 31, 2020 but could be extended up to three times in thirty day increments upon paying a $50,000 extension fee for each extension.

32.    On July 1, 2020 Dixon asserted that Plaintiff was in default of the Loan. Dixon recorded the Deed in Lieu on July 2, 2020.

---

[3] Not to be confused with GH Lumar, LLC which was formed on June 5, 2020 by Lumar and Aledo West as a separate entity from GH Lumar JV because there is no plan of conversion filed and no record of GH Lumar JV being converted into GH Lumar, LLC.

Plaintiff's Original Answer to Plaintiff-in-Intervention Lumar Land & Cattle, LLC's Original
Complaint in Intervention for Declaratory Judgment and Counterclaims Against Intervenor
Page 9

**App. 025**

33.    Although Plaintiff executed one or more extensions, Plaintiff did not close on the First Buy Back Agreement. However, Robert Potts, CEO and President of Dixon, had informed Plaintiff that Dixon would still execute and close on a new buy back agreement based on similar terms including paying off the amount remaining under the Loan once Plaintiff had secured the necessary financing ("**Second Buy Back Agreement**") – thus Plaintiff was essentially receiving credit for the prior loan payments.

34.    In December 2020, Plaintiff began working with AgAmerica Lending to refinance the remaining portion of the Loan with Dixon. Martin was involved in communications and/or participated in discussions with AgAmerica in order to assist Plaintiff including by working to get the necessary appraisal(s) on the Remaining Property for AgAmerica to provide the requested financing.

35.    Between January 18, 2021 and January 21, 2021, Martin and Hughes negotiated to purchase 118.34 acres from Plaintiff and appeared to have agreed to final terms including purchase price on behalf of the buyer, "Jim Martin and/or his assigns." At the last minute, however, Martin did not execute the agreement.

36.    Around the same period that AgAmerica had completed its due diligence and expressed its desire to finance the Second Buy Back Agreement, Plaintiff was negotiating with Potts the final terms of the agreement. Martin participated in and/or was copied on communications between Plaintiff and Dixon about these negotiations. On January 21, 2021 Plaintiff and Potts had seemingly agreed to the final terms of the Second Buy Back Agreement, but such agreement was subject to final approval from the Dixon board of directors at a meeting that was scheduled to be held on January 23, 2021.

Plaintiff's Original Answer to Plaintiff-in-Intervention Lumar Land & Cattle, LLC's Original
Complaint in Intervention for Declaratory Judgment and Counterclaims Against Intervenor
Page 10

**App. 026**

37.    Apparently on or about January 23, 2021 in lieu of executing the contract for the purchase of the 118 acres, Martin, on behalf of Lumar and without the knowledge of Plaintiff, contracted with Dixon to purchase 204.50-acre parcel from the Remaining Property. Additionally, Martin obtained an option and/or right of first refusal ("**ROFR**") to purchase the remaining portion of the Remaining Property.

38.    As a result of Martin's conduct including on behalf of Lumar, the board of directors decided not to formally execute Plaintiff's buyback agreement on the Remaining Property.

39.    On January 27, 2021, Dixon deeded 6.15 acres from the Remaining Property to Martin.

40.    On April 23, 2021 Dixon deeded the 204.5 acre tract to Lumar and recorded a Memorandum of Option Agreement to Martin on the remaining portion of the Remaining Property.

41.    On October 4, 2021 Martin deeded to GH Lumar, LLC 5.48 acres apparently from the 6.15 acres he had acquired.

## V.    CLAIMS FOR RELIEF

### COUNT I

### (Tortious Interference with a Contract)

42.    On information and belief, Lumar, acting through Martin, interfered with Plaintiff's First Buyback Agreement when they negotiated and closed on the acquisition of 6.15 acres out of the Remaining Property. Given that the standard periods to perform due diligence and to close on a real estate purchase contract, Lumar apparently began negotiating and/or entered into the contract to purchase the 6.15 acres out of the Remaining Contract while Plaintiff had an agreement to buy back the Remaining Property under the First Buy Back Agreement which Lumar was aware of.

Plaintiff's Original Answer to Plaintiff-in-Intervention Lumar Land & Cattle, LLC's Original
Complaint in Intervention for Declaratory Judgment and Counterclaims Against Intervenor
Page 11

**App. 027**

On information and belief, they also began negotiating the purchase of the 204.5 acre property and/or other agreements related to the Remaining Property.

