UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

CASE NO. 3:22-cv-2118-X

-------------------------------------------------x

SECURITIES & EXCHANGE COMMISSION,

                    Plaintiffs,

v.

TIMOTHY BARTON, et al.,

                    Defendants.

-------------------------------------------------x

TRANSCRIPT OF THE HEARING

BEFORE THE HONORABLE BRANTLEY STARR

UNITED STATES DISTRICT JUDGE

Dallas, Texas

July 23, 2024

10:01 a.m.

A P P E A R A N C E S:


FOR THE PLAINTIFF:

      SECURITIES & EXCHANGE COMMISSION
          801 Cherry Street
          Suite 1900
          Fort Worth, Texas 76102
      BY:  KEEFE M. BERNSTEIN, ESQ.
          bernsteink@sec.gov
          (817) 900-2607


FOR THE DEFENDANT BARTON:

      HUNTON ANDREWS KURTH, LLP
          2200 Pennsylvania Avenue NW
          Suite 905
          Washington, DC 20037
      BY:  MICHAEL J. EDNEY, ESQ.
          TED HUFFMAN, ESQ.
          medney@HuntonAK.com
          (202) 778-2204


FOR THE RECEIVER:

      BROWN FOX, LLP
          8111 Preston Road
          Suite 300
          Dallas, Texas 75225
      BY:  TIM WELLS, ESQ.
          tim@brownfoxlaw.com
          (214) 327-5000
      ALSO PRESENT:  CORT THOMAS, ESQ.

**COURT REPORTER:**   MS. RACHEL ERICKSON, RPR, CRR, CRC
                      United States Court Reporter
                      1100 Commerce Street
                      Room 1315
                      Dallas, Texas 75242
                      rachel_erickson@txnd.uscourts.gov


     Proceedings reported by mechanical stenography and transcript produced by computer.


                          *  *  *  *

- P R O C E E D I N G S -

THE COURT SECURITY OFFICER:  All rise.

THE COURT:  Thank you.  You can be seated.

Okay.  We are here in Civil Action No. 3:22-CV-2118.  That's Securities and Exchange Commission versus Barton, et al.

Let's do appearances, first for the SEC, and then for Barton, and then for the Receiver.

MR. BERNSTEIN:  Your Honor, Keefe Bernstein on behalf of the SEC.

THE COURT:  Thank you, Mr. Bernstein.

And for Barton?

MR. EDNEY:  Good morning, Your Honor.  Michael Edney on behalf of the Defendant, Mr. Barton.

THE COURT:  Thank you, Mr. Edney.  And for the Receiver.

MR. WELLS:  Good morning, Your Honor.  Tim Wells on behalf of the Receiver.

THE COURT:  Thank you.

And, Mr. Thomas, you're here too.

MR. THOMAS:  Yes, Your Honor.

THE COURT:  So, the hearing, as we put on the docket, is to consider the sale of properties for the Amerigold Suites and Hall Street.

So I'll let -- Mr. Wells, you start off.  And I

don't want to Groundhog Day y'all.  So how about we talk about them.  I'll just let you talk about both properties and see if there have been any other offers that meet the statutory requirements since you filed your notice on the docket and talked about the notice you filed in the Dallas Morning News.

But, when you talk about those, can you at least talk about the properties individually so we don't fully muddy up the record.  I'm trying to torture you all as minimally as possible but still keep a clean record.

So, Mr. Wells, go ahead and lay out the case for Amerigold and Hall property, if you would.

MR. WELLS:  Yes, Judge, thank you.

So, as the Court is well aware, the Receiver filed two motions to approve sales docket 500 with the supporting appendix 501 and docket 502, of the supreme appendix 503.

The only opposition to the sales is from Mr. Barton, who has filed two objections; one for each of those properties.  As the Court noted, we filed a notice of publication.  The sales were publicized in the Dallas Morning News on July 1st, 2024.  And, before addressing the specifics of each sale, I'm happy to answer any questions the Court has regarding those specific sales.  But it sounds like the Court is interested in the notice and if

we've received any other offers.

THE COURT:  That's right, Mr. Wells.  I don't have any other questions beyond those.

MR. WELLS:  Thank you, Judge.

So, first I'll just note there was an objection filed whether this Court has jurisdiction.  And, so, to create a fulsome record for the likely appeal that will come, I'm happy to walk through the jurisdiction, and I'm sure the Court has jurisdiction to hear this matter.  And, so the Fifth Circuit has said that during dependency of an interlocutory appeal, a district court may proceed with matters not involved in the appeal.  We have briefed this extensively in our reply on pages 2 through 6.

