IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § § § | |
| | § | Case No. 3:22-CV-2118-X |
| **Plaintiff,** | § | |
| | § | |
| v. | § | |
| | § | |
| TIMOTHY BARTON, *et al.*, | § | |
| | § | |
| **Defendants.** | § | |

## MOTION OF INTERESTED PARTY MCCORMICK 101, LLC
## TO MODIFY STAY PROVISION SET FORTH IN RECEIVER ORDER

*Introduction*

September 20, 2022.

That is the last date on which a payment was made on the loan (the **"Loan"**) held by McCormick 101, LLC (**"McCormick"** or **"Lender"**). By the time this Motion is heard, the Loan will have been in payment default *for more than 2 years.* Likewise, the property securing the Loan, which includes the Amerigold Suites in Dallas Texas (all property, both real and personal, securing the Loan being referred to herein collectively as the **"Property"**) will have been immune from foreclosure for more than 2 years, pursuant to the Court's two receivership orders entered in this case.

All of is this simply because the Property has been made the subject of this receivership estate due to one general allegation, utterly devoid of specificity, contained in the SEC's Complaint filed against Mr. Barton as part of this case:

97993122.3

Barton, using entities he controlled, then misappropriated nearly all the investor funds, misusing them to, among other things, purchase properties in the name of other entities he controlled, pay undisclosed fees and commissions to Fu, pay expenses associated with unrelated real estate development projects, and fund his lifestyle.

Complaint, paras. 4, 38.

That's it. No specific allegation that Barton used any specific funds to acquire the Property. No attempt, in the SEC's allegations, to trace any particular monies flowing from Barton to McCormick's borrower, Goldmark Hospitality, LLC (**"Borrower"**). And no allegation that Borrower used any such funds to purchase the Property. No such allegations have been made, and, needless to say, 2 years into this case, no evidence has been presented by the Government to such effect. (To the contrary, the Complaint alleges that the offensive offerings that were made to investors were made in the time period from March 2017 through May 2019, Complaint, paras. 26, 65; the Loan made to Borrower and held by McCormick was made in November 2019).

Receiverships are at their core equitable proceedings. Yes, litigation undertaken by the SEC against those alleged of wrongdoing normally takes time and can be cumbersome and unwieldy. But it should not be unduly prejudicial to innocent third parties, like McCormick. Here, the indebtedness owed to McCormick increases by the day, while its collateral is both mismanaged and diminishes in value. Continued imposition of the stay in this matter, with no end game in sight, with the Receiver being allowed to hold the Property indefinitely, and with zero recompense to McCormick pending such stay, is fundamentally unfair – and is inequitable.

McCormick last filed a motion for modification of the stay provision (the **"Prior Motion"**) in the order appointing the Receiver (the **"Receiver Order"**) on February 16, 2024. The Prior Motion was denied by the Court on March 7, 2024. Since then, another proposed sale of the

Property has fallen by the wayside,[1] with McCormick watching from the sideline all the while, with fingers crossed.

The core facts are these: (1) another *6-plus months have passed* since McCormick's Prior Motion was filed; (2) *no payments* have been received on the Loan; (3) there is currently *no prospective purchaser for* the Property; (4) the *income generated by the Property is in decline* under the watch of the Receiver; and (5) the *operating expenses being incurred* at the Property, under the Receiver's administration, *are increasing*. For reasons that are obvious, McCormick now moves again for modification of the stay and injunction provision in the Receiver Order.

### *Receivership as an Equitable Proceeding – and the Equitable Consideration of the Interests of* <u>*All*</u> *Constituents of the Receivership Estate*

*The Interests of Investors and the Interests of McCormick as a Secured Lender*

Receiverships are proceedings in equity. *See W.F. Potts Son & Co. v. Cochrane*, 59 F.2d 375, 378 (5th Cir. 1932) ("[A receivership] proceeding is purely equitable; it should [be] decided upon equitable grounds"). As such, receivers are bound to impartially consider the equities *of all constituents of a receivership estate, and not just some of them. See Jones v. Wells Fargo Bank, N.A.*, 666 F.3d 955, 966 (5th Cir. 2012) (emphasis added) ("A receiver is 'the representative and protector of the interests of *all persons, including creditors*, shareholders and others, in the property of the receivership'") (emphasis added).

In this case, McCormick is of course cognizant of the interests of investors allegedly defrauded by Mr. Barton and the other Defendants in this case. Likewise, McCormick is aware of the Receiver's efforts to generate proceeds that might be made available to such investors if such investors are in fact found to be entitled to recovery from Mr. Barton and the other Defendants.

