IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § § § | |
| *Plaintiff*, | § § § | |
| v. | § § | No. 3:22-cv-2118-X |
| TIMOTHY BARTON, et al. | § § § | |
| *Defendants*, | § | |

# RECEIVER'S REPLY TO BARTON'S OPPOSITION TO RECEIVER'S FOURTH QUARTERLY FEE APPLICATION

Respectfully submitted,

By: /s/ Charlene C. Koonce
    Charlene C. Koonce
     Texas Bar No. 11672850
     charlene@brownfoxlaw.com
    Timothy B. Wells
     Texas Bar No. 24131941
     tim@brownfoxlaw.com
    BROWN FOX PLLC
    8111 Preston Road, Suite 300
    Dallas, TX 75225
    Tel. 214.327.5000
    Fax. 214.327.5001

*Attorneys for Receiver Cortney C. Thomas*

Cort Thomas files this Reply to Defendant's Opposition (Dkt. 597), to the Receiver's Fourth Quarterly Fee Application (Dkt. 593, the "Motion"), and respectfully shows the Court as follows.

### A. The Fees and Expenses Are Reasonable,[1] Well Within the Court's Discretion, and Payment By the SEC Has Not Been Properly Presented to the Court

The Response ignores this Court's discretion in determining fees awarded to receivers. *SEC v. Allen*, No. 3:11-CV-882-O, 2013 WL 12125996, at *2 (N.D. Tex. Feb. 26, 2013); *see also SEC v. Safety Fin. Serv., nc.*, 674 F.2d 368, 373 (5th Cir. 1982). It also ignores the deference arising from the absence of an objection by the SEC. *Allen*, 2013 WL 12125996, at *3. In addition to the lodestar analysis and the *Moody* considerations,[2] a receiver's compensation generally "corresponds with the degree of responsibility and business ability required in the management of the affairs intrusted [sic] to him, and the perplexity and difficulty involved in that management." *Stuart v. Boulware*, 133 U.S. 78, 82 (1890). Even when a receivership is dissolved, reversed, or unsupported legally or equitably, courts have extremely broad discretion in determining how to tax the costs of the receivership. *See SEC v. Elliott*, 953 F.2d 1560, 1577 (11th Cir. 1992).

Repeatedly, the Response suggests fees should be borne by the SEC. That assertion, however, is improperly raised in a response[3] and provides no basis to deny the requested fees as reasonable and necessary. The argument also omits a significant aspect of the law regarding the irrelevant assertion that "irregular or unauthorized" appointments justify imposing the costs of a receivership on the party who sought the appointment.[4] First, nothing about the Receiver's

---

[1] The Receiver concedes a mathematical error exists in the number of hours reported for accounting associate Kiranpreet Walia as stated on p. 12 of the Response and therefore agrees to reduction of $1,470 for that time.

[2] *SEC v. W.L. Moody & Co., Bankers (Unincorporated),* 374 F.Supp. 465, 480 (S.D.Tex.1974), *aff'd,* 519 F.2d 1087 (5th Cir.1975).

[3] As this Court has repeatedly instructed Barton, a response is not the appropriate mechanism in which to seek independent relief.

[4] *Response* p. 4.

– 1 –

appointment was unauthorized. Although the Fifth Circuit vacated the Initial Receivership Order,[5] it stayed vacatur and remanded the case for consideration of a new Receivership Order thereby implicitly concluding authority existed for the initial and the subsequent appointment. Second, although the Fifth Circuit concluded this Court had initially utilized the wrong standard in determining that a receiver was appropriate, any irregularity, if it had existed, was corrected by the current Receivership Order.[6]

B.  **The Evidence and Discussion Regarding the *Johnson* Factors is More Than Sufficient.**

   1.  **The Skill and Experience of the Receiver's Team is Amply Demonstrated**

Barton does not assert that the reduced rates charged by the Receiver or any member of his team are unreasonable. Rather than contending the Receiver or any member of the Receiver's professional team lack experience or skill, or that their reputations or other professional qualities are deficient, Barton contends the Receiver failed to provide adequate evidence of these factors with respect to the reasonableness of the fees. The arguments have no merit.

