# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § § § | |
| *Plaintiff*, | § § | |
| v. | § § | No. 3:22-cv-2118-X |
| TIMOTHY BARTON,<br>CARNEGIE DEVELOPMENT, LLC,<br>WALL007, LLC,<br>WALL009, LLC,<br>WALL010, LLC,<br>WALL011, LLC,<br>WALL012, LLC,<br>WALL016, LLC,<br>WALL017, LLC,<br>WALL018, LLC,<br>WALL019, LLC,<br>HAOQIANG FU (A/K/A MICHAEL FU),<br>STEPHEN T. WALL, | § § § § § § § § § § § § § § | |
| *Defendants*, | § § | |
| DJD LAND PARTNERS, LLC, and<br>LDG001, LLC, | § § § | |
| *Relief Defendants*. | § | |

## RECEIVER'S TENTH QUARTERLY STATUS REPORT (4Q24)

Cortney C. Thomas, as the court-appointed Receiver in the above-referenced case, submits the following Tenth Quarterly Status report for the Fourth Quarter of 2024 pursuant to this Court's Order Appointing Receiver [Dkt. 417] (the "Receivership Order" or "RO").[1]

Pursuant to the Receivership Order, the Receiver is directed to submit quarterly reports that contain the following information:

---

[1] The Receiver's nine prior Quarterly Reports [Dkts. 67, 139, 225, 299, 373, 456, 491, 543, and 583], as well as his Declaration and Interim Report [Dkt. 308], are hereby incorporated by reference as if fully set forth herein.

A.      A summary of the operations of the Receiver;

B.      A description of all known Receivership Property, including approximate or actual valuations, anticipated or proposed dispositions, and reasons for retaining assets where no disposition is intended;

C.      The amount of cash on hand, the amount and nature of accrued administrative expenses, and the amount of unencumbered funds in the estate;

D.      A schedule of all the Receiver's receipts and disbursements (attached as **Exhibit A** to the Quarterly Status Report), with one column for the quarterly period covered and a second column for the entire duration of the receivership;

E.      A description of liquidated and unliquidated claims held by the Receivership Estate, including the need for forensic and/or investigatory resources; approximate valuations of claims; and anticipated or proposed methods of enforcing such claims (including likelihood of success in; (i) reducing the claims to judgment; and, (ii) collecting such judgments);

F.      A list of all known creditors with their addresses and the amounts of their claims;

G.      The status of Creditor Claims Proceedings, after such proceedings have been commenced; and

H.      The Receiver's recommendations for a continuation or discontinuation of the receivership and the reasons for the recommendations."

RO at ¶ 59.

# I.
## SUMMARY OF THE OPERATIONS OF THE RECEIVER

The Receiver and his team performed less work on Receivership tasks during the Fourth Quarter of 2024 than any prior quarter.[2]  This decrease is largely attributable to two factors:

First, Braton's second appeal of the Receivership Order, on a non-expedited basis, has continued to delay the Receiver's institution of a claims process, pursuit of certain lawsuits, and clean-up of the majority of the dozens of lawsuits the Receiver inherited upon his appointment.

---

[2] Whereas prior Quarterly Reports copy-pasted much of the background information from prior reports (*see, e.g.*, Ninth Quarterly Report [Dkt. 583]), this Report—and likely future reports while Barton's appeals are pending and limited activity occurs—will instead focus on updating only those matters with actual changes from the Quarter.

Second, and far more impactful to the Receiver's work, Barton's improper interlocutory appeals of sale orders have prevented the Receiver from being able to secure title policies for any of his approved sales, effectively giving Barton the stay he previously sought (and was denied) by both the District Court and the Fifth Circuit. This *de facto* stay has had immense consequences on the Receivership Estate because of the significant debt that encumbers every single property currently held by the Receiver. For the first few months of the Receivership, the Receiver has targeted three properties to sell: the Rock Creek Property, the Frisco Gate Property, and the Amerigold Suites. Collectively, the original approved sale price of these three assets is $15.9 million. The principal long balance (before interest) on these same three properties is approximately $10 million.[3] However, between the date each of these sales was approved and December 31, 2024, over $1 million in interest accrued. Additionally, the sale price of the Amerigold Suites decreased by $700,000 during this period because of the original purchaser's withdrawal and the change in market conditions. In other words, because of Barton's improper[4] interlocutory appeals of Sale Orders and other wrongful conduct, the Receivership Estate has lost at least $1.7 million in equity on these three properties alone.

If Barton's delays that at the Fifth Circuit persist, the limited equity that remains in the Receivership Assets—with the exception of the four HUD Properties, which have their own substantial legal issues—will continue to erode at a rate of approximately $170,000 per month— and $2 million per year. In short, these improper appeals of sale order have already substantially impacted the Receivership Estate and, if Barton continues to pursue them, will only further negatively deteriorate the remaining equity unless the Fifth Circuit prohibits them. Until that

---

[3] This includes Palisades' purchase money, though the Receiver has been unwilling to pay any interest on these funds.

[4] The Fifth Circuit originally dismissed the Rock Creek appeal for lack of jurisdiction, before later withdrawing the opinion and instead denying as moot.

occurs, it will remain impossible for the Receiver to accruable predict the potential realizable value of the Receivership Estate.

Below, the Receiver provides an update of the status of the District Court Case, Barton's appeals, and the Defendants' criminal case:

### A.    Barton's Appeal of the Receivership Order and Sale Orders

The Court entered its Initial Receivership Order[5] [Dkt. 29] on October 18, 2022.  Barton subsequently appealed the Initial Receivership Order [Dkt. 66].  While his appeal was pending, Barton sought stays of the Receivership from both the District Court and the Fifth Circuit.  The stays were denied.  Barton also sought an accelerated appeal at the Fifth Circuit, which heard oral argument on May 1, 2023.  On June 28, 2023, that court issued a published opinion that vacated the Receivership Order effective 90 days after the issuance of the Fifth Circuit's mandate and remanded back to the district court for further proceedings.  The Fifth Circuit later modified its opinion[6] and issued its mandate on August 31, 2023.

That same day, the District Court ordered [Dkt. 305] the SEC to move for entry of a new Receivership Order on or before September 7, 2023, with Barton's response due September 25, 2023, and the SEC's reply due October 5, 2023.  The Court also directed the Receiver to submit a declaration "providing all information obtained since his appointment that he believes is relevant to the Court's consideration of a proposed new receivership order, or anything else he believes will assist the Court or help inform the Court's deliberation on this matter."

---

[5] Capitalized terms used but not defined herein shall have the meanings ascribed in the Receiver's Ninth Quarterly Report [Dkt. 583].

