UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | |
| *Plaintiff*, | |
| v. | Civil Action No. 3:22-cv-2118-x |
| TIMOTHY BARTON, CARNEGIE DEVELOPMENT, LLC, WALL007, LLC, WALL009, LLC, WALL010, LLC, WALL011, LLC, WALL012, LLC, WALL016, LLC, WALL017, LLC, WALL018, LLC, WALL019, LLC, HAOQIANG FU (a/k/a MICHAEL FU), STEPHEN T. WALL, | |
| *Defendants*, | |
| DJD LAND PARTNERS, LLC, and LDG001, LLC, | |
| *Relief Defendants*. | |

**MCCORMICK 101 LLC'S MEMORANDUM IN SUPPORT OF MOTION FOR
(1) IMMEDIATE THIRD-PARTY INSPECTION OF AMERIGOLD SUITES
REGARDING TENANT LIFE SAFETY ISSUES AND (2) OTHER RELATED RELIEF**

## <u>TABLE OF CONTENTS</u>

BACKGROUND ............................................................................................................ 1

    Goldmark Hospitality and Amerigold Suites ............................................................ 1

    Life Safety Issues at the Property ............................................................................. 1

    McCormick's Relationship to Goldmark and the Amerigold Property...................... 3

    Goldmark's Involvement in Pending SEC Receivership ........................................... 4

    Current Procedural Posture....................................................................................... 4

ARGUMENT .............................................................................................................. 5

    I.    Economics Should Neither Dictate Nor Supersede the Life Safety of Tenants at the Amerigold Property.................................................................................................... 5

    II.    The Receiver Must Operate the Amerigold Property in Compliance with All State Laws. ........................................................................................................................ 7

    III.    The Receiver Acts at the Behest of the Court, and the Facts Here Support the Relief Requested under the *Stanford* Factors.................................................................... 10

RELIEF REQUESTED................................................................................................ 13

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*In re Cajun Elec. Power Co-op., Inc.*,
    185 F.3d 446 (5th Cir. 1999) ................................................................ 8

*In re Grandview Estates Associates, Ltd.*,
    89 B.R. 42 (Bankr. W.D. Mo. 1988)................................................... 10

*In re Montgomery Mall Ltd. Partnership*,
    704 F.2d 1173 (10th Cir. 1983) ......................................................... 10

*In re Vel Rey Properties, Inc.*,
    174 B.R. 859 (Bankr. D.D.C. 1994) .................................................... 8

*S.E.C. v. Stanford Int'l Bank Ltd.*,
    424 F. App'x 338 (5th Cir. 2011) ................................................. 11, 12

*Saravia v. 1736 18th St., N.W., Ltd. P'ship*,
    844 F.2d 823 (D.C. Cir. 1988) ........................................................ 7, 8

*Sec. & Exch. Comm'n v. Barton*,
    79 F.4th 573 (5th Cir. 2023) ............................................................... 6

*USA v. Petters*,
    2008 WL 5101419 (D. Minn. Nov. 6, 2008) ..................................... 10

**STATUTES**

11 U.S.C. § 365(d)(1) ............................................................................. 10

28 U.S.C. § 959................................................................................ 7, 8, 9, 12

McCormick 101 LLC ("**Lender**"), by its undersigned attorneys, files this Motion for (1) an Immediate Third-Party Inspection of Amerigold Suites Regarding Tenant Life Safety Issues and (2) Other Related Relief ("**Motion**"), which includes relief from stay with respect to the Amerigold Suites as well as Timothy Barton.  In support of its Motion, the Lender respectfully states as follows:

## BACKGROUND

### Goldmark Hospitality and Amerigold Suites

Goldmark Hospitality, LLC ("**Goldmark**") owns Amerigold Suites, an extended stay multifamily apartment complex located at 13636 Goldmark Drive in Dallas, Texas ("**Amerigold Property**" and/or **"Property"**).  The Amerigold Property is comprised of 73 units and provides furnished apartments for corporate housing and extended stay rentals.  Approximately 62 units are presently occupied, and the tenants include adults, seniors, children, and those with disabilities. The Property is currently managed by a single-person property manager ("**Property Manager**").

