**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | § § § | |
| *Plaintiff*, | § § § | |
| **v.** | § § | **No. 3:22-cv-2118-X** |
| **TIMOTHY BARTON, et al.** | § § § | |
| *Defendants*. | § | |

**RECEIVER'S OMNIBUS RESPONSE TO MCCORMICK 101 LLC'S
REQUEST FOR EXPEDITED BRIEFING AND MOTION FOR
(1) IMMEDIATE THIRD-PARTY INSPECTION OF AMERIGOLD SUITES
REGARDING TENANT LIFE SAFETY ISSUES AND (2) OTHER RELATED RELIEF**

Charlene C. Koonce
 Texas Bar No. 11672850
 charlene@brownfoxlaw.com
Timothy B. Wells
 Texas Bar No. 24131941
 tim@brownfoxlaw.com
BROWN FOX PLLC
8111 Preston Road, Suite 300
Dallas, TX  75225
Tel. 214.327.5000
Fax. 214.327.5001

*Attorneys for Receiver Cortney C. Thomas*

**TABLE OF CONTENTS**

I.     INTRODUCTION ................................................................................................. 1

II.    BACKGROUND ................................................................................................. 2

III.    ARGUMENT...................................................................................................... 4

     A.    The Receiver is Remedying the Issues McCormick Notes in the Motion .............. 4

     B.    The Receiver is Following the Law ........................................................ 4

     C.    McCormick is a Sophisticated Investor Who Knew What it Was Buying ............. 5

     D.    The Stay Should Remain in Place............................................................ 6

          1.    Preserving the Status Quo............................................................ 6

          2.    Timing in the Course of the Receivership ................................... 8

     E.    The Stay and Barton.................................................................................. 9

     F.    Responding to McCormick's Repeated Motions is Draining Receivership Resources ................................................................................. 10

IV.    CONCLUSION................................................................................................... 11

–i–

# TABLE OF AUTHORITIES

Cases

*Chambers v. NASCO, Inc.*,
  501 U.S. 32 (1991).......................................................................................................... 11

*Rishmague v. Winter*,
  616 Fed. App'x 138 (5th Cir. 2015) ............................................................................... 7

*SEC v. Adams*,
  No. 318CV00252, 2023 WL 8483662 (S.D. Miss. June 28, 2023)............................. 9

*SEC v. Byers*,
  609 F.3d 87 (2d Cir. 2010) ............................................................................................. 6

*SEC v. Heartland Group Ventures, LLC*,
  No. 4:21-CV-01310-O-BP, 2023 WL 4157490 (N.D. Tex. May 18, 2023), *report and recommendation adopted*, No. 4:21-CV-01310-O-BP, 2023 WL 5333278 (N.D. Tex. Aug. 18, 2023) ............................................................................................................... 7

*SEC v. Kaleta*,
  No. CIV.A. 4:09-3674, 2012 WL 2577537 (S.D. Tex. July 3, 2012) .......................... 9

*SEC v. Provident Royalties, L.L.C.*,
  No. 3:09-CV-1238-L, 2011 WL 2678840 (N.D. Tex. July 7, 2011)........................... 7

*SEC v. Stanford Int'l Bank Ltd.*,
  424 Fed. App'x 338 (5th Cir. 2011) .......................................................................... 6, 8

*SEC v. Vescor Cap. Corp.*,
  599 F.3d 1189 (10th Cir. 2010) ..................................................................................... 6

*SEC v. Wencke,*
  742 F.2d 1230 (9th Cir.1984) ........................................................................................ 6

*United States v. Acorn Tech. Fund, LP,*
  429 F.3d 438 (3rd Cir. 2005) ...................................................................................... 7, 9

Cort Thomas, the Court-appointed Receiver, responds to Nonparty McCormick 101 LLC's ("McCormick") Motion for (1) Immediate Third-Party Inspection of Amerigold Suites Regarding Tenant Life Safety Issues and (2) Other Related Relief [Dkt. 612 and 613] (the "Motion") and Request for Expedited Briefing [Dkt. 615] ("Expedited Request") and in support respectfully shows the Court as follows:

## I.     INTRODUCTION

As a threshold matter, McCormick's Expedited Request is moot, and regardless, as detailed below, there was no emergency justifying expedited briefing or expedited relief. Accordingly, the Receiver submits his Response on the date it would otherwise be due.

