**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

|  |  |  |
|---|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | § § § | |
| *Plaintiff,* | § § § | |
| **v.** | § § | **No. 3:22-cv-2118-X** |
| **TIMOTHY BARTON, et al.** | § § § | |
| *Defendants.* | § § | |

**APPENDIX IN SUPPORT OF RECEIVER'S OMNIBUS RESPONSE TO MCCORMICK 101 LLC'S REQUEST FOR EXPEDITED BRIEFING AND MOTION FOR (1) IMMEDIATE THIRD-PARTY INSPECTION OF AMERIGOLD SUITES REGARDING <u>TENANT LIFE SAFETY ISSUES AND (2) OTHER RELATED RELIEF</u>**

– 1 –

Respectfully submitted,

By: _/s/ Timothy B. Wells_____
    Charlene C. Koonce
     Texas Bar No. 11672850
     charlene@brownfoxlaw.com
    Timothy B. Wells
     Texas Bar No. 24131941
     tim@brownfoxlaw.com
    BROWN FOX PLLC
    8111 Preston Road, Suite 300
    Dallas, TX  75225
    Tel. 214.327.5000
    Fax. 214.327.5001

*Attorneys for Receiver Cortney C. Thomas*

## CERTIFICATE OF SERVICE

Pursuant to Fed. R. Civ. P. 5(d)(1)(B), as amended, no certificate of service is necessary, because this document is being filed with the Court's electronic-filing system.

– 3 –

| EXHIBIT | DOCUMENT | APP PAGES |
|---------|----------|-----------|
| A | Declaration of Receiver Cortney C. Thomas in Support of Receiver's Omnibus Response to McCormick 101 LLC's Motion [Dkts. 612, 613, and 615] | APP001 – 002 |
| A-1 | Asset Sale Agreement between McCormick 101, LLC and Texas Brand Bank | APP003 – 056 |
| A-2 | Invoice dated March 20, 2025 from ElectricMan reflecting repairs made at Amerigold Suites | APP057 – 060 |
| A-3 | Photos reflecting repairs made at Amerigold Suites and the Amerigold Suites' current condition, taken between March 20–24, 2025 | APP061 – 069 |
| A-4 | 2024 Fire and Life Safety Fire Code Inspections for the Amerigold Suites | APP070 – 075 |
| A-5 | 2023 Fire and Life Safety Fire Code Inspections for the Amerigold Suites | APP076 – 089 |

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § § § | |
| *Plaintiff*, | § § § | |
| v. | § § | No. 3:22-cv-2118-X |
| TIMOTHY BARTON, et al. | § § § | |
| *Defendants.* | § | |

**DECLARATION OF RECEIVER CORTNEY C. THOMAS IN SUPPORT OF**
**RECEIVER'S OMNIBUS RESPONSE TO MCCORMICK 101 LLC'S MOTION**

1.      My name is Cortney C. Thomas.  I have personal knowledge of the matters set forth in this Declaration, I am of sound mind, and I am otherwise competent to testify to these matters.

2.      For the Court's convenience, I have attached a copy of the Asset Sale Agreement between McCormick 101, LLC and Texas Brand Bank as Exhibit A-1.

3.      On March 20, 2025 I instructed my counsel, Tim Wells, to meet with an electrician and retaining wall repair company at the Amerigold Suites to coordinate repairs to open electrical junction boxes and to discuss options to repair the retaining wall. The electrician was able to complete his work on March 20, 2025. I am still soliciting additional bids to repair the retaining wall. Until the wall can be repaired, I had caution tape installed to warn individuals to stay away from the wall. I also had locks installed on unlocked electrical boxes. Additionally, the pool was recently resurfaced and cleaned before McCormick filed its Motion.[1]

4.      A true and correct copy of the invoice from the electrician detailing the work completed is attached as Exhibit A-2.

---

[1] "Motion" refers to McCormick 101, LLC's Motion for (1) Immediate Third-Party Inspection of Amerigold Suites Regarding Tenant Life Safety Issues and (2) Other Related Relief [Dkt. 612 and 613].

1

**APP001**

5.      True and correct copies of photos showing the repairs made at the Amerigold Suites and the Amerigold Suites' current condition, which were taken between March 20–24, 2025, are attached as Exhibit A-3.

6.      In 2023 and 2024, Amerigold Suites passed its annual Fire and Life Safety Fire Code Inspection. A True and correct copy of the 2024 Fire and Life Safety Fire Code Inspections for the Amerigold Suites is attached as Exhibit A-4. A True and correct copy of the 2023 Fire and Life Safety Fire Code Inspections for the Amerigold Suites is attached as Exhibit A-5.

7.      Based on the representations made in the Motion and conversations with my counsel, it is my understanding that the condition of the retaining wall has not changed since McCormick acquired the loan on Amerigold Suites.

8.      When McCormick sought my conference for the Motion, I clearly stated I did not oppose a life-safety inspection by an inspector of my choosing and that the Motion was accordingly unnecessary. McCormick, however, persisted in filing the Motion. In responding to McCormick's Motion, the Receivership Estate has incurred an expense of $3,500.00, which is the reasonable amount of fees spent responding to this Motion.

9.      I declare under penalty of perjury that the foregoing is true and correct.

March 27, 2025

                                                    /s/ Cortney C. Thomas
                                                   CORTNEY C. THOMAS

2

APP002

# EXHIBIT A-1

## ASSET SALE AGREEMENT

THIS ASSET SALE AGREEMENT ("Agreement"), entered into this _____ day of December, 2022, ("Effective Date") by and between TEXAS BRAND BANK (the "Seller"), and MCCORMICK 101, LLC (the "Buyer"), sets forth the terms and conditions whereby the Seller agree to sell and the Buyer agrees to purchase the Loan identified herein.

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Seller and the Buyer hereby agree as follows:

**1.    Definitions**.  Capitalized terms shall be defined as set forth in this Agreement, including in Appendix A to this Agreement.

**2.    Agreement to Purchase and Sell**.  Subject to and in accordance with the terms and conditions of this Agreement, the Seller hereby agree to sell, assign, transfer and convey to the Buyer on the Closing Date, and the Buyer hereby agrees to purchase and accept on the Closing Date, all rights, title, and interests of the Seller, together with all payment and performance obligations of the Seller, as of the Closing Date, in, to and under the Loan set forth on the Loan Schedule.

**3.    Payment of Purchase Price; Closing**.  The closing shall occur on the Closing Date, by delivery of Closing Documents by hand or overnight delivery.  In the event a copy of the Seller's signature to this Agreement is not delivered to the Buyer within one Business Day after the date hereof, the Buyer may extend the Closing Date by one Business Day for each Business Day of such delay.

Except to the extent such amounts are required to be remitted to the applicable Obligor or are permitted to be retained by  Seller pursuant to this Agreement, the Buyer shall be entitled to (a) all payments of principal actually received by Seller or their servicer with respect to the Loan after the Calculation Date; (b) all payments of interest actually received by the Seller or their servicer with respect to such Loan after the Calculation Date; and (c) all other monies collected or received by Seller or their servicer after the Calculation Date with respect to such Loan.

**3.1    Intentionally Omitted**.

**3.2    Payment of Purchase Price.**  On the Closing Date, the Buyer shall pay to the Seller by wire transfer in immediately available funds, the Purchase Price.  The Purchase Price shall be calculated on a settlement statement prepared by the Seller and made available for the Buyer's review two Business Days prior to the Closing Date.

**3.3    Conveyance**.  Upon receipt of the Purchase Price, the Seller shall sell, assign, transfer and convey the Loan to the Buyer subject to and in accordance with the provisions of this Agreement.

**APP004**

**3.4    Taxes, Fees, Etc**.  The Buyer shall pay all transfer, filing and recording fees, taxes (including all 2022 property taxes), costs and expenses, and any applicable documentary taxes, required to be paid by either the Seller or the Buyer in connection with the transactions contemplated hereby, and hereby agrees to indemnify and hold the Seller harmless from and against any and all claims, liability, costs and expenses arising out of or in connection with the failure of the Buyer to pay any such amount on a timely basis.  The Seller shall be entitled to require the payment of any such fees, taxes, costs and expenses at or prior to the closing and as a condition thereof.  This Section shall not require the Buyer to pay any recording fees and expenses related to recording intervening assignments of mortgage to the related Seller, or the taxes, costs or expenses related to the Seller' sale or income tax obligations occasioned by the sale of the Loan.

**3.5    Payments Subsequent to the Closing Date**.  From time to time after the Closing Date the Seller shall pay to the Buyer, promptly after receipt thereof, the net amount of any Collections received by the Seller on or after the Calculation Date (to the extent collected in good funds by the Seller) and not already so paid to the Buyer.

**4.        Transfer of Loan**.

**4.1    Closing Documents**.  Not later than the Closing Date, the Seller shall deliver to the Buyer (i) a Bill of Sale in the form attached hereto as Attachment 1, selling, assigning, transferring and conveying to the Buyer all rights, title and interests of the Seller in, to and under the Loan, all on the terms and conditions set forth in this Agreement; (ii) the original Note, or affidavits of lost Note, endorsed to the Buyer by allonge in the form attached hereto as Attachment 2; and (iii) assignment(s) of the Mortgage in the form attached hereto as Attachment 3 (collectively, to the extent delivered to the Buyer, the "Closing Documents").  The endorsements and assignments included in the Closing Documents shall be without recourse, representation or warranty of any kind or nature.  Such qualifying language on the endorsements and assignments shall not affect, limit or enlarge the obligations of the Seller and the rights, remedies and recourse of the Buyer under this Agreement.

**4.2    Intentionally Omitted.**

**4.3    Delivery of Collateral Documents, Etc**.  Promptly after the closing, the Seller shall deliver to the Buyer the entire Review File including, without limitation, originals of each Collateral Document to the extent originals are in the Seller's possession.

**4.4    Delivery of Additional Loan Information**.  Seller shall provide the following: pay-off statement for the Loan prepared as of closing date, pay histories for the Loan through the closing date, and the next payment due date(s).

**4.5    Execution of Separate Loan Assignments**.  At and after the closing, to the extent prepared by the Buyer, the Seller shall execute, and acknowledge if appropriate, for delivery to the Buyer one or more additional documents to the extent required by applicable public recording or filing laws to transfer to such Buyer the rights, title and interests of the Seller in, to and under the purchased Loan ("Separate Loan Assignment").  The Separate Loan Assignment shall be without recourse, representation or warranty of any kind or nature.  Such qualifying language on the

2

**APP005**

Separate Loan Assignment shall not affect, limit or enlarge the obligations of the Seller and the rights, remedies and recourse of the Buyer under this Agreement. The Buyer shall prepare and furnish any and all further Separate Loan Assignment, if necessary, in form satisfactory to the Seller.  The Buyer shall promptly file or record the Separate Loan Assignment, at its sole cost and expense.

**4.6**  **Hazard, Liability Insurance, Etc**.  At the request of the Buyer, the Seller shall cooperate with the Buyer in executing written requests to each hazard, casualty and liability insurer, and to the writing agent for each flood hazard insurer, issuing a policy of insurance obtained by an Obligor with respect to the Loan, requesting an endorsement of its policy of insurance effective on the Closing Date adding the Buyer as the mortgagee, the loss payee and/or an insured named therein, as the case may be, together with instructions that such endorsement be forwarded directly to the Buyer, with a copy to the Seller at the addresses herein specified for notices.  Each such request shall be prepared by the Buyer at its sole cost and expense, and any additional premium or other charge in connection therewith shall be paid by the Buyer.   To the extent the Loan constitute personal or real property, the Seller expressly disclaims any obligation to pay property taxes, or pay any related transaction taxes or other fees.

**5.**  __Representations and Warranties of the Buyer__.   The Buyer hereby represents and warrants as follows:

**5.1**  **Organization, Existence, Etc**.  The Buyer is duly formed or organized, validly existing and in good standing under the laws of the jurisdiction of its formation or organization, and is registered or qualified to conduct business in all other jurisdictions in which the failure to be so registered or qualified would materially and adversely affect the ability of the Buyer to perform its obligations hereunder.

**5.2**  **Authority and Enforceability, Etc**.  The Buyer has the power and authority to execute, deliver and perform each of the Sale Documents to which it is a party and has taken all necessary action to authorize such execution, delivery and performance.  The Buyer's execution of this Agreement and its performance of its obligations hereunder are not subject to any further approval, vote or contingency from any person or committee.  Assuming due authorization, execution and delivery by the Seller, the Sale Documents and all obligations of the Buyer thereunder are the legal, valid and binding obligations of the Buyer, enforceable in accordance with the terms of the Sale Documents, except as such enforcement may be limited by bankruptcy, insolvency, reorganization or other laws affecting the enforcement of creditors' rights generally and by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

**5.3**  **Conflict with Existing Laws or Contracts**.  The execution and delivery of the Sale Documents and the performance by the Buyer of its obligations thereunder will not conflict with or be a breach of any provision of any law, regulation, judgment, order, decree, writ, injunction, contract, agreement or instrument to which the Buyer is subject; and the Buyer has obtained any consent, approval, authorization or order of any court or governmental agency or body required for the execution, delivery and performance by the Buyer of the Sale Documents.

3

**APP006**

**5.4    Financial Condition**.  Neither the Buyer nor any general partner, limited partner, shareholder or joint venturer in the Buyer is involved in any financial difficulties which would impair or prevent a closing pursuant to this Agreement on the Closing Date.  The Buyer has now and will have as of the Closing Date sufficient liquid assets, capital and net worth to meet its obligations under the Sale Documents and to pay the Purchase Price without any financing or other contingencies.

**5.5    Decision to Purchase**.  The Buyer's bid and decision to purchase the Loan is based upon its own comprehensive review and independent expert evaluation and analysis of the Review File and other materials deemed relevant by the Buyer and its agents.  The Buyer has read and agrees to all of the terms and conditions of the Bid Award Letter dated December 7, 2022.  The Buyer is fully aware that collection and enforcement of the Loan may be limited by the Receivership and that the Obligor is the subject of a Receivership Order, as more particularly described in Exhibit "A", attached hereto (the "Receivership" or the "Receivership Order").  Buyer has made such independent investigation as the Buyer deems to be warranted in to the Receivership, as well as nature, title, attachment, perfection, priority, validity, enforceability, collectability, and value of the Loan, the title, condition and value of any collateral securing the Loan, the market conditions and other characteristics of the places where any such collateral is located, and all other facts it deems material to the purchase of the Loan.

**5.6    No Reliance**.  In entering into this Agreement and the other Sale Documents, the Buyer has not relied upon any oral or written information from the Seller or any of their respective employees, agents, attorneys or representatives, other than the limited representations and warranties of the Seller contained herein.  The Buyer acknowledges that no employee, agent, attorney or representative of the Seller has been authorized to make, and that the Buyer has not relied upon, any statements, representations or warranties other than those specifically contained in this Agreement.

