**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

SECURITIES AND EXCHANGE
COMMISSION,

          Plaintiff,

v.

Timothy Barton, et al.,

          Defendants.

Case No. 3:22-cv-2118-X

**MCCORMICK 101 LLC'S REPLY IN SUPPORT OF MOTION FOR (1) IMMEDIATE
THIRD-PARTY INSPECTION OF AMERIGOLD SUITES REGARDING
TENANT LIFE SAFETY ISSUES AND (2) OTHER RELATED RELIEF**

McCormick 101 LLC ("Lender") respectfully files this Reply (the "Reply") in support of

its Motion for (1) Immediate Third-Party Inspection of Amerigold Suites Regarding Tenant Life

Safety Issues and (2) Other Related Relief (the "Motion").

**INTRODUCTION**

The Receiver goes to great lengths in his response ("Response") to deflect responsibility

for overtly dangerous conditions existing at the Property until these dangers were brought before

the Court by Lender.[1] The reason why these repairs were made *after* the filing of Lender's Motion

is obvious. They evidence the Receiver's thinly veiled effort to render moot the relief requested

by Lender, including the need for access for a professional property condition assessment ("PCA").

The Receiver contends that no one – including Lender – should be given access to the

Property unless the Receiver himself selects the inspector. The reason given: he doesn't want an

inspector "who will nitpick every single potential issue with the Property." (Resp., p. 2). What

---

[1] These dangerous conditions were so overt that they were discernible to a lay person's naked eye as noted in the Motion's Declaration of Jeremy Halverson ("Halverson Declaration"). (ECF No. 614, App. p. 2-4).

does the Receiver fear? Lender openly invited the Receiver to join the inspector and offered to provide the PCA to the Court, so the Court with its own eyes can determine the breadth of any imminent harm.[2]

It is plainly evident to everyone in this case that the Receiver believes he needs this Property to generate cash flow to fund the costs of this receivership and provide a recovery to investors. He cites, again and again, case law that provides that a balance of harms must be employed. Yet, the Receiver overlooks the critical issue and distinction in Lender's pending Motion. Unlike the shifting of money from one pot to the other, the issue of tenant life safety is squarely before this Court and, frankly, constitutes the most significant of harms possible.

The Receiver ignores case law cited by Lender that life safety is of paramount value when balancing such harms. The Receiver also ignores that Lender could foreclose and make the necessary repairs, which Lender has tried to do but has been stayed again and again. In fact, the Receiver suggests that the reason why a PCA is not needed: it would "need to be disclosed to a potential buyer." (Resp., p. 2). This is disconcerting for multiple reasons:  (1) it starts from the very proposition that there *are* problems with this Property that the Receiver does not want made public – unless, of course, there is an inspector whom the Receiver can select who won't "nitpick" and (2) the priority is not tenant life safety, but the alleged impact on a potential buyer.

Presuming *arguendo* that investor recovery trumps tenant life safety, the Receiver's position is both myopic and wrong. First, potential buyers of this Property have already expressed interest and indeed two have already gone under contract, both of whom are aware of the "warts" the Receiver acknowledges exist at the Property. (Resp., p. 2). Both are sophisticated real estate

---

[2] Even after Lender's Motion, the Receiver still did not visit the Property. Instead, he sent his legal counsel to handle the repairs. (Resp., Apdx., p. APP001). This further underscores the lack of onsite management capable of addressing life safety proactively.

buyers. Second, the Property's value relates to myriad factors, including fluctuating interest rates, absorption rates, cap rates, market rental rates, local rental availability, and myriad other factors. Third, an elegant and simple solution is readily available to address the purported economic parade of horribles that the Receiver contends will ensue. It is distinctly within this Court's authority to require that the PCA be filed under seal. Problem solved.

