# United States Court of Appeals
# for the Fifth Circuit

_____

No. 23-11237
CONSOLIDATED WITH
No. 24-10004

_____

United States Court of Appeals
Fifth Circuit

**FILED**

April 17, 2025

Lyle W. Cayce
Clerk

SECURITIES AND EXCHANGE COMMISSION,

*Plaintiff—Appellee*,

*versus*

TIMOTHY BARTON,

*Defendant—Appellant*.

_____

Appeals from the United States District Court
for the Northern District of Texas
USDC No. 3:22-CV-2118

_____

Before HIGGINBOTHAM and WILLETT, *Circuit Judges*. [*]

DON R. WILLETT, *Circuit Judge*:

This case involves a receivership and preliminary injunction in an ongoing securities enforcement action. Timothy Barton was involved in a scheme to develop underutilized land with assistance from loans given by Chinese nationals. Eventually, the Securities and Exchange Commission and the Department of Justice opened parallel civil and criminal proceedings

_____

[*] These appeals are being decided by a quorum. 28 U.S.C. § 46(d).

against Barton and his associates. As relevant here, the SEC alleged violations of antifraud provisions of the Securities Act, 17 U.S.C. § 77q(a), and the Exchange Act, 15 U.S.C. § 78j(b). In an effort to preserve lenders' assets, the SEC sought a receivership. Barton now appeals various district-court orders imposing and administering a receivership and preliminary injunction freezing Barton's assets (those which were not included in the receivership). He also requests reassignment of the case on remand. As there was no abuse of discretion by the district court, we AFFIRM the imposition and scope of the receivership and the grant of a preliminary injunction. We DISMISS Barton's appeal of certain orders administering the receivership for lack of jurisdiction. And we DENY Barton's request to reassign the case to another district-court judge.

I

In 1990, Timothy Barton founded JMJ Development, an entity focused on developing "underutilized land into single family homes, apartments, and hotels." Since then, Barton and JMJ Development have engaged in "major, revenue-producing projects."

Nearly thirty years later, in 2017, Barton worked with Texas builder Stephen Wall and Chinese businessman Haoqiang Fu to offer investment opportunities to Chinese investors. To implement this scheme, they established a series of special-purpose entities, each responsible for funding the purchase and development of a specific parcel of land. The SEC refers to these as "Wall Entities." And in pitching the project to Chinese nationals, Barton, Fu, and Wall highlighted it as an opportunity for them to "invest to avoid risk" and attain "higher profit[s] than overseas bond investment[.]" Those who participated were promised a high fixed rate of interest—10%—in exchange for their loans.

No. 23-11237
c/w No. 24-10004

The loan agreements indicated that funds would go to the purchase and development of a specified property. But instead, according to the SEC's complaint, Barton spent investor funds on his lavish lifestyle and developments not contemplated in the loan agreements.

Following an investigation, the SEC and Department of Justice opened parallel civil and criminal proceedings against Barton and his associates. Relevant here, the SEC alleged Barton violated the antifraud provisions of the Securities Act and Exchange Act.

Despite these legal proceedings, Barton's spending continued. Remarkably, in the period following the SEC's complaint, Barton spent, at the very least, hundreds of thousands of dollars in traceable investor funds by paying lawyers, moving funds to other entities, making payments on his personal credit card, and spending on "meals, car payments, educational expenses, . . . payments to [his] ex-wife and children, and mortgage payments on the residence [he] lived in." Barton also purchased a private plane.

To curtail this spending of investor funds, the SEC sought to establish a receivership over any company controlled by Barton. The district court granted it, and Barton appealed in 2023. On appeal, our court vacated the receivership order.[1] We found that the district court erred in both determining that the receivership was necessary and determining the scope of the entities covered by the receivership. As to propriety of the receivership, we emphasized that the district court used the wrong standard in determining whether a receivership was warranted. Our court instructed the district court to, on remand, apply the test set forth in *Netsphere, Inc. v. Baron* ("*Netsphere I*").[2] As to the receivership's scope, we determined that

---

[1] *See SEC v. Barton*, 79 F.4th 573, 575 (5th Cir. 2023).

[2] 703 F.3d 296, 305 (5th Cir. 2012)

the receivership swept too broadly and stated that "a receivership's jurisdiction extends only over property subject to the underlying claims[.]"[3] So "the district court abused its discretion by including all Barton-controlled entities in the receivership without first finding that they had received or benefited from the ill-gotten funds."[4]

On remand, the SEC again asked the district court to impose a receivership. Following extensive briefing and evidentiary hearings, the district court granted a new receivership. The district court determined that the receivership was proper under *Netsphere I* and set the scope of the new receivership to include all entities that "received or benefited from assets traceable to Barton's alleged fraudulent activities that are the subject of this litigation." The SEC requested that the receivership cover 82 entities, but the district court ultimately included only 54 of those entities.

After it had established the receivership and appointed a receiver, the district court performed its role in supervising the receivership. It ratified certain actions taken in the course of the prior receivership. And it later approved the sale of certain properties held by the receivership. Additionally, the district court issued a preliminary injunction freezing the assets of Barton-controlled entities outside the receivership.

Barton again appeals. In this second appeal, Barton challenges the district court's jurisdiction to appoint the receiver, its decision to appoint the receiver, the scope of the receivership, the district court's administration of the receivership, and the preliminary injunction. And he asks us to, on remand, reassign the case to a different district-court judge.

---

[3] *Barton*, 78 F.4th at 580.

[4] *Id.* (citation omitted).

No. 23-11237
c/w No. 24-10004

II

Because jurisdiction is a threshold matter, we address it first.[5] Barton claims that the district court failed to determine whether the loan agreements qualified as "securities[.]" In Barton's view, such an error is relevant to both "whether the Commission had the power to bring this case and whether the District Court had the power to hear it." He relies on two out-of-circuit cases to suggest that "[i]f the transaction does not involve a 'security' the court lacks subject matter jurisdiction."[6]

Barton is correct that "if the [loan agreements] are not securities, there is not only no federal jurisdiction to hear the case but also no federal cause of action on the stated facts."[7] However, "[a]lthough the district court did not expressly address" whether the loan agreements are securities, "a finding that it had subject matter jurisdiction is implicit" in its imposition of a receivership and grant of a preliminary injunction.[8] And moreover, it

_____

[5] *See United States v. Shkambi*, 993 F.3d 388, 389 (5th Cir. 2021).

[6] *Mishkin v. Peat, Marwick, Mitchell & Co.*, 744 F. Supp. 531, 553 (S.D.N.Y. 1990); *see also GBJ Corp. v. Sequa Corp.*, 804 F. Supp. 564, 565 (S.D.N.Y. 1992).

