# EXHIBIT G

**(ORDER LIST: 607 U.S.)**

**MONDAY, MARCH 30, 2026**

**ORDER IN PENDING CASE**

24-7351 PITCHFORD, TERRY V. CAIN, COMM'R, MS DOC, ET AL.

The motion of petitioner for appointment of counsel is granted.

**CERTIORARI GRANTED**

25-352 YOUNGE, JASMINE V. FULTON JUDICIAL CIR. DIST. ATT'Y

The petition for a writ of certiorari is granted.

**CERTIORARI DENIED**

24-672 WILSON, ERMA V. MIDLAND CTY., TX, ET AL.

25-465 BARTON, TIMOTHY V. SEC

25-512 ) ADAMU, JIBRIL V. UNITED STATES
)
25-5908 ) LANDJI, JEAN-CLAUDE O. V. UNITED STATES

25-570 AGILENT TECHNOLOGIES, INC. V. SYNTHEGO CORP.

25-582 WHITMER, GOV. OF MI, ET AL. V. ENBRIDGE ENERGY, LP, ET AL.

25-728 U.S. AND GA, EX REL. SENTERS V. QUEST DIAGNOSTICS INC.

25-732 WELLS, AMOS V. GUERRERO, DIR., TX DCJ

25-759 LAVIGNE, AMBER V. GREAT SALT BAY COM. SCH.

25-878 ROGERS, TODD J. V. OHIO

25-881 HADSELL, CHRISTOPHER V. ISHAM, CATHERINE

25-892 CORNETT, ROBERT J. V. USDC ED MI

25-903 BEZANSON, SANDRA, J. V. EXETER HOSPITAL, INC.

25-914 PABLE, CHRIS V. CHICAGO TRANSIT AUTH., ET AL.

25-924 NEEDHAM, TESSA, ET AL. V. MERCK & CO., INC., ET AL.

25-930 PIMLICO, LLC V. CIR

| | |
|---|---|
| 25-937 | GARCIA, LINDA C. V. USCIS, ET AL. |
| 25-948 | UPSOLVE, INC., ET AL. V. JAMES, ATT'Y GEN. OF NY |
| 25-954 | SEVILLE INDUST., L.L.C. V. SMALL BUSINESS ADMIN., ET AL. |
| 25-956 | VELTOR UNDERGROUND, LLC V. SBA, ET AL. |
| 25-957 | CHEN, BAOMING V. MULLIN, SEC. OF HOMELAND, ET AL. |
| 25-964 | TNSG HEALTH CO., LTD., ET AL. V. CLARKE, MURRAY C., ET AL. |
| 25-979 | LIVINGSTON, RICHARD L. V. CURTIS, DOUGLAS |
| 25-987 | FLYING T RANCH, INC. V. STILLAGUAMISH TRIBE |
| 25-1000 | CLARK, ADRIENNE L. V. UNITED STATES |
| 25-1010 | TOMKO, LEE M. V. MARTIN, BRUNO |
| 25-1025 | MALDONADO-PASSAGE, JOSEPH A. V. UNITED STATES |
| 25-1032 | WILLIAMS, ANTHONY D. V. CIR |
| 25-1033 | NRA GROUP, LLC V. DURENLEAU, NICOLE, ET AL. |
| 25-1034 | SHERMAN, ADAM J. V. UNITED STATES |
| 25-6065 | EL MALIK, RASHID V. COLLINS, SEC. OF VA |
| 25-6647 | JOHNSON, EMANUEL V. DIXON, SEC., FL DOC, ET AL. |
| 25-6669 | RIVERA, EZEQUIEL V. NESTLE USA, INC. |
| 25-6680 | CRUZADO-LAUREANO, JUAN M. V. OFFICE OF THE COMPTROLLER OF PR |
| 25-6696 | BENTON, EVELYN R. V. BERKSHIRE RICHMOND LLC |
| 25-6713 | NEBRASKA, EX REL. KOCH V. DISTRICT COURT OF NE |
| 25-6717 | ELKHARWILY, ALAA V. KAISER PERMANENTE, ET AL. |
| 25-6733 | CHEN, MAY V. DISTRICT OF COLUMBIA, ET AL. |
| 25-6734 | CARTER, SAMUEL V. HONOLULU POLICE DEPT., ET AL. |
| 25-6735 | CHEN, MAY V. DISTRICT OF COLUMBIA, ET AL. |
| 25-6772 | MANBORDE, MARIO A. V. BONDI, ATT'Y GEN. |
| 25-6776 | ENGEN, CAROL V. UNITED STATES |
| 25-6796 | MARTINEZ, CARLOS V. CALIFORNIA |

