FILED-USDC-NDTX-DA
'26 JUN 3 PM3:23
JJF

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § | |
| | § | |
| *Plaintiff,* | § | Civil Action No. 3:22-cv-2118-X |
| | § | |
| v. | § | |
| | § | |
| TIMOTHY L. BARTON, et al., | § | |
| | § | |
| *Defendants.* | § | |

**DEFENDANT TIMOTHY L. BARTON'S MOTION FOR PRESERVATION OF STATUS QUO UNDER FEDERAL RULE OF CIVIL PROCEDURE 60(b) AND BRIEF IN SUPPORT**

Defendant Timothy L. Barton ("Defendant" or "Barton") respectfully moves the Court, pursuant to Federal Rule of Civil Procedure 60(b), Rule 62, 28 U.S.C. § 1651, and the Court's inherent equitable authority, for preservation of the status quo as to all Receivership real property whose sale was approved by Orders now more than two years old — including the Frisco Gate Property, the Rock Creek Property, the Amerigold Suites, and any other Receivership real property as to which a previously approved sale has not yet consummated. In support, Defendant states:

## I. INTRODUCTION

This Motion is not an attempt to relitigate matters affirmed in SEC v. Barton, No. 24-10004 (5th Cir. Apr. 17, 2025). It asks the Court to recognize that the orders affirmed on direct appeal approved specific transactions, not perpetual blanket disposition authority. The passage of time, the apparent expiration of the original transactional terms, the staleness of the appraisal record, the material changes in market conditions, and — as developed in Section IV.E below — recent regulatory enforcement actions against the contracted purchaser's named principal raise concrete questions under Rule 60(b) that should be answered before any closing occurs.

Defendant frames this Motion under Rule 60(b) expressly, and applies each subdivision below. Subdivisions (4), (5), and (6) supply the substantive grounds for preservation; Rule 62 supplies the interim mechanism.

Defendant concedes, candidly, that no acute emergency requires expedited decision. That concession is the predicate of the requested relief, not an obstacle to it. The *Receivership Order* itself, [Dkt. 650], does not condition the Receiver's sale authority on any emergency; but it also does not authorize accelerated or expedited consummation of stale, materially modified transactions years after the original approval, particularly where credible questions have arisen regarding the contracted purchaser's present capacity and qualifications. The *Receivership Order* requires the Receiver to act "*with due regard to the realization of the true and proper value*" of receivership real property (Paragraph 93) and conditions transfer of clear title on a "further Order of this Court" (Paragraph 94). It is those two structural commands — together with the Receiver's fiduciary obligation to confirm that any proposed counterparty can in fact consummate the transaction — that anchor the relief Defendant requests.

## II. RELEVANT PROCEDURAL AND TRANSACTIONAL BACKGROUND

1. The *Receivership Order* [Dkt. 650], entered June 23, 2025, governs the Receiver's authority. Its Paragraphs 93 and 94 are central to this Motion.

2. Paragraph 93 provides, in relevant part: *"the Receiver is authorized to locate, list for sale or lease, engage a broker for sale or lease, cause the sale or lease, and take all necessary and reasonable actions to cause the sale or lease of all real property in the Receivership Estates, either at public or private sale, on terms and in the manner the Receiver deems most beneficial to the Receivership Estate, and with due regard to the realization of the true and proper value of such real property."*

3. Paragraph 94 provides: *"Upon further Order of this Court, pursuant to such procedures as may be required by this Court and additional authority such as* 28 U.S.C. §§ 2001 *and* 2004, *the Receiver will be authorized to sell, and transfer clear title to, all real property in the Receivership Estates."*

4. The Frisco Gate Property is subject to a Purchase and Sale Agreement ("**PSA**") between the Receiver and Petra Development, dated December 13, 2022, filed at *Appendix A to [Dkt. 111]*, signed by Rashid Salem as Manager on December 15, 2022. The PSA contemplated a defined closing window: a Feasibility Period ending thirty (30) days after

the December 13, 2022 Effective Date, with closing required "on or before 4:00 p.m. (Central time) on the date which is sixty (60) days after the expiration of the Feasibility Period, or earlier date as agreed in writing by the Parties" (PSA § 5.1(a)).

5. By that contractual measure, the original outside closing date was approximately March 13, 2023. Defendant respectfully requests that the precise contractual closing-date computation be confirmed by the Receiver on the present record.

6. On January 31, 2023, this Court entered [Dkt. 142], approving sale of the Frisco Gate Property under the December 13, 2022 PSA. Following the Fifth Circuit's vacatur of the original Receivership Order, the Court entered [Dkt. 438] on December 15, 2023, again approving sale of the Frisco Gate Property — referencing the same underlying PSA, as described by the Receiver to have been amended five times. See [Dkt. 376] at 4–6 (describing First through Fifth Amendments).

7. The Rock Creek Property is subject to a One to Four Family Residential Contract (Resale) between the Receiver and JNJ Group, LLC, dated November 16, 2022, filed at Exhibit A to [Dkt. 77]. The Receiver has reported that he leased the Rock Creek Property to the same approved purchaser pending closing and that the parties "have entered into several extensions of the closing date." [Dkt. 728] at 28–32.

