**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>TIMOTHY L. BARTON, et al.,<br><br>Defendants,<br><br>DJD LAND PARTNERS, LLC, and LDG001, LLC,<br><br>Relief Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Civil Action No. 3:22-CV-2118-X |

**DEFENDANT TIMOTHY L. BARTON'S REPLY TO THE RECEIVER'S OMNIBUS RESPONSE [DKT. 832] IN SUPPORT OF HIS MOTIONS FOR CLARIFICATION AND PRE-CLOSING DISCLOSURE REGARDING THE ROCK CREEK AND FRISCO GATE PROPERTIES [DKTS. 807, 808]**

TO THE HONORABLE BRANTLEY STARR,

UNITED STATES DISTRICT JUDGE:

Defendant Timothy L. Barton files this Reply to the Receiver's Omnibus Response [Dkt. 832] in support of his motions at Dkts. 807 and 808.[1]

## I. THE RESPONSE CONCEDES THE DISPOSITIVE FACTS

The Response is three pages long. It attaches no declaration, no contract, no amendment, no assignment, no settlement statement, and no certification. It answers two motions that seek transaction documents by declining, again, to provide any transaction document. It concedes that the Frisco Gate sale has not closed, and it rests on two grounds only: that the Rock Creek sale "has already closed," Dkt. 832 at 1, and that the quarterly reporting process, including the Sixteenth Quarterly Status Report filed the same day, "already exists," id. at 2 (citing Dkt. 650 ¶¶ 111–13). Both grounds fail on the Receiver's own filings.

1 This reply is directed to the Receiver's Omnibus Response [Dkt. 832], filed July 30, 2026, and is timely under Local Rule 7.1(f). No leave is required. Dkt. 747 (leave requirement "shall not apply to responses and replies filed pursuant to L.R. 7.1(e),(f)"). Mr. Barton's consolidated reply addressing the Commission's parallel response [Dkt. 822] is at Dkt. 830 and is incorporated by reference; this reply addresses the new matter in the Receiver's Response and in his Sixteenth Quarterly Status Report [Dkt. 838], filed the same day.

## II. ROCK CREEK: THE CLOSING OCCURRED WHILE MR. BARTON'S WRITTEN INQUIRY WAS PENDING, AND THE RELIEF SOUGHT IS NOT MOOT

### A. The chronology the Receiver's own filings establish

The Sixteenth Status Report discloses that the Rock Creek sale closed on June 25, 2026. Dkt. 838 at 33. Four days later, on June 29, 2026, Mr. Barton wrote to the Receiver and his counsel and asked them to confirm in writing, as to this very property, "[t]hat the purchase-and-sale agreement, and all material terms thereof . . . remains the true, valid, and currently enforceable contract, and remains in force," that the purchaser remained the Court-approved purchaser, and that no material terms had changed. Dkt. 807, Ex. 1. The transaction had already closed. Counsel's June 30 reply said only that "we are in all respects complying with the court's orders." Id. His July 2 reply declined the "multiple (and hostile) requests" and advised that "[t]he Receiver will be filing his quarterly report on July 30, 2026." Id. Neither reply mentioned that the closing had occurred days earlier.

The Court first heard of the closing in a subordinate clause of the Receiver's July 8 response to a motion about a washer and dryer: "Now that the Rock Creek Property sale has finally closed (as will be detailed in the Receiver's next Quarterly Status Report) . . . ." Dkt. 793 at 2. That filing gave no date, no terms, and no accounting, and by its own words deferred the details for another three weeks. Mr. Barton filed his motion the next day, July 9, still describing a proposed closing, because nothing of record disclosed otherwise. The full disclosure arrived on July 30, five weeks after the fact. Dkt. 838 at 33–34. The Response now asks the Court to deny the motion as moot because the sale "has already closed." Dkt. 832 at 1. The record thus reflects that the Receiver did not disclose the June 25 closing in response to Mr. Barton's written inquiries and now relies on that previously undisclosed closing as the basis for mootness.

