**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** *Plaintiff,* | § | |
| **v.** | § | **Civil Action No. 3:22-cv-02118-X** |
| **TIMOTHY BARTON, et al.,** *Defendants,* | § | |
| **DJD LAND PARTNERS LLC, and LDG001 LLC,** *Relief Defendants.* | § | |

**DEFENDANT TIMOTHY L. BARTON'S RESPONSE AND BRIEF IN OPPOSITION TO RECEIVER'S MOTION FOR EXTENSION OF TIME TO FILE SEVENTH THROUGH FIFTEENTH QUARTERLY FEE APPLICATIONS [DKT. 850] AND, ALTERNATIVELY, REQUEST FOR CONDITIONS ON ANY EXTENSION**

## TABLE OF CONTENTS

I. THE RECEIVERSHIP ORDER CONTEMPLATES CURRENT, REVIEWABLE FEE DISCLOSURE ..... 3

II. THE RECEIVER'S STATED LIQUIDITY RATIONALE DOES NOT EXPLAIN WHY THE APPLICATIONS CANNOT BE FILED ..... 6

III. THE MOTION ITSELF CONFIRMS A MULTI-YEAR EXTENSION PATTERN NOW COVERING NINE CONSECUTIVE QUARTERS ..... 7

IV. LIQUIDATION MAKES THE CURRENT FEE LIABILITY A MATERIAL ECONOMIC FACT, NOT A MERE BILLING DETAIL ..... 9

V. THE RECEIVER'S ASSERTED $2 MILLION ANNUAL "COST" DOES NOT ESTABLISH A $2 MILLION NET ECONOMIC LOSS ..... 10

VI. THE RECORD WARRANTS SEPARATE ACCOUNTING OF LIQUIDATION, PRESERVATION, AND TRACING COSTS ..... 12

VII. THE OUTSTANDING APPLICATIONS MUST CONTAIN BILLING DETAIL SUFFICIENT FOR MEANINGFUL REVIEW ..... 13

VIII. TRACING, FORENSIC ACCOUNTING, AND AUDIT WORK SHOULD BE SEGREGATED AS A DISTINCT FEE CATEGORY ..... 14

IX. FEES, RECEIPTS, DISBURSEMENTS, AND CROSS-ENTITY ALLOCATIONS SHOULD BE RECONCILED BY RECEIVERSHIP ESTATE ..... 15

X. THE PRE-FILING CORRESPONDENCE CONFIRMS BARTON'S OPPOSITION AND LEAVES THE BASIS FOR THE SEC'S NON-OPPOSITION UNEXPLAINED ..... 17

XI. ALTERNATIVE RELIEF: ANY EXTENSION SHOULD BE CONDITIONED ON IMMEDIATE DISCLOSURE ..... 19

XII. CONCLUSION ..... 22

## TABLE OF AUTHORITIES

### Cases

*EEOC v. BDO USA, L.L.P.,* 876 F.3d 690, 695–97 (5th Cir. 2017) ..... 14
*Louisiana Power & Light Co. v. Kellstrom,* 50 F.3d 319 (5th Cir. 1995) ..... 13
*SEC v. Barton,* 135 F.4th 206, 220 (5th Cir. 2025) ..... 14
*SEC v. Barton,* 79 F.4th 573, 580–81 (5th Cir. 2023) ..... 14

TO THE HONORABLE BRANTLEY STARR,
UNITED STATES DISTRICT JUDGE:

Defendant Timothy L. Barton respectfully responds to and objects to Receiver Cortney C. Thomas's Partially Unopposed Motion for Extension of Time to File Seventh, Eighth, Ninth, Tenth, Eleventh, Twelfth, Thirteenth, Fourteenth, and Fifteenth Quarterly Fee Applications [Dkt. 850] (the "Motion"). The Motion seeks to extend all nine outstanding applications to November 16, 2026. The Seventh through Fifteenth applications cover nine consecutive quarters—April 1, 2024 through June 30, 2026. Dkt. 850 at 2–5. The Receiver now expressly states that neither he nor his professional team has been compensated for any time or expense after March 31, 2024. Id. at 5.

The Motion should be denied because its liquidity rationale may explain deferred payment, but not deferred disclosure. Dkt. 850 creates the central sequencing problem: assets are sold to generate liquidity; that liquidity may then become the practical source from which accumulated professional fees are sought and, if approved, paid; yet the Motion postpones disclosure of the amount and allocation of those fees until November. The Court and Barton are therefore asked to evaluate liquidation before they know a material component of what liquidation may fund. At minimum, any extension should require immediate disclosure of the accrued fee exposure, reviewable billing narratives, segregation of tracing and forensic-accounting work, and entity-level allocation. Those conditions address Dkt. 850 only; they do not ask the Court to decide the ultimate reasonableness of fees not yet presented.

