**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** *Plaintiff,* | § | |
| **v.** | § | **Civil Action No. 3:22-cv-02118-X** |
| **TIMOTHY BARTON, et al.,** *Defendants,* | § | |
| **DJD LAND PARTNERS LLC, and LDG001 LLC,** *Relief Defendants.* | § | |

**DEFENDANT TIMOTHY L. BARTON'S**
**MOTION FOR LEAVE TO FILE OBJECTIONS TO THE RECEIVER'S**
**SIXTEENTH QUARTERLY STATUS REPORT [DKT. 838] AND BRIEF IN SUPPORT**

TO THE HONORABLE BRANTLEY STARR,
UNITED STATES DISTRICT JUDGE:

Defendant Timothy L. Barton respectfully moves for leave to file the attached Objections to the Receiver's Sixteenth Quarterly Status Report [Dkt. 838] and the supporting Appendix. The Court's June 5, 2026 Order permits Mr. Barton to proceed pro se but directs that he "must seek leave of the Court before filing any motion," except responses and replies under Local Rule 7.1(e) and (f). Dkt. 747 at 1. This motion is submitted to comply with that directive.

The supporting Appendix includes Mr. Barton's declaration under penalty of perjury concerning his review of the transactional materials attached as Exhibits 3 through 27 to Dkt. 308. See App. 011–012.

The proposed objections concern the administration and reporting of the receivership under the operative modified Order Appointing Receiver [Dkt. 650], including the Liquidation Plan and

quarterly-report requirements in Paragraphs 109 through 113, the status of the forensic accounting and claims process, entity-level accounting, accrued administrative expenses, and current liquidation activity described in Dkt. 838. The objections are directed to the Court and seek judicial supervision of the receivership; they do not communicate with any purchaser or other person covered by the Agreed Injunction.

The Receiver has expressly taken the position that the Court may review the July 30 report and, if further information is required, "direct the Receiver accordingly." Dkt. 832 at 2. The attached objections identify the specific additional information and accounting Mr. Barton contends the operative order requires. Allowing the objections to be filed will place those issues before the Court on a developed record without altering any response deadline the Court may set.

Accordingly, Mr. Barton requests that the Court grant leave and deem the attached Exhibit A Objections and supporting Appendix filed as of the date of the Court's order, with the Receiver permitted to respond within the time provided by Local Rule 7.1(e).

Dated: August 20, 2026

Respectfully submitted,

*/s/ Timothy L. Barton*
**Timothy L. Barton**
Defendant, Pro Se
1846 East Rosemeade Parkway, #232
Carrollton, TX 75007
(214) 914-3811
timothy.barton@proton.me

## CERTIFICATE OF CONFERENCE

Pursuant to Local Rule 7.1(b), on August 18, 2026, Defendant Timothy L. Barton conferred by email with Keefe Bernstein, counsel for the Securities and Exchange Commission, and Charlene Koonce, counsel for the Receiver, regarding the relief requested in this Motion. Both the Securities and Exchange Commission and the Receiver oppose the requested relief.

***/s/ Timothy L. Barton***
**Timothy L. Barton, Pro Se**

## CERTIFICATE OF SERVICE

I certify that on August 20, 2026, I filed this document through the Court's CM/ECF system, which will transmit notice of electronic filing to all registered counsel of record. To the extent any party entitled to service is not served electronically, I will cause service by a method permitted by Federal Rule of Civil Procedure 5.

*/s/ Timothy L. Barton*
**Timothy L. Barton,** Pro Se

# Exhibit A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** *Plaintiff,* | § | |
| **v.** | § | **Civil Action No. 3:22-cv-02118-X** |
| **TIMOTHY BARTON, et al.,** *Defendants,* | § | |
| **DJD LAND PARTNERS LLC, and LDG001 LLC,** *Relief Defendants.* | § | |

**DEFENDANT TIMOTHY L. BARTON'S OBJECTIONS TO THE RECEIVER'S SIXTEENTH QUARTERLY STATUS REPORT [DKT. 838]**

**TABLE OF CONTENTS**

I. INTRODUCTION AND BASIS FOR THESE OBJECTIONS ........ 3
II. THE REPORT IS NOT THE REPORT OF THE OPERATIVE RECEIVERSHIP ORDER REQUIRES ........ 3
A. The Report answers a superseded order ........ 3
B. The Liquidation Plan required by Dkt. 650 ¶¶ 109–110 has never been filed ........ 4
C. The Report is not "a full report and accounting of each Receivership Estate" ........ 4
D. The Report does not state the amount of accrued administrative expenses ........ 5
E. The Report contains no creditor list and no claim valuations ........ 5
III. AFTER NEARLY FOUR YEARS, THERE IS NO CLAIMS PROCESS AND NO DISTRIBUTION ........ 6
IV. LIQUIDATION IS PROCEEDING ON EXAMPLE-BASED TRACING WHILE THE COMPLETE ACCOUNTING REMAINS UNDONE ........ 7
A. The Receiver's own filings describe examples, not a completed tracing ........ 7
B. The 2023 declarations rest on selected transaction sequences without complete bank records ........ 8
C. The Fifth Circuit's decisions do not eliminate the need for an asset-specific record ... **Error! Bookmark not defined.**

D. The remedy: require an asset-specific best-interest record and preserve proceeds where tracing remains incomplete .......... **Error! Bookmark not defined.**

