**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | § | |
| | § | |
| ***Plaintiff,*** | § | |
| | § | |
| **v.** | § | **No. 3:22-cv-2118-X** |
| | § | |
| **TIMOTHY BARTON, CARNEGIE DEVELOPMENT, LLC, WALL007, LLC, WALL009, LLC, WALL010, LLC, WALL011, LLC, WALL012, LLC, WALL016, LLC, WALL017, LLC, WALL018, LLC, WALL019, LLC, HAOQIANG FU (A/K/A MICHAEL FU), STEPHEN T. WALL,** | § | |
| | § | |
| ***Defendants,*** | § | |
| | § | |
| **DJD LAND PARTNERS, LLC, and LDG001, LLC,** | § | |
| | § | |
| ***Relief Defendants.*** | § | |

**RECEIVER'S VERIFIED MOTION TO RATIFY SETTLEMENT AGREEMENT**
**<u>WITH SOUTHERN PROPERTIES CAPITAL, LTD. ETC., AND BRIEF IN SUPPORT</u>**

Charlene C. Koonce
State Bar No. 11672850
charlene@brownfoxlaw.com
James F. Hopper
State Bar No. 24116535
jimmy@brownfoxlaw.com
BROWN FOX PLLC
2699 Howell St., Suite 500
Dallas, Texas 75204
T: (214) 327-5000
F: (214) 327-5001

# TABLE OF CONTENTS


I. INTRODUCTION ........ 1

II. BACKGROUND ........ 2

A. The D4 Entities and D4 Properties ........ 2

B. The Initial Receivership Order and the "Admin Order" ........ 4

C. SPC's Intervention and the Second Receivership Order ........ 6

D. The Parameters of the Receiver and SPC's Dispute ........ 8

i. SPC's Attempted Exercise of its Conversion Rights. ........ 8

ii. Inclusion as Receivership Entities. ........ 9

E. Mediation and Settlement with SPC ........ 11

III. ARGUMENT ........ 12

A. Legal Standards and the Receiver's Authority to Compromise Claims and Sell Property ........ 12

B. The Terms of the Settlement Agreement ........ 13

C. The Settlement Agreement is in the Best Interests of the Receivership Estate ........ 15

i. The Settlement Agreement Provides the Receivership Estate With $12 Million ........ 17

ii. The Settlement Agreement Mitigates Multiple Significant Risks ........ 19

a) In an Appeal by SPC the D4 Entities Could Be Excluded From The Receivership Estate ........ 19

b) The Court Could Rule That SPC Properly Exercised Its Conversion Rights By Relying On The Parties' Original Intent ........ 21

c) Litigating The Dispute With SPC And Then Barton Would Result In Significant But Mostly Avoidable Litigation Expenses ........ 22

IV. CONCLUSION AND REQUEST FOR RELIEF ........ 23

# TABLE OF AUTHORITIES

**Cases**


*1701 Commerce Acquisition, LLC v. Macquarie US Trading, LLC*,
No. 02-21-00333-CV, 2022 WL 3904976 (Tex. App.—Fort Worth Aug. 31, 2022, no pet.) . 22

*Ackerman v. Am. Airlines, Inc.*,
924 F. Supp. 749 (N.D. Tex. 1995) .......... 20

*Am. Elec. Power Co. Inc. v. Affiliated FM Ins. Co.*,
556 F.3d 282 (5th Cir. 2009) .......... 21

*Associated Recovery v. Does 1-44*,
No. 3:16-CV-1025-L, 2018 WL 1517863 (N.D. Tex. Mar. 28, 2018), *aff'd sub nom. Associated Recovery L.L.C. v. Does 1- 44*, 769 Fed. Appx. 160 (5th Cir. 2019) .......... 20

*FSLIC v. PSL Realty Co.*,
630 F.2d 515 (7th Cir. 1980), *cert. denied*, 452 U.S. 961, 69 L. Ed.2d 971, 101 S.C t. 319 (1981) .......... 12, 13

*FSLIC v. Spark Tarrytown, Inc.*,
829 F. Supp. 82 (S.D.N.Y. 1993) .......... 13

*Gaskill v. Gordon*,
27 F.3d 248 (7th Cir. 1994) .......... 13

*Ibarra v. Tex. Empl. Comm'n*,
823 F.2d 873 (5th Cir. 1987) .......... 12

*Icee of Am., Inc. v. Mid-Am. Icee Corp.*,
No. 3:02-CV-0364-L, 2005 WL 2415940 (N.D. Tex. Sept. 29, 2005) .......... 20

*Martinelli v. Hearst Newspapers, L.L.C.*,
65 F.4th 231 (5th Cir. 2023), *cert. denied*, 144 S. Ct. 2561, 219 L. Ed. 2d 1227 (2024) .......... 20

*Matter of AKD Investments*,
79 F.4th 487 (5th Cir. 2023) .......... 20

*Ritchie Capital Mgmt., L.L.C. v. Kelley*,
785 F.3d 273 (8th Cir. 2015) .......... 12

*SEC v. Barton*,
135 F.4th 206 (5th Cir. 2025) .......... passim

*SEC v. Barton*,
79 F.4th 573 (5th Cir. 2023) .......... 6

*SEC v. Lincoln Thrift Ass'n*,
577 F.2d 600 (9th Cir. 1978) .......... 12

*SEC v. Safety Fin. Serv., Inc.*,
674 F.2d 368 (5th Cir. 1982) .......... 12

*SEC v. Stanford Int'l Bank Ltd.*,
No. 3:09-CV-0298-N, 2015 WL 10818588 (N.D. Tex. Sept. 23, 2015) .......... 12

*SEC v. Stanford Int'l Bank, Ltd.*,
927 F.3d 830 (5th Cir. 2019) .......... 12

**Statutes**

28 U.S.C. § 2001 .......... 5, 13

28 U.S.C. § 2004 .......... 5, 13

**Other Authorities**

RESTATEMENT (SECOND) OF JUDGMENTS § 27 (1982) .......... 20

Cort Thomas, the court-appointed Receiver in this case, moves the Court for an order ratifying the Receiver's settlement agreement (the "Settlement Agreement," attached as **Exhibit A**) with Southern Properties Capital, Ltd. (along with its affiliates and special purpose vehicles, "SPC.") In support of this motion, the Receiver would respectfully show the Court as follows:

## I. INTRODUCTION

This motion arises from the Receiver's efforts to resolve disputes with SPC regarding the ownership and possession of certain apartment complexes: Bellwether Ridge in DeSoto, Texas; the Parc at Windmill Farms in Forney, Texas; the Parc at Ingleside near Corpus Christi, Texas; and the Parc at Opelika in Alabama (collectively, the "Apartment Complexes" or "D4 Properties")[1]. Following his appointment and consistent with all governing statutes and orders—orders issued by this Court and the Fifth Circuit—the Receiver has endeavored to protect and maximize estate assets. His efforts have included extensive negotiations with SPC and briefing regarding the D4 Properties.[2] To avoid further protracted litigation regarding the D4 Properties, after the Fifth Circuit affirmed the Receivership Order, the Receiver and SPC mediated their disputes regarding the D4 Properties.

