**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | § | |
| | § | |
| ***Plaintiff,*** | § | |
| | § | |
| **v.** | § | **No. 3:22-cv-2118-X** |
| | § | |
| **TIMOTHY BARTON, *et al.*** | § | |
| | § | |
| ***Defendants.*** | § | |

**RECEIVER'S VERIFIED MOTION FOR APPOINTMENT OF APPRAISERS, APPROVAL OF APPRAISALS, APPROVAL HEARING, AND APPROVAL OF THE TRANSFER OF ALL RECEIVERSHIP INTEREST IN D4FR, LLC, THE RECORD OWNER OF "PARC AT WINDMILL FARMS"**

Cort Thomas, as the court appointed Receiver, respectfully moves the Court as follows:[1]

## I. SUMMARY

As more fully articulated in the SPC Ratification Motion, the Receiver and SPC have reached a global settlement of all their disputes concerning the four D4 Properties (defined below), including SPC's claims that it is the rightful owner of the D4 Properties. While the Receiver does not believe that he must comply 28 USC § 2001 to complete the transfers of interest contemplated herein, out of an abundance of caution to comply with the Court's Order Appointing Receiver (the "Receivership Order," defined below) and 28 U.S.C. § 2001 (the "Statute") he requests appointment of three appraisers, approval of the appraisals, a hearing regarding approval of the sale of certain property, and, ultimately, the approval of the transfer discussed below.

## II. FACTUAL BACKGROUND

### A. The Receivership Order and the Property.

1. On October 18, 2022, the Court entered an Order Appointing Receiver (the "Initial Receivership Order") by which Cortney C. Thomas was appointed as Receiver for certain entities owned or controlled by Defendant Barton (the "Receivership Entities"). The Court directed the Receiver to take possession and control of all Receivership Assets, "[t]he assets of the[] Receivership Entities," and Receivership Records. Receivership Order ¶¶ 6, 16, 17.

2. Following the Fifth Circuit's vacatur and remand of the Initial Receivership Order, this Court entered a second Order Appointing Receiver, which again directed the Receiver to

---

[1] Concurrently with filing this Motion (the "Windmill Farms Transfer Motion"), the Receiver is also filing (1) his Verified Motion to Ratify Settlement Agreement with Southern Properties Capital, Ltd. (the "SPC Ratification Motion"); (2) Motion for Appointment of Appraisers, Approval of Appraisals, Approval Hearing, and Approval of Transfer of Membership Interests in D4DS, LLC (the "Bellwether Transfer Motion"); (3) Motion for Appointment of Appraisers, Approval of Appraisals, Approval Hearing, and Approval of Transfer of the Membership Interests in D4IN Parc at Ingleside (the "Ingleside Transfer Motion"); and (4) Motion for Appointment of Appraisers, Approval of Appraisals, Approval Hearing, and Approval of Sale of Parc at Opelika (the "Opelika Sale Motion"). The Ratification Motion, Bellwether Transfer Motion, Ingleside Sale Motion, and Opelika Sale Motion are each hereby incorporated by reference as if fully set forth herein.

assume possession and control over a more limited set of Receivership Entities and all Receivership Assets. Dkt. 417, ¶¶ 1-2. The Court entered a third Order Appointing Receiver on June 23, 2025. Dkt. 650.[2]

3. On November 16, 2022, the Court entered the Order Governing the Administration of the Receivership ("Administrative Order") which established procedures for sales of real property in conformity with the Statute.[3]

4. Various "D4 Entities" are identified as Receivership Entities, and with minor exceptions not relevant to this motion, the parent entities of each D4 Entity is also a Receivership Entity. Each D4 Entity is the record owner of realty on which an apartment complex is located. More specifically, D4DS, LLC owns Bellwether Ridge, which is located in DeSoto Texas; D4FR, LLC owns the Parc at Windmill Farms, located in Forney, Texas; D4IN, LLC owns the Parc at Ingleside located in Corpus Christi, Texas; and D4OP, LLC owns the Parc at Opelika, located in Opelika, Alabama.[4]

5. D4FR is the owner of the Parc at Windmill Farms—a 272 unit apartment complex located at 1003 Windmill Farms Boulevard, Forney, Texas (the "Property"). D4FR is also the borrower on a HUD loan (the "HUD Loan") serviced by Greystone Servicing Corporation, Inc. ("Greystone"). The HUD Loan matures on August 1, 2061 and accrues interest at 3.9% annually. As of June 30, 2026, the balance on the HUD Loan was $33,534,994.15. Defendant Timothy Barton is listed as the "Section 50 party" to the HUD Loan and associated Regulatory Agreement,

---

[2] The Order entered at Dkt. 650 modified the Order entered at Dkt. 417 only with regard to require Defendant Barton to obtain leave of court before filing any further bar grievances. The Order entered at Dkt. 650 was also subject to an interlocutory appeal, which was dismissed by the Fifth Circuit on May 18, 2026. *See* Dkt. 649, and Appeal No. 25-10871. Collectively, Dkt. 417 and 650 are referenced as the "Receivership Order."

