**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § | |
| | § | No. 3:22-cv-2118-X |
| Plaintiff, | § | |
| v. | § | |
| TIMOTHY BARTON, et al., | § | |
| Defendants, | § | |
| DJD LAND PARTNERS, LLC, and LDG001, LLC, | § | |
| Relief Defendants. | § | |

**DEFENDANT TIMOTHY BARTON'S CONSOLIDATED RESPONSE AND OBJECTION TO THE RECEIVER'S MOTION TO RATIFY THE SPC SETTLEMENT (DKT. 872) AND MOTIONS FOR APPROVAL OF TRANSFERS AND SALE (DKTS. 874, 876, 878, 880)**

## TABLE OF CONTENTS

I. PRELIMINARY STATEMENT ....................4
II. BARTON'S STANDING ....................5
III. BACKGROUND ....................6
IV. LEGAL STANDARD ....................7
V. OBJECTIONS ....................8
A. Threshold appraisal and valuation defects ....................8
B. Unsupported hypothetical contingency fee ....................9
C. Consideration and unexamined alternatives ....................10
D. Prices below the Receiver's own benchmarks ....................11
E. Preservation of tracing and apportionment value ....................12
F. Developer-fee, Section 50, and non-signatory rights ....................13
G. Dkt. 792 process and absence of demonstrated urgency ....................14
H. No demonstrated economic necessity for disposition ....................15
I. Commercially unusable competing-bid conditions ....................16
J. Unsupported and misallocated SPC debt ....................17
K. Missing property-management accounting ....................17
L. Defective transfer instruments and assignee provisions ....................18
VI. COMPLETED RECORD AND EVIDENTIARY HEARING ....................18
VII. RELIEF REQUESTED ....................20

## TABLE OF AUTHORITIES

**Cases**


Acadia Land Co. v. Horuff, 110 F.2d 354 (5th Cir. 1940) ........................................................7, 8

Black v. UniBank, No. 25-50986 (5th Cir. Aug. 25, 2026).................................. 5, 7, 8, 12, 18-19

Liu v. SEC, 591 U.S. 71 (2020)........................................................................................12

SEC v. Barton, 135 F.4th 206 (5th Cir. 2025) ...............................................................12, 14

SEC v. Barton, 170 F.4th 938 (5th Cir. 2026) ..................................................................4, 14

SEC v. Stanford International Bank, Ltd., 927 F.3d 830 (5th Cir. 2019)............................7, 10, 13

SEC v. T-Bar Resources, LLC, No. 3:07-CV-1994-B, 2008 WL 4790987 (N.D. Tex. Oct. 28, 2008) ...........................................................................................................................7, 8


**Statutes**


28 U.S.C. § 2001(b) .............................................................................................7, 8, 16

28 U.S.C. § 2004.....................................................................................................7, 8

TO THE HONORABLE UNITED STATES DISTRICT JUDGE BRANTLEY STARR:

Defendant Timothy Barton, individually and pro se, responds and objects to the Receiver's Verified Motion to Ratify Settlement Agreement with Southern Properties Capital, Ltd. ("SPC") (Dkt. 872) and to the four related motions for approval of transfers and sale (Dkts. 874, 876, 878, 880). Except where otherwise noted, every figure below comes from the Receiver's own filings, the settlement documents (Dkt. 873), or this Court's record. This Response seeks only the disposition of the Receiver's pending motions and the conditions on which any approval should rest. Barton does not move for affirmative relief here; any request for discovery or for relief from the litigation stay (Dkt. 650) will be presented, if necessary, by separate motion for leave under Dkt. 747.

## I. PRELIMINARY STATEMENT

Barton does not contend that a receivership asset can never be transferred before final judgment. The Fifth Circuit has approved property-specific receivership sales supported by the statutory procedures and record evidence demonstrating why the transaction conserved the estate's best interests. See SEC v. Barton, 170 F.4th 938, 944-45 (5th Cir. 2026). The question here is narrower and transaction-specific: whether these four assets, collectively valued at well over $100 million, may be irreversibly transferred through this settlement when three valuation packages contain the same appraisal of the wrong property, material financial facts remain unaccounted for, SPC's debt and ownership rights remain disputed, the topping-bid conditions materially favor SPC, independent rights are purportedly released, and reasonable alternatives have not been adequately compared. Three years ago the Receiver characterized SPC as "at most ... an unsecured creditor whose claim will be addressed through a claims process, along with many, many other similarly situated creditors." Dkt. 188 at 2-3. His present motion still maintains that SPC's attempted

conversion "failed to satisfy the conditions precedent" and was "executory and ineffective." Dkt. 872 paras. 26-30. The Receiver also identifies $6,940,710.13 in project-account assets that accompany the entities. Dkt. 872 at 15. Under Black v. UniBank, the Court cannot resolve the disputed valuation, accounting, contractual, and ownership facts merely by accepting the Receiver's characterizations. Barton asks the Court to deny or defer ratification and approval, require the targeted production and accounting described below, and conduct an evidentiary hearing before any irreversible transfer.

