**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § | |
| Plaintiff, | § | **No. 3:22-cv-2118-X** |
| v. | § | |
| TIMOTHY BARTON, et al., | § | |
| Defendants, | § | |
| DJD LAND PARTNERS, LLC, and LDG001, LLC, | § | |
| Relief Defendants. | § | |

**SOUTHERN PROPERTIES CAPITAL, LTD.'S RESPONSE IN SUPPORT OF THE RECEIVER'S VERIFIED MOTION TO RATIFY SETTLEMENT AGREEMENT (DKT. 872), RESPONSE TO DEFENDANT BARTON'S OBJECTION (DKT. 885), AND BRIEF IN SUPPORT**

**USE OF GENERATIVE ARTIFICIAL INTELLIGENCE**

This Response was prepared with generative-artificial-intelligence assistance.

## TABLE OF CONTENTS


**I. Preliminary Statement** ........ 1

**II. Barton Identifies No Pecuniary Interest, and the Two Rights He Asserts as His Own Are Not Impaired by This Settlement** ........ 4

A. Barton Does Not Claim That the Estate Will Be Solvent, and Without That He Has No Stake in the Price. ........ 4

B. The Developer Fee Is Not Adjudicated by This Settlement, and SPC Will Not Oppose Saying So. ........ 5

C. The Section 50 Position Is a HUD Question, and the Settlement Preserves Rather Than Resolves It. ........ 5

D. Barton Cannot Assert the Rights of Non-Signatories, and a Savings Provision Answers the Objection He Can Make. ........ 6

**III. Section 2001 Does Not Govern the Membership-Interest Transfers, and This Court's Own Order Authorizes the Valuation Evidence Barton Attacks** ........ 7

**IV. The Estate Is Not Conveying Clean Title, the Release of SPC's Claims Is Part of the Price, and the Bid Terms Disclose Exactly That** ........ 9

A. The Agreement Says in Terms That These Are Not Free-and-Clear Sales. ........ 9

B. What SPC Compromises Is the Measure of What the Estate Receives. ........ 10

C. The Consideration Is the Price Recited in the MPAs and the PSA, and the Satisfaction of SPC's Claims Is a Component of It. ........ 11

D. A Bona Fide Overbid Must Deliver the Same Package, Which Is What § 2001(b) Requires. ........ 11

E. SPC Will Not Oppose Reasonable Adjustments to the Mechanics, Including a Clarification of the Overbid Threshold. ........ 12

**V. A Compromise Is Measured Against the Litigation Alternative, Not Against the Estate's Best Imaginable Day** ........ 13

A. Barton's Benchmarks Are Not Offers, and the Contracts He Cites Died Three Years Ago. ........ 13

B. The Receiver Compared the Settlement to Litigation, Which Is the Right Comparison. ........ 14

C. The Manager-Held Accounts Are Not a Windfall, and the Receiver Disclosed Them. ........ 16

D. Barton's Request That the Court Reserve Value for Tracing Rests on a Premise That Defeats It. ........ 16

**VI. *SEC v. Hill* (*Black v. UniBank*) Does Not Command an Evidentiary Hearing on This Record** ........ 17

**VII. The Relief Barton Actually Seeks Is Delay, and the Estate Pays for It** ........ 19

**VIII. Conclusion and Prayer**......21
**Certificate of Service**......21

# TABLE OF AUTHORITIES

## Cases

*Acadia Land Co. v. Horuff*, 110 F.2d 354 (5th Cir. 1940) ....... 8

*SEC v. Hill*, No. 25-50986, 2026 U.S. App. LEXIS 25845 (5th Cir. Aug. 25, 2026) ....... 3, 17–18

*SEC v. Barton*, 135 F.4th 206 (5th Cir. 2025), cert. denied sub nom. Barton v. SEC, 2026 WL 858414 (U.S. Mar. 30, 2026) ....... 4

*SEC v. Barton*, 170 F.4th 938 (5th Cir. 2026) ....... 20

*SEC v. Barton*, No. 25-11043, 2026 U.S. App. LEXIS 16117 (5th Cir. June 3, 2026) (per curiam) (unpublished) ....... 20

*SEC v. Barton*, No. 25-10871, 2026 U.S. App. LEXIS 14187 (5th Cir. May 18, 2026) (per curiam) (unpublished) ....... 20

*SEC v. Elliott*, 953 F.2d 1560 (11th Cir. 1992) ....... 18

*SEC v. Safety Fin. Serv., Inc.*, 674 F.2d 368 (5th Cir. 1982) ....... 18

*SEC v. Sharp Capital, Inc.*, 315 F.3d 541 (5th Cir. 2003) ....... 18

*SEC v. Stanford Int'l Bank, Ltd.*, 927 F.3d 830 (5th Cir. 2019) ....... 1, 6, 19

*SEC v. T-Bar Res., LLC*, No. 3:07-CV-1994-B, 2008 U.S. Dist. LEXIS 87880 (N.D. Tex. Oct. 28, 2008) ....... 7

## Statutes and Rules

28 U.S.C. § 2001 ....... 2, 7–9, 11–12

28 U.S.C. § 2004 ....... 7

N.D. Tex. L.R. 7.1(i)(1) ....... 16

## Record

Order Governing Administration of Receivership Estate, Dkt. 63 §§ A.1, D.2 ....... 2, 8

Memorandum Opinion and Order, Dkt. 416 at 17 n.82 ....... 17

SPC's Brief ISO Response to Receiver's Motion for Summary Judgment, Dkt. 247 ....... 5, 10–11, 17

SPC's Brief ISO Response to SEC's Motion for Appointment of Receiver, Dkt. 329 ....... 17

Memorandum Opinion and Order, Dkt. 858 ....... 19

Receiver's Verified Motion to Ratify Settlement Agreement, Dkt. 872 ....... 1–3, 6–11, 14–16, 20–21

