**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | **No. 3:22-cv-2118-X** |
| **v.** | § | |
| | § | |
| **TIMOTHY BARTON, et al.,** | § | |
| | § | |
| **Defendants,** | § | |
| | § | |
| **DJD LAND PARTNERS, LLC, and LDG001, LLC,** | § | |
| | § | |
| **Relief Defendants.** | | |

**SUPPLEMENTAL APPENDIX IN SUPPORT OF DEFENDANT TIMOTHY BARTON'S SUPPLEMENT TO CONSOLIDATED RESPONSE AND OBJECTION (DKT. 885) TO THE RECEIVER'S MOTIONS AT DKTS. 872, 874, 876, 878 AND 880 (EXHIBITS D-L)**

# INDEX OF SUPPLEMENTAL EXHIBITS

Exhibits A–C accompanied Dkt. 885; D–L are the separate Supplemental Exhibits to Consolidated Response and Objection (Dkt. 885).

| Ex. | Description |
|---|---|
| D | SPC Exercise Notices, October 3, 2022, with enclosures |
| E | Declaration of Bradley Muth, March 10, 2023 (Dkt. 179 App. 2–22) |
| F | TCI SEC Filings Excerpt Sheet (Notes Receivable, Q3 2022–Q2 2026) |
| G | HUD Departmental Enforcement Center Letter re Parc at Windmill Farms, Feb. 2, 2023 |
| H | SPC Letter Agreement re Parc at Ingleside, June 13, 2019 |
| I | Windmill Farms Fourth Amendment to Note (eff. Nov. 1, 2020) and Second Amendment to Letter Loan Agreement (May 31, 2021) |
| J | Receiver's Sixteenth Quarterly Status Report, Dkt. 838 at 41–48 (HUD Apartments) |
| K | Amended and Restated Pledge and Security Agreement (TRWF–JMJ, Bellwether Ridge), Sections 7.13–7.15 |
| L | First Amendment to Note (Oct. 1, 2019, Article V Asset Management and Fees) and same-date Rescission (D. Moos) |

# EXHIBIT D

Southern Properties Capital, Ltd. — Exercise Notices dated October 3, 2022, signed by Bradley J. Muth, President, with enclosures (following this cover: Bellwether Ridge, pp. 2–5; Parc at Windmill Farms, pp. 6–35; Parc at Ingleside, pp. 36–65)

*Source: Timothy Barton loan files; also filed by SPC at Dkt. 179 (Exs. 22, 38). SEC v. Barton, No. 3:22-cv-2118-X (N.D. Tex.)*

**SOUTHERN PROPERTIES CAPITAL LTD.**
1603 LBJ Freeway, Suite 800
Dallas, Texas 75234

October 3, 2022

**VIA HAND DELIVERY**
Enoch Investments, LLC
TRWF LLC
JMJAV, LLC
JMJD4, LLC
D4DS, LLC
c/o JMJ Development, LLC
13901 Midway Road, Suite 102
Dallas, Texas 75244
Attn: Timothy Barton

Re: Conversion option for Bellwether Ridge Project; **EXERCISE NOTICE**

Dear Mr. Barton:

Southern Properties Capital Ltd. ("SPC") hereby exercises its option to acquire all interest of the addresses above in the Project known as Bellwether Ridge, DeSoto, Texas ("Project").

As you know, the Apartments at Bellwether Ridge, LLC and D4DS, LLC have previously executed a purchase contract to effect such transfer through a deed, once the lender on the Project and HUD have consented to the transfer. Attached is a proposed First Amendment to such contract together with a check for $100.00 made out to Enoch Investments, LLC, TRWF LLC and JMJAV, LLC.

Please return the signed amendment so we can continue to process the TPA approval. If you or your attorney have any questions, please contact Jay LaJone of Steptoe & Johnson PLLC at 214-373-2556.

Sincerely,

By: ____________________
Bradley J. Muth, President

15519290v1

REORDER 905 - U.S. PATENT NO. 5538290, 5575508, 5641183, 5785353, 5984364, 60300(



CHECK PAYMENT NBI 311667 DATE 10/03/2022

Enoch Investments/TRWF/JMJAV
JMJ01

| INVOICE | DESCRIPTION | NET AMOUNT |
|---|---|---|
| CONVERSION_NOTI | SPC Conversion Notice | $ 100.00 |
| | TOTALS: | $ 100.00 |

Southern Properties Capital Ltd
1603 LBJ Freeway
Suite 300
DALLAS, TX 75234

THIS CHECK IS VOID WITHOUT A PURPLE & BLUE BORDER AND BACKGROUND PLUS A KNIGHT & FINGERPRINT WATERMARK ON THE BACK - HOLD AT ANGLE TO VIEW

Southern Properties Capital Ltd
1603 LBJ Freeway, Suite 800
Dallas, TX 75234 (469)522-4200

Bank Leumi USA
New York, NY

VOID AFTER 90 DAYS

311667

1-279/260

**DATE** 10/03/2022

PAY TO THE ORDER OF Enoch Investments/TRWF/JMJAV

AMOUNT $ 100.00

*One Hundred Dollars and 00 Cents*

Enoch Investments/TRWF/JMJAV
Enoch Investments, LLC
TRWF LLC
JMJAV, LLC
Dallas, TX 75234

Alla Dzyuba [signature]

⑈311667⑈ ⑆026002794⑆ 4104294800⑈

**FIRST AMENDMENT TO AGREEMENT OF PURCHASE AND SALE**

This First Amendment to Agreement of Purchase and Sale ("Amendment") is made and entered into this ___ day of October, 2022, by and between **APTS AT BELLWETHER RIDGE, LLC**, a Delaware limited liability company ("Purchaser") and **D4DS LLC**, a Texas limited liability company ("Seller"):

**RECITALS**

A. Pursuant to an Agreement for Purchase and Sale ("Contract") dated July 6, 2021, Seller agreed to sell, and purchaser agreed to buy improved real property located in the City of Desoto, County of Dallas, State of Texas, known as Bellwether Ridge Apartments ("Property").

B. The parties desire to amend the Contract under the terms and conditions set forth below.

**AGREEMENTS**

NOW, THEREFORE, in consideration of ten and no/100 Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1. Financing. The Financing Contingency Period, as such term is defined in the Contract, is hereby amended to expire on March 31, 2023.

2. Counterparts/Delivery: This Amendment may be executed in any number of counterparts and by the different parties on separate counterparts, and each such counterpart shall be deemed to be an original but all such counterparts shall together constitute one and the same agreement. The parties hereto may execute and deliver this Amendment by forwarding facsimile, telefax, email or other means of copies of this instrument showing execute by the partis sending the same, and the parties agree and intend that such signature shall have the same

effect as an original signature, that the parties shall be bound by such means of execution and delivery, and that the parties hereby waive any defense to validity based on any such copies or signatures.

3. Continued Validity. Except as amended hereby, the Agreement is and shall remain in full force and effect as originally written and executed.

4. Captions. Headings of paragraphs are for convenience of reference only and shall not be construed as part of this Amendment.

EXECUTED as of the date first written above.

**PURCHASER:**

**APTS AT BELLWETHER RIDGE, LLC,**
a Delaware limited liability company

**By:** ____________________
**Name:** ____________________
**Title:** ____________________
**Date:** ____________________

**SELLER:**

**D4DS LLC,**
a Texas limited liability company

**By:** ____________________
**Name:** ____________________
**Title:** ____________________
**Date:** ____________________

**SOUTHERN PROPERTIES CAPITAL LTD.**
1603 LBJ Freeway, Suite 800
Dallas, Texas 75234

October 3, 2022

**VIA HAND DELIVERY**
ENOCH INVESTMENTS, LLC
TRWF LLC
JMJAV, LLC
D4FR, LLC
c/o JMJ Development, LLC
13901 Midway Road, Suite 102
Dallas, Texas 75244
Attn: Timothy Barton

Re: Conversion option for Parc at Windmill Farms Apartments Project;
**EXERCISE NOTICE**

Dear Mr. Barton:

Southern Properties Capital Ltd. ("SPC") hereby exercises its option to acquire all interest of the addresses above in the Project known as Parc at Windmill Farms, Forney, Texas ("Project").

Attached is a proposed purchase contract to effect a transfer from the Project owner, D4FR LLC to SPC through a deed, once the lender on the Project and HUD have consented to the transfer. Also attached is a check for $100.00 made out to Enoch Investments, LLC, TRWF LLC and JMJAV, LLC.

Please return the signed contract so we can continue to process a TPA approval of the transfer. If you or your attorney have any questions, please contact Jay LaJone of Steptoe & Johnson PLLC at 214-373-2556.

Sincerely,

SOUTHERN PROPERTIES CAPITAL LTD.

By: ______________________
Bradley J. Muth, President

15519368v1

REORDER 905 - U.S. PATENT NO. 5538290, 5575508, 5641183, 5785353, 5984364, 60300

Enoch Investments/TRWF/JMJAV
JMJ01

CHECK PAYMENT NBI 311666 DATE 10/03/2022

| INVOICE | DESCRIPTION | NET AMOUNT |
|---|---|---|
| CONVERSION-NOTE_1 | SPC Conversion Notice | $ 100.00 |
| | TOTALS: | $ 100.00 |

Southern Properties Capital Ltd
1603 LBJ Freeway
Suite 300
DALLAS, TX 75234

THIS CHECK IS VOID WITHOUT A PURPLE & BLUE BORDER AND BACKGROUND PLUS A KNIGHT & FINGERPRINT WATERMARK ON THE BACK - HOLD AT ANGLE TO VIEW

Southern Properties Capital Ltd
1603 LBJ Freeway, Suite 800
Dallas, TX 75234
(469)522-4200

Bank Leumi USA
New York, NY

VOID AFTER 90 DAYS

311666

1-279/260

DATE 10/03/2022

PAY TO THE ORDER OF Enoch Investments/TRWF/JMJAV

AMOUNT $ 100.00

*One Hundred Dollars and 00 Cents*

Enoch Investments/TRWF/JMJAV
Enoch Investments, LLC
TRWF LLC
JMJAV, LLC
Dallas, TX 75234

Alla Dzyuba

⑈311666⑈ ⑆026002794⑆ 4104294800⑈

# AGREEMENT FOR PURCHASE AND SALE

This **AGREEMENT FOR PURCHASE AND SALE** (this "**Agreement**"), is made and entered into as of October ____, 2022 (the "Effective Date"), by and between SOUTHERN PROPERTIES CAPITAL LTD., a British Virgin Islands corporation ("**Purchaser**"), and D4FR LLC, a Texas limited liability company ("**Seller**").

## WITNESSETH:

## ARTICLE 1: AGREEMENT FOR PURCHASE AND SALE

1.1 Seller agrees to sell and cause to be conveyed to Purchaser, and Purchaser agrees to purchase, the following real and personal property (collectively, the "**Project**") on the terms and conditions contained herein:

(a) The real property located in the City of Forney, Dallas County, State of Texas, described with particularity on Exhibit "A" (the "**Land**") together with all existing buildings, structures, fixtures, amenities and improvements thereon situated including apartment units known as the Parc at Windmill Farms Apartments, and together with all easements and other rights appurtenant to such Land, as well as Seller's rights, titles and interests in and to the mineral rights for the Land, if any (together, the "**Property**");

(b) Seller's interest as landlord in all leases and occupancy agreements affecting the Property reflected in the current rent roll attached hereto as Exhibit "C" (the "**Current Rent Roll**"), as updated by the certified Closing Rent Roll to be delivered by Seller to Purchaser at Closing (the "**Leases**") or any space therein and any prepaid rent and Seller's interest in all security deposits and guaranties;

(c) Seller's right, if any, to the use of the name "Parc at Windmill Farms Apartments" in connection with the Property and any other trademarks, copyrights, trade names or other intangible rights associated with the Property in which Seller has a transferable right including any telephone numbers associated with on-site management and leasing operations, and website(s) and internet address(es) which relate to the Property (the "**Intangible Property**");

(d) All of Seller's right, title and interest in and to all items of personal property owned by Seller and located at the Property and used in the operation thereof including, without limitation, plans, specifications, building supplies, marketing materials, boilers, HVAC equipment, alarms, signage, fittings, appliances, shades, wall-to-wall carpet, draperies, screens and screening, awnings, plants, shrubbery, landscaping, furniture, furnishings, office equipment, lawn care and building maintenance equipment, and other furnishings or items of personal property used in connection with the ownership and operation of the Land (the "**Personal Property**");

(e) All of Seller's right, title and interest in and to all service contracts and agreements relating to the Property, to the extent such agreements are permitted under this Agreement (the "**Contracts**") (but specifically excluding management and leasing agreements ("**Management and Leasing Agreements**"), which will be terminated by Seller on or before

Closing), all rights of actions against previous owners of the Land and Improvements, and any unexpired warranties and guarantees relating to the Personal Property;

(f) All of Seller's right, title and interest in and to any permits, certificates of occupancy or other licenses and governmental approvals held by Seller in connection with the ownership or operation of the Project (the "**Permits**"), to the extent that the same are assignable; and

(g) All escrows and reserves associated with the First Lien (hereinafter defined) for the Project, including, without limitation, the tax and insurance reserves, the MIP reserve and the replacement and repair reserve.

## ARTICLE 2: PURCHASE PRICE

2.1 The purchase price (the "**Purchase Price**") for the Project shall be an amount equal to the First Lien Amount as hereinafter defined, payable as follows:

Assumption by Purchaser of the unpaid balance of the existing HUD-insured note and first lien mortgage, dated December 1, 2017, encumbering the Property in the original principal amount of $36,240,000.00 ("**First Lien**"). The amount to be assumed will be the outstanding principal balance, plus accrued but unpaid interest, as of Closing ("**First Lien Amount**").

2.2 (a) Not later than three (3) business days after the Effective Date of this Agreement, Purchaser shall deliver a check in the amount of $1,000.00 ("**Earnest Money Deposit**") to Commonwealth Land Title Insurance Company (the "**Title Company**"), 5949 Sherry Lane, Suite 111, Dallas, Texas 75225, Attn: James P. Lazar ("**Escrow Agent**") to be held in escrow in an interest-bearing account pursuant to the terms of this Agreement pending the Closing.

(b) As used in this Agreement, the term "Deposit" shall mean any sums, including the Earnest Money Deposit, and, if applicable, the Closing Extension Deposit, and instruments and accrued interest thereon, if any, held by Escrow Agent hereunder. The Deposit shall be applied to the Purchase Price at the Closing. If Purchaser desires to terminate this Agreement pursuant to a right granted to Purchaser in any section of this Agreement, Purchaser shall effect such termination by giving written notice thereof to Seller and Escrow Agent within any applicable time period provided therefor in this Agreement. Upon receipt of such notice, unless otherwise provided herein, Escrow Agent shall return the Deposit to Purchaser without the requirement of any further notice or instruction, this Agreement shall wholly cease and terminate, and no party to this Agreement shall have any further claim against, or obligation to, any other party to this Agreement except as expressly provided herein, and the lien, if any, of Purchaser against the Project shall automatically cease and terminate. In the event that notice shall not have been given or be deemed to have been given prior to the last day of the Inspection Period (as hereinafter defined) and Seller shall object to the disbursal of the Deposit, the Escrow Agent shall hold the Deposit pending a non-appealable adjudication by a court of competent jurisdiction or by joint written instructions of Seller and Purchaser.

## ARTICLE 3: PHYSICAL CONDITION OF PROJECT, INSPECTION PERIOD

3.1 Purchaser will inspect the Project during the hereinafter described Inspection Period. Purchaser acknowledges that Seller has not made, does not make and is unwilling to make any express or implied representations or warranties as to the present, past or future physical condition, income, expenses, operation, legality of occupancy or any other matter affecting or related to the Project except as specifically set forth in this Agreement. No representation, warranty or covenant made by Seller in this Agreement or any document delivered pursuant hereto shall survive the Closing except as expressly provided in this Agreement. Purchaser agrees to purchase the Project in its "AS IS" condition (but subject only to the express representations and warranties herein) with a complete waiver of any and all warranties as to the condition of the Project or its fitness for any purpose, other than as expressly provided herein, all in accordance with the waiver language to be included in the Special Warranty Deed conveying the Property to Purchaser (the "**Deed**").

3.2 Any documents, records or information provided to Purchaser in connection with Purchaser's inspection of the Project shall be kept in strictest confidence (but may be disclosed to Purchaser's agents, brokers, accountants, advisors, consultants, attorneys and prospective lenders or investors) and shall be returned to Seller in the event that this Agreement is canceled for any reason. In the event that Purchaser elects not to proceed with this transaction, Purchaser shall deliver to Seller copies of all reports prepared for Purchaser by third-parties in connection with its inspection, without any representation as to the accuracy thereof, upon receipt of payment from Seller of the actual costs for such reports incurred by Purchaser.

3.3 Seller represents and warrants to Purchaser as of the date of this Agreement as follows:

(a) Seller is a Texas limited liability company, duly formed, validly existing and in good standing in the state of its formation and is qualified to do business in Texas.

(b) Seller has full power and authority to enter into and perform this Agreement. The execution, delivery and performance of this Agreement by Seller has been duly and validly authorized by all necessary action on the part of Seller and all required consents and approvals have been duly obtained.

(c) All Due Diligence Materials delivered in furtherance of Purchaser's inspection of the Project, including all leases, lease correspondence, and rent rolls have been prepared and assembled in the ordinary course of business by Seller's fee manager, are believed to be true, complete and accurate and have been relied upon by Seller.

(d) The Rent Roll is a true, correct and complete list of all of the Leases and rent roll for the Property. The rents and other sums due or to become due under each Lease have not been assigned, encumbered or subjected to any lien by Seller. Seller has provided Purchaser with true, correct and complete copies of all the Leases, including all amendments thereto. To Seller's actual knowledge, which has not been contradicted by any written notice; (i) the Leases have been duly authorized and executed by the landlord, and, by the tenant thereunder, (ii) the Leases are in full force and effect according to the terms set forth therein, (iii) the Leases set forth

the entire agreement between landlord and tenant with respect to the premises affected thereby; (iv) there are no uncured defaults under the Leases; and (v) the Rent Roll and other financial information prepared by Seller as part of the Seller Deliveries are true and complete in all material respects. Seller has not (i) made any representations to any tenant regarding the condition of the premises covered by any Lease or the compliance of the premises with any applicable governmental regulations, except as expressly set forth in the Leases, (ii) granted any concessions to any tenant not disclosed in such Lease; or (iii) received any written notice of any defaults under the Leases. There are no lease brokerage agreements, leasing commission agreements or other agreements providing for payments of any amounts for leasing activities or procuring tenants with respect to the Property other than any agreements explicitly contained in the Leases. The Leases set forth all Tenant inducement costs and commissions that are currently due and payable or which have otherwise accrued with respect to any Lease. Other than as provided for in the Leases, there are no other agreements, oral or written, in connection with any Tenant inducement costs or leasing commissions that may become due and payable in the future in connection with any Lease.

(e) The operating statements of the Project to be delivered by Seller to Purchaser during the Inspection Period were prepared in the ordinary course of business by Seller's fee manager, are believed to be accurate, and have been relied upon by Seller.

(f) To the best knowledge of Seller, the Permits have been duly and validly issued, are in full force and effect.

(g) To the best knowledge of Seller, there is no litigation or arbitration or other legal or administrative suit, action, proceeding of any kind pending against or involving Seller relating to Seller's ownership of the Property or any part thereof which would prevent Seller from conveying the Project in accordance with this Agreement. Except as may be described in the Due Diligence Materials, Seller has not received any notice from any Governmental Authority with respect to any violation of any applicable zoning ordinances and building codes, flood disaster laws and health and environmental laws, rules and regulations (hereinafter collectively called the "Applicable Laws").

(h) Seller is not a "foreign person" as defined in Section 1445 of the Internal Revenue Code of 1986, as amended, and the Income Tax Regulations thereunder.

(i) Seller owns fee simple title to the Property, subject to the exceptions of record.

(j) Except for the Contracts, there will be no contracts or other agreements which affect or will affect or which are or will be obligations of the Purchaser or the Property after the Close of Escrow. All of the service contracts currently effecting the Property ("Service Contracts") may be terminated without penalty or other payment upon no more than thirty (30) days' notice except for the contract for electrical service.

(k) To Seller's knowledge, the Property is not in violation of any recorded covenants, conditions, restrictions or other agreements recorded in the Real Property Records of Dallas County, Texas ("Recorded CC&Rs").

(l) To the best of Seller's knowledge or as described in the Due Diligence Materials (i) the Property is free of hazardous wastes, materials, substances, urea formaldehyde, PCB's and all other toxic, radioactive or hazardous wastes, materials, substances or contaminations in excess of amounts permitted under applicable federal, state and local regulations (collectively, "Hazardous Materials"); and (ii) no Hazardous Materials have been stored, disposed or located upon the Property except in the ordinary course of business for a multi-family residential community. Without in any way limiting the generality of above, neither the Property nor the Seller are the subject of any pending or, to the best of Seller's knowledge or as described in the Due Diligence Materials or the Violation, threatened investigation or inquiry by any Governmental Authority, or are subject to any remedial obligations under any Applicable Laws pertaining to health or the environment ("Applicable Environmental Laws"), including, without limitation, the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended ("CERCLA"), the Resource Conservation and Recovery Act of 1987, as amended ("RCRA"), and this representation and warranty would continue to be true and correct following disclosure to any applicable Governmental Authority of all relevant facts, conditions and circumstances pertaining to the Property and/or the Seller. Seller has taken all steps necessary to determine and has determined that no hazardous substances, solid wastes, or other substances known or suspected to pose a threat to health or the environment ("Hazards") have been disposed of or otherwise released on or to the Property or exist on or within any portion of the Property. To the knowledge of Seller, or as otherwise disclosed in the Due Diligence Materials, no prior use, either by Seller or the prior owners of the Property, has occurred, which violates any Applicable Environmental Laws. The use which Seller makes of the Property will not result in the disposal or release of any hazardous substance, solid waste or Hazard on, in or to the Property. The terms "hazardous substance" and "release" shall each have the meanings specified in CERCLA, and the terms "solid waste" and disposal" (or "disposed") shall each have the meanings specified in RCRA; provided, however, that in the event either that CERCLA or RCRA is amended so as to broaden the meaning of any term defined thereby, such broader meaning shall apply subsequent to the effective date of such amendment; and provided further that, to the extent that the laws of the State of Texas establish a meaning for "hazardous substance", "release", "solid waste", or "disposal" which is broader than that specified in either CERCLA or RCRA, such broader definition shall apply. To the best of Seller's knowledge and belief, there has been no litigation brought or threatened nor any settlement reached by or with any parties alleging the presence, disposal, release, or threatened release, of any hazard substance, solid wastes or Hazards from the use or operation of the Property. To the best of Seller's knowledge and belief after diligent investigation and inquiry, the Property is not on any federal or state "Superfund" list, nor subject to any environmentally related liens.

(m) Except as set forth in the Title Commitment or Due Diligence Materials, there are no unpaid assessments (governmental or otherwise) for sewers, water, paving, electrical power or otherwise affecting the Property (matured or unmatured) and, to the best of Seller's knowledge, no such assessments are threatened. There are no options, contracts or other obligations outstanding for the sale, exchange or transfer of the Property, or any portion thereof.

(n) At the Closing there will be no unpaid bills or claims in connection with any repair of the Property or other work performed or materials purchased in connection with the Property, or sufficient funds in the reasonable judgment of Purchaser shall be escrowed for such purpose.

(o) Seller has not received any written notice from any governmental entity of any violation by Seller of any law, rule or regulation affecting the Property or its use including any environmental law or regulation, nor any written notice that the Property is in violation of any applicable building or zoning code or ordinance, except for any such matters which may have been previously cured by Seller.

(p) There are no persons employed by Seller in connection with the operation of the Property, and there are no maintenance, advertising, management, leasing, employment, or service contracts affecting the Property that will be in effect at Closing except for the Contracts unless expressly assumed in writing by Purchaser. Otherwise, Seller shall terminate any such employee and any such contracts (not expressly assumed by Purchaser) other than the Contracts at or prior to the Closing.

If, at any time prior to Closing, Seller shall discover that any representation or warranty contained in this Article 3.3 is, or has become, inaccurate in any material respect, Seller shall so notify Purchaser in writing (the "Correction Notice"), and Purchaser shall have the right by notice given in writing not more than five (5) business days after receipt of the Correction Notice to terminate this Agreement and receive a refund of the Deposit. The representations and warranties contained in this Agreement shall survive one (1) year from the Closing Date.

3.4 Purchaser intends to conduct its physical inspection of the Project beginning on the Effective Date of this Agreement and ending at 5:00 p.m. Dallas, Texas time, thirty (30) days after the Effective Date (**"Inspection Period"**). The Purchaser's inspection shall be at the sole cost and expense of Purchaser and at times approved in advance by Seller's manager (not to be unreasonably withheld) so as to minimize disturbance to the operations of the Project, its employees, and guests. Seller shall reasonably assist with such inspection and shall provide Purchaser with access to the Project, but shall not be obligated to incur any material cost or expense in connection therewith or to furnish any information other than at the place where same is maintained. During the Inspection Period, Seller shall provide Purchaser with accurate and complete copies of, or permit Purchaser to review at the Property, all books and records in the possession of Seller or its agents relating to the Project, including, without limitation, all of the Leases, Contracts and Permits, all lease files and correspondence, all property tax bills in Seller's possession, utility bills, and repair and maintenance records with respect to the Property and Personal Property. All information received by Purchaser relating to the Project, Seller or its affiliates shall be kept in strict confidence (subject to the terms above) and used solely for the purpose of determining the advisability of proceeding with the transaction described in this Agreement. On or before five (5) days after the Title Company's receipt of the Deposit, Seller shall deliver to Purchaser or make the items described on Exhibit "D" (collectively, the **"Due Diligence Materials"**) available to Purchaser for Purchaser's review:

PURCHASER ACKNOWLEDGES THAT PURCHASER HAS INSPECTED AND INVESTIGATED THE PROPERTY (OR PRIOR TO THE CLOSING WILL HAVE INSPECTED AND INVESTIGATED THE PROPERTY) AND HAS ENTERED INTO THIS AGREEMENT BASED UPON SUCH INVESTIGATION AND INSPECTION AND PURCHASER'S RIGHT TO CONDUCT THE INSPECTION AND INVESTIGATION PURSUANT TO THIS ARTICLE 3. EXCEPT AS EXPRESSLY PROVIDED IN THIS AGREEMENT AND THE WARRANTIES OF TITLE SET FORTH IN THE ACT OF SALE,

PURCHASER ACKNOWLEDGES THAT IT IS RELYING SOLELY ON ITS OWN INVESTIGATION AND INSPECTION OF THE PROPERTY AND NOT ON ANY INFORMATION PROVIDED FOR OR ON BEHALF OF SELLER. EXCEPT AS EXPRESSLY PROVIDED IN THIS AGREEMENT AND THE WARRANTIES OF TITLE SET FORTH IN THE DEED, THE SALE OF THE PROPERTY IS MADE ON AN "AS IS", "WHERE IS" AND "WITH ALL FAULTS" BASIS, AND PURCHASER EXPRESSLY ACKNOWLEDGES THAT, IN CONSIDERATION OF THE AGREEMENTS OF THE SELLER AND EXCEPT AS EXPRESSLY PROVIDED IN THIS AGREEMENT AND THE WARRANTIES OF TITLE SET FORTH IN THE DEED, SELLER HAS NOT MADE ANY WARRANTY OR REPRESENTATION, EXPRESS OR IMPLIED, OR ARISING BY OPERATION OF LAW, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTY OF SUITABILITY, HABITABILITY, CONDITION, ELIGIBILITY, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE WITH RESPECT TO THE PROPERTY OR ANY PORTION THEREOF AND SELLER HAS NO LIABILITY OF ANY KIND TO PURCHASER ON ACCOUNT OF THE FOREGOING. THE PROVISIONS OF THIS PARAGRAPH SHALL SURVIVE THE CLOSING.

