**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| **v.** | § | **No. 3:22-cv-2118-X** |
| | § | |
| **TIMOTHY BARTON, et al.** | § | |
| | § | |
| *Defendants*, | § | |

**RECEIVER'S CONSOLIDATED REPLY IN SUPPORT OF VERIFIED MOTION TO RATIFY SETTLEMENT AGREEMENT WITH SOUTHERN PROPERTIES CAPITAL, LTD AND MOTIONS TO TRANSFER ALL RECEIVERSHIP INTEREST D4 ENTITIES OR PROPERTIES**

Charlene C. Koonce
Texas Bar No. 11672850
charlene@brownfoxlaw.com
BROWN FOX PLLC
2699 Howell Street, Suite 500
Dallas, TX 75204

Timothy B. Wells
Texas Bar No. 24131941
tim@brownfoxlaw.com
BROWN FOX PLLC
306 W. 7th Street, Suite 1000
Fort Worth, TX 76102
T: (214) 327-5000
F: (214) 327-5001

In support of his Verified Motion to Ratify Settlement Agreement with Southern Properties Capital, Ltd. ("SPC") (Dkt. 872) and four related motions seeking approval to transfer any interests in the related D4 Entities or Properties (Dkts. 874, 876, 878, 880), Cort Thomas, as the court-appointed Receiver, files this consolidated Reply to Barton's Response (Dkt. 885) and respectfully shows the Court as follows.

## I. INTRODUCTION

None of Barton's objections provide any basis for the Court to deny ratification of the Receiver's Settlement Agreement with SPC nor any basis for the Court to deny approval of the transfer of the Receivership Interests in D4DS, LLC, D4FR, LLC, and D4IN, LLC, and the properties owned by those entities, and the Parc at Opelika to SPC. To start, Barton's opposition, to the extent premised on a clerical error concerning appraisals, has been corrected. Next, many of Barton's valuation objections rest on outdated valuations and a misinterpretation of the law. Further, Barton has no standing to object on behalf of "equity owners" or others "claiming through" Receivership Entities, but even if he did, such objections and claims would belong to the Receivership Estate and are appropriately settled by the Receiver. Barton's objections premised on a "development fee" lack evidence, and, his reliance on *Black v. UniBank*, which is actually *SEC v. Hill*, No. 25-50986, 2026 WL 2493656 (5th Cir. Aug. 25, 2026), in asserting an evidentiary hearing is required misconstrues the case.

Through his Response, Barton also seeks to obtain discovery from the Receiver while employing several oft-repeated tactics used repeatedly in this receivership—ignoring facts, making false assertions, obfuscating, and seeking delay. For instance, Barton wholly fails to acknowledge the risk which motivated the settlement: engage in costly litigation with SPC and potentially recover nothing for the Receivership Investors or settle and recover a sum certain. Absent a settlement with SPC, any effort to sell the D4 Entities' membership interests or the relevant

properties would have required costly litigation potentially lasting years. Even if the Receiver prevailed at the district court level and secured unencumbered rights to the D4 Entities and Properties, given the amount in dispute, an appeal would have undoubtedly followed further delaying resolution. In performing his fiduciary duties and seeking to maximize the value of Receivership Estate assets, the Receiver determined that settling for a sum certain was more prudent than rolling the dice on expensive and potentially protracted litigation. Accordingly, the Court should ratify the SPC settlement and approve the transfer of the membership interests in the D4 Entities and Properties.

## II. ARGUMENT

### A. Barton Has No Standing to Object on Behalf of "Equity Holders" or "Others Claiming Through Receivership Entities."

Barton's overarching complaints about the SPC Settlement are valuation and process. But Barton has no standing to object to either. Indeed, Barton concedes that he is raising only "two Barton-specific issues"—a developer fee for the Opelika property and his status as the HUD Section 50 signatory. Dkt. 885 at 5. These objections wholly lack merit and are addressed below.

