**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | § | |
| *Plaintiff*, | § | |
| **v.** | § | **No. 3:22-cv-2118-X** |
| **TIMOTHY BARTON, CARNEGIE DEVELOPMENT, LLC, WALL007, LLC, WALL009, LLC, WALL010, LLC, WALL011, LLC, WALL012, LLC, WALL016, LLC, WALL017, LLC, WALL018, LLC, WALL019, LLC, HAOQIANG FU (A/K/A MICHAEL FU), STEPHEN T. WALL,** | § | |
| ***Defendants*,** | § | |
| **DJD LAND PARTNERS, LLC, and LDG001, LLC,** | § | |
| ***Relief Defendants*.** | § | |

**RECEIVER'S PARTIALLY UNOPPOSED**
**VERIFIED MOTION TO RATIFY SETTLEMENT AGREEMENT**
**WITH LIBERTY BANKERS LIFE INSURANCE COMPANY AND**
**AMERICAN BENEFIT LIFE INSURANCE COMPANY AND BRIEF IN SUPPORT**

**TABLE OF CONTENTS**


I. INTRODUCTION ..... 1

II. BACKGROUND ..... 3

A. The Collateral Properties ..... 3

B. The Relevant Loans ..... 4

C. The Initial Receivership Order and the "Admin Order" ..... 5

D. The Second Receivership Order ..... 7

E. The July 8 Order and Receiver's Negotiations with Lenders ..... 8

III. ARGUMENT ..... 9

A. Legal Standards and the Receiver's Authority to Compromise Claims ..... 9

B. The Terms of the Settlement Agreement ..... 10

C. The Settlement Agreement is in the Best Interests of the Receivership Estate ..... 11

IV. CONCLUSION AND REQUEST FOR RELIEF ..... 14

# TABLE OF AUTHORITIES

**Cases**

*FSLIC v. PSL Realty Co.*,
630 F.2d 515 (7th Cir. 1980), *cert. denied*, 452 U.S. 961, 69 L. Ed.2d 971, 101 S.C t. 319 (1981) ........ 9

*FSLIC v. Spark Tarrytown, Inc.*,
829 F. Supp. 82 (S.D.N.Y. 1993) ........ 9

*Gaskill v. Gordon*,
27 F.3d 248 (7th Cir. 1994) ........ 10

*Ibarra v. Tex. Empl. Comm'n*,
823 F.2d 873 (5th Cir. 1987) ........ 9

*Ritchie Capital Mgmt., L.L.C. v. Kelley*,
785 F.3d 273 (8th Cir. 2015) ........ 9

*SEC v. Barton*,
79 F.4th 573 (5th Cir. 2023) ........ 7

*SEC v. Lincoln Thrift Ass'n*,
577 F.2d 600 (9th Cir. 1978) ........ 9

*SEC v. Safety Fin. Serv., Inc.*,
674 F.2d 368 (5th Cir. 1982) ........ 9

*SEC v. Stanford Int'l Bank Ltd.*,
No. 3:09-CV-0298-N, 2015 WL 10818588 (N.D. Tex. Sept. 23, 2015) ........ 9

*SEC v. Stanford Int'l Bank, Ltd.*,
927 F.3d 830 (5th Cir. 2019) ........ 9

Cort Thomas, the court-appointed Receiver in this case, moves the Court for an order ratifying the Receiver's settlement agreement (the "Settlement Agreement," attached as **Exhibit A**) with Liberty Bankers Life Insurance Company ("Liberty") and American Benefit Life Insurance ("American Benefit" and together with Liberty, the "Liberty Parties").[1] In support of this motion, the Receiver respectfully shows the Court as follows:

## I. INTRODUCTION

This motion arises from the Receiver's efforts to resolve disputes with the Liberty Parties regarding the ownership and possession of certain land in Venus, Texas, which served as collateral on several loans. The efforts began in earnest with a mediation held on September 4, 2025 (the "Initial Mediation"), led by retired United States Bankruptcy Judge Harlin Hale, with the Liberty Parties' affiliate Southern Property Capital ("SPC") over other properties held by Receivership Entities. *See generally* Receiver's Verified Motion to Ratify Settlement Agreement With Southern Properties Capital, Ltd., Etc. and Brief in Support [Dkt. 872] (the "Motion to Ratify the SPC Settlement Agreement"). After the Initial Mediation, the Receiver and SPC reached agreement on a settlement in principle and began a lengthy process negotiating a settlement agreement. The parties were close to reaching agreement on all terms related to that settlement, but SPC refused to give up its purported claims to the funds from a certain Receivership bank account.