43.     Texas law protects existing contracts from interference. *See Juliette Fowler Homes, Inc. v. Welch Assoc., Inc..*, 793 S.W.2d 660, 665-66 (Tex. 1990). Thus, a party to a contract has a cause of action for tortious interference against any nonparty to the contract who wrongly induces another contracting party to breach the contract. *Holloway v. Skinner*, 898 S.W.2d 793, 794-95 (Tex. 1995). The elements of the cause of action for tortious interference are: (1) the existence of a contract subject to interference, (2) willful and intentional interference (3) that proximately causes damage, and (4) actual damage or loss. *ACS Investors, Inc. v. McLaughlin*, 943 S.W.2d 426, 430 (Tex. 1997); *SITQ E.U., Inc. v. Reata Rests., Inc.*, 111 S.W.3d 638, 647 n.7 (Tex. App.--Fort Worth 2003, pet. denied). *All Am. Tel., Inc. v. USLD Communs., Inc.*, 291 S.W.3d 518, 531 (Tex. App.—Fort Worth 2009).

44.     Plaintiff and Dixon had negotiated and agreed to execute the contract referred to as First Buyback Agreement. Lumar, through Martin, willfully and intentionally interfered with the First Buyback Agreement. Lumar, with knowledge of the history and negotiations between Plaintiff and Dixon, negotiated to purchase the 6.14 acres of the Remaining Property at the same time Plaintiff and Dixon were negotiating the execution of the First Buyback Agreement. If not for Lumar's interference, Plaintiff would have been able to execute the First Buyback Agreement and prevent the loss of property. Plaintiff suffered an actual loss of 6.14 acres of the Remaining Property as well as damages for money and time spent negotiating with Dixon.

45.     As a result of such actions, Lumar interfered with the parties' performance under such contract including further negotiations related to such contract. Plaintiff requests that Lumar's

Plaintiff's Original Answer to Plaintiff-in-Intervention Lumar Land & Cattle, LLC's Original
Complaint in Intervention for Declaratory Judgment and Counterclaims Against Intervenor
Page 12

**App. 028**

Complaint be denied, and that Lumar be ordered to return the property, and that Plaintiff be awarded damages.

## COUNT II

### (Tortious Interference – Prospective Contract)

46.    Plaintiff incorporates the allegations in the preceding paragraphs as if fully set forth herein.

47.    On information and belief, Lumar, acting through Martin, interfered with Plaintiff's Second Buyback Agreement when they negotiated and closed on the acquisition of 6.15 acres out of the Remaining Property. The closing of the 6.15 acres occurred only 4 days after the board of directors for Dixon decided not to proceed with the Second Buyback Contract. Given the short time period, Martin and Lumar had apparently been negotiating and/or entered into a contract for the 6.15 acres around the time Plaintiff had negotiated and seemingly agreed with Potts on the Second Buyback Agreement.

48.    Likewise, Dixon decided not to proceed with the Second Buyback Agreement because Dixon instead chose to sell the 204.5 acres to Lumar and Martin along with granting an option and ROFR on the remaining portion of the Remaining Property. Lumar and Martin had obviously made an offer to purchase the 204.5 acres and obtain an option and/or ROFR on remaining portion of the Remaining Property prior to Dixon's board of directors deciding not to proceed with the Second Buyback Agreement. At no time did Lumar and Martin disclose to Plaintiff that that they were negotiating or had entered into any agreement related to any of the Remaining Property.

49.    The elements of tortious interference with prospective contract are: (1) there was a reasonable probability that the plaintiff would have entered into a business relationship with a third

Plaintiff's Original Answer to Plaintiff-in-Intervention Lumar Land & Cattle, LLC's Original Complaint in Intervention for Declaratory Judgment and Counterclaims Against Intervenor
Page 13

**App. 029**

party; (2) the defendant either acted with a conscious desire to prevent the relationship from occurring or knew the interference was certain or substantially certain to occur as a result of the conduct; (3) the defendant's conduct was independently tortious or unlawful; (4) the interference proximately caused the plaintiff injury; and (5) the plaintiff suffered actual damage or loss as a result. *Gil Ramirez Grp., L.L.C. v. Houston Indep. Sch. Dist.*, 786 F.3d 400, 417 (5th Cir. 2015) (quoting *Coinmach Corp. v. Aspenwood Apartment Corp.*, 417 S.W.3d 909, 923 (Tex. 2013)). *Santander Consumer USA, Inc. v. Zeigler Chrysler Dodge Jeep-Downers Grove, LLC*, No. 3:16-CV-3310-B, 2017 U.S. Dist. LEXIS 98041, at *22-23 (N.D. Tex. 2017).