In denying Barton's previously filed motions to stay the Receivership order, the Fifth Circuit has concluded that the administration of Receivership Estate is not a matter involved in that appeal.

And, so, moreover, Congress has said that through Federal Rule of Civil Procedure 62 that it has exempted interlocutory appeals of the Receivership orders from an automatic stay that would otherwise arise during an appeal.

And, so, Mr. Barton, he has not sought a stay here, and he's trying to use a jurisdictional argument to seek a stay that he has not sought here.

And, so, turning specifically to the Court's question about if there have been any other offers for the properties, since filing the notice of publication, we have not received any other offers for the properties. The highest offers we have received are what we briefed in our motions.

And, so, then, returning to Mr. Barton's objections, he says that the Court must maintain the status quo while an appeal is pending, and that's just not the case. Mr. Barton has not sought a stay and was previously denied that stay. And, so, if the Court were required to maintain the status quo, that would essentially act as an automatic stay, which the Fifth Circuit has said is not the case.

Mr. Barton has also objected that the Court cannot expand the Receiver's authority, but approving these sales does not expand the Receiver's authority. The receivership order already empowers the Receiver to sell property in paragraphs 40 and 41 of that order. This hearing just merely satisfies the statutory requirement of 28 USC 2001.

And, so these sales are in the best interest of the Receivership. The properties continue to accrue interest at a very high rate. These two properties alone accrue $43,000 in interest every month. For all the

properties in the Receivership, that is $170,000 a month accruing in interest. Per year, that is approximately $2 million. And since the start of the Receivership in October of '22, that's over $3.5 million in value that has evaporated through interest.

The Hall Street property accrues interest at 9.009 percent, which is approximately $1,023 per day. And so, understandably, the lenders are pressing for these properties to be sold. They're not receiving any payments, as we've briefed extensively to the Court. The receivership order stays those payments. And, so, they are pressing for the stay to be lifted so that they can get the value, or get their interest that is accruing.

Concurrently, the property values have been falling for commercial properties, as evidenced by the drop in sale price for the Amerigold property, that we previously brought to the Court, at a price of $5.5 million.

And now the highest offer we've been able to receive is $4.8 million. That is a drop in $700,000 since we initially brought that to the Court. This is due to the rising interest rates and the changing market conditions that just no longer support that previous $5.5 million price. As we briefed in our motions, the previous buyer decided that the value wasn't there in that property, and

walked away from the prior sale.

And, so, the estate is -- the estate's cash strapped, and it has not been able to pay taxes for the Hall property, property in Frisco, and another property known as the Ridgeview edition.  And, so, approving these sales will provide much needed resources to the receivership to be able to operate.

And, so, as the Court noted, we did file a publication, we've received no competing offers.

And I can turn to the specifics of each property now.

So, turning to Amerigold Suites, as I previously mentioned, the sale price is $4.8 million.  The Receiver conducted three new appraisals for this sale.  The average value of those appraisals was $5,546,667.  The lowest appraisal was 4.17 million.  And the highest was a ranged appraisal, which was a broker's opinion, a value that was 6.7 million to 7.1 million.  But it averaged out because there are the 5 million, $5.5 million number.

And, so, this sale exceeds the statutory requirements of two-thirds value listed in 28 USC 2001.

This property accrues interest at $13,000 a month.  And, so, the meter just continually running this property's value continues to erode.

There's a principal balance of over

$2.4 million.  And, in the time that this property has sat since the Receiver previously brought it to the Court, it has lost significant value, about $210,000 in extra interest from the initial approval.

So, if the property sold today for the $4.8 million, that would bring it -- that would cover the receivership estate at approximately 1.8 million, which is, as I said before, greatly needed by the receivership estate to operate.

As we briefed extensively to this Court, the Amerigold Suites takes considerable management and is a drain on the receivership estate assets.  We've replaced multiple AC units for about nearly half the property now. It continues to lose money every month between interest payments and insurance and just the general management operations of it.  But for the interest being stayed, the property is not self-sustaining.  And, so, it needs a lot of rehabilitation to make it marketable to the broader public.