---

[1] *See* termination letter, dated as of August 12, 2024, from prospective purchaser, Centeridge LLC to Receiver, attached hereto as **Exhibit A.**

At the same time, however, the interests of such investors should not be elevated to such a degree that the legitimate interests of a secured lender are unfairly subordinated or neglected. The interests of the investors are, after all, contingent – dependent upon an actual finding of fraud or other actionable wrongdoing on the part of Mr. Barton or the other Defendants. And by no means do those contingent, unsecured interests prime the current, non-contingent, secured lien of a lender like McCormick. The interests of McCormick are definite – and McCormick is owed principal in an amount in excess of $2.48 million, a debt that is owed ***irrespective*** of the outcome of the current SEC litigation against Mr. Barton. The principal balance owed to McCormick is $2,481,098.27. At the default rate of 15 percent per annum,[2] interest accrues on that debt at the per diem rate of $1033.79. Upon the 2-year anniversary of the last payment made on the Loan (September 20, 2024), interest will have accrued on the Loan in the amount of $754,667.39.

*The Facts of the Stanford Case in Comparison to the Facts of This Case*

The *Stanford* case,[3] oft-cited in this proceeding, does not support the indefinite stay and injunction (2 years running, and with no end game in sight) to which McCormick has been subject in this proceeding. First, in *Stanford*, it was certain of *the investors themselves* who sought modification of the stay so that they may proceed with arbitration proceedings outside the scope

---

[2] The Receiver has announced his intention to challenge McCormick's right to recover interest on the Loan at the default rate. The Receiver should be under no illusions, however, regarding McCormick's right to recover such interest. First, the Receiver ascends to no greater right or interest than was held by Borrower with respect to defending against the obligations owed to McCormick under the Loan. *See Securities & Exchange Commission v. Nardyan*, No. 3:16-CV-1417-M, 2017 WL 447205, at *5 (N.D.Tex. Feb.2, 2017) ("The general rule is that a receiver acquires no greater rights in property than the debtor had; in other words, a receiver stands in the shoes of the entity in receivership"). Second, the Loan is governed by Texas law, and under Texas law, a default interest rate, so long as not usurious, is entirely enforceable by a lender against a commercial borrower. *See* Tex.Fin.Code Ann. Section 303.009 ("For a contract made, extended, or renewed under which credit is extended for a business, commercial, investment, or similar purpose, the limitation on the ceilings determined by those computations is 28 percent a year"); *American Pearl Group, LLC v. National Payment Systems, LLC,* No. 3:22-CV-00693-N, 2023 WL 4375000, at *1 (N.D.Tex. July 5, 2023) ("The usury statues set out in the Texas Finance Code establish that the maximum allowable interest rate for a commercial transaction such as this is 28 percent annually").

[3] *SEC v. Stanford International Bank Ltd.,* 424 F.App'x 338 (5th Cir. 2011).

of the receivership. Thus, some investors were seeking to move forward with independent recovery efforts, prior in time to other, *like-situated* creditors (i.e., other investors) of the receivership estate.

Second, the investors in *Stanford* were seeking to recover general funds (and not collateral) from persons and entities (Lenoir, McDaniel, Cox and Blackwell)[4] who were allegedly liable to the investors in the case commenced by the SEC. Such is not the case here, where McCormick seeks to foreclose *its specific lien* on the Property (which lien provides McCormick with actual, legal priority, with respect to the Property, over general unsecured creditors) against a non-Defendant in the instant litigation.

Third, the requested actions of the investors in *Stanford* (in seeking to proceed with arbitration for the purpose of collecting funds for themselves, which might otherwise have been made available for ratable distribution among like-situated investors) are different from the enforcement action that would be undertaken by McCormick in this case. The arbitration actions of the investors in *Stanford* could not conceivably have generated funds for the receivership estate in that case. Instead, those arbitration actions could only have resulted in monies being paid to the moving investors themselves (and not to non-moving investors), thereby depleting funds that might otherwise have been ratably shared among all investors.

By contrast, in this case, a foreclosure sale of the Property could conceivably generate proceeds in excess of the indebtedness owed to McCormick. The sale could be structured such that it would occur only after a marketing campaign undertaken by the very same broker who has acted on behalf of the Receiver throughout this case. This is the very type of provision and guardrail that was being discussed between counsel for the Receiver and counsel for McCormick

---

[4] *Id.,* at 340.