First, although the reasonableness of an hourly rate must be supported by the record, "the district court is itself an expert in assessing these matters." *Davis v. Bd. of Sch. Comm'rs of Mobile Cnty.*, 526 F.2d 865, 868 (5th Cir. 1976); *see also Alto-Shaam, Inc. v. Manitowoc Co.*, No. 7:09-CV-018-O, 2012 WL 12978015, at *4 (N.D. Tex. Feb. 2, 2012) (O'Connor, J.). Here, the record evidences the Receiver's expertise in the dozens if not hundreds of motions or responses he has filed, as well as his in-person testimony and his numerous and extensive Declarations.[7] The Court has also stated on the record its trust in the Receiver's qualifications as one reason for his selection.

---

[5] The Receivership Order entered on October 18, 2022, Doc. 29, hereafter, the "Initial Receivership Order."

[6] Doc 417, hereafter, the "Receivership Order."

[7] *See* for example, Doc. 308.

The Receiver's experience is also detailed in other filings.[8] Ms. Koonce's 20+ years of experience in government enforcement receivership matters is stated in the Motion,[9] and the Court also possesses extensive familiarity with her expertise and skill based on 100+ motions, responses or replies she has drafted as reflected in the docket, as well as numerous appearances before the Court.[10] The Court thus has ample evidence regarding the Receiver's and Ms. Koonce's skill and experience to evaluate the experience and background of the Receiver's team, although those factors are hardly the sole basis for the reasonableness of the fees at issue.[11] *See Louisiana Power & Light Co.*, 50 F.3d at 327 (finding no abuse of discretion in district court's fee award despite vagueness objections, given "the district court's familiarity with this case, including the quality of the attorneys' work over a period of several years.").

### 2.  The Rates Charged are Far Lower than Comparable Rates in the Community.

"The reasonable hourly rate is the rate prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." *BMO Harris Bank, N.A. v. RidgeAire, Inc.*, 2014 WL 12612803, at *1 (E.D. Tex. June 4, 2014) (internal quotations omitted). An attorney's uncontested and customary billing rate, if within the range of prevailing market rates is *"prima facie* reasonable" as the lodestar. *Louisiana Power & Light Co*, 50 F.3d at 328. The trial court itself is an expert as to the reasonableness of attorney's fees and may exercise its own

---

[8] *See* Report, Doc. 308, pp. 1-2. The Court may of course judicially notice these documents in the docket.

[9] Motion, p. 18.  Other courts have overruled objections to Ms. Koonce's fees, concluding her work was "helpful and of high quality." *FTC v. IAB Mktg. Associates, LP*, No. 12-61830-CIV, 2013 WL 12032590, at *2 (S.D. Fla. Feb. 11, 2013).

[10] Other briefing also provides additional information about Ms. Koonce's experience and qualifications. *See* Doc. 134, ¶ 33 (Koonce licensed in Texas since 1991, admitted before the Fifth and Eleventh Circuit Courts of Appeal, graduated from Pepperdine School of Law with honors, worked as an associate at Gibson Dunn & Crutcher for several years, and more than twenty years at Scheef & Stone, LLP, where she became the firm's first female equity partner. Throughout thirty years of practice, Koonce has engaged in complex business litigation and served as or represented government enforcement receiver in more than three dozen federal cases).

[11] Both cases cited for Barton's assertion that "[c]onclusory statements that someone has practiced for so long or is at such firm . . . prove reasonableness of that individual's fees," address conclusory time entries rather than factual statements regarding a timekeeper's background and experience.

expertise and judgment in making an independent valuation of appropriate attorney fees. *See Primrose Operating Co. v. Nat'l Am. Ins. Co.*, 382 F.3d 546, 562 (5th Cir. 2004).