[6] The Fifth Circuit's Opinion suspended the Receiver's ability to sell or dispose of any property not previously approved by the Court; however, initially the court expressly authorized the Receiver to engage in "activities in furtherance of sales or dispositions of property that have already occurred or been approved by the district court."  The Fifth Circuit later modified its prior opinion and suspended the Receiver's ability to sell or dispose of any property, including those properties that the District Court had previously authorized the Receiver to sell.

The Receiver filed his Declaration and Interim Report [Dkt. 308][7] on September 5, 2023. As detailed more fully in the Declaration and Interim Report, the significant time and expense of preparing the Declaration and Interim Report were justified, among other things, because the filing was mandated by the District Court, complied with the Receiver's duties under the Receivership Order, and most importantly, gave the Receivership (and thus defrauded investors and creditors) the best chance to maximize and accurately identify the assets to be included in the Receivership Estate given the Receiver's extensive efforts during the first months of the Receivership.

The SEC filed its Motion for Appointment of a Receiver, for a Preliminary Injunction and Ancillary Relief, and to Lift Stay for Limited Purpose [Dkt. 309] (the "Second Motion to Appoint Receiver") on September 7, 2023. A hearing on the Second Motion to Appoint Receiver occurred on October 11, 2023. On November 29, 2023, the District Court entered several orders, including (1) its Memorandum Opinion and Order [Dkt. 416], which grants the SEC's Second Motion to Appoint Receiver as to 54 of the 82 entities included in the motion; (2) an Order Appointing Receiver (the "Second Receivership Order") [Dkt. 417], which re-appointed the undersigned to administer the Receivership Estate for the 54 entities; and (3) a Preliminary Injunction Order [Dkt. 418], which, among other things, freezes the assets of any other entity that Barton directly or indirectly controls, including almost all of the Initial Receivership Entities that were not included in the Second Receivership Order.

On October 27, 2023, the Receiver filed an Expedited Motion to Approve, Ratify, Adopt, and Otherwise "Bless" Previous Actions of Receiver and Orders Issued Prior to Effective Date of Vacatur of Initial Receivership Order [Dkt. 372] (the "Blessing Motion"). The purpose of the

---

[7] The Receiver's Declaration and Interim Report, together with all prior Quarterly Status Reports of the Receiver, are hereby incorporated by reference as if fully set forth herein.

Blessing Motion was to preserve Receivership Estate Assets and prevent confusion in light of vacatur of the Initial Receivership Order and the anticipated entrance of a second receivership order. More specifically, the Blessing Motion asked the Court to ratify certain prior actions in order to minimize the costs related to performance of a new Receivership Order—for instance the necessity of filing amended Notices of Stay in each of the ancillary cases stayed in reliance on the Initial Receivership Order as well as many other similar tasks—and to foreclose Barton's ability to sue the Receiver individually[8] or otherwise seek to unwind sales, settlements, and other activities previously approved by the Court under the Initial Receivership Order. Alternatively, in the event the Court decided not to enter a new Receivership Order, the Receiver requested a discharge and the related and incidental relief related to discharge.

On November 29, 2023, the District Court entered its Order Granting in Part Receiver's Blessing Motion [Dkt. 419] (the "Blessing Order"), which, among other things, (1) ratified all activities undertaken by the Receiver and his retained professionals in good faith under the Initial Receivership Order (and provided immunity for such acts); (2) approved the carryover of accrued fees and expenses and authorized the Receiver to file one Final Accounting at the end of the Receivership; and (3) specifically ratified certain prior Orders.

On December 7, 2023, Defendant Barton filed an interlocutory appeal of the Memorandum Opinion and Order, the Second Receivership Order, the Preliminary Injunction and Freeze Order, and the Blessing Order. Fifth Circuit Case No. 23-11237. Barton did not seek a stay of the Receivership from the District Court or the Fifth Circuit (presumably because his prior requests had been denied and because, as detailed below, he had obtained a *de facto* stay via his improper interlocutory appeals of sale orders). Barton also did not seek expedited review from the Fifth

---

[8] Barton had intimated this intent. *See* Dkt. 223 at 9; *SEC v. Barton*, Appeal No. 22-11132, ECF No. 113 at 7.

Circuit.  Whereas oral argument occurred approximately three months after Barton's notice of appeal with the Initial Receivership Order, it was not set until approximately fourteen months later with the Second Receivership Order.  Oral argument on the appeal is currently set for February 3, 2025.

### B.    Barton's Improper Appeal of Individual Sale Orders[9]

As detailed at length in prior reports, the overwhelming majority of the Receivership Assets are real property assets.  Indeed, upon the Receiver's appointment, compared to the $26 million the SEC claims was taken from investors, there was less than $75,000 in available cash.  Given the lack of available cash to the Receivership, the significant amounts of debt on each piece of Receivership Property (outlined further below) that was continuing to accrue, and the costs to maintain these properties (including, at a minimum, property taxes), the Receiver quickly endeavored to sell certain of the assets.  Initially, this included the Rock Creek Property, the Frisco Gate Property, and the Amerigold Suites.  After holding hearings and confirming that 28 U.S.C. § 2001 had been satisfied for each of these proposed sales, the District Court entered orders approving these sales on December 20, 2022 [Dkt. 104], January 31, 2023 [Dkt. 142], and March 29, 2023 [Dkt. 202], respectively.  Barton, in turn, filed improper interlocutory appeals of the Rock Creek Sale Order (Case No. 22-11226) and the Amerigold Suites Sale Order (Case No. 23-10515).[10]  Barton did not initially appeal the Frisco Gate Sale Order (though he subsequently appealed the sale after the Second Receivership Order).

---

[9] The Receiver has omitted discussion of Barton's interlocutory appeals of other non-sale orders; however, these other appeals are discussed in the Receiver's Ninth Quarterly Report [Dkt. 583].

[10] As reflected in numerous prior Reports and briefs, Barton also interfered with these sales, for instance by contacting the purchasers or filing lis pendens.

Multiple title companies have indicated that Barton's appeal of the Receivership Order itself has no impact on the title company's ability to issue a title policy (and for the Receiver to close a transaction), so long as no stay is granted by the District Court or the Fifth Circuit. However, these title companies have nevertheless proven unwilling to issue title policies and close transactions so long as Barton's appeals of the individual sale orders themselves are pending. The Receiver, who for some reason has not been designated as the appellee in those proceedings, has tried to intervene and file motions to dismiss, but to no avail. Thus, the effect of Barton's improper interlocutory appeals of the sale orders has been a *de facto* stay.