Goldmark and the Amerigold Property have been designated as assets of the receivership estate ("**Receivership Estate**") in this case.  All actions related to the Amerigold Property by any and all third parties have been stayed ("**Stay**") pursuant to the order appointing the receiver ("**Receiver Order**") entered in this case.  (Dkt. 29).

### Life Safety Issues at the Property

As explained in greater detail below, the Lender files this Motion to inform the Court of exigent life safety issues facing the tenants ("**Tenants**") of the Amerigold Property – Tenants who have been caught in the crosshairs of this receivership for the past 29 months.  These life safety issues present a variety of dangerous conditions as noted herein, including *inter alia*, a large

retaining wall that is in imminent threat of collapsing, multiple exposed electrical wires, and other clear and present dangers to the Tenants and visitors (collectively, "**Life Safety Issues**").

In support of this Motion, the Lender submits the Declaration of Jeremy Halverson ("**Halverson**") as <u>Exhibit 1</u> of the Appendix to this Motion.[1]  During Halverson's preliminary site visit to the Property, Frank Guzman ("**Guzman**") (a maintenance professional at the Property) pointed out a broken and collapsing retaining wall.  Guzman stated, "I wouldn't want to be here when that thing falls down, it's going to crush someone like a bug. We've been trying to fix it for 10 years." (Ex. 1, ¶¶ 7-8).  Halverson observed the large brick retaining wall weighing several hundred pounds that is collapsing.  (*Id.* at ¶ 9).  The area around the retaining wall appears to be a common pet relief area with Tenants walking their pets near the wall.  (*Id.* at ¶ 10).  This retaining wall could severely injure an adult or kill a child if it collapsed on them.  (*Id.* at ¶ 11).  Halverson also observed at least 10 exposed live electrical wires in OUTDOOR areas of the Amerigold Property. (*Id.* at ¶ 12).  Five of these exposed live electrical wires were open conduit boxes with pigtails exposed, which present a clear and present danger to children, Tenants, and visitors and could also cause a fatality if a child unscrewed the pigtails and touched the wrong wire.  (*Id.*).  Halverson also noted at least 10 broken OUTDOOR light fixtures with hard wiring exposed.  (*Id.* at ¶ 13).

For the Court's convenience, photographs of the myriad Life Safety Issues are attached as Exhibits 2-71 to the Appendix to this Motion.  (*See* Appendix, Exhibits 2-71).  These exhibits show the Property is rife with safety issues: live wires exposed in multiple locations, multiple

---

[1] Halverson is employed as Vice President of Beltway Capital Management, LLC, the servicer of the Lender's loan in this matter.  (Ex. 1, ¶¶ 3-4).  Halverson obtained the Receiver's consent to conduct a preliminary site visit of the Property.  (*Id.* at ¶ 6).  Halverson is not a professional inspector and conducted the site visit on behalf of the Lender.  (*Id.* at ¶¶ 5-6).  During the site visit, Halverson reviewed the status and condition of the Lender's collateral.  (*Id.* at ¶¶ 6-7).

unlatched/unlocked sheds with signage indicating that dangerous equipment is inside, unrepaired windows boarded with wood, a retaining wall leaning dangerously next to a walkway and between units, cracking foundation around the pool, structural damage both inside and outside, a beam with more than 20 exposed, rusted screws on the outside of the leasing office, and more. (*Id.* at ¶¶ 8-16).

These Life Safety Issues and the other matters contained in the Halverson Declaration demonstrate that the Tenants at the Amerigold Property are facing unacceptable dangers that have gone unaddressed during the pendency of this Receivership. Under no circumstance should such Life Safety Issues exist under the Receiver's watch, particularly as the Receiver acts at the behest of and as a fiduciary of this Court. **In other words, no circumstances in this case warrant the risk of the Tenants' and the public's life safety**. Indeed, such Life Safety Issues form the basis for immediate relief from stay when an estate or a fiduciary is ill-equipped or lacks the financial wherewithal or managerial resources to maintain such safety as further discussed herein. In fact, the inability to address these issues increases unnecessary exposure and risk for all involved – most obviously the Tenants but also the assets of this very Receivership Estate if tenants are injured or harmed.