For the fourth time McCormick moves this Court to lift the Stay (defined below) provided by the Receivership Order. McCormick asks the Court to order an inspection and without pause, also lift the Stay to allow McCormick to foreclose and to pursue Barton individually. McCormick's request to foreclose, presented in a motion purportedly premised on concern for the Amerigold tenant's safety, reveals the ruse underlying the Motion. But as this Court is well aware from McCormick's three prior motions seeking to lift the Stay, McCormick acquired its interest in the Amerigold Suites, *after* the Property[1] was already in receivership, and as the Motion suggests, while it was in substantially the same condition as it is now. Yet, nothing about McCormick's acquisition of the Note (defined below) on the Property reveals *any* of the concerns (or ignorance of conditions) that purportedly prompted the instant request for an inspection.  Nor did McCormick bring these issues to the Receiver's attention prior to conferring about the Motion.

Setting aside the disingenuous basis for the Motion, any "life safety" issues as the Property would be of grave importance to the Receiver.  Upon learning of the concerns raised in

---

[1] The Amerigold Suites is also referred to as the "Property."

McCormick's Motion, the Receiver immediately began working with contractors to repair certain electrical issues and the retaining wall. While the Receiver is confident any "life safety" issues have been or will be addressed, it bears noting that any third-party inspection report McCormick seeks will have to be disclosed to a potential buyer. The Receiver believes that it would be improper to allow McCormick, whose desire (as indicated by four motions to lift stay) is to foreclose on the Property, to select an inspector who will nitpick every single potential issue with the Property, which the Receiver readily admits has substantial warts. Instead, as he informed McCormick during the conference on the Motion, the Receiver is not opposed to a third-party life-safety inspection of the Property, as long as the Receiver can choose the inspector.

## II.    BACKGROUND

1.    On October 18, 2022, the Court entered an Order Appointing Receiver (the "Initial Receivership Order") by which Cort Thomas was appointed as Receiver for certain entities. The Court directed the Receiver to take possession and control of all Receivership Assets and Receivership Records defined in the Initial Receivership Order. Goldmark Hospitality, LLC, the owner of the and the Amerigold Suites, was included in the Initial Receivership Order.

2.    At the time the Initial Receivership Order was entered, Texas Brand Bank ("TBB") held a loan on the Amerigold Suites (the "Note"). On or about December 22, 2022, shortly after entry of the Initial Receivership Order, McCormick entered into an Asset Sale Agreement with TBB pursuant to which McCormick acquired the Note. When it purchased the Note, no payments had been made since September 2022. A copy of the Receivership Order was attached to the Asset Sale Agreement, and that Agreement provided in relevant part:

> "The Buyer is fully aware that collection and enforcement of the Loan may be limited by the Receivership and that the Obligor is the subject of a Receivership Order (attached) . . . ***Buyer has made such independent investigation as the Buyer deems to be warranted in to the Receivership***, as well as nature, title, attachment, perfection, priority, validity, enforceability, collectability, and value

of the Loan, the title, ***condition*** and value of ***any collateral*** securing the Loan, the market conditions and other characteristics of the places where any such collateral is located, and all other facts it deems material to the purchase of the Loan."[2]

3.      The Asset Sale Agreement also stated that TBB made no representations regarding limitations that might apply to enforcement or collection of the loan based on the Receivership, that collection and enforcement could be limited by the Receivership.[3]