**5.7    Buyer a Sophisticated Investor**.  The Buyer is a sophisticated investor (as that term is used in regulations promulgated under the Securities Act of 1933) who could withstand the loss of the entire Purchase Price.

**5.8    Information True and Correct, Full Disclosure**.  The information provided by the Buyer in connection with its qualification as a bidder, was true and correct on the date provided and did not omit any information necessary to the accuracy and full disclosure of information provided and such information is accurate and complete on the date hereof.

**5.9    Confidentiality Agreement**.  The Buyer has not violated any of the terms of the Confidentiality Agreement.  At no time has the Buyer or any of its representatives or agents communicated with any Obligor or any of its representatives or agents regarding the Loan.  The Buyer has no affiliation with, any ownership interest in, or agreement with the Obligor or any of its representatives or agents regarding the Loan.

**5.10    Brokers**.  No broker or other party entitled to a commission is involved in connection with this transaction.

4

**APP007**

**6.**     **<u>Disclaimer of Representations, Warranties and Recourse</u>**.  This sale is made without recourse against the Seller, or representation or warranty by the Seller, whether expressed, implied or imposed by law, of any kind or nature except as expressly provided in <u>Sections 6.1</u> and <u>6.2</u> of this Agreement.  The Seller has attempted to provide accurate information to all prospective Bidders.  Without limiting the generality of the foregoing, the Seller does not represent, warrant or insure the accuracy or completeness of any information or its sources of information contained in the Bid Package or in the Review File, Collateral Documents, Note or Loan (whether contained in originals, duplicate originals, copies, or magnetic media, including computer tapes and disks), including without limitation any reports or other information prepared by accountants, engineers, appraisers, environmental consultants or other professionals.  The Seller has not, does not and will not make any representations or warranties with respect to the collectability of that Loan or the value or condition of the Mortgaged Property.  To the extent the Loan constitute personal or real property, such property is sold "AS IS, WHERE IS, WITH ALL FAULTS".  The Seller expressly disclaims any representations or warranties with respect to all such matters.

**6.1**     **Representations and Warranties by the Seller.**  Subject to the disclaimer in <u>Section 6</u> above, the Seller hereby makes the following limited representations and warranties:

**6.1.1   Organization, Existence, Etc**.  The Seller is duly formed or organized, validly existing and in good standing under the laws of the jurisdiction of their formation or organization, and are registered or qualified to conduct business in all other jurisdictions in which the failure to be so registered or qualified would materially and adversely affect the ability of the Seller to perform their obligations hereunder.

**6.1.2   Authority, Enforceability, Etc**.  The Seller has taken all reasonable action to authorize execution, delivery and performance of each of the Sale Documents to which it is a party.  Assuming due authorization, execution and delivery by the Buyer, the Sale Documents and, subject to the Receivership, all the obligations of the Seller thereunder are the legal, valid and binding obligations of the Seller, enforceable in accordance with the terms of the Sale Documents, except as such enforcement may be limited by the Receivership, bankruptcy, insolvency, reorganization or other laws affecting the enforcement of creditors' rights generally and by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

**6.1.3   Conflict with Existing Laws or Contracts**.  To the best of Seller's current knowledge and belief, and, including the Receivership, the execution and delivery of the Sale Documents and the performance by the Seller of their obligations thereunder will not conflict with or be a breach of any material provision of any law, regulation, judgment, order, decree, writ, injunction, contract, agreement or instrument to which the Seller is subject; and Seller has made full disclosure to Buyer of the Receivership. Seller has obtained any consent, approval, authorization or order of any court or governmental agency or body required for the execution, delivery and performance by the Seller of the Sale Documents, as demonstrated by the terms stated in that certain letter dated December 9, 2022, which were accepted and agreed to by Charlene Koonce, attorney for the Receiver.  The said letter is attached hereto as <u>Exhibit "B"</u>.  Seller makes no representation or warranty as to any limitations that might apply to the enforcement or collection of the Loan as a result of the Receivership and Buyer has entered into this transaction

based on its own interpretation of the laws, regulations, judgments, orders, decrees, writs, injunctions, contracts, agreements or instruments related thereto.

**6.1.4    Legal Action Against Seller**.  To the best of Seller's current knowledge and belief, and, with the exception of the Receivership, there is no action, suit or proceeding of which the Seller has received actual notice pending against the Seller in any court or by or before any other governmental agency or instrumentality which would materially affect the ability of the Seller to carry out the transactions contemplated by the Sale Documents.

**6.1.5    Brokers.**  No broker or other party entitled to a commission is involved in connection with this transaction.

**6.2    Representations and Warranties by Seller as to the Loan**.  Subject to the disclaimer in Section 6 and except as otherwise disclosed in the Review File or in publicly available records, the Seller hereby represents and warrants that, as to the Loan, the following representations and warranties are true and correct in all material respects as of the date hereof.

**6.2.1    Title to Loan.**  Subject to the Receivership, the Seller has good title to and is the sole owner and holder of the Loan, free and clear of any liens, claims, encumbrances or other charges whatsoever, except as to any encumbrances created by the Receivership.  The Loan is not subject to any prior assignment, conveyance, transfer or participation or agreement to assign, convey, transfer or participate, in whole or in part.

**6.2.2    Enforceability.**  To the best of the Seller's knowledge and belief, the Note and Mortgage are the legal, valid and binding obligations of the Obligor thereof, enforceable against such Obligor in accordance with their terms (a) except as such enforcement and collection may be limited by the Receivership, bankruptcy, insolvency, reorganization or other similar laws affecting the enforcement of creditors rights generally and by general equity principles (regardless of whether such enforcement is considered in a proceeding in equity or at law) and (b) except particular remedies, waivers and other provisions may not be enforceable, but such unenforceability does not affect the practical realization of the intended benefits of the Mortgage, meaning the ability of the holder thereof to foreclose the Mortgage for any payment default by the maker or obligor thereunder, subject to the limitations set forth above in this Section 6.2.2.

**6.2.3    No Defense by Obligor.**  To the best of the Seller's knowledge, and, except for any limitations imposed by the Receivership, the Obligor has no valid defense that prevents enforcement by the holder thereof of the provisions of the Note or Mortgage, or realization by the holder thereof or its assigns against the Mortgaged Property that arises from applicable local, state or federal laws, regulations or other requirements pertaining to usury and any or all other requirement of any federal, state or local law including, without limitation, truth-in-lending, real estate settlement procedures, consumer credit protection, and equal credit opportunity or disclosure laws applicable to such Loan.  To the best of Seller's knowledge and belief, the Loan is not subject to any valid right of rescission, set-off, abatement, diminution, counterclaim or defense that prevents enforcement by the Seller thereof or their assigns of the provisions of the Note or Mortgage, or realization by the Seller thereof or its assigns against the Mortgaged Property of the

6

intended benefits of such Mortgage and no such claims have been asserted as of the date hereof with respect to such Loan.

**6.2.4    Loan and Loan Document Schedule.**  The information set forth on <u>Schedule A</u> with respect to the Loan is true and correct in all material respects.

**6.2.5    No Modification.**  Except by written instrument or other written documentation contained in the Review File, neither the Seller  nor, to the best of the Seller's current knowledge an belief, any prior holder of the Loan has modified the Note or Mortgage or satisfied, canceled or subordinated the Note or Mortgage in whole or in part or released all or any material portion of the Mortgaged Property from the lien of the Mortgage or executed any instrument of release, cancellation or satisfaction.  The Note and Mortgage and any documents modifying their terms included in the Review File are true and correct copies of the documents they purport to be and have not been superseded, amended, modified, canceled or otherwise changed except as disclosed in the Review File.

**6.2.6    Review File.**  With the exception of any Excluded Information, the Review File includes all material documents in the possession of the Seller, or copies thereof, relating to the Loan.

**6.2.7    Disbursement of Loan Proceeds.**  The Obligor does not have the right to disbursement of additional loan proceeds or future advances with respect to the Loan.

**6.2.8    Cross-Collateralization.**  The Loan is not secured by the same property as any other loan held by the Seller or its affiliated entities, which is not the subject of this Agreement.

**6.2.9    Litigation.**  To the best of the Seller's current knowledge and belief, and except for the Receivership, and the information contained in the Title Fact Sheet dated December 14, 2022, provided to Seller by Buyer, there is no litigation, proceeding or governmental investigation pending, or any order, injunction or decree outstanding, existing or relating to the Loan or Mortgaged Property.

**6.2.10  Lien Position.**    Buyer has conducted its own investigation as to the lien position of Seller and is satisfied with such position.

**6.2.11  Taxes.**  With respect to the Loan, all real property taxes, tax assessments, insurance premiums, water, sewer and municipal charges, leasehold payments or ground rents affecting the related Mortgaged Property through 2021 have been paid.

**6.3      Remedies.**  Subject to the express disclaimers in <u>Section 6</u>, upon discovery by the Buyer of a material breach of any of the foregoing representations and warranties made by the Seller pursuant to <u>Sections 6.1</u> and <u>6.2</u> during the Survival Period noted in <u>Section 16</u> hereto which materially and adversely affects the value of the Loan sold on the Closing Date (each, a "<u>Breach</u>"), the Buyer shall deliver to the Seller a notice of breach within thirty (30) days of discovery of such Breach.  Such notice of breach must be delivered by the Buyer to the Seller within the Survival Period. The Seller shall have a period of ninety (90) days from the receipt by Seller of a notice of

7

**APP010**

breach (the "Cure Period") within which to: (i) correct or cure such Breach in all material respects; provided, that if the Seller requires, in its reasonable discretion, information from the Buyer that it had provided to the Buyer or its designees or requires, in its reasonable discretion, access to copies of any loan documents that it has provided to the Buyer or its designees, the Seller shall provide written notice to the Buyer and the Buyer shall provide all such information or access to such documents within five (5) Business Days of receipt of such notice. If the Seller is unable to cure such a material Breach, the Seller shall (i) reimburse to the Buyer an amount, which in no event shall exceed the lesser of (x) the Repurchase Price and (y) the Purchase Price, equal to the mutually agreed to reduction in value of the Loan based upon the Breach; or (ii) repurchase the Loan at the Repurchase Price. In the event that the Seller elects the option described in clause (i) in the immediately preceding sentence, the Seller and the Buyer shall promptly negotiate in good faith to reach a mutual agreement with respect to the applicable reimbursement amount.

**7.      Conditions Precedent to Closing.** The respective obligations of the Buyer and the Seller to complete the purchase and sale of the Loan pursuant to this Agreement are subject to the fulfillment on or prior to Closing Date of each of the following additional conditions to be fulfilled by the other, unless the same is specifically waived in writing by the party for whose benefit the same is to be fulfilled:

**7.1      Performance of Covenants**. The Seller and the Buyer shall have performed all of their respective covenants and agreements contained herein which are required to be performed by them on or prior to the Closing Date.

**7.2      Representations and Warranties**. All representations and warranties of the Buyer set forth in Section 5 and the Seller set forth in Sections 6.1 and 6.2 of this Agreement shall be true in all material respects at and as of the Closing Date.

**7.3      Governmental Approvals**. All requisite federal, state and local governmental and regulatory approvals relating to the transactions contemplated hereby, if any, shall have been obtained. Buyer shall satisfy itself as to all such requisite approvals independently from any investigation or representation from Seller, any and all of which are hereby expressly disclaimed by Seller.

**7.4      Other Approvals**. Upon the request of the other, the Seller and the Buyer shall provide certified copies of appropriate resolutions, directions and consents approving the execution and delivery of the Sale Documents and the consummation of the transactions contemplated thereby together with such other certificates of incumbency and other evidences of authority as the Seller or the Buyer or their respective counsel may reasonably require.

**8.      Certain Obligations of the Buyer**.

**8.1      Collection Practices**. The Buyer will not violate any laws relating to unfair credit collection or foreclosure practices in connection with the Loan.

**APP011**

**8.2     Reporting to or for the Internal Revenue Service**.  The Buyer agrees to submit all Internal Revenue Service Forms and Information Returns for the Loan for the period during which it owns the Loan.

**8.3     Current Litigation**.  With exception of the Receivership, the parties are aware of no claim, action, lawsuit, foreclosure action, bankruptcy, or other proceeding, administrative or judicial, or similar action related to the Loan prior to the Effective Date.

**8.4 Buyer's Duties Regarding Future Litigation**.  The Buyer agrees to notify the Seller immediately in the event a claim, counterclaim or crossclaim is brought or threatened against the Seller for claims arising from events after the Closing Date in the Receivership, any litigation, bankruptcy or foreclosure involving a Loan. The Buyer, at its cost and expense, shall assume the defense of the Seller with respect to any such claims arising from events after the Closing Date; provided however, that the Seller may choose, at its sole discretion, but shall not have an obligation, to assume the defense of such claims. In connection therewith, subject to the other provisions of this Agreement, the Buyer shall have the sole responsibility to determine the appropriate direction and strategy for such litigation or proceeding, excluding matters which the Seller elects at its sole discretion to defend. The Buyer shall have no duty to defend the Seller for any claim, counterclaim or crossclaim brought or threatened against the Seller, based on the Seller's actions or failure to act, for claims arising from events before the Closing Date.

**9.     Notice to Obligor**.  The Buyer shall, within thirty (30) days after the Closing Date or such other period as may be required by applicable regulations or laws, give notice of this transfer to the Obligor(s) by first class U.S. Mail.

**10.     Notice of Claim**.  The Buyer shall immediately notify the Seller of any claim or any litigation against the Seller, or any of their predecessors or affiliates, which may come to its attention relating to the Loan.

**11.     Notices**.  All notices or deliveries required or permitted hereunder shall be in writing and delivered personally or by facsimile or generally recognized overnight delivery service, and shall be deemed given (a) when delivered, if delivered personally or by facsimile, or (b) on the following Business Day, if sent by generally recognized overnight delivery service, in each case to the Seller at the following addresses, to the Buyer at the address set forth on the signature page below, or such other address as either party may hereafter designate by notice given in compliance with this Section to the other party:

SELLER:     c/o Texas Brand Bank
            4161 McKinney Ave., Suite 101
            Dallas, Texas 75204
            Attention:  William E Lowe
            Telephone Number:  (214) 219-0003
            Email:  WELowe@TexasBrandBank.com

9

BUYER:      c/o Beltway Capital Management, LLC
Executive Plaza II
11350 McCormick Road, Suite 902
Hunt Valley, MD 21031
Attention:  Jeremy Halverson, Vice President
Telephone Number:  (410) 403-2073
Facsimile Number:  (410) 403-2070
Email: _____

12.    **Severability**.  Each part of this Agreement is intended to be severable.  If any term, covenant, condition or provision hereof is unlawful, invalid, or unenforceable for any reason whatsoever, and such illegality, invalidity, or unenforceability does not affect the remaining parts of this Agreement, then all such remaining parts hereof shall be valid and enforceable and have full force and effect as if the invalid or unenforceable part had not been included.