## **ARGUMENT**

### I. **THE RECEIVER CONCEDES LIFE SAFETY ISSUES, AND THE RECORD DOES NOT REFLECT THAT ALL LIFE SAFETY ISSUES HAVE BEEN ADDRESSED**

If the Receiver is unable to afford needed repairs and/or properly manage the Property to ensure tenant life safety, then the stay should be lifted to allow Lender to move forward with foreclosure so that such issues may be addressed. The threshold issue is what life safety issues may exist beyond those overtly perceived by a lay person visiting the Property. *See* fn. 1. This is why the request for the PCA is made: to ensure transparency exists in this proceeding so that the Receiver, Lender, and – most importantly this Court – can properly assess the life safety issues.

The Receiver contends that he has "already begun remedying the electrical and retaining wall issues." Response, p. 4. This is an admission on the record that the life safety issues Lender complained of were or are present at the Property. It is also an acknowledgment that it took Lender's prompting and action to spur such repairs.

Equally troubling is that the Receiver's Response does not support a finding that the dangers reported by Lender have all been corrected. The Receiver claims that with the exception of the retaining wall, he has addressed all of the life safety issues noted in the pictures attached to the Halverson Declaration. Lender vehemently disagrees. Receiver attaches only eight pictures (two of which relate to the same retaining wall and the third relates to a pool), compared to the 70 pictures provided by Halverson regarding repairs. (Receiver's Apdx., Ex. A-3; Lender's Apdx.,

Exs. 2-71). Compare Halverson's detailed Declaration with the Receiver's oblique Response:

> Halverson also observed at least 10 exposed live electrical wires in OUTDOOR areas of the Amerigold Property….Five of these exposed live electrical wires were open conduit boxes with pigtails exposed….at least 10 broken OUTDOOR light fixtures with hard wiring exposed….live wires exposed in multiple locations, multiple unlatched/unlocked sheds with signage indicating that dangerous equipment is inside, unrepaired windows boarded with wood, a retaining wall leaning dangerously next to a walkway and between units, a cracking foundation around the pool, structural damage both inside and outside, a beam with 20+ exposed rusted screws on the outside of the leasing office, and more.

In response, the Receiver appends an invoice from ElectricMan stating:

> Came out to correct various electrical issues across the outside of the apartment complex, adding blank plates to weatherproof boxes, blanking off broken globe lights, adding plates to 8x8 junction boxes, and removing some broken conduit and wire, adding a bubble cover to an outlet, and securing a couple of loose junction boxes, **before and after pictures attached**.

(Resp. Apdx., Ex. A-2) (emphasis added). Yet where are the "before" and "after" pictures that this invoice references? Clearly, the "before" pictures are not attached. Of the eight pictures in Appendix A-3, only three pictures relate to electrical. This is hardly compelling evidence.

It goes without saying that placing "caution tape" held up by two metal poles supported by rocks against a collapsing retaining wall hardly constitutes sufficient protection from a dangerous condition. Even an untrained eye should know that a more viable solution – such as the installation of a plywood overlay with cones or even saw horses blocking the wall – would be an easy and inexpensive interim remedy to a dangerous condition. Additionally, the Receiver's own pictures demonstrate the collapsed retaining wall's compromise of the adjacent building's foundation. Three weeks later, the Receiver still has not entered into a contract for repair.

## II.    THE RECEIVER CASTS BLAME ON EVERYONE BUT HIMSELF

The Receiver points the finger at everyone but himself for the state of the Property. Lender is concerned about tenant safety? Well, Lender is a sophisticated investor and should have known what it was buying. Lender points out clear code violations at the Property? Well, the Property

passed 2023 and 2024 "Fire and Life Safety Fire Code Inspections." These excuses don't cut it if a tenant or a child is hurt. Just ask a plaintiff's attorney. The problems with such finger pointing are manifold: (1) Lender purchased the Note and Mortgage <u>after</u> the Receiver was appointed to operate the Property in compliance with 28 U.S.C. § 959; (2) the Receiver is unable to prove when the other life safety issues existed;[3] and (3) the Receiver tries to transform a typical "as is/where is" contract clause into a suggestion that Lender knew of these issues before even the Receiver did. How can that be when Lender took title to the loan documents *after* the Receiver himself was appointed? Nowhere in the Receiver's Response is an explanation of how these safety issues arose or how long they existed under his management. Nor does the Response explain why it took Lender's Motion for the Receiver to take action.