[7] *Williamson v. Tucker*, 645 F.2d 404, 416 (5th Cir. 1981); *see also United Hous. Found., Inc. v. Forman*, 421 U.S. 837, 859 (1975) (holding the court had no federal jurisdiction at when so-called "stock" did not qualify as "securities" under federal securities laws).

[8] *Passmore v. Baylor Health Care Sys.*, 823 F.3d 292, 295–96 (5th Cir. 2016) ("Although the district court did not expressly address this issue, a finding that it had subject matter jurisdiction is implicit in its dismissal of the Passmores' suit based on Texas law. *See Cadle Co. v. Neubauer*, 562 F.3d 369, 371 (5th Cir. 2009) (district court's denial of motions to vacate was implicit finding of subject matter jurisdiction)."); *see also Blanchard 1986 Ltd. v. Park Plantation LLC*, No. CV 04-1864, 2007 WL 2381268, at *6 (W.D. La. July 30, 2007) ("In *Royal*, the court issued a final judgment on the merits of the case without discussing jurisdictional-related issues. Implicit in that court's judgment, therefore, was a finding that the court had subject matter jurisdiction." (citing *Royal Insurance Co. of America v. Quinn–L Capital Corp.*, 960 F.2d 1286 (5th Cir. 1992))), *report and*

No. 23-11237
c/w No. 24-10004

expressly stated it had subject matter jurisdiction in the initial appointment of a receiver—after the SEC argued in its motion that the loan agreements were securities.

Even if the district court erred by failing to explicitly address whether the loan agreements were securities prior to imposing the receivership, any error was harmless. The district court later answered the very question Barton contests, when granting the preliminary injunction: "[T]he Court finds, by a preponderance of the evidence, that the loan agreements are securities because they are investment contracts and notes[.]"

We agree. A preponderance of the evidence shows that the loan agreements are investment contracts, regardless of whether they are notes, thus establishing subject matter jurisdiction.[9]

By its terms, 15 U.S.C. § 78c(a)(10) defines securities to include investment contracts, among other instruments. "[T]he essential ingredients of an investment contract[,]" as the Supreme Court instructed in *SEC v.*

---

*recommendation adopted sub nom. Blanchard 1986 Ltd. v. Park Plantation, LLC*, No. CV 04-1864, 2007 WL 9813122 (W.D. La. Aug. 17, 2007), *aff'd sub nom. Blanchard 1986, Ltd. v. Park Plantation, LLC*, 553 F.3d 405 (5th Cir. 2008).

[9] *See Reule v. Jackson*, 114 F.4th 360, 365 (5th Cir. 2024) (requiring a preponderance of the evidence to establish that the court has subject matter jurisdiction); *see also id.* ("The issue of subject matter jurisdiction cannot be waived, and federal courts are duty-bound to examine the basis of subject matter jurisdiction at all stages in the proceedings and dismiss if jurisdiction is lacking." (internal quotation marks and citations omitted)); *Sentry Ins. v. Morgan*, 101 F.4th 396, 398 (5th Cir. 2024) ("As the party invoking federal jurisdiction, [plaintiff] has 'the burden of proving subject matter jurisdiction by a preponderance of the evidence.'" (citation omitted)). Even if the district court did *not* consider this issue—though we find it did—we may still consider it. *See Masel v. Villarreal*, 924 F.3d 734, 743 (5th Cir. 2019), *as revised* (June 6, 2019) ("Before proceeding to the merits of plaintiffs' securities-fraud claims, we must first address the threshold question—not considered by the district court—whether plaintiffs have successfully pleaded the existence of a security.").

No. 23-11237
c/w No. 24-10004

*W.J. Howey Co.*, include: (1) "an investment of money"; (2) "in a common enterprise"; (3) with an expectation of profits; and (4) those profits are generated "solely from the efforts of others."[10]

First, the loan agreements involved an investment of money: The Chinese national investors invested money by loaning it to the Wall entities in exchange for the promise of greater returns. Barton argues that nothing was "purchased or otherwise acquired in exchange for value" because the "money was simply loaned and for the primary purpose of providing the Chinese national lenders an excuse to move money to the United States." But Barton's own promotional materials contradict such a purpose. In promoting the business venture, he described the opportunities as "overseas real estate investment[s]" that promised "higher profit[s] than overseas bond investment[.]" And the loan agreements themselves promised a return of 10% in interest on the initial loan.

Second, the Chinese nationals' "loans" were given, via loan agreement, to a "common enterprise." We apply "so-called broad vertical commonality, under which a common enterprise exists when 'the fortuity of the investments collectively is essentially dependent upon promoter expertise.'"[11] In other words, all we require for commonality is that the investors collectively rely on the promoter's expertise.[12] Here, the lenders' fortunes collectively depend on Barton's (the promoter's) expertise in developing the relevant properties and repaying the loans, with interest.

---

[10] 328 U.S. 293, 301 (1946).

[11] *Matter of Living Benefits Asset Mgmt., L.L.C.*, 916 F.3d 528, 536 (5th Cir. 2019) (quoting *SEC v. Cont'l Commodities Corp.*, 497 F.2d 516, 522 (5th Cir. 1974)).

[12] *See id.* (quoting *Long v. Shultz Cattle Co.*, 881 F.2d 129, 140–41 (5th Cir. 1989)).

No. 23-11237
c/w No. 24-10004

Barton contends the lenders' fortunes are not linked to Barton's expertise because the loan agreements contemplate pre-determined repayment no matter how the Wall Entities performed. But "an investment scheme promising a fixed rate of return can be an 'investment contract' and thus a 'security' subject to the federal securities laws."[13] In assessing the loan agreements, we look to the "economic reality" of the transaction.[14] And the "economic reality" of the loan agreements show that the lenders' returns depended on Barton's expertise in developing property, avoiding default, and repaying the loans.

Third, the lenders expected profits. Under our "broad vertical commonality approach, 'the second and third prongs of the *Howey* test may in some cases overlap to a significant degree.'"[15] That's the case here. The lenders relied on Barton's expertise (the second prong) *to obtain profits* (the third prong). And Barton's promotional materials promised the lenders that exact outcome—the opportunity to make profits.

Finally, the lenders' profits were wholly dependent on the efforts of others—Barton and Wall. Generally, we inquire into "whether the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise."[16] Here, the lenders' profits depend on more than just Barton's and Wall's "undeniably significant" efforts, going beyond what we have historically required. The profits here are inextricably and entirely dependent on Barton's and Wall's work developing and managing the properties.

_____

[13] *SEC v. Edwards*, 540 U.S. 389, 397 (2004).

[14] *Howey*, 238 U.S. at 298.