25-6803 MEYER, JOE V. UNITED STATES

25-6854 GLOVER, LONNY S. V. MINNESOTA

25-6900 NUNEZ SANCHEZ, ELIEL V. UNITED STATES

25-6903 GREEN, FLOYD H. V. UNITED STATES

25-6904 GUEVARA, DAWN M. V. UNITED STATES

25-6905 HARRIS-FRANKLIN, MARKHEL D. V. UNITED STATES

25-6908 WILLIAMS, NORRIS V. UNITED STATES

25-6917 KELLY, HARLAN, L. V. UNITED STATES

25-6919 BENTON, ROBERT V. UNITED STATES

25-6920 BROWN, GABRIEL V. UNITED STATES

25-6921 TELLO-ALVARADO, ELISEO V. UNITED STATES

25-6923 NARANJO-AGUILAR, MARCO A. V. UNITED STATES

25-6924 MIRANDA-DE LA HOYA, CARLOS V. UNITED STATES

25-6927 GRAHAM, MARQUISE V. UNITED STATES

25-6928 GARCIA-ZAMORA, PABLO V. UNITED STATES

25-6931 CROMAR, PAUL K. V. UNITED STATES

25-6933 CAMACHO, ISMAEL V. UNITED STATES

25-6936 PELTON, MATTHEW L. V. UNITED STATES

25-6941 INGALLS, STEVEN V. VINARDI, WARDEN

25-6944 TSO, THOMAS V. UNITED STATES

25-6946 CARPENTER, BENJAMIN A. V. UNITED STATES

The petitions for writs of certiorari are denied.

25-6383 OCHAR, WILSON V. LENTEGRITY, ET AL.

The motion of petitioner for reconsideration of order denying leave to proceed *in forma pauperis* is granted. The order entered February 23, 2026, is vacated. The petition for a writ of certiorari is denied.

25-6434 BASKIN, NATASHA T. V. PITRE, ALGERNON M.

The motion of petitioner for reconsideration of order denying leave to proceed *in forma pauperis* is granted. The order entered March 2, 2026, is vacated. The petition for a writ of certiorari is denied.

25-6744 HOLMES, C. V. HOLMES, JAMES KEVIN

The motion of petitioner for leave to proceed *in forma pauperis* is denied, and the petition for a writ of certiorari is dismissed. See Rule 39.8.

**HABEAS CORPUS DENIED**

25-6968 IN RE LE'HENRí R. COMIéR

25-6984 IN RE BILLY M. WITT, ET UX.

25-6991 IN RE JUSTIN ROSSI

The petitions for writs of habeas corpus are denied.

**REHEARING DENIED**

25-210 SYNNOTT, JAMES V. BURGERMEISTER, PAUL, ET AL.

The motion for leave to file a petition for rehearing with the supplemental appendix under seal is granted. The petition for rehearing is denied.

# SUPREME COURT OF THE UNITED STATES

JAMES SKINNER *v.* LOUISIANA

ON PETITION FOR WRIT OF CERTIORARI TO THE SUPREME COURT OF LOUISIANA

No. 25–1. Decided March 30, 2026

The petition for a writ of certiorari is denied.

JUSTICE SOTOMAYOR, with whom JUSTICE JACKSON joins, dissenting from the denial of certiorari.

Petitioner James Skinner and his codefendant Michael Wearry were both tried for the 1998 murder of Eric Walber based on similar sets of evidence, which centered on the same two eyewitness accounts. Wearry was convicted and sentenced to death. Skinner, after his initial capital trial ended with a hung jury, was convicted by an 11-to-1 vote and sentenced to life in prison. In 2016, this Court vacated Wearry's conviction because the prosecution in his case had "[b]eyond doubt" violated its constitutional obligation to disclose favorable evidence to him. *Wearry* v. *Cain*, 577 U. S. 385, 392 (2016) (*per curiam*). Yet, Skinner remains incarcerated—and may remain incarcerated for the rest of his life—even though the prosecution failed to disclose the same favorable evidence to him in connection with his case.

Because Skinner was subject to the same constitutional violations that Wearry was (and more), he is entitled to the same relief that Wearry received. The Louisiana courts denied him that relief. Rather than leaving that injustice in place, the Court should have granted certiorari to uphold its obligations to ensure the supremacy of its own decisions and to treat like defendants alike.

## I

### A

Eric Walber was murdered in April 1998. The case soon went cold, but reopened nearly two years later when Sam

Scott, who was then incarcerated, contacted the police and implicated Wearry in the killing. *Id.*, at 386–387.

Scott gave the police many significantly different accounts of Walber's murder. At first, Scott denied any involvement in the murder and did not implicate Skinner. *Ibid.*; App. to Pet. for Cert. 19a–24a (App.). He also got basic facts about the crime wrong, stating that Walber had been shot (not true) and that the murder had taken place on Blahut Road (it took place miles away, on Crisp Road). See *Wearry*, 577 U. S., at 386–387. As Scott kept talking with the police, he continued to "chang[e] his account of the crime over the course of four later statements, each of which differed from the others in material ways." *Id.*, at 387. Ultimately, Scott settled on a story that became the centerpiece of both Wearry's and Skinner's trials.