8. On December 15, 2023, the Court entered [Dkt. 437] approving sale of the Rock Creek Property.

9. The Fifth Circuit affirmed in SEC v. Barton, No. 24-10004 (5th Cir. Apr. 17, 2025); mandate issued June 23, 2025.

10. On August 7, 2025, this Court administratively closed the case while preserving (i) the Receiver's ability to perform his duties under the Order Appointing Receiver and (ii) the parties' ability to make "appropriate filings." [Dkt. 728] at 9.

11. No transaction has consummated. No subsequent order of this Court has expressly approved (a) the post-Fifth-Amendment transactional posture of the Frisco Gate Property,

(b) any amendment of the Rock Creek transaction beyond the original 2022 contract, or (c) any updated appraisal contemporaneous to closing for either Property.

12. On January 31, 2025, the Office of the Attorney General for the District of Columbia filed a civil enforcement action naming **Rashid Salem** personally, **Petra Management Group, LLC**, and three single-purpose limited liability companies (4825-4829 North Capital St L.L.C., 5616 13th St NW L.L.C., and 743 Fairmont St NW LLC). See OAG Press Release dated January 31, 2025 (attached as **Exhibit A**). On October 16, 2025, the DC OAG announced a $700,000 settlement of that action, together with reform commitments and three years of compliance monitoring. See OAG Press Release dated October 16, 2025 (attached as **Exhibit B**).

## III. LEGAL STANDARD

Federal Rule of Civil Procedure 60(b) authorizes relief from a final order on six enumerated grounds. Defendant addresses each in turn so the Court can squarely evaluate the requested preservation in light of the specific subdivision invoked.

### *A. Rule 60(b)(1) — Mistake, Inadvertence, Surprise, or Excusable Neglect*

Defendant does not invoke Rule 60(b)(1) as a present ground for preservation. The one-year limitation in Rule 60(c)(1) forecloses (b)(1) relief as to the December 15, 2023 sale Orders. Defendant identifies this subdivision only for completeness.

### *B. Rule 60(b)(2) — Newly Discovered Evidence*

Although the one-year limitation likewise bars formal (b)(2) relief as to the December 15, 2023 Orders, Defendant respectfully notes that *present-day* market evidence — including current appraisal evidence Defendant intends to present under separate cover — together with the *post-affirmance* January 31, 2025 DC OAG enforcement action against the named principal of the contracted Frisco Gate purchaser (Exhibit A) are properly considered under (b)(5) and (b)(6) below, where the inquiry is whether continued prospective application of the prior Orders remains equitable or whether extraordinary circumstances warrant relief.

### *C. Rule 60(b)(3) — Fraud, Misrepresentation, or Misconduct*

Defendant does not formally invoke Rule 60(b)(3) at this time. Defendant reserves the right to file under (b)(3) if further discovery of the Receiver's post-affirmance dealings — and of the Receiver's due diligence (or lack thereof) into the contracted purchaser's present capacity, given the publicly available regulatory record — reveals a predicate sufficient under controlling Fifth Circuit standards.

### *D. Rule 60(b)(4) — The Judgment Is Void*

Rule 60(b)(4) authorizes relief where the underlying judgment is void. Defendant submits that, to the extent the Receiver intends to consummate transactions whose operative contractual terms expired by their own terms, were materially modified through multiple post-approval amendments, or have been revived without the "further Order of this Court" required by Paragraph 94 of the *Receivership Order*, consummation in that posture would exceed the scope of authority the Court itself defined. A consummation undertaken in excess of the Court-defined authority is, in substance, an action taken without judicial approval and therefore raises substantial questions regarding whether consummation remains within the scope of the authority previously approved by the Court — questions this Court should resolve before the transaction is irreversible.

### *E. Rule 60(b)(5) — Continued Prospective Application Is No Longer Equitable*

Rule 60(b)(5) permits relief where "applying [the judgment] prospectively is no longer equitable." The Supreme Court has confirmed that Rule 60(b)(5) provides a means by which a party may obtain relief from an order with prospective application where a significant change in factual conditions or in law renders continued enforcement no longer equitable, under a flexible standard that places the burden on the party seeking relief to show that changed circumstances warrant modification. That is the heart of Defendant's Motion. The orders approving sale rested on a defined transactional record: 2022 PSAs at a defined price, with a defined closing window, supported by appraisals and broker value opinions as of late 2022 valuation dates, and entered under a "best interest" analysis premised on then-current economic conditions and concerns about eroding equity. Each of those premises has materially changed by the simple operation of time:

- The original PSA closing window expired in or about March 2023; no closing has occurred in the more than three years since.

- The Frisco Gate transaction has been the subject of at least five amendments, per the Receiver's own description at [Dkt. 376].

- The appraisals and broker opinion of values on which the Court relied were effective late 2022; they are now more than three years stale. Market conditions in the Dallas–Fort Worth metroplex — including in the Frisco corridor and Rock Creek specifically — have materially changed.

- The Receiver's original "best interest" analysis was premised on the proposition that delay would erode equity. That premise has been tested by time and, Defendant contends, has been falsified by appreciation.

- Subsequent to original approval, the named principal of the contracted Frisco Gate purchaser became the subject of a public DC OAG civil enforcement action that resolved in a $700,000 settlement plus three years of compliance monitoring. See **Exhibits A & B**.