**B. Effectual relief remains available, so the motion is not moot**

A case "becomes moot only when it is impossible for a court to grant any effectual relief whatever." Chafin v. Chafin, 568 U.S. 165, 172 (2013) (quoting Knox v. Serv. Emps. Int'l Union, 567 U.S. 298, 307 (2012)); see Church of Scientology of Cal. v. United States, 506 U.S. 9, 12–13 (1992) (availability of "some form of meaningful relief" defeats mootness even where the status quo cannot be fully restored). The disclosure and certification relief sought in Dkt. 807 remains fully available after closing: the operative contract together with the "numerous extensions of the closing date" the Report concedes, Dkt. 838 at 32, none of which appears on the docket or was submitted for approval; the assignment and purchaser-identity confirmations; the final settlement statement; and a sworn certification that the transaction that closed on June 25, 2026 conformed to the Second Rock Creek Sale Order [Dkt. 437] and to 28 U.S.C. § 2001(b). The Sixteenth Status Report narrates selected figures, but it attaches none of these documents. Narration is not verification, and a quarterly status report is not a closing file.

The figures the Report does disclose confirm why review matters. The property sold for the $1,400,000 approved in 2022, but by the June 25, 2026 closing the loan principal plus accrued note-rate interest totaled $1,454,785.10, exceeding the price. Dkt. 838 at 33. The Receiver resolved that shortfall by privately negotiating a discounted payout of $1,215,198 to the lender, negotiations the Report concedes "occurred prior to the entrance of the Court's Lender Order," id. at 33 & n.10, and by renegotiating both brokers' commissions at closing, id. at 34. Those changes altered the closing disbursement structure and directly determined the estate's net recovery. Paragraph 94 contemplates a "further Order of this Court" before clear title passes. If the lender payoff, commission structure, or other closing economics materially differed from the transaction the Court approved, the Court could not meaningfully determine compliance with Paragraph 94 or the sale orders without the operative contract, amendments, and final settlement statement. After those disbursements the estate received $61,836.12 in cash, id., from a sale the Court approved four

years earlier on materially different economics. The recovery should remain separately identifiable and segregated pending tracing, estate-specific accounting, and further order concerning distribution. The closing documents are therefore necessary to determine whether the disbursement arrangement was authorized by the existing sale orders or required additional approval under Dkt. 650 ¶ 94.

**C. The disclosed economics require a transaction-specific accounting**

The newly disclosed economics confirm that meaningful post-closing relief remains available and that the requested closing file must contain enough transaction-specific information to reconcile the stated recovery. From the $1,400,000 sale price, the Receiver paid $1,215,198 to the lender, credited $31,528 in prepaid rent already held, paid $13,595.88 in prorated taxes, paid $35,000 to each broker, and paid $7,842 to the title company. Dkt. 838 at 33–34. The estate received $61,836.12 in cash, and the Report places the total benefit, including prepaid rent, at $93,364.12. Id. at 34. The broker commissions and title charge alone totaled $77,842—$16,005.88 more than the cash received at closing. After nearly four years of administration, the Report does not disclose whether the disposition produced a positive net recovery after including the appraisals, statutory-sale procedures, Receiver time, counsel time, and other Rock Creek-specific professional expenses. The proportionality question is whether the total cost of obtaining the reported $93,364.12 benefit—including $61,836.12 in closing cash—substantially outweighed that benefit.

The Report provides no Rock Creek-specific total for the Receiver's fees, counsel's fees, appraisal charges, publication costs, or other professional expenses generated by the sale proceedings and closing efforts. It also states that Receiver, counsel, and accountant fees accruing since April 1, 2024 remain unpaid and are "extensive," without allocating them by property or task. Id. at 76–77. Under Fifth Circuit authority, a receiver is the "representative and protector" of all interests in receivership property, and the receiver's object is to maximize value for investors and creditors. Jones v. Wells Fargo Bank, N.A., 666 F.3d 955, 966–67 (5th Cir. 2012). The

Receiver should therefore be required to provide enough transaction-specific information to demonstrate that the sale and its associated expenses conserved estate value and complied with the Court's orders. The existing quarterly process supplies neither the amount spent to produce the recovery nor a means to evaluate that proportionality.