## I. THE RECEIVERSHIP ORDER CONTEMPLATES CURRENT, REVIEWABLE FEE DISCLOSURE

The operative Receivership Order requires prior Court approval before the Receiver or Retained Personnel are paid from the Receivership Estates. Dkt. 650 ¶ 116. It further provides

that, within forty-five days after each calendar quarter, the Receiver and Retained Personnel "shall apply" to the Court for compensation and expense reimbursement. Id. ¶ 117. At least thirty days before filing each application, the Receiver must serve SEC counsel with a complete proposed application, all exhibits, and relevant billing information. Id. The Motion does not state whether the SEC has already received or reviewed the complete proposed applications or relevant billing information for the nine outstanding quarters.

The Order also makes each quarterly application interim and expressly subjects compensation to cost-benefit and final review at the close of the Receivership. Dkt. 650 ¶ 118. Quarterly disclosure therefore supplies the contemporaneous cost side of the Court's review; final review tests those costs against the benefits achieved. Repeatedly deferring the applications postpones the first part of that analysis while expenses continue to accrue.

The reporting provisions point in the same direction. The Receiver must file a full report and accounting of each Receivership Estate and report cash on hand, the amount and nature of accrued administrative expenses, receipts, disbursements, and known liabilities. Dkt. 650 ¶¶ 111–12. The relief requested below asks that the delayed fee information be reconciled with those existing accounting obligations; it does not require the creation of a new accounting system.

**Historical fee-application record.**

The same thirty-day pre-filing requirement appeared in both earlier Receivership Orders. See Dkt. 29 ¶ 64; Dkt. 417 ¶ 64. The filed certificates of conference, however, do not establish a uniform record of thirty-day service. The First Application (Dkt. 156), filed February 14, 2023, states that the application and invoice exhibits were provided to the SEC on January 22, 2023—23 days before filing. The Second Application (Dkt. 237), filed May 15, 2023 and covering

January 1 through March 31, 2023, repeats January 22, 2023 as the date the application and invoice exhibits were provided to the SEC. Because that date precedes the end of the quarter covered by the application, the filed certificate is facially inconsistent with the billing period and does not reliably establish when a complete quarter-end package was served. The original Third Application (Dkt. 300), filed August 14, 2023, states a July 15, 2023 SEC delivery date—exactly thirty days before filing. The renewed Third Application (Dkt. 539), filed July 26, 2024, repeats the July 15, 2023 date while also stating that the renewed application was later provided to the SEC, without identifying that later date.

The Fourth, Fifth, and Sixth Applications likewise state in their bodies that a complete proposed application, exhibits, and relevant billing information had been "originally provided" to the SEC, but the filed documents do not identify the date of that earlier complete delivery. Their certificates identify later transmission dates of December 23, 2024 for Dkt. 593 and July 2, 2025 for Dkts. 654 and 656—eight days and six days before filing, respectively. Barton does not ask the Court in this response to adjudicate historical compliance from an incomplete docket record. The narrower point is that the docket does not consistently establish when the complete pre-filing packages were served. Against that history, Dkt. 850's silence as to whether the SEC has already received the complete proposed applications, exhibits, and relevant billing information for the nine outstanding quarters is material to the weight that should be given to the SEC's non-opposition.

The docket likewise does not establish whether SEC counsel received unredacted or materially less-redacted billing narratives for the First through Sixth Applications, what substantive review was performed, or whether the Commission's prior non-opposition or acquiescence rested on complete billing information. Barton does not ask the Court in this

response to adjudicate any broader historical fee-review issue. The point is narrower: the present record reinforces the need to determine what information the SEC received and reviewed before its current non-opposition is accorded weight.

## II. THE RECEIVER'S STATED LIQUIDITY RATIONALE DOES NOT EXPLAIN WHY THE APPLICATIONS CANNOT BE FILED

The Motion ties the requested delay directly to liquidity. It states that only one Receivership real-estate asset has been sold, that available cash remains scarce in light of property taxes, administrative expenses, and secured debt, and that the Receiver therefore seeks to postpone the fee applications until additional funds are received. Dkt. 850 at 5. Those facts may explain why approved compensation cannot presently be paid. They do not explain why the amount of the accrued liability cannot be filed, disclosed, and reviewed now.