V. COMMINGLED ADMINISTRATION: THREE BANK ACCOUNTS FOR MORE THAN FIFTY ESTATES .......... 11

VI. THE HUD APARTMENTS: OPERATING PROPERTIES WITH NO REPORTED OPERATIONS .......... 12

VII. ASSET-SPECIFIC OBJECTIONS .......... 15

A. Rock Creek .......... 16

B. Frisco Gate .......... 17

C. Amerigold Suites .......... 17

D. The Four D4 Entities and the HUD Apartments .......... 18

E. The Venus Development Entities .......... 19

F. Ridgeview Addition .......... 19

G. Gillespie Villas and TC Hall .......... 19

H. BM318 (Bear Creek) and the Previously Disposed Estates .......... 20

VIII. BANKRUPTCY-ESTATE PROCEEDS REQUIRE A TRANSACTION-SPECIFIC ACCOUNTING .......... 20

IX. THE REPORT'S NARRATIVE CHARACTERIZATIONS ARE UNSWORN AND ARE DISPUTED .......... 21

X. REQUESTED RELIEF .......... 22

## TABLE OF AUTHORITIES

### Cases

*Netsphere, Inc. v. Baron*, 703 F.3d 296 (5th Cir. 2012) .......... 9
*SEC v. Barton,* 135 F.4th 206 (5th Cir. 2025) .......... 9
—*SEC v. Barton,* No. 24-10788, slip op. at 9–12 (5th Cir. Mar. 25, 2026) .......... 9
*SEC v. Barton,* 79 F.4th 573 (5th Cir. 2023) .......... 9

### Statutes and Rules

11 U.S.C. § 541(a)(1) .......... 20
28 U.S.C. § 1334(e)(1) .......... 20
Fed. R. Bankr. P. 9019 .......... 20

TO THE HONORABLE BRANTLEY STARR,
UNITED STATES DISTRICT JUDGE:

## I. INTRODUCTION AND BASIS FOR THESE OBJECTIONS

On July 30, 2026, the Receiver filed his Sixteenth Quarterly Status Report [Dkt. 838] (the "Report"), covering the second quarter of 2026. Defendant Timothy L. Barton objects to the Report. These objections rest almost entirely on the Receiver's own filings: the Report, the operative Order Appointing Receiver [Dkt. 650], the Fifteenth Report [Dkt. 728], and the Receiver's 2023 Declaration and Interim Report supporting the receivership's scope [Dkt. 308]. Measured against the order that governs it, the Report discloses a receivership that is not being administered as the Court directed. In summary: (1) the Report is keyed to a superseded order and omits categories the operative order requires; (2) the Liquidation Plan due in September 2025 has not been identified; (3) after almost four years there is no claims process and no distribution; (4) the forensic accounting remains unfinished while liquidation proceeds on example-based tracing; (5) more than fifty estates are administered through a Main Receivership Account and two identified account groupings; (6) four operating apartment complexes appear without an operating accounting; (7) two Receivership Entities that were Chapter 11 debtors require transaction-specific accounting of settlement and other proceeds; and (8) the Report's disputed narrative characterizations are unsworn. The relief Mr. Barton seeks is set out in Part X.

## II. THE REPORT IS NOT THE REPORT OF THE OPERATIVE RECEIVERSHIP ORDER REQUIRES

### A. The Report answers a superseded order

The Report states that it is submitted "pursuant to this Court's Order Appointing Receiver [Dkt. 417]," and it measures its own contents against "RO at ¶ 59." Dkt. 838 at 1, 3. Dkt. 417 is the Second Receivership Order, entered November 29, 2023. On June 23, 2025, the Court entered the modified Order Appointing Receiver [Dkt. 650], which now governs and which the Receiver

has elsewhere identified as the operative order. See Dkt. 832 at 2. Under Dkt. 650 the reporting duties are set out at ¶¶ 109–113, and they are more demanding than the provision the Report recites.

**B. The Liquidation Plan required by Dkt. 650 ¶¶ 109–110 has never been filed**

Paragraph 109 of the operative order provides that the Receiver "is authorized, empowered, and directed to develop a plan for the fair, reasonable, and efficient recovery and liquidation of all remaining, recovered, and recoverable Receivership Property (the 'Liquidation Plan')." Dkt. 650 ¶ 109. Paragraph 110 sets the deadline: "Within ninety (90) days of the entry date of this Order, the Receiver shall file the Liquidation Plan in the above-captioned action." Dkt. 650 ¶ 110. The order was entered June 23, 2025. The Liquidation Plan was therefore due by approximately September 21, 2025.

The words "Liquidation Plan" do not appear in the Report's 102 pages, and Mr. Barton has located no filing identified as the Liquidation Plan required by Dkt. 650 ¶¶ 109–110. The omission is material because the Receiver estimates that remaining equity is eroding at approximately $180,000 per month. Dkt. 838 at 4. The Court's July 8, 2026 order separately directed property-by-property lender proposals and a report within ninety days, with sales to follow if workable proposals are not obtained. Dkt. 792 at 1–2. That order underscores the need for the plan Dkt. 650 requires: a filed statement of what will be sold, in what sequence, on what timetable, at what cost, and with what projected net recovery.

The quarterly-report obligation itself runs from "the date on which the Receiver files his Liquidation Plan." Dkt. 650 ¶ 111. The reporting regime presupposes a plan that has never been filed.

**C. The Report is not "a full report and accounting of each Receivership Estate"**

Paragraph 111 requires "a full report and accounting of each Receivership Estate," reflecting the existence, value, and location of all Receivership Property and the extent of liabilities

of "the Receivership Estates." Dkt. 650 ¶ 111 (emphasis added). The receivership comprises more than fifty separately named entities. Dkt. 650 ¶ 1 (listing the Receivership Entities). Each has its own assets, its own creditors, and its own competing claimants. Yet the Report provides no entity-level accounting of any kind. It is a consolidated narrative accompanied by schedules for exactly three bank accounts. Dkt. 838 at 76 & n.28. A creditor of one estate cannot determine from the Report what its debtor estate holds, owes, has received, or has spent.