Through mediation, the parties reached a global resolution of all their disputes concerning the D4 Properties, and after extensive negotiations (including a second meditation in August 2026), memorialized the agreement in a Settlement Agreement and related Purchase and Sale Agreements.

As the Court is aware, from inception, this Receivership Estate has been cash-starved and the likely value of the assets included in the Estate fell far short of the total losses sustained by

[1]Capitalized terms that are not specifically defined above have the same meaning ascribed in prior briefing or orders.

[2] *See for example,* summary judgment briefing and related documents at Docket Nos. 177-184; 188, 189, 203, 206-208; 215, 217, and 220 (collectively, the "Parties' Summary Judgment Briefing").

the defrauded investors and creditors for whose benefit the receivership was imposed. Over the course of nearly four years, Defendant Barton has impeded, stymied and interfered with virtually every effort intended to maximize value, including every single asset sale approved by the Court. All the while, interest has continued to accrue on the loans encumbering all real properties thereby eroding their net value. Barton's interference and pugilist opposition to every substantive motion filed by the Receiver has also exponentially multiplied the fees and costs incurred in administering the estate. Comparatively, although the Court has not yet had an opportunity to resolve the SEC's claims on their merits, as the Fifth Circuit concluded regarding the SEC's claims against Barton, "the SEC has sufficiently shown a substantial likelihood of success on the merits."[3] *SEC v. Barton*, 135 F.4th 206, 226–27 (5th Cir. 2025).

As the Court has acknowledged repeatedly in ratifying prior settlements and approving sales and despite the certain appeal and delay that will follow, because it is in the best interests of the Receivership Estate, the Court should ratify the Settlement Agreement discussed below.

## II. <u>BACKGROUND</u>

### A. The D4 Entities and D4 Properties

1. In connection with purchasing and developing the Apartment Complexes, before the Receiver's appointment, Timothy Barton ("Barton") created four separate "D4" entities: D4DS, LLC; D4FR, LLC; D4IN, LLC; and D4OP, LLC (collectively the "D4 Entities").

2. The D4 Entities respectively hold controlling ownership interests and are the record owners in each of the D4 Properties as follows:

Bellwether Ridge is owned by D4DS, LLC;

---

[3] More specifically, the Court determined, "[t]he record reflects extensive fraudulent activity by which Barton, with scienter, solicited investments from Chinese nationals for real estate development projects but misappropriated those funds and used them for improper, personal purposes. Moreover, Barton inflated land purchase prices to increase investments and falsely told investors that the investments were fully guaranteed, even though the guaranteeing company had no assets." *Id.* at 226-27 (footnotes omitted).

The Parc at Windmill Farms is owned by D4FR, LLC;

The Parc at Ingleside is owned by D4IN, LLC; and

The Parc at Opelika is owned by D4OP, LLC.

3. Other Barton-controlled entities (the "D4 Parent Entities") own a majority interest in the D4 Entities, and the construction companies involved in the development of the D4 Properties also own a small interest, as follows:

> D4DS, LLC is owned by: JMJD4, LLC (98.5%), JMJAV, LLC (1%), and N.E. Construction, LLP (0.5%);
>
> D4FR, LLC is owned by: JMJD4, LLC (98.5%), JMJAV, LLC (1%), and N.E. Construction, LLP (0.5%);
>
> D4IN, LLC is owned by: JMJD4, LLC (98.75%), JMJAV, LLC (1%), and AXIA Contracting, LLC (0.25%);
>
> D4OP, LLC is owned by: D4OPM, LLC (98.75%), ONE MF D4, LLC (1%), and Bakken Contracting Co. LLC dba BC Contracting Co. (0.25%).

4. The D4 Entities borrowed money from the United States Department of Housing and Urban Development ("HUD") to purchase the real estate and begin development of the D4 Properties (the "HUD Loans"). The HUD Loans contain multiple restrictive covenants and terms, including prohibiting any party other than HUD from holding a security interest, prohibiting the transfer of any interest in the mortgaged property or any interest, and prohibiting any UCC filings against the borrowing D4 Entity or the D4 Property, among other restrictions.

5. SPC and the D4 Parent Entities entered into a series of agreements for each D4 Property (the "Pledge and Security Agreements") by which SPC loaned money and was assigned the right to convert debt owed in connection with the D4 Properties into equity, or by which SPC would receive almost all membership interests in the respective D4 Entities upon satisfaction of certain conditions and following written notice from SPC (the "Conversion Rights").

6. SPC loaned its money to another Barton-controlled entity, JMJ Development, LLC ("JMJ") through promissory notes (the "Notes"). The Notes were unsecured. The D4 Parent Entities pledged to JMJ their respective membership interest in each D4 Entity in exchange for the proceeds of SPC's loans, which each of the D4 Parent Entities provided to their respective subsidiary D4 Entity.

**B. The Initial Receivership Order and the "Admin Order"**

7. On October 18, 2022 the Court entered an Order Appointing Receiver (the "Initial Receivership Order"), [Dkt. 29], which named Cort Thomas as Receiver for the Receivership Entities and directed him to take custody, control, and possession of all Receivership Property. Initial Receivership Order ¶ 6(B). The Initial Receivership Order empowered the Receiver to "take such action as necessary and appropriate for the preservation of Receivership Property or to prevent the dissipation, concealment, or inequitable distribution of Receivership Property," to "pursue, resist, defend, compromise or otherwise dispose of all suits, actions, claims, and demands which may now be pending or which may be brought by or asserted against the Receivership Entities," and *Id.* ¶¶ 6(E), (G), (J). The Initial Receivership Order also prohibited any activity intended to perfect liens, take possession or control over any Receivership Asset or interfere with the Receiver's possession and control over such assets. *Id.* ¶ 32.