[3] In connection with issuance of the Receivership Order, the Court ratified the Administrative Order. Dkt. 419.

[4] These entities are collectively referenced as the "D4 Entities."

and signed the promissory note for the HUD Loan and all associated contract documents as the President of D4FR.

**B. The Southern Properties' Loan and Conversion Rights.**

6. Separately, but in connection with D4FR's purchase of the real estate on which Windmill Farms was constructed, Receivership Entity JMJ Development, LLC ("JMJ") executed a promissory note (the "Note") for $7,300,000 (later increased to $8,300,000) with Southern Properties Capital, LTD ("Southern Properties"). The debt created by the Note is referenced below as the "JMJ Debt." Southern Properties asserts the purpose of the JMJ Debt was to provide additional capital to D4FR in connection with the construction of the Apartment Complex. As of June 30, 2026, an affiliate of Southern Properties claims that the balance of the Note is $9,809,312.03.

7. As evidenced through various motions filed by the Receiver and SPC,[5] the primary dispute between Southern Properties and the Receiver centers upon a series of different agreements Barton and various Receivership Entities entered into with SPC. Southern Properties asserts that these agreements give it the ability to convert its loan, as evidenced by the Note, to equity in D4FR. SPC contends it exercised its option to convert the JMJ Debt into equity in D4FR on or about October 3, 2022, when it sent JMJ a conversion option purchase contract for the Property.

**C. The MPA and Settlement Agreement**

8. While the Receiver disputes the validity of SPC's prior conversion and ownership claims, as articulated more fully in the Motion to Ratify, the Receiver strongly believes that it is in the best interest of the Receivership to resolve the SPC dispute now. Accordingly, the Receiver and SPC entered into a Settlement Agreement, which was submitted for ratification concurrently

---

[5] *See e.g.*, Dkt. Nos. 206, 207, 208-1-208-5 (MSJ, supporting brief and evidence); Dkt. Nos. 254, 247-253 (Response and supporting brief and evidence) and Dkt. 215, 226, 233 and 234 (motion to strike and related briefing).

with this Motion. The Receiver also entered into Member Purchase Agreements (the "MPAs") related to three of the D4 Entities, including an MPA related to all Receivership Entities' interests in D4FR.[6] The transfer of interests contemplated by the Settlement Agreement and the MPA related to D4FR at issue here, is made specifically subject to SPC's continuing conversion rights. In other words, any competing bid made in compliance with the Statute will be subject to SPC's contractual rights to convert its debt into equity and thereby claim ownership of the subject D4 Entity and its Property, including for purposes of this Motion, Windmill Farms.

**D. Payment Required of SPC**

9. The transaction contemplated by the MPA is not contingent on a due diligence period. Indeed, SPC has agreed to enter the MPA with no diligence period at all. Within seven (7) days of Court ratification of the Settlement Agreement and Court approval of the transfer contemplated by the MPA as requested in this motion,[7] SPC will make a one-time payment of $9,175,912.39 to a separate interest-bearing account held by the Receiver (the "Escrow Payment"), which is the total of the allocable share of the Settlement Payment attributable to Transfer of Interests pursuant to the MPAs for Bellwether Ridge, Windmill Farms, and Ingleside.[8] The Receiver will hold the Escrow Payment until thirty (30) days after satisfaction of certain Conditions Precedent.

10. The Escrow Payment, together with the SPC Debt and HUD Debt totals $47,815,802.19 (the "Contract Price").

---

[6] The Settlement Agreement is attached as **Exhibit A-1** (APP-005-019). The MPA related to the transfer of interests in D4FR, LLC is attached as **Exhibit A-2** (APP020-027).

[7] Ratification of the Settlement Agreement and approval of the transfer of membership interests are collectively referenced below as the "Conditions Precedent."

[8] $4,471,496.01 of the Escrow Payment is attributable to the MPA for Windmill Farms. An additional Escrow Payment will be made with regard to sale of the Property owned by D4OP, LLC.