## II. BARTON'S STANDING

Barton appears solely in his individual capacity and does not purport to litigate claims belonging to any entity. He objects because the proposed release expressly runs against "equity holders ... or any other party claiming by, through or under" the Receivership Entities, Dkt. 873 App. 13 ¶ 10, and therefore purports to reach his own independent rights although he is not a settlement party and receives no consideration. The record also identifies two Barton-specific issues that must be resolved, not assumed away. First, Section 7.15(a)(ii) of the Pledge and Security Agreements expressly conditions conversion on payment in full of "all fees owed to Timothy Barton or his affiliates for developer's fees," Dkt. 208 App. 162, and SPC admits that an Opelika developer fee remains unpaid, Dkt. 247 at 15-16 [App. 703]. The present record does not identify whether that receivable is payable to Barton personally or to an affiliate. Barton does not assert an affiliate's receivable; he asks the Court to require the Receiver to identify the actual payee, amount, and contractual enforcement right before an order purports to release or impair any fee owed to Barton individually. Second, the record identifies Barton as the "Section 50" signatory on the four HUD transactions, Dkt. 208 App. 20 ¶ 48, but the present papers do not establish what personal certification duties, defenses, or exposure, if any, survive a transfer, assumption, HUD

approval, or payoff. That issue must be addressed expressly. The interests of N.E. Construction, LLP, AXIA Contracting, D4OPM, LLC, One MF D4, LLC, and other non-signatories are discussed only as evidence of the settlement's asserted breadth, not as claims Barton prosecutes on their behalf.

## III. BACKGROUND

SPC sent "exercise notices" for three of the properties on October 3, 2022 — one week after the Commission filed this case and before the initial receivership order. Dkt. 872 ¶ 25. In February 2023 the Receiver moved to sell Parc at Windmill Farms and Bellwether Ridge to Palmetto/i3, an unrelated cash buyer, for $51,000,000 and $27,000,000, supported by three property-specific 2023 appraisals per property averaging $53.17 million and $29.03 million. Dkts. 161 at 5, 8 & nn.6–9; 164 at 6, 8 & nn.6–9. SPC filed an expedited opposition and moved to intervene, Dkts. 174, 177–184; the Receiver responded by continuing the sale hearing at his own request, Dkt. 188, and moving for summary judgment on SPC's claimed ownership, Dkts. 206–207, with the loan documents at Dkt. 208. SPC responded. Dkts. 247–254. The Court stayed the briefing when the Fifth Circuit vacated the first receivership order, Dkt. 306; the motion was thereafter not adjudicated and, with other pending motions, was subject to dismissal without prejudice — it remains available for renewal. The $78 million of cash contracts were not consummated after SPC objected and intervened and the Receiver obtained the continuance. Barton's contemporaneous response identified two prospective buyers he had directed to the estate, interested in the two properties plus a third "for at least $107 million, and willing to negotiate," citing an offer already of record, Dkt. 185 at 4–5 (citing Dkt. 72 App. 4), and the Receiver's reply confirmed an actual negotiated offer from CEI. Dkt. 193 at 8–9.

On July 8, 2026 this Court directed the Receiver "to solicit proposals from lenders for each Receivership Property" to pay down loans "and allow remaining claims to be dealt with as part of the Receivership's claims process," with free-and-clear sales and a judicial priority determination as the fallback. Dkt. 792 at 1–2. On August 24, 2026 the Receiver filed this settlement — resolving SPC's unadjudicated claim first, outside the claims process, by agreeing to convey the assets themselves. The Court set the four sale motions for hearing on September 29, 2026, Dkt. 882; the ratification motion is not set for hearing.