Dkt. 873 App. 005–018 (¶¶ 6(a)–(b), 10–11, 13, 24) ....... 2–3, 6, 9–12, 14–17

Appendix ISO Receiver's Motion for Approval of Transfer of Interest in D4DS, LLC, Dkt. 875 App. 021–027 (Membership Purchase Agreement) ....... 13

Receiver's Verified Motion for Approval of Sale of Parc at Opelika, Dkt. 880 ....... 8, 14

TO THE HONORABLE UNITED STATES DISTRICT JUDGE BRANTLEY STARR:

Southern Properties Capital, Ltd. ("SPC") files this Response in Support of the Receiver's Verified Motion to Ratify Settlement Agreement (Dkt. 872) (the "Motion"), Response to Defendant Timothy Barton's Objection (Dkt. 885) (the "Objection"), and Brief in Support.[1]

## I. PRELIMINARY STATEMENT

The Settlement Agreement between SPC and the Receiver should be approved because absent a settlement, this Receivership will devolve into years of costly litigation between the Receiver and SPC over the ownership of the D4 Properties and Entities, the HUD and SPC debt will continue to accrue interest reducing or eliminating any equity value in the Properties, and the Receivership will have less, not more, to distribute to investors and creditors. (Dkt. 872 at 6). Barton's Objection is without merit and should be overruled for the reasons set forth below.

Barton's Objection runs twenty-three pages and raises twelve grounds, but its architecture is simple: it treats the Settlement Agreement as though it were an auction of unencumbered real estate, measures the consideration against benchmarks drawn from a sale process that never happened and outdated appraisals and offers, and then asks the Court to order production, hold an evidentiary hearing, and defer ruling. It nowhere engages the only question the Court must answer — whether a compromise of a genuinely disputed ownership claim over the D4

[1]SPC is the counterparty to the Settlement Agreement the Motion asks the Court to ratify, and ¶ 13 of that Agreement obligates SPC to cooperate in obtaining ratification "including through any litigation, appeals, or similar legal challenges to ratification or approval of the transactions contemplated by this Settlement Agreement." SPC's Complaint in Intervention (Dkt. 184) was stayed at Dkt. 217 and dismissed without prejudice at Dkt. 306; its later Motion for Intervention (Dkt. 327) was denied without prejudice at Dkt. 343 with leave to refile. SPC did not refile after entry of the Second Receivership Order (Dkt. 417), and it is not presently a party to this action. SPC therefore files this response by separate motion for leave, filed concurrently, and respectfully requests that the Court consider it in ruling on the Motion.

Properties and Entities is "fair and equitable and in the best interests of the estate." *SEC v. Stanford Int'l Bank, Ltd.*, 927 F.3d 830, 840 (5th Cir. 2019).

The Objection's silent premise is that the estate owns the four D4 apartment properties free and clear and is selling them cheap. It does not, and the Settlement Agreement has never said otherwise. SPC has maintained since October 3, 2022 — before the first receivership order issued — that it exercised the Conversion Rights created by the Pledge and Security Agreements as to three of the four D4 Properties; it holds the notes evidencing the SPC Debt; it asserts Assignment Rights as to the fourth; and it claims to be the equitable owner of the D4 Entities and the Properties, having supplied the land, funded the construction, and managed the development. (Dkt. 873 App. 6–8).[2] The Receiver disputes every one of those contentions. (Dkt. 872 ¶¶ 24–30). The ownership dispute between SPC and the Receiver is the subject of the compromise, and its extinguishment is part of what the estate receives. Not one price comparison in the Objection accounts for the cost to the Receivership estate to litigate the dispute or the value of the resolution of that dispute.

SPC does not take up every objection; the Receiver is the movant and bears the burden of supporting the relief he seeks. However, SPC addresses the following five points that are properly its own. [3]

---

[2] Citations to the Receiver's Motion (Dkt. 872) are to the ECF page numbers stamped at the top of each page. Citations to SPC's summary-judgment response (Dkt. 247) and to the Objection (Dkt. 885) are to those briefs' own page numbers, which is how the Objection cites them; for Dkt. 247 the ECF page is the brief page plus five. Citations to the Settlement Agreement are to the appendix page numbers of Dkt. 873.

[3] Barton's Objection is untimely. The Order Governing Administration of Receivership Estate provides that "[i]f no objections are filed within seven (7) days of the service of a motion filed by the Receiver, the Receiver shall file with the Court a Notice of No Objection, in which case the Court may, if it agrees with the relief sought, enter the proposed order sua sponte, or set the matter for hearing." (Dkt. 63 § A.1(a)). The Motion was served August 24, 2026. Seven days ran on August 31. Barton filed his Objection on September 3, without explanation and without seeking an extension. (Dkt. 885 at 22). SPC does not urge that as an independent ground for overruling the Objection, but it bears on the schedule Barton now

***First,*** Barton identifies no pecuniary interest in the outcome, and the two rights he does assert as his own — an Opelika developer fee and a "Section 50" signatory position — are not impaired by this settlement. SPC does not ask the Court to adjudicate these issues and will not oppose an express savings provision preserving them. An objection that a proposed order is too broad is answered by narrowing the order, not by denying the motion.

***Second,*** 28 U.S.C. § 2001 does not govern the transfer of membership interests. Membership interests are personal property. Section 2004 makes § 2001 applicable to personalty "unless the court orders otherwise," and this Court ordered otherwise in the Order Governing Administration of Receivership Estate (Dkt. 63). The same order expressly authorizes the Receiver to use broker opinions of value as the "appraisals" required by § 2001(b). Barton's threshold statutory argument is foreclosed by the order under which this receivership has operated since November 2022.