3.5 In consideration of the option to purchase the Project granted to Purchaser under the terms of this Article 3 (the "**Option**"), Purchaser shall pay to Seller the sum of ONE HUNDRED DOLLARS ($100), the sufficiency of which consideration is hereby acknowledged by the parties. Such payment shall be fully earned by Seller's delivery to Purchaser of an executed copy of this Agreement, and shall be credited to Seller at the Closing or deducted from the Deposit if the Deposit is returned to Purchaser.

3.6 If Purchaser, in Purchaser's sole and absolute discretion, decides that the Project or any aspect of it is unsatisfactory, then Purchaser shall have the right to terminate this Agreement by giving written notice to Seller and Escrow Agent at any time during the Inspection Period and have the Deposit, less the Option fee described in Section 3.5, above, returned to it and neither party shall have any further obligation to the other except as expressly provided in this Agreement. If Purchaser does not give Seller and Escrow Agent written notice on or before 7 p.m. Central Time on the last day of the Inspection Period that Purchaser waives its right to terminate this Agreement pursuant to this Section 3.6, then Purchaser shall be deemed to have terminated this Agreement.

3.7 Purchaser shall have (10) ten days after the Inspection Period ("**Board Approval Period**") to obtain the approval of its Board of Directors to the transaction contemplated hereby. If Purchaser's Board of Directors approves this transaction, it shall give notice of such approval to Purchaser ("**Board Approval Notice**"). If Purchaser does not notify Seller within said period that such approval has been obtained, then this Agreement shall be deemed void ab initio and the Deposit shall be returned to Purchaser and neither party shall have any further obligation to the other.

3.8 Covenants.

(a) Between the date of this Agreement and the Closing Seller shall continue to maintain the Property in accordance with Seller's prior practices, ordinary wear and tear, casualty

losses and condemnation excepted. During the term of this Agreement, Seller shall not take any action which would materially adversely affect the title to the Property.

(b) Seller will cause fire and extended coverage insurance relating to the Property to be maintained in full force and effect at an amount no less than the full replacement cost of the Property.

(c) Seller shall continue to operate the Property in accordance with its normal and customary practice after the Effective Date and prior to Closing, so that the Property will be in substantially the same condition on the Closing Date as on the Effective Date, reasonable wear and tear excepted. After the Effective Date, Seller shall not, without approval of Purchaser enter into any new Service Contracts that are not cancelable without any penalty or fee on thirty (30) days' or less notice by Seller. Seller shall terminate all Service Contracts related to the Property prior to Closing, unless Purchaser elects (prior to expiration of the Inspection Period) to assume such Service Contracts. From and after the Effective Date through the Closing, Seller, at its sole cost and expense, shall (i) not voluntarily subject the Property to any additional liens, encumbrances, covenants, conditions, easements, rights-of-way or similar matters, (ii) not make any alterations to the Property, except in the ordinary course of business, all of which Seller shall complete at its sole cost and expense prior to Closing, (iii) pay for all capital and other improvements which are performed or contracted for by Seller at or prior to Closing, and (iv) not accept from any tenant payment of rent more than one (1) month in advance, or apply any security deposit to rent or any other default by any tenant. Seller shall continue to lease residential units in accordance with Seller's prior practices and market conditions.

(d) Seller shall not remove any personal property from the Property without the consent of Seller unless the same is replaced by property of equal or greater value, and will make all necessary repairs and replacements during such time.

3.9 <u>Conditions to Purchaser's Obligations.</u> Purchaser's obligation to purchase the Property shall be conditioned upon the satisfaction of each of the following conditions prior to or simultaneously with the Closing any of which may be waived by written notice from Purchaser to Seller:

(a) Seller has complied with and otherwise performed the obligations of Seller set forth in this Agreement.

(b) All representations and warranties of Seller as set forth in this Agreement shall be in all material respects substantively true and correct as of the date hereof and on the date of Closing (except for representations which by their terms are made as of a specific date or refer to a specific date).

(c) Financing

(1) Seller is the borrower under the First Lien in the original principal amount of $36,240,000.00. The First Lien is secured by a first mortgage lien on the Property. As provided in Section 2 herein, Seller and Purchaser have agreed that the Purchase Price in the amount of the outstanding principal balance thereof shall be paid via Purchaser's assumption of the First Lien. Because the Project will be encumbered by financing insured by HUD, closing of this transaction shall be subject to the approval by HUD and the lender under the First Lien ("**Lender**") of a Transfer of Physical Assets ("**TPA**") of the Project. Any and all documents to be executed by Seller in connection with the TPA shall be subject to Purchaser's approval, not to be unreasonably withheld, conditioned or delayed. From and after the consummation by Seller of the HUD Final Endorsement Closing with respect to the First Lien until the Closing or earlier termination of this Agreement, Seller authorizes Purchaser to contact Lender with respect to facilitating the TPA and assumption of the First Lien ("Loan Assumption"). The "**Financing Contingency**" shall be deemed satisfied when the parties have obtained conditional Lender and HUD approval to the TPA with conditions, including the form of the Loan Assumption documents, approved by Purchaser in its reasonable discretion. Provided Seller has provided Purchaser with all documents necessary including the Due Diligence Documents, Purchaser agrees to file the application for TPA with the Lender by the date that is fourteen (14) days after the Board Approval Period. If Lender requires additional information from Seller or Purchaser, Purchaser shall have a reasonable amount of time after receipt of such information required to make a filing or supplemental filing. In the event that on or before the 180th day following the Board Approval Period (the "**Financing Contingency Deadline**"), the Financing Contingency has not been satisfied, this Agreement will terminate, the Deposit shall be returned to Purchaser, and the parties shall have no further obligations hereunder (except for obligations that are expressly intended to survive termination of this Agreement). At all times prior to satisfaction of the Financing Contingency, whether by the Financing Contingency Deadline or the Extended Financing Contingency Deadline, Seller shall reasonably cooperate with Purchaser in such efforts, including without limitation the execution of any applications which are required to be executed by the existing owner of the Project and the furnishing of any and all information in its possession which is reasonably required by Purchaser in its efforts to obtain approval of the TPA and satisfy the Financing Contingency. Purchaser shall be required to pay all costs, fees, assumption fees, or other charges imposed or incurred by the Lender, HUD or Seller in connection with the TPA and the Loan Assumption, other than Seller's legal fees incurred therewith.

(d) Purchaser shall at all times have the right to waive any conditions (other than those given under Section 3.9(c) above), provided that no such waiver shall be effective unless such waiver or waivers are in writing; provided that if Closing occurs and Purchaser has actual knowledge of the non-fulfillment of any such condition, such act of consummating Closing shall be deemed a waiver of such known, unfulfilled condition. Any such waiver shall be deemed a release of Seller and any liability of Seller, if any, as a result of the failure of such condition.

## ARTICLE 4: PERMITTED ENCUMBRANCES TO TITLE

4.1 Purchaser agrees to accept title to the Property subject to the following matters (collectively, the "Permitted Encumbrances"):

(a) Leases and tenancies reflected on the Rent Roll and such further Leases as may be entered into in accordance with this Agreement.

(b) Liens securing payment of all ad valorem, intangible and other real and personal property taxes, special and general assessments, school taxes, and water and sewer charges against the Property or the Personal Property covered by this Agreement for the tax year in which the Closing Date occurs and subsequent years to the extent such items are properly apportioned under this Agreement, and the lien of any special taxes not entered of record against the Property on the Closing Date.

(c) Servitudes, easements and restrictive covenants, if any, which are recorded in the land records of the County Clerk of Dallas County, Texas, as of the date hereof and which do not materially affect the marketability of the Property.

(d) Matters approved or deemed approved pursuant to the terms of this Agreement.

(e) Zoning ordinances and regulations and building restrictions and regulations affecting the Property on the Closing Date.

(f) The First Lien.

(g) All building, subdivision, land sales, securities, ecology, environmental protection and like laws, ordinances, rules and regulations of governmental authorities, including those of any and all regulatory agencies and administrative officials having or asserting jurisdiction over the Property.

## ARTICLE 5: CONDITION OF TITLE, TITLE INSURANCE

5.1 Seller shall promptly obtain from the Title Company through Escrow Agent, and deliver to Purchaser, a title commitment (the "Title Commitment") to issue a TLTA Owner's Policy of Title Insurance (the "Title Policy") insuring Purchaser's title to the Property to be good and indefeasible in the amount of the Purchase Price, containing coverage over all general exceptions subject to only the Permitted Encumbrances. A copy of the Title Commitment and legible copies of each of the documents of record reflected therein shall be furnished to the attorneys for Purchaser and Seller. Seller shall also deliver to Purchaser a copy of the Existing Survey. Within ten (10) days of receipt of the title materials described above, together with the Existing Survey, Purchaser shall give written notice (the "Objection Notice") to the attorney for Seller identifying with particularity any defect of title to which Purchaser objects (the "Objections") separately specifying and setting forth each such Objection. Seller shall be entitled to reasonable adjournments of the Closing Date not exceeding thirty (30) days in the aggregate, to cure the Objections, unless waived by Purchaser. If Purchaser gives Seller an Objection Notice within the period set forth above, then all matters disclosed on the Title Commitment which are not objected to in such Objection Notice shall be deemed to be Permitted Encumbrances.

5.2 Seller shall not be required to expend any money or bring any action or proceeding or do any other thing in order to deliver the Project or convey title to the Property as required by this Agreement or the Objection Notice. If Seller gives Purchaser notice (the "Response Notice")

that Seller is unable or unwilling to convey the Project or title to the Project as required by this Agreement or the Objection Notice, Purchaser may, as its exclusive remedy, elect by written notice given to Seller within five (5) days after the Response Notice is given, either (a) to accept such title as Seller is able to convey without any reduction or abatement of the Purchase Price, or (b) to terminate this Agreement, in which event the Deposit and Financing Period Extension Fee shall be returned to Purchaser.

5.3 If Purchaser shall fail to give timely notice of its election to terminate this Agreement, Purchaser shall be deemed to have accepted all matters reflected on the Title Commitment as Permitted Encumbrances.

5.4 Unpaid liens for real estate and personal property taxes for years prior to the fiscal year in which the Closing Date occurs and any other matters which Seller is obligated to pay and discharge at the Closing shall not be deemed objections to title, but the amount thereof chargeable to Seller, plus interest and penalties thereon charged by the taxing authority, if any, shall be deducted from the Purchase Price on the Closing Date and paid to the Title Company with instructions to pay and discharge such matters.

5.5 Closing costs associated with the Closing and typically paid by a seller including, but not limited to, deed stamps, transfer taxes, and Seller's attorneys' fees shall be paid by Seller. Seller shall pay all premiums and other fees associated with the Title Policy and survey to be delivered at Closing. The cost of physical inspection, accounting, audit, and other investigations made in connection with Purchaser's due diligence, Purchaser's attorneys' fees and all other costs associated with the Closing shall be paid by Purchaser.

5.6 Time is of the essence with respect to the provisions of this Section 5.

## ARTICLE 6: CLOSING

6.1 Provided that all of the conditions of this Agreement shall have theretofore been satisfied, the closing (the "**Closing**") of the purchase and sale of the Property shall be conducted at the offices of the Escrow Agent (or at such other location as shall be mutually agreeable to Seller and Purchaser) on the date ("**Closing Date**") that is on or before ten (10) days after the Financing Contingency Deadline.

6.2 Upon Seller's and Purchaser's delivery of all required documents and instruments and payment of the Purchase Price and other amounts required herein, Purchaser and Seller shall prepare and sign a closing statement reflecting the adjustments and payments made and agreements in connection therewith. Seller and Purchaser shall jointly deliver a copy of the closing statement and all of the aforesaid documents to the Title Company which shall do the following:

(a) Record the Deed and loan documents, if any, associated with this transaction.

(b) Deliver to Seller and Purchaser or other appropriate party the documents and payments delivered to it as escrow holder for delivery to such party.

(c) Pay all recording taxes and transfer fees and all filing fees reflected on the closing statement.

(d) Issue the Title Policy and, if applicable, an endorsement to the existing Lender's Policy of Title Insurance.

(e) File the reports required by Section 6045 of the Internal Revenue Code and regulations promulgated thereunder.

## ARTICLE 7: DOCUMENTS REQUIRED ON CLOSING DATE

7.1 At or prior to the Closing, Seller shall execute and/or deliver the following to Purchaser through Escrow Agent:

(a) A Deed in a form reasonably acceptable to Seller and Purchaser and approved by HUD.

(b) A Blanket Conveyance, Bill of Sale and Assignment, in a form reasonably acceptable to Seller and Purchaser and approved by HUD (the "**Bill of Sale**").

(c) An Assignment and Assumption of Leases in a form reasonably acceptable to Seller and Purchaser and approved by HUD (the "**Assignment of Leases**"), as well as the hereinafter described Tenant Notification Letter.

(d) A pro forma of the Title Policy, as described in Section 5.1 of this Agreement.

(e) Keys to all locks and plans and specifications for the Property, if in the possession of Seller, which shall be delivered to Purchaser's representative at the Property.

(f) A rent roll for the Property (the "**Closing Rent Roll**") dated and certified as of the Closing Date listing each tenant, the monthly base rent payable, lease expiration date, security deposit and reflecting any rent due at the time of closing.

(g) The originals or certified copies of the leases and other occupancy agreements described in the Closing Rent Roll.

(h) All transfer documents (the "**Transfer Documentation**") necessary to assume the First Lien executed by Seller and the Existing Lender and to release Seller and current guarantors.

(i) Organizational and authority documents satisfactory to the Title Company.

(j) All costs and fees required to be paid by Seller pursuant to Article 8.

(k) Such other documents and instruments as may be required by this Agreement or by the Title Company in order to consummate the transactions described in this Agreement and to issue the Title Policy to Purchaser.

(l) A non-foreign (FIRPTA) affidavit for Seller complying with the requirements of Internal Revenue Code Section 1445(f)(3) and the regulations promulgated thereunder.

(m) Evidence of termination of those Contracts that are terminable pursuant to Section 3.7(b)(vi).

(n) An affidavit acceptable to the Title Company reflecting that there are no changes to the Survey except those approved by the Purchaser.

(o) Such other instruments and affidavits as are customarily executed by the seller of an interest in real property in connection with the recording of a deed.

7.2 At or prior to the Closing, Purchaser shall execute and/or deliver the following to Escrow Agent:

(a) The Purchase Price.

(b) The Deed.

(c) The Bill of Sale.

(d) The Assignment of Leases.

(e) The Transfer Documentation executed by Purchaser.

(f) Organizational and authority documents satisfactory to the Title Company.

(g) A written notice of the acquisition of the Property by Purchaser, originally executed by Seller and Purchaser, which shall be transmitted to all tenants and to other parties affected by the sale and purchase of the Property (the "**Tenant Notification Letter**"). Such notice (in the form of Exhibit "B" hereto) shall inform the addressees of the sale and transfer of the Property to Purchaser and contain appropriate instructions relating to the payment of future rentals and the giving of future notices. The said notices shall specify that unapplied security deposits under the tenant leases have been delivered to the Purchaser and that the Purchaser is responsible for the refund thereof and such notice shall be in form and substance adequate under local law to relieve Seller of all liability for return of such deposits.

(h) All costs and fees required to be paid by Purchaser pursuant to Article 8.

(i) Such other documents and instruments as may be required in this Agreement or by the Title Company in order to consummate the transactions described in this Agreement.

(j) Such other instrument, affidavits, and tax returns as are customarily executed by the purchaser of an interest in real property in connection with the recording of the deed.

## ARTICLE 8: APPORTIONMENTS AND ADJUSTMENTS

8.1 Seller shall be responsible for and pay all accrued expenses with respect to the Project accruing up to 11:59 P.M. on the day prior to the Closing Date (the "Adjustment Date") and shall be entitled to receive and retain all revenue from the Project accruing up to the Adjustment Date; provided, however, that if the Closing Date occurs on the last day of the month, the Adjustment Date shall be the Closing Date.

8.2 On the Closing Date, the following adjustments and apportionments shall be made by authorized representatives of the parties in cash as of the Adjustment Date:

(a) Rent payable and paid for the month of Closing shall be prorated as of the Adjustment Date. There shall be no proration of delinquent rentals. After the Closing, Purchaser shall continue to bill tenants for sums reflected on the Closing Rent Roll as past due, shall receive such rents as trustee for Seller, and shall deliver such sums to Seller if, as and when received. Such rents shall be applied first to costs of collection, second to rents due for the Closing Month, third to rents due to Purchaser at the time of receipt, and last to rents due Seller for periods prior to Closing. After the Closing, if Seller receives rents for periods after the Closing Date, it shall remit such sums to Purchaser within two (2) business days of receipt.

(b) Real estate taxes, ad valorem taxes, school taxes, assessments and personal property, intangible and use taxes, if any. In the event that either the tax assessment or the tax rate for the current year is not known at Closing, the parties shall prorate at Closing on the basis of the last known values and rates and adjust the prorations once such values or rates become known for the current year. Seller shall pay installments of confirmed assessments that have been levied against the Property and are due and payable as of the Closing. Purchaser shall pay all installments of any special assessments due after Closing.

(c) Charges under Contracts affecting the Project on the Adjustment Date, and utility charges and relating to the Project, including any payments made to Seller prior to the Closing Date in respect of Contracts, laundry lease or information services, whether characterized as "decorating fees", "sign-up bonuses", "additional rents" or the like.

(d) Utilities, water and sewer charges on the basis of the period for which assessed.

(e) Income from vending machines and tenant services, if any.

8.3 At the Closing, Purchaser will receive a credit against the Purchase Price in an amount equal to all unapplied security deposits held under Leases in effect on the Adjustment Date, against Purchaser's receipt and indemnification therefor. Upon making such credit, Purchaser will be deemed to have received all such security deposits and shall be fully responsible for the same as if a cash amount equal to such security deposits were actually delivered to Purchaser. Prior to the Closing, Seller reserves the right to apply security deposits as provided under the respective leases and permitted by applicable law; provided however, Seller shall not apply security deposits for any rentals due for the month in which the Closing Date occurs.

8.4 All other income of the Property, accruing or relating to the period through the Adjustment Date shall be paid to Seller. All other income of the Property, accruing or relating to the period commencing on the Adjustment Date and thereafter shall be paid to Purchaser.

8.5 All other expenses, such as utilities, maintenance and other operating expenses, incurred in connection with the Property and accruing or relating to the period through the Adjustment Date shall be the responsibility of and paid by Seller. Seller shall pay the existing amounts due under Construction Contracts. All other expenses, such as utilities, maintenance and other operating expenses incurred in connection with the Property and accruing or relating to the period commencing on the date of Closing and thereafter shall be the responsibility of and paid by Purchaser.

8.6 At the Closing and subject to the prorations herein provided, Seller shall receive a cash credit in an amount equal to the sum of all amounts held in escrow by holder of the First Lien, including, without limitation, hazard insurance premiums, taxes and MIP reserve or repair and replacement reserve. All escrows associated with the First Lien shall be assigned to Purchaser.

8.7 Walk-Through. Seven (7) days prior to Closing, Seller and Purchaser will perform a walk-through of all vacant units to determine which ones are not made-ready for rental.

8.8 To the extent that any amount of any of the above items shall not be available for exact proration as of the Closing, the proration at Closing will be based on the best available information and Seller or its representative and Purchaser or its representative shall meet as soon after the Closing as possible, but in no event later than thirty (30) days after Closing, and compute and settle and adjust or readjust the Closing prorations between the parties as of the date of Closing. Rents, if any, collected by Purchaser after the Closing shall be applied first to any amounts due Purchaser and then to the extent such rents relate to the period through and including the day before the day of the Closing shall be paid to Seller. Purchaser agrees to use good faith collection procedures with respect to the collection of any delinquent rentals, but will have no liability for the failure to collect any such amounts and will not be required to incur any material cost, conduct lock-outs or take any other legal action to enforce collection of any such amounts owed to Seller by tenants of the Property. The provisions of this Section 8.6 shall survive Closing.

The provisions of this **ARTICLE 8** shall survive the Closing.

## ARTICLE 9: REMEDIES

9.1 If Purchaser breaches its obligation to purchase the Project pursuant to this Agreement, and after receipt of any applicable notice and a five (5) day opportunity to cure, then Seller shall have the right, as its sole and exclusive remedy, to terminate this Agreement by giving Purchaser and the Escrow Agent written notice thereof and, upon receipt of such notice the Escrow Agent shall deliver the Deposit to Seller which shall retain the same as liquidated damages. Seller shall not be required to give Purchaser notice of failure to close, on the date provided in this Agreement and Purchaser shall not have any five (5) day grace period therefor. Seller and Purchaser acknowledge that the amount of damages resulting from a breach of this Agreement by Purchaser would be difficult or impossible to accurately ascertain and that Seller's damages would, in any event, be substantial and would exceed the Deposit. Upon Seller's receipt of the Deposit,

this Agreement shall wholly cease and terminate, no party to this Agreement shall have any further claim, agreement, or obligation to any other party to this Agreement, and any lien of Purchaser against the Project shall automatically cease, terminate and be released.

9.2 If the sale contemplated by this Agreement is not consummated because of Seller's failure to perform its obligations hereunder, Purchaser shall be entitled, as its exclusive remedy, to elect after notice to Seller and a five (5) day opportunity to cure either (a) to terminate this Agreement and have the Deposit returned to it or (b) to enforce specific performance of Seller's obligations under this Agreement. Purchaser shall not be required to give Seller notice of failure to close, on the date provided in this Agreement and Seller shall not have any five (5) day grace period therefor.

9.3 The non-breaching party shall also be entitled to recover against the breaching party its costs and expenses, including reasonable attorneys' fees and court costs, incurred by such non-breaching party in enforcing any of the remedies hereunder, as determined by a court of competent jurisdiction in Texas.

## ARTICLE 10: DAMAGE, DESTRUCTION OR CONDEMNATION

10.1 Seller agrees to maintain its present policies of casualty insurance covering the Project in full force and effect from the date of this Agreement through and including the Closing Date.

10.2 If either a substantial part of the improvements on the Land is damaged or destroyed or any part of the Property is taken by condemnation or other power of eminent domain then Purchaser shall have the right to terminate this Agreement based upon such damage, destruction or taking. If Purchaser does not terminate this Agreement as aforesaid, then on the Closing Date:

(i) The Purchase Price shall not be reduced, but Seller shall credit the Purchase Price with an amount equal to any sums of money collected by Seller under its policies of casualty insurance or renewals thereof insuring against the loss in question (after deducting any reasonable expenses incurred by Seller in collecting such insurance and any amount that Seller shall have paid or shall be obligated to pay for repairs or restoration of the damage), and Seller shall assign, transfer and set over to Purchaser at Closing all of Seller's right, title and interest in and to its casualty insurance policy or policies with respect to the Property and any further sums payable under said policies, plus the amount of any deductibles; provided that in no event shall the credits and insurance assigned to Purchaser exceed the cost of the unrepaired damage; and

(ii) Seller shall assign, transfer and set over to Purchaser all of Seller's right, title and interest in and to any awards that may be made for any taking by condemnation or other power of eminent domain.

10.3 For the purposes of this Article, a substantial part of the Improvements on the Land shall be deemed to mean a portion having a value of $100,000 or more or which would require expenditure of $100,000 or more for repair or restoration.

## ARTICLE 11: BROKER

11.1 Purchaser represents and warrants to Seller that neither Purchaser nor any entity related to Purchaser has dealt with any broker or other person or entity who would be entitled to a commission, consulting fee or other brokerage fee in connection with the transactions described in this Agreement.

11.2 Seller represents and warrants to Purchaser that neither Seller nor any entity related to Seller has dealt with any broker or other person or entity that would be entitled to a commission, consulting fee, or other brokerage fee in connection with the transactions described in this Agreement.

11.3 Each party agrees to indemnify, defend and hold the other harmless of and from any loss, cost, damage or expense (including reasonable attorneys' fees and court costs) arising out of any inaccuracy in the representation or warranty made by such party in Sections 11.1 and 11.2 above.

11.4 Notwithstanding any other provision of this Agreement to the contrary, the provisions of this Article shall survive the Closing and any prior termination of this Agreement for any reason whatsoever.

## ARTICLE 12: NOTICES

12.1 Any notice given or required to be given pursuant to any provision of this Agreement shall be in writing and shall be personally delivered or sent by facsimile, certified U.S. mail, with return receipt requested, or a reputable commercial courier service guaranteeing overnight delivery, and shall be deemed to have been given upon receipt if personally delivered, or, as the case may be, upon transmittal by facsimile with electronic confirmation of receipt, upon deposit in U.S. mail or upon delivery to such commercial courier, with delivery charges prepaid, if sent by such a courier, in either case addressed as follows:

Seller:

D4FR LLC
13901 Midway Road, Suite 102
Dallas, Texas 75244
Attention: Timothy Barton
Telephone: 972-385-9934
E-mail: TBarton@jmjdevelopment.net

Purchaser:

Southern Properties Capital Ltd.
1603 LBJ Freeway, Suite 800
Dallas, Texas 75234
Attn: Bradley Muth
Phone: 469-522-2366
E-mail:bradley.muth@pillarincome.com

with a copy to: Steptoe & Johnson PLLC
1603 LBJ Freeway, Suite 750
Dallas, Texas 75234
Attn: Jay A. LaJone
Phone: 214-373-2556
E-mail:jay.lajone@steptoe-johnson.com

12.2 (a) Either party may, by giving notice to the other in the manner set forth above, change the address to which notices shall be sent to it, provided that any such change or address shall be effective three (3) days after it is given.