Barton asserts that he is objecting "solely in his individual capacity and does not purport to litigate claims belonging to any entity." *Id.* Yet, he also purports to object to the *release of* "'equity holders . . . or any other party claiming by, through or under' the Receivership Entities" included in the Settlement.[1] *Id.* Thus, rather than his individual capacity, by definition, this objection rests on a purported status as, or at least standing to assert an objection on behalf of, an "equity holder" or a "party claiming by, through or under' the Receivership Entities." But Barton

[11] Any complaint about the release of these parties by SPC deserves no consideration, since the objection would be tantamount to complaining about the elimination of risk born by these third parties.

provides no evidence that he is an equity holder in any of the D4 Entities, and indeed even if he was, based on the Receivership Order, he no longer holds any such equity. *See* Dkt. 650 at ¶ 57.

Similarly, even if Barton had standing as a "party claiming by, through or under the Receivership Entities," any objection to these third-parties' release of SPC fails because the Receiver alone holds such claims and thus has the authority to release them against all persons. *See Zacarias v. Stanford Int'l Bank, Ltd.*, 945 F.3d 883, 900 (5th Cir. 2019) (affirming Receiver's settlement of claims and bar order precluding investor claims, where investors' claims were "derivative of and dependent on the receiver's claims."). As explained by the Fifth Circuit and another court in the Northern District, claims that affect and interfere with the assets of the receivership estate are such derivative claims. *See id.*; *see also SEC v. Faulkner*, No. 3:16-CV-1735-D, 2021 WL 3930091, at *10 (N.D. Tex. Sept. 2, 2021) (Fitzwater, J.). Thus, settlement of claims directly affecting receivership assets, such as ownership of the D4 Entities or Properties and SPC's encumbrances on those Properties and Entities, are reserved for the Receiver, who "is entitled to pursue the corporation's claims for the benefit not of the wrongdoers but of innocent investors." *Zacarias*, 945 F.3d at 896–97 (internal quotations omitted).

**B. Objections Regarding a "Developer Fee" and Barton's Status as the HUD Section 50 Signatory Provide No Basis to Deny Ratification or Transfer.**

Without providing any evidence, Barton claims he is personally owed a developer fee related to the Opelika property. *See* Dkt. 885 at 5. But his contention rests on Section 7.15(a)(ii) of the Pledge and Security Agreements for a different property (D4FR and the Parc at Windmill Farms property) which provides for payment of "all fees owed to Timothy Barton or his affiliates." *See* Dkt. 885 at 13; *cf* Dkt. 208 at APP162. There is, however, no evidence that the Opelika Pledge

and Security agreement contained this same provision, [*see* Dkt. 208-3 at APP939–APP959].[2] Barton also concedes that "[t]he present record does not identify whether that receivable is payable to Barton personally or to an affiliate." Dkt. 885 at 5.

Barton's Section 50 objection is equally unavailing. He argues that as the Section 50 signatory for the HUD loans, the Settlement Agreement "does not establish whether Barton has any continuing certification duty, personal exposure, defense, or right following approval, assumption, or payoff." Dkt. 885 at 13. Yet, through SPC's assumption of the HUD loans as required by the Settlement, any obligations to HUD would be assumed by SPC. Thus, ratification of the Settlement will eliminate any obligations owed by Barton. If Barton's objection rests on his obligations to facilitate the HUD assumption to SPC, the Receivership Order requires his full compliance and cooperation, eliminating any basis for such an objection.[3] *See* Dkt. 650 at 19.

**C. Barton's Valuation and Sale Condition Objections Are Meritless.**

Barton's objection to the valuation of the D4 Properties relies on a misunderstanding of 28 U.S.C. § 2001 (the "Statute") and outdated valuations. First, as the Receiver noted in his Motion to Ratify, with regard to each D4 Entity except D4OP, the Receiver is selling only intangible membership interests, rather than real estate. Thus, the Admin Order [Dkt. 63] and its modifications of 28 U.S.C. § 2004, govern the sale of the membership interests in D4FR, D4IN, and D4DS. Any argument that the sale of Opelika, the only property subject to § 2001, does not

[2] Further, according to SPC's prior briefing, which Barton cites to, "Barton and his companies received a development fee from SPC and were otherwise reimbursed by SPC for any expenses they incurred," and that "[t]he Receivership will receive the last payment under the Opelika contract once a cost certification of the project is obtained by HUD." Dkt. 247 at 15. Thus, based on the record before the Court, any residual Opelika development fee is payable to the Receivership—not Barton.