While the negotiations with SPC were ongoing, on July 8, 2026, the Court issued an Order (the "July 8 Order") instructing the Receiver to begin negotiations with lenders for each Receivership Property to determine a reasonable path forward.[2] Pursuant to this Order, the

[1] Capitalized terms that are not specifically defined above have the same meaning ascribed in prior briefing or orders.

[2] *See* Dkt. 792.

Receiver has contacted the lenders for each Receivership Property. The Receiver has begun presenting the following offers to each lender: (1) receive a cash payment for the full principal balance; (2) at closing in connection with the eventual sale of the property, receive the full principal balance plus 40% of the non-default interest; (3) the Receiver will sell the property free and clear of the liens pursuant to the July 8 Order, liens will attach to the sale proceeds, and competing claims will be dealt with as part of the forthcoming claims process; or (4) in a scenario where the principal balance plus 40% of the non-default interest exceeds the appraised value of a property, the Receiver is offering lenders the option to pay $100,000 in cash in exchange for abandoning the Receivership Entities' interest in the property.

To both resolve the outstanding issues with SPC and to comply with the July 8 Order, the Receiver and SPC/the Liberty Parties held a second mediation on August 12, 2026 (the "Second Mediation"). In the Second Mediation, the Receiver and the Liberty Parties discussed possible resolutions for the loans and collateral properties in Venus that are the subject of this Motion to reach a global resolution on all outstanding issues between the Receiver and SPC/the Liberty Parties.[3] The Parties reached an agreement whereby Liberty will pay $100,000 to the Receivership Estate and abandon its interest in one property,[4] in exchange for the Receiver abandoning his interests in three properties used to cross collateralize Liberty's loans in order to allow Liberty to initiate foreclosure proceedings at its election. As detailed below, this proposal is in the best interest of the Receivership Estate because each of the properties' appraised values are less than the principal balance plus 40% of the non-default interest, after accounting for

[3] The underlying dispute and settlement agreement between the Receiver and SPC are detailed in the Receiver's Verified Motion to Ratify Settlement Agreement With Southern Properties Capital, Ltd., Etc. and Brief in Support [Dkt. 872] (the "Motion to Ratify the SPC Settlement Agreement").

[4] Liberty will also abandon its 0.30675% membership interest in 2999TC JMJ Equity, LLC. This additional concession did not materially impact the Receiver's decision to enter the settlement.

brokerage fees, closing costs, taxes, and attorneys' fees. In other words, in a marketed sale, the Receivership Estate would not receive any funds from a sale of these properties, so the Settlement Agreement provides the Receivership Estate with funds that it otherwise would not receive.

As the Court has acknowledged repeatedly in ratifying prior settlements and despite the certain appeal and delay that will follow, because it is in the best interests of the Receivership Estate, the Court should ratify the Settlement Agreement discussed below and permit the Receiver to abandon the collateral.

## II. BACKGROUND

### A. The Collateral Properties

1. Prior to the Receiver's appointment, several Receivership Entities—Ridgeview Addition, LLC; JMJ Development, LLC; Lynco Ventures, LLC; and DJD Land Partners, LLC—were in the process of developing single-family communities around Venus, Texas.

2. The planned developments included, among other tracts, the following land parcels relevant to the instant motion:

- A 63.764 acre tract as further described and labeled as Tract 1 in in Exhibit A attached to the Settlement Agreement (the "Lynco Northstar Collateral"),
- A 128.8645 acre tract as further described and labeled as Tract 2 in Ex. A (the "DJD Northstar Collateral"), and
- A 1.01 acre tract as further described and labeled as Tract 3 in Ex. A (the "One Acre Northstar Collateral").
- 15.004 acres of land as further described and labeled as Tract 4 in Ex. A (the "Ridgeview Collateral").

3. The most recent appraised values for the properties are as follows:

- Lynco Northstar Collateral: $1,430,000;
- DJD Northstar Collateral: $2,490,000;

- One Acre Northstar Collateral: $285,000; and
- Ridgeview Collateral: $2,650,000.