50.    There was a reasonable probability that Plaintiff and Dixon would have entered into a contract under the Second Buyback Agreement. Dixon was willing to agree to the terms of the Second Buyback Agreement as indicated by Robert Potts, president and CEO of Dixon. Lumar acted with a conscious desire to prevent the contract or at least knew the interference was certain or substantially certain to occur as a result of Lumar's conduct. Lumar's personal knowledge of the relationship between Plaintiff and Dixon allowed it to usurp any potential deal between Plaintiff and Dixon for its own personal gain. Lumar's conduct was independently tortious or unlawful in that it used insider information to create a negative result for Plaintiff. If not for Lumar's interference, Plaintiff and Dixon would have completed their contract. Plaintiff suffered actual damage and loss in that Lumar deprived Plaintiff the ability to preserve its right in property.

51.    As a result of Martin and Lumar's action as related to the 204.5 acres and the ROFR/Option, Dixon chose not to proceed with the Second Buyback Agreement causing Plaintiff to suffer damages. Plaintiff requests that Lumar's Complaint be denied, that Lumar be ordered to return the property, and that Plaintiff be awarded damages.

Plaintiff's Original Answer to Plaintiff-in-Intervention Lumar Land & Cattle, LLC's Original
Complaint in Intervention for Declaratory Judgment and Counterclaims Against Intervenor
Page 14

**App. 030**

## COUNT III

### (Breach of Fiduciary Duties)

52.     Lumar was owned and operated by Martin. Lumar along with Martin owed certain formal and informal fiduciary duties to Plaintiff which were breached. Under the rules enacted and promulgated by the Texas Real Estate Commission ("**TREC**"), Martin as the licensed real estate agent for Plaintiff, owed the highest fiduciary obligations to Plaintiff such as the duties of loyalty, care, honesty, good faith and fair dealing, and maintain confidentiality including that they represent the interests of Plaintiff, be faithful and observant to the trust placed by Plaintiff, place no personal interest above that of Plaintiff, exercise integrity, deal honestly and fairly with all parties, and convey all known information that could affect decisions of the Plaintiff related to a property.[4]

53.     Furthermore, Lumar should be held liable for Martin's actions because an alter ego relationship existed between Martin and Lumar.  The alter-ego doctrine and veil piercing principles may be applied in reverse including under §21.223 of the Texas Business Organizations Code to hold a company such as Lumar liable for the for the liabilities of the individual member(s) such as Martin on the basis that the company is the alter-ego of the members or on the basis of fraud or other similar theories such as the breach of fiduciary duties described herein.  *Clement v. Blackwood*, 2018 WL 826856 *11 (Tex. App.—Eastland 2018, pet. denied).  This alter ego relationship is evidenced by the fact that Martin owns and operated Lumar. Holding only Martin liable would result in injustice. Martin had personal, insider knowledge of the relationship between Plaintiff and Dixon. Martin used Lumar as a veil to hide from his fiduciary duty.

---

[4] See §§ 531.1, 531.2, 535.2, 535.156 in Chapter 531 Canons of Professional Ethics and Conduct in the TREC Rules

Plaintiff's Original Answer to Plaintiff-in-Intervention Lumar Land & Cattle, LLC's Original
Complaint in Intervention for Declaratory Judgment and Counterclaims Against Intervenor
Page 15

**App. 031**

54.     Not only did Martin and Lumar owe formal fiduciary duties to Plaintiff, but they also owed the same fiduciary duties on an informal basis because of the special relationship that existed between Plaintiff (including its related entities) and Martin (including Lumar). Fiduciary duties can arise from informal relationships between the parties such as moral, social, domestic, or purely personal relationships. *Thigpen v. Locke*, 363 S.W.2d 247, 253 (Tex. 1962). Whether such a fiduciary relationship exists is determined from the actualities of the relationship between the persons involved and evidence of the justifiable trust and confidence that is necessary to create a fiduciary relationship. *Id.*