The Receiver is doing everything that he can to keep it in habitable condition for the tenants that live there.  But in order to raise rents, or anything, as Mr. Barton suggested, it needs considerable renovations, which is incorporated in the market value of it.  The potential buyers have seen the condition of it and realized that it

will require a significant capital investment to make it marketable to the broader public.

Turning to the Hall Street property, that's the second property the Receiver is briefing to the Court today. It has a sales price of $6 million. The average appraised value for that property with the three new appraisals that the Receiver conducted for this property is $5,136,421.

This price -- the sales price is higher significantly than the average appraised value and satisfies the statutorily required two-thirds appraised value. This property has a principal balance -- has a note on it with a principal balance of over $4.6 million. And, as I mentioned earlier, it accrues interest at over nine percent a month due to a variable interest rate on the note on that property. It has -- which equates to over $30,000 per month in interest that is evaporating the value of that property.

Due to the high principal balance of this property, if it was sold, the net recovery to the receivership estate would be approximately $900,000.

This property was previously marketed by Mr. Barton, and it's our understanding that the current buyer has contracted with Mr. Barton before to buy this property for a lower price. We understand it may be in the

range of about ten percent less than we're currently selling it now.

And, so, this sale is about the top of the market, and we are fairly certain that this is the highest price that we could receive for this property.  And if this sale is not approved, I'm sure that we could get that appraised again.

And, so, the Court has already, in its recent orders, appointed the appraisers for the purpose of providing their appraisals, and it accepts that the appraisal satisfied 28 USC 2001.  And, so the Receiver would ask the Court approve each sale and allow each property to be sold free and clear of all liens and transferring any liens to the remaining proceeds.

I'm happy to answer any specific questions the Court has.

THE COURT:  Okay.  Thank you, Mr. Wells.  I don't have any other further questions now, but I might after I hear from others.  So thank you for your layout.

Mr. Edney, I know you have objections to the sale of both properties.  So, what can you tell me about your objections?

MR. EDNEY:  Thank you, Your Honor.

Your Honor, I do appreciate you hearing us on both properties at the same time.  Some of my objections

apply to both.  So I think it will be efficient.  And let me start with one of those overarching objections.  I think the record shows here that these proposed sales are going off at a bit of a discount to what we could get otherwise.  And that's due to the legal overhang of objections to the Receiver's authority over these properties and the appeals.

We saw on page 7 of the omnibus reply brief that the Receiver believes that these sales are not going to close until the pending appeal of Your Honor's most recent receivership order is concluded.  That process is going on.  The SEC just filed their opposition brief yesterday.  And we're in a situation now that if the appeal is successful, this is all kind of irrelevant.  If the appeal is unsuccessful, the value proposition that the Receiver is bringing to Your Honor -- and I direct Your Honor to page 7 of the reply brief -- is that while these sales will be more ready to go and will save 60 to 90 days of due diligence that the buyer would have to do under these contracts that can occur now as opposed to after the appeals are resolved.

What we're not seeing in the papers, Your Honor, is evidence that the accrued interest -- and I think Mr. Wells meant to say on the TC Hall property that the interest was nine percent per year, I think, not per month.

Is that right, Mr. Wells?

MR. WELLS:  That is correct.

MR. EDNEY:  So, we're not seeing evidence that the accrued interest is in the 60- to 90-day period.  The only benefit of approving these things now is going to exceed the discount that the legal overhang is taking in these situations.  And the better course, we're urging the Court, is to delay these proposals on the table, take them back up when the appeal is resolved, which is not going to take forever.  I mean, we are in the late innings of that process.  Either the SEC is going to win, or we are.  And if the SEC does prevail, I think we can have a better process for selling these things.  They're not going to close anyways until the appeal is resolved.  And we can have the process that I believe Congress intended when it stood up 28 USC Section 2001.

This was a process where these sales were to happen in the open to bring in buyers with notice of the terms and the ability to top the offers in the private sale as opposed to a court-conducted auction.  And if we do that after the appeal is resolved, it's our view that everybody wins.  Either we don't waste the time with this process if the appeals succeed.  If the appeals fail, a better marketing process can be conducted bringing better value to the estate, better value that will exceed the interest expense of 60 to 90 days that we're saving here.  Because

that's -- when it comes right down to it, when we see in the reply brief, that's all the value that is being advanced at this point.

So we would urge the Court to adjourn this hearing and to take up these proposed sales after the appeal is resolved.  We do this certainly for two reasons.