97993122.3

in connection with the Prior Motion – discussions that were halted when the Court denied the Prior Motion prior to completion of its briefing process and prior to oral argument on the same.

*Application of the Stanford Factors to This Case – the <u>Status Quo is Not Being Preserved</u>, and the <u>Interests of McCormick are Being Injured</u>*

Aside from the distinctions, set forth above, between *Stanford* and this case, the *Stanford* factors, when applied to McCormick's motion, *do* weigh in favor of the motion being granted. The first factor is whether refusing to modify the stay provision preserves the *status quo* or whether the moving party will suffer substantial injury if not permitted to proceed. Here, a failure to modify the stay in no manner preserves the *status quo.* Instead, it results in (1) McCormick's debt increasing, day after day after day, (2) McCormick at the same receiving zero payment (either from its Borrower or from the receivership estate) on its Loan, and (3) the Property diminishing in value under the languishing stewardship of the Receiver.

As to the third component above, a new real estate tax assessment on the Property has nearly tripled the annual real estate taxes payable on the Property – thereby decreasing the Property's net operating income, and, in turn, its value. In addition, net operating income at the Property has been further eroded by the insurance expenditures made by the Receiver since the commencement of the receivership, which have increased from approximately $20,000 annually, pre-receivership, to $170,000 over the past 12 months.

More important, the Receiver's Eighth Receiver Report, filed with the Court on July 30, 2024, states at p. 59 that the gross income generated by the Property for the second quarter of 2024 was $200,752.46. ***In the course of the receivership, none of the income from the Property has been offered by the Receiver for payment of any portion of the debt service owed to McCormick.*** Moreover, under the Receiver's watch, the quarterly gross income generated by the Property ***has***

97993122.3

*decreased* from the amount of gross income generated prior to the commencement of the receivership, according to the financial reporting delivered by the Borrower:

° In the first six months of 2022:       $451,711 (or $225,855 per quarter); and

° For the full year of 2021:       $912,277 (or $228,069 per quarter).

The diminution in gross income thus is approximately $25-28,000 per quarter, or approximately $100-112,000 per year.

Likewise, operating expenses at the Property have vastly *increased* in the course of the receivership in comparison to pre-receivership operating expenses – which, of course, diminishes net operating income at the Property, and, in turn, the Property's value.  The following is a total of the operating expenses incurred at the Property during the receivership:

° Quarter 1 2023:       $202,343;

° Quarter 2 2023:       $187,686;

° Quarter 3 2023:       $181,475;

° Quarter 4 2023:       $113,782;

° Quarter 1 2024:       $265,056; and

° Quarter 2 2024:       $136,731.

In stark contrast, quarterly operating expenses at the Property averaged $97,726 in 2021 and $104,928 in 2022.[5]   As the Court can see, expenditures for operations at the Property has skyrocketed under the administration of the Receiver.

The debt on the Loan is getting larger, each day.  No payment has been made on the Loan, for approximately 2 years now.  The value of the Property securing the Loan, meanwhile, is

---

[5] In the course of the receivership, the Property has not been professionally managed.  The total amount of management fees paid, over the past 12 months, to the unlicensed property manager currently at the Property is $38,344 – compensation paid in addition to allowing her to live rent-free at the Property.  By contrast, a traditional, professional property management company would charge a fee equal to 3 percent of revenue, or approximately $35,000.

97993122.3

diminishing, together with its income-producing capacity.  In short, there is no *status quo* being "preserved" here.  Instead, there is substantial injury to McCormick – with no plan in place, and with no end in sight.

Nor is "the Receiver's task to marshal, preserve and conserve the receivership estate as much for [McCormick's] benefit as for the benefit of all of the other creditors."[6]  In this regard, McCormick's position is entirely distinct from the position of the investors in this case (and from the investors who sought stay relief in *Stanford*).  McCormick is a *secured* creditor, with a lien on distinct property, owned by a non-Defendant int this action.  As such, McCormick has the first and exclusive right to receipt of proceeds from a sale of the Property, up to the amount of the debt owed to it – and is in no need of the Receiver's preservation or conservation of the Property.  The investors in S*tanford*, on the other hand, were like-situated, *unsecured* claimants, who benefited from that receiver's preservation and conservation of assets, so as to ensure a ratable distribution among them.