The Motion provides the Receiver's regular billing rate of $575 per hour, his discounted rate of $385, and explains that all members of the Receiver's team bill at discounted rates.[12] The Motion also provides comparable rates charged by other receivers and their counsel in the Northern District of Texas, which ranged between $1,395 and $445 (in a 2018 case).[13] In comparison, Barton does not challenge the rates here as unreasonable, only as lacking evidence. The objection ignores the information in the Motion and docket, and given the reduced rates at issue, lacks merit.

### 3. The Results Obtained Justify the Fees

The premise of Barton's objection to the "results obtained" is flawed. First, seeking sales of properties is hardly the sole "result" of the Receiver and his team's efforts during the relevant period. And indeed, the objection fails to specifically reference any entries, presumably because the invoices do not reflect efforts to sell properties that were not already under contract.[14] Instead, billing entries that reference communications with title companies and review of title documents evidence work in support of the Receiver's tracing analysis.[15] Second, the pending (and prior) appeal of the Receivership Order are not impediments to closing sales. Instead, to date, title companies have been unwilling to issue title insurance while improper appeals of orders approving

---

[12] The Response also ignores that the discounted rates are further discounted for much of the time at issue, based on the tasks performed. *See* Motion at p. 8.

[13] Doc. 593, n. 6. The Receiver's rate in the *Agridime* case was initially $1,395.

[14] During the relevant time-period, limited communications occurred with the contracted purchasers of three properties; activities that were neither enjoined nor improper.

[15] *See* for example, Wells time entries at App. pp. 27, 29, 31, 32, 33, 34. For a further explanation of this work, *see* Doc. 308, ¶ 26: "A repeated practice employed by Barton that has rendered tracing difficult, was selling or refinancing a property and instructing the title company to transfer the proceeds to a different property transaction. . . . To trace these funds, . . . [we] contacted the many title companies . . . and requested closing documents for these transactions. Due to the number of entities, the title companies often had difficulty locating all of the transactions which required my team and I to scour the Initial Receivership Entity records and county deed records. . ."

the sales of the properties are pending.[16]  Finally, as explained in response to Barton's objections to various motions to approve sales, "by seeking approval of these sales [while appeals are pending] . . . the Receiver seeks to run the due diligence periods related to each property sale concurrently with the . . . the appeal, such that the sales will close shortly after resolution of the appeal."[17]  The Receiver thus seeks, where possible, to minimize the continuing loss of equity caused by accruing interest.[18]

C.   **Expenses Included in the Motion are Reasonable.**

1.   **Vacatur of the Receiver's Appointment Was Stayed.**

Barton ignores the meaning of the Fifth Circuit's August 31, 2023 order, as well as the import of additional relevant orders.  As the Fifth Circuit held in both its withdrawn June 2023 opinion and the superseding August 31, 2023 opinion, vacatur of the Receivership Order was "effective 90 days from the issuance of" of the appellate mandate, while this Court considered a new receivership order.[19] The Receivership Order was entered on November 29, 2023,[20] and vacatur of the Initial Receivership Order became effective only after the Receivership Order was entered.  Thus, work performed while the Initial Receivership Order was in force was fully authorized at the time the work was performed.  And, this Court also ratified all work by the Receiver and his team that had been performed pursuant to the Initial Receivership Order.[21]

---

[16] *See* for example, Doc. 528, n.1, and p. and p. 7 ("As Barton is well aware, his serial (and improper) appeals of sale orders have dissuaded title companies from issuing title policies on prior Court-approved sales."); Doc 543, pp. 13-14; and Doc. 308 ¶ 21. The Receiver continues efforts to locate a title company that will insure title to allow the sales to close, and also continues in his efforts to have these serial, jurisdiction-less appeals dismissed.

[17] Doc. 528.

[18] *Id.* Through the date of the Receiver's Amicus Brief, interest is eroding estate value by at least $170,000 per month.

[19] *SEC v. Barton,* 79 F.4th 573, 580-581 (5th Cir. 2023).

[20] Doc. 417.