On June 19, 2023, the Fifth Circuit entered an Order dismissing the Rock Creek appeal for lack of jurisdiction, finding, among other things, that the Rock Creek Sale Order was not a final decision amenable to appellate review and that the collateral order doctrine was not applicable. *See* Case No. 22-11226 at Dkt. 74-1. However, in light of the decision on the appeal of the Initial Receivership Order, on September 1, 2023, the Fifth Circuit withdrew its prior opinion and entered a new opinion that simply dismissed the Rock Creek appeal as moot. Similarly, a prior opinion dismissing the appeal of the Amerigold Suites Sale Order [Case No. 23-10515 at Dkt. 48] was also withdrawn, and that appeal was similarly denied as moot.

After entrance of the Second Receivership Order in November 2023, the purchasers of the Rock Creek Property, the Frisco Gate Property, and the Amerigold Suites were all still initially interested in moving forward with their respective transactions. Following briefing by the Receiver, the Court held a second approval hearing for each sale and on December 15, 2023 and entered the Second Rock Creek Sale Order [Dkt. 437], the Second Frisco Gate Sale Order [Dkt. 438], and the Second Amerigold Suites Sale Order [Dkt. 436]. Despite knowing the Fifth Circuit had previously dismissed earlier appeals for lack of jurisdiction (at least initially), Barton

once again filed an interlocutory appeal of each of these sale orders [Dkt. 440] and, seemingly to cure the lack of jurisdiction (at least temporarily) and prolong the life of those appeals, later asked the Fifth Circuit to consolidate appeals of the sale orders with the appeal of the Second Receivership Order. The request was granted, effectively extending Barton's *de facto* stay on the sale of the Rock Creek Property and the Frisco Gate Property[11] until resolution of his appeal of the Second Receivership Order.

As discussed further below, during the summer of 2024, the Receiver also sought (and obtained) the approval of the sale of the Hall Property [Dkt. 538]. Barton has also filed an interlocutory appeal [Dkt. 554] of the Hall Sale Order. Case No. 24-10788. On December 2, 2024, Barton filed a motion to stay that appeal pending resolution of the consolidated appeal of the Receivership Order and other sale orders. The Fifth Circuit granted the Motion on December 4, 2024.

The Receiver is hopeful that the Fifth Circuit will rule on the appeals of the Sale Orders at the same time it rules on Barton's appeal of the Second Receivership Order and that Barton's improper interlocutory appeals of sale order will finally cease.

### C. Status of Defendants' Criminal Case

On September 20, 2022, at the United States Department of Justice's request, a grand jury indicted Defendant Barton for wire fraud, conspiracy to commit wire fraud, and securities fraud. *See United States v. Barton, et al.*, No. 3:22-cr-352-K (N.D. Tex.). On October 13, 2022, Defendant Fu, rather than being similarly indicted, instead waived indictment and pleaded guilty to the sale of unregistered securities. On December 12, 2023, the Department of Justice filed its

---

[11] Based at least in part on the delay in closing, the initial purchaser of the Amerigold Suites has since terminated the agreement (as has a second purchaser).

First Superseding Indictment, which names Tim Barton, Stephen Wall, and Saskya Bedoya as co-defendants.

Barton's criminal trial was initially set for May 8, 2023. Since that initial setting, it has since been re-set (at Barton or other defendants' request) to February 5, 2024, then September 9, 2024, and then March 3, 2025. During the Fourth Quarter of 2024, the trial was once again reset (at Barton's request) to October 6, 2025.

### D.    Barton's Motion for Protective Order Regarding Fees

As detailed in the Receiver's Fourth Status Report [Dkt. 299], on March 21, 2023, the Receiver filed his Motion to Compel Documents and Information from Attorneys, Request for Sanctions, and Brief in Support [Dkt.199], seeking an order compelling attorneys representing Defendant Barton, Hunton Andrews Kurth LLP, to disclose the source of any retainer or security interest and related information received in connection with their representation of Defendant Timothy Barton, so the Receiver could verify that counsel complied with their duty to ensure that the funds or security interest received were not paid with Receivership Assets. On April 26, 2023, Hunton Andrews Kurth LLP ("Hunton") provided the Receiver with information and documents he had requested and by agreement, paid half of the requested sanctions. Accordingly, the Receiver withdrew the Motion on April 27, 2023.

During the Second Quarter of 2024, Hunton informed the Receiver that it had received an additional, small payment of fees on behalf of Barton. The Receiver requested additional details surrounding the transaction (again, to verify that the funds or security interest received were not paid with Receivership Assets). On August 1, 2024, Barton instead filed a motion for leave to file a motion for protective order under seal [Dkt. 544]. The motion was initially denied without prejudice [Dkt. 545] for failure to comply with the Court's local rules. The motion for leave to file under seal was re-filed on August 22 [Dkt. 555]. On October 16, 2024, the Court noted another

deficiency in Barton's filing (that it was not accompanied by a signed declaration).  Barton's counsel submitted a declaration on October 25, 2024.  On November 6, 2024, the Court denied Barton's Motion for Leave [Dkt. 585].  Barton then filed his Motion for Protective Order [Dkt. 587] on November 18, 2024.  The Receiver has responded [Dkt. 591], Barton has replied [Dkt. 592], and the Motion is pending as of the date of this Report.

## II.
## DESCRIPTION OF ALL KNOWN RECEIVERSHIP PROPERTY

To-date, the overwhelming majority of the Receiver's time—and a substantial portion of his counsel's time, when not responding to Defendant Barton's filings—has been spent (1) identifying real estate-related assets of the Receivership Entities; (2) reaching out to lenders and other interested parties on each property; (3) responding to a multitude of those same lenders' motions to lift the Receivership Order's stay on foreclosure efforts (many of the properties were already in default upon the Receiver's appointment, and the Receiver has not had sufficient cash to service any of the debt on the properties); (4) determining insurance, utility, tax, and other payments coming due on each of the properties; (5) identifying and communicating with a host of potential purchasers of each of the properties; (6) identifying brokers and other professionals willing to assist in the initial valuation and eventual sale of these properties; (7) identifying appraisers who will be able to help carry out the mandates of 28 U.S.C. § 2001; and (8) reviewing lien reports and title commitments on the properties.

As originally outlined in the Receiver's Initial Report and then further illustrated in every Report that followed, without exception, the real estate assets held by the Receivership Entities face significant challenges.  All but one of the real property assets are heavily leveraged,[12] with

---

[12] The one property that is not "heavily" leveraged—the Gillespie Property discussed below—still has a sizeable loan on the property ($550,000 loan compared to $1.1 million value).

some having favorable interest rates and others having abnormally high rates. Additionally, as to the most valuable assets at one time owned by the Receivership Entities (the HUD apartments described below), significant legal challenges have complicated potential dispositions of such properties, making recovery uncertain. Finally, as of the date of this Report, the economic environment remains uncertain and interest rates have remained at high levels.