### *McCormick's Relationship to Goldmark and the Amerigold Property*

On November 14, 2019, Goldmark obtained a commercial real estate loan ("**Loan**") related to the Property. The Lender is the current holder of the Goldmark Loan Agreement, Promissory Note, Deed of Trust, Security Agreement and Financing Statement (collectively, "**Loan Documents**") relating to the Amerigold Property.

### *Goldmark's Involvement in Pending SEC Receivership*

The pending action ("**Action**") before the Court was commenced against Timothy Barton ("**Barton**") and others on September 23, 2022.  As part of these proceedings, the Securities and Exchange Commission ("**SEC**") moved this Court for entry of the Receiver Order whereby Cortney C. Thomas was appointed as receiver ("**Receiver**").  The Receiver Order vested in the Receiver exclusive authority to administer the property of the defendants in this case and included, at Paragraphs 34-36, the broad Stay which limits the ability of third parties to take action "until further Order of this Court."  (Dkt. 29 at ¶¶ 34-36).

### *Current Procedural Posture*

On February 3, 2025, the Fifth Circuit Court of Appeals heard oral argument in Case No. 23-11237[2] in which Barton contested, *inter alia*, the nature and scope of assets included in the Receivership Estate.  More specifically, Barton maintained that the District Court retroactively reapproved orders approving the sales of certain assets, including the Amerigold Property.  (Brief for Appellant, Case No. 23-11237 (5th Cir.) at Dkt. 52-1, pp. 14, 48, 81).  The parties currently await a ruling from the Fifth Circuit as to whether various assets (including the Amerigold Property) constitute assets of the Receivership Estate.

If Barton prevails, the Amerigold Property is no longer subject to the Stay contained in the Receivership Order.  If Barton loses, the Amerigold Property remains subject to the Stay contained in the Receiver Order.  Given the exigencies of the noted Life Safety Issues and the inability to determine when the Court of Appeals may rule – which may be months – the adjudication of the danger to Tenants and the Lender's requested relief is in no way premature.

---

[2] Case No. 23-11237 was consolidated with Case No. 24-10004 in the Fifth Circuit Court of Appeals.

4

## ARGUMENT

**I.      Economics Should Neither Dictate Nor Supersede the Life Safety of Tenants at the Amerigold Property.**

Regrettably, multiple Life Safety Issues exist at the Amerigold Property.  This is despite extensive interest in the Amerigold Property by potential purchasers and despite the efforts of multiple parties who presented both the financial wherewithal and managerial ability to ensure Tenant safety.  Indeed, such interest spans over multiple years by at least two buyers who have been forced to abandon their efforts to acquire the Property due to the threat of litigation and the inability to procure title insurance due to the pending disputed receivership.  Indeed, the interest in the Amerigold Property is so pervasive that Barton, a key defendant in this case, has lodged repeated appeals contending that the Amerigold Property should not be part of the Receivership Estate.  The Receiver counters that the Property and the Tenants' rents remain assets of the Receivership Estate and should be utilized to protect equity investors' investments.  Neither is in the best interests of the Tenants.

Despite this overwhelming interest and multiple offers and efforts by third parties to reposition the Property, such parties are stayed to the direct detriment of the Property's Tenants. The Tenants are the ones who encounter these very real and dangerous hazards on a daily basis and whose rents are diverted to support the operation of this receivership, the funding of administrative expenses, and the financial recoveries for investors who perhaps unknowingly pit their equity investments against tenants' life safety rather than appropriate reinvestment in the Property.  Such a result certainly should not be countenanced by this Court nor should it be the inexorable result of this case simply because Goldmark (not the Tenants) may theoretically have benefitted from some de minimis and yet to be proven ill-gotten gain.  Despite the reams of paper

filed and the thousands of dollars spent in this case, a key constituency remains overlooked – the Tenants.