4.      Following the Fifth Circuit's vacatur of the Initial Receivership Order, after briefing and a hearing, on November 29, 2023, the Court entered a new Receivership Order (the "Receivership Order") Dkt. 417.  When deciding which entities to include in the Receivership Order as Receivership Entities, the Court determined that Goldmark Hospitality, LLC ("Goldmark") received no less than $200,000 of Wall Investor Funds and used those funds "to make improvements to the [Amerigold Suites], fund hotel operations, and pay the manager of the hotel." Dkt. 416.[4]

5.      The Receivership Order, like the Initial Receivership Order, includes a stay of enforcement and a stay of litigation against the Receiver and all Receivership Entities (collectively, the "Stay").  Dkt. 417, ¶¶ 34-36.

6.      McCormick has filed three prior motions to lift the Stay— first at Dkt. 311 and at Dkt. 321—both of which the Court denied on November 29, 2023 [Dkt. 421]—again at Dkt 463, which the court denied on March 7, 2024 at Dkt. 477, and again at Dkt. 563, which the Court denied at Dkt. 584.

---

[2] *See* Dkt. 317 at ¶ 5.5 (emphasis added). For the Court's convenience, a true and correct copy of the Asset Sale Agreement is also attached as Exhibit A-1.

[3] *See id.*

[4] The Court utilized, in part, the Receiver's Declaration and Interim Report [Dkt. 308] to make this determination; however, the examples the Receiver provided were not exhaustive. Since submitting his Declaration and Interim Report, the Receiver has discovered additional tracing examples.

– 3 –

### III.    ARGUMENT

**A.    The Receiver is Remedying the Issues McCormick Notes in the Motion**

The Motion asserts that issues exist with a retaining wall and electrical boxes at the Amerigold Suites. Despite McCormick's efforts to bootstrap property condition issues into justification for foreclosure and because as discussed below the Receiver has at all times sought to operate the Amerigold Suites in compliance with the law and such that the value of the Property is preserved, he has already begun remedying the electrical and retaining wall issues.

As shown in the photos included in the supporting appendix, the Receiver hired an electrician to install covers on any open electrical boxes and place covers over any light fixtures with exposed wires.[5] The Receiver installed locks on unlocked electrical boxes[6] and is in the process of receiving bids from retaining wall repair companies to fix the wall highlighted in the Motion.[7] Until the wall can be repaired, the Receiver had caution tape installed to warn individuals to stay away from the wall.[8]  Photos of the pool, which was recently resurfaced and cleaned before McCormick filed its Motion, are also included in the Appendix.[9] Had McCormick raised the issues listed in the Motion with the Receiver directly and more than a few hours before it filed the Motion, these issues would have been addressed without the need to involve the Court and the expense of the Motion and Response.

**B.    The Receiver is Following the Law**

The Receiver agrees with McCormick that he must follow the law—and he is. In fact, only a few months ago, in July 2024, the Amerigold Suites passed its annual Fire and Life Safety Fire

---

[5] Declaration of Cortney Thomas ("Thomas Dec.") ¶ 3; APP062–64.

[6] Thomas Dec. ¶ 3: APP065–66.

[7] Thomas Dec. ¶ 3.

[8] Thomas Dec. ¶ 3; APP068–69.

[9] APP067.

Code Inspection.[10] Amerigold also passed a similar inspection in 2023.[11] Despite McCormick's assertions to the contrary, the Receiver has protected the safety of the Amerigold Suites and its tenants by rehabbing more than half of the air conditioning units,[12] repairing roof damage related to severe storms, and performing extensive repairs to the community pool, among other things.[13]

As stated repeatedly, when the Receiver assumed control of the Amerigold Suites, insurance on the Property was on the verge of cancellation, shut off notices had been issued for electricity service, significant water bills were long overdue, and trash service had been discontinued.[14] It was thus evident that payment for services essential to maintain *any* occupancy and crucial repairs and maintenance had been ignored.[15] Since his appointment, the Receiver has protected the safety and habitability of the Property by keeping it insured, getting and keeping all utilities caught up, and making necessary repairs.[16] The Receiver has attempted to sell the Property multiple times, but Barton's improper appeal of Sales Orders on the Property have continued to delay any such sale.[17]

## C.    McCormick is a Sophisticated Investor Who Knew What it Was Buying

In the Asset Sale Agreement McCormick signed with TBB, McCormick acknowledged that it was a Sophisticated Buyer under the Securities Act of 1933 and further acknowledged that it had conducted an "independent investigation" into the "condition and value" of the Amerigold

---

[10] APP070–75.