13.    **Construction**.  Unless the context otherwise requires, singular nouns and pronouns (including defined terms), when used herein, shall be deemed to include the plural and vice versa, and impersonal pronouns shall be deemed to include the personal pronoun of the appropriate gender.

14.    **Assignment**.  This Agreement and the terms, covenants, conditions, provisions, obligations, undertakings, rights and benefits hereof, including any attachments hereto, shall be binding upon, and shall inure to the benefit of, the undersigned parties and their respective heirs, executors, administrators, representatives, successors, and assigns.  Notwithstanding anything herein to the contrary, however, the Buyer shall not assign its rights under this Agreement without the prior written consent of the Seller, except that the Buyer may assign its rights under this Agreement to an affiliate, and in the event of any assignment both the Buyer and assignee shall be jointly and severally liable hereunder.

15.    **Prior Understandings**.  This Agreement supersedes any and all prior discussions and agreements between the Seller and the Buyer with respect to the purchase of the Loan and other matters contained herein, and this Agreement contains the sole and entire understanding between the parties hereto with respect to the transactions contemplated herein.

16.    **Survival**.  Each and every covenant made by the Buyer or the Seller in this Agreement shall survive the closing and shall not merge into the Closing Documents, but instead shall be independently enforceable, provided, however, that the Seller' representations and warranties set forth in Sections 6.1 and 6.2 shall expire thirty (30) days after the Closing Date (the "Survival Period"), after which time no claim for breach of the Seller' representations or warranties may be made.

17.    **Choice of Law**.  This Agreement and claims arising out of or in connection therewith shall be governed by and construed and enforced in accordance with the laws of the State of Texas, and the Buyer consents to jurisdiction in the federal or state courts situated in the county of the Seller's principal place of business, Dallas County, Texas.

10

**APP013**

18.    **Time of the Essence**.  Time is of the essence of all provisions of this Agreement.   This Agreement is contingent upon Closing and funding of the Purchase Price or before December 30, 2022.

19.    **Limitation of Damages**.   Neither party shall be liable to the other party for any consequential, special or punitive damages.  The Buyer's remedies set forth in Section 6.3 shall be the exclusive remedies of the Buyer, and the Buyer shall not be entitled to any other rights, remedies or other relief, at law or in equity, for the Seller' breach of any representation or warranty set forth in this Agreement.

20.    **Counterparts; Faxed and/or Electronically Transmitted Document.**  This Agreement may be executed and delivered by the parties in a facsimile or electronic mail format and in any number of separate counterparts, all of which, when delivered, shall together constitute one and the same document.

[Signatures on Following Page]
[Remainder of Page Intentionally Left Blank]

11

**APP014**

IN WITNESS WHEREOF, the parties hereto have caused these presents to be duly executed as of the Effective Date.

**SELLER:**

**TEXAS BRAND BANK**

By:_____

Name:  William E Lowe

Title:    President & CEO

**BUYER:**

**MCCORMICK 101, LLC,**
a Maryland limited liability company

By:_____

Name:  Jeremy Halverson

Title:   Vice President

R:\SHACKLAW\50423\1\Goldmark Hospitality Purchase and Sale Agreement.Final.docx

12

**APP015**

IN WITNESS WHEREOF, the parties hereto have caused these presents to be duly executed as of the Effective Date.

**SELLER:**

**TEXAS BRAND BANK**

By:_____

Name: William E Lowe

Title:    President & CEO

**BUYER:**

**MCCORMICK 101, LLC,**
a Maryland limited liability company

By:_____

Name: Jeremy Halverson

Title:   Vice President

R:\SHACKLAW\50423\1\Goldmark Hospitality Purchase and Sale Agreement Final.docx

12

**APP016**

# EXHIBIT "A"

# RECEIVERSHIP

13



# BROWN FOX

Charlene Koonce
214.367.7503
charlene@brownfoxlaw.com

October 18, 2022

**Via Fax 469-429-1432 and U.S. Mail**
Texas Brand Bank
c/o Branch Manager
1919 S Shiloh Rd, Suite 100
Garland, TX 75042

RE:    Cause No. 3:22-CV-2118-X; *Securities and Exchange Commission v. Timothy Barton, et al.*; pending in the United States District Court for the Northern District of Texas, Dallas Division

Dear Sir or Madam:

## ATTENTION LEGAL DEPARTMENT

Please be advised that on October 18, 2022, the assets of each of the entities listed below were placed in receivership and Cort Thomas was appointed as Receiver. A copy of the Order Appointing Receiver ("Receivership Order") is enclosed and outlines Mr. Thomas's obligation and right to assume exclusive custody, control, and possession of all assets of, or in the possession, custody, or under the control of the defendants, relief defendants, and related entities listed below (the "Receivership Entities"):

- Defendant Carnegie Development, LLC;
- Defendant WALL007, LLC;
- Defendant WALL009, LLC;
- Defendant WALL010, LLC;
- Defendant WALL011, LLC;
- Defendant WALL012, LLC;
- Defendant WALL016, LLC;
- Defendant WALL017, LLC;
- Defendant WALL018, LLC;
- Defendant WALL019, LLC;
- Relief Defendant DJD Land Partners, LLC;
- Relief Defendant LDG001, LLC;
- Other entity: BM318 LLC;
- Other entity: D4DS LLC;
- Other entity: D4FR LLC;
- Other entity: D4KL LLC;
- Other entity: Enoch Investments LLC;

8111 Preston Road, Suite 300, Dallas, Texas 75225    214.327.5000    214.327.5001
BROWNFOXLAW.COM

**APP018**

October 18, 2022
Page 2

- Other entity: FHC Acquisition LLC;
- Other entity: Goldmark Hospitality LLC;
- Other entity: JMJ Acquisitions LLC;
- Other entity: JMJ Development LLC;
- Other entity: JMJAV LLC;
- Other entity: JMR100 LLC;
- Other entity: Lajolla Construction Management LLC;
- Other entity: Mansions Apartment Homes at Marine Creek LLC;
- Other entity: MO 2999TC, LLC;
- Other entity: Orchard Farms Village LLC;
- Other entity: Villita Towers LLC;
- Other entity: 126 Villita LLC; and
- *All other entities controlled, directly or indirectly, by Timothy Lynch Barton (SSN: XXX-XX-1728; DOB: 08/17/19XX; Texas ID XXX1398).*

The Receivership Order enjoins all persons and entities from disturbing Receivership Assets or interfering with the Receiver's right to possession and control over Receivership Assets, requires that persons or entities with possession or control over Receivership Assets immediately provide notice to the Receiver and remit those assets to the Receiver, stays all efforts to enforce a lien or take possession or custody of any Receivership Assets, **and requires that all persons and entities that receive a copy of the Order, without need of formal service, cooperate fully with the Receiver.** *See* ¶¶ 15, 18, 25, 32, 33.

The Receiver obtained information indicating that one or more of the Receivership Entities has or had within the last year accounts at your institution. Accordingly, **within 10 days of the date of this letter**, for all accounts currently open or that were closed after January 1, 2021, please provide (a) a list of all accounts for which any Receivership Entity is identified as an owner; (b) a list of all accounts for which Timothy Barton is listed as an owner or signatory; (c) state whether each such account is open, and if closed, when it was closed; (d) for each account, copies of the signature cards and all documents signed when each account was opened; (e) the current balance of each account; and (f) for each account, monthly statements from January 1, 2020 through the present.

Please be advised that any effort to set off or collect any amounts due from any of the Receivership Defendants is also prohibited by the Receivership Order.

If you have any questions or comments regarding this matter, feel free to contact me at 214-367-7503 or at charlene@brownfoxlaw.com.

Sincerely,

Charlene C. Koonce

Enclosure

APP019

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § § § § § | |
| *Plaintiff,* | § | Civil Action No. 3:22-cv-2118-X |
| v. | § § | |
| TIMOTHY BARTON, CARNEGIE DEVELOPMENT, LLC, WALL007, LLC, WALL009, LLC, WALL010, LLC, WALL011, LLC, WALL012, LLC, WALL016, LLC, WALL017, LLC, WALL018, LLC, WALL019, LLC, HAOQIANG FU (a/k/a MICHAEL FU), STEPHEN T. WALL, | § § § § § § § § § § § § § § § § | |
| *Defendants,* | § § | |
| DJD LAND PARTNERS, LLC, and LDG001, LLC, | § § § | |
| *Relief Defendants.* | § § | |

## ORDER APPOINTING RECEIVER

**WHEREAS** this matter has come before this Court upon motion of Plaintiff Securities and Exchange Commission ("SEC") to appoint a receiver in the above-captioned action; and,

1

**APP020**

WHEREAS the Court finds that, based on the record in these proceedings, the appointment of a receiver in this action is necessary and appropriate for the purposes of marshaling and preserving all assets of the Receivership Entities (defined below);

WHEREAS this Court has subject matter jurisdiction over this action and personal jurisdiction over the Receivership Entities, and venue properly lies in this district.

WHEREAS, the Court finds that the SEC has brought this action to enforce the federal securities laws, in furtherance of the SEC's police and regulatory powers, and the relief sought by the SEC and provided in this Order is in the public interest by preserving the illicit proceeds of fraudulent conduct, penalizing past unlawful conduct and deterring future wrongdoing, and is not in furtherance of a pecuniary purpose, and therefore, the Court concludes that the entry of this Order is excepted from the automatic stay pursuant to 11 U.S.C. §362(b)(4).

NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:

1. This Court hereby takes exclusive jurisdiction and possession of the assets, of whatever kind and wherever situated, including all tangible and intangible property, of Wall007, LLC, Wall009, LLC, Wall010, LLC, Wall011, LLC, Wall012, LLC, Wall016, LLC, Wall017, LLC, Wall018, LLC, Wall019, LLC, Carnegie Development, LLC, DJD Land Partners, LLC, LDG001, LLC, and any other entities that Defendant Timothy Barton directly or indirectly controls, including, but not limited to, the following Barton-controlled entities that received investor funds, real

2

APP021

property interests purchased with investor funds, or own property interests that were improved with or otherwise have benefited from the use of investor funds: BM318 LLC; D4DS LLC; D4FR LLC; D4KL LLC; Enoch Investments LLC; FHC Acquisition LLC; Goldmark Hospitality LLC; JMJ Acquisitions LLC; JMJ Development LLC; JMJAV LLC; JMR100 LLC; Lajolla Construction Management LLC; Mansions Apartment Homes at Marine Creek LLC; MO 2999TC, LLC; Orchard Farms Village LLC; Villita Towers LLC; and 126 Villita LLC (collectively, "Receivership Entities"). The assets of these Receivership Entities are referenced below as "Receivership Assets."

2.      Until further Order of this Court, Cortney C. Thomas is hereby appointed to serve without bond as receiver (the "Receiver") for the estates of the Receivership Entities.

### I.      GENERAL POWERS AND DUTIES OF RECEIVER

3.      The Receiver shall have all powers, authorities, rights, and privileges heretofore possessed by the officers, directors, managers and general and limited partners of the entity Receivership Entities under applicable state and federal law, by the governing charters, by-laws, articles and/or agreements in addition to all powers and authority of a receiver at equity, and all powers conferred upon a receiver by the provisions of 28 U.S.C. §§ 754, 959 and 1692, and FED. R. CIV. P. 66.

4.      The trustees, directors, officers, managers, employees, investment advisers, accountants, attorneys and other agents of the Receivership Entities are hereby dismissed and the powers of any general partners, directors and/or managers are hereby suspended. Such persons and entities shall have no authority with respect

3

to the Receivership Entities' operations or assets, except to the extent as may hereafter be expressly granted by the Receiver. The Receiver shall assume and control the operations of the Receivership Entities and shall pursue and preserve all of their claims.

5.       No person holding or claiming any position of any sort with any of the Receivership Entities shall possess any authority to act by or on behalf of any of the Receivership Entities.

6.       Subject to the specific provisions in Sections II through XII below, the Receiver shall have the following general powers and duties:

A.       To use reasonable efforts to determine the nature, location, and value of all property interests of the Receivership Entities, including, but not limited to, monies, funds, securities, credits, effects, goods, chattels, lands, premises, leases, claims, rights and other assets, together with all rents, profits, dividends, interest or other income attributable thereto, of whatever kind, which the Receivership Entities own, possess, have a beneficial interest in, or control directly or indirectly ("Receivership Property" or, collectively, the "Receivership Estates");

B.       To take custody, control, and possession of all Receivership Property and records relevant thereto from the Receivership Entities; to sue for and collect, recover, receive, and take into possession from third parties all Receivership Property and records relevant thereto;

C.       To manage, control, operate, and maintain the Receivership Estates and hold in his possession, custody, and control all Receivership Property, pending further Order of this Court;

D.       To use Receivership Property for the benefit of the Receivership Estates, making payments and disbursements and incurring expenses as may be necessary or advisable in the ordinary course of business in discharging his duties as Receiver;

E.       To take any action which, prior to the entry of this Order, could have been taken by the officers, directors, partners, managers, trustees, and agents of the Receivership Entities;

4

APP023

F.      To engage and employ persons in his discretion to assist him in carrying out his duties and responsibilities hereunder, including, but not limited to, accountants, attorneys, securities traders, registered representatives, financial or business advisers, liquidating agents, real estate agents, forensic experts, brokers, traders, or auctioneers;

G.      To take such action as necessary and appropriate for the preservation of Receivership Property or to prevent the dissipation, concealment, or inequitable distribution of Receivership Property;

H.      Enter into and cancel contracts and purchase insurance as the Receiver deems necessary or advisable;

G.      The Receiver is authorized to issue subpoenas for documents and testimony consistent with the Federal Rules of Civil Procedure;

I.      To bring such legal actions based in law or equity in any state, federal, or foreign court as the Receiver deems necessary or appropriate in discharging his duties as Receiver;

J.      To pursue, resist, defend, compromise or otherwise dispose of all suits, actions, claims, and demands which may now be pending or which may be brought by or asserted against the Receivership Entities; and,

K.      To take such other action as may be approved by this Court.

## II.    ACCESS TO INFORMATION

7.      The individual Receivership Entities and the past and/or present officers, directors, agents, managers, general and limited partners, trustees, attorneys, accountants, and employees of the entity Receivership Entities, as well as those acting in their place, are hereby ordered and directed to preserve and turn over to the Receiver forthwith all paper and electronic information of, and/or relating to, the Receivership Entities and/or all Receivership Property; such information shall include but not be limited to books, records, documents, accounts, and all other instruments and papers.

5

APP024

8.      Within ten (10) days of the entry of this Order, the Receivership Entities shall file with the Court and serve upon the Receiver and the SEC a sworn statement, listing: (a) the identity, location, and estimated value of all Receivership Property; (b) all employees (and job titles thereof), other personnel, attorneys, accountants, and any other agents or contractors of the Receivership Entities; and, (c) the names, addresses, and amounts of claims of all known creditors of the Receivership Entities.