Additionally, the Receiver self-servingly states that he would have made repairs if Lender had picked up the phone. This is beyond troubling. The Property is currently an asset of the receivership estate, subject to the custody, control, and fiduciary duties of the Receiver. The Receiver's suggestion that Lender had to even make a phone call in the first instance to point out life safety issues is beyond inexplicable. Life safety is not an issue over which the Receiver and Lender must haggle. It is of paramount importance to the Court, tenants and the Dallas community.

Furthermore, Lender has no reason to believe the Receiver's contention that a simple phone call is all it would have taken to spur action by this Receiver. Indeed, if the Receiver wants Lender (even informally or by implication) to be responsible for alerting him to issues on the Property, this is but more proof that this Court should cut out the middleman and allow Lender to foreclose.

---

[3] Had the Receiver conducted his own PCA at the outset of this receivership, like most prudential receivers would have done, the Receiver could have tried to argue as such. This is a predicament of the Receiver's own creation. As to the retaining wall, the Receiver claims that Lender should have known about the condition of the wall. First, there is no evidence to establish Lender knew about this wall, much less knowledge based upon a reference to an as is / where is loan sale clause.

Lender should not be required to strike an over-the-phone side deal with the Receiver and be prevented from bringing these important issues before the Court.

The Receiver's fire safety inspections are equally unavailing. Ignoring for a moment that a fire code inspection has absolutely nothing to do with the issues Lender raised in its Motion (exposed wiring, pool retaining wall, etc.), passing an inspection should, in Lender's view, serve as a baseline and is not itself affirmative proof that a property, let alone the Property, is entirely safe. And indeed the Property *was not safe* despite the 2023 and 2024 fire inspections the Receiver relies upon. (Resp., Apdx. Ex. A-4, A-5). The Receiver glibly states that the Property "passed" the inspections. (Resp., p. 4-5). However, a careful look at the reports reveal code violations that were not repaired until the Receiver was notified including a July 2024 report violation that "All extinguishers need to be serviced." (Resp., Apdx. Ex. A-4). How could code-approved fire extinguishers not be available to tenants so far into this receivership? Furthermore, the fact that the code violations Lender detailed in its Motion were not mentioned in the 2023 and 2024 fire department reports does not mean the violations are *not* code violations. (Motion, pp. 9-10). The Receiver asks the Court to disbelieve things that it can see with its own eyes.

## III.   LENDER SHOULD BE ALLOWED TO RETAIN A PCA INSPECTOR, AND THE COURT SHOULD CONSIDER LIFTING THE STAY

Lender should be allowed to retain a PCA inspector, and the Court should consider lifting the stay based on the results of the PCA. Lender submits the following factors warrant this relief: "'(1) whether refusing to lift the stay genuinely preserves the status quo or whether the moving party will suffer substantial injury if not permitted to proceed; (2) the time in the course of the receivership at which the motion for relief from the stay is made; and (3) the merit of the moving party's underlying claim.'" *SEC v. Stanford Int'l Bank Ltd.*, 424 Fed. App'x 338, 341 (5th Cir. 2011) (quoting *SEC v. Wencke*, 742 F.2d 1230, 1231 (9th Cir. 1984)).

With regard to the status quo, the court must "balance the Receiver's interest in maintaining the status quo with any injury the moving party may suffer if the stay remains in place." *Schwartzman v. Rogue Int'l Talent Grp., Inc.*, CIV.A. 12–5255, 2013 WL 460218 (E.D. Pa. Feb. 7, 2013). The risk of injury in declining to grant Lender's requested relief is obvious and detailed extensively herein, both from the tenants' perspective and Lender's perspective.