[15] *Living Benefits Asset Mgmt.*, 916 F.3d at 536 (quoting *Long*, 821 F.2d at 141).

[16] *SEC v. Koscot Interplanetary, Inc.*, 497 F.2d 473, 483 (5th Cir. 1974) (cleaned up).

8

No. 23-11237
c/w No. 24-10004

Accordingly, the loan agreements qualify as investment contracts, and thus as securities—so we need not assess whether they also qualify as notes. And as a result, the district court correctly found it had subject-matter jurisdiction.

## III

As the district court had jurisdiction, we now turn to the heart of Barton's appeal: the imposition of a receivership. Barton argues that the district court abused its discretion by again granting a receivership. Not so.

We have jurisdiction over the imposition of the receivership pursuant to 28 U.S.C. § 1292(a)(2), which grants jurisdiction for "interlocutory orders appointing receivers[.]"[17] We review the imposition of a receivership for abuse of discretion.[18]

Federal Rule of Civil Procedure 66 permits "anyone showing an interest in certain property or a relation to the party in control or ownership thereof such as to justify conservation of the property by a court officer" to seek appointment of a receiver.[19] "Correspondingly, a district court has authority to place into receivership assets in litigation 'to preserve and protect the property pending its final disposition.'"[20]

---

[17] 28 U.S.C. § 1292(a)(2) ("[T]he courts of appeals shall have jurisdiction of appeals from: . . . *[i]nterlocutory orders appointing receivers*, or refusing orders to wind up receiverships or to take steps to accomplish the purposes thereof, such as directing sales or other disposals of property[.]" (emphasis added)).

[18] *See, e.g.*, *Barton*, 79 F.4th at 577; *SEC v. Spence & Green Chem. Co.*, 612 F.2d 896, 904 (5th Cir. 1980).

[19] *Netsphere I*, 703 F.3d at 305 (quotation marks and citation omitted).

[20] *Id.* (citing *Gordon v. Washington*, 295 U.S. 30, 37 (1935)).

No. 23-11237
c/w No. 24-10004

As we previously instructed,[21] the district court applied *Netsphere I*, and in doing so, it determined that a receivership was necessary. Under *Netsphere I*, a receivership is appropriate where there's "1) a clear necessity to protect the defrauded investors' interest in property, 2) legal and less drastic equitable remedies are inadequate, and 3) the benefits of receivership outweigh the burdens on the affected parties."[22] Contrary to Barton's arguments, the district court did not abuse its discretion because these factors weigh in favor of the SEC.

A

First, the receivership is "clear[ly] necess[ary] to protect a party's interest in property[.]"[23] The investors' property interests face numerous threats—from Barton, market conditions, and third-party actions.

Without a receivership, Barton's actions threaten to further dissipate the investment assets. Recall that Barton continued his spending spree even after he had been indicted. And accordingly, there is no indication that he has been deterred from his conduct.

Furthermore, the value of the assets will decline if they are not well managed. Indeed, as the district court recognized, "[a] number of the properties require active management, including an operating hotel, apartment complexes, and properties in development." Without such management, investors' assets—and the ability to gain interest as well—will deteriorate. A receivership provides a mechanism to actively manage the property without Barton at the helm.

---

[21] *See Barton*, 79 F.4th 573.

[22] *Id.* at 578–79 (citing *Netsphere I*, 703 F.3d at 305).

[23] *Id.* at 578; *Netsphere I*, 703 F.3d at 305.

No. 23-11237
c/w No. 24-10004

Additionally, the receivership is necessary because it protects investor assets from third-party actions. The district court noted that the assets included in the receivership are "mired in liens, lawsuits, and foreclosures that threaten to further diminish the value of the assets." And "[e]very piece of real property but one in the initial receivership is encumbered by debt[.]" A receivership allows the court to issue a parallel stay of litigation and foreclosure while the receiver works "to mollify secured creditors' concerns." Without such a stay, "foreclosures would have eliminated millions of dollars in property value" from the assets in the receivership. Therefore, the receivership was necessary to protect investor's property interests from creditors.

Barton argues for a standard outside the confines of *Netsphere I*, requesting that we require "a significant and imminent risk of asset flight that cannot be controlled by other means[,]" such as "where liquid assets are at high risk of being transferred outside the court's jurisdiction." But *Netsphere I* only suggested a receivership may be justified "to prevent the threatened diversion of assets through fraud or mismanagement[,]" "to prevent the corporation from dissipating corporate assets[,]" and "to pay defrauded investors"[24]—not the higher standard that Barton now requests. Barton fails to show why we should hold real-property receiverships to a different standard than those for liquid assets; indeed, his reliance on the Stanford securities fraud litigation[25] is misplaced, given that it, like Barton's, included real property.[26] And regardless, the district court aptly "held that there

_____

[24] *Netsphere I*, 703 F.3d at 306.

[25] *SEC v. Stanford Int'l Bank, Ltd.*, 927 F.3d 830, 836 (5th Cir. 2019).

[26] *See* Order Approving Procedures for Sales of Real Property by the Receiver, *SEC v. Stanford Int'l Bank, Ltd.*, No. 3:09-cv-298 (N.D. Tex. Jan. 25, 2010), ECF No. 979.

No. 23-11237
c/w No. 24-10004

was . . . asset flight" based on Barton's spending of investor funds after the SEC filed its civil enforcement action.

B

Second, any "less drastic remedies" would be inadequate. Barton's proposed alternative arrangements all involve Barton exerting some degree of control over investor assets—which increases the risk of asset dissipation.[27]

Barton proffered an alternative arrangement consisting of a monitorship paired with a temporary injunction freezing asset transfer. The district court rejected both monitorships and asset freezes. It found monitorships unsuitable because such an arrangement would still allow Barton too much control over the relevant assets and would not provide a method to stay litigation. And it rejected asset freezes because the assets required dynamic management due to operational requirements and potential exposure to liability or waste.

But while the district court considered each potential remedy in isolation, it did not consider them as a combination. Barton proposes a hybrid monitorship-injunction that would "prohibit certain categories of transactions without appropriate approvals, including selling or incumbering any asset, taking out a loan, and making an expenditure over a certain threshold."

Barton's authorities in support of this hybrid monitorship-injunction miss the mark. For example, he cites a monitorship order seemingly without

---

[27] Barton also advocates for a standard "closely akin to the strict scrutiny standard applied against restrictions of fundamental constitutional rights." But Barton identifies no authority for such a standard, so we proceed by applying *Netsphere I*.