At Skinner's trial,[1] Scott testified to the following series of events. On the day of Walber's murder, Wearry, Scott, a man named Randy Hutchinson, and two others (not including Skinner) were shooting dice on the side of the road when Walber drove by in a small hatchback Ford Focus. Wearry was losing, and decided to rob Walber. Wearry and Hutchinson then ran into the street to stop Walber's car; Hutchinson pulled Walber out, beat him, and shoved him into the cargo area of Walber's car; and all five men piled into that car and drove off with Walber. The group then drove around, occasionally stopping for Hutchinson to remove Walber from the car, beat him, and shove him back in. At one stop, they encountered Skinner and another man: Eric Brown. Skinner then got into the driver's seat of Walber's car and drove the group (now totaling seven men, including Walber) in that car out to Crisp Road, with Brown following in his own car. Once there, Wearry and Hutchinson removed Walber from the car and everyone else

[1] These facts come from Skinner's second trial after his first jury could not reach a verdict. See Tr. in *State* v. *Skinner*, No. 15992.

got out. Skinner then got back into the driver's seat and ran Walber over, killing him. Scott admitted at trial that he had changed his testimony many times since he first came to the police, that he had often lied in doing so, and that he was receiving a deal in exchange for his testimony.

Eric Brown was the State's only other eyewitness. Brown testified that he and Skinner encountered Wearry and his group on the day of the murder and that he and Skinner followed the group to Crisp Road in Brown's car. Once there, Brown said that Skinner got out of the car and told Brown that he would catch up with him later. Brown said he then drove away in his own car moments before Walber's death, leaving Skinner with the group including Wearry, Scott, and Hutchinson. Brown admitted at trial that he had first told the police a different story, in which he identified a different man as Wearry's accomplice and left Skinner out of the story entirely. Brown also acknowledged that he was serving a 15-year drug sentence at the time he testified.

Apart from Scott and Brown, the State elicited testimony from two individuals who claimed Skinner had confessed to the Walber murder. First, Ryan Stinson, who was briefly Skinner's cellmate in jail, testified that Skinner had confessed to a version of the crime much different from the one in Scott's telling. According to Stinson, Skinner told him that Skinner and Walber were driving in Walber's car alone one day and that Skinner wanted Walber to pull over to meet Skinner's friends, but that Walber refused. This angered Skinner, so Skinner killed the engine, snatched the keys, dragged Wearry out of the car with his friends, and ran Walber over.[2] Second, Raz Rogers, who was a longtime

---

[2] Stinson also claimed to have surreptitiously taken handwritten notes of this confession (which the jurors reviewed at trial). These reflect yet a different version of events: Walber was driving Skinner; Skinner wanted to drive but Walber refused to let him; this "pissed [Skinner] off," and so Skinner coaxed Walber into driving to Crisp Road, where Skinner and his friends killed Walber. App. to Brief in Opposition 93a–95a.

friend of Skinner's, testified that he asked Skinner years after the murder if he knew what had happened to Walber. According to Rogers, Skinner responded that he and "some [others] did that." Tr. 2597–2598 (May 13, 2005).

In its closing, the State began by lauding Scott as a "hero," whose "consci[ence]" and "gumption" were the key reasons the case was solved. Tr. 2911–2912 (May 14, 2005). The State also claimed that "there's not been one single shred of evidence to contradict the way Sam Scott says this happened." *Id.*, at 2914. As for Brown, the State touted his testimony many times, emphasizing that he had acted selflessly and got "[n]othing" in return for his testimony. *Ibid.* After discussing those two eyewitnesses at some length, the closing then turned to Rogers and Stinson. As to Stinson, the State acknowledged he was a "problem child," whose testimony was "[a]bsolutely" "inconsistent with other things [the jury had] heard." *Id.*, at 2916. As to Rogers, the prosecution emphasized that there was not "one shred of evidence that Raz Rogers was involved" in the crime "in anyway." *Id.*, at 2915.

Ultimately, the jury convicted Skinner by a vote of 11-to-1, and Skinner was sentenced to life imprisonment without the chance of parole.

B

Wearry also was convicted for his role in Walber's murder; unlike Skinner, though, he was sentenced to death. *Wearry*, 577 U. S., at 388. His trial looked much like Skinner's. As with Skinner, the prosecution offered no physical evidence of guilt. Scott was the State's "star witness." *Id.*, at 387. Brown "corroborated" Scott's testimony, and the State told the jury that Brown had "'no deal on the table.'" *Id.*, at 387, 393. Although Wearry's trial featured no reported confession, there was other evidence implicating him. One witness placed Wearry in Walber's blood-stained car on the night of the murder and later saw Wearry with

Walber's class ring; another witness saw Wearry throwing away a bottle of cologne that Walber had with him the night of his murder; and jail employees testified that they heard Wearry admit to being "a bystander when the crime occurred." *Id.*, at 388; see *id.*, at 400 (ALITO, J., dissenting).