### *F. Rule 60(b)(6) — Any Other Reason That Justifies Relief*

Rule 60(b)(6) is the residual ground available where the case presents extraordinary circumstances not captured by subdivisions (1)–(5). Defendant submits that the conjunction of (i) the apparent expiration of the originally approved contractual framework, (ii) the constitutional concerns under Luis v. United States, 578 U.S. 5 (2016), (iii) the administrative-closure status of this case, (iv) the post-affirmance regulatory record regarding the contracted purchaser's principal, and (v) the irreversibility of real-property transfer while there being no emergency collectively present extraordinary circumstances within the meaning of (b)(6).

## IV. ARGUMENT

### *A. Paragraph 94 of the Receivership Order Independently Requires a "Further Order" Before Transfer of Clear Title.*

The *Receivership Order* itself states that the Receiver "will be authorized to sell, and transfer clear title to," receivership real property only "Upon further Order of this Court, pursuant to such procedures as may be required by this Court and additional authority such as 28 U.S.C. §§ 2001 and 2004." [Dkt. 650] ¶ 94 (emphasis added). The structure is intentional: locating, listing, and

contracting for sale (Paragraph 93) is one category of authority; transferring clear title is another, conditioned on further judicial process.

This Court approved a *defined* transaction at [Dkt. 142] in January 2023 and re-approved a *defined* transaction at [Dkt. 438] in December 2023 — each time tied to the operative state of the PSA before it. As described by the Receiver, the PSA has since been amended at least five times. [Dkt. 376] at 4–6. A reasonable reading of Paragraph 94 — read in conjunction with 28 U.S.C. § 2001(b) — is that material changes to the operative transactional terms after the approval Order require a further Order before clear title may be transferred. That is the precise question Defendant asks this Court to resolve before any closing occurs.

***B. The Original PSA Closing Window Expired by Its Own Terms; Revival Years Later Requires Renewed Judicial Scrutiny.***

Section 5.1(a) of the December 13, 2022 PSA fixed an outside closing date of approximately March 13, 2023 (sixty days after expiration of a thirty-day Feasibility Period). No closing occurred. The Receiver has described five subsequent contractual amendments. [Dkt. 376] at 4–6. Defendant submits, respectfully, that the conjunction of (i) elapsed closing date, (ii) successive amendments, and (iii) materially changed market conditions converts the present transaction into something legally and factually distinct from the transaction the Court approved in 2023.

This is not an argument that the PSA is "void" as a matter of pure contract law. It is the more disciplined argument: the Court approved a specific transaction with specific economics and specific timing. A revived, amended, and stale version of that transaction is, on the current record, materially different from what the Court approved. Whether the difference rises to the level requiring renewed judicial approval under Paragraph 94 of the *Receivership Order* and § 2001(b) is itself a question the Court should answer before consummation moots it.

***C. Paragraph 93's "True and Proper Value" Standard Requires Contemporaneous Valuation Evidence.***

Paragraph 93 of the *Receivership Order* obligates the Receiver to act "with due regard to the realization of the true and proper value of such real property." [Dkt. 650] ¶ 93. That standard is not satisfied by reliance on three-year-old appraisals as the sole valuation basis for a transaction the Receiver now intends to consummate. The appraisals supporting [Dkt. 438] had effective

valuation dates in late 2022; they have not been refreshed in any record visible to Defendant. Compliance with Paragraph 93 — together with the statutory two-thirds threshold of § 2001(b) — requires that the Court direct the Receiver to obtain and file current appraisal evidence before any closing.

Section 2001(b) reinforces this conclusion. The statute provides that, before confirmation of any private sale, "the court shall appoint three disinterested persons to appraise such property," and that "[n]o private sale shall be confirmed at a price less than two-thirds of the appraised value." 28 U.S.C. § 2001(b). Those safeguards are mandatory, and a broker's opinion of value — while potentially informative — is not the equivalent of the three court-appointed disinterested appraisals the statute contemplates. On the present record, the valuation basis for the approved sales appears to rest in material part on broker opinions of value together with appraisals bearing late-2022 effective dates. Defendant does not contend that the prior sale Orders were void from inception. Defendant submits only that, before any transfer of clear title, the Court should direct the Receiver to confirm on a current record that the § 2001(b) valuation safeguards — including the three-disinterested-appraiser requirement and the two-thirds-of-appraised-value floor — are satisfied as of consummation, rather than as of approval more than three years ago.

### *D. Market Values of the Subject Properties Have Materially Appreciated, Inverting the Receiver's Original Equity-Erosion Premise.*

At the time of approval, the Receiver argued that delay would erode estate equity. See, e.g., [Dkt. 76]; [Dkt. 110]. Defendant contends, and intends to demonstrate by current appraisal evidence submitted under separate cover, that market values for the Frisco Gate Property and the Rock Creek Property have materially appreciated in the interim. If the record bears that out, the original "best interest" analysis under § 2001(b) no longer holds, and prospective application of the December 15, 2023 sale Orders is no longer equitable within the meaning of Rule 60(b)(5).

### *E. Buyer-Entity Qualification and Capacity for the Frisco Gate Transaction; Recent Regulatory Record of the Named Principal.*

The Frisco Gate PSA was signed by Rashid Salem as Manager of Petra Development on December 15, 2022. More than three years have since elapsed. In the interim, the publicly available regulatory record has materially changed. Specifically:

13. On **January 31, 2025**, the Office of the Attorney General for the District of Columbia filed a civil enforcement action against **Petra Management Group, LLC**, **Rashid Salem** personally, and three single-purpose limited liability companies, alleging violations of the District's Human Rights Act and Consumer Protection Procedures Act in connection with housing-voucher practices at three District apartment complexes. See OAG Press Release dated January 31, 2025 (attached as **Exhibit A**); see also OAG Complaint, filed January 30, 2025.