The timing further supports a focused accounting. The Receiver states that a title company declined to issue a policy while the first Rock Creek appeal was pending, that a title company again declined after the second sale-order appeal, and that the parties entered "numerous extensions" while the Receiver searched for a title company willing to close. Id. at 30–32. Whether that history is characterized as multiple sale-approval and closing cycles or as one contract subjected to repeated unsuccessful closing efforts, the Receiver should provide a transaction-specific schedule identifying the direct Receiver, counsel, broker, appraisal, title, publication, and other professional fees or expenses allocated to Rock Creek, including the date, payee, amount, purpose, and whether each was incurred during a period when an appeal or identified title obstacle prevented closing. The requested accounting would permit the Court to determine the actual net economic result of the Rock Creek disposition and whether the quarterly reporting process supplies the transaction-level information the Receiver claims it supplies. Mr. Barton seeks disclosure and reconciliation only at this stage and reserves any objection concerning the reasonableness, necessity, allocation, authorization, or potential surcharge of particular expenses until the accounting and supporting records are produced.

## III. FRISCO GATE: NOTHING IS MOOT, AND THE SIXTEENTH STATUS REPORT SUPPLIES NONE OF THE REQUESTED ITEMS

The Frisco Gate sale has not closed. Dkt. 838 at 36 (the transaction "remains pending today"). No mootness argument is available, and the Response offers none specific to this property. What it argues instead is that the quarterly status reporting process makes the requested order

"duplicative and unnecessary." Dkt. 832 at 2. That is a merits argument, not mootness, and the Receiver's same-day Report demonstrates otherwise.

Measured against the ten items requested in Dkt. 808 at 5–6, the Sixteenth Quarterly Status Report contains none of them. It does not attach the operative purchase and sale agreement or any amendment; it identifies no amendment after the Fourth. It states no current scheduled closing date; the Report gives none at all. It contains no statement that Petra Development, LLC remains the purchaser; the purchaser's name appears nowhere in the Report. It offers no proof of funds, no certificate of good standing, no title-company closing requirements, no declaration of the disclosures made to the purchaser or the title company, no certification that the transaction terms remain materially identical to those the Court approved, and no updated appraisal. The Receiver relies on the Report as proof that the "existing reporting process" suffices. But the Report omits every requested item, confirming that the quarterly process does not provide the requested pre-closing disclosure.

What the Report does show is a transaction that has traveled a long way from its approval. The Court approved a $9,000,000 sale in January 2023 and re-approved it in December 2023; four amendments followed by late 2023; parking complications persist, and the Receiver acknowledges he "may be forced to take the property through a fully brokered process." Dkt. 838 at 37. On his own projection, a closing today would net approximately $900,000 to the estate after payment of principal ($2,981,661.92), standard interest (approximately $1,017,483.97 as of June 30, 2026), Palisades' $3.5 million in purchase money, and three years of unpaid property taxes. Id. at 37–38. Interest accrues at $24,994.66 per month, and the lender separately claims $1,964,679.89 in default interest. Id. at 38 & n.12. The best-interest finding of December 2023 was not made on these numbers. The current debt, tax, interest, parking, and projected-net-proceeds profile is materially different from the transaction presented when approval was entered and warrants current

disclosure before any closing. Requiring the pre-closing filings delays nothing: on the Receiver's own account, closing awaits lender negotiations and unresolved parking issues, not Mr. Barton.

## IV. THE RESPONSE'S REMAINING OBJECTIONS FAIL

First, the Response invokes the reporting mechanism of Dkt. 650 ¶¶ 111–13. Quarterly narration after the fact is not the mechanism the Receivership Order prescribes for passing clear title, which occurs "[u]pon further Order of this Court, pursuant to such procedures as may be required by this Court and additional authority such as 28 U.S.C. §§ 2001 and 2004." Dkt. 650 ¶ 94. Rock Creek illustrates the difference between the two: under the existing process, the Court learned the terms of a June 25 closing on July 30.