The Receivership Order separates those concepts. Paragraph 116 requires Court approval before compensation is paid; Paragraph 117 separately requires the Receiver and Retained Personnel to apply for compensation on a quarterly schedule. Dkt. 650 ¶¶ 116–17. A fee application can be filed and adjudicated even if payment must await liquidity. Indeed, when cash is constrained, knowing the size and allocation of the unpaid professional liability becomes more—not less—important because future sale proceeds may become the source from which those accumulated fees are sought.

The Receiver's own current reporting sharpens that distinction. Dkt. 838 states that liquidity concerns have forced the Receiver both to delay submission of fee applications and to "pick-and-choose which property taxes to pay." Dkt. 838 at 24. The report also identifies concrete property-level obligations, including secured debt, accrued interest, and unpaid taxes. See, e.g., Dkt. 838 at 37–38. Those disclosures may support a claim that payment priorities are

difficult; they do not identify which particular presently payable obligation makes filing the fee applications impossible. Nor does Dkt. 850 identify, by creditor or taxing authority, the specific amount presently due, the due date or delinquency status, the penalties or interest accruing, or why that obligation prevents disclosure and judicial review rather than payment. This matters because Dkt. 650 ¶ 114 separately authorizes ordinary-course expenses and tax payments without prior Court approval, while ¶¶ 116–17 separately govern approval and filing of professional compensation.

The proposed order submitted with the Motion would extend all nine applications to November 16, 2026 without requiring any interim disclosure of the accrued amounts or their allocation. Dkt. 850-1 at 1–2. That is particularly consequential because the Motion simultaneously states that significant equity remains in Receivership assets, anticipates additional sales in the near future, and asserts that delay in sales costs the Receivership more than $2 million annually. Dkt. 850 at 5. If carrying costs are material to the liquidation decision, the accumulated professional-fee liability is equally material to determining the net value that liquidation can produce.

## III. THE MOTION ITSELF CONFIRMS A MULTI-YEAR EXTENSION PATTERN NOW COVERING NINE CONSECUTIVE QUARTERS

The present request is not an isolated scheduling adjustment. The Receiver's own Motion identifies prior extension requests filed on November 3, 2023; February 14, 2024; May 15, 2024; August 13, 2024; November 15, 2024; February 14, 2025; May 13, 2025; August 5, 2025; November 11, 2025; February 10, 2026; and May 11, 2026. Dkt. 850 at 2–4. Thus, before the present Motion, the Receiver had already sought repeated extensions over more than two and one-half years as additional quarterly applications accumulated.

The current request extends that pattern. Dkt. 850 seeks to defer the Seventh through Fifteenth Quarterly Fee Applications together until November 16, 2026. Those applications cover April 1, 2024 through June 30, 2026. Thus, twenty-seven months of professional time and expense would remain outside the ordinary quarterly application cycle. Dkt. 850 at 2, 5.

The Receiver has also identified the materiality of the accumulated liability without disclosing its amount. The Sixteenth Quarterly Status Report states that the only accrued and unpaid administrative expenses, apart from property taxes, are Receiver and professional fees for Q2 2024 through Q2 2026, and characterizes those outstanding liabilities as “extensive.” Dkt. 838 at 76–77. The Motion repeats that no compensation has been received for work after March 31, 2024, but still supplies no aggregate dollar amount. Dkt. 850 at 5. The Court therefore knows the liability is material, but not its size.

The prior approval orders provide a useful—but necessarily rough—measure of why present disclosure matters. The amounts actually authorized in the First through Sixth Quarterly Fee Applications total $2,621,351.29: $349,868.70 (Dkt. 195), $444,394.22 (Dkt. 287), $437,741.03 (Dkt. 553), $795,230.44 (Dkt. 609), $340,857.15 for the Fifth Application and $253,259.75 for the Sixth Application (Dkt. 667). That is an average of approximately $436,891.88 per approved quarter. If that historical average were applied only as an illustrative run-rate to the nine outstanding quarters, the resulting figure would be approximately $3.93 million. Barton does not assert that $3.93 million is the actual accrued liability: the first application covered a partial quarter, the fourth order included certain expenses incurred beyond the underlying service quarter, workloads vary materially by quarter, and the unfiled applications have not been reviewed. The calculation is offered solely to demonstrate that the undisclosed

liability may be economically material enough that its actual amount should be disclosed rather than deferred.

## IV. LIQUIDATION MAKES THE CURRENT FEE LIABILITY A MATERIAL ECONOMIC FACT, NOT A MERE BILLING DETAIL

On July 8, 2026, the Court directed the Receivership into its "next phase," ordered the Receiver to solicit lender proposals for each Receivership Property, and stated that absent workable proposals the Court would instruct the Receiver to sell Receivership Properties free and clear and later determine claim and lien priorities. Dkt. 792 at 1–2. Dkt. 850 now states that the Receiver expects additional sales in the near future and relies on the asserted cost of delay—more than $2 million annually—as part of the need to move those sales forward. Dkt. 850 at 5.