**D. The Report does not state the amount of accrued administrative expenses**

Paragraph 112.B requires each quarterly report to state "[t]he amount and nature of accrued administrative expenses." Dkt. 650 ¶ 112.B. The Report acknowledges that the Receiver, his counsel, and his accountants have accrued unpaid fees continuously since April 1, 2024—nine consecutive quarters—and describes those liabilities only as "extensive." Dkt. 838 at 77. No amount is given. The omission has become more consequential. On August 11, 2026, the Receiver moved to extend until November 16, 2026 the deadline for his Seventh through Fifteenth Quarterly Fee Applications—the nine applications that would quantify the unpaid professional charges now described only as "extensive." Dkt. 850 at 5. The Court is therefore being asked to supervise continued liquidation without a current figure for the administrative claims that will consume liquidation proceeds. At minimum, the Receiver should disclose the amount accrued to date, by professional and by quarter, before further liquidation is authorized.

**E. The Report contains no creditor list and no claim valuations**

Paragraph 112 also requires "[a] list of all known creditors with their addresses and the amounts of their claims," Dkt. 650 ¶ 112.F, and, as to claims held by the estates, "approximate valuations of claims" and the "likelihood of success" in reducing them to judgment and collecting them, id. ¶ 112.E. The Report contains neither. No creditor list appears, although the Report states that "dozens of creditors have already been identified." Dkt. 838 at 100. And while Parts III and

IV of the Report describe the Receiver's affirmative and inherited actions, it assigns no approximate valuation and no likelihood-of-success assessment to any of them. Dkt. 838 at 80–100. Four years in, the Court cannot learn what the estates' claims are worth, what their pursuit will cost, or who the creditors are.

## III. AFTER NEARLY FOUR YEARS, THERE IS NO CLAIMS PROCESS AND NO DISTRIBUTION

The Report states plainly: "The Receiver has not yet filed a Motion for Order Establishing Claims Adjudication Process." Dkt. 838 at 100. The receivership was imposed on October 18, 2022. Dkt. 29. The Report still speaks of what will happen "[i]f a claims process is initiated." Dkt. 838 at 100 (emphasis added). Sixteen reports in, the claims process remains hypothetical, the identification of investors incomplete, and the SFAR reflects no distribution to any alleged co-lender or party in interest in almost four years. The recommendation section repeats the same forward-looking commitment prior reports have made. Dkt. 838 at 101. A receivership justified as investor protection has, to date, protected no investor with a single dollar, while administrative claims against the estates accrue "extensive[ly]." Dkt. 838 at 77.

The absence of a claims process is compounded by an absence more fundamental: sixteen reports in, there is no verified identification of the persons the receivership exists to protect. The receivership's stated justification is the protection of the alleged Wall co-lenders; yet the Receiver has never filed a verified schedule stating who they are, what each is claimed to have funded and when, the bank or wire records evidencing it, or the claims each has asserted. Mr. Barton disputes the existence, the amounts, and the provenance of the alleged co-lender fundings, and he contends—and the completed accounting should determine—that certain alleged co-lenders failed to fund or defaulted on their funding commitments, giving rise to claims held by the Receivership

Estates against those persons that ¶ 112.E requires the Receiver to describe and value, and ¶ 98 requires him to investigate. Neither has been done.

The record also identifies a creditor-side issue that the required claims process should resolve rather than assume away. Mr. Barton contends that on July 1, 2019, counsel for the borrower entities, Vance McMurry, served six notices asserting funding defaults relating to Wall010, Wall011, Wall012, Wall017, Wall018, and Wall019. App. 002-007. Counsel for Michael Fu, Platinum Investments Corporation, and Silverland Finance Ltd. responded on July 11, 2019 and denied that a default had occurred. App. 008-010. The Receiver's duty under Dkt. 650 ¶¶ 98 and 112.E is not to accept either side's position as established, but to investigate the dispute and report any resulting estate claims and approximate value before liquidation is treated as a distribution process for assumed creditors.

Identification must come with proof. Mr. Barton disputes the authenticity of the lender documentation on which the alleged co-lender claims would rest, none of which has been proven up in this action—including electronically executed instruments as to which no execution certificates or audit records have been produced—and he reserves all objections to their genuineness, execution, and enforceability. Any claims process should require each claimant to establish its claim as provided in paragraph (8) below. A receivership that liquidates first, and identifies and verifies its beneficiaries later, inverts its own justification.

## IV. LIQUIDATION IS PROCEEDING ON EXAMPLE-BASED TRACING WHILE THE COMPLETE ACCOUNTING REMAINS UNDONE

### A. The Receiver's own filings describe examples, not a completed tracing

The Receiver's September 2023 declaration describes its tracing presentation as illustrative: it provides "a single example" for entities discussed in that section and states that the examples "do not provide a complete picture of all instances." Dkt. 308 ¶ 54. Its transactional

exhibits are "by no means" the totality. Id. ¶ 58. As to the Wall Entities, the Receiver stated that he had "not yet determined the exact amount of Wall Investor Funds that flowed into each." Id. ¶ 57. As to additional entities, he stated that the team had "focused to date on entities holding assets" and that "[m]y forensic accounting is ongoing." Id. ¶ 188.

Two and a half years later, the Fifteenth Report still described the forensic accounting as "ongoing" and said the work had been refocused on "finding tracing examples." Dkt. 728 at 68. The present Report again states that "the forensic accounting is still ongoing," that the accountants worked on it during the quarter only "in a very limited fashion," and that delay is attributable in part to "the Receiver's continued non-payment of his accountants and lawyers for time incurred since April 1, 2024." Dkt. 838 at 70–71. The accounting the Receiver calls "of paramount importance to the Receiver's duties," id. at 70, remains unfinished while liquidation proceeds.