8. Additionally, the Initial Receivership Order removed all "directors, officers, managers . . . and other agents of the Receivership Entities" and "the powers of any general partners, directors and/or managers" was "suspended." *Id.* ¶ 4, and authorized the Receiver to control the operations of any Receivership Entity. *Id.* Similarly, the Receiver was authorized to "take any action which, prior to the entry of this Order, could have been taken by the officers, directors, partners, managers, trustees, and agents of the Receivership Entities. . . " *Id.* 6.E.

9. Subject to further orders of the Court and 28 U.S.C. §§ 2001[4] and 2004,[5] the Initial Receivership Order also allowed the Receiver to "cause the sale or lease, and take all necessary and reasonable actions to cause the sale or lease of all real property in the Receivership Estates . . . on terms and in the manner the Receiver deems most beneficial to the Receivership Estate, and with due regard to the realization of the true and proper value of such real property." *Id.* ¶ 40-41.

10. In furtherance of the orderly administration of the Receivership, the Court also entered its Order Granting Motion for Order Governing Administration of Receivership Estate, Etc. (the "Admin Order") in which it authorized the sale of personal property pursuant to private sales and established the manner of notice and approval for such sales. Dkt. 63. The Court expressly exempted from those requirements "any compromise, sale, or other disposition of contractual rights or pending choses in actions, regarding which no further Court approval is required." *See* Dkt. 63 ¶ 4g. The Court, however, also authorized the Receiver, "in his discretion," to "seek Court approval prior to compromising, selling, or otherwise disposing of these intangible rights." *Id.*

11. In December 2022, Barton appealed the Initial Receivership Order, but during the pendency of the appeal, the receivership was not stayed.[6]

[4] "Property in the possession of a receiver . . . shall be sold at public sale in the district wherein such receiver was first appointed. . . (b) After a hearing, of which notice to all interested parties shall be given by publication or otherwise as the court directs, the court may order the sale of such realty at a private sale for cash or other consideration and upon such terms and conditions as the court approves, if it finds that the best interests of the estate will be conserved thereby…." 28 U.S.C. §§ 2001(a), (b).

[5] "Any personalty sold under any order or decree of any court of the United States shall be sold in accordance with section 2001 of this tile, unless the court orders otherwise." 28 U.S.C. § 2004.

[6] *See* Dkt. 132 and Appeal No. 22-11132, *SEC v. Barton,* Jan. 6, 2023 Mem. Op, Dkt. 00516601709. In its opinion vacating the Initial Receivership Order, the Fifth Circuit stayed "the receiver's power to sell or dispose of property belonging to receivership entities, including the power to complete sales or disposals of property already approved by the district court, is immediately suspended, and this suspension will remain in effect until the receivership order is vacated 90 days from the issuance of this court's mandate. . . . [The stay did] not apply to activities in furtherance of sales or dispositions of property that have already occurred or been approved by the district court. "Activities in

### C. SPC's Intervention and the Second Receivership Order

12. On February 22, 2023, the Receiver filed a motion to approve the sale of two of the D4 Properties [Dkts. 161, 164], seeking authorization to sell those two D4 Properties free and clear of any claim by SPC, arguing that SPC could only participate in the proceeds of the sale as an investor or creditor to the extent of any unpaid loans or fees owed to it by any Receivership Entities.

13. SPC responded by filing a Complaint in Intervention [Dkt. 184], which the Court stayed pending completion of a "summary proceeding." Dkt. 217.

14. On April 13, 2023, the Receiver filed a Motion for Summary Judgment Regarding SPC's Claimed Ownership Interest in Certain Receivership Properties ("Receiver's Motion for Summary Judgment") [Dkt. 207], regarding which SPC filed a lengthy response.

15. When the Fifth Circuit vacated the Initial Receivership Order,[7] this Court stayed consideration of and all briefing deadlines related to the Receiver's Motion for Summary Judgment. Dkt. 306.

16. After the Fifth Circuit remanded the case for further proceedings, the SEC filed its Motion for Appointment of a Receiver, for a Preliminary Injunction and Ancillary Relief, and to Lift Stay for Limited Purpose [Dkt. 309] (the "Second Motion to Appoint Receiver").

17. SPC then filed a Motion for Intervention and a response in opposition to the SEC's Second Motion to Appoint Receiver. Dkt. 327, 329.

---

furtherance" do not include the completion of the sale of any property. Should the district court enter a new receivership order before the present order is vacated, this partial stay has no bearing on any actions a receiver may take under the new order."

[7] *See SEC v. Barton*, 79 F.4th 573 (5th Cir. 2023).

18. The Court denied without prejudice SPC's Motion for Intervention and ordered that SPC could refile its motion after the Court resolved the SEC's Second Motion to Appoint Receiver. Dkt. 343.

19. On November 29, 2023, this Court entered its (1) its Memorandum Opinion and Order [Dkt. 416], which granted the SEC's Second Motion to Appoint Receiver as to 54 of the 82 entities included in the motion; (2) an Order Appointing Receiver (the "Receivership Order") [Dkt. 417], which re-appointed the Receiver over each of the D4 Entities and all but two of the D4 Parent Entities.[8] The Receivership Order included the same authority, prohibitions, and provisions as the Initial Receivership Order. *Id.*

20. The Court also ratified certain prior orders, including the Admin Order. Dkt. 419.

21. On April 17, 2025, the Fifth Circuit affirmed the Receivership Order. *SEC v. Barton*, 135 F.4th 206, 222-23 (5th Cir. 2025). In its opinion, tracking this court's careful analysis, the appellate court expressly affirmed inclusion of the D4 and D4 Parent Entities in the Receivership Estate based on the specific test created in the first appeal. *Id.*

22. Barton appealed the Fifth Circuit's decision, but on March 30, 2026, the United States Supreme Court rejected his petition for writ of certiorari.

23. The Court entered a third Order Appointing Receivership Order on June 23, 2025. Dkt. 650.[9]

---

[8] The only D4 Parent Entities not included in the Second Receivership Order are D4OP, LLC's two parent entities, D4OPM, LLC and One MF D4, LLC. Dkt. 650.