**E. Transfer of Interest in the Record Owner of the Property.**

11. Pursuant to the MPA, within fourteen (14) days after the satisfaction of the Conditions Precedent, the Receiver will transfer to SPC all membership interests held by the Receiver in D4FR (totaling 99.5% of membership interests), the record owner of Windmill Farms. In consideration of the transfer of interests, SPC waives and releases any entitlement to recover on the JMJ Debt, as well as releasing any other claim or entitlement asserted against any Receivership Entity or the Receiver. In the event a third-party submits a competing bid as contemplated by the Statute, SPC's release would not apply, and thus any third-party purchaser would potentially acquire the membership interests at issue subject to the JMJ Debt, as well as SPC's Conversion Rights.

## III. ARGUMENT AND AUTHORITIES

As noted above, this transaction involves a *settlement* requiring the transfer of *membership interests* in the D4 Entities. It does not contemplate the sale of any realty. *See* TEX. BUS. ORGS. CODE § 101.106(b) ("A member of a limited liability company or an assignee of a membership interest in a limited liability company does not have an interest in any specific property of the company.");[9] *see also RLI Ins. Co. v. Caliente Oil, Inc.*, 469 F. Supp. 3d 729, 739–40 (W.D. Tex. 2020) (rejecting argument that ownership interest in LLC entity also conveyed an ownership interest in equipment owned by the LLC). Nonetheless because Barton will undoubtedly appeal an order that approves the transfer if one is entered, without waiver of his entitlement to argue on appeal that the Statute does not apply and to avoid the delay and uncertainty incident to such an

[9] Relevant Agreements for the D4 Entities require the same conclusion: "Company Assets shall be deemed to be owned by the Company as an entity, and no Member, individually or collectively, shall have any ownership interest in such Company Assets or any portion thereof. Title to any or all Company Assets shall be held in the name of the Company. All Company Assets shall be recorded as the property of the Company on its books and records, irrespective of the name in which legal title to such Company Assets are held." *See* Dkt. 208-5, p. ID 6908 (Amended Regulations of D4IN, Article VIII).

appeal in the unlikely event an appellate court were to determine (1) this transfer of personalty falls within the otherwise plain language of the Statute governing sales of realty; (2) an appellate court possesses jurisdiction over such an appeal; and, (3) this Court's approval of the transaction, if granted, was an abuse of discretion, the Receiver demonstrates satisfaction of the Statute in connection with this Motion for approval of the transfer.

### A. Legal Standard

Pursuant to the Statute,[10] the Court may order the sale of real property via private sale "if it finds that the best interests of the estate will be conserved thereby." Before the confirmation of any private sale, (1) "the court shall appoint three disinterested persons to appraise such property or different groups of three appraisers each to appraise properties of different classes or situated in different localities[, and] [n]o private sale shall be confirmed at a price less than two-thirds of the appraised value;" (2) "the terms [of the sale] shall be published in such newspaper or newspapers of general circulation as the court directs at least ten days before confirmation" and a hearing held, "of which notice to all interested parties shall be given by publication or otherwise as the court directs;" and (3) "[t]he private sale shall not be confirmed if a bona fide offer is made, under conditions prescribed by the court, which guarantees at least a 10 per centum increase over the price offered in the private sale." 28 U.S.C. § 2001(b).

### B. The Court Should Appoint The Identified Appraisers and Accept Their Appraisals.

In accordance with this Court's Orders and the Statute, the Receiver obtained three

---

[10] In comparison, "in the equity receivership context, parties have sought and courts have rendered decisions regarding whether to approve or reject settlement agreements based on courts' wide discretion in administering an equity receivership." *SEC v. Safety Fin. Serv., Inc.*, 674 F.2d 368, 373 (5th Cir. 1982) "Receivership courts, like bankruptcy courts, may also exercise discretion to approve settlements of disputed claims to receivership assets, provided that the settlements are 'fair and equitable and in the best interests of the estate.'" *SEC v. Stanford Int'l Bank, Ltd.*, 927 F.3d 830, 840 (5th Cir. 2019) (quoting *Ritchie Capital Mgmt., L.L.C. v. Kelley*, 785 F.3d 273, 278 (8th Cir. 2015)). For the reasons stated above, although the Receiver contends the Court's broad discretion, unfettered by the constraints of the Statute govern approval of the subject transaction, he utilizes the more exacting parameters of the Statute as the controlling standard.

independent appraisals of the Property. Two are certified appraisals, and one is an informal broker opinion of value (collectively, the "Appraisals").[11] True and correct copies of the three appraisals are included in the Appendix as **Exhibits A-3, A-4, and A-5** (APP028-204, APP205-345, and APP346-378). The Receiver requests that the Court appoint the appraisers for the purpose of providing the attached Appraisals and accept these three appraisals as required by the Statute.