## IV. LEGAL STANDARD

A receivership court has broad discretion, but a compromise of disputed claims must be "fair and equitable and in the best interests of the estate." SEC v. Stanford Int'l Bank, Ltd., 927 F.3d 830, 840 (5th Cir. 2019). For a private sale of real property, 28 U.S.C. § 2001(b) requires a noticed hearing, three court-appointed disinterested appraisers, publication, a price of at least two-thirds of appraised value, and non-confirmation if a bona fide ten-percent-higher offer is made. Those safeguards are conditions precedent to a valid private sale. Acadia Land Co. v. Horuff, 110 F.2d 354, 354-55 (5th Cir. 1940); SEC v. T-Bar Resources, LLC, No. 3:07-CV-1994-B, 2008 WL 4790987, at *3-4 (N.D. Tex. Oct. 28, 2008). Section 2004 applies the same terms to personal property "unless the court orders otherwise." Thus, even if the Administrative Order modifies strict § 2001 procedures for the membership-interest transfers, the Receiver still must supply competent, property-specific evidence sufficient for the Court to determine fair value and the estate's best interests. Further, whatever authority Stanford permits over derivative claims affecting the receivership res, a receiver cannot compromise an independent, non-derivative contractual or personal right without establishing that the right belongs to the estate or otherwise falls within the Court's receivership jurisdiction. 927 F.3d at 840-43, 845-

50.https://www.ca5.uscourts.gov/Opinions/pub/17/17-11114-CV0.pdf Finally, Black v. UniBank holds that minimum due process in an equity receivership requires the court to permit an objector to present evidence and argument on disputed facts, expressly adjudicate the objector's claims and defenses or adopt a receiver determination that actually does so, and minimally trace factual conclusions to record evidence or require the receiver to do so.https://law.justia.com/cases/federal/appellate-courts/ca5/25-50986/25-50986-2026-08-25.html No. 25-50986, slip op. at 25-28 (5th Cir. Aug. 25, 2026).

## V. OBJECTIONS

**A. Threshold defect: the Opelika sale lacks the appraisal record § 2001(b) requires, and the three membership-transfer records cannot support reliable valuation or best-interest findings.**

Dkts. 877, 879, and 881 each label Exhibit A-4 as the NVC appraisal for a different property - Parc at Ingleside, Parc at Windmill Farms, and Parc at Opelika - but each exhibit is the same appraisal of Bellwether Ridge: the same address (841 S. Polk Street, DeSoto, Texas), NVC file number DAL25101168, $28,000,000 conclusion, and 150-unit description. Dkt. 877 App. 178-318; Dkt. 879 App. 205-345; Dkt. 881 App. 264-404. The NVC values recited for those three properties ($49.5 million, $25 million, and $31 million, Dkt. 873 nn.3-5) therefore are not supported by the exhibits filed. For the direct Opelika real-estate sale, that is a threshold statutory defect: § 2001(b), Acadia, and T-Bar require three disinterested appraisals of the property being sold before confirmation. For the membership-interest transfers, § 2004 permits the Court to order a different procedure, but the Receiver elected to prove value and best interests through appraisal and broker evidence. Three of those evidentiary packages contain an appraisal of the wrong property. The Court therefore cannot make reliable valuation or best-interest findings even if the Administrative Order modifies strict § 2001 procedures. See Black, slip op. at 25-28. Exhibit A-5 is a Walker & Dunlop pricing deck repeated in all four appendices; the firm's engagement and

compensation terms are not in the record, and Opelika's $32.85 million "strike price" matches none of its three filed scenarios ($33.6 million, $34.85 million, and $36.1 million). Before any hearing, the Receiver should file corrected, current, property-specific valuation evidence; Opelika must be supported by three court-appointed disinterested appraisers, and any professional whose opinion is offered for a membership transfer should disclose its engagement, compensation, and transaction interests.

**B. The Receiver is surrendering a merits position he has never abandoned, at a discount justified only by an unretained, unauthorized, hypothetical contingency fee.**

The Receiver's own filings maintain that SPC never acquired the ownership it claims. Section 7.15 conditions the $100 conversion on prior HUD TPA approval and payment in full of Barton's developer's fees. Dkt. 208 App. 162. Neither is shown to have occurred: the record identifies no HUD approval of any transfer — the settlement itself is built around a twelve-month effort to obtain approval in the future, Dkt. 873 App. 11–12 ¶ 6(c)–(d) — and SPC admits the Opelika fee remains unpaid. Dkt. 247 at 15–16 [App. 703]. The October 3, 2022 notices failed the 30-day notice, attached unexecuted agreements, and lacked HUD approval, Dkt. 872 ¶¶ 26–27; the motions and their exhibits identify no notice of default or acceleration on any note; and the assignment instrument names a misnamed assignee — “Southern Properties Capital, LLC” — entitled to exercise the assigned rights “only … in the event of a default.” Dkt. 207 at 2; Dkt. 247 at 36, 41–42. SPC's principal defense — that these are “conditions to closing, not exercise of the option,” Dkt. 247 at 42–43 — at minimum confirms that no closing or consummated transfer occurred and leaves substantial the Receiver's contention that the attempted exercise remained “executory and ineffective.” Dkt. 872 ¶ 30. SPC's assertion that HUD approval is “merely ministerial,” Dkt. 247 at 36–40, is undercut by Section 21 of the HUD Security Instruments and by SPC's own twelve-month HUD Approval Period.