***Third***, the consideration the estate receives is not $12 million. It is the price recited in each Membership Purchase Agreement and in the Purchase and Sale Agreement — the HUD loan balance SPC assumes or pays off, the SPC loan balance that is satisfied, and a stated portion of the Settlement Payment — plus the release of SPC's ownership, conversion and assignment claims. (Dkt. 872 at 18; Dkt. 873 App. 11 ¶ 6(b), App. 14 ¶¶ 10–11). A stranger offering cash alone offers the estate less, because the estate would still face SPC's unresolved claims and still have to litigate them. That is why the Agreement requires an overbid to be made expressly subject to those claims. Barton's Objection ignores the value to the estate of SPC's release of its ownership claims to the D4 Properties.

---

proposes: a party who lets the Court's window close does not thereby acquire the right to reopen it for a production and an evidentiary hearing.

**Fourth**, Barton's price tables compare the compromise to things that are not comparable to it — cash contracts from February 2023 that were never consummated, and broker scenarios that are not offers. A compromise is not measured against the estate's best imaginable day. It is measured against the litigation alternative, discounted for cost, delay, and the real possibility of losing.

**Fifth**, *SEC v. Hill* — Barton's *Black v. UniBank* — does not require an evidentiary hearing here. It holds that a district court *does not abuse its discretion where it affords* certain minimum process — a safe harbor, not a constitutional floor — and it reaffirms the threshold this Circuit has always required: an objector must show how he was prejudiced and how he would have fared better in a plenary proceeding. Barton has put no evidence before the Court at all.

What the Objection actually seeks is time. The fourteenth request for relief asks the Court to bar any closing for fourteen days after entry of an approval order so that a stay application "may be presented in an orderly manner." (Dkt. 885 at 22). The Settlement Agreement is void by its own terms if ratification does not occur within sixty days of the Motion's filing. Delay is not a neutral act in this receivership. It is the relief Barton is seeking.

For these reasons, SPC respectfully requests that the Court overrule the Objection and grant the Motion.

## II. BARTON IDENTIFIES NO PECUNIARY INTEREST, AND THE TWO RIGHTS HE ASSERTS AS HIS OWN ARE NOT IMPAIRED BY THIS SETTLEMENT

### A. Barton Does Not Claim That the Estate Will Be Solvent, and Without That He Has No Stake in the Price.

Barton says he "appears solely in his individual capacity and does not purport to litigate claims belonging to any entity." (Dkt. 885 at 5). Taking him at his word, the Objection never explains how he is worse off if the estate receives $12 million rather than some larger sum. He does not contend that the receivership estate is solvent. He does not contend that investors and

creditors will be paid in full with a surplus left over. He does not contend that a dollar more in the estate is a dollar that reaches him.

That silence disposes of most of the Objection. Sections A through E and G through L of the Objection are complaints about *price* and *process* — the appraisal record, the valuation benchmarks, the debt allocation, the property-management accounting, the bid conditions. Every one of them belongs to the estate and its beneficiaries. The Fifth Circuit has confirmed that the D4 Entities were properly included in the receivership and rejected Barton's effort to write a proportionality limit into that rule. *SEC v. Barton*, 135 F.4th 206, 221–23 (5th Cir. 2025), *cert. denied sub nom. Barton v. SEC*, 2026 WL 858414 (U.S. Mar. 30, 2026). Having lost the argument that the assets are not the estate's, Barton cannot recast himself as the estate's guardian.

His arithmetic makes the same mistake. Barton computes "approximately $42.3 million in gross equity" by taking the stipulated values, deducting the HUD debt, and stopping there — that is, by declining to deduct SPC's claim. (Dkt. 885 at 10). A figure calculated by assuming away the very dispute the settlement resolves is not a measure of what the estate has. It is a statement of what the estate would have if it won.

**B. The Developer Fee Is Not Adjudicated by This Settlement, and SPC Will Not Oppose Saying So.**

Barton's developer-fee objection defeats itself on its own terms. Barton admits Section 7.15(a)(ii) of the Pledge and Security Agreements at issue conditions conversion on payment of "all fees owed to Timothy Barton **or his affiliates**," concedes that "[t]he present record does not identify whether that receivable is payable to Barton personally or to an affiliate," and then states that he "does not assert an affiliate's receivable." (Dkt. 885 at 5) (emphasis added). He therefore asks the Court to order the Receiver to establish the predicate for his own standing.

The record he invokes also runs the other way. SPC's filed brief states that "Barton and his companies received a development fee from SPC and were otherwise reimbursed by SPC for any expenses they incurred," and that "[t]he Receivership will receive the last payment under the Opelika contract once a cost certification of the project is obtained by HUD." (Dkt. 247 at 15). Barton cites those same pages. (Dkt. 885 at 5, 13). On the record he chose, the developer fees were funded by SPC and paid, and the residual Opelika payment runs to the Receivership — not to him.

Barton's request is backwards, and it is unnecessary. SPC does not contend that ratification extinguishes any developer fee owed to Barton individually, and SPC will not oppose an express provision in the approval order stating that the order neither adjudicates nor releases any developer fee or contractual enforcement right belonging to Barton in his individual capacity. What SPC will not accept is the premise that a fee whose payee, amount, and enforceability are all unknown must be quantified before a $12 million compromise can be approved.

### C. The Section 50 Position Is a HUD Question, and the Settlement Preserves Rather Than Resolves It.

Barton's second individual objection is that the record identifies him as the "Section 50" signatory on the four HUD transactions and that the papers do not establish "what personal certification duties, defenses, or exposure, if any, survive a transfer, assumption, HUD approval, or payoff." (Dkt. 885 at 5–6).