(b) The attorney for each party to this Agreement identified in Article 12.1 may give notices on behalf of his client with the same force and effect as if such notice were given directly by such party.

## ARTICLE 13: ASSIGNMENT

13.1 Purchaser may, without the prior written consent of Seller, but upon providing written notice of such assignment to Seller, assign its rights and interest in this Agreement and the Deposit and Additional Payments to a third party.

## ARTICLE 14: MISCELLANEOUS

14.1 The following matters of general application shall apply to this Agreement and control interpretation notwithstanding any provision apparently to the contrary:

(a) This Agreement is binding upon and shall inure to the benefit of the parties hereto, their respective heirs, successors, legal representatives and permitted assigns.

(b) Wherever under the terms and provisions of this Agreement the time for performance falls upon a Saturday, Sunday or legal holiday in the state where Seller or Purchaser maintains the office reflected in Article 12 hereof, such time for performance shall be extended to the next business day thereafter.

(c) This Agreement may be executed in one or more counterparts, all of which when taken together shall constitute one and the same agreement. Escrow Agent is authorized to attach multiple signature pages to a single conformed original.

(d) The captions at the beginning of the several paragraphs, Sections and Articles are for convenience in locating the context, but are not part of the context. Unless otherwise specifically set forth in this Agreement to the contrary, all references to Exhibits contained in this Agreement refer to the Exhibits which are attached to this Agreement, all of which Exhibits are incorporated in, and made a part of, this Agreement by reference. Unless otherwise specifically set forth in this Agreement to the contrary, all references to Articles, Sections, paragraphs and clauses refer to portions of this Agreement.

(e) If any term or provision of this Agreement shall be held to be illegal, invalid, unenforceable or inoperative as a matter of law, the remaining terms and provisions of this

Agreement shall not be affected thereby, but each such remaining term and provision shall be valid and shall remain in full force and effect.

(f) This Agreement and the other writings referred to in, or delivered pursuant to, this Agreement, embody the entire understanding and contract between the parties hereto with respect to the Project and supersede any and all prior agreements and understandings between the parties hereto, whether written or oral, formal or informal, with respect to the subject matter of this Agreement. This Agreement has been entered into after full investigation by each party and its professional advisors, and neither party is relying upon any statement, representation or warranty made by or on behalf of the other which is not expressly set forth in this Agreement.

(g) No extensions, changes, waivers, modifications or amendments to or of this Agreement, of any kind whatsoever, shall be made or claimed by Seller or Purchaser, and no notices of any extension, change, waiver, modification or amendment made or claimed by Seller or Purchaser shall have any force or effect whatsoever, unless the same is contained in writing and is fully executed by the party against whom such matter is asserted.

(h) This Agreement shall be governed and interpreted in accordance with the laws of the State where the Property is located.

(i) Each party hereto shall pay all charges specified to be paid by them pursuant to the provisions of this Agreement and their own attorney's fees in connection with the negotiation, drafting and closing of this Agreement.

(j) Purchaser and Seller agree that this Agreement has been entered into solely for the benefit of Purchaser and Seller and no other person or entity, it being the intention of Purchaser and Seller that no person or entity not a party to this Agreement shall have any right or standing to (a) bring any action against Purchaser or Seller based on this Agreement, or (b) assume that any provision of this Agreement will be enforced or remain unmodified or unwaived, or (c) assert that it or he is or should be or was intended to be a beneficiary or any provision of this Agreement.

(k) The parties agree that any actions taken or documents (including this Agreement) signed by any trustee, officer, or director of Seller or Purchaser are undertaken in their fiduciary capacity and no recourse shall be had to the personal assets of any such trustee, officer, or director for enforcement of this Agreement.

(l) Wherever a time is set forth for performance or notice in this Agreement, time shall be of the essence unless explicitly stated to be otherwise.

(m) Purchaser and Seller agree that the Property will not be actively marketed and the Seller will not enter into negotiations with any other prospective purchasers while this Agreement is in effect or any contract negotiations are pending.

[*Signature page to follow*]

**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be executed in their names by their respective duly authorized representatives as of the day and year first above written.

Seller: **D4FR LLC,**
a Texas limited liability company

By: ______________________________
Timothy Barton, President

Purchaser: **SOUTHERN PROPERTIES CAPITAL LTD.,**
a British Virgin Islands corporation

By: ______________________________
Name: ______________________________
Title: ______________________________

## ACKNOWLEDGEMENT OF RECEIPT BY TITLE COMPANY

The undersigned Title Company hereby acknowledges receipt of a fully executed copy of the Agreement on this, the ______ day of _________________, 20___, and agrees to accept, hold and disburse the Earnest Money Deposit in accordance with the provisions of the Contract. The undersigned acknowledges that it is not a party to this Agreement and that it is executing below solely for the purpose of the foregoing acknowledgment and agreement.

TITLE COMPANY:

Commonwealth Land Title Insurance Company

By: ______________________________
Name: James P. Lazar
Title: Escrow Agent

**EXHIBITS**:

A - Legal Property Description
B - Tenant Notification Letter
C - Current Rent Roll
D - Due Diligence Materials

# EXHIBIT "A"

## LEGAL PROPERTY DESCRIPTION

**EXHIBIT "B"**

**TENANT NOTIFICATION LETTER**

Dated: ___________, 20___

______________________________
______________________________
______________________________
______________________________

Re: ____________________________________________ ("Property")

Dear ____________________:

As of the date of this letter, ____________________________________________, a ___________________________ and the former owner of the Property ("Seller"), transferred title and possession of the Property to ________________________________ ("Purchaser").

Pursuant to the provisions of Section ______ of the Texas ___________, you are hereby notified that Purchaser is responsible for all of the obligations of the landlord under your lease first arising from and after the date hereof. Seller is joining in the execution of this letter to acknowledge the fact that title and possession to the Property and all future responsibilities of the landlord under your lease have been transferred to Purchaser.

From and after the date of this letter, please make all rental checks payable to ___________ ___________________________, and deliver same to _______________________________, until otherwise notified in writing.

Sincerely,

**PURCHASER:**

______________________________________,
a ______________________________________

By: ________________________________
Name: ________________________________
Title: ________________________________

**ACKNOWLEDGED:**

**SELLER:**

__________________________________,
a ________________________________

By: ____________________________
Name: __________________________
Title: ___________________________

# EXHIBIT "C"

## CURRENT RENT ROLL

**(see attached)**

# EXHIBIT "D"

# DUE DILIGENCE MATERIALS

**(see attached)**

| | | Item | Received | Comments |
|---|---|---|---|---|
| 1 | | Item | Received | Comments |
| 2 | | | | |
| 3 | **I. General Information (Title, Survey, Etc.)** | | | |
| 4 | 1 | Description of Property: legal description | | |
| 5 | 2 | Mortgage documents (note, deed of trust, etc.) and other liens/deeds on the Property (if applicable). | | |
| 6 | 3 | Title documents | | |
| 7 | 4 | ALTA Survey | | |
| 8 | 5 | As Builts or Building plans (please note if they are located at the property) | | |
| 9 | **II. Contracts** | | | |
| 10 | 6 | Service Contracts: List and copies of service contracts, equipment leases, warranties, vehicles and other agreements relating to the operation of the property, including assignability/cancellation provisions: | | |
| 11 | | Cable | | |
| 12 | | Laundry | | |
| 13 | | Phone | | |
| 14 | | Internet | | |
| 15 | | Landscaping | | |
| 16 | | Trash removal | | |
| 17 | | Pest Control | | |
| 18 | | Termite | | |
| 19 | | Resident Water/Sewer reimbursement billing | | |
| 20 | 7 | Vendor List | | |
| 21 | 8 | Permits & License | | |
| 22 | 9 | Insurance Certificates and Policies and a loss run for the past 3 years | | |
| 23 | 10 | Management Agreement or leasing agreements | | |
| 24 | 11 | Utility Bills for the Property for the 2 most recent months | | |
| 25 | 12 | Warranties/guarantees: with respect to any part of the property or any mechanical equipment in, on or about the property; including but not limited to termites, roofs, laundry equipment, and pool | | |
| 26 | **III. Financial Information** | | | |
| 27 | 13 | Detail Operating Statements: Current month & past three calendar years, to include a current 12 month rolling report. Audited financials if a HUD deal - three years | | |
| 28 | 14 | Capital Expenditures: Past three years, detailed with dollar amounts | | |
| 29 | 15 | Current Budget | | |
| 30 | 16 | Rent Roll: tenants' unit number, square feet, lease beginning/ending dates, base rent per unit, free rent/rent abatement, security deposit. In Excel the 1st month. | | |
| 31 | 17 | Current Lease form with addendums - leases to be available for inspection at site visit | | |
| 32 | 18 | Bank Statements & Reconciliations: last 3 months for property | | |
| 33 | 19 | Accounts payable/aging list - will need to be updated immediately prior to closing | | |
| 34 | 20 | Aged delinquency & prepaid reports - will need updated immediately prior to | | |
| 35 | 21 | All Units report in Excel | | |
| 36 | 22 | Rentable Items report | | |

| 1 | | Item | Received | Comments |
|---|---|---|---|---|
| 2 | | | | |
| 3 | **I. General Information (Title, Survey, Etc.)** | | | |
| 4 | 1 | Description of Property: legal description | | |
| 5 | 2 | Mortgage documents (note, deed of trust, etc.) and other liens/deeds on the Property (if applicable). | | |
| 6 | 3 | Title documents | | |
| 7 | 4 | ALTA Survey | | |
| 8 | 5 | As Builts or Building plans (please note if they are located at the property) | | |
| 9 | **II. Contracts** | | | |
| 10 | 6 | Service Contracts: List and copies of service contracts, equipment leases, warranties, vehicles and other agreements relating to the operation of the property, including assignability/cancellation provisions: | | |
| 11 | | Cable | | |
| 12 | | Laundry | | |
| 13 | | Phone | | |
| 14 | | Internet | | |
| 15 | | Landscaping | | |
| 16 | | Trash removal | | |
| 17 | | Pest Control | | |
| 18 | | Termite | | |
| 19 | | Resident Water/Sewer reimbursement billing | | |
| 20 | 7 | Vendor List | | |
| 21 | 8 | Permits & License | | |
| 22 | 9 | Insurance Certificates and Policies and a loss run for the past 3 years | | |
| 23 | 10 | Management Agreement; or leasing agreements | | |
| 24 | 11 | Utility Bills for the Property for the 2 most recent months | | |
| 25 | 12 | Warranties/guarantees: with respect to any part of the property or any mechanical equipment in, on or about the property; including but not limited to termites, roofs, laundry equipment, and pool | | |
| 26 | **III. Financial Information** | | | |
| 27 | 13 | Detail Operating Statements: Current month & past three calendar years, to include a current 12 month rolling report. Audited financials if a HUD deal - three years | | |
| 28 | 14 | Capital Expenditures: Past three years, detailed with dollar amounts | | |
| 29 | 15 | Current Budget | | |
| 30 | 16 | Rent Roll: tenants' unit number, square feet, lease beginning/ending dates, base rent per unit, free rent/rent abatement, security deposit. In Excel the 1st month. | | |
| 31 | 17 | Current Lease form with addendums - leases to be available for inspection at site visit | | |
| 32 | 18 | Bank Statements & Reconciliations: last 3 months for property | | |
| 33 | 19 | Accounts payable/aging list - will need to be updated immediately prior to closing | | |
| 34 | 20 | Aged delinquency & prepaid reports - will need updated immediately prior to | | |
| 35 | 21 | All Units report in Excel | | |
| 36 | 22 | Rentable Items report | | |

**SOUTHERN PROPERTIES CAPITAL LTD.**
1603 LBJ Freeway, Suite 800
Dallas, Texas 75234

October 3, 2022

**VIA HAND DELIVERY**
ENOCH INVESTMENTS, LLC
JMJAV, LLC
JMJD4, LLC
D4IN, LLC
c/o JMJ Development, LLC
13901 Midway Road, Suite 102
Dallas, Texas 75244
Attn: Timothy Barton

Re: Conversion option for Parc at Ingleside Apartments Project; **EXERCISE NOTICE**

Dear Mr. Barton:

Southern Properties Capital Ltd. ("SPC") hereby exercises its option to acquire all interest of the addresses above in the Project known as Parc at Ingleside Apartments, Ingleside, Texas ("Project").

Attached is a proposed purchase contract to effect a transfer from the Project owner, D4IN LLC, to SPC through a deed, once the lender on the Project and HUD have consented to the transfer. Also attached is a check for $100.00 made out to Enoch Investments, LLC and JMJAV, LLC.

Please return the signed contract so we can continue to process TPA approval of the transfer. If you or your attorney have any questions, please contact Jay LaJone of Steptoe & Johnson PLLC at 214-373-2556.

Sincerely,

SOUTHERN PROPERTIES CAPITAL LTD.

By: [signature]
Bradley J. Muth, President

15519351v1

REORDER 905 - U.S. PATENT NO 5538290, 5575508, 5641183, 5785353, 5984364, 603000

CHECK PAYMENT NBR 311668 DATE 10/03/2022

Enoch Investments LLC and JMJAV LLC
JMJ02

| INVOICE | DESCRIPTION | NET AMOUNT |
|---|---|---|
| CONVERSION_NOTE | SPC Conversion Notice | $ 100.00 |
| | TOTALS: | $ 100.00 |

Southern Properties Capital Ltd
1603 LBJ Freeway
Suite 300
DALLAS, TX 75234

THIS CHECK IS VOID WITHOUT A PURPLE & BLUE BORDER AND BACKGROUND PLUS A KNIGHT & FINGERPRINT WATERMARK ON THE BACK - HOLD AT ANGLE TO VIEW

Southern Properties Capital Ltd
1603 LBJ Freeway, Suite 800
Dallas, TX 75234
(469)522-4200

Bank Leumi USA
New York, NY

VOID AFTER 90 DAYS

311668

1-279/260

DATE 10/03/2022

AMOUNT
$ 100.00

PAY TO THE ORDER OF Enoch Investments LLC and JMJAV LLC

*One Hundred Dollars and 00 Cents*

Enoch Investments LLC and JMJAV LLC
Dallas, TX 75234

Alla Dzyuba

⑈311668⑈ ⑆026002794⑆ 4104294800⑈

# AGREEMENT FOR PURCHASE AND SALE

This **AGREEMENT FOR PURCHASE AND SALE** (this "**Agreement**"), is made and entered into as of October _____, 2022 (the "Effective Date"), by and between SOUTHERN PROPERTIES CAPITAL LTD., a British Virgin Islands corporation ("**Purchaser**"), and D4IN LLC, a Texas limited liability company ("**Seller**").

## WITNESSETH:

## ARTICLE 1: AGREEMENT FOR PURCHASE AND SALE

1.1 Seller agrees to sell and cause to be conveyed to Purchaser, and Purchaser agrees to purchase, the following real and personal property (collectively, the "**Project**") on the terms and conditions contained herein:

(a) The real property located in the City of Ingleside, San Patricio County, State of Texas, described with particularity on Exhibit "A" (the "**Land**") together with all existing buildings, structures, fixtures, amenities and improvements thereon situated including apartment units known as the Parc at Ingleside Apartments, and together with all easements and other rights appurtenant to such Land, as well as Seller's rights, titles and interests in and to the mineral rights for the Land, if any (together, the "**Property**");

(b) Seller's interest as landlord in all leases and occupancy agreements affecting the Property reflected in the current rent roll attached hereto as Exhibit "C" (the "**Current Rent Roll**"), as updated by the certified Closing Rent Roll to be delivered by Seller to Purchaser at Closing (the "**Leases**") or any space therein and any prepaid rent and Seller's interest in all security deposits and guaranties;

(c) Seller's right, if any, to the use of the name "Parc at Ingleside Apartments" in connection with the Property and any other trademarks, copyrights, trade names or other intangible rights associated with the Property in which Seller has a transferable right including any telephone numbers associated with on-site management and leasing operations, and website(s) and internet address(es) which relate to the Property (the "**Intangible Property**");

(d) All of Seller's right, title and interest in and to all items of personal property owned by Seller and located at the Property and used in the operation thereof including, without limitation, plans, specifications, building supplies, marketing materials, boilers, HVAC equipment, alarms, signage, fittings, appliances, shades, wall-to-wall carpet, draperies, screens and screening, awnings, plants, shrubbery, landscaping, furniture, furnishings, office equipment, lawn care and building maintenance equipment, and other furnishings or items of personal property used in connection with the ownership and operation of the Land (the "**Personal Property**");

(e) All of Seller's right, title and interest in and to all service contracts and agreements relating to the Property, to the extent such agreements are permitted under this Agreement (the "**Contracts**") (but specifically excluding management and leasing agreements ("**Management and Leasing Agreements**"), which will be terminated by Seller on or before

Closing), all rights of actions against previous owners of the Land and Improvements, and any unexpired warranties and guarantees relating to the Personal Property;

(f) All of Seller's right, title and interest in and to any permits, certificates of occupancy or other licenses and governmental approvals held by Seller in connection with the ownership or operation of the Project (the "**Permits**"), to the extent that the same are assignable; and

(g) All escrows and reserves associated with the First Lien (hereinafter defined) for the Project, including, without limitation, the tax and insurance reserves, the MIP reserve and the replacement and repair reserve.

## ARTICLE 2: PURCHASE PRICE

2.1 The purchase price (the "**Purchase Price**") for the Project shall be an amount equal to the First Lien Amount as hereinafter defined, payable as follows:

Assumption by Purchaser of the unpaid balance of the existing HUD-insured note and first lien mortgage, dated June 13, 2019, encumbering the Property in the original principal amount of $25,201,000.00 ("**First Lien**"). The amount to be assumed will be the outstanding principal balance, plus accrued but unpaid interest, as of Closing ("**First Lien Amount**").

2.2 (a) Not later than three (3) business days after the Effective Date of this Agreement, Purchaser shall deliver a check in the amount of $1,000.00 ("**Earnest Money Deposit**") to Commonwealth Land Title Insurance Company (the "**Title Company**"), 5949 Sherry Lane, Suite 111, Dallas, Texas 75225, Attn: James P. Lazar ("**Escrow Agent**") to be held in escrow in an interest-bearing account pursuant to the terms of this Agreement pending the Closing.

(b) As used in this Agreement, the term "Deposit" shall mean any sums, including the Earnest Money Deposit, and, if applicable, the Closing Extension Deposit, and instruments and accrued interest thereon, if any, held by Escrow Agent hereunder. The Deposit shall be applied to the Purchase Price at the Closing. If Purchaser desires to terminate this Agreement pursuant to a right granted to Purchaser in any section of this Agreement, Purchaser shall effect such termination by giving written notice thereof to Seller and Escrow Agent within any applicable time period provided therefor in this Agreement. Upon receipt of such notice, unless otherwise provided herein, Escrow Agent shall return the Deposit to Purchaser without the requirement of any further notice or instruction, this Agreement shall wholly cease and terminate, and no party to this Agreement shall have any further claim against, or obligation to, any other party to this Agreement except as expressly provided herein, and the lien, if any, of Purchaser against the Project shall automatically cease and terminate. In the event that notice shall not have been given or be deemed to have been given prior to the last day of the Inspection Period (as hereinafter defined) and Seller shall object to the disbursal of the Deposit, the Escrow Agent shall hold the Deposit pending a non-appealable adjudication by a court of competent jurisdiction or by joint written instructions of Seller and Purchaser.

## ARTICLE 3: PHYSICAL CONDITION OF PROJECT, INSPECTION PERIOD

3.1 Purchaser will inspect the Project during the hereinafter described Inspection Period. Purchaser acknowledges that Seller has not made, does not make and is unwilling to make any express or implied representations or warranties as to the present, past or future physical condition, income, expenses, operation, legality of occupancy or any other matter affecting or related to the Project except as specifically set forth in this Agreement. No representation, warranty or covenant made by Seller in this Agreement or any document delivered pursuant hereto shall survive the Closing except as expressly provided in this Agreement. Purchaser agrees to purchase the Project in its "AS IS" condition (but subject only to the express representations and warranties herein) with a complete waiver of any and all warranties as to the condition of the Project or its fitness for any purpose, other than as expressly provided herein, all in accordance with the waiver language to be included in the Special Warranty Deed conveying the Property to Purchaser (the "**Deed**").

3.2 Any documents, records or information provided to Purchaser in connection with Purchaser's inspection of the Project shall be kept in strictest confidence (but may be disclosed to Purchaser's agents, brokers, accountants, advisors, consultants, attorneys and prospective lenders or investors) and shall be returned to Seller in the event that this Agreement is canceled for any reason. In the event that Purchaser elects not to proceed with this transaction, Purchaser shall deliver to Seller copies of all reports prepared for Purchaser by third-parties in connection with its inspection, without any representation as to the accuracy thereof, upon receipt of payment from Seller of the actual costs for such reports incurred by Purchaser.

3.3 Seller represents and warrants to Purchaser as of the date of this Agreement as follows:

(a) Seller is a Texas limited liability company, duly formed, validly existing and in good standing in the state of its formation and is qualified to do business in Texas.

(b) Seller has full power and authority to enter into and perform this Agreement. The execution, delivery and performance of this Agreement by Seller has been duly and validly authorized by all necessary action on the part of Seller and all required consents and approvals have been duly obtained.

(c) All Due Diligence Materials delivered in furtherance of Purchaser's inspection of the Project, including all leases, lease correspondence, and rent rolls have been prepared and assembled in the ordinary course of business by Seller's fee manager, are believed to be true, complete and accurate and have been relied upon by Seller.

(d) The Rent Roll is a true, correct and complete list of all of the Leases and rent roll for the Property. The rents and other sums due or to become due under each Lease have not been assigned, encumbered or subjected to any lien by Seller. Seller has provided Purchaser with true, correct and complete copies of all the Leases, including all amendments thereto. To Seller's actual knowledge, which has not been contradicted by any written notice; (i) the Leases have been duly authorized and executed by the landlord, and, by the tenant thereunder, (ii) the Leases are in full force and effect according to the terms set forth therein, (iii) the Leases set forth

the entire agreement between landlord and tenant with respect to the premises affected thereby; (iv) there are no uncured defaults under the Leases; and (v) the Rent Roll and other financial information prepared by Seller as part of the Seller Deliveries are true and complete in all material respects. Seller has not (i) made any representations to any tenant regarding the condition of the premises covered by any Lease or the compliance of the premises with any applicable governmental regulations, except as expressly set forth in the Leases, (ii) granted any concessions to any tenant not disclosed in such Lease; or (iii) received any written notice of any defaults under the Leases. There are no lease brokerage agreements, leasing commission agreements or other agreements providing for payments of any amounts for leasing activities or procuring tenants with respect to the Property other than any agreements explicitly contained in the Leases. The Leases set forth all Tenant inducement costs and commissions that are currently due and payable or which have otherwise accrued with respect to any Lease. Other than as provided for in the Leases, there are no other agreements, oral or written, in connection with any Tenant inducement costs or leasing commissions that may become due and payable in the future in connection with any Lease.

(e) The operating statements of the Project to be delivered by Seller to Purchaser during the Inspection Period were prepared in the ordinary course of business by Seller's fee manager, are believed to be accurate, and have been relied upon by Seller.

(f) To the best knowledge of Seller, the Permits have been duly and validly issued, are in full force and effect.

(g) To the best knowledge of Seller, there is no litigation or arbitration or other legal or administrative suit, action, proceeding of any kind pending against or involving Seller relating to Seller's ownership of the Property or any part thereof which would prevent Seller from conveying the Project in accordance with this Agreement. Except as may be described in the Due Diligence Materials, Seller has not received any notice from any Governmental Authority with respect to any violation of any applicable zoning ordinances and building codes, flood disaster laws and health and environmental laws, rules and regulations (hereinafter collectively called the "Applicable Laws").

(h) Seller is not a "foreign person" as defined in Section 1445 of the Internal Revenue Code of 1986, as amended, and the Income Tax Regulations thereunder.

(i) Seller owns fee simple title to the Property, subject to the exceptions of record.

(j) Except for the Contracts, there will be no contracts or other agreements which affect or will affect or which are or will be obligations of the Purchaser or the Property after the Close of Escrow. All of the service contracts currently effecting the Property ("Service Contracts") may be terminated without penalty or other payment upon no more than thirty (30) days' notice except for the contract for electrical service.

(k) To Seller's knowledge, the Property is not in violation of any recorded covenants, conditions, restrictions or other agreements recorded in the Real Property Records of Dallas County, Texas ("Recorded CC&Rs").

(l) To the best of Seller's knowledge or as described in the Due Diligence Materials (i) the Property is free of hazardous wastes, materials, substances, urea formaldehyde, PCB's and all other toxic, radioactive or hazardous wastes, materials, substances or contaminations in excess of amounts permitted under applicable federal, state and local regulations (collectively, "Hazardous Materials"); and (ii) no Hazardous Materials have been stored, disposed or located upon the Property except in the ordinary course of business for a multi-family residential community. Without in any way limiting the generality of above, neither the Property nor the Seller are the subject of any pending or, to the best of Seller's knowledge or as described in the Due Diligence Materials or the Violation, threatened investigation or inquiry by any Governmental Authority, or are subject to any remedial obligations under any Applicable Laws pertaining to health or the environment ("Applicable Environmental Laws"), including, without limitation, the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended ("CERCLA"), the Resource Conservation and Recovery Act of 1987, as amended ("RCRA"), and this representation and warranty would continue to be true and correct following disclosure to any applicable Governmental Authority of all relevant facts, conditions and circumstances pertaining to the Property and/or the Seller. Seller has taken all steps necessary to determine and has determined that no hazardous substances, solid wastes, or other substances known or suspected to pose a threat to health or the environment ("Hazards") have been disposed of or otherwise released on or to the Property or exist on or within any portion of the Property. To the knowledge of Seller, or as otherwise disclosed in the Due Diligence Materials, no prior use, either by Seller or the prior owners of the Property, has occurred, which violates any Applicable Environmental Laws. The use which Seller makes of the Property will not result in the disposal or release of any hazardous substance, solid waste or Hazard on, in or to the Property. The terms "hazardous substance" and "release" shall each have the meanings specified in CERCLA, and the terms "solid waste" and disposal" (or "disposed") shall each have the meanings specified in RCRA; provided, however, that in the event either that CERCLA or RCRA is amended so as to broaden the meaning of any term defined thereby, such broader meaning shall apply subsequent to the effective date of such amendment; and provided further that, to the extent that the laws of the State of Texas establish a meaning for "hazardous substance", "release", "solid waste", or "disposal" which is broader than that specified in either CERCLA or RCRA, such broader definition shall apply. To the best of Seller's knowledge and belief, there has been no litigation brought or threatened nor any settlement reached by or with any parties alleging the presence, disposal, release, or threatened release, of any hazard substance, solid wastes or Hazards from the use or operation of the Property. To the best of Seller's knowledge and belief after diligent investigation and inquiry, the Property is not on any federal or state "Superfund" list, nor subject to any environmentally related liens.