[3] Notably, throughout the Receivership Barton has refused to assist the Receiver with any HUD related transactions. Indeed, when the Receiver was working to finalize the final endorsement for the HUD loan on the Opelika property Barton refused to sign cost certification documents requiring the Receiver to get approval from HUD for the Receiver to sign the documents. *See* Dkt. 456 at 32.

comply with the statute based on too few appraisals is moot because the Receiver filed amended appendices containing the correct appraisals. *See* Dkts. 886–89.

Barton's reliance on 2023 values demonstrates the importance of immediate ratification and the authority to complete the transfers contemplated by the Settlement Agreement rather than after uncertain litigation: the properties are losing value. After nearly four years of Barton's stall and delay tactics,[4] rising interest rates and continued volatility in the real estate market (and broader economic climate as a whole) have significantly eroded the value of all or nearly all Receivership Assets, including the D4 properties.[5]

Barton also asserts, without any authority, that the "Receiver must compare available alternatives before surrendering the assets" and that the entities bank accounts "must be separately accounted for and valued in determining the settlement's actual economics." Dkt. 885 at 10–11. But this is not the test. The Statute only requires the Court to evaluate the value of the real property being sold.[6] Likewise, Barton directs the Court to the aggregate values of the D4 properties,[7] an argument that again ignores the Statute, which requires the sale price of each individual property to be 2/3 of the average appraised value, a standard satisfied by each transfer or sale at issue.

Barton further objects that the conditions imposed on any overbid frustrates § 2001's statutory safeguard. But the statute is intended to measure an overbid against purchasers' offers.

---

[4] Indeed, Barton's efforts to impede every effort to maximize the value of the Receivership Assets place him squarely at fault for much of the decrease in value.

[5] *See e.g.* the 2023 average appraised value of the Parc at Windmill Farms, $53,166,666 (Dkt. 161 at 7) compared to 2026 average appraised value of $51,833,333 (Dkt. 878 at 7); and the 2023 average appraised value of Bellwether Ridge, $29,033,333 (Dkt. 164 at 7) compared to the 2026 average appraised value of $27,283,333 (Dkt. 874 at 7).

[6] "After a hearing, . . . the court may order the sale of such realty or interest or any part thereof at private sale for cash or other consideration and upon such terms and conditions as the court approves, if it finds that the best interests of the estate will be conserved thereby. . . No private sale shall be confirmed at a price less than two-thirds of the appraised value." 28 U.S.C. § 2001 (b).

[7] *See* Dkt. 885 at 11.

*See 28* U.S.C. § 2001(b) (a "private sale shall not be confirmed if a bona fide offer is made, under conditions prescribed by the court, which guarantees at least a 10 per centum increase *over the price offered in the private sale*.") (emphasis added). The "price" offered in this private sale[8] should be the total consideration provided in the Settlement Agreement. Here, an offeror who only tenders a cash offer equal to SPC's payment would leave the Receivership Estate subject to SPC's unresolved claims, the SPC Debt, and the SPC litigation. Such an offer provides far less than the compensation provided by SPC, thereby justifying the Settlement Agreement's requirement that "any purported 'bona fide' purchaser offering to pay more than 10 percent of the total consideration set forth in the MPAs and the PSA in accordance with 28 U.S.C. § 2001 shall make any such offer expressly subject to SPC's Conversion Rights, Assignment Rights, and ownership claims with respect to the Interests and the Opelika Property." Dkt. 873 at APP011, ¶ 6(b). These constraints are why the Receiver cannot close the sale of any of these Properties on the open market: no bona fide purchaser would purchase them until SPC's claims are resolved. Thus, the requirements that a competing offeror match the total value provided by SPC, plus the 10% required by the Statute, recognizes the total compensation provided by the Settlement Agreement, and recognize the purpose and the letter of the statutory safeguard.