**B. The Relevant Loans**

4. On April 26, 2021, American Benefit, a wholly owned subsidiary of Liberty, made a loan to Ridgeview Addition, LLC with a committed sum of $2,050,000 (the "Ridgeview Loan"), secured by the Ridgeview Collateral.

5. As permitted under the Receivership Order, no payments have been made on the Ridgeview Loan since the institution of the Receivership Case.

6. As of June 30, 2026, the outstanding principal balance of the Ridgeview Loan is $1,826,300.98, the accrued non-default interest is $543,020.05, the accrued default interest is $678,775.34, and the accrued fees and expenses are $40,233.41.

7. On January 22, 2020, Liberty made a loan to JMJ Development, LLC, with a committed sum of $2,000,000, (the "JMJ Loan"), secured by a second lien deed of trust on three parcels: the Ridgeview Collateral, the Lynco Northstar Collateral, and the DJD Northstar Collateral.

8. As permitted under the Receivership Order, no payments have been made on the JMJ Loan since the institution of the Receivership Case.

9. As of June 30, 2026, the outstanding principal balance of the JMJ Loan is $1,450,000, accrued non-default interest is $514,347.16, the accrued default interest is $411,477.84, and the accrued fees and expenses are $14,773.18.

10. The Ridgeview Loan is cross collateralized with the JMJ Loan.

11. After the inception of the Receivership, Liberty purchased two loans from Southern Star Capital, LLC as lender to DJD Land Partners, LLC, as follows: (i) a loan with an

original principal amount of $900,000 secured by a first lien on the Lynco Northstar Collateral (the "Wall009 Loan"); and (ii) a loan with an original principal amount of $127,500 secured by a first lien on the One Acre Northstar Collateral (the "DJD Loan").

12. As permitted under the Receivership Order, no payments have been made on the Wall009 Loan or the DJD Loan, since the institution of the Receivership Case.

13. As of June 30, 2026, the outstanding principal balance of the Wall009 Loan is $810,000, and the accrued non-default interest is $169,201.23, the accrued default interest is $342,513.50, and the accrued fees and expenses are $95,137.18.

14. As of June 30, 2026, the outstanding principal balance of the DJD Loan is $127,500, the accrued non-default interest is $15,902.57, the accrued default interest is $40,535.39, and the accrued fees and expenses are $53,448.49.

15. The Wall009 Loan is cross collateralized with the DJD Loan.

**C. The Initial Receivership Order and the "Admin Order"**

16. On October 18, 2022 the Court entered an Order Appointing Receiver (the "Initial Receivership Order"), [Dkt. 29], which named Cort Thomas as Receiver for the Receivership Entities and directed him to take custody, control, and possession of all Receivership Property. Initial Receivership Order ¶ 6(B). The Initial Receivership Order empowered the Receiver to "take such action as necessary and appropriate for the preservation of Receivership Property or to prevent the dissipation, concealment, or inequitable distribution of Receivership Property," to "pursue, resist, defend, compromise or otherwise dispose of all suits, actions, claims, and demands which may now be pending or which may be brought by or asserted against the Receivership Entities." *Id.* ¶¶ 6(E), (G), (J). The Initial Receivership Order also prohibited any

activity intended to perfect liens, take possession or control over any Receivership Asset or interfere with the Receiver's possession and control over such assets. *Id.* ¶ 32.

17. Additionally, the Initial Receivership Order removed all "directors, officers, managers . . . and other agents of the Receivership Entities" and "the powers of any general partners, directors and/or managers" was "suspended," *Id.* ¶ 4, and authorized the Receiver to control the operations of any Receivership Entity. *Id.* Similarly, the Receiver was authorized to "take any action which, prior to the entry of this Order, could have been taken by the officers, directors, partners, managers, trustees, and agents of the Receivership Entities. . . " *Id.* ¶ 6.E.

18. In furtherance of the orderly administration of the Receivership, the Court also entered its Order Granting Motion for Order Governing Administration of Receivership Estate, Etc. (the "Admin Order") in which it authorized the Receiver to abandon property that is "subject to a lien approximately equal to or in excess of the fair market value the Receiver would net from a sale of the [p]roperty." Dkt. 63, ¶ 3a. The Court authorized the Receiver, "in his discretion," to "seek Court approval prior to compromising, selling, or otherwise disposing of these intangible rights," while also expressly exempting the Receiver from certain notice requirements "any compromise, sale, or other disposition of contractual rights or pending choses in actions, regarding which no further Court approval is required." *See Id.* ¶ 4g. The Admin Order further authorizes the Receiver to "abandon any interest in … property to the lienholder" when "the Receiver determines that a sale cannot be conducted as required by 28 U.S.C. § 2001 with the result of a net benefit to the Receivership Estate…" *Id.* ¶ D.1.