55.     As previously described, Martin not only served as the real estate agent for Plaintiff, but Martin also physically managed the Original Property along with all property owned by Plaintiff's related entities in Parker County and nearby areas including controlling access, managing hunting and grazing leases. Martin also advised Plaintiff and assisted Plaintiff with obtaining the MUD on the Original Property and performing certain predevelopment work on the Remaining Land and other properties owned by Plaintiff's related entities such as surveying, platting, permitting, budgeting, and land planning. Martin had also been tasked with securing proposals from builders to purchase lots once Plaintiff developed the Remaining Property. Additionally, Martin was involved with Plaintiff's efforts to modify the Loan with Dixon and refinance the Loan with potential third party lenders including a part of the Second Buyback Agreement. Additionally, Plaintiff relied on Martin's physical knowledge of the Original Property, knowledge of the area including the real estate market, and land development knowledge and experience. As a result, Plaintiff developed a special relationship of trust and confidence with Martin which gave rise to Martin and Lumar owing informal fiduciary duties including duties of loyalty, care, and good faith and fair dealing to Plaintiff. Lumar and Martin failed to adhere to their

Plaintiff's Original Answer to Plaintiff-in-Intervention Lumar Land & Cattle, LLC's Original
Complaint in Intervention for Declaratory Judgment and Counterclaims Against Intervenor
Page 16

App. 032

fiduciary obligations as a result of the allegations described above including as related to their contract and acquisition of the 6.15 acres, the 204.5 acres, and the option/ROFR on the remaining portion of the Remaining Property and their efforts to develop such property (collectively, "**Lumar Transactions**") which he and Lumar benefited from and which damaged Plaintiff.

56.    Moreover, they also utilized and benefited from Plaintiff's confidential information that they acquired from Plaintiff during the course of Martins' representation and relationship with Plaintiff which they utilized in the performance of the Lumar Transactions.

57.    As a result, Martin and Lumar breached their fiduciary duty and obligation to maintain confidentiality and not use or disclose Plaintiff's confidential information for their own purposes. Plaintiff requests that Lumar's Complaint be denied, that Lumar be ordered to return the property, and that Plaintiff be awarded damages.

**COUNT IV**

**(Fraud)**

58.    Martin and Lumar committed fraud including when Martin falsely represented to Plaintiff that he was there to do what he could and to help Plaintiff and its principal, Tim Barton, as related to the Original Property including to refinance, purchase the Remaining Property back from Dixon, and develop the Remaining Property. Instead, Martin and Lumar utilized such misrepresentations and their relationship of trust and confidence to obtain confidential and proprietary information which he used for his and Lumar's benefit without the knowledge or consent of Plaintiff in furtherance of the Lumar Transactions, and which was in direct conflict with Plaintiff's efforts to buy back the Remaining Property.

Plaintiff's Original Answer to Plaintiff-in-Intervention Lumar Land & Cattle, LLC's Original
Complaint in Intervention for Declaratory Judgment and Counterclaims Against Intervenor
Page 17

App. 033

59.     The elements of fraud include: 1) a misstatement or omission; 2) of material fact; 3) made with the intent to defraud; 4) on which the plaintiff relied; and 5) which proximately caused the plaintiff's injury. *Cyrak v. Lemon*, 919 F.2d 320 (5th Cir. 1990).

60.     Lumar, through its owner and operator Martin, made a misstatement that it would help Plaintiff in relation to the Original Property and the Remaining Property. This was a material fact as Lumar used the information obtained through this process to cause harm to Plaintiff. Lumar intended to defraud Plaintiff, as evidenced by the eventual sale of property from Dixon to Lumar. Plaintiff relied on Lumar's owner and operator, Martin, as he was Plaintiff's real estate agent. The misstatement proximately caused the injury. The information Lumar obtained would not have been available if not for Plaintiff's reliance on the misstatements.

61.     Furthermore, Lumar should be held liable because an alter ego relationship existed between Martin and Lumar. This alter ego relationship is evidenced by the fact that Martin owns and operates Lumar. Holding only Martin liable would result in injustice. Martin had personal, insider knowledge of the relationship between Plaintiff and Dixon. Martin used Lumar as a veil to perpetrate a fraud.  The alter-ego doctrine and veil piercing principles may be applied in reverse including under §21.223 of the Texas Business Organizations Code to hold a company such as Lumar liable for the for the liabilities of the individual member(s) such as Martin on the basis that the company is the alter-ego of the members or on the basis of fraud. *Clement v. Blackwood*, 2018 WL 826856 at *11.

62.     Plaintiff requests that Lumar's Complaint be denied, that Lumar be ordered to return the property, and that Plaintiff be awarded damages.