First of all, it's long been our position that real property is not fungible.  If the receivership is overturned, this is not a transaction that could be unwound and that we should be holding on here until after the appeal is resolved.  Effectively, I think the Receiver is saying that's what's going to happen.  The flip side of that coin here is that if the receivership is upheld, we do have an interest in making sure maximum value is obtained for these properties.

And with the appeal going on, with the uncertainty over the authority of the Receiver to sell these properties, we don't think that that's what's happening here.  And just the better course, as a matter of equity, is to take these matters up when the appeal is resolved in the relatively near future.

So that's our position on both properties as a matter of equity.

Now, let me say this about the legal overhang. I think you've seen in the papers there is some criticism

of our appeals of the -- of the sale orders previously in this case as being without jurisdiction. And I think the word "improper" is thrown around a lot. I obviously disagree with that. I'm not filing improper appeals. I think the big issue in terms of these sales not closing is the primary appeal of the receivership orders. I think buyers are looking for that to be resolved. Title companies are looking for that to be resolved before they're willing to close on these sales.

To the extent that the sale appeals are the thing that's holding it up, I do want to remind the Court what the Fifth Circuit has done here. The Fifth Circuit in the *United States versus "a" Manufacturing* in 1976 case made very clear that orders authorizing a Receiver to sell real property are immediately appealable. The Fifth Circuit earlier in proceedings in this case with regard to another appeal of a prior sale order did temporarily hold that it lacked jurisdiction over an appeal for a sale order.

We sought re-hearing on that, and it really brought "a" Manufacturing to the Court's attention and noted that that was still good law in this Circuit, and it had not been overturned. And on re-hearing that, opinion was vacated. So this talk about these appeals of sale orders being improper, I don't think that that has -- I

don't think that has a lot of basis, at least not under the law of the Fifth Circuit.  These were properly taken.

But, at the end of the day, the main driver here is the appeal of the receivership order.  That is coming up closely on the horizon.  And the better course here is to wait until that is resolved.

That's the equitable issue.

We also believe that there are legal barriers. We've argued to Your Honor in the past that disturbing the status quo of these real properties in a prejudgment receivership should be saved for the most extraordinary circumstances, which I don't believe are laid out here. I'll go into that in a moment.

There's also the issue of jurisdiction.  Your Honor, we haven't raised that before in this case.  We are raising it now.  Especially in light of the Fifth Circuit's jurisdictional discussion in the recent Chamber of Commerce case, you know, we believe that -- and I want to be clear about the distinction we're drawing here -- Your Honor does have the authority to enforce his existing receivership order.  And the Receiver gets to do many, many, many things without coming back to this Court.  And I'm not contesting that.  And when we have sought stays in the past, we have sought to shut down many, many of those activities that go beyond the sales of real property.  But the one thing that

the Receiver can't do without coming back to this Court and getting additional authority is to sell real property.

And we believe, Your Honor, that approving these sales would be an augmentation of the receivership order that is currently on appeal.  It would be a supplementation of the Receiver's existing authority, not an enforcement of the order but a supplementation of it. And, really, the only court to have considered this question directly, the Middle Direct of Florida in the *SEC versus Kirkland* case, said, look, in that circumstance, given 28 USC 2001 and the need for the Court to come in and say yes to the Receiver doing additional things, that is an augmentation of the order that's under appeal; that is improper under the circumstances.  And I think -- and that right now we're without jurisdiction to do.

So we are bringing that jurisdictional objection at this point.  We think it's right.  We think it's pretty limited, frankly.  Because Your Honor's receivership order was really quite broad.  This is one of the few things that the Receiver can't do without coming back to Your Honor for additional approval.

We do think it dovetails with what should happen in this situation, that until the Receiver's authority is dealt with by the appellate courts, and frankly, until Mr. Barton's liability is adjudicated, the

better course is to bundle these assets, keep them safe, and have them available for use in any final adjudication of liability.  But the jurisdictional issue in this situation happens to dovetail with those equitable arguments and legal arguments about keeping the status quo as it is.

Just a couple other things.

And if I may for just a second -- sorry, I'm a touch under the weather.

THE COURT:  It happens.

MR. EDNEY:  So, with regard to the Amerigold Suites property, one thing I think is striking about the papers here is that we have general assertions about the sustainability in keeping it going as an operating concern but not a lot of detail.  We have challenged the Receiver to explain exactly what the occupancy is.  We still haven't seen that even in the reply brief.  There's no declarations or affidavits from the people who are running the property.