*Application of the Stanford Factors to This Case – the Timing of This Motion*

The second *Stanford* factor is the timing, in the course of the receivership, at which the motion for relief is made.  This factor is clearly designed to prevent one constituent's "rush" to exercise its own rights at an early stage of the receivership, before a receiver can gain control of the assets he is charged with administering.  In *Stanford*, the court determined that the 1-year mark of the receivership was too early, given the receiver's efforts in the case, to grant a motion for modification of the stay and injunction.  Admittedly, there is no exact science with respect to the issue of "how long is too long."  However, it goes without saying that there have been two consecutive receivership orders entered in this case, and they have stayed McCormick's

---

[6] Court's Order denying McCormick's Prior Motion, p. 2, referencing the first factor in the *Stanford* analysis.

97993122.3

enforcement of its Loan for 2 years now – twice the time that was at issue in *Stanford.* And, in this case, multiple efforts have been made to sell the Property without resort to foreclosure, and all have failed. McCormick has knocked on this door before – but has not been impatient. Two years is a long time to wait, particularly when a lender's debt is growing, no payments are being made on that debt, and there is no definite plan in place for an alternative resolution.

The timing of this motion is appropriate.

*Application of the Stanford Factors to This Case – the Merits of McCormick's Underlying Claim*

The third *Stanford* factor is the simplest of all – the merits of McCormick's underlying claim. As the Court noted at p. 3 – 4 of its prior Order, "McCormick as the holder of Goldmark Hospitality's mortgage loan for the Amerigold Suites, is entitled to repayment – as the Court noted in its order approving the sale of the Amerigold Suites." This factor rests squarely in favor of McCormick.

With respect to the Prior Motion, and motions made by other secured lenders in this case, it should be noted that the Receiver has, incredibly, asserted that McCormick and other lenders do *not* prevail with respect to this third factor of the *Stanford* test. The Receiver, in so contending, has obviously obscured this third factor with the first, arguing that denial of the motion really preserves the *status quo* and does not prejudice McCormick or other moving lenders. The Court should recognize this obscurity for what it is – a mixing of *Stanford's* first and third factors. As to the third factor – the merits of McCormick's underlying claim – McCormick clearly prevails.

### Conclusion

Neither Mr. Barton nor any other Defendant in this action is the owner of the Property that is the subject of this Motion. Mr. Barton is the owner of *an equity interest* in the Borrower, but is not in any way, shape or form the owner of the Property itself. That notwithstanding, the Property

(as opposed to Mr. Barton's equity interest) has found itself swept up in the course of this receivership, with absolutely no specific allegation set out in the SEC's Complaint that it so belongs, and with no evidence, in the course of this case's 2-year existence, that the Property itself (as opposed to Mr. Barton's equity interest in Borrower) should be subject to the sweeping injunction set forth in the Receiver Order.

As set forth above, the increase in the indebtedness owed under the Loan is outpacing the Property's ability to generate net operating income, particularly with the Property being administered by the Receiver rather than by a licensed property manager.  The receivership is not just preventing McCormick from being paid, it is placing at risk McCormick's ability to get paid.

The motion should be granted.

Respectfully submitted,

**POLSINELLI PC**

By:  */s/  P. Kyle Cheves*
P. KYLE CHEVES (SBN 24126723)
2950 N. Harwood Street, Suite 2100
Dallas, Texas 75201
(214) 397-0030
kcheves@polsinelli.com

BRETT D. ANDERS (*pro hac vice* forthcoming)
BRADLEY R. GARDNER (*pro hac vice* forthcoming)
KELSEY E. HODGDON (*pro hac vice* forthcoming)
900 West 48th Place, Suite 900
Kansas City, Missouri 64112
(816) 753-1000
banders@polsinelli.com
bgardner@polsinelli.com
khodgdon@polsinelli.com

ATTORNEYS FOR
MCCORMICK 101, LLC

97993122.3

## CERTIFICATE OF CONFERENCE

Pursuant to Local Rule 7.1, I hereby certify that on August 29, 2024, movant's counsel conferred with counsel for the Receiver regarding the substance of this motion and the relief sought herein. As a result of these discussions Counsel for the Receiver stated they are opposed to the relief requested. Further, on August 30, 2024, movant's counsel conferred with counsel for Plaintiff Securities and Exchange Commission who indicated that the Securities and Exchange Commission is likewise opposed.

/s/ P. Kyle Cheves
P. Kyle Cheves

## CERTIFICATE OF SERVICE

I hereby certify that on the 4th day of September 2024, a true and correct copy of the foregoing Motion was filed with the Clerk of the Court using the CM/ECF system, which will send a notice of such filing to all counsel of record.

/s/ P. Kyle Cheves
P. Kyle Cheves

97993122.3