[21] Doc. 419 (the "Blessing Order"); S*ee also* Doc. 408, the Reply ISO the Blessing Motion, at pp. 2-4 ("[V]acatur does not preclude subsequent ratification premised on a new receivership order.").

## 2. None of the Work At Issue Exceeded the Scope of the Fifth Circuit's Order

Barton complains the "Receiver directed substantial resources toward justifying his re-employment," and similarly argues that the Receivership was directed "not to perform certain actions . . . [but] did it anyway."[22] Both assertions are incorrect. As explained in the Receiver's Interim Report and Declaration,[23] the work reflected in the pending Motion was necessary and required to comply with (1) this Court's order to prepare and file the Report providing information for the Court to evaluate which, if any, entities and properties satisfied the test articulated by the Fifth Circuit; (2) with the obligations in the Initial Receivership Order; and (3) because "the best interests of the Receivership Estate—particularly the defrauded investors and creditors—require maximizing and accurately identifying the assets included in the Receivership Estate."[24]

Further, Barton's complaint that work exceeded the scope of the Fifth Circuit's order fails to identify any time entry or any specific work that was unauthorized. The argument also ignores the Fifth Circuit's initial order, entered on June 18, 2023, in which the Receiver's power to sell or dispose of property belonging to the receivership entities was suspended, but "activities in furtherance of sales or dispositions of property that have already occurred or been approved by the district court"[25] were not. And notably, this Court had approved prior sales because the sales were in the best interests of the Receivership Estate.[26] Finally, Barton's arguments that the Motion contradicts prior representations regarding the Estate's limited cash resources relies on the

---

[22] Response p. 8.

[23] Doc. 308, hereafter the "Report").

[24] *See* Doc. 308, ¶¶ 13-19.

[25] *SEC v. Barton*, Appeal No. 22-11132, Mem. Op. p. 13, *superseded by Barton,* 79 F.4th at 573.  The August 31, 2023 decision also clarified that, "[a]ctivities in furtherance" [of pending sales] "do not include the completion of the sale of any property."

[26] *See* Docs. 104, 142, 202, 436, 437, 438.  Limited (and authorized) communications with contracted purchasers as necessary, also occurred.

transcript of a hearing conducted before the Receiver had settled various claims which generated cash used to pay some administrative costs,[27] and the July 26, 2024 Renewed, Partially Unopposed Third Quarterly Fee Application, in which the Receiver accurately reported that "until sales begin to close, . . . the Receivership will continue to be cash-strapped, although certain settlements of litigation matters is expected to continue generating some income."[28]  These statements were, and are accurate.  The Receivership Estate is *still* cash strapped, and its ability to pay, belatedly and only partially, some administrative costs, provides no basis to deny the Motion.

### 3. Fees Have Not Been Incurred For Impermissible or Impossible Activities[29]

Barton identifies no time entries that reflect time spent seeking to sell properties while the authority for that activity was suspended, and no such work occurred.  Similarly, Barton's contention that "the only bills to be paid are their own bills," is refuted by virtually every single Report or Declaration filed by the Receiver, in which he has identified the growing debt that encumbers every property and which the Estate lacks assets to satisfy, as well as other expenses, which include for example, property taxes.[30]

### 4. Microsoft 365 Licenses and Intuit Expenses are Reasonable

Barton complains the Receiver's explanation for expenses related to Microsoft 365 licensing is conclusory, insufficiently documented and that July and August 2023 expenses for the licenses are unjustified.  The expenses were necessitated by Barton's refusal to answer any questions about the location of documents or the Receivership Entities' computer system, which

---

[27] *See* Docs. 497, 549, 550.

[28] Doc. 539, pp. 9-10.

[29] As discussed above, the appeal of the Receivership Order is not the basis for an inability to close sales, and efforts to obtain approval of sales to staunch the erosion of equity while waiting for dismissal of the jurisdiction-less appeals sales seek to preserve estate value by accelerating closure once the appeals are dismissed. *See infra,* and Doc. 528.