Additionally, the Receivership has been cash-starved from the outset. These cash-flow issues still exist today—despite the Receiver's best efforts to increase liquidity and the District Court and Fifth Circuit's repeated denials of Barton's requested stays[13]—because Barton's practice of appealing sale orders has caused title companies to refuse to issue title policies. For the majority of 2023, sales that would net over $4 million to the Receivership sat approved; to date, however, these sales still have not closed. Even worse, as outlined below, this delay and associated uncertainty have already caused both the original purchaser of the Amerigold Suites and a second purchaser to walk away from the previously approved (and re-approved) sale. The market has changed markedly since the Spring of 2023, and even with a fully brokered process, the highest bidder in 2024 was willing to pay $700,000 less than the original purchaser.

Stated differently, with every passing month, accruing interest collectively for all Receivership Assets is between approximately $170,000 (at standard interest rates) and $260,000 (at default interest rates). As a result, if the Receivership Estate does not sell any of the real estate assets (again because of the *de facto* freeze Barton has obtained), between $2 million and $3 million in interest alone accrues annually, further reducing the assets that may ultimately be available to defrauded investors and creditors. Looking at just the three property sales initially

---

[13] But–for the Receiver's decision to delay submission of his Third, Fourth, Fifth, Sixth, and Seventh Fee Applications to the Court, the cash concerns would have only been further exacerbated. To date, the Receiver has elected to pay certain other administrative expenses (*e.g.*, property taxes) while delaying submission of over a year's worth of fee applications, and only recently re-submitted his Third Fee Application to the Court.

approved by the District Court in 2023 and delayed by Barton's improper interlocutory appeals of sale orders, the monthly interest cost is between approximately $40,000 (standard rates) and $90,000 (default rates)—meaning that as of December 31, 2024, using the original agreed, approved closing dates for each transaction, the delayed closing of just these three properties has already cost the Receivership Estate roughly $1 million, even applying standard, non-default interest rates. Meanwhile, liquidity concerns have prevented the Receiver from servicing any of the outstanding debt, which in turn has led to multiple motions to lift stay filed by secured lenders. But–for the automatic stay, given the significant debt on virtually all properties, significant foreclosures would have happened months ago on nearly every real estate asset of the Receivership. And finally, these same liquidity concerns have forced the Receiver to delay submission of fee applications for work performed over a year ago and to pick-and-choose which property taxes to pay.

Based on the information now known by the Receiver, the Receiver believes the following real estate assets may result in a net recovery for the receivership estate and provides an update to his proposed plan for the fair, reasonable, and efficient disposition of the properties:

A.    **Real Estate Assets**

1.    **4107 Rock Creek Drive**

Receiver Entity SF Rock Creek owns a residential property located at 4107 Rock Creek Drive in Dallas (the "Rock Creek Property"). Wall Investor Funds have been traced into the Rock Creek Property, and accordingly the Rock Creek Property is a Receivership Asset. See Mem. Op. and Order [Dkt. 416] at 13-14 & n. 63.

For additional background on this property, see the Receiver's Ninth Quarterly Report [Dkt. 583]. On two occasions, the Court has approved the sale of the Rock Creek Property. The

appeal of the Second Rock Creek Sale Order is currently pending, and title companies have been unwilling to issue a title policy until the appeal of the sale order is dismissed.

The Court approved the Receiver's request to sell the Rock Creek property for $1.4 million on December 20, 2022. However, the principal balance of the existing loan is $1,053,000, and between December 20, 2022 and December 31, 2024 alone, approximately $234,716.81 in interest accrued (applying the non-default interest rate of 9.9%). While the Receiver still anticipates net proceeds flowing into the Receivership Estate, the continued uncertainty surrounding the closing date makes it impossible to accurately predict the amount of funds that will flow into the Receivership Estate. Regardless, the funds flowing into the Receivership if closing occurs in 2025 will be considerably less than they otherwise would have been had closing occurred in December 2022 or January 2023. Interest continues to accrue on this property at a rate of $8,889.97 per month (and $109,645.03 per year).

### 2. Frisco Gate Property

Receivership Entity FHC Acquisitions, LLC is the record owner of approximately 4.5 acres at the corner of the Dallas North Tollway and John Hickman Parkway in Frisco (the "Frisco Gate Property"). Wall Investor Funds have been traced into the Frisco Gate Property, and accordingly the Frisco Gate Property is a Receivership Asset. *See* Mem. Op. & Order [Dkt. 416] at 13-14 & n. 61.

For additional background on this property, see the Receiver's Ninth Quarterly Report [Dkt. 583]. On two occasions, the Court has approved the sale of the Frisco Gate Property. While Barton did not appeal the First Frico Gate Sale Order, he chose to appeal the Second Frisco Gate Sale Order. The appeal of the Second Frisco Gate Sale Order is currently pending, and title companies have been unwilling to issue a title policy until the appeal of the sale order is dismissed.

The Receiver is also still working with the Frisco Gate purchaser to remedy certain parking disputes relating to the property, parking issues that were not previously disclosed by Barton.

The Court has approved the Receiver's request to sell the Frisco Gate property for $9 million. After payment of the principal balance of the existing loan ($2,981,661.92), interest at the standard rate (at least $593,107.06 as of December 31, 2024), Palisades' purchase money of approximately $3.5 million, 2023 taxes ($174,883.28), 2024 taxes ($116,956.35), and closing costs, the Receiver anticipates that if this sale were to close today, it would result in net proceeds of approximately $1.5 million into the Receivership Estate. Notably, but-for the sale order appeals and the undisclosed parking issue, the Receiver would have closed this transaction on or before April 14, 2023. Between that day and December 31, 2024, at least $409,942.94 in additional interest has accrued, as well as approximately $233,545.20 in property taxes ($643,488.14 in total equity lost). Interest continues to accrue on this property at a rate of $19,051.43 per month (and $232,364.53 per year).[14]

### 3.    2999 Turtle Creek

For additional background on this property, see the Receiver's Ninth Quarterly Report [Dkt. 583]. Prior to the Receiver's appointment, a federal bankruptcy judge declared that Barton no longer owned this property. However, at the time of the Receiver's appointment, Barton was still in possession of the property. After threatened litigation and a mediation with retired Bankruptcy Judge Harlin Hale, the Receiver and the lender on the property—HNGH Turtle Creek, LLC ("HNGH")—agreed to settle claims, including the Receiver's fraudulent transfer claims related to payments made from investor proceeds, for a sum of $2.5 million, with payment to be

---

[14] Despite a stay prohibiting the suit, the relevant taxing authority has also instituted a lawsuit to recover the taxes owed on the property, which have not been paid due to cash limitations and because such taxes would presumably be

made over four installments.  This settlement, combined with other smaller settlements, are what have enabled the Receiver to pay some Receivership costs and administrative expenses (albeit belatedly).  Barton has appealed the Court's ratification of its prior order approving the HNGH settlement agreement.  The final settlement payment of $750,000 is due in May 2025.