This situation begs a more fundamental question. Under a non-receivership scenario, rents paid by tenants of multifamily properties are directly reinvested in the property and in attendant life safety efforts, deferred maintenance and upkeep, and other measures designed for the safekeeping of Tenants. Here, however, these Tenants' rents are serving two competing masters – (1) a process designed to maximize recoveries for equity investors who have no affiliation with the Property and who now seek to utilize rents to bolster their own recoveries and (2) those Tenants who live at the Property whose rents are being diverted to support recoveries of unsecured equity investors. This would be far less of an issue if the Amerigold Property constituted a Class A Property that required minimal repairs and maintenance. However, that is not the case here. Indeed, given the state of disrepair of the Amerigold Property, one must seriously question whether Goldmark even "benefitted" from Barton's alleged fraudulent activities, as shown by the evidence provided in this Motion and revealed to date in this case. *Sec. & Exch. Comm'n v. Barton*, 79 F.4th 573, 580–81 (5th Cir. 2023).[3]

This is the clear and unfortunate procedural posture of this case. It is these circumstances that warrant the Lender's requested relief. To be clear, the Lender is not suggesting that the Receiver is not discharging his duties with skill and acumen or to the best of his ability under the circumstances. The Receiver is a lawyer by trade, not a property manager or a real estate

---

[3] To date it is unclear what funds have been specifically traced via forensic analysis to Goldmark. The Lender believes that no such tracing has been demonstrated directly linking funds to the Property. As such, the question emerges whether Goldmark somehow "benefitted" from the alleged fraud. The facts regarding such purported benefit in the instant Motion speak for themselves. The condition of the Property, as shown in the Halverson Declaration and Exhibits 2-71, hardly suggests any "benefit" to the Property.

professional. Receiverships such as these present unique issues and difficult choices, especially when financial resources are strained as they are here. Yet, it is the harsh reality that in almost two and a half years, the Property remains entangled in the morass of the receivership whose very existence remains in dispute while expenses increase, income decreases, and assets dwindle. The ultimate resolution of the Barton/investor dispute should not supplant the immediate interests of public safety.

## II.    The Receiver Must Operate the Amerigold Property in Compliance with All State Laws.

Federal law expressly mandates that the Receiver manage and operate the Amerigold Property in compliance with state law:

> "Except as provided in section 1166 of title 11, a trustee, **receiver** or manager **appointed in any cause pending in any court of the United States**, including a debtor in possession, **shall manage and operate the property in his possession as** such trustee, **receiver** or manager **according to the requirements of the valid laws of the State in which such property is situated, in the same manner that the owner or possessor thereof would be bound to do if in possession thereof**."

28 U.S.C. § 959 (emphasis added).

Indeed, when public health and safety requirements compete against federal equity receiverships, such equity receiverships must yield. This law applies to the Receiver in this case. The District of Columbia Court of Appeals' ruling in *Saravia v. 1736 18th St., N.W., Ltd. P'ship*, 844 F.2d 823, 827 (D.C. Cir. 1988) is instructive: "Nor will the general bankruptcy policy of fostering the rehabilitation of debtors serve to preempt otherwise applicable state laws dealing with public safety and welfare. This, we believe, is the import of 28 U.S.C. § 959(b)."

In a case highly analogous to this one, the Bankruptcy Court for the District of Columbia expressly concluded that a chapter 7 bankruptcy trustee must operate an apartment complex in

compliance with state law life safety and health requirements, especially while the trustee sought

to continue operating the apartment complex to maximize recoveries for unsecured creditors:

> **Section 959 was intended to negate the idea that a trustee "could ignore the rules of law of the state of operation affecting the conduct of the business committed to his charge" in order to maximize the return for the unsecured creditors**….
>
> In *Saravia*, the D.C. Circuit Court of Appeals, relying on 28 U.S.C. § 959(b), held that the debtor's estate must "'manage and operate the property ... according to the valid laws of the [jurisdiction] in which such property is situated....' 28 U.S.C. § 959(b)." …. In the case, the court concluded that the rejection of the tenants' leases by the debtor did not relieve the debtor of the obligation to comply with the requirements imposed by the District of Columbia housing code for the benefit of public health and safety. **The court reasoned that bankruptcy was not meant to be an automatic shield for the estate from state laws regulating health and safety**. *Id.* at 827 (citing *Midlantic Nat'l Bank v. New Jersey Dep't of Envtl. Protection*, 474 U.S. 494, 106 S.Ct. 755, 88 L.Ed.2d 859 (1986)).
>
> ***
>
> **In this case, the trustee is not liquidating the property. Rather, the trustee is requesting court approval to manage and operate the property, within the meaning of § 959(b), in order to increase the sale value of the property. The trustee intends to run the building as a going concern, continuing to rent out the apartments and collect the rent, while he attempts to avoid liens and arranges an orderly sale of the building. Therefore, under *Saravia*, the trustee, standing in the shoes of the owner, would be required to comply with the D.C. housing regulations**.