[11] APP076–89.

[12] *See* Dkt. 543 at 35–36.

[13] *See* Dkt. 570 at 36.

[14] *See* Dkt. 139 at 18; Dkt. 225 at 21; Dkt. 299 at 25; Dkt. 373 at 28; Dkt. 456 at 33; Dkt. 491 at 34; Dkt. 543 at 35.

[15] *See* Dkt. 308 at 87.

[16] *See* Dkt. 583 at 36.

[17] *See* Dkt. 599 at 16–17.

Suites before purchasing the Note.[18] Taking Frank Guzman's statement at face value that the retaining wall has been in its current condition for 10 years,[19] when McCormick purchased the loan two and a half years ago, the Property was in substantially the same condition. The Court should not allow McCormick, to leverage the condition of the retaining wall as support for lifting the Stay, where the condition of the retaining wall *has not changed* since McCormick acquired the Note for the Property.[20]

### D.       The Stay Should Remain in Place

Stays in receivership matters serve as additional tools furthering the goals of the receivership. *SEC v. Byers*, 609 F.3d 87, 92 (2d Cir. 2010). The Stay is intended to protect receivership assets and defrauded investors and serve "considerations of judicial economy." *SEC v. Vescor Cap. Corp.*, 599 F.3d 1189, 1197 (10th Cir. 2010). Three factors inform the court's broad discretion regarding whether to lift a litigation stay: "'(1) whether refusing to lift the stay genuinely preserves the status quo or whether the moving party will suffer substantial injury if not permitted to proceed; (2) the time in the course of the receivership at which the motion for relief from the stay is made; and (3) the merit of the moving party's underlying claim.'" *SEC v. Stanford Int'l Bank Ltd.*, 424 Fed. App'x 338, 341 (5th Cir. 2011) (quoting *SEC v. Wencke,* 742 F.2d 1230, 1231 (9th Cir.1984)). Although McCormick identifies the governing factors, it misapplies the factors and does not provide ample justification to lift the Stay.

#### 1.       Preserving the Status Quo

In evaluating the first factor, the Court compares the Receiver's interests with those of the movant. *Id.* at 341. The "Receiver's interests" encompass "not only protection of the receivership

---

[18] APP007.

[19] *Motion* at 2.

[20] Thomas Dec. ¶ 7.

*res,* but also protection of defrauded investors and considerations of judicial economy.'" *SEC v. Provident Royalties, L.L.C.*, No. 3:09-CV-1238-L, 2011 WL 2678840, at \*3 (N.D. Tex. July 7, 2011) (quoting *United States v. Acorn Tech. Fund, LP,* 429 F.3d 438, 443 (3rd Cir. 2005)). Protecting the receivership estate, including judicial resources at issue with respect to the estate, is accordingly the status quo that the Court seeks to preserve. *See SEC v. Heartland Group Ventures, LLC*, No. 4:21-CV-01310-O-BP, 2023 WL 4157490, at \*2–3 (N.D. Tex. May 18, 2023), *report and recommendation adopted*, No. 4:21-CV-01310-O-BP, 2023 WL 5333278 (N.D. Tex. Aug. 18, 2023) (rejecting motion to lift stay in favor of personal injury litigant, based on preserving estate assets and preventing loss of receivership properties preserved through the stay); *Rishmague v. Winter*, 616 Fed. App'x 138 (5th Cir. 2015) (upholding district court's decision not to lift a litigation stay several years into a receivership to preserve receivership assets). The Receiver, rather than the challenging creditor, is in the best position to evaluate the impact of relief from the stay, and thus the Receiver's agreement or opposition warrants significant weight. *Provident Royalties, L.L.C.*, 2011 WL 2678840 at \*2.