9.      Within twenty (20) days of the entry of this Order, the Receivership Entities shall file with the Court and serve upon the Receiver and the SEC a sworn statement and accounting, with complete documentation, covering the period from January 1, 2017 to the present:

A.      Of all Receivership Property, wherever located, held by or in the name of the Receivership Entities, or in which any of them, directly or indirectly, has or had any beneficial interest, or over which any of them maintained or maintains and/or exercised or exercises control, including, but not limited to: (a) all securities, investments, funds, real estate, automobiles, jewelry, and other assets, stating the location of each; and (b) any and all accounts, including all funds held in such accounts, with any bank, brokerage, or other financial institution held by, in the name of, or for the benefit of any of them, directly or indirectly, or over which any of them maintained or maintains and/or exercised or exercises any direct or indirect control, or in which any of them had or has a direct or indirect beneficial interest, including the account statements from each bank, brokerage, or other financial institution;

B.      Identifying every account at every bank, brokerage, or other financial institution: (a) over which Receivership Entities have signatory authority; and (b) opened by, in the name of, or for the benefit of, or used by, the Receivership Entities;

C.      Identifying all credit, bank, charge, debit, or other deferred payment card issued to or used by each Receivership Defendant, including but not limited to the issuing institution, the card or account number(s), all persons or entities to which a card was issued and/or with authority to use a card, the balance of each account and/or card as of the most recent billing statement, and all statements for the last twelve (12) months;

6

APP025

D.    Of all assets received by any of them from any person or entity, including the value, location, and disposition of any assets so received;

E.    Of all funds received by the Receivership Entities, and each of them, in any way related, directly or indirectly, to the conduct alleged in the SEC's Complaint. The submission must clearly identify, among other things, all investors, the securities they purchased, the date and amount of their investments, and the current location of such funds;

F.    Of all expenditures exceeding $1,000 made by any of them, including those made on their behalf by any person or entity; and

G.    Of all transfers of assets made by any of them.

10.    Within thirty (30) days of the entry of this Order, the Receivership Entities shall provide to the Receiver and the SEC copies of the Receivership Entities' federal income tax returns for the years 2017 through 2021 with all relevant and necessary underlying documentation.

11.    The individual Receivership Entities and the entity Receivership Entities' past and/or present officers, directors, agents, attorneys, managers, shareholders, employees, accountants, debtors, creditors, managers and general and limited partners, and other appropriate persons or entities shall answer under oath to the Receiver all questions which the Receiver may put to them and produce all documents as required by the Receiver regarding the business of the Receivership Entities, or any other matter relevant to the operation or administration of the receivership or the collection of funds due to the Receivership Entities.

12.    The Receivership Entities are required to assist the Receiver in fulfilling his duties and obligations. As such, they must respond promptly and truthfully to all requests for information and documents from the Receiver.

7

APP026

### III.    ACCESS TO BOOKS, RECORDS, AND ACCOUNTS

13.    The Receiver is authorized to take immediate possession of all assets, bank accounts or other financial accounts, books and records, and all other documents or instruments relating to the Receivership Entities. All persons and entities having control, custody, or possession of any Receivership Property are hereby directed to turn such property over to the Receiver.

14.    The Receivership Entities, as well as their agents, servants, employees, attorneys, any persons acting for or on behalf of the Receivership Entities, and any persons receiving notice of this Order by personal service, email, facsimile transmission, or otherwise, having possession of the property, business, books, records, accounts, or assets of the Receivership Entities are hereby directed to deliver the same to the Receiver, his agents, and/or employees.

15.    All banks, brokerage firms, financial institutions, and other persons or entities which have possession, custody, or control of any assets or funds held by, in the name of, or for the benefit of, directly or indirectly, any of the Receivership Entities that receive actual notice of this Order by personal service, email, facsimile transmission, or otherwise shall:

A.    Not liquidate, transfer, sell, convey, or otherwise transfer any assets, securities, funds, or accounts in the name of or for the benefit of the Receivership Entities except upon instructions from the Receiver;

B.    Not exercise any form of set-off, alleged set-off, lien, or any form of self-help whatsoever, or refuse to transfer any funds or assets to the Receiver's control without the permission of this Court;

C.    Within five (5) business days of receipt of that notice, file with the Court and serve on the Receiver and counsel for the SEC a certified statement setting forth, with respect to each such account or other asset, the balance in

8

APP027

the account or description of the assets as of the close of business on the date of receipt of the notice; and,

D.    Cooperate   expeditiously   in   providing   information   and transferring funds, assets, and accounts to the Receiver or at the direction of the Receiver.

## IV.    ACCESS TO REAL AND PERSONAL PROPERTY

16.    The Receiver is authorized to take immediate possession of all personal property of the Receivership Entities, wherever located, including but not limited to electronically stored information, computers, laptops, hard drives, external storage drives, and any other such memory, media or electronic storage devices, books, papers, data processing records, evidence of indebtedness, bank records and accounts, savings records and accounts, brokerage records and accounts, certificates of deposit, stocks, bonds, debentures, and other securities and investments, contracts, mortgages, furniture, office supplies, and equipment.

17.    The Receiver is authorized to take immediate possession of all real property of the Receivership Entities, wherever located, including but not limited to all ownership and leasehold interests and fixtures. Upon receiving actual notice of this Order by personal service, email, facsimile transmission or otherwise, all persons other than law enforcement officials acting within the course and scope of their official duties, are (without the express written permission of the Receiver) prohibited from: (a) entering such premises; (b) removing anything from such premises; or, (c) destroying, concealing, or erasing anything on such premises.

18.    The Receivership Entities, all persons acting on behalf of any Receivership Defendant, and any person who receives actual or constructive notice of

APP028

this Order who has or had possession or control over any Receivership Assets, is directed to:

    A.    Hold and retain any such Receivership Assets that are within his or her control and prohibit any person or entity from assigning, concealing, converting, disbursing, dissipating, encumbering, liquidating, loaning, pledging, selling, spending, transferring, or withdrawing any such Asset except:

    1.    As directed by further order of the Court; or

    2.    As directed in writing by the Receiver.

    B.    Within five (5) business days after being served a copy of this Order, provide the Receiver a sworn statement setting forth:

    1.    The account number and other identifying information for any such Receivership Asset belonging to, for the use or benefit of, under the control of, or subject to access by any Defendant or Receivership Defendant;

    2.    The balance of each such account, or a description of the nature and value of such Asset as of the close of business on the day on which this Order is received, and, if the account or other Asset has been closed or removed, or more than $5,000 withdrawn or transferred from it, on or after March 1, 2021, the date of the closure or removal of the funds, the total funds removed or transferred, and the name of the person or entity to whom such account or other Asset was remitted;

    3.    All keys, codes, and passwords, entry codes, combinations to locks, and information or devices required to open or gain access to any Asset or Document, including, but not limited to, access to the business premises, computer servers, networks, or databases, or telecommunications systems or devices;

    4.    The identification and location of any safe deposit box, commercial mailbox, or storage facility belonging to, for the use or benefit of, under the control of, or subject to access by any Defendant or Receivership Entity, and if the safe deposit box, storage facility, commercial mailbox, or storage facility has been closed or removed, the date closed or removed;

    5.    Within five (5) business days of a written request from the Receiver, provide the Receiver copies of all Documents relating to each

10

APP029

Receivership Asset, including, but not limited to account applications, statements, corporate resolutions, signature cards, checks, drafts, deposit tickets, transfers to and from the accounts, all other debit and credit instruments or slips, currency transaction reports, 1099 forms, and safe deposit box logs.

19.     In order to execute the express and implied terms of this Order, the Receiver is authorized to change door locks to the premises described above. The Receiver shall have exclusive control of the keys. The Receivership Entities, or any other person acting or purporting to act on their behalf, are ordered not to change the locks in any manner, nor to have duplicate keys made, nor shall they have keys in their possession during the term of the receivership.

20.     The Receiver is authorized to open all mail directed to or received by or at the offices or post office boxes of the Receivership Entities, and to inspect all mail opened prior to the entry of this Order, to determine whether items or information therein fall within the mandates of this Order.

21.     Upon the request of the Receiver, the United States Marshal Service, in any judicial district, is hereby ordered to assist the Receiver in carrying out his duties to take possession, custody, and control of, or identify the location of, any assets, records, or other materials belonging to the Receivership Estate.

## V.     REPATRIATION OF ASSETS AND DOCUMENTS

22.     Immediately upon service of this Order, any person or entity with possession or control over any Receivership Assets shall:

A.      Take such steps as are necessary to transfer to the United States all Documents and Assets that are located outside the United States and belong to, are for the use or benefit of, under the control of, or subject to access by any Defendant or Receivership Entity; and

11

APP030

10/18/2022   09:40 AM   10:149542194J2  FROM:2143620951        Page: 14

    B.    Hold and retain all repatriated Assets and prevent the disposition, transfer, or dissipation of such Assets except as required by this Order.

23.    Receivership Entities, their officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, are preliminarily restrained and enjoined from taking any action that may result in the encumbrance or dissipation of foreign Assets, or in the hindrance of the repatriation required by this Order, including:

    A.    Sending any statement, letter, fax, email or wire transmission, telephoning, or engaging in any other act, directly or indirectly, that results in a determination by a foreign trustee or other entity that a "duress" event has occurred under the terms of a foreign trust agreement until such time as all Assets have been fully repatriated according to Section VIII of this Order; or

    B.    Notifying any trustee, protector, or other agent of any Defendant or Receivership Entity of the existence of this Order, or of the fact that repatriation is required under a court Order, until such time as all Assets have been fully repatriated according to Section VIII of this Order.

## VI.   NOTICE TO THIRD PARTIES

24.    Defendants and the Receivership Entities shall immediately provide a copy of this Order to each affiliate, sales entity, successor, assign, member, officer, director, employee, agent, independent contractor, client, servant, attorney, subsidiary, division, and representative of any Defendant or Receivership Defendant. Within ten (10) business days following service of this Order, Defendants and Receivership Entities shall serve on the Receiver a declaration identifying the name, title, address, telephone number, date of service, and manner of service of each person

12

APP031

Defendants or Receivership Entities served with a copy of this Order in compliance with this provision.

25.    Copies of this Order may be served by the Receiver by any means, including U.S. first class mail, overnight delivery, facsimile, electronic mail, or personally by agents or employees of the Receiver, by any law enforcement agency, or by process server, upon any person, including financial institutions, that may have possession, custody, or control over any Asset or Document belonging to, for the use or benefit of, under the control of, or subject to access by any Receivership Defendant, or that may otherwise be subject to any provision of this Order. Service upon any branch or office of any financial institution shall constitute service upon the entire financial institution.

26.    The Receiver shall promptly give notice of his appointment to all known officers, directors, agents, employees, shareholders, creditors, debtors, managers, and general and limited partners of the Receivership Entities, as the Receiver deems necessary or advisable to effectuate the operation of the receivership.

27.    All persons and entities owing any obligation, debt, or distribution with respect to an ownership interest to any Receivership Defendant shall, until further ordered by this Court, pay all such obligations in accordance with the terms thereof to the Receiver and its receipt for such payments shall have the same force and effect as if the Receivership Defendant had received such payment.

28.    In furtherance of his responsibilities in this matter, the Receiver is authorized to communicate with, and/or serve this Order upon, any person, entity, or

13

APP032

government office that he deems appropriate to inform them of the status of this matter and/or the financial condition of the Receivership Estates. All government offices which maintain public files of security interests in real and personal property shall, consistent with such office's applicable procedures, record this Order upon the request of the Receiver or the SEC.

29.    The Receiver is authorized to instruct the United States Postmaster to hold and/or reroute mail which is related, directly or indirectly, to the business, operations, or activities of any of the Receivership Entities (the "Receiver's Mail"), including all mail addressed to, or for the benefit of, the Receivership Entities.

30.    The Postmaster shall not comply with, and shall immediately report to the Receiver, any change of address or other instruction given by anyone other than the Receiver concerning the Receiver's Mail. The Receivership Entities shall not open any of the Receiver's Mail and shall immediately turn over such mail, regardless of when received, to the Receiver. All personal mail of any individual Receivership Entities, and/or any mail appearing to contain privileged information, and/or any mail not falling within the mandate of the Receiver, shall be released to the named addressee by the Receiver. The foregoing instructions shall apply to any proprietor, whether individual or entity, of any private mailbox, depository, business or service, or mail courier or delivery service, hired, rented, or used by the Receivership Entities. The Receivership Entities shall not open a new mailbox, or take any steps or make any arrangements to receive mail in contravention of this Order, whether through the U.S. mail, a private mail depository, or courier service.

14

APP033

31.    Subject to payment for services provided, any entity furnishing water, electric, telephone, sewage, garbage, or trash removal services to the Receivership Entities shall maintain such service and transfer any such accounts to the Receiver unless instructed to the contrary by the Receiver.

## VII.    INJUNCTION AGAINST INTERFERENCE WITH RECEIVER

32.    The Receivership Entities and all persons receiving notice of this Order by personal service, email, facsimile or otherwise, are hereby restrained and enjoined from directly or indirectly taking any action or causing any action to be taken, without the express written agreement of the Receiver, which would:

A.    Interfere with the Receiver's efforts to take control, possession, or management of any Receivership Property; such prohibited actions include but are not limited to using self-help or executing or issuing or causing the execution or issuance of any court attachment, subpoena, replevin, execution, or other process for the purpose of impounding or taking possession of or interfering with or creating or enforcing a lien upon any Receivership Property;

B.    Hinder, obstruct, or otherwise interfere with the Receiver in the performance of his duties; such prohibited actions include but are not limited to concealing, destroying, or altering records or information;

C.    Dissipate or otherwise diminish the value of any Receivership Property; such prohibited actions include but are not limited to releasing claims or disposing, transferring, exchanging, assigning, or in any way conveying any Receivership Property, enforcing judgments, assessments, or claims against any Receivership Property or any Receivership Defendant, attempting to modify, cancel, terminate, call, extinguish, revoke, or accelerate (the due date), of any lease, loan, mortgage, indebtedness, security agreement, or other agreement executed by any Receivership Defendant or which otherwise affects any Receivership Property;

D.    Create, operate, or exercise any control over any new business entity, whether newly formed or previously inactive, including any partnership, limited partnership, joint venture, sole proprietorship or corporation, without first providing the Receiver with a written statement disclosing: (1) the name of the business entity; (2) the address, telephone number, e-mail address, and website address of the business entity; (3) the

15

APP034

names of the business entity's officers, directors, principals, managers, and employees; and (4) a detailed description of the business entity's intended activities; or,

E.    Interfere with or harass the Receiver, or interfere in any manner with the exclusive jurisdiction of this Court over the Receivership Estates.