As to timing, this factor is affected by a variety of considerations, such as the number of entities, complexity of the scheme, and other factors. *U.S. v. JHW Greentree Capital, L.P.*, 12-cv-00116, 2014 WL 2608516, at *7 (D. Conn. 2014) (citing *SEC v. Stanford Int'l Bank*, 424 F. App'x. 338, 341 (5th Cir. 2011)). Indeed, there is no definitive timeframe and the inquiry as to timing is "inherently case-specific." *U.S. v. Acorn Tech. Fund, L.P.*, 429 F.3d 438, 450 (3rd Cir. 2005). Indeed, this jurisdiction lifted the stay after just two years in an SEC receivership. *See S.E.C. v. Provident Royalties, L.L.C.*, 3:09–CV–1238–L, 2011 WL 2678840 (N.D. Tex. July 7, 2011) (timing factor weighed in favor of lifting stay where receivership was almost two years old); *SEC v. Stanford Int'l Bank, Ltd.*, 09-cv-0298-N, 2011 WL 13180449, at *3-4 (N.D. Tex. May 6, 2011) (lifting stay in receivership that was "just over two years old" to allow foreclosure of property), *aff'd*, 465 Fed. Appx. 316 (5th Cir. 2012). The Receiver's timing point utterly misses the mark. Framed another way:  How long must this case be pending before the Court can consider life safety issues? Two and a half years? Five years? Lender submits zero years is the appropriate timeline.

The "merit" factor bears in favor of relief from stay where a party "has colorable claims to assert which justify lifting the receivership stay." *Acorn Tech.*, 429 F.3d at 444. Lender's claims clearly have merit, a fact that the Receiver did not even address in his Response.

Separately, and as addressed in detail in Lender's Motion, life safety issues provide an express exception to the general principles of a stay. *See* Motion, pp. 10-11. The Receiver's

Response ignores this argument, because he has no law to counter it. The *Stanford* factors in no way preempt or supplant the express edict of federal statute 28 U.S.C. § 959. Indeed, a federal equity receivership does not and cannot trump federal statutes including those expressly directed at the duties of a receiver. This includes 28 U.S.C. § 959 which mandates that the Receiver manage and operate the Property in compliance with state law: Receiver "shall manage and operate the property in his possession as such trustee, receiver or manager according to the requirements of the valid laws of the State in which such property is situated, in the same manner that the owner or possessor thereof would be bound to do if in possession thereof." Indeed, when public health and safety requirements compete against federal equity receiverships, such equity receiverships must yield. No general federal equity receivership and no efforts to funnel funds to equity investors at the expense of the life safety and on the backs of tenants should be countenanced. *cf. Saravia v. 1736 18th St., N.W., Ltd. P'ship*, 844 F.2d 823, 827 (D.C. Cir. 1988) ("Nor will the general bankruptcy policy of fostering the rehabilitation of debtors serve to preempt otherwise applicable state laws dealing with public safety and welfare. This, we believe, is the import of 28 U.S.C. § 959(b).").

The Receiver contends he is in compliance with this federal statute. The extensive facts detailed herein evidence the contrary – including the Receiver's limited pictures, the failure to include before and after pictures referenced by the electrician's invoice, the state of the retaining wall and the Receiver's efforts to pass off makeshift caution tape as an acceptable interim remedy, prior code violations involving such basic things as fire extinguishers, the Receiver's failure to retain a reputable property manager even capable of addressing such basic things as meeting with an electrician, and the Receiver's refusal to allow anyone but his own hand-selected inspector who will not "nitpick" the Property. Such non-compliance can and does trump the *Stanford* factors.