No. 23-11237
c/w No. 24-10004

any explicit power to enjoin or approve certain transactions.[28] Even if monitorships *with* power to enjoin or approve transactions exist,[29] such an arrangement is not preferable to a receivership in this case. The district court made a strong showing that keeping Barton in charge comes with an unacceptably high risk of further asset dissipation. Moreover, Barton has been held in contempt for violating certain requirements in place under the previous receivership order. Barton has made no showing that a monitorship would police his conduct any more effectively than a contempt order. And the district court was correct that "[s]uch a gamble of a remedy is insufficient to protect investors' interests."

In sum, a receivership is the only appropriate remedy because no other remedy insulates the investor assets from Barton while also allowing for a litigation stay and active management.

C

Finally, the benefits of a receivership—evidenced by the two prior factors discussed—outweigh its burdens. If there's no receivership, creditors will chip away at the assets, assets requiring active management will fall into disrepair or disuse, and Barton may further dissipate investor assets—as he has done already. Without the receivership, the foreclosures alone would cost, as the receiver and district court noted, millions of dollars that would be "otherwise available for satisfaction of Investor claims." These costs would

---

[28] *See In re American Registrar & Transfer Co.*, Exchange Act Release No. 77,922, at 8 (May 25, 2016) (monitor shall "conduct a comprehensive review . . . and recommend corrective measures"), https://www.sec.gov/files/litigation/admin/2016/33-10082.pdf.

[29] *See, e.g.*, *SEC v. GPB Capital Holdings, LLC*, No. 23-8010-CV, 2024 WL 4945247, at *1 (2d Cir. Dec. 3, 2024) (discussing order affirming "monitor's 'authority to approve or disapprove of'" certain corporate decisions).

severely limit recovery for the defrauded investors in the future. In short, a benefit of the receivership is that it virtually eliminates all of these risks.

Barton contends that this receivership is without benefit due the appointed receiver's alleged incompetence. But such a claim overlooks the significant benefits a receivership offers, as noted above. It also ignores the receiver's experience in managing disputes and consultation with other professionals, which are highly relevant—and helpful—in navigating the myriad issues plaguing receivership property. The only real burdens of the receivership fall upon Barton—and we recognize that difficulty. While the district court considered these burdens, it soundly exercised its discretion to conclude that the above benefits to the defrauded investors outweigh the burdens on Barton.

Accordingly, the district court, after assessing the *Netsphere I* factors, did not abuse its discretion in imposing the receivership.

## IV

We next turn to the scope of the receivership, which is within this court's jurisdiction over interlocutory appeals from orders imposing receiverships.[30] Barton contends that the district court included property which is not the subject matter of the litigation. We disagree.

"[A] court's equitable powers do not extend to property unrelated to the underlying litigation[.]"[31] So the equitable remedy of a receivership cannot cover "property that is not the subject of an underlying claim or controversy."[32] Applying this principle, we previously instructed the district

---

[30] *Cf. Barton*, 79 F.4th at 577, 580–81; 28 U.S.C. § 1292(a)(2).

[31] *Netsphere I*, 703 F.3d at 310.

[32] *Id.*

No. 23-11237
c/w No. 24-10004

court that any possible receivership "can only extend over entities that *received or benefited from* assets traceable to Barton's alleged fraudulent activities that are the subject of this litigation."[33] And that's exactly the scope of the receivership at issue here.

Barton argues the district court committed eight legal errors regarding the scope of the receivership, including:

1. "[D]etermining that it was sufficient that a company [benefited] from lender funds to seize it";
2. "[D]etermining that receipt of a small amount of lender funds was sufficient to seize a whole company";
3. "[H]olding that, once a company received some assets traced to lender funds, everything that company spent thereafter was lender funds";
4. "[F]inding that temporary receipt of alleged lender funds sufficed to seize an entire company and all its assets";
5. "[N]ot demanding that the Commission use the Wall and other entities' accounting records, which documented the sources and uses of the lender funds";
6. "[N]ot requiring competent expert testimony on the apparently complex accounting issue of tracing lender funds through multiple business entities";
7. "[A]ccepting purported tracing evidence from the receiver, whose appointment and seizure of records was illegal"; and
8. "[N]ot exercis[ing] any discretion over what assets should be included in the receivership."

---

[33] *Barton*, 79 F.4th at 580–81 (emphasis added).

No. 23-11237
c/w No. 24-10004

In practice, these supposed "errors" boil down to three arguments: The district court included entities who did not receive or benefit *enough* from lender funds; failed to require proper tracing evidence; and finally, did not exercise discretion.

A

Start with the first category—whether the included entities received or benefited *enough* from lender funds. The district court followed the rule we previously articulated: "Should the district court decide that a new receivership is justified on remand, *it can only extend over entities that received or [benefited] from assets traceable to Barton's alleged fraudulent activities that are the subject of this litigation*."[34] Nothing in this rule sets a proportionality limitation or requires that the receipt of lender funds be permanent. Indeed, if the rule did so, it would encourage rapid reshuffling of assets—the very problem which has confounded tracing efforts so far in this case, let alone those to come. Accordingly, the district court did not abuse its discretion in following a rule our court already set, and we do not change that rule now, following the rule of orderliness.[35]

More tellingly, the received-or-benefited-from rule is the rule Barton himself requested in the initial district court proceedings and appeal.[36] Barton cannot have a second bite at the apple to change the standard after

———————————————

[34] *Id.* (emphasis added).

[35] *See Jacobs v. Nat'l Drug Intelligence Ctr.*, 548 F.3d 375, 378 (5th Cir. 2008) ("It is a well-settled Fifth Circuit rule of orderliness that one panel of our court may not overturn another panel's decision, absent an intervening change in the law, such as by a statutory amendment, or the Supreme Court, or our *en banc* court.").

[36] *See Barton*, 79 F.4th at 580 ("Barton . . . argues that the district court erred by placing multiple entities he controls in the receivership without any showing that they received or [benefited] from ill-gotten investor funds.").

16

No. 23-11237
c/w No. 24-10004

*winning* his first appeal (and getting the standard which he requested), even if the rule he requested isn't quite as beneficial as he'd originally thought.

Perhaps most importantly, the alternative rule that Barton now seeks—that a particular entity *sufficiently* receives or benefits from lender funds—is unworkable. Counsel at oral argument seemed to recognize as much. When asked how much an entity would need to receive or benefit from lender funds to be properly included in a receivership, counsel only stated that entities would need to possess "substantial amounts of lender funds," otherwise lesser measures should be used. According to Barton, "in this context, with real estate assets," there are lesser measures to preserve "the quantum"—"less than half of the company's funds"—through less drastic measures of liens or injunctions. But that is both unworkable and inconsistent with the rule Barton sought in his initial appeal.

The district court limited asset seizures that are attenuated from the litigation. Specifically, the district court declined to extend the benefits analysis up the chain of ownership, which kept certain assets outside of the receivership. And for assets where an asset freeze was enough to "offer the needed protection to investors[,]" the district court also refused to extend the receivership.