For Wearry, however, trial was not the end of the matter. After Wearry's conviction became final, capital counsel representing him in postconviction proceedings uncovered significant evidence that the prosecution had not disclosed. As this Court later held, that evidence "would have undermined the prosecution and materially aided Wearry's defense at trial." *Id.*, at 388–389 (majority opinion).

As to Scott, undisclosed police records "cast doubt on [his] credibility." *Id.*, at 389. One of Scott's fellow prisoners reported hearing Scott say that he "wanted to 'make sure [Wearry] gets the needle cause he jacked over [Scott].'" *Ibid.* Another prisoner told the police that he witnessed the Walber murder, but later recanted and admitted that Scott had both "'told him what to say'" and "suggested that lying about having witnessed the murder 'would help him get out of jail.'" *Id.*, at 389–390.

Further, the State failed to turn over medical records relating to Hutchinson that undermined Scott's testimony. Recall, Scott testified that Hutchinson had run out into the street, repeatedly hauled Walber in and out of the car, and beat Walber; he also said Hutchinson crawled into the cargo area of Walber's car after the murder. See *id.*, at 390. The medical records revealed, however, that about a week before the murder, Hutchinson had undergone major knee surgery to repair a ruptured tendon. See *ibid.* According to an expert, Hutchinson's surgically repaired knee "could not have withstood running, bending, or lifting substantial weight" by the time of Walber's murder, making Scott's account potentially physically impossible, and certainly highly implausible. *Ibid.*; see *id.*, at 393.

As to Brown, undisclosed evidence belied the State's assertions at trial that he sought no favors for his testimony. Rather, according to those records, Brown "had twice sought a deal to reduce his existing sentence in exchange for" his testimony and police had told Brown "that they would 'talk to the D. A. if he told the truth.'" *Id.*, at 390.

In postconviction proceedings, Wearry argued that the State's failure to disclose this favorable evidence violated his due process rights under *Brady* v. *Maryland*, 373 U. S. 83 (1963). Although the Louisiana courts ruled against him, this Court disagreed and summarily reversed.

As the Court saw things, it was "[b]eyond doubt" that "the newly revealed evidence suffice[d] to undermine confidence in Wearry's conviction." 577 U. S., at 392. "Scott's credibility, already impugned by his many inconsistent stories, would have been further diminished" by the implausibility of his account with respect to Hutchinson, the fact that he "had coached another inmate to lie about the murder" to "get out of jail," and the fact that his testimony was driven by a desire to "settle a personal score." *Id.*, at 393. To the extent jurors found Scott more credible due to Brown's corroborative testimony, moreover, those jurors "might have thought differently" had they learned of Brown's undisclosed possible benefit from his testimony. *Id.*, at 394. It was true that the State had also elicited other evidence at trial; but "[e]ven if the jury . . . could have voted to convict Wearry," the Court had "'no confidence that [the jury] would have done so.'" *Ibid.* (emphasis deleted). As a result, the Court held that Wearry's due process rights were violated and his conviction could not stand. *Id.*, at 396.

Today, due to a plea deal that Wearry and the State reached after this Court's decision, Wearry not only is off death row, he has been freed from prison.

C

Skinner's postconviction path has found less success. Unlike Wearry, Skinner did not receive capital counsel to assist with postconviction proceedings. Instead, he proceeded *pro se* in state and federal court and initially failed to secure any relief. See *State ex rel. Skinner* v. *State*, 2009–2043 (La. 8/18/10), 42 So. 3d 394; *Skinner* v. *Cain*, 2011 WL 2802859 (MD La., July 15, 2011). After this Court decided *Wearry*, however, Skinner learned about the evidence withheld in Wearry's case and was able to secure his own postconviction counsel. Conducting a renewed investigation, Skinner's counsel was then able to unearth yet additional withheld evidence that, Skinner now argues, further weakened the case against him.

First, Scott not only got several key parts of the story wrong before landing on his ultimate trial narrative, but according to Skinner, newly discovered police records also showed that the police fed Scott information to shape his story. See App. 19a, 25a. That included, for example, the police telling Scott that the murder took place on Crisp Road, not Blahut Road, where Scott had first erroneously indicated.