14. On **October 16, 2025**, the DC OAG announced a **$700,000 settlement** of that action, together with reform commitments and three years of compliance monitoring. See OAG Press Release dated October 16, 2025 (attached as **Exhibit B**); see also Petra Consent Order, executed.

15. Additional publicly available material reviewed by Defendant — including marketing materials referencing a Frisco "Petra Park" concept at kirksey.com/portfolio/projects/petra-park and other publicly accessible compilations regarding Rashid Salem-affiliated entities — together raise legitimate, non-frivolous questions about whether the contracted purchaser remains presently qualified and financially capable of consummating a $9,000,000 transaction.

Defendant does not assert that the contracted purchaser entity is fictitious or that the regulatory record renders the PSA per se invalid. Defendant respectfully submits, however, that the conjunction of (i) the lapse of the original contractual closing window, (ii) the named principal's personal involvement as a defendant in a DC OAG enforcement action that settled for $700,000 within the past twelve months, and (iii) the absence on the record of any current proof-of-funds or capacity confirmation from the contracted purchaser, collectively trigger a Receiver-side fiduciary obligation to verify capacity before consummation. That obligation flows directly from Paragraph 93's mandate of "due regard to the realization of the true and proper value" of receivership real property — value cannot be realized at closing if the purchaser cannot fund the closing.

Defendant accordingly requests that the Court, before any closing, direct the Receiver to file on the record:

(a) the present legal status of Petra Development (jurisdiction of organization, current standing certificate, and registration status with the Texas Secretary of State to the extent transacting business in Texas);

(b) the present authority of Rashid Salem (or any successor signatory) to bind the contracting entity;

(c) current proof of funds or fully executed financing commitment sufficient to fund the $9,000,000 purchase price plus closing costs;

(d) any assignment or substitution of the purchaser entity that has occurred since December 15, 2022;

(e) a representation as to whether the contracted purchaser, the entities it manages, or the named principal are subject to any then-pending civil enforcement actions, settlements with conditions still in effect, or regulatory compliance monitoring (including the DC OAG consent order described in Exhibits A and B); and

(f) the Receiver's diligence file documenting his verification of (a)–(e) above.

***F. Texas Practice and the Receiver's Fiduciary Obligation Support Pre-Closing Proof-of-Funds Verification.***

Texas commercial real estate practice routinely conditions multi-million-dollar private sales on documented proof of funds or executed financing commitments. Defendant does not assert that any specific Texas statute mandates proof of funds in this context. Defendant submits instead that the Receiver's fiduciary obligation under Paragraph 93 of the *Receivership Order* — read in conjunction with the "best interest of the estate" finding required under 28 U.S.C. § 2001(b) — incorporates, at minimum, a reasonable verification that the contracted purchaser is presently capable of funding the contracted transaction. A "best interest" determination based on a purchaser who cannot in fact close is no determination at all.

The point is sharpened in light of the regulatory record described in Section IV.E. Where the named principal of the contracted purchaser has personally settled, within the past twelve months, a DC OAG enforcement action for $700,000 plus three years of compliance monitoring, the Receiver's

fiduciary diligence cannot reasonably be satisfied by the same proof-of-funds posture that may have sufficed in late 2022. The minimum reasonable diligence requires (at least) current proof of funds or financing commitments adequate to fund a $9,000,000 closing — to be filed on the record, subject to objection and review, before any transfer of clear title occurs.

***G. Sixth Amendment Concerns Under Luis v. United States.***

Defendant remains the subject of an active parallel federal criminal proceeding. The Supreme Court in Luis v. United States, 578 U.S. 5 (2016), held that the Sixth Amendment prohibits the pretrial restraint of legitimate, untainted assets needed to retain counsel of choice. Defendant acknowledges that this Court has found Wall Investor Funds traceable into the Frisco Gate and Rock Creek Properties. See [Dkt. 416] at 13–14. Luis nonetheless requires a particularized analysis as to any portion of equity that may not be traceable. Consummation of these sales will convert real-property equity into pooled receivership funds, foreclosing or substantially impairing any Luis-based claim Defendant might pursue with respect to untainted equity. Preservation pending that analysis is therefore not optional; it is constitutionally indicated.

***H. The Absence of Emergency Does Not Justify Accelerated Consummation.***

Defendant acknowledges that the *Receivership Order* does not condition the Receiver's sale authority on an emergency. It also does not authorize accelerated or expedited consummation in the absence of one. The Receiver has waited more than three years to consummate the Frisco Gate transaction through five amendments, and more than three years to consummate the Rock Creek transaction through multiple closing-date extensions. No imminent financial collapse[1], foreclosure event, or other irreparable estate harm has been shown. The same equity-erosion concerns the Receiver originally invoked are inapplicable to a market in which values have appreciated rather than depreciated.