Second, the Response argues Mr. Barton "should not be allowed to hold up the sales." Dkt. 832 at 2. The motions expressly disclaim any attack on the Court's approvals. Dkt. 807 at 1; Dkt. 808 at 1. Nothing about Rock Creek can now be delayed, and Frisco Gate has no scheduled closing to delay. A seven-day filing requirement postpones nothing except closings that could not be certified as authorized, and those are the closings the Court would want to see first.

Third, the Response objects that separate responses would "needlessly consume Estate resources." Id. Every document requested already exists in the Receiver's closing files, and the certification is a few pages signed by the officer of this Court who possesses them. The estate's Second Quarter expenses were $130,837.20, its accrued professional fees since April 2024 are, in the Receiver's word, "extensive," and alleged co-lenders have received nothing. Dkt. 838 at 76–77. The Receiver and the Commission have filed separate oppositions to producing documents that already exist in the closing files; the record does not identify any meaningful incremental cost of filing those documents for the Court's review. See Dkt. 830 at 4–5.

Finally, the Response concedes the correct path: "The Court can review the Receiver's July 30 report and, if it requires further information, direct the Receiver accordingly." Dkt. 832 at 2. That is what the motions request. The Report is now of record, and what it omits is itemized above;

the further direction is warranted. The Response's concern that information not flow to Barton "unilaterally" is answered by the motions themselves: every filing runs to the Court, and Mr. Barton has proposed in camera or under-seal treatment for anything commercially sensitive. Dkt. 807 at 7; Dkt. 830 at 4.

## V. CONCLUSION AND REQUESTED RELIEF

Mr. Barton respectfully requests that the Court deny the Receiver's request to dismiss Dkts. 807 and 808 as moot, and instead order: (1) as to Rock Creek, that within seven days the Receiver file the operative contract and every extension, amendment, and assignment; the final closing or settlement statement; a sworn certification that the transaction that closed on June 25, 2026 conformed to the Second Rock Creek Sale Order [Dkt. 437] and 28 U.S.C. § 2001(b), identifying any material change and the authority for each disbursement made at closing; and an identification of the account in which the net proceeds are held, with those proceeds segregated and separately identified pending tracing, estate-specific accounting, and further order concerning distribution; and a transaction-specific schedule sufficient to reconcile the Rock Creek sale economics, organized by each material sale-approval or closing cycle and identifying each direct Receiver, counsel, broker, appraisal, title, publication, and other professional fee or expense allocated to Rock Creek, including the date, payee, amount, purpose, and whether it was incurred during a period when an appeal or identified title obstacle prevented closing; (2) as to Frisco Gate, that the Receiver file the items identified in Dkt. 808 at 5–6 before any closing, and that no closing occur until the Court has confirmed the Receiver's authority to close on the current version of the transaction, or at minimum that the Receiver give fourteen days' advance notice of closing accompanied by the operative agreement and all amendments; (3) that any commercially sensitive material be submitted in camera or under seal at the Court's election; and (4) such other and further relief as is just and proper.

Transparency after the fact is not a substitute for compliance before the fact. The Receiver cannot rely upon completion of a transaction that was not fully disclosed before closing as both a shield against judicial review and a basis for mootness.

Dated: August 4, 2026
Respectfully submitted,

***/s/ Timothy L. Barton***
**Timothy L. Barton**
Defendant, Pro Se
1846 East Rosemeade Parkway, #232
Carrollton, TX 75007
(214) 914-3811
timothy.barton@proton.me

## CERTIFICATE OF SERVICE

Pursuant to Federal Rule of Civil Procedure 5(d)(1)(B), no separate certificate of service is necessary because this document is being filed with the Court's electronic-filing system, which will serve all counsel of record.