In that posture, gross sale proceeds are not the relevant measure of economic benefit. The Court must be able to determine what remains after secured obligations, transaction costs, accrued professional liabilities, and the additional costs required to finish the Receivership. The Sixteenth Report states that the only completed real-estate sale generated $61,836.12 in cash at closing and describes a $93,364.12 total benefit when prepaid rent is included. Dkt. 838 at 34. Without transaction-specific and estate-specific professional-fee allocation, the Court cannot determine the corresponding net benefit after Receiver, counsel, accounting, appraisal, and other professional costs.

Barton does not presently assert that the outstanding professional liabilities will consume all liquidation proceeds; the delayed applications make that impossible to know. That information deficit is the point. If the Motion's asserted annual carrying cost is relevant to whether liquidation should proceed rapidly, the accumulated professional-fee cost is equally relevant to whether those sales will produce meaningful net value after administration.

## V. THE RECEIVER'S ASSERTED $2 MILLION ANNUAL "COST" DOES NOT ESTABLISH A $2 MILLION NET ECONOMIC LOSS

Dkt. 850 does not use the asserted "over $2 million annually" figure merely as background. It invokes that figure as part of the economic rationale for additional sales and then asks to postpone the nine fee applications until additional Receivership funds are received. Dkt. 850 at 5. But gross carrying expense is not synonymous with net economic loss. The Receiver's own reports already identify, property by property, components such as principal, standard interest, taxes, closing costs, appraisals, operating expenses, and estimated sale proceeds. See, e.g., Dkt. 838 at 34–38, 50–57, 78–79. What Dkt. 850 does not provide is a consolidated property-by-property calculation showing the components of the asserted $2 million and the offsetting economic items necessary to determine the net effect of holding each asset.

A meaningful net analysis should identify, for each material property included in the Receiver's asserted annual-cost figure: gross rental or operating receipts; operating expenses; property taxes, insurance, maintenance, and utilities; interest separately from any principal reduction; property-specific Receiver, legal, accounting, brokerage, appraisal, and transaction costs; and the change in market value during the relevant period. Principal reduction, if any, increases equity and is not economically identical to interest expense. Likewise, gross carrying expenditures cannot be equated with net loss without accounting for income and changes in value. Barton does not contend that those offsetting amounts necessarily exceed the carrying expenses; he asks that the Court require the data needed to determine the actual result.

The Receiver's own reports illustrate why property-specific analysis matters. For Frisco Gate, early broker opinions and appraisals generally placed value between approximately $8.9 million and $10.8 million, while the contracted sale price was $9 million. Dkt. 838 at 34–35. By

contrast, the Receiver reports that the Amerigold Suites' later contracted sale price was $700,000 below the original contract and attributes that reduction in part to changed market conditions. Dkt. 838 at 24, 50–57. Those different property histories caution against converting an aggregate carrying-cost figure into an assumed aggregate economic loss without current valuation and income data.

Barton does not ask the Court on this extension motion to determine the present market value of any particular Receivership property or to infer appreciation or depreciation from generalized market conditions. The narrower point is accounting-based. If the Receiver relies on an aggregate annual carrying-cost figure as part of the economic justification for continued liquidation, the Court should have the corresponding property-specific valuation, income, expense, and debt information necessary to determine whether that gross carrying cost represents an actual net economic loss. The Receiver's own reports already show that different properties have experienced materially different valuation, financing, income, and disposition histories. A single aggregate carrying-cost figure therefore cannot substitute for property-specific net economic analysis.

The proposed sequence compounds the information problem: assets may be sold to generate liquidity before the Court knows the amount of the accumulated professional liability that the resulting liquidity may be used to satisfy. The Court should know that liability before additional estate assets are converted to cash, not only after sale proceeds create the liquidity from which fees may ultimately be sought and, if approved, paid. Otherwise, the Court is asked to evaluate liquidation using disclosed property carrying costs while nine quarters of potentially substantial professional costs remain undisclosed.

## VI. THE RECORD WARRANTS SEPARATE ACCOUNTING OF LIQUIDATION, PRESERVATION, AND TRACING COSTS

The Receiver's own current reporting provides a sufficient basis for examining how professional resources have been allocated. The Sixteenth Quarterly Status Report states that the forensic accounting remains unfinished and that during Q2 2026 the accountants continued that work only "in a very limited fashion." Dkt. 838 at 69–71. At the same time, substantial professional activity has been devoted to property administration, proposed sales, sale-approval proceedings, appellate issues, title matters, contracting, and closing activity.