**B. The 2023 declarations rest on selected transaction sequences without complete bank records**

The Receiver's 2023 Declaration and Interim Report [Dkt. 308] presents selected transaction sequences across multiple entities. The Receiver himself described the presentations as examples that did "not provide a complete picture of all instances," Dkt. 308 ¶ 54, and stated that the forensic accounting was ongoing. Id. ¶ 188. Those examples can support investigation and preservation; they do not substitute for the completed entity-by-entity accounting the Receiver now concedes remains unfinished. Mr. Barton declares that his review of Dkt. 308, Exhibits 3 through 27, identifies account-months for which corresponding monthly statements do not appear among those exhibits. App. 011-012.

That distinction matters at disposition. A multi-step tracing theory can depend on beginning balances, intervening transactions, repayment entries, and the characterization of intercompany transfers. Where the Receiver seeks an irreversible sale, the Court should have the completed

analysis for the affected estate rather than only the illustrative sequences that the Receiver originally presented while his accounting remained ongoing.

**C. The Fifth Circuit's decisions do not eliminate the need for an asset-specific record**

The Fifth Circuit vacated the first receivership order, *SEC v. Barton*, 79 F.4th 573 (5th Cir. 2023), and later affirmed the second as a permissible protective measure on the preliminary record then before the Court. *SEC v. Barton*, 135 F.4th 206, 220 (5th Cir. 2025) ("Barton II"). More recently, the Fifth Circuit affirmed the Hall Street sale and rejected a categorical rule that receivership real property may not be sold before final judgment absent exigent circumstances. *SEC v. Barton*, No. 24-10788, slip op. at 9–12 (5th Cir. Mar. 25, 2026) ("Barton III"). Barton III held that whether a sale "should have" been approved is captured by the requirement that the district court determine whether the sale is in the best interest of the estate, and it emphasized the district court's broad powers and wide discretion in supervising an equity receivership. Id. at 9–11.

Barton III does not resolve the objection presented here. Mr. Barton does not contend in this filing that the Court lacks authority to approve any sale before final judgment or that exigent circumstances are an absolute prerequisite. Rather, he contends that the best-interest determination should be made on an asset-specific record sufficient to show the affected estate's current value, liabilities, carrying costs, transaction and professional costs, projected net recovery, and the state of the tracing and accounting required by Dkt. 650. The Hall Street affirmance itself rested on transaction-specific evidence—including continuing interest accrual, the absence of a higher offer, and an expected net recovery. Id. at 11–12. The missing estate-level information identified in these objections is therefore relevant to, rather than foreclosed by, Barton III.

Nor did Barton II or Barton III complete the Receiver's later-described ongoing forensic accounting or adjudicate, entity by entity and dollar by dollar, the traceability of every asset. The Commission's claims remain untried, and Mr. Barton preserves all merits defenses.

**D. The remedy: require an asset-specific best-interest record and preserve proceeds where tracing remains incomplete**

The operative order sets out investigation, reporting, and liquidation duties that should inform one another. It appoints the Receiver "for the purposes of marshaling and preserving all assets of the Receivership Entities," Dkt. 650 at 2; directs him to determine the nature, location, and value of Receivership Property, id. ¶ 59.A; to investigate the manner in which the entities' financial and business affairs were conducted, id. ¶ 98; and to report for each estate its property, liabilities, claims and valuations, and creditors, id. ¶¶ 111–112. Those requirements supply information relevant to the best-interest determination for a proposed disposition.

Paragraphs 109–110 separately require a Liquidation Plan for "all remaining, recovered, and recoverable Receivership Property." Read together, those provisions contemplate liquidation decisions informed by the Receiver's investigation and estate-specific reporting. The objection is not that liquidation is categorically unauthorized until every accounting task is complete. It is that the Report describes liquidation while the tracing remains "ongoing," the required estate-level accounting and claims information are absent, the alleged co-lenders have not been verified in a claims process, and the merits remain untried. Where a sale must proceed before tracing is complete, the Court can preserve the issue by requiring an asset-specific best-interest showing and segregating identifiable net proceeds pending the completed analysis.

Traceability remains material to the scope and allocation of the receivership. The operative order takes jurisdiction over the named entities on the express finding that each "received or benefited from assets traceable to Barton's alleged fraudulent activities." Dkt. 650 ¶ 1. Barton II

upheld the receivership on the preliminary record, and Barton III upheld a particular sale on a transaction-specific best-interest record; neither decision converted the Receiver's illustrative tracing examples into a final estate-by-estate quantification. The completed analysis should therefore state what portion of each affected estate is traceable under the Receiver's methodology and what portion, if any, is not.

A completed analysis should be capable of showing, estate by estate, the source and path of the funds the Receiver attributes to Wall investors, with the complete monthly statements needed to test beginning balances, intervening activity, and repayment entries. Where a tracing theory depends on commingled accounts, the Receiver should identify the methodology applied—including any lowest-intermediate-balance principle the accountant considers applicable—and state the resulting tainted and untainted components of each affected estate. No such completed estate-specific statement appears in the Report.

The need is underscored by scale. The Commission alleges that Mr. Barton "raised approximately $26 million from over 100 investors." Compl. [Dkt. 1] ¶ 1; Dkt. 838 at 5. The operative receivership extends to more than fifty entities. Dkt. 650 ¶ 1. On the Receiver's own report, a single property—Windmill Farms—has an average appraised value of $53,166,666. Dkt. 838 at 46. Before irreversible disposition across a receivership of that breadth, the completed estate-specific accounting should define what portion of each estate is actually reached by the asserted tracing theory.