[9] The Order entered at Dkt. 650 modified the Order entered at Dkt. 417 only with regard to requiring Defendant Barton to obtain leave of court before filing any further bar grievances. The Order entered at Dkt. 650 was also subject to an interlocutory appeal, which was dismissed by the Fifth Circuit on May 18, 2026. *See* Dkt. 649, and Appeal No. 25-10871.Collectively, Dkt. 417 and 650 are referenced as the "Receivership Order."

**D. The Parameters of the Receiver and SPC's Dispute**

24. As reflected generally in their respective summary judgment briefing and SPC's Motion in Intervention, two overarching issues generally frame the Receiver and SPC's dispute: (1) whether SPC's purported exercise of its Conversion Rights was effective, and (2) whether the D4 Entities should be included in the Receivership Estate.

**i. SPC's Attempted Exercise of its Conversion Rights.**

25. On October 3, 2022, about a week after the SEC filed its lawsuit against Barton but before the Initial Receivership Order was issued, SPC purported to exercise its Conversion Rights created by the Pledge and Security Agreements for Bellwether Ridge, Windmill Farms, and the Parc at Ingleside.

26. SPC purportedly exercised its Conversion Right for D4FR by sending D4FR a proposed purchase contract by which D4FR would deed the property to SPC. The Receiver contends, however, that SPC failed to provide the requisite 30-day notice, the purchase contract that it sent did not include Barton's signature, and SPC did not obtain prior HUD approval for such a transfer, as required in the controlling agreements.

27. SPC purported to convert its equity interest in D4DS and D4IN through an October 3 "Exercise Notice," similar to the one sent to D4FR, which included the same, and additional, deficiencies: SPC failed to satisfy the 30-day notice requirement, included an unexecuted purchase agreement, and failed to obtain HUD approval.

28. SPC has not sought to exercise the assigned rights against D4OP provided in the Pledge and Security Agreement related to the Opelika Pledge Agreement, presumably in observance of the stay provision in the Receivership Order.

29. Although not specified in the controlling documents, SPC has consistently argued, and Barton has not to date contested, that SPC and Barton intended that SPC would develop the

D4 Properties and then exercise its Conversion Rights and take control of the D4 Properties. In support of its assertion, SPC contends that it "has at all times acted as the owner of the Complexes" because it "purchased the raw land, funded the escrow agreements and letters of credit for working capital, provided construction management during development, provided property management once leased, and provided substantially all equity funding." Dkt. 247, p. 3. SPC's position is that such actions "evidence and are consistent with an ownership interest in the [D4 Properties], not an interest as mere passive lender or investor" [*Id.*]. SPC further claims that it is an innocent third party, not involved in the alleged fraudulent scheme conducted by Barton, and has received no payments from Barton.

30. The Receiver contends that SPC has not effectively exercised conversion or assignment rights provided in the relevant agreements with respect to *any* D4 Entity, including because SPC failed to satisfy the conditions precedent for it to exercise its Conversion Rights. The Receiver therefore contends SPC's attempt to exercise those rights was executory and ineffective, and because of the stay provisions in the Receivership Order, SPC cannot exercise such rights in the future. Accordingly, the Receiver asserts SPC lacks any basis to extract the D4 Properties from the Receivership. The Receiver also disputes SPC's characterization as an innocent third-party, pointing to multiple indicia of unclean hands, and based on financial and contractual records, also disputes SPC's purported ownership and control premised on SPC's alleged "management" activities. Finally, the Receiver also contends that SPC's parole arguments related to the parties' intent and SPC's post-execution conduct are wholly irrelevant to the ownership of the D4 Properties, which is governed by unambiguous contracts.

**ii. Inclusion as Receivership Entities.**

31. The second dispute between the Receiver and SPC rests on inclusion of the D4 Entities in the Receivership Estate. SPC contends, as it did in briefing submitted in opposition to

the Second Receiver Motion, that none of the D4 Entities should have been included as Receivership Entities because the D4 Entities allegedly have only a tangential connection to Barton; very little, if any, investor funds are directly traced into the D4 Entities; and the investor funds were not used to develop, construct, or operate the D4 Properties.

32. SPC argues that the funding for the D4 Properties came from two other sources: (1) mortgage loans from HUD and (2) equity from SPC. Dkt. 329, p. 5.

33. Barton agreed with this argument and in response to the Second Motion for Receiver and the appeal regarding the Receivership Order and also argued that the D4 Entities should not be included in the Receivership. Dkt. 334, p. 16.

34. The Receiver contends inclusion of the D4 and Parent Entities has already been litigated and both this Court and the Fifth Circuit rejected SPC's and Barton's arguments about this issue. Specifically, as this Court concluded in its Memorandum in support of the Receivership Order, the D4 Entities "received or benefitted from" investor funds based on multiple transactions with "commingled funds" to each D4 Entity: $25,000 and $30,000 to D4DS in August 2019; $106,097.770 to D4FR in July 2019, paying salaries to D4IN; and $15,000 and $210,000 to D4OP in June and December 2021. Dkt. 416, pp. 16-19. While SPC contested these transactions as being "made in error" and "in-and-out/cancelled transactions" this Court nonetheless found that they satisfied the standard necessary for including the subject entities in the Receivership Estate [*id.*]. This Court also found that the D4 Entities were only able to secure their respective HUD loans by relying on assets that were purchased with or received investor funds. Dkt. 416, p. 15.

35. The Fifth Circuit Court of Appeals affirmed the inclusion of the D4 Entities in the Receivership, specifically ruling that this Court did not abuse its discretion by including the "four apartment complexes" in the Receivership Estate. *Barton*, 135 F.4th at 222-23.

**E. Mediation and Settlement with SPC**

36. After the Fifth Circuit affirmed the Receivership Order, SPC and the Receiver resumed discussions aimed at resolving their disputes regarding the D4 Properties. To avoid a second round of expensive, protracted, and uncertain litigation, the Receiver and SPC mediated before retired Chief Bankruptcy Judge Harlin D. Hale. Both parties submitted lengthy and detailed mediation statements and both sides attended mediation in person, with numerous officers and representatives as well as three lawyers, attending on behalf of SPC. The mediation lasted into the evening, with the Parties failing to reach a resolution.