The three appraisals value the Property at $48,200,000,[12] $49,500,000,[13] $57,800,000[14] resulting in an average appraised value of $51,833,333.33.[15] Thus, the settlement value for the transfer of the membership interest in DRFR, $47,815,802.19,[16] exceeds two-thirds of the average appraised value of the Property[17] as required by 28 U.S.C. § 2001(b). As outlined below, the Receiver contends the proposed transfer of the member interests and thus the transfer of the Property both satisfies the two-thirds threshold and as will be further explained at a hearing, is in the best interest of the receivership.

### C. The Terms of Any Competing Offers and Request for a Hearing on the Proposed Transfer

The Statute also requires that the Court conduct a hearing to consider any proposed sale.

---

[11] As permitted by the Court's Administration Order, to minimize expenses, the Receiver is using one informal opinion of value as an appraisal due to the cost of a certified appraisal on commercial property. Dkt. 63 at 9 ("Similarly, the Receiver may in his discretion utilize informal "opinions of value" received from respected brokers in the respective industries related to the subject property, as one or more of the "appraisals" required by § 2001(b).")

[12] The appraisal was issued by Stone Berger and Jimmy H. Jackson of Integra Realty Resources ("IRR") and is dated as of December 11, 2025. *App.* pp. 028-204.

[13] The appraisal was issued by National Valuation Consultants, Inc. ("NVC") on or around November 26, 2025. *App.* pp. 205-345.

[14] The Broker Opinion of Value was issued by Walker & Dunlop on or around August 27, 2025. *App.* pp. 346-378.

[15] The average appraised value was calculated using the average price of each of appraisal or Broker Opinion of Value $48,200,000.00, $49,500,000.00, and $57,800,000.00, respectively.

[16] This amount is based on the balance due on the HUD loan as of June 30, 2026 [$33,534,994.15], the balance due on the JMJ Debt [$9,809,312.03] plus the amount of the Escrow Payment attributable to Windmill Farms [$4,471,496.01].

[17] D4FR has no meaningful assets other than the Property and its related accounts and thus appraisals of the Property are a fair equivalent for the value of the membership interests that are the subject of the MPAs.

At least ten days before the hearing, the Statute further requires publication of the terms of the proposed sale so that bona fide interested purchasers can submit competing bids of not less than 10% more than the Contract Price. To provide the same monetary and intrinsic value to the Receivership Estate as the proposed transaction with SPC, the Receiver requests that any competing offer (hereafter a “Bona Fide Competing Offer”) be required to also include written acknowledgement, signed under penalty of perjury in the form attached as **Exhibit A-6** (the “Acknowledgement) (APP379-382), which confirms:

- The transaction includes no due diligence period;
- Any purchase of all Receivership Entity interests in D4FR will be subject to SPC’s Conversion Rights;
- Proof of funds on deposit to satisfy the full Bona Fide Competing Offer;
- As evidence that the competing offer is bona fide, deposit of 10% of the Bona Fide Competing Offer amount into escrow within 24 hours of communicating the Bona Fide Competing Offer to the Receiver;
- Deposit in escrow of the Bona Fide Competing Offer amount (10% more than the Contract Price), is required within seven days of less the funds deposited as Earnest Money, is required within **seven days** of entry of an Order by the District Court granting this Motion. This deposit into escrow is required regardless of whether the Order is appealed or subject to any subsequent stay order;
- Funds paid into escrow as required above are released to the Receiver within thirty days of court approval of this Motion;
- Funds paid into escrow, including funds released to the Receiver, will not be refunded, regardless of the outcome of any appeal of the Order granting this Motion and regardless of whether SPC exercises its Conversion Rights (before or after entry of such an Order);

Further, the Receiver also requests that any Bona Fide Competing Offer be accompanied by a corporate resolution, board approval or other express authorization for the Bona Fide Competing Offer by any management or governing authority over the offeror, or a written and signed statement, supported by any operative documents, explaining why such authorization is

unnecessary.