The motion discounts the estate's litigation alternative to a $15.4 million "best day in court" by assuming that the Receiver would retain contingency counsel "likely on a 40% contingency" costing approximately $10.6 million. Dkt. 872 at 15-16. The record identifies no retained contingency counsel, engagement agreement, negotiated percentage, or order authorizing such an arrangement. The ownership dispute is already substantially developed and briefed. A hypothetical $10.6 million future expense cannot rationally be deducted from the estate's litigation alternative without evidence that the expense will actually be incurred, in that amount, on those terms. The Receiver should be required to explain what changed in his merits analysis since Dkts. 188 and 207 and how he valued SPC's disputed contractual position when selecting the settlement. A fiduciary's compromise must reflect the strength of the estate's position. Stanford, 927 F.3d at 840.

**C. The consideration is inadequate on the Receiver's own numbers, and the motion never weighs the alternatives.**

The Receiver stipulates equity of $19,613,243 in the three positive-equity properties after deducting HUD balances and SPC's claimed loan balances and treating one negative-equity property as zero. Dkt. 872 at 13-14. Before deducting SPC's disputed claim, the same stipulated values less HUD debt yield approximately $42.3 million in gross equity. In addition, approximately $6,940,710.13 in project-account assets accompany the entities, including tenant security deposits and potentially restricted funds; the Receiver identifies $5,336,184.00 as auditor-reported available excess cash as of December 31, 2025. Dkt. 872 at 15 & n.13; Dkt. 873 App. 13 para. 7. Those amounts should not be treated as uniformly distributable cash, but they must be separately accounted for and valued in determining the settlement's actual economics. The Court cannot evaluate the headline $12 million payment without considering the assets and cash transferred with the entities. Nor does the motion meaningfully compare reasonable alternatives, including adjudicating the substantially briefed ownership/conversion dispute; refinancing;

redeeming or paying off whatever SPC balances are ultimately proven; conducting a commercially competitive property sale with SPC paid according to its adjudicated priority; or following the claims process contemplated by Dkt. 792. Barton need not prove today which alternative ultimately prevails. The Receiver must compare available alternatives before surrendering the assets.

**D. The prices are below the Receiver's own 2023 contracts, his stipulated values, and his broker's floor scenarios.**

| Measure | Windmill Farms | Bellwether | Ingleside | Opelika |
|---|---|---|---|---|
| **Feb. 2023 cash contract (Dkts. 161, 164)** | $51,000,000 | $27,000,000 | — | — |
| 2023 appraisal average (id.) | $53,166,666 | $29,033,333 | — | — |
| Receiver's broker (W&D) lowest 2025 scenario | $55,800,000 | $29,300,000 | $31,500,000 | $33,600,000 |
| Stipulated value 6/30/26 (Dkt. 873) | $51,833,333 | $27,283,333 | $27,250,000 | $32,070,000 |
| **2026 settlement contract price** | $47,815,802 | $23,919,918 | $30,931,756 | $29,486,932 |
| Occupancy (Receiver's appraisals, Dec. 2025) | 91% | 93% | 85% | 90% |

These are completed, operating apartment communities at the occupancy levels the Receiver's own appraisals report. In the aggregate, the contract prices ($132.15 million) run $6.28 million below the values the Receiver stipulated eight weeks before filing and $18.0 million below his broker's lowest scenarios; for Windmill Farms and Bellwether they are $6.27 million below the cash contracts the Receiver held in February 2023 — contracts that were not consummated after SPC's objections and intervention and the Receiver's requested continuance, Dkts. 174, 177,

188. Ingleside's contract price alone exceeds its stipulated value, and Barton does not overstate the point; the aggregate comparison, and the identity of the beneficiary, carry it. The Receiver concedes he “might have received a higher purchase price” by listing the properties. Dkt. 880 at 9.