He has stated the answer. Whatever obligations Barton owes under the HUD instruments arise from those instruments and are owed to HUD. Neither the Receiver nor SPC can enlarge or discharge them, and the Settlement Agreement does not purport to. It provides instead that SPC will seek HUD's approval of the transfer, the assumption, and the Transfer of Physical Assets

and, failing that, will pay the HUD loans off. (Dkt. 872 at 19). A payoff retires the very instruments Barton says create his exposure. He is better off under this settlement than under the status quo, not worse.

### D. Barton Cannot Assert the Rights of Non-Signatories, and a Savings Provision Answers the Objection He Can Make.

Barton objects that the release at Dkt. 873 App. 14 ¶ 10 reaches "equity holders . . . or any other party claiming by, through or under" the Receivership Entities, then concedes that he "does not assert their claims." (Dkt. 885 at 14). He asks only that the Court "state that approval neither adjudicates nor releases independent rights belonging to any non-party or non-signatory." *Id.*

SPC does not oppose that request. *Stanford* holds that a receivership court has "no authority to dismiss claims that are unrelated to the receivership estate" and cannot extinguish "independent, non-derivative third-party claims that do not affect the *res* of the receivership estate." 927 F.3d at 843, 847. SPC has never asked for more. The Settlement Agreement resolves the disputes between the Receiver and SPC concerning the D4 Entities and the D4 Properties; it is not a bar order against the world. If the Court wishes to make that explicit, SPC will not object.

That disposes of Barton's Section F entirely — and it disposes of it without a hearing, a production, or a continuance.

## III. SECTION 2001 DOES NOT GOVERN THE MEMBERSHIP-INTEREST TRANSFERS, AND THIS COURT'S OWN ORDER AUTHORIZES THE VALUATION EVIDENCE BARTON ATTACKS

Barton's threshold argument is that the transfers cannot be approved because § 2001(b) demands "three court-appointed disinterested appraisers" of "the property being sold." (Dkt. 885

at 8). The argument fails at the first step as to three of the four assets, and this Court's own order answers it as to all four.

**Section 2004 says so.** "Any personalty sold under any order or decree of any court of the United States shall be sold in accordance with section 2001 of this title, **unless the court orders otherwise**." 28 U.S.C. § 2004 (emphasis added). Section 2001 contains no parallel escape clause; § 2004 does. Membership interests in a limited liability company are personalty. The Receiver said as much: "With regard to each D4 Entity except D4OP, the Receiver is selling only intangible membership interests, rather than real estate. Thus, the Admin Order and its modifications of 28 U.S.C. § 2004 govern the sale of the membership interests in D4FR, D4IN and D4DS." (Dkt. 872 at 18 n.11).

**Barton's own authority says so.** Judge Boyle drew precisely this distinction in the case he cites: "in allowing courts to order the private sale of personal property, 28 U.S.C. § 2004 informs that courts are to follow the same procedures outlined in § 2001(b), 'unless the court orders otherwise,'" and "Congress thus considered deviating from the rigors of § 2001(b)'s procedures in relaxing the process for the sale of personalty." *SEC v. T-Bar Res., LLC*, No. 3:07-CV-1994-B, 2008 U.S. Dist. LEXIS 87880, at *9 (N.D. Tex. Oct. 28, 2008). The same opinion observes that every reported instance of a court invoking § 2004's exception "involves the sale of personal property, and no authority exists for failing to follow the plain text of § 2001(b) when the sale concerns real property." *Id.* at *9 n.4. *T-Bar* holds that "a court must have the assistance of three appraisals before confirming the private sale of real property." *Id.* at *7 (emphasis added). *Acadia* is the same: a realty case construing the realty statute, decided on facts the court described as "not . . . even . . . a substantial compliance with the provisions of the statute, but . . .

a total disregard thereof." *Acadia Land Co. v. Horuff*, 110 F.2d 354, 355 (5th Cir. 1940). Neither case reaches an intangible interest in a limited liability company.

**And this Court has already ordered otherwise as to the evidence itself.** Dkt. 63 provides that "[i]f multiple offers are received from disinterested purchasers for any one property, the Court hereby concludes that the Receiver may, in his discretion, utilize any one or more of such offers as one or more of the 'appraisals' required by § 2001(b)," and that "the Receiver may in his discretion utilize informal 'opinions of value' received from respected brokers in the respective industries related to the subject property, as one or more of the 'appraisals' required by § 2001(b)." Dkt. 63 § D.2. For each property the Receiver submitted two certified appraisals and one broker opinion of value, and he invoked this provision of Dkt. 63 for the third. (Dkt. 880 at 7 & n.8). To the extent Barton objects that one of the three valuations is a broker's opinion rather than a certified appraisal, or that the broker's engagement terms are not in the record, this Court authorized that evidence four years ago, in the order that has governed every disposition in this receivership since.

Barton's remaining move is to say that because the Receiver elected to submit appraisal and broker evidence, he must be held to § 2001 whether or not it applies. (Dkt. 885 at 8). But the Receiver did more than the statute required: "Nonetheless, in an abundance of caution, the Receiver will also seek approval of the sale of these three entities' membership interests, following the procedures and standards set forth in 28 U.S.C. § 2001." (Dkt. 872 at 18 n.11). Prudence is not a waiver. A receiver who volunteers additional process does not convert a discretionary election into a jurisdictional prerequisite.

For the Parc at Opelika — the one asset conveyed as real estate — § 2001 does apply, and the Receiver has said he will follow it. *Id.* Barton's quarrel there is with the sufficiency of

the Receiver's appraisal exhibits. The Receiver has since filed corrected appendices. (Dkts. 886–888).