(m) Except as set forth in the Title Commitment or Due Diligence Materials, there are no unpaid assessments (governmental or otherwise) for sewers, water, paving, electrical power or otherwise affecting the Property (matured or unmatured) and, to the best of Seller's knowledge, no such assessments are threatened. There are no options, contracts or other obligations outstanding for the sale, exchange or transfer of the Property, or any portion thereof.

(n) At the Closing there will be no unpaid bills or claims in connection with any repair of the Property or other work performed or materials purchased in connection with the Property, or sufficient funds in the reasonable judgment of Purchaser shall be escrowed for such purpose.

(o) Seller has not received any written notice from any governmental entity of any violation by Seller of any law, rule or regulation affecting the Property or its use including any environmental law or regulation, nor any written notice that the Property is in violation of any applicable building or zoning code or ordinance, except for any such matters which may have been previously cured by Seller.

(p) There are no persons employed by Seller in connection with the operation of the Property, and there are no maintenance, advertising, management, leasing, employment, or service contracts affecting the Property that will be in effect at Closing except for the Contracts unless expressly assumed in writing by Purchaser. Otherwise, Seller shall terminate any such employee and any such contracts (not expressly assumed by Purchaser) other than the Contracts at or prior to the Closing.

If, at any time prior to Closing, Seller shall discover that any representation or warranty contained in this Article 3.3 is, or has become, inaccurate in any material respect, Seller shall so notify Purchaser in writing (the "Correction Notice"), and Purchaser shall have the right by notice given in writing not more than five (5) business days after receipt of the Correction Notice to terminate this Agreement and receive a refund of the Deposit. The representations and warranties contained in this Agreement shall survive one (1) year from the Closing Date.

3.4 Purchaser intends to conduct its physical inspection of the Project beginning on the Effective Date of this Agreement and ending at 5:00 p.m. Dallas, Texas time, thirty (30) days after the Effective Date ("**Inspection Period**"). The Purchaser's inspection shall be at the sole cost and expense of Purchaser and at times approved in advance by Seller's manager (not to be unreasonably withheld) so as to minimize disturbance to the operations of the Project, its employees, and guests. Seller shall reasonably assist with such inspection and shall provide Purchaser with access to the Project, but shall not be obligated to incur any material cost or expense in connection therewith or to furnish any information other than at the place where same is maintained. During the Inspection Period, Seller shall provide Purchaser with accurate and complete copies of, or permit Purchaser to review at the Property, all books and records in the possession of Seller or its agents relating to the Project, including, without limitation, all of the Leases, Contracts and Permits, all lease files and correspondence, all property tax bills in Seller's possession, utility bills, and repair and maintenance records with respect to the Property and Personal Property. All information received by Purchaser relating to the Project, Seller or its affiliates shall be kept in strict confidence (subject to the terms above) and used solely for the purpose of determining the advisability of proceeding with the transaction described in this Agreement. On or before five (5) days after the Title Company's receipt of the Deposit, Seller shall deliver to Purchaser or make the items described on Exhibit "D" (collectively, the "**Due Diligence Materials**") available to Purchaser for Purchaser's review:

PURCHASER ACKNOWLEDGES THAT PURCHASER HAS INSPECTED AND INVESTIGATED THE PROPERTY (OR PRIOR TO THE CLOSING WILL HAVE INSPECTED AND INVESTIGATED THE PROPERTY) AND HAS ENTERED INTO THIS AGREEMENT BASED UPON SUCH INVESTIGATION AND INSPECTION AND PURCHASER'S RIGHT TO CONDUCT THE INSPECTION AND INVESTIGATION PURSUANT TO THIS ARTICLE 3. EXCEPT AS EXPRESSLY PROVIDED IN THIS AGREEMENT AND THE WARRANTIES OF TITLE SET FORTH IN THE ACT OF SALE,

PURCHASER ACKNOWLEDGES THAT IT IS RELYING SOLELY ON ITS OWN INVESTIGATION AND INSPECTION OF THE PROPERTY AND NOT ON ANY INFORMATION PROVIDED FOR OR ON BEHALF OF SELLER. EXCEPT AS EXPRESSLY PROVIDED IN THIS AGREEMENT AND THE WARRANTIES OF TITLE SET FORTH IN THE DEED, THE SALE OF THE PROPERTY IS MADE ON AN "AS IS", "WHERE IS" AND "WITH ALL FAULTS" BASIS, AND PURCHASER EXPRESSLY ACKNOWLEDGES THAT, IN CONSIDERATION OF THE AGREEMENTS OF THE SELLER AND EXCEPT AS EXPRESSLY PROVIDED IN THIS AGREEMENT AND THE WARRANTIES OF TITLE SET FORTH IN THE DEED, SELLER HAS NOT MADE ANY WARRANTY OR REPRESENTATION, EXPRESS OR IMPLIED, OR ARISING BY OPERATION OF LAW, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTY OF SUITABILITY, HABITABILITY, CONDITION, ELIGIBILITY, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE WITH RESPECT TO THE PROPERTY OR ANY PORTION THEREOF AND SELLER HAS NO LIABILITY OF ANY KIND TO PURCHASER ON ACCOUNT OF THE FOREGOING. THE PROVISIONS OF THIS PARAGRAPH SHALL SURVIVE THE CLOSING.

3.5 In consideration of the option to purchase the Project granted to Purchaser under the terms of this Article 3 (the "**Option**"), Purchaser shall pay to Seller the sum of ONE HUNDRED DOLLARS ($100), the sufficiency of which consideration is hereby acknowledged by the parties. Such payment shall be fully earned by Seller's delivery to Purchaser of an executed copy of this Agreement, and shall be credited to Seller at the Closing or deducted from the Deposit if the Deposit is returned to Purchaser.

3.6 If Purchaser, in Purchaser's sole and absolute discretion, decides that the Project or any aspect of it is unsatisfactory, then Purchaser shall have the right to terminate this Agreement by giving written notice to Seller and Escrow Agent at any time during the Inspection Period and have the Deposit, less the Option fee described in Section 3.5, above, returned to it and neither party shall have any further obligation to the other except as expressly provided in this Agreement. If Purchaser does not give Seller and Escrow Agent written notice on or before 7 p.m. Central Time on the last day of the Inspection Period that Purchaser waives its right to terminate this Agreement pursuant to this Section 3.6, then Purchaser shall be deemed to have terminated this Agreement.

3.7 Purchaser shall have (10) ten days after the Inspection Period ("**Board Approval Period**") to obtain the approval of its Board of Directors to the transaction contemplated hereby. If Purchaser's Board of Directors approves this transaction, it shall give notice of such approval to Purchaser ("**Board Approval Notice**"). If Purchaser does not notify Seller within said period that such approval has been obtained, then this Agreement shall be deemed void ab initio and the Deposit shall be returned to Purchaser and neither party shall have any further obligation to the other.

3.8 <u>Covenants.</u>

(a) Between the date of this Agreement and the Closing Seller shall continue to maintain the Property in accordance with Seller's prior practices, ordinary wear and tear, casualty

losses and condemnation excepted. During the term of this Agreement, Seller shall not take any action which would materially adversely affect the title to the Property.

(b) Seller will cause fire and extended coverage insurance relating to the Property to be maintained in full force and effect at an amount no less than the full replacement cost of the Property.

(c) Seller shall continue to operate the Property in accordance with its normal and customary practice after the Effective Date and prior to Closing, so that the Property will be in substantially the same condition on the Closing Date as on the Effective Date, reasonable wear and tear excepted. After the Effective Date, Seller shall not, without approval of Purchaser enter into any new Service Contracts that are not cancelable without any penalty or fee on thirty (30) days' or less notice by Seller. Seller shall terminate all Service Contracts related to the Property prior to Closing, unless Purchaser elects (prior to expiration of the Inspection Period) to assume such Service Contracts. From and after the Effective Date through the Closing, Seller, at its sole cost and expense, shall (i) not voluntarily subject the Property to any additional liens, encumbrances, covenants, conditions, easements, rights-of-way or similar matters, (ii) not make any alterations to the Property, except in the ordinary course of business, all of which Seller shall complete at its sole cost and expense prior to Closing, (iii) pay for all capital and other improvements which are performed or contracted for by Seller at or prior to Closing, and (iv) not accept from any tenant payment of rent more than one (1) month in advance, or apply any security deposit to rent or any other default by any tenant. Seller shall continue to lease residential units in accordance with Seller's prior practices and market conditions.

(d) Seller shall not remove any personal property from the Property without the consent of Seller unless the same is replaced by property of equal or greater value, and will make all necessary repairs and replacements during such time.

3.9 Conditions to Purchaser's Obligations. Purchaser's obligation to purchase the Property shall be conditioned upon the satisfaction of each of the following conditions prior to or simultaneously with the Closing any of which may be waived by written notice from Purchaser to Seller:

(a) Seller has complied with and otherwise performed the obligations of Seller set forth in this Agreement.

(b) All representations and warranties of Seller as set forth in this Agreement shall be in all material respects substantively true and correct as of the date hereof and on the date of Closing (except for representations which by their terms are made as of a specific date or refer to a specific date).

(c) Financing

(1) Seller is the borrower under the First Lien in the original principal amount of $36,240,000.00. The First Lien is secured by a first mortgage lien on the Property. As provided in Section 2 herein, Seller and Purchaser have agreed that the Purchase Price in the amount of the outstanding principal balance thereof shall be paid via Purchaser's assumption of the First Lien. Because the Project will be encumbered by financing insured by HUD, closing of this transaction shall be subject to the approval by HUD and the lender under the First Lien ("**Lender**") of a Transfer of Physical Assets ("**TPA**") of the Project. Any and all documents to be executed by Seller in connection with the TPA shall be subject to Purchaser's approval, not to be unreasonably withheld, conditioned or delayed. From and after the consummation by Seller of the HUD Final Endorsement Closing with respect to the First Lien until the Closing or earlier termination of this Agreement, Seller authorizes Purchaser to contact Lender with respect to facilitating the TPA and assumption of the First Lien ("Loan Assumption"). The "**Financing Contingency**" shall be deemed satisfied when the parties have obtained conditional Lender and HUD approval to the TPA with conditions, including the form of the Loan Assumption documents, approved by Purchaser in its reasonable discretion. Provided Seller has provided Purchaser with all documents necessary including the Due Diligence Documents, Purchaser agrees to file the application for TPA with the Lender by the date that is fourteen (14) days after the Board Approval Period. If Lender requires additional information from Seller or Purchaser, Purchaser shall have a reasonable amount of time after receipt of such information required to make a filing or supplemental filing. In the event that on or before the 180th day following the Board Approval Period (the "**Financing Contingency Deadline**"), the Financing Contingency has not been satisfied, this Agreement will terminate, the Deposit shall be returned to Purchaser, and the parties shall have no further obligations hereunder (except for obligations that are expressly intended to survive termination of this Agreement). At all times prior to satisfaction of the Financing Contingency, whether by the Financing Contingency Deadline or the Extended Financing Contingency Deadline, Seller shall reasonably cooperate with Purchaser in such efforts, including without limitation the execution of any applications which are required to be executed by the existing owner of the Project and the furnishing of any and all information in its possession which is reasonably required by Purchaser in its efforts to obtain approval of the TPA and satisfy the Financing Contingency. Purchaser shall be required to pay all costs, fees, assumption fees, or other charges imposed or incurred by the Lender, HUD or Seller in connection with the TPA and the Loan Assumption, other than Seller's legal fees incurred therewith.

(d) Purchaser shall at all times have the right to waive any conditions (other than those given under Section 3.9(c) above), provided that no such waiver shall be effective unless such waiver or waivers are in writing; provided that if Closing occurs and Purchaser has actual knowledge of the non-fulfillment of any such condition, such act of consummating Closing shall be deemed a waiver of such known, unfulfilled condition. Any such waiver shall be deemed a release of Seller and any liability of Seller, if any, as a result of the failure of such condition.

## ARTICLE 4: PERMITTED ENCUMBRANCES TO TITLE

4.1 Purchaser agrees to accept title to the Property subject to the following matters (collectively, the "Permitted Encumbrances"):

(a) Leases and tenancies reflected on the Rent Roll and such further Leases as may be entered into in accordance with this Agreement.

(b) Liens securing payment of all ad valorem, intangible and other real and personal property taxes, special and general assessments, school taxes, and water and sewer charges against the Property or the Personal Property covered by this Agreement for the tax year in which the Closing Date occurs and subsequent years to the extent such items are properly apportioned under this Agreement, and the lien of any special taxes not entered of record against the Property on the Closing Date.

(c) Servitudes, easements and restrictive covenants, if any, which are recorded in the land records of the County Clerk of Dallas County, Texas, as of the date hereof and which do not materially affect the marketability of the Property.

(d) Matters approved or deemed approved pursuant to the terms of this Agreement.

(e) Zoning ordinances and regulations and building restrictions and regulations affecting the Property on the Closing Date.

(f) The First Lien.

(g) All building, subdivision, land sales, securities, ecology, environmental protection and like laws, ordinances, rules and regulations of governmental authorities, including those of any and all regulatory agencies and administrative officials having or asserting jurisdiction over the Property.

## ARTICLE 5: CONDITION OF TITLE, TITLE INSURANCE

5.1 Seller shall promptly obtain from the Title Company through Escrow Agent, and deliver to Purchaser, a title commitment (the "Title Commitment") to issue a TLTA Owner's Policy of Title Insurance (the "Title Policy") insuring Purchaser's title to the Property to be good and indefeasible in the amount of the Purchase Price, containing coverage over all general exceptions subject to only the Permitted Encumbrances. A copy of the Title Commitment and legible copies of each of the documents of record reflected therein shall be furnished to the attorneys for Purchaser and Seller. Seller shall also deliver to Purchaser a copy of the Existing Survey. Within ten (10) days of receipt of the title materials described above, together with the Existing Survey, Purchaser shall give written notice (the "Objection Notice") to the attorney for Seller identifying with particularity any defect of title to which Purchaser objects (the "Objections") separately specifying and setting forth each such Objection. Seller shall be entitled to reasonable adjournments of the Closing Date not exceeding thirty (30) days in the aggregate, to cure the Objections, unless waived by Purchaser. If Purchaser gives Seller an Objection Notice within the period set forth above, then all matters disclosed on the Title Commitment which are not objected to in such Objection Notice shall be deemed to be Permitted Encumbrances.

5.2 Seller shall not be required to expend any money or bring any action or proceeding or do any other thing in order to deliver the Project or convey title to the Property as required by this Agreement or the Objection Notice. If Seller gives Purchaser notice (the "Response Notice")

that Seller is unable or unwilling to convey the Project or title to the Project as required by this Agreement or the Objection Notice, Purchaser may, as its exclusive remedy, elect by written notice given to Seller within five (5) days after the Response Notice is given, either (a) to accept such title as Seller is able to convey without any reduction or abatement of the Purchase Price, or (b) to terminate this Agreement, in which event the Deposit and Financing Period Extension Fee shall be returned to Purchaser.

5.3 If Purchaser shall fail to give timely notice of its election to terminate this Agreement, Purchaser shall be deemed to have accepted all matters reflected on the Title Commitment as Permitted Encumbrances.

5.4 Unpaid liens for real estate and personal property taxes for years prior to the fiscal year in which the Closing Date occurs and any other matters which Seller is obligated to pay and discharge at the Closing shall not be deemed objections to title, but the amount thereof chargeable to Seller, plus interest and penalties thereon charged by the taxing authority, if any, shall be deducted from the Purchase Price on the Closing Date and paid to the Title Company with instructions to pay and discharge such matters.

5.5 Closing costs associated with the Closing and typically paid by a seller including, but not limited to, deed stamps, transfer taxes, and Seller's attorneys' fees shall be paid by Seller. Seller shall pay all premiums and other fees associated with the Title Policy and survey to be delivered at Closing. The cost of physical inspection, accounting, audit, and other investigations made in connection with Purchaser's due diligence, Purchaser's attorneys' fees and all other costs associated with the Closing shall be paid by Purchaser.

5.6 Time is of the essence with respect to the provisions of this Section 5.

## ARTICLE 6: CLOSING

6.1 Provided that all of the conditions of this Agreement shall have theretofore been satisfied, the closing (the "**Closing**") of the purchase and sale of the Property shall be conducted at the offices of the Escrow Agent (or at such other location as shall be mutually agreeable to Seller and Purchaser) on the date ("**Closing Date**") that is on or before ten (10) days after the Financing Contingency Deadline.

6.2 Upon Seller's and Purchaser's delivery of all required documents and instruments and payment of the Purchase Price and other amounts required herein, Purchaser and Seller shall prepare and sign a closing statement reflecting the adjustments and payments made and agreements in connection therewith. Seller and Purchaser shall jointly deliver a copy of the closing statement and all of the aforesaid documents to the Title Company which shall do the following:

(a) Record the Deed and loan documents, if any, associated with this transaction.

(b) Deliver to Seller and Purchaser or other appropriate party the documents and payments delivered to it as escrow holder for delivery to such party.

(c) Pay all recording taxes and transfer fees and all filing fees reflected on the closing statement.

(d) Issue the Title Policy and, if applicable, an endorsement to the existing Lender's Policy of Title Insurance.

(e) File the reports required by Section 6045 of the Internal Revenue Code and regulations promulgated thereunder.

## ARTICLE 7: DOCUMENTS REQUIRED ON CLOSING DATE

7.1 At or prior to the Closing, Seller shall execute and/or deliver the following to Purchaser through Escrow Agent:

(a) A Deed in a form reasonably acceptable to Seller and Purchaser and approved by HUD.

(b) A Blanket Conveyance, Bill of Sale and Assignment, in a form reasonably acceptable to Seller and Purchaser and approved by HUD (the "**Bill of Sale**").

(c) An Assignment and Assumption of Leases in a form reasonably acceptable to Seller and Purchaser and approved by HUD (the "**Assignment of Leases**"), as well as the hereinafter described Tenant Notification Letter.

(d) A pro forma of the Title Policy, as described in Section 5.1 of this Agreement.

(e) Keys to all locks and plans and specifications for the Property, if in the possession of Seller, which shall be delivered to Purchaser's representative at the Property.

(f) A rent roll for the Property (the "**Closing Rent Roll**") dated and certified as of the Closing Date listing each tenant, the monthly base rent payable, lease expiration date, security deposit and reflecting any rent due at the time of closing.

(g) The originals or certified copies of the leases and other occupancy agreements described in the Closing Rent Roll.

(h) All transfer documents (the "**Transfer Documentation**") necessary to assume the First Lien executed by Seller and the Existing Lender and to release Seller and current guarantors.

(i) Organizational and authority documents satisfactory to the Title Company.

(j) All costs and fees required to be paid by Seller pursuant to Article 8.

(k) Such other documents and instruments as may be required by this Agreement or by the Title Company in order to consummate the transactions described in this Agreement and to issue the Title Policy to Purchaser.

(l) A non-foreign (FIRPTA) affidavit for Seller complying with the requirements of Internal Revenue Code Section 1445(f)(3) and the regulations promulgated thereunder.

(m) Evidence of termination of those Contracts that are terminable pursuant to Section 3.7(b)(vi).

(n) An affidavit acceptable to the Title Company reflecting that there are no changes to the Survey except those approved by the Purchaser.

(o) Such other instruments and affidavits as are customarily executed by the seller of an interest in real property in connection with the recording of a deed.

7.2 At or prior to the Closing, Purchaser shall execute and/or deliver the following to Escrow Agent:

(a) The Purchase Price.

(b) The Deed.

(c) The Bill of Sale.

(d) The Assignment of Leases.

(e) The Transfer Documentation executed by Purchaser.

(f) Organizational and authority documents satisfactory to the Title Company.

(g) A written notice of the acquisition of the Property by Purchaser, originally executed by Seller and Purchaser, which shall be transmitted to all tenants and to other parties affected by the sale and purchase of the Property (the "**Tenant Notification Letter**"). Such notice (in the form of Exhibit "B" hereto) shall inform the addressees of the sale and transfer of the Property to Purchaser and contain appropriate instructions relating to the payment of future rentals and the giving of future notices. The said notices shall specify that unapplied security deposits under the tenant leases have been delivered to the Purchaser and that the Purchaser is responsible for the refund thereof and such notice shall be in form and substance adequate under local law to relieve Seller of all liability for return of such deposits.

(h) All costs and fees required to be paid by Purchaser pursuant to Article 8.

(i) Such other documents and instruments as may be required in this Agreement or by the Title Company in order to consummate the transactions described in this Agreement.

(j) Such other instrument, affidavits, and tax returns as are customarily executed by the purchaser of an interest in real property in connection with the recording of the deed.

## ARTICLE 8: APPORTIONMENTS AND ADJUSTMENTS

8.1 Seller shall be responsible for and pay all accrued expenses with respect to the Project accruing up to 11:59 P.M. on the day prior to the Closing Date (the "Adjustment Date") and shall be entitled to receive and retain all revenue from the Project accruing up to the Adjustment Date; provided, however, that if the Closing Date occurs on the last day of the month, the Adjustment Date shall be the Closing Date.

8.2 On the Closing Date, the following adjustments and apportionments shall be made by authorized representatives of the parties in cash as of the Adjustment Date:

(a) Rent payable and paid for the month of Closing shall be prorated as of the Adjustment Date. There shall be no proration of delinquent rentals. After the Closing, Purchaser shall continue to bill tenants for sums reflected on the Closing Rent Roll as past due, shall receive such rents as trustee for Seller, and shall deliver such sums to Seller if, as and when received. Such rents shall be applied first to costs of collection, second to rents due for the Closing Month, third to rents due to Purchaser at the time of receipt, and last to rents due Seller for periods prior to Closing. After the Closing, if Seller receives rents for periods after the Closing Date, it shall remit such sums to Purchaser within two (2) business days of receipt.

(b) Real estate taxes, ad valorem taxes, school taxes, assessments and personal property, intangible and use taxes, if any. In the event that either the tax assessment or the tax rate for the current year is not known at Closing, the parties shall prorate at Closing on the basis of the last known values and rates and adjust the prorations once such values or rates become known for the current year. Seller shall pay installments of confirmed assessments that have been levied against the Property and are due and payable as of the Closing. Purchaser shall pay all installments of any special assessments due after Closing.

(c) Charges under Contracts affecting the Project on the Adjustment Date, and utility charges and relating to the Project, including any payments made to Seller prior to the Closing Date in respect of Contracts, laundry lease or information services, whether characterized as "decorating fees", "sign-up bonuses", "additional rents" or the like.

(d) Utilities, water and sewer charges on the basis of the period for which assessed.

(e) Income from vending machines and tenant services, if any.

8.3 At the Closing, Purchaser will receive a credit against the Purchase Price in an amount equal to all unapplied security deposits held under Leases in effect on the Adjustment Date, against Purchaser's receipt and indemnification therefor. Upon making such credit, Purchaser will be deemed to have received all such security deposits and shall be fully responsible for the same as if a cash amount equal to such security deposits were actually delivered to Purchaser. Prior to the Closing, Seller reserves the right to apply security deposits as provided under the respective leases and permitted by applicable law; provided however, Seller shall not apply security deposits for any rentals due for the month in which the Closing Date occurs.

8.4 All other income of the Property, accruing or relating to the period through the Adjustment Date shall be paid to Seller. All other income of the Property, accruing or relating to the period commencing on the Adjustment Date and thereafter shall be paid to Purchaser.

8.5 All other expenses, such as utilities, maintenance and other operating expenses, incurred in connection with the Property and accruing or relating to the period through the Adjustment Date shall be the responsibility of and paid by Seller. Seller shall pay the existing amounts due under Construction Contracts. All other expenses, such as utilities, maintenance and other operating expenses incurred in connection with the Property and accruing or relating to the period commencing on the date of Closing and thereafter shall be the responsibility of and paid by Purchaser.

8.6 At the Closing and subject to the prorations herein provided, Seller shall receive a cash credit in an amount equal to the sum of all amounts held in escrow by holder of the First Lien, including, without limitation, hazard insurance premiums, taxes and MIP reserve or repair and replacement reserve. All escrows associated with the First Lien shall be assigned to Purchaser.

8.7 Walk-Through. Seven (7) days prior to Closing, Seller and Purchaser will perform a walk-through of all vacant units to determine which ones are not made-ready for rental.

8.8 To the extent that any amount of any of the above items shall not be available for exact proration as of the Closing, the proration at Closing will be based on the best available information and Seller or its representative and Purchaser or its representative shall meet as soon after the Closing as possible, but in no event later than thirty (30) days after Closing, and compute and settle and adjust or readjust the Closing prorations between the parties as of the date of Closing. Rents, if any, collected by Purchaser after the Closing shall be applied first to any amounts due Purchaser and then to the extent such rents relate to the period through and including the day before the day of the Closing shall be paid to Seller. Purchaser agrees to use good faith collection procedures with respect to the collection of any delinquent rentals, but will have no liability for the failure to collect any such amounts and will not be required to incur any material cost, conduct lock-outs or take any other legal action to enforce collection of any such amounts owed to Seller by tenants of the Property. The provisions of this Section 8.6 shall survive Closing.

The provisions of this **ARTICLE 8** shall survive the Closing.

## ARTICLE 9: REMEDIES

9.1 If Purchaser breaches its obligation to purchase the Project pursuant to this Agreement, and after receipt of any applicable notice and a five (5) day opportunity to cure, then Seller shall have the right, as its sole and exclusive remedy, to terminate this Agreement by giving Purchaser and the Escrow Agent written notice thereof and, upon receipt of such notice the Escrow Agent shall deliver the Deposit to Seller which shall retain the same as liquidated damages. Seller shall not be required to give Purchaser notice of failure to close, on the date provided in this Agreement and Purchaser shall not have any five (5) day grace period therefor. Seller and Purchaser acknowledge that the amount of damages resulting from a breach of this Agreement by Purchaser would be difficult or impossible to accurately ascertain and that Seller's damages would, in any event, be substantial and would exceed the Deposit. Upon Seller's receipt of the Deposit,

this Agreement shall wholly cease and terminate, no party to this Agreement shall have any further claim, agreement, or obligation to any other party to this Agreement, and any lien of Purchaser against the Project shall automatically cease, terminate and be released.

9.2 If the sale contemplated by this Agreement is not consummated because of Seller's failure to perform its obligations hereunder, Purchaser shall be entitled, as its exclusive remedy, to elect after notice to Seller and a five (5) day opportunity to cure either (a) to terminate this Agreement and have the Deposit returned to it or (b) to enforce specific performance of Seller's obligations under this Agreement. Purchaser shall not be required to give Seller notice of failure to close, on the date provided in this Agreement and Seller shall not have any five (5) day grace period therefor.