### D. Barton's Process Objections Misstate the Law, Which Does Not Require An Evidentiary Hearing.

Barton argues that under *Black v. UniBank*, (a.k.a. *SEC v. Hill*), "the Court cannot resolve the disputed valuation, accounting, contractual, and ownership facts merely by accepting the Receiver's characterizations" and instead "must conduct an evidentiary hearing." Dkt. 885 at 5. The argument mischaracterizes the Fifth Circuit's holding. *Hill* involved a Ponzi scheme in which

[8] The Receiver again stresses that for three of the four transactions at issue, personalty rather than realty is being transferred, subject to a Settlement Agreement. Thus, he does not believe and does not concede that the Statute applies, but nonetheless, demonstrates satisfaction of the Statute to avoid further delay.

investors obtained secured loans from UniBank. The receiver submitted a report and recommendation in support of his request to make a pro rata distribution of receivership funds to investors but recommended providing nothing to UniBank because of its participation in the fraud. *Hill*, 2026 WL 2493656, at *1. In a "terse, one-paragraph order," the district court adopted the receiver's R & R and denied Unibank's objection seeking to uphold its priority position. *Id.* The Fifth Circuit "vacate[d] the Order solely for failure of the district court to satisfy the requirements of due process, given the Order's one-paragraph adoption of the Receiver's cursory analysis in his R&R on UniBank's objection without sufficient tracing of facts and law." *Id.* at 5, 9 (noting the Receiver's R & R "offered only a cursory analysis rebutting UniBank's objections."). The Circuit did not vacate because the district court declined to hold an evidentiary hearing, but because the district court rested "entirely on the Receiver's laurels," and its "one-paragraph order" neither adjudicated the objector's claims nor traced any facts to the record. *Id.*

Here, the Receiver is not asking the Court to adopt a report and recommendation. He has filed a motion, supported by evidence, which Barton has responded to. Barton could have attached evidence to his Response but decided not to. In this case, the Court will presumably weigh both sides' arguments and issue an order tracing facts and law. Thus an evidentiary hearing is not required by *Hill*.

In further contrast to *Hill*, the Receiver has not asked for an evidentiary hearing nor does the hearing on the sales require live testimony or additional evidence than has already been submitted. *Compare, Hill*, 2026 WL 2493656, at *12 ( "the Receiver himself who suggested that an evidentiary hearing could be appropriate.").

Barton also asserts that he is not relitigating the Fifth Circuit's inclusion of the D4 entities in the Receivership, yet he argues that *Hill* requires evidence-connected findings be made to

reserve tracing and apportionment issues. *Hill* requires no such thing. The "reserved analysis" Barton refers to is for apportionment of the funds recovered, not how to treat what went in orout for traceable investor funds.[9] Nonetheless, if the "apportionment issue" Barton relies on is a request for a further analysis of commingling or tracing of investor funds into these entities and properties (an issue mooted by the Fifth Circuit in affirming inclusion of the D4 Properties in the Estate), resolution will depend on bank records created when Barton made the fraudulent transfers that prompted the SEC to file suit, not funds remaining in the Receivership bank accounts.

Similarly, Barton also asserts that his dispute about the value of these properties and their inclusion in the Estate based on tracing means the Court must preserve the proceeds of the Settlement and determine "apportionment" before the funds are distributed. No authority supports this assertion. Instead, the Court can determine value and compliance with § 2001 based on the evidence presented with the Receiver's Motions.

**E. Barton Seeks Delay and a Discovery End-Run.**

Barton's requested relief reveals his true intentions: delaying performance of the Settlement Agreement as long as possible and gathering ammunition for further interference. All of the hoops Barton asks the Receiver and SPC to jump through—property level accounting, annual HUD audits and approvals, payoffs and identities for each note, appraiser and broker engagement letters, executed pledge and assignment letters, the development agreements, delaying any property transfer fourteen days—are designed to impede the transaction. The Settlement

[9] *See* Dkt. 417 at 17 n.82 ("At the end of the case, the Receiver would have custody of commingled funds (some attributable to Wall Investors Funds and some not). Different methodologies like the lowest intermediate balance test might be used to apportion those funds, and those methodologies have their own rules for handling arguments like SPC's arguments on refunded transactions. But for now, the Court's marching orders are to determine whether entities like D4DS received Wall Investor Funds, and it did.").

Agreement by its terms is void, however, if the Court does not ratify it within sixty days of the Motion's filing. Every step Barton proposes is intended to run out the clock.[10]

Beyond delay, Barton also seeks discovery from the Receiver. Barton currently has a motion seeking discovery pending before the Court. *See* Dkt. 819. While the Court has yet to rule on that motion, Barton apparently seeks to garner information through these objections. But the Court should not permit unwarranted, unnecessary, and costly discovery sought through Barton's Response.