19. In December 2022, Barton appealed the Initial Receivership Order, but during the pendency of the appeal, the receivership was not stayed.[5]

**D. The Second Receivership Order**

20. The Fifth Circuit vacated the Initial Receivership Order and remanded the case for further proceedings,[6] after which the SEC filed its Motion for Appointment of a Receiver, for a Preliminary Injunction and Ancillary Relief, and to Lift Stay for Limited Purpose [Dkt. 309] (the "Second Motion to Appoint Receiver").

21. On November 29, 2023, this Court entered its (1) its Memorandum Opinion and Order [Dkt. 416], which granted the SEC's Second Motion to Appoint Receiver as to 54 of the 82 entities included in the motion; (2) an Order Appointing Receiver (the "Second Receivership Order") [Dkt. 417], which re-appointed the Receiver over each Ridgeview Addition, LLC, JMJ Development, LLC, Lynco Ventures, LLC, and DJD Land Partners, LLC. The Second Receivership Order included the same authority, prohibitions, and provisions as the Initial Receivership Order. *Id.*

22. The Court also ratified certain prior orders, including the Admin Order. Dkt. 419.

23. On April 17, 2025, the Fifth Circuit affirmed the Second Receivership Order. *SEC v. Barton*, 135 F.4th 206, 222-23 (5th Cir. 2025).

---

[5]*See* Dkt. 132 (denying Barton's motion to stay pending appeal); *see also* Appeal No. 22-11132, *SEC v. Barton,* Jan. 6, 2023, Dkt. 46-2 (denying stay pending appeal). In its opinion vacating the Initial Receivership Order, the Fifth Circuit stayed "the receiver's power to sell or dispose of property belonging to receivership entities, including the power to complete sales or disposals of property already approved by the district court, is immediately suspended, and this suspension will remain in effect until the receivership order is vacated 90 days from the issuance of this court's mandate. . . . [The stay did] not apply to activities in furtherance of sales or dispositions of property that have already occurred or been approved by the district court. "Activities in furtherance" do not include the completion of the sale of any property. Should the district court enter a new receivership order before the present order is vacated, this partial stay has no bearing on any actions a receiver may take under the new order." Appeal No. 22-11132, *SEC v. Barton,* Aug. 31, 2023 Mem. Op., Dkt. 150-1 at 13.

[6] *See SEC v. Barton*, 79 F.4th 573 (5th Cir. 2023).

24. Barton appealed the Fifth Circuit's decision, but on March 30, 2026, the United States Supreme Court rejected his petition for writ of certiorari.

25. The Court entered a third Order Appointing Receiver on June 23, 2025 (the "Receivership Order"). Dkt. 650.[7]

**E. The July 8 Order and Receiver's Negotiations with Lenders**

26. The Court later entered the July 8 Order [Dkt. 792], which granted the Receiver 90 days to "solicit proposals from lenders for each Receivership Property to determine if there is a path forward to accomplish sales, pay down some or all the outstanding pre-Receivership balances on the loans, and allow remaining claims to be dealt with as part of the Receivership's claims process."[8] Pursuant to this Order, the Receiver has requested document and loan balances from all lenders. The Receiver has also begun presenting lenders with the following options: (1) receive a cash payment for the full principal balance; (2) at closing in connection with the sale of the property, receive the full principal balance plus 40% of the non-default interest; (3) the Receiver will sell the property free and clear of the liens in accordance with Dkt. 792, liens will attach to the sale proceeds, and competing claims will be dealt with as part of the claims process; or (4) for properties in which the principal balance plus 40% of the non-default interest exceeds the appraised value of that property, the Receiver is offering the lender the option to pay $100,000 in cash in exchange for the Receiver abandoning its interest in the property.