Plaintiff's Original Answer to Plaintiff-in-Intervention Lumar Land & Cattle, LLC's Original
Complaint in Intervention for Declaratory Judgment and Counterclaims Against Intervenor
Page 18

App. 034

## COUNT V

### (Conversion)

63.    Through Martin's work with and representation of Plaintiff, Martin and Lumar possessed certain intellectual property and work product of Plaintiff related to the acquisition and development of the Original Property and Remaining Property including as related to the MUD, land planning, surveys, valuations, costs, platting, permitting, and land planning. (collectively, "**Work Produc**t") Martin and Lumar have utilized such Work Product for their own purposes as related to the Lumar Transactions without consent of Plaintiff resulting in Martin and Lumar's conversion of Plaintiff's Work Product and Plaintiff being damaged.

64.    There are four elements to a conversion claim: (1) Plaintiff owned, had legal possession of, or was entitled to possession of the property; (2) Defendant assumed and exercised dominion and control over the property in an unlawful and unauthorized manner, to the exclusion of and inconsistent with plaintiff's rights; (3) Plaintiff made a demand for the property; (4) Defendant refused to return the property. *Apple Imports, Inc. v. Koole*, 945 S.W.2d 895, 899.

65.    Plaintiff had negotiated with Dixon for an agreement to repurchase, giving Plaintiff entitlement to possession of the property. Lumar used Work Product of Plaintiff to sour the agreement and cause Dixon to pursue an alternative agreement with Lumar. Plaintiff has made demand for the property. Lumar now as a part owner of the Property has not returned the portion of the property it obtained from Dixon. Lumar thus has converted property of the Plaintiff to its own use and enjoyment.

66.    Plaintiff requests that Lumar's Complaint be denied, that Lumar be ordered to return the property, and that Plaintiff be awarded damages.

Plaintiff's Original Answer to Plaintiff-in-Intervention Lumar Land & Cattle, LLC's Original
Complaint in Intervention for Declaratory Judgment and Counterclaims Against Intervenor
Page 19

**App. 035**

**COUNT VI**

**(Fraud in Real Estate Transaction (Tex. Bus. Comm. Code §27.01))**

67.    Plaintiff incorporates the allegations in the preceding paragraphs as if fully set forth herein. In addition to the foregoing causes of action, Lumar through Martin's actions committed statutory fraud in a real estate transaction (Tex. Bus. Comm. Code §27.01) including through the fraudulent conduct described in the preceding paragraphs that they utilized in furtherance of the Lumar Transactions to acquire all or part of the Remaining Property which Plaintiffs seek to recover.

68.    Fraud in a transaction involving real estate consists of a (1) false representation of a past or existing material fact, when the false representation is (A)made to the person for the purpose of inducing that person to enter into a contract; and (B) relied on by that person in entering into that contract . . . Tex. Bus. & Com. Code. Ann. § 27.01(a) (West 2009).

69.    Lumar, through its owner and operator Martin, made false representations to Plaintiff that it would help in negotiating with Dixon. Lumar instead made a personal deal with Dixon for the purchase of the property in lieu of Dixon negotiating with Plaintiff. Plaintiff relied on Lumar's representations and negotiated a contract with Dixon under Martin's advisement. Lumar caused the negotiations to ultimately fail, causing harm to Plaintiff.

70.    Furthermore, Lumar should be held liable because an alter ego relationship existed between Martin and Lumar. This alter ego relationship is evidenced by the fact that Martin owns and operates Lumar. Holding only Martin liable would result in injustice. Martin had personal, insider knowledge of the relationship between Plaintiff and Dixon. Martin used Lumar as a veil to perpetrate a fraud.  The alter-ego doctrine and veil piercing principles may be applied in reverse including under §21.223 of the Texas Business Organizations Code to hold a company such as

Plaintiff's Original Answer to Plaintiff-in-Intervention Lumar Land & Cattle, LLC's Original
Complaint in Intervention for Declaratory Judgment and Counterclaims Against Intervenor
Page 20

**App. 036**

Lumar liable for the for the liabilities of the individual member(s) such as Martin on the basis that the company is the alter-ego of the members or on the basis of fraud or other similar theories. *Clement v. Blackwood*, 2018 WL 826856 at *11.

71.    Plaintiff requests that Lumar's Complaint be denied, that Lumar be ordered to return the property, and that Plaintiff be awarded damages.