But we've also challenged the Receiver to explain, if there is low occupancy, why that is.  It's been ascribed to the condition of the property, but we have brought it to Your Honor's attention the sales contract, the prior sales contract, that required the Receiver not to take on new tenants.  And I don't think there's been any assertion even today that the effort to bring on additional

tenants has resumed in the wake of the cessation of that sales contract.

The Amerigold Suites property is unique in terms of the assets that have been put before Your Honor because it isn't raw land, it does have an operating business on it, and it does generate revenue.  So, properly managed -- and I think Your Honor needs to demand details from the Receiver about whether it is being managed to create enough revenue to keep it in place, keep it safe until the appeal is resolved and until liability is resolved.  You know, absent those facts, I don't think we're in a position to say that the sale today is better than keeping it where it is.

And, of course, as I discussed earlier and on the basis of page 7 of the reply brief, we're not even talking about a sale today, we're talking about a sale after the appeal is resolved.  That does not seem like the better course under these circumstances.

It's also, Your Honor, on the frontiers of Your Honor's tracing analysis.  This is a property, you know, this case is about loans from Chinese nationals that have occurred over a limited time in the past.  This property was purchased 19 years ago.  I understand Your Honor's rulings about the solar panels that were put on the roof and salary expenses that were used to promote the property.

But this is kind of on the outer rim of the core of receivership assets, which are actual properties where investor funds were used to purchase them.  This is a legacy asset that I think is -- I think the Fifth Circuit is going to be delving into how we split the onion there, it's going to be a big focus.  And I think since this is out, you know -- is it Jupiter, is it Neptune, or is it Mercury.  We have some Mercury properties, we have some, you know, kind of outer planetary properties.  This is a particular situation to kind of hit the pause button and say let's let this property continue to generate revenue, let's get the detail from the Receiver that we need to assess whether it's reaching its full potential to be self-sustaining, and let's address whether it should be sold, you know, after the Fifth Circuit weighs in on whether it's a property that really should be in the receivership state.

You know, same thing, too, with the TC Hall property.  That property is a -- it's over in the Turtle Creek neighborhood.  It is permanent and entitled for hotel development, which I don't think the appraisal's really taken full accounting of.  It's right there on Turtle Creek Boulevard, and it is a property that was, you know, purchased and managed by the Defendant's son.  So, again, it's an outer-orbiting asset that I think there are going

to be serious questions in the Fifth Circuit appeal about. I think the better course there, it is accruing at nine percent interest per year, but the better course there is to hit the pause button on that till the Fifth Circuit decides and, you know, that the 60 or 90 days of interest there, which, you know, I mean, is not -- I know it's not trivial, but what is that?  That's three percent of the loan.  It's a couple hundred thousand dollars, perhaps.  I just don't think it's worth it under the circumstances, not worth it for the receivership estate.

So we urge Your Honor to hit the pause button on these requests, carry them until the appeal is resolved, and revisit them then.

I'd be happy to answer any of Your Honor's questions.  But, in addition to our arguments raised in the papers, that's our presentation today.

THE COURT:  Thank you, Mr. Edney.

Question on the notice that the Receiver filed on alleged interference with the property.  What can you tell me from your client's position on that notice? Talking to title companies, talking to buyers that the Receiver was talking to on contracting.  What can you tell me that your client has or has not done in that regard?

MR. EDNEY:  Your Honor, I'd like an opportunity to come back to you on that, if I could.  I'm not prepared

to speak to that.

THE COURT:  Well, and I didn't set it for a show cause hearing, so I can't force you to tell me something.  But what I do need to say is, with the receivership order, I know it's being appealed.  But Section 7, paragraph 32 -- this is Document 417 in this case.  Let me make sure you all have notice of it.  It says, "The receivership entities and all persons receiving notice of this order" -- that includes everyone in this room now -- "are hereby restrained and adjoined from directly or indirectly taking any action, causing any action to be taken without the express written agreement of the Receiver which would" -- and you drop down to subsection B -- "hinder, obstruct, or otherwise interfere with the Receiver in the performance of his duties."

I have no problems with you all talking to a buyer the Receiver is not talking to and coming in with a better offer.  And, honestly, that's the purpose of this hearing.  I would love for you to walk in with an offer that's ten percent higher.  I want that to happen.  That's not interference.  But if you talk to someone that they're trying to contract with and sow doubt, that is absolutely hindering or interfering with the Receiver's duties.