[30] *See* Doc. 308, ¶¶108, 228; Doc. 583.

in turn required hiring computer analysts to locate and preserve electronic data.[31] In analyzing the Receivership Entities' computers, the analysts found 79 distinct Microsoft 365 user accounts, which in turn required activation (by payment) to access the users' data, for every user. Utilizing these licenses enabled exporting and storing files offline and eliminating the need for active licenses for all of Barton's prior user accounts.[32]

As explained previously, justification for the Intuit expenses also originated with Barton's contempt.[33] The Quickbooks fees were necessary to obtain the data stored on that platform (while Barton refused to provide access). Because the Quickbooks entries frequently contradicted entries in bank records and suggested intentionally misleading entries, after garnering as much information from that platform as possible, the majority of the licenses were discontinued.[34]

### 5. Entries Are Not Overly Redacted, and Redactions Are Permissible

Redacted billing records are acceptable if the court has sufficient information to form an opinion on the reasonableness of the fees. *Randolph v. Dimension Films*, 634 F. Supp. 2d 779, 800 (S.D. Tex. 2009); *Produce Pay, Inc. v. Amore Produce, LLC*, No. 7:20-CV-00293, 2021 WL

---

[31] *See, e.g.,* Docs. 133, 166, 478.

[32] The cases cited by Barton do not support denial of the fees and expenses and instead suggest enhancement may be appropriate. *See* Response, p. 10, citing *Combs v. City of Huntington, Tex.*, 829 F.3d 388, 391 (5th Cir. 2016) (affirming downward adjustment to lodestar based on "limited success" of the prevailing party but also observing that although lodestar is "presumed reasonable," adjustment is appropriate where "factor that may be properly considered in determining a reasonable fee" are not considered) (internal quotation omitted); *Islamic Ctr. of Mississippi, Inc. v. City of Starkville, Miss.*, 876 F.2d 465, 468 (5th Cir. 1989) (reversing in part, district court's refusal to adjust lodestar upwards, where the attorney was "very able and experienced . . . litigator" whose "expertise . . . has commanded the respect of th[e] court on many occasions," but the district court "made no express finding . . . whether such an increase was necessary to induce competent counsel to accept such cases in the future, . . [or] whether the lodestar should be enhanced based upon the delay in payment of fees for legal services."); *Porter v. Cooke*, 127 F.2d 853, 857 (5th Cir. 1942) (reversing judgment taxing costs of receivership against defendant-appellees, where "institution of the suit and the procurement of the receivership was wrongful as against" appellees and facts underlying claims were contrary to what the appellants had asserted); *Louisiana Power & Light Co.*, 50 F.3d at 326–27 (affirming district court's refusal to reduce a fee award based on vagueness objections, given court's broad discretion to "*accept or reject* fee applications and the district court's familiarity with the case) (emphasis original).

[33] *See* Docs. 133, 166, 225.

[34] *See* Doc. 225, pp. 34-35; Doc. 133, pp. 6-7, 8; Doc. 308 ¶ 44,

5155715, at *3–4 (S.D. Tex. July 21, 2021) (Alanis, M.J.) (partially redacted entries provided sufficient information for the Cout to determine that the time expended was reasonable). Barton fails to identify any specific entry that is overly redacted, but the Motion proposed and the Receiver reiterates his offer of unredacted invoices for the Court's *in camera* review, if necessary.

### 6. Barton Misconstrues Testimony Regarding Fees Billed for Tax Returns.

Barton complains that the Receiver misrepresented the percentage of time billed by his accountants for preparing tax returns.[35] In so doing, Barton ignores half of the Receiver's explanation and the further detail in the accountants' billing statements: the "underlying accounting and auditing work that primarily assisted the preparation of these tax filings."[36] The Receiver's estimate and explanation regarding tax work was not inaccurate.