### 4.    HUD Apartments

Receivership Entities D4DS, LLC, D4FR, LLC, DRIN, LLC, and D4OP, LLC, are the record owners and HUD borrowers on four separate apartment complexes in Texas and Alabama (collectively, the "HUD Apartments").  These properties include Bellwether Ridge in DeSoto, Texas (owned by D4DS, LLC), the Parc at Windmill Farms in Forney, Texas (owned by D4FR, LLC), the Parc at Ingleside near Corpus Christi, Texas (owned by D4IN, LLC), and the Parc at Opelika in Alabama (owned by D4OP, LLC).  The HUD Apartments each received or benefitted from Wall Investor Funds, and accordingly the HUD Apartments are Receivership Assets.  *See* Mem. Op. & Order at 14-19.

For additional background on these properties, see the Receiver's Ninth Quarterly Report [Dkt. 583].  Each of these properties was developed under (and is currently encumbered by) separate sizeable HUD loans administered through Greystone.  Third-Party Southern Properties Capital, Ltd. ("SPC") provided a smaller second loan for each of the properties.  SPC claims that its mezzanine loans were "convertible" in nature, whereby it had the option to convert its debt position into equity ownership of certain affiliated Receivership Entities and, indirectly, ownership of the HUD Apartments.  SPC further claims that as to the DeSoto, Forney, and Ingleside HUD Apartments, it exercised conversion options prior to the appointment of the Receiver.  While the Receiver is optimistic that he will ultimately succeed on the question of ownership of the HUD Apartments, if SPC is successful in its challenge, the possibility exists that the Receivership Entities will not obtain any recovery on these properties.  After Barton's appeal of the Receivership

Order is resolved, the Receiver intends to refile his motion for summary judgment regarding proper ownership of these properties. If SPC is determined to be the owner of the HUD Apartments, the Receivership will receive $0. If the Receivership Entities are the owners of these properties, the current best estimate net value to the Receivership Estate would be between $15 million and $18 million.[15] Finally, despite early complaints by Barton that these properties should be sold (compared to the Rock Creek Property or the Amerigold Suites), Barton now claims that D4DS, LLC, D4FR, LLC, DRIN, LLC, and D4OP, LLC should not be Receivership Entities and instead those entities should be restored to him.

### 5.    Amerigold Suites

Receivership Entity Goldmark Hospitality, LLC is the record owner of a 70-unit extended-stay hotel located at 13636 Goldmark Dr. in Dallas, Texas (the "Amerigold Suites"). Wall Investor Funds have been traced into the Amerigold Suites, and accordingly the Amerigold Suites is a Receivership Asset. *See* Mem. Op. & Order [Dkt. 416] at 13-14 & n. 62.

For additional background on this property, see the Receiver's Ninth Quarterly Report [Dkt. 583]. The Court initially approved the sale of the property to the First Amerigold Purchaser for $5,500,000. After entrance of the Second Receivership Order, the Court entered a Second Amerigold Suites Sale Order, again approving the sale for $5,500,000 to the First Amerigold Purchaser. When that purchaser eventually withdrew from the deal because of the continued appellate delays, the Receiver again brokered the property and contracted with the Second Amerigold Purchaser, albeit for a sale price of $4,800,000 (a reduction of $700,000). Because of Barton's comments that he would soon resume possession and control over the property [see

---

[15] Note that all values provided below are based upon opinions of value that the Receiver obtained in early 2023. Markets have changed considerably since that time. Moreover, while the HUD loan balances for each HUD property have decreased, such decrease likely will not be a 1:1 correlation, because the low-interest debt on the properties is actually accretive to the properties' value.

Dkt. 558], the Second Amerigold Purchaser terminated the agreement. Moreover, Barton also filed yet another appeal of the Second Amerigold Sale Order.

Even if the Receiver were able to find another purchaser for $4,800,000, after payment of the principal balance of the existing loan ($2,481,098.27), interest at the standard rate (approximately $382,401.91 as of December 31, 2024), broker commissions (approximately $190,000), and closing costs, the Receiver would anticipate net proceeds flowing into the Receivership Estate of approximately $1.7 million from the sale to the Second Amerigold Purchaser. Notably, the continued appellate delays resulting from Barton's improper interlocutory appeal of the original March 29, 2023 sale order has already cost the Receivership roughly $300,979.28 in standard, non-default interest through December 31, 2024 and $700,000 in reduction in value (a total of $1,000,979.28). Interest continues to accrue on this property at a rate of $13,733.67 per month (and $166,730.69 per year).

### 6.    Venus Development

Prior to the Receiver's appointment, several Initial Receivership Entities were in the process of developing single-family communities around Venus, Texas (collectively, the "Venus Properties") and were negotiating a development agreement with the City of Venus. Wall Investor Funds have been traced into each of the Venus properties outlined herein, and accordingly the Venus Properties are Receivership Assets. *See* Mem. Op. & Order [Dkt. 416] at 12-13 & nn. 54-57, 66.

For additional background on this property, see the Receiver's Ninth Quarterly Report [Dkt. 583]. During 2023 and 2024, the Receiver met with multiple industry professionals who were willing to examine the feasibility of the Venus Project. While these individuals were willing to examine the development out of courtesy to the Receiver and without a fee, none of these individuals was willing to be engaged by the Receiver because of Defendant Barton's litigious

history before and during this Receivership. During the First Quarter of 2024, the Receiver retained a consulting expert to advise him on the highest and best use of the properties included in the Venus Project, as well as the feasibility of Barton's proposed development of the Venus Project. The details of this consulting expert's work will be shared at a later date. At this time, the Receiver still cannot determine if he will be able to recover any value for the Receivership Estate from the Venus Development or, if any net recoverable value exists, what that value will ultimately be. At a minimum, however, $1,856,659.27 in interest has accrued on these properties since the Receiver's appointment, and until the Fifth Circuit provides guidance on Barton's improper appeals of Sale Orders, the Receiver does not anticipate moving forward with a sale of the Venus Properties. Interest continues to accrue on these properties at a rate of $103,868.35 per month (and $1,293,030.61 per year).

### 7.    Ridgeview Addition

Receivership Entity Ridgeview Addition, LLC owns approximately 54 platted lots near Bulldog Road in Venus, Texas (the "Ridgeview Property"). Wall Investor Funds have been traced into the Ridgeview Property, and accordingly the Ridgeview Property is a Receivership Asset. *See* Mem. Op. & Order [Dkt. 416] at 13 & n. 59.