*In re Vel Rey Properties, Inc.*, 174 B.R. 859, 862–63 (Bankr. D.D.C. 1994) (emphasis added)

(internal citations omitted).

    In fact, the Fifth Circuit has also enforced 28 U.S.C. § 959(b)'s mandate and embraced the

sound policy undergirding this federal law. *In re Cajun Elec. Power Co-op., Inc.*, 185 F.3d 446,

453–54 (5th Cir. 1999) ("a bankruptcy trustee must 'manage and operate the property according

to the valid laws of the State in which such property is situated,' *see* 28 U.S.C. § 959(b), and we

agree with our sister circuits that 'the import' of this section is that 'the general bankruptcy policy

of fostering the rehabilitation of debtors [will not] serve to preempt otherwise applicable state laws

8

dealing with public safety and welfare.'").  There is no dispute that federal law mandates that the Receiver must comply with health and safety requirements – even if such Life Safety Issues were not created by the Receiver.

The Amerigold Property is clearly not in compliance with local and municipal codes, including the City of Dallas housing requirements.  By way of example, the Property does not satisfy even the minimum requirements specified by the City of Dallas Code Compliance Chapter 27 Housing Standards Manual, a copy of which is attached to the Appendix as <u>Exhibit 72</u> and an excerpt which is provided below:

### Section 27.11 (a) (c) – Minimum Property Standards

**General:** Minimum property standards apply to vacant and occupied buildings, properties, and structures must comply with all federal, state, and local laws and regulations, including the construction codes.  Written leases must be provided by owners in English, Spanish, or Vietnamese upon the occupant's request. An owner who enters into a written lease shall, upon the occupant's request provide the occupant with a written lease in the occupant's primary language, if the primary language is English, Spanish or Vietnamese.

**Repairs:** All repairs must be performed in a workmanlike manner in accordance to federal, state, and local laws and regulations, including the construction codes.

**Property standards:** An owner shall maintain the premise in operating condition without any holes, excavations, or sharp protrusions, and without any other object or condition that exists on the land and is reasonable capable of causing injury to a person.

 

**HAZARDS ON LAND**

Page **6** of **22**

(City of Dallas Code Compliance Chapter 27 Housing Standards Manual, at p. 6).

Even a cursory review of the Dallas City Code's Minimum Property Standards ("**Dallas Property Standards**") and photographs of the Property reveal multiple violations, including, *inter alia*, issues related to retaining walls, swimming pools, removal of dead trees and items that are

9

reasonably capable of causing injury, electrical issues, as well as the lack of "repairs in accordance with all applicable federal, state, and local laws, rules and regulations including the construction codes." (*See* Exhibit 72, Dallas Property Standards, § 27-11).  The current situation cannot continue to exist under 28 U.S.C. § 959(b) and warrants relief from the stay.

### III.    The Receiver Acts at the Behest of the Court, and the Facts Here Support the Relief Requested under the *Stanford* Factors.

The Receiver serves at the behest of and upon the direction of the Court.  This includes being a fiduciary of not only monetary and physical assets, but ensuring that life safety is of the utmost importance.  Yet, in light of numerous parties' legal wrangling, the Tenants' interests remain overlooked and underserved as demonstrated by the pictures attached to the Halverson Declaration.

This situation can be easily likened to a bankruptcy case, where multiple interests compete for limited resources.  *Cf. USA v. Petters*, 2008 WL 5101419 (D. Minn. Nov. 6, 2008) (given how rare non-bankruptcy receiverships are, bankruptcy principles are an appropriate analogy for SEC receiverships).  In these scenarios, bankruptcy courts are loathe to allow dangerous conditions to exist.   In fact, a clear mechanism is in place under the Bankruptcy Code to allow for relief from the stay "for cause" when dangerous conditions are extant.  11 U.S.C. § 365(d)(1); *see also In re Montgomery Mall Ltd. Partnership*, 704 F.2d 1173 (10th Cir. 1983) (lifting bankruptcy automatic stay and allowing foreclosure to proceed on a mall in part because expert testimony established that the shopping center presented a public hazard and could result in injury to tenants or customers absent repairs); *In re Grandview Estates Associates, Ltd.*, 89 B.R. 42 (Bankr. W.D. Mo. 1988) (denying debtor's motion for stay because of asbestos in an apartment building where "public interest [could] only be served by getting the [] premises into the hands of a financially responsible

entity as quickly as possible" to undertake the costly removal of asbestos). These bankruptcy cases provide a clear roadmap for what the result should be here as well.