McCormick argues that the Receiver is draining resources from the Property for other Receivership expenses or properties rather than repairing the Amerigold Suites. As it has been informed repeatedly, however, McCormick is incorrect. The Receiver operates a separate bank account for Goldmark Hospitality, evidenced by the separate accounting included in his quarterly reports, and all income from the Amerigold Suites is deposited in this account.[21] None of the Receivership expenses are paid from this account.[22]

The Receiver continues rehabilitating the Property and making repairs as need arises and

---

[21] *See*, *e.g.*, Dkt. 599 at 38–48.

[22] *See id.*

funds allow, and in the process, continues receiving passing certifications from code inspections. Nonetheless, as he has noted repeatedly, including in motions seeking approval to sell the Property, it needs major renovations.[23]   In the Receiver's judgment and in light of his obligations to all creditors, undertaking those renovations rather than selling the Property is not  in the best interest of the Receivership Estate.[24] The Receiver has accordingly attempted to sell the Amerigold Suites numerous times, but has been prevented from closing these sales.[25] Preserving the status quo until Barton's improper sale order appeals are resolved, serves the best interest of the Receivership Estate and judicial economy.

### 2.        Timing in the Course of the Receivership

"Timing in a receivership process is fact specific, based on the number of entities, the complexity of the scheme, and any number of other factors."  *Stanford*, 424 Fed. App'x at 341. McCormick's arguments regarding the second factor focus primarily on the length of time the receivership has been in place. However, McCormick ignores the relative infancy, in terms of progress of this receivership, due to Barton's first round of appeals, (including dismissal of his appeal of the first order that approved the sale of the Amerigold Suites), and the delays caused by the still pending appeal of the new Receivership Order.[26]   Unlike many receiverships at the two-year mark, this case has not progressed substantially towards finality: the SEC's claims against Barton are stayed, and due to the pending appeal, the Receiver is in no position to seek or evaluate investor or creditor claims or distribute assets.

---

[23] *See* Dkt. 500 at 9.

[24] *See* Dkt. 543 at 36-37 ("[T]o avoid using limited receivership assets to continue operating the Property at a loss, the Receiver continues to believe that selling the Property is in the best interest of the Receivership Estate.")

[25] *See* Dkt. 599 at 17–18.

[26] *See* Dkt. 584; *see also* Dkt. 609 at 2 ("The Receiver has yet to close on the sale of any real property in the estate or service any of the debt that encumbers the assets due to Barton's appeals and interference.").

Numerous courts have considered a two-year-old receivership in which a receiver has not made significant progress towards liquidating and distributing assets or where the Receiver is still discovering new facts, too "youthful" to lift the stay. *See Acorn Tech. Fund, L.P.,* 429 F.3d at 450 (denying motion to lift stay after three years, where "new facts" continued to come to light); *SEC v. Kaleta*, No. CIV.A. 4:09-3674, 2012 WL 2577537, at *3 (S.D. Tex. July 3, 2012) (denying motion to lift stay after three years, where the Receiver "continues to pursue various Estate claims and thus is not yet prepared to distribute Estate assets" and if stay was lifted "Receiver would lose necessary control over Estate assets for purposes of administering Receivership."); *SEC v. Adams*, No. 318CV00252, 2023 WL 8483662, at *2 (S.D. Miss. June 28, 2023) (denying motion to lift stay, after five years, where "the Receiver continues to pursue various claims for the Receivership Estate and is, therefore, not yet prepared to distribute the Receivership Estate's assets.") (internal quotation omitted)).   Since the Receivership is still in its infancy and the Receiver has demonstrated he is caring for the Property, the second factor does not weigh in favor of lifting the stay.