## VIII.    COOPERATION WITH THE RECEIVER

33.    Defendants and Receivership Entities, and their officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, whether acting directly or indirectly and all persons who receive actual notice of this Order, shall fully cooperate with and assist the Receiver in taking and maintaining possession, custody, or control of the Assets and Documents of the Receivership Entities. This cooperation and assistance shall include, but is not limited to:

A.    Providing information to the Receiver as directed above or that the Receiver deems necessary to exercise the authority and discharge the responsibilities delegated to the Receiver under this Order;

B.    Advising all persons who owe money to the Receivership Entities that all debts should be paid directly to the Receiver; and

C.    Transferring funds at the Receiver's direction and producing Documents related to the Assets and sales of the Receivership Entities. The entities obligated to cooperate with the Receiver under this provision include financial institutions and persons that have transacted business with the Receivership Entities. The Receiver shall promptly notify the Court and SEC counsel of any failure or apparent failure of any person or entity to comply in any way with the terms of this Order.

## IX.    STAY OF LITIGATION

34.    As set forth in detail below, the following proceedings, excluding the instant proceeding and all police or regulatory actions and actions of the SEC related

16

APP035

to the above-captioned enforcement action, are stayed until further Order of this Court:

> All civil legal proceedings of any nature, including, but not limited to, bankruptcy proceedings, arbitration proceedings, foreclosure actions, default proceedings, or other actions of any nature involving: (a) the Receiver, in his capacity as Receiver; (b) any Receivership Property, wherever located; (c) any of the Receivership Entities, including subsidiaries and partnerships; or, (d) any of the Receivership Entities' past or present officers, directors, managers, agents, or general or limited partners sued for, or in connection with, any action taken by them while acting in such capacity of any nature, whether as plaintiff, defendant, third-party plaintiff, third-party defendant, or otherwise (such proceedings are hereinafter referred to as "Ancillary Proceedings").

35.    The parties to any and all Ancillary Proceedings are enjoined from commencing or continuing any such legal proceeding, or from taking any action, in connection with any such proceeding, including, but not limited to, the issuance or employment of process.

36.    All Ancillary Proceedings are stayed in their entirety, and all Courts having any jurisdiction thereof are enjoined from taking or permitting any action until further Order of this Court. Further, as to a cause of action accrued or accruing in favor of one or more of the Receivership Entities against a third person or party, any applicable statute of limitation is tolled during the period in which this injunction against commencement of legal proceedings is in effect as to that cause of action.

## X.    MANAGING ASSETS

37.    For each of the Receivership Estates, the Receiver shall establish one or more custodial accounts at a federally insured bank to receive and hold all cash equivalent Receivership Property (the "Receivership Funds").

17

**APP036**

38.    The Receiver's deposit account shall be entitled "Receiver's Account, Estate of Barton Companies" together with the name of the action.

39.    The Receiver may, without further Order of this Court, transfer, compromise, or otherwise dispose of any Receivership Property, other than real estate, in the ordinary course of business, on terms and in the manner the Receiver deems most beneficial to the Receivership Estate, and with due regard to the realization of the true and proper value of such Receivership Property.

40.    Subject to Paragraph 42 immediately below, the Receiver is authorized to locate, list for sale or lease, engage a broker for sale or lease, cause the sale or lease, and take all necessary and reasonable actions to cause the sale or lease of all real property in the Receivership Estates, either at public or private sale, on terms and in the manner the Receiver deems most beneficial to the Receivership Estate, and with due regard to the realization of the true and proper value of such real property.

41.    Upon further Order of this Court, pursuant to such procedures as may be required by this Court and additional authority such as 28 U.S.C. §§ 2001 and 2004, the Receiver will be authorized to sell, and transfer clear title to, all real property in the Receivership Estates.

42.    The Receiver is authorized to take all actions to manage, maintain, and/or wind-down business operations of the Receivership Estates, including making legally required payments to creditors, employees, and agents of the Receivership Estates and communicating with vendors, investors, governmental and regulatory authorities, and others, as appropriate.

APP037

43.    The Receiver shall take all necessary steps to enable the Receivership Funds to obtain and maintain the status of a taxable "Settlement Fund," within the meaning of Section 468B of the Internal Revenue Code and of the regulations.

## XI.    INVESTIGATE AND PROSECUTE CLAIMS

44.    The Receiver is authorized, empowered, and directed to investigate, prosecute, defend, intervene in or otherwise participate in, compromise, and/or adjust actions in any state, federal, or foreign court or proceeding of any kind as may in his discretion, and in consultation with SEC counsel, be advisable or proper to recover and/or conserve Receivership Property.

45.    Subject to his obligation to expend receivership funds in a reasonable and cost-effective manner, the Receiver is authorized, empowered, and directed to investigate the manner in which the financial and business affairs of the Receivership Entities were conducted and (after obtaining leave of this Court) to institute such actions and legal proceedings, for the benefit and on behalf of the Receivership Estate, as the Receiver deems necessary and appropriate; the Receiver may seek, among other legal and equitable relief, the imposition of constructive trusts, disgorgement of profits, asset turnover, avoidance of fraudulent transfers, rescission and restitution, collection of debts, and such other relief from this Court as may be necessary to enforce this Order. Where appropriate, the Receiver should provide prior notice to Counsel for the SEC before commencing investigations and/or actions.

46.    The Receiver hereby holds, and is therefore empowered to waive, all privileges, including the attorney-client privilege, held by all entity Receivership Entities.

19

47.     The Receiver has a continuing duty to ensure that there are no conflicts of interest between the Receiver, his Retained Personnel (as that term is defined below), and the Receivership Estate.

## XII.  BANKRUPTCY FILING

48.     Effective immediately, the Receiver, as sole and exclusive officer, director and managing member of Wall007, LLC, Wall009, LLC, Wall010, LLC, Wall011, LLC, Wall012, LLC, Wall016, LLC, Wall017, LLC, Wall018, LLC, and Wall019, LLC (collectively, "Wall Entities"), shall possess sole and exclusive authority and control over the Wall Entities, as debtors-in-possession, in their respective Chapter 11 cases titled *In re WALL007 LLC, et al.*, No. 22-41049 (Bankr. E.D. Tex.) (the "Bankruptcy Cases") pending in the U.S. Bankruptcy Court for the Eastern District of Texas (the "Bankruptcy Court"). The employment of any and all other officers, directors, managers or other employees of the Wall Entities is and are hereby terminated by the Court. All such persons shall comply with the applicable provisions of this Order.

49.     Within thirty (30) days of the entry of this Order, the Receiver shall report to this Court as to whether the Bankruptcy Cases should continue in Chapter 11, or be converted to Chapter 7, dismissed or suspended during the course of the receivership. The Receiver shall file the appropriate pleadings with the Court and the Bankruptcy Court effectuating this Order.

50.     The Receiver may seek authorization of this Court to file voluntary petitions for relief under Title 11 of the United States Code (the "Bankruptcy Code") for other Receivership Entities. If a Receivership Defendant is (or has been) placed in

20

APP039

bankruptcy proceedings, the Receiver may become, and may be empowered to operate each of the Receivership Estates as, a debtor in possession. In such a situation, the Receiver shall have all of the powers and duties as provided a debtor in possession under the Bankruptcy Code to the exclusion of any other person or entity. Pursuant to Paragraph 3 above, the Receiver is vested with management authority for all entity Receivership Entities and may therefore file and manage a Chapter 11 petition.

51.    All persons and entities, other than the Receiver, are barred from commencing any bankruptcy proceedings against any of the Receivership Entities.

## XIII.  LIABILITY OF RECEIVER

52.    Until further Order of this Court, the Receiver shall not be required to post bond or give an undertaking of any type in connection with his fiduciary obligations in this matter.

53.    The Receiver and his agents, acting within scope of such agency ("Retained Personnel"), are entitled to rely on all rules of law and Orders of this Court and shall not be liable to anyone for their own good faith compliance with any order, rule, law, judgment, or decree. In no event shall the Receiver or Retained Personnel be liable to anyone for their good faith compliance with their duties and responsibilities as Receiver or Retained Personnel.

54.    This Court shall retain jurisdiction over any action filed against the Receiver or Retained Personnel based upon acts or omissions committed in their representative capacities.

55.    In the event the Receiver decides to resign, the Receiver shall first give written notice to the SEC's counsel of record and the Court of its intention, and the

21

APP040

resignation shall not be effective until the Court appoints a successor. The Receiver shall then follow such instructions as the Court may provide.

## XIV.  RECOMMENDATIONS AND REPORTS

56.    The Receiver is authorized, empowered, and directed to develop a plan for the fair, reasonable, and efficient recovery and liquidation of all remaining, recovered, and recoverable Receivership Property (the "Liquidation Plan").

57.    Within ninety (90) days of the entry date of this Order, the Receiver shall file the Liquidation Plan in the above-captioned action, with service copies to counsel of record.

58.    Within thirty (30) days after the end of each subsequent calendar quarter following the date on which the Receiver files his Liquidation Plan, the Receiver shall file and serve a full report and accounting of each Receivership Estate (the "Quarterly Status Report"), reflecting (to the best of the Receiver's knowledge as of the period covered by the report) the existence, value, and location of all Receivership Property, and of the extent of liabilities, both those claimed to exist by others and those the Receiver believes to be legal obligations of the Receivership Estates.

59.    The Quarterly Status Report shall contain the following:

A.    A summary of the operations of the Receiver;

B.    The amount of cash on hand, the amount and nature of accrued administrative expenses, and the amount of unencumbered funds in the estate;

C.    A schedule of all the Receiver's receipts and disbursements (attached as Exhibit A to the Quarterly Status Report), with one column for the quarterly period covered and a second column for the entire duration of the receivership;

22

**APP041**

D.  A description of all known Receivership Property, including approximate or actual valuations, anticipated or proposed dispositions, and reasons for retaining assets where no disposition is intended;

E.  A description of liquidated and unliquidated claims held by the Receivership Estate, including the need for forensic and/or investigatory resources; approximate valuations of claims; and anticipated or proposed methods of enforcing such claims (including likelihood of success in: (i) reducing the claims to judgment; and, (ii) collecting such judgments);

F.  A list of all known creditors with their addresses and the amounts of their claims;

G.  The status of Creditor Claims Proceedings, after such proceedings have been commenced; and,

H.  The Receiver's recommendations for a continuation or discontinuation of the receivership and the reasons for the recommendations.

60.  On the request of the SEC, the Receiver shall provide the SEC with any documentation that the SEC deems necessary to meet its reporting requirements, that is mandated by statute or Congress, or that is otherwise necessary to further the SEC's mission.

## XV.  FEES, EXPENSES, AND ACCOUNTINGS

61.  Subject to the paragraphs below, the Receiver need not obtain Court approval prior to the disbursement of Receivership Funds for expenses in the ordinary course of the administration and operation of the receivership. Further, prior Court approval is not required for payments of applicable federal, state, or local taxes.

62.  Subject to the paragraph immediately below, the Receiver is authorized to solicit persons and entities ("Retained Personnel") to assist him in carrying out the duties and responsibilities described in this Order. The Receiver shall not engage any

23

APP042

Retained Personnel without first obtaining an Order of the Court authorizing such engagement.

63.     The Receiver and Retained Personnel are entitled to reasonable compensation and expense reimbursement from the Receivership Estates. Such compensation shall require the prior approval of the Court.

64.     Within forty-five (45) days after the end of each calendar quarter, the Receiver and Retained Personnel shall apply to the Court for compensation and expense reimbursement from the Receivership Estates (the "Quarterly Fee Applications"). At least thirty (30) days prior to filing each Quarterly Fee Application with the Court, the Receiver will serve upon counsel for the SEC a complete copy of the proposed Application, together with all exhibits and relevant billing information in a format to be provided by SEC staff.

65.     All Quarterly Fee Applications will be interim and will be subject to cost benefit and final reviews at the close of the receivership. At the close of the receivership, the Receiver will file a final fee application, describing in detail the costs and benefits associated with all litigation and other actions pursued by the Receiver during the course of the receivership.

66.     Quarterly Fee Applications may be subject to a holdback in the amount of 20% of the amount of fees and expenses for each application filed with the Court. The total amounts held back during the course of the receivership will be paid out at the discretion of the Court as part of the final fee application submitted at the close of the receivership.

24

APP043

67.   Each Quarterly Fee Application shall:

A.   Contain representations that: (i) the fees and expenses included therein were incurred in the best interests of the Receivership Estate; and, (ii) unless previously disclosed to and approved by the Court, the Receiver has not entered into any agreement, written or oral, express or implied, with any person or entity concerning the amount of compensation paid or to be paid from the Receivership Estate, or any sharing thereof.

68.   At the close of the Receivership, the Receiver shall submit a Final Accounting, in a format to be provided by SEC staff, as well as the Receiver's final application for compensation and expense reimbursement.

**IT IS SO ORDERED**, this 18th day of October, 2022.

BRANTLEY STARR
UNITED STATES DISTRICT JUDGE

25

**APP044**

# EXHIBIT "B"

## LETTER

**APP045**



A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS & COUNSELORS

**Derek D. Rollins**
9201 N. Central Expressway
Fourth Floor
Dallas, Texas 75231
(214) 780-1400 (Main)
(214) 780-1401(Fax)
drollins@shackelford.law

December 9, 2022

VIA EMAIL: CHARLENE@BROWNFOXLAW.COM
Charlene Koonce
Brown Fox PLLC
8111 Preston Road, Suite 300
Dallas, Texas 75225

> Re:   Cause No. 3:22-Cv-2118-X; *Securities and Exchange Commission V. Timothy Barton, et al.*, pending in the United States District Court For The Northern District of Texas – Dallas Division

Dear Ms. Koonce,

As you know, my law firm represents Texas Brand Bank (the "Bank"). We have discussed, on more than one occasion, the fact the Bank has an outstanding loan to Goldmark Hospitality, LLC (herein, the "Goldmark Loan"). The underlying loan documents and information concerning this loan has been provided to you.

The Bank may desire to sell or otherwise transfer the Goldmark Loan to a third-party in the ordinary course, which prospective sale is expressly permitted by the operative loan documentation. Due to ever-changing market conditions, the Bank may elect to sell and/or otherwise transfer the Goldmark Loan in a very short amount of time.

Though the Bank understands and appreciates its rights as a secured creditor are limited by virtue of the Receivership Order (herein defined), you and I have discussed the fact that neither of us view the Bank's prospective sale of the Goldmark Loan as prohibited by the Receivership Order. Moreover, nothing in the Court's Order Appointing Receiver (the "Receivership Order"), including Paragraph 15 thereof, requires the Bank to obtain prior approval from the Court or the Receiver of any proposed sale of the Goldmark Loan. In the event of a sale, the Bank understands that its successor would take the Goldmark Loan subject to the Receivership Order.

To avoid any potential misunderstanding, if anything herein varies from your recall or understanding of our discussions, please let me hear from you as soon as possible. Otherwise, please acknowledge the foregoing by signing in the space below and returning your signature to me.

Charlene Koonce
December 9, 2022
Page 2

Sincerely,

Derek D. Rollins

cc:     Texas Brand Bank
        Lawson Pedigo, Esq.