## IV.    **THE STAY SHOULD BE IMMEDIATELY LIFTED AS TO BARTON**

The Receiver requests that the automatic stay be left in place at least until Tim Barton's ("Barton") appeal is decided. Lender foresaw the Receiver's argument that the Court should wait for the result of Barton's appeal. The Receiver does not respond to the substance of Lender's argument: that "stay relief is appropriate because pursuit of non-receivership assets do[es] not impact the Receivership Estate." Motion, pp. 7, 12. Barton should not be able to benefit from the stay in this case – using the Receiver Order as both a sword and shield – while he remains free to fight the Receiver tooth and nail. The Receiver has failed to provide any semblance why Barton is deserving of such protection, other than the potential prospect of lift stay motions. How can this unquantifiable statement justify protecting assets that are not even receivership assets under his jurisdiction and purview?  It cannot.

## V.    **THE RECEIVER'S REQUEST FOR LEGAL FEES IS IMPROPER**

While not styled as "sanctions," the Receiver ends his Response with a request for $3,500 in legal fees. This request is a superficial attempt by the Receiver to paint Lender as wasteful and litigious. However, the Receiver's immediate response to the Motion – addressing the very life safety issues Lender raised in its Motion – serves as more than ample basis why this Motion was not wasteful. Furthermore, with regard to the Receiver's argument that Lender shouldn't need to file these motions, Lender completely agrees. In an ideal world, Lender would not spill ink telling a court-appointed receiver to remedy glaring issues with a property he manages. Obviously, we do not live in a perfect world, and the Receiver's self-serving statement that he would remedy any issues if Lender would but pick up the phone is meant to distract from the fact that dangerous conditions did exist and on his watch, potentially for months if not years. If the stay is not lifted and Lender happens to discover other dangerous conditions (assuming the Receiver even allows

Lender access to the Property in the future), should Lender wring its hands and decline to alert the Court for fear of being labeled litigious? Such a dangerous precedent should not be countenanced.

The Receiver utterly omits the standard for sanctions and cites to no law to support his request. That is because the law does not remotely support the Receiver's position. To the extent the Receiver is asking for his fees to be covered for accruing excessive costs arising from unreasonable and vexatious litigation under 28 U.S.C. § 1927, a district court must find that the sanctioned attorney multiplied the proceedings both "unreasonably" and "vexatiously." *FDIC v. Calhoun*, 34 F.3d 1291, 1297 (5th Cir. 1994). This requires "evidence of bad faith, improper motive, or reckless disregard of the duty owed to the court." *Edwards v. Gen. Motors Corp.*, 153 F.3d 242, 246 (5th Cir. 1998). The Receiver has not and cannot show that such bad faith exists, nor is Lender's Motion meritless, particularly as it disclosed to this Court life safety issues. Sanctions under Federal Rule of Civil Procedure 11(c) are equally unavailing as the Receiver is similarly unable to show that Lender's Motion was made for an improper purpose or was frivolous or lacking evidentiary support. *See* Fed. R. Civ. P. 11.

For the reasons stated herein, Lender respectfully requests that its Motion be granted.

Dated: March 30, 2025

Respectfully submitted.

**DENTONS US LLP**
Jill Nicholson
233 S. Wacker Dr., Suite 5900
Chicago, IL 60606
Tel: (312) 876-8000
jill.nicholson@dentons.com
(admitted pro hac vice)
*Attorney for McCormick 101 LLC*

**DENTONS US LLP**
By: */s/ Spencer D. Hamilton*
Spencer D. Hamilton,
State Bar No. 24087656
100 Crescent Court, Suite 900
Dallas, Texas 75201
Tel: (214) 259-0900
spencer.hamilton@dentons.com
*Attorney for McCormick 101 LLC*

**<u>CERTIFICATE OF SERVICE</u>**

I certify that, on March 30, 2025, true and correct copies of the foregoing document was served electronically on all parties registered to receive notice of filings in this case through the Court's CM/ECF PACER system.

<u>*/s/ Spencer D. Hamilton*</u>
Spencer D. Hamilton