B

Next, take the second category of errors—whether the district court required proper tracing evidence.

To begin, trial courts have "wide latitude" in deciding the admissibility of lay or expert testimony.[37] Barton argues the district court

---

[37] *Williams v. Manitowoc Cranes, L.L.C.*, 898 F.3d 607, 625 (5th Cir. 2018); *see United States v. Davis*, 53 F.4th 833, 848–49 (5th Cir. 2022).

No. 23-11237
c/w No. 24-10004

abused its discretion by not requiring expert testimony in tracing funds because the analysis in this case was more than "basic math[.]" Additionally, Barton emphasizes that the SEC's staff accountant (who is not a certified public accountant) could not admit to any methodology for distinguishing funds in JMJ accounts received from sources other than investor funds.

Contrary to Barton's argument, the SEC's offered testimony and tracing evidence was sufficient. Indeed, the SEC relied on actual evidence—specific examples from financial records—of funds or benefits flowing from the investors to the benefitting entities—not just expenditures from entities that received investor funds. And the SEC did so because the accounting records of the Wall and other entities were insufficient to trace the relevant funds—never mind that Barton refused to provide many of the records he faults the SEC for not using.

As the SEC accountant testified, the SEC's method was to "take the bank records, identify investor deposits and then trace those investor funds through the bank accounts to see how they were used." That does not require expert testimony.[38] Even Barton's expert testified that specialized tracing methodology is not required for actual tracing. And even more tellingly, Barton's expert did not perform his own tracing analysis or otherwise opine that even a *single entity* placed in the receivership had not received or benefited from investor funds.

---

[38] *See, e.g.*, *Davis*, 53 F.4th at 848–49 (holding forensic accountant's tracing analysis was admissible, nonexpert testimony which "relied on basic math" to trace the flow of funds from bank records).

No. 23-11237
c/w No. 24-10004

Additionally, courts in this circuit routinely allow testimony from the receiver.[39] And the receiver's testimony—which Barton argues should not have been admitted—was especially useful here because the receiver was tasked with tracing funds under the first receivership order.

The district court committed no abuse of discretion in its admission and assessment of the tracing evidence.

C

Finally, look at the district court's use of discretion. The district court's "marching order[]"—which Barton argues showed a *lack* of discretion—was merely a legal rule to determine what types of property or assets over which a receivership *may* extend. As such, our court's standard was a ceiling for the receivership, not a floor. And the district court properly applied the received-or-benefited-from rule as a floor: *Using its discretion*, it only included 54 of the 82 entities the SEC sought the receivership to cover. For instance, the exclusion of certain entities that owned (or were higher in the ownership chain above) entities that benefited from the investor funds demonstrates that the district court's application of the received-or-benefited-from principle was anything but mechanical. And, again *using its discretion*, the district court froze other assets via preliminary injunction, rather than placing them in the receivership.

---

[39] *See, e.g., Taylor v. U.S. Bank Nat. Ass'n*, No. H–12–3550, 2015 WL 507526, at *14 (S.D. Tex. Feb. 6, 2015) ("The court finds that the advocate-witness rule is not applicable because the receiver is not serving as the attorney for the receivership."); *cf. Janvey v. Romero*, 817 F.3d 184, 190 (5th Cir. 2016) (discussing receiver testimony); *In re Ondova Ltd. Co.*, No. 09-34784-SGJ-11, 2012 WL 5879147, at *8 (Bankr. N.D. Tex. Nov. 21, 2012) (similar).

No. 23-11237
c/w No. 24-10004

D

Barton draws attention to "several significant entities" that, in his view, erroneously fell within the scope of the receivership due to a combination of these supposed "errors." These include companies which owned four apartment complexes, FHC Acquisitions LLC (which was allegedly "funded through identified third parties unrelated to the Chinese-national lenders at issue in this case"), companies which JMJ Development had ownership claims to, and "the Defendant's only home, which was held by an LLC[.]" For each of these entities, Barton re-emphasizes some subset of the errors described above.

Though these examples are illustrative of Barton's arguments, none change the outcome. Indeed, none of the supposed "errors" Barton asserts rise to the level of an abuse of discretion. Accordingly, we affirm the orders related to the scope of the receivership.

V

Next, we turn to Barton's challenges to the district court's administration of the receivership. Specifically, Barton contends the district court erred when it ratified actions taken during the prior receivership, approved appraisals, and confirmed the sale of assets from the receivership estate. But we only have jurisdiction to review the orders approving sales of property, thanks to a "wrinkle" in our precedent.[40] And we hold that the district court did not abuse its discretion in confirming those sales.

---

[40] *Netsphere, Inc. v. Baron ("Netsphere II")*, 799 F.3d 327, 333 (5th Cir. 2015); *see United States v. "A" Manufacturing Co., Inc.*, 541 F.2d 504, 506 (5th Cir. 1976) (relying mainly on cases interpreting the final-judgment doctrine); *SEC v. Janvey*, 404 F. App'x 912, 914 (5th Cir. 2010).

No. 23-11237
c/w No. 24-10004

A

The text of 28 U.S.C. § 1292(a)(2) precludes our jurisdiction to review receivership orders: "[T]he courts of appeals shall have jurisdiction of appeals from: . . . [i]nterlocutory orders appointing receivers, or refusing orders to wind up receiverships or to take steps to accomplish the purposes thereof, such as directing sales or other disposals of property[.]"

In *Netsphere II*, we held that § 1292(a)(2) permits interlocutory appeals only for "orders appointing receivers" or orders "refusing . . . to take steps to accomplish the purposes of [winding up receiverships]."[41] To reach that conclusion, we looked at the text and structure of § 1292(a)(2). We "interpret[ed] the verb phrase 'refusing orders' to modify both the infinitive phrase 'to wind up receiverships' and the infinitive phrase 'to take steps to accomplish.' The parallel structure of both infinitive phrases suggest that is a reasonable outcome."[42] We also recognized that "every circuit to squarely consider this question has reached the same result."[43] And, most importantly, such a conclusion relied on our circuit's prior caselaw applying this statute,[44] in cases such as *Belleair Hotel Co. v. Mabry*[45] and *Wark v. Spinuzzi*.[46] Where a district court had "not refused an order to wind up the

_____

[41] *Netsphere II*, 799 F.3d at 331–34.

[42] *Id.* at 332 (cleaned up).

[43] *Id.*

[44] *See id.*

[45] 109 F.2d 390 (5th Cir. 1940).

[46] 376 F.2d 827 (5th Cir. 1967) (per curiam).