Second, Skinner points to additional undisclosed evidence that undermines Brown's testimony. In a police statement, one of Brown's fellow prisoners told police that Brown admitted to participating in the Walber carjacking, but "was try[ing] to pin this crime on" Wearry and that Brown thought the police "would believe him because he ha[d] told on others befor[e]." *Id.*, at 50a. Additional records show that Brown had also identified, in a police photo array, a man named Dashain Moore "as th[e] guy [he] saw with Michael Wear[r]y . . . the same night that [Walber] was killed." *Id.*, at 36a–37a. Moore had been prosecuted for a similar carjacking one month after Walber's murder, during which Moore boasted that he "killed . . . the Walber boy" and "didn't care if he killed" the second victim, too. *Id.*,

at 79a–80a. At Moore's trial, in fact, the prosecution had emphasized in closing that Moore had "ma[de] a statement that he had killed [Walber]." *Id.*, at 82a–83a. Finally, not only did Brown ask for a deal in connection with his testimony against Skinner and Wearry, as it turned out, soon after Skinner's second trial, he received a sentence reduction to time served and had other charges against him indefinitely continued. *Id.*, at 56a–57a; Pet. for Cert. 13.

Third, as to Rogers, Skinner identifies a police note from before trial showing an anonymous caller reporting that "Raz [Rogers and another] confessed to 'someone' that they murdered Eric Walber." App. 76a. This contradicted the prosecution's statement that there was not "even one shred of evidence that Raz Rogers was involved." Tr. 2915 (May 14, 2005). Moreover, although Rogers testified that he had quit smoking marijuana years before Skinner's trial, prosecutors did not reveal to Skinner that, the night before Rogers was set to testify, he was arrested for marijuana possession. App. 74a–75a; Pet. for Cert. 14–15.

Fourth, Skinner argues that Stinson struck an undisclosed deal with the prosecution involving his transfer to a new prison. This was based on a *pro se* lawsuit Stinson filed alleging that the prosecution agreed to such transfer in exchange for his testimony at Skinner's trial. See Reply to Brief in Opposition 8–9.

Fifth, Skinner identifies a series of police notes from the Walber investigation identifying other individuals who (in addition to Moore) confessed to the crime or may have been involved. One reportedly was seen "beating Eric [Walber] on Crisp Rd. the night of the murder," was then seen covered in "blood" the same night, later called police to ask "if he was a prime suspect in the murder," and "boast[ed]" that he had killed Walber. App. 85a, 88a–89a, 95a. Several other individuals (a guidance counselor, probation officer, and boy scout troop leader) told police that a different individual had "been saying he killed" Walber, possibly in

concert with the first suspect who had called the police to ask if he was being investigated. *Id.*, at 91a–95a. None of these suspects were ever disclosed to Skinner.

Armed with all this evidence, plus the *Brady* evidence this Court had already found material and unlawfully withheld in Wearry's case, Skinner filed a renewed application for postconviction relief in Louisiana court. In June 2023, the postconviction court denied relief. On Skinner's *Brady* claim, the court held that "[t]he statements presented, on their face, without further evidence of credibility, are not sufficient to undermine confidence in the outcome of the trial." App. 3a. Moreover, it held, "the *Wear*[*r*]*y* case is distinguishable enough from the instant case that its decision does not compel this Court to follow suit." *Ibid.* The court, however, gave no reason why the *Brady* claim in this case was different from or any weaker than Wearry's.

The Louisiana Court of Appeal denied review, over one dissent. The Louisiana Supreme Court also denied review, with two justices dissenting. Justice Griffin wrote that she would have granted Skinner a new trial in light of this Court's decision in *Wearry*, finding "no legitimate basis to treat the two co-defendants differently." *Id.*, at 8a. This petition followed.

## II

The Court's decision in *Wearry* compels the conclusion that the decision below cannot stand. Although this Court usually declines to grant summary relief in fact-intensive cases like this one, *Wearry* makes resolution of Skinner's petition especially straightforward and important. Alternatively, if fuller briefing and oral argument were required to explore the important question presented adequately, the Court should have granted certiorari to do so, not denied review.

A

"'[T]he suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.'" *Wearry*, 577 U. S., at 392 (quoting *Brady*, 373 U. S., at 87). "Favorable" evidence includes evidence that "undermin[es] witness credibility." 577 U. S., at 392 (citing *Giglio* v. *United States*, 405 U. S. 150, 153–154 (1972)).

Evidence "qualifies as material when there is 'any reasonable likelihood' it could have 'affected the judgment of the jury.'" 577 U. S., at 392. The materiality standard "does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal"; it asks only whether "in its absence [the defendant] received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles* v. *Whitley*, 514 U. S. 419, 434 (1995). This "is not a sufficiency of the evidence test," and the defendant "need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict." *Id.*, at 434–435. Instead, the undisclosed evidence need only be sufficient to "put the case in such a different light as to undermine confidence in the verdict." *Id.*, at 435. In deciding whether that is the case, the total effect of all the suppressed evidence must be considered "collectively, not item by item." *Id.*, at 436.

B

*Wearry* requires reversal here. Like in *Wearry*, no physical evidence connected Skinner to the murder. In both cases, Scott was the State's "star witness" and "hero," whose account the State told the jury was indispensable to its case and not contradicted by "one single shred of evidence." *Wearry*, 577 U. S., at 387; Tr. 2911–2913 (May 14, 2005).