***I. Jurisdictional Preservation Following Administrative Closure.***

The Court's August 7, 2025 administrative-closure order preserved the Receiver's authority to perform his duties under the Order Appointing Receiver and likewise preserved the parties' ability

---

[1] The Fifteenth Quarterly Status Report reflects that the receivership estate holds sufficient funds and faces no imminent cash requirements. See [Dkt. 728-1] Ex. A-1 (Standardized Fund Accounting Report reflecting a balance of $1,245,547.36 as of March 31, 2026).

to make "appropriate filings." [Dkt. 671]. The order does not divest this Court of jurisdiction; it does not authorize irreversible disposition of real property during administrative closure without further judicial process; and it does not displace the structural commands of Paragraphs 93 and 94 of the *Receivership Order*.

### *J. Real Property Is Unique; Consummation Is Irreversible.*

Real property is, by long-settled equitable principle, unique. Once title transfers to a third-party purchaser, restoration is rarely available. Equitable remedies that would otherwise be available under Rule 60(b), or any Luis claim may be foreclosed or substantially impaired by consummation. Irreversibility is the classic predicate for preservation relief.

## V. PRAYER FOR RELIEF

WHEREFORE, Defendant Timothy L. Barton respectfully prays that the Court:

1. Preserve the status quo as to the Frisco Gate Property, the Rock Creek Property, and any other Receivership real property whose previously approved sale has not yet consummated, by directing that no closing or transfer of legal title occur until the Court has resolved the matters identified herein;

2. Direct the Receiver to file, within a reasonable period to be set by the Court, a report addressing each of the following:

   (a) the present contractual posture of each pending transaction, including (i) the operative purchase and sale agreement (with all amendments) and (ii) the current closing-date framework;

   (b) the present legal status of each purchaser entity, including jurisdiction of organization, current good-standing certificate, registration status in Texas, signatory authority, and any assignment or substitution since execution;

   (c) current proof of funds or fully executed financing commitments adequate to fund the contracted purchase price plus closing costs for each pending transaction;

(d) the appraisals or broker's opinions on which the Receiver intends to rely at closing, including whether those reflect valuation dates contemporaneous to closing;

(e) a representation as to whether the contracted purchaser, the entities it manages, or its named principals are subject to any then-pending civil enforcement actions, regulatory settlements with conditions still in effect, or compliance monitoring; and

(f) the conformity of the contemplated closing with Paragraphs 93 and 94 of the *Receivership Order* and with 28 U.S.C. § 2001;

3. Set a status conference or briefing schedule on Defendant's anticipated substantive motion under Rule 60(b)(4), (b)(5), and (b)(6); and

4. Grant such other and further relief, including any preservation order under the Court's inherent equitable authority or under the All Writs Act, as the Court deems just and proper.

Dated: June 3, 2026.

Respectfully submitted,

*/s/ Timothy L. Barton*
Defendant, Pro Se
1846 East Rosemeade Parkway,
#232 Carrollton, TX 75007
(214) 914-3811
timothy.barton@proton.me

## CERTIFICATE OF CONFERENCE

Pursuant to Local Rule 7.1(b), Defendant has conferred with counsel for the Receiver and counsel for the SEC regarding the relief requested in this Motion. As of the time of filing, Defendant has not yet received each party's position on the requested relief. Defendant will promptly supplement this certificate to state whether the Motion is opposed once those positions are received.

/s/ *Timothy L. Barton*
Defendant, Pro Se

## CERTIFICATE OF SERVICE

Pursuant to Federal Rule of Civil Procedure 5(d)(1)(B), no certificate of service is necessary because this document is being filed with the Court's electronic-filing system, which will serve all counsel of record.

/s/ *Timothy L. Barton*
Defendant, Pro Se

# EXHIBIT A

DISTRICT OF COLUMBIA
Office of the Attorney General
ATTORNEY GENERAL BRIAN L. SCHWALB

MENU

Newsroom

# Office of the Attorney General Sues Petra Management Group for Illegally Limiting Affordable Housing Options in DC

**January 31, 2025**

*Landlord Uses Elaborate Scheme to Exploit District Housing Subsidies and Rent Control Exemptions For Profit, Discriminating Against Low-Income District Tenants*

The Office of the Attorney General for the District of Columbia (OAG) today sued the owners and manager of three District apartment complexes—4825-4829 North Capital St L.L.C., 5616 13th St NW L.L.C., 743 Fairmont St NW LLC, Rashid Salem, and Petra Management Group, LLC (collectively, "Petra")—for discriminating against prospective tenants without housing subsidies through an elaborate, unlawful scheme to maximize profits. Together, the three buildings have over 100 units.

An OAG investigation found that, at these buildings, Petra is illegally exploiting a District law that exempts apartment units from rent control requirements when leased to tenants with government-funded housing vouchers. Under this scheme, Petra rents units exclusively to voucher holders, deliberately excluding low- and moderate-income tenants without vouchers in order to skirt rent-controlled rates and charge higher rates subsidized by the federal and District government. The renters Petra bars from the three buildings include lower-wage workers who make too much to qualify for subsidies, senior citizens, and individuals with disabilities on fixed incomes. In its lawsuit, OAG alleges that Petra's rent-maximization scheme violates the District's Human Rights Act (HRA) and Consumer Protection Procedures Act (CPPA) by discriminating against individuals without housing vouchers based on their source of income.