The missing fee applications therefore provide objective evidence capable of showing how Receivership resources have actually been allocated. The applications should separately identify professional time and expense devoted to: (1) tracing and forensic accounting; (2) preservation, maintenance, and operation; and (3) liquidation and transaction activity—including proposed sales, failed or delayed transactions, sale-approval litigation, appellate sale work, title issues, repeated contracting and extensions, brokerage, marketing, and closing activity. Where practicable, liquidation-related work should be allocated to the property or proposed transaction that generated it. Barton does not ask the Court to decide on Dkt. 850 whether a different management strategy would have produced a better result; the requested segregation simply permits the Court to compare administrative cost with transaction-level recovery using the Receiver's own billing records.

The completed Rock Creek transaction illustrates the need. As discussed above, the Sixteenth Report states that the property sold for $1.4 million, that the lender payoff was negotiated to $1,215,198, and that only $61,836.12 remained as cash proceeds for the Estate at closing; the Report describes $93,364.12 of total benefit when prepaid rent is included. Dkt. 838

at 33–34. A disposition producing $61,836.12 in closing cash cannot be evaluated meaningfully without knowing what the Receivership spent marketing, contracting, litigating, obtaining approval for, extending, resolving title or closing issues, and ultimately closing that transaction. The point is not to prejudge those expenses, but to place the transaction's actual net economic result before the Court.

## VII. THE OUTSTANDING APPLICATIONS MUST CONTAIN BILLING DETAIL SUFFICIENT FOR MEANINGFUL REVIEW

The Fifth Circuit's fee-review jurisprudence requires documentation sufficient to permit meaningful review. In *Louisiana Power & Light Co. v. Kellstrom*, an attorney-fee/lodestar case, the Fifth Circuit held that a fee applicant bears the burden of documenting appropriate hours and rates and recognized that hours may be reduced or eliminated when supporting documentation is too vague to permit meaningful review. 50 F.3d 319, 324–26 (5th Cir. 1995). Barton relies on Kellstrom for that documentation principle, not as a receivership-specific rule governing every aspect of Receiver compensation.

Prior Receivership billing materials provided to Barton have contained substantial redactions in narrative descriptions. Barton does not contend that every redaction is improper, and he does not seek disclosure of genuinely privileged legal advice. But a fee entry that discloses only the professional, hours, rate, and charge while withholding the subject and purpose of the work may prevent meaningful evaluation of necessity, duplication, allocation, and compensability. The solution is narrowly tailored disclosure of nonprivileged billing information, with in-camera review where a particular narrative genuinely cannot be disclosed.

Accordingly, each materially redacted entry should identify, to the extent possible without revealing privileged content: the date; professional; time; amount; general nature of the

work; the entity, property, asset, litigation, or matter to which it relates; the functional category of the work; and the specific protection invoked for any withheld narrative. Where fuller public disclosure would reveal protected material, the Receiver should submit the complete unredacted entry under seal for in-camera review rather than eliminate judicial scrutiny altogether.

The general privilege principles are settled: the party asserting attorney-client privilege bears the burden of establishing it, and privilege is not presumed merely because counsel participated in a communication. See *EEOC v. BDO USA, L.L.P.,* 876 F.3d 690, 695–97 (5th Cir. 2017). BDO arose in discovery, but its burden-of-proof principle underscores why a generalized "privileged" label should not replace an entry-specific basis when compensation is sought from Receivership Estate assets.

## VIII. TRACING, FORENSIC ACCOUNTING, AND AUDIT WORK SHOULD BE SEGREGATED AS A DISTINCT FEE CATEGORY

Tracing is not collateral to this Receivership's history. In Barton I, the Fifth Circuit held that a receivership could extend only to entities that received or benefited from assets traceable to the alleged fraudulent activities at issue. See *SEC v. Barton,* 79 F.4th 573, 580–81 (5th Cir. 2023). The subsequent panel affirmed the reimposed receivership. See *SEC v. Barton,* 135 F.4th 206, 220 (5th Cir. 2025). Barton does not use this response to relitigate that affirmance. He asks the Court to determine, through the Receiver's own time records, what professional resources were actually devoted to the tracing and forensic work that became central to the remand and to administration of the Receivership.

The Receiver's own current Sixteenth Report makes the segregation particularly appropriate. It states that the accountants still had not completed the forensic accounting; that the post-Barton I work included selected tracing examples showing where alleged Wall Investor

Funds flowed into particular assets; that the accountants observed extensive commingling among Receivership Entity funds and accounts; and that Ahuja & Clark's accounting, when complete, should enable tracing from Wall-entity investors into other Receivership Entities and potentially determine how those funds were used. Dkt. 838 at 69–71. During Q2 2026, however, the accountants continued that work only "in a very limited fashion," and the forensic accounting remained ongoing. Id. at 71.