## V. COMMINGLED ADMINISTRATION: THREE BANK ACCOUNTS FOR MORE THAN FIFTY ESTATES

The requirement of an accounting "of each Receivership Estate," Dkt. 650 ¶ 111, is consistent with Paragraph 90's separate direction that "[f]or each of the Receivership Estates" the Receiver establish one or more custodial accounts. Dkt. 650 ¶ 90. The Report instead describes a

Main Receivership Account, Amerigold Suites accounts, and a D4OP, LLC account. Dkt. 838 at 76 & nn.27–29. Rock Creek sale proceeds of $61,836.12 and a BM318 royalty payment of $528 were both deposited into the Main Receivership Account. Id. at 77.

Whatever administrative convenience a pooled account may provide, the Report does not reconcile that structure with Paragraph 90's per-estate text or Paragraph 111's requirement for an accounting of each estate. A creditor or owner of one estate cannot determine from the Report what cash attributable to that estate has been received, transferred, or spent.

The Report's own footnotes show cross-account administration. Amerigold Suites insurance premiums were paid from the Main Receivership Account in February and March 2026, and $13,880.70 was later transferred from the Amerigold account back to the Main account on April 7, 2026. Dkt. 838 at 78 n.31, 79 n.32. The Report also notes that $400,192.49 held in the name of D4OP, LLC was "currently unavailable to the other Receivership Entities." Id. at 76 n.29. Those disclosures make an entity-level reconciliation necessary.

The Report itself characterizes pre-receivership inter-entity activity as "extensive comingling between various Receivership Entity funds and accounts." Dkt. 838 at 70. At minimum, the same concern for entity separateness warrants a transparent reconciliation of the Receiver's own pooled administration. The Court should require compliance with Paragraphs 90 and 111, or a clear explanation of the authority for any different structure, together with an entity-by-entity accounting of receipts, disbursements, and transfers.

## VI. THE HUD APARTMENTS: OPERATING PROPERTIES WITH NO REPORTED OPERATIONS

Receivership Entities D4DS, LLC, D4FR, LLC, D4IN, LLC, and D4OP, LLC are the record owners of four apartment complexes: Bellwether Ridge in DeSoto, Texas; the Parc at Windmill Farms in Forney, Texas; the Parc at Ingleside near Corpus Christi, Texas; and the Parc

at Opelika in Opelika, Alabama. Dkt. 838 at 41–42 (the Report at 41 names "DRIN, LLC," an apparent error for D4IN, LLC). These are completed, operating properties: construction at Opelika is finished, id. at 47, and "the HUD Apartments have third-party property managers," id. at 48. The Report values them in the range of $29 million, $53 million, and $28–31 million, and states each HUD and SPC loan balance to the dollar. Id. at 44–48.

What the Report does not state, for any of the four properties, is a single operating figure. No gross rental receipts. No occupancy. No operating expenses. No management fees. Not the identity of the property managers, nor their contracts, nor the compensation they take. Not the bank accounts into which four apartment complexes' rents are deposited, nor the balances in those accounts, nor reserve or escrow positions, nor debt-service status. Exhibit A to the Report contains no account for D4DS, D4FR, or D4IN at all, and the one HUD-entity account the receivership schedules do include—D4OP's—received no deposits during the entire quarter. Dkt. 838 at 78.

The omission is material because the Receiver confirms that these are operating apartment properties managed by third parties. Dkt. 838 at 48. Yet the Report does not disclose where rents are deposited, the balances of operating or reserve accounts, occupancy, debt-service performance, or net cash flow. Those are ordinary operating records available from the property managers and lenders. Without them, the Court cannot determine whether continued operation, refinancing, or sale produces the best net result for the particular estate.

The Report also does not identify a payment default, acceleration, or lender demand requiring an immediate sale of any of the four HUD Apartments. Dkt. 838 at 41–48. The point is not that Mr. Barton asks the Court to assume the properties are profitable; it is that the Report supplies valuations and loan balances while omitting the operating data needed to answer that

question. A liquidation decision should be made on the complete operating record, not on an accounting that excludes the properties' revenues and reserves.

The reporting gap is visible in the Receiver's own schedules. Exhibit A to the Report shows no account for D4DS, D4FR, or D4IN and no deposits into the D4OP account during the quarter. Dkt. 838 at 78. Because the Receiver acknowledges that third-party property managers operate the HUD Apartments, id. at 48, the supplemental report should identify every account, reserve, and escrow maintained for each property and account for the revenues and disbursements from October 18, 2022 to the present.

The rents these properties generate are revenues of Receivership Estates. Whoever is collecting those rents, the rents are revenues of Receivership Estates: the four D4 entities are Receivership Entities over whose assets this Court has taken "exclusive jurisdiction and possession." Dkt. 650 ¶ 1. Either the rents are being collected and applied by third parties without any account to this Court; or they are being collected under SPC's claimed conversion rights, which this Court has never adjudicated, Dkt. 838 at 42–43; or they are held in accounts the Report does not disclose. Whichever is true, ¶¶ 111 and 112 require the answer to appear in the quarterly report, and it does not.

Mr. Barton accordingly requests that the Court order the Receiver to file, within thirty days, a sworn per-property operating accounting for each of the four HUD Apartments from October 18, 2022 to the present, stating: (a) the identity of each property manager and a copy of each management agreement; (b) monthly gross rental receipts and occupancy; (c) monthly operating expenses and management compensation; (d) the identity, location, and balance of every account into which revenues of D4DS, D4FR, D4IN, or D4OP have been deposited; (e) all funds held by any property manager, lender, or servicer for the account of D4DS, D4FR, D4IN, or D4OP,

including operating reserves, replacement reserves, tax and insurance escrows, and HUD-required reserve for replacement accounts, stated by account and by holder; (f) debt-service payments made and arrearages claimed on the HUD and SPC loans; (g) the debt-service coverage ratio and net cash flow for each property for each fiscal year since October 18, 2022; and (h) every transfer of any such funds to any person, with the authority for each transfer.