37. Judge Hale kept the mediation open, however, and made a mediator's proposal, which both parties accepted. The mediator's proposal called for the parties to memorialize the agreement by drafting the Settlement Agreement and this motion. Over the following weeks and months, the parties exchanged several drafts of the Settlement Agreement and the supporting documents and even attended a second mediation with Judge Hale, ultimately finalizing and executing the agreement in August 2026.

38. As discussed at length below, the Receiver strongly believes that the resulting settlement adequately accounts for the possible benefits and significant risks of protracted litigation with SPC and is in the best interest of the Receivership Estate.

## III. ARGUMENT

### A. Legal Standards and the Receiver's Authority to Compromise Claims and Sell Property

Any action by the district court "supervising an equity receivership is committed to his sound discretion and will not be disturbed unless there is a clear showing of abuse." *SEC v. Safety Fin. Serv., Inc.*, 674 F.2d 368, 373 (5th Cir. 1982)( It is "a recognized principle of law that the district court has broad powers and wide discretion to determine the appropriate relief in an equity receivership.") (quoting *SEC v. Lincoln Thrift Ass'n*, 577 F.2d 600, 606 (9th Cir. 1978)). "Ordinarily, parties are free to settle cases amongst themselves without court involvement." *SEC v. Stanford Int'l Bank Ltd.*, No. 3:09-CV-0298-N, 2015 WL 10818588, at *2 (N.D. Tex. Sept. 23, 2015) (citing *Ibarra v. Tex. Empl. Comm'n*, 823 F.2d 873, 878 (5th Cir. 1987)). However, "in the equity receivership context, parties have sought and courts have rendered decisions regarding whether to approve or reject settlement agreements based on courts' wide discretion in administering an equity receivership." *Id.* "Receivership courts, like bankruptcy courts, may also exercise discretion to approve settlements of disputed claims to receivership assets, provided that the settlements are 'fair and equitable and in the best interests of the estate.'" *SEC v. Stanford Int'l Bank, Ltd.*, 927 F.3d 830, 840 (5th Cir. 2019) (quoting *Ritchie Capital Mgmt., L.L.C. v. Kelley*, 785 F.3d 273, 278 (8th Cir. 2015)).

Generally, "the Receiver has wide powers to acquire, organize and distribute the property of the receivership." *Stanford Int'l Bank, Ltd.*, 927 F.3d at 840. This Court's orders, including but not limited to the Receivership Order, define the Receiver's authority and guide his judgment. *FSLIC v. PSL Realty Co.*, 630 F.2d 515, 521 (7th Cir. 1980), *cert. denied*, 452 U.S. 961, 69 L. Ed.2d 971, 101 S.C t. 319 (1981) ("Receiver is an officer of the court and subject to its orders in relation to the property for which he is responsible until discharged by the court");

*FSLIC v. Spark Tarrytown, Inc.*, 829 F. Supp. 82, 85 (S.D.N.Y. 1993). The orders of the appointing court are the sole source of a receiver's authority, and receivers are therefore authorized to petition the appointing court on matters related to the administration of the receivership. *Gaskill v. Gordon*, 27 F.3d 248, 251 (7th Cir. 1994) (imposing lien for receiver's costs on property administered by receiver*); PSL Realty Co*., 630 F.2d at 521.

Unless modified by a court order, 28 U.S.C. § 2001 governs a Receiver's sale of realty and 28 U.S.C. § 2004 governs the sale of personalty. In the Receivership Order, this Court expressly authorized sales of realty pursuant to 28 U.S.C. § 2001 and in the Admin Order, modified the statute's appraisal requirements. *See* Dkt.650, ¶¶93-94; Dkt. 63 ¶ D.2.[10] The Admin Order also modifies the process imposed by 28 U.S.C. § 2004 and authorizes the Receiver to sell personal property in private sales following notice and resolution of any objections and sell intangible personal property and compromise claims without further court order. *Id.* at ¶ 4 (a) – (g).

**B. The Terms of the Settlement Agreement**

To avoid the expense and uncertainty of potential litigation, the Receiver and SPC agreed to fully settle any claims each party against the other in connection with the D4 Entities or D4 Properties. As demonstrated by its terms below, the Settlement Agreement is fair and equitable and in the best interests of the Receivership Estate. Although the necessity of court approval for

[10] "Sale of Real Property, if any, shall be made pursuant to 28 U.S.C. § 2001 with further motions and notices filed and published as required by that statute. If multiple offers are received from disinterested purchasers for any one property, the Court hereby concludes that the Receiver may, in his discretion, utilize any one or more of such offers as one or more of the "appraisals" required by § 2001(b). Similarly, the Receiver may in his discretion utilize informal "opinions of value" received from respected brokers in the respective industries related to the subject property, as one or more of the "appraisals" required by § 2001(b)." Admin Order, Dkt. 63, ¶ D.2.

settlement agreements is expressly excused, in accordance with SPC's desire for court-approval, the Court should, in its discretion, ratify the Settlement Agreement.[11]

Pursuant to the terms of the Settlement Agreement, SPC will pay the Receiver a total of $12 million after the Court's ratification of the Settlement Agreement (the "Settlement Payment"). Based on the value of each D4 Property, the balance owed on each HUD Loan, and the balance owed on each of SPC's loans, the Settlement Agreement specifies the portion of the Settlement Payment attributable to each property, as follows:

- The total compensation provided by SPC for transfer of D4DS, LLC's membership interests (the "**D4DS, LLC Transfer**"), is $23,919,918.38 (the "**D4DS, LLC Transfer Price**"), which consists of the HUD loan balance in the amount of $16,979,078.75 to be assumed by SPC, the SPC loan balance in the amount of $4,587,193.66, and $2,353,645.97 of the Settlement Payment;

- The total compensation provided by SPC for transfer of D4FR LLC's membership interests (the "**D4FR, LLC Transfer**") is $47,815,802.19 (the "**D4FR, LLC Transfer Price**"), which consists of the HUD loan balance in the amount of $33,534,994.15 to be assumed by SPC, the SPC loan balance in the amount of $9,809,312.03, and $4,471,496.01 of the Settlement Payment;

- The total compensation provided by SPC for transfer of D4IN, LLC membership interests (the "**D4IN, LLC Transfer**") is $30,931,755.78 (the "**D4IN, LLC Transfer Price**"), which consists of the HUD loan balance in the amount of $23,708,803.94 to be assumed by SPC, the SPC loan balance in the amount of $4,872,181.43, and $2,350,770.41 of the Settlement Payment; and

- The total compensation provided by SPC for sale of Opelika to SPC (the "**Opelika Sale**") is $29,486,932.23 (the "**Opelika Sales Price**"), which consists of the HUD loan balance in the amount of $21,879,316.64 to be assumed by SPC, the SPC loan balance in the amount of $4,783,527.98, and $2,824,087.61 of the Settlement Payment.