The Receiver also requests that the Court schedule a hearing on or before October 23, 2026 to consider the sale.[18] The Receiver will publish notice of the hearing at least ten (10) days prior to the hearing date as required by 28 U.S.C. § 2001(b) and provide notice of the hearing through the receivership website. Additionally, the Receiver requests that the Court require any objections to the proposed transfer be filed no later than ten days after the date of an order setting the hearing, or fourteen days before such hearing, whichever date is earlier.

The Receiver requests that any Bona Fide Competing Offers be served on the Receiver and filed with the Court at least two days before the hearing scheduled to consider the transfer.

### D. After the Hearing, the Court Should Approve the Transfer, or Any Bona Fide Competing Offers, as in the Best Interest of the Receivership.

The disposition of the membership interests and thus the Property outlined above is in the best interest of the Receivership. First, transfer to any third party would be subject to SPC's contested Conversion Rights, a condition that effectively bars any transaction until SPC's disputed rights are resolved through expensive, time-consuming and uncertain litigation. Second, while the Receiver believes he would likely prevail in such litigation, the outcome is far from certain. If the Receiver were to lose that litigation, he would recover nothing for the Receivership Estate from these Properties. Third, while such litigation and the inevitable appeal were pending, the Receiver would be unable to move forward with any claims process or necessary steps to move this receivership towards a conclusion, despite a nearly four-year wait already.

Moreover, the Apartment Complexes are the most valuable Receivership Assets—assets Barton himself had suggested at the inception of the case should be sold to compensate the

[18] To comply with the publication requirement, the Receiver requests that the Court schedule the hearing at least two weeks after this motion is filed. Due to competing obligations and conflicts, the Receiver also requests that the Court not schedule the hearing on or between September 7-22 or October 8-13.

defrauded investors—and to date, the Receiver has not had sufficient assets or reason to initiate a claims process such that progress can be made towards finalization.[19] Further, as the Court is aware, to date, Barton's contumacious activities and meritless appeals have precluded the Receiver from closing any sale, thereby justifying efforts to generate income through a settlement with SPC.

For these reasons as well as those that will be articulated at a hearing, the Receiver requests that the Court conclude that transfer of any Receivership Entities' membership interests in D4FR to SPC as set forth in the MPA is in the best interests of the receivership estate.

## IV. CONCLUSION AND PRAYER

As set forth above, the Receiver requests that the Court (1) appoint the three appraisers identified above and in the Appraisals included in the Appendix; (2) approve and accept the Appraisals provided by each appraiser; (3) set this matter for hearing to consider approval of the transfer on the terms provided by the MPA and the Settlement Agreement or as offered in any Bona Fide Competing Offer received at least two days before the hearing set on this Motion; (4) require that any Bona Fide Competing Offers be submitted to the Receiver at least two days before the date of the hearing and on the form attached as Exhibit C; and, (5) provided no timely Bona Fide Competing Offers are received at least two days before the date of the hearing, enter an order authorizing the Receiver to transfer the subject membership interests pursuant to the terms of the MPA. The Receiver also requests such other and further relief to which he is justly entitled.

[19] Any claims process would only be established by this Court's order, and the Receiver would not likely request permission to make any distribution until the Court rules on the merits of the SEC's claims against Barton.

Respectfully submitted,

By: */s/ Charlene C. Koonce*

Charlene C. Koonce
Texas Bar No. 11672850
charlene@brownfoxlaw.com
James F. Hopper
Texas Bar No. 24116535
jimmy@brownfoxlaw.com
BROWN FOX PLLC
2699 Howell St., Suite 500
Dallas, TX 75204
Tel. 214.327.5000
Fax. 214.327.5001

*Attorneys for Receiver Cortney C. Thomas*

## VERIFICATION

My name is Cortney C. Thomas. I am over the age of 18 and am fully competent to make this verification. I declare under penalty of perjury that the facts stated above are within my personal knowledge and are true and correct.

*/s/ Cortney C. Thomas*
Cortney C. Thomas

## CERTIFICATE OF CONFERENCE

The undersigned certifies that on August 20, 2026, counsel for the Receiver conferred with counsel for the SEC and Defendant Barton. The Commission is unopposed. Defendant Barton is opposed.

*/s/ Charlene C. Koonce*
Charlene C. Koonce

**CERTIFICATE OF SERVICE**

Pursuant to Fed. R. Civ. P. 5(d)(1)(B), as amended, no certificate of service is necessary, because this document is being filed with the Court's electronic-filing system.

*/s/ Charlene C. Koonce*
Charlene C. Koonce