**E. Any disposition must preserve sufficient value for the tracing and apportionment issues the Court reserved.**

Barton acknowledges that the Fifth Circuit affirmed inclusion of the D4 entities in the Receivership Estate and rejected a proportionality threshold for inclusion. SEC v. Barton, 135 F.4th 206, 222-23 (5th Cir. 2025). This objection does not revisit that holding. Inclusion resolved custody, not final entitlement or distribution of one hundred percent of the entities' accumulated value. This Court expressly reserved the lowest-intermediate-balance and apportionment analysis until "the end of the case." Dkt. 416 at 17 n.82. The settlement counterparty itself recites that the D4 entities "have only a tangential connection to Barton," that "very little, if any, investor funds are directly traced into the D4 Entities," and that investor funds were not used to develop, construct, or operate the properties. Dkt. 873 App. 7; accord Dkt. 329 at 5. The extent of any traceable investor funds in the D4 entities has never been adjudicated; the Court reserved that question. Under Black, those disputed facts require evidence-connected findings before the reserved entitlement questions are rendered meaningless by an irreversible transfer. If a disposition is approved, the order must preserve sufficient disputed proceeds or substitute value to permit the reserved tracing and apportionment issues to remain capable of meaningful adjudication.

The same preservation principle applies to the alleged benefit supporting custody. The record identifies salary and office payments and two transfers ($210,000 and $15,000) that SPC characterized as cancelled in-and-out transactions. Dkt. 416 at 18 & nn.87-93; Dkt. 308 paras. 81(a)-(b), 95. The estate now controls the entities, the properties, and approximately $6.94 million in manager-held project accounts. Liu is instructive by analogy, not as a rule of receivership

administration: equitable recovery is measured and bounded by the relevant benefit. 591 U.S. 71, 79-80 (2020). The Receiver's other theories - assistance obtaining HUD or EIDL loans - involve debts that must be repaid, not a presently quantified traceable res. Dkt. 308 paras. 81(c)-(d). These disputes do not categorically bar every disposition before final judgment; they require any approval order to preserve the disputed economic value or proceeds until the Court decides the entitlement and apportionment issues it reserved.

**F. The proposed releases do not separately address Barton's developer-fee rights, his Section 50 position, or the independent rights of non-signatories.**

Stanford permits receivership settlements and bar orders affecting derivative claims and the receivership res, but it preserves the limit that independent, non-derivative rights cannot be extinguished without jurisdiction and appropriate process. 927 F.3d at 840-43, 845-50.https://www.ca5.uscourts.gov/Opinions/pub/17/17-11114-CV0.pdf Three separate issues require findings here. First, Section 7.15(a)(ii) expressly names fees owed to "Timothy Barton or his affiliates," and SPC admits an Opelika developer fee remains unpaid. Dkt. 208 App. 162; Dkt. 247 at 15-16. The record must identify the actual payee, amount, and enforcement right. Barton asserts only any fee or enforcement right belonging to him individually; he does not prosecute an affiliate's receivable. Second, the record identifies Barton as the Section 50 signatory, Dkt. 208 App. 20 para. 48, while Section 21 of the Security Instruments requires prior written HUD approval for a transfer of an interest in a borrower. The settlement allows up to twelve months to obtain HUD approval or pay off the loans, Dkt. 873 App. 11-12 para. 6(c)-(d), but it does not establish whether Barton has any continuing certification duty, personal exposure, defense, or right following approval, assumption, or payoff. Before approval, the Receiver should provide the precise contractual or regulatory source and obtain HUD approval, payoff/release, appropriate indemnification, or an express provision preserving Barton's individual rights and defenses. Third, the release reaches

"equity holders" and persons claiming through the entities, Dkt. 873 App. 13 para. 10, despite non-signatories receiving no consideration. Barton does not assert their claims; he asks the Court to state that approval neither adjudicates nor releases independent rights belonging to any non-party or non-signatory.

**G. Dkt. 792 authorized a process, not this result, and the absence of demonstrated urgency bears on best interests rather than authority.**