## IV. THE ESTATE IS NOT CONVEYING CLEAN TITLE, THE RELEASE OF SPC'S CLAIMS IS PART OF THE PRICE, AND THE BID TERMS DISCLOSE EXACTLY THAT

### A. The Agreement Provides That These Are Not Free-and-Clear Sales.

Barton's Section I treats the competing-bid provisions as a device to keep bidders away. They are the opposite. They exist because the Receiver cannot convey what SPC claims to own, and the Agreement requires him to say so:

> "The Motions for Approval of the Sales shall provide that the Sales are not free and clear of all liens and interests. To the contrary, the Transfer of Interests and the Opelika Sale are expressly subject to the HUD Loans, SPC's Conversion Rights and Assignment Rights, SPC's Debt, SPC's ownership claims, and any UCC liens."

(Dkt. 873 App. 11 ¶ 6(b)). Those claims are neither new nor manufactured for this settlement. SPC sent notice exercising its Conversion Rights on October 3, 2022, two weeks before the Initial Receivership Order. (Dkt. 872 ¶¶ 25–27; Dkt. 873 App. 6). It refrained from exercising its Assignment Rights as to Opelika only in observance of the stay. (Dkt. 872 ¶ 28). It holds the notes and the Pledge and Security Agreements that created both rights. And it has asserted throughout — in a Complaint in Intervention, in a summary-judgment response, and in the recitals of the Settlement Agreement — that it is the equitable owner of the D4 Entities and the Complexes, having supplied the land, funded the construction, and managed the development, and that money damages could not compensate it because real property is unique. (Dkt. 873 App. 6–8). The Receiver disputes all of it. (Dkt. 872 ¶¶ 24, 29–30).

The Court need not resolve that dispute to rule on this Motion. It needs only to recognize that the dispute exists, that it encumbers every one of the four assets, and that this settlement

resolves a dispute that could take years and millions of dollars in legal fees the Receivership estate cannot afford to litigate to final conclusion, with an uncertain outcome.

**B. What SPC Compromises Is the Measure of What the Estate Receives.**

SPC has maintained one position in this case since October 3, 2022, and it has never abandoned it. SPC contends that it "perfected and is now the 100% member of the owners of the Complexes," that the Complexes "constitute an entirely separate *res* that should not be included in the Receivership Estate," and that SPC "is not in the queue and never has been." (Dkt. 247 at 16, 12, 1 n.1). The Receiver has disputed SPC's position and previously moved for summary judgment on the issues. (Dkt. 872 ¶¶ 24, 29–30). But absent a settlement, the outcome of that dispute is uncertain and could cost millions of dollars to litigate to conclusion, particularly since SPC's contention is that there are factual issues that preclude summary judgment and require a trial, not to mention the appeals that almost certainly would follow.

SPC does not ask this Court to resolve that dispute, and nothing here should be read as inviting it to. The Agreement preserves SPC's contentions only "in the event that this Settlement Agreement is not approved." (Dkt. 873 App. 17 ¶ 24). If the Court ratifies the Settlement Agreement, they are gone — released in full, together with SPC's claims under the Pledge and Security Agreements, its claims to the SPC Debt, and the claims joined in the Receiver's summary-judgment motion and SPC's response. *Id.* (App. 14 ¶¶ 10–11).

That is what Barton's arithmetic leaves out. A party that has told this Court for four years that it already owns the four D4 Properties is paying $12 million to the Receivership estate, assuming or retiring the HUD indebtedness on all four properties, and surrendering an unadjudicated ownership claim whose denial it valued in this Court at $16.9 million in damages

on two properties alone. (Dkt. 247 at 49). Whatever the merits, that is a substantial thing for the estate to receive — and the estate receives it only if the Court approves the settlement.

### C. The Consideration Is the Price Recited in the MPAs and the PSA, and the Satisfaction of SPC's Claims Is a Component of It.

The Receiver did not price these transactions as cash sales. Each purchase price, as the Motion states, "consists of the HUD loan balance in the amount of $[…] to be assumed by SPC, the SPC loan balance in the amount of $[…], and $[…] of the Settlement Payment." (Dkt. 872 at 18; accord Dkt. 873 App. 11 ¶ 6(b)). The consideration therefore has three components, and the cash is the smallest of them: SPC assumes or pays off the HUD indebtedness; the SPC Debt secured by the pledged membership interests is satisfied; and SPC pays $12 million.

A fourth component sits in the release. Upon ratification, payment, and transfer, SPC releases the Receiver and every Receivership Entity from "any and all demands, claims, actions, causes of action, rights, liabilities, obligations, suits, damages, or controversies whether known or unknown . . . regarding or relating to the D4 Properties, D4 Entities, HUD Loans, the Pledge and Security Agreements, the other loan documents related to the SPC Debt or any other issues in dispute between the Receiver and SPC," expressly including the claims joined in the Receiver's summary-judgment motion, SPC's response, and SPC's intervention. (Dkt. 873 App. 14 ¶ 11). The ownership fight ends. The conversion fight ends. The specific-performance demand ends.

Barton's tables count the cash and nothing else. That is not the price.

### D. A Bona Fide Overbid Must Deliver the Same Package, Which Is What § 2001(b) Requires.

The statute measures an overbid against what the private purchaser offered. A private sale "shall not be confirmed if a bona fide offer is made, under conditions prescribed by the court,

which guarantees at least a **10 per centum increase over the price offered in the private sale**." 28 U.S.C. § 2001(b) (emphasis added). The price offered in this private sale is the total consideration recited in the MPAs and the PSA. A stranger who tenders cash equal to that number has not offered the estate the same thing, because the estate would keep SPC's unresolved claims, keep the SPC Debt, and keep the litigation.

That is why the Agreement provides that "any purported 'bona fide' purchaser offering to pay more than 10 percent of the total consideration set forth in the MPAs and the PSA in accordance with 28 U.S.C. § 2001 shall make any such offer expressly subject to SPC's Conversion Rights, Assignment Rights, and ownership claims with respect to the Interests and the Opelika Property." (Dkt. 873 App. 11 ¶ 6(b)). A competing bidder is not being taxed. He is being told what he would be buying. The alternative Barton proposes — a bid formula that ignores SPC's claims — would not produce a higher price for the estate; it would produce a purchaser who believed he was acquiring clean title and a confirmation order the estate could not honor.