9.3 The non-breaching party shall also be entitled to recover against the breaching party its costs and expenses, including reasonable attorneys' fees and court costs, incurred by such non-breaching party in enforcing any of the remedies hereunder, as determined by a court of competent jurisdiction in Texas.

## ARTICLE 10: DAMAGE, DESTRUCTION OR CONDEMNATION

10.1 Seller agrees to maintain its present policies of casualty insurance covering the Project in full force and effect from the date of this Agreement through and including the Closing Date.

10.2 If either a substantial part of the improvements on the Land is damaged or destroyed or any part of the Property is taken by condemnation or other power of eminent domain then Purchaser shall have the right to terminate this Agreement based upon such damage, destruction or taking. If Purchaser does not terminate this Agreement as aforesaid, then on the Closing Date:

(i) The Purchase Price shall not be reduced, but Seller shall credit the Purchase Price with an amount equal to any sums of money collected by Seller under its policies of casualty insurance or renewals thereof insuring against the loss in question (after deducting any reasonable expenses incurred by Seller in collecting such insurance and any amount that Seller shall have paid or shall be obligated to pay for repairs or restoration of the damage), and Seller shall assign, transfer and set over to Purchaser at Closing all of Seller's right, title and interest in and to its casualty insurance policy or policies with respect to the Property and any further sums payable under said policies, plus the amount of any deductibles; provided that in no event shall the credits and insurance assigned to Purchaser exceed the cost of the unrepaired damage; and

(ii) Seller shall assign, transfer and set over to Purchaser all of Seller's right, title and interest in and to any awards that may be made for any taking by condemnation or other power of eminent domain.

10.3 For the purposes of this Article, a substantial part of the Improvements on the Land shall be deemed to mean a portion having a value of $100,000 or more or which would require expenditure of $100,000 or more for repair or restoration.

## ARTICLE 11: BROKER

11.1 Purchaser represents and warrants to Seller that neither Purchaser nor any entity related to Purchaser has dealt with any broker or other person or entity who would be entitled to a commission, consulting fee or other brokerage fee in connection with the transactions described in this Agreement.

11.2 Seller represents and warrants to Purchaser that neither Seller nor any entity related to Seller has dealt with any broker or other person or entity that would be entitled to a commission, consulting fee, or other brokerage fee in connection with the transactions described in this Agreement.

11.3 Each party agrees to indemnify, defend and hold the other harmless of and from any loss, cost, damage or expense (including reasonable attorneys' fees and court costs) arising out of any inaccuracy in the representation or warranty made by such party in Sections 11.1 and 11.2 above.

11.4 Notwithstanding any other provision of this Agreement to the contrary, the provisions of this Article shall survive the Closing and any prior termination of this Agreement for any reason whatsoever.

## ARTICLE 12: NOTICES

12.1 Any notice given or required to be given pursuant to any provision of this Agreement shall be in writing and shall be personally delivered or sent by facsimile, certified U.S. mail, with return receipt requested, or a reputable commercial courier service guaranteeing overnight delivery, and shall be deemed to have been given upon receipt if personally delivered, or, as the case may be, upon transmittal by facsimile with electronic confirmation of receipt, upon deposit in U.S. mail or upon delivery to such commercial courier, with delivery charges prepaid, if sent by such a courier, in either case addressed as follows:

Seller:

D4IN LLC
13901 Midway Road, Suite 102
Dallas, Texas 75244
Attention: Timothy Barton
Telephone: 972-385-9934
E-mail: TBarton@jmjdevelopment.net

Purchaser:

Southern Properties Capital Ltd.
1603 LBJ Freeway, Suite 800
Dallas, Texas 75234
Attn: Bradley Muth
Phone: 469-522-2366
E-mail:bradley.muth@pillarincome.com

with a copy to: Steptoe & Johnson PLLC
1603 LBJ Freeway, Suite 750
Dallas, Texas 75234
Attn: Jay A. LaJone
Phone: 214-373-2556
E-mail:jay.lajone@steptoe-johnson.com

12.2 (a) Either party may, by giving notice to the other in the manner set forth above, change the address to which notices shall be sent to it, provided that any such change or address shall be effective three (3) days after it is given.

(b) The attorney for each party to this Agreement identified in Article 12.1 may give notices on behalf of his client with the same force and effect as if such notice were given directly by such party.

## ARTICLE 13: ASSIGNMENT

13.1 Purchaser may, without the prior written consent of Seller, but upon providing written notice of such assignment to Seller, assign its rights and interest in this Agreement and the Deposit and Additional Payments to a third party.

## ARTICLE 14: MISCELLANEOUS

14.1 The following matters of general application shall apply to this Agreement and control interpretation notwithstanding any provision apparently to the contrary:

(a) This Agreement is binding upon and shall inure to the benefit of the parties hereto, their respective heirs, successors, legal representatives and permitted assigns.

(b) Wherever under the terms and provisions of this Agreement the time for performance falls upon a Saturday, Sunday or legal holiday in the state where Seller or Purchaser maintains the office reflected in Article 12 hereof, such time for performance shall be extended to the next business day thereafter.

(c) This Agreement may be executed in one or more counterparts, all of which when taken together shall constitute one and the same agreement. Escrow Agent is authorized to attach multiple signature pages to a single conformed original.

(d) The captions at the beginning of the several paragraphs, Sections and Articles are for convenience in locating the context, but are not part of the context. Unless otherwise specifically set forth in this Agreement to the contrary, all references to Exhibits contained in this Agreement refer to the Exhibits which are attached to this Agreement, all of which Exhibits are incorporated in, and made a part of, this Agreement by reference. Unless otherwise specifically set forth in this Agreement to the contrary, all references to Articles, Sections, paragraphs and clauses refer to portions of this Agreement.

(e) If any term or provision of this Agreement shall be held to be illegal, invalid, unenforceable or inoperative as a matter of law, the remaining terms and provisions of this

Agreement shall not be affected thereby, but each such remaining term and provision shall be valid and shall remain in full force and effect.

(f) This Agreement and the other writings referred to in, or delivered pursuant to, this Agreement, embody the entire understanding and contract between the parties hereto with respect to the Project and supersede any and all prior agreements and understandings between the parties hereto, whether written or oral, formal or informal, with respect to the subject matter of this Agreement. This Agreement has been entered into after full investigation by each party and its professional advisors, and neither party is relying upon any statement, representation or warranty made by or on behalf of the other which is not expressly set forth in this Agreement.

(g) No extensions, changes, waivers, modifications or amendments to or of this Agreement, of any kind whatsoever, shall be made or claimed by Seller or Purchaser, and no notices of any extension, change, waiver, modification or amendment made or claimed by Seller or Purchaser shall have any force or effect whatsoever, unless the same is contained in writing and is fully executed by the party against whom such matter is asserted.

(h) This Agreement shall be governed and interpreted in accordance with the laws of the State where the Property is located.

(i) Each party hereto shall pay all charges specified to be paid by them pursuant to the provisions of this Agreement and their own attorney's fees in connection with the negotiation, drafting and closing of this Agreement.

(j) Purchaser and Seller agree that this Agreement has been entered into solely for the benefit of Purchaser and Seller and no other person or entity, it being the intention of Purchaser and Seller that no person or entity not a party to this Agreement shall have any right or standing to (a) bring any action against Purchaser or Seller based on this Agreement, or (b) assume that any provision of this Agreement will be enforced or remain unmodified or unwaived, or (c) assert that it or he is or should be or was intended to be a beneficiary or any provision of this Agreement.

(k) The parties agree that any actions taken or documents (including this Agreement) signed by any trustee, officer, or director of Seller or Purchaser are undertaken in their fiduciary capacity and no recourse shall be had to the personal assets of any such trustee, officer, or director for enforcement of this Agreement.

(l) Wherever a time is set forth for performance or notice in this Agreement, time shall be of the essence unless explicitly stated to be otherwise.

(m) Purchaser and Seller agree that the Property will not be actively marketed and the Seller will not enter into negotiations with any other prospective purchasers while this Agreement is in effect or any contract negotiations are pending.

[*Signature page to follow*]

**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be executed in their names by their respective duly authorized representatives as of the day and year first above written.

Seller: **D4IN LLC,**
a Texas limited liability company

By: ______________________________
Timothy Barton, President

Purchaser: **SOUTHERN PROPERTIES CAPITAL LTD.,**
a British Virgin Islands corporation

By: ______________________________
Name: ______________________________
Title: ______________________________

ACKNOWLEDGEMENT OF RECEIPT BY TITLE COMPANY

The undersigned Title Company hereby acknowledges receipt of a fully executed copy of the Agreement on this, the ______ day of ____________________, 20___, and agrees to accept, hold and disburse the Earnest Money Deposit in accordance with the provisions of the Contract. The undersigned acknowledges that it is not a party to this Agreement and that it is executing below solely for the purpose of the foregoing acknowledgment and agreement.

TITLE COMPANY:

Commonwealth Land Title Insurance Company

By: ______________________________
Name: James P. Lazar
Title: Escrow Agent

**EXHIBITS**:

A - Legal Property Description
B - Tenant Notification Letter
C - Current Rent Roll
D - Due Diligence Materials

# EXHIBIT "A"

## LEGAL PROPERTY DESCRIPTION

## EXHIBIT "B"

## TENANT NOTIFICATION LETTER

Dated: ___________, 20___

______________________________
______________________________
______________________________
______________________________

Re: ___________________________________________ ("Property")

Dear ____________________:

As of the date of this letter, ______________________________________, a ___________________________ and the former owner of the Property ("Seller"), transferred title and possession of the Property to ________________________________ ("Purchaser").

Pursuant to the provisions of Section ______ of the Texas ___________, you are hereby notified that Purchaser is responsible for all of the obligations of the landlord under your lease first arising from and after the date hereof. Seller is joining in the execution of this letter to acknowledge the fact that title and possession to the Property and all future responsibilities of the landlord under your lease have been transferred to Purchaser.

From and after the date of this letter, please make all rental checks payable to ___________ __________________________, and deliver same to _____________________________, until otherwise notified in writing.

Sincerely,

**PURCHASER:**

______________________________________,
a ______________________________________

By: ________________________________
Name: ________________________________
Title: ________________________________

**ACKNOWLEDGED:**

**SELLER:**

______________________________,
a ______________________________

By: ______________________________
Name: ______________________________
Title: ______________________________

# EXHIBIT "C"

## CURRENT RENT ROLL

**(see attached)**

**EXHIBIT "D"**

**DUE DILIGENCE MATERIALS**

**(see attached)**

| 1 | | Item | Received | Comments |
|---|---|---|---|---|
| 2 | | | | |
| 3 | | **I. General Information (Title, Survey, Etc.)** | | |
| 4 | 1 | Description of Property: legal description | | |
| 5 | 2 | Mortgage documents (note, deed of trust, etc.) and other liens/deeds on the Property (if applicable). | | |
| 6 | 3 | Title documents | | |
| 7 | 4 | ALTA Survey | | |
| 8 | 5 | As Builts or Building plans (please note if they are located at the property) | | |
| 9 | | **II. Contracts** | | |
| 10 | 6 | Service Contracts: List and copies of service contracts, equipment leases, warranties, vehicles and other agreements relating to the operation of the property, including assignability/cancellation provisions: | | |
| 11 | | Cable | | |
| 12 | | Laundry | | |
| 13 | | Phone | | |
| 14 | | Internet | | |
| 15 | | Landscaping | | |
| 16 | | Trash removal | | |
| 17 | | Pest Control | | |
| 18 | | Termite | | |
| 19 | | Resident Water/Sewer reimbursement billing | | |
| 20 | 7 | Vendor List | | |
| 21 | 8 | Permits & License | | |
| 22 | 9 | Insurance Certificates and Policies and a loss run for the past 3 years | | |
| 23 | 10 | Management Agreement: or leasing agreements | | |
| 24 | 11 | Utility Bills for the Property for the 2 most recent months | | |
| 25 | 12 | Warranties/guarantees: with respect to any part of the property or any mechanical equipment in, on or about the property; including but not limited to termites, roofs, laundry equipment, and pool | | |
| 26 | | **III. Financial Information** | | |
| 27 | 13 | Detail Operating Statements: Current month & past three calendar years, to include a current 12 month rolling report. Audited financials if a HUD deal - three years | | |
| 28 | 14 | Capital Expenditures: Past three years, detailed with dollar amounts | | |
| 29 | 15 | Current Budget | | |
| 30 | 16 | Rent Roll: tenants' unit number, square feet, lease beginning/ending dates, base rent per unit, free rent/rent abatement, security deposit. In Excel the 1st month. | | |
| 31 | 17 | Current Lease form with addendums - leases to be available for inspection at site visit | | |
| 32 | 18 | Bank Statements & Reconciliations: last 3 months for property | | |
| 33 | 19 | Accounts payable/aging list - will need to be updated immediately prior to closing | | |
| 34 | 20 | Aged delinquency & prepaid reports - will need updated immediately prior to | | |
| 35 | 21 | All Units report in Excel | | |
| 36 | 22 | Rentable Items report | | |

| | | Item | Received | Comments |
|---|---|---|---|---|
| 1 | | **Item** | **Received** | **Comments** |
| 2 | | | | |
| 3 | | **I. General Information (Title, Survey, Etc.)** | | |
| 4 | 1 | Description of Property: legal description | | |
| 5 | 2 | Mortgage documents (note, deed of trust, etc.) and other liens/deeds on the Property (if applicable). | | |
| 6 | 3 | Title documents | | |
| 7 | 4 | ALTA Survey | | |
| 8 | 5 | As Builts or Building plans (please note if they are located at the property) | | |
| 9 | | **II. Contracts** | | |
| 10 | 6 | Service Contracts: List and copies of service contracts, equipment leases, warranties, vehicles and other agreements relating to the operation of the property, including assignability/cancellation provisions: | | |
| 11 | | Cable | | |
| 12 | | Laundry | | |
| 13 | | Phone | | |
| 14 | | Internet | | |
| 15 | | Landscaping | | |
| 16 | | Trash removal | | |
| 17 | | Pest Control | | |
| 18 | | Termite | | |
| 19 | | Resident Water/Sewer reimbursement billing | | |
| 20 | 7 | Vendor List | | |
| 21 | 8 | Permits & License | | |
| 22 | 9 | Insurance Certificates and Policies and a loss run for the past 3 years | | |
| 23 | 10 | Management Agreement: or leasing agreements | | |
| 24 | 11 | Utility Bills for the Property for the 2 most recent months | | |
| 25 | 12 | Warranties/guarantees: with respect to any part of the property or any mechanical equipment in, on or about the property; including but not limited to termites, roofs, laundry equipment, and pool | | |
| 26 | | **III. Financial Information** | | |
| 27 | 13 | Detail Operating Statements: Current month & past three calendar years, to include a current 12 month rolling report. Audited financials if a HUD deal - three years | | |
| 28 | 14 | Capital Expenditures: Past three years, detailed with dollar amounts | | |
| 29 | 15 | Current Budget | | |
| 30 | 16 | Rent Roll: tenants' unit number, square feet, lease beginning/ending dates, base rent per unit, free rent/rent abatement, security deposit. In Excel the 1st month. | | |
| 31 | 17 | Current Lease form with addendums - leases to be available for inspection at site visit | | |
| 32 | 18 | Bank Statements & Reconciliations: last 3 months for property | | |
| 33 | 19 | Accounts payable/aging list - will need to be updated immediately prior to closing | | |
| 34 | 20 | Aged delinquency & prepaid reports - will need updated immediately prior to | | |
| 35 | 21 | All Units report in Excel | | |
| 36 | 22 | Rentable Items report | | |

# EXHIBIT E

Declaration of Bradley Muth in Support of Southern Properties Capital, Ltd.'s Motion for Intervention, dated March 10, 2023 (Dkt. 179, Appendix Vol. I, App. 2–22), including Appendix Index.

*Source: Docket, SEC v. Barton, No. 3:22-cv-02118-X (N.D. Tex.).*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | § | |
| *Plaintiff,* | § | |
| v. | § | **CASE NO. 3:22-cv-2118-X** |
| **TIMOTHY BARTON ET AL.,** | § | |
| *Defendants,* | § | |
| **DJD LAND PARTNERS, LLC, and LDG001, LLC,** | § | |
| *Relief Defendants.* | § | |

**APPENDIX VOLUME I**

**APPS. 2-107**

**IN SUPPORT OF SOUTHERN PROPERTIES CAPITAL, LTD.'S MOTION FOR INTERVENTION, OPPOSITION TO RECEIVER'S VERIFIED MOTIONS FOR APPOINTMENT OF APPRAISER, APPROVAL OF APPRAISERS, APPROVAL OF HEARINGS AND APPROVAL OF SALES AND BRIEF IN SUPPORT OF COMPLAINT FOR DECLARATORY RELIEF WITH RESPECT TO PARC AT WINDMILL FARMS AND BELLWETHER RIDGE**


| Ex. No. | Title | App. No. |
|---|---|---|
| Ex. A | Declaration of Bradley Muth | App. 2-22 |
| Ex. 1 | Promissory Note | App. 24-36 |
| Ex. 2 | Deed of Trust | App. 38-90 |
| Ex. 3 | Windmill Letter Loan Agreement | App. 92-94 |
| Ex. 4 | Windmill Note | App. 96-107 |

Case 3:22-cv-02118-X Document 93-19 Filed 09/17/23 Page 27 of 109 PageID 6416

**RESPECTFULLY SUBMITTED BY:**

/s/ *C. Gregory Shamoun*
**C. GREGORY SHAMOUN**
State Bar No. 18089650
Email: g@snlegal.com
**BRIAN K. NORMAN**
State Bar No. 00797161
Email: bkn@snlegal.com
**J. BLAIR NORRIS**
State Bar No. 24014515
Email: bn@snlegal.com
**SHAMOUN & NORMAN, LLP**
1800 Valley View Lane, Suite 200
Farmers Branch, Texas 75234
Telephone (214) 987-1745
Facsimile: (214) 521-9033

**ATTORNEYS FOR SOUTHERN PROPERTIES CAPITAL, LTD.**

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that, on March 10, 2023, a true and correct copy of the foregoing document was served upon all counsel of record through the Court's CM/ECF system:

**C. Gregory Shamoun**
State Bar No. 18089650
Email: g@snlegal.com
**Brian K. Norman**
State Bar No. 00797161
Email: bkn@snlegal.com
**J. BLAIR NORRIS**
State Bar No. 24014515
Email: bn@snlegal.com
**SHAMOUN & NORMAN, LLP**
1800 Valley View Lane, Ste 200
Farmers Branch, TX 75234

_____ FACSIMILE
_____ CERTIFIED MAIL, RRR
_____ U.S. FIRST CLASS MAIL
_____ HAND DELIVERY
_X_ ELECTRONIC TRANSMISSION

/s/ *C. Gregory Shamoun*
**C. GREGORY SHAMOUN**

# EXHIBIT A

Case 3:22-cv-02118-X Document 179 Filed 03/10/23 Page 4 of 109 PageID 4686

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | **CASE NO. 3:22-cv-2118-X** |
| | § | |
| **TIMOTHY BARTON ET AL.,** | § | |
| | § | |
| *Defendants,* | § | |
| | § | |
| **DJD LAND PARTNERS, LLC, and LDG001, LLC,** | § | |
| | § | |
| *Relief Defendants.* | § | |

**DECLARATION OF BRADLEY MUTH IN SUPPORT OF SOUTHERN PROPERTIES CAPITAL, LTD.'S MOTION FOR INTERVENTION, OPPOSITION TO RECEIVER'S VERIFIED MOTIONS FOR APPOINTMENT OF APPRAISER, APPROVAL OF APPRAISERS, APPROVAL OF HEARINGS AND APPROVAL OF SALES AND BRIEF IN SUPPORT OF COMPLAINT FOR DECLARATORY RELIEF WITH RESPECT TO PARC AT WINDMILL FARMS AND BELLWETHER RIDGE**

"My name is Bradley Muth, I am over the age of twenty-one (21), have never been convicted of a felony or a crime involving moral turpitude, and am fully competent to testify in all respects. I have personal knowledge of all facts set forth herein.

1. I am a real estate executive with over 30 years of experience in development, acquisitions, finance, asset management, and portfolio management. I am the President and Chief Executive Officer of Pillar Income Asset Management ("Pillar"), Transcontinental Realty Investors, Inc. ("TCI"), and American Realty Investors, Inc. ("ARI"). Pillar, TCI, and ARI are national real estate companies publicly traded on the New York Stock Exchange that specialize in the acquisition, development, and management of multifamily and commercial real estate. The

Case 3:22-cv-02118-X Document 179 Filed 08/10/23 Page 5 of 109 PageID 4687

companies also develop raw land for single family home communities. The companies operate a portfolio of hundreds of properties, tens of thousands of multifamily units, and thousands of raw land holdings. I oversee all aspects of investment and operations for the above companies, including Southern Properties Capital, Ltd. ("SPC"). TCI is the 100% passive owner of SPC. When TCI and SPC are stated to perform functions, in certain situations its affiliate Pillar is the effective manager carrying out the functions.

2. Prior to joining Pillar, TCI, and ARI, I served as Senior Managing Director at ValueRock Realty Partners in California, where I was a member of the firm's Executive and Investment Committees with execution oversight of all development, including ground up and redevelopment activities. Prior to ValueRock, I spent the majority of my career with ING Realty Partners as partner and Managing Principal. In my career, I have overseen the acquisition, development, and portfolio management of over $8 billion in real estate investments, including over 20,000 apartment units across the United States.

**Summary of Business Model**

3. To provide context, TCI and its affiliates, such as SPC, are in the business of building and managing properties, including multifamily residential projects. One of the business models TCI uses when building properties is to outsource the developer role. There are many business advantages to outsourcing the developer role. For example, by outsourcing the developer role, TCI can operate a leaner corporate structure by reducing personnel and associated expenses, such as payroll and benefits. Another advantage is that TCI can delegate to the outside developer certain responsibilities rather than performing them internally. Responsibilities that TCI can delegate to the developer include negotiating the acquisition of the real property, pursuing zoning, obtaining mortgage financing, and setting up processes. Under TCI's business model, TCI pays

the developer a developer's fee for these services. The developer does not invest or contribute its own money in the project. Once the project is complete and ready for use, the developer transfers the project to TCI or an affiliate. Under this business model, TCI and the developer intend that TCI or an affiliate will subsequently own and manage the project.

4. TCI has used this business model of outsourcing the developer on a number of projects. TCI has outsourced the developer role to a number of developers, including Timothy Barton ("Barton"). SPC outsourced the developer role to Barton on projects known as Parc at Windmill Farms (Forney) ("Parc at Windmill Farms" or "Parc at Windmill Project") and Bellwether Ridge (DeSoto) ("Bellwether" or "Bellwether Project") (collectively, the "SPC Projects").

5. As discussed in more detail below, the SPC Projects followed the similar business model, which was that SPC was effectively the primary responsible party and simply outsourced the developer role to Barton, SPC paid Barton a developer fee, Barton obtained HUD mortgage financing, pursued zoning, and provided other developer services. SPC provided the land, funded all of the equity, and managed the construction and operations of the projects. At all times, it was contemplated that after the development stage, Barton would transfer ownership to SPC, who would continue with ownership and management of the properties.

6. It is important that for the SPC Projects SPC was not merely a passive lender. Rather, SPC identified land sites; oversaw and managed entitlement efforts; controlled and funded planning and design efforts; assembled and maintained required documents for the land development projects; managed and approved the construction process; provided certificates of deposit and cash collateral to obtain Letters of Credit; Funded change orders and costs overruns; and managed the operations and leasing of properties.

7. As I describe below, TCI's and SPC's financial statements issued during development of the projects evidence the indicia of future ownership from an accounting perspective. The equity financing mechanism that SPC used on the projects was a mezzanine loan in the form of a convertible loan, pursuant to which SPC could, and expected to exercise the option of converting the loan to 100% equity in the project. The low interest rate, 5%, evidences that the conversion feature was part of the consideration SPC bargained for, especially since this capital was contributed to the highest risk tranche of the project's capitalization. This rate is below typical construction loans with a 60% to 70% loan-to-value (LTV) and far below the market required return-on-investment (ROI) on equity funding. Importantly, the mezzanine loans are secured by a pledge of stock, as described below, and perfected by the filing of UCC financing statements.

8. On October 3, 2022, SPC sent letters exercising its option to convert its loan to equity with respect to Parc at Windmill Farms and Bellwether. Although SPC's exercise remains subject to certain, what I believe to be ministerial, conditions, SPC exercised its option for its ownership right in the SPC Projects.

**Parc at Windmill Farms**

9. SPC exercised its option to own the apartment complex property known as Parc at Windmill Farms. Parc at Windmill Farms is located in Forney, Texas. It consists of 17 residential buildings and two clubhouses. The residential buildings total 272 units and have total rentable area of approximately 280,000 square feet.

**A. HUD holds the Mortgage Loan on Parc at Windmill Farms**

10. As mentioned, on Parc at Windmill Farms, SPC outsourced the developer role to Barton. Barton used as developer one of his companies, JMJ Development, LLC ("JMJ"). To

obtain a mortgage loan for Parc at Windmill Farms, Barton used as borrower his company D4FR, LLC, a Texas limited liability company ("D4FR"). D4FR obtained the mortgage loan from the United States Department of Housing and Urban Development ("HUD"). On or about August 25, 2017, D4FR applied for the HUD loan. HUD approved D4FR's application. HUD agreed to provide for Greystone Servicing Corporation, Inc. ("Greystone"), to make the loan and administer to D4FR. The loan was for the principal amount of $36,540,600.00.

11. Following the commitment from HUD, D4FR executed additional HUD loan documents on or about December 1, 2017, including a Borrower's Oath, Promissory Note, and Deed of Trust. True and correct copies of the Promissory Note and Deed of Trust are attached as **Exhibit 1** and **Exhibit 2.**

**B. SPC's Mezzanine Loan on Parc at Windmill Farms**

12. SPC provided the equity capital to fund the remaining amount necessary for the construction of Parc at Windmill Farms. SPC made a convertible loan to JMJ. SPC and JMJ entered into a Letter Loan Agreement dated December 14, 2017 (the "Windmill Letter Loan Agreement"). A copy of the Windmill Letter Loan Agreement is attached as **Exhibit 3.** It provided that JMJ shall execute and deliver a Promissory Note. JMJ, as borrower, executed a promissory note in favor of SPC, as lender, in the principal amount of $7,300,000.00 (the "Windmill Note"). A copy of the Windmill Note is attached as **Exhibit 4.**

13. JMJ provided to SPC security for the Windmill Note by assigning to SPC all of JMJ's right, title and interest in the membership interests of D4FR's parent company, JMJD4, LLC ("JMJD4"). Specifically: TWRF, LLC ("TWRF") holds a 100% membership interest in JMJAV, LLC ("JMJAV"). In turn, JMJAV holds a 1% membership interest in JMJD4, and Enoch Investments, LLC ("Enoch") holds the remaining 99% membership interest in JMJD4. TWRF,

Case 3:22-cv-02118-X Document 179 Filed 03/10/23 Page 9 of 109 PageID 4691

JMJAV and Enoch each executed Amended and Restated Pledge and Security Agreements pledging to JMJ all of the member interests in JMJAV and JMJD4 (collectively, "Windmill Amended and Restated Pledge and Security Agreements"). Copies of the Windmill Amended and Restated Pledge and Security Agreements are attached as **Exhibit 5, Exhibit 6** and **Exhibit 7.** As a result, TRWF, JMJAV and Enoch pledged to JMJ 100%of the member interests in JMJAV and JMJD4, which JMJ assigned to SPC.