**F. Barton's Claims that the Receiver Has Abandoned His Position Is Incorrect.**

The Receiver has not abandoned his position regarding the D4 entities. He simply acknowledged that sitting idly and waiting for the parallel criminal case to conclude and the SEC's claims to be resolved before re-engaging SPC in a long, drawn-out fight was untenable. The Receiver has maintained throughout the Receivership that the D4 Entities and Properties are Receivership Entities and Receivership Assets. But as the Receiver has explained multiple times, significant litigation expenses primarily motivate the Receiver's willingness to settle with SPC. The Receiver has been unable to service any of the significant debt that encumbers the Receivership Estate's real properties. The Settlement Payment will enable the Receiver to continue managing the Receivership Estate in accordance with the Receivership Order, including finally

[10] Barton's conduct in this regard has been so flagrant that the Court recently issued an order regarding "Barton's efforts to flood this Court and the Receivership with largely frivolous, overlapping motions," and warned that [s]hould Barton continue this course of conduct, the Court will invoke Rule 11 to consider an award of attorney's fees to the Receivership to compensate for time and Receivership Assets used to respond to such redundant and meritless motions" Dkt. 858. The Fifth Circuit is aware of Barton's scheme as well. It has told him that "[f]urther appeals from sale orders or non-sale administrative orders will be viewed with skepticism and will incur sanctions if deemed frivolous." *SEC v. Barton*, 170 F.4th 938, 946 n.8 (5th Cir. 2026). Undeterred, Barton has continued his appeals and the Fifth Circuit has dismissed at least one appeal for lack of jurisdiction and directed him to show cause why sanctions should not be imposed under Federal Rule of Appellate Procedure 38. *See SEC v. Barton*, No. 25-11043, 2026 WL 1591071, at *4 (5th Cir. June 3, 2026).

seeking the establishment of a claims process and beginning working through the significant debt, tax, and other obligations on the remaining real estate assets.

If the Receiver and SPC had not been able to reach a settlement, SPC would undoubtedly file litigation seeking resolution of its ownership claims quickly and forcefully. And even if the Receiver could secure a victory at the trial court level, SPC would surely have appealed. The cash-strapped Receivership Estate lacks assets to fund such a time-consuming and costly fight and would not have been able to engage outside counsel on an hourly basis. Contingency counsel would have been required. Barton may quarrel with the Receiver's estimation on litigation costs, but the Court has ample evidence before it to accept the Receiver's[11] verified representations about these costs.

## III. <u>CONCLUSION</u>

"The primary purpose of the equitable receivership is the marshaling of the estate's assets for the benefit of aggrieved investors and other creditors of the receivership entities." *SEC v. Stanford Int'l Bank, Ltd.*, 927 F.3d 830, 840 (5th Cir. 2019). Ratifying the Settlement Agreement will net $12 million for the Receivership Estate without the downside risk. The Court should ratify the SPC Settlement Agreement.

Additionally, the Court should appoint the requested appraisers, accept the submitted appraisals and following the required hearing (again, required only regarding Opelika, but requested to satisfy the inapplicable Statute regarding all four transactions in an abundance of caution) approve the transfers of the D4 Entities and their subject Properties.

[11] The Receiver is notably, a seasoned, successful litigation and trial attorney.

Respectfully submitted,

By: */s/ Charlene C. Koonce*
Charlene C. Koonce
Texas Bar No. 11672850
charlene@brownfoxlaw.com
BROWN FOX PLLC
2699 Howell Street, Suite 500
Dallas, TX 75204

Timothy B. Wells
Texas Bar No. 24131941
tim@brownfoxlaw.com
BROWN FOX PLLC
306 W. 7th Street, Suite 1000
Fort Worth, TX 76102
T: (214) 327-5000
F: (214) 327-5001

*Attorneys for Receiver Cortney C. Thomas*

**CERTIFICATE OF SERVICE**

Pursuant to Fed. R. Civ. P. 5(d)(1)(B), as amended, no certificate of service is necessary because this document is being filed with the Court's electronic-filing system.