27. Here, for each of Ridgeview Addition, Lynco Northstar, and the One Acre Northstar Collateral, the principal on all outstanding loans plus 40% of the non-default interest

[7] The Order entered at Dkt. 650 modified the Order entered at Dkt. 417 only with regard to requiring Defendant Barton to obtain leave of court before filing any further bar grievances. The Order entered at Dkt. 650 was also subject to an interlocutory appeal, which was dismissed by the Fifth Circuit on May 18, 2026. *See* Dkt. 649, and Appeal No. 25-10871.Collectively, Dkt. 417 and 650 are referenced as the "Receivership Order."

[8] In response to a motion from the Receiver, the Court extended the deadline for compliance with the July 8 Order until October 30, 2026. *See* Dkt. 945.

exceeds likely sales proceeds after accounting for cross-collateralization, the properties' appraised value, broker commissions, closing costs, outstanding taxes, and attorneys' fees. Therefore, it is in the best interest of the Receivership Estate to receive a $100,000 payment when the Receivership Estate would otherwise receive no benefit from property sales.

28. As discussed at length below, the Receiver strongly believes that the resulting settlement adequately accounts for the possible benefits and risks and is in the best interest of the Receivership Estate.

## III. ARGUMENT

### A. Legal Standards and the Receiver's Authority to Compromise Claims

Any action by the district court "supervising an equity receivership is committed to his sound discretion and will not be disturbed unless there is a clear showing of abuse." *SEC v. Safety Fin. Serv., Inc.*, 674 F.2d 368, 373 (5th Cir. 1982) (It is "a recognized principle of law that the district court has broad powers and wide discretion to determine the appropriate relief in an equity receivership.") (quoting *SEC v. Lincoln Thrift Ass'n*, 577 F.2d 600, 606 (9th Cir. 1978)). "Ordinarily, parties are free to settle cases amongst themselves without court involvement." *SEC v. Stanford Int'l Bank Ltd.*, No. 3:09-CV-0298-N, 2015 WL 10818588, at *2 (N.D. Tex. Sept. 23, 2015) (citing *Ibarra v. Tex. Empl. Comm'n*, 823 F.2d 873, 878 (5th Cir. 1987)). However, "in the equity receivership context, parties have sought and courts have rendered decisions regarding whether to approve or reject settlement agreements based on courts' wide discretion in administering an equity receivership." *Id.* "Receivership courts, like bankruptcy courts, may also exercise discretion to approve settlements of disputed claims to receivership assets, provided that the settlements are 'fair and equitable and in the best interests of the estate.'" *SEC v. Stanford Int'l Bank, Ltd.*, 927 F.3d 830, 840 (5th Cir. 2019) (quoting *Ritchie Capital Mgmt., L.L.C. v. Kelley*, 785 F.3d 273, 278 (8th Cir. 2015)).

Generally, "the Receiver has wide powers to acquire, organize and distribute the property of the receivership." *Id.* This Court's orders, including but not limited to the Receivership Order, define the Receiver's authority and guide his judgment. *FSLIC v. PSL Realty Co*., 630 F.2d 515, 521 (7th Cir. 1980), *cert. denied*, 452 U.S. 961 (1981) ("Receiver is an officer of the court and subject to its orders in relation to the property for which he is responsible until discharged by the court"); *FSLIC v. Spark Tarrytown, Inc.*, 829 F. Supp. 82, 85 (S.D.N.Y. 1993). The orders of the appointing court are the sole source of a receiver's authority, and receivers are therefore authorized to petition the appointing court on matters related to the administration of the receivership. *Gaskill v. Gordon*, 27 F.3d 248, 251 (7th Cir. 1994) (imposing lien for receiver's costs on property administered by receiver*); PSL Realty Co*., 630 F.2d at 521.

**B. The Terms of the Settlement Agreement**

Pursuant to the July 8 Order, and to avoid the expense and uncertainty of potential litigation with Liberty's affiliate SPC, the Receiver and the Liberty Parties agreed to fully settle any claims each party has against the other in connection with the land tracts and loans discussed above. As demonstrated by its terms below, the Settlement Agreement is fair and equitable and in the best interests of the Receivership Estate. Although the necessity of court approval for settlement agreements is expressly excused, in accordance with Liberty's desire for court-approval, the Court should, in its discretion, ratify the Settlement Agreement.