## COUNT VII

## (Conspiracy)

72.    Plaintiff incorporates the allegations in the preceding paragraphs as if fully set forth herein. Lumar conspired with Martin; Hazlewood; Aledo West, Hughes; Railhead; GH Lumar JV; and/or GH Lumar, LLC to commit fraud including fraud in a real estate transaction , converted Plaintiff's Work Product, tortiously interfered with the First Buyback Agreement, tortiously interfered with the Second Buyback Agreement, and breached the fiduciary duties that were owed to Plaintiff as previously described in the foregoing counts in order to further the Lumar Transactions causing Plaintiff to be damaged.

73.    "A conspiracy to defraud involves (1) two or more persons; (2) with a common purpose; (3) undertaking a common action to defraud; (4) where each person possesses intent to defraud; and (5) each person understands that the other conspirators share the common purpose." *Durrschmidt v. Frost Nat'l Bank (In re R&K Fabricating, Inc.)*, Nos. 10-33878, 12-03177, 2013 Bankr. LEXIS 1192, at *17 (Bankr. S.D. Tex. 2013) (citing *Bayou Terrace Investment Corp. et al. v. Lyles*, 881 S.W. 2d 810, 815 (Tex. App.—Hous. [1st Dist.] 1994)).

74.    Here, Martin along with Lumar acted in common with the several aforementioned persons for the purpose of, and intent to, defraud the Plaintiff.

Plaintiff's Original Answer to Plaintiff-in-Intervention Lumar Land & Cattle, LLC's Original
Complaint in Intervention for Declaratory Judgment and Counterclaims Against Intervenor
Page 21

**App. 037**

75.    Plaintiff requests that Lumar's Complaint be denied, that Lumar be ordered to return the property, and that Plaintiff be awarded damages.

## COUNT VIII

### Declaratory Judgment

76.    Plaintiff incorporates the allegations in the preceding paragraphs as if fully set forth herein. Plaintiff seeks a declaratory judgment that Lumar is not a bona fide purchaser related to the Lumar Transactions. A bona fide purchaser is one who acquires property in good faith, for value, and without notice, constructive or actual, of any third party claim or interest. *Madison v. Gordon,* 39 S.W.3d 604, 606 (Tex. 2001); *Houston Oil Co. v. Hayden*, 135 S.W. 1149, 1152 (Tex. 1911); *Carter v. Converse*, 550 S.W.2d 322, 329 (Tex. Civ. App.--Tyler 1977, writ ref'd n.r.e.). Notice may be constructive or actual. *Madison,* 39 S.W.3d at 606. *Flack v. First Nat'l Bank*, 226 S.W.2d 628, 631 (Tex. 1950); *American Surety Co. v. Bache*, 82 S.W.2d 181, 183 (Tex. Civ. App.--Fort Worth 1935, writ ref'd). Actual notice rests on personal information or knowledge. *Madison,* 39 S.W.3d at 606 Constructive notice is notice the law imputes to a person not having personal information or knowledge. *Id*.

77.    Given Lumar's notice of the claims and interest of Plaintiff in the Remaining Property, Lumar had constructive and/or actual knowledge of Plaintiff's claims to the Property. Furthermore, Lumar did not acquire any of the Remaining Property including the ROFR or Option in good faith based on the preceding allegations.

78.    Either because of Lumar's knowledge of Plaintiff's claims or because of Lumar's lack of good faith, it was not a bona fide purchaser of any of the Remaining Property, the ROFR, or the Option.

Plaintiff's Original Answer to Plaintiff-in-Intervention Lumar Land & Cattle, LLC's Original Complaint in Intervention for Declaratory Judgment and Counterclaims Against Intervenor
Page 22

**App. 038**

79.    Plaintiff requests that Lumar's Complaint be denied, that Lumar be ordered to return the property, and that Plaintiff be awarded damages.

## VI.    PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiff requests that this Court deny relief requested in Lumar Land & Cattle, LLC's Complaint for the reasons that it is (i) not a good faith transferee pursuant to the provisions of 11 U.S.C. § 550(b); (ii) not a bona fide purchaser for value of the subject real property; and that (iii) expunging the Notice of Lis Pendens as to the subject real property is inappropriate for lack of status as a good faith transferee and bona fide purchaser. Finally, Plaintiff seeks return of the Property acquired by Lumar from Dixon as well as damages against Lumar, including costs and fees and further requests that the Court grant such other and further relief to which it may show itself justly entitled.

DATED: March 21, 2022.