So I'm not setting a show cause hearing now, but I want there to be crystal clarity on this.  If you

talk to someone new and generate a higher offer, great, pat on the back, attaboy.  If you talk to someone who they are talking to and cause that person's number to drop or that person walks away from the negotiating table, that is hindrance, that is interference.

MR. EDNEY:  Your Honor, I appreciate that.  And it's crystal clear in my mind with regard to what the order provides.  I do think that the flip side of the coin here is that the Receiver should be transparent with the title companies, too, that these appeals are going on.  And I don't know whether that's happening or not.  But I'll certainly advise my client to the extent that's happened, that it can't happen again.  Now, I don't know that it has. I'm happy to speak with him briefly and come back to Your Honor.  But, I appreciate you --

THE COURT:  I won't require you to speak to him and come back, but I'll just put my understanding here on the table.  And that's -- for example, that's also one thing that I wonder about at the hearing, which is why I'm glad everyone's talked about that the closing would only occur afterwards.

That does change the financial picture of things, as you've argued, Mr. Edney.  But it does also make clear to me a couple of things.  One, that there is no deception going on, on the Receiver's part in trying to

sell the property for an inflated price that's not factoring in pending litigation.  I don't want deception to cause a higher price.  I'm not trying to benefit the receivership estate at the expense of unwitting buyers.

MR. EDNEY:  That's right.

THE COURT:  The flip side of that is I also know that the price isn't discounted because of the litigation.  I know there are arguments that there's litigation, there must be a discount.  But, in my view, if there's not a closing until the litigation has concluded over the validity of the receivership's authority, then I know there is not a discount, from an economic standpoint. So it's, perhaps, resulting in less money to the receivership than if they were to deceive somebody.  But it's being fair to all parties involved.

And, just let me confirm.  You don't have an offer on your hands that is higher -- I know ten percent or the statute -- but any higher than the offers that we've been talking about today?

MR. EDNEY:  No, Your Honor.

THE COURT:  Thank you, Mr. Edney.

MR. EDNEY:  Thank you, Your Honor.

THE COURT:  Mr. Bernstein, let me ask you, is there anything that the SEC wants to add?

MR. BERNSTEIN:  No, Your Honor .

THE COURT:  Okay.  Let me ask if there is anyone else here who needs to say something.

Okay.  So, what I need to say is -- then I'll make oral findings here -- that I think the requirements of the statute are met in terms of the three appraisals, the average, and the amounts under the contract meeting the statutory threshold of two-thirds or higher at the average appraised value.  Already said that in my prior orders both on Amerigold and Hall, but I'll reconfirm that today.

The question for today's hearing is two-fold.  One, are there any other competing offers that are ten percent higher than the ones that we've talked about previously?  And, two, are the sales in the best interest of the receivership estate?  I think that we don't have any evidence of a higher sale that could come in, much less ten percent higher.  The question on, is it in the best interest of the receivership estate: I believe that it is.

So I get Mr. Edney's point that these sales couldn't close until after appeals conclude on the authority of the receivership .

But I do believe that the kind of receivership we have here is unique, and that cuts in both ways.  It's unique because it is largely a real estate-based deal.  It would be easier to conclude that we should pause this and reconvene after appeals are exhausted if it's raw land.

But we do have properties that have incredible upkeep when it comes to Amerigold and interest that keeps accruing. Albeit, we don't have to pay it in the meantime because of my stay in the receivership. But I do think the net balance means that agreeing to a contract for sale on the sooner side is better. So I think it benefits the receivership estate both for Amerigold and Hall Street.

So I'll go ahead and put on the docket later on this week an approval of those, knowing that there wouldn't be a closing until after appeals are exhausted.

Okay. That concludes this hearing. Thank you for being here and for the good lawyering. And we'll see you all the next time we need a hearing in this case.

(Proceedings concluded at 10:37 a.m.)

CERTIFICATION

I, Rachel C. Erickson, United States Court Reporter for the United States District Court in and for the Northern District of Texas, Dallas Division, hereby certify that the above and foregoing contains a true and correct transcript of the proceedings in the above entitled and numbered cause.

WITNESS MY HAND on this 28th day of August, 2024.

/s/ Rachel C. Erickson_____
RACHEL C. ERICKSON, RPR, CRR, CRC
United States Court Reporter
1100 Commerce St., Room 1315
Dallas, Texas 75242
(214) 753-2170