### 7. Time Entries are Sufficiently Detailed.

**a)** Barton complains entries in the accountants' bills for "[d]iscussion regarding status of the project and next steps," are vague, excessive and inadequately documented. The Motion, however, provides further detail regarding the work performed and references additional descriptions of the work in the Receiver's Fifth Status Report.[37] Moreover, the accountants voluntarily wrote off more than $35,000.[38]

**b)** References to "tracing" in the bills are likewise further explained in the Motion, the Receiver's Fifth Status Report, and were described in painstaking detail in the Receiver's Report, as well as his live testimony.[39]

---

[35] Response, p. 12.

[36] Motion, p. 9. Additionally, as discussed in the Motion, Barton had not filed tax returns for the Receivership Entities since 2019, which accordingly necessitated extensive work.

[37] Motion, p. 9, referencing Doc. 373, p. 43, Doc. 308, *passim*, and Doc. 361, 362, 363, and 364 (which evidence further details of the tracing analysis performed).

[38] Motion, p. 10.

[39] *See* Motion, pp. 6-9.

  **c)**  Sufficient detail for the time expended preparing, supporting, and revising the Receiver's ninety-nine page Report, (which attached 80 pages of exhibits that were also prepared and reviewed by the Receiver and his team),[40] is evidenced in the time entries, the Receiver's description of that work in the Motion, his Fifth Status Report, and most notably, the incredibly detailed Report.[41] Moreover, the Receiver explained much of his time was spent overseeing the accountants' work, which was then incorporated (through discussion and exhibits) into his Report, and, he wrote off significant amounts of his time in connection with preparation of the Report.[42]

  **d)**  Barton's objection about other purportedly vague, excessive, duplicative or inadequately documented time entries rest on his inaccurate summaries of the bills, his Exhibit 6.[43] The Exhibit includes time entries for dates that are not included in the bills or the Motion, for instance in January, February, March, April, May, June, October, November and December of 2023.[44] And the time recorded for the various timekeepers in Barton's Exhibit does not correspond to the time that was actually billed.[45] In short, the Exhibit is misleading and inaccurate, and the objection does not warrant any reduction or denial of the fees requested.

  The Receiver requests that the Court overrule the objection and grant the Motion.

---

[40] As discussed at the hearing regarding the SEC's motion to re-appoint a receiver, each exhibit was also supported by bank records, further analysis, and extensive work. *See* Doc. 361, 362, 363, and 364.

[41] Motion, pp. 5-6; Doc. 373 p. 8, ("significant time and expense of preparing the Declaration and Interim Report were justified . . . because the filing was mandated by the District Court, complied with the Receiver's duties under the Receivership Order, and most importantly, gave the Receivership (and thus defrauded investors and creditors) the best chance to maximize and accurately identify the assets to be included in the Receivership Estate . . ."); Doc. 308.

[42] Motion p. 5.

[43] Response, pp. 45- 52.

[44] *See* Response, p. 46, 47, 49, 50- and 51.

[45] As one example only, Barton provides a purported summary of Tim Wells' time on July 13, 2023, which does not appear in the actual invoice. *Compare* Response p. 45 and Motion, App. pp. 40-41. The Exhibit, like all other exhibits submitted with the Response lacks any proffering or authenticating testimony, **and notably, also lacks any confirmation that the Exhibit provides** *true and correct information.*

Respectfully submitted,

By: */s/ Charlene C. Koonce*
    Charlene C. Koonce
     Texas Bar No. 11672850
     charlene@brownfoxlaw.com
    Timothy B. Wells
     Texas Bar No. 24131941
     tim@brownfoxlaw.com
    BROWN FOX PLLC
    8111 Preston Road, Suite 300
    Dallas, TX 75225
    Tel. 214.327.5000
    Fax. 214.327.5001

*Attorneys for Receiver Cortney C. Thomas*

## **CERTIFICATE OF SERVICE**

Pursuant to Fed. R. Civ. P. 5(d)(1)(B), as amended, no certificate of service is necessary, because this document is being filed with the Court's electronic-filing system.

*/s/ Charlene C. Koonce*
Charlene C. Koonce