For additional background on this property, see the Receiver's Ninth Quarterly Report [Dkt. 583]. As of the date of this Report, it is uncertain whether the Receiver will be able to reach agreements with the lenders, the City of Venus, and Lillian Homes.

### 8.    Gillespie Property

Receivership Entity Gillespie Villas, LLC owns a residential/multi-family property located at 3600 Gillespie Dr. in Dallas, Texas (the "Gillespie Property"). On December 13, 2022, the Court entered its Second Supplemental Order, which, among other things, confirmed that Gillespie Villas LLC is a Receivership Entity. Wall Investor Funds have been traced into the Gillespie

Property, and accordingly the Gillespie Property is a Receivership Asset. *See* Mem. Op. & Order [Dkt. 416] at 13-14 & n. 64.

For additional background on this property, see the Receiver's Ninth Quarterly Report [Dkt. 583]. The Receiver has secured the necessary appraisals and opinions of value on the Gillespie Property, which on average value the property at approximately $1,100,000. The property remains in poor physical condition and without extensive repairs, is unrentable. The Gillespie Property is subject to a single promissory note, with an account balance exceeding $817,000, meaning if the property were to sell today, prior to closing costs and broker fees, it would result in a net benefit of less than $300,000 to the Receivership. At a minimum, however, $267,954.51 in interest has accrued on this property since the Receiver's appointment, and until the Fifth Circuit provides guidance on Barton's improper appeals of Sale Orders, the Receiver does not anticipate moving forward with a sale of the Gillespie Property. Interest continues to accrue on this property at a rate of $8,470.71 per month (and $251,786.42 per year).

### 9.    Hall Property

Receivership Entity TC Hall, LLC owns approximately 0.5 acres of raw land located at 3407 & 3409 Hall Street in Dallas, Texas (the "Hall Property"). Wall Investor Funds have been traced into the Hall Property, and accordingly the Hall Property is a Receivership Asset. *See* Mem. Op. & Order [Dkt. 416] at 13-14 & n. 65.

For additional background on this property, see the Receiver's Ninth Quarterly Report [Dkt. 583]. The Court has approved the Receiver's sale of the property to the Hall Purchaser for $6,000,000. Barton's interlocutory appeal [Dkt. 554] of the Hall Sale Order is still pending and has been stayed by the Fifth Circuit. Case No. 24-10788. Similar to the other properties outlined above, because of Barton's improper interlocutory appeal of the Hall Sale Order, the title company has indicated that it is unwilling to issue a title policy until that appeal of the sale order is dismissed.

After payment of the principal balance of the existing loan ($4,063,000.00), interest at the standard rate (approximately $575,717.70 as of December 31, 2024), broker commissions (approximately $180,000), and closing costs, the Receiver anticipates net proceeds flowing into the Receivership Estate of approximately $1.2 million. Notably, between the Court's approval of the sale on July 25, 2024 and December 31, 2024 alone, approximately $107,000 in interest accrued. Interest continues to accrue on this property at a rate of $20,786.95 per month (and $251,786.42 per year).

### 10.    Other Potential Real Estate Assets

As outlined in the Receiver's original Motion to Compel (which was filed in January 2023 and granted during the Second Quarter of 2023), Defendant Barton still has not provided the overwhelming majority of the information required by the Initial Receivership Order, including a list of properties owned by the Receivership Entities. The Second Receivership Order contained the same requirements, and while Barton sought [Dkt. 424] and received [Dkt. 427] an extension of his deadline to comply with these requirements (including a list of assets), he did not provide any information before the deadline and still has not provided the requested information as of the date of this Report. While the Receiver has endeavored to identify separately all properties owned by the Receivership Entities, the Receiver has reason to believe other properties that received or benefitted from Wall Investor Funds and that are owned, either directly or indirectly, by Defendant Barton exist. The Receiver's investigation is ongoing.

### B.    Other Identified Assets of the Receivership.

Although still subject to his on-going investigation, the Receiver believes the following assets may be additional sources of recovery for the receivership:

Artwork at Rock Creek Property. As discussed in the Initial Report, upon securing possession of the Rock Creek Property, the Receiver noticed several holes in the wall confirming,

as he had been told, that artwork had been removed prior to his visit to the residence. Despite multiple oral and written requests, for several weeks, Defendant Barton provided no list of artwork. However, on November 15, Defendant Barton disclosed, perhaps inadvertently, pictures of some of the artwork that had been removed. *See* Dkt. 58 at 29, 30, 33, 35. Additionally, the Receiver located financial statements indicating that Barton believed the Receivership Entities owned artwork worth approximately $12 million. In January 2023, the Receiver filed a Motion to Compel [Dkt. 133] Barton to disclose this and other information in accordance with the Receivership Order. Barton has claimed that very little artwork was in either the Rock Creek Property or the Turtle Creek Property. *See* Dkt. 160-1 at 23. Without additional information regarding these pieces of art and their current location, it is impossible to ascertain the value of any such art.

Vehicles. The Receiver has identified multiple vehicles that may have been purchased in whole or in part with Receivership Assets. The Receiver is still determining what ownership interest the Receivership Entities have in these vehicles.

Airplane. Receivership Entity JMJAV, LLC is the registered owner of a 1982 Learjet 55 located in Arlington, Texas. The Receiver has received information indicating Third Coast Bank, SSB holds an approximately $350,000 note on the plane, and Elite Jet Solutions, LLC holds a $143,576.63 mechanic's lien. The Receiver was informed that the aircraft has been parked at Elite Jet Solutions since 2019. Elite Jet Solutions estimates the plane needs approximately $355,000 in parts and repairs to make it airworthy.

During the Fourth Quarter of 2024, the Receiver obtained a professional appraisal of the airplane, which assesses the value of the plane at $100,000. The Receiver is currently working with Third Coast Bank and Elite Jet to determine potential paths forward.

Participation Interests.  During the twelve months prior to the appointment of the Receiver (or longer in some instances), Receivership Entities AVG West, LLC, Orchard Farms Village, LLC, Mansions Apartment Homes at Marine Creek, LLC, D4KL, LLC, and 126 Villita, LLC (or their affiliates) sold properties in Fort Worth, Killeen, San Antonio, and Winter Haven, Florida. In connection with these sales, the Receivership Entities often (though not always) received millions of dollars in sale proceeds, while also retaining a participation interest in the projects moving forward.