This Court has relied upon the Fifth Circuit's decision in *S.E.C. v. Stanford Int'l Bank Ltd.*, 424 F. App'x 338, 341 (5th Cir. 2011), regarding the standard for obtaining relief from the stay in an SEC receivership. This standard includes the following three factors: "(1) whether refusing to lift the stay genuinely preserves the status quo or whether the moving party will suffer substantial injury if not permitted to proceed; (2) the time in the course of the receivership at which the motion for relief from the stay is made; and (3) the merit of the moving party's underlying claim." *S.E.C. v. Stanford Int'l Bank Ltd.*, 424 F. App'x 338, 341 (5th Cir. 2011) (quoting *SEC v. Wencke*, 742 F.2d 1230, 1231 (9th Cir.1984)).

The *Stanford* decision addressed whether claimants in an SEC receivership should be stayed from pursuing arbitration claims for damages they sustained against their Stanford financial advisors. *Stanford*, 424 F. App'x at 341. *Stanford* concluded that the claimants' demand for immediate arbitration was "outweighed by the importance of maintaining control over the receivership estate…." *Id*. The facts before this Court present a wildly different scenario than those in *Stanford*. Unlike *Stanford*, Tenants' rents are being funneled to fund this receivership rather than used to protect their safety. Innocent bystanders are being exposed to the very dangers that all other courts loathe. And for every dollar the Receiver expends to fight to keep this dangerous Property in the Receivership Estate, it is one less dollar that goes to either the life safety of Tenants or even the claimants in this case. Here, no responsible owner can step up to ensure compliance with federal law or state law as required, because this process has been stayed. Here, preserving the status quo only leads to a dangerous result. Indeed, the harm presented here clearly outweighs any potential benefit from preserving the status quo.

Furthermore, even assuming *arguendo* that investors' financial interests could or should be prioritized over others' life safety, preserving the current status quo only hurts efforts to "marshal, preserve and conserve the receivership estate." *Id*. Given the clear and present danger at the Property, the exposure to the Receiver and the Receivership Estate if Tenants or visitors are harmed is significant, particularly because everyone involved has known—or now knows, pursuant to this Motion—that the dangerous conditions exist here.

Finally, the requested relief will not cause the proverbial run on the bank and flood this Court with lift stay motions. The stay relief requested regarding the Property is narrowly limited to a situation where federal and state laws are not being abided by and where life safety issues exist. With respect to Barton, stay relief is appropriate because pursuit of non-receivership assets do not impact the Receivership Estate.

The second *Stanford* factor addressed the timing of claimants' lift stay requests, noting: "Timing in a receivership process is fact specific, based on the number of entities, the complexity of the scheme, and any number of other factors." *Id*. The timing of such requested relief is indeed fact-specific and a one-size-fits-all approach is neither appropriate nor countenanced by the Fifth Circuit. Unlike *Stanford*, this is not a receivership that involves "billions of dollars," nor is it especially complicated. *Id.* at 341-42. The timing makes clear that after 29 months, the Property is not being maintained in a manner that complies with the law. Waiting for further erosion to the Property and to Tenants' safety in light of the recent facts revealed by the site inspection, makes clear that time is of the essence.

The third *Stanford* factor addresses the merits of the moving party's claims. Clearly, the pictures attached to the Halverson Declaration are worth a thousand words and speak for themselves. The City of Dallas Code Compliance Chapter 27 Housing Standards Manual

demonstrates that even minimal standards for this Property are not being met. As such, the third *Stanford* factor is satisfied.

## **RELIEF REQUESTED**

The relief requested by this Motion is comprised of multiple requests. <u>First</u>, the Lender respectfully files this Motion to request that the Court provide immediate access to a professional third-party inspector to conduct a full and complete inspection of the Amerigold Property to be presented to this Court. The report will set forth the Life Safety Issues and other challenges facing this Property as well as the attendant cost to bring this Property in compliance with safety standards and local and municipal codes as required by the Dallas Property Standards and 28 U.S.C. § 959(b). The Lender invites the SEC and the Receiver to walk the Property with the inspector, to the extent neither has previously done so.