Where the first two factors weigh against lifting the stay, the Court need not evaluate the third. *Adams*, No. 2023 WL 8483662, at *2; *Kaleta*, 2012 WL 2577537, at *3.

## E.    The Stay and Barton

While the Receiver takes no position with respect to McCormick's entitlement to recover from Barton based on a personal guaranty,[27] the Receivership Order provides that the Stay applies to "any of the Receivership Entities' past or present officers, directors, managers, agents, parent

---

[27] To date, although Barton has professed an inability to pay the expensive law firm that represents him as well as court-ordered sanctions, he nonetheless has retained an accounting expert. *See* Dkt. 314 ("An expert is assisting the Defense in its opposition to the SEC's motion."). He has also retained a second law firm. *See* Dkt. 595.  Barton thus presumably possesses assets independent of the entities and properties that are currently included within the scope of the Receivership Order which could be used to satisfy any liability assessed regarding a personal guaranty.

or affiliated entities, or general or limited partners sued for, or in connection with, any action taken by them while acting in such capacity of any nature." The Motion promises to be the first in a likely flood of similar motions that will (1) necessitate the expenditure of Receivership assets in responding; (2) almost certainly require additional receivership assets in seeking to stay claims Barton will attempt to assert against the Receiver in connection with such litigation; and (3) potentially require further work and expense to the Receivership Estate, even if not a party, in responding to discovery requests related to such litigation. Accordingly, since Barton signed the personal guaranty in conjunction with a loan to Goldmark, the Receiver requests that the Court deny McCormick's request to pursue Barton individually, at least until Barton's appeal of the Receivership Order is decided.

**F.      Responding to McCormick's Repeated Motions is Draining Receivership Resources**

In support of lifting the Stay, McCormick argues that "for every dollar the Receiver expends to fight to keep this dangerous Property in the Receivership Estate, it is one less dollar that goes to either the life safety of Tenants or even the claimants in this case." *Motion* at 11. Yet, McCormick's repeated motions—four to date, filed by three different law firms—seeking to lift the Stay are themselves an obvious drain on precious Receivership resources.

When McCormick sought the Receiver's conference for the Motion, he clearly stated he did not oppose an inspection and that the Motion was accordingly unnecessary. McCormick, however, persisted in filing the Motion. Since the Receiver has been forced to expend resources fighting an unnecessary motion (and a fourth request to lift the stay), he requests that the Court order McCormick to reimburse the Receivership Estate fees in the amount of $3,500.00,[28] which

---

[28] Thomas Dec. ¶ 8.

is the reasonable amount of fees spent responding to this Motion.[29]

## IV.   CONCLUSION

For the reasons set forth above, the Receiver prays for an order denying McCormick 101 LLC's Motion and ordering McCormick to pay $3,500 to the Receivership and such other relief to which the Receiver may be justly entitled.

Respectfully submitted,

By: */s/ Timothy B. Wells*
    Charlene C. Koonce
     Texas Bar No. 11672850
     charlene@brownfoxlaw.com
    Timothy B. Wells
     Texas Bar No. 24131941
     tim@brownfoxlaw.com
    BROWN FOX PLLC
    8111 Preston Road, Suite 300
    Dallas, TX  75225
    Tel. 214.327.5000
    Fax. 214.327.5001

*Attorneys for Receiver Cortney C. Thomas*

## CERTIFICATE OF SERVICE

Pursuant to Fed. R. Civ. P. 5(d)(1)(B), as amended, no certificate of service is necessary, because this document is being filed with the Court's electronic-filing system.

---

[29] *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 45–46 (1991) ("[A] court may assess attorney's fees when a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons. . . . The imposition of sanctions in this instance transcends a court's equitable power concerning relations between the parties and reaches a court's inherent power to police itself, thus serving the dual purpose of vindicat[ing] judicial authority without resort to the more drastic sanctions available for contempt of court and mak[ing] the prevailing party whole for expenses caused by his opponent's obstinacy.").