Acknowledged:

_____
Charlene Koonce,
Attorney for Receiver

APPENDIX A

DEFINITIONS

**"Agreement"** is defined in the preamble hereto.

**"Bid Award Date"** means the date of the Bid Award Letter.

**"Bid Award Letter"** means the letter dated December 7, 2022, between Seller and Buyer to confirming the agreement to purchase the Loan.

**"Bid Amount"** means the amount bid by the Buyer for the Loan as shown on the Bid Letter.

**"Business Day"** means any day other than a Saturday, Sunday or national holiday.

**"Buyer"** is defined in the preamble hereto, and shall also mean and include its heirs, personal representatives, successors and assigns.

**"Calculation Date"** is November 8, 2022.

**"Closing Date"** is December 22, 2022.

**"Closing Documents"** is defined in <u>Section 4.1</u> of this Agreement.

**"Collateral Document"** means the Mortgage, any assignments of leases and rents, security agreements, financing statements, guaranties, and other agreements or documents, whether an original or a copy and whether or not similar to those enumerated, evidencing, securing, guarantying or otherwise documenting or giving notice of the Loan and any performance or payment obligations with respect thereto or any document evidencing ownership in any asset that was acquired in connection with a foreclosure, deed-in-lieu of foreclosure or otherwise in connection with the resolution of a Loan, and title insurance policies insuring the ownership or liens thereof, provided, however, that the term "Collateral Document" shall expressly exclude the Note.

**"Collections"** means all payments, proceeds and/or awards, actually received by the specified holder of the Note, in cash, including checks which have been reduced to good funds, for current application to the indebtedness of the Obligor under the Loan, whether or not so applied and, if so applied, whether applied to principal, interest, fees, or any other such indebtedness.

**"Confidentiality Agreement"** means any confidentiality agreement executed by the Buyer in favor of the Seller relating to the sale of the Loan.

**"Excluded Information"** means information or documentation excluded from the Review File or redacted from documents left in the Review File relating to the Loan or the Obligors

15

including internal memoranda and officer comments, attorney-client correspondence or other information from attorneys or prepared in anticipation of litigation, personal tax returns, and any documents prepared by or for the use of the Seller regarding the valuation of the Loan.

"**Litigation**" is defined in <u>Section 8.3</u> of this Agreement.

"**Loan**" means the loan obligations and debts evidenced by the Note and includes (a) the Note; (b) all rights to payment and other rights, title and interests of the Seller in, to and under the Note, specifically including, all accrued interest and late charges; (c) each Collateral Document; (d) all rights, title, interests, powers, liens or security interests of the Seller in, to or under each Collateral Document, including without limitation claims and rights to and interests in proceeds of hazard or casualty insurance covering collateral securing such Loan and awards in eminent domain and condemnation proceedings affecting such collateral; (e) all Collections received by the Seller on or after the Closing Date and then or thereafter actually collected in good funds; (f) any right, claim or cause of action, and any liability or counterclaim associated therewith, arising out of or in connection with litigation pending, if any; (g) any judgment or execution based upon the Note or any Collateral Document, to the extent attributable thereto, and any lien arising from any such judgment or execution; and (h) all other documents held by the Seller contained in the Review File with respect to the Loan.

"**Loan Schedule**" means, as applicable to the context in which such term is used relating to the sale of the Loan, the Loan Schedule attached hereto as <u>Schedule A</u>.  The Loan Schedule shall contain the fields set forth on <u>Schedule B</u> attached hereto.

"**Mortgage**" means each mortgage, deed of trust or other similar instrument, if any, securing the Note, including, without limitation, all modifications, restructurings, extensions consolidations and amendments thereof.

"**Mortgaged Property**" means the real property covered by the Mortgage.

"**Note**" means each promissory note, other instrument evidencing indebtedness or other asset as listed on <u>Schedule A,</u> including, without limitation, all modifications, restructurings, extensions, consolidations and amendments thereof.

"**Obligor**" means the maker, co-maker of the Note and any guarantor, surety or other primary, secondary or other party obligated with respect to the Loan or any performance or payment obligation in connection therewith, and any other party who has granted collateral for or whose property or any part thereof is subject to any encumbrance securing the Loan or any performance or payment obligation in connection therewith.

"**Purchase Price**" means $2,175,000.00, which is the product of the unpaid principal balance of each Loan as of the Calculation Date and the related purchase price percentage as set forth for the related Loan in the Loan Schedule (the "Loan Level Purchase Price Percentage")

"**Receivership**" or "**Receivership Order**" means the receivership described in <u>Exhibit "A"</u> to this Agreement.

APP049

**"Repurchase Price"** means the Purchase Price.

**"Review File"** means all instruments and documents, in the files of the Seller pertaining to the Loan, including without limitation, the Note and any Collateral Documents and any loan summaries prepared by Seller, but excluding any Excluded Information.

**"Sale Documents"** means the Bid Package (including this Agreement and all attachments hereto), and all other instruments, agreements, certificates and other documents at any time executed and delivered by or on behalf of the Seller and/or the Buyer in connection with the sale of the Loan.

**"Separate Loan Assignment"** is defined in <u>Section 4.5</u> of this Agreement.

**"Seller"** is defined in the preamble hereto and shall mean each Seller entity signing a signature page to this Agreement, separately but not jointly, and solely with respect to the Loan corresponding to each Seller entity on the Loan Schedule, and shall also mean and include each Seller's respective successors and assigns.

END OF APPENDIX A

17

**APP050**

SCHEDULE A

LOAN SCHEDULE AND LOAN DOCUMENTS

| LOAN NUMBER | BORROWER NAME | LOAN DOCUMENTS |
|---|---|---|
| 2753178 | GOLDMARK HOSPITALITY LLC | 1) **Promissory Note** dated as of November 14, 2019 made by Goldmark Hospitality, LLC in favor of Texas Brand Bank in the principal sum of $2,584,249.00; 2) **Loan Agreement** dated as of November 14, 2019 by and between Goldmark Hospitality, LLC and Texas Brand Bank; 3) **Guaranty Agreement** dated as of November 14, 2019 made by Timothy Barton to and for the benefit of Texas Brand Bank; 4) **Security Agreement** dated as of November 14, 2019 made by Goldmark Hospitality, LLC and Texas Brand Bank;; 5) Deed of Trust **Security Agreement - Financing Statement** dated November 14, 2019 and recorded November 20, 2019 with the Dallas County Clerk as document #201900314312 made by Goldmark Hospitality, LLC for the benefit of Texas Brand Bank; 6) **Memorandum of Modification and Extension Agreement** made by and between Goldmark Hospitality, LLC as Borrower and Texas Brand Bank as Lender dated April 7, 2020 and recorded June 19, 2020 with the Dallas County Clerk as document #202000157930; 7) **Extension and Modification** dated April 7, 2020 by and among Texas Brand Bank as Lender and Goldmark Hospitality, LLC as Borrower and Timothy Barton as Guarantor; 8) **Loan Policy of Title Insurance** Policy No: M-0000-064284535, File No.: 516778-S-TX-CR-NK dated November 20, 2019, Amount of Insurance $2,584,249.00, Name of Insured: Texas Brand Bank and each successor in ownership of the indebtedness secured by the insured mortgage. |

17

**APP051**

SCHEDULE B

DATA FIELDS ON THE LOAN SCHEDULE

1. Seller Name    Texas Brand Bank
2. Current Unpaid Principal Balance $2,481,098.27
3. Current P&I Payment  $19,699.75
4. Current Interest Rate  6.50%
5. Next Payment Due Date (Interest Paid to Date) 10/14/2022
6. Borrower Name  Goldmark Hospitality LLC
7. Property Street Address, including city, state and zip code  13636 Goldmark Dr, Dallas, TX 75240
8. Escrow Balance  N/A

19

**APP052**

ATTACHMENT 1

BILL OF SALE

_____ (the "Seller"), for value received and pursuant to the terms and conditions of that certain Asset Sale Agreement dated _____ between the Seller and _____ (the "Buyer"), does hereby sell, assign, transfer and convey to the Buyer, its heirs, administrators, representatives, successors and assigns, all rights, title and interests of the Seller, as of the date hereof, in, to and under the Loan described in the Asset Sale Agreement.

THIS BILL OF SALE IS EXECUTED WITHOUT RECOURSE AND WITHOUT REPRESENTATIONS OR WARRANTIES OF ANY KIND OR NATURE, EXPRESSED, IMPLIED OR IMPOSED BY LAW, EXCEPT AS EXPRESSLY PROVIDED IN THE ASSET SALE AGREEMENT.

EXECUTED this ____ day of _____, _____.

SELLER:

_____

_____

By:_____
Its:_____

20

APP053

ATTACHMENT 2

ALLONGE

Reference is made to the $_____ promissory note dated _____ from _____ (the "Note") payable to the order of _____ ("Assignor")[, as successor to _____]. It is intended that this Allonge be attached to and made a permanent part of the Note.

Pay to the order of _____ ("Assignee"), without recourse, representations or warranties of any kind.

Executed this ___ day of _____, _____.

_____

_____

By:_____

Its:_____

21

**APP054**

ATTACHMENT 3

Recorded                                    By:

_____
_____
_____
_____

And When Recorded Mail To:

_____
_____
_____
_____

*(Space above this line for Recorder's use)*

ASSIGNMENT OF MORTGAGE

_____ ("Assignor"), having an address of _____, the holder of the mortgage dated _____ from _____ in favor of Assignor recorded in the _____ Registry of Deeds in Book \_\_\_, Page \_\_\_ (together with any amendments, renewals, extensions, or modifications thereto, the "Mortgage") hereby assigns the Mortgage, and the notes and claims secured thereby, to _____ ("Assignee") with an address of _____. This assignment is made without recourse, representations or warranties of any kind.

[THE REMAINDER OF THIS PAGE WAS LEFT BLANK INTENTIONALLY]

22

APP055

**IN WITNESS WHEREOF**, Assignor has duly executed this Assignment as of _____, 20___.

By:_____

Its:_____

STATE OF _____ )
                        )
COUNTY OF _____)

On the _____ day of _____ in the year 20___ before me, the undersigned, personally appeared _____, the _____ of _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is(are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies) , that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument, and that such individual made such appearance before the undersigned in the City of _____, _____ County, _____.

_____
Notary Public

My Commission Expires:_____

23

# EXHIBIT A-2

**APP057**



ElectricMan, Inc.
Quality Electrical Services
13551 Floyd Circle
Dallas, TX 75243
TECL # 21058
(972) 792-7270

**BILL TO**

Brown Fox PLLC
13636 Goldmark Drive
Dallas, TX 75240 USA

| | INVOICE | INVOICE DATE |
|---|---|---|
| | 43429 | Mar 20, 2025 |

**JOB ADDRESS**

Brown Fox PLLC
13636 Goldmark Drive
Dallas, TX 75240 USA

**Completed Date:**
**Payment Term:** Due Upon Receipt

### DESCRIPTION OF WORK

Came out to correct various electrical issues across the outside of the apartment complex, adding blank plates to weatherproof boxes, blanking off broken globe lights, adding plates to 8x8 junction boxes, and removing some broken conduit and wire, adding a bubble cover to an outlet, and securing a couple of loose junction boxes, before and after pictures attached.

| TASK | DESCRIPTION | QTY | PRICE | TOTAL |
|---|---|---|---|---|
| Service Charge-Com | Service Charge - Dispatch to commercial location and initial diagnostic:<br>Dispatch to commercial location and initial diagnostic | 1.00 | $194.00 | $194.00 |
| Install - Commercial | Install - Commercial:<br>Various fixes | 1.00 | $2,342.00 | $2,342.00 |
| Install - Commercial | Install - Commercial:<br>Extra blank plates | 12.00 | $17.00 | $204.00 |

| PAID ON | TYPE | MEMO | AMOUNT |
|---|---|---|---|
| 3/20/2025 | Visa | | $210.01 |
| 3/20/2025 | Visa | | $2,756.04 |

Invoice #43429

APP058

| | |
|---|---|
| **SUB-TOTAL** | $2,740.00 |
| **TAX** | $226.05 |
| | |
| **TOTAL DUE** | $2,966.05 |
| **PAYMENT** | $2,966.05 |
| | |
| **BALANCE DUE** | **$0.00** |

We know you have a choice in service providers. Thank you for putting your trust in ElectricMan. We appreciate your business!

**CUSTOMER AUTHORIZATION**

SERVICE AUTHORIZATION

I, the undersigned, am the owner, authorized representative, or tenant of the premises at which the work described above is to be performed. I hereby authorize ElectricMan, Inc. to perform the described work and to use such labor and material as you deem advisable. I agree to pay for the work in accordance with the terms set forth herein and will pay any balance due upon completion of the work. If I fail to pay the balance when due, I agree to pay interest on the unpaid balance at the rate of 1.5% per month. If an action for collection of any amounts due hereunder is instituted, I agree to pay all court costs and reasonable attorney's fees incurred by you in connection with the litigation and/or settlement of the claim. I also agree to pay any bank charges and attorney's fees incurred by you if my check fails to clear. I have read and agree to the Terms and Conditions. All parts replaced will be discarded unless otherwise specified herein. My signature authorizes the work and, if a credit card is used for payment, my signature authorizes the charge to that credit card for the amount due.
I authorize you to proceed with the work described for the price of $2,966.05.

Sign here                              Date    3/20/2025

**CUSTOMER ACKNOWLEDGEMENT**

ACCEPTANCE OF WORK PERFORMED

I find the service and materials rendered and installed, in connection with the above work mentioned, to have been completed in a satisfactory manner. I agree that the amount of $2,966.05 set forth on the contract is the total and complete charge.

Sign here                              Date    3/20/2025

APP059

## TERMS & CONDITIONS
### DISCLAIMERS

It is agreed that ElectricMan, Inc. is not responsible for the following:

1. Damage caused to the customer's property as a result of obtaining access to and exposing wiring and electrical systems.
2. Additional electrical work beyond that specifically mentioned in this estimate and proposal including, but not limited to, that which may be required because of pre-existing electrical code violations or additional work revealed to be necessary as a result of performing the specified work.
3. Any repairs, installation, removal or replacement of non-electrical items or activities including but not limited to: concrete, paving, asphalt, slabs, sidewalks, driveways, patios, pools, shrubbery, grass lawns, fences, plumbing and fixtures, painting decorations, plastering, sheetrock and other wall coverings, glass, carpentry, millwork, cabinets, floors, carpeting, floor surfaces and preparation, roofing flashing, sheet metal gutters, downspouts, brick, stonework, extension walls, steel and other framework.

Customer accepts full responsibility for the prompt payment of all costs of this agreement even though customer may intend to obtain reimbursement from others such as landlords, tenants, insurance companies and tort feasors.

This proposal and said specifications shall not be altered or modified except by written agreement between the parties hereto and verbal understandings and agreements with representatives shall not be binding unless set forth herein.