No. 23-11237
c/w No. 24-10004

receivership or to take appropriate steps to that end[,]" we did not have jurisdiction.[47]

The receivership orders Barton appeals are not "orders appointing receivers" or a district court's "*refus[al] . . .* to wind up receiverships or to take steps to accomplish the purpose" of winding up the receivership.[48] Nevertheless, Barton argues we have jurisdiction under *United States v. "A" Manufacturing Co., Inc.*, which found jurisdiction under § 1292(a)(2) for an interlocutory appeal of an order confirming a sale of property.[49] But that court—decades after *Belleair Hotel Co.* and *Wark*—based its conclusion on three cases untethered to § 1292(a)(2): a case "taken from a final decree and not from an interlocutory order[;]"[50] an out-of-circuit case concerning sale of property by a receiver without reference to the then-existing interlocutory appeal statute (which is similar to today's § 1292(a)(2));[51] and a case which "[wa]s final, so far as title under the sale is concerned" and which found

---

[47] *Belleair Hotel Co.*, 109 F.2d at 390–91 ("[S]ection 129 of the Judicial Code, as amended, 28 U.S.C.A. §§ 225, 227"—a precursor to § 1292(a)(2) with nearly identical phrasing—"makes provision for appeals from interlocutory orders refusing to take appropriate steps to wind up a pending receivership, such as directing a sale or other disposal of the property, but we have no such order before us. In this case, the court has not refused an order to wind up the receivership or to take appropriate steps to that end."); *see also Wark*, 376 F.2d at 827 ("Under 28 U.S.C.A. 1292(2) 'interlocutory orders appointing receivers or refusing orders to wind up receiverships or to take steps to accomplish the purposes thereof, such as directing sales or other disposals of [property]' are appealable. This is not such an order nor is it a final decision . . . The appeal is therefore [d]ismissed.").

[48] 28 U.S.C. § 1292(a)(2) (emphasis added); *see Netsphere II*, 799 F.3d at 331.

[49] 541 F.2d 504, 506 (5th Cir. 1976).

[50] *Id.* at 506 (citing *First Nat'l Bank v. Shedd*, 121 U.S. 74, 85 (1887)).

[51] *New York v. Kilsheimer*, 251 F.2d 175, 176 (2d Cir. 1957). *Kilsheimer* followed *Belleair* by almost twenty years, but *Kilsheimer* didn't cite to the jurisdictional statute relied upon by the court in *Belleair Hotel Co.*—nor could it. *See Belleair Hotel Co.*, 109 F.2d at 390–91. *Belleair Hotel Co.* precluded the availability of that statutory basis for interlocutory appeal for *Kilsheimer*'s set of facts. *See id.*

No. 23-11237
c/w No. 24-10004

"[w]e have often decided that a decree confirming a sale, if it is final, may be appealed from."[52] *"A" Manufacturing*, standing alone, would ordinarily give us jurisdiction to at least review the sale orders.

But the rule of orderliness prohibits such a conclusion now. *"A" Manufacturing*'s conclusion—that appellate courts have jurisdiction under § 1292(a)(2) for interlocutory appeals of property-sale orders—conflicts with that of the earlier courts in *Belleair Hotel Co.* and *Wark*—that "interlocutory orders which do not refuse orders to wind-down a receivership are not reviewable[.]"[53] Accordingly, the rule of orderliness mandates that we follow the earlier reading of the statute[54]—the *Belleair Hotel Co.-Wark* approach—which does not permit interlocutory appeals for these types of administrative receivership orders and which *Netsphere II* faithfully applied.

Even though § 1292(a)(2) does not grant us jurisdiction for the *administrative* orders in this case, the collateral-order doctrine does grant us jurisdiction to review the *sales* orders.

We have previously found a district court's approval of a receiver's distribution plan was within the collateral-order doctrine (without discussing any statutory basis for jurisdiction), and thus, we had jurisdiction.[55] Our

---

[52] *"A" Manufacturing*, 541 F.2d at 506 (quoting *Sage v. Cent. R. Co. of Iowa*, 96 U.S. 712, 714 (1877)).

[53] *Netsphere II*, 799 F.3d at 334 (first citing *Belleair*, 109 F.2d at 390–91; then citing *Wark*, 376 F.2d at 827 (5th Cir. 1967)). The fact that *Belleair Hotel Co* and *Wark* involved a lease of property and turnover of bonds to the receiver, respectively, are of no consequence. The central conclusions about the statutory basis for jurisdiction over interlocutory orders are in direct conflict with *"A" Manufacturing*. *See id.*

[54] *See Rios v. City of Del Rio*, 444 F.3d 417, 425 n.8 (5th Cir. 2006).

[55] *See SEC v. Forex Asset Mgmt. LLC*, 242 F.3d 325, 330–31 (5th Cir. 2001).

23

No. 23-11237
c/w No. 24-10004

reasoning reflected the finality of the manner in which the assets would be distributed and the actual distribution of those assets, thus making the assets "likely unrecoverable" and the order "effectively unreviewable."[56]

That same reasoning applies with equal force to reviewing property sales—in other words, we can review "likely unrecoverable" assets and "effectively unreviewable" orders—but nothing more. This conclusion aligns with *"A" Manufacturing*'s reasoning (aside from its incorrect reading of § 1292(a)(2)) based on the finality of property sales. Accordingly, our jurisdiction over interlocutory appeals of receivership orders is limited to those related to sales or distributions under the collateral-order doctrine.

In sum, we have jurisdiction to review the district court's orders approving property sales, but we do not have jurisdiction to review the orders refusing the use of receivership funds for defense costs and blessing certain actions of the earlier (vacated) receivership. As for the latter category, the district court only ratified orders that approved the receiver's settlement of claims (none of which were sale orders).[57]

B

Having established that we have jurisdiction to review *only* the orders approving sales of assets in the receivership, we turn to the merits of those orders. "It is a recognized principle of law that the district court has broad powers and wide discretion to determine the appropriate relief in an equity

_____

[56] *Id.* at 330.

[57] *See Netsphere II*, 799 F.3d at 332 (summarizing Fifth and sister circuits' refusal of jurisdiction for "orders directing the payment of monies or the transfer of property to receivers and their professionals" and "other orders issued in the course of a receivership, such as authorizing the execution of a lease by a receiver").

24

receivership."[58] The district court acted within its discretion to approve the sales of certain assets from the receivership. The district court only approved the sales after determining that it was in the best interests of the receivership estate and otherwise complied with the law. Indeed, the district court considered changes in market conditions and all statutory requirements before determining the sales were in the best interest of the receivership estate and approving the sales. And as the SEC notes, evidence showed market conditions had deteriorated since the prior approvals of the sales, which reinforced that sales would be better than allowing the property value to decrease. Accordingly, the district court did not abuse its discretion when it approved certain sales of assets from the receivership estate.