Yet the State suppressed evidence showing that Scott's story was likely physically impossible (given Hutchinson's surgery), that Scott coached people to lie about Walber's murder to get out of jail, and that Scott was testifying "to settle a personal score" against Wearry. *Wearry*, 577 U. S., at 393. In both cases, Brown was the only other eyewitness, whom the State announced would get "[n]othing" for his testimony. Tr. 2914 (May 14, 2005). Again, suppressed evidence showed that Brown was in fact motivated by the "possibility of a reduced sentence on an existing conviction." *Wearry*, 577 U. S., at 394. Together, this suppressed evidence sufficed to eliminate the *Wearry* Court's "'confidence that [the jury] would have'" voted to convict Wearry. *Ibid.* (emphasis deleted). That alone requires reversal.

For Skinner, though, there is much more. To start, when a "verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt" for *Brady* purposes. *United States* v. *Agurs*, 427 U. S. 97, 113 (1976). Unlike in Wearry's case, Skinner's first trial ended with a hung jury, and his second trial ended with a nonunanimous verdict. Today, the latter would be unconstitutional under *Ramos* v. *Louisiana*, 590 U. S. 83 (2020). In any event, non-unanimity betrays a weaker case and can contribute to "concern[s] about the reliability and accuracy of the jury's verdict." *Brown* v. *Louisiana*, 447 U. S. 323, 333 (1980); see *Johnson* v. *Louisiana*, 406 U. S. 356, 362 (1972) ("Of course, the State's proof could perhaps be regarded as more certain if it had convinced all 12 jurors").

With that in mind, the amount and significance of the additional suppressed evidence here is staggering. Take the two eyewitnesses first. Scott, for one, could have been further undermined by evidence that the police developed his (already "inconsistent") testimony for him. *Wearry*, 577 U. S., at 393; see, *e.g.*, App. 25a. Brown, even more strikingly, identified a man other than Skinner in a photo array

as Wearry's sole accomplice; that man, moreover, bragged about killing Walber while committing a separate carjacking soon after Walber's death. App. 36a–37a, 79a–83a. Besides identifying a highly plausible alternative suspect in the Walber murder, the suppressed evidence could have been used to attack Brown's continuously shifting stories further. Brown, like Scott, also informed a fellow prisoner that he intended to "pin th[e] crime on" Wearry. *Id.*, at 50a.

Turn next to Rogers. The State failed to turn over evidence that he had reportedly confessed to the Walber murder, too—in direct contradiction to the prosecution's boast that there was not "one shred of evidence" connecting Rogers to the crime "in anyway." Compare *id.*, at 76a, with Tr. 2915 (May 14, 2005). Rogers also apparently lied on the stand about his marijuana use, as evidenced by his undisclosed mid-trial arrest on a marijuana charge. Knowing about this arrest would have allowed Skinner to attack both Rogers's truthfulness and his motive for testifying, given his increased incentive to curry favor with the authorities.

As to the claimed *Brady* violations regarding Stinson, the evidence is not as direct. Skinner points not to contemporaneous evidence of a deal, but rather Stinson's own claims, several months after Skinner's trial, that the prosecution promised to transfer him to another prison in exchange for his testimony. Regardless, considered alongside all the other withheld evidence in this case, and given the implausible and inconsistent confession he reported, the possibility that Stinson testified with the expectation of securing favorable treatment from the prosecution further supports Skinner's case. See *Wearry*, 577 U. S., at 394.

Finally, there is significant evidence of other possible suspects, even beyond the man Brown identified in the photo array. One possible suspect repeatedly confessed, according to three independent sources. Another was seen covered in blood the night of the murder, reportedly confessed, and asked the police if he was a suspect.

Skinner's trial, in short, was plagued by piles of suppressed evidence that his counsel easily could have used to further undermine an already weak case against him. This Court already held that a subset of that evidence sufficed to find a *Brady* violation "[b]eyond doubt" for Skinner's codefendant. 577 U. S., at 392. Given that there is substantially more undisclosed evidence at issue here, it is illogical to deny Skinner's *Brady* claim now.

C

1

The State's attempt to defend the decision below does nothing to change that conclusion.

Mostly, the State focuses on one fact: Unlike in Wearry's case, here there was evidence, from Rogers and Stinson, that Skinner confessed. As a result, the State argues, whatever suppressed evidence there might have been, it could not have affected the jury's guilty verdict. This distinct feature of Skinner's case, however, does not bear the weight the State demands of it.