**"Petra is exploiting the District's affordable housing crisis for profit—lining its pockets by limiting housing options for tenants who don't have subsidies but still struggle to afford a home. It is illegal in the District for landlords to discriminate against tenants based on their income, and Petra's elaborate scheme just further distorts a market that already puts rents out of reach for many,"** said Beth Mellen, Assistant Deputy Attorney General and Senior Counsel for Housing Protection and Affordability. "**Our lawsuit seeks to put an end to Petra's illegal conduct and help ensure that every Washingtonian has equal access to an affordable place to live."**

Rent control laws ensure that residents with limited means who do not have housing vouchers can still afford to rent safe, habitable housing in the District. In 2020, the most recent year for which data is available, the median rent for non-rent-controlled units was $2,554 per month compared to $1,442 per month for rent-controlled units.

Rent control applies to all units built before 1976, unless there is an exemption. One exemption allows a landlord to charge more than the rent-controlled amount for a unit leased to a tenant with a government-subsidized housing voucher. The exemption is permitted only after the landlord leases the unit to the voucher holder and obtains District approval. Once approved, the landlord may charge the higher rent—paid partly by the tenant and mostly by the government—as long as the tenant occupies the unit. The unit must revert back to rent control when the voucher holder moves out.

The three rent-controlled buildings where Petra is abusing this exemption to rent control are The Adams at 4825-4829 North Capitol St NE, The Madison at 5616 13th St NW, and The Keystone at 743 Fairmont St NW. Petra's scheme to exclude renters without subsidies from these buildings has been evident at every stage—from acquisition to advertisement to rental. Petra financed the purchase of each building by telling lenders they would only charge the higher government-subsidized rates for all units, rather than the rent-controlled rates required by law. Next, Petra has advertised vacant units at these buildings only at the higher subsidized rate, even though they are prohibited from charging that rate until *after* they receive an application from a voucher holder and obtain an exemption for the unit. Finally, since owning these buildings, Petra has rented vacant units only to voucher holders at the higher subsidized rents. At these rents, the units are unaffordable to renters with limited means who do not have vouchers. At The Adams, for example, one three-bedroom unit would be leased to a tenant without a voucher at a rent-controlled rate of $1,000.25, yet Petra has advertised and rented it at a subsidized rate more than three times that amount, at $3,131.00 per month.

By excluding tenants without subsidies from The Adams, The Keystone, and The Madison, Petra is discriminating against prospective tenants based on their source of income, in violation of the HRA. Petra also has made discriminatory, false, and misleading statements, in violation of the HRA and the CPPA, by advertising vacant units only at higher subsidized rates despite

not having an exemption from the lower, legally required rent-controlled rates at the time of advertisement. As a result of their unlawful conduct, Petra is limiting affordable housing options in the District for low- and moderate-income renters who need them, all while profiting from public funds intended to create more affordable housing,

OAG's lawsuit seeks to put an end to Petra's illegal scheme, secure restitution and damages for any identifiable victims, and obtain civil penalties, costs, and attorney's fees payable to the District.

A copy of the complaint is available here. (https://oag.dc.gov/sites/default/files/2025-01/2025.01.30%20Petra%20Complaint.pdf)

This matter is being handled by Assistant Attorney General Nadeen J. Saqer, Kevin Vermillion, Deputy Director of the Office of Consumer Protection, and Alicia M. Lendon, Chief of the Civil Rights & Elder Justice Section.

***Attorney General Brian Schwalb is recused from this case.*

← Back to the Newsroom Main Page (/newsroom)

## Media Contacts

oagpress@dc.gov (mailto:oagpress@dc.gov) | (202) 442-8919 (tel:202-442-8919)

Search By Keyword

press, community, lawsuits

Start Date

dd/mm/yyyy

End Date

dd/mm/yyyy

## Categories

- ☐ Article
- ☐ Blog
- ☐ Press Release
- ☐ Remarks
- ☐ Testimony

## Topics

- ☐ Antitrust
- ☐ Child Support
- ☐ Civil Rights
- ☐ Community Resources
- ☐ Consumer Alerts
- ☐ Consumer Protection
- ☐ Elder Justice
- ☐ Environmental Protection
- ☐ Immigration

- ☐ Nonprofit
- ☐ Public Corruption
- ☐ Public Safety
- ☐ Tenant Rights
- ☐ Worker Rights

Apply

# Recent Articles

JUNE 1, 2026
**Attorney General Schwalb Secures $1 Million from Political Texting Firm for Failure to Pay DC Sales Tax** (/release/attorney-general-schwalb-secures-1-million)

MAY 13, 2026
**Attorney General Schwalb Secures $1.255 Million Judgment Against Affordable Housing Nonprofit Director Who Misused Funds** (/release/attorney-general-schwalb-secures-1255-million)

MAY 7, 2026
**Attorney General Schwalb Announces Developer Will Pay $400,000 to Fix Unsafe Construction At DC Condo Building** (/release/attorney-general-schwalb-announces-developer-will)

APRIL 30, 2026
**Attorney General Schwalb Sues DC Government Contractor for Defrauding District and Stealing Wages from Workers** (/release/attorney-general-schwalb-sues-dc-government)

## Office of the Attorney General for the District of Columbia

**About OAG** (/about-oag)
**Public Safety** (/public-safety)
**Child Support** (/child-support-services)
**Worker Rights** (/worker-rights)
**Housing Justice** (/housing-justice)
**Consumer Protection** (/consumer-protection)
**Environment** (/environmental-protection)
**Civil Rights** (/civil-rights)
**Opportunities** (/jobs-partner-opportunities)
**Community** (/about-oag/oag-community)
**Newsroom** (/newsroom)
**Contact** (/about-oag/contact-us)

**OFFICE HOURS**
Monday to Friday,
8:30 a.m. to 5:00 p.m.

400 6th Street, NW
Washington, DC 20001

**PHONE:** (202) 727-3400 (tel:(202) 7273400)
**FAX:** (202) 347-8922 (tel:(202) 3478922)
**TTY:** (202) 727-3400 (tel:(202) 7273400)
**EMAIL:** oag@dc.gov (mailto:oag@dc.gov)

**ADDITIONAL CONTACTS**

For adult felony and federal cases in the District of Columbia, call the U.S. Attorney's Office at (202) 252-7566 (tel:(202) 2527566).