The fee applications should therefore separately identify and total all time and expense for: tracing of lender or investor funds; forensic accounting; source-and-use analysis; bank-record reconstruction; QuickBooks reconstruction or verification; asset- or entity-specific tracing; fraudulent-transfer tracing; audit work; and preparation of tracing reports, schedules, memoranda, or spreadsheets. The schedule should identify the professional, hours, rates, fees, period, entity or asset, and resulting work product. If no separate coding exists, the Receiver should state that and provide the best reasonable allocation from the contemporaneous narratives.

This request does not prejudge the answer. If substantial tracing work was performed, the segregated time records will demonstrate it. If comparatively little was performed, the same records will demonstrate that fact. Either way, the Court should have an objective record rather than competing characterizations.

## IX. FEES, RECEIPTS, DISBURSEMENTS, AND CROSS-ENTITY ALLOCATIONS SHOULD BE RECONCILED BY RECEIVERSHIP ESTATE

The Receivership Order requires a full report and accounting of each Receivership Estate. Dkt. 650 ¶ 111. That requirement becomes especially important where multiple entities, properties, and accounts are administered together or where shared professional work is paid

from a central account. Aggregate Receivership totals can conceal which entity generated the cash, which entity received the benefit of the work, and which entity ultimately bore the expense.

Accordingly, professional billing should be coded by entity or Receivership Estate whenever the work is entity-specific. For shared work, the Receiver should identify the entities benefited and the allocation method. The corresponding accounting should show, using existing books and records, each entity's opening cash or identifiable assets; rents and operating receipts; sale or settlement proceeds; direct operating expenses; professional fees; allocated common expenses; transfers in; transfers out; and ending or net position.

Any material cross-entity transfer or payment should identify the originating entity or account, recipient or beneficiary, amount, purpose, allocation methodology, and any intercompany receivable or payable recorded as a result. This is not a request to presume that a cross-entity payment was improper. Indeed, the Fifteenth Report itself identifies at least one Amerigold insurance payment made from the Main Receivership Account and later reimbursed from the Amerigold account. Dkt. 728 at 76 n.31. The point is that entity-level reconciliation is necessary to distinguish a proper reimbursed allocation from an unreconciled cross-entity subsidy.

This relief should be implemented from existing accounting data so that compliance does not itself become a new major fee project. If the Receiver's current books cannot produce an entity-level reconciliation or do not maintain intercompany balances, the Receiver should say so expressly. That fact would itself be material to the Court's cost-benefit review.

## X. THE PRE-FILING CORRESPONDENCE CONFIRMS BARTON'S OPPOSITION AND LEAVES THE BASIS FOR THE SEC'S NON-OPPOSITION UNEXPLAINED

The record is clear that this extension is opposed. On August 10, 2026, the Receiver advised Barton and SEC counsel that he intended to request an extension to November 16, 2026 for the April-June 2026 application and all earlier unfiled quarters. SEC counsel responded: "Unopposed." App. APP-008. The Receiver's filed Certificate of Conference now confirms that the Commission is unopposed and Barton is opposed. Dkt. 850 at 6.

On August 12, 2026, Barton wrote separately to SEC counsel, expressly opposing the extension and asking whether the SEC had received or reviewed the outstanding invoices and billing records; knew the aggregate accrued but unfiled professional fees; knew the amount paid to date; had compared projected liquidation proceeds against accrued and anticipated professional expenses; and possessed unredacted billing records. App. APP-006–007. Barton had separately advised the Receiver on August 10 that he opposed the extension and requested every outstanding application, the supporting invoices, quarter-by-quarter accruals, aggregate approved and paid fees, all accrued or deferred professional liabilities, and the estimated additional cost to complete liquidation. App. APP-010–011.

On August 13, 2026, SEC counsel responded that the Receivership Order provides the procedures for the Receiver's fee applications and stated: "We will review the Receiver's fee applications in accordance with those procedures." App. APP-005. That response addresses what the SEC says it will do when the applications are submitted. It does not state whether, before telling the Receiver it was "Unopposed," the SEC had already received or reviewed the outstanding invoices or unredacted billing narratives, knew the aggregate accrued but unfiled professional liability, or performed any net-recovery analysis. Later that day, Barton replied that the response did not answer those factual questions, specifically repeated whether the SEC had

reviewed the unredacted invoices, and asked the SEC to reconsider its "Unopposed" position or, at minimum, review the unredacted outstanding billing and accrued liabilities before supporting further delay. App. APP-003–004.