Mr. Barton further requests that no sale or other disposition of any of the four HUD Apartments be approved absent the sworn operating accounting described above or, if the Receiver seeks an earlier disposition, an asset-specific showing demonstrating why sale before completion of that accounting is in the best interest of the affected estate. Any such showing should disclose the operating information then available, current debt and carrying costs, transaction and professional costs, and projected net recovery, with identifiable net proceeds segregated as appropriate pending completion of the required accounting. The point is not to impose a categorical bar on pre-judgment sales, but to ensure that the Court has the property-level information necessary to make the best-interest determination recognized in Barton III.

## VII. ASSET-SPECIFIC OBJECTIONS

The Fifth Circuit affirmed the Receivership Order as a permissible protective measure on the preliminary record then before it. *SEC v. Barton*, 135 F.4th 206 (5th Cir. 2025). It later affirmed the Hall Street sale under the best-interest-of-the-estate standard. *SEC v. Barton*, No. 24-10788, slip op. at 9–12 (5th Cir. Mar. 25, 2026). Mr. Barton does not ask the Court, in this filing, to revisit the inclusion of any entity or to adopt a categorical rule against sales before final judgment. For present purposes, the entities remain in the receivership under the affirmed order. The asset-specific objection is instead that future dispositions should be supported by a record sufficient to permit the best-interest determination Barton III requires, including the estate-specific tracing and accounting available for the asset. For each entity below, the requested consequence is either that

the completed tracing be filed before disposition or, if a sale proceeds first based on an adequately supported best-interest showing, that identifiable net proceeds be segregated pending completion of the tracing and allocation of tainted and untainted components.

**A. Rock Creek**

The Rock Creek sale closed on June 25, 2026 at $1.4 million; the lender took a discounted payoff of $1,215,198; brokers were paid $70,000; and the estate received $61,836.12—4.4 percent of the sale price. Dkt. 838 at 33–34. The Report acknowledges "numerous extensions of the closing date," none of which appears on the docket. Id. at 32. The Receiver's July 30 response states that he had previously notified the Court of the completed closing in Dkt. 793; the transaction details were reported in Dkt. 838 at 33–34. Dkt. 832 at 1. Mr. Barton incorporates his motions and replies concerning this transaction [Dkts. 807, 830] and renews his request that the closing documents, settlement statement, and disbursement authority be filed of record.

The Report does not disclose the transaction-specific professional fees incurred in pursuing the Rock Creek sale. That omission matters because the estate received $61,836.12 in cash at closing, while Dkt. 850 confirms that professional fee applications covering work after March 31, 2024 remain unfiled and seeks to defer them until November 16, 2026. Dkt. 850 at 5. The Court therefore cannot determine from the present record the transaction's net benefit after professional costs. The Receiver should provide that transaction-specific accounting before the proceeds are consumed by further administrative expense.

The tracing record should be described with equal precision. Dkt. 308 ¶¶ 59–61 states that SF Rock Creek received commingled funds and presents the Receiver's tracing theory, but that presentation was part of the same declaration that expressly characterized its transactional presentations as examples rather than a complete tracing. See Dkt. 308 ¶¶ 54, 58. Because the sale

has closed, the proceeds should be preserved and segregated until the completed analysis identifies the tainted and untainted components of the estate.

**B. Frisco Gate**

The Frisco Gate sale "remains pending today." Dkt. 838 at 36. The Report discloses no closing date, attaches no operative contract, and contains none of the ten categories of transaction documents identified in Dkt. 808. Meanwhile standard interest accrues at $24,994.66 per month, the lender claims default interest of $1,964,679.89 at 18 percent plus $53,765.30 in fees, and the projected net to the estate on a $9 million sale is roughly $900,000. Id. at 37–38. A property-tax suit has been filed against the property notwithstanding the stay. Id. at 38 n.13. A court-supervised sale in this posture should not be invisible to the Court supervising it.

The Receiver's declaration states that FHC Acquisition received Wall Investor Funds used to pay down the Frisco Gate loan and supplies "an example of such a transaction." Dkt. 308 ¶ 71. The objection is therefore not that the Receiver asserted no tracing; it is that the assertion rests on the same example-based presentation the Receiver concedes was incomplete, while the forensic accounting remains ongoing. Because the sale remains pending, the completed estate-specific analysis should be filed before closing or, if an urgent closing is authorized first, the net proceeds should be segregated pending that analysis.

**C. Amerigold Suites**

Amerigold is the one operating asset for which the Report provides operating data, and that data raises its own questions. Gross rental income for the quarter was $180,052.44, Dkt. 838 at 77; expenses were $125,546.14, id. at 79. No debt-service payment on the note secured by the property appears among the disbursements, and the Report does not state that note's balance or default posture. An operating property held for nearly four years, generating positive cash flow, with no

disclosed mortgage payments and no resolution strategy, is precisely what a Liquidation Plan under ¶ 109 was to address.

The tracing record for Amerigold illustrates the same distinction. Dkt. 308 ¶ 103 states that Amerigold received Wall Investor Funds for improvements and operations and refers to examples in Exhibit 9. Mr. Barton disputes the characterization of the intercompany activity and notes that Goldmark Hospitality acquired the property in 2005, before the 2017–2019 Wall investments. The appropriate response is not to treat either side's characterization as final, but to require the completed accounting to quantify what Wall funds, if any, reached acquisition, improvements, or operations and what portion of the present asset is traceable to them.