[11] As specified in the Settlement Agreement and supporting documents, including each relevant Purchase and Sale Agreement, with regard to D4OP, the Settlement Agreement requires sale of the realty, and the Receiver will accordingly follow the procedures required by 28 U.S.C. § 2001 for that sale. With regard to each D4 Entity except D4OP, the Receiver is selling only intangible membership interests, rather than real estate. Thus, the Admin Order and its modifications of 28 U.S.C. § 2004 govern the sale of the membership interests in D4FR, D4IN and D4DS. Nonetheless, in an abundance of caution, the Receiver will also seek approval of the sale of these three entities' membership interests, following the procedures and standards set forth in 28 U.S.C. § 2001.

Additionally, control over funds held by the property manager[12] in operating accounts for each property will be released to SPC in connection with the settlement. In turn, SPC will obtain HUD's approval for the transfer and assumption of the HUD-based mortgage loans on the subject Properties, as well as HUD's approval for a Transfer of Physical Assets (a "TPA approval"). If SPC is unable to obtain HUD's approval for transfer of the HUD-based loans and the TPA, SPC has agreed to pay off the HUD loans.

## C. The Settlement Agreement is in the Best Interests of the Receivership Estate

The Receiver believes that the Settlement Agreement is fair and equitable and in the best interests of the Receivership Estate because, among other things, it (i) brings $12 million—much needed capital—into the Receivership Estate and (ii) mitigates multiple significant risks.

As of June 30, 2026, taking the average appraised value for the four properties, minus the total HUD debt and the total SPC debt for the properties, results in potential equity of **$19,613,243.46**:

| Entity | Avg. Value | HUD Balance | SPC Balance | Today's Equity |
|---|---|---|---|---|
| D4DS | $27,283,333.33 | $16,979,078.75 | $4,587,193.66 | $5,717,060.92 |
| D4FR | $51,833,333.33 | $33,534,994.15 | $9,809,312.03 | $8,489,027.15 |
| D4IN | $27,250,000.00 | $23,708,803.94 | $4,872,181.43 | $0.00 |
| D4OP | $32,070,000.00 | $21,879,316.64 | $4,783,527.98 | $5,407,155.38 |
| | | | | **$19,613,243.46** |

[12] The property manager was selected by SPC and is an SPC affiliate.

Additionally, as of the date of this filing, the property manager maintains bank accounts that collectively hold **$6,940,710.13**:[13]

| Entity | Account | Balance (8/21/26) |
|---|---|---|
| D4DS | 9784 | $1,494,791.06 |
| D4DS (SD) | 9797 | $47,000.00 |
| D4FR | 9483 | $2,532,973.27 |
| D4FR (SD) | 9496 | $121,000.00 |
| D4IN | 9810 | $102,908.19 |
| D4IN (SD) | 9836 | $82,000.00 |
| D4OP | 398 | $2,471,037.61 |
| D4OP (SD) | 408 | $89,000.00 |
| | | **$6,940,710.13** |

At the same time, as outlined herein, for the Receiver to obtain this "best day in court" result, he would (1) retain contingency counsel, likely on a 40% contingency (approximately $10.6 million) and (2) pay experts, court costs, and Receiver time, among other things required under a standard contingency arrangement (conservatively estimated to cost an additional $500,000). Thus, using today's values[14] the Receiver's best day in court would net approximately $15,400,000. While this best-day-in-court admittedly exceeds the $12,000,000[15] the Receiver keeps as part of the settlement, the litigation risk that the Receiver obtains $0, the costs of such litigation irrespective of whether the Receiver ultimately wins, the risk of decreasing property values, and the delay inherent in the litigation necessary to proceed with a sale, all support disposition through the settlement at issue. Given these risks and factors,

[13] The management accounts hold tenant security deposits, as well as other funds including "excess cash." HUD requires a 'minimum balance" be maintained in these accounts, and that minimum balance fluctuates, although ownership of the "excess cash" would be subject to litigation "Excess cash" is calculated annually. AS of December 31, 2025, auditors reported $5,336,184.00 in available excess cash.

[14] Of course, the Receiver could not make an immediate sale given SPC's claimed ownership interests and Barton's inevitable appeal of any sale order. Moreover, future value, interest rates, and other relevant variables are unknown.

[15] Pursuant to the Settlement Agreement, SPC will pay the Receiver $12,000,000 and will relinquish its claim of ownership to approximately $507,000 in funds held in a separate D4OP account. These funds predominantly consist of payments from the lender in connection with cost certification of the project and funds transferred by the Receiver to cure findings of improper pre-Receivership transfers of funds from D4OP accounts to other Receivership Entities.

choosing to avoid the risks, costs, and delays of litigation in exchange for $12,000,000 is in the best interest of the Receivership Estate.

**i. The Settlement Agreement Provides the Receivership Estate With $12 Million**

As detailed at length in the Receiver's prior Reports, this Receivership has been cash-starved from the outset. As of the date of this Motion, the Receiver has been unable to service any of the significant debt that encumbers the Receivership Estate's real estate assets. The Settlement Payment will enable the Receiver to continue managing the Receivership Estate in accordance with the Receivership Order, including finally beginning to work through the significant debt, tax, and other obligations on the remaining real estate assets. Moreover, compared to the other Receivership properties (with the exception of the Amerigold Suites), the D4 Properties require significant oversight by the Receiver, particularly surrounding annual audits required by HUD. If the settlement with SPC is approved, the Receivership Estate will no longer bear the burden of these fees.

Barton may object that any resolution of the Receiver's dispute with SPC should wait until the conclusion of his criminal trial or the SEC's claims. However, in contrast to the financial benefits of the settlement, the D4 Properties' value to the Receivership Estate is at risk because of SPC's position in the litigation, its Conversion Rights, and the extensive expenses that will be incurred if the Receiver and SPC litigate rather than compromise. If the Receiver and SPC had not been able to reach a settlement, SPC undoubtedly would seek resolution of its ownership claims quickly (by either seeking leave to exercise its Conversion Rights or by filing a declaratory action), forcefully (SPC had already retained a deep bench of experienced litigation attorneys for the potential fight), and doggedly (given the value of the D4 properties, SPC would pursue any and all appellate avenues, even if the Receiver were to succeed in the District Court).