Barton does not contend that an emergency or exigent circumstances are an independent legal prerequisite to a receivership sale; the Fifth Circuit rejected that proposition and held that the controlling question is the estate's best interests. SEC v. Barton, 170 F.4th at 944-45. But Dkt. 792 did not pre-approve this settlement. It directed the Receiver to solicit lender proposals, pursue sales and debt paydowns, allow remaining claims to proceed through the claims process, and, if workable proposals could not be secured, proceed to free-and-clear sales followed by judicial determination of competing claims and priorities against proceeds. Dkt. 792 at 1-2. It did not adjudicate SPC's ownership, conversion, debt amount, or priority; approve these prices, appraisals, releases, assignees, or bidding terms; or determine that these transactions conserve the estate's best interests. The Receiver should disclose the lender-proposal process and explain why SPC's disputed claim is instead resolved first by conveying the assets, transferring related accounts, and embedding disputed debt in competing bids. The absence of a concrete showing comparable to Hall Street's $1,023 daily interest accrual is relevant to whether these operating properties should be surrendered now on these terms rather than through an available alternative. Id. at 944-45. In Barton's submission, an order approving the actual transfers and Opelika sale would conclusively determine these transaction-specific questions, resolve statutory, valuation, accounting, release, and authority issues distinct from ultimate SEC liability, and become effectively unreviewable after consummation because ownership, control, HUD relationships, and onward assignments may

not be practically restored. See SEC v. Barton, 135 F.4th at 224-25. That record should be made expressly while any stay pending appeal is addressed, if necessary, by separate motion.

**H. The motions do not establish a present economic necessity for a sale or settlement of the D4 properties.**

The motions do not establish an economic necessity for the immediate sale, transfer, or settlement of the D4 properties. They supply no property-level net operating income, debt-service coverage, capital-expenditure, reserve, delinquency, tax, insurance, or management-cost figures from which the Court could determine whether immediate disposition is economically preferable to continued operation. What the record does reflect is substantial property-level cash balances and continuing rental operations.

Where an asset is producing income, is not materially depleting receivership resources, and the estate is not facing a demonstrated liquidity shortfall, maintaining the status quo may better preserve value than proceeding with an irreversible disposition. The relevant question is therefore not merely whether the Receiver has authority to seek a sale or settlement, but whether the present circumstances establish a sufficient economic justification for doing so now.

The Receiver identifies $6,940,710.13 across manager-held property accounts as of August 21, 2026, including tenant security deposits, and $5,336,184.00 in auditor-reported available excess cash as of December 31, 2025. Dkt. 872 at 15 & nn.12–13. Although those amounts require classification and a complete accounting, the present motions do not identify a separate estate-wide liquidity shortfall or explain why immediate disposition is needed to meet one. To the extent the Receiver relies on estate-wide carrying costs reported elsewhere (see Dkt. 838), the motions do not tie any such burden to these four properties. Continued operation and accounting may preserve both the assets and their income stream while the disputed issues are resolved.

Accordingly, absent a more particularized showing that disposition of the D4 properties is presently necessary, economically beneficial, or otherwise in the best interests of the receivership estate, the more prudent course is to preserve the existing status quo. The Receiver can continue the accounting, reporting, and administration of these properties consistent with the approach followed during the receivership while the Court resolves the remaining issues concerning ownership, authority, valuation, and the proposed disposition.

For these reasons, the absence of a demonstrated liquidity need or property-specific carrying burden weighs in favor of denying or deferring the proposed sale or settlement of the D4 properties at this time.

**I. The competing-bid conditions cannot be satisfied by any bona fide third party.**

A topping bidder must (1) exceed a debt-inclusive price by ten percent; (2) additionally cover "the monetary value of SPC's Debt ... plus ten (10%) percent of such Debt," MPA art. 4.1, Dkt. 875 App. 21-22, even though the record does not identify the property entities as obligors on that debt; (3) close immediately with no diligence period or HUD window while SPC receives up to twelve months for HUD approval; (4) escrow ten percent within 24 hours and the balance within seven days; and (5) accept a non-refundable escrow "regardless of the outcome of any appeal ... and regardless of whether SPC exercises its Conversion Rights." Dkt. 873 App. 11–12 ¶ 6(b); Dkt. 876 at 8-9. A bidder therefore buys subject to the same conversion claim the Receiver characterizes as failed. Dkt. 872 paras. 26-30. For Opelika, conditions that make a bona fide ten-percent overbid commercially unusable frustrate Section 2001(b)'s statutory safeguard. For the membership transfers, the same one-sided terms undermine any finding that the process tests fair value or conserves the estate's best interests. Any approval should require a refundable escrow, a reasonable diligence period, no debt-based bid adjustment unless the Receiver establishes the debt's valid

amount, asset-specific nexus, collateral, enforceability, and priority, equivalent HUD timing, and equal treatment of bidders.