Barton's objection that "the record does not identify the property entities as obligors on that debt," (Dkt. 885 at 16), misapprehends the mechanism. The SPC Debt is secured by pledges of the very membership interests being conveyed; that is what created the Conversion Rights he spends four pages disputing. A buyer of pledged interests takes subject to the pledge whether or not the entity whose interests are pledged signed the note.

### E. SPC Will Not Oppose Reasonable Adjustments to the Mechanics, Including a Clarification of the Overbid Threshold.

SPC has no interest in a process that looks foreclosed, and it does not need one. If the Court concludes that a refundable deposit, a defined diligence period, or a longer closing window

would better test the market, SPC will not oppose those adjustments so long as they do not disturb the economic terms of the compromise or its timing.

Barton also reads Article 4.1 of the Membership Purchase Agreements to require a competing bidder to pay for the SPC Debt twice — once inside the Purchase Price and again as a separate add-on "plus ten (10%) percent of such Debt." (Dkt. 885 at 16; Dkt. 875 App. 22 art. 4.1). The Purchase Price already includes the SPC Debt component, so the second sentence of Article 4.1 is susceptible to that reading, and SPC does not intend it. SPC will accept an order clarifying that the overbid threshold is one hundred ten percent of the total consideration recited in the applicable MPA or the PSA, with the bid taken subject to SPC's claims as ¶ 6(b) provides. Barton asks the Court to deny the Motion because the bid procedures are imperfect. The remedy for imperfect bid procedures is better bid procedures. The bid procedures can be adjusted to resolve Barton's concerns about them, if the Court deems such adjustments are appropriate. This is not a basis to deny the Motion.

## V. A COMPROMISE IS MEASURED AGAINST THE LITIGATION ALTERNATIVE, NOT AGAINST THE ESTATE'S BEST IMAGINABLE DAY

### A. Barton's Benchmarks Are Not Offers, and the Contracts He Cites Died Three Years Ago.

The centerpiece of the Objection is a table showing that the settlement's contract prices sit below the Receiver's stipulated values, below his broker's lowest 2025 scenarios, and below February 2023 cash contracts. (Dkt. 885 at 11). The table is arithmetically accurate and analytically empty.

The February 2023 contracts were never consummated. Barton says so himself, and he says why: they failed "after SPC's objections and intervention and the Receiver's requested continuance." *Id.* at 11–12. A contract that did not close in a different interest-rate environment three and a half years ago is not a measure of what these assets will fetch today. Nor are Walker

& Dunlop's "scenarios" offers; they are pricing indications, and Barton does not suggest that any buyer has ever tendered one of them. Barton also quotes the Receiver's acknowledgment that he "might have received a higher purchase price if he had been able to retain a broker and list the Property," (Dkt. 885 at 12), but omits the rest of the sentence: "the claims asserted by Southern Properties and its Conversion Rights precluded that process." (Dkt. 880 at 9).

More fundamentally, the comparison is improper for the reasons set out in Part IV above. The transactions Barton invokes were free-and-clear sales of assets the estate owned outright. These transactions are expressly not free and clear. (Dkt. 873 App. 11 ¶ 6(b)). A purchaser buying into a contested ownership claim pays less than a purchaser buying clean title — which is precisely why the Receiver's litigation alternative had to be valued, and why he valued it.

**B. The Receiver Compared the Settlement to Litigation, Which Is the Right Comparison.**

The Receiver's analysis in the Motion is the proper one. He computed a "best day in court" — total victory on the disputed conversion issue — of "approximately $15,400,000," net of contingency counsel and costs. (Dkt. 872 at 20). He then explained why $12 million now is worth more than $15.4 million someday: "the litigation risk that the Receiver obtains $0, the costs of such litigation irrespective of whether the Receiver ultimately wins, the risk of decreasing property values, and the delay inherent in the litigation necessary to proceed with a sale." *Id.*

Barton's answer is that the Receiver's assumed forty-percent contingency and $10.6 million fee are hypothetical because no contingency counsel has been retained. (Dkt. 885 at 10). Of course, none has been retained — the Receiver settled instead of litigating. Barton's objection reduces to the proposition that a fiduciary may not estimate the cost of a road he did not take. That is neither the law nor sound practice. The relevant comparison is not $12 million against

$15.4 million; it is $12 million, certain and immediate, against a contested ownership fight with a floor of zero, a multi-year timeline, and an appellate history in this very case that needs no rehearsal.

The Receiver also identified the alternative Barton says was never weighed and explained why it is worse. Because SPC's motion to intervene was denied without prejudice and SPC did not participate in the appeal, the Receiver acknowledged that SPC "could be permitted to re-urge that the D4 Entities should be excluded from the Receivership Estate," and that a successful challenge "would have a devastating financial impact on the Receivership Estate, particularly since the D4 Properties are the most valuable assets in the Receivership Estate." (Dkt. 872 at 24–25). If the D4 Entities were excluded, "SPC would move forward to perfect its Conversion Rights thereby stripping Barton of *any* value from these assets." (*Id.* at 25 n.19). And the Receiver explained why contingency counsel entered the calculus: given "the time intensity and other burdens imposed on the Receivership Estate by the anticipated battle, contingency counsel likely would be retained to litigate the case, which would in turn take a significant portion of any proceeds resulting from a resolution in favor of the Receivership Estate." (*Id.* at 27). That is a verified comparison of the compromise to the litigation alternative. Barton offers no other.