14. JMJ signed the Assignment of Pledge and Security Agreement ("Windmill Assignment"). A copy of the Windmill Assignment is attached as **Exhibit 8.** As a result, all of the equity interest in D4FR's parent company, JMJD4, was pledged to SPC (the "Windmill Collateral" or "Windmill Pledged Equity"). Importantly, the Windmill Assignment granted SPC the right to convert the loan to equity, discussed immediately below.

15. Each of the Windmill Amended and Restated Pledge and Security Agreements includes Section 7.15, titled "Conversion Option." Section 7.15 provides a mechanism for SPC to exercise an option to acquire the Windmill Pledged Equity. Section 7.15 states in relevant part:

> Upon thirty (30) days' notice (the "Exercise Notice"), Lender shall be entitled to exercise an option to acquire the Collateral from Pledgor for the consideration of $100.00.

16. The Windmill Letter Loan Agreement and Windmill Promissory Note were amended several times as follows:

a. On October 1, 2019, JMJ and SPC signed the First Amendment to Promissory Note adding new requirements for asset management and fees. However, on the same day, JMJ and SPC rescinded this amendment in its entirety. Copies of the Amendment and Rescission are attached as **Exhibit 9** and **Exhibit 10.**

b. On October 25, 2019, JMJ and SPC signed a First Amendment to the Letter Loan Agreement increasing the prior loan of $7,300,000.00 to $8,300,000.00. A copy of the First Amendment is attached as **Exhibit 11.** They executed a Second Amendment to Promissory Note, to update the loan amount. A copy of the Second Amendment is attached as **Exhibit 12.** They executed a First Amendment to each Pledge and Security Agreement to amend the term "Loan" to refer to increased amount. Copies of the First Amendments are attached as **Exhibit 13.**

c. On May 1, 2020, JMJ and SPC executed the Third Amendment to Promissory Note to extend the maturity date of the loan to November 1, 2020. A copy of the Third Amendment is attached as **Exhibit 14.**

d. On November 1, 2020, JMJ and SPC executed the Fourth Amendment to Promissory Note to extend the maturity date to November 1, 2022. A copy of the Fourth Amendment is attached as **Exhibit 15.**

e. On May 31, 2021, JMJ and SPC signed the Second Amendment to Letter Loan Agreement changing the default provision to provide that an "Event of Default" includes any default under the development agreement. A copy of the Second Amendment is attached as **Exhibit 16.**

17. On May 13 and 14, 2020, multiple UCC financing statements were filed securing SPC's interest in the membership interests. They were as follows:

- Texas UCC Financing Statement, Filing # 20-0017679567 (Enoch)
- Delaware UCC Financing Statement, Filing # 20203378223 (TRWF)
- Texas UCC Financing Statement, Filing # 20-0017975172 (JMJAV)

- Texas UCC Financing Statement, Filing # 20-0017974808 (JMJAV)

- Delaware UCC Financing Statement, Filing # 20203407113 (JMJD4)

Copies of the Financing Statements are attached as **Exhibit 17, Exhibit 18, Exhibit 19, Exhibit 20** and **Exhibit 21.**

### C. SPC Exercises its Option to Convert its Loan to Equity

18. SPC exercised its option set forth in the Windmill Amended Pledge and Security Agreements. The option allowed SPC to acquire the equity from D4FR for the consideration of $100.00. SPC exercised its option, thereby converting the loan to an ownership interest to acquire the equity.

19. On October 3, 2022, SPC sent a letter exercising its conversion option to Enoch, TRWF, JMJAV, D4FR, and JMJ ("Windmill Exercise Letter"). A copy of the Exercise Letter is attached as **Exhibit 22.** The Windmill Exercise Letter stated that SPC "hereby exercises its option to acquire all interest of the addresses [sic] above in the Project known as Parc at Windmill Farms, Forney, Texas." SPC attached to the Windmill Exercise Letter a form of "Agreement for Purchase and Sale" to complete the transfer of the Parc at Windmill Project from D4FR to SPC, once HUD consented to the transfer. A copy of the form of Agreement is attached to **Exhibit 22.** SPC also attached a check for $100.00 as required consideration. A copy of the check is attached to **Exhibit 22.** The letter was delivered on October 4, 2022 at 8:16 am. A copy of the confirmation of receipt is attached as **Exhibit 23.**

20. After learning that a Receiver had been appointed, SPC notified the Receiver of SPC's ownership rights with respect to Parc at Windmill Farms. On November 3, 2022, SPC sent a letter to the Receiver providing him with a description and copies of: (i) the Windmill Exercise

Letter; (ii) the Windmill Amended and Restated Pledge and Security Agreements; (iii) the Windmill Assignment; (iv) the Windmill Note; and (v) the Windmill Letter Loan Agreement and amendments. SPC also provided the Receiver with a description of the HUD loan documents. A copy of the November 3, 2022 letter is attached as **Exhibit 24.**

21. Importantly, SPC's November 3, 2022 letter gave notice to the Receiver of the grounds for SPC's right to convert its interest to an ownership interest and the procedure for doing so. SPC wrote:

> The terms of the [HUD] Mortgage Documents allow for an assumption of the loan, subject to the approval of Greystone and HUD. Section 7.15 of the [Windmill Amended and Restatement Pledge Agreements] provides the mechanism under which the Mezzanine Loan can be converted to an ownership interest. Upon Lender's exercise, the Pledges contemplate that the Parties will make application to Greystone and HUD for consent to a Transfer of Physical Assets ("TPA"). To initiate this process, a signed agreement for such a purchase must be submitted with the signed TPA application.

**Bellwether Ridge Project**

22. SPC exercised its option to own the apartment complex property known as the Bellwether Ridge Apartments ("Bellwether" or "Bellwether Project"). Bellwether is located in Desoto, Texas. It consists of nine residential buildings and one clubhouse. The residential buildings total 150 units with a total rentable area of 140,511 square feet.

**A. HUD holds the Mortgage Loan on Bellwether**

23. Similar to Parc at Windmill Farms, SPC outsourced the developer role to Barton for the Bellwether Project. Barton used JMJ as developer. To obtain a mortgage loan for Bellwether, Barton used as the borrower his company, D4DS, LLC, a Texas limited liability company ("D4DS"). D4DS obtained a HUD loan. HUD agreed to provide the loan to Greystone, to administer to D4DS. The loan was for the principal amount of $19,021,200.00.

24. To finalize the loan, D4DS executed HUD loan documents on or about October 1, 2017, including a Promissory Note and Deed of Trust. Copies of the Promissory Note and Deed of Trust are attached as **Exhibit 25** and **Exhibit 26.** The Loan was modified to reduce the principal amount to $18,608,100.00.

**B. SPC's Mezzanine Loan on Bellwether**

25. SPC provided the Bellwether Project with equity financing to fund the construction of the Bellwether Project in the form of a convertible loan. JMJ, as borrower, executed a note in favor of SPC, as lender, in the principal amount of $3,800,000.00 (the "Bellwether Note"). A copy of the Bellwether Note is attached as **Exhibit 27.**

26. Similar to Parc at Windmill Farms, JMJ provided to SPC security for the Bellwether Note by assigning to SPC all of JMJ's right, title and interest in the membership interests of D4DS's parent company, JMJD4. Specifically: TWRF holds a 100% membership interest in JMJAV. In turn, JMJAV holds a 1% membership interest in JMJD4, and Enoch holds the remaining 99% membership interest in JMJD4. TWRF, JMJAV and Enoch each executed Amended and Restated Pledge and Security Agreements pledging to JMJ all of the member interests in JMJAV and JMJD4 (collectively, "Bellwether Amended and Restated Pledge and Security Agreements"). Copies of the Bellwether Amended and Restated Pledge and Security Agreements are attached as **Exhibits 28, Exhibit 29** and **Exhibit 30.** As a result, TRWF, JMJAV and Enoch pledged to JMJ 100% of the member interests in JMJAV and JMJD4, which JMJ assigned to SPC.

27. JMJ signed an Assignment of Pledge and Security Agreement ("Bellwether Assignment"). A copy of the Bellwether Assignment is attached as **Exhibit 31.** As a result, all of the equity interest in D4DS's parent company, JMJD4, was pledged to SPC (the "Bellwether

Case 3:22-cv-02118-X Document 179 Filed 03/10/23 Page 14 of 103 PageID 4696

Collateral" or "Bellwether Pledged Equity"). Importantly, the Bellwether Assignment granted SPC the right to convert the loan to equity, discussed immediately below.

28. Each of the Bellwether Amended and Restated Pledge and Security Agreements also included Section 7.15's "Conversion Option," granting SPC an option to acquire either the Bellwether Pledged Equity or the Bellwether Project for consideration of $100.00.

29. On May 13 and 14, 2020, multiple UCC financing statements were filed. They were as follows:

- Texas UCC Financing Statement, Filing # 20-0017679567 (Enoch)
- Delaware UCC Financing Statement, Filing # 20203378223 (TRWF)
- Texas UCC Financing Statement, Filing # 20-0017975172 (JMJAV)
- Texas UCC Financing Statement, Filing # 20-0017192082 (JMJAV)
- Delaware UCC Financing Statement, Filing # 20203275759 (JMJD4)

True and correct copies of the Financing Statements are attached as **Exhibit 32, Exhibit 33, Exhibit 34, Exhibit 35** and **Exhibit 36.**

30. The following year, on July 6, 2021, pursuant to the Agreement for Purchase and Sale, D4DS agreed to sell Bellwether to SPC affiliate APTS at Bellwether Ridge, LLC ("APTS"). Additionally, the agreement stated that if SPC decided to exercise the Conversion Option, APTS will now be the entity that receives the $100.00 consideration. A copy of the Agreement for Purchase and Sale is attached as **Exhibit 37.**

**C. SPC Exercises its Option to Convert its Loan to Equity.**

Case 3:22-cv-02118-X Document 179 Filed 03/10/23 Page 15 of 109 PageID 4697

31. SPC exercised its option set forth in the Bellwether Amended Pledge and Security Agreements. The option allowed SPC to acquire the equity for the consideration of $100.00. SPC exercised its option, thereby converting the loan to an ownership interest to acquire the equity.

32. On October 3, 2022, SPC sent a letter exercising its conversion option to Enoch, TRWF, JMJAV, JMJD4, D4DS, and JMJ ("Bellwether Exercise Letter"). A copy of the Bellwether Exercise Letter is attached as **Exhibit 38.** The Bellwether Exercise Letter stated that SPC "hereby exercises its option to acquire all interest of the addresses [sic] above in the Project known as Bellwether Ridge, DeSoto, Texas." SPC attached to the Bellwether Exercise Letter a "First Amendment to the Purchase and Sale Agreement" to complete the transfer of the Bellwether Project from APTS to SPC, once HUD consented to the transfer. The First Amendment extended the Financing Contingency Period to March 31, 2023, due to HUD taking longer than expected to approve. A copy of the amendment is attached to **Exhibit 38.** SPC also attached a check for $100.00 as required consideration, which is also attached to **Exhibit 38.** The letter was delivered at 8:16 a.m. on October 4, 2022. A copy of the receipt of confirmation is attached as **Exhibit 39.**

33. After learning that a Receiver had been appointed, SPC notified the Receiver of SPC's ownership rights with respect to Bellwether. On November 3, 2022, SPC sent a letter to the Receiver providing him with a description and copies of: (i) the Bellwether Exercise Letter; (ii) the Bellwether Amended and Restated Pledge and Security Agreements; (iii) the Bellwether Assignment; (iv) the Bellwether Note; and (v) the Bellwether Letter Loan Agreement. SPC also provided the Receiver with a description of the HUD loan documents. A copy of the November 3, 2022 Letter is attached as **Exhibit 40.**

34. Importantly, SPC's November 3, 2022 letter gave notice to the Receiver of the grounds for SPC's right to convert its interest to an ownership interest and the procedure for doing so. SPC wrote:

> The terms of the [HUD] Mortgage Documents allow for an assumption of the loan, subject to the approval of Greystone and HUD. Section 7.15 of the [Bellwether Amended and Restatement Pledge Agreements] provides the mechanism under which the Mezzanine Loan can be converted to an ownership interest. Upon Lender's exercise, the Pledges contemplate that the Parties will make application to Greystone and HUD for consent to a Transfer of Physical Assets ("TPA"). To initiate this process, a signed agreement for such a purchase must be submitted with the signed TPA application.

**Convertible Debt**

35. It is helpful to explain convertible debt. With convertible debt, an entity borrows money from a lender, like a typical loan. Unlike a typical loan, however, convertible debt allows the debt to be converted to equity at a later date. This is because the lender will typically offer the loan at a lower rate since the lender can later obtain equity in the company. A debtor sometimes agrees to take on convertible debt if the debtor planned to only temporarily hold the asset, which is what happened here.

36. For example, Company A borrows money from Bank B. Under the agreement, Bank B obtains the right to convert the debt into 100% company equity. Subsequently, Bank B exercises its right. Because of Bank's B exercise, Bank B now owns 100% of Company A. Company A, conversely, no longer owes money to Bank B.

37. In this case, SPC extended convertible debt relating to the SPC Projects. This meant that SPC had the right to convert the debt into 100% equity ownership of the SPC Projects. This right was an integral part of the bargain at the time the convertible loans were made (and long before the Receiver was appointed). SPC converted the debt into equity and is now the 100%

equity owner of Bellwether and Parc at Windmill Farms. Functionally, this is different from a traditional loan. The convertible loan carried an interest rate of 5%, which was much lower than the market capped rate of upwards to at least 10% to 15% or more one would expect at the time of the loans, taking into account the nature of the risk of a mezzanine loan of all equity)..

38. Classifying SPC's interests in the SPC Projects as solely "loans" is inaccurate because it does not provide full context. As shown by the TCI and SPC accounting records, discussed below, SPC effectively treated the properties as investments because it intended on exercising its exclusive right to convert its debt to 100% equity.

**Parc at Windmill Farms and Bellwether were SPC's Investments, not Loans**

39. Attached to my Declaration as **Exhibit 41** is a copy of SPC's "Audited Consolidated Financial Statements" as of December 31, 2021 ("SPC 2021 Financial Statements"). Attached to my Declaration as **Exhibit 42** is a copy of SPC's "Interim Unaudited Consolidated Financial Statements" as of September 30, 2022 ("SPC Interim 2022 Financial Statements"). These financial statements address Parc at Windmill Farms and Bellwether. The SPC financial statements show that SPC considered Parc at Windmill Farms and Bellwether to effectively be ownership investments, not merely loans.

40. Before explaining further, some context is crucial. SPC is listed on the Tel Aviv Stock Exchange, not the New York Stock Exchange. Because of this, SPC's financial statements are based on International Financial Reporting Standards ("IFRS"). IFRS uses fair market value instead of historical cost, which is used in the United States. With this in mind, an analysis of SPC's financial statements can be better understood.

41. To start, Note 10 in the SPC 2021 Financial Statements is titled, "Notes Receivable." Ex. 41 at p. 30. The table, shown below, includes Parc at Windmill Farms and

Bellwether:

| Borrower / Project | Carrying Value 2021 | Carrying Value 2020 | Interest Rate | Maturity Date |
|---|---|---|---|---|
| Autumn Breeze(1) | $ 10,365 | $ 4,854 | 5.00 % | 7/1/22 |
| Bellwether Ridge(1)(2) | 12,308 | 5,898 | 5.00 % | 11/1/26 |
| Forest Pines(1) | 9,404 | 2,294 | 5.00 % | 11/1/22 |
| Parc at Ingleside(1) | 2,426 | 2,422 | 5.00 % | 11/1/26 |
| Parc at Opelika(1)(3) | 1,363 | — | 10.00 % | 1/13/23 |
| Parc at Windmill Farms(1) | 18,819 | 10,770 | 5.00 % | 11/1/22 |
| Plum Tree(1) | 1,979 | 1,113 | 5.00 % | 4/26/26 |
| RNC Portfolio, Inc.(4) | — | 9,430 | 5.00 % | 9/1/24 |
| Spyglass of Ennis(1)(5) | 9,488 | 4,680 | 5.00 % | 11/1/22 |
| Steeple Crest(1) | 13,355 | 6,389 | 5.00 % | 8/1/26 |
| | $ 79,507 | $ 47,850 | | |

42. Below the table, the 2021 Financial Statements explain that SPC owns convertible debt in the properties listed in the table, including Parc at Windmill Farms and Bellwether. It states the following:

> "The note is convertible, at our option, into a 100% ownership interest in the underlying development property and is collateralized by the underlying development property." *Id.*

The 2021 Financial Statements add further explanation, stating:

> "The convertible loans are stated at fair value, which has been determined based on valuations performed by independent external valuation experts who hold recognized and relevant professional qualifications and who have experience in the category of the assets being valued." *Id.*

The 2022 Financial Statements mirror this point, adding:

> "The Company accounts for its investment in convertible notes at fair value that is based on third-party appraisals." Ex. 42 at p. 9.

43. Combining the above statements, and the table, make clear that SPC carried the notes receivable for these convertible loans, not at the loan amounts, but at the value of equity based primarily on the appraised value of the properties, as prescribed by IFRS rules, showing that SPC treated the properties in the way SPC would as owner of the properties.

Case 3:22-cv-02118-X Document 179 Filed 03/10/23 Page 19 of 109 PageID 4761

44. First, SPC owned convertible debt "into a 100% ownership interest" in both properties. Ex. 41 at p. 30. This is different from a typical loan because SPC could, "at its option," obtain 100% ownership interest in both properties. *Id.* SPC did just that on October 3, 2022 when it exercised its option to acquire 100% equity interest in Parc at Windmill Farms and Bellwether.

45. Second, SPC explains that it had the properties valued by "independent external valuation experts" or "third-party appraisals." *Id.;* Ex. 42 at p. 9. If these were simply loans, SPC would not have gone through the process of having the properties appraised for the purpose of determining their carrying values. Such an action is consistent with ownership because SPC was expending resources to ascertain the properties' values, as opposed to simply waiting for a return on its loan.

46. Importantly, SPC expended resources on the properties in many ways other than paying Barton a developer's fee and reimbursing his expenses. SPC utilized in-house staff and resources to participate in the development of both properties. SPC also performed many services for both properties, including, among others, identifying land sites; overseeing and managing entitlement efforts; controlling and funding planning and design efforts; assembling and maintaining required documents for the land development projects; managing and approving the construction process; providing certificates of deposit and cash collateral to obtain Letters of Credit; funding change orders and costs overruns; and managing the operations and leasing of properties.

47. If these were merely loans, then SPC would not have expended extensive resources into completing the above services for both properties. This is shown in SPC's financial statements, which show that SPC carried the notes receivable for the convertible value of the loans, not at the

stated loan amounts, but at the value of equity based on the appraised value of the properties. This demonstrates that SPC treated the properties as it would if it owned the properties.

**Comparing SPC's Financial Statements with TCI 10Ks**

48. TCI is SPC's parent company. TCI's 10Ks encompass SPC's financial statements. As stated above, TCI is a real estate company that specializes in the acquisition, development, ownership, and management of multifamily and commercial real estate. TCI is a publicly traded company that is listed on the New York Stock Exchange and has public shareholders.

49. Unlike SPC's financial statements, which are based on international standards, TCI's 10Ks are completed in accordance with Generally Accepted Accounting Principles ("GAAP") and U.S. Securities and Exchange Commission ("SEC") regulations. According to the SEC, per Staff Accounting Bulletin No. 104, revenue can only be recognized when collectability is reasonably assured.

50. It is important that TCI did not recognize interest income under SPC's mezzanine loans because of the view that TCI, through SPC, would exercise its right of conversion for ownership. TCI would not be expected to recognize the interest income because when it chose to exercise its conversion rights, as it planned, such interest income would have been forgiven, per the mezzanine loans.

51. This is shown in TCI's 10Ks. In its 10Ks, TCI accrued, but fully reserved, interest income recognition on the convertible loans. Under the SPC mezzanine loans, any uncollected interest income is forgiven in the event of conversion. TCI had the ability and the intent to convert the SPC mezzanine loans into 100% equity interest in Bellwether and Parc at Windmill Farms. TCI, through SPC, exercised its rights. Any interest was forgiven once TCI exercised its

convertible rights. Since TCI planned to exercise its right, it did not recognize interest income on the convertible loans.

52. As mentioned, TCI 10Ks and SPC's financial statements differ due to TCI being listed on the New York Stock Exchange and SPC being listed on the Tel Aviv Stock Exchange. SPC's financial statements are based on fair market value, whereas TCI's are based on historical cost. The difference between these values is shown in the tables below. Compare the difference in value for the properties between SPC's 2021 financial statements (the first table) and TCI's 2021 10Ks (the second table) for each document's "Notes Receivable" section:

| Borrower / Project | Carrying Value 2021 | Carrying Value 2020 | Interest Rate | Maturity Date |
|---|---|---|---|---|
| Autumn Breeze(1) | $ 10,365 | $ 4,854 | 5.00 % | 7/1/22 |
| Bellwether Ridge(1)(2) | 12,308 | 5,898 | 5.00 % | 11/1/26 |
| Forest Pines(1) | 9,404 | 2,294 | 5.00 % | 11/1/22 |
| Parc at Ingleside(1) | 2,426 | 2,422 | 5.00 % | 11/1/26 |
| Parc at Opelika(1)(3) | 1,363 | — | 10.00 % | 1/13/23 |
| Parc at Windmill Farms(1) | 18,819 | 10,770 | 5.00 % | 11/1/22 |
| Plum Tree(1) | 1,979 | 1,113 | 5.00 % | 4/26/26 |
| RNC Portfolio, Inc.(4) | — | 9,430 | 5.00 % | 9/1/24 |
| Spyglass of Ennis(1)(5) | 9,488 | 4,680 | 5.00 % | 11/1/22 |
| Steeple Crest(1) | 13,355 | 6,389 | 5.00 % | 8/1/26 |
| | $ 79,507 | $ 47,850 | | |

| Borrower / Project | Carrying Value 2021 | Carrying Value 2020 | Interest Rate | Maturity Date |
|---|---|---|---|---|
| ABC Land and Development, Inc | $ 4,408 | $ 4,408 | 9.50% | 6/30/2026 |
| ABC Paradise, LLC | 1,210 | 1,210 | 9.50 % | 6/30/2026 |
| Autumn Breeze(1) | 2,486 | 1,867 | 5.00% | 7/1/2022 |
| Bellwether Ridge(1) | 3,967 | 3,858 | 5.00% | 11/1/2026 |
| Forest Pines(1) | 6,472 | 2,869 | 5.00% | 11/1/2022 |
| Lake Wales | 3,000 | 3,000 | 9.50% | 6/30/2026 |
| Legacy Pleasant Grove | 496 | 496 | 12.00 % | 10/23/2022 |
| McKinney Ranch | 4,554 | 4,554 | 6.00% | 9/15/2022 |
| One Realco Land Holding, Inc | 1,728 | 1,728 | 9.50 % | 6/30/2026 |
| Parc at Ingleside(1) | 3,700 | 2,523 | 5.00% | 11/1/2026 |
| Parc at Opelika(1) | 2,305 | — | 10.00% | 1/13/2023 |
| Parc at Windmill Farms(1) | 7,830 | 7,803 | 5.00% | 11/1/2022 |

53. If SPC viewed the properties as mere loans, then it would have listed the properties in accordance with the cost of the loan, not the properties' market value. In other words, if SPC viewed the properties as loans, then the carrying value listed in its financial statements would match the carrying value listed in TCI's 10Ks. Instead, SPC had the properties appraised by independent valuators, an act consistent with ownership of the real estate.

**TCI's 10Ks Also Show that Parc at Windmill Farms is not a Mere Loan**

54. I am aware that the SEC refers to TCI's 10Ks to assert that SPC's interests in Bellwether and Parc at Windmill Farms amounted to loans. This is not accurate when one considers the comprehensive picture. TCI's 10Ks, as far back as 2018, are attached as exhibits to my Declaration. Attached to my Declaration as **Exhibit 43** is the TCI Form 10-K for fiscal year ended December 31, 2021 ("2021 10K"), as **Exhibit 44** is the TCI Form 10-K for fiscal year ended December 31, 2020 ("2020 10K"), as **Exhibit 45** is the TCI Form 10-K for fiscal year ended December 31, 2019 ("2019 10K"), as **Exhibit 46** is the TCI Form 10-K for fiscal year ended December 31, 2018_ ("2018 10K") and as **Exhibit 47** is the TCI Form 10-K for fiscal year ended December 31, 2017_ ("2017 10K").

55. In the attached 2020 10K and 2021 10K, TCI describes its interest in Parc at Windmill Farms not as a loan, but as a "note . . . convertible, at our option, into a 100% ownership interest." Ex 43 at p. 42; Ex. 44 at p. 41. The 2018 10K and 2019 10K provide that TCI "intends to service and hold for investment the mortgage notes in [TCI's] portfolio." Ex. 45 at p. 57; Ex. 46 at p. 48. "Servic[ing] and hold[ing] for investment" a convertible loan is not consistent with a mere loan; it is consistent with property ownership.

56. SPC, which TCI owns, exercised its option on October 3, 2022, when it converted its note for Parc at Windmill Farms into a 100% ownership interest. SPC is now the sole owner of Parc at Windmill Farms.

**TCI's 10Ks also Show that Bellwether is not a Mere Loan**

57. In its 10Ks, TCI always included Bellwether as a "Notes Receivable" or a "Mortgage Loan." In the 10Ks, there is a table listing all notes receivable TCI owns. TCI had

Case 3:22-cv-02118-X Document 1-19 Filed 03/10/23 Page 23 of 103 PageID 4705

convertible debt into 100% ownership interest for all entities included in the table. Bellwether was included in each table. An example of such a table is included below. Ex. 43 at p. 42.