Pursuant to the terms of the Settlement Agreement, Liberty will pay the Receiver a total of $100,000 after the Court's ratification of the Settlement Agreement (the "Settlement Payment"). Upon making the Settlement Payment, Liberty shall be deemed to have abandoned all of Liberty's interest in the DJD Northstar Collateral. Upon receipt of the Settlement Payment, the Receiver will abandon the Ridgeview Collateral, the Lynco Northstar Collateral, and the One Acre Northstar Collateral. The Receiver will forfeit any right to object to foreclosure

proceedings[9] instituted by the Liberty Parties (in their sole discretion) regarding such collateral. As of the date of the Receiver's Abandonment, the Receiver will not be responsible for any liens, liabilities, or obligations on or connected to the Ridgeview Collateral, the Lynco Northstar Collateral, or the One Acre Northstar Collateral. The Settlement Agreement further provides that, upon Court Ratification, the Settlement Payment, and the Receiver's Abandonment, the Liberty Parties release Defendant Barton from claims regarding the loans and collateral described above, conditioned upon Barton executing and delivering to Liberty a corresponding release in the form attached to the Settlement Agreement as Exhibit B. The Settlement Agreement is subject to the condition precedent and termination provisions set forth in its Paragraphs 2 and 3.

**C. The Settlement Agreement is in the Best Interests of the Receivership Estate**

The Receiver believes that the Settlement Agreement is fair and equitable and in the best interests of the Receivership Estate because it resolves the Receiver's disputes with Liberty over multiple pieces of Receivership property and does so in a way that (1) brings funds into the Receivership versus a recovery of $0, even if sales occurred, and (2) results in Liberty's abandonment of a piece of its cross-collateralization.

The Settlement Payment is money that the Receivership Estate otherwise would not receive from a sale of these properties because the Receivership Estate holds negative equity in these properties.[10] As described below, the Receivership Estate would not stand to gain any

[9] Following abandonment, the Receivership Estate will no longer hold any interest in these properties and thus would neither have any standing to object to foreclosure, nor any basis for doing so. Nor would the foreclosure proceedings violate the litigation stay provisions of the Receivership Order.

[10] As has been detailed repeatedly in prior filings, the real estate assets in this Receivership were saddled with extensive debt from the outset. Despite the Receiver's attempts to sell multiple pieces of real estate in the first months of the Receivership, Defendant Barton stymied such sales for multiple years by filing meritless appeals of sale orders. All the while, interest on the loans for each property continued to accrue, resulting in most if not all remaining Receivership properties being underwater but–for a discount of accrued standard interest.

funds from a sale of Ridgeview Collateral or the Lynco Northstar Collateral and most likely would not receive any funds from the sale of the One Acre Northstar Collateral, and, in any event, the Receivership Estate certainly would not gain more than the Settlement Payment for the sale of the three properties.

For purposes of determining whether this settlement is in the best interest of the Receivership Estate, the Receiver first assumes that he would be able to contract to sell the Ridgeview Collateral, Lynco Northstar Collateral, and One Acre Northstar Collateral for their appraised values ($2,650,000, $1,430,000, and $285,000, respectively). The Receiver then further assumes (1) a conservative broker's fee of 4% and (2) that the lender agrees to accept its principal plus 40% of standard, non-default interest, which is the proposal the Receiver has been making to Lenders under the July 8 Order [Dkt. 792]. The calculation is as follows:

1. **Ridgeview Collateral:**

Beginning with the assumption of a sale at appraised value ($2,650,000), subtract outstanding taxes ($115,703.80) and a conservative estimate of a 4% broker fee ($106,000), which results in net sale proceeds of $2,428,296.20. From there, apply the principal owed on the Ridgeview Loan ($1,826,300.98), plus 40% of simple interest owed ($217,208.02—40% of the $543,020.05 total simple interest), and the Receivership Estate's remaining proceeds would be $384,787.20. Then, apply the principal owed on the JMJ Loan ($1,450,000), plus 40% of simple interest owed ($205,738.86—40% of the $514,347.16 total simple interest) to the remainder, and it results in **$1,270,951.66** still being owed on the JMJ Loan.

2. **<u>Lynco Northstar Collateral:</u>**

Beginning with the assumption of a sale at appraised value ($1,430,000), subtract a 4% broker fee ($57,200).[11] From there, apply the remaining amount owed on the JMJ Loan principal plus 40% interest after the hypothetical sale of the Lynco Northstar Collateral ($1,270,951.66), and the Receivership Estate's remaining proceeds would be $101,848.34. Then, apply the principal owed on the Wall009 Loan ($810,000), plus 40% of simple interest owed ($67,680.49) to the remainder, and it results in **$775,832.16** still being owed on the Wall009Loan.