Respectfully submitted,

/s/ Joyce W. Lindauer
Joyce W. Lindauer
State Bar No. 21555700
Sydney A. Ollar
State Bar No. 24125932
Austin Y. Taylor
Louisiana Bar No. 37325
Joyce W. Lindauer Attorney, PLLC
1412 Main St., Suite 500
Dallas, Texas 75202
Telephone: (972) 503-4033
Facsimile: (972) 503-4034
Email: joyce@joycelindauer.com
       austin@joycelindauer.com
       sydney@joycelindauer.com
ATTORNEYS FOR DEBTOR/PLAINTIFF

Plaintiff's Original Answer to Plaintiff-in-Intervention Lumar Land & Cattle, LLC's Original Complaint in Intervention for Declaratory Judgment and Counterclaims Against Intervenor
Page 23

App. 039

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on March 21, 2022, a true and correct copy of the foregoing document was served via email pursuant to the Court's ECF system upon the parties receiving electronic notice in this case.

/s/ Joyce W. Lindauer
Joyce W. Lindauer

Plaintiff's Original Answer to Plaintiff-in-Intervention Lumar Land & Cattle, LLC's Original
Complaint in Intervention for Declaratory Judgment and Counterclaims Against Intervenor
Page 24

**App. 040**

App. 041

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| IN RE: | § § | |
| SECURITIES AND EXCHANGE COMMISSION, | § § § | |
| Plaintiff, | § § § | No. 3:22-cv-2118-X |
| vs. | § § § | |
| TIMOTHY BARTON, et al. | § § | |
| Defendant, | § | |

## AFFIDAVIT

State of Texas
County of Dallas

I, Debbie Farah, Realtor C21 Commercial, License No. 3519428, located at 4231 Walnut Bend ,

Jacksonville, FL 32257 do hereby swear under oath that:

## 1.    DETAILS

1.    My name is Debbie Farah. I am a realtor. The facts stated in this affidavit are within my personal knowledge and are true and correct.

2.    On July 19, 2024, I received an email from Ron Hughes (ron@railheadrealty.com) with the subject '1,321.10 Ac.' The email contains important details regarding a property project.

3.    The email specifies that Jim Martin would like me to assess the primary project. Jim Martin, through his affiliate companies GH Lumar, LLC (Subdivisions: Bear Creek Ranch and Bear Creek North) and Lumar Land & Cattle, LLC (Bear Creek Estates), has developed approximately 406 acres and 204 acres, respectively.

Page 1

4.    The developments by Jim Martin's affiliate companies include:

   a)  Fully-platted lots

   b)  Concrete roads (with larger lots having dedicated concrete driveways)

   c)  Rocked entryways

   d)  Underground electricity

   e)  Fixed wireless internet service

   f)  Jim Martin is willing to sell an additional 1,321.10 acres of land at $35,000 per acre. The actual survey shows 1,321.10 acres.

5.    The property offers tremendous views of the Fort Worth skyline and combines a rural lifestyle with close proximity to Fort Worth, which had a population of just under 1 million in 2022, while the Dallas-Fort Worth Metropolitan Statistical Area (DFW MSA) has a population in excess of 7.6 million.

6.    The first attachment in the email is a map showing the subject land's proximity to Fort Worth. Additionally, there are estate-like subdivisions with a planned high-profile golf course approximately 3.4 miles down Bear Creek Rd from the subject location.

7.    The email includes links to "Information About Brokerage Services (https://www.trec.texas.gov/sites/default/files/pdf-forms/IABS%201-0.pdf)" and "Consumer Protection Notice (https://www.trec.texas.gov/sites/default/files/pdf-forms/CN%201-2.pdf)"

8.    Following exhibits are attached to this affidavit received as they were and presented in their true and correct copies:

   a)  Attached hereto as **Exhibit A** is a true and correct copy of the email I received from Ron Hughes on July 19, 2024.

   b)  Attached hereto as **Exhibit B** is a true and correct copy of the document titled "107-9607 Remainder After Plats 1,321.10 Ac.pdf," which contains detailed information about the property.

   c)  Attached hereto as **Exhibit C** is a true and correct copy of the document titled "359-9515

App. 043

Remainder Tracts Title Survey Plat-Sh 1 Of 2 Delta 2," which contains additional detailed information about the property.

d) Attached hereto as **Exhibit D** is a true and correct copy of the document titled "Location Map Overall Property," which shows the location of the property.

e) Attached hereto as **Exhibit E** is a true and correct copy of the document titled "Overall Base Prop," which provides further details about the property.

f) Attached hereto as **Exhibit F** is a true and correct copy of the document titled "Overall Base Property Topo," which provides topographical details about the property.