For example, the following funds were among those paid to Receivership Entities surrounding the sales of developments at Marine Creek, Orchard Farms, and Winter Haven:

- $800,000 on March 14, 2022 to Mansions Apartment Homes at Marine Creek, LLC

- $500,000 on March 14, 2022 to Orchard Farms Village, LLC

- $200,000 on May 6, 2022 to Mansions Apartment Homes at Marine Creek, LLC

- $2,000,000 on May 9, 2022 to AVG West, LLC (Winter Haven)

Although the Receiver's accountants still have not completed their forensic accounting, it appears that the majority of the above-described funds flowed into a bank account held at Texas Brand Bank in the name of Receivership Entity Broadview Holdings LLC.[16]

Certain Receivership Entities maintained participation interests of varying percentages with regard to some but not all of the above-referenced property sales (e.g., the Receiver does not believe a participation agreement exists for AVG West, LLC).  The Receiver is still investigating and analyzing potential value of participation interests related to the Killeen and San Antonio

---

[16] A bank statement from September 2022 indicates that over $100,000 in Receivership Entity funds were transferred from the Broadview Holdings Account to Defendant Barton's law firms.

properties.  While it is impossible to predict the value these contractual interests may ultimately generate for the Receivership Estate, the Receiver is optimistic that some value will be realized.

> Walker Ranch.  As detailed in prior reports, the Receiver previously engaged in extensive negotiations with Byron Walker regarding the return of certain fraudulent transfers.  The Receiver remains optimistic that he and Walker will be able to reach agreement, but is waiting on completion of the forensic accounting to conclude any such settlement.

### III.
### AMOUNT OF CASH ON HAND AND ACCRUED ADMINISTRATIVE EXPENSES, INCLUDING FIRST QUARTER RECEIPTS AND DISBURSEMENTS

> During the initial 30 days of the Receivership, the Receiver opened bank accounts for the Receivership Estate at Veritex Bank in order to administer the receipt and disposition of monies in the Receivership.  Additionally, because of the continued operations of the Amerigold Suites, the Receiver continued to maintain an accounts at Veritex Bank.[17]

> As reflected more fully in the schedule of the Receiver's receipts and disbursements that is attached hereto as Exhibit A,[18] during the Fourth Quarter of 2024, the Receiver deposited $754,064.99 into the Receivership Estate (including earned interest) and also received rental income from the Amerigold Suites totaling $185,510.00.  Total expenses during the Fourth Quarter of 2024 were $239,142.04.

---

[17] During the Fourth Quarter of 2023, the Receiver moved the Amerigold Suites accounts from Vista Bank to Veritex Bank at Vista's insistence.

[18] Included in Exhibit A are (1) the Standardized Fund Accounting Report ("SFAR") required by the Court, (2) an itemized list of receipts and disbursements to date in the Receivership accounts at Veritex Bank, (3) an itemized list of receipts and disbursements to date in the Amerigold Suites accounts; and (4) an itemized list of receipt and disbursements to date in the D4OP LLC account.

As of the end of the Fourth Quarter of 2024, the balance held in the receivership bank accounts under the Receiver's control is $2,056,588.90.[19]  However, these cash reserves do not mean the that the Receivership is now in a healthy financial position or that it is able to begin servicing its significant debt (again, to date the Receiver has not serviced any of the millions of dollars of debt on the properties, and interest of over $2 million per year continues to accrue).  In addition to the outstanding property taxes referenced above, the Receivership also owes significant accrued and unpaid administrative expenses to the Receiver and his professionals, who have not been paid for any of their efforts since July 1, 2023.  Given the length of time (eighteen months) of the Receiver and his professionals' unpaid fees, combined with the large amount of work that has been required to maintain the receivership, these outstanding liabilities are extensive.  The Receiver estimates that the available cash balance will be much lower after the payment of property taxes and pending fee applications at the end of the First Quarter of 2025.

### A.    Description of Recoveries from Fourth Quarter of 2024

#### 1.    Deposits into Main Receivership Account

Between October 1, 2024, and December 31, 2024, the Receiver deposited $754,064.99 into the Main Receivership Account, comprised of the following:

HNGH Settlement Payment.  During the Fourth Quarter of 2024, HNGH made a settlement payment of $750,000, its third of four payments under its settlement agreement with the Receiver.

Interest Deposits.  During the Fourth Quarter of 2024, the Receiver received a total of $4,064.99 in interest payments.

---

[19] Of the total deposits into the main Receivership bank account, $60,000 are funds related to the Walker Ranch transaction discussed above, and $400,192.49 related to funds held in the name of D4OP LLC that are currently unavailable to the other Receivership Entities.

### 2.      Deposits into Amerigold Suites Account

Between October 1, 2024, and December 31, 2024, the Amerigold Suites generated $185,510.00 in gross rental income.

### 3.      Deposits into D4OP LLC Account

Between October 1, 2024, and December 31, 2024, the Receiver did not deposit any funds into the D4OP LLC account held at Veritex.

## B.      Description of Disbursements from Fourth Quarter of 2024

### 1.      Disbursements from Main Receivership Account

Between October 1, 2024, and December 31, 2024, the Receivership spent $52,989.42 from the Main Receivership Account, comprised of the following:

Utility Fees.   The Receiver paid $49.69 to Dallas Water Utilities related to water and sewage at Gillespie during the Quarter.

Landscaping.   During the Fourth Quarter of 2024, the Receiver paid $1,925.00 to landscapers related to mowing at the Gillespie, Hall, Frisco, and Ridgeview Properties.

Insurance.   During the Fourth Quarter of 2024, the Receiver paid $1,678.42 related to insurance for Receivership properties..

IT Expenses.   Because the Receiver has been unable to pay his professionals for any time spent on this matter since April 1, 2023, the Receiver has been forced to incur certain expenses directly.   During the Fourth Quarter of 2024, this included charges related to data hosting (of the Defendants email servers), totaling $1,408.11.

Other Miscellaneous Expenses.   During the Fourth Quarter of 2024, the Receiver also (1) paid $45,178.20 to the Texas Comptroller for state taxes and (2) paid $2,750 to a plane appraiser.

## 2.    Disbursements from Veritex Accounts (Amerigold Suites)

Between October 1, 2024, and December 31, 2024, the Receivership spent $185,313.41 on the Amerigold Suites, comprised of the following:

Payments to Property Manager.  During this Quarter, the Receiver paid the property manager at Amerigold a total of $10,004.39.

Maintenance and Cleaning Payments.  During this Quarter, the Receiver paid maintenance and cleaning contractors a total of $7,342.50.

Landscaping.  During this Quarter, the Receiver paid $3,900.00 in landscaping and tree trimming invoices.

Repair Costs.  During this Quarter, the Receiver paid $17,004.61 in repairs to roofing, HVAC, and flooring contractors.

Utility Payments.  During this Quarter, the Receiver paid $90,248.03 in utility payments for electricity, water, and internet.