<u>Second</u>, this Motion asks that such other and further relief be granted to the Lender to take such actions to foreclose so that a responsible foreclosure bidder with financial wherewithal can take title to the Property to correct these breaches of the law and to ensure the minimum standards required under Texas law. Parties opposing the Lender's requested relief may opine that the Court should "punt" or "defer" a ruling on this Motion until the Fifth Circuit decides Barton's consolidated appeal. However, the risks posed to Tenants while waiting months for a Fifth Circuit ruling is obvious and should not go unaddressed during this time. Moreover, the equitable powers vested in the Receiver do not trump the Receiver's federally mandated obligations to comply with state law, including all health and safety requirements.

While an "off ramp" to the problems at the Amerigold Property may not be favored by equity investors, the SEC, the Receiver or even Barton, their interests do not supersede public laws involving health and safety. Even assuming *arguendo* the investors were to successfully object to

this Motion, they will ultimately not win the war. The likely cost to bring the Amerigold Property into compliance with the law will only serve to materially erode any receivership assets available to these investors after licensed contractors are hired and necessary repairs are made. In fact, it is quite likely that the Receivership Estate may be rendered administratively insolvent to bring the Property into compliance. And even if the investors were to win a proverbial motions battle, they do so at the expense of the life safety of Tenants who reside at the Property. Either way, such a result is neither supported by equity nor federal or state law.

Third, the Lender requests that the Stay imposed upon the Lender be lifted as to Barton. As this Court is sure to remember, Barton is a named defendant in this case and the guarantor of the Loan on the Amerigold Property. Oddly, Barton's assets are not included in the Receivership Estate even though he has been accused of fraud. This creates a counterintuitive and rather bizarre result. Barton benefits from the Stay and is free to use whatever assets he has to fight the Receiver and the sale of the Property with endless multiple appeals, while the innocent Lender is restrained from pursuing Barton under Barton's guaranty. The Lender has not been accused of wrongdoing. Barton has. Yet, the practical result is that Barton can use the Receiver Order both as a shield and a sword – a result that is at best nonsensical.

In connection with its pursuit of Barton, the Lender has offered to retrieve and copy any documents related to the Property in the Receiver's possession at the Lender's expense. This offer supports the Lender's position that assets that are not part of the Receivership Estate (such as Barton's personal assets) should be dealt with outside of the confines of this Action.

Counsel for the Lender consulted with counsel for the Receiver concerning the subject matter of this Motion prior to submission. The Receiver conveyed that he is open to an inspection, but the parties were ultimately unable to agree on who is entitled to select the third-party inspector

14

and unable to agree on whether the Court should wait to review the results of the inspection prior to deciding to lift the stay and granting other relief sought by this Motion.

For each of the reasons stated above, the Lender respectfully requests that the Court grant the relief requested herein.  The Lender also requests that, to the extent the Court may not be prepared to immediately rule on the requests contained herein, the Court allow the Lender to renew and supplement its requests for the relief contained herein upon receipt of the formal third-party property inspection report.

Dated: March 6, 2025

Respectfully submitted,

**DENTONS US LLP**

By:  */s/ Spencer D. Hamilton*
Spencer D. Hamilton
State Bar No. 24087656
Clay Taylor
State Bar No. 24033261
100 Crescent Court, Suite 900
Dallas, Texas 75201
Tel:  (214) 647-2496
Fax: (214) 259-0910
clay.taylor@dentons.com
spencer.hamilton@dentons.com

- and -

Jill Nicholson
233 S. Wacker Dr., Suite 5900
Chicago, IL 60606
Tel: (312) 876-8000
jill.nicholson@dentons.com
(admitted *pro hac vice*)

*Attorneys for McCormick 101 LLC*

## <u>CERTIFICATE OF SERVICE</u>

I certify that, on March 6, 2025, true and correct copies of the foregoing and accompanying documents were served electronically on all parties registered to receive notice of filings in this case through the Court's CM/ECF PACER system.

*/s/ Spencer D. Hamilton*
Spencer D. Hamilton