### LIMITED SERVICE WARRANTY

ElectricMan, Inc. warrants, to the extent stated herein, electrical service or repair furnished by it. The stated period of warranty commences upon installation or repair of wiring or electrical system. The warranty period on services performed is 90 days, unless otherwise stated in "comments" on the front of this invoice.

Purchaser understands that ElectricMan, Inc.'s liability under this warranty is limited to repair, replacement, or refund of purchaser's money, and does not extend to property damage resulting from overload or misuse of electrical system which fails during the agreed upon warranty period. ElectricMan, Inc. specifically disclaims any implied warranties. ElectricMan, Inc. does not warranty the materials supplied, however, purchaser may have a warranty through the manufacturer.

This warranty gives you specific legal rights. You may also have other rights under state law.

### NOTICE TO OWNER

This contractor is registered to do business in the state in which this work is performed. Where required, this contractor has posted with the State all necessary bonds or cash deposits for the purpose of satisfying claims against the contractor for negligent or improper work or breach of contract in the conduct of the contractor's business. This bond or cash deposit my not be sufficient to cover a claim which might arise from the work done under your contract. If any supplier of materials used in your construction project or any employee of the contractor or subcontractor is not paid by the contractor or subcontractor on your job your property may be liened to force payment. If you wish additional protection, you may request the contractor to provide you with original "lien release" documents from each supplier or subcontractor on your project. The contractor is required to provide you with further information about lien release documents if you request it. General information is also available from the licensing board in your state.

### GENERAL PROVISIONS

This Agreement shall be governed by and construed and enforced in accordance with the laws of the state of Texas. The customer hereby irrevocably submits to the jurisdiction of any state or federal court sitting in Dallas County, Texas over any action or proceeding arising out of or relating to this Agreement, and irrevocably agrees that all claims in respect of such action or proceeding may be heard and determined in such state or federal court. This Agreement is binding upon and inures to the benefit of the parties, their successors and permitted assigns.

Regulated by the Texas Department of Licensing and Regulation, P.O. Box 12157, Austin, TX 78711, 1-800-803-9202, 512-463-6599, website: www.license.state.TX.US/Complaints.

# EXHIBIT A-3

APP061





**APP063**



**APP064**



APP065



APP067





**APP069**

# EXHIBIT A-4

APP070

Dallas Fire-Rescue Department

1551  Baylor St.
Dallas, TX  75226
(214) 670-4319

Thursday, 25 July, 2024

Attn: Joanna  Roberts                          Property Address:
Amerigold Suites                                Amerigold Suites
13636  Goldmark Dr  #                          13636  Goldmark DR
Dallas, TX 75240-4246                          Dallas,  TX  75240-4246

Re:  Re-inspection - 1st Reinspection  on  July 25 2024

**Congratulations**, your annual Fire and Life Safety Fire Code Inspection has satisfactorily been completed. Dallas Fire & Rescue would like to take this time to thank you for making Fire and Life Safety a priority. Please click here to complete our customer satisfaction survey.

Note: Records of inspection reports are maintained by the Inspections & Life Safety Education Division of the City of Dallas Fire & Rescue Department and are part of public record requirements of the State of Texas.

Inspection Notes:
Amerigold Suites Annual Inspection

6/12/24 1 inspection with Joanna Roberts. 4 hazards found, 1 notice issued. SVillarreal

7/25/24 1 Reinspection with Joanna Roberts, 4 hazards corrected, 1 notice issued, 1 Reinspection fee notice issued (70289). Case closed. SVillarreal

Inspector:                                      Property Representative:

FPO Selina Villarreal                           Joanna Roberts
selina.villarreal@dallasfire.gov
214-724-7196

*TX-DH807 / 598813 / 342833*

**APP071**

**Amerigold Suites**
**1st Reinspection**

**Inspection on July 25 2024**

**Violations repaired / total: 4 / 4**

## Violation/Information Page(s)

## General Inspection Information

**Number of APARTMENT BUILDINGS Inspected:**

11

**Number of APARTMENT UNITS Inspected:**

**Number of APARTMENT BUILDINGS Re-Inspected:**

**Number of APARTMENT UNITS Re-Inspected:**

**Additional Inspector(s):**

## Inspection Violations

**Provide marking or striping for all designated FIRE LANES**

**503.3** 503.3 Marking. Approved striping, or when allowed by the fire code official, approved signs, or both shall be provided for fire apparatus access roads to identify such roads or prohibit the obstruction thereof. The means by which fire lanes are designated shall be maintained in a clean and legible condition at all times and be replaced or repaired when necessary to provide adequate visibility. 1. Striping – Fire apparatus access roads shall be marked by painted lines of red traffic paint 6 inches (152 mm) in width to show the boundaries of the lane. The words NO PARKING - FIRE LANE or FIRE LANE - NO PARKING shall appear in 4-inch (102 mm) white letters at 25-foot (7620 mm) intervals on the red border markings along both sides of the fire lanes. Where a curb is available, the striping shall be on the vertical face of the curb. 2. Signs – Signs shall read NO PARKING - FIRE LANE or FIRE LANE - NO PARKING and shall be 12 inches (305 mm) wide and 18 inches (457 mm) high. Signs shall be painted on a white background with letters and borders in red, using not less than 2-inch (51 mm) lettering. Signs shall be permanently affixed to a stationary post and the bottom of the sign shall be 6 feet, 6 inches (1981 mm) above finished grade. Signs shall be spaced not more than 50 feet (15 240 mm) apart. Signs may be installed on permanent buildings or walls or as approved by the fire code official. Signs shall be posted on both sides of the fire apparatus road. Exception: Group R-3 and Group U occupancy fire apparatus access roads are not required to be marked when approved by the fire code official.

**Inspector Notes:  6/12/24 Fire lanes need re-striping.**

| Violation found on | Will be rechecked on or after | Repaired on |
| --- | --- | --- |
| 06/12/2024 | 07/03/2024 | 07/25/2024 |

  

**SERVICE fire extinguishers and recharge those expended. Annual service required by state Licensee**

**906.2** 906.2 General requirements. Portable fire extinguishers shall be selected, installed and maintained in accordance with this section and NFPA 10. Exceptions: 1. The distance of travel to reach an extinguisher shall not apply to the spectator seating portions of Group A-5 occupancies. 2. Thirty-day inspections shall not be required and maintenance shall be allowed to be once every 3 years for dry-chemical or halogenated agent portable fire extinguishers that are supervised by a listed and approved electronic monitoring device, provided that all of the following conditions are met: 2.1. Electronic monitoring shall confirm that extinguishers are properly positioned, properly charged and unobstructed. 2.2. Loss of power or circuit continuity to the electronic monitoring device shall initiate a trouble signal. 2.3. The extinguishers shall be installed inside of a building or cabinet in a noncorrosive environment. 2.4. Electronic monitoring devices and supervisory circuits shall be tested every 3 years when extinguisher maintenance is performed. 2.5. A written log of required hydrostatic test dates for extinguishers shall be maintained by the owner to verify that hydrostatic tests are conducted at the frequency required by NFPA 10. 3. In Group I-3, portable fire extinguishers shall be permitted to be located at staff locations.

**Inspector Notes:  6/12/24 All extinguishers need to be serviced.**

| Violation found on | Will be rechecked on or after | Repaired on |
|---|---|---|
| 06/12/2024 | 07/03/2024 | 07/25/2024 |




**SEAL penetrations in floors, walls, ceilings with approved material**

**703.2** 703.2 Repair of penetrations. Where damaged, materials used to protect membrane- and through-penetrations shall be replaced or restored with materials or systems that meet or exceed the code requirements applicable at the time when the assembly was constructed, remodeled or altered.

**Inspector Notes:  6/12/24 repair penetration in office bathroom ceiling and in hallway of building 21.**

| Violation found on | Will be rechecked on or after | Repaired on |
|---|---|---|
| 06/12/2024 | 07/03/2024 | 07/25/2024 |




**Provide and maintain OPEN-FLAME COOKING and HEATING DEVICES to not be LOCATED or USED on combustible balconies, decks, or combustible construction. Such devices should also not be used on combustible balconies, decks, or within 10 feet of combustible construction.**

308.1.4   308.1.4 Open-flame cooking and heating devices. Open- flame cooking devices, charcoal grills and other similar devices used for cooking shall not be located or used on combustible balconies, decks, or within 10 feet (3048 mm) of combustible construction. Exceptions: 1. One- and two-family dwellings, except that LP-gas containers are limited to a water capacity not greater than 50 pounds (22.68 kg) [nominal 20-pound (9.08 kg) LP-gas capacity] with an aggregate LP-gas capacity not to exceed 100 lbs (5 containers). All LP-gas contains shall be stored outside, as per Chapter 61. 2. Where buildings, balconies and decks are protected by an automatic sprinkler system, except that LP-gas containers are limited to a water capacity not greater than 50 pounds (22.68 kg) [nominal 20 pound (9.08 kg) LP-gas capacity], with an aggregate LP-gas capacity not to exceed 40 lbs (2 containers). 3. LP-gas cooking or heating devices having LP-gas container with a water capacity not greater than 2 1/2 pounds [nominal 1 pound (0.454 kg) LP-gas capacity].

**Inspector Notes:  6/12/24 grill on balcony needs to be removed.**

| Violation found on | Will be rechecked on or after | Repaired on |
|---|---|---|
| 06/12/2024 | 07/03/2024 | 07/25/2024 |



*TX-DH807 / 598813 / 342833*

**APP075**

# EXHIBIT A-5

APP076

Dallas Fire-Rescue Department

1551  Baylor St.
Dallas, TX  75226
(214) 670-4319

Thursday, 22 June, 2023

Attn: Joanna  Roberts
Amerigold Suites
13636  Goldmark Dr  #
Dallas, TX 75240-4246

Property Address:
Amerigold Suites
13636  Goldmark DR
Dallas,  TX  75240-4246

Re:  Re-inspection - 1st Reinspection  on  June 22 2023

# Congratulations, your Annual Fire and Life Safety Fire Code Inspection has satisfactorily been completed. Dallas Fire & Rescue would like to take this time to thank you for making Fire and Life Safety a priority. Please click here to complete our customer satisfaction survey.

Note: Records of inspection reports are maintained by the Inspections & Life Safety Education Division of the City of Dallas Fire & Rescue Department and are part of public record requirements of the State of Texas.

Inspection Notes:
Annual Inspection needed.

5/16/23 Annual inspection 13 Bldgs w/ Joanna Roberts…23 hazards found…0 corrected….2 special tests…1 notice issued…Reinspection scheduled 5/30/23 …
Went over required form for unit inspection…
M. Liebel

6/22/23 Reinspection w/ Joanna Roberts…23 hazards corrected…0 hazards remaining…1 notice issued…114 fee #58923 $171 issued… no reinspection needed…case closed…M. Liebel

Inspector:

Fire Prevention Officer Misty Liebel

misty.liebel@dallasfire.gov
469-323-5916

Property Representative:

Joanna Roberts

*TX-DH807 / 554181 / 342833*
**APP077**

**Amerigold Suites**
**1st Reinspection**

**Inspection on June 22 2023**
**Violations repaired / total: 23 / 23**

**Violation/Information Page(s)**

## General Inspection Information

**Number of HOTEL or MOTEL UNITS Inspected:**

**Number of HOTEL or MOTEL BUILDINGS Inspected:**

**Number of HOTEL or MOTEL UNITS Re-Inspected:**

**Number of HOTEL or MOTEL BUILDINGS Re-Inspected:**

**Business Name:**
   amerigold suites

## Inspection Violations

**308.1.4** 308.1.4 Open-flame cooking and heating devices. Open-flame cooking devices, charcoal grills and other similar devices used for cooking shall not be located or used on combustible balconies, decks, or within 10 feet (3048 mm) of combustible construction. Exceptions: 1. One- and two-family dwellings, except that LP-gas containers are limited to a water capacity not greater than 50 pounds (22.68 kg) with an aggregate LP-gas capacity not to exceed 100 lbs (5 containers). 2. Where buildings, balconies and decks are protected by an approved automatic sprinkler system, except that LP-gas containers are limited to a water capacity not greater than 50 pounds (22.68 kg), with an aggregate LP- gas capacity not to exceed 40 lbs (2 containers). 3. LP-gas cooking or heating devices having LP-gas container with a water capacity not greater than 2 1/2 pounds.

**Inspector Notes:  Discontinue use or storage of open flame cooking devices within 10 ft of bldgs**

| Violation found on | Will be rechecked on or after | Repaired on |
|---|---|---|
| 05/16/2023 | 05/30/2023 | 06/22/2023 |

 

*TX-DH807 / 554181 / 342833*

**1103.9** 1103.9 Carbon monoxide alarms. Existing Group I-1, I-2, I- 4 and R occupancies shall be equipped with carbon monoxide alarms in accordance with Section 915, except that the carbon monoxide alarms shall be allowed to be solely battery operated.

**Inspector Notes:  Provide form stating all units have been inspected and have working carbon monoxide detectorsReceived form stating all units were checked and corrected all units needing correction**

| Violation found on 05/16/2023 | Will be rechecked on or after 05/30/2023 | Repaired on 06/22/2023 |
|---|---|---|

**315.3** 315.3 Storage in buildings. Storage of materials in buildings shall be orderly and stacks shall be stable. Storage of combustible materials shall be separated from heaters or heating devices by distance or shielding so that ignition cannot occur.

**Inspector Notes:  Maintenance and shed required to be stored in orderly manner**

| Violation found on 05/16/2023 | Will be rechecked on or after 05/30/2023 | Repaired on 06/22/2023 |
|---|---|---|

 

**2808.5** 2808.5 Combustible waste. The storage, accumulation and handling of combustible materials and control of vegetation shall comply with Chapter 3.

**Inspector Notes:  Discontinue accumulation of waste against buildings**

| Violation found on 05/16/2023 | Will be rechecked on or after 05/30/2023 | Repaired on 06/22/2023 |
|---|---|---|

  

*TX-DH807 / 554181 / 342833*

**Post ADDRESS visible from the street**

505.1  505.1 Address identification. New and existing buildings shall be provided with approved address identification. The address identification shall be legible and placed in a position that is visible from the street or road fronting the property. Address identification characters shall contrast with their background. Address numbers shall be Arabic numbers or alphabetical letters. Numbers shall not be spelled out. Each character shall be not less than 6 inches (152.4 mm) high with a minimum stroke width of 1/2 inch (12.7 mm). Where required by the fire code official, address identification shall be provided in additional approved locations to facilitate emergency response. Where access is by means of a private road and the buildings do not immediately front a street, and/or the buildings cannot be viewed from the public way, a monument, pole or other sign with approved 6 inch (152.4 mm) height building numerals or addresses and 4 inch (101.6 mm) height suite/apartment numerals of a color contrasting with the background of the building or other approved means shall be used to identify the structure. Numerals or addresses shall be posted on a minimum 20 inch (508 mm) by 30 inch (762 mm) background with a border. Address identification numbers shall be maintained. Exception: R-3 single family occupancies shall have approved numerals of a minimum 3 ½ inches (88.9 mm) in height and a color contrasting with the background clearly visible and legible from the street fronting the property and rear alleyway where such alleyway exists.