## VI

Next, we turn to the preliminary injunction, which froze the assets which the district court did not include in the receivership. We have appellate jurisdiction over the preliminary injunction freezing Barton's assets pursuant to 28 U.S.C. § 1292(a)(1). We review the issuance of a preliminary injunction for abuse of discretion.[59] And we review any findings of fact for clear error and conclusions of law *de novo*.[60]

Barton argues that the district court "misinterpreted and misapplied the legal standard" in granting the injunction. But Barton is incorrect.

_____

[58] *SEC v. Safety Fin. Serv., Inc.*, 674 F.2d 368, 372–73 (5th Cir. 1982) (internal quotation marks and citation omitted).

[59] *See Perez v. City of San Antonio*, 98 F.4th 586, 594 (5th Cir. 2024).

[60] *See id.*

No. 23-11237
c/w No. 24-10004

A

In *Starbucks Corp. v. McKinney*, the Supreme Court required that
"absent a clear command from Congress, courts must adhere to the
traditional four-factor [*Winter v. Natural Resources Defense Council, Inc.*]
test."[61] Admittedly, the district court focused its analysis on the then-
prevailing test from *SEC v. First Financial Group of Texas*.[62] That test was a
Commission-specific test to obtain a preliminary injunction and required "a
proper showing . . . by the SEC that there is a reasonable likelihood that the
defendant is engaged or about to engage in practices that violate the federal
securities laws."[63]

Contrary to Barton's argument, however, the district court *did*
address the traditional *Winter* four-factor test for injunctions, albeit in a
footnote. The Supreme Court has not mandated that such analysis is in the
body of the opinion versus a footnote—only that the analysis is completed.[64]
Accordingly, the district court did not err.

Additionally, the district court did not abuse its discretion when it
imposed a preliminary injunction based on the traditional four factors. Under
that test, a plaintiff seeking a preliminary injunction must make a clear
showing that he is "likely to succeed on the merits," "likely to suffer
irreparable harm in the absence of preliminary relief," "that the balance of
equities tips in his favor," and that "an injunction is in the public interest."[65]

_____

[61] 602 U.S. 339, 346 (2024) (discussing *Winter v. Nat. Resources Def. Council, Inc.*,
555 U.S. 7, 20, 22 (2008)).

[62] *See* 645 F.2d 429, 434 (5th Cir. 1981).

[63] *Id.* (cleaned up).

[64] *See, e.g.*, *Starbucks*, 602 U.S. at 346; *Winter*, 555 U.S. at 20, 22.

[65] *Starbucks*, 602 U.S. at 345–46 (quoting *Winter*, 555 U.S. at 20, 22).

No. 23-11237
c/w No. 24-10004

First, the SEC has sufficiently shown a substantial likelihood of success on the merits.[66] To establish a violation of the specified securities laws, the SEC must prove by a preponderance of the evidence that in connection with the purchase, offer, or sale of any security, Barton made a material misrepresentation or omission of material fact with the requisite mental state.[67] And the district court found, by a preponderance of the evidence, "a reasonable likelihood that defendants, acting with scienter, obtained money from Wall Investors by making false statements about the use of the investments, misappropriating the money, misstating land purchase prices, and making false statements about whether the investments were fully guaranteed, in violation of § 17(a) of the 1933 Act and § 10(b) of the 1934 Act and Rule 10bn-5." We agree. The record reflects extensive fraudulent activity by which Barton, with scienter,[68] solicited investments from Chinese nationals for real estate development projects but misappropriated those funds and used them for improper, personal purposes. Moreover, Barton inflated land purchase prices to increase investments and falsely told investors that the investments were fully guaranteed, even though the guaranteeing company had no assets.

Second, the SEC has also shown irreparable harm to the defrauded investors through further dissipation of assets. If those assets were distributed, there would be no recovery for the defrauded investors—thus

_____

[66] The SEC's complaint alleged that Barton violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5, and Section 17(a) of the Securities Act, 17 U.S.C. § 77q(a).

[67] *See generally SEC v. Gann*, 565 F.3d 932, 936 (5th Cir. 2009); *SEC v. Seghers*, 298 F. App'x 319, 327 (5th Cir. 2008).

[68] *See SEC v. Sethi*, 910 F.3d 198, 206 (5th Cir. 2018) (citing *Broad v. Rockwell, Int'l Corp.*, 642 F.2d 929, 961 (5th Cir. 1981) (en banc)) (requiring a showing only of "severe recklessness" to prove scienter).

27

No. 23-11237
c/w No. 24-10004

making the harm irreparable. And freezing the assets which are not in the receivership is appropriate to prevent such irreparable harm, given that Barton's commingling of funds and transferring of properties hindered tracing efforts. Such an injunction provides the SEC and the district court additional time to trace funds and prevent further dissipation of assets which would cause irreparable harm.

Barton's suggestion that the SEC should already know exactly which entities received or benefited from lender funds—and thus, any entities which should be enjoined—ignores the reality that the SEC and receiver haven't been able to "trace all entities that have 'received or benefited from' [investor funds]" due to Barton's conduct. The asset freeze is necessary to permit additional tracing *before* more assets are dissipated.[69] While the "[t]he general federal rule of equity is that a court may not reach a defendant's assets unrelated to the underlying litigation and freeze them so that they may be preserved to satisfy a potential money judgment[,]"[70] as Barton emphasizes, such a rule does not apply here. The asset freeze is merely to determine which assets are the subject matter of the litigation.

Third, the concern for dissipation of assets and the defrauded investors' irreparable harm outweighs any harm to Barton if he is enjoined from transferring assets. Indeed, Barton's most significant interests are his

---

[69] *See Barton*, 79 F.4th at 580 ("Under [*FDIC v. Faulkner*, 991 F.2d 262, 267-68 (5th Cir. 1993)], the SEC could have sought an injunction freezing asset transfers while it traced the funds and determined which entities should be placed in the receivership."); *see also In re Fredeman Litig.*, 843 F.2d 821, 825 (5th Cir. 1988) (commenting that "orders issued (a) to preserve property that might be the subject of a final decree or (b) to enjoin conduct that might be enjoined under a final decree . . . would be permissible because '[a] preliminary injunction is always appropriate to grant intermediate relief of the same character as that which may be granted finally'" (alterations in original) (citations omitted)).

[70] *In re Fredeman Litig.*, 843 F.2d at 824.

28

No. 23-11237
c/w No. 24-10004

defense costs and alleged homelessness. But neither of these are impacted by the injunction; instead, they are relevant to the receivership.[71] Accordingly, these interests—and any others which Barton could claim—do not outweigh recovery for the defrauded investors.