To start, the State is factually wrong that "the core basis for the jury's verdict" was Skinner's "confessions to murdering Eric Walber." Brief in Opposition 15. The prosecution implicitly recognized as much: Its closing argument overwhelmingly focused on Scott (its "hero") and Brown ("the other person who was out there that night and came forward"). Tr. 2911–2914. For Stinson, by contrast, the prosecution's closing conceded that he was a "problem child" whose testimony was "[a]bsolutely" "inconsistent with" other testimony (such as Scott's and Brown's). *Id.*, at 2916. The prosecution also discussed Rogers only briefly in its closing argument, likely because he provided almost no detail on Skinner's role in the murder. That is not to mention the additional possible ways that the defense could have undermined Stinson's and Rogers's conflicting and threadbare testimony, if the additional *Brady* evidence that

related to them (Stinson's alleged mid-trial transfer deal and Rogers's undisclosed reported confession and mid-trial marijuana arrest) had been properly disclosed. See *supra*, at 8. The bottom line is that, contrary to the State's presentation now, Scott and Brown (as in *Wearry*) were the heart of the prosecution's case, while Stinson's and Rogers's inconsistent and vague second-hand reports of confessions were comparatively peripheral.

Even putting all of that to the side, the State's focus on the confessions mistakes the *Brady* materiality standard for a "sufficiency of the evidence test." *Kyles*, 514 U. S., at 434. The question is not, as the State asks, whether the confessions here could "sustain the jury verdict," if there was sufficient "independent evidence" to convict Skinner, or if other evidence "provided firm ground for the jury's verdict." *E.g.*, Brief in Opposition i, 9, 18, 26. The question is whether there is "'any reasonable likelihood' [the undisclosed evidence] could have 'affected the judgment of the jury.'" *Wearry*, 577 U. S., at 392. That is why a *Brady* claim can succeed "even if . . . the undisclosed information may not have affected the jury's verdict." 577 U. S., at 392, n. 6. It is also part of the reason why *Wearry* was a clear case even though the State also pointed to "independent evidence" connecting Wearry to the murder. *Id.*, at 393; see *id.*, at 388; *id.*, at 400 (ALITO, J., dissenting) (collecting evidence, including several witnesses who testified to seeing Wearry in Walber's blood-spattered car the night of the murder and jail guards who testified to Wearry admitting to being present at the murder, contrary to Wearry's alibi). Here too, even if a jury could have convicted Skinner after considering all of the undisclosed evidence on which Skinner now relies, the existing verdict plainly is not one "worthy of confidence." *Kyles*, 514 U. S., at 434; see *Wearry*, 577 U. S., at 392 (finding it immaterial if the jury "could have" convicted Wearry).

Beyond the confessions, the State offers little argument that the undisclosed evidence here was immaterial. As to much of the undisclosed evidence at issue, the State simply says nothing at all. That includes: the Hutchinson evidence, the evidence that Scott coached others to lie about the Walber murder, the evidence about other suspects, the evidence that Brown told another prisoner that he had it in for Wearry, and more.

As to other evidence, the State says little more. It dismisses Rogers's reported confession as "not . . . serious," without explanation, Brief in Opposition 25, which is surprising given the overwhelming value the State attributes to other second-hand confessions, see *supra*, at 13–14. The State also suggests that it had no obligation to disclose evidence of Rogers's mid-trial arrest on drug charges because prosecutors (somehow) might not have heard about it. "But '*Brady* suppression occurs when the government fails to turn over even evidence that is known only to police . . . and not to the prosecutor.'" *Wearry*, 577 U. S., at 393–394, n. 8; see *Kyles*, 514 U. S., at 438 (rejecting similar argument by Louisiana).[3] Further, the State contends that Scott's statement about wanting to "'make sure [Wearry] gets the needle'" would not have mattered to Skinner's jury like it mattered to Wearry's, appearing to suggest that it would have shown only Scott's willingness to lie to get Wearry, not Skinner, executed. To state this last argument is to refute it. In all, nothing about the record here can leave the Court confident that the outcome of trial was not affected by the prosecution's nondisclosure of favorable evidence.

---

[3] The State also argues that this evidence is not material because Rogers was caught on Crisp Road, which "corroborat[ed]" his other testimony that he and Skinner used to smoke together on Crisp Road, where Walber was murdered. Brief in Opposition 25–26. That does not follow. While this coincidence does link Rogers to the road on which the murder took place, it confirms nothing about Skinner's presence on the road the night of the murder.

2

Finally, the State urges the Court to deny relief on procedural grounds. It argues that, given the fact-intensive nature of Skinner's claim, the decisions below are too sparse to permit meaningful review and that the Court should follow its usual practice of awaiting review until after federal habeas proceedings have completed.