For federal cases generally, call the U.S. Department of Justice at (202) 514-2000 (tel:202-514-2000).

An official website of the District of Columbia government

© 2026 OAG DC. All rights reserved.
Powered by I.F. (https://ifsight.com)
Google Translate Disclaimer (https://oag.dc.gov/google-translate-disclaimer)

# EXHIBIT B

DISTRICT OF COLUMBIA
Office of the Attorney General
ATTORNEY GENERAL BRIAN L. SCHWALB

MENU

## Newsroom

# Office of the Attorney General Announces Petra Management Group Will Pay $700k to Resolve Lawsuit Over Housing Voucher Abuse Scheme

**October 16, 2025**

*Petra Will Also Reform Practices, Including by Publicly Advertising All Available Rent-Controlled Apartments at Rent-Controlled Rates*

The Office of the Attorney General (OAG) today announced that the owners and manager of three District apartment complexes—Petra Management Group, LLC, Rashid Salem, 4825-4829 North Capital St L.L.C., 5616 13th St NW L.L.C., and 743 Fairmont St NW LLC, (collectively, "Petra")—will pay $700,000 and reform their practices to resolve the Office of the Attorney General's lawsuit alleging that Petra had illegally discriminated against lower income DC residents in order to boost profits, effectively limiting affordable housing options in DC.

In January 2025, OAG sued Petra (https://oag.dc.gov/release/office-attorney-general-sues-petra-management) for evading the District's rent control requirements that make housing affordable for low-income residents who do not receive housing vouchers or other subsidies. The lawsuit alleged that Petra was gaming DC's housing voucher system so that they could rent to tenants who did receive vouchers, and charge them higher, government-subsidized rates. Under the terms of today's settlement agreement, Petra will end its discriminatory practices, publicly advertise available rent-controlled apartments at the lawful rent-controlled rates rather than the higher subsidized rates, provide fair housing training to staff, and submit to three years of compliance monitoring by OAG, in addition to paying significant penalties. The settlement is still subject to final court approval.

**"Too many DC residents are already struggling to find an affordable place to live, and the Office of the Attorney General will not tolerate source of income-based housing discrimination that further limits affordable housing options,"** said Beth Mellen, Assistant Deputy Attorney General and Senior Counsel for Housing Protection and Affordability. **"Petra illegally exploited the District's housing voucher program for profit—taking advantage of DC taxpayers as well as tenants without vouchers in need of affordable housing, including seniors and people with disabilities on fixed incomes. Today's settlement both holds Petra accountable and ensures that more Washingtonians can access affordable housing."**

**"Today's settlement is a win for tenants across Ward 4 and DC who have been denied affordable housing as a result of Petra's abuses,"** said Councilmember Janeese Lewis George. **"OAG's lawsuit details a clear pattern by Petra of exploiting District law to maximize profits and discriminating against lower-income tenants. While there's still more work to do to address the harmful conduct of Petra Properties in Ward 4, I'm grateful to have Attorney General Schwalb as a partner in fighting for DC residents' rights to safe, affordable, dignified housing."**

**"Petra was putting profits above people, making it impossible for working families to find safe, affordable housing,"** said Councilmember Robert White. **"Deliberately impeding our neighbors' right to live affordably while profiting off them at their own expense is simply unjust. That's a recipe for a broken housing system and we won't tolerate it."**

Under DC law, all units built before 1976 are subject to rent control unless landlords qualify for certain exemptions. An OAG investigation uncovered evidence that Petra illegally exploited a law exempting apartments from rent control requirements when they are leased to tenants with government-funded housing vouchers or other subsidies. The lawsuit alleges that Petra illegally leased rent-controlled apartments solely to voucher holders, which enabled it to charge significantly higher rental rates subsidized by the federal and District governments. As a result, Petra deliberately excluded low- and moderate-income tenants without subsidies who would have been eligible to rent apartments at lower rent-controlled rates. Petra perpetuated this profit-maximization scheme by advertising its apartments exclusively at the increased subsidized rates without disclosing the rent-controlled rates it was legally required to charge.

OAG filed suit in January 2025, alleging that Petra's scheme unlawfully discriminated against prospective tenants based on their source of income, in violation of the District's Human Rights Act (HRA) and Consumer Protection Procedures Act (CPPA).

To resolve this litigation, Petra Management Group and its co-defendants will:

- **Pay $700,000** to the District.