The issue is therefore not whether the SEC promises to review the Receiver's fee applications when they are eventually filed. It is whether the SEC had an adequate financial basis when it affirmatively stated that it was "Unopposed" to postponing disclosure until November 16, 2026. Barton asked that question directly before the SEC's response, App. APP-006–007, and reiterated it after the response, App. APP-003–004. The SEC's August 13 response did not identify any such review. App. APP-005. Barton does not ask the Court to infer misconduct from that non-answer. The narrower point is that the Commission's non-opposition does not disclose what billing information, accrued-liability data, or net-recovery analysis it reviewed before taking its position, while the Receiver's current report characterizes the unpaid liabilities as extensive.

Paragraph 117 of the Receivership Order gives the SEC a distinct pre-filing review role: SEC counsel is to receive the complete proposed application, all exhibits, and relevant billing information at least thirty days before filing. Dkt. 650 ¶ 117. Earlier in this case, the Court stated that the SEC's opposition or acquiescence to a Receiver fee application would be given "great weight." Dkt. 287 at 2. Dkt. 850 does not state whether SEC counsel has already received or reviewed the complete proposed applications or relevant billing information for the nine outstanding quarters. The basis of the SEC's position therefore matters to the Court's review.

Before according the Commission's non-opposition weight in deciding whether another extraordinary extension is warranted, the Court should ascertain whether SEC counsel has received and reviewed the complete proposed applications, exhibits, and relevant billing

information contemplated by Dkt. 650 ¶ 117 for the outstanding quarters; whether that review included billing narratives sufficient to evaluate the work performed; whether the SEC knows the aggregate accrued professional liability and projected completion costs; and whether those liabilities were evaluated against projected net recovery. If the SEC has not reviewed those materials, its non-opposition can be evaluated in that light.

This is not a request to compel interrogatory-like discovery from the SEC through a response to Dkt. 850. It asks the Court to determine the informational basis for a position that the Receiver itself invokes as "Unopposed" and that prior fee orders state may receive significant weight. Any genuinely privileged material that cannot be disclosed publicly can remain subject to appropriate protection and, where necessary, judicial in-camera review.

## XI. ALTERNATIVE RELIEF: ANY EXTENSION SHOULD BE CONDITIONED ON IMMEDIATE DISCLOSURE

If the Court is inclined to grant additional time to assemble or file the formal applications, it can preserve that accommodation without permitting the liability information to remain undisclosed until November. Barton respectfully requests that any extension of Dkt. 850 be conditioned as follows:

**1.** Within seven days, the Receiver file a Fee Status Schedule identifying each of the Seventh through Fifteenth Quarterly Fee Applications, each professional or firm, and for each quarter the fees and expenses incurred, amounts already paid (if any), amounts accrued but unfiled, amounts unpaid, and the total outstanding liability.

**2.** The Fee Status Schedule also state the Receiver's present good-faith estimate of additional Receiver, counsel, accounting, brokerage, claims-administration, and other professional costs

necessary to complete the liquidation and wind-down contemplated by Dkt. 792 and described in Dkt. 850.

**3.** All outstanding and future fee applications contain billing narratives sufficient to permit meaningful review. For each material redaction, the Receiver identify the protection asserted and disclose the nonprivileged information necessary to identify the general subject, entity or matter, functional category, time, rate, and amount. Any entry the Receiver contends cannot be adequately described publicly should be submitted unredacted under seal for in-camera review.

**4.** The Receiver separately total and identify professional fees and expenses attributable to three functional categories: (a) tracing and forensic accounting, including audit, source-and-use analysis, bank-record reconstruction, and related accounting work; (b) preservation, maintenance, and operation of Receivership properties and entities; and (c) liquidation and transaction activity, including marketing, brokerage, proposed or failed sales, contract negotiation and extensions, sale-approval litigation, appellate sale work, title work, and closing activity. For each category, the disclosure should identify the professionals involved, hours, fees, entities or assets examined or benefited, and resulting reports, schedules, or work product, subject to legitimate privilege or protection. Liquidation and transaction costs should be allocated to the particular property or transaction where practicable; if no separate coding exists, the Receiver should provide the best reasonable allocation available from contemporaneous billing narratives.

**5.** The Receiver provide an entity- or Receivership-Estate-level allocation of professional fees and expenses, identify the methodology used for shared expenses, and provide a

reconciliation of material cross-entity transfers or payments, including recorded intercompany balances or reimbursements.