**D. The Four D4 Entities and the HUD Apartments**

Part VI addresses the absence of an operating accounting for these four properties. The 2023 declaration separately asserts tracing or indirect benefit as to each: D4DS allegedly received Wall or commingled funds, Dkt. 308 ¶ 84; D4FR allegedly received Wall Investor Funds used in construction, id. ¶ 91; D4IN allegedly benefited through salary payments and HUD-loan support while the accounting remained ongoing, id. ¶ 95; and D4OP allegedly received Wall Investor Funds used in construction, id. ¶ 97. Each paragraph relies on examples or an incomplete accounting. The Court should require the final, quantified tracing before irreversible disposition of these assets.

The asset-specific point is therefore narrow: the 2023 declarations assert tracing or benefit, but the Receiver also states that the accounting was ongoing and that the transactional presentations were examples. Dkt. 308 ¶¶ 54, 84, 91, 95, 97, 188. Before disposition, the completed analysis should quantify the amount and pathway attributed to each D4 estate.

**E. The Venus Development Entities**

For the Venus Development entities, the Report describes holding costs and no completed disposition strategy. Dkt. 838 at 57–64, 78. Dkt. 308 ¶ 120 is especially important as to Venus 59, LLC: the Receiver states that, unlike the other listed Venus parcels, Venus 59 was not bought using Wall Investor Funds or proceeds from properties bought with such funds, while separately alleging that Venus 59 indirectly benefited from development work performed by Receivership Entities. That is precisely the kind of distinction the completed accounting must quantify before disposition: direct purchase-money tracing is absent, and the asserted indirect benefit must be identified and valued rather than assumed.

**F. Ridgeview Addition**

Ridgeview Addition presents a multi-step tracing theory. The Receiver states that Wall Investor Funds were traced to Ridgeview through proceeds from Villita Towers routed through a series of transfers and provides one example in Exhibit 14. Dkt. 308 ¶ 126. Mr. Barton disputes the characterization and contends the property was acquired in Carnegie Development's ordinary course. Because the theory depends on a multi-entity chain and the Receiver's accounting remains unfinished, the completed tracing should identify the relevant balances, transfers, and repayments before disposition.

**G. Gillespie Villas and TC Hall**

Gillespie Villas, LLC and TC Hall, LLC also involve asserted tracing coupled with third-party ownership issues. Dkt. 308 identifies them as entities claimed by non-party Max Barton. Id. ¶¶ 163–169. The Receiver states that Gillespie was purchased using proceeds from properties bought with Wall Investor Funds and provides an example, id. ¶ 164; he further states that Wall Investor Funds were traced to the Hall Street Property through financing secured by Gillespie, id. ¶¶ 167–168. Mr. Barton disputes those characterizations and ownership attributions. Because

disposition could affect a non-party claimant, the completed, quantified tracing and ownership record should precede any sale.

**H. BM318 (Bear Creek) and the Previously Disposed Estates**

The objection also extends to estates already disposed of. Dkt. 308 asserted a tracing theory as to BM318 and the Court's 2023 memorandum opinion relied on that theory in continuing BM318 within the receivership. See Dkt. 308 ¶ 154 & Ex. 21; Dkt. 416 at 12 n.53. The Receiver later presented BM318 settlements at Dkt. 524, while the 2999TC/HNGH settlement was approved at Dkt. 236. Because the Receiver now concedes that the forensic accounting remains ongoing, the Court should require an estate-specific reconciliation of the consideration from those dispositions and preserve identifiable proceeds pending the completed accounting.

## VIII. BANKRUPTCY-ESTATE PROCEEDS REQUIRE A TRANSACTION-SPECIFIC ACCOUNTING

Two Receivership Entities discussed above—2999TC Acquisitions, LLC and BM318, LLC—also were debtors in Chapter 11 cases. The Receiver later compromised claims associated with those entities. This objection does not ask this Court to decide, on the present record, that any settlement or transfer violated a bankruptcy-court order. It asks for a transaction-specific accounting that identifies the bankruptcy authority for each compromise, the recipient of the consideration, the account in which the proceeds were deposited, and the treatment of the applicable bankruptcy creditors.

2999TC filed Chapter 11 on October 29, 2021. In re 2999TC Acquisitions, LLC, No. 21-31954-swe11 (Bankr. N.D. Tex.). The Receiver later settled litigation involving HNGH Turtle Creek, LLC; this Court approved the settlement at Dkt. 236. The present Report states that receipts of Receivership Estates generally are deposited into the Main Receivership Account. Dkt. 838 at 76. The quarterly reports do not provide an entity-level reconciliation showing the 2999TC

settlement consideration, bankruptcy-court authorization, distributions to 2999TC creditors, and any balance remaining for that entity.

BM318 likewise was a Chapter 11 debtor. In re BM318, LLC, No. 21-04051-mxm (Bankr. N.D. Tex.). The Receiver settled claims involving the Dixon Water Foundation and Lumar Land and Cattle, Dkt. 524, and Dkt. 838 records a $528 BM318 royalty payment deposited into the Main Receivership Account. Dkt. 838 at 77. The Report does not provide the entity-level reconciliation necessary to determine what BM318 consideration was received, what bankruptcy orders governed it, what creditors were paid, and what balance remains attributable to BM318.

The governing bankruptcy provisions make that accounting important. Section 1334(e)(1) vests exclusive jurisdiction over property of the debtor and the bankruptcy estate in the district court in which the bankruptcy case is commenced or pending. 28 U.S.C. § 1334(e)(1). Causes of action belonging to the debtor ordinarily constitute property of the estate under 11 U.S.C. § 541(a)(1), and compromises of bankruptcy-estate claims are generally governed by Fed. R. Bankr. P. 9019. The Court need not resolve any jurisdictional conflict here to require the Receiver to identify the orders and authority under which these proceeds were administered.