Stated simply, sitting idly and waiting for the parallel criminal case to conclude and the SEC's claims to be resolved before re-engaging SPC was untenable. Moreover, as the Fifth Circuit concluded in affirming this Court's determination, the SEC's claims are "likely to succeed on the merits,"[16] and extensive evidence supports this Court's financial analysis justifying inclusion of the D4 Entities and D4 Properties in the receivership. Similarly, in affirming this Court's approval of prior sales, only one of which has closed, the Fifth Circuit approved of this Court's broad discretion in its determination that prior sales were in the best interest of the Receivership Estate and complied with the governing statutes, while acknowledging that deteriorating market conditions reinforced the wisdom of a sale to preclude further loss of value. *Barton*, 135 F.4th at 225.

As the Receiver has demonstrated in his Status Reports and various pleadings filed throughout the case,[17] even at the inception of the case, recoverable assets fell short of the losses sustained by the defrauded investors and creditors. Nearly four years later, accruing interest, continued and ever-evolving volatility in the real estate market (and broader economic climate as a whole), and administrative costs have significantly eroded the value of all or nearly all other Receivership Assets and the likely net recovery. While Barton may assert the Court should not approve this Settlement Agreement *yet*, his prior interference with sales of other properties, together with the risks inherent with continued ownership of the D4 Properties undermine such arguments. Barton should not be heard to complain about this Settlement Agreement based on timing, where he has impeded every other effort to maximize value and raise cash. In short, Barton's conduct necessitated the timing of this Settlement Agreement and the proposed disposition of the D4 Properties, which are in any event, in the best interests of the Estate.

---

[16] *Barton*, 135 F.4th at 227.

[17] *See generally*, Receiver's Status Reports, and particularly, Receiver's Declaration and Interim Report, Dkt. 308.

### ii. The Settlement Agreement Mitigates Multiple Significant Risks

The Settlement Agreement eliminates several costly risks to the Receivership Estate, namely: (1) that the D4 Entities could be excluded from the Receivership Estate; (2) the Court could determine that SPC properly exercised its Conversion Rights or should be allowed to do so; and (3) significant litigation expenses the Receivership Estate will incur if required to litigate its dispute with SPC.

#### a) In an Appeal by SPC the D4 Entities Could Be Excluded From The Receivership Estate

This Court denied without prejudice SPC's Motion to Intervene and SPC did not participate in the appeal of the Receivership Order. Thus, unlike Barton, if it were to litigate inclusion of the D4 Entities in the Receivership, it could be entitled to re-urge arguments it contends warrant excluding those entities from the estate.

More specifically, in asserting that the D4 Entities should not be included in the Receivership Estate, SPC (and Barton himself) argued that little to no investor funds were paid to develop, build, or operate the D4 Properties. *See* Dkt. 329, p 5. The Court addressed and rejected this argument, finding that the D4 Entities "received or benefitted from" investor funds based on multiple transactions with "commingled funds" to each D4 Entity, as listed in Section III.B. *supra* Dkt. 416, pp. 16-19. SPC however, contested each of these transactions as being "made in error" and "in-and-out/cancelled transactions," [*id.*], although the Court nonetheless found these transactions showed that the D4 Entities "received or benefitted from" investor funds. *Id.* The Court also relied on the fact that the D4 Entities were only able to secure their respective HUD loans by relying on assets that were purchased with or received Wall Investor Funds. Dkt. 416, p. 15. The Fifth Circuit affirmed the Court's ruling with respect to including the D4 Entities in the Receivership Estate. *Barton*, 135 F.4th at 222-23.

The Receiver contends that relitigating these issues should be barred by the law of the case doctrine or collateral estoppel. *See Matter of AKD Investments*, 79 F.4th 487, 491 (5th Cir. 2023) (decision regarding any issue, even if only decided by "necessary implication" governs the same issues in subsequent stages of the same case); *Associated Recovery v. Does 1-44*, No. 3:16-CV-1025-L, 2018 WL 1517863, at *15 (N.D. Tex. Mar. 28, 2018), *aff'd sub nom. Associated Recovery L.L.C. v. Does 1- 44*, 769 Fed. Appx. 160 (5th Cir. 2019) (applying collateral estoppel to dismiss claims based on the Fifth Circuit's prior rulings related to a receivership order, even though the parties were not identical in the instant action, because "collateral estoppel does not require complete identity of parties" and the party that was not involved in the receivership "had the opportunity to and did file numerous documents in [that action] and in appeals to the Fifth Circuit") (citation omitted)).[18] Alternatively, even if not technically barred, the Receiver would argue that SPC's arguments would be rejected (again) by the same District Court, and any subsequent appellate panel would be required to enforce the decision of the prior panel. *See Martinelli v. Hearst Newspapers, L.L.C.*, 65 F.4th 231, 234 (5th Cir. 2023), *cert. denied*, 144 S. Ct. 2561, 219 L. Ed. 2d 1227 (2024) (Under this circuit's rule of orderliness, one panel ... may not overturn another panel's decision, absent an intervening change in the law, such as by a statutory amendment, or the Supreme Court, or our *en banc* court.") (internal quotation omitted)). Nevertheless, because both collateral estoppel and law of the case are an imprecise fit in these circumstances, the Receiver acknowledges that SPC could be permitted to re-urge that the D4 Entities should be excluded from the Receivership Estate. If successful, such a challenge

[18] *See also Icee of Am., Inc. v. Mid-Am. Icee Corp.*, No. 3:02-CV-0364-L, 2005 WL 2415940, at *4 (N.D. Tex. Sept. 29, 2005) ("'[N]on-mutual defensive collateral estoppel, "bars a plaintiff from litigating the same issue against successive defendants after that issue has been decided adversely to that plaintiff.'") (quoting *Ackerman v. Am. Airlines, Inc.*, 924 F. Supp. 749, 752 (N.D. Tex. 1995)); RESTATEMENT (SECOND) OF JUDGMENTS § 27 (1982) ("When an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim.").

would have a devastating financial impact on the Receivership Estate, particularly since the D4 Properties are the most valuable assets in the Receivership Estate.[19] While the Receiver remains confident in his legal position for the reasons stated above, the risk of total loss warrants ratifying the Settlement Agreement.