**J. The record does not establish the amount, obligors, collateral, or allocation of the asserted "SPC Debt."**

The parties' own filings identify the obligors. JMJ Development, LLC executed the $7.3 million note later increased to $8.3 million; JMJ also executed a $3.8 million note. Dkts. 161 at 3; 164 at 3; 247 at 27-29 [App. 1173, 1178]. JMJAV, LLC is the Ingleside borrower, Dkt. 247 at 32, and the Opelika borrowers are non-receivership entities D4OPM, LLC and One MF D4, LLC, id. at 37-38. The record does not identify D4DS, D4FR, D4IN, or D4OP as note obligors, yet MPA article 4.1 loads the disputed "SPC Debt" onto competing bids and the settlement pays the Opelika balance from estate proceeds. The settlement's $24.05 million figure is not a stipulated adjudication: original principals total approximately $23.86 million, no default notice is identified, and SPC's affiliate collected project revenues that may generate payments, credits, offsets, or other adjustments. Before approval, the Receiver should produce payoff-quality statements for each note identifying principal, accrued interest, fees, payments, credits, offsets, and collections; identify each actual obligor and item of collateral; and explain why any debt of JMJ, JMJAV, D4OPM, or One MF D4 may properly be included in the transfer price or topping-bid obligation for a different entity or property.

**K. The property-management accounts are estate-side funds held by the buyer's affiliate, without a complete four-year property-level accounting.**

The Receiver identifies $6,940,710.13 across manager-held accounts as of August 21, 2026, including tenant security deposits, and $5,336,184.00 in auditor-reported available excess cash as of December 31, 2025. He also states that the manager was selected by SPC and is an SPC affiliate. Dkt. 872 at 15 & nn.12-13. Settlement paragraph 7 releases all estate claims to those

accounts to the entities being transferred. The affiliation is not the dispositive fact; the missing accounting is. The Court lacks a complete evidentiary record of beginning balances; all rents and other collections; operating expenditures; distributions; management fees; tenant security deposits; restricted accounts; excess cash; payments or credits applicable to SPC debt; and current balances. The annual HUD audits and any HUD violation or cure correspondence are also absent. Because these material financial facts are disputed and the transfer would be irreversible, Black requires an opportunity to present evidence and argument, express adjudication of the relevant claims and defenses or adoption of a receiver determination that actually addresses them, and factual conclusions tied to the record before the accounts or entity interests are transferred.https://law.justia.com/cases/federal/appellate-courts/ca5/25-50986/25-50986-2026-08-25.html No stale aggregate balance can substitute for a sworn, property-by-property accounting.

**L. The transfer instruments and assignee provisions remain defective or incomplete.**

The Bellwether MPA names "D4DS, LLC" as seller of "the Membership Interests of Seller in D4DS, LLC," but the instrument does not identify the record holder or holders of the interests being conveyed or the percentage each holds. Dkt. 875 App. 21. The Settlement describes transfers of 99.5%, 99.5%, and 99.75%, while the motions describe interests "totaling 100%," Dkt. 876 at 5. The documents also permit performance through unidentified "Affiliated Single Purpose Entities." Dkt. 873 App. 16 para. 23. Before approval, the Receiver should identify each proposed assignee's legal name, existence, jurisdiction of organization, capitalization, contractual assumption, HUD eligibility, consent to jurisdiction and venue, and the estate's post-closing recourse. The Receiver should also file corrected transfer instruments reconciling the seller, percentage interests, and chain of title. These are not objections to any assignee's place of

organization; they are basic prerequisites to determining who will perform, what that entity will assume, whether HUD can approve it, and how the estate can enforce the agreement after closing.

## VI. THE RECEIVER SHOULD COMPLETE HIS RECORD, AND AN EVIDENTIARY HEARING SHOULD PRECEDE ANY RULING

Material facts central to these motions remain disputed: the property-specific appraisal record; current account balances and four years of flows through the SPC-affiliated manager; the payoff balances, obligors, collateral, payments, credits, and offsets for each SPC note; the appraisers' and broker's interests; the identity and capacity of proposed assignees; and the payee, amount, and enforcement source for the unpaid developer fee. Black holds that minimum due process requires (1) an opportunity to present evidence and argument on disputed facts, (2) express adjudication of the objector's claims and defenses or adoption of a receiver determination that actually addresses them, and (3) factual conclusions minimally traced to record evidence. No. 25-50986, slip op. at 25-28. The Receiver is the movant and bears the burden of supporting the relief he seeks. Each category of missing evidence is within his possession, custody, or control, or that of his settlement counterparty and the property manager his own motion describes as an SPC affiliate. Before any hearing, the Court should require the Receiver to file: (1) complete statements and a sworn, property-level accounting for the manager-held accounts and the Receiver Account from October 18, 2022; (2) the annual HUD audits and all HUD approval, violation, cure, assumption, payoff, or release correspondence; (3) payoff-quality accountings for each SPC note identifying the obligor, principal, accrued interest, fees, payments, credits, and offsets; (4) the appraisal and broker engagement letters and compensation and conflict disclosures; (5) the executed pledge and assignment instruments and the identity and assumption documents of each proposed assignee; and (6) the Development Agreements, HUD cost certifications, and source documents identifying the developer-fee payee and amount. Requiring a movant to support his

own motion is a condition of proceeding on that motion; it requires neither relief from the litigation stay nor a discovery order. On this record, Black supports an evidentiary hearing for three reasons: the identified evidence is controlled by the Receiver, SPC, or SPC's affiliated manager rather than by Barton; the disputed matters concern the value and ownership of the very assets being transferred; and consummation would materially impair Barton's ability to present that evidence later. Barton anticipates that the hearing will require testimony from the property-account custodian (collections, expenses, management fees, distributions, security deposits, reserves, debt payments, and current balances); the Receiver or his accountant (the settlement model, the assumed contingency arrangement, the released claims, and the alternatives considered); the appraisers and the Walker & Dunlop representative (the property actually appraised, engagement and compensation terms, methodology, and the meaning of each scenario); and the custodians of the HUD, entity-ownership, and developer-fee records. Any discovery beyond the Receiver's own record will be sought, if necessary, by separate motion for leave under Dkt. 747.

## VII. RELIEF REQUESTED

Defendant Barton respectfully requests that the Court:

Primary relief:

1. Deny the motions on the existing record or, alternatively, defer ruling;
2. Set the Motion to Ratify (Dkt. 872) for hearing together with Dkts. 874, 876, 878, and 880, and decline to rule on the transfer and sale motions before the settlement they implement has been heard;
3. Require corrected, current, property-specific valuation evidence, including three court-appointed disinterested appraisals for the Opelika real-estate sale;

4. Require the Receiver, before any hearing and as a condition of proceeding on his motions, to file the property-level accounting, HUD, loan, valuation-engagement, assignee, and developer-fee materials identified in Part VI, including payoff-quality SPC loan statements and a complete property-management accounting;

5. Conduct an evidentiary hearing before approving any irreversible transfer, with express findings tied to record evidence;https://law.justia.com/cases/federal/appellate-courts/ca5/25-50986/25-50986-2026-08-25.html

6. Require the Receiver to disclose the Dkt. 792 lender-proposal process and compare reasonable alternatives, including adjudication, refinancing, payoff or redemption, competitive sale, and claims-process treatment;

7. Require the Receiver to establish through property-specific evidence any present liquidity need, material carrying burden, or other economic justification for immediate disposition and to compare that asserted need against continued operation and preservation of the status quo;

If the Court nevertheless approves a transaction:

8. Require commercially usable topping-bid procedures, including a refundable escrow, reasonable diligence, equivalent HUD timing, and no debt-based bid adjustment unless the Receiver establishes the debt's valid amount, asset-specific nexus, collateral, enforceability, and priority;

9. Require disclosure of every assignee's identity, capacity, assumption, HUD eligibility, and jurisdictional commitments, and of all transaction professionals' compensation and conflicts;

10. Quantify and preserve any developer-fee or contractual enforcement right belonging to Barton individually, without adjudicating any affiliate's receivable through this objection;
11. Provide that nothing in the approval order releases or adjudicates independent rights belonging to Barton or any non-party or non-signatory;
12. Address HUD approval or payoff and Barton's Section 50 position expressly through release, indemnification, or preservation of his individual rights and defenses;
13. Preserve sufficient disputed proceeds or substitute value to permit meaningful adjudication of the tracing and apportionment issues previously reserved by the Court;
14. Provide that no closing, transfer of control, or transfer of funds occur until fourteen days after entry of any approval order, so that any application for a stay may be presented in an orderly manner; and
15. Grant such other and further relief as the Court deems just.

Dated: September 3, 2026

Respectfully submitted,

***/s/ Timothy Barton***
**Timothy L. Barton, Pro Se**
1846 East Rosemeade Parkway, #232
Carrollton, Texas 75007
Telephone: (214) 914-3811
timothy.barton@proton.me

**CERTIFICATE OF SERVICE**

I hereby certify that on September 3, 2026, I electronically filed the foregoing Defendant Timothy Barton's Consolidated Response and Objection using the Court's CM/ECF system, which will send notice of the filing to all counsel of record and other registered ECF participants.

***/s/ Timothy L. Barton***
**Timothy L. Barton**