The parties themselves recited the point when they signed the Settlement Agreement: they "recognize that litigation to fully and finally resolve the claims and contentions of each will take many years, cost both sides a significant amount in attorney's fees, and result in continuing risk and uncertainty for both Parties and the Complexes and their management, all in the context of an uncertain real estate market." (Dkt. 873 App. 8).

Barton offers no competing number. He offers no declaration, no appraisal, no expert, no alternative bidder, and no evidence of any kind. The Objection is unverified and unaccompanied

by an appendix. *See* N.D. Tex. L.R. 7.1(i)(1). The Motion, by contrast, is verified by the Receiver under penalty of perjury. (Dkt. 872 at 28).

### C. The Manager-Held Accounts Are Not a Windfall, and the Receiver Disclosed Them.

Barton's Sections C and K treat the funds in the property-management accounts as unaccounted-for consideration. But the Receiver disclosed those accounts, itemized them entity by entity, disclosed that "[t]he property manager was selected by SPC and is an SPC affiliate," and disclosed that the accounts "hold tenant security deposits as well as other funds," that HUD requires a fluctuating minimum balance, and that "ownership of the 'excess cash' would be subject to litigation." (Dkt. 872 at 19–20 & nn.12–13). He further disclosed that SPC "will relinquish its claim of ownership" to funds held in a separate D4OP account. *Id.* at 20 n.15. The Agreement recites that the parties "dispute ownership of the Property Management Accounts and the Receiver Account." (Dkt. 873 App. 9).

Barton's own brief concedes that these "amounts should not be treated as uniformly distributable cash." (Dkt. 885 at 10). He is right. Tenant security deposits belong to tenants. HUD minimum balances belong where HUD says they belong. What remains is a disputed pool that this settlement resolves rather than litigates. Disclosure is not concealment, and a disclosed asset whose ownership is contested is not a hidden thumb on the scale.

### D. Barton's Request That the Court Reserve Value for Tracing Rests on a Premise That Defeats It.

Barton asks that any approval order "[p]reserve sufficient disputed proceeds or substitute value to permit meaningful adjudication of the tracing and apportionment issues previously reserved by the Court." (Dkt. 885 at 22). For the premise he borrows the settlement counterparty's own recitals — that the D4 entities "have only a tangential connection to Barton," that "very little, if any, investor funds are directly traced into the D4 Entities," and that investor

funds were not used to develop, construct, or operate the properties. (Dkt. 885 at 12 (quoting Dkt. 873 App. 7 and citing Dkt. 329 at 5)).

Those are SPC's contentions, and SPC has never softened them. Its filed brief opens: "Not one dollar of investors' funds has been traced to the Complexes." (Dkt. 247 at 1). It states that "the real estate developments were funded entirely by the HUD loans and SPC convertible loans." *Id.* at 46.

Barton cannot have the premise and the remedy together. If SPC's contention is right, there is nothing traceable into these four assets and nothing to apportion, and a reserve buys the estate nothing but delay. If it is wrong, Barton has offered nothing to show it is wrong — no accounting, no tracing analysis, no declaration, no expert. He asks the Court to hold back the consideration for a compromise on a factual proposition he has neither proved nor attempted to prove, borrowed from the party whose position is the opposite of what his request requires.

Nor has this Court reserved what Barton says it reserved. The footnote he cites observes that at the end of the case methodologies such as the lowest-intermediate-balance test "might" be used, and then states that "for now, the Court's marching orders are to determine whether entities like D4DS received Wall Investor Funds, and it did." (Dkt. 416 at 17 n.82). A footnote noting that a methodology might someday apply is not a reservation of rights, and it is not a basis for escrowing the consideration for a settlement the Agreement voids if ratification is delayed.

## VI. *SEC v. HILL* (*BLACK v. UNIBANK*) DOES NOT COMMAND AN EVIDENTIARY HEARING ON THIS RECORD

Barton's request for an evidentiary hearing rests almost entirely on *SEC v. Hill*, No. 25-50986, 2026 U.S. App. LEXIS 25845 (5th Cir. Aug. 25, 2026) — the decision Barton cites as *Black v. UniBank* — which he reads to hold that "minimum due process in an equity receivership **requires** the court to" do three things. (Dkt. 885 at 8). That is not what the Fifth Circuit wrote. It

wrote that "a district court supervising an equity receivership **does not abuse its discretion where it affords** a minimum of due process by (1) permitting the objector to present evidence when the facts are in dispute and to make arguments on those facts, (2) expressly adjudicating the objector's claims and defenses or adopting the receiver's determination thereof, and (3) minimally tracing conclusions of fact to evidence or requiring the receiver to do so." *Hill*, 2026 U.S. App. LEXIS 25845, at *30 (emphasis added). A sentence describing when a court is safe is not a sentence describing what a court must do. The same opinion reaffirms that "[t]he district court has broad powers and wide discretion to determine relief in an equity receivership," that "summary proceedings generally afford due process," and that adopting a receiver's determination is "standard practice." *Id.* at *16, *26, *28 (quoting *SEC v. Elliott*, 953 F.2d 1560, 1567 (11th Cir. 1992), and citing *SEC v. Safety Fin. Serv., Inc.*, 674 F.2d 368, 372 (5th Cir. 1982)).

*Hill* also enforces a threshold Barton has not crossed: an objector "must show how they were prejudiced by the summary proceedings and how they would have been better able to defend their interests in a plenary proceeding." *Id.* at *28 (quoting *Elliott*, 953 F.2d at 1567); *accord SEC v. Sharp Capital, Inc.*, 315 F.3d 541, 547 (5th Cir. 2003). And the facts in *Hill* are not these facts. The objector there was a commercial bank holding perfected security interests, contesting a claims determination and distribution plan, which had placed 9,100 pages of record evidence before the district court, and as to which the receiver himself had suggested that an evidentiary hearing might be appropriate. *Id.* at *31. Barton is a defendant, not a secured creditor; he contests a compromise, not a distribution; he has filed argument and nothing else; and no one has invited a hearing.

Closer to home, in *Stanford* the district court "refused to allow parties to offer evidence or live testimony or engage in cross-examination" at the settlement hearing, and the Fifth Circuit rejected the resulting due-process challenge: the objectors "were provided notice of the settlement hearing, were able to fully brief their position and provide affidavits, and they have offered nothing more on appeal." 927 F.3d at 838, 848 n.19. Barton has had notice, has briefed at length, and could have filed affidavits. He filed none.

## VII. THE RELIEF BARTON ACTUALLY SEEKS IS DELAY, AND THE ESTATE PAYS FOR IT

Read the Objection's requests in order and the object comes into focus. Deny or defer. Order a production. Convene an evidentiary hearing with testimony from the property-account custodian, the Receiver, his accountant, the appraisers, a Walker & Dunlop representative, and "the custodians of the HUD, entity-ownership, and developer-fee records." (Dkt. 885 at 20). And then: "[p]rovide that no closing, transfer of control, or transfer of funds occur until fourteen days after entry of any approval order, so that any application for a stay may be presented in an orderly manner." *Id.* at 22.

That is not a request to improve the transaction. It is a request to run out the clock on it. The Settlement Agreement is void if the Court does not ratify it within sixty days of the Motion's filing. Every step Barton proposes consumes weeks the agreement does not have.

This Court has seen the pattern. Three weeks ago it found that Barton's filings "reflect Barton's efforts to flood this Court and the Receivership with largely frivolous, overlapping motions," and warned that "[s]hould Barton continue this course of conduct, the Court will invoke Rule 11 to consider an award of attorney's fees to the Receivership to compensate for time and Receivership assets used to respond to such redundant and meritless motions." (Dkt. 858). The Fifth Circuit has said much the same, warning that "[f]urther appeals from sale orders

or non-sale administrative orders will be viewed with skepticism and will incur sanctions if deemed frivolous." *SEC v. Barton*, 170 F.4th 938, 946 n.8 (5th Cir. 2026). Since then the Fifth Circuit has twice dismissed Barton appeals for lack of jurisdiction and directed him to show cause why sanctions should not be imposed under Federal Rule of Appellate Procedure 38. *SEC v. Barton*, No. 25-11043, 2026 U.S. App. LEXIS 16117, at *9–10 (5th Cir. June 3, 2026) (per curiam) (unpublished); *SEC v. Barton*, No. 25-10871, 2026 U.S. App. LEXIS 14187, at *4–5 (5th Cir. May 18, 2026) (per curiam) (unpublished).

The Receiver has already explained the cost of the delay incurred to date: "Over the course of nearly four years, Defendant Barton has impeded, stymied and interfered with virtually every effort intended to maximize value, including every single asset sale approved by the Court. All the while, interest has continued to accrue on the loans encumbering all real properties thereby eroding their net value." Dkt. 872 at 6. The Fifth Circuit has held that a receivership court may weigh exactly that. *SEC v. Barton*, 170 F.4th at 945–46. And it has held that "a receiver need not stand by while receivership estate assets deteriorate. In fact, a receiver cannot do so." *Id.* at 945 n.6.

Barton's Section H argues the converse — that because the properties are occupied and producing income, the status quo should be preserved. But the status quo is a receivership carrying HUD debt on four apartment communities whose ownership is contested by a party asserting a conversion right, with no claims process yet run and no cash generated for the estate. Preserving that is not preservation. It is attrition.

The Receiver has also answered the premise under oath. The Motion states that "this Receivership has been cash-starved from the outset," that "[a]s of the date of this Motion, the Receiver has been unable to service any of the significant debt that encumbers the Receivership

Estate's real estate assets," and that, "compared to the other Receivership properties (with the exception of the Amerigold Suites), the D4 Properties require significant oversight by the Receiver, particularly surrounding annual audits required by HUD." (Dkt. 872 at 21). Barton's assertion that the motions identify no liquidity need ignores the sworn statement that does.

## VIII. CONCLUSION AND PRAYER

The Settlement Agreement brings $12 million into an estate that needs capital, satisfies the SPC Debt secured by the pledged interests, moves the HUD exposure to a party willing to assume or retire it, and extinguishes — without a trial — an ownership claim asserted before the first receivership order and never adjudicated in nearly four years. It does all of that on terms the Receiver has verified under oath. Barton has answered with argument, not evidence; with benchmarks, not offers; by counting the cash and ignoring the rest of the price; and with a schedule designed to outlast the agreement's own expiration.

Southern Properties Capital, Ltd. respectfully requests that the Court overrule Defendant Barton's Consolidated Response and Objection (Dkt. 885), grant the Receiver's Verified Motion to Ratify Settlement Agreement (Dkt. 872), and grant SPC such other and further relief to which it may be justly entitled.

Respectfully submitted,

**FERGUSON BRASWELL FRASER KUBASTA PC**

By: /s/ *Douglas J. Buncher*
**Douglas J. Buncher**
State Bar No. 03342700
2500 Dallas Parkway, Suite 600
Plano, Texas 75093
Telephone: (972) 378-9111
Direct: (469) 480-7596
Facsimile: (972) 378-9115
dbuncher@fbfk.law

**ATTORNEYS FOR SOUTHERN PROPERTIES CAPITAL, LTD.**

## CERTIFICATE OF SERVICE

I hereby certify that on September 14, 2026, I electronically filed the foregoing using the Court's CM/ECF system, which will serve all counsel of record and registered ECF participants, including Defendant Timothy Barton, pro se, who is a registered ECF user (Dkt. 777).

*/s/ Douglas J. Buncher*