**9. Notes Receivable**

The following table summarizes our notes receivables at December 31, 2021 and 2020:

| Borrower / Project | Carrying Value 2021 | Carrying Value 2020 | Interest Rate | Maturity Date |
|---|---|---|---|---|
| ABC Land and Development, Inc. | $ 4,408 | $ 4,408 | 9.50% | 6/30/2026 |
| ABC Paradise, LLC | 1,210 | 1,210 | 9.50 % | 6/30/2026 |
| Autumn Breeze(1) | 2,486 | 1,867 | 5.00 % | 7/1/2022 |
| Bellwether Ridge(1) | 3,967 | 3,858 | 5.00 % | 11/1/2026 |

Under the table, the 2020 10K and the 2021 10K state, "[t]he note is convertible, at our option, into a 100% ownership interest in the underlying development property, and is collateralized by the underlying development property." Ex. 43 at p. 42; Ex. 44 at p. 41.

58. SPC had the right to convert its loan regarding Bellwether into 100% equity. TCI withheld recognizing interest income concerning Bellwether because it intended to exercise its right to conversion for Bellwether. SPC did not view Bellwether as a mere loan; it viewed Bellwether as an investment property it intended to, and did, fully acquire.

**VAA Joint Venture.**

59. SPC commenced development of Parc at Windmill Farms and Bellwether in 2017. Thereafter, more than a year later, in November 2018, TCI formed a joint venture with Macquarie Group, Ltd. The joint venture was Victory Abode Apartments, LLC ("VAA"). VAA held a large portfolio of real estate properties, including properties financed by HUD. The VAA portfolio resulted in TCI reaching its limitation on HUD financing. On or about September 16, 2022, VAA completed the closing on a sale of substantially all of its real estate properties. The VAA sale resulted in bringing TCI back down under HUD limitations and allowed for SPC to proceed to hold additional HUD-financed properties. It is important that until September 16, 2022, SPC was not able to hold additional HUD-financed properties, and that to comply with HUD regulations,

SPC had to wait until after September 16, 2022 to exercise its option to convert Parc at Windmill Farms and Bellwether to equity and keep the existing HUD debt in place.

**Business Records**

60. I am a custodian of records for SPC, responsible for ensuring that SPC maintains accurate and complete records of its regularly conducted activities. Attached to my Declaration are Exhibits 1 through 47 from SPC. These exhibits were made at or near the time of the events referenced in each exhibit by, or from information transmitted by, someone with knowledge of the facts; were kept by SPC in the course of regularly conducted activity; and were made as part of the regular practice of that activity.

I declare under penalty of perjury that the foregoing is true and correct."

Executed in Dallas County, State of Texas, on the 10th of March 2023.

Brad Muth

BRADLEY MUTH

Case 3:22-cv-01018-X Document 31-19 Filed 03/10/26 Page 25 of 102 PageID 707

# EXHIBIT 1

# EXHIBIT F

Transcontinental Realty Investors, Inc. — Forms 10-K, 10-Q and 8-K, Q3 2022 through Q2 2026: “Notes receivable” disclosures and related statements, with EDGAR links

*Source: SEC EDGAR (public). Print the cited pages from EDGAR before filing.*

# EXHIBIT F

## Transcontinental Realty Investors, Inc. (NYSE: TCI; SEC CIK 733590) — "Notes receivable" disclosures concerning Bellwether Ridge, Parc at Windmill Farms, Parc at Ingleside and Parc at Opelika, Q3 2022 through Q2 2026

Excerpt sheet prepared from the filings as published on SEC EDGAR. Each entry gives the filing, the EDGAR link, and the verbatim language and figures. The full filings are public records available at the links. [Before filing: print the cited pages from EDGAR and attach them behind this sheet, or replace this sheet with them.]

| Filing | Verbatim language / figures (in thousands where stated) |
|---|---|
| Form 10-Q, quarter ended Sept. 30, 2022 (filed Nov. 10, 2022) EDGAR link | Bellwether Ridge(1) $3,973 / $3,967 · 5.00% · 11/1/26; Parc at Windmill Farms(1) $7,836 / $7,830 · 5.00% · 11/1/22; Parc at Ingleside(1) $3,663 / $3,700 · 5.00% · 11/1/26; Parc at Opelika Phase II(1) $2,914 / $2,305 · 10.00% · 1/13/23. No reference to any exercise notice, conversion, the Receiver, or the Barton litigation. |
| Form 10-K, fiscal year ended Dec. 31, 2022 (filed Mar. 23, 2023) EDGAR link | MD&A: "We have investment in nine notes receivable that were issued to fund the development of multifamily properties. Each of these notes are convertible, at our option, into a 100% ownership interest in the underlying property." Notes receivable (details): Bellwether Ridge $3,798; Parc at Windmill Farms $7,886; Parc at Ingleside $3,759; Parc at Opelika Phase II $3,190 (thousands). Subsequent events: "There are no subsequent events that would require an adjustment to the financial statements." |
| Form 10-Q, quarter ended Mar. 31, 2023 EDGAR link | "The following table summarizes our notes receivable as of March 31, 2023 and December 31, 2022:" Bellwether Ridge(1) $3,798 / $3,798 · 5.00% · 11/1/26; Parc at Windmill Farms(1)(4) $7,886 / $7,886 · 5.00% · 11/1/22; Parc at Ingleside(1) $3,759 / $3,759 · 5.00% · 11/1/26; Parc at Opelika Phase II(1)(4) $3,190 / $3,190 · 10.00% · 1/13/23. Footnote (1): "The note is convertible, at our option, into a 100% ownership interest in the underlying development property, and is collateralized by the underlying development property." Footnote (4): "We are working with the borrower to extend the maturity and/or exercise our conversion option." |
| Form 10-K, fiscal year ended Dec. 31, 2023 (filed Mar. 21, 2024) EDGAR link | Same four notes at $3,798 / $7,886 / $3,759 / $3,190 (thousands), each tagged "ownership interest if note converted: 100.00%." "Substantially all of our assets are held by our wholly-owned subsidiary, Southern Properties Capital Ltd. ('SPC') …." Item 3, Legal Proceedings: "None." |
| Form 10-K, fiscal year ended Dec. 31, 2024 (filed Mar. 20, 2025) EDGAR link | Same four notes at the same carrying values. No reference to any conversion, the receivership, or SEC v. Barton. |
| Form 10-K, fiscal year ended Dec. 31, 2025 (filed Mar. 12, 2026) EDGAR link | Same four notes at the same carrying values; total notes receivable $123,678 (thousands). No reference to any conversion, the receivership, the Sept. 4, 2025 mediation, or the settlement. |
| Form 10-Q, quarter ended Mar. 31, 2026 EDGAR link | Same four notes; Windmill Farms and Opelika Phase II footnoted (1)(4): "We are working with the borrower to extend the maturity and/or exercise our conversion option." |
| Form 10-Q, quarter ended June 30, 2026 (filed Aug. | Note 8, Notes receivable: Bellwether Ridge(1) $3,798 / $3,798 · 5.00%; Parc at Windmill Farms(1)(4) $7,886 / $7,886 · 5.00%; Parc at Ingleside(1) $3,759 / $3,759 |

| | |
|---|---|
| 6, 2026)<br>EDGAR link | · 5.00%; Parc at Opelika Phase II(1)(4) $3,190 / $3,190 · 10.00%; total $120,879 (6/30/26) / $123,678 (12/31/25). Footnote (1): "The note is convertible, at our option, into a 100% ownership interest in the underlying property, and is collateralized by the underlying property." Footnote (4): "We are working with the borrower to extend the maturity and/or exercise our conversion option." No reference to SPC's claimed conversion, the Receiver, Barton, or the August 2026 settlement. |
| Form 8-K, Ex. 99.5 (Sept. 19, 2022) — SPC Immediate Report to the Israel Securities Authority and Tel Aviv Stock Exchange dated Sept. 18, 2022, signed by Erik L. Johnson, Director and CFO of SPC<br>EDGAR link | "On September 16, 2022 … the Sale Transaction was completed …." "The Holdback Properties are encumbered by HUD insured mortgages." "Upon approval by HUD, the Company will assume the mortgages on the Holdback Properties and formal title in the Holdback Properties will be distributed to the Company." |
| Form 8-K, Ex. 99.7 (Nov. 2, 2022) — SPC Immediate Report<br>EDGAR link | "[T]he transfer of the formal title in those properties will take place no later than six months, and as early as the date upon which the Company obtains HUD approval … the actual receipt of approval depends on factors beyond the Company's control." |
| Form 8-K (Dec. 2021) — appointment of Bradley J. Muth<br>EDGAR link | "Effective as of December 16, 2021, the Board … appointed Bradley J. Muth, age 61, President and Chief Executive Officer of the Company." |
| Form 8-K (Aug. 2020) — Daniel J. Moos<br>EDGAR link | "Mr. Moos will continue as the Chief Executive Officer ('CEO') of Southern Properties Capital LTD, a British Virgin Islands Company ('SPC'), wholly owned by the Issuer …." |
| Form 8-K (May 28, 2024) — Erik L. Johnson<br>EDGAR link | "Effective May 28, 2024, the Board … appointed Erik L. Johnson, age 56, President and Chief Executive Officer." |

Reconciliation of carrying values to the record. TCI's reported balances ($3,798,000; $7,886,000; $3,759,000; $3,190,000 — total $18,633,000) correspond to the balances the Receiver reported "as of January 17, 2023" in Dkt. 207 at 13–14 ($3,797,758.95; $7,885,547.12; $3,759,163.65; $3,189,595.90 — total $18,632,065.62). The Settlement Agreement stipulates "SPC Loan balance[s] … including accrued interest, as of June 30, 2026" of $4,587,193.66; $9,809,312.03; $4,872,181.43; $4,783,527.98 — total $24,052,215.10 (Dkt. 873 App. 8). Difference: approximately $5,419,215.

Sources reviewed: SEC EDGAR full-text search of TCI (CIK 733590) and American Realty Investors, Inc. (CIK 1102238) filings, Jan. 1, 2019 – Sept. 8, 2026, for "Barton," "receiver," "receivership," and "subpoena." No filing references SEC v. Barton, the Receiver, or any conversion of the four notes.

# EXHIBIT G

U.S. Department of Housing and Urban Development, Departmental Enforcement Center, letter dated February 2, 2023, to DD4FR, LLC, Attn: Timothy Barton, regarding Mortgagor–Enforcement Center Referral for AFS Ending December 31, 2021, Parc at Windmill Farms, FHA No. 113-35682.

*Source: Timothy Barton Files; SEC v. Barton, No. 3:22-cv-02118-X (N.D. Tex.).*

U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT
*Fort Worth Satellite Office, VS6*
Attn: Departmental Enforcement Center
307 W. 7th St., Suite 1000, Fort Worth, TX 76102
TELEPHONE: (817) 978-9500; FAX (817) 978-9504

OFFICE OF GENERAL COUNSEL
DEPARTMENTAL ENFORCEMENT CENTER

February 2, 2023

Sent via email to Timothy Barton at tbarton@jmjdevelopment.net

D4FR, LLC
Attn: Timothy Barton, Mortgagor
1755 Wittington Pl Ste 340
Dallas, Texas 75234

SUBJECT: Enforcement Center Referral for AFS ending 12/31/2021
Project Name: Parc at Windmill Farms
Project Location: Forney, Texas
FHA Number: 11335682
iREMS Number: 800243612

Dear Timothy Barton:

The Parc at Windmill Farms was referred to the Departmental Enforcement Center (DEC) Fort Worth Satellite Office as a result of the Real Estate Assessment Center (REAC) assessment of the 2021 audited annual financial statement (AFS).

**Unauthorized Distributions**

As a part of each AFS which you submit to HUD, you are required to submit a Computation of Surplus Cash. This document shows what Surplus Cash may be available for distribution during the next fiscal period (provided certain other terms of your Regulatory Agreement with HUD are met at the time of the proposed distribution).1

The 2021 compliance flag is for Unauthorized Distribution of Project Funds in excess of available Surplus Cash. The December 31, 2020, Computation of Surplus Cash was in the amount of $46,288. The Mid-year Computation of Surplus Cash dated June 30, 2021, reported $349,157. The Contributions was in the amount of $290,039. The Interest on Notes Payable were $5,039. The Principal Payments on Loans or Notes Payable were $150,000. Distributions reported $809,519. Therefore, there was an unauthorized distribution of $279,074 ($46,288 + $349,157 + $290,039 - $5,039 – $150,000 – $809,519).

An unauthorized distribution would be a violation of your Regulatory Agreement with HUD (please see Sections 1.g., 1.ee., 11.a., 14, 35.c. and 35.d.). HUD could demand repayment of the unauthorized distribution for $279,074 or could pursue double this amount under 12 U.S.C. §1715z-4a. However, since the property had surplus cash of $431,984 as of December 31, 2021, **on this one occasion**, HUD will not require repayment of the unauthorized distribution.

1 See, for example, Section 14.b. which restricts distributions when certain needs of the tenants or project are not

being appropriately met.

**Be advised that all disbursements may only be made in accordance with your business agreements with HUD. Violations can subject you to certain sanctions and penalties, including, but not limited to, civil money penalties, an action for double damages pursuant to 12 U.S.C. §1715z-4a, and foreclosure of the mortgage or deed of trust securing the debt.**

If you have any questions, please contact Tiffany Davis-Edwards, Financial Analyst, at Tiffany.N.Davis-Edwards@hud.gov.

Sincerely,

Jerry Creamer
Supervisory Enforcement Analyst
Fort Worth Satellite Office

cc: Amy Velasquez, Branch Chief, Fort Worth Asset Management Office
Ulana J Sigler, Account Executive, Fort Worth Multifamily Housing Program Office

# EXHIBIT H

Southern Properties Capital, Ltd. Letter Agreement dated June 13, 2019 to JMJD4, LLC, JMJAV, LLC and Enoch Investments, LLC re Parc at Ingleside (developer's-fee and HUD-approval conditions)

*Source: Timothy Barton loan files (closing binder). SEC v. Barton, No. 3:22-cv-2118-X (N.D. Tex.)*

**SOUTHERN PROPERTIES CAPITAL, LTD**
1603 LBJ Freeway, Suite 800
Dallas, Texas 75234

June 13, 2019

JMJD4, LLC
JMJAV, LLC
Enoch Investments, LLC
1775 Whittington Place, Suite 340
Farmers Branch, Texas 75234

Re: Parc at Ingleside, Ingleside, Texas ("Property")

Gentlemen:

JMJD4, LLC ("JMJD4") owns 98.75% of the membership interest in D4IN, LLC (the "Company"). JMJAV, LLC ("JMJAV") owns 1% of the membership interest in the Company. Axia Contracting, LLC owns a 0.25% membership interest in the Company. The Company owns the Property.

JMJD4, Enoch Investments, LLC ("Enoch") and JMJAV agree that provided the developer's fee for the Property has been paid, that upon 10 days written notice to you at the address listed above, Enoch and JMJAV will assign 100% of the membership interests in JMJD4 to Southern Properties Capital, Ltd., or its designee and that upon such assignment and the assignment of JMJAV's interest in the Company, once HUD has approved the transfer, the Promissory Note of even date herewith in the amount of $6,634,490 will be cancelled.

JMJD4, JMJAV and Enoch also agree that at the time of transfer, the Property will be subject to no liens other than the HUD insured first lien encumbering the Property.

Please indicate your acceptance by countersigning this letter.

Very truly yours,

Southern Properties Capital, Ltd.

By: [signature]
Name: Daniel J. Moos
Title: President & CEO

1100155 -Letter Agreement - Parc at Ingelside (6712.0020)

**ACCEPTED AND AGREED EFFECTIVE**
**June 13, 2019**

**JMJD4, LLC,**
a Delaware limited liability company

By: ______________________________
Timothy Barton, President

**JMJAV,LLC,**
a Texas limited liability company

By: ______________________________
Timothy Barton, Managing Member

**ENOCH INVESTMENTS, LLC,**
a Delaware limited liability company

By: ______________________________
Timothy Barton, President

# EXHIBIT I

Fourth Amendment to Promissory Note (JMJ Development, LLC / SPC — Parc at Windmill Farms), effective November 1, 2020, extending maturity to November 1, 2022 (signed for SPC by Erik L. Johnson, President); Second Amendment to Letter Loan Agreement dated May 31, 2021

*Source: Timothy Barton loan files. SEC v. Barton, No. 3:22-cv-2118-X (N.D. Tex.)*

# FOURTH AMENDMENT TO PROMISSORY NOTE

This Fourth Amendment to Promissory Note ("Amendment") is entered into effective as of the 1st day of November, 2020 ("Effective Date"), by and between **JMJ DEVELOPMENT, LLC,** a Texas limited liability company ("Borrower") and **SOUTHERN PROPERTIES CAPITAL, LTD,** a British Virgin Islands corporation ("Lender").

## RECITALS

A. As evidenced by that certain Promissory Note ("Note"), dated on or about December 14, 2017, executed by Borrower and made payable to Lender, Lender made a loan in the amount of $7,300,000.00 to Borrower.

B. Borrower and Lender subsequently executed a First Amendment to Promissory Note ("First Amendment"), dated as of October 1, 2019, which First Amendment was rescinded in its entirety by a Rescission of First Amendment to Promissory Note, dated as of October 1, 2019, and duly executed by Borrower and Lender.

C. Borrower and Lender subsequently executed a Second Amendment to Promissory Note ("Second Amendment"), dated as of October 25, 2019, wherein the loan amount was increased from $7,300,000.00 to $8,300,000.00.

D. Borrower and Lender subsequently executed a Third Amendment to Promissory Note ("Third Amendment"), dated as of May 1, 2020, wherein the maturity date of the Note was extended from May 1, 2020 to November 1, 2020.

E. Borrower and Lender desire to further amend the Note, as amended by the Second Amendment and the Third Amendment, to extend the maturity date of the Note from November 1, 2020, to November 1, 2022, as more fully described below.

## AGREEMENTS

NOW, THEREFORE, for and in consideration of Ten and No/100 Dollars ($10.00), the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereby agree as follows:

1. The Maturity Date, as such term is defined in the Note, as amended, is changed to November 1, 2022.

2. Except as expressly modified and extended hereby, all terms and provisions of the Note are and shall remain unchanged, and the Note and all loan documents relating thereto are hereby ratified and confirmed and shall be and shall remain in full force and effect.

3. Borrower hereby agrees and acknowledges that it is well, justly and truly indebted to Lender

pursuant to the terms of the Note, as modified and extended hereby. Borrower hereby promises to pay to Lender or its order the Note in accordance with the terms thereof, as modified and extended hereby.

4. Borrower hereby represents and warrants that there are no offsets, claims, counterclaims or defenses which Borrower has against payment and enforcement of the Note, as modified herein.

5. This Agreement represents the final agreement between the parties herein and may not be contradicted by evidence of prior, contemporaneous, or subsequent oral agreements of the parties. There are no unwritten oral agreements between the parties.

[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK]

**BORROWER:**

**JMJ DEVELOPMENT, LLC,**
a Texas limited liability company

By: ______________________
Timothy Barton, President

**LENDER:**

**SOUTHERN PROPERTIES CAPITAL, LTD,**
a British Virgin Islands corporation

By: ______________________
Name: Erik L. Johnson
Title: President

**SECOND AMENDMENT TO**
**LETTER LOAN AGREEMENT**

**THIS SECOND AMENDMENT TO LETTER LOAN AGREEMENT** (the "Amendment"), dated May 31, 2021, is entered into by JMJ Development, LLC, a Texas limited liability company (the "Borrower") and Southern Properties Capital LTD, a British Virgin Island company (the "Lender").

**WHEREAS**, the Borrower and Lender are parties to that certain Letter Loan Agreement, dated on or about December 14, 2017 (the "Letter Loan Agreement"), in the amount of $7,300,000.00 (the "Loan") as evidenced by a Promissory Note of even date therewith, as amended ("Note") and a ;

**WHEREAS**, the Letter Loan Agreement was amended by a First Amendment to Letter Loan Agreement, dated October 25, 2019, to increase the Loan to $8,300,000.00 (the "Amended Loan");

**WHEREAS**, Borrower entered into a Development Agreement with D4FR, LLC, a Texas limited liability company dated November 6, 2017 for the development of the property described therein;

**WHEREAS**, the Borrower and Lender desire to amend the Letter Loan Agreement to add an additional Event of Default, as defined in the Letter Loan Agreement;

**NOW THEREFORE**, in consideration of the premises and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, it is agreed by each party hereto as follows:

1. It is hereby agreed and understood that an Event of Default, as defined in the Letter Loan Agreement, shall also mean the following:

   "any event of default under the Development Agreement. Upon the occurrence of any default under the Development Agreement, regardless of whether any party is or may be entitled to cure such default and regardless of whether the either party of the Development Agreement has commenced the exercise of remedies, Lender shall be entitled to exercise any and all remedies available under the Development Agreement or at law or in equity.

2. Except as amended hereby, all terms conditions and provisions of the Letter Loan Agreement, Note and any other loan document related to the Loan shall remain in full force and effect as originally written.

IN WITNESS WHEREOF, the parties hereto have duly executed this Second Amendment to Letter Loan Agreement, as of the date and year first above written.

BORROWER:

JMJ Development, LLC
a Texas limited liability company

By: ____________________________
Timothy Barton, President

LENDER:

Southern Properties Capital LTD
a British Virgin Island company

By: ____________________________
Erik Johnson, President

2. Except as amended hereby, all terms conditions and provisions of the Letter Loan Agreement, Note and any other loan document related to the Loan shall remain in full force and effect as originally written.

IN WITNESS WHEREOF, the parties hereto have duly executed this Second Amendment to Letter Loan Agreement, as of the date and year first above written.

BORROWER:

JMJ Development, LLC
a Texas limited liability company

By: ______________________________
Timothy Barton, President

LENDER:

Southern Properties Capital LTD
a British Virgin Island company

By: ______________________________
Erik Johnson, President

# EXHIBIT J

Receiver's Sixteenth Quarterly Status Report (2Q26), filed July 30, 2026 (Dkt. 838), cover page and pages 41–48 (Section 4, HUD Apartments)

*Source: Docket, SEC v. Barton, No. 3:22-cv-2118-X (N.D. Tex.)*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | § | |
| | § | |
| ***Plaintiff*,** | § | |
| | § | |
| **v.** | § | **No. 3:22-cv-2118-X** |
| | § | |
| **TIMOTHY BARTON, CARNEGIE DEVELOPMENT, LLC, WALL007, LLC, WALL009, LLC, WALL010, LLC, WALL011, LLC, WALL012, LLC, WALL016, LLC, WALL017, LLC, WALL018, LLC, WALL019, LLC, HAOQIANG FU (A/K/A MICHAEL FU), STEPHEN T. WALL,** | § | |
| | § | |
| ***Defendants*,** | § | |
| | § | |
| **DJD LAND PARTNERS, LLC, and LDG001, LLC,** | § | |
| | § | |
| ***Relief Defendants*.** | § | |

**RECEIVER'S SIXTEENTH QUARTERLY STATUS REPORT (2Q26)**

Cortney C. Thomas, as the court-appointed Receiver in the above-referenced case, submits the following quarterly status report for the Second Quarter of 2026 pursuant to this Court's Order Appointing Receiver [Dkt. 417] (the "Receivership Order" or "RO").

The Receiver previously filed his Initial Status Report [Dkt. 67], covering the period October 18, 2022, through November 17, 2022; his Second Status Report [Dkt. 139], covering the period November 18, 2022, through December 31, 2022; his Third Status Report [Dkt. 225], covering the period January 1, 2023, through March 31, 2023; his Fourth Status Report [Dkt. 299],

transfer claims would only deplete the Receivership Estate with no guarantee of success. Consequently, the Receivership Estate's receipt of $2.5 million of potentially $3.95 million in fraudulent transfer amounts was a fair and equitable result.

The Court ultimately granted [Dkt. 236] the Motion to Approve Settlement Agreement with HNGH on May 15, 2023. On May 16, 2023, Defendant Barton filed a Notice of Appeal of the Court's Order approving the HNGH Settlement Agreement. Fifth Circuit Case No. 23-10516. On May 26, 2023, Barton separately filed a motion to stay with the Fifth Circuit that, among other things, sought a stay of the HNGH Settlement, including the Receiver's transfer of possession of the Turtle Creek Office to HNGH. On June 8 and June 9, 2023, the Fifth Circuit denied the motion to stay to the extent it sought to suspend the HNGH Settlement. On July 17, 2023, the Fifth Circuit dismissed Barton's separate appeal of the Order approving the HNGH Settlement Agreement. On October 12, 2023, the Fifth Circuit withdrew its prior opinion and stated that the opposed motion to dismiss the appeal would instead be carried with the case. On August 14, 2024, the appeal was dismissed as moot in light of the Court's ratification order.

As of the date of this Report, certain ancillary matters remain pending, including the Receiver's Motion for Final Decree. During the Fourth Quarter of 2025, the District Court adopted the bankruptcy court's report and recommendation that the District Court withdraw the reference. The case is now pending in Case No. 3:25-cv-1949-X. During the First Quarter of 2026, certain ancillary filings were submitted by Barton and his former counsel, including an improper motion for summary judgment. On June 17, 2026, the Court struck the motion for summary judgment.

#### 4. HUD Apartments

Receivership Entities D4DS, LLC, D4FR, LLC, DRIN, LLC, and D4OP, LLC, are the record owners and HUD borrowers on four separate apartment complexes in Texas and Alabama

(collectively, the "HUD Apartments"). These properties include Bellwether Ridge in DeSoto, Texas (owned by D4DS, LLC), the Parc at Windmill Farms in Forney, Texas (owned by D4FR, LLC), the Parc at Ingleside near Corpus Christi, Texas (owned by D4IN, LLC), and the Parc at Opelika in Alabama (owned by D4OP, LLC). The HUD Apartments each received or benefitted from Wall Investor Funds, and accordingly the HUD Apartments are Receivership Assets. *See* Mem. Op. & Order at 14-19.

Each of these properties was developed under (and is currently encumbered by) separate sizeable HUD loans administered through Greystone. Third-Party Southern Properties Capital, Ltd. ("SPC") provided a smaller second loan for each of the properties. SPC claims that its mezzanine loans were "convertible" in nature, whereby it had the option to convert its debt position into equity ownership of certain affiliated Receivership Entities and, indirectly, ownership of the HUD Apartments. SPC further claims that as to the DeSoto, Forney, and Ingleside HUD Apartments, it exercised conversion options prior to the appointment of the Receiver.

During the First Quarter of 2023, the Receiver entered into contracts to sell the DeSoto and Forney HUD Apartments owned by D4DS and D4FR, respectively, and filed motions to approve these sales free and clear of SPC's purported "ownership" premised on the claimed conversion of its debt into equity. [Dkts. 161 & 164]. SPC responded that the Receiver had no right to sell the DeSoto and Forney HUD Apartments [Dkt. 178]. The Court ultimately continued the hearing on the Receiver's motions to sell these properties and ordered the Receiver and SPC to file summary judgment briefing on the issue of ownership of the HUD Apartments. The Receiver filed his motion for summary judgment on April 13, 2023 [Dkt. 207], and SPC filed its response on May 30, 2023 [Dkts. 246 & 247]. The Receiver's deadline to file a reply brief was originally stayed in light of the Fifth Circuit's opinion regarding the Receivership Order, and the Court has since dismissed

without prejudice all pending motions, including the sale motion and the motion for summary judgment. While the Receiver believes that he would ultimately succeed on the question of ownership of the HUD Apartments, if SPC is successful in its challenge, the possibility exists that the Receivership Entities will not obtain any recovery on these properties.

As noted in prior Reports, Defendant Barton has suggested in various filings that the sale of one, two, or three of these properties would result in the recovery of sufficient funds to pay a 100% recovery to the Wall Investors. However, as the Receiver has detailed in prior filings, this position not only ignores SPC's arguments regarding its equity position in the properties, but, even assuming that SPC's loans are treated as debt, ignores the existing HUD and SPC debt. If SPC is determined to be the owner of the HUD Apartments, the Receivership will receive $0. Even if the Receiver is victorious after protracted and expensive litigation with SPC, the best-case scenario to the Receivership in terms of value realized would be far less than the $26 million alleged in the SEC's complaint. Barton's suggestion also ignores the non-Wall creditors who would participate in the Receivership's eventual claims process, increasing total losses well in excess of $26 million.

Finally, at the hearing on the Motion to Approve the sale of the Amerigold Suites (discussed below), Barton indicated (through counsel) that contrary to prior assertions regarding the use of sale proceeds from these properties, Barton now contends he should receive the proceeds from the sale of any HUD Apartments rather than the Receivership Estate because the D4 Entities should not be receivership entities in the first place. Barton's change of heart was later confirmed by his challenges to the HUD Apartments (and other properties) being included in any new Receivership Order, as well as by argument at the hearing related to the Second Receivership Order. While Barton's arguments were rejected (first by the District Court and then the Fifth Circuit), SPC sought to intervene and participate in the hearing. The District Court denied SPC's

request without prejudice to SPC refiling at a later date. SPC claims that it has not had an opportunity to be heard on this issue and intends to ask the District Court to hear it on this issue. As will be detailed in future reports during the Fall of 2025, the Receiver and SPC mediated their ownership dispute with Retired United States Bankruptcy Judge Harlin Hale.

Similar to prior Quarterly Reports, each of the HUD Apartments is dealt with in turn:

**a) Bellwether Ridge (DeSoto)**

Receivership Entity D4DS, LLC is the record owner and HUD borrower on a certain apartment complex located at 841 S. Polk Street in DeSoto, Texas ("Bellwether Ridge"). In accordance with this Court's Orders and 28 U.S.C. § 2001, the Receiver obtained three independent appraisals of the Property. One is a certified appraisal, and two are informal broker opinions of value. The three appraisals valued Bellwether Ridge at $28,000,000, $27,750,000 - $29,750,000, and $28,800,000 - $31,900,000 resulting in an average appraised value of $29,033,333.

After the Receiver's appointment, he consulted multiple industry professionals and brokers regarding the potential value of the Property and three other similar projects (Parc at Windmill Farms in Forney, the Parc at Ingleside outside of Corpus Christi, and the Parc at Opelika in Alabama) that involve both HUD loans serviced by Greystone and additional loans from SPC to JMJ. Due to the uncertainty surrounding the outstanding dispute with SPC, the Receiver ultimately was unable to reach agreement to engage the brokers, who expressed unease in marketing the properties due to SPC's ownership claims.

Despite difficulties listing the Property with a broker, the Receiver communicated with dozens of potential interested purchasers. While most of the potential purchasers ultimately were unwilling to submit offers on the Property, the Receiver obtained multiple offers on the Property, the highest of which was a letter of intent submitted by Palmetto Capital Partners, LLC—on behalf

of a joint venture (Polk Street 2023, LLC) between Palmetto and i3 Interests LLC (collectively, "Palmetto/i3")—on November 30, 2023 at a purchase price of $27,000,000.

During the following months, the Receiver and Palmetto/i3 engaged in protracted negotiations regarding the purchase and sale agreements for the Property and one other related property. During this time, the Receiver continued to communicate with other potential interested purchasers, none of whom provided higher offers than that received from Palmetto/i3. Finally, on February 21, 2023, the Receiver and Palmetto/i3 entered into a Purchase and Sale Agreement, whereby the Receiver agreed, subject to Court approval and certain other contingencies, to sell the Property to Palmetto/i3, which will assume the existing HUD loan, for a total of $27,000,000.[15]

The Receiver has been increasingly pessimistic in light of the protracted and thorough summary judgment briefing, that he will be able to reach agreement with SPC to treat its loan as just that—a loan that will be paid at closing. Regardless of any ultimate agreement, SPC's claims to the proceeds from the sale of Bellwether Ridge can be administered through a claims process, where the adjudication of its claim to the proceeds from the sale of any HUD Apartment complex could range from treatment as an unsecured creditor, to the Court's determination that SPC is entitled to 100% of the sale proceeds.

As of the date of this Report, the contract for the sale of Bellwether Ridge remains pending, but the Sale Motion has been denied without prejudice. Pursuant to the parties' contract, because several months have passed since the execution of the agreement, either of the parties to the contract may terminate at any time. Once the issue of SPC's claimed ownership has been resolved, court approval for any sale will still be necessary pursuant to 28 U.S.C. § 2001. If SPC is ultimately determined not to be the rightful owner of the property, if the D4 Entities ultimately

[15] SPC's claimed ownership was a significant factor in the purchase price.

remain Receivership Entities, and if the Court approves the sale, after discounting the HUD loan balance ($17,044,548), the SPC loan balance including interest $4,539,194), and the fee to buyer's broker ($270,000), the sale would result in a net benefit of approximately $5.1 million to the Receivership Estate prior to other closing costs.

**b) Parc at Windmill Farms (Forney)**

Receivership Entity D4FR, LLC is the record owner and HUD borrower on a certain apartment complex located at 1003 Windmill Farms Blvd., Forney, TX 75126 ("Windmill Farms"). In accordance with this Court's Orders and 28 U.S.C. § 2001, the Receiver obtained three independent appraisals of Windmill Farms. One is a certified appraisal, and two are informal broker opinions of value. The three appraisals value Windmill Farms at $50,000,000, $52,000,000 - $56,000,000, $53,000,000 - $58,000,000 resulting in an average appraised value of $53,166,666.

Despite difficulties listing the Property with a broker (as outlined above), after communicating with dozens of potential interested purchasers, the Receiver ultimately entered into a Purchase and Sale Agreement with Palmetto/i3 whereby the Receiver agreed, subject to Court approval, to sell the Property to Palmetto/i3, which will assume the existing HUD loan, for a total of $51,000,000.

As of the date of this Report, the contract for the sale of Windmill Farms remains pending, but the Sale Motion has been denied without prejudice. If SPC is ultimately determined not to be the rightful owner of the property, if the D4 Entities ultimately remain Receivership Entities, and if the Court approves the sale, after discounting the HUD loan balance ($33,654,892), the SPC loan balance including interest ($9,709,647), and the fee to buyer's broker ($510,000), the sale would result in a net benefit of approximately $7.1 million to the Receivership Estate prior to other closing costs.

c) **Parc at Ingleside (Corpus Christi area)**

Receivership Entity D4IN, LLC is the record owner and HUD borrower on a certain apartment complex located at 2850 Ave. J, Ingleside, TX, 78362 ("Parc at Ingleside"). The Receiver is still gathering opinions of value and appraisal(s) on this property and anticipates discussing those in future status reports. To date, he has received opinions of value ranging between $28 million and $31.1 million. As of March 31, 2026, the balance on the HUD loan for this property was $23,792,490, and the SPC loan including interest was $4,824,670. While the Receiver is hopeful that the value of this property compared to its loans will continue to increase in the coming months while the ownership dispute with SPC is resolved, the estimates above indicate that the sale of this property would result in the infusion of between $0 and $2.5 million into the Receivership Estate.

d) **Parc at Opelika (Alabama)**

Receivership Entity D4OP, LLC is the record owner and HUD borrower on a certain apartment complex located at 1375 McCoy Street, Opelika, AL 36801 (the "Parc at Opelika). Construction on Opelika is complete. While the Receiver encountered multiple challenges that delayed final endorsement of the HUD loan on the property—including construction liens, interest payments that had to be made when draw requests were delayed, ongoing challenges surrounding the Receiver's lack of access to QuickBooks and the Receivership Entities' digital files (as outlined below), and Barton's refusal to sign cost certification documents—final endorsement of the HUD loan finally occurred during the Fourth Quarter of 2023. As noted in prior Reports, pre-Receivership findings identified by auditors—regarding repayment of an SBA loan and repayment of monies sent to other Receivership Entities—have been cured.

Similar to Bellwether Ridge, Windmill Farms, and Ingleside, Opelika has both a HUD loan as well as additional funding from SPC. As of March 31, 2026, the balance on the HUD loan for

this property was $21,962,056, and the SPC loan including interest was $4,702,900. SPC claims that while it has not yet converted its debt to equity, its convertible loan will allow it to do so in the future.

**5. Amerigold Suites**

Receivership Entity Goldmark Hospitality, LLC is the record owner of a 70-unit extended-stay hotel located at 13636 Goldmark Dr. in Dallas, Texas (the "Amerigold Suites"). Wall Investor Funds have been traced into the Amerigold Suites, and accordingly the Amerigold Suites is a Receivership Asset. *See* Mem. Op. & Order [Dkt. 416] at 13-14 & n.62.

While the HUD Apartments have third-party property managers, Goldmark Hospitality, LLC and other Receivership Entities coordinated with contractors to manage the Amerigold Suites. As discussed in his Initial Report, in the months prior to the institution of the Receivership, the Amerigold Suites had negative cashflow, in part because of a high number of vacant units and the generally poor condition of several units. Within days of the Receiver's appointment, he learned, among other things, that insurance on the property was on the verge of cancellation, that electricity was on the verge of being shut off, and that significant water bills were long overdue, even under a prior negotiated settlement. The Receiver was forced to expend scarce Receivership resources to preserve this asset and ensure that operations continued. Moreover, but–for the Receivership Order's automatic stay on foreclosure and other lender remedies, the lender, Texas Brand Bank, would likely have been entitled to foreclosure after the Receiver's appointment since insufficient assets existed (and continue to exist) to make mortgage payments (whether on this property or any of the other properties owned by the Initial Receivership Entities).

During the Fourth Quarter of 2022 and continuing into the First Quarter of 2023, the Receiver and his team were forced to expend considerable effort (1) convincing electrical and water utility companies not to shut off services to the property; (2) securing property and liability

# EXHIBIT K

Amended and Restated Pledge and Security Agreement, TRWF LLC (Pledgor) to JMJ Development, LLC (Lender), Bellwether Ridge — first page and pages 17–19 (Sections 7.13 Successors and Assigns; 7.14 Termination; 7.15 Conversion Option)

*Source: Timothy Barton loan files (closing binder); also at Dkt. 208 App. SEC v. Barton, No. 3:22-cv-2118-X (N.D. Tex.)*

# AMENDED AND RESTATED

# PLEDGE AND SECURITY AGREEMENT

This **AMENDED AND RESTATED PLEDGE AND SECURITY AGREEMENT** (as amended, modified and supplemented and in effect from time to time, this "**Agreement**") dated as of October ___, 2017, is from **TRWF LLC,** a Delaware limited liability company ("**Pledgor**") to **JMJ DEVELOPMENT, LLC**, a Texas limited liability company (together with its successors and assigns, "**Lender**").

RECITALS:

A. Pursuant to that certain Letter Loan Agreement of even date herewith between TRWF LLC, a Delaware limited liability company ("Borrower") and Lender (as amended, restated, replaced, supplemented or otherwise modified, the "**Loan Agreement**"), Lender agreed to make a loan in the amount of $3,800,000.00 (the "**Loan**") to Borrower. Capitalized terms used but not otherwise defined herein shall have the meanings given to them in the Loan Agreement.

B. To secure Borrower's obligations under the Loan Documents, Pledgor is required, among other things, to pledge, and by this Agreement does pledge, among other things, all of its right, title and interest in, to and under the Collateral (as defined below). Pledgor has executed and delivered that certain Pledge and Security Agreement dated October ___, 2017, and has executed this Amended and Restated Pledge and Security Agreement in order to amend and restate certain provisions of the Pledge and Security Agreement.

NOW, THEREFORE, in consideration of the foregoing and in order to induce Lender to make the Loan, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto hereby agree as follows:

## ARTICLE I - GRANT OF SECURITY INTEREST; COLLATERAL

Section 1.1 Collateral. As security for the full and punctual payment of the Debt and performance of Pledgor's obligations under the Loan Documents and Pledgor's obligations under this Agreement (whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise, including without limitation the payment of amounts that would become due but for the operation of the automatic stay under Section 362(a) of the Bankruptcy Code, 11 U.S.C. §362(a)), whether allowed or allowable as claims) (collectively, the "**Secured Obligations**"), Pledgor hereby grants, pledges, hypothecates, transfers and assigns to Lender a first priority and continuing lien on, and first priority security interest, in, and, in furtherance of such grant, pledge, hypothecation, transfer and assignment, hereby transfers and assigns to Lender as collateral security, all of Pledgor's right, title, ownership, equity or other interests in and to the following, whether now owned or hereafter acquired, now existing or hereafter arising and wherever located (collectively, the "**Collateral**"):

shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns and pronouns shall include the plural and vice versa.

Section 7.8 Headings, Etc. The headings and captions of various paragraphs of this Agreement are for the convenience of reference only and are not to be construed as defining or limiting, in any way, the scope or intent of the provisions hereof.

Section 7.9 Counterparts. This Agreement may be executed in several counterparts, each of which counterparts shall be deemed an original instrument and all of which together shall constitute a single Agreement. The failure of any party hereto to execute this Agreement, or any counterpart hereof, shall not relieve the other signatories from their obligations hereunder.

Section 7.10 Remedies of Pledgor. If a claim or adjudication is made that Lender or its agents or nominees, has acted unreasonably, or has unreasonably delayed acting, in any case where by law or under this Agreement or the other Loan Documents, Lender or such agent or nominee, as the case may be, has an obligation to act reasonably or promptly, Pledgor agrees that neither Lender nor its agents, shall be liable for any monetary damages, and Pledgor's sole remedies shall be limited to commencing an action seeking injunctive relief or declaratory judgment. The parties hereto agree that any action or proceeding to determine whether Lender has acted reasonably shall be determined by an action seeking declaratory judgment.

Section 7.11 Entire Agreement. This Agreement and the other Loan Documents embody the final, entire agreement of Pledgor and Lender with respect to the Secured Obligations and supersedes any and all prior commitments, agreements, representations, and understandings, whether written or oral, relating to the subject matter hereof. This Agreement is intended by Pledgor and Lender as a final and complete expression of the terms of the Agreement, and no course of dealing between Pledgor and Lender, no course of performance, no trade practices, and no evidence of prior, contemporaneous or subsequent oral agreements or discussions or other extrinsic evidence of any nature shall be used to contradict, vary, supplement or modify any term of this Agreement. There are no oral agreements between Pledgor and Lender.

Section 7.12 Waiver of Right to Trial by Jury. PLEDGOR HEREBY AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THIS AGREEMENT, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY PLEDGOR, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE. LENDER IS HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY PLEDGOR.

Section 7.13 Successors and Assigns. This Agreement and all obligations of Pledgor hereunder shall be binding upon the successors and assigns of Pledgor, except that Pledgor, unless otherwise expressly provided in the Loan Agreement and then only to the extent provided

therein, shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of Lender. Lender shall have the right to assign its interest in this Agreement and all rights and remedies of Lender hereunder shall inure to the benefit of Lender and its participants, successors and assigns. Neither this Agreement nor anything set forth herein is intended to, nor shall it, confer any rights on any person or entity other than the parties hereto and all third party rights are expressly negated.

Section 7.14 Termination. Upon the indefeasible payment and performance in full of the Secured Obligations, this Agreement shall terminate and upon Lender's execution and delivery to Pledgor of documents prepared by Pledgor and acceptable to Lender, which shall, upon such execution and delivery, terminate Lender's Lien on the Collateral.

Section 7.15 Conversion Option. Upon thirty (30) days' notice (the "Exercise Notice"), Lender shall be entitled to exercise an option to acquire the Collateral from Pledgor for the consideration of $100.00.

(a) As a condition to the exercise of such option and the closing thereunder, the following conditions shall be satisfied: (i) Lender (or Lender's assignee) shall have received approval for a TPA (Transfer of Physical Assets) from HUD for transfer of the ownership of D4DS LLC, (ii) all fees owed to Timothy Barton or his affiliates for developer's fees shall have been paid in full, and (iii) payment of $100.00 to exercise the option of the transfer by Pledgor of the Collateral to Lender or Lender's assignee which will document the transfer of control of D4DS LLC. Upon receipt of such notice, Pledgor shall assemble all organizational documents, records, tax returns and other information related to each Pledged Entity (the "Pledged Entity Documents") for delivery to Lender. Lender shall furnish Pledgor with assignments for the absolute transfer and conveyance of the Collateral to Lender, and Pledgor shall execute and deliver such assignments to Lender at the closing of the sale, which shall be held on or before the thirty (30) days following the Exercise Notice. Such assignments shall contain such terms and provisions, including warranties and representations concerning the Collateral, as shall be required by and satisfactory to Lender. At the closing, Pledgor shall deliver to Lender all of the Pledged Entity Documents. At the closing, the consideration for exercise of the option shall be that all of the indebtedness evidenced by the Loan shall be deemed satisfied in consideration of the transfer and conveyance of the Collateral to Lender.

(b) In the alternative, upon receipt of the Exercise Notice, Pledgor may elect to transfer to Lender the D4DS Property instead of and in place of the Collateral (the "Project Transfer"). In such event, Pledgor shall notify Lender in writing of such election and Lender shall have five (5) days within which to consent to the Project Transfer, which consent shall not be unreasonably withheld. As a condition to the exercise of the Project Transfer and the closing thereunder, the following conditions shall be satisfied: (i) Lender (or Lender's assignee) shall have received approval for a TPA (Transfer of Physical Assets) from HUD for transfer of the ownership of the D4DS Property, (ii) all fees owed to Timothy Barton or his affiliates for developer's fees shall have been paid in full, (iii) payment of $100.00 to exercise the option of the transfer by Pledgor of the D4DS Property to Lender or Lender's assignee, and (iv) Each of JMJAV LLC and Enoch Investments, LLC, who have executed and delivered Amended and Restated Pledge and Security Agreements related to ownership interests in D4DS LLC, shall also have elected to transfer the D4DS Property to Pledgor. Upon receipt of such notice, Pledgor

shall assemble all documents related to the D4DS Property and other information related to the D4DS Property (the "Project Transfer Documents") for delivery to Lender. Lender shall furnish Pledgor with deeds and assignments for the absolute transfer and conveyance of the D4DS Property to Lender, and Pledgor shall cause D4DS to execute and deliver any and all such deeds and assignments to Lender at the closing of the sale, which shall be held on or before the thirty (30) days following the Exercise Notice (or within such time frame as may be necessary to obtain the TPA approval. Such deeds and assignments shall contain such terms and provisions, including warranties and representations concerning the Collateral, as shall be required by and satisfactory to Lender. At the closing, Pledgor shall deliver to Lender all of the Project Transfer Documents. At the closing, the consideration for exercise of the option shall be that all of the indebtedness evidenced by the Loan shall be deemed satisfied in consideration of the transfer and conveyance of the D4DS Property to Lender.

(c) Notwithstanding any other term or provision of this Section 7.15 to the contrary, upon exercise of the option and delivery of the Exercise Notice, Pledgor, each of JMJAV LLC, and Enoch Investments, LLC, by and through D4DS LLC, as the owner of the D4DS Property, shall have the right to transfer and convey the D4DS Property to Lender in lieu of any transfer of the Collateral.

Section 7.16 Liability of Pledgor. Subject to the qualifications below, Lender shall not enforce the liability and obligation of Pledgor to perform and observe the obligations contained in the Note, this Agreement or the other Loan Documents by any action or proceeding wherein a money judgment shall be sought against Pledgor, except that Lender may bring a foreclosure action, an action for specific performance or any other appropriate action or proceeding to enable Lender to enforce and realize upon its interest under the Note, this Agreement and the other Loan Documents, or in the Collateral given to Lender pursuant to the Loan Documents; provided, however, that, except as specifically provided herein, any judgment in any such action or proceeding shall be enforceable against Pledgor only to the extent of Pledgor's interest in the Collateral given to Lender, and Lender, by accepting the Note, this Agreement and the other Loan Documents, agrees that it shall not sue for, seek or demand any deficiency judgment against Pledgor in any such action or proceeding under or by reason of or under or in connection with the Note, this Agreement or the other Loan Documents. The provisions of this Section shall not, however, (i) constitute a waiver, release or impairment of any obligation evidenced or secured by any of the Loan Documents; (ii) impair the right of Lender to name Pledgor as a party defendant in any action or suit for foreclosure and sale under the Loan Documents; (iii) affect the validity or enforceability of or any guaranty made in connection with the Loan or any of the rights and remedies of Lender thereunder; or (iv) impair the right of Lender to obtain the appointment of a receiver.

Nothing contained herein shall in any manner or way release, affect or impair the right of Lender to recover, and Pledgor shall be fully and personally liable and subject to legal action, for any loss, cost, expense, damage, claim or other obligation (including without limitation reasonable attorneys' fees and court costs) incurred or suffered by Lender arising out of or in connection with the following:

# EXHIBIT L

First Amendment to Promissory Note dated October 1, 2019 (adding Article V, Asset Management and Fees) and Rescission of First Amendment of even date — JMJ Development, LLC / Southern Properties Capital, Ltd. (Bellwether Ridge), each signed for SPC by Daniel J. Moos, President

*Source: Timothy Barton loan files. SEC v. Barton, No. 3:22-cv-2118-X (N.D. Tex.)*

# FIRST AMENDMENT TO PROMISSORY NOTE

**THIS FIRST AMENDMENT TO PROMISSORY NOTE** (the "Amendment"), dated as of October 1, 2019, is entered into by JMJ Development, LLC, a Texas limited liability company (the "Borrower") and Southern Properties Capital LTD, a British Virgin Island company (the "Lender").

**WHEREAS**, the Borrower and Lender are parties to that certain Promissory Note, dated October 19, 2017, in the amount of $3,800,000.00 (the "Promissory Note"); and

**WHEREAS**, the Borrower and Lender desire to amend the Promissory by the addition of Article V, Asset Management and Fees.

**NOW THEREFORE,** in consideration of the premises and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, it is here agreed by each party hereto as follows:

1. Amendment to Promissory Note. It is hereby agreed and understood that the Promissory Note shall be amended by adding the following in its entirety:

## ARTICLE V
## ASSET MANAGEMENT AND FEES

5.1 *Asset Management.* Lender shall be responsible for providing Asset Management services (the "Services"), which includes direction to property management to ensure that the Real Estate (also referred to in this Note as the "Property") performs in a manner consistent with the other properties in the portfolio of the Lender.

52 *Asset Management Fee.* As compensation for providing the Services described above, Borrower shall pay to the Lender the Net Income of the Property as defined by the Semi-Annual HUD approved Excess Cash Release.

5.3 *Termination Fee.*

(a) Termination as a Result of a Sale or Transfer of the Property to the Lender. In the event of a sale or transfer of the Property to Lender, the obligation to pay the Asset Management Fee shall terminate as of the date of sale or transfer.

(b) Termination as a Result of a Sale or Transfer of the Property Other than to the Lender. In the event of a sale or transfer of the Property to any party other than the Lender, the obligation to pay the Asset Management Fee shall terminate as of the date of sale or transfer; provided, however, Lender shall be entitled to receive a payment equal to the HUD Excess Cash Release formula through the Closing Date at the time such Excess Cash payment is distributed.

*5.4 Defined Terms.* All capitalized terms used in this Article V, and not otherwise defined in this Note, shall have the meaning ascribed to such terms in the HUD Regulatory Agreement that governs the HUD insured construction loan obtained by D4DS, LLC for construction of the Project upon the Property.

2. Except as amended hereby, all terms, conditions and provisions of the Promissory Note shall remain in full force and effect as originally written.

**IN WITNESS WHEREOF**, the parties hereto have duly executed this First Amendment to Promissory Note, as of the date and year first above written.

**BORROWER:**

JMJ Development, LLC
a Texas limited liability company

By: ______________________
Timothy Barton, President

**Accepted By:**

**LENDER:**

Southern Properties Capital LTD
a British Virgin Island company

By: ______________________
Daniel J. Moos, President

**RESCISSION OF FIRST AMENDMENT**
**TO PROMISSORY NOTE**

This **RESCISSION OF FIRST AMENDMENT TO PROMISSORY NOTE**, effective as of October 1, 2019, is entered into by JMJ Development, LLC, a Texas limited liability company (the "Borrower") and Southern Properties Capital LTD., a British Virgin Island company (the "Lender").

**WHEREAS**, Borrower and Lender are parties to that certain Promissory Note, dated October 19, 2017, in the amount of $3,800,000.00 (the "Promissory Note");

**WHEREAS**, Borrower and Lender are parties to that certain First Amendment to Promissory Note, dated October 1, 2019 (the "Amendment"); and

**WHEREAS**, Borrower and Lender desire to rescind the First Amendment to the Promissory Note which added Article V, Asset Management and Fees to the Promissory Note.

**NOW, THERFORE**, in consideration of the premises and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, it is hereby agreed by each party hereto as follows:

1. Rescission of Amendment to Promissory Note. It is hereby agreed and understood that the First Amendment to the Promissory Note is hereby removed in its entirety and the Promissory Note no longer reflects such amendment.

**IN WITNESS WHEREOF**, the parties hereto have duly executed this Rescission of First Amendment to Promissory Note, as of the date and year first above written.

**BORROWER:**

**JMJ DEVELOPMENT, LLC**
a Texas limited liability company

By:____________________________
Timothy Barton, President

**Accepted By:**

**LENDER:**

**Southern Properties Capital LTD**
a British Virgin Island company

By:____________________________
Daniel J. Moos, President

K:\Abode\Corps\SPC\Loans (incl Revolving LOC, Options)\Convertible Loans\Bellwether Ridge\100119 (Bellwether) Rescission to 1st Amendment (Artice V)-JMJ to SPC.docx