**3. <u>One Acre Northstar Collateral:</u>**

Beginning with the assumption of a sale at appraised value ($285,000),[12] subtract a 4% broker fee ($11,400). From there, apply the remaining amount owed on the cross-collateralized Wall009 Loan principal plus 40% interest ($775,832.16), and the Receivership Estate would have a negative remaining balance of $502,232.16. When then combined with the principal owed on the DJD Loan ($127,500), plus 40% of simple interest ($6,361.03) to the remainder, and it results in a negative balance of $636,093.19. Considering that the calculations above do not account for closing costs, attorneys' fees, other liens on certain properties, etc., a sale would result in an even greater negative balance.

In addition to the fact that the Settlement Payment results in funds that would otherwise not be available to the Receivership Estate absent a settlement, the Receivership Estate also benefits from Liberty abandoning all interests in DJD Northstar Collateral, with Liberty providing a recordable full release of Liberty's lien on the DJD Northstar Collateral which

[11] There are no outstanding taxes owed on the Lynco Northstar Collateral or the One Acre Northstar Collateral.

[12] Liberty provided appraisals that set a lower appraised value for the One Acre Northstar Collateral. Out of an abundance of caution, the Receiver has used the more recent, higher appraised value from his appraiser for purposes of this calculation.

creates the possibility of a net recovery through sale of that collateral, subject to the Receiver's negotiation with another lienholder on that property.

Finally, the structure of the Settlement Agreement presents a reasonable compromise that allows the Receiver in future negotiations with other lenders to maintain the position that he is offering each lender the same set of options. The Settlement Agreement is consistent with the options the Receiver is offering lenders on all other similarly situated properties given the Receivership Estate's negative equity position.

## IV. CONCLUSION AND REQUEST FOR RELIEF

In light of the foregoing, the Receiver respectfully requests that the Court ratify the Settlement Agreement and find that (i) the Receiver's Abandonment is authorized under Section D.1 of the Order Granting Motion for Order Governing Administration of the Receivership Estate [Dkt. 63]; (ii) 28 U.S.C. § 2001 does not apply to the Receiver's Abandonment; and (iii) upon the Receiver's Abandonment, the abandoned parcels are no longer Receivership Property and the stay and injunctive provisions of the Order Appointing Receiver do not bar foreclosure by Liberty or American Benefit. The Receiver further requests such other and further relief to which he may be justly entitled.

Respectfully submitted,

*/s/ Timothy B. Wells*

Charlene C. Koonce
Texas Bar No. 11672850
charlene@brownfoxlaw.com
James F. Hopper
Texas Bar No. 24116535
jimmy@brownfoxlaw.com
BROWN FOX PLLC
2699 Howell St., Suite 500
Dallas, Texas 75204

Timothy B. Wells
Texas Bar No. 24131941
tim@brownfoxlaw.com
BROWN FOX PLLC
306 W. 7th Street, Suite 1000
Fort Worth, TX 76102
T: (214) 327-5000
F: (214) 327-5001

## VERIFICATION

My name is Cortney C. Thomas. I am over the age of 18 and am fully competent to make this verification. I declare under penalty of perjury that the facts stated above are within my personal knowledge and are true and correct.

*/s/ Cortney C. Thomas*
Cortney C. Thomas

**CERTIFICATE OF CONFERENCE**

The undersigned certifies that on October 13, 2026 counsel for the Receiver conferred via email with counsel for the SEC and with Defendant Barton regarding the relief requested above and provided each with a copy of the motion. The SEC indicated that it is unopposed to the relief requested herein. Defendant Barton indicated that he "oppose[s] the motion and its requested relief as presently presented" and requested a host of additional information and for three business days after receipt to review and confer further. Given the Settlement Agreement's deadlines, the Receiver is required to file this motion today. If Defendant Barton later indicates he is unopposed, the Receiver will file an amended certificate of conference.

*/s/ Timothy B. Wells*
Timothy B. Wells

**CERTIFICATE OF SERVICE**

Pursuant to Fed. R. Civ. P. 5(d)(1)(B), as amended, no certificate of service is necessary because this document is being filed with the Court's electronic-filing system.