### 2.    CONCLUSION

Based on my professional analysis and overview of the documents and context provided by Ron Hughes, the property under discussion having a total area of 1321 acres is a high valued property. Jim Martin is currently proposing to sell it at $35,000 per acre or more than $46 million, and it can be sold for more value based upon the current demographics and on-going developments in the nearby vicinity with regards to its demand.

Under penalty of perjury, I hereby declare and affirm that the above stated facts, to the best of my knowledge, are true and correct.

DATED this 29 day of July, 2024

_____
Signature

/s/ *Debbie Farah*
Debbie Farah

Page 3

## NOTARY ACKNOWLEDGMENT

State of ~~Texas~~ Florida                    )
                                              )    (Seal)
County of ~~Dallas~~ Duval                    )

The foregoing instrument was acknowledged before me this _29_ day of __July_, 2024, by the undersigned, Debbie Farah, who is personally known to me or satisfactorily proven to me to be the person whose name is subscribed to the within instrument.

_____
Signature

_____
Notary Public

DONNA MICHELLE ORTOLANI
Notary Public
State of Florida
Comm# HH196731
Expires 11/8/2025

My Commission Expires: _____

Page 4

**App. 044**

## Exhibit A

**From:** Ron Hughes <Ron@railheadrealty.com>
**Date:** July 19, 2024 at 5:33:28 PM EDT
**To:** Debbie Farah <debbie@debbiefarah.com>
**Cc:** Jim Martin <Jim@martinlandsales.com>
**Subject: 1,321.10 Ac**

Debbie,

This is the initial or primary project which Jim would like you to assess. We do not have a formal package as Jim Martin has just recently decided that he would consider selling the subject property as opposed to developing it himself.

Jim, through two of his affiliate companies, GH Lumar, LLC (Subdivisions: Bear Creek Ranch and Bear Creek North) and Lumar Land & Cattle, LLC (Bear Creek Estates) has already developed approximately 406 acres and 204 acres, respectively. Development to date includes: fully-platted lots, served by concrete roads (larger lots have dedicated concrete driveways as well), rocked entryways, underground electricity, fixed wireless internet service, etc. Immediately to the south, of these subdivisions, Jim has rights to continue development of 1,321.10 acres but would be willing to explore selling this acreage at $35,000 per acre. (note that the actual survey shows 1,321.10 acres while the graphics are labeled 1,317.6 acres but, obviously, the survey would be the correct acreage).

The existing subdivisions as well as a large portion of the residual acreage have tremendous views of the Fort Worth skyline and offer the best of both worlds with respect to rural lifestyle with close proximity to Ft. Worth with a 2022 population of just under 1 million...while the DFW MSA sports a population in excess of 7.6 million. The first attachment is a map showing the subject land in proximity to Fort Worth. Also, there are additional estate-like subdivisions with a planned high-profile golf course approximately 3.4 miles down Bear Creek Rd from the subject location. Click on the following link to see the subject location as well as the referenced additional development underway **https://www.google.com/maps/dir/32.6106353,-97.5801141/32.6342004,-97.6261279/@32.6202088,-97.632142,7323m/data=!3m1!1e3!4m2!4m1!3e0?entry=ttu** This map is approximately 18 months to 2 years out of date but still gives you a feel for the frontage developments as well as the proximity to Fort Worth.

Please feel free to call Jim 817.538.6846 or me with any questions. Thanks,

Ron

### Information About Brokerage Services

https://www.trec.texas.gov/sites/default/files/pdf-forms/IABS%201-0.pdf

### Consumer Protection Notice

https://www.trec.texas.gov/sites/default/files/pdf-forms/CN%201-2.pdf

**Ron L. Hughes**
**TX Broker**
**Cell: 817.307.3863**
**Email:** Ron@RailheadRealty.com
**Website:** www.RailheadRealty.com

Page 5









1,317.6 ACRES

**App. 049**



1,317.6 ACRES

BEAR CREEK

PARKER COUNTY, TEXAS

| REV | DESCRIPTION | DATE |
|---|---|---|
| 1 | | |
| 2 | | |
| 3 | | |
| 4 | | |
| 5 | | |
| 6 | | |

SCALE: AS SHOWN
DATE: 07 2024
DRAWN BY:
CHK'D BY:
JOB NO.:
FILE:
SUBMITTAL DATE: JULY 2024
SHEET