Trash Payments.  During this Quarter, the Receiver paid $2,869.14 for trash collection at the property.

Pest Control.  During this Quarter, the Receiver paid $1,362.85 relating to pest control at the property.

Insurance Payments.  During this Quarter, the Receiver paid $51,308.07 in insurance premium payments.

Bank Fees.  During this quarter, the Receiver paid $10.00 in check fees, wire fees, and other miscellaneous bank fees.

Other Miscellaneous Expenses.  During the Fourth Quarter of 2024, the Receiver also paid (1) $1,563.82 related to Propertyware software used at Amerigold.[20]

## IV.
## DEVELOPMENT OF CLAIMS HELD BY
## RECEIVERSHIP ESTATE

The Receiver continues to investigate potential claims against third parties and the likelihood of success of such claims.  On March 1, 2024, the Receiver filed his Motion for Leave to File Complaints against Third Parties [Dkt. 472].  The Court granted the motion [Dkt. 488].

To date, the Receiver has filed two fraudulent conveyance lawsuits: *Thomas v. Walji, et al.*, No. 3:24-cv-512-X and *Thomas v. Fu. et al.*, No. 3:24-cv-612-X.  As of the date of this Report, both lawsuits are still pending but have been stayed pending resolution of Barton's appeal of the Receivership Order.

## V.
## OTHER PENDING LITIGATION

During the first day of the Receivership, the Receiver and his team interviewed multiple lawyers who officed in the Turtle Creek office who were aware of (and in many respects involved in) dozens of active and closed litigation matters involving the Receivership Entities.  As the Fourth Quarter of 2022 progressed, the Receiver and his team became aware of several additional active litigation matters involving the Receivership Entities and began speaking to counsel for counter-parties.  These conversations continued throughout 2023, with one additional lawsuit against the Receivership Entities being filed (and stayed upon the Receiver's discovery of the proceeding) during the Fourth Quarter of 2023, and another being filed (and stayed) during the Fourth Quarter of 2024.  Pursuant to ¶¶ 34-36 of the Receivership Order, all civil legal proceedings

---

[20] The Receiver's team also inadvertently paid a $839.21 insurance payment for the Rock Creek Property during the Fourth Quarter of 2024.  This payment was reimbursed during the First Quarter of 2025.

of any nature involving the Receivership Entities and the Receivership Entities' past or present officers, directors, managers, agents, parent or affiliated entities, are stayed until further order of the Receivership Court.

In the past, the Receiver has included a list of all active (but stayed) litigation matters of which the Receiver was aware. Below, the Receiver now includes only those cases with updates from the Fourth Quarter of 2024

### A.    BM318-Related Litigation

**1.    *BM318, LLC v. Dixon Water Foundation*, No. 4:20-BK-42789 (Bankr. N.D. Tex.)**

As detailed in prior Reports, the Receiver has settled certain claims with the Dixon Water Foundation and Lumar Land & Cattle. The settlement was approved by the bankruptcy court and also ratified by the District Court. Barton has appealed the District Court's ratification of the settlement agreement [Dkt. 554]. He has also appealed the Bankruptcy Court's approval of the settlement to a different District Court. Dixon, Lumar, and the Receiver jointly moved to dismiss the appeal during the Fourth Quarter of 2024. As of the date of this report, that motion remains pending.

On October 24, 2024, counsel for Lumar filed a motion to expunge a lis pendens that Barton filed in September 2024. A hearing on Lumar's motion was held in November 2024. The bankruptcy judge ultimately determined that the lis pendens was wrongly filed and directed its expunction.

### B.    3820 Illinois-Related Litigation

**1.    *JMJ Development, LLC v. Tamamoi, LLC and 3820 Illinois, LLC*, No. DC-22-02622 (68th District Court, Dallas County)**

As detailed in prior reports, Barton also filed an interlocutory appeal of the Court's Order [Dkt. 550] ratifying the Receiver's settlement with Tamamoi. Fifth Circuit Case No. 24-10788.

During the Fourth Quarter of 2024, Barton sought (and received) a stay of the appeal pending resolution of the appeal of the Second Receivership Order.

### C.    Other Pending Litigation Matters

#### 1.    *City of Frisco v. FHC Acquisition, LLC et al.*, No. 493-07371-2024 (493rd District Court, Collin County, Texas)

During the Fourth Quarter of 2024, the City of Frisco sued FHC Acquisition, LLC for unpaid property taxes related to the Frisco Gate Property. Upon learning of the proceeding, the Receiver filed a notice of stay.

## VI.
## STATUS OF CLAIMS PROCEEDINGS FOR INVESTORS AND CREDITORS

The Receiver has not yet filed a Motion for Order Establishing Claims Adjudication Process. The Receiver anticipates that in addition to Wall Investor claims, he will also receive substantial creditor claims. The Receiver anticipates moving forward with the claims process shortly after resolution of Barton's pending appeal of the Receivership Order.

## VII.
## PROPOSED PLAN FOR ADMINISTERING THE RECEIVERSHIP

The next immediate steps for administration of the Receivership include (1) continuing to secure and maintain the assets of the Receivership, including, liquidating assets of the Receivership where necessary to preserve and maximize their value; (2) completing a forensic accounting of the Receivership's bank accounts to (a) determine the amount of monies flowing into the Wall Entities from investors, (b) trace where those monies ultimately flowed, and (c) identify potential fraudulent transfers and transferees; and (3) completing the identification of investors in the Wall Entities.

## VIII.
## RECOMMENDATION FOR CONTINUATION OF RECEIVERSHIP

This is the tenth report from the Receiver and extensive work still remains. More specifically, the Receiver intends to (1) continue securing, maintaining, and selling assets; (2) continue pursuing potential fraudulent conveyances; (3) continue investigating potential damages claims against third parties; (4) petition the Court to establish an investor and creditor claims process; and, (5) upon a determination of liability, agreement of Defendants, or further order of this Court, eventually make distributions pursuant to a Court-approved distribution plan. Accordingly, the Receiver recommends that the Receivership continue.

Dated: January 29, 2025

Respectfully submitted,

**RECEIVER CORTNEY C. THOMAS**

By: */s/ Cortney C. Thomas*
    Cortney C. Thomas
    State Bar No. 24075153
    cort@brownfoxlaw.com
    BROWN FOX PLLC
    8111 Preston Road, Suite 300
    Dallas, Texas 75225
    T: (214) 327-5000
    F: (214) 327-5001

## CERTIFICATE OF SERVICE

Pursuant to Fed. R. Civ. P. 5(d)(1)(B), as amended, no certificate of service is necessary, because this document is being filed with the Court's electronic-filing system.