**Inspector Notes:  Repair bldg number signs and replace suite signs on glass doors to multiple units**

| Violation found on 05/16/2023 | Will be rechecked on or after 05/30/2023 | Repaired on 06/22/2023 |

  



*TX-DH807 / 554181 / 342833*

**APP080**

**Provide marking or striping for all designated FIRE LANES**

**503.3** 503.3 Marking. Approved striping, or when allowed by the fire code official, approved signs, or both shall be provided for fire apparatus access roads to identify such roads or prohibit the obstruction thereof. The means by which fire lanes are designated shall be maintained in a clean and legible condition at all times and be replaced or repaired when necessary to provide adequate visibility. 1. Striping – Fire apparatus access roads shall be marked by painted lines of red traffic paint 6 inches (152 mm) in width to show the boundaries of the lane. The words NO PARKING - FIRE LANE or FIRE LANE - NO PARKING shall appear in 4-inch (102 mm) white letters at 25-foot (7620 mm) intervals on the red border markings along both sides of the fire lanes. Where a curb is available, the striping shall be on the vertical face of the curb. 2. Signs – Signs shall read NO PARKING - FIRE LANE or FIRE LANE - NO PARKING and shall be 12 inches (305 mm) wide and 18 inches (457 mm) high. Signs shall be painted on a white background with letters and borders in red, using not less than 2-inch (51 mm) lettering. Signs shall be permanently affixed to a stationary post and the bottom of the sign shall be 6 feet, 6 inches (1981 mm) above finished grade. Signs shall be spaced not more than 50 feet (15 240 mm) apart. Signs may be installed on permanent buildings or walls or as approved by the fire code official. Signs shall be posted on both sides of the fire apparatus road. Exception: Group R-3 and Group U occupancy fire apparatus access roads are not required to be marked when approved by the fire code official.

**Inspector Notes:  Fire lane needs to be restriped throughout property**

| Violation found on | Will be rechecked on or after | Repaired on |
|---|---|---|
| 05/16/2023 | 05/30/2023 | 06/22/2023 |

 

**Provide and maintain smoke detectors in approved locations for each RENTAL UNIT**

**907.2.11** 907.2.11 Single- and multiple-station smoke alarms. Listed single- and multiple-station smoke alarms complying with UL 217 shall be installed in accordance with Sections 907.2.11.1 through 907.2.11.7 and NFPA 72.

**Inspector Notes:  Provide form stating all units have been inspected and they have smoke alarms in all sleeping areas and hallways outside sleeping areas and they have been checked and working properlyReceived form stating all units were checked and corrected all units needing correction.**

| Violation found on | Will be rechecked on or after | Repaired on |
|---|---|---|
| 05/16/2023 | 05/30/2023 | 06/22/2023 |

*TX-DH807 / 554181 / 342833*

**APP081**

**SERVICE fire extinguishers and recharge those expended. Annual service required by state Licensee**

**906.2** 906.2 General requirements. Portable fire extinguishers shall be selected, installed and maintained in accordance with this section and NFPA 10. Exceptions: 1. The distance of travel to reach an extinguisher shall not apply to the spectator seating portions of Group A-5 occupancies. 2. Thirty-day inspections shall not be required and maintenance shall be allowed to be once every 3 years for dry-chemical or halogenated agent portable fire extinguishers that are supervised by a listed and approved electronic monitoring device, provided that all of the following conditions are met: 2.1. Electronic monitoring shall confirm that extinguishers are properly positioned, properly charged and unobstructed. 2.2. Loss of power or circuit continuity to the electronic monitoring device shall initiate a trouble signal. 2.3. The extinguishers shall be installed inside of a building or cabinet in a noncorrosive environment. 2.4. Electronic monitoring devices and supervisory circuits shall be tested every 3 years when extinguisher maintenance is performed. 2.5. A written log of required hydrostatic test dates for extinguishers shall be maintained by the owner to verify that hydrostatic tests are conducted at the frequency required by NFPA 10. 3. In Group I-3, portable fire extinguishers shall be permitted to be located at staff locations.

**Inspector Notes:  Service all extinguishers on propertyForm stating all 1st floor units have new or serviced extinguisher**

| Violation found on | Will be rechecked on or after | Repaired on |
|---|---|---|
| 05/16/2023 | 05/30/2023 | 06/22/2023 |

**MOUNT portable fire extinguishers in conspicuous accessible locations**

**906.5** 906.5 Conspicuous location. Portable fire extinguishers shall be located in conspicuous locations where they will have ready access and be immediately available for use. These locations shall be along normal paths of travel, unless the fire code official determines that the hazard posed indicates the need for placement away from normal paths of travel.

**Inspector Notes:  Be sure all extinguishers are mounted appropriately**

| Violation found on | Will be rechecked on or after | Repaired on |
|---|---|---|
| 05/16/2023 | 05/30/2023 | 06/22/2023 |

  

**MOUNT portable fire extinguishers so that the tops are not more than 5 feet above the floor**

**906.9.1** 906.9.1 Extinguishers weighing 40 pounds or less. Portable fire extinguishers having a gross weight not exceeding 40 pounds (18 kg) shall be installed so that their tops are not more than 5 feet (1524 mm) above the floor.

**Inspector Notes:  Lower extinguisher in maintenance**

| Violation found on | Will be rechecked on or after | Repaired on |
|---|---|---|
| 05/16/2023 | 05/30/2023 | 06/22/2023 |



**Install extinguishing system for COOKING APPLIANCES producing grease laden vapors**

**904.13** 904.13 Commercial cooking systems. The automatic fireextinguishing system for commercial cooking systems shall be of a type recognized for protection of commercial cooking equipment and exhaust systems of the type and arrangement protected. Preengineered automatic dry- and wet-chemical extinguishing systems shall be tested in accordance with UL 300 and listed and labeled for the intended application. Other types of automatic fire-extinguishing systems shall be listed and labeled for specific use as protection for commercial cooking operations. The system shall be installed in accordance with this code, NFPA 96, its listing and the manufacturer's installation instructions. Automatic fire-extinguishing systems of the following types shall be installed in accordance with the referenced standard indicated, as follows: 1. Carbon dioxide extinguishing systems, NFPA 12. 2. Automatic sprinkler systems, NFPA 13. 3. Automatic water mist systems, NFPA 750. 4. Foam-water sprinkler system or foam-water spray systems, NFPA 16. 5. Dry-chemical extinguishing systems, NFPA 17. 6. Wet-chemical extinguishing systems, NFPA 17A. Exception: Factory-built commercial cooking recirculating systems that are tested in accordance with UL 710B and listed, labeled and installed in accordance with Section 304.1 of the International Mechanical Code.

**Inspector Notes:  Maintain or remove commercial cooking equipment All commercial cooking equipment removed**

| Violation found on | Will be rechecked on or after | Repaired on |
|---|---|---|
| 05/16/2023 | 05/30/2023 | 06/22/2023 |



**Service extinguishing systems for commercial cooking applications every 6 MONTHS or after activation**

**904.13.5.2** 904.13.5.2 Extinguishing system service. Automatic fire-extinguishing systems shall be serviced not less frequently than every six months and after activation of the system. Inspection shall be by qualified individuals, and a certificate of inspection shall be forwarded to the fire code official upon completion.

**Inspector Notes:  Maintain or remove all commercial cooking equipment**

| Violation found on 05/16/2023 | Will be rechecked on or after 05/30/2023 | Repaired on 06/22/2023 |
|---|---|---|

 

**Remove GREASE from cooking appliances, vent-hoods, ducts, etc**

**606.3.3** 606.3.3 Cleaning. Hoods, grease-removal devices, fans, ducts and other appurtenances shall be cleaned at intervals as required by Sections 606.3.3.1 through 606.3.3.3.

**Inspector Notes:  Service or remove all commercial cooking equipment**

| Violation found on 05/16/2023 | Will be rechecked on or after 05/30/2023 | Repaired on 06/22/2023 |
|---|---|---|



*TX-DH807 / 554181 / 342833*

**APP084**

**Discontinue LOCKING - BLOCKING exit doors, exit windows, or exit pathways**

**1032.2** 1032.2 Reliability. Required exit accesses, exits and exit discharges shall be continuously maintained free from obstructions or impediments to full instant use in the case of fire or other emergency. An exit or exit passageway shall not be used for any purpose that interferes with a means of egress.

**Inspector Notes:  Provide form stating all units have been inspected and 2nd exits are not blockedReceived form stating all units were checked and corrected all units needing correction**

| Violation found on | Will be rechecked on or after | Repaired on |
|---|---|---|
| 05/16/2023 | 05/30/2023 | 06/22/2023 |



**SEAL penetrations in floors, walls, ceilings with approved material**

**703.2** 703.2 Repair of penetrations. Where damaged, materials used to protect membrane- and through-penetrations shall be replaced or restored with materials or systems that meet or exceed the code requirements applicable at the time when the assembly was constructed, remodeled or altered.

**Inspector Notes:  Seal all holes throughout property**

| Violation found on | Will be rechecked on or after | Repaired on |
|---|---|---|
| 05/16/2023 | 05/30/2023 | 06/22/2023 |

   



*TX-DH807 / 554181 / 342833*

**APP085**

**Remove the accumulation of combustible WASTE**

**304.1** 304.1 Waste accumulation prohibited. Combustible waste material creating a fire hazard shall not be allowed to accumulate in buildings or structures or upon premises.

**Inspector Notes:  Remove combustible waste piled next to buildings**

| Violation found on | Will be rechecked on or after | Repaired on |
|---|---|---|
| 05/16/2023 | 05/30/2023 | 06/22/2023 |



**Maintain 30 inch clearance to ELECTRICAL equipment**

**603.4** 603.4 Working space and clearances. Working space around electrical equipment shall be provided in accordance with Section 110.26 of NFPA 70 for electrical equipment rated 1,000 volts or less, and Section 110.33 of NFPA 70 for electrical equipment rated over 1,000 volts. The minimum required working space shall be not less than 30 inches (762 mm) in width, 36 inches (914 mm) in depth and 78 inches (1981 mm) in height in front of electrical service equipment. Where the electrical service equipment is wider than 30 inches (762 mm), the minimum working space shall be not less than the width of the equipment. Storage of materials shall not be located within the designated working space.

**Inspector Notes:  Discontinue storage around electrical panels in maintenance**

| Violation found on | Will be rechecked on or after | Repaired on |
|---|---|---|
| 05/16/2023 | 05/30/2023 | 06/22/2023 |



*TX-DH807 / 554181 / 342833*

**APP086**

**Provide COVERS for electrical outlets, switches, junction boxes, and breaker boxes**

> **603.2.2** 603.2.2 Open electrical terminations. Open junction boxes and open-wiring splices shall be prohibited. Approved covers shall be provided for all switch and electrical outlet boxes.

**Inspector Notes:  Missing cover outside of shedMissing cover in office**

| Violation found on | Will be rechecked on or after | Repaired on |
|---|---|---|
| 05/16/2023 | 05/30/2023 | 06/22/2023 |

 

**Provide one _____ rated portable fire extinguisher for each _____ square feet. Maximum travel distance**

> **906.3** 906.3 Size and distribution. The size and distribution of portable fire extinguishers shall be in accordance with Sections 906.3.1 through 906.3.4.

**Inspector Notes:  Service all extinguishers on propertyForm stating all 1st floor units have new or serviced extinguisher Corrected and recieved invoice**

| Violation found on | Will be rechecked on or after | Repaired on |
|---|---|---|
| 05/16/2023 | 05/30/2023 | 06/22/2023 |

  

**PROVIDE, MAINTAIN, AND POST AN EVACUATION DIAGRAM DEPICTING TWO EVACUATION ROUTES ON OR IMMEDIATELY ADJACENT TO TO EVERY REQUIRED EGRESS DOOR IN SLEEP**

**403.9.1.1** 403.9.1.1 Evacuation diagrams. A diagram depicting two evacuation routes shall be posted on or immediately adjacent to every required egress door from each hotel or motel sleeping unit and shall include the following: 1. A description of the fire alarm system and an explanation of its operation (including the meaning of signals). 2. A map showing all emergency exit locations and how they are designated. 3. Information on how to report a fire or other emergency to the Dallas Fire-Rescue Department and/or building management. 4. A warning not to use elevators in case of fire. 5. General instructions as to self-protective measures a person should take if trapped in a room by fire or smoke.

**Inspector Notes:  Emergency evacuation map required in all units**

| Violation found on | Will be rechecked on or after | Repaired on |
|---|---|---|
| 05/16/2023 | 05/30/2023 | 06/22/2023 |

**Provide and maintain IDENTIFICATION SIGNAGE for all DOORS into ELECTRICAL CONTROL PANEL ROOMS.**

**603.4.1** 603.4.1 Labeling. Doors into electrical control panel rooms shall be marked with a plainly visible and legible sign stating "ELECTRICAL ROOM" or similar approved wording. The disconnecting means for each service, feeder or branch circuit originating on a switchboard or panelboard shall be legibly and durably marked to indicate its purpose unless such purpose is clearly evident. Where buildings or structures are supplied by more than one power source, markings shall be provided at each service equipment location and at all interconnected electric power production sources identifying all electric power sources at the premises in accordance with NFPA 70.

**Inspector Notes:  Add signage throughout property for electrical closets**

| Violation found on | Will be rechecked on or after | Repaired on |
|---|---|---|
| 05/16/2023 | 05/30/2023 | 06/22/2023 |

  

**Provide and maintain IDENTIFICATION SIGNAGE for all rooms containing FIRE PROTECTION and UTILITY EQUIPMENT readily visible.**

**509.1** 509.1 Identification. Fire protection equipment shall be identified in an approved manner. Rooms containing controls for air-conditioning systems or fire protection systems shall be identified for the use of the fire department. Approved signs required to identify fire protection system equipment and equipment location shall be constructed of durable materials, permanently installed and readily visible.

**Inspector Notes:  Utility signage required throughout property**

| Violation found on | Will be rechecked on or after | Repaired on |
|---|---|---|
| 05/16/2023 | 05/30/2023 | 06/22/2023 |

  

**Discontinue STORAGE of COMBUSTIBLES inside BOILER ROOMS, MECHANICAL ROOMS, ELECTRICAL ROOMS, and FIRE COMMAND CENTERS.**

**315.3.3** 315.3.3 Equipment rooms. Combustible material shall not be stored in boiler rooms, mechanical rooms, electrical equipment rooms or in fire command centers as specified in Section 508.1.5.

**Inspector Notes:  Discontinue excessive storage around water heaters**

| Violation found on | Will be rechecked on or after | Repaired on |
|---|---|---|
| 05/16/2023 | 05/30/2023 | 06/22/2023 |



*TX-DH807 / 554181 / 342833*

**APP089**