Finally, as the district court found, "seeking to protect the interests of defrauded investors and uphold federal securities law is in the public interest."

As a result, the district court did not abuse its discretion in granting the preliminary injunction according to the *Winter* factors.

B

Barton's other challenges to the injunction are unavailing. He contends that the district court should not have relied on what the SEC "alleges" as evidence. But the district court relied on SEC filings, which contained ample record evidence—including deposition and investigative testimony, loan agreements, investor presentations, and declarations—to reach its conclusion.

Relatedly, Barton faults the district court for failing to demand that the SEC prove that he knowingly made false statements to lenders when procuring the loans. But the district court found by a preponderance of the evidence "a reasonable likelihood that defendants, acting with scienter, obtained money from [investors] by making false statements about the use of the investments, . . . misstating land purchase prices, and making false

---

[71] *See SEC v. Quinn*, 997 F.2d 287, 289 (7th Cir. 1993) (collecting cases) ("Just as a bank robber cannot use the loot to wage the best defense money can buy, . . . a swindler in securities markets cannot use the victims' assets to hire counsel who will help him retain the gleanings of crime.").

No. 23-11237
c/w No. 24-10004

statements about whether the investments were fully guaranteed." Nothing more was required,[72] and we do not impose a more onerous standard today.

Barton also argues that "evidence of past violations is not sufficient for a preliminary injunction." But evidence of Barton's "past violations" is irrelevant to the *Winter* analysis now required, rather than the test in *First Financial*.

Accordingly, there was no abuse of discretion.

## VII

Finally, we address Barton's request that we reassign the case on remand to someone other than Judge Starr. Reassignment is an "extraordinary" and "rarely invoked" remedy[73]—one that is nowhere near warranted here.

We have two tests for determining whether to reassign a case—a "stringent" one and an "informal" one. The stringent test considers three factors: (1) "whether the original judge would reasonably be expected upon remand to have substantial difficulty in putting out of his mind or her mind previously-expressed views or findings determined to be erroneous . . . [,]" (2) "whether reassignment is advisable to preserve the appearance of justice," and (3) "whether reassignment would entail waste and duplication

---

[72] *See, e.g.*, *First Fin. Grp. of Tex.*, 645 F.2d at 434; *Gann*, 565 F.3d at 936; *Seghers*, 298 F. App'x at 327; *Aaron v. SEC*, 446 U.S. 680, 695–97 (1980) (requiring proof of scienter for violation of Section 17(a)(1) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5); *Sethi*, 910 F.3d at 206 (citing *Broad*, 642 F.2d at 961) (requiring a showing only of "severe recklessness" to prove scienter); *see also CIGNA Corp. v. Amara*, 563 U.S. 421, 444 (2011) (noting the "default rule for civil cases" is preponderance of the evidence).

[73] *Fort Bend Cnty. v. U.S. Army Corps of Engineers*, 59 F.4th 180, 202 (5th Cir. 2023) (cleaned up).

No. 23-11237
c/w No. 24-10004

out of proportion to any gain in preserving the appearance of fairness."[74] The lenient test asks whether an objective observer would reasonably "question the judge's partiality."[75] Because the stringent test's second factor "aligns with the question posed by the [lenient] test[,]"[76] we will address the factors of the stringent test—each of which shows why reassignment is unwarranted.

First, Judge Starr cannot "reasonably be expected" to have "difficulty" putting aside "previously-expressed views" determined on appeal to be erroneous.[77] Far from "fail[ing] . . . to address our earlier opinion on this matter,"[78] Judge Starr followed what he termed our "marching orders" after we found he initially did not apply the correct legal test. Indeed, he dutifully implemented the remand and applied *Netsphere I*, conducting a thorough analysis on why the receivership was proper under that test and establishing its scope.

Second, as to the appearance of justice, Barton claims that the district court's reference to "defrauded investors" and Barton's likelihood to "dissipate, conceal, or transfer assets" and "alter or destroy documents relevant to this action" show that Judge Starr pre-judged the case against

---

[74] *Pulse Network, L.L.C. v. Visa, Inc.*, 30 F.4th 480, 495–96 (5th Cir. 2022) (internal quotation marks and citation omitted) (reassigning antitrust case where judge "candidly revealed his disdain for antitrust law and antitrust plaintiffs" and "repeatedly stymied [Plaintiff's] legitimate requests to engage in critical discovery").

[75] *Id.* at 495 n.25 (internal quotation marks and citation omitted).

[76] *United States v. Khan*, 997 F.3d 242, 249 (5th Cir. 2021); *see also Pulse Network*, 30 F.4th at 495 n.25 ("[T]he two tests are 'redundant' . . . So, we needn't apply the second test." (cleaned up)).

[77] *Pulse Network*, 30 F.4th at 495.

[78] *In re DaimlerChrysler Corp.*, 294 F.3d 697, 701 (5th Cir. 2002).

31

him.[79] But that's not true. Judge Starr was required to find fraud before granting a preliminary injunction. And that finding was supported by significant record evidence. Moreover, the district court was similarly required to make findings, based on Barton's conduct, relevant to the necessity of a receivership and injunction. Barton can't complain that the district court seemed biased merely because it ruled against him. If such a ruling was a basis for showing judicial bias, *every* losing party would make the same argument (but they don't).[80]

Third, given the length and complexity of the proceedings, reassignment risks significant delay and waste. Despite this risk, Barton argues that "reassignment will not involve waste or duplicative proceedings" because the case is "still in its procedural infancy." Regardless that Barton hasn't filed an Answer and discovery hasn't started, the nearly 600 docket entries in the district court and 16,815-page record on appeal indicate otherwise.

Reassignment here is not just unwarranted; it would be highly inefficient and wasteful of judicial resources.

\* \* \*

The abuse-of-discretion standard is a high bar, and one that Barton has failed to meet across the board. The district court did not abuse its discretion in imposing the receivership, setting its scope, administering the

---

[79] Barton also takes the extreme approach of accusing the district court of freezing assets "to aid the Commission in winning a case." Such an accusation, in this case, is both baseless and improper.

[80] Indeed, the district court has denied relief sought by the SEC and receiver: "I want to preserve [receivership assets] as much as possible for either a return to Barton, if he wins, or sending back to the . . . investors, if Mr. Barton loses." But the SEC and receiver do not complain of judicial bias.

No. 23-11237
c/w No. 24-10004

receivership's sales, or in granting a preliminary injunction. Moreover, there is no basis to reassign the case on remand.

Accordingly, we AFFIRM the imposition and scope of the receivership and the grant of a preliminary injunction. We DISMISS Barton's appeal of administrative orders unrelated to sales for lack of jurisdiction. And we DENY his request to reassign the case to another district-court judge.