The first contention is easily dispatched: It would be perverse to allow manifestly erroneous lower-court judgments to stand precisely because of their cursory analysis. In any event, the analysis the postconviction court did provide is wrong on its face, and the Court at the very least should have corrected the obvious legal errors and remanded for a proper analysis. See, *e.g.*, *Grady* v. *North Carolina*, 575 U. S. 306, 310–311 (2015) (*per curiam*) (summarily vacating decision of state high court that applied erroneous federal legal principles). The postconviction court faulted Skinner for failing to provide "evidence of credibility," App. 3a, but this Court has never imposed a standalone credibility requirement on material *Brady* evidence. That makes sense, given that credibility is the province of the jury, see, *e.g.*, *United States* v. *Scheffer*, 523 U. S. 303, 312–313 (1998), and *Brady* violations prevent the jury from assessing the credibility of material evidence. The postconviction court's only other reasoning was that "the *Wear*[*r*]*y* case is distinguishable enough." App. 3a. The question in *Wearry*, however, was "[b]eyond doubt." 577 U. S., at 392. Even if this case were a closer call, that would not end the analysis.

On the State's second point, it is true that this Court is less apt to intervene in "state postconviction proceedings," as opposed to after federal habeas review. *Lawrence* v. *Florida*, 549 U. S. 327, 334 (2007). Summary reversal, moreover, is generally inappropriate in "fact-intensive" cases, especially with lengthy trial records. See *e.g.*, *Cavazos* v. *Smith*, 565 U. S. 1, 9, 11, 16–17 (2011) (Ginsburg, J., dissenting); but see *Klein* v. *Martin*, 607 U. S. ___, ___–___

(2026) (*per curiam*) (slip op., at 10–12) (parsing materiality of alleged *Brady* evidence to summarily reverse grant of postconviction relief). This case, however, is unique because of the Court's prior grant of relief in *Wearry*.

To begin, and as *Wearry* underscored, "[t]his Court, of course, has jurisdiction over the final judgments of state postconviction courts, see 28 U. S. C. §1257(a), and exercises that jurisdiction in appropriate circumstances." 577 U. S., at 395–396. Although the Court's usual practice may be to await federal habeas proceedings in the ordinary case, nothing in its precedents requires the abdication of responsibility to correct obvious errors of law, even in this posture. See *id*., at 396 (collecting cases).

Moreover, although this case is undoubtedly fact-intensive, the legal error is made much more obvious, and the analysis is much simplified, by the Court's prior analysis in *Wearry*. There, the Court already conducted much of the necessary analysis, which involved the same crime and substantially overlapping witnesses and suppressed evidence. Of course, there are differences between this case and *Wearry*; no two trials are identical. Those differences, however, pale in comparison to their similarities. If, on the other hand, the Court needed additional briefing and argument to fully address Skinner's claims, the appropriate course of action would be to grant plenary review, not simply to deny Skinner's petition.

Given the significant overlap with *Wearry*, moreover, the Court has a strong interest here in vindicating the supremacy of its decisions. The postconviction court's one-sentence conclusion that this case is "distinguishable enough" from *Wearry* borders on open defiance. App. 3a.[4] The Court

---

[4] Unfortunately, "[w]e have repeatedly reversed . . . Louisiana courts" for failing to heed *Brady*'s requirements. *Brown* v. *Louisiana*, 598 U. S. ___, ___ (2023) (JACKSON, J., dissenting from denial of certiorari) (slip op., at 4) (collecting cases); see Brief for Two Louisiana Prisoners as *Amici*

should have corrected this error. See, *e.g.*, *Moore* v. *Texas*, 586 U. S. 133, 139, 143 (2019) (*per curiam*) (summarily reversing where the state court "repeat[ed]" the errors that this Court previously condemned); *id.*, at 143 (ROBERTS, C. J., concurring) (agreeing that state court "repeated the same errors that this Court previously condemned—if not quite *in haec verba*, certainly in substance").

That raises one final point: "the actual inequity that results when the Court chooses which of many similarly situated defendants should be the chance beneficiary of" a given rule. *United States* v. *Johnson*, 457 U. S. 537, 556, n. 16 (1982) (emphasis deleted). Here, it is all but certain that, if Skinner had received counsel earlier and his case had traveled to this Court with Wearry's, both men would have secured the same relief. By happenstance and largely due to lack of representation, however, Skinner's case was delayed. That delay should not mean that justice is denied. It is true that Skinner may yet receive relief in federal court, as the Fifth Circuit recently granted authorization for him to file a successive habeas application. App. 9a–11a. Yet, there is no need to "forc[e Skinner] to endure yet more time [i]n Louisiana's [prisons] in service of a conviction that is constitutionally flawed" while federal habeas proceedings play out. *Wearry*, 577 U. S., at 396.

* * *

Equal justice under law, the phrase engraved on the front of this Court's building, requires that two codefendants, convicted of the same crime, who raised essentially the same constitutional claims, receive the same answer from the courts. Here, because the Louisiana courts refused to apply this Court's *Brady* precedents, including a decision by this Court involving the very same evidence, Skinner risks spending the rest of his life in prison while Wearry walks

---

*Curiae* 13–18 (questioning treatment of *Brady* claims in Louisiana courts based on troubling data).

free. Because the Court refuses to enforce its own precedents, I respectfully dissent from the denial of certiorari.