- **Publicly advertise all available rent-controlled apartments at rent-controlled rates.** If any rent-controlled unit Petra owns, operates, or manages becomes vacant, Petra must post an advertisement for that unit on at least one publicly available forum, such as through a Multiple Listing Service (MLS) or apartment rental websites like Zillow.com, Apartments.com, or Redfin.com. Petra must list the unit for rent at the lawful rent-controlled rate.

- **Reform leasing and advertising practices at all of its DC properties.** Petra will end its discriminatory leasing and advertising practices at all of the properties it owns, operates, and manages in the District. This includes the three properties originally named in the lawsuit and extends to Petra's entire DC rental portfolio.

- **Provide fair housing training to staff.** Petra must provide fair housing training to all its staff who provide property management or leasing services for its properties.

- **Submit to three years of compliance monitoring by OAG**: Each year for three years following this settlement, Petra must provide documents to OAG on all of its rent-controlled properties in DC, which will allow OAG to monitor the company's compliance with the District's rent control, human rights, and consumer protection laws and with the terms of the settlement agreement. Petra must provide additional detailed records to OAG upon request to ensure continued compliance.

A copy of the settlement is available here (https://oag.dc.gov/sites/default/files/2025-10/Petra%20Consent%20Order%20-%20Executed%20%281%29.pdf).

This matter was handled by Assistant Attorneys General Nadeen J. Saqer and Camila Ramirez, Civil Rights and Elder Justice Chief Alicia M. Lendon, and Director of the Office of Consumer Protection Kevin Vermillion.

### How To Report Discrimination

District residents who believe that they have experienced or witnessed housing discrimination, or any other form of discrimination, may report it to OAG's Civil Rights & Elder Justice Section by:

- Calling (202) 727-3400
- E-mailing OAGCivilRights@dc.gov (mailto:OAGCivilRights@dc.gov)
- Mailing OAG, ATTN: Civil Rights & Elder Justice Section at 400 6th Street, NW, Washington, DC 20001

OAG's civil rights work complements the work of the District's Office of Human Rights (https://ohr.dc.gov/) (OHR), which is the primary District agency that investigates individual discrimination complaints. You can file a complaint with OHR at ohr.dc.gov/service/file-discrimination-complaint (https://ohr.dc.gov/service/file-discrimination-complaint) or call 202-727-4559.

← Back to the Newsroom Main Page (/newsroom)

## Media Contacts

oagpress@dc.gov (mailto:oagpress@dc.gov) | (202) 442-8919 (tel:202-442-8919)

Search By Keyword

press, community, lawsuits

Start Date

dd/mm/yyyy

End Date

dd/mm/yyyy

## Categories

- ☐ Article
- ☐ Blog
- ☐ Press Release
- ☐ Remarks
- ☐ Testimony

## Topics

- ☐ Antitrust
- ☐ Child Support
- ☐ Civil Rights
- ☐ Community Resources
- ☐ Consumer Alerts
- ☐ Consumer Protection
- ☐ Elder Justice
- ☐ Environmental Protection
- ☐ Immigration
- ☐ Nonprofit
- ☐ Public Corruption
- ☐ Public Safety
- ☐ Tenant Rights
- ☐ Worker Rights

Apply

# Recent Articles

JUNE 1, 2026
**Attorney General Schwalb Secures $1 Million from Political Texting Firm for Failure to Pay DC Sales Tax** (/release/attorney-general-schwalb-secures-1-million)

MAY 13, 2026
**Attorney General Schwalb Secures $1.255 Million Judgment Against Affordable Housing Nonprofit Director Who Misused Funds** (/release/attorney-general-schwalb-secures-1255-million)

MAY 7, 2026
**Attorney General Schwalb Announces Developer Will Pay $400,000 to Fix Unsafe Construction At DC Condo Building** (/release/attorney-general-schwalb-announces-developer-will)

APRIL 30, 2026
**Attorney General Schwalb Sues DC Government Contractor for Defrauding District and Stealing Wages from Workers** (/release/attorney-general-schwalb-sues-dc-government)

## Office of the Attorney General for the District of Columbia

**About OAG** (/about-oag)
**Public Safety** (/public-safety)
**Child Support** (/child-support-services)
**Worker Rights** (/worker-rights)
**Housing Justice** (/housing-justice)
**Consumer Protection** (/consumer-protection)
**Environment** (/environmental-protection)
**Civil Rights** (/civil-rights)
**Opportunities** (/jobs-partner-opportunities)
**Community** (/about-oag/oag-community)
**Newsroom** (/newsroom)
**Contact** (/about-oag/contact-us)

**OFFICE HOURS**

Monday to Friday,
8:30 a.m. to 5:00 p.m.

400 6th Street, NW
Washington, DC 20001

**PHONE:** (202) 727-3400 (tel:(202) 7273400)
**FAX:** (202) 347-8922 (tel:(202) 3478922)
**TTY:** (202) 727-3400 (tel:(202) 7273400)
**EMAIL:** oag@dc.gov (mailto:oag@dc.gov)

**ADDITIONAL CONTACTS**

For adult felony and federal cases in the District of Columbia, call the U.S. Attorney's Office at (202) 252-7566 (tel:(202) 2527566).

For federal cases generally, call the U.S. Department of Justice at (202) 514-2000 (tel:202-514-2000).

An official website of the District of Columbia government

© 2026 OAG DC. All rights reserved.
Powered by I.F. (https://ifsight.com)
Google Translate Disclaimer (https://oag.dc.gov/google-translate-disclaimer)