**6.** Before according the SEC's non-opposition weight, the Court ascertain whether SEC counsel has received and reviewed the complete proposed applications, exhibits, and relevant billing information contemplated by Dkt. 650 ¶ 117 for the outstanding quarters; the date each complete package was received; whether the review included billing narratives sufficient to evaluate the work performed; whether the SEC knows the aggregate accrued professional liability and projected completion costs; and whether it evaluated those liabilities against projected net recovery.

**7.** No fees or expenses attributable to an unfiled or unapproved quarterly application be paid from Receivership assets or newly realized sale proceeds except by further order of the Court after the applicable fee application has been filed and reviewed, consistent with Dkt. 650 ¶ 116.

**8.** The formal applications be filed on the shortest reasonable schedule set by the Court after the interim disclosures above, rather than postponed en masse to November 16, 2026 without current liability disclosure.

**9.** The Receiver identify the specific property-tax, ordinary-course administrative, and secured-debt obligations relied upon as the liquidity basis for Dkt. 850, stating for each the creditor or taxing authority, amount presently due, invoice or assessment date, due date, delinquency status, applicable interest or penalties, and the Receivership Estate or property to which the obligation is allocated. The disclosure should also state whether the obligation is subject to any stay or other restriction on enforcement and explain why it prevents filing or disclosure of the fee applications rather than merely delaying payment.

**10.** The Receiver provide a property-by-property schedule supporting the asserted "over $2 million annually" carrying cost, identifying gross rents or operating revenue; operating expenses; debt interest; any principal reduction; property taxes; insurance; utilities and maintenance; property-specific Receiver and professional costs; brokerage and transaction costs; and the resulting net carrying cost or benefit for the period relied upon.

**11.** For each material property included in the liquidation analysis, the Receiver identify the value when he assumed control; subsequent appraisals, broker opinions of value, or other valuation analyses; current estimated market value and the principal comparable sales or other basis relied upon; proposed or actual sale price; and the resulting change in value. The disclosure should use existing valuation materials where available and need not require a new appraisal solely for this response unless the Court orders otherwise.

**12.** The Receiver provide a consolidated projected net-recovery schedule showing expected gross sale or liquidation proceeds, secured debt and taxes, transaction costs, accrued and unpaid professional fees, reasonably anticipated completion costs, and the estimated residual amount after those obligations. The purpose is to permit the Court to compare gross carrying-cost assertions with the complete projected economics of liquidation.

## XII. CONCLUSION

The question presented is no longer whether the Receiver should receive an ordinary scheduling accommodation. Dkt. 850 asks the Court to defer nine consecutive quarterly fee applications covering twenty-seven months of professional work, while admitting that those fees remain unpaid because the Receivership lacks liquidity and expects additional sale proceeds. The Receiver's current report characterizes the accumulated liability as extensive, yet neither Dkt. 838 nor Dkt. 850 states the total amount. At the same time, the current report confirms that the

forensic accounting remains unfinished and continued only in a very limited fashion during Q2 2026. Dkt. 838 at 69–71, 76–77. The historical approval orders show that the first six fee applications alone resulted in approximately $2.62 million of authorized compensation and expenses; the current reports now characterize more than two years of later unpaid professional liabilities as "extensive" without stating their amount. Because Dkt. 850 itself places Receivership economics at issue, the record should disclose three basic measures before further liquidation proceeds become the practical source from which accumulated fees may be sought and, if approved, paid: the actual net economic cost or benefit of holding the material properties; the total accrued, paid, unpaid, and projected professional cost of the Receivership; and the projected residual value after secured debt, taxes, transaction costs, professional fees, and remaining administrative liabilities.

The Court can resolve the problem without prejudging any fee request. Barton respectfully requests that the Court DENY Dkt. 850 and decline to enter the proposed order at Dkt. 850-1. Alternatively, if the Court grants any extension, Barton requests that it condition the extension on the immediate fee-status, redaction, liquidation/preservation/tracing, entity-allocation, cross-entity reconciliation, and SEC-review disclosures set out above, and that no accumulated unapproved professional fees be paid from newly realized sale proceeds before the applicable applications are filed and reviewed. Barton further requests such other relief directly related to Dkt. 850 as the Court deems just and appropriate.

Dated: August 14, 2026

Respectfully submitted,

***/s/ Timothy L. Barton***
**Timothy L. Barton**
Defendant, Pro Se
1846 East Rosemeade Parkway, #232
Carrollton, TX 75007
(214) 914-3811
timothy.barton@proton.me

**CERTIFICATE OF SERVICE**

I certify that on August 14, 2026, I filed the foregoing with the Clerk of Court through the Court's CM/ECF system, which will transmit notice of electronic filing to all counsel of record registered to receive electronic service.

***/s/ Timothy L. Barton***
**Timothy L. Barton,** Pro Se