The issue is concrete because the Main Receivership Account also bears administrative expenses and the Report discloses substantial accrued professional liabilities. Dkt. 838 at 76–77. Before proceeds associated with a former Chapter 11 debtor are used for receivership-wide expenses, the Receiver should provide an entity-specific reconciliation and identify the legal basis for that treatment. See generally Netsphere, Inc. v. Baron, 703 F.3d 296 (5th Cir. 2012).

## IX. THE REPORT'S NARRATIVE CHARACTERIZATIONS ARE UNSWORN AND ARE DISPUTED

The Report is an unsworn administrative filing. To the extent it characterizes Mr. Barton's motives and litigation conduct, or attributes the receivership's condition to his appeals, see, e.g.,

Dkt. 838 at 3–4, Mr. Barton disputes those characterizations and asks the Court not to treat them as substitutes for sworn evidence on contested facts. His appellate rights produced the vacatur of the first receivership order. SEC v. Barton, 79 F.4th 573. More importantly for Dkt. 838, no appeal prevented the Receiver from filing the Liquidation Plan required by Dkt. 650, quantifying accrued fees, commencing a claims process, or providing the entity-level and operating accountings required by the operative order.

## X. REQUESTED RELIEF

For these reasons, Mr. Barton respectfully requests that the Court sustain these objections and enter an order:

(1) directing the Receiver, within a time certain set by the Court, to complete the forensic accounting and estate-specific tracing of the alleged Wall investor funds, using complete monthly statements and a disclosed methodology that accounts for beginning balances, intervening activity, repayment entries, and any applicable commingled-funds principles, and to file for each Receivership Estate a statement of the tainted and untainted components of its assets;

(2) requiring, before approval of any further liquidation of Receivership Property, an asset-specific record sufficient to permit a best-interest-of-the-estate determination, including the proposed disposition, current valuation and marketing information, debt and carrying costs, estimated transaction and professional costs, projected net recovery, and the estate-specific tracing and accounting then available; where a disposition is authorized before tracing is complete, directing that identifiable net proceeds be preserved and segregated pending completion of the analysis; and directing the Receiver to file the Liquidation Plan required by Dkt. 650 ¶¶ 109–110, stating for each remaining asset the

proposed disposition, sequence, timetable, estimated transaction and professional costs, and projected net recovery to the affected estate;

(3) ordering that any entity or asset the completed analysis shows did not receive or benefit from Wall Investor Funds be released from the receivership, and specifically requiring the Receiver to quantify the asserted indirect benefit as to Venus 59, LLC before any disposition because Dkt. 308 ¶ 120 states that Venus 59 was not purchased with Wall Investor Funds or proceeds of properties purchased with such funds;

(4) directing the Receiver to identify every executed settlement or disposition that occurred before a completed estate-specific tracing was filed—including the dispositions addressed at Dkt. 236, Dkt. 524, and Dkt. 838 at 69—and to preserve and segregate identifiable associated proceeds pending the Court's determination, after the completed accounting, of any appropriate remedial relief;

(5) directing the Receiver to file a supplemental report providing (a) an accounting of each Receivership Estate as required by Dkt. 650 ¶ 111, (b) the amount, by professional and by quarter, of all accrued and unpaid administrative expenses as required by Dkt. 650 ¶ 112.B, (c) the creditor list and claim valuations required by ¶¶ 112.E–F, and (d) a verified schedule identifying each alleged Wall co-lender, the date and amount of each claimed funding, the bank or wire records evidencing it, and the claims each has asserted, together with a description and valuation under ¶ 112.E of any claims the Estates hold against co-lenders arising from failures to fund;

(6) directing the Receiver to file the sworn per-property operating accounting for the four HUD Apartments described in Part VI above, covering October 18, 2022 to the present;

(7) directing that each Receivership Estate with operations or cash maintain a separate depository account, that inter-estate transfers occur only upon Court order, and that the Receiver file a schedule of all inter-estate transfers made since October 18, 2022;

(8) directing the Receiver to file a motion to establish a claims process, or to show cause why none has been filed, within thirty days; and providing that any claims process require each claimant to prove its claim with contemporaneous bank and wire records and authenticated instruments—including, for electronically executed documents, the associated execution certificates and audit trails—subject to examination and objection; and

(9) directing the Receiver to file, within thirty days, an entity-specific accounting of all consideration received in connection with any Receivership Entity that is or was a debtor under title 11—including the 2999TC/HNGH settlement at Dkt. 236 and BM318 settlements at Dkt. 524—identifying the governing bankruptcy and district-court orders, each receipt and disbursement, distributions to entity creditors, and the present balance attributable to each entity; and to segregate any presently identifiable proceeds pending further order; and

(10) granting such other and further relief as is just and proper.

Dated: August 20, 2026

Respectfully submitted,

***/s/ Timothy L. Barton***

**Timothy L. Barton**
Defendant, Pro Se
1846 East Rosemeade Parkway, #232
Carrollton, TX 75007
(214) 914-3811
timothy.barton@proton.me
Bar No.: Pro Se / Not Applicable

**CERTIFICATE OF SERVICE**

I certify that on August 20, 2026, I filed this document through the Court's CM/ECF system, which will transmit notice of electronic filing to all registered counsel of record. To the extent any party entitled to service is not served electronically, I will cause service by a method permitted by Federal Rule of Civil Procedure 5.

***/s/ Timothy L. Barton***
**Timothy L. Barton, Pro**