**b) The Court Could Rule That SPC Properly Exercised Its Conversion Rights By Relying On The Parties' Original Intent**

SPC's primary position is that, except the Parc at Opelika, it properly exercised its Conversion Rights and thus is currently the actual owner of all D4 Properties. In support, SPC argues its purported exercise of its Conversion Rights is consistent with SPC and Barton's intent at the time the parties entered into the Pledge and Security Agreements. SPC contends that the intent was for SPC to develop the D4 Properties and then exercise its Conversion Rights and take control of the D4 Properties. SPC argues that its conduct throughout the development and management of the D4 Properties—including providing construction management, property management, and the equity funding [Dkt. 247, p. 3]—evidence its role as the owner of the D4 Properties.

While the Receiver is unaware of any evidence contradicting SPC and Barton's intent at the time they entered the respective contracts, the Receiver contends that all evidence of intent would be inadmissible parol evidence when interpreting the terms of presumably unambiguous contracts. *See Am. Elec. Power Co. Inc. v. Affiliated FM Ins. Co.*, 556 F.3d 282, 288 (5th Cir. 2009) (rejecting parol evidence by which movant asserted "parties had a broader-than-usual meaning in mind" for certain terms, because "[e]xtrinsic evidence is inadmissible either to explain or to contradict [an] instrument's [clear] terms") (internal quotation omitted)). Thus, the

[19] Moreover, from a practical standpoint, if the D4 Entities and Properties are excluded from the Receivership Estate, SPC would move forward to perfect its Conversion Rights thereby stripping Barton of *any* value from these assets.

Receiver's position is that SPC's conduct regarding the D4 Properties has no role in the Court's interpretation of the contracts that determine the present ownership of the D4 Entities or the D4 Properties. *See 1701 Commerce Acquisition, LLC v. Macquarie US Trading, LLC*, No. 02-21-00333-CV, 2022 WL 3904976, at *11 (Tex. App.—Fort Worth Aug. 31, 2022, no pet.) ("At bottom, the 'understanding or belief' that Appellant offers to recharacterize the nature of the payment made to discharge the Mezzanine Loan is unavailing when it stands in contradiction to the terms of the document that conveyed and characterized that payment.").

If, however, the Court were to determine ambiguity or some other basis existed for admitting evidence of the parties' original intent and were to find SPC's evidence persuasive, the Receivership Estate risks losing the D4 Properties. Once again, this risk of total loss justifies ratifying the Settlement Agreement.

**c) Litigating The Dispute With SPC And Then Barton Would Result In Significant But Mostly Avoidable Litigation Expenses**

Significant litigation expenses were a primary motivation underlying the Receiver's willingness to settle with SPC. After SPC had filed its lengthy Response and multiple volumes of evidence but before the Receiver had filed his Reply, the Court denied without prejudice the Receiver's equally long Motion for Summary Judgment. [Dkt. 306]. Notably, in connection with its briefing, SPC had requested discovery from the Receiver which the Receiver opposed.[20] Dkt. 247. In connection with his Reply, the Receiver was also preparing to challenge SPC's expert testimony as well as the admissibility of much of the lay testimony offered in support of SPC's opposition. Following the extensive briefing that had already occurred, when it vacated the Initial Receivership Order, the Fifth Circuit changed the standard governing which entities and

[20] Because the Court stayed briefing on the Motion for Summary Judgment before the Receiver's Reply was due, his opposition to SPC's requested discovery was not filed in the docket.

properties could be included in the receivership. Thus, in a renewed summary judgment battle, the Parties would need to undertake new summary judgment briefing, including SPC's arguments about inclusion of the D4 Entities in the Receivership, deal with protracted and extensive evidentiary objections and potentially, expensive and time-consuming discovery. SPC had also requested a hearing on several of these matters. Given the time intensity and other burdens imposed on the Receivership Estate by the anticipated battle, contingency counsel likely would be retained to litigate the case, which would in turn take a significant portion of any proceeds resulting from a resolution in favor of the Receivership Estate.

Moreover, assuming the Receiver were to prevail against SPC, any transaction regarding the Apartment Complexes would almost certainly be subject to further litigation initiated by Barton. After prevailing against SPC, the Receiver would sell the D4 Properties to a third party. Barton, however, would appeal any order approving such sale, forcing the Receivership Estate to incur more expenses in defending such sales and further delaying the eventual recovery for the Estate based on such sales. While litigation from Barton may be inevitable, litigation with SPC is not. The settlement with SPC allows the Receivership Estate to avoid all litigation expenses related solely SPC as well as the delay incident to such litigation.

## IV. CONCLUSION AND REQUEST FOR RELIEF

In light of the foregoing, the Receiver respectfully requests that the Court ratify the Settlement Agreement with SPC and grant the Receiver such other and further relief to which he may be justly entitled.

Dated: August 24, 2026

Respectfully submitted,

*/s/ Charlene C. Koonce*

Charlene C. Koonce
State Bar No. 11672850
charlene@brownfoxlaw.com
James F. Hopper
State Bar No. 24116535
jimmy@brownfoxlaw.com
BROWN FOX PLLC
2699 Howell St., Suite 500
Dallas, Texas 75204
T: (214) 327-5000
F: (214) 327-5001

**VERIFICATION**

My name is Cortney C. Thomas. I am over the age of 18 and am fully competent to make this verification. I declare under penalty of perjury that the facts stated above are within my personal knowledge and are true and correct.

*/s/ Cortney C. Thomas*
Cortney C. Thomas

**CERTIFICATE OF CONFERENCE**

The undersigned certifies that on August 20,2026 the Receiver conferred via email with counsel for the SEC, and with Defendant Barton regarding the relief requested above. The SEC has indicated that it is unopposed to the relief requested herein. Defendant Barton indicated that he is opposed to this Motion.

*/s/Charlene C. Koonce*
Charlene C. Koonce

**CERTIFICATE OF SERVICE**

Pursuant to Fed. R. Civ. P. 5(d)(1)(B), as amended, no certificate of service is necessary because